No. 04-0074C,
into which has been consolidated No. 04-0075C
Judge Hewitt

---

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---

PACIFIC GAS & ELECTRIC COMPANY,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

---

# DEFENDANT'S RESPONSE TO PLAINTIFF'S MOTION TO COMPEL DISCOVERY

---

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

HAROLD D. LESTER, JR.
Assistant Director

JOHN C. EKMAN
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Telephone: (202) 353-0897
Facsimile: (202) 307-2503

Attorneys for Defendant

OF COUNSEL:

JANE K. TAYLOR
Office of General Counsel
U.S. Department of Energy
1000 Independence Avenue, S.W.
Washington, D.C. 20585

September 15, 2005

TABLE OF CONTENTS

PAGE(S)

SUMMARY OF ARGUMENT . . . . . . . . . . 1

ARGUMENT . . . . . . . . . . 4

I. PG&E'S REQUEST FOR PRODUCTION OF DOCUMENTS ARE OVERBOARD . . . . . . . . . . 4

A. A Party Is Not Entitled To Sweeping Discovery Of Information That Is Not Relevant To The Subject Matter Of The Issues In The Case . . . . . . . . . . 4

B. Even When Information Sought Is Relevant, The Court Will Preclude Discovery That Is Unduly Burdensome Or Expensive . . . . . . . . 6

C. The Government Has Previously Attempted To Produce All Non-Privileged Documents That Relate To The Scheduling, Pace, Capacity, Acceptance, And Removal Of Utility SNF Under The Standard Contracts . . . . . . . . . . 7

D. The Decision Of The United States Court Of Appeals For The Federal Circuit In *Indiana Michigan*, Issued Friday, Eliminates The Need To Consider Future Damages In This Litigation, Rendering Irrelevant Requests For Information About Possible Future Events . . . . . 9

E. With Regard To PG&E's Specific Document Production Requests, PG&E Has Not Identified Any Basis For A Motion To Compel . . . . . . 12

1. Several Of PG&E's Document Productions Requests Appear To Have Been Resolved Before PG&E Filed Its Motion To Compel . . . . . . . . . . 12

2. Several Of PG&E's Requests Are Duplicative Of Those Served In The *Yankee Atomic* Litigation And Were Previously Resolved By The Court In That Case . . . . . . . . . . . . 14

3. Requests Seeking Documents Relevant Only To Future Damages Should Be Barred Pursuant To *Indiana Michigan* . . . . 18

4. Other Requests Are Simply Overboard . . . . . . . . . . 22

TABLE OF CONTENTS (cont'd)

PAGE(S)

II. PG&E'S DEMAND FOR A RULE 30(b)(6) DEPOSITION ON THE DOCUMENTS THAT THE GOVERNMENT HAS PRODUCED, AS WELL AS THOSE THAT IT HAS WITHHELD AS PRIVILEGED, AND ON OTHER TOPICS EITHER SEEKS INFORMATION IN EXCESS OF THAT REQUIRED BY RULE 34, IS INAPPROPRIATE, OR IS BETTER RESOLVED ON WRITTEN QUESTIONS . . . . . . . . . . . . . . . 24

A. The Purpose Of Rule 30(b)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

B. The Requirements Of And Obligations Created By Rule 30(b)(6) . . . . . 26

C. The Court's Authority To Limit Rule 30(b)(6) And To Order Discovery Through Alternative Means . . . . . . . . . . . . . . . . . . . . . . . . . 26

D. Defendant's Objections To The Plaintiff's Proposed Topics . . . . . . . . . 29

1. PG&E's Asserted Need For Its Rule 30(b)(6) Deposition Conflicts With Rule 34 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

2. To The Extent That PG&E Actually Needs Additional Information About The Groupings And Organization Of The Documents On The Production Website, That Information, To The Extent Required By Rule 34, Is Better Obtained Through Interrogatories . . . . . . . . . . . . . . . . . . . 34

3. PG&E's Request For A Deposition On The Docuemnts That The Government Has Produced And The Documents That The Government Has Withheld As Privileged Is Inappropriate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

4. Because Most Of The Documents On The Production Website Were Produced To Counsel For PG&E Before This Case Was Even Filed, And Counsel Has Previously Deposed DOE About Past Document Production Efforts, Written Questions About Any Additional Search Efforts, As A First Step, Appear More Appropriate Than Another Deposition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

TABLE OF AUTHORITIES

CASES PAGE(S)

Alexander v. FBI,
186 F.R.D. 137 (D.D.C. 1998) . . . . . 29

Broadway & 96th St. Realty Co. v. Loew's Inc.,
21 F.R.D. 347 (S.D.N.Y. 1958) . . . . . 5

Carpenter Tech. Corp. v. Armco, Inc.,
Civ. No. 90-0740, 1990 WL 61180 (E.D. Pa. May 8, 1990) . . . . . 4

Catellus Dev. Corp. v. United States,
26 Cl. Ct. 210, 214 (1992) . . . . . 7

EEOC v. American Int'l Group, Inc.,
No. 83-6390, 1994 WL 376052 (S.D.N.Y. July 18, 1994) . . . . . 28

Exxon Research & Engineering Co. v. United States,
44 Fed. Cl. 597 (1999) . . . . . 29

Flynn v. Church of Scientology,
116 F.R.D. 1 (D. Mass. 1986) . . . . . 5

In re Fontaine,
402 F. Supp. 1219 (S.D.N.Y. 1975) . . . . . 5

Food Lion, Inc. v. United Food & Commercial Workers Int'l Union,
103 F.3d 1007 (D.C. Cir. 1997) . . . . . 5

Herbert v. Lando,
441 U.S. 153 (1979) . . . . . 4

Independent Petrochemical Corp. v. Aetna Cas. & Sur. Co.,
117 F.R.D. 283 (D.D.C. 1986) . . . . . 6

In re Independent Serv. Org. Antitrust Litig.,
168 F.R.D. 651 (D. Kan. 1996) . . . . . 28

Indiana Michigan Power Co. v. United States,
No. 04-5122, 2005 WL 2173563 (Fed. Cir. Sept. 9, 2005) . . . . . passim

International Graphics, Div. of Moore Bus. Forms, Inc. v. United States,
3 Cl. Ct. 715 (1983) . . . . . 5

TABLE OF AUTHORITIES (cont'd)

CASES PAGE(S)

International Paper Co. v. United States,
36 Fed. Cl. 313 (1996) . . . . . . . . . . 7

Martin v. Valley Nat'l Bank of Arizona,
140 F.R.D. 291 (S.D.N.Y. 1991) . . . . . . . . . . 27

McClain v. Mack Trucks, Inc.,
85 F.R.D. 53 (E.D. Pa. 1979) . . . . . . . . . . 4, 5

McCormick-Morgan, Inc. v. Teledyne Indus., Inc.,
134 F.R.D. 275 (N.D. Cal.),
rev'd in other part, 765 F. Supp. 611 (N.D.Cal. 1991) . . . . . . . . . . 28, 29

McCormick-Morgan, Inc. v. Teledyne Industries, Inc.,
134 F.R.D. 651 (N.D. Cal.),
rev'd in other part, 765 F. Supp. 275 (N.D. Cal.1991) . . . . . . . . . . 28

Micro Motion, Inc. v. Kane Steel Co.,
894 F.2d 1318 (Fed. Cir. 1990) . . . . . . . . . . 6, 27

Padana Assicurazioni-Societa Aziono v. M/V Caribbean Express I,
No. Civ.A. 97-3855, 1999 WL 30966 (E.D. La. Jan. 21, 1999) . . . . . . . . . . 27

Prokosch v. Catalina Lighting, Inc.,
193 F.R.D. 633 (D. Minn. 2000) . . . . . . . . . . 25, 26, 34

Protective Nat'l Ins. Co. v. Commonwealth Ins.,
137 F.R.D. 267 (D. Neb. 1989) . . . . . . . . . . 29

Reed v. Bennett,
193 F.R.D. 689 (D. Kan. 2000) . . . . . . . . . . 27

Regent Nat'l Bank v. Dealers Choice Automotive Planning, Inc.,
1998 WL 961377 (E.D. Pa. 1998) . . . . . . . . . . 5

Resolution Trust Corp. v. S. Union Co.,
985 F.2d 196 (5th Cir. 1993) . . . . . . . . . . 25

In re Surety Ass'n of Am.,
388 F.2d 412 (2d Cir. 1967) . . . . . . . . . . 5

TABLE OF AUTHORITIES (cont'd)

CASES PAGE(S)

United States v. District Council of New York City,
90 Civ. 5722, 1992 WL 208284 (S.D.N.Y. 1992) . . . . . 28

Upsher-Smith Labs., Inc. v. Mylan Labs., Inc.,
944 F. Supp. 1411 (D. Minn. 1996) . . . . . 5

Yankee Atomic Electric Co. v. United States,
No. 98-126C (Fed. Cl. June 2, 1999) . . . . . passim

STATUTES

42 U.S.C. §§ 10132 & 10172 . . . . . 16

42 U.S.C. § 10133 . . . . . 16

42 U.S.C. § 10134(a)(1) . . . . . 16

42 U.S.C. § 10134(a)(2)(A) . . . . . 16

42 U.S.C. § 10134(b) . . . . . 16

42 U.S.C. § 10134(f) . . . . . 16

42 U.S.C. § 10135 . . . . . 16

42 U.S.C. § 10141(a) . . . . . 16

42 U.S.C. § 10141(b)(i)(iii) . . . . . 16

42 U.S.C. §§ 10151-10157 . . . . . 16

42 U.S.C. §§ 10161-10169 . . . . . 16

42 U.S.C. §§ 10173-10173c . . . . . 16

42 U.S.C. §§ 10174-10174a . . . . . 16

42 U.S.C. § 10175 . . . . . 16

42 U.S.C. § 10222 . . . . . 16

TABLE OF AUTHORITIES (cont'd)

STATUTES PAGE(S)

42 U.S.C. §§ 10241-10251 . . . . . . . . . . 16

42 U.S.C. §§ 10261-10270 . . . . . . . . . . 16

10 C.F.R. § 961.11 . . . . . . . . . . 1, 8, 24

MISCELLANEOUS

22 Am. Jr. 2d Damages § 488 (2003) . . . . . . . . . . 9

8 C. Wright, A. Miller, & R. Marcus, Federal Practice & Procedure § 2008.1 (2d ed. 1994) . 4, 6, 7

8A C. Wright, A. Miller, & R. Marcus, Federal Practice & Procedure § 2213 (1994) . . . . . . . . 32

4 J. Moore, Moore's Federal Practice 26-431 . . . . . . . . . . 5

7 J. Moore, Moore's Federal Practice § 30.02[1] (3d ed. 2001) . . . . . . . . . . 25

Restatement (Second) of Judgments § 26(1)(e) . . . . . . . . . . 9, 10

Wisconsin Lawyer 15 (July 1996) . . . . . . . . . . 27

# INDEX TO DEFENDANT'S APPENDIX


| DOCUMENT | PAGE |
|---|---|
| Plaintiff's Objections And Responses To Defendant's First Set Of Requests For Production Of Documents, dated June 13, 2005 | 1 |
| E-mail to Robert L. Shapiro regarding document production, dated August 19, 2005 | 54 |
| Declaration of Steven Baggett, Nuclear Regulation Commission | 55 |
| Declaration of Thomas Pollog, Department of Energy | 58 |

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| PACIFIC GAS & ELECTRIC COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | ) | No. 04-0074C, into which has been consolidated No. 04-0075C (Judge Hewitt) |

DEFENDANT'S RESPONSE TO PLAINTIFF'S MOTION TO COMPEL DISCOVERY

Defendant, the United States, respectfully responds to "Pacific Gas & Electric Company's Motion To Compel Discovery And Request For Expedited Hearing," which plaintiff, Pacific Gas & Electric Company ("PG&E"), filed on August 25, 2005. Further, defendant respectfully requests that the Court issue a protective order (1) to limit PG&E's discovery in the manner described below and (2) to relieve the Government of any obligation to respond to PG&E's oppressive discovery demands. In support of this motion, we rely upon the following memorandum and attached exhibits.

SUMMARY OF ARGUMENT

Over the past six years in the spent nuclear fuel ("SNF") cases pending before this Court, the Government, in response to numerous requests for document production both in coordinated discovery proceedings and from individual SNF plaintiffs, has produced more than one million images to the various SNF plaintiffs, including PG&E. In general, we have attempted to produce all documents that we have been able to locate that relate to the scheduling, pace, capacity, acceptance, and removal of SNF acceptance from the nuclear utilities under the "Standard Contract For Disposal Of Spent Nuclear Fuel And/Or High-Level Radioactive Waste" ("Standard Contract"), 10 C.F.R. § 961.11; contract formation issues; documents relating to

whether Greater-Than-Class-C radioactive waste ("GTCC waste") is covered by the Standard Contract; and other related matters. Our production has been extensive and thorough. Recently, counsel for PG&E, who was also counsel for the plaintiff in Yankee Atomic Electric Co. v. United States, No. 98-126C (Fed. Cl.), and two other SNF cases that went to trial last summer, served the Government with a set of broad document production requests, many of which were identical copies of document production requests that the Yankee plaintiffs had served. Previously, the Court in Yankee Atomic rejected the Yankee Atomic plaintiffs' broad requests and required a much narrower production focused on the issues in these cases. In the same manner, the Court should not revisit those rulings and should similarly find that the document searches that the Government has agreed to undertake are sufficient and that PG&E's broader requests are irrelevant and too burdensome to require the Government to satisfy.

Further, many of PG&E's requests seek far-reaching discovery into the Department of Energy's thoughts, activities, and hopes for opening a repository and beginning SNF acceptance in the future. However, in Indiana Michigan Power Co. v. United States, No. 04-5122, 2005 WL 2173563 (Fed. Cir. Sept. 9, 2005), the United States Court of Appeals for the Federal Circuit held that plaintiffs in the SNF cases pursuing claims only for partial, not total, breach of contract may not recover future damages in these cases, but, instead, should return to court in the future if and when they incur damages from the Department of Energy's delay. Accordingly, although PG&E apparently intended in this litigation to ask the Court to speculate about future events and to create an anticipated future world for the purpose of awarding future damages in this case, the Court, in light of Indiana Michigan, will not need to engage in that effort. Instead, it will award costs already incurred in the past, without the need to speculate here about the future. As a

result, all of PG&E's broad requests for continual discovery about the Department of Energy's thoughts about the future, in addition to their burdensome nature, are now irrelevant to this litigation.

Finally, PG&E has also requested a deposition pursuant to RCFC 30(b)(6) of witnesses about the Government's search for documents responsive to PG&E's document production requests, as well as about all of the "[d]ocuments that have been produced on the government's document production website responsive" to those requests and all "[d]ocuments that have been withheld from production by the government on privilege and/or work-product grounds . . . ." Pl. Exh. 8, at 1-2.[1] Counsel for PG&E, in his role as counsel in the Yankee Atomic case, has already taken three Rule 30(b)(6) depositions regarding the Government's document production efforts. Given this history, it appears more efficient and cost-effective, as an initial step, for PG&E to seek any information about additional searches through interrogatories or a deposition on written questions, rather than once again to have to prepare a witness to testify about the entirety of the Government's document search efforts over the past six years. With regard to PG&E's request for a Rule 30(b)(6) deposition about all documents that the Government has produced and has withheld as privileged, that request is not stated "with painstaking specificity" in a manner that would allow the Government to prepare a witness to testify, implicates (with regard to privileged documents) serious privilege issues, and is much better suited to written questions to the extent that PG&E has questions about specific documents. For these reasons, PG&E's request for uncontrolled and expensive discovery should be denied.

---

[1] "Pl. Exh. __" refers to the exhibits attached to PG&E's motion to compel, filed August 25, 2005. "Pl. Br. __" refers to the motion to compel. "Def. App. __" refers to the appendix accompanying this response.

## ARGUMENT

### I. PG&E'S REQUESTS FOR PRODUCTION OF DOCUMENTS ARE OVERBROAD

#### A. A Party Is Not Entitled To Sweeping Discovery Of Information That Is Not Relevant To The Subject Matter Of The Issues In The Case

RCFC 26 allows for discovery of "any matter, not privileged, which is relevant to the claim or defense of any party . . . ." RCFC 26(b)(1) (emphasis added). "While the scope of discovery is generally broad, it is not without its bounds." Carpenter Tech. Corp. v. Armco, Inc., Civ. No. 90-0740, 1990 WL 61180, at *3 (E.D. Pa. May 8, 1990) (citing McClain v. Mack Trucks, Inc., 85 F.R.D. 53, 57 (E.D. Pa. 1979)). "Perhaps the single most important word in Rule 26(b)(1) is 'relevant' because it is only relevant matter than may be the subject of discovery." 8 C. Wright, A. Miller, & R. Marcus, Federal Practice & Procedure § 2008, at 99 (2d ed. 1994). Although the discovery rules are generally to be accorded a broad and liberal treatment, courts are required to strictly and firmly apply limitations to require that information sought be "relevant" to the subject matter of the case at hand:

> But the discovery provisions, like all of the Federal Rules of Civil Procedure, are subject to the injunction of Rule 1 that they "be construed to secure the just, speedy, and inexpensive determination of every action." To this end, the requirement of Rule 26(b)(1) that the material sought in discovery be "relevant" should be firmly applied, and the district courts should not neglect their power to restrict discovery where "justice requires [protection for] a party or person from annoyance, embarrassment, oppression, or undue burden or expense . . . ." Rule 26(c). With this authority at hand, judges should not hesitate to exercise appropriate control over the discovery process.

Herbert v. Lando, 441 U.S. 153, 177 (1979) (emphasis added).

Particularly in cases involving broad sweeping discovery requests that would impose incredible time, resource, and cost commitments upon the party from which discovery is sought, "practical considerations dictate that the parties should not be permitted to roam in shadow zones of relevancy and to explore matter which does not presently appear germane on the theory that it might become so." In re Surety Ass'n of Am., 388 F.2d 412, 414 (2d Cir. 1967) (quoting Broadway & 96th St. Realty Co. v. Loew's Inc., 21 F.R.D. 347, 352 (S.D.N.Y. 1958)); see Food Lion, Inc. v. United Food & Commercial Workers Int'l Union, 103 F.3d 1007, 1012 (D.C. Cir. 1997) (discovery of "information that has no bearing on the case" should be disallowed); Upsher-Smith Labs., Inc. v. Mylan Labs., Inc., 944 F. Supp. 1411, 1444 (D. Minn. 1996) (precluding search into "shadow zones of relevancy" in complex litigation); In re Fontaine, 402 F. Supp. 1219, 1221 (S.D.N.Y. 1975) (same). A party asserting that it is entitled to sweeping discovery should be required to show reasonable grounds for belief that all of the records sought are relevant to the subject matter involved in the pending action. See, e.g., International Graphics, Div. of Moore Bus. Forms, Inc. v. United States, 3 Cl. Ct. 715, 718-19 (1983); Regent Nat'l Bank v. Dealers Choice Automotive Planning, Inc., 1998 WL 961377 (E.D. Pa. 1998); McClain v. Mack Trucks, Inc., 85 F.R.D. 53, 57 (E.D. Pa. 1979). "[W]here the relevance of information sought in discovery proceedings is questionable . . . discovery of the requested information will be denied." Flynn v. Church of Scientology, 116 F.R.D. 1, 3 (D. Mass. 1986) (quoting 4 J. Moore, Moore's Federal Practice 26-431).

B. Even When Information Sought Is Relevant, The Court Will Preclude Discovery That Is Unduly Burdensome Or Expensive

Even when discovery requests are designed to seek relevant information, RCFC 26(b)(2) contemplates limitations upon discovery when it is "unreasonably cumulative or duplicative," is obtainable from a less burdensome source, seeks information that the party has already had ample opportunity to obtain, or is unduly burdensome or expensive. As the United States Court of Appeals for the Federal Circuit has succinctly explained, discovery of relevant information may be curtailed in various circumstances:

> Discovery may not be had regarding a matter which is "not relevant to the subject matter involved in the pending action." Fed. R. Civ. P. 26(b)(1). Even if relevant, discovery is not permitted where no need is shown, or compliance would be unduly burdensome, or where harm to the person from whom discovery is sought outweighs the need of the person seeking discovery of the information.

Micro Motion, Inc. v. Kane Steel Co., 894 F.2d 1318, 1323 (Fed. Cir. 1990) (emphasis in original); see Independent Petrochemical Corp. v. Aetna Cas. & Sur. Co., 117 F.R.D. 283, 286 (D.D.C. 1986) (denying motion to compel production of categories of information "as imposing an inordinate and expensive burden for information marginally relevant at most"). These criteria call "for a recognition that in many cases where the sole object is to recover money the cost of discovery is something the court should have in mind when contemplating limitations on the amount of discovery activity that is appropriate." 8 C. Wright, A. Miller, & R. Marcus, supra, § 2008.1, at 120. This rule affirms "the already-emerging change in orientation of judges to emphasize management of litigation, specifically curtailing overuse, whether intentional or thoughtless, of broad discovery." Id. § 2008.1, at 121.

Finally, RCFC 26(c) provides, in pertinent part:

> Upon motion by a party or by the person from whom discovery is sought, . . . and for good cause shown, the court may make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden and expense, including one or more of the following:
>
> > (1) that the discovery not be had;
> >
> > * * *
> >
> > (3) that the discovery may be had only by a method of discovery other than that selected by the party seeking discovery;
> >
> > (4) that certain matters not be inquired into, or that the scope of the discovery be limited to certain matters . . . .

Id. Although "mindful" that the moving party for a protective order "bears the burden of showing 'good cause,'" this Court has stated that it "will not allow discovery that is 'unduly burdensome or expensive, taking into account the needs of the case, the amount in controversy, the limitations on the parties' resources, and the importance of the issues at stake in the litigation.'" International Paper Co. v. United States, 36 Fed. Cl. 313, 317 (1996) (quoting RCFC 26(b)). For the reasons that follow, the Court should conclude that the above-quoted rule is particularly applicable where, as here, the discovery sought is irrelevant, unduly burdensome, and expensive. See Catellus Dev. Corp. v. United States, 26 Cl. Ct. 210, 214 (1992) ("the [Court] has broad discretion to limit and restrict discovery when justice so requires").

### C. The Government Has Previously Attempted To Produce All Non-Privileged Documents That Relate To The Scheduling, Pace, Capacity, Acceptance, And Removal Of Utility SNF Under The Standard Contracts

The issues in this case relate to the damages that PG&E has incurred as a result of DOE's delay in beginning SNF acceptance. As we have discussed in numerous briefs filed in this Court in other SNF cases, the Court, in determining whether any incurred costs were caused by DOE's

delay, will need to determine specifically what DOE's contract performance obligations were and then determine whether, had DOE timely performed those contract performance obligations, PG&E still would have to have incurred any of the costs that it seeks to recover here. Because PG&E continues to generate nuclear power and to generate SNF, and because PG&E is required to store its new SNF for at least five years after its removal from the reactor before it could request that DOE accept it, 10 C.F.R. § 961.11, App. E ¶ 3, PG&E, regardless of any delay by DOE, would still have to incur SNF storage costs until at least five years after it stopped generating nuclear power (and creating new SNF) and until DOE was otherwise obligated to remove all SNF from its sites.

Because the Standard Contract does not contain a specific rate of SNF acceptance, but instead creates a mechanism by which any SNF acceptance schedule was to be defined during contract performance, the issues that the Court will have to decide relate to the schedule upon which DOE was obligated to accept PG&E's SNF. Accordingly, in the past, we have made every effort to locate and produce all non-privileged documents relating to scheduling, pace, capacity, acceptance, and removal of utility SNF under the Standard Contracts. Further, because issues relating to whether DOE is obligated to accept Greater-Than-Class-C radioactive waste ("GTCC waste") under the Standard Contract may arise in certain SNF cases, we have made every effort to locate and produce all non-privileged documents regarding (1) whether GTCC waste is covered by the Standard Contract and (2) the schedule upon which DOE purportedly would have accepted GTCC waste, to the extent that it had any obligation to do so.

D. The Decision Of The United States Court Of Appeals For The Federal Circuit In *Indiana Michigan*, Issued Friday, Eliminates The Need To Consider Future Damages In This Litigation, Rendering Irrelevant Requests For Information About Possible Future Events

On Friday, September 9, 2005, the United States Court of Appeals for the Federal Circuit issued its decision in Indiana Michigan Power Co. v. United States, No. 04-5122, 2005 WL 2173563 (Fed. Cir. Sept. 9, 2005). In that decision, the Federal Circuit rejected the SNF plaintiff's argument that, in response to the plaintiff's election to treat DOE's delay in beginning SNF acceptance as a partial breach of contract, the trial court should have allowed the plaintiff to recover not only its actual incurred costs arising from the partial breach, but also costs that it currently anticipates it will incur in the future because of the delay. The appellate court found that, "[b]ecause of its highly speculative nature, a claimant may not recover, at the time of the first suit for partial breach, prospective damages for anticipated future nonperformance resulting from the same partial breach." Id. Instead, the appellate court agreed that, "[i]f the breach of an entire contract is only partial, the plaintiff can recover only such damages as he or she has sustained, *leaving prospective damages to a later suit in the event of future breaches*." Id. (quoting 22 Am. Jur. 2d Damages § 488 (2003)) (italics supplied by appellate court). It specifically agreed with the principles of section 26(1)(e) of the Restatement (Second) of Judgments, which provides that, in a partial breach case, the plaintiff may only "sue from time to time for the damages incurred to the date of suit . . .," and found that it applied to the SNF partial breach claim.[2] Indiana Michigan, 2005 WL 2173565.

[2] The appellate court also quoted from comment g to section 26 of the Restatement (Second) of Judgments, which provides that, in a partial breach case, the plaintiff "is entitled to maintain an action for damages sustained from breaches up to the institution of the action, and the judgment does not preclude a further action by him for a breach occurring after that date."

The precedent of the Indiana Michigan decision is directly applicable here. PG&E is asserting a partial, rather than total, breach claim in this case. Accordingly, pursuant to Indiana Michigan, PG&E's damages in this case are limited to those that it has incurred as a result of DOE's delay "to the date of suit." Indiana Michigan, 2005 WL 2173563 (quoting Restatement (Second) of Judgments § 26(1)(e)).

Yet, many of PG&E's document production requests are unrelated to those previously incurred costs. In this litigation, to establish that costs actually incurred were caused by DOE's delay and would not have been incurred absent that delay, PG&E will need to establish what DOE's obligations to PG&E under the Standard Contract were – specifically, the amount of SNF that DOE was obligated to accept from PG&E at specific points in time – and then establish that, had DOE satisfied those obligations, PG&E would not have to have incurred the costs that it is claiming in this litigation.[3] To satisfy that obligation, PG&E will need to define DOE's obligations under the Standard Contract – specifically, the schedule upon which DOE was obligated to accept PG&E's SNF. Discovery regarding that topic would involve information about the "but for" world under which DOE was obligated to perform under the Standard

---

Indiana Michigan, 2005 WL 2173563 (emphasis added).

[3] Because PG&E owns operating nuclear reactors, it is continuing to generate SNF and, regardless of DOE's delay, would still have to incur costs to store that SNF. Further, DOE was only obligated to begin SNF acceptance from the nuclear utility industry by January 31, 1998, and was not required to complete SNF acceptance by that date. Accordingly, even assuming timely SNF acceptance, PG&E would still have had SNF on its site for a significant period of time (regardless of the rate of SNF acceptance that was selected) and would still have to incur SNF storage costs for that period of time. In this litigation, PG&E must distinguish between those costs that resulted from DOE's delay of its contract obligations and those costs that it would have incurred even if DOE had satisfied its contract obligations.

Contract. To establish causation, PG&E will need to compare the "but for" world with the actual events that have occurred up until the date that it is entitled to recover costs: the date of suit.

However, much of the discovery that PG&E has identified in its motion to compel relates not to the "but for" world or events that occurred up to the date of suit, but instead relates to possible future events. For example, in Request No. 15, PG&E includes a request for production of all documents related to "the order or sequence among utilities in which DOE will accept spent fuel from utilities" in the future. Pl. Exh. 1, at 13 (emphasis added).[4] Similarly, in Request Nos. 31 and 32, PG&E seeks production of all documents "related to the date by which DOE will begin accepting spent fuel from utilities" and "related to any estimate or projection that DOE will begin accepting spent fuel from utilities later than 2010." Pl. Exh. 1, at 9. The information about future possible events is simply irrelevant to the specific damages that, pursuant to the Federal Circuit's decision in Indiana Michigan, PG&E is entitled to pursue under a partial breach theory. Below, in discussing specific document production requests, we will identify those that seek documents relevant only to future damages claims.

[4] Request No. 15 also seeks production of documents relating to "the order in which DOE would have accepted spent fuel if it had started accepting such spent fuel on or before January 31, 1998." Pl. Exh. 1, at 13 (emphasis added). We have previously produced all such documents, to the extent that they are not privileged, that we were able to locate after a reasonable search.

E. With Regard To PG&E's Specific Document Production Requests, PG&E Has Not Identified Any Basis For A Motion To Compel

1. Several Of PG&E's Document Production Requests Appear To Have Been Resolved Before PG&E Filed Its Motion To Compel

We are unaware of the existence of any dispute between the parties relating to several of the matters identified in PG&E's motion to compel. To the extent that we have not identified a continuing basis for a dispute, we respond to those requests here:

> Production of a privilege log: At pages 12 and 13 of its motion to compel, PG&E complains that the Government has notified PG&E that privilege logs will be posted "in due course" but "has refused to provide a timetable for such postings or assurance that, when posted, these logs will enable PG&E to determine what documents have been withheld on privilege grounds . . . ." However, our most recent privilege log was posted to the production website on August 18, 2005, the day before PG&E filed its motion to compel.[5] This log was posted four days before we completed our extensive production of all of the contract files for all of the Standard Contract holders on August 22, 2005. Further, in earlier-filed spent nuclear fuel cases, we previously produced extensive privilege logs detailing all privilege claims that had been asserted to date, and those logs have long been available to PG&E. Accordingly, given that our privilege log for our most recent document production was produced before PG&E filed its motion to compel, we do not understand the basis for PG&E's request for the Court's assistance.

> Document Production Request No. 24 originally sought all documents that "in any way describe," as well as "comment upon" or "mention," "the casks or similar devices in which spent fuel from civilian nuclear reactors has been or could be stored or

[5] In footnote 3 of its motion to compel, PG&E acknowledges that the Government informed it that it would be posting its most recent privilege log by the end of the week of August 15, 2005, but asserts that, "[a]s of this filing, this new privilege log had not yet been posted." Pl. Br. 13 n.3. PG&E's assertion is incorrect. Although counsel for PG&E may not have realized it at the time, he was notified by e-mail at on August 19, 2005, that the container containing the privilege log had been posted to and was available on the Government's secured production website. Def. App. 54.

transported." Pl. Exh. 1, at 8. In response to our objections, PG&E has now limited its request to the following: "Documents showing that Yucca Mountain is being designed to handle canistered fuel." Pl. Br. 8. With that limitation, we can respond to PG&E's request, making available to PG&E all of the documents on the RIS-Web containing Yucca Mountain design documents, as well as the production of any additional responsive documents that DOE locates.

Document Production Request No. 25 originally sought production of all documents regarding the "costs and expenses that have been or may be incurred by any person to store spent fuel at civilian nuclear reactors." Pl. Exh. 1, at 8. In response to our objection regarding the breadth of this request, PG&E has limited its request to "[a]ny studies or analyses conducted by the government relating to the costs of at-reactor storage." Pl. Exh. 5, at 2. It appears that this request is not reasonably calculated to lead to the discovery of admissible evidence, given that the issue in this case will be what PG&E's costs are, not what others' costs have been or may be. Nevertheless, by letter dated August 18, 2005, we notified PG&E that we had produced all such non-privileged documents that we had been able to locate, but were continuing to search to ensure that we had produced all such non-privileged documents. The bulk of any documents recently created in this category is information generated at the request of the Department of Justice or DOE's Office of General Counsel to assist in (1) analyzing damages claims in this litigation or (2) analyzing potential settlements with nuclear utilities. Any earlier studies or analyses have long been available to counsel for PG&E.

Document Production Request No. 27: Originally, PG&E sought production of all documents "related to storage, disposal, transportation, preparation, packaging, inspection, and pickup of spent fuel placed in canisters, multi-element sealed canisters or other containers however described." Pl. Exh. 1, at 8. In response to our objections regarding the breadth of the request, PG&E has limited its request to "[a]ll documents (to the extent not already produced) concerning DOE's own program to develop multi-purpose canisters ('MPCs') in the early 1990s." Pl. Br. 9-10. DOE has already completed production of these documents, having made them available on the RIS-Web or on the Government's production website.

### 2. Several Of PG&E's Requests Are Duplicative Of Those Served In The *Yankee Atomic* Litigation And Were Previously Resolved By The Court In That Case

This Court has previously ruled upon the propriety of Request Nos. 19, 23, and 30 in response to a motion to compel that counsel for plaintiff filed in another spent nuclear fuel case, Yankee Atomic Electric Co. v. United States, No. 98-126C (Fed. Cl.). As counsel for plaintiff acknowledged in the "Instructions" to PG&E's document production requests, several of PG&E's requests "are similar" to those that the Yankee Atomic plaintiffs served upon the Government. Pl. Exh. 1, at 4 ¶ 2. As we explained to the Court in response to the plaintiff's motion to compel in Yankee, we have attempted, and continue to attempt, to locate all documents that are related to scheduling, pace, capacity, acceptance, and removal of utility SNF under the Standard Contract. We have also attempted to locate and produce all documents that relate to the formation of the Standard Contract. Although these issues fall within the scope of the document production requests, the breadth of the actual requests far exceeds those categories. By order dated June 2, 1999, the Court limited the Government's obligation to respond to the plaintiff's requests in Yankee Atomic to those dealing with (1) scheduling, pace, capacity, acceptance, and removal of SNF under the Standard Contract and (2) the formation of the Standard Contract. Yankee Atomic Elec. Co. v. United States, No. 98-126C, slip op. at 9 (Fed. Cl. June 2, 1999).

Similarly, the Government should not be required to produce documentation here beyond the matters described above, as discussed in more detail below:

> Document Production Request No. 19 seeks all documents "between DOE and any other part of the Executive Branch, and between DOE and any part of the Legislative Branch, or between the Legislative Branch and the Executive Branch that in any way

describe, comment upon, approve or disapprove, discuss, reflect, mention, or refer to NWPA."[6] Pl. Exh. 1, at 7. In its June 2, 1999 order, the Court specifically referenced this request, finding it "particularly unfocused, seeking any communications within the Executive Branch which 'refer to NWPA.'" Yankee Atomic Elec. Co. v. United States, No. 98-126C, slip op. at 5 (Fed. Cl. June 2, 1999). In response to our objection to this incredibly broad request, PG&E has limited its request to "DOE intra-governmental communications 'related to the government's duties, obligations and performance under the NWPA and the Standard Contracts.'" Pl. Exh. 5, at 2. Yet, as evidenced by the accompanying declaration, that purported limitation would not save any search time, given that DOE's files are not organized in a manner that separates inter-agency and intra-agency documents. Accordingly, it would take months and months just to search all offices and files within just one office of DOE, Def. App. 58-59, much less every other office within DOE that deals with matters relating to the NWPA. To the extent that PG&E is seeking production of documents relevant to the schedule that DOE was obligated to or ever planned to use to accept SNF from the nuclear utility contract holders, we have provided those particular documents to the extent that they were located and relate to the commercial utility SNF. Yet, PG&E's request is far broader than that topic. Instead, it seeks production of every internal DOE communication relating to the NWPA.

The work that DOE performs pursuant to the NWPA includes such matters as (1) selecting a potential repository site for site characterization and site selection, see 42 U.S.C. §§ 10132 & 10172; (2) characterizing the potential repository site, see 42 U.S.C. § 10133; (3) obtaining approval for the repository, including but not limited to the work necessary to develop the Site Approval and Construction Authorization recommendation by the Secretary of Energy to the President, 42 U.S.C. § 10134(a)(1), the recommendation by the President to Congress, 42 U.S.C. § 10134(a)(2)(A); and congressional approval, 42 U.S.C. § 10135;

[6] In response to our objection to this request, PG&E informed us that its request could have been broader, indicating that it had not insisted upon the production of documents internal to the Legislative Branch. Pl. Exh. 3, at 3. However, just as it lacks sufficient control to access and produce documents of the Judicial Branch, the Executive Branch has neither the ability nor the obligation to produce documents in the sole possession of the Legislative Branch. Accordingly, PG&E's proported limitation upon this request is superfluous.

(4) submitting a license application to the Nuclear Regulatory Commission for a construction authorization for a repository, see 42 U.S.C. § 10134(b); (5) creating an Environmental Impact Statement, see 42 U.S.C. § 10134(f); (6) establishing regulatory standards and criteria, including the Environmental Protective Agency's rule to protect health and safety of the general environment from offsite releases of radioactive material, 42 U.S.C. § 10141(a), and the Nuclear Regulatory Commission's rule to provide technical criteria in (a) approving or disapproving the license application for construction, (b) applying to receive and possess SNF and high-level radioactive waste, and (3) the closure and decommissioning of the repository, 42 U.S.C. § 10141(b)(i)-(iii); (7) operating an Interim Storage Program outside the context of the Standard Contract, 42 U.S.C. §§ 10151-10157; (8) operating a Monitored Retrievable Storage facility, 42 U.S.C. §§ 10161-10169; (9) entering into benefit agreements with Nevada or Indian tribes, 42 U.S.C. §§ 10173-10173c; (10) reporting to Congress on the effects of locating a repository at Yucca Mountain, 42 U.S.C. §§ 10174-10174a; (11) securing certification of waste transport packages from the NRC and technical assistance to affected localities and Indian tribes, 42 U.S.C. § 10175; (12) creating, operating, and monitoring the Nuclear Waste Fund, 42 U.S.C. § 10222; (13) employing a Nuclear Waste Negotiator to attempt to locate a site for a Monitored Retrievable Storage facility, 42 U.S.C. §§ 10241-10251; and (14) ensuring creation of a Nuclear Waste Technical Review Board, 42 U.S.C. §§ 10261-10270.

Nevertheless, the Government has made available to PG&E the RIS-Web, which contains a wide range of files from the Office of Civilian Radioactive Waste Management, and PG&E is certainly able to conduct its own searches to attempt to locate documents that it believes responsive to this request. However, to the extent that PG&E also wants the Government to conduct a DOE-wide search of all employees' offices and files to locate every internal DOE "intra-governmental" communication regarding the NWPA, PG&E has not identified any basis, and it does not appear to attempt to identify any basis, to justify that type of massive search or for expanding the Government's search beyond documents involving or containing information relating to scheduling, pace, capacity, acceptance, and removal of commercial utility SNF.

Document Production Request No. 23 refers to "the storage and disposal of spent fuel at sites other than civilian nuclear reactors." See Pl. Exh. 1, at 8 (emphasis added). It has now limited its

request to documents "relating to the feasibility of on-going storage of non-commercial SNF (*e.g.*, Navy fuel, research reactor fuel) at non-civilian nuclear reactors." Pl. Br. 7. We cannot identify any relevance of this request to the amount of damages to which PG&E is incurring as a result of the Department of Energy's failure to begin acceptance of nuclear utilities' SNF by January 31, 1998. The request, as written, relates to any matter involving the storage or disposal of non-commercial SNF, including technical matters, political matters, and fee issues.[7] Further, the request includes spent fuel that is of a different character than the type of SNF generated by commercial nuclear reactors. Def. App. 60. In addition, national security concerns make production of documents regarding storage of Navy SNF very difficult, if not impossible. Def. App. 60.

It appears that this request may be geared more towards reopening the nuclear utility industry's prior argument before the United States Court of Appeals for the District of Columbia Circuit that DOE should be directed through specific performance to begin acceptance of plaintiffs' spent nuclear fuel immediately. Previously, the nuclear utilities argued that, because DOE is able to dispose of foreign reactor SNF that the United States controls, the appellate court should order DOE to accept and dispose of commercial SNF in the same manner, even though the NWPA bars it. The Court of Federal Claims has no jurisdiction to order specific performance. Further, the United States Court of Appeals for the District of Columbia has declined the industry's request for specific performance in decisions that the industry did not appeal. As a result, the requested information is completely irrelevant to the issues presently before the Court of Federal Claims and, therefore, is objectionable. Again, Senior Judge Merow denied this request in Yankee Atomic.

Document Production Request No. 30 seeks all documents that relate to decommissioning of PG&E's Humboldt Bay Power Plant Unit 3. Pl. Exh. 1, at 8. Again, to the extent that such documents deal with scheduling or related matters involving PG&E's SNF acceptance and the scheduling of that acceptance, we have attempted and continue to attempt to locate and produce any such

[7] As indicated in the accompanying declaration from the NRC, the amount of time that the NRC would have to spend responding to this request would be unduly burdensome, particularly in light of its irrelevance to this litigation.

documents that have not already been produced. However, the decommissioning of PG&E's reactor is a matter separate from the storage and acceptance of PG&E's SNF. Further, the requirement to produce every document "related to" the decommissioning is excessively broad, given that not all such documents would relate to PG&E's storage costs for SNF.[8] Nevertheless, the bulk of the documents associated with the Humboldt Bay decommissioning, to the extent that they are in the Government's possession, are already publicly available. Further, to the extent that documents deal with SNF acceptance scheduling or the costs of SNF storage, we are attempting to ensure that we produce all such documents. Again, with regard to the request in Yankee Atomic for decommissioning documents relating to Yankee Atomic's shutdown nuclear reactor, Senior Judge Merow limited the Government's production obligation to documents relating to schedule.

3. Requests Seeking Documents Relevant Only To Future Damages Should Be Barred Pursuant To *Indiana Michigan*

The following requests seek information, at least in part, relevant only if the Court were to consider future damages. Specifically, several of PG&E's requests for production are relevant only if the Court needs to construct scenarios about when, in the future, DOE will begin accepting SNF from nuclear utilities. In light of the Federal Circuit's recent decision in Indiana Michigan, those requests for discovery should be denied:

> Document Production Request No. 15: In this request, PG&E seeks production of all documents that are
>
> > related to the order or sequence among utilities in which DOE will accept spent nuclear from utilities, including but not limited to the order in which DOE would have accepted spent fuel if it had started accepting such spent fuel on or before January 31, 1998, the order in which DOE will accept spent fuel from utilities when DOE begins accepting spent fuel from utilities, and any plans, projections or

[8] In the attached declaration, the NRC has identified the burden of the broad search that PG&E's request would impose. Def. App. 55-56.

> estimates by DOE of the order or sequence in which DOE would have accepted or will accept spent fuel from utilities.

Pl. Exh. 1, at 13 (emphasis added). PG&E's request should be considered in two parts.

With regard to PG&E's request for documents regarding the order in which DOE "would have" accepted SNF, DOE's production of this information has long been complete. Even though the schedule upon which DOE "would have" removed SNF does not necessarily equate with and may be more aggressive than the schedule by which DOE was obligated to accept SNF, we have produced all documents that we have been able to locate after a reasonable search. The Government's production has included all non-privileged documents that we have located related to exchanges of SNF acceptance allocations and other theories that counsel for plaintiff asserted in the Yankee case. Accordingly, no dispute exists regarding that part of PG&E's request.

With regard to PG&E's request for documents regarding the order in which DOE "will" accept SNF in the future and any "plans, projections or estimates by DOE of the order or sequence in which DOE . . . will accept spent fuel from utilities" in the future, the Federal Circuit's decision in Indiana Michigan disposes of the need to litigate events that may occur in the future. Although it is possible that future events in the "but for" world might be relevant to a determination of those costs that, in the "but for" world, PG&E would have had to incur regardless of DOE's delay, DOE's actual future performance is no longer at issue here. To the contrary, at best, PG&E is entitled to recover any damages that it has already incurred based upon events and delays that have already transpired. Because DOE's internal deliberations regarding when or how it hopes to perform in the future do not matter for purposes of PG&E's current permissible damages claim, those deliberations are not a proper focus of discovery.

In the past, we have produced a large number of documents relating to DOE's continual evaluation of this program, its efforts to define the date by which it believes a repository at Yucca Mountain could be available, and its efforts to develop plans for possible future activities. These documents, which have required extensive and continuing document production efforts by the Government, are all available to PG&E. However, the nuclear utilities' continual requests for full discovery of DOE's internal

deliberations and evaluations of the repository program, on a continuing and invasive basis, is extremely counterproductive. Instead of being able to focus upon efforts to complete the Yucca Mountain process and deliberate internally regarding the best manner in which to do that, DOE is constantly responding to discovery requests regarding those efforts. These constant inquiries and the obligation either to disclose or to engage in the extensive work necessary to invoke the deliberative process privilege regarding all such internal deliberations both (1) discourage free and open deliberations within DOE, given that any suggestions are likely to be produced and immediately subjected to requests for deposition of the individual making the suggestion and (2) disruptive of DOE's work on the program. Because these issues are now rendered irrelevant to any permissible damages claim, these types of constant and disruptive inquiries should cease.

Document Production Request Nos. 31 and 32: Here, PG&E requests that DOE produce all documents regarding "the date by which DOE will begin accepting SNF from utilities" in the future, as well as any documents "related to any estimate or projection that DOE will begin accepting spent fuel from utilities later than 2010." Pl. Br. 1, at 9. Although an extensive number of documents have already been produced that relate to these topics, these requests have been rendered irrelevant in light of the Federal Circuit's recent decision in Indiana Michigan. For that reason, PG&E's requests for further searches and production should be denied.[9]

Document Production Request No. 33 seeks production of all documents "related to the needs or requirements (whether current, estimated, or projected) for storage and disposal of spent fuel from domestic commercial nuclear reactors." Pl. Exh. 1, at 9. We have already produced, or are in the process of producing, that information which we have located relating to DOE's analyses of these matters, to the extent that they are not privileged. We

---

[9] Further, as DOE continues to work upon the Yucca Mountain project and to deliberate internally about the date that it believes it may be able to begin acceptance, it is likely that many non-public documents generated during these deliberations would be claimed as privileged. Given that these documents are now irrelevant to the issues in this litigation, it would be inappropriate to require DOE constantly to have to engage in the paperwork necessary to invoke that privilege as new internal documents are generated.

presume that the information that PG&E seeks is that which DOE uses in projecting future SNF discharges from nuclear reactors, which it extracts from RW-859 data submitted by nuclear utility contract holders. From that data, DOE makes various projections about the future. Accordingly, to the extent that PG&E seeks that type of data, it has already been produced, subject to supplementation with any more recently generated documents that we locate associated with DOE's projections and estimates.

Unfortunately, based upon the phrasing of PG&E's request, it could be interpreted to require the production of any document in which a nuclear utility identifies a potential need in the future for dry storage, even in a passing reference. Given that it includes "the . . . requirements . . . for . . . disposal of spent fuel," it could be interpreted as virtually every document dealing with SNF disposal, including broad aspects of the development of the repository. Not only is such a request overly broad, it is rendered completely irrelevant (to the extent that it was not already) by the Indiana Michigan decision. The request for this information, "whether current, estimated, or projected," clearly anticipates looking at possible future acceptance of SNF. Yet, because the Court will not now be attempting to create a future SNF acceptance scenario, this request is irrelevant, regardless of its breadth.

Document Production Request No. 36: Here, PG&E seeks production of all documents "related to the ability of DOE to perform its obligations under the Standard Contract and PG&E's Contract, including but not limited to DOE's past and present intentions to perform these obligations and estimates of when and how DOE will be able to perform these obligations." Pl. Exh. 1, at 9. In addition to the vagueness of the meaning of the words "the ability of DOE," which makes it difficult to respond to this request, the request seeks information about DOE's future performance. The Federal Circuit's decision in Indiana Michigan renders this inquiry irrelevant to this litigation and PG&E's current permissible damages claims.[10]

[10] To the extent that DOE's "past intentions" are relevant to this litigation, all such documents that the Government was able to find after a reasonable search are already available.

4. Other Requests Are Simply Overbroad

Other requests that PG&E has submitted are simply overbroad. Again, PG&E has made requests for production that would include documents potentially relevant to this litigation, but that are phrased in such a manner that they require searches for and production of documents that have nothing to do with or are incredibly tangential to the issues in this litigation:

> Document Production Request No. 22: In this request, PG&E seeks production of all "[c]ommunications between PG&E and either DOE or the United States Nuclear Regulatory Commission related to spent fuel." Pl. Exh. 1, at 8. As an initial matter, we do not understand the reason that PG&E needs the Government to produce all communications between it and the Government, given that PG&E was either sent or received each of those documents. When asked to explain the reasons that PG&E needed the Government to search for and produce every single document between the parties relating to SNF, the response was not that there had been some kind of inadvertent document destruction issue at PG&E, but only that PG&E did not have to explain and the Government is simply obligated to produce all such documents, regardless of the search effort needed or the cost. Consideration of this request should be guided by the fact that PG&E should already have all of these documents. PG&E's request is particularly bold, given that, in response to the Government's document production requests, PG&E informed the Government that it would not be producing documents "filed by or on behalf of PG&E" with the California Public Service Commission, the Federal Energy Regulatory Commission or other ratemaking bodies . . . ." Def. App. 3-4.
>
> In any event, although PG&E's request includes documents that might be relevant to this litigation – for example, communications between the parties about PG&E's contract, which are contained in the PG&E contract file that we have already produced – it also seeks every single document that is "related to spent fuel." PG&E has not explained how every single document that "relate[s] to spent fuel," including those potentially dealing with the chemical makeup of SNF and other matters unrelated to schedule and PG&E's cost of storage, is somehow relevant to this litigation. Further, PG&E has provided no assistance to the Government with regard to this request, failing to identify the specific documents or

categories of documents that it believes DOE and the NRC should have received and/or sent to PG&E. We have attempted to search for and produce all documents relating to SNF acceptance schedule issues, and PG&E has those documents. To the extent that PG&E wants a wider-ranging search for documents, it should be required to identify the specific documents or categories of documents that it recalls having sent to DOE and/or the NRC and to explain both the relevance of those documents and PG&E's need for production of those documents. Otherwise, this request seems intended merely to keep the Government busy with a useless and time-consuming search of the files of two separate agencies. See Def. App. 55-56 (describing burden).

Document Production Request Nos. 26, 28, and 29: PG&E seeks production of all documents in the Federal Government "related to the storage, disposal, transportation, preparation, packaging, inspection, and pickup" of Greater-Than-Class-C radioactive waste ("GTCC waste"), failed fuel, nonstandard fuel, and "other than standard fuel." Pl. Exh. 1, at 8. Although, with regard to its request for information regarding nonstandard fuel and "other than standard fuel," it has now limited its request to "documents pertaining to Yucca Mountain design considerations for failed fuel and non-standard fuel," Pl. Br. 10,[11] it has not limited its requests regarding GTCC waste and failed fuel in any manner. With regard to PG&E's requests regarding GTCC waste and failed fuel, they simply are overbroad.[12] We have previously searched for and produced documents relating to (1) whether GTCC waste is covered by the Standard Contract; (2) the schedule upon which utilities' GTCC waste could have been accepted, to the extent that such documents exist at all; and (3) the schedule upon which failed fuel, nonstandard fuel, and "other than standard fuel" could have been accepted. In fact, the nuclear utility plaintiffs have taken

[11] In its motion, PG&E complains that this request is directly relevant to the Government's contention "that it is not obligated under PG&E's contract to store utilities' failed fuel and non-standard fuel." Pl. Br. 10. For the record, PG&E apparently misunderstands our contention. We do not contend that, under the Standard Contract, DOE will not ultimately accept both failed and nonstandard fuel. However, pursuant to Appendix E of the Standard Contract, 10 C.F.R. § 961.11, DOE is not obligated to accept failed fuel, nonstandard fuel, or "other than standard fuel" on the same oldest-fuel-first schedule that applies to standard fuel.

[12] The attached declaration identifies the burden of these requests, as written. Def. App. 55-56, 59.

extensive discovery regarding these matters, and these issues were heavily litigated in the Yankee Atomic trial in which counsel for PG&E participated. Further, PG&E's request for all documents relating to the still-developing design parameters for a repository at Yucca Mountain is potentially overwhelming. The number of documents dealing with potential Yucca Mountain designs is staggering. However, the bulk of documents dealing with the Yucca Mountain licensing effort, which would encompass all design materials, is available on the RIS-Web, a searchable electronic document system. Yet, PG&E has not taken advantage of the availability of the RIS-Web or requested access to it since it filed its suit. Given the tangential relevance of the documents being requested, PG&E has access to all documents that it could need to develop any theories about failed and nonstandard fuel that it believes appropriate. At the very least, it should be required to review the RIS-Web to determine whether the information there is sufficient for its needs before it insists upon extremely broad and irrelevant agency searches.

## II. PG&E'S DEMAND FOR A RULE 30(b)(6) DEPOSITION ON THE DOCUMENTS THAT THE GOVERNMENT HAS PRODUCED, AS WELL AS THOSE THAT IT HAS WITHHELD AS PRIVILEGED, AND ON OTHER TOPICS EITHER SEEKS INFORMATION IN EXCESS OF THAT REQUIRED BY RULE 34, IS INAPPROPRIATE, OR IS BETTER RESOLVED ON WRITTEN QUESTIONS

### A. The Purpose Of Rule 30(b)(6)

"A deposition is a record of testimony taken outside the courtroom that has been certified in conformity with the Federal Rules of Civil Procedure so that a court may regard it as equivalent to testimony delivered inside the courtroom under oath." 7 J. Moore, Moore's Federal Practice § 30.02[1], at 30-14 (3d ed. 2001). "The purpose of a deposition is to find out what the witness saw, heard, and knows, or what the witness thinks, through a question and answer conversation between the deposing lawyer and the witness." Id.

Rule 30(b)(6) was added to the Federal Rules of Civil Procedure in 1970. Pursuant to that rule, a party "may name a corporation, partnership, association, or governmental agency as

the deponent and designate the matters on which he requests examination, and the organization shall then name one or more" individuals "to appear and testify on its behalf with respect to matters known or reasonably available to the organization." Committee Note of 1970 to Amendment, Fed. R. Civ. P. 30. This procedure was to "supplement[] the existing practice whereby the examining party designates the corporate official to be deposed." Id.

The rule's drafters believed that Rule 30(b)(6) would "curb the 'bandying' by which officers or managing agents of a corporation are deposed in turn but each disclaims knowledge of facts that are clearly known to persons in the organization and thereby to it." Id.; see Prokosch v. Catalina Lighting, Inc., 193 F.R.D. 633, 638 (D. Minn. 2000). The rule was intended to "streamline[] the discovery process." Resolution Trust Corp. v. S. Union Co., 985 F.2d 196, 197 (5th Cir. 1993). According to its drafters, "[t]he provision should also assist organizations which find that an unnecessarily large number of their officers and agents are being deposed by a party uncertain of who in the organization has knowledge." Id. In addition, Rule 30(b)(6) was intended to "reduce the difficulties now encountered in determining, prior to the taking of the deposition, whether a particular employee or agent is a 'managing agent.'" Id. However, the rule's drafters specifically stated that "a court's decision whether to issue a protective order may take account of the availability and use made of the procedures provided in this subdivision" – specifically, Fed. R. Civ. 30. Committee Note of 1970 to Amendment, Fed. R. Civ. P. 30.

B. The Requirements Of And Obligations Created By Rule 30(b)(6)

Under Rule 30(b)(6), a party may in his notice of deposition "name as the deponent a . . . governmental agency," but must "describe with reasonable particularity the matters on which

examination is requested." RCFC 30(b)(6) (emphasis added). "In that event, the organization so named shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which each person will testify." Id. "The persons so designated shall testify as to matters known or reasonably available to the organization." Id. "The responding party 'must make a conscientious good-faith endeavor to designate the persons having knowledge of the matters sought by [the interrogator] and to prepare those persons in order that they can answer fully, completely, unevasively, the question posed by [the interrogator] as to the relevant subject matters.'" Prokosch, 193 F.R.D. at 638 (citation omitted).

### C. The Court's Authority To Limit Rule 30(b)(6) And To Order Discovery Through Alternative Means

"[T]o allow the Rule to effectively function, the requesting party must take care to designate, with painstaking specificity, the particular subject areas that are intended to be questioned, and that are relevant to the issues in dispute." Prokosch, 193 F.R.D. at 638 (emphasis added). RCFC 30(b)(6) is a trade-off. In exchange for relief from the burden of identifying an appropriate witness in an organization, a party serving a Rule 30(b)(6) notice must narrow the inquiry, "describ[ing] with reasonable particularity the matters on which examination is requested." Id. "An overbroad Rule 30(b)(6) notice subjects the noticed party to an impossible task." Reed v. Bennett, 193 F.R.D. 689, 692 (D. Kan. 2000). "To avoid liability, the noticed party must designate persons knowledgeable in the areas of inquiry listed in the notice." Id. "Where, as here, the defendant cannot identify the outer limits of the areas of inquiry noticed, compliant designation is not feasible." Id. Courts have not hesitated to quash Rule 30(b)(6) notices that fail to meet the requirement of "reasonable particularity." See, e.g., Martin

v. Valley Nat'l Bank of Arizona, 140 F.R.D. 291, 315 (S.D.N.Y. 1991) (inquiry into "the Department's review of all other ESOP-financed buyouts through the present" termed "plainly overbroad or otherwise beyond the proper scope of discovery"); Padana Assicurazioni-Societa Aziono v. M/V Caribbean Express I, No. Civ.A. 97-3855, 1999 WL 30966, at *2 (E.D. La. Jan. 21, 1999) ("[t]he subject notices refer only to 'the causes of the loss or damage to the cargo as described in the Complaint,' a description that is insufficiently particularized"); S. Means, "The Corporation As Witness," Wisconsin Lawyer 15 (July 1996) ("a deposition notice directed to a corporation's knowledge of 'the contract' may be objected to as overly vague and ambiguous").[13]

Further, as previously discussed, "[e]ven if relevant, discovery is not permitted where no need is shown, or compliance would be unduly burdensome, or where the harm to the person from whom discovery is sought outweighs the need of the person seeking discovery of the information." Micro Motion, 894 F.2d at 1323 (emphasis in original). Consistent with these principles, courts have quashed wide-ranging Rule 30(b)(6) notices because such discovery is more efficiently obtained through the review of documents and the depositions of individual witnesses. E.g., In re Independent Serv. Org. Antitrust Litig., 168 F.R.D. 651, 654 (D. Kan. 1996); McCormick-Morgan, Inc. v. Teledyne Indus., Inc., 134 F.R.D. 275, 285-87 (N.D. Cal.), rev'd in other part, 765 F. Supp. 611 (N.D. Cal. 1991); see also United States v. District Council of New York City, 90 Civ. 5722, 1992 WL 208284, at *15 (S.D.N.Y. 1992) (quashing Rule 30(b)(6) notice because, "[w]hile the District Court certainly has the right to discover relevant factual information . . . those facts have not been concealed by the Government. They are

[13] RCFC 26(c) provides that the Court may issue a protective order "where justice requires to protect a party or person from annoyance . . . oppression, or undue burden or expense."

available in the documents provided and through depositions of fact witnesses who were named as having relevant information.").

In McCormick-Morgan, Inc. v. Teledyne Industries, Inc., 134 F.R.D. 651 (N.D. Cal.), rev'd in other part, 765 F. Supp. 275 (N.D. Cal. 1991), for example, the district court quashed a Rule 30(b)(6) notice addressing the bases for a party's contentions and directed the parties to use alternative means of discovery. The court reasoned that, "[i]n a [complex] case like this, no one human being can be expected to set forth, especially orally in a deposition, a fully reliable and sufficiently complete account of all the bases for the contentions made and positions taken." Id. at 285; see EEOC v. American Int'l Group, Inc., No. 83-6390, 1994 WL 376052, at *3 (S.D.N.Y. July 18, 1994) (Rule 30(b)(6) depositions are not designed to be memory contests of facts in a file). The McCormick-Morgan court discussed, as an alternative to a Rule 30(b)(6) deposition, the use of contention interrogatories, determining that the court should evaluate which of the two methods is more cost-effective and appropriate in a given situation:

> [T]he question to which [the court] now turn[s] is: which of the available devices is most appropriate, i.e., which device would yield most reliably and in the most cost-effective, least burdensome manner information is sufficiently complete to meet the needs of the parties and the court in a case like this?

McCormick-Morgan, 134 F.R.D. at 286.

In Exxon Research & Engineering Co. v. United States, 44 Fed. Cl. 597 (1999), this Court considered and adopted the test set forth in McCormick-Morgan. Specifically, this Court determined that interrogatories, in lieu of a Rule 30(b)(6) deposition, "avoid the problem of requiring [a party] to designate one or more persons to explain" the party's positions in the litigation, id. at 602, finding that interrogatories “should be a less expensive method and are a

less invasive method of letting the [party] learn the information." Id. at 601. This Court also recognized that "a Rule 30(b)(6) deposition may not be appropriate when the topic is very complex." Id. (citing Protective Nat'l Ins. Co. v. Commonwealth Ins., 137 F.R.D. 267 (D. Neb. 1989)). The Court held that the party seeking the Rule 30(b)(6) deposition should first pursue interrogatories, as such interrogatories might well answer the noticing party's questions, before the Court would consider the possibility of a Rule 30(b)(6) deposition. Id. at 602; see Alexander v. FBI, 186 F.R.D. 137, 142-43 (D.D.C. 1998) (ordering that further Rule 30(b)(6) depositions could not proceed until "after [deposing parties] have [submitted and] received written discovery responses on this issue and have taken the deposition" of a fact witness).

### D. Defendant's Objections To The Plaintiff's Proposed Topics

#### 1. PG&E's Asserted Need For Its Rule 30(b)(6) Deposition Conflicts With Rule 34

Although not directly related to whether PG&E's request for a Rule 30(b)(6) deposition is appropriate, PG&E's asserted reason for this deposition is simply without foundation. PG&E asserts that this deposition is necessary because the Government "has not complied with its obligations under RCFC 34." Pl. Br. 14. In its motion, it complains that the Government is obligated to produce documents "either as they are kept in the usual course of business identifying the source of each produced document or labeled to correspond to each request in the order the requests are presented." Pl. Br. 2. It complains that the Government has, in fact, not complied with this obligation. It asserts that, accordingly, it needs to take a Rule 30(b)(6) deposition to mandate compliance with Rule 34.[14]

[14] It appears that PG&E may be complaining that the Government did not comply with Rule 34 because it posted its electronically produced document collections on a production

PG&E's assertion is simply bizarre, particularly in light of PG&E's failure to satisfy the standard that it apparently believes the Government must meet under Rule 34. Even before we received document production requests from the nuclear utility plaintiffs, we conducted a broad search for those documents and files that we anticipated the utility plaintiffs might request through discovery. We undertook this time-intensive effort, beginning in 1999, because we knew that repetitive requests for the production of documents by different plaintiffs at different times would create an impossible situation for the Government. To attempt to avoid the need to disrupt agency activities repeatedly and constantly during the discovery process, we engaged in a massive search effort that was wide-ranging. Subsequently, during coordinated discovery proceedings in 2001 and 2002, the Government again conducted searches of the agency to attempt to locate documents responsive to the discovery requests that we had been served by more than a dozen SNF plaintiffs. Since that time, we have attempted to respond to various document production requests as various plaintiffs have submitted those requests, and we have now produced more than one million images to the SNF plaintiffs. Recently, we completed the task of producing all of the contract files for all of the Standard Contract holders, anticipating that, in the future, we will receive requests for each of these files, and we have made those files

---

website, made available simultaneously to all SNF plaintiffs, rather than on compact disks as it had originally produced documents in this litigation. See Pl. Br. 12. We do not understand this assertion. The production website is merely a substitute for the production of disks. Specifically, a series of containers of documents is essentially loaded onto the production website, and the utility plaintiffs can then go to the website and download each container either onto their computer systems or, if they prefer, onto a disk. Production of documents on the website is no different in form or substance than production of documents on CDs. The only difference is in the significantly reduced cost to the Government in no longer having to provide actual CDs to every plaintiff and in no longer having to attempt to keep track of which plaintiffs have been provided with which disks.

available to all of the SNF plaintiffs. Although we presumably will be required to supplement our document production from time to time as new issues develop in these cases, we hope that the bulk of our production is complete. To the extent that the various plaintiffs seek production of documents relating to the damages that they have incurred or will incur because of DOE's delay, DOE will not have documents regarding the reasonableness of each plaintiff's costs. Documents about their damages will come from the various plaintiffs themselves.

In producing documents, we generally have collected files from individuals within the agency and, to ease the burden of production and to ensure that all plaintiffs have access to the same documents, we have electronically scanned those documents with Bates stamp numbers for identification purposes. We have also provided a log that identifies the individual from whom each file was obtained. See Pl. Exh. 7, at "Page 16 of 41" through "Page 41 of 41." Although we electronically scanned each of the employees' files so that they could be produced to all of the nuclear utility plaintiffs, the files were scanned in the order and manner that they were received from each Federal employee. To date, we have produced over one million images to the plaintiffs over the course of six years. In addition, we have provided counsel for the plaintiffs with access to the electronic Record Information System, a searchable electronic document storage system that contains a voluminous number of documents and that DOE maintains in the ordinary course of business.

PG&E's complaint apparently is that we did not go through the entirety of the Government's past document production and identify, within each of the multitude of files previously produced, which documents related to which of PG&E's document production requests. See Pl. Br. 3. PG&E's complaint is inappropriate for three reasons. First, the

producing party has the option of selecting whether it will produce files in the manner in which they were maintained in the ordinary course of business or organized and labeled to correspond to the categories in the requests. 8A C. Wright, A. Miller, & R. Marcus, Federal Practice & Procedure § 2213, at 431-32 (1994). Under that rule, the producing party still has a burden to select and produce the items requested, "[r]equiring further that these requested materials be segregated according to the requests would impose a difficult and usually unnecessary additional burden on the producing party." Id. We also provide the SNF plaintiffs with a list identifying the employee or "official" file from which each container of produced documents was found, as well as a list of the Bates stamp prefixes and their meaning.[15] Because we have not attempted to "hide" documents by burying a damaging document from one file in another massive file, but instead have produced employees' files and official contract files as they were maintained in the ordinary course of business, we have satisfied our obligation under Rule 34.[16]

Second, counsel for PG&E has had copies of the large majority of the documents that the Government has produced for a significant period of time through his work in the Yankee Atomic case, in which the parties participated in an almost eight-week trial in July and August 2004. Although we have recently produced the contract files for all of the Standard Contract

[15] For example, the "CTR" Bates stamp prefix relates to documents from the files of Government contractors, and the "NRC" prefix relates to documents from the files of the NRC.

[16] To the extent that greater effort is necessary in response to every document production request that we receive in each of the 59 different pending SNF cases, the Court should reinstitute coordinated discovery proceedings and require coordination among the plaintiffs in the submission of their document production requests. Without such coordination and a limitation on the number of successive document production requests that plaintiffs can make, the Government's burden in responding to document production requests would be impossible.

holders over the course of the past few months, the bulk of all other documents were previously produced to counsel for Yankee Atomic prior to the trial of that case and, presumably, were used by counsel in that case to the extent that they were deemed relevant. To the extent that PG&E wants the Government to go through all of those previously produced files and to identify those documents that relate to each specific PG&E document production request – the bulk of which are either identical to or substantially similar to requests that were served in Yankee Atomic – it would appear that such an effort is redundant, given that we presume that counsel for plaintiff has already undertaken that task in his work in the Yankee Atomic case. The rules regarding discovery should not be applied without reference to the history of this litigation or be invoked merely to create "busy work" for the Government.

Third, to the extent that PG&E actually believes that Rule 34 imposes greater burdens than those to which the Government has submitted, PG&E has failed to comply with those burdens. Like the Government, PG&E did not produce the actual original paper copies of its files, but instead provided the Government with electronic copies of documents that had been scanned into an electronic system with Bates stamp numbers for identification purposes. In response to the Government's individual document production requests, PG&E did not identify those files or documents that were specifically responsive to each document production request. See Def. App. 5-19. Absent having complied with the interpretation of Rule 34 that it now proposes, PG&E should not be heard to complain that the Government has failed to comply with Rule 34.

2. To The Extent That PG&E Actually Needs Additional Information About The Groupings And Organization Of The Documents On The Production Website, That Information, To The Extent Required By Rule 34, Is Better Obtained Through Interrogatories

PG&E alleges that it "needs a government witness to explain the various groupings and organization of the documents posted on the production website in the context of PG&E's Requests in order to determine what, if any, documents have been produced by the government in response to PG&E's Requests." Pl. Br. 15. PG&E then speculates that "the only reason the government is purportedly unable to identify witnesses who can testify to these subjects is because it has failed to comply with its fundamental discovery obligations under the rules." Pl. Br. 15. In actuality, we are unclear as to the purpose or breadth of a deposition on this topic, given that the topic lacks the "painstaking specificity" that is necessary to allow us to prepare one or more witnesses to respond to it. See Prokosch, 193 F.R.D. at 638. To the extent that PG&E desires an explanation of the manner in which the production website works and how containers are loaded onto the website, it would seem more efficient simply to have our litigation support contractor, with an attorney from our office, sit with a technical representative from counsel for PG&E's office and go through the website with him, answering questions when they arise. To the extent that PG&E desires some specific explanation regarding the specific documents on the containers that have been loaded to the website, they are loaded by reference to the employee from whose files the documents came or the "official" contract files from which they came. We do not understand the need for a further deposition on this point. To the extent that PG&E is attempting to have the Government tie every document in the production to PG&E's specific document production requests, PG&E is attempting to create an obligation to exceeds Rule 34 and, in any event, seems needless given counsel for PG&E's history in this

litigation and with the document collections that have previously been produced. In any event, if the Court were to require the Government to go through its past productions and tie them to specific PG&E requests, that effort is better performed in written responses to specific questions, rather than through a deposition.

3. PG&E's Request For A Deposition On The Documents That The Government Has Produced And The Documents That The Government Has Withheld As Privileged Is Inappropriate

PG&E asserts that it also needs "an appropriate 30(b)(6) witness" to testify "about what responsive documents have been withheld on privilege and/or work-product grounds in response to or as a result of PG&E's Requests to determine the propriety of the government's privilege assertions." Pl. Br. 15. It also seeks a deposition on the "[d]ocuments that have been produced on the government's document production website in response to or as a result of Plaintiff's First Request for Production of Documents." Pl. Br. 14. These requests are so broad that they could be interpreted to require the Government to produce a multitude of witnesses to testify about the contents of these documents, a request that is, based upon the case precedent discussed above, inappropriate. Although PG&E has disclaimed that it is seeking to depose individuals about the contents of documents, see Pl. Exh. 10, at 2, we do not understand, if that is true, the information that PG&E is attempting to obtain or the scope of witness preparation that is necessary for these topics. Certainly, they are not stated with "painstaking specificity." If PG&E has questions about particular documents that have been produced, within reason, it would be highly more efficient for it to put those questions in writing, rather than to require us to guess about which documents PG&E might ask. Written questions are particularly appropriate, given that PG&E's last request – for a deposition about documents withheld as privileged – appears highly likely to

seek disclosure of privileged information that should be obtained, to the extent appropriate, through the existing privilege logs.

4. Because Most Of The Documents On The Production Website Were Produced To Counsel For PG&E Before This Case Was Even Filed, And Counsel Has Previously Deposed DOE About Past Document Production Efforts, Written Questions About Any Additional Search Efforts, As A First Step, Appear More Appropriate Than Another Deposition

In its deposition notice, PG&E also seeks a deposition on the Government's searches for documents (Deposition Topic No. 1) and the results of the Government's searches for documents (Deposition Topic No. 2) in response to PG&E's document production requests. Pl. Exh. 8. Previously, on February 10, 1999, April 8, 1999, and February 19, 2002, counsel for PG&E deposed DOE, in Rule 30(b)(6) depositions, about its prior document search efforts. See Pl. Exh. 9, at 1. Counsel for PG&E has asserted that he does not intend to duplicate those depositions, although he leaves the door open to duplication by asserting that "the results of these prior efforts (including searches undertaken prior to February 19, 2002) certainly seem relevant to the government's response to PG&E's requests." Pl. Exh. 10, at 1. Nevertheless, because of his intensive involvement in discovery in the SNF cases, both in Yankee Atomic and the coordinated discovery proceedings, it appears redundant to require, yet again, that a DOE employee prepare himself for yet another deposition about document searches since 2002. To the extent that PG&E is attempting to have DOE tie every document produced to a specific PG&E production request, that effort exceeds the scope of Rule 34 and, in this case, seems unnecessary in light of counsel's use of the bulk of the produced documents in Yankee Atomic. Nevertheless, to the extent that additional information is appropriate, interrogatories or a

deposition on written questions appears more efficient than requiring DOE to prepare a witness or witnesses for potentially unlimited and unknown questions about search efforts.

## CONCLUSION

For the foregoing reasons, we respectfully request that the Court deny PG&E's motion to compel and issue a protective order in accordance with the discussion above.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/ Harold D. Lester, Jr.
HAROLD D. LESTER, JR.
Assistant Director

s/ John C. Ekman
JOHN C. EKMAN
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tele: (202) 353-0897
Fax: (202) 307-2503

OF COUNSEL:

JANE K. TAYLOR
Office of General Counsel
U.S. Department of Energy
1000 Independence Ave., S.W.
Washington, D.C. 20585

September 15, 2005

Attorneys for Defendant