Page 86

Q. So early 2005?

A. Want to say that, yes.

Q. Now, did you have any involvement in the preparation of PG & E's damages claim against the government in this case?

MR. SHAPIRO: Going to instruct Mr. Pulley not to answer that question. Calls for information protected by the work product doctrine.

MR. DAMELIN: Well, I asked Mr. Pulley if he had any involvement in preparing the claim. I'm not sure how that's protected. The claim was submitted to the government, and I think we have the -- the right to ascertain how that claim was prepared.

MR. SHAPIRO: I disagree.

MR. DAMELIN: Just a moment.

(Discussion off the record.)

MR. DAMELIN: Mr. Shapiro, as I think I just stated, we believe we are entitled to the information, specifically as to Mr. Pulley, whether he was involved in the preparation of the damages claim submitted to the government in this case.

If the instruction to Mr. Pulley is to not answer questions about his involvement in the preparation of that claim, it is our position that the deposition will remain open, potentially to further

Page 87

pursue with Mr. Pulley his involvement with the damages claim if he is not -- if he's instructed not to answer those questions today.

The claim -- it is part of discovery that we are attempting to ascertain how the damages claim was prepared and Mr. Pulley's role in preparation of that claim and, if necessary, I hope we can avoid that, we could proceed to the court for permission to proceed with Mr. Pulley -- to question Mr. Pulley about his involvement in the damages claim.

If your instruction to him is to continue for him not to answer the questions we will move on to some additional questions, but that is our position regarding his involvement, and for that matter, the same question to other witnesses in this case regarding their involvement in preparation of the PG & E damages claim.

MR. SHAPIRO: I don't know all the questions you intend to ask and certainly you can pursue questions regarding what costs PG & E has incurred that -- you can find out whether Mr. Pulley has knowledge of those, but in terms of the specific preparation of a document filed with the court, the instruction's going to stand.

MR. DAMELIN: Well, let me ask these questions

Page 88

again so we can have this for the record.

Q. Mr. Pulley, did you have any involvement in the preparation of Pacific Gas & Electric's damages claims submitted to the government in this case?

MR. SHAPIRO: You can go ahead and answer that.

THE WITNESS: Yes.

BY MR. DAMELIN:

Q. Can you please describe your involvement in preparation of that claim to me?

MR. SHAPIRO: Then I'm going to instruct Mr. Pulley not to answer.

BY MR. DAMELIN:

Q. Mr. Pulley, did you have any involvement in determining what should be claimed as a damage by Pacific Gas & Electric in this case?

A. No.

Q. Did you have any involvement in determining what should be listed as any type of offset or credit to the government as part of PG & E's claim in this case?

A. No.

Q. Has Pacific Gas & Electric hired or retained any expert witnesses in this case?

MR. SHAPIRO: Objection. Again, I'm going to

Page 89

instruct Mr. Pulley not to answer that question.

BY MR. DAMELIN:

Q. Have you had any contact or spoken with any person retained as an expert witness by Pacific Gas & Electric in this case?

MR. SHAPIRO: I'm going to instruct Mr. Pulley not to answer that question.

MR. DAMELIN: Well, I would just simply reiterate our earlier position regarding the instruction not to answer and the fact that communications between -- if they exist, between Mr. Pulley and any expert witnesses retained by Pacific Gas & Electric in this case are not privileged communications and thus, should be subject to discovery by the government.

And also just to note, to the extent that expert witnesses, if they are retained by Pacific Gas & Electric in this case, have relied in any way on information provided by Mr. Pulley, we will again seek to redepose Mr. Pulley on those questions.

Q. Mr. Pulley, have you provided any information to expert witnesses retained by Pacific Gas & Electric on this case on any costs that are claimed as damages against the government?

MR. SHAPIRO: First I'm going to object that

Page 90

it's vague what you mean by "expert witnesses." We don't have any expert witnesses identified in the case. The time frame for identifying expert witnesses is in November, but again, I'm going to instruct Mr. Pulley not to answer regarding communications that he may have had, specifics of communications he may have had assisting with the preparation of PG & E's damage claim.

BY MR. DAMELIN:

Q. Mr. Pulley, have you provided any information or documents to PG & E legal counsel regarding costs claimed as damages against the government?

MR. SHAPIRO: I'm going to instruct Mr. Pulley not to answer that as well and note for the record that that's covered both by the attorney-client privilege and by the work product document.

BY MR. DAMELIN:

Q. Now, Mr. Pulley, did you have any involvement in the stack removal project at Humboldt Bay?

A. Not directly.

Q. What about indirectly?

A. I was -- yes.

Q. And what was your indirect involvement in the stack removal project?

A. I was an engineer here in the general office

Page 91

and was asked to do some civil calculations related to concrete weight.

Q. And what time frame were you asked to do those calculations?

A. In the latter part of 1998.

Q. And beyond that particular work, did you do -- did you have any other involvement in the stack removal project at Humboldt Bay?

A. No.

Q. And was that particular project ongoing when you transferred to Humboldt Bay itself?

A. I think it had completed prior to my move there.

Q. Now, did you have or do you have any involvement in the SAFSTOR operations at Humboldt Bay?

A. Could you repeat?

(Mr. Stouck enters the deposition room.)

BY MR. DAMELIN:

Q. Did you have or do you have any involvement in SAFSTOR operations at Humboldt Bay?

A. Yes, I do.

Q. Can you please describe for me what your involvement is or has been?

A. As I described before, I get involved with maintenance and modifications to systems. I described

Page 92

the rad waste system early in my tenure there. Any other work -- they needed some beams modified by the spent fuel pool as part of inspecting spent fuel in the last couple of years.

Q. Was that work related -- you describe it as modifications to spent fuel pool; is that the word that you used?

A. Yes.

Q. And was that related to the investigation at Humboldt Bay regarding missing spent fuel rods or spent fuel assemblies?

A. Yes.

Q. And when did you work on those modifications to the spent fuel pool?

A. The latter part of 2004 and a bit early this year.

Q. Was the work that you did related to the spent fuel pool in that capacity all directly related to that investigation of the missing fuel rods or pieces?

A. That was the driving project of that.

Q. Was there another basis for the modifications that you worked on, other than that investigation?

A. Yes.

Q. And what were those?

A. The -- part of the ISFSI Project is we've got

Page 93

to characterize all of the fuel that we're going to put into the casks, so it's partly related to that.

Q. What type of modifications did you work on?

A. We had cover beams on the pool that we needed to modify so that they could get the video equipment down into certain areas to view all of the areas of the pool.

Q. And that was a project or a matter that you worked on?

A. Yes.

Q. And when was that actually performed, that modification?

A. As I stated before, the latter part of '04, early '05.

Q. Any other modifications of the fuel -- spent fuel pool that you worked on?

A. No.

Q. And the work that was done, those modifications to the spent fuel pool, was that done by PG & E personnel or contractors outside of PG & E?

A. I think a little combination of both.

Q. And the -- you had noted characterization of the spent fuel. When did that activity occur at Humboldt Bay?

A. That's been somewhat of an ongoing project for

# EXHIBIT G

# CONDENSED TRANSCRIPT & WORD INDEX

## DEPOSITION OF LARRY WOMACK

## PG&E VS. UNITED STATES

## SEPTEMBER 12, 2005

COPY

BARKLEY
Court Reporters

(310) 207.8000 Los Angeles
(949) 955.0400 Orange County
(415) 433.5777 San Francisco
(916) 922.5777 Sacramento
(408) 885.0550 San Jose
(951) 686.0606 Inland Empire
(818) 702.0202 San Fernando Valley
(858) 455.5444 San Diego
(760) 322.2240 Palm Springs

UNITED STATES COURT OF FEDERAL CLAIMS

PACIFIC GAS & ELECTRIC COMPANY, ) Plaintiff(s), ) No. 04-0074C, into ) which has been ) consolidated No. ) 04-0075C vs. THE UNITED STATES, ) Defendant(s). )

----

DEPOSITION OF LARRY WOMACK
Held at Pacific Gas and Electric Company
77 Beale Street
San Francisco, California
Monday, September 12, 2005, 9:27 a.m.

----

REPORTED BY: James Beasley, CSR No. 12807



APPEARANCES

For the Plaintiff(s):
GREENBERG TRAURIG
BY: JERRY STOUCK
ROBERT L. SHAPIRO, Co-counsel
800 Connecticut Ave., NW, Suite 500
Washington, DC 20006
202.331.3173
Fax: 202.261.4751
stouckj@gtlaw.com

For the Defendant(s):
U.S. DEPARTMENT OF JUSTICE
BY: JOHN C. EKMAN
SCOTT DAMELIN, Co-counsel
1100 L Street, NW
Washington, DC 20530
202.353.0897
Fax: 202.307.0972
john.ekman@usdoj.gov



INDEX OF EXAMINATIONS


| EXAMINATIONS | PAGE |
|---|---|
| MR. EKMAN | 10 |


INDEX OF EXHIBITS


| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 1 | E-mail dated December 6, 1995 attaching the minutes from the DCPP decommissioning meeting held in San Ramon on November 21, 1995, three pages | 70 |
| 2 | E-mail dated December 27, 1995 attaching minutes from the HBPP dismantlement feasibility meeting that took place in San Ramon on December 11, 1995, four pages | 82 |
| 3 | E-mail dated June 14, 1996 attaching attachments for the UPC briefing book, 17 pages | 96 |
| 4 | E-mail dated June 14, 1996 attaching the UPC briefing book, 21 pages | 96 |
| 5 | Public Utilities Commission of the State of California Resolution E-3503 dated December 3, 1997, 12 pages | 125 |
| 6 | Job Estimate dated April 27, 1999, three pages | 132 |
| 7 | Memorandum to Various from R.B. Willis dated April 28, 1999, 21 pages | 136 |




INDEX OF EXHIBITS CONTINUED


| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 8 | E-mail string, the first of which listed is from Larry Womack to Tom Moulia; cc'd Emily Papapietro, Tom Tyler dated November 2, 2000 with attachment, 13 pages | 141 |
| 9 | Job Estimate Revision #2 dated May 7, 2004, seven pages | 148 |
| 10 | E-mail from Roy Willis to Larry Womack; cc'd Terry Nelson, John Albers, Bruce Norton, Larry Pulley, Bob Kapus dated May 14, 2004, four pages | 151 |
| 11 | Humboldt Bay Unit 3 Decommissioning Alternatives dated October 1, 1997, six pages | 155 |
| 12 | Humboldt Bay Power Plant Removal of Ventilation Stack Incremental Costs Due to Fuel in Pool Cost Estimate dated April 2005, one page | 157 |
| 13 | Humboldt Bay Power Plant Unit 3 - SAFSTOR Cost Estimate dated April 2005, two enlarged pages | 161 |
| 14 | Humboldt Bay Power Plant Independent Spent Fuel Storage Installation Licensing/Fabrication/Construction Cost Estimate dated April 2005, one enlarged page | 163 |
| 15 | Humboldt Bay Power Plant SAFSTOR to Decommissioning, 21 pages | 165 |
| 16 | Used Fuel Storage Org Chart (Draft), one page | 165 |

preparation for your deposition here today?
MR. STOUCK: Same objection and instruction.
BY MR. EKMAN:
Q. Did any documents you may have reviewed refresh your recollection about matters you may be asked to testify about today?
MR. STOUCK: Same objection and instruction.
MR. EKMAN: This objection gets broader and broader every week. All right. I'll make the same reservation, which is we're going to have to leave the deposition open.
You know, obviously, we feel we're entitled to know, not substantive communications, but certainly what he did.
MR. STOUCK: I don't understand how that's not work product, but I understand your position.
BY MR. EKMAN:
Q. One additional question just to get the instruction.
Did you select any documents yourself personally to review in preparation for your deposition here today?
MR. STOUCK: Same objection and

Page 13

instruction.
BY MR. EKMAN:
Q. Outside of any instructions your counsel may have given you concerning the selection of documents, did you personally select any documents for the deposition here today?
MR. STOUCK: Same objection and instruction.
BY MR. EKMAN:
Q. All right. Mr. Womack, let's talk about your employment history. Let's start with the present day and work our way backwards.
What are you currently employed as?
A. Currently I perform consulting services, and those fall into roughly two categories. The first category is -- or are work activities I was engaged with with PG&E before my retirement at the end of December 2004. This is an example of that.
The second category is basically -- I call it nuclear -- operational nuclear safety consulting for other nuclear power plants.
Q. Let's start with that first -- or the second one, nuclear safety consulting. Can you generally tell me what's involved in that?
A. Well, by a licensee's license, they're

Page 14

required to have certain safety oversight functions. One of those is typically referred to as an offsite safety review committee, and I sit on two offsite safety review committees for two utilities.
Q. Is there a name of this consulting -- of your consulting company?
A. It's just me.
Q. Are you incorporated?
A. No, I'm not.
Q. The first one you talked -- you mentioned work activities that you were working on at the time you retired, I think you said December of 2004?
A. That's correct.
Q. And you said "this is an example." When you said "this is an example," what do you mean by "this"?
A. I was involved in review of matters related to this litigation during my 10 years as vice president of nuclear technical services. So after I left, PG&E requested that I return under contract to act as -- to assist this case.
Q. When you say you were involved in the review of matters related to this litigation, what

Page 15

kind of matters are you talking about?
A. I'd just say general matters. I was aware when the initial complaint was filed, aware of its status. I was not responsible for performing that. But I was aware of what was going on.
Q. And why -- did you have any direct involvement when you were employed at PG&E in this litigation?
A. I'm not sure what you mean by direct.
MR. STOUCK: And again, I think you're getting into kind of a work product area. What the guy does -- what the witness does or anyone at the company does in relation to this litigation, I think, is work product.
If you want to ask him about what he did to help build the ISFSIs or address other contracts involved in this case, I think those are fair questions. But what he did to help the litigation, I think, is, again, getting into largely work product.
BY MR. EKMAN:
Q. Let's take a step out, then. Let's go back to your current position.
What type of activities have you been involved in concerning Pacific Gas and Electric

Page 16

since you retired from PG&E?

A. Really principally three scopes of work. the permit to construct the Diablo ISFSI that was granted by the California Coastal Commission had a condition requiring access to PG&E's property. I am assisting PG&E in interface with the Coastal Commission on that matter.

Second scope is our shutdown power plant, shutdown nuclear power plant, Humboldt Bay Unit 3, has an application before the Coastal Commission for construction of an ISFSI. I have assisted that team at Humboldt in interface with the Coastal Commission.

Q. And you said there were three scopes of work. What's the third?

A. The third was I've been retained to participate in this case. Retained is the wrong word, but asked to support this case.

Q. What type of work have you done in connection with this case under this agreement with PG&E as a consultant?

MR. STOUCK: Again, John, that, I think, calls for a work product answer. You're not asking for facts that are at issue in this case or for facts that might lead to discoverable evidence.



What the company does and what its personnel does in support of this case is work product. That's our position.

BY MR. EKMAN:

Q. Let me ask this. Since you've retired, have you you been --

MR. STOUCK: Sorry. Since he's a neophyte at depositions, I just wanted to let him know that these objections come up from time to time.

BY MR. EKMAN:

Q. Let me ask if you had any involvement in the preparation of Pacific Gas and Electric's damages claim in this case.

MR. STOUCK: Again, I think it's the same issue. I mean, tell me -- give me a theory why that doesn't call for work product.

MR. EKMAN: First of all, it's a yes or no question.

MR. STOUCK: Okay. That doesn't -- is that -- that doesn't tell me that it's not work product.

MR. EKMAN: If it's no, then it's over and I walk away. If it's yes, if he's had involvement in the preparation of the claim, I'm entitled to know what portions of the claim he's had



involvement with.

MR. STOUCK: I don't think that's true. Absolutely not.

MR. EKMAN: How am I supposed to ask him questions?

MR. STOUCK: Ask him about facts. Does he know, you know, why the ISFSI was built; does he know what the company has done to deal with the government's breach of contract. Those are facts that are fair game for discovery.

The preparation of our litigation materials, our position is it's work product. You can take whatever position you want, but that's our position.

BY MR. EKMAN:

Q. Let's just go down one by one.

Did you have any role in the preparation of the initial disclosures of the costs -- let me rephrase that.

Did you have any preparation in the -- were you involved at all in the preparation of cost summaries for the Diablo Canyon ISFSI for costs related to the Diablo Canyon ISFSI?

MR. STOUCK: Okay. Now, I'll object to that on form and vagueness grounds, but you may



answer if you understand the question.

THE WITNESS: Let me repeat back. You're asking me if I contributed or had a role in the preparation of those items?

BY MR. EKMAN:

Q. Yes.

A. The answer is no.

Q. Did you contribute anything concerning the costs that were incurred or that are allegedly to be incurred for the Humboldt Bay ISFSI?

MR. STOUCK: I'll object again on form and vagueness grounds, but if you understand the question, you may answer.

THE WITNESS: Again, if you could repeat the question.

BY MR. EKMAN:

Q. Are you aware that Pacific Gas and Electric is seeking damages from the Federal Government based upon the breach of the Standard Contract between PG&E and the Department of Energy?

A. Yes.

Q. Do you know what the categories of damages, in other words, what kinds of activities PG&E is seeking compensation for?

A. Broadly, not specifically. I couldn't

list them for you.
Q. Do you know if PG&E is seeking damages related to the Diablo Canyon ISFSI?
A. Yes.
Q. And you didn't have any involvement in the preparation of any documents that summarized the costs associated with the Diablo Canyon ISFSI?
MR. STOUCK: Objection; form. It's vague, but you may answer.
THE WITNESS: I did not.
BY MR. EKMAN:
Q. Do you know if PG&E is seeking damages related to the Humboldt Bay ISFSI?
A. Yes.
Q. All right. And did you have any involvement in the preparation of cost summaries related to the damages or the costs that have been incurred for that project and that are alleged to be incurred in that project?
MR. STOUCK: Objection; form. It's vague, but you may answer.
THE WITNESS: No, I did not.
BY MR. EKMAN:
Q. Do you know if PG&E is seeking costs associated with SAFSTOR for the Humboldt Bay ISFSI



in this litigation?
A. Yes.
Q. Did you have any involvement in the preparation of cost summaries that showed costs that allegedly have been incurred and that are to be incurred by PG&E for Humboldt Bay SAFSTOR?
MR. STOUCK: Objection; form. It's vague, but you may answer.
THE WITNESS: No.
BY MR. EKMAN:
Q. Are you aware that PG&E -- do you know if PG&E is seeking any costs related to the removal of the stack, the vent stack at the Humboldt Bay facility?
A. Yes.
Q. Did you have any involvement in the preparation of costs that PG&E is seeking as damages for that activity?
MR. STOUCK: That is different than your prior questions and calls for work product, and I think I'll instruct him not to answer that one.
MR. EKMAN: Let me rephrase it.
BY MR. EKMAN:
Q. Did you have any involvement in preparation of cost summaries that allegedly showed



costs that PG&E incurred for that stack removal?
MR. STOUCK: That is objectionable on form grounds.
It's vague, but you may answer. These are fine points and I'm sorry.
THE WITNESS: No, I did not.
BY MR. EKMAN:
Q. Did you have any involvement in determining -- let me step back.
If I use the word "incremental," does that word have any meaning to you?
A. Yes, generally. It depends on the context it's used.
Q. Sure. Well, let me ask my question then, and if you don't understand it, I'll rephrase it.
Did you have any involvement in determining which costs PG&E incurred associated with the vent stack removal were caused or incremental or caused by or incremental to the Department of Energy's breach of the Standard Contract?
MR. STOUCK: Yeah, that's work product. That calls for work product, and I'll object and instruct him not to answer.
///



BY MR. EKMAN:
Q. Are you aware of whether PG&E is seeking all of its costs that it incurred in connection with the vent stack removal from the government in this litigation?
A. I don't believe PG&E is seeking costs -- the total costs to remove the vent stack.
Q. You understand they're only seeking a part of that cost?
A. Yes.
Q. Do you know what that part of that cost is supposed to represent?
MR. STOUCK: Objection; form. It's vague, but you may answer.
THE WITNESS: Broadly. Given the fact that the vent stack sat adjacent to the reactor building and the spent fuel pool, there were costs associated with its removal, principally in the form of additional safety measures that were required in order to prevent, you know, an interaction, dropping of materials onto the refueling building and potentially into the spent fuel pool. That would be incremental.
BY MR. EKMAN:
Q. Did you have any involvement in

determining which costs PG&E incurred for the project as a whole were related to the presence of spent nuclear fuel in the fuel pool?

MR. STOUCK: Again, that's been asked and answered and it calls for a work product answer. It does. It calls for information about how we went about preparing materials that are involved in this litigation, or it calls for expert testimony.

MR. EKMAN: Well, it might call for expert testimony. That's certainly true. You have a claim for, what is it, about 20 percent of the total vent stacks. Somebody made determinations as to what costs were incremental to the Department of Energy's breach or, to put a finer point on it, what costs were caused by the presence of spent nuclear fuel in the pool.

I get to ask witnesses if they had any role in determining whether costs that were incurred for a project were related to the presence of spent fuel in the pool. If I can't ask the witnesses, then I don't know who the heck I can ask.

MR. STOUCK: Well, there might be a way to get the information you're trying to get, but I don't think the pending question is a fair question



in light of the work product protection.

MR. EKMAN: We'll come back to that.

Q. Other than those three activities, do you do any other work for PG&E currently?

A. No, sir.

Q. All right. Now, this will take us back, then, to December of 2004?

A. Yes. I retired December 31st, 2004.

Q. What was your position at that time?

A. At the time I left, I was vice president, nuclear services.

Q. And how long had you had that position?

A. In one form or another since January 1st, 1995.

Q. And what were -- what was -- what were your responsibilities in that job?

A. The principal responsibility that remained unchanged through that period was for engineering associated with Diablo Canyon and, for the most part, Humboldt Bay and management development of large projects. An example of a large project is the ISFSI.

Q. And that would be the ISFSIs at both facilities?

A. That's right.



Q. You said "for the most part Humboldt Bay." What do you mean when you say "for the most part Humboldt Bay"?

A. Well, Humboldt Bay as a -- I'll call it a dual-use site. There was nuclear operations and fossil operations. Anything associated with engineering on the fossil operations I was not involved with.

Q. How many people reported to you?

A. I don't recall exactly, but, you know, through the course of 10 years, anywhere from maybe a low of 300 to a high of 600. And again, that's just a vague recollection.

Q. And what organizations were underneath you?

A. Engineering. I'm trying to think of what else. Projects, these major projects. Fuels. Fuel procurement. And there were a number of organizations that came and went depending on the period in that 10 years.

Q. All right. Prior to January 1st of '95, what was your role at PG&E?

A. Prior to that point in time I was -- in today's terminology, would be director of steam generation. Steam generation was the name PG&E had



given to its conventional gas and oil fire generation plus its geothermal generation.

Q. And how long did you have that position?

A. I had that position for just over three years. I believe it was October of '91 that I went into that position.

Q. As director, just generally, what was your responsibility -- responsibilities?

A. It was oversight of day-to-day operation of six PG&E facilities engaged in providing a sizable fraction of PG&E's daily electric needs.

Q. During this time period, did you have any role in the nuclear side of PG&E?

A. One role.

Q. What was that role?

A. I continued to be a part of the nuclear emergency response organization.

Q. And what is that organization?

A. It's an organization that, should circumstances warrant the declaration of an alert, a site area emergency or a general emergency, which are three of the four NRC emergency event classifications, that organization comes together to provide management support for the utilities' response to the emergency -- management and

A. Bachelor's was in '75.
Q. Master's?
A. '76.
Q. Do you have any other training, postgraduate training other than on-the-job training?
A. Again, you mean --
Q. Schoolwise?
A. Schoolwise? Again, I'm not sure what would fall under that category.
Q. Do you have any -- do you have any other degrees?
A. No, I do not.
Q. Have you attended any other classes at universities?
A. Yes.
Q. What kinds of coursework have you taken since?
A. I guess I'd call it management development, strategic management, you know, accounting.
Q. Where did you take those classes?
A. Interestingly enough, at Stanford.
Q. And would you -- did you take these classes just in connection with your employment to



become a better manager?
A. They were associated with my employment, yes.
Q. But they didn't result in any additional degrees?
A. No, they did not.
Q. Just to try to put a finer point on some of the issues we discussed or didn't discuss earlier relating to your work on this litigation, have you been retained as an expert witness in this case?
MR. STOUCK: That's not a fair question either, John. It's work product.
MR. EKMAN: I knew I was going to get an objection. I'm asking the question.
MR. STOUCK: I'll instruct him not to answer that. We will tell you who our experts are on the required disclosure date with enthusiasm.
MR. EKMAN: Sure.
Q. What I'd like to do, I think, based upon your time period of employment, is really go back into the time January of '95 to December of 2004 when you were vice president of nuclear services and talk about what your involvement may have been in a variety of projects that were occurring at the



nuclear facilities of PG&E.
Did you have any role in decision-making concerning spent nuclear fuel management at Diablo Canyon during that time period?
MR. STOUCK: Form. It's vague, but you may answer.
THE WITNESS: I'd ask you to give me an example of what "role" means there.
BY MR. EKMAN:
Q. All right. Were you involved in the decision-making process concerning the implementation of dry storage at Diablo Canyon?
A. Yes, I was.
Q. And what was your involvement in that?
A. My role was to see that the options available were thoroughly analyzed, to prepare associated analyses and recommendations to PG&E senior management for their selection or approval.
Q. And how did you make sure that the options that were available were thoroughly analyzed by your folks?
A. That's a very broad question.
Q. It is.
A. I'd suffice to say using an engineer's skills and understanding how to address the breadth



of a technical issue.
Q. When you say options available, what options are you referring to?
A. Principally dry cask storage or additional wet storage. And those would be beyond really the expectation of the contract beginning in 1998.
Q. What do you mean by that?
A. You asked what options. What I meant to say is there were two options, two principal options beyond that dictated in the contract, the responsibility of the Department of Energy is what I meant.
Q. Sorry. It was imprecise. When you say beyond the expectation of the contract, what did you mean when you said that?
MR. STOUCK: I thought he just answered that.
THE WITNESS: Yeah, I think simply as I said. Was my understanding, still is my understanding that the Department of Energy had an obligation commencing in 1998. So beyond that obligation.
MR. STOUCK: I think what he -- correct me if I'm wrong, but I think what he's saying is that another option was for DOE to remove the fuel.

A. Yes, I do.
Q. Was the idea that there was a possibility that -- during this time period -- let me rephrase that.
During this time period, were you aware that PG&E might seek recoupment of its costs associated with the ISFSI from the Department of Energy?
A. As this indicates, we did talk about mechanisms to collect moneys and what all those alternatives were, that being one example.
Q. All right. And this relates to ISFSI construction. Do you recall in this time period or -- well, let's leave it at this time period -- whether the possibility that DOE would be asked to pay for ongoing O&M costs for Humboldt Bay was discussed?
A. I really don't recall.
Q. How about after this time period at any time in which you worked at --
A. I don't recall that. In fact, this is informative. I had forgotten that this was even considered.
(Exhibit 12 was marked for identification.)



BY MR. EKMAN:
Q. Mr. Womack, I'm handing you Exhibit 12 to your deposition, which is a document entitled: Humboldt Bay Power Plant Removal of Ventilation Stack, Incremental Cost Due to Fuel in Pool, Cost Estimate April 2005.
And I'll represent to you this is a document we were provided by counsel from PG&E in connection with this litigation.
Have you ever seen Exhibit 12 before?
A. I may have. You said this is part of the --
Q. This was part of the --
A. -- of the complaint or --
Q. It was part of the initial disclosures. It's a mechanism that the court sets up so the defendant -- and actually so the plaintiff can understand what the defenses are and the defendant can understand what the claim is and I'm being very general there.
A. Okay.
Q. Anyway, we were provided this by counsel for PG&E in connection with that procedural mechanism. And I just want to know if you've seen this before.



A. I may have. I don't recall looking at it in any detail or reading through it.
Q. And I know I asked you this before, but with this document in front of you, I want to ask it again.
Did you have any involvement in the collection of these invoices and the determination that they were incremental costs due to fuel in the pool?
MR. STOUCK: John, I think we have the same problem. I want to be consistent here. I think the answer to that question is work product.
MR. EKMAN: Well, it can't be work product.
MR. STOUCK: Why not?
MR. EKMAN: Because I'm entitled to know if he picked out -- was involved in picking out these invoices and deciding whether they were caused by the presence of fuel in the pool. And if he was involved in that, I'm entitled to go through each of those invoices and ask how he knew that invoice X or Y was incremental or was caused by fuel in the pool.
MR. STOUCK: If this, as you represented, is a document that's part of the litigation



materials, I don't think you're entitled to inquire as to its origin.
Again, there are certainly questions you can ask about the invoices and whatnot, but --
MR. EKMAN: Well, before I go down the road of asking him, there is a yes or no question. And I'm not sure the yes or no question -- the answer is privileged in any way.
MR. STOUCK: What's the question? Was he involved in preparing this?
BY MR. EKMAN:
Q. Were you involved in the collection of these invoices -- you see there's P.O. numbers. Were you involved --
MR. STOUCK: If you stop there, that's a good question, but the determination about incremental cost I think is part of somebody's preparation of the claim.
MR. EKMAN: Well, though -- well, let me start there.
BY MR. EKMAN:
Q. Were you involved in the collection of these invoices related to the vent stack project?
MR. STOUCK: You can answer that.
THE WITNESS: No.

BY MR. EKMAN:
Q. Do you actually know if you've ever even seen any of these invoices? I know I haven't given you any of the invoices, but would you have even seen in your capacity as vice president these types of invoices?
A. Probably not, based on their size.
Q. Again, I think I asked this, but I want to make sure I've tied it up. Were you involved at all in determining what costs were incurred by PG&E because of the presence of spent fuel in the pool?
MR. STOUCK: Hold on one sec. That's okay. You can answer that.
THE WITNESS: So my repeat back, was I involved --
MR. STOUCK: It's not necessarily related to this exhibit, as I understand the question.
MR. EKMAN: No. Just in general. Can you read it back. (No read back performed.)
Q. Were you involved at all in determining what costs were incurred by PG&E because of the presence of spent fuel in the pool?
THE WITNESS: No.
(Exhibit 13 was marked for identification.)



BY MR. EKMAN:
Q. Mr. Womack, I'm handing you Exhibit 13, which is a document entitled: Humboldt Bay Power Plant Unit 3 SAFSTOR Cost Estimate, April 2005 and as with the other document, I'll represent to you that this is a spreadsheet that we received in connection with this litigation from plaintiff's attorneys, from PG&E counsel.
Have you ever seen this document before?
MR. STOUCK: Excuse me for one second. What was the representation?
MR. EKMAN: This was something received by us from PG&E's counsel.
THE WITNESS: So have I ever seen this, no.
BY MR. EKMAN:
Q. Were you asked to collect any cost information, any past cost information relating to Humboldt Bay Unit 3 SAFSTOR -- and by past I mean costs of 2004 and before?
MR. STOUCK: I'll object to form. It's vague and it may call for work product, but it may not. I can't tell from the question. You can answer, if you know, if you have an answer.
THE WITNESS: No, I didn't provide any of



this data, to the best of my knowledge.
BY MR. EKMAN:
Q. And you see -- you will note that there is costs that are 2005 and after. I'll give you an example. Line 23, Warehouse HBPP Nuclear PCC.
Do you see that?
A. Yes.
Q. You said that you didn't have any responsibility for any of the costs and my question was specifically the ones prior to 2004. Did you provide any estimates of future costs associated with Humboldt Bay SAFSTOR in connection with this case?
MR. STOUCK: Objection; form. It's vague, but you can answer.
THE WITNESS: No.
(Exhibit 14 was marked for identification.)
BY MR. EKMAN:
Q. Mr. Womack, I've handed you what's been marked as Exhibit 14, which is a cost estimate also dated April 2005, this time for the Independent Spent Fuel Storage Installation Licensing Fabrication and Construction. And as with the others, I'll represent to you that that was a



document that we were provided by counsel for PG&E.
Have you ever seen Exhibit 14 before?
A. No.
Q. In connection with this case, were you asked to collect any past cost information relative to specific activities associated with the Humboldt Bay ISFSI -- and by past I mean 2004 and earlier?
MR. STOUCK: Objection; form. It's vague, but you can answer.
THE WITNESS: No.
BY MR. EKMAN:
Q. And then you'll see there are future costs -- I'll give you an example. Line -- let's see, line 19, which are costs that begin in 2010. It's entitled: PG&E/contract oversight operations of ISFSI.
Do you see that?
A. I do.
Q. And that's just an example, but did you provide any cost estimates for activities that would be engaged in in the future at the Humboldt Bay ISFSI?
MR. STOUCK: Objection; form. It's vague, but you may answer.
THE WITNESS: No, I did not.

# EXHIBIT H

# CONDENSED TRANSCRIPT & WORD INDEX

## DEPOSITION OF ROBERT KAPUS

## PG&E VS. UNITED STATES

## SEPTEMBER 28, 2005

COPY

BARKLEY Court Reporters

(310) 207.8000 Los Angeles
(949) 955.0400 Orange County
(415) 433.5777 San Francisco
(916) 922.5777 Sacramento
(408) 885.0550 San Jose
(951) 686.0606 Inland Empire
(818) 702.0202 San Fernando Valley
(858) 455.5444 San Diego
(760) 322.2240 Palm Springs

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---o0o---

PACIFIC GAS & ELECTRIC COMPANY, )
Plaintiff, )
vs. ) Case No.
) 04-0074C,
THE UNITED STATES, ) Consolidated
) into 04-0075C
Defendant. )

---o0o---

WEDNESDAY, SEPTEMBER 28, 2005

DEPOSITION OF ROBERT KAPUS

VOLUME I

---o0o---

REPORTED BY: BALINDA DUNLAP, CSR 10710, RPR, CRR, RMR



APPEARANCES

---o0o---

FOR THE PLAINTIFF:

GREENBERG TRAURIG
800 Connecticut Avenue, N.W., Suite 500
Washington, D.C. 20006
BY: ROBERT L. SHAPIRO, ESQ.
JERRY STOUCK, ESQ.

FOR THE DEFENDANT:
U.S. DEPARTMENT OF JUSTICE CIVIL DIVISION
1100 L Street, N.W., Room 12020
Washington, D.C. 20530
BY: SCOTT DAMELIN, ESQ.
JOHN EKMAN, ESQ.

ALSO PRESENT:

Jon Couchman, VERIS Consulting, LLC



INDEX

---o0o---

| EXAMINATION | PAGE |
|---|---|
| EXAMINATION BY MR. EKMAN | 5 |

EXHIBITS

—o0o—

| DEFENDANT'S | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Document entitled "Humboldt Bay Power Plant Removal of Ventilation Stack Incremental Costs Due to Fuel in Pool" dated April 2005 | 47 |
| 2 | Document entitled "HBPP SAFSTOR Damages Prior to expert Analysis/Initial Disclosures" dated April 22, 2005 | 101 |
| 3 | Two-page spreadsheet entitled "Humboldt Bay Power Plant Unit 3 - SAFSTOR Cost Estimate" dated April 2005 | 101 |
| 4 | Document entitled "Pacific Gas and Electric Company Spent Nuclear Fuel Litigation Matter Cost Analysis Documentation" | 142 |
| 5 | Six pages of SAP printouts | 158 |
| 6 | Document entitled "HBPP ISFSI Damages Prior to Expert Analysis/Initial Disclosure" dated April 22, 2005 | 160 |
| 7 | Spreadsheet entitled "Humboldt Bay Power Plant Independent Spent Fuel Storage Installation Licensing/Fabrication/Construction Cost Estimate" dated April 2005 | 160 |
| 8 | Document entitled "HBPP ISFSI" | 169 |
| 9 | Two pages of SAP printouts | 179 |
| 10 | Document entitled "Pacific Gas and Electric Company Spent Nuclear Fuel Litigation Matter Cost Analysis Documentation HBPP ISFSI Non-Labor | 182 |



| | | |
|---|---|---|
| 11 | Document entitled "Supplemental Page Cost and Accounting Detail Sheet" | 194 |
| 12 | Meeting Minutes HBPP Decommissioning Feasibility dated November 21, 1995 | 211 |
| | E-mail from David Sokolsky to various people dated 12/27/95 | 211 |
| 13 | E-mail from David Sokolsky to various people dated 12/27/95 | 213 |
| 14 | E-mail dated 1/15/96 | 216 |
| 15 | Document entitled "Economic Evaluation Humboldt Bay Power Plant Dismantlement of Unit 3" | 216 |
| 16 | E-mail from Robert Kapus to Julia Angel dated 6/6/96 | 222 |
| 17 | E-mail with attached document entitled "Humboldt Bay Power Plant Nuclear Unit 3 Decommissioning PG&E Utility Policy Committee Briefing Book Draft" dated June 14, 1996 | 223 |
| 18 | E-mail with attached document entitled "DECON Cost Study" | 223 |
| 19 | Four pages of SAP printouts | 224 |

categories and see that there's more money in one category over another category. But I am just wondering more generally if you can tell me why there would be differences between Exhibit 3 and Exhibit 2, if you know?
A. Well, I notice that the numbers from 1999 through, looks like 2005, are exactly the same.
Q. Right.
A. And that it is numbers in the future that are different.
Q. Do you know why that is?
A. It could be an escalation issue, is my -- would be my assumption.
Q. Do you know if Exhibit 3 was used to generate Exhibit 2?
A. I believe so, yes.
Q. Were you asked to provide information in connection with preparation of the initial damages disclosures relating to the Humboldt Bay SAFSTOR costs?
A. Yes.
Q. Who asked you to provide that information?
MR. SHAPIRO: Objection. I am going to instruct Mr. Kapus not to answer that question. Implicates attorney-client privilege.
Q. BY MR. EKMAN: Did your attorneys ask you to prepare that, as implicit in the objection?

Page 109

MR. SHAPIRO: Again, I am going to instruct Mr. Kapus not to answer.
MR. EKMAN: I don't think who asked him is privileged. Certainly implicit in an attorney-client privilege instruction would be that the attorneys had some involvement. Perhaps I suppose the experts did.
Q. Do you know who prepared Exhibit 2?
A. Charles River.
Q. Who is Mr. River?
A. It is a company. Charles River Associates, I believe.
Q. And who are they?
A. An independent company that's providing these kind of documents.
Q. All right. Let's just get this out of the way. Have you spoken with anyone who you understand to be -- who you understand is going to be designated as a testifying expert in this litigation?
A. No.
Q. Have you spoken with folks at Charles River Associates?
A. Yes.
Q. How many times?
A. Often. I mean, 20, 30 times.
Q. Since early 2005?

Page 110

A. Yes.
Q. What are the -- I don't want to know 20, 30 conversations, obviously, but what in general do you all talk about?
MR. SHAPIRO: I am going to instruct Mr. Kapus not to answer that on the work product privilege.
MR. EKMAN: And obviously -- I expected that. Obviously if there is a testifying expert that's identified and the testifying expert states that he's had communications with Mr. Kapus, you know, we are going to reserve the right to call Mr. Kapus back and talk to him about those communications. The communications of a testifying expert are not privileged.
I am not interested, however, in Mr. Kapus's conversations with nontestifying experts. I want to make that clear for the record.
But with respect to testifying experts, you know, obviously that's a different issue from our perspective, and we are going to reserve that right.
Q. Let's talk about -- I am not really interested in Exhibit 2 since you didn't prepare it. What I am interested in is Exhibit 3. So let's talk about Exhibit 3.
The first issue I want to understand is the numbers that appear in the column A and column B. Based on our earlier conversation, column B, in parens, are the cost

Page 111

center numbers?
A. That's correct.
Q. What are the numbers in column A?
A. The actual SAP order numbers.
Q. All right. Now, how did you -- let's start with "Engineering" just as an example. How did you generate -- how would you generate the past cost for that particular SAP order number?
A. You can run SAP order reports that will give you that information for that order year by year.
Q. And how do you know that SAP order number relates to SAFSTOR at Humboldt Bay?
A. Each order number is identified to a particular provider cost center, and a provider cost center in this case would be unit 3. Therefore, only charges in that order would only be charged for that facility.
Q. So for past costs, then, for example, for "Engineering," is simply a process of pulling that past information of actual incurred costs from the SAP system?
A. That's correct.
Q. Nothing more complicated than that?
A. That's correct.
Q. And I talk about "Engineering." Is that true for all of the categories that are on this Exhibit 3?
A. Yes, it is.

Page 112