# EXHIBIT E

# CONDENSED TRANSCRIPT & WORD INDEX

## DEPOSITION OF CHRIS WARNER

## PG & E VS. UNITED STATES

## AUGUST 3, 2005

COPY

BARKLEY
Court Reporters

(310) 207.8000 Los Angeles
(949) 955.0400 Orange County
(415) 433.5777 San Francisco
(916) 922.5777 Sacramento
(408) 885.0550 San Jose
(951) 686.0606 Inland Empire
(818) 702.0202 San Fernando Valley
(858) 455.5444 San Diego
(760) 322.2240 Palm Springs

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

PACIFIC GAS & ELECTRIC )
COMPANY, )
)
) No. 04-0074C, into
Plaintiff(s), ) which has been
) consolidated No.
vs. ) 04-0075C
)
THE UNITED STATES, ) Volume I
)
) Pages 1 to 203
Defendant(s). )
)

----

DEPOSITION OF CHRISTOPHER WARNER
Held at Pacific Gas and Electric Company
77 Beale Street
San Francisco, California
Wednesday, August 3, 2005, 1:09 p.m.

----

REPORTED BY: James Beasley, CSR No. 12807



APPEARANCES

For the Plaintiff(s):
GREENBERG TRAURIG
BY: JERRY STOUCK
800 Connecticut Avenue, NW, Suite 500
Washington, DC 20006
202.331.3173
Fax: 202.261.4751
stouckj@gtlaw.com

For the Defendant(s):
U.S. DEPARTMENT OF JUSTICE
BY: JOHN C. EKMAN
SCOTT DAMELIN, Co-counsel
SHARON A. SNYDER, Co-counsel
1100 L Street, NW Room 7013
Washington, DC 20530
202.353.0897
Fax: 202.307.0972
john.ekman@usdoj.gov



INDEX OF EXAMINATIONS

EXAMINATIONS PAGE
MR. EKMAN 6

INDEX OF EXHIBITS

NO. DESCRIPTION PAGE
1 ACORD HLW Goals for Mid-1993, six pages 120
2 Letter from Christopher Warner to Ms. Beth Tomasoni dated March 14, 1997, nine pages 124
3 Letter to Beth Tomasoni from Christopher Warner dated August 4, 1997, three pages 136
4 Private Fuel Storage Facility Financial Analysis Mescalero Apache Tribe, Northern States Power date March 1994, 16 pages 150
5 Private Fuel Storage Facility Financial Analysis dated December 20, 1994, 10 pages 151
6 Outline of Issues Relating to Development of Private Fuel Storage Facility, 30 pages 155
7 Letter to Scott Northard from Chris Warner dated September 30, 1994, three pages 158
8 Business Plan dated December 20, 1994, 63 pages 160



INDEX OF EXHIBITS CONTINUED

9 Matrix Environmental Planning Memo to mand from Ernie Ralston dated July 25, 2000, three pages 183
10 Memorandum to Nuclear Business and Financial Management, et al., from Nuclear Operations Support dated April 23, 1990, eight pages 188
11 E-string, the first of which listed is from Karen Forsgard to many dated January 9, 1998, two pages 195
12 Handwritten notes, three pages 196
13 Utility Lawsuit Over Nuclear Waste Site, four pages 197
14 Brain Storming Session on Doe Notice of Inquiry, one page 198
15 Letter to Kent Christman at Mellen Bank dated September 4, 1998, three pages 199

QUESTIONS WITNESS WAS INSTRUCTED NOT TO ANSWER

PAGE LINE
Q. Do you recall specifically what documents you looked at? 9 10

analysis, in and of itself, I wouldn't have played any role in that it was a technical evaluation of technical feasibility. In terms of the licensing or license ability of the reracking, I would have had strictly a legal role.
Q. And would you consider advice that you provided in connection with that licensing to be privileged?
A. Yes.
Q. Do you recall who headed the study concerning reracking at Diablo -- the possibility of reracking at Diablo Canyon?
A. It may have been Mr. Womack.
Q. Does the name Mark Smith mean anything to you?
A. I recall there was a Mark Smith who worked at Diablo canyon. I don't remember exactly what his role was.
Q. Mr. Womack would probably be the person to talk to about that?
A. Yes.
Q. Were you involved at all in the decision to construct dry storage or to proceed toward the construction of dry storage at Diablo Canyon?
A. Yes, in the sense that the tail end of my



period advising on nuclear legal issues coincided with starting to consider dry cast storage versus reracking versus something else.
Q. And would your involvement have been strictly legal?
A. It was legal in commercial, but nonlegal, if you want to call it that, to the extent we would also be looking at the DOE program, the DOE contract and whether DOE was likely to fulfill its obligation.
Q. And was that business or legal?
A. Well, mixed, because as you can imagine, advice regarding potential breach or breach or remedies or legal remedies all during that period would have been legal advice.
Q. Were you involved at all in the ultimate business decision as to whether to proceed with the reracking alternative or to proceed with the dry storage alternative?
A. Not really. In terms of choosing between those two alternatives, I would not have been involved in the business decision. I could have -- at the beginning of that process I probably was involved in just providing general legal advice on licensability of one versus the other and



researching the licensability and things like that, but not in the decision as between the two.
Q. Are you familiar with the term "decommissioning study"?
A. Yes.
Q. And do you know what a decommissioning study is?
A. Yes.
Q. What is a decommissioning study, in your own words?
A. Well, there are two aspects. In my own words, one is a periodic update on decommissioning costs and sufficiency for the NRC as part of the license conditions; and the second is a rate-making concept which is a decommissioning study submitted to the California Public Utilities Commission in support of the current rates we charge to fund the decommissioning funds for both Humboldt and Diablo Canyon.
Q. Did you have a role in the preparation of decommissioning studies?
A. I had a traditional role while I was in the nuclear counsel job in reviewing the studies as they came to finality. I would not have participated as directly in the drafting or



preparation.
Q. And why would you review decommissioning studies, drafts?
A. To the extent they were submitted to the CPUC as part of a legal regulatory proceeding, I would be a reviewer; to the extent it might have been submitted to the NRC in a formal letter given the importance of that from the standpoint of decommissioning funds sufficiency, I probably would have reviewed it.
Q. Did you have any role in determining what assumption should be used in the decommissioning studies?
A. No, not directly. I would have a role in reviewing the document from a legal and regulatory credibility standpoint.
Q. If you saw something that dealt with the legal side of these studies and how they're used that was incorrect, would you have made efforts to have them correct it?
A. Yes.
Q. If you saw anything that was -- that you knew from a business standpoint, nonlegal standpoint that looked incorrect, would you flag that issue with somebody to make sure it was

accurate?
A. If it affected the legal or regulatory credibility.
Q. Would you agree with the statement -- I'll just say this statement. It's important that the information provided to regulatory bodies is as accurate and complete as possible. Would you agree with that statement?
A. Yes.
Q. Is -- are these decommissioning studies ultimately used as evidence or used as evidence in the rate-making proceedings?
A. Yes.
Q. And they're ultimately used on behalf of PG&E's rate filing?
A. Yes.
Q. Do you know who, nonlegal, was responsible for the oversight of decommissioning studies, say, beginning when you began?
A. Right. No, because I think it would have been various people. To the extent it was an NRC submittal, you'd have your NRC regulatory folks that would review plus the subject matter experts within the nuclear power generating business unit. And I couldn't tell you who that would be.



To the extent these decommissioning studies were part of a rate filing at the California Public Utilities Commission, then the attorney and the regulatory project manager as wells as any witnesses sponsoring testimony in support of the rate-making would be responsible for reviewing them.
So over a period of time there would be different people at different times for different filings.
Q. Did you have any involvement in the 2002 Nuclear Decommissioning Cost Triennial Proceeding?
A. I would have been -- had a general supervisory role over the attorney or attorneys who would have submitted that filing and litigated that filing for the CPUC.
Q. But it would have been strictly in an oversight capacity?
A. That's correct.
Q. Are you familiar with an entity called "NEI"?
A. Yes, I am.
Q. And what is NEI?
A. I believe it is the Nuclear Energy Institute.



Q. What's its role?
A. It's a trade and technical and lobbying organization comprised, I think, mainly of nuclear utilities and nuclear industry entities.
Q. Do you participate in NEI?
A. Not currently. When I was in my role as the chief nuclear counsel, I would participate on the NEI lawyers committee.
Q. And what's the purpose of the NEI lawyers committee?
A. Mainly to monitor legal issues associated with the nuclear industry; develop joint positions as appropriate.
Q. Have you ever heard of an entity called -- I think it's called the Nuclear Utility Group or NUG?
A. No.
MR. STOUCK: NUG?
THE WITNESS: It is not an attractive acronym.
MR. EKMAN: It's not. Mark that.
(Exhibit 9 was marked for identification.)
BY MR. EKMAN:
Q. Mr. Warner, I've handed you what's been



marked as Exhibit 9, which is a memo entitled, "Matrix Environmental Planning" dated July 25, 2000; Subject: Humboldt Power Plant ISFSI Project."
A. Right.
Q. This document, as you can see on the first page, has been redacted.
Do you see that?
A. Yes, I do.
Q. There are two names that are redacted.
Do you see that?
A. Yes, I do.
Q. I'll represent to you that the reason I was able to pull this document for your deposition is because we were provided with an index that indicated you were a copy on this or at least you were an addressee on this document and the redaction appears to -- on the right appears to say "Chris Warner."
My question is -- and this really follows up on some of the earlier questions I was asking you. For something like this -- and feel free to look at it as much as you want -- is the fact that you received this document, do you consider that to be privileged?

# CONDENSED TRANSCRIPT & WORD INDEX

## DEPOSITION OF CHRIS WARNER, VOL. II

**PG & E VS. UNITED STATES**

**AUGUST 4, 2005**

COPY

BARKLEY
Court Reporters

(310) 207.8000 Los Angeles
(949) 955.0400 Orange County
(415) 433.5777 San Francisco
(916) 922.5777 Sacramento
(408) 885.0550 San Jose
(951) 686.0606 Inland Empire
(818) 702.0202 San Fernando Valley
(858) 455.5444 San Diego
(760) 322.2240 Palm Springs

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

PACIFIC GAS & ELECTRIC )
COMPANY, )
)
) No. 04-0074C, into
Plaintiff(s), ) which has been
) consolidated No.
vs. ) 04-0075C
)
THE UNITED STATES, ) Volume II
)
) Pages 204 to 296
Defendant(s). )
)

----

DEPOSITION OF CHRISTOPHER WARNER
245 Market Street, Room 1402
San Francisco, California
Thursday, August 4, 2005, 8:21 a.m.

----

REPORTED BY: James Beasley, CSR No. 12807



APPEARANCES

For the Plaintiff(s):
GREENBERG TRAURIG
BY: JERRY STOUCK
800 Connecticut Avenue, NW, Suite 500
Washington, DC 20006
202.331.3173
Fax: 202.261.4751
stouckj@gtlaw.com

For the Defendant(s):
U.S. DEPARTMENT OF JUSTICE
BY: JOHN C. EKMAN
1100 L Street, NW Room 7013
Washington, DC 20530
202.353.0897
Fax: 202.307.0972
john.ekman@usdoj.gov



INDEX OF EXAMINATIONS


| EXAMINATIONS | PAGE |
|---|---|
| MR. EKMAN | 208 |


INDEX OF EXHIBITS


| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 16 | Draft Used Fuel Storage, one page | 208 |
| 17 | Civilian High-Level Waste Program, three pages | 211 |
| 18 | Memorandum to Nuclear Safety Assessment and Regulatory Affairs, et al., from Nuclear Operations Support dated June 3, 1991, one page | 215 |
| 19 | Memorandum to Various from Manager, Nuclear Operations Support dated August 25, 1992, six pages | 218 |
| 20 | Memorandum to Various from Nuclear Operations Support dated August 25, 1992, two pages | 222 |
| 21 | E-mail to many from Suresh dated June 30, 1995, two pages | 226 |
| 22 | Memorandum to Various from Senior Vice President and General Manager - Nuclear Power Generation dated August 27, 1996, 22 pages | 229 |
| 23 | E-mail string, the first of which listed is to Bruce Patton from Patricia Melendres-Keller undated, seven pages | 237 |
| 24 | High-Level Nuclear Waste Workshop package, 23 pages | 239 |




INDEX OF EXHIBITS CONTINUED


| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 25 | Draft Agenda, High-Level Waste/Low-Level Waste Strategy Meeting, 21 pages | 243 |
| 26 | Reracking Alternative Spent Fuel Storage Diablo Canyon Power Plant Overview (Draft) dated April 4, 1995, 12 pages | 246 |
| 27 | Letter to David Oatley dated September 7, 1990, five pages | 248 |
| 28 | E-mail to many from Chris Warner dated April 22, 1992, one page | 252 |
| 29 | Meeting Announcement dated April 22, 1992, five pages | 255 |

BY MR. EKMAN:
Q. I've handed you Exhibit 18, which is a letter dated June 3rd, 1991 from Jeffrey Gardner to several addressees, including Mr. Locke, who's in your department.
A. That's correct.
Q. Who is Mr. Gardner?
A. I believe that Mr. Gardner's position was in the operational side of the Diablo Canyon Power Plant at that time.
Q. And I see at the bottom in the cc's that you are copied on this?
A. Yes.
Q. And is this something you would have been copied on if one of your underlings was on the --
A. Yes, generally.
Q. I just want to direct your attention to the last paragraph of this letter. It says:
"The purpose of the June 24 meeting is to explore the issues and options associated with long-range spent fuel storage plans at DCPP and to identify the organizational responsibilities and interfaces needed to address these issues."

Page 216

Do you see that language?
A. Yes, I do.
Q. What would -- what would the role of legal have been in connection with this type of meeting regarding Diablo Canyon?
A. Certainly to provide legal advice on licensing or litigation or legal issues associated with various long-term storage options for the plant. In addition, to the extent that this meeting was, in effect, contingency planning for the possibility that DOE would not meet the 1998 date and would breach the contract, we would of course be providing general legal advice associated with the Standard Contract.
Q. And at such a meeting -- well, let me ask it more broadly.
In connection with Diablo Canyon spent fuel storage, there are issues that are beyond legal that are relevant to storage considerations, like technical issues?
A. Yes.
Q. Feasibility issues?
A. Yes.
Q. And of course, legal, regulatory and licensing issues?

Page 217

A. Yes.
(Exhibit 19 was marked for identification.)
BY MR. EKMAN:
Q. This is Exhibit 19, which is a memo dated August 25, 1992 regarding spent fuel storage action plan development. It's from John M. Gisclon, G-i-s-c-l-o-n, to a variety of recipients, and you are listed as a cc on this letter.
A. Yes.
Q. First of all, are there any lawyers in the recipient line?
A. No, there are not.
Q. What is Mr. Gisclon?
A. Based on my recollection, he was in our nuclear operations support area and was a -- an engineer with design basis and technical specifications expertise.
Q. The reason I'm showing you this is I'm -- since you did receive it, let me ask, are you familiar -- you're familiar with Pacific Gas and Electric document format?
A. Yes, I am.
Q. Can you look at the attachment to this letter -- or memo. It's entitled, "NPGBU Issue

Page 218

Spent Nuclear Fuel Storage and Disposal." The first page has a validator, GMR.
A. Right.
Q. Is that Mr. Rueger?
A. Yes, it is.
Q. And there's an initiator, which is DOD and RWL. Do you know who those folks are?
A. Yes. They're staff personnel under Mr. Gisclon in the nuclear operation support, or were at the time. One is David L. Duke and the other is, I believe, Robert Lorenz.
Q. And what is an initiator?
A. I'm not so sure this format was used all that consistently across the business unit or even for any long period of time. But I think the initiator would be typically the staff persons preparing the memorandum.
Q. And the validator would be their supervisor?
A. Well, not strictly. The validator might be the utility decision-maker, such as an officer or senior officer such as Mr. Rueger.
Q. Do you know what NBGU stands for?
A. Yes, nuclear power business generation unit.

Page 219

and feasibility design base analysis would most likely be the ones that would have the knowledge.
Q. And if you look at the reracking feasibility study, or this status --
A. Yes.
Q. -- it appears to be focused upon the technical side of feasibility as opposed to, say, the licensing side of feasibility.
A. That's correct.
Q. That is whether the Diablo Canyon wet pools can actually have a rerack performed in them?
A. Yes. This appears to me to be strictly an engineering and technical feasibility analysis as opposed to factoring in other matters.
Q. And since that's the case, can you tell me why you and Mr. Locke would have been copied on this kind of technical status update?
A. Again, very broadly, it's difficult to separate technical analysis of projects for a nuclear power plant that are known to require licensing by the NRC or require contracts or other types of legal documents.
And so very typically the engineering groups would cc we lawyers just to be sure that as the project moves forward, we're most knowledgeable

Page 228

about the technical and business and economic feasibility aspects.
Q. At this time Diablo Canyon is not proceeding with a full scale reracking of its wet pools; is that right?
A. I'm not familiar with where we are currently.
Q. So do you know when your involvement in this issue area would have stopped?
A. Probably in that phasing out of my role in the 2000/2001 time frame and the transition to Mr. Manheim.
Q. So Mr. Manheim would now have -- be getting copies presumably on the things you were getting copied on?
A. Yes.
(Exhibit 22 was marked for identification.)
BY MR. EKMAN:
Q. I've handed you what's been marked as Exhibit 22, which is a draft letter dated August 27th, 1996 to a variety of people, including you, with Mr. Rueger's -- at least a place for Mr. Rueger's signature on the second page.
Have I correctly identified the document?

Page 229

A. Yes, you have.
Q. And there's an attachment to the document -- actually, there's several attachments to the document concerning spent fuel management issue areas identified and then a financial analysis.
A. Yes, I see that.
Q. All right. This would have been the time period where you would have been involved in spent fuel management issues?
A. Yes.
Q. In the first sentence it says:
"The spent fuel management plan presented to the management committee in June 1995 set a milestone at the end of 1997, at which time a recommendation would be made regarding which on-site storage option should be pursued.
Would you have been -- do you recall any meeting with the management committee?"
A. Yes, I do.
Q. In the 1995 time frame?
A. Yes, I do.

Page 230

Q. And was there a spent fuel management plan that was presented to the committee?
A. I would expect there would have been.
Q. Would you have participated in the preparation of that spent fuel management plan?
A. Yes.
Q. Would that spent fuel management plan have had legal components to it?
A. Yes. I mean, in terms of whether the document had legal components in it, I couldn't say. But yes, there would have been legal advice provided as part of the development of that plan and the review of it by the management committee of that plan.
Q. And there also would have been nonlegal business issues?
A. That's correct.
Q. And they would have been embodied in that plan too?
A. Yes.
Q. And let me ask. As a matter of practice, if you can answer as a matter of practice, did legal do -- for the management committee, would legal prepare strictly legal documents to give to the management committee in connection with

Page 231

Q. And you think you would have been there?
A. I think I probably would have been there.
Q. There is a project -- if you go back a little bit in the document, there's what's called a "Project Analysis Model."
A. Yes, I see that.
Q. And with Project it says, "Dry Storage-Base Case." There's "Dry Storage - Pessimistic. Dry storage - Optimistic."
I've seen a lot of these types of financial analyses in the documents that were produced to the government.
And what I would like to know is: Do you know who is responsible for putting together these types of financial analyses, net present value analyses for long-term storage options?
A. Generally there's -- inside the business unit there would be an economic or business analysis group, and that group would be responsible for furnishing a business case analysis that would justify or would not justify various major capital projects.
Q. During this time period, who would have been at the head of that office?
A. Mr. Charles Bangert, B-a-n-g-e-r-t.



Q. And he would have been responsible for these types of analyses?
A. Yes.
Q. Do you know who currently is in that office?
A. No, I do not.
Q. Are you familiar with something called the high-level waste core team?
A. No, not directly. Again, if you showed me a document with membership or charter, I may be able to recall.
(Exhibit 23 was marked for identification.)
BY MR. EKMAN:
Q. I've handed you what's been marked as Exhibit 23. Exhibit 23 is an e-mail string with some attachments. The first e-mail mentions what's called the HLW core team, and core team members include a variety of people, including you?
A. Yes.
Q. Does this refresh your recollection as to what the HLW core team was?
A. Yes, it does.
Q. What was it?
A. It was generally a core team for project



management for moving forward with spent fuel storage contingency plans and projects.
Q. And what was your role in the core team?
A. Provide legal and nonlegal advice.
Q. The same as we've discussed?
A. Yes.
Q. And if you go back, in this exhibit -- it's Bates No. 6286 -- there's a summary of a meeting, again, with a variety of attendees listed.
A. Yes, I see that.
Q. Including you?
A. Yes.
Q. Is this meeting related to the core team?
A. I believe it is, although I think what you would see typically is that you might have a core team, but you have a more informal set of working group personnel who at any given time would get together to work on project matters.
Q. Now, would the core team have been involved in both Humboldt Bay and Diablo Canyon?
A. Technically they would, but given that Humboldt Bay also had different management and different circumstances, there would be additional folks involved for Humboldt Bay as well, at least that would be my recollection.



Q. In the summary under the agenda, there's a document reference called an objective statement for the management committee.
Do you see that?
A. Yes, I do.
Q. Do you know, sitting here, what that document was?
A. No, I don't recall. I think typically what would occur is that a group like this would help draft a management committee presentation and the presentation leader in Power Point or in text would include various components.
Q. And Mr. Patton, it appears, prepared the notes of this meeting. What was Mr. Patton's role?
A. Mr. Patton had initial project management responsibilities associated with the Diablo Canyon and possibly Humboldt components.
(Exhibit 24 was marked for identification.)
BY MR. EKMAN:
Q. I've handed you Exhibit 24, which is a document which, at least the one I'm handing you, has a cover page called the "High-Level Nuclear Waste Workshop," and then attached is -- I don't know how to characterize it, whether it's a rep

# EXHIBIT F

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| PACIFIC GAS & ELECTRIC COMPANY<br>Plaintiff,<br>-vs-<br>THE UNITED STATES,<br>Defendant. | No. 04-0074C, which has been consolidated No. 04-0075C (Judge Hewitt) |

DEPOSITION OF LAWRENCE B. PULLEY

Pages

DATE: July 27, 2005

TIME: 9:42 a.m.

LOCATION: PG&E Building
77 Beale Street
Conference Room 303
San Francisco, California

REPORTED BY: Joanmarie Torreano, CSR, CRR, CRP
Certified Shorthand Reporter
License Number C-6504

COPY

A P P E A R A N C E S:

For the Plaintiff:

GREENBERG TRAURIG
BY: ROBERT L. SHAPIRO
JERRY STOUCK
800 Connecticut Avenue, N.W.
Suite 500
Washington, D.C. 20006
(202) 331-3173

For the Defendant:

U.S. DEPARTMENT OF JUSTICE,
CIVIL DIVISION
BY: SCOTT DAMELIN
JOHN C. EKMAN
1100 L Street, N.W.
Washington, D.C. 20530
(202) 353-0897



I N D E X

INDEX OF EXAMINATIONS


| EXAMINATION BY: | PAGE |
|---|---|
| MR. DAMELIN...................... | 5 |


INDEX OF EXHIBITS


| Defendant's Exhibit | | Page |
|---|---|---|
| 1 | HBPP ISFSI Damages Prior to Expert Analysis Initial Disclosures, April 22 2005 (1 pg.) | 111 |
| 2 | Humboldt Bay Power Plant Independent Spent Fuel Storage Installation Licensing/Fabrication/Construction Cost Estimate April 2005 (1 pg.) | 124 |
| 3 | Meeting notes from SMUD ISFSI meeting August 31, 2000 (2 pgs.) | 211 |
| 4 | August 2, 2001 Meeting to Wakeup Humboldt ISFSI Project (1 pg.) | 214 |
| 5 | HBPP ISFSI Kickoff meeting, November 8, 2001 (1 pg.) | 218 |
| 6 | April 2nd or 3rd, 2003 Agenda and Schedule (1 pg.) | 221 |
| 7 | NRC - PG & E Meeting April 3, 2003 Humboldt Bay ISFSI Project (36 pgs.) | 222 |




INDEX OF EXHIBITS


| Defendant's Exhibit | | Page |
|---|---|---|
| 8 | NRC - PG & E Meeting April 3, 2003 Humboldt Bay ISFSI Project (29 pgs.) | 228 |
| 9 | Humboldt Bay ISFSI Project Dry Storage System Supplier Contract Review (2 pgs.) | 230 |
| 10 | Contract for the Humboldt Bay Power Plant Spent Fuel Storage System (147 pgs.) | 235 |
| 11 | Project Status Report (2 pgs.) | 240 |
| 12 | Advice letter dated October 12, 2004 (8 pgs.) | 243 |
| 13 | Job Estimate dated 04/25/04 (2 pgs.) | 246 |
| 14 | Job Estimate Revision #2, dated May 7, 2004 (6 pgs.) | 250 |
| 15 | E-mail dated May 14, 2005, to Lawrence Womack from Roy Willis, with attached | 252 |
| 16 | Humboldt Bay ISFSI Decom Timeline for PNAC (3 pgs.) | 251 |
| 16 | Memorandum dated December 7, 2004, to Larry F. Womack from Larry B. Pulley (2 pgs.) | 256 |
| 17 | PG & E letter dated January 14, 2005, to Peter Douglas from Roy B. Willis, with attachments (18 pgs.) | 257 |




LAWRENCE B. PULLEY,

having been first duly sworn by the Certified Shorthand Reporter to tell the truth, the whole truth and nothing but the truth was examined and testified as follows:

EXAMINATION BY MR. DAMELIN

Q. Good morning.

A. Yes.

Q. My name is Scott Damelin. I'm an attorney with the United States Department of Justice. With me today is John Ekman, also an attorney with the Department of Justice in the case of Pacific Gas & Electric versus United States.

Can you please state your full name for the record?

A. Name is Lawrence Bond Pulley.

MR. DAMELIN: Mr. Shapiro, would you like to introduce yourself for the record?

MR. SHAPIRO: I'm Robert Shapiro, Greenberg Traurig.

BY MR. DAMELIN:

Q. Mr. Pulley, where are you currently employed?

A. I am employed at Gas & Electric Company at the Humboldt Bay Power Plant.

Q. How long have you been employed with Pacific