# EXHIBIT B

previously, and I request it be marked for identification.

It is entitled Additional Testimony on the Corcoran and Other Office Closings, dated May 8th, 1995.

ALJ MALCOLM: All right. We'll mark that as Exhibit 127.

MR. SCARFF: Thank you, your Honor.

And I would request that it be entered into evidence under stipulation.

MS. WILSON: We have no objection.

ALJ MALCOLM: All right. We'll do that.

Let's go off the record.

(Off the record)

[ Back on the record.

Ms. Wilson, you may present PG&E's witness.

MS. WILSON: Yes, your Honor.

I'd like to call Mr. Thomas LaGuardia to the stand.

ALJ MALCOLM: Good morning, Mr. LaGuardia.

THOMAS S. LA GUARDIA, called as a witness by Pacific Gas and Electric Company, having been sworn, testified as follows:

MS. WILSON: Your Honor, if I may, I'd like to have marked as the next exhibit in order a document I have previously distributed entitled "Pacific Gas and Electric Company, 1996 Test Year General Rate Case Workpapers Application Chapter 13C, Nuclear Decommissioning Cost Study."

ALJ MALCOLM: Mark that as Exhibit 128.

DIRECT EXAMINATION

BY MS. WILSON:

Q Mr. LaGuardia, are your qualifications as set forth in Exhibit 1?

A Yes, they are.

Q And could you tell us, please, what testimony you are sponsoring today?

A I'm sponsoring testimony as presented in Chapter 13C of Exhibit 6.

Q And Mr. LaGuardia, are you also sponsoring Exhibit 128, your workpapers that have just been marked?

A Yes, I am.

Q Do you have any changes or corrections to make to your testimony at this time?

A No.

Q To the extent your testimony contains facts, are these facts true and correct to the best of your knowledge?

A Yes, they are.

Q To the extent your testimony contains opinions, do these opinions represent your best professional judgment?

A Yes, they do.

Q And this testimony we have just talked about, Chapter 13C of Exhibit 6 and Exhibit 128, were they prepared by you or under your direction?

A Yes, they were.

Q Mr. LaGuardia, I have a few additional questions.

Could you explain please what the basis of your nuclear decommissioning costs were?

A Yes. We prepared, the company prepared -- our company prepared the studies based on information provided to us by Pacific Gas and Electric. The information consisted of drawings, inventory, inventories of equipment, specifications and such to describe the physical plant as it exists today and as it is expected to exist in the future, but primarily as it exists today.

Based on the equipment that is installed on-site at this point and based on the best available information on the levels of contamination, radioactive contamination that exists and calculated values of vessels and internals activation, radioactive activation, the cost estimate that we prepared for the decom scenario for Diablo and the SAFSTOR scenario for Humboldt Bay was for, what I'll call, the simple scenario, the planned predetermined scenario of the plant operating for its full life and shut down under a planned and organized program.

For that scenario, the costs for Diablo Canyon Units 1 and 2 is $839 million, and for Humboldt Bay is about $102 million.

We did not look into situations that might occur that we can't -- did not have a value to put to that; such things as premature shutdown of the units which has occurred in the industry: In Rancho Seco and Shorham and Yankee Rowe and Ft. San Vrain and San Onofre Unit 1.

We did not examine those, the effects of those costs except we -- I believe they'll be higher as experienced by these plants that have already shut down. They have seen costs that run far in excess of what they originally anticipated if the plant were to shut down on its normal plant shutdown basis. We do not consider changes that would occur over the next 20, almost 25 years of operations of those units for such things like steam-generator change-out, which the industry has to change pressurized water reactors. Many of them have to change out steam generators, leaving the old steam generators on-site in some form of mausoleum to be removed at the time of decommissioning.

Surrey and North Anna have gone through and built mausoleums on-site. We have not included that type of cost here because at this point, that has not occurred.

We have not taken into account any changes in the schedule of the planned shutdowns if the plant operates for a longer period for either of the units of Diablo Canyon. If it operates for a longer --

These highly radioactive components will actually be more radioactive than the spent nuclear fuel that will be moved from the vessel since it will receive exposure for 30 or 40 years of operation.

It does not include those special curie charges to dispose of those components.

Typically those components have to be buried in a dedicated slit trench 50 or more feet below surface rather than the typical 27 feet that is used for Class A wastes. It does not -- our estimate does not include any adjustments for difficulties associated with multiple reactors being decommissioned at one time throughout the State of California, not just reactors but process plants. There are over 2200 -- I think 2245 -- waste generators in California alone, and if all of them decide to ship their waste at one point, it could cause some backup for those burial grounds, I suspect, and that typically under operational rules for burial facilities they're not allowed to have more than a certain limit of unburied waste on site. So the trucks basically back up -- back up outside the door -- outside the gate.

These types of activities have not been included in our estimate.

Because we don't have any direct data right now as to what their actual occurrence is, we have not put any dollar value to it.

But we expect in every case that I mentioned it would likely increase costs.

In the past the Commission has accounted for such differences by adding additional contingency to the estimates that we have provided. In this case our cost studies are based on contingency values of approximately 16 percent for Diablo Canyon and almost 22 percent for Humboldt Bay.

The Commission, in prior rate cases, has adopted a contingency value to be used of approximately 50 percent, and that, again, is not included in the estimates that we've determined nor that I mentioned here this morning.

MS. WILSON: Thank you, Mr. LaGuardia.

Your Honor, Mr. LaGuardia's now available for cross-examination.

ALJ MALCOLM: Thank you.

Mr. Alvarez?

MR. ALVAREZ: Thank you, your Honor.

CROSS-EXAMINATION

BY MR. ALVAREZ:

Q Good morning, Mr. LaGuardia.

My name is Armando Alvarez, and I represent the consumer interests of the Federal Executive Agencies.

A Good morning, Mr. Alvarez.

Q As you stated, you are the witness that's sponsoring the TLG studies; is that correct?

A Yes.

Q And those studies included specific engineering-based estimates of contingencies for Diablo Canyon Unit 1, Unit 2, and the Humboldt Bay Power Plant Unit 3; is that correct?

A Yes.

Q And as you stated, for Diablo Canyon Unit 1, your cost estimate includes an average contingency of approximately 16.58 percent?

A I believe that's correct.

Q And for Diablo Canyon Unit 2 --

A Yes.

Q -- your cost estimate includes an average contingency of approximately 16.13 percent; is that correct?

A Yes.

Q Is it also correct that for Diablo Canyon Units 1 and 2 and for Humboldt Bay you performed applications of contingencies on a line-by-line basis?

A Yes. We do.

Q Okay.

Now, in the current TLG study, from your testimony, you stated that all disposal costs for low-level radioactive waste have been included in the estimates; is that correct?

A All disposal costs as identified by the then-available information in 1994.

Q Okay.

A Which, as I indicated just a moment ago, was for the base burial cost.

In 1994 the information we had was that the estimate we used, which was $350 a cubic foot --

Q Uh-huh.

A -- was an all-encompassing burial cost.

It was only last week, literally Thursday or Friday, that I received a letter from this -- from another client of ours, from the State -- sorry -- from the Ward Valley site manager indicating that there was another charge that has yet to be determined and that's the cost for disposal of high-curie shipments or high-weight shipments, and, as indicated, usually requires a deep, dedicated slit trench or heavy-weight shipments might require an extra heavy capacity crane to be brought on site at extra cost, and that type of cost was not included in our estimate as we understood that the $350 a cubic foot was an all-encompassing estimate.

Now we are finding out that that's not the case.

Q So, then, it's -- you would say that it's not correct that the current study takes into consideration increases in the disposal costs for the low-level radioactive wastes.

A That's correct.

Q At the time that you prepared the study.

A That's correct.

Q Okay.
And as you identified those increases, those would be based on the charges for high-curie or high-weight shipments?
A That's correct.
And the change in the base burial cost.
Q Okay.
The disposal costs that you did use in your study -- did those estimates reflect substantial increases from prior estimates included in previous decommissioning studies?
A With respect to the base burial cost?
Q Yes.
A Is that what your question is?
We -- we did account for the higher burial costs that we were aware of in 1994, and so it did account for the waste burial cost increase since our previous estimate which I believe was 1991.
Q That's correct. 1991.
Would you characterize those increases as substantial or significant?
A Yes.
Q Now, the costs that you are referring to as far as the high-curie and the high-weight shipments -- why were those unknown to you at the time that you prepared this study?
A Based on information that we received through Pacific Gas and Electric, the State statutes

regarding the development of the regional compact at Ward Valley specifically did not address surcharges for high-curie shipments or high-weight shipments, and it was our understanding it was a single-valued base burial charge that was to be applied.

This new information that we received from the site manager is the first indication that there may be additional surcharges that need to be accounted for.

But the State statute as it was drafted, to develop the Ward Valley facility, did not mention any additional surcharges.

And we have followed that same logic in studies that we have done for other California plants up to this point, and now we're evaluating some of those factors with respect to our other clients.

Q You mention that the California PUC established that a 50-percent contingency factor was going to be used for the nuclear decommissioning; is that correct?

A Yes. That's -- based on the precedent that it had done that in the past to account for these variable low-level waste costs -- the costs that have changed rapidly over the years and other factors.

Q In that decision, reference the 50-percent contingency factor, the Commission also noted that your study did not accurately account for two factors,

those being changes in safety regulations and increases in the cost of waste disposal; is that correct?

MS. WILSON: Excuse me.

Do you have a copy of the decision?

MR. ALVAREZ: No, I don't have a copy of the decision, but I will withdraw the question if that would be necessary to answer it.

MS. WILSON: Well, if -- I mean if the witness can answer without a cite. I mean it's just difficult to have extensive cross-examination without citations.

MR. ALVAREZ: Okay. Okay. I understand.

Let me rephrase it.

Q The changes in safety regulations and the cost of waste disposal -- to your knowledge, were those mentioned in the decision -- the same decision where the 50-percent contingency factor was discussed?

A Yes, that those two points were raised by the ruling -- the Commission's ruling. They indicated that we did not address them in our cost estimate -- change -- changes in regulatory rules and regulations, if you will, and changes in waste disposal, and that is a correct statement with respect to waste disposal and regulations.

We stated -- I remember testifying to those two points, that we could not include the costs in our estimates for potential changes to regulations that had not yet been identified. So we did not put

a cost associated with that or a contingency value associated with major changes to regulations that deal with decommissioning.

So, to answer your question, yes.

Q Okay.

A A long answer to it -- your question.

Q Thank you.

The current study -- how did that address the increase in the cost of waste disposal?

A We only recognized the then-current estimated costs for this waste disposal, recognizing inflation as it occurs, if you will, not projected future costs of waste disposal.

We based our information on the estimates that were available in 1994 for disposal of wastes, made no prediction or projection of what those costs might be at the time of the plant shutdown. We took the straight face waste value and used that in our cost estimate.

Q And how has your current study addressed changes in safety regulations?

A We recognized changes in safety regulations. The safety regulations that we deal with are primarily related to the amount of residual radioactivity that may be left behind after the termination of the license.

The NRC is in the process of promulgating new rules to deal with this issue.

We've evaluated the new rules and he impact on costs, and we are confident that our cost estimates factor those proposed new regulations in there, for this one -- one instance.

We have not factored into it unidentified new rules that the NRC might come up with over the next 20-odd years of operation. That type of estimate we did not include in our cost estimate; that type of projection we have not estimated in our cost estimate.

Q Is it your opinion that the contingency factors that you used in the current study for Diablo Canyon Units 1 and 2 are appropriate for projects of this size and this type?

A Yes, for plants that are -- yes. The answer is yes, and the -- we approach it from the standpoint that if the plant were going to be shut down today, those would be the appropriate contingency factors to use.

We allow, of course, that the plant's going to operate for its full licensed life. But, based on the information that's available today, on the plant inventory of how much equipment is physically installed at the site and what structures are radioactive and cleaned and have to be removed from the site, the contingency values address those types of activities in removing and disposing of those materials.

It allows that the plant will operate through the end of its license life. We calculate it as though the radioactivity will have built up, particularly the reactor vessel, to its end-of-life values and assume that that is going to be done today.

I hope I'm not confusing you.

We calculate the end-of-life radioactive inventory in the plant, we assume that that work's going to be done today.

A Right.

Q So there are not going to be any unforeseen changes in that inventory.

Q Right.

A If, for example, the plant for some reason was shut down for ten years between today and year 2005 and then restarted up again through the end of its license life, there would be a change in that inventory. We would have to recalculate what that end-of-life inventory would be of radioactivity.

[ We did not take that into account. We assumed the plant was going to operate for its full license life, have an inventory at the end. We were assuming all the work was going to be done today as though it had operated for its full license life.

Q In your opinion, do the estimates of the decommissioning cost, including the estimates for contingency costs, represent the best-available

estimates for such costs at the time that the study was prepared?

MS. WILSON: I just -- object to the -- I'd like some clarification.

When you say "contingencies," do you mean the contingencies that Mr. LaGuardia has added or the 50 percent contingency required by the Commission?

MR. ALVAREZ: The contingencies that Mr. LaGuardia used in his study.

THE WITNESS: Yes.

MR. ALVAREZ: Q Okay. In regards to the license life or the operating life of the units at Diablo Canyon Units 1 and 2, would you agree that the decommissioning costs should be recovered over the operating life of the units?

A That's not the area of my testimony.

Q So you couldn't answer that yes or no?

A It's not my -- I have not testified to that issue.

And generally speaking, that is done at -- in other jurisdictions, yes. But --

Q Okay.

A -- it's not necessarily the best situation in every case.

Q Okay. When you prepared your decommissioning cost study, were you aware that PG&E had applied for an extension to the NRC of its operating license for those units?

A We were aware that they were in the process of getting ready to do that, yes.

Q And are you aware now that the NRC has granted PG&E's request for operating license extensions for Diablo Units 1 and 2?

A Yes.

Q Can you explain the difference between operating license and a possession-only license?

A An operating license, the NRC grants to operate the physical plant to produce power. And that is granted for a period of years.

A possession-only license is one that is applied for at the end of plant operations to possess radioactive materials on-site but not to operate the plant as a nuclear power plant.

It is a possession-only license and it is applied for as part of the process to reduce the costs during the preparations phase for decommissioning the facility.

The operating phase of the work requires extensive technical specifications, testing and inspections and maintenance work to be performed. It is a very costly process for safety purposes or operation. When the plant shuts down, most of those safety functions disappear, frankly, because the fuel is removed from the core and it cannot be run as a power reactor anymore.

And so, the -- in virtually every case, the licensees have applied to the NRC for a possession-only license which reduces many of those inspections and tests that have to be made under the technical specifications, and reduces their need to maintain a large staff on-site and they can reduce their costs during that period.

Q In that request K3A, you indicated that as a result of the extension granted to PG&E by the NRC, the operating license for Diablo Unit 1 has been extended to September 22nd, 2021, and for Unit 2, it was extended to April 26th, 2025; is that correct?

A Yes, I believe so.

Q And both of these dates are based upon a period of 40 years of operation after the date of the issuance of the low power licenses for each unit; is that correct?

A Yes.

Q Is it also correct that similar operating license extensions that reflect an operating life that extends 40 years from the date of the issuance of the low power license are common in the nuclear industry?

A They are becoming common now, yes.

Q Okay. Based on the NRC's granting of operating license extensions, would you expect that substantial decommissioning activities for Unit 1 would now be expected to commence after September 22nd, 2021?

A That's when the work would begin, yes.

Q And similarly, for Unit 2, would you expect that substantial decommissioning activities would begin after April 26th, 2025?

A Yes. The -- when you are using the term "substantial," I presume you mean physical plant removal or operations for removal.

Prior to shutdown on either of those dates, there would be some engineering and planning we have factored into the cost for decommissioning where one does some -- where the decommissioning team will start to examine some of the considerations on decommissioning. That's done prior to -- typically done prior to shutdown, so some initial -- but substantial costs would be incurred after shutdown.

Q Would that be Period 1 that you reference in your testimony?

A Yes.

Q Does the fact that the NRC granted PG&E operating license extensions for Diablo Canyon Units 1 and 2 impact the estimate of your decommissioning costs?

A We expect it could be some additional -- there would be some additional on-site spent fuel storage retired. It would obviously use more fuel to operate longer, a longer period. They will require, therefore, additional spent fuel storage canisters to

be constructed on-site to store the fuel until the DOE can take the fuel and dispose of it.

And there will be the cost associated with the dismantling of those canisters and storage modules at the end of the license life, at the end of the -- at the end of the last shipment of fuel off-site.

So there should be some nominal additional costs associated with decommissioning.

The longer life would require some small increase in the cost for disposal for shipping off more curies of radioactive material from the radioactive vessels and its internals, relatively small impact in the total picture. But nevertheless, it would have to be accounted for on a subsequent update, perhaps.

Q So in your opinion, that would be the full impact of those --

A Generally speaking, yes. Those would be major factors.

MR. ALVAREZ: I have no further questions, your Honor.

ALJ MALCOLM: Thank you, Mr. Alvarez.

Is there any redirect?

MS. WILSON: Just a moment, your Honor.

ALJ MALCOLM: Off the record.

(Off the record)

ALJ MALCOLM: Back on the record.

MS. WILSON: Just a few questions, your Honor.

REDIRECT EXAMINATION

BY MS. WILSON:

Q Mr. LaGuardia, in preparing your study, in taking the assumptions from PG&E to prepare your studies, did PG&E provide TLG with estimated decommissioning dates?

A Yes, they did.

Q What dates were those?

A Those are the dates which I believe are 2015 -- I have to go back and look. The earlier dates, not the latter dates after life extension application.

Q And in -- you discussed in response to questions from Mr. Alvarez that you're aware that the license has been extended for Diablo Canyon Units 1 and 2.

Did PG&E provide you with any changed scheduled decommissioning dates following the receipt of those approvals from the NRC?

A Not any planned dates, no.

Q In answering questions from Mr. Alvarez regarding decommissioning, changed decommissioning dates based on the license extension, you weren't basing your answer on changed dates PG&E had given you, were you?

A No, I was not.

Q You were basing your answers on a hypothetical assuming extended operation of the plant through the license extension period?

A Yes.

Q And your estimates regarding changes in decommissioning costs and timing were related to the assumption that the operating life would be extended through the license extension?

A Yes.

MS. WILSON: Thank you. That's all I have.

ALJ MALCOLM: Is there any recross, Mr. Alvarez?

MR. ALVAREZ: Yes.

RECROSS-EXAMINATION

BY MR. ALVAREZ:

Q Has PG&E provided you with any information that the operating life would not be through the period granted by the extensions?

A No. There was no specific direction as to that they were intending to have the license life extension permitting them to do -- there was no formal commitment that I was aware of that something intended to operate through that full period.

Q So as far as you're aware, they intend to operate through the license period?

A I think that's their intent. Whether they are committing to do that, I can't answer you. I don't know that.

Perhaps another witness could respond to that.

MR. ALVAREZ: That's all, your Honor.

ALJ MALCOLM: Thank you, Mr. LaGuardia.

THE WITNESS: Thank you.

ALJ MALCOLM: And I understand correctly that Mr. Chan doesn't need to get on the stand?

MS. WILSON: No, not for me.

MR. SCARFF: Your Honor, since no party has cross for Mr. Chan, I would request that his testimony on the nuclear decommissioning study which is Chapter 13B be treated as if he has testified as a sworn witness today by stipulation.

ALJ MALCOLM: All right. With there being no objections, we'll do that.

MS. WILSON: And if I may move into evidence Exhibit 128.

ALJ MALCOLM: No objection?

MR. SCARFF: No objection.

ALJ MALCOLM: Then we will move Exhibit 128 into the record.

MR. SCARFF: Your Honor, we would request about a five-minute recess at this point to coordinate the next set of witnesses.

ALJ MALCOLM: Sure.

We'll be in recess until 11:00 o'clock.

(Recess taken)

[ ALJ MALCOLM: Back on the record.

I understand we're stipulating to Mr. Storz' testimony with regard to Account 925; is that right, Mr. Scarff?

MR. SCARFF: Yes.

ALJ MALCOLM: And so DRA may present its next witness.

MR. SCARFF: We would call Joel Tolbert.

ALJ MALCOLM: Good morning

MR. TOLBERT: Good morning.

JOEL TOLBERT, called as a witness by the Division of Ratepayer Advocates, having been sworn, testified as follows:

MR. SCARFF: Your Honor, at this time I would like to have marked for identification four additional exhibits, some of which I've already distributed to you.

[ The first one will be revisions to Exhibit 27, Chapter 9, dated May 1995 which is the errata to Mr. Tolbert's testimony on Electric RO.

ALJ MALCOLM: Mark that as Exhibit 129.

MS. WILSON: May I have a copy of that one?

MR. SCARFF: (Handing document to counsel)

The second item I'd like marked is Revisions to Exhibit 28, Chapter 9C, also dated May 1995, which is the errata to Mr. Tolbert's testimony on the Gas RO.

ALJ MALCOLM: We'll mark it as Exhibit 130.

MR. SCARFF: The third item is a spread sheet, one-page spread sheet entitled PG&E's, should be Injuries by Type. There's a typo there.

ALJ MALCOLM: We'll mark that as Exhibit 131.

# EXHIBIT C

# FIELDER FIELDER & FIELDER

ATTORNEYS AT LAW

Scott L. Fielder
419 Spring Street, Suite A
Nevada City, California 95959
Tel: 530-478-1600
Fax: 530-475-1699

March 27, 1998

Mr. Bruce Smith, Project Manager
PACIFIC GAS AND ELECTRIC COMPANY
Mail Code B9A
P.O. Box 770000
San Francisco, CA 94120

Re: PG&E 1999 Test Year GRC
<u>First Data Request of The Redwood Alliance</u>

Dear Mr. Smith:

Hugh Fielder and Mary Fielder 508 West Main Street, Suite D
Visalia, California 93291 Tel: 209-627-5322 Fax: 209-627-3624

Please provide the following information concerning the Humboldt Power Plant Unit ~3 as soon as it becomes available but no later than April 10, 1998. If the information cannot be provided by that date, please provide a written explanation within seven working days (April 3, 1998) from the date of this letter. If you have any guestions regarding this data request, please call as soon as possible at the above phone number.

<u>Data Requests</u>

1. How does PG&E pay for ongoing SAFSTOR activities? Is there a particular account or revenue stream that can be accessed or utilized? Has this changed since AB 1890 became law (e.g., PUC Section 379)? What were the annual expenditures for SAFSTOR from 1988 through 1997? What are the projected expenditures for 1998 through 2000? Provide relevant workpapers and supporting material.

2. Regarding the table on pg. 5A-5 of PG&E Ex. No. 6, provide an itemized list of activities in the miscellaneous nuclear power expense for 1996-1999. What has caused the increase from $2.7 million in 1996 to a projected $4.2 million for 1998 and $3.7 million projected for 1999?

3. On pg. 14E-3 of PG&E Ex. No. 6, the estimated cost of decommissioning the Humboldt nuclear facility beginning in 1998 is $210 million. The estimated cost for decommissioning in 2015 is $194 million. Since both estimates are in 1997 dollars what accounts for the difference in the estimates? Provide all documentation that explains the difference.

4. Regarding the statement on pg. 14E-4 of PG&E Ex. No. 6 about the Caisson In-leakage Repair Project, a site radiation survey, and a stack removal project, provide a breakdown of the



activities and costs involved. How much of the work has been completed to date and when will it be finished? Provide all working papers and correspondence with the CPUC, and the Nuclear Regulatory Commission (NRC) during the last two years regarding these activities. Similarly, provide a copy of all correspondence during the last two years with the CPUC and the NRC concerning SAFSTOR, decommissioning and safety issues.

5. How does PG&E distinguish between SAFSTOR and decommissioning activities? What criteria are used and have they been modified since the Humboldt facility was placed in SAFSTOR? In response to this guestion, provide a list of initial decommission activities that have been or will be undertaken within the next two years. Were these activities (SAFSTOR and decommissioning) listed in previous documents such as the Environmental Re~ort for the Decommissioning of Humboldt Bav Power Plant Unit No. 3 (July 1984)? Provide a copy of all the relevant documents.

6. As noted in PG&E Ex. No. 14, Funding for Preliminary Humboldt Decommissioning Activities, itemize the type and projected expenditures for permits for a dry cask storage facility. How long will it take to acguire the necessary permits? On an annual basis, will the expenditures be roughly the same throughout this time frame? Does the permit licensing reguest include the design and testing of dry casks?

7. Does PG&E have any financial stake in any of the companies chosen to design and test dry casks and will PG&E financially benefit from the sale of casks to other utilities or energy companies?

8. Does PG&E anticipate any financial benefits from implementing the dry cask storage plan or from immediate dismantlement? Include all relevant economic analyses and working papers.

9. What other utilities are, or are in the process of, using dry cask storage technology? Provide all relevant information regarding cost, time to implement, and experience to date.

10. Is it necessary to complete the fuel transfer to dry casks prior to any other decommissioning activity beginning, or can they be accomplished simultaneously?

11. Regarding the statements on Pg. 63 (Document P01-1238-002 Rev.0, Section 7, pg. 1 of 2) of the 1998 SAFSTOR, Chapter 14F of PG&E Ex. No. 6, provide a copy of workpapers or other material related to the discussion of low-level radioactive waste disposal costs. Include any study or analysis developed by U.S. Ecology or



TLG Services, Inc. regarding the changes in LLRW disposal costs during the last ten years.

12. How much low-level radioactive waste (LLRW) has been shipped form the Humboldt facility since 1988? Provide workpapers and analyses listing volume, disposal and transportation cost, disposal site and date shipped.

13. Has TLG Services analyzed various options for disposal of LLRW from Humboldt in the 1996 or previous GRC proceedings? Provide a copy of all analyses and supporting workpapers.

14. Provide all cost estimates for additional processing and volume reduction of LLRW including representative market prices for the vendors providing the services.

15. In reference to pg. 14F-4 of PG&E Ex. No. 6, provide new cost projections for radioactive waste disposal that show a 45 percent increase since 1994. Provide any additional materials or analyses that contain forecasts for the next five years.

16. With respect to the discussion of SAFSTOR decommissioning activities on pg. 19 (Doc. P01-1238-002, Sect. 2, Page 1 of 11) of the 1998 SAFSTOR of PG&E Ex. No. 6, Chapter 14F, what are the recently issued regulations that make it likely that PG&E will be

required to prepare a new PSDAR and a license termination plan? Provide a copy of the applicable regulations.

17. On pg. 14F-4 of PG&E Ex. No. 6 an estimate of $22 million is listed to pay for the cost to site, license and construct, and decommission an on-site dry cask storage facility. Provide an itemized cost breakdown of all anticipated activities associated with the facility including the timeline necessary to complete the tasks. Include applicable workpapers and supporting materials.

18. What is the estimated cost of disposal of spent fuel from the Humboldt facility? How much has this estimate changed during the last ten years? What is the projected cost estimate if the spent fuel remains in the dry cask storage facility until 2015?

19. Regarding the discussion on pg. 7, Chapter 14F of PG&E Ex. No. 6, provide the actual or estimated decommissioning costs and relevant data (megawatt rating, years in operation, etc.) for Shippingport, Shoreham, Yankee Rowe, Trojan, Rancho Seco, pathfinder and Cintichen reactor facilities.

20. Does PG&E intend to sell the Humboldt Bay Power Plant either before or after the dismantlement is completed? Provide all pertinent workpapers, memorandums, or other materials.



21. Regarding the updated PSDAR of February 1998, provide a copy of the references that appear on pg. 11, which are: (1) NUREG-0586, "Final Generic Environmental Impact Statement on Decommissioning of Nuclear Facilities," dated August 1988; (2) NUREG-1166, "Final Environmental Statement for Decommissioning Humboldt Bay Power Plant, Unit No. 3," dated April 1987; (3) PG&E Letter HBL-97-003, submitted to the NRC regarding Application of New Decommissioning Rule, dated February 20, 1997; (4) Humboldt Bay Power Plant, Unit No. 3 Decommissioning Safety Evaluation Report, dated April 29, 1987; (5) SAFSTOR Decommissioning Plan for the Humboldt Bay Power Plant, Unit No. 3, Revision 1, dated July 1994; (6) TLG Services, Inc. Letter P01-1238-9707, regarding Decommissioning Cost Estimates for Humboldt Bay Power Plant Unit 3, dated December 4, 1997; and (7) Environmental Report, Attachment 6 to PG&E's application to decommission HBPP, dated July 30, 1984.

22. Please identify all decommissioning cost estimates prepared by TLG Services in 1997 and 1998 for nuclear power plants in the U.S. other than Diablo Canyon and Humboldt Bay. For each estimate, please provide: (a) the estimated cost of decommissioning; (b) the assumed method of decommissioning; (c) the assumed cost for disposal of LLRW (in dollars and in dollars per unit of volume); (d) the assumed cost for any storage of spent

nuclear fuel; and (e) a copy of the report documenting the cost estimate.

23. Page 14E-6, on lines 12 to 15, quotes from pg. 239 of "Project and Cost Engineers" handbook, Second Edition, American Association of Cost Engineers. Please provide a copy of the chapter from which this quote is taken.

24. Please provide all documentation supporting the 40 percent and 30 percent contingency factors applied to Humboldt Bay decommissioning costs for Alternatives 1 and 2 respectively. (See pg. 14E-8).

25. Identify any guidelines, formal (such as NRC or CPUC rules) or informal (such as internal company policies) that PG&E uses in deciding whether a particular expense is appropriately paid for from decommissioning funds.

26. Provide all examples of cases in which PG&E applied its criteria to decisions about whether a particular expense would be appropriately paid for from the external decommissioning fund.

27. Does PG&E have an estimate of the cost of having an Independent Board of Consultants and a cost monitoring system in place with regard to the decommissioning of Humboldt Unit 3?

28. Pages 3 and 4 of PG&E Exhibit 14 (Funding for Preliminary



Humboldt Decommissioning Activities) state that "Due to the limited nature of the $7 million of licensing activities proposed above relative to the full decommissioning of Humboldt Unit 3, PG&E believes that establishing such a board at this time is unnecessary for those activities." Please describe the facts that support PG&E's belief, and provide all studies, memoranda, and other documentation that support this position.

Very truly yours,
FIELDER FIELD & FIEL

BY:

TH REDWOOD ALLIANCE SLF:cfh

cc: Mr. Bruce Biewald Mr. Jim Adams

# EXHIBIT D

# CONDENSED TRANSCRIPT & WORD INDEX

## DEPOSITION OF CHRIS WARNER, VOL. II

## PG & E VS. UNITED STATES

## AUGUST 4, 2005

BARKLEY
Court Reporters

(310) 207.8000 Los Angeles
(949) 955.0400 Orange County
(415) 433.5777 San Francisco
(916) 922.5777 Sacramento
(408) 885.0550 San Jose
(951) 686.0606 Inland Empire
(818) 702.0202 San Fernando Valley
(858) 455.5444 San Diego
(760) 322.2240 Palm Springs

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

PACIFIC GAS & ELECTRIC COMPANY, Plaintiff(s), vs. THE UNITED STATES, Defendant(s).

No. 04-0074C, into which has been consolidated No. 04-0075C

Volume II

Pages 204 to 296

----

DEPOSITION OF CHRISTOPHER WARNER
245 Market Street, Room 1402
San Francisco, California
Thursday, August 4, 2005, 8:21 a.m.

----

REPORTED BY: James Beasley, CSR No. 12807

Page 204

APPEARANCES

For the Plaintiff(s):
GREENBERG TRAURIG
BY: JERRY STOUCK
800 Connecticut Avenue, NW, Suite 500
Washington, DC 20006
202.331.3173
Fax: 202.261.4751
stouckj@gtlaw.com

For the Defendant(s):
U.S. DEPARTMENT OF JUSTICE
BY: JOHN C. EKMAN
1100 L Street, NW Room 7013
Washington, DC 20530
202.353.0897
Fax: 202.307.0972
john.ekman@usdoj.gov

Page 205

INDEX OF EXAMINATIONS


| EXAMINATIONS | PAGE |
|---|---|
| MR. EKMAN | 208 |


INDEX OF EXHIBITS


| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 16 | Draft Used Fuel Storage, one page | 208 |
| 17 | Civilian High-Level Waste Program, three pages | 211 |
| 18 | Memorandum to Nuclear Safety Assessment and Regulatory Affairs, et al., from Nuclear Operations Support dated June 3, 1991, one page | 215 |
| 19 | Memorandum to Various from Manager, Nuclear Operations Support dated August 25, 1992, six pages | 218 |
| 20 | Memorandum to Various from Nuclear Operations Support dated August 25, 1992, two pages | 222 |
| 21 | E-mail to many from Suresh dated June 30, 1995, two pages | 226 |
| 22 | Memorandum to Various from Senior Vice President and General Manager - Nuclear Power Generation dated August 27, 1996, 22 pages | 229 |
| 23 | E-mail string, the first of which listed is to Bruce Patton from Patricia Melendres-Keller undated, seven pages | 237 |
| 24 | High-Level Nuclear Waste Workshop package, 23 pages | 239 |


Page 206

INDEX OF EXHIBITS CONTINUED


| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 25 | Draft Agenda, High-Level Waste/Low-Level Waste Strategy Meeting, 21 pages | 243 |
| 26 | Reracking Alternative Spent Fuel Storage Diablo Canyon Power Plant Overview (Draft) dated April 4, 1995, 12 pages | 246 |
| 27 | Letter to David Oatley dated September 7, 1990, five pages | 248 |
| 28 | E-mail to many from Chris Warner dated April 22, 1992, one page | 252 |
| 29 | Meeting Announcement dated April 22, 1992, five pages | 255 |


Page 207

Nuclear Utility Group, and then it's identified as the legal memorandum from outside counsel.
Do you see that?
A. Yes, I see that.
Q. Does this refresh your recollection at all based on the description of what the Nuclear Utility Group was?
A. Yes, it does somewhat to the extent that it involved a group of utilities. And again, I'm just speculating without seeing the memorandum, but a group of utilities who ultimately were involved in I think what we called the Indiana, Michigan and Northern States Power litigation, this may be that group.
Q. And PG&E was involved in that litigation?
A. Yes.
Q. All right. If you could go to page 19.
A. I'm there.
Q. Number 82, there's a Terence Grebel, G-r-e-b-e-l, listed in the author line.
A. Yes.
Q. Is he an attorney?
A. No. He, at that time, was most likely the manager of our licensing group. And so he would have been acting under the general supervision of

Page 272

our attorneys with regard to licensing submittals.
Q. And the only attorney in the recipient or copy line is Mr. Locke; is that right?
A. That appears to be correct.
Q. And the description is:
"E-mail to counsel from client Re: DCPP ISFSI and reracking issues prepared in anticipation of reracking licensing proceedings."
A. Yes.
Q. So this would come under the larger rubric of under the supervision of an attorney --
A. Yes, I believe so.
Q. -- in the context of a licensing proceeding?
A. Yes.
Q. And therefore attorney-client?
A. Yes.
(Discussion off the record.)
BY MR. EKMAN:
Q. Let me -- if you go to 87 on page 20 of the next page. All right. And it's 87. It is listed as a report plan. Again, I recognize this postdates your involvement.
There's no author, no recipient, no

Page 273

copyees, and it says:
"Report Re: Spent fuel Storage Issues. Prepared at the request of counsel."
Do you see that?
A. Yes, I see that.
Q. Other than looking at the document, is there any way that you could tell why it is that this was prepared at the request of counsel?
A. I can only speculate, but I can tell you, just knowing the time frame of the report and knowing that we had multiple active litigation that we were involved in, the proceedings we were involved in in terms of spent fuel storage and the projects for the ISFSI, et cetera, that it would be not surprising, in fact likely, that reports that we develop regarding the status of those proceedings would be developed under the supervision or by an attorney.
Q. If we could go to the next page, 21.
A. Yes.
Q. 92, 93, there's actually -- I'm going to try to shorten up, because there are a lot of these listed on this privilege log.
It's a set of documents, variety of

Page 274

documents, no author listed. The recipient is the Board of Directors for Pacific Gas and Electric, and then the description is always a legal analysis and recommendations, and then it is either in relation to an existing rate case or in connection with the -- like 92, in anticipation of future general rate cases.
Based on the description -- and let's start with 92.
A. Yes.
Q. Do you know what kind of document they're talking about there?
A. I believe I do, although I would have to look at the document itself to refresh, but I think typically in connection with certain regulatory proceedings at CPUC, the preparation of the actual filing and the position that we would take would go to the Board of Directors. In this case I think it appears to be in the connection of decommissioning cost recovery filings.
And to the extent it would go to the Board of Directors for approval, it would be approval for what amounts to that legal and regulatory filing and request.
So similar to preparing a draft rate case

Page 275

filing, the recommendation would be pursuant to the supervision or directly by the attorneys involved in preparing that filing.

Q. Now, do you know if PG&E has sought funding for -- in any of its rate cases for the future long-term spent fuel storage obligations that it's currently expecting to incur?

A. No, I don't know.

Q. Has -- in the past when it's going to incur, say, costs associated with -- I'm trying think of something that was in your time frame.

There was a reracking that predated your time frame at Diablo Canyon. Did they seek -- do you know if they went, if PG&E went to the rate commission to seek payment for that cost associated with that reracking?

A. It's a little bit of a complicated question in that up until 2001, Diablo Canyon, in particular, was not subject to general cost-to-service regulation. So all of our costs to service were recovered through what was either called performance-based rates or incremental cost incentive rates.

So we didn't go, per se, for approval for a particular capital or operating expense. We got



recovery through these incremental rates. After 2001 and beginning in 2001, Diablo Canyon did go back on general cost to service rate-making. And so we would submit what amounts to an annual budget for nuclear costs for Diablo Canyon to the CPUC after that time.

Q. Is it possible -- and again, I can show you -- I don't know how many of these there are. Many of these have been withheld on the grounds of work product and attorney client.

Is it possible that part of the legal analysis and recommendations could include issues relating to long-term spent fuel storage and what types of actions should be taken by Pacific Gas and Electric to address those?

A. And I don't want to -- I want to make sure I follow my counsel's advice, but --

MR. STOUCK: Well, my advice is he's asking you about a document you haven't seen and a possibility that, I guess, anything's possible if you want to answer.

THE WITNESS: What I also want to do in terms of -- maybe I should consult with counsel briefly.

MR. EKMAN: That's fine. Let me say for



the record that we don't know if he's seen it or not. Most of these, if not all of them, are undated.

MR. STOUCK: When you say these --

MR. EKMAN: There is --

MR. STOUCK: These meaning these kinds of documents, like 96 and 97?

MR. EKMAN: Yeah. There's a -- the next page -- I could probably open up to a page -- page 82.

MR. STOUCK: Why don't you step out for a second.

(Discussion off the record.)

BY MR. EKMAN:

Q. You were discussing whether you could provide me an explanation of what this is, these types of --

MR. STOUCK: Well, the question was, I thought, something to the effect of whether these documents were to address dry cast storage.

MR. EKMAN: Yes.

THE WITNESS: And here is how I look at these descriptions. First of all, I have not looked at these particular documents. Some of this is just pure speculation. Documents that were



prepared for the Board of Directors that relate to nuclear decommissioning cost filings, for example, I would expect to be general documents that would simply state that we're going to go in and request the following revenue requirement on a broad basis for decommissioning contributions for Diablo Canyon decommissioning fund and for the Humboldt Bay decommissioning funds.

And those documents I would not expect to get into any much, if any, detail over the components of decommissioning. In fact, the Diablo Canyon decommissioning contributions don't involve incurrance of any costs until decommissioning of the plant, which is long into the future.

To the extent that there are documents prepared that talked about general rate case filings, those general rate case filings are what they are, generally public documents ultimately as PG&E's filed them with the California Public Utilities Commission.

I would not expect the internal documents that go to the Board of Directors to go into much detail about specific components of the nuclear power generation business unit's costs.

Again, those specific components would