# EXHIBIT 2

# CONDENSED TRANSCRIPT & WORD INDEX

## DEPOSITION OF ROBERT KAPUS

## PG&E VS. UNITED STATES

## SEPTEMBER 28, 2005

COPY


BARKLEY Court Reporters

(310) 207.8000 Los Angeles
(949) 955.0400 Orange County
(415) 433.5777 San Francisco
(916) 922.5777 Sacramento
(408) 885.0550 San Jose
(951) 686.0606 Inland Empire
(818) 702.0202 San Fernando Valley
(858) 455.5444 San Diego
(760) 322.2240 Palm Springs

---o0o---

BE IT REMEMBERED that on Wednesday, the 28th day of September 2003, commencing at the hour of 9:31 a.m. thereof, at 77 Beale Street, Room 303, San Francisco, California, before me, Balinda Dunlap, a Certified Shorthand Reporter in and for the County of Sacramento, State of California, personally appeared:

ROBERT KAPUS

a Witness herein; called as a witness by the Defendant; who, after having been duly sworn by the Certified Shorthand Reporter to tell the truth, the whole truth, and nothing but the truth, testified as follows:

---o0o---

EXAMINATION BY MR. EKMAN

Q. Good morning.
A. Good morning.
Q. Just so I am pronouncing your name right, is it Mr. Kapus or Kapus?
A. Kapus.
Q. All right. I have been pronouncing it correctly. Mr. Kapus, my name is John Ekman. With me today are Jon Couchman and Scott Damelin. Scott and I are attorneys with the U.S. Department of Justice, and Mr. Couchman is assisting us on this case from an accounting perspective.



Have you ever had your deposition taken before?
A. No, I haven't.
Q. Let me just go over a few ground rules. It is a question and answer session. If you can answer audibly, "yes," "no" instead of using "uh-huhs," nods of the head, those things don't come out very well on the record. I am sure you can appreciate that.
From time to time your attorney, Mr. Shapiro, may interpose an objection. Unless he instructs you not to answer a question, I'd ask that you provide an answer. If you don't understand a question that I have asked, please let me know, and I'll be happy to rephrase it for you again so that you're answering the question that I'm asking, okay?
A. Okay.
Q. And I will take breaks and take them regularly, but if you need a break at any time, please let me know.
A. Yes, sir.
Q. And I will oblige.
A. Yes, sir.
Q. All right. Mr. Kapus, could you state your business address for the record, please.
A. 1000 King Salmon Avenue, Eureka, California.
Q. What's the zip?
A. 95503.
Q. Is that -- are you at the Humboldt Bay facility?



A. The Humboldt Bay Power Plant facility.
Q. What is your current job title?
A. I have two basic titles. One is budget coordinator, and the other one is financial services supervisor.
Q. Financial services supervisor?
A. Right.
Q. Let's start with budget coordinator. How long have you been budget coordinator?
A. With PG&E, 19 years.
Q. And how about financial services supervisor?
A. The title has been for the last couple of years. It was a reorganization of a couple of people and me at Humboldt Bay.
Q. Let's start with the easier of the two, then. Financial services supervisor, what are your responsibilities as a financial services supervisor?
A. Budget coordination, contract administration for Humboldt Bay Power Plant, and the warehouse falls under my supervision, also.
Q. Is financial services supervisor different from budget coordinator?
A. No. The budget coordinating position stayed with me when I became the financial services supervisor, also. It is just different people address me differently.
Q. Were there tasks that you now have --



responsibilities that you now have that you didn't have when you were just a budget coordinator?
A. Yeah, the contract administration and the warehouse.
Q. And you have only had those for the last couple years?
A. Yes.
Q. Can you tell me what's involved in being a contract administrator?
A. I have one person that reports to me that prepares contracts for the fossil side of Humboldt Bay Power Plant, and I review the procurement requests for those contracts to make sure that the scope is well-defined in it, that any term -- unique terms and conditions of that contract are spelled out, review that it is within the budget plans for that particular year, that it's got the correct accounting on it.
And then when the contract is going through the process of being authorized, I make sure that all of those are -- the criteria is met before PG&E signs the contract.
Q. Who is your one report?
A. Sue Adams.
Q. And what is her title?
A. Procurement specialist.
Q. You say that this is on the fossil side of the plant?
A. Yes.
Q. Do you have any contract administration duties for

the nuclear side?
A. Yes, I do.
Q. All right. And what are those duties?
A. Very similar duties as the fossil side. Basically exactly the same thing as the fossil side, the difference being that the contracts are prepared at Diablo Canyon or by the procurement department here in San Francisco on occasion. Predominantly they are prepared by Diablo Canyon for the nuclear side.
Q. Why is that?
A. There are special criterias, issues with contracts related to issues on the nuclear side as far as NRC issues, licensing issues, things like that.
And Diablo Canyon being a nuclear power plant, their procurement people, they know those issues very well. Therefore, we grab on to their expertise.
Q. What role do you play in contract procurement, or contract administration -- or in that process at Humboldt Bay for the nuclear side?
A. Exactly the same thing as the fossil side. I go through it within the budget, look at the scope of the contract, make sure it is well-defined, that the terms are what we prefer in a contract. If there's any special conditions in there, that they are identified.
I present the contracts to whoever the authority is

Page 9

to sign that contract based on our delegation of authority letters, and assure them that, yes, this is within our budget. If not, how we are going to fund it type of thing. So we have to do trade-offs within the budget.
Q. It looks like, then, from my notes, the one difference is the actual preparation of the contract that you don't do on the nuclear side?
A. I do not prepare the contract. I see the contract after it's prepared, and I review it to make sure that everything is there.
Q. And you have only been doing this, again, for the last couple of years?
A. For the contract issues, I have actually been involved in them at Humboldt for probably the last five years.
Q. And that would have been in your capacity as a budget coordinator?
A. As a budget coordinator at Humboldt and as a -- I am trying to think of the title that I had when I was in San Francisco. It was, like, financial services analyst in San Francisco. Because I was working from San Francisco on Humboldt Bay prior to being located there.
Q. How long have you been at Humboldt Bay physically?
A. I physically moved up there in 2000. I had been, for two and a half years prior to that, driving up on Monday and

Page 10

coming back on Friday and working up there every week.
Q. Since 1999, 2000, you have really worked at Humboldt Bay?
A. Yes.
Q. Prior to that you were out of San Francisco?
A. I was out of San Francisco assigned primarily to Diablo Canyon with some support to Humboldt Bay.
Q. You mentioned warehouse. What is the warehouse?
A. The warehouse is a facility at Humboldt Bay where we have a stock of materials that I am going to call them consumable-type materials that we need to keep the fossil units operating. It has, like, gaskets, bolts, lights, just all kinds of materials that are used quite often to maintain the facility.
Some of the materials in the warehouse could also be used on the nuclear side for the equipment that's required to maintain the fuel in a safe environment, I'll say. Such as gaskets for pumps or fuses for some piece of equipment, things like that.
Q. All right. Now, let's talk about what you have been doing longer, which is budget coordination. Let's start with Humboldt Bay. Today what type of work is involved in the budget coordination side of what you do?
A. Prepare -- well, I prepare the annual budgets for Humboldt Bay. Basically, I prepare that by meeting with the

Page 11

different department heads. We meet actually almost monthly, but we do more extensive review in the third quarter of the year of what the budget needs are going to be for the following year.
I price up the labor portion of it based on the information that's available to me for our employees. We look at contract requirements that we feel we will need the next year. It's looked at at an SAP actual order level so that we can monitor our budget against our actuals during the year. We'll identify any special material requirements, types of outages that we will be having.
On the nuclear side, we will look at what types of equipment -- particularly radiological equipment that we will need to replace because of the age of the equipment or a change in the requirements of the equipment that we have. We'll look at if there's any special projects that we need to do and budget them.
That's kind of a high profile of the budget process. As the year progresses, the actual year, every month we'll produce a report of a comparison of here's where we forecasted this month, and here's what we actually expended. Here's what we expended to date, where we planned to be. Here's the year-end forecast, where we are sitting and talking to the department people about the projections in the future saying, "Do we have the money to do all this?" If we

Page 12

don't, we discuss what we are going to defer workwise to stay within our budget.

We meet -- we try to meet monthly. Sometimes it is every other month, depending on people's workloads, looking at long-term issues at Humboldt Bay Power Plant, looking out into the next ten years of what types of costs are going to be incurred or projects we will need to perform, what types of outages we have each year. We have major overhauls. We have planned outages. They are very different in cost between the two.

Boiler certifications come up every three years. We have those we have to look at, and other major repairs of the plant based on the age of the equipment. There's -- we kind of know that our feed water heaters have to be repaired every so often, based on the availability of the tubes and things like that.

We look at environmental issues. If we've had -- if there's an environmental issue that's coming out of EPA or someplace, we look at what that impact is to us and what modifications the plant will need to go through and estimate that into the future.

We review this document at Humboldt Bay, but we share it with people like Terry Nelson, who is the director for fossil generation, so that he kind of has a feeling of where we're going with things. It is also used for a basis for our



GRC filings that are coming up. Our GRC and our nuclear decommissioning filings, because of SAFSTOR stuff, is in the nuclear decommissioning filings, not the GRC.

Q. Let me jump ahead. What is your education?

A. I am a structural engineer by degree.

Q. Where's your degree from?

A. Oregon -- well, let's see. The school changed its name between my two degrees. It is Oregon Institute of Technology, is where I got my Bachelor degree. I have an Associate degree from Oregon Technical Institute.

Q. And in structural engineering?

A. Yes.

Q. And are you a licensed engineer?

A. No.

Q. Have you ever been?

A. No.

Q. Now, let me jump back, and I think you'll see why I asked that question. You said that you meet -- try to meet monthly with the different department heads?

A. Yes.

Q. First of all, can you give me an idea what kinds of departments we're talking about?

A. Engineering, radiological protection, maintenance, operations, environmental, security.

Q. All right. Each of those topics, looking just to see



if this is a correct statement, seem to me that the folks that you're going to be meeting with, the department heads, are going to have particularized knowledge that's relevant to their particular department; is that a fair statement?

A. They have knowledge to their particular department, but there's also a lot of crossover knowledge, especially to maintenance, engineering and operations. Those three are very linked together.

Q. Now, when you are meeting with them, what is -- one thing that you said that you do is price up the labor portion of the annual budget?

A. During the budget process, yes.

Q. That's your job?

A. Yes.

Q. And how do you price up the labor? Can you just start to finish how that would happen, generally?

A. Okay. The PG&E labor, SAP actually will produce a listing of every employee at Humboldt Bay and tell me their annual salaries. And it also tells me their productive time over the last year.

So we do an analysis of that labor. We escalate it based on guidelines that the company will provide -- the budget department provides us. And then just go in -- review the productive labor.

Because if I have an employee that may have been out



because of a back injury or had extensive reasons for being out one particular year, and I know that's not common, then I'll adjust the productive labor for the following year.

Q. All right. And in terms of determining, like, the number of staff, for instance, the radiological department is going to need, whose job is that?

A. That would be the manager of radiation protection department.

Q. So you take what he tells you, and then "This is how many employees I am going to need," and then you price it up for the budget?

A. Basically we look at the employees he currently has and say, "Okay. Are these the employees you continue to need for the next year?" And occasionally we may need somebody else. We know people are retiring, so we adjust for those.

Q. You mentioned things like looking at what types of radiological equipment might need to be repaired or replaced?

A. Yes.

Q. Again, would you be relying upon somebody -- the radiological department head?

A. Yes, yes.

Q. But would you have any role in costing the replacement cost or the repair cost?

A. Actually, the radiological department will give me an estimate of the cost for those particular items they need to

Q. And it is your understanding that it is?
A. Yes.
Q. And did you understand when you prepared this that that was the purpose of this analysis?
A. Yes.
Q. You mentioned that you're comparing the costs that result from the removal of the vent stack with fuel in the pool versus, I think you said, late in the actual decommissioning of the Humboldt Bay Power Plant?
A. Yes.
Q. When you say late in the actual decommissioning, what was the original timetable for the removal of the vent stack?
A. Well, it would have been after the fuel had been removed from the pool. Exactly where it was in relationship to other activities, I am not sure. I would have to go look at a schedule from the 2002 study to make sure.
Q. This document did not exist prior to early 2005?
A. That's correct.
Q. Were you the only one involved in preparing or assembling the information that ultimately went into this document?
A. No.
Q. Who else was involved in that project?
MR. SHAPIRO: Objection. Instruct Mr. Kapus not to answer. Privilege.

Page 49

Q. BY MR. EKMAN: Let me ask this: Were there any other PG&E employees who were involved in the preparation of this document?
MR. SHAPIRO: Again, I am going to object and instruct Mr. Kapus not to answer.
MR. EKMAN: On whether there were other PG&E employees involved in the preparation of this document? I mean, we know that. We know Mr. Willis and Mr. Kahler are both involved in the preparation of this, at least according to Mr. Willis.
I mean, if he has meetings and obtained -- let me ask another question.
Q. Based on your experience, education and experience, and also work on the vent stack project during the '90s, or involvement in that project, did you have the ability to determine incremental costs alone?
A. Yes.
MR. SHAPIRO: Objection. Vague.
Q. BY MR. EKMAN: You did. That's okay. You did?
A. Yes.
Q. Did you determine incremental costs on your own?
MR. SHAPIRO: Objection. Vague.
THE WITNESS: During the actual work?
Q. BY MR. EKMAN: No, no, in terms of when you sat down in 2005 to actually put this together. Did you alone

Page 50

determine which costs -- which activities, which costs were incremental?
A. No.
MR. SHAPIRO: Again, I am going to object and instruct Mr. Kapus not to answer that question.
MR. EKMAN: What's the basis for that?
MR. SHAPIRO: Privilege, work product.
MR. EKMAN: He's telling me he relied on other folks. I am entitled to know what other people he relied upon to produce something that's going to go into damages. I assume that neither you nor Mr. Stouck provided the technical inputs that would go into this kind of analysis.
If he spoke with other employees at PG&E, got their expertise and drew from that expertise to make up -- to figure out what is going to go into this amount, I am entitled to know that.
MR. SHAPIRO: You are talking about a document that was prepared in the course of litigation for submittal as part of the damages. Exactly how this document or comparable documents were put together, what process was used, who talked to whom, that's covered by the work product doctrine.
You can ask all kinds of questions about what the costs were, to the extent Mr. Kapus has knowledge of that, as opposed to the process of putting it together.
Mr. Kapus -- you have asked for Mr. Kapus's

Page 51

deposition. Mr. Kapus is not here as a -- has not been identified as a -- as an expert witness. We haven't gotten to that point in the case.
I think that's -- you're heading down that direction that you're entitled to inquire what an expert has relied upon. That's not this deposition.
MR. EKMAN: And unfortunately I don't have a cost summary for 1997, 1998, because it wasn't done in '97, '98. So I have to ask my questions in relation to the documents that I have.
It strikes me as odd that you can basically seek a million dollars, and because I have to ask about a process that was used to generate an estimate, that it is totally protected. Or if they had done it contemporaneously, which they didn't, presumably I may be able to ask about this.
We may come back to this. We may get the Court on the phone for this one. I don't quite know logistically how we are going to do that, because we all have cell phones here.
Q. Let me ask specifically -- let's start with the first topic. There's "HBPP Environmental Services." There's a charge for $736. What activities were determined to be incremental -- not costs. What activities were determined to be incremental to the project?
MR. SHAPIRO: Objection. Vague.

Page 52

Q. Is there something you could look at that would determine whether you did or did not?
A. Yeah, an SAP document.
Q. All right. And how long would it take for you to actually print out an SAP printout for every contract cost that was incurred on the vent stack project?
A. Referring to a document such as this?
Q. Sure, that encompasses the entire whatever, 4 and a half million dollars of costs that were incurred.
A. It could take a better part of a day.
Q. But that is available on the SAP system?
A. That is available on SAP.
Q. And SAP could answer my question of whether all of Mr. Norton's time was charged -- whether, basically, the $16,500 of Mr. Norton's time is total or only a part of his total time?
A. Yes.
Q. All right. Is there some -- is there a process at PG&E for reviewing the expense reports of contractors to determine that the costs are appropriately charged to PG&E?
A. Yes.
Q. And what is that process?
A. The -- each contractor has a PG&E person that's responsible for that contract. That responsible person will review all of the invoices, including the backup for



expenses, and concur or not concur to it.
Q. And who was the PG&E person responsible for reviewing expenses on the stack removal project?
A. Most of them, if not all of them, would have been Mr. Kahler.
Q. If you could go behind tab B. It is fairly far back. Tab B is documents that support that roughly thousand dollars in expenses. It is Bates No. 25001, is how it ends. It is almost all the way back to tab 4. It is three pages from the back, 25001.
A. Yes.
Q. This is an invoice, Mr. Bruce Norton, says, "Group TLG Services, Inc." We notice that there were two charges to a golf pro shop that have been deleted with the note "delete." Do you see that?
A. Yes.
Q. Is that deleted -- do you know if that's deleted by PG&E or was deleted by Mr. Norton or his people?
A. I do not know who wrote the "delete."
Q. If the PG&E person responsible for reviewing expenses found an expense that they believe was not appropriately charged through, would it be common practice to, though -- would they cross it out, or is there some other mechanism for disallowing that expense?
A. They would cross it out.



Q. And do you know why -- do you know why Mr. Norton -- for instance, for this, the group is TLG Services, Inc., is he associated with TLG?
A. No.
Q. Do you know why it says "TLG Services, Inc."?
A. He was at an annual conference of TLG's at this particular time.
Q. Did you -- in determining that the thousand dollars was appropriately -- or was incremental, did you review the expenses to ensure that all the expenses were incurred in relation to the vent stack project?
MR. SHAPIRO: I am going to object and instruct Mr. Kapus not to answer on the grounds of work product.
I want to be a little clearer than we have been. Some of these objections have been vague, but we have taken the position that the process for putting together this estimate is protected by the work product doctrine. I think what your question is fairly getting at is part of that process.
MR. EKMAN: That's outrageous.
Q. Let me ask this: In determining incrementality, in determining that a thousand dollars would pass through to the government, did you review the supporting invoices to ensure that the time that the -- or the expenses that Mr. Norton was passing through were, in fact, related to his work on the



vent stack project?
A. They were reviewed when we processed the invoice.
Q. So you relied on the earlier review, then?
A. Yes.
Q. And on the allocation in the internal accounting software?
A. Yes.
Q. All right. The next item relates to Bechtel, and it is behind tab 4. It is a $9,227 charge, "Evaluate design and mods for stack removal." Based on our review of the first page, which is 25004, from the accounting system --
A. Yes.
Q. -- it looked to us like the $9,000 amount was made up of the totals below, beginning with 2001.61 and going all the way down to 4,673?
A. Correct.
Q. If you look at the invoices that are provided, you'll see on the invoices there are various item numbers. In the case of the first one, it is item 20 to 24?
A. Yes.
Q. And item 24 is the stack removal project?
A. Yes.
Q. How was it determined -- well, first of all, do you know what work Bechtel was performing at the site in connection with the stack removal project?