# EXHIBIT 1

00001

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

-----------------------------------:

PACIFIC GAS & ELECTRIC COMPANY, :
:
Plaintiff, :
:
vs. : No. 04-074C into
: which has been
UNITED STATES OF AMERICA, : consolidated No.
: 04-075C
Defendant. :
-----------------------------------:

Washington, D.C.

Thursday, September 22, 2005

Deposition of:

W. JOHN ARTHUR, III

called for oral examination by counsel for Plaintiff, pursuant to notice, at Greenberg, Traurig, L.L.P., 800 Connecticut Avenue, Northwest, Suite 500, Washington, D.C., before Shari R. Broussard, a Notary Public in and for the District of Columbia, beginning at 9:41 a.m., when were present on behalf of the respective parties:

00028

necessary quality is built and then we'll announce what that date is going to be.

BY MR. STOUCK:

Q The last time you answered that question with a specific date or time frame, you, Mr. John Arthur, what was the answer that you gave?

MS. HERRMANN: Objection. Hold on. Mr. Stouck, this is really what we were talking about in our letter.

I get the sense that where you're going here is future activities, when things are going to happen in the future, and based on the Indiana Michigan ruling by the Fed Circuit, I don't believe that's relevant. Maybe you can tell me where you're going if anywhere other than that.

MR. STOUCK: Okay. I was going to the phone to call Judge Hewitt, but --

MS. HERRMANN: Okay.

MR. STOUCK: -- I think there's a tremendous amount of relevance to future activities and I intend to ask those questions and I think we're probably going to need to take it up with the

00029

judge.

MS. HERRMANN: I think we need to do that right away, I mean just get it out of the way.

MR. LO RE: Can we go off the record? Are we going to do this on the --

MR. STOUCK: No, no, stay on the record, please.

MR. LO RE: Thank you, counsel. I would like to know for the record whether we're going to keep the witness in the room.

My suggestion is that Mr. Arthur be excused from the room while we talk to the judge and that's what I would counsel that we do. In fact, that's what we're going to do and we can take that up with the judge as well. Thank you.

MR. STOUCK: And why is that, counsel?

MR. LO RE: Because obviously we will be discussing issues that may be your theory of the case or our theory of the case and I simply don't think it's appropriate to have the witness involved in that.

MR. STOUCK: Okay.

00035

JUDGE HEWITT: Well, the first reason would be it's discovery and it could lead to discoverable information.

MR. STOUCK: That's right, Your Honor, and that was certainly on my list, not necessarily first, but I like the sound of it.

I guess the first thing on my list is that the proper procedure here is to adjourn the deposition, send Mr. Arthur back to Nevada and move for a protective order, but be it as it may, you're available, so here we are.

One of the key issues in this case, as you know is, or at least from our point of view, is what is a reasonable schedule for pickup of this spent nuclear fuel. This court has a ruling on that issue or approaches that issue in the Commonwealth Edison case.

JUDGE HEWITT: It only says that what was being proposed wasn't, but go on.

MR. STOUCK: That is correct. Our position is that it's a missing term and the court needs to supply a reasonable term and, therefore,

# EXHIBIT 2

00001

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

PACIFIC GAS & ELECTRIC COMPANY, )
Plaintiff, )
v. ) Docket No.: 04-74C
UNITED STATES, )
Defendant. )

Suite 617, Chambers
National Courts Building
717 Madison Place, N.W.
Washington, D.C.
Friday
October 14, 2005

The parties met, pursuant to notice of the Court, at 2:04 p.m.

BEFORE: HONORABLE EMILY C. HEWITT
Judge

APPEARANCES:

For the Plaintiff (via telephone):
JERRY STOUCK, Esquire
ROBERT SHAPIRO, Esquire
KEVIN STERN, Esquire
Greenberg Traurig
800 Connecticut Avenue, N.W., Suite 500
Washington, D.C. 20006
(202) 331-3100

00016

this case, the complaint was filed. That's with respect to the rate, Your Honor, and if you'll indulge me just a little bit more, I want to talk about the so-called "reasonableness aspect" that Mr. Shapiro raised today and, I believe, that Mr. Stouck raised several weeks ago.

THE COURT: What would be the period of time from the point of view -- I'm going to ask this of the Plaintiff and then the Defendant, and I'll come back to you for you to chat with the point you were on, Mr. LoRe. But, Mr. Shapiro, what is the period of time, the maximum extent of the period of time, for which we could be looking at damages in this portion in this case in our trial next June 16th?

MR. SHAPIRO: This is Robert Shapiro.

THE COURT: A plus. Go on.

MR. SHAPIRO: Thank you, Your Honor. I assume that you're referring to the time, how far --

THE COURT: Both directions, the beginning and the end date.

MR. SHAPIRO: Robert Shapiro again. As far as the beginning date, it's our position that the federal circuit's Indiana Michigan decision does not put a limit on a beginning date. I couldn't tell you off the top of my head what the first costs we're

00017
claiming. There are some that predate the breach, but I don't have, as I'm sitting here, a firm date on that.

THE COURT: When you said they predate the breach, do you mean they predate -- what date are you referring to as the breach date?

MR. SHAPIRO: Robert Shapiro again. January 31, 1998.

THE COURT: Uh-huh.

MR. SHAPIRO: We know, from a filing that the government made in the Wisconsin Electric case, that the government has taken the position, at least in that case, and we assume that they intend --

THE COURT: Wait a minute. I'm interested in your position here, not the government's. I'll ask them.

MR. SHAPIRO: Okay. It's our position that there is certainly nothing in the federal circuit decision that purports or suggests --

THE COURT: Just tell me what you're claiming, the dates you're claiming for.

MR. SHAPIRO: Your Honor, again, I don't have the data on just when the damages started.

THE COURT: Let me tell you how you can answer this. Sometime in -- give me a decade --

00018

MR. SHAPIRO: -- the 1990's, Your Honor.

THE COURT: And then what's the end date?

MR. SHAPIRO: The end date, to be perfectly frank, Your Honor, we have not concluded our analysis of how to address the Indiana Michigan decision with respect to exactly when to cut off damages. We would certainly not agree with the position just articulated by Mr. LoRe --

THE COURT: I wasn't listening for his answer just then.

MR. SHAPIRO: I believe it was the time of the filing of the complaint. There is certainly flexibility in the federal circuit's articulation of the rule to go at least through trial and perhaps even beyond trial, and we simply have not gotten to the point where we've finalized our position on that. In our initial disclosures, the damage claim went out through 2012. It is not our current intent to pursue damages through 2012 in light of the federal circuit's Indiana Michigan decision.

THE COURT: Thank you. What is the view of the United States on the period of time that you understand right now that the suit is looking for damages?

MR. LoRe: Your Honor, Alan LoRe here. I

00019

was about to answer your question, and then I thought maybe I misunderstood. Were you asking, Your Honor, what our understanding is of the Plaintiff's claim?

THE COURT: Right, and then if you think that the bracket should be someplace else, tell me what it is.

MR. LoRe: Your Honor, I think, at this stage in the litigation, it would be easier for me to answer what our position is with respect to what we believe they are entitled to.

THE COURT: Okay.

MR. LoRe: I am not at liberty to talk specifically to the Plaintiffs' complaint or the specific claims that they are making.

With respect to our position on what the span of damages should be, or the time period for damages, it would be, Your Honor, and, again, this is pursuant to the holding in Indiana Michigan, we would be talking about the duty to mitigate began no earlier, according to the federal circuit, than -- I believe it's May 25th of 1994, which is when the federal circuit made a determination that there was a duty to mitigate because of the notice of inquiry that was issued by the Department of Energy.

Then on the other side of the coin, our

00020

position, as I said earlier, Your Honor, and, again, this goes to -- I think it's page 5 of the Indiana Michigan decision that says clearly, in our mind, that the damages should go no later than -- I believe the term the court uses is "the date of the action," and our interpretation of that, Your Honor, is that would be the date that the complaint was filed in this matter.

THE COURT: Uh-huh. There are a lot of law issues out there in this case. Are you sure we don't need some kind of a summary judgment proceeding?

MR. LESTER: Your Honor, this is Mr. Lester. We were just discussing that perhaps it would be a good idea for us to go ahead and file a motion on the future damages issue to get it before the Court and get it resolved.

MR. STOUCK: Your Honor, this is Jerry Stouck. If I may, on that?

THE COURT: You may, Mr. Stouck.

MR. STOUCK: Thank you very much. You know, we're heading towards trial. There is obviously going to be a trial here. Quite frankly, we don't think there is any need at this point for a summary judgment motion to decide this question in the abstract. We'll present evidence at trial. It's not going to go out

00021

to 2012.

And if I may just add, I didn't know that we were going to get onto this subject, but, of course, it is pertinent to the discovery issue, but let me just say that the rationale of Indiana Michigan, as we read it, is that the Court said that future damages are not available because they are speculative. Okay? Well, there is nothing speculative about the cost, the dollars that PG&E have spent, the checks that they have paid and have been returned since the time that the complaint was filed up to today, and there is nothing speculative about those costs as of the time of trial, and --

THE COURT: Wait a minute. Mr. Stouck, sorry to slow you down, but you said there is a sentence in there with your "nothing speculative" --

MR. STOUCK: I just want --

THE COURT: Mr. Stouck?

MR. STOUCK: Yes.

THE COURT: There was a sentence that you stated there is nothing speculative about the checks. I just didn't hear it.

MR. STOUCK: -- written and paid by PG&E --

THE COURT: Checks paid and then --

MR. STOUCK: -- incurred costs for spent

00022

fuel storage subsequent to the time of the complaint.
My point is --
THE COURT: I'm sorry. Subsequent --
MR. STOUCK: -- to the time of the complaint in this case, which was filed in January 2004.
THE COURT: Uh-huh.
MR. STOUCK: There is a sentence, and we're perfectly frank about it, there is a sentence in the opinion, or, I think, a quote from another source, that talks about limiting damages to the time of suit, but there is another sentence that talks about the ability of Indiana Michigan to collect its damages as they are incurred. And so the text of the opinion, I don't think, answers the question that's being discussed.
The rationale, though, -- that's what I wanted to get to -- the underlying rationale is that future costs may be speculative, and I'm simply making the point that as we go about the task of figuring out how we're going to decide what the end date is for damages, we keep in mind the rationale, and I would urge the Court to keep in mind that the dollars that are being spent right now today are not speculative, and at least up until the time of trial, they won't be speculative.

00023

In terms of a summary judgment motion, these suits are very expensive, as the Court is aware, and perhaps appropriately so up to a point. There is a lot at stake for both sides, but since we have to go to trial anyway, I would urge that we not take a sidetrack on paper briefing of this question in the abstract. The Court can best decide it after you see the facts and see, you know, how the damages claims weigh out in the whole context of our claim.

THE COURT: Thank you, Mr. Stouck.

We are back to Mr. LoRe, I think, and it may be that we ventilated some of the issues that you wanted to discuss, but go ahead, Mr. LoRe. You're discussing why the 15 requests for production were not proper for the United States to respond to in full.

MR. LoRe: Thank you, Your Honor. Alan LoRe again. One, I would just like to very briefly respond to what Mr. Stouck said in the context of the Indiana Michigan case. I think it's important for the Court to focus on the fact that the fed. circuit in Indiana Michigan cited to the restatement of judgment, Section 26, which sets forth a cut-off date for damages as of the date of the complaint. And I think that it should inform the Court as to what the federal. circuit, as we understand it.

00024

THE COURT: The mandate, obviously, won't have issued in this case at this time. Are there pending motions from the Plaintiff's bar to reconsider?

MR. LoRe: Your Honor, Alan LoRe here. None that I am aware of, Your Honor.

THE COURT: Yes.

MR. LoRe: Mr. Stouck and I have been discussing Indiana Michigan several times in the context of other cases over the last few weeks.

THE COURT: Certainly.

MR. STOUCK: This is Jerry Stouck.

THE COURT: Thank you.

MR. STOUCK: The deadline is, I believe, October 24th for any such petitions.

THE COURT: For rehearing or rehearing en banc.

MR. STOUCK: And, Your Honor, again, if I may, --

THE COURT: Certainly. This is Mr. Stouck?

MR. STOUCK: Yes.

THE COURT: Thank you.

MR. STOUCK: One or two more sentences about this, and, again, just because this is an issue that's going to come up in a lot of cases.

00025

It's important to bear in mind the facts of Indiana Michigan in respect to future damages. Indiana Michigan was a company that had not even begun to build a dry storage facility at the time of trial, and, in fact, will not begin to build a dry storage facility for some time in the future. It hasn't spent one dollar yet on dry storage.

In the context of those facts, it just doesn't matter where the line gets drawn, whether it's at the time of the complaint, at the time of trial, or some other time that might fit within the common definition of "no future damages." It just doesn't matter on those facts because they are all off into the future.

And so, again, I would just urge the Court that in a case like ours where we have started building dry storage facilities, -- PG&E has spent tens of millions of dollars, if not more than that, at two different sites and is in the process actively of building these facilities to store its spent fuel, again, going to the rationale there is simply nothing speculative about that, and we think that the Court can best decide this issue on --

THE COURT: This is obviously going to be an important matter, and I'm going to ask you to brief

00026
it, and there may be other issues, when we get through today, that we're going to brief.

I think, presently advised, my view of Indiana Michigan is that the court had an opportunity to avoid a kind of a replay of the Winstar litigation, for lack of a better comparison. It took the first case that it got that was fully developed, and it may not have been the case that the plaintiff's bar would have wanted to go up with, but that's the case they got, and that's the luck they got in this. They got a very strong panel -- all panels at the federal circuit, of course, are strong, but one that had been there through a fair amount of the Winstar litigation, and Judges Lourie and Mayer, of course, had been there through all of it.

It appeared to me -- I need to figure out -- we all do -- what the lines are, but it appeared to me that they were trying to turn this into football instead of, at least, girls' lacrosse. Girls' lacrosse is played to natural boundaries, and it can be quite chaotic in that regard, and football is played to hard-line boundaries. Men's lacrosse is actually played to hard-line boundaries. And it appeared to me that they were trying to set a court, a basketball court or a playing field, so that people

00027

would know where at least some of the corners were.

That is the way I read the opinion, in that the trial judges got some -- the intention of the thing appeared to me to be telling the parties and the trial judges basically a little bit of a roadmap for the litigation. We have two weeks set aside for this, and we, the Court, need to make our best judgment about what the issues are that really can be in play, and I think that we need to just come to grips with that opinion and what the shape of the playing field is now before we do a lot of preparation.

I don't intend to -- if the persuasive briefing is that the shape of the field for this game excludes periods from and after January 22, 2004, the time to know that is now, as close to now as we can. It appears to me that the circuit is trying to get us to make some sharp corners here and do the best we can with this pretty crisp, as these things go, opinion.

We may find other issues during the day. Another issue that's out there which we do need to, and, I think, can be brought up, is the United States has stated the position -- Mr. LoRe did a little earlier -- that the dates of claim -- that the claim couldn't extend earlier than May 25, 1994. There are sentences in the opinion that, I think, perhaps may

00028

not be quite as sharp at the corners Mr. LoRe has stated, and we need to figure out where that's located as well, and that may be a fact-driven matter. We need to figure those things out. But I don't think we're likely to do better on this in doing the law issues when, in the heat of battle -- if this is a legal issue, the factual development on the end of the time, it seems to me that that is something that can be settled legally.

There may be factual development on the early part, but I think that we should develop those issues and not leave them -- we will have a sufficient, I feel quite sure, amount of stuff on our plate next spring in preparation for trial not to have this all to be coming up in positioning, in interaction, with that factual preparation. That's a little longer speech than I intended, but I do think we need to brief on that.

Back to 15. Mr. LoRe, have you come to the end of a sentence, a paragraph, there?

MR. LoRe: Alan LoRe speaking, Your Honor. I've come to the end of the paragraph. I just had two quick things I wanted to add, with the Court's indulgence. The first is that we do agree, as Mr. Lester stated, that it would be helpful to brief these

00048

sentence, "the order in which DOE will accept spent fuel from utilities when DOE begins accepting, and any plans, projections, or estimates," and now you've got a conjunctive here with an "or," "or sequence in which DOE would have accepted or will accept."

It seems to me that all of the portions of that which refer to "will accept" are not highly probative, and there is a lot of evidence, based on all of the motion practice that I've seen reports of from my colleagues, that there is a lot of evidence on the "would have" that goes back to the eighties and nineties.

So if there were an absence of evidence on this, and I know the view is we can have evidence, and then it's evidence so we can have more evidence, but it doesn't seem to me that what they are going to do, now 22, 23 years later after the program has gotten underway, what they are going to do, however many years it is when this actually occurs, 30 years after the program gets underway, in the teens sometime or 2010 or thereafter, it seems to me that that's very low-grade ore; and, therefore, I am not going to compel the production of documents which deal about DOE will accept spent nuclear fuel from utilities. "Including, but not limited," is fine.

00051

MR. STOUCK: Your Honor, Jerry Stouck. If I may just make one point also, and we do appreciate your ruling, and hopefully we can get through some of the rest of this, but just point that I want to bring out, which, I think, will also be relevant perhaps to some other requests.

THE COURT: You're the attorney of record, Mr. Stouck, so let me just confirm what I understood to be that Mr. Shapiro has receded on the motion to compel on 15, with the modification imposed by the Court that 15 is now out of the case.

MR. STOUCK: Again, Your Honor, if I may address that. This is Jerry Stouck.

THE COURT: Thank you.

MR. STOUCK: It's convenient in some contexts to talk about rate and sequence as the only issues before the Court on a schedule, but that is much too simplistic, and, in fact, it's wrong.

Let me give you one other example. I'll try to be brief as I can about it; it won't take long. The government has argued in some cases, including this one, that the dry storage containers that PG&E is putting its spent fuel into are "not covered by the contract, and it will not pick them up."

Two points on that. One is in the past, and

00052
that is, in the early 1990's, it was the Department of Energy, Your Honor, who came up with the idea of dry storage containers and suggested that utilities put their fuel in dry storage containers and issued requests for proposal for dry storage containers, so that's evidence in the past that the Court will hear that goes to the reasonableness of our putting our spent fuel into dry storage containers.

But on the future side, when this issue came up, frankly, quite late in the Yankee case, we showed Judge Merow a picture of the Yucca Mountain surface facilities that was very current, like two weeks' old, that had a picture of a "dry cask storage transfer facility" or something like that, you know, a picture of a facility at Yucca Mountain that was prepared to accept dry storage containers, and that's kind of an example of a factor that goes beyond the kind of simplistic, but sometimes convenient, sequence and rate rubric and goes to a technical issue.

The government is taking the position that dry storage containers are not covered by the contract, that dry storage containers go to the end of the line, and so that's another example of something that has not much to do with rate or sequence but does have to do with whether DOE's real-world plans right

00053

now at Yucca Mountain are probative of what would have been reasonable in 1998.

So, again, I --

THE COURT: Mr. Stouck, I'm sorry. This is procedural. I want to coordinate with you all, in case we do need to run over, and I really don't plan to schedule a hearing tomorrow, so if we do run over past the time where all of us have to turn to something else this afternoon, I have two possible times on Monday that we could continue this if we don't get through it. One of them is Monday, nine-thirty, and the other would be right around two.

Let me just ask the parties quickly on the line. Could Plaintiff put up someone at nine-thirty?

MR. STOUCK: Yes, Your Honor.

THE COURT: Could Defendant?

MR. LESTER: Your Honor, this is Mr. Lester. Actually, Your Honor, the Southern Nuclear trial starts Monday morning.

THE COURT: Woa'. That's why we're having this now. Right? So we actually are going to be continuing. Okay.

MR. LESTER: Mr. LoRe and I, I think, could sneak out and do it at two. We would like to be there for the opening statements and the --

THE COURT: Let me just ask the Plaintiffs, then, if you're going to be sneaking out, would one be better?

MR. LESTER: I don't think so, Your Honor. It doesn't matter.

MR. STOUCK: Whatever the Court's preference is, Your Honor.

THE COURT: Okay. So nine-thirty is not good. Okay. Sorry for the procedural interruption. Go ahead, Mr. Stouck.

MR. STOUCK: Your Honor, I was largely one. Again, to be frank, and we appreciate the opportunity, the issues here are complex, at least some are, and the facts -- I was suggesting or informing the Court that the facts go beyond just what is the rate and what is the sequence.

THE COURT: Well, Mr. Stouck, just by way of advice for a future time, if you have a piffy little example about something that's in the future, see, you're arguing right now a motion for reconsideration on an order of the Court with respect to Document Request No. 15. That's what you're doing, and you could have probably avoided that by putting a good factual example in when several times I asked for a feel for what would be useful here from that future

00055

information. This is very colorful, but it's a little out of time.

We're going to move to our next subject, which is, let's see, I think, 19.

MR. SHAPIRO: This is Robert Shapiro. Yes, 19 is the next one on our list. It concerns communications between DOE and other parts of the executive branch as well as the legislative branch. The document refers to the subject being related to the Nuclear Waste Policy Act.

THE COURT: Thank you. Has there been any progress between the parties on resolving this? It looked like, from the back and forth, that there might have been.

MR. SHAPIRO: Your Honor, this is Robert Shapiro again. We certainly have told the government that we are willing to narrow that further. If the related to the NWPA is the real crux of the government's concerns, we can narrow this to communications that really relate more narrowly to the standard contract, but I don't believe that's going to resolve the parties' dispute.

THE COURT: Well, there are several pieces in here. It's communications between DOE and any other part of the executive branch, DOE and any part

# EXHIBIT 3

# ACCEPTANCE PRIORITY RANKING

# &

# ANNUAL CAPACITY REPORT

U.S. DEPARTMENT OF ENERGY
OFFICE OF CIVILIAN RADIOACTIVE WASTE MANAGEMENT
WASHINGTON, DC 20585

JULY 2004

## CONTENTS

1.0 INTRODUCTION ....................1
1.1 BASIS FOR THE ACCEPTANCE PRIORITY RANKING....................1
1.2 BASIS FOR THE ANNUAL CAPACITY REPORT ....................2
Table 1 – Projected Nominal Waste Acceptance Rates for Spent Nuclear Fuel .....2
Table 2 – Summary of Purchasers' Annual Allocations (MTU) ....................3
1.3 SUBMITTAL OF COMMENTS ON THIS REPORT....................4

REFERENCES ....................5

APPENDIX – A 2004 ACCEPTANCE PRIORITY RANKING ....................A.1
APPENDIX – B ANNUAL ACCEPTANCE CAPACITY ALLOCATIONS FOR THE DISPOSAL OF SPENT NUCLEAR FUEL ....................B.1

# ACCEPTANCE PRIORITY RANKING
# &
# ANNUAL CAPACITY REPORT

## 1.0 INTRODUCTION

The Nuclear Waste Policy Act of 1982, as amended (the Act)[1], assigns the Federal Government the responsibility for the disposal of spent nuclear fuel and high-level waste. Section 302(a) of the Act authorizes the Secretary to enter into contracts* with the owners and generators** of commercial spent nuclear fuel and/or high-level waste. *The Standard Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste*[2] (Standard Contract) established the contractual mechanism for the Department's acceptance and disposal of spent nuclear fuel and high-level waste. It includes the requirements and operational responsibilities of the parties to the Standard Contract in the areas of administrative matters, fees, terms of payment, waste acceptance criteria, and waste acceptance procedures. The Standard Contract provides for the acquisition of title to the spent nuclear fuel and/or high-level waste by the Department, its transportation to Federal facilities, and its subsequent disposal.

The Standard Contract requires the Department to issue an annual Acceptance Priority Ranking (APR) report and an Annual Capacity Report (ACR). The APR establishes the order in which the Department allocates the projected acceptance capacity for commercial spent nuclear fuel. The ACR applies projected nominal acceptance rates for the system to the APR, resulting in individual allocations for the owners and generators expressed in metric tons of uranium (MTU). These capacity allocations form the basis for the Purchasers' submittal of Delivery Commitment Schedules (DCS). As specified in the Standard Contract, the ACR is for planning purposes only and, thus, is not contractually binding on either DOE or the Purchasers.

## 1.1 BASIS FOR THE ACCEPTANCE PRIORITY RANKING

As required by the Standard Contract, the APR is based on the date the spent nuclear fuel was permanently discharged, with the oldest spent nuclear fuel, on an industry-wide basis, given the highest priority. The phrase "date the spent nuclear fuel was permanently discharged" means the date the reactor went subcritical for the purpose of permanently discharging the spent nuclear fuel, as reported to the Department by the Purchasers on the Nuclear Fuel Data Survey Form, RW-859. The APR is the basis for allocating projected spent nuclear fuel (SNF) acceptance capacity in the ACR. The 2004 APR listing is based on SNF discharges through December 31, 2002. The APR listing has been included as Appendix A.

---

* Individual contracts are based upon the Standard Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste (10 CFR Part 961).

** Owners and generators of spent nuclear fuel and high-level waste who have entered into contracts with the Department and/or have paid fees for purchase of disposal services are referred to as "Purchasers." In identifying the Purchasers listed in this report, the Department has relied upon written notices received pursuant to Article XII and XIV of the Purchasers' disposal contracts. In the event that any Purchaser believes that the listed designation is inappropriate, the Purchaser should contact the Department.

Future discharges will be added to the priority ranking based on their date of permanent discharge. If SNF currently designated as temporarily discharged is redesignated as permanently discharged (without subsequent irradiation), the date of redesignation will become the ranking date, instead of the date of actual discharge. Reinserted assemblies, previously designated as permanently discharged, will be removed from the priority ranking.

## 1.2 BASIS FOR THE ANNUAL CAPACITY REPORT

The ACR (see Appendix B) applies a 10-year projected nominal waste acceptance rate to the APR, resulting in individual capacity allocations. The projected nominal acceptance rate is based on the assumption of SNF acceptance beginning in 2010 at the Yucca Mountain Geologic Repository. These projected nominal waste acceptance rates are presented in Table 1.

**Table 1. Projected Nominal Waste Acceptance Rates for Spent Nuclear Fuel**

| Year | SNF (MTU) |
|---|---|
| 2010 | 400 |
| 2011 | 600 |
| 2012 | 1,200 |
| 2013 | 2,000 |
| 2014 | 3,000 |
| 2015 | 3,000 |
| 2016 | 3,000 |
| 2017 | 3,000 |
| 2018 | 3,000 |
| 2019 | 3,000 |

The Department will further define and specify the system operating and waste acceptance parameters as the Program progresses, and inform the Purchasers accordingly. Until the SNF is accepted by the Department, Section 111 (a)(5) of the Act assigns the waste owners and generators the primary responsibility to provide for, and pay the costs of, interim storage.

The Tables in Appendix B list the Purchasers' annual allocations for each of the first 10 years*** of projected CRWMS operation. Table 2 presents a summary of all Purchasers' annual allocations based on the nominal waste acceptance rates for the 10-year period covered by this report.

*** The term "year," when used in reference to capacity allocation in this report, means the calendar year, beginning January 1 and ending December 31.

## TABLE 2. SUMMARY OF PURCHASERS' ANNUAL ALLOCATIONS (MTU)[a]

| PURCHASER | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Aerotest Operations, Inc. | - | - | - | - | - | - | - | - | - | - | - |
| Alabama Power Company | - | - | - | - | 45.6 | 119.3 | 73.4 | 77.8 | 60.2 | 89.9 | 466.2 |
| [illegible]eren UE | - | - | - | - | - | - | 38.7 | 44.3 | 38.0 | 30.3 | 151.3 |
| [illegible]erGen Energy Company, LLC | 31.1 | 43.0 | 46.8 | 114.4 | 51.7 | 36.4 | - | 67.0 | 88.6 | 107.4 | 586.4 |
| Arizona Public Service Company | - | - | - | - | - | - | - | 66.5 | 69.4 | 66.2 | 202.1 |
| Baltimore Gas & Electric Co. | - | - | - | 82.6 | 107.5 | 89.6 | 93.8 | 62.0 | 64.2 | - | 499.7 |
| BWXT | - | - | 0.1 | 0.1 | - | 0.1 | 0.1 | - | 0.1 | - | 0.1[b] |
| Carolina Power & Light Company | - | 69.7 | 48.0 | 50.5 | 145.8 | 118.3 | 116.0 | 87.3 | 87.4 | 94.8 | 817.8 |
| Cleveland Electric Illuminating Co. | - | - | - | - | - | - | - | - | 22.6 | 76.7 | 99.4 |
| Connecticut Yankee Atomic Power Co. | 65.5 | 22.5 | 41.6 | 21.9 | 42.1 | 42.1 | 44.5 | 21.8 | 21.0 | - | 323.1 |
| Consumers Power Co. | - | 2.5 | 87.4 | 31.1 | 32.9 | 59.9 | 24.8 | 3.1 | 25.9 | 32.0 | 299.6 |
| Dairyland Power Cooperative | 0.8 | 6.0 | 3.0 | 3.9 | 4.9 | 5.7 | 6.1 | 7.8 | - | - | 38.1 |
| Detroit Edison Company | - | - | - | - | - | - | - | - | 19.1 | - | 19.1 |
| Dominion Nuclear Connecticut, Inc. | 5.5 | 40.7 | 52.5 | 41.9 | 113.8 | 93.3 | 103.6 | 123.7 | 103.9 | 71.2 | 750.1 |
| Dow Chemical | - | - | - | - | - | - | - | - | - | - | - |
| Duke Power Company | - | 24.9 | 48.2 | 176.4 | 124.2 | 162.3 | 200.0 | 318.5 | 234.6 | 246.3 | 1,535.5 |
| Energy Northwest | - | - | - | - | - | - | 10.8 | 29.4 | 52.5 | 37.9 | 130.7 |
| Entergy Arkansas, Inc. | - | - | - | 51.5 | 76.6 | 83.3 | 60.6 | 76.8 | 28.2 | 87.6 | 464.6 |
| Entergy Gulf States, Inc. | - | - | - | - | - | - | - | 30.5 | 41.1 | 32.9 | 104.5 |
| Entergy Louisiana, Inc. | - | - | - | - | - | - | - | 38.6 | 31.8 | 70.8 | 141.1 |
| Entergy Nuclear FitzPatrick, LLC | - | - | - | 51.4 | 30.0 | 71.8 | 34.4 | 35.8 | 33.6 | 27.3 | 284.2 |
| Entergy Nuclear Generation Company | - | 3.9 | 25.5 | 82.6 | 17.1 | 83.9 | - | 34.2 | - | - | 247.2 |
| Entergy Nuclear Indian Point 2, LLC | 3.0 | 27.7 | 32.8 | 27.1 | 52.8 | 33.8 | 63.5 | 31.1 | 33.0 | 25.8 | 330.6 |
| Entergy Nuclear Indian Point 3, LLC | - | - | - | 29.3 | 34.7 | 34.7 | 33.0 | 36.1 | 28.4 | 33.8 | 229.9 |
| Entergy Nuclear Vermont Yankee, LLC | - | 72.9 | - | 40.2 | 50.7 | 41.5 | 41.3 | 24.9 | 25.0 | 23.6 | 320.0 |
| Exelon Generation Company, LLC | 21.1 | 60.5 | 251.2 | 466.7 | 488.3 | 451.7 | 419.8 | 375.2 | 523.9 | 433.6 | 3,491.9 |
| Florida Power & Light Co. | - | 20.9 | 59.6 | 78.7 | 169.3 | 112.4 | 141.8 | 117.1 | 86.9 | 122.2 | 908.9 |
| Florida Power Corporation | - | - | - | 0.9 | 46.4 | 58.3 | 30.1 | 41.3 | - | 33.8 | 210.8 |
| FPL Energy Seabrook, LLC | - | - | - | - | - | - | - | - | - | - | - |
| G.E. Uranium Management Corporation | 145.2 | - | - | - | - | - | - | - | - | - | 145.2 |
| General Atomics | 0.1 | 0.1 | - | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1[b] |
| [illegible]ral Electric Company | 0.3 | - | - | - | - | - | - | - | - | - | 0.3 |
| [illegible]orgia Power Company | - | - | - | 5.2 | 91.6 | 105.3 | 103.2 | 116.3 | 103.3 | 117.3 | 642.2 |
| Indiana Michigan Power Co. | - | - | - | 57.8 | 132.6 | 120.2 | 119.3 | 35.7 | 65.7 | 71.5 | 602.9 |
| Interstate Power & Light | - | - | 15.4 | 36.4 | 32.0 | 23.6 | 22.0 | 23.4 | 21.9 | 19.1 | 193.9 |
| Kansas Gas & Electric Company | - | - | - | - | - | - | - | 27.7 | 33.7 | 35.3 | 96.7 |
| Maine Yankee Atomic Power Company | - | 26.4 | 57.9 | 78.0 | 52.5 | 30.0 | 54.8 | 24.5 | 20.8 | 27.4 | 372.3 |
| Nebraska Public Power District | - | - | 23.6 | 13.8 | 80.9 | 41.9 | 21.2 | 37.3 | 32.2 | 30.9 | 281.7 |
| Nine Mile Point Nuclear Power Station, LLC | 9.4 | 49.0 | 38.9 | 30.8 | 68.1 | - | 74.8 | 31.1 | - | 36.3 | 338.4 |
| Northern States Power Co. | - | 26.2 | 99.6 | 65.2 | 111.4 | 143.1 | 58.9 | 92.6 | 52.3 | 38.4 | 687.6 |
| Omaha Public Power District | - | - | 22.3 | 35.4 | 14.8 | 21.9 | 32.3 | 16.4 | 15.2 | 13.1 | 171.4 |
| Pacific Gas & Electric Company | 7.3 | 6.0 | 15.9 | - | - | - | - | 47.5 | 65.3 | 110.2 | 252.1 |
| Pennsylvania Power & Light Co. | - | - | - | - | - | - | 89.6 | 103.5 | 121.2 | 78.9 | 393.2 |
| Pennsylvania Power Company | - | - | - | - | 6.0 | 48.7 | 35.2 | 63.6 | 56.3 | 31.8 | 241.6 |
| Portland General Electric Company | - | - | - | 0.5 | 40.5 | 34.9 | 42.2 | 54.2 | 48.8 | 49.0 | 270.0 |
| PSEG Nuclear LLC | - | - | - | - | 46.9 | 72.6 | 64.6 | 133.0 | 96.0 | 133.8 | 547.0 |
| Rochester Gas and Electric Company | 32.0 | 4.6 | 24.4 | 32.3 | 35.8 | 12.7 | 35.1 | 23.5 | 12.8 | 23.6 | 236.9 |
| Sacramento Municipal Utility District | - | - | - | 35.3 | 49.2 | 32.0 | 30.1 | - | 82.0 | - | 228.6 |
| South Carolina Electric & Gas Company | - | - | - | - | - | - | 50.4 | 27.6 | 28.0 | 31.9 | 137.9 |
| South Texas Project NOC | - | - | - | - | - | - | - | - | 9.8 | 50.4 | 60.2 |
| Southern California Edison Co. | 35.6 | 20.5 | 38.6 | 19.2 | 19.3 | - | 73.9 | 118.7 | 112.7 | 60.5 | 498.9 |
| Systems Energy Resources, Inc. | - | - | - | - | - | - | - | 101.5 | 50.4 | 50.2 | 202.1 |
| Tennessee Valley Authority | - | - | - | 64.2 | 297.8 | 236.0 | 277.0 | - | 33.1 | 60.3 | 968.4 |
| Texas Utilities Generating Company | - | - | - | - | - | - | - | - | - | - | - |
| Toledo Edison Co. | - | - | - | - | - | 65.2 | 30.6 | - | 30.5 | 28.1 | 154.3 |
| U.S. DOE | 22.9 | 6.8 | 7.8 | 7.3 | 89.5 | 88.0 | 0.1 | 0.1 | 15.7 | - | 237.8[b] |
| Virginia Electric and Power Co. | - | 8.2 | 113.3 | 54.7 | 105.5 | 133.0 | 151.3 | 86.0 | 108.6 | 85.9 | 846.4 |
| Wisconsin Electric Power Company | 16.3 | 43.1 | 32.6 | 64.2 | 50.2 | 57.0 | 29.9 | 53.7 | 37.8 | 37.7 | 422.5 |
| Wisconsin Public Service Corporation | - | - | 4.4 | 33.8 | 35.1 | 25.9 | 49.8 | 23.1 | 17.1 | 26.5 | 215.7 |
| Y[illegible]ee Atomic Electric Company | 9.9 | 10.1 | 9.7 | 18.1 | 8.5 | 9.4 | 17.7 | 8.3 | 9.2 | 8.4 | 109.2 |
| NOMINAL TOTAL | 400 | 600 | 1,200 | 2,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 22,200 |

a Differences in Purchaser allocations for individual years in Annual Capacity Report may differ from the Acceptance Priority Ranking due to rounding.

b These totals are not the sum of the annual allocations because the actual annual values are much less than .1 MTU.



PDCP0009595

## 1.3 SUBMITTAL OF COMMENTS ON THIS REPORT

Written comments are requested, especially from the Purchasers, on the content and format of this report. Comments received on previous reports were used to identify issues that needed to be addressed by the Department and the Purchasers in the implementation of the Standard Contract provisions. Comments on this report should be addressed to:

Mr. David K. Zabransky
Contracting Officer
Office of Civilian Radioactive Waste Management, RW-20E
U.S. Department of Energy
1000 Independence Avenue, SW
Washington, DC 20585

Or by e-mail at:

dave.zabransky@rw.doe.gov

# REFERENCES

[1]"Nuclear Waste Policy Act of 1982," Public Law 97-425 (January 7, 1983) and the "Nuclear Waste Policy Amendments Act of 1987," Title V, Subtitle A, Public Law 100-203 (December 22, 1987).

[2]U.S. Department of Energy, "Standard Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste," Code of Federal Regulations, Title 10, Part 961, 2004.