No. 04-0074C
into which has been consolidated No 04-0075C
Judge Hewitt

(Filed Electronically, December 9, 2005)

---

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---

PACIFIC GAS & ELECTRIC COMPANY,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

---

# REPLY IN SUPPORT OF MOTION TO COMPEL "DELIBERATIVE PROCESS" DOCUMENTS

---

JERRY STOUCK
Greenberg Traurig, LLP
800 Connecticut Avenue, NW
Suite 500
Washington, DC 20006
(202) 331-3173
(202) 261-4751
*Counsel for Plaintiff*
Pacific Gas & Electric Company

Of Counsel:
ROBERT L. SHAPIRO
Greenberg Traurig, LLP

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........ ii

INDEX OF APPENDIX ........ iii

DISCUSSION ........ 2

I. The Issues Presented Here Have Not Been Resolved Against PG&E........ 2

II. The Government Has Not Established That The 453 Documents In Question Should Be Withheld Under The Deliberative Process Privilege. ........ 4

A. The Deliberative Process Privilege Must Be Asserted By The Head Of The Pertinent Agency Or Department........ 8

B. The Documents The Government Has Withheld Do Not Qualify For the Deliberative Process Privilege. ........ 15

C. The Deliberative Process Privilege Is Qualified, And Even If It Did Apply To Some of the Documents The Government Has Withheld, PG&E's Need For That Evidence Requires Disclosure Here........ 25

CONCLUSION ........ 29

# TABLE OF AUTHORITIES

FEDERAL CASES PAGE

*Cetron Electronic Corp. v. United States*, 207 Ct. Cl. 985 (1975) .......................................... 9, 10

*Charter Federal Sav. Bank v. United States,* 52 Fed. Cl. 120 (2002)............................................ 4

*Dep't of Energy v. Brett*, 659 F.2d 154 (Temp. Emer. Ct. App. 1981) .................................... 9, 10

*Jade Trading, LLC v. United States,* 65 Fed. Cl. 487 (2005) .................................................. 3, 10

*Kaiser Aluminum & Chem. Corp. v. United States*, 157 F. Supp. 939 (1958) ............... 6, 7, 16, 25

*Marriott Int'l Resort, L.P. v United States*, 61 Fed. Cl. 411 (2004)................................. 3, 4, 9, 26

*State of Alaska v. United States*, 16 Cl. Ct. 5 (1988) ..................................................................... 26

*Sun Oil Co. v. United States*, 514 F.2d 1020 (1975)........................................................ 25, 26, 27

*United States v. Nixon*, 418 U.S. 683 (1974) ..................................................................... 5, 15, 16

*Walsky Constr. Co. v United States,* 20 Cl. Ct. 317 (1990) .................................................. 16, 18

*Yankee Atomic Elec. Co. v. United States*, 54 Fed. Cl. 306 (2002) ........................................... 2, 9

# INDEX OF APPENDIX

DOCUMENT PAGE

*Yankee Atomic v. U.S.*, No. 98-126 (Fed. Cl. 1998) Order dated August 25, 2003 ....1

Unconsolidated Spent Fuel Plaintiff's Joint Motion for An Order for Coordinated Discovery dated July 9, 2001 ....5

Order granting Unconsolidated Spent Fuel Plaintiff's Joint Motion for An Order for Coordinated Discovery dated September 26, 2001 ....33

Joint Discovery Order dated November 1, 2001 ....35

Review Draft, Summary of Conclusions MRS Action Plan Task G ....39

February 2, 1990 Memorandum, Transmittal of the Predecisional Draft Annotated Outline ....42

July 15, 1994 Interoffice Correspondence, Review Draft Delivery ....55

Preliminary Draft, "The Acceptance Criteria for Commercial Spent Nuclear Fuel Canisters" ....67

August 26, 1992 Memorandum, Transmittal of Predecisional Draft GTCC LLW Strategic Plan ....88

February 27, 2001 Email and Attached Draft Correspondence to S. Redeker, Sacramento Municipal Utility District ....123

September 1997 Draft Revision 1, "The Waste Acceptance Civilian Radioactive Waste Management System, Material Control and Accounting Plan" ....129

*Marriott International v. U.S.*, No. 05-5046 (Fed. Cir. 2005), Selected Portions of Brief For the Appellant, The United States ....157

Affidavits Asserting Deliberative Process Privilege and Associated Delegations Chart ....162

Amended Table of Challenges, Government Documents Withheld on the Basis of Deliberative Process Privilege ....166

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| PACIFIC GAS & ELECTRIC COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | No. 04-074C<br>into which has been consolidated<br>No. 04-075C<br><br>(Judge Hewitt)<br><br>Electronically filed: December 9, 2005 |

REPLY IN SUPPORT OF MOTION TO COMPEL
"DELIBERATIVE PROCESS" DOCUMENTS

The government's opposition ("Opp.") to PG&E's motion to compel "deliberative process" documents ("Mot.") makes essentially four arguments in attempting to justify the government's withholding of the 453 documents in challenged by PG&E's motion. First, the government argues that the deliberative process privilege has been properly asserted, as to all challenged documents, in the eight affidavits ("declarations") from four different subordinate officials that the government relies upon and submitted with its opposition, Opp. at 21-28, 29-32. Second, it argues that those affidavits establish the essential elements of the privilege, namely, that each document is "pre-decisional" and "deliberative," and if disclosed would cause the kind of particular harm to agency operations that this privilege is designed to protect, Opp. at 21-28. Third, the government argues that PG&E has not made a showing of need for any of the documents that outweighs the government's showing of potential harm from its disclosure, Opp. at 28-29.

Importantly, these three arguments are not independent in the sense that if any one argument is correct as to a given document, that document may properly be withheld under the deliberative process privilege. To the contrary, *all three* of these arguments must be correct

before this privilege may be held to protect a given document. Apparently recognizing the difficulty of prevailing on all three issues as to all 453 documents, as a fourth and overarching argument the government also contends, *see* Opp. at 1-9, that the three issues identified above – delegation, the elements of the deliberative process privilege, and balancing need against harm from disclosure – have already been resolved in the government's favor in prior rulings on this privilege, by former Judge Sypolt in the spent fuel litigation "common discovery" proceeding, *see Yankee Atomic Elec. Co. v. United States,* 54 Fed. Cl. 306 (2002), and by Judge Merow in the "*Yankee*" cases, *see* Order of Aug. 25, 2003, copy included in the appendix to this reply ("RA ") at 1. (The appendix to PG&E's motion is referred to here as "MA __," and the appendix to the government's opposition is referred to here as "GA __".)

None of the government's arguments has merit. The Court therefore should reject the government's attempt to stretch this narrow and limited privilege beyond recognition – and reason – in an attempt to justify the withholding of hundreds of internal agency documents based on nothing more than the "say so" of subordinate officials.[1]

DISCUSSION

I. The Issues Presented Here Have Not Been Resolved Against PG&E.

PG&E explained in its motion to compel why the ruling of Judge Sypolt, which only addressed 34 documents, and that of Judge Merow, which only addressed the 89 documents covered by the "Bubar" affidavit, are not controlling here, *see* Mot. at 23-24, 8-9. The

[1] The government also contends that forty-five of the documents it withheld on deliberative process grounds are beyond the scope of discovery based on this Court's Orders suggesting a January 28, 2004 cut-off date for discovery, Opp. at 9-11. By separate motion filed today, PG&E has asked the Court to clarify or reconsider that issue. As noted in that motion, it is significant (indeed, perhaps dispositive) that the government itself identified these forty-five documents as responsive – that is, relevant – to PG&E discovery requests before labeling these documents as privileged.

government nevertheless complains vociferously that PG&E is re-litigating issues already decided in its favor. *See* Opp. at 1-9. That is plainly wrong as to the 315 documents that the government acknowledges were "not covered" by affidavits submitted to Judges Sypolt and Merow, *see* Opp. at 5. Although those documents are now covered by affidavits first submitted here with the government's opposition, the applicability of the deliberative process privilege to these 315 documents has never before been addressed by this Court.

The government is also wrong to assert that PG&E is re-litigating issues concerning the 145 documents that were involved in the motions before Judges Sypolt and Merow. This case had not been filed – and PG&E thus was not before the Court – when Judge Sypolt and Judge Merow issued their rulings, so PG&E could not possibly be bound by those rulings. For that reason, the government appropriately does even not argue that PG&E is formally bound by issue preclusion. Moreover, and contrary to the government's suggestion that Judge Sypolt's deliberative process ruling is "applicable to the SNF litigation," Opp. at 7, the common discovery proceeding was implemented by a "Joint Motion for an Order for Coordinated Discovery" filed July 9, 2001, RA 5, which Judge Sypolt granted by Order dated September 26, 2001, RA 33, and which specifically listed (at 2, RA 34) the "cases [that] will be governed by the consolidated discovery order." PG&E's case, which did not exist, is obviously not listed.

But even if PG&E were technically "bound" in some sense by Judge Sypolt's deliberative process ruling it would be appropriate to revisit that ruling, which, as other Judges of this Court have held, is contrary to established precedent, poorly-reasoned, and wrong. *See Marriott Int'l Resort, L.P. v United States*, 61 Fed. Cl. 411, 419 (2004) ("this Court disagrees with both the reasoning of *Yankee Atomic* and its result"); *Jade Trading, LLC v. United States,* 65 Fed. Cl. 487, 496 n.25 (2005). Indeed, as Judge Sypolt herself noted in a related context in

the common discovery proceeding, "discovery orders are interlocutory orders that are neither final nor immediately appealable. . . Interlocutory orders are not subject to *res judicata* or the law of the case doctrine and may always be reconsidered prior to final judgment. . . This is true even when a case is reassigned or transferred to a new judge." Order of November 1, 2001, RA 35, at 3-4. *See also Charter Federal Sav. Bank v. United States,* 52 Fed. Cl. 120, 122 n.2 (2002) (Sypolt, J.) ("One trial court is not bound by the prior ruling of a coordinate court, either in the same case (or cases) or in a different case involving the same legal issues.").

The government also suggests that except for documents from the "Bubar" affidavit that Judge Merow ordered released (50 in number), he "sustained," *see* Opp. at 5, the government's assertions of deliberative process privilege. In context, and coupled with Judge Merow's conclusion that "no valid purpose would be served in again resolving the procedural aspect of claiming privilege," Judge Merow's August 25, 2003 Order in the *Yankee* cases, copy at RA 1, is best read as simply failing to address the withheld documents covered by the other four affidavits from subordinate officials that the government submitted in the those cases.[2] Certainly Judge Merow did not endorse Judge Sypolt's conclusions, and indeed he does not even address (much less resolve) the delegation issue or any other substantive element of the deliberative process privilege. But here again, even if Judge Merow had addressed those matters, his rulings would not be binding here for the reasons noted above.

## II. The Government Has Not Established That The 453 Documents In Question Should Be Withheld Under The Deliberative Process Privilege.

In turning to the merits, it is important to emphasize that the heart of the deliberative process privilege is a showing that disclosure of particular documents will cause serious harm to government decision-making. *See Marriott Int'l*, 61 Fed. Cl. at 419 (privilege can only apply to

[2] Documents Judge Merow ordered released came from no affidavit other than Ms. Bubar's.

documents if "their release would significantly impede the agency's operations"). It is only that harm, and nothing else concerning this privilege, that can possibly justify withholding relevant evidence from the Court. It is therefore significant that the potential for such harm is hardly mentioned in government's opposition brief, and is referenced only in the most general of terms in the eight affidavits the government relies upon here. The government does begin its substantive discussion by quoting *United States v. Nixon*, 418 U.S. 683, 705 (1974), to the effect that "human experience teaches" that officials who expect "public dissemination" of their remarks "may well tempor candor . . . to the detriment of the decision-making process," *see* Opp. at 11. But the *holding* in that case was that the President's own documents had to be released. The government's brief barely mentions the crucial harm factor again, and never describes (nor do the accompanying affidavits, *see* pp. 17 below) any *particular* harm that might result from disclosure of any of the 453 documents in question.

The explanation for this glaring silence on the crucial issue is simple: release of the documents in question will not cause any particular harm to the making of significant agency decisions, and the government knows it. Indeed, although as PG&E explained, *see* Mot. at 8-9, Judge Merow ordered the release of fifty documents over which the government had claimed the deliberative process privilege, the government does not even suggest that release of those documents has caused any harm whatsoever to DOE's operations. Plainly there has been no such harm. Thus, the vague and conclusory allegations of harm set forth in "Bubar" affidavit the government submitted in claiming the privilege, *see* GA 120-21 (attesting that release of all 89 documents, including draft letters, "would have a 'chilling effect' on the give-and-take involved in agency decisionmaking") were either completely false, or at least sufficiently untrue that the government has chosen now to omit any mention of the "harm" it alleged then. The vague

allegations of potential harm contained in the eight affidavits the government relies upon here are similarly lacking in credibility, as shown below at pp. 17.

Indeed, any release of documents here would occur under the existing protective order, a circumstance 1) that PG&E emphasized, *see* Mot. at 2, but the government does not address, and 2) that will prevent the "public dissemination" that the government cites as the source of potential harm. In fact, in addition to requiring confidentiality, the protective order in this case explicitly requires that protected documents "shall be used by the receiving party solely for the purpose of conducting litigation in the spent nuclear fuel cases pending in t[his Court] and not for any business or other purpose whatsoever." *See* Order of April 21, 2005. It is difficult to fathom how release of the challenged documents, under the limitations of that protective order, could cause any harm whatsoever – a matter (the protective order) that the government pointedly does not address.[3]

It is also important to emphasize once again that the deliberative process privilege is very narrow, as shown by the seminal decision in this jurisdiction applying the privilege, *Kaiser Aluminum & Chem. Corp. v. United States*, 157 F. Supp. 939 (1958). *Kaiser* involved a claim of privilege over a single document. However, the Court of Claims made clear that in discovery Kaiser has requested – and obtained – all manner of other internal agency documents and drafts:

> The request was in the broadest form. As it was ultimately fully complied with except as to one specific document, it suffices to say that the request included all internal GSA reports, memoranda, or other documents concerning these sales to Kaiser and Reynolds prepared by all employees or agents of the Administration for intra-agency use, particularly prior drafts of the Kaiser contract with Agency

[3] To the extent further protection is warranted, which PG&E doubts, released documents could be placed under seal, as some other spent fuel plaintiffs have requested for their expert damages reports. The government's contention that any document released here would have to be given to all other spent fuel plaintiffs, Opp. at 2, may be correct as a matter of fairness but not technically, particularly given that apparently no other spent fuel plaintiff has expressed interest in these documents after the government asserted privilege by filing a motion such as this.

> interpretation and justification thereof and similar papers in connection with that claim.

157 F. Supp. at 943. The Administrator of GSA personally claimed privilege over that "one specific document," not because it was "internal," or "for intra-agency use," or a "draft" or contained "interpretation and justification" – all such documents were produced to Kaiser. Rather, that one withheld document was in the particular sub-category potentially subject to this narrow privilege, because it was "confined to recommendations and advice on program policy." *Id*. at 944. As the court explained, speaking through Justice Reed, that one specific document contained "intra-agency advice on policy [of] the kind that every head of an agency or department *must rely upon* for aid in *determining a course of action*. . . ." *Id* .at 945 (emphasis added). In short, "[h]ere . . . there was an administrator reaching a decision." *Id.* at 946.

The most casual perusal of the government's privilege log in this case reveals that the 453 documents challenged here are not in this narrow subcategory of "deliberative" agency documents, but instead are various routine, everyday drafts and internal documents *unrelated* to any "recommendation" or "advice" on "program policy" and *not* of the kind that agency heads "rely upon . . .in determining a course of action." *See*, for example, the documents described on pp. 4-5, 9, and 11-12 of PG&E's motion. (The portions of the government's privilege log describing all 453 challenged documents are reproduced in the "Table of Challenges" that PG&E has prepared.[4] Among the best example of documents the government has withheld that cannot possibly qualify for this privilege are the twenty-eight documents (nos. 402-406, 408-413, 416-429, 432-434, MA 34) concerning how NRC should respond to a letter from a university

[4] The appendix to this reply includes an "Amended Table of Challenges" at RA 166, which is identical to the original at MA 1, except the amended version adds an additional column showing, for each listed document, which government affidavit claims the privilege over that document.

professor, including draft responses. *See* GA 177-182 (affidavit asserting privilege as to those documents).

Moreover, the government has already produced in this case hundreds of draft documents, including draft letters, and reports and other documents marked "predecisional draft," "review draft," and the like, that are wholly indistinguishable from similar documents it is withholding purportedly on the basis of the deliberative process privilege. *See, e.g.,* RA 39 ("Review Draft"), RA 42 ("Predecisional Draft"), RA 55 ("Review Draft"), RA 67 ("Preliminary Draft"), RA 88 ("Predecisional Draft"), RA 123 ("Draft"), RA 129 ("Draft"). This raises the disturbing prospect that the true reason for withholding is not that the 453 documents are drafts, or internal, or "predecisional" – the government has produced scores of such documents – but rather simply that the particular documents the government is now withholding contain evidence damaging to its litigation positions. That certainly appears to be the case with respect to documents Judge Merow ordered released from the "Bubar" affidavit. *See* Mot. at 18-19.

As noted at the outset, in order to prevail on its claim of deliberative process privilege as to any given document, the government must prevail on three distinct issues. As we now explain, the government's position on each issue is exceedingly weak and the Court should reject it.

### A. The Deliberative Process Privilege Must Be Asserted By The Head Of The Pertinent Agency Or Department.

The government attempts to defend the validity of its delegations (and redelgations, down through various levels) of authority to assert the deliberative process privilege on three grounds: 1) governing precedent; 2) the alleged practicality and necessity of allowing delegation; and 3) the meticulous formality of the delegations documents included in the

appendix to the government's opposition. These arguments are all untenable and should be rejected.

Although the government obscures the point, PG&E acknowledges that neither the Federal Circuit nor its predecessor has ever squarely held that the deliberative process privilege must be asserted by the agency head and cannot be delegated. Nonetheless, the Court of Claims came pretty close in *Cetron Electronic Corp. v. United States*, 207 Ct. Cl. 985 (1975), where the court noted explicitly that the government did "not assert the doctrine of executive privilege which can be *personally invoked only* by the head of a department or agency." *Id*. at 989 (emphasis added). *Cf. Marriott Int'l*, 61 Fed. Cl. at 417 (delegation "is not tenable in light of directly applicable precedent binding on this Court"). As noted in *Marriott Int'l*, 61 Fed. Cl. 417, "[s]ince *Cetron*, this Court has regularly required that executive privilege be invoked only by the heads of agencies. . . " (citing cases). The singular exception in this Court is Judge Sypolt's ruling in *Yankee Atomic,* which relied – wrongly – on the Federal Circuit's decision in *Dep't of Energy v. Brett*, 659 F.2d 154 (Temp. Emer. Ct. App. 1981), as "precedential" and persuasive. *Yankee Atomic*, 54 Fed. Cl. at 310 & n.5.

Indeed, although the government's opposition obscures this point also – stating twice that *Brett* has been "adopted as binding precedent for at least certain cases," Opp. at 14; *see id*. at 20 – the government candidly admitted in its appeal brief in the pending interlocutory appeal of *Marriott Int'l* that *Brett* is "not binding" in other cases – such as this one. *See* RA 157(excerpts from that brief); s*ee also Marriott Int'l,* 61 Fed. Cl. at 419 ("*Yankee Atomic* also misconstrued the Federal Circuit's adoption of TECA precedent . . . for the notion that *Brett* is controlling precedent ."). Moreover, *Brett* did not even involve a delegated assertion of the deliberative process privilege, but simply suggested in *dictum* that lower level government officials could

assert the privilege. 659 F.2d at 155. The government asserts that that suggestion "presumably would allow the head of an agency to delegate his or her authority to assert th[is] privilege," Opp. at 20, but if adopted, *Brett* in fact would eviscerate the requirement that the head of the agency have any involvement at all in asserting the deliberative process privilege.

While relying heavily on *Brett*, the government denigrates *Cetron*, in large part because the government's opposition materially misquotes that decision. The government states that "nothing in the plain language of *Cetron* requires personal exercise of the privilege by an agency head, but instead allows for exercise by 'the head of a department' *of* an agency." Opp. at 17 (emphasis added). What *Cetron* actually says, however, as quoted above and also on the prior page of the government's opposition, *see* Opp. at 16, is that this privilege "can be personally invoked only by the head of a department *or* agency." *Cetron*, 207 Ct. Cl. at 989 (emphasis added). That statement is clear – "*only* by the head of a department or agency."

The government also argues that delegation is appropriate because the delegees purportedly have "greater expertise and knowledge" than agency heads, Opp. at 17-18, and it suggests that agency heads are too busy to devote requisite time and attention to personally review all documents the government's lawyers identify as within the deliberative process privilege.

Properly understood, however, subordinate agency officials do not have greater expertise and knowledge *of the type required to invoke this privilege*. What is required is sufficient authority and judgment, by virtue of position, to provide the Court with a fulsome explanation of why disclosure of these particular documents (subject to a protective order) would cause actual harm to agency decision-making, not just a "rubber stamp" of the privilege determinations made by government counsel. The latter is all that is provided by the eight affidavits the government

relies upon here, which, as discussed below, contain nothing but conclusory allegations of potential harm from disclosure and vague (or no) descriptions of the "decisions" and "deliberations" the government is trying to protect. No "greater expertise and knowledge" is needed to provide such conclusory, "rubber stamp" affidavits, and the Court also does not have the benefit of the authority and judgment that an affidavit from an agency head would provide.

The government's reliance on labyrinthine delegation documents is also misplaced. As an initial matter, the whole concept of "delegating" authority to invoke the deliberative process privilege is a mirage. In reality, the subordinate delegees are invoking the privilege, and the agency heads have no actual involvement in the matter whatsoever. So what the government is really saying is that this privilege can be invoked by any subordinate government official who happens to be on the receiving end of a delegation, or a re-delegation, or a re-re-delegation, that originated with an agency head. The practicalities of what the government has done would be exactly the same if no delegation of authority had ever occurred. Indeed, as noted above, the government relies for its delegation theory on a decision – *Brett* – that did not involve any delegation, and the government cites no case that does involve delegation (other than *Yankee Atomic*). In short, delegation is just a way of pretending obedience to *Cetron*, *Kaiser* and other decisions requiring that agency heads invoke the executive privilege.

More fundamentally, there is no basis in law or policy for the proposition that a government official, or any individual, can delegate his or her authority in a manner contrary to applicable substantive law, including the law of evidence. The crux of *Cetron* and *Kaiser* is that invocation of this particular government privilege should be reserved for those rare instances where an agency head takes the time and trouble to explain to the Court the harm that would result from disclosure. A delegee cannot fill that role. Under the government's "logic," if the

Secretary of Defense observed a military air crash at an official air show and was called to testify about the circumstances of the crash, he (or she) could "delegate" his "authority" to testify on that matter to a subordinate official, who may have great "expertise" in air crash analysis – and more time to testify. The government's argument here is equally absurd. Established case law and sound policy reasons require that agency heads invoke the deliberative process privilege, and no collection of delegation papers can – or should – supplant this well-established legal requirement.

The delegation papers the government has presented also do not justify its delegation arguments. To conclude otherwise would be the ultimate bootstrap – delegation is acceptable because the government carefully and "properly" delegated the authority through meticulous written delegations. Moreover, to a substantial degree the government's delegation papers are an elaborate charade. As shown below, the delegations the government relies upon were first made as a result of challenges to the assertion of deliberative process privilege in the spent fuel litigation. PG&E has prepared a chart, *see* RA 162 ("Delegation Chart"), which lists all the delegation papers in the government's appendix. As that chart also shows, most of the delegations the government relies upon were executed the same day (or otherwise proximate in time) as the affidavits of the delegees to which the delegations relate, making it perfectly obvious that the delegations were made for the specific purpose of justifying the claims of privilege the government is making here.

For example:

-- as shown in the Delegation Chart, at RA 163, the day that Mr. Milner executed his first affidavit, GA 1, May 13, 2002, was the *same day* that former Secretary of Energy Abraham signed a document, GA 70; *see* RA 163 (Ref. No. 3) amending a pre-existing delegation of

authority to a DOE Undersecretary, *see* GA 53; *see* RA 163 (Ref. No. 1), to provide for the first time that the Undersecretary could delegate to the Director of OCRWM (the "Office of Civilian Radioactive Waste Management") authority to assert the deliberative process privilege, and also the same day (May 13, 2002) that the DOE Undersecretary signed a document, GA 71; *see* RA 163 (Ref. No. 4), amending a pre-existing redelegation of authority to the OCRWM Director, *see* GA 64; *see* RA 163 (Ref. No. 2), to provide for the first time that the OCRWM Director could assert and/or further redelegate the deliberative process privilege, and also the same day (May 13, 2002) that the OCRWM Director signed a document, GA 72; *see* RA 163 (Ref. No. 6), redelegating that authority to Mr. Milner.

-- The government contends, Opp. at 31, with respect to both of Mr. Milner's affidavits dated June 13, 2003, GA 13, GA 19, that the same redelegations down to Mr. Milner described above, *i.e.*, Ref. Nos. 2-5 on PG&E's Delegation Chart, RA 163, are applicable to those affidavits. However, as also reflected on the Delegation Chart, RA 163-164 (Ref Nos. 6-9), the original delegation (Ref. No. 1) from former DOE Secretary Abraham to the DOE Undersecretary, GA 53, which is at the top of this "chain" of delegations down to Mr. Milner, was "rescinded" and replaced by a series of new delegations to the DOE Undersecretary, first from former Secretary Abraham and then from current DOE Secretary Bodman. One of those documents, *see* RA 163 (Ref. No. 6), rescinding and replacing the original delegation to the Undersecretary was dated before Mr. Milner's June 13, 2003 affidavits, and three of them, *see* RA 163-164 (Ref. Nos. 7-9), were dated after those affidavits but prior to Mr. Milner's November 10, 2005 affidavit. These higher-level "rescind and replace" documents raise questions about the earlier, lower-level redelegations of authority.

-- In addition, with respect to Mr. Milner's November 10, 2005 affidavit, the government concedes that the most recent higher-level delegation, from DOE Secretary Bodman to the DOE Undersecretary (Ref. No. 10, GA 119), "did not expressly include language directly relating to the authority to assert the deliberative process privilege." Opp. at 31-32. Then, *two weeks after* Mr. Milner signed this latest affidavit, the government, on November 23, 2005, had DOE Secretary Bodman retroactively amend the initial delegation at the top of the chain that leads down to Mr. Milner, *see* RA 164 (Ref No. 10, GA 119); Opp. at 31-32. This raises questions about the November 10, 2005 Milner affidavit.

Before showing that the similar circumstances and difficulties surround the other delegations of authority the government relies upon here, it is worthwhile to observe that ultimately, all this paperwork is just that – it adds nothing of substance, and certainly cannot change the fact that it is the delegees who are invoking the deliberative process privilege here, with no substantive involvement of the agency heads. In fact, this paperwork confirms that it is government counsel who are really calling the shots on assertion of deliberative process privilege. That not even counsel can get the paperwork straight speaks volumes about how significant the paperwork really is.

-- as also shown on the Delegation Chart, RA 164 (Ref. No. 12), on June 11, 2003, the *day before* Ms. Bubar's June 12, 2003 affidavit, GA 120, the DOE Assistant Secretary first redelegated to her "authority to asset the deliberative process privilege over documents specific to the Department of Energy response to Governor King's letter" regarding GTCC waste issues.

-- as also shown on the Delegation Chart, RA 165 (Ref. No. 13), the DOE Assistant Secretary first delegated to Mr. Marcinowski "authority to assert deliberative process privilege over documents specific to the Department of Energy's plans for disposition of [GTCC waste]"

on November 10, 2005, which may have been prior to, after, or on (the Court has no way to know) the day Mr. Marcinowski signed his affidavit, which is dated "November ___, 2005."

-- as also shown on the Delegation Chart, former NRC Chairman Meserve first delegated to Mr. Virgilio authority to "assert the deliberative process privilege on behalf of the [NRC] in the cases involving the standard contract" on July 24, 2002, the same day that Mr. Virgilio signed his first affidavit, GA 199; see RA 165 (Ref. No. 14). Chairman Meserve's resignation in March 2003 raises questions concerning Mr. Virgilio's two subsequent affidavits dated June 9, 2003, GA 176, and November 9, 2005, GA 186.

In sum, to whatever extent *Cetron* does not resolve the delegation issue, and presuming that the pending *Marriott Int'l* appeal is not decided in time to be applied here, there are good and valid reasons *on principle* why the Court should adhere to the long line of authority in this Court requiring that the deliberative process privilege be invoked only by the head of an agency or department. The purported delegations and redelegations and re-redelegations of authority relied upon by the government should be disregarded.

### B. The Documents The Government Has Withheld Do Not Qualify For the Deliberative Process Privilege.

Regardless who invokes the deliberative process privilege – or how the delegation issue is resolved – the government's claims of privilege can only be upheld if the Court is satisfied that the elements of the privilege are established as to each withheld document. *See, e.g., Nixon,* 418 U.S. at 703 (citing *Marbury v. Madison*, 5 U.S. 137, 177 (1803)). There are three elements, each of which must be met.

First, in government's words, the documents "must be pre-decisional – that is, they must precede the subject decision in temporal sequence." Opp. at 12. In theory, perhaps any governmental "decision" could involve deliberations the disclosure of which would be harmful,

which is the touchstone of the deliberative process privilege. In reality, however, the "harm" from disclosure of most government decisions is trivial. Government officials at every level make "decisions" everyday, such as where to site a building, whether to hold a meeting, what items to put on the meeting agenda, whether to reorganize an agency, etc. That does not mean that disclosure of all the internal drafts and documents leading to all those "decisions" would cause the type of harm that the deliberative process privilege protects against. The same can be said about disclosure of internal documents leading to "decisions" about how to respond to a letter. In fact, significant harm from disclosure of deliberations is generally possible only when high-level or otherwise formal program policy decisions are involved. The type of decision that must be involved is described in *Kaiser.* It is also illustrated by the fact that the government has released in this litigation documents that are marked "predecisional," *see, e.g.,* RA 42, RA 88, with no concern for the "harm," if any, that disclosure of those documents might cause, but do not actually presage a decision on program policy.

Second, as the government also notes, "the documents must be deliberative." Opp. at 12. Here again, almost by definition virtually every draft and other internal agency document is "deliberative" in some sense. But as *Kaiser* also shows, to be covered by the deliberative process privilege the document should be "confined to recommendations and advice on program policy." *Kaiser*, 157 F. Supp. at 944, *see id.* at 943 ("intra-office advice on policy"). Although it is possible that substantial harm may result from disclosure of deliberations set forth in fulsome, formal "advice" and "recommendations", disclosure of the "deliberations" reflected in most internal government documents and drafts is unlikely to cause any significant harm, and probably none at all. S*ee Walsky Constr. Co. v United States,* 20 Cl. Ct. 317, 322 (1990) ("If this

court placed all evaluative processes and documents within the executive privilege, an enormous share of administrative action would disappear from public view.").

The third element of this privilege, and by far the most important, is the potential harm from disclosure of a deliberative, pre-decisional document. As noted above and as demonstrated further below, the government's brief and its affidavits here give this crucial "harm" element – the only aspect of the privilege that can justify withholding evidence – short shrift.

Because the deliberative process privilege has not been invoked here by an agency or department head, the government's privilege claims are far more numerous than they would be and should be. But despite the large volume of withheld documents, the Court's task need not be burdensome, because the affidavits the government has presented so clearly fail to justify its privilege claims. On their face, those affidavits show that the elements of serious harm from disclosure, and of high-level "decisions" and "deliberations" of the type this privilege protects, are completely lacking.

Starting with the three affidavits first presented here (as opposed to those also previously presented to Judge Sypolt or Judge Merow), *see* RA 162 (chart correlating all government affidavits and delegations relied upon here) Mr. Milner's November 10, 2005 affidavit, GA 27, which claims the deliberative process privilege as to 181 documents, describes the potential harm from disclosure only at the outset in the following two sentences, which purport to apply to each of the 181 withheld documents:

> I have determined that disclosure of any of the deliberative contents of the documents identified in the following list would be injurious to the Federal Government's decision-making functions because such disclosure would tend to inhibit frank and candid discussion necessary to effective government. Indeed, disclosure would have a chilling effect upon many future discussions at DOE."

GA 28, ¶ III. This is a very far cry from the "'precise and certain reasons' for maintaining [] confidentiality," *Walsky Constr.,* 20 Cl. Ct. at 320, that the government must show before this privilege can be upheld. Indeed, as noted above "human experience teaches" that adverse effects of the kind Mr. Milner mentions are always possible when internal documents are released publicly. That truism is not enough to impinge the search for truth by allowing the government to withhold evidence.

Rather, in order for this Court accept the government's privilege claims here, Mr. Milner's affidavit would have to explain how, and why and what *particular* harm to agency decision-making is threatened by release of each particular document. Yet Mr. Milner provides the Court no reason at all to believe that, or even evaluate whether, any such particular harm will result from disclosure of any one challenged document. For this reason alone the government's claim of deliberative process privilege over 181 documents described in Mr. Milner's November 10, 2005 affidavit must be rejected.

But that is not the only reason. The descriptions in this affidavit make clear that none of the documents covered by it involve formal or high-level "decisions" about program policy, or "deliberations" leading to such decisions, of the type the deliberative process is designed to protect. In fact, as noted below, many, many of the descriptions of documents in the eight affidavits the government relies upon here, including this one, do not even *mention* any "decision" of any type.

For example, Mr. Milner's November 10, 2005 affidavit, GA 27, states that:

-- the document described in ¶ 1, at GA 28, reflects "deliberations relating to a potential decision regarding a change in intra-Departmental responsibilities."

-- the three documents described in ¶ 3, at GA 29, "reflect DOE's deliberations and internal discussions regarding responses to Dairyland's request ["seeking assistance in the disposal of its SNF"]." (The document described in ¶ 2 appears to be separately covered by the attorney-client privilege, which PG&E is not challenging here, but as to the deliberative process privilege it is also deficient).

-- the document described in ¶ 4, at GA 29, reflects "internal deliberations by DOE regarding the potential use of transportation service contractors to perform certain waste acceptance, transportation and storage functions. . . and form part of the deliberative process." (This description does not even purport to mention a "decision").

-- the document described in ¶ 5, at GA 30, "reveals policy deliberations within DOE regarding the design and operation of the repository at Yucca Mountain." (Again, no "decision" is even mentioned).

-- the three documents described in ¶ 6 "reflect[] OCRWM's proposed response to the [DOE] Inspector General's requests." (No "decision" mentioned).

-- the five documents described in ¶ 7, GA 30-31, "reveal the policy deliberations of DOE regarding the issuance of the 2004 ACR/APR." (No "decision" mentioned, but apparently treating issuance of July 2004 ACR/APR as a "decision").

PG&E could go on, paragraph-by-paragraph, but as these first seven paragraphs show, the Court can quickly work through the Mr. Milner's November 10, 2005 on its own and see that none of the documents described there qualify for withholding under the deliberative process privilege. Indeed, it would compound the injustice of the government's excessive and improper use of this privilege if the huge number of documents involved impeded review of each document description in each affidavit – particularly given that the examples above plainly show

that the deliberative process privilege does not apply to the documents the government is withholding.

The second new affidavit the government has first presented here, Mr. Marcinowski's affidavit dated "November __, 2005," GA 130, claims the deliberative process privilege over 116 documents. It also describes the potential harm from disclosure of all these documents only collectively, at the outset, in four highly general sentences. *See* GA 130-31 (*e.g.*, "If these documents were disclosed, agency personnel would, in my opinion, be reluctant to set forth their opinions."). Like the same short, general, and rote statements in Mr. Milner's affidavit quoted above, the truism that disclosure of internal documents can be harmful is not enough to justify acceptance of the deliberative process privilege, particularly given that the government regularly produces internal documents in discovery in litigation and has done so in this case. The government would only be able to justify impinging on the search for truth by withholding these 116 documents if Mr. Marcinowski's affidavit described some particular, clear, serious harm threatened by the release of each particular document, and did so in sufficient detail that the Court could evaluate – and accept – the claimed threat. Because Mr. Marcinowski's affidavit does not do that, the government's claim of privilege over all 116 documents should be rejected.

But that is not the only reason to reject these privilege claims here either. Mr. Marcinowski's November 2005 affidavit shows that the "decision" and "deliberative" elements of the privilege are also not present. For example, Mr. Marcinowski's affidavit states that:

-- the two documents described in ¶ A, GA 131, "reveal the deliberations of DOE regarding the manner in which the agency would address an EIS for the disposal of GTCC waste." (No mention of a "decision").

-- the document described in ¶ B, GA 132, the forty documents described in ¶ C, GA 132-33, the twenty-one documents described in ¶ D, GA 133-34, the seventeen documents described in ¶ E, GA 134-35, the two documents described ¶ F, GA 135, and the two documents described in ¶ G, GA 135, all "reveal" the same as above for the documents described in paragraph A, and in exactly the same words, except ¶ F refers to "the Department and other executive agencies." (No mention of a "decision" in any of these paragraphs). Indeed, Mr. Marcinowski uses the identical language to that quoted above to describe what is "revealed" by the seven documents described in ¶¶ M, P, Q, R, T, W and X of his affidavit. Other paragraphs report that documents "reveal" or "reflect" other matters. For example:

-- the two documents described in ¶ H, GA 136, "reflect the deliberations within DOE regarding the potential scope and activities involved in the preparation of an EIS." (No mention of any "decision").

-- the two documents described in ¶ I, GA 136, "reveals [sic] the deliberations of DOE regarding the manner in which the agency would address an EIS for the disposal of GTCC waste." (No "decision" mentioned.).

-- the three documents described in ¶ J, GA 136, "reveal the deliberations within DOE on how to respond to Senator Akaka's question ["regarding DOE's ability to develop a disposal facility for GTCC"]." (No "decision" mentioned.).

-- the two documents described in ¶ K, GA 136-37, "are draft DOE news releases." (No "decision" mentioned).

-- the document described in ¶ M, GA 137, "reveals the deliberations of DOE regarding potential plans for disposal of GTCC." (No "decision" mentioned).

Plainly, and even apart from Mr. Marcinowski's failure to articulate any specific harm threatened by the disclosure of these documents, they do not involve "deliberations" about high-level program policy "decisions" of the type the deliberative process is designed to protect. To conclude otherwise – given that these documents appear to be no different from innumerable other internal DOE documents – is to give license to the government to withhold virtually any internal document on deliberative process grounds, and the concomitant ability to pick and choose which internal documents to produce in order to advance its litigation objectives.

And as with the Milner affidavit, although Mr. Marcinowski's affidavit covers 116 different documents, the Court can quickly and readily see that his cursory claim of threatened harm from disclosure and his descriptions of each document are wholly inadequate to justify the government's claim of deliberative process privilege over these documents.

Reviewing in similar detail the other six affidavits the government relies upon with respect to the 453 challenged documents would add little to the illustrative discussion above, but PG&E would like to highlight key features of those affidavits.

First, Mr. Virgilio's new affidavit first presented here, dated November 9, 2005, GA 186, and covering eighteen documents, describes the threatened harm from disclosure of those documents in the same collective, brief and rote terms described above – and indeed, in virtually the identical words used by Mr. Marcinowski, which words presumably were drafted by government counsel. This affidavit covers documents relating to the government's plans for disposal of GTCC waste, which is a key issue in these spent fuel cases, as Judge Merow noted in ordering the release of such documents "despite the invocation of deliberative process privilege." RA 2. For example, the document described in ¶ F, GA 189-90, "reflects, and is part of, the deliberations of the NRC on how to address the storage of GTCC." No "decision" is mentioned.

The documents described in ¶¶ I and J, GA 190-91, "reflect the deliberations of the NRC on how to respond to" a letter from a university professor. The deliberative process privilege does not apply to these documents.

Second, Mr. Virgilio's previous affidavit relied upon by the government, dated June 9, 2003, and covering forty-six documents, GA 176-185, describes the threatened harm from disclosure of the documents in the same brief, rote and collective terms (and virtually the same words), *see* GA 176-77, as his new, November 9, 2005 affidavit. More than half the documents described in the June 9, 2003 affidavit relate to NRC's "deliberations" about how to respond to the letter from the university professor mentioned above. The other described documents relate to GTCC waste, and similarly involve the routine, day-to-day internal activities of NRC. The deliberative process privilege cannot apply to these documents

Third, Mr. Milner's three prior affidavits, dated May 13, 2002 and covering 24 documents, GA 1, June 13, 2003 and covering 63 documents, GA 13, and June 13, 2003 and covering 58 documents, GA 19, say the following, and nothing more, about the harm that will result from disclosure of these documents:

-- the June 13, 2003 affidavits contain only the following same two sentences on the issue of threatened harm (with the minor difference in the second sentence noted below), *see* GA 14, GA 20: "I have determined that disclosure of any of the deliberative process contents of the documents disclosed in the following list would be injurious to the Federal Government's decision-making functions because such disclosure would tend to inhibit the frank and candid discussion necessary to effective government. Indeed, disclosure would have a chilling effect on * any future budget discussions as well as several related and continuing policy issues at DOE." (In the June 13, 2003, the following follows the *: "many future discussions at DOE.").

-- the May 13, 2002 affidavit says nothing at all – not one word - about harm that might result from disclosure of the documents described there. The closest it gets to the topic is in this one sentence: "DOE has a policy of protecting its deliberative processes in order to assure free flow of ideas and candid discussion of alternatives, which are essential to its efficient operation." GA 1

On the crucial issue of threatened harm from disclosure – the only justification for the deliberative process privilege to exist – the brief, general and rote sentences in the June 2003 Milner affidavits are inadequate. And the non-existent sentences "in" the May 2002 Milner affidavit make clear both that the deliberative process privilege cannot apply to the twenty-four documents described there and that Judge Sypolt was flatly wrong to conclude otherwise – regardless of the delegation issue. If the government does not even *allege* harm from disclosure, there is simply nothing for the deliberative process privilege to protect. Finally, like the other affidavits described above, these previous affidavits from Mr. Milner go on to describe routine internal documents that are not eligible for withholding under the deliberative process privilege.

The June 10, 2003 affidavit from Mr. Friedman, GA 147, covering three documents, suffers the same defects. The threatened harm from disclosure of these documents is described in general, rote terms. GA 148. The document descriptions do not mention a "decision" of any kind. Rather, those documents are a "draft OIG [Office of Inspector General] audit report to OCRWM regarding the review of Yucca Mountain's surface facilities," "a similar version of the draft audit," and "a workpaper entitled 'Audit of Yucca Mountain's Proposed Waste Handling Facility.' The workpaper contains data and questions submitted by an OIG auditor to OCRWM." *See* GA 149. These documents from the DOE Inspector General's office may be sensitive, though these descriptions do not indicate if they are. But even if that is true, it does not

distinguish these documents from other sensitive documents routinely exchanged in discovery subject to appropriate protective orders. What is clear from the descriptions in the Friedman affidavit is that these three documents are likely to contain highly probative evidence about how the DOE spent fuel program could have, and should have, and absent the breach would have operated – key issues in this case.

### C. The Deliberative Process Privilege Is Qualified, And Even If It Did Apply To Some of the Documents The Government Has Withheld, PG&E's Need For That Evidence Requires Disclosure Here.

Deliberative process is a qualified privilege that may be overcome by a proper showing. *See Kaiser,* 157 F. Supp. at 946 ("The document sought here . . . [is] privileged from inspection . . . but not absolutely."). As explained in PG&E's motion and noted above, this led Judge Merow to order disclosure of fifty documents described in the government's "Bubar" affidavit, without even deciding whether the privilege had been properly invoked. Mot. at 21-23.

In *Sun Oil Co. v. United States*, 514 F.2d 1020, 1024-25 (1975), the Court of Claims articulated the relevant considerations for determining whether the privilege, even when properly invoked, should be overcome. In that case, former President Nixon invoked executive privilege over four documents prepared for him when in office by aides. The court assumed without deciding that executive privilege could be invoked by a former President, but ordered the documents produced by extending to civil cases the rule of *Nixon* -- that even where the President is involved, the executive privilege is qualified and may be overcome. The standard the court laid down for overcoming the privilege was rather lenient:

> These papers might well lead to the discovery of admissible evidence and are suggestively relevant to the subject matter of this action. Plaintiffs seem to believe that they will ultimately be able to prove [certain matters] which they think, if shown, would make their case. They are entitled to try to show this, and a *generalized claim of privilege*, assuming a former President can assert it, *cannot prevail against the plaintiffs' need to develop the facts by resort to discovery*.

*Sun Oil*, 514 F.2d at 1025.

If that is the standard for overcoming executive privilege when Presidential papers are concerned, then *a fortiori* the standard applicable here for overcoming the deliberative process privilege cannot be stricter, and if anything should be even more lenient. But that need not be decided, because under the standard set forth in *Sun Oil*, the "generalized claim of privilege" asserted here by the government in its vague and cursory affidavits "cannot prevail against" PG&E's "need to develop the facts by resort to discovery." That is, because the government has not even suggested – much less established – that disclosure of any of the challenged documents would cause any *particular* harm to agency decision-making, *cf. Marriott Int'l*, 61 Fed. Cl. at 419 ("significantly impede the agency's operations"), there is nothing on the other side of the balance to stand in the way of PG&E's "need," and indeed right, to discovery of the evidence it seeks. Although in some other case the Court may have to balance competing interests to determine if this qualified privilege has been overcome (for example, if an agency head presents a proper affidavit), in this case, because the government has shown no threatened harm from disclosure, ordering the challenged documents released based on the qualified nature of this privilege is essentially the same as concluding the privilege does not apply in the first place. Absent threatened harm from disclosure, there is nothing for the privilege to protect, and also nothing for the Court to balance against PG&E's discovery rights. *See State of Alaska v. United States*, 16 Cl. Ct. 5, 11 (1988) (deliberative process privilege "may also be defeated by a showing of evidentiary need by plaintiffs that outweighs the harm that disclosure.").

And even if the Court could find on the present record that the government has properly shown that the deliberative process privilege is applicable to some of the withheld documents – a finding the Court cannot and should not make for reasons stated above – still, PG&E's need for

these documents is very real and should be recognized as overriding. The executive privilege was properly invoked in *Sun Oil*, where Mr. Nixon personally signed an affidavit, s*ee* 514 F.2d at 1021-22, yet the court ultimately concluded that Mr. Nixon's "generalized claim of privilege" had to yield to "plaintiffs' need to develop the facts" by obtaining the "suggestively relevant" disputed documents. Here, the documents the government has withheld are not merely "suggestively relevant," they concededly are relevant (or "might well lead to the discovery of admissible evidence," *Sun Oil,* 514 at 1025), because the government gathered them and place them on its privilege log in response to PG&E's discovery requests.

Given the present posture of the deliberative process privilege issues, no useful purpose would be served by demonstrating on a document-by-document basis that PG&E's evidentiary need outweighs the government's asserted interest (through harm from disclosure). For reasons outlined above, PG&E fully expects the Court to order the release of all the challenged documents, or a least a very great many of them, on the ground that the government has failed to establish that the deliberative process applies in the first instance. Accordingly, to avoid potentially unnecessary effort by PG&E and the Court, PG&E respectfully requests that to whatever extent (if any) the Court may find the government has made a proper *prima facie* showing that the deliberative process applies to certain documents, PG&E be permitted at that time to make a more particularized showing of why its need for those (presumably much smaller number of) documents outweighs the potential harm from disclosure of those documents.

For two groups of documents, however, PG&E's need is clear and can be stated now in straightforward terms on a categorical basis. The first group are those documents pertaining to the government's plans for disposition of GTCC waste. Judge Merow already found "compelling necessity" for release of those documents, a standard he took from a Court of

Claims case predating *Sun Oil* which has been supplanted by the more lenient standard that later decision articulated for overcoming executive privilege claims. *See* RA 1 (Judge Merow's Aug. 25, 2003 Order). Despite the evolution in the legal standard, PG&E has the same compelling need for the documents as the spent fuel plaintiffs before Judge Merow had, and for the same reasons he articulated:

> [D]efendant has indicated a litigation position that the continued presence of Greater than Class C Waste ("GTCC") on a reactor site, requiring storage and security costs, would obviate or reduce damages, such as storage or security costs, that are claimed based on the failure of the government to commence removal of spent nuclear fuel [as required]. Thus, the Government's plans with respect to its obligations, pursuant to [a 1985 statute], to dispose of GTCC, must be fully disclosed to enable the court to make a finding(s) on the validity of this defense []. It appears there may only be inchoate plans, or recommended plans, but it is concluded that unless defendant abandons its GTCC defense against monetary claims in this matter, there exists a compelling necessity for the production of all documentation which can contribute to an evidentiary finding as to whether GTCC material will be left on a reactor site after spent nuclear fuel . . . is removed.

RA 2-3. For these same reasons, all GTCC-related documents that the government is still withholding on deliberative process grounds should be produced, regardless whether the deliberative process privilege would be applicable absent this "compelling necessity." Otherwise, the fifty GTCC-waste-related documents that Judge Merow ordered released on this basis from the "Bubar" affidavit would present a partial and incomplete record on the issues.

In addition, the great many documents the government is withholding on deliberative process grounds that describe or concern DOE's past and current plans for its present fuel program should also be released on the basis that PG&E's need is overriding regardless of the applicability of the deliberative process privilege. Such documents may well be cumulative of other evidence, but if so, that would be an argument for excluding them from trial, not from discovery. A selection of such documents is listed on pp. 11-12 of PG&E's motion, and the

others the government is withholding on deliberative process grounds can be readily identified from the affidavit descriptions and/or PG&E's Amended Table of Challenges, RA 166-208. The government cannot claim any burden in producing these documents, since they have already been collected and listed in the government's privilege log. PG&E is entitled to determine what trial evidence it will present from the *entire* collection of documents pertaining to DOE's spent fuel program plans, not just from the partial collection that the government has already produced and over which it has decided not to assert deliberative process privilege.

## CONCLUSION

For the reasons set forth above and in PG&E's motion to compel, the Court should reject the government's claims of deliberative process privilege in their entirety and direct the government to produce all 453 documents listed on the Amended Table of Challenges in the appendix to this reply. RA 166.

Dated: December 9, 2005

Respectfully submitted,

JERRY STOUCK
Greenberg Traurig, LLP
800 Connecticut Ave, NW, Suite 500
Washington, D.C. 20006
(202) 331-3173
(202) 261-4751 fax
*Counsel for Plaintiff*
Pacific Gas & Electric Company

Of Counsel:
ROBERT L. SHAPIRO
Greenberg Traurig, LLP