# In the United States Court of Federal Claims

No. 98-126 C
(Filed August 25, 2003)

| | |
|---|---|
| YANKEE ATOMIC ELECTRIC COMPANY, Plaintiff, | * |
| v. | * |
| THE UNITED STATES, Defendant. | * |

## ORDER [1/]

By motion, filed March 6, 2003, plaintiff seeks to compel production of documents and testimony withheld by defendant as privileged in 2003. Plaintiff's motion comprised 476 pages, including preface and appendix. Defendant's opposition, filed June 20, 2003, comprised 144 pages, including preface and appendix. Plaintiff's reply, filed August 5, 2003, comprised 116 pages, including preface and appendix. Thus, analysis of the briefing in this matter has required preparation and study of 736 pages of material dealing with well over 250 claims of privilege. Counsel are encouraged to resolve discovery issues by agreement, when at all possible, to obviate this time consuming and expensive allocation of resources by all concerned.

The parties have devoted substantial briefing effort to the procedural requirements for claiming deliberative process privilege. The main area of dispute is the extent to which the decision to claim such privilege may be delegated below the head of the agency concerned. Plaintiff contests the ruling in this regard made during

[1/] This should also be deemed applicable in *Connecticut Yankee v. United States*, No. 98-154 C and *Maine Yankee v. United States*, No. 98-474 C.

the consolidated discovery proceedings involving spent nuclear fuel cases, and seeks a more restrictive determination based on precedent such as *Cetron Electronic Corp. v. United States*, 207 Ct. Cl. 985 (1975). *See also Kaiser Aluminum & Chemical Corp. v. United States*, 141 Ct. Cl. 38, 157 F. Supp. 939 (1958) (Opinion by Justice Reed, sitting by designation). However, there is no dispute that the deliberative process privilege, even if correctly invoked, is not absolute. For example, in *Weiss v. United States*, 180 Ct. Cl. 863, 870 (1967), the court ruled as follows:

> The Secretary of the Navy says the document is staff advice of a subordinate to a superior, and no doubt, it is. *Kaiser Aluminum & Chemical Corp. v. United States*, 141 Ct. Cl. 38, 157 F. Supp. 939 (1958). However, before we allowed the claim of privilege in that case we also considered whether it was necessary to obtain the document to avoid a miscarriage of justice. We held that it was not in the case then at bar, and accordingly the claim of privilege was successful. Here we have the opposite side of the coin. We are not concerned with military and diplomatic secrets, which are in a class by themselves. The privilege here is not absolute and must yield to compelling necessity.

In the circumstance of this case and given the consolidated discovery ruling, it is concluded that no valid purpose would be served in again resolving the procedural aspect of claiming privilege. The essential issue with respect to moving this matter to trial is whether plaintiff has shown necessity for the material withheld which would require its disclosure despite the invocation of deliberative process privilege.

As noted in the Order, filed June 26, 2003, defendant has indicated a litigation position that the continued presence of Greater than Class C Waste ("GTCC") on a reactor site, requiring storage and security costs, would obviate or reduce damages, such as storage or security costs, that are claimed based on the failure of the government to commence removal of spent nuclear fuel by January 31, 1988. Thus, the Government's plans with respect to its obligation, pursuant to the Low-Level Radioactive Waste Policy Amendments Act of 1985, 42 U.S.C. §§ 2021b-2021i, to dispose of GTCC, must be fully disclosed to enable the court to make a finding(s) on the validity of this defense defendant asserts. It appears that there may only be inchoate plans, or recommended plans, but it is concluded that unless defendant abandons its GTCC defense against monetary claims in this matter, there exists a

compelling necessity for the production of all documentation which can contribute to an evidentiary finding as to whether GTCC material will be left on a reactor site after spent nuclear fuel and/or high level waste is removed. If a fee must be assessed for GTCC removal this fact also must receive consideration in damage considerations, particularly as to quantification issues.

Accordingly, the claims of privilege and the opposition thereto have been individually reviewed and, on the basis of compelling necessity, it is concluded that the following documents, using the numbers assigned in plaintiff's March 6, 2003 motion, must be produced: 58, 61, 69, 74, 76, 77, 88, 89, 90, 92, 93, 94, 95, 96, 97, 98, 99, 102, 103, 104, 111, 112, 120, 136, 138, 139, 146, 149, 154, 155, 156, 157, 203, 206, 209, 211, 212, 214, 216, 219, 220, E14, E15, E39, E40, E41, E42, E43, E44 (minus DOJ E-mail), and E95.

With respect to the opposition plaintiff also addressed to attorney-client or work product privilege claims, the descriptions in the logs have each been examined and it is concluded that the following documents do not, in their entirety, meet the necessary requirements for the privilege claimed and must be modified and produced as noted: 3 ("legal" notes redacted and document then produced), 9 (only if, as plaintiff alleges, the document is the same as one produced), 61 (produce after redacting substance of legal communications, Urie memo, and correspondence tracking sheet), 66 (produce after redacting handwritten notes from Urie), 67 (produce after redacting substance of legal communications, note by Urie), 70 (produce after redacting substance of legal communications, Urie memo, correspondence tracking sheet), 100 (produce after redacting substance of legal communications), 106 (produce after redacting substance of legal advice), 113 (produce after redacting substance of legal communications), 115 (produce after redacting substance of legal communications, Urie memo), 135 (produce after redacting legal discussions), 137 (produce after redacting legal advice and discussions), 142 (produce after redacting substance of legal communications, Urie memo, correspondence tracking sheet), 145 (same as 142), 202 (summary of letters for a meeting does not meet criteria for attorney-client claim and compelling necessity obviates deliberative process assertion), 204 (produce after redacting legal notes), 205 (produce after redacting description of legal advice), 208 (same as 205), E44 (produce after redacting DOJ material and legal advice), E46 (produce after redacting legal advice portion).

With the exception of the above-listed production, it is concluded that the assertions of privilege by defendant are otherwise, sustained.

Accordingly, it is **ORDERED**:

(1) That plaintiff's motion, filed March 6, 2003, shall be **GRANTED** to the extent of the production called for above and, otherwise, **DENIED**;

(2) That to the extent testimony was withheld on the subject matter of the production ordered herein, that testimony shall now be taken.

James F. Merow
Senior Judge

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| YANKEE ATOMIC ELECTRIC COMPANY (98-126C) (Merow, S.J.) | ) | |
| CONNECTICUT YANKEE ATOMIC POWER COMPANY (98-154C) (Merow, S.J.) | ) | |
| MAINE YANKEE ATOMIC POWER COMPANY (98-474C) (Merow, S.J.) | ) | |
| FLORIDA POWER & LIGHT COMPANY (98-483C) (Andewelt, J.) | ) | |
| NORTHERN STATES POWER COMPANY (98-484C) (Wiese, J.) | ) | |
| DUKE POWER, A Division of DUKE ENERGY CORP. (98-485C) (Tidwell, S.J.) | ) | |
| INDIANA MICHIGAN POWER COMPANY (98-486C) (Hodges, J.) | ) | |
| SACRAMENTO MUNICIPAL UTILITY DISTRICT (98-488C) (Yock, S.J.) | ) | |
| SOUTHERN NUCLEAR OPERATING COMPANY, et al. (98-614C) (Merow, S.J.) | ) | |
| COMMONWEALTH EDISON COMPANY (98-621C) (Hewitt, J.) | ) | |
| BOSTON EDISON COMPANY (99-447C) (Allegra, J.) | ) | |
| GPU NUCLEAR, INCORPORATED (00-440C) (Bush, J.) | ) | |
| WISCONSIN ELECTRIC POWER COMPANY (00-697C) (Merow, S.J.) | ) | |
| POWER AUTHORITY OF THE STATE OF NEW YORK (00-703C) (Damich, J.) | ) | |
| OMAHA PUBLIC POWER DISTRICT (01-115C) (Bush, J.) | ) | |
| NEBRASKA PUBLIC POWER DISTRICT (01-116C) (Weinstein, J.) | ) | |
| TENNESSEE VALLEY AUTHORITY (01-249C) (Bruggink, J.) | ) | |
| Plaintiffs, | ) | |
| v. | ) | |
| UNITED STATES, | ) | Judge Wiese |
| Defendant. | ) | |

JOINT MOTION FOR AN ORDER FOR COORDINATED DISCOVERY

Pursuant to Chief Judge Baskir's Order of May 22, 2001, designating Judge Wiese as the managing judge, and the Court's direction at the hearing held on June 14, 2001, the parties respectfully provide the following proposal regarding coordinated discovery in the cases before the Court. The parties have filed this motion in each of the cases before the Court and have requested that an order which provides for discovery pursuant to the schedule set forth below be entered in each case.

Cases Included in Coordinated Discovery: The following cases will be governed by the consolidated discovery order:

Yankee Atomic Electric Company v. United States (98-126C)
Connecticut Yankee Atomic Power Company v. United States (98-154C)
Maine Yankee Atomic Power Company v. United States (98-474C)
Florida Power & Light Company v. United States (98-483C)
Northern States Power Company v. United States (98-484C)
Duke Power, A Division of Duke Energy Corp. v. United States (98-485C)
Indiana Michigan Power Company v. United States (98-486C)
Sacramento Municipal Utility District v. United States (98-488C)
Southern Nuclear Operating Company, et al. v. United States (98-614C)
Commonwealth Edison Company v. United States (98-621C)
Boston Edison Company v. United States (99-447C)
GPU Nuclear, Incorporated v. United States (00-440C)
Wisconsin Electric Power Company v. United States (00-697C)
Power Authority of the State of New York v. United States (00-703C)
Omaha Public Power District v. United States (01-115C)
Nebraska Public Power District v. United States (01-116C)
Tennessee Valley Authority v. United States (01-249C)

These plaintiffs are hereinafter referred to as "plaintiffs."[1]

Scope of Discovery: The parties will proceed with discovery on the issues associated with the schedule of acceptance of spent nuclear fuel pursuant to the Standard Contract, 10 C.F.R. Part 961. These issues, hereinafter referred to as "schedule issues," include the order, pace, and rate of acceptance of spent nuclear fuel and high-level radioactive waste pursuant to the Standard Contract, any priority for shutdown reactors, exchanges of acceptance slots, and the Government's obligation to accept and timing of acceptance of Greater-Than-Class C Waste.

Document Production:

a. On or before July 23, 2001, the Government shall provide a designated representative of the plaintiffs' counsel with one set of all the documents (and any accompanying indexes) previously provided to the plaintiffs in Yankee Atomic Electric Co. v. United States, No. 98-126C (Fed. Cl.), Connecticut Yankee Atomic Power Co. v. United States, No. 98-154C (Fed. Cl.), and Maine Yankee Atomic Power Co. v. United States, No. 98-474C (Fed. Cl.) (collectively the "Yankee utilities"). The designated representative will then distribute copies of the documents to counsel for each of the plaintiffs. The Yankee utilities authorize the release of these documents to the other plaintiffs subject to this order, including any proprietary information contained in these documents, subject to the terms of the protective order to be entered in each case.

---

[1] The parties have not been able to agree to a separate discovery track for the three Yankee Utilities, and, accordingly, that matter will have to be addressed and resolved separately. This Motion and Order is without prejudice to Yankee Utilities' right to seek a separate discovery track for their cases. If a separate discovery track is ordered in the Yankee Utilities' cases, the provisions of this Order may need to be modified for those cases.

b. Subject to the installation of the necessary telephone lines by the local telephone utility and barring other technical difficulties, the Government shall provide the capability to search the document database known as the "RIS-web" beginning July 23, 2001, to those counsel for plaintiffs who have submitted access applications to and been granted access by DOE. Procedures will be established to provide to plaintiffs' counsel the documents counsel request from the database. Subject to the stipulation to be entered by the Court regarding the Government's right to hold back privileged documents, the Government shall provide the documents in electronic format requested by plaintiffs' counsel within 20 days of each such request or, if electronic production is not feasible within that time frame, shall provide paper copies of those documents, with production of electronic production at a later date.

c. During the week of August 1, 2001, the Government shall begin to produce to plaintiffs' counsel a set of document images in electronic format collected from various DOE locations. This production, totaling approximately 540,000 images, shall take place on a rolling basis and shall be completed no later than September 14, 2001.

d. On or before August 31, 2001, the Government shall produce copies of the contracting officer's files for each plaintiff utility to plaintiffs' counsel. Each plaintiff in the cases subject to this order authorizes the release of the contracting officer's file relating to its Standard Contract to the other plaintiffs in the cases subject to this order, subject to the terms of the protective order to be entered in each case.

e. On or before September 4, 2001, plaintiffs, as a collective group, shall serve on the Government a single set of document requests regarding the schedule issues. The

Government's written response to the document request shall be served on plaintiffs' counsel on October 9, 2001. The Government shall complete its production of documents responsive to the requests no later than October 29, 2001.

f. On or before September 4, 2001, the Government shall serve on each of the plaintiffs a set of document requests regarding the schedule issues. Each plaintiffs' written response to the document request shall be served on the Government on October 9, 2001. Each plaintiff shall complete its production of documents responsive to the requests no later than October 29, 2001.

g. On or before August 31, 2001, plaintiffs' counsel and the Government shall submit a plan to address the production of e-mail messages by the parties. The plan shall contain a date for the production of e-mail by the parties.

h. On or after October 29, 2001, plaintiffs shall be entitled to take a RCFC 30(b)(6) deposition of a Government witness[es] related to the Government's document production. On or after October 29, 2001, the Government shall be entitled to take a RCFC 30(b)(6) deposition of a utility witness[es] in each case governed by this order related to that utility's document production.

Written Discovery

a. On or before September 4, 2001, plaintiffs, as a collective group, will serve on the Government a set of interrogatories regarding the schedule issues. The Government shall serve its answers to the interrogatories on October 9, 2001.

b. On or before September 4, 2001, the Government will serve on each of the plaintiffs a set of interrogatories on the schedule issues. Each plaintiff shall serve its answers to interrogatories on October 9, 2001.

c. Thereafter, plaintiffs, as a collective group, may serve no more than 20 additional interrogatories on the Government on the schedule issues. The Government may serve no more than 20 additional interrogatories on each of the plaintiffs on the schedule issues. Such interrogatories shall be served no later than December 15, 2001. The due date for responses to such interrogatories shall be governed by the Rules of the Court of Federal Claims.

d. Plaintiffs, as a collective group, shall be entitled to propound requests to admit on the Government regarding the schedule issues. The Government shall be entitled to propound requests to admit on each of the plaintiffs. The last date to serve requests to admit shall be December 15, 2001. The due date for responses to such requests to admit shall be governed by the Rules of the Court of Federal Claims.

Depositions:

a. On or before October 15, 2001, Plaintiffs shall provide an initial list of Government employees and third party witnesses the plaintiffs intend to depose on the schedule issues, subject to the plaintiffs' right to identify additional deponents based on additional information that becomes available in discovery.[2] Each Government employee witness will be deposed only once with regard to the schedule issues, unless circumstances, including the availability of additional discovery or the testimony of the witness, warrant otherwise. Counsel for any plaintiff may attend and participate in those depositions.

---

[2] The plaintiffs and the Government also have the right to conduct third-party discovery regarding the schedule issues in accordance with the RCFC during the discovery period identified in this Motion. In additon, nothing contained herein shall affect the right of the parties

b. On or before October 15, 2001, the Government shall provide an initial list of employee witnesses for each utility and third party witnesses the Government intends to depose on the schedule issues, subject to the Government's right to identify additional deponents based on additional information that becomes available in discovery. Each utility employee witness will be deposed only once with regard to the schedule issues, unless circumstances, including the availability of additional discovery or the testimony of the witness, warrant otherwise. Counsel for any plaintiff may attend and participate in those depositions.

c. Depositions of Government employee, utility employee and third-party witnesses shall be scheduled to take place between November 1, 2001, and January 31, 2002. The parties shall confer and agree upon a set of guidelines that will govern how these depositions will be scheduled and conducted by October 15, 2001.

Status Conference: The parties propose that a status conference be scheduled for February 13, 2002, with the Court to discuss the next steps in the cases and how best to resolve the schedule issues.

Protective Order: The parties request that the Court in each case enter the protective order filed with this motion.

Discovery Judge: The parties request that a judge be appointed as a discovery judge to decide disputes concerning discovery which the parties are unable to resolve themselves.

---

to submit expert witness reports or conduct expert witness discovery, as needed, after the discovery addressed in this motion is completed.

Respectfully submitted,

ALEX D. TOMASZCZUK
SHAW PITTMAN LLP
1650 Tysons Boulevard
McLean, VA 22102
Tel.: (703) 770-7940
Counsel of Record for Plaintiffs:
Boston Edison Company
Duke Power Company
Florida Power and Light Company
GPU Nuclear, Inc.
Indiana Michigan Power Company
Northern States Power Company
Power Authority of the State of
New York

M. STANFORD BLANTON
Balch & Bingham LLP
1710 Sixth Avenue North
Birmingham, AL 35203
Tel.: (205) 251-8100
Counsel of Record for Plaintiff:
Southern Nuclear Operating Company
Counsel of Record for Plaintiff:

(by ADT)

STUART E. SCHIFFER
Acting Assistant Attorney General
DAVID M. COHEN
Director

HAROLD D. LESTER, JR.
Assistant Director
FRANKLIN E. WHITE, JR.
Assistant Director
MARIAN E. SULLIVAN
WILLIAM L. OLSEN
RUSSELL A. SHULTIS
BRYAN S. BANES
Trial Attorneys
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th floor
1100 L Street, N.W.
Washington, D.C. 20530
Tel.: (202) 307-6288

Date: 7/9/01

RICHARD C. JOHNSON
Jenner & Block
601 Thirteenth Street, N.W.
Suite 1200 South
Washington, DC 20005
Tel.: (202) 639-6075
Counsel of Record for Plaintiff:
Commonwealth Edison Company

Richard C. Johnson (by ADT)

JERRY STOUCK
Spriggs & Hollingsworth
1350 I Street, N.W., 9th floor
Washington, D.C. 20005-3305
Tel.: (202) 898-5839
Counsel of Record for Plaintiffs:
Yankee Atomic Electric Company
Connecticut Yankee Atomic Power Company
Maine Yankee Atomic Power Company

Jerry Stouck (by ADT)

RICHARD W. OEHLER
Perkins Coie LLP
1201 Third Avenue, 40th Floor
Seattle, WA 98101-3099
Tel.: (206) 583-8419
Counsel of Record for Plaintiff:
Wisconsin Electric Power Company

Richard W. Oehler (by ADT)

MELVIN C. GARBOW
Arnold & Porter
555 Twelfth Street, N.W.
Washington, DC 20004-1206
Tel.: (202) 942-5666
Counsel of Record for Plaintiff:
Sacramento Municipal Irrigation District

Melvin C. Garbow (by ADT)

PETER K. SHEA
Office of General Counsel
Tennessee Valley Authority
400 West Summit Hill Drive
Knoxville, TN 37902-1401
Tel.: (865) 632-7319

Peter K. Shea (by ADT)

Document #: 1140794 v.1

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| [UTILITY], Plaintiff, v. THE UNITED STATES, Defendant. | ) ) ) ) ) ) ) ) ) | No. XX-XXXC (Judge xxxx) |

PROTECTIVE ORDER

The Court has determined that certain information that may necessarily be disclosed orally or in writing during this action and the other cases pending before the Court concerning the Standard Contract, 10 C.F.R. Part 961 (hereinafter referred to as the "spent nuclear fuel cases"), may be proprietary, confidential, or otherwise protectable. To address these concerns, it is ordered that protected information, provided formally or informally during the course of the spent nuclear fuel cases, shall be disclosed by the parties only as follows:

1. "Protected information" as used herein means:

(a) information, proprietary or confidential information, contained in any document (including any pleading, motion, brief, or notice) produced, filed, or served by any party to this litigation that is designated as protected by a party (See ¶3); and

(b) information, including any proprietary or confidential information contained in any deposition,

testimony, hearing or transcript thereof, or any affidavit, taken or provided during this litigation that is designated as protected by a party (See ¶ 3).

2. (a) Protected information shall be used by private parties solely for the purposes of this litigation and shall not be given, shown, made available, discussed, or otherwise communicated in any form except as provided herein.

(b) Except as provided in paragraph 2(d) and (e), the only categories of persons who may be given access to protected information are (i) legal counsel for a party in the spent nuclear fuel cases and (ii) independent consultants and experts assisting such counsel in connection with the litigation.

(c) To be granted access to protected information, any such person shall first read this Order and, if an attorney, execute a copy of the Application for Access to Materials Under Protective Order by Inside or Outside Counsel (Exhibit A-1) or, if a consultant or expert, execute a copy of the Application for Access to Materials Under Protective Order by a Consultant or Expert (Exhibit A-2). The party seeking to have such person granted access shall then provide a copy of the executed Application to counsel of record for each other party in the spent nuclear fuel cases. Such person shall, without further action by the Court, be permitted access to protected material at the close of the second business day

after the other parties have received the Application, unless, in the interim, any party informs the requesting party of an objection. If the parties are unable to reach agreement regarding an objection, the party seeking access may present the matter to the Court. Such person shall not be given access unless and until the Court authorizes such access.

(d) Paralegal, clerical and administrative support personnel assisting any counsel who has been admitted under this Order may be given access to protected information if such personnel have first been informed by such counsel of the obligations imposed by this Order.

(e) Court, procuring agency and Department of Justice personnel are automatically subject to the terms of this Order and are entitled to access to protected information, without further action.

3. (a) Protected material of any kind may be provided only to the Court and to individuals authorized by this protective order, and must be in a sealed parcel containing the legend "PROTECTED MATERIAL ENCLOSED" conspicuously placed on the outside of the parcel containing the protected information. A copy of the certificate of service identifying the document being filed should be attached to the front of each envelope.

(b) The first page of each document containing protected material is to be clearly marked as follows:

(c) Any courtesy copies of protected materials that are filed with the Court for use by the judge should be marked as such.

(d) The Court will maintain properly marked protected pleadings or materials under seal.

5. (a) A party that files a pleading in accordance with paragraph 3 hereof shall, within one business day, serve on the other party a proposed redacted copy of the pleading with the claimed protected information deleted and clearly marked "proposed redacted copy" in the upper right-hand corner of the first page.

(b) Within two business days after receipt of the proposed redacted copy, counsel for the opposing party shall advise the party originating the pleading of any additional redactions required. The originating party shall promptly provide counsel for the opposing party with a copy of the pleading with these additional redactions and clearly marked "agreed-upon redacted copy—may be made public" in the upper right-hand corner of the first page. During the two day period, the proposed redacted copy shall be treated as protected. At the expiration of the two day period, or when agreement is reached, the agreed-upon redacted copy shall be

filed with the Court by the originating party.

(c) Counsel for a party may serve on counsel for the Government or counsel for any other plaintiff in the other spent nuclear fuel cases a proposed redacted copy of any document (other than a pleading, to which paragraphs 4(a) and (b) apply). Counsel for the Government or for the party to whom the document belongs shall respond within two business days, advising counsel for the party seeking release of the document of any additional redactions required. Once agreement is reached, counsel for the party seeking release of the document may release the document to individuals not covered by this protective order.

6. Counsel for any party in the spent nuclear fuel cases may at any time object to the designation of particular information as protected. If the parties are unable to resolve the matter, counsel for the objecting party may submit the matter to the Court for resolution. Until the Court resolves the matter, the disputed information shall be treated as protected.

7. Each person covered by this Order shall take all necessary precautions to prevent disclosure of protected information, including but not limited to physically securing, safeguarding and restricting access to the protected information. The confidentiality of information learned

pursuant to this order shall be maintained in perpetuity.

8. Within 30 days after the conclusion of all the spent nuclear fuel cases covered by this order (including any and all appeals and remands), counsel for each party shall return the protected information to the counsel for the party to whom the protected information belongs. Provided the documents are marked protected and are properly secured, counsel for each party may retain one copy of the unredacted pleadings.

9. Nothing contained in this Order shall preclude either party from seeking relief from this Order through the filing of an appropriate motion with the Court that sets forth the basis for the relief sought.

10. If a party determines that a previously produced document inadvertently was not identified as containing protected information, the producing party shall give notice in writing that the document is to be treated as containing protected information, and thereafter the designated document shall be treated in accordance with this Order.

11. Counsel for the parties shall promptly report any breach of the provisions of this Order to counsel of record in each of the spent nuclear fuel cases. Upon discovery of any breach, counsel shall immediately take appropriate action to cure the violation and retrieve any protected information that may have been disclosed to persons not covered by this Order.

The parties shall reasonably cooperate in determining the reasons for any such breach.

IT IS SO ORDERED.

______________________________
Judge XXXXXXXXX

July __, 2001

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| [UTILITY],<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. XX-XXXC<br>(Judge xxxx) |

**APPLICATION FOR ACCESS TO MATERIALS UNDER**
**PROTECTIVE ORDER BY OUTSIDE OR INSIDE COUNSEL**

1. I, ______________________, hereby apply for access to protected materials covered by the protective order issued in connection with this proceeding.

2. a. [outside counsel only] I am an attorney with the law firm of ______________________ and have been retained to represent ______________________, a party to this proceeding.

b. [inside counsel only] I am in-house counsel for ______________________, a party to this proceeding. My title is ______________________.

3. I am ____ /am not ____ a member of the bar of the United States Court of Federal Claims (the "Court").

4. My professional relationship with the party I represent in this proceeding and its personnel is strictly one of legal counsel. I am not involved in competitive decisionmaking as discussed in U.S. Steel Corp. v. United States, 730 F.2d 1465 (Fed. Cir. 1984), for or on behalf of the party I represent, any entity that is an interested party to this proceeding, or any other firm that might gain a competitive advantage from access to the material disclosed under the protective order. I do not provide advice or participate in any decisions of such parties in matters involving similar or corresponding information about a competitor. This means that I do not, for example, provide advice concerning or participate in decisions about marketing or advertising strategies, product research and development, product design or competitive structuring and composition of bids, offers, or proposals with respect to which the use of protected material could provide a competitive advantage.

5. [outside counsel only] I identify here (by writing "none" or listing names and relevant circumstances) those attorneys in my firm who, to the best of my knowledge, cannot make the representations set forth in the preceding paragraph:

________________________________________

________________________________________

________________________________________

6. I identify here (by writing "none" or listing names, position, and responsibilities) any member of my immediate family who is an officer or holds a management position with an interested party in the proceeding or with any other firm that might gain a competitive advantage from access to the material disclosed under the protective order:

________________________________________

________________________________________

________________________________________

7. I identify here (by writing "none" or identifying the name of the forum, case number, date, and circumstances) instances in which I have been denied admission to a protective order, had admission revoked or been found to have violated a protective order issued by any administrative or judicial tribunal:

________________________________________

________________________________________

________________________________________

8. [inside counsel only] I have attached a detailed narrative providing the following information:

a. my position and responsibilities as in-house counsel, including my role in providing advice in procurement-related matters;

b. the person(s) to whom I report and their position(s) and responsibilities;

c. the number of in-house counsel at the office in which I work and their involvement, if any, in competitive decisionmaking and in providing advice in procurement-related matters;

d. my relationship to the nearest person involved in competitive decisionmaking (both in terms of physical proximity and corporate structure); and

e. measures taken to isolate me from competitive decisionmaking and to protect against the inadvertent disclosure of protected material to persons not admitted under the protective order.

9. I have read the protective order issued by the Court in this proceeding. I will comply in all respects with that order and will abide by its terms and conditions in handling any protected information produced in connection with the proceeding.

10. I acknowledge that a violation of the terms of the protective order may result in the imposition of such sanctions as may be deemed appropriate by the Court and in possible civil and criminal liability.

By my signature, I certify that, to the best of my knowledge, the representations set forth above (including any attached statements) are true and correct.

________________________________ ____________________________

Signature Date Executed

________________________________

Telephone Number

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| [UTILITY], | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. XX-XXXC |
| v. | ) | (Judge xxxx) |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

**APPLICATION FOR ACCESS TO MATERIALS UNDER PROTECTIVE ORDER BY CONSULTANT OR EXPERT**

1. I, the undersigned, am a ______________________ with ______________________ and hereby apply for access to protected materials covered by the protective order issued in connection with this proceeding.

2. I have been retained by ____________________ and will, under the direct and control of ____________________, assist in the representation of ____________________ in this proceeding.

3. I hereby certify that I am not involved in competitive decisionmaking as discussed in U.S. Steel Corp. v. United States, 730 F. 2d 1465 (Fed. Cir. 1984), for or on behalf of any party to this proceeding or any other firm that might gain a competitive advantage from access to the material disclosed under the protective order. Neither I nor my employer provides advice or participates in any decisions of such parties in

matters involving similar or corresponding information about a competitor. This means, for example, that neither I nor my employer provides advice concerning or participates in decisions about marketing or advertising strategies, product research and development, product design or competitive structuring and composition of bids, offers, or proposals with respect to which the use of protective materials could provide a competitive advantage.

4. My professional relationship with the party for whom I am retained in this proceeding and its personnel is strictly as a consultant on issues relevant to the proceeding. Neither I, my spouse, nor any member of my immediately family holds office or a management position in any company that is a party in this proceeding or with any competitor or potential competitor of a party.

5. I have attached the following information:

a. a current resume describing my education and employment experience to date;

b. a list of all clients for whom I have performed work within the two years prior to the date of this application and a brief description of the work performed;

c. a list of all clients for whom my employer has performed work within the two years prior to the date of this

application, and for whom the use of protected material could provide a competitive advantage, and a brief description of the work performed;

d. a statement of the services I am expected to perform in connection with this proceeding;

e. a description of the financial interests that I, my spouse, and/or my family has in any entity that is an interested party in this proceeding or whose protected material will be reviewed; if none, I have so stated;

f. a list identifying by name of forum, case number, date and circumstances, all instances in which I have been granted admission or been denied admission to a protective order, had a protective order admission revoked or been found to have violated a protective order issued by an administrative or judicial tribunal; if none, I have so stated; and

g. a statement of the professional associations to which I belong, including membership numbers.

6. I have read a copy of the protective order issued by the Court in this proceeding. I will comply in all respects with all terms and conditio s of that order in handling any protected information produced in connection with the proceeding. I will not disclose any protected information to any individual who has not been admitted under the protective order by the Court.

7. I acknowledge that a violation of the terms of the protective order may result in the imposition of such sanctions as may be deemed appropriate by the Court and in possible civil and criminal liability.

By my signature, I certify that, to the best of my knowledge, the representations set forth above (including the attached statements) are true and correct.

| | |
|---|---|
| _________________________ | ______________________ |
| Signature | Date Executed |

_________________________

Name and Title

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| [UTILITY], | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. XX-XXXC |
| v. | ) | (Judge xxxx) |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

STIPULATED ORDER GOVERNING REVIEW OF THE DEPARTMENT OF ENERGY'S ELECTRONIC "RECORD INFORMATION SYSTEM" DATABASE

Upon stipulation of the parties,

IT IS ORDERED that discovery in this action relating to the Department of Energy's electronic "Record Information System" database be governed by the following:

1. This order extends to any type of privilege or protection claimed, although no party at this time necessarily agrees to any other party's interpretation or scope of any privilege or other protection that may be asserted.

2. Each party reserves the right to challenge the assertion, interpretation, or scope of any privilege or other protection claimed by the other party.

3. The parties have agreed that plaintiff in this litigation will be allowed to search electronically for documents relevant to the issues in this case that are currently maintained in an electronic database maintained by the Department of Energy called the Records Information System ("RIS"). By allowing plaintiff in this litigation access to the RIS, defendant will

not be considered to have waived any privilege or protection applicable to any document or information contained in or upon that database. After plaintiff in this litigation reviews documents contained in or upon the RIS and identifies those documents contained therein that it wishes defendant to produce in this litigation, defendant will be entitled to review those documents and withhold from physical production any documents that it deems privileged or subject to protection. Any such documents withheld will be identified on a privilege log. This agreement will not affect plaintiff's rights to challenge defendant's assertion of privilege or protection, except that plaintiff will not be entitled to assert that defendant has waived any privilege or protection by allowing plaintiff access to the RIS.

4. Nothing in this order shall prohibit a party from withholding from review and/or production any document covered by any privilege(s) or protection.

IT IS SO ORDERED.

Judge XXXXXXXXX

July __, 2001

# In the United States Court of Federal Claims

(Filed September 26, 2001)

| | | |
|---|---|---|
| ******************************************* | * | |
| YANKEE ATOMIC ELECTRIC COMPANY | * | |
| CONNECTICUT YANKEE ATOMIC POWER COMPANY | * | |
| MAINE YANKEE ATOMIC POWER COMPANY | * | **Case Nos.** |
| FLORIDA POWER & LIGHT COMPANY | * | **98-126C, 98-154C, 98-474C, 98-483C,** |
| NORTHERN STATES POWER COMPANY | * | **98-484C, 98-485C, 98-486C, 98-488C,** |
| DUKE POWER, A Division of DUKE ENERGY CORP. | * | **98-614C, 98-621C, 99-447C, 00-440C,** |
| INDIANA MICHIGAN POWER COMPANY | * | **00-697C, 00-703C,** |
| SACRAMENTO MUNICIPAL UTILITY DISTRICT | * | **01-115C, 01-116C, 01-249C** |
| SOUTHERN NUCLEAR OPERATING COMPANY, <u>et al</u>. | * | |
| COMMONWEALTH EDISON COMPANY | * | |
| BOSTON EDISON COMPANY | * | |
| GPU NUCLEAR, INCORPORATED | * | UNCONSOLIDATED |
| WISCONSIN ELECTRIC POWER COMPANY | * | |
| POWER AUTHORITY OF THE STATE OF NEW YORK | * | |
| OMAHA PUBLIC POWER DISTRICT | * | **Judge Diane Gilbert Weinstein** |
| NEBRASKA PUBLIC POWER DISTRICT | * | |
| TENNESSEE VALLEY AUTHORITY | * | **Discovery Judge** |
| Plaintiffs, | * | |
| | * | |
| v. | * | |
| | * | |
| THE UNITED STATES, | * | |
| Defendant. | * | |
| ******************************************* | | |

**Order**

As discussed at the discovery Status Conference held on September 20, 2001, the Joint Motion for an Order for Consolidated Discovery filed on July 10, 2001, is granted, with the exception of Document Production ¶ G. Parties are granted an enlargement of time until October 1, 2001, to submit a plan addressing the production of e-mail messages.

Defendant is ordered to file a report within ten days of the conclusion of written discovery stating whether it intends to file a motion for summary judgment and the basis therefor.

DIANE GILBERT WEINSTEIN
Judge, U.S. Court of Federal Claims

# In the United States Court of Federal Claims

(Filed November 1, 2001)

FILED
NOV - 1 2001
U.S. COURT OF FEDERAL CLAIMS

****************************************** *

YANKEE ATOMIC ELECTRIC COMPANY *
CONNECTICUT YANKEE ATOMIC POWER COMPANY *
MAINE YANKEE ATOMIC POWER COMPANY *
FLORIDA POWER & LIGHT COMPANY *
NORTHERN STATES POWER COMPANY *
DUKE POWER, A Division of DUKE ENERGY CORP. *
INDIANA MICHIGAN POWER COMPANY *
SACRAMENTO MUNICIPAL UTILITY DISTRICT *
SOUTHERN NUCLEAR OPERATING COMPANY, et al. *
COMMONWEALTH EDISON COMPANY *
BOSTON EDISON COMPANY *
GPU NUCLEAR, INCORPORATED *
WISCONSIN ELECTRIC POWER COMPANY *
POWER AUTHORITY OF THE STATE OF NEW YORK *
OMAHA PUBLIC POWER DISTRICT *
NEBRASKA PUBLIC POWER DISTRICT *
TENNESSEE VALLEY AUTHORITY *

Plaintiffs, *

v. *

THE UNITED STATES, *

Defendant. *

******************************************

Case Nos.
98-126C, 98-154C,
98-474C, 98-483C,
98-484C, 98-485C,
98-486C, 98-488C,
98-614C, 98-621C,
99-447C, 00-440C,
00-697C, 00-703C,
01-115C, 01-116C,
01-249C

UNCONSOLIDATED

Judge Diane Gilbert Weinstein

Discovery Judge

## Order

On October 9, 2001, plaintiffs filed a motion for clarification of this court's September 26, 2001 order. Defendant responded on October 23, 2001.

Plaintiffs request this court to modify its prior order, which directs defendant to file a report at the conclusion of written discovery stating whether it intends to file a motion for summary judgment and the basis therefor. Plaintiffs submit that any dispositive motion must await the completion of all discovery and must be resolved by the judge responsible for each individual SNF case. Plaintiffs also argue that this court's order is premature and unnecessarily disruptive, inconsistent with the parties' negotiated discovery schedule and Judge Wiese's opinion expressed during a previous hearing, and generally beyond the limited scope of the proceedings before this court.

Defendant's opposition argues that the order is not disruptive to the discovery proceedings nor contrary to the negotiated discovery schedule. Furthermore, defendant maintains that prohibiting dispositive motions until after all of discovery is complete is wasteful and contrary to the purposes of Rule 56 of the Rules of the United States Court of Federal Claims (RCFC).

The order that defendant report its intentions as to any future dispositive motions after written discovery is neither premature, disruptive of the negotiated discovery schedule, nor beyond the scope of the court's discretion in these proceedings. Plaintiff's contention that the order permits the discovery judge to decide dispositive motions ignores the plain language of the order, which orders only a report, not a motion, and the discussion at the status conference on September 20, 2001. Further, even if it ordered a motion, nothing in the order indicates that the individual judges would not be the decision makers.

Plaintiffs also cite no authority for their central proposition that a party must be absolutely precluded from filing a dispositive motion before full discovery has been completed. Indeed, plaintiffs argument is inconsistent with the Federal Circuit's view of the intent and operation of RCFC 56(f). "A party may not simply assert ... that discovery was necessary and thereby overturn

summary judgment when it failed to ... set out reasons for the need for discovery in an affidavit." **Sweats Fashions, Inc. v. Pannill Knitting Co., Inc.**, 883 F.2d 1560, 1567 (Fed. Cir. 1987). See also **Simmons Oil Corp. v. Tesoro Petroleum Corp.**, 86 F.3d 1138, 1144 (Fed. Cir. 1996) (requiring a specific showing of how additional discovery would rebut a summary judgment motion); **New America Shipbuilders, Inc. v. United States**, 871 F.2d 1077 (Fed. Cir. 1989)(holding that trial court did not abuse its discretion in suspending discovery pending summary judgment motion where opponent made no showing of need for further discovery).

Plaintiffs' position that a report on a possible summary judgment motion would violate the negotiated discovery procedure is unsupported. The government, a party to the negotiations, disagrees, as a matter of fact. Moreover, the negotiated procedure does not explicitly preclude summary judgment motions prior to the close of discovery. And, even if it did, the procedure may be revised, if not by the parties, by the court.

Finally, plaintiffs' contention that the judge who presides over discovery proceedings may not act inconsistently with previous comments regarding coordinated discovery (allegedly by Judge Wiese during a hearing held before the appointment of a discovery judge) is incorrect. First, the comments do not support plaintiffs' position that dispositive motions may not be filed before discovery is complete. Second, even if they did, such interlocutory rulings cannot bind this court.

Discovery orders are interlocutory orders that are neither final nor immediately appealable. **Quantum Corp. v. Tandon Corp.**, 940 F.2d 642, 644 (Fed. Cir. 1991). Interlocutory orders are not subject to res judicata or the law of the case doctrine and may always be reconsidered prior to final judgment. See **John Simmons Co. v. Grier Bros. Co.**, 258 U.S. 82, 90-91 (1922) (as long as the court has jurisdiction over an action, it should have complete power over interlocutory orders made therein and should be able to revise them when it is consonant with equity to do so); **Senza-Gel Corp. v. Seiffhart**, 803 F.2d 661 (Fed. Cir. 1986) ( res judicata is simply inapplicable to an interlocutory decision or order because such order is subject to revision by the district court at any time

before entry of final judgment); 18 Charles Allen Wright et al, Federal Practice and Procedure § 4478 (1981). This is true even when a case is reassigned or transferred to a new judge. See **In re Agent Orange Prod. Liab. Litig.**, 733 F.2d 10, 13 (2d Cir.1984) ("It is well established that the interlocutory orders and rulings made pre-trial by a district judge are subject to modification by the district judge at any time prior to final judgment, and may be modified to the same extent if the case is reassigned to another judge."); **Langevine v. District of Columbia**, 106 F.3d 1018, 1023 (D.C.Cir. 1997) (the judge to whom case reassigned had full authority to reconsider previous judge's interlocutory order); 1B James W. Moore et al., Moore's Federal Practice ¶ 0.404[4.--2] (2d ed.1996) ("[T]ransfer [between judges] should no more freeze prior rulings than it should require their routine reexamination.").

This court has been delegated authority over the above-captioned cases during the discovery phase of the proceedings and is not absolutely bound by agreements negotiated between parties or comments made in prior hearings. The September 26, 2001 order not only is proper, it is desirable, as it may result in the narrowing of discoverable issues and elimination of the need for time-consuming and costly discovery, or even, optimally, of trial. This accords with the Federal Circuit's interpretation of Rule 56 and the discretion accorded to trial judges. Needless to say, each of the individual judges in these cases retains the right to decide a dispositive motion in his/her case for him/herself. Plaintiffs' motion for clarification therefore is denied.\1

DIANE GILBERT WEINSTEIN
Judge, U.S. Court of Federal Claims

---

\1 The parties are directed to the October 19, 2001 order mandating the filing of motions and other material during the discovery phase with the discovery judge only.

# DRAFT

REVIEW DRAFT FOR DISSCUSSION ONLY

SUMMARY OF CONCLUSIONS

MRS ACTION PLAN TASK G

(1) Purpose

- Identify functions of storage in federal system
- Quantify requirements for each function
- Analyze abilitiies of MRS/NO-MRS systems to meet requirements
- Identify contribution of MRS in integrating FWMS/Reactors

(2) Conclusions

2.1 The functions of storage in the FWMS are:

- Enable acceptance
- Process scheduling
- Reliability Enhancement
- Heat Management [more generally - waste stream conditioning]

2.2 Requirements for Acceptance Enabling Function vary inversly with goal for maximumum at reactor storage, and directly with time prior to initiation of emplacement.

| Additional at-reactor storage goal (MTU) | Repository Start Date 2003 | 2013 |
|---|---|---|
| 5000 | 15000 | 45000 |
| 10000 | 5000 | 30000 |
| 15000 | 0 | 20000 |
| 20000 | 0 | 11000 |

A repository - only system cannot meet reqirements to limit additional at-reactor storage to below 15000 tons regardless of deployment date.

The ability of an MRS-based system in which NWPAA linkages are observed is also dependent on the repositiory deployment date. Such a system, limited to 15000 tons capacity, can limit additional at-reactor storage to less than 5000 tons for a 2003 repository but to no less than 17000 tons for a 2013 repository.

Only a system in which MRS storage capacity is greater than 15000 MTU and in which operation is independent of the repository schedule can meet this requirement for all cases. This conclusion is independent of the allocation of functions between the MRS and repository.

# DRAFT

## 2.3 Process Scheduling (Lag) Storage

Requirements for process scheduling storage depend on system configuration, and so are slightly different between systems with and without MRS facilities.

A repository facility in a repository only system would require approximately 100 tons of process scheduling storage to meet normal operational needs. This is well within the design basis of the facility. Total lag storage requirements within both MRS and repository are approximately 300 tons in aa MRS-based system including consolidation and would be less for other MRS-based configurations.

Since any of the system configurations studied could meet requirements for lag storage with existing design capacities, the ability to meet lag storage needs is not a factor in favor of any particular configuration.

## 2.4 Reliabiltiy Enhancement

Lag storage availible in both MRS and Repository only systems provide high operating reliabiltity for the system for expected levels of equipment failure and restoration downtime. Niether system has an advantage in maintaining reliable operation for this type of failure.

If the MRS could be operated independently of the operational status of the repository, the larger quantities of storage availible in a system including an MRS would confer a higher degree of system reliability in the face of long-term outages in particular system functions. Such storage would allow continuity of other functions. This feature of a system including an MRS would be compromised under the NWPAA provisions which require operations at an MRS to be suspended in the event of interuptions in the emplacement function.

## 2.5 Heat Management

Preliminary studies by LLNL for the Yucca Mountain Project show that there may be performance advantages in an emplacement sequence which selects high burnup fuel and seeks to minimize panel-to -panel variation in (350 year) integrated energy deposition levels. This type of heat management may be accomplished by selection of spent fuel direct from reactors (with or without an MRS) , consistent with the allocation of acceptance rights under the standard contract, provided that spent fuel selected for delivery may differ from the oldest fuel availible.

# DRAFT

The ability of a system with an MRS to resequence the waste stream accepted provides a more general ability to manage panel-to-panel thermal characteristics for alternative acceptance sequences. Utilizing an MRS in this manner may require greater storage capacity than the 15000 MTU specified in the NWPAA.

Management of the within - panel (or year) variation of spent fuel thermal characteristics also clearly be accomplished within a system containing an MRS. The 750 MTU limit on storage at a repository could limit the ability of a repository - only system to perform this function.

XEROX TELECOPIER 495 ; 2- 2-90;12:52PM P.2/10

FEB 02 '90 11:34 WASTE MANAGEMENT

United States Government

Department of Energy

Idaho Operations Office

# memorandum

DATE: February 2, 1990

SUBJECT: Transmittal of the Predecisional Draft Annotated Outline of the Environmental Assessment for the Interim Storage of Greater-Than-Class C Low Level Waste

TO: W. F. Newberry
Low Level Technical Support Branch
DOE-HQ, EM-351, E-467/GTN

Enclosed for your review, comment, and transmittal to EH-25 is a predecisional draft annotated outline of the environmental assessment for interim storage of Greater-Than-Class C Low Level Waste (GTCC LLW). This annotated outline describes the planned approach for addressing environmental concerns related to the interim storage of GTCC LLW at an existing DOE facility. The type of information and level of detail that is planned for the environmental assessment is discussed.

The approach for complying with the requirements of the National Environmental Policy Act (NEPA) for this task has been discussed with Mr. Warren Black of EH-25. Mr. Black requested an annotated outline to document these discussions and to ensure all parties understand and agree to this approach. Through discussions with Mary Magleby, I understand that Mr. Black has requested the annotated outline be submitted to him as soon as possible. Therefore, I am telefaxing a copy to you for transmittal to Mr. Black and will follow up with a formally transmitted copy.

Following your review of the outline, please submit your comments to Mary Magleby. Receipt of your comments by February 14, 1990 would be appreciated. If you would like additional information, please contact me at FTS 583-1508.

William C. Lattin, Acting Manager
National Low-Level Waste Program

cc: J. E. Conner, EG&G
M. T. Magleby, EG&G

HQR-077-2986

# ENVIRONMENTAL ASSESSMENT FOR THE INTERIM STORAGE OF GREATER-THAN-CLASS C LOW-LEVEL WASTE (GTCC LLW)

Annotated Outline
February 1, 1990

## EXECUTIVE SUMMARY

The environmental assessment (EA) will evaluate environmental impacts associated with the transportation and interim storage of commercially-generated wastes which exceed the NRC definition of Class C radioactive wastes intended for disposal. Programmatic considerations of future dedicated storage and disposal of GTCC LLW will also be addressed. Information will be provided on those DOE installations which are currently capable of serving as interim (short-term) storage sites utilizing existing facilities and documentation. Potential generic environmental impacts that will be examined include radiation impacts to workers and the public along the transportation routes, impacts at the storage site(s), and appropriate accident scenarios. A preferred interim storage site (yet to be identified) will be assessed in detail within the EA; viable alternative sites will also be presented but in lesser detail. Anticipated requirements under NEPA for future longer-term GTCC LLW management and disposal phases will also be discussed.

## TABLE OF CONTENTS

## ACRONYMS

## 1. PURPOSE AND NEED

### 1.1 Purpose

The Low-Level Radioactive Waste Policy Amendments Act of 1985 (P.L. 99-240) makes the federal government responsible for disposing of commercially generated GTCC LLW. The Department of Energy (DOE) will perform the governmental functions necessary under the Act to ensure that safe disposal is provided. To fulfill this responsibility, DOE proposes the rapid development of facilities and programs which allow GTCC LLW generators management options (other than on site storage at the place of generation) prior to the availability of permanent disposal.

### 1.2 Need

Certain commercial generators may not possess the financial resources required to ensure safe storage of GTCC LLW while disposal capacity is being developed. As early as mid-1990, limited amounts of GTCC LLW may require storage at a location other than the generators site in order to minimize risks to public health and safety. DOE intends to provide short-term interim

storage capacity at an existing DOE waste management facility until dedicated storage or permanent disposal options become available.

1.3 Scope of Environmental Review

This EA will address overall long-term management concerns by outlining the background, short-term/long-term management goals, and disposal options pertaining to GTCC LLW. Emphasis will be directed towards the interim storage of GTCC LLW (beginning in mid-1990 and continuing for approximately five years). Sufficient evidence will be provided to determine whether the proposed action concerning interim storage of GTCC waste will require preparation of an Environmental Impact Statement (EIS) or a Finding of No Significant Impact (FONSI). Descriptions and generic environmental analysis of the dedicated storage phase will be presented in sufficient detail to cover the prospect of the material staying at the interim site for an extended period. The anticipated transition from the current EA to future NEPA documentation will also be presented.

No discussions will be made regarding institutional or policy issues at any of the candidate sites with the possible exception of a brief reference to those specific factors which may have been used by DOE-HQ to eliminate otherwise viable candidate site(s). Similarly, because existing DOE facilities and procedures will be utilized to the maximum possible extent, it will be stated that the socioeconomic impacts of the proposed action are of minor significance. A socioeconomic analysis will not be performed.

2. PROPOSED ACTION AND ALTERNATIVES

2.1 Strategic Planning

The National Low-Level Radioactive Waste Management Program has developed a strategic plan concerning the management of GTCC LLW. This strategy calls for three sequential tasks to be performed in fulfilling the requirements of P.L. 99-240:

1. Interim storage of limited quantities of GTCC LLW at currently operating DOE facilities on an as-needed basis,

2. General acceptance of GTCC LLW in a dedicated storage facility prior to disposal, and

3. Disposal in a facility licensed by the Nuclear Regulatory Commission (NRC).

Development of a licensed federal disposal capability for GTCC LLW is a complex and time consuming process. Because disposal capacity will probably not be available to the private sector until the year 2010, a dedicated storage facility may be required to assure safe long-term storage. The need for such a facility, along with appropriate waste acceptance criteria, must still be firmly established. If dedicated storage is found necessary, such a facility would not be available until January 1, 1995.

Interim storage at an existing DOE facility will provide a short-term GTCC LLW storage capacity beginning in mid-1990. Acceptance will be restricted to GTCC LLW which is being held by commercial generators in a fashion inconsistent with NRC regulations, thereby presenting an immediate threat to public health and welfare. Criteria will be established by which DOE will evaluate and qualify generators for interim storage.

## 2.2 Proposed Action

### 2.2.1 Interim Storage Site Selection

In order to meet the mid-1990 operational goal, an established DOE facility currently storing wastes similar to GTCC LLW will be selected for interim storage. Site selection will be based on data derived from a survey of the technical storage capabilities of the DOE facilities. A survey questionnaire was sent to DOE Field Operations Offices at DOE-Richland, DOE-Idaho, DOE-Albuquerque, DOE-Las Vegas, DOE-Oak Ridge, and DOE-Savannah River. Field office personnel responded by providing information on physical capabilities, capacity, infrastructure, and regulatory issues. A survey team then visited each field office to clarify responses and obtain additional information. All information will be analyzed relative to standardized evaluation criteria and results published in a formal technical document. This document will be paraphrased and referenced in the EA.

Interim storage site evaluation criteria required that (1) significant changes would not be required for the facilities baseline operational and safety documentation; (2) that the facility met the requirements of DOE Orders; (3) that the facility was capable of storing GTCC LLW; (4) that the facility was capable of interim storage until a dedicated storage facility is established in 1995; and (5) that the acceptance of GTCC LLW would not adversely affect any DOE defense waste activity. The identity of the preferred interim storage facility or facilities will be presented.

### 2.2.2 Waste Characterization and Generation

The characteristics of GTCC LLW will be defined. The definition of the NRC Class C radioactive waste criteria will appear. The potential sources of GTCC LLW (and their expected contribution to aggregate GTCC LLW generation) will be identified. Explanation will be given regarding the wide variations (2,000 $m^3$ to 17,000 $m^3$) in long-term GTCC LLW generation volume projections. Specific waste sources, composition, volume, activity, and principal radionuclide information concerning those GTCC wastes likely to require interim storage will be documented and existing technical references provided.

### 2.2.3 Waste Packaging, Transport, and Treatment

Packages suitable for containing GTCC LLW are strongly influenced by the characteristics of the transport system and waste itself. While a wide variety of waste types fall into the GTCC classification, these can be divided into two general types; (1) those whose external radiation dose rates permit direct human contact during the handling operations (contact-handled), and (2)

those whose intense external radiation dose rates necessitate use of remote handling equipment (remote-handled).

Contact-handled waste packages (typically 30- or 55-gallon carbon steel or stainless steel drums) are likely to contain fission products or TRU materials. Transportation of GTCC LLW destined for interim storage will be handled in either unshielded or lightly shielded trucks. TRU wastes would require, by regulation, stringent constraints on container release in the event of involvement in transportation accidents. Further analysis is proceeding to determine what commercially available packaging would be suitable for these GTCC wastes.

Remote-handled GTCC wastes include activated metals from reactor decommissioning and unpackaged sealed sources. Substantial shielding is required during transport. Sealed sources are small, well packaged within steel capsules, and will usually be transported in their original shielded containers (or other commercially available containers) as contact-handled material. Larger, more irregularly-shaped high radiation wastes may require treatment and/or unique packaging and transport methods to meet DOT requirements. Further investigation must be performed to determine the suitability of existing containers for such uses. Reactor decommissioning wastes or other large radiation-emitting waste materials are not expected to require interim storage.

No provisions for the treatment of GTCC LLW are being planned for the interim storage facility. Any treatments applied to individual wastes in order to meet transportation standards or storage site waste acceptance criteria will be performed at the site of generation or an alternative treatment site before the waste is committed to interim storage. Subsequent treatments required for dedicated storage and/or disposal will not be performed at the interim storage facility.

2.2.4 Dedicated Storage

Prior to development of a federal dedicated storage facility the potential need for general acceptance of GTCC LLW will be verified. DOE will solicit expressions of interest in commercial development and operation of capable storage facilities. In the absence of viable alternative options capable of addressing long-term storage, a DOE dedicated storage facility may be developed and made available by January 1, 1995.

Waste acceptance criteria for dedicated storage will be established and existing facility environmental and operational documentation modified (or created in the event of construction of a new facility) to accommodate long-term GTCC LLW storage. An Environmental Assessment under NEPA is expected to be required for dedicated storage and will be developed by the DOE or, in the event of commercial operations for waste storage, the NRC in support of a permit issuance action. Waste generators will be responsible for preparation, packaging, and transportation of the waste to dedicated storage.

2.2.5 Disposal

Alternative disposal technologies will be evaluated to determine their respective suitability for application against various GTCC waste streams. Such technologies include deep geologic disposal and methods involving near-surface and intermediate-depth disposal. NRC and EPA performance objectives for disposal may require treatment to improve specific waste forms. Volume reduction, compaction, incineration, solidification, or other techniques may be necessary. For planning purposes, it is assumed that required treatment facilities will be located at the planned High Level Waste (HLW) geologic repository in Yucca Mountain, Nevada. This is the reference GTCC LLW disposal facility which is scheduled to be available as early as the year 2010. It is anticipated that the disposal facility NEPA documentation (EIS) will address the commercial GTCC waste stream. Should an alternative disposal facility be utilized for disposal, the existing facility documentation will be amended or supplemented as appropriate under NEPA to accommodate GTCC LLW.

2.3 No Action Alternative

The no action alternative will not provide an assured capacity for the safe storage of GTCC LLW. Consequently, individual waste generators will be relied upon to comply with applicable NRC storage requirements for their waste.

2.4 Interim Storage Site Considerations

Time, storage capacity, available infrastructure, and DOE and EPA siting constraints will be discussed (based upon information acquired through the technical survey) to enable narrowing of the list of investigated sites to a single preferred site and available alternatives. All investigated sites will be individually discussed in equal detail. No remarks will be made concerning any institutional issues of the potential storage sites.

2.5 Transportation Considerations

The volume of GTCC LLW which will require interim storage has been estimated at 66 $m^3$. This estimate is currently undergoing review and may be adjusted (with justification) within the EA. Because the utility industry (a source of wide variation in waste volume projections) is not anticipated to contribute GTCC LLW stored on an interim basis, highway transportation in exclusive use or multi-purpose shipments is assumed. Radiologic and non-radiologic risks from such movements are directly related to the number of shipments and miles traveled. Generators will be held responsible for transport to the DOE storage area whenever possible; however, because interim storage will service only financially incapacitated generators, it is assumed that DOE will be required to assure that proper provisions are made for packaging and transportation.

This section will also address general highway transportation routing, logistics, and packaging concerns relevant to the candidate facilities which may not lend themselves to examination under Section 2.4. General transportation issues relevant to the movement of GTCC LLW over highways to

storage facilities and from storage to a permanent disposal location will be presented.

## 2.6 Comparison of Alternatives

The identity of the preferred interim storage site (expected to be selected in February, 1990) and the deciding factors used for selection will be clearly presented. Suitable alternative storage sites will also be identified and described as to their desirability for storage purposes. Selection process considerations which may have been given to multiple storage sites (to alleviate possible transportation issues and/or material management problems) will also be documented if available. Brief discussions (if required) of institutional related issues will be restricted to only those concerns which may have been utilized by DOE-HQ to eliminate a candidate site from further consideration.

# 3. AFFECTED ENVIRONMENTS FOR INTERIM STORAGE

## 3.1 Candidate Storage Sites

This section will briefly describe the environment surrounding the preferred and alternative sites under consideration for interim storage. Information will include details on area land use, topography, geology, hydrology, meteorology, ecology, and ambient radiolcgical characteristics. Existing NEPA documentation from the sites will be heavily utilized as an informational source and referenced where possible.

## 3.2 Transportation Routes

Routing analysis performed by ORNL will be used to develop discussions concerning several highway routes to the preferred interim storage facility and select alternative sites. This analysis will include Hanford, INEL, NTS, ORNL, and SRP. Because GTCC waste destined for interim storage appears extremely variable with regards to type, form, points of origin, and method of packaging, numerous assumptions will probably be required to provide adequate input to the risk analysis model. For instance, the widely dispersed and uncertain points of origin might be addressed by developing several generalized but hypothetically representative points of origin across the nation. The lack of specificity in origin\destination information would result in innumerable and redundant routing patterns; consequently, only bounding situations will be presented.

## 3.3 Alternative Sites Considered But Not Evaluated In Detail

Not all evaluated DOE facilities describe in Section 2.4 may be found suitable for interim storage of GTCC LLW. Unacceptable facilities will be identified along with the reasons why they were removed from active consideration.

## 4.0 ENVIRONMENTAL CONSEQUENCES OF THE PROPOSED ACTION AND ALTERNATIVES

### 4.1 Generic Impacts

The environmental consequences of the proposed action will be generically assessed and the transportation and storage impacts relevant to the existence of a GTCC LLW storage facility will be outlined. Minimal emphasis will be made regarding specific location, facility design, and employed operational procedures. Projections will be made on resources required to transport and maintain adequate storage of the waste, the health and safety implications accompanying contact- and remote-handled GTCC LLW, and the potential impacts resulting from the occurrence of an accident.

### 4.2 Site Specific Impacts

The generic impacts outlined in Section 4.1 will be refined as to their specific effect upon the preferred interim storage facility. Radiological and non-radiological impacts will be assessed for transportation workers, storage facility workers, and the public along routes and near the storage facility. Radiation risk data will be presented in tables using person-rem/kilometer and person-rem/shipment units. Risk for the affected populations will be judged in excess latent cancers for radiation and for carcinogenic hazardous materials. Hazardous materials which may be involved with the interim storage of GTCC LLW will be referenced against existing site documentation pertaining to RCRA. Existing facility environmental documentation will be heavily relied upon as a source of information. Other sources may include NEPA documents for other candidate storage sites and available safety analysis reports (SARs).

Existing storage site safety analysis reports and NEPA documents will be examined to determine if commercial GTCC LLW storage is adequately addressed. AIRDOS, the EPA approved modeling code for radionuclide emissions under normal conditions, will be used to assess the radiological impacts at the storage site if existing documentation proves inadequate. RADTRAN III or IV will be used to assess radiological transportation impacts. It has been estimated that as much as eight percent of GTCC LLW destined for interim storage may also be regulated under provisions of RCRA. Because current volume, source, and characterization information is highly presumptive for this material, no detailed risk analysis for commercial GTCC mixed waste will be included in the EA; existing site-specific documentation on this issue will be paraphrased and referenced if available and appropriate.

Construction is not assumed to be required at the preferred facility; consequently, construction impacts will not be assessed. Cumulative effects at the preferred interim storage site resulting from the addition of GTCC LLW will be described as well as the effects resulting from employing the no action alternative.

### 4.3 Impacts of No Action Alternative

Brief discussions will be made concerning the expected impacts and implications resulting from not performing the proposed action at the proposed storage site.

4.4 Mitigative Measures

Methods and procedures identified as being capable of alleviating potential impacts of GTCC LLW storage upon the preferred facility will be presented or reference.

5.0 FEDERAL, STATE, AND LOCAL ENVIRONMENTAL REGULATIONS

This section will describe applicable regulation and orders, including 10 CFR 61, 10 CFR 71, 40 CFR 61, 40 CFR 191, 40 CFR 260-270, 40 CFR 1500-1508, 49 CFR 100-199, and DOE Orders 5400.1, 5400.3, 5440, 5820.2A. The discussion will also cover those State and local requirements relevant to the interim storage of GTCC LLW at the preferred facility. Because of the high degree of uncertainty attached to the GTCC LLW source term (for interim storage), only brief reference will be made to the regulatory status of those commercial GTCC mixed waste which would also be subject to the storage prohibition of the RCRA land ban (40 CFR 268). Acceptance of such banned waste could result in a noncompliance storage situation.

6.0 CONSULTATION AND COORDINATION

A list of agencies and persons requiring consultation for the proposed action will be provided, as required by the Council of Environmental Quality regulations [40 CFR 1508.9(B)].

7.0 REFERENCES

8.0 LIST OF PREPARERS

Appendix A: METHODS USED IN CALCULATING ENVIRONMENTAL CONSEQUENCES

Appendix B: LETTERS OF CONSULTATION

HQR-077-2993