PREDECISIONAL DRAFT

# Managing Greater-Than-Class C Low-Level Radioactive Waste: A Strategic Plan

## 1. INTRODUCTION

Under Public Law 99-240, the Low-Level Radioactive Waste Policy Amendments Act of 1985 (the Act), the Federal Government is responsible for disposing of Greater-Than-Class C low-level radioactive waste (GTCC LLW) generated by licensees of the Nuclear Regulatory Commission (NRC) and Agreement States in a facility licensed by the NRC. The strategy outlined in this document is intended to fulfill the Department of Energy's (DOE) responsibility under Public Law 99-240 to provide for disposal of GTCC LLW, recognizing that acceptance and management of this waste before actual availability of disposal capacity are integral to a comprehensive management plan designed to protect public health and safety. The costs, schedules, and work scope for disposal are based on the assumption that the GTCC LLW disposal facility will be separate from those facilities planned for other radioactive wastes. Disposal capability may not be in place until 2010 or later, based on DOE estimates for providing for disposal of other waste types.

Although DOE generates waste with similar characteristics to GTCC LLW generated by NRC and Agreement State licensees, DOE-generated waste does not require disposal in an NRC licensed facility. Consequently, GTCC LLW generated by licensees of the NRC and Agreement States is managed separately from DOE-generated waste. This strategic plan does not apply to DOE-generated waste; however, options for incorporating GTCC LLW with other DOE storage and disposal obligations will continue to be evaluated.

Some waste generators may be unable to provide storage for GTCC LLW while disposal capacity is being developed.[a] Limited amounts of GTCC LLW may soon require storage at a location other than the generator's site to minimize risks to public health and safety. DOE plans to provide interim storage capabilities at an existing DOE radioactive waste management facility for limited amounts of GTCC LLW. GTCC LLW would only be accepted for interim storage if, in the judgment of the regulatory authority, it constitutes a threat to public health and safety. For those situations where the waste generator lacks the financial resources needed to continue storing the waste at the facility, DOE will not charge a fee for interim storage. In cases where financial resources are available, the fee will be based on a case-by-case determination.

DOE also plans to provide for longer-term storage of GTCC LLW, on an as-needed basis, at a DOE dedicated storage facility. The volume, characteristics, and timing of GTCC LLW requiring storage off the site of generation before the availability of disposal will be assessed. The dedicated storage facility may be constructed in stages to provide storage when needed. Disposal of GTCC LLW will be provided as early as possible. A fee methodology will be established in conjunction with the storage and disposal capabilities to ensure that the fees assessed by DOE for acceptance of GTCC LLW are reasonable and reflect the most current information regarding the

a. Letter, Robert M. Bernero, NRC, to Leo Duffy, DOE, June 4, 1990. Subject: Request for assistance in two interrelated areas of safety concerning GTCC LLW.

DOE's overall costs for these activities. Subsidies may be required to assist some generators to ensure protection of public health and safety.

A summary chart of major decision points for interim storage, dedicated storage, and disposal of GTCC LLW is shown in Figure 1.

## 1.1 Background

Under Section 3(b) of Public Law 99-240, the Federal Government (i.e., the DOE) is responsible for the disposal of GTCC LLW generated by licensees of the NRC and Agreement States in a facility licensed by the NRC. In February 1987, in response to Section 3(b)(3) of the 1985 Act, DOE submitted a report to Congress entitled *Recommendations for Management of Greater-Than-Class C Low-Level Radioactive Waste.*[1] The report discussed options for fulfilling DOE's statutory responsibility and issues that would need to be addressed before substantial progress could be made. Storage of GTCC LLW by DOE was not specifically addressed by Public Law 99-240; however, DOE authorization to provide storage incidental to disposal has been inferred from the Act. The report also announced DOE's commitment to have a program in place for accepting limited amounts of GTCC LLW for storage within two years. Although siting the interim storage facility was more time-consuming than expected, the Oak Ridge Reservation has been recommended; interim storage is currently planned to be available in 1994.

Organizations within DOE and the private sector have already made significant progress in many waste management areas such as waste characterization, treatment, transportation, storage, and disposal. This work will form the basis for many of the GTCC LLW management tasks required to implement this plan. Ongoing coordination and cooperation among the various offices and programs within DOE, NRC, the Environmental Protection Agency (EPA), State agencies, and the private sector are essential to accomplish the objectives of this plan. Communication and, as appropriate, working agreements will be established to support early recognition and resolution of interdepartmental and interagency issues that may arise from impacts or interactions required to fulfill DOE waste management functions.

## 1.2 Bases and Assumptions

This section lists the bases and assumptions underlying the strategy for each of the three tasks of the program.

### 1.2.1 Interim Storage

- If necessary, waste accepted into interim storage will be transferred to dedicated storage, about 5 years after the start of interim storage operations.

- The private sector's interim storage capabilities are insufficient, and the private sector is not interested in developing interim storage.

- For public safety reasons, as judged by the NRC or Agreement State regulatory agency, DOE will be requested to accept limited amounts of GTCC LLW beginning by 1994.




Figure 1. Strategy for managing GTCC LLW. 3

- DOE is authorized by Public Law 99-240 to accept GTCC LLW for disposal before a disposal facility is available and to store the waste until it can be disposed of in accordance with the Act.

- National Environmental Policy Act (NEPA) requirements for interim storage will be met through preparation of an Environmental Assessment (EA) and a Finding of No Significant Impact (FONSI).

- A facility selected for interim storage of mixed GTCC LLW, if needed, will already have a Resource Conservation and Recovery Act (RCRA) permit in place to store such waste.

- Waste volumes requiring interim storage will be relatively small, consisting primarily, if not exclusively, of sealed radiation sources.

- Treatment before interim storage will not be required; however, sealed sources may be consolidated.

- Approximately 2,000 sealed sources will require interim storage.[b,c] Fees will be determined on a case-by-case basis.

- Transportation capabilities are adequate, but DOE assistance will be necessary to transport 2,000 sealed sources to interim storage. Transportation of any other GTCC LLW to the interim storage facility will be evaluated on a case-by-case basis.

- Transportation of GTCC LLW from interim storage to dedicated storage will be the responsibility of DOE.

### 1.2.2 Dedicated Storage

- DOE is authorized by Public Law 99-240 to accept GTCC LLW for disposal before a disposal facility is available and to store the waste until it can be disposed of in accordance with the Act.

- Waste from dedicated storage will be transferred for disposal by approximately 2010.

---

b. Letter from Robert Bernero, NRC, to Leo Duffy, DOE, January 6, 1992. Subject: Department of Energy acceptance of Greater-Than-Class C low-level radioactive waste under the current emergency provisions of the Atomic Energy Act of 1954, as amended.

c. Letter from Leo Duffy, DOE, to Robert Bernero, NRC, April 7, 1992. Subject: Plans for Department of Energy acceptance of Greater-Than-Class C low-level radioactive waste from commercial sources.

**PREDECISIONAL DRAFT**

- Dedicated storage may be provided by the private sector or by DOE and may be located at an existing DOE facility or at a new facility. The current reference case assumes that an existing DOE facility will be modified and used for dedicated storage.

- If dedicated storage is located at an existing DOE facility, supplementing the existing facility's Environmental Impact Statement (EIS) or preparing an EA leading to a FONSI will satisfy NEPA requirements. If DOE constructs a new facility, an EIS will be necessary.

- The facility will be developed consistent with applicable DOE orders and standards. NRC regulations governing similar facilities will be used as guidelines.

- NRC licensing of a DOE dedicated storage facility will not be required.

- The dedicated storage facility will be constructed in a modular fashion based upon the need of each generator type for such storage (waste categories are defined in DOE/LLW 114).[2] Assumptions regarding the need for dedicated storage are:

  - Dedicated storage will be needed for all sealed sources before disposal. When initially built, the dedicated storage facility will be sized to accommodate the 27,000 sealed sources identified in the NRC survey.[3]

  - DOE-held potential GTCC LLW will continue to be stored at the various DOE facilities and will not be transferred to dedicated storage.

  - All waste in the "other generator waste" category[2] will require dedicated storage.

  - Nuclear utility operations waste will require dedicated storage, but not until well after the initial operation date for dedicated storage.

  - Nuclear utility decommissioning waste will not require dedicated storage.

- There will be no requirement for generators to transfer GTCC LLW to DOE for dedicated storage before disposal.

- DOE will provide treatment of GTCC LLW for dedicated storage if required to ensure safe and efficient storage; such treatment will be minimal. Further treatment will be provided before disposal as required to satisfy disposal requirements.

- The dedicated storage facility will be capable of storing mixed waste.

- Modifications of existing transportation capabilities will be minor, and transportation of waste not held in interim storage will be the responsibility of the generator.

- DOE will transport GTCC LLW in interim storage to dedicated storage, where it will be stored until disposal capacity is available.

### 1.2.3 Disposal

- A disposal facility limited to GTCC LLW disposal is assumed as the reference case. However, other disposal alternatives (i.e., disposal in conjunction with other waste types) will be investigated. For cost estimating purposes, a separate deep geologic facility is assumed.
- More than one disposal method may be desirable to accommodate the various subcategories of GTCC LLW.
- The disposal facility (or facilities) will initially be sized to accommodate the total projected waste volume.
- Preliminary site characterization data for DOE facilities will be available as a point of departure for the site characterization tasks.
- DOE will provide necessary treatment and packaging of GTCC LLW before disposal.
- The disposal facility will remain operational for at least 25 years after the end of the peak generation period for GTCC LLW.
- 10 CFR 61[4] provides the basis for the requirements for GTCC LLW disposal. 10 CFR 60[5] and draft proposed regulations expected to be published as 40 CFR 193 provide additional guidance to be used as applicable.
- Transportation of GTCC LLW from DOE dedicated storage to the disposal facility will be the responsibility of DOE. Transportation of GTCC LLW not held in DOE storage will be the responsibility of the generator. Modification of existing transportation capabilities will be required.

### 1.2.4 Funding

Need to have a funding strategy in mind since this section implies a strategy

- Pending collection of fees by DOE from generators for acceptance of GTCC LLW, Federal funding will be sufficient to meet scheduled objectives.
- Beneficiaries will bear "reasonable costs" incurred by DOE as the result of the management and disposal of their GTCC LLW. However, some subsidies by the Federal Government will be required to protect public health and safety by providing storage and disposal to generators who cannot afford to pay the total fee for costs incurred by DOE.

## 1.3 Characterization of GTCC LLW

### 1.3.1 Classification

The NRC has developed a classification system for commercial LLW based on the kinds of near-surface disposal techniques needed to ensure safe isolation of each class of waste. This system, included in 10 CFR 61, establishes three classes of LLW (A, B, and C), with Class C requiring the

most rigorous disposal procedures and techniques. GTCC LLW exceeds the NRC concentration limits for Class C LLW and is not generally acceptable for near-surface disposal. LLW is classified as GTCC LLW if it exceeds either the limits for long-lived radionuclides listed in Table 1 or the limits for short-lived radionuclides listed in Table 2.

Identification of the waste generators, quantities, and characteristics of the waste awaiting disposal is a prerequisite for developing and carrying out plans for acceptance and disposal of GTCC LLW. Several different sets of GTCC LLW volume projections have been previously developed. These vary significantly, ranging from 2,000 $m^3$ in DOE's February 1987 report to Congress to 17,000 $m^3$ in NUREG/CR-4370.[6] The uncertainty in GTCC LLW volume projections has been greatly reduced by development and publication of the GTCC LLW characterization report, *Greater-Than-Class C Low-Level Radioactive Waste Characterization: Estimated Volumes, Radionuclide Activities, and Other Characteristics*[2]. The current base case volume is 3,240 $m^3$.

**Table 1.** Long-lived radionuclides.

| Nuclide | Concentration ($Ci/m^3$) |
|---|---|
| C-14 | 8 |
| C-14 in activated metal | 80 |
| Ni-59 in activated metal | 220 |
| Nb-94 in activated metal | 0.2 |
| Tc-99 | 3 |
| I-129 | 0.08 |
| | (nCi/g) |
| alpha-emitting TRU (half-life > 5 yr) | 100 |
| Pu-241 | 3,500 |
| Cm-242 | 20,000 |

**Table 2.** Short-lived radionuclides.

| Nuclide | Concentration ($Ci/m^3$) |
|---|---|
| Ni-63 | 700 |
| Ni-63 in activated metal | 7000 |
| Sr-90 | 7000 |
| Cs-137 | 4600 |

In developing the GTCC LLW characterization report, DOE conducted a waste characterization effort that better defined and improved upon previous projections. Inconsistencies in data from a 1986 EIA survey of NRC and Agreement State licensees and other uncertainties, including regulatory, institutional, and technical issues, were addressed by a team of reviewers including DOE, NRC, and private industry representatives. The issues addressed included disposition of DOE-held potential GTCC LLW, waste generated by fuel rod consolidation, concentration averaging, appropriate packaging factors, nonfuel-bearing components, and timing of decommissioning waste disposal.

Research into the issues of nonfuel-bearing components, packaging factors, concentration averaging, and light water nuclear reactor GTCC LLW component production rates were conducted to support the GTCC LLW characterization effort. The technical review results, research findings, and the EIA survey data form the basis for estimates of GTCC LLW documented in the GTCC LLW characterization report. These data reside in a computer projection model that projects waste volumes and radionuclide activities to the year 2035.

The GTCC LLW characterization data are categorized as

- Nuclear utility waste
    - Operations
    - Decommissioning
- Sealed source waste
- DOE-held potential GTCC LLW
- Other generator waste.

The data are projected in three cases: low, base, and high. The base case represents the most reasonable data, and low and high cases depict the limits of the base case. Each of these projection cases is developed with (a) unpackaged volumes, (b) packaged volumes, and (c) concentration averaging values applied to the packaged volumes. The three projection cases combined with the three packaging scenarios result in nine data sets for projected volumes.

The current base case volumes for the projected waste streams are

| Scenario | Nuclear utility waste $m^3$ | Sealed sources $m^3$ | DOE-held GTCC LLW $m^3$ | Other generator waste $m^3$ |
|---|---|---|---|---|
| Unpackaged | 8.41E+02 | 1.6E-02 | N/A[d] | N/A[d] |
| Packaged | 1.85E+03 | 6.08E+00 | 1.08E+03 | 3.07E+02 |
| Concentration Averaged | 1.21E+03 | N/A[e] | N/A[e] | N/A[e] |

d. Much of this waste is currently packaged.

e. Insufficient information was available to calculate the effects of concentration averaging on these wastes.

Radionuclide activities associated with the generator categories are:

| Activity | Nuclear utility waste (curies) | Sealed sources (curies) | DOE-held waste (curies) | Other generator waste (curies) |
|---|---|---|---|---|
| Total | 6.50E+07 | 3.03E+05 | 5.38E+05 | 2.92E+03 |

The majority of GTCC LLW volume and radionuclide activity will be generated by the nuclear utility industry. DOE-held potential GTCC LLW is currently being evaluated further to determine whether, based the specific conditions under which DOE accepted the waste, disposal in an NRC licensed facility is required. Preliminary results from this study indicate that much of this waste will not require disposal in an NRC licensed facility, which will reduce the projected volumes and radionuclide activity of this waste category. Sealed source information is based on data from a 1989 NRC survey of NRC specific licensees and Agreement State licensees. The only mixed waste reported (approximately 6.22E+00 $m^3$) is included in the other generator waste category.

The total volume and radionuclide activity for all base case packaged GTCC LLW is

| | |
|---|---|
| Volume | 3.24E+03 $m^3$ |
| Radionuclide activity | 6.58E+07 Ci |




Figure 2. Interim storage logic.

11

determine whether a valid justification for acceptance into interim storage based on potential risk to public health and safety, exists. Other preoperational activities include studying the feasibility of consolidating sealed sources for storage, developing site-specific waste acceptance criteria, revising the facility's RCRA Part A permit (if needed), developing operational and safety plans, developing a records system, and finalizing a fee structure for interim storage documented by publication of a *Federal Register* notice. For those situations where the waste generator lacks the financial resources needed to continue storing the waste at the facility, DOE will not charge a fee for interim storage. In cases where financial resources are available, the fee will be based on a case-by-case determination.

Following completion of the EA and the assumed FONSI, any needed facility modifications will be completed. When the facility modifications and the preoperational activities are complete, waste receiving and storage operations will begin.

## 2.3 Milestones

The schedule, milestones, and decision points for development of interim storage capacity are presented in Figure 2. The major milestones are listed below.

- Complete notification of host State Governor and Congressional delegation by September 1992

- Finalize EA and issue FONSI by August 1993

- Begin operation of interim storage facility by March 1994.

# 3. DEDICATED STORAGE

## 3.1 Objective

The objective of the dedicated storage task is to provide, on an as-needed basis, the capability for acceptance and long-term storage of GTCC LLW pending availability of disposal capability.

## 3.2 Strategy

Dedicated storage needs for GTCC LLW can be satisfied by private sector initiative or by utilizing a DOE facility. For the reference planning case, the private sector is assumed to be unwilling to assume the business risks associated with dedicated storage. A DOE facility can be used by designing and constructing a new facility, assumed to be sited at an existing DOE or Federal site, or by modifying an existing DOE facility. The latter option, modification of an existing DOE facility, is the reference case assumed for planning purposes.

Initial operation of the dedicated storage facility is targeted for five years after initial waste receipt into interim storage (i.e., 1999). It currently appears that this schedule can be met by any of the development options (DOE versus private sector, new versus existing facility). If the reference case, modification of an existing DOE facility, is selected, dedicated storage may be provided as early as 1997. Consequently, the reference case start date for dedicated storage is 1997.

DOE will provide dedicated storage of GTCC LLW on an as-needed basis; if no storage capability beyond interim storage is needed, none will be provided. A DOE policy on the definition of "as-needed" has not yet been developed. Examples of hypothetical situations that will be considered in developing as-needed eligibility criteria for dedicated storage are as follows:

- A programmatic need dictates that wastes stored in the interim storage facility must be removed from interim storage before the availability of disposal capability.

- Wastes require storage to protect public health and safety, but the established interim storage facility lacks capability to receive or store the particular waste type or quantity.

- A waste generator seeks to terminate its NRC license, and continued waste storage is an impediment to the license termination.

- A nuclear power plant is permanently shut down, and waste removal is a necessary step in the decommissioning process.

- A determination is made that DOE is legally obligated to accept any and all GTCC LLW, upon the demands of fee-paying generators, before the availability of disposal capability.

Following development of the eligibility criteria for dedicated storage, periodic evaluations of dedicated storage needs will be initiated. These evaluations are intended to ensure that the needs (if any) are identified early enough to develop the required dedicated storage capability. Dedicated storage facility development may be performed in a modular fashion, so that facility expansion costs can be deferred in accordance with the timing of identified storage needs.

Is this still true?



For planning purposes, it is assumed that the categories of sealed source waste and other generator waste will require dedicated storage. Nuclear utility operations waste is also assumed to require dedicated storage but not until well after the initial operation date of 1997. Nuclear utility decommissioning waste is assumed not to require dedicated storage, because most utility decommissioning operations are expected to be performed after GTCC LLW disposal capability has been established. Because DOE-held potential GTCC LLW is currently being stored safely at DOE facilities, it is assumed not to require dedicated storage.

Before development of a Federal facility for dedicated storage, expressions of interest in commercial development and operation of a facility or facilities that could provide such storage will be solicited. It is assumed that any commercially owned and operated facility for this purpose would require a license from the NRC or Agreement State agency to store GTCC LLW for the time period contemplated in this plan. Expressions of interest will be solicited via a notice published in the *Commerce Business Daily*. In the event that dedicated storage is established in the private sector, DOE will monitor progress and performance and verify that all applicable requirements are met. In the absence of a viable commercial option for dedicated storage, a DOE facility will be designed or modified according to DOE technical and performance standards. The NRC has stated that an NRC license will not be required for a DOE dedicated storage facility;[h] however, the storage facility will be built to standards that would be required under an equivalent NRC or Agreement State license.

Criteria for facility and site evaluations will be developed. Existing DOE facilities and other Federal facilities will be evaluated. Upon selection of a facility, modifications to the facility will be designed and the operational documents will be revised. Appropriate NEPA documentation will be prepared to support the dedicated storage facility development. If no existing facilities suitable for modification and use can be identified, the option of new facility development will be pursued.

For the reference case, modification of an existing DOE facility, it may be possible to satisfy NEPA requirements by supplementing an existing Environmental Impact Statement (EIS) previously written for that facility. If no applicable EIS exists, a specific NEPA document (assumed to be an EA) will be developed. If the construction of a new facility is proposed, it is assumed that an EIS will be required.

Several activities support the GTCC LLW dedicated storage task. Waste acceptance criteria and a fee schedule will be developed. The need for treatment of GTCC LLW to ensure safe and efficient storage will be evaluated. Acceptable waste containers and any needed transportation/storage cask modifications will be identified.

Waste generator responsibilities are expected to include (a) preparation, packaging, and transportation of the GTCC LLW to the dedicated storage facility according to applicable standards and criteria and (b) payment, when DOE takes the waste, of the fee established by DOE to recover reasonable costs for handling, treatment, storage, and final disposal, including the cost for transportation from dedicated storage to the disposal facility.

---

h. Memorandum from William C. Parler, General Counsel, NRC, to Chairman Zech and Commissioners Roberts, Carr, Rogers, and Curtiss, June 30, 1989. Subject: Storage of Greater-Than-Class C waste by the Department of Energy.

## 3.3 Milestones

The schedule, major milestones, and decision points for development of dedicated storage capacity are given in Figure 3. The major milestones are listed below.

- Select option for dedicated storage (private sector development, modification of an existing DOE facility, or development of a new facility) by July 1994
- Complete NEPA documentation by July 1995 (assuming reference case of modifying an existing DOE facility)
- Complete design in July 1996 (assuming reference case)
- Obtain facility readiness approval by July 1997 (assuming reference case).




16

Figure 3. Dedicated storage logic.



HQR-077-3151

# 4. DISPOSAL

## 4.1 Objective

The objective of the disposal task is to develop the capability to dispose of GTCC LLW in an NRC licensed facility (or facilities) beginning in approximately 2010.

## 4.2 Strategy

Under NRC regulations, GTCC LLW is required to be disposed of in a deep geologic repository unless other methods of disposal are approved by the NRC.[7] Disposal concepts other than a deep geologic repository may be acceptable for some, if not all, GTCC LLW streams. The feasibility of collocating some GTCC LLW in a deep geologic repository for spent fuel, and high-level waste is being investigated. However, the reference case for this GTCC LLW disposal strategy is a separate disposal facility. For cost estimating purposes, a separate deep geologic facility is assumed.

The strategy for establishing GTCC LLW disposal capability includes disposal concept and site evaluations and disposal facility design and construction. Full implementation of NEPA requirements and NRC licensing requirements will be integral parts of these processes. Ongoing coordination and cooperation among various offices within the DOE, NRC, EPA, and private sector are essential to accomplishing the objectives of this plan. The major activities, milestones, and decision points are shown in Figure 4. *(Note that the schedule for disposal, Figure 4, is currently being updated through the process of revising the GTCC LLW Long-Range Planning Document.)*

Disposal concepts will be evaluated to determine their suitability for the various GTCC LLW streams. Disposal technology options meeting applicable requirements could include near-surface, intermediate-depth, and deep-geologic disposal alternatives. Disposal technology options will be evaluated against technical criteria (e.g., dose limits established in health and safety regulations) and schedule, cost, and institutional issues.

These disposal concept evaluations will result in selection of the disposal system to be implemented. More than one disposal concept may be warranted to accommodate the unique characteristics of the various GTCC LLW categories. The concept selection process will include a more thorough evaluation of collocation options.

Disposal facility siting is also included in the strategy for developing a separate GTCC LLW disposal facility. Existing DOE sites will receive preference, unless unique disposal concept requirements warrant consideration of new sites. This activity will consist of site screening and evaluation, followed by site selection. Detailed site characterization data will be obtained for the selected site to support the subsequent design, licensing, construction, and environmental impact evaluation activities.

Some of the GTCC LLW may require treatment to improve the containment capability of the waste form. Therefore, various treatment alternatives will be evaluated and screened, and the appropriate location for the treatment facility will be determined. For planning purposes, it is assumed that the treatment facility will be collocated with the disposal facility; however, the




Figure 4. Disposal logic.

18



HQR-077-3153

development tasks required to provide treatment capabilities would not change significantly if the treatment facility were located elsewhere.

Disposal capability development will also be supported by the ongoing waste characterization, packaging, and transportation tasks. The fee methodology and fee schedules will be updated periodically to ensure that the waste generators bear all reasonable costs incurred by DOE in providing GTCC LLW storage and disposal capabilities. Studies will be performed to ensure that treatment, packaging, and transportation approaches are consistent with the technical requirements of the disposal facility. Throughout the treatment, packaging, and transportation support tasks, private sector involvement will be encouraged to support Federal activities in these areas.

An EIS is assumed to be required to support the development of the GTCC LLW disposal facility and to ensure that environmental and public concerns are fully addressed. The facility design and potential environmental impacts will be sufficiently documented in the license application to allow the NRC to evaluate compliance with licensing requirements.

Upon issuance of an NRC license, the disposal facility will be constructed, and operations will begin. It is assumed that disposal of GTCC LLW will begin by about 2010, based on the schedule for a similar DOE Program for high-level radioactive waste disposal. However, as shown by the following milestones, it may be possible to begin disposal operations earlier for the reference case of a separate GTCC LLW disposal facility.

## 4.3 Milestones

The schedule, major milestones, and decision points for development of disposal capacity are shown in Figure 4. The major milestones for the reference case of a separate GTCC LLW disposal facility are listed below. *(Note that these dates may change during the ongoing revision to the GTCC LLW Long-Range Planning Document.)*

- Recommend disposal systems to be used in the disposal facility conceptual design by March 1994
- Select the GTCC LLW disposal site by May 1997
- Submit the NRC license application by 2004
- Complete the disposal facility design by 2006
- Complete disposal facility construction and begin waste receiving operations by 2008

# 5. BUDGET ESTIMATE

The estimated budget required to complete the objectives through 1998, as described in this plan, is presented in Table 3. The yearly budget is allocated to the three main capabilities: interim storage, dedicated storage, and disposal.

The estimated budget supports the schedules for key activities in each capability. It is assumed that interim storage will become operational in FY-94 and operate until dedicated storage is available. The waste inventory from interim storage will then be transferred to dedicated storage. Construction of the dedicated storage facility is scheduled to start in FY-96. Dedicated storage operations are scheduled to begin in FY-97. Funding of less than the estimated budget will delay the date that each capability (i.e., interim storage, dedicated storage, and disposal) becomes operational.

1998?

**Table 3.** GTCC LLW Program budget estimate ($ in millions).

| Capability | FY 1993 | FY 1994 | FY 1995 | FY 1996 | FY 1997 | FY 1997 |
|---|---|---|---|---|---|---|
| Interim storage | 2.0 | 2.0 | 2.0 | 2.0 | 2.0 | 2.3 |
| Dedicated storage | 1.5 | 3.8 | 2.6 | 9.0 | 6.4 | 3.8 |
| Disposal | 1.6 | 2.3 | 2.7 | 3.5 | 4.0 | 4.6 |
| TOTALS | 5.1 | 8.1 | 7.3 | 14.5 | 12.4 | 10.7 |

# 6. REFERENCES


1. Department of Energy, *Recommendations for Management of Greater-Than-Class C Low-Level Radioactive Waste, Report to Congress in Response to Public Law 99-240*, DOE/NE-0077, February 1987.

2. Department of Energy, *Greater-Than-Class C Low-Level Radioactive Waste Characterization: Estimated Volumes, Radionuclide Activities, and Other Characteristics*, DOE/LLW-114, August 1991.

3. Nuclear Regulatory Commission, *Above Class C Source/Device Inventory Survey*, November 1989.

4. Code of Federal Regulations, 10 CFR Part 61, "Licensing Requirements for Land Disposal of Radioactive Waste," Office of the Federal Register, January 1, 1992.

5. Code of Federal Regulations, 10 CFR Part 60, "Disposal of High-Level Radioactive Wastes in Geologic Repositories," Office of the Federal Register, January 1, 1992.

6. Nuclear Regulatory Commission, *Update of Part 61 Impacts Analysis Methodology*, NUREG/CR-4370, Vol. 1, January 1986.

7. Federal Register, 54 *FR* 100, "10 CFR Part 61, Disposal of Radioactive Wastes," Nuclear Regulatory Commission, May 29, 1989.

# Appendix A

## Excerpt From

## Public Law 99-240—January 15, 1986
## The Low-Level Radioactive Waste Policy Amendments Act of 1985, Section 3(b)

# Appendix A

## Excerpt From

## Public Law 99-240—January 15, 1986 The Low-Level Radioactive Waste Policy Amendments Act of 1985, Section 3(b)

"(b)(1) The Federal Government shall be responsible for the disposal of-

"(A) low-level radioactive waste owned or generated by the Department of Energy;

"(B) low-level radioactive waste owned or generated by the United States Navy as a result of the decommissioning of vessels of the United States Navy;

"(C) low-level radioactive waste owned or generated by the Federal Government as a result of any research, development, testing, or production of any atomic weapon; and

"(D) any other low-level radioactive waste with concentrations of radionuclides that exceed the limits established by the Commission for class C radioactive waste, as defined by section 61.55 of title 10, Code of Federal Regulations, as in effect on January 26, 1983.

"(2) All radioactive waste designated a Federal responsibility pursuant to subparagraph (b)(1)(D) that results from activities licensed by the Nuclear Regulatory Commission under the Atomic Energy Act of 1954, as amended, shall be disposed of in a facility licensed by the Nuclear Regulatory Commission that the Commission determines is adequate to protect the public health and safety.

"(3) Not later than 12 months after the date of enactment of this Act, the Secretary shall submit to the Congress a comprehensive report setting forth the recommendations of the Secretary for ensuring the safe disposal of all radioactive waste designated a Federal responsibility pursuant to subparagraph (b)(1)(D). Such report shall include-

"(A) an identification of the radioactive waste involved, including the source of such waste, and the volume, concentration, and other relevant characteristics of such waste;

"(B) an identification of the Federal and non-Federal options for disposal of such radioactive waste;

"(C) a description of the actions proposed to ensure the safe disposal of such radioactive waste;

"(D) a description of the projected costs of undertaking such actions;

**PREDECISIONAL DRAFT**

"(E) an identification of the options for ensuring that the beneficiaries of the activities resulting in the generation of such radioactive wastes bear all reasonable costs of disposing of such wastes; and

"(F) an identification of any statutory authority required for disposal of such waste.

"(4) The Secretary may not dispose of any radioactive waste designated a Federal responsibility pursuant to paragraph (b)(1)(D) that becomes a Federal responsibility for the first time pursuant to such paragraph until ninety days after the report prepared pursuant to paragraph (3) has been submitted to the Congress."

| | | |
|---|---|---|
| FROM | : | Robert Burgoyne <"Robert Burgoyne" <dzabrans-conv>> |
| TO | : | Dave Zabransky <"Dave Zabransky" <dzabrans-conv>>, Thomas Pollog <"Thomas Pollog" <dzabrans-conv>>, Mark Senderling <"Mark Senderling" <dzabrans-conv>>, Ed Benz <"Ed Benz" <dzabrans-conv>> |
| DATE | = | 02/27/2001 |
| TIME | : | 13:55:00 GMT |
| SUBJECT | : | SMUD Revised Draft |
| BODY | : | This version reflects a concensus of Ed's, Mark's and my comments. |

# DRAFT

Mr. Steve Redeker
Manager, Plant Closure and Decommissioning
Sacramento Municipal Utility District
P.O. Box 15830
Sacramento, CA 95852-1830

Dear Mr. Redeker:

The Department has received your letter of January 22, 2001 providing notice of your plans to begin the loading activities at the Rancho Seco Independent Spent Fuel Storage Installation in spring 2001. The Department has no current plans to observe these operations.

Your letter also raises several other questions related to the Department's acceptance of Nuclear Regulatory Commission certified dual-purpose storage/transport systems under the disposal contract between SMUD and the Department. As you have stated, the Department has previously stated its willingness to initiate the appropriate actions to include such dual-purpose storage/transport systems as acceptable waste forms under the terms of the disposal contract.

As requested in your letter, and in accordance with the commitment made in our previous correspondence, the Department will initiate actions to include dual purpose systems certified by the Nuclear Regulatory Commission (Commission) for both transportation and storage, as acceptable waste forms under the disposal contract with SMUD. We are in the process of identifying the extent of, and methods for effecting such contract modifications, including the development of specifications that may be placed on "Standard" dual-purpose systems. It has been our expectation that after receipt at the repository, dual-purpose systems will be opened and the spent fuel removed for placement into a waste disposal package. Therefore, in order for a dual-purpose system to be classified as "Standard" we anticipate that, at a minimum, it must provide that the spent fuel stored allows for its unloading and handling like an intact fuel assembly. Dual-

# DRAFT

purpose systems that do not allow for the unloading and handling of the spent fuel in the same manner as an intact assembly will be classified as "non-standard" under the terms of the contract.

Additionally, while the Department continues to believe in the merits of a multi-purpose storage/transport/disposal system, we are unable at this time to define final design and acceptance criteria for the disposability aspects of such a system. However, since there may be some benefit attributable to the integrity of zirconium cladding during disposal, we would prefer that reasonable efforts be made to preclude further degradation of the cladding during storage or transport.

Your letter also requests that the Department afford SMUD's spent fuel advanced acceptance due to the permanently shutdown status of your facility. The Department has previously considered such requests for other similarly situated contract holders, and has determined that such priority acceptance cannot be granted without adversely impacting other contract holders in the waste acceptance queue. Instead, we suggest you explore utilizing the provisions of the contract that allow contract holder's to advance the acceptance of their spent fuel by trading acceptance allocations with other contract holders. I have enclosed a copy of a previous letter from Mr. Barrett on this subject for your information.

When we have further developed our ideas regarding modifications to the disposal contract, we will contact you to schedule discussions on this matter. In the meantime, please contact me at 202-586-9198 if you require any further information.

DKZ

| | | |
|---|---|---|
| FROM | : | Robert Burgoyne <"Robert Burgoyne" <dzabrans-conv>> |
| TO | : | Dave Zabransky <"Dave Zabransky" <dzabrans-conv>> |
| DATE | = | 02/27/2001 |
| TIME | : | 09:31:00 GMT |
| SUBJECT | : | Re: smud draft |
| BODY | : | comments noted |

HQR249 0204

# DRAFT

Mr. Steve Redeker

Manager, Plant Closure and Decommissioning

Sacramento Municipal Utility District

P.O. Box 15830

Sacramento, CA 95852-1830

Dear Mr. Redeker:

The Department has received your letter of January 22, 2001 providing notice of your plans to begin the loading ~~of spent fuel storage loading~~ activities at the Rancho Seco Independent Spent Fuel Storage Installation in spring 2001. The Department has no current plans to observe these operations.

Your letter also raises several other questions related to the Department's acceptance of Nuclear Regulatory Commission certified dual-purpose storage/transport systems under the disposal contract between SMUD and the Department. As you have stated, the Department has previously stated its willingness to initiate the appropriate actions to include such dual-purpose storage/transport systems as acceptable waste forms under the terms of the disposal contract.

As requested in your letter, and in accordance with the commitment made in our previous correspondence, the Department will initiate actions to include storage systems certified by the Nuclear Regulatory Commission (Commission) for both transportation and storage (dual-purpose systems) as acceptable waste forms under the disposal contract with SMUD. We are in the process of identifying the extent of and method for effecting such contract modifications, including the development of specifications that may be placed on "standard" dual-purpose systems. While we continue to believe in the overall benefits

# DRAFT

that may accrue to a multi-purpose storage/transport/disposal system, is our current expectation that after receipt at the repository, dual-purpose systems (either DPCs or MPCs) will be opened and the spent fuel removed for placement into a waste disposal package. Therefore, in order for a dual purpose system to be classified as "standard" we anticipate that, at a minimum, it must provide that the spent fuel stored in any such dual-purpose system ~~be in a condition that~~ allows for its unloading and handling like an intact fuel assembly. Dual-purpose systems that do not allow for the unloading and handling of the spent fuel in the same manner as an intact assembly will be classified as "non-standard" under the terms of the contract.

Your letter also requests that the Department afford SMUD's spent fuel advanced acceptance due to the permanently shutdown status of your facility. The Department has previously considered such requests for other similarly situated contract holders, and has determined that such priority acceptance cannot be granted without adversely impacting other contract holders in the waste acceptance queue. Instead, we suggest you explore utilizing the provisions of the contract that allow contract holder's to advance the acceptance of their spent fuel by trading acceptance allocations with other contract holders. I have enclosed a copy of a previous letter from Mr. Barrett on this subject for your information.

When we have further developed our ideas regarding modifications to the disposal contract, we will contact you to schedule discussions on this matter. In the meantime, please contact me at 202-586-9198 if you require any further information.

DKZ

HQR249 0206

TOM:
Should this cover Pu? NO

QA: N/A

**The Waste Acceptance ~~Element of the~~**
**Civilian Radioactive Waste Management System**
**Material Control and Accounting Plan** for

Staff vs entity (element)

**Draft Revision 1**

**September, 1997**

Left Justify

Prepared for:

U.S. Department of Energy
Office of Civilian Radioactive Waste Management
1000 Independence Avenue, S.W.
Washington, DC. 20585

Prepared by:

TRW Environmental Safety Systems Inc.
2650 Park Tower Drive
Suite 800
Vienna, Virginia 22180

Under Contract Number
DE-AC01-91RW00134

## TABLE OF CONTENTS

Page

1. INTRODUCTION . . . . . 1
   - 1.1 OVERVIEW . . . . . 1
   - 1.2 PURPOSE AND OVERVIEW OF THE MC&A PLAN . . . . . 2
   - 1.3 STRUCTURE AND CONTENT OF THE MC&A PLAN . . . . . 2
2. BACKGROUND . . . . . 5
   - 2.1 APPLICABLE MATERIALS AND TECHNOLOGIES . . . . . 5
   - 2.2 OVERVIEW OF ITEM ACCOUNTING APPLICABLE TO THE CRWMS . . . . . 6
   - 2.3 APPLICABILITY OF VARIOUS SAFEGUARDS PROGRAMS TO THE CRWMS . . . . . 6
3. MC&A PROGRAM REQUIREMENTS . . . . . 10
   - 3.1 DOMESTIC REQUIREMENTS . . . . . 10
   - 3.2 INTERNATIONAL MC&A REQUIREMENTS . . . . . 10
4. WASTE ACCEPTANCE . . . . . 12
   - 4.1 OVERVIEW OF WASTE ACCEPTANCE MC&A COMPONENTS . . . . . 12
   - 4.2 FACILITY DESCRIPTIONS . . . . . 12
   - 4.3 CHEMICAL AND PHYSICAL FORM(S) OF SNF AND HLW . . . . . 13
   - 4.4 ITEM ACCOUNTING SYSTEM . . . . . 13
   - 4.5 VERIFICATION OF SHIPPING RECORDS . . . . . 14
   - 4.6 RECEIPT AND SHIPMENT OF SNF AND HLW . . . . . 14
   - 4.7 PHYSICAL INVENTORY SYSTEM . . . . . 14
   - 4.8 ITEM CONTROL SYSTEM . . . . . 15
   - 4.9 HARDWARE AND SOFTWARE SUPPORT . . . . . 16
   - 4.10 MC&A RECORDS AND REPORTS . . . . . 16
   - 4.11 MEASUREMENT AND MEASUREMENT CONTROLS . . . . . 18
   - 4.12 MC&A MANAGEMENT ORGANIZATION . . . . . 18
   - 4.13 RECORDS MANAGEMENT . . . . . 20
   - 4.14 INCIDENT REPORTING . . . . . 21
   - 4.15 TRAINING . . . . . 22
   - 4.16 HANDLING/PROCESSING OF SAFEGUARDS INFORMATION . . . . . 22
5. TRANSPORTATION . . . . . 24
6. STORAGE AND MINED GEOLOGIC DISPOSAL SYSTEM FACILITIES . . . . . 25

6.1 WASTE RECEIVING . . . . . 25
6.2 ITEM TRANSACTION REPORT . . . . . 26
6.3 MATERIAL STATUS REPORT . . . . . 26
6.4 PHYSICAL INVENTORY . . . . . 26
6.5 LOSS OF SPECIAL NUCLEAR MATERIAL OR ACCIDENTAL CRITICALITY REPORTING . . . . . 27
6.6 MC&A RECORD KEEPING . . . . . 27
6.6.1 MC&A Records . . . . . 27
6.6.2 MC&A Record Storage . . . . . 27
6.7 MC&A PROCEDURES . . . . . 27
6.8 ITEM CONTROL AREAS (ICAs) . . . . . 28

7. SPECIAL PROVISIONS FOR DOE-OWNED SNF . . . . . 29

7.1 SPECIAL MC&A ISSUES FOR DOE-OWNED SNF . . . . . 29
7.2 PROVISIONS IN CRWMS MC&A PROGRAM FOR DOE-OWNED SNF . . . . . 29
7.3 ORGANIZATIONAL RESPONSIBILITIES . . . . . 29

8. QUALITY ASSURANCE AND ADMINISTRATIVE REQUIREMENTS . . . . . 31

8.1 MC&A QUALITY ASSURANCE PROGRAM . . . . . 31
8.2 ADMINISTRATIVE AND OPERATIONAL PROCEDURES . . . . . 31
8.3 MC&A PROGRAM REVIEW . . . . . 31

9. ORGANIZATIONAL RESPONSIBILITIES AND INTERFACES . . . . . 32

9.1 INTRODUCTION . . . . . 32
9.2 EXTERNAL INTERFACES . . . . . 32
9.2.1 NRC Interface . . . . . 32
9.2.2 Interfaces with Waste Storage Sites . . . . . 32
9.3 INTERNAL INTERFACES . . . . . 32
9.3.1 Waste Acceptance . . . . . 32
9.3.2 Transportation . . . . . 34
9.3.3 Storage and Disposal at MGDS . . . . . 34

10. REFERENCES . . . . . 36

APPENDIX A, ACRONYMS . . . . . A-1

APPENDIX B, DEFINITIONS . . . . . B-1

APPENDIX C, NRC-DOE CORRESPONDENCE . . . . . C-1

APPENDIX D, CROSS REFERENCE BY SOURCE DOCUMENT .................. D-1

## LIST OF FIGURES

Page

1-1 Safeguards and Security Framework ........................................ 2
8-1 MC&A Information Interfaces .............................................. 36

## LIST OF TABLES

Page

CROSS REFERENCE BY SOURCE DOCUMENT .............................. D-2

# 1. INTRODUCTION

## 1.1 OVERVIEW

The Nuclear Waste Policy Act of 1982 established the Office of Civilian Radioactive Waste Management (OCRWM) within the Department of Energy (DOE) to achieve safe, permanent disposal of spent nuclear fuel (SNF) and high-level radioactive waste (HLW). As part of these activities, OCRWM has the responsibility for establishing a safeguards and security program that encompasses the Civilian Radioactive Waste Management System (CRWMS) Waste Acceptance, Transportation, Storage, and Mined Geologic Disposal System (MGDS) elements. This program is being implemented to provide a consistent approach to protect public health and safety and to promote the common defense and security. In implementing this program, OCRWM will ensure that CRWMS facilities and/or activities are in compliance with all applicable safeguards and security requirements. The Nuclear Regulatory Commission (NRC) defines those security threats relevant to the CRWMS and defines the safeguards measures required to counteract these threats.

The component of OCRWM's Safeguards and Security Program covered by this document is material control and accounting (MC&A). MC&A covers the identification and verification of nuclear materials, followed by continuous monitoring and control of these materials. As shown in Figure 1-1, MC&A of nuclear materials is not to be confused with physical protection of these materials, or non-nuclear security issues involving information and personnel, which are addressed by other segments of the Safeguards and Security Program.




**Figure 1-1.** Safeguards and Security Framework

This plan outlines the planned implementation of MC&A by the Waste Acceptance element. Integration of MC&A activities across CRWMS elements is essential to successful MC&A and justifies the need for this CRWMS MC&A Plan. The benefits of integrated MC&A within the CRWMS elements include:

- Continued confirmation that SNF and HLW is in appropriate locations, with a prompt investigation of irregularities indicating possible misplacement of canisters

- Generation of information to aid in reporting nuclear material inventories
- Support of retrievability operations should retrieval become necessary

Because continuity of knowledge can be broken at any time, implementation of provisions in this MC&A Plan can be assumed to begin well before SNF or HLW enters the CRWMS. This Plan has been prepared at this time because waste sites with SNF and HLW intended for delivery to the CRWMS are beginning to load and seal canisters, with no plans to reopen these canisters at a later date. If CRWMS inventory reverification is to be avoided, personnel loading canisters or assigned to long-term monitoring of canistered SNF should be aware of OCRWM's MC&A requirements prior to canister loading.

## 1.2 PURPOSE AND OVERVIEW OF THE MC&A PLAN

This MC&A Plan summarizes overall MC&A requirements and presents an implementation strategy for the Waste Acceptance project element. It covers MC&A activities for commercial SNF, both canistered and uncanistered; DOE-owned SNF, both canistered and uncanistered; and HLW. The Plan addresses record keeping and reporting to the NRC for acquisition, receipt, transfer, inventory (including location), and disposal of all SNF and HLW; the performance of a physical inventory of SNF and HLW; and the framework for establishing procedures sufficient to enable the CRWMS to account for SNF and HLW. MC&A activities which are anticipated to be implemented by other project elements are also discussed.

## 2. BACKGROUND

Material control and accounting involves the life-cycle tracking of selected nuclear materials using data verification and item accountability, in conjunction with the controlled maintenance of key records and databases. CRWMS MC&A activities consist of two parts: item control, which includes those activities involving the identification, verification, and/or assay of the nuclear materials, and continuity of knowledge, which covers activities involving the surveillance of these materials to detect possible loss or diversion of materials from the system.

### 2.1 APPLICABLE MATERIALS AND TECHNOLOGIES

Special nuclear material (SNM) subject to MC&A is defined in Title 10, Part 72 of the Code of Federal Regulations (CFR) to include plutonium (Pu), U-233, uranium enriched with U-233 or U-235, and any other material that the NRC so designates pursuant to Section 51 of the Atomic Energy Act of 1954 (amended). For the purposes of this MC&A Plan, only SNF or HLW containing Pu and/or U-233/235 will be subject to MC&A. In addition, this MC&A Plan assumes that items that can not be easily separated into SNM and non-SNM fractions (e.g., an SNF assembly or vitrified HLW) will be subject to CRWMS MC&A in their entirety, even where only a small fraction by weight consists of SNM per 10 CFR Part 72. This means that CRWMS MC&A will track material at the item level rather than at the level of SNM content.

There are numerous methods for material identification and verification, as well as choices of technologies available to support these efforts. The most basic of the methods for material identification is operator declaration of material content, which is sufficient when the materials are uniquely labeled and the required information on the physical properties of the special nuclear materials is available. Visual verification of physical properties is often used to supplement operator information in cases where material identifiers are in question. Once materials are loaded, seals and tamper indicating devices are used to continue the canister or cask surveillance activities.

Surveillance is one of the two integral parts of MC&A activities that ensure continuity of knowledge. Surveillance technologies range from continuous visual monitoring, as required during transportation, to unattended systems designed to detect changes in otherwise static environments such as those found at a storage facility. Many of these technologies assume physical containment of, and limited access to, the safeguarded materials. Technologies include video surveillance, unattended video surveillance (limited to areas with no operator activities), motion detectors, door locks or switches, and digital image comparisons

Documentation is the other integral part of MC&A to ensure continuity of knowledge. Regardless of the surveillance technology used, the documentation and data generated must be archived in a quality manner that can prove continuity of knowledge. Gaps in the documentation of surveillance activities limit the rapid detection of lost or diverted materials and require physical reverification of the safeguarded materials. Specific methods of data collection and archival are dependent upon the MC&A objectives, which are a function of the regulatory agency directing the activities (see Section 3.1 for CRWMS MC&A requirements). Documentation must be developed under an approved QA

program to ensure defendability (see Chapter 7). Electronic databases can complement but can not replace physical records.

## 2.2 OVERVIEW OF ITEM ACCOUNTING APPLICABLE TO THE CRWMS

The CRWMS will use item accounting as the primary method for the MC&A of SNF and HLW throughout the CRWMS. An item is defined as any discrete quantity or container of material to be safeguarded that is uniquely identified, has a known elemental and isotopic composition, and is not scheduled to undergo additional processing while contained in the CRWMS. An item may be an individual spent fuel assembly, a canistered assembly, or a canister containing.HLW or a group of assemblies. MC&A will not be conducted on the components which make up an item in the CRWMS.

A key component of item accounting will include the use of unique item identification numbers and the installation of tamper indicating devices to detect possible diversion of safeguarded items. Individual assemblies are marked with identification numbers provided by the manufacturer. In cases where this number is not unique or has become illegible due to damage or corrosion, alternative methods for uniquely identifying and documenting the assembly must be developed before the assembly can be accepted into the CRWMS.

It is anticipated that most items accepted into the CRWMS will be in canisters. Each canister will have or will be given a unique identification number that represents the entire canister, with this number permanently marked on the exterior of the canister. Where the canister contains assemblies, each with its own identification number, assembly numbers will be recorded and kept with the documentation for the canister, but the canister identification number will be used for item accounting once the canister is sealed.

Tamper indicating devices are physical attachments to the canisters of material to be safeguarded. Their purpose is to indicate that there was an unauthorized attempt made (either successful or unsuccessful) to open the canister. In the CRWMS, NRC-approved tamper indicating devices will be applied to all canisters on which the lids are not seal-welded, per NRC-approved procedures. Seal-welded canisters will not require tamper indicating devices. The integrity of the tamper indicating devices and the integrity of the seal welds will be inspected on a periodic basis.

## 3. MC&A PROGRAM REQUIREMENTS

The *Integrated Safeguards and Security Requirements Analysis* (CRWMS Management & Operating Contractor, 1996) identified requirements contained in the Code of Federal Regulations (CFRs), NRC Regulatory Guides, and Nuclear Regulatory Documents (NUREGs) that are applicable to safeguards in the CRWMS. These requirements are classified as "domestic" or "international," where "domestic" refers to MC&A records and reporting requirements imposed upon the CRWMS facilities by the NRC, generally as a license condition, and "international" refers to additional requirements above and beyond the domestic requirements imposed by the NRC to meet IAEA Nonproliferation Treaty requirements. International requirements apply only to facilities specifically selected by the IAEA for the imposition of IAEA safeguards. The requirements identified in the *Integrated Safeguards and Security Requirements Analysis* are summarized in this section.

### 3.1 DOMESTIC MC&A REQUIREMENTS

Domestic MC&A requirements consist primarily of records retention and reporting. Records requirements for storage are contained in 10 CFR 72.72 (covers a central interim storage facility and repository storage), while records on the receipt, handling, and disposal of SNF and HLW in the geologic repository are covered in 10 CFR 60.71. These include the maintenance of records showing the receipt, inventory, disposal, acquisition, and transfer of all SNF at the facility; an annual physical inventory of all SNF in storage at the facility; the establishment and maintenance of written MC&A procedures; and the remote retention of duplicate records in the event the primary records are destroyed.

Reporting requirements during storage are defined in 10 CFR 72.74, 72.76, and 72.78 and in 10 CFR 60.71 and 60.75 for a geologic repository. These include reporting to the NRC any accidental criticality or loss of special nuclear material; the movement of any SNM into or out of a location where the inventory is maintained on DOE/NRC Form 741, Nuclear Material Transaction Report; and the twice annual submission of inventory status on DOE/NRC Form 742, Material Balance Report.

In addition to the records and reporting requirements, there is a stipulation in 10 CFR 961.11 that all SNF is subject to verification by DOE prior to acceptance into the CRWMS. The incorporation of some type of tamper indicating device on the outside of transportation casks to provide evidence that the cask has not been opened by unauthorized persons is required by 10 CFR 71.43.

### 3.2 INTERNATIONAL MC&A REQUIREMENTS

International MC&A requirements, contained in 10 CFR 75, apply to facilities selected by the IAEA for the imposition of IAEA safeguards. Once completed, the interim storage facility (if built) and the repository facilities will be eligible for selection for the imposition of international safeguards by the IAEA. International safeguards requirements can be categorized as submittal of installation information, MC&A records keeping, reporting, inspections, and advance notification of shipment.

Facilities selected for IAEA safeguards are required to submit information regarding the general layout of the facility, proposed MC&A procedures, identification of features relevant to safeguards,

and establishment of item control areas. This information is subject to verification by IAEA personnel, and requires updating if the status of previously reported information changes.

Required records include written MC&A procedures, inventory and inventory change records for each item control area, and operating records describing inventory and measurement activities.

Required reports include an initial inventory report, required upon notification that the facility has been selected for IAEA safeguards; Nuclear Material Transaction Report (DOE/NRC Form 741) and Material Balance Report (DOE/NRC Form 742) for each item control area (which are identical to the NRC-required reports listed in Section 3.1 above); and special reports in the event of the possibility of loss of nuclear material, or unexpected changes in containment of the nuclear material to the extent that unauthorized removal of nuclear material has become possible. All information is submitted to the IAEA by the NRC, rather than by the facility where safeguards have been imposed.

operator/licensee of the

Inspections of the facility may be carried out by the IAEA on an ad hoc, routine, or special basis. The facility is required to grant the IAEA inspectors access to records and strategic points in and between item control areas as identified in the submitted installation information.

The facility is required to provide the IAEA (via the NRC) advance notification of international import or export of nuclear material under certain circumstances, or of the domestic transfer of nuclear material to a facility that is not on the list of U.S. eligible facilities (as all U.S. commercial power reactors and proposed CRWMS facilities are or will be on the list of eligible facilities, this is not likely to happen).