# 4. WASTE ACCEPTANCE'S ROLE IN MC&A

The Waste Acceptance element is responsible for accepting SNF and HLW into the CRWMS and for the transfer of SNF title from the waste storage sites to DOE at the time of acceptance. Waste Acceptance MC&A responsibilities include development and implementation of MC&A activities associated with the receipt of SNF and HLW into the CRWMS. These activities include the following:

- Documentation of Chemical and Physical Form(s) of SNF and HLW (Section 4.1)
- Item Accounting System (Section 4.2)
- Verification of Shipping Records (Section 4.3)
- Physical Inventory System (Section 4.4)
- Hardware and Software Support to MC&A Records and Reports (Section 4.5)
- Records Management (Section 4.6)
- Incident Reporting (Section 4.7)
- Handling/Processing of Safeguards Information and Other Sensitive MC&A Information (Section 4.8)

## 4.1 DOCUMENTATION OF CHEMICAL AND PHYSICAL FORM(S) OF SNF AND HLW

Items to be accepted into the CRWMS must have physical descriptions adequate to assess compatibility with handling, transportation, storage, and disposal activities, and to form the basis for subsequent MC&A activities. As a minimum, this information should include the following for each type of material (uncanistered fuel, canistered fuel, or HLW in the form of glass logs):

- Type of waste (e.g., BWR SNF, PWR SNF, etc.)
- Form of waste (manufacturer, assemblies, canned assemblies, consolidated fuel rods, etc.)
- Physical description of the waste (assembly serial numbers, dimensions, spacing, etc.)
- Physical description of the canister (where applicable)
- Isotopic composition of the waste prior to irradiation
- Burnup
- Date of final discharge from the reactor
- Special nuclear material content subsequent to irradiation
- Description of any unusual incidents associated with the use or handling of the contained waste (i.e., dropped assembly, etc.)
- The results of any tests, inspections, or observations associated with the contained waste

Characterization data for commercial SNF will be collected and provided to the CRWMS in accordance with 10 CFR Part 961.11.IV.A.1 and VI.A.2(b). Characterization data for DOE-owned SNF and HLW will be collected and provided in accordance with any agreement(s) between OCRWM and the DOE organizations providing the SNF or HLW to the CRWMS.

The Waste Acceptance element will continue to collect these data according to the OCRWM Spent Nuclear Fuel Verification Plan and will retain responsibility of data baselining for MC&A purposes. Revisions to the Standard Contract, if mandated as a result of a requirement for additional information, will also be the responsibility of the Waste Acceptance element.

## 4.2 ITEM ACCOUNTING SYSTEM

A CRWMS accounting system for item tracking and accounting will be developed. This system will consist of a database that serves as a master ledger, with data provided from control and subsidiary ledgers that are reconciled at prescribed intervals or after key activities, such as completion of a physical inventory (see Section 4.4). Subsidiary ledgers will be maintained by each shipper of SNF and HLW, and by each operator of an item control area.

The Waste Acceptance element will be responsible for developing and operating this accounting system. The Waste Acceptance element will design the system, prepare the database, and develop guidance for development of electronic ledgers at project-level facilities that can be linked to the system. The Waste Acceptance element will also designate ~~an individual to be the~~ Nuclear Materials Accountant. This ~~individual~~ will have the responsibility for maintaining an overall accounting of items in the CRWMS.

## 4.3 VERIFICATION OF SHIPPING RECORDS

Shipment documentation will be verified for completeness as part of the process for acceptance of SNF and HLW into the CRWMS. If on-site storage of SNF and HLW in packages authorized for shipment is required, the shipping records should demonstrate proper item control and continuity of knowledge during the period of storage. Records to be provided to OCRWM are as specified in the Standard Contract and the OCRWM Spent Nuclear Fuel Verification Plan.

The Waste Acceptance element will be responsible for developing guidance for records verification. The Waste Acceptance element ~~or its contractor~~ will perform shipping records verification where required for acceptance of SNF and HLW into the CRWMS. Guidance will be in the form of a procedure that will be attached as an appendix to this MC&A Plan.

## 4.4 PHYSICAL INVENTORY SYSTEM

A physical inventory of all items under CRWMS management will be performed periodically, with a maximum duration between inventories of 12 months. Each inventory is to consist of two independent verifications of items in all Item Control Areas (ICAs). These will include the following areas:

- Wet and/or dry interim storage areas
- Staging (receiving or shipping) and lag storage areas
- ~~Permanent~~ repository

Where appropriate, the inventory may consist of a records verification of additions and removals from a secure ICA, rather than a physical inspection of stored items.

The Waste Acceptance element will provide detailed guidance for the development and implementation of a system for physical inventory control. Guidance will be in the form of a series of procedures that will be attached as an appendix to this MC&A Plan.

## 4.5 HARDWARE AND SOFTWARE SUPPORT TO MC&A RECORDS AND REPORTS

Computer systems will be used to support surveillance systems, to archive data on the physical and chemical forms of safeguarded items, to document MC&A activities, and to disseminate information among MC&A staff supporting the various program elements. The Waste Acceptance element will define and document the hardware and software requirements for applicable MC&A activities described in this MC&A Plan. Hardware and software compatibility between program elements and between related MC&A activities will be considered in the development of requirements.

In general, the hardware and software system will be developed to accomplish the basic activities necessary to support storage, management and distribution of MC&A information.

Data

### 4.5.1 Storage

The system will be designed to electronically archive the Verification Data, which will consist of numeric, alphanumeric and text data for each assembly and other item verified. Some of this data may be proprietary, sensitive or otherwise classified data. The system will also electronically archive NRC/DOE Form 741 Data, which will consist of numeric, alphanumeric and text data for each assembly and other item verified. Some of this data may be sensitive or otherwise classified data.

Data

### 4.5.2 Management

The hardware and software system will be implemented to provide immediate identification and documentation of contents of casks during transport and locate casks in various ICAs by entering the item's unique identifier. It is anticipated that ICAs will be designated in:

- Wet and/or dry interim storage areas
- Staging (receiving or shipping) and lag storage areas
- ~~Permanent~~ repository

Geologic

The system will have the ability to transfer data when casks are re-batched, and report the SNM quantities in any particular cask, taking into account both rebatching of items and decay. This will include the capability to determine how many assemblies are in each cask as well as how many casks are located in each ICA. The system will track internal movements of each cask from ICA to ICA and generate an internal form to document this movement

As of this revision to the MC&A Plan, the system will be developed ~~with the capability~~ to calculate the Plutonium-~~depletion-ratio~~ (in grams) every six months (~~see~~ NUREG-0007 Rev. 2, page 10). ~~It is OCRWM's~~ intent to seek regulatory ~~relief from this~~ requirement, but until relief is granted the system must incorporate this requirement.

In relation to each of these capabilities, the system will be able to maintain classified data (when applicable).

(1)

### 4.5.3 Distribution

In order to comply with all reporting requirements, the system will be developed with the capability to forward the required Material Balance Report (DOE/NRC Form 742) to the NRC every six months, reporting the total number of casks and the isotopic contents of each ICA. The ability will also be developed to prepare inventory reports (casks and/or isotopes) for inspectors upon demand.

## 4.6 RECORDS MANAGEMENT

Item accounting information generated by MC&A staff in the execution of duties should be archived in such a form that events can be readily reconstructed through a review of these documents. All records generated from activities described in this plan will be maintained in compliance with applicable regulations. The following records retention will comply with the applicable requirements in 10 CFR 72.72 and 10 CFR 60.71:

- Storage Facilities - retention for 5 years after the item is removed from the facility
- Repository Facilities - indefinite retention
- Centralized Files (Records Processing Center) - indefinite retention

MC&A documentation to be delivered to the Records Processing Center in accordance with the applicable CRWMS QA Procedure includes:

- Facility Descriptions -- records on physical descriptions of ICAs
- Inventory Data -- databases of physical and chemical properties of safeguarded items
- SNF Accounting Records -- records generated from the safeguards accounting system
- Verification Records -- records generated from SNF and HLW verification activities
- Physical Inventory Records -- records generated from the periodic item inventory
- Containment and Surveillance Records -- records generated from activities ensuring containment of SNF and HLW and from ongoing surveillance of these items
- Item Transfer Records -- both external and internal facility receipts and shipments
- Item Location Records -- records of the location where each item is stored and the date it was placed into storage.

Providing documents to the Records Processing Center, which will serve as the second location for records, will comply with the CRWMS Quality Assurance (QA) requirements that duplicate records be maintained in human or electronic readable form with current technologies. Centralized storage will be separate from SNF and HLW storage locations and the repository so that the two sets of records are at independent locations, where the likelihood of both record sets being destroyed by a single event is negligible.

The Waste Acceptance element will coordinate MC&A records retention at the program level and will periodically perform audits of records. These audits will ensure the completeness and defensibility of records supporting item accounting and continuity of knowledge for safeguarded items, particularly items managed by more than one program element. Waste Acceptance MC&A staff also will manage the transfer of waste acceptance records to the Records Processing Center

required to support MC&A records retention in accordance with the applicable CRWMS QA procedures.

### 4.7 INCIDENT REPORTING

Must be done according to the regulations. MC&A staff should investigate and establish item losses, as directed by the local site manager. Activities will be in conjunction with other control functions (safety, criticality control, and environmental control). Local management will determine the regulatory reporting procedures and staff responsible for compliance activities.

The Waste Acceptance element will develop program-level guidance for MC&A incident reporting and resolution and will document this guidance in the form of a procedure that will be added to this CRWMS MC&A Plan as an appendix. The Waste Acceptance element will develop and implement a surveillance program once the CRWMS begins receipt and safeguarding of SNF and HLW to ensure adequate incident reporting and resolution. Waste Acceptance project-level activities in this area are not required.

### 4.8 HANDLING/PROCESSING OF SAFEGUARDS INFORMATION

Documentation generated by MC&A activities will be collected and reviewed by MC&A staff other than those generating the records. The review will ensure that all anomalies in the data have been identified, all incidents have been resolved, and applicable regulatory agencies have been provided documentation that reviews MC&A activities and demonstrates continuing compliance with the MC&A requirements outlined in this Plan. Where appropriate, MC&A staff supporting this effort will prepare additional documentation required by external agencies to demonstrate continuity of knowledge for safeguarded items.

The Waste Acceptance element will be responsible for the analysis and dissemination of safeguards information once CRWMS receipt of SNF and HLW commences. The Waste Acceptance element will prepare a procedure for these activities, which will be included in this MC&A Plan as an appendix.

## 5. OTHER ELEMENT'S ROLES IN IMPLEMENTATION OF MC&A

Both the Transportation and Storage/Repository elements will have unique roles in the implementation of MC&A requirements within the CRWMS. Specific implementation of these requirements will be determined individually by these elements. For completeness of the discussion of the implementation of MC&A within the CRWMS, the expected roles of these other elements are discussed below.

### 5.1 Transportation

The CRWMS Transportation element is responsible for shipments of SNF and HLW, including SNF and HLW transfers from the reactor sites or other waste storage sites to ~~an interim storage facility or the repository facility~~. The Transportation element may exist as a single organization or as transportation contractors under the direction of OCRWM.

The Transportation element's role in MC&A activities will be to transfer required MC&A documentation between waste owners and/or generators and the CRWMS and to maintain control of the material while it is in transit. Procedures for accomplishing these activities will be developed by the Transportation element ~~or its contractors~~ and will be coordinated with other CRWMS elements.

### 5.2 ~~Storage and~~ Repository Facilities

The CRWMS Storage (if applicable) and Repository Facilities elements will be responsible for the short- and long-term storage of accepted waste, as well as the permanent disposal of the waste in a mined repository. The role these elements will play in the implementation of an MC&A program will be extensive, as these elements will be responsible for accounting for and controlling the waste over an extended period of time. The discussions of storage and repository MC&A activities are combined because of the similarities in the MC&A requirements and implementation strategies between the CRWMS storage (i.e., a centralized interim storage facility) and repository facilities.

OCRWM will apply to the NRC for a license under 10 CFR Part 60 to receive and possess SNF and HLW at the repository. A description of the implementation of the OCRWM MC&A Program at the repository facilities will be included in the Safety Analysis Report section of the repository license application to be submitted to the NRC in accordance with the requirements of 10 CFR 60.21(c)(10).

Currently, 10 CFR Part 60 does not specifically address MC&A requirements at the repository beyond the safeguards requirements of 10 CFR 60.21(c)(10). Section 10 CFR 60.21(b)(3) requires that DOE include, in the license application for the repository, a certification that such safeguards will be provided at the geologic repository operations area as are required at comparable surface facilities to promote common defense and security. In correspondence between NRC and DOE (Appendix C, Sherr to Desell letter, dated March 5, 1993), NRC stated that an above ground, interim storage facility is considered comparable to a repository facility, because the waste materials accepted in each are the same. Therefore, the NRC has proposed review criteria for a repository facility MC&A Program using interim storage facility MC&A requirements from 10 CFR Part 72,

Footnote

Subpart D (Appendix C; Holonich to Shelor letter, (1993a) and enclosures dated July 7, 1993) as the scope of the review. It is for this reason that it is expected that 10 CFR Part 72 MC&A requirements will be met at the repository facility, rather than the more general requirements of 10 CFR Part 70, which apply to SNM more readily accessible and separable than SNM in irradiated fuel rods or vitrified HLW. However, because 10 CFR Part 72, Subpart D does not address the use of tamper indicating devices or the establishment of MC&A organizations, program reviews, and ICAs, it is further expected that 10 CFR 70.51(e)(1)(I) and 70.58 (b), (c)(2), and (d) requirements will also serve as guidelines.

Movement of SNF and HLW at the repository from the surface facility to the underground facility will be considered an internal transfer between different ICAs. Internal transfers of SNF will be made and documented in accordance with written procedures. NRC Form 741 will accompany SNF until final disposition. The entire underground facility will be considered a single unit. As material is physically emplaced in the repository, it will become part of that unit.

Implementation of MC&A at the either a storage facility or the underground facility of the repository will be fully developed by the Storage and Repository elements. It is expected that MC&A activities conducted by the Storage and Repository elements will include: verification of the information regarding the waste at the time it is received at the facility; completion of Nuclear Material Transaction Reports (DOE/NRC Form 741) and Material Status Reports (DOE/NRC Form 742), as required; maintenance of continuity of knowledge of the material through conduction of physical inventories or other measures, as required; and the retention of all necessary MC&A records.

Last

## 6. SPECIAL PROVISIONS FOR DOE-OWNED SNF

The principle difference between DOE-owned SNF and commercial SNF is that the latter is regulated by the NRC prior to entry into the CRWMS, while the former is not. Once the SNF enters the CRWMS, there will be no difference in how it is safeguarded. Consequently, this section only addresses item control and continuity-of-knowledge issues that impact acceptance of HLW and DOE-owned SNF into the CRWMS.

Central to the current OCRWM position on commercial SNF is the fact that these materials, managed under NRC regulation while at the commercial utility, meet the NRC requirements for item control and continuity of knowledge immediately prior to entering the CRWMS. As long as documentation detailing physical and chemical characteristics of the SNF is provided by each waste storage site, the documentation is validated by the CRWMS, and continuity of knowledge is maintained through the transfer of title to the CRWMS, the SNF will meet CRWMS MC&A requirements for waste acceptance. There are no plans for on-site verification of physical or chemical characteristics of the SNF prior to acceptance into the CRWMS.

No such history of item control and continuity of knowledge exists for the majority of DOE-owned SNF and exists only partially for HLW. It is the responsibility of the DOE organization currently storing the SNF to develop and implement MC&A procedures for producing the characteristics data and continuity of knowledge needed before HLW and the DOE-owned SNF meet CRWMS MC&A requirements for waste acceptance. Specific activities and data that will have to be documented by these procedures include:

- Unique item identification (e.g., serial numbers stamped on items)
- Collection and/or validation of physical and chemical characteristics data
- Item control once materials are identified and characterized
- Data storage and security

This MC&A Plan covers only Waste Acceptance element activities. This means that those MC&A activities under other elements' or other organizations' responsibility are excluded and will be covered elsewhere. CRWMS activities specific to DOE-owned SNF cannot be identified until OCRWM and DOE-EM negotiate their respective roles for the accomplishment of required MC&A activities. Those activities identified as the domain of DOE-EM will not be included in this MC&A Plan, except where they interface with CRWMS activities.

Pending negotiations between OCRWM and DOE-EM, responsibility for implementing special MC&A provisions for DOE-owned SNF can be defined only in general terms. The Waste Acceptance element will be responsible for developing appropriate interface procedures in cases where they must interface with DOE-EM's MC&A activities. The Waste Acceptance element will also provide technical assistance to DOE-EM in developing their portion of MC&A activities.

Each program element is responsible for the appropriate project-level activities assigned to OCRWM. Each program element is also responsible for providing technical assistance to DOE-EM in the implementation of their portion of MC&A activities.

# 7. QUALITY ASSURANCE AND ADMINISTRATIVE REQUIREMENTS

## 7.1 MC&A QUALITY ASSURANCE PROGRAM

The MC&A Program will comply with all requirements of the CRWMS Quality Assurance Program, which meets the requirements of 10 CFR Parts 60, 71, and 72. The CRWMS Quality Assurance Requirements Document (DOE/RW-0333P, QARD) is the document to be used as the framework on which quality assurance for MC&A activities will be developed and evaluated. The QARD was developed to clarify and consolidate into one document all OCRWM quality assurance requirements and the Quality Assurance Program Description. Each version of the QARD is reviewed and approved by the NRC.

Items and associated activities required for physical protection, as defined by 10 CFR Part 73, have been determined to be subject to QARD requirements. Items and activities in the MC&A Program will be evaluated in accordance with the appropriate QA procedures to determine whether or not that item or activity is important to the physical protection of a facility and is required for item accounting. In the event that such determination is made, then that item or activity becomes subject to the requirements of the QARD and will be controlled by the appropriate procedures of the QA program.

## 7.2 ADMINISTRATIVE AND OPERATIONAL PROCEDURES

Written administrative procedures will be established, maintained, and followed for notification, reporting, and record requirements; staff responsibilities, authorities, and qualifications; MC&A Program reviews; organizational structure; and training requirements by each CRWMS project element. Such procedures will be written in accordance with the QARD and will achieve MC&A Program objectives.

Written operational procedures for MC&A will be established, maintained, and followed for the performance of physical inventories, use of tamper indicating devices, material status report, material transaction report, and receipt and transfer operations by the CRWMS. Operational procedures will be written in accordance with the QARD and will achieve MC&A Program objectives.

## 7.3 MC&A PROGRAM REVIEW

Independent reviews of the MC&A Program will be performed at least once per 12-month period by individuals independent of both MC&A management and personnel who have direct involvement for implementation of the MC&A Program. The MC&A Program review will include a review and audit of MC&A procedures and practices and an audit of the MC&A records. The results of the review and audit, in conjunction with recommendations for improvements, will be documented and reported directly to OCRWM and the affected OCRWM contractors.

## 8. REFERENCES

[Note: Laws, Regulations, and Orders cited in the document are not included in this chapter.]

1. Civilian Radioactive Waste Management System Management & Operating Contractor, *Integrated Safeguards and Security Requirements Analysis*, March 8, 1996.

2. Letter, Theodore S. Sherr (NRC) to Linda Desell (DOE), 1993. *Response to January 1993 Letter*, March 5, 1993.

2. Letter, Joseph J. Holonich (NRC) to Dwight E. Shelor (DOE), 1993a. *Transmittal of Staff's Review Strategies for the Topics of Safeguards Certification, Physical Security Plan, and Nuclear Material Control*, July, 7, 1993.

3. U.S. Department of Energy, 1995. *Quality Assurance Requirements and Description.* DOE/RW-0333P, Revision 5. Office of Civilian Radioactive Waste Management, Washington, DC, October 1995.

4. U.S. Department of Energy, 1994. *Regulatory Guidance Document*, Office of Civilian Radioactive Waste Management, Washington DC, June.

5. U.S. Department of Energy, 1993b. *OCRWM Safeguards and Security Plan*, Office of Civilian Radioactive Waste Management, Washington, DC, September.

6. U.S. Nuclear Regulatory Commission, 1988. *Instructions for Completing Nuclear Material Transaction Reports and Concise Note Forms*, NUREG/BR-0006, Revision 3.

7. U.S. Nuclear Regulatory Commission, 1989. *Instructions for Completing Material Balance Report and Physical Inventory Listing*, NUREG/BR-0007, Revision 2, July 1, 1989.

[All relevant references, source documents, standards, and requirements documents will be added as the plan is developed.]

# APPENDIX A

# ACRONYMS

| | |
|---|---|
| BWR | Boiling Water Reactor |
| CFR | Code of Federal Regulations |
| CRWMS | Civilian Radioactive Waste Management System |
| DOE | Department of Energy |
| HLW | High-Level Radioactive Waste |
| IAEA | International Atomic Energy Agency |
| ICA | Item Control Area |
| MC&A | Material Control and Accounting |
| NRC | Nuclear Regulatory Commission |
| NUREG | Nuclear Regulatory Document |
| OCRWM | Office of Civilian Radioactive Waste Management |
| PWR | Pressurized Water Reactor |
| Pu | Plutonium |
| QA | Quality Assurance |
| QARD | Quality Assurance Requirements Document |
| SNF | Spent Nuclear Fuel |
| SNM | Special Nuclear Material |
| U | Uranium |

# APPENDIX B

# DEFINITIONS

BURNUP: A measure of nuclear reactor fuel consumption expressed as the amount of energy generated per unit weight of fuel.

CRWMS: The Civilian Radioactive Waste Management System is the composite of sites, facilities, systems, equipment, materials, information, activities, and personnel required to perform those activities necessary to manage spent nuclear fuel and high-level radioactive waste disposal.

INVENTORY: The total amount of possessed special nuclear material, comprised of the sum of additions to inventory, beginning inventory, ending inventory, and removals from inventory, after all common terms have been excluded.

ITEM: Any discrete quantity or container of SNM or source material, not undergoing processing, having an assigned element and isotopic quantity, and a unique identification.

ITEM CONTROL AREA: A controlled area within the storage facility where the quantity of SNF and HLW may be determined at any time. Areas would include a material receiving area, storage areas, etc.

MATERIAL CONTROL AND ACCOUNTING (MC&A): Control and accounting of special nuclear material at fixed sites and documentation of the transfer of special nuclear materials.

REPOSITORY: A set of structures and facilities designed, constructed, and operated by DOE for the receipt, handling, possession, safeguarding, and final emplacement of spent nuclear fuel and high-level radioactive waste. It consists of surface facilities and an underground disposal area.

CENTRALIZED INTERIM STORAGE FACILITY: A set of structures and facilities designed, constructed, and operated by DOE for the receipt, transfer, handling, packaging, possession, safeguarding, and storage of spent nuclear fuel pending shipment to a repository.

PHYSICAL INVENTORY: Determination of nuclear material onsite at any given time, on an item basis.

SOURCE MATERIAL: Uranium or thorium, or a combination, in any physical or chemical form, but not special nuclear material.

SPECIAL NUCLEAR MATERIAL (SNM): Radioactive material that satisfies the following conditions:

(1) Material enriched in isotopes of Plutonium, U-233, or U-235, and any other material that the NRC, pursuant to the provisions of section 51 of the Atomic Energy Act of 1954, as amended, determines to be special nuclear material, but does not include source material

(2) Any material artificially enriched by any of the foregoing, but does not include source material.

WBF → Search for & check use

SPENT NUCLEAR FUEL (SNF): Fuel withdrawn from a nuclear reactor following irradiation, which has not been chemically separated into its constituent elements by reprocessing; contains special nuclear material, by-product material, source material, and other radioactive materials. This fuel exhibits the characteristics described in 10 CFR 73.50.

SURFACE FACILITY: Storage or handling facilities at the repository.

TAMPER INDICATING DEVICE: A device placed on a container or vault in a manner and at a time that ensures a clear indication of any violation of the integrity of previously made measurements of SNM within the container or vault.

WASTE STORAGE SITE: Any location which is licensed by the NRC or otherwise authorized to store spent nuclear fuel or high-level radioactive waste. The only waste storage sites of concern in this MC&A plan are those operated by organizations who have executed a contract with DOE under 10 CFR 961.11 or similar agreement.

# APPENDIX C

# NRC-DOE CORRESPONDENCE

# APPENDIX D

## CROSS REFERENCE BY SOURCE DOCUMENT

This table is provided as a roadmap to assist in locating regulations that are discussed in the CRWMS MC&A Plan.

| Source Document | Location in MC&A Plan |
|---|---|
| 10 CFR 60 | 3.1, 4.6 |
| 10 CFR 60.21 | 5.2 |
| 10 CFR 60.71 | 3.1, 4.6 |
| 10 CFR 70 | 5.2 |
| 10 CFR 70.51 | 5.2 |
| 10 CFR 71.43 | 3.1 |
| 10 CFR 72 | 2.1 |
| 10 CFR 72.72 | 3.1, 4.6 |
| 10 CFR 72.74 | 3.1 |
| 10 CFR 73 | 7.1 |
| 10 CFR 961.11 | 3.1 |

BRIEF FOR THE APPELLANT, THE UNITED STATES

---

IN THE UNITED STATES COURT OF APPEALS

FOR THE FEDERAL CIRCUIT

---

No. 05-5046

---

MARRIOTT INTERNATIONAL RESORTS, L.P.
and MARRIOTT INTERNATIONAL JBS CORPORATION,

Plaintiffs-Appellees

v.

UNITED STATES,

Defendant-Appellant

---

Appeal from the United States Court of Federal Claims
in consolidated cases nos. 01-CV-256 and 01-CV-257,
Judge Charles F. Lettow

---

EILEEN J. O'CONNOR
Assistant Attorney General

RICHARD T. MORRISON
Deputy Assistant Attorney General

GILBERT S. ROTHENBERG (202) 514-3361
JONATHAN S. COHEN (202) 514-2970
JOAN I. OPPENHEIMER (202) 514-2954
Attorneys
Tax Division
Department of Justice
Post Office Box 502
Washington, D.C. 20044

Attorneys for the Appellant

TABLE OF CONTENTS

Page

Table of contents . . . . . . . . . . . . . . . . . . . . . . i
Table of authorities . . . . . . . . . . . . . . . . . . . . ii
Statement of related cases . . . . . . . . . . . . . . . . . vi
Jurisdictional statement . . . . . . . . . . . . . . . . . . vii
Statement of the issue . . . . . . . . . . . . . . . . . . . 1
Statement of the case . . . . . . . . . . . . . . . . . . . 1
Statement of the facts . . . . . . . . . . . . . . . . . . . 3

1. The partnership transactions . . . . . . . . . . . . . 3

2. The parties' contentions . . . . . . . . . . . . . . . 5

3. The discovery dispute . . . . . . . . . . . . . . . . 6

4. The motion to compel . . . . . . . . . . . . . . . . . 10

Summary of argument . . . . . . . . . . . . . . . . . . . . 12
Argument:

The Court of Federal Claims erred in holding that only the head of an agency can invoke the deliberative process privilege . . . . . . . . . . . . 15

Standard of Review . . . . . . . . . . . . . . . . . . . 15

A. Introduction . . . . . . . . . . . . . . . . . . . . . .

B. The requirement that the head of the agency invoke executive privilege, which originated in state secrets cases, is unnecessary for the less sensitive deliberative process privilege . . . . . . 20

C. The predominant and preferable view is that the head of the agency does not need to invoke the deliberative process privilege personally . . . . 25

D. The assertion of the deliberative process privilege by a high-level subordinate who has personally reviewed the documents provides adequate assurance that the Government properly invokes the privilege . . . . . . . . . . . . . . . 34

See McClelland v. Andrus, 606 F.2d 1278, 1290 (D.C. Cir. 1979); Kaiser Aluminum, 157 F. Supp. at 947; Agent Orange, 97 F.R.D. at 434. In camera inspection is also used (although less frequently) to determine whether the documents are in fact privileged. See U.S. Dep't of Energy v. Brett, 659 F.2d 154 (Temp. Emer. Ct. App. 1981); Vons Cos. v. United States, 51 Fed. Cl. 1, 22-23 (2001), modified on other grounds, 89 A.F.T.R.3d 2002-301 (Fed. Cl. 2001).

In camera inspection of documents is not readily available for documents allegedly subject to the state secrets privilege, however. Such inspection is to be avoided. Russell Weaver & James Jones, The Deliberative Process Privilege, 54 Mo. L. Rev. 279, 309 (1989). As the Supreme Court stated in Reynolds (345 U.S. at 10):

> It may be possible to satisfy the court, from all the circumstances of the case, that there is a reasonable danger that compulsion of the evidence will expose military matters which, in the interest of national security, should not be divulged. When this is the case, the occasion for the privilege is appropriate, and the court should not jeopardize the security which the privilege is meant to protect by insisting upon an examination of the evidence, even by the judge alone, in chambers.

See also Guong, 860 F.2d at 1066-67 (rejecting contention that state secrets could be considered by the court in camera in action for breach of employment contract requiring the performance of covert military operations); Ellsberg v. Mitchell, 709 F.2d 51, 59 nn.37-38 (D.C. Cir. 1983) (establishing a scale

for determining when a court should conduct an in camera inspection of documents allegedly subject to the state secrets privilege).

The courts have recognized the difference between the state secrets privilege and the deliberative process privilege in holding that the latter privilege does not need to be invoked by the head of the agency. See, e.g., Brett, 659 F.2d 154;7/ Landry, 204 F.3d 1125. In Brett, the district court, relying on Reynolds, had rejected the Department of Energy's claim of deliberative process privilege because the privilege was not invoked by the head of the agency. The Temporary Emergency Court of Appeals reversed. It reasoned that Reynolds was "inapposite [because] Reynolds dealt with an absolute privilege for state secrets, not the deliberative process privilege." Id. at 155. Similarly, in holding that the deliberative process privilege did not need to be asserted by the head of the agency, the District of Columbia Circuit recognized that "decisions involving the more sensitive and absolute privilege for state and military secrets have been more insistent on assertion [of privilege] at the highest level." Landry v. FDIC, 204 F.3d 1125, 1136 (D.C. Cir. 2000).

---

7/ This Court adopted decisions of the Temporary Emergency Court of Appeals as binding precedent as a foundation for deciding cases transferred to it "in accordance with Pub. L. No. 102-572." Texas American Oil Corp. v. United States Dep't of Energy, 44 F.3d 1557, 1561 (Fed. Cir. 1995) (en banc). Marriott was not transferred to the Federal Circuit pursuant to Pub. L. No. 102-572, and Brett, therefore, is not binding precedent here.

The commentators have also suggested that it is unnecessary to have the same requirements for the state secrets privilege and the deliberative process privilege. As early as 1976, a law review note stated (76 Colum. L. Rev. at 166 (footnote omitted)):

> One wonders, however, whether the rank of the person claiming the privilege ought to be the same for both privileges. It is imperative that the decision of whether to file a claim of state secret privilege be restricted to officials of the highest level; one would not want a file clerk in the Defense Department to decide that the specifications for the latest nuclear submarine should be produced for discovery. There is less reason, however, for occupying an executive department head's time with the desirability of disclosing an intra-agency memo regarding policy matters, since indiscrete disclosure would be of less moment. Why should not the Director of the FBI--instead of the Attorney General (as is currently required)--be authorized to claim a privilege for FBI reports? It does not make sense for the Attorney General to be the <u>only</u> official who can lodge such a claim. [Emphasis in original.]

<u>See also</u> Weaver & Jones, 54 Mo. L. Rev. at 308-10.

Proposed Rule 509 of the Federal Rules of Evidence also treated the two privileges differently. Under Proposed Rule 509(c), only the chief officer of the government agency could claim the state secrets privilege, while any government attorney could assert the "privilege for official information," <u>i.e.</u>, the deliberative process privilege. Rules of Evidence for United States Courts and Magistrates, 56 F.R.D. 183, 251 (1972). According to the Advisory Committee, "the lesser participation by the judge in cases of state secrets" warranted requiring the head

**Affidavits Asserting Deliberative Process Privilege Over Contested Documents**

| Govt. App | Declarant | Date | No. Docs |
|---|---|---|---|
| **SYPOLT** | | | |
| 1 | Milner | May 13, 2002 | 24 |
| **MEROW** | | | |
| 176 | Virgilio | June 9, 2003 | 46 |
| 13 | Milner | June 13, 2003 | 63 (FY 2003) |
| 19 | Milner | June 13, 2003 | 58 (other than FY 2003) |
| 147 | Friedman | June 10, 2003 | 3 - no associated delegation. |
| **HEWITT** | | | |
| 27 | Milner | November 10, 2005 | 181 |
| 130 | Marcinowski | November __, 2005 | 116 |
| 186 | Virgilio | November 9, 2005 | 18 |

| Ref No | Govt App | Delegation No. | From | To | Date | Affidavits | Notes |
|---|---|---|---|---|---|---|---|
| 1 | 53 | Delegation No. 00-002.00 *(delegated the Secretary's authority to take certain actions, including asserting the deliberative process privilege)* | Spencer Abraham, Sec. of Energy | Under Secretary for Energy, Science and Environment | 12/6/2001 | | ¶ 1.8 "On a nonexclusive basis, **assert the…deliberative process privilege** with respect to **any Environmental Management ("EM")** matters arising under the Under Secretary's cognizance." |
| 2 | 64 | Redelegation No. 00-002.06 *(Redelegating certain authority conferred by No. 1 above.)* | Robert Card, Under Sec. for Energy, Science and Environment | Director, OCRWM | 1/8/2002 | | This order delegates authority to the Director of OCRWM only for certain actions, **not including** the authority to **assert the deliberative process privilege** |
| 3 | 70 | Amendment to Delegation Order No. 00-002.00 *(Which is at Ref. No 1 above.)* | Spencer Abraham, Sec.of Energy | Under Sec.for Energy, Science and Environment | 5/13/2002 | | Allows Under Secretary, **on matters pertaining to OCRWM**, to delegate to the Director, OCRWM, authority to assert the del. proc. priv.) Adds ¶ 1.10C "**Assert** on a nonexclusive basis, the Federal Government's **deliberative process privilege** with respect to **any matters arising under his or her cognizance**" |
| 4 | 71 | Amendment to Redelegation Order No. 00-002.06 *(Which is at Ref. No 2 above.)* | Robert Card, Under Sec. for Energy, Science and Environment | Director, OCRWM | 5/13/2002 | | Amends Redelegation Order No. 00-002.06 (at Ref. No. 2) by adding ¶ 1.4 which allows the Director, OCRWM to assert the deliberative process privilege. |
| 5 | 72 | Memorandum, redelegating authority delegated under amendment to No. 00-002.06 *(which was amended (at Ref. No.. 4 above) to allow the delegation of the authority to assert the deliberative process privilege)* | Margaret Chu, Director, OCRWM | Ronald Milner, COO, OCRWM | 5/13/2002 | Milner<br>• 5/13/02, 24 docs (Sypolt)<br>• 6/13/03, 2 affidavits, 121 docs (Merow)<br>• 11/10/2005, 181 docs (Hewitt) | Delegating **only** the authority to assert the deliberative process privilege over documents **within the cognizance of the OCRWM** |
| 6 | 73 | Delegation No. 00-002.00A *(which replaced 00-002.00 at Ref. No. 1)* | Spencer Abraham, Sec. of Energy | Under Secretary for Energy, Science and Environment | 9/12/2002 | | ***DOE Delegation 00-002.00 is replaced by this new delegation.*** (*See* GA 82 ¶2)<br>¶1.8 - on a nonexclusive basis, assert the deliberative process privilege with respect to **any Environmental Management ("EM")** matters arising under the Under Secretary's cognizance. |
| 7 | 84 | Delegation No. 00-002.00B *(which replaced 00-002.00A at Ref. No. 6)* | Spencer Abraham, Sec. of Energy | Under Secretary for Energy, Science and Environment | 10/4/2004 | | ¶1.8 - on a nonexclusive basis, assert the deliberative process privilege with respect to **any Environmental Management ("EM") matters** arising under the Under Secretary's cognizance.<br>***Replaced Delegation Order No 00-002.00A*** (*See* GA 93 ¶2) |

| Ref No | Govt App | Delegation No. | From | To | Date | Affidavits | Notes |
|---|---|---|---|---|---|---|---|
| 8 | 95 | Delegation No. 00-002.00C *(which replaced 00-002.00B at Ref. No.7)* | Samuel Bodman, Sec. of Energy | Under Sec. for Energy, Science and Environment | 4/13/2005 | | ¶1.10 - on a nonexclusive basis, assert the deliberative process privilege with respect to **any Environmental Management ("EM") matters** arising under the Under Secretary's cognizance. ****Replaced Delegation Order No 00-002.00B** (See* GA 105 ¶2) |
| 9 | 107 | Delegation No. 00-002.00D *(which replaced 00-002.00C at Ref. No. 8)* | Samuel Bodman, Sec. of Energy | Under Sec.for Energy, Science and Environment | 8/26/2005 | | ¶1.10 - on a nonexclusive basis, assert the deliberative process privilege with respect to **any Environmental Management ("EM")** matters arising under the Under Secretary's cognizance. ****Replaced Delegation Order No 00-002.00C** (See* GA 117 ¶2) |
| 10 | 119 | Amendment to Delegation Order No. 00-002D (at *Ref. No. 9)* | Samuel Bodman, Sec. of Energy | Under Sec. for Energy, Science and Environment | 11/23/2005 | | Allows Under Secretary, **on matters pertaining to OCRWM**, to delegate to Director, OCRWM, authority to assert the **deliberative process privilege.**) Amending 00-002D (*Ref. No. 9)*, adding ¶1.12.C "Assert, on a nonexclusive basis, the Federal Government's **deliberative process privilege** with respect to **any matters arising under his or her cognizance.**" 164 |
| 11 | 142 | Redelegation No. 00-002.03 *(which redelegates authority granted under 00-002.00 at Ref. No. 1)* | Robert Card, Under Sec. for Energy, Science and Environment | Asst. Sec. for Environmental Management | 1/8/2002 | | Redelegating authority delegated under Order No. 00-002.00 (*Ref. No.1)* but no longer limited to asserting the **deliberative process privilege** over matters related to Environmental Management, *see* ¶1.1 "on a nonexclusive basis, assert the Federal Government's **deliberative process privilege** with respect to **any matters** arising under his or her cognizance." (GA 142) |
| 12 | 145 | Memorandum - Redelegation of Authority Delegated by Redelegation Order No. 00-002.03 *(which further delegates to Ms. Bubar ,only certain authority delegated originally from 00-002.00 (at Ref. No. 1) to 00-002.03 (at Ref. No. 11))* | Jessie Roberson, Asst. Sec. for Environmental Management | Patrice Bubar, Associate Deputy Asst. Sec. for Integration and Disposition | 6/11/2003 | **Bubar**<br>• 6/12/03, 89 docs (Merow) | Delegating "authority to assert the **deliberative process privilege** over documents **specific to the Department of Energy response to Governor King's letter"** regarding GTCC issues "within the cognizance of the Office of Environmental Management." |

| Ref No | Govt App | Delegation No. | From | To | Date | Affidavits | Notes |
|---|---|---|---|---|---|---|---|
| 13 | 146 | Memorandum - Redelegation of Authority Delegated by Redelegation Order No. 00-002.3 *(as with memorandum at Ref. No. 12 above, redelegates only certain authority to a departmental subordinate)* | James Rispoli, Asst. Sec. for Environmental Management | Frank Marcinowski, Deputy Asst. Sec. for Logistics and Waste Disposition Enhancements | 11/10/2005 | **Marcinowski**<br>• 11/00/05, 116 docs (Hewitt) | Delegating "authority to assert **deliberative process privilege** over documents **specific to the Department of Energy's plans for disposition of** [**GTCC**] within the cognizance of the Office of Environmental Management." |
| 14 | 199 | Delegation of Authority | Richard Meserve, Chairman, NRC (resigned March 2003) | Martin Virgilio, Director, Office of Nuclear Materials Safety and Safeguards | 7/24/2002 | **Virgilio**<br>• 7/24/02, 10 docs (Sypolt)<br>• 9/5/02 amendment to 7/24 aff., no new docs (Sypolt)<br>• 6/9/03, 46 docs (Merow)<br>• 11/9/05, 18 docs (Hewitt) | Delegates the authority to "assert the **deliberative process privilege on behalf of the [NRC]** in the cases involving the standard contract…"<br>* This delegation is the only delegation leading down to Mr. Virgilio, so all his affidavits rest on this delegation. |
| 15 | 200 | Assertion of the Deliberative Process Privilege on Behalf of the Commission | Richard Meserve, Chairman, NRC (resigned March 2003) | Martin Virgilio, Director, Office of Nuclear Materials Safety and Safeguards | 9/5/2002 | | Not specifically a delegation, but rather providing additional guidance and specific instructions relating to asserting the privilege regarding spent fuel litigation. |