No. 04-0074C, into which has been
consolidated No. 04-0075C
(Judge Hewitt)

IN THE UNITED STATES COURT OF THE FEDERAL CLAIMS

PACIFIC GAS & ELECTRIC COMPANY,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

# DEFENDANT'S RESPONSE TO PLAINTIFF'S MOTION FOR CLARIFICATION OR RECONSIDERATION ON DISCOVERY RESTRICTION

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

HAROLD D. LESTER, JR.
Assistant Director

JOHN C. EKMAN
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
100 L Street N.W.
Washington, DC 20530
Tele: (202) 353-0897
Fax: (202) 307-2503

Attorneys for Defendant

OF COUNSEL:

JANE K. TAYLOR
Office of General Counsel
U.S. Department of Energy
1000 Independence Ave., S.W.
Washington, D.C. 20585

SCOTT DAMELIN
SHARON SNYDER
JOSHUA E. GARDNER
TODD J. COCHRAN
Civil Division
Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530

December 14, 2005

TABLE OF CONTENTS

TABLE OF CONTENTS . . . . . . . . . . i

TABLE OF AUTHORITIES . . . . . . . . . . ii

BACKGROUND . . . . . . . . . . 1

DISCUSSION . . . . . . . . . . 5

I. PG&E'S CONTENTION THAT THE COURT SHOULD REVISIT ITS PREVIOUS DECISION REGARDING A DISCOVERY CUT-OFF DATE IS WITHOUT MERIT . . . . . . . . . . 5

A. All Discovery Requests Must Be Measured Against PG&E's Burden To Establish The Difference Between The "But For" World And The Actual World . . . . . . . . . . 6

B. DOE's 2004 Annual Capacity Report Is Not Relevant Because It Does Not Contemplate Performance In A "But For" World_ . . . . . . . . . . 9

C. The Burden Imposed By PG&E's Open-Ended Discovery Requests Is Unnecessary And Irrelevant . . . . . . . . . . 12

D. The Government Has Not Selectively Produced Post-2004 Documents . . . . . . . . . . 13

CONCLUSION . . . . . . . . . . 14

# TABLE OF AUTHORITIES

## CASES

Alaska Pulp Corp. v. United States,
59 Fed. Cl. 400 (2004) ............ 6

Energy Capital Corp. v. United States,
60 Fed. Cl. 315 (2004) ............ 9

Florsheim Shoe Co. v. United States,
744 F.2d 787 (Fed. Cir. 1984) ............ 9

Indiana Michigan Power Co. v. Department of Energy,
88 F.3d 1272 (D.C. Cir. 1996) ............ 11

Indiana Michigan Power Co. v. United States,
422 F.3d 1369 (Fed. Cir. 2005) ............ passim

Indiana Michigan Power Co. v. United States,
60 Fed. Cl. 639 (2004) ............ 3

San Carlos Irrigation & Drainage Dist. v. United States,
111 F.3d. 1557 (Fed. Cir. 1997) ............ 6

## STATUTES AND REGULATIONS

42 U.S.C. § 10101 ............ 2

42 U.S.C. § 10131 ............ 2

42 U.S.C. § 10222 ............ 2, 9, 10

## MISCELLANEOUS

48 Fed. Reg. 16590 (Apr. 18, 1983) ............ 3

48 Fed. Reg. 5458 (Feb. 4, 1983) ............ 3, 10

# INDEX TO APPENDIX

DOCUMENT PAGE

September 1995 Analysis of The Total System Life Cycle Cost of The Civilian Radioactive Waste Management Program . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Trial Testimony Of Robert Morgan, Tennessee Valley Authority v. United States, No. 01-249C (Fed. Cl.) (July 14, 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| PACIFIC GAS & ELECTRIC COMPANY, Plaintiff, | ) | |
| v. | ) | No. 04-0074C, into which has been consolidated No. 04-0075C (Judge Hewitt) |
| THE UNITED STATES, Defendant. | ) | |

DEFENDANT'S RESPONSE TO PLAINTIFF'S MOTION FOR CLARIFICATION OR RECONSIDERATION ON DISCOVERY RESTRICTION

Pursuant to the Court's December 9, 2005 order, defendant, the United States, respectfully responds to the motion by plaintiff, Pacific Gas & Electric Company ("PG&E") requesting "clarification or reconsideration on discovery restriction." In the Court's December 2, 2005 order granting, in part, and denying, in part, PG&E's motion to compel discovery for Document Request No. 22, the Court held that the appropriate cut-off date for discovery in this case is January 28, 2004, the date that PG&E amended its complaints. For the reasons stated below, the Court's decision to allow PG&E extensive discovery in this case beyond January 31, 1998 is generous to PG&E given that any evidence necessary to define the "but for" world against which PG&E's incurred costs must be compared to determine causation necessarily was generated prior to the alleged partial breach.

BACKGROUND

This case is one of 59 cases currently pending before the Court of Federal Claims alleging a partial breach of the Standard Contract for Disposal of Spent Nuclear Fuel and/or High Level Radioactive Waste ("Standard Contract"). To consider PG&E's request for continuing and

apparently never-ending discovery into post-breach activities within the Government, it is important to understand the context of PG&E's claims.

On January 7, 1983, the Nuclear Waste Policy Act of 1982 ("NWPA"), Pub. L. 97-425, 96 Stat. 2201 (codified at 42 U.S.C. §§ 10101-10270 (1982)), was enacted. The bases for Congress' passage of the NWPA included statutory findings that the public health and safety necessitated that the Government provide a solution for the permanent storage and disposal of spent nuclear fuel ("SNF") and high-level radioactive waste ("HLW"), but that the costs of the interim and permanent storage and disposal of SNF and HLW were the responsibility of those entities that created the SNF and HLW. 42 U.S.C. §§ 10131(a)(4)-(5) (1982). The NWPA provided that the Secretary would enter into contracts with the owners and generators of SNF of domestic origin for "the acceptance of title, subsequent transportation, and disposal of such [SNF]." 42 U.S.C. § 10222(a)(1) (1982). The NWPA also required that the contracts with the nuclear utilities provide that:

> (A) following commencement of operation of a repository, the Secretary shall take title to the high-level radioactive waste or spent nuclear fuel involved as expeditiously as practicable upon the request of the generator or owner of such waste or spent fuel; and
>
> (B) in return for the payment of fees established by this section, <u>the Secretary, beginning not later than January 31, 1998, will dispose of the high-level radioactive waste or spent nuclear fuel involved as provided in this subtitle.</u>

42 U.S.C. § 10222(a)(5) (emphasis added).

On February 4, 1983, DOE, in furtherance of its obligations pursuant to the NWPA, 42 U.S.C. § 10222, published a notice of proposed rulemaking in the Federal Register, proposing terms for the "Standard Contract for Disposal of Spent Nuclear Fuel and/or High-Level

Radioactive Waste" ("Standard Contract") mandated by the NWPA, 42 U.S.C. § 10222. See 48 Fed. Reg. 5458 (Feb. 4, 1983). On April 18, 1983, DOE issued the terms of the Standard Contract as a final rule. 48 Fed. Reg. 16590, 16592 (Apr. 18, 1983). PG&E and the Department of Energy signed the Standard Contract on June 30, 1983.

Because it lacked a suitable disposal facility, DOE did not begin the acceptance of SNF by January 31, 1998. Subsequently, numerous contract holders sued the Government, alleging, among other things, a partial breach of the Standard Contract, and seeking damages as a result of the Government's breach. Several of these cases have already proceeded through trial, and, in the only damages decision that this Court has yet issued, this Court found that none of the plaintiff's claimed damages had been caused by DOE's delay, but, instead, were costs that would have been incurred regardless of that delay. See Indiana Michigan Power Co. v. United States, 60 Fed. Cl. 639, 664 (2004). Subsequently, the plaintiff in Indiana Michigan appealed that decision to the United States Court of Appeals for the Federal Circuit, but the Court affirmed the trial court's decision not to award damages to the contract holder in that case. See Indiana Michigan Power Co. v. United States, 422 F.3d 1369 (Fed. Cir. 2005). The Federal Circuit also held that a claim for partial breach precludes the recovery of future damages. Id. at 1276. The Federal Circuit explained that, "[b]ecause of its highly speculative nature, a claimant may not recover, at the time of the first suit for partial breach, prospective damages for anticipated future nonperformance resulting from the same partial breach." Id. (citing San Carlos Irrigation & Drainage Dist. v. United States, 111 F.3d 1557, 1563 (Fed. Cir. 1997) & 9 Arthur L. Corbin, Corbin on Contracts, § 956 (Interim ed. 1993)). Noting that future damages may be awarded where a plaintiff claims a total breach of contract, the Federal Circuit held that, where a "claim is

premised upon the government's partial breach, its damages were limited to those costs incurred prior to the date of its suit." Indiana Michigan, 422 F.2d at 1276-77 (emphasis added). The Federal Circuit further referred to the "date of suit" as "the time of the institution of the action." Indiana Michigan, 422 F.3d at 1377(quoting Restatement (Second) of Judgments § 26(e) & cmt. g (1982)). In discussing the rules for the Court to apply in future cases, the Federal Circuit expressly stated that the SNF plaintiff's grievance "falls within [the Restatement (Second) of Judgments] subsection (e)'s exception," id. at 1378, which expressly limits damages in a partial breach case to those "incurred to the date of suit," Restatement (Second) of Judgments § 26(e) (1982), or "damages sustained from breaches up to the time of the institution of the action." Id. § 26 cmt. g, at 241 (quoted in Indiana Michigan, 422 F.3d at 1377). The Federal Circuit also explained that, where the breach of a contract is only partial, "the plaintiff can recover only such damages as he or she has sustained, leaving prospective damages to a later suit in the event of future breaches." Id. at 1377 (quoting 22 Am. Jur. 2d Damages § 488 (2003)) (emphasis in original).

On January 22, 2004, PG&E filed its complaints in this Court and, on January 28, 2005, filed amended complaints, claiming, among other things, a partial breach of the Standard Contract based upon DOE's failure to begin accepting SNF "not later than January 31, 1998." Pl. Amend. Compl. ¶¶ 1, 23, 25. On June 3, 2005, PG&E served broad and far-reaching discovery requests upon the Government, seeking, among other things, the production of documents that post-date the Government's 1998 failure to begin SNF acceptance by six years. Unsatisfied with the Government's response to its requests, PG&E filed a motion to compel discovery on August 25, 2005, and requested an expedited hearing. The Court held two

telephonic hearings on October 14 and 17, 2005, regarding PG&E's motion to compel. On October 18, 2005, the Court issued an order granting in part, and denying in part, PG&E's motion to compel. In that order, the Court limited PG&E's requests to those documents created up to January 22, 2004, the date that PG&E filed its initial complaints. In addition, the Court requested that the parties provide the legal basis regarding the discoverability of the materials that PG&E sought under Production Request No. 22, which sought "[c]ommunications between PG&E and either [the Department of Energy (DOE)] or the United States Regulatory Commission [(NRC)] related to spent fuel." Following the briefing of this issue, on December 2, 2005, the Court issued an order requiring that "plaintiff narrow its request by specifically identifying to defendant the offices and divisions within the NRC to which it sent or from which it received correspondence 'related to spent fuel' and the time periods within which it believes it sent or received such correspondence." The Court also explained that "[p]laintiff is not entitled to production of communications made after January 28, 2004," the date that PG&E filed its amended complaints. PG&E now requests that the Court reconsider its decision that January 28, 2004 is an appropriate cut-off date for discovery in this case and require that the Government continue to produce all documents responsive to its broad discovery requests on a continuing basis, as they are generated.

## DISCUSSION

### I. PG&E'S CONTENTION THAT THE COURT SHOULD REVISIT ITS PREVIOUS DECISION REGARDING A DISCOVERY CUT-OFF DATE IS WITHOUT MERIT

PG&E contends in its motion for clarification or reconsideration of the Court's decision limiting discovery to January 28, 2004, that this limitation upon discovery is inappropriate

because "there are many, many examples of documents generated after January 2004, that are not only relevant to, but compelling evidence concerning, the key disputed issues [in] this case." Pl. Mot. at 2.[1] PG&E has a fundamental misunderstanding of the issues in this case.

### A. All Discovery Requests Must Be Measured Against PG&E's Burden To Establish The Difference Between The "But For" World And The Actual World

To establish damages in this case, PG&E "must prove the requirements for an award by a preponderance of the evidence," and these "requirements include: causation, foreseeability, and reasonable certainty in the amount of damages." Alaska Pulp Corp. v. United States, 59 Fed. Cl. 400, 413-14 (2004). With regard to the causation element, PG&E must establish that its costs are a direct result of, and were "caused" by DOE's delay, such that the costs would not have been incurred absent the delay. San Carlos Irrigation & Drainage Dist. v. United States, 111 F.3d 1557, 1563 (Fed. Cir. 1997) ("[a] plaintiff must show that but for the breach, the damages alleged would not have been suffered"). To establish this element, PG&E will have to show, among other things, that the costs it has allegedly incurred in the "actual" world would not have been incurred in the "but for," or non-breach, world.[2]

In addition to this causation requirement, PG&E's damages in this partial breach action are limited by the Federal Circuit's decision in Indiana Michigan. Pursuant to the direction in that case, PG&E is precluded from seeking damages in a partial breach case, like this one, that post-date the filing of its amended complaint. Indiana Michigan, 422 F.3d at 1276-77. Instead,

---

[1] "Pl. Mot. at __" refers to PG&E's December 9, 2005 "Motion for Clarification Or Reconsideration On Discovery Restriction."

[2] PG&E would also need to show that its costs were reasonable, could not reasonably have been mitigated, and were necessary.

PG&E may recover damages for future partial breaches in a subsequent lawsuit once those damages have been incurred. Consequently, this damages trial is limited in scope to those alleged damages that PG&E has incurred through the filing of its amended complaint on January 28, 2004.

Accordingly, there are three primary elements that the Court will need to resolve relating to PG&E's damages claim. First, the Court must identify the "but for" world in which DOE began acceptance of contract holders' SNF by January 31, 1998, specifically identifying the rate at which the Standard Contract required DOE to accept SNF and the SNF acceptance allocations running to PG&E based upon that rate. Second, the Court must identify the activities that PG&E would have to have undertaken, and the costs that PG&E would have to have incurred, in that "but for" world to store or maintain its SNF until it was time for DOE to accept it. Third, the Court must identify what costs PG&E has actually incurred (and for what purposes) to store SNF on-site, through the date of its amended complaints filings, so that it can determine what costs are an incremental result of DOE's delay. In evaluating PG&E's requests for extensive and ever-continuing discovery into Government activities and thought processes in the actual world that post-date the amended complaint filings by six years, the Court should compare PG&E's discovery requests against the issues that remain in this case following the Federal Circuit's decision in Indiana Michigan. Only by comparing PG&E's requests to these elements can the Court determine whether PG&E's discovery requests are relevant to this litigation and whether its requests for never-ceasing discovery regarding post-January 31, 1998 activities are justified in light of the burden to the Government. PG&E's own damages expert, Dr. Brad Cornell, explains

in his report that, "a standard approach to determining damages in a breach of contract claim . . . is to compare PG&E's actual costs to the costs PG&E would have incurred 'but for' the breach."

Because causation is determined by comparing the actual world with the "but for" world, the cut-off for discovery of documents from the Government's files should be as early as 1998. In defining the "but for" world, the Court must first look at the contract and its requirements, given that it is the contract language that creates and defines the scope of the parties' mutual obligations. To the extent that the Court needs further evidence to define the Government's contract obligations, it should, at most, look at documents or evidence that contemplate performance pursuant to the contract in the "but for" world and relate to specific contract obligations created by the Standard Contract. The Federal Circuit in Indiana Michigan held that the Government announced in 1994 that it would not meet its contractual obligations, see Indiana Michigan, 422 F.3d at 1375, and, in September 1995, DOE recognized in a planning document that it would not be able to open an Monitored Retrievable Storage facility ("MRS") by January 31, 1998. App. at 1-3.[3] PG&E's apparent suggestion that it might be able to define performance in the "but for" world by reference to documents that were created more than 10 years after DOE's announcement that it would not be able to satisfy any "but for" world requirements is nonsensical. To the extent that PG&E needs documents from the Government's files relating specifically to the costs that PG&E incurred between 1998 and the date upon which it filed its amended complaints, DOE would likely not possess any such documents and, if it did, they would be limited to those relating to such costs and would not assist in defining a "but for" world against which to assess causation.

---

[3] "App. at __" refers to the appendix accompanying this motion.

The crux of PG&E's argument is that it is improper for the Court to "conflate[] the issue of a cut-off date for damages with the issue of a cut-off date for discovery." Pl. Mot. at 1.[4] PG&E has not cited to a single case in support of the proposition that such a cut-off is improper. Indeed, such a cut-off date for discovery in this case is not only entirely reasonable and sensible, but is well within this Court's inherent authority to limit the scope of discovery. See Florsheim Shoe Co. v. United States, 744 F.2d 787, 797 (Fed. Cir. 1984) ("Questions of the scope and conduct of discovery are, of course, committed to the discretion of the trial court.") (cited in Energy Capital Corp. v. United States, 60 Fed. Cl. 315, 318 (2004)). Here, particularly given the Federal Circuit's decision in Indiana Michigan, this Court is well within its discretion to limit discovery in this case to the date upon which PG&E filed its amended complaints.

B. DOE's 2004 Annual Capacity Report Is Not Relevant Because It Does Not Contemplate Performance In A "But For" World

In its motion, PG&E points to DOE's 2004 Annual Capacity Report ("ACR") as "a highly probative DOE document" in this litigation. Pl. Mot. at 4. Following Indiana Michigan, and as we explain below, the 2004 ACR does not have any significance in this case.

As stated above, the NWPA provided that the Secretary of Energy would enter into contracts with the owners and generators of SNF of domestic origin for "the acceptance of title, subsequent transportation, and disposal of such [SNF]." 42 U.S.C. § 10222(a)(1) (1982). The NWPA further provided that DOE begin acceptance of SNF from utilities generally by January 31, 1998. 42 U.S.C. § 10222(a)(5). The statute did not mandate a rate of acceptance.

---

[4] "Pl. Mot. at __" refers to PG&E's "motion for clarification or reconsideration on discovery restriction," filed on December 9, 2005.

On February 4, 1983, DOE, in furtherance of its obligations pursuant to the NWPA, 42 U.S.C. § 10222, published a notice of proposed rulemaking in the Federal Register, proposing terms for the "Standard Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste" ("Standard Contract") mandated by the NWPA, 42 U.S.C. § 10222. See 48 Fed. Reg. 5458 (Feb. 4, 1983). Although the proposed Standard Contract itself did not identify a specific rate by which DOE would accept contract holders' SNF, it provided for DOE's issuance of documents for planning purposes to assist in the eventual definitization of the specific rate and order of SNF acceptance and disposal. 48 Fed. Reg. 5458, 5463 (Feb. 4, 1983) (Art. V.B.5 & Art. V.B.6) (emphasis added). The proposed contract further provided that, in 1991, DOE would publish acceptance rates that would begin the process of establishing DOE's contractual obligations of acceptance under the contract.[5]

Prior to 1991, DOE discussed a number of scenarios under which it could meet its contractual obligation of beginning acceptance of SNF by January 31, 1998. These included a 1983 draft mission plan and a 1995 mission plan. Both of these documents contemplated performance beginning by January 31, 1998, at one Federal repository, followed by a second Federal repository, with a total aggregate acceptance rate of 6,000 MTU. In 1987, DOE concluded that because a repository would not open by January 31, 1998, DOE would not be able to rely upon such a facility to begin performance under the Standard Contract. As an alternative, DOE sought and received Congressional approval to begin performance of the Standard Contract

[5] DOE's reason for excluding an express term regarding a rate of acceptance was based upon the uncertainties that DOE knew it was facing in Federal waste disposal activities that were to occur before January 31, 1998. App. at 4-6.

at an interim storage site referred to as a monitored retrievable storage system ("MRS").[6] Based upon assumed acceptance of SNF at an MRS beginning in 1998, DOE published its 1991 ACR which set forth acceptance rates through the first 10 years of contract performance. The rate of acceptance contained in the 1991 ACR were: 400 MTU in 1998, 600 MTU in 1999, then 900 MTU each year until 2007.[7]

In September 1995, DOE officially recognized that it would not be able to open an MRS by January 31, 1998 and, instead, assumed that it would begin performance at a Federal repository beginning in 2010. App. at 1-3. By doing so, DOE further acknowledged that it could not satisfy its contractual obligation to begin performance under the Standard Contract. Accordingly, any planning documents generated after September 1995 do not reflect contemplation of a "but for" world relevant to measuring damages in this case. Consequently, contrary to PG&E's assertion that it is "a highly probative DOE document," DOE's 2004 ACR is simply not relevant to the Court's inquiry in this matter because it contemplates DOE's

---

[6] In the "but for" world, DOE was not obligated to begin the acceptance of SNF at a permanent Federal repository, but rather could have begun acceptance at an MRS facility. In Indiana Michigan Power Co. v. United States, 88 F.3d 1272 (D.C. Cir. 1996), the United States Court of Appeals for the District of Columbia held that the Government's obligation to begin the disposal of spent nuclear fuel and high-level waste by January 31, 1998 was not conditioned upon the existence of a permanent Federal repository. Id. at 1277. As a result, DOE's plans in the actual world to perform at Federal repository at a particular rate of acceptance simply have no bearing upon DOE's performance obligations in the "but for" world.

[7] Further, the Government disagrees with PG&E's assertion that reasonableness is the "applicable legal standard for DOE's performance given that PG&E's contract is silent on the issue." Pl. Mot. at 4. The Standard Contract is not silent on the issue of DOE's obligation to accept SNF. Rather, as we discussed above, and as we will show at trial, the Standard Contract provides for a contractual mechanism for the development of the schedule and rate of acceptance – a mechanism that DOE utilized in the early 1990s.

performance beginning 12 years after 1998, and DOE performance beginning with a repository and not an MRS.

Further, even if the 2004 ACR/APR were somehow relevant in this case, it does not follow that all documents issued after January 2004 are relevant and, therefore, discoverable. As discussed above, because all documents created after January 31, 1998 by definition contemplate performance after DOE was obligated to begin industry-wide performance under the Standard Contract, documents issued after this date simply are not relevant for purposes of establishing either the Government's liability in this case or PG&E's damages. PG&E's broad assertion that all documents that post-date its amended complaints are relevant, regardless of their subject matter or relationship to the issues in this case, is incorrect.

### C. The Burden Imposed By PG&E's Open-Ended Discovery Requests Is Unnecessary And Irrelevant

By its motion, PG&E seeks to have the Department of Justice micro-manage DOE's waste disposal program, continuously requesting that DOE produce documents created by DOE in connection with its continuing program, even though these documents would lack any relevance to DOE's obligations in the "but for" world or in the quantification of PG&E's damages. PG&E simply is engaging in a fishing expedition that is not reasonably calculated to lead to the introduction of admissible evidence in this case. Indeed, PG&E has not even suggested when discovery should end in this case and, instead, cryptically suggests that the Court should "allow discovery of documents and fact subsequent to [January 28, 2004], subject to applicable Court Rules." Pl. Mot. at 6. PG&E's lack of any reasonable cut-off date for discovery in this case belies the tenuous position that it now seeks to advance.

D. The Government Has Not Selectively Produced Post-2004 Documents

Finally, PG&E's contention that the Government has somehow acknowledged that documents that post-date January 28, 2004, are relevant to issues in this case because the Government has placed certain post-January 2004 documents on its privilege log simply is erroneous. Pl. Mot. at 5, n.1. The Government prepared its privilege log in this case before the United States Court of Appeals for the Federal Circuit resolved the scope of trials in spent nuclear fuel cases in Indiana Michigan Power Co. v. United States, 422 F.3d 1369 (Fed. Cir. 2005). In Indiana Michigan, the Federal Circuit held that a plaintiff in an SNF case that alleges a partial, rather than a total, breach of contract is limited "to those costs incurred prior to the date of its suit." Id. at 1376-77. The Federal Circuit's decision in Indiana Michigan puts to rest any issue that documents that post-date PG&E's 2004 complaint are relevant to the damages issues in this case.[8] PG&E's allegations that the Government's past compliance with discovery demands relating to issues that were not yet resolved by the appellate court somehow requires the Court and the Government to reevaluate discovery after such guidance is issued is simply unfounded.

---

[8] PG&E also appears to imply that the Government has taken inconsistent positions with respect to its willingness to accept an SNF plaintiff's supplementation of its complaint to recover damages that post-date the plaintiff's initial complaint. Pl. Mot. at 5. Although the Government anticipates that it will address this issue in more detail in its reply to PG&E's response to strike portions of Brad Cornell's expert report, the Government has consistently maintained that, although an SNF plaintiff may seek leave to file a supplemental complaint to obtain damages that post-date its complaint, the Court has discretion to deny such leave, particularly where it would prejudice the Government. Unlike in Wisconsin Electric Power Co. v. United States, No. 00-00697 (Fed. Cl.), where fact discovery currently is continuing, here, fact discovery has already closed, and the Government would be significantly prejudiced should PG&E seek leave to file a supplemental complaint at this late stage in the litigation.

CONCLUSION

For the foregoing reasons, the Government respectfully requests that the Court deny PG&E's motion for clarification or reconsideration.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/ Harold D. Lester, Jr.
HAROLD D. LESTER, JR.
Assistant Director

s/John C. Ekman by Joshua E. Gardner
JOHN C. EKMAN
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, NW
Washington, D.C. 20530
Tel: (202) 353-0897
Fax: (202) 307-2503

OF COUNSEL:

JANE K. TAYLOR
Office of General Counsel
U.S. Department of Energy
1000 Independence Ave., S.W.
Washington, D.C. 20585

SCOTT DAMELIN
SHARON SNYDER
JOSHUA E. GARDNER
TODD J. COCHRAN
Civil Division
Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530

December 14, 2005

Attorneys for Defendant