IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| PACIFIC GAS & ELECTRIC COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | No. 04-0074C, into which has been consolidated No. 04-0075C<br>(Judge Hewitt)<br><br>Electronically Filed on Dec. 15, 2005 |

REPLY IN SUPPORT OF MOTION FOR CLARIFICATION OR RECONSIDERATION ON DISCOVERY RESTRICTION

The government's opposition ("Opp.") to PG&E's motion seeking clarification or reconsideration concerning a discovery cut-off of January 28, 2004, addresses a whole number of substantive issues that ultimately underscore the merit of PG&E's motion. The substantive issues the government discusses should be resolved by the Court in substantive rulings, after trial or perhaps through motions *in limine*, not back-handedly on the basis of an artificial discovery cut-off that actually *prevents* the Court from addressing these substantive issues on a full factual record.

The government's opposition also lays out a whole series of straw men that either are simply wrong factually, or otherwise have nothing to do with the discovery cut-off issue before the Court. We address those first, so the Court may focus on the real issue here, which is whether PG&E should be precluded from obtaining and using evidence that, under PG&E's theory of the case, is both relevant and probative on key disputed issues.

1. The government first asserts, *see* Opp. at 1-2, that PG&E is requesting "continuing and apparently never-ending discovery into post-breach activities within the Government." That is wrong. Fact discovery in this case is closed, subject to the resolution of outstanding motions. PG&E has no intention of serving additional discovery requests. As trial nears, there may be particular documents that PG&E seeks from public sources or requests the government to provide for use at trial, but generally discovery is closed.

The particular impetus for PG&E's present motion was the government's suggestion, in its opposition to PG&E's motion to compel "deliberative process" documents, that the Court had "already held" that 45 of those documents listed on the government's privilege log were beyond the scope of discovery because they were created after January 28, 2004. *See* Opposition Brief filed November 23, 2005, at 9-11. PG&E expects to prevail on that motion, and if it does, it would be no burden whatsoever for the government to produce those already-collected and logged documents. PG&E thus realized that the government was not advancing any valid reason (like burden) for limiting discovery, but rather was in effect claiming that post-January 28, 2004, documents are *not relevant* to any disputed issue in this case. PG&E knows that is wrong, as noted in its motion and discussed further below, but more fundamentally, PG&E knows that relevance is a *substantive* issue that should not be resolved by the Court at a telephonic discovery conference, or in a footnote to a discovery order, without benefit of full briefing and full consideration of the particular substantive issue involved.

Even more troubling, PG&E was concerned that unless it could persuade the Court to distinguish the issue of a cut-off for discovery from the issue of a cut-off for

damages (or from other related substantive issues), the government would attempt to "leverage" the footnote in the January December 2 Order into an argument that the Court has "already held" that *damages* must be cut-off on January 28, 2004, and then that the Court has "already held" that no evidence created after that date can be *admitted* at trial, and so on – issues that have not yet actually been briefed, much less addressed by the Court in this case. So what PG&E seeks is clarity in the Court's rulings, particularly its substantive rulings, not "continuing and apparently never-ending discovery" as the government asserts.

2. The government next suggests, *see* Opp. at 2-4, that the Federal Circuit decision in *Indiana Michigan* justifies a discovery cut-off of January 28, 2004. *See Indiana Michigan v. United States,* 422 F.3d 1369 (Fed. Cir. 2005). As PG&E explained in its motion, however, *Indiana Michigan* at most addresses the issue of a cut-off for damages; it does not address the separate question whether later-dated documents can be relevant to issues pertaining to past damages. As demonstrated in PG&E's motion and further below, later-dated documents can be highly relevant to past damages issues.

3. The government then argues, *see* Opp. at 6-12, that the only evidence relevant to the "but-for" world is evidence concerning what DOE was actually doing in the period before the breach, and particularly in the 1990's. While that may be the government's theory of the case, it is flawed – to say the least – for at least three reasons. First, this Court has already ruled that what DOE was doing in the 1990's, particularly regarding Annual Capacity Reports ("ACRs") and Delivery Commitment Schedules "DCSs"), is not controlling here with respect to the "rate of acceptance" issue or, presumably, other "schedule" issues. *Commonwealth Edison Co. v. United States*, 56 Fed. Cl. 652, 665

(2003) ("5. DCS Submissions and Annual Capacity Reports Not Binding"). The government now directly flouts that central ruling in *Commonwealth Edison* by arguing that the DOE "contract further provided that, in 1991, DOE would publish acceptance rates that would begin the process of *establishing* DOE's contractual obligations of acceptance under the contract." Opp. at 10 (emphasis added; footnote omitted). Second, as DOE contracting officer David Zabransky admitted at deposition and at the "Yankee" trial, and as other testimony at that trial confirmed, DOE used unreasonably low acceptance rates in the 1991 ACR because it already knew by then it would miss the 1998 date and it wanted to "minimize its obligations to utilities." *Yankee* Trial Transcript ("TT") 4166:16-18 (Zabransky), Exhibit 1; *see* Zabransky 04/18/02 Dep. Tr. 365:1-5; *see* 363:1-17 (identifying 1995 ACR/APR), Exhibit 2; *Yankee* TT 7622:4-8 (Vance), Exhibit 3, ("[T]he lower rate was going to be used. The decision had been made. And the reason was that it was obvious at that point that '98 was not going to be met and that they desired to limit the liability to purchasers."). *Cf. Commonwealth Edison Co.,* 56 Fed.Cl. at 665 ("The court agrees that DOE's use of the 1991 ACR to limit the amount of SNF requested by the utilities in their DCS submissions may be a breach of defendant's duty of good faith and fair dealing.").

Finally, the government's argument that only evidence from before the breach is relevant to the "but for" world is flawed because it rests only on the government's theory of the case. In contrast, under PG&E's theory – and governing caselaw – because the contract is silent on acceptance rate and other "schedule" issues, the Court must supply a "reasonable" rate and schedule. *See, e.g.,* Restatement (Second) of Contracts § 204; *Essex Electro Eng'rs, Inc. v. Danzig,* 224 F.3d 1283, 1291 (Fed. Cir. 2000) (if contract

does not specify a time for performance, government must perform within a reasonable time); *David Nassif Assocs. v. United States,* 557 F.2d 249 (Ct. Cl. 1977) ("fair inference to say that what the parties had in mind was a cafeteria of a size reasonable under all the circumstances"), *after remand,* 644 F.2d 4 (Ct. Cl. 1981) (addressing question of "reasonable" size after trial "given that what was intended was a profit-oriented cafeteria facility geared essentially to a one-meal-a-day operation"). As shown in PG&E's motion and further below, what DOE is doing now, or plans to do in the future, is plainly evidence of what a "reasonable" schedule would be.

4. The government's next argument, that the PG&E is "burdening" the government by "continuously requesting that DOE produce documents created by DOE in connection with its continuing program," Opp. at 12, and by "engaging in a fishing expedition," *id.,* and that "PG&E has not even suggested when discovery should end in this case," *id.*, is another straw man. PG&E is doing no such things. It is simply asking the Court not to pre-judge the relevance of post-complaint evidence to various substantive issues involved in this case, when the parties have hardly yet had the opportunity to brief most of those substantive issues. Instead, PG&E now should be able to obtain discovery without any cut-off date restriction, and *later* the parties can argue (and the Court can decide) what is relevant and/or should be admitted into the trial record.

5. Lastly, the government denies that it has selectively produced post-2004 documents, explaining that its current position that post-January 2004 documents are not discoverable is based on the recent *Indiana Michigan* decision. But regardless of the government's motivation – and on this point PG&E does not challenge the government's

motivation – it is beyond dispute that if further discovery of post-January 2004 documents is precluded, the factual record will be "selective" because many such documents have already been produced and indeed introduced in prior spent fuel trials.

6. The government's arguments simply do not stand up to the undeniably "broad scope of discovery in this court." *Int'l Paper Co. v United States*, 36 Fed. Cl. 313 (1996). Tellingly, the government does not address that legal principle, which is controlling here and to which the government demonstrably has no answer. *See also United States v. Nixon,* 418 U.S. 683, 709 (1974) ("The need to develop all relevant facts in the adversary system is both fundamental and comprehensive.").

7. PG&E has already explained that evidence of DOE's current and future actions is highly relevant in showing what a "reasonable" schedule would be – and would have been in the "but for" world. Importantly, PG&E is not necessarily saying that *everything* about DOE's current and future plans is relevant, but only that it cannot be said that *nothing* about DOE's current and future plans is relevant. Because that cannot be said, discovery of such matters must be permitted, including matters that post-date January 28, 2004.

The government's suggestion that the 2004 ACR/APR "does not have any significance in this case" is ridiculous given the governing, "reasonable schedule" standard that the Court must supply in the face of the contract's silence. Plainly DOE's reaffirmation, even today, that it plans to accept spent fuel at an annual rate of 3000 MTU demonstrates that such a rate is physically, logistically and practically "reasonable." Another example of an issue on which post-January 2004 documents may be relevant concerns the legal standard governing mitigation of damages. Under settled law,

reaffirmed in *Indiana Michigan*, PG&E is entitled to recover costs it "reasonably" incurs in attempting to avoid further loss from DOE's breach. *E.g., Chain Belt Co. v. United States,* 115 F. Supp. 701, 714 (Ct. Cl. 1953) ("[P]laintiff was under an obligation to avoid by a reasonable effort any damages which it should have foreseen and, having done so, it may recover as damages the expense incurred in such reasonable effort to avoid harm."); *Indiana Michigan*, 422 F.3d at 1375 ("Indian Michigan is 'not precluded from recovery . . . to the extent that it has made reasonable but unsuccessful efforts to avoid loss.'") (quoting Restatement (Second) of Contracts § 350(2)). The government has taken the position in other spent fuel cases, and may do so here, that a utility's storage of spent fuel in a "multi-purpose" container – one suitable for both storage and transportation – is not reasonable because such containers "may" not be acceptable to DOE. In response, utilities point to the fact that in the early 1990's, DOE created the concept of multi-purpose containers, and even contracted for the development of such containers until Congress withdrew funding in the mid-1990s. At that point utilities, reasonably believing that the concept DOE had developed was a sound one, contracted o their own for the development and fabrication of transportable containers.

After a long hiatus of no federal interest in transportable containers, DOE recently announced plans to revive the concept, and encourage the development of multi-purpose containers for use in DOE's spent fuel program. *See* Press Release, United States Department of Energy, New Yucca Mountain Repository Design to be Simpler, Safer and More Cost Effective (October 25, 2005) *available at* http://www.doe.gov/engine/content.do?PUBLIC_ID=19063&BT_CODE=PR_PRESSRELEASES&TT_CODE=PRE

SSRELEASE. Plainly, this recent evidence confirms the reasonableness of PG&E's use of transportable containers – or, at a minimum, is relevant to that issue.

In sum, there are several available and appropriate procedural devices to preclude evidence, or object to its introduction at trial – motions for summary judgment, motions *in limine*, etc. Rulings on such motions are as much substantive as evidentiary, and should only be made after full consideration of what issues the parties contend are relevant. The Court should not pre-judge any substantive issue in this case by artificially limiting discovery in advance of full consideration of the underlying substantive issue. That is particularly true given that the issue of a damages cut-off date is likely to be considered by the Court in the very near future, in connection with the government's recently-filed motion to strike portions of the report of PG&E's damages expert.

Ultimately, the government is prematurely – and wrongly – seeking to limit the evidence available to PG&E to prove its case. As PG&E has the burden of proof on damages issues, any such limitation is not only unwarranted, it is unfair and prejudicial to PG&E.

## CONCLUSION

For these reasons, and those stated in PG&E's motion, the Court should clarify or reconsider that portion of its December 2, 2005 Order indicating a discovery cut-off of January 28, 2004, and instead allow discovery of documents and facts subsequent to that date, subject to applicable Court Rules.

Dated: December 15, 2005

Respectfully submitted,

s/Jerry Stouck

JERRY STOUCK
Greenberg Traurig, LLP
800 Connecticut Avenue, NW
Suite 500
Washington, DC 20006
(202) 331-3173 Phone
(202) 261-4751 Fax
*Counsel for Plaintiff*
Pacific Gas & Electric Company

Of Counsel:
Robert L. Shapiro
Greenberg Traurig, LLP

# EXHIBIT 1

**Yankee Atomic Electric v. U.S Nos.: 98-126C, 98-154C, 98-474C August 5, 2004**

**Heritage Reporting Corporation**

**Page 4107 to Page 4238**

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:


*HERITAGE REPORTING CORPORATION*
*1220 L Street, N.W.*
*Suite 600*
*Washington, DC 20005*
*Phone: 202-628-4888*
*FAX: 202-371-0935*

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

YANKEE ATOMIC ELECTRIC COMPANY, )
CONNECTICUT YANKEE ATOMIC POWER )Case Nos.:
COMPANY, and MAINE YANKEE ATOMIC ) 98-126C
POWER COMPANY, ) 98-154C
Plaintiffs, ) 98-474C
)
THE UNITED STATES, )
Defendant. )

Courtroom 5
National Courts Building
717 Madison Place, N.W.
Washington, D.C.

Thursday, August 5, 2004
Volume 18

The parties met, pursuant to the notice of the Judge, at 10:00 a.m.

BEFORE: THE HONORABLE JAMES F. MEROW



APPEARANCES:
ON BEHALF OF YANKEE ATOMIC ELECTRIC COMPANY, CONNECTICUT YANKEE ATOMIC POWER COMPANY and MAINE YANKEE ATOMIC POWER COMPANY:
JERRY STOUCK, ESQ.
ROBERT SHAPIRO, ESQ.
PETER J. SKALABAN, JR., ESQ.
VIVEK K. HATTI, ESQ
Spriggs & Hollingsworth
1350 I Street, N.W.
Washington, D.C. 20005
(202) 898-5800

ON BEHALF OF YANKEE ATOMIC ELECTRIC COMPANY, CONNECTICUT YANKEE ATOMIC POWER COMPANY:
MERRILL J. ATKINS, ESQ.
Assisting General Counsel
19 Midstate Drive
Auburn, Massachusetts 01560
(508) 721-3042

(Appearances Continued on the Next Page.)



APPEARANCES CONTINUED:

ON BEHALF OF MAINE YANKEE ATOMIC POWER COMPANY:
JOSEPH D. FAY, ESQ.
General Counsel
Maine Yankee
321 Old Ferry Road
Wiscasset, Maine 04578
(207) 882-5603

On Behalf of the Defendant:
HAROLD LESTER, JR., ESQ.
JOHN EKMAN, ESQ.
MARIAN E. SULLIVAN, ESQ.
HEIDE L. HERRMANN, ESQ.
R. ALAN MILLER, ESQ.
KEVIN B. CRAWFORD, ESQ.
RUSSELL SHULTIS, ESQ.
U.S. Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530
(202) 305-7562

***Index appears at end of transcript***



P R O C E E D I N G S
\- - - - - -

MS. SULLIVAN: Good morning, Your Honor. We're ready to call our next witness unless there's anything we need to handle preliminarily.
THE COURT: Okay.
MS. SULLIVAN: The government calls David Zabransky.
Whereupon--
DAVID ZABRANSKY
a witness, called for examination, having been duly sworn, was examined and testified as follows:
DIRECT EXAMINATION
BY MS. SULLIVAN:
Q. Good morning, Mr. Zabransky. Are you currently employed at the Department of Energy?
A. Yes, I am.
Q. And to what office within the Department of Energy are you currently assigned?
A. I'm in the Office of Civilian Radioactive Waste Management, and I work in the Office of Systems Analysis and Strategy Development within that office.
Q. What are your current responsibilities?
A. I report to Chris Kouts, and I work on issues related to the standard contract, other

Page 4163

A. The Department would be obligated to. We'd have to figure out some way to either store more fuel, work nights and weekends, work 24-hour shifts, whatever it took, but the contract gives the utilities rights to do that. Once we sign the DCSes, if they adjust them, we'll have to live with them.

Q. But you don't know how the Department would manage to accommodate that, do you?

A. I just said, Mr. Shapiro, we'd work back shifts, we'd work weekends, we'd park stuff, but it's our obligation to figure that out when and if it happens.

THE COURT: Would that possibly have any impact on accepting canistered fuel? For instance, if a number of canisters resulted in, say, being 10 percent over the allocation, if you accepted canistered fuel?

THE WITNESS: I think canistered fuel, one of the issues with that is if we have to accept it and repackage it immediately, which could be the case, that could severely limit the throughput of the facilities, so that would have to be factored into that.

THE COURT: If you didn't have to reopen them and just, the total quantity might not exactly

Page 4164

match the allocation.

THE WITNESS: And that's one of the reasons I think that provision was put in there for, was that originally there was an understanding that the allocation was a very precise number to the nearest tenth of a ton, but that could result in a less than full cask, two and a half casks, which didn't make a lot of sense, and that by adjusting it plus or minus 20 percent was one way of dealing with that.

BY MR. SHAPIRO:

Q. I wanted to make sure I understood your last testimony correctly, Mr. Zabransky. So you're saying – and let's take the current, the most recent ACR that ramps up to an acceptance rate of 3,000 MTUs per year?

A. Yes, it does.

Q. And let's say we're in one of those years with 3,000 MTUs acceptance and utilities with allocations and the allocations that are provided for under that ACR and APR and instructions that were sent along with them would equal that 3,000 MTU, wouldn't it?

A. Yes, it does.

Q. And so if all those utilities bumped up the amounts they want to deliver by 20 percent, and the

Page 4165

Department would have to handle roughly 3,600 MTUs?

A. Yes, it would.

Q. And it's your testimony that the Department would have the capability to manage to do that?

A. No, my testimony was the Department was aware of that when it issued the ACR, and we'll deal with that, that should have come to pass. It doesn't have the capabilities today, but it would have to get them.

Q. So the Department could get those capabilities?

A. I don't see any reason why it couldn't.

Q. I want to ask you just a couple of questions about annual capacity reports, just mentioned the most recent one, the one that was sent out last week, when is spent fuel presumed to start to be picked up by the Department in that annual capacity report?

A. The report issued last week supports operations beginning in 2010.

Q. Is that the date provided in the annual capacity report, or is it like the earlier one that just had a year one instead of an actual year assigned?

A. I believe that report, and I'm doing it

Page 4166

from memory, has a table that shows 400 tons of acceptance in 2010.

Q. I want to ask you a question or two about the prior ACR. That's the one that was issued in 1995.

A. Okay.

Q. Now, the rates in that annual capacity report, you can pull that out if you don't recall it, but the rates in that annual capacity report are considerably smaller than the acceptance rates in last week's July 2004 annual capacity report, isn't that true?

A. Those rates, I believe, were 400, 600 and then 900 through the balance of the 10-year period, yes, they're smaller.

Q. And isn't it true that the Department was trying to minimize its obligations to utilities by using those rates in the 1995 ACR?

A. That may have been one of the considerations that went into that. There was no plans for a repository before 2010 at that point in time, and there was no change from the prior 4, 6, 9, 9, 9 acceptance rates in the '95 ACR, yes.

Q. I'm not asking just what may have been. Is it your opinion the Department was trying to minimize

Page 4167

its obligations by putting in those rates in the 1995 ACR?

A. In my opinion, that was probably one of the things being thought about, yes.

Q. I'm still not quite getting a complete answer to my question. I think you qualified your last answer that said that was probably one of the considerations minimizing the Department's obligations. Wasn't it your opinion that the Department indeed was trying to minimize its obligations?

MS. SULLIVAN: Objection, asked and answered, argumentative.

THE WITNESS: And I think I said, yes, they were, but I'm not sure that was the only consideration for those rates.

BY MR. SHAPIRO:

Q. Now I, want to turn back to your time when you were at WEPCO and looking at ACRs in that time period. Again, we can pull one of these out, but you recall some of those annual capacity reports noted right on there that the ACR's for planning purposes only, and it's not contractually binding on either the Department or purchasers?

A. I believe they all say that, including the

Page 4168

current one.

Q. And when you were at WEPCO, you concluded from that, that WEPCO could not rely on the department to actually accept the fuel based on the ACR, isn't that correct?

A. I believe that WEPCO needed to execute DCSes and have them approved to have any commitment from the government.

Q. You couldn't rely on the ACR?

A. The ACR was the basis for the DCS, no, there's nothing to rely upon an ACR. It's a report.

Q. Now, we've talked about a couple different acceptance rates for the Department to receive spent fuel from utilities. There's the one that ramps up to 3,000 MTU and the current ACR. You believe that acceptance rate is reasonable, don't you?

A. That's the rate that's in our requirements documents, the facilities are being designed for, and that's the rate the Department has put forth as its willing to commit to in the new ACR, yes.

Q. So you believe that the acceptance rate in the 19 – in the 2004 ACR is reasonable?

A. I believe that the rate in the ACR which presumes we'll have Yucca Mountain up and running is reasonable, yes.

Page 4169

Q. And, again, turning back to your time when you were at WEPCO, much earlier on in the process, you believe that a reasonable acceptance rate would have been one that would have reflected the aggregate rate of discharges, plus some amount of work-off, isn't that correct?

A. I believe that's the case, yes.

Q. And it's your personal opinion that an appropriate rate of acceptance under the standard contract would be a rate which kept pace with discharges and removed some of the backlog, that's correct?

A. Again, to the extent that's accomplishable, I think that's an appropriate thing for the Department to commit to.

Q. And you do think that is accomplishable by the Department?

A. That's the current plans for 2010, the Department's planning to accomplish it, yes.

Q. And, again, turning back to your time at WEPCO, when you were there, it was your position and understanding that an acceptance rate that ramped up to 3,000 MTU would be such a rate that was sufficient to work off the backlog and the discharges in a reasonable time frame?

Page 4170

A. That would have been the company's desire and my desire, yes.

Q. And it was your position and WEPCO's position when you were there that the Department had to be prepared to accept spent fuel from the utilities on a schedule which would obviate the construction of deployment of additional at-reactor storage capacity after January 31, 1998?

A. I believe that's the position we communicated to the Department in response to some of their mission plans, yes.

Q. You believe that's the position that you communicated, or you're unsure?

A. I believe it is. I mean, you're asking me for something that happened 20 years ago, but I think that's we said, yes.

Q. I think we may have that document. Let's confirm.

A. Okay.

Q. Mr. Zabransky, you're being handed what is actually an excerpt from what we have been calling here Plaintiffs' Exhibit 95, which is the complete three volume set of the 1985 mission plan. And you may know or recall the third volume of that set includes, I believe, all of the comments sent in by

Page 4235

A. There's also defects or potential concerns with lack of spacers, torn grid straps, anything that might impact the overall integrity may be an issue that has to be looked at and will be looked at, as the license is developed.

Q. That may be an issue that has to be looked at –

A. Yes.

Q. – or will have to be looked at? Do you know that these issues are going to have to be dealt with or may the result be that there's actually no problem with these – with things like clouding?

A. Mr. Shapiro, I can't tell you yes, and I can't tell you no, so until we get a license and know what the facility does, I can't answer the question.

THE COURT: Mr. Zabransky, do you know if NRC requires – in licensing for a dry storage facility, like the one pictured there, requires a sealed system as opposed to bolted?

THE WITNESS: No, the NRC is licensed under Part 72, both sealed/welded canisters, as well as bolted storage casks, so both are licensed pursuant to their requirement. They have a functional requirement that you can't allow any leakage to the environment, and it's up to the engineer to meet that

Page 4236

in any way he chooses to.

THE COURT: Okay.

MR. SHAPIRO: Nothing further, Your Honor.

THE COURT: Nothing further.

MS. SULLIVAN: Nothing further, Your Honor, thank you.

THE COURT: You're excused. Thank you very much for your testimony.

THE WITNESS: Thank you very much, sir. Have a good day.

THE COURT: I take it we're adjourned until Monday?

MR. LESTER: Monday at 10:00 a.m., Your Honor, yes.

THE COURT: Okay. We're adjourned until Monday morning at 10:00 a.m.

(Whereupon, at 1:28 p.m., the trial was recessed, to reconvene at 10:00 a.m., on Monday, August 9, 2004.)

Page 4237

C O N T E N T S.


| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| DAVID ZABRANSKY | 4110 | 4145 | 4216 | 4227 |


E X H I B I T S


| EXHIBIT NO: | MARKED | RECEIVED |
|---|---|---|
| Plaintiffs | | |
| PX-81................................4145 | | |


Page 4238

CERTIFICATE OF REPORTER

DOCKET NOS.: 98-126C, 98-154C, 98-474C
CASE TITLE: Yankee Atomic Electric v. U.S
HEARING DATE: August 5, 2004
LOCATION: Washington, D.C

I hereby certify that the proceedings and evidence are contained fully and accurately on the tapes and notes reported by me at the hearing in the above case before the United States Court of Federal Claims.

Date: 8/5/04

Cynthia Simmons, RMR, CRR
Official Reporter
Heritage Corporation
Suite 600
1220 L Street, N.W.
Washington,D.C. 20005-4019

# EXHIBIT 2

00227

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - x

YANKEE ATOMIC ELECTRIC COMPANY; : Case Nos. 98-126C,
CONNECTICUT YANKEE ATOMIC POWER : 98-154C, 98-474C,
COMPANY; MAINE YANKEE ATOMIC : 98-483C, 98-484C,
POWER COMPANY; FLORIDA POWER & : 98-485C, 98-486C,
LIGHT COMPANY; NORTHERN STATES : 98-488C, 98-614C,
POWER COMPANY; DUKE POWER, a : 98-621C, 99-447C,
Division of DUKE ENERGY CORP.; : 00-440C, 00-695C,
INDIANA MICHIGAN POWER COMPANY; : 00-703C, 01-115C,
SACRAMENTO MUNICIPAL UTILITY : 01-116C, 01-249C

- - - - - - - - - - - - - - - - - X

(Caption continued on the next page)

Continued Deposition of DAVID ZABRANSKY
Washington, D.C.
Thursday, April 18, 2002
9:44 a.m.

Job No.: 112597-2
Pages 227 through 459, Volume 2
Reported by: Diane Gomez, RPR

00363

Q Did the Department of Energy at any point starting with the time this document was published, March 1995, referring to Zabransky Exhibit 5, starting in March 1995 did the Department of Energy ever use the acceptance rates published in that document for its own planning purposes, for the purposes of planning for the operation of the waste management system?

A The Department of Energy never used these rates for the planning for the operation of a repository facility.

Q I'm not asking -- not my question.

A Okay. Repeat the question.

Q Did you ever use these rates beginning in March of 1995 for the planning for the federal waste management system?

A No, we did not.

Q Let me show you Exhibit 38.

(Deposition Exhibit Zabransky 38 was marked for identification and was attached to the transcript.)

Q Which is unsigned, but it has "official

00364
file copy" on the second page and has your name down at the bottom of the second page. Do you know what this document is?

A This is a draft of a transmittal letter that would have gone from Sam Rousso to the director, who at that time was Dan Dreyfus, recommending approval for the publication of the '95 ACR. I believe that's what it is. The '94 -- '94 ACR, published in March '95.

Q Is that document the one that's marked Exhibit 5?

A That's what this document refers to, yes.

Q And all those initials to the right-hand side indicate various approvals of the document?

A Right, to that point in time.

Q Okay. Why did the Department of Energy publish a document to be used as the basis for delivery commitment schedules using rates which it was not using itself for the purpose of planning the system?

A The department carried over the rates it had in the previous ACR and did not change them.

00365

Q Was the department trying to minimize the commitments it had to utilities who were parties to the standard contracts in using this document, in using Exhibit 5?

A I believe that that was a consideration.

Q Were there any other considerations that you can think of for using those rates?

A There was no other basis to develop any other rates at that point in time.

(Deposition Exhibit Zabransky 39 was marked for identification and was attached to the transcript.)

Q We have marked as Exhibit 39 to your deposition, Mr. Zabransky, a document entitled Analysis of a Total System Life Cycle Cost of the Civilian Radioactive Waste Management Program. Are you familiar with that document?

A I've seen this document. I'm not familiar with it, but I know what it is.

Q Did you participate in any way, shape or form in either providing any of the information for the document or helping draft it?

CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC

I, Diane Gomez, Registered Professional Reporter, the officer before whom the foregoing proceedings were taken, do hereby certify that the foregoing transcript is a true and correct record of the proceedings; that said proceedings were taken by me stenographically and thereafter reduced to typewriting under my supervision; and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal this 18th day of April 2002.

My commission expires:
June 14, 2005

_________________________
NOTARY PUBLIC IN AND FOR
THE DISTRICT OF COLUMBIA

# EXHIBIT 3

**Yankee Atomic Electric v. U.S Nos.: 98-126C, 98-154C, 98-474C August 30,2004**

**Heritage Reporting Corporation**

**Page 7615 to Page 7688**

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

*HERITAGE REPORTING CORPORATION*
*1220 L Street, N.W.*
*Suite 600*
*Washington, DC 20005*
*Phone: 202-628-4888*
*FAX: 202-371-0935*

Page 7615

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

YANKEE ATOMIC ELECTRIC )
COMPANY, CONNECTICUT YANKEE ) Case Nos.:
ATOMIC POWER COMPANY, and MAINE ) 98-126C
YANKEE ATOMIC POWER COMPANY, ) 98-154C
Plaintiffs, ) 98-474C
v. )
THE UNITED STATES, )
Defendant. )

Courtroom Number 5

National Courts Building
717 Madison Place, N.W.
Washington, D.C.

Monday, August 30, 2004

VOLUME 34

The parties met, pursuant to the notice of the Judge, at 2:00 p.m.

BEFORE: THE HONORABLE JAMES F. MEROW

Page 7616

APPEARANCES:

ON BEHALF OF YANKEE ATOMIC ELECTRIC COMPANY, CONNECTICUT YANKEE ATOMIC POWER COMPANY and MAINE YANKEE ATOMIC POWER COMPANY:
JERRY STOUCK, ESQ.
ROBERT SHAPIRO, ESQ.
PETER J. SKALABAN, JR., ESQ.
Spriggs & Hollingsworth
1350 I Street, N.W.
Washington, D.C. 20005
(202) 898-5800

ON BEHALF OF THE DEFENDANT:
HAROLD LESTER, JR., ESQ.
JOHN EKMAN, ESQ.
MARIAN E. SULLIVAN, ESQ.
HEIDE L. HERRMANN, ESQ.
R. ALAN MILLER, ESQ.
KEVIN B. CRAWFORD, ESQ.
RUSSELL SHULTIS, ESQ.
U.S. Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530
(202) 305-7562

Page 7617

APPEARANCES (Continued):

ON BEHALF OF SCOTT VANCE:
JAY E. SILBERG, ESQ.
Shaw Pittman, LLP
2300 N Street, N.W.
Washington, D.C. 20037-1128
(202) 663-8063

** Index appears at the end of transcript **

Page 7618

P R O C E E D I N G S

MR. SHAPIRO: Your Honor, Plaintiffs call Scott Vance.
THE COURT: Okay.
Whereupon,

SCOTT VANCE

was called as a witness, and, having first been duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. SHAPIRO:
Q Mr. Vance, I just want to start out with a couple questions about your background. If we can start with your educational background.
A I have a bachelor of science in general engineering from Idaho State University, and two master's from MIT, a master's in nuclear engineering and a master's in technology and policy.
Q And where are you currently employed?
A I'm currently employed at Shaw Pittman.
Q And what's your position there?
A A nuclear regulatory specialist.
Q Mr. Vance, since you're called as an impeachment witness, I want to focus right in on what we're interested in talking about. Did you do any work on the 1991 Annual Capacity Report?

Page 7619

A Yes. I did.
Q What was your role in working on that document?
A At that time. I was working for Pacific Northwest Lab. PNL. I was working for the group of individuals who are the primary support to headquarters radioactive waste. RW as it's been referred to. in preparing contract documents. specifically the ACR.
And my role was to assist in preparation of the document. which included developing a draft of the document. actually developing the text. editing it as changes were submitted. and ultimately preparing the -- what we call the camera-ready copy of the document which was actually turned into the document as it was produced.
Q And just in case it's not entirely clear to the Court. what was PNL's role in the program at that time?
A Prior to the consolidation of Contractor Services into the management and operation contractor. the various aspects of implementation of the civilian radioactive waste management program were distributed through several different labs and different field offices.

Page 7620

PNL's role was to support the Office of Waste Acceptance. And Waste Acceptance had the task of dealing with contractually required documents.
Q And did you have a particular primary contact point at DOE that you worked with?
A Yes, I did. That was Alan Brownstein.
Q I want to focus specifically on the 1991 Annual Capacity Report. I believe that's been accepted into evidence as Defendant's Exhibit 24. And you're aware of the acceptance rate that's set out in that document?
A I am.
Q And that's the rate that ramps up to 900 MTU per year?
A That is correct.
Q What was the rationale for that acceptance rate?
MS. SULLIVAN: Objection. Foundation.
MR. SHAPIRO: He's already said he worked – more or less wrote it and edited it and worked on that document, Your Honor.
THE COURT: I'll overrule. You can testify as to that.
THE WITNESS: At least one of the foundations for that rate was DOE's desire to limit

Page 7621

their liability to purchasers from the standard contract.
BY MR. SHAPIRO:
Q How do you know that that was one of the – one of DOE's reasons for having that acceptance rate?
A At the time we were involved in what was known as the ACR issue resolution process. And that process was one where DOE was interacting with the purchasers to resolve 34 identified issues with the standard contract.
At that time, we were told that we were going to potentially use a lower rate in the 1991 ACR. And myself and the other individual at PNL who were working on the document were concerned that, in fact, if the lower rate was used, the efforts that we had undertaken to resolve the issues in the ACR issue resolution process would have been in vain because we believed that purchasers would have determined that DOE was not serious about resolving those issues because the rate would have been so low.
And so we met with Mr. Brownstein – myself, the other individual from PNL met with Mr. Brownstein and we had an extended conversation as to what rate should be used.
And we argued that the justifications for

Page 7622

the lower rate did not overcome the harm that would result from the use of the lower rate. And I was told at that time specifically from Alan Brownstein that the lower rate was going to be used. The decision had already been made. And the reason for that was that it was obvious at that point that '98 was not going to be met and that they desired to limit the liability to purchasers.
Q And when did you have this meeting with Mr. Brownstein?
A It would have been early in the year. And I'm thinking spring of 1991. The ACR was published late that year in December. And I based that upon the normal cycle for making those decisions as to what would be in the document.
Q And you mentioned a couple times that there was someone else that you were working with at PNL on these issues who attended the meeting. Who was that?
A That was Pat McDuffie.
MR. SHAPIRO: If I could have a moment, Your Honor.
THE COURT: Sure.
MR. SHAPIRO: We have no further questions for Mr. Vance, Your Honor.
THE COURT: Any cross?.

Page 7687

CONTENTS

WITNESS DIRECT CROSS REDIRECT RECROSS
SCOTT VANCE 7618 7626

EXHIBITS

EXHIBIT NO. MARKED RECEIVED
PX-288 YA 7644
PX-300 YA 7645
PX-301 MY 7645
PX-353 7646
PX-393 7649
PX-437 7650
PX-458 7650
PX-459 7650
PX-899 7674
PX-1002 7652
PX-1003 7652
PX-1280 7657
PX-1933 7669
PX-1949 7670
PX-2040 7671

Page 7688

CERTIFICATE OF REPORTER

DOCKET NO.: 98-126C; 98-154C; 98-474C
CASE TITLE: YANKEE ATOMIC ELECTRIC COMPANY, CONNECTICUT YANKEE ATOMIC POWER COMPANY and MAINE YANKEE ATOMIC POWER COMPANY
HEARING DATE: August 30, 2004
LOCATION: Washington, DC

I hereby certify that the proceedings and evidence are contained fully and accurately on the tapes and notes reported by me at the hearing in the above case before the United States Court of Claims.

Date: 8/30/04

Vicky J. Stallsworth, RMR, CRR
Official Reporter
Heritage Reporting Corporation
Suite 600
1220 L Street, N.W.
Washington, D.C. 20005-4019