No. 04-0074C
into which has been consolidated No 04-0075C
Judge Hewitt

(Filed Electronically, December 16, 2005)

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

PACIFIC GAS & ELECTRIC COMPANY,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

# OPPOSITION TO MOTION FOR SUMMARY JUDGMENT ON COUNTS II AND III OF PG&E'S COMPLAINTS

JERRY STOUCK
Greenberg Traurig, LLP
800 Connecticut Avenue, NW
Suite 500
Washington, DC 20006
(202) 331-3173
(202) 261-4751
*Counsel for Plaintiff*
Pacific Gas & Electric Company

Of Counsel:
ROBERT L. SHAPIRO
Greenberg Traurig, LLP

# TABLE OF CONTENTS

Page

I. PG&E IS SEEKING RESTITUTION AS AN APPROPRIATE ALTERNATIVE REMEDY THAT PG&E IS ENTITLED TO PLEAD NOW AND ELECT LATER IF IT WISHES ..... 2

A. PG&E May Plead and Pursue Inconsistent Remedies ..... 2

B. Under Applicable Law, No Contract Election Has Been Made By PG&E ..... 3

II. PG&E'S CLAIM FOR A TAKING OF ITS REAL PROPERTY APPEARS PREMATURE AND SHOULD BE DISMISSED WITHOUT PREJUDICE FOR THAT REASON ..... 6

A. Ripeness Concerns Warrant Dismissal of PG&E's Takings Claim Without Prejudice. ..... 7

B. *Commonwealth Edison* Is Distinguishable And Not Controlling. ..... 8

C. Dismissal Without Prejudice Is Appropriate Under Applicable Rules And Caselaw. ..... 12

# APPENDIX

Document ..... Page

Exhibit 1: June 26, 2003 Order in *Yankee Atomic Electric Company v. United States*, No. 98-126C (Fed. Cl.) ..... 1

Exhibit 2: Pages S13574-75 of the December 14, 2005 Daily Congressional Record ..... 7

**TABLE OF AUTHORITIES**

Cases Page

*Beacon Oil Co. v. O'Leary*, 71 F.3d 391 (Fed. Cir. 1995) .......... 5

*Canal Elec Co. v. United States*, 65 Fed. Cl. 650 (2005) .......... 11

*Cienega Gardens v. United States*, 194 F.3d 1231 (Fed. Cir. 1998) .......... 9

*Cienega Gardens v. United States*, 331 F.3d 1319 (Fed. Cir. 2003) .......... 9, 10

*Commonwealth Edison Co. v. United States*, 56 Fed. Cl. 652 (2003) .......... passim

*Consolidated Edison Co. v. United States*, 67 Fed. Cl. 285 (2005) .......... 11

*Detroit Edison Co. v. United States*, 56 Fed. Cl. 299 (2003) .......... 11

*Dow Chem. Co. v. United States*, 226 F.3d 1334 (Fed. Cir. 2000) .......... 3

*Engineered Products Co. v Donaldson Co., Inc.*, 147 Fed. Appx. 979 (Fed. Cir. 2005) .......... 13

*Foman v. Davis*, 371 U.S. 178 (1973) .......... 13

*Franconia Assocs. v. United States*, 536 U.S. 129 (2002) .......... 10

*Gately v. Commonwealth of Mass.*, 2 F.3d 1221 (1st Cir. 1993) .......... 5

*Harden v. TRW, Inc.*, 959 F.2d 201 (11th Cir. 1992) .......... 2

*Hendler v. United States*, 952 F.2d 1364 (Fed. Cir. 1991) .......... 7

*Jet, Inc. v. Sewage Aeration Systems*, 223 F.3d 1360 (Fed. Cir. 2000) .......... 12

*Maine Yankee Atomic Power Co. v. United States*, 225 F.3d 1336 (Fed. Cir. 2000) .......... 11

*McDonnell Douglas Corp. v. United States*, 182 F.3d 1319 (Fed. Cir. 1999) .......... 3

*Mobil Oil Explor. & Prod. Se., Inc. v. United States*, 530 U.S. 604 (2000) .......... 3, 6

*Omaha Public Power Dist. v. United States*, 2005 WL 3216929 .......... 11

*Palazzolo v Rhode Island*, 533 U.S. 606 (2001) .......... 8

*Petrofsky v. United States*, 488 F.2d 1394 (Ct. Cl. 1973) .......... 2

*Rule v. Brine, Inc.*, 85 F.3d 1002 (2d Cir. 1996) .......... 2

*Sacramento Mun. Utility Dist. v. United States*, 61 Fed. Cl. 438 (2004) .......... 11

*Siderpali, S.P.A. v. Judal Indus.*, 833 F. Supp. 1023 (S.D.N.Y. 1993) ........................................ 4

*Systems Fuels, Inc. v. United States*, 65 Fed. Cl. 163 (2005) ..................................................... 11

*Texas v. United States*, 523 U.S. 296 (1998) .................................................................................. 9

*Wynfield Inns v. Edward Leroux Groups, Inc.*, 896 F.2d 483 (11th Cir. 1990) ............................ 4

*Yankee Atomic Elec. Co. v. United States*, 2004 WL 1535688 ..................................................... 4

Other Authorities

*Federal Practice and Procedure* § 1479 (2d ed. 2005) .............................................................. 13

RCFC 8(a) ......................................................................................................................................... 2

RCFC 8(e) ......................................................................................................................................... 2

RCFC 56(H)(1) ................................................................................................................................. 2

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| PACIFIC GAS & ELECTRIC COMPANY,<br>Plaintiff,<br>v.<br>UNITED STATES OF AMERICA,<br>Defendant. | No. 04-0074C, into which has been consolidated No. 04-0075C (Judge Hewitt)<br><br>Filed electronically: Dec. 16, 2005 |

OPPOSITION TO MOTION FOR SUMMARY JUDGMENT
ON COUNTS II AND III OF PG&E'S COMPLAINTS

The government's motion for summary judgment ("MSJ") on PG&E's claim for restitution of contract fees paid, and on PG&E's claim for a taking of its real property, has no merit and should be denied. PG&E's restitution claim is the kind of alternative claim for relief that is expressly permitted by Rule 8(a), and PG&E is only required to elect which remedy to pursue prior to final judgment, not now. PG&E's takings claim is very likely to become meritorious in the future, but by challenging the claim now, the government's motion points up the fact that the takings claim appears premature – it rests on allegations that in the future (albeit the near future), government actions will require PG&E to use its own property for the public purpose of storing spent nuclear fuel. As of today, nothing has been taken. PG&E's takings claim therefore should be dismissed without prejudice on ripeness grounds, so that it may be reasserted in the future when appropriate, and the government's motion for summary judgment on that claim likewise should be denied without prejudice so that the government may also present its arguments at an appropriate, later time.

## I. PG&E IS SEEKING RESTITUTION AS AN APPROPRIATE ALTERNATIVE REMEDY THAT PG&E IS ENTITLED TO PLEAD NOW AND ELECT LATER IF IT WISHES

The government's premise and sole argument for objecting to PG&E's restitution claim, that "PG&E asserts a restitution claim under a partial breach of contract," MSJ at 3, is simply wrong. PG&E's restitution claim seeks an alternative remedy for the government's breach. PG&E recognizes that in order to pursue that alternative restitution remedy it will have to elect to declare a total breach, but under well-established law, PG&E need only make that election at some point prior to final judgment, not now.[1]

### A. PG&E May Plead and Pursue Inconsistent Remedies

It is black letter procedural law (at least in the federal system) that plaintiffs may pursue alternate remedies, even if they are inconsistent. *See, e.g., Petrofsky v. United States*, 488 F.2d 1394, 1405 (Ct. Cl. 1973) (regarding "claim for a refund" and "claim for damages for breach," "plaintiff could have pleaded both claims simultaneously but alternatively"). Indeed, RCFC 8(a) explicitly allows claims for relief "in the alternative or of several different types." *See also* RCFC 8(e). Equally clear is that plaintiffs are entitled to present evidence supporting multiple inconsistent remedies to a trier of fact. *See, e.g., Harden v. TRW, Inc.*, 959 F.2d 201, 204 (11th Cir. 1992) ("[A] plaintiff is entitled to submit both theories to the jury if there is sufficient evidence to support them both."); *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996) ("Where the complaint asserts claims on theories of both contract and quantum meruit and there is a genuine dispute as to the existence of a contract, the plaintiff need not make a pretrial election between these theories; he is entitled to have the case submitted to the jury on both theories."); Dobbs, *The Law of Remedies* §12.7(6) ("Although it may be a nuisance to structure proper

[1] Though pleading form is not controlling, it is worth noting that Count II of PG&E's now-consolidated complaints, which claim restitution, do not allege or rest upon a claim of a "partial breach."

instructions or interrogatories to the jury if both claims are submitted, there is no reason to require a pre-verdict election.").

B. Under Applicable Law, No Contract Election Has Been Made By PG&E

The Federal Circuit considered the contract-election doctrine in *Dow Chem. Co. v. United States*, 226 F.3d 1334 (Fed. Cir. 2000), which held that a non-breaching contract party does not waive its right to terminate the contract and elect total breach remedies unless a delay in making the election has prejudiced the party in breach. *Id*. at 1346 (no waiver of termination right "by continuing to urge the government to perform and by failing to terminate . . . in a reasonable time," because "there is no evidence the government was prejudiced by Dow's delay in terminating the license."). Here, the government does not even *allege* any prejudice from PG&E's parallel pursuit of a "partial" breach claim and its failure thus far to declare a total breach or to terminate the contract.

The *Dow* holding is unremarkable. In *McDonnell Douglas Corp. v. United States*, 182 F.3d 1319, 1327 (Fed. Cir. 1999), the Federal Circuit enforced the same rule: "a party that chooses to proceed with the contract – even if it is the government – does not thereby waive its right to terminate for default." And with specific reference to restitution, the Supreme Court likewise explained in *Mobil Oil Explor. & Prod. Se., Inc. v. United States*, 530 U.S. 604, 621-622 (2000), that the government "cannot claim that the companies waived their rights simply by urging performance." These decisions are also consistent with *Restatement (Second) of Contracts* § 378, which provides that " when a party has more than one remedy under the rules stated in this chapter, his manifestation of a choice of one of them by bringing suit or otherwise is not a bar to another remedy unless the remedies are inconsistent and the other party materially changes his position in reliance on the manifestation." (emphasis added).

Applying these principles, it is clear that PG&E has not waived its right to claim a total breach, and thus has made no "binding" election that would here preclude a remedy for total breach – like restitution. Indeed, Judge Merow reached precisely that conclusion in the "*Yankee*" cases, when he denied a government pre-trial motion *in limine* that sought to preclude the plaintiffs there from pursuing their alternative restitution claims. *Yankee Atomic Elec. Co. v. United States,* 2004 WL 1535688, at *3-5. As Judge Merow recognized, a "final" election only need be made "at some point prior to final judgment." *Id.* at *5 (citing *Wynfield Inns v. Edward Leroux Groups, Inc*., 896 F.2d 483, 488 (11th Cir. 1990)). In fact, courts have recognized that a plaintiff may continue to pursue a remedy even after the entry of judgment in its favor on an inconsistent remedy, as long as no execution is made on the judgment. *See Wynfield Inns*, 896 F.2d at 488-90 (trial court directed verdict on one of two alternative remedies, but that interlocutory judgment did not bar continued pursuit of the other remedy); *Siderpali, S.P.A. v. Judal Indus*., 833 F. Supp. 1023, 1028-1029 (S.D.N.Y. 1993).[2]

PG&E's preferred remedy is the recovery of damages for a partial breach. PG&E's position is that the Court should award PG&E the damages it seeks for DOE's partial breach, reflecting the additional and ongoing costs that PG&E has been required to incur to store its spent fuel for an extended period, and the Court also should reserve PG&E's right to later pursue additional damages "as they are incurred." *Indiana Michigan*, 422 F.3d at 1377. Positions the government is taking, however, lead to the conclusion that PG&E should recover nothing for the government's partial breach. The government has explicitly argued for a zero damages result in other spent fuel cases, and PG&E expects the government may eventually argue explicitly for

---

[2] Indeed, even after entry and execution on a final judgment for partial breach, there is no reason in principle why a plaintiff could not subsequently declare a total breach and obtain restitution, subject to offset, as in other cases, for the value of what the government provided prior to the total breach.

zero damages here as well. In addition, uncertainties and challenges facing the government's spent fuel disposal program may ultimately lead to a conclusion that it is untenable to continue to hope for eventual contractual performance by DOE. Therefore, PG&E respectfully reserves its right to make a final election "after a verdict but prior to judgment," which in this case means after the Court issues a decision on damages but before entering judgment (which the Court should not do until PG&E makes its final election).

PG&E's restitution claim is for return of all contract fees it has paid to DOE to date, totaling just over $300 million, and, with termination of the contract, cancellation of PG&E's future fee obligations. So the amount of that claim is not subject to any legitimate dispute. If, contrary to PG&E's position, the Court were to reject some or all of PG&E's claimed damages for partial breach, and/or refuse (or fail) to effectively reserve PG&E's right to later pursue future damages, PG&E in response could conceivably elect to pursue restitution and, for reasons explained above, PG&E retains the right to do so before final judgment.

PG&E is mindful that in *Indian Michigan* the Federal Circuit raised some questions about the availability of a restitution remedy. *See id.* at 1374. But the government, appropriately, does not even suggest that restitution would not be available if PG&E were to declare a total breach. As the government well knows, the Federal Circuit has frequently instructed that its decisions are precedent only on "legal issues that were actually decided in a prior action." *Beacon Oil Co. v. O'Leary*, 71 F.3d 391, 395 (Fed. Cir. 1995). *See Gately v. Commonwealth of Mass.*, 2 F.3d 1221, 1226 (1st Cir. 1993) ("[I]f an issue is not argued, or though argued is ignored by the court or reserved, the decision does not constitute a precedent to be followed."). Needless to say, *Indiana Michigan* did not address a total breach claim, much less a restitution claim, so the

Federal Circuit's *dicta* concerning total breach is no impediment to full consideration of such claims if and when they are properly presented to that court.[3]

For these reasons, the government's motion for summary judgment on PG&E's restitution claim must be denied. And for the same reasons, there is no occasion now for the Court to address any other issue pertaining to the restitution claim.

## II. PG&E'S CLAIM FOR A TAKING OF ITS REAL PROPERTY APPEARS PREMATURE AND SHOULD BE DISMISSED WITHOUT PREJUDICE FOR THAT REASON

With respect to PG&E's claim that the government has taken its real property for the public purpose of storing spent fuel, PG&E is mindful that this Court, in *Commonwealth Edison*, 56 Fed. Cl. 652 (2003) dismissed the takings claim of another spent fuel plaintiff. For several different reasons outlined below, that ruling is distinguishable and not controlling here. More importantly, however, although the government does not explicitly argue that PG&E's takings claim is unripe, the government's motion demonstrates that the claim is unripe. That is so because PG&E has not yet commenced physical construction of the spent fuel dry storage facility – the Independent Spent fuel Storage Facility, or "ISFSI" – involved in the claim. PG&E therefore requests that the Court, rather than addressing the government's various summary

---

[3] If squarely presented with the issue, PG&E is confident the Federal Circuit would recognize that the Nuclear Waste Policy Act ("NWPA") is no impediment to a total breach claim, since contrary to *Indiana Michigan*'s *dicta* (uninformed by any briefing of the matter), the NWPA only "authorizes" rather than "requires" contracts, and the provision regarding the need to have a contract to obtain a license raises only regulatory issues, not a bar to a restitution claim.

The Federal Circuit's *dicta* on total breach also appears contrary to the Supreme Court decision in *Mobil Oil*, 530 U.S. at 608, which held, in accordance with black letter restitution law, that "[i]f the Government said it would break, or did break, an important contractual promise, . . . the Government must give the companies their money back. And it must do so whether the contracts would, or would not, ultimately have proved financially beneficial to the companies." Contrary suggestions in *Indiana Michigan* cannot be relied upon at least until the Federal Circuit is given the opportunity to reconcile or conform its decision to *Mobi Oil*.

judgment arguments now, simply to dismiss PG&E's takings claim without prejudice on ripeness grounds. That way, PG&E can reassert the claim later, if and when it ripens, at which time the government also may pursue the arguments in its motion.

### A. Ripeness Concerns Warrant Dismissal of PG&E's Takings Claim Without Prejudice.

As background, PG&E originally filed two complaints, which have now been consolidated into one action. See Order of April 12, 2005 (consolidating cases). One complaint, in No. 04-075, seeks damages arising at PG&E's Diablo Canyon facility on the central California coast. That is the site of two operating nuclear power plants, where due to DOE's partial breach PG&E is currently building a dry storage ISFSI for its spent fuel. The other complaint, in No. 04-074, seeks damages arising at PG&E's Humboldt Bay facility in northern California, the site of one much smaller nuclear plant that was permanently shutdown since 1976. Due to DOE's partial breach, PG&E is also implementing a dry storage ISFSI at Humboldt Bay.

PG&E asserted a takings claim only regarding the Humboldt Bay site. *See* Count III of Amended Complaint in No. 04-074C. In essence, that takings claim alleges that because upon the completion and loading of the ISFSI the Humboldt Bay nuclear plant will be decommissioned, disassembled and completely removed from the site, eventually PG&E's use and enjoyment of its real property will be impaired by the continuing presence at the site of *only* spent fuel and the GTCC waste generated in the decommissioning process. Both the spent fuel and GTCC waste will remain on site in the ISFSI indefinitely, which is ample to make out a permanent taking. *See, e.g., Hendler v. United States,* 952 F.2d 1364, 1376-77 (Fed. Cir. 1991) ("'permanent' does not mean forever, or anything like it.").

The heart of PG&E's takings claim is that fact that the physical presence at Humboldt Bay of the ISFSI and the waste it contains will substantially interfere with PG&E's use of its

property there indefinitely, and perhaps forever. However, because construction of the Humboldt Bay ISFSI has not begun, the claimed "taking" is unripe. The government has simply not taken anything yet. The ripeness doctrine, of course, is very well developed in takings jurisprudence, and frequently requires plaintiffs to come back later when the claim is more concrete and fit for judicial resolution. *See generally Palazzolo v Rhode Island,* 533 U.S. 606 (2001).

Although ripeness considerations thus require that PG&E's takings claim be deferred now, it is also appropriate that PG&E be afforded the opportunity – through dismissal without prejudice – to bring the claim back later. By definition, claims that are unripe now may, and very often do, become ripe for adjudication later. Here, once PG&E's ISFSI is constructed at Humboldt Bay it undeniably will intrude upon, and interfere with alternative uses of, the real property on which it physically rests. Those future facts make it a viable takings claim.

The Court need not delve into the substantive takings issue now, however, and indeed cannot do so given the lack of ripeness (or at least should not do so given the "apparent" lack of ripeness). Nonetheless, it is important to recognize that dismissal of the takings claim in *Commonwealth Edison* in no way precludes success on such a claim, later, here.

B. *Commonwealth Edison* Is Distinguishable And Not Controlling.

The dismissal ruling in *Commonwealth Edison* rested on the Court's conclusion that "prior to the Standard Contract DOE did not have an obligation to accept or dispose of plaintiff's SNF or HLW." 56 Fed. Cl. at 652. The Court thus found that "plaintiff's claim for a taking is *dependent* upon the existence of the Standard Contract and therefore plaintiff's rights are enforceable through a contract remedy." *Id.* (emphasis added). Notably, *Commonwealth Edison* did not involve a damages claim for storage of GTCC waste. *See id.* at 658. The Court thus found that GTCC waste issues were "unripe," and denied the government's partial summary

judgment motion addressed to those issues on that basis. *Id.* at 659. As the Court explained, "a claim is not ripe for judicial review if it is premised upon 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'" *Id.* at 658 (quoting *Texas v. United States,* 523 U.S. 296, 300 (1998)).

As noted above, *Commonwealth Edison* is distinguishable and not controlling as to any future PG&E takings claim at Humboldt Bay for several reasons. Two of those reasons are reflected in Judge Merow's subsequent ruling in the "*Yankee*" cases denying the government's motion for summary judgment on takings claims. *See Yankee Atomic Elec. Co. v. United States,* Order of June 29, 2003 at 4-5, copy attached as Exhibit 1 ("*Yankee* Order"). First, Judge Merow's denial of the government's takings motion relied significantly on the Federal Circuit's decision in *Cienega Gardens v. United States*, 331 F.3d 1319 (Fed. Cir. 2003), which was rendered two days after *Commonwealth Edison* and therefore could not have been considered, or followed, there. As Judge Merow noted, in *Cienega Gardens*, the appellate court "held that a continued restriction on property owners' right to control their property resulted in a taking requiring compensation." *Yankee* Order at 5. *Cienega Gardens* is particularly instructive because prior proceedings in that case had established that the government had no contractual obligation to allow prepayment of the underlying private mortgages. *See Cienega Gardens v. United States,* 194 F.3d 1231 (Fed. Cir. 1998). The Federal Circuit nevertheless held that the government's *failure to accept* prepayments constituted a taking because it prevented the property owner mortgagees from making unencumbered use of their property. 331 F.3d at 1328-30. *Cienega Gardens* thus establishes that government *inaction* alone – even apart from any government contract – can work a taking. It would thus seem to undermine the rationale of the takings dismissal ruling in *Commonwealth Edison*, or at least call for reexamination of the issue

in light of this subsequent Federal Circuit guidance. *See also Franconia Assocs. v. United States*, 536 U.S. 129, 143-44 (2002) (claim in case similar to *Cienega Gardens* arose not from statutory restrictions on prepayment but only from HUD's late *refusal* to accept a prepayment.)

Second, the *Yankee* cases involved nuclear plants that are shutdown and undergoing decommissioning, like the Humboldt Bay plant, and they therefore involved claims for GTCC waste storage costs – like PG&E's claims at Humboldt Bay, but unlike *Commonwealth Edison*. Judge Merow relied on those GTCC waste claims in denying the government's takings motion. Accepting this Court's conclusion in *Commonwealth Edison*, that "to the extent plaintiff's claim is contract based, taking recovery is precluded," *Yankee* Order at 5, Judge Merow recognized that the presence of GTCC waste at the *Yankee* sites distinguished the situation before him in a material way, because the government had a pre-existing, non-contractual, *statutory* obligation to remove the GTCC waste. *Id.*

Third, Commonwealth Edison should not be considered controlling as to a takings claim that PG&E may re-assert in the future because the salient facts may change. For example, just this week a Bill was introduced in the U.S. Senate which would require DOE to take title to utility spent fuel at the various existing reactor sites, and thereupon assume all financial and other responsibility for maintenance of the spent fuel. *See* Exhibit 2 attached herein (floor statement of Senator Reid upon introduction of S. 2099). The government argues in its motion that the facts do not make out a "physical taking," because there has been no *physical* invasion of property by the Government," MSJ at 10, but that issue will take on an entirely different complexion if the pending "take-title" bill, or something like it, is enacted. It thus is not only unnecessary but would be unfair to prejudge any future PG&E takings claim – which by

definition will be based on future facts – on the basis of facts existing today, which are subject to change and may well change before PG&E's takings claim ripens.

Finally, PG&E notes that *Commonwealth Edison* is the only decision in this Court to have dismissed the takings claim in a spent fuel case of this type, whereas four other Judges in seven other similar cases have refused to dismiss such claims – including in cases that, unlike this one, are not factually distinguishable from *Commonwealth Edison. Omaha Public Power Dist. v. United States*, 2005 WL 3216929; *Systems Fuels, Inc. v. United States*, 65 Fed. Cl. 163, 171-73 (2005); *Sacramento Mun. Utility Dist. v. United States*, 61 Fed. Cl. 438, 442-43 (2004): *Detroit Edison Co. v. United States*, 56 Fed. Cl. 299, 300-02 (2003); *Yankee* Order at 3-5; *see also Maine Yankee Atomic Power Co. v. United States,* 225 F.3d 1336, 1342-43 (Fed. Cir. 2000) (affirming refusal to dismiss takings claims under contractual "disputes" clause). Particularly given that there has yet been no direct appellate guidance on the substance of the takings issue in these cases, the significant number of decisions contrary to *Commonwealth Edison* counsels in favor of dismissing the takings claim here without prejudice and allowing PG&E to come back later if and when the claim has ripened.[4]

[4] *Canal Elec Co. v. United States*, 65 Fed. Cl. 650 (2005), which dismissed a takings claim, has sometimes mistakenly been lumped together with spent fuel breach of contract cases like PG&E's case, but that case is very different, as the opinion makes clear. *See, e.g., id*. at 651 ("Plaintiff's suit is based not on the Standard Contract but upon the Government's statutory obligation to handle nuclear material."). In particular, the takings claim in *Canal Electric,* which is the principal claim asserted there, is factually and conceptually distinct from PG&E's claim here for a taking of its real property. The takings claim in *Canal Electric* was brought by the seller of a nuclear plant that alleges a taking because the value of that plant – and thus the sale proceeds – were dramatically reduced by DOE's failure to implement a timely or effective spent fuel program. There are other spent fuel cases involving such "seller" claims, and also rulings in those cases that decline to dismiss the takings claim, *see, e.g., Consolidated Edison Co. v. United States*, 67 Fed. Cl. 285, 291-92 (2005), but like *Canal Elec.*, those cases and rulings are inapposite here.

C. Dismissal Without Prejudice Is Appropriate Under Applicable Rules And Caselaw.

By its very nature a dismissal on ripeness grounds is without prejudice, since the presumption is that the claim may ripen later, at which time asserting it would be proper. Indeed, strictly speaking the Court does not even have the authority to resolve the merits of an unripe claim – such as by dismissing it with prejudice – because a claim that is not ripe is not justiciable. *See Commonwealth Edison,* 56 Fed. Cl. at 652 (justiciability doctrines like ripeness preclude courts "from issuing advisory opinions or deciding disputes that are not concrete and adverse") (citation omitted).

Procedurally, where a plaintiff requests dismissal of a claim but not the entire action it is not entirely clear among courts and commentators whether the dismissal should be under Rule 41(a), governing "Voluntary Dismissal," or Rule 15(a), governing amendments to pleadings, here to the complaint. *See Jet, Inc. v. Sewage Aeration Systems,* 223 F.3d 1360, 1364 (Fed. Cir. 2000). Which Rule is used is immaterial here, however, given that the government has answered and moved for summary judgment, because where that has occurred both Rules require the Court's approval to effectuate dismissal of a claim – whether "by Order of Court" under Rule 41(a)(2), or by granting leave to amend the complaint under Rule 15(a) (unless the defendant gives written consent to such amendment, which PG&E has requested and the government has refused).

In *Jet, Inc.*, 223 F.3d at 1364, the Federal Circuit suggested that "Rule 15(a) is technically the preferred rule to apply." That Rule expressly provides that "leave shall be freely given when justice so requires." And as the Federal Circuit has also explained:

> [t]he Supreme Court has interpreted this [directive] to mean that "[i]n the absence of any apparent or declared reason-such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by

> amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc. - the leave sought should . . . be 'freely given.'"

*Engineered Products Co. v Donaldson Co., Inc.*, 147 Fed. Appx. 979, 987 (Fed. Cir. 2005) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1973). The same standards should also apply under Rule 41(a), because the commentators agree that "the same considerations are relevant to dropping the claim regardless of which rule is invoked." 6 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1479 (2d ed. 2005). Indeed, Rule 41(a) also provides expressly that "[u]nless otherwise stated. . . the dismissal is without prejudice").

Since PG&E is voluntarily dismissing its takings claim, it is difficult to imagine what prejudice the government could even claim as a result – much less establish. As this Court explained in *Commonwealth Edison* in dismissing the government's GTCC waste motion, ""[t]he burden of having to defend another lawsuit does not appear to be sufficient hardship to warrant immediate consideration of an issue not otherwise ripe for decision." 56 Fed. Cl. at 659.

CONCLUSION

For these reasons, the Court should deny the government's motion for summary judgment upon Counts II of both PG&E Complaints and Count III of the Complaint in No. 04-074, and also should direct the dismissal without prejudice of PG&E's takings claim asserted in that Count III.

Dated: December 16, 2005

Respectfully submitted,

s/ Jerry Stouck

JERRY STOUCK
GREENBERG TRAURIG, LLP
800 Connecticut Avenue, NW, Suite 500
Washington, D.C. 20006
(202) 331-3173 (telephone)
(202) 261-4751(facsimile)

*Counsel for Plaintiff*
PACIFIC GAS & ELECTRIC

Of Counsel:

Robert L. Shapiro
GREENBERG TRAURIG, LLP

# EXHIBIT 1

# In the United States Court of Federal Claims

No. 98-126C
(Filed June 26, 2003)

RECORDS COPY
214.002
CLIENT / MATTER # Pldgs.

| | |
|---|---|
| YANKEE ATOMIC ELECTRIC COMPANY, Plaintiff, | * |
| v. | * |
| THE UNITED STATES, Defendant. | * |

**ORDER** [1/]

Following the decision in *Maine Yankee Atomic Power Co. v. United States*, 225 F.3d 1336 (Fed. Cir. 2000) proceedings in this matter have been devoted to completing extensive pretrial proceedings. Plaintiff has submitted comprehensive damage schedules and, pursuant to the applicable pretrial orders, defendant retained an expert accounting firm to examine and audit the extensive books and records supporting the items and figures submitted by plaintiff. Plaintiff has recently submitted substantially increased claimed damage amounts and defendant is presently proceeding to audit and examine the books and records supporting these new figures. Responding schedules identifying items and figures in dispute will then be submitted by defendant. The parties have also provided lists of trial witnesses and exhibits. Very extensive document discovery has been completed and some seventy-five depositions have been taken to date in connection with pretrial preparation activity. Final pretrial submissions are now due at the end of September with a trial to follow shortly thereafter.

Defendant has, however, taken several defenses it has cited in pretrial proceedings to date in this matter and asserted them in the format of motions for summary judgment. These motions are: Defendant's Motion for Partial Summary

---

[1/] (This should also be deemed applicable in *Connecticut Yankee v. United States*, No. 98-154 C and *Maine Yankee v. United States*, No. 98-474 C).

Judgment Regarding the Rate of Spent Nuclear Fuel Acceptance, filed November 9, 2001; Defendant's Motion for Partial Summary Judgment Regarding Plaintiff's Greater than Class C Radioactive Waste Arguments, filed November 7, 2001; and Defendant's Motion for Summary Judgment Upon Count III of Plaintiff's Complaint [Taking Claim], filed November 14, 2001.

Responses by plaintiff to these motions were deferred to conform to the schedule for pretrial submissions plaintiff was required to submit. Defendant has, however, more recently, filed the same motions in most of the pending cases, brought by other utilities, but involving the same breach of contract liability established in *Maine Yankee.*

By the Order, filed April 14, 2003, accelerated action was prescribed for the resolution of certain of these filings, including those motions filed by defendant in this case.

A decision on these three motions as filed by defendant in *Commonwealth Edison Co. v. United States,* No. 98-621 C, was issued on June 10, 2003.

In the *Commonwealth Edison Co.* opinion, the court denied defendant's motion concerning the rate of Spent Nuclear Fuel ("SNF") Acceptance, ruling that damages need not be limited by the quantities of SNF which had been submitted on a delivery commitment schedule ("DCS"). The Court's well reasoned ruling in *Commonwealth Edison Co.* on this issue of rate of SNF acceptance is adopted here. The determination of the rate of acceptance, to the extent this will impact on the amount of damages claimed, is thus in dispute and must be resolved by evidentiary proceedings.

The instant case differs from *Commonwealth Edison Co.* in one aspect. Plaintiff's facility is shut down and is in the process of decommissioning. The standard contract in Article VI B1(b) provides that "... priority may be accorded any SNF and/or HLW removed from a civilian nuclear power reactor that has reached the end of its useful life or has been shut down permanently for whatever reason." However, the pretrial evidence indicates that there has been no decision to apply this priority. Plaintiff's damages are premised on a relatively quick pick-up of all its SNF and/or HLW after the commencement date of January 31, 1998. Thus the considerable costs of storage and security incurred, and to be incurred, after the

assumed pick-up is complete are claimed as damages. Given the age of plaintiff's SNF, this assumed early pick-up completion could be accomplished only by the application of a shut-down priority or by use of "exchanges" authorized by Article V E of the standard contract. There are disputes over material facts underlying the bases for the use of "exchanges" with other utilities having older SNF in order to obtain an earlier assumed pick-up for damage measurement purposes. In the unlikely event evidentiary proceedings produce a conclusion that plaintiff's damage approach requires the development of a pick-up schedule for all SNF and/or HLW from all utilities covered by a standard contract, including a number of utilities not now before the court, the parties have been placed on notice that the court reserves the option of invoking the primary jurisdiction doctrine. That is, in the unlikely event that such a comprehensive multi-year SNF pick-up schedule were required in order to determine damages, the Department of Energy, by rule making equivalent to that which resulted in the *Indiana Michigan Power Co. v. United States Department of Energy*, 88 F.3d 1272 (D.C. Cir. 1996) and *Northern States Power Co. v. Department of Energy*, 128 F.3d 754 (D.C. Cir. 1997) decisions, could be requested for the purpose of developing such a schedule and a report of the result to the court for use in this litigation. *See United States v. Western Pac. R. R.*, 352 U.S. 59, 63-64 (1956); *Reiter v. Cooper*, 507 U.S. 258, 268-69 (1993); Louis L. Jaffe, *Primary Jurisdiction*, 77 HARV. L. REV. 1037 (1964). The request would be initiated by the use of the call procedure set forth in 28 U.S.C. § 2507(a). Reservation of this primary jurisdiction option is in recognition that the Court of Federal Claims is not an agency tasked with developing a comprehensive schedule for SNF pick-up, whereas the Department of Energy has this responsibility under the contract at issue and related legislation. The Court takes evidence, reviews all damage proof and determines the amounts that are attributed to the failure to commence SNF and/or HLW pick-up as of January 31, 1998. In no event would the Department of Energy determine damages, were primary jurisdiction to be invoked to obtain schedule and exchanges information.

Accordingly, the analysis and ruling with respect to defendant's Rate of Spent Nuclear Fuel Acceptance motion as set forth in *Commonwealth Edison* is adopted herein with the exception of the determination at Sl. Op. p.22 that there shall be no remand under primary jurisdiction doctrine. In the instant case that option shall remain open for consideration should further proceedings establish the need for it. As in the *Commonwealth Edison Co.* ruling, defendant's rate of SNF acceptance motion shall be denied.

Defendant's motion concerning plaintiff's Greater than Class C Radioactive Waste Arguments ("GTCC") as filed in *Commonwealth Edison Co.* is there denied. The Court determined that the issue of contract coverage with respect to GTCC is not ripe for judicial decision. Upon review of the substantial evidence cited by the parties it appears that, at present, defendant has the better argument as to the lack of a contract obligation for defendant to dispose of GTCC. Defendant does concede that it has a statutory obligation to dispose of GTCC, pursuant to The Low-Level Radioactive Waste Policy Amendments Act of 1985 ("LLRWPA"). Pub. L. No. 99-240 (codified at 42 U.S.C. §§ 2021b-2021i). There is no time specified for this disposal obligation.

However, even if it were to be determined that the contract at issue does not cover GTCC, the issue of the defendant's policy(ies) concerning GTCC removal is still relevant to the damage determination required in this case. This is because, in pretrial submissions, defendant indicates that the continued presence of GTCC on the plaintiff's shut down reactor site would require plaintiff to incur storage and security costs even if the SNF and/or HLW were assumed to have been removed as a result of a prompt commencement of pick-up activity no later than January 31, 1988. Accordingly, defendant proposes to utilize the continued presence of GTCC at plaintiff's reactor site to eliminate or reduce the damages that plaintiff attributes to the failure to remove SNF and/or HLW. There are material disputes of fact concerning the Department of Energy's policy, or lack of policy, concerning its LLRWPA obligation to assume custody of GTCC. Plaintiff asserts the evidence will show that the Department of Energy would not leave GTCC on a reactor site after removing all SNF and/or HLW. Defendant disputes this contention. To the extent that it is necessary to resolve the GTCC policy issue in order to determine the extent of damages attributed to the failure to commence SNF and/or HLW removal by January 31, 1988, evidentiary proceedings are required. Thus, for the reasons cited in *Commonwealth Edison Co.* and because, in any event, material facts are in dispute, defendant's GTCC motion shall be denied.

With respect to defendant's motion for summary judgment upon Count III of plaintiff's Complaint, which asserts a Fifth Amendment taking claim, in *Commonwealth Edison Co.*, this same motion was granted, except as to GTCC waste, (Slip. Op. at pp 4-6). In *Detroit Edison Co. v. United States*, 56 Fed. Cl. 299 (2003), defendant's same taking motion was denied. Upon examination of the evidence cited by the parties, it is concluded that a dismissal of plaintiff's taking count would be

premature at this point in the proceedings. In *Cienega Gardens v. United States*, ___ F.3d ___ (No. 02-5050, June 12, 2003) the Federal Circuit held that a continued restriction on property owners' right to control their property resulted in a taking requiring compensation. Plaintiff asserts that depriving it of control of its reactor site by requiring use of the site for SNF and/or HLW and GTCC storage also results in a taking requiring compensation. Defendant counters that prior to the contract at issue, it had no obligation to dispose of plaintiff's SNF and/or HLW, therefore asserting that plaintiff's claim can only be for breach of contract. Citing *Florida Power & Light Co. v. Westinghouse Elec. Corp.*, 826 F.2d 239, 245-48 (4th Cir. 1987), *cert. denied,* 485 U.S. 1021 (1988), which details the understandings concerning the government's undertakings with regard to SNF from the inception of the "Atoms for Peace" program in the 1950's, plaintiff contests that the government's obligation to accept SNF and/or HLW is solely contract based. As set forth in *Detroit Edison*, to the extent that plaintiff's claim is contract based, taking recovery is precluded. However, defendant urges that GTCC is not covered by the contract at issue. If so, a continued presence of GTCC on plaintiff's site despite defendant's statutory obligation to dispose if it could, conceivably, form the basis for a taking claim. *See Beneson v. United States*, 212 Ct. Cl. 375, 548 F.2d 939 (1977). Taking issues are normally fact intensive and require evidentiary proceedings for their resolution. *See Yuba Goldfields, Inc. v. United States*, 723 F.2d 884, 887 (Fed. Cir. 1983). This case is no exception. The presence of issues regarding the government's long term policy with respect to the disposition of SNF and/or HLW, together with the fact that there is material on plaintiff's real property which should be removed pursuant to contract or otherwise, counsels against resolving the taking count in plaintiff's complaint prior to the conclusion of trial proceedings.

Accordingly, based on the above discussion, it is **ORDERED** that defendant's three motions, cited above, shall be **DENIED.**

James F. Merow
Senior Judge

# EXHIBIT 2

it for weapons testing saying, "We will go believing that everything is in the hands of God."

I appreciate the understanding and the patience shown by the Marshall's Government and their citizens as we proceed to review the issues raised concerning the effects of the nuclear testing program, and I hope the introduction of this legislation will be seen as an example of our commitment to see that those issues receive a full and fair review and discussion.

---

By Mr. REID (for himself, Mr. ENSIGN, Mr. BENNETT, and Mr. HATCH):

S. 2099. A bill to amend the Nuclear Waste Policy Act of 1982 to require commercial nuclear utilities to transfer spent nuclear fuel from spent nuclear fuel pools into spent nuclear fuel dry casks and convey to the Secretary of Energy title to all spent nuclear fuel thus safely stored; to the Committee on Environment and Public Works.

Mr. REID. Mr. President, I rise today for Senator ENSIGN, Senator BENNETT and myself to introduce a bill to increase the safety and security of our Nation's nuclear power infrastructure, The Spent Nuclear Fuel On-Site Storage Security Act of 2005.

I am convinced that the proposed Yucca Mountain nuclear waste dump will never be built because of the myriad of scientific, safety and technical problems in which it is mired. It simply is neither safe nor secure, as illustrated by several significant scientific, legal, and budgetary setbacks this past year.

Here are some of the highlights: On July 9, 2004, the DC Circuit Court of Appeals sided with the people of Nevada in a lawsuit to stop the proposed Yucca Mountain project. The court decided that U.S. Environmental Protection Agency's radiation standard for the site was not stringent enough to protect the public from the significant risks associated with nuclear waste and failed to follow the recommendation by the National Academy of Sciences.

On August 31, 2004, the Nuclear Regulatory Commission's Atomic Safety and Licensing Board rejected Department of Energy's Yucca Mountain document database, saying it had failed to make public many of the documents that it had in its possession. The Board said, "Given the 15 years that DOE had to gather, review, and produce its documents and the fact that the date of production, and the incompleteness of its privilege review, it is clear to us that DOE did not meet its obligation, in good faith, to make all reasonable efforts to make all documentary materials available."

On October 4, 2004, the DOE Inspector General found that DOE has given away more than $500,000 worth of Yucca Mountain construction equipment in 2003. Half a million dollars is a tremendous amount of the people's money to waste.

On November 22, 2004, the Nuclear Waste Technical Review Board said DOE does not have a plan for safely transporting nuclear waste to the proposed repository.

On February 7, 2005, Dr. Margaret Chu, most recently the Director of the Office of Civilian Radioactive Waste Management, said the project would be delayed until 2012 and that DOE's license application to the Nuclear Regulatory Commission would not be filed until December 2005, delayed a year. To date, the license application still has not been filed.

On February 8, 2005, the Nuclear Waste Technical Review Board have called for hearings to review concerns over the corrosion of the titanium drip shields that are intended to keep water from leaking into casks inside Yucca Mountain.

On February 28, 2005, a DOE official said the proposed Yucca Mountain repository may not open until 2015.

On March 16, 2005, DOE revealed that documents and models about water infiltration at Yucca Mountain, a key issue, had been falsified.

On July 18, 2005, DOE announced that it will use dedicated train service for its rail transport of spent nuclear fuel and high-level waste to Yucca Mountain, a shift from two decades of administration policy that ignores the fact that about one-third of reactor sites are not capable of shipping fuel by rail.

On August 22, 2005, EPA published its revised radiation standards for the proposed Yucca Mountain high-level waste dump. These standards are wholly inadequate, do not meet the law's requirements and do not protect public health and safety.

On October 13, 2005, DOE began a series of actions to overhaul the Yucca Mountain project. We are going back to the drawing board, frequently revisiting proposals discarded decades ago as unsafe or unworkable.

On October 25, 2005, DOE announced that it would be redesigning the spent fuel storage process, both the containers and facilities.

On November 16, 2005, the DOE Inspector General announced that DOE has ignored numerous admitted instances of falsification of technical and scientific date on the project, showing that years of quality assurance problems continue.

On November 17, 2005, DOE sent a detailed letter to its contractor specifying some of the desired changes in the site proposal.

At the December 7, 2005, at the NRC–DOE quarterly meeting on Yucca Mountain, DOE announced that it expects to re-baseline the project mid-2006, requiring many of the technical and scientific analyses to be redone.

On November 19, 2005, the Energy and Water Appropriations bill became law, cutting the Yucca Mountain budget to $577 million, half of what DOE said it would need to keep the project on track.

In numerous media reports, DOE has confirmed that it is preparing a legislative package that addresses Yucca Mountain. Clearly, DOE cannot meet the current public health, safety and technical requirements.

It should be clear to anyone that the proposed Yucca Mountain project is scientifically unsound and that it cannot meet the requirements of law. It is not going anywhere. Delay after delay costs the taxpayers billions and billions of dollars for a project that the courts have ruled does not meet sufficient safety or public health standards. I do not believe that Yucca Mountain will ever open, and Nevada and the country will be safer for our successful efforts to stop the project.

Yet, we must safely store spent nuclear fuel.

A 1979 study by the Sandia National Laboratory determined that, if all the water were to drain from a spent fuel pool, dense-packed spent fuel would likely heat up to the point where it would burst and then catch fire, releasing massive quantities of volatile radioactive fission products into the air. Both the short-term and the long-term contamination impacts of such an event could be significantly worse than those from Chernobyl. The consequences would be so severe and would affect such a large area that all precautions must be taken to preclude them. This is the type of serious, avoidable risk against which all the Nation's nuclear sites can and should be protected to counter terrorist threats.

It is time to look at other nuclear waste alternatives. Fortunately, the technology to realize a viable, safe and secure alternative is readily available and can be fully implemented within 6 years if we act now. That technology is dry cask storage.

The technology for long-term storage of spent nuclear fuel in dry storage casks has improved dramatically in the past 20 years. Seventeen cask designs have. been licensed by the Nuclear Regulatory Commission, which says that spent nuclear fuel can be safely stored using dry cask storage on-site at the nuclear power plants for at least 100 years. Already, dry casks safely store spent nuclear fuel at 34 sites throughout the country, many of them near communities, water ways and transportation routes. The Nuclear Energy Institute has projected 83 of the 103 active reactors will have dry storage by 2050.

Compared to water-filled pools, dry storage casks are significantly less vulnerable to natural and human-induced disasters, including floods, tornadoes, temperature extremes, sabotage, and missile attacks. In addition, dry storage casks are not subject to drainage risks, whether intentional or accidental.

On March 28, 2005, the Washington Post revealed that a classified National Academy of Sciences report concluded that the government does not fully understand the risks a terrorist attack

could pose to spent nuclear fuel pools and that it ought to expedite the removal of the fuel to dry storage casks that are more resilient to attack.

Our bill requires commercial nuclear utilities to safely transfer spent nuclear fuel from temporary storage in water-filled pools to secure storage in licensed, on-site dry cask storage facilities. After transferal, the Secretary of Energy will take title and full responsibility for the possession, stewardship, maintenance, and monitoring of all spent fuel thus safely stored. Finally, our bill establishes a grant program to compensate utilities for expenses associated with transferring the waste. The costs of transferring the waste and providing the grants will be offset by withdrawals from the utility-funded Nuclear Waste Fund.

Nuclear facilities currently provide 20 percent of our Nation's electricity, but in light of the events of September 11, they also present a security risk that we simply must address. There cannot be any weak links in the chain of security of our Nation's nuclear power infrastructure. There is absolutely no justification for endangering the public by densely packing nuclear waste in vulnerable spent fuel pools when it can be stored safely and securely in dry casks. This bill guarantees all Americans that our Nation's nuclear waste will be stored in the safest way possible.

I ask unanimous consent that the text of the bill printed in the RECORD.

There being no objection, the bill was ordered to be printed in the RECORD, as follows:

S. 2099

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

**SECTION 1. SHORT TITLE.**

This Act may be cited as the "Spent Nuclear Fuel On-Site Storage Security Act of 2005".

**SEC. 2. DRY CASK STORAGE OF SPENT NUCLEAR FUEL.**

(a) IN GENERAL.—Title I of the Nuclear Waste Policy Act of 1982 (42 U.S.C. 10121 et seq.) is amended by adding at the end the following:

**"Subtitle I—Dry Cask Storage of Spent Nuclear Fuel**

**"SEC. 185. DRY CASK STORAGE OF SPENT NUCLEAR FUEL.**

"(a) DEFINITIONS.—In this section:

"(1) CONTRACTOR.—The term 'contractor' means a person that holds a contract under section 302(a).

"(2) SPENT NUCLEAR FUEL POOL.—The term 'spent nuclear fuel pool' means a water-filled container in which spent nuclear fuel rods are stored.

"(3) SPENT NUCLEAR FUEL DRY CASK.—The term 'spent nuclear fuel dry cask' means the container, and all the components and systems associated with the container, in which spent nuclear fuel is stored at a Commission-licensed independent spent fuel storage facility located at the power reactor site. The design of any such spent nuclear fuel dry cask shall be approved by the Commission.

"(b) TRANSFER OF SPENT NUCLEAR FUEL.—

"(1) IN GENERAL.—A contractor shall transfer spent nuclear fuel from spent nuclear fuel pools to spent nuclear fuel dry casks at a Commission-licensed independent spent fuel storage facility located at the power reactor site.

"(2) SPENT NUCLEAR FUEL STORED AS OF DATE OF ENACTMENT.—A contractor shall complete the transfer of all spent nuclear fuel that is stored in spent nuclear fuel pools as of the date of enactment of this subsection not later than 6 years after the date of enactment of this subsection.

"(3) SPENT NUCLEAR FUEL STORED AFTER DATE OF ENACTMENT.—A contractor shall complete the transfer of any spent nuclear fuel that is stored in a spent nuclear fuel pool after the date of enactment of this subsection not later than 6 years after the date on which the spent nuclear fuel is discharged from the reactor.

"(4) INADEQUATE FUNDS.—If funds are not available to complete a transfer under paragraph (2) or (3), the contractor may apply to the Commission to extend the deadline for the transfer to be completed.

"(c) FUNDING.—The Secretary shall make grants to compensate a contractor for expenses incurred in carrying out subsection (b), including costs associated with—

"(1) licensing and construction of an independent spent fuel storage facility located at the power reactor site;

"(2) construction and delivery of spent nuclear fuel dry casks;

"(3) transfers of spent nuclear fuel;

"(4) documentation relating to the transfers;

"(5) security; and

"(6) hardening.

"(d) CONVEYANCE OF TITLE.—

"(1) DETERMINATION.—Not later than 30 days after the transfer of spent nuclear fuel from a spent nuclear fuel pool to a spent nuclear fuel dry cask, the Commission shall determine whether the contractor carried out the transfer in full compliance with regulations promulgated by the Commission.

"(2) NONCOMPLIANCE.—If the Commission determines that any technical standard or compliance provision under the regulations was not complied with, the Commission shall—

"(A) notify the contractor; and

"(B) take such actions as are necessary to obtain full compliance.

"(3) CERTIFICATION AND CONVEYANCE OF TITLE.—When the Commission determines that the contractor has fully complied with the regulations—

"(A) the Commission shall certify that safe transfer has been accomplished; and

"(B) the Secretary shall accept the conveyance of title to the spent nuclear fuel dry cask (including the contents of the cask) from the contractor.

"(4) RESPONSIBILITY.—A conveyance of title under paragraph (3)(B) shall confer on the Secretary full responsibility (including financial responsibility) for the possession, stewardship, maintenance, and monitoring of all spent nuclear fuel transferred to the Secretary.".

(b) FUNDING.—Section 302(d) of the Nuclear Waste Policy Act of 1982 (42 U.S.C. 10222(d)) is amended—

(1) in paragraph (5), by striking "and" at the end;

(2) in paragraph (6), by striking the period at the end and inserting "; and"; and

(3) by adding at the end the following:

"(7) the provision of grants under section 185(d).".

**SEC. 3. IMMEDIATE CONVEYANCE OF TITLE TO SPENT NUCLEAR FUEL PREVIOUSLY CERTIFIED TO BE IN COMPLIANCE.**

Not later than 30 days after the date of enactment of this Act, the Secretary of Energy shall accept the conveyance of title to all spent nuclear fuel with respect to which, before the date of enactment of this Act, the Nuclear Regulatory Commission has certified that a contractor under section 302 of the Nuclear Waste Policy Act of 1982 (42 U.S.C. 10222) has completed transfer to spent nuclear fuel dry casks in compliance with applicable regulations in effect as of the date of transfer.

---

By Mr. SMITH (for himself and Mr. KERRY):

S. 2100. A bill to amend the Internal Revenue Code of 1986 to improve the deduction for depreciation; to the Committee on Finance.

Mr. SMITH. Mr. President, our economy has changed dramatically in recent years as a result of the development of new technologies and industries. However, we have not updated our tax depreciation system to reflect these advancements. In fact, the recovery periods used to calculate depreciation allowances have not been adjusted since 1986—and in some cases not since 1962. For example, a personal computer has a depreciable life of 5 years even though its economic life is only 2 to 3 years.

Today, I am introducing legislation that will respond to these changes by modernizing and simplifying the tax depreciation rules. Senator KERRY has joined me in introducing the Tax Depreciation, Modernization and Simplification Act of 2005, which will encourage capital investment and make it easier for companies to comply with the tax law.

This legislation will allow the Treasury Department, in consultation with Congress, to modify and create new class lives for capital assets. Any new classification created by the Treasury Department must reflect the anticipated useful life and decline in value over time of the asset. In addition, it should take into account when the asset is technologically or functionally obsolete for its original purpose. With this new regulatory authority, Treasury will be able to develop class lives that are more in line with assets' economic lives.

Another provision in this legislation deals with the mid-quarter convention. The mid-quarter convention is one of the placed-in-service conventions that directs when depreciation for an asset begins or ends. The mid-quarter convention, however, creates significant complexity. Taxpayers must wait until after the tax year ends to determine whether to use the half-year or mid-quarter convention. Therefore, consistent with a Joint Committee on Taxation recommendation, the bill eliminates the mid-quarter convention for simplification purposes.

Small businesses are the heart of our economy. We, in Congress, should do everything we can to ease the administrative burdens for small businesses. That is why we should make small business expensing permanent. These rules permit small businesses to expense immediately up to $100,000 of the cost of property each year. This proposal will maintain this important simplification which is set to expire at the end of 2007.