IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| PACIFIC GAS & ELECTRIC COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | ) ) ) ) ) ) ) ) ) | No. 04-0074C, into which has been consolidated No. 04-0075C (Judge Hewitt) |

DEFENDANT'S RESPONSE TO PG&E'S MOTION TO ESTABLISH TIME FRAME FOR CONSIDERATION OF FUTURE DAMAGES

Defendant, the United States, respectfully submits this response to the "Motion To Establish Time Frame For Consideration Of Future Damages" (the "motion") filed by the plaintiff, Pacific Gas & Electric Company ("PG&E"), on December 23, 2005. In an effort to eliminate duplicative briefing, and because PG&E has incorporated into its motion its opposition to "Defendant's Motion To Strike Portions Of The Expert Report Of Brad Cornell Related To Future Damages," we similarly incorporate our November 29, 2005 motion to strike Dr. Cornell's future damages opinions and our January 9, 2005 reply to PG&E's opposition to that motion.

SUMMARY OF ARGUMENT

PG&E's motion is the second motion pending before this Court that seeks the entry of an order concerning the scope of PG&E's damages in this case. The first motion, which the Government filed on November 29, 2005, sought the entry of an order striking portions of the expert report of Dr. Bradford Cornell that concerned alleged damages post-dating the filing of PG&E's amended complaint. In response to the Government's motion to strike, and as restated in its instant motion, PG&E asserted that the Government's motion was procedurally improper and that PG&E would be filing an affirmative motion on the future damages issue. See Pl. Br.

1.[1] Based upon its decision to file an "affirmative" motion, PG&E obviously believes that its motion is procedurally proper under the decision in Indiana Michigan Power Co. v. United States, 422 F.3d 1369 (Fed. Cir. 2005). PG&E is mistaken. Instead, the only motion that PG&E affirmatively could file that properly would place this issue before the Court is a motion for leave to file an amended or supplemental complaint. No such motion is pending; indeed, PG&E steadfastly has refused to file such a motion. As a result, this Court should not, as a matter of law, consider extending the dates associated with PG&E's alleged damages beyond those set by the amended complaint.

## ARGUMENT

In Indiana Michigan, the United States Court of Appeals for the Federal Circuit issued a clear statement of the law concerning the remedies available to plaintiffs seeking damages under a partial breach of contract theory that is binding precedent in this Court and governs the litigation between PG&E and the Government. See Strickland v. United States, 423 F.3d 1335, 1338, n.3 (Fed. Cir. 2005); Crowley v. United States, 398 F.3d 1329, 1335 (Fed. Cir. 2005). As a matter of law, the Federal Circuit held that future damages are not recoverable in a partial breach case. Indiana Michigan, 422 F.3d at 1377-78. As it did in response to the Government's motion to strike, PG&E contends that the Federal Circuit's discussion of future damages does not "provide this Court with binding or clear guidance on the extent to which future damages may be awarded" in this partial breach action. Pl. Br. 2. PG&E also continues to maintain that Indiana Michigan provided no clear demarcation between past and future damages for the

[1] "Pl. Br. __" refers to "PG&E's Motion To Establish Time Frame For Consideration Of Future Damages," filed on December 23, 2005.

purposes of a partial breach claim. Pl. Br. 3. As discussed at length in the Government's briefs upon this issue, PG&E significantly understates the clarity of Indiana Michigan. Indeed, a plain reading of Indiana Michigan demonstrates a lack of any ambiguity as to how the Federal Circuit defines future damages.

In Indiana Michigan, the Federal Circuit held that a partial breach claimant may "sue from time to time for the damages incurred to the date of suit," defined as "the time of the institution of the action." Indiana Michigan, 422 F.3d at 1377 (emphasis added) (quoting Restatement (Second) of Judgments § 26(e) & cmt. g (1982)). While the Court discussed other potential options for dealing with a partial breach claim, the appellate court expressly found that the grievance at issue "falls within [the Restatement (Second) of Judgments] subsection (e)'s exception," id. at 1378, which expressly limits damages in a partial breach case to those "incurred to the date of suit," Restatement (Second) of Judgments § 26(e) (1982), or "damages sustained from breaches up to the time of the institution of the action." Id. § 26 cmt. g, at 241 (quoted in Indiana Michigan, 422 F.3d at 1377).[2] Additionally, the Federal Circuit held that "subsequent claims accrue for the purposes of the statute of limitations at the time such damages are incurred." Id. at 1378. Accordingly, all plaintiffs that allege a partial breach of contract "must bring any future actions for damages related to DOE's breach of the Standard Contract within six years of incurring such damages." Id.

[2] As discussed by the Government in its other briefs upon this matter, PG&E's attempt to distinguish the facts of Indiana Michigan with those of this case is a red herring. As discussed in the Government's other briefing upon this issue, the Federal Circuit's decision was rendered as a matter of law and not based upon the particular facts present in Indiana Michigan.

Under Indiana Michigan, PG&E is limited to the recovery of past costs, as measured by the date of its most recent amended complaint. This necessarily is so, as this Court's jurisdiction is defined by reference to the partial breach, or partial breaches, that had occurred prior to the date upon which the PG&E filed its amended complaint. See Newman-Green, Inc. v. Alfonzo-Larrain, 490 U.S. 826, 830 (1989) ("[t]he existence of federal jurisdiction ordinarily depends on the facts as they exist when the complaint is filed"). The most recent complaint filed in this case was PG&E's January 28, 2004 amended complaint. Consistent with Indiana Michigan, and in lieu of any motion for leave to supplement or amend its complaint, January 28, 2004, is the date through which damages should be limited for the purposes of this trial. Here, counsel for PG&E has failed to seek leave to file either an amended or supplemental complaint to extend the date at issue for damages beyond the date of the initial amended complaint. Given the fact that discovery already has concluded in this case, it would appear inappropriate at this juncture to allow PG&E to add additional years to its pending damages claim.

PG&E's unexplained refusal to seek leave to file an amended complaint is in stark contrast to the actions taken by other plaintiffs in the SNF cases referenced in PG&E's motion. In Southern Nuclear Operating Co. v. United States, No. 98-614C (Merow, S.J.), the plaintiff filed a two-page supplemental complaint before trial that sought damages through December 31, 2004. Since costs through December 31, 2004, were actual incurred costs and supporting documentation for those incurred costs had been produced to the Government during discovery and prior to the depositions of all relevant damages witnesses, the Government did not object to the plaintiffs' motion, filed pursuant to RCFC 15(d), to supplement its complaint to allow for the Court's resolution of costs incurred. Likewise, in Systems Fuels, Inc. v. United States, No. 03-

2624C (Braden, J.), and Wisconsin Electric Power Co. v. United States, No. 00-697C (Merow, S.J.), we agreed not to oppose motions for leave to allow the plaintiffs to file either amended or supplemental complaints, where those motions and amended or supplemental complaints were filed at an appropriate time in the discovery process. In those cases, and because the Government had access to supporting documentation for the past actual costs encompassed by the supplemental or amended pleading prior to the close of discovery, we agreed not to oppose the requests to litigate costs that post-dated the filing of the initial complaint in each of those cases, but pre-dated the new complaint filed with the Court.

PG&E's reliance upon the Judge Lettow's decision in Tennessee Valley Authority v. United States, 60 Fed. Cl. 665 (2004), among other cases, is misplaced. In that decision, entered before the Federal Circuit's Indiana Michigan decision, the Court reached its conclusion regarding the scope of damages in a partial breach case based upon its application of the Section 26(b) of the Restatement (Second) of Judgments.[3] Id. at 678, n.16. As a result, no amended or supplemental complaint ever was filed by the plaintiff in TVA. However, in Indiana Michigan, the Federal Circuit found that Subsection 26(e) of the Restatement (Second) of Judgments, rather than Subsection 26(b), applies to these partial breach actions. Indiana Michigan, 422 F.3d at 1378 (plaintiff's "grievance falls within subsection (e)'s exception for injury experienced during the execution phase of a continuing contract"). Pursuant to Subsection 26(e), damages run only to the date of the complaint.

The consistency in all of the cases that post-date Indiana Michigan is that the plaintiffs followed the simple procedural requirement of seeking leave to file an amended or supplemental

---

[3] All of Judge Lettow's decisions cited in PG&E's brief pre-date Indiana Michigan.

complaint pursuant to RCFC 15(d) and only sought past costs that had been disclosed to the Government and supported with actual cost documentation prior to the close of discovery. Here, PG&E inexplicably has failed to seek leave to file an amended or supplemental complaint, and has sought damages beyond December 31, 2004, the last date upon which the Government was presented with actual past costs, rather than future cost estimates. See, e.g., Deposition of Robert Kapus, September 28, 2005, at 314:8-13, 321:24-322:3, 335:6-7 (App. 1-4)[4]; Deposition of L. Jearl Strickland, August 18, 2005, at 73:12-15; 78:6-10 (App. 5-7).[5] This Court lacks jurisdiction to entertain damages associated with partial breaches occurring after PG&E's complaint was filed. Newman-Green, 490 U.S. at 830. In light of that fact and the Federal Circuit's directives in Indiana Michigan, PG&E's assertions that it can merely litigate post-complaint costs in this case through a date of its own choosing are wholly unsupported. If PG&E seeks leave to file a supplemental or amended complaint in this case in the future, we will address the appropriateness of that request at that time, considering its timing, the fact that fact discovery has concluded, and the deficiencies in its existing production.

Finally, the Government strongly disputes PG&E's contention that its alleged damages are, somehow, more certain than those alleged by Indiana Michigan. In addition to issues relating to PG&E's failure of proof, there are significant causation issues presented by PG&E's

---

[4] "App. __" refers to the appendix attached to this motion.

[5] Even then, PG&E's production of "actual costs" support for 2004 and earlier is woefully deficient. For example, PG&E has failed to produce information sought by the Government that concerns its internal labor costs that are being passed through to damages. Without the information requested by the Government, we are unable properly to analyze that significant portion of PG&E's claim. We anticipate that PG&E's failure to produce meaningful responses to certain discovery requests will be the subject of a future motion *in limine*.

alleged past damages. Moreover, in its “Opposition To Motion For Summary Judgment On Counts II and III Of PG&E’s Complaint,” PG&E noted the introduction of a bill in the United States Senate that would “require DOE to take title to utility spent fuel at the various existing reactor sites, and thereupon assume all financial and other responsibility for maintenance of spent fuel.” Id. at 10. This bill is but one example of something that could arise that would have a substantial effect upon the costs that PG&E will incur in the future. Accordingly, the rationale that the Federal Circuit utilized in Indiana Michigan, barring recovery of future damages in a partial breach case, is sensible. Of course, the issues affecting PG&E’s claim appropriately are addressed at trial, and not in this briefing.

## CONCLUSION

For the foregoing reasons, and for the reasons discussed in our other briefing upon this issue, we respectfully request that the Court deny PG&E's motion to establish a time frame for damages as procedurally improper and, instead, strike those portions of Dr. Cornell's report involving opinions associated with alleged damages incurred or estimated to be incurred after January 28, 2004.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/ Harold D. Lester, Jr.
HAROLD D. LESTER, JR.
Assistant Director

s/John C. Ekman
JOHN C. EKMAN
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, NW
Washington, D.C. 20530
Tel: (202) 353-0897
Fax: (202) 307-2503

OF COUNSEL:

JANE K. TAYLOR
Office of General Counsel
U.S. Department of Energy
1000 Independence Ave., S.W.
Washington, D.C. 20585

SCOTT DAMELIN
SHARON SNYDER
JOSHUA E. GARDNER
TODD J. COCHRAN
Civil Division
Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530

January 9, 2006

Attorneys for Defendant

# APPENDIX

# CONDENSED TRANSCRIPT & WORD INDEX

## DEPOSITION OF ROBERT KAPUS, VOL. II

**PG&E VS. UNITED STATES**

**SEPTEMBER 29, 2005**

COPY

BARKLEY
Court Reporters

(310) 207.8000 Los Angeles
(949) 955.0400 Orange County
(415) 433.5777 San Francisco
(916) 922.5777 Sacramento
(408) 885.0550 San Jose
(951) 686.0606 Inland Empire
(818) 702.0202 San Fernando Valley
(858) 455.5444 San Diego
(760) 322.2240 Palm Springs

SAN FRANCISCO, CALIFORNIA, SEPTEMBER 29, 2005
AFTERNOON SESSION
---o0o---
(Reporter marked Exhibit No. 35 for identification.)
(Reporter marked Exhibit No. 36 for identification.)
MR. EKMAN: All right. Back on.
Q. Good afternoon, Mr. Kapus. You have been handed two exhibits, Exhibit 35, which is a document entitled "DCPP ISFSI Damages Prior to Expert Analysis/initial Disclosures April 22, 2005." And Exhibit 36, which is something called the "Diablo Canyon Power Plant Independent Spent Fuel Storage Installation Cost Estimate April 2005."
A. That's correct.
Q. Have you seen Exhibit 35 before?
A. Yes.
Q. When did you see Exhibit 35?
A. After the submittal of the claim.
Q. And is this a similar document that was prepared by Charles River?
A. Yes, it is.
Q. And have you seen Exhibit 36 before?
A. Yes.
Q. Did you prepare Exhibit 36?



A. Yes, I did.
Q. And when did you prepare Exhibit 36?
A. In the March, April time frame.
Q. Just as we discussed with the Humboldt Bay exhibits that you prepared, was -- did the information contained in Exhibit 36 exist in other formats prior to the preparation of Exhibit 36?
A. Yes, it did.
Q. Did it exist in similar formats?
A. Yes.
Q. Had you -- prior to preparing Exhibit 36, have you ever prepared a cost estimate for the Diablo Canyon ISFSI?
A. No.
Q. You had not?
A. That's correct.
Q. Have you ever prepared a summary of past costs? And by "past," I mean the ones 2004 and earlier.
A. Yes.
Q. In a similar format to Exhibit 36?
A. Yes.
Q. But you had never done a future estimate for Diablo Canyon?
A. No, I have.
Q. Just not in this format?
A. In a similar format to this.



Q. And did you draw upon that past work in preparing Exhibit 36?
A. To a large degree, yes.
Q. To what degree no? Can you give me an example of something that was new on this page that hadn't existed before?
A. The California sales tax, a serious look at the escalation in the contract, the "Coastal Commission," "DB Neish Coastal Commission" line items, like the NRC inspection during construction, and the NRC inspectors after the ISFSI had been constructed. Those are the major ones that were added in this particular document.
Q. Otherwise it pretty well tracks prior documents?
A. Yes.
Q. Have you done any cost estimate since, as you had with at least one of the Humboldt Bay estimates? Have you done a more recent cost estimate for the Diablo Canyon ISFSI?
A. It is in process right now.
Q. And what's the purpose of that document?
A. To update information that we have received since we prepared this document. We have actually received the proposals and issued the contract for the construction of the ISFSI and the upgrades of the roads.
Q. So that's to have the -- what are in here as estimates actually tie up to a contract?



A. To a contract.
Q. Any -- is that being prepared in connection with this litigation?
A. No.
Q. That's just in connection with your --
A. With our process of analyzing our costs that we need to have for Diablo Canyon in any budget year.
Q. Right. I think what we can do is as we are going through this -- and, again, representing the 2005 and ahead are technically estimates; is that right?
A. Yes, that is correct.
Q. And '04 and earlier are actuals?
A. Yes.
Q. I'll ask -- I think that would be the best way to say if there's actual contracts now that would tie up the costs. Is that all right with you?
A. Okay.
Q. It may only be that one, but we'll see. All right. We have a similar issue between 35 and 36 where we saw in Humboldt Bay, where the ISFSI costs in 35 are different from those in 36?
A. Yes.
Q. And do you believe that 36 was used to help generate 35?
A. Yes, I do.





2

differentiations based on the type of work being performed at Humboldt Bay?
A. Yes.
Q. And is there a reason that you all don't do it at the two facilities?
A. The main reason is that Humboldt Bay, the ISFSI is a decommissioning cost, and we want to monitor that in a level of detail that could be reviewed by an independent reviewer later in minor scopes.
Q. And why -- why would that be important?
A. As part of your decommissioning trust process, there is the possibility of an independent review of all of your charges that have been incurred.
Q. All right. Let's start with PG&E labor. How many employees does Diablo Canyon have?
A. I don't know the exact number.
Q. Do you know an approximate number?
A. No, I don't.
Q. Do you know how many, for instance, in 2004 billed time, charged time to the ISFSI?
A. I would estimate somewhere in the order of 30 to 40 people of different levels have charged time to the project during that time frame.
Q. Are the folks who work on the ISFSI at PG&E, are they dedicated to the ISFSI?

Page 319

A. Some are.
Q. How many do you think are dedicated to the ISFSI?
A. Ten, 12.
Q. And this is a question I asked yesterday with Humboldt Bay. If I were interested in knowing how many people billed and charged time since 1998 and how much time they have charged in any given year, is that information available on the SAP system?
A. Yes, it is.
Q. And how long would it take to generate that information?
A. Probably about two days. It is a significant amount of information.
Q. Are there any charges in PG&E labor that are not actual charges? In other words, where it is just somebody's time being billed at 100 percent?
A. No.
Q. So everybody who is involved is charging their time?
A. Yes.
Q. And if they are doing something else, they should be charging their time to something else?
A. Yes.
Q. Lines 10 through 20 represent "Other Contract Support." Do you see that?
A. Yes.

Page 320

Q. From '98 to 2004, all of the costs are in line 20 called "Miscellaneous Other Contracts"?
A. That's correct.
Q. I am just going to say this to keep it going quickly. As I understand it, the reason for that is up until 2004, you all didn't differentiate between these various contractors?
A. No, that's not correct.
Q. Then why is it everything is in the "Miscellaneous Other Contracts" as opposed to Bechtel?
A. The actuals, I just took the bottom line numbers of the contracts. In 2005 I was using my forecast document to come up with the dollars by the different contractors.
Q. So, in fact, there are, then, individual charges that are associated with, perhaps, these various contractors in '98?
A. Yes.
Q. '99?
A. Yes.
Q. You just decided to aggregate them?
A. Yes.
Q. How hard would it be to unaggregate them?
A. It's not an extremely difficult task. It is just somewhat time-consuming.
Q. All right. When did you put together the estimates that you applied in '05 and '06?

Page 321

A. The '05 would have been in the mid to late '04 time frame, and the '06 would have been in the early '05 time frame, late '04 time frame.
Q. And you just took the work that you did --
A. Yes.
Q. How did you make these estimates for these different contractors?
A. Jearl Strickland actually provided a lot of the information for these contractors.
Q. Was that based on contracts?
A. Yes.
Q. Are some of these contracts time and materials?
A. There could be some in there.
Q. And there could be some fixed price, also?
A. Yes.
Q. Line 23 there is a $22,900 charge that sort of hangs out there in '05?
A. Yes.
Q. What is that for?
A. It could be a retention payment. Exactly what it is, I am not sure.
Q. Should that be -- we should be able to tie that to the Holtec contract?
A. Yes, I believe so.
Q. Line 33, which is called "Bonds/letter of Credit" --

Page 322

Q. And then how did you ultimately cost it up?
A. I would have to look on my notes to make sure which option we went with.
Q. NRC fees from 2002 to 2004, those are actuals, right?
A. That's correct.
Q. From 2005 and forward, those are estimates?
A. They are estimates, that's correct.
Q. How did you arrive -- how were these estimates arrived at?
A. 2005 was arrived at by information that the NRC had provided us of what they estimated their fees were going to be for this particular year, and beyond that is based on the NRC fees for an ISFSI escalated.
Q. And where did you get the information for the NRC's fees for an ISFSI?
A. There's an NRC document that lists the fees for different -- all the different fees that they have, and there's a section in there that refers to an ISFSI.
Q. You picked out the escalation?
A. Yeah.
Q. You escalated it?
A. Yes.
Q. That's not in the NRC document?
A. No.
Q. NRC inspections, how are those estimates reached?



A. Actually, again, talking to Southern Cal Edison, when they have actually experienced the NRC coming out and doing annual inspections. We got an idea of how many people, and how long they were there and how often they came.
Q. And you cost it?
A. Yes.
Q. With an escalation, 3 percent, it looks like?
A. Yes.
Q. "ISFSI Construction Pad Security," did you say this was one of the topics that you now had a contract for?
A. Yes.
Q. Are those consistent with the contract price?
A. No.
Q. What is the contract price now?
A. My understanding is it is about 3 million more than what's on this document.
Q. And what -- over what period of time will those costs --
A. '05, '06, I believe.
Q. Late '05, obviously?
A. Yes.
Q. Has construction started?
A. Not that I know, no.
Q. Is there anything above for future where there are contracts that didn't exist at the time this was put



together?
A. No.
Q. What about the road upgrades, does that now have a contract?
A. It is part of the same contract as the construction.
Q. When you say 3 million more, that's 3 million for aggregate?
A. Yes, for the aggregate of these two line items.
Q. The ISFSI is loaded through the use of a crawler?
A. That's correct.
Q. As opposed to rail?
A. Yes.
Q. "Fuel Loading Campaigns," how are these estimated?
A. They are estimated -- actually, we received a proposal from Holtec on the cost to load a canister, and then this has been modified to reflect whether it is eight canisters or some other number of canisters.
Q. Just by multiplication?
A. Yes.
Q. Do you know if it's -- do you know if that's the proper way to do it, that it is by per-canister basis?
A. When they submitted the proposal, it will cost you this much per canister.
Q. Do you know if you are going to use Holtec --
A. No, we don't.



Q. It is possible you could use PG&E people?
A. We could use PG&E people, yes.
Q. It is possible that Holtec is not even the best price, right?
A. That could be.
Q. When do you think -- given that the loading here is listed as 2007, I think it is late 2007, when would you enter into the contract with that? To the extent you are going to contract it out, when would you do that?
A. I would imagine it would be writing the request for proposals in the first, second quarter of '06.
Q. So you'll have to make a decision by then whether to do it internally or farm it out?
A. Yes.
Q. "ISFSI Security," $20 million beginning in 2007, how is that arrived at?
A. Jearl actually received from the security operations at Diablo a number of officers that would be required, incremental officers that would be required for the ISFSI security, and I took that number times their billing rate and allowance for materials for testing and all that kind of stuff, and that's the basis of the number.
Q. And would those be PG&E employees?
A. You know, I don't know if the guards at the -- the actual armed guards at Diablo are PG&E or if they are





4

# CONDENSED TRANSCRIPT & WORD INDEX

## DEPOSITION OF LUTHER JEARL STRICKLAND, JR.

**PG&E VS. UNITED STATES**

**AUGUST 18, 2005**

COPY

BARKLEY
Court Reporters

(310) 207.8000 Los Angeles
(949) 955.0400 Orange County
(415) 433.5777 San Francisco
(916) 922.5777 Sacramento
(408) 885.0550 San Jose
(951) 686.0606 Inland Empire
(818) 702.0202 San Fernando Valley
(858) 455.5444 San Diego
(760) 322.2240 Palm Springs

5

A Bruce reports to me. And I think the best way to explain it is that he had some project manager responsibilities prior to my involvement with the project in July of 2000.
And in turn, once I took over, then he had the responsibility for finalizing negotiations of the Holtec contract. And in turn, has been my project construction manager. Such that he's been responsible for developing design that would now be over the construction aspects.
Q Now, this estimate is dated April 2005. Does that mean that the 2005 and forward costs are all estimates?
A That's correct.
Q And then should the 2004 and earlier all be actuals?
A Yes.
Q Have you updated this information at all since April 2005?
A I have not.
Q Do you know if anyone else has updated this information since April 2005?
A I don't think so. It may have been, but I don't have direct knowledge.

Page 73

Q Do you have indirect knowledge that something was done?
A I know that something needs to be done. Just like I noted with construction costs are projected to be higher and other areas such as escalation under the Holtec contract, that that number is going to be higher than what's presented here.
So as those numbers become clearer, then we'll have to revise the total cost.
Q And do you know if anybody at PG&E is currently in the process of updating the estimates?
A I know I have the responsibility to do so.
Q It's your job?
A That's correct.
Q Has somebody asked you to update the information on this spreadsheet?
A No. Not yet.
Q You're expecting that will happen however?
A I've committed to -- I've told people I will update this.
Q That's your own initiative?

Page 74

A That's my own initiative.
Q Who did you tell that you would update this?
A My superior, which is Rod Curb, and Donna Jacobs, who is the new vice president.
Q And when are you anticipating the update to occur?
A Within the next 60 days.
Q Is there any specific reason in Exhibit 2 why you take the costs out to 2015?
A There's no specific reason.
Q On Exhibit 2 you can see line 34. Do you see that it says, "Escalation from 12/2001"?
A Yes.
Q Since you mentioned escalation, I'll ask about it.
Do you know why -- why is 12/2001 a relevant date to put in that line item?
A It's part of the actual contract with Holtec. That that was the point in time that their bid price for the components was established.
And so from that point, then, this established indices that would be used to be able to track what escalation should be.

Page 75

And so there's a series of formulas that then go through and set a point in time in the future when materials procured, when verification starts and so forth that you would then compute escalation against.
Q So it's not a fixed escalator?
A No, it's not a fixed escalator; it's based on indices.
Q It's a fixed formula?
A It's a fixed formula.
Q But the escalator can change based on changes, for example, the prices of materials?
A Absolutely.
Q Were you involved in the negotiation of the Holtec contract?
A On a limited basis.
Q Whose responsibility was the negotiation process with Holtec?
A It was assigned to Bruce Patton, Lee Cassidy and Larry Womack.
Q I want to go through the spreadsheet, and it's a lot of information and I'll try not to do it too slowly. I have a lot of other stuff to talk about, too.
A No problem.

Page 76

Q But I want to get a sense for what different things are happening here?
A Okay.
Q Let's start with line 7, which is PG&E labor.
Do you know what -- what work is represented by that line item?
A PG&E labor, what's included there is my cost, Bruce Patton, Rich Hagler, Terry Grebel, for licensing. Bruce Patton, Rich Hagler were engineering. It also includes my clerical support. So it's the direct cost of PG&E labor associated with the project.
Q Would that also include work, for instance, by the geotechnical, geosciences folks at PG&E headquarters?
A That's correct. For direct employees, not the consulting contracts that they have established.
Q That would be separate?
A That's separate.
Q Do you spend 100 percent of your time on this ISFSI project?
A That's correct.
Q And does Mr. Patton?

Page 77

A Yes.
Q Was Mr. Patton -- did Mr. Patton's employment pre-exist the ISFSI?
A Yes. I think he has 35 years with the company.
Q And for these costs, again, 2004 is actual and 2005 and 2006 would be estimated?
A That's correct.
Q Did you estimate the 2005 and 2006?
A Yes, I did.
Q How did you -- what's the basis for those estimates?
A The basis is in looking at the activities that needed to be completed in 2005 and 2006. And in turn, given my best projection of what the cost would be associated with those activities.
Q Is there a reason that the numbers go from the 800, $900,000 range from the prior two years up to 1.5 and nearly $2 million in '05 and '06?
A Yes.
Q What's the reason?
A The basis is that as we move into the implementation phase, we are having to pull other

Page 78

resources from the Diablo Canyon plant which includes scheduling, work planning, other people from the engineering department to develop design change packages and so forth. So it becomes more labor intensive of PG&E employees.
Q And, again, all the billing information, for lack of a better word -- I'm a lawyer, I'll call it billing information -- will be reflected in PG&E's computer systems?
A Absolutely.
Q And all of that is internal labor, the PG&E labor line?
A That's correct.
Q Do you know if these cost categories or these -- each year includes overheads, payroll taxes, benefits as well as straight salary?
A My understanding is that a rate is established for each PG&E employee within a specific role, development, however you want to define that. And that that rate includes some portion of overhead. I don't know the exact formula.
Q Would Mr. Kapus have knowledge of that?
A Mr. Kapus should have direct knowledge.
Q And other than the information contained

Page 79

in -- in terms of the billing on PG&E's computer system, accounting system, is there any other documents that would support the labor costs, the incurred costs?
A Using the computer accounting is really the best way. That way it gives you the names, dates of services and so forth.
Q What kind of -- do you know what kind of system is used?
A It's SAP.
Q All right. Let's talk about other contract support.
A Okay.
Q It looks like all of these are estimates. Is that right?
MR. STOUCK: Objection to form. Vague.
BY MR. EKMAN:
Q And I'm talking about lines 10 through 19.
A They are essentially estimates at this point in time that we have existing work orders with these various firms for specific activities, and so they are best estimates at this point.
Q So are there existing work orders -- and let's talk about actually ten through 15, where

Page 80

CERTIFICATE OF SERVICE

I hereby certify that on this 9th day of January, 2006, a copy of foregoing "DEFENDANT'S RESPONSE TO PG&E'S MOTION TO ESTABLISH TIME FRAME FOR CONSIDERATION OF FUTURE DAMAGES" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/John C. Ekman