# In the United States Court of Federal Claims

No. 04-74C
(into which has been consolidated No. 04-75C)

(E-Filed: January 25, 2006)

| | |
|---|---|
| PACIFIC GAS AND ELECTRIC COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | Motion to Compel the Production of Documents and Testimony Withheld as Privileged; Attorney-Client Privilege; Whether Description in Privilege Log is Sufficient to Invoke Attorney-Client Privilege; Work Product Doctrine; Whether Documents Prepared for Regulatory Proceedings were Prepared In Anticipation of Litigation; Whether the Work Product Doctrine Applies to Certain Responses to Deposition Questions |

Jerry Stouck, Washington, DC, for plaintiff. Robert L. Shapiro, Washington, DC, of counsel.

John Clifford Ekman, with whom were Peter D. Keisler, Assistant Attorney General, David M. Cohen, Director, and Harold D. Lester, Jr., Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, for defendant. Jane K. Taylor, Office of General Counsel, United States Department of Energy, Washington, DC, and Scott R. Damelin, Sharon A. Snyder, Joshua E. Gardner, and Todd J. Cochran, Civil Division, Department of Justice, Washington, DC, of counsel.

OPINION

HEWITT, Judge

The court has before it Defendant's Motion to Compel the Production of Documents and Deposition Testimony Improperly Withheld on the Basis of Privilege (Def.'s Mot. or Motion), PG&E's Response to Defendant's Motion to Compel the Production of Documents and Testimony Withheld as Privileged (Pl.'s Resp. or Response), and Defendant's Reply to Plaintiff's Response to Defendant's Motion to Compel the Production of Documents and Deposition Testimony Improperly Withheld on the Basis of Privilege (Def.'s Reply or Reply). Defendant moves the court "to compel the production of documents and deposition testimony improperly withheld by plaintiff . . . on the basis of the attorney-client privilege and the work product doctrine." Def.'s Mot. at 1.

Defendant's Motion lists six categories of documents that it moves the court to compel:

> (1) documents related to public regulatory proceedings, including, but not limited to, PG&E's rate proceedings before the California Public Utilities Commission [(CPUC)], proceedings before the California Coastal Commission [(CCC)], and licensing proceedings before the Nuclear Regulatory Commission [(NRC)]; (2) memoranda prepared for the Board of Directors which contain business and regulatory information related to the public regulatory proceedings; (3) memoranda, correspondence, and reports drafted by non-lawyer PG&E employees sent to non-lawyer PG&E employees which happen to [provide a courtesy copy (cc) to] PG&E lawyers, among others; (4) memoranda, correspondence, and reports drafted by non-lawyer PG&E employees sent to non-lawyer PG&E employees, as well as counsel, which in the description indicates that the document was "provided at request of counsel"; (5) documents that purport to be attorney-client protected but contain no [indication of] author or recipient; and (6) documents sent to regulatory entities.

Def.'s Mot. at 2. With respect to testimony, defendant states that "PG&E counsel improperly instructed its deponents not to answer questions regarding its damages claim and whether the deponent had discussion with PG&E's experts, during their depositions," id., and moves the court to allow defendant to "re-open the depositions of Messrs. Pulley, Womack and Kapus," id. at 19.

Subsequent to the filing of defendant's Motion, plaintiff and defendant reached an agreement with respect to most of the documents in categories three, four, five, and six.[1] See Def.'s Reply at 3-5. The production of documents listed in categories one (documents related to public regulatory proceedings) and two (memoranda prepared for the Board of Directors), with the exception of Document No. 683, remains in dispute. Id. at 5-7. Whether it was proper for plaintiff to instruct its witnesses not to respond during their depositions also remains in dispute. See id. at 8-11. Finally, in its Reply, defendant argues for the first time that the court "should order PG&E to produce any documents prepared for its regulatory proceedings by any third parties." Id. at 8. The court will rule on each of these items in turn.[2]

## I. Documents Related to Public Regulatory Proceedings

### A. Summary of the Parties' Arguments

In its Motion, defendant states that "PG&E has improperly asserted work product privilege over more than two hundred documents that were prepared for presentation before one of several regulatory agencies that are charged with overseeing the operations at PG&E – the [California Public Utilities Commission (CPUC)], the [Nuclear Regulatory Commission (NRC)], and the [California Coastal Commission (CCC)]." Def.'s Mot. at 5. These documents, defendant argues, were created as a "necessar[y] part of the ordinary course of [plaintiff's] business. The 'primary motivating purpose' behind the creation of the documents for these proceedings is not to assist in pending or impending litigation but rather to further PG&E[']s business . . . [by] set[ting] rates, . . . licens[ing] its operations, or . . . deal[ing] with its coastal property." Id. at 8-9. Thus, defendant concludes, "[b]ecause the preparation of these documents was clearly necessary based on public requirements, they are not protected by the work product doctrine and must be produced." Id. at 8.

---

[1]Defendant states that plaintiff "indicated that it would produce 29 of the 33 documents" in category six, and that defendant "considers the remaining four documents (Nos[.] 195, 196, 229, and 722) to fall within category one . . . , documents related to public regulatory proceedings." Def.'s Reply at 3. The documents listed in category one are still in dispute. While Document Nos. 195, 196, and 229 are already listed in category one, Document No. 722 is not. See Def.'s Mot. Exhibit (Ex.) A. The court considers Document No. 722 a part of category one for the purposes of this Motion.

[2]The court uses Exhibit A to defendant's Motion to determine the exact document numbers in plaintiff's Revised Privilege Log that remain in dispute in each category.

Plaintiff responds that "'[t]he work product privilege may be claimed for material prepared for administrative proceedings . . . as well as for proceedings before courts of record.'" Pl.'s Resp. at 3-4 (quoting Duplan Corp. v. Deering Milliken, Inc., 61 F.R.D. 127, 131 (D.S.C. 1973)). Plaintiff states that this fact "alone disposes of most of the government's complaints about PG&E's privilege assertions." Id. at 4. Indeed, according to plaintiff, the administrative proceedings "conducted by these agencies are overseen by commissioners and administrative law judges appointed under federal and state constitutional authority . . . , [and] each of these proceedings provides an opportunity for interested parties to intervene and participate in hearings concerning PG&E's filings before the commission." Id. at 4-5. Thus, plaintiff argues that these "[a]dministrative proceedings . . . constitute litigation" and documents prepared in connection with them should therefore be protected as work product. Id. at 5.

After describing why each type of administrative proceeding at issue should be characterized as "litigation" for the purposes of the work product doctrine, see id. at 5-7, plaintiff states that

> [t]he government argues that these documents had multiple purpose[s] . . . because PG&E's real interest was the underlying rates or licenses that are the subjects of the proceedings. But this argument is too broad. No plaintiff engages in litigation for the litigation itself. Even here, PG&E's ultimate objective is obtaining a damages recovery, not engaging in litigation. Nor can the government properly distinguish between a public utilities commission rate case filing or licensing application and the administrative litigation over such filings and applications. Those filings are akin to complaints in litigation before this [c]ourt. The subsequent litigation is all part of a single litigation proceeding.

Id. at 8 (citation omitted). Moreover, plaintiff argues that the documents at issue "do not lose their privileged status simply because such litigation is routine for PG&E." Id. at 8. Finally, plaintiff asserts that

> [t]he government's claim that the documents are not protected by the work product doctrine because they were created in response to specific regulatory requirements misstates the law and the nature of the documents at issue. . . . [T]he work product doctrine does not protect material assembled "[] pursuant to public requirements unrelated to litigation . . . ." Thus, the existence of regulations concerning documents related to

> administrative litigation does not prevent a document from being protected by the work product doctrine.

Id. at 9 (quoting United States v. El Paso Co., 682 F.2d 530, 542 (5th Cir. 1982)) (emphasis added in plaintiff's Response). Plaintiff therefore concludes that these documents, "created in anticipation and in support of adversarial regulatory actions," should be protected under the work product doctrine. Id. at 9.

In its Reply, defendant argues that

> [w]hile PG&E states that the documents it has withheld are documents prepared for administrative proceedings at the CPUC, NRC, and CCC, PG[&]E has failed to meet its burden of establishing that "the primary motivating purpose" behind the creation of the documents was to assist in pending or impending litigation. PG&E has not met its burden because it cannot. The primary motivating purpose behind the creation of this category of withheld documents is to set its rates before the CPUC, to license its operating facilities before the NRC, or to establish permits before the CCC. The Government does not deny that there may be litigation associated with these proceedings. However, . . . [t]he test is not whether there may be litigation associated with the submission of documents to regulatory entities, but rather whether the documents were prepared primarily for litigation or alternatively, for some business reason. PG&E has not met this test . . . .

Def.'s Reply at 6. Thus, defendant concludes, "the [c]ourt should order all documents withheld by PG&E that are related to regulatory proceedings before the CPUC, the NRC, and the CCC to be produced immediately." Id.

B. Discussion

1. The Work Product Doctrine

The work product doctrine, codified for the United States Court of Federal Claims in Rule 26(b)(3) of the Rules of the Court of Federal Claims (RCFC),[3] is intended to

---

[3]RCFC 26(b)(3) provides that:

> a party may obtain discovery of documents and tangible things otherwise

(continued...)

preserve a zone of privacy in which a lawyer can prepare and develop legal strategy "with an eye toward litigation," free from unnecessary intrusion by adversaries. Hickman v. Taylor, 329 U.S. 495, 510-511 (1947). The work product doctrine provides for the qualified protection of documents and tangible things prepared by or for a party or that party's representative "in anticipation of litigation or for trial." RCFC 26(b)(3). "At its core, the work product doctrine shelters the mental processes of . . . attorney[s], providing a privileged area within which [they] can analyze and prepare [their] client's case." United States v. Nobles, 422 U.S. 225, 238 (1975); see also Allen v. Chicago Transit Auth., 198 F.R.D. 495, 500 (N.D. Ill. 2001) ("Th[e] intent [of the work product doctrine] is to protect the adversarial process by providing an environment of privacy in which a litigator may creatively develop strategies, legal theories, and mental impressions outside the ordinary liberal realm of federal discovery provisions, thereby insuring that the litigator's opponent is unable to ride on the litigator's wits.").

However, the work product doctrine is not an absolute bar to discovery of materials prepared in anticipation of litigation. Work product can be produced

> upon a showing that the party seeking discovery has substantial need of the materials in the preparation of the party's case and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means. In ordering discovery of such materials when the required showing has been made, the court shall protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation.

---

[3](...continued)

> discoverable under subdivision (b)(1) of this rule and prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent) only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of the party's case and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means. In ordering discovery of such materials when the required showing has been made, the court shall protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation.

RCFC 26(b)(3). Because RCFC 26(b)(3) and Rule 26(b)(3) of the Federal Rules of Civil Procedure are identical, the court uses interpretation of the latter by other federal courts as persuasive authority.

RCFC 26(b)(3). Thus, RCFC 26(b)(3)

> provides that, even if the party seeking discovery of information otherwise protected by the work product doctrine has made the requisite showing of need and undue hardship, courts must still protect against the disclosure of mental impressions, conclusions, opinions, or legal theories of an attorney and his agents. Stated differently, [RCFC] 26(b)(3) establishes two tiers of protection: first, work prepared in anticipation of litigation by an attorney or his agent is discoverable only upon a showing of need and hardship; second, "core" or "opinion" work product that encompasses the "mental impressions, conclusions, opinion, or legal theories of an attorney or other representative of a party concerning the litigation" is "generally afforded near absolute protection from discovery." Thus, core or opinion work product receives greater protection than ordinary work product and is discoverable only upon a showing of rare and exceptional circumstances.

In re Cendant Corp. Sec. Litig., 343 F.3d 658, 663 (3d Cir. 2003) (citing, inter alia, In re Ford Motor Co., 110 F.3d 954, 962 n.7 (3d Cir. 1997)).

"Like all privileges, the work product doctrine must be strictly construed." Mims v. Dallas County, 230 F.R.D. 479, 484 (N.D. Tex. 2005) (citing McCook Metals L.L.C. v. Alcoa, Inc., 192 F.R.D. 242, 260 (N.D. Ill. 2000) (work product doctrine "significantly restricts the scope of discovery and must be narrowly construed in order to aid in the search for the truth") and Republican Party of N.C. v. Martin, 136 F.R.D. 421, 429 (E.D.N.C. 1991) (same)); see also Allen, 198 F.R.D. at 500 ("Only by strictly construing the elements of work product, can the doctrine's original intent be best served."). "The burden is on the party who seeks work product protection to show that the materials at issue were prepared by its representative in anticipation of litigation or for trial." Mims, 230 F.R.D. at 484 (citations omitted). Once this initial burden is met, the party seeking discovery must establish a "substantial need of the materials in the preparation of the party's case and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means." RCFC 26(b)(3). "[A]ny doubts, ambiguities, uncertainties, or silences as to the scope of the work product Rule should be resolved in favor of the Rules' overall policy of liberal discovery." Stout v. Ill. Farmers Ins. Co., 150 F.R.D. 594, 602 (S.D. Ind. 1993), aff'd, 852 F. Supp. 704, 705 (S.D. Ind. 1994).

a. In Anticipation of Litigation

"The threshold determination in a case involving a claim of work product privilege is whether the material sought to be protected from discovery was prepared in anticipation of litigation" or was prepared in the ordinary course of business or for other purposes. Allendate Mut. Ins. Co. v. Bull Data Sys., Inc., 145 F.R.D. 84, 86 (N.D. Ill. 1992). "Documents created for other purposes that prove useful in subsequent litigation are not attorney work product; similarly, documents that are routinely prepared in the ordinary course of business are outside the scope of work product protection." In re Gabapentin Patent Litig., 214 F.R.D. 178, 184 (D.N.J. 2003); see also Nat'l Union Fire Ins. Co. v. Murray Sheet Metal Co., 967 F.2d 980, 984 (4th Cir. 1992) ("The document must be prepared because of the prospect of litigation when the preparer faces an actual claim or a potential claim following an actual event or series of events that reasonably could result in litigation. Thus, we have held that materials prepared in the ordinary course of business or pursuant to regulatory requirements or for other non-litigation purposes are not documents prepared in anticipation of litigation within the meaning of Rule 26(b)(3)."); Gutter v. E.I. Dupont de Nemours & Co., No. 95-CV-2152, 1998 WL 2017926, at *3 (S.D. Fla. May 18, 1998) ("Documents created for business reasons which . . . were not intended to assist in prosecution or defense of a lawsuit, are not protected from discovery by the . . . work product privileges.") (citing In re Baimco Sec. Litig., 148 F.R.D. 91 (S.D.N.Y. 1993)). "Furthermore, the prospect of litigation may not be so remote as to be a 'mere possibility.'" Weil Ceramics & Glass, Inc. v. Work, 110 F.R.D. 500, 505 (E.D.N.Y. 1986). "[T]he mere fact that a discovery opponent anticipates litigation does not qualify an 'in-house' document as work product." Allen, 198 F.R.D. at 500. "It is often difficult to difficult to determine with precision when a particular attorney's work is [developed] 'in anticipation of litigation' rather than '. . . in the ordinary course of business.'" Int'l Ins. Co. v. Certain Underwriters at Lloyd's London, No. 88 C 9838, 1990 WL 205461, at *6 (N.D. Ill. Nov. 27, 1990) (citing Janicker v. George Washington Univ., 94 F.R.D. 648, 650 (D.D.C. 1982)).

Because the phrase "in anticipation of litigation" "eludes precise definition," there are "a variety of approaches and conflicting decisions in the case law." Harper v. Auto-Owners Ins. Co., 138 F.R.D. 655, 659 (S.D. Ind. 1991); see also Allendate, 145 F.R.D. at 86 ("The determination of whether materials are prepared in anticipation of litigation . . . , while central to the work product doctrine, eludes precision."); United States v. El Paso Co., 682 F.2d 530, 542 (5th Cir. 1982) ("[W]e concede that determining whether a document is prepared in anticipation of litigation is a slippery task.").

"Under one approach, this determination requires an inquiry into 'the primary motivational purpose behind the creation of the document.'" In re Raytheon Sec. Litig., 218 F.R.D. 354, 357 (D. Mass. 2003) (quoting United States v. Gulf Oil Corp., 760 F.2d 292, 296 (Temp. Emer. Ct. App. 1985) (involving documents prepared on behalf of a

company at the requirement of its auditors). Under this approach, "if the primary motivating purpose behind the creation of the document is not to assist in pending or impending litigation, then a finding that the document enjoys work product immunity is not mandated." Gulf Oil Corp., 760 F.2d at 296. Defendant urges the court to adopt this standard for determining whether a document was prepared "in anticipation of litigation," and points out that this court has used "'the primary motivating purpose' standard to analyze whether a document was prepared in anticipation of litigation." Def.'s Mot. at 7 (citing Cabot v. United States, 35 Fed. Cl. 442, 445 (1996)).

"Under a second approach, the work product doctrine protects a broader category of documents." In re Raytheon Sec. Litig., 218 F.R.D. at 357. This approach is often termed the "because of" standard, which states that "[w]here a document was created because of anticipated litigation, and would not have been prepared in substantially similar form but for the prospect of that litigation, if falls within [the protections afforded by the work product doctrine]." United States v. Adlman, 134 F.3d 1194, 1195 (2d Cir. 1998) (emphasis added). In Adlman, the Second Circuit elaborated on the "because of" approach:

> The formulation of the work-product rule used by the Wright & Miller treatise, and cited by the Third, Fourth, Seventh, Eighth, and D.C. Circuits, is that documents should be deemed prepared "in anticipation of litigation," and thus within the scope of the Rule, if "in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation."
>
> . . . .
>
> . . . [I]t should be emphasized that the "because of" formulation . . . withholds protection from documents that are prepared in the ordinary course of business or that would have been created in essentially similar form irrespective of the litigation. It is well established that [the] work-product privilege does not apply to such documents. Even if such documents might also help in preparation for litigation, they do not qualify for protection because it could not fairly be said that they were created "because of" actual or impending litigation.

Adlman, 134 F.3d at 1202 (internal citations omitted); see also In re Sealed Case, 146 F.3d 881, 884 (D.C. Cir. 1998) (applying "because of" test and noting that "for a document to meet this standard, the lawyer must at least have had a subjective belief that

litigation was a real possibility, and that belief must have been objectively reasonable"); Logan v. Commercial Union Ins. Co., 96 F.3d 971, 976-77 (7th Cir. 1996) (applying "because of" test and concluding that insurance claim documents requested by injured worker concerning how insurance company intended to defend against worker's actions were created in anticipation of litigation and subject to work product protection); Nat'l Union Fire Ins. Co. v. Murray Sheet Metal Co., Inc., 967 F.2d 980, 984 (4th Cir. 1992) ("[Because] document must be prepared because of the prospect of litigation when the preparer faces an actual claim or a potential claim following an actual event or series of events that reasonably could result in litigation . . . [,] materials prepared in the ordinary course of business or pursuant to regulatory requirements or for other non-litigation purposes are not documents prepared in anticipation of litigation"); Simon v. G.D. Searle & Co., 816 F.2d 397, 401 (8th Cir. 1987) (applying "because of" test and concluding that, in contrast to individual case reserve figures calculated by the defendant's attorneys, aggregate risk management documents were not prepared in anticipation of litigation but rather constituted business planning documents); United States v. Rockwell Int'l, 897 F.2d 1255, 1266 (3d Cir. 1990) (applying "because of" test). The "because of" test has also been employed by this court. See Energy Capital Corp. v. United States, 45 Fed. Cl. 481, 485 (2000) ("'The initial inquiry is whether, in light of the nature of the documents and the factual situation in a particular case, the document can be fairly said to have been prepared or obtained because of the prospect of litigation.'") (quoting Occidental Chem. Corp. v. OHM Remediation Servs. Corp., 175 F.R.D. 431, 434 (W.D.N.Y. 1997)) (emphasis added).

Regardless of whether a court uses the "primary motivating purpose" or the "because of" approach, "documents that are required to be prepared to comply with the law may not be protected." In re Raytheon Sec. Litig., 218 F.R.D. at 359. Indeed, "[i]n limiting work product to materials prepared 'in anticipation of litigation,' the drafters of [RCFC] 26(b)(3) excluded from the rule's protection 'materials assembled in the ordinary course of business, or pursuant to public requirements unrelated to litigation, or for other non-litigation purposes.'" Id. (quoting Fed. R. Civ. P. 26(b)(3) Advisory Committee Note); see also Martin v. Bally's Park Place Hotel & Casino, 983 F.2d 1252, 1260-61 (3d Cir. 1993) (citing advisory committee note); United States v. Rockwell Int'l, 897 F.2d 1255, 1265-66 (3d Cir. 1990) (noting language of advisory committee and directing district court on remand to determine with specificity the party's primary motivation in creating and maintaining the tax accrual document at issue); El Paso, 682 F.3d at 544 (citing advisory committee notes and concluding that "written ultimately to comply with SEC regulations, the tax pool analysis carries much more the aura of daily business than it does of courtroom combat" and "are not protected work product materials"). "This exclusion from work product protection of materials assembled 'pursuant to public requirements unrelated to litigation' applies 'even if the party is aware that the document

may also be useful in the event of litigation.' In Re Raytheon Sec. Litig., 218 F.R.D. at 359 (quoting Pacamor Bearings v. Minebea Co., 918 F. Supp. 491, 513 (D.N.H. 1996)). However, it is also true that this advisory committee note "indicates by implication that materials prepared pursuant to public requirements but related to litigation are protected." Thomas Wilson, Note, The Work Product Doctrine: Why Have an Ordinary Course of Business Exception?, 1988 Colum. Bus. L. Rev. 587, 601 (1988) (emphasis added). In any event, "[t]hese passages emphasize that the purpose for which a party created a document is the fundamental requirement of the Rule, and that when litigation is reasonably anticipated, certain, or even underway, a court must still undertake an examination of why a document was produced." Harper, 138 F.R.D. at 661 (emphasis in original).

b. "Litigation"

The determination of what constitutes "litigation" for the purposes of the work product doctrine's "in anticipation of litigation" formula is an extremely important one, especially in the context of this case. The Restatement (Third) of the Law Governing Lawyers takes a broad view of what constitutes "litigation" for the purposes of the work product doctrine:

> Litigation includes civil and criminal trial proceedings, as well as adversarial proceedings before an administrative agency, an arbitration panel or a claims commission, and alternative-dispute-resolution proceedings such as mediation or mini-trial. It also includes a proceeding such as a grand jury or a coroner's inquiry or an investigative legislative hearing. In general, a proceeding is adversarial when evidence or legal argument is presented by parties contending against each other with respect to legally significant factual issues. Thus, an adversarial rulemaking is litigation for purposes of the immunity.

Restatement (Third) of the Law Governing Lawyers (Restatement) § 87 cmt. h (2000).

"'Adversarialness' is the touchstone of this approach to the 'litigation' question, and a number of courts seem to have followed it to a large degree." In re Grand Jury Subpoena, 220 F.R.D. 130, 147 (D. Mass. 2004). "[T]he preferred approach gives protection only to those documents or portions of documents that were prepared principally to assist in anticipated adversarial proceedings." Golden Trade, S.r.L. v. Lee Apparel Co., No. 90 Civ. 6291, 1992 U.S. Dist. LEXIS 17739, at *9 (S.D.N.Y. Nov. 20, 1992); see also Willingham v. Ashcroft, 228 F.R.D. 1, 4 (D.D.C. 2005) (stating that "litigation" includes "a proceeding in court or administrative tribunal in which the parties

have the right to cross-examine witnesses or to subject an opposing party's presentation of proof to equivalent disputation. . . . In other words, to constitute 'litigation,' the proceeding must be adversarial.") (citation omitted); In re Grand Jury Subpoena Duces Tecum, 112 F.3d 910, 924 (8th Cir. 1997) ("Courts have applied work product immunity in a variety of legal contexts. The essential element of each case, however, is that the attorney was preparing for or anticipating some sort of adversarial proceeding involving his or her client.") (citations omitted); Jumper v. Yellow Corp., 176 F.R.D. 282, 285 (N. D. Ill. 1997) ("The work-product doctrine only extends to communications made as part of the adversary process.").

c. Case Law

The court has reviewed numerous persuasive authorities that have considered whether the work product doctrine applies to protect from discovery documents similar in nature to those in dispute in this case – namely, documents created in preparation for rate-setting, license, or permit application proceedings such as those before the CPUC, NRC, and CCC.[4] As a general matter, "documents prepared in connection with routine administrative filings under the securities, tax, and other regulatory laws are . . . held not to be covered by the work product exemption." Biddison v. Chicago, No. 85 C 10295, 1989 U.S. Dist. LEXIS 3991, at *2 (N.D. Ill. Feb. 3, 1989) (citing Gulf Oil Corp., 760 F.2d at 296 and In re Special Sept. 1978 Grand Jury, 640 F.2d 49, 65 (7th Cir. 1980)). However, "[s]ince administrative proceedings not infrequently lead to litigation, . . . work product issues relating to documents prepared in connection with administrative filings frequently involve close and difficult questions." Biddison, 1989 U.S. Dist. LEXIS 3991, at *2 (comparing Gulf Oil Corp., 760 F.2d at 296 (holding that documents prepared at an accountant's request to allow the preparation of financial reports required by the federal securities laws are not protected by the work product privilege, while noting that "[t]he case presents a close question") with Hodges, Grant & Kaufman v. United States, 768 F.2d 719, 722 (5th Cir. 1985) (documents prepared by accountant for the client's use in "'dealing with the IRS' . . . may well have been prepared in anticipation of an administrative dispute" and hence may constitute work product)).

In the securities regulation context, some courts have held that documents prepared for an independent auditor in connection with a publicly held corporation's efforts to

---

[4]The parties have not suggested, and the court has not found, any authority from this court or the Federal Circuit that provides guidance in this regard. Nor has the court found any authority dealing directly with the issue of whether some or all documents created in anticipation of the particular rate-setting, license, or permit application proceedings involved in this case are protected by the work product doctrine.

comply with the federal securities laws do not constitute attorney work product because they are created primarily for (or because of, depending on the standard used) the business purpose of preparing financial reports that would satisfy the requirements of the federal securities laws. Gulf Oil Corp., 760 F.2d at 297; see also El Paso, 682 F.2d at 543-44 (finding that documents "written ultimately to comply with [Securities Exchange Commission (SEC)] regulations" were prepared "with an eye on its business needs, not on its legal ones" and do not "contemplate litigation in the sense required to bring it within the work product doctrine"); Indep. Petrochemical Corp. v. Aetna Cas. & Sur. Co., 117 F.R.D. 292, 298 (D.D.C. 1987) (declining to extend work product protection to audit letters prepared by an attorney where Magistrate Judge's in camera examination of the letters revealed that they were not prepared to assist company in present or reasonably anticipated litigation but rather to assist accounting firm "in the performance of regular accounting work done by such accounting firms"); McEwen v. Digitran Sys., Inc., 155 F.R.D. 678, 684 (D. Utah 1994) (after reviewing documents in camera, concluding that the defendants had not sustained the burden of proof that the documents were protected by the work product privilege because the "primary motivating purpose" behind the creation of the documents appeared to be to enable the re-issuance of defendants's financial statements in order to relist its stock, not to assist attorneys in connection with pending or anticipated litigation).

The patent application process has also produced a number of helpful cases that carefully analyze what constitutes attorney work product created in anticipation of "litigation." In McCook Metals L.L.C. v. Alcoa, Inc., 192 F.R.D. 242, 260 (N.D. Ill. 2000), the Northern District of Illinois stated that

> [i]n th[e Seventh Circuit], preparation of a patent application for prosecution has generally not been held to be in anticipation of litigation, as it is primarily an ex parte administrative, not an adversarial, proceeding. Specific items relating to the patent application process that were not deemed work product included decisions regarding which specifications to include in the patent application, decisions to use certain terms in the original patent application, and technical information from the client to attorney used for the purpose of preparing a patent application.
>
> However, documents produced in preparation for a patent reexamination proceeding when related litigation was subsequently initiated in the federal courts have been held to be made in anticipation of litigation, and thus protected by the work product doctrine. In these cases, the court reasoned that, regardless of whether the reexamination proceeding was initiated by a competitor or the patent holder, "the reexamination

> proceeding is an adversarial proceeding, similar to 'litigation[,]'[] to which the work product doctrine applies." Documents prepared for an interference proceeding were also held to be protected.

McCook, 192 F.R.D. at 260 (internal citations and quotations omitted).

Following this precedent, the McCook court compelled the production of documents created in preparation of defendant's patent application, but ordered the protection of documents prepared in preparation for appeal to the Board of Patent Appeals and Interferences. Id. at 261. The court explained the adversarial nature of the latter proceedings that persuaded it to deem them "litigation" for the purposes of the work product doctrine:

> After the applicant, now called the appellant, has filed his notice of appeal, he has two months to file a brief on the appeal . . . in which he must set forth his arguments. The examiner then submits his answer to the appellant's brief. The appellant may file a reply brief or a request for an oral hearing within one month of the filing of [the] Examiner's answer. The Board of Patent Appeals and Interferences then arrives at a decision.
>
> . . . .
>
> Th[is] reexamination proceeding, which has been held to constitute "litigation" for the purposes of the work product doctrine, is similar to the final appeals proceeding [before the Federal Circuit] in that although both are ex parte proceedings, neither is "nowhere nearly as non-adversarial and ex parte as is a typical application for initial issuance of a patent."
>
> . . . .
>
> In both the appeal process and the reexamination proceedings, the patent applicant or holder is in a defensive position and in an adversarial relationship to the examiner. Also, in both situations, the attorney is in the position of drafting intricate legal documents, neatly arranging raw technical facts into verbal packages, and practicing the art of a legal wordsmith to persuade the examiner to make a favorable finding for his client. As compared to the initial application request in which the applicant and the examiner are on fairly neutral grounds, the appeal proceeding and the reexamination proceeding force a heightened need of persuasiveness on

> the part of the attorney, and an increased level of adversity between the applicant and the examiner. All of these are characteristics of litigation.
>
> The [c]ourt finds that an appeal before the Board of Patent Appeals and Interferences, although an ex parte proceeding, is of an adversarial nature sufficient to constitute "litigation[,]"[] thus[] warranting application of the work product doctrine to attorney materials made in anticipation thereof. This construction is further supported by the fact that the individual filing the patent application, previously referred to as applicant, is referred to as an appellant after the filing of a notice of appeal. Of course, any appeal thereafter to the Federal Circuit or civil action before the District Court for the District of Columbia would also be protected by the work product doctrine.

Id. at 261-262 (internal citations and quotations omitted).

The Southern District of New York has taken a similar approach with respect to patent application proceedings:

> [D]ocuments prepared in contemplation of ex parte proceedings before the [Patent and Trade Office (PTO)] are not, on that basis alone, entitled to work-product protection. In contrast, if a document is prepared in anticipation of or with an eye to future adversarial administrative proceedings or future litigation, it will be protected, subject of course to the discovering party's ability to show a pressing need for the document.
>
> . . . .
>
> Under this approach, even if the document was prepared to address issues in an ex parte patent proceeding, any portions of it that explicitly address the prospect of future litigation or offer an analysis of issues principally pertinent to such a proceeding will be protected.

Golden Trade, 1992 U.S. Dist. LEXIS 17739, at *8-9 (citations omitted); accord In re Gabapentin Patent Litig., 214 F.R.D. at 184-85 ("'Generally, work performed by an attorney to prepare and prosecute a patent does not fall within the parameters of the work product protection . . . since the prosecution of [a] patent is a non-adversarial, ex parte proceeding. Thus, work done to that end is not "in anticipation of" or ["]concerning" litigation. This rule does not, however, preclude application of the work product protection to work performed to prosecute a patent application if it was also p[er]formed

in anticipation of or concerning litigation.'") (quoting In re Mineaba Corp., 143 F.R.D. 494, 499 (S.D.N.Y. 1992)).

Many courts have analyzed the context of other types of administrative, regulatory, or investigative proceedings to determine whether documents created in preparation of these proceedings are protected under the work product doctrine. In Biddison, the Northern District of Illinois ruled on "whether lawyers' 'work product,' used in its generic sense, generated in the course of preparing an environmental impact statement [(EIS)], should be treated as protected work product." Biddison, 1989 U.S. Dist. LEXIS 3991, at *1. The court found that

> under normal circumstances, a document generated in connection with the preparation of an EIS should not be treated as work product. The circumstances surrounding the preparation of the EIS in this case, however, counsel a different result. A brief review of the history of this litigation demonstrates that the preparation of the EIS in this case was inextricably bound up with defendants' defense of a seamless web of litigation, beginning before the preparation of the EIS and still going on.
>
> . . . .
>
> . . . [T]he EIS at issue here was prepared as a result of litigation, and its approval was almost immediately challenged by litigation. . . . The EIS was little more than the bridge from one lawsuit to another.

Biddison, 1989 U.S. Dist. LEXIS 3991, at **3-5. Thus, because "[t]he EIS . . . was prepared with the knowledge that litigation over the environmental impact of the planned . . . expansion was a virtual certainty and that the EIS would be at the center of that litigation," id. at *8, the court concluded that "attorney work product relating to the preparation of the EIS was in fact generated in anticipation of litigation and should be protected by the work product privilege," id.

In In re Grand Jury Subpoenas dated March 9, 2001, 179 F. Supp. 2d 270, 274 (S.D.N.Y. 2001), the Southern District of New York, in connection with an investigation by the court into the circumstances surrounding the grant of presidential pardons, examined whether documents created by attorneys to assist their clients in obtaining those pardons could be withheld as protected attorney work product. The court found that "once [the clients] decided to seek presidential pardons, the [attorneys] ceased providing legal services in an adversarial context. They faced no opposing parties or adversaries

and the pardon proceedings were entirely ex parte." Id. Thus, the court concluded that "the objections based on the work product doctrine . . . are overruled." Id.

In Binks Manufacturing Co. vs. National Presto Industries, Inc., 709 F.2d 1109, 1111 (7th Cir. 1983), a contractual dispute arose between Binks, the manufacturer and seller of an "industrial spray finishing and baking system," and Presto. Binks sued Presto for the purchase price of the system, and Presto counterclaimed for damages resulting from defective design and manufacture of, and late delivery of, the system. Id. Prior to the litigation, there had been much negotiation between the parties regarding operational problems with the system. Id. at 1112. Binks had sent a letter to Presto, requesting full payment for the system's purchase price. Id. at 1119. As a result, Lavers (a Presto in-house attorney) went to a Presto plant to interview employees about the system's problems and to examine the equipment. Id. at 1113. He later sent back memos and letters to Presto's chief in-house counsel regarding these problems. Id. In one, he set forth a recommended strategy to be used in negotiations with Binks concerning these problems. Id. As a result of these memos and letters, Presto wrote Binks, indicating all of the problems seen, and advising that, unless the problems were taken care of, Presto would send its own experts to correct the problems, and withhold payments to "set off against our damages." Id. at 1120. Two of the letters or memos by Lavers were ordered produced by the lower court, over the work product objection of Presto. Id. at 1118.

"The Seventh Circuit, in upholding the lower court's ruling requiring production of these documents, stressed that in neither letter (by Binks or by Presto) were there any threats of, or expression of intent to institute, litigation." Guardsmark, Inc. v. Blue Cross & Blue Shield, 206 F.R.D. 202, 207 (W.D. Tenn. 2002) (citing Binks, 709 F.2d at 1119-20). The Binks court concluded that, "while there may have been 'the remote prospect of litigation' when Lavers prepared his memoranda, [Presto] has failed to meet its burden of proving that the memoranda were 'prepared . . . because of the prospect of litigation,' or, that 'some articulable claim, likely to lead to litigation,' had arisen." Binks, 709 F.2d at 1120 (citation omitted); see also Janicker v. George Washington U., 94 F.R.D. 648, 650 (D.D.C. 1982) ("[T]he distinction between whether defendant's 'in house' report was prepared in the ordinary course of business or was 'work product' in anticipation of litigation is an important one. The fact that defendant anticipates the contingency of litigation resulting from an accident or event does not automatically qualify an 'in house' report as work product. . . . A more or less routine investigation of a possibly resistable claim is not sufficient to immunize an investigative report developed in the ordinary course of business.") (citations omitted), cited with approval in Binks, 709 F.2d at 1119.

In California ex. rel. Wheeler v. Southern Pacific Transportation Co., No. CIV S-92-1117 LKK GGH, 1993 U.S. Dist. LEXIS 21128, at *15 (E.D. Cal. Sept. 2, 1993), the Eastern District of California ruled on whether the plaintiff could properly assert work product protection over documents that were required to be created under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA). The court first noted that "well established case law has refused to protect that information which a party has acquired because of a public or business duty simply because a litigation involving that information is probable or in existence." Id. at *16. The court continued:

> Cases deciding that documents were generated in the ordinary course of business or as a result of an independent duty, have all reached the conclusion that such reports will not receive work product protection. For example, in cases deciding that police reports were not protected by the work product doctrine, the court looked at whether the police investigation was made in anticipation of litigation or whether it was routine procedure. Further, a medical examiner's report which was prepared pursuant to an obligation to determine the cause of death, and in furtherance of his routine duties as a city employee, was held not to be in anticipation of litigation . . . .

Id. at *17 (internal citations and footnote omitted). Then, having determined that the plaintiff "had an independent duty to assess damages under CERCLA," id. at *19, *26, the court concluded that the "assertion of a work product immunity is insufficient to overcome the regulatory scheme that calls for disclosure of the documents at issue," id. at *33; see also Goosman v. A. Duie Pyle, Inc., 320 F.2d 45, 52 (4th Cir. 1963) (declining to extend work product protection to documents because "[t]hey were made in the ordinary course of business under [Interstate Commerce Commission (ICC)] regulations and do not represent the lawyer's work product within the holding in Hickman v. Taylor").

In Jumper, the Northern District of Illinois analyzed whether documents prepared in anticipation of arbitration or grievance proceedings were protected under the work product doctrine. The court stated that "[c]ourts have found that the work product doctrine applies to documents prepared by or for a party in connection with arbitrations because arbitrations are adversarial in nature and can be fairly characterized as 'litigation.'" 176 F.R.D. at 286. Thus, because "[p]laintiff concedes that 'the [parties] were adversarial to each other in the grievance proceeding,'" the court concluded "that the grievance proceedings here can be characterized as 'litigation' for purposes of the work product doctrine." Id. The court therefore granted-in-part the defendant's motion for a protective order. Id. at 287; see also Willingham, 228 F.R.D. at 5 (allowing work

product protection to documents prepared in anticipation of an administrative complaint, because "[w]hen plaintiff challenged the [Drug Enforcement Administration (DEA)]'s decision to discipline her by appealing its decision to the [Merit Systems Protection Board (MSPB)], she initiated an adversarial action against the agency."); cf. Niagara Mohawk Power Corp. v. Stone & Webster Eng'g Co., 125 F.R.D. 578, 586 (N.D.N.Y. 1989) ("The work product doctrine has been held to protect documents prepared in anticipation of an administrative proceeding such as the Public Service Commission's prudence proceeding."); United States v. AT&T, 86 F.R.D. 603, 628 (D.D.C. 1979) ("[A] routine Government administrative inquiry . . . cannot fairly be described as anticipating litigation . . . .").

Finally, the court notes that there is a line of cases, similar to those discussed above, that describe the proper standard in analyzing "dual-purpose" documents. For example, in Soeder v. General Dynamics Corp., 90 F.R.D. 253, 255 (D. Nev. 1980), the District Court for the District of Nevada held that documents resulting from an aircraft manufacturer's investigation into a crash of one of its planes did not qualify as work product because, in addition to preparing for litigation, the manufacturer had an "equally reasonable desire . . . to protect future pilots and passengers of its aircraft, to guard against adverse publicity in connection with such aircraft crashes, and to promote its own economic interests by improving its prospect for future contracts for production of said aircraft." Thus, the court found that the work product doctrine did not apply to these investigative documents. Id.

Similarly, in Stout, 150 F.R.D. at 604-05, the District Court for the Southern District of Indiana analyzed whether documents prepared by an insurer "for concurrent purposes before making a claims decision" should be protected under the work product doctrine. The court stated:

> We believe that the appropriate standard for evaluating dual-purposed documents to be[:] . . . If a document or thing would have been created for non-litigation uses regardless of its intended use in litigation preparation, it should not be accorded work product protection. Because the document would have been created for non-litigation reasons anyway, disclosure of the information therein would not disadvantage its creator, or advantage his opponent, by revealing the creator's legal strategy or tactics; thus, the document's release in discovery would not contravene the policies supporting the work product rule. There is no proprietary interest to protect, no threat to the orderly and fair administration of litigation, and no loss of incentive for attorneys or parties to creatively develop their cases. Since neither the language nor purposes of the work product [r]ule would

be contradicted by this standard, we are constrained to so narrowly construe it.

Id. Thus, the court "presume[d] that documents which were produced by an insurer for concurrent purposes before making a claims decision would have been produced regardless of litigation purposes and therefore do not constitute work product." Id. at 605; see also Harper, 138 F.R.D. at 661 ("Because the work product rule does not prevent discovery of documents prepared for non-litigation purposes, it would be an unwarranted extension of that rule to prevent access to such a broad range of documents merely because of the inherent importance of such documents to several interests, one of which happens to be litigation. The danger is surely slight that release of a document that is produced in the ordinary and regular course of a party's business would reveal damaging litigation strategy of that party simply because such a document may also be helpful in litigation. . . . Documents prepared for concurrent purposes, therefore, should not be classified as work product. Such an approach is consistent with the purposes of the work product rule and avoids the impossibility of weighing the asserted motives behind the creation of a document to determine which one is primary.").

The Ninth Circuit has also examined whether the work product doctrine should be extended to such "dual-purpose" documents in In re Grand Jury Subpoena, 357 F.3d 900, 907 (9th Cir. 2003). There, the court noted that, in addition to litigation contemplated as a result of the initiation of an EPA investigation, "some of [an investigator's] documents were also prepared in compliance with the Information Request and the Consent Order, or were otherwise related to the cleanup of the CERCLA sites." Id. As to these documents, the court held that, "notwithstanding their dual purpose character, [they] fall within the ambit of the work product doctrine. The documents are entitled to work product protection because, taking into account the facts surrounding their creation, their litigation purpose so permeates any non-litigation purpose that the two purposes cannot be discretely separated from the factual nexus as a whole." Id. at 909-10; cf. United States v. Frederick, 182 F.3d 496, 501 (7th Cir. 1999) ("[A] dual purpose document – a document prepared for use in preparing tax returns and for use in litigation – is not privileged; otherwise, people in or contemplating litigation would be able to invoke, in effect, an accountant's privilege, provided that they used their lawyer to fill out their tax returns.").

2. Analysis

The potentially analogous authorities summarized above provide a context for and inform the court's decision as to whether documents created in preparation for rate-setting, license, or permit application proceedings such those before the CPUC, NRC, and CCC can or should be protected from discovery under the work product doctrine. The

court seeks to avoid the necessity of briefing specific to, and in camera review of, each individual document sought to be protected by providing guidance to the parties as to the court's view of the types of documents that are protected in this context as documents created "in anticipation of litigation" under the work product doctrine.

As an initial matter, the court does not find it necessary to decide here whether the "primary motivating purpose" or the "because of" approach is the correct application of RCFC 26(b)(3), because the court's final determination in this discovery dispute does not turn on which standard is used. In any event, the court notes that under either formulation, "documents that are prepared in the ordinary course of business or that would have been created in essentially similar form irrespective of the litigation" are not protected. Adlman, 134 F.3d at 1202. Generally, the court is guided by the proposition that "the purpose for which a party created a document is the fundamental requirement of the Rule, and that when litigation is reasonably anticipated, certain, or even underway, a court must still undertake an examination of why a document was produced." Harper, 138 F.R.D. at 661 (emphasis in original).

a. Adversarial Aspects of CPUC and NRC Proceedings Constitute "Litigation" for the Purposes of the Work Product Doctrine, but CCC Proceedings do Not

Before addressing whether the "purpose[s] for which [plaintiff] created a document" warrant protection of that document under the work product doctrine and describing what kinds of documents the court considers to be prepared "in anticipation of litigation" in this context, the court must in the first instance determine whether rate-setting, license, or permit application proceedings before the CPUC, NRC, or CCC, or any aspects of such proceedings, constitute "litigation" for the purposes of the work product doctrine. To make this determination, the court reviews the parties' descriptions of these proceedings as well as authorities identified by the court in its research in order to analogize each type of proceeding to the various administrative contexts analyzed in the potentially analogous case law the court has reviewed.

CPUC proceedings are proceedings in which general rates for utility company customers are established. Plaintiff points out that "[t]he CPUC has characterized general rate proceedings as litigation." Pl.'s Resp. at 5 (citing In re Application of Pac. Gas & Elec. Co., 2004 WL 1376593 (Cal. P.U.C. May 27, 2004) (referring to issues "litigated" in a general rate case)). Moreover, "[t]he witness supporting [any] testimony [submitted] is then subject to cross-examination at the hearing." Id. at 6. Plaintiff points to "numerous instances of PG&E witnesses being cross-examined by interested parties at general rate case hearings." Id. (citing Pl.'s Resp. Ex. B at 1780 (transcript of cross-

examination of PG&E witness Thomas LaGuardia by Armando Alvarez, representing the "consumer interests of the Federal Executive Agencies"). In addition, plaintiff argues that "[t]he CPUC's decommissioning triennial cost proceedings also constitute litigation in that the CPUC issues findings of fact and conclusions of law after reviewing briefs and conducing hearings that include[] the presentation of testimony and exhibits and the cross-examination of witnesses." Id. (citing In re S. Cal. Edison Co., 2003 WL 22426989 (Cal. P.U.C. Oct. 2, 2003)). Finally, plaintiff explains that

> third parties to CPUC proceedings are entitled to and often choose to intervene, creating contentious, adversarial proceedings. Interveners often submit interrogatories and data requests, requiring PG&E to prepare extensive and detailed responses. . . . Draft documents such as [these responses] relating to general rate case[s] and decommissioning cost triennial proceedings were prepared in anticipation of those litigation matters, and as such, are protected from disclosure by the work product doctrine.

Id. (citing, inter alia, Cal. Code Regs. tit. 20, § 54 (2005)).

NRC proceedings relate to plaintiff's license to operate its nuclear power plants. As to proceedings before the NRC, plaintiff states that "PG&E's submission of an application to amend its license initiates an adjudicatory proceeding that provides interested parties with the opportunity to participate in a hearing." Id. (citing, inter alia, 10 C.F.R. §§ 2.101(f)(1) and 2.315 (2005)). Plaintiff also notes that "[a]t a hearing concerning a licensee-initiated application to amend its license, the applicant has the right to present evidence and rebuttal testimony and to cross-examine witnesses." Id. at 7 (citing 10 C.F.R. § 2.711). It also appears that the applicant's witnesses are subject to cross-examination by another party to the hearing, if any. See 10 C.F.R. § 2.711. Finally, "NRC specifically recognizes the applicability of the work product doctrine and privileges to its proceedings." Pl.'s Resp. at 7 (citing 10 C.F.R. § 2.705(b)(1) and (3)).

CCC proceedings relate to plaintiff's obtaining a permit to build on coastal property for its business. With respect to CCC permit proceedings, plaintiff states that they "provide for a public hearing on the permit application . . . [which] contemplates testimony by interested parties and rebuttal testimony. . . . Thus, PG&E's decision to file a permit application[] initiates a hearing process that is adversarial" and documents created in preparation of such a hearing should be protected by the work product doctrine. Id.

Defendant does not attempt to address, let alone rebut, these descriptions of CPUC, NRC, and CCC proceedings as "litigation" for the purposes of the work product doctrine. See Def.'s Reply at 6 ("The Government does not deny that there may be litigation associated with these proceedings."). Defendant merely states that "[t]he test is not whether there may be litigation associated with the submission of documents to regulatory entities, but rather whether the documents were prepared primarily for litigation or alternatively, for some business reason." Id. This statement ignores the crux of plaintiff's argument: that the proceedings themselves are litigation, and therefore documents created in anticipation of them are protected from discovery under the work product doctrine. Indeed, defendant fails to address plaintiff's argument that these documents

> were prepared solely in anticipation of the various administrative proceedings. The government argues that these documents had multiple purpose[s] . . . because PG&E's real interest was the underlying rates or licenses that are the subject of the proceedings. But this argument is too broad. No plaintiff engages in litigation for the litigation itself. Even here, PG&E's ultimate objective is obtaining a damages recovery, not engaging in litigation. Nor can the government properly distinguish between a public utilities commission rate case filing or licensing application and the administrative litigation over such filings and applications. Those filings are akin to complaints in litigation before this [c]ourt. The subsequent litigation is all part of a single litigation proceeding.

Pl.'s Resp. at 8.

Even if not addressed by defendant, plaintiff's argument must be evaluated. Plaintiff's analogy – comparing license and permit application proceedings to litigation such as that in this case – has the appeal of an easy and universally applicable solution to the current dispute, but it ultimately fails to convince. In order to attempt to achieve its "ultimate objective [of] obtaining a damages recovery" here, plaintiff had to file a complaint against the United States Government, the opponent from which it seeks to obtain a damages recovery. The "ultimate objective" of this litigation, therefore, is adversarial – to win damages from an opposing party against whom plaintiff has served a complaint. There would be no "litigation," nor would this court have jurisdiction, without an adversarial claim against plaintiff's opponent, the United States Government. By contrast, in a license or permit application proceeding or a public utilities rate case, the "ultimate objective" is not adversarial – rather, it is to set rates with or obtain a license or permit from a regulatory body in order to advance the applicant's business or comply with regulations. In a license or permit filing, plaintiff does not file a complaint against an

opponent, but rather files an application for the license or permit with a neutral regulatory commission. Therefore, the court disagrees that filings before these administrative proceedings "are akin to complaints in litigation before this [c]ourt." Pl.'s Resp. at 8.

The question remains, however, whether these administrative proceedings, or some aspects thereof, may constitute "litigation" for the purposes of the work product doctrine. The purpose of these proceedings is not adversarial, as it is in traditional litigation. But, as illustrated by plaintiff in its briefing, see Pl.'s Resp. at 5-7, adversarial parties have the opportunity to intervene and cross examination and rebuttal testimony may be heard in some of these proceedings, creating an environment potentially akin to the adversarial litigation in which the work product doctrine is intended to be applied. Cf. Restatement § 87 cmt. h ("In general, a proceeding is adversarial [and thus constitutes 'litigation' under the work product doctrine] when evidence or legal argument is presented by parties contending against each other with respect to legally significant factual issues."). The court must therefore determine which of these proceedings, or which aspects of each of them, do in fact constitute "litigation."

The CPUC's website provides:

> A General Rate Case [(GRC)] is the major regulatory proceeding for California utilities, which provides the CPUC an opportunity to perform an exhaustive examination of a utility's operations and costs. Typically performed every three years, the GRC allows the CPUC to conduct a broad and detailed review of a utility's revenues, expenses, and investments in plant and equipment to establish an approved revenue requirement.

http://www.cpuc.ca.gov/cfaqs/generalratecasegrc.htm (last visited Jan. 15, 2006). Thus, the purpose of a GRC before the CPUC is "to establish an approved revenue requirement." Similarly, it appears that the purpose of the CPUC's decommissioning triennial cost proceedings "is to set the annual revenue requirements for . . . decommissioning . . . for nuclear power plants." In re So. Cal. Edison Co., 2003 WL 22426989 (Cal. P.U.C. Oct. 2, 2003), cited in Pl.'s Resp. at 6. Thus, the purpose and inherent nature of these proceedings before the CPUC is not adversarial; rather, their purpose is to establish revenue requirements, a necessary part of the ordinary business of a public utility company, working with its regulator to establish accurate rates and revenues.

However, plaintiff states, and defendant does not dispute, that "third parties to CPUC proceedings are entitled to and often choose to intervene, creating contentious, adversarial proceedings." Pl.'s Resp. at 6. Indeed, section 52(b) of Title 20 of the

California Code of Regulations states that "[w]henever any electrical, gas, . . . or sewer system utility files an application to increase any rate, the utility shall give notice of hearing, not less than five nor more than 30 days before the date of hearing, to entities or persons who may be affected thereby . . . ." These "entities or persons who may be affected" then have an opportunity to intervene: "In a complaint proceeding petitions to intervene and become a party" will be heard by the presiding officer, and "[i]f leave is granted, the petitioner thereby becomes an intervener and a party to the proceeding to the degree indicated by the order allowing intervention, or by the presiding officer at the hearing." Cal. Code Regs. tit. 20, § 53. In addition, the sole provision of the California Code of Regulations cited by plaintiff states:

> In an investigation or application proceeding . . . , an appearance may be entered at the hearing without filing a pleading, if no affirmative relief is sought, if there is full disclosure of the persons or entities in whose behalf the appearance is to be entered, if the interest of such persons or entities in the proceeding and the position intended to be taken are stated fairly, and if the contentions will be reasonably pertinent to the issues already presented and any right to broaden them unduly is disclaimed.
>
> A person or entity in whose behalf an appearance is entered in this manner becomes a party to and may participate in the proceeding to the degree indicated by the presiding officer.

Cal. Code. Regs. tit. 20, § 54.[5] Moreover, if the intervention is adversarial and "[i]f the Commission or the presiding officer is of the opinion that the complexity or importance of the issues so warrant, the Commission or the presiding officer may direct or permit the presentation of oral argument." Cal. Code. Regs. tit. 20, § 76.

Thus, proceedings before the CPUC can, in some circumstances, resemble "litigation." However, it is also true that initial filings for these proceedings, and any evidence presented or testimony provided to the CPUC thereafter in order accurately to set rates and revenues, can take the form of "primarily ex parte administrative, not . . . adversarial, proceeding[s]." McCook, 192 F.R.D. at 260. Indeed, it appears to the court from the briefing before it that, much like an applicant in a patent application proceeding,

---

[5]The fact that plaintiff cites this section rather than section 53 in contending that "third parties to CPUC proceedings are entitled to intervene" indicates to the court that the proceedings before the CPUC referred to by plaintiff as constituting "litigation" for the purposes of the work product doctrine are "investigation or application proceedings," Cal. Code Regs. tit. 20, § 54 rather than "complaint proceedings," Cal. Code Regs. tit. 20, § 53.

an applicant seeking to set rates and the presiding officer "are on fairly neutral grounds." Id. at 262. And it is entirely possible that an applicant may "face[] no opposing parties or adversaries" such that the "proceedings [are] entirely ex parte." In re Grand Jury Subpoenas dated March 9, 2001, 179 F. Supp. 2d at 274. Even when another party does intervene in these proceedings before the CPUC, it is simply "participat[ing] in the proceeding to the degree indicated by the presiding officer," see Cal. Code. Regs. tit. 20, § 54, and the purpose of the intervention may not be entirely adversarial, if at all. Given this, and that the ultimate goal of such proceedings is not adversarial but rather accurately to set rates and revenues as required by the CPUC, the court does not believe it would serve the purposes of the work product doctrine to provide the blanket label of "litigation" to every aspect of these proceedings. Cf. In re Grand Jury Subpoena, 220 F.R.D. at 147 ("'Adversarialness' is the touchstone of this approach to the 'litigation' question, and a number of courts seem to have followed it to a large degree."). Instead, only those aspects of proceedings before the CPUC that are truly adversarial should be treated as "litigation" for the purposes of the work product doctrine.

With regard to licensing proceedings before the NRC, Title 10, § 2.101 of the Code of Federal Regulations sets forth the procedures for filing "an application for a license, a license transfer, or an amendment to a license . . . with the Director of the Office of Nuclear Reactor Regulation or Director of the Office of Nuclear Material Safety and Safeguards." The applicable provisions of § 2.101 state, in pertinent part:

> (a)(1) . . . A prospective applicant may confer informally with the NRC staff prior to the filing of an application.
>
> (a)(2) Each application for a license for a facility or for receipt of waste radioactive material from other persons for the purpose of commercial disposal by the waste disposal licensee will be assigned a docket number. However, to allow a determination as to whether an application for a construction permit or operating license for a production or utilization facility is complete and acceptable for docketing, it will be initially treated as a tendered application. A copy of the tendered application will be available for public inspection at the NRC Web site, http://www.nrc.gov, and/or at the NRC Public Document Room. Generally, the determination on acceptability for docketing will be made within a period of thirty (30) days.
>
> . . . .

(f)(1) Each application for construction authorization for a [High-level radioactive waste (HLW)] repository at a geologic repository operations area . . . , and each application for a license to receive and possess high-level radioactive waste at a geologic repository operations area . . . , and any environmental statement required in connection therewith . . . shall be processed in accordance with the provisions of this paragraph.

. . . .

(f)(5) If a tendered document is acceptable for docketing, the applicant will be requested to submit to the Director of Nuclear Material Safety and Safeguards such additional copies of the application and environmental impact statement as the regulations . . . require . . . .

. . . .

(f)(8) The Director of Nuclear Material Safety and Safeguards will cause to be published in the FEDERAL REGISTER a notice of docketing which identifies the State and location at which the proposed geologic repository operations area would be located and will give notice of docketing to the governor of that State. The notice of docketing will state that the Commission finds that a hearing is required in the public interest, prior to issuance of a construction authorization . . . .

(g) Each application for a license to receive radioactive waste from other persons for disposal . . . shall be processed in accordance with the provisions of this paragraph.

. . . .

(g)(1)(i) Upon receipt of a tendered application, the Commission will publish in the FEDERAL REGISTER notice of the filed application and will notify the governors, legislatures and other appropriate State, county, and municipal officials and tribal governing bodies of the States and areas containing or potentially affected by the activities at the proposed site and the alternative sites. The Commission will inform these officials that the Commission staff will be available for consultation pursuant to § 61.71 of this chapter. The FEDERAL REGISTER notice will note the opportunity for interested persons to submit views and comments on the tendered application for consideration by the Commission and applicant.

10 C.F.R. § 2.101 (2005).[6] Much like the CPUC proceedings described above, these NRC application proceedings are not initiated against another party for adversarial purposes, but rather for the purpose of obtaining "a license for a facility or for receipt of waste radioactive material from other persons for the purpose of commercial disposal by the waste disposal licensee." 10 C.F.R. § 2.101(a)(2).

Again, however, plaintiff indicates, and defendant does not dispute, that "PG&E's submission of an application to amend its license initiates an adjudicatory proceeding that provides interested parties with the opportunity to participate in a hearing." Pl.'s Resp. at 6 (citing 10 C.F.R. §§ 2.101(f)(1) and 2.315).[7] Moreover, "the NRC specifically recognizes the applicability of the work product doctrine and privileges to its proceedings." Id. at 7 (citing 10 C.F.R. § 2.705(b)(1) and (3)).[8]

---

[6]It appears that the regulations were amended before the start of 2006. Compare 10 C.F.R. 2.101(f)(1) (2005) with 10 C.F.R. 2.101(f)(1) (2006). The court's conclusion with regard to whether NRC licensing proceedings constitute "litigation" for the purposes of the work product doctrine does not change because of this amendment.

[7]The court notes, however, that this participation, at least for "[a] person who is not a party," is only at "the discretion of the presiding officer." 10 C.F.R. § 2.315(a). Moreover, a participant is only "permitted to make a limited appearance by making an oral or written statement of his or her position on the issues . . . within the limits and on the conditions fixed by the presiding officer." Id. Finally, a participant "may not otherwise participate in the proceeding[, and s]uch statements of position shall not be considered evidence in the proceeding." Id.

[8]10 C.F.R. § 2.705(b)(3) states:

> A party may obtain discovery of documents and tangible things otherwise discoverable under paragraph (b)(1) of this section and prepared in anticipation of or for the hearing by or for another party's representative (including his attorney, consultant, surety, indemnitor, insurer, or agent) only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of this case and that he is unable without undue hardship to obtain the substantial equivalent of the materials by other means. In ordering discovery of such materials when the required showing has been made, the presiding officer shall protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney for a party concerning the proceeding.

10 C.F.R. § 2.705(b)(3). The court notes that the only difference between this section and RCFC 26(b)(3) is that this section applies the work product doctrine to documents "prepared in

(continued...)

Nevertheless, as with CPUC proceedings, the court declines to find that the work product doctrine should apply to all aspects of an NRC licensing proceeding such that an NRC licensing proceeding is generally and always "litigation" for the purposes of the work product doctrine. Indeed, in no sense is an NRC license applicant "in a defensive position and in an adversarial relationship to" the NRC. Cf. McCook, 192 F.R.D. at 262. Instead, an applicant and the NRC "are on fairly neutral grounds." See id.; cf. Willingham, 228 F.R.D. at 5 (allowing work product protection to documents prepared in anticipation of an administrative complaint because, "[w]hen plaintiff challenged the DEA's decision to discipline her by appealing its decision to the MSPB, she initiated an adversarial action against the agency").[9] Moreover, outside participants who are not parties may only make a "limited appearance by making an oral or written statement of his or her position on the issues." 10 C.F.R. § 2.315(a). Thus, because the purpose of NRC license application proceedings is not adversarial, and the inherent nature of these proceedings is largely ex parte, the court believes it prudent to find that only those aspects of these proceedings that are truly adversarial should constitute "litigation" for the purposes of the work product doctrine.

With regard to CCC permit application proceedings, Title 14, Section 13066 of the California Coastal Regulations provides guidance to the court as to the nature of the proceedings:

> The commission's public hearing on a permit application shall, unless the chairperson directs otherwise, proceed in the following order:
>
> (a) The executive director shall make a presentation to the commission identifying the application, describing the project, and summarizing the staff recommendation, including the proposed findings, proposed conditions, and written correspondence received prior to the public hearing.

---

[8](...continued)
anticipation of or for the hearing" rather than those "prepared in anticipation of litigation or for trial."

[9]The court also notes, as the McCook court did, that plaintiff is called an "applicant" in these proceedings, which generally refers to an ex parte and neutral relationship with the regulatory body ruling on the application. Plaintiff is not referred to as an "appellant," or a plaintiff, as would be the case in more adversarial contexts. See McCook, 192 F.R.D. at 261 ("After the applicant, now called the appellant, has filed his notice of appeal, . . . he must set forth his arguments. . . . Th[is] reexamination proceeding . . . is 'nowhere nearly as non-adversarial and ex parte as is a typical application for initial issuance of a patent.'").

(b) The public testimony portion of the public hearing shall proceed in the following order:

(1) Persons or their representatives desiring to state their views on the application shall have the opportunity to do so as follows:

(A) The applicant;

(B) Other persons supporting the application;

(C) Persons opposing the application;

(D) Other persons.

(2) The chairperson may allow rebuttal testimony by the applicant in accordance with Public Resources Code section 30333.1(a).

(3) The executive director may respond to and comment, as appropriate, on the testimony presented by any previous speaker.

(4) The chairperson may close the public testimony portion of the public hearing when a reasonable opportunity to present all questions and points of view has been allowed.

(c) Questions by commissioners will be in order at any time following any person's presentation.

(d) At the conclusion of the public testimony portion of the public hearing, the executive director may propose to change the staff recommendation or the commission may propose to add, delete, or modify the conditions contained in the staff recommendation. The applicant and the executive director shall have an opportunity to comment briefly and specifically on any proposed change.

(e) The commission shall vote on a permit application in accordance with section 13090.

Cal. Code Regs. tit. 14, § 13066.

While it is true that "CCC permit proceedings . . . provide for a public hearing on the permit application," Pl.'s Resp. at 7, with an opportunity for "[p]ersons opposing the application" to submit public testimony, Cal. Code Regs. tit. 14, § 13066(b)(1)(C), again, the purpose and nature of these proceedings is not adversarial. Nor does the court have any indication whether opposition frequently occurs, or if plaintiff ever faced opposition. The court finds that proceedings before the CCC least resemble "litigation" for the purposes of the work product doctrine. These proceedings seem to the court to be "primarily ex parte administrative, not . . . adversarial, proceeding[s]." McCook, 192 F.R.D. at 260. Thus, the court ORDERS that any documents otherwise not privileged and created in anticipation of permit application proceedings before the CCC be produced to defendant.[10]

b. Guidance as to What Constitutes "In Anticipation of Litigation" in the Context of CPUC and NRC Proceedings

Having determined that only the truly adversarial aspects, if any, of proceedings before the CPUC and NRC constitute "litigation" for the purposes of the work product doctrine,[11] and that CCC permit proceedings do not constitute "litigation," the court turns to provide guidance to the parties as to what kinds of documents created in preparation of the CPUC and NRC proceedings were created "in anticipation of litigation" and therefore

---

[10]Because the court finds that permit application proceedings before the CCC do not constitute "litigation" for the purposes of the work product doctrine, the court does not reach the question of whether documents created in preparation for these proceedings were created "in anticipation of litigation." However, the court notes that California Public Resources Code § 30601 (2005) states that "a coastal development permit shall be obtained from the commission for . . . [a]ny development which constitutes a major public works project or a major energy facility." (emphasis added). This suggests that plaintiff was required to apply to obtain a coastal development permit in order to build a coastal development to aid its business, further indicating to the court that any documents created in preparation for this application process were not created "in anticipation of litigation." See Fed. R. Civ. P. 26(b)(3) Advisory Committee Note ("Materials assembled in the ordinary course of business, or pursuant to public regulatory requirements unrelated to litigation, or for other non-litigation purposes are not under the qualified immunity provided by this subdivision.").

[11]"Adversarial aspects," as used here and below, refers to aspects of these proceedings in which an adverse party or intervener cross-examined, challenged, or otherwise opposed plaintiff in these proceedings. The parties should be clear that "adversarial aspects" does not refer to aspects of these proceedings which were entirely ex parte, or in which the examining agency, rather than any opponent, questioned, challenged, or otherwise required information from plaintiff.

may be protected from discovery under the work product doctrine. The fundamental inquiry that must be made is "the purpose for which a party created a document." Harper, 138 F.R.D. at 661. Indeed, even when opposition or intervening adversarial parties have become involved in these proceedings, "a court must still undertake an examination of why a document was produced." Id.

Documents created by plaintiff "in the ordinary course of business or that would have been created in essentially similar form irrespective of" the potential adversarial aspects of these proceedings (the aspects here deemed "litigation") before the CPUC or NRC are not protected by the work product doctrine. Adlman, 134 F.3d at 1202; see also Stout, 150 F.R.D. at 604 ("If a document or thing would have been created for non-litigation uses regardless of its intended use in litigation preparation, it should not be accorded work product protection."). The court now provides analyses of various documents listed in plaintiff's Revised Privilege Log for the purpose of permitting the parties to analogize these examples to disputed documents not mentioned in this Opinion and thereby to resolve any further discovery disputes involving the work product doctrine that they may have.

Document Nos. 14 and 83,[12] and those like them, should be produced because such documents appear not to have been created in response to or in anticipation of the adversarial aspects of NRC licensing proceedings, if any. Rather, they appear to be prepared by plaintiff "with an eye on its business needs, not on its legal ones," and do not "contemplate litigation in the sense required to bring [them] within the work product doctrine." El Paso, 682 F.2d at 543; accord In re Gabapentin Patent Litig., 214 F.R.D. at 184-85 ("'Generally, work performed by an attorney to prepare and prosecute a patent does not fall within the parameters of the work product protection . . . since the prosecution of [a] patent is a non-adversarial, ex parte proceeding. Thus, work done to that end is not "in anticipation of" or ["]concerning" litigation.'") (quoting In re Mineaba Corp., 143 F.R.D. at 499)).

---

[12]Document Nos. 14 and 83 are described as "Draft Licensing Report on Spent Fuel Racks for DCPP . . . ," Pl.'s Resp. Ex. A (Plaintiff's Revised Privilege Log) at 2, and "Draft Licensing Report Regarding DCPP Reracking of Spent Fuel Pools," id. at 8, and both are described as being "Prepared in Anticipation of Litigation - Regulatory Proceedings - NRC Licensing Amendment Proceedings," id. at 2, 8.

Document No. 155,[13] and those like it, although consisting of "draft, handwritten . . . testimony," should not be protected by the work product doctrine if such drafts would have been prepared irrespective of the potential adversarial aspects of a GRC before the CPUC. Providing testimony is necessary in these primarily ex parte proceedings in order to "establish an approved revenue requirement," http://www.cpuc.ca.gov/cfaqs/generalratecasegrc.htm (last visited Jan. 15, 2006), and this testimony is likely to be given whether or not intervening or opposing parties are involved. Thus, it appears to the court that "while there may have been 'the remote prospect of litigation' when" plaintiff prepared this draft testimony, plaintiff "has failed to meet its burden proving that the [drafts] were 'prepared . . . because of the prospect of litigation,' or, that 'some articulable claim, likely to lead to litigation,' had arisen." See Binks 709 F.2d at 1120 (citations and quotations omitted) (emphases in original).[14]

Document Nos. 92-101,[15] 212-228,[16] 764, and 770,[17] and those like them, should not be protected under the work product doctrine because they appear to consist of documents created in preparation for a filing, not for a "litigation" as the court has defined it here. Such preparatory documents are not created in anticipation of "initiat[ing] an adversarial action against" another party or agency, Willingham, 228 F.R.D. at 5 (emphasis added), but rather are created in anticipation of filing to apply for a license or to set rates in the ordinary course of business or pursuant to regulatory

---

[13]Document No. 155 is described as "Draft, Handwritten Willis Testimony prepared in anticipation of litigation - regulatory proceedings - NDCTP." Pl.'s Resp. Ex. A (Plaintiff's Revised Privilege Log) at 3.

[14]By contrast, to the extent any of these drafts were prepared in anticipation of cross-examination by an opposing or intervening party, they should be protected under the work product doctrine.

[15]Document Nos. 92-101 are described as "Recommendations and Legal Analysis and Recommendations Prepared at the Request or Under the Supervision of Counsel for Submission and Presentation to the PG&E Board of Directors for Approval and Analysis of Proposed Regulatory Filing with CPUC regarding Decommissioning Costs for HBPP." Pl.'s Resp. Ex. A (Plaintiff's Revised Privilege Log) at 9-11.

[16]Document Nos. 212-228 are described as "Draft Response[s] to NRC Request for Additional Information Regarding License Amendment Request. Prepared for Filing Before the NRC." Pl.'s Resp. Ex. A (Plaintiff's Revised Privilege Log) at 17-19.

[17]Document Nos. 764 and 770 are both described as "Draft Application[s] . . . Prepared for Filing in GRC Proceedings Before the [CPUC]." Pl.'s Resp. Ex. A (Plaintiff's Revised Privilege Log) at 83.

requirements or ex parte requests from an agency, irrespective of any adversarial aspects of the proceedings that may potentially arise. These documents cannot be described as those whose "litigation purpose so permeates any non-litigation purpose that the two purposes cannot be discretely separated from the factual nexus as a whole." In re Grand Jury Subpoena, 357 F.3d at 910. Their preparation was not "inextricably bound up with . . . a seamless web of litigation, beginning before the[ir] preparation . . . and still going on." Biddison, 1989 U.S. Dist. LEXIS 3991, at *3; see also Harper, 138 F.R.D. at 661 ("The danger is surely slight that release of a document that is produced in the ordinary and regular course of a party's business would reveal damaging litigation strategy of that party simply because such a document may also be helpful in litigation.").

Document No. 722,[18] and those like it, should not be protected under the work product doctrine because it appears to the court that this document "would have been created in essentially similar form irrespective of the litigation" as the court has defined it here, Adlman, 134 F.3d at 1202, and was not created either "because of," or with a "primary motivating purpose" to assist in, the potential adversarial aspects of CPUC proceedings, but instead "to address issues in an ex parte . . . proceeding." Golden Trade, 1992 U.S. Dist. LEXIS 17739, at *9.

Document Nos. 707-710,[19] and those like them, should not be protected under the work product doctrine, unless the "[h]andwritten [n]otes" have to do with strategy or tactics with respect to adversarial aspects of proceedings before the NRC. Otherwise, the court finds that these notes are more akin to the

> [s]pecific items relating to the patent application process that were not deemed work product[, which] included decisions regarding which specifications to include in the patent application, decisions to use certain terms in the original patent application, and technical information from the client to attorney used for the purposes of preparing a patent application.

McCook, 192 F.R.D. at 260; cf. Janicker, 94 F.R.D. at 650 ("[T]he distinction between whether defendant's 'in house' report was prepared in the ordinary course of business or

---

[18]Document No. 722 is described as "Draft Letter to the NRC Regarding DCPP Licensing Issues. Prepared in Anticipation of Filing Before the NRC." Pl.'s Resp. Ex. A (Plaintiff's Revised Privilege Log) at 79.

[19]Document Nos. 707-710 are described as "Handwritten Notes of Counsel (R. Locke) Regarding Spent Fuel Storage Strategy. Prepared in Anticipation of Litigation - Regulatory Proceedings - NRC." Pl.'s Resp. Ex. A (Plaintiff's Revised Privilege Log) at 77.

was 'work product' in anticipation of litigation is an important one. The fact that defendant anticipates the contingency of litigation . . . does not automatically qualify an 'in house' report as work product. . . . A more or less routine investigation of a possibly resistable claim is not sufficient to immunize an investigative report developed in the ordinary course of business.") (citations omitted). "In-house" documents created in preparation to file for or submit accurate information during these administrative proceedings are not work product under RCFC 26(b)(3). See Allen, 198 F.R.D. at 500 ("the mere fact that a discovery opponent anticipates litigation does not qualify an 'in-house' document as work product.").

On the other hand, Document Nos. 110-113,[20] and those like them, should be protected under the work product doctrine, as long as the "strategy" referred to is related to foreseen adversarial aspects of the NRC licensing proceedings. Such "strategy" documents were potentially created "because of," or with a "primary motivating purpose" to assist in, the adversarial aspects of these proceedings.[21]

---

[20]Document Nos. 110-113 are described as "Draft DCPP ISFSI Licensing Scenario Timeline Reflecting Regulatory Strategy Prepared at the Request of Counsel in Anticipation of Litigation - Regulatory Proceedings - NRC." Pl.'s Resp. Ex. A (Plaintiff's Revised Privilege Log) at 11.

[21]On the other hand, if these documents were not created because of the adversarial aspects of these proceedings, but rather in the ordinary course of attempting to be successful in setting rates or obtaining permits or licenses vis à vis the regulatory agency conducting the proceeding, and the prospect of adversarial aspects did not significantly alter such "strategy documents," see Adlman, 134 F.3d at 1202 ("[D]ocuments that . . . would have been created in essentially similar form irrespective of the litigation" are not covered by the work product doctrine), then these documents are more akin to "in-house" documents and should not be covered by work product protection, accord Janicker, 94 F.R.D. at 650 ("The fact that a defendant anticipates the contingency of litigation . . . does not automatically qualify an 'in house' report as work product."); Weil Ceramics, 110 F.R.D. at 505 ( "Furthermore, the prospect of litigation may not be so remote as to be a 'mere possibility.'"). Indeed, while plaintiff states that "many of the documents concern legal strategy related to applications to the relevant agencies for approval of rates or grant or licenses or permits, or are drafts of such documents," Pl.'s Resp. at 10, the only "legal strategy" that should be protected under the work product doctrine is that which was created in response to or in preparation for adversarial aspects of these proceedings.

Similarly, Document Nos. 263-267,[22] and those like them, should most likely be protected under the work product doctrine. Plaintiff's description of these documents states that they were created "[p]ursuant to intervention and opposition to GRC proceedings before the CPUC," Pl.'s Resp. Ex. A (Plaintiff's Revised Privilege Log) at 21, which indicates to the court that they were most likely created "'in anticipation of' or [']concerning' [an adversarial interaction]," In re Gabapentin Patent Litig., 214 F.R.D. at 184 (quotation omitted), or "prepared as a result of," Biddison, 1989 U.S. Dist. LEXIS 3991, at **4-5, adversarial aspects of the CPUC proceedings. If the description accurately reflects the purpose for which they were prepared, these documents "are entitled to work product protection because, taking into account the facts surrounding their creation, their litigation purpose so permeates any non-litigation purpose that the two purposes cannot be discretely separated from the factual nexus as a whole." In re Grand Jury Subpoena, 357 F.3d at 910.

Finally, as a general matter, any documents prepared or generated "because of a public or business duty," Wheeler, 1993 U.S. Dist. LEXIS 21128, at *16, or "assembled in the ordinary course of business, or pursuant to public requirements unrelated" to the adversarial aspects of these proceedings, Fed. R. Civ. P. 26(b)(3) Advisory Committee Note, should not be protected under the work product doctrine, see Wheeler, 1993 U.S. Dist. LEXIS 21128, at *32 ("[A]ssertion of a work product immunity is insufficient to overcome the regulatory scheme that calls for disclosure of the documents at issue."). If a document was prepared in order to obtain a permit or license, an undoubtedly business-related purpose, rather than in order to respond to, rebut, strategize for, or otherwise "litigate" against a known adversary, it should not be protected under the work product doctrine. This is so even if the document is later used in adversarial aspects of these proceedings:

> Because the document would have been created for non-litigation reasons anyway, disclosure of the information therein would not disadvantage its creator, or advantage his opponent, by revealing the creator's legal strategy or tactics; thus, the document's release in discovery would not contravene the policies supporting the work product rule. There is no proprietary interest to protect, no threat to the orderly and fair administration of litigation, and no loss of incentive for attorneys or parties to creatively develop their cases. Since neither the language nor purposes of the work

[22] Document Nos. 263-267 are described as "Draft Data Response Document Prepared for Submission to the CPUC in Response to Specific Requests for Information from ORA; Pursuant to Intervention and Opposition to GRC Proceedings Before the CPUC." Pl.'s Resp. Ex. A (Plaintiff's Revised Privilege Log) at 21.

> product [r]ule would be contradicted by this standard, we are constrained to so narrowly construe it.

Stout, 150 F.R.D. at 604-05; see also Harper, 138 F.R.D. at 661 ("The danger is surely slight that release of a document that is produced in the ordinary and regular course of a party's business would reveal damaging litigation strategy of that party simply because such a document may also be helpful in litigation."); Gutter, 1998 WL 2017926, at *3 ("Documents created for business reasons which . . . were not intended to assist in prosecution or defense of a lawsuit, are not protected from discovery by the . . . work product privileges.").

C. Conclusion

In conclusion, only documents that were created "with an eye towards" adversarial aspects of administrative proceedings before the CPUC or NRC, and that would not have been created in similar form but for these adversarial aspects, should be afforded protection as documents created "in anticipation of litigation" under the work product doctrine of RCFC 26(b)(3). The court finds that this approach "insur[es] that the litigator's opponent" in these proceedings, if any, "is unable to ride on the litigator's wits," Allen, 198 F.R.D. at 500, while taking care that the work product doctrine remains "narrowly construed in order to aid in the search for the truth," McCook, 192 F.R.D. at 260. This approach is therefore "consistent with the purposes of the work product rule," and it furthermore "avoids the impossibility of weighing the asserted motives behind the creation of [every] document to determine which one is primary." Harper, 138 F.R.D. at 661.

The court has attempted, given the scant briefing describing these complex administrative proceedings and the brief descriptions provided in plaintiff's Revised Privilege Log, to obviate the need to obtain briefing specific to, and to conduct an in camera review of, each individual document in dispute by providing guidance to the parties as to what "purpose[s] for which a party created a document," Harper, 138 F.R.D. at 661 (emphasis in original), afford that document protection under the work product doctrine as a document created "in anticipation of litigation," RCFC 26(b)(3), in the context of this case. Using the guidance provided in this Opinion, the parties shall confer with each other to determine whether there continue to be any disputes regarding work product protection of documents related to public regulatory proceedings.

Although the parties are strongly encouraged to resolve any differences regarding these documents by using the guidance provided in this Opinion, if there do continue to be disputes, defendant shall notify the court through a motion to compel listing each

individual document still in dispute and detailing the reasons therefor, including points and authorities as to why each document was not prepared "in anticipation of litigation" as that phrase has been defined in this Opinion and/or why defendant "has substantial need of the materials in preparation of [plaintiff's] case and [why defendant] is unable without undue hardship to obtain the substantial equivalent of the materials by other means," RCFC 26(b)(3), on or before February 9, 2006.[23] Plaintiff shall respond to such a motion, describing in detail its arguments, including points and authorities as to why each individual document disputed was in fact prepared "in anticipation of litigation" as that phrase has been defined in this Opinion and/or why defendant has not made the requisite showing of "substantial need," on or before five business days following the electronic filing of defendant's motion. Defendant shall reply to plaintiff's response on or before three days following the electronic filing of plaintiff's response. If the parties' briefing does not, in the view of the court, resolve the disputed issues as to any document, the court will conduct an in camera review of that document.

## II. Memoranda Prepared for the Board of Directors

### A. Summary of the Parties' Arguments

---

[23]The court notes that some of the documents listed as "documents related to public regulatory proceedings" still in dispute, see Def.'s Mot. Ex. A (listing disputed document numbers), claim to be protected under both the work product doctrine as well as the attorney-client privilege, or under the attorney-client privilege alone, see, e.g., Document Nos. 588, 609, 291-292, Pl.'s Resp. Ex. A (Plaintiff's Revised Privilege Log) at 63, 66, 23. To the extent that the parties have not already resolved any dispute regarding whether the attorney-client privilege protects these documents, and to the extent that this Opinion does not otherwise resolve such disputes, defendant shall so indicate, identifying the individual documents still in dispute and detailing the reasons therefor, including points and authorities as to why they should be produced, in its motion to compel.

Furthermore, in its Reply, defendant notified the court that "PG&E produced to the Government on November 7, 2005, a supplemental Privilege Log containing entries for 1062 additional documents that it has withheld on privilege grounds but that had not previously been identified. A cursory review of this privilege log shows that PG&E has withheld additional documents in the same categories as those challenged by the Government in its motion to compel." Def.'s Reply at 2 n.1. The parties shall use this Opinion in resolving any disputes associated with documents in plaintiff's supplemental privilege log. To the extent they cannot resolve any of these disputes, defendant shall so indicate, identifying the individual documents still in dispute and detailing the reasons therefor, including points and authorities as to why they should be produced, in its motion to compel.

In its Motion, defendant states that "[i]t appears that many documents that were sent to PG&E's Board of Directors or other management-level committees . . . have been withheld on . . . attorney-client . . . grounds . . . improperly." Def.'s Mot. at 14.[24] This is because, defendant argues, "while the description of the documents indicates legal analysis, there is with many of the documents no indication of the author of document." Id. at 15. Moreover, asserts defendant, "[t]here is no indication that any of these documents should be protected because they reveal confidential client communications or because they are communications that resulted from the client seeking legal advice." Id. For these reasons, defendant argues that these documents should not be protected under the attorney-client privilege. Id. at 14-15.

Plaintiff responds that

> [i]n preparing the privilege log produced on June 21, 2005, PG&E listed authors and recipients only when there are individuals listed on the face of the document. But the lack of such a listing on the document does not mean that the document is not privileged. An otherwise clearly privileged memorandum reflecting legal advice from the general counsel's office to the Board of Directors does not lose its privileged status simply because the name of the lawyer and Board member are not listed on the document.[25] The description field of PG&E's privilege log clearly states that those documents do reflect communications between lawyers and the Board or management committee.

Pl.'s Resp. at 12 (citing Document Nos. 92 and 93, Pl.'s Resp. Ex. A (Plaintiff's Revised Privilege Log) at 9)). Indeed, plaintiff contends, "[t]he privilege log entries for these . . . documents . . . explicitly state that they contain 'legal analysis and recommendations submitted to the Board of Directors of PG&E for approval.'" Id. at 13.[26] Thus, plaintiff

---

[24]To the extent that any of these "documents that were sent to PG&E's Board of Directors or other management-level committees" have also been withheld "on work product grounds," Def.'s Mot. at 14, the parties shall refer to Part I of this Opinion to determine whether work product protection has been properly applied to these documents.

[25]Plaintiff cites no legal authority to support this proposition.

[26]Plaintiff is referring here to Document Nos. 92 and 93, but generally all 19 of the disputed documents in the category of "memoranda prepared for the Board of Directors," see Def.'s Mot. Ex. A (Listing of Disputed Documents), contain such a description or one similar to it, see, e.g., Document Nos. 193, 290, 333-34, Pl.'s Resp. Ex. A (Plaintiff's Revised Privilege

(continued...)

claims that these documents should be protected under the attorney-client privilege. Pl.'s Resp. at 12-13.

Defendant's Reply states that "PG&E did not cure the basic flaw in its privilege log regarding these documents – it did not identify any author or other information identifying that the information in the documents at issue were prepared by an attorney for PG&E to provide legal (rather than business) advice to PG&E." Def.'s Reply at 7. Thus, defendant argues, "PG&E cannot assert the attorney-client privilege for the documents. PG&E does not meet its burden of explaining why these documents should be protected . . . . thus[] the [c]ourt should order the production of these [19] documents." Id.

B. Discussion

1. The Attorney-Client Privilege

The attorney-client privilege is properly invoked where:

> (1) the asserted holder of the privilege is or sought to become a client; (2) the person to whom the communication was made (a) is a member of the bar of a court [and] . . . (b) in connection with this communication is acting as a lawyer; (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding [and] . . . (4) the privilege has been (a) claimed and (b) not waived by the client.

First Fed. Sav. Bank of Hegewisch v. United States, 55 Fed. Cl. 263, 266 (2003) (citing Energy Capital, 45 Fed. Cl. at 484-85). The privilege "encourages complete disclosure of information in the nature of confidential communications by a client to the attorney during the attorney-client relationship." CIT Group/Equip. Fin., Inc. v. United States, 24 Cl. Ct. 540, 542 (1991); see UpJohn Co. v. United States, 449 U.S. 383, 389-91 (1981). Moreover, "the attorney-client privilege does not shield all information that a client divulges to an attorney, or vice versa, but rather is limited to instances where legal advice is sought or rendered." First Fed. Sav. Bank, 55 Fed. Cl. at 266 (citing In re Grand Jury Subpoena Duces Tecum, 731 F.2d 1032, 1037 (2d Cir. 1984)). The privilege "evaporates upon any voluntary disclosure of confidential information to a third party . . . ." Carter v.

---

[26](...continued)
Log).

Gibbs, 909 F.2d 1450, 1451 (Fed. Cir. 1990). Furthermore, "the privilege impedes the search for truth and is therefore to be strictly construed." First Fed. Sav. Bank, 55 Fed. Cl. at 266 (citing Energy Capital, 45 Fed. Cl. at 484)).

The attorney-client privilege is not restricted to individuals, but may be invoked by a corporate entity as well. UpJohn, 449 U.S. at 390. "Although in the corporate context the privilege was initially limited to the 'control group,' the privilege has been extended to middle and lower level employees when certain criteria are met." First Fed. Sav. Bank, 55 Fed. Cl. at 266 (citing Upjohn, 449 U.S. at 389-91). However, the "privilege is waived if the communications are disclosed to employees who did not need access to" them. Baxter Travenol Labs. v. Abbott Labs., No. 84 C 5103, 1987 U.S.Dist. LEXIS 10300, at *14 (N.D. Ill. June 19, 1987) (citing Diversified Indus., Inc. v. Meredith, 572 F.2d 596, 609 (8th Cir. 1977)). "The appropriateness of a corporation's invocation of the privilege is decided on a case-by-case basis." First Fed. Sav. Bank, 55 Fed. Cl. at 266 (citing UpJohn , 449 U.S. at 396-97).

"The privilege does not apply to the fact of communication between a client and attorney. It is the substance of the communication which is protected, not the fact that there has been communication." Burton v. R.J. Reynolds Tobacco Co., 170 F.R.D. 481, 484 (D. Kan. 1997) (citing United States v. Kendrick, 331 F.2d 110, 113 (4th Cir. 1964) and Howell v. United States, 442 F.2d 265 (7th Cir. 1971)). The attorney-client privilege only affords protection to confidential communications seeking or rendering legal, rather than business, advice. United States v. Defazio, 899 F.2d 626, 635 (7th Cir. 1990). "Only when an attorney is giving advice concerning the legal implications of conduct, whether past or proposed, is the privilege properly invoked." Burton, 170 F.R.D. at 484 (citing Hercules Inc. v. Exxon Corp., 434 F. Supp. 136 (D. Del. 1977)). For the privilege to apply, "[l]egal advice must predominate . . . . The privilege does not apply where the legal advice is merely incidental to business advice." Id. (citations omitted).

"Communications made by and to in-house lawyers in connection with representatives of the corporation seeking and obtaining legal advice may be protected by the attorney-client privilege just as much as communications with outside counsel." Boca Investerings P'ship v. United States, 31 F. Supp. 2d 9, 11 (D.D.C. 1998) (citing Upjohn, 449 U.S. at 389-97, In re Sealed Case, 737 F.2d 94, 99 (D.C. Cir. 1984) and United States v. United Shoe Mach. Corp., 89 F. Supp. 357, 360 (D. Mass. 1950)). On the other hand, "communications made by and to the same in-house lawyer with respect to business matters, management decisions or business advice are not protected by the privilege. Id. In any event, courts have routinely "upheld the assertion of the attorney-client privilege and denied discovery of legal advice or information conveyed by a corporation's attorney to its board of directors." Great Plains Mut. Ins. Co. v. Mut. Reins. Bureau, 150 F.R.D.

193, 198 (D. Kan. 1993) (citing In Re Grand Jury 90-1, 758 F. Supp. 1411 (D. Colo. 1991) (corporate president's letter to the board of directors discussing legal advice given to president by attorney was protected from disclosure to the grand jury; corporation was client, and the president relayed the information to the board of directors as means of making legal advice available to the corporation); Shriver v. Baskin-Robbins Ice Cream Co., 145 F.R.D. 112, 114 (D. Colo. 1992) (communications between corporate counsel and company personnel are privileged so long as they concern matters within the scope of the employee's corporate duties; an otherwise privileged communication by a lawyer to a corporate agent does not lose its protected status simply because the agent then conveys the attorney's opinion to a corporate committee charged with acting on such issues); Welch v. Bd. of Dirs. of Wildwood Golf Club, 146 F.R.D. 131, 139 (W.D. Pa. 1993) (defendant properly asserted attorney-client privilege regarding portions of minutes of its board of directors' meetings as board of directors was seeking legal advice in regard to potential litigation); E. Techs., Inc. v. Chem-Solv, Inc., 128 F.R.D. 74 (E.D. Pa. 1989) (after in camera review of the unexpurgated minutes of the board of directors' meeting, court concludes that portions of minutes are protected by the attorney-client privilege)).

When a party invokes the attorney-client privilege by providing a privilege log, "the description of each document and its contents must be sufficiently detailed to allow the court to determine whether the elements of attorney-client privilege . . . have been established. Failing this, the documents must be produced." Smithkline Beecham Corp. v. Apotex Corp., 2005 U.S. Dist. LEXIS 37837, at **28-29 (E.D. Pa. December 30, 2005). RCFC 26(b)(5) provides the appropriate standard:

> When a party withholds information . . . by claiming that it is privileged . . . the party shall make the claim expressly and shall describe the nature of the documents, communications, or things not produced or disclosed in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the applicability of the privilege or protection.

RCFC 26(b)(5).[27]

"The rule does not attempt to define for each case what information must be provided . . . . Details concerning time, persons, general subject matter, etc. may be appropriate." Fed. R. Civ. Pro. 26(b)(5) Advisory Committee Notes. "Where descriptions in the privilege log fail to meet this standard, 'then disclosure is an

---

[27]RCFC 26(b)(5) and Rule 26(b)(5) of the Federal Rules of Civil Procedure are identical and thus the court uses federal courts' interpretation of the latter as persuasive authority.

appropriate sanction.'" Smithkline, 2005 U.S. Dist. LEXIS 37837, at *30 (quoting Smithkline Beecham Corp. v. Apotex Corp., 193 F.R.D. 530, 534 (N.D. Ill. 2000)). "[W]here no author is listed, [a party] must describe the content of the documents such that [the opposing party] and th[e] [c]ourt may better assess the applicability of the privilege." Fidelity & Deposit Co. v. McCulloch, 168 F.R.D. 516, 523 (E.D. Pa. 1996). The court "scrutinize[s] closely any privilege claim where [a party] is unable to identify the author or has provided only a general group-wide description for the recipients." Smithkline, 2005 U.S. Dist. LEXIS 27837, at *33 (citing, inter alia, Wilderness Soc'y v. U.S. Dep't of Interior, 344 F. Supp. 2d 1, 17 (D.D.C. 2004) (denying privilege where "defendants fail to identify the author . . . and in some cases do not even identify the recipient")).

2. Analysis

Each document that defendant moves the court to compel under the category of "memoranda prepared for the Board of Directors" is described in plaintiff's Revised Privilege Log as: "Recommendations and Legal Analysis Prepared at the Request or Under the Supervision of Counsel for Submission and Presentation to the PG&E Board of Directors [or the PG&E Management Committee] for Approval and Analysis of Proposed Regulatory Filing with" the CPUC or NRC, or in language very similar. Document Nos. 92-101, Pl.'s Resp. Ex. A (Plaintiff's Revised Privilege Log) at 9-11; see id., Document Nos. 92-101, 193, 290, 333-334, 677-679, 681-683. In the "Author" column, plaintiff either states "Pacific Gas & Electric Company," see, e.g., id., Document Nos. 92-101, or "None," see, e.g., id., Document Nos. 677-679. In the "Recipient" column, plaintiff either states "Womack, L.," see, e.g., id., Document Nos. 92-101, presumably a member of the Board of Directors of PG&E, "PG&E Management Committee," see, e.g., id., Document No. 677, "[PG&E] Board of Directors," see, e.g., id., Document No. 678, or "[PG&E] Utility Policy Committee," see, e.g., id., Document No. 679. Plaintiff also explains that these documents "reflect[] legal advice from the general counsel's office to the Board of Directors," Pl.'s Resp. at 12, and that "[w]here other other documents are a collaborative effort among or within PG&E departments, the company itself may be noted as the author," id. at 12 n.3

The court must decide whether "the description of each document and its contents . . . [is] sufficiently detailed to allow the court to determine . . . [that] the elements of attorney-client privilege . . . have been established. Failing this, the documents must be produced." Smithkline, 2005 U.S. Dist. LEXIS 37837, at **28-29; see also McCulloch, 168 F.R.D. at 523 ("[W]here no author is listed, [a party] must describe the content of the documents such that [the opposing party] and th[e] [c]ourt may better assess the

applicability of the privilege."). The court finds that plaintiff has failed to meet this standard.

Plaintiff has not sufficiently "describe[d] the nature of the documents, communications, or things not produced or disclosed in a manner that . . . enable[s] other parties to assess the applicability of the privilege or protection." RCFC 26(b)(5). Although plaintiff claims that the documents generally contain "[r]ecommendations and [l]egal [a]nalysis," see, e.g., Document Nos. 92-101, Pl.'s Resp. Ex. A (Plaintiff's Revised Privilege Log) at 9-11; cf. Burton, 170 F.R.D. at 484 ("Legal advice must predominate. . . . The privilege does not apply where the legal advice is merely incidental to business advice.") (citations omitted), there is no way for the court to determine whether "the person to [or from] whom the communication was made . . . is a member of the bar of a court," or that "the communication relates to a fact of which the attorney was informed . . . by his client . . . without the presence of strangers." First Fed. Savings Bank, 55 Fed. Cl. at 266 (citing Energy Capital, 45 Fed. Cl. at 484-85. Indeed, plaintiff's statement that "[w]here other documents are a collaborative effort among or within PG&E departments, the company itself may be noted as the author," Pl.'s Resp at 12 n.3, belies the notion that the court or defendant can adequately "assess the applicability of the privilege or protection." RCFC 26(b)(5); cf. Abbott Labs.,1987 U.S.Dist. LEXIS 10300, at *14 ("[T]he privilege is waived if the communications are disclosed to employees who did not need access to [them].").

While it is true that "courts routinely 'have upheld the assertion of the attorney-client privilege and denied discovery of legal advice or information conveyed by a corporation's attorney to its board of directors,'" Pl.'s Resp. at 12-13 (quoting Great Plains Mut. Ins. Co., 150 F.R.D. at 198), plaintiff's privilege log is not sufficiently descriptive for the court to determine that these documents were in fact created by PG&E attorneys, or that they were "conveyed by" PG&E's attorneys to their client, accord Wilderness Soc'y, 344 F. Supp. 2d at 17 ("Regarding four documents . . . , the defendants fail to identify the author of the document and in some cases . . . do not even identify the recipient. This makes it impossible for the Court to determine if this is a communication between an attorney and a client, a necessary requirement to assert the attorney-client privilege."); cf. Smithkline, 2005 U.S. Dist. LEXIS 27837, at *33 ("[The court] scrutinize[s] closely any privilege claim where [a party] is unable to identify the author or has provided only a general group-wide description for the recipients."). Thus, "disclosure is an appropriate sanction." Smithkline, 2005 U.S. Dist. LEXIS 37837, at *30; accord Wilderness Soc'y, 344 F. Supp. 2d at 17 ("[T]he defendants have failed to satisfy their burden to show that the documents were properly withheld under the attorney-client privilege."); Schwab v. Sears, Roebuck & Co. (In re Derienzo), 1998 Bankr. LEXIS 635, at **18-19 (Bankr. M.D. Pa. April 28, 1998) ("One category of

documents which were determined not to be subject to the attorney-client privilege were those in which the author of the document was not known. . . . [T]he Court could not determine whether or not they were documents produced by anyone either representing the [d]efendants or an agent and/or employee of those [d]efendants. All documents that had an unknown author were, therefore, found to be outside the attorney-client privilege.").

C. Conclusion

Although the court believes that it would be within its discretion in the circumstances of this case to order plaintiff to produce to defendant Document Nos. 92-101, 193, 290, 333-334, 677-679, and 681-683, the court exercises its discretion to ORDER plaintiff to PRODUCE Document Nos. 92-101, 193, 290, 333-334, 677-679, and 681-683 for IN CAMERA INSPECTION. On or before February 2, 2006, plaintiff shall cause to be delivered to chambers in a sealed envelope two copies of each of Document Nos. 92-101, 193, 290, 333-334, 677-679, and 681-683.

III. Whether it was Proper for Plaintiff to Instruct its Witnesses not to Respond During Their Depositions

A. Summary of the Parties' Arguments

Defendant's Motion states that "PG&E's counsel has . . . , throughout discovery in this matter, repeatedly prevented the Government from fully deposing many of PG&E employees and former employees by unjustified and disruptive tactics. Counsel have instructed deponents not to answer questions regarding the preparation of the damages claim provided to the Government and whether the deponent had discussions with PG&E's expert witnesses and the substance of those discussions." Def.'s Mot. at 16 (citing Def.'s Mot. Ex. F (Pulley Deposition (Dep.)) at 86-90 and Ex. G (Womack Dep.) at 14-26, 38,159-162). Defendant argues that "[s]uch a withholding of relevant information regarding subjects that plaintiff itself has put at issue in this litigation is improper and an inappropriate use of the attorney-client privilege and work product doctrine." Id. After citing the test set forth in Hearn v. Rhay, 68 F.R.D. 574 (E.D. Wash. 1975), for whether "a party has waived the attorney-client or work product privileges in putting the matter subject to the privilege at issue," Def.'s Mot. at 16, defendant asserts that "[t]he key inquiry is whether application of the work product doctrine would place a hardship on the development of our case – has it denied the Government from discovering information vital to the defense of the case[?]" Id. at 17. Defendant answers this question in the affirmative:

> counsel's instruction not to answer questions regarding the damages claim does deny us information key to the defense here. It appears that counsel is attempting to cloak information about the damages calculations that may lead to relevant information about the basis for the costs, including how the costs were calculated, [and] who had input into the process of determining what categories of costs were recoverable. These inquiries are necessary to a full understanding of PG&E's damages claim. Without the information, the Government is not able to adequately defend against costs that may be arguably specious or at least questionable.

Id. at 17-18. Thus, according to defendant, "[t]he [c]ourt should order plaintiff to produce the witnesses so that they can be questioned thoroughly about the damages claim." Id. at 18.

Plaintiff responds that "PG&E counsel has appropriately instructed witnesses not to answer questions . . . concerning the preparation of PG&E's damages claim." Pl.'s Resp. at 14. Indeed, plaintiff asserts, "[a] party does not automatically waive . . . privileges, which protect the formulation of legal opinions or litigation strategy, simply by bringing suit." Id. at 15 (citing Zenith Radio Corp. v. United States, 764 F.2d 1577, 1580 (Fed. Cir. 1985)). Plaintiff argues that "PG&E counsel specifically limited its objections to questions that concerned the preparation of PG&E's formal damages claim, as set out in its initial disclosures, which was a document prepared for this litigation and served on the government. PG&E counsel has not prevented the government from answering questions concerning costs it has incurred due to the breach." Id. at 16. In such circumstances, plaintiff states that "[t]he government has not made a sufficient showing that it needs the withheld information to warrant the release of privileged material." Id. Thus, according to plaintiff, "in no event should the government be permitted to call PG&E witnesses to pose such questions." Id. at 17.

In its Reply, defendant points out that "PG&E points to no authority for the notion that claim preparation is by definition protected by either the attorney-client privilege or the work product doctrine." Def.'s Reply at 8. Moreover, defendant argues, "PG&E did not assert a protection against disclosure of claim preparation material in any consistent manner." Id. Defendant states that "PG&E's blanket assertion is unsupported and violative of our rights to discovery. Whether [Robert Kapus, PG&E's budget coordinator/financial services supervisor,] had assistance from other PG&E employees in preparing the damages claim and, if so, the kind of input that he received, are directly relevant to the Government's inquiry into the damages [claimed] here. . . . The Government is entitled to discover information required to appraise the reasonableness of the damages claimed here." Id. at 10-11. Thus, defendant concludes, "[a]sserting work

product and attorney-client privilege during the fact depositions of PG&E witnesses was wholly improper[] and obstructive[,] and has clearly prejudiced the Government in completing fact discovery." Id. at 11.

B. Discussion

The court declines to address defendant's application of the Hearn test, adopted by the Federal Circuit, see Afro-Lecon, Inc. v. United States, 820 F.2d 1198, 1204-05 (Fed. Cir. 1987), in determining whether privileges that have attached to allow plaintiff's counsel properly to instruct witnesses not to answer questions regarding the preparation of plaintiff's damages claim have been waived. While defendant raises this test with regard to when a "party has waived the attorney-client privilege," Def.'s Mot. at 17 (emphasis added), plaintiff has not objected to the questioning of witnesses regarding the preparation of its damages claim on attorney-client privilege grounds, but rather on the grounds that the work product doctrine applied to these questions. See, e.g., Def.'s Reply Ex. 2 (Dep. of Robert Kapus) at 75 (plaintiff's counsel, Mr. Shapiro, explaining: "I want to be a little clearer than we have been. Some of these objections have been vague, but we have taken the position that the process for putting together this estimate is protected by the work product doctrine."). And while defendant's argument that "counsel's instructions not to answer questions regarding the damages claim does deny us information key to the defense," Def.'s Mot. at 17, may be appropriate in determining, under RCFC 26(b)(3), whether defendant "has substantial need of the materials in the preparation of the [defendant's] case," such that defendant may overcome the protections afforded plaintiff by the work product doctrine, the court finds it unnecessary to engage in such an inquiry.

Instead, the court finds that the appropriate course is to determine whether plaintiff's invocation of the work product doctrine to protect these witnesses from responding to defendant's questions regarding the preparation of plaintiff's damages claim was proper in the first place. Examples of the objections and witness instructions given by PG&E's counsel are instructive:

> Q: [Mr. Ekman, defendant's counsel, to Larry Womack] Did you have any involvement in determining which costs PG&E incurred associated with the vent stack removal were . . . caused by or incremental to the Department of Energy's breach of the Standard Contract?
>
> Mr. Stouck [plaintiff's counsel]: Yeah, that's work product. That calls for work product, and I'll object and instruct him not to answer.

Def.'s Mot. Ex. G (Womack Dep.) at 23, cited in Def.'s Mot. at 17.

> Q: [Mr. Damelin, defendant's counsel, to Lawrence Pulley] Now, did you have any involvement in the preparation of PG&E's damages claim against the government in this case?
>
> Mr. Shapiro [plaintiff's counsel]: Going to instruct Mr. Pulley not to answer that question. Calls for information protected by the work product doctrine.

Def.'s Mot. Ex. F (Pulley Dep.) at 86: 3-8, cited in Def.'s Mot. at 17.

> Q: [Mr. Ekman, defendant's counsel] Were you the only one involved in preparing or assembling the information that ultimately went into this document [Humboldt Bay Power Plant Removal of Ventilation Stack Incremental Costs Due to Fuel in Pool, Cost Estimate April 2005]?
>
> A: [Robert Kapus] No.
>
> Q: Who else was involved in that project?
>
> Mr. Shapiro: Objection. Instruct Mr. Kapus not to answer. Privilege.
>
> Q: Let me ask this: Were there any other PG&E employees who were involved in the preparation of this document?
>
> Mr. Shapiro: Again, I am going to object and instruct Mr. Kapus not to answer.
>
> . . . .
>
> Q: . . . Did you alone determine which costs – which activities , which costs were incremental?
>
> A: No.
>
> Mr. Shapiro: Again, I am going to object and instruct Mr. Kapus not to answer that question.
>
> [Q]: What's the basis for that?

> Mr. Shapiro: Privilege, work product.
>
> . . . .
>
> Mr. Shapiro: You are talking about a document that was prepared in the course of litigation for submittal as part of the damages. Exactly how this document or comparable documents were put together, what process was used, who talked to whom, that's covered by the work product doctrine.

Def.'s Reply Ex. 2 (Kapus Dep.) at 49-51, cited in Def.'s Reply at 8-9.

The work product doctrine, discussed in more detail above, see supra, Part I.B.1., "provides protection only for documents and tangible things and . . . not for facts a party may have learned, even if they were learned from work product documents that are not themselves discoverable." Westside Marrero Jeep Eagle, Inc. v. Chrysler Corp., No. 97-3012, 1998 U.S. Dist. LEXIS 8938, **3-4 (E.D. La. June 10, 1998) (emphasis added) (citing 8 Charles Alan Wright, Arthur R. Miller & Richard W. Marcus, Federal Practice and Procedure § 2024, at 337-38 (2d ed. 1994)); see also RCFC 26(b)(3) ("[A] party may obtain discovery of documents and tangible things . . . prepared in anticipation of litigation . . . only upon a showing . . . [of] substantial need . . . .") (emphasis added); cf. Advisory Committee Notes, Fed. R. Civ. P. 26(b)(3) ("Even though a party may ultimately have to disclose in response to interrogatories or requests to admit, he is entitled to keep confidential documents containing such matters prepared for internal use."). "In addition, the work product doctrine furnishes protection for some forms of work product not in tangible form, but these are limited to the mental impressions, conclusions, opinions, legal theories, thought processes and recollections of an attorney or other representative of a party concerning the litigation." Williams v. Chrysler Fin. Corp., No. 98-2931, 1999 U.S. Dist. LEXIS 6902, at *5 (E.D. La. May 3, 1999) (emphasis added) (citing 8 Wright, Miller & Marcus § 2024, at 337-38 (citing Hickman, 329 U.S. 495 and Fed. R. Civ. P. 26(b)(3))); see also In re Cendant Corp. Sec. Litig., 343 F.3d at 662 ("It is clear from Hickman that work product protection extends to both tangible and intangible work product."). "Furthermore, this protection extends beyond materials prepared by an attorney to include materials prepared by an attorney's agents and consultants." In re Cendant Corp. Sec. Litig., 343 F.3d at 662 (emphasis added).

Witness responses to questions regarding the preparation of plaintiff's damages claim are not "documents [or] tangible things" under RCFC 26(b)(3). Nor do such questions, directed at PG&E employees, call for intangible work product "of an attorney or other representative of a party concerning the litigation," RCFC 26(b)(3) (defining a "party's representative" to "includ[e] the . . . party's attorney, consultant, surety,

indemnitor, insurer, or agent); cf. In re Cendant Corp. Sec. Litig., 343 F.3d at 665 ("Litigation consultants retained to aid in witness preparation may qualify as non-attorneys who are protected by the work product doctrine.") (citing In re Ford Motor Co., 110 F.3d 954, 967 (3d Cir. 1997) (the work product doctrine protected materials prepared by an in-house technical assistant for meetings to be attended by an outside technical consulting firm and lawyers regarding an issue in a product liability suit); Martin v. Bally's Park Place Hotel & Casino, 983 F.2d 1252 (3d Cir. 1993) (a technical report prepared by a consulting firm was protected from discovery because the document was prepared in anticipation of litigation by a party's representative (a consultant) for that party's representative (the company's in-house lawyer)); United Coal Cos. v. Powell Constr. Co., 839 F.2d 958, 966 (3d Cir. 1988) (the work product doctrine extended beyond materials reflecting an attorney's mental impressions to encompass materials prepared in anticipation of litigation by a party's insurer); Sprague v. Director, Office of Workers' Compensation Programs, 688 F.2d 862, 869-870 (1st Cir. 1982) (opinion letter setting forth expert's medical opinion was protected because it was prepared to advise counsel)).

Thus, plaintiff's counsel's assertion that responses of PG&E employees to deposition questions regarding the preparation of plaintiff's damages claim are "covered by the work product doctrine," Def.'s Reply Ex. 2 (Dep. of Robert Kapus) at 51, attempts to stretch the doctrine beyond its recognized boundaries. To the extent that such questions call for the substance of communications made from these employees to their attorneys, the attorney-client privilege may apply, cf. Burton, 170 F.R.D. at 484 ("The privilege does not apply to the fact of communication between a client and attorney. It is the substance of the communication which is protected, not the fact that there has been communication.") (citing Kendrick, 331 F.2d at 113 and Howell, 442 F.2d at 265), but the transcripts of depositions cited above do not appear to call for such information, nor does plaintiff's counsel appear to object to questions on such grounds.

C. Conclusion

For the foregoing reasons, the court ORDERS that the depositions of Messrs. Kapus, Womack, Pulley, and any other PG&E employee improperly instructed to not answer questions regarding the preparation of plaintiff's damages claim, be REOPENED. If the parties have further disputes regarding the permissibility of objections to questions during depositions, the parties shall contact chambers for guidance at that time and during the respective deposition by telephone at (202) 357-6564.

IV. Documents Prepared by Third Parties for Regulatory Proceedings

In its Reply, defendant for the first time requests the court to "order PG&E to produce any documents prepared for its regulatory proceedings by any third parties." Def.'s Reply at 8. However, "[r]aising the issue for the first time in a reply brief does not suffice; reply briefs reply to arguments made in the response brief – they do not provide the moving party with a new opportunity to present yet another issue for the court's consideration. Further, the non-moving party ordinarily has no right to respond to the reply brief, at least not until oral argument." Novosteel v. United States, 284 F.3d 1261, 1274 (Fed. Cir. 2002). Therefore, "[a]s a matter of litigation fairness and procedure, then, we must treat this argument as waived." Id.; see also Norman v. United States, 429 F.3d 1081, 1091 (Fed. Cir. 2005) ("Arguments raised for the first time in a reply brief are not properly before this court. Although this practice is 'not governed by a rigid rule,' we will adhere to it except 'where circumstances indicate that it would result in basically unfair procedure.'") (quoting Becton Dickinson & Co. v. C.R. Bard, Inc., 922 F.2d 792, 800 (Fed. Cir. 1990)) (citation omitted).

V. Conclusion

For the foregoing reasons and to the extent stated in Parts I, II and III of this Opinion, defendant's Motion is GRANTED-IN-PART and DENIED-IN-PART. The parties shall continue to contact the court at any time when it appears that the involvement of the court may assist in securing "the just, speedy, and inexpensive determination of [this] action." RCFC 1.

IT IS SO ORDERED.

s/ Emily C. Hewitt
EMILY C. HEWITT
Judge