No. 04-0074C
into which has been consolidated
No. 04-0075C
Judge Hewitt

(Filed Electronically, April 10, 2006)

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

PACIFIC GAS & ELECTRIC COMPANY,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

# PG&E'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW

JERRY STOUCK
Greenberg Traurig, LLP
800 Connecticut Avenue, NW
Suite 500
Washington, DC 20006
(202) 331-3173
(202) 261-4751
*Counsel for Plaintiff*
Pacific Gas & Electric Company

Of Counsel:
ROBERT L. SHAPIRO
Greenberg Traurig, LLP

# TABLE OF CONTENTS

PAGE

INTRODUCTION ........ 1

STATEMENT OF FACTS ........ 2

I. MEANS OF SPENT FUEL STORAGE AT COMMERCIAL NUCLEAR POWER PLANTS ........ 2

II. PG&E'S NUCLEAR POWER PLANTS ........ 3

A. HBPP Background ........ 4

B. DCPP Background ........ 6

III. GOVERNMENT SPENT FUEL DISPOSAL PROGRAM ........ 7

A. Development of Government Responsibility for Disposal Program ........ 7

B. Development of the Standard Contract ........ 9

C. Reasonable Acceptance Rate ........ 10

D. Reasonable Sequence of Acceptance ........ 11

E. GTCC Waste ........ 12

F. DOE's Failure to Make Progress Toward Performance ........ 13

IV. PG&E RESPONSE TO ANTICIPATED AND ACTUAL FAILURE OF DOE PERFORMANCE ........ 16

A. Response at DCPP ........ 16

1. Development of an ISFSI ........ 16

2. Interim Cask Pit Rack ........ 18

B. Response at HBPP ........ 18

PAGE


1. Extended SAFSTOR Operations ........ 18

2. Development of an ISFSI........ 18

3. HBPP Stack Take-Down........ 19

C. Off-Site Storage ........ 20

V. AMOUNT OF DAMAGES........ 21

STATEMENT OF ISSUES OF FACT AND LAW ........ 21

ISSUES OF LAW........ 21

ISSUES OF FACT........ 22

VI. DISCUSSION OF LEGAL PRINCIPLES ........ 23

A. Basic Damages Principles........ 23

B. The Evidence Establishes Foreseeability........ 24

C. The Evidence Establishes Causation ........ 28

D. The Evidence Establishes Reasonable Certainty........ 33

E. Government Offsets........ 35

1. Proposed deduction based on statute of limitations........ 35

2. Suggested elimination of certain damages categories based on "schedule" issues. ........ 36

3. Proposed deduction for "non-breach" SNF loading costs. 42

4. Proposed deductions for costs that are "not supported" or "not incremental." ........ 44

5. Proposed deduction of labor and allocated costs. ........ 46

6. Suggested deduction of costs to store failed fuel........ 49

**PAGE**

7. Proposed deduction of costs to plan and implement storage of GTCC waste. .................................................... 51

F. Restitution and Takings Claims .................................................... 58

CONCLUSION .......................................................................................................... 59

# TABLE OF AUTHORITIES

**CASES** **PAGE**

*Ace-Federal Reporters, Inc. v. Barram*, 226 F.3D 1329 (Fed. Cir. 2000) ........................ 33

*Alvin, Ltd. v. United States Postal Serv.*, 816 F.2d 1562 (Fed. Cir. 1987) ........................ 39

*Auer v. Robbins*, 519 U.S. 452 (1997) ........................ 53

*B-E-C-K Constructors v. United States*, 571 F.2d 25 (Ct. Cl. 1978) ........................ 38

*Bluebonnet Sav. Bank v. United States*, 266 F.3d 1348 (Fed. Cir. 2001) ................. passim

*Chain Belt Co. v. United States*, 115 F. Supp. 701 (Ct. Cl. 1953) ........................ 29

*Christensen v. Harris County*, 529 U.S. 576 (2000) ........................ 53

*Cienega Gardens v. United States*, 38 Fed. Cl. 64 (1997) ........................ 30

*Commonwealth Edison Co. v. United States*, 56 Fed. Cl. 652 (2003) ....................... passim

*David Nassif Assocs. v. United States*, 557 F.2d 249 (Ct.Cl. 1977) ........................ 39

*David Nassif Assocs. v. United States*, 644 F.2d 4 (Ct.Cl. 1981) ........................ 40

*Energy Capital Corp. v. United States*, 302 F.3d 1314 (Fed. Cir. 2002).................... 24, 33

*Essex Electro Eng'rs, Inc. v. Danzig*, 224 F.3d 1283 (Fed. Cir. 2000) ........................ 38

*Fallini v. United States*, 56 F.3d 1378 (Fed. Cir. 1995) ........................ 35

*Firestone Tire & Rubber Co. v. United States*, 444 F.2d 547 (Ct. Cl. 1971) ........................ 55

*Gaston & Assocs., Inc. v. United States*, 27 Fed. Cl. 243 (1992) ........................ 55

*General Warehouse Two, Inc. v. United States*, 389 F.2d 1016 (Ct. Cl. 1967) ................ 55

*Hughes Communications Galaxy, Inc. v. United States*, 271 F.3d 1066 (Fed. Cir. 2001) ........................ 24

*In re Connecticut Yankee Atomic Power Company*, Docket No. ER97-913-000, 84 FERC ¶ 63,009, 1998 WL 656747 (Aug. 31, 1998) ..................... 54

*In re Kellet Aircraft Corp.*, 186 F.2d 197 (3d Cir. 1950) ........................ 30

*Indiana Michigan Power Co. v. Dep't of Energy*, 88 F.3d 1272 (D.C. Cir. 1996) ........... 16

*Indiana Michigan Power Co. v. United States*, 422 F.3d 1369 (Fed. Cir. 2005) ........................ passim

*Indiana Michigan Power Co. v. United States*, 57 Fed. Cl. 88, 99 (2003) ........................ 25

*Inwood Laboratories, Inc. v. Ives Laboratories, Inc.*, 456 U.S. 844 (1982) ..................... 44

*Ketchikan Pulp Co. v. United States*, 20 Cl. Ct. 164 (1990) ........................ 30

**CASES** **PAGE**

*Koby v. United States*, 53 Fed. Cl. 493, 496 (2002) ........................................................ 31

*Locke v. United States*, 283 F.2d 521 (4th Cir. 1960).......................................... 31, 33, 42

*Metric Constructors, Inc. v. National Aeronautics & Space Admin.*, 169 F.3d 747
(Fed. Cir. 1999)...................................................................................... 38, 55

*Moore v. Hannon Food Service, Inc.* 317 F.3d 489 (5th Cir. 2003) ............................ 53, 54

*Northern States Power Co. v. Dep't of Energy*, 128 F.3d 754 (D.C. Cir. 1997)............... 15

*Peter Kiewit Sons' Co. v. United States*, 109 Ct. Cl. 390 (1947)..................................... 55

*Roedler v. Department of Energy*, 255 F.3d 1347 (Fed. Cir. 2001) ................................ 38

*Sacramento Municipal Util. Dist. v. United States*, No. 98-488C (Ct. Cl. 1998)...... passim

*San Carlos Irrigation & Drainage Dist. v. United States*, 111 F.3d 1557
(Fed. Cir. 1997)............................................................................................ 23

*Specialty Assembling & Packing Co. v. United States*, 355 F.2d 554 (Ct. Cl. 1966)....... 38

*T.C. Bateson Constr. Co. v. United States*, 319 F.2d 135 (Ct. Cl. 1963) ......................... 31

*Tennessee Valley Authority v. United States*, 60 Fed. Cl. 665 (2004) .............26, 28-29, 32

*Tennessee Valley Authority v. United States*, 69 Fed. Cl. 515 (2006) ....................... passim

*Thermo Electron Corp. v. Schiavone Constr. Co.*, 958 F.2d 1158 (1st Cir. 1992)........... 40

*United States v. Seckinger*, 397 U.S. 203 (1970)....................................................... 54, 55

*Wells Fargo Bank, N.A. v. United States*, 88 F.3d 1012 (Fed. Cir. 1996) ........................ 26

*Yankee Atomic Elec. Co. v. United States*, No. 98-126C (Fed. Cl.
filed Feb. 18, 1999)..................................................................... 26, 29, 30, 37

**FEDERAL STATUTES**

28 U.S.C. § 2501............................................................................................. 35

42 U.S.C. § 10156(a)(1) (2000) ........................................................................ 27

42 U.S.C. § 10222(a)(5)(B) (2000)...................................................................... 2

**FEDERAL RULES**

Fed. R. Evid. Rule 1006..................................................................................... 34

**FEDERAL REGULATIONS**

10 C.F. R. § 61.55(a)(2)(iv) (the "1989 Rule") .......... 51-52, 53
48 Fed. Reg. 5458 .......... 9
48 Fed. Reg. 16,590 .......... 10, 25
48 Fed Reg. 54,391 .......... 27
53 Fed. Reg. 17,709 .......... 53
54 Fed. Reg. 22,579 .......... 52
54 Fed. Reg. 22,578 .......... 13, 52
60 Fed. Reg. 21,793 .......... 15

**OTHER AUTHORITIES**

E. ALLAN FARNSWORTH, FARNSWORTH ON CONTRACTS § 12.14 (1990) .......... 24, 27
DAN D. DOBBS, LAW OF REMEDIES, § 12(6)(2) (1993) .......... 30
RESTATEMENT (SECOND) OF CONTRACTS (1981) .......... passim

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

Filed Electronically on April 10, 2006

| | | |
|---|---|---|
| PACIFIC GAS & ELECTRIC COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 04-0074C, into which has been |
| v. | ) | consolidated No. 04-0075C |
| | ) | (Judge Hewitt) |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

**PG&E'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW**

Pursuant to RCFC, Appendix A, ¶ 14(a) and the Court's Scheduling Order of February 18, 2005, PG&E submits the following memorandum of contentions of fact and law:[1]

## INTRODUCTION

This case presents a straightforward claim for breach of contract damages. As required by the Nuclear Waste Policy Act of 1982 ("NWPA"), DOE entered into contracts with all nuclear utilities, under which, in return for very substantial fees, DOE assumed financial responsibility for storage and disposal of commercial spent nuclear fuel and high-level radioactive waste "beginning not later than January 31, 1998." 42

[1] Although PG&E has conformed its contentions of fact and law in this memorandum to the Court's Opinion of March 30, 2006 limiting consideration of damages in this round of litigation to those incurred through 2004, PG&E respectfully preserves for the record its disagreement with the Court's ruling as outlined in prior briefing.

U.S.C. § 10222(a)(5)(B) (2000).[2] PG&E has paid all fees required to date under its contract with DOE (the "Contract"), but, more than eight years after the mandatory 1998 "start" date, has received no performance in return from DOE.

Through December 31, 2004, PG&E paid DOE more than $286 million in Contract fees, and, as required by the Contract, PG&E continues to pay DOE fees of more than $6 million every calendar quarter. Because of DOE's breach, however, PG&E has been required to incur additional and very substantial costs to investigate, implement and operate means to store its Spent Fuel for an extended period of time after 1998. Those costs are exactly the type of costs that the NWPA and DOE's spent fuel contracts were designed and intended to allow utilities like PG&E to avoid. Under well-established law, those costs are recoverable as damages here.

## STATEMENT OF FACTS

### I. MEANS OF SPENT FUEL STORAGE AT COMMERCIAL NUCLEAR POWER PLANTS

Commercial nuclear reactors in the United States were designed to temporarily store spent fuel "wet," in pools pending its removal from the plant site. In this arrangement, spent fuel is stored under water that removes residual heat generated by radioactive decay and provides shielding so that the radiation from the spent fuel does not impact people or the environment. Spent fuel pools are equipped with racks that hold the spent fuel. Given a particular rack arrangement, any particular pool can hold only a specified amount of spent fuel. The operation of a spent fuel pool requires utilities to

[2] For ease of reference, PG&E will use "spent fuel" to refer to both forms of waste covered by the Contract (i.e., spent nuclear fuel and high-level radioactive waste).

bear the labor, maintenance, security, management and other costs of operating the pool. This cost does not vary significantly with the amount of spent fuel in the pool. The storage capacity of a spent fuel pool can be increased to a limited extent in some instances by "re-racking" the pool. In that process, additional racks are added to the spent fuel pool or the existing racks are replaced with ones having a more compact design. Re-racking requires not only the purchase of the new racks but also significant labor involved in the installation of the new racks. In addition, an operating nuclear reactor should have a spent fuel pool with sufficient unused capacity to accommodate all of the spent fuel currently in the reactor itself. This storage capacity is frequently referred to as a "full core off-load reserve capacity."

Commercial nuclear reactors can also store spent nuclear fuel in a "dry" form. In this arrangement, after sufficient in-pool decay time spent fuel is moved from the spent fuel pool to containers which are designed to keep radiation from the spent fuel from reaching the atmosphere. These containers are costly to purchase. In addition, the movement of spent fuel from wet to dry storage is expensive, as it entails special purpose equipment and substantial labor costs. Once spent fuel is in dry storage, however, the ongoing costs of a dry storage facility for operations, maintenance, labor, security and other costs are significantly less than those of a spent fuel pool containing a similar amount of spent fuel.

## II. PG&E'S NUCLEAR POWER PLANTS

PG&E owns two nuclear power plants: the Diablo Canyon Power Plant ("DCPP") is an operational two-unit generating facility located on the Pacific Coast near San Louis Obispo, California; Humboldt Bay Power Plant Unit 3 ("HBPP") is a permanently shutdown nuclear reactor located on Humboldt Bay near Eureka, California.

A. HBPP Background

HBPP was one of the nation's early commercial nuclear-powered electric generating facilities. HBPP began operation in August 1963. The plant was last operated for generating electricity in 1976.

HBPP entered a planned shutdown in 1976 for refueling. During that outage, the NRC raised concerns regarding the potential impact of seismic activity at the plant site. Substantial additional regulatory requirements were imposed by the NRC in light of the accident at the Three Mile Island Unit 2 ("TMI") nuclear power plant in March 1979. In addition, the NRC began developing safety goals and implementing guidelines after the TMI accident, which created uncertainty regarding the regulatory requirements that would be faced by HBPP. In December 1979, the California Public Utilities Commission ("CPUC") required PG&E to analyze the economics of the merits of restarting HBPP. In a 1980 study commissioned by PG&E, Bechtel concluded that the economic merits of restarting HBPP were uncertain. The NRC issued additional regulatory guidance in 1983. In that same year, PG&E undertook a further analysis of the economic merits of restarting HBPP, which concluded that the economic merits of restarting HBPP had further declined. Additional analysis also showed that converting HBPP to be powered by non-nuclear fuel was not economically viable. In light of these factors, PG&E decided in June 1983 to retire HBPP. Consistent with that decision, in 1984 PG&E moved all of the nuclear fuel in its reactor core into HBPP's spent fuel pool.

Upon studying its decommissioning options for HBPP in 1981 and 1982, PG&E concluded that because the spent nuclear fuel must remain on site until DOE is ready to accept it, PG&E had only one reasonable option for decommissioning HBPP at that time. That option was custodial "SAFSTOR," which under Nuclear Regulatory Commission

("NRC") regulations essentially involved placing the unit in a mothball condition to assure that the public health and safety are adequately protected before the plant is later decontaminated and dismantled. HBPP officially entered SAFSTOR status in 1988 with an effective date in 1985. Under NRC guidelines, PG&E is to complete decommissioning of HBPP within 30 years, or by 2015. When HBPP entered into SAFSTOR status, PG&E concluded that there would be ample time for shipment of its spent fuel to DOE pursuant to facilities being developed pursuant to the NWPA.

In July 1985, Battelle completed a study for PG&E examining its alternatives for extended storage of HBPP's spent nuclear fuel. That study concluded that extended storage in the onsite storage pool was the most attractive course of action. Consistent with the results of the Battelle study, as part of a loan agreement needed for the purchase of pollution control bonds for DCPP, PG&E agreed in 1985 to not store nuclear waste from any other facility, including HBPP, at the DCPP site.

In June 1987, PG&E entered into a Memorandum of Agreement with a group of individuals referred to as the Joint Intervenors. In the agreement, the parties acknowledged that no DOE facility existed to accept spent nuclear fuel from HBPP and that dry cask storage of the spent nuclear fuel was not authorized by the NRC for sites such as HBPP (i.e., there is a relatively high risk of earthquakes and other seismic activity). Dry cask storage was not authorized for sites such as HBPP at the time due to the high seismic nature of the site. PG&E agreed in the Memorandum to reexamine the possibility of utilizing dry cask storage if and when such a storage option became available for sites such as HBPP. PG&E continued to monitor its options for storing HBPP's spent nuclear fuel. In December 1991, PG&E had another study of its options

for storing HBPP's spent nuclear fuel conducted. That study concluded that dry cask storage was still not an option for HBPP.

Consistent with the parties' Contract, PG&E paid DOE a one-time fee for the spent fuel at HBPP in 1985. *See* Contract, Art. VIII. At that time, PG&E calculated its one-time fee obligation treating the spent nuclear fuel that remained in its reactor core in 1983, following the 1976 shutdown, as "in core" fuel under the Contract terms. *See* Art. VIII.A.3. In its 1991 Acceptance Priority Ranking "APR"), DOE treated the core of nuclear fuel removed to the HBPP spent fuel pool in 1984 as discharged at that time, even though that core of nuclear fuel had never been used to operate the reactor. In 1992, PG&E and DOE agreed that this last core of HBPP's nuclear fuel would be treated as discharged in 1976, rather than "in core" fuel as of 1983. In accordance with that agreement, PG&E agreed to pay an amount (with interest) reflecting the difference between its one-time Contract fee payment in 1985 and a recalculated one-time fee obligation based upon the status of all of its nuclear fuel as spent nuclear fuel discharged as of 1976. *See id*. That additional payment was made in 1996.

B. DCPP Background

DCPP was designed in the 1960's, and the first unit's construction permit was issued in 1968. However, due to regulatory issues, the plant's units did not begin commercial operation until the mid-1980s. Since then, DCPP has been an important source of electricity for PG&E, and has made important contributions to PG&E's revenues and profits. Each DCPP nuclear unit has its own, independent spent fuel pool. The capacity of DCPP's spent fuel pools were consistent with that of comparably-sized commercial nuclear power plants designed in the 1960's through the mid-1970's.

DOE and PG&E entered into their spent fuel disposal Contract in 1983, and it required that spent fuel removal services begin by 1998. Shortly after the Contract was entered, because, as will be discussed below, spent fuel was no longer being reprocessed in this country, it became clear to PG&E that it would need additional capacity for the storage of spent nuclear fuel being generated at DCPP. In light of that need, PG&E reracked the DCPP spent fuel pools in 1986-87. PG&E expected that the increased capacity of the DCPP spent fuel pools would be sufficient for its spent fuel storage needs until approximately 2006. PG&E anticipated that DOE would begin accepting spent fuel from DCPP by that time under the parties' Contract so that PG&E would not need any additional spent fuel storage capacity at DCPP.

In addition to the one-time fee noted above, PG&E pays additional Contract fees (of about $6 million) each calendar quarter for DOE's services to accept and dispose of PG&E's spent fuel. PG&E is fully up to date on such fee payments.

## III. GOVERNMENT SPENT FUEL DISPOSAL PROGRAM

### A. Development of Government Responsibility for Disposal Program

From the dawn of the Atomic Age, the disposal of commercial spent fuel has always been a federal government responsibility. But the government has never met this obligation.

Until 1977, commercial nuclear utilities in the United States had expected that their spent fuel would be reprocessed, as is done to this day in Europe and elsewhere in the world. Indeed, some commercial spent fuel was reprocessed at a facility in West Valley, New York in the 1960s, including some transported by rail from HBPP. Reprocessing enables additional energy from the enriched uranium in the spent fuel and from plutonium produced during plant operation to be utilized. Reprocessing also

substantially reduced the volume of waste requiring disposal. However, with traditional technologies, reprocessing also results in some amount of weapons-grade plutonium.

In 1977, President Carter banned reprocessing of spent fuel from commercial nuclear power plants so as to limit the amount of weapons grade plutonium in the hopes of limiting the proliferation of nuclear weapons. The 1977 ban on domestic reprocessing of spent fuel from commercial nuclear power plants effectively thwarted the development of a domestic reprocessing industry. In light of the reprocessing ban, the federal government undertook the development of a solution for the disposition of spent fuel from commercial nuclear power plants. The federal solution that was developed was for deep geologic disposal of the material.

The particulars of the federal program for the disposal of spent fuel from commercial nuclear reactors were set out in the NWPA. The NWPA set a date of January 31, 1998 for the commencement of spent fuel disposition services from DOE. The 1998 commencement date reflected a legislative compromise. Utilities wanted DOE to begin removing their spent fuel immediately in 1983, whereas other interested parties urged a date later than 1998 for such removal to assure requisite technical and regulatory lead-up time. Pursuant to the compromise date of 1998, the developers of the NWPA understood that utilities would be responsible for the costs of storing their spent fuel until January 31, 1998, but that after that time, such storage and ultimately disposal would be a federal government responsibility. The NWPA required that DOE's obligations to utilities be set out in contracts. The developers of the NWPA employed the contract mechanism to help ensure that utilities would have a remedy in the event that DOE failed to perform in a timely manner.

The NWPA did not set out the specific terms for the rate or sequence of spent fuel acceptance from utilities. These terms were not set out in the NWPA, at least in part, because it was not immediately clear just how much acceptance would be appropriate. However, the developers of the NWPA understood and intended that spent fuel would be accepted from utilities at a reasonable rate consistent with the purpose of the NWPA to alleviate the problem of spent fuel accumulation caused by the termination of reprocessing. In particular, the developers of the NWPA understood and intended that spent fuel acceptance from utilities would be at a sufficient rate such that by January 31, 1998, no utility would have to add to the spent fuel storage capacity of its nuclear plants nor incur otherwise avoidable spent fuel storage costs; in other words, January 31, 1998 would be a point of demarcation between utility and federal and financial responsibility for spent fuel storage and disposition costs.

B. <u>Development of the Standard Contract</u>

President Reagan signed the NWPA into law on January 7, 1983. Because the NWPA required that contracts between DOE and utilities be signed by June 30, 1983, the contracts between DOE and utilities were developed hurriedly. DOE decided not to negotiate the terms of individual contracts with each commercial nuclear utility. Instead, DOE decided to develop a standard contract to be used with all utilities through notice and comment rulemaking. *See* 48 Fed. Reg. 5458 (1983). Ultimately, DOE drafted the standard contract and provided for little input from utilities. Utility input was largely limited to providing comments in response to the proposed rule containing the initial draft standard contract published in February 1983. *see id.*, and attendance at a few meetings with DOE officials.

In the standard contract published as a final rule by DOE in April 1983, DOE largely refused to include terms in the contract that were not otherwise set out as requirements in the NWPA. *See* 48 Fed. Reg. 16,590 (1983). Accordingly, DOE did not include an acceptance rate term in the standard contract and instead left that as an open term. In one of the very few instances where DOE accepted a suggestion from utilities to alter the draft standard contract published in February 1983, DOE added a provision providing for the exchange of spent fuel acceptance allocations among utilities. *Id.* at 16,592. In the final standard contract, DOE rejected requests from some utilities to delete a provision in the draft contract permitting DOE to accord priority acceptance to spent fuel from permanently shutdown nuclear power plants. *Id.* at 16,593. In rejecting calls to delete this provision, DOE explained that it was important to ensure that utilities not be required to store spent fuel at reactors for prolonged periods after those reactors permanently shut down. *Id.*

DOE and PG&E entered into a standard contract, *i.e.*, the Contract, on June 30, 1983.

C. <u>Reasonable Acceptance Rate</u>

DOE made clear its understanding of the elements of a reasonable acceptance rate soon after enactment of the NWPA. DOE understood and intended that no utility would have to add additional spent fuel storage capacity after January 31, 1998. *See, e.g.*, Proceedings of the 1983 Civilian Radioactive Waste Management Information Meeting, December 12-15, 1983, Program Overview by Robert Morgan (the first acting director of the DOE spent fuel disposition program) (PG&E Exh. 267). DOE also understood and intended that the acceptance rate should reflect an efficient spent fuel acceptance program. *See, e.g.*, Mission Plan for the Civilian Radioactive Waste Management

Program, Vol. I (DOE/RW-0005) (PG&E Exh. 86). In addition, DOE understood and intended that the acceptance rate would be sufficient to both accommodate discharges of spent fuel from commercial reactors after January 31, 1998 and to work off the backlog of previously discharged spent fuel being stored by utilities as of that time. Nuclear utilities shared these understandings.

An acceptance rate from commercial nuclear utilities ramping promptly up to 3000 MTU per year starting in 1998 would have been consistent with these elements for a reasonable acceptance rate. A 3000 MTU per year acceptance rate would have enabled virtually all utilities to not incur avoidable spent fuel storage costs after January 31, 1998. Such a rate would also have been programmatically efficient in that it would have been technologically achievable and would have helped to minimize program costs. Indeed, DOE's plans for the spent fuel acceptance program since its inception, up to and including its July 2004 Acceptance Capacity Ranking and Annual Priority Report ("ACR/APR") (PG&E Exh.1182), have been consistent with – and for the most part have been predicated upon – a 3000 MTU per year acceptance rate.

D. Reasonable Sequence of Acceptance

A reasonable sequence of spent fuel acceptance would have made liberal use of the standard contract's exchange mechanism. The standard contract indicates that spent fuel acceptance allocations should be provided to utilities in the order in which they discharged spent fuel from their reactors – an oldest-fuel-first ("OFF") sequence. If DOE had started performance in 1998 at an acceptance rate ramping up to 3000 MTU per year, PG&E would have needed little alteration of its initial OFF acceptance allocations through exchanges in order to minimize its spent fuel storage costs. Nevertheless, PG&E and many other utilities would have engaged in exchanges.

DOE and utilities expected that the standard contract's exchange mechanism would have been used to enable utilities to optimize the sequence of DOE's acceptance of spent fuel from individual commercial utilities. *See* September 28, 1995 letter from Daniel Dreyfus of DOE to Andrew Kadak (PG&E Exh. 115) (exchange mechanism would "allow industry to optimize the allocation of waste acceptance capacity to meet individual utility needs, without the overt involvement of [DOE]."). Although the standard contract provides DOE with discretion in the approval of exchanges, DOE intended to exercise that discretion reasonably to effectuate the parties' intent for the exchanges provision. Indeed, the parties expected the exchange provision to work well enough to eliminate the need for DOE to accord priority acceptance to spent fuel from permanently shutdown reactors. And to the extent such exchanges did not develop, DOE would have used the priority acceptance from shutdown reactors mechanism as necessary to have ensured that no shutdown commercial reactor would had to have waited for an extended period before delivering the last of its spent fuel to DOE.

With reasonable exchanges, absent DOE's breach the last spent fuel would have been removed from HBPP in 1998, and DOE would have begun spent fuel removal from DCPP in 2006, or earlier if necessary to enable PG&E to not incur avoidable spent fuel storage costs at DCPP.

E. <u>GTCC Waste</u>

The parties understood when they entered the contract in 1983 that the decommissioning of commercial nuclear power plants would result in the generation of Greater-than-Class-C ("GTCC") waste from reactor internals. The parties intended at the time of contracting that such waste would be disposed of in a deep geologic repository. DOE's responsibility to dispose of GTCC waste was confirmed and codified in the Low

Level Radioactive Waste Policy Amendments Act of 1985 ("LLWPAA"), and DOE has long intended and planned to dispose of GTCC waste in a deep geologic repository with spent nuclear fuel. *See* pp. 51, 55-58 below (further describing GTCC waste and DOE's plans).

The NRC has determined by rule that GTCC waste requires permanent isolation, meaning that it must be disposed of in a deep geologic repository. 54 Fed. Reg. 22,578, 22,583 (1989). And while that regulation permits DOE to seek NRC approval of an alternative means of disposal for GTCC waste, DOE has never sought such approval. As with spent fuel, the parties' Contract does not include terms governing the specific timing for DOE's removal of GTCC waste from utilities. A reasonable term requires that utility GTCC waste be removed no later than the last of utilities' spent nuclear fuel.

And even if GTCC waste were not technically covered by the terms of the parties' contract, consistent with the LLWPAA and DOE's long-standing plans to provide GTCC waste removal services when the need arises, DOE would have removed HBPP's GTCC waste with its spent fuel absent the breach. DOE has not removed HBPP's GTCC waste and has no plans to do so because it intends to manage and dispose of utility GTCC waste together with utility spent nuclear fuel, and in the absence of DOE removal of spent nuclear fuel from utility sites, there is no urgency for DOE to remove GTCC waste from utility sites. Moreover, DOE has failed to take actions to plan for or dispose of utility GTCC waste so as not to undermine its litigation position in this and other spent fuel cases before the Court.

F. <u>DOE's Failure to Make Progress Toward Performance</u>

Within the first few years of the start of DOE's program for spent fuel disposal, it became evident that the program was not making progress toward development of a

repository that would enable DOE to start accepting spent fuel by January 31, 1998. By 1987, Congress responded to this lack of progress by refocusing the DOE program on the characterization of Yucca Mountain as a potential disposal site through passage of the Nuclear Waste Policy Amendments Act of 1987. The amendments also substantially restricted DOE's ability to use temporary storage of utility spent fuel as a means of performing its spent fuel removal obligations to utilities by January 31, 1998. The amendments linked establishment of temporary storage under the NWPA, called Monitored Retrievable Storage ("MRS"), to progress in development of the repository. The amendments prohibited the siting of an MRS until DOE received construction authorization for a repository; the amendments also prohibited DOE from storing more than 10,000 MTU of spent fuel at a MRS facility until the repository was licensed to receive spent fuel.

Enactment of the 1987 amendments put DOE's ability to perform its contractual obligations by January 1998 in great jeopardy. DOE acknowledged the likelihood that it would not start accepting spent fuel from utilities by January 31, 1998 through publication of documents such as the Draft 1988 Mission Plan Amendment (DOE/RW-0187) (PG&E Exh. 90) and the 1989 Report to Congress on the Reassessment of the Civilian Radioactive Waste Management Program (DOE/RW-0316P) (PG&E Exh. 91). DOE further acknowledged difficulties in its performance by 1998 in documents such as the 1991 Annual Capacity Report ("ACR") (DOE/RW-0331P) (PG&E Exh. 70), in which it made clear that DOE would not be able to accept any spent fuel from utilities by 1998 unless Congress cut the linkages between the repository and an MRS facility. The 1991 ACR also projected only limited acceptance of spent fuel from utilities in the first years

of the program in anticipation that, at best, only some of the linkages between the repository and a MRS would be cut. As a further response to its anticipated delay in performance of spent fuel removal services from utilities, DOE initiated a "multi-purpose" (*i.e.*, storage and transportation) canister program in the early 1990s to help accommodate utility spent fuel requiring storage outside of spent fuel pools until DOE could start accepting (and transporting) utility spent fuel.

In light of the publicly-available information on the lack of progress in the DOE program, by the early 1990s PG&E had substantial doubts as to whether DOE would meet its obligation to begin removing utility spent fuel, including PG&E's spent fuel, by January 31, 1998. By the mid-1990s, it became clear to PG&E that DOE would not perform at all by January 31, 1998. This was clear from the continued lack of reported progress in the DOE program. DOE further made clear the likelihood that it would not perform by 1998 by arguing that it lacked an obligation to do so in the absence of a repository in a Notice of Inquiry published in 1994, 59 Fed. Reg. 27,007, and in a Final Interpretation of the Standard Contract published in 1995, 60 Fed. Reg. 21,793. Even after the D.C. Circuit rejected the Final Interpretation in *Indiana Michigan Power Co. v. Dep't of Energy*, 88 F.3d 1272 (D.C. Cir. 1996), holding that DOE's obligation to perform by January 31, 1998 was "unconditional," DOE responded by formally informing utilities in 1996 that it would nonetheless not perform by 1998. *See Northern States Power Co. v. Dep't of Energy*, 128 F.3d 754, 757 (D.C. Cir. 1997).

DOE did not accept any spent fuel from any utility, including PG&E, by January 31, 1998. DOE has still not removed any spent fuel from PG&E.

It is entirely unclear when, if ever, DOE will start to accept spent fuel from PG&E. DOE has previously said that it would not perform before 2010. More recently, DOE has acknowledged that it cannot start accepting spent fuel from utilities until well after 2010. DOE currently has no target date for commencing spent fuel acceptance from utilities.

IV. PG&E RESPONSE TO ANTICIPATED AND ACTUAL FAILURE OF DOE PERFORMANCE

PG&E has responded reasonably to the anticipated and actual failure of DOE to perform its spent fuel removal obligations, including incurring reasonable costs.

A. Response at DCPP

1. Development of an ISFSI

Beginning in 1992, PG&E started to examine its options for addressing its spent fuel storage needs at DCPP after 2006 (when the DCPP spent fuel pools were projected to reach capacity while maintaining a full-core reserve) in light of DOE's failure to make progress toward being able to accept its waste and in anticipation of DOE not beginning to commence Contract performance by January 31, 1998. PG&E considered a variety of alternatives for managing its spent fuel storage needs at DCPP, including off-site storage at a private storage facility, fuel rod consolidation, reracking the spent fuel pools and dry cask storage at an Independent Spent Fuel Storage Installation ("ISFSI"). A study PG&E had performed in 1993 recommended that PG&E explore each of these alternatives but that it would not be necessary for PG&E to chose a storage technology until 1999.

By 1995, PG&E had decided not to pursue rod consolidation, as this technology had not been demonstrated to be successful on a large scale. Instead, PG&E decided to pursue reracking and dry cask storage as options for increasing DCPP's on-site spent fuel

storage capacity. Upon due consideration, PG&E identified dry cask storage as its preferred option for adding on-site storage capacity, with reracking serving as a contingency plan for ensuring sufficient storage capacity at DCPP in the event PG&E experienced delays in implementing dry cask storage. PG&E initially identified dry cask storage as its first choice over reracking because it was strongly preferred by the NRC and because it could provide for additional storage capacity incrementally, if such capacity became needed. Although DCPP's and HBPP's seismic requirements were beyond the bounds of then-approved dry cask storage licenses, by the mid-1990's PG&E reasonably expected that cask vendors would be able to generically certify casks that could be licensed to envelope the seismic requirements for DCPP and HBPP. PG&E also decided to participate in an effort to develop an off-site storage option.

By 1999, at DCPP, PG&E was focused primarily on developing an ISFSI. PG&E was focusing on dry cask storage over reracking because it was estimated that costs would be lower, it permitted PG&E to incur costs only as additional storage was needed, it was favored by the local community and regulators, and in light of continued anticipated DOE delays in spent fuel removal, it was predicted that it would be needed to support the eventual decommissioning of the site.

In 2001, after competitive bidding, PG&E contracted with Holtec International to complete the NRC licensing and fabrication of the dry cask storage system to be used at the DCPP ISFSI. PG&E reasonably selected Holtec based on cost and other factors. PG&E applied for the DCPP ISFSI license in December 2001, and the NRC granted the license in March 2004. Holtec and PG&E have obtained the remaining approvals to construct the ISFSI and fabricate the dry cask storage systems. PG&E is currently

constructing the pad for the ISFSI, and Holtec is manufacturing the dry cask storage systems and special cask handling equipment. PG&E has reasonably proceeded with the DCPP ISFSI project in a step-wise manner.

2. Interim Cask Pit Rack

Due to the high-seismic nature of the site, it ultimately became necessary for a site-specific NRC license to be obtained for the DCPP ISFSI. The licensing process entailed more time to complete than reflected in the initial plans contemplating use of a general license. In light of the additional time required for licensing and the potential for further schedule delays, PG&E became concerned that the ISFSI might not be operational by the time it was needed to maintain sufficient capacity in the DCPP spent fuel pools to permit discharge of the full cores of the reactors, in the event that such a discharge became necessary. Because of this concern, PG&E reasonably decided to obtain temporary fuel storage racks to be placed in the pools' cask loading pits if they became necessary. After careful study of its options, PG&E contracted with Holtec in November 2003 to design, license and fabricate the temporary racks. PG&E submitted the license application for the temporary racks in November 2004, and the NRC granted the license in November 2005. PG&E authorized Holtec to fabricate the racks in January 2005.

B. Response at HBPP

1. Extended SAFSTOR Operations

Because DOE did not remove the spent fuel at HBPP in 1998 and still has not done so, PG&E has been required to maintain the spent fuel at HBPP in its spent fuel pool and to maintain HBPP in SAFSTOR mode.

2. Development of an ISFSI

By 1995, in light of progress by other utilities in developing dry cask storage, and in light of DOE's anticipated failure to remove spent fuel from HBPP until at least 2010, PG&E decided to reexamine development of an ISFSI at HBPP. In 1996, PG&E decided to attempt to pursue an ISFSI at HBPP in light of DOE's anticipated failure to perform until at least 2010 and PG&E's desire to terminate costly SAFSTOR operations at HBPP, and thus be able to complete decommissioning of the plant, which PG&E believed would become more expensive over time. (The plant cannot be decommissioned until the spent fuel pool is emptied). Although PG&E preliminarily decided to pursue development of an ISFSI at HBPP in 1996, PG&E reasonably limited expenditures on this project pending approval of such expenditures by the CPUC as part of its next General Rate Case. PG&E obtained conditional CPUC approval for the HBPP ISFSI in October 1999. PG&E proceeded reasonably to complete a thorough geotechnical review of the HBPP ISFSI site in order to help ensure successful licensing of the facility. At times, development of the HBPP was slowed due to the limited geosciences resources available to PG&E, and the company's reasonable decision to accord priority in the use of those limited resources to the ISFSI project at DCPP.

PG&E contracted with Holtec International in 2002 to complete NRC licensing and fabrication of the HBPP dry cask storage system, and PG&E submitted its license application to the NRC in 2003. The NRC approved that application in January 2006. PG&E subsequently authorized Holtec to begin fabrication of the casks.

3. HBPP Stack Take-Down

In the late 1990's, the NRC expressed concern about the potential for parts of the 240-foot masonry vent stack at HBPP to fall into the spent fuel building in the event of a

seismic incident. In light of that concern, PG&E decided to take down that vent stack and replace it with a much shorter, metal vent stack. Had DOE removed HBPP's spent fuel in a timely manner in 1998, PG&E would have dismantled the 240-foot vent stack as part of the regular decommissioning of HBPP, which would have begun in 1998 or 1999. Because of DOE's breach and the resulting presence of spent fuel in the spent fuel pool, however, PG&E had to incur additional costs to take down the vent stack in smaller pieces and with greater care than would have been the case absent the presence of spent fuel. In addition, because of the continued presence of spent fuel in the pool, PG&E had to replace the 240-foot stack with another, shorter stack.

C. Off-Site Storage

In light of DOE's anticipated failure to begin removal of spent fuel from DCPP and HBPP for an extended period and the substantial uncertainty regarding just when, if ever, DOE would come to remove PG&E's spent fuel, PG&E reasonably incurred costs to explore private, off-site storage options. From 1995 to 1997, PG&E made payments to a consortium pursuing development of an off-site ISFSI at Indian reservations. PG&E reasonably stopped making further payments to this effort in 1997 when it began to appear that it was unlikely that this off-site ISFSI would be in a position to receive spent fuel from PG&E in time for the company to avoid substantial spent fuel storage costs at DCPP.

V. AMOUNT OF DAMAGES

PG&E has incurred substantial costs due to DOE's failure to begin removal of PG&E's spent fuel by January 31, 1998. PG&E has incurred the following categories of costs through 2004 (in millions):[3]

| | |
|---|---|
| HBPPSAFSTOR | $44.8 |
| HBPP ISFSI | $09.8 |
| HBPP Stack Removal | $00.9 |
| DCPP ISFSI | $36.1 |
| DCPP Temporary Racks | $02.7 |
| Pre-1998 DCPP Storage Option Costs | $01.5 |
| Off-site Storage Options | $00.9 |
| Total: | $96.7 |

**STATEMENT OF ISSUES OF FACT AND LAW**

ISSUES OF LAW

PG&E believes this case does not "require" the Court to "resolve" any legal issues; rather, the case requires the Court to apply well-established principles of contract damages and mitigation law to the facts presented here. The established legal principles involved in this case are set forth below at pp 23-35.

[3] As discussed with the government's counsel, PG&E anticipates making modest adjustments to these figures reflecting, primarily, PG&E decisions not to dispute some of the reductions to PG&E's damage claim proposed by the government's experts. Before making those adjustments, however, PG&E has been waiting for an additional expert witness report from the governments' damages expert. The government's counsel has represented that this expert is preparing an additional report based on data PG&E provided to the government in January 2006. To date, PG&E has not received that report.

As an example of a legal issue that the Court "may" resolve in this case, PG&E notes that the parties have different positions on whether their spent fuel Contract covers GTCC waste. As explained below, however, *see* pp. 51-58, the Court can adjudicate PG&E's damages claim and award PG&E the damages it seeks without necessarily resolving that issue. Similarly, there are other legal issues involved in this case that the Court may choose to address but does not need to "resolve" to adjudicate PG&E's damages claims.

To the extent the government identifies legal issues it believes the Court does need to resolve to decide this case, PG&E will respond to those issues appropriately.

<u>ISSUES OF FACT</u>

1. Whether DOE's anticipated or actual breach of contract motivated – *i.e.*, caused – PG&E incur the costs it claims as damages?

2. Whether PG&E's damages were reasonably foreseeable to the government?

3. Whether the fact of PG&E's damages is established, and whether the amount of damages claimed by PG&E is a fair and reasonable approximation of those damages?

4. Whether the government can satisfy its burden to show, factually, that any one or more item of cost that PG&E claims as damages was not incurred by PG&E in a reasonable attempt to mitigate the effects of DOE's breach of contract?

5. Whether the government can satisfy its burden to show that PG&E's damages should be offset because even if DOE had performed its Contract obligations as

required, GTCC waste would have been stranded at HBPP and PG&E would have incurred measurable, reasonably certain, incremental costs to store that waste.

6. Whether the government can satisfy its burden to show that PG&E's damages should be offset because even if DOE had performed its Contract obligations as required, PG&E would have incurred any one or more item of cost that PG&E claims as damages?

7. Whether, if DOE had performed its Contract obligations as required beginning in 1998, it is fair and reasonable to estimate that DOE would have removed all spent fuel from HBPP by 1999?

## VI. DISCUSSION OF LEGAL PRINCIPLES

This case presents a straightforward claim for breach of contract damages.

### A. Basic Damages Principles

As the Federal Circuit recently reaffirmed in another spent fuel case, *Indiana Michigan Power Co. v. United States*, 422 F.3d 1369, 1373 (Fed. Cir. 2005), "[t]he remedy for breach of contract is damages sufficient to place the injured party in as good a position a it would have been had the breaching party fully performed. *San Carlos Irrigation & Drainage Dist. v. United States*, 111 F.3d 1557, 1562 (Fed. Cir. 1997). 'The general principle is that all losses, however described, are recoverable.' Restatement (Second) of Contracts § 347 cmt. c (1981)." *Accord Bluebonnet Sav. Bank v. United States,* 266 F.3d 1348, 1355 (Fed. Cir. 2001); *Sacremento Municipal Util. Dist. v. United States*, No. 98-488C (March 31, 2006), Slip op. at 41 ("*SMUD*"); *Tennessee Valley Authority v. United States*, 69 Fed. Cl. 515, 522 (2006) ("*TVA*"); *see* Restatement (Second) of Contracts § 347 cmt. a (1981) (Rest. 2d Cont.).

These "benefit of the bargain" or "expectation" damages encompass mitigation expenses incurred by the non-breaching party, including that party's costs of arranging alternatives to the breaching parties' required performance. *See* Rest. 2d Cont. § 347, cmt. a, b (expectation measure includes costs to "arrange a substitute transaction" and "costs incurred in a reasonable effort, whether successful or not, to avoid loss"); *Hughes Communications Galaxy, Inc. v. United States*, 271 F.3d 1066, 1067-68 (Fed. Cir. 2001) (affirming award for additional costs of "cover" transactions); *Bluebonnet Sav. Bank,* 266 F.3d at 1355-56. The damages incurred by PG&E are of this type – because of DOE's anticipated and now actual breach, PG&E incurred costs to investigate and implement alternative SNF storage arrangements, and has done so in a reasonable way. Under settled law, also reaffirmed in *Indiana Michigan*, such damages "are recoverable where: (1) the damages were reasonably foreseeable by the breaching party. . . , (2) the breach is a substantial causal factor in the damages, and (3) the damages are shown with reasonable certainty." *Indiana Michigan,* 422 F.3d at 1373; *see Energy Capital Corp. v. United States*, 302 F.3d 1314, 1320 (Fed. Cir. 2002); *Bluebonnet Sav. Bank*, 266 F.3d at 1355. The evidence in this case establishes these elements with respect to all seven categories of damages PG&E claims, and PG&E therefore should be awarded the damages it seeks and thus made whole for the DOE breach.

B. The Evidence Establishes Foreseeability

"Foreseeability is a question of fact. . . ." *Bluebonnet Sav. Bank,* 266 F.3d at 1355. It may be established by showing that the breaching party actually foresaw the consequences of the breach, *see* E. ALLAN FARNSWORTH, FARNSWORTH ON CONTRACTS, § 12.14, at 245-46 & n.18 (1990) ("the term *foreseeable* must be taken to include *foreseen*"), or that the consequences were foreseeable "in the ordinary course of events."

Rest. 2d Cont. § 351 (2)(a). In the latter event, "the test is an objective one based on what [the promisor] had reason to foresee." *Id.* cmt. a.

Under either test, the evidence established that PG&E's damages were foreseeable in the event of a DOE breach. Overwhelming evidence shows that an important purpose of both the NWPA and the DOE spent fuel contracts that implement that statute – a purpose well-understood by DOE – was to prevent contracting utilities from having to incur additional costs of on-site storage of spent fuel after January 31, 1998. This purpose of avoiding additional on-site spent fuel storage facilities and costs is essentially undisputed, and has already been relied upon by this Court and others. *See Commonwealth Edison Co. v. United States,* 56 Fed. Cl. 652, 667 (2003). "The deposition testimony of several DOE officials involved with the SNF program supports plaintiff's assertion that the intent of the NWPA and the parties was to avoid the construction by utilities of additional at-reactor storage."). That same testimony will be placed in the trial record here through deposition designations, *e.g.*, 4/22/02 Barrett Dep. v. Tr., at 55-56; *id.* at 59:4-11; 5/01/02 Milner Depo. Tr. at 73:20-22, and PG&E witnesses will testify to the same effect at trial. Similarly, in *Indiana Michigan Power Co. v. United States*, 57 Fed. Cl. 88, 99 (2003), the Court found "uniform support" in the summary judgment record there for the conclusion that "Congress and the parties anticipated that [DOE] would collect fuels at a rate sufficient to eliminate the need for additional storage capacity on site. . . ." *See also* 48 Fed. Reg. 16,590, 16,593 (promulgation of final standard contract; rejecting comments suggesting that contract provision for priority acceptance from shutdown plants be deleted, stating: "[t]his type of

priority is necessary to prevent reactors from waiting 20 or 30 years to be decommissioned after they finish generating electricity.").

Where an avowed purpose of the contract at issue is to help utilities *avoid* on-site storage costs that could be avoided through removal of spent fuel, and DOE's breach of that contract has led a utility to incur such on-site storage costs (and to explore other spent fuel storage options), *a fortiori* those costs are a foreseeable consequence of the breach. This Court recognized as much in *Yankee Atomic Elec. Co. v. United States*, No. 98-126C (Fed.Cl. filed Feb. 18, 1998):

> As noted in *Tennessee Valley Authority v. United States*, 60 Fed. Cl. 665, 674 n.10 (2004], 'the intent of the NWPA and the parties to the Standard Contract was to avoid the construction by utilities of additional at-reactor storage after January 31, 1998.' DOE's failure to perform under the Standard Contract thus has led to the very thing the NWPA and the Standard Contract were designed to forestall, *i.e.*, the construction of dry storage facilities for spent nuclear fuel at nuclear power electricity generating plants. . . .

*Yankee Atomic*, Order of June 28, 2004, 2004 WL 1535688, at *7. *Cf. Wells Fargo Bank, N.A. v. United States,* 88 F.3d 1012, 1023 (Fed. Cir. 1996) (profits on transactions lost due to a breach are reasonably foreseeable when the "purpose of the contract . . . was for the plaintiff to make profits on the subject of the contract".). This Court made the same factual finding after trial in *TVA*: "DOE also recognized that utilities might be forced to build additional on-site storage facilities if DOE were not successful in performing under its contracts for SNF disposal, as reflected by the fact that one of DOE's goals was to preclude the utilities' need to provide storage outside their spent fuel pools. . . . In short, the court finds that it was entirely foreseeable to DOE that failure to perform under the

contract would result in damages of the nature and magnitude that TVA claims. *TVA,* 69 Fed.Cl. at 528.

Contrary to this Court's finding after trial in *TVA* (quoted above) that the magnitude, as well as the nature, of damages claimed by a spent fuel plaintiff was foreseeable, the government argued in *Yankee Atomic* that the magnitude of damages was not foreseeable. Even apart from the legal question whether the magnitude of damages need be foreseeable, *see* E. ALLAN FARNSWORTH, 3 FARNSWORTH ON CONTRACTS § 12.14 at 262 (3d ed. 2004 ) ("The magnitude of the loss need not have been foreseeable. . . ."), as a matter of fact, here the magnitude of PG&E's damages here was actually foreseen by DOE. Though the "Federal Interim Storage" contemplated by section 136(a) (1) of the NWPA, 42 U.S.C. § 10156(a)(1) (2000), expired in 1990, fee schedules for such storage that DOE developed in 1983 established a "full cost recovery" fee of $670 per kg. of uranium/fuel. *See* 48 Fed. Reg. 54,391 (Dec. 2 1983). At that rate, storage of HBPP's 28.2 metric tons of uranium spent fuel (each MTU equals 1000 kg.) would cost almost $19 million, and storage of the 122 MTU of DCPP fuel to be loaded into the ISFSI there in the first two loads would cost more than $81 million. So the magnitude of cost for "interim" storage was actually foreseen by DOE, in 1983.[4]

[4] The finding in *SMUD* that the utility's use of dual-purpose, transportable spent fuel storage containers was not foreseeable, *see* Slip op at 43-45, applies an overly-strict and incorrect legal standard, and also appears factually wrong, at least on the evidence PG&E will present. The correct legal test under contract mitigation law, as discussed below, is whether use of such dual-purpose containers was "reasonable" under the circumstances. And the factual answer is clearly yes given, among other things, that DOE itself had implemented a multi-purpose container program in the early 1990's and that making the spent fuel "transport-ready" would obviously facilitate its removal when DOE commenced performance. Indeed, the fact that DOE was itself promoting multi-purpose containers in the early 1990s would seem to satisfy even *SMUD*'s overly-strict foreseeability requirement, and the Court never explained why it didn't.

C. <u>The Evidence Establishes Causation</u>

Causation, like foreseeability, is a question of fact. *Bluebonnet Sav. Bank*, 266 F. 3d at 1356. Here, the evidence establishes that it was DOE's anticipated and now actual breach that motivated PG&E to incur the mitigation costs it claims as damages. Indeed, the government has not and cannot point to anything else that caused PG&E to incur these costs, and there was no other cause. PG&E simply had no reason – other than DOE's default – to investigate off-site Spent Fuel storage, or study the relative merits of reracking versus dry storage at DCPP, or design and build dry storage facilities at both HBPP and DCPP, or continue maintaining HBPP is SAFSTOR after 1998. Thus, DOE's breach was more than a "substantial factor" causing PG&E to incur the damages claimed here, it was the *only* causal factor. *See TVA*, 69 Fed. Cl. at 515 ("TVA's decision to build dry storage was made in direct response to DOE's breach").

PG&E's response to DOE's threatened, and now actual default should come as no surprise. As reaffirmed in *Indiana Michigan*, mitigation efforts are not merely an option for the victim of a contract breach, but a duty: "Once a party has reason to know that performance by the other party will not be forthcoming, . . . he is *expected* to take such affirmative steps as are *appropriate in the circumstances* to avoid loss by making substitute arrangements or otherwise." *Indiana Michigan*, 422 F.3d at 1375 (quoting Rest. 2d Cont. § 350 cmt. b) (emphasis added). Given the unmistakable early evidence of DOE's threatened default, which became apparent at least as early as DOE's 1989 Report to Congress on the Reassessment of the Radioactive Waste Management Program – and given the potentially disastrous consequences of not planning for extended on-site spent fuel storage – PG&E's mitigation efforts beginning in the 1990's plainly were "appropriate in the circumstances." *See Tennessee Valley Authority v. United States*, 60

Fed. Cl. 665, 674(2004) (spent fuel plaintiff was "justified, indeed obligated, to take steps to minimize its losses in light of DOE's imminent non-performance"); *cf. Yankee Atomic Elec. Co. v. United States,* Order of June 28, 2004, 2004 WL 1535688, at *6 ("Should plaintiffs have waited until [January] 31, 1998 and then decided what to do with their nuclear waste? The court thinks not.").

The evidence also demonstrates that PG&E's investigation of spent fuel storage alternatives and its ultimate judgment to pursue dry storage were eminently "reasonable," which is the well-settled mitigation standard. The reasonableness standard is universally recognized. The Court of Claims applied that standard more than fifty years ago in *Chain Belt Co. v. United States*, 115 F. Supp. 701 (Ct.Cl. 1953), a case much like this one where the injured party, prior to but in anticipation of the government's breach, had to arrange an alternative to the government's performance. In language equally applicable here, the *Chain Belt* court explained:

> [P]laintiff was under an obligation to avoid by a reasonable effort any damages which it should have foreseen and, having done so, it may recover as damages the expense incurred in such reasonable effort to avoid harm . . . . It makes no difference whether the breach has already occurred, or where . . . it is merely impending under circumstances such that it was not reasonable for plaintiff to expect defendant to prevent the harm.

*Id*. at 714; *accord Indiana Michigan*, 422 F.3d at 1375; *TVA*, 69 Fed. Cl. at 528 ("There is no dispute that TVA acted to mitigate the damages caused by DOE's partial breach. . . . TVA's expenses of its mitigation are accordingly recoverable to the extent they are reasonable."); *SMUD*, Slip op. at 51 ("if an injured party's efforts to mitigate damages from a breach are reasonable, they are recoverable").

As is implicit in the "reasonableness" standard, costs of mitigation are recoverable whether or not the effort is successful. *See* Rest. 2d Cont. § 347 cmt. c. (costs incurred in reasonable efforts to avoid loss are recoverable "whether successful or not"); *Cienega Gardens v. United States*, 38 Fed. Cl. 64, 79 (1997) ("[w]hether or not an attempt to mitigate damages is successful, the non-breaching party may recover for injury incurred during such mitigation as long as the attempt was reasonable"), *vacated on other grounds*, 162 F.3d 1123 (Fed. Cir. 1998); DAN B. DOBBS, LAW OF REMEDIES §12(6)(2), at 127 (2d ed. 1993) ("Dobbs") ("[T]he plaintiff's damages are adjusted upwards to reflect all the reasonable costs he incurs in attempting to avoid losses, whether or not he was successful in doing so."); *see also Ketchikan Pulp Co. v. United States*, 20 Cl. Ct. 164, 166 (1990) (reasonableness of the injured party's mitigation action is "judged by the facts and circumstances at the time the action is taken"); *id.* (injured party does not have to undertake extraordinary efforts to "ferret out the single best situation which will absolutely minimize the breaching party's damages"); *In re Kellet Aircraft Corp.*, 186 F.2d 197, 198 (3d Cir. 1950) ("[w]here a choice has been required between two reasonable courses, the person whose wrong forced the choice can not complain that one rather than the other was chosen.").

Finally, as this Court has also recognized in other spent fuel cases, applying established law, "[t]o eliminate or reduce [plaintiff]'s mitigation-related damages, the government bears the burden of showing that [plaintiff]'s mitigation efforts were unreasonable." *TVA*, 69 Fed. Cl. at 523; *SMUD*, Slip op. at 51 ("the Government bears the burden of proving that actions to mitigate were unreasonable"); *Yankee Atomic*, Order of August 29, 2003 at 3 ("[d]efendant would have the burden of proof as to any such

failure to mitigate assertion") (citing *T.C. Bateson Constr. Co. v. United States*, 319 F.2d 135, 140 (Ct. Cl. 1963); *see Koby v. United States*, 53 Fed. Cl. 493, 496 (2002)). As discussed further below, the government cannot carry its burden to show that PG&E's claimed mitigation damages are *not* reasonable and "appropriate in the circumstances." *See* Rest. 2d Cont. § 350 cmt. b. The Court therefore should award those damages and make PG&E whole.

As also discussed further below (and contrary to arguments the government has made in some other cases), to establish causation PG&E is not required to establish exactly when DOE would have removed its spent fuel in the "non-breach" world. What matters to causation in this case is *that* DOE would have removed PG&E's spent fuel in a reasonable time frame starting in January 1998, not precisely *when* DOE would have done so. DOE's fundamental performance obligation under the Contract was to remove PG&E's spent fuel, and DOE has not done so. The costs PG&E has incurred as a result, to investigate alternatives and ultimately arrange extended on-site spent fuel storage, "directly and naturally resulted from th[at] breach." *Locke v. United States*, 283 F.2d 521, 524 (1960). To the extent the government contends that PG&E would have incurred some element of its claimed damages even if DOE has performed as the Contract requires – because, for example, DOE would have performed on a slow, elongated, inefficient schedule – the government has the burden to prove that contention if it is "to eliminate or reduce [plaintiff]'s mitigation-related damages." *See TVA*, 69 Fed. Cl. at 523; *id.* at 530-31 ("the government frames this argument as one of causation, . . . but in the circumstances of this case, it realistically is a contention aimed at limiting the amount of damages TVA may recover as a result of its mitigation efforts."); *see also SMUD*, Slip

op. at 41-49 (finding causation established as a matter of fact, without discussing the rate or schedule for DOE acceptance in the non-breach world); *id* at 63 n.40 (noting that factual record in that case was inadequate to make a finding about the rate of acceptance).

Applying these principles, DOE's default caused PG&E's damages in all seven categories both factually and legally. PG&E incurred the damages in each category because of DOE's anticipated and now actual breach, and in a reasonable attempt to investigate spent fuel storage alternatives or to provide extended, on-site storage in a reasonable way.

The government may argue that PG&E's expenditures to explore off-site SNF storage, including payments to Private Fuel Storage ("PFS"), were not caused by DOE's breach. In *Indian Michigan*, this Court made a factual finding that Indiana Michigan's payments to PFS were not caused by the breach, 60 Fed. Cl. at 658-59, and the Federal Circuit affirmed that finding, 422 F.3d at 1376. This is an example of an issue where the particular facts presented in different spent fuel cases differ in material ways. The Federal Circuit seemingly recognized this in *Indiana Michigan*, as it was careful to limit the basis for its affirmance on the PFS damages issue by noting that "the *credited evidence* also showed that the utility's investment in the private fuel storage facility was speculative and that the high cost of the venture was unforeseeable." *Id.* at 1376 (emphasis added). As noted above, in this case PG&E will present evidence (apparently not offered in *Indiana Michigan*) showing that DOE, in 1983, actually foresaw the very high cost of spent fuel interim storage, which is what PFS will provide. Similarly, in *Indiana Michigan* plaintiff's own witness conceded that PFS was "a 'speculative' venture," *see* 60 Fed Cl. at 659, whereas in this case PG&E's witnesses will explain that

they continue to view PFS as a potentially viable option. Indeed, subsequent to *Indiana Michigan*, PFS has obtained an NRC license, which plainly runs counter to assessments of PFS as speculative.

D. The Evidence Establishes Reasonable Certainty

Reasonable certainty is also a question of fact. *See Bluebonnet Sav. Bank*, 266 F.3d at 1356-58. The standard is well-established: "[c]ertainty is sufficient if the evidence adduced enables the court to make a fair and reasonable approximation of the damages." *Locke*, 283 F.2d at 524. Moreover, "[i]f a reasonable probability of damage can be clearly established, uncertainty as to the amount will not preclude recovery." *Id.*; *accord Bluebonnet Sav. Bank*, 266 F.3d at 1356-57; *Ace-Federal Reporters, Inc. v. Barram*, 226 F.3d 1329, 1333 (Fed. Cir. 2000).

Here, the fact of damage is clear. And PG&E's damages proof easily meets the "fair and reasonable approximation" standard. First, pursuant to the Court's March 30, 2006 Order, the damages PG&E is claiming now are limited to past costs that have already been incurred. By definition such costs are neither speculative nor uncertain, as the Federal Circuit recognized in *Indiana Michigan*. Plainly the actual, past costs PG&E claims as damages here are far more "reasonably certain" than the future lost profits of a new venture upheld in *Energy Capital Corp. v. United States*, 302 F.2d 1314 (Fed. Cir. 2002), which were projected to occur in a future "but for" world, not in the actual, "breach" world where PG&E has *already* incurred its claimed damages.

Second, the past costs PG&E is claiming as damages are taken, almost entirely, *directly* from PG&E's "SAP" accounting system, which the company uses to account for its costs in the ordinary course of its business. Costs PG&E is claiming as damages in each of the seven damages categories identified above will be set forth on a summary

damages exhibit, which, consistent with Fed. R. Evid. Rule 1006, summarizes underlying PG&E accounting data from the SAP system. PG&E witness Bob Kapus created PG&E's summary damages exhibits for the four largest damages categories (the two ISFSIs, HBPP SAFSTOR and the DCPP Temporary Cask Pit Rack) by personally taking the costs charged to those projects from SAP accounting system reports and placing the costs on the summary exhibits. Mr. Kapus did the same for the summary damages exhibit showing PG&E's claimed pre-1998 costs, though because PG&E's SAP accounting system became operative in 1996, Mr. Kapus took costs prior to then from other PG&E accounting workpapers. Costs shown on PG&E's summary damages exhibit for a sixth damages category, the HBPP stack take-down, also reflect costs taken from the SAP accounting system. Damages in the seventh category, costs to investigate off-site storage options, are drawn directly from PFS and other pertinent invoices.

Because PG&E's SAP accounting system is reliable, and because the costs PG&E is claiming as damages are taken from that accounting system, PG&Es claimed damages are more than "reasonably certain." Indeed, as PG&E also will explain at trial, virtually all the costs PG&E is claiming as damages here have been approved (albeit sometimes in different cost categories) in contested ratemaking proceedings before the California Public Utilities Commission. Notably, in addition to the SAP accounting system reports that are the source for most figures on PG&E's summary cost exhibits, PG&E has provided the government with about 17,500 invoices covering virtually all claimed costs, as well as schedules that "tie" the invoices to particular cost entries on the SAP accounting reports that PG&E also provided the government. The government reviewed those invoices and raised objections or questions about a relative handful – all of which

objections and questions PG&E answered during the discovery process in a manner that should satisfy the government.

For these reasons, the damages amounts claimed by PG&E easily satisfy the "reasonable certainty" standard.

E. Government Offsets.

As noted above, under established mitigation law, in order to reduce or eliminate the mitigation costs that PG&E has already incurred, the government bears the burden of proving that PG&E's mitigation efforts were unreasonable or that particular claimed costs are not reasonable. *See* Rest. 2d Cont. § 350(2); *SMUD*, Slip op. at 51; *TVA*, 69 Fed. Cl. at 523. None of the arguments the government has articulated during discovery for reducing or eliminating PG&E's damages has merit.

1. Proposed deduction based on statute of limitations.

The report of proferred government damages expert Larry Johnson states that government counsel instructed him that the six year statute of limitations under "may" preclude recovery of mitigation costs PG&E incurred prior to January 24, 1998, a date six years before these consolidated cases were instituted on January 24, 2004. But the statute of limitations bars claims, not damages. Here, PG&E's claim for breach of contract accrued on January 31, 1998, when DOE missed that contractually-mandated SNF pick-up date. Until that date PG&E had no claim to assert, and by asserting its claims within six years after that date, PG&E satisfied the limitations requirement under 28 U.S.C. § 2501. *See, e.g.*, *Indiana Michigan*, 422 F.3d at 1378 (quoting *Fallini v. United States*, 56 F.3d 1378, 1380 (Fed. Cir. 1995) ("a cause of action accrues [only] when all the events have occurred that fix the defendant's alleged liability and entitle the plaintiff to institute an action"). Indeed, the government's suggestion that § 2501 bars recovery of mitigation

costs PG&E incurred prior to the breach conflicts with *Indian Michigan*: "we see *no reason* why efforts to avoid damages in contemplation of a partial breach should not also be recoverable." 422 F.3d at 1375 (emphasis added).

2. <u>Suggested elimination of certain damages categories based on "schedule" issues.</u>

In other spent fuel cases, the government has filed motions and presented trial testimony in support of its theory that the DOE contract "prescribes" (or contains a "mechanism" for prescribing) a rate and schedule for spent fuel acceptance. Under that theory, the delivery commitment schedules ("DCS") submitted by utilities in the 1990's, combined with the very slow 900 MTU annual acceptance rate published in DOE's 1991 and 1995 Annual Capacity Reports ("ACR") (but not in any ACR before or since), create a "binding" contractual acceptance rate and schedule. The government has not presented that theory by motion here, presumably because this Court rejected the government's theory in *Commonwealth Edison*, 56 Fed. Cl. 652. Nor has the government offered expert opinions to support its theory. PG&E nevertheless expects the government to attempt to offer trial evidence concerning its slow-rate theory.

The purported relevance of the slow-rate theory to damages arises from the fact that the theory produces a slow, elongated, inefficient schedule for DOE's spent fuel acceptance from contracting utilities. Under such a schedule, DOE's acceptance of spent fuel from certain utilities is delayed for up to 20 years, or even more, after the 1998 program start-date. Based on that slow schedule, the government has argued that certain costs spent fuel plaintiffs claim as damages would have been incurred "even if" DOE had performed its contract obligations. For example, in the *Yankee Atomic* case, the

government argued that the three utilities involved there, and by implication most other nuclear utilities as well, would have built expensive dry storage facilities even if DOE had performed its contract obligations exactly as the parties intended.

That implausible argument is wrong for several different reasons, particularly on the facts of this case. Initially, however, it is important to recognize and also to understand why this government argument does not concern causation, as the government suggests, but rather is just another attempt to "limit[] the amount of damages [PG&E] may recover as a result of its mitigation efforts." *TVA*, 69 Fed. Cl. at 529-30. The argument does not concern causation for the simple reason that what "would have" happened in the "non-breach" world is not what *caused* PG&E to incur the costs it is claiming here. PG&E incurred those costs because of what *did* happen in the *breach* world – *i.e.*, beginning in the late 1980s and early 1990's, DOE inaction threatened a substantial breach of contact, and in 1998 DOE did actually breach the contract. *That* is what caused PG&E to investigate and then implement dry storage, to investigate off-site spent fuel storage options, and to make the other efforts to mitigate the breach that gave rise to the damages it now claims here. What DOE "would have" done in the but-for world did not "cause" PG&E to do anything.

The government's slow-rate theory is wrong, first, because the contract construction on which it is based is wrong. As this Court held in *Commonwealth Edison*, 56 Fed. Cl. 652, the DOE contract does not prescribe any particular schedule for DOE's acceptance of spent fuel. Accordingly, as the Court explained in *Yankee Atomic*, relying on the *Commonwealth Edison* ruling, "DOE was to commence pickup at a *reasonable* rate no later than January 31, 1998." *Yankee Atomic*, Order of June 28, 2004 at 9, No.

98-126, 2004 WL 1535686 at *6 (denying motions *in limine*) (emphasis added). This requirement of a reasonable rate for DOE's performance reflects well-settled law that, where a contract is missing a term addressing a significant issue, the court must enforce a reasonable term. *See, e.g.,* Rest. 2d Cont. § 204. For example, *Essex Electro Eng'rs, Inc. v. Danzig*, 224 F.3d 1283, 1291 (Fed. Cir. 2000), held that if a contract does not specify a time for performance, the government must perform within a reasonable time. *Accord B-E-C-K Constructors v. United States*, 571 F.2d 25, 31 (Ct. Cl. 1978); *see Specialty Assembling & Packing Co. v. United States*, 355 F.2d 554, 565 (Ct. Cl. 1966).[5] Federal Circuit precedent also dictates that "reasonable" in this case means consistent with the purpose of the NWPA and the contemporaneous understandings of DOE and the contracting utilities. In *Roedler v. Department of Energy,* 255 F.3d 1347, 1352 (Fed. Cir. 2001), which involved one of the same standard contracts involved here, the Court instructed: "[f]or determination of contractual and beneficial intent when, as here, the contract implements a statutory enactment, it is appropriate to inquire into the governing statute and its purpose."

The government's slow-rate theory is wrong, second, because overwhelming evidence – well known throughout the nuclear industry – shows that both DOE and the contracting utilities long understood and intended, consistent with the purpose of the NWPA, that DOE would remove utility spent fuel beginning not later than January 31,

[5] Here, of course, the Contract is not entirely silent on scheduling matters. Explicit Contract terms, including that DOE would take title to spent fuel "as expeditiously as practicable" (second whereas clause) and the provisions for exchanges of acceptance slots (Art. V.E.) and for priority acceptance of spent fuel from shut down plants (Art. VI.B.1.(b)), demonstrate that the parties intended to provide for a robust and efficient schedule. *See, e.g., Metric Constructors, Inc. v. National Aeronautics & Space Admin.*, 169 F.3d 747, 753 (Fed. Cir. 1999) (contract interpretation should "give[] effect to all its terms and leav[e] no provision meaningless").

1998 on a schedule that was robust, efficient and calculated to help utilities avoid additional on-site storage costs after that date. Indeed, except for DOE's ACR/APR documents issued in 1991 and 1995, which used the 900 MTU rate for reasons this Court has already rejected, *Commonwealth Edison,* 56 Fed. Cl. at 666-67, the 3000 MTU per year acceptance rate that PG&E maintains is reasonable appears in virtually every DOE planning document from 1983 up to the present, including the ACR/APR that DOE issued in June 2004. In addition, substantial evidence shows that DOE was actively planning, after enactment of the NWPA but before DOE recognized that it would not meet the 1998 deadline, to remove spent fuel from utilities on a schedule that incorporated the 3000 MTU rate and was otherwise effective and efficient. This powerful evidence of contractual intent is entitled to great weight. *See, e.g. Alvin, Ltd. v. United States Postal Serv.*, 816 F.2d 1562, 1566 (Fed. Cir. 1987) (quoting *Macke Co. v. United States*, 467 F.2d 1323, 1325 (Ct. Cl.1972)) ("'how the parties act under the arrangement, before the advent of controversy, is often more revealing than the dry language of the written agreement by itself'"). Further, as noted above in the fact section, DOE planning documents and other substantial evidence also show that exchanges of acceptance allocations were expected to occur, and would have occurred, to make the DOE spent fuel acceptance schedule more efficient. *See, e.g.,* DOE's September 1993 HBPP Site and Facility Waste Transportation Services Planning Document (PG&E Exhibit 846 at 1). ("It would seem prudent for the utility [*i.e.*, PG&E] to acquire allocation rights to complete shipping all of the Humboldt Bay fuel in a single shipping campaign "). *See also David Nassif Assocs. v. United States*, 557 F.2d 249, 259 n.6 (Ct.Cl. 1977) (finding that, although office building lease documents did not clearly

address the subject, "it is a fair inference to say that what the parties had in mind was a cafeteria of a size reasonable under all the circumstances"), *David Nassif Assocs. v. United States*, 644 F.2d 4, 7 (Ct.Cl. 1981) (after trial on question of "reasonable" size for cafeteria, assessing evidence of "what was intended"); *Thermo Electron Corp. v. Schiavone Constr. Co.*, 958 F.2d 1158, 1164 (1st Cir. 1992) (determining reasonable time for performance "on the basis of all the evidence").

Third, the government's slow-rate theory is particularly misguided in this case because even at annual acceptance rates much lower than 3000 MTU, if DOE had commenced performance as required in 1998, the spent fuel at HBPP would have been completely removed within a couple of years at most (thus allowing PG&E to avoid both dry storage and continued SAFSTOR costs), and sufficient quantities of spent fuel would have been removed from DCPP before its spent fuel pools filled up in about 2006 or 2007 to also avoid the need for dry storage there. In fact, the same is true at both sites even at a 900 MTU/yr. acceptance rate, provided that exchanges take place in reasonable manner. And the same is also true at both sites – the HBPP spent fuel is gone within a year or two after 1998, and enough DCPP spent fuel is removed before 2007 to avoid dry storage – even without any exchanges, if the 3000 MTU acceptance rate is used.

Finally, the government's slow-rate theory must be rejected because there is no evidence that it portrays a "reasonable" spent fuel pick-up schedule, which is the governing legal standard. There is no factual evidence, and the government has disclosed no expert opinion, that a 900 MTU/yr. acceptance rate would be reasonable or consistent with the purpose of the DOE contract or the NWPA. To the contrary, the government's low-rate theory is demonstrably unreasonable because, as noted above, it would require

most utilities to build expensive dry storage facilities "even if" DOE has performed beginning in 1998.

For all these reasons, the government cannot satisfy its burden of demonstrating that any category of PG&E's claimed damages should be reduced or eliminated because, under the government's slow-rate theory, the claimed costs would have been incurred even if DOE had performed as intended. *See TVA*, 69 Fed. Cl. at 533 ("The government has not met its burden of showing that TVA would have had to pursue dry storage even if DOE had performed under the contract, and the court therefore rejects the government's assertion that TVA's damages should be limited as a result.").

Ultimately, in addition to other evidence of a reasonable DOE acceptance schedule noted above, PG&E will also present evidence showing that DOE would have completed removal of spent fuel from HBPP by 1999 had DOE performed its Contract obligations as required. That evidence will consist of expert analysis and opinions of Mr. Frank Graves, which relies upon and is consistent with DOE spent fuel program documents and with testimony from others (including former DOE program participants) concerning what the parties intended to be, and what would be, a reasonable and efficient spent fuel removal schedule in the non-breach world. Certainly that evidence bolsters the other evidence showing that PG&E's damages were caused by DOE's breach, but as noted above, proof of the precise date DOE would have removed PG&E's spent fuel is not necessary to make the causation showing. Rather, the HBPP "pool-empty" date is specifically relevant only to determining the "reasonably certain" amount of one category of PG&E's damages – the SAFSTOR damages. Those damages consist of the costs PG&E has incurred to operate HBPP's spent fuel pool subsequent to the time the pool

would have been empty had DOE performed as required, 1999, and PG&E's evidence of that date more than satisfies the applicable "fair and reasonable approximation" standard. *Locke*, 283 F.2d at 524.

3. Proposed deduction for "non-breach" SNF loading costs.

The government proposes an offset to damages of $6.43 million, arguing that if DOE had performed beginning in 1998, PG&E would have incurred costs in this amount to load its HBPP spent fuel into the transportation containers that the Contract requires DOE to provide. This argument is wrong for two related reasons. First, and most fundamentally, as this Court recognized in both *TVA* and *SMUD*, it would only be appropriate to offset the cost of loading PG&E's spent fuel into DOE transportation containers if the breach had allowed PG&E to *avoid* those costs. Yet because DOE's breach is only partial, PG&E's costs of loading its spent fuel to DOE have merely been deferred, not avoided. PG&E will incur those costs in the future, when DOE performs and picks up PG&E's spent fuel. It would therefore be legally wrong, as well as unfair, to deduct or offset now costs that PG&E has not yet incurred, but will incur in the future. The *TVA* Court put it this way:

> "[t]he alleged benefit stems purely from timing; both DOE and TVA contemplate that DOE will still perform under the contract at some future date. . . As matters now stand, any benefit inhering to TVA because of delayed loading costs would be *entirely speculative*. It is not possible to ascertain the method DOE will ultimately use for SNF acceptance.

*TVA*, 69 Fed. Cl. at 542 (emphasis added). The *SMUD* Court agreed: "[s]ince DOE and SMUD both contemplate that DOE will still perform under the Standard Contract at some future date, any benefit to SMUD, because of delayed loading costs, would be *entirely speculative*." *SMUD*, Slip op. at 59 (emphasis added).

In addition, the calculation of this proposed $6.43 million offset by the government's "technical expert" Mr. Brewer is based on fantastically incorrect assumptions, and that figure itself is also "entirely speculative. Mr. Brewer bases his calculation on very small capacity truck casks which he assumes hold two spent fuel assemblies. Because HBPP has 390 spent fuel assemblies in its spent fuel pool, Mr. Brewer's assumption hypothetically requires PG&E to load 195 small casks (each with 2 of the 390 assemblies), thus multiplying the loading time and costs unduly and driving loading costs above $6 million. That cost is not only excessive, it is "entirely speculative," as *TVA* and *SMUD* explain. *See TVA*, 69 Fed. Cl. at 542 ("It is not possible to ascertain the method DOE will ultimately use for SNF acceptance. The size and type of casks to be used to transport the SNF are not known; no casks have been approved for the purpose.").

As in *TVA* and *SMUD*, the Court here should reject the government's proposed offset for "non-breach" DOE loading costs as speculative, both because the costs are merely deferred, not avoided, and because the government's $6.43 million loading cost figure is itself speculative. Moreoever, as PG&E's economic expert Professor Brad Cornell will explain, this offset should also be rejected on economic grounds. Professor Cornell demonstrates that because PG&E will incur DOE loading costs in the future, and because the amount of those future loading costs as well as the amount of the "non-breach" loading costs are uncertain, it is reasonable from an economic perspective to assume that the future DOE loading costs offset the hypothetical non-breach DOE loading costs. At bottom, as the Court explained in *TVA*, "the 'benefits' the government

seeks to setoff are too speculative to meet the standards set forth by the Federal Circuit in *Indiana Michigan*. 69 Fed.Cl. at 543.

4. Proposed deductions for costs that are "not supported" or "not incremental."

The government has sought to reduce PG&E's claimed damages by objecting to a number of specific cost items as either unsupported or "not incremental." These criticisms also should be rejected.

Initially, the Court should be aware that during discovery PG&E carefully considered the government's objections to specific cost items included in damages, and in certain cases PG&E has made adjustments based on these objections. As indicated below, PG&E also explained fully why the government's other objections are unfounded or simply incorrect. PG&E expects that the government will drop at least some of those remaining objections, but pending confirmation of that in further pretrial discussions, PG&E explains here why the Court should reject any of these objections that the government does elect to litigate.

Regarding support for the costs included in PG&E's claimed damages, it is for the Court, not the government's damages "experts," to determine whether PG&E has appropriately established its damages with requisite proof. *See, e.g., Inwood Laboratories, Inc. v. Ives Laboratories, Inc.*, 456 U.S. 844, 856 (1982) ("Determining the weight and credibility of the evidence is the special province of the trier of fact."). As noted above, PG&E intends to prove the amount of its claimed damages by presenting summary exhibits based on SAP accounting data. PG&E also will present testimony, from Mr. Kapus and others, to substantiate the accuracy of the claimed damage amounts.

Production of invoices to the government is thus not even necessary here. Nonetheless, as also noted above, PG&E has produced about 17,500 supporting invoices to the government. During discovery PG&E addressed the government's claim that it could not locate 17 invoices (PG&E identified those invoices for the government, thus presumably mooting this "issue"), and PG&E similarly addressed the government's complaints that it could not understand certain invoices by providing explanatory documentation and/or offering to provide verbal explanations. To the extent those responses (as well as PG&E's other evidence) do not lead the government to drop its objections to the costs covered by the invoices in question, the Court should reject the government's "determination" that PG&E has not provided adequate support for its claimed damages. In fact, PG&E is filing a motion in *limine* to preclude the government from offering expert testimony on this issue, which is an issue for the Court to decide based on applicable evidentiary and substantive law.

The Court should also reject the government's proposed deduction from damages of specific cost items that the government contends are "not incremental" to the breach because, allegedly, PG&E would have incurred essentially the same costs in the "non-breach" world. With respect to some of these proposed deductions, the government is simply wrong as a matter of fact that the activity giving rise to the cost would have occurred in the non-breach world. For example, the government's "technical expert" Mr. Brewer opines that PG&E's costs for spent fuel inspection at HBPP also would have been incurred in the "non-breach" world. But in addition to the problems noted above with speculating about costs that are only deferred and not avoided in the non-breach world, PG&E's evidence will show that PG&E's fuel inspection costs at HBPP were incurred

for tasks specifically tied to dry storage implementation – which would not have occurred in the non-breach world.

For some of the supposedly "non-incremental" costs the government proposes to deduct, it is possible that some similar activity might have occurred in the non-breach world, but the government has no basis other than speculation to assert that the non-breach costs would have been comparable, or anything close, to the demonstrated costs that PG&E has actually incurred. Because the government has the burden of proving these offsets, and because PG&E also has no non-speculative basis for calculating the non-breach costs, if any, the government's proposed deductions must be rejected. The Court in *SMUD* appropriately followed a comparable approach with respect to labor severance and recruiting costs that the government sought to deduct from damages:

> In order to offset labor severance and recruiting costs, the Government would have to establish employee by employee whether SMUD would have offered severance payments or recruiting costs would have been paid, but for the breach. This evidence was not developed. For this reason, the court has declined to speculate about SMUD's labor severance and recruiting costs, and determined not to offset these alleged costs.

*SMUD*, Slip op. at 54.

5. <u>Proposed deduction of labor and allocated costs.</u>

The government's proffered "damages expert," Larry Johnson, stated in his report that all internal PG&E labor costs included in PG&E's claimed damages, and all other costs that PG&E's SAP accounting system allocates as costs of particular projects on the basis of standard accounting rules, should be deducted from PG&E's claimed damages simply because, allegedly, Mr. Johnson had not been provided sufficient data to analyze whether these costs are "incremental" to the breach. These proposed deductions totaled

about 40% of PG&E's claimed damages through 2004, or nearly $40 million.[6] PG&E subsequently (on January 31, 2006) provided Mr. Johnson additional data concerning these costs, and government counsel has indicated that Mr. Johnson is preparing a supplemental report that will "add back" some amount of these labor and/or allocated costs. PG&E reserves the right to respond appropriately to any deductions still proposed in that supplemental report, but explains here why these labor and allocated costs are appropriately included in its claimed damages.

Under standard cost accounting practices generally, and under PG&E's SAP accounting system specifically, care is taken to assure that all costs incurred on particular projects are appropriately charged to those projects. PG&E's claimed damages include labor costs and certain other costs that PG&E's SAP system allocates to particular projects because all these costs were, as a matter of fact, incurred by PG&E in pursuing activities caused by DOE's breach – *i.e.*, these labor and allocated costs were incurred in implementing dry storage at DCPP or HBPP, in conducting SAFSTOR operations at HBPP, in implementing the temporary cask pit rack at HBPP, etc. PG&E testimony will support the soundness of its cost accounting practices, and the propriety of including labor and allocated costs in damages because they are costs actually incurred due to DOE's breach.

In both *TVA* and *SMUD*, the government argued that labor costs and at least certain allocated costs should be deducted from damages because these costs would have

[6] Mr. Johnson's report does not state the amount of his proposed deduction for these items for damages through 2004, because his report eliminates all damages after January 28, 2003, the date of PG&E's amended complaint, based on an "instruction of counsel" that such damages are not recoverable. That instruction is now superseded by the Court's March 30, 2006 Order, allowing damages through December 31, 2004 in the current proceeding.

been incurred regardless of the breach. *See TVA,* 69 Fed.Cl. at 537. As an initial matter, that argument is wrong as a matter of simple logic: if the labor and allocated costs in question are charged to projects *caused* by the breach, then absent the breach, those charges would *not* be made and the costs they represent – on those "breach projects" – would not be incurred. Nevertheless, pending a further report from Mr. Johnson on this issue, the government's theory seems to be that employees earn salaries and those salaries are paid regardless whether the employees work on breach projects. *See TVA,* 69 Fed. Cl. at 537 (noting government theory).

After a thorough review of applicable case law, the Court in *TVA* rejected the government's broad theory and adopted the rule set out in those decisions, which is more in line with the commonsense notion that costs charged to breach projects would not be incurred absent the breach – "the test for recovery is a targeted one: whether use of the internal resources by TVA deprived it of the ability to employ those resources on other projects. That TVA would have paid its employees in all events is not material to this inquiry." *TVA*, 69 Fed. Cl. at 539. Consistent with that statement of the law, PG&E's evidence will show that the resources represented by the labor and allocated costs charged to breach projects and included in PG&E's damages here were, because of the breach, not available to be employed by PG&E on other than breach projects. Indeed, even prior to the *TVA* decision, PG&E's economic expert Professor Cornell recognized that one key inquiry was whether the need to charge allocated costs to breach projects deprived PG&E of the use of the underlying resources on other projects. He therefore directed that allocated costs not meeting that standard, which PG&E's SAP accounting

system nevertheless may have charged to breach projects or which PG&E otherwise would include in damages, be "backed-out" of PG&E's damages claim.

Ultimately, employing a factual analysis very much like Professor Cornell's, the *TVA* Court accepted only modest deductions of labor and overhead costs included in TVA's claimed damages. The Court in *SMUD* accepted *TVA*'s legal analysis, and thus adopted *TVA*'s conclusion that "[t]he fact that an injured party has used internal resources to mitigate a breach does not foreclose the injured party from recovering such costs." *SMUD*, Slip op. at 64. But the *SMUD* Court's factual analysis of the labor costs included in SMUD's damages claim was completely cursory. Although the Court directed significant deductions from the claim of internal labor costs, it failed to explain the rationale for those deductions or to justify them under the test from *TVA* that it had adopted. *Id.* And in directing the deduction of other overhead costs, the *SMUD* Court provided even less explanation of the basis for its ruling. *See id.* at 64-65. Here again, PG&E respectfully submits that the *SMUD* Court's treatment of internal labor and overhead costs is mistaken, and the basis for the partial deductions of those costs was certainly not explained by the *SMUD* Court.

6. Suggested deduction of costs to store failed fuel.

The government has argued in other spent fuel cases, and has indicated through the report of its "technical expert" Mr. Brewer that it will argue in this case, that the parties' Contract gives DOE "discretion" to defer acceptance of "failed fuel," a category of spent fuel assemblies having various physical defects that are caused during normal reactor operations. There are a number of failed fuel assemblies at HBPP. Based on this supposed Contract discretion, the government has argued that even if DOE had

performed as required and removed "intact" fuel that is not failed, it would have deferred acceptance of and thus stranded failed fuel at utility sites, and the cost to store that failed fuel should be offset from damages.

This argument has no merit. Although a Contract provision allows DOE to consider the "technical feasibility of disposing of such [failed] fuel on the currently agreed schedule," *see* Art. VI.A.2.(b), the Contract does not thereby give DOE "discretion" to "defer" acceptance of failed fuel. This Court so held in *SMUD*. *See SMUD*, Slip op. at 56 ("the Standard Contract does not give DOE discretion to defer acceptance of failed fuel"). Moreover, trial evidence here will demonstrate that failed fuel has been and continues to be routinely transported with "intact" fuel that is not failed. The common method for transporting failed fuel is to place the failed assemblies in failed fuel "cans" that have the same outside dimensions as intact assemblies, and thus allow the failed assemblies to be handled and transported just like intact assemblies. Significant quantities of utility failed fuel have been transported in that manner, and in the late 1970's one of the government's national laboratories, Battelle, even proposed studying whether the HBPP failed fuel could be transported outside of failed fuel cans. This and other evidence makes clear there are no "technical feasibility" issues with transporting HBPP failed fuel, and DOE therefore would have removed HBPP's failed fuel on the same reasonable schedule as its intact fuel.

The government's proposal to offset PG&E's damages the costs of storing stranded failed fuel should be rejected for the simple reason that, if DOE had performed as required beginning in 1998, there would not be any stranded failed fuel and therefore

PG&E would not incur any costs to store such failed fuel. The government's contrary position is both contractually wrong, and speculative.

7. Proposed deduction of costs to plan and implement storage of GTCC waste.

In other spent fuel cases involving permanently shutdown reactors, the government has argued for a deduction from damages of the costs plaintiffs have incurred for storage of GTCC waste. Based on issues raised in discovery, PG&E expects the government to advance the same position here. This GTCC waste, sometimes called "reactor internals," consists of highly-irradiated metal from near the reactor core. Such GTCC material exists in all nuclear reactors, but only becomes GTCC "waste" upon decommissioning and dismantlement of a plant subsequent to shutdown.[7]

The government's position rests on the claim that the parties' Contract does not require DOE to remove PG&E's GTCC waste. That claim is wrong as a matter of Contract construction, but even if it were not, as shown below no deduction of GTCC waste-related costs would be warranted for other reasons. *See* pp. 55-58 below. The Contract expressly covers "high-level radioactive waste" ("HLW"), a term the Contract defines to include "other highly radioactive material that the Commission, consistent with existing law, determines by rule requires permanent isolation." Contract, Art. I.12.(b). GTCC waste fits this definition. There is no dispute that GTCC waste is highly radioactive, and, although disputed by the government, in 1989 the NRC determined by "by rule" that GTCC waste requires permanent isolation. *See* 10 C.F. R. §

---

[7] Utilities may possess other types of GTCC, most notably "non fuel components," such as control rod elements, thimble plugs, and other reactor hardware, all of which is indisputably covered by the standard contract and "may be included as part of the spent nuclear fuel delivered for disposal." *See* Contract, App. E, ¶ B.2.

61.55(a)(2)(iv) (the "1989 Rule"); *see also* Disposal of Radioactive Wastes, 54 Fed. Reg. 22578 (May 25, 1989) (codified at 10 C.F.R. Part 61).

In that 1989 Rule, the NRC provided that GTCC "*must* be disposed of in a geologic repository [i.e., permanent isolation] as defined in Part 60 of this chapter unless proposals for disposal for such waste in a disposal site licensed pursuant to this part are *approved* by the Commission." 10 C.F.R. § 61.55 (a)(2)(iv) (emphasis added). On its face, this mandatory ("must") rule requires permanent isolation, and it permits exceptions (if even possible) only if "approved" by the NRC. Indeed, DOE conceded the point in a pre-litigation, internal discussion paper that acknowledges that utility GTCC waste likely falls under the NWPA: "In general, provisions allowing exceptions do *not* obviate the *mandatory* nature of rules." PG&E Exh. 441 (emphasis added). *See also* 54 Fed. Reg. at 22,579 (changes made in 1989 Rule "obviate any need to reclassify certain GTCC wastes as HLW [i.e., high-level waste"] and would "achieve[s] the same purpose" as formally declaring the waste to be HLW).

The government has nevertheless argued, in other spent fuel cases, that due to the "unless" clause of the 1989 Rule – i.e., "unless proposals for disposal for such waste in a disposal site licensed pursuant to this part are approved by the Commission" – the Rule does not in fact "require" permanent isolation of GTCC waste, because the NRC can always approve some alternative to geologic disposal. This argument fails because the Rule does require permanent isolation "unless" there is an *approved* alternative, and it is undisputed that *there is no such alternative*. Moreover, the time to determine whether there is an approved alternative for purposes of applying the Contract definition of HLW

was the time when DOE's performance was due – 1998 – and there was no approved alternative to geologic disposal then either.

The dispositive point showing that GTCC waste fits the Contract definition of HLW is that the 1989 Rule requires GTCC waste to be disposed of in a geologic repository unless proposals for disposal of such waste in another licensed site are actually "approved" by the NRC. 10 C.F.R. 61.55(a)(2)(iv). The requirement for actual approval by the NRC of any alternative to repository disposal, as opposed to the language of NRC's proposed rule, which required only that a proposal for alternative disposal have been "submitted" to the NRC, *see* 53 Fed. Reg. 17,709, 17,715 (May 18, 1988), reflects the NRC's responsibility to assure that some other safe and appropriate disposal path actually be *in place* before DOE could be allowed to avoid taking GTCC waste to the NWPA repository. And because no such alternative disposal site has been "approved," as the NRC Rule unambiguously requires, the "unless" clause of the Rule is inoperative and GTCC waste is covered by the parties' Contract under the plain language defining "HLW."

The government has also argued in other cases that the 1989 Rule is ambiguous, but those arguments are based on extra-textual statements made by NRC when it proposed the Rule. Such statements are legally irrelevant, because the regulation is unambiguous on its face. *See Christensen v. Harris County*, 529 U.S. 576, 588 (2000) ("In *Auer v. Robbins*, 519 U.S. 452 (1997)], we held that an agency's interpretation of its own regulation is entitled to deference. . . . But *Auer* deference is warranted only when the language of the regulation is ambiguous."). A situation similar to that here arose in *Moore v. Hannon Food Service, Inc.* 317 F.3d 489, 496 (5th Cir. 2003). There, in

"declin[ing] to extend *Auer* deference to the [Labor] Secretary's interpretation, because [the regulation] is unambiguous," the Fifth Circuit rejected a purported "ambiguity" that was "found only by contrasting the regulation's language with the Secretary's interpretation." *Id*. at 497. As the court explained:

> Under *Christensen*, this approach is backwards. The presence or lack of ambiguity in a regulation should be determined *without reference* to proposed interpretations . . . .

*Id.* at 496-97 (emphasis added).

Finally, to the extent any ambiguity did exist (and PG&E contends there is none), it would rest entirely in the Contract itself – *i.e.* whether the Contract's definition of HLW covers highly radioactive GTCC waste where the NRC has determined that the waste requires permanent isolation in the absence of an approved alternative. Plainly, for reasons outlined above, construing the Contract to cover such waste is a *reasonable* interpretation (even if other interpretations might also be reasonable), as shown also by the opinion of a FERC Administrative Law Judge that "there is a reasonable likelihood that GTCC waste . . . is covered in the Standard DOE contract," *In re Connecticut Yankee Atomic Power Company*, Docket No. ER97-913-000, 84 FERC ¶ 63,009, 1998 WL 656747 (Aug. 31, 1998), by an internal analysis prepared for DOE by technical experts working for DOE, PG&E Exh. 367, and by the beliefs of leaders and long-standing participants in the nuclear industry, as trial testimony will show.

Because this construction is reasonable, the Contract necessarily covers GTCC waste under the doctrine of *contra preferendum*. *See United States v. Seckinger*, 397 U.S. 203, 210 (1970) ("[a]mong these principles [of federal contract law interpretation] is the general maxim that a contract should be construed most strongly against the drafter,

which in this case was the United States"); *Metric*, 169 F.3d at 752 (construing latent ambiguity in contract against the drafter); *Firestone Tire & Rubber Co. v. United States*, 444 F.2d 547, 551 (Ct.Cl. 1971) ("the drafting party [] must bear the risk of any contractual uncertainty, ambiguity or inequitable consequence") (citation omitted); *Gaston & Assocs., Inc. v. United States*, 27 Fed. Cl. 243, 249 (1992) (adopting contractor's reasonable interpretation of an ambiguous clause). Under this rule, "[i]f the contract is reasonably susceptible of two differing interpretations, that interpretation placed on the contract by the nondrafting party will prevail." *General Warehouse Two, Inc. v. United States*, 389 F.2d 1016, 1019 (Ct.Cl. 1967). Further, *contra preferendum* applies with particular force where, as here, the government enjoyed superior bargaining power in the negotiations. *See, e.g., Seckinger*, 397 U.S. at 216 (holding "[t]his principle is appropriately accorded considerable emphasis in this case because of the vast economic resources and stronger bargaining position in contract negotiations"); *Peter Kiewit Sons' Co. v. United States*, 109 Ct. Cl. 390, 418 (1947) ("[t]his rule is especially applicable to Government contracts where the contractor has nothing to say as to its provisions").

Importantly, even if Contract did not cover GTCC waste, the government still could not establish that any offset from damages is appropriate. First, it is undisputed that DOE is obligated to dispose of utility GTCC waste under the LLRWAA of 1985, and pursuant to that statute, DOE committed to Congress that it would take GTCC waste "as needed" starting in 1989. See 1987 Report to Congress on Recommendations for Management of GTCC Low-Level Radioactive Waste at 4-2 (PG&E Exh.. 349) (making commitment); Jan. 23, 2001 GTCC Program Planning Meeting Materials, Attachment 3

(PG&E Exh. 381) ("DOE did not meet its commitment [to Congress] to begin accepting GTCC waste for storage by February 1989"). Moreover, overwhelming evidence, including a series of detailed DOE planning documents, shows that DOE long planned to implement the 1985 Act by disposing of utility GTCC waste at the Yucca Mountain repository. *E.g.*, DOE's 1999 GTCC Low-Level Radioactive Waste Program Management Plan (PG&E Exh. 400); DOE's 1995 GTCC Low-Level Radioactive Waste Program Management Plan (PG&E Exh. 399). That evidence, together with the small quantity of GTCC waste existing at the few shutdown reactors, makes clear that if DOE had performed as required beginning in 1998, it would have removed the utility GTCC waste for disposal at Yucca Mountain along with utility spent fuel, regardless "technical" contract coverage. Lake Barrett, a long-time senior official and periodic acting director of DOE's spent fuel program, forthrightly acknowledged as much at his deposition:

> Q. Now a different question: Is it your expectation that when the Department of Energy commences the acceptance of Yankee Atomic's spent fuel [also a shutdown plant], it will accept at the same time contemporaneously Yankee Atomic's GTCC and remove it away from the site?
>
> A. When all the extraneous legal matters are finally resolved my expectation is the greater than Class C waste will go at the same time, contemporaneously, at the same time.

5/15/02 Barrett Depo. Tr. at 395:18-396:4 (objections omitted); *see id.* at 397:10 ("I believe that *should* go at the same time") (emphasis added).

Second, in the improbable event that DOE would have removed all the HBPP spent fuel but left its small amount of GTCC waste behind – despite clear Contract coverage for GTCC waste, and despite DOE's longstanding plans to remove it along with spent fuel – the government still cannot justify a deduction from PG&E's damages

through 2004. PG&E intends to procure and load a dry storage container for its HBPP GTCC waste, but those actions and their associated costs will not occur until after 2004. Moreover, although the government's "technical expert" Mr. Brewer vaguely suggests that storage of GTCC waste alone would involve at least some of the same costs as storage of spent fuel, he ultimately concedes that "given that a GTCC-only facility has not been designed or approved . . . , estimating the cost of such a facility would involve significant speculation." Brewer Expert Report at 24 (footnote omitted). At bottom, therefore, the government cannot satisfy its burden to establish an offset from damages for the cost of GTCC-only storage because its own witness concedes that "estimating the cost of such a facility would involve significant speculation."

Accordingly, no deduction from PG&E's damages is warranted on account of GTCC waste because the parties' Contract is properly construed to cover GTCC waste; because, regardless of Contract coverage, the evidence establishes that if DOE had performed as required it would have removed PG&E's GTCC waste at HBPP together with the spent fuel; and because, in any event, the government has not identified any costs – and has conceded it is speculative to estimate any costs – that PG&E would nevertheless incur if DOE were to remove PG&E's HBPP spent fuel but strand GTCC waste at the HBPP site.

In *SMUD* the Court did allow an offset for GTCC waste storage costs. *See SMUD*, Slip op at 61-62. For the reasons set forth above, PG&E respectfully submits that that ruling was mistaken. In addition, the persuasive value of the *SMUD* ruling is quite limited, because as the Court noted there, SMUD primarily argued that issues pertaining to DOE's obligation to remove GTCC waste were not ripe – *i.e.*, not presented – in that

case. *See id*. Given that approach, arguments and evidence outlined above that PG&E will present in this case presumably were not aired in a fulsome way, and perhaps not at all, in *SMUD.* Indeed, although the *SMUD* Court notes the government's position that GTCC waste is not covered by the standard contract, the Court does not even specifically rule on that issue and certainly does not explain the basis for any such ruling. *See id.; see also Commonwealth Edison*, 56 Fed. Cl. at 657-59 (following better approach of declining to address GTCC waste issue, because it was not ripe).

F. Restitution and Takings Claims

As the Court is aware, in PG&E's response to the government's motion for summary judgment on Counts II and III of PG&E's complaints ("PG&E's 12/16/06 Response Brief ") , PG&E explained that (1) under Federal Circuit precedent, it has not made any election of remedies and is only required to do so prior to judgment; hence, PG&E retains the right to declare a "total" breach and obtain restitution of Contract fees it has paid to DOE; and (2) its claim for a taking of real property at HBPP is unripe and should be dismissed without prejudice for that reason.

The basic evidence needed to establish the potential restitution claim is the amount of PG&E's Contract fee payments, which PG&E will put in evidence at trial. Regarding the takings claim, PG&E notes that the Court's March 30, 2006, Opinion and Order fixing December 31, 2004 as the last date through which damages will be considered at the upcoming trial, with subsequent damages to be considered later pursuant to *Indiana Michigan Power Co. v. United States*, 422 F.3d 1369 (Fed. Cir. 2005), strongly supports PG&E's position that its claim for a taking of real property at HBPP should be dismissed without prejudice as unripe. That claim is based on the interference with PG&E's real property rights that will arise from the construction and

indefinite duration of a spent fuel dry storage facility at HBPP. *See* 12/16/06 PG&E Response Brief at 7-13. But that facility will not be constructed until well *after* December 31, 2004, and thus the interference with property that is the gravamen of PG&E's taking claim will not occur until after that date. The takings claim is thus not ripe – it can no more be adjudicated now than can PG&E's post-2004 damages be adjudicated now. Therefore, the takings claim should be dismissed without prejudice for lack of ripeness.

## CONCLUSION

For the reasons set forth above and to be established through trial evidence, the Court should enter judgment for PG&E for damages in the amount it claims at trial.

Dated: April 10, 2006

Respectfully submitted,

s/ Jerry Stouck
Jerry Stouck
Greenberg Traurig, LLP
800 Connecticut Avenue, NW
Suite 500
Washington, DC 20006
(202) 331-3173 Phone
(202) 261-4751 Fax
Counsel for Plaintiff
Pacific Gas & Electric Company

Of Counsel:

Robert L. Shapiro
Greenberg Traurig, LLP