October 1999.[91] Although the funding request was eventually approved, three months of delay is attributed to the extended decision process of the ALJ in the CPUC rate case and the approval of internal funding for the project, limiting activities and extending the schedule at HBPP.

Following funding approval, HBPP experienced an additional seven months of delay due to extended site selection and associated additional Geosciences activities, and completing the RFP for cask vendor bid solicitations.[92] Throughout the rest of 1999, HBPP made less than planned progress on the development of both the RFP package and on the development of non-vendor dependent packages for the ER and SAR required for RFP completion. Although progressing on the work, HBPP limited the activities to only those essential to keep the project moving forward, and instructed the licensing and Geosciences staff to hold off on non-RFP activities during this period.[93] Thus, separation of the RFP preparation task between DCPP and HBPP also contributed to the extended period of RFP development for HBPP.[94]

Actual expenditures at HBPP lagged behind the planned expenditures throughout 1999. HBPP issued the RFP to vendors in March 2000, resulting in a critical delay of 10 months to the dry storage project schedule. Internal schedules and presentations to the NRC at the end of 1999 reflected this delay and depicted a commensurate slip in downstream milestones for licensing and development.[95]

### *II.B.7. HBPP Review Period 2 (March 2000 to February 2001) – Vendor Contract/Licensing*

Following the completion of the RFP in March 2000, and through February 2001, HBPP incurred an additional 11 months of critical delay in proceeding to its next critical milestone – finalizing source selection and contracting with a cask vendor (Holtec) in order to continue development of the Part 72 license application.

Causation

1. **3 months** of delay are attributed to extended vendor source selection and contract negotiations with Holtec.

2. **8 months** of delay are attributed to three primary root causes: 1) Allocation of PG&E resources to completion of DCPP source selection and Part 72 submittal at the expense of HBPP

[91] Willis memo dated 27Apr99, PDCP0004687-88; Job Estimate dated 27Apr99, PHBP0005681-83; HBPP ISFSI Licensing and Design Project Charter dated 28Apr99, PHBP0007302-7322; Rueger memo 27Jul99, PDCP0004698; Willis email dated 19Aug99, PHBP0007251-7252; Willis memo 30Sep99, PDCP0004699-00; Willis memo dated 05Nov99, PDCP0004702; Willis deposition 24-25Aug05 at 178-179, 241-243.

[92] Project Status Report – Aug99, dated 19Aug99, PHBP0033501; Willis memo to Moulia, 23Oct00, PHBP0028588-93; Willis memo 17Oct00, PHBP0032789; Cluff memo 12Jul99, PHBP0078614-5.

[93] Willis email dated 19Aug99, PHBP0007251-7252; Bruce Norton Invoice/Timesheets 01Sep99-30Nov99, dated 01Dec99, PHBP0031768-72.

[94] HBPP Licensing Report Submittal (Revised 15Jun99), EVR, SAR & RFP Schedules: Baseline Schedule Rev. 0, 12Aug99, PHBP0001008-1033; HBPP ISFSI Licensing Schedule (Updated 12Aug99) dated 18Aug99, PHBP0007470-7475; Project Status Report dated 19Aug99, PHBP0033501; Moulia email dated 18Oct99, PHBP0014926; Willis memo dated 05Nov99, PDCP0004702; Project Status Report – Feb00, PDCP0013329; Willis email 25Feb00, PPGE0056266-67.

[95] See generally: Kapus email 15Oct99, PHBP0007584; NRC/PG&E Communications Meeting dated 10Nov99, PHBP0009108-9121; HBPP ISFSI Licensing Report Submittal (updated 10Nov99), Combined EVR, SAR & RFP Schedules, Rev. 2 dated 10Nov99, PHBP0000948-0974; HBPP ISFSI SAR-ER Completion, circa Dec99, PHBP0059612; HBPP ISFSI Licensing Report Submittal (updated 12Jan00), Combined EVR, SAR & RFP Schedules, Rev. 2 dated 12Jan00, PHBP0028304; Project Status Report-Jan00, dated 07Feb00, PDCP0013329, PHBP0049560-9573; Willis memo dated 25Feb00, PPGE0056266-6267; Project Status Report – Mar00, dated 10Apr00, PHBP0049627-9639.

work, 2) Extended geologic analysis related to HBPP ISFSI site selection, and 3) Extended geotechnical work by Geosciences and Geomatrix related to earthquake analysis, site characterization, and the completion of the seismic hazard analysis at HBPP.

Discussion

Following the issuance of the RFP for cask vendor solicitation, PG&E anticipated contract award within one to two months. HBPP issued its RFP in March 2000 but did not have a vendor contract executed by February 2001.

The vendor selection process was protracted by three months, primarily due to an extension of time prior to the submittal of the bid from Holtec which was received by HBPP in May 2000. By July 2000, Holtec was the recommended bidder for the dry storage systems at DCPP and HBPP.[96] While DCPP moved forward with Holtec by issuing a letter of authorization to work on licensing support in August 2000, HBPP did not have a similar agreement and did not have a contract in place with Holtec by February 2001.[97]

At the time that Holtec emerged as the preferred bidder in mid-2000, PG&E directed its limited resources toward the prosecution of DCPP vendor source selection and licensing process, at the expense of the HBPP vendor contract and licensing schedule.[98] Fall 2000 schedule projections at this time moved the vendor contract award and Part 72 application milestones for HBPP almost one year into the future from where they were planned in the spring of 2000. As a result, actual expenditures at HBPP continued to lag behind the planned expenditures throughout 2000.[99]

Complicating the vendor selection and license application process at HBPP were extensive geologic analyses related to site selection for the HBPP ISFSI, characterization of earthquakes in Taiwan for application to Humboldt Bay design criteria, and the completion of the Humboldt Bay seismic hazards analysis.[100] HBPP did not settle on a site for the ISFSI location until October 2000.[101] By February 2001 the initial seismic hazards analysis was complete, but HBPP had not significantly progressed with finalizing a contract with Holtec for cask design or vendor selection for ISFSI design, and progress on HBPP's Part 72 license submittal was limited. PG&E's focus had shifted to DCPP and resources were directed toward completion of the DCPP Part 72 during this time.[102]

---

96 Bid Evaluation Update dated 20Jun00, PDCP0004199-4212; Advice letter 2095-E dated 28Mar01, PPGE0057448; Patton deposition 30Sep05 at 186-187.

97 PG&E Letter of Authorization to Holtec dated 31Aug00, PPGE0053771-3772.

98 Preliminary Schedule for HBPP ISFSI, circa Jul00, PHBP0040076-77; PG&E Meeting w/NRC Summary dated 22Sep00, PHBP0058563; Cliff deposition 15Nov05 at 46-52, 57-58, 81-84, 100, 110; Strickland deposition 18Aug05 at 129-131, 133, 167; Patton deposition 30Sep05 at 52, 103-105; Womack deposition 12-13Sep05 at 150-151, 195-196; Kapus deposition 28-29Sep05 at 358-359; Pulley deposition 27Jul05 at 21-26.

99 See e.g., Monthly Cost Status Rpt dated Mar00, PHBP0049627-9639; Project Status Report – Mar00 dated 06Mar00, PHBP0049597; HBPP Unit No. 3 Decommissioning Schedule dated 16Aug00.

100 Cluff deposition 15Nov05 at 27, 98-99.

101 Willis memo dated 17Oct00, PHBP0032789; Willis memo dated 23Oct00, PHBP0028588-8593; Cluff deposition 15Nov05 at 94-95.

102 Analysis Of Review of Seismic hazard and Design for HB ISFSI License Application dated 15Feb01, PDCP0025775-77; Project Status Report – Nov00 dated 06Dec00, PHBP0072290; Dry Storage Weekly Update 19Feb01, PHBP0052563-65; Pulley deposition 27Jul05 at 21-26.

*II.B.8. HBPP Review Period 3 (March 2001 to April 2002) – Vendor Contract/Licensing*

Through the balance of 2001 and into the spring of 2002, HBPP continued critical activities regarding finalizing a contract with Holtec, progressing with analyses on ISFSI design, and working on the Part 72 license application process. These activities were conducted at a slower pace than originally planned, however, since HBPP work continued to suffer from a lack of resources that were directed toward the completion of the DCPP license submittal, and experienced additional holds on work due to additional CPUC funding requests. Moreover, additional geotechnical work was identified, protracting the development of HBPP dry storage progress. Diablo Canyon submitted its Part 72 license application in December 2001 and by March 2002 had submitted its Part 50 license amendment request and began to free up resources for the completion of HBPP work. As of April 2002, however, HBPP did not have a contract in place with Holtec and had made little progress toward completion of Part 72 licensing activity, resulting in an additional 14 months of critical delay to its dry storage project.

Causation

1. **14 months** of delay are attributed to the protracted period of limited progress on HBPP dry storage development due to the priority of DCPP license completion activities, holds for additional funding requests through the CPUC, and extended negotiations of the Holtec contract.

Discussion

Since PG&E resources during this period were directed at completing the DCPP contracting and licensing activity, HBPP suffered from a commensurate lack of progress due to delays in the DCPP schedule. The DCPP dry storage project was delayed during this period due to additional geotechnical re-work identified to be non-compliant with regulatory guidelines and complications of the PG&E bankruptcy proceedings on the Holtec contract with DCPP.[103] As a result, HBPP's dry storage project experienced significant periods of inactivity or slowed progress on its work to finalize contract negotiations with Holtec and other ISFSI design vendors and the development of its Part 72 and Part 50 license applications.

By April 2001, HBPP had completed approximately 25% of the ISFSI SAR/ER application. Shortly thereafter HBPP work was limited pending CPUC decisions on additional funding, and recommendations were made for DCPP staff to take over the completion of HBPP licensing activity when DCPP work was completed.[104] In May 2001, for example, HBPP listed its license application submittal as "TBD" and reported costs for the month of approximately $1500. DCPP, in contrast, incurred costs of nearly $1 million for May 2001.[105]

In August and November 2001 HBPP held "kick off" meetings to restart the HBPP dry storage project in anticipation of imminent DCPP license submittals, but DCPP work was further delayed and this effectively suspended HBPP work until DCPP released its Part 72 application in

---

[103] See e.g., Dry Cask Storage Update dated 08Apr01, PDCP0026606-08; Dry Cask Storage Update dated 29May01, PDCP0026612-15; Pulley memo 07May04, PHBP0005762-70; See also discussion on DCPP dry storage sections for detail on the progress on the DCPP project during this period.

[104] HBPP Mid-Year Program Update dated 06Apr01, PHBP0030749-0763; Moulia memo dated 18May01, PDCP0004732-4733.; Job Estimate Revision dated 31May01, PHBP0033659-62; Job Estimate Rev. 1 dated 10Nov01, PHBP0014886-4889; Moulia memo dated 14Nov01, PHBP0005674-5676.

[105] Project Status Report – May01, dated 08Jun01, PDCP0017832.

December 2001 and its Part 50 license amendment request in April 2002.[106] By April 2002 HBPP had not significantly progressed with finalizing a contract with Holtec for cask design or vendor selection for ISFSI design, and progress on HBPP's Part 72 license submittal was again limited. PG&E's focus was still centered on completion of the DCPP Part 72 and Part 50 during this time, and delays to that process had a commensurate effect on the progress at HBPP.[107] Schedules developed from mid-2001 through early 2002 for the completion of HBPP dry storage activities reflected the dependency on DCPP activity and the resulting delays.[108]

### *II.B.9. HBPP Review Period 4 (May 2002 to December 2002) – Vendor Contract/Licensing*

In April 2002, as DCPP concluded its activity to submit its Part 72 and Part 50 license applications, staff resources began to move to HBPP to ramp up operations to continue its dry storage project.[109] By the end of December 2002, HBPP had contracted with Holtec as the dry cask supplier and initiated ISFSI design efforts, but delays to completion of additional seismic hazards analyses resulted in an additional 7 months of critical delay to the project.

Causation

1. **7 months** of delay are attributed to the transition of staff from DCPP, the completion of additional seismic hazards analyses, and the final negotiations of the Holtec cask system contract.

Discussion

In March and April 2002, HBPP held an ISFSI project "re-start" meeting and initiated work orders to complete remaining analysis tasks to finalize geotechnical analyses, and conducted contract negotiations with Holtec.[110] Work began by incorporating comments and lessons learned from the DCPP license submittal activities into HBPP's processes for developing its Part 72 license application.[111] HBPP also initiated the solicitation and received bids on ISFSI design work, awarding a contract to Enercon in September 2002.[112]

The primary work during this period was the completion of additional seismic hazard analyses by PG&E's Geosciences department with assistance from Geomatrix and Matrix Environmental Planning in support of license application development, exacerbated again by resource

---

106 Dry Cask Storage Update dated 29May01, PDCP0026612-15; Meeting to Wakeup Humboldt ISFSI Project dated 02Aug01, PHBP0032599; HBPP ISFSI Kickoff Meeting dated 08Nov01, PHBP0033712; Dry Cask Storage Update 15Apr02, PDCP0026609-6611; Meeting notes 16Apr02, PHBP0033285-87.

107 Cluff deposition 15Nov05 at 46-52, 57-58, 81-84, 100, 110; Strickland deposition 18Aug05 at 129-131, 133, 167; Patton deposition 30Sep05 at 103-105; Willis deposition 24-25Aug05 at 304-305, 308, 314; Kapus deposition 28-29Sep05 at 358-359.

108 Project Status Report – May01, dated 08Jun01, PDCP0017832; HBPP Activity Schedule, Jul01, PHBP0038855-57; HBPP Activity Schedule, Aug01, PHBP0038861-63; HBPP Early Decommissioning Schedule dated 23Aug01, PPGE0007545; HBPP Activity Schedule, Oct01, PHBP0038847-49; Moulia memo 14Nov01, PHBP0005674-76; Dry Cask Storage Update 17Nov01, PDCP0026653-56; HBPP Integrated ISFSI Project Schedule, Dec01, PHBP0038864-8865; HBPP Seismic Hazard Study Plan and Schedule for 2002, Dec01, PHBP0038866-90; Project Status Report – Jan02 dated 06Feb02, PHBP0035665-5666.

109 Dry Cask Storage Update 15Apr02, PDCP0026609-6611;

110 Meeting Notes, 16Apr02, PHBP0033285-7; HBPP ISFSI Project, Transmittal of Work Plan GEO 2002-01, Rev. 0, 06Mar02, PHBP0035759, PHBP0032617, PHBP0033474-3477.

111 HBPP ISFSI ER Punchlist, 16Apr02, PHBP0059842-5.

112 Project Status Rpt - Sep02, 03Oct02, PHBP0071798.

limitations and scheduling conflicts with ongoing DCPP RAI responses.[113] During this period the Holtec contract process was held up waiting for completion of these activities.[114] HBPP signed the contract with Holtec after extended negotiations in January 2003, but incurred seven months of additional critical delay to the dry storage project during this period. Project schedules developed in January 2003 reflect this delay.[115]

### *II.B.10. HBPP Review Period 5 (January 2003 to December 2003) – Part 72 License Submittal*

This period is characterized by the actual development and completion of the HBPP Part 72 license application submittal to the NRC. HBPP achieved the remainder of its planned progress during this period. Holtec began to finalize cask/canister and equipment designs, and HBPP worked on finalizing ISFSI designs to support the application submittal.[116] HBPP completed the Part 72 license application in December 2003, incurring an additional six months of critical delay.

Causation

1. **6 months** of delay is attributed to extended completion of Part 72 license application submittal activities.

Discussion

In January 2003, following the execution of the Holtec contract for the HI-STAR HB dry cask storage system, HBPP developed plans to accomplish the license submittal application with Holtec support. Although HBPP effectively met these new plans for completion, this task was still delayed when compared to HBPP's initial plans for this work.[117]

Concerns regarding the condition of the fuel at HBPP were raised early in 2003 which were reported as having a direct input on the Holtec designs necessary to support the Part 72 license application. These concerns persisted throughout 2003.[118] Enercon completed its preliminary engineering design for the ISFSI in April 2003, and submitted the specification in October 2003.[119]

---

[113] See e.g., CWA, 12Jun02, PHBP0080818; Workplan, 04Oct02, PHBP0061473-6; CWA 07Oct02, PHBP0080814; Matrix invoices, 30Apr02, PHBP0080851; 31May02, PHBP0063066; Letter 08Aug02, PHBP0063117-9; PHBP0063076-7; 31Dec02, PHBP0062992; Workplan, 04Oct02, PHBP0061475-6; PHBP0061473; Willis memo dated 03May02, PDCP0004734; Job Estimate 07May04, PHBP0005735-39; Cluff deposition 15Nov05 at 44-46; Willis deposition 24-25Aug05 at 324-325; Womack deposition 12-13Sep05 at 149-150; Pulley deposition 27Jul05 at 21-26, 77-78.

[114] Project Status Report - Oct02, dated 13Nov02, PHBP0035811; Meeting Notes from Humboldt Bay ISFSI meeting 16Apr02, PHBP0033285-3287; Quality Verification memo dated 04Jun02, PHBP0061287; NRC-PG&E Meeting, 03Apr03, PHBP0039856-9884.

[115] Project Status Report – Nov02 dated 10Dec02, PDCP0017857-7858; Project Status Report – Dec02 dated 16Jan03, PDCP0017859-7860; Holtec HBPP Contract, executed 06Jan03, PPGE0005484-5699; See e.g., HBPP ISFSI Project Schedule dated 16Jan03, PHBP0038844-8846.

[116] See e.g., HBIP Meeting dated 19Feb03, PHBP0035677; HBPP ISFSI Project Schedule dated 24Feb03, PHBP0028299-8303; Holtec Invoices May-Dec03, PHBP0052300-09, PHBP0078366-67, PHBP0052284-89, PHBP0052270-73, PHBP0052265, PHBP0052365-8.

[117] See e.g., Project Status Reports Apr 03 - Jun03, PHBP0079582-3, PHBP0079636, PHBP0079802-3.

[118] HBPP ISFSI Fuel Condition Mtg, 30Jan03, PHBP0061280-1; Project Status Reports May03-Dec03, PHBP0079636, PHBP0079802-3, PHBP0079748-9, PHBP0079530-1, PHBP0079695-6, PDCP0017865-6, PDCP0017867-70.

[119] See e.g., Project Status Report – Jul03 dated 23Jul03, PHBP0020373, PHBP0020395; Enercon Report dated 16Apr03, PHBP0055717-5729; Enercon letter dated 17Apr03, PHBP0055715-5716; Enercon Spec 09Oct03, PHBP0055738; Project Status Report – Oct03 dated 17Nov03, PHBP0079343-4, PDCP0017865-7866.

Through the remainder of 2003, HBPP conducted various hazard, accident, and design reviews with Holtec, Enercon, and other project consultants in addressing the development of various sections of the SAR.[120] Work also progressed on the ISFSI vault design and the Part 50 LAR. Progress and support was less than planned, however, and completion dates for SAR sections slipped throughout the year.[121] An integration review was held in November 2003 to ensure consistency among SAR/ER sections.[122] HBPP submitted its Part 72 license application to the NRC in December 2003 under docket 72-27.[123]

### *II.B.11. HBPP Review Period 6 (January 2004 to November 2005) – Part 72 License Approval*

This final period is characterized by HBPP support of the NRC review process of the Part 72 license application, and continued development of the Part 50 license amendment request and Coastal Development Permit. This period was performed slightly ahead of original plans, and one month of recovery was realized during this period.

Discussion

HBPP developed and submitted the Part 50 license amendment request to the NRC in July 2004. Following this, HBPP submitted the Coastal Development Permit to the California Coastal Commission in January 2005.[124] PG&E received the Part 72 license application in November 2005, approximately one month ahead of baseline schedule plans for this activity.[125] In December 2005, PG&E received the Part 50 license amendment regarding the use of the Holtec davit crane in the refueling building for cask handling operations.[126]

Through Advice letter 2565-E, PG&E requested the disbursement of $35.9 million from the decommissioning trust fund in October 2004. This request was approved in February 2005 following an ORA protest in November 2004.[127]

The Part 72 license review activity is critical during this period, and the Part 50 submittal and Coastal Development Permit processes were accomplished under this controlling activity's schedule. Going forward, Holtec was released for procurement in January 2006 and the Holtec scope of work for fabrication and delivery of HI-STAR HB components is pacing the eventual completion of the HBPP dry storage system.[128]

---

120 See e.g., HB ISFSI Punchlist 02May03, PHBP0005884-5; Regulatory Services HBPP 30Jun03, PHBP0054385-88; ISFSI SAR – HBPP Work Packages 18Jul03, PHBP0005888-92; HBPP ISFSI License Application SAR Production, 12Aug03, PHBP0005910-16.

121 See e.g., HBPP May 2003 Fossil & Nuclear Expense Programs Actuals/Plan/Forecast 09Jun03 PHBP0020300-04; HBPP Jul 2003 Fossil & Nuclear Expense Programs Actuals/Plan/Forecast 06Aug03 PHBP0020336-40; Monthly Status Rpt 13Aug03, PHBP0005843; HBPP ISFSI License Application SAR Production 04Sep03, PHBP0005828-32.

122 Grebel email 16Sep03, PPGE0057585; Project Status Report – Nov03, dated 16Dec03, PDCP0017869-70.

123 72-27 SER, 18Nov05, Enclosure 2, xiii (NRC website); PGE letter 04Dec03, PDCP0011457-58; Cluff Deposition 15Nov05 at 57; Willis deposition 24-25Aug05 at 180.

124 Humboldt Bay ISFSI and Decom Timeline for PNAC, 03Feb05, PHBP005630-5631; PG&E letter to CCC 14Jan05, PHBP0005166-67; PG&E Draft letter, Mar05, PHBP0035828-29.

125 Willis deposition 24-25Aug05 at 254; PG&E Meeting with the NRC, 22Apr99, PHBP0011701-1727.

126 NRC letter 15Dec05 re: Docket 50-133, Amendment No. 37 to DPR-7, No Bates, NRC website – ADAMS).

127 Advice 2565, 12Oct04, PHBP0045005-5011.

128 Pulley deposition 27Jul05 at 69-70, 83-84; Lewis deposition 27Jan06 at 63-64, 163-165.

EXHIBIT A

# Baseline Schedule: Diablo Canyon & Humboldt Bay Dry Storage Projects

06Feb06




PG&E v. USA
CFC No. 04-74/75C

Contract Solutions LLC

EXHIBIT B

# DCPP Dry Storage Project - As-Built Critical Delay By Period

06Feb06




PG&E v. USA
CFC No. 04-74/75C

Contract Solutions LLC

EXHIBIT C

# HBPP Dry Storage Project - As-Built Critical Delay By Period

06Feb06




PG&E v. USA
CFC No. 04-74/75C

Contract Solutions LLC

EXHIBIT C

# HBPP Dry Storage Project - As-Built Critical Delay By Period

06Feb06




PG&E v. USA
CFC No. 04-74/75C

Contract Solutions LLC

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

ORIGINAL

-------------------------------x

PACIFIC GAS & ELECTRIC )
COMPANY, ) No. 04-0074C into
Plaintiff, ) which has been
v. ) consolidated No.
UNITED STATES OF AMERICA, ) 04-075C
Defendant. ) (Judge Hewitt)

-------------------------------x

Deposition of JOHN R. MCGRATH

Washington, D.C.

Tuesday, March 14, 2006

9:35 a.m.

Job No.: 1-74325

Pages 1 - 192

Reported By: Joan V. Cain

identify the delays and variances between those two items.

Q What makes you an expert in schedule and delay analysis?

A Generally, my education and work experience.

Q What about your education makes you an expert in scheduling delay analysis?

A I have a bachelor of science in aerospace engineering, and an engineering degree allows me to understand the concepts -- technical concepts sometimes that are involved in forming a schedule, planning a schedule, or developing a schedule or analyzing a schedule.

And I have a master's in business administration, which covers a variety of the topics, obviously. But it primarily covers areas like project management and industrial engineering, which is managing projects, managing business units, and things that involve schedules as an integral part of either operating a company or operating or managing a particular project.

Q What about your work history makes you an expert in schedule and delay analysis?

A Well, generally, I've been working with schedules since I started work at McDonnell Douglas in 1988 developing schedules, managing schedules, creating inputs to schedules, and, you know, operating the portions of my responsibilities on the project and operating to a schedule.

And since 1992, I've been analyzing schedules in a consulting capacity, both forensically and prospectively in different capacities.

MR. SHAPIRO: Mark this as Exhibit 1.

(McGrath Deposition Exhibit 1 was marked for identification and was attached to the deposition transcript.)

BY MR. SHAPIRO:

Q Mr. McGrath, you've been handed what's been marked as Exhibit 1 to your deposition. Would you tell us what it is, please.

A This is the expert report I prepared in this matter, the PG&E matter, which has a cover

forward to the end of the project to ultimately determine what the critical path of the project was.

Q When a field such as, again, nuclear facility construction, which you don't have actual experience or education or training on how that field works, how do you go about understanding the logical relationship of that construction project to enable you to create a critical path for that project?

A Primarily, through the project records, the personnel involved in the project that creates the schedules, that create the logic, that actually perform the work in the sequence that they do perform the work.

Q So in essence, you're relying on the documentation created by those that are experts in the construction of a nuclear facility from which you make your judgments as to what parts of the project are critical or not?

MS. SNYDER: Objection, calls for speculation.

Go ahead.

A In essence, I do rely extensively on the project documentation and the actual contemporaneous documents produced by the people scheduling and working the project.

BY MR. SHAPIRO:

Q So in essence, the schedule and delay analysis is comparing a baseline projected schedule to the actual experience of an organization performing that project?

A In regards to the PG&E case or in general?

Q In general.

A Well, that could be one aspect of schedule analysis in general. As I mentioned earlier, there's several -- there can be several reasons you'd utilize a schedule analysis but --

Q What about in the PG&E case?

A In this case, that's essentially the analysis that I performed.

Q And to the extent an event takes longer than was forecast in the initial schedule, you don't have any means of determining whether the initial projection was too optimistic or the implementation

Humboldt Bay Power Plant and Diablo Canyon Power Plant.

Q So you're saying you have the expertise to make a judgment as to how long it should take to construct a dry storage facility at a nuclear power plant?

A No, I'm not saying that. I'm saying that I reviewed the contemporaneous evidence at the time and rely on the schedules produced by the personnel at PG&E as a reasonable benchmark for the planned duration of this project, these projects.

Q So you don't have the expertise to make a judgment as to how long it should take to construct a dry storage facility at a nuclear power plant?

A I possibly have expertise to do that. If I was tasked with actually developing the schedule for this project or another project, I would develop that schedule using my scheduling expertise. I would also, of course, gather many inputs from many qualified people on the actual data and assumptions and everything else that would go into the creation of that schedule, but I did not create the baseline

A Correct.
Q You yourself don't have the expertise sufficient to determine how long it should take to develop a license application under 10 CFR Part 72, do you?
A No. Again, I relied on the documents that PG&E produced and developed that estimated that activity and its duration.
Q The next milestone listed is getting a license granted under 10 CFR Part 72, correct?
A Yes.
Q You yourself don't have the expertise to judge how long one should expect for the actual grant of a license under 10 CFR Part 72, correct?
A Correct. I used the PG&E estimates and the NRC inputs that they considered to determine the duration of that activity.
Q And once licenses are granted, you don't have expertise to determine yourself how long it should take to actually construct the dry storage facility, do you?
A I didn't develop that part of the schedule.

preparing this report.

So I don't disagree that the Court could do that in some respects. I'm presenting that -- the analysis and the support for that analysis in some respects so that a third party or some other party can do that.

Q Well, now that you've sifted through the documents, couldn't the government's counsel that you're working with simply present the documents that you've determined are the relevant documents and offer those to the Court for the Court to simply compare the forecasted schedule to the actual experience?

A I can't speculate on what the government's counsel will or will not do.

Q I'm asking as a theoretical matter. Wouldn't that work? Couldn't the government counsel simply take the documents that you've identified as reflecting a forecasted schedule and an actual experience schedule and offer those to the court for the Court to compare the dates on the two documents?

MS. SNYDER: Objection, asked and answered.

Calls for speculation.

A Theoretically, I'm sure that they could -- the government's counsel could do that.

BY MR. SHAPIRO:

Q And if the government's counsel did that, then the Court could adequately compare the forecasted schedule to the -- to the actual experience to see the variances, correct?

MS. SNYDER: Objection, asked and answered. Calls for speculation.

A That is correct. In my opinion, that would not give you -- wouldn't be that illuminating as to any of the detail beneath that high-level comparison. But the comparison in that manner certainly could be done, and theoretically anyone could do that.

BY MR. SHAPIRO:

Q What's the detail that you feel would be missing from that comparison?

A Well, the detail is what's in my report as far as illustrating the reasons and the causes for the variances that are identified in the scheduling.

their options were at the time and nothing further than that.

BY MR. SHAPIRO:

Q So you yourself don't have the expertise to know whether or not PG&E could have successfully implemented its dry storage facilities at Diablo Canyon and Humboldt Bay through use of general licenses?

A I haven't been asked to determine that, so I don't know.

Q You don't know if you have the expertise to determine whether or not PG&E could have successfully used general licenses to implement its dry storage facilities?

MS. SNYDER: Objection, asked and answered. Beyond the scope of the report.

A I haven't researched that, so I don't know. I don't have an opinion on that. I don't -- haven't researched that.

BY MR. SHAPIRO:

Q You don't have an opinion on your own personal expertise?

its work on its ISFSI projects incrementally and serially."

What do you mean by "incrementally and serially"?

A What I mean by that is -- what I mean by incrementally is a discrete phase of work as one increment. And by serial, I mean the discrete phases of work were performed essentially one after another instead of in parallel.

Q You're not saying that it was imprudent in any way for PG&E to proceed in an incremental and serial manner in the implementation of its ISFSI projects, are you?

A No, I'm not.

Q And you would lack the expertise to offer an opinion as to whether or not PG&E's pursuit of its ISFSIs in an incremental manner was imprudent in any way, correct?

A That's correct.

Q Also on page 5 of your report, you say that the ISFSI projects have off-ramps and PG&E has not exercised them, correct?

Q In fact, you lack the expertise to determine whether or not PG&E was negligent in any way in the preparation of its Part 72 license application for the Humboldt Bay ISFSI, correct?

MS. SNYDER: Objection, assumes facts not in evidence.

A My expertise in this case is in relating the descriptions and causes of the delays that are contained in the contemporaneous records to this particular activity and to this particular time period, and that's what I've relayed here in the report.

BY MR. SHAPIRO:

Q So you yourself don't have personal expertise to determine whether or not PG&E was negligent, in any way, in the preparation of its Part 72 license application of the Humboldt Bay ISFSI, correct?

MS. SNYDER: Objection, assumes facts not in evidence.

A I'm sorry. Could I have that back, please?

(The reporter read the record as

BY MR. SHAPIRO:

Q Well, to what extent do you have expertise to determine whether the delay in submittal of PG&E's NRC license application for the Humboldt Bay ISFSI was due to imprudence by PG&E?

A Only in the comparison of the actual work for that activity, to the planned work for that activity, and whether it represents a variance in their plans or not.

Q Well, you do opine that there's a variance between the planned work and the actual experience for the Humboldt Bay ISFSI, correct?

A Yes.

Q But you're not saying that that variance is due to any imprudence by PG&E, correct?

A I characterized the variance as I've written in pages 22 through 28 in my report and that characterization is based on the project records and the contemporaneous documents and how they characterize the actual prosecution of work, how those documents characterize that.

Q You don't have the expertise to look at the

variance between the planned schedule for the Humboldt Bay ISFSI and the actual schedule for that ISFSI, the actual experience in the development of that ISFSI to say whether that variance was due to imprudent conduct by PG&E, correct?

MS. SNYDER: Objection, assumes facts not in evidence. Same objection. Calls for speculation.

A Only to the extent that that characterization would be contained in the project records. It's not an independent characterization that I would make.

BY MR. SHAPIRO:

Q And you wouldn't make an independent characterization as to whether or not the variance in the actual experience versus the forecasted schedule was due to imprudence, at least in part, because you don't have the expertise to make such a determination, correct?

MS. SNYDER: Assumes facts not in evidence. Asked and answered a number of times.

A That's correct.

Q Let me focus first on Humboldt Bay. Your reasons for using April 1999 as a baseline are that PG&E presented a schedule to the Nuclear Regulatory Commission in roughly that time frame is consistent with other schedules developed between May of 1998 and April '99. It's consistent with the contract between PG&E and Holtec, and it was developed prior to the approval of funding allocations and the start of meaningful work, correct?

A Correct.

Q Why is presentation to the Nuclear Regulatory Commission important to knowing that a schedule is the valid baseline for an ISFSI project?

A It's an indication that the schedule is more than just an internal work in process schedule.

Q You do not have expertise regarding NRC oversight and regulation of nuclear power plants, do you?

A No.

Q So you lack the expertise to know the significance of submitting a projected schedule for the development of an ISFSI to the

Nuclear Regulatory Commission, correct?

MS. SNYDER: Objection, assumes facts not in evidence.

A The significance of the presentation to the NRC is indicated in the project records as what it is. It's a presentation outside the company.

BY MR. SHAPIRO:

Q But beyond knowing that the schedule was presented outside the company, you don't have any expertise to know how significant submittal of that schedule to the Nuclear Regulatory Commission is, do you?

A Not beyond what's indicated in the project records.

Q I think one other reason you offered for using April 1999 as the baseline for Humboldt Bay is that that time frame was coincident with development of a project charter and a job estimate for the ISFSI project, correct?

A That's correct.

Q Why is coincidence with development of a job estimate project charter significant for using

that schedule as a baseline?
A Those events coincided with the start of meaningful and consistent work on that project. And generally, you'd like to use a schedule that's created at the beginning of a level of effort and not one that's been impacted by actual events already or one that's, you know, too preliminary to use as a meaningful baseline.
Q Do all PG&E projects have project charters?
A I don't know.
Q Do you know the extent to which projects at PG&E have charters or not?
A No, I don't.
Q Do you have any understanding of the significance of issuance of a project charter for a construction project at PG&E?
A The understanding I have is, from the project charter document itself and other documents that relate to the project charter at that time.
Q You haven't compared the project charter for the Humboldt Bay ISFSI to other project charters for projects at PG&E, correct?

A No.
Q To your knowledge, there is no project charter for the Diablo Canyon ISFSI, correct?
A I don't believe so. I know the project charter for Humboldt Bay was updated and revised and may contain some references to Diablo Canyon, but I don't believe there's a specific project charter for Diablo Canyon.
Q Do you have any understanding as to why there is a project charter for Humboldt Bay, but there isn't such a charter for the Diablo Canyon ISFSI?
A Just from what's written in the project charter itself and the surrounding documents, you know, it's most likely a preference of the project manager at the time.
Q You say that the baseline schedule that you used for the Humboldt Bay ISFSI was developed before funding allocations were created, correct?
A Before approval of certain funding allocations were -- was granted.
Q What's a "funding allocation" as you're

Q Did the baseline schedule for the Humboldt Bay ISFSI that you're opining to come from a specific document?

A For the most part, yes.

Q Which specific document?

A Footnote 9 on page 9 represents some primary citations for the baseline schedule. I believe the most -- the first citation is probably the most strongly corresponding to the milestone dates, you see there on that table, which is the April 22nd, '99 meeting with the NRC, Bates PHBP 0011701 to '1727. I'd point you to that as the most direct comparison of this list of baseline activities.

Q Well, you say that April 1999 was the appropriate time frame for development of a baseline schedule for the Humboldt Bay ISFSI, true?

A True.

Q But your report lists a number of documents from the April '99 time frame with a number of somewhat different schedules for the Humboldt Bay ISFSI, true?

conclusions and my opinions in this matter, my citations with the contemporaneous records and deposition testimony that support them. And to reach a different conclusion, while possible, I don't believe the weight of the evidence would support that.

BY MR. SHAPIRO:

Q Is there a name for the methodology you employed to reach your conclusion that the December 1999 time frame for completion of the Part 72 license applications for PG&E's ISFSIs was realistic and attainable?

A I discuss generally the methodology I used to identify the baseline schedule on pages 8 and 9 of my report. Within that description, I believe I described the methodology as, you know, without specific terminology. As essentially, a review of all project records and data available, you know.

Most importantly, the contemporaneous records at that time as well as, you know, deposition testimony and any other data available to me to determine and to identify which schedule and

as far as their baseline schedule goes. I didn't independently develop that schedule for that duration for that activity.

Q In fact, you have no expertise in NRC licensing matters, correct?

MS. SNYDER: Asked and answered earlier in the day.

A Other than what relates to my review of the records in this project and my analysis of this project, no.

BY MR. SHAPIRO:

Q You're not offering an -- I want to go back to that. I have to start from scratch.

Tell me all the expertise you have in NRC licensing matters.

A Well, as we discussed earlier, I did schedule analysis and delay analysis for the SMUD case.

Q And that makes you an expert in NRC licensing matters?

A Not necessarily. My expertise in that matter was related to the documentary evidence

Q Yes.

A Which is Diablo Canyon review period 2, I assume. Certainly, the Geosciences Oversight Committee, which conducted a review of the geotechnical work to date, March 2001, identified additional efforts, and there were additional efforts identified by the geosciences department itself as they performed the work in support of the safety analysis report and the environmental report of the Part 72 license.

And generally, I refer to the write-up I made in the report to answer your question on the specifics of additional work, rather than paraphrase it to you, by reading it.

Q Mr. McGrath, you don't have the expertise to determine what sort of geotechnical analyses are required to construct an ISFSI, do you?

A No.

Q You attribute another six months of delay of the Diablo Canyon ISFSI project and you need to rework geosciences work associated with the ISFSI, correct?

CERTIFICATE OF SHORTHAND REPORTER-NOTARY PUBLIC

I, Joan V. Cain, Court Reporter, the officer before whom the foregoing deposition was taken, do hereby certify that the foregoing transcript is a true and correct record of the testimony given; that said testimony was taken by me stenographically and thereafter reduced to typewriting under my direction and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal this 17th day of March 2006.

My commission expires:
June 15, 2009

Joan V. Cain
NOTARY PUBLIC IN AND FOR THE
DISTRICT OF COLUMBIA

(The following Acknowledgement of Deponent Page is included in the event at the conclusion of John R. McGrath's deposition he elects to read and sign his deposition transcript.)

* * *

ACKNOWLEDGMENT OF DEPONENT

I, John R. McGrath, do hereby acknowledge that I have read and examined the foregoing testimony, and the same is a true, correct and complete transcription of the testimony given by me, and any corrections appear on the attached Errata sheet signed by me.

12 Apr 06 ______________________ [signature] ______________________

(DATE) (SIGNATURE)

JESSICA D. DECLERCQ
NOTARY PUBLIC
STATE OF COLORADO
My Commission Expires 04/04/2009

[signature] 4-12-06
My commission expires 4/4/09
Residing in Highlands Ranch, CO
County Douglas



PAGE 2/3 * RCVD AT 4/17/2006 8:23:51 AM [Eastern Daylight Time] * SVR:WDC-PS1/3 * DNIS:5 * CSID: * DURATION (mm-ss):01-06

# ERRATA SHEET

IN RE: PG&E v. United States

RETURN BY: ____________________

| PAGE | LINE | CORRECTION AND REASON |
|---|---|---|
| 49 | 21 | "base" should be "basis" |
| 177 | 16 | "appending" should be "pending" |

_______________ (DATE)

_______________ (SIGNATURE)



PAGE 3/3 * RCVD AT 4/17/2006 8:23:51 AM [Eastern Daylight Time] * SVR:WDC-PS1/3 * DNIS:5 * CSID: * DURATION (mm-ss):01-06

TOTAL P.03