general question than what we were talking about.

If you're asking for the decommissioning studies we did, have I gone back and reviewed as-built cost versus estimated cost, the answer is, no, I have not.

Q. And with particular reference to the ISFSI costs, you would give the same answer?

A. Yeah.

That was really what my answer was for.

Q. Okay. Good.

MR. STOUCK: I want to get your coffee, so let's take another short break.

(Discussion off the record.)

BY MR. STOUCK:

Q. So you really, Mr. Brewer, if I'm understanding your testimony, you don't know -- you really cannot testify at all about how accurate were the estimates of ISFSI costs included in the decommissioning cost studies that ABZ did; is that correct --

MR. GARDNER: Objection,

discussing, they will include costs of loading?

A. Yeah.

And cost of loading falls into the same thing I said about the cask, only the cost of loading is highly dependent on the facility and the utility involved, but, yeah, my million would as a general rule of thumb and only as that include the loading cost.

Q. You've never worked in an ISFSI; is that correct?

A. I have never worked at an ISFSI.

Q. You've only visited 2 fully operational ISFSIs, Calvert Cliffs and Maine Yankee?

A. Yeah, I think that's true.

Q. When were you at Maine Yankee?

A. It would have been -- the last time I was there was when we were doing the audits up there. I don't remember the time frame of that.

Q. Is that what you meant when you said in the TVA deposition that you had visited?

A. Yeah, we went down to the ISFSI.

Q. And looked at it?

A. Yeah.

We saw them transferring casks and watched them do that.

Q. Neither you nor ABZ has ever been involved -- I may have asked you this already, and I apologize if that's so.

Neither you nor ABZ has ever been involved in ISFSI licensing, is that correct, the process of licensing an ISFSI?

A. We have never been a participant in applying for a license, that's correct.

Q. Or a cask license?

A. Or a certificate of compliance for a cask, no.

Q. Neither you nor ABZ has ever been involved in the design of an ISFSI; is that correct?

MR. GARDNER: Objection, vague.

A. That is correct.

BY MR. STOUCK:

Q. And neither you or ABZ has ever been

involved in ISFSI construction management,
meaning day-to-day construction management.
Correct?
MR. GARDNER: Same objection.
A. That is correct. We've never been an active manager of that construction project.
BY MR. STOUCK:
Q. You have done oversight of ISFSI construction at San Onofre; is that correct?
A. Yes.
Q. But nowhere else?
A. Right.
Q. What exactly did you do at San Onofre in terms of oversight of ISFSI construction?
A. I personally -- I only reviewed some information. Other people from ABZ actually went and did tours. I didn't go on any of those trips.
Q. What information did you review?
A. The information that San Onofre provided to us about how they planned to operate

In a lot of cases, I could express the opinion that is here without one of these documents, but in the absence of citing the document, it would simply be, I'm saying, I know that because I know that.

BY MR. STOUCK:

Q. I see.

A. Okay.

Q. Sometimes it's support for your opinions?

A. I think that's a fair characterization.

Q. Okay. All right.

Now, are there any documents you wanted to review or requested that you were not able -- in order to express these opinions that you were not able to obtain for whatever reason?

A. I have a bit of a problem with the question for the following reason: I am unaware of any document, a specific document or documents that I would have requested or did request that I didn't get.

You say -- you identified instances -- this really carries over from 1.

First, I've identified -- quote -- I've identified instances where the errors are the result of inclusion of costs that are not incremental.

Do you see that?

A. Yes, I do.

Q. Okay. What expertise do you rely on in determining whether or not particular claimed costs are incremental?

A. By, incremental, I think that's what I really say in the footnote that's there. It's simply a matter that I am making the assessment that this activity in the simplest sense would have been necessary in order to deliver fuel to DOE had they begun picking up fuel in 1998, and therefore, it's an activity that have would occurred independent of the breach.

Q. Okay. Anything else that you mean by your concept of incremental in this report other than that the cost would have been incurred

of the estimated cost is the result of the failure to appropriately consider or evaluate the relevant information, the failure of PG&E to appropriately consider.

A. Yes.

Q. Just tell me if you can -- I'm not getting a clear picture of the difference between not reasonable and not supportable.

A. Not supportable is a matter that it is not possible given the documentation I've seen to reach a conclusion as to whether the cost is incremental or whether the amount of that cost is reasonable given the activity being performed.

Not reasonable is, I have reached a conclusion that says, this is a cost that will be incurred or may be incurred, but the amount is in my estimation unreasonable for one or more reasons. Perhaps the assumptions that go into developing the amount are unreasonable.

Q. Then the last paragraph above the

case now, you know, even in 1998, you know, 40 years after they stopped running the plant, so I don't know anyone who would rely on records from 1968 to now load the fuel into a cask 40 years later -- or 30 years later.

Q. If this inspection was done in 2000 and if the ISFSI is going to be loaded in 2007, would you rely on that inspection, or would you need another visual reinspection?

MR. GARDNER: Objection, vague.

A. Largely, I think you probably could rely on that inspection.

Now, if you found assemblies where there had been degradation of certain types, one might want to look at them again, but most of these things don't happen in relatively short time periods like that.

BY MR. STOUCK:

Q. How would you know if you had to do another inspection without doing an inspection?

A. No. You mischaracterized what I'm saying.

are or aren't.

Q. Do you know if PG&E or a contractor or whoever performed these inspections took photographs or video of the fuel?

A. I know that people routinely do that. Whether they did, I don't know.

Q. So you -- if you didn't know whether they did it at all, you don't know if they did that for photos or video for each or some assemblies?

A. I would not know that.

Q. Do you know if the inspection was limited to an inspection only of failed fuel as indicated by written documentation?

A. I do not know that it was limited to only failed fuel.

Q. You do not know one way or the other?

A. I don't really know either way, although given the amount of the data, got a lot of failed fuel assemblies if it is just failed fuel.

Q. Do you know if the inspection included an inspection of material in the pool other than fuel, intact or failed fuel, in other words, nonfuel items?

A. The answer is no.

And if it did, then I would contend that the description of the work was somewhat misleading. The work says, inspection of fuel, not, inspection of pool content.

Q. Where is the description?

A. In the cost category. It says, visual inspection of fuel.

Q. That's 3 words on an Excel spreadsheet.

Is that what you're relying on for understanding -- excuse me one second -- is that what you're relying on for understanding of what was done here?

A. I'm relying on several things. One that -- one is the lack of any other documentation I can find about the detail of what they did, and also at some level the deposition

Q. In the future, when DOE picks up PG&E's spent nuclear fuel from its Humboldt Bay facility, do you know if DOE will rely on the inspection of that spent fuel that PG&E has already performed, the one we've been talking about for the last few minutes here -- or rather whether DOE will want to inspect the fuel again?

MR. GARDNER: Objection, lack of foundation.

Objection, calls for speculation.

A. The answer is, I can't speak for DOE. I don't know what they will or won't do.

BY MR. STOUCK:

Q. If DOE does not rely on PG&E's inspection, in other words, the reports and the assembly-by-assembly data that you referred to previously, in the future when it comes to pick up the fuel, what options does DOE have?

A. I'm sorry.

I didn't understand the question.

Q. If DOE in the future is not going to rely on the inspection that's already been done.

A. Right.
Q. Does that mean all nuclear facilities or all facilities, period, like all the buildings in downtown San Francisco?
A. I don't know about the office buildings. I don't know whether they own or rent their buildings or what. But any of their transmission facilities or anything else would be in that category.
Q. He pronounces it Rueger by the way.
A. I recognize that I mispronounce his name.
Q. You're not alone.
The Rueger testimony you cite stated that the PG&E program -- the seismic program was for Diablo Canyon and not for Humboldt.
Is that your understanding?
A. I believe that's what he said.
I also believe that's probably a bit of an overstatement on his part, that in fact their program really is for everything, but if all they had was Diablo, they would still be

would have been the responsibility of DOE to -- and if DOE were going to take those containers, it would be their responsibility to do it.

BY MR. STOUCK:

Q. Does that mean that it's your opinion it was not reasonable for PG&E, or are you saying you're not giving an opinion on whether or not it was reasonable for PG&E to get this part 71 license?

MR. GARDNER: Objection, compound.

A. I believe that if PG&E thought that DOE would take these containers, then it was not reasonable for them to do it.

BY MR. STOUCK:

Q. Okay. And the basis for that is your understanding that DOE is obligated to provide transportation containers?

A. That is correct.

Q. Any other basis for the opinion that it was not reasonable for PG&E to incur these costs?

A. No.

record, I think that's a little different.

Are you now saying -- you're not commenting one way or the other on whether it was reasonable for PG&E to do it?

You are saying that whether or not it was reasonable for them to incur this cost in the abstract, it's not appropriate for them to claim damages for this cost?

Is that what you're saying?

A. The opinion I'm really offering is, it's not appropriate to be claimed as damages.

Q. You say here -- I'm reading -- quote -- the last clause of this paragraph in your report on page 12: There is no reason for PG&E to incur cost for transportation licensing, close quote.

Do you see that?

A. Yeah.

Q. That's your opinion?

A. That's right.

Q. Suppose DOE never comes. Assume DOE never comes. Assume we have a perfect crystal

Q. But you're not offering an opinion one way or the other on whether it was a reasonable thing for PG&E to do to incur the costs I guess implicitly so long as it doesn't charge them over to the government?

A. If PG&E had reasons to do that and they decided they wanted to do that, then, fine, go ahead, do it.

Q. You're not offering an opinion about whether that was reasonable or not.

You're just offering an opinion that whatever the costs are should not be recovered from the government?

A. Because I think it was not necessary for them to do it, which is different than reasonable I think.

Q. Your opinion is, not necessary -- do you have an opinion or whether it was reasonable one way or the other?

MR. GARDNER: Objection, asked and answered.

Also objection, beyond the scope of

Mr. Brewer's expert report.

A. I'm not offering any opinion about the reasonableness.

BY MR. STOUCK:

Q. We're going to turn just briefly as I said a moment ago here -- I want to get into a few questions on but-for loading costs if we can, and then we'll pick up with that in the morning. That's on page 10.

You start this section by saying that the Humboldt Bay claim includes no costs for the loading of fuel to the ISFSI.

Right?

A. I believe that is correct.

Q. Okay. Do you know what Professor Cornell -- Dr. Cornell said at his deposition about that omission?

A. No.

I know what he said in his report. I don't know what he said in his deposition. I have not read his deposition transcript.

Q. Okay. I will preface this by

CERTIFICATE OF COURT REPORTER

UNITED STATES OF AMERICA )
DISTRICT OF COLUMBIA )

I, CHERYL A. LORD, the reporter before whom the foregoing deposition was taken, do hereby certify that the witness whose testimony appears in the foregoing deposition was sworn by me; that the testimony of said witness was taken by me in machine shorthand and thereafter transcribed by computer-aided transcription; that said deposition is a true record of the testimony given by said witness; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this deposition was taken; and, further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto, or financially or otherwise interested in the outcome of this action.

Cheryl A. Lord

CHERYL A. LORD

Notary Public in and for
the District of Columbia

My Commission expires April 30, 2006

UNITED STATES COURT OF FEDERAL CLAIMS

PACIFIC GAS & ELECTRIC COMPANY,)
Plaintiff, )
v. ) No. 04-0074C
UNITED STATES OF AMERICA, )
Defendant. )

ORIGINAL

\- - - - - - - - - - - -

DEPOSITION OF WARREN K. BREWER

VOLUME II

Friday, February 24, 2006

The deposition of WARREN K. BREWER was convened on Friday, February 24, 2006, commencing at 9:39 AM, at the offices of GREENBERG TRAURIG LLP, 800 Connecticut Avenue, N.W., Suite 500, Washington, D.C., before Cheryl A. Lord, Registered Professional Reporter, Certified Realtime Reporter, and Notary Public for the District of Columbia.

the NRC were to develop guidance for storage of reactor-related GTCC waste under a 10 CFR part 30 or part 70 license, such guidance would be consistent with 10 CFR part 72.

Q. Okay. And what does that mean?

That means that the security requirements are identical?

That's what you rely on for that conclusion?

MR. GARDNER: Objection to the extent it mischaracterizes Mr. Brewer's testimony.

A. Well, I think it says that the requirements that one would have to meet are the same. Now, you got to --

BY MR. STOUCK:

Q. Well, if --

A. Let me finish my comment.

Security requirements are negotiable. The NRC sets functional requirements. You have to meet those functional requirements. You have to demonstrate to them

how you will satisfy those functional requirements.

So I'm saying, whatever -- those requirements would be the same. So if I went to the NRC and said, here is what I need for an ISFSI, it would be the same thing for what I needed for GTCC.

BY MR. STOUCK:

Q. The basis for your conclusion that the security requirements at a GTCC only ISFSI would be identical to the security requirements at a spent fuel ISFSI is the sentence that you read here about guidance being consistent with part 72; is that correct, Mr. Brewer?

MR. GARDNER: Objection, mischaracterizes Mr. Brewer's previous testimony.

A. It's that and the last sentence of this quoted section and again the discussions that I was involved with with the NRC.

BY MR. STOUCK:

Q. We'll get to the discussions later. Stick with writings.

What does the last sentence say?

Any application for a 10 CFR part 30 or 70 license may use to the extent appropriate, parenthesis, considering the case-by-case criteria the application would be proposing, close quote, the guidance developed for 10 CFR part 72.

Do you see that?

A. Yes.

Q. This passage right here is what you rely upon for your conclusion that the security requirements for a GTCC only ISFSI would be identical to the security requirements for a spent fuel ISFSI; is that correct?

A. With respect to written documents, this is this document and this particular thing that I cite.

Q. No such guidance has ever been issued by the NRC; isn't that correct?

A. I do not believe they ever issued such guidance.

Q. The guidance about storage of

Q. Your understanding is that the term other than standard fuel appears in the contract?

A. I believe the term standard appears in the contract, and there are other categories that since they aren't standard are other than standard. I don't remember whether the term other than standard appears in the contract.

Q. And failed fuel is not standard fuel. That's your understanding?

A. My understanding is that failed fuel is not standard fuel.

Q. Under the contractual classification?

A. That is my understanding, correct.

Q. You cite the Pulley deposition as a source of your statement that Humboldt Bay has failed fuel.

A. Yes.

Q. Any other basis for believing that?

A. They bought cans for failed fuel in their Holtec contract.

Q. Can you think of any other basis?

BY MR. STOUCK:

Q. Do you know if DOE -- are you saying DOE does not have an obligation to transport failed fuel?

MR. GARDNER: Objection, calls for a legal conclusion.

A. I'm saying I'm not offering any opinion about what DOE's obligation is as to when or if or how to take failed fuel.

BY MR. STOUCK:

Q. I understand that.

MR. STOUCK: Can we just go back one question, please. (Reading the court reporter's realtime screen.)

BY MR. STOUCK:

Q. You say the issue is one of contractual obligation, not of technical ability.

What is the issue in your understanding of contractual obligation?

MR. GARDNER: Objection, calls for a legal conclusion.

Objection, outside the scope of

ISFSI. It's looking for other activities that the plant would have to perform, like the decommissioning, like understanding what the PSDAR is. That's the expertise.

It's really reading the descriptions and deciding whether these are activities uniquely related to the fuel storage or not.

BY MR. STOUCK:

Q. I notice in exhibit 18, you accept -- the characterization of what we're looking at, the attachments, are they timesheets?

A. I think that's fair.

Q. They're not the same as exhibit 19. They record time and describe it?

A. That's right. They record the time and what the individual was doing.

Q. There's 3 sections again corresponding to the 3 sections of costs that we talked about at the outset, ventilation stack removal project, ISFSI project, and site characterization study.

Q. Now, suppose Bob Kapus told you -- do you know who he is?

A. Yes.

Q. Suppose he told you -- he's sitting right here and he told you he knows what this work is and he knows it's related to dry cask storage.

I take it from what you said, that would not be enough for you to agree that the cost is appropriately included in the claim, because unless you know exactly what it was, you couldn't go to step 2 and evaluate whether it would also be needed in the nonbreach world.

Right?

MR. GARDNER: Objection, misstates Mr. Brewer's opinions in this case.

A. If Mr. Kapus were sitting here and said that, I would ask him, what was it, and he would tell me, and we would be at an end.

BY MR. STOUCK:

Q. Then you would evaluate what I'm calling step 2.

Q. So there's no cost included in the claim?

A. No, there is cost included in the claim, but there's no reason for it to be.

Q. Because you believe that the one fee for the operating Diablo Canyon plant would also cover the ISFSI?

A. I believe that's what the fee structure in the regulations specifies.

Q. Based on what?

A. My reading of the fee schedule.

Q. Anything else?

A. No.

Q. Okay. And that's in the Code of Federal Regulations?

A. Code of Federal Regulations part 171.

Q. I'm not trying to be -- make light of it, but the expertise that you rely on there is your ability to read the Code of Federal Regulations.

Anything else?

Do you say that that ISFSI fee that PG&E is claiming for Diablo Canyon should be excluded from the claim?

A. I don't say that at all.

I say it's -- I say there is no such fee. It's not incremental. What you do with it or without it in the claim is not my opinion.

Q. But your report does say there's no such fee?

A. Yes.

Q. But there is such a fee at Humboldt?

A. Yes.

Q. In 2005, it was 159,000 dollars?

A. For fiscal year 2005, it was 159,000 dollars.

Q. And there's a downward trend you think for the last 10 years or so?

A. Yes.

Q. Do you know what the proposed fee at Humboldt Bay is for 2006?

A. Humboldt Bay would be no different than the other plant in decommissioning or ISFSI.

CERTIFICATE OF COURT REPORTER

UNITED STATES OF AMERICA )
DISTRICT OF COLUMBIA )

I, CHERYL A. LORD, the reporter before whom the foregoing deposition was taken, do hereby certify that the witness whose testimony appears in the foregoing deposition was sworn by me; that the testimony of said witness was taken by me in machine shorthand and thereafter transcribed by computer-aided transcription; that said deposition is a true record of the testimony given by said witness; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this deposition was taken; and, further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto, or financially or otherwise interested in the outcome of this action.

Cheryl A. Lord

CHERYL A. LORD

Notary Public in and for
the District of Columbia

My Commission expires April 30, 2006

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

PACIFIC GAS AND ELECTRIC COMPANY )
)
Plaintiff, )
)
v. ) Case No. 04-74C (into which has been consolidated No. 04-75C)
)
UNITED STATES OF AMERICA )
)
)
Defendant. )
)

**EXPERT WITNESS REPORT**
**OF**
**WARREN K. BREWER**

## 1. PURPOSE

My report provides an evaluation of technical issues related to the claim for damages brought by Pacific Gas and Electric Company (PG&E) against the Department of Energy (DOE) for not beginning acceptance of spent nuclear fuel from the nuclear industry contract holders in 1998. PG&E's claim relates to three plants at two separate sites – the Humboldt Bay Nuclear Power Plant (HBPP) and the Diablo Canyon Power Plant (DCPP).[1] My evaluation of PG&E's claim focused on technical issues associated with the handling, storing, and transporting of spent nuclear fuel assemblies. In evaluating the technical issues relevant to PG&E's claimed costs, I reviewed the report submitted by Dr. Brad Cornell supporting PG&E's damage claim for costs incurred through FY2004 and costs estimated to be incurred in the future.[2] This report critiques certain of those costs set forth in PG&E's report.

## 2. SUMMARY OF CONCLUSIONS

In my review of PG&E's damage claim and Dr. Cornell's report, I have identified a number of specific errors requiring adjustments. First, I have identified instances where the errors are the

---

1 The HBPP consists of a single boiling water reactor, which was permanently shutdown in 1976 and which is co-located on the Humboldt Bay site with two fossil-fired power plants. There are 2 pressurized water reactor plants (Unit 1 and Unit 2) at the DCPP site. Each plant at DCPP has a separate spent fuel pool.

2 Expert Report of Dr. Brad Cornell (11/10/2005), Case No. 04-074, Pacific Gas and Electric v. United States of America. This includes the supporting spreadsheets which are referred to by name in my report.

result of inclusion of costs that are not incremental[3] to the breach or the failure to provide appropriate offsets for activities that would have occurred in the but-for world. These adjustments are grouped under the heading of Not Incremental.

Second, I have identified a number of situations where the documentation provided in support of actual or estimated costs is not sufficient to reach a reasoned and supportable opinion as to whether the subject costs are incremental or whether the costs are reasonable. That failure in supportable documentation may result in an overstatement of the claimed costs. In this report, these comments are grouped under the heading of Not Supported costs.

Third, I have identified future costs where the estimated costs are not reasonable. In general, the unreasonable nature of the estimated costs is the result of the failure to appropriately consider or evaluate the relevant information. Such costs are identified as Not Reasonable costs.

Finally, part 5.C of this report includes comments concerning what costs would be incurred if certain assumptions about the but-for or actual world were determined by the court to be true.

The detailed discussion of my opinions in this report is divided into discussion of past costs and future costs. This report defines past costs as costs up through 2004, which were based on recorded expenditures by PG&E. This report defines future costs as costs estimated by PG&E to be incurred in 2005 and later.

## 3. EXPERIENCE

I am one of the owners of ABZ, Incorporated, an engineering consulting company performing work for the commercial nuclear power industry. My qualifications as an expert in nuclear engineering, including the handling and storage of spent nuclear fuel, are based on working in the nuclear industry for over 29 years. I have experience in design, construction, testing, and operation of nuclear reactors and reactor systems. As a consultant, I have performed activities relating to regulatory interpretation and compliance. I have estimated the cost of decommissioning nuclear power plants, including spent fuel management, and reviewed the estimates of others. I have performed work for state and federal agencies, as well as the utilities.

I have testified three times previously as an expert witness. The most recent expert witness testimony was before the United States Court Of Federal Claims concerning the spent fuel claim of the Tennessee Valley Authority (TVA), Case No. 01-249C. My second expert witness testimony was before an international arbitration tribunal in a dispute between Mitsubishi Heavy Industries (Japan) and Finmeccanica (Italy) concerning misappropriation of engineering design information. The first time was before the New Hampshire Decommissioning Finance Committee, a committee organized by the New Hampshire state legislature to oversee the funding of decommissioning for nuclear plants serving New Hampshire residents.

3 Throughout this report, the term incremental with respect to costs is used to signify that the cost is the result of the failure of DOE to begin spent fuel acceptance from the industry in 1998 and that, but for this breach, the subject costs would not have been incurred.

I am being compensated at the rate of $275 per hour for my work on this matter.

A detailed description of my experience is provided in Appendix A.

## 4. METHODOLOGY AND DOCUMENTS REVIEWED

I evaluated PG&E's claimed costs by reviewing Dr. Cornell's report, publicly available information, and other information obtained through discovery in this case. These documents included computer spreadsheets used to develop the claim and depositions of PG&E's fact witnesses. The documents that I relied upon in forming my opinions are listed in Appendix B.

## 5. DETAILED OPINIONS CONCERNING PG&E'S CLAIMED COSTS

### 5.A. Past Costs

### 5.A.1 Humboldt Bay

In evaluating PG&E's claimed costs for HBPP, I reviewed the report of Dr. Cornell, the PG&E spreadsheets that identified the costs in more detail, documents provided by PG&E and the deposition testimony of PG&E personnel. The purpose of my review of these documents was to determine for each of the costs if the cost was incremental to the breach, if the cost was supportable and if the cost was reasonable.

1. Visual Inspection of Fuel - Not Incremental

   PG&E's damage claim includes costs for the visual inspection of the spent fuel and HBPP.[4] The spent fuel would have to be visually inspected by the utility whether the fuel was being loaded into storage casks for storage in an ISFSI or being loaded into transportation casks for removal by DOE. Thus, the costs associated with the visual inspections would occur in both the actual and but-for worlds and are therefore, not incremental to the breach.

   Such inspections are needed to ensure that the detailed actual condition and characteristics of the fuel meet the technical requirements of the license for the storage cask or transportation cask. Additionally, in the case of delivery of fuel to the DOE, the inspections are needed so that DOE can be accurately informed as to the condition of the fuel so planning can be performed to ensure an appropriate transportation cask is provided and to plan for the ultimate disposal at the repository. In his deposition, Mr. Lawrence Pulley agreed that the visual inspection would also have been required in the but-for world.[5]

---

4 Line 12 on tab labeled "ISFSI Cash Flow" on spreadsheet titled "HBPP ISFSI Damages 102705.xls".

5 Deposition of Lawrence B. Pulley, dated July 27, 2005, 136:16- 137:2.

2. HBPP Used Fuel Documentation Discrepancy - Not Incremental

PG&E's claimed damages include the cost for work to resolve a discrepancy in the documentation concerning the HBPP spent fuel and any other special nuclear material in the spent fuel pool.[6,7] This work would have been required in the but-for world and thus is not incremental to the breach.

10 CFR Part 74 requires commercial reactor licensees such as PG&E to maintain records on the inventory of special nuclear material, including spent nuclear fuel.[8] The work covered by this cost in the HBPP claim is to resolve a discrepancy in these records discovered in a 2004 review of the spent fuel pool inventory involving three segments of a fuel rod removed from the reactor in 1968 and in-core detectors removed as long ago as 1973.[9]

Not only did the error in documentation that necessitated this work occur long before the failure of DOE to begin spent fuel acceptance in 1998, but independent of the DOE performance, the spent fuel pool inventory and ultimate resolution of this document discrepancy would have been necessary to allow for the decommissioning of the HBPP.

On December 20, 2005, the NRC issued a notice of violation and proposed imposition of civil penalty against PG&E regarding this inventory discrepancy.[10] In this notice of violation, the NRC noted that PG&E had more than one opportunity, first in 1966, and again in 1975, to identify and correct the discrepancies. Thus, the delay of DOE to begin acceptance of spent fuel from the industry neither caused nor increased the scope of the work needed to resolve PG&E's document discrepancies.

3. Rad Material Disposal - Not Incremental

---

6 Line 73 on tab labeled "1998-2009 Costs" on spreadsheet titled "1999-2009 SAFSTOR 102205.xls".

7 Deposition of Robert Kapus, September 28 and 29, 2005,149:15-150:14.

8 10 CFR Part 74 defines "special nuclear material" as: "(1) Plutonium, uranium-233, uranium enriched in the isotope U233 or in the isotope U235, and any other material which the Commission, pursuant to the provisions of section 51 of the Atomic Energy Act of 1954, as amended, determines to be special nuclear material, but does not include source material; or (2) Any material artificially enriched by any of the foregoing, but does not include source material." This includes spent nuclear fuel.

9 NRC News, No. IV-05-040, dated December 21, 2005.

10 Letter from Bruce S. Mallet, NRC Regional Administrator, to David H. Oatley, PG&E, EA-05-166 dated December 20, 2005, "NOTICE OF VIOLATION AND PROPOSED IMPOSITION OF CIVIL PENALTY - $96,000 (NRC Special Inspection Report No 050-00133/05-002)"

PG&E's claimed damages include costs for the disposal of radioactive waste.[11] Significant portions of these past costs are for the disposal of contaminated soil and rubble.[12] Having contaminated soil or rubble which needs to be removed as part of decommissioning a nuclear power plant is not uncommon. However, contaminated soil generally comes from events occurring during plant operation and not specifically or especially from the operation of the spent fuel pool. Contaminated soil would generally come from a leak in a plant system such as a contaminated plant drain or from a spill of radioactive material being stored or moved on the site. In the absence of a large single event, the creation of a large amount of contaminated soil would likely be the result of a slow but long term leak along with the passage of sufficient time to allow the leakage to spread, thus contaminating a larger volume.

As for the contaminated rubble, there is no particular reason such material would be generated from the operation of the spent fuel pool. Contaminated rubble would most likely come from demolition of a plant structure which had been previously contaminated by a radioactive leak or spill. There is no obvious reason to believe that the operation of the spent fuel pool would result in any significant amount of rubble, contaminated or clean.

I am not aware of any information that has been provided or is available to reasonably link the creation of this contaminated soil or rubble to the operation of the spent fuel pool at any time, much less in the time since the fuel would have been removed from the HBPP if DOE had begun spent fuel acceptance in 1998. I am unaware of any information that would indicate that the continued operation of the spent fuel pool worsened or expanded any existing contamination so as to increase the cost of cleanup. Thus, I conclude that the costs for disposal of contaminated soil and rubble from 1999 through 2004, specifically $45,450 in 2000, $28,350 in 2001, $126,760 in 2003 and $122,277 in 2004, are not incremental to the breach.

4. Rad Material Disposal - Not Supported

Paragraph 5.A.1.3 above addresses the cost included in PG&E's claim for disposal of radioactive material classified as soil or rubble. This paragraph addresses the remaining costs in PG&E's claim for radioactive material disposal.[13] These remaining costs for radioactive waste disposal, not included in

---

11 Line 14 on tab labeled "1998-2009 Costs" on spreadsheet titled "1999-2009 SAFSTOR 102205.xls".

12 In his deposition, Robert Kapus (123:13-25) identified that the large increase in cost for 2003 and 2004 was due to disposal of a "significant amount" of contaminated soil. Further review of the invoices provided by PG&E in support of this line item of costs generally identifies the types of materials being processed. These invoices are included in a document titled "HBPP SAFSTOR Non-Labor Costs, Order No. 2014988 - Rad Material Disposal, Binder 1 of 1, 1999-2004", PACD005154 to PACD005588.

13 Line 14 on tab labeled "1998-2009 Costs" on spreadsheet titled "1999-2009 SAFSTOR 102205.xls".

item 5.A.1.3 above, total about $389,000, or an average of almost $65,000 per year in 1999 through 2004. From review of the invoices provided in support of these costs, this includes the cost for boxes to be used in disposing of waste as well as disposal of metal, dry active waste (DAW), sludge, and asbestos. I am not aware of any information that connects the creation and hence, disposal, of this waste to the operation of the spent fuel pool. In particular, I am not aware of any information that would connect the creation of this waste to continued operation of the spent fuel pool after the time when all the fuel would have been removed if DOE had begun acceptance of spent fuel from the industry in 1998.

In fact, there is reason to suspect that some of these costs are not related to the operation of the spent fuel pool. For example, the boxes purchased could have been used for the disposal of any low specific activity waste such as the soil or rubble discussed in 5.A,1.3 above, or other waste from decommissioning activities.[14]

Also, PG&E's damages claim includes the costs for disposal of 5050 pounds of contaminated metal in 1999.[15] While the operation of a spent fuel pool may occasionally result in the creation of new contaminated metal[16], I am aware of no information that would support a conclusion that this large amount of contaminated metal was due to the continued operation of the spent fuel pool. Further, the invoice for the disposal of this metal identifies that the material was received for disposal from PG&E on March 5, 1999. Using PG&E's assumption that all spent fuel would have been removed from the spent fuel pool by the end of 1998, the PG&E claimed costs would only be reasonable if all 5050 pounds of contaminated metal would have to have been created, packaged and shipped in the approximately 2 month period from the end of December 1998 to the beginning of March 1999 and if the activity that created the waste would not have been required as part of the decommissioning of HBPP.

While continued operation of the spent fuel pool would create some amount of low-level waste, the types of concerns discussed above, coupled with the lack of any identified documentation to connect the radioactive waste to the continued operation of the spent fuel pool, do not allow a supportable conclusion that these costs are incremental to the breach.

---

14 The boxes are referred to on PACD005178 as B-25 boxes. This is a standard box for disposal of low level waste.

15 PACD005190.

16 The reference to new contaminated metal is to distinguish newly contaminated material from items such as fuel handling tools which would constitute contaminated metal associated with the spent fuel pool, but which would have been contaminated earlier during operation of the plant and thus, would be part of the normal decommissioning waste.

5. Investigation of Taiwan Earthquake - Not Incremental

PG&E's claimed costs include costs in 2000 for the investigation of an earthquake that occurred in Taiwan.[17] I believe that this investigation would have been performed independent of the presence of spent fuel at HBPP. PG&E has an active seismic program responsible for all of PG&E's facilities and not just HBPP. Further, a memorandum concerning one of the invoices related to the Taiwan earthquake investigation identified that it had been determined that a portion of the charged amount should have been charged to Diablo Canyon Long Term Seismic Program and not the HBPP ISFSI.[18] If the investigation into the Taiwan earthquake was in any way due to the long term seismic program in support of DCPP, then there is every reason to believe that the investigation of this earthquake would have been performed by PG&E whether or not there was spent fuel at HBPP or plans for an ISFSI at HBPP. This conclusion is consistent with the deposition testimony of Gregory A. Rueger that PG&E has "a very strong long term seismic program, not for Humboldt Bay, but for Diablo Canyon as part of our license to operate the plant . . ."[19]

6. Insurance - Not Supported

PG&E's claimed damages include costs for insurance.[20] I am not aware of any documentation that provides the basis or details of the costs in this line. Mr. Robert Kapus testified that this cost was "NEO, nuclear", that PG&E received a credit relative to this insurance, and that this credit was reflected in the claimed costs.[21] I believe that the insurance likely being referred to is nuclear insurance provided by Nuclear Electric Insurance Limited (NEIL). PG&E is a NEIL member and NEIL has, in the past, made substantial distributions to its member insured.[22] In some cases, depending on the length of membership and the total premium

---

17 Line 13 on tab labeled "ISFSI Cash Flow" on spreadsheet titled "HBPP ISFSI Damages 102705.xls".

18 PACD044766. Memo from Barbara Clark to Robert Kapus dated December 28, 2000, "RE: Transfer of Taiwan Earthquake Charges".

19 In his deposition, Mr. Gregory A. Rueger (August 23, 2005, 254:4-261:22) identified that PG&E has a very active seismic program that reviews virtually every earthquake that happens around the world. He further identified that the active seismic program is part of the license to operate the DCPP. He also stated that while the seismic program looked at both nuclear and non-nuclear facilities, the main reason for the program is DCPP.

20 Line 97 on tab labeled "ISFSI Cash Flow" on spreadsheet titled "HBPP ISFSI Damages 102705.xls"

21 Deposition of Robert Kapus, September 28 and 29, 2005, 156:17-158:5. Mr. Kapus identified the insurance as NEO, but acknowledged that he is not sure what this stands for.

22 NEIL 2004 Annual Report. Page 34 shows a list of insured utilities and identifies if they are NEIL members. While it is possible to obtain insurance coverage from NEIL without being a member, only members are entitled to distributions. Page 6 provides a graph of the cumulative distributions made to members from 1995 through 2004.

paid over time, the distributions have exceeded the premiums and, thus, the insurance coverage becomes net income.[23]

I understand that there have been no invoices produced for the claimed insurance costs. Also, I am not aware of any documentation identifying the coverages included in these costs, the premiums and any distributions from NEIL or any other insurer. Given this lack of supporting information, it is not possible to reach a supportable conclusion that the insurance coverages are reasonable or that the premiums and distributions have been accurately reflected in the claimed costs.

7. Invoice Review - Not Supported

I reviewed invoices that were provided by PG&E in support of claimed costs to determine if there was sufficient information to conclude that the work covered by these invoices was incremental to the breach and reasonable. In performing this evaluation, any title or description of the work contained in the invoice was reviewed and a search was made for any documentation concerning the subject purchase order, work order or contract.

Appendix C is a list of those invoices related to HBPP where I could not find sufficient information to allow me to reach a supportable conclusion that the charges were for work that was incremental to the breach or reasonable. In particular, I found insufficient information to reasonably conclude that the work (or very similar work) would not have been needed for delivery of fuel to DOE or for the decommissioning of the HBPP in the but-for world.[24]

Examples of the types of invoices included in Appendix C are:

a. PACD027236 to 027245 - Bruce Norton & Associates - The invoice includes charges for three items: Ventilation Stack Removal Project, ISFSI/Decommissioning Studies, and Site Characterization Study during 1998. Work reported under the

---

23 NEIL 1999 Annual Report, page 18, identifies that in 1999 the total distribution to all members was 2.75 times the total premiums charged to the members.

24 I have not concluded definitively that all the invoices other than those included in Appendix C are incremental and reasonable under all circumstances. In creating Appendix C, I have taken a conservative approach and not included invoices in the list if I could find any description, no matter how general, of the covered work that would indicate unambiguously that the work was for materials or an activity needed to design, construct or operate an ISFSI. For example, an invoice that only indicated the cost was for professional services for ISFSI licensing was not included on the list because licensing work is an essential activity in the creation of an ISFSI. The invoice was excluded from the list even though this very general description was insufficient to understand in any detail the work which was done or critically judge the magnitude of the cost. Although the general area of work is needed, if a greater level of detail were available about the work performed, it is possible that some of the costs might be determined not to be incremental to the breach or not reasonable.

heading of Decommissioning Studies or Site Characterization[25] could be work required for decommissioning independent of the presence of spent fuel.

A review of the detailed time reporting provided with this invoice suggests that some of the work is not incremental to the continued storage of spent fuel. The following are a few examples of items that would appear to be related to decommissioning or site characterization:

1) PACD02739, 1/9/98, receipt and review of draft cover letter for PSDAR
2) PACD02740, 3/13/98, work on HBPP decommissioning organization and related issues
3) PACD02724, 3/16/98, Meetings regarding HBPP decommissioning issues
4) PACD02724, 3/24/98 and 3/25/98, Meetings with TLG for CPUC hearing. TLG performed the decommissioning cost estimates at this time for PG&E
5) PACD027241, 7/22/98 and 7/23/98, work on decommissioning issues
6) PACD027241, 8/12/98 through 8/14/98, work on decommissioning issues
7) PACD027243, 2/23/98 and 2/24/98, work on site characterization report
8) PACD027244, 8/18/98 through 10/10/98, work on site characterization report

b. PACD027748 - Interiors Incorporated - The description is "Design & Project Management Build (19) Work Stations w/ existing product on Site" - Without additional information, it is not possible to understand the scope of the work or to form an opinion as to whether these costs are incremental to the breach world or are otherwise reasonable.

c. PACD028679 - Pacific Mobile Structures, Inc. - The description consists of "Delivery to Eureka" and "Installation". There is insufficient information here to understand the scope of the work. It is not possible to form an opinion as to whether the costs are incremental to the breach or are otherwise reasonable.

d. PACD031953 - Altran - The work is described as "Dry Cask Storage Part 50". This is confusing at best. The ISFSI at HBPP is being licensed under a Part 72 specific license and not under a

[25] Site characterization is a process of surveying the reactor site in anticipation of decommissioning to fully define the radiological condition of the site and provide a full understanding of the work needed to remove the residual radioactive material from the site so that the reactor license may be terminated. Site characterization is an essential part of the decommissioning of any site.

general license as part of the plant Part 50 license. It is unclear what changes, analysis or evaluation of the Part 50 license would be unique to the breach world or would be otherwise reasonable.

8. But-for Fuel Loading Costs - Not Reasonable

The HBPP claim includes no costs for the loading of fuel to the ISFSI.[26] The assumption being made by PG&E is that the cost to load the fuel for acceptance by DOE in the but-for world is the same as the cost for loading to the ISFSI in the actual world. PG&E's damage claim assumes the only difference would be when the costs are incurred.[27] However, the casks being loaded for the HBPP ISFSI are large casks that would require shipment by rail, but HBPP has no rail spur. In the absence of a rail spur, the fuel would have to be moved by truck, which involves much smaller casks.[28,29] The delivery commitment schedules (DCS) submitted for HBPP by PG&E, request shipment by truck.[30] Licensed transportation casks for BWR fuel that can be moved on legal weight trucks hold only 2 BWR assemblies[31] compared to the Hi-Star casks being used for the HBPP ISFSI that hold 80 HBPP BWR assemblies.

The time and cost for loading a spent fuel cask are not directly proportional to the number of assemblies contained in the cask. Specifically, there are some activities that will not scale with the number of assemblies being more nearly fixed and thus, proportionately larger for small casks compared to large casks. As a result, the cost for using small casks will be larger than the cost for large casks for an equal total number of assemblies.

The but-for world fuel loading costs for HBPP should be based on the use of truck casks. The starting point for calculating these costs is the Holtec cost for loading the 5 fuel casks for the HBPP ISFSI. This cost is identified in the Holtec

---

26 Expert Report of Dr. Brad Cornell (11/10/2005), page 14, notes that spent fuel loading costs will be incurred with or without the breach and the spreadsheet labeled "HBPP ISFSI Damages 102705.xls" includes no cost for the loading of fuel from the spent fuel pool to the ISFSI.

27 The but-for costs would be incurred earlier in time than the actual cost, which would not be incurred until at least 2009. Thus, with the inherent assumption that the magnitude of the costs in constant year dollars is the same, the net present value of the but-for world costs would be greater and there should be a net credit against any calculated damages.

28 Deposition of William Stock, August 19, 2005, 90:11-92:24.

29 It is possible that large railroad type casks could be transported from the site to a railhead by heavy haul vehicle. However, I am unaware of any information supporting that such heavy haul would be possible or practical and if such a method were used, there would be additional costs such as for heavy haul that have not been identified or considered in the calculation of claimed costs.

30 PDCP0009771, PDCP0009772, PDCP0009768 and PDCP0009768 all dated 8/24/1992.

31 Examples of a small cask of this type are the NLI- 1/2 or the NAC LWT.

contract as $1,384,984.[32] Loading of a large cask, such as the Hi-Star, would be expected to take 6 to 7 days and a small cask would take 1 to 2 days.[33,34] As stated above the large cask holds 80 assemblies and the small cask holds 2 assemblies. Using these factors, the loading cost for the but-for world is calculated to be $6,430,000.[35,36]

---

32 PHBP0034453, line 4.

33 There is variation in the estimated and experienced time for loading casks. Thus, not all data will reflect the same values. The times do not always include all the same activities and the durations sometimes are sited based on calendar days although work was performed only part of the day while others report the duration based on a 24 hour work day. The durations here are based on 24 hour work days. The actual calendar time would be longer if work were not done around the clock, but that would not alter the calculation done here. A duration of 6 to 7 days is reasonably consistent with experience, although there are reasons one could estimate significantly shorter times. Using a shorter time would increase the but-for loading costs, which would cause a larger reduction of any calculated damages.

"NAC International S/T Storage Casks" by Ivan Stuart, contained in Monograph on Spent Nuclear Fuel Storage Technologies, edited by E.R. Johnson and P.M. Severot, March 1997 lists in Table 6-5 a duration of loading for a NAC - I28 cask of 7 days. This cask is a large cask holding 28 PWR assemblies. The PWR version of the Hi-Star which is used at HBPP holds either 24 or 32 PWR assemblies, so this NAC cask is of a similar capacity to the Hi-Star. The document identifies less than a 24 hour work day over this 7 day period and thus, would reflect a duration of less than 6 or 7 days (based on a 24 hour work day). However, use of this short period would, I believe, be overly optimistic based on other experience and would result in a much larger and unconservative but-for loading cost.

A paper titled "Dry Spent Nuclear Fuel Management Lessons Learned", presented June 9, 1999 at an American Nuclear Society Professional Development Workshop in Boston, Massachusetts provides information on loading of one type of large cask. The specific information is presented on the next to last page of the presentation. This identifies the loading of a cask to take 108 hours (one week working a total of 48 hours and one week working a total of 60 hours) or just about 4.5 days. This paper also gives a cost for the loading of about $222,000 per cask. Escalating this to 2005 dollars at 3% per year gives a cost of about $265,000, which is not much different than the $230,000 per cask calculated from the PG&E data. However, using a duration of 4.5 days for a large cask would significantly increase the but-for world costs and the 4.5 day duration is at the extreme low end of what would be expected for loading a large cask. The general point to be made here is that the 6 to 7 days assumed is not unreasonably short. As indicated above, I believe the 6 to 7 day duration to be more representative than the 3 or 4.5 days discussed in these two cited documents.

34 Deposition of R. Alan Chapman, February 23, 2005, 181:7-183:1 in Tennessee Valley Authority v. United States of America, Case No. 01-249C. Loading a small cask at the Browns Ferry Nuclear Plant in December 2003 took from Saturday morning to late Sunday.

35 In performing the detailed calculation, the longer period of 7 days was assumed for the large cask and the shorter time of 1 day for the small casks. These assumptions make the but-for world costs less than would be calculated if the other extremes of the durations were assumed. Clearly, assuming 2 days per small cask rather than one would double the calculated cost. Also, the Holtec estimated cost is for the loading of 5 casks. It is not entirely clear from the Holtec contract whether this accounts for mobilization and demobilization costs for this work. However, in my calculations I have assumed that mobilization and demobilization costs equal to the cost of loading one cask are included in the estimated costs. Thus, in determining the cost per cask from the Holtec estimate, I have divided the total cost by 6 (5 for the actual casks and 1 for mob/demob) rather than 5. Also, the initial disclosures for PG&E's claim included costs of almost $1 million for oversight of spent fuel loading to the ISFSI. In my calculations I have ignored these costs, assuming that, at a minimum, the oversight costs would be the same in the but-for and breach

The total cost for the calculated but-for transfer is not dependent on the assumed acceptance rate by DOE. This is primarily due to the use of the small casks and the lightness of the HBPP assemblies. The distribution of the but-for loading costs with time should be $1,583,000 in 1998, $1,286,000 in 1999, $527,000 in 2000 and $3,034,000 in 2001 assuming the rate of acceptance by DOE in the 1991 or 1995 Annual Capacity Report.[37]

9. Holtec Contract, Part 71 license - Not Incremental[38]

PG&E's claimed damages include costs for obtaining a Part 71 license for the Hi-Star casks being used for the ISFSI HBPP.[39] Part 71 is the portion of the code dealing with licensing casks for transportation. A Part 71 license is not needed to store fuel in the ISFSI. Storage requires a Part 72 license. Since DOE is responsible for providing casks for transportation, there is no reason for PG&E to incur costs for transportation licensing.

5.A.2 Diablo Canyon

1. Invoice Review

I reviewed invoices that PG&E provided in support of claimed costs to determined if there was sufficient information to conclude that the work covered by these invoices was incremental to the breach and reasonable. In performing this evaluation, any title or description of the work contained in the invoice was reviewed and a search was made for any documentation concerning the subject purchase order, work order or contract.

a. Not Incremental

---

worlds. I have done this even though it is likely that in the but-for world PG&E would use small casks since the total loading would take longer in calendar time and the oversight costs would be greater.

36 If it were determined that the but-for world fuel loading costs should be based on a large rail type cask, rather than the truck cask assumed here, there would be additional but-for world costs. Most, if not all, of the plant modifications needed to support the use of the Hi-Star casks for the ISFSI would be needed in the but-for world and those costs would not be incremental to the breach. Also, there would be other but-for world costs for additional road modifications, rail access or other improvements or facilities to allow movement of the large rail casks from the HBPP site. Such additional but-for world costs would reduce the alleged damages.

37 The rates in the two reports are the same. Annual Capacity Report, December 1991, DOE/RW-0331P. Acceptance Priority Ranking & Annual Capacity Report, March 1995, DOE/RW-0457.

38 In this instance, not incremental means that PG&E has assumed responsibility for an activity that it is not required to perform in either the breach or but-for world.

39 Line 105 on tab labeled "Holtec Data" on spreadsheet titled "HBPP ISFSI Damages 102705.xls". The cost is also shown in Appendix A, "Fixed Price Payment Allocation" of Contract 3500120394, PHBP0034452, line 11.