As part of my review of invoices, I identified two groups of invoices that represent non-incremental costs. The first is a group of invoices from Altran.[40] The description on each of the invoices is "Feed/Steam Flow Scaling Design Change". The feedwater and steam systems have a significant role in the production of power from the plant, but they have nothing to do with the storage of spent fuel in either the breach or but-for worlds. Thus, any work related to steam and feed flow would not be incremental to the breach.

The second set of invoices are from LSA Associates.[41] The description for each of these invoices is "Steam Generator Replacement". The only connection between the replacement of steam generators and the storage of spent fuel is that at the time the replacement is to be performed, it would be essential that the spent fuel pool had sufficient space to off-load the entire core (i.e., one full core reserve). However, other than possibly setting a planned time for the steam generator replacement or establishing a milestone on the schedule for additional spent fuel storage to support the replacement, there would be no connection between the spent fuel and the steam generator replacement. There is no reason that any substantive amount of work related to steam generator replacement would be linked to the spent fuel. Consequently, there is no reason that work associated with these invoices would be incremental to the breach.

b. Not Supported

Appendix D is a list of those invoices where I could not find sufficient information to allow me to reach a supportable conclusion that the charges were for work that was unique to storage of spent fuel in the breach world or is otherwise reasonable. In particular, I found insufficient information to reasonably conclude that the work (or very similar work) would not have been needed for delivery of fuel to DOE or for the operation of DCPP.[42]

---

40 The 5 invoices are for a period from December 2000 through February 2001. PACD050811-050812, PACD050814-050815, PACD050817-050818, PACD050820-050821 and PACD0508023-0508024.

41 There are 14 invoices for a period from April 2004 through October 2004. PACD056300, PACD056302-056303, PACD056305, PACD056307, PACD056309, PACD056311, PACD056313, PACD056318, PACD056319, PACD056324, PACD056326, PACD056328, and PACD056330. I am aware that some of these invoices were not included in the claimed costs, but most were in the claimed costs. I have kept the complete list of invoices here to identify all the invoices related to the steam generator replacement that were provided in discovery.

42 I have not concluded definitively that all the invoices other than those included in Appendix D are incremental and reasonable under all circumstances. In creating Appendix D, I have taken a conservative approach and not included invoices in the list if I could find any description, no matter how general, of the covered work that would indicate unambiguously that the work was for materials or an activity needed to design, construct or operate an ISFSI. For example, an invoice that only indicated that the costs were for professional services for ISFSI licensing was not

Examples of the types of invoices included in Appendix D are:

1) PACD048222 - Goddard Claussen - The description of the work is "Professional Services" with three phases, "Planning", "Preparation" and "Implementation" identified. It is not possible to form any opinion about whether this invoice represents work incremental to the breach or is otherwise reasonable because these descriptions are insufficient.

2) PACD050116 - Goddard Claussen - The description is "Professional Services". Without some additional description about the work being performed, no conclusion can be reached as to whether these costs are incremental or are otherwise reasonable. The invoices on PACD050124, PACD050148, PACD050164, PACD050169, PACD050176, PACD050178, and PACD050180 are essentially the same.

3) PACD049917 - ENERCON Services, Inc. - The description of the work is "DCPP Cask Support LAR[43]". It is unclear from just this description that the work being performed would not be needed in the but-for world or is otherwise reasonable.[44] This could be the case if the work has to do with structures, systems or components, or procedures or processes for the handling of spent fuel in or around the spent fuel pool.

4) PACD050066 to 050068 - GBH Distributing, Inc. - From the descriptions provided, this invoice is for video equipment, including two television sets. There is no information on the invoice that identifies the intended location or use of this equipment. Therefore, no conclusion can be reached as to whether these costs are incremental to the breach or are otherwise reasonable.

5) PACD050028 to 050029 - GBH Distributing, Inc. - Again, from the invoice descriptions, this is more video equipment, including two more television sets. There is no information on the invoice that identifies the intended location or use of this equipment. Therefore, no conclusion can be reached as to whether these costs are incremental to the breach or are otherwise reasonable.

---

included on the list because licensing work is a essential activity in the creation of an ISFSI. The invoice was excluded from the list even though this very general description was insufficient to understand in any detail the work which was done or critically judge the magnitude of the cost. Although the general area of work is needed, if a greater level of detail were available about the work performed, it is possible that some of the costs might be determined not to be incremental to the breach or not reasonable.

43 LAR stands for License Amendment Request and would be a document submitted to modify the NRC license.

44 To say that the same work would be needed in the but-for world may not mean that precisely the same work is needed. It does mean that while the breach and but-for worlds may require work with different details, there is a conceptual one-to-one correspondence and the level of effort in the two worlds would be indistinguishable.

6) PACD050215 to 050223 - HGP, Inc. - The invoice is identified as charges for professional services and the first page states that a detailed breakdown of the service is provided in Attachment 1. Attachment 1 does provide a breakdown, but it is simply an identification of the number of hours billed by specific individuals with no information on the specific work performed by any of the persons listed. Therefore, there is insufficient information to reach the conclusion that this work is incremental to the breach or is otherwise reasonable.

7) PACD050550 - Geomatrix Consultants, Inc. - This invoice is for work on "ISFSI Access Road Ground Motions". This invoice concerns seismic events during the transfer of fuel to the ISFSI. What is unclear in evaluating this invoice is whether the work would have a corresponding, although not necessarily identical, effort in the but-for world. That is, if seismic evaluation of the road to move fuel to the ISFSI is needed, it is unclear why similar evaluations would not be needed for the path loaded fuel casks would take when leaving the site in the but-for world.

8) PACD050938 - ENOVA Engineering Services - The description is "Slab Evaluation of the Effect of Cask Drop Inside the Auxiliary Building". Depending on the size and weight of the cask provided by DOE in the but-for world, it would be necessary to perform the same type of evaluation for the but-for world. Without specifics or some explanation about how the actual and but-for worlds would be different in this regard, it is not possible to conclude that this work is incremental to the breach or is otherwise unreasonable.

5.B. Future Costs[45]

5.B.1 Humboldt Bay

1. Oversight of ISFSI Operations- Not Supported

PG&E's estimated future damages include a line item labeled "Oversight of ISFSI Ops."[46] The only explanation of this cost of over $500,000 per year is given on the tab labeled "Future Costs" in the spreadsheet titled "HBPP ISFSI Damages.xls". The information provided there simply states the cost is based on 3 full time equivalent persons per year (2080 hours) at $75 per hour. However, there is no explanation as to what specific activities or functions these 3 persons would be performing or why 3 full time equivalents are needed. Further, the future costs tab identifies that the $75 per hour is a PG&E/contractor composite rate. Thus, the rate reflects neither PG&E employees nor contractors and a different cost would be estimated if it were assumed the positions were all PG&E employees or all contract personnel. There is not sufficient support for these

45 As identified earlier in this report, future costs are costs claimed for 2005 and later.

46 Line 23 on tab labeled "ISFSI Cash Flow" on spreadsheet titled "HBPP ISFSI Damages 102705.xls". The costs included are $542,500 in 2010, $558,800 in 2011 and $575,600 in 2012.

estimated costs to conclude that these estimated costs are an accurate representation of the costs that will be incurred in the future.

2. Insurance

PG&E's estimated future damages include cost for insurance.[47] I am not aware of any documentation that provides the basis or details of the costs in this line. There are costs in both the ISFSI damages and the SAFSTOR costs for the same future years, but I am unaware of any documents or information identifying what the distinction is between the costs in the two spreadsheets.

There was deposition testimony from Mr. Robert Kapus that this was "NEO, nuclear", that PG&E received a credit relative to this insurance and that this credit was reflected in the claimed costs for past costs but not for future costs.[48] As stated above in discussing past costs, I believe that the insurance likely being referred to is nuclear insurance provided by Nuclear Electric Insurance Limited (NEIL). PG&E is a NEIL member and NEIL has, in the past, made substantial distributions to its member insureds.[49] In some cases, depending on the length of membership and the total premium paid over time, the distributions have exceeded the premiums and thus the insurance coverage becomes a net income.[50]

Further, review of the NEIL annual reports for 2000 and 2004, indicates that NEIL has made substantial distributions to its members every year since 1991.[51] Mr. Kapus stated in his deposition that no credit for distributions was included in the estimate of future costs because they might not get a distribution. While predicting whether distributions will occur and the magnitude of such distributions is speculative at best, it is my opinion that if one were to make an assumption about NEIL distributions, the most appropriate assumption, based on the long continuous history of such distributions being made, would be to assume that there would be some distribution. Thus, I conclude that there is not sufficient support for the future insurance costs.

---

47 Line 97 on tab labeled "ISFSI Cash Flow" on spreadsheet titled "HBPP ISFSI Damages 102705.xls" and line 97 on tab labeled "1998-2009 Costs" on spreadsheet titled "1999-2009 SAFSTOR 102205.xls".

48 Deposition of Robert Kapus, September 28 and 29, 2005,156:17-158:5. Mr. Kapus identified the insurance as NEO, but acknowledged that he is not sure what this stands for.

49 NEIL 2004 Annual Report. Page 34 shows a list of insured utilities and identifies if they are NEIL members. While it is possible to obtain insurance coverage from NEIL without being a member, only members are entitled to distributions. Page 6 provides a graph of the cumulative distributions made to members from 1995 through 2004.

50 NEIL 1999 Annual Report, page 18, identifies that in 1999 the total distribution to all members was 2.75 times the total premiums charged to the members.

51 NEIL 2000 Annual Report, page 5, provides a graphic that shows distributions were made every year from 1991 through 2000. The NEIL 2004 Annual Report, page 6, has a similar graphic showing that distributions were made every year through 2004. Thus, there is at a minimum a history of 13 consecutive years of NEIL making substantial distributions to the members.

3. NRC ISFSI Fees - Not Reasonable

PG&E's estimated future damages include NRC ISFSI fees.[52] The explanation for these fees on the tab labeled "Future Costs" in the spreadsheet titled "HBPP ISFSI Damages 102705.xls" states that the cost is based on a cost of $240,000 per year which is the claimed average of the annual fee charged by NRC for an ISFSI for 2003, 2004 and 2005[53]. However, the fee shown for 2005 is $203,000 when the fiscal year 2005 fee was $159,000, the fee shown for 2004 is $207,000 when the fiscal year 2004 fee was $203,000 and the fee shown for 2003 is $309,000 when the fiscal year 2003 fee was $319,000.[54] Even if the average of these years was appropriate to use as the basis for estimating future costs, the average would be $227,000 and not the $240,000 calculated and used by PG&E.

However, if the NRC fees are examined over a longer period of 1994 through 2005, there is a clear downward trend in the fees.[55] There are years where the fee goes much lower than the general trend would predict and there are a few years where the fee goes up compared to the previous year. However, the overall trend is a reduction in the fee over time. Thus, while the variation in historical fees makes clear that trying to predict the future fees is speculative, the general trend indicates that if one were to speculate, the better choice would be to use the most recent year (FY2005) fee of $159,000 rather than some average of prior years.

4. Other NRC fees - Not Supported

PG&E's estimated future damages include costs for other NRC fees. These fees are identified as "NRC Inspections during construction", "NRC Loading Dry Run", and "NRC Inspections".[56] These estimated costs, as described on the "Future Costs" tab of the spreadsheet labeled "HBPP ISFSI Damages 102705.xls", are based on an assumed number of persons for an assumed number of hours over an assumed period for NRC work related to the HBPP ISFSI. This spreadsheet provides no explanation of the basis for the assumed manning, assumed hours or

---

52 Line 72 on tab labeled "ISFSI Cash Flow" on spreadsheet titled "HBPP ISFSI Damages 102705.xls".

53 The future costs included in the damages is this value escalated to future dollars.

54 The FY 2005 fee is identified in 10 CFR 171.15(c)(1) and included in the current NRC website (www.nrc.gov). Consistent with the labeling of past editions, this would be the 1-1-06 edition. The FY 2004 fee is identified in 10 CFR 171(c)(1), 1-1-05 edition. The FY 2003 fee is identified in 10 CFR 171.15(c)(1), 1-1-04 edition. The PG&E spreadsheet does not identify if the stated fees are for fiscal years or calendar year. However, even if one were to assume that the fees were for calendar years, it is not clear how the specified amounts were determined.

55 10 CFR 171, 1-1-95 edition (which gives the FY 94 rate) through 1-1-05 edition plus the most recent version as shown on the NRC website (www.nrc.gov). The annual fee in FY 1994 was $335,000 and in the current code for FY2005 it is $159,000.

56 This includes the costs on lines 70, 71 and 73 on tab labeled "ISFSI Cash Flow" on spreadsheet titled "HBPP ISFSI Damages 102705.xls".

assumed duration. Mr. Robert Kapus in his deposition stated that the costs were based on information from Southern California Edison (SCE) which was then adjusted based on the judgement of himself and two other PG&E personnel.[57] I am not aware of any information concerning what the data obtained from SCE was or how this data was adjusted to arrive at the estimated costs for PG&E. Further, at least with regard to inspection cost during ISFSI operation, the NRC Inspection manual identifies the level of effort required for such inspections. I am unaware of how this NRC information was evaluated or considered in arriving at the estimated costs. Not only does the estimation of such future costs necessarily involve speculation, but in addition, for the reasons given here, there is insufficient information to form a supportable opinion as to the reasonableness of the estimated costs.

5. Rad material disposal - Not Supported

PG&E's estimated future damages include a total of almost $1 million for radioactive material disposal in 2006 to 2009.[58] I am unaware of any explanation of the basis for these estimated costs. I have not seen any explanation as to why the waste being disposed of is unique to the breach world. I have not seen any information that would allow me to form a supportable opinion concerning these estimated costs as reasonable or incremental to the breach.

6. Nuclear Mixed Waste Disposal - Not Supported

PG&E's estimated future damages include the cost for disposal of mixed waste.[59] Mixed waste is material which presents a non-radiological hazard which has also been radiologically activated or contaminated. Thus, mixed waste disposal must deal with the hazardous nature of the basic material as well as the additional concerns and requirements created by the material also being radioactive.

I have seen no evidence that any mixed waste will be generated in the future, any explanation as to the magnitude of the disposal costs or that such costs are incremental to the breach. In his deposition, Mr. Roy Willis stated that the majority of mixed waste would be asbestos, lead or mercury that became radioactively contaminated. However, Mr. Willis did not provide any explanation as to why such mixed waste would be created due to the continued storage of spent fuel. In fact, Mr. Willis stated that the asbestos and lead paint present at HBPP would have been there prior to the dry storage project. I am unaware of any information that would lead me to conclude that any mixed waste disposal

---

57 Deposition of Robert Kapus, September 28 and 29, 2005, 196:24-197:13. The spreadsheet line numbers referred to in the deposition are different from what is referenced here because the deposition exhibit was an earlier version of the spreadsheet and had the title "HBPP ISFSI Damages.xls".

58 Line 14 on tab labeled "1998-2009 Costs" on spreadsheet titled "1999-2009 SAFSTOR 102205.xls".

59 Line 40 on tab labeled "1998-2009 Costs" on spreadsheet titled "1999-2009 SAFSTOR 102205.xls".

costs unique to the breach world will be incurred, much less to reasonably estimate the cost of such disposal.

7. DOE D&D Fees - Not Incremental

PG&E's estimated future damages include DOE dismantlement and decontamination (D&D) fees.[60] These D&D fees are not a result of the failure of DOE to begin spent fuel acceptance from the industry in 1998. The fees are being collected under provisions of the Energy Policy Act of 1992 and are for the cleanup (D&D) of DOE uranium enrichment facilities. The amount collected from each utility is dependent on the amount of enriched uranium obtained by that utility from the DOE facilities.[61] Thus, DOE charges these fees to PG&E because of activities during the actual operation of HBPP and not because of the continued storage of spent fuel. Consequently, these costs are not incremental to the breach.

5.B.2 Diablo Canyon

1. Plant Modifications - Not Supported

The PG&E estimated future damages include costs for plant modifications.[62] These modifications were described in general terms by Mr. Jearl Strickland in his deposition.[63] I am unaware of any information or explanation as to why the same or similar modifications would not be needed in the but-for world. For example, Mr. Strickland identified that one of the modifications was for attaching the seismic restraint (5.B.2.1) to the walls and floor. However, if the same or similar restraint were needed in the but-for world, which is possible depending on the size and type of cask assumed for the but-for world, then this modification is not unique to the breach world.

Mr. Strickland also identified that some of the modifications were to provide additional support under the truck bay. Such modifications would have been needed in the but-for world depending on the size and weight of the DOE cask. I am not aware of any explanation as to why such modification to the truck bay floor would not have been needed in the but-for world.

2. NRC ISFSI Fees - Not Incremental

---

60 Line 77 on tab labeled "1998-2009 Costs" on spreadsheet titled "1999-2009 SAFSTOR 102205.xls".

61 DOE website, www.oha.doe.gov/utility1.htm and 10 CFR 766.

62 Line 66 on tab labeled "LTP" on spreadsheet titled "ISFSI DCPP Damages 102705.xls"

63 Deposition of Luther Jearl Strickland, Jr., August 18, 2005, 106:2-108:11. Mr. Strickland stated he had no direct knowledge of whether any of the modifications would be needed to deliver the fuel to DOE.

PG&E's estimated future damages include NRC ISFSI Fees.[64] The explanation for these fees on the tab labeled "Future Data" in the spreadsheet titled "ISFSI DCPP Damages 102705.xls" states that the cost is based on a cost of $240,000 per year, which is the claimed average of the fees charged for 2003, 2004 and 2005[65]. As discussed above in 5.B.1.3 for HBPP, I believe that the basis for the future estimate of these fees is not reasonable. However, for DCPP there is an additional reason that the fees are not incremental. DCPP is still an operating power reactor during the period over which these costs are estimated to occur, 2005 to 2012. In accordance with 10 CFR Part 171, the NRC's decommissioning/spent fuel storage annual fee is not charged to an operating reactor facility.[66] The operating reactor, such as DCPP during this period, pays the operating reactor annual fee, which is the same whether there is an ISFSI or not.

3. NRC Inspections - Not Supported

PG&E's estimated future damages include costs for NRC inspections.[67] The explanation of these costs given in the "Future Data" tab of the spreadsheet titled "ISFSI DCPP Damages 102705.xls" is the same as for the corresponding costs in the HBPP claim. However, the amounts in the two claims in a common year are different.[68] I have seen no explanation as to why the two are different.

Further, there is reason to expect the HBPP and DCPP costs for continuing NRC inspections to be substantially different. During the years these costs are estimated to occur, HBPP is in existence for the purpose of storing the spent fuel and, thus, the inspection costs associated with storing the fuel would include inspections of programmatic activities such as radiological controls or ALARA (As Low As Reasonably Achievable). However, during these years DCPP would still be an operating power reactor and all of the programmatic activities would be inspected and audited independent of the presence of an ISFSI. The only incremental on-going inspection costs would be those unique to an ISFSI. Based on the NRC manual, the estimated hours for routine inspections of an ISFSI

---

64 Line 77 on tab labeled "LTP" on spreadsheet titled "ISFSI DCPP Damages 102705.xls".

65 The future costs included in the damages are this value escalated to future dollars for each of the years where costs are included.

66 10 CFR 171.15(c)(1) states that the fees estimated by PG&E are applicable to power reactor (Part 50) licensee that are in decommissioning and have spent fuel on site and Part 72 licensees of ISFSI who do not have a Part 50 license.

67 Line 78 on tab labeled "LTP" on spreadsheet titled "ISFSI DCPP Damages 102705.xls".

68 For example, in 2009, the HBPP cost for these inspections is $56,300 but for DCPP the cost is $50,600. The description of how the costs are calculated as shown on the Future Cost tab of the respective spreadsheets both state that the cost is based on 3 persons for 1 week, two times per year.

during operations is "3 hours per inspector every 6 months."[69] Assuming 3 inspectors, this would amount to only about $2500 per year for the direct inspection costs. Even factoring time for travel, the costs would be much less than the annual cost of over $50,000 in PG&E's claimed costs. I have seen no documentation to explain why the estimated costs are appropriate.

4. Other NRC fees - Not Supported

PG&E's estimated future damages also included costs for other NRC fees. These fees are labeled as "NRC Inspectors During Construction", "NRC License Amendment" and "NRC Demonstration of Loading". [70] For two of these costs, the inspectors during construction and demonstration of loading, the "Future Data" tab of the spreadsheet labeled "ISFSI DPP Damages 102705.xls", states the costs is based on an assumed number of persons for an assumed number of hours over an assumed period for NRC work related to the DCPP ISFSI. This spreadsheet provides no explanation of the basis for the assumed manning, assumed hours or assumed duration. For the third item, the license amendment, there is no description of the basis in the spreadsheet and I am unaware of any description of the scope of work included in this cost. For this third item, without understanding the scope of the effort, there is no way to evaluate the reasonableness of the estimated cost or whether the cost is incremental to the breach.

Mr. Robert Kapus in his deposition stated that at least some of these costs were based on information from Southern California Edison (SCE) which was then adjusted based on the judgement of himself and two other PG&E personnel.[71] I am not aware of any information concerning what the data obtained from SCE was or how this data was adjusted to arrive at the estimated costs for PG&E. Additionally, the NRC inspection manual provides some guidance as to the expected effort for certain types of inspections.[72] I am unaware of any documentation or information describing how this NRC guidance was considered in estimating the inspection costs. Not only does the estimation of such future

---

69 NRC Inspection Manual, Inspection Procedure 60855; Operation of an Independent Spent Fuel Storage Installation," paragraph 04.02, dated March 3, 2002

70 This includes the costs on lines 74, 75 and 76 on tab labeled "LTP" on spreadsheet titled "ISFSI DCPP Damages 102705.xls". The lines are labeled as "NRC Inspectors During Construction", "NRC License Amendment", and "NRC Demonstration of Loading".

71 Deposition of Robert Kapus, September 28 and 29, 2005, 196:24-197:13 and 335:25-336:8. The reference to pages 196 and 197 is where the basis for these costs for HBPP was discussed. The later reference is discussing the estimate for DCPP but it indicates the same process was used as for HBPP.

72 For example, NRC Inspection Manual, Inspection Procedure 60855; Operation of an Independent Spent Fuel Storage Installation," paragraph 04.01, dated March 3, 2002 provides estimates of the effort required to prepare for inspection of loading or unloading activities. This guidance says 3 inspectors for about 72 hours each or a total of about 216 man-hours. At the current NRC cost of $205 per hour (stated in 10 CFR Part 170.20) this would come to about $44,000. However, PG&E's estimated costs for NRC inspection of the fuel loading dry run is almost 20 times this amount ($814,000).

costs necessarily involve speculation, but in addition for the reasons given here, there is insufficient information to form a supportable opinion as to the reasonableness of the estimated costs.

5. ISFSI Road Upgrades - Not Supported

PGE's estimated future damages include costs for upgrading the road from the plant to the ISFSI.[73] The cost for the ISFSI road upgrades is described on the "Future Data" tab of the "ISFSI DCCP Damages 102705.xls" spreadsheet as based on a Scientech estimate and gives a value of $874,000 for upgrading over 1 mile of road. The damages spreadsheet (i.e., the "LTP" tab of this same spreadsheet) gives the costs as $1,120,000. Also, an earlier version of the damages spreadsheet identified the cost as $1,450,000.[74] Regardless of the reason for the differences in the estimated costs, these differences demonstrate the difficulties in estimating future costs and, thus, the speculation that is involved in such estimating.

Additionally, because the loaded casks must be moved from the fuel building whether they are going to the ISFSI or to DOE, there would be some part of the path (at least right near the building) that would be common. I am unaware of any description or discussion of what part of the road would need to be upgraded to support delivery of fuel to DOE versus loading to the ISFSI. Thus, the information I have seen is not sufficient to allow reaching a reasonable and supportable opinion about what part of these costs are incremental to the breach.

5.C. General Comments

5.C.1 Failed Fuel

The operating and maintenance costs for an ISFSI are independent of the number of fuel assemblies being stored in the ISFSI. If other than standard fuel is not subject to the same acceptance schedule as standard fuel, other than standard fuel (including failed fuel) may have been required to be stored for an extended time, even if DOE had initiated acceptance of standard spent fuel assemblies from the industry in 1998. Since the cost to operate and maintain a spent fuel storage facility is independent of the amount of fuel being stored, as long as any other than standard fuel must be stored, there would be no incremental operating and maintenance costs for the storage of the standard spent fuel.

HBPP has fuel that would be classified as other than standard fuel generally and failed fuel specifically. HBPP has between 27 and 100 such assemblies.[75] Based on information from Holtec, the casks to be used for the HBPP ISFSI are capable of each

---

73 Line 87 on tab labeled "LTP" on spreadsheet titled "ISFSI DCPP Damages 102705.xls".

74 Line 72 on tab labeled "LTP" on spreadsheet titled "ISFSI DCPP Damages.xls".

75 Deposition of Lawrence B. Pulley, July 27, 2005, 137:11-15 and 177:9-178:2

holding as many as 80 failed fuel assemblies.[76] Thus, at least one of the 5 storage casks will contain failed fuel.[77] Assuming that a dry storage facility would be constructed to store the failed fuel for this indeterminate period, the cost to design and license the facility would not be different than the cost to design and license the facility for all the fuel. Further, 1/5 of the facility construction costs (the minimum part required for the failed fuel), would not be incremental to the failure of DOE to begin spent fuel acceptance in 1998.[78] Alternatively, PG&E could have continued to store the spent fuel, including the failed fuel, in the spent fuel pool.

5.C.2 Greater than Class C Waste (GTCC)

10 CFR Part 72 defines Greater than Class C waste (GTCC) as:

> ". . . waste means low-level radioactive waste that exceeds the concentration limits of radionuclides established for Class C waste in § 61.55 of this chapter."

PG&E has GTCC waste at HBPP.[79] Storing GTCC waste by itself requires security and monitoring to protect the health and safety of the public and site workers similar to the requirements for storing spent fuel assemblies. The required staffing and operating costs to maintain such a GTCC storage facility are essentially identical to those for a facility to store spent fuel assemblies. This conclusion is based on discussions with NRC personnel as well as NRC documents concerning the licensing of GTCC storage facilities that state in part:

> "The NRC does not believe that additional guidance specifically for 10 CFR Parts 30/70 licenses is needed. However, if the NRC were to develop guidance for storage of reactor-related GTCC waste under a 10 CFR Part 30 or 70 license, such guidance would be consistent with 10 CFR Part 72. The NRC prefers that reactor-related GTCC waste be stored under the provisions of 10 CFR Part 72. Therefore, to promote effectiveness and efficiency the NRC is deferring development of any guidance for 10 CFR Parts 30 and 70. However, any application for a 10 CFR Part 30 or 70 license may use, to the extent appropriate (considering the case-by-case criteria the application would be proposing), the

---

76 PHBP0059280.

77 If there are actually 80 or less failed fuel assemblies, it is possible that only one cask would contain failed fuel. If there are actually more than 80 failed fuel assemblies then at least 2 of the casks would contain failed fuel.

78 This is a simplified separation of the costs that is in PG&E's favor. As with most construction projects, the costs to build an ISFSI really consist of costs that are scalable based on size (variable costs) and costs that are insensitive to size (fixed costs). In the case of an ISFSI, the base security system or building to house the system would be fixed regardless of whether the facility had 1 cask or 5 casks. Thus, there would be some construction costs that would be incurred in total regardless of the size and this would cause the cost of the 1 cask facility for failed fuel to be larger than the simple 1/5 of total construction costs suggested in this comment. Thus, the assumed scaling of construction costs minimizes the portion of the cost that would be incurred in the absence of the DOE breach.

79 Deposition of Lawrence B. Pulley, July 27, 2005, 185:16-187:8.

guidance developed for 10 CFR Part 72 in submission of an application."[80]

Thus, during any period when GTCC is stored, there will be no incremental operating cost for the storage of spent fuel assemblies with one exception. Once all the fuel is removed from the site, the annual fee for an ISFSI would no longer be applicable.[81],[82]

The design and construction costs for a GTCC-only facility might be less than for a fuel storage facility. For example, a spent fuel storage cask would not necessarily be needed for storing GTCC and thus, the storage container used for GTCC may be cheaper than a spent fuel storage cask.[83] On the other hand, some things like the security systems would not be measurably different since the security requirements would be essentially the same. However, given that a GTCC-only facility has not been designed or approved by the NRC[84], estimating the cost of such a facility would involve significant speculation.

---

80 Final Rule, Interim Storage of GTCC Waste, June 1, 2001 page 26. Also, 10 CFR Part 72 is the part of the code applicable to the design and licensing of spent fuel storage facilities.

81 10 CFR Part 171 indicates that the annual fee ($159,000 for FY2005) is only applicable when spent fuel is present on the site.

82 It is possible that the facility staff could be different by 1 or 2 individuals for a GTCC facility compared to a spent fuel storage facility. However, in the absence of actually developing the staffing and obtaining NRC agreement with this plan, it would be highly speculative to assume any reduction. Also, given the comment below concerning the capital expense for a GTCC storage facility, assuming a lower operating cost would be unreasonable.

83 The cost of the container is not important in making adjustments to the HBPP claim. The cost of the spent fuel cask for the GTCC was not included in the claimed costs so no conclusion about the cost of a GTCC container would result in any adjustment to the claimed costs.

84 Here the reference is not just to the fact that no such facility has been designed or approved for HBPP, but I am unaware of any such facility for any utility.

5.C.3 Storage Cask

I was requested to provide information concerning several different spent fuel storage cask designs. In particular, for the casks identified in the table below, I was asked whether or not the design utilized a seal canister (sometimes referred to as a multi-element sealed basket). This information is contained in the table below.

| Cask Name | Uses Canister (Yes/No) |
|---|---|
| Nuhoms 24P[85] | Yes |
| Nuhoms 7P[86] | Yes |
| VSC-24[87] | Yes |
| Castor V/21[88] | No |
| Castor X/33[89] | No |
| TN-32[90] | No |
| NAC-I28[91] | No |
| MC-10[92] | No |

85 Certificate of Compliance 72-1004, Amendment 5, 1/07/2004.

86 Transnuclear website, www.transnuclear.com/pdf/proj%20prgress.pdf.

87 Certificate of Compliance 72-1007, Amendment 4, 02/03/03.

88 General Nuclear Systems website, www.gnsi-gnb.com/castor_.asp and "GNSI Spent Fuel Cask Technology", presentation by W.J. McConaghy, April 16, 2004.

89 Ibid.

90 Certificate of Compliance 72-1021, Amendment 1, 02/20/01.

91 "NAC International S/T Storage Casks" by Ivan Stuart, contained in Monograph on Spent Nuclear Fuel Storage Technologies, edited by E.R. Johnson and P.M. Severot, March 1997.

92 "Westinghouse MC-10 Spent Fuel Storage Cask", by Hugh M. Costello, contained in Monograph on Spent Nuclear Fuel Storage Technologies, edited by E.R. Johnson and P.M. Severot, March 1997.

6. I respectfully reserve the right to express additional opinions, supplement or amend the opinions in this report, or provide additional reasons for these opinions, as additional documents are produced, the transcripts of expert and fact depositions become available for my review, and new facts are introduced during discovery and trial.

Warren K. Brewer 1/27/06

Warren K. Brewer Date

**Appendix A**

WARREN K. BREWER

EDUCATION
Bettis Reactor Engineering School, 1976
M.S., Nuclear Engineering, Massachusetts Institute of Technology, 1976
B.S., Electrical Engineering, Louisiana Tech University, 1974

EXPERIENCE
1986 - Present - ABZ, Incorporated. Consulting Engineer specializing in nuclear power plant operations, decommissioning, severe accident analysis, electrical systems, instrumentation and controls, inservice inspection and testing (ISI/IST), configuration management, and procedure and technical specification reviews.

Participated in evaluation and analysis of damage claims resulting from the Department of Energy's breach of the contract with nuclear plant operators for the disposal of spent nuclear fuel. Participated in evaluation of actual costs as well as projected costs. Assisted in the preparation of expert witness reports.

Supported nuclear utility in its design basis documents program at multi-unit site, assisting in development of system DBDs. Wrote procedures to implement DBD reconstitution, performed calculation reviews, analyzed discrepancies, performed licensing-basis reviews and performed independent reviews of completed system DBDs.

Conducted in-depth review of technical specifications and associated surveillance test procedures for an operating boiling water reactor. Provided technical comments on specifications and procedures to the utility. Provided interface with utility representatives for resolution of comments. Data developed was utilized in a computerized system for scheduling and tracking test performance.

Performed reviews of operating, regulatory and management history of the Rancho Seco plant and assisted in the preparation of expert witness testimony evaluating the prudence, management effectiveness and technical soundness of the operation of the plant. This review included analysis of the management and technical programs for operation, analysis of the implementation of these programs, evaluation of responses to problems, and evaluation of response to regulatory concerns. The resulting testimony was submitted to the Federal Energy Regulatory Commission in support of an action brought by the Pacific Gas

and Electric Company.

Performed management and technical reviews of the seismic design of the Pacific Gas and Electric Company's Diablo Canyon Power Plant. These reviews were conducted as the basis for preparation of expert witness testimony before the California Public Utility Commission. These reviews included evaluation of the programs for performance of the engineering and design, review of the seismic design audit conducted by an independent contractor, and review of the actual seismic design criteria, assumptions, inputs and calculations.

Participated in preparation of expert witness testimony concerning the operation and maintenance of a nuclear power plant in the Northeast. The review and analysis included evaluation of technical and management programs and procedures, the implementation of these programs and procedures, and utility response to specific operational and regulatory problems and concerns. In short, the analysis and resulting testimony focused on the question of whether the plant was well-maintained and operated from the standpoint of sound engineering practice, compliance with Nuclear Regulatory Commission (NRC) requirements and adherence to industry standards.

Participated in planning and engineering associated with decommissioning of a nuclear power plant. This included analysis of regulatory requirements for decommissioning and preparation of licensing documents to support decommissioning, preparation of cost estimates, preparation and review of schedules, and preparation and review of detailed performance specifications for the conduct of decommissioning work. Assisted executive management in assessing overall project progress and direction.

Prepared decommissioning estimates for commercial nuclear power stations and government research reactors. Testified before state regulators on the adequacy of a decommissioning cost estimate and assisted in the preparation of testimony for rate hearings on decommissioning funding. Prepared reports for state regulators concerning issues and evaluating costs estimates for decommissioning, low-level waste disposal and extended spent fuel storage. Provided training to state regulators on decommissioning technology and methodology of decommissioning cost estimating.

Contributed to the development of methods for estimating the cost of stabilization and cleanup of commercial nuclear plants following a severe reactor accident. The accidents considered range from partial core melt with the reactor vessel intact to full core melt with violent reactor vessel failures. Contributed to the development of

the methodology for combining such estimating techniques with a plant-specific probabilistic risk assessment (PRA) to produce detailed analysis of plant needs for insurance to cover such possibilities. Performed severe accident cost analysis and provided information and recommendations concerning the level of nuclear property insurance coverage to utility risk managers based on these analyses. Developed a computer aided model for such nuclear property insurance analyses that has been used by both ANI and NEIL, the two providers of such insurance, for evaluating both customer and underwriter needs.

Managed and participated in the development of computer program for fluid flow analysis. The program is applicable to a wide range of facilities and industries. The program has been marketed world wide since 1992 with an estimated 20,000 to 25,000 users as of the year 2000.

Managed the development of advanced computer systems for assisting plant staff in compliance with regulatory requirements. These systems utilize artificial intelligence programming techniques to model expert knowledge associated with these regulatory requirements. The systems developed included:

- Surveillance Requirements Monitor - This system provides assistance in tracking and scheduling technical specification surveillance tests and inservice tests. Development of the system included codifying the detailed plant conditions and administrative requirements for scheduling of these tests. This system has been in commercial use for about two years.

- Data Trending System - This system provides assistance in tracking and trending detailed test data, including assessment of recorded data for compliance with limits specified in the technical specifications and the American Society of Mechanical Engineers (ASME) code. Other functions include tracking the use of measuring and test equipment. This system has been in commercial use for about two years at one facility and for about eight months at a second facility.

- Event Reportability Monitor - This system, developed as a pilot project for the Pacific Gas and Electric Company, provides expert assistance in determining the reportability of plant events in accordance with technical specification requirements and Code of Federal Regulation requirements.

- Limiting Conditions for Operation Monitor - This system, also developed as a pilot project for the Pacific Gas and Electric

Company, assists in assessing the status of plant components and equipment against the limiting conditions for operation in platechnical specifications. The system identifies any required corrective action, provides detailed explanation of the results and keeps a log of required actions and deadlines.

- Personnel Manager - This system was developed to assist plant management to monitor scheduling of nuclear plant operators and ensure compliance with the regulations concerning the use of overtime for nuclear plant operations personnel while ensuring the required staffing was maintained at all times. The system was developed for two different utilities with different operating shifts rotations and plant specific requirements.

Developed methods for verification and validation of expert system computer codes based on industry guidelines and accepted criteria for conventional codes. Applied these methods to systems developed and discussed above. Presented lecture to the NRC on methods of verification and validation as part of a lecture series on software quality assurance. Authored paper for ASME meeting in the Fall of 1990 on the subject of expert system verification and validation.

Reviewed and commented on environmental impact statements for proposed reactor facilities, radioactive waste disposal facilities and commercial power plant decommissioning.

Contributed technical analysis and guidance to computer software development firm engaged in producing an artificial intelligence-based system for training reactor operators in emergency procedure response. This involved the design of realistic yet workable user interface, evaluation and analysis of emergency procedures to assist in modeling correct operator actions, assisting in developing training text to be included in the system, and development of a simple plant simulation for use as an initial prototype. After procurement of a very detailed plant simulation, evaluated the plant behavior produced and created emergency scenarios for testing and demonstration of system capabilities.

1986 - Pickard, Lowe and Garrick, Inc. Consulting Engineer.

Conducted detailed review of technical specification surveillance test requirements for a nuclear power plant. This included detailed review of the implementing programs and procedures, and providing detailed comments for procedure revisions to ensure regulatory compliance. In this review, primary responsibility was for electrical and instrumentation and controls functions,

particularly control of emergency core cooling systems and primary containment isolation.

Conducted detailed review of technical specification requirements, technical specification basis, regulatory background, industry practice and implementing procedures at a nuclear power plant for required logic system functional testing and simulated automatic actuation testing of emergency core cooling systems and primary containment isolation. This work involved review of procedures against detailed system schematics to determine the adequacy of the procedures. Formulated procedure changes and technical response to solve a long-standing regulatory concern with the adequacy of these tests.

Reviewed plant-specific probabilistic risk assessment (PRA). Along with general evaluation, provided assessment of operational considerations and/or lessons resulting from the PRA.

Participated in procedure review and upgrade project. This project involved review of operations procedures as well as surveillance test procedure and preparation of revised procedures to improve technical accuracy and content, and to incorporate human factors considerations for enhancing ease of use and strict compliance.

1982 - 1986 - United States Navy, Division of Naval Reactors. Head, Reactor Plant Systems - New Design Submarine. Lead responsibility for reactor plant performance, safety and quality.

Conducted various trade-off studies to establish overall design criteria for new design reactor and propulsion plant. This included evaluation of possible performance maintainability, survivability, constructability and cost. Established general design characteristics for further development.

Evaluated various proposed core designs to determine optimum design to fit overall propulsion plant design goals. This included evaluation of thermal hydraulic performance, safety evaluation, normal plant response analysis and reactor structural design assessment, including response under shock loading.

Reviewed and approved conceptual system designs, performance criteria and detailed design bases. As design progressed, this included increasing levels of detail to system design descriptions, design calculations, component sizing, system schematics and construction details.

Participated in design of major plant components to ensure structural soundness, compliance with overall design goals and

ability to interface with other systems and propulsion plant arrangement.

Reviewed and approved design of reactor plant structures, such as component foundations. This was very important since effort was made to optimize designs to conserve weight and space while still meeting shock design requirements, satisfying construction constraints and retaining life-cycle maintainability. This work included detailed review of shock analysis and formulation of design modifications to eliminate areas of non-conformance. Also reviewed and approved arrangement and support of major piping to ensure structural capability and maintain adequate flexibility to account for all operating conditions, including ship motion.

Reviewed and approved plant arrangements. This involved participation in audits of the full-scale plant mockup, as well as drawing reviews. The reviews of the full-scale mockup focused on ensuring plant equipment was arranged so that ease of operation and maintenance were maintained within the technical constraints for performance and function.

Reviewed reactor and plant control system designs for compatibility with mechanical system designs and core performance and capabilities.

Reviewed and approved operating transient response predictions to be used in life-cycle evaluations of plant. This included detailed analysis of the reactor core response to various operating and abnormal transients, coupled with the connecting system responses. Thus, this involved evaluation of the core design thermal hydraulic response, as well as the dynamic fluid system response of primary and secondary systems.

Developed life-cycle plant operating profile based on mission requirements and data from previous submarine classes. This profile was used in establishing the detailed core design parameters necessary to achieve the desired core lifetime.

Had lead responsibility for design initiatives to mitigate the consequences of complete loss of AC power and to ensure safety of surrounding population if this type event occurred near port.

Participated in extensive effort to reduce plant weight. This involved evaluation of new materials, unique construction ideas, significant system design change from past practice and alternative design criteria. Each idea evaluated was considered for its total effort on capability, constructability, life-cycle cost and maintainability.

Participated in Naval Reactors crew quizzes for crews of operating submarines to test knowledge and ability of ship crew to safely and efficiently operate the propulsion plant. Responsibility was mainly for testing in the area of reactor plant mechanical system operation.

1980 - 1982 - United States Navy, Division of Naval Reactors. Head, Reactor Plant Systems - TRIDENT Submarines. Supervised engineering group. Directed efforts concerning design, construction, operation, maintenance, testing and configuration control of reactor plant fluid systems and structures for TRIDENT submarine. Similar duties in connection with land-based TRIDENT reactor plant prototype.

Responsible for shock design of shipboard reactor plant components and structures. Similarly, responsible for seismic design of structures, systems and components unique to land-based prototype. Seismic design was done to the same criteria imposed on commercial nuclear power plants.

Developed inservice test (IST) and inservice inspection (ISI) program for land-based prototype conforming to ASME Code, Section XI. Thus, these programs were in compliance with the requirements imposed on commercial nuclear power plants.

Responsible for design, acceptance testing, operation and maintenance procedure for emergency core cooling system for the land-based prototype. This system was designed to comply with NRC requirements imposed on commercial power plants for similar systems. This also included design of remote shutdown capability, ultimate heat sink and remote operating station habitability systems for long-term cooling if the normal operating stations became uninhabitable.

Responsible for preparation of reactor plant operating, maintenance and test procedures. This included monitoring of the test program performance, evaluation of test results and resolution of test program problems.

Evaluated operation incidents and established corrective actions based on these evaluations. Corrective actions could include design change or procedure changes.

Evaluated and resolved construction deviations from specified requirements. Deviations were evaluated for effect on functional capabilities, structural soundness, and effect on operability and maintainability. These evaluations included evaluation of effect on core thermal hydraulic performance, system response and plant

shielding, where applicable.

Participated in examination of prototype operating crews to evaluate level of knowledge and capability to safely operate the reactor plant.

Responsible for design, construction, operation and maintenance of support systems, such as process cooling water and associated cooling tower to support prototype operation.

1976 - 1980 - United States Navy, Division of Naval Reactors. Project Engineer, TRIDENT Class submarine propulsion plant design. Coordinated government laboratory and shipyard work in all phases of design, construction, operation, testing and maintenance of steam plant fluid systems for TRIDENT submarines and land-based TRIDENT submarine prototype.

Responsible for design of shipboard structures and piping systems in accordance with shock design criteria.

Responsible for preparation of verbatim compliance operating and maintenance procedures. This included performance of procedure verification and validation.

Responsible for design of safety systems unique to the land-based prototype, including compliance with NRC requirements for similar systems in commercial power plants.

Evaluated and resolved shipyard construction deviations for structures and systems under my cognizance. This included approval of as-built conditions of formulation, and approval of corrective actions.

Participated in the evaluation, analysis and resolution of large-scale shipyard error resulting in unapproved material substitutions. This involved tracking and identifying where incorrect materials had been used, evaluating and testing the acceptability of the material as-built, and approving the as-built condition or specifying the required rework.

Testimony

State of New Hampshire Decommissioning Finance Committee hearing on the Seabrook Nuclear Power Plant decommissioning funding, 1994

Mitsubishi Heavy Industries, Ltd (Japan) v. Finmeccanica S.p.A., Azienda Ansaldo (Italy), as successor in interest to Anslado S.p.A., International Court of Arbitration, Case Number 10269/OL/ESRT/TE, June 2001.

Tennessee Valley Authority v. United States of America, Case No. 01-249C, July 2005.

## Appendix B

## DOCUMENTS RELIED ON

Spreadsheet titled "HBPP ISFSI Damages 102705.xls

Spreadsheet titled "1999-2009 SAFSTOR 102205.xls

Spreadsheet titled "HBPP ISFSI Damages.xls

Spreadsheet titled "1999-2009 SAFSTOR.xls

Spreadsheet titled "ISFSI DCPP Damages 102705.xls

Spreadsheet titled "ISFSI DCPP Damages.xls

Deposition of Lawrence B. Pulley, July 27, 2005

Deposition of Robert Kapus, September 28 and 29, 2005

Deposition of Gregory A. Rueger, August 23, 2005

Deposition of William Stock, August 19, 2005

Deposition of Luther Jearl Strickland, Jr., August 18, 2005

Deposition of R. Alan Chapman, February 23, 2005 (TVA v. USA, Case No. 01-247C)

10 CFR Part 74, "Material Control And Accounting of Special Nuclear Material"

10 CFR 171 (1-1-95 edition through 1-1-06 edition), "Annual Fees For Reactor Operating Licenses, And Fuel Cycle Licenses And Material Licenses, Including Holders Of Certificates of Compliance. Registrations. And Quality Assurance Program Approvals And Government Agencies Licensed By NRC"

10 CFR 766, "Uranium Enrichment Decontamination and Decommissioning Fund; procedures for Special Assessment of Domestic Utilities"

10 CFR Part 170, "Fees For Facilities, Materials, Import and Export Licenses, And Other Regulatory Services Under the Atomic Energy Act of 1954, As Amended"

10 CFR Part 72, "Licensing Requirements for the Independent Storage of Spent Nuclear Fuel, High-Level Nuclear Waste, and Reactor-Related Greater Than Class C Waste"

PACD005154 to PACD005588, "HBPP SAFSTOR Non-Labor Costs, Order No. 2014988 - Rad Material Disposal, Binder 1 of 1, 1999-2004"

PACD044766, e-mail message from Barbara Clark to Robert Kapus, "Re: Transfer of Taiwan Earthquake Charges", 12/28/00

Invoices from Altran to PG&E Re: Feed/Steam Flow Scaling Design Change:
PACD050811 - 050812, PACD050814 - 050815 December 2000
PACD050817-050818 January 2001
PACD050820-050821, PACD0508023-0508024 February 2001

Invoices from LSA to PG&E on Steam Generator Replacement Project:
PACD056300 April 2004
PACD056302-056303, PACD056313, PACD056318, PACD056319 May 2004
PACD056305, PACD056307 June 2004
PACD056309, PACD056311 July 2004
PACD056324, PACD056326 September 2004
PACD056328, PACD056330 October 2004

PDCP0009771, PDCP0009772, PDCP0009768 and PDCP0009768 all dated 8/24/1992, HBPP Delivery Commitment Schedules

PHBP0034452, Appendix A, "Fixed Price Payment Allocation" of Contract 3500120394

PHBP0034453, Holtec Contract No. 3500120394

PHBP0059280, Holtec Contract No. 3500120394

NEIL 2004 Annual Report

NEIL 2000 Annual Report

NEIL 1999 Annual Report

Expert Report of Dr. Brad Cornell, 11/10/2005, Case No. 04-074, Pacific Gas And Electric v. United States of America

NRC News, No. IV-05-040, dated December 21, 2005, "NRC Staff Proposes $96,000 Civil Penalty Against PG&E For Spent Fuel Pool Storage Violations at Humboldt Bay"

Letter from Bruce S. Mallet, NRC Regional Administrator, to David H. Oatley, PG&E, EA-05-166 dated December 20, 2005, "NOTICE OF VIOLATION AND PROPOSED IMPOSITION OF CIVIL PENALTY - $96,000 (NRC Special Inspection Report No 050-00133/05-002)"

DOE website, www.oha.doe.gov/utility1.htm, regarding Nuclear Utility Assessments

GNSI website, www.gnsi-gnb.com/castor_.asp, regarding Design Features of the CASTOR cask

Transnuclear website, www.transnuclear/pdf/proj%20prgress.pdf, regarding H.B. Robinson/Brunswick/Crystal River project overview

NRC Inspection Manual, Inspection Procedure 60855; Operation of an Independent Spent Fuel Storage Installation," paragraph 04.02, dated March 3, 2002

Final Rule, Interim Storage of GTCC Waste, June 1, 2001

"NAC International S/T Storage Casks" by Ivan Stuart contained in Monograph on Spent Nuclear Fuel Storage Technologies, edited by E.R. Johnson and P.M. Severot, March 1997

"Westinghouse MC-10 Spent Fuel Storage Cask" by Hugh M. Costello contained in Monograph on Spent Nuclear Fuel Storage Technologies, edited by E.R. Johnson and P.M. Severot, March 1997

"Dry Spent Nuclear Fuel Management Lessons Learned", a paper presented June 9, 1999 by John P. Broschak, at an American Nuclear Society Professional Development Workshop in Boston, MA

"GNSI Spent Fuel Cask Technology", presentation on April 16, 2004 by W.J. McConaghy to Board on Radioactive Waste Management in Albuquerque, NM

Annual Capacity Report, December 1991, DOE/RW-0331P

Acceptance Priority Ranking & Annual Capacity Report, March 1995, DOE/RW-0457

Certificate of Compliance 72-1004, Amendment 5, January 7, 2004

Certificate of Compliance 72-1007, Amendment 4, February 3, 2003

Certificate of Compliance 72-1021, Amendment 1, February 20, 2001

Invoices with Bates Numbers:
PACD027236, PACD027748, PACD028673, PACD028679, PACD028725, PACD028751, PACD031953, PACD031788, PACD031799, PACD042041, PACD044807, PACD035324, PACD037874, PACD048035, PACD048165, PACD047993, PACD048222, PACD050066, PACD050028, PACD050116, PACD050124, PACD050148, PACD050148, PACD050164, PACD050169, PACD050176, PACD050180. PACD050178, PACD050215, PACD050343 PACD050348, PACD050366, PACD050374, PACD050390, PACD050406, PACD050416, PACD050488, PACD050555, PACD049917, PACD049922, PACD051273, PACD051446, PACD051008, PACD051081, PACD052451, PACD052479, PACD052482, PACDO53908, PACD053911, PACD053921, PACD053929, PACD053934, PACD053982, PACD055261, PACD055171, PACD055881, PACD055900, PACD055903, PACD055906, PACD055915 PACD055925, PACD056047, PACD056078, PACD056085, PACD056088, PACD056091, PACD056094, PACD056099, PACD056102, PACD056106, PACD056109, PACD056112, PACD056115, PACD056117, PACD056129,

PACD056133, PACD056138, PACD056369, PACD056372, PACD055542, PACD055546, PACD055550, PACD055868, PACD070139, PACD070146, PACD070172, PACD070195, PACD070227, PACD070231, PACD070249 PACD070256, PACD070270, PACD070276, PACD070295, PACD070309

## Appendix C

Humboldt Bay

| Bates | Vendor Name |
|---|---|
| PACD027236 | Bruce Norton & Associates |
| PACD027748 | Interiors Incorporated (Haworth Inc.) |
| PACD028673 | Cosby Home Service Company |
| PACD028679 | Pacific Mobile Structures |
| PACD028725 | Cosby Home Service Company |
| PACD028751 | Haberstock Construction |
| PACD031953 | Altran |
| PACD031788 | Altran |
| PACD031799 | Altran |
| PACD042041 | William Lettis & Associates |
| PACD044807 | GeoLabs, Inc. |
| PACD035324 | Enercon Services, Inc. |
| PACD037874 | William Lettis & Associates |

## Appendix D
Diablo Canyon

| Bates | Vendor Name | Bates | Vendor Name |
|---|---|---|---|
| PACD048035 | Altran | PACD055171 | Enova |
| PACD048165 | Altran | PACD055881 | D.B. Neish |
| PACD047993 | Altran | PACD055900 | D.B. Neish |
| PACD048222 | Goddard Claussen | PACD055903 | D.B. Neish |
| PACD050066 | GBH Distributing, Inc. | PACD055906 | D.B. Neish |
| PACD050028 | GBH Distributing, Inc. | PACD055915 | D.B. Neish |
| PACD050116 | Goddard Claussen | PACD055925 | D.B. Neish |
| PACD050124 | Goddard Claussen | PACD056047 | Enova |
| PACD050148 | Goddard Claussen | PACD056078 | Enova |
| PACD050148 | Goddard Claussen | PACD056085 | Enova |
| PACD050164 | Goddard Claussen | PACD056088 | Enova |
| PACD050169 | Goddard Claussen | PACD056091 | Enova |
| PACD050176 | Goddard Claussen | PACD056094 | Enova |
| PACD050180 | Goddard Claussen | PACD056099 | Enova |
| PACD050178 | Goddard Claussen | PACD056102 | Enova |
| PACD050215 | HGP | PACD056106 | Enova |
| PACD050343 | LSA Associates, Inc. | PACD056109 | Enova |
| PACD050348 | LSA Associates, Inc. | PACD056112 | Enova |
| PACD050366 | LSA Associates, Inc. | PACD056115 | Enova |
| PACD050374 | LSA Associates, Inc. | PACD056117 | Enova |
| PACD050390 | LSA Associates, Inc. | PACD056129 | Enova |
| PACD050406 | LSA Associates, Inc. | PACD056133 | Enova |
| PACD050416 | LSA Associates, Inc. | PACD056138 | Enova |
| PACD050488 | Transnuclear West | PACD056369 | Westinghouse Electric Co., LLC |
| PACD050555 | Geomatrix Consultants, Inc. | PACD056372 | Westinghouse Electric Co., LLC |
| PACD049917 | Enercon | PACD055542 | Aaron Reed & Associates, LLC |
| PACD049922 | Enercon | PACD055546 | Aaron Reed & Associates, LLC |
| PACD051273 | Bechtel Construction Company | PACD055550 | Aaron Reed & Associates, LLC |
| PACD051446 | Enova | PACD055868 | D.B. Neish |
| PACD051008 | Enova | PACD070139 | Bechtel Construction Company |
| PACD051081 | F. Randall Huey Consulting | PACD070146 | Cannon Associates |
| PACD052451 | William, Lettis, and Associates | PACD070172 | Enova |
| PACD052479 | William, Lettis, and Associates | PACD070195 | Enova |
| PACD052482 | William, Lettis, and Associates | PACD070227 | Enercon Services, Inc. |
| PACDO53908 | Enova | PACD070231 | Enercon Services, Inc. |
| PACD053911 | Enova | PACD070249 | Bechtel Construction Company |
| PACD053921 | Enova | PACD070256 | Cannon Associates |
| PACD053929 | Enova | PACD070270 | Enova |
| PACD053934 | Enova | PACD070276 | Enova |
| PACD053982 | Enova | PACD070295 | D.B. Neish |
| PACD055261 | Enova | PACD070309 | D.B. Neish |