No. 04-0074C, into which has been
consolidated No. 04-0075C
(Judge Hewitt)

---

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

PACIFIC GAS & ELECTRIC COMPANY,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

---

# DEFENDANT'S RESPONSE TO PLAINTIFF'S MOTION *IN LIMINE* TO EXCLUDE WARREN K. BREWER'S EXPERT TESTIMONY

---

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

HAROLD D. LESTER, JR.
Assistant Director

JOHN C. EKMAN
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, NW
Washington, D.C. 20530
Tel: (202) 353-0897
Fax: (202) 307-2503

Attorneys for Defendant

OF COUNSEL:

JANE K. TAYLOR
Office of General Counsel
U.S. Department of Energy
1000 Independence Ave., S.W.
Washington, D.C. 20585

SCOTT R. DAMELIN
JOSHUA E. GARDNER
SHARON A. SNYDER
Trial Attorneys
Civil Division
Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530

April 28, 2006

## TABLE OF CONTENTS

**PAGE**

SUMMARY OF ARGUMENT . . . . . 1

ARGUMENT . . . . . 2

I. STANDARD FOR ADMISSIBILITY OF EXPERT TESTIMONY . . . . . 2

II. MR. BREWER'S OPINIONS . . . . . 6

III. MR. BREWER'S EXPERTISE AND QUALIFICATIONS . . . . . 9

IV. MR. BREWER'S OPINIONS ARE BOTH RELEVANT AND RELIABLE . . . 16

A. Mr. Brewer's Identification Of Activities Contained In PG&E's Damages Claim That Would Have Occurred In The "But For" World Is Based Upon Specialized, Technical Knowledge . . . . . 16

1. Investigation of Taiwan Earthquake . . . . . 16

2. Costs of Storing Failed Fuel . . . . . 19

3. Visual Fuel Inspection . . . . . 21

B. Mr. Brewer's Opinion That Certain Cost Items Are Not Supported Do Not Constitute Inadmissible Evidentiary Determinations . . . . . 25

C. Mr. Brewer Is Not Offering Any Legal Opinions That Intrude Upon The Province Of The Court . . . . . 28

1. Used Fuel Document Discrepancy . . . . . 28

2. Part 71 Transportation License . . . . . 30

3. Greater Than Class C Low-Level Radioactive Waste . . . . . 31

V. MR. BREWER HAS THE EXPERTISE TO DETERMINE THE COSTS ASSOCIATED WITH LOADING SNF AT HUMBOLDT BAY IN THE "BUT FOR" WORLD . . . . . 34

CONCLUSION . . . . . 35

# TABLE OF AUTHORITIES

**CASES** **PAGE(S)**


Beech Aircraft Corp. v. Rainey,
488 U.S. 153 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Betterbox Communications Ltd. v. BB Technologies, Inc.,
300 F.3d 325 (3d Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

California Fed. Bank v. United States,
395 F.3d 1263 (Fed. Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Daubert v. Merrill Dow Pharmaceuticals, Inc.,
509 U.S. 579 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3, 4

Deal v. Hamilton County Bd of Educ.,
392 F.3d 840 (6th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

First Tennessee Bank Nat. Assoc. v. Barreto,
268 F.3d 319 (6th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

First Union Nat. Bank v. Benham,
423 F.3d 855 (8th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Forrest v. Beloit Corp.,
424 F.3d 344 (3d Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Kumho Tire Co. v. Carmichael,
526 U.S. 137 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Living Designs, Inc. v. E.I. Dupont De Nemours & Co.,
431 F.3d 353 (9th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Micro Chemical, Inc. v. Lextron, Inc.,
317 F.3d 1387 (Fed. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 5, 20

Pacific Gas & Electric Co. v. United States,
Nos. 04-74, 2006 WL 950207 (Fed. Cl. Mar. 30, 2006) . . . . . . . . . . . . . . . . . . . . . . . . 8

Rink v. Cheminova, Inc.,
400 F.3d 1286 (11th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Seaboard Lumber Co. v. United States,
308 F.3d 1283 (Fed. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

## TABLE OF AUTHORITIES (cont'd)

**CASES** **PAGE(S)**


TRW Title Ins. Co. v. Security Union Title Ins. Co., 887 F. Supp. 1029 (N.D. Ill. 1995) . . . . . . . . 27, 28

Tennessee Valley Authority v. United States, No. 01-249C (Fed. Cl.) . . . . . . . . 6, 10

Tyler v. Union Oil Co., 304 F.3d 379 (5th Cir. 2002) . . . . . . . . 5

United States v. Jones, 107 F.3d 1147 (6th Cir.), cert. denied, 521 U.S. 1127, 117 S. Ct. 2527, 138 L. Ed.2d 1027 (1997) . . . . . . . . 3

United States v. Lopez-Lopez, 282 F.3d 1 (1st Cir. 2002) . . . . . . . . 6

United States v. Mamah, 332 F.3d 475 (7th Cir. 2003) . . . . . . . . 5

United States v. Taylor, 239 F.3d 994 (9th Cir. 2001) . . . . . . . . 6

United States v. Urbina, 431 F.3d 305 (8th Cir. 2006) . . . . . . . . 5

United States v. Young, 316 F.3d 649 (7th Cir. 2002) . . . . . . . . 3

Westfed Holdings, Inc. v. United States, 55 Fed. Cl. 544 (2003), aff'd in part, rev'd in part, 407 F.3d 1352 (Fed. Cir. 2005) . . . . . . . . 33, 35


**STATUTES**


10 C.F.R.] 50.59 . . . . . . . . 15

10 C.F.R. Part 71 . . . . . . . . passim

10 C.F.R. 961.11, Art. VI. Appendix . . . . . . . . 9

Fed. R. Evid. 702 . . . . . . . . 4, 5

**TABLE OF AUTHORITIES (cont'd)**

Low-Level Radioactive Waste Policy Amendments Act of 1985 ("LLRWPA"), Pub. L. No. 99-240 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

## INDEX TO APPENDIX

DOCUMENT

Portions of Deposition Transcript of Warren K. Brewer,
Pacific Gas & Electric v. United States, No. 04-0074 (February 23-24, 2006) . . . . . . . . .1

Portions of Trial Testimony of Warren K. Brewer
Tennessee Valley Authority v. United States, No. 01-249 (July 12, 2005) . . . . . . . . . . . 36

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| PACIFIC GAS & ELECTRIC COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 04-0074C, into which has been consolidated No. 04-0075C (Judge Hewitt) |

DEFENDANT'S RESPONSE TO PLAINTIFF'S MOTION *IN LIMINE* TO EXCLUDE WARREN K. BREWER'S EXPERT TESTIMONY

Pursuant to Rule 16 of the Rules of this Court ("RCFC"), defendant, the United States, responds to the motion *in limine* filed by Pacific Gas & Electric Company ("PG&E"), regarding the expert testimony of the Government's technical expert, Warren K. Brewer.

SUMMARY OF ARGUMENT

PG&E's motion to exclude the Government's technical expert, Warren Brewer, rests upon a fundamental misunderstanding of the nature of Mr. Brewer's opinions, as well as the bases for these opinions. Indeed, the real thrust of PG&E's scattershot challenge to Mr. Brewer goes to the weight that PG&E believes the Court should give to Mr. Brewer's opinions rather than to his qualifications or the reliability of his conclusions.

As discussed below, Mr. Brewer has 30 years of experience in the nuclear industry, including substantial experience in the estimation of the costs associated with the handling and storage of spent nuclear fuel ("SNF"), as well as the licensing requirements associated with these activities – issues that are central to this case. Further, Mr. Brewer's opinions are both plainly relevant and helpful to the Court's understanding of the issues in this case and are based upon reliable principles. Consequently, the Court should deny PG&E's motion to exclude Mr. Brewer's opinions.

## ARGUMENT

### I. STANDARD FOR ADMISSIBILITY OF EXPERT TESTIMONY

The United States Court of Appeals for the Federal Circuit has explained that, under the Supreme Court's decision in Daubert v. Merrill Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), the Court has an obligation to screen expert testimony for both relevance and reliability. Seaboard Lumber Co. v. United States, 308 F.3d 1283, 1301 (Fed. Cir. 2002). Although the standard articulated by the Supreme Court in Daubert must be met even in non-jury cases such as this one, Seaboard Lumber Co., 308 F.3d at 1302, the "'gatekeeper' doctrine was designed to protect juries and is largely irrelevant in the context of bench trials." Deal v. Hamilton County Bd of Educ., 392 F.3d 840, 852 (6th Cir. 2004). Further, "the trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system." Micro Chemical, Inc. v. Lextron, Inc., 317 F.3d 1387, 1392 (Fed. Cir. 2003) (citing Advisory Committee Note to Federal Rule of Evidence 702).

Although the Supreme Court in Kumho Tire Co. v. Carmichael, 526 U.S. 137 (1999), expanded the Court's gatekeeping function under Daubert from "scientific" testimony to all expert testimony, the Court concluded that, in cases not involving scientific testimony, "[t]he factors identified in Daubert may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of the testimony." Id. at 150. In that circumstance, the Supreme Court explained that "the relevant reliability concerns may focus upon personal knowledge or experience." Id.; see Betterbox Communications Ltd. v. BB Technologies, Inc., 300 F.3d 325, 329 (3d Cir. 2002) (affirming the trial court's admittance of a marketing expert who opined upon the likelihood of confusion between two trademarks, and

concluding that testimony was based upon the witness's "personal knowledge or experience . . . rather than a methodology that satisfies the Daubert factors"); Living Designs, Inc. v. E.I. Dupont De Nemours & Co., 431 F.3d 353, 368 n.14 (9th Cir. 2005) ("Concerning the reliability of non-scientific testimony such as [Berly's], the 'Daubert factors . . . simply are not applicable to this kind of testimony, whose reliability depends heavily on the knowledge and experience of the expert, rather than the methodology or theory behind it") (citation omitted) (emphasis in original); United States v. Young, 316 F.3d 649, 657 (7th Cir. 2002) (affirming admission of psychiatric mental health nurse who offered testimony concerning domestic abuse victim's recantation, concluding that her methodology was reliable based upon her extensive experience and review of relevant documents in the case).

The United States Court of Appeals for the Sixth Circuit has explained the distinction in the sufficiency of expert methodology between scientific and non-scientific expert testimony:

> Contrary to First Tennessee's argument, the fact that Iorlano's opinions may not have been subjected to the crucible of peer review, or that their validity has not been confirmed through empirical analysis, does not render them unreliable and inadmissible. In United States v. Jones, 107 F.3d 1147, 1158 (6th Cir.), cert. denied, 521 U.S. 1127, 117 S. Ct. 2527, 138 L. Ed.2d 1027 (1997), this court recognized that the four specific factors utilized in Daubert may be of limited utility in the context of non-scientific expert testimony. We noted that "[i]f [the Daubert] framework were to be extended to outside the scientific realm, many types of relevant and reliable expert testimony – that derived substantially from practical experience – would be excluded. Such a result would turn Daubert, a case intended to relax the admissibility requirements for expert evidence, on its head. Id. at 1158. Indeed, even the Berry court itself recognized that "[t]he distinction between scientific and non-scientific expert testimony is a critical one[,]" and that Daubert is "only of limited help" in assessing technical or experiential expertise.

First Tennessee Bank Nat. Assoc. v. Barreto, 268 F.3d 319 (6th Cir. 2001) (rejecting application of Daubert reliability factors to banking expert's opinion concerning prudent lending practices because expert testimony "derived largely from [expert's] own practical experiences throughout forty years in the banking industry"). Ultimately, the inquiry under Rule 702 is a flexible one, Daubert, 509 U.S. at 594, and trial courts "have substantial discretion in deciding how to test an expert's reliability." Rink v. Cheminova, Inc., 400 F.3d 1286, 1292 (11th Cir. 2005) (citation omitted).

Under Rule 702, an expert witness must possess "specialized knowledge" regarding the area of testimony. Fed. R. Evid. 702. As then-Judge Alito, writing on behalf of the United States Court of Appeals for the Third Circuit, explained in discussing the requisite specialized knowledge necessary to qualify as an expert under Rule 702:

> "The basis for this specialized knowledge 'can be practical experience as well as academic training and credentials,'" and "[w]e have interpreted the specialized knowledge requirement liberally." However, "'at a minimum, a proffered expert witness . . . must possess skill or knowledge greater than the average layman . . . .'"

Betterbox Communications, 300 F.3d at 327-28 (citations omitted) (affirming admittance of marketing expert on the issue of the likelihood of confusion in certain trademarks based upon his experience in the field).

Under Rule 702, a witness may qualify as an expert "based on his own knowledge, skill experience, training or education." First Union Nat. Bank v. Benham, 423 F.3d 855, 862 (8th Cir. 2005) (citing Fed. R. Evid. 702). Further, the factual basis for an expert's opinion goes to the credibility of the testimony rather than the admissibility, and it is up to PG&E, the party challenging the admissibility of Mr. Brewer's testimony, to examine the factual basis for the

opinions through cross-examination. Id.; see Tyler v. Union Oil Co., 304 F.3d 379, 393 (5th Cir. 2002) (holding that attempt to show that expert's underlying data was unreliable is an issue to resolve upon cross-examination at trial). Indeed, where the parties' experts rely upon conflicting sets of facts, "it is not the role of the trial court to evaluate the correctness of facts underlying one expert's testimony" in determining whether they have appropriate expertise. Micro Chemical, Inc. v. Lextron, Inc., 317 F.3d 1387, 1392 (Fed. Cir. 2003).[1]

Further, pursuant to Federal Rule of Evidence 704, expert testimony is not objectionable simply because it embraces an ultimate issue to be decided by the fact-finder. See Beech Aircraft Corp. v. Rainey, 488 U.S. 153, 169 (1988) (recognizing that Federal Rules of Evidence 702 through 705 "permit experts to testify in the form of an opinion, and without any exclusion of opinions on 'ultimate issues'"); United States v. Urbina, 431 F.3d 305, 311 (8th Cir. 2006) (affirming expert testimony concerning *modus operandi* of drug traffickers because "a court can allow opinion testimony if the expert's specialized knowledge is helpful to the [fact-finder] to understand the evidence or determine a fact in issue, even if the opinion embraces an ultimate issue to be decided by the [fact-finder]"); Forrest v. Beloit Corp., 424 F.3d 344, 353 (3d Cir. 2005) (affirming expert testimony from biomechanical engineer that presence of a guard would have prevented plaintiff's injury, because expert may offer testimony concerning ultimate issue in case).

---

[1] This is to be distinguished from an expert who issues opinions that lack any arguable factual support, a situation which may be a proper basis for the exclusion of that expert's opinions. See United States v. Mamah, 332 F.3d 475, 477-478 (7th Cir. 2003) (affirming exclusion of sociologist and anthropologist as experts because they based their opinions upon insufficient facts or data).

At bottom, the Court must find that an expert's specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue. United States v. Lopez-Lopez, 282 F.3d 1, 14 (1st Cir. 2002) (affirming admittance of expert on the *modus operandi* of individuals importing drugs into the United States because expert's testimony was not within fact-finder's common knowledge); United States v. Taylor, 239 F.3d 994, 998 (9th Cir. 2001) (affirming admittance of academic expert on the relationship between pimps and prostitutes because "[b]y and large, the relationship between pimps and prostitutes is not the subject of common knowledge").

II. MR. BREWER'S OPINIONS

Mr. Brewer has offered technical opinions in this case based upon his 30 years of experience in the nuclear industry. These technical opinions may be grouped into one of four categories.[2] First, Mr. Brewer has offered opinions that certain activities included in PG&E's damages claims would have occurred regardless of DOE's delay. Brewer Op. 2.[3] These opinions are important because, if PG&E would have to have engaged in certain activities and incurred certain costs in the "but for" world, regardless of DOE's delay, those costs are not

---

[2] As apparent support for its motion, PG&E contends that "Mr. Brewer's resume fails to mention SNF even once." Pl. Mot. 6. Even if this were somehow a litmus test for expertise, which it plainly is not, PG&E's assertion is demonstrably incorrect. Indeed, on page 2 of Mr. Brewer's resume, he states that he has "[p]repared reports for state regulators concerning issues and evaluating costs estimates for decommissioning, low-level waste disposal and extended spent fuel storage." Brewer Op. A-2 (emphasis added).

[3] "Brewer Op. __" refers to Mr. Brewer's expert report in this case, which is attached as an exhibit to PG&E's motion *in limine*. For the Court's reference, we have attached as Appendix A to our response those pages of Mr. Brewer's deposition transcript in this case referred to in this response, and Appendix B is a copy of those pages of Mr. Brewer's trial testimony in Tennessee Valley Authority v. United States, No.01-249C (Fed. Cl.) referred to in this response.

incremental to DOE's breach and are not properly recoverable. See California Fed. Bank v. United States, 395 F.3d 1263, 1268 (Fed. Cir. 2005) (holding that non-breaching party may not "be awarded more than it would have received if the contract had been performed"). As discussed in more detail below, the activities that Mr. Brewer identifies as necessary in the "but for" world include: (1) PG&E's visual inspection of the SNF at its Humboldt Bay facility prior to the loading of the SNF into dry storage, Brewer Op. 5.A.1.1; (2) a used fuel document discrepancy discovered in the course of preparing the Humboldt Bay SNF for dry storage, Brewer Op. 5.A.1.2; (3) the disposal of certain low-level radioactive waste at Humboldt Bay, Brewer Op. 5.A.1.3; (4) PG&E's investigation of an earthquake in Taiwan, Brewer Op. 5.A.1.5; (5) activities related to obtaining a 10 C.F.R. Part 71 license at Humboldt Bay, Brewer Op. 5.A.1.9;[4] and (6) activities associated with steam generator replacement and feed/steam flow scaling design work at Diablo Canyon, Brewer Op. 5.A.2.1.a.

Second, Mr. Brewer has offered an opinion that, with respect to Humboldt Bay, PG&E has failed properly to consider the cost of loading SNF to DOE in the "but for" world and that such loading costs would have been significantly greater in the "but for" world than in the actual world. Brewer Op. 5.A.1.8. Mr. Brewer notes that PG&E's expert, Dr. Cornell, assumes that the cost of loading SNF to DOE in the "but for" world would have been the same as the cost of loading SNF into dry storage in the actual world. Id. Mr. Brewer concluded that, based upon a technical review of Humboldt Bay's capabilities in terms of fuel handling in the "but for" world,

[4] With respect to Mr. Brewer's opinion concerning PG&E's activities associated with obtaining a Part 71 transportation license, his opinion is slightly different than his other opinions. Rather than opine that PG&E would have needed a Part 71 license in the "but for" world, Mr. Brewer's opinion is that obtaining a Part 71 transportation license is unnecessary for the storage of SNF in either the "but for" or the actual world. Brewer Op. 5.A.1.9.

Humboldt Bay either would have had to loaded smaller truck casks, at a significantly greater cost to PG&E than the costs that PG&E will expend on the casks that will be loaded to its ISFSI, or would have had to modify its facilities to handle larger casks, resulting in the plant modifications contained in PG&E's claim having to have been incurred in the "but for" world regardless of DOE's delay. Id.

Third, Mr. Brewer has offered opinions that certain invoices do not contain sufficient information to allow him to determine whether the activities reflected in those invoices would have been necessary regardless of the Government's delay in SNF acceptance or whether the activities claimed in those activities are otherwise reasonable, Brewer Op. 5.A.1.4; 5.A.1.6; 5.A.1.7; & 5.A.2.1.b.[5]

Finally, Mr. Brewer has offered several opinions under the category of "General Comments," Brewer Op. 5.C.

- Under the Standard Contract, DOE has the discretion to remove from the "oldest fuel first" acceptance queue "other than standard

---

[5] Although Mr. Brewer also expressed similar opinions concerning claimed future activities in PG&E's damages claim, based upon this Court's March 30, 2006 decision precluding the recovery of damages that post-date December 31, 2004, Pacific Gas & Electric Co. v. United States, Nos. 04-74, 2006 WL 950207 (Fed. Cl. Mar. 30, 2006), Mr. Brewer will not express these opinions relating to PG&E's future damages at trial. Consequently, any challenge by PG&E related to these opinions is moot.

Similarly, in response to Mr. Brewer's expert report, PG&E provided supplemental binders of invoices in an attempt to provide sufficient detail for its claimed costs. In connection with these binders, PG&E explained that certain invoices upon which Mr. Brewer offered opinions, such as the invoices related to feed and steam systems and the steam generator replacement, Brewer Op. 5.A.2.1.a., were not being included in the damages claim. Although PG&E challenges Mr. Brewer's opinions with respect to these topics in a footnote in its motion, Pl. Mot. 11 n.17, because these activities are not being claimed as damages, Mr. Brewer will not be expressing an opinion at trial concerning the feed and steam systems and the steam generator replacement. Therefore, PG&E's challenge to these opinions also is moot.

fuel," as defined in Appendix E to the Standard Contract, if DOE determines that it is not "technically feasible" to handle such fuel on the same acceptance schedule as "standard" SNF. 10 C.F.R. 961.11, Art. VI. Appendix E classifies "failed fuel" as "other than standard fuel" subject to DOE's schedule adjustment. Id. App. E. Mr. Brewer has opined that, if DOE were entitled to delay the acceptance of Humboldt Bay's failed fuel, PG&E would not have any incremental operating and maintenance ("O&M") costs associated with its dry storage facility because O&M costs are independent of the number of assemblies stored in dry storage. Brewer Op. 5.C.1. Mr. Brewer further opines that, had PG&E decided to store its failed fuel in a dry storage facility for an indefinite period of time in the "but for" world, the costs associated with the design and licensing of such a facility would have been incurred regardless of DOE's performance and a portion of the construction costs for such a facility would have been incurred regardless of DOE's performance.

- PG&E possesses Greater Than Class C low-level radioactive waste ("GTCC"), which is covered by the Low-Level Radioactive Waste Policy Amendments Act of 1985 ("LLRWPA"), Pub. L. No. 99-240 (codified at 42 U.S.C. §§ 2021b-2021i), rather than the Nuclear Waste Policy Act ("NWPA"). Although the LLRWPA makes GTCC low-level radioactive waste disposal a Federal responsibility, it does not identify any specific deadlines by which DOE must act to accept or dispose of GTCC low-level radioactive waste or establish any specific deadlines by which DOE must enter into agreements with commercial utilities regarding their payment of costs associated with the acceptance and disposal of their GTCC low-level radioactive waste. Assuming that GTCC waste disposal is not covered by the Standard Contract, Mr. Brewer has opined that PG&E's storage of GTCC low-level radioactive waste in the Humboldt Bay dry storage facility, absent SNF, would not constitute an incremental O&M cost to PG&E because the costs of storing GTCC by itself would generally be comparable to the cost of storing SNF. Brewer Op. 5.C.2.

## III. MR. BREWER'S EXPERTISE AND QUALIFICATIONS

The Government is offering Mr. Brewer as an expert in the fields of nuclear engineering, nuclear fuel handling and storage, general regulatory requirements and licensing costs associated with the handling and storage of SNF, and operational issues associated with SNF. Recently, the

Court in Tennessee Valley Authority v. United States, 01-249C (Fed. Cl.), another spent fuel case involving alleged damages arising from DOE's delay under the Standard Contract, qualified Mr. Brewer as an expert on these identical subjects. Tr. 1840-1854 (Brewer) (TVA).[6]

Contrary to PG&E's assertion, Mr. Brewer has significant experience regarding the storage, maintenance, and handling of SNF. Mr. Brewer has worked as a nuclear engineer for almost 30 years, first as a naval officer and later as a civilian employee for the Division of Naval Reactors. Tr.1790:7-10 (Brewer) (TVA). Currently, Mr. Brewer serves as a principal for ABZ, Incorporated, a nuclear consulting firm. Tr.1790:10-11 (Brewer) (TVA).[7]

Mr. Brewer holds a masters degree in nuclear engineering from Massachusetts Institute of Technology and attended the Bettis Reactor Engineering School, a school run by the Bettis

---

[6] Mr. Brewer also has provided expert testimony on two previous occasions. First, Mr. Brewer has offered expert testimony concerning a review of cost estimates for the decommissioning of the Seabrook Nuclear Power Plant before the State of New Hampshire Nuclear Decommissioning Finance Committee. Tr.1802:8-17 (Brewer) (TVA). Second, Mr. Brewer offered testimony before an international arbitration tribunal concerning general engineering issues associated with heat recovery steam generators. Tr.1802:18-25 (Brewer) (TVA).

[7] In Mr. Brewer's deposition in this case, counsel for PG&E asked the following questions:

> Q: You told Mr. Shea at the TVA deposition some things about your background and experience, and I'm familiar with your answers there.
> I assume those were truthful?
> A: Yes.
> Q: If I asked you the same questions, you'd give me the same answers today?
> A: Yes.

Tr.6:8-16 (Brewer) (PG&E). Consequently, for purposes of this response, we refer both to Mr. Brewer's deposition testimony in this case, as well as Mr. Brewer's testimony in TVA.

Atomic Power Laboratory for the Division of Naval Reactors. Tr.1789:9-17 (Brewer) (TVA). Mr. Brewer's course of graduate level study at the Bettis Atomic Power Laboratory included nuclear physics courses, heat transfer of fluid flow, and reactor design, all of which culminated in the design of a nuclear reactor. Tr.1789:20-1790:4 (Brewer) (TVA).

While at the Division of Naval Reactors, Mr. Brewer held a variety of responsibilities, including "cradle-to-grave" maintenance of the nuclear reactors in naval ships. Tr.1790:12-19 (Brewer) (TVA). For example, Mr. Brewer was responsible for all activities related to initial concept design, detail design, construction, initial testing, operation, maintenance, refueling, and ultimate disposal and dismantlement of navy nuclear reactors. Tr.1790:19-23 (Brewer) (TVA). Mr. Brewer was responsible for both nuclear submarines and a land-based prototype reactor. Tr.22:12-22 (Brewer) (PG&E); Tr.1791:1-16 (Brewer) (TVA). In connection with this land-based prototype, Mr. Brewer was responsible for ensuring that all Nuclear Regulatory Commission ("NRC") licensing requirements were followed. Tr.1791:8-16 (Brewer) (TVA). Mr. Brewer also was responsible for the handling of SNF while in the Navy, including the review and approval of procedures to be used during the refueling process, ensuring that all preparatory activities had been completed (*i.e.*, that the shipyard had all the equipment necessary and that individuals were property trained), and, to the extent there were problems during the loading or refueling of fuel, helping to resolve those problem. Tr.24:2-13 (Brewer) (PG&E); Tr.1791:21-1792:10 (Brewer) (TVA).[8] Mr. Brewer was personally involved, in a managerial and

[8] Mr. Brewer also had responsibility for budgetary matters while working for the Navy, including the establishment of the annual operating budget for the section in which he worked. Tr.1792:11-20 (Brewer) (TVA).

oversight capacity, in approximately six refuelings while in the Navy. Tr.30:9-31:12 (Brewer) (PG&E).

Subsequent to his work in the Navy, Mr. Brewer worked as a commercial nuclear industry consultant, first at Pickard, Lowe & Garrick, and, for the past 19 years, as a principal at ABZ, Inc. Brewer Op. A-4; Tr.1793:1-21 (Brewer) (TVA). While at Pickard Lowe & Garrick, Mr. Brewer's work focused on operational considerations and regulatory compliance associated with commercial nuclear power plants. Brewer Op. A-4; Tr.1793:1-8 (Brewer) (TVA). Mr. Brewer's work while at ABZ has covered a wide variety of issues related to commercial nuclear reactors, including the estimation of costs associated with the maintenance and storage of SNF:

> Initially, most of our work centered on regulatory compliance, evaluating various programs at reactors and at utilities and how they complied with the regulations from testing and operation and helping in certain types of licensing efforts related to compliance with those regulations. Later on, we became involved fairly heavily in decommissioning cost estimating, which continues to be an activity we're engaged in.
>
> That activity has to do with evaluating the costs and activity necessary to dismantle and decommission a nuclear reactor facility and at least, as of the time we've become involved in that process, always includes the cost and methods for how you maintain, store and deal with spent fuel.
>
> * * * *
>
> One of the other big activities that we've engaged in, in ABZ, is what we call severe accident cost estimating. That has to do with estimating the cost of cleanup of facilities after a sever reactor accident. Those cost estimates are used by the utility, particularly the risk managers, to help them in determining how much nuclear property insurance to buy.
>
> Again, that particular function includes considerations of how do you get the fuel out of the core, now in a somewhat damaged state

> potentially, and what do you do with it and what does that mean in terms of costs?

Tr.1793:20-1795:4 (Brewer) (TVA) (emphasis added).

Mr. Brewer has been personally involved in approximately 12 different decommissioning cost estimates for commercial nuclear power plants and, with one exception, all have included the estimation of costs for storing and transporting SNF out of a utility's spent fuel pool. Tr.17:5-15; Tr.50:5-10; Tr.59:12-19; Tr.68:16-22 (Brewer) (PG&E); Tr.1798:17-1799:4 (Brewer) (TVA). Mr. Brewer was personally involved in each estimate of costs concerning an Independent Spent Fuel Storage Installation ("ISFSI"), which is a dry storage facility for SNF. Tr.81:9-11 (Brewer) (PG&E). Further, in connection with his decommissioning cost estimation work, as well as his consulting work in connection with the SNF litigation, Mr. Brewer has reviewed certificates of compliance for every cask design currently licensed by the NRC. Tr.50:13-56:14 (Brewer) (PG&E). Significantly, Mr. Brewer has been involved in the oversight of construction of an ISFSI in the course of his decommissioning estimate work:

> Yes, we've been involved over the past few years with the monitoring and commenting on the construction of the ISFSI at Southern California Edison's San Onofre facility, and that's being done, like I said, as part of the decommissioning cost estimating work we've done for them, to help them in understanding where they're headed, what that means to the cost, whether there are things we see where they might change what they're doing to do this more cheaply, so we've been involved in that for a few years.

Tr.1800:11-24 (Brewer) (TVA); Tr.92:8-10 (Brewer) (PG&E). Mr. Brewer personally reviewed information concerning how the San Onofre nuclear facility planned to operate its facility, including the planned staffing of the facility. Tr.92:13-93:2 (Brewer) (PG&E). These

decommissioning cost estimates have been accepted by rate-making authorities. Tr.1800:6-8 (Brewer) (TVA).[9]

Mr. Brewer also has significant experience working with the licensing requirements applicable to the regulation of nuclear utilities. For example, Mr. Brewer developed artificial intelligence programs to assist utilities in complying with regulatory issues. Tr.42:1-4 (Brewer) (PG&E). Further, Mr. Brewer previously was involved in the design basis reconstitution programs undertaken by nuclear utilities in the 1980s. Tr.1795:7-9 (Brewer) (TVA). These programs were a response to concerns at certain utilities that they did not have adequate documentation as to why their plants were designed in a particular manner and how the designs satisfied all the applicable licensing requirements and regulations. Tr.1795:10-14 (Brewer) (TVA). To address these issues, certain utilities instituted design basis reconstitution programs, in which Mr. Brewer had personal involvement reviewing all the design decisions that were made and calculations that were undertaken to confirm that there was a sufficient basis for and understanding of why a particular facility was designed in a particular manner. Tr.1795:14-24 (Brewer) (TVA). Indeed, as Mr. Brewer has explained, this review required significant familiarity with the regulatory requirements that govern nuclear plants:

> It does, and in fact, that's a large part of what the work is, looking at what the regulations require and how the design in fact complies with those regulations and why the decisions were made that were made to build it the way you did in order to satisfy the regulations. In particular, in my work at Southern California Edison on their design basis reconstitution program, I wrote the procedures that they used, that all design basis people used for evaluating what are called [10 C.F.R.] 50.59 changes.

---

[9] Mr. Brewer has published several articles related to decommissioning cost estimates. Tr.42:1-19 (Brewer) (PG&E).

> There's a section of the Code that allows utilities to make certain types of changes to the facility without getting approval of the NRC, and there's certain conditions that must be met in order for them to be allowed to make those kinds of changes. Like most regulations, the words aren't necessarily as clear as they might be, and in the process of this program, the issue was how do you go about reviewing that and how do you ensure that all the 50.59 changes that have been made are really satisfactory.

Tr.1796:3-24 (Brewer) (TVA).

Mr. Brewer also has been involved in other regulatory compliance and technical specification compliance issues, including surveillance test programs, in which Mr. Brewer has reviewed a utility's entire surveillance test program, evaluated the testing procedures, commented upon where they needed to be changed to satisfy the plant's license, and, in certain circumstances, actually rewriting the procedures to comply with the regulatory requirements. Tr.1797:10-1798:16 (Brewer) (TVA). Indeed, Mr. Brewer has assisted PG&E in the past in complying with the NRC's regulatory requirements. Tr.98:18-100:19 (Brewer) (PG&E).

As Mr. Brewer explained in his deposition in this case, his expertise related to issues associated with the loading of SNF into dry storage casks derives from his experience in estimating such costs in decommissioning cost studies, as well as his work analyzing SNF damages claims. Tr.45:6-46:18 (Brewer) (PG&E). Similarly, Mr. Brewer's expertise related to the regulatory requirements for the handling and storage of SNF derives from his work in estimating such costs in decommissioning cost studies:

> Q. Where did you get this expertise in handling and storage of commercial spent nuclear fuel that you just mentioned?
>
> A. Again, in doing decommissioning estimates, it's part of – by the time we started performing decommissioning estimates – "we" being ABZ – dry storage of fuel was part

> and parcel of that work. And in doing that, we needed to understand that to be able to do the estimates.
>
> We had clients who were building dry storage, and so, you know, we talked to them about that as part of – I mean, one of the first decommissioning cost estimates we did was for Calvert Cliffs. Calvert Cliffs at the time was just finishing their ISFSI. So that was incorporated into the estimate, and we dealt with them in terms of starting to learn the area.

Tr.48:10-49:6 (Brewer) (PG&E). As a result of Mr. Brewer's significant experience in the nuclear industry, he is knowledgeable concerning the functions that need to be performed in operating an ISFSI. Tr.83:14-19 (Brewer) (PG&E). Mr. Brewer also has visited multiple sites that contained operational ISFSIs and has observed the loading of SNF into casks. Tr.90:12-91:4 (Brewer) (PG&E). Consequently, and contrary to PG&E's contention, Mr. Brewer has substantial experience and expertise in the areas upon which he has opined: namely, the storage, maintenance, handling, and licensing requirements associated with SNF.

## IV. MR. BREWER'S OPINIONS ARE BOTH RELEVANT AND RELIABLE

### A. Mr. Brewer's Identification Of Activities Contained In PG&E's Damages Claim That Would Have Occurred In The "But For" World Is Based Upon Specialized, Technical Knowledge

#### 1. Investigation of Taiwan Earthquake

Contrary to PG&E's scattershot of arguments concerning his opinions, Mr. Brewer has significant experience and expertise in the areas of SNF handling, storage and licensing, he has applied this expertise in expressing his opinions in this case, and his technical opinions clearly are of assistance to the Court. PG&E first contends that Mr. Brewer's opinions concerning the identification of activities in PG&E's damages claim that would occurred in the "but for" world

do not rely upon any specialized knowledge and, therefore, are not helpful to the Court. Pl. Mot. 11. PG&E is mistaken.

Mr. Brewer has opined that the costs which PG&E has incurred associated with the investigation of an earthquake in Taiwan, and which it has charged to the Humboldt Bay facility, would have been incurred by PG&E in connection with the operation of the Diablo Canyon facility in the "but for" world. Brewer Op. 5.A.1.5. Based upon Mr. Brewer's knowledge that PG&E has an active seismic program for all of its facilities, and the fact that Diablo Canyon was an operating nuclear facility, Mr. Brewer concluded:

> [T]hat if all they had was the operating plant at Diablo Canyon, independent of spent fuel, they're running a reactor there, they would still be involved in this active program of seismic – about seismic issues, and they would still be investigating all these seismic events that happened around the world, including this Taiwan earthquake.

Tr.276:7-14 (Brewer) (PG&E). Mr. Brewer further explained at his deposition:

> I believe based upon the fact that Diablo Canyon has always been – seismic issues have always been a big issue with Diablo Canyon as most things in California. I think that they have always had a very active program.
>
> I think Mr. Reuger emphasizes that. I think that PG&E for example on their corporate Web site make a point about Diablo Canyon and how they're so interest in seismic evens.
>
> So I think they would have done this as a continued commitment to the NRC and probably the CPUC to continue operating Diablo Canyon.
>
> * * * *
>
> The simple fact that they designed the Diablo Canyon plant 3 times because of seismic issues. Seismic issues are and have been an extremely important part of history of Diablo Canyon.

> So I think as their people have said, as their Web site says, they investigate all seismic events around the world, virtually all.

Tr.278:13-279:2; Tr.282:7-15 (Brewer) (PG&E).

PG&E challenges Mr. Brewer's opinion on the grounds that he is not utilizing any "specialized knowledge," but instead relies upon Mr. Reuger's deposition testimony and the memorandum allocating costs between Diablo Canyon and Humboldt Bay. Pl. Mot. 12. Consequently, PG&E contends that Mr. Brewer's opinion is not helpful to the Court, as the Court is equally capable of reaching the same conclusion as Mr. Brewer. Id. PG&E's understanding of Mr. Brewer's opinion is mistaken.

Contrary to PG&E's contention, Mr. Brewer's opinion concerning the Taiwan earthquake study is based upon his experience and knowledge concerning the seismic requirements at operating nuclear facilities, rather than simply Mr. Reuger's deposition testimony and the memorandum allocating costs associated with the Taiwan earthquake study. With regard to Mr. Brewer's experience concerning seismic issues at nuclear facilities, as a project manager for the Trident submarine mechanical systems, he was responsible for the design of the support system for the submarines' nuclear equipment. Brewer Op. A-7. As Mr. Brewer states in his resume, he was "[r]esponsible for shock design of shipboard reactor plant components and structures, systems and components unique to land-based prototype. Seismic design was done to the same criteria imposed on commercial nuclear power plants." Brewer Op. A-7 (emphasis added). Further, while a consultant at ABZ, Mr. Brewer performed management and technical reviews of the seismic design of PG&E's Diablo Canyon power plant. Brewer Op. A-2. This work included an "evaluation of the programs for performance of the engineering and design, review of the seismic design audit conducted by an independent contractor, and review of the actual

seismic design criteria, assumptions, inputs and calculations." Id. Consequently, Mr. Brewer clearly possesses "specialized knowledge" concerning seismic issues at nuclear facilities that goes beyond that of a layperson, and this knowledge is of assistance to the Court. Betterbox Communications, 300 F.3d at 327-38 (explaining that "specialized knowledge" requirement is to be interpreted liberally and may be based upon practical experience as well as academic training and credentials). Mr. Reuger's deposition testimony and the memorandum simply confirm Mr. Brewer's independently held opinion, which is based upon his substantial experience involving seismic issues as commercial nuclear power plants, including PG&E's Diablo Canyon facility. PG&E's challenge to Mr. Brewer's opinion should be rejected.

2. Costs of Storing Failed Fuel

As discussed above, Mr. Brewer opines that, because the operation and maintenance ("O&M") costs for a dry storage facility are not dependent upon the number of SNF assemblies being stored, and to the extent that failed fuel is not subject to the same acceptance schedule as Standard SNF and would have been stored for an extended time in the "but for" world, PG&E would have had to incur the same O&M costs that it claims here regardless of DOE's delay. Brewer Op. 5.C.1. Further, Mr. Brewer opines that the cost to design and license a dry storage facility for failed fuel would be the same as the cost to design and license the Humboldt Bay ISFSI, and, therefore, to the extent that PG&E would have placed its failed fuel in dry storage in the "but for" world, the cost to design and license the Humboldt Bay ISFSI would have been incurred regardless of the Government's delay in SNF acceptance. Id. Finally, Mr. Brewer concludes that, because at least one of the five dry storage casks at Humboldt Bay will contain

failed fuel, PG&E would have to have incurred one-fifth of the cost to construct the ISFSI regardless of DOE's delay. Id.

PG&E challenges Mr. Brewer's opinion on the grounds that he is assuming a "hypothetical" situation where DOE delays the acceptance of failed fuel and that his analysis "consists of nothing more than applying basic math to uncontested facts." Pl. Mot. 13. PG&E's contentions are misplaced.

First, rather than rely upon a "hypothetical" situation, Mr. Brewer has assumed that the Government's position concerning DOE's acceptance of failed fuel is correct. To the extent that PG&E disagrees with the Government's position, such disagreement is not a proper basis for the exclusion of Mr. Brewer's opinion. Micro Chemical, 317 F.3d at, 1392 (holding that, where the parties' experts rely upon conflicting sets of facts, "it is not the role of the trial court to evaluate the correctness of facts underlying one expert's testimony").[10]

Second, contrary to PG&E's assertion that Mr. Brewer has done nothing more than apply "basic math" to determine the effect of extended failed fuel storage at Humboldt Bay, Mr. Brewer, based upon his training as a nuclear engineer and his extensive work on estimating dry storage costs in decommissioning cost studies, has offered opinions concerning the fixed and variable nature of different cost elements. For example, Mr. Brewer has offered an opinion that the O&M costs and the costs associated with the licensing and design of a dry storage facility are fixed costs, while costs associated with the construction of an ISFSI are variable costs. Indeed,

[10] Indeed, two of PG&E's experts, Frank Graves and Ivan Stuart, opine at great lengths about a "hypothetical" market for the exchange of DOE acceptance allocations and transportation campaigns, respectively, in the "but for" world. Under PG&E's apparent standard for expert testimony, the opinions of Messrs. Graves and Stuart are improper.

Mr. Brewer's opinion that the cost to operate a spent fuel storage facility is independent of the amount of fuel stored is not based upon a "hypothetical," and involves no math whatsoever. These determinations of variable and fixed costs are of assistance to the Court, which may not possess the technical expertise to make these determinations. Consequently, Mr. Brewer's ability to differentiate the different cost components associated with dry storage plainly requires "skill or knowledge greater than the average layman," Betterbox Communications, 300 F.3d at 327-28, and is properly the subject of expert testimony.

3. Visual Fuel Inspection

Mr. Brewer has opined that the visual fuel inspection that PG&E conducted at Humboldt Bay prior to loading the SNF into dry storage in the actual world would have been required had PG&E loaded SNF to DOE in the "but for" world regardless of DOE's delay. Brewer Op. 5.A.1.1. PG&E challenges Mr. Brewer's opinion on the ground that Mr. Brewer's opinion allegedly is not supported by "specialized knowledge." Pl. Mot. 14. However, even a cursory reading of Mr. Brewer's deposition in this case refutes PG&E's contention.

As Mr. Brewer explained in his deposition, based upon his extensive knowledge of the NRC's licensing requirements for specific casks, including his review of virtually every current cask's certificate of compliance, the visual inspection of fuel would be required prior to loading SNF into any cask – whether it be for on-site storage or for off-site shipment to DOE:

> Q. The purpose of the inspection was to make sure that the fuel that was being loaded into the containers met the requirements of the NRC license; is that right?
>
> A. I believe that's true, yes.

Tr. 161:21-162:3 (Brewer) (PG&E); Brewer Rep. 5.A.1.1 ("Such inspections are needed to ensure that the detailed actual condition and characteristics of the fuel meet the technical requirements of the license for the storage cask or transportation cask").

Mr. Brewer further explained:

> [I]t would be professionally irresponsible for anyone to take spent nuclear fuel without knowing what they're getting, so you got to tell them some way, and since they were going to put them in these storage casks, now is the time to look at the fuel assemblies.
>
> * * *
>
> Ultimately part of the goal is to say that fuel that I'm going to load into the cask – whether it be a transportation cask or a storage cask – meets the requirements of the specifics of compliance for that cask.
>
> * * *
>
> You're looking – the simple fact is, the certificate of compliance for any cask has requirements that says, the content of this cask can be this. And it describes that fuel, enrichments, burnups, whether or not I can have broken assemblies, what I have to do with the broken assemblies if I have them, whatever. So you are looking at assemblies so that you can, A, document what you will put in the casks, and, B, assure yourself and be able to ensure to the NRC later that in fact you've loaded only fuel that meets the requirements of those certificates.
>
> * * *
>
> So once again, I need to know – if I'm the plant operator, licensee, I need to know what I'm putting in those casks so that I can stand up and tell the NRC that I've met the requirements of the certificate in terms of what I've put inside the cask.

Tr.162:15-20; Tr.165:15-19; Tr.167:14-168:3; Tr.178:18-179:1 (Brewer) (PG&E). Further, as discussed above, Mr. Brewer's decommissioning estimate work has involved the review of cask certificates and requirements for cask contents, as well as the review of fuel inspection costs and

activities at other facilities. Tr.17:5-15; Tr.50:13-56:14; Tr.59:12-19; Tr.68:16-22 (Brewer) (PG&E); Tr.1798:17-1799:4 (Brewer) (TVA).

Mr. Brewer has relied upon his extensive specialized, technical knowledge of the NRC's regulatory and licensing requirements in offering his opinion concerning PG&E's visual inspection of the SNF at Humboldt Bay. Contrary to PG&E's assertion, Mr. Brewer confirmed his independent conclusion based upon a review of deposition testimony of PG&E employee Lawrence Pulley, who stated that the visual inspection of the SNF would have been required in the "but for" world, as well as PG&E employee Roy Willis, who stated that the purpose of the visual inspection was to comply with the cask license. Brewer Op. 5.A.1.1; Tr.160:21-161:18; Tr.176:19-177:6; 204:3-6; 209:3-9 (Brewer) (PG&E).

PG&E also claims that Mr. Brewer's opinion is a "tautology" because he does not rely upon "sufficient facts or data" as to the activities in which PG&E was involved to visually inspect its fuel prior to the loading into dry storage. Pl. Mot. 14. Although it is true that Mr. Brewer does not know each of the specific activities in which PG&E engaged to visually inspect its fuel, such knowledge, as Mr. Brewer explained in his deposition, is irrelevant to his opinion:

> Given the similarity of the certificates of compliance for transportation of storage casks in terms of its explanation about the allowed content, there is no reason that those inspections would be different in scope if that's the reason the inspection were being done.

Tr.180:9-14 (Brewer) (PG&E). Again, the basis for Mr. Brewer's opinion is (1) his understanding of the NRC's technical licensing requirements to load and store SNF; (2) his understanding of the requirements contained in various cask certificates of compliance; and (3) his knowledge, based upon his substantial decommissioning cost estimating experience, of the

types of inspection records and costs incurred by other utilities in the course of their visual inspections. Simply put, Mr. Brewer's opinion is based upon "sufficient facts or data" and does not constitute a "tautology."

Finally, PG&E claims that Mr. Brewer opined that "it would be prudent to re-inspect the SNF prior to loading" if "a certain amount of time had passed," and, therefore, because there may be additional visual fuel inspections in the future, he cannot know whether the work that would be required in the "but for" world will ultimately be the same as the visual inspection work required in the actual world. Pl. Mot. 14-15. PG&E has completely misconstrued Mr. Brewer's testimony.

When asked why PG&E could not simply rely upon paperwork instead of a visual inspection prior to loading SNF into dry storage, Mr. Brewer explained:

> Partly because the fuel may have degraded in some way in the interim between – even if I did an inspection of every assembly as I removed it from the reactor, I don't know what that looks like particularly in Humboldt Bay's case now, you know, even in 1998, you know, 40 years after they stopped running the plant, so I don't know anyone who would rely on records from 1968 to now load the fuel into a cask 40 years later – or 30 years later.

Tr.168:18-169:5 (Brewer) (PG&E). Indeed, when asked whether he believed that PG&E would have to conduct an additional visual inspection after PG&E loads its SNF into dry storage, Mr. Brewer stated, "I wouldn't do it, but someone else might decide they wanted to. I don't know that there would be a really good reason to do it." Tr.171:3-5 (Brewer) (PG&E). Mr. Brewer explained that, unlike newer SNF, "the fuel at Humboldt Bay is very old, very cold, it's going to be an inert environment inside the cask." Tr.195:14-196:2 (Brewer) (PG&E). In fact, Mr. Brewer stated that an additional visual inspection of the fuel would be highly unlikely after the

SNF is loaded into casks and the spent fuel pool is dismantled, because "you can't pull [the SNF] out in the air and look at them." Tr.194:2-9 (Brewer) (PG&E). Consequently, Mr. Brewer has not offered any opinion that it would be prudent or likely that PG&E would engage in an additional fuel inspection once PG&E loads its SNF into dry storage and, in fact, has offered an opinion to the contrary.[11]

B. Mr. Brewer's Opinion That Certain Cost Items Are Not Supported Do Not Constitute Inadmissible Evidentiary Determinations

As discussed above, Mr. Brewer has offered an opinion in this case that certain invoices lack sufficient information to make a determination as to whether the activities contained in those invoices would have been performed by PG&E regardless of the Government's delay in SNF acceptance and are otherwise reasonable. PG&E challenges Mr. Brewer's opinion on the ground that it "is nothing more than an intrusion on the Court's exclusive power to determine the sufficiency of PG&E's evidence." Pl. Mot. 9-10. PG&E has misconstrued Mr. Brewer's opinion concerning unsupported costs.

First, Mr. Brewer is not offering any opinion concerning whether certain invoices should be removed from PG&E's damages claim because they provide insufficient detail to determine whether the claimed costs would have been incurred in the "but for" world regardless of DOE's delay or whether these claimed costs are otherwise reasonable. Tr.554:22-555:8; Tr.555:14-18

[11] In fact, presumably the reason that PG&E pursued dual-purpose dry storage at Humboldt Bay was to facilitate decommissioning and to avoid the need to rehandle the fuel again, including engaging in additional fuel inspections. To the extent that PG&E has expended significant money to pursue a dual-purpose dry storage system that contains transportation features, but believes it ultimately will utilize DOE's transportation cask, PG&E's pursuit of dual-purpose dry storage is plainly unreasonable.

(Brewer) (PG&E). Consequently, Mr. Brewer has not offered any conclusions that intrude upon the province of this Court to weigh and consider documentary evidence.

Second, Mr. Brewer's opinion concerning the unsupported nature of certain invoices is helpful to the Court, as Mr. Brewer has applied the technical experience and expertise he possesses to identify where a particular invoice may relate to activities not related to the Government's delay in SNF acceptance, such as decommissioning activities:

> What I looked for – have looked for is understanding whether the work is something that in this case when they start talking about decommissioning work, the decommissioning is not by itself part of storing the fuel. It's part of decommissioning, something they would have had to do anyway.
>
> But you're absolutely right. The problem is, I can't tell from this, how does it connect to the fuel storage as opposed to just the normal decommissioning.

Tr.567:5-15 (Brewer) (PG&E).

Indeed, when asked to identify the expertise upon which he relied upon in reaching his conclusions concerning the unsupported costs, Mr. Brewer explained:

> It's not quite looking for the word ISFSI. It's looking for other activities that the plant would have to perform, like the decommissioning, like understanding what the PSDAR is. That's the expertise.
>
> It's really reading the descriptions and deciding whether these are activities uniquely related to the fuel storage or not.

Tr.568:22-569:7 (Brewer) (PG&E). Without Mr. Brewer's opinions, the Court would be unaware that a particular invoice could relate to activities other than SNF storage. Consequently, Mr. Brewer's opinion that certain invoices lack sufficient support to determine

whether they are related to activities that PG&E would have engaged in regardless of DOE's delay and are otherwise reasonable are of assistance to the Court.[12]

Finally, PG&E contends that, because Mr. Brewer stated that a PG&E fact witness, such as Robert Kapus, could potentially explain whether a particular invoice was related to DOE's delay or was otherwise reasonable, Mr. Brewer's opinions are not helpful to the Court. Pl. Mot. 10. In fact, PG&E's contention actually undermines its challenge to Mr. Brewer's opinion. Mr. Kapus is an engineer who presumably has the technical capability to make determinations as to whether a particular invoice relates to activities other than SNF storage. In fact, PG&E has identified Mr. Kapus as a "hybrid fact-expert" witness on its witness list, presumably precisely for this reason. Apparently, PG&E's position is that it may use its "hybrid fact-expert" witnesses to establish the incrementality of a claimed cost – which would not intrude upon the province of the Court – yet the Government may not present the testimony of its engineering expert that a particular invoice does not contain sufficient information to determine whether such activities would have been incurred in the "but for" world regardless of DOE's delay. This argument is both unprincipled and illogical.

---

[12] In this regard, Mr. Brewer's testimony is decidedly different than the expert testimony that the United States district court excluded in <u>TRW Title Ins. Co. v. Security Union Title Ins. Co.</u>, 887 F. Supp. 1029 (N.D. Ill. 1995). In that case, the expert simply added two dollar amounts together that were contained in two separate documents in an attempt to ascertain amounts received by the plaintiff. <u>Id.</u> at 1031. The court concluded that the expert provided no demonstrated expertise and simply relied upon documents that already were in evidence. <u>Id.</u> In contrast, Mr. Brewer is utilizing his expertise gained from years of developing decommissioning cost estimates to note where a particular invoice may relate to activities other than dry storage, such as decommissioning. Plainly, Mr. Brewer's opinions are more than simply a layman's reading of invoices.

C. Mr. Brewer Is Not Offering Any Legal Opinions That Intrude Upon The Province Of The Court

1. Used Fuel Document Discrepancy

PG&E argues that, because Mr. Brewer's "sole basis" for his opinion that the used fuel document discrepancy included in PG&E's damages claim would have been undertaken regardless of the Government's delay in SNF acceptance is the "legal" interpretation of the NRC's Notice of Violation and Proposed Imposition of Civil Penalty ("NRC Notice"), Mr. Brewer's opinion should be excluded. PG&E misconstrues Mr. Brewer's opinion.

Mr. Brewer opined that, because the document discrepancy at Humboldt Bay occurred before DOE would have performed in the "but for" world, and was independent of DOE's performance, the costs associated with the used fuel document discrepancy would have been incurred regardless of DOE's delay in SNF acceptance. Brewer Op. 5.A.1.2. Mr. Brewer explained that, in 2004, Humboldt Bay discovered a discrepancy in the records associated with its spent fuel pool inventory. Id. Mr. Brewer based his opinion upon his review of the description of the discrepancy, the requirements for fuel accountability contained in 10 C.F.R. Part 74, the facts contained in the NRC Notice, the timing of the event, and deposition testimony of PG&E's witnesses. Mr. Brewer explained in his deposition that the expertise upon which he relied in reaching this opinion involved:

> [m]y expertise in decommissioning, because I understand that the NRC is going to require the utility to demonstrate and assert that all the radioactive material has been accounted for and removed from the site before they're going to tear up your part 50 license.

Tr.230:12-21 (Brewer) (PG&E).

Indeed, as discussed above, Mr. Brewer has developed computer codes that implement the NRC's regulations, and these programs include the scheduling of surveillance tests, trending to equipment data, and compliance with the NRC restrictions on operator overtime. Brewer Op. A-3. This work required Mr. Brewer to know the regulations and understand how they would be implemented at several different plants. In addition, these projects required Mr. Brewer to understand the policies, programs, and procedures used to implement the regulations to develop the "rules" for the computer program that he created.

Further, Mr. Brewer explained the basis for his opinion that the costs associated with the document discrepancy would have occurred in the "but for" world:

> You're required – the NRC requires people to keep track of special nuclear material. They require them to do inventories on a periodic basis. It's a big deal.
>
> As part of decommissioning the plant, they would want to see those final inventories. So unless everybody dropped the ball and lost track of this, then it would be found as part of the NRC's review ultimately that you had adequately accounted for all the radioactive material on the site.

Tr.233:4-14 (Brewer) (PG&E).

In connection with this opinion, Mr. Brewer noted that the NRC Notice, which imposed a civil penalty upon PG&E for the discrepancy, stated that PG&E had multiple opportunities to identify and correct the discrepancy, first in 1966 and again in 1975. Id. Mr. Brewer is not offering any "legal" interpretation of the NRC Notice. He simply cites to facts contained in the NRC Notice as further support for his opinion that the document discrepancy is unrelated to DOE's performance under the Standard Contract and, therefore, would have occurred in the "but for" world. Indeed, Mr. Brewer's opinion is based upon his knowledge of decommissioning

activities and his knowledge of the requirements for the control of special nuclear materials, including SNF. Consequently, PG&E's contention that Mr. Brewer is offering a legal interpretation of the NRC Notice is simply incorrect.

2. Part 71 Transportation License

PG&E next contends that Mr. Brewer has impermissibly engaged in a legal interpretation of the Standard Contract and the Code of Federal Regulations in concluding that the costs associated with obtaining a 10 C.F.R. Part 71 license are not required for the storage of SNF. Pl. Mot. 16-17. PG&E is mistaken.

Mr. Brewer has offered an opinion that a Part 71 cask transportation license is not a technical requirement for the storage of SNF under Part 72 of the Code of Federal Regulations. Brewer Op. 5.A.1.9. Mr. Brewer's conclusion is based upon a review of the technical scope of work related to obtaining a cask transportation license contained in PG&E's Holtec contract; an understanding of the fact that 10 C.F.R Part 71 provides for licensing casks for transportation of fuel, whereas 10 C.F.R. Part 72 provides for licensing of casks for storage; an understanding that a transportation license pursuant to 10 C.F.R. Part 71 license is not needed for the storage of spent nuclear fuel; and direction by DOJ counsel that, under the Standard Contract, DOE is obligated to provide casks for transport of PG&E's spent fuel.

As discussed above, Mr. Brewer has significant experience in the rules, standards, and guidance concerning the NRC's licensing process. His experience includes the preparation of license applications and the procedures needed to comply with the license. He was responsible for the implementation of the license requirements at a Naval Reactors nuclear prototype designed to meet all NRC requirements and performed evaluations of license activities at nuclear

power plants. Indeed, Mr. Brewer's experience extends beyond the NRC regulations to the science and engineering that forms the basis for the regulations. This experience is more than sufficient to allow Mr. Brewer to offer the opinion that Part 71 licensing is unnecessary for the storage of SNF, and that only Part 72 licensing is necessary. PG&E's contention that Mr. Brewer is offering a legal opinion concerning the Code of Federal Regulations or the Standard Contract is incorrect.

3. Greater Than Class C Low-Level Radioactive Waste

Mr. Brewer has offered an opinion that the O&M costs associated with the storage of Greater Than Class C low-level radioactive waste ("GTCC") by itself would generally be the same as the O&M costs associated with either the storage of SNF by itself or the storage of SNF with GTCC. Brewer Op. 5.C.2. Mr. Brewer based his conclusion upon the fact that:

> Storing GTCC waste by itself requires security and monitoring to protect the health and safety of the public and site workers similar to the requirements for storing spent fuel assemblies. The required staffing and operating costs to maintain such a GTCC storage facility are essentially identical to those for a facility to store spent nuclear fuel.

Id.

PG&E claims that Mr. Brewer has impermissibly offered a legal conclusion because he has interpreted NRC regulatory guidance in reaching his conclusion. Pl. Mot. 17-18. PG&E's argument is without merit for several reasons.

First, as discussed above, Mr. Brewer possesses significant experience and expertise related to the NRC's licensing requirements concerning the storage and handling of SNF, including the application and interpretation of 10 C.F.R. Part 30, 10 C.F.R. Part 50, and 10 C.F.R. Part 72, as well as the 10 C.F.R. Part 72 rule making. Further, Mr. Brewer has substantial

experience in estimating the cost of decommissioning a nuclear power plant, including the costs to design, license, and construct an ISFSI. Tr.17:5-15; Tr.50:5-10; Tr.59:12-19; Tr.68:16-22 (Brewer) (PG&E); Tr.1798:17-1799:4 (Brewer) (TVA). This knowledge of costs is, in turn, based upon an understanding of the engineering, design, and safety principles that are the basis for all activities that are necessary for the safe storage of SNF in an ISFSI. Mr. Brewer's detailed understanding of these safety principles is obtained both from his formal education and training in nuclear disciplines as well as a practical application of those principles in the nuclear industry. In addition, based upon his experience in preparing decommissioning cost estimates, as well as his understanding of the major costs associated with SNF storage, Mr. Brewer is aware that the major cost driver for storage post-9/11 is security, and Mr. Brewer has opined that these security requirements would be essentially the same as for SNF absent a detailed demonstration by the utility that the GTCC would pose a significantly lower risk than the storage of SNF. Brewer Op. 5.C.2; Tr.493:14-494:10 (Brewer) (PG&E).

Consequently, applying this knowledge and experience working with the NRC's highly technical regulatory requirements, Mr. Brewer concluded that, if a GTCC-only storage facility were to be licensed by the NRC, the NRC would begin its review and approval process by reference to the requirements in Part 72 (storage of SNF) and, in the absence of any demonstration that the potential risk was less for the storage of GTCC-only compared to the storage of SNF alone or SNF and GTCC, the storage requirements would be the same. Tr.486:19-487:7; 492:5-13 (Brewer) (PG&E). Certainly, Mr. Brewer's understanding of the complicated and technical nature of the NRC's regulations and technical guidance is of assistance to the Court. Further, Mr. Brewer is not offering any "legal interpretation" concerning

the NRC's technical guidance, but rather is utilizing his knowledge and expertise concerning the NRC's licensing requirements to offer an opinion concerning the requirements for the storage of GTCC.

Second, Mr. Brewer's reliance upon conversations that he has had with Francis Young, a Senior Transportation Program Manager at the NRC, to confirm his understanding of the NRC's requirements for the storage of GTCC is not an attempt to "back door" hearsay statements into evidence, as PG&E suggests. Indeed, as Federal Rule of Evidence 703 itself plainly states, "the facts or data [upon which an expert witness relies] need not be admissible in evidence in order for the opinion or inference to be admitted." Indeed, the Government has identified Mr. Young as a witness in this case who may be called to testify "about the management of GTCC by nuclear utilities," Def. Exhibit List, at 4, and Mr. Young offered testimony about issues associated with the storage of GTCC in the Yankee cases.[13]

Third, PG&E's assertion that Mr. Brewer has engaged in impermissible legal interpretation by relying upon the NRC's regulatory guidance and NRC staff members is all the more disingenuous given that PG&E's own "expert," Michael Meisner, has opined in precisely the same manner. Indeed, although Mr. Meisner takes issue with Mr. Brewer's conclusions

[13] PG&E's reliance upon this Court's decision in Westfed Holdings, Inc. v. United States, 55 Fed. Cl. 544 (2003), aff'd in part, rev'd in part, 407 F.3d 1352 (Fed. Cir. 2005), for the proposition that Mr. Brewer's reliance upon discussions he had with NRC officials is a basis for exclusion is misplaced. In Westfed, the plaintiff challenged the testimony of the Government's expert, Dr. Hamm, in part based upon Dr. Hamm's reliance upon facts that were not in evidence. Id. at 574. In this case, as discussed above, Mr. Brewer's opinion concerning the NRC requirements for the storage of GTCC is based only in part upon his conversations with Mr. Young. More fundamentally, although the Court expressed concerns with certain of Dr. Hamm's opinions in Westfed, it ultimately denied the plaintiff's motion to strike and qualified Dr. Hamm as an expert. Id. at 575.

concerning the storage of GTCC low-level radioactive waste, he does so by imposing his own interpretation upon various NRC regulations and staff guidance, as well by reliance upon an unidentified NRC employee. PG&E's contention that Mr. Brewer's reliance upon NRC regulations and guidance is inappropriate, while presenting an expert with precisely the same manner of analysis simply demonstrates the overreaching nature of PG&E's argument.

## V. MR. BREWER HAS THE EXPERTISE TO DETERMINE THE COSTS ASSOCIATED WITH LOADING SNF AT HUMBOLDT BAY IN THE "BUT FOR" WORLD

In contrast to PG&E's criticism of Mr. Brewer's failed fuel opinion as involving "simple math," PG&E takes the opposite tack with Mr. Brewer's estimation of "but for" loading costs at Humboldt Bay and faults Mr. Brewer for relying upon "complex, interrelated accounting assumptions" that go "well beyond the scope of his expertise." Pl. Mot. 18. This argument borders on the frivolous.

Mr. Brewer is not relying upon any accounting experience in estimating the loading costs for Humboldt Bay in the "but for" world. Rather, he is relying upon his background as a nuclear engineer with almost 20 years of experience in estimating the costs for storing and transporting SNF out of a utility's spent fuel pool in connection with decommissioning cost estimates. Tr.17:5-15; Tr.50:5-10; Tr.59:12-19; Tr.68:16-22 (Brewer) (PG&E); Tr.1798:17-1799:4 (Brewer) (TVA). The "advanced concepts" and "complex calculations" upon which PG&E complains Mr. Brewer relies are nothing more than well-established cost estimation techniques that Mr. Brewer has used for numerous utilities in the course of decommissioning cost estimation. Indeed, Mr. Brewer's estimates have been accepted by public utility commissions, state agencies, and nuclear insurance companies. In addition, Mr. Brewer has testified before

state regulators on the adequacy of a particular decommissioning cost estimate and assisted in the preparation of testimony for rate hearings on decommissioning trust funding. Brewer Op. A-2. Similarly, Mr. Brewer has prepared reports for state regulators concerning issues and evaluating cost estimates for decommissioning, low-level waste disposal, and extended spent fuel storage. Id. In fact, Mr. Brewer has provided training to state regulators on both decommissioning technology and on the methodology of decommissioning cost estimating. In short, Mr. Brewer plainly has the requisite expertise to engage in the "but for" loading cost analysis that he performed in this case.

## CONCLUSION

For the foregoing reasons, the Government respectfully requests that the Court deny PG&E's motion to exclude the expert testimony of Mr. Brewer.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/ Harold D. Lester, Jr.
HAROLD D. LESTER, JR.
Assistant Director

OF COUNSEL:

JANE K. TAYLOR
Office of General Counsel
U.S. Department of Energy
1000 Independence Ave., S.W.
Washington, D.C. 20585

SCOTT R. DAMELIN
JOSHUA E. GARDNER
SHARON A. SNYDER
Trial Attorneys
Civil Division
Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530

s/John C. Ekman by Joshua E. Gardner
JOHN C. EKMAN
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, NW
Washington, D.C. 20530
Tel: (202) 353-0897
Fax: (202) 307-2503

April 28, 2006

Attorneys for Defendant

CERTIFICATE OF SERVICE

I hereby certify that on this 28th day of April, 2006, a copy of foregoing "DEFENDANT'S RESPONSE TO PLAINTIFF'S MOTION *IN LIMINE* TO EXCLUDE WARREN K. BREWER'S EXPERT TESTIMONY" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/Joshua E. Gardner