Page 98

Q. Is that right?
A. I would think that would generally be the case.
It's not out of the total realm of possibility he could issue something that I disagreed with, because we don't always agree on everything.
I don't recall there being any issues about which we had significant disagreement.
Q. Thank you.
He told me in the Yankee cases that he did a prudency review for Pacific Gas & Electric while he was at Pickard Lowe & Garrick.
Were you involved in that prudency review?
A. I was not.
Q. Have you ever done any work for Pacific Gas & Electric?
A. Yes, I have.
Q. Are these listed on your resume?
A. I don't know.

Page 99

Q. One of them I would describe as an event reportability monitor.
A. Yeah.
Q. When was that?
A. My best recollection is, we're talking about '88, maybe. That was for the regulatory affairs group.
MR. GARDNER: Jerry, I'd refer you to A 2 -- actually A 1 and A 2.
MR. STOUCK: Is that where it is?
MR. GARDNER: Yep.
Last paragraph on A 1, over to A 2.
MR. STOUCK: Thank you very much.
BY MR. STOUCK:
Q. Right.
And then -- oh, okay.
And then --
MR. GARDNER: Of exhibit 1.
BY MR. STOUCK:
Q. What about limiting conditions for operations monitor?
Do you recall that?

Page 100

A. Yeah.
Q. What was that?
A. You want me to describe what that system is?
Q. No.
What your work was.
A. Again, it was with the regulatory affairs department, and it was talking about -- it was looking at developing a system to assist operators in complying with the limiting conditions for operations parts of the technical specifications that are part of the license, and in analyzing -- to help them analyze the complex relationship between operability of equipment to decide when they needed to take certain actions dictated by the license.
So it was an operator aid, if you will, to understanding the interconnections of the plant.
Q. Diablo Canyon?
A. It was more general than that, but it would not have been related to Humboldt Bay.

Page 101

Q. When was that work done?
A. About that same time. It would have been the late '80s. I don't recall exactly when, but in that time frame.
Q. While you were at ABZ?
A. Yeah.
I never did any work for PG&E at Pickard Lowe & Garrick.
Q. But you were personally involved in both of these 2 projects?
A. That's correct.
Q. And both of them were related to testimony that was submitted to the California Public Utilities Commission?
A. Neither of those related to them.
Q. Your resume says they did.
Oh, I'm sorry.
FERC?
A. Neither of those are anything to do with FERC.
Q. These were just internal reports to management?

Page 158

remember seeing them.
BY MR. STOUCK:
Q. But you do agree that the ones you cite don't have that source designation?
A. That is correct.
Q. So you were looking at the ones that did not have the source, parentheses?
MR. GARDNER: Objection to the extent it mischaracterizes Mr. Brewer's previous testimony.
A. The ones that I cite here don't have that. Those are the ones I was looking at to make the connection with the cost here.
BY MR. STOUCK:
Q. We may have covered this, but I'm not sure.
When you say you don't remember looking at a spreadsheet that had the title with the parentheses, source, does that mean those were available to you, or were they, and you didn't happen to look at them, or did you only have available to you the spreadsheets that you

Page 159

cite here?
MR. GARDNER: Objection, compound.
A. I had other spreadsheets besides those as I think I said before.
Whether or not I had one that said, source, on it or not, I don't know. All the spreadsheets that I had, I looked at, whatever that set is.
BY MR. STOUCK:
Q. Tell me what that set is, because I will tell you that I believe we gave to the government all the spreadsheets that are cited on that page I showed you. Some of those do have this paren, source, paren.
Were those available to you or not available to you?
A. The best answer I can give you is, I don't believe I had any spreadsheets with the paren, source, in the title.
Q. So that implies to me that somebody, maybe counsel for example, gave you a set of spreadsheets and said -- maybe it was a big set,

Page 160

but there was a set that was handed to you by someone rather than you selecting the spreadsheets that you looked at; is that correct?
MR. GARDNER: Objection to the extent it mischaracterizes Mr. Brewer's' testimony.
A. I was given a set of spreadsheets. I did not -- I did not make a request from some bigger list. I was given a set.
BY MR. STOUCK:
Q. Okay. By counsel?
A. Yes.
Q. Do you know when this visual inspection you talk about took place?
A. I don't remember now. I really don't remember the year it took place, no.
Q. That doesn't matter to you?
A. Doesn't matter to my opinion.
Q. For what purpose was the inspection done?
A. The purpose, and I believe that Mr. Willis expressed this opinion as well -- it

Page 161

was done because it was necessary to confirm that the fuel that they were going to load into the storage casks would meet the requirements of the NRC license for those casks. And I agree with what he said, that that's the way you go about making sure that's the case.
Q. Are you sure it was Willis?
Because you cite Pulley.
A. The thing I'm talking about is Mr. Willis. Mr. Willis when asked the question whether or not it would be necessary in the but-for world I believe never reached a conclusion. He said, I know why we did it. I'm not sure what the but-for world would be if DOE were showing up.
Mr. Pulley on the other hand offered a concrete answer when asked the question about would it be needed in the but-for world.
Q. Let's talk about your opinions.
A. Sure.
Q. The purpose of the inspection was to make sure that the fuel that was being loaded

into the containers met the requirements of the NRC license; is that right?
A. I believe that's true, yes.
Q. Any other purpose for the inspection?
A. Ultimately, it would also serve the purpose to be able to tell the DOE when they're going to accept your fuel the state of that fuel.
Q. How do you know that?
A. What do you mean?
Q. How do you know that that is a purpose that this inspection -- these inspection results could be put to?
A. There's not a document that says that, but it would be professionally irresponsible for anyone to take spent nuclear fuel without knowing what they're getting, so you got to tell them some way, and since they were going to put them in these storage casks, now is the time to look at the fuel assemblies.
Q. I thought -- you don't think DOE is going to open these cans again and look at the



fuel?
A. I don't know whether DOE is going to open those cans again before they take the stuff to the mountain. I have no opinion about that. I don't know the answer to that.
Q. Let's come back to that.
Do you know if DOE will have to inspect the fuel again before loading the ISFSI?
Take a step back.
You know the fuel is still in the pool.
Right?
A. Yes.
Q. So loading the ISFSI is in the future.
Correct?
A. That is correct.
Q. Do you know if PG&E will have to inspect the fuel again before loading the ISFSI?
A. I do not believe there's a reason for PG&E to reinspect the fuel unless they conclude their previous inspection was



insufficient for some reason.
Q. Didn't ask about a reason.
Do you know if PG&E will have to inspect the fuel again -- will inspect the fuel again?
Do you know if they're going to inspect the fuel again before loading the ISFSI?
A. I see nothing that says they're going to inspect it again, and I know of no reason to do that if the initial inspection was complete.
Q. Is it possible for -- would it be possible for PG&E to load their ISFSI without inspecting the fuel, without performing this inspection that they've performed?
A. I don't believe so.
Q. Can't load an ISFSI without inspecting the fuel?
A. At some point in time.
Q. Have you ever participated yourself in the inspection of commercial spent nuclear fuel?



A. No.
Q. How about any spent nuclear fuel?
A. No.
Q. What do you mean in your answer to say my last 2 questions by, inspection?
What are we talking about?
What is an inspection in this context?
A. In this context, you're visually looking at the fuel to ascertain the state of the assemblies. The state of the assemblies can mean anything from missing pieces, broken pieces, cladding failures of whatever size, big, small, whatever.
Ultimately part of the goal is to say that that fuel that I'm going to load into the cask -- whether it be a transportation cask or a storage cask -- meets the requirements of the specifics of compliance for that cask.
Q. Visual inspection, does that mean that the cost that you reference without putting a dollar sign on it in footnote 4 are labor

Page 166

costs?
A. I believe they are probably both labor cost and some equipment costs.
Q. What kind of equipment is used in a visual inspection?
A. You're going to have to have remote viewing equipment like cameras and such, because you can't -- unlike new fuel where I can sit the fuel up and walk over and look at it, I can't do that with spent fuel.
Q. So the eyes are not necessarily human eyes in this context?
A. That's correct, not directly at least.
Q. You mentioned that they were looking at the state of the assembly, missing pieces, broken pieces, cladding failures.
All of that to me connotes in some sense failed fuel.
Will you accept that characterization?
Is that what this inspection is

Page 167

focused primarily on, to determine how much and what kind of failed fuel there is?
Is that most or all of what's going on?
A. Let me try a little different approach.
Q. Okay.
A. If I were talking to another engineer, I would probably put it in exactly those terms, that they're looking for, quote, failed fuel, but I know that failed fuel has a contractual connotation here too, so I don't want to confuse those 2.
You're looking -- the simple fact is, the certificate of compliance for any cask has requirements that says, the content of this cask can be this. And it describes that fuel, enrichments, burnups, whether or not I can have broken assemblies, what I have to do with the broken assemblies if I have them, whatever. So you are looking at the assemblies so that you can, A, document what you put in the casks, and

Page 168

B, assure yourself and be able to ensure to the NRC later that in fact you've loaded only fuel that meets the requirements of the certificate.
Q. Why can't all those characteristics that you just mentioned -- those characteristics go beyond -- and I'm not talking about contractual requirements. Failed fuel is not really a technical term, but I'm talking about the technical aspect of failed fuel for now. You mentioned things that go beyond that like enrichment and burnup.
A. Absolutely.
Q. Why can't all of those characteristics that you just mentioned, enrichment, burnup, broken pieces, cladding failures, be determined from paperwork without need for additional visual inspection?
A. Partly because the fuel may have degraded in some way in the interim between -- even if I did an inspection of every assembly as I removed it from the reactor, I don't know what that looks like particularly in Humboldt Bay's

Page 169

case now, you know, even in 1998, you know, 40 years after they stopped running the plant, so I don't know anyone who would rely on records from 1968 to now load the fuel into a cask 40 years later -- or 30 years later.
Q. If this inspection was done in 2000 and if the ISFSI is going to be loaded in 2007, would you rely on that inspection, or would you need another visual reinspection?
MR. GARDNER: Objection, vague.
A. Largely, I think you probably could rely on that inspection.
Now, if you found assemblies where there had been degradation of certain types, one might want to look at them again, but most of these things don't happen in relatively short time periods like that.
BY MR. STOUCK:
Q. How would you know if you had to do another inspection without doing an inspection?
A. No. You mischaracterized what I'm saying.

Page 170

If I -- I know what the fuel was when I took it out of the reactor, or I have some indication. I don't know how good those records are or were, not looking at them. I don't know.

Q. All right.

A. But let's say I do the inspections and everything is as I anticipated it would be, I still need to do that initial inspection.

Q. This is when you take it out of the --

A. No.

I've taken it out of the reactor back in 1968. Now, '98 comes along, or 2000, I do this inspection, I'm going to need to do that because of time if nothing else, not to mention 1968 -- I'm not sure what the state of the records are -- but if everything were as I expected, no real surprise in that, I would probably not redo the inspection to load it in 2007 or 8 or 9.

Q. When you say, probably.

Is that an opinion?

Page 171

You're saying you wouldn't have to do it?

A. I wouldn't do it, but someone else might decide they wanted to. I don't know that there would be a really good reason to do it.

Q. So PG&E might be planning to do another inspection before -- assuming I'm right about my 2000 date here, they might be planning to do another inspection.

Do you know if they are?

MR. GARDNER: Objection, lack of foundation.

A. I don't know if they are, and if they did one in 2000 and they're going to do it again before they load it, then I'm not sure why they did the one in 2000. They should have waited and done it.

BY MR. STOUCK:

Q. Maybe they did it in 2000 because it had been 25 years since they took the fuel out and they did it in 2007 because they came across in the interim a documentation discrepancy which

Page 172

led them to believe that maybe they should do another one.

A. Their documentation discrepancy I don't think has anything to do with doing a visual inspection of the fuel.

Q. Can you describe the nature of the work that PG&E did in inspecting the spent fuel?

I guess we've got these cameras going into the pools.

Is that what happens?

A. M-hm, yeah.

Q. How many people does it take to do one of these inspections?

A. I don't know. I'm not sure how many people would be involved. There would be some small number, but I don't think it would be a large number. Quite honestly, it doesn't matter to me.

Q. Doesn't matter to you.

Now, you have never reviewed the certificate of compliance for the Humboldt Bay containers.

Page 173

Right?

A. I have not reviewed the specific certificate for that shortened version of the HI-STAR, that's correct.

Q. So you don't know what it requires with respect to fuel?

A. Do I know the detail?

No.

Q. What kind of written reports if any were produced by -- as a result of this inspection that we're talking about?

A. I believe they produced data sheets for every assembly that identified who did the inspections, what the results were, any defects that were found.

Q. You've seen those?

A. I've seen those, yes.

Q. Subsequent to the issuance of your report?

A. Yes.

Q. So those sheets -- you don't need to review the results of this inspection to give

Page 174

your opinion?
A. No, because the results aren't at issue in the opinion. Whether everything was fine or not wouldn't matter.
Q. Were all of the fuel assemblies inspected?
Do you know?
A. You know, I don't know the answer to that. And if they didn't inspect them all and they have to inspect the others at a later time, I would contend that that again is not incremental, because they ultimately have to inspect them all.
Q. Do you know if this work was done by PG&E staff employees or contractors?
A. I don't know.
Q. Aside from the data sheets for each assembly that you reviewed subsequent to the issuance of your report, do you know if there any other written reports of the results of this inspection?
A. I do not know for certain that there

Page 175

are or aren't.
Q. Do you know if PG&E or a contractor or whoever performed these inspections took photographs or video of the fuel?
A. I know that people routinely do that. Whether they did, I don't know.
Q. So you -- if you didn't know whether they did it at all, you don't know if they did that for photos or video for each or some assemblies?
A. I would not know that.
Q. Do you know if the inspection was limited to an inspection only of failed fuel as indicated by written documentation?
A. I do not know that it was limited to only failed fuel.
Q. You do not know one way or the other?
A. I don't really know either way, although given the amount of the data, got a lot of failed fuel assemblies if it is just failed fuel.

Page 176

Q. Do you know if the inspection included an inspection of material in the pool other than fuel, intact or failed fuel, in other words, nonfuel items?
A. The answer is no.
And if it did, then I would contend that the description of the work was somewhat misleading. The work says, inspection of fuel, not, inspection of pool content.
Q. Where is the description?
A. In the cost category. It says, visual inspection of fuel.
Q. That's 3 words on an Excel spreadsheet.
Is that what you're relying on for understanding -- excuse me one second -- is that what you're relying on for understanding of what was done here?
A. I'm relying on several things. One that -- one is the lack of any other documentation I can find about the detail of what they did, and also at some level the deposition

Page 177

testimony about -- by the PG&E people about the purpose of this inspection.
Mr. Willis is the one that said the inspection was done to ensure you met the cask requirements. He didn't say anything about looking for other stuff in the pool.
Q. Do you have any reason to believe that that is why the inspection was done other than Mr. Willis's testimony?
A. The fact that you need to do such an inspection to load the casks.
Q. You know that?
A. Yes.
Q. Without regard to Mr. Willis?
A. Yes.
Q. Now, if the costs that we're talking about here on your Excel spreadsheet or in this category of visual inspection of fuel costs do include costs for inspecting nonfuel items that are in the pool, do you have an opinion whether that cost, just that portion of the cost for the inspection of the nonfuel items is incremental?

Page 178

A. I'd say it's still not incremental but for a different reason.
The other stuff in the pool if I need to inspect it for some reason is an issue of decommissioning the plant. It's not an issue about whether DOE started picking up spent fuel in 1998.
Q. Do you understand the contractual concept of nonfuel components?
A. If you're talking about other things that go with the fuel?
Q. I am now.
A. Then I would still say it's not incremental, because once again, what you can or can't put in the cask in terms of nonfuel components is an issue addressed in the certificates of compliance.
So once again, I need to know -- if I'm the plant operator, licensee, I need to know what I'm putting in those casks so that I can stand up and tell the NRC that I've met the requirements of the certificate in terms of what

Page 179

I've put inside the cask.
Q. Do you know if this inspection included inspection of GTCC waste?
A. I do not.
Q. Do you know if there's any GTCC waste in the pool?
A. It is my understanding there is.
Q. Last sentence on page 3 here says -- last sentence of the first paragraph -- let me tell you which sentence I'm talking about.
Under, visual inspection of fuel not incremental, there's a paragraph that starts: PG&E, apostrophe S -- the last sentence says, quote: Thus the costs associated with the visual inspections would occur in both the actual and but-for worlds and are therefore not incremental to the breach, close quote.
Do you see that?
A. I see that.
Q. Are you saying -- are you just saying that some kind of inspection would be done in the nonbreach world, or is it your opinion

Page 180

that the costs of the fuel inspection would be the same in total in the nonbreach world as PG&E spent in the breach world?
Do you understand -- one alternative is, there would be some inspection in the nonbreach world. The other alternative is, you're saying the exact same costs would be spent in both worlds.
A. Given the similarity of the certificates of compliance for transportation of storage casks in terms of its explanation about the allowed content, there is no reason that those inspections would be different in scope if that's the reason the inspection were being done.
Now, if PG&E was inspecting something for a reason not related to putting the fuel into casks, I've not seen the explanation of that and couldn't offer an opinion about that. But to the extent the inspection was done to put it in the storage casks, I believe the cost would be the same to put it into a transportation cask.
Q. You don't know whether or not there

Page 181

was some other purpose for this inspection that we're talking about that was done other than to ascertain compliance with the certificate of compliance, is that correct, for the casks?
A. I don't know of any documentation about that, of any other reason for doing it.
Q. There could be another reason or could not be.
You don't know?
MR. GARDNER: Objection, asked and answered.
A. There could be some other reason.
BY MR. STOUCK:
Q. Now, do you know if the DOE spent fuel contract -- you understand the reference?
A. Yes.
Q. Some people call it a standard contract. I call it the DOE spent fuel contract.
Do you know if that contract addresses inspection of spent fuel prior to loading into transportation casks?
A. I don't ever recall in looking at

Page 194

MR. STOUCK: Yeah. That's it.
A. If they chose not to rely upon the inspection that was done when the fuel was put in the cask, then quite honestly, everybody has got a big problem, because you could do another inspection. I don't know how you do it at a facility that now has its pool removed, because you can't pull these things out in the air and look at them, at least not with me around.
BY MR. STOUCK:
Q. Okay. Even if DOE does not -- one option would be another inspection maybe at Yucca Mountain in a pool.
Is that a possibility?
MR. GARDNER: Objection to the form of the question, calls for speculation.
Objection, lack of foundation.
A. May be.
BY MR. STOUCK:
Q. That's a possibility?
MR. GARDNER: Same objections.
A. To the extent that there are a lot

Page 195

of things that are possible, that's possible.
BY MR. STOUCK:
Q. Now, let's say DOE doesn't come to pick up the Humboldt Bay spent nuclear fuel until 2020.
Okay?
A. Okay.
Q. And let's say it gets loaded in 2007, so that's 13 years. It's in the casks for 13 years.
You got it so far?
A. DOE doesn't come to pick the fuel up until 2020.
Q. Would that 13-year period be a sufficiently long period of time that in your opinion it would be appropriate to perform another inspection of the fuel to see if its condition had changed over that 13-year period?
A. For Humboldt Bay, my guess -- my belief would be no.
And my reason for saying that is, the fuel at Humboldt Bay is very old, very cold,

Page 196

it's going to be an inert environment inside the cask.
That would be different for a plant where the fuel that I put in was very hot and would remain very hot for a long time, so I think there's a difference to be made.
I also know there is work that's been done and is ongoing about the potential for degradation of fuel cladding inside dry storage casks. I know that people have done such work.
Q. Are you familiar with it?
A. Not particularly, no.
Q. Even if DOE does not inspect the fuel again -- I'm going to get off my 2020 date. I don't think anybody really knows when they're going to come.
Would you agree with that?
MR. GARDNER: Objection, beyond the scope of Mr. Brewer's expert report.
A. I don't know and I wouldn't offer any opinion one way or the other.
BY MR. STOUCK:

Page 197

Q. I just wanted to erase the 2020 date.
I'm talking about whenever they come in the future to pick up the Humboldt Bay spent nuclear fuel, even if DOE does not perform another inspection, do you know if there are costs that PG&E will incur in the future when DOE picks up its Humboldt Bay fuel that PG&E would not have incurred in the nonbreach world?
MR. GARDNER: Objection, vague.
BY MR. STOUCK:
Q. Other than inspection costs.
A. In the actual world, are there costs that they would incur when they come to pick up Humboldt Bay's fuel that they would not incur in the but-for world?
Q. Correct.
MR. GARDNER: Objection, vague.
Objection, calls for speculation.
A. The answer would generally be no, but on the other hand, I can't say with any great certainty, because I don't know what DOE is going

Page 202

And so it just doesn't matter to me.
BY MR. STOUCK:
Q. Is it possible that when DOE does come to pick up the HI-STAR containers -- excuse me.
Is it possible that when DOE does come to pick up the Humboldt Bay spent nuclear fuel, the HI-STAR containers will have to be opened?
MR. GARDNER: Objection, calls for speculation.
Objection, lack of foundation.
A. To the extent again that lots of options are possible, that is a possible option.
BY MR. STOUCK:
Q. And there would be a cost associated with that.
Correct?
A. There would be cost associated with that, and who bore that cost, I have no idea.
Q. There's another example of costs that would not be borne in the nonbreach world;

Page 203

is that correct?
A. Your original question was that Humboldt Bay would incur, and I don't know if it would incur any of these costs.
Q. In the nonbreach world.
Is that what you were just telling me?
A. These costs are for the actual world, but they wouldn't occur in the nonbreach, and I don't know whether they would incur them or who. I have no idea how those possibilities would be paid for or which possibilities would be the fact.
Q. Or how possible they are?
A. I would agree with that. I do not know that either.
Q. Okay. Let's talk about Mr. Pulley's testimony which you've referred to here. This is an example of -- you don't strictly speaking sort of rely on Pulley for this conclusion, but you're citing his testimony because it supports your independent conclusion that visual

Page 204

inspection would be required in the but-for world?
A. Mr. Pulley's comment is not the source of my opinion.
My opinion originated first, and his statement is simply a support for that opinion.
Q. You don't know the basis for Pulley's -- let's take a look at his testimony here.
MR. STOUCK: It's been about an hour.
Do you want to take a break?
THE WITNESS: Yes.
(Recess.)
BY MR. STOUCK:
Q. Okay. Do you recall what Mr. Pulley or whether Mr. Pulley gave a basis for his view that the visual inspection would also be necessary in the nonbreach world?
A. I don't recall that he did or didn't.
Q. And whatever the basis was, it's not

Page 205

important to your opinion, whatever the basis for his opinion was?
A. If he provided a basis, if he did, then I concluded that it didn't matter to me.
Q. Could Pulley be wrong about this need for visual inspection in the nonbreach world?
A. I don't think he's wrong.
Q. Why do you believe he'd know -- you don't believe he's wrong because you have an independent opinion?
A. I have an independent opinion, and I also think that Mr. Willis's testimony about this same issue comports with mine, in terms of his reason for why they needed to do the inspection.
MR. STOUCK: Could we go off the record for one second?
(Discussion off the record.)
BY MR. STOUCK:
Q. In terms of Willis comports with yours in terms of why the visual inspection was needed in the nonbreach world.

Page 206

Is that what you're saying?
A. Mr. Willis in his deposition, I believe, offers a -- when asked whether it would be needed in the nonbreach world I think basically says he doesn't know, but goes on to offer the opinion as to why the inspection was needed for the actual world.
Q. Yes.
A. And that reason is to make sure that you comply with the cask requirements.
So I believe -- now, the fact that he says he doesn't know what that means to the nonbreach world really doesn't matter to me. His reason for doing the inspection is exactly the reason I believe the inspection is done --
Q. Got it.
A. -- and the basis for my conclusion.
Q. Thank you for that clarification.
Why didn't you cite Willis here?
Any reason, or just oversight?
A. Well, Willis never was clear about whether he agreed or didn't agree. I mean, he

Page 207

was very iffy about the whole thing, so Pulley was a much -- in my mind it was a more straightforward answer. Mr. Pulley's answer to the question, do you need to do this in the nonbreach world was much more straightforward.
Q. Why do you believe Pulley would know anything about the nonbreach world?
Is he an expert?
MR. GARDNER: Objection, form.
A. Is he an expert?
BY MR. STOUCK:
Q. Let me stick with the compound question.
Why do you believe that Mr. Pulley would know anything at all about the nonbreach world?
A. I don't know I'd phrase it that way.
I think I would phrase it that I believe that Mr. Pulley may have knowledge about what it takes to transport fuel.
Okay?
Whether that be in the breach or the

Page 208

nonbreach world is -- I don't know that -- I don't know if I went and asked Mr. Pulley whether he would say he knows a lot about the nonbreach world, but I think he understands this -- the technology and what's required, and so I think his conclusion was simply that he would have to inspect the fuel to put it in a transportation cask.
Q. Willis said the same thing, if I understand what you're telling me.
A. Willis said that it was necessary to inspect the fuel in the actual world to put it in a storage cask, that he wasn't sure about what the requirements for transportation casks were.
Q. Okay. I see.
So this -- the fact that Pulley agrees apparently, according to you, that the visual inspection would have been required in the nonbreach world, that's not role what you're relying on.
You're relying on his explanation of the reason for that?

Page 209

MR. GARDNER: Objection, mischaracterizes Mr. Brewer's previous testimony.
A. In terms of Mr. Willis, what I draw from him is his explanation of why they did this visual inspection.
They did it to comply with the cask license, and that supports my conclusion that says, I would have to do an inspection to satisfy the transportation cask license.
BY MR. STOUCK:
Q. What about the Diablo Canyon?
Why not deduct fuel inspection costs there?
You don't deduct any costs from Diablo Canyon for fuel inspection.
Correct?
A. To the extent that there are fuel inspection costs in Diablo Canyon that were -- that are being made as part of the claim, I'm not aware that they're there, so if they're included in some line, I'm not sure that I'm aware of that.

Page 230

gets to line 14. I don't think there's ever a way the NRC would let you out of the license for operating the plant when you had a discrepancy in inventory of special nuclear material.
They would demand that you explain to them where the hell the stuff went. They just aren't going to -- I mean, this is important to them. It's not something they're just going to say, oh, you can't find these fuel rod pieces, that's fine, we'll just tear up your license anyway.
Q. You say, this work could have been required in the nonbreach world.
What expertise do you rely on in saying that?
A. My expertise in decommissioning, because I understand that the NRC is going to require the utility to demonstrate and assert that all the radioactive material has been accounted for and removed from the site before they're going to tear up your part 50 license.
Q. Do you have any personal experience

Page 231

with a document discrepancy of the same type PG&E experienced?
MR. GARDNER: Objection, vague.
A. You mean specifically with spent fuel pieces?
BY MR. STOUCK:
Q. Yeah.
A. No.
Q. What about other kinds of document discrepancies relating to any aspects of spent fuel?
Do you have any personal experience?
MR. GARDNER: Objection, vague.
A. Not that I recall.
BY MR. STOUCK:
Q. So --
A. Can I say one other thing though?
It's really not important that it's about spent fuel.
It's important that it's about special nuclear material and about radioactive materials.

Page 232

Q. What is special nuclear material?
A. It could include things that are not fuel. There are pieces of detectors. There are pieces of Radiex (phonetic), pieces of radiographic sources that could be that kind of thing. So it's not just fuel.
Q. You don't have any personal experience with document discrepancies concerning those other types of special nuclear material either, though, do you?
A. Well, that implies that there's something truly unique about this. It's an inventory.
Q. I'm not implying anything.
A. I'm just saying, I don't, but I've never been responsible for resolving such a discrepancy.
Q. Do you know how the discrepancy was discovered?
A. No.
I really don't know how they discovered the discrepancy.

Page 233

Q. Well, how often do you know, then, it would have been discovered in the nonbreach world?
A. You're required -- the NRC requires people to keep track of special nuclear material. They require them to do inventories on a periodic basis. It's a big deal.
As part of decommissioning the plant, they would want to see those final inventories. So unless everybody dropped the ball and lost track of this, then it would be found as part of the NRC's review ultimately that you had adequately accounted for all the radioactive material on the site.
Q. And you can say that with confidence even though you don't know how it was -- how this discrepancy was discovered; is that correct?
A. I believe I can say that with confidence regardless of that, yes.
Q. Okay. Are you saying that in the nonbreach world, some work to resolve the discrepancy would have been necessary without any

Page 274

Q. Do you know how much PG&E spends each year on its seismic program?
A. I don't know that either.
Q. Do you know what work is performed in that program -- is this inspection of the Taiwan earthquake part of that seismic program that you refer to?
A. I believe so.
Q. Do you know what other work in investigation of this earthquake is performed?
A. I think as Mr. Rueger explained as well as explained on the PG&E Web site that PG&E has an ongoing staff devoted to seismic investigations and that they try to keep abreast of all seismic activity and understand what that means, particularly with relationship to the continued operation of Diablo Canyon.
Q. You say here that the program -- this is on the fourth line, PG&E has an active seismic program, quote, responsible for all of PG&E facilities and not just HBPP.
Correct?

Page 275

A. Right.
Q. Does that mean all nuclear facilities or all facilities, period, like all the buildings in downtown San Francisco?
A. I don't know about the office buildings. I don't know whether they own or rent their buildings or what. But any of their transmission facilities or anything else would be in that category.
Q. He pronounces it Rueger by the way.
A. I recognize that I mispronounce his name.
Q. You're not alone.
The Rueger testimony you cite stated that the PG&E program -- the seismic program was for Diablo Canyon and not for Humboldt.
Is that your understanding?
A. I believe that's what he said.
I also believe that's probably a bit of an overstatement on his part, that in fact their program really is for everything, but if all they had was Diablo, they would still be

Page 276

doing it.
Q. Okay. What's the significance of that comment, if all they were doing was Diablo, they would still be doing it?
Why do you say that?
A. That's really the thrust of my comment, that if all they had was the operating plant at Diablo Canyon, independent of spent fuel, they're running a reactor there, they would still be involved in this active program of seismic -- about seismic issues, and they would still be investigating all these seismic events that happened around the world, including this Taiwan earthquake.
Q. The crux of your opinion is, they'd still be spending the 300,000 or whatever the amount is on studying the Taiwan earthquake --
A. Right.
Q. -- if all they had was Diablo?
A. Right.
Q. Now, if PG&E had no nuclear facilities, would it need a seismic program?

Page 277

A. You know, I don't know about the regulation of fossil-fired facilities, so I don't know.
Q. Let me ask the question and then -- the question is why PG&E incurred these costs for studying the Taiwan earthquake.
I guess you've implied that this was just an ongoing part of their seismic program. They studied this earthquake the way they study any earthquake.
Is that a fair characterization of what you're telling me?
A. I believe the fact that they studied this earthquake is no different than other earthquakes they would study.
Q. So you don't know whether or not the study of this earthquake was related to the Humboldt ISFSI license application.
Correct?
Or do you?
A. I don't know that, but even if it were -- as I said here, I believe they would have

Page 278

done the review of this earthquake to support the
continued operation of Diablo Canyon regardless
of whether Humboldt Bay was building an ISFSI or
not.
The fact that it may relate to the
licensing of Humboldt Bay's ISFSI is really not
the issue for me.
Q. What's the basis for your opinion
that they would have studied this earthquake
and -- are you also telling me studied in the
same way, same cost if all they had was Diablo?
What's the basis for that?
A. I believe based upon the fact that
Diablo Canyon has always been -- seismic issues
have always been a big issue with Diablo Canyon
as most things in California. I think that they
have always had a very active program.
I think Mr. Rueger emphasizes that.
I think that PG&E for example on their corporate
Web site make a point about Diablo Canyon and how
they're so interested in seismic events.
So I think they would have done this

Page 279

as a continued commitment to the NRC and probably
the CPUC to continue operating Diablo Canyon.
Now, as to whether or not the cost
would have been the same or not, the simple
answer is, I have no information available to me
to explain why they would have been different if
all there was was Diablo Canyon.
Q. Do you claim expertise in what it
costs to study earthquakes as part of a seismic
program?
A. I'm not commenting about the cost
amount.
Q. You're not commenting about -- you
are commenting about the cost amount.
You're commenting that it's not
incremental, which means that whatever they spent
would have been spent in the nonbreach world.
Correct?
MR. GARDNER: Objection to the
extent it mischaracterizes Mr. Brewer's previous
testimony.
BY MR. STOUCK:

Page 280

Q. It would have been comparable costs
in both worlds.
Is that what you're saying?
A. I'm saying -- let me be clear: I'm
saying that there is -- that I believe there
would have been an investigation of this
earthquake in either world.
As for the cost, I have no basis in
their -- in the documentation that I've reviewed
to explain to me or to justify why the cost would
be different in the but-for world --
Q. There's no documentation that you've
been provided at all about what any cost in the
nonbreach world would be.
Correct?
All of the documentation you've been
provided is costs in the breach world.
Correct?
A. Yeah.
And quite honestly, that's a real
problem, because the assertion is somehow that
these costs would be different, but no one

Page 281

explained -- would explain or has explained why
they would be different.
Q. That's fine.
But you're here today to explain why
they would not have been different.
MR. GARDNER: Objection, form.
BY MR. STOUCK:
Q. That's what I thought you were here
for.
I'm not trying to argue with you
here, but you can't tell me whether or not these
costs would have been different in the nonbreach
world; is that correct?
You can tell me that you haven't
seen anything that indicates they're different.
But I'm asking for you, Warren
Brewer, inside your head, with all of your
knowledge and expertise over the past 25 years or
more, can you tell me anything about whether or
not these costs to study this Taiwan earthquake
would have been different in the nonbreach world?
A. My opinion is, they would have

Page 282

advocated it and they would have spent what they spent.
Q. Okay. What's the basis for that opinion.
Any other basis?
A. No.
The simple fact that they designed the Diablo Canyon plant 3 times because of seismic issues. Seismic issues are and have been an extremely important part of history of Diablo Canyon.
So I think as their people have said, as their Web site says, they investigate all seismic events around the world, virtually all.
Q. Do you know that seismic issues are relevant to NRC licensing under part 72?
A. That's correct.
Q. And you know that Humboldt Bay has a part 72 license for its ISFSI?
A. Yes.
Q. Do you know if the NRC specifically

Page 283

asked PG&E to study the Taiwan earthquake in connection with the Humboldt Bay ISFSI license?
A. I do not.
Q. And whether or not NRC asked PG&E to do that is not relevant to your opinions.
Correct?
A. That's correct.
Q. So if NRC had asked PG&E to study the Taiwan earthquake in connection with the Humboldt Bay ISFSI license, you would not change your opinion and say that these costs are breach-related.
Correct?
A. I would not change my answer unless there was some explanation provided as to, here is what we would have done absent that NRC request.
Q. Suppose the NRC didn't ask PG&E to study the Taiwan earthquake, but PG&E instead decided to incur these costs to study the Taiwan earthquake because PG&E on its own thought it would be helpful to the Humboldt part 72 license

Page 284

application, and absent that factor, PG&E would not have incurred these costs.
Then you would agree -- under my hypothetical, you would agree that these costs are included --
A. If you're saying it were a fact that PG&E would not have investigated this earthquake other than for the Humboldt Bay ISFSI, would the cost be incremental.
Do I have that right?
Q. Let's answer that one.
A. If that hypothetical were true, then it would be incremental.
Q. I was saying slightly different, which is, if they would not have incurred all of these costs but for their belief that at least some part of the cost, maybe all, would be helpful to the Humboldt part 72 license, then you would agree that whatever part of those costs that they incurred only because of the helpfulness are incremental?
A. Let me try it slightly different.

Page 285

If there are some of the costs which they incurred only because of the Humboldt Bay ISFSI, then I would agree that those parts would be.
Q. Do you know if the Taiwan earthquake involved any data of special interest to the Humboldt location?
A. I know a little about that. I know that the fault line involved in the Taiwan earthquake is similar to the fault line that is important to Humboldt Bay.
Q. How do you know that?
A. There are documents I've looked at that talk about that.
Q. That fact is not important to your opinions?
A. No, because I don't think that changes the fact that it would still have been of interest for Diablo Canyon.
Q. Would it affect your opinion about the incremental nature of these costs if the seismic conditions of the Taiwan earthquake site