UNITED STATES COURT OF FEDERAL CLAIMS

PACIFIC GAS & ELECTRIC COMPANY,)
Plaintiff, )
v. ) No. 04-0074C
UNITED STATES OF AMERICA, )
Defendant. )

\- - - - - - - - - - - -

DEPOSITION OF WARREN K. BREWER

VOLUME II

Friday, February 24, 2006

The deposition of WARREN K. BREWER was convened on Friday, February 24, 2006, commencing at 9:39 AM, at the offices of GREENBERG TRAURIG LLP, 800 Connecticut Avenue, N.W., Suite 500, Washington, D.C., before Cheryl A. Lord, Registered Professional Reporter, Certified Realtime Reporter, and Notary Public for the District of Columbia.

Q. It allows it?
I'm reading -- I'll show it to you. It says, allows -- this rule -- quote: This rule allows storage of reactor-related GTCC waste either under a part 72 specific license or under parts 30 and/or 70, close quote.
MR. GARDNER: Objection. The document speaks for itself.
BY MR. STOUCK:
Q. Does that sound right?
A. That's fine.
The opinion I've offered has nothing to do with whether it's licensed under 30, 70, or 72.
Q. What is it in this thing that you quote in your report that supports your opinion?
MR. GARDNER: Objection, vague.
BY MR. STOUCK:
Q. What is it about this that --
A. In particular, let's go to the quoted section here.
The second sentence: However, if



the NRC were to develop guidance for storage of reactor-related GTCC waste under a 10 CFR part 30 or part 70 license, such guidance would be consistent with 10 CFR part 72.
Q. Okay. And what does that mean?
That means that the security requirements are identical?
That's what you rely on for that conclusion?
MR. GARDNER: Objection to the extent it mischaracterizes Mr. Brewer's testimony.
A. Well, I think it says that the requirements that one would have to meet are the same. Now, you got to --
BY MR. STOUCK:
Q. Well, if --
A. Let me finish my comment.
Security requirements are negotiable. The NRC sets functional requirements. You have to meet those functional requirements. You have to demonstrate to them



how you will satisfy those functional requirements.
So I'm saying, whatever -- those requirements would be the same. So if I went to the NRC and said, here is what I need for an ISFSI, it would be the same thing for what I needed for GTCC.
BY MR. STOUCK:
Q. The basis for your conclusion that the security requirements at a GTCC only ISFSI would be identical to the security requirements at a spent fuel ISFSI is the sentence that you read here about guidance being consistent with part 72; is that correct, Mr. Brewer?
MR. GARDNER: Objection, mischaracterizes Mr. Brewer's previous testimony.
A. It's that and the last sentence of this quoted section and again the discussions that I was involved with with the NRC.
BY MR. STOUCK:
Q. We'll get to the discussions later. Stick with writings.



What does the last sentence say?
Any application for a 10 CFR part 30 or 70 license may use to the extent appropriate, parenthesis, considering the case-by-case criteria the application would be proposing, close quote, the guidance developed for 10 CFR part 72.
Do you see that?
A. Yes.
Q. This passage right here is what you rely upon for your conclusion that the security requirements for a GTCC only ISFSI would be identical to the security requirements for a spent fuel ISFSI; is that correct?
A. With respect to written documents, this is this document and this particular thing that I cite.
Q. No such guidance has ever been issued by the NRC; isn't that correct?
A. I do not believe they ever issued such guidance.
Q. The guidance about storage of

Page 489

reactor-related GTCC waste under 10 CFR part 30 or 70.
Right?
A. I do not believe they have.
Q. And do you know if -- okay.
Are you an expert on security requirements at nuclear facilities?
A. I am not an expert on security requirements.
Q. And you're not an expert on licensing requirements at nuclear facilities, is that right, or are you?
A. That would depend on perhaps on what you mean by that.
I've done licensing work for utilities.
Q. What kind?
A. Done reviews and modifications to compliance programs for technical specification, which are required by the regulations. As part of design basis documentation work at Southern California Edison, I was responsible for writing

Page 490

the procedure for that program about ensuring regulatory compliance with 10 CFR part 50.59.
We've done other test reviews. As I said yesterday, we developed a computer program that's been in use for 20 years with complying with technical -- regulatory requirements for what's called surveillance testing, as well as later on, we modified that to control data trending that's required.
So it would depend on the area.
Q. All of those things you mentioned were at operating nuclear plants.
Correct?
A. Yes.
Q. None of those licensing experiences you just mentioned involved GTCC waste.
Correct?
MR. GARDNER: Objection, vague.
A. None of those activities involved GTCC waste in any specific way.
To the extent that programs at

Page 491

operating plants have anything to do with radiological controls, it may have an impact. So I don't want to cut it off too short, but there was nothing directly related to GTCC waste.
BY MR. STOUCK:
Q. You are not an expert on licensing requirements for GTCC waste storage, is that correct, or are you?
A. I don't know. I'm a bit hung up about the word expert. I've never licensed a GTCC facility.
Q. Here is what I'm getting at: It sounds to me like what you're telling me about GTCC waste storage you're drawing from a couple of documents and a couple conversations we're about to talk about.
You're sort of interpreting what you've read and heard and just telling me that rather than speaking from your own sort of analysis, your own understanding and experience.
Is that a fair characterization of what you're telling me?

Page 492

A. That's why I said part of this is from my reading of part 72. I believe that what they conclude here is in fact correct.
Q. What do they conclude here?
A. If you want to store GTCC, you're going to start from the requirements of part 72. Like any other license application that you make to the NRC, one can say, yeah, here is your requirements, but I think I'm special for some reason, and I want to do different X, Y, or Z.
This may or may not be possible anywhere for any kind of application you make.
Q. These -- this statement was made years before -- several years before the current security requirements for facilities that -- let me start over.
This statement was made at a point in time when the security requirements for storage of nuclear materials were very, very different from what they currently are; isn't that correct?

Page 493

MR. GARDNER: Objection, vague.
A. Pre-these were made pre-9/11.
BY MR. STOUCK:
Q. Radically different requirements apply today than were in force for security at the time this statement was made.
Correct?
MR. GARDNER: Objection, vague.
A. Different now. More security is required.
BY MR. STOUCK:
Q. Radically different?
A. I would not categorize it as radically.
Q. Very different?
MR. GARDNER: Objection, vague.
A. Categorize as different.
BY MR. STOUCK:
Q. How different?
You wouldn't use an adjective?
9/11 was a major event requiring substantially more security.

Page 494

How many armed security officers were required at Diablo Canyon prior to 9/11?
A. I don't know the answer to that.
Q. How many --
A. Let me finish my answer.
No one unless they have specific knowledge of a facility can answer that question for any facility, because that's not -- there are minimum requirements in the NRC guidelines at any time, and how you comply with those guidelines is your security plan.
And that -- at that point that's your requirement, what you've committed to in the security plan.
Q. The class in security requirements for nuclear facilities that occurred after 9/11 however radical they were or not do not affect in your opinion that this statement made before 9/11 is equally applicable today.
Correct?
A. I believe that, and I believe that because of the radiological consequences of GTCC

Page 495

if it were to be taken from a facility of this type.
Q. Your understanding is that the security requirements that are imposed at facilities that house spent fuel are aimed at protecting against radiological hazards.
Is that your testimony?
A. It's against someone damaging that facility and creating a radiological problem or taking the material from that facility and doing something with it. That's the point of the security requirements.
Q. Doing what?
A. What do you mean?
Q. What would they do with it?
A. Create some kind of environmental disaster.
Q. Is criticality a concern with GTCC waste?
A. No, criticality is not.
Q. Does that affect your opinion about the identical security requirements?

Page 496

A. No, because security has nothing to do with criticality.
Q. Does that affect your opinion in any way about the identical costs of storage at a GTCC only facility?
A. No.
Q. Is heat dissipation a concern with GTCC waste?
A. Yes, it is. At some points in time the GTCC waste can put off more heat than spent fuel.
Q. Is that true at Humboldt Bay?
A. My guess is neither the fuel nor the GTCC at Humboldt Bay will put off much heat.
Q. Why?
A. That's been a long time since the plant ran.
Q. Do you know what part 30 covers?
A. It's byproducts, all kinds of radioactive materials.
Q. What is byproduct material?
A. Other kinds of radiological sources

Q. What I've handed you as exhibit 18 is the set of documents that are listed under paragraph A on page 809; is that right?
A. That's right.
Q. Some of these are also mentioned on page 9 under items 1 through 8; is that right?
A. That would be correct.
Q. Okay. You say in your report that decommissioning studies or site categorization could be required independent of spent fuel.
Right?
A. That's right.
Q. Okay. Do you know if the decommissioning studies or site characterization work covered by this invoice are required independent of spent fuel?
A. Let me say this.
There obviously are decommissioning studies needed independent of fuel. There's obviously site characterization needed independent of fuel.
All I'm saying in my comment is, the



information provided in these invoices is insufficient for me to decide whether the specific things Bruce Norton & Associates were doing in those areas were unique to the breach world or whether they would have been required for the decommissioning of the plant in the absence of the spent fuel.
Q. Should the -- excuse me one second.
(Pause.)
BY MR. STOUCK:
Q. Should the -- the fact that this says on the first page here, 0026, ISFSI, slash, decommissioning studies, that doesn't satisfy you that it's related to the ISFSI?
A. No.
Particularly when I look at the further detail that's provided in the invoices.
Q. Should the costs, the charges on this invoice or this collection of invoices -- is it one invoice?
A. I think this is one invoice.
Q. Should the charges on this invoice



in your opinion that are listed for decommissioning studies or ISFSI -- excuse me -- ISFSI, slash, decommissioning studies or site characterization, should those charges be deducted from PG&E's claim?
MR. GARDNER: Objection, compound.
A. It's beyond the scope of what I'm offering an opinion about.
BY MR. STOUCK:
Q. Your opinion is, you just can't tell what they are?
A. I cannot tell whether they are incremental or not.
Q. And you're not giving an opinion about what implications that has for the includability of the claim or recoverability or anything else?
A. That is correct.
Q. Do you know if the charges that are shown on this invoice -- look at the first page.
Above the line, you've got 3 items, triple 024, triple 026, triple 028.



A. Correct.
Q. Below the line you've got those same numbers with a number of hours of consulting services, price per hour, and extended cost.
Right?
A. Correct.
Q. Do you even know if the charges that are shown on this invoice for ISFSI, slash, decommissioning study and site characterization study are included in the costs that PG&E is claiming as damages?
A. All I can truly say is, I believe that some of them would be. Otherwise, they wouldn't have been provided as support for those. But I've not done the accounting to tie these amounts to amounts in the claim.
Q. The reason that you think that these costs are included in the claim or at least some of them is that this document was provided as support?
A. That's correct.
Q. Is there any other basis for your

Page 565

I mean, if all this were were
meeting with Geosciences to work on seismic issues for the ISFSI, I would have concluded it was work related to the ISFSI, and that would have been that.
Q. Now, can I conclude -- let's just look at the next one.
Your report missès the 2, but it should be 027242.
Right?
Maybe not.
A. No.
I think it's the same page.
Q. Okay. Sorry.
That's another typo?
A. It's a different kind of typo. The zero is left off.
Q. Left the zero off the end.
So it's 3-16. Meetings with E. Kahler, K-A-H-L-E-R, et al., re HBPP decommissioning issues and work on same. Meeting with L. Cluff and work on draft ISFSI.

Page 566

Again, your opinion is, you cannot tell from that entry whether all of that work is related to the ISFSI?
A. That's correct.
Q. That's the only opinion you're giving?
A. Yes.
Q. Can you tell from that entry whether any of that work is related to the ISFSI?
A. Whatever part of that had to do with the meeting with Mr. Cluff about the ISFSI proposal obviously has to do with building the ISFSI.
Q. If we went down the rest of these items 4 through 8, it would be the same thing, what you see in this collection of papers, timesheets from exhibit 18, you can't tell from what's written there that every part of that work is related to the ISFSI, so you give an opinion that you can't tell from that.
A. And more generally, that is the case about the invoices I've cited in appendix C and

Page 567

D. That's the opinion I'm offering about all of those.
Q. And what expertise do you rely on for that opinion?
A. What I looked for -- have looked for is understanding whether the work is something that in this case when they start talking about decommissioning work, the decommissioning is not by itself part of storing the fuel. It's part of decommissioning, something they would have had to do anyway.
But you're absolutely right. The problem is, I can't tell from this, how does it connect to the fuel storage as opposed to just the normal decommissioning.
Q. Can I conclude from -- would it be appropriate for me to conclude that as to any entry in exhibit 18 that you have not specifically -- are these just examples?
A. Yes.
Q. There may be other examples that you don't specifically --

Page 568

A. That's right.
Q. Have you quantified the amount -- do you have any opinion about whether this should be deducted from the claim?
A. I'm not offering any opinion about that.
Q. Do you know if Mr. Johnson does?
A. I don't. I don't know what opinions Mr. Johnson is offering.
Q. Back to expertise.
What expertise -- the only expertise that I can discern is expertise that is required to read English, because I can read these things, and if I don't see a reference to ISFSI, then I conclude that there's not enough information to know if it's related to the ISFSI.
What additional expertise are you bringing to bear in offering this opinion?
MR. GARDNER: Objection, form.
A. I almost don't disagree with you, but only almost.
It's not quite looking for the word

Page 569

ISFSI. It's looking for other activities that the plant would have to perform, like the decommissioning, like understanding what the PSDAR is. That's the expertise.
It's really reading the descriptions and deciding whether these are activities uniquely related to the fuel storage or not.
BY MR. STOUCK:
Q. I notice in exhibit 18, you accept -- the characterization of what we're looking at, the attachments, are they timesheets?
A. I think that's fair.
Q. They're not the same as exhibit 19.
They record time and describe it?
A. That's right.
They record the time and what the individual was doing.
Q. There's 3 sections again corresponding to the 3 sections of costs that we talked about at the outset, ventilation stack removal project, ISFSI project, and site characterization study.

Page 570

Right?
MR. GARDNER: Objection to the extent it mischaracterizes the document.
BY MR. STOUCK:
Q. Do you see that?
A. Yeah.
It is broken into in essence the item numbers that are given on the front page.
Q. The examples we just looked at, the first three were all in the section of these timesheets that is under the heading, ISFSI project.
Right?
A. That is correct.
Q. And this is for Bruce Norton & Associates.
Right?
A. That is correct.
Q. Do you know Mr. Norton?
A. No, I do not.
Q. He listed all these under ISFSI project.

Page 571

If you look at Bates number 27239, they're charged to a contract number and so forth. He's charging Pacific Gas & Electric Company for these things for ISFSI charges.
Would it be an appropriate conclusion from the opinion that you're offering that it is possible Mr. Norton has defrauded Pacific Gas & Electric Company by misdescribing the services?
MR. GARDNER: Objection, mischaracterizes exhibit 18.
BY MR. STOUCK:
Q. Is that what you're saying, that it's possible that Bruce Norton & Associates defrauded PG&E by misdescribing his services?
MR. GARDNER: Objection, mischaracterizes exhibit 18.
Objection, mischaracterizes Mr. Brewer's previous testimony.
A. I'm not making any such suggestion.
The fact is, whatever label they put on the project, they may have agreed that these

Page 572

things are going to be charged to this charge number, this account number, whatever. That's between Mr. Norton and PG&E as to how he allocates or charges his time.
My only discussion has to do with the detail of what Mr. Norton says he was doing and whether it relates to the ISFSI.
BY MR. STOUCK:
Q. I'm just not sure that's right.
What you're really saying is that Mr. Norton has submitted a bill to PG&E for work that he is telling them relates to the ISFSI project, and that might be wrong.
Isn't that what you're saying?
MR. GARDNER: Objection.
MR. STOUCK: I'm not done yet.
MR. GARDNER: I can't tell.
Q. It might not be. The work that's described by Mr. Norton under ISFSI project might not be related to the ISFSI project.
Isn't that what you're saying?
MR. GARDNER: Are you done?