# Appendix B

Page 1561

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

TENNESSEE VALLEY AUTHORITY, )
Plaintiff, ) Case No. 01-249C
v. )
THE UNITED STATES, )
Defendant. )

Courtroom 4
National Courts Building
717 Madison Place NW
Washington, D.C.

Tuesday, July 12, 2005
Volume 8

The parties met, pursuant to the notice of the Judge, at 10:10 a.m.

BEFORE: THE HONORABLE CHARLES F. LETTOW

Page 1562

APPEARANCES:
ON BEHALF OF THE PLAINTIFF:
PETER K. SHEA, ESQ.
EDWIN W. SMALL, ESQ.
TENNESSEE VALLEY AUTHORITY
400 West Summit Hill Drive
Knoxville, Tennessee 37902-1499
(865) 632-7319

ON BEHALF OF THE DEFENDANT:
ALAN J. LO RE, ESQ.
SONIA ORFIELD, ESQ.
SHARON A. SNYDER, ESQ.
KEVIN CRAWFORD, ESQ.
U.S. Department of Justice
1100 L Street, Northwest
Washington, D.C. 20530
(202) 305-7562

***Index appears at end of transcript***

Page 1563

P R O C E E D I N G S

\- - - - - -

THE COURT: Good morning. I congratulate our reporter on solving her technical difficulties so promptly. Good job. Do we have any preliminary matters before we continue with the cross-examination of Mr. Kouts?

MR. LO RE: Your Honor, we did have one preliminary matter, and the Court's indulgence, we would like to have a sidebar. Is that possible?

THE COURT: I suppose what we might do -- well, yes, we can always excuse Mr. Kouts temporarily.

MR. LO RE: This is actually something I would prefer is just discussed off --

THE COURT: Let us do this right down by the reporter.

(Discussion off the record.)

THE COURT: The Court thanks counsel and thanks them for their cooperation one with another. With that, Mr. Small, are you ready to continue with your cross-examination?

MR. SMALL: Yes, Your Honor.

Whereupon--

CHRISTOPHER KOUTS

Page 1564

a witness, called for examination, having been previously duly sworn, was examined and testified further as follows:

CROSS-EXAMINATION (Resumed)

BY MR. SMALL:

Q. Good morning, Mr. Kouts.

A. Kouts. Good morning.

Q. I'd like to return first to something you talked about yesterday under the heading M&O contractors. Did I have that right?

A. Yes.

Q. Okay And what is an M&O contractor again?

A. The M&O designation stands for management and operating contractor.

Q. And I believe you talked about documents that were produced by M&O contractors and how there would be some indication that the Department had approved those documents, is that right?

A. I believe my testimony was to the effect that the contractor document was not accepted by the Department unless it was published under the Department's letterhead with the Department's seal and with the Department's document designation.

Q. Okay. And so a document that did not meet the criteria that you've just testified to would simply be a contractor document, as opposed to a DOE

36

Page 1789

DIRECT EXAMINATION
BY MS. ORFIELD:
Q. Mr. Brewer, what company do you work for?
A. I work for ABZ, Incorporated.
Q. And what is your position there?
A. I'm one of the founders of the corporation and treasurer of the corporation.
Q. What academic degrees do you hold?
A. I hold a Bachelor of Science degree in electrical engineering from Louisiana Tech University, and I hold a Master of Science degree in nuclear engineering from the Massachusetts Institute of Technology, and I also attended the Bettis Reactor Engineering School. The last of those, the Bettis Reactor Engineering School, is a school run by the Bettis Atomic Power Laboratory solely for the Division of Naval Reactors.
Q. Can you describe your course of study at the Bettis Atomic Reactor Engineering School?
A. Right. As I said, the Bettis Reactor Engineering School is run by the Bettis Atomic Power Lab for the Division of Naval Reactors, and the Division of Naval Reactors is a joint DOD/DOE organization responsible for the Nuclear Propulsion Program of the United States Navy. In that course,

Page 1790

it's a graduate level course including nuclear physics courses, heat transfer of fluid flow, reactor design, all culminating in a project where the students are required to design a reactor.
Q. Can you briefly describe your general experience in the nuclear industry?
A. I've worked as a nuclear engineer for a little over 29 years now, first as a naval officer, later as a civilian employee for the Division of Naval Reactors, and subsequently as a consultant both for another company, as well as ABZ, Incorporated.
Q. What was your first position in the nuclear field?
A. My first position in the nuclear field was at the Division of Naval Reactors. In that position, I held a variety of responsibilities, but largely, that organization was responsible for the cradle-to-grave maintenance of the nuclear reactors in naval ships. And by that, I mean its everything from the initial conceptual design through the detail design, through construction, the initial testing, operations, maintenance, refueling, and the ultimate disposal and dismantlement of those reactors.
Q. And what classes of submarine reactor plants do you work with?

Page 1791

A. Yeah, in my responsibilities there, I worked on every class of nuclear submarine plant from the USS Nautilus through the most recently constructed class, which is called the Seawolf or SSN-21 class.
Q. And did you also have responsibility for a land-based prototype reactor?
A. Yes, at one point in my responsibilities there, I was the reactor plant lead for the construction of a land-based prototype that was used for training by naval reactors in the naval nuclear program, and it was the first facility that NR had ever built that was being built to the NRC's requirements and regulations. We weren't strictly being governed by the NRC, but we had agreed that we would comply and meet with all of their requirements.
Q. Did your duties in the Navy include the handling of spent nuclear fuel?
A. Yes, they did.
Q. Can you describe that further?
A. Well, like most any other activity I would have been involved in, that involvement would have, did include things like reviewing the procedures to be used, approving the procedures to be used, making sure that all the preparatory activities had been

Page 1792

taken care of, making sure that the shipyard or whoever was going to perform that activity. In this case, it would be a shipyard doing refueling, that they had all the equipment necessary, their people were all trained, they were ready to go, and if during the process there were any kind of problem, either programmatic or in any kind of the details, we would be responsible for helping them resolve those issues and get on with the work and complete it.
Q. During your time with the Navy, did you also have responsibility for budget matters?
A. Yes, I did.
Q. Specifically, what did you have responsibility for?
A. The naval reactors program was divided into different sections or areas of responsibility, and later in my career there, I became responsible for the work program, which is basically the annual operating budget for the section that I worked in.
Q. Okay. And what did you do after you left the Division of Naval Reactors?
A. I left NR in early 1986 and went to work for a consulting company here in Washington, D.C., called Pickard, Lowe & Garrick.

37

Page 1793

Q. And what is the nature of the work that Pickard, Lowe & Garrick does?

A. Pickard, Lowe & Garrick did a variety of consulting type activities for the commercial nuclear industry, as well as for some governmental agencies. The particular group that I was associated with in that organization had to do with operational considerations and regulatory compliance.

Q. When did you leave Pickard, Lowe & Garrick?

A. I think, officially, I left at the beginning of 1987. Mr. Abbott, who I had met at Pickard, Lowe & Garrick, and a gentleman named Fred Zoepfl, who I had worked with in the Navy, who also worked for Pickard, Lowe & Garrick and in fact was my reason for going to work at Pickard, Lowe & Garrick, convinced me that our interests were slightly different than what PLG's were, and we should go out and start our own company, and that is in fact when we started ABZ.

Q. In the 19 years of ABZ's existence, what sorts of projects have you worked on?

A. Initially, most of our work centered on regulatory compliance, evaluating various programs at reactors and at utilities and how they complied with the regulations from testing and operation and

Page 1794

helping in certain types of licensing efforts related to compliance with those regulations. Later on, we became involved fairly heavily in decommissioning cost estimating, which continues to be an activity we're engaged in.

That activity has to do with evaluating the costs and activity necessary to dismantle and decommission a nuclear reactor facility and at least, as of the time we've become involved in that process, always includes the cost and methods for how you maintain, store, and deal with spent fuel.

Initially, in the industry, spent fuel wasn't really considered part of the decommissioning estimating process, but ever since, I believe, the middle to late '80s, that's become pretty much the case. It's always there.

One of the other big activities that we've engaged in, in ABZ, is what we call severe accident cost estimating. That has to do with estimating the cost of cleanup of facilities after a severe reactor accident. Those cost estimates are used by the utility, particularly the risk managers, to help them in determining how much nuclear property insurance to buy.

Again, that particular function includes

Page 1795

considerations of how do you get the fuel out of the core, now in a somewhat damaged state potentially, and what do you do with it and what does that mean in terms of costs?

Q. And have you also been involved in design basis reconstitution?

A. Yes. We, everybody at ABZ and me, in particular, were involved in a couple of design basis reconstitution efforts, and what that really is, is I believe, in the '80s sometime, there was a concern at some utilities about not understanding why the plants were constructed the way they were and how they satisfied all the requirements and the regulations and why they were built the way they were, and those utilities undertook what have been come to be known as design basis reconstitution programs.

And in those programs, you go back and review all the design decisions that were made, including calculations that were done, to make sure that there's a good basis and that there's a good understanding of why the facility is the way it is, so that going forward, you can understand when you , when someone wants to make a change, what the implications of that change might be.

Q. And does that work require good familiarity

Page 1796

with the regulatory requirements that govern nuclear plants?

A. It does, and in fact, that's a large part of what the work is, is looking at what the regulations require and how the design in fact complies with those regulations and why the decisions were made that were made to build it the way you did in order to satisfy the regulations. In particular, in my work at Southern California Edison on their design basis reconstitution program, I wrote the procedure that they used, that all the design basis people used for evaluating what are called 5059 changes.

There's a section of the Code that allows utilities to make certain types of changes to the facility without getting approval of the NRC, and there's certain conditions that must be met in order for them to be allowed to make those kinds of changes. Like most regulations, the words aren't necessarily as clear as they might be, and in the process of this program, the issue was how do you go about reviewing that and how do you ensure that all the 5059 changes that have been made are really satisfactory?

That's kind of important because, here,

Page 1797

because there is a corresponding section in Part 72 of the Code, which is Part 7248, which is exactly that same type of change process, only related to the storage of spent fuel, and with the few exceptions where the words obviously have to be different because we're talking about spent fuel, as opposed to an operating reactor, those two sections, 7248 and 5059, are virtually identical. I mean, the process is the same.

Q. Okay. You had spoken about work on regulatory compliance or technical specification compliance earlier. Could you give us a few examples of your work in that area?

A. I think the very first thing I ever did working at PLG, and then we've done a couple of these at ABZ, is look at what's called the surveillance test program, which is a program embedded within the technical specifications for a reactor, in terms of periodic testing that has to be performed. Now, the technical specifications largely identify conceptually what has to be done and the frequency it has to be done at.

The real trick is then in taking that conceptual kind of thing and converting it into a real procedure and that – into a procedure that can

Page 1798

be done by the plant. So we've been involved in a couple of projects of going through and reviewing the entire surveillance test program, evaluating the testing procedures, commenting on where they need to be changed in order to satisfy the license of the plant.

And then later on, we in fact were involved in a couple of cases where we actually were involved in the actual rewriting of the procedures to make them comply. Along with that, in, I think, about 1988 or '89, in trying to help utilities deal with these periodic tests, we developed an artificial intelligence based computer program to help them schedule those tests, and that particular system has been in operation at one utility now, I think, for about 15 or 16 years.

Q. You also mentioned your work on decommissioning cost estimating. Can you give us more detail on what that involves?

A. We've done a variety of things both in doing our own decommissioning cost estimates, as well as reviewing those of others. We've done, I believe, at this point, 13 different estimates. That includes redoing estimates of a given plant, okay. All of those, with one exception, have always included costs

Page 1799

about storing the spent fuel. The one case where they didn't was it simply wasn't there. Because of the nature of the facility, there was no spent nuclear fuel there.

So, you know, like I said, we've done about 13 of our own estimates. Now, we've done reviews of other people's, and the biggest project we did in reviewing others was a project done for the Massachusetts attorney general's office, where we looked at the decommissioning cost estimates for nine different facilities in the northeast, and the questions we were asked to focus on in reviewing those estimates were Low-Level Waste disposal cost and spent fuel storage cost.

Q. And in general, how are the decommissioning cost estimates that you've performed used by utilities?

A. Well, the decommissioning cost estimates are used as part of the rate-making process. They use the decommissioning cost estimate to plan what their expenditures are going to be and to plan what kind of monies they need to get from their rate payers, in order to pay for the ultimate decommissioning of the plant.

And, you know, that rate-making is

Page 1800

controlled either by public utility commissions or public service commissions or, in some cases, FERC, and the utilities have submitted our estimates as part of that rate-making process to the appropriate bodies.

Q. So your cost estimates have been accepted by rate-making authorities?

A. They have.

Q. Have you also reviewed – I'm sorry. Strike that.

In the course of your decommissioning cost estimate work, have you ever been involved in the construction of an ISFSI?

A. Yes, we've been involved over the past few years with monitoring and commenting on the construction of the ISFSI at the Southern California Edison's San Onofre facility, and that's being done, like I said, as part of the decommissioning cost estimating work we've done for them, to help them in understanding where they're headed, what that means to the cost, whether there are things we see where they might change what they're doing to do this more cheaply, so we've been involved in that for a few years.

Q. Now, you also mentioned that you've worked

39

Page 1801

on severe accident –
A. Yes.
Q. – cost analyses. Can you elaborate on that a bit?
A. Well, the real issue is that a nuclear utility is required by law to buy a certain amount of nuclear property insurance. That insurance covers the cost of cleaning up the facility after a nuclear event. What we have done is we have done studies where we take the probabilistic risk assessments that are done by utilities which evaluate the range and type of accidents that are at least possible in the facility, take that and combine that with the cost estimating, to say, here's what it cost for this event to clean up, coupling that with the probability, whether it's a more probable or less probable event, and creating information that can be used by the risk managers, basically, the insurance people at these facilities, to decide how much insurance to buy because there's a fairly wide range. You know, you're required by law to buy slightly over a billion dollars of coverage, and at one point in time, you could buy almost 4 billion dollars. The difference between 1 billion and 4 billion in coverage is a pretty healthy premium, so

Page 1802

there's a great interest in determining what's the right number for them, given the potential exposure they see from these accidents and their own risk aversion and risk perspective.
Q. Have you previously given expert testimony?
A. I have twice before.
Q. And what were those occasions?
A. The first time was before the state of New Hampshire Nuclear Decommissioning Finance Committee. That was a committee set up by the state legislature, I believe it was, of New Hampshire, to review and have an effect on the decommissioning planning of any of the facilities in New Hampshire or that service New Hampshire customers. In particular, the testimony I provided was in reviewing cost estimates for the decommissioning of the Seabrook Nuclear Power Plant.
Q. Okay. And on the second occasion?
A. Second occasion was testimony before an international arbitration tribunal in a case between Mitsubishi Heavy Industries and an Italian company by the name of Finmeccanica. That particular case had nothing to do with nuclear, per se. It was more of a general engineering issue and dealt with what are called heat recovery steam generators.

Page 1803

MS. ORFIELD: Your Honor, we tender Mr. Brewer as an expert in the fields of nuclear engineering, nuclear fuel handling and storage, including the methods of storage and handling, general regulatory requirements –
THE COURT: You know what, Ms. Orfield, you're going to find that I tend to copy these down and parse them very closely.
MS. ORFIELD: I will speak very slowly.
THE COURT: So you've got to slow down enough so that my old hands can write down what you're saying.
MS. ORFIELD: I'll do that.
THE COURT: Thank you.
MS. ORFIELD: We tender Mr. Brewer as an expert in the fields of nuclear engineering and nuclear fuel handling and storage.
THE COURT: Now, is that two categories or one?
MS. ORFIELD: That is two categories.
THE COURT: So it's nuclear engineering is one.
MS. ORFIELD: And nuclear fuel handling and storage is the second. And then I have a description of what that includes.

Page 1804

THE COURT: Well, all right, but your explanation is what nuclear fuel handling and storage means?
MS. ORFIELD: Yes, what we intend to refer to by that description.
THE COURT: All right. If you'd like me to know that, please tell me.
MS. ORFIELD: Including the methods of storage and handling; general regulatory requirements and licensing; costs, including capital and operating expenses and operational issues; that's the end of the description.
THE COURT: Now, before – Mr. Shea, is this your witness?
MR. SHEA: Yes, it would be mine, Your Honor.
THE COURT: It is yours. Before I turn this over to Mr. Shea for his voir dire, may I just note to you, probably for tomorrow morning preferably, that it is usually helpful to, just a second, to have some idea about whether, and I'm going to read from Federal Rule of Evidence 702, one, the testimony is based upon sufficient facts or data; two, the testimony is the product of reliable principles and methods; and three, the witness has

Page 1811

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

TENNESSEE VALLEY AUTHORITY, )
Plaintiff, ) Case No. 01-249C
v. )
THE UNITED STATES, )
Defendant. )

Courtroom 4
National Courts Building
717 Madison Place NW
Washington, D.C.

Wednesday, July 13, 2005
Volume 9

The parties met, pursuant to the notice of the Judge, at 9:35 a.m.

BEFORE: THE HONORABLE CHARLES F. LETTOW

Page 1812

APPEARANCES:
ON BEHALF OF THE PLAINTIFF:
PETER K. SHEA, ESQ.
EDWIN W. SMALL, ESQ.
TENNESSEE VALLEY AUTHORITY
400 West Summit Hill Drive
Knoxville, Tennessee 37902-1499
(865) 632-7319

ON BEHALF OF THE DEFENDANT:
ALAN J. LO RE, ESQ.
SONIA ORFIELD, ESQ.
SHARON A. SNYDER, ESQ.
KEVIN CRAWFORD, ESQ.
U.S. Department of Justice
1100 L Street, Northwest
Washington, D.C. 20530
(202) 305-7562

***Index appears at end of transcript***

Page 1813

P R O C E E D I N G S
\- - - - -
THE COURT: Good morning. Do we have any preliminary matters this morning, Mr. Shea?
MR. SHEA: No, Your Honor.
THE COURT: Mr. Lo Re, Ms. Orfield?
MR. LO RE: I don't believe so, Your Honor.
MS. ORFIELD: No, Your Honor.
THE COURT: Ms. Orfield, if I recall correctly, you had a few questions to ask Mr. Brewer.
Whereupon--
WARREN BREWER
a witness, called for examination, having been previously duly sworn, was examined and testified further as follows:
DIRECT EXAMINATION (Resumed)
THE COURT: Ms. Orfield, you may proceed.
MS. ORFIELD: Thank you, Your Honor.
BY MS. ORFIELD:
Q. Good morning, Mr. Brewer.
A. Good morning.
Q. Were you retained by the government to provide assistance with this case?
A. I was in August or September of last year.
Q. And what were you retained to do?
A. I was retained to review the TVA claim for

Page 1814

cost issues related to the technical aspects of building the ISFSI and loading the fuel in the ISFSI.
Q. Did you prepare a report for this case?
A. Yes, I did.
Q. If you'll take a look in the folder or binder in front of you, there should be a document that we've marked as Exhibit DX-216.
A. Yes.
Q. Is your report that document?
A. Yes, it is.
Q. Does that report reflect the opinions you've arrived at?
A. Yes, it does.
Q. Do you hold those opinions to a reasonable degree of certainty based upon your expertise?
A. Yes, I do.
Q. Can you please describe the facts or data that you relied on in coming to each of your opinions?
A. Okay. I reviewed the TVA claim documents. There were, I believe, four of them. Those documents included not only the cost reports reported, but descriptions of the activities that led to those costs. They included descriptions of contractor work and contracts executed to perform that work.

analysis for a rack? No.

Q. In your survey of the TVA costs, you didn't perform any what you called bottoms-up or grounds-up estimates, did you?

A. I did not, and that was a purposeful decision on my part.

Q. Essentially, you used TVA's actual costs and then extrapolated from them?

A. Right, because that reflects the actual experience and TVA's administrative and organizational processes.

Q. And you've reviewed the standard contract, but not the TVA contract?

A. I have reviewed the standard contract. I don't remember that I particularly reviewed it in this case, and I don't know that any of my opinions are contingent upon any sort of understanding I gleaned from review of that contract.

MR. SHEA: Your Honor, we have no further questions at this time, but we would oppose the general offer on the following grounds: Number one, the qualification of nuclear engineering is far too broadly based. I mean, that covers such a wide ground, and we've seen nothing that ties anything here to such a broad offer. As to fuel handling and



storage and the methods of storage and handling, I don't know that we've seen any testimony that tells us that Mr. Brewer has been involved in actual day-to-day ISFSI work in any way, shape, manner, or form.

Cost estimating always looks to the future and to things that might happen in the future, as opposed to things that are happening today. As to operational issues and costs, I don't know what the operational issues they're referring to are here, so it's very difficult for me to respond to that more particularly, but as to costs, it's clear that he's not an accountant. I see that he's an engineer. I don't doubt that he's an engineer. I don't see that he's an expert is my problem.

Your Honor, I don't see the transition from point A to point B.

THE COURT: Ms. Orfield, what do we do about the broad area of nuclear engineering? I have no doubt that Mr. Brewer is a nuclear engineer in a sense, but that discipline, if you will, is certainly applicable in this case, but in a – well, I was going to say constraint, that's not exactly right, in a discrete way.

MS. ORFIELD: Well, Your Honor, I think we



have demonstrated that Mr. Brewer has a degree in nuclear engineering. He's been working in the field for many years. I don't actually – just a moment. I don't have the actual year he started, but I believe it's approaching 30 years. He's done many different facets of nuclear engineering work. He's described many of them today and yesterday. He also, I think, definitely demonstrated qualification in the other issues mentioned by Mr. Shea. He has extensive experience in costing.

THE COURT: Well, now, that's a separate topic.

MS. ORFIELD: Okay.

THE COURT: I propose to come to that in a moment or so. Let's not get off the subject.

MS. ORFIELD: All right. He certainly described many different areas within the field of nuclear engineering that he's done extensive work in, and I definitely think that he has shown his qualification in that category.

THE COURT: Mr. Shea, I wonder if you could join Ms. Orfield at the podium and if you could give any suggestions you may have as to how we address the broad topic of nuclear engineering.

MR. SHEA: Well, at a minimum, I think we



should be limiting it to the aspects that are involved in this case, that we should be trying to determine what it is that Mr. Brewer wishes to opine on in the areas of nuclear engineering with regard to this case. One of those areas is nuclear fuel handling and storage, and that's a subset of nuclear engineering.

Another area that's going to come up in this case is obviously going to be issues with regard to construction design basis documents in regard to an ISFSI, where he talks about his professional opinion about certain studies that TVA had performed and the reasonableness of their studies. I understand that Mr. Brewer has done decommissioning cost estimates for ISFSIs.

THE COURT: Now, let's not get into the cost estimation part just yet.

MR. SHEA: I think they're related, is the problem.

THE COURT: Well, they are. I don't have any doubt about that. But let's just focus on the engineering part.

MR. SHEA: For the engineering part, the focus I think should be on – it's hard to get, you get over to the operational, you're still – that's

42

Page 1843

the problem. I think nuclear engineering is just too broad a topic to do, it's almost impossible to bound. If we look at the individual discrete categories, perhaps then we can get further along the lines without a general offer of expertise in all areas for all things.

THE COURT: Well, the testimony though is that Mr. Brewer has carried forward with a design of a nuclear reactor prototype, and I take it, it was constructed and installed and is operational for naval training purposes and complied with the NRC's – well, I wouldn't say licensing requirements, but technical requirements, and Mr. Brewer said it complied with them in every respect, so he certainly is more qualified than most folks on the street in this particular area.

MR. SHEA: Absolutely; that isn't, of course, one of the areas at issue here.

THE COURT: Well, I know. My inclination is to allow the qualification in the nuclear engineering area, notwithstanding its breadth. I will do that, all right, so one of the areas will be nuclear engineering. Now, let's deal with the second. I am much more dubious about nuclear fuel handling and storage.

Page 1844

I don't have any trouble with Mr. Brewer's qualifications regarding cost evaluative work respecting nuclear fuel handling and storage, and I'm going to say evaluative, rather than cost estimating or cost review work, because there is both a looking forward and a looking backward aspect to this exercise, and evaluative might be broad enough to cover both. What would you think about that, Ms. Orfield?

MS. ORFIELD: Your Honor, in terms of the Court's concern with fuel handling, I would just point out that Mr. Brewer did testify that he worked, that he handled, had responsibility for fuel handling while he was in the Navy, and of course, fuel handling is also an issue that comes up in all of these estimates that he has completed. It's something that is part of – relevant to those estimates.

THE COURT: Well, you have proposed that we start with the second category as being the broad one of nuclear fuel handling and storage. That's not really what Mr. Brewer is proposing to address in his testimony. He really is evaluating costs, as I understand it, and, you know, you've got a subset of nuclear fuel handling and storage which is really the

Page 1845

thrust of his testimony, and that's not appropriate.

MS. ORFIELD: Well, Your Honor, he's evaluating costs that are associated with the fuel handling.

THE COURT: Yes, that's exactly right. That's what I propose to say, cost evaluation work respecting nuclear fuel handling and storage. Now, we haven't heard from Mr. Shea. I'll let you think about that for a moment or so, Ms. Orfield. Mr. Shea, what do you think about that qualification area? Mr. Brewer, you're listening to all this, and you've got thoughts of your own that I can't listen to just at the moment.

MR. SHEA: I suppose that I think that's fair, is ultimately what I think, Your Honor.

THE COURT: All right. Thank you. Ms. Orfield, I'm not saying – you don't have to say whether it's fair or not. You just tell me whether it's acceptable or not.

MS. ORFIELD: Your Honor, it's not clear to me whether the second category you've discussed is what you're proposing for the entire rest of Mr. Brewer's qualification, or is there, are you planning to continue with the rest of the list?

THE COURT: To some extent, the rest of the

Page 1846

list is encompassed by the broad first category. I am not proposing a third or a fourth category.

MS. ORFIELD: Okay.

THE COURT: This is it.

MS. ORFIELD: I mean, I would ask that it also relate to costs and regulatory issues.

THE COURT: Well, that's tautological in this country, nuclear matters, fuel matters, reactor matters, all of those matters are so regulated by the NRC that it just comes with the territory.

MS. ORFIELD: So it's encompassed in –

THE COURT: Yes, it is.

MS. ORFIELD: – what you're saying he's qualified for?

THE COURT: Right. Mr. –

MR. SHEA: May I interrupt here, Your Honor?

THE COURT: Yes.

MR. SHEA: I'm not at all sure that we have reached one area in this, and that's the issue of the studies that Mr. Brewer wishes to opine upon with regard to design criticality analyses, thermal criticality analyses, cask tipover analyses, and all those. Now, I don't view those as cost evaluative issues. I view those as substantive issues as well.

Page 1847

THE COURT: That's why we have the nuclear engineering category, to my mind, because those are engineering issues, and they have to pass muster with the NRC.

MR. SHEA: But is there any link between Mr. Brewer's background that makes him expert in those issues, as opposed to simply an engineer looking at those issues? It's true that he's an engineer, and it's true that an engineer can look at issues like that and offer opinions. I'm concerned about the expertise here, Your Honor, and the lack of experience in that particular area with those particular analyses and that particular equipment.

THE COURT: Are you talking explicitly about the licensing of an ISFSI -- I always get that wrong, a dry storage facility --

MR. SHEA: More specifically than that, Your Honor, there were seven or eight studies that were performed that Mr. Brewer challenges the reasonableness of.

THE COURT: Yes.

MR. SHEA: And he does that on the basis that, in his opinion, they were not necessary for the design, construction, or operation of an ISFSI, and that's where I'm having a problem because he has not

Page 1848

designed or constructed an ISFSI, among other things.

MS. ORFIELD: Mr. Brewer testified that he has worked for numerous clients in helping them comply with regulations, which he has also testified are very similar to the regulations that govern an ISFSI.

MR. SHEA: Well, I'm not into close enough for government work.

THE COURT: Well --

MS. ORFIELD: He's also said that he was explicitly involved in assisting one client with the construction of an ISFSI and consulting with them during that process.

THE COURT: Now, just a moment, Ms. Orfield. Well, now, I remember yesterday afternoon Mr. Brewer's testimony about doing some work respecting Southern California Edison's San Onofre, if I recall correctly, facility. I don't know exactly, I don't remember exactly what that work was. I remember that's what, that's what we're talking about -- you're talking about?

MS. ORFIELD: Yes, Your Honor.

MR. SHEA: I believe that was cost overview and analysis work, Your Honor, they were hired to look at the quality, just sort of look at the

Page 1849

construction costs coming in and eventually do the same type of analysis coming from the other cost estimates.

THE COURT: Ms. Orfield?

MS. ORFIELD: It might be helpful if we could have Mr. Brewer describe it further. However, I would also note that he has testified that the regulations, the other regulations that he worked with governing nuclear power plants are not significantly different from those that govern an ISFSI, and he's done extensive work having to do with those regulations.

THE COURT: Well, the same principles apply, I don't have any doubt about that, in the broadest possible sense, but I think you might get a little disagreement from the NRC about the grubby details. Do we have any disagreement about qualifying Mr. Brewer as an expert on cost evaluative work respecting nuclear fuel handling and storage? Let's just nail that one down.

MR. SHEA: Nailed down from my perspective, Your Honor.

THE COURT: All right. Ms. Orfield?

MS. ORFIELD: Yes, Your Honor.

THE COURT: All right. Now, we're talking

Page 1850

about, only as far as the Court is concerned, Mr. Brewer's qualifications to address licensing requirements for an ISFSI, I'm just going to say dry storage facility, too many consonants in that.

MS. ORFIELD: And this is under the broad heading of nuclear engineering.

THE COURT: That's correct, as far as the Court's concerned. Now, we can leave it at that, or you can pursue the matter further. It's up to you.

MS. ORFIELD: Well, I'm not sure where things stand, but I do believe we've shown ample qualification to address those issues under that heading.

THE COURT: Well --

MS. ORFIELD: Including structural analysis.

THE COURT: You want to make sure that you've done that to your own satisfaction. It's, as we've discussed before, to the Court's mind, the licensing aspects are part and parcel of the nuclear engineering and other work generally in this country, just because of our regulatory spectrum. But, you know, you've got to have a specific qualification if you want the Court to make credibility findings respecting Mr. Brewer's testimony on some of these

44

Page 1851

points that Mr. Shea is suggesting might be at issue in the next few hours.

MS. ORFIELD: Well, in terms of licensing, I think he's definitely demonstrated familiarity with reviewing licenses to assist clients numerous times.

THE COURT: He has that.

MS. ORFIELD: So I don't think licensing should be an issue.

THE COURT: I don't think that's exactly Mr. Shea's point.

MS. ORFIELD: In terms of – I'm having trouble recalling what Mr. Shea's point was. I believe it had to do with the studies.

THE COURT: No, what would be prudently necessary for an operator of a nuclear plant not only to gain, to get licensing, the requisite licenses from the Nuclear Regulatory Commission for a facility and for the components of that facility, but also for the plant owners and operators' peace of mind. I mean, I'm putting words in Mr. Shea's mouth.

MR. SHEA: But that's the thrust of the absence of experience with actual design and construction.

MS. ORFIELD: With regard to an ISFSI specifically?

Page 1852

MR. SHEA: Yes, with regard to the particular studies, the 7 or 10 particular studies, whatever they are, that we have here.

THE COURT: We can leave it. The Court is perfectly happy to leave it right there.

MS. ORFIELD: Well, Your Honor, I would like it to be clear that Mr. Brewer is qualified to address those matters.

THE COURT: Well, I'm sure he will address them.

MS. ORFIELD: But I would like him, I would like it to be clear that he's been recognized as an expert to address them, and he has testified that he's very familiar with the regulations that govern ISFSIs, that those are very similar to other regulations he's worked with extensively, that he has worked with those regulations specifically on, with a specific operating ISFSI, also in his consulting work on other matters, litigation matters.

THE COURT: Let's just say we're spending much too much time on this exercise. What we really ought to be doing is focusing on the fact that Mr. Brewer's testimony on the areas that Mr. Shea has suggested that he will address would be credible, more credible to the extent he can say this happened

Page 1853

or he has experience that he can relate by analogy or otherwise to the particular situation at hand. That's true in any circumstance. We're not dealing with something that is unusual.

MS. ORFIELD: I'd also like to note that the studies that Mr. Shea is referring to don't just deal with ISFSI licensing, but they also have to do with plant operation and moving fuel.

THE COURT: Well, exactly, that's right. You want to try to qualify Mr. Brewer for a third area, or are you satisfied?

MS. ORFIELD: I guess I'm not sure of the state of his qualification, whether the nuclear engineering category has encompassed, whether the Court has recognized that that encompasses what we've been discussing with regard to ISFSI licensing and plant operation and fuel handling.

THE COURT: It does, as we've discussed.

MS. ORFIELD: Okay.

THE COURT: It just naturally does because you can't have one of these facilities unless it's licensed.

MS. ORFIELD: Okay, Your Honor.

THE COURT: So Mr. Brewer can testify about it. We're just talking about the degree of his

Page 1854

expertise and how credible his testimony's going to be, and that's something you have to work on in your direct examination of Mr. Brewer.

MS. ORFIELD: Okay. Thank you, Your Honor.

THE COURT: Does that help?

MS. ORFIELD: Yes, Your Honor.

THE COURT: All right. Thank you. Now that we've got that sorted, Ms. Orfield, you may proceed.

MS. ORFIELD: Ms. Miller, would you please pull up Demonstrative 21?

DIRECT EXAMINATION (Resumed)

BY MS. ORFIELD:

Q. Mr. Brewer, you should have a notebook that has these demonstratives –

A. Yes, I do.

Q. – in front of you. Now, can you give me a summary of the opinions that you've reached in the report?

A. Yes, first, the cost for transfer of fuel in the but-for world has been understated. Second, if it were determined to be necessary that in the but-for world there would be a need for an ISFSI at either Browns Ferry or Sequoyah, that the cost for that facility would be the same as what has actually