# APPENDIX

Excerpts From Dr. Neuberger's Report Demonstrate
That His Opinions Are The Product Of Speculation And Hypothesis

| — Gray-colored rows include text from the Report's heading.<br>— Other rows include excerpts from designated sections of the Report.<br>— Bolded and italicized text indicate emphasis added. | ¶ | Rep. at |
|---|---|---|
| **V. CRITIQUE OF THE GRAVES MODEL** | | |
| **A. The Graves model relies on questionable and unsupported assumptions** | | |
| Any modeling effort must use certain assumptions as key inputs. The reliability of a model's predictions depends, in part, on the accuracy and reasonableness of these underlying assumptions | 37 | 10 |
| **1. Mr. Graves relies on cost estimates of uncertain relevance** | | |
| Mr. Graves relies on cost estimates provided by Roderick Knight . . . It is ***unclear***, however, whether these estimates are representative of the industry-wide costs for which Mr. Graves uses them | 39 | 10-11 |
| Without knowledge of the true distribution of these costs, however, it is ***difficult to know if*** the four studies chosen by Mr. Knight are truly indicative of relevant average industry costs. | 40 | 11 |
| **2. Mr. Graves fails to consider license extensions** | | |
| Since the assumed rate of aggregate acceptance in each year drives many of the predictions of Mr. Graves' model, the "must move" mountain is significant. ***If*** the slope of the mountain is lower, Mr. Graves' conclusions about aggregate acceptance ***may be inaccurate***. | 45 | 13 |
| **4. Mr. Graves assumes a uniform full core reserve policy across all utilities** | | |
| Some utilities, however, ***may seek*** to maintain pool reserves different than one full core. | 50 | 14 |
| Additionally, Mr. Graves ignores the possibility that utilities ***may place value*** on additional capacity in their spent fuel pools over and above their respective reserve policies. | 50 | 14 |
| **B. Mr. Graves' Economic Sequence Model provides an incomplete characterization of the supply and demand for trading DOE acceptance rights** | | |
| Mr. Graves ignores factors besides avoidable cost that ***could affect*** the demand for DOE acceptance rights, including risk aversion, uncertainty, and political, regulatory and community pressure. | 52 | 15 |

| | ¶ | Rep. at |
|---|---|---|
| A utility ***may desire*** acceptance rights beyond its "must move" needs to reduce pool storage and obtain additional flexibility to address future spent fuel storage needs. | 52 | 15 |
| A utility ***may face*** political pressure from environmental groups, community activists or local ratepayers to reduce the quantities of SNF stored onsite, whether or not there are avoidable costs tied to that fuel. | 52 | 15 |
| These ***potentially important*** factors are not considered in the Graves model in influencing both the demand and supply for DOE acceptance rights | 52 | 15 |
| From an economics perspective, these assumptions lack credibility. They ignore the ***possibility*** that removing SNF from a nuclear facility before it is actually "required" ***may have value*** in and of itself. | 56 | 16 |
| For example, a utility ***may perceive*** that the removal of SNF from its pool reduces operational risk. | 56 | 16 |
| Mr. Graves also fails to recognize that early removal of spent fuel ***may have*** considerable value to a utility in terms of its relations with ratepayers and other stakeholders. | 57 | 16 |
| In Figure 5, I present a more complete characterization of the market in which the factors affecting the supply of DOE acceptance rights are also modeled.… [I]t is ***impossible to estimate*** how this more complete depiction of the market would affect any individual utility's ability to purchase DOE acceptance rights . . . | 60 | 17 |
| It is also ***possible*** that a shock to the supply side of this hypothetical market ***could eliminate*** all trading. | 61 | 17 |
| **C. The Graves model unrealistically assumes perfect information and thus ignores the impact of uncertainty on the market for DOE acceptance rights** | | |
| Even if DOE's acceptance program were not interrupted by such an event, ***uncertainty could produce*** the same result. | 65 | 19 |
| Concerns about the ***potential*** interruption of acceptance ***might lead*** many utilities to change their valuations and place extraordinary values on current rights versus uncertain future rights. | 65 | 19 |
| Supply of these rights ***could virtually disappear*** because, in the presence of uncertainty, utilities ***might use*** their OFF allocations ***even if*** they do not "need" them in the current year according to Mr. Graves' criteria. | 65 | 19 |
| Uncertainty about future performance or future events, however, would lead to different behavior.<br>• In that setting, ***some*** utilities ***might*** withhold their acceptance rights from the nascent trading market.<br>• ***Some might*** adopt a "wait and see" attitude about the DOE acceptance program.<br>• With OFF allocations in hand, they ***might wait*** for proof that DOE ***could*** actually perform and ***could*** perform at its ***projected*** rates for a period of years. | 66 | 19 |

| **D. In the presence of uncertainty, risk management and strategic behavior would further complicate Mr. Graves' market** | | |
|---|---|---|
| | ¶ | Rep. at |
| In a more realistic and uncertain setting, however, utilities ***may choose*** to withhold these rights for at least two reasons. | 74 | 22 |
| First, a utility with current rights but no current "must move" situation ***may choose*** to withhold some or all of those rights from the market and use them instead to have some of its own fuel removed before it faces a "must move" condition. | 74 | 22 |
| It ***may make*** this decision to reduce its perceived risk of an unexpected shutdown, to provide additional storage capacity in the event of an interruption in DOE acceptance, or in recognition of political or social pressures from the local community | 74 | 22 |
| Second, a utility ***might*** withhold rights to restrict supply in the market and thereby exert upward pressure on current market prices | 75 | 22 |
| In fact, strategic behavior ***could affect*** many aspects of Mr. Graves' modeling framework. | 76 | 22 |
| Buyers and sellers ***may send*** misleading signals about the valuations they place on DOE acceptance rights. | 77 | 23 |
| Risk-averse utilities ***might*** strategically bid up prices of currently "unneeded" rights in order to obtain those rights to the detriment of utilities that are in "must move" situations. | 77 | 23 |
| In that case, those utilities with the highest avoidable costs ***might not*** be able to secure current acceptance rights | 77 | 23 |
| In the presence of uncertainty, risk aversion, and strategic behavior, trading of DOE acceptance rights could occur at a whole range of prices…Trading also ***might not*** occur at all. | 79 | 23 |
| **F. Mr. Graves overstates the relevance of other markets as support for the development of a market for DOE acceptance rights** | | |
| An exchange of DOE acceptance rights…***may face*** physical constraints imposed by the utilities, the transportation system, or DOE. | 86 | 25 |
| Any disruption to the DOE program ***could stifle*** the trading market and lead to unavoidable "must move" situations for utilities… | 88 | 26 |
| While the number of market participants is ***not necessarily*** a determinant of the depth of the market, more traders ***likely means*** more trading activity and a ***greater likelihood*** that market prices will reflect underlying values | 90 | 26 |
| In the hypothetical market for DOE acceptance rights…There are ***potentially*** an infinite number of outcomes, many of which would not resemble those proposed by Mr. Graves | 94 | 27-28 |

| VI. CRITIQUE OF THE CORNELL DAMAGES ANALYSIS | | |
|---|---|---|
| **B. Some of Professor Cornell's damages may not represent incremental costs imposed by the Government's failure to perform** | | |
| | ¶ | Rep. at |
| PG&E also includes time spent by PG&E employees working on the ISFSI projects as direct charges to these cost accounts. Such employee time, however, ***may not*** be consistent with the concept of incremental costs. If an employee's compensation is unaffected by the specific activities he or she performs, then including some of that employee's compensation in damages ***may not*** reflect a cost to PG&E that is truly incremental to the breach | 104 | 31 |
| Again, a cost allocation for managerial purposes is ***not necessarily*** consistent with an out-of-pocket incremental expense included in a conceptually valid measure of damages | 108 | 33 |
| ***If*** all of these conditions are not satisfied in every instance, then congestion ***may not*** really exist. | 109 | 33 |
| **C. Professor Cornell ignores decommissioning costs, despite their potential effect on PG&E's damages** | | |
| To the extent that the present value of decommissioning costs differs in the breach and but-for worlds, this timing ***may*** affect damages. | 110 | 33 |
| ***If***, however, decommissioning costs escalate at a rate slower than PG&E's cost of capital, then delays resulting from the Government's breach actually *reduce* these costs in present value terms and provide a net benefit to the utility and to ratepayers. These ***potential*** benefits are ignored in Professor Cornell's estimate of damages. | 111 | 34 |
| ***If*** similar types of costs are associated with decommissioning Humboldt Bay, then delays imposed by the Government's breach will actually provide a net benefit to PG&E. | 112 | 34 |
| ***If*** the rate of return PG&E earns on trust fund assets has exceeded the rate at which decommissioning costs have escalated, then PG&E has benefited from the Government's breach and resulting decommissioning delays. The magnitude of these benefits can be ***estimated*** by multiplying the difference between the trust fund return and the rate of escalation of decommissioning costs during the relevant period. For example, ***if*** the difference between the return and the cost escalation rate is two percent, and the trust fund contains $250 million, then PG&E is benefiting by $5 million for every year that decommissioning is delayed by the Government's breach. These benefits ***may be*** an appropriate offset to any award of damages to PG&E. | 113 | 34-35 |

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| PACIFIC GAS & ELECTRIC COMPANY<br><br>Plaintiff,<br><br>vs.<br><br>THE UNITED STATES<br><br>Defendant. | No. 04-0074C, into which has been consolidated No. 04-0075C<br><br>January 27, 2006 |

# EXPERT WITNESS REPORT

# OF

# JONATHAN A. NEUBERGER, PH.D.

*Protected material*
*To be disclosed only in accordance with*
*U.S. Court of Federal Claims Protective Order*

## TABLE OF CONTENTS


I. ASSIGNMENT ..... 1

II. QUALIFICATIONS ..... 2

III. SUMMARY OF OPINIONS ..... 3

IV. THE GRAVES MODEL ..... 5

V. CRITIQUE OF THE GRAVES MODEL ..... 9

A. The Graves model relies on questionable and unsupported assumptions ..... 10

B. Mr. Graves' Economic Sequence Model provides an incomplete characterization of the supply and demand for trading DOE acceptance rights ..... 14

C. The Graves model unrealistically assumes perfect information and thus ignores the impact of uncertainty on the market for DOE acceptance rights ..... 18

D. In the presence of uncertainty, risk management and strategic behavior would further complicate Mr. Graves' market ..... 21

E. Mr. Graves predicts that trades would take place at a zero price ..... 23

F. Mr. Graves overstates the relevance of other markets as support for the development of a market for DOE acceptance rights ..... 24

G. Mr. Graves overstates the efficiency gains from his model ..... 28

VI. CRITIQUE OF THE CORNELL DAMAGES ANALYSIS ..... 30

A. The Cornell damages framework ..... 30

B. Some of Professor Cornell's damages may not represent incremental costs imposed by the Government's failure to perform ..... 31

C. Professor Cornell ignores decommissioning costs, despite their potential effect on PG&E's damages ..... 33




*Protected material*
*To be disclosed only in accordance with*
*U.S. Court of Federal Claims Protective Order*

VII. SIMULATION OF THE DOE MODEL UNDER ALTERNATIVE AGGREGATE ACCEPTANCE RATES ....... 35

A. The DOE model ....... 35

B. Results ....... 36



*Protected material*
*To be disclosed only in accordance with*
*U.S. Court of Federal Claims Protective Order*

## EXHIBITS

| | |
|---|---|
| **Exhibit 1** | Curriculum vitae of Jonathan A. Neuberger |
| **Exhibit 2** | Documents and Data Reviewed and Considered |
| **Exhibit 3** | "Must Move" Mountain of Spent Fuel: License Extension Affects Acceptance Rate Conclusion |
| **Exhibit 4** | Example of The Effect of Reduced Participation in The Graves Model |
| **Exhibit 5** | Example of The Effect of Price Sensitive Participation and a Supply Shock |



*Protected material*
*To be disclosed only in accordance with*
*U.S. Court of Federal Claims Protective Order*

## I. ASSIGNMENT

1. My name is Jonathan A. Neuberger. I have been asked by counsel for the U.S. Department of Justice ("DOJ") to analyze certain aspects of the models used by experts for Pacific Gas & Electric Company ("PG&E" or "plaintiff") to quantify its claim for damages against the Government for partial breach of the "Standard Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste" ("Standard Contract") between PG&E and the U.S. Department of Energy ("DOE").

2. I understand that the Nuclear Waste Policy Act of 1982 ("NWPA") authorized DOE to enter into contracts with commercial nuclear utilities concerning the acceptance and disposal of spent nuclear fuel ("SNF") generated by those utilities. Under the terms of this contract, the utilities pay fees into a Nuclear Waste Fund, whose purpose is to pay DOE program costs, including the building of a storage facility, the transportation of SNF, and the storage and monitoring of that waste. DOE's performance under the contract was to commence by January 31, 1998.

3. DOE did not begin accepting SNF in 1998. In response, utilities filed suit for partial breach of the Standard Contract, alleging that the Government's delay imposed on the utilities the obligation to incur the costs of storing SNF that would not have been incurred had DOE begun performance in 1998.

4. PG&E, which owns nuclear power plants at Humboldt Bay and Diablo Canyon, was among the companies that filed a legal action. In order to quantify its damages arising from the Government's partial breach, PG&E has engaged the services of two different expert consultants, Frank Graves of The Brattle Group and Brad Cornell of CRA International.

5. I have been asked to assess the modeling framework used by Mr. Graves for purposes of determining the dates by which PG&E allegedly would have had its SNF removed from Humboldt Bay in the "but for" world, that is, absent the Government's partial breach of the Standard Contract. Mr. Graves presents a model



*Protected material*
*To be disclosed only in accordance with*
*U.S. Court of Federal Claims Protective Order*

whose predictions purportedly approximate the outcomes of a nascent market for intertemporal trading of DOE acceptance rights.[1] Mr. Graves asserts that the outcomes of this nascent market would be more efficient than DOE's "oldest fuel first" ("OFF") acceptance priority rankings set forth in the Standard Contract. In this report, I provide an economic analysis and critique of the assumptions, theory, and practical implications of Mr. Graves' model.

6. The output of Mr. Graves' model informs the damages calculations offered by Professor Cornell in terms of the dates in the but-for world when PG&E's SNF allegedly would have been removed from Humboldt Bay.

7. I have also been asked to provide an assessment of certain aspects of the modeling approach referenced in Professor Cornell's report to quantify PG&E's damages. I understand that DOJ has engaged another expert to provide a more detailed analysis of PG&E's damages estimate.

8. I have also been asked by DOJ counsel to simulate the DOE model for allocating acceptance rights based on the OFF priority rankings to provide the Government's damages expert an alternative basis for determining the dates by which PG&E would have had its SNF removed in the but-for world.

9. I am being compensated at a rate of $400 per hour for my work in this case. I will be compensated at the same rate if I am asked to testify at deposition or trial.

## II. QUALIFICATIONS

10. I am a Senior Vice President in the economic consulting firm Economists Incorporated ("EI"). My *curriculum vitae*, which contains a list of my publications, professional experience, and prior testimony, is attached as Exhibit 1 to this report.

[1] The term "intertemporal trading" refers here to the trading of DOE rights for acceptance at different points in time.



*Protected material*
*To be disclosed only in accordance with*
*U.S. Court of Federal Claims Protective Order*

11. In May 1978 I received an undergraduate degree in international relations from Georgetown University. I received my master's degree in economics from Johns Hopkins University in May 1985, and my Ph.D. in economics from Johns Hopkins University in July 1988.

12. From 1988 to 1994, I was an Economist in the Research Department of the Federal Reserve Bank of San Francisco. In that capacity, I conducted research and policy analyses of banking and financial markets. In particular, I studied aspects of bank and thrift lending decisions, portfolio management, risk, and the behavior of bank holding company stocks. I also performed competitive analyses related to regulatory applications for bank mergers and acquisitions. During most of this period, I also served as Visiting Assistant Professor of Economics at Mills College, Oakland, California, teaching courses in economics and finance.

13. Subsequent to leaving the Federal Reserve Bank of San Francisco, I served as: an Economist and Manager at the accounting firm Deloitte & Touche, LLP; a Senior Economist at Benderly Economic Associates; a Senior Managing Economist at LECG, Inc.; and a Partner at the consulting firm Bates & White, LLC. In each of these positions, I used the analytical tools of economics, statistics and finance to address issues of financial performance, business conduct, risk management, and economic policy. In addition, much of my professional experience has focused on measuring and assessing economic damages in commercial litigation involving companies in a broad range of industries.

## III. SUMMARY OF OPINIONS

14. The modeling framework presented by Mr. Graves provides an overly simplistic representation of the incentives and market forces facing utilities for holding, buying and selling DOE acceptance rights. Mr. Graves asserts that the allocation of acceptance rights based on OFF is economically inefficient and that a market for trading these rights would have developed readily and quickly in the but-for world.



*Protected material*
*To be disclosed only in accordance with*
*U.S. Court of Federal Claims Protective Order*

While the formation of such a market may be intuitively appealing from an economics perspective, Mr. Graves' model fails to capture many of the fundamental drivers that would affect this hypothetical market and thus produces unreliable results. The Graves model relies on questionable and unsupported assumptions and inputs, provides an incomplete characterization of the trading market, and ignores sociopolitical concerns and important factors relating to uncertainty and risk that would affect the behavior of market participants.

15. Professor Cornell opines that damages should reflect only those costs that are incremental to the Government's partial breach of the Standard Contract. This principle is consistent with my understanding of the correct definition of economic damages. In practice, however, it is unclear that Professor Cornell's damages model comports with this principle. Based on my review of his report and supporting documents, he includes a number of costs that are, in fact, not incremental to the breach. These costs include time spent by PG&E personnel on breach-related activities as well as certain overhead expenses and allocated costs that are attributed to the breach.

16. My simulation of the DOE allocation rights model reveals that, under the aggregate rate of acceptance identified in the 1991 Annual Capacity Report ("ACR"), and based on OFF priority rankings, PG&E's Humboldt Bay facility would have had the last of its spent fuel removed in 2001. Applying the same acceptance rate (extending the rate as described below) to Diablo Canyon, the first pickup from DOE would be in 2012.

17. In expressing these opinions, I make the following reservations:

a. The opinions I express in this report are based on my review of available documents and various analyses I have performed. I respectfully reserve the right to express additional opinions, supplement or amend the opinions in this report, or provide additional reasons for these opinions, as additional documents



*Protected material*
*To be disclosed only in accordance with*
*U.S. Court of Federal Claims Protective Order*

are produced, the transcripts of expert and fact depositions become available for my review, and new facts are introduced during discovery and trial.

b. I have identified in Exhibit 2 the documents that I reviewed and considered in preparing my report. In addition to these documents, I may use other exhibits as a summary or to support my opinions in this case. I also may consider additional exhibits introduced in connection with the testimony of other experts or witnesses, or other documents produced in this case, and I may revise or amend my opinions accordingly.

## IV. THE GRAVES MODEL

18. The underlying motivation of Mr. Graves' modeling framework is his view that the allocation of DOE acceptance rights according to the OFF priority rankings is economically inefficient. This lack of efficiency allegedly arises because OFF allocates acceptance rights based solely on the age of the spent fuel and without regard to the costs utilities face to store that spent fuel. According to Mr. Graves, acceptance under an OFF regime would cause many utilities to incur costs that could be avoided under a different allocation mechanism.

19. Mr. Graves' model assumes that if a utility can avoid incurring additional at-reactor expenses by trading acceptance rights with other utilities, then it has an incentive to make such trades. For the industry as a whole, he asserts that the trading of DOE acceptance rights lowers the sum total of at-reactor storage costs, producing a result that is purportedly more economically efficient than OFF, at least for utilities.

20. To identify how this market for trading DOE acceptance rights would function in the but-for world, Mr. Graves breaks down his analysis into two components. The first component is addressed in his so-called "must move" model.[2] In this model, Mr. Graves compiles data as of the end of 1993 from every commercial nuclear

[2] The phrase "must move" is not one that appears in either the Standard Contract or in the NWPA.



*Protected material*
*To be disclosed only in accordance with*
*U.S. Court of Federal Claims Protective Order*

reactor in the United States regarding existing volumes of spent fuel in storage, the amounts and timing of expected future discharges of SNF, existing storage capacity, including both pool storage and onsite dry storage, and expiration dates of original operating licenses. The "must move" model is an accounting mechanism that combines all these different data to determine when existing storage capacities will be reached for each individual utility.

21. The only criterion in the Graves model for determining if a utility is in a "must move" condition is whether or not the utility must incur incremental storage costs to address its SNF storage needs. Consider, for example, the case of an operating reactor. If the facility has sufficient storage space in its pool for the current year's discharges (including an assumed reserve of one full core), then those discharges impose no direct incremental storage costs on the utility as it continues to operate the plant and the pool. In this case, Mr. Graves assumes that the utility does not face a "must move" situation in that year. In contrast, if the current year's discharges go beyond the pool's capacity (again, including a reserve), then the utility must incur incremental storage costs by removing sufficient spent fuel from the pool to an onsite dry storage facility ("Independent Spent Fuel Storage Installation" or "ISFSI") to accommodate the current discharges.[3] Under these circumstances, the amount of SNF that must be removed from the pool to accommodate the current discharges and enable the plant to continue operating becomes "must move" in the Graves model.

22. Similar logic applies to plants that reach the end of their operating licenses. The Standard Contract specifies that SNF must be cooled in a spent fuel pool for a period of at least five years before it becomes eligible to be removed by DOE. For a shutdown plant, once the last discharges have cooled for five years, Mr. Graves assumes that the entire contents of the pool are available for removal. Because the plant must continue to operate the pool if it contains any SNF, and thereby incur the

[3] The utility may also be able to rerack its spent fuel pool in this situation, although Mr. Graves does not allow for this possibility in his model.



*Protected material*
*To be disclosed only in accordance with*
*U.S. Court of Federal Claims Protective Order*

costs of continued operations and maintenance ("O&M"), Mr. Graves assumes that all of the shutdown plant's spent fuel becomes "must move" once the five-year cooling period has elapsed. Mr. Graves also assumes that any SNF stored on an ISFSI by 1995 is "must move" fuel.

23. Based on these assumptions, Mr. Graves identifies for each nuclear plant when it would face a "must move" situation and how much fuel must be moved to alleviate that situation.

24. Mr. Graves also uses his "must move" assumptions to quantify the cumulative sum over time of "must move" spent fuel from all facilities, consisting of the amounts identified from both operating and shutdown reactors and from existing ISFSIs. He depicts this cumulative sum in area charts in his report, showing a growing "mountain" of "must move" spent fuel over time.

25. The "must move" analysis is used by Mr. Graves for two purposes. First, he uses the slope and shape of the mountain of "must move" fuel to justify an overall acceptance rate for DOE spent fuel removal that he believes is economically efficient. According to Mr. Graves, the DOE program should be operated at a rate sufficient to accept current discharges plus some portion of the backlog of previously discharged SNF. Given the size and shape of his mountain of "must move" spent fuel, he asserts that an annual rate that ramps up rapidly to 3,000 metric tons of uranium ("MTUs") is appropriate for this purpose.

26. Second, the "must move" analysis is used as an input to the second component of Mr. Graves' modeling framework, the "Economic Sequence Model" or "ESM." This model combines the timing and quantity of SNF in each "must move" situation with estimates of the incremental at-reactor storage costs of addressing that situation. These cost estimates are average figures drawn from four decommissioning studies provided by Roderick Knight and include estimates of the O&M costs of a spent fuel pool, the costs of building an ISFSI, the O&M costs of an existing ISFSI, and the per-cask costs of adding another cask to an existing ISFSI.



*Protected material*
*To be disclosed only in accordance with*
*U.S. Court of Federal Claims Protective Order*

27. According to Mr. Graves, the costs of storing "must move" SNF are "avoidable" in the but-for world through the operation of his assumed trading market. Mr. Graves assumes that every utility will participate in this market and that every utility that possesses early DOE acceptance rights will offer all of those rights to the market, "buying back" those rights it needs for its own "must move" condition. Every utility with "must move" fuel bids for rights based on its per-MTU avoidable storage costs. The lowest price that clears the market is the marginal price at which all trades are conducted in that year. Those utilities that bid at or above the market-clearing price will accelerate their place in the DOE acceptance queue through exchanges, while those whose per-MTU avoidable costs are below the market-clearing price will be unsuccessful in trading in that year, will have to incur the costs to address their "must move" condition, and will re-enter the trading market the following year.

28. Mr. Graves assumes that suppliers of acceptance rights are "price takers" and will sell their current rights at whatever marginal bid price clears the market. In effect, Mr. Graves assumes the supply curve for acceptance rights is vertical, with the amount of allocations supplied to the market equal to the total DOE acceptance rate for that year.

29. In Mr. Graves' non-breach world, he predicts that trading of DOE acceptance rights will occur at prices greater than zero in the first three years of the program (beginning in 1998). Thereafter, Mr. Graves predicts that bid prices for acceptance rights will approach zero because the annual supply of acceptance rights will exceed the demand.

30. Mr. Graves acknowledges that the actual behavior of the trading market might not develop in the but-for world exactly as his model suggests. He asserts, however, that events in any trading market would closely resemble the predictions of his modeling framework.



*Protected material*
*To be disclosed only in accordance with*
*U.S. Court of Federal Claims Protective Order*

31. Mr. Graves also acknowledges that he is unable to identify the parties to any individual trade. While his model shows successful bidders, it is unable to identify which utilities actually exchange acceptance rights with those bidders.

## V. CRITIQUE OF THE GRAVES MODEL

32. The modeling framework presented by Mr. Graves purportedly models a "but-for" world in which DOE's performance under the Standard Contract begins in early 1998. Mr. Graves' model has the practical effect of raising estimates of damages for his clients relative to those that are based solely on the OFF rankings contained in the Standard Contract.

33. Despite its asserted purpose, Mr. Graves' model fails to capture many of the fundamental features of a trading market in the real world. He provides an incomplete and overly simplistic depiction of the incentives and market forces that would impact the operations of such a market. As a result, it is difficult to give credence to Mr. Graves' predictions regarding how this market would function and, more directly, how it would impact the situation that the plaintiff would have faced in the but-for world.

34. In modeling the behavior of any market, it is desirable to capture all economically relevant factors affecting the market and its participants. These factors include determinants of potential supply and demand, as well as those that may influence market participation.

35. In Mr. Graves' model, the only factor that determines demand is his definition of avoidable costs. In fact, demand will be influenced by other factors that he does not consider. For example, risk and uncertainty associated with the storage of spent fuel and with the DOE acceptance of that fuel will affect demand, as will sociopolitical and regulatory concerns and pressures. On the supply side, Mr. Graves assumes that the aggregate supply is equal to the aggregate rate of acceptance in each year. As a



*Protected material*
*To be disclosed only in accordance with*
*U.S. Court of Federal Claims Protective Order*

result, Mr. Graves ignores the fact that supply in this market will be influenced by many of the same factors affecting demand, including risk, uncertainty and local political concerns. In addition, and in contrast to the operation of Mr. Graves' model, the supply in his market is not held by a single entity, such as DOE, but rather by every nuclear utility with OFF allocation rights in substantially different amounts.

36. As discussed below, many of the factors that Mr. Graves ignores would materially affect the outcomes predicted in his nascent trading market. These omissions undermine the validity of his framework and the reliability of his conclusions.

### A. The Graves model relies on questionable and unsupported assumptions

37. Any modeling effort must use certain assumptions as key inputs. The reliability of a model's predictions depends, in part, on the accuracy and reasonableness of these underlying assumptions. In this instance, Mr. Graves relies on certain assumptions that fail to reflect accurately relevant storage costs, SNF storage requirements and storage capacity of U.S. nuclear power plants. These assumptions have a direct impact on the operation of his hypothetical market and the predictions he makes about trading.

#### 1. Mr. Graves relies on cost estimates of uncertain relevance

38. In the Graves model, the only determinant of the demand for DOE acceptance rights is incremental at-reactor storage costs. These costs determine a utility's willingness to pay for DOE rights through trading. Accordingly, the measures of storage costs associated with different "must move" conditions are crucial to the model's predictions.

39. For this purpose, Mr. Graves relies on cost estimates provided by Roderick Knight. These cost estimates are derived from simple averages from four decommissioning studies Mr. Knight reviewed, and are intended to reflect average industry-wide storage costs for operating a spent fuel pool, building a new ISFSI, and operating



*Protected material*
*To be disclosed only in accordance with*
*U.S. Court of Federal Claims Protective Order*

and maintaining an existing ISFSI. It is unclear, however, whether these estimates are representative of the industry-wide costs for which Mr. Graves uses them.

40. Statistical theory suggests that, in drawing inferences about an underlying population from a sample, a larger sample size generally increases the likelihood that the sample reflects the true population average. In most cases, as sample size increases, the greater the precision of the point estimate of the average. In this case, Mr. Knight provides a sample of only four cost studies. Without knowledge of the true distribution of these costs, however, it is difficult to know if the four studies chosen by Mr. Knight are truly indicative of relevant average industry costs. In the absence of some rather extreme assumptions about how these costs are distributed, a sample size of four does not provide much statistical power for drawing inferences about the industry average.

**2. Mr. Graves fails to consider license extensions**

41. In his base-case scenario, which serves as the basis for his opinions, Mr. Graves assumes that the operating life of each nuclear reactor is determined by its original operating license.[4] At the end of that license, he assumes that the plant shuts down and enters the period in which the last discharges of spent fuel must be cooled in the pool for five years. At the end of that five-year cooling period, he assumes that all of the plant's SNF becomes "must move" and that the only thing preventing the plant from commencing decommissioning activities is DOE removal of all spent fuel from the facility's pool.

42. This assumption ignores the fact that many utilities have applied to the Nuclear Regulatory Commission ("NRC") for 20-year extensions to their current operating licenses. As of December 27, 2005, license renewal applications had already been approved by the NRC for 39 reactors, 10 more were under review, and letters of

[4] There are some exceptions to this rule, where utilities have successfully extended their original licenses to account for the period of time during which the facility was being constructed. PG&E's Diablo Canyon is one example.



*Protected material*
*To be disclosed only in accordance with*
*U.S. Court of Federal Claims Protective Order*

intent to apply for license extensions had been filed with the NRC for 27 more.[5] This represents approximately three-quarters of all operating reactors in the U.S.

43. These license extensions make economic sense. Projections of electricity demand and the economics of nuclear power reveal that nuclear is and will remain an important and relatively low-cost source of electricity for the foreseeable future.[6] This has been apparent for some time: the first of these license-extension applications was filed by Baltimore Gas & Electric back in early 1998. More recent developments, such as electricity market restructuring and high fossil fuel prices, have only made nuclear assets even more valuable. In addition, nuclear power plants hold tremendous value in terms of the real options they provide to utility owners. Moreover, the favorable economics of nuclear power is unrelated to the Government's breach; license extension would have been desirable in both breach and but-for worlds. Mr. Graves apparently acknowledges that license extension would affect the results of his model. As discussed below, his electronic files contain an alternative scenario of his model in which license extensions are assumed, but this alternative scenario does not serve as the basis for his opinions in this case.

44. Mr. Graves' assumption of no license extensions impacts his model mostly in the future, during the period after about 2015, when many of the utilities' original licenses expire. At that time, and after the required five-year cooling period, all of the SNF at shutdown plants becomes "must move" in Mr. Graves' analysis. Accordingly, the so-called mountain of "must move" fuel that he purports to measure rises rapidly as nuclear power plants are assumed to shut down.

45. Mr. Graves' assumption concerning the mountain of "must move" fuel is relevant to the current case. Mr. Graves uses the overall shape and slope of this mountain of "must move" SNF to support his opinion that an aggregate acceptance rate of 3,000

[5] These data are taken from the NRC website, www.nrc.gov, accessed January 25, 2006.

[6] For example, in projecting the role of nuclear power in electricity generation, the Energy Information Administration (EIA) states, "Nuclear generating capacity in the AEO2006 reference case is projected to increase from about 100 gigawatts in 2004 to about 109 gigawatts in 2019 and to remain at that level (about 10 percent of total U.S. generating capacity) through 2030." See "Annual Energy Outlook 2006 Overview," EIA, p. 7. Retrieved on January 17, 2006 at http://www.eia.doe.gov/oiaf/aeo/pdf/earlyrelease.pdf.



*Protected material*
*To be disclosed only in accordance with*
*U.S. Court of Federal Claims Protective Order*

MTUs per year is required for the program. The slope of his "must move" mountain dictates conclusions concerning the efficiency of DOE's acceptance rate. If the slope of the mountain decreases, however, conclusions favoring one rate over another will be affected. Since the assumed rate of aggregate acceptance in each year drives many of the predictions of Mr. Graves' model, the "must move" mountain is significant. If the slope of the mountain is lower, Mr. Graves' conclusions about aggregate acceptance may be inaccurate.

46. The impact of Mr. Graves' assumption regarding license extension can be seen by comparing the mountain of "must move" fuel in his base case to the same accumulation of SNF in his alternative license-extension simulation. These results are shown in Exhibit 3. The top panel shows Mr. Graves' base-case scenario. The lower panel contains the license-extension case with adjustments to remove ISFSI "must move" fuel and to account for the number of shutdowns assumed in Mr. Graves' base case. Clearly, the rate at which "must move" fuel accumulates in the next several decades is dramatically reduced by incorporating license extension.

47. One implication of this slower accumulation of SNF is that significantly lower rates of acceptance would stay ahead of the mountain of "must move" fuel for an extended period of time. Mr. Graves argues that a rapid ramp-up to an eventual 3,000 MTU rate is required to get and keep ahead of current discharges plus some portion of the backlog. Given the more gradual increase in "must move" fuel shown in the lower panel of Exhibit 3, however, an acceptance rate as low as 900 MTUs per year through 2010, with a ramp up to 3,000 MTUs thereafter, would accomplish the same goal. A slower ramp-up rate, however, likely would affect the date at which Humboldt Bay's SNF is removed, even in the perfect market assumed by Mr. Graves.

### 3. Mr. Graves allows no reracks after 1995

48. Another assumption underlying the Graves model is his assertion that reracking of spent fuel pools is unavailable to nuclear power plant operators after 1995. I



*Protected material*
*To be disclosed only in accordance with*
*U.S. Court of Federal Claims Protective Order*

understand that reracking is the process by which a utility increases pool capacity by adding additional or more densely packed storage racks. I understand that a rerack is typically a less expensive way to increase available onsite storage capacity than building an ISFSI.

49. Mr. Graves' assumption freezes pool capacities at 1995 levels and deprives utilities in the model from using a more cost-effective means of addressing limitations in spent fuel storage capacity.[7] I have been informed that the capacity of many spent fuel pools at U.S. nuclear power plants has been increased through reracking after 1995. This means that Mr. Graves incorrectly measures available pool storage capacity at a number of nuclear power plants and thereby mischaracterizes their "must move" conditions.

#### 4. Mr. Graves assumes a uniform full core reserve policy across all utilities

50. Mr. Graves assumes that every utility maintains a pool reserve equal to one full core of assemblies. This assumption plays an important role in his model because it is one of the determinants of "must move" conditions and the need for alternative storage. Some utilities, however, may seek to maintain pool reserves different than one full core. Additionally, Mr. Graves ignores the possibility that utilities may place value on additional capacity in their spent fuel pools over and above their respective reserve policies.

### B. Mr. Graves' Economic Sequence Model provides an incomplete characterization of the supply and demand for trading DOE acceptance rights

51. In his Economic Sequence Model, Mr. Graves purports to describe the likely development and operation of the market for trading DOE acceptance rights. This characterization of the market, however, is incomplete and unlikely to produce any reliable predictions of trading volumes or market prices.

[7] Mr. Graves makes no attempt to determine which post-1995 reracks would have been required had DOE begun performance under the Standard Contract.



*Protected material*
*To be disclosed only in accordance with*
*U.S. Court of Federal Claims Protective Order*

52. Mr. Graves ignores factors besides avoidable cost that could affect the demand for DOE acceptance rights, including risk aversion, uncertainty, and political, regulatory and community pressure. A utility may desire acceptance rights beyond its "must move" needs to reduce pool storage and obtain additional flexibility to address future spent fuel storage needs. A utility may face political pressure from environmental groups, community activists or local ratepayers to reduce the quantities of SNF stored onsite, whether or not there are avoidable costs tied to that fuel. These potentially important factors are not considered in the Graves model in influencing both the demand and supply for DOE acceptance rights. All that matters in this model is the incremental storage costs associated with a current "must move" situation.

53. While much of Mr. Graves' analysis focuses on the demand side, he ignores the factors affecting the supply side of this market. In Mr. Graves' model, all acceptance rights are supplied to the market. Moreover, all of these rights are supplied to the market regardless of the prevailing price. In effect, Mr. Graves assumes that the supply of DOE acceptance rights is perfectly inelastic with respect to price, that is, he assumes a vertical supply curve. Given his assumption that every utility willingly participates in the market, the vertical supply curve is at that year's aggregate rate of acceptance.

54. This assumption of a vertical supply curve leads to some rather extreme implications. If a holder of DOE acceptance rights is willing to offer all of its rights at any price, it means that the utility effectively places zero value on those rights. Mr. Graves' model implies that DOE acceptance rights are worthless to any utility that does not need them right now. In fact, Mr. Graves goes a step further, suggesting that such unneeded rights are a nuisance whose exercise involves incurring loading costs or disrupting plant operations earlier than is necessary.[8] Mr. Graves predicts that acceptance rights would even trade at a zero price.

[8] See Graves deposition, January 24, 2006.



*Protected material*
*To be disclosed only in accordance with*
*U.S. Court of Federal Claims Protective Order*

55. It is important to recall that the trading of DOE acceptance rights is, in fact, an intertemporal swapping of these rights – a utility that purchases current rights turns over an identical quantity of future rights to the counterparty in the transaction. By imposing a vertical supply curve, Mr. Graves assumes that selling utilities place the same value on current and future rights. In effect, this implies that time has no value in his modeling framework.

56. From an economics perspective, these assumptions lack credibility. They ignore the possibility that removing SNF from a nuclear facility before it is actually "required" may have value in and of itself. For example, a utility may perceive that the removal of SNF from its pool reduces operational risk. Although Mr. Graves has written articles about risk management, he fails to acknowledge the potential risk-reducing benefits of currently available but "unneeded" DOE acceptance rights.

57. Mr. Graves also fails to recognize that early removal of spent fuel may have considerable value to a utility in terms of its relations with ratepayers and other stakeholders. PG&E's 2004 "Corporate Responsibility Report" describes the many groups and considerations that influence its decision making, including environmental concerns and relations with the communities in which it operates. By voluntarily using DOE acceptance rights that it does not immediately "need," PG&E could demonstrate to local communities, to environmental groups and to regulatory bodies that it is actively pursuing strategies to reduce the quantity of SNF stored onsite.

58. Recognizing that early acceptance rights have value to utilities that hold them would change the predictions of Mr. Graves' model dramatically. In Figure 4, I present in the top panel a simple supply and demand graph of Mr. Graves' market. The downward-sloping demand curve (labeled D) reflects Mr. Graves' demand side analysis of avoidable costs. The vertical supply curve (labeled S) incorporates his view that supply is perfectly inelastic with respect to price at the aggregate acceptance rate. The equilibrium price in this hypothetical market occurs at the intersection of



*Protected material*
*To be disclosed only in accordance with*
*U.S. Court of Federal Claims Protective Order*

supply and demand, and is the lowest willingness to pay among buyers that clears the market.

59. In the bottom panel of Exhibit 4, I maintain Mr. Graves' assumption of a vertical supply curve, but recognize that any value attached to "unneeded" acceptance rights would shift the vertical supply curve inward, from S to S'. That is, not all utilities would participate in the trading market; some utilities would withhold some of their rights for their own use, even though they are not in immediate "must move" situations. Fewer rights would trade and the marginal price of trades would be higher.

60. In Figure 5, I present a more complete characterization of the market in which the factors affecting the supply of DOE acceptance rights are also modeled. Suppliers place a range of values on their current acceptance rights, just as potential purchasers do on the demand side. As above, some utilities would choose not to offer any of their current rights because the costs and risks of selling them are too great. Others might agree to sell if the offering price were sufficiently high. The result, shown in the top panel of Figure 5, is the identification of a more typical upward-sloping supply curve (labeled S") depicting the prices suppliers would require to offer rights to the trading market. In this setting, equilibrium involves lower trading volumes and higher prices than those identified by Mr. Graves. Moreover, in the absence of a utility-by-utility analysis of the value of acceptance rights among suppliers, or at the very least knowledge of how these valuations are distributed, it is impossible to estimate how this more complete depiction of the market would affect any individual utility's ability to purchase DOE acceptance rights and thus to reduce its SNF storage costs in the but-for world.

61. It is also possible that a shock to the supply side of this hypothetical market could eliminate all trading. Consider, for example, a hypothetical event that caused DOE to suspend the SNF acceptance program for an indefinite period of time. This could be a terrorist attack, a train derailment, a technical problem, or any number of other events that result in a disruption to the DOE acceptance program. If utilities are



*Protected material*
*To be disclosed only in accordance with*
*U.S. Court of Federal Claims Protective Order*

uncertain about the date when the program will be resumed, current DOE acceptance rights will become more valuable to utilities that hold them, while future rights will be less valuable. The result is an upward shift of the supply curve, resulting in even less supply at higher prices. It is also conceivable that the shift in supply will be so great that no trading will occur at any price. This situation is shown graphically in the bottom panel of Exhibit 5, with the shift of the supply curve from S'' to S'''. In fact, this no-trade situation could be the initial condition of the market, even without the assumed supply shock.

62. I conclude from this analysis that Mr. Graves models only a simplistic part of the market for DOE acceptance rights and ignores many of the fundamental factors that would determine supply, demand, trading volumes and prices in the but-for world. While the development of a new market may have intuitive appeal to an economist, Mr. Graves' model fails to provide any meaningful insights to the behavior of this market or the ability of any individual utility to trade for earlier DOE acceptance rights.

### C. The Graves model unrealistically assumes perfect information and thus ignores the impact of uncertainty on the market for DOE acceptance rights

63. An unstated assumption in the Graves modeling framework is the view that market participants have perfect information about every utility's "must move" condition and associated costs, as well as about the future performance of DOE. In effect, Mr. Graves assumes that if DOE had begun performance under the Standard Contract, then virtually all uncertainty in the market for DOE acceptance rights would be eliminated. Every utility would participate in this market with absolute confidence, with perfect information, and without any meaningful market frictions.

64. In my opinion, this is an unrealistic view of the environment in which this market would function. Even if utilities had expected DOE performance throughout the 1990s and even if DOE began to perform under the Standard Contract in 1998, operators of nuclear power plants still would have faced considerable uncertainty



*Protected material*
*To be disclosed only in accordance with*
*U.S. Court of Federal Claims Protective Order*

regarding future events that could impact their operations and profitability, their spent fuel storage needs, and even the continued operation of the DOE acceptance program.

65. In fact, uncertainty would exert unknown and largely unknowable influences on Mr. Graves' market for DOE acceptance rights. In the previous section, I described a hypothetical event that disrupted the DOE program and shifted the supply curve upward and to the left. Even if DOE's acceptance program were not interrupted by such an event, uncertainty could produce the same result. Concerns about the potential interruption of acceptance might lead many utilities to change their valuations and place extraordinary values on current rights versus uncertain future rights. Supply of these rights could virtually disappear because, in the presence of uncertainty, utilities might use their OFF allocations even if they do not "need" them in the current year according to Mr. Graves' criteria.

66. This kind of uncertainty would have existed in the but-for world long before DOE actually accepted any spent fuel. Mr. Graves predicts that utilities would begin trading for rights long before 1998. With an ACR in place, and with approved Delivery Commitment Schedules ("DCSs"), he claims that utilities would have begun arranging for trades to mitigate their "must move" conditions in the early to mid-1990s. This prediction is based on Mr. Graves' assumption that utilities would have had perfect foresight and perfect confidence that the program would operate flawlessly, even before it began. Uncertainty about future performance or future events, however, would lead to different behavior. In that setting, some utilities might withhold their acceptance rights from the nascent trading market. Some might adopt a "wait and see" attitude about the DOE acceptance program. With OFF allocations in hand, they might wait for proof that DOE could actually perform and could perform at its projected rates for a period of years.

67. Another important consequence of perfect information in Mr. Graves' framework is his result that market-clearing bid prices for acceptance rights fall in every year. The efficient allocation of acceptance rights in the Graves model requires declining bid



*Protected material*
*To be disclosed only in accordance with*
*U.S. Court of Federal Claims Protective Order*

prices over time. With perfect foresight that prices will fall, buyers face incentives to wait until the last possible moment to obtain earlier acceptance rights. If your "must move" condition arises next year, it makes no sense to acquire acceptance rights this year because you know with certainty that prices will be lower when you actually face your "must move" situation. The absence of uncertainty ensures that participants in the market are "well behaved" in this respect.

68. In the presence of uncertainty, however, prices for allocation rights could move in any direction from year to year, depending on interceding events or different utilities' changing perceptions of the likelihood of future events. Uncertainty would disrupt the tidy functioning of the market assumed by Mr. Graves and could produce outcomes that are radically different from what his simplistic model predicts. Even if utilities act rationally, economic theory suggests that an efficient allocation of acceptance rights in the presence of uncertainty will be different, perhaps dramatically so, from Mr. Graves' allegedly efficient allocation in the presence of perfect information.

69. Moreover, Mr. Graves' model fails to capture an important temporal aspect of uncertainty. With perfect information, there is no difference in value between acceptance rights in different future years. A supplier receives the same price for selling a current right regardless of whether he obtains in return an acceptance right in five years or in twenty. In an uncertain world, however, rights at different future dates would have different values. A seller's assessment of the probability of a disruptive or negative event could very well be affected by the length of time during which that event is allowed to occur. Almost all econometric models exhibit expanding confidence intervals as the prediction period increases. The same result would apply here. Expanding confidence intervals or, stated somewhat differently, greater variance of potential outcomes would make sellers highly sensitive to the dates of the acceptance rights for which they trade.



*Protected material*
*To be disclosed only in accordance with*
*U.S. Court of Federal Claims Protective Order*

### D. In the presence of uncertainty, risk management and strategic behavior would further complicate Mr. Graves' market

70. In contrast to the hypothetical world modeled by Mr. Graves, companies in the real world face uncertainty and a host of risks that must be assessed and managed. Mr. Graves acknowledges that, in the nuclear power industry, these risks include, among others, supply risk, demand risk, price risk, operational risk, and security risk. Similarly, even a successfully functioning DOE acceptance program entails its own risks, including logistical, technical, regulatory and political risks. These risks would not have disappeared in the but-for world even if DOE had begun performing in 1998.

71. In the real world, companies of all sorts engage in a constant balancing act of managing risk and maximizing profits. The process of risk management entails measuring and understanding the various risks a company faces, and devising strategies for limiting those risks to the extent possible within the constraints imposed by financial and other objectives. Some risks are simply too disruptive or costly to accept; risk management in these instances typically entails devising strategies that minimize in an absolute sense the likelihood that the particular risky event can occur. For a nuclear utility, an example of such a risk might be a premature or unexpected reactor shutdown, an enormously costly event. To manage this risk, the utility may take operational or other steps to make the likelihood of an unexpected shutdown as small as possible in an absolute sense. In so doing, however, the utility may have to incur substantial risk-management expenses, and thereby reduce its profits. Other risks may be less severe or costly. In those cases, a utility may accept a certain level of risk but enjoy higher expected profits.

72. In Mr. Graves' framework, however, the tradeoff between risk management and profit maximization disappears. He assumes away any meaningful uncertainty or risk and thus frees market participants to focus solely on minimizing the at-reactor storage costs of certain utilities. This characterization of the environment in which utilities operate is unrealistic.



*Protected material*
*To be disclosed only in accordance with*
*U.S. Court of Federal Claims Protective Order*

73. The management of uncertainty and risk would manifest itself in any number of ways that could affect the output of Mr. Graves' model. A risk-averse utility, for example, may choose to reduce the risk of shutdown by increasing the reserve in its spent fuel pool. With differing degrees of risk aversion, owners of operating reactors could adopt a range of reserve assumptions in the but-for world that would modify their "must move" conditions in the Graves model and produce incentives and results that are at odds with his predictions.

74. Mr. Graves assumes that every utility with current acceptance rights will supply all of its current rights to the market. In the absence of uncertainty, Mr. Graves assumes that utilities face no incentives to withhold rights from the trading market and use these rights themselves. In a more realistic and uncertain setting, however, utilities may choose to withhold these rights for at least two reasons. First, a utility with current rights but no current "must move" situation may choose to withhold some or all of those rights from the market and use them instead to have some of its own fuel removed before it faces a "must move" condition. It may make this decision to reduce its perceived risk of an unexpected shutdown, to provide additional storage capacity in the event of an interruption in DOE acceptance, or in recognition of political or social pressures from the local community.

75. Second, a utility might withhold rights to restrict supply in the market and thereby exert upward pressure on current market prices. That is, to the extent that utilities wished to participate in such a market they could engage in strategic behavior to manipulate quantities and prices and take advantage of other utilities that are seeking to trade for current rights.

76. In fact, strategic behavior could affect many aspects of Mr. Graves' modeling framework. For example, he effectively assumes that every utility is aware of every other utility's cost structure and willingness to pay for current acceptance rights. As a result, every market participant knows every bid price, thereby enabling the lowest bid that clears the market to be the price at which all transactions take place in a given year.



*Protected material*
*To be disclosed only in accordance with*
*U.S. Court of Federal Claims Protective Order*

77. Yet this assumption fails to recognize that utilities conceal elements of their cost structures from their competitors based on the proprietary nature of the information. Buyers and sellers may send misleading signals about the valuations they place on DOE acceptance rights. Risk-averse utilities might strategically bid up prices of currently "unneeded" rights in order to obtain those rights to the detriment of utilities that are in "must move" situations. In that case, those utilities with the highest avoidable costs might not be able to secure current acceptance rights.

78. Another example of strategic behavior relates to the so-called "last trade" problem. Utilities in Mr. Graves' trading market need to arrange trades with multiple counterparties over multiple years to obtain sufficient acceptance rights to eliminate the problem. After engaging in several bilateral arrangements, suppose the utility needs one more trade to complete the re-allocation. Suppliers possess enormous bargaining power in these negotiations because a failed last trade would unwind all of the benefits of the previous trading arrangements. The buyer in this situation has almost no bargaining power. In a realistic setting, the price of this last trade could be bid up by potential suppliers holding out their supply of rights; the final price of this trade could be almost anything. Yet Mr. Graves assumes that this last trade will take place at the same price as all others in that year, namely the marginal bid price that clears the market.

79. In the presence of uncertainty, risk aversion, and strategic behavior, trading of DOE acceptance rights could occur at a whole range of prices, none of which resembles Mr. Graves' predictions. Trading also might not occur at all. Moreover, the efficient allocation of acceptance rights in the presence of uncertainty is different from the allocation presented by Mr. Graves in the absence of uncertainty. His model reveals little about likely allocations in the real world.

**E. Mr. Graves predicts that trades would take place at a zero price**

80. In the base-case analysis that supports his opinions in this case, Mr. Graves predicts that trades would occur at positive prices only for the first three years of the DOE



*Protected material*
*To be disclosed only in accordance with*
*U.S. Court of Federal Claims Protective Order*

acceptance program. After that time, the value of DOE acceptance rights falls to zero because the supply of OFF-based DOE allocations exceeds the demand under Mr. Graves assumed aggregate acceptance rate. Nevertheless, he states in his report that utilities would continue to trade even at prices approaching zero. This prediction is suspect.

81. Given the inherent value of DOE acceptance rights described above, it is highly unlikely that trades could ever occur at zero prices – these rights are simply too valuable to be given away. This suggests that all of the time and expense associated with the design, development and implementation of Mr. Graves' trading market becomes meaningless after only a few years. After an initial flurry of activity, significant trading simply disappears.

82. Mr. Graves' zero-price conclusion also demonstrates his failure to account for or value risk and uncertainty.

**F. Mr. Graves overstates the relevance of other markets as support for the development of a market for DOE acceptance rights**

83. Mr. Graves has referred to the development of other markets to support his opinion that a market for DOE acceptance rights would have developed rapidly and easily in the but-for world. In my view, the relevance of these other markets to the current case is significantly overstated.

84. One such market referred to by Mr. Graves is the market for emission rights. This market began in the early 1990s as regulatory agencies sought market-based solutions for reducing air pollution from power plants and other industrial facilities. These markets typically follow a "cap-and-trade" framework. In this type of arrangement, like the market for sulfur dioxide, regulators impose caps on the total volume of permissible emissions, allocate allowances to pollute to each regulated entity, and allow polluting facilities to trade rights to pollute. One facility may decide to spend money on expensive pollution-control equipment, thereby reducing its levels of pollution and its use of allocated emission rights. That facility can then sell some of



*Protected material*
*To be disclosed only in accordance with*
*U.S. Court of Federal Claims Protective Order*

its excess rights to another facility that chooses not to make the investment in costly pollution-control equipment. In addition, third parties, like environmental groups, can enter the market and bid for pollution rights with no intention of ever using them. The goal of these systems is to reduce the overall caps year by year, and allow the market to determine who gets to pollute and at what price.

85. While the concept of a market for emission rights may have similarities to a market for DOE acceptance rights, there are many features of emissions markets that differ from the market proposed by Mr. Graves in the current case. For example, trading in emissions markets entails buying or selling rights to pollute. The market for DOE acceptance rights, in contrast, involves intertemporal swapping of rights to have spent nuclear fuel removed from a nuclear power plant. A seller of DOE rights may receive money but it also receives future acceptance rights for its facility. Pollution rights involve no such swap.

86. A purchase or sale of a right to pollute is essentially an accounting operation registered by the regulator and involves little or no change in activities at the trading facilities. An exchange of DOE acceptance rights, however, can entail significant operational or logistical changes in both plant operations and the execution of the program, and may face physical constraints imposed by the utilities, the transportation system, or DOE.

87. Differences in the underlying good being traded also change the impact of a potential market failure. In the case of pollution rights, the industry regulator determines aggregate caps and individual allowances. In the absence of regulatory constraints, each polluter's incentive to reduce emissions may be quite small. Since caps place an artificial ceiling on pollution, the regulator can respond to a breakdown in the market for trading emission allowances by choosing whether or not to continue enforcing the cap system. On the side of polluters, a plant may respond to a market breakdown by simply not complying, thereby facing potential fines or penalties. Both the regulator and market participants have some flexibility to mitigate disruptions in the trading market.



*Protected material*
*To be disclosed only in accordance with*
*U.S. Court of Federal Claims Protective Order*

88. No such flexibility exists in the hypothetical market for DOE acceptance rights. Any disruption to the DOE program could stifle the trading market and lead to unavoidable "must move" situations for utilities that could have been avoided simply by not participating in the market and using their OFF allocations. The costs of "noncompliance," and thus the value of SNF removal rights, is not determined by a policy goal that a regulator can choose to enforce or not, but instead by the economic and social costs of spent fuel storage.

89. The nature of uncertainty in the market for emission allowances also differs from that in the market for DOE acceptance rights. Uncertainty may exist in emissions markets related to enforcement of caps, but there is no uncertainty about delivery or future compliance once the pollution right is purchased. In contrast, a utility that trades current for future acceptance rights has no guarantee that the scheduled pickup will actually occur. In addition, the possibility that a utility may not be able to complete all proposed trades or that DOE might reject a proposed trade adds another layer of uncertainty to the market for DOE acceptance rights.

90. There are other relevant differences as well. The market for emission rights encompasses thousands of participants, including companies that pollute as well as interested third parties.[9] The potential market for DOE acceptance rights includes only signatories to the Standard Contract. While the number of market participants is not necessarily a determinant of the depth of the market, more traders likely means more trading activity and a greater likelihood that market prices will reflect underlying values.

91. The history of the emissions market also suggests that Mr. Graves overstates the ease with which his market for DOE acceptance rights would develop. Emissions

[9] For example, according to the Acid Rain Program, "Phase II, which began in the year 2000, tightened the annual emissions limits imposed on these large, higher emitting plants and also set restrictions on smaller, cleaner plants fired by coal, oil, and gas, encompassing over 2,000 units in all." (http://www.epa.gov/airmarkets/arp/overview.html#phases, viewed on January 19, 2006). As to the participation in the market, "Under both the Acid Rain Program and the NOx Budget Trading Program, anyone can purchase allowances, including both regulated companies and members of the general public." (http://www.epa.gov/airmarkets/trading/buying.html, viewed on January 19, 2006).



*Protected material*
*To be disclosed only in accordance with*
*U.S. Court of Federal Claims Protective Order*

markets took time to develop. Industry analysts, including Mr. Graves, made early predictions regarding the volume of trades and the prices at which these trades would occur. Almost all of these predictions proved to be well off the mark. One unexpected outcome was "over-compliance," that is, decisions by many power plants and other polluters to invest in pollution-control equipment even though they could have purchased emissions allowances for less than the pollution controls they added. Analysts suggested that companies were acting inefficiently, spending more than they really needed to spend on emission controls. Instead, companies apparently found value in more traditional forms of regulatory compliance, perhaps in terms of their impact on public perceptions or community relations. Clearly, the incentives associated with compliance were misjudged.

92. Market prices for pollution credits also proved to be well below those predicted by analysts like Mr. Graves. Industry analysts also over-predicted trading volumes. These markets proved to be "thinner" than expected, despite the potential benefits to be gained from trading.

93. Emissions markets also did not function perfectly right from the start, as Mr. Graves suggests would be the case in his market for DOE acceptance rights. It took several years for participants to develop confidence that the market could function as intended. Price discovery occurred only over time. In fact, EPA auctions were introduced into the emissions markets as a mechanism to jump-start the trading market. These auctions have been the subject of considerable criticism for their design and for the prices they produced. While most transactions in emissions markets are now private bilateral trades, the EPA auctions assisted in the process of price discovery and were a tool to help foster the creation of the market for trading emissions rights.

94. In the hypothetical market for DOE acceptance rights, Mr. Graves makes no predictions regarding a government-imposed auction system to help start the market. He simply assumes this market will develop on its own and function perfectly from the outset. In fact, Mr. Graves avoids completely the actual mechanism by which



*Protected material*
*To be disclosed only in accordance with*
*U.S. Court of Federal Claims Protective Order*