trades will occur in his model. Yet the structure of the market, whether by auction or some other mechanism, is an essential element to determine how trades take place, how prices and trading volumes are determined, and how the benefits of those trades are distributed between buyers and sellers. There are potentially an infinite number of outcomes, many of which would not resemble those proposed by Mr. Graves.

95. Mr. Graves also has referred to the stock market as evidence that markets can function well. This reference is inapt. If the recently developed market for trading emissions rights has limited relevance for a hypothetical market for DOE acceptance rights, then any analogies drawn from the stock market are even more remote. The New York Stock Exchange, for example, has been functioning for over 200 years, has practices and procedures that have been refined over time, uses elaborate market mechanisms that continue to evolve, and relies on an extensive body of regulations governing trading practices, information disclosures, and other important aspects affecting the market. Moreover, stock markets include thousands, if not millions, of participants engaging in billions of transactions a day. There is almost nothing about these markets, other than the fact that some form of trading occurs, that is informative about a nascent market for trading DOE acceptance rights.

### G. Mr. Graves overstates the efficiency gains from his model

96. Mr. Graves argues that his market for trading DOE acceptance rights would improve the efficiency of the program by reducing at-reactor costs of storing SNF. One aspect of this efficiency improvement is the number of site visits required under OFF allocations and under the allocations predicted by his model. In Figure 5 of his report, Mr. Graves presents two stacked bar charts – one showing the number of site visits from 1998 to 2003 under OFF and another showing the same figures for the allocations based on his basic ESM. This chart in fact overstates the benefits of his model in terms of site visits.



*Protected material*
*To be disclosed only in accordance with*
*U.S. Court of Federal Claims Protective Order*

97. These figures are skewed by the presence in his ESM numbers of a few unusually large pickups from shutdown reactors and operating ISFSIs. He also lumps together unallocated acceptance rights in 2001 and 2002 into a single group entailing a single site visit. This results in a number of site visits and average pickup quantity that does not accurately reflect the results of his model. If the few large campaigns identified in Figure 5 are eliminated, the efficiency gains reported by Mr. Graves largely, if not completely, disappear.

98. Mr. Graves' Figure 4 also overstates the benefits of his trading market. In this "windowpane" chart, he identifies the number of plant-years in which avoidable costs are incurred under OFF and his ESM allocations. The results of this chart, and the savings he suggests are generated by his trading market, are driven primarily by his assumption regarding no license extensions. The vast majority of "unserved plant years" under OFF occurs at shutdown facilities. If licenses are assumed to be extended, however, then the number of facilities incurring avoidable costs declines dramatically under OFF, and the benefits, in terms of reduced at-reactor costs, fall dramatically. Mr. Graves' other assumptions regarding the treatment of ISFSI and full pool "must move" spent fuel also affect the graphical depiction of the efficiencies allegedly gained by his model.

99. The results in Figure 4 drive Mr. Graves' estimates of the dollar savings to the utility industry from his trading market, which he estimates at $2.6 billion over the roughly 40-plus years of the DOE program. Once license extensions are incorporated into the model, however, a significant portion of these cost savings disappear. For example, for every year in which a shutdown "must move" condition is eliminated, the alleged benefits from the trading market fall by approximately $11.6 million[10].

[10] The annual cost figure is drawn from the expert report of Roderick Knight, November 10, 2005.



*Protected material*
*To be disclosed only in accordance with*
*U.S. Court of Federal Claims Protective Order*

## VI. CRITIQUE OF THE CORNELL DAMAGES ANALYSIS

### A. The Cornell damages framework

100. While Mr. Graves embarks on a hypothetical exercise to describe the development of a market for trading DOE acceptance rights, Professor Cornell was engaged to perform the more practical task of quantifying PG&E's damages in the current matter.

101. As described by Professor Cornell, there are two ways to go about quantifying PG&E's damages. The first entails a complete representation of costs in the actual and but-for worlds, with damages computed as the difference between the two. Professor Cornell dismisses this approach as overly detailed and extremely difficult to accomplish. The alternative, which he uses in the current case, is to identify those costs that are purely incremental to the Government's breach. In this way, he asserts, it is possible to focus only on those costs that are the result of the Government's failure to perform.

102. According to Professor Cornell, certain costs are easy to isolate as incremental to the Government's breach, such as the costs associated with ongoing pool storage at Humboldt Bay. Had the Government performed under the Standard Contract as originally scheduled, he asserts, the SNF in Humboldt's spent fuel pool would have been removed in 1998 (based on Mr. Graves' predictions), and PG&E would have been able to commence decommissioning of the facility shortly thereafter. Accordingly, Professor Cornell categorizes all ongoing O&M pool costs at Humboldt Bay as incremental after 1998. In other instances, the process of identifying incremental costs is less clear. For these costs, Professor Cornell relies on PG&E accounting data, including both direct charges to allegedly breach-related activities and allocations of indirect costs. The goal, he asserts, is to focus only on those costs that are truly incremental to the breach.



*Protected material*
*To be disclosed only in accordance with*
*U.S. Court of Federal Claims Protective Order*

### B. Some of Professor Cornell's damages may not represent incremental costs imposed by the Government's failure to perform

103. The conceptual basis for Professor Cornell's damages analysis is to isolate those costs that are incremental to the breach. In this regard, Professor Cornell's approach to damages is consistent with my understanding of how damages should be computed. In the context of a breach of contract, the economic theory of damages suggests that only those costs actually imposed by the breach are eligible to be considered as damages.

104. In practice, however, it is unclear whether Professor Cornell's estimate of PG&E's damages is consistent with this conceptual framework. Professor Cornell relies on PG&E's internal cost-accounting data to measure breach-related costs. PG&E's accounting system includes various cost categories related to breach activities. One example is planning for, building and operating ISFSIs at both of its nuclear facilities. Costs for outside contractors or equipment or materials involved in the ISFSI design and construction projects are charged directly to these breach categories in PG&E's cost-accounting system. In addition to the costs for outside vendors and materials, PG&E also includes time spent by PG&E employees working on the ISFSI projects as direct charges to these cost accounts. Such employee time, however, may not be consistent with the concept of incremental costs. If an employee's compensation is unaffected by the specific activities he or she performs, then including some of that employee's compensation in damages may not reflect a cost to PG&E that is truly incremental to the breach.

105. In this regard, it is important to recognize that the definition of cost from a cost-accounting perspective may differ from the definition of cost in a damages context. As a company managing its expenses, PG&E undoubtedly wants to know how its employees spend their time and how much it costs for employees to perform different activities. The identification of activity costs is one purpose of a cost-accounting system. From an economic damages perspective, however, if the employee's total compensation is unaffected by the specific tasks that employee



*Protected material*
*To be disclosed only in accordance with*
*U.S. Court of Federal Claims Protective Order*

performs, the company incurs no incremental costs if that employee is working on the ISFSI project versus some non-breach activity. Unless it can be shown that the company hired additional personnel, or paid overtime to employees because of their work on a breach-related project, or would have reduced staff in the absence of the breach, there are no incremental employee-related damages. In my view, much of the direct labor charged to PG&E's breach-related projects should be re-evaluated from a damages perspective, rather than relying on the project codes in the company's internal cost-accounting system.

106. This issue is compounded in the PG&E accounting system because direct-charge employee costs include various cost "burdens," such as pensions, insurance, meals and other costs attributed to an employee's time. For cost-accounting purposes, PG&E wants to track the fully burdened costs of its employee's time, but from an economic damages perspective, these costs are not incremental to the breach.

107. The same perspective should be used in considering various indirect costs that Professor Cornell attributes to the Government's breach. In his report, Professor Cornell describes a detailed review of various indirect costs, some of which are allocated to breach-related projects in PG&E's accounting system. He recognizes that some of these indirect costs are unaffected by the breach and should be excluded from damages. Professor Cornell states that some indirect cost categories involve shared resources where demand for these resources is "congested." He includes some portion of the costs of these congested resources in damages, even though the nature of the congestion and the associated costs are not clearly described.

108. A good example is certain costs associated with PG&E's CEO. PG&E categorized the CEO as a congested resource. Professor Cornell includes in his estimate of damages some portion of costs attributable to the CEO, even though the CEO's compensation is almost surely unrelated to his involvement in breach-related activities. It is also unclear whether the CEO has consistently been involved in addressing breach issues in such a way that would justify including an allocation of



*Protected material*
*To be disclosed only in accordance with*
*U.S. Court of Federal Claims Protective Order*

his time in every year. Again, a cost allocation for managerial purposes is not necessarily consistent with an out-of-pocket incremental expense included in a conceptually valid measure of damages.

109. Professor Cornell's assertion that congestion can be accurately measured is questionable. He argues that congestion can be reflected in the need for staff to work longer hours or to hire additional personnel, in delays imposed by the breach for completing various tasks, in reduced productivity, or in lower work quality. Each of these types of congestion, however, could impose different types of costs on the company that are in fact extremely difficult to measure. Allocating overheads for congested resources also suggests that congestion is constant over time, that slack resources never exist, that breach-related projects are no more valuable than other activities, and that managers are incapable of setting priorities or allocating existing resources. If all of these conditions are not satisfied in every instance, then congestion may not really exist. If costs cannot be measured in a reasonably accurate way, then they should be excluded from a reliable measure of damages.

### C. Professor Cornell ignores decommissioning costs, despite their potential effect on PG&E's damages

110. In his estimate of PG&E's damages, Professor Cornell ignores decommissioning costs related to Humboldt Bay. These are the costs the utility will incur when it eventually dismantles its nuclear facility at Humboldt Bay. He recognizes that the Government's failure to perform under the Standard Contract as originally scheduled may delay the dates at which this facility can be decommissioned. To the extent that the present value of decommissioning costs differs in the breach and but-for worlds, this timing may affect damages. Professor Cornell justifies omitting these costs by arguing that if costs of decommissioning escalate at the same rate as the relevant discount rate (PG&E's weighted average cost of capital), then the two factors offset each other and the present value of these costs are identical in the breach and but-for worlds and can be ignored.



*Protected material*
*To be disclosed only in accordance with*
*U.S. Court of Federal Claims Protective Order*

111. If, however, decommissioning costs escalate at a rate slower than PG&E's cost of capital, then delays resulting from the Government's breach actually *reduce* these costs in present value terms and provide a net benefit to the utility and to ratepayers. These potential benefits are ignored in Professor Cornell's estimate of damages.

112. One of Professor Cornell's assignments in this case was to predict various future costs for PG&E's ISFSI construction and cask-loading campaigns at the two facilities. For this purpose, Professor Cornell projected time series of cost indices, including general inflation and specific cost measures as delineated in contracts with vendors. The results of these projections are shown graphically on pages 73 and 74 of his report. Although the exact growth rates associated with these series is not reported, many of them grow between 20 and 25 percent between 2001 and 2012. Notably, an eight percent growth rate (slightly less than Professor Cornell's estimate of PG&E's weighted average cost of capital of 8.24 percent) would result in growth over the same period of approximately 50 percent. That is, many of the cost measures are projected to grow more slowly between 2001 and 2012 than the relevant discount rate. If similar types of costs are associated with decommissioning Humboldt Bay, then delays imposed by the Government's breach will actually provide a net benefit to PG&E.

113. A corollary benefit associated with delayed decommissioning also applies. Plaintiff asserts that PG&E would have been able to commence decommissioning at Humboldt Bay as early as 1999 in the but-for world (assuming Humboldt's fuel is removed in 1998, as Mr. Graves predicts). Decommissioning has been delayed in the actual world, at least through the present. In the interim, PG&E has been earning interest on its decommissioning trust fund for Humboldt Bay. If the rate of return PG&E earns on trust fund assets has exceeded the rate at which decommissioning costs have escalated, then PG&E has benefited from the Government's breach and resulting decommissioning delays. The magnitude of these benefits can be estimated by multiplying the difference between the trust fund return and the rate of escalation of decommissioning costs during the relevant



*Protected material*
*To be disclosed only in accordance with*
*U.S. Court of Federal Claims Protective Order*

period. For example, if the difference between the return and the cost escalation rate is two percent, and the trust fund contains $250 million, then PG&E is benefiting by $5 million for every year that decommissioning is delayed by the Government's breach. These benefits may be an appropriate offset to any award of damages to PG&E.

## VII. SIMULATION OF THE DOE MODEL UNDER ALTERNATIVE AGGREGATE ACCEPTANCE RATES

114. I was asked by DOJ to simulate the DOE model for computing allocations of acceptance rights based on the OFF priority rankings. I am familiar with this model from my work in previous spent nuclear fuel litigation. For this purpose, I was asked to simulate the model in the but-for world under a scenario that contains the trajectory of aggregate acceptance rates identified in the 1991 ACR. This trajectory includes a three-year ramp-up to 900 MTUs per year and maintenance of the 900 MTU rate from 2000 through 2007. I was asked to assume that the 900 MTU rate continues through 2009, with a ramp-up to 3,000 MTUs by 2015.

### A. The DOE model

115. The DOE model is a tool developed by the agency for predicting SNF discharges for each nuclear facility and allocating DOE acceptance rights. This model is sufficiently flexible to enable simulation under alternative aggregate acceptance rates. SNF discharges and storage rights allocation are calculated in the DOE model in two steps: first, a model to project SNF is run; second, given the projected discharges, a second model is run to determine the allocations for each individual reactor. These allocations are established using DOE's OFF priority ranking rules, and are subject to overall industry acceptance rates.

116. DOE has developed a calculation methodology to project future discharges of SNF by all commercially operated U.S. nuclear reactors. The primary input to the model is historical discharge data and five-year projections for future discharges. These inputs



*Protected material*
*To be disclosed only in accordance with*
*U.S. Court of Federal Claims Protective Order*

were supplied by the utilities in the Energy Information Administration's ("EIA") 2004 RW-859 utility survey. The model generates outputs of burn-up distribution, the number of assemblies, the metric tons of uranium of SNF discharged, enrichment, and a schedule of discharge dates for each reactor until its operating license expires.

117. The five-year projections allow identifying a reactor-specific discharge cycle of either 18 or 24 months, and projecting a schedule of discharge dates over the operating life of a plant. The five-year projections also provide a baseline burn-up, which combined with a growth rate in burn-ups, provides the basis to estimate future burn-ups over the discharge schedule. Once firm level burn-up data are projected, an energy-balance factor is applied to guarantee consistency between the total discharges projected by the model and the total nuclear generation of electricity projected by the EIA.

**B. Results**

118. The simulation of the DOE model reveals that, under the 1991 ACR, Humboldt Bay would have had the last of its fuel removed from the spent fuel pool in 2001. With my assumptions under the same scenario, Diablo Canyon would have its first pickup of spent fuel from DOE in 2012.



*Protected material*
*To be disclosed only in accordance with*
*U.S. Court of Federal Claims Protective Order*

I declare that the foregoing report is true and correct.

Executed on January 27, 2006

Jonathan A. Neuberger



*Protected material*
*To be disclosed only in accordance with*
*U.S. Court of Federal Claims Protective Order*

# Exhibit 1

## Curriculum Vitae of Jonathan A. Neuberger



*Protected material*
*To be disclosed only in accordance with*
*U.S. Court of Federal Claims Protective Order*

# CURRICULUM VITÆ

## Jonathan A. Neuberger

**Address**

Economists Incorporated
EmeryStation North
5980 Horton Street
Emeryville, CA 94608
(510) 547-6910
neuberger.j@ei.com

**Home**

361 28th Street
San Francisco, CA 94131
(415) 826-8634

**Education**

Ph.D. Economics, Johns Hopkins University, 1988

M.A. Economics, Johns Hopkins University, 1985

B.S. International Relations, Georgetown University, 1978
(Magna Cum Laude, Phi Beta Kappa)

**Areas of Expertise**

Economic Damages; Commercial and Financial Litigation Analysis; Intellectual Property Valuation and Litigation Analysis; Microeconomic and Financial Analysis; Tax and Transfer Pricing Analysis; Statistics and Econometrics

**Professional Experience**

Senior Vice-President, Economists Incorporated (2002 – present)

Partner, Bates & White, LLC (2000 – 2002)

Senior Managing Economist, LECG, Inc. (1998 – 2000)

Senior Economist, Benderley Economic Associates (1996 – 1998)

Economist and Manager, Deloitte & Touche, LLP (1994 – 1996)

Economist, Federal Reserve Bank of San Francisco
(1988 – 1994)

PXE006 0043

## Qualifications

### *Analysis of Economic Damages*

- Served as testifying expert for the U.S. government in multiple breach of contract cases involving private companies and federal government agencies
- Analyzed companies operating in a broad range of industries, including aerospace and defense, electric power generation, telecommunications, timber, and financial services
- Calculated economic damages under alternate theories, including expectations, lost profits, restitution, reliance and replacement cost of capital
- Testified on behalf of non-government clients involved in commercial and other private litigation
- Designed, developed, and implemented opinion survey regarding loss of asset values on behalf of private client in the civil aviation industry; interpreted and testified on survey results
- Served as consulting expert in dozens of commercial litigation matters involving economic damages; developed analyses, prepared written reports, and briefed testifiers

### *Financial Analysis for Litigation*

- Testified on behalf of the federal government in the largest government contracting dispute in history; analyzed corporate financial condition, financing requirements and available sources and costs of external finance; performed *pro forma* financial projections; estimated bankruptcy risk

**Qualifications (continued)**

***Financial Analysis for Litigation (continued)***

- Served as testifying expert in *Winstar* litigation involving failed savings and loan associations; analyzed thrift operations, lending decisions, board of directors' oversight and corporate governance; estimated the value of goodwill and the costs of raising external capital to replace goodwill
- Conducted financial analyses in a number of securities litigation matters, involving such instruments as common and preferred stock, corporate bonds, derivative securities, futures, swaps and options
- Evaluated the appropriateness of investment recommendations by financial advisors
- Performed event studies and other stock price analyses to estimate damages
- Analyzed damages claims involving prejudgment interest

***Analysis for Intellectual Property Litigation***

- Performed economic analyses of damages and other issues in patent and copyright disputes
- Computed damages using different methodologies, including lost profits, unjust enrichment and reasonable royalties
- Quantified the value of complementary assets in the income generated by use of patented technology
- Estimated costs to "invent around" patented technology

**Qualifications (continued)**

### *Antitrust Analysis*

- Performed economic analysis of competitive impacts arising from bank mergers and acquisitions
- Defined relevant geographic markets, analyzed mix of available banking services, and investigated actual and potential competition from bank and non-bank financial institutions
- Designed, developed and implemented surveys of consumer and business banking customers
- Analyzed economic consequences of non-competitive behavior in consumer goods markets, including price fixing, illegal cartels, and other restraints of trade
- Assessed the impact of alleged anticompetitive behavior by motor sports sanctioning bodies

### *Valuation and Other Non-Litigation Analyses*

- Performed valuation analyses of companies, divisions, tangible property and intangible assets in a broad range of manufacturing and service industries
- Utilized alternative valuation methodologies, including discounted cash-flow, market, and cost-based approaches
- Conducted valuation analyses of intellectual property
- Helped companies to develop strategies to maximize the value of intellectual property portfolios
- Authored research in applied microeconomic issues in banking and financial markets

**Qualifications (continued)**

***Transfer Pricing***

- Performed transfer-pricing analyses for a broad range of multinational companies operating in industries such as computer peripheral equipment, semiconductors, semiconductor manufacturing equipment, aerospace, engineering services, and employment services

- Analyzed intercompany transfers of goods, services, and intellectual property

- Prepared transfer-pricing analyses for multiple purposes, including tax planning and strategy, audit defense work, and Tax Court litigation

- Worked for a variety of clients, including U.S. companies, foreign companies, and the Internal Revenue Service

***Risk Management***

- Co-founded EI's Risk Management Practice

- Designed, developed and implemented models of risk measurement to assist banks and other financial institutions to manage multiple types of business risk, including market, interest rate, and operational risks

- Co-authored chapter in risk-management handbook prepared by Casualty Actuarial Society

**Testimony**

*Janeanne Doar, et al. v. Chiao Smith & Associates, et al.*, Superior Court of California, County of Marin; testified at deposition, December 2005.

**Testimony (continued)**

*Southern Nuclear Operating Co., Alabama Power Co., Georgia Power Co. v. United States*, U.S. Court of Federal Claims; filed expert report, testified at deposition and trial, October 2005.

*In re J.T. Thorpe Inc., J.T. Thorpe, Thorpe Holding Co., Thorpe Technologies, Inc.*, U.S. Bankruptcy Court, Central District of California; filed expert report and declaration, testified at deposition, June 2005.

*Metabyte, Inc., and Vivek Mehta v. Canal+ Technologies, S.A.*, U.S. District Court for the Northern District of California; filed expert report, testified at trial, June 2005.

*Precision Pine & Timber Co. v. United States*, U.S. Court of Federal Claims; filed expert reports, testified at deposition and trial, June 2005.

*Barron Aircraft, LLC v. Dassault Falcon Jet Corp.;* Superior Court of the State of Delaware, New Castle County; filed expert report, September 2004.

*Gwen Sykes v. Douglas Sykes,* Superior Court of the State of California, County of Alameda; filed expert report, September 2004.

*Indiana Michigan Power Co. v. United States,* U.S. Court of Federal Claims; filed expert report, testified at deposition and trial, March 2004.

*Local America Bank of Tulsa, FSB, et al. v. United States,* U.S. Court of Federal Claims; filed expert report, testified at depositions, April 2003, August 2003.

*Dan Hixson v. El Monte Motors,* State of California Arbitration, filed expert report; testified at deposition, May 2003.

*Pinpoint Consumer Targeting Services, LLC v. United States,* U.S. Court of Federal Claims; filed expert report, March 2003.

**Testimony (continued)**

*A.G. Route Seven Partnership, et al. and Federal Deposit Insurance Corporation v. United States*, U.S. Court of Federal Claims; filed expert report; testified at deposition, January 2002.

*McDonnell Douglas Corporation and General Dynamics Corporation v. United States*, U.S. Court of Federal Claims; filed expert report; testified at deposition and trial, May 2001.

**Publications and Working Papers**

"Tax Reform and Bank Behavior," *FRBSF Weekly Letter*, December 16, 1988.

"Capital Market Imperfections and the q-Theory of Investment: Theory and Evidence," *Federal Reserve Bank of San Francisco Working Papers in Applied Economics, #89-03,* 1989.

"The Thrift Insurance Crisis," with Michael C. Keeley, *FRBSF Weekly Letter*, March 31, 1989.

"Corporate Investment," *FRBSF Weekly Letter*, June 30, 1989.

"FIRREA and Deposit Insurance Reform," *FRBSF Weekly Letter*, December 1, 1989.

"Bank Pricing of Retail Deposit Accounts and "The California Rate Mystery,"" with Gary C. Zimmerman, *Federal Reserve Bank of San Francisco Economic Review*, No. 2, 1990.

"Imperfect Information and the Community Reinvestment Act," with William C. Gruben and Ronald H. Schmidt, *Federal Reserve Bank of San Francisco Economic Review*, No. 3, 1990.

"Interest Rate Competition," with Gary C. Zimmerman, *FRBSF Weekly Letter*, July 27, 1990.

"Costly Information and the CRA," with Ronald H. Schmidt, *FRBSF Weekly Letter*, September 21, 1990.

**Publications and Working Papers (continued**

"How to Close Troubled Banks," *FRBSF Weekly Letter*, December 7, 1990.

"Risk and Return in Banking: Evidence from Bank Stock Returns," *Federal Reserve Bank of San Francisco Economic Review*, No. 4, 1991.

"Depositor Discipline and Bank Runs," *FRBSF Weekly Letter*, April 12, 1991.

"Bank Stock Risk and Return," *FRBSF Weekly Letter*, November 1, 1991.

"Bank Holding Company Stock Risk and the Composition of Bank Asset Portfolios," *Federal Reserve Bank of San Francisco Economic Review*, No. 3, 1992.

"Risk-Based Capital Standards and Bank Portfolios," *FRBSF Weekly Letter*, January 10, 1992.

"Is A Bad Bank Always Bad?" *FRBSF Weekly Letter*, May 1, 1992.

"First Quarter Bank Results: Good News, Bad News," with Karen J. Trenholme, *FRBSF Weekly Letter*, July 24, 1992.

"Interest Rate Risk and Bank Capital Standards," *FRBSF Weekly Letter*, November 6, 1992.

"On the Changing Composition of Bank Portfolios," *FRBSF Weekly Letter*, March 19, 1993.

"Interest Rate Risk at U.S. Commercial Banks," *FRBSF Weekly Letter*, July 23, 1993.

"Conditional Risk and Return in Bank Holding Company Stocks: A Factor-GARCH Approach," in *Conference on Bank Structure and Competition*, Federal Reserve Bank of Chicago, 1994.

**Publications and Working Papers (continued)**

"Industry Effects in the Stock Returns of Banks and Nonfinancial Firms," *FRBSF Weekly Letter*, March 24, 1994.

"A Market-Based Approach to CRA," with Ronald H. Schmidt, *FRBSF Weekly Letter*, May 27, 1994.

"Transfer Pricing and Foreign Exchange Risk," (with Mukesh Bajaj and Brian Becker), *Transfer Pricing*, Tax Management, Inc., Vol. 8, No. 6, July 14, 1999.

**Exhibit 2**
**Documents and Data Reviewed and Considered**

1. U.S. Department of Energy, Office of Civilian Radioactive Waste Management, "Annual Capacity Report," DOE/RW-0331P, December 1991 and "Acceptance Priority Ranking and Annual Capacity Report," DOE/RW-0457, March 1995.

2. EIA 2000, *Final 1998 RW-859 Database, Rev. 1*. Washington, D.C.: U.S. Department of Energy, Energy Information Administration. ACC: MOV.20000714.0015.

3. Expert Report of Brad Cornell, and Expert Report e-files, November 10, 2005.

4. Expert Witness Report of C. Frank C. Graves, November 10, 2005, and supporting electronic files.

5. Frank C. Graves' publications. Bates numbers: PEXP0007036-PEXP0007312.

6. Deposition testimony of Frank C. Graves in *Yankee Atomic et al. vs. U.S.*: volume I, November 12, 2001; volume II, November 13, 2001; volume III, November 14, 2001; volume IV, January 3, 2002.

7. Trial testimony of Frank C. Graves in *Yankee Atomic et al. vs. U.S.*

8. Expert Witness Report of Ivan F. Stuart, November 10, 2005.

9. Expert Witness Report of Roderick W. Knight, November 10, 2005.

10. U.S. Department of Energy Discharges Model and Allocations Model.

11. CD containing documents in electronic format: PEXP0000001 PEXP0007022.

12. Second Annual Corporate Responsibility Report, PG&E Corporation. Accessed on 12/12/05 at http://www.pgecorp.com/corp_responsibility/reports/2004/2004_PGE_CRR_Full.pdf.

13. "Annual Energy Outlook 2006 Overview," EIA, p. 7. Retrieved on January 17, 2006 at http://www.eia.doe.gov/oiaf/aeo/pdf/earlyrelease.pdf.

14. License extension information retrieved from NRC website, www.nrc.gov.

15. Emissions markets information from EPA website, www.epa.gov.

PXE006 0052

# Exhibit 3

## "Must Move" Mountain of Spent Fuel:
## License Extension Affects Acceptance Rate Conclusion

**Graves base case (fast ramp-up of acceptance rates and no license extensions)**




**Alternate case assumes license extensions, Graves' base case for shutdown reactors, no ISFSI "Must Move" fuel, and slower ramp-up of acceptance rate**




PXE006 0053

# Exhibit 4

**Example of The Effect of Reduced Participation in The Graves Model**







PXE006 0054

## Exhibit 5

**Example of The Effect of Price Sensitive Participation and a Supply Shock**







PXE006 0055

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---------------------------------X

| | | |
|---|---|---|
| PACIFIC GAS & ELECTRIC COMPANY | : | No. 04-0074C, into which has been consolidated No. 04-0075C |
| Plaintiff, | : | |
| vs. | : | January 27, 2006 |
| THE UNITED STATES | : | Volume I |
| Defendant. | : | Pgs. 1 - 309 |

---------------------------------X

ORIGINAL

Washington, D.C.

Monday, March 6, 2006

Deposition of

JONATHAN A. NEUBERGER, PH.D.

called for oral examination by counsel for Plaintiff, pursuant to notice, at the Law Offices of Greenberg Traurig, 800 Connecticut Avenue, N.W., Suite 500, Washington, D.C., before Cindy L. Sebo, RMR, CRR, CSR, RPR, Capital Reporting Company, Notary Public in and for the District of Columbia, beginning at 9:33 a.m., when were present on behalf of the respective parties:

expert, other than your -- your work in the spent fuel cases while at Economists Incorporated, you haven't worked on cases involving the nuclear industry, have you?

A That's correct.

Q You mentioned two other spent fuel cases that you've worked on. Those are the -- Southern Company's case and the Indiana-Michigan case?

A Correct.

Q You haven't worked on any other spent fuel cases?

MR. GARDNER: Objection to the extent it calls for work product, and I would instruct Mr. Neuberger not to answer.

THE WITNESS: I'll take my counsel's advice and not -- not talk about those other cases.

BY MR. SHAPIRO:

Q So there are other spent fuel cases that you've worked on?

A Not that I've testified in as of yet.

Q But so far, as a nontestifying expert,

A I know we requested some writings of Mr. Graves, some of which -- most of which I think were not directly related to spent fuel litigation, but just some of the other work that he had done, again, building a picture of -- of the kinds of things that -- that he's done over the years.

But I'd say, with respect specifically to this case, it was more just going through the various components of the models, understanding exactly -- understanding exactly what was done, developing some sense of the economics underlying those calculations and the opinions in his report, and then ultimately memorializing those opinions in an expert report.

Q What quantitative analyses did you perform or ask Mr. Graves to perform as part of your work critiquing Mr. Graves' analysis?

A I don't know that there was specific run it with these numbers, do something different. I mean, I don't know that there was specifically quantitative work. I mean, the nature of my critique here is more from an economic theory

standpoint: Does this model follow fundamental economic principles; are there any aspects of the alleged or purported markets that would develop that -- that were left out of the model, that were omitted from the model; were any of those factors important; and -- basically just through each of us working on understanding those models; and then, through discussions, arriving at a set of opinions regarding the economics of Mr. Graves' analysis.

I don't think there was specific quantitative work that I sent Mr. Gurrea off to do -- Dr. Gurrea I should say. It was more -- as I say, the nature of my critique here is more from the standpoint of economic principles and economic theory and less on, oh, this isn't the right number, that isn't the right number.

Clearly, I do take issue with some of the inputs to the model, and those are actual numbers, for example, Mr. Knight's cost estimates, but there wasn't statistical analysis. I didn't have Dr. Gurrea go off and do old regressions or to develop his own version of the model.

looking at Dr. Cornell's analysis?
A Yes.
Q And what sort of help did you receive?
A Again, Dr. Gurrea and I work -- were in offices right next door to each other. We worked pretty closely on the spent fuel litigation cases, and probably early on in the assignment, he perhaps focused on Mr. Graves a little more and I focused on Dr. Cornell a little more; but, ultimately, we both read both reports, we both went through the models, we talked about what was going on in -- in both sets of models.
And the opinions obviously are my own, but I talked with Dr. Gurrea on an ongoing basis about all the aspects of the case and what our assignment was and ultimately submitted an expert report describing the opinions that I reached.
Q In the third part of your work in this case, running the DOE model, how did you go about that part of your -- your assignment?
A Through work that we've done in -- in the two previous spent fuel cases that I talked

about, we had been given a copy of the DOE models for allocating acceptance rights based on OFF. And counsel asked us to run a scenario of that model using the acceptance rates contained in the 1991 Annual Capacity Reports, the ACR.

And so in those models, it's a fairly straightforward matter to change a key assumption like aggregate acceptance, and we did that, took the results, and then looked specifically at PG&E -- and, you know, it's a very short section in my report -- but just basically described the impact of running the DOE models on PG&E's dates for when fuel would be removed.

Q How did you go -- how did you go about actually putting together your expert witness report in this case?

A I wrote 99.9 percent of it.

Q Did you go through multiple drafts?

A Well, the way I write an expert report is I sit down and I start writing, I try to, in many instances, come up with some fairly concise summaries of what I want to say and then I begin

about Humboldt Bay having its spent fuel removed in 1998 reliable, but you're not willing to say that Mr. Graves is wrong?

A I did not independently model the but-for world, so I didn't -- I don't have a counterexample to say it absolutely without question, to a reasonable degree of certainty, would not have gotten out.

My position is -- and I state this in my report -- is that Mr. Graves' model doesn't tell us much either about whether Humboldt Bay would have gotten out a year earlier.

Q How would you describe the methodology you used to reach your opinion regarding the lack of reliability of Mr. Graves' model of exchanges?

A In my view, Mr. Graves' model is incomplete at best. It omits many factors that would influence the incentives to exchange. I applied fundamental economic principles and theory to look at the model that was provided by Mr. Graves and to conduct a review based on my understanding of economic theory and economic

principles, whether that model was a reliable depiction of what likely would have happened.

Q Was there -- is there a name for the methodology you used to reach your conclusions regarding the reliability of Mr. Graves' model?

A Yeah, economics.

Q You can't be any more specific than that?

A I applied economic theory to Mr. Graves' methodology, and based on my understanding and my experience and my education in economics, it is my belief that Mr. Graves' model omits many factors that would affect the demand and supply of exchanges, the incentive to exchange and, therefore, does not produce reliable estimates of what would have happened in a nonbreach world.

Q You are familiar, aren't you, Dr. Neuberger, that within the field of economics, there are certain kinds of analysis -- we discussed some of these earlier -- such as regression analyses, sensitivity analyses? You're familiar with those concepts; correct?

A Yes.
Q There's no comparable name for the methodology you employed to reach your opinions regarding the reliability of Mr. Graves' model here?
A You could probably call it anything you want: market analysis, applying economic principles to markets, supply and demand analysis. It's basically applied microeconomic analysis.
Economists are trained to understand the workings of markets, and I applied my understanding to this particular framework and asked is this model capturing factors that would affect the demand and supply of exchanges in a but-for world. And in my view, it captures some of those aspects, but omits many others.
So I don't have a specific name. I would call it applied microeconomic analysis, market analysis. I did not conduct statistical tests. I didn't run regressions. Those are all empirical analytical tools. The nature of my critique is more theoretical. Is this market

they give for -- for either excluding evidence or excluding testimony or ascribing it some weight. All I can do is provide the analysis that I've done to show that, in my view, there are deficiencies in this model that render its results less than reliable.

BY MR. SHAPIRO:

Q How could the court test the reliability of your analysis?

MR. GARDNER: Objection; lack of foundation. Objection; calls for speculation. Also, it calls for a legal conclusion.

THE WITNESS: I don't know. I think if my arguments are reasonable, if they seem intuitively correct, then presumably the court would give them some weight.

BY MR. SHAPIRO:

Q So you can't think of a way in which the court could test the reliability of your methodologies?

MR. GARDNER: Same objections.

THE WITNESS: Again, I don't know

hypothetical world here, right? So there's a certain amount of speculation that goes on to establish a position or a damages estimate.

Mr. Graves has said this is the way things would happen. In my view, things would not have happened that way.

Q By how much do you think Mr. Graves is off?

MR. GARDNER: Objection; vague.

THE WITNESS: It's unclear to me that any trading would take place, frankly, in the early years anyway.

BY MR. SHAPIRO:

Q You're not prepared to say by how much Mr. Graves is off in his -- in his results?

A I don't have a quantitative measure to say this one is wrong, this one is wrong, that one is right, that one is wrong. So I can't say quantitatively by how much he's off.

Q Similarly, you have a statement in your expert witness report that Mr. Graves' model fails to provide any meaningful insights into the

through economic logic, whether they would affect the model is another.

Q And since you haven't quantified the effect of the factors that you criticize Mr. Graves for not considering, you're not even sure that they would ultimately affect the outcomes predicted by Mr. Graves because, for example, as you point out, these -- these other factors might have washed each other out?

A The reason I said "may" was for that possibility. I've not done the modeling, so I don't know how with -- with a reasonable degree of certainty, how they would exactly interact.

It is my belief as an economist that these factors would affect the operations of a trading market and, therefore, a model that ignores them doesn't tell you what the predictions would be in a market that does incorporate these factors. The tool isn't sufficient for the job.

It's my belief that all of these factors are important and would affect the market. This model doesn't incorporate them; therefore, it

storage of spent nuclear fuel. I do have expertise as an economist and a quantitative analyst to be able to take data if it were available or to obtain data and estimate the impact of an event like that on the DOE market or the -- the market for exchanges.

Q I was asking really just about the likelihood of there being a technical problem in the DOE program that would cause at least a temporary disruption of the program. You don't have the expertise to estimate the likelihood of the program suffering such a technical problem?

MR. GARDNER: Objection; asked and answered.

THE WITNESS: It would be my expectation that DOE would have performed some kind of contingency planning estimating, perhaps, the likelihood of events like this in some of their preacceptance program planning. I could certainly -- you know, if I could obtain data like that or documents like that, I believe I would be in a position to be able to estimate the likelihood

of such an event and how it would impact a DOE program.

Again, I'm not a technical expert in spent fuel storage or transportation; but given sufficient data about events that could disrupt the program, I believe that I could estimate their impact on the exchanges market.

BY MR. SHAPIRO:

Q Let me ask about an example. If I recall correctly, you said that you did try to do some modeling of an alternative world -- I think you testified yesterday that you -- you did some work as an expert on the A12 case?

A That's correct.

Q And you were looking at the cash flows of McDonnell Douglas?

A Correct.

Q And you were looking at what those cash flows would have looked like in an alternative world?

A Yes.

Q And that -- the alternative world we're

ACKNOWLEDGMENT OF DEPONENT

I, JONATHAN A. NEUBERGER, PH.D., do hereby acknowledge I have read and examined the foregoing pages of testimony, and the same is a true, correct and complete transcription of the testimony given by me, and any changes or corrections, if any, appear in the attached errata sheet signed by me.

3/23/06

Date

JONATHAN A. NEUBERGER, PH.D.

Capital Reporting Company
1000 Connecticut Avenue, Northwest
Suite 505
Washington, D.C. 20006
(202) 857-3376

Case Name: PG&E v. US
Witness: JONATHAN A. NEUBERGER, PH.D.
Date: March 6, 2006

ERRATA SHEET

| Page No. | Line No. | Change |
|---|---|---|
| 24 | 7 | "extensive", not "excessive" |
| 83 | 17 | "Monte Carlo simulation", not "Monte Carlo example" |
| 84 | 5 | "Value at Risk" not "value risks" |
| 109 | 9 | "source of storing fuel" not "source of fuel" |
| 124 | 10 | "reactors" not "managers" |
| 228 | 16 | "or prices" not "of prices" |
| 239 | 3 | "and on the supply" not "on the supply" |
| 385 | 16 | "mechanism by which" not "mechanism that" |
| 453 | 14 | "expert and" not "economist and" |
| 512 | 21 | "any exchanges" not "any changes" |

[signature] 3/23/06
Signature Date

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| PACIFIC GAS AND ELECTRIC COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | No. 04-74C<br>(into which has been consolidated No. 04-75C)<br>(Judge Hewitt) |

**Expert Report of Brad Cornell (11/10/2005)**

## I. Qualifications

(1) I am a Visiting Professor of Finance at the California Institute of Technology. I am also a Senior Consultant to CRA International (CRA). I earned a M.S. degree in Statistics from Stanford University in 1974 and earned my Ph.D. degree in Financial Economics also from Stanford University in 1975.

(2) Since 1975, I have taught a variety of courses, including courses involving corporate valuation, the law and finance of corporate acquisitions and restructuring, corporate financial theory, and securities valuation and investments. Prior to joining the Cal Tech faculty, I was Director of the Bank of America Research Center at the Anderson Graduate School of Management at the University of California, Los Angeles (UCLA). At UCLA, I twice served as Vice-Chairman of the Anderson School and twice served as Chairman of the Finance Department. I have also taught

(28) For current purposes I use the WACC to discount the projected incremental costs for 2008 to 2012. Calculation of the WACC requires an estimate of the after-tax cost of debt (and the cost of preferred stock, if any), the cost of equity, and the relative weights of debt and equity in the company's capital structure. To calculate the after-tax cost of debt, I use the weighted average yield to maturity on PG&E's outstanding debt that has been reported in Standard & Poor's October 2005 Bond Guide.[6] As shown in Appendix F, the average yield to maturity is 5.47%, which comes to 3.24% on an after-tax basis assuming a tax rate of 40.75%.[7] This rate is the combined state and federal marginal tax rates for PG&E.

(29) For the cost of equity, I have been asked to use PG&E's currently authorized return on equity of 11.22%.[8] The relative weights of debt and equity (including preferred stock) are 37.4% and 62.6% respectively. Multiplying the after-tax cost of debt and the cost of equity by these weights produces an after-tax WACC of 8.24%.[9] This is the rate I use to discount the projected costs from 2008 to 2012.

**D. Decommissioning Costs**

(30) Decommissioning is defined as the removal and safe disposal of radioactive components and materials and the cleaning of radioactive contamination remaining in buildings and on the site. Various

[6] This Bond Guide does not show all of PG&E's long-term debt instruments. Consequently, PG&E debt instruments not listed in the Bond Guide have been excluded from this yield to maturity analysis because of insufficient data.
[7] For the derivation of the combined federal and state tax, see Table 17 in Appendix F.
[8] http://biz.yahoo.com/e/050511/pcg8-k.html, visited October 26, 2005.
[9] See Appendix F for calculation details.

decommissioning costs would arise (though at different times) whether or not the government had breached the contract. For example, PG&E will incur spent fuel loading costs (to DOE) with or without the breach. But for the breach, loading would have occurred from the spent fuel pools, whereas with the breach loading will be from dry storage. Plant decommissioning will occur with or without the breach. The timing and amount of these costs, both in the actual and "but for" worlds, is uncertain. Therefore, the most reasonable assumption that can be made at this juncture is that the present value of these costs will be approximately the same for both the actual and "but for" worlds. In making this assumption, I am effectively assuming that the rising costs of such decommissioning activities anticipated by PG&E is offset by the discount rate.

**E. Results**

(31) I present my damage calculations for each of the seven categories below. For each category, my staff and I have reviewed PG&E's actual cost data and its forecast of future costs. With respect to cost projections, I have reviewed the underlying assumptions and methods and made modifications where I thought appropriate. These modifications are discussed below. There are two cost/benefit categories that my analysis does not account for, but which could affect total damages. These are (1) the land consumed for temporary spent fuel storage, and (2) swap benefits and costs. With respect to land consumed for temporary storage, although PG&E already owns the property that will be used for temporary storage,

**Table 1: Incremental Cost of DOE Breach**

| *(millions of dollars)* | Costs through 2003 | Costs through 2004 | Costs through 2005 | Costs through 2006 | Costs through 2007 | Costs through 2012 |
|---|---|---|---|---|---|---|
| 1. Humboldt SAFSTOR | $35.5 | $44.8 | $53.5 | $63.3 | $72.8 | $89.8 |
| 2. Humboldt ISFSI | $8.3 | $9.8 | $14.3 | $20.0 | $28.1 | $45.8 |
| 3. Humboldt Stack Removal | $0.9 | $0.9 | $0.9 | $0.9 | $0.9 | $0.9 |
| 4. Diablo Canyon ISFSI | $24.4 | $36.1 | $53.1 | $79.1 | $91.1 | $127.4 |
| 5. Diablo Canyon Temporary Racks | $0.5 | $2.7 | $4.0 | $7.2 | $7.2 | $7.4 |
| 6. Diablo Canyon Storage Options Study | $1.5 | $1.5 | $1.5 | $1.5 | $1.5 | $1.5 |
| 7. Offsite Storage Evaluations (Humboldt and Diablo Canyon) | $0.9 | $0.9 | $0.9 | $0.9 | $0.9 | $0.9 |
| Total | $72.0 | $96.6 | $128.2 | $172.9 | $202.5 | $273.7 |

(33) In the remaining parts of my report I describe my treatment of two important aspects of the damage calculation – Holtec escalation and cost allocations – before setting out more specific details of my treatment of each of the seven breach-related projects.

**F. Holtec Escalation**

(34) PG&E has contracts in place with Holtec for the design, cast fabrication and construction oversight of ISFSIs at the Humboldt and Diablo Canyon

incremental costs through various earlier dates, using the methodology summarized above and discussed throughout this report.

Brad Cornell

Brad Cornell
Los Angeles, California
November 10, 2005