veris

# Expert Report of R. Larry Johnson

**Pacific Gas & Electric Company**

**v.**

**United States of America**

**In the U.S. Court of Federal Claims**
**No. 04-0074C into which has been**
**consolidated No. 04-0075C (Judge Hewitt)**

**Prepared By:**
**R. Larry Johnson, CPA**

R Larry Johnson

**April 13, 2006**

## TABLE OF CONTENTS


Introduction ........................................................................................................1

Summary Conclusions ........................................................................................5

Detailed Findings ................................................................................................6
- I. Pre-January 22, 1998 Damages.............................................................9
- II. Non-Incremental Costs .......................................................................10
- III. Costs Based on Erroneous Assertions ................................................17
- IV. Costs Not Supported By Adequate Details or Documentation...........19

Alternative Acceptance Scenario ......................................................................26

Summary Calculations ......................................................................................27

Curriculum Vitae of R. Larry Johnson .............................................................28

Documents Considered.......................................................................................35

Compensation ....................................................................................................38

Appendix A .......................................................................................................39

Appendix B .......................................................................................................40

## INTRODUCTION

I have been engaged by the United States Department of Justice to review and analyze the calculations of economic damages presented by Dr. Bradford Cornell ("Dr. Cornell") of CRA International, in his report dated November 10, 2005, with respect to an alleged partial breach by the U.S. Department of Energy ("DOE") of DOE Contract No. DE-CR-01-83NE44394 dated June 6, 1983 ("the DOE contract"). That contract provides in part, for the acceptance by DOE of spent nuclear fuel ("SNF") and high-level radioactive waste ("HLW") from Pacific Gas & Electric Company ("PG&E" or "Plaintiff").

This report contains opinions that have been revised from those I expressed in my expert report dated January 27, 2006. The opinions expressed in this revised report reflect changes resulting from the Court's March 29, 2006 order limiting damages to those incurred through December 31, 2004. My opinions have also been modified to reflect documentation and testimony provided by PG&E subsequent to the issuance of my initial expert report. Opinions expressed in my initial report not affected by subsequent events are also presented in this report for completeness.

PG&E operates two nuclear reactors at Diablo Canyon located in San Luis Obispo, California ("Diablo Canyon"), and maintains a shutdown facility at Humboldt Bay in Eureka, California ("Humboldt Bay").

In his expert report ("Cornell Report"), Dr. Cornell has presented seven categories of asserted damages, which total $96.6 million through 2004 as follows:

| Activities | Asserted Damages (000's omitted) |
|---|---|
| Humboldt Bay SAFSTOR | $ 44,780 |
| Humboldt Bay ISFSI | 9,776 |
| Humboldt Bay Stack Removal | 919 |
| Total Humboldt Bay | 55,475 |
| Diablo Canyon ISFSI | 36,089 |
| Diablo Canyon Temporary Racks | 2,671 |
| Diablo Canyon Storage Options Study | 1,451 |
| Total Diablo Canyon | 40,211 |
| Offsite Storage Evaluations | 900 |
| Total Asserted Damages | $ 96,586 |

Dr. Cornell has described the "standard" measure of damages as follows:

> *"I have relied on a standard approach to determining damages in a breach of contract claim, which is to compare PG&E's actual costs to the costs PG&E would have incurred 'but for' the breach. Damages are the costs incurred by PG&E as a result of the breach."*[1]

According to Dr. Cornell, the process used to identify and quantify PG&E's damages included the following four phases:

1. *"Develop a comprehensive understanding of the historic PG&E cost information for each of the seven categories"*
2. *"Understand PG&E's means of producing cost forecasts"*
3. *"Develop a forecast of labor and materials indices for use in forecasting costs under PG&E's contracts with cask/canister company Holtec"*
4. *"Determine incremental allocated costs for breach projects."*[2]

[1] Cornell Report, page 4.
[2] Cornell Report, pages 9-11.

With regard to PG&E's historic costs, Dr. Cornell states in his expert report that the task of assembling documents related to these costs was undertaken by Celerity Consulting Group ("Celerity").[3] Regarding future costs, Dr. Cornell states he relied on three sources from PG&E: contractually specified amounts, internal capital budgeting documentation, and estimates by project managers at PG&E who purportedly had specific knowledge of the expected timing and value of expenditures.

Implicit in Dr. Cornell's calculation of damages is his acceptance of PG&E's asserted annual rate of acceptance of spent fuel by DOE. My evaluation of damages in this case and the adjustments pursuant to that evaluation are calculated using the Plaintiff's asserted rate of acceptance and, after making the appropriate adjustments to damages assuming Plaintiff's acceptance rate, using an alternative rate of acceptance, which I define in more detail later. I am not opining as to which, if any, of the acceptance rate scenarios is contractually required or appropriate. Instead, I am providing an analysis of damages that arise from these possible scenarios. Should the court rule at the trial on this matter that assumptions other than those contained in these scenarios are appropriate, I would be prepared at the trial of this matter, with input from other expert witnesses retained by the Government, and with sufficient lead time, to calculate the associated damages.

Where I have not offered an opinion regarding a claimed cost, it should not be considered an implied opinion that PG&E has proven that the cost resulted from the DOE's partial breach.

I reserve the right to modify my conclusions upon a subsequent determination of the need for any such modifications.

During the course of my review of the asserted damages, I have considered and relied upon the conclusions of Mr. Warren Brewer of ABZ, Inc. ("Mr. Brewer") with regard to technical issues related to storage of spent nuclear fuel. I have also relied on Mr. Brewer for the quantification of costs related to certain activities that are appropriate offsets to the damages asserted by Dr. Cornell.

---

[3] Cornell Report, page 9.

Further, I have considered and relied upon the conclusions of Dr. Jonathan Neuberger of Economics, Incorporated ("Dr. Neuberger") with regard to spent fuel acceptance and discharge assumptions and the implications of those assumptions on the asserted damages.

In the conduct of my engagement, I have been assisted by various members of the staff of VERIS Consulting, LLC.

The process by which the damages assertions reflected in Dr. Cornell's report were reviewed and analyzed included inspection of accounting and cost related documents, spreadsheets, invoices, contracts and other documents reflecting historical costs incurred by PG&E. This documentation was prepared and summarized by both PG&E personnel and Celerity.[4] My analysis also included a review of documents and spreadsheets provided by the Plaintiff in support of Dr. Cornell's report.

[4] Cornell Report, page 9.

## SUMMARY CONCLUSIONS

Dr. Cornell's calculations of asserted damages are materially flawed for the following reasons:

1. Dr. Cornell lacks a basis for concluding that the costs he asserted as damages are proper. Specifically, Dr. Cornell:

    - Failed to understand and document PG&E's cost accounting data and procedures;
    - Inspected no invoices or other support for historical costs;
    - Conducted no detailed analysis of electronic models and spreadsheets created by PG&E personnel, Celerity and/or his staff;
    - Placed undue reliance on the work product of PG&E personnel;
    - Placed undue reliance on Celerity calculations and analyses with no review of its work product.

2. The asserted damages include costs incurred prior to January 22, 1998, which Government counsel has advised me may not be recoverable.

3. The asserted damages include costs that are not incremental or are not supported by adequate details or documentation. The specific nature and amount of the costs that are so characterized are described in the detailed findings of this report.

## DETAILED FINDINGS

### DR. CORNELL FAILED TO EVALUATE THE BASIS UPON WHICH COSTS ARE INCLUDED IN DAMAGES

Dr. Cornell conducted an insufficient analysis of PG&E's costs that have been claimed as damages. Dr. Cornell failed to examine and investigate documentation that was provided by PG&E in support of the historical costs incurred. He failed to review the invoices provided by PG&E to ascertain whether the costs claimed related to the storage of spent nuclear fuel and whether those costs were incurred as a consequence of the DOE's partial breach. Instead, Dr. Cornell simply accepted summary cash flow sheets that were created by PG&E employees in connection with this litigation and adopted those costs as damages. Dr. Cornell's efforts do not constitute the development of a "comprehensive understanding of historic PG&E cost information."[5]

Dr. Cornell has also failed to investigate and verify the accuracy of data contained in PG&E and Celerity-generated documents that he relies upon as the basis for significant asserted damages. Examples of this failure are reflected in the following deposition testimony of Dr. Cornell:

> *Q: "...What about just verifying that the costs are actually correct that you've been provided is that part of your—*
>
> *A: No, that wasn't part of the assignment.*
>
> *Q: You guys have the capability to do that?*
>
> *A: To an extent. But we're not a forensic accounting firm. We're more of a high level economics and financial consulting firm. So usually that type of work is done by accounting firms or specialized firms like Celerity."*[6]
>
> . . . .
>
> *Q: "Do you know what specific work Celerity performed in this case, why they were hired?*
>
> *A: Not specifically, no."*[7]

---

[5] Cornell Report, page 9.
[6] Deposition of Bradford Cornell, January 19, 2006, page 306.
[7] Deposition of Bradford Cornell, January 18, 2006, page 84.

In response to specific questioning concerning a Celerity calculation impacting PG&E's damages, Dr. Cornell testified,

> *Q: "Does the final back out calculation rely on the work that Celerity generated?*
>
> *A: Yes.*
>
> *Q: Professor Cornell, you've been handed exhibit 25, which is a tab called "Celerity Back-outs." We're actually going to put this on the screen because it is difficult to read in paper form. I'm wondering of you've ever seen Exhibit 25 before?*
>
> *A: No.*
>
> *Q: And just as an example, do you know – let's take media relations for example. This is year 2000. Do you know what these different line items mean? Let's start with "SAP claim basis." Do you know what that means?*
>
> *A: No. I've never seen the document before, so this is pretty much Greek to me."*[8]

Finally, Dr. Cornell testified about supporting evidence,

> *Q: "Do you know what – was there any – do you know if any support was provided, for example, the 48 million dollars in medical costs in '02, like underlying support documents?*
>
> *A: I don't think they were provided to us. We wouldn't ask for them, because what would we do with them? We're not going to argue about it anyway."*[9]

[8] Deposition of Bradford Cornell, January 19, 2006, page 281.
[9] Deposition of Bradford Cornell, January 19, 2006, page 305.

The measurement and classification of asserted damages reflect inclusion of amounts that I have adjusted as follows:

| | Humboldt Bay | | | Diablo Canyon | | | | |
|---|---|---|---|---|---|---|---|---|
| | SAFSTOR | ISFSI | Stack Removal | ISFSI | Temporary Racks | Storage Options | Storage Evaluations | Total |
| PG&E's total asserted damages through 12/31/04 (000's omitted) | $ 44,780 | $ 9,776 | $ 919 | $ 36,089 | $ 2,671 | $ 1,451 | $ 900 | $ 96,586 |
| VERIS Adjustments | | | | | | | | |
| Pre-January 22, 1998 | - | 29 | - | 64 | - | 1,451 | 900 | 2,444 |
| Non-incremental Costs | 7,232 | 8,323 | 919 | 3,150 | 202 | - | - | 19,826 |
| Costs based on erroneous assertions | - | 33 | - | 4,062 | - | - | - | 4,095 |
| Not supported by adequate details or documentation | 6,129 | 446 | - | 3,200 | 81 | - | - | 9,856 |
| Adjusted nominal dollar costs | $ 31,419 | $ 945 | $ - | $ 25,613 | $ 2,388 | $ - | $ - | $ 60,365 |

The documentation provided by PG&E in support of internal labor and overheads prior to my initial expert report was inadequate for me to evaluate the appropriateness of its inclusion as an element of damages as it did not permit an analysis of whether the claimed costs were incurred incrementally and as a consequence of the DOE's partial breach. Further, the damages claimed for internal labor included not only salaries and wages, but also a wide variety of overhead costs that are embedded in what PG&E calls "activity labor." The supporting documentation provided prior to my initial expert report did not allow for the separate identification of what constituted actual salaries and wages versus what constituted an allocation of overheads.

Subsequent to the issuance of my initial expert report, PG&E provided documentation related to internal labor, which included additional information such as the names of PG&E personnel that charged time to asserted breach projects as well as the number of hours those individuals charged to specific projects. Based on my analysis of the additional documentation provided, it is clear that PG&E has claimed damages for all internal hours charged to asserted breach projects, without regard to or analysis of whether the cost represented an additional cost

to the company as a consequence of the breach or whether that cost would have been incurred but for the breach.

Further, the information provided was incomplete in several respects as follows:

- Labor information for the years 2002 and 2003 for the Diablo Canyon Temporary Racks was omitted.
- Labor information for charges associated with the "Spent Fuel Rerack Study" (Order #2008802) and the "High Level Waste Public Relations" (Order #2004811) order numbers, which are part of the Diablo Canyon Storage Options Study category was omitted.
- Labor information for costs incurred in 1995 that were claimed as part of the Diablo Canyon Storage Options Study was omitted.

Notwithstanding Dr. Cornell's unfounded inclusion of all internal labor and overheads, the additional documentation provided by PG&E as well as additional testimony from PG&E personnel, has allowed me to analyze the damages claimed for internal labor costs related to the Humboldt Bay SAFSTOR, Humboldt Bay ISFSI, Diablo Canyon ISFSI, and the Diablo Canyon Temporary Rack damages categories.

## I. PRE-JANUARY 22, 1998 DAMAGES

I have been advised by Government counsel that there may be a legal bar to the recovery of costs claimed prior to January 22, 1998. Consequently, I have adjusted the asserted damages to remove all costs incurred prior to that date. To calculate this adjustment, I have excluded 1/12th of the damages claimed by Dr. Cornell in the year 1998 and all costs incurred prior to 1998.[10]

---

[10] Notwithstanding this instruction from counsel, I would have removed at least $1.35 million of the $2.52 million of Plaintiff's asserted pre-January 22, 1998 costs. Of this amount, approximately $900,000 relates to private fuel storage characterized as "Storage Evaluations" by Dr. Cornell and $450,000 of PG&E internal labor.

## II. NON-INCREMENTAL COSTS

Costs recoverable as an element of damages include only those that would not have been incurred but for the partial breach. The damages calculated by Dr. Cornell fail to meet the incremental standard.

As described later, certain of PG&E's costs have been not been adequately supported, therefore I was unable to determine whether any portion of those unsupported costs are not incremental.

However, I did identify certain other costs that are not incremental to the partial breach.

### HUMBOLDT BAY SAFSTOR – NON-INCREMENTAL

| | Adjustment (000's omitted) |
|---|---|
| PG&E Labor | $ - |
| 1999 SAFSTOR Costs | 3,812 |
| Fossil Security | 2,049 |
| "HBPP Used Fuel Documentation Discrepancy" | 1,048 |
| Rad Material Disposal | 323 |
| Total Non-Incremental Costs | $ 7,232 |

*PG&E Labor*

Mr. Kapus testified that approximately 65% of the hours worked at Humboldt Bay relate to nuclear as compared to the fossil generation activities.[11] [12] Moreover, the hourly labor information provided by PG&E is reasonably consistent with Mr. Kapus' testimony in this regard. I have therefore not adjusted internal labor at the Humboldt Bay SAFSTOR. However, with respect to fossil security, the "Used Fuel Document Discrepancy," non-labor overheads, and the alternative acceptance rate, adjustments have been made as described later in this report.

[11] Humboldt Bay also operates two fossil generating power plants in addition to storing spent nuclear fuel and some employees split time between the nuclear and fossil operations.
[12] Deposition of Robert Kapus, September 28, 2005, page 24.

*1999 SAFSTOR Costs*

The Plaintiff has asserted that an exchange of acceptance allocation rights would have allowed PG&E to exchange its 1999 acceptance rights at Humboldt Bay for 1998 acceptance rights at some market price. I have been instructed by counsel to assume that an exchange of acceptance allocation rights was not possible. Without these theoretical exchanges, Humboldt Bay would not have been able to remove all of its spent fuel in 1998 as asserted in its claim and would have incurred all costs of SAFSTOR through the year 1999 in the but for world.[13] This adjustment provides an offset in the but for world for all SAFSTOR costs claimed in 1999 that have not otherwise been adjusted herein.

*Fossil Security*

In addition to storing spent nuclear fuel, the Humboldt Bay facility operates two fossil generating plants. PG&E has claimed approximately $7.75 million for security costs at Humboldt Bay from 1999 through 2004. Based on the additional testimony of Mr. Kapus, this amount includes all security costs incurred at Humboldt Bay.[14] In 1999 and 2000 the security costs at Humboldt Bay were $329,000 and $271,000 respectively. Mr. Kapus testified that these amounts were based on the industrial security guidelines that were in effect prior to September 11th, 2001.[15] Beginning in 2001, additional nuclear security was added to supplement the industrial security.

Mr. Kapus testified that in 2005 a decision was made to separately quantify and record the portion of the total security that would relate to the fossil power generating activities at Humboldt Bay, however, no such identification had been made in prior years.[16] Mr. Kapus testified that the amount attributed to fossil security in 2005 was between $400,000 and $500,000 dollars;[17] however, he indicated that the fossil component in prior years would be lower because, although the relevant number of employees would not change, they were compensated at a lower rate.[18]

---

[13] This assumes the Plaintiff's asserted rate of acceptance. As discussed later in the report, an alternative rate of acceptance implies that Humboldt Bay's fuel would not be removed until 2001 in the but for world.
[14] Deposition of Robert Kapus, March 30, 2006, page 84.
[15] Deposition of Robert Kapus, March 30, 2006, page 86.
[16] Deposition of Robert Kapus, March 30, 2006, page 83-84.
[17] Deposition of Robert Kapus, March 30, 2006, page 86.
[18] Deposition of Robert Kapus, March 30, 2006, page 88.

PG&E has included security costs in its damages related to fossil power generating activities for the years 1999 through 2004 even though the fossil operation at Humboldt Bay would have required industrial security regardless of the breach. Consequently, the amounts incurred for fossil related industrial security for the years 1999 through 2004 should be removed from the damages claimed for Humboldt Bay security costs. Based on the testimony of Mr. Kapus, I have removed from damages the amounts claimed for industrial security in 1999 and 2000. For 2001 through 2004 I have removed amounts consistent with Mr. Kapus' testimony that the industrial security costs escalated from their 1999 level to approximately $400,000 to $500,000 in 2005.[19]

*"HBPP Used Fuel Documentation Discrepancy"*

The Humboldt Bay "Used Fuel Documentation Discrepancy" involved the discovery, by PG&E personnel, of a documentation discrepancy regarding the location of certain spent fuel rod segments. Mr. Brewer has opined that the costs claimed to investigate and resolve this documentation discrepancy are not incremental, as they would have also been incurred in the but for world as part of decommissioning. Furthermore, PG&E personnel testified that this discrepancy would have to be resolved as part of the decommissioning process.[20]

Based on the opinion of Mr. Brewer and the testimony of PG&E personnel, I have removed the cost of the "HBPP Used Fuel Documentation Discrepancy" from the damages asserted by Dr. Cornell.

*Rad Material Disposal*

Mr. Brewer has opined that amounts claimed as part of Radiation Protection costs in Dr. Cornell's damages assertions related to soil and rubble disposal are not incremental, as they would have been incurred in the but for world. Mr. Brewer has identified those specific costs in his expert report and I have adjusted the asserted damages accordingly.

---

[19] I have removed $325,000 in 2001, $350,000 in 2002, $375,000 in 2003 and $400,000 in 2004.
[20] Deposition of Roy B. Willis, August 24, 2005, page 143.

**HUMBOLDT BAY ISFSI – NON-INCREMENTAL**

| | Adjustment (000's omitted) |
|---|---|
| PG&E Labor | $ 1,390 |
| Visual Inspection of Fuel | 327 |
| Investigation of Taiwan Earthquake | 176 |
| Fuel Transfer Offset | 6,430 |
| Total Non-Incremental Costs | $ 8,323 |

*PG&E Labor*

Mr. Kapus testified that certain Humboldt Bay employees spent "100 percent or substantially all their time" working on the Humboldt Bay ISFSI project.[21] I have removed internal labor for the Humboldt Bay ISFSI project with the following exceptions: (1) specific employees identified by Mr. Kapus; and (2) employees who worked on the ISFSI project and on SAFSTOR. All other employees who charged time to the ISFSI project are not incremental to the breach.

*Visual Inspection of Fuel*

Mr. Brewer has opined that costs claimed for the "Visual Inspection of Fuel" are not incremental as this activity would have also been required in the but for world. Consistent with Mr. Brewer's opinion, Larry Pulley, PG&E's Dry Storage Project Manager for Humboldt Bay, testified that this activity would have been required to load DOE casks with spent fuel assemblies in the but for world,

> *Q: "Now, do you know if the costs of visual -- excuse me, the visual inspection of the fuel would also be incurred to load DOE casks or Department of Energy casks with spent fuel assemblies?*
>
> *A: I guess my opinion would be yes."*[22]

Consequently, as this activity would have also been required in the but for world, I have adjusted the claimed damages to remove this non-incremental cost.

---

[21] Deposition of Robert Kapus, March 30, 2006, page 113.
[22] Deposition of Lawrence B. Pulley, July 27, 3005, page 136.

*Investigation of Taiwan Earthquake*

Mr. Brewer has opined that the costs claimed related to the "Investigation of Taiwan Earthquake" are not incremental to the breach, as this investigation would have also occurred in the but for world. Furthermore, a PG&E internal email indicates that the invoices provided for investigating the Taiwan Earthquake should be partially allocated to the Diablo Canyon Long Term Seismic Program.[23] Such an allocation implies that this activity was not caused by the partial breach.

*Fuel Transfer Offset*

Dr. Cornell's report assumes that PG&E will incur spent fuel loading costs to DOE with or without the breach, and that "the present value of these costs will be approximately the same for both the actual and the 'but-for' worlds."[24] In the but for world, loading at Humboldt Bay would have occurred from the spent fuel pool, whereas, in the breach world, based upon PG&E's claim, it allegedly will occur directly from dry storage. Mr. Brewer has opined that Humboldt Bay would have incurred increased loading costs in the but for world due to the use of truck casks, which hold less fuel than rail casks. Mr. Brewer has concluded that the loading costs for these truck casks would have been $6.4 million. I have reduced damages asserted by Dr. Cornell by this amount to reflect that PG&E has avoided this cost.

**HUMBOLDT BAY STACK REMOVAL – NON-INCREMENTAL**

| | Adjustment (000's omitted) |
|---|---|
| Stack Removal Costs | $ 919 |
| Total Non-Incremental Costs | $ 919 |

*Stack Removal Costs*

I have been instructed by counsel to remove all costs associated with the Humboldt Bay Stack Removal category from damages. This adjustment represents the entire amount of damages claimed for this category.

[23] Email from Barbara Clark to Robert Kapus, December 29, 2000 (PACD044766).
[24] Cornell Report, page 14.

**DIABLO CANYON ISFSI – NON-INCREMENTAL**

| | Adjustment (000's omitted) |
|---|---|
| PG&E Labor | $ 3,145 |
| Enercon Crane Modifications | 5 |
| Total Non-Incremental Costs | $ 3,150 |

*PG&E Labor*

Unlike Humboldt Bay where spent nuclear fuel is only stored, the Diablo Canyon facility is an operating plant with active power generating nuclear reactors. The normal power generating activities that take place at Diablo Canyon are not incremental to the breach. Therefore, the time spent on the Diablo Canyon ISFSI project by employees who are primarily employed to work on power generating activities is also not incremental to the breach. Mr. Kapus testified that certain Diablo Canyon employees spent "100 percent or substantially all their time" working on the Diablo Canyon ISFSI project.[25] As the employees identified by Mr. Kapus were "full-time dedicated"[26] to the ISFSI project, I have not adjusted the costs claimed for these employees. I have, however, removed from damages the labor costs associated with other Diablo Canyon employees who were not dedicated to the ISFSI project as these costs would have been incurred by PG&E pursuant to normal power generating activities.

*Enercon Crane Modifications*

I have been instructed by counsel to remove the cost associated with a specific invoice from Enercon Services, Inc. related to crane modifications. This invoice is included on Appendix D of Mr. Brewer's report[27] and was previously removed from damages as an unsupported cost. Subsequent documentation has been provided that has permitted identification of this cost as related to crane modifications.

---

[25] Deposition of Robert Kapus, March 30, 2006, page 113.
[26] Deposition of Robert Kapus, March 30, 2006, page 111-112.
[27] This Enercon invoice can be found at PACD070227.

**DIABLO CANYON TEMPORARY RACK – NON-INCREMENTAL**

| | Adjustment (000's omitted) |
|---|---|
| PG&E Labor | $ 202 |
| Total Non-Incremental Costs | $ 202 |

*PG&E Labor*

As previously discussed the additional labor documentation provided in connection with the Diablo Canyon Temporary Rack omitted data for 2002 and 2003. I have therefore removed all labor damages claimed in these years based on the lack of sufficient reliable data to support their inclusion. Mr. Kapus testified that only Mr. Vosburg spent "100 percent or substantially all his time" working on the Temporary Rack project in 2004. My review of the labor data, however, indicates Mr. Grebel spent a substantial amount of his time working on the Temporary Rack in 2004 while his remaining time in 2004 was spent on the Diablo Canyon ISFSI project. As a result, I have not adjusted damages for the time spent on the Temporary Rack project by Messrs. Vosburg and Grebel. I have removed from damages the labor costs associated with other Diablo Canyon employees who were not dedicated to the Temporary Rack project as these costs would have been incurred by PG&E pursuant to normal power generating activities.

## III. COSTS BASED ON ERRONEOUS ASSERTIONS

The damages asserted by Dr. Cornell include the following costs based on erroneous assertions:

| | Humboldt Bay | | | Diablo Canyon | | | | |
|---|---|---|---|---|---|---|---|---|
| | SAFSTOR | ISFSI | Stack Removal | ISFSI | Temporary Racks | Storage Options | Storage Evaluations | Total |
| Unpaid Escalation | $ - | $ - | $ - | $ 3,740 | $ - | $ - | $ - | $ 3,740 |
| Unpaid Sales Tax | - | - | - | 271 | - | - | - | 271 |
| Altran Invoices | - | 33 | - | - | - | - | - | 33 |
| GBH Distributing, Inc. Invoice | - | - | - | 16 | - | - | - | 16 |
| F. Randall Huey Invoices | - | - | - | 35 | - | - | - | 35 |
| Total (000's omitted) | $ - | $ 33 | $ - | $ 4,062 | $ - | $ - | $ - | $ 4,095 |

*Unpaid Escalation*

Dr. Cornell claimed damages for escalation related to certain Holtec costs incurred in 2004. Based on the additional testimony of Mr. Kapus, none of this escalation claimed as damages was actually incurred in 2004.

> Q: *My question is do you know why that escalation is in 2004?*
>
> A: *I have a feeling that CRA put it in the wrong column.*
>
> Q: *You didn't do that?*
>
> A: *No. This is not my escalation, this is CRA's calculation.*
>
> Q: *That confirms what we suspected. And let me just ask to make the record clear. PG&E did not pay 3.7 million to Holtec in 2004?*
>
> A: *We did not pay for 3.7 million for escalation in 2004, that is correct.*
>
> Q: *Have you paid it yet?*
>
> A: *No.*

Based on the testimony of Mr. Kapus it is clear that PG&E did not incur any Holtec escalation charges in 2004 and I have therefore removed these claimed costs from damages.

*Unpaid Sales Tax*

In addition to claiming damages for Holtec escalation costs in 2004, damages include sales tax that was calculated based on the unpaid escalation. Consequently, I have removed the 7.25% sales tax that was asserted as damages related to the unpaid escalation.

*Altran Invoices*

Mr. Kapus has testified that two invoices from Altran (PACD031788 and PACD031799) should not have been included in the damages claim as asserted by Dr. Cornell.[28] Consequently, I have removed their associated cost from damages.

*GBH Distributing, Inc. Invoice*

Mr. Kapus has testified that an invoice from GHB Distributing, Inc. (PACD050028) should not have been included in the damages claim as asserted by Dr. Cornell.[29] Consequently, I have removed the associated cost from damages.

*F. Randall Huey Invoices*

Mr. Kapus has testified that two invoices from F. Randall Huey Consulting (PACD051081 and PACD051083) should not have been included in the damages claim as asserted by Dr. Cornell.[30] Consequently, I have removed their associated cost from damages.

[28] Deposition of Robert Kapus, March 30, 2006, page 57.
[29] Deposition of Robert Kapus, March 30, 2006, page 119.
[30] Deposition of Robert Kapus, March 30, 2006, page 120.

## IV. COSTS NOT SUPPORTED BY ADEQUATE DETAILS OR DOCUMENTATION

The damages asserted by Dr. Cornell include the following costs for which either no support or inadequate support has been provided:

| | Humboldt Bay | | | Diablo Canyon | | | | |
|---|---|---|---|---|---|---|---|---|
| | SAFSTOR | ISFSI | Stack Removal | ISFSI | Temporary Racks | Storage Options | Storage Evaluations | Total |
| Non-Incremental Support Costs | 2,506 | 21 | - | 16 | 13 | - | - | 2,556 |
| Other Support Costs | 3,234 | 305 | - | 643 | 68 | - | - | 4,250 |
| Accounting Discrepancy | - | - | - | 2,196 | - | - | - | 2,196 |
| Rad Material Disposal | 389 | - | - | - | - | - | - | 389 |
| Brewer Adjustments | - | 120 | - | 345 | - | - | - | 465 |
| Total (000's omitted) | $ 6,129 | $ 446 | $ - | $ 3,200 | $ 81 | $ - | $ - | $ 9,856 |

*Non-Incremental Support Costs*

Embedded in all PG&E labor costs are allocated costs that represent non-labor overheads. Dr. Cornell concedes that a portion of such allocated costs claimed as damages are not incremental to the breach. To account for these non-incremental overheads, Dr. Cornell has attempted to back out certain allocated costs to isolate PG&E labor and overhead costs he asserts are incremental.

Dr. Cornell did not perform the analysis required to quantify these non-incremental overheads. Rather, his work papers show a reliance on Celerity to back out the allegedly appropriate amount. However, when asked about Celerity's role at his deposition, Dr. Cornell testified,

> *Q: "Do you know what specific work Celerity performed in this case, why they were hired?*
>
> *A: Not specifically, no."*[31]

[31] Deposition of Bradford Cornell, January 18, 2006, page 84.

In response to specific questioning concerning the method Celerity used to back-out non-incremental overheads, Dr. Cornell further testified

> *Q: "Does the final back out calculation rely on the work that Celerity generated?*
>
> *A: Yes.*
>
> *Q: Professor Cornell, you've been handed exhibit 25, which is a tab called "Celerity Back-outs." We're actually going to put this on the screen because it is difficult to read in paper form. I'm wondering of you've ever seen Exhibit 25 before?*
>
> *A: No.*
>
> *Q: And just as an example, do you know – let's take media relations for example. This is year 2000. Do you know what these different line items mean? Let's start with "SAP claim basis." Do you know what that means?*
>
> *A: No. I've never seen the document before, so this is pretty much Greek to me."*[32]

Furthermore, Dr. Cornell testified:

> *Q: "Do you know if CRA did any recalculation of the back-outs after Celerity had done its analysis?*
>
> *A: No, I don't believe so."*[33]

Based on the insufficient documentation provided and Dr. Cornell's inability to explain the calculation of these non-incremental support costs, I have eliminated the amount "backed out" in his damages claim, which totaled $2.091 million.

Rather, in order to separate these non-labor costs from the damages claimed for PG&E labor, I have relied on the testimony and workpapers of Ms. Betty Philips, a PG&E Accounting Manager. In contemporaneously prepared internal documents, PG&E has identified the portion of PG&E Labor that represents salaries, benefits, and payroll taxes versus other non-labor overheads that have been allocated to PG&E labor.[34] I have used this information to remove from damages the portion of internal PG&E labor costs that represents these other non-labor related overheads, which totaled $4.648 million.

[32] Deposition of Bradford Cornell, January 19, 2006, page 281.
[33] Deposition of Bradford Cornell, January 19, 2006, page 280.
[34] The percentage of PG&E Labor representing salaries, benefits, and payroll taxes was obtained from the "Billa.xls" files that were provided in connection with this claim.

The net effect of my adjustment is to reduce damages by $2.557 million.

*Other Support Costs*

Dr. Cornell includes damages for various employee benefit and overhead costs that he has described as "Other Support Costs." Dr. Cornell's report indicates that he calculated these "Other Support Costs" by multiplying the "activity cost of each breach project" by three different percentages designed to capture costs for "Pension, PBOPs, and LTD," "Insurance and Casualty," and "Company Support" costs.[35] The calculation of these three percentages was documented in a spreadsheet titled "Allocated Costs Master 1996-2005.xls." My analysis of the data used and calculations performed to calculate "Other Support Costs" indicated that Dr. Cornell did not seek to understand the source of the values used nor did he critically analyze the reasonableness of the results.

> *Q: "Do you know what – was there any – do you know if any support was provided, for example, the 48 million dollars in medical costs in '02, like underlying support documents?*
>
> *A: I don't think they were provided to us. We wouldn't ask for them, because what would we do with them? We're not going to argue about it anyway."*[36]

An example of an unreasonable result produced from Dr. Cornell's methodology is the calculation of the applicable percentage for "Company Support Costs," in which a significant factor is depreciation. However, Dr. Cornell testified that depreciation <u>should not be included as a part of damages</u> because it did not represent a cash expenditure.

> *A: "In cost accounting, you might show depreciation as a cost. But in an economic model with damages, it's not. It's not a cash outflow."*[37]

Dr. Cornell further testified:

> *Q: "Do you know how your expert report treats depreciation?*
>
> *A: It's my understanding that the expert report, whenever possible, uses actual cost data. So it's not subtracting out depreciation. It's using actual cost."*[38]

---

[35] Cornell Report, pages 26 and 27.
[36] Deposition of Bradford Cornell, January 19, 2006, page 305.
[37] Deposition of Bradford Cornell, January 18, 2006, page 111.
[38] Deposition of Bradford Cornell, January 18, 2006, page 112.

Removing depreciation costs from Dr. Cornell's calculation of "Company Support Costs" dramatically decreases the applicable percentage.

Furthermore, Dr. Cornell did not attempt to understand the values used for depreciation. From 1999 through 2002, the incremental depreciation costs calculated by Dr. Cornell's model fluctuated between $6.6 and $8.8 million. In 2003, depreciation inexplicably increases to $94.8 million. When questioned on this increase Dr. Cornell testified as follows:

*Q: "Do you know why depreciation went from 8.8 million to 94 million in 2003?*

*A: It didn't go to 94. You mean 34? Or is that 94?*

*Q: That's 94.*

*A: No, I don't. That's astonishing. "*[39]

The notes on Dr. Cornell's spreadsheet claim that incremental depreciation "varies in proportion to labor."[40] This claim would therefore indicate a more than 10 fold increase in staff company-wide between 2002 and 2003, though there is no evidence that such an increase occurred. It is clear that the difference in depreciation between 2002 and 2003 has little to do staffing levels at PG&E and nothing to do with the DOE's partial breach.

Furthermore, based on the additional testimony of Ms. Philips, Dr. Cornell's calculation of all amounts in the Other Support Costs category are based on estimated values when actual values exist and could have been used. In the case of depreciation, Dr. Cornell's spreadsheet indicates that the source of the values is a spreadsheet file from a CRA employee's computer that was not provided to the Government in this matter. When asked to explain specific components of the depreciation values, Ms. Philips could not provide explanations of the nature of the costs.

*Q: There's a category here called "Office Machines." Let me find it. Line 14. What's included in "Office Machines"?*

*A: I don't know for sure. Probably copy machines and maybe fax machines and things like that, but I don't really know the details behind it.*

[39] Deposition of Bradford Cornell, January 19, 2006, page 323-324.
[40] Allocated Costs Master 1996-2005.xls, Depreciation Details tab.

. . . .

*Q: Do you know what "DCPP Transmission Systems" is down on 61?*

*A: No.*

*Q: Do you know what "DCPP Comm Quip Computer Based" is?*

*A: No.*

Additionally, Ms. Philips testified that PG&E does not normally include the "Company Support Costs" portion of the Other Support Costs when calculating amounts to be billed to 3rd parties.[41]

Another example of an unreasonable result produced from Dr. Cornell's methodology is the inclusion of costs based on "Pension VRI Interest" in the calculation of "Other Support Costs." Ms. Philips testified that this cost relates to a retirement benefit paid to past PG&E employees, not current employees who may be involved in breach projects.

*Q: What's pension VRI interest?*

*A: That's, VRI is a Voluntary Retirement Incentive, I think it might stand for, that was years and years ago, affected the entire company, and so it has to do with those some interest on those particular pensioners.*

. . . .

*Q: So that does not relate, then, to current PG& E employees; is that right?*

*A: That would be my understanding.*

Based on the above considerations, I believe that Dr. Cornell has failed to reasonably calculate the value of the "Other Support Costs" that he asserts as damages. These amounts have been removed from damages.

*Accounting Discrepancy*

Dr. Cornell states in his report that he relied on Celerity to assemble documents that support the historic costs incurred by PG&E.[42] However, when questioned about the binders of Celerity support documents, Dr. Cornell testified as follows:

[41] Deposition of Betty Phillips, March 29, 2006, page 153-154.
[42] Cornell Report, page 9.

*Q: "And do you know if Celerity produced binders of supporting cost information?*

*A: To CRA?*

*Q: To CRA.*

*A: I don't think they did, but I'm not sure.*

*Q: And do you know if they produced them to government?*

*A: No, I don't know that.*

*Q: I'll tell you that they did produce it to us, and that's what we're going to use as the basis for some of these questions. You haven't seen the Celerity binders then?*

*A: No."*[43]

Additionally, Dr. Cornell testified that his staff also did not review the binders,

*Q: "Do you know if your staff reviewed any of the Celerity binders?*

*A: I'm quite certain that we never even got them.* "[44]

The Celerity documentation contains some support for the non-labor portion of historic costs such as those related to contracts and materials. My analysis of the total costs contained in the Celerity summary schedules identified a discrepancy compared to the total non-labor damages claimed by Dr. Cornell.

Mr. Kapus testified that there are a small number of invoices included in the Celerity binders that were not included in damages claimed by Dr. Cornell.[45] Further, Mr. Kapus explained that the manner in which Celerity compiled the binders of invoices for historic costs did not correspond to the manner in which he compiled costs for this claim. Specifically, there is a timing difference between the two methods that prevents a comparison of the costs on an annual basis. Mr. Kapus explained that PG&E uses what are called "notice of receipts" (NORs) in accounting for its costs and in compiling their damages claim. These NORs represent estimates of costs for services rendered during the current year for which invoices will not be

[43] Deposition of Bradford Cornell, January 19, 2006, pages 277-278.
[44] Deposition of Bradford Cornell, January 19, 2006, page 278.
[45] Deposition of Robert Kapus, March 30, 2006, page 110.

received until the following year.[46] In contrast, Celerity included invoices in the year the cost was actually paid.[47]

Despite the explanations provided by Mr. Kapus, I am unable to reconcile the amount of non-labor damages claimed for the Diablo Canyon ISFSI compared with the amount supported by invoices in the Celerity binders. Specifically, I am unable to explain variances totaling $2.15 million, which I have therefore removed from damages.[48]

*Rad Material Disposal*

As previously discussed in the Non-Incremental section for SAFSTOR, amounts related to soil and rubble disposal within the Radiation Protection costs asserted by Dr. Cornell have been removed based on the opinion of Mr. Brewer. Mr. Brewer has also concluded that the balance of damages claimed for Rad Material Disposal that are not related to soil and ruble disposal costs should be removed because they are not supported by adequate details or documentation.[49]

*Brewer Adjustments*

Certain historic costs were determined to be not supported by adequate details or documentation based upon the opinion of Mr. Brewer. Based on additional documentation received subsequent to the issuance of my initial expert report and conversations with Mr. Brewer, certain of these costs remain unsupported. Appendix A for Humboldt Bay ISFSI and Appendix B for Diablo Canyon ISFSI contain details related to the measurement of these damages.[50]

---

[46] Deposition of Robert Kapus, March 30, 2006, page 162.
[47] Deposition of Robert Kapus, March 30, 2006, page 162.
[48] This total variance includes $(1,280,793) in 2000, $(1,204,098) in 2001, $224,640 in 2002, $176,164 in 2003, and $(66,057) in 2004.
[49] Note that Rad Material Disposal is a subsection of Dr. Cornell's damages category called "Radiation Protection."
[50] Appendices A and B were formerly Appendices B and C in my initial expert report.

## ALTERNATIVE ACCEPTANCE SCENARIO

I have been asked to calculate the impact on damages if an alternative acceptance rate was assumed in the but for world. The assumed scenario provides for acceptance at a rate of 400 Metric tons of Uranium ("MTUs") increasing to 900 MTUs and ultimately to 3000 MTUs. In quantifying the impact of this scenario on asserted damages, I am relying on the opinion of Dr. Neuberger.

***Humboldt Bay***

Dr. Neuberger has opined that under the alternative acceptance rate, Humboldt Bay would not have had all of its spent fuel removed by DOE until 2001. The effect of Dr. Neuberger's opinion is that all costs of operating Humboldt Bay SAFSTOR through 2001 would have been incurred by PG&E in the but for world. To calculate the effect on damages of assuming the alternative acceptance rate compared to the acceptance rate asserted by PG&E, I have removed all SAFSTOR costs incurred in the years 2000 and 2001 that have not otherwise been adjusted herein.[51]

***Diablo Canyon***

Dr. Neuberger has opined that under the alternative acceptance rate, Diablo Canyon would obtain its first pickup from DOE in 2011. The effect of Dr. Neuberger's opinion is that all costs of building additional storage capacity at Diablo Canyon through at least January 28, 2004, would have been incurred by PG&E in the but for world.[52] To calculate the effect on damages of assuming the alternative acceptance rate compared to the acceptance rate asserted by PG&E, I have removed all costs associated with adding additional storage capacity at Diablo Canyon that have not otherwise been adjusted herein.

---

[51] All costs claimed for SAFSTOR in 1999 have already been removed based on the reasons described in the Humboldt Bay SAFSTOR – Non-Incremental section of this report.

[52] All costs claimed for additional storage capacity at Diablo Canyon beyond 1/28/04 have already been removed based on instruction from counsel that such costs are not legally recoverable in this case.

## SUMMARY CALCULATIONS

The following tables summarize the damage scenarios I have described in this report.

### ADJUSTED DAMAGES BASED ON PLAINTIFF'S ASSERTED ACCEPTANCE RATE

| | Humboldt Bay | | | Diablo Canyon | | | | |
|---|---|---|---|---|---|---|---|---|
| | SAFSTOR | ISFSI | Stack Removal | ISFSI | Temporary Racks | Storage Options | Storage Evaluations | Total |
| PG&E's total asserted damages through 12/31/04 (000's omitted) | $ 44,780 | $ 9,776 | $ 919 | $ 36,089 | $ 2,671 | $ 1,451 | $ 900 | $ 96,586 |
| VERIS Adjustments | | | | | | | | |
| Pre-January 22, 1998 | - | 29 | - | 64 | - | 1,451 | 900 | 2,444 |
| Non-incremental Costs | 7,232 | 8,323 | 919 | 3,150 | 202 | - | - | 19,826 |
| Costs based on erroneous assertions | - | 33 | - | 4,062 | - | - | - | 4,095 |
| Not supported by adequate details or documentation | 6,129 | 446 | - | 3,200 | 81 | - | - | 9,856 |
| Adjusted nominal dollar costs | $ 31,419 | $ 945 | $ - | $ 25,613 | $ 2,388 | $ - | $ - | $ 60,365 |

### ADJUSTED DAMAGES BASED ON ALTERNATIVE ACCEPTANCE RATE

| | Humboldt Bay | | | Diablo Canyon | | | | |
|---|---|---|---|---|---|---|---|---|
| | SAFSTOR | ISFSI | Stack Removal | ISFSI | Temporary Racks | Storage Options | Storage Evaluations | Total |
| Adjusted nominal dollar costs assuming Plaintiff's acceptance rate (000's omitted) | $ 31,419 | $ 945 | $ - | $ 25,613 | $ 2,388 | $ - | $ - | $ 60,365 |
| Additions to but for world | 9,302 | - | - | 25,613 | 2,388 | - | - | 37,303 |
| Adjusted nominal dollar costs | $ 22,117 | $ 945 | $ - | $ - | $ - | $ - | $ - | $ 23,062 |

# R. LARRY JOHNSON, CPA

**EXPERIENCE:**

**CEO - VERIS Consulting, LLC (2000 – Present)**
**MANAGING PARTNER - JOHNSON LAMBERT & CO. (1986 - 2005)**

Direct client responsibility for all litigation consulting services. Experience includes forensic analysis; liability, causation and damages consultation; discovery assistance; preparation of damages analysis and expert testimony. Engagements have included many which required several thousands of hours of assistance and involved damages in the hundreds of millions of dollars.

Specialized industries involved in litigation assignments have included insurance, nuclear power, finance, software development, telecommunications, real estate, government contractors, professional service firms and hotels.

Oversees all consulting services that VERIS provides, including survey research and technology consulting.

As managing partner of Johnson Lambert & Co. from 1986 through 2005, oversaw the accounting and auditing practice of that firm.

For 18 years through 1986 associated with Ernst & Whinney. Admitted to partnership in 1978, named partner in charge of accounting and auditing for its Washington, D.C. practice in 1980 and served as Mid-Atlantic Regional Director of insurance services.

**MEMBER-AICPA FINANCIAL SERVICES EXPERTS PANEL (2000 – 2001)**

One of 15 original members of panel designed to monitor developments affecting the delivery and reporting of financial services in the U.S.

**MEMBER-AICPA INSURANCE COMPANIES COMMITTEE (1989 – 1993) (1997 – 1999)**

One of 15 members responsible for development of accounting and financial reporting for U.S. insurance enterprises.