**<u>MEMBER-ACCOUNTING STANDARDS EXECUTIVE COMMITTEE</u> (1994 - 1997)**

One of 15 members of the Accounting Standards Executive Committee of the American Institute of Certified Public Accountants, which was the highest authority in the U.S. Accounting Profession with responsibility for industry-specific accounting and reporting matters.

**<u>OTHER AICPA COMMITTEES</u>**

Served as a member of the AICPA Committee on Relations with Actuaries and on task forces including the following:

- Auditing Loss Reserves
- Mutual Life Insurance Companies
- Deposit Accounting (Chair)
- Mass Tort Liabilities

**EDUCATION:** BS University of Maryland, magna cum laude. Completed MBA work, George Washington University.

**TRIAL AND ARBITRATION TESTIMONY**

- *Elizabeth R. Costle, Commissioner of Insurance Banking and Securities of the State of Vermont, as Receiver of Ambassador Insurance Company v. Doris June Chait, et al.* (D. N.J., No. 85-2441) (June and July 2005)
- *Yankee Atomic Electric Company, Connecticut Yankee Atomic Power Company, Maine Yankee Atomic Power Company v. United States* (Fed. Cl. Nos. 98-126C, 98-154C, 98-474C) (August 2004)
- *American Capital Corporation and Transcapital Financial Corporation and Federal Deposit Insurance Corporation as Successor to the Rights of Transohio Savings Bank v. U.S.* (Fed. Cl., No. 95-523C) (July 2004)
- *Donna Lee H. Williams v. Prudential Securities, Inc. et al.* (Circuit Court of the Ninth Judicial Circuit in and for Orange County, Florida, Case No. CI96-3225) (September 2003)
- *Southern Group Indemnity, Inc. v. Rachlin Cohen & Holtz, LLP* (In re Arbitration AAA No.: 32 y 181 00369 00) (August 2002)
- *Arbitration between Ernst & Young and Sphinx International, Inc., formerly known as Phoenix International Limited, Inc.* (July 2002)
- *Arbitration between U. S. Fidelity & Guaranty Co., et al. and Vesta Insurance Company et al.* (June 2002)
- *Arbitration Between Certain Underwriters at Lloyd's, London and Unionamerica Insurance Company Limited, Petitioners and BCS Insurance Company, Respondent* (April 2002)
- *Arbitration Between Houston General Insurance Company and Certain Underwriters at Lloyd's, London and Other Insurers Subscribing to Reinsurance Agreements* F 96/2992/00 and F 97/2992/00 (January 2002)

**DEPOSITION TESTIMONY**

- *Southern Nuclear Operating Company et al. v. United States*, Fed. Cl., No. 98-614C, (August 2005)
- *Ferguson v. Hannover Ruckversicherungs-Aktiengesellschaft and Lion Holding, Inc.*, S.D.N.Y., Nos. 02 Civ.4258 and 02 Civ. 4261 (June 2005)
- *American Federal Bank F. S. B. v. United States of America*, Fed. Cl. No. 95-498C (June 2005)
- *Tribune Company v. Swiss Reinsurance America Corporation*, N.D. Ill, No. 02 C 4772 (January 2005)
- *M. Diane Koken v. Viad Corporation* (January 2005)
- *In Re The Arbitration Between The Canada Life Assurance Company and The Guardian Life Insurance Company of America* (December 2004)
- *Arbitration between Swiss Re Life & Health, Inc. as successor in Interest to the Lincoln Entities v. ES Rückversicherung, A.G.* (September 2004)
- *American Capital Corporation and Transcapital Financial Corporation and Federal Deposit Insurance Corporation as Successor to the Rights of Transohio Savings Bank v. U.S.* (Fed. Cl., No. 95-523C) (June 2004)
- *Yankee Atomic Electric Company, Connecticut Yankee Atomic Power Company, Maine Yankee Atomic Power Company v. United States* (Fed. Cl. Nos. 98-126C, 98-154C, 98-474C) (June and August 2002 and May 2004)
- *Circle Group Internet, Inc. v. Atlas, Pearlman, Trop & Borkson, P.A. et al. v. Spector & Wong, LLP et al.* (S.D.Fla., Case No. 02-61082-CIV) (May 2004)
- *Scott B. Lakin, et al. v. KPMG, et al.* (In the Circuit Court of Jackson County, Missouri at Kansas City, Case No. 02CV233493) (March 2004)
- *Quartet Holdings Inc., Quartet Services, Inc. and Ronald G. Tepper v. BDM International, Inc. and TRW, Inc.*, (Superior Court for the District of Columbia Civil Division Civil Action No. 0000344-01) (February 2004)

- *In the Matter of an Arbitration between Alta Health & Life Insurance Company, and Swiss Re Life & Health America, Inc* (July 2003)
- *Liquidation of Centennial Life Insurance Company, Kathleen Sebelius, Commissioner of Insurance for the State of Kansas, in her Capacity as the Liquidator and Daniel Watkins in his Capacity as the Special Deputy Liquidator v. KPMG Peat Marwick LLP, et al.*, (District Court of Shawnee County Kansas, Case No. 98 CV 144 ) (April 2003)
- *Claudia Peltz and Peter May v. Richard Rampell, Rampell & Rampell, P.A., Cuyler Capital Factors, Inc., Ellen Rampell, James Hall, Henry Ullmann, and Peter N. Brant* (The Fifteenth Judicial Circuit in and for Palm Beach, Florida, General Jurisdiction Division, Case No. CL-96-3288 AE) (March 2003)
- *M. Dianne Koken, Insurance Commissioner of the Commonwealth of Pennsylvania as Statutory Liquidator of PIC Insurance Group, Inc. (In Liquidation) v. Charles M. Lederman, et al.* (E.D. Pa., No. 00-cv-755) (May 2000 and December 2002)
- *Vesta Insurance Group, Inc. et al. v. The Cincinnati Insurance Company*, Circuit Court for Jefferson County, Alabama, Civil Action No. CV 98-5946 AWH (November 2002)
- *Elizabeth R. Costle, Commissioner of Insurance Banking and Securities of the State of Vermont, as Receiver of Ambassador Insurance Company v. Doris June Chait, et al.* (D. N.J., No. 85-2441) (October 2002 and October 2003)
- *Donna Lee H. Williams Commissioner for the State of Delaware as Receiver for National Heritage Life Insurance Company, a company in Liquidation v. Prudential Securities, Inc., as a Successor in Interest to Prudential-Bache Securities, et al.*, (In the Circuit Court of the Ninth Judicial Circuit in and for Orange County, Florida, Case No. CI 96-3225 Division 33) (September 2002)
- *Southern Group Indemnity, Inc. v. Rachlin Cohen & Holtz, LLP* (In re Arbitration AAA No.: 32 y 181 00369 00) (April and July 2002)
- *American Federal Bank, FSB v. United States* (Fed. Cl., No. 95-498C) (March and April 2002)
- *Arbitration Between Certain Underwriters at Lloyd's, London and Unionamerica Insurance Company Limited, Petitioners and BCS Insurance Company, Respondent* (March 2002)

- *Susan F. Cogswell, Insurance Commissioner of the State of Connecticut as Liquidator of First Connecticut Life Insurance Company v. Arthur Andersen*, (Connecticut Superior Court, Complex Litigation Docket X02 CV 98 015625) (February 2002)
- *Palfed, Inc. and Palmetto Savings Bank of South Carolina v. The United States* (Fed. Cl., No. 95-496C) (January 2002)
- *Arbitration between U.S. Fidelity & Guaranty Company/F&G and Vesta Fire Insurance Corporation, et al.* (January 2002)
- *Arbitration Between Houston General Insurance Company and Certain Underwriters at Lloyd's, London and Other Insurers Subscribing to Reinsurance Agreements F 96/2992/00 and F 97/2992/00* (September and October 2001, and January 2002)

**SPEECHES:**

Evolving Theories of Liabilities and Damages Against Third Parties International Association of Insurance Receivers 2005 Insolvency Workshop (February 2005)

Evaluating Risk Transfer in Reinsurance Contracts -- Reinsurance Association of America, New York (July 2001)

## DOCUMENTS CONSIDERED

**Expert Reports and Testimony:**

Expert Report of Dr. Bradford Cornell of CRA International, dated November 10, 2005

Expert Report of Mr. Ivan Stuart, dated November 10, 2005

Expert Report of Mr. Frank C. Graves, dated November 10, 2005

Expert Report of Mr. Roderick W. Knight, dated November 10, 2005

Expert Report of Mr. Warren Brewer of ABZ, Inc., dated January 27, 2006

Expert Report of Dr. Jonathan Neuberger of Economics Inc., dated January 27, 2006

Deposition Testimony of Mr. Robert Kapus, dated September 28 and 29, 2005 and March 30, 2006

Deposition Testimony of Mr. Lawrence B. Pulley, dated July 27, 2005

Deposition Testimony of Mr. Gregory Rueger, dated August 23, 2005

Deposition Testimony of Mr. Jearl Strickland, dated August 18, 2005

Deposition Testimony of Mr. Roy Willis, dated August 24, 2005

Deposition Testimony of Ms. Betty Phillips, dated October 19, 2005 and March 29, 2006

Deposition Testimony of Mr. Bradford Cornell, dated January 18 and 19, 2006

**Documents and Electronic Files:**

PG&E's RCFC 26(a)(1) Disclosures:

1999-2009 SAFSTOR.xls
Cask Pit Rack0328DOE.doc
DCPP ISFSI 1995-1997.xls
DCPP ISFSI.xls
HBPP ISFSI Damages.xls
HBPP ISFSI.xls
HBPP SAFSTOR.xls
ISFSI DCPP Damages.xls
PFS and Mescalero Payments List (2).xls
PFS_Mescalero_invoices.pdf
Pre 1998 study costs.pdf
Spent Fuel Storage at Diablo Canyon 050418.xls
Stack Removal Project.xls

Pacific Gas & Electric Company's Response to Defendant's First Set of Interrogatories Relating to Damages, July 29, 2005

Documents produced in relation to Dr. Cornell's report:

PG&E Master 051027.xls

Allocated Costs:

*PG&E Departmental Support Costs:*
98billa.pdf, 99billa.pdf, 00billa.pdf, 01billa.pdf, 02billa.pdf, 03billa.pdf, 04billa.pdf, 05billa.pdf

*PG&E Third Party Overhead Costs:*
99 Billable Cost Schedule.xls, 00billa.xls, 01billa.xls, 02billa.xls, 03billa.xls, 04billa.xls, 05billa.xls

Activity price policy_doc.pdf
Allocated Costs Master 1996-2005.xls

Diablo Canyon ISFSI:

ISFSI DCPP Damages 102705.xls
ISFSI DCPP Damages 102905 (source).xls

Humboldt Bay SAFSTOR:

1999-2009 SAFSTOR 102205.xls
1999-2009 SAFSTOR 102205 (source).xls

Humboldt Bay ISFSI:

HBPP ISFSI Damages 102705.xls
HBPP ISFSI Damages 102805 (source).xls

Diablo Canyon Temporary Racks:

Cask Pit Temp Rack 101305.xls
Cask Pit Temp Rack 101305 (source).xls

Pre-1998 Diablo Canyon Study:

DCPP ISFSI 1995-1997.xls
DCPP ISFSI 1995-1997 (source).xls

Humboldt Bay Stack Removal:

Stack Removal Project 051028.xls

Stack Removal Project (source).xls
Stack Removal Total Costs 051104.pdf

Off-Site Storage:

Off-Site Storage Master v1.0.xls
PFS_Mescalero_invoices.pdf

Celerity Consulting Group, LLC binders:

PACD000001-PACD0070373
PRCD0070486-PRCD0080589

PG&E Internal Labor:

DCPP ISFSI.xls
DCPP Order Cask Pit Rack.xls
HBPP ISFSI.xls
HBPP SAFSTOR.xls
HBPP Stack Removal.xls
HBPP Stack Removal Incremental.xls

Insurance:

PHBP0088000- PHBP0088097

Additional Invoices Provided:

PACD038794.0001- PACD038794.0016
PACD031975.0001- PACD031975.0004
PACD040062.0001- PACD040062.0021
PACD035255.0001- PACD035255.0027
PACD001817.0001
PACD004735.0001
PACD004854.0001- PACD004854.0002
PACD004891.0001
PACD004983.0001
PACD004997.0001- PACD004997.0003
PACD011140.0001- PACD011140.0002
PACD005900.0001- PACD005900.0039
PACD048184.0001
PACD047935.0001
PACD050686.0001- PACD050686.0049
PACD053611.0001

Exhibit 54 to Deposition of Robert Kapus, March 30, 2006

## COMPENSATION

The Compensation for our work is at our normal professional rates, which range between $125-$400 per hour depending on the personnel assigned to the engagement. Our compensation is in no way dependent on our findings or the ultimate outcome of the case.

**Appendix A**
**Humboldt Bay ISFSI**

| Year | Bates Number | Vendor Name | Amount |
|---|---|---|---|
| 1998 | PACD027236 | Bruce Norton & Associates | 37,620 |
| 1999 | PACD027748 | Interiors Incorporated (Haworth Inc.) | 7,293 |
| 1999 | PACD028673 | Cosby Home Service Company | 7,198 |
| 1999 | PACD028679 | Pacific Mobile Structures | 19,200 |
| 1999 | PACD028725 | Cosby Home Service Company | 5,006 |
| 1999 | PACD028751 | Haberstock Construction | 24,731 |
| 2000 | PACD042041 | William Lettis & Associates | 22,575 |

**Appendix B**
**Diablo Canyon**

| Year | Bates Number | Vendor Name | Amount |
|---|---|---|---|
| 1999 | PACD048222 | Goddard Claussen | 20,034 |
| | | | |
| 2000 | PACD050066 | GBH Distributing, Inc. | 10,269 |
| 2000 | PACD050116 | Goddard Claussen | 10,798 |
| 2000 | PACD050124 | Goddard Claussen | 5,500 |
| 2000 | PACD050148 | Goddard Claussen | 5,500 |
| 2000 | PACD050148 | Goddard Claussen | 5,500 |
| 2000 | PACD050164 | Goddard Claussen | 6,105 |
| 2000 | PACD050169 | Goddard Claussen | 5,529 |
| 2000 | PACD050176 | Goddard Claussen | 5,500 |
| 2000 | PACD050180 | Goddard Claussen | 5,500 |
| 2000 | PACD050178 | Goddard Claussen | 5,521 |
| 2000 | PACD050488 | Transnuclear West | 13,079 |
| 2000 | PACD050555 | Geomatrix Consultants, Inc. | 9,397 |
| 2000 | PACD049917 | Enercon | 17,920 |
| 2000 | PACD049922 | Enercon | 18,012 |
| | | | |
| 2001 | PACD051273 | Bechtel Construction Company | 15,960 |
| 2001 | PACD051446 | Enova | 21,500 |
| 2001 | PACD051008 | Enova | 8,275 |
| 2001 | PACD052451 | William, Lettis, and Associates | 21,745 |
| 2001 | PACD052479 | William, Lettis, and Associates | 8,840 |
| 2001 | PACD052482 | William, Lettis, and Associates | 6,280 |
| | | | |
| 2002 | PACDO53908 | Enova | 21,500 |
| 2002 | PACD053911 | Enova | 21,500 |
| 2002 | PACD053921 | Enova | 8,750 |
| 2002 | PACD053929 | Enova | 11,026 |
| 2002 | PACD053934 | Enova | 14,211 |
| | | | |
| 2003 | PACD055171 | Enova | 6,138 |
| | | | |
| 2004 | PACD056047 | Enova | 9,840 |
| 2004 | PACD070139 | Bechtel Construction Company | 12,229 |
| 2004 | PACD070249 | Bechtel Construction Company | 13,102 |

Page 10

asked you do you consider yourself an expert in economics, the answer was no. I can show you the transcript. Is that still your answer?

A I'd like you to show me the transcript.

Q It's on page 6643. You see that, line 16, do you consider yourself an expert in economics, you said no?

A Well, the reason why I asked to see the transcript is I think that there is ambiguity about what economics might mean and to make sure that there was clarity at the time of this testimony I said in response to the first question about whether or not I considered myself an expert in economics, to read from the transcript at page 6642, if you define economics for me perhaps I could be responsive. I think that some people think measures of damages reflect varying economic principles. I do believe I consider myself to be an expert in the means and manner in which one calculates damages. So to that extent that would be incorporated in someone's use of economics. I'm certainly not an expert in Keynesian principles and then it goes and

Page 11

ultimately there's a question about, that you referred me to, in which I give the answer no, that I did not consider myself an expert in economics.

Q So from 6643, that's fine, I'm just trying to ascertain whether your testimony would be the same from page 6642 line 16 through say 6643 line 18?

A Yes, it would be.

MR. STOUCK: Off the record.

(Off the record)

BY MR. STOUCK:

Q Back on. Now the current rate at which VERIS bills your time, Mr. Johnson, is what, hourly rate?

A I think it depends upon --

Q For this engagement?

A I think it's $400 an hour, but I could be wrong about that.

Q And how many spent fuel cases have you been for -- in how many spent fuel cases have you been named as an expert for the government?

A Three.

Page 12

Q That's the Yankee's, Southern and this case?

A That's correct.

Q And I take it the testimony you gave in the Southern case at trial was truthful?

A It was.

Q If I were to ask you the same questions that you were asked in those instances in the Southern case deposition and trial here today you'd give me the same answers?

A If you were to ask me the same questions about the Southern matter, I would give you the same answers. I don't know to what extent those same questions might or might not be applicable to my opinions in this matter.

Q In this matter, PG&E, what did the Department of Justice ask you to do?

A To review, consider documentation for and ultimately determine the appropriateness of the amounts claimed as damages in Mr. Cornell's report and as a part of doing that to most specifically focus on those damages that occurred prior to

Page 13

January 2004 the date at which we were instructed to cut off the measure of damages.

Q In the course of responding to or fulfilling the assignment you just described you considered all of the costs claimed as damages in Brad Cornell's report, Professor Cornell's report?

A I certainly was aware of it. I don't think we applied the same kind of analysis to those costs which are being claimed that occur or will be incurred after January 2004, nor those which occurred prior to the date at which counsel instructed would be subject to statute of limitations issues.

Q That's because of the instructions?

A That's correct.

Q You're not offering -- are you offering any opinions about costs claimed as damages after January 28, 2004?

A The opinions I'm offering is that they would be excluded pursuant to my understanding and direction as regards to the Indiana Michigan decisions rendered by the court.

nuclear insurance matters?
A I know that Mr. Brewer has knowledge about nuclear insurance matters. I have not evaluated whether and to what extent I believe he holds expertise in that manner.
Q Did you ask Mr. Brewer about the nuclear insurance cost information that you were seeking that you just mentioned in your answer a couple minutes ago?
A I think there were conversations about it.
Q Are you familiar with Mr. Brewer's testimony at his deposition about the insurance costs that PG&E claims as damages in this case?
A No.
Q Certainly before issuing your report you didn't talk or no one at VERIS talked to Mr. Brewer at all about his view of the insurance costs claimed as damages in this case; is that right?
A I don't know that's what I said.
Q I'm asking you if that's true or not. Before issuance of your report, did you or anyone at VERIS consult with Mr. Brewer at all about his view



of the insurance costs claimed as damages by PG&E in this case?
A Well, my recollection, and it's not with complete recall, is that his report discusses insurance and identifies that the insurance program is one in which frequently credits are available at some point in time and he saw no evidence that those had been considered. And, moreover, he saw no evidence that the insurance amounts being claimed were supported by information, documents, data or anything else. I did not personally discuss that with Mr. Brewer but I believe his report identifies those matters and I reviewed his report and I've included that in the documents I've considered.
Q Beyond what's in Mr. Brewer's report there were no discussions between you or anyone else at VERIS and Mr. Brewer about his views of the insurance costs claimed at damages by PG&E; is that correct?
A I don't know. I can only speak to no conversations between me and Mr. Brewer. Members of my organization might have had those conversations.



Q Prior to the issuance of your report you were not with familiar with anything that Mr. Brewer had to say about the insurance costs claimed as damages other than what's written in his report; is that correct?
A I was not.
Q My statement is correct?
A Your statement is correct.
Q Did you yourself have personal access to the government's --
MR. STOUCK: Off the record.
(Off the record)
BY MR. STOUCK:
Q Did you yourself have personal access to the government's document database in this case or did you have to request documents from John Ekman or someone in his office? I'm talking about you personally, did you have personal access to the government's document database?
A I think I would have requested information.
Q That would be true also of anyone at



VERIS, did anyone at VERIS have the ability to sit down at a computer screen and login to the government's document database?
A Not to my knowledge.
Q So whatever documents you obtained were pursuant to requests of Department of Justice personnel or they would forward things to you or VERIS?
A I think that's probably true.
Q So this list on pages 28 through 30 of the report which of these documents, if any, did you yourself look at?
A Cornell's report. Brewer's report. Neuberger's report. Certain aspects of the testimony of Mr. Kapus and Mr. Pulley. I've seen certain schedules that were printed from certain of these electronic files.
Q Which electronic files are we talking about? What page?
A Page 28, but I believe that also continues to page 29 because I think that the one speaks to the initial disclosure and then on page 29 there are

Page 30

more electronic files that are described under the allocated costs heading.

Q Did you yourself review any of these Excel spreadsheets or PDF files that are listed on page 28 under the initial disclosures in this engagement?

A I think I might have seen some. I did not conduct a personal review of any of them.

Q And turning to page 29, can you just be a little more specific about, and 30, which of these -- the top document, the response to the first set of interrogatories, did you review that?

A I did not.

Q Under documents produced in relation to Dr. Cornell's report, can you tell me which of these spreadsheets you -- or these electronic documents or other documents that are listed here under that heading you yourself personally reviewed?

A No, I think my answer would be the same as it was to the initial disclosure. I've seen a printout of certain of those. I did not personally analyze any one of them.

Q Turn to page 30 you will see Celerity

Page 31

Consulting Group, LLC, binders. Do you know what those are?

A Those are documents produced in connection with work done by Celerity, as I understand it, the purpose of which was to conduct analysis of historical costs that were ultimately included in the damages as to which Dr. Cornell has opined.

Q Did you yourself review these Celerity binder documents?

A No, I've seen schedules that compile certain information but I've not looked at the individual binders.

Q Can you list for me the types of documents that are included with the Celerity binders that you cite in your report?

A It is the detailed information about the historical costs that are being included that are non-labor costs, so based -- recognizing that I've already said I did not review the binders themselves, I can't tell you specifically what those documents look like. They purport to identify the historical non-labor costs that are appropriately

Page 32

includable as an element of damages for the periods as to which they relate.

Q Do you know if there are any purchase orders in that collection of documents, is that the kind of document that's in there?

A I think there is but I have no firsthand knowledge.

Q Do you know if all of the documents -- these documents that are referenced, the very last two lines of page 30 on your report, do you know if all those documents are PG&E generated documents or if those documents also include some documents generated by Celerity?

A My understanding is they include some documents generated by Celerity but not original source documents.

Q Original source documents what do you mean?

A Invoices, entries of original books and records, purchase orders, other things that would evidence the basis for a historical cost.

Q Are there invoices in the set of

Page 33

documents?

A I don't recall.

Q You don't know?

A I was told. I don't recall as I sit here.

Q That's not important to any of your opinions whether these documents include invoices?

A No.

Q My statement is correct, whether this includes invoices is not important to your opinions; is that correct?

A That's correct.

Q Can you tell me anything at all about the Celerity generated documents, of what nature they are that are included in this set of documents in the binders?

A Beyond what I've already said?

Q Yes.

A No. I described what my understanding was and that they purport to compile the historical record of costs of a non-labor nature that were to be utilized by Dr. Cornell for purposes of compilation of his damages calculation.

are asserted to vary in proportion to labor, which I believe is something that my report specifically identifies when discussing the issue of depreciation. But I can't tell you specifically which document on the documents considered this resides.

Q Can you tell me whether it is listed -- can you testify that it is one of the documents listed in your report as documents considered?

A Not with certainty.

Q Is that a no? Do you know whether or not this document, Exhibit Number 4, is listed as one of your documents considered?

A I said I expected that it was because my report refers to comments that were obtained from this document, but since I can't tell specifically what this might have been described at when it was in electronic form I don't know.

Q You don't know -- if it is listed on page 29 or 30 of your report under documents considered, you don't know which of those documents there it is?

A Yes, that's correct.



Q You didn't conduct any personal review of the document prior to issuing your report?

A No, I discussed some of the general concepts reflected by this document but I did not personally inspect the document.

Q Okay. Do you know what category of costs this document relates to?

A Well, I think this document being the totality of Johnson 4 includes and refers to the percentages used by Dr. Cornell to derive cost assertions for damages related to pensions, post-retirement benefits other than pension and long-term disability, as well as insurance and casualty, as well as what he refers to as company support.

Q Are these activity costs, do you know if PG&E considered those cost categories you just described as activity costs?

A I don't know whether or not they met whatever their definition of activity costs might have been.

(Exhibit No. 5 was marked)



Q Mark this as Number 5, please.
Mr. Johnson, you've been handed what's been marked as Exhibit 5. Do you know if this is one of the documents listed in your documents considered? I will tell you it's got a title on it that says PG&E Master 051027.xls Settings. And there's a document on page 29 which is identified as PG&E Master 051027.xls. So I guess a sub-question under my question would be do you know if that's the same document or Exhibit 5 is otherwise one of the documents considered in your report?

A I think it's a document considered in my report and my expectation would be pursuant to what you just identified.

Q You think it's the same document?

A I can't say, again, with certainty, but my expectation is that it is.

Q You have not reviewed Exhibit 5 before, or have you?

A I don't believe I personally reviewed the document. I have seen references to items that are summarized in the document but I have not personally



inspected the document.

Q You have seen references to items summarized in this document, like which ones?

A Like the incremental costs of DOE breach which is Table 1 of the document that identifies costs by year in the seven categories that PG&E identified, as well as various ways in which that is then presented in alternative or additional details in pages that are after this.

Q Do you know if this document was created by PG&E personnel or by Professor Cornell or someone in his office?

MR. EKMAN: Objection, foundation.

A I'm not certain. I think that there was some data that was a part of the initial submission that it's not clear to me whether or not Dr. Cornell was involved with. I don't believe that that's this. And it's my understanding that although the information was based upon what he was provided by PG&E and/or Celerity that this was compiled by staff working for Dr. Cornell.

Q Can you tell me how this relates to

Page 58

that there be appropriate evidence to demonstrate the nature of the cost, that in fact the cost is associated with a breaching activity and that it's incremental to that activity and in the absence of that that it be excluded as an element of damages.

Q Have you done anything more here, Mr. Johnson, than compare all the lines on the Celerity summary sheets with all the invoices that PG&E provided and determined that some costs on the summary sheets are not associated with any invoices that have been provided? Have you done anything more than that with respect to the costs covered by the last paragraph on page 17?

A And therefore conclude that it should be excluded from damages, I've done that as well.

Q Have you done anything more than what I said and what you said?

A No.

Q Do you know whether under the rules of evidence applicable in this case these costs that you removed from damages can be established to the court's satisfaction without invoices?

Page 59

A As a matter of law.

Q You don't know the answer to that question?

A It's a matter of law and I don't have any legal opinions. I would expect that the court would consider my views and the inability to evaluate the nature of the cost by reference to a specific invoice, but without knowing the basis upon which the court might otherwise conclude that this is includable I wouldn't have an opinion.

Q You don't know whether under the rules of evidence applicable in this case these costs that you remove in the last paragraph on page 17 can be established to the court's satisfaction without invoices?

A I do not.

Q Let's turn back to page 32 Appendix A and I think they're all in Exhibit 6. Let's start with the top document. What is this PACD 038791?

A It's a document that compiles costs that were ultimately included in the cash flows as being includable in damages and specifically the item that

Page 60

is referenced at item 15 is the 29,000 as to which we did not see invoice support.

Q Did you yourself determine that these invoices were missing from these costs?

A No.

Q Did others at VERIS, one of the three individuals that you mentioned at VERIS, determine that these invoices were missing?

A Yes.

Q So logic tells me that someone at VERIS reviewed all of the invoices that were provided?

A Yes.

Q Someone at VERIS, who was that?

A It was a combination of the three people that I identified.

Q A combination of those people compared all the invoices that were provided with I guess all of the Celerity summary sheets; is that right?

A Yes.

Q And then concluded that as to the items listed on page 32 of your report Appendix A invoices were missing from costs that were included on the

Page 61

summary sheets?

A Correct.

Q What did you do?

A I discussed that finding with them and I concluded that it should be identified in my report as such that there should be an appendix that lists the items with specificity and the costs should be excluded from the measures of damages.

Q You believe it's appropriate to rely on your staff for the purposes of listing these invoices here in reaching your conclusions about damages?

A Absolutely.

Q Based on the work of Celerity that you've seen or you've become familiar with, could Celerity have performed this task of determining which costs listed on the Celerity summary sheets are not associated with invoices that have been provided?

MR. EKMAN: Objection.

A Could they have?

MR. EKMAN: Vague.

Q Yeah.

Page 62

A I guess they could have. I think that Dr. Cornell could have also.
Q Do you know if Mr. Brewer could have done that?
A He might have in some cases.
Q Back to the first page of Exhibit 6. Do you know what accounting system generated this?
A No.
Q You don't know what accounting system or software PG&E uses?
A I'm sure they use lots of software, lots of accounting systems, and I have no firsthand knowledge of them. They use SAP, but I don't know what parts they use and how they use it.
Q Is the top page of Exhibit 6 something that SAP generated, do you know?
A I wouldn't think that it was but it could be.
Q Why wouldn't you think that it was?
A I think this was generated for purposes of this litigation.
Q Do you know whether all the costs listed

Page 63

on this page are included in claimed damages?
A I don't know as I sit here.
Q But you do know the one that you mentioned, line 15, this $29,000, you believe is not associated with any invoice that anyone at VERIS could find in the materials provided?
A That's correct.
Q Is the problem here -- was this document the top page of Exhibit 6 generated by -- you did say you thought it was generated for purposes of this damages claim; is that right?
A Generally, yes, although, again, I've not seen a particular document.
Q Well, do you know whether or not this document was generated -- you don't know whether or not this document was generated by a PG&E accounting system; is that correct?
A That's correct.
Q And that's not important to your opinions?
A That's also correct. What's important is there's an item included in damages for which there's no invoice support and we've identified id

Page 64

and I'm certain if there's invoice support out there you would provide it to us.
Q You say you're certain this item is included in damages, how do you know that, must be from the Celerity summary sheets?
A I think that's right, but I based it upon my conversations with members of my staff.
Q Is the problem here you don't know if this $29,000 charge was incurred or whether or not it was incurred -- you can't -- strike that.
Is there anything more here other than the invoice is not there?
A You know, I've already said about three times why the invoice was necessary. It's still necessary for those same reasons I identified five minutes ago.
Q If you had the invoice you would proceed to some subsequent stage of your analysis?
A That's correct.
Q That stage of analysis would include determining whether or not this particular charge was incremental to the breach?

Page 65

A Yes.
Q You have the expertice to determine that?
A Depending upon what the invoice shows we might or we might have conferred with Mr. Brewer.
Q You yourself did not make any judgment or offer any opinions about the incremental nature of costs shown on invoices, you relied on Mr. Brewer for all, I thought, for all of those conclusions about -- where we did have invoices but costs are being excluded, this is Appendix B and C, I think I thought you relied on Brewer for all those; is that right?
A I don't know that Appendix B and C are all the issues taken as to incrementality. I think there are others that are described in the body of my report. As to those items, setting aside the components of labor and the costs associated with labor that included embedded overhead as well as thal allocations of the support costs that I've also described, I think specific charges that were removed of a non-labor nature because they were non-incremental were in, as I recall, all cases

Page 122

trusts that because it's in your books and records it's right, that in fact what they've done is produced something that's an incremental measure of the harm caused by the partial breach.

Q What expertise do you rely on in offering the opinion that it was not appropriate for Dr. Cornell to rely solely on cost information provided by PG&E?

A Because he expressed his opinion. His opinion doesn't say PG&E told me and I'm accepting that and discounting. If that's what he said, if his testimony is I don't really know but they told me and they must be right because they told me and they're a big company and they got books and records and they create journal entries and general ledgers and all these things, and all I've done is told them what they ought to be doing, they have assured me that's what they did, and they've given me the data and I've present valued it, if that's what his conclusions is then I don't take exception to his conclusions but it sure leaves a big hole as to what the proper measure of the damages is.

Page 123

Q I'm trying to explore whether it's appropriate or not in the kind of engagement that Cornell was engaged in to rely upon cost data from PG&E and what I'm taking from you is at least to some extent it is appropriate to rely on that, would you agree with that?

A So long as it's not undue reliance and as long as there's a basis for the reliance and so long as it's subject to appropriate scrutiny, analytical observation and a degree of analysis that he didn't provide.

Q Looking for anomalies, what other kind of analysis should Dr. Cornell have performed before you would agree -- strike that.

Undue reliance on the PG&E cost data, that term is also mentioned at the bottom of paragraph one, how do you go about distinguishing in this engagement between reliance on Celerity or the work product of PG&E personnel that's appropriate reliance versus undue reliance, is there a standard you have in mind that you can articulate?

A Sure. It's not blind reliance. It's not

Page 124

accepting because they said so. Take Celerity, what they did, what their competency was, what the scope of their work was, how they did their work. What their specific findings are, and not to say I don't know what they did, I don't know exactly who they are, and actually to say I don't think we got their binders when apparently they did. He doesn't know whether they got them or not.

So it seems to me it's quite clear that there's undue reliance because he is relying on Celerity without understanding what they did or even who they are. A similar thing would extend to PG&E. What his testimony is is he was basically a traffic cop. He told them where to go to get the information and then he accepted it when they gave it back to him and simply rated in cash flows that he could discount. He didn't do the kind of analysis that in my view caused the reliance to no longer be undue.

Q You do not list Dr. Cornell's deposition in your documents considered, Professor Cornell's, I therefore conclude you did not review that

Page 125

deposition transcript; is that correct?

A I don't think it was available at the time of my report.

Q Have you reviewed it since?

A I have.

Q It's your understanding that he didn't know anything about Celerity's work, is that your understanding of his testimony?

A Actually I want to go back.

Q I thought that's what you testified?

A I want to go back. I believe that his deposition was available and the reason why it's not considered in the considered documents is because explicit references are made to in my report. As I said earlier, the documents considered generally is a supplement to documents identified specifically in the report. So my testimony that I just gave a moment ago was in error. I did have and did consider Dr. Cornell's deposition prior to the issuance of my report.

Q Did you read it?

A Yes.

Page 138

Q So really the only opinions that you are offering based on analysis that you have done relate to costs between January 28, 1998 and January 28 2004 except some opinions that might control the labor costs, non-incremental allocated costs and invoices; does that sound right?
A And those costs footnoted that deal with prior to January 1998.
Q On page 7 it says based on counsel's instruction you adjusted the asserted damages to remove all costs allegedly incurred to be incurred subsequent to that date, right, that's what it says, pretty close, next to the last sentence in that paragraph.
A Yes.
Q You say to calculate this adjustment I've excluded 11/12ths of the damages claimed by Dr. Cornell in 2004 and all costs asserted thereafter. You see that?
A Yes.
Q Is it your opinion that a good way to estimate the costs claimed as damages from before

Page 139

January 28, 2003 and distinguish those costs from the claimed damages in 2003 that are after that date is to use this 11/12ths fraction?
A You're using 2003.
Q Strike that. Is it your opinion that a good way to estimate from the costs claimed as damages that in 2004 that are appropriately kept in the claim and distinguish those from the costs in 2004 that are not appropriately kept in the claim based on counsel's instruction is to use this 11/12ths fraction?
A Yes.
Q In using that estimation method did you do anything to assure yourself that PG&E's claim damages in 2004 are evenly distributed or sufficiently evenly distributed across the 12 months of the year to make that estimation method reliable or did you just make that assumption without conducting any such analysis?
A I made that assumption based upon reasonable expectation that they would be evenly distributed and I did nothing to independently

Page 140

verify that assumption.
Q And again, you have no basis for excluding post January 28, 2004 costs from PG&E's claimed damages other than counsel's instruction and whatever opinions Brewer might offer about those costs -- strike that question.
Look at page 20. You're aware Mr. Brewer criticizes some of the claimed costs that occur in periods after January 28, 2004?
A I'm aware of that generally, yes.
Q As either not reasonable or not incremental or not supported?
A I'm aware generally of those opinions.
Q You deduct those damages based on Brewer's opinion? I'm trying to determine whether those costs that Brewer criticizes after January 28th 2004 are deducted twice on this chart, once on the line titled Indiana Michigan opinion and again on the line or lines that either say non-incremental costs are not supported by adequate details?
A No, they're not.
Q How do you know that?

Page 141

A Because the costs that we adjusted as either not being incremental or not supported by adequate details or documentation were limited to those costs that were asserted to be incurred between January 1998 and January 2004.
Q You did not do anything based on Brewer's opinions with costs outside or at least after January 28, 2004?
A Because I excluded them entirely, I did not consider any other aspect of them. To the extent that those costs for whatever reason be re-inserted in the claim or the subject of a future claim, then and only then would I consider whether or not for reasons either of my own or Mr. Brewer's they should be removed as either non-incremental, not reasonable or not supported.
Q If I wanted to find out where numbers came from is there something -- I did not see anything in your work papers, Mr. Johnson, that would have told me or gave me a good road map as to where those costs came from?
A If I could point you to page 7 of my

Q In using that estimation method you didn't conduct any analysis to assure yourself that PG&E's claimed damages in '98 are evenly distributed across the 12 months of the year?
A I did not.
Q And other than what's covered in footnote 11 you have no basis for excluded pre-January 28th, 2004 costs other than counsel's instructions?
A Nor for including it either. I have no basis for speaking to pre-January 1998 damages except to the extent that I've identified it in the footnote.
Q Because you haven't analyzed it?
A That's correct.
Q And even the footnote -- does the footnote reflect analysis of those costs or just some recollection from the Southern case, as to the PFS costs?
A As the private storage, what you said.
Q Recollection from Southern, you haven't analyzed that issue in this case?
A I have not.



Q The PFS issue?
A That's correct.
Q Is that because counsel asked you not to analyze damages prior to January 28, 1998 and counsel asked you not to analyze damages after January 28, 2004, is that why you didn't analyze those respective sets of damages other than what's reflected in footnote 11?
A No.
Q It's because when you got the instruction from counsel you decided that based on that instruction you would not need to or want to or it wasn't useful?
A It would be an unnecessary exercise to analyze something that was being adjusted anyhow.
Q Did you consider the possibility that counsel's instruction either might not be right or the law might change or in some manner costs prior to January 28, 1998 on the one hand and after January 28, 2004 on the other those costs might not be excludable from this case on the basis of counsel's instruction, did you consider that at all?



A Yes.
Q But you still, nevertheless, did not undertake any analysis of those costs outside those dates?
A And I expressly reserve the right to modify my conclusions based upon subsequent discovery or different interpretation made by the courts.
Q So you considered the possibility that counsel's instruction might not be right or binding or determinative for some reason, but having considered that possibility you still did not analyze costs prior to -- claimed costs prior to January 28, '98 or claimed costs after January 28, 2004 at least you haven't done so to date; is that correct.
A That's correct.
Q Do you know whether this $900,000 in private school storage mentioned in footnote 11 are all the costs related to private fuel storage that PG&E's claiming as damages?
A No.



Q You don't know?
A No.
Q So do you know whether there are any costs that PG&E's claiming as damages for private fuel storage that relate to periods subsequent to January 28, 1998?
A Not about which I'm aware.
Q You're not aware of any subsequent to that date?
A That's correct.
Q Then do you know whether the $900,000 that's mentioned in footnote 11 are all the costs that PG&E's claims is damages relating to private fuel storage?
A No.
Q So if there are additional costs to the $900,000 that PG&E's claiming as damages relating to private fuel storage, I guess from your prior answers those costs would also be prior to January 28, 1998?
A Yes.
Q You're not aware if they're there or not?

Page 162

representatives to make adjustments?
A Yeah, to the extent that it corroborates views that I've identified of Mr. Brewer.
Q If you were not -- if there were no PG&E testimony, representative testimony, in this case, would all of your opinions still be the same?
A Yes.
Q So it's really PG&E representative testimony is corroborative?
A That's the word I used.
Q You're basically relying on Brewer to the extent PG&E representative testimony corroborates what Brewer says or we think it does you cite that testimony in your report here as well?
A I think it provides additional evidence.
Q You would give the same opinions even if you did not cite to or know about that PG&E representative testimony in every instance?
A Asked and answered, yes.
Q Regarding cost items where you rely on Brewer for the opinion that they are not incremental?

Page 163

A Yes.
Q One of your jobs was to quantify, put a number on, the amount of costs that Brewer says are not incremental; is that correct?
A In circumstances which he did not.
Q In circumstances where Brewer did not quantify the amount but he did offer the opinion that a cost category is not incremental one of your jobs was to quantify that amount?
A Yes.
Q Did you have any other job with respect to those costs in that category where Brewer says they're not incremental brewer does not quantify the amount of the cost?
A Other than making the quantification?
Q Right.
A I don't believe so.
Q You referred a moment ago -- are there some costs where Brewer says they're incremental and he provides a number?
A I believe with respect to fuel transfer offset that he provides the calculation of the

Page 164

avoided costs and I think with respect to the RAD material that he's identified the specific elements of cost that he believes would have been incurred in the but for world as well.
Q Now, in those categories of costs where Brewer gives the opinion that they lack adequate support?
A Which is now a separate question.
Q New question. There's several categories of costs where Brewer says that in his opinion they lack adequate support. Again, one of your jobs with respect to costs in those categories is to quantify the amount of the costs that lack adequate support; is that correct?
A To the extent that the non-adequate support was based on a finding of Mr. Brewer and he did not so quantify, yes.
Q Certainly in that category are your Appendix B and C invoices?
A That is correct.
Q The invoices lack adequate support and then he says nothing about the amount of the

Page 165

invoices and you add the amount of invoices?
A I think that's correct.
Q Do you do anything else with respect to the cost items covered by Appendix B and C invoices other than quantify them by adding the amount of the invoices?
A No.
Q Are there any other categories of costs that Brewer identifies as lacking adequate support where he provides the costs or are there any other categories other than the invoices in B and C where Brewer says that those costs items lack adequate support that you address in your report?
MR. EKMAN: Just object, Mr. Brewer's report speaks for itself.
A I think RAD material disposal to the extent that it wasn't eliminated as not being incremental was completely adjusted as the difference not being adequately supported and that's based upon Mr. Brewer's opinions.
Q He provides the cost amounts for those items?





A51.1

Page 182

document and that the stuff at page 29 was more likely something prepared by Cornell's firm, if not Cornell.

Q Both of them?

A I have no reason to distinguish one from the other.

Q So do you know which of these SAFSTOR cost schedules listed on page 29 when you went into the spreadsheet to find the cost for the used fuel documentation discrepancy, do you know which spreadsheet you went into?

A I don't specifically as I sit here, no.

Q You didn't do that, your staff did that?

A Yes.

Q You just said go find this cost and remove it and they found it and removed it in substance?

A In substance.

Q Are you adding anything to the opinion of Brewer other than the ability to find this cost on the SAFSTOR spreadsheet, right, what you're adding is your opinion that it's reasonable under the circumstances here to assume that the non-breach

Page 183

costs for used fuel documentation resolution are comparable to the breach world costs, is that something you're adding to Brewer's opinion?

A I'm adding, first of all, essentially the definition of the damages that they ought to be those which are incremental. Mr. Brewer has identified activities that he does not believe are incremental and in many circumstances monetized this activity.

Q What's the difference between Brewer's identification of activities that are non-incremental and your identification of damages that are non-incremental?

A I don't think that's what I said. I do not believe Mr. Brewer is offering opinions that an amount ought to be excluded because it's not incremental and that's the proper measure of economic damage. He might be saying that but ultimately what he's identified is activities and costs that in his judgment either would have been incurred in the but for world or not appropriately supported in the real world. And I've used that

Page 184

data and that information and those conclusions to determine what should or should not be adjusted from damages based upon the requirement that those costs be incremental to the breach related activity.

Q Do you know if Brewer offers any opinion at all on whether the costs for resolving the used fuel documentation discrepancy in the non-breach world are the same or not the same as the costs for resolving discrepancy in the breach world?

A I'm not aware that he does.

Q So to the extent that comparability is important to your work, that's something that comes from you, we covered that?

A Yes.

Q Are you adding anything to the opinion of Brewer other than the ability to find the breach world costs of resolving the used fuel documentation discrepancy on one of the spreadsheets that you've been provided by Cornell or by the plaintiff and subtracting it?

A And the opinion of how you measure damages.

Page 185

Q You're adding that?

A Yeah.

Q And the opinion how to measure damages is you subtract costs of non-incremental activities?

A Correct, to the extent that they are being included.

Q So what you add to Brewer is the ability to find the cost of the used fuel documentation discrepancy in the breach world on the SAFSTOR spreadsheet and the opinion that assuming that cost is non-incremental it should be deducted from damages?

A Yes.

Q Anything else adding to Brewer's opinion about the non-incremental nature of this activity?

A I don't believe so.

Q Do you know if Brewer has the expertise to find -- you see on the screen this is a panel labeled Humboldt Bay ISFSI?

A Yes.

Q There's three items listed. This is our database of materials relating to the case. Two of

Page 190

were doing but in terms of removing or adjusting,
but I don't recall specifically what, if any, I did.
Q The next tab is Holtec Data. Do you know what that is?
A I know that the Holtec information was used in part to create some of the inflation rates, but beyond that I don't have any specific knowledge.
Q Does that refresh your recollection other than sort of reading this have you seen this Holtec data did you make use of it in your work?
A No.
Q Next tab is Future Costs. Do you know what that is other than what the words mean?
A Future Costs, which I've said, I excluded and I didn't specifically analyze, no.
Q What about ACT, do you know what that is? ACT, I'm asking you if you know what that is?
A ACT could mean a lot of things, if it's in context I might understand it.
Q Now it's open, do you know?
A Could mean activity.
Q Activity Costs. You haven't seen this

Page 191

before or have you?
A I don't believe I've seen this particular spreadsheet.
Q Do you know what it's used for in the context of Cornell's work?
A I believe generally to compile cash flows associated with labor and related costs for purposes of the damages calculation.
Q Can you tell me anything about what this ACT tab is used for?
A No.
Q Go to the ISFSI tab. Do you know what this schedule under the ISFSI Cash Flow tab is used for?
A This is one of the seven categories of claims that Professor Cornell compiles and this I believe is the cash flows by year associated with the elements for this particular category of the damage claim.
Q How does that different from the ACT tab?
A I don't know. One might feed into the other but I don't know specifically.

Page 192

Q You really haven't studied these schedules; is that right?
A I have not.
Q Celerity Back-outs, let me skip that one. Actual Cost Back-up Data, we understand what those words mean. Now that you see this tab opened on the screen do you know what's reflected on this tab Actual Cost Back-up Data on this spreadsheet?
A No.
Q Next is Holtec Escalation. You do understand what Cornell has done in his report with respect to Holtec Escalation?
A Yes.
Q That's all futures, you did not analyze that?
A That's correct.
Q Output is the last tab. Do you recognize this schedule? See output tab of the Humboldt Bay ISFSI, non-source spreadsheet that's listed in your report?
A I might have seen this. I don't have a specific recollection.

Page 193

Q And so no detailed review of Exhibit 8 or 9 or any of the other costs schedules listed on page 29 and page 30 for the different damages categories, no detailed review of those spreadsheets was conducted by you, correct?
A You being me, Larry Johnson, that's correct.
Q Or necessary to your work, well, was a detailed review of these schedules conducted by your staff?
A Yes.
Q Mr. Couchman perhaps would know all the answers to my questions?
A I don't know, but someone among members of my team I would expect would have answers to any of your questions that were reasonably inquiring about the nature of these schedules.
Q And how they worked and what they purported to show?
A I'm not sure for everything but to the extent necessary to understand the components of the claim.

Page 194

Q That would have been the reason that your staff would have reviewed all these schedules I referred to?
A And to identify the specific components in a more detailed fashion than the claim itself.
Q And that was done?
A Yes, it was.
Q By your staff?
A Yes.
Q But it's not important to your opinion -- the opinions that you're offering that you know how these schedules work or what they represent?
A That's correct.
Q You relied on your staff for that?
A Yes.
Q To the extent it needs to be done for you to do Your work?
A Yes.
Q Go to page 9 RAD Material Disposal. You relied on Mr. Brewer's opinion that certain RAD waste disposal costs are not incremental?
A Those that relate to soil and rubble

Page 195

disposal.
Q You rely on Brewer for that?
A Yes.
Q You have no opinion about that one way or the other?
A That's correct.
Q In this instance you rely on Mr. Brewer's identification of the specific costs included in the claimed RAD material disposal costs that are not incremental, correct?
A Yes.
Q Brewer separates out the costs in that category he believes are non-incremental versus the costs he believes are not well-supported or not appropriately supported, correct?
A Yes.
Q And you accept his opinions about those matters and deduct all of the claimed costs for RAD material disposal either because of Brewer's opinion that some part of those costs are non-incremental or because of his related opinion that the other part of those costs are not appropriately supported?

Page 196

A Yes.
Q Do you know how Mr. Brewer separated or determined which costs in this category were not incremental versus which costs were not appropriately supported?
A I think he I identified categories of costs related to soil and rubble disposal and he identified that that was an activity that was not an incremental activity and he identified the costs associated with that non-incremental activity.
Q Do you know how he identified the costs associated with that?
A I don't know.
Q Was it from review of invoices, do you know?
A If I knew it would have been from his report and I don't recall.
Q Other than what's stated in his report you don't know that and just don't need to know that for the work you do?
A Yes and yes.
Q So what do you add to Brewer's opinions

Page 197

with respect to RAD material disposal costs other than the ability to find the -- is it your understanding that between Brewer's non-incremental opinion and Brewer's non-supported opinion that he would exclude all of the claimed RAD material disposal costs from damages?
A Yes.
Q What do you add to Brewer's opinions for this item other than the ability to find the total claimed costs of RAD material disposal costs and deduct it from damages?
A And my professional opinion that damages ought to be properly measured as the difference between what would have happened in a but for world and what is asserted reasonably happened in the alternative world.
Q As a matter of economics?
A Yes.
Q And that is based on your expertise as a damages expert?
A All the things I previously testified about this morning.

Page 222

Maybe. That's not the measure in my view. It's whether or not in the absence of the breach the cost would have still been incurred and in that circumstance it shouldn't be included as damages. That's consistent with my views and I believe that's consistent with Professor Cornell's views of what in his view is the standard method of calculating damages is.

Q I thought you told me at the beginning of our discussion of this cost item that unlike visual inspection of fuel and the resolution of the document discrepancy for this cost item, the investigation of the earthquake, you were relying on Brewer's opinion about the incremental nature of this activity; is that wrong?

A I'm relying on Brewer's opinions about the incremental nature of all three activities.

Q There was some difference because of the fact this earthquake would have occurred in the breach world and the non-breach world?

A I believe the record would show that you attempted to distinguish between what the costs

Page 223

might have been for the activity in the preceding two examples in the but for world and my reason for using the costs, the real costs, as the costs in the but for world and I said, first of all, because the plaintiff had not constructed a non-breach cash flow and, secondly, because on that basis I thought it was a reasonable proxy to use for the costs they would have incurred in the non-breach world.

Q For those other two?

A For the other two elements of costs and that Mr. Brewer had not specifically identified that the same level of costs would have been incurred because they are different circumstances at different times.

Here there is one earthquake at one time and if the activity of investigation would have occurred in the non-breach world it seems to me no reason to think that it would have occurred at a different dollar amount because it's one earthquake and one investigation.

So, therefore, I characterize Mr. Brewer's opinion on this in a different light. That is to

Page 224

say, once he concluded that the activity itself was not incremental, I think his implicit opinion is that the dollars are also the measure of the lack of incremental cost is the amount of dollars expended.

Q You subtract but for world loading costs of 6.4 million dollars based on Brewer's opinions that those costs would have been incurred in the but for world?

A Yes.

Q The but for world is the one as portrayed by PG&E in its claim; is that right?

A With the elimination of the acceptance allocation agreement, yes, but in all other respects it is their scenarios.

Q What does that mean, the elimination of the acceptance allocation?

A You said I used PG&E's assertions.

Q About the schedule for removal; is that correct?

A Yes.

Q Without qualification?

A Yes.

Page 225

Q What were you referring to?

A I said earlier one of the elements of costs I adjusted as not being incremental is the 1999 SAFSTOR costs.

Q You have no opinion yourself about the costs of loading spent fuel transportation containers in a non-breach world; is that correct?

A Well, I have an opinion that they should be considered and Mr. Brewer's identified, quantified and I've considered it.

Q You don't have an opinion yourself about what the cost would be for this activity in the non-breach world?

A I do not.

Q You don't have the expertise to determine what the cost for this loading transportation containers for spent fuel would be in the non-breach world, correct?

A I do not.

Q What is the basis for your opinion that the costs, whatever they are, of loading transportation containers for spent fuel in the

Page 234

expertise to estimate the future loading costs, right, I thought you told me that?

A I believe to the extent it calls upon the same skill set as he used to estimate the cost of the past but for world activity, yes.

Q Why do you believe he would have the expertise to do the estimate because you think it draws on the same skill sets that he has already used to estimate the but for costs?

A That is my reasonable understanding and expectation.

Q Have you added to Mr. Brewer's opinion about but for loading costs except the ability to subtract the 6.4 million dollars from the damages?

A I'm really good at subtraction and I have subtracted it because it's a cost avoided.

Q I thought it's not avoided, it's deferred, some cost is going to be incurred in the future?

A It is a cost through January 2004 which has been avoided.

Q And the fact that some cost for the same activity is going to be incurred in the future, do

Page 235

you agree that some cost for the same activity is going to be incurred in the future?

MR. EKMAN: Object to the extent that mischaracterizes --

Q Same activity meaning the activity of removing the spent fuel from the Humboldt Bay Power Plant?

A Some cost for some activity to remove the spent fuel will, I expect, be incurred in the future by PG&E.

Q And that fact does not affect your opinion that for purposes of this case and the damages that are being claimed, this 6.4 million dollars of non-breach loading costs, should be deducted from damages, correct?

A Correct.

Q Is the fact that some cost for a comparable activity of spent fuel will be incurred in the future, is it relevant at all to your opinion that the non-breach world loading costs should be deducted from damages?

A Given the instruction I've been given by

Page 236

counsel that the measure of damages for purposes of this claim cuts off at January of 2004 it's not.

Q Absent that instruction, would the fact that costs for the comparable activity of removing the spent nuclear fuel from Humboldt Bay Power Plant would be incurred in the future, would it be relevant to your opinion that the but for world loading costs should be removed in the absence of the instruction from counsel you just mentioned?

A And in the absence of that instruction my consideration would look at future costs as well? I don't know what happens when that instruction's --

Q Whatever you would do absent that instruction, would it make relevant to your opinion that the 6.4 million should be deducted the fact the costs for a comparable activity will be incurred in the future?

A If counsel said either Indiana Michigan doesn't exist or disregard it or for some other reason don't limit the damages to those that have actually been incurred by the date of the filing of the claim in January 2004 but include all those that

Page 237

are reasonably certain to occur as well as those that have occurred that are associated with an incremental to the breach, I would have looked at and considered the opinions of Mr. Brewer to the extent he then formed them about what the level of activity would be in the breach world associated with the removal of spent fuel in the future. And I would have discounted those or I would have evaluated their reasonableness or their incremental nature depending upon the results of that analysis. None of which I did, because all of those costs to the extent that they might be incurred would be incurred after January of 2004.

Q Why is counsel's instruction or your understanding of Indiana Michigan or both to the effect that damages in this case that we're in should be cut off, future damages should be cut off at some point in time which is January 28, 2004, why does that instruction or that understanding -- why is that relevant to whether or not these future loading costs that affect your opinion about the deductibility of the but for world, why is that



202.857 DEPO www.CapitalReportingCompany.com
1000 Connecticut Avenue NW Suite 505 Washington, DC 20006

incurred by PG&E in this alternative but for world, that's your opinion?
A Yes.
Q And is there anything to that opinion more than adding back in to damages the asserted damages, SAFSTOR damages, for 1999, 2000 and 2001?
A Subtracting from, and not 1999 because that got thrown out because of the exchange acceptance.
Q The affect of your reliance on Neuberger's opinion in this respect is to subtract from damages two additional years of SAFSTOR costs?
A As to Humboldt Bay, yes.
Q Anything else that you do in your analysis and opinions as a result of Neuberger's alternative acceptance rate opinions for damages at Humboldt Bay than subtract out those two years of damages?
A And those two years are the as-adjusted SAFSTOR damages, not as asserted, so make adjustments then I remove them all.
Q You make the adjustments for some reasons other than Neuberger?



A I make the adjustments because they're not incremental, not supported or not reasonable. In the base case scenario which PG&E's acceptacne scheduled as accepted and I further adjust them to remove those two years based on Dr. Neuberger's opinions in the alternative acceptance scenario.
Q The only thing you do based on Neuberger's opinion is to remove the balance of the asserted SAFSTOR damages for 2000 and 2001, correct?
A Correct.
Q What expertise do you rely upon for that other than the ability to perform the arithmetic?
A Well, I think that actually what it's removing is the cash flows asserted to have occurred by PG&E and Professor Cornell and I guess by Celerity as they've been adjusted by me after consideration of other reports and the expertise I've added to that I've already described. So I didn't take PG&E's number and subtract it, I took a number that's already been adjusted based upon the expertise that I've described in accounting, auditing and economics. After making those



adjustments the remaining part of what I add is simply a subtraction.
Q So the expertise that you rely on to deduct the remaining part based on Neuberger's opinion is the ability to perform subtraction?
A After relying on other expertise to get to the number that's being subtracted, correct.
Q Neuberger's opinion about the alternative acceptance scenario has no affect at all on Humboldt Bay ISFSI damages, correct?
A I think that's correct.
Q Or on any other category of damages at Humboldt Bay other than SAFSTOR damages, correct?
A I also think that's correct.
Q That's your opinion?
A Yes.
Q You say here page 19, Dr. Neuberger has opined that under the alternative acceptance rate Diablo Canyon would obtain its first pickup from DOE in 2011. See that?
A Yes.
Q That's what you rely upon from Neuberger,



that 2011 date, with respect to Diablo Canyon?
A Yes.
Q Then you say, the affect Dr. Neuberger's opinion is that all costs of building additional storage capacity at Diablo Canyon through at least January 28, 2004 would have been incurred by PG&E in the but for world?
A Correct.
Q What costs -- we're talking about the ISFSI costs?
A I think there's reracking cost as well.
Q Any other costs?
A I don't believe so.
Q What about the PFS costs, do you have any opinion whether or not whether the PFS costs would have been incurred under this alternative acceptance scenario?
A My role is to evaluate costs as elements of damages. Whether or not PG&E would have spent that $900,000 or some other sum is something that I'm not in a position to evaluate, but I have excluded it because it precedes the statute of

included in that and that's my opinion.
My opinion is, further, that in order for me to form a conclusion about whether it is or it isn't I ought to know what's included in it. My view for the government to be writing a check for insurance the government ought to know that it's for something that is attached to and would not have been incurred but for the breach and that that ought to have a standard more than because PG&E says so.
Q And that opinion involves something more than the legal standard under the rules of evidence and substantive law that the court would apply in determining whether these claim costs are recoverable; is that right?
MR. EKMAN: Objection, asked and answered.
A I don't know what the rule and the standard the court will apply. I said that for purposes of Larry Johnson expressing an opinion it would have to be based on more than because they said so. And, moreover, if I was going to write somebody a check I would want it to be for more than because they say I owe it.



Q Suppose Mr. Kapus testifies that he knows what these costs -- some category of costs, let's take the NPG regulatory services costs, he knows what those costs are, it's back to the same thing you still want to see documentation?
A I'm having a hard time getting the answer across. You've asked me that question four times. If he knows what it's for, he's seen the document, simply show it to us. What is he going to say no, I'm not going to show it to you.
Q You'd say the same thing with respect to the insurance costs?
A Yes, obviously, I've said it. I don't think I'm disguising my opinions. I don't think there's any gist to my opinions. I think it's clear.
Q If PG&E has provided additional documentation about the insurance costs -- you don't know if they have?
MR. EKMAN: Asked and answered.
Q You also don't know if VERIS has been asked to or you've been asked to express any further



opinions about the insurance costs; is that right?
MR. EKMAN: Asked and answered.
(Exhibit No. 18 was marked)
A I've said if it's been provided my expectation is we are considering as we sit here.
Q You don't know as we sit here whether or not you have been asked to offer additional opinions about insurance costs; is that correct?
A I don't know as I sit here.
Q And if you had been asked you would know?
A Unless there's been some mental lapse in my ability to recall, which I don't expect there has been.
Q That means you haven't been asked to express those opinions?
A To the best of my knowledge I have not been asked.
(Exhibit No. 17 was marked)
Q Mark this as 17. Mr. Johnson, you've been handed what's been marked as 17, which is Appendix C of Mr. Brewer's report. Do you recognize that as such?



A Yes.
Q And this is a list of invoices that I think you tell me are the same ones listed in your Appendix B and C; is that right?
A Yeah, I think D and c, although arranged slightly differently.
Q Your Appendix B is a list of invoices Brewer lists in C and your Appendix C is a list of invoices Brewer identifies in Appendix D?
A With the dollar amounts added in our Appendix B and C respectively.
Q But otherwise the same invoices?
A Yes.
Q You say Brewer gives opinions that costs covered by all these invoices are not support by adequate detail or documentation?
A Correct.
Q And that is the only basis for your deducting the costs covered by these invoices from damages, right?
A Correct.
Q And what expertise do you rely upon in

Page 458

that's appropriate for me. I've told you why I did. If you don't like it, that's okay.

Q What did you do to satisfy yourself that Neuberger had the expertise to conclude -- offer opinions about when the spent fuel would be picked up based on his alternative acceptance, if anything?

A I told you I had prior experience in which he has done similar work and prior experience which he's been similarly accepted as an expert in this court to give similar opinions.

Q Look at page 4 of your report. You say Dr. Cornell's calculations of asserted damages are materially flawed for the following reasons?

A Yes.

Q Are you saying here in context there's -- does materially flawed mean that there's one or more things wrong with the particular damage item that you have the opinion that that cost is not includable in damages in this case?

A I think you asked me if there could be costs that would be properly includable notwithstanding the material flaws and I said yes.

Page 459

I also said my view is his work is worthless, he compiled a bunch data and discounted it to its present value. What he added was a discount rate and inflation rate. That's my view. That's the material flaw. He adds no value. His expertise is, I think, as it relates to this matter simply a function of telling someone conceptually something ought to be incremental accepting what he was told then as being incremental and putting it in a cash flow and discounting it.

So I think that one needs to understand that that's the scope of his work and that those are material flaws if one is going to then express an opinion as a matter of professional judgment that these thing are properly includable as damages.

Q That's the gist of the opinion that you're offering?

A I think it's pretty much the specifics of the opinion.

Q And you rely on your expertise to offer that opinion?

A I do.

Page 460

Q Page 5 third sentence it says, "he failed to review the invoices provided by PG&E to ascertain whether the costs claimed related to the storage of spent nuclear fuel and whether those costs were incurred as a consequence of DOE's partial breach." You see that?

A Yes.

Q Is it your understanding one can determine from review of invoices whether costs are incurred as a consequence of DOE's breach?

A Maybe. Certainly if you don't look at it you can't tell, if you look at it you might be able to tell.

Q Do you have the expertise to look at the invoices whether they're incurred as a consequence of breach?

A Depends upon whether it's something involving a technical or not.

Q In some instances you would not have the expertise?

A That's correct.

Q In some you might?

Page 461

A That's also correct.

Q Do you know whether Cornell has that expertise?

A I don't know. My understanding he has no technical expertise. My understanding is he utilized no technical expertise. My understanding is he relied on no technical expertise. Only thing he did was use Celerity, then he doesn't know why, or what he used them for. So I don't know what expertise he thinks he's used.

Q There's at least some invoices even if Cornell did review them he probably wouldn't be able to tell whether they were incremental breach or not?

A That speaks to another flaw.

Q Is that right?

A Sure.

Q But reviewing invoices is not the only way to determine if the costs reflected on those invoices are related to the storage of spent fuel, is it?

A You want to come up with another one?

Q You think it is the only way to determine

Page 142

with him along the way, but he's quite honestly otherwise engaged at the moment and he participated in this virtually none.

Q. Did anyone else besides yourself have substantive input to your report?

A. The only substantive input were the guys that helped me do the invoice review that I told you about.

Q. Who was that?

A. One of the gentleman's name is John Palombi. The other gentleman's name is David Ashley.

Q. Now, still at the top of page 2 where it says, second. We have been talking about nonincremental opinions.

Second, it says, quote: I have identified a number of situations where the documentation provided in support of actual or estimated costs is not sufficient to reach a reasoned and supportable opinion as to whether the subject costs are incremental or whether the costs are reasonable.

Page 143

Do you see that?

A. I see that.

Q. That failure in supportable documentation may result in an overstatement of the claim costs in this report, these comments are grouped under the heading of not supported cost.

Do you see that?

A. Yes.

Q. My understanding of the word may means that you are not giving an opinion of whether or not the failure in supportable documentation would -- excuse me -- does result in an overstatement of claim costs; is that right?

You're not giving an opinion about whether or not the failure in supportable documentation does result in an overstatement of the claim cost, only that it may?

A. If I were able to draw such a conclusion, it wouldn't be unsupported. That's the whole point of unsupported.

Page 144

I am unable to reach a conclusion as to whether or not it ought to be included or not. In the end, you're right, I'm not making a comment that says, those costs represent things that I can definitely say should not be there.

Q. What do you mean by, not supportable?

What does that mean when you say that?

A. What I mean is I think what I said here, that the documentation provided is not sufficient for me to reach a reasoned conclusion that that activity is an incremental cost and is a cost consistent with the activity being identified.

Q. Okay. And then third -- we'll come back to that -- future costs where the estimated costs are not reasonable.

And I'm trying to -- tell me in your own words what the difference is between not -- it says here, in general, the unreasonable nature

Page 145

of the estimated cost is the result of the failure to appropriately consider or evaluate the relevant information, the failure of PG&E to appropriately consider.

A. Yes.

Q. Just tell me if you can -- I'm not getting a clear picture of the difference between not reasonable and not supportable.

A. Not supportable is a matter that it is not possible given the documentation I've seen to reach a conclusion as to whether the cost is incremental or whether the amount of that cost is reasonable given the activity being performed.

Not reasonable is, I have reached a conclusion that says, this is a cost that will be incurred or may be incurred, but the amount is in my estimation unreasonable for one or more reasons. Perhaps the assumptions that go into developing the amount are unreasonable.

Q. Then the last paragraph above the