No. 04-0074C,
into which has been consolidated No. 04-0075C
(Judge Hewitt)

---

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---

PACIFIC GAS & ELECTRIC COMPANY,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

---

# DEFENDANT'S MOTION *IN LIMINE* TO EXCLUDE CERTAIN EXPERT TESTIMONY AT TRIAL

---

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

HAROLD D. LESTER, JR.
Assistant Director

JOHN C. EKMAN
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Telephone: (202)353-0897
Facsimile: (202)307-2503

OF COUNSEL:

JANE K. TAYLOR
Office of General Counsel
U.S. Department of Energy
1000 Independence Avenue, S.W.
Washington, D.C. 20585

SCOTT DAMELIN
SHARON SNYDER
JOSHUA E. GARDNER
TODD J. COCHRAN
Civil Division
Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530

May 3, 2006

Attorneys for Defendant

# TABLE OF CONTENTS

**PAGE(S)**

STATEMENT OF FACTS ..................................................................................................... 2

I. FACTS RELATING TO MR. GRAVES' TESTIMONY .................................... 2

II. FACTS RELATING TO THE TESTIMONY OF PG&E'S REMAINING EXPERT WITNESSES ................................................................ 8

ARGUMENT ............................................................................................................................ 10

I. THE COURT HAS THE POWER AND THE DUTY TO GRANT MOTIONS *IN LIMINE* TO LIMIT THE SCOPE OF TRIAL IN APPROPRIATE CIRCUMSTANCES .............................................................. 10

II. A MOTION *IN LIMINE* IS APPROPRIATE IF A PROPOSED TESTIFYING EXPERT WITNESS LACKS THE QUALIFICATIONS TO SATISFY FEDERAL RULE OF EVIDENCE 702 OR THE STANDARDS SET BY THE SUPREME COURT IN *DAUBERT* AND *KUMHO TIRE* ........................................................................................ 11

A. To Be Admissible, Mr. Graves' Opinions Must Be Reliable And Relevant ......................................................................... 11

B. To Establish That Mr. Graves' Testimony Is Reliable, PG&E Must Establish That He Is Qualified To Render The Opinions At Issue ........................................................................................ 13

C. Mr. Graves' Opinions Must Be Helpful To The Trier Of Fact ................ 14

III. MR. GRAVES' OPINION CONCERNING THE RATE OF ACCEPTANCE SHOULD BE EXCLUDED ..................................................... 16

A. Mr. Graves Is Not A Qualified Expert Witness Upon The Issue Of The Proper Pace For DOE's Acceptance Of Spent Nuclear Fuel ...... 16

B. Even If Mr. Graves Were Qualified To Be An Expert Witness Upon The Rate Of Acceptance, The Methodology Underlying His Conclusions Is Unreliable .............................................................. 17

C. Even If Mr. Graves' Opinion Was Reliable, The Opinion Is Not Helpful To The Trier Of Fact And Is, Therefore, Irrelevant ............ 17

IV. MR. GRAVES' OPINIONS CONCERNING THE HYPOTHETICAL EXCHANGES MARKET SHOULD BE EXCLUDED ..................................... 18

A. Mr. Graves' Exchanges Model Is Not Reliable ...................................... 18

B. Mr. Graves' Exchanges Opinion, Even If Reliable, Is Not Helpful To The Court ........................................................................................ 27

V. TO THE EXTENT THAT THE COURT EXCLUDES THE OPINIONS OF ANY GOVERNMENT EXPERTS, PG&E'S EXPERTS WHO OFFER SIMILAR OPINIONS ALSO SHOULD BE EXCLUDED ................... 29

A. Professor Cornell Should Be Excluded To The Extent That The Court Concludes That Testimony Concerning The Incremental Nature Of PG&E's Claimed Costs Constitutes A Legal Conclusion ...... 29

B. To The Extent The Court Excludes Dr. Neuberger's Economic Criticisms Of Mr. Graves On The Basis That Dr. Neuberger Did Not Develop An Alternative Model, The Court Also Should Exclude The Testimony Of Ivan Stuart and Michael Meisner ................ 30

CONCLUSION ............................................................................................................. 32

**TABLE OF AUTHORITIES**

**CASES**

**PAGE(S)**

Ancho v. Pentek Corp.,
157 F.3d 512 (7th Cir. 1998) .......... 15

Apostol v. United States,
838 F.2d 595 (1st Cir. 1988) .......... 13

Baskett v. United States,
2 Cl. Ct. 356, 367-68 (1983) .......... 10

Berry v. City of Detroit,
25 F.3d 1342 (6th Cir. 1994), cert. denied, 513 U.S. 1111 (1992) .......... 14

Bluebonnet Sav. Bank, FSB v. United States,
339 F.3d 1341 (Fed. Cir. 2003) .......... 28

Bluebonnet Sav. Bank, FSB v. United States,
67 Fed. Cl. 231 (2005) .......... 28

Bourjaily v. United States,
483 U.S. 171 (1987) .......... 11

Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.,
509 U.S. 209 (1993) .......... 20

Callahan v. A.E.V., Inc.,
182 F.3d 237 (3d Cir. 1999) .......... 21

Carroll v. Otis Elevator Co.,
896 F.2d 210 (7th Cir. 1990) .......... 14

Castle v. United States,
48 Fed. Cl. 187 (2000),
aff'd in part, rev'd in part, 301 F.3d 1328 (Fed. Cir. 2002) .......... 19

Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of N.Y.,
447 U.S. 557 (1980) .......... 23

Coast Fed. Bank, FSB v. United States,
48 Fed. Cl. 402 (2000) .................................................................................. 28

Columbia First Bank, FSB v. United States,
60 Fed. Cl. 97 (2004) .................................................................................... 19

Concord Boat Corp. v. Brunswick Corp.,
207 F.3d 1039 (8th Cir. 2000) ....................................................................... 21

Daubert v. Merrell Dow Pharmaceuticals, Inc.,
509 U.S. 579 (1993) ........................................................................................ passim

Dhillon v. Crown Controls, Inc.,
269 F.3d 865 (7th Cir. 2001) ...................................................................... 13, 15

Dolphin Tours, Inc. v. Pacifico Creative Serv., Inc.,
773 F.2d 1506 (9th Cir. 1985) ....................................................................... 18

Domingo v. T.K., M.D.,
289 F.3d 600 (9th Cir. 2002) ......................................................................... 12

Eagleston v. Guido,
41 F.3d 865 (2nd Cir. 1994), cert. denied, 516 U.S. 808 (1995) ................................. 14

Elkind v. Liggett & Meyers, Inc.,
635 F.2d 156 (2d. Cir.1980) ........................................................................... 21

Employers Reinsurance Corp. v. Mid-Continent Cas. Co.,
202 F. Supp. 2d 1212 (D. Kan. 2002) ............................................................ 15

Federal Trade Comm'n v. Elders Grain, Inc.,
868 F.2d 901 (7th Cir. 1989) ...................................................................... 22, 23

Fifth Third Bank v. United States,
55 Fed. Cl. 223 (2003) ............................................................................... 19, 20

Franklin Fed. Sav. Bank v. United States,
55 Fed. Cl. 108 (2003), & ......................................................................... 18, 19

General Elec. Co. v. Joiner,
522 U.S. 136 (1997) ................................................................................... 12, 18

Genty v. Resolution Trust Corp.,
937 F.2d 899 (3d Cir. 1991) ......................................................................... 13

Glendale Fed. Bank, FSB v. United States,
43 Fed. Cl. 390 (1999) .......... 20

Glendale Fed. Bank, FSB v. United States,
239 F.3d 1374 (Fed. Cir. 2001) .......... 20, 28

Hamling v. United States,
418 U.S. 87 (1974) .......... 13

Hanover Shoe, Inc. v. United Shoe Machinery Corp.,
392 U.S. 481 (1968) .......... 23

Hardin v. Ski Venture, Inc.,
50 F.3d 1291 (4th Cir. 1995) .......... 14

Hi-Shear Tech. Corp. v. United States,
53 Fed. Cl. 420 (2002), aff'd, 356 F.3d 1372 (Fed. Cir. 2004) .......... 28

Honorable v. Easy Life Real Estate Sys.,
100 F. Supp. 2d 885 (N.D. Ill. 2000) .......... 23, 24

Illinois Brick Co. v. Illinois,
431 U.S. 720 (1977) .......... 23

Image Tech. Services, Inc. v. Eastman Kodak Co.,
903 F.2d 612 (9th Cir. 1990) .......... 24

Indiana Michigan Power Co. v. United States,
422 F.3d 1369 (Fed. Cir. 2005) .......... 27

Joy v. Bell Helicopter Textron, Inc.,
999 F.2d 549 (D.C. Cir. 1993) .......... 11, 12

Kidder, Peabody & Co. v. IAG Int'l Acceptance Group N.V.,
28 F. Supp. 2d 126 (S.D.N.Y. 1998) .......... 18

Kumho Tire Co. v. Carmichael,
526 U.S. 137 (1999) .......... passim

Lithuanian Commerce Corp. v. Sara Lee Hosiery,
179 F.R.D. 450 (D.N.J. 1998) .......... 12

Masters v. Hesston Corp.,
291 F.3d 985 (7th Cir. 2002) .......... 11, 13

Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,
475 U.S. 574 (1986) .......... 20, 21

O'Conner v. Commonwealth Edison Co.,
13 F.3d 1090 (7th Cir. 1994) .......... 12

Oiness v. Walgreen Co.,
88 F.3d 1025 (Fed. Cir. 1996), cert. denied, 519 U.S. 1112 (1997) .......... 20

Palmerin v. City of Riverside,
794 F.2d 1409 (9th Cir. 1986) .......... 10

Ralston v. Smith & Nephew Richards, Inc.,
275 F.3d 965 (10th Cir. 2001) .......... 11, 12, 13

Sacramento Municipal Utility District v. United States,
No. 98-488, 2006 WL 950218 (Mar. 31, 2006) .......... 2, 3

San Carlos Irrigation & Drainage Dist. v. United States,
111 F.3d 1557 (Fed. Cir. 1997) .......... 2

Sherbert v. Alcan Aluminum Corp.,
66 F.3d 965 (8th Cir. 1995) .......... 15

Shockley v. Arcan, Inc.,
248 F.3d 1349 (Fed. Cir. 2001) .......... 19, 20

Slattery v. United States,
69 Fed. Cl. 573 (2006) .......... 18

Southern Nat'l Corp. v. United States,
57 Fed. Cl. 294 (2003) .......... 20

Southern Pacific Communications Co. v. American Telephone & Telegraph Co.,
556 F. Supp. 825 (D.D.C. 1982) .......... passim

Story Parchment Co. v. Paterson Parchment Paper Co.,
282 U.S. 555 (1931) .......... 28

Suess v. United States,
52 Fed. Cl. 221 (2002) .......... 20

Summers v. Missouri Pacific R.R. Sys.,
132 F.3d 599 (10th Cir. 1997) .......... 15

Surace v. Caterpillar, Inc.,
111 F.3d 1039 (3rd Cir. 1997) .......... 14

United States v. Bourgeois,
950 F.2d 980 (5th Cir. 1992) .......... 13

United States v. E.I Du Pont & De Nemours & Co.,
118 F. Supp. 41 (D. Del. 1951) .......... 24

United States v. Realty Multi-List, Inc.,
629 F.2d 1351 (5th Cir. 1980) .......... 24

Virgin Atlantic Airways Ltd. v. British Airways PLC,
69 F. Supp. 2d 571 (S.D.N.Y.1999), aff'd, 257 F.3d 256 (2d Cir. 2001) .......... 21

Weisgram v. Marley Co.,
528 U.S. 440 (2000) .......... 20

White v. Delta Constr. Int'l, Inc.,
285 F.3d 1040 (Fed. Cir. 2002) .......... 28

White Mountain Apache Tribe of Az. v. United States,
10 Cl. Ct. 115, 116 (1986) .......... 10

Willems Indus., Inc. v. United States,
155 Ct. Cl. 295 F.2d 822 (1961) .......... 19

Willems Indus., Inc. v. United States,
295 F.2d 822 (Ct. Cl. 1961) .......... 28

William Green Constr. Co. v. United States,
201 Ct. Cl. 477 F.2d 930 (1973), cert. denied, 417 U.S. 909 (1974) .......... 28

Wunderlich Contracting Co. v. United States,
175 Ct. Cl. 351 F.2d 956 (1965) .......... 28

## STATUTES

10 C.F.R. 961.11 .......................................................................................................... 2, 3, 6

## MISCELLANEOUS

Restatement (Second) of Contracts § 347(c) ................................................................... 18

Fed. R. Evid. 702 ............................................................................................................ 11, 13

Advisory Committee Notes, 2000 Amendments, Fed. R. Evid. 702 .......................................... 11

**INDEX TO APPENDIX**

1. Expert Witness Report of Frank C. Graves ........ A1-A56

2. Expert Report of Brad Cornell (11/10/05) (pages 1-40) ........ A57-A96

3. Ivan F. Stuart Rebuttal Expert Witness Report ........ A97-A106

4. Expert Witness Report of Michael J. Meisner ........ A107-A119

5. Deposition of Bradford Cornell, taken January 18-19, 2006 ........ A120-A122

6. Trial Transcript, Yankee Atomic Electric Co. v. United States, No. 98-126 (Merow, S.J.), July 14, 2004 ........ A123-A124

7. Trial Transcript, Yankee Atomic Electric Co. v. United States, No. 98-126 (Merow, S.J.), July 15, 2004 ........ A125-A126

8. Deposition of Frank Graves, Yankee Atomic Electric Co. v. United States, No. 98-126 (Merow, S.J.), taken November 12, 2001 ........ A127-A128

9. Deposition of Frank Graves, Yankee Atomic Electric Co. v. United States, No. 98-126 (Merow, S.J.), taken November 13, 2001 ........ A129-A130

10. Deposition of Frank Graves, Yankee Atomic Electric Co. v. United States, No. 98-126 (Merow, S.J.), taken November 14, 2001 ........ A131-A132

11. Errata to Frank Graves Depositions, Yankee Atomic Electric Co. v. United States, No. 98-126 (Merow, S.J.), taken November 12-14, 2001 ........ A133-A141

12. Deposition of Frank Graves, January 24-25, 2006 ........ A142-A180

13. Defendant's Exhibit 112 ........ A181-A183

14. Defendant's Exhibit 231 ........ A184-A188

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| PACIFIC GAS & ELECTRIC COMPANY, Plaintiff, v. UNITED STATES, Defendant. | ) | No. 04-0074C into which has been consolidated No. 04-0075C (Judge Hewitt) |

DEFENDANT'S MOTION *IN LIMINE* TO EXCLUDE CERTAIN EXPERT TESTIMONY AT TRIAL

Pursuant to Rule 16 of the Rules of the Court of Federal Claims and the Court's orders dated March 24 and May 2, 2006, defendant, the United States, respectfully requests that the Court enter an order excluding the presentation of expert testimony from Frank Graves at trial.[1] Additionally, and as a protective matter, the Government moves to exclude the testimony of Brad Cornell, Ivan Stuart, and Michael Meisner, three additional expert witnesses identified by plaintiff, Pacific Gas & Electric Company ("PG&E"), to the extent that the Court agrees with PG&E's contentions raised in its motions *in limine* filed against all of the Government's expert witnesses.

[1] If the Court agrees with the Government that it is appropriate to strike Mr. Graves' opinions and testimony in this case, that portion of PG&E's motion *in limine* that seeks to strike responsive economics-based opinions from Dr. Jonathan Neuberger, offered to rebut Mr. Graves, is moot.

## STATEMENT OF FACTS

### I. FACTS RELATING TO MR. GRAVES' TESTIMONY

Frank Graves is an expert witness that plaintiff, Pacific Gas & Electric Company ("PG&E"), has identified to testify concerning two issues. First, PG&E purportedly will offer testimony from Mr. Graves, as an expert, concerning the "pace . . . on which DOE would have and should have been accepting PG&E's spent nuclear fuel . . . under the parties' contract." "PG&E's Witness List Pursuant to Appendix A, ¶ 15(a)" ("PG&E's Witness List") at 2. Second, Mr. Graves is expected to offer testimony concerning the acceleration of PG&E's place in the Standard Contract's "oldest-fuel-first" ("OFF") acceptance queue through the operation of a hypothetical market for the exchange of approved delivery commitment schedules ("DCSs"), developed by Mr. Graves for the spent nuclear fuel ("SNF") cases. Id.

As this Court is aware, under the Standard Contract, acceptance rights are determined upon an OFF basis, with the oldest discharged fuel receiving the earliest acceptance rights by the Department of Energy ("DOE"). 10 C.F.R. 961.11, Art. VI, B.1.(a). PG&E proposes that Mr. Graves will testify concerning his opinions that the OFF priority ranking is inefficient. "Expert Witness Report of Frank C. Graves" ("Graves Rep.") at 11 (A.11).[2] To remedy what he views as an inefficient contractual acceptance mechanism, Mr. Graves has created a model that purports to simulate the exchange of DCSs between contract holders in the "but for" world.[3] Id. at 12

---

[2] "A.__" refers to the appendix attached to this motion.

[3] Under the Standard Contract, utilities may exchange approved DCSs, subject to DOE's right, "in its sole discretion," to approve or disapprove any proposed exchange. 10 C.F.R. 961.11, Art. V.E. The mere fact that DOE has the discretion to disapprove exchange requests renders PG&E's exchanges theory speculative. See, e.g., San Carlos Irrigation & Drainage Dist. v. United States, 111 F.3d 1557, 1563 (Fed. Cir. 1997). This Court recently

(A.12). To determine how this hypothetical exchanges market would have worked in the "but for" world, Mr. Graves utilizes two models which result in the two opinions that will be offered by PG&E at trial.

First, Mr. Graves models a so-called "must move" SNF mountain that purports to depict all SNF that currently is stored and that is projected to be stored at commercial nuclear utilities that he believes could – and should – be removed by DOE. Graves Rep. at 6 (A.6). Mr. Graves uses his graphical projection of the "must move" mountain to argue for the implementation of a 3,000 MTU steady-state rate, following a short ramp-up period. Graves Rep. at 8-9 (A.8-A.9). The term "must move," however, is a creation of Mr. Graves for this litigation, and it does not exist in the Standard Contract. Deposition of Frank Graves, January 24-25, 2006 ("Graves Dep.") at 48:15-22 (A.147).

Mr. Graves makes various assumptions, for the purpose of defining the "must move" condition, that lack any factual predicate. He assumes that all SNF stored at a shutdown facility is "must move" five years after shutdown[4] and that SNF at operating reactors becomes "must move" when the utility's wet pool exceeds single full core reserve. Graves Rep. at 4-5 (A.4-A.5). However, Mr. Graves' model does not account for the fact that many utilities now are

---

rejected another SNF plaintiff's contention that exchanges would have occurred in the "but for" world because the contention was impermissibly speculative. See Sacramento Municipal Utility District v. United States, No. 98-488, 2006 WL 950218 (Mar. 31, 2006) ("To accept SMUD's position [regarding exchanges], the court would need to speculate about whether SMUD would have been successful in trading SMUD's acceptance priority with another utility or convincing DOE to accept SMUD's SNF early. The law does not permit the court to do so").

[4] This five-year time period is based upon a provision in the Standard Contract which requires SNF to have cooled for *at least* five years prior to being eligible for acceptance from DOE. See 10 C.F.R. § 961.11, App. E ¶ 3. We will demonstrate at trial that it is DOE's preference to accept SNF that has cooled at least 10 years because it facilitates SNF handling.

applying for and being granted license renewals for their nuclear reactors from the Nuclear Regulatory Commission ("NRC"), extending their operating lives an additional 20 years. Graves Dep. at 188:11-16 (A.158). Mr. Graves' model also does not account for the fact that many utilities reracked their wet SNF storage pools after 1995, expanding the available SNF storage in those pools and deferring any need for a separate dry storage facility. Graves Dep. at 156:13-157:4, 194:20-195:5 (A.153, A.159). With respect to the rate at which DOE allegedly "would have and should have" accepted SNF from the industry, Mr. Graves purports to offer the opinion that the 3,000 MTU steady-state acceptance rate set forth in certain DOE program documents, issued after the formation of the Standard Contract, is economically reasonable. Graves Rep. at 8 (A.8).

Mr. Graves had no involvement in the formation of the Standard Contract. Graves Dep. at 49:1-3 (A.147). Mr. Graves is not an expert in public policy or Government affairs. Id. at 47:14-48:4 (A.147). He is not an expert in DOE's spent fuel management program. Id. at 147:21-148:6 (A.152). Indeed, Mr. Graves has had no involvement in the DOE waste acceptance program. Id. at 148:7-10 (A.152). His only involvement in issues relating to the Standard Contract has come through his retention in SNF cases involving three prematurely shutdown Yankee utilities (tried together in July and August 2004 under the caption Yankee Atomic Electric Co. v. United States, No. 98-126 (Merow, S.J.)), and PG&E's prematurely shutdown Humboldt Bay facility. Id. In connection with his opinions, he reviewed a variety of DOE program documents that post-date the Standard Contract from which he selected the rate that he ultimately elected to model. Id. at 145:21-147:16 (A.152). Finally, Mr. Graves is not

offering any testimony concerning DOE's performance obligations under the Standard Contract. Id. at 45:17-46:4 (A.146-A.147).

Second, and based upon his belief that the OFF acceptance queue is inefficient, Mr. Graves models a hypothetical market for the exchange of approved DCSs which he calls the "Economic Sequence Model" ("ESM"). Graves Dep. at 257:11-258:11 (A.164-A.165), Graves Rep. at 11-12 (A.11-A.12). Mr. Graves created the ESM in connection with his expert testimony in the Yankee cases. Graves Dep. at 36:22-37:18 (A.144-A.145). The ESM combines the timing and quantity of SNF for each utility in a "must move" condition with estimates of the incremental at-reactor storage costs of addressing the asserted "must move" situation. Trial Testimony of Frank Graves, Yankee Atomic Electric Co. v. United States, No. 98-126 (Merow, S.J.), July 14, 2004, at 767:8-769:17 (A.124). Mr. Graves' opinion concerning the hypothetical exchanges market is based upon an assumption that all contract holders with early DOE acceptance rights would have offered all of those rights to his market. Graves Dep. at 251:1-253:16 (A.163). These acceptance rights are reallocated within Mr. Graves' hypothetical market based upon the assumption that every operational and shutdown utility with "must move" SNF would have bid upon the available acceptance rights in any year based upon an industry-wide average of avoidable storage costs calculated upon an MTU basis. Graves Rep. at 12 (A.12).

The cost of acceptance rights is established through the application of the lowest price that clears the market – that is, by the amount of money upon a per-MTU basis that the last bidder which obtains allocations in that year is willing to pay. Deposition of Frank Graves, Yankee Atomic Electric Co. v. United States, No. 98-126 (Merow, S.J.), taken November 13, 2001, at 291:9-18 (A.130). That bid price becomes the price at which all trades are conducted in

that year. Deposition of Frank Graves, Yankee Atomic Electric Co. v. United States, No. 98-126 (Merow, S.J.), taken November 14, 2001, at 590:9-19 (A.132). Mr. Graves' model assumes that all "sellers" of allocations – those that decelerate their place in the acceptance queue – are price takers that lack the ability to behave strategically.[5] Trial Testimony of Frank Graves, Yankee Atomic Electric Co. v. United States, No. 98-126 (Merow, S.J.), July 15, 2004, at 984:24-985:3 (A.126). Mr. Graves assumes that DOE approves all exchanges, even though utilities are required to submit their exchange requests to DOE, which had, "in its sole discretion," the right to approve or disapprove those requests. 10 C.F.R. § 961.11, Art. V.E; Deposition of Frank Graves, Yankee Atomic Electric Co. v. United States, No. 98-126, taken November 12, 2001, at 167:9-19 (A.128).

To determine the marginal bid price, the ESM contains financial inputs associated with the following storage activities: (i) continued wet storage operations and maintenance ("O&M") costs (applied in his model to shutdown reactors); (ii) dry storage construction costs, including per cask costs to add capacity at a dry storage facility ("ISFSI") (applied in his model to operational reactors); and (iii) dry storage O&M costs. Graves Dep. at 65:13-19 (A.148); Graves Rep. at 12 (A.12). The figures used in his ESM model were based upon estimates provided by another PG&E expert, Roderick Knight. Id. at 23:22-24:6 (A.143); Graves Rep. at 12 (A.12). Although Mr. Knight was deposed in this case, PG&E has not identified Mr. Knight as an expert witness at trial.

---

[5] Mr. Graves hypothesizes that the trading of these acceptance rights will occur at prices greater than zero for only the first three years of the program – beginning in 1998 – and then predicts that the bid prices for exchanging acceptance rights approach zero because the supply of acceptance rights exceed the demand for these rights. Graves Rep. at 14 (A.14).

The cost inputs are significant because Mr. Graves' model uses those inputs, and his calculation of the marginal bid price, to calculate the cost of trading to utilities, such as PG&E, that accelerate their place in the acceptance queue. Graves Rep. at 13-14 (A.13-A.14). The costs of accelerating within the acceptance queue become a necessary offset to PG&E's damages claim. Graves Dep. at 159:13-18 (A.154). Indeed, Professor Cornell admits that the amounts PG&E would have paid to avoid those storage costs must be included in the damages claim as an offset to the Government. Deposition of Bradford Cornell, taken January 18-19, 2006 ("Cornell Dep.") at 119:7-19 (A.122).

In creating his model, Mr. Graves failed to conduct any empirical study concerning the willingness of nuclear utilities to exchange acceptance rights in the "but for" world. He never even spoke to representatives of PG&E in connection with his opinions in this case. Graves Dep. at 158:14-159:11 (A.154). Indeed, had Mr. Graves reviewed PG&E's internal documents, his conclusions concerning the viability of exchanges may have been affected. For example, in a 1992 document reflecting notes from a PG&E meeting upon SNF issues – notes that reflect PG&E's acceptance of DOE's 1991 ACR and the resultant DCS process – PG&E concluded that, "[w]hile utilities can sell their allotments, the general lack of storage capacity by utilities makes such sales seem unlikely." DX 231 (A.186). Likewise, in a 1987 letter to an attorney representing intervenor groups that were seeking an agreement from PG&E to ship its SNF to DOE as soon as a DOE facility was available, Richard Locke, in-house counsel for PG&E, suggested the inclusion of language tying SNF shipments from Humboldt Bay to the acceptance terms and queue contained in the Standard Contract. DX 112 (A.181-A.182). Significantly, Mr.

Locke noted that, under his suggested language, shipments of SNF "will be in accordance with priorities established by DOE over which PgandE [sic] has no control." Id. (emphasis added).

## II. FACTS RELATING TO THE TESTIMONY OF PG&E'S REMAINING EXPERT WITNESSES

Professor Cornell has been identified as an economist who will offer expert testimony concerning the "damages PG&E has incurred as a result of DOE's partial breach of contract." PG&E Witness List at 1. As set forth in his report and deposition testimony, Professor Cornell's testimony concerning PG&E's "damages" involves his determination and conclusions concerning the costs that PG&E incurred as a result of DOE's partial breach. "Expert Report of Brad Cornell (11/10/05)" ("Cornell Rep.") at ¶ 10 (A.60). This testimony includes opinions concerning the incremental nature of PG&E's costs and the asserted lack of any incremental "benefits" that PG&E obtained as a result of the breach. Id. at ¶ 12 (A.61-A.62). As Professor Cornell explained in his expert report:[6]

> I have relied on a standard approach to determining damages in a breach of contract claim, which is to compare PG&E's actual costs to the costs PG&E would have incurred "but for" the breach. Damages are the costs incurred by PG&E as a result of the breach.
>
> * * *
>
> Calculating the incremental cost of the breach necessarily requires me to identify the costs that would have been incurred by PG&E absent the breach. Two approaches are possible. One is to calculate the costs of PG&E's entire Humboldt and Diablo Canyon operations with the breach and without the breach (assuming no change in revenue between scenarios). In this case, damages are

[6] As we will demonstrate at trial, although Dr. Cornell claims that damages constitute the incremental difference between the "but for" and actual worlds, a proposition with which the Government does not generally disagree, Dr. Cornell failed to engage in any analysis to determine whether claimed costs truly were incremental to the Government's delay in SNF acceptance from PG&E.

> the difference in costs between under each scenario. There are no changes in revenues that have to be considered in the "but for" analysis because there is no change in output at either plant as a result of the breach. This approach is unnecessarily broad in scope.
>
> * * *
>
> As a more direct and practical approach, I estimate incremental "but for" costs recognizing first that only a subset of PG&E's costs are sensitive to DOE's breach, and second, as discussed above, in all but two of the seven categories, "but for" costs are zero. . . .

Id. at ¶¶ 10, 16, 17 (A.60, A.63-A.64) (footnote omitted); see also id. at ¶¶ 13-17, 20, 24-25, 41-42, 47-49, 52-54, 56-58, 60, and 63 (A.62-A.68, A.77-A.89) (containing references to "incremental" costs). Indeed, as Professor Cornell explained in his deposition, "[t]hose were two – they certainly had my fingerprints on them, because one of the things I said right from the beginning to Mr. Stouck and in conversations with Mr. Kapus and certainly with my staff was 'We got to figure out what's true incremental costs here.'" Cornell Dep. at 56:10-21 (A.121).

PG&E has offered Ivan Stuart to, among other things, critique the opinions of the Government's technical expert, Warren Brewer, concerning the SNF loading costs that Humboldt Bay would have incurred in the "but for" world. See PG&E Witness List at 4. Mr. Stuart's rebuttal report, rather than offer an affirmative opinion concerning what the loading costs for Humboldt Bay would have been in the "but for" world, simply claims that it is unreasonable for Mr. Brewer to assume that Humboldt Bay would have loaded small truck casks in the "but for" world. Ivan F. Stuart Rebuttal Expert Witness Report at 1-9 (A.97-A.105). Similarly, PG&E has offered Michael Meisner to criticize Mr. Brewer's opinion concerning the cost to store GTCC waste in the "but for" world. Mr. Meisner's rebuttal report criticizes Mr. Brewer's interpretation of the Nuclear Regulatory Commission's regulatory guidance, but does

not offer an alternative cost for the storage of GTCC waste.[7] Expert Witness Report of Michael J. Meisner at 1-9 (A.107-A.115).

## ARGUMENT

### I. THE COURT HAS THE POWER AND THE DUTY TO GRANT MOTIONS *IN LIMINE* TO LIMIT THE SCOPE OF TRIAL IN APPROPRIATE CIRCUMSTANCES

This Court has acknowledged that "[a] motion *in limine* is a recognized method under [RCFC] 16 and Fed. R. Civ. P. 16 for obtaining a pretrial order simplifying issues for trial," White Mountain Apache Tribe of Az. v. United States, 10 Cl. Ct. 115, 116 (1986), and "is a useful tool to prevent a party before trial from encumbering the record with irrelevant, immaterial or cumulative matters." Baskett v. United States, 2 Cl. Ct. 356, 367-68 (1983); see Palmerin v. City of Riverside, 794 F.2d 1409, 1413 (9th Cir. 1986) (motion *in limine* is useful to "resolve issues which would otherwise 'clutter up' the trial"). In fact, as this Court has previously acknowledged, the Court has a duty to exercise its power to exclude testimony or evidence in appropriate cases:

> There is no question under [RCFC] 16, that this court, as a trial court, has the power to issue pretrial orders simplifying issues for trial. Not only does this court have such power, it has a duty to exercise it in appropriate cases. This power allows the court, *inter alia*, to define the issues, facts, and theories actually in contention and to weed out extraneous issues. Too, this court also has the authority to issue pretrial rulings concerning the admissibility at trial of proposed testimony and documentary evidence.

Baskett, 2 Cl. Ct. at 359 (emphasis added).

---

[7] Mr. Meisner's deposition in this matter currently is scheduled for May 16, 2006.

## II. A MOTION *IN LIMINE* IS APPROPRIATE IF A PROPOSED TESTIFYING EXPERT WITNESS LACKS THE QUALIFICATIONS TO SATISFY FEDERAL RULE OF EVIDENCE 702 OR THE STANDARDS SET BY THE SUPREME COURT IN *DAUBERT* AND *KUMHO TIRE*

### A. To Be Admissible, Mr. Graves' Opinions Must Be Reliable And Relevant

Federal Rule of Evidence ("FRE") 702, as amended in 2000, provides that expert witness testimony is admissible only if the proposed expert witness is qualified as an expert "by knowledge, skill, experience, training, or education" and, further, if the testimony of the proposed expert satisfies the other requirements of the rule that:

> (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.

FRE 702 imposes on the Court a special "gatekeeping obligation" to prevent the introduction of certain expert testimony that is irrelevant or unreliable. See, e.g., Kumho Tire Co. v. Carmichael, 526 U.S. 137, 141 (1999); Joy v. Bell Helicopter Textron, Inc., 999 F.2d 549, 569 (D.C. Cir. 1993). The Supreme Court's decisions in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), and Kumho Tire, 526 U.S. 137 (1999), require "judges to determine that scientific testimony," as well as technical or other specialized expert testimony, "offered under Federal Rule of Evidence 702 is both relevant and reliable." Masters v. Hesston Corp., 291 F.3d 985, 991 (7th Cir. 2002). Further, the party proposing to introduce expert opinion "has the burden of establishing that the pertinent admissibility requirements are met by a preponderance of the evidence." Advisory Committee Notes, 2000 Amendments, Fed. R. Evid. 702 (citing Bourjaily v. United States, 483 U.S. 171 (1987)); see also Ralston v. Smith

& Nephew Richards, Inc., 275 F.3d 965, 970 n.4 (10th Cir. 2001) (citing cases); Lithuanian Commerce Corp. v. Sara Lee Hosiery, 179 F.R.D. 450, 457 (D.N.J. 1998).

The Supreme Court has rejected the familiar refrain that it has sufficient safeguards against irrelevant or unreliable expert testimony in the opponent's ability to present its own expert testimony or to cross-examine each other's experts at trial. Daubert, 509 U.S. at 596; see Joy, 999 F.2d at 569 (rejecting "'let it all in' philosophy" of expert testimony). The Supreme Court requires Federal courts to exercise greater care to prevent the admission of unreliable or irrelevant expert opinion because "Federal Rules of Evidence 702 and 703 grant expert witnesses testimonial latitude unavailable to other witnesses on the 'assumption that the expert's opinion will have a reliable basis in the knowledge and experience of his discipline.'" Kumho Tire, 526 U.S. at 138 (quoting Daubert, 509 U.S. at 592).

Ultimately, "[p]roposed testimony must be supported by appropriate validation – *i.e.*, 'good grounds,' based on what is known." Daubert, 509 U.S. at 590, 593-94; see Kumho Tire, 526 U.S. at 149-50; Advisory Committee Notes, 2000 Amendments, Fed. R. Evid. 702. As the Supreme Court explained in Daubert, 509 U.S. at 590, expert "'knowledge' connotes more than subjective belief or unsupported speculation." Accord O'Conner v. Commonwealth Edison Co., 13 F.3d 1090, 1106 (7th Cir. 1994). "[N]othing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert." General Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997). "The reasoning between steps in a theory must be based on objective, verifiable evidence and scientific" or other "methodology of the kind traditionally used by experts in the field." Domingo v. T.K., M.D., 289 F.3d 600, 607 (9th Cir. 2002). In some cases, reliability will

depend upon the "scientific foundations" of the opinion testimony, while, in other cases, "the relevant reliability concerns may focus upon personal knowledge or experience." Kumho Tire, 526 U.S. at 150. However, "it will at times be useful to ask even of a witness whose expertise is based purely on experience, say, a perfume tester able to distinguish among 140 odors at a sniff, whether his preparation is of a kind that others in the field would recognize as acceptable." Id.

### B. To Establish That Mr. Graves' Testimony Is Reliable, PG&E Must Establish That He Is Qualified To Render The Opinions At Issue

As the first step in analyzing whether proposed expert testimony is reliable, the Court must determine whether the expert rendering the opinion is "qualified" in the relevant field to do so, by reason of his or her "knowledge, skill, experience, training, or education." Fed. R. Evid. 702; see Masters, 291 F.3d at 991 ("[t]o gauge reliability, the district judge must determine whether the expert is qualified in the relevant field . . . ."); Ralston, 275 F.3d at 969 (expert must be qualified by knowledge, skill, experience, training, or education). Trial courts have broad discretion in deciding whether a witness qualifies as an expert. Hamling v. United States, 418 U.S. 87, 108 (1974); United States v. Bourgeois, 950 F.2d 980, 986-87 (5th Cir. 1992). However, the party proffering the witness as an expert has the burden of laying a foundation that establishes that the witness is qualified. See, e.g., Genty v. Resolution Trust Corp., 937 F.2d 899, 917 (3d Cir. 1991); Apostol v. United States, 838 F.2d 595, 599 (1st Cir. 1988). The Court's special "gatekeeping obligation" demands that the Court require the plaintiff to meet this burden before qualifying the expert, "only admitting such testimony after receiving satisfactory evidence of its reliability." Dhillon v. Crown Controls, Inc., 269 F.3d 865, 869 (7th Cir. 2001).

Further, the mere fact that an expert may be qualified in one area does not necessarily mean that he is qualified to testify in other technical or specialized areas. Qualification to testify

as an expert requires that the area of the witness' competence matches the subject matter of the witness' testimony. "Whether a witness is qualified as an expert can only be determined by comparing the area in which the witness has superior knowledge, skill, experience, or education with the subject matter of the witness's testimony." Carroll v. Otis Elevator Co., 896 F.2d 210, 212 (7th Cir. 1990); see Berry v. City of Detroit, 25 F.3d 1342, 1351 (6th Cir. 1994) ("issue with regard to expert testimony is not the qualifications of a witness in the abstract, but whether those qualifications provide a foundation for a witness to answer a specific question"), cert. denied, 513 U.S. 1111 (1992). Courts frequently have precluded a witness from testifying as an expert where the witness has specialized knowledge on one subject, but seeks to opine on a different subject. See, e.g., Surace v. Caterpillar, Inc., 111 F.3d 1039, 1055-56 (3rd Cir. 1997) (although expert qualified as an electromechanical engineer, his opinion was not admissible because he had no education, training, or experience with the technical issue upon which his opinion was offered); Hardin v. Ski Venture, Inc., 50 F.3d 1291, 1296 (4th Cir. 1995) (expert in recreational safety was not qualified to render expert opinion on snowmaking); Eagleston v. Guido, 41 F.3d 865, 873-74 (2nd Cir. 1994) (witness who held doctorate in sociology not qualified to render expert opinion on domestic violence or proper police training procedures), cert. denied, 516 U.S. 808 (1995).

### C. Mr. Graves' Opinions Must Be Helpful To The Trier Of Fact

Assuming that the expert is qualified and reached his opinion in a reliable manner, the testimony is not admissible unless it is relevant:

> Rule 702 further requires that the evidence or testimony "assist the trier of fact to understand the evidence or to determine a fact in issue." This condition goes primarily to relevance. "Expert testimony which does not relate to any issue in the case is not

> relevant and, ergo, non-helpful." The consideration has been aptly described by Judge Becker as one of "fit." "Fit" is not always obvious, and scientific validity for one purpose is not necessarily scientific validity for other, unrelated purposes.

Daubert, 509 U.S. at 590-91 (citations omitted). Thus, whenever expert testimony is offered, the Daubert inquiry must be conducted, including an inquiry into whether the opinion is relevant and "tied to the facts" of a particular "case." Id. at 150.

As part of this relevance inquiry, the Court must determine whether the proffered expert testimony is helpful to the trier of fact. See, e.g., Daubert, 509 U.S. at 591 (helpfulness goes primarily to relevance); Summers v. Missouri Pacific R.R. Sys., 132 F.3d 599, 603 (10th Cir. 1997) ("the second element, helpfulness to the trier of fact, evaluates relevancy"); Employers Reinsurance Corp. v. Mid-Continent Cas. Co., 202 F. Supp. 2d 1212, 1215 (D. Kan. 2002) ("[t]he touchstone of Rule 702 is helpfulness of the expert testimony [to the trier of fact], a condition that goes primarily to relevance"). The opinion of an expert is not "helpful" to the Court, and therefore is not admissible, if it answers a question that the fact-finder could answer without the purported expert opinion. See Sherbert v. Alcan Aluminum Corp., 66 F.3d 965, 967-68 (8th Cir. 1995). "[A]n expert . . . must testify to something more than what is 'obvious to the layperson' in order to be of any particular assistance to the jury" or the Court. Ancho v. Pentek Corp., 157 F.3d 512, 519 (7th Cir. 1998); see Dhillon, 269 F.3d at 871 (expert opinion must be more than "common sense").

## III. MR. GRAVES' OPINION CONCERNING THE RATE OF ACCEPTANCE SHOULD BE EXCLUDED

### A. Mr. Graves Is Not A Qualified Expert Witness Upon The Issue Of The Proper Pace For DOE's Acceptance Of Spent Nuclear Fuel

Mr. Graves is not qualified to testify as an expert concerning the "pace . . . on which DOE would have and should have been accepting PG&E's spent nuclear fuel . . . under the parties' contract." PG&E Witness List at 2. Mr. Graves is not an expert in public policy or Government affairs. He was not involved in the promulgation of the NWPA or the formation of the Standard Contract. Mr. Graves is not an expert in DOE's spent fuel management program; in fact, he has had no involvement in the DOE waste acceptance program. Mr. Graves selected the rate to analyze for "economic reasonableness" from certain DOE program documents, all of which post-date the formation of the Standard Contract and which will, in any event, be available to the Court at trial for consideration. Finally, Mr. Graves is not offering any testimony concerning the fundamental issue in this case – DOE's performance obligations under the Standard Contract.

It is clear from Mr. Graves' testimony that he does not possess any knowledge, skill, experience, training, or education in the areas implicated by an opinion concerning the rate at which DOE "would have and should have" accepted SNF from the industry beginning in 1998. Mr. Graves asserts virtually no knowledge of the Standard Contract and, certainly, no specialized knowledge or experience that would qualify him to determine DOE's responsibilities for the rate of SNF acceptance under the terms of the Standard Contract. As a result, PG&E should be precluded from offering testimony from Mr. Graves concerning the rate at which DOE "would have and should have" accepted beginning in 1998.

B. Even If Mr. Graves Were Qualified To Be An Expert Witness Upon The Rate Of Acceptance, The Methodology Underlying His Conclusions Is Unreliable

Mr. Graves' methodology for determining the economic reasonableness of his selected rate of acceptance is unreliable. Mr. Graves' analysis is highly subject to the assumptions that underlie his "must move" mountain. If Mr. Graves either were to alter his assumption concerning license renewals for operating reactors or his assumption that SNF stored at prematurely shutdown reactors constitutes "must move" SNF, the slope of the "must move" mountain declines significantly, thereby affecting the conclusion concerning the "reasonable" rate of acceptance. Graves Dep. at 208:20-211:17 (A.161). The fact that simple, factually-supported adjustments to his assumptions would modify the conclusions that he generates renders his model unreliable.

C. Even If Mr. Graves' Opinion Was Reliable, The Opinion Is Not Helpful To The Trier Of Fact And Is, Therefore, Irrelevant

Mr. Graves' expert opinion is fundamentally unhelpful to this Court. At issue in this case is the rate of acceptance at which DOE was contractually obligated to accept SNF – an issue upon which Mr. Graves does not opine. This Court does not need Mr. Graves' testimony upon the alleged "reasonableness" of the 3,000 MTU steady-state rate to determine the Government's contractual obligation under the Standard Contract. Further, it is irrelevant to the contents of the terms of the Standard Contract, which establish the parties' obligations under the contract.

## IV. MR. GRAVES' OPINIONS CONCERNING THE HYPOTHETICAL EXCHANGES MARKET SHOULD BE EXCLUDED

### A. Mr. Graves' Exchanges Model Is Not Reliable

As discussed above, expert "'knowledge' connotes more than subjective belief or unsupported speculation." Daubert, 509 U.S. at 590. Indeed, Mr. Graves' opinions must be supported by facts and not constitute unsupported speculation. See General Elec. Co., 522 U.S. at 146. Here, Mr. Graves' opinions are based upon speculative and overly-simplistic economic theory and lack grounding in any facts.

In determining whether a hypothetical model, such as Mr. Graves' ESM model, provides sufficient basis for an award of damages, the Court must determine whether the plaintiff has established a realistic and complete "but for" world. Dolphin Tours, Inc. v. Pacifico Creative Serv., Inc., 773 F.2d 1506, 1512 (9th Cir. 1985) ("[i]n projecting free market profits, antitrust plaintiffs are not entitled to assume favorable aspects of an anticompetitive market"); Restatement (Second) of Contracts § 347(c). Where, as here, PG&E attempts to prove that it has suffered damages using a computer model of the hypothetical "but for" company premised upon a number of critical assumptions, the "failure to establish the reasonableness of these assumptions is fatal" to the damage claim. Southern Pac. Communications Co. v. AT&T, 556 F. Supp. 2d 825, 1076 (D.D.C. 1982), aff'd, 740 F.2d 1011 (D.C. Cir. 1984); see Kidder, Peabody & Co. v. IAG Int'l Acceptance Group N.V., 28 F. Supp. 2d 126, 133-34 (S.D.N.Y. 1998) (calculations based upon "series of assumptions and projections" prevent lost profits from being reasonably certain). PG&E's damages models may not be based upon mere speculation or hypotheticals. Slattery v. United States, 69 Fed. Cl. 573, 582 (2006) (citing Franklin Fed. Sav.

Bank v. United States, 55 Fed. Cl. 108 (2003), & Willems Indus., Inc. v. United States, 155 Ct. Cl. 360, 295 F.2d 822 (1961)).

This Court has repeatedly rejected as inherently speculative expert models that lack evidentiary foundation, finding that the proof upon which a plaintiff relies in such models "must be rooted in fact" and that "[a] claim whose basic structural components lack such factual foundation is simply speculation." Castle v. United States, 48 Fed. Cl. 187, 206 (2000), aff'd in part, rev'd in part, 301 F.3d 1328 (Fed. Cir. 2002). A plaintiff's damages model must "be based on sufficient factual evidence, must use assumptions and calculations that are moored in that factual evidence, and must be credible." Columbia First Bank, FSB v. United States, 60 Fed. Cl. 97, 107-08 (2004); see Shockley v. Arcan, Inc., 248 F.3d 1349, 1362 (Fed. Cir. 2001) (plaintiff must supply "adequate evidence to enable the fact-finder to responsibly estimate future losses based on sound economic models and evidence, not pure guesswork").

In Fifth Third Bank v. United States, 55 Fed. Cl. 223 (2003), the Court rejected the plaintiff's damages model, explaining that the model failed because it created a certain result "without identifying any specific investments or opportunities" that would have allowed the plaintiff to obtain the modeled result:

> Plaintiff's model ignores the presence of competitors similarly unfettered by the breaching provisions of FIRREA. But the most outstanding flaw is the assumption that the But-for-Bank would, even if it could, engage in the same type of activities without identifying any specific investments or opportunities, and that these activities would produce the same results (discounted to be conservative) as the actual business activities in which plaintiff engaged. The court agrees with defendant that this deficiency renders plaintiff's model speculative as a matter of fact and law.

Id. at 241 (emphasis added); see Shockley, 248 F.3d at 1363-64 (rejecting accounting expert's model because underlying assumption lacked factual underpinnings and, therefore, any basis in economic reality); Oiness v. Walgreen Co., 88 F.3d 1025, 1029-30, 1032 (Fed. Cir. 1996) (rejecting model where damages rested upon unsupported assumptions "fraught with speculation," plaintiff's expert "offered no sound economic reasoning to support his assumption," and expert's "projections lacked evidentiary support"), cert. denied, 519 U.S. 1112 (1997); accord Southern Nat'l Corp. v. United States, 57 Fed. Cl. 294, 305 (2003); see also Glendale Fed. Bank, FSB v. United States, 43 Fed. Cl. 390, 399 (1999) ("The court believes that plaintiff's lost profits model suffers from serious defects, which undercut the basis for using it as a credible model for ascertaining lost profits . . . ."), aff'd in relevant part, vacated in part, 239 F.3d 1374 (Fed. Cir. 2001); Suess v. United States, 52 Fed. Cl. 221, 228 (2002) (rejecting damages model as "premised on unrealistic assumptions").

The Supreme Court is in accord. Specifically, the Supreme Court has held that expert opinion cannot sustain a judgment when the opinion "is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable." Brooke Group Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209, 242 (1993). Where expert testimony is speculative, it is not competent proof, and such testimony contributes "nothing to a 'legally sufficient evidentiary basis.'" Weisgram v. Marley Co., 528 U.S. 440, 454 (2000) (citing Brooke Group, 509 U.S. at 242). As the Supreme Court has instructed, while "[e]xpert testimony is useful as a guide to interpreting market facts, . . . it is not a substitute for them." Brooke Group, 509 U.S. at 242; see Matsushita Elec. Indus. Co. v.

Zenith Radio Corp., 475 U.S. 574, 594 n.19 (1986) (expert opinion evidence "has little probative value in comparison with the economic factors.").

The decisions of courts outside this Circuit support the conclusion that hypothetical expert models which lack evidentiary support must be rejected. The United States Court of Appeals for the Eighth Circuit has held that deficiencies in the foundation of an expert's opinion resulted in conclusions that were "mere speculation." Concord Boat Corp. v. Brunswick Corp., 207 F.3d 1039, 1057 (8th Cir. 2000). Similarly, in Virgin Atlantic Airways Ltd. v. British Airways PLC, 69 F. Supp. 2d 571 (S.D.N.Y.1999), aff'd, 257 F.3d 256 (2d Cir. 2001), the district court held that "an expert's opinion is not a substitute for a plaintiff's obligation to provide evidence of facts that support the applicability of the expert's opinion to the case." Id. at 579-80; see Elkind v. Liggett & Meyers, Inc., 635 F.2d 156, 170-172 (2d. Cir.1980) (rejecting expert testimony on the price at which the market would have valued the stock if there had been disclosure as hypothetical and "entirely speculative"); Callahan v. A.E.V., Inc., 182 F.3d 237, 257 (3d Cir. 1999) (hypothetical "but for" calculations "usually rely upon unrealistic *ex ante* assumptions about the business environment, such as assumptions of perfect knowledge of future demand, future prices, and future costs that tend to overstate the plaintiff's damages claim").[8]

---

[8] As the district court recognized in Southern Pacific Communications Co. v. American Telephone & Telegraph Co., 556 F. Supp. 825 (D.D.C. 1982), "[i]n an effort to keep speculation in check, a number of courts have distinguished between damage claims based upon reasonable business plans actually developed and adopted by businessmen and claims based upon made-for-trial speculation about what different business decisions the plaintiff might have made under different circumstances." Id. at 1084. Mr. Graves' model fits the "made-for-trial speculation" of which the Southern Pacific court pejoratively speaks. PG&E's hypothetical exchanges model is not based upon any pre-existing business plan, but, instead, is the pure fabrication of its hired expert.

Mr. Graves' model is not premised upon any investigation that he undertook concerning the willingness of nuclear utilities to exchange acceptance allocations with other utilities, concerning his client's subjective beliefs in the 1980s and early 1990s concerning the viability of exchanges, or concerning the obstacles to exchanges that might exist. Before preparing his model, Mr. Graves failed to contact any utility – including PG&E – to determine the viability of or evidentiary foundation for an exchanges market that might have developed absent DOE's delay in beginning SNF acceptance. Indeed, Mr. Graves admits that his model does not necessarily set forth what would have happened had DOE timely performed. Graves Dep. 45:6-46:4; Graves Rep. at 12. Instead, Mr. Graves' model is based entirely upon the application of flawed economic theory following from assumptions that a market for exchanges of SNF acceptance allocations, absent DOE's delay in beginning SNF acceptance, would have been analogous to a perfectly competitive market.

Consistent with a perfectly competitive market, Mr. Graves assumes that all entities with SNF acceptance allocations would have participated in the exchanges market and that no utilities would have rationed that participation. Graves Dep. at 380:13-381:9 (A.168). Mr. Graves further assumes that market participants would have had perfect information available to them, that the market would have negligible transaction and information costs, that decision-making concerning market participation would have been driven solely by economic considerations, that all utilities trading down in the acceptance queue would have been price takers, and that the market would have had sufficiently numerous participants. These assumptions are all consistent with the "invisible hand" theory and perfect competition. See Federal Trade Comm'n v. Elders Grain, Inc., 868 F.2d 901, 907 (7th Cir. 1989) (model of perfect competition implies infinite

number of sellers, identical costs, a perfectly homogeneous product, and perfectly informed buyers).

Courts have rejected the application of economic models premised upon perfectly competitive marketplaces. "No market fits the economist's model of perfect competition." Elders Grain, 868 F.2d at 907. As the United States Supreme Court has recognized, "[t]here is no reason for believing that the marketplace of ideas is free from market imperfections any more than there is to believe that the invisible hand will always lead to optimum economic decisions in the commercial market." Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of N.Y., 447 U.S. 557, 592 (1980). "'[I]n the real economic world rather than an economist's hypothetical model,' the latter's drastic simplifications generally must be abandoned." Illinois Brick Co. v. Illinois, 431 U.S. 720, 742 (1977) (quoting Hanover Shoe, Inc. v. United Shoe Machinery Corp., 392 U.S. 481 (1968)).

The district court's holding in Honorable v. Easy Life Real Estate Sys., 100 F. Supp. 2d 885 (N.D. Ill. 2000), is instructive here. In analyzing a model premised upon perfect competition, the district court found that the conditions which must exist to support a "perfect" market are theoretical, not real:

> [E]conomic theories that imply that market prices are efficient, thus beneficial for consumers, presuppose that consumers are informed, markets are competitive, and the costs of making transactions are not excessively burdensome. To produce theoretical equilibrium, neoclassical economics in fact assumes *perfect* information, *perfect* competition, and *no* transaction costs, among other idealizations. But these assumptions must be relaxed, and perhaps, ultimately replaced, if economic theory is to have any application to what happens in actual markets.

Id. at 888-89 (italics in original). Indeed, the court concluded that, if perfect market conditions "fail to obtain to a sufficient degree, even the rough efficiency of the market outcome can no longer be presumed," and "the conclusion (that markets are efficient) no longer follows from the premises." Id. at 889; see Image Tech. Services, Inc. v. Eastman Kodak Co., 903 F.2d 612, 617 (9th Cir. 1990) ("market imperfections can keep economic theories about how consumers will act from mirroring reality"); United States v. Realty Multi-List, Inc., 629 F.2d 1351, 1368 (5th Cir. 1980) (perfect competition is theoretical concept as all markets subject to varying degrees of imperfections); United States v. E.I Du Pont & De Nemours & Co., 118 F. Supp. 41, 49 (D. Del. 1951) ("[w]e start . . . with recognition that all practicable forms of competition are 'imperfect,' and that the 'perfect competition' of economic theory is academic.").

Upon examination, there are numerous factors that would preclude the market from operating as depicted by Mr. Graves. These factors include the requirement for Government approval of exchanges, the Government's right "in its sole discretion" to deny exchange requests, the limited number of participants, the varying costs of participants, the effect of socio-political considerations and risk upon utilities' desires and abilities to participate, and the lack of perfect information concerning utility costs. In ignoring each of these facts, Mr. Graves has rendered his model unreliable.

The opinions that he gave in the Yankee litigation, when compared to his opinions here, further confirm the unreliability of his opinions. There are several inconsistencies between Mr. Graves' model used in Yankee and the model that underlies his opinions here. See Graves Dep. at 71:12-18, 171:4-172:4, 194:20-195:5 (A.149, A.156, A.159). As a result of these inconsistencies, the output of his model changed dramatically, highlighting the significant error

rate in his analysis. Specifically, Mr. Graves' opinion changed concerning the amounts that utilities were willing to pay, the years in which utilities were bidding for or selling allocations, the number of SNF allocations (in MTUs) being sought by utilities each year, and the fundamental operating status of certain utilities. See, e.g., Graves Dep. at 171:4-172:4, 199:22-201:13 (A.156, A.160); see also Table 1, below. Significantly, between his Yankee and PG&E models, Mr. Graves' conclusions concerning the behaviors of the three Yankee utilities and, consequently, the "but for" world, varies substantially. Graves Dep. at 199:22-201:13, 278:16-279:1 (A.160, A.166). As set forth below, the three Yankee utilities obtain substantially different allocations in his hypothetical exchanges market:

**Table 1**
**MTUs of Acceptance Resulting From Exchanges According to ESM**
**(PG&E v. Yankee Model)**

| | Maine Yankee | | Connecticut Yankee | | Yankee Atomic | |
|---|---|---|---|---|---|---|
| | PG&E | Yankee | PG&E | Yankee | PG&E | Yankee |
| **1998** | 40.8 | | | | 127 | 122.4 |
| **1999** | 20.4 | | | | | 5 |
| **2000** | | | | 34.5 | | |
| **2001** | 20.4 | 250 | | 414.6 | | |
| **2002** | 30.6 | 291.8 | | | | |

In the Yankee version of his model, all three Yankee utilities are treated as shutdown and have all of their SNF removed by 2002. Graves Dep. at 199:22-201:13 (A.156). In contrast, in the PG&E version of his model, Maine Yankee and Connecticut Yankee are treated as operating reactors and

bid in an entirely different manner (with Connecticut Yankee failing to bid for any allocations in the first six years of the DOE program). Graves Dep. at 36:2-14 (A.144) Given that Mr. Graves purports to model the "but for" world in both cases, the different outputs of his model demonstrate the model's fundamental lack of reliability and indicate that, in any SNF case in which he testifies, the particular plaintiff in that case will be assumed to be given priority treatment over every other contract holder, even though, in other SNF cases, he will assume or has assumed that <u>other</u> plaintiffs will be given priority treatment over every other contract holder. In essence, his inconsistent testimony from case to case seeks to maximize damages against the Government in every case, by creating preferences for every contract holder (essentially allowing every contract holder to move forward in the acceptance queue, with none moving backwards) that, in the "but for" world realistically could not have occurred.

Finally, by ignoring risk in determining full participation by all utilities in his hypothetical market, Mr. Graves' model improperly presumes that all contract holders would have a high level of certainty and definitive knowledge of the future. Graves Dep. 134:11-136:4 (A.150). After assuming the existence of "efficient" and uninterrupted Government performance in the "but for" world, Mr. Graves assumes that all contract holders would act in their own best interests (defined solely by financial considerations) based upon that perfect and certain knowledge. The problems of such an assumption are obvious:

> By modeling a 'but for' company whose investment decisions are determined . . . with perfect knowledge of future demand and future costs rather than on any business plan that [plaintiff] actually adopted, [plaintiff's] hypothetical model avoids any element of management fallibility. The 'but for' company never makes mistakes in planning or building its [business]. <u>To permit damages to be awarded on the basis of such an idealized business plan would open . . . defendants to virtually unlimited damage</u>

> claims based upon whatever after-the-fact scheme plaintiffs, or their lawyers and economists might conjure up. Such conjectures about what plaintiffs might have thought of doing at an earlier time provide no meaningful measure of damages actually suffered by plaintiffs.

Southern Pac. Communications, 556 F. Supp. at 1083 (citations omitted; emphasis added). "The model merely represents an after-the-fact conjecture about what [plaintiffs] might have considered doing in the 'but for' world created by [plaintiffs'] economists and computer experts." Id. at 1083. By assuming that utilities would not have been required to consider uncertainty and risk in the "but for" world – even though the exchanges he models all would have been completed (and the acceptance queue fully re-ordered) by the date of DOE's first acceptance in 1998 – the model provides the Court no insight into what "but for" world would have looked like.[9]

B. Mr. Graves' Exchanges Opinion, Even If Reliable, Is Not Helpful To The Court

In this case, PG&E is offering Mr. Graves' testimony for the proposition that PG&E's SNF fully would have been removed from its Humboldt Bay reactor site by 1998, as opposed to 1999 under the OFF queue and PG&E's proposed contractual rate of acceptance. However, as the plaintiff, PG&E bears the burden of establishing "foreseeability, causation, and reasonableness" of its damages. Indiana Michigan Power Co. v. United States, 422 F.3d 1369, 1376 (Fed. Cir. 2005). Ultimately, "[t]he remedy for breach of contract is damages sufficient to place the injured party in as a good a position as it would have been had the breaching party fully performed." Id. at 1373. Conversely, "the non-breaching party should not be placed in a better

[9] If Mr. Graves is allowed to testify, the Government will present evidence of significant additional deficiencies in his opinions.

position through the award of damages than if there had been no breach."[10] Bluebonnet Sav. Bank, FSB v. United States, 339 F.3d 1341, 1344-45 (Fed. Cir. 2003) (citing White v. Delta Constr. Int'l, Inc., 285 F.3d 1040, 1043 (Fed. Cir. 2002) ("the non-breaching party 'should on no account get more than would have accrued if the contract had been performed.'" ).

PG&E also bears the burden of proving "the amount of loss with sufficient certainty so that the determination of the amount of damages will be more than mere speculation." Willems Indus., Inc. v. United States, 295 F.2d 822, 831 (Ct. Cl. 1961). To meet its burden to demonstrate damages arising from the Government's breach of the Standard Contract, a claimant must furnish the Court with "a reasonable basis for the computation" of damages. Wunderlich Contracting Co. v. United States, 175 Ct. Cl. 180, 199, 351 F.2d 956, 968 (1965). Speculative damages are not compensable. Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 562-63 (1931); William Green Constr. Co. v. United States, 201 Ct. Cl. 616, 626, 477 F.2d 930, 936-37 (1973), cert. denied, 417 U.S. 909 (1974); Hi-Shear Tech. Corp. v. United States, 53 Fed. Cl. 420, 436 (2002), aff'd, 356 F.3d 1372 (Fed. Cir. 2004).

Mr. Graves lacks the requisite expertise to testify concerning the cost components contained within his model. Here, Mr. Graves' model relies upon an expert who is not going to

---

[10] To the extent that PG&E asserts, as it now appears to assert, that the "but for" world is speculative and, therefore, not susceptible of proof, it is unclear how PG&E will meet its burden upon the issue of exchanges. In fact, to the extent that PG&E cannot establish the "but for" world and prove which of the costs that it has been required to incur would not have been necessary in the "but for" world, it will have failed to establish causation for its claimed damages. See, e.g., Bluebonnet Sav. Bank, FSB v. United States, 67 Fed. Cl. 231, 238-39 (2005) (plaintiffs must establish plausible "but-for world" as part of causation analysis); Coast Fed. Bank, FSB v. United States, 48 Fed. Cl. 402, 403 n.25 (2000) (plaintiffs bear burden of propounding realistic "but for" scenario); see also Glendale Fed. Bank, FSB v. United States, 239 F.3d 1374, 1380 (Fed. Cir. 2001) (plaintiffs bear burden of demonstrating "what might have been . . . .").

be offered at trial. As a result, Mr. Graves' opinion concerning the price that PG&E would have paid to other utilities to advance itself in the DOE acceptance queue is unsupported by admissible evidence. Without admissible evidence to prove the offset, any application of Mr. Graves' exchanges theory to award PG&E damages beginning in 1999 at Humboldt Bay would place PG&E in a better position than had DOE performed the Standard Contract. Consequently, Mr. Graves' opinion is not helpful to the Court because it fails to provide a critical aspect of the "but for" world.

## V. TO THE EXTENT THAT THE COURT EXCLUDES THE OPINIONS OF ANY GOVERNMENT EXPERTS, PG&E'S EXPERTS WHO OFFER SIMILAR OPINIONS ALSO SHOULD BE EXCLUDED

### A. Professor Cornell Should Be Excluded To The Extent That The Court Concludes That Testimony Concerning The Incremental Nature Of PG&E's Claimed Costs Constitutes A Legal Conclusion

As discussed above, Professor Cornell has been identified as an economist who will offer expert testimony concerning the "damages PG&E has incurred as a result of DOE's partial breach of contract." PG&E Witness List at 1. Professor Cornell's opinions include conclusions regarding the incremental nature of PG&E's costs and the asserted lack of any incremental "benefits" that PG&E obtained as a result of the breach. In PG&E's motions to exclude the testimony of two of the Government's experts, Warren Brewer and Dr. Jonathan Neuberger, PG&E contends that offering opinions concerning the incremental nature of a plaintiff's claimed damages constitutes an impermissible legal opinion. "Motion to Exclude Testimony Of Jonathan A. Neuberger" ("Neuberger Mot.") at 11. Although the Government strongly disagrees with PG&E's unsupported contention, as set forth in its responses to PG&E's motions, PG&E's damages expert, Professor Cornell, is being offered to testify concerning the same opinions that

PG&E asserts are improper. Consequently, to the extent that the Court concludes that opinions concerning the incremental nature of PG&E's damages claim constitutes an impermissible legal conclusion, we respectfully request that the Court exclude the testimony of Professor Cornell.

B. To The Extent The Court Excludes Dr. Neuberger's Economic Criticisms Of Mr. Graves On The Basis That Dr. Neuberger Did Not Develop An Alternative Model, The Court Also Should Exclude The Testimony Of Ivan Stuart And Michael Meisner

In PG&E's motion in *limine* concerning the Government's expert economist, Dr. Neuberger, PG&E contends that the Court should exclude his testimony because, although he offers an economic critique of Mr. Graves and his model, he has not offered an alternative model. Neuberger Mot. at 7. Although PG&E's contention lacks any merit, to the extent that the Court excludes Dr. Neuberger's testimony because he did not offer an alternative model, the Court also should exclude the rebuttal testimony of Ivan Stuart and Michael Meisner, two experts that PG&E has identified as expert witnesses at trial.

As an initial matter, although PG&E bears the burden of demonstrating all costs that it would have incurred in the "but for" world, PG&E has failed to identify any witnesses to testify as to Humboldt Bay's cost of loading SNF to DOE, which it has avoided as a result of the partial breach, or to the costs associated with the storage of Greater-Than-Class-C low-level radioactive waste ("GTCC") in the "but for" world. Indeed, the only witness identified to testify about these issues is the Government's technical expert, Warren Brewer.

As set forth above, PG&E has offered Mr. Stuart to, among other matters, critique Mr. Brewer's opinion concerning the SNF loading costs that Humboldt Bay would have incurred in the "but for" world. Likewise, PG&E has offered Mr. Meisner to criticize Mr. Brewer's opinion concerning the cost to store GTCC waste in the "but for" world. If the Court accepts PG&E's

unsupported and fundamentally incorrect contention concerning the need for an expert to offer an affirmative alternative analysis, Mr. Stuart's and Mr. Meisner's opinions and testimony should be excluded as well.[11]

[11] In addition, PG&E criticized Mr. Brewer for offering a legal interpretation of the NRC's regulatory guidance. See Plaintiff's "Corrected Motion *in limine* To Exclude Warren K. Brewer's Expert Testimony" at 18. As we discussed in our response to PG&E's motion *in limine*, Mr. Brewer is not offering any legal interpretations of the NRC's regulatory guidance, but, rather, is applying his substantial knowledge and experience concerning the NRC's regulations to assist the Court in understanding the highly technical issues in this case. Mr. Meisner's rebuttal opinions simply offer different interpretations of the same regulatory guidance upon which Mr. Brewer relies. To the extent the Court concludes that Mr. Brewer has offered legal interpretations of the NRC's regulatory guidance and excludes his testimony upon that basis, that same conclusion should apply with equal force to Mr. Meisner, and his opinions should be excluded upon those grounds.

## CONCLUSION

For the foregoing reasons, the Government respectfully requests that the Court exclude the testimony and opinions of Mr. Graves. Further, to the extent that the Court grants any of PG&E's motions *in limine*, we respectfully request that those orders apply with equal force to PG&E's experts.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/ Harold D. Lester, Jr.
HAROLD D. LESTER, JR.
Assistant Director

s/John C. Ekman
JOHN C. EKMAN
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, NW
Washington, D.C. 20530
Tel: (202) 353-0897
Fax: (202) 307-2503

OF COUNSEL:

JANE K. TAYLOR
Office of General Counsel
U.S. Department of Energy
1000 Independence Ave., S.W.
Washington, D.C. 20585

SCOTT DAMELIN
SHARON SNYDER
JOSHUA E. GARDNER
TODD J. COCHRAN
Civil Division
Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530

May 3, 2006

Attorneys for Defendant