# Appendix

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| PACIFIC GAS AND ELECTRIC COMPANY<br>Plaintiff,<br>v.<br>UNITED STATES OF AMERICA<br>Defendant. | No. 04-0074C, into which has been consolidated No. 04-0075C (Judge Hewitt) |

EXPERT WITNESS REPORT OF FRANK C. GRAVES

## I. INTRODUCTION AND APPROACH

I have been asked to prepare this report to describe what would have been reasonable performance by the United States government in accepting spent nuclear fuel and high-level radioactive waste (together, spent fuel) under the terms of its 1983 contract with the Plaintiff, the Pacific Gas and Electric Company (PG&E). PG&E owns two nuclear plants, Humboldt Bay and Diablo Canyon, both covered by the contract with the government (via the U.S. Department of Energy, DOE) for spent fuel removal. It is well known and accepted that the government has not satisfied the obligations of that contract, having failed to remove spent fuel from any utility. I describe in this report a reasonable description of how the government would have performed in the hypothetical non-breach world where it did satisfy its contract obligations. In particular, I characterize the schedule of spent fuel acceptance from the two PG&E plants in that non-breach environment.

In reaching my conclusions, I have considered information contained in a number of documents related to spent fuel storage and disposal, the DOE spent fuel program, and

publicly available information on nuclear power plants. I have also considered representative estimates of spent fuel storage costs provided by Roderick Knight of Knight Cost Engineering Services, LLC, and testimonies of Dr. John Bartlett and Mr. Ivan Stuart regarding what level of program performance would be feasibility and reasonable. Appendix 1 provides a complete listing of the data and information I considered in forming my opinions.

I have over twenty years experience in assisting utilities in the design and implementation of long-range planning, investment, and operating policies, and in assisting their counsel with regulatory compliance and policy review. My work has involved market design and performance evaluations, capacity expansion and network modeling, investment and contract prudence reviews, estimation of marginal costs, price forecasting, design and pricing of new services, and financial simulation and valuation assessments. I have testified on the economics of electric and gas industry restructuring before the FERC and State regulatory commissions on numerous topics, including market entry, antitrust, retail and wholesale transmission access, power contract interpretations, service unbundling, new services, and cost of capital. I have testified in state and federal courts regarding contract disputes and compliance with environmental regulations. I recently testified regarding the government's failure to remove spent nuclear fuel in a similar case involving the Yankee Atomic, Maine Yankee and Connecticut Yankee nuclear plants. I am the author of several papers on approaches to and the impacts of restructuring of the electric and gas industries in the U.S., and I am a member of professional societies for mathematics, electrical engineering, and energy economics. I received an M.S. with a concentration in finance from the M.I.T. Sloan School of Management in 1980, and a B.A. in Mathematics from Indiana University in 1975. Additional detail on my experience and qualifications to offer the opinions included in this report is set out in Appendix 2. Appendices 3 and 4 list the cases in which I have testified as an expert at trial or by deposition during the preceding four years, and my publications for the preceding ten years. The Brattle Group is being paid $475 per hour for my time working on this matter.

### I.A. Approach to Modeling Non-Breach Spent Fuel Acceptance

PG&E's contract is one of approximately sixty such contracts, based on a standard form (the Standard Contract, or Contract) signed around the same time between the government and owners of U.S. commercial nuclear reactors (Purchasers, in the Standard Contract). Each Contract provides that the U.S. government, represented by the DOE, will remove Purchaser's spent nuclear fuel and high-level radioactive waste (HLW) from their nuclear facilities, in exchange for payments based on the amount of power generated by the nuclear reactors and designed to cover the full costs of the program.[1] In aggregate, these Contracts cover spent nuclear fuel disposal from all U.S. commercial reactors.

The Standard Contract does not spell out a timetable for the schedule of spent fuel acceptance from individual Purchasers or facilities, nor indeed for the overall program. The Contract does specify that the DOE would begin acceptance by January 31, 1998. Article IV.B.5 creates an initial priority ranking for acceptance under a paradigm known as Oldest Fuel First (OFF), which allocates the earliest acceptance priority to the oldest spent fuel. The Contract also contemplated, in Article V.E, that Purchasers could exchange their positions in the acceptance order. Finally, the Contract specifies that spent fuel must cool for at least 5 years, after which it becomes eligible for pickup. In this context, the schedule of non-breach spent fuel acceptance at any particular facility depends on the performance of the overall program, and the schedule of acceptance from other facilities. Conceptually, the problem can be separated into two parts:

1. Pace of acceptance: the aggregate rate at which the spent fuel program accepts spent fuel.
2. Sequence of acceptance: The allocation of the program's aggregate acceptance among individual Purchasers and facilities (the acceptance priority).

Despite the Contract's lack of specificity, economic logic can be used to characterize the

[1] Throughout the remainder of this report, I focus on spent nuclear fuel and do not consider high-level radioactive waste (HLW) separately. This is because HLW quantities are sufficiently small and similar in character to spent fuel that their inclusion would not alter my conclusions.

non-breach program, addressing both pace and sequence. This characterization is based on the timing of Purchasers' economic needs for spent fuel removal and evidence that a program capable of reasonably serving those needs would have been economically reasonable and technically achievable. The importance of implementing the DOE program in an efficient manner, in terms of pace and sequence, is reflected in many DOE spent fuel program documents. This need and expectation was testified to by John Bartlett, former Director of the DOE spent fuel program, during the summer 2004 trial in the Yankee cases, and it is consistent with mitigating the financial burden on Purchasers, who are responsible for the total costs of the spent fuel program.

## II. AGGREGATE ACCEPTANCE RATE IN THE NON-BREACH WORLD

To determine the acceptance rate in the non-breach world, I rely on evidence regarding Purchasers' economic need for spent fuel removal, and on evidence that it would be feasible and reasonable to accept spent fuel at a rate consistent with those needs. This latter evidence comes in part from the DOE's plans for the spent fuel program over time, and it is corroborated by other sources.

### II.A. The Economic Need for Spent Fuel Removal – Must Move Analysis

To identify Purchasers' economic needs for spent fuel removal, it is first necessary to understand the basic economics of spent fuel storage. An operating nuclear reactor must have a spent fuel pool, and the costs of operating that pool (e.g., security, engineering and maintenance) are essentially fixed, i.e., independent of the quantity of fuel in the pool. Any individual pool can accommodate only a limited amount of spent fuel because of physical space limits and how the fuel is arranged in the pool. I understand that almost all operating nuclear plants make it a practice to reserve sufficient space in the pool to accommodate the discharge of all the fuel in the reactor core in case of emergency – a so-called Full Core Reserve or Full Core Offload Capability (FCR or FCOC). Thus the available storage capacity in an operating plant's pool is the total pool capacity minus FCR, minus the inventory of spent fuel already stored in the pool.

If an operating plant runs out of storage space in its pool and has additional spent fuel discharges to accommodate, then either some spent fuel must be removed from the site (e.g., delivered to the DOE under the spent fuel program), or substantial incremental cost must be incurred to create additional at-reactor storage capacity (e.g., installing a dry storage facility).[2] When a plant shuts down, the pool must continue to operate for some time, until the last fuel discharged becomes cool enough for handling (5 years, under the Standard Contract). After that time, the pool can be decommissioned and ongoing pool operating costs can be avoided, if/when the spent fuel is removed.

This leads to an economic concept for understanding how the government's spent fuel program would have worked in the non-breach world. Spent fuel storage imposes essentially no incremental (avoidable) cost, as long as the spent fuel inventory does not exceed a pool's capacity, or until 5 years beyond reactor shutdown. However, once 1) pool storage limits are reached, or 2) the plant has been shut down for at least 5 years, the plant owner begins to incur incremental costs from adding or maintaining storage capacity. This results in an economic need to remove spent fuel, which I refer to as a "Must Move" condition. That is, a facility is in a Must Move condition if it needs to remove spent fuel in order to avoid significant incremental storage costs. I label the two circumstances that lead to a Must Move condition as Full Pool Must Move (FPMM), when an operating facility runs out of pool space, or Shutdown Must Move (SDMM), five years after shutdown when all the spent fuel can be removed.

I have performed an analysis of the Must Move needs of each commercial nuclear power plant in the U.S. This analysis determines, for each facility, when spent fuel storage requirements will begin to impose significant incremental costs, and how much spent fuel would have to be removed by what time to avoid that incremental cost. Reliable data on

---

[2] In some circumstances, it may be possible to create additional capacity in a pool, for instance by re-racking the spent fuel assemblies in an arrangement of greater density. Though re-racking can be less costly than dry storage, it also incurs a substantial expense. I do not consider re-racking in my analyses, in part because it is difficult to obtain data on the potential for re-racking at individual sites. However, this approach to re-racking lends conservatism to my results, because if lower-cost alternatives are available to Purchasers other than PG&E, that would make it easier for PG&E to have its spent fuel removed sooner.

historical and forecasted nuclear reactor operations is readily available, due to extremely detailed record-keeping and the relative predictability of operations over time, making it straightforward to develop a quantitative model of future Must Move requirements. This analysis is based on DOE data on spent fuel pool storage capacities, inventories and projected spent fuel discharge data.[3] For each nuclear facility, the Must Move analysis tracks the amount of spent fuel initially present at the facility, the amount and timing of additional spent fuel discharges, and the spent fuel pool storage capacity (net of FCR), to determine when each facility reaches one of the two possible Must Move conditions. The aggregate results of my Must Move analysis – the industry-wide quantities of spent fuel that will incur avoidable economic cost, distinguished according to the two categories – are illustrated in Figure 1.[4]




[3] *Spent Fuel Storage Requirements 1994-2042*, US Department of Energy, Office of Civilian Radioactive Waste Management, June 1995. Minor adjustments were made to this data to eliminate implied premature shutdowns for several reactors, for which there was no apparent basis.

[4] The DOE data on which this analysis is based assumes that reactors retire at the end of their original license lives. (This assumption does not to affect my results for PG&E's plants; the sensitivity of my results to this and other assumptions is discussed later.) The narrow band at the top of the Full Pool Must Move area corresponds to pre-1998 FPMM spent fuel, which is treated slightly differently from other FPMM in later analyses.



6

**Figure 1: Aggregate Must Move Spent Fuel**

The aggregate quantity of Must Move spent fuel starts in 1998 at several thousand metric tons (MTU), climbs at around 1,000 to 2,000 MTU/year for about the first twenty years, and climbs at over 3,000 MTU/year for about the next twenty years as large numbers of plants shut down.[5] With regard to these needs, an economically appropriate non-breach acceptance rate would accommodate the average Must Move needs, would start early enough so it is not overwhelmed by the higher needs in later years, and would stay somewhat ahead of aggregate Must Move needs. A rate that did not satisfy these criteria would impose unnecessary costs and risks on nuclear plant owners and their customers.

### II.B. Feasibility of Acceptance Rate

Recognizing the economic need to remove spent fuel, another important consideration in judging the overall reasonableness of an acceptance rate is whether it is technically feasible and economically reasonable to implement it throughout the entire program. This includes whether the rate is reasonable with respect to loading spent fuel at reactor sites, transporting it to the permanent repository (possibly by way of an interim storage facility), and emplacing the waste in the permanent repository. A good starting point for understanding what rate would be technically feasible and reasonable in this context is the planning that occurred for the DOE spent fuel program itself.

All of the many DOE planning documents and studies that I am aware of, beginning with the 1985 Mission Plan and continuing through today, use a steady-state acceptance rate of 3,000 MTU/year at a geologic repository.[6] All the program plans also show repository acceptance beginning at a lower rate and ramping up to the 3,000 MTU/year steady state rate in 3-6 years. This long history of using a ramp-to-3,000 MTU/year acceptance rate in program planning is consistent with the fact that this rate is feasible and reasonable

[5] Spent fuel quantities are often measured in units of metric tons of uranium (MTU), reflecting the mass of uranium in the original fuel.

[6] The acceptance rate of the overall program may differ from this, e.g., if there are additional facilities such as a second repository or an interim storage facility, and/or if a repository is substantially delayed relative to the start of the program.

throughout the entire waste management system. Ivan Stuart confirms that it would have been technically feasible and programmatically reasonable for the waste disposal program to load spent fuel at a rate of 3,000 MTU/year from reactors and transport it at this rate to an interim and/or permanent facility. Dr. John Bartlett similarly testifies that this rate is reasonable for emplacing spent fuel in a permanent repository, corresponding to one 10 MTU cask per day, 300 days per year. He also confirms that it would be feasible and reasonable for the program to ramp up to the 3,000 MTU/year steady state acceptance rate within three years.

### II.C. Acceptance Rate Conclusion

Among the program planning acceptance rates that ramp up to 3,000 MTU/year, several slightly different ramp-up profiles have been used. For my numerical analyses to characterize non-breach acceptance, I use the rate shown in Table 1. This particular rate first appeared, to my knowledge, in the Draft 1988 Mission Plan.[7] This acceptance rate, beginning in 1998, satisfies the criteria I specified above and so is economically appropriate with respect to the industry's aggregate need to remove spent fuel.

| | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 Forward |
|---|---|---|---|---|---|---|---|
| Acceptance (MTU) | 1,200 | 1,200 | 2,000 | 2,000 | 2,700 | 3,000 | 3,000 |

Source: Draft 1988 Mission Plan; 1990 Annual Capacity Report

**Table 1: Aggregate Non-Breach DOE Acceptance Rate**

[7] In the Draft 1988 Mission Plan, this acceptance rate began in 2003, which is clearly inconsistent with the Contract requirement that acceptance begin in 1998. The 1990 version of the DOE Annual Capacity Report, a periodic publication that projected program acceptance for planning purposes, used the same acceptance rate, but starting in 1998, as the basis for its Upper Bounding Case.




**Figure 2: Non-Breach Acceptance Rate and Must Move Spent Fuel (Supply and Demand for Spent Fuel Acceptance)**

Figure 2 compares graphically this DOE acceptance rate (the supply of spent fuel acceptance) with my results for the quantity of Must-Move spent fuel (the demand for spent fuel acceptance). As can be seen, this acceptance rate is reasonable with respect to Must Move needs. Starting with a modest backlog of Must Move spent fuel at the start of the program in 1998, this acceptance rate would make it possible to work down the backlog within a few years and to get somewhat ahead of the actual economic need to remove spent fuel, staying ahead thereafter. That aggregate headroom provides a buffer for dealing with later years in which Must Move fuel is generated at a faster rate than the program's acceptance rate, as well as for the possibility that actual Must Move needs might differ from the forecast. Just on the basis of comparing this acceptance rate with aggregate Must Move needs, it can be seen that all facilities, including the PG&E plants, could have all of their Must Move needs served (and thus incur no incremental spent fuel storage costs) from about 2001 forward, when cumulative supply exceeds demand.

This acceptance rate is also consistent with overall program efficiency, which is of course an important public policy goal in any context, but particularly here since the Purchasers are required to pay the full cost of the program. While I have not formally analyzed how overall program cost is influenced by the aggregate acceptance rate, other analyses have concluded that the most efficient program acceptance rate would be 3,000 MTU/year or more. Several studies, including some performed for the DOE, have found that at-reactor storage costs are the only program costs that vary substantially with acceptance rate, and at-reactor costs are minimized at an acceptance rate of 3,000 to 5,000 MTU/year.[8]

This result makes intuitive sense as well. The overall program must eventually accept, transport and dispose of all spent fuel. Broadly speaking, repository size and development costs are driven by the total amount of spent fuel that must eventually be disposed, not the rate at which it is accepted. Total loading and transportation costs are primarily determined by the quantity of spent fuel and the distance it must be moved, not by the acceptance rate.[9] Pre-closure operating costs are minimized by loading the repository expeditiously and at a steady rate, but not faster than the spent fuel is created and can be ready to move. Since at-reactor storage costs are the only costs that vary substantially with the acceptance rate, a rate that minimizes at-reactor costs will also approximately minimize overall program costs.

## III. SEQUENCE OF ACCEPTANCE IN THE NON-BREACH WORLD

Although the Contract does not explicitly identify the sequence in which spent fuel would actually be accepted, its provisions, in particular the initial OFF acceptance priority and the exchange mechanism, create the basis for understanding how a reasonably efficient

---

[8] E.g., *Civilian Radioactive Waste Management System Throughput Rate Analysis*, August 17, 1993, prepared for U.S. Department of Energy by System Analysis, Civilian Radioactive Waste Management System Management and Operating Contractor. See also McKee, R. W. and H. D. Huber, "Determination of Cost Effective Waste Management System Receipt Rates," Pacific Northwest Laboratory, from the Proceedings of the High Level Radioactive Waste Management Conference, Las Vegas, NV, April 28 - May 3, 1991.

[9] Costs can also be affected by the extent to which shipments are consolidated, as I address later. This issue is separate from the question of the aggregate acceptance rate.

sequence would have been achieved.[10] With the OFF acceptance priority creating a well-defined initial property right for spent fuel removal services, Purchasers could exchange their allocations to redistribute acceptance priority and improve efficiency.[11] While the DOE does have the right to approve exchanges, its position was that Purchasers themselves would "optimize" the acceptance sequence, without direct involvement by the DOE.

In the non-breach world, Purchasers would have used exchanges to improve on the initial OFF acceptance allocation until they reached a good approximation of the economically efficient allocation, because they face substantial incentives to do so. The OFF acceptance priority is highly inefficient and would impose substantial avoidable costs on Purchasers. In brief, the problem with OFF is that it disperses removal priority for a given facility steadily across many years of plant operation and retirement, when the economic need for removal is typically far more concentrated in time. Accordingly, removal according to OFF priority would be entirely inadequate for some facilities, and unnecessary for others. By pursuing exchanges with each other, Purchasers in the aggregate could save hundreds of millions of dollars by avoiding unnecessary at-reactor storage costs. Exchanges are entirely voluntary so they would be pursued insofar as they are in Purchasers' individual interest, making many Purchasers better off and none worse off. Attractive exchanges would also be readily identifiable and easily achieved. It is quite straightforward to determine the allocation and need for spent fuel removal – much as I have done in this proceeding. (Indeed, such analysis is much easier than determining supply and demand in many other markets that perform quite well.) It requires the type

[10] In addition to the OFF and Exchange provisions, the Contract also raises shutdown priority, emergency deliveries, and failed fuel as issues that may affect acceptance priority. Article VI.B.1 states that priority "may" be granted to shut down facilities, though does not say how that determination would be made. Article V.D makes allowance to accept emergency deliveries. In my analyses, I do not consider these alternative allocations of acceptance priority. Shutdown priority rights are ambiguous, and would affect only the initial priority allocation, not the economically efficient allocation. The need for emergency deliveries may not materialize, and would likely be small relative to the overall program, so would not substantially change the result in any case. Regarding failed fuel, the contract arguably allows it to be accepted on an adjusted schedule, if it is not feasible to accept it on the same schedule as non-failed fuel. I am aware of no such technical feasibility issues. Experience has shown that failed fuel has not created substantially different technical requirements for placement in dry storage, as evidenced by testimony from Michael Meisner, Chief Nuclear Officer of Maine Yankee Atomic Power Co., during that company's summer 2004 spent fuel hearing. I am not aware of any evidence to suggest that DOE has been planning to accept failed fuel on a different schedule than other spent fuel. Thus I treat failed fuel the same as non-failed fuel.

[11] The exact mechanism by which exchanges would have occurred was never developed, because the program never progressed to that stage.

of analyses that I describe below – a determination of the initial OFF priority allocation, and analysis of spent fuel storage capacities and requirements at individual facilities to determine economic needs. This analytic simplicity means that Purchasers who desired to exchange acceptance priority in the non-breach world could have easily identified potential buyers and sellers of acceptance priority, along with the approximate prices (which might be zero) at which they would be willing to transact.

### III.A. Determining the Economically Efficient Sequence

I have developed a model, the Economic Sequence Model (ESM), that determines the efficient sequence of spent fuel removal, given the Must Move needs of individual facilities and the program's acceptance rate as determined above. This model closely approximates the results I would expect to observe under exchanges of OFF acceptance allocations among Purchasers. The ESM is in principle very simple. In each year it begins with the Must Move needs of each facility, determines the storage costs that could be avoided if those needs were met (using representative spent fuel storage costs provided by Rod Knight), and ranks the facilities according to their economic priority for removing spent fuel. This economic priority ranking is based on the facilities' "willingness to pay", or avoidable annual costs, for spent fuel removal on a cost-per-MTU basis (because exchanges would occur on an MTU-for-MTU basis). In economic terms, this ranking creates the demand curve for spent fuel acceptance. The ESM then allocates the available acceptance in that year according to this economic priority ranking – i.e., it allocates acceptance to those who need it most, matching supply (total annual acceptance) to demand.[12] If any Must Move needs are unmet in a given year, they are carried over to the following year (because that fuel is still Must Move) and combined with new Must Move needs, and the process is repeated, year after year.

The ESM determines the economically efficient acceptance sequence, given the overall program acceptance rate. In reality, exchanges might not reach this precise sequence.

---

[12] *Consistent with the efficient use of transportation resources, the ESM includes a constraint that acceptance must be allocated so as to completely fill each transport cask.*

However, they would achieve approximately this sequence, because any substantially different sequence would incur considerable unnecessary storage costs. The avoidable costs could be millions to tens of millions of dollars each year for a single facility. To avoid these unnecessary costs, Purchasers would be keenly motivated to identify and carry out additional exchanges until essentially all advantageous exchanges had been made – that is, until the revised allocation reached a good approximation of the efficient allocation, minimizing at-reactor storage costs. Since information regarding the allocations and likely needs of potential exchange counterparties is readily available, there is ample opportunity for Purchasers to identify and perform essentially all advantageous exchanges well in advance of the fuel removal dates.

The ESM results show that the program could and would have served the vast majority of Must Move needs once the program began. All Full Pool Must Move needs would have been served when needed; i.e., starting in 1998, all plants at risk of running out of pool space would have had enough spent fuel removed to avoid developing a new dry storage facility or adding to an existing one. A few plants with existing dry storage facilities or shutdown pools would continue to operate them and incur incremental storage costs for up to a couple of years, in order to accommodate the greater economic needs of others. However, beginning about 2001 and thereafter, all Must Move needs of all types would be served as soon as they arose, and the program would begin to get ahead of immediate needs. This is the same basic result that was observed previously by comparing the aggregate Must Move quantity with total acceptance in Figure 2. Must Move needs would continue to arise after 2001, but with proper allocation, there would be sufficient acceptance to serve all those needs, plus remove additional spent fuel that was not yet incurring any incremental storage cost.

Purchasers would not give away allocation rights freely in the early years when not all Must Move fuel could be served, since in those years, potentially unserved Purchasers would be willing to pay up to their avoidable costs. The ESM determines the market value or price of early acceptance priority as the willingness to pay of the marginal Purchaser in that year (where the marginal Purchaser is the first whose Must Move needs

could not be entirely served in a particular year). This is consistent with trading results expected in microeconomic theory, which observes that prices are set by the intersection of the aggregate willingness to pay curve (the demand curve) with the supply curve.[13] Figure 3 illustrates the resulting market value (price) of acceptance allocations for each year.




Note: Value of acceptance allocations goes to (approximately) zero in 2001 and remains zero thereafter.

**Figure 3: Market Value of Acceptance Allocations from the Economic Sequence Model**

The ESM results show that acceptance allocations start at an initial value of $102,000/MTU in 1998 and then drop quickly to zero in 2001. This reflects the fact that in the first few years, cumulative acceptance is below the aggregate Must Move need, causing the resource (spent fuel acceptance) to be scarce and valuable. Beginning in 2001 and beyond, total acceptance exceeds the immediate need for spent fuel removal –

[13] Here, the "supply curve" is vertical in each year at that year's annual acceptance, since the program would be run with fixed, pre-specified annual acceptance quantities that are not affected by price.

i.e., supply exceeds demand – and the value accordingly goes to zero.[14] Since the Standard Contract contemplated exchanges (i.e., swaps) of acceptance allocations rather than independent purchases and sales, each Purchaser wanting to acquire a different acceptance schedule would exchange away some of their existing allocation and acquire the same quantity in a different year, paying or receiving the net difference in value.

### III.B. Implications for PG&E Plants

From the results described in the previous section, it is possible to identify when PG&E's plants (indeed, any plant) would have had spent fuel removed in the non-breach world – this is just the efficient re-allocation of acceptance rights identified by the ESM.

For Humboldt Bay, in order to facilitate removing spent fuel and decommissioning the nuclear unit in the non-breach world, PG&E would have advanced acceptance as much as was economical. Its initial acceptance allocations under OFF (at the acceptance rate I use) would have occurred in 1998 (13 MTU) and 1999 (16 MTU).[15] Of course, Humboldt Bay would have preferred to remove all its spent fuel in 1998 and thereby avoid another year of unproductive expenditures on spent fuel storage. The ESM results show that Humboldt Bay's avoided costs would place it among those willing to pay for accelerated removal in 1998, as shown in Table 2. That is, it would have been economical for Humboldt Bay to pay to exchange all of its 1999 allocations for 1998 allocations at the market price, removing all 29 MTU of its spent fuel promptly in 1998 and terminating its spent fuel pool O&M and other site maintenance costs sooner. The ESM results show that exchanging the 1999 OFF allocations for 1998 allocations would have imposed a net exchange cost of $1.4 million in 2005 present value.[16] Even if Humboldt Bay's spent fuel were removed on a strict OFF basis, only one year's

---

[14] This is not to say that exchanges beyond 2001 would occur at precisely $0/MTU; there could be some nominal price to reflect administrative and convenience costs. But since there is an excess supply, the price would be essentially zero.

[15] Strictly speaking, the allocations are associated with PG&E, not Humboldt Bay, and PG&E's allocations are not distinguished between Humboldt Bay and Diablo Canyon. However, since all of Humboldt Bay's OFF allocations and Must Move needs occur well in advance of any of Diablo Canyon's allocations or needs, the two plants' acceptance can be treated separately.

[16] This is equal to the quantity of acceptance allocations exchanged (16 MTU) times the difference in value between 1998 and 1999 (approximately $68,000/MTU), which is $1.1 million in 1998. This value is moved forward to 2005 at a risk-free interest rate of 3.6% to yield the 2005 value of $1.4 million.

incremental pool operating cost would have been incurred in the non-breach world.

| *Year* | *Must Move Needs (MTU)* | *OFF Priority Allocation (MTU)* | *ESM Priority Allocation (MTU)* | *Difference (Unserved Must Move Needs under ESM) (MTU)* |
|---|---|---|---|---|
| 1998 | 29 | 13 | 29 | 0 |
| 1999 | 0 | 16 | 0 | 0 |
| 2000 | 0 | 0 | 0 | 0 |
| 2001 | 0 | 0 | 0 | 0 |
| 2002 | 0 | 0 | 0 | 0 |
| 2003 | 0 | 0 | 0 | 0 |
| **Total Payments for Exchanges (PV in 2005 Dollars): $1.4 Million** | | | | |

Note: Humboldt Bay has no further Must Move needs after removal of its approximately 29 MTU of spent fuel.

**Table 2: Summary of Non-Breach Spent Fuel Removal – Humboldt Bay**

Diablo Canyon, being an operating plant with adequate space in its pools for several years beyond 1998, would have had no immediate need to remove its spent fuel in the non-breach world. Diablo Canyon's initial acceptance allocations under OFF begin to accrue in 2004 (47 MTU) and continue thereafter, averaging about 70 MTU/year, as shown in Table 3. Diablo Canyon's cumulative OFF allocations are always ahead of (earlier than) its Must Move needs, so it would not have needed to use exchanges to advance its fuel removal position. Thus, even if DOE removed Diablo Canyon's spent fuel strictly on an OFF basis, its pool would not have filled up, and PG&E would not have incurred any incremental storage costs there. In fact, Diablo Canyon could afford to delay its acceptance by a couple of years relative to its initial OFF allocations. By the time Diablo Canyon's OFF allocations had begun to arise, though, the value of acceptance rights would have gone to essentially zero, and it would not have had an opportunity to profit meaningfully from exchanges. (Diablo Canyon may have engaged in some exchanges nonetheless to improve the convenience of its allocation schedule.)

| *Year* | *Must Move Needs (MTU)* | *OFF Priority Allocation (MTU)* | *ESM Priority Allocation (MTU)* | *Difference (Unserved Must Move Needs under ESM) (MTU)* |
|---|---|---|---|---|
| 1998 | 0 | 0 | 0 | 0 |
| 1999 | 0 | 0 | 0 | 0 |
| 2000 | 0 | 0 | 0 | 0 |
| 2001 | 0 | 0 | 0 | 0 |
| 2002 | 0 | 0 | 0 | 0 |
| 2003 | 0 | 0 | 0 | 0 |
| 2004 | 0 | 47 | 0 | 0 |
| 2005 | 0 | 65 | 0 | 0 |
| 2006 | 0 | 69 | 0 | 0 |
| 2007 | 42 | 94 | 51 | 0 |
| 2008 | 0 | 78 | 0 | 0 |
| 2009 | 74 | 74 | 65 | 0 |
| 2010 | 38 | 75 | 38 | 0 |
| 2011 | 36 | 39 | 36 | 0 |
| 2012 | 74 | 111 | 74 | 0 |
| 2013 | 0 | 39 | 0 | 0 |
| 2014 | 74 | 112 | 74 | 0 |
| 2015 | 38 | 0 | 38 | 0 |
| 2016 | 36 | 113 | 36 | 0 |

**Total Payments for Exchanges (PV in 2005 Dollars): $0**

Note: Diablo Canyon's Must Move needs beyond 2016 continue to be met by the efficient allocation of acceptance priority.

**Table 3: Summary of Non-Breach Spent Fuel Removal –Diablo Canyon**

### III.C. Inefficiency of OFF and Incentives for Efficient Acceptance Priority

It is unreasonable to expect that the OFF allocation, or any allocation similar to it, would actually have been used by DOE, because it is extraordinarily inefficient, and there are enormous gains to be had by reallocating acceptance through exchanges. Figure 4 illustrates how much better the ESM allocation addresses Must Move needs, compared with the OFF allocation. With each row corresponding to a nuclear facility and each column to a year, this figure shows a shaded cell to indicate an unserved Must Move need at a given facility in a given year, with the color of the shading indicating the nature of

the unserved need (e.g., full pool or shutdown). As can be seen, the ESM allocation has unserved removal needs at only a few facilities, and only in the first three years. It entirely avoids adding more spent fuel to an existing or new dry storage facility. The OFF acceptance schedule, by contrast, would entail the unnecessary construction of several new dry storage facilities after 1998, and require extended operation of many wet and dry storage facilities for many years.[17] Based on the representative storage costs applied in the ESM, the OFF allocation could impose as much as $2.7 billion in incremental storage costs, vs. only about $0.1 billion with the ESM allocation – a difference of about $2.6 billion.[18]

[17] This is based on a facility-level allocation of OFF; actually OFF allocations are assigned at the Purchaser level. Some Purchasers with multiple facilities may choose a different allocation across those facilities.

[18] Cost estimates are in present value to 2005. These costs are approximate, but do offer a reasonable estimate of magnitude of storage costs involved. A 1989 study found that a "modified shutdown priority" for acceptance, very similar to the ESM allocation, would approximate the result of exchanges, and could save approximately $1.3 million in at-reactor storage costs as compared with OFF priority. See *Spent Fuel Acceptance Scenarios Devoted to Shutdown Reactors: A Preliminary Analysis*, Pacific Northwest Laboratory, October 1989.