


| | ESM | | OFF | |
|---|---|---|---|---|
| | 3 | Shutdown Pool Operation (Plant-Years) | 198 | |
| | 8 | Dry Storage-Operation Only (Plant-Years) | 71 | |
| | 0 | Dry Storage-Add Spent Fuel (Plant - Years) | 41 | |
| | 0 | New Dry Storage Facilities | 8 | |
| | **11** | **Total Unserved Plant-Years** | **318** | |
| | 7 | Total Unserved Plants | 52 | |

**Figure 4: Unserved Must Move Needs under ESM and OFF Allocations**

The most important benefit of reallocating acceptance according to economic need is the ability to avoid unnecessary at-reactor storage costs. But exchanges would also have other benefits. One is that while an OFF acceptance allocation would entail accepting essentially arbitrary and usually small amounts of spent fuel from many different Purchasers in each year, exchanges would tend to consolidate acceptance into fewer, larger batches, or "campaigns". This would likely simplify logistics and reduce costs both at reactors and in transportation, relative to the OFF allocation, and so I would

expect that the DOE itself would have actively encouraged such exchanges. Ivan Stuart supports the proposition that campaigns are a more efficient way to accept spent fuel, as does a study directed specifically at this question.[19] Figure 5 illustrates the number of facilities and the quantities of acceptance under both the ESM and OFF allocations. As can be seen, ESM entails fewer, larger acceptances than the OFF allocation.[20] In the first three years of the program, the ESM allocation would involve pickups at 61 facilities per year, averaging 72 MTU. In contrast, in these first three years OFF entails pickups at 100 facilities, averaging 44 MTU per pickup. The discrepancy increases further in years 2001 and beyond when the ESM allocation, having dealt with all backlogged Must Move needs and having slack acceptance capacity, would facilitate even more substantial campaigns.[21]




| ESM | | 1998 - 2000 | OFF | |
|---|---|---|---|---|
| 61 | Sites | Total Site Visits | 100 | Sites |
| 72 | MTU | Average Pick-up/Site Visit | 44 | MTU |

**Figure 5: Acceptance Campaigns Under ESM and OFF Allocations**

19 J.W. Doman and T.E. Tehan, "Significance of Campaigned Spent Fuel Shipments", High Level Radioactive Waste Management, 1993.

20 Again, based on a facility-level rather than Purchaser-level OFF allocation.

21 It is not possible to make a direct comparison in later years, because the allocation of program slack (over 1,000 MTU in 2001, almost 2,000 MTU in 2002 and continuing throughout the program) is not specified by the ESM.

## IV. Sensitivity Analyses and Conclusion

In the non-breach world, both Humboldt Bay and Diablo Canyon would have had spent fuel removed promptly when needed after the 1998 start date for contract performance, and would have avoided incurring any incremental spent fuel storage costs beyond 1998. Performing several sensitivity analyses, I found these results unchanged. An acceptance rate that is somewhat different (i.e., a different ramp-up to the 3,000 MTU/year steady state acceptance) would not change my conclusions. Indeed, even aggregate acceptance rates that are substantially lower and delayed – rates that would not be reasonable non-breach acceptance rates – yield the same result for PG&E's plants, though not necessarily for others.

Experience has shown that reactors do not necessarily retire at the end of their original license lives; some have shut down early and most others are now expected to receive license extensions. Testing the effect of this, I found that it would not change the timing of spent fuel removal from PG&E's plants. Other sensitivity analyses, e.g., with different storage costs, show that my results are not affected by reasonable variation in other assumptions. In fact, even if exchanges were not to occur at all and acceptance was based on OFF priority, the results for the PG&E facilities would be almost unchanged. This is because PG&E's OFF allocations closely match its Must Move needs, a circumstance that many other facilities do not share. These sensitivity analyses show that my conclusions regarding the PG&E facilities are extraordinarily robust.



21

Respectfully submitted,

November 10, 2005

Frank C. Graves
Principal


22

## Appendix 1
## List of Information and Documents Considered in Forming Opinions

1. U.S. Department of Energy Contract No. DE-CR01-83NE44402, Contract for Disposal of Spent Nuclear Fuel and/or High Level Radioactive Waste (June 30, 1983).

2. *Nuclear Waste Policy Act of 1982*, as presented in 42 USC Chapter 108 – Nuclear Waste Policy, 1/6/97.

3. *Nuclear Waste Policy Amendments Act of 1987*, as presented in 42 USC Chapter 108 – Nuclear Waste Policy, 1/6/97.

4. *Mission Plan for the Civilian Radioactive Waste Management Program*, U.S. DOE, June 1985, DOE/RW-0005.

5. *OCRWM Mission Plan Amendment*, June 1987, US DOE, DOE/RW-0128.

6. *Draft 1988 Mission Plan Amendment*, June 1988 US DOE, DOE/RW-1087.

7. *Report to Congress on Reassessment of the Civilian Radioactive Waste Management Program*, November 1989, US DOE, DOE/RW-0247.

8. *The DOE Position on the MRS Facility*, U.S. DOE, June 1989, DOE/RW-0239.

9. *MRS Systems Study Task G Report – The Role and Functions of Surface Storage of Radioactive Material in the Federal Waste Management System*, Pacific Northwest Laboratory, Apr. 1989.

10. *MRS System Study Summary Report*, U.S. DOE, June 1989, DOE/RW-0235.

11. *Annual Capacity Report,* U.S. DOE. (1987, 1988, Draft 1989, 1990, 1991, 1992.)

12. *1992 Acceptance Pricing Ranking,* U.S. DOE, May 1993; Revision 1.

13. *Acceptance Priority Ranking & Annual Capacity Report*, U.S. DOE, (1995, 2004).

14. *Spent Fuel Storage Requirements 1994-2042*, U.S. DOE, June 1995, DOE/RW-0431-Rev.1.

15. *Viability Assessment of a Repository at Yucca Mountain*, US DOE, December 1998, DOE/RW-0508.

16. *Analysis of the Total System Life Cycle Cost of the Civilian Radioactive Waste Management Program*, U.S. DOE, December 1998, May 2001, DOE/RW-0510.

17. *Civilian Radioactive Waste Management System Requirements Document*, U.S. DOE, Revision 05, January 1999; Revision 06, September 2004.

18. *Civilian Radioactive Waste Management System, Waste Acceptance System Requirements Document*, U.S. DOE, Revision 4, January 2002.

19. *Civilian Radioactive Waste Management Program Plan*, U.S. DOE, Revision 3, February 2000.

20. *Civilian Radioactive Waste Management System Throughput Rate Analysis*, August 17, 1993, Prepared for U.S. Department of Energy, Prepared by System Analysis, Civilian Radioactive Waste Management System Management and Operating Contractor.

21. *Spent Fuel Acceptance Scenarios Devoted to Shutdown Reactors: A Preliminary Analysis*, Pacific Northwest Laboratory, October 1989.

22. "Significance of Campaigned Spent Fuel Shipments" by J.W. Doman and T.E. Tehan, published in Volulme I of High Level Radioactive Waste Management, Proceedings of the Fourth Annual International Conference, Las Vegas, Nevada, April 26-30, 1993.

23. Gottlieb, Peter and W. Bailey III, F. Emami, L.M. Ford, and J.F. King, "Throughput Study for the Civilian Radioactive Waste Management System," from the Proceedings of the High Level Radioactive Waste Management Conference, Las Vegas, NV, April 12-16, 1992.

24. McKee, R.W. and H.D. Huber, "Determination of Cost Effective Waste Management System Receipt Rates," Pacific Northwest Laboratory, from the Proceedings of the High Level Radioactive Waste Management Conference, Las Vegas, NV, April 28-May 3, 1991.

25. S.R. Rod, "Cost Estimates of Operating Onsite Spent Fuel Pools After Final Reactor Shutdown," Pacific Northwest Laboratory, August 1991.

26. *Spent Nuclear Fuel Discharges from U.S. Reactors 1993*, February 1995, Energy Information Administration, Department of Energy.

27. *2005 – 2006 Information Digest, NUREG-1350, Volume 17.* United States Nuclear Regulatory Commission. July 2005.

28. *License Expiration, Capacity and Generation for U.S. Nuclear Power Plants*, Nuclear Energy Institute, April 2005. Available at www.nei.org.

29. *2002 Summary of U.S. Generating Company In-Pool Spent Fuel Storage Capability Projected Year That Full Core Discharge Capability is Lost*. Energy Resources International, June 2002. Available at www.nei.org

30. *2002 Form 10-K/A*. PG&E Corporation, Pacific Gas and Electric Company. Securities and Exchange Commission.

31. *Issuance of Amendments for Diablo Canyon Nuclear Power Plant, Unit No. 1 (TAC No. M84006) and Unit No. 2 (TAC No. M84007)*. Available at www.nrc.gov. March 1, 1995.

32. *Dresden – Issuance of Amendment (TAC No. MA5414)*. Available at www.nrc.gov. August 24, 2000.

33. *Draft Issuance of Amendment to Facility Operating License No. NPF-29 Grand Gulf Nuclear Station, Unit 1 (TAC No. M92993)*. Available at www.nrc.gov. December 21, 1998.

34. *Palisades Plant – Issuance of Amendment Re: Revision to Operating License Expiration Date (TAC No. MA8753)*, December 14, 2000. Available at www.nrc.gov.

35. *Change to Operating License Expiration Date to Reflect Facility Construction Time, Peach Bottom Atomic Power Station, Units 2 and 3 (TAC Nos. M83762 and M83763)*, March 28, 1994. Available at www.nrc.gov.

36. *Amendment Application Nos. 195 and 180, Supplement 1 Proposed Change to the Operating License Expiration Date San Onofre Nuclear Generating Station Units 2 and 3*, February 24, 2000. Available at www.nrc.gov.

37. *San Onofre Nuclear Generating Station (Songs), Units 2 and 3 – Issuance of Amendments Re: Extend License Expiration Date (TAC Nos. MA7348 and MA7349)*, March 9, 2000. Available through www.nrc.gov.

38. *Turkey Point Units 3 and 4 – Issuance of Amendments Re: Radiological Effluent Releases – 10 CFR 20 Requirements (TAC Nos. M82921 and M82922)*, April 20, 1994. Available at www.nrc.gov.

39. *Amendment No. 158 to Facility Operating License for Fort Calhoun*, Nuclear Regulatory Commission.

40. Gross Domestic Product Implicit Price Deflator, from Federal Reserve Bank of St. Louis Economic Research database, October 28, 2005.

41. Blue Chip Economic Indicators, October 10, 2005.

42. Cost of Capital Yearbook, Ibbotson Associates (2001, 2005).

43. Yields on Treasury Securities released on 10/24/2005 (Federal Reserve Bank of St. Louis).

44. Yankee Atomic v. United States, 98-126C, Trial Transcript (Testimonies of Dr. John Bartlett, Michael Meisner and Ivan Stuart).

45. Settlement Agreement between Exelon and DOE in lawsuits No. 98-621C, No. 04-102C, No. 04-103C, No. 04-104C, dated August 5, 2004.

46. Letter from Daniel Dreyfus, OCRWM Director, to Dr. Andrew Kodak, President and CEO of Yankee Atomic, dated September 28, 1995.

47. Communication with David Vosburg (PG&E) regarding Diablo Canyon's current spent fuel storage needs.

48. *Deposition of Nancy Slater*, April 21, 1999.

49. *John W. Bartlett Expert Witness Report*

50. *Ivan F. Stuart Expert Witness Report*

51. *Roderick Knight Expert Witness Report*

## Frank C. Graves

Mr. Graves assists corporations, often regulated utilities, in the design and implementation of long-range planning, investment, and operating policies, and he assists their counsel with regulatory compliance and litigation support. He has extensive experience with electric utility capacity expansion and network modeling, investment and contract prudence reviews, estimation of marginal costs, design and pricing of new services, financial simulation, risk management and valuation techniques. He has testified before the FERC and state regulatory commissions, as well as in federal court, on the economics of gas and electric industry restructuring, breach of contract disputes, cost of service, risk management for supply procurement, and adequacy of market competition. He received an M.S. with a concentration in finance from the M.I.T. Sloan School of Management in 1980, and a B.A. in Mathematics from Indiana University in 1975.

### REPRESENTATIVE CONSULTING EXPERIENCE

*Regulated Industry Restructuring*

- As a result of vertical unbundling, many utilities must procure a substantial portion of their power from resources they do not own or operate. Market prices for such supplies are quite volatile. In addition, utilities may face future customer switching to or from their supply service, especially if they are acting as provider of last resort (POLR). This problem is a blending of risk management with the traditional least-cost Integrated Resource Planning (IRP). Regulatory standards for findings of prudence in such a hybrid environment are often not well understood or articulated, leaving utilities at risk for cost disallowances that can jeopardize their credit-worthiness. Mr. Graves has assisted several utilities in devising updated procurement mechanisms and associated regulatory guidelines that clarify the conditions for approval of plans, in order to make possible the expedited procurement of power from wholesale market suppliers.

- There is a strong tendency in electric restructuring to impose "provider of last resort" (POLR) transitional supply obligations on the incumbent distcos. Unfortunately, POLR obligations that are extremely protective of customers harm the development of competitive retail power markets and can impose extreme, viability-threatening costs or risks on distcos. Mr. Graves developed policy papers and tutorials on this problem for the Edison Electric Institute, and advised several utilities on the design and valuation of alternative POLR specifications and coverage strategies.

- As a means of unbundling to retain ownership but not control of generation, some utilities turned to divesting output contracts. Mr. Graves was involved in the design and approval of such agreements for an entire fleet of generation. The work entailed estimating and projecting cost functions that were likely to track the future marginal and total costs of the units, and analysis of the financial risks the plant operator would bear from the output pricing formula. Testimony on risks under this form of restructuring was presented.

- Mr. Graves worked with the executive committees of several utilities in designing regulatory strategies for influencing the pace and procedures associated with the transition to retail electric access. These have also included comprehensive business strategies and integrated planning tools for service unbundling and pricing, incentive ratemaking, corporate reorganization, market forecasting, asset valuation, and risk management.

- Mr. Graves contributed to the design and pricing of unbundled services on several natural gas pipelines. To identify attractive alternatives, the marginal costs of possible changes in a pipeline's service mix were quantified by simulating the least-cost operating practices subject to the network's physical and contractual constraints. Such analysis helped one pipeline to justify a zone-based rate design for its firm transportation service. Another pipeline used this technique to demonstrate that unintended degradations of system performance and increased costs could ensue from certain proposed unbundlings that were insensitive to system operations.

- For several natural gas pipeline companies, Mr. Graves evaluated the cost of equity capital in light of the requirements of FERC Order 636 to unbundle and reprice pipeline services. In addition to traditional DCF and risk positioning studies, the risk implications of different degrees of financial leverage (debt capitalization) were modeled and quantified. Aspects of rate design and cost allocation between services that also affect pipeline risk were considered.

- Mr. Graves assisted several utilities in forecasting market prices, revenues, and risks for generation assets being shifted from regulated cost recovery to competitive, deregulated wholesale power markets. Such studies have facilitated planning decisions, such as whether to divest generation or retain it, and have been used as the basis for quantifying stranded costs associated with

restructuring in regulatory hearings. Mr. Graves' work in this area has helped several utilities develop long term planning models for managing their generation assets in a competitive market.

*Market Competition*

- Regulatory and legal approvals of utility mergers require evidence that the combined entity will not have undue market power and that it will create operating synergies that produce benefits for electric customers. Mr. Graves assisted several utilities in evaluating the competitive impacts of potential mergers and acquisitions. He has identified ways in which transmission constraints reduce the number and type of suppliers, along with mechanisms for incorporating physical flow limits in FERC Delivered Price Test for mergers.

- A major concern associated with electric utility industry restructuring is whether or not generation markets are adequately competitive. Because of the state-dependent nature of transmission transfer capability between regions, itself a function of generation use, the quality of competition in the wholesale generation markets can vary significantly and may be susceptible to market power abuse by dominant suppliers. Mr. Graves helped one of the largest ISOs in the U.S. develop market monitoring procedures to detect and discourage market manipulations that would impair competition.

- Vertical market power arises when sufficient control of an upstream market creates a competitive advantage in a downstream market. It is possible for this problem to arise in power supply, in settings where the likely marginal generation is dependent on very few fuel suppliers who also have economic interests in the local generation market. Mr. Graves analyzed this problem in the context of the California gas and electric markets and filed testimony to explain the magnitude and manifestations of the problem.

- The increased use of transmission congestion pricing has created interest in merchant transmission facilities. Mr. Graves assisted a developer with testimony on the potential impacts of a proposed line on market competition for transmission services and adjacent generation markets. He also assisted in the design of the process for soliciting and ranking bids to buy tranches of capacity over the line.

- Many regions have misgivings about whether the preconditions for retail electric access are truly in place. In one such region, Mr. Graves assisted a group of industrial customers with a critique of retail restructuring proposals to demonstrate that the locally weak transmission grid made adequate competition among numerous generation suppliers very implausible.

*Electric and Gas Transmission*

- For the electric utility regulatory commission of Colombia, S.A., Mr. Graves led a study to assess the inadequacies in the physical capabilities and economic incentives to manage voltages at adequate levels. The *Brattle* team developed minimum reactive power support obligations and supplement reactive power acquisition mechanisms for generators, transmission companies, and distribution companies.

- On behalf of the Electric Power Research Institute (EPRI), Mr. Graves wrote a primer on how to define and measure the cost of electric utility transmission capacity for better planning, pricing, and regulatory policies. The text covers the basic electrical engineering of power circuits, utility practices to exploit transmission economies of scale, means of assuring system stability, economic dispatch subject to transmission constraints, and the estimation of marginal costs of transmission. The implications for a variety of policy issues are also discussed.

- The natural gas pipeline industry is wedged between competitive gas production and competitive resale of gas delivered to end users. In principle, the resulting basis differentials between locations around the pipeline ought to provide efficient usage and expansion signals, but traditional pricing rules prevent the pipeline companies from participating in the marginal value of their own services. Mr. Graves worked to develop alternative pricing mechanisms and service mixes for pipelines that would provide more dynamically efficient signals and incentives.

- Mr. Graves analyzed the spatial and temporal patterns of marginal costs on gas and electric utility transmission networks using optimization models of production costs and network flows. These results were used by one natural gas transmission company to design receipt-point-based transmission service tariffs, and by another to demonstrate the incremental costs and uneven

distribution of impacts on customers that would result from a proposed unbundling of services.

*Utility Operations*

- Several utilities with coal-fired power plants are facing allegations from the U.S. EPA that they have conducted past maintenance on these plants which should be deemed "major modifications", thereby triggering New Source Review standards for air quality controls. Mr. Graves has helped one such utility assess limitations on the way in which GADS data can be used retrospectively to quantify comparisons between past actual and projected future emissions. For another utility, Mr. Graves developed estimates of changes in emissions before and after repairs using production costing simulations. In both cases, testimony was presented.

- The U.S. Government is contractually obligated to dispose of spent nuclear fuel at commercial reactors after January 1998, but it has not fulfilled this duty. As a result, nuclear facilities that are shutdown or facing full spent fuel pools are facing burdensome costs and risks. Mr. Graves prepared testimony on the incremental costs being borne by three nuclear operating companies with shutdown units as a result of this federal failure to perform.

- Capturing the full value of hydroelectric generation assets in a competitive power market is heavily dependent on operating practices that astutely shift between real power and ancillary services markets, while still observing a host of non-electric hydrological constraints. Mr. Graves led studies for several major hydro generation owners in regard to forecasting of market conditions and corresponding hydro schedule optimization. He has also designed transfer pricing procedures that create an internal market for diverting hydro assets from real power to system support services firms that do not yet have explicit, observable market prices.

- The impacts of transmission open access and generation competition on utility financial health are well documented. In addition, there substantial impacts on fuel suppliers, due to revised dispatch, repowerings and retirements, changes in expansion mix, and altered load shapes and load growth under more competitive pricing. For EPRI, Mr. Graves contributed to a study that projected changes in fuel use within and between ten large power market

regions spanning the country under different scenarios for the pace and success of restructuring.

- Mr. Graves led a gas distribution company in the development of an incentive ratemaking system to replace all aspects of its traditional cost of service regulation. The base rates (for non-fuel operating and capital costs) were indexed on a price-cap basis (RPI-X), while the gas and upstream transportation costs allowances were tied to optimal average annual usage of a reference portfolio of supply and transportation contracts. The gas program also included numerous adjustments to the gas company's rate design, such as designing new standby rates so that customer choice will not be distorted by pricing inefficiencies.

- An electric utility with several out-of-market independent power contracts wanted to determine the value of making those plants dispatchable and to devise a negotiating strategy for restructuring the IPP agreements. Mr. Graves developed a range of forecasts for the delivered price of natural gas to this area of the country. Alternative ways of sharing the potential dispatch savings were proposed as incentives for the IPPs to renegotiate their utility contracts.

- For an electric utility considering the conversion of some large oil-fired units to natural gas, Mr. Graves conducted a study of the advantages of alternative means of obtaining gas supplies and gas transportation services. A combination of monthly and daily spot gas supplies, interruptible pipeline transportation over several routes, gas storage services, and "swing" (contingent) supply contracts with gas marketers was shown to be attractive. Testimony was presented on why the additional services of a local distribution company would be unneeded and uneconomic.

- A power engineering firm entered into a contract to provide operations and maintenance services for a cogenerator, with incentives fees tied to the unit's availability and operating cost. When the fees increased due to changes in the electric utility tariff to which they were tied, a dispute arose. Mr. Graves provided analysis and testimony on the avoided costs associated with improved cogeneration performance under a variety of economic scenarios and under several alternative utility tariffs.

- Mr. Graves helped several pipelines design incentive pricing mechanisms for recovering their expected costs and reducing their regulatory burdens. Among these have been Automatic Rate Adjustment Mechanisms (ARAMs) for indexation of operations and maintenance expenses, construction-cost variance-sharing for routine capital expenditures that included a procedure for eliciting unbiased estimates of future costs, and market-based prices capped at replacement costs when near-term future expansion was an uncertain but probable need.

- For a major industrial gas user, he prepared a critique of the transportation balancing charges proposed by the local gas distribution company. Those charges were shown to be arbitrarily sensitive to the measurement period as well as to inconsistent attribution of storage versus replacement supply costs to imbalance volumes. The tariff design, a commodity charge on a per-cash-in/cash-out at spot market gas prices with penalties for very deep imbalances, or an incremental storage inventory and withdrawal capacity used on-peak, were shown to be cheaper, more efficient, and less complex to administer. This analysis helped the parties reach a settlement based on the cash-in/cash-out design.

- The Clean Air Act Amendment authorized electric utilities to trade emission allowances (EAs) as part of their approach to complying with $SO_2$ emissions reductions targets. For the Electric Power Research Institute (EPRI), Mr. Graves developed multi-stage planning models to illustrate how the considerable uncertainty surrounding future EA prices justifies waiting to invest in irreversible control technologies, such as scrubbers or SCRs, until the present value cost of such investments is significantly below that projected from relying on EAs.

- For an electric utility with a troubled nuclear plant, Mr. Graves presented testimony on the economic benefits likely to ensue from a major reorganization. The plant was to be spun off to a jointly-owned subsidiary that would sell available energy back to the original owner under a contract indexed to industry unit cost experience. This proposal afforded a considerable reduction of risk to ratepayers in exchange for a reasonable, but highly uncertain prospect of profits for new investors. Testimony compared the incentive benefits and potential conflicts under this arrangement to the

outcomes foreseeable from more conventional incentive ratemaking arrangements.

- Mr. Graves helped design Gas Inventory Charge (GIC) tariffs for interstate pipelines seeking to reduce their risks of not recovering the full costs of multi-year gas supply contracts. The costs of holding supplies in anticipation of future, uncertain demand were evaluated with models of the pipeline's supply portfolio that reveal how many non-production costs (demand charges, take-or-pay penalties, reservation fees, or remarketing costs for released gas) would accrue under a range of demand scenarios. The expected present value of these costs provided a basis for the GIC tariff.

- Mr. Graves performed a review and critique of a state energy commission's assessment of regional natural gas and electric power markets in order to determine what kinds of pipeline expansion into the area was economic. A proposed facility under review for regulatory approval was found to depend strongly on uneconomic bypass of existing pipelines and LDCs. In testimony, modular expansion of existing pipelines was shown to have significantly lower costs and risks.

- For several electric utilities with generation capacity in excess of target reserve margins, Mr. Graves designed and supervised market analyses that compared the marginal operating costs of all power plants not needed to meet target reserves to the marginal costs for 50 to 100 neighboring utilities. These cost curves were then overlaid on the corresponding curve for the client utility to identify which neighbors were competitors and which were potential customers. The strength of their relative threat or attractiveness could be quantified by the present value of the product of the amount, duration, and differential cost of capacity that was displaceable by the client utility.

- Mr. Graves specified algorithms for the enhancement of the EPRI EGEAS generation expansion optimization model, to capture the first-order effects of financial and regulatory constraints on the preferred generation mix.

- For a major electric power wholesaler, Mr. Graves developed a framework for estimating how pricing policies affect the relative attractiveness of capacity expansion alternatives. Traditional cost-recovery pricing rules can significantly distort the choice between two otherwise equivalent capacity

plans, if one includes a severe "front end load" while the other does not. Price-demand feedback loops in simulation models and quantification of consumer satisfaction measures were used to appraise the problem. This "value of service" framework was generalized for the Electric Power Research Institute.

- For a large gas and electric utility, Mr. Graves participated in coordinating and evaluating the design of a strategic and operational planning system. This included computer models of all aspects of utility operations, from demand forecasting through generation planning to financing and rate design. Efforts were split between technical contributions to model design and attention to organizational priorities and behavioral norms with which the system had to be compatible.

- For a major electronic and semiconductor firm, Mr. Graves critiqued and refined a proposed procedure for ranking the attractiveness of research and development projects. Aspects of risk peculiar to research projects were emphasized over the standards used for budgeting an already proven commercial venture.

- For an oil and gas exploration and production firm, Mr. Graves developed a framework for identifying what industry groups were most likely to be interested in natural gas supply contracts featuring atypical risk-sharing provisions. These provisions, such as price indexing or performance requirements contingent on market conditions, are a form of product differentiation for the producer, allowing it to obtain a price premium for the insurance-like services.

- For a natural gas distribution company, Mr. Graves established procedures for redefining customer classes and for repricing gas services according to customers' similarities in load shape, access to alternative gas supplies, expected growth, and need for reliability. In this manner, natural gas service was effectively differentiated into several products, each with price and risk appropriate to a specific market. Planning tools were developed for balancing gas portfolios to customer group demands.

- For a Midwestern electric utility, Mr. Graves extended a regulatory *pro forma* financial model to capture the contractual and tax implications of canceling

and writing off a nuclear power plant in mid-construction. This possibility was then appraised relative to completion or substitution alternatives from the viewpoints of shareholders (market value of common equity) and ratepayers (present value of revenue requirements).

- For a corporate venture capital group, Mr. Graves conducted a market-risk assessment of investing in a gas exploration and production company with contracts to an interstate pipeline. The pipeline's market growth, competitive strength, alternative suppliers, and regulatory exposure were appraised to determine whether its future would support the purchase volumes needed to make the venture attractive.

- For a natural gas production and distribution company, he developed a strategic plan to integrate the company's functional policies and to reposition its operations for the next five years. Decision analysis concepts were combined with marginal cost estimation and financial *pro forma* simulation to identify attractive and resilient alternatives. Recommendations included target markets, supply sources, capital budget constraints, rate design, and a planning system. A two-day planning conference was conducted with the client's executives to refine and internalize the strategy.

- For the New Mexico Public Service Commission, he analyzed the merits of a corporate reorganization of the major New Mexico gas production and distribution company. State ownership of the company as a large public utility was considered but rejected on concerns over efficiency and the burdening of performance risks onto state and local taxpayers.

*Financial Analysis*

- As a tax-revenue enhancement measure, the IRS was considering a plan to recapture deferred taxes associated with generation assets that were divested or reorganized during state restructurings for retail access. Mr. Graves prepared a white paper demonstrating the unfairness and adverse consequences of such a plan, which was instrumental in eliminating the proposal.

- The energy and telecom industries have been plagued by scandals regarding alleged trading and accounting misrepresentations, such as wash trades, manipulations of mark-to-market valuations, premature recognition of revenues, and improper use of off-balance sheet entities. In many cases, this

conduct has preceded or caused financial collapse and subsequent shareholder suits. Mr. Graves lead research on accounting and financial evidence for such misconduct, including event studies of the stock price movements around the time of the contested practices, and reconstruction of accounting and economic justifications for the way asset values and revenues were recorded.

- Recent gas price increases in the U.S. put several natural gas and electric utilities in the position of having to counter claims that they should have hedged more of their fuel supplies at times in the past. Mr. Graves developed testimony to rebut this hindsight criticism and risk management techniques for fuel (and power) procurement for utilities to apply in the future to avoid prudence challenges.

- A large public power agency was concerned about its debt capacity in light of increasing competitive pressures to allow its resale customers to use alternative suppliers. Mr. Graves lead a team that developed an Economic Balance Sheet representation of the agency's electric assets and liabilities in market value terms, which was analyzed across several scenarios to determine safe levels of debt financing. In addition, new service pricing and upstream supply contracting arrangements were identified to help reduce risks.

- Wholesale generating companies intuitively realize that there are considerable differences in the financial risk of different kinds of power plant projects, depending on fuel type, length and duration of power purchase agreements, and tightness of local markets. However, they often are unaware of how if at all to adjust the hurdle rates applied to valuation and development decisions. Mr. Graves lead a Brattle analysis of risk-adjusted discount rates for generation; very substantial adjustments were found to be necessary.

- A major telecommunications firm was concerned about when and how to reenter the Pacific rim for wireless ventures following the economic collapse of that region in 1997-99. Mr. Graves lead an engagement to identify prospective local partners with a governance structure that made it unlikely for them to divert capital from the venture if markets went soft. He also helped specify contracting and financing structures that create incentives for the venture to remain together should it face financial distress, while offering strong returns under good performance.