12. "Opportunities for Electricity Storage in Deregulating Markets" (with Thomas Jenkin and Dean Murphy), *The Electricity Journal*, October 1999.

13. *How Competitive Market Dynamics Affect Coal, Nuclear and Gas Generation and Fuel Use – A 10 Year Look Ahead* (with L. Borucki, R. Broehm, S. Thumb, and M. Schaal), Final Report, May 1999, TR-111506 (Palo Alto, CA: Electric Power Research Institute, 1999).

14. "Price Caps for Standard Offer Service: A Hidden Stranded Cost" (with Paul Liu), *The Electricity Journal*, Volume 11, Number 10, December 1998.

15. *Mechanisms for Evaluating the Role of Hydroelectric Generation in Ancillary Service Markets* (with R.P. Broehm, R.L. Earle, T.J. Jenkin, and D.M. Murphy), Final Report, November 1998, TR-111707 (Palo Alto, CA: Electric Power Research Institute, 1998).

16. "PJM Market Competition Evaluation White Paper," (with Philip Hanser), prepared for PJM, L.L.C., October, 1998.

17. *Energy Market Impacts of Electric Industry Restructuring: Understanding Wholesale Power Transmission and Trading* (with S.L. Thumb, A.M. Schaal, L.S. Borucki, and R. Broehm), Final Report, March 1998, EPRI TR-108999, GRI-97/0289 (Palo Alto, CA: Electric Power Research Institute, 1998).

18. "One-Part Markets for Electric Power: Ensuring the Benefits of Competition" (with E. Grant Read, Philip Q Hanser, and Robert L. Earle), Chapter 7 in *Power Systems Restructuring: Engineering and Economics*, M. Ilić, F. Galiana, and L. Fink, eds. (Boston: Kluwer Academic Publishers, 1998, reprint 2000), pp. 243-280.

19. "Railroad and Telecommunications Provide Prior Experience in 'Negotiated Rates'" (with Carlos Lapuerta), *Natural Gas*, July 1997.

20. "The Economics of Negative Barriers to Entry: How to Recover Stranded Costs and Achieve Competition on Equal Terms in the Electric Utility Industry" (with William B. Tye), Electric Industry Restructuring, *Natural Resources Journal*, Volume 37, No. 1,Winter 1997.

21. "Capacity Prices in a Competitive Power Market" (with James A. Read), *The Virtual Utility: Accounting, Technology & Competitive Aspects of the Emerging Industry*, S. Awerbuch and A. Preston, eds. (Boston: Kluwer Academic Publishers, 1997), pages 175-192.

22. "Stranded Cost Recovery and Competition on Equal Terms" (with William B. Tye), *Electricity Journal*, Volume 9, Number 10, December 1996.

23. "A Framework for Operations in the Competitive Open Access Environment" (with Marija D. Ilić, Lester H. Fink, Albert M. DiCaprio), *Electricity Journal*, Volume 9,

Number 3, April 1996.

24. "Potential Impacts of Electric Restructuring on Fuel Use," EPRI *Fuel Insights*, Issue 2, September 1995.

25. "Optimal Use of Ancillary Generation Under Open Access and its Possible Implementation" (with Maria Ilić), *M.I.T. Laboratory for Electromagnetic and Electronic Systems Technical Report*, LEES TR-95-006, August 1995.

26. *A Primer on Electric Power Flow for Economists and Utility Planners*, TR-104604, The Electric Power Research Institute, EPRI Project RP2123-19, January 1995.

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| PACIFIC GAS AND ELECTRIC COMPANY, Plaintiff, | : | No. 04-74C (into which has been consolidated No. 04-75C) (Judge Hewitt) |
| v. | : | |
| UNITED STATES OF AMERICA, Defendant. | : | |

**Expert Report of Brad Cornell (11/10/2005)**

**I. Qualifications**

(1) I am a Visiting Professor of Finance at the California Institute of Technology. I am also a Senior Consultant to CRA International (CRA). I earned a M.S. degree in Statistics from Stanford University in 1974 and earned my Ph.D. degree in Financial Economics also from Stanford University in 1975.

(2) Since 1975, I have taught a variety of courses, including courses involving corporate valuation, the law and finance of corporate acquisitions and restructuring, corporate financial theory, and securities valuation and investments. Prior to joining the Cal Tech faculty, I was Director of the Bank of America Research Center at the Anderson Graduate School of Management at the University of California, Los Angeles (UCLA). At UCLA, I twice served as Vice-Chairman of the Anderson School and twice served as Chairman of the Finance Department. I have also taught

at the UCLA Law School. Aside from my teaching responsibilities, I have been active in research. I have written more than 70 articles and two books on finance and securities, *Corporate Valuation: Tools for Effective Appraisal and Decision-Making*, published by McGraw-Hill, and *The Equity Risk Premium and the Long-Run Future of the Stock Market*, published by John Wiley. To complement my academic writing, I have also authored articles for *The Wall Street Journal* and the *Los Angeles Times*.

(3) My research has been widely recognized. In 1988, I was cited by the Financial Management Association as one of the ten most prolific authors in the field of finance. I have also received prizes and grants for my research from the Chicago Board of Trade, the Chicago Mercantile Exchange and the Institute for Quantitative Research in Finance. My article, "Corporate Stakeholders and Corporate Finance," for which my co-author, Alan C. Shapiro, and I received the 1987 Distinguished Applied Research Award from the Financial Management Association, is one of the most frequently cited article published in Financial Management since 1985. In 1999, I was awarded the I/B/E/S prize for empirical work in finance and accounting (with Wayne Landsman and Jennifer Conrad.)

(4) I have also been active in my profession. I am a past Vice-President of the Western Finance Association. I am also a past director of both the American Finance Association and the Western Finance Association. I have served as an associate editor of numerous professional journals

including: *The Journal of Finance*, *The Journal of Futures Markets*, *The Journal of Financial Research* and *The Journal of International Business Studies*. I have served as a reviewer for nearly a dozen other professional journals. I am currently a member of the Pension Policy Board of the Aerospace Corporation.

(5) My background is described more fully in my curriculum vitae, which is attached hereto as Exhibit 1. A list of my publications including those published over the last ten years is also included as part of Exhibit 1. A list of my deposition and trial testimony over the last four years is attached as Exhibit 2.

(6) CRA charges $650 per hour for my services.

## II. Purpose

(7) I have been asked by counsel for Pacific Gas & Electric (PG&E) to determine damages assuming that PG&E's claim regarding breach of contract by the Federal government (hereafter, the government) with regard to spent nuclear fuel removal is found valid. According to the claim, absent breach the government would have removed spent nuclear fuel and high level radioactive waste (together "spent fuel") from PG&E's Humboldt nuclear plant by the end of 1998, and from PG&E's Diablo Canyon plant by approximately 2006.

## III. Summary of Findings

(8) Based on my review of PG&E financial data, and discussions with PG&E staff, I have calculated PG&E's damages to total $72.0 million through

2003, $96.6 million through 2004, $128.2 million through 2005, $172.9 million through 2006, $202.5 million through 2007 and $273.7 million through 2012. These figures reflect damages to PG&E because of the government's failure to remove spent fuel from both Humboldt Bay and Diablo Canyon power plants consistent with contractual obligations as claimed by PG&E. Damages are calculated through several potential end dates that may be decided by the Court. For this analysis, the end of 2007 is assumed to be the time at which damages will be awarded. The end of 2012 is assumed to be the earliest point in time at which the government may pick up PG&E's spent fuel. Additional damages will result should the government fail to remove spent fuel from PG&E's plants by that time.

## IV. Documents Relied On

(9) The documents that I considered to calculate damages are listed in Appendix C.

## V. Methodology and Results

(10) I have relied on a standard approach to determining damages in a breach of contract claim, which is to compare PG&E's actual costs to the costs PG&E would have incurred "but for" the breach. Damages are the costs incurred by PG&E as a result of breach. The relevant period for this comparison is the early 1990s through December 2012. The start date is the time at which PG&E determined that there existed sufficient uncertainty as to whether the DOE would perform for it to be necessary to

begin planning and devoting valuable resources for additional spent fuel management beyond the contractual date for removal by the government. Counsel has asked me to determine damages over various end dates because of uncertainty as to the appropriate period over which damages may be claimed. I have not calculated any pre-judgment interest, as I understand such interest is not legally available in this case. I have applied discounting to incremental costs from 2008 onwards. All costs are calculated on a pre-tax basis because the award itself will be taxed.

(11) I have reviewed PG&E's costs in seven separate activities related to spent fuel storage and management:

1. Humboldt SAFSTOR;[1]
2. Humboldt Independent Spent Fuel Storage Installation (ISFSI);
3. Humboldt Stack Removal;
4. Diablo Canyon ISFSI;
5. Diablo Canyon Temporary Racks;
6. Diablo Canyon Storage Options Study; and
7. Offsite Storage Evaluations.

(12) Based on discussions with PG&E's staff and review of cost analyses prepared by PG&E, it is my opinion that these categories reasonably characterize the elements of damage PG&E has or expects to incur as a

[1] SAFSTOR is not an acronym. It is defined in the NRC's Information Digest, 2004-2005 Edition (NUREG-1350, Vol. 16, Rev. 1) as, "A method of decommissioning in which the nuclear facility is placed and maintained in such condition that the nuclear facility can be safely stored and subsequently decontaminated (deferred decontamination) to levels that permit release for unrestricted use." See http://www.nrc.gov/reading-rm/doc-collections/nuregs/staff/sr1350/v17/sr1350v17.pdf (visited November 1, 2005).

consequence of the government's breach. During the course of this engagement, my staff and I inquired as to whether there were any other incremental costs or benefits caused by the breach. No other incremental costs or benefits have been identified.

(13) PG&E has provided me with records of actual costs incurred under each of these categories. PG&E has also provided me with projected costs. Two of the cost categories concern the evaluation of storage options. Three of the cost categories – the ISFSI installations and the temporary storage racks at Diablo Canyon – relate to the storage of spent fuel. For each of these five cost categories, evaluating the incremental cost associated with the breach is straightforward (notwithstanding cost allocation issues which I discuss below) because the evaluation and construction of assets designed to store spent fuel beyond the date it would have been removed is unnecessary absent the breach.

(14) Two cost categories require additional consideration of costs but for breach. The removal of the Humboldt stack would have occurred even without the breach (and at about the same time) as part of Humboldt decommissioning. With the breach, the stack was removed in 1999 due to concerns with stability near a seismic fault line. However, under the breach the cost of removing the stack following DOE's breach was higher because, first, additional steps in de-construction had to be undertaken to prevent the stack from collapsing into the area containing spent fuel, and second, a smaller replacement stack had to be constructed to permit

ventilation discharge from the Humboldt Bay plant. The incremental cost of the breach to PG&E with respect to stack removal costs is the cost of undertaking these additional steps.

(15) But for the breach, some costs for Humboldt SAFSTOR would still have been incurred. PG&E is damaged only to the extent that SAFSTOR costs, as a result of the breach, are made larger or made to last longer (or both). In the "but for" scenario, the government would have removed spent nuclear fuel in 1998. Absent the breach, SAFSTOR costs after 1998 would have been zero because spent fuel would have been removed and the decommissioning of Humboldt Bay would have commenced. SAFSTOR costs up to 1998 are the same with or without the breach. The incremental cost of the breach to PG&E in this activity is therefore all SAFSTOR costs incurred from 1999 onwards.

**A. "But For" Costs Implicit In Other Damages Calculations**

(16) Calculating the incremental cost of the breach necessarily requires me to identify the costs that would have been incurred by PG&E absent the breach. Two approaches are possible. One is to calculate the costs of PG&E's entire Humboldt and Diablo Canyon operations with the breach and without the breach (assuming no change in revenues between scenarios). In this case, damages are the difference in costs under each scenario. There are no changes in revenues that have to be considered in the "but for" analysis because there is no change in output at either plant as a result of the breach. This approach is unnecessarily broad in scope.

 Confidential – Subject to Protective Order

(17) As a more direct and practical approach, I estimate incremental "but for" costs recognizing first that only a subset of PG&E's costs are sensitive to DOE's breach, and second, as discussed above, in all but two of the seven cost categories, "but for" costs are zero.[2] Narrowing the scope in this way simplifies the analysis tremendously without any reduction in accuracy. My staff inquired about system-wide benefits to PG&E of breach, in particular whether breach projects produced any incoming revenue streams for PG&E or reduced costs elsewhere in the organization, but PG&E's staff were unable to point to any benefits.

**B. Measuring Costs**

(18) Information necessary to develop cost estimates was gathered through a process of communication between PG&E and my staff. This process occurred over a seven month period beginning March 2005, commencing with a series of conference calls that involved numerous PG&E parties and consultants who were knowledgeable about the operations of the two power plants, and/or were familiar with the costs and activities involved in the storing of spent fuel. These parties included personnel in budgeting and risk management at PG&E, managers in charge of projects directly related to the government's breach, and PG&E's outside consultants. In these initial calls, my staff developed an understanding of the obligations of the various parties and the amounts and timing of expenditures with and but for the breach. My staff received files primarily from Robert Kapus,

[2] Storage cost studies, design and construction of the two ISFSIs and the Diablo Canyon temporary rack would not have been required had DOE met its obligation in a timely manner. However, some stack removal and SAFSTOR costs would have been incurred without breach.

Financial Services Manager at Humboldt Bay, documenting contracts PG&E has with outside suppliers, and documenting the costs incurred by PG&E related to the storage of spent fuel.[3] This information was used by PG&E to provide a preliminary damage estimate in PG&E's RCFC[4] 26(a)(1) Disclosures of April 22, 2005.

(19) Subsequent to that submission, additional investigation and analysis was undertaken to develop the damages estimate included in this report. The development of this cost estimate included four distinct phases.

(20) The first phase was to develop a comprehensive understanding of the historic PG&E cost information for each of the seven cost categories. The task of assembling the documents related to these costs was undertaken by consultants from Celerity Consulting Group (Celerity), a litigation and business consulting firm. Documentation of these costs has been provided to me. In addition, my staff had on-site meetings with PG&E employees on June 7 and 8, 2005. These meetings were primarily concerned with historic data. In particular I asked that it be verified that the cost assumptions made by PG&E were consistent with an economist's definition of incremental costs as it is applied to a damages claim. In some cases, adjustments to calculations were made.[5] PG&E employees involved in these meetings in person or by phone included Robert Kapus; Jearl Strickland, Project Manager – Diablo Canyon (DCPP) Used Fuel

---

[3] Celerity Consulting Group (Celerity) has prepared back up documentation for costs claimed as damages.
[4] Rules of the United States Court of Federal Claims.
[5] For example, it was determined at this meeting that PG&E overheads may include some non-incremental overheads. I requested that these be reviewed and backed-out.

Storage Project; Bruce Patton, DCPP ISFSI Development Project Manager; and Larry Pulley, Project Manager - Humboldt Bay ISFSI Project. These meetings enabled my staff to further inform me regarding the cost data and assumptions. As a result of the meetings, a range of tasks related to obtaining additional cost information was identified. PG&E completed these tasks in the subsequent five months.

(21) A second phase of developing the damages claim was to understand PG&E's means of producing cost forecasts. Capital budgeting requires specific knowledge concerning the timing and value of expenditures on a particular project, and I have relied on three sources from PG&E for estimating future expenditures:

1. Contractually specified amounts, many subject to formal escalation adjustments (I address escalation separately);
2. Internal capital budgeting documentation. The estimates reviewed were actual internal capital budgeting documents, and in several cases had been submitted to and approved by the management committee of PG&E; and
3. The estimates by project managers at PG&E who have specific knowledge on the expected timing and value of expenditures.

(22) The primary contact at PG&E for this information was Robert Kapus. In all cases, my staff has documented the sources used for each of the forecast cost items. These sources are included in Appendix C.

(23) A third phase required developing a forecast of labor and materials indices for use in forecasting costs under PG&E's contracts with cask/canister company Holtec. There were two main issues to consider in producing indices forecasts. The first was to determine which series to use. The Holtec contracts require that cost escalations over time be determined by applying ten contractually-specified, publicly-available indices, which I refer to as "the Holtec indices". However, seven Holtec indices have been discontinued and the contract is unclear about how to determine replacement indices for some of these discontinued indices. Replacement series are currently being negotiated. I have considered the contract and identified replacement series which appear to me to be consistent with the contract. My selections are effectively placeholders pending the outcome of negotiations. If the dispute is resolved – either by agreement or through arbitration – my selected series will be replaced with the series resulting from negotiations or arbitration decisions. The second issue is to forecast the growth rates of these indices out to December 2012. I describe my forecasting method in Appendix E.2.

(24) A fourth phase in developing the damages claim was to determine incremental allocated costs for breach projects. PG&E has a body of allocated support costs. Only some of these costs are borne in support of breach activities. I therefore instructed my staff to check PG&E's accounting data and to remove all allocated costs not incremental to

breach activities. I describe in more detail my treatment of allocated costs in paragraphs (39) to (51).

### C. Discounting

(25) I have been asked to consider all costs incurred through December 2007 to be pre-judgment and to exclude pre-judgment interest from these cash flows. For incremental costs forecast to be incurred by PG&E between January 2008 and December 2012 inclusive, discounting is required to compute their present value as of January 1, 2008. Depending on the interpretation of the costs, there are two choices for the discount rate.

(26) One way to interpret the costs is as a reimbursement stream that the court will require the government to pay PG&E. As such, the stream is virtually risk free and should be discounted at the after-tax yield on U.S. government securities with a duration comparable to the payment stream. The after-tax rate is used because PG&E will have to pay tax on any award it receives.

(27) The alternative is to treat the estimated cost stream as having a risk profile comparable to PG&E's on-going business. Under this interpretation, the risk arises from the fact that actual costs may diverge from the estimates in the normal course of business. If this framework is correct, the appropriate discount rate is PG&E's after-tax, weighted-average cost of capital, or WACC. Because the WACC exceeds the yield on U.S. Treasury securities, discounting at the WACC will lead to smaller damage estimates.

(28) For current purposes I use the WACC to discount the projected incremental costs for 2008 to 2012. Calculation of the WACC requires an estimate of the after-tax cost of debt (and the cost of preferred stock, if any), the cost of equity, and the relative weights of debt and equity in the company's capital structure. To calculate the after-tax cost of debt, I use the weighted average yield to maturity on PG&E's outstanding debt that has been reported in Standard & Poor's October 2005 Bond Guide.[6] As shown in Appendix F, the average yield to maturity is 5.47%, which comes to 3.24% on an after-tax basis assuming a tax rate of 40.75%.[7] This rate is the combined state and federal marginal tax rates for PG&E.

(29) For the cost of equity, I have been asked to use PG&E's currently authorized return on equity of 11.22%.[8] The relative weights of debt and equity (including preferred stock) are 37.4% and 62.6% respectively. Multiplying the after-tax cost of debt and the cost of equity by these weights produces an after-tax WACC of 8.24%.[9] This is the rate I use to discount the projected costs from 2008 to 2012.

**D. Decommissioning Costs**

(30) Decommissioning is defined as the removal and safe disposal of radioactive components and materials and the cleaning of radioactive contamination remaining in buildings and on the site. Various

[6] This Bond Guide does not show all of PG&E's long-term debt instruments. Consequently, PG&E debt instruments not listed in the Bond Guide have been excluded from this yield to maturity analysis because of insufficient data.
[7] For the derivation of the combined federal and state tax, see Table 17 in Appendix F.
[8] http://biz.yahoo.com/e/050511/pcg8-k.html, visited October 26, 2005.
[9] See Appendix F for calculation details.

 Confidential – Subject to Protective Order

decommissioning costs would arise (though at different times) whether or not the government had breached the contract. For example, PG&E will incur spent fuel loading costs (to DOE) with or without the breach. But for the breach, loading would have occurred from the spent fuel pools, whereas with the breach loading will be from dry storage. Plant decommissioning will occur with or without the breach. The timing and amount of these costs, both in the actual and "but for" worlds, is uncertain. Therefore, the most reasonable assumption that can be made at this juncture is that the present value of these costs will be approximately the same for both the actual and "but for" worlds. In making this assumption, I am effectively assuming that the rising costs of such decommissioning activities anticipated by PG&E is offset by the discount rate.

**E. Results**

(31) I present my damage calculations for each of the seven categories below. For each category, my staff and I have reviewed PG&E's actual cost data and its forecast of future costs. With respect to cost projections, I have reviewed the underlying assumptions and methods and made modifications where I thought appropriate. These modifications are discussed below. There are two cost/benefit categories that my analysis does not account for, but which could affect total damages. These are (1) the land consumed for temporary spent fuel storage, and (2) swap benefits and costs. With respect to land consumed for temporary storage, although PG&E already owns the property that will be used for temporary storage,

this use constitutes a cost because PG&E could otherwise use the land for other purposes. I have not been provided with information to quantify this cost at present.[10] Swap benefits refer to the gains from the exchange of fuel removal rights "but for" the breach compared to expected gains or losses from later exchanges which may actually take place. The value of any foregone gains from swaps is addressed by Frank C. Graves.

(32) Taking account of all of the foregoing, my findings are summarized in Table 1. More detailed schedules of damages by category are included in Appendix A.

[10] However, I reserve the right to include an estimate for damages related to loss of land use if sufficient information is provided to me prior to trial.

**Table 1: Incremental Cost of DOE Breach**

| *(millions of dollars)* | Costs through 2003 | Costs through 2004 | Costs through 2005 | Costs through 2006 | Costs through 2007 | Costs through 2012 |
|---|---|---|---|---|---|---|
| 1. Humboldt SAFSTOR | $35.5 | $44.8 | $53.5 | $63.3 | $72.8 | $89.8 |
| 2. Humboldt ISFSI | $8.3 | $9.8 | $14.3 | $20.0 | $28.1 | $45.8 |
| 3. Humboldt Stack Removal | $0.9 | $0.9 | $0.9 | $0.9 | $0.9 | $0.9 |
| 4. Diablo Canyon ISFSI | $24.4 | $36.1 | $53.1 | $79.1 | $91.1 | $127.4 |
| 5. Diablo Canyon Temporary Racks | $0.5 | $2.7 | $4.0 | $7.2 | $7.2 | $7.4 |
| 6. Diablo Canyon Storage Options Study | $1.5 | $1.5 | $1.5 | $1.5 | $1.5 | $1.5 |
| 7. Offsite Storage Evaluations (Humboldt and Diablo Canyon) | $0.9 | $0.9 | $0.9 | $0.9 | $0.9 | $0.9 |
| Total | $72.0 | $96.6 | $128.2 | $172.9 | $202.5 | $273.7 |

(33) In the remaining parts of my report I describe my treatment of two important aspects of the damage calculation – Holtec escalation and cost allocations – before setting out more specific details of my treatment of each of the seven breach-related projects.

**F. Holtec Escalation**

(34) PG&E has contracts in place with Holtec for the design, cast fabrication and construction oversight of ISFSIs at the Humboldt and Diablo Canyon

plants. The contracts were finalized in 2001 and will be in place for many years. The contracts specify costs in considerable detail but there is recognition of, and a response to, the uncertainty associated with changes in prices for labor and materials over such a long time. Under heading "Price Adjustment Methods," the Holtec contracts provide for escalations in materials and labor costs. Escalation is effected by tying the price of fabrication components to publicly-available cost indices.

(35) The Diablo Canyon and Humboldt Bay contracts specify the use of the indices as shown in Table 2.

**Table 2: Holtec Escalation Indices for Diablo Canyon and Humboldt Bay Power Plants**

| Series Code | Series Description | DCPP Escalation | HBPP Escalation | Series Status |
|---|---|---|---|---|
| EEU31344104 | Average Weekly Earnings Of fabricated structural metal workers (Not seasonally adjusted) | MPC: Labor | MPC-HBs: Labor | Discontinued March 2003 |
| ENR-Material Price Indexes | ENR-Material Price Indexes, Concrete, Ready-Mix, 4000 p.s.i., Los Angeles | HISTORM (Storage Casks): Concrete | -- | Continues |
| NCS wages survey | NCS Mean hourly earnings of blue-collar occupations; machine operators, assemblers, and inspectors, Pittsburgh, Pa. | HISTORM (Storage Casks): Labor MPC: Labor Transfer Cask: Labor | HISTAR-HBs: Labor | Continues |
| EEU31344106 | Average Hourly Earnings Of fabricated structural metal workers (Not seasonally adjusted) | HISTORM (Storage Casks): Labor Transfer Cask: Labor Other Materials: Labor | HISTAR-HBs: Labor Other Equipment: Labor | Discontinued March 2003 |
| EEU80871106 | Average Hourly Earnings Of fabricated engineering services workers | Other Materials: Labor | MPC-HBs: Labor Services Home Office Engineering and Computer Code Utilization Cost Schedule | Discontinued March 2003 |
| WPU10170291 | Producer Price Index - Metals and metal products: Semifinished products, carbon (Not seasonally | Other Materials: Material | Other Equipment: Materials | Discontinued December 2003 |

| Series Code | Series Description | DCPP Escalation | HBPP Escalation | Series Status |
|---|---|---|---|---|
| | adjusted) | | | |
| WPU10170711 | Producer Price Index - Metals and metal products: Sheets, c.r., carbon (Not seasonally adjusted) | HISTORM (Storage Casks): Other Material Transfer Cask: All Other Material | -- | Discontinued December 2003 |
| WPU10240449 | Producer Price Index - Metals and metal products: Refined lead (Not seasonally adjusted) | Transfer Cask: Lead | -- | Continues |
| WPU10170455 | Producer Price Index - Metals and metal products: Plate and structurals, stainless (Not seasonally adjusted) | MPC: Material | MPC-HBs: Material | Discontinued December 2003 |
| WPU10170412 | Producer Price Index - | -- | HISTAR HBs: Material - Carbon Steel | Discontinued December 2003 |

(36) These indices raise two problems in calculating the value of breach damages through 2012:

1. The majority of the ten indices specified in the Holtec contract were discontinued in 2003. Although the Holtec contracts have rules for handling this eventuality, in only some cases do these rules point unambiguously to the appropriate replacement index.
2. The set of indices to be used must be forecast from the last available observation through 2012.

(37) I describe the process by which I identify replacement series and the forecasting procedure in Appendix E. My selected replacements are shown in Table 3. If negotiations (or arbitration) between PG&E and Holtec are finalized my selected series will be replaced with the series agreed to in negotiations (or determined by arbitration), and I will adjust

my damages determinations accordingly using the same methodology described in this report.

**Table 3: Selected Indices for Escalation Calculation**

| Specified Index | Series Description | Replacement Series | Series Description |
|---|---|---|---|
| EEU31344104 | Average weekly earnings of fabricated structural metal production workers | CEU3133231204 | Average weekly earnings of fabricated structural metal products production workers |
| EEU31344106 | Average hourly earnings of fabricated structural metal production workers | CEU3133231206 | Average hourly earnings of fabricated structural metal products production workers |
| EEU80871106 | Average hourly earnings of engineering services production workers | CEU6054134006 | Average hourly earnings of engineering and drafting services production workers |
| WPU10170291 | Producer price index for metals and metal products: semifinished products, carbon | WPU101702 | Producer price index for metals and metal products: semifinished steel mill products |
| WPU10170711 | Producer price index for metals and metal products: sheets, c.r., carbon | WPU101707 | Producer price index for metals and metal products: cold rolled sheets and strip |
| WPU10240449 | Producer price index for metals and metal products: refined lead | No Change | |
| WPU10170455 | Producer price index for metals and metal products: plate and structurals, stainless | WPU101704 | Producer price index for metals and metal products: hot rolled bars, plates, & structural shape |
| WPU10170412 | Producer price index for metals and metal products: Carbon plates | WPU101704 | Producer price index for metals and metal products: hot rolled bars, plates, & structural shape |
| ENR-Material Price Index | Concrete, Ready-Mix, 4000 p.s.i., Los Angeles | No Change | |
| National Compensation Survey (NCS) | Mean hourly earnings of Pittsburgh, Pa. machine operators, assemblers, and inspectors. | No Change | |

**G. Inflation**

(38) Non-Holtec costs, including the cost of PG&E's internal labor and materials, will also see cost increases as a result of general price inflation. I therefore add inflation to forecasts of non-Holtec costs from January 2006 through 2012. My forecasts assume future inflation of 2.9% in 2006, 2.5% for 2007 through 2009, 2.4% in 2010, and 2.5% in 2011 and 2012. These values are from US consensus inflation forecasts contained in the Blue Chip Economic Indicators.[11]

**H. Treatment of Accounting Overheads**

(39) I now describe my treatment of PG&E's cost allocations which affects all breach-related projects. PG&E internal labor and materials costs, including those related to the breach, are sourced from PG&E's accounting database SAP. The costs managed by this accounting system can be divided into two categories:

- Direct charge costs: costs which are directly charged to specific PG&E projects including the breach projects; and
- Allocated costs: costs which are not directly charged to specific PG&E projects in SAP but which are instead allocated to specific projects according to a standard accounting rule.

(40) The difference between the two cost categories can be illustrated with examples. A direct cost in the SAP system is the materials purchased for the construction of the ISFSI. Those materials, not being shared with any

[11] Blue Chip Economic Indicators, volume 30 number 10, October 10, 2005.