other project, constitute a direct charge cost. An example of an allocated cost is the cost of telephones and desktop PCs. These are generally purchased together for many projects, charged to a common cost pool, and the costs are then allocated to each project according to a standard accounting rule. In instances where telephones or desktop PCs are associated with a single project, they are charged directly to the project and counted as a direct cost.

(41) I have examined whether PG&E's treatment of allocated costs is consistent with the definition of incremental cost. In this case, incremental cost is defined as an economic cost incurred by PG&E that would not have been incurred absent the breach. By "economic cost" I mean both explicit costs in the form of additional expenditure by PG&E, or implicit costs which include costs due to foregone or delayed production or congestion of resources. As an example of these two forms of costs, consider the effect of the breach on PG&E's internal Information System Technology Services (ISTS) support. ISTS support can respond to the additional workload placed on it by the breach by either hiring an additional person (an explicit cost) or by making do with its existing labor and delaying service or lowering quality (an implicit cost). Whether explicit or implicit, the breach causes PG&E to incur economic costs that can be measured in dollars with reasonable accuracy.

(42) An examination of the costs being allocated to breach projects by SAP suggested that a portion of these allocated costs may not be incremental to the breach. An adjustment is required to "back out" those allocated costs that could not be shown to be incremental to the breach.

(43) To determine the required adjustments, I asked my staff to obtain descriptions of each item of allocated costs and the relationship of those costs to the breach. Based on this, my staff and I classified each item of allocated cost as belonging to one of the following five cost categories:

1. **Direct overheads.** Costs which are directly caused by breach projects but which are nevertheless accounted for as allocated costs, because of measurement imperfections or transactions costs in dealing with the small dollar values of some items. "Direct" overhead costs might include the cost of office stationery used by a breach project, or by an additional person in payroll hired to bear the higher workload with the breach. Ideally these costs would be charged directly to the project but have instead been captured by the PG&E accounts as allocated costs.
2. **Complementary overheads.** Costs which are complementary to other costs which are incremental to the breach. Complementary overheads include the telephone and PC required by every person at PG&E including those working on breach projects.
3. **Congested common resources diverted by breach projects to the detriment of another project.** When a breach project makes use of a common resource – that is, a resource that would have been purchased

by PG&E in the same amount absent the breach – other projects may be deprived of the common resource, which is costly. For example, PG&E's IT support department is a common resource and breach projects may divert a share of the department's resources. Even if the breach causes no additional costs to running the IT support (nobody extra is hired), PG&E incurs costs if the department is delayed in processing a repair order or if there is a higher error rate in conducting those repairs. The reasonable measure of such costs is the share of IT costs diverted to the breach project, which absent the breach PG&E would deploy and use productively on other worthwhile projects.

4. **Uncongested common resources diverted by breach project without detriment to another project.** This refers to common resources diverted by breach projects but without imposing costs elsewhere in PG&E.
5. **Common resources not diverted.** Common resources in this category are not employed by breach projects.

(44) The classification of allocated cost items into these five categories is included in Appendix B.

(45) Costs in categories 1, 2 and 3 are incremental to the breach and are therefore included in the claim. These categories include costs which have been proximately caused by the government's failure to perform. In contrast, Categories 4 and 5 have been excluded from my analysis of damages, because these resources are either entirely unaffected by the

breach or are resources used in breach projects that have not imposed clear opportunity costs on PG&E. An opportunity cost would arise if a resource diverted because of the government's breach could have been used to produce clear benefits in other activities of PG&E.

(46) The classification of categories 3 and 4 involves an element of judgment. The difference between these categories is whether the shared resource is congested or not, i.e., whether use of that resource by a breach project imposes costs on PG&E by depriving access to that resource by some other part of PG&E. A congested resource is placed in category 3 and a share of its cost is included in my determination of damages. An uncongested resource is placed in category 4 and there is no contribution of its costs to the damages claim.

(47) To determine whether a shared resource is congested or not, my staff and I have relied on the experience and judgment of PG&E staff. My staff and I have discussed the nature of these common resources with PG&E staff at some length to determine to the extent possible whether they are appropriately classified as category 3 or 4. Because the question whether category 3 and category 4 costs are appropriately included in breach damages depends on a factual assessment of whether diverted costs are congested or not, the issue is ultimately one for the court to decide. To assist with this, I have asked PG&E and its consultants at Celerity to separately calculate the value of category 3 and category 4 costs to allow the trier of fact to consider these categories separately should this be

required. I have calculated the effects if category 4 costs are considered incremental to the breach and summarize my findings in Appendix G.

(48) PG&E puts allocated costs into two categories. One category includes non-pension labor benefits and material burden costs (see footnote 12 for a complete list) and PG&E regularly includes these costs in "activity costs." "Activity cost" is a label used by PG&E for internal costs comprising labor, facility charges, materials and other cost categories.[12] All allocated costs in this first category are reflected in the activity costs in the schedules in Appendix A. However, as explained above, not all allocated costs are incremental. Accordingly, I have backed these non-incremental costs out of activity costs.[13]

(49) The other category of allocated costs includes pension, insurance and casualty costs, and company support costs, which I collectively refer to as "other support costs." Although PG&E accounts for other support costs, it does not regularly include other support costs in activity costs and I must therefore separately allocate the incremental portion of these costs. The process by which other support costs are included in the claim is as follows:

1. Each item of other support costs is placed into one of the five cost categories (as described above);

[12] "Activity Price Policy" (dated 12/7/2004) defines activity cost to include labor, non-productive time (vacation, sick), materials, PCC-specific contracts, employee-related costs (travel, training, conferences), desktop, facility charge, vehicles, and supervision and management and other support costs. Activity costs exclude costs of project-specific materials and contractors, which are directly charged.

[13] These backed out allocated costs are labeled "Non-Incremental Support Costs Backed Out" in Appendix A tables. Backed out costs are those which have been determined to be in cost categories 4 or 5.

2. The total value of other support costs in categories 1, 2 and 3 is calculated. This is the incremental other support cost;
3. This incremental other support cost is divided by total activity costs, producing a percentage ratio (*R*%);
4. The activity cost of each breach project is then multiplied by *R*% to determine its share of allocated other support costs;
5. These allocated other support costs are included in breach damages.

(50) This method results in the allocations of other support costs to activity costs shown in Table 4. Note that the amounts allocated to activity costs vary over time as allocated other support costs and activity costs change. PG&E was able to provide data on other support costs for 1999 through 2005 but does not produce forecasts of other support costs. To project future values of other support costs I have used 2005 other support costs percentages and applied these percentages to forecast activity costs through 2012. I have used 1999 other support cost percentages to calculate other support costs before 1999.

**Table 4: Allocations to Activity Costs for Other Support Costs**

| Allocated Cost | Pension, PBOPs, and LTD | Insurance and Casualty | Company Support |
|---|---|---|---|
| Pre-1999 | 0.3% | 0.0% | 5.0% |
| 1999 | 0.3% | 0.0% | 5.0% |
| 2000 | 1.5% | 0.0% | 3.9% |
| 2001 | 1.9% | 0.0% | 3.8% |
| 2002 | 8.3% | 2.6% | 1.7% |
| 2003 | 10.2% | 3.0% | 8.5% |
| 2004 | 8.6% | 2.9% | 5.8% |
| 2005 | 6.7% | 2.7% | 4.3% |
| Post-2005 | 6.7% | 2.7% | 4.3% |

(51) I now comment on each of the seven breach categories.

## VI. Project Analysis

### A. Humboldt SAFSTOR

(52) Costs related to the continued storage of spent fuel in the Humboldt Bay power plant spent fuel pool until an Independent Spent Fuel Storage Installation (ISFSI) can be completed are directly the result of the contract breach. In the absence of the breach, I understand that the government would have removed the spent fuel in 1998, making continued pool storage unnecessary. Consequently, "but for" costs beyond this date would have been zero and I count the full cost of SAFSTOR as incremental to the breach beginning from the start of 1999 until the end of 2009, when PG&E expects the Humboldt Bay spent fuel pool to be emptied. Table 5 in Appendix A presents the actual costs associated with spent fuel operations between 1999 and 2004 and projected costs for 2005

through 2009. These costs are largely operations and maintenance and include fees and projects mandated by the Nuclear Regulatory Commission (NRC). Based on PG&E data, examination of documentation of historic costs provided to me by Celerity and my own calculations, historic costs actually incurred from 1999 through 2004 sum to $44.8 million.[14] Projected costs from 2005 through 2009 sum to $45.0 million.[15] The total estimate of Humboldt SAFSTOR damages is $89.8 million. Details of these costs are presented in Table 5.

**B. Humboldt ISFSI**

(53) PG&E must store the spent fuel until DOE accepts it and I have been advised that PG&E for a variety of reasons has reasonably decided to provide for such storage in a dry storage facility called ISFSI. I understand these reasons include that 1) studies have confirmed that an ISFSI is the most cost-effective option in the long-run; 2) the community prefers dry storage;[16] 3) because of a settlement agreement in 1987, HBPP is under obligation to pursue dry storage as soon as reasonably possible;[17] and 4) an ISFSI enables decommissioning of the nuclear plant. Had DOE performed as required PG&E would not have found it necessary to construct an ISFSI. Consequently, there are no "but for" costs absent the

---

[14] The cost data I have relied on from PG&E for all damages categories includes actual costs through September 2005. Since the last three months of 2005 is still estimated, I categorize the whole year as an estimate.

[15] Costs occurring from 2008 throuh 2012 in various cateogries have been discounted.

[16] See for example "Memorandum of Understanding" between Intervenors and PG&E (June 8, 1987), Bates numbers PHBP0028867-8870, and deposition of Larry Womack, September 12, 2005, Pacific Gas and Electric Company vs. United States, United States Court of Federal Claims No. 04-0074C.

[17] Memorandum of Agreement (June 8, 1987), Bates numbers PHBP0000346-349.

breach. I therefore include all costs associated with the design, construction, operations and security at the Humboldt ISFSI as damages. Table 6 in Appendix A to this report summarizes the actual and expected costs for the construction of this storage facility. The sum of costs incurred through 2004 is $9.8 million and projected costs through December 2012 are $36.0 million. The total incremental cost of the Humboldt ISFSI is $45.8 million.

(54) I note the following with respect to the Humboldt Bay damages:

- Holtec cost escalation is contractually tied to movements in specified government indices.[18] I have produced forecasts of Holtec indices using the method I describe in Appendix E.2;
- Coastal Commission costs are directly associated with the ISFSI at Humboldt Bay and are therefore incremental. I have been advised that the Coastal Commission approved a development permit for the ISFSI conditioned upon PG&E providing public access to the bay on plant property. The deal did not involve a transfer of property (PG&E continues to own the land), but PG&E must develop and maintain a public trail. The costs of these activities are properly included in damages.

### C. Humboldt Stack Removal

(55) In 1997, PG&E notified the NRC of its intent to remove a 240 foot tall ventilation stack and the NRC "strongly suggested" to PG&E that it

[18] See Holtec Contract No. 3100813919, Bates numbers PPGE0004954-5358.

pursue this project at the Humboldt Bay Power plant because of safety concerns resulting from the stack's proximity to the spent fuel pools.[19] In 1998, the 240 foot ventilation stack was replaced with a 50 foot vent stack that is less vulnerable to seismic-induced damage. Stack removal costs would be incurred regardless of the breach. However, the magnitude of the removal costs was increased because of the breach. "But for" the breach, the stack would have been taken down during decommissioning after the spent fuel was removed from the pool. The presence of spent fuel required a more complex and expensive removal procedure and also required construction of a replacement stack. The additional stack removal costs caused by the presence of spent fuel are shown in Table 7 in Appendix A and total $919,420.

(56) I have been advised that subsequent to the work being undertaken the additional cost of taking the stack down in the presence of spent fuel and constructing the replacement stack was separated from baseline stack removal costs by the project manager. I understand that in most cases discrete additional deconstruction steps were taken that were directly associated with additional precautions required when nuclear fuel is present. The incremental cost attributable to the breach, identified above, represents about 16% of the total cost of stack removal.[20]

[19] As related by Robert Kapus, Financial Services Manager at Humboldt Bay.
[20] The total cost of stack removal was $5,740,139.29. See SAP report document detailing these costs (file Stack Removal Total Costs 051104.pdf).

**D. Diablo Canyon ISFSI**

(57) Because spent fuel removal by the government has been delayed until at least 2012 and quite likely beyond that date, PG&E must also construct an ISFSI to store spent fuel at Diablo Canyon. I have been advised that, for several reasons, this is a reasonable way to provide for additional spent fuel storage made necessary by the DOE's breach. These reasons include 1) studies have confirmed that an ISFSI is the most cost-effective long-run option; and 2) the community prefers dry storage. Absent the breach, the ISFSI would not be necessary. Thus, all Diablo Canyon ISFSI costs must be considered damages. Table 8 in Appendix A shows the costs associated with the construction and operation of the facility through December 2012. The sum of costs incurred through 2004 is $36.1 million and projected costs through to the end of 2012 are $91.3 million. The total incremental cost of the Diablo Canyon ISFSI through 2012 is therefore $127.4 million.

(58) I note the following with respect to the Diablo Canyon damages:

- Holtec cost escalation is contractually tied to movements in specified government indices.[21] I have produced forecasts of Holtec indices using the method I describe in Appendix E.2;
- Coastal Commission costs exist only because of the ISFSI at Diablo Canyon and are therefore incremental. I have been advised that the Coastal Commission approved construction of the ISFSI conditioned upon PG&E providing public access to the northern end of its land.

[21] See Holtec Contract No. 3100813919, Bates numbers PPGE0004954-5358.

As at Humboldt Bay, the deal did not involve a transfer of property and PG&E continues to own the land, but PG&E must develop and maintain a trail, provide guides, and monitor and protect vegetation. The costs of these activities are properly included in damages.

**E. Diablo Canyon Temporary Racks**

(59) I understand that PG&E has found it necessary to procure temporary racks in both Diablo Canyon plant spent fuel pools to accommodate spent fuel for which there would have been adequate space if the government had removed spent fuel as anticipated by the contract. Consequently, these rack costs would not have been incurred in the "but for" world and represent damages to PG&E.

(60) Table 9 in Appendix A presents the costs associated with the temporary racks. The sum of costs incurred through 2004 is $2.7 million and projected costs through December 2012 are $4.8 million. The total incremental cost of the Diablo Canyon Temporary Racks is $7.4 million.

(61) About 35% of forecast total expenditure on the temporary racks at Diablo Canyon has been spent and invoiced as of the end of September 2005. Subsequent remaining costs have been forecast based on expected PG&E labor, contractual specifications and forecasts of required contractors and materials.

**F. Studies and Evaluations**

(62) I have been advised that in the early 1990's, PG&E was faced with a clear risk of the DOE's non-performance under its contract and the concomitant

risk of prolonged spent fuel storage obligations. PG&E consequently found it necessary to identify and evaluate alternative storage options and study specific options. These efforts were not trivial and the associated costs represent another damage component, because they would not have been incurred absent the breach. These costs are summarized in Appendix A at Table 10 and Table 11.

## VII. Conclusion

(63) The government's failure to remove spent fuel from both Humboldt Bay and Diablo Canyon Power plants consistent with contractual obligations has caused PG&E to incur costs relating to the identification, construction and safe operation of spent fuel storage systems that are in addition to costs that would have been incurred absent the government's breach. I have considered the timing and value of these costs through 2012, the earliest date at which the DOE may collect spent fuel from PG&E. I have not applied discounting to – nor calculated interest on – costs incurred through 2007 on the assumption that damages would be awarded at the end of 2007, and that therefore these costs are pre-judgment. Forecast costs between 2008 and 2012 have been discounted to January 1, 2008 using the calculation of PG&E's after-tax weighted average cost of capital described above. Total costs expected to occur through 2007, plus the discounted value of costs expected to occur over the period January 1, 2008 through December 2012, are $273.7 million. Table 1 shows total

incremental costs through various earlier dates, using the methodology summarized above and discussed throughout this report.

Brad Cornell
Los Angeles, California
November 10, 2005

# Appendix A: Incremental Costs of DOE Breach – Cash Flow Summary

**Table 5: Humboldt Bay SAFSTOR Cash Flow**

| Thousands of dollars (000s) | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Engineering | 9 | 851 | 604 | 605 | 678 | 550 | 806 | 829 | 850 | 871 | 893 |
| Support Services | 4 | 155 | 168 | 186 | 181 | 191 | 228 | 234 | 240 | 246 | 253 |
| Radiation Protection | 372 | 1,191 | 1,272 | 1,630 | 1,910 | 1,941 | 1,365 | 2,058 | 2,110 | 2,163 | 2,217 |
| Warehouse | 0 | -1 | 0 | 0 | 0 | 0 | 35 | 60 | 61 | 63 | 64 |
| Operations | 14 | 576 | 568 | 711 | 611 | 791 | 819 | 912 | 935 | 958 | 982 |
| Maintenance | 23 | 630 | 573 | 405 | 506 | 666 | 559 | 707 | 725 | 743 | 761 |
| Environmental | 2 | 110 | 98 | 121 | 110 | 99 | 141 | 145 | 149 | 153 | 157 |
| Plant Manager | 280 | 1,114 | 1,226 | 1,116 | 1,265 | 1,017 | 971 | 1,112 | 1,140 | 1,169 | 1,198 |
| Security | 329 | 271 | 1,336 | 2,053 | 1,775 | 1,988 | 1,684 | 2,146 | 2,200 | 2,256 | 2,312 |
| Operate HBPP SAFSTOR | 3,621 | 78 | 181 | 101 | 445 | -244 | 69 | 0 | 0 | 0 | 0 |
| SAFSTOR Projects | 104 | -1 | 11 | 3,388 | 536 | 1,297 | 1,400 | 1,010 | 498 | 387 | 114 |
| Insurance | 40 | 20 | 31 | 49 | 64 | 96 | 96 | 96 | 102 | 102 | 0 |
| Non-Incremental Support Costs Backed Out | -192 | -278 | -71 | -88 | -305 | -218 | -255 | -247 | -254 | -261 | -267 |
| Other Support Costs | 165 | 175 | 178 | 562 | 1,099 | 1,055 | 769 | 746 | 767 | 787 | 805 |
| Total Cash Flow | 4,770 | 4,890 | 6,174 | 10,840 | 8,874 | 9,228 | 8,688 | 9,809 | 9,523 | 9,636 | 9,489 |



Confidential – Subject to Protective Order

**Table 6: Humboldt ISFSI Cash Flow**

| Thousands of dollars (000s) | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| PG&E Labor | 89 | 1,159 | 1,229 | 231 | 535 | 342 | 269 | 186 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| ISFSI License Application Submittal | 256 | 1,123 | 1,507 | 167 | -421 | 609 | 34 | 22 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Post License Submittal | 0 | 0 | 0 | 0 | 0 | 0 | 583 | 1,511 | 781 | 580 | 0 | 0 | 531 | 544 | 558 |
| Non-Holtec Scope | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3,101 | 389 | 0 | 0 | 0 | 0 |
| Plant Security | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,787 | 1,830 | 1,880 | 1,924 |
| Plant O&M | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 194 | 199 | 204 | 209 |
| Loading of GTCC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| NRC Scope | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 254 | 361 | 321 | 329 | 338 | 346 |
| Insurance | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 109 | 108 | 108 | 107 |
| HOLTEC Scope | | | | | | | | | | | | | | | |
| Engineering/Licensing For ISFSI Application | 0 | 0 | 0 | 0 | 0 | 990 | 454 | 153 | 200 | 0 | 0 | 0 | 0 | 0 | 0 |
| Post Receipt of License | 0 | 0 | 0 | 0 | 0 | 598 | 58 | 2,542 | 976 | 3,857 | 3,995 | 1,582 | 0 | 0 | 0 |
| Holtec Optional Scope | 0 | 0 | 0 | 0 | 0 | 0 | 46 | 142 | 319 | 280 | 1,372 | 147 | 0 | 0 | 0 |
| Escalation | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3,424 | 0 | 1,363 | 405 | 0 | 0 | 0 |
| Non-Incremental Support Costs Backed Out | -3 | -157 | -135 | -12 | -43 | -20 | -17 | -18 | -51 | -52 | -54 | -260 | -238 | -244 | -250 |
| Other Support Costs | 4 | 53 | 60 | 12 | 62 | 70 | 44 | 23 | 59 | 60 | 62 | 299 | 274 | 281 | 288 |
| Total Cash Flow | 346 | 2,177 | 2,661 | 399 | 133 | 2,589 | 1,471 | 4,560 | 5,708 | 8,079 | 7,487 | 4,585 | 3,033 | 3,110 | 3,181 |



Confidential – Subject to Protective Order

**Table 7: Humboldt Stack Removal Cash Flow**

| | 1998 |
|---|---|
| PG&E Labor | $99,604 |
| Contracts | $440,688 |
| Additional Cuts | $168,000 |
| Crane Relocation | $224,500 |
| Non-Incremental Support Costs Backed Out | -$17,675 |
| Other Support Costs | $4,302 |
| Total Cash Flow | $919,420 |



Confidential – Subject to Protective Order

**Table 8: Diablo Canyon ISFSI Cash Flow**

| Thousands of dollars (000s) | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| PG&E Labor | 222 | 348 | 1,054 | 2,476 | 1,465 | 885 | 805 | 1,912 | 2,003 | 1,997 | 869 | 0 | 0 | 0 | 0 |
| DCPP Portion of Costs Shared With HBPP | 0 | 0 | 0 | 0 | 896 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Holtec Scope | 200 | 150 | 32 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Coastal Commission | 0 | 0 | 0 | 0 | 0 | 0 | 360 | 70 | 395 | 329 | 337 | 346 | 354 | 363 | 372 |
| NRC Costs | 0 | 0 | 0 | 0 | 83 | 267 | 248 | 201 | 654 | 1,210 | 407 | 316 | 323 | 331 | 340 |
| ISFSI Construction (Pad/Security/Cask Transfer Facility) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4,032 | 12,238 | 1,055 | 0 | 0 | 0 | 0 | 0 |
| Fuel Loading Campaigns | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| ISFSI Security | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 492 | 2,008 | 2,058 | 2,104 | 2,158 | 2,215 |
| Misc (Plant Modifications, SFP crane, ISFSI road upgrade, property taxes) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,090 | 2,797 | 0 | 17 | 60 | 88 | 122 | 196 |
| Non-Incremental Support Costs Backed Out | -16 | -42 | -160 | -151 | -85 | -44 | -47 | -142 | -135 | -231 | -262 | -202 | -206 | -211 | -217 |
| HOLTEC SCOPE (Contract 3100813919) Engineering/Licensing Support | 0 | 0 | 2,172 | 1,635 | 487 | 2,015 | 810 | 100 | 100 | 0 | 0 | 0 | 0 | 0 | 0 |
| Initial Order (Campaign 1) | 0 | 0 | 0 | 0 | 0 | 0 | 4,245 | 4,147 | 4,979 | 562 | 578 | 596 | 614 | 632 | 651 |
| Second Eight Casks (Campaign 2) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2,764 | 3,593 | 771 | 0 | 0 | 0 |
| Third Twelve Casks (Campaign 3) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4,966 | 6,198 | 1,312 |
| Holtec Escalation | 0 | 0 | 0 | 0 | 0 | 0 | 3,740 | 518 | 0 | 1,156 | 487 | 0 | 2,601 | 1,324 | 0 |
| Other (Not Holtec) Contract Support | 345 | 417 | 1,585 | 4,836 | 2,091 | 733 | 1,388 | 4,811 | 2,754 | 2,315 | 1,049 | 1,075 | 1,101 | 1,128 | 1,156 |
| Other Support Costs | 11 | 15 | 44 | 120 | 157 | 173 | 124 | 224 | 213 | 365 | 414 | 318 | 326 | 334 | 343 |
| Total Cash Flow | 762 | 888 | 4,729 | 8,915 | 5,095 | 4,030 | 11,672 | 16,962 | 25,998 | 12,014 | 9,497 | 5,337 | 12,271 | 12,379 | 6,367 |



Confidential – Subject to Protective Order

94

**Table 9: Diablo Canyon Temporary Racks Cash Flow**

| Thousands of dollars (000s) | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|---|---|---|---|---|
| PG&E Labor | 50 | 137 | 195 | 351 | 839 | 0 | 0 | 0 | 0 |
| Contract Support - O&M | 0 | 281 | 1,948 | -357 | 0 | 0 | 0 | 0 | 0 |
| Contract Support - Capital | 0 | 0 | 0 | 1,166 | 1,940 | 0 | 0 | 0 | 0 |
| Materials | 0 | 0 | 0 | 1 | 6 | 0 | 0 | 0 | 0 |
| Other Capital Costs | 0 | 0 | 0 | 174 | 308 | 0 | 0 | 0 | 0 |
| Dismantlement | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 284 |
| Non-Incremental Support Costs Backed Out | 0 | -4 | -4 | -8 | -19 | 0 | 0 | 0 | 0 |
| Other Support Costs | 6 | 29 | 33 | 43 | 110 | 0 | 0 | 0 | 0 |
| Total Cash Flow | 56 | 443 | 2,171 | 1,372 | 3,183 | 0 | 0 | 0 | 284 |

95



Confidential – Subject to Protective Order

**Table 10: Diablo Canyon Pre-1998 Study Cash Flow**

| | Through 1995 | 1996 | 1997 |
|---|---|---|---|
| PG&E Labor | $199,009 | $159,085 | $203,933 |
| Contracts | $108,700 | $250,405 | $658,757 |
| Other | $8,000 | $4,668 | $2,672 |
| Non-Incremental Support Costs Backed Out | -$59,956 | -$33,780 | -$68,863 |
| Other Support Costs | $6,373 | $5,838 | $6,141 |
| Total Cash Flow | $262,127 | $386,215 | $802,641 |

**Table 11: Off-Site Storage Study Cash Flow**

| | 1995 | 1996 | 1997 |
|---|---|---|---|
| Mescalero Fuel Storage, L.L.C. | $540,586 | $0 | $0 |
| Private Fuel Storage, L.L.C. | $0 | $163,637 | $195,294 |
| Non-Incremental Support Costs Backed Out | $0 | $0 | $0 |
| Other Support Costs | $0 | $0 | $0 |
| Total Cash Flow | $540,586 | $163,637 | $195,294 |





Confidential -- Subject to Protective Order