IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| PACIFIC GAS & ELECTRIC COMPANY,<br>Plaintiff,<br>v.<br>UNITED STATES OF AMERICA,<br>Defendant. | ) | No. 04-0074C, into which has been consolidated No. 04-0075C (Judge Hewitt) |

Expert Witness Report Of Michael J. Meisner

I have been asked by counsel for PG&E to address a claim in Warren Brewer's, report of January 27, 2006: that GTCC-waste-only storage costs would be similar to costs incurred for storage of spent nuclear fuel.

My qualifications are set out in my resume which is appended as exhibit 1. I have not authored any publications in the preceding ten years, and I have not testified as an outside expert at trial or by deposition within the preceding four years (I did, however, provide expert testimony as a company officer at trial and deposition in *Maine Yankee Atomic Power Co. v. United States*, No. 98-474C (Fed. Cl.)). The information I considered in forming my opinions is listed in exhibit 2. I am being paid $300 per hour for my time working on this matter.

A. Nuclear Facility Regulatory Background

Mr. Brewer's claims about GTCC waste necessarily involve application of various principles of NRC regulations governing the licensing of nuclear facilities. Most of the costs Mr. Brewer refers to arise, if at all, due to regulatory requirements. In

understanding the licensing of commercial nuclear regulatory facilities it is helpful to review some basic concepts.

The Nuclear Regulatory Commission (NRC) separately licenses commercial nuclear functions. The following license types contained in Title 10 of the Code of Federal Regulations are relevant to the GTCC storage issue raised by Mr. Brewer.

**10 CFR Part 30** – authorizes the possession and use of "byproduct material." Byproduct material is radioactive material that is made radioactive through the process of utilizing materials such as nuclear fuel in a commercial nuclear reactor. In other words, during the nuclear fission process in a reactor, some metal materials in the reactor structure become radioactive themselves as a byproduct of radiation from the fissioning fuel. These materials are the "greater than class C" (GTCC) waste discussed in this report.

**10 CFR Part 50** – authorizes the construction and operation of a commercial nuclear power plant.

**10 CFR Part 72** – authorizes the extended storage of spent nuclear fuel independent of a reactor and its spent fuel pool.

10 CFR Part 50 licensees have a unique status. As a condition of their license, they are automatically granted Part 30 and Part 72 licenses that remain in effect throughout the life of the Part 50 license. Part 50 licensees, therefore, already have full license authority from the NRC to store GTCC (under a Part 30 license) and to store spent nuclear fuel (under a Part 72 license).

B. GTCC-Waste-Only Storage Costs

In reaching his conclusion regarding GTCC-waste-only storage costs, Mr. Brewer constructs a wholly artificial scenario under which a nuclear power plant licensee would request a separate Part 30 license to store only GTCC. In applying for such a license, Mr. Brewer contends that the NRC would apply requirements in Part 72 associated with storage of spent nuclear fuel as a condition of approval of the Part 30 license. Mr. Brewer's conclusion is based entirely on a misinterpretation of a single paragraph within an NRC document that is not contained in NRC regulation, coupled with discussion with unnamed NRC personnel.

In particular, Mr. Brewer claims that GTCC-only storage:

- "... requires security and monitoring ... similar to requirements for storing spent nuclear fuel,"
- "... staffing and operating costs ... are essentially identical to those for a facility to store spent fuel assemblies," and
- "... security systems would not be measurably different since the security requirements would be essentially the same."

His conclusions are incorrect and belied by actual industry experience.

1. NRC Rulemaking on Interim Storage of GTCC

For his conclusions, Mr. Brewer relies heavily on a paragraph in NRC's 2001 rulemaking[1] associated with interim storage of GTCC. To the casual reader, the

[1] October 11, 2001, Final Rule, Interim Storage of GTCC Waste, 66 Fed. Reg. 51823

paragraph[2] might suggest that NRC requirements associated with the storage of spent nuclear fuel in an independent spent fuel storage installation (ISFSI) under Part 72 also apply to storage of GTCC under a Part 30 license.

In fact, NRC's 2001 rulemaking had nothing to do with developing, and did not develop, requirements for the sole storage of GTCC waste. The rulemaking was prepared to solve one primary problem associated with dual regulation of GTCC waste by NRC and the States.

Prior to the rulemaking, NRC regulations for ISFSI storage (10 CFR 72) did not address the co-located storage of spent fuel and GTCC. As a result, a nuclear power plant licensee who wished to terminate its primary operating license (10 CFR 50) and store spent fuel at an ISFSI under a separate Part 72 license would have found itself in a "catch 22" if it also wished to store GTCC at the ISFSI. While its primary Part 50 operating license had provisions to ensure that the NRC was the regulatory body for storage of GTCC, no such provisions existed under Part 72. This provision is relevant, because in the absence of a federal regulation to the contrary, it is presumed that States regulate low-level radioactive waste (as that term is defined by the NRC), including GTCC waste. Consequently, upon receipt of the separate Part 72 license and surrender of

[2] "The NRC does not believe that additional guidance specifically for 10 CFR Parts 30/70 licensees is needed. However, if the NRC were to develop guidance for storage of reactor-related GTCC waste under a 10 CFR Part 30 or 70 license, such guidance would be consistent with 10 CFR Part 72. The NRC prefers that reactor-related GTCC waste be stored under the provisions of 10 CFR Part 72. Therefore, to promote effectiveness and efficiency the NRC is deferring development of any guidance for 10 CFR Parts 30 and 70. However, any application for a 10 CFR Part 30 or 70 license may use to the extent appropriate (considering the case-by-case criteria the application would be proposing), the guidance developed for 10 CFR Part 72 in submission of an application." 66 Fed. Reg. 51823 at 51829.

the Part 50 license, the licensee would be under the dual regulatory authority of the State for purposes of GTCC storage and the NRC for spent fuel storage.

Recognizing that dual regulation is an undesirable circumstance for any licensee, and prompted by a licensee petition to that effect, the NRC prepared the 2001 rulemaking to ensure its sole regulatory authority over GTCC stored at an ISFSI when a nuclear power plant's Part 50 license no longer applied. In other words, the new Part 72 regulation explicitly recognized the authority of a Part 72 licensee to co-locate GTCC and spent fuel in an ISFSI upon termination of their Part 50 license.

Having accomplished its primary purpose in retaining exclusive NRC regulatory authority over co-located GTCC/fuel storage under Part 72, the NRC also recognized that co-located GTCC storage could, under some conditions, present an undesirable safety effect on the stored spent fuel. As a result, the NRC developed guidance[3] to ensure that GTCC storage could be safely co-located with fuel storage.

The guidance for safe co-located storage of GTCC was unrelated to the storage facility, security systems, staffing, and the like. Rather, the guidance addressed issues such as the form of GTCC (e.g., liquid GTCC was not allowed). Emphasis was placed upon ensuring that there was no adverse interaction between stored GTCC and stored spent fuel, as well as ensuring that public and occupational radiation doses from the combined effect of GTCC and spent fuel storage met regulatory requirements. The guidance, in fact, was so non-specific about the storage facility itself that it did not even license the containers in which GTCC was to be stored.

---

[3] November 6, 2001, Spent Fuel Project Office, Interim Staff Guidance – 17, Interim Storage of Greater Than Class C Waste.

Mr. Brewer refers to this GTCC guidance as being applicable to facilities wishing to store only GTCC. But since neither the updated Part 72 nor the underlying guidance for co-located storage of GTCC refer in any way to facility or security requirements associated with GTCC-only storage, Mr. Brewer has no basis to generalize the single paragraph he cited to a conclusion that a GTCC storage-only facility would be required to meet NRC requirements for spent fuel storage under Part 72.

The only other basis for Mr. Brewer's conclusions about GTCC-only storage is attributed to discussions with unnamed NRC personnel. In preparation for testimony in another DOE damages case, I spoke with one of the two Lead NRC Technical Staff responsible for development of the 2001 rulemaking. He confirmed that my analysis above accurately reflected NRC's rulemaking.

Although Mr. Brewer has no other basis for his conclusions than I have addressed above, it is worthwhile, in the next two sections, to discuss the practical aspects of licensing and storage of GTCC waste. Actual practice departs from Mr. Brewer's conclusions.

2. Actual GTCC Storage

Virtually all nuclear plant licensees possess, use and store GTCC and have done so without applying security, monitoring and other criteria that Mr. Brewer contends the NRC would require for GTCC-only storage. In actual practice some situations, particularly during nuclear plant decommissioning, are sharply in contrast with Mr. Brewer's conclusions about what NRC requirements would apply to GTCC storage.

It is necessary to store GTCC at various locations during decommissioning for years at a time before it is disposed of or stored at an ISFSI. In practice, this storage is

accomplished without meeting the security, monitoring and other requirements Mr. Brewer contends would be necessary.

An example is instructive. Part 72 security requirements for the storage of spent fuel at ISFSIs incorporate many of the security requirements for nuclear power plants contained in Part 73. Part 73 requires "vital areas" be maintained. Security control of these vital areas is addressed extensively in Part 73. One requirement associated with vital areas mandates that they be contained within an "isolation zone" which in turn has costly facility equipment required such as intrusion detection equipment. In fact, a major portion of the cost of designing, constructing and operating an ISFSI is due to "vital area" requirements.

While "vital areas" are indeed maintained for spent fuel at an ISFSI, this is not required of GTCC storage at decommissioning facilities even though the Part 50 requirements for vital areas are identical to those for an ISFSI under Part 72. The difference is in the nature of the material stored. GTCC is not spent fuel and does not share many of the accident concerns associated with spent fuel that require additional security arrangements. Said another way, GTCC is not "vital" equipment requiring "vital area" controls under NRC regulations.

In order to facilitate decommissioning, many Part 50 decommissioning facilities eliminate their "vital area" controls for GTCC storage including isolation zones, intrusion detection equipment, security officer patrols, etc. This is done even though the Part 50 licensees share virtually the same security requirements for "vital areas" as ISFSI licensees. Clearly, if NRC were going to apply the same security requirements to GTCC-

only storage as they do to spent fuel storage as Mr. Brewer contends they would not allow nuclear plant licensees to eliminate "vital area" controls for GTCC.[4]

3. Practical Licensing of a GTCC-Only Storage Facility

Mr. Brewer proposes a wholly artificial situation wherein a nuclear plant licensee requests a separate NRC Part 30 license for a GTCC-only storage facility, assuming the Department of Energy had removed all spent fuel.

In practice, no nuclear plant licensee would pursue this course for the simple reason that they already possess a Part 30 license for use of GTCC, and, as noted above, are storing GTCC in some cases contrary to Mr. Brewer's view of what NRC requirements apply.

Once the spent fuel was removed from their facility, licensees would simply eliminate unnecessary structures, systems, staffing and procedures to create a much less costly GTCC-only storage facility. These facility changes would be accomplished under existing regulatory authorities and licenses, requiring no prior NRC approvals.

C. Conclusions

In summary,

- NRC's 2001 rulemaking and implementation guidance added no GTCC storage requirements other than those necessary to eliminate adverse effects of GTCC on stored spent fuel,

[4] The "vital area" example discussed is just but one example of a general principle: NRC security requirements for ISFSIs apply only to spent fuel and high level waste storage, not GTCC storage.

- ISFSI security requirements do not apply to GTCC storage; they are reserved explicitly for spent fuel,
- Nuclear plant licensees already have a Part 30 license and would not apply for another to satisfy Mr. Brewer's unnatural scenario, and
- These same licensees are already storing GTCC under their Part 30 license, often in a manner contrary to Mr. Brewer's view of NRC regulations applicable to Part 30 licensees.

Michael J. Meisner 3/9/06
Date

Exhibit 1

Resume

Michael Meisner

Education:

B.S. Nuclear Engineering – University of Wisconsin, 1980

Professional Positions:

All with Entergy Nuclear (previously, Mid-South Utilities)

1981 – 1988 – Waterford 3 Nuclear Power Station, outside New Orleans. Began as a licensing engineer, promoted to licensing supervisor (1984) and licensing manager (1986). Responsible for initial licensing of Waterford 3 with emphasis on NUREG 0737 requirements, FSAR development and Technical Specifications. Served as Waterford 3 representative to the CE Owners Group (1983 – 1988) and as vice-chairman of the group (1987-1988).

1988 – 1996 – Promoted to the Grand Gulf Nuclear Power Station, outside Vicksburg, Ms., as Director of Nuclear Safety & Regulatory Affairs. Responsible for nuclear licensing and regulatory affairs and the industry operating experience program. Winner of the first Top Industry Practice (TIP) award for over $70M in cost reductions to Grand Gulf through cost beneficial licensing actions negotiated with the NRC. Served on numerous NEI working groups.

1996 – 1997 – Corporate Director of Licensing for all (5) Entergy nuclear plants

1997 – Vice-President Nuclear Safety & Regulatory Affairs, Maine Yankee. Entergy was under contract to Maine Yankee to provide management services for plant restart and, later, decommissioning. Responsible for nuclear licensing, operating experience program, quality assurance program and emergency planning. Founded and chaired (1997 – 2005) NEI's decommissioning working group representing the industry before the Nuclear Regulatory Commission. Member of NEI's spent nuclear fuel working group.

1998 – 2001 – President, Maine Yankee

2001 – 2005 – Chief Nuclear Officer, Maine Yankee. As president and, later, CNO responsibilities included loading spent fuel into dry cask storage canisters, remediation and final status survey of the facility, quality assurance and regulatory and political interactions.

Maine Yankee successfully completed decommissioning in 2005 on-budget and on-schedule, including construction and operation of an ISFSI containing 60 canisters of spent fuel and 4 canisters of GTCC.

Retired from Entergy in August, 2005

Exhibit 2

## DOCUMENTS RELIED ON

Expert Witness Report of Warren K. Brewer, January 27, 2006

10 CFR Parts 30, 50, 72, 73

Final Rule, Interim Storage of GTCC Waste, 66 Fed. Reg. 51823 (Oct. 11, 2001)

November 6, 2001, Spent Fuel Project Office, Interim Staff Guidance – 17, Interim Storage of Greater Than Class C Waste.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| PACIFIC GAS & ELECTRIC COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 04-0074C, into which has been |
| | ) | consolidated No. 04-0075C |
| UNITED STATES OF AMERICA, | ) | (Judge Hewitt) |
| | ) | |
| Defendant. | ) | |

Certificate of Service of Rebuttal Expert Witness Report

I certify that copies of Rebuttal Report of Frank C. Graves dated March 10, 2006 and Expert Witness Report of Michael J. Meisner dated March 9, 2006 were served by email on March 10, 2006 and by hand on March 13, 2006 on the following:

John C. Ekman
Trial Attorney
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
Classification Unit, Eighth Floor
1100 L Street, N.W.
Washington, D.C. 20530

Robert L. Shapiro