IN THE UNITED STATES COURT OF FEDERAL CLAIMS

PACIFIC GAS & ELECTRIC, )
 )
Plaintiff, )
 )
vs. ) Case No. 04-0074C
 ) Volume I
THE UNITED STATES, )
 )
Defendants. )
 )

THE DEPOSITION OF BRADFORD CORNELL was taken on behalf of the Defendant at 9:36 a.m. on Wednesday, January 18, 2006, at 1055 East Colorado Boulevard, Suite 420, Pasadena, California, before SERENA WONG, CSR 10250, RPR, Certified Shorthand Reporter for the State of California.



APPEARANCES:

FOR THE PLAINTIFF:

GREENBERG TRAURIG
BY: JERRY STOUCK, ESQ.
800 Connecticut Avenue NW
Suite 500
Washington, D.C. 20006
(202) 331-3173

FOR THE DEFENDANT:

U.S. DEPARTMENT OF JUSTICE
BY: JOHN C. EKMAN, ESQ.
SCOTT DAMELIN
1100 L Street NW
Washington, D.C. 20530.
(202) 353-0897

ALSO PRESENT:

Jon Couchman
Lauren Polino
Jonathan Neuberger
Robert Kapus



INDEX


| THE WITNESS | EXAMINED BY | PAGE |
|---|---|---|
| Bradford Cornell | Mr. Ekman | 5 |


EXHIBITS


| DEFENDANT'S | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Expert Report of Brad Cornell | 10 |
| 2 | Celerity Company Overview | 86 |
| 3 | Humboldt Bay Power Plant Cost Estimate | 157 |
| 4 | HBPP ISFSI Damages, Settings | 160 |
| 5 | HBPP ISFSI Damages, Cash Flow | 162 |
| 6 | HBPP ISFSI Damages, Holtech Data | 186 |
| 7 | HBPP ISFSI Damages, Future Costs | 190 |
| 8 | HBPP ISFSI DAmages, ACT | 191 |
| 9 | HBPP ISFSI Damages, Actual Cost Backup Data for Humboldt Bay Independent Spent Fuel Storage Installation | 197 |
| 10 | HBPP ISFSI Damages, Output | 198 |
| 11 | HBPP Unit 3 SAFSTOR Cost Estimate | 216 |
| 12 | Consumer Price Index | 218 |
| 13 | 1999 to 2009 SAFSTOR, Costs | 219 |
| 14 | 1999 to 2009 SAFSTOR, PG&E ATY Costs | 230 |
| 15 | 1999 to 2009 SAFSTOR, Output | 232 |




WEDNESDAY, JANUARY 18, 2006, 9:36 A.M.
PASADENA, CALIFORNIA

THE COURT REPORTER: Raise your right hand.
Do you solemnly affirm the testimony you're about to give in this deposition shall be the truth, the whole truth, and nothing but the truth?
THE WITNESS: Yes.

BRADFORD CORNELL,

was called as a witness by the Defendant, and having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. EKMAN:
Q Good morning, Professor Cornell.
A **Good morning.**
Q My name is John Ekman. I'm with the Department of Justice. I'm joined by a few people today. At the end of the table is Scott Damelin, also from the Department of Justice. Next to me is John Couchman and Lauren Polino, who are from Veris Consulting. And then next to Lauren is Jonathan Neuberger, who is from Economists Incorporated out of

Q Do you know how that was communicated to him, provided to him?
A **Some of it may have been electronics. Some of it may have been hard copy. I didn't really ask him about that.**
Q And ultimately, the spreadsheets that you would be relying upon for your analysis would be the ones that Mr. Burgess ultimately created?
A **Yes.**
Q Just taking a step back conceptually, we talked a little bit earlier about valuation. Is there a difference between the valuation of damages and measuring damages in your mind? Or --
A **The only difference would be valuation implies to me reducing it to one number, an amount by which I could pay you, and that would settle the claim. Measurement of damages may include different things at different points in time that haven't been collapsed through a single number.**
Q All right. How does -- in terms of a past cost, for example, past incurred cost, if you -- because, obviously, you would agree that your report does contain significant past incurred cost. Is that fair?
A **Yes.**

Page 54

Q In terms of a past incurred cost where there is no time value of money being factored in as we have here, is the assembly of all of the past cost information -- is that, in your mind, valuation or is that measurement or is it reporting or is it something else?
A **Well, it's mostly reporting, but there are a couple issues that arise in a damage context that you need to think about economically. Perhaps the most important is incremental cost. If you're only -- if you're only interested in the cost associated with a certain activity, you have to isolate the cost related to that activity, which, when you have a big company like PG&E that's integrated and all, may require some work.**
**Another thing that you'd have to worry about or at least address or think about is whether the costs were reasonable. For instance, I have a computer system that runs certain lights in my house. And I asked that the clock be reset. And an individual showed up, and he had all the wrong equipment, so it ended up taking him an immense amount of time to set the clock. He then charged me $445 to set the clock. I didn't think that was reasonable, and therefore -- it wasn't the true economic cost. That also reflected major screwups on**

Page 55

**the part of the provider.**
**So you at least have to raise the question of whether the costs were necessary economic costs in addition to whether they were incremental. So even though they're past, it doesn't mean you can necessarily just dump them all into a spreadsheet and add them up.**
Q And we're going to talk, obviously, more about both of those. But let's start with incremental costs.
In looking at your report, there were a couple areas that appeared to have your fingerprints on them. One was the treatment of allocated costs, and the other was treatment of overheads.
A **Those were two -- they certainly had my fingerprints on them, because one of the things I said right from the beginning to Mr. Stouck and in conversations with Mr. Kapus and certainly with my staff was, "We got to figure out what's true incremental costs here." And Matt Burgess and Mark Burkman spent quite a bit of time working with the company attempting to solve that problem.**
**And one of the solutions, as you'll see, is Appendix B, beginning on page 41. Yes, it's B. There was other work done in addition to B, but that's all the effort, getting back the incremental cost from the PG&E**

Page 56

**system, which is not really designed precisely for th[illegible] purpose.**
Q It's an accounting system, not a damages system?
A **Right, that's correct.**
Q In looking at incremental costs and separating out the detailed analysis -- that's my word, "detailed analysis" -- concerning allocated costs and overheads, do you know if there were any costs that CRA eliminated from the claim, based on the fact that it -- that you all determined it was nonincremental or not incremental?
A **Well, that was the back-and-forth between Burgess and Burkman and Kapus and his people, was working out both the overheads and elements of the activity costs which needed to be netted out. CRA was very involved in that process.**
Q Do you know -- the next topic you mentioned was reasonableness, which would you agree is a consideration in looking at a damages claim?
A **I'd agree it's a consideration.**
Q And why is it a consideration?
A **Well, if the damaged party did not act rationally or appropriately in dealing with the dama[illegible] the law may say they don't get the recovery in full**

Page 57

**the breach.**
Q All right. Paragraph 31. In the middle of the paragraph, paragraph 31, on page 14, it says, "There are two costs/benefit categories that my analysis does not account for, but which could affect total damages. These are, one, the land consumed for temporary spent fuel storage; and, two, swap benefits and costs."
Do you see that?
A **Yes.**
Q And then you go on to state that you have not been provided information sufficient to quantify the value of the land, or No. 1; is that right? Or I'm sorry. Yeah, No. 1.
A **Right.**
Q Is that still correct?
A **Yes. And it doesn't look to me like it would be a meaningfully large cost. Again, I may be costing PG&E a few dollars by not including it, but it's minor.**
Q All right. Do you expect to be provided with information that would allow you to do a land valuation?
A **No. I don't expect to be computing incremental land cost.**
Q And just for the record, while I don't expect that we'll get an opinion, obviously we reserve any questions on that issue if he is ultimately called upon



to issue on that type of opinion.
With respect to No. 2, the exchanges issue, you do not quantify gains or losses; is that right?
A **Right.**
Q Mr. Graves is responsible for that?
A **Right.**
Q Are you aware that PG&E allegedly incurs cost in the but-for world to move up in the acceptance queue at Humboldt Bay?
A **Yes, I recall Graves saying it's 1.4 million dollars.**
Q Why are those costs not reflected as an onset to damages in your report?
A **I think ultimately they could be. For now, I don't know that that's Graves' final opinion, and he hasn't testified at trial. But to the extent that there is a number there, it would either be an offset or an addition, depending on what he finally ends -- testifies to.**
Q All right. Paragraph 32 has the what's called table attached, incremental cost of DOE breach.
Do you see that?
A **Yes.**
Q There's a very high level of summation or summary damages?



A **Yes, through different periods of time.**
Q And for different categories?
A **Right.**
Q No. 7, do you know what No. 7 relates to?
A **Yeah. This was a study done of what alternatives they had for storing spent nuclear fuel off-site.**
Q Have you ever heard of an entity called Private Fuel Storage?
A **I might have, yes, but I don't recall the context.**
Q Do you know what Private Fuel Storage is?
A **I don't know. From what I remember, it was -- no, I'm not sure, so I should say I'm not sure.**
Q Based on the answer, I assume, then, you have not investigated the Private Fuel Storage effort?
A **No.**
Q I would also assume, then, you haven't reviewed any Private Fuel Storage documents?
A **Well, I'm trying to remember if this was related to studies of storing fuel on Indian lands. I don't recall. But I know that the company engaged in studies of what else they might do other than store it at the plants.**
Q Are you -- with respect to any of the seven



categories, are you here to provide an opinion that ar[illegible] of those activities was reasonable to undertake in the face of the breach?
A **No. I presumed that some activity is probably a pretty good idea.**
Q All right. Paragraph 39 on page 20.
A **39; yes.**
Q This paragraph sets out two different types of cost. One is called the direct charge cost, and the other is called an allocated cost.
Do you see that?
A **Yes.**
Q Do you know if internal labor is a direct cost or allocated cost in PG&E's accounting system?
A **I knew the answer to that question. I'll have to think. I'll have to come back to that one. I knew, and I don't -- as I sit here right now, I'm drawing a blank on it.**
Q Well, I'll tell you, we will get to it.
Let me ask you this. Let me ask it a different way. Sitting here, is there something you can think of that would refresh your recollection about whether it's a direct cost or allocated cost, again, in their accounting records?
A **I don't know, since I don't remember the**

Page 574

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

YANKEE ATOMIC ELECTRIC )
COMPANY, CONNECTICUT YANKEE ) Case Nos.:
ATOMIC POWER COMPANY, and MAINE ) 98-126C
YANKEE ATOMIC POWER COMPANY, ) 98-154C
Plaintiffs, ) 98-474C
v. )
THE UNITED STATES, ) Consolidated
Defendant. )

Courtroom Number 7

National Courts Building
717 Madison Place, N.W.
Washington, D.C.

Wednesday, July 14, 2004

VOLUME 3

The parties met, pursuant to the notice of the Judge, at 10:01 a.m.

BEFORE: THE HONORABLE JAMES F. MEROW

Page 575

APPEARANCES:
ON BEHALF OF YANKEE ATOMIC ELECTRIC COMPANY, CONNECTICUT YANKEE ATOMIC POWER COMPANY and MAINE YANKEE ATOMIC POWER COMPANY:
JERRY STOUCK, ESQ.
ROBERT SHAPIRO, ESQ.
PETER J. SKALABAN, JR., ESQ.
MICHAEL R. MINER, ESQ.
VIVEK H. HATTI, ESQ.
Spriggs & Hollingsworth
1350 I Street, N.W.
Washington, D.C. 20005
(202) 898-5800

ON BEHALF OF YANKEE ATOMIC ELECTRIC COMPANY and CONNECTICUT YANKEE ATOMIC POWER COMPANY
GERALD GARFIELD, ESQ.
General Counsel
Day, Berry & Howard, LLP
CityPlace I
Hartford, Connecticut 06103
(860) 275-0182

Page 576

APPEARANCES CONTINUED:

ON BEHALF OF MAINE YANKEE ATOMIC POWER COMPANY:
JOSEPH D. FAY, ESQ.
General Counsel
Maine Yankee
321 Old Ferry Road
Wiscasset, Maine 04578
(207) 882-5603

ON BEHALF OF THE DEFENDANT:
HAROLD LESTER, JR., ESQ.
JOHN EKMAN, ESQ.
MARIAN E. SULLIVAN, ESQ.
HEIDE L. HERRMANN, ESQ.
R. ALAN MILLER, ESQ.
KEVIN B. CRAWFORD, ESQ.
RUSSELL SHULTIS, ESQ.
U.S. Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530
(202) 305-7562

** Index appears at the end of transcript **

Page 577

P R O C E E D I N G S
MR. SHAPIRO: Your Honor, we're ready to proceed with Dr. Bartlett.
THE COURT: Good.
MR. SHAPIRO: The plaintiffs call John Bartlett.
THE COURT: Okay.
Whereupon,
JOHN WESLEY BARTLETT
was called as a witness, and, having first been duly sworn, was examined and testified as follows:
MR. SHAPIRO: Your Honor, once again, we have a notebook with some documents we would like to provide the witness and to provide copies to you as well, and to government counsel.
I know we have the fan, Your Honor, which is pleasant. But, obviously, if you have any trouble hearing, let us know.
THE COURT: I'm more worried about the reporter.
DIRECT EXAMINATION
BY MR. SHAPIRO:
Q Would you state your name for the record, please.
A My name is John Wesley Bartlett.

Page 766

program, which would be sufficient to keep up with the economic problems that would arise from having spent nuclear fuel at the reactor sites which were storing it in anticipation of government removal.
The second was to determine what sequence of removal amongst the various parties that had spent nuclear fuel would be attractive to reduce overall costs for the utilities that were bearing those storage costs.
Q Given the lack of specificity in the contract that you mentioned, how did you decide to proceed with the task of looking at those issues?
A Like the two problems itself, I broke it down into two distinct kinds of analysis. The first was what I've called the must-move analysis in my report.
And that involves identifying when spent nuclear fuel at each facility would become a source of increased storage costs at each facility or, equivalently, when its removal would help avoid cost such that it should be part of the solution of the government compliance program to eliminate that exposure or to substantially reduce that exposure.
So the first question was how much such fuel is there, and when does that arise in aggregate. And

Page 767

that was my must-move analysis.
I also performed an economic modeling of the market that might help reallocate the rights to have your spent nuclear fuel removed in a fashion that would assure that waste was picked up in an economically efficient manner, thereby, minimizing costs. And I called that the economic sequence model.
Q I would like to talk about each of those two kinds of models in turn, starting with the must-move analysis. Let's make sure we understand just what you – you mean by must-move – can you tell us what you mean by must-move.
A Sure. Periodically, as I'm sure has been explained, nuclear power plants discharge spent nuclear fuel from their reactors into wet storage pools. And by and large, the wet storage pools have a fixed cost of operation and are designed to have slack capacity to absorb a fair amount of waste before they fill up.
However, at some point, it's possible for them to become full, which is a – what I call a full-pool situation.
At that point, for the plant to continue operation, it needs to find a new way of storing the incremental waste that will continue to come out of

Page 768

the power plant in the future.
So from that point forward, that plant has a must-move situation facing it, because, if it doesn't find a way to move that waste away, it will bear additional storage costs that it otherwise would not have. So that's one kind of must-move circumstance that can arise.
Another is that a nuclear power plant can be in operation for years and then reach the end of its license or operating life and shut down. And from that point on, there's no additional increases in the waste in the pool. But after that waste is pooled for 5 years, it's eligible for pickup under the standard contract.
And from then on, if it's not picked up, the utility has to bear operations and maintenance costs at that facility simply to keep monitoring and reporting and protecting the waste that's there. So that's a cost that would also be avoidable from that point on if the waste was removed under the DOE pickup program.
So that's a second category of must-move fuel is pool – is shutdown pools that are at least 5 years old.
Q And can you explain for us why was it – the

Page 769

must-move analysis an important first step in your work?
A Yes. The reason is the combination of these two types of must-move fuel, the full pool, and the shutdown pools define the total demand for removal that is necessary in order for the industry to not bear additional at-reactor storage costs.
So it's a – it can be used to, both, size an appropriate program in aggregate, that is, the program has to be large enough to keep up with that rate of must-move fuel creation; and, second, knowing who has must-move fuel in a particular year ultimately informs who would prefer to get out – to have their waste handled first.
And so it also helps determine the economic sequence of when it's – when it would be efficient to remove the waste.
Q Mr. Graves, I want to make sure that we don't create confusion over different kinds of terms. Can you explain the difference between must-move fuel, as you determined it, the demand for removal, and the creation of spent nuclear fuel, discharge of fuel from reactors. How are these two concepts different?
A Sure. When a power plant is operating, it removes about a third of its nuclear fuel core every

Page 794

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

YANKEE ATOMIC ELECTRIC COMPANY, CONNECTICUT YANKEE ATOMIC POWER COMPANY, and MAINE YANKEE ATOMIC POWER COMPANY,
Plaintiffs,
v.
THE UNITED STATES,
Defendant.

Case Nos.: 98-126C, 98-154C, 98-474C
Consolidated

Courtroom Number 7

National Courts Building
717 Madison Place, N.W.
Washington, D.C.

Thursday, July 15, 2004

VOLUME 4

The parties met, pursuant to the notice of the Judge, at 10:00 a.m.

BEFORE: THE HONORABLE JAMES F. MEROW

Page 795

APPEARANCES:
ON BEHALF OF YANKEE ATOMIC ELECTRIC COMPANY, CONNECTICUT YANKEE ATOMIC POWER COMPANY and MAINE YANKEE ATOMIC POWER COMPANY:
JERRY STOUCK, ESQ.
ROBERT SHAPIRO, ESQ.
PETER J. SKALABAN, JR., ESQ.
VIVEK H. HATTI, ESQ.
ROBERT E. JOHNSTON, ESQ.
Spriggs & Hollingsworth
1350 I Street, N.W.
Washington, D.C. 20005
(202) 898-5800

ON BEHALF OF YANKEE ATOMIC ELECTRIC COMPANY and CONNECTICUT YANKEE ATOMIC POWER COMPANY
GERALD GARFIELD, ESQ.
General Counsel
Day, Berry & Howard, LLP
CityPlace I
Hartford, Connecticut 06103
(860) 275-0182

Page 796

APPEARANCES CONTINUED:

ON BEHALF OF MAINE YANKEE ATOMIC POWER COMPANY:
JOSEPH D. FAY, ESQ.
General Counsel
Maine Yankee
321 Old Ferry Road
Wiscasset, Maine 04578
(207) 882-5603

ON BEHALF OF THE DEFENDANT:
HAROLD LESTER, JR., ESQ.
JOHN EKMAN, ESQ.
MARIAN E. SULLIVAN, ESQ.
HEIDE L. HERRMANN, ESQ.
R. ALAN MILLER, ESQ.
KEVIN B. CRAWFORD, ESQ.
RUSSELL SHULTIS, ESQ.
U.S. Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530
(202) 305-7562

** Index appears at the end of transcript **

Page 797

P R O C E E D I N G S
THE COURT: Mr. Shapiro.
MR. SHAPIRO: Your Honor, we're ready for Mr. Graves to retake the stand.
THE COURT: Okay. Mr. Graves, good morning.
THE WITNESS: Thank you.
Whereupon,
FRANK C. GRAVES
having been previously duly sworn, was examined and testified further as follows:
DIRECT EXAMINATION (Continued)
BY MR. SHAPIRO:
Q Mr. Graves, as I'm sure you recall, we were about to get into the second of your opinions concerning your economic sequence model. But just to remind the Court where we were before we left off, if you could explain for us once again your final conclusion regarding the reasonable acceptance rate.
A Yes. Yesterday I explained that the must-move volumes of spent fuel have the time profile that's shown in the graph that's on display right now. We've been calling this the must-move mountain because it cumulatively rises to about 90,000 tons of waste that needs to be removed by a – as soon as possible after it's accrued.

Page 982

buyers, nor sellers. They just live with the OFF rights that they had. And the other parties do the buying and selling.
And as I described, a market that's half the size or even, in fact, smaller than that turns out to be able to basically accomplish the same thing.
Q I think what you said, though, is that, if you removed half the buyers and half the sellers, then the market works about the same. But if we're just talking about removing sellers, I think you acknowledge, in fact, the market is going to look a little different.
If you've got the same number of buyers seeking same number of slots, you remove half the supply, that's going to affect the market. I think we established that earlier, didn't we?
A We did. But I was uncomfortable with your definition what it means to not participate as a seller but still want to be a buyer. It's not clear that would be acceptable with the rest of the market for a person to be half in the game. If you don't want to sell, it may be that you were stuck with your OFF rights, and you were neither a buyer, nor a seller. You can't be just buying and not reselling.
Q Are you aware of the fact that there are

Page 983

statutory constraints on Northern States Power regarding the storage of spent fuel at the Prairie Island; that is, Prairie Island reactor?
A No.
Q You don't consider the possibility that congressional delegations, governors or local politicians may prefer the removal of spent nuclear fuel over the trading of earlier allocations, do you?
A It's a variation on the same case we just discussed. If someone or some region decides they don't want their local utilities to participate in trading but, rather, to stick slavishly to their OFF rights, then they will have to simply observe the rest of the market trading in and out.
And they will see that they either forgo the opportunity to make a profit from selling into that market with no improvement in their own local waste, or they'll have to not get out as early as they could if they were willing to buy.
But if you're willing to buy, you have to be willing to sell. If you're not willing to do that, you're not going to participate.
So if – and, again, I said my sensitivity shows that it's easy for half of the market, 25 percent – I mean, 50 percent of the states where

Page 984

there's nuclear plants to make a political decision of that character and there still be enough volume in the market for essentially the same result that I simulate.
Q I assume you'd have the same answer if I threw in citizens groups instead of governors.
A Sure. Whoever is the obstacle, the same effect.
Q Your model doesn't consider the possibility that utilities might have retained earlier allocations just to make sure DOE's program is working. In other words, they may trade later, but they want to see, on the ground, is this thing going to work. You don't consider that.
A I don't simulate that. That's a possible friction that could occur where they could either hold back a portion that's more – that, you know, tests the early waters or tests the time when they need must-move; or they charge a premium for the participation in those more sensitive periods, whatever they happen to be.
But unless lots of parties do that, again, it won't fundamentally change the pattern.
Q You assume that the sellers of allocations are price takers, correct?

Page 985

A The price that I impute, yes, is the last price in the – the – avoided by the buyer who would like to have rights.
Q And so you don't assume that sellers may try to act strategically to determine who is going to pay more for allocations in any particular year?
A Well, there's two possible interpretations of what you mean by acting strategically. One might mean that they simply try to pursue a bilateral negotiation with somebody and get a better deal than they can get through my market clearing price.
Q That's what I'm talking about.
A Yeah. That could happen, sure.
Q I want to go quickly to demonstrative – I think it's 23. This is the first – this is the initial OFF allocation slot, right?
A Yes. Before swaps have occurred.
Q Okay. I want to look at plant B. Plant B has enough in years 1 and 3 to take care of its problem in years 2 and 3, right?
A Yes.
Q So, technically, they don't need to exchange any rights in order to deal with their fuel.
A Well, technically, none of them need to in the sense that they eventually get out by year 5. But

UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| YANKEE ATOMIC ELECTRIC COMPANY, Plaintiff, vs. UNITED STATES OF AMERICA, Defendant. | X : : : : : X | No. 98-126 C (Senior Judge Merow) |
| CONNECTICUT YANKEE ATOMIC POWER COMPANY, Plaintiff, vs. UNITED STATES OF AMERICA, Defendant. | : : : : : : X | No. 98-154 C (Senior Judge Merow) |
| MAINE YANKEE ATOMIC POWER COMPANY, Plaintiff, vs. UNITED STATES OF AMERICA, Defendant. | : : : : : : X | No. 98-474 C (Senior Judge Merow) |

VOLUME I

PAGES 1 - 235

Deposition of Frank C. Graves

Washington, D.C.

Monday, November 12, 2001

Reported by: Deborah Larson Hommer, RPR

scheduled up or down by 20 percent, and paragraph D talks about the DOE's ability to accept emergency deliveries of spent nuclear fuel or high-level waste before the otherwise provided date in the delivery schedule.

**Q. And what is your understanding of the exception provided in paragraph B.3 of Article VI?**

MR. SHAPIRO: Objection. Calls for a legal conclusion.

THE WITNESS: B.3?

BY MS. POWELL:

**Q. B.3 of Article VI, which is on page 16 of Graves 4.**

A. This appears to be an administrative requirement that the waste has to have been properly described to DOE, otherwise they're not obliged to pick it up.

**Q. Do you agree that paragraphs B and D of Article V and paragraph B.3 of Article VI do not mention swaps or exchanges?**

MR. SHAPIRO: Objection. Calls

166

for a legal conclusion.

THE WITNESS: I don't see anything in those particular paragraphs that address the question of exchanges, no.

BY MS. POWELL:

**Q. Article V in paragraph E of the contract, which is on page 12 --**

A. Yes.

**Q. -- concerns exchanges. Do you understand that the contract provides, quote, that DOE shall in advance have the right to approve or disprove in its sole discretion any exchanges -- I have omitted a few words, but --**

MR. SHAPIRO: Objection. Calls for a legal conclusion. Vague.

THE WITNESS: I do notice this clause, that it does state that DOE shall have the right to approve or disapprove, yes.

BY MS. POWELL:

**Q. Would the location of spent fuel have any impact on DOE's decisions to approve**

167

**or disapprove exchanges?**

MR. SHAPIRO: Objection. Vague.

THE WITNESS: Nothing is articulated here as to the criterion that would be applied.

BY MS. POWELL:

**Q. I understand that nothing is articulated here. But in your opinion would the fuel location have any impact on DOE's decisions to approve or disapprove the exchanges?**

MR. SHAPIRO: Objection. Vague.

THE WITNESS: Actually, it certainly is conceivable that location could matter as a feature in trying to achieve more efficient logistics for picking up the waste. I doubt that most exchanges would be in conflict with that goal, but there is conceivably a few that would need to be sharpened or refined to make it even better than what otherwise occurred.

BY MS. POWELL:

168

**Q. What about transportation facilities? Would transportation facilities have any impact on DOE's decision to approve or disapprove exchanges?**

MR. SHAPIRO: Objection. Vague.

THE WITNESS: I'm not sure what a transportation facility means.

BY MS. POWELL:

**Q. Let me skip that. Let me go back for a second to the fuel location. On what basis -- I think you said you doubted that fuel location would have much of an impact on DOE's decision to approve or disapprove exchanges. On what basis do you doubt the fact that fuel location would impact DOE's decision?**

A. A couple of things. One is that, by and large, departures from Oldest Fuel First acceptance order will improve the efficiency of the logistical side of this problem, because rather than picking up small amounts of fuel at many locations, larger batches of

169

UNITED STATES COURT OF FEDERAL CLAIMS

COPY

| | |
|---|---|
| YANKEE ATOMIC ELECTRIC COMPANY, Plaintiff, vs. UNITED STATES OF AMERICA, Defendant. | No. 98-126 C (Senior Judge Merow) |
| CONNECTICUT YANKEE ATOMIC POWER COMPANY, Plaintiff, vs. UNITED STATES OF AMERICA, Defendant. | No. 98-154 C (Senior Judge Merow) |
| MAINE YANKEE ATOMIC POWER COMPANY, Plaintiff, vs. UNITED STATES OF AMERICA, Defendant. | No. 98-474 C (Senior Judge Merow) |

VOLUME II

PAGES 236 - 444

Deposition of Frank C. Graves

Washington, D.C.

Tuesday, November 13, 2001

Reported by: Deborah Larson Hommer, RPR

**an option?**

MR. SKALABAN: Objection. Vague.

THE WITNESS: I guess I'm not aware that we were able to specify a cost or function that would describe the cost or potential for the amount of re-racking that could occur at any particular plant well enough to incorporate it into the model.

But we concluded that omitting it makes our results conservative from the point of view of understanding when shutdown fuels -- pools would be taken out in the but-for world.

And the basic reason is that if re-racking costs had been available as a way of avoiding full-pool Must-Move condition, if they had been higher than ISFSI costs, then they would have been rejected. That is no better than what the model already does.

If they had been lower than ISFSI costs, then they would have reduced the

289

willingness to pay of the full pools for priority in the exchanges.

So they could have only -- the inclusion of another alternative for how to mitigate exposure could have only reduced the competition for acceptance rates between full-pool and shutdown facilities.

Since my clients have shutdown facilities, and assessment of when they could get out if they were competing against ISFSI at full pools is conservative, they would have gotten out sooner in all likelihood -- if any different, it would have been sooner in the re-racking environment.

BY MS. POWELL:

**Q. But wouldn't reducing the willingness to pay also reduce the gains from selling the exchanges?**

MR. SKALABAN: Objection. Vague.

THE WITNESS: Yes. It could have reduced the price of swaps to the extent

290

a full pool was on the margin in setting the price.

BY MS. POWELL:

**Q. It could have reduced the gains or it would have reduced the gains from selling the exchanges?**

MR. SKALABAN: Objection. Asked and answered.

THE WITNESS: It matters whether or not the facility with the opportunity to re-rack as opposed to using ISFSI is the marginal bidder or price-setter in the model or not. If it is someone who saves money but was already getting a benefit out of the trades that were in excess of their avoided costs, then it doesn't change anything. It just changes the benefit to that party, but it doesn't change the model results.

BY MS. POWELL:

**Q. Mr. Graves, are there full pools which are buyers in your economic-sequence model?**

291

A. Yes, many.

**Q. Do you know, Mr. Graves, whether all fuel assemblies have the same weight?**

MR. SKALABAN: Objection. Vague.

THE WITNESS: Yes. Could you clarify across what spectrum of the assemblies you're asking the question?

BY MS. POWELL:

**Q. I can try. Everybody.**

MR. SKALABAN: The same objection.

THE WITNESS: I already indicated that we have weights that are specific to the types of assemblies at each facility, so I understand they vary.

BY MS. POWELL:

**Q. Do you know what the approximate weight of a PWR assembly is? I believe that's a pressurized water reactor assembly.**

MR. SKALABAN: Objection. Vague.

292

UNITED STATES COURT OF FEDERAL CLAIMS

COPY

| | |
|---|---|
| YANKEE ATOMIC ELECTRIC COMPANY,<br>Plaintiff,<br>vs.<br>UNITED STATES OF AMERICA,<br>Defendant. | No. 98-126 C<br>(Senior<br>Judge Merow) |
| CONNECTICUT YANKEE ATOMIC POWER COMPANY,<br>Plaintiff,<br>vs.<br>UNITED STATES OF AMERICA,<br>Defendant. | No. 98-154 C<br>(Senior<br>Judge Merow) |
| MAINE YANKEE ATOMIC POWER COMPANY,<br>Plaintiff,<br>vs.<br>UNITED STATES OF AMERICA,<br>Defendant. | No. 98-474 C<br>(Senior<br>Judge Merow) |

VOLUME III

PAGES 445 - 605

Deposition of Frank C. Graves

Washington, D.C.

Wednesday, November 14, 2001

Reported by: Deborah Larson Hommer, RPR

DCSs for the swaps obtained, so sometime in advance of six months ahead of 1998 or more, but I didn't try to identify any particular time.

BY MS. POWELL:

**Q. Turning to page 14 of Exhibit 1 of your report.**

A. Page 14?

**Q. Page 14, please, yes. In the middle of the second full paragraph I think you write that, "The clearing price for all acceptance slots in a given year is equal to the marginal bid (the lowest winning bid) and is paid by all" -- let's stop there.**

**You write, "The clearing price for all acceptance slots in a given year is equal to the marginal bid (the lowest winning bid)."**

A. Yes.

**Q. Isn't the clearing price in your calculation the sum of the present values of the marginal bids in each year?**

590

MR. SHAPIRO: Objection. Vague.

THE WITNESS: Yes. What we've done is split a problem into two parts. When you try to think about what your avoided cost would be, you actually avoid by getting -- by suspending your responsibility for spent nuclear fuel, both the costs you bear in this year and subsequent years as well.

So you are -- but you would only avoid those up to the extent to which you would have to continue to operate and buy rights that would be expensive. If and when rights become very cheap -- and as we've discussed, I treat them as having a value of zero after year 2002 because there is so much excess supply -- from then on, getting out any sooner than that doesn't help you avoid any costs because rights would be free from that point on. So we rank bids for purposes of deciding who would be a winner on the basis of current year's avoided costs so that the model doesn't have to look ahead.

591

What we discover is that the bid prices fall so fast in future periods that that is a good approximation to looking ahead anyway. But then just to reflect the fact that you do avoid a few more years of benefit up to the point when slots would become free to calculate the clearing price, we include the marginal bids in each subsequent year that are positive as part of the price in the year in which you buy the slots.

So if you buy slots in 2000, you would pay for the sum of bids -- marginal clearing prices in 2001, 2002. In 2001 you would just pay the 2001 and 2002 prices. In 2002 you would pay just the '02 prices.

And that reflects the fact that you get the benefit of displacing future operations at the marginal value of what prices would be in those years. It would have been possible to make a model try to simultaneously solve for bids that looked multiple periods ahead and found all market

592

prices simultaneously, but it would have been a very, very elaborate piece of software for very little difference in the results. So we treated this as an approximation to a little bit more sophisticated calculation.

BY MS. POWELL:

**Q. Mr. Graves, can a given utility be the marginal bidder in more than one year?**

MR. SHAPIRO: Objection. Vague.

THE WITNESS: I think it can happen. It's not prevented in the model, and I think it can happen. As a matter of fact, I believe Maine Yankee has something like that happen to it. I think it gets half of its rights in 2001 and half of its rights in 2002, which is actually an inefficient solution for it.

It actually penalizes it some, because it would have been better off to either bid a little bit more in 2001 and get more rights and be done or not bid at all in 2001 and wait for 2002. And either way would

593