38

analysis, we didn't make a distinction between -- the way we handled prior ISFIS's that already existed was that they were not bid separately in their willingness to pay to be cleaned up.

Now we've separated those out so that if the site has the prior ISFIS and any other kind of spent fuel facility, the two are bit separately now, as opposed to being bundled in the first analysis. And that causes a few -- I think there's about eight or ten pre-existing ISFIS's by 1998, making bids distinct from the rest of the facilities there at those plants.

We also changed the way we handle full core reserve, which used to be treated as part of a full pool, even at shutdown. And now we've merged it with shutdown so that it's not treated as a constraint on the last period of willingness to pay, so --

**Q And so it's only a constraint on operational reactors at this point?**

A Right.

**Q Are there any others that you can think**

39

**of?**

A Well, there's one other refinement we made, which is we also developed an enhanced version of the ESM or the economic sequence model, which allows us to deal with circumstances where the must-move demands exceeds supply for multiple years into the future; in such a fashion that in the event that future must-move problems are more expensive than current must-move problems, the model can look ahead and figure that out, and decide whether it needs to solve -- to not solve the current must-move problem because the future problem is more valuable.

**Q Now, ultimately, the enhanced model is not the model that underlies the expert report; is that right?**

A Except in the sensitivity analyses. It's not needed in the base analysis. That's correct.

**Q And among the other things, you were attempting to accommodate or deal with in that enhanced model is the possibility that there would**

40

**be a lower rate of acceptance, at least for a period of time, than you assume in your expert report; is that right?**

A Yes.

**Q Same question with respect to your expert report. Obviously there are differences between this report and the Yankee report.**

**But did you use the original expert report or the final expert report in Yankee as a template, or again was this drafted basically from scratch?**

A I think this is pretty much from scratch, except at the very high level, saying we want to describe the must-move model first, and then the economic sequencing. But other than that, it's certainly different in text and explanations.

**Q In the course of -- in the time period of between late January of 2005 and I belive November 10, 2005, did you speak with any PG&E employees?**

A I, personally, did not. My staff may

41

have.

**Q Do you know if your staff did?**

A I believe they did in at least one respect. Because we did get PG&E's own assessment of when they would be hitting a must-move constraint. And that coincided quite close with our projections.

**Q Are you speaking of for Diablo Canyon, Humbolt Bay, or both?**

A Diablo Canyon.

**Q You wanted to know when they were running out of full core reserve, when they encroached full core reserve?**

A Yes. That's right.

**Q And you say you know that because you understand that you got that information from PG&E for Diablo Canyon?**

A That's correct.

**Q Do you know who at Diablo Canyon provided that information or who at PG&E provided that information?**

A No. But I can find out.

42

Q If you don't know, I don't want to know.
A Okay.
Q Do you know specifically -- can you identify anybody by name that you are aware of that your staff spoke with?
A No. Not that I can recall at this time.
Q So obviously, to the extent that there were conversations with PG&E and outside of the information relating to Diablo Canyon and its full core reserve, any conversations that may have been had with PG&E are not relevant to your opinions?
A That's correct. I'm not relying on them.
Q Let's turn to your expert report.
MR. EKMAN: Mark that.
(Deposition Exhibit No. 1 was marked for identification.)
BY MR. EKMAN:
Q Mr. Graves, you've been handed what has been marked as Exhibit 1, which is intended to be a full copy of your expert report in this case.
First of all, do you recognize this

43

document?
A I do.
Q And is this document your expert report?
A It is.
Q And the expert report fully states the opinions that you're providing in this case; is that right?
A So far.
Q Are there any opinions that aren't in your expert witness report that you think you're going to provide in this case?
A I'm sure I'll have reactions to the government's position.
Q You'll have an opportunity to provide a supplemental report, as well. So I'll have an opportunity to talk to you again, as well.
Just for the record, Exhibit 1 is not signed. We do have a signed copy. The reason Exhibit 1 is not signed is the only signed version we received is a hard copy in a black and white. For the purposes of our discussion, it's helpful to have the color copy, which came from a PDF that

44

was provided to us from Mr. Shapiro.
A Yes.
Q Obviously, if during our discussion -- and I'll represent to you this is what we got from PG&E's counsel. If during our discussion you see something that you think may conflict with the signed version, I'd like you to tell me about that. That shouldn't occur. Okay?
A Fine.
Q But if it does, please point it out, just to make sure that, you know, the records's clear. I'd really rather not use the black and white version.
A Neither would I.
Q Good. All right. I want to go through -- start by going through your report, and just some questions that I have, follow-ups obviously.
In the introduction approach, there is a sentence down toward the bottom of that first paragraph that says, I describe in this report a reasonable description of how the government would

45

have performed in the hypothetical non-breach world where it did satisfy its contractural obligations.
Do you see that?
A Yes.
Q What do you mean by that sentence?
A Well, of course, we're in a breach world, where the government did not satisfy its obligations. And so we need a description or model of what the world would have looked like had it done so. And we have to develop that based on reasonable economic principles of what good efficient performance would have looked like. And so I've -- in this report, I lay out a description of what I think satisfies that kind of expectation.
Q All right. You are not here to provide any expert opinion concerning what DOE's obligations or for that matter PG&E's obligations are under the standard contract; is that right?
A Right. I'm not trying to offer any legal interpretation of what are the thresholds of

46

performance that either was entitled to. I'm offering an economic view of what would have been a reasonable performance to expect based on the foreseeable economics and costs of the program.
**Q All right. You're not here to -- and we'll talk about your -- what I'll call your rate opinion in a moment.**
**But you're not here to provide testimony to the court that DOE was obligated to perform at the rate that's set forth in your report?**
A Again, not in any legal sense. Obviously, the contract itself is not clear as to what was the performance parameters that were expected or required. So I'm offering again just an economic view of what would have been a plausible, justifiable approach to performance, which would have been reasonable for the parties to expect the government to have satisfied.
**Q You're not here to testify that as a matter of law the government was obligated to perform consistent with the economic efficiencies as defined in your report; is that right?**

47

A Well, I think as efficiency have various kinds, it is sought in the program, and is a reasonable public policy expectation to have for a full cost program that's being imposed on the or provided for the nuclear utilities. So I do think that as a matter of public policy they were obligated to perform efficiently.
Whether that means they had to adhere narrowly to this representation of it, that's another question. I don't think that they had -- that this is the only exact solution to the problem. But solutions very similar to mine would have been needed and appropriate.
**Q But you're not here as an expert on public policy; is that right?**
MR. SHAPIRO: Objection. Vague.
THE WITNESS: I don't know even know what an expert on public policy would be.
BY MR. EKMAN:
**Q Someone with a public policy master's degree. I can tell you they do give them out. I think you can actually get Ph.D.'s in them. Let**

48

**me ask it a different way.**
**Are you an expert in government affairs?**
MR. SHAPIRO: Objection. Vague.
THE WITNESS: No.
BY MR. EKMAN:
**Q Is it your opinion that DOE's obligated, under the standard contract, to pick up must-move fuel when it becomes must-move?**
A Well, it strikes me as a legal question again, which is not the scope of my testimony. So in that sense, I don't have an opinion on that.
**Q And I'm going to try to avoid asking you the same questions that you were asked for three-and-a-half days in Yankee.**
**But must-move fuel, just for the record, that's your -- you coined that term, you believe you may have coined that term?**
A I may have, yes. I haven't seen it in anybody else's work.
**Q You understand that that is not a term that appears in the standard contract?**
A That's correct.

49

**Q And you weren't involved in the promulgation of the standard contract?**
A Correct.
**Q Have you ever read the administrative history of the standard contract?**
A Not that I recall.
**Q Are you an expert in government contracts?**
A No.
**Q With respect to this sentence, aren't you also describing how utilities would have behaved in the non-breach world, as opposed to simply how the government would have performed?**
A Well, they're interrelated. Certainly to the extent there are the exchanges, those are at least initiated by utilities perceiving, you know, that they have a preferred schedule relative to the one that was the default OFF initiation in the program.
On the other hand, that feeds back to the logical burden on the government and affects the total costs of the program. So I'm looking at

62

MR. SHAPIRO: Objection. Vague.
THE WITNESS: So by "valid," we'd have to be asking is it a good indicator of the mean for the population. I'm sure it's not a perfect indicator, because there's many other -- that is, I'm sure it won't equal the population mean exactly.
On the other hand, it's -- if I was a pure frequency strict constructionist statistician, I would say, well, there's four points. And then I have an unbiased estimate of the mean from those four points. It may be noisy in that it's not a very precise estimate, but it's unbiased. And that's -- but at least I have no reason to move it up or down in other directions.
On the other hand, in this case we have Mr. Knight, who is an expert in the industry and who himself knows something about the character of both those plants that are in his sample and the ones that he -- that otherwise occur in the population. So I don't -- it's validity as an indicator of the industry characteristics I think

63

stems from his expertise more than from the sample size.
BY MR. EKMAN:
**Q Do you know if he had access to more data than was provided in his expert report; in other words, could he have increased the sample size?**
A I don't know.
**Q Do you know if he had access to any of the data in his report?**
A Well, he obviously used it. So in that sense, he surely had access to the data. I'm not sure what you're getting at.
**Q Do you know how Mr. Knight's cost estimates compare, for the activity that he's estimating, compare to PG&E's claim in this case?**
A Very roughly. I've seen -- after I prepared my testimony, I saw a draft or a copy of Mr. Cornell's report. And as I recall, the numbers were within a couple million dollars by category of the costs that Mr. Knight had represented.

64

**Q Do you know how Mr. Knight's cost estimates compare to other claims that the government -- or that have been litigated fully before -- in the court of claims for these activities, the ISFIS construction for example?**
A I don't.
**Q Do you know what forms the basis for Mr. Knight's estimates concerning dry storage operations and maintenance costs?**
A As I recall, again, there's four or five utilities from whom he's taken operating or projected experience and calculated their annual costs.
**Q And let me ask this.**
**Do you understand that he took the O&M cost from decommissioning studies, took all his costs from decommissioning studies?**
A I don't know if that's true or not.
**Q But you did read his report?**
A I did.
**Q I'll represent to you that he relied on decommissioning studies.**

65

A Okay.
**Q Do you understand why decommissioning studies are performed?**
**Just "yes" or "no."**
A Generally, sure.
**Q And do you understand that generally that the purpose of decommissioning studies is to account for costs that a facility would incur after it has ceased its operations during the decommissioning of that facility?**
A Sure. That's consistent with my understanding.
**Q And so, for example, Mr. Knight provides an input for dry storage operations and maintenance costs to your model; is that right?**
A Yes.
**Q And it's roughly 6-and-a-half million dollars, I think?**
A I think that's right.
**Q Do you know if that average or that mean is based on the assumption that the facility itself has now shut down, and that all spent fuel**

**right?**
MR. SHAPIRO: Objection. Vague.
THE WITNESS: To the extent all you are avoiding in the given year is one more year of O&M, I treat all dry storage O&M costs as the same throughout all the facilities in my model.
BY MR. EKMAN:
**Q Do you know how it changed in the average; in other words, if it happened to be less than that, would affect the allocations?**
A There's two general affects that I can anticipate. One is it could lower the cost of exchanges for people who want to accelerate them, because somebody's voiding costs who might have otherwise bid for them would be lower. And so it could lower the price.
It could also mean that conceivably someone who would have won a right in an early attempt to accelerate their removals due to having a dry storage problem would have said I'm not as nervous about curing this problem quickly as the model has represented. So they might not win as



relative to someone else.
**Q So with respect to the first category, if in a particular year the marginal bidder is ISFIS, what you characterize as ISFIS must-move fuel, and instead of bidding it at 6-and-a-half million, bits at half a million, it's possible then that the marginal bid, and therefore the overall price of the allocations, would drop in that particular case, provided that that bidder still wins?**
A That's correct.
**Q In the Yankee model, one of your inputs is crane upgrades.**
**Do you recall that?**
A Yes, I do.
**Q And that's no longer an input in this model; is that right?**
A That's right.
**Q And why is that?**
A On reflection, we decided that crane upgrades would have been likely required regardless of breach or non-breach, because they



reflect simply the engineering problem at the site, which isn't dependent on the breach. So that's not a marginal cost. So we dropped it from willingness to pay in this case.
**Q Who made that determination?**
A My staff and I.
**Q What expertise do you have that would allow you to make that determination?**
A I think we discussed that with the NAC folks after the Yankee case, and concluded that maybe that wasn't a necessary cost any longer.
**Q Now, back in the Yankee case, did you all request NAC provide you data inputs specifically -- in other words, you provided them a list -- or did NAC provide with the data inputs that they thought were relevant for your model? How did that work?**
A I can't recall how it got initiated. I'm -- I suspect we asked for categories in a very broad sense of saying we need O&M costs, setup costs, costs per cask, decommissioning costs. And they may have refined that list for us or



suggested, you know, a slightly different tax on the mean. But I just -- I don't recall who -- who started it.
**Q And at trial, I believe it was Mr. Pennington by that point in time, he did testify concerning the crane upgrade cost in Yankee; is that right?**
A Yes.
**Q And testified that that was an appropriate cost to included in your model; is that right?**
A Yes. I believe so.
**Q Now, here, did you provide a list to Mr. Knight of the items you want to cost for, or did he simply provide you with the type of costs he believed would be relevant for your model?**
A Again, I don't recall the sequencing. He may have read our Yankee reports and begun with that as a reference point for this level of structure that we needed.
**Q Do you know if he was specifically instructed not to provide crane upgrade costs?**

134

A Brought -- we ate with Jerry Stouck. And we brought Jerry up to speed on what we discussed this morning, a little summary. Let's see. He had a couple of questions about what is -- refreshing his memory about what's new about the model or different than prevailed in the past versions. Talked a little bit about what kind of failed fuel there is at the facilities. And then we mostly talked about the Wizards, how they're -- non-related stuff.

**Q All right. Well, let me follow up on a couple of question that we talked -- topics we talked about earlier.**

**Could there have been uncertainty in DOE's performance, even in the non-breach world?**

MR. SHAPIRO: Objection. Vague.

THE WITNESS: Yes. There's -- there are parameters even within the contract that are explicit about allowing for adjustment for emergencies and circumstances that might perturb the pattern of performance. And industry circumstances could always occur that would

135

necessitate a -- sort of a major change in the program: A terrorist event, or a major failure of a bunch of nuclear facilities that suddenly had to be shut down.

So there's -- everyone could imagine that there would be some degree of volatility in the performance. But for purposes of figuring out what was reason to expect, we wouldn't predicate the design or your expectations on the worst case scenario, but on the scenario that unfolded in response to what you expected to be the character of the problem.

And that's pretty well defined in this case. Because we know that the discharges are, while not perfectly static, are at least pretty easily to predict. And they clear -- and it's pretty to understand when they create an economic problem at each of the facilities.

So anticipating a program that would deal with that, with some slack in it, is enough to deal with I think reasonably the kinds of uncertainties that people would have. And, of

136

course, to figure out, in a litigation setting, what performance would've looked like, we have to specify a representative example of that, which is what I've got.

BY MR. EKMAN:

**Q Let me rephrase that a little bit.**

**Assuming DOE performed and was doing all the stuff up through '98 that you think moves toward performance, and then even assuming DOE performs, could there still be -- see at DOE a start performance at your rate in 1998, on February 1st, could there be some uncertainty still in the DOE program and in DOE's ability to accept fuel?**

A I think I'm not seeing any difference between that and your previous question. Sure. There could be anxieties that some degree of emergencies could arise that would perturb or delay or shift priority slightly for awhile.

On the other hand, you know, the program has a pretty big architecture to it. And it would take a lot to derail the whole program. And if

137

there was something out there which was likely and reasonable fear that it could do that, that should have been designed into a satisfactory strategy by the DOE in the first instance to deal with that event.

So we can't have it that there's a derailing strategy out there which everyone's afraid of, but which isn't, you know, at least somehow anticipated by the DOE. Otherwise, it's a misdesigned program.

**Q In talking about the applications of -- or in talking about DOE's performance, and in talking about economic efficiencies -- which is what you discuss in your model -- ultimately, isn't the real question here not whether one way is more efficient than other another way; in other words, your rate versus a 900 rate, your exchanges model versus an non-exchanges model; but rather whether DOE agreed or did not agree to perform in a manner that would deal with the must-move fuel as you define it in your report? Isn't that ultimately just the beginning and end of any**

the 900 rate, you could get out on the same schedule that I've simulated. It would cost you more.

**Q You haven't spoken with any PG&E employee or executive concerning what they would have viewed as performance in the non-breach world?**

A No. I have no idea.

**Q Would you agree that what the parties thought they were getting is relevant to determining performance in a non-breach world?**

A Only in a very weak sense. Normally in a bilateral I would be more inclined to give that quite a bit of weight of saying you and I strike a deal that only includes the two of us; and I have some expectation and you have some expectation. And that if we haven't jotted -- written it down clearly enough, at least that dictates some of what we consider satisfactory performance from the other side.

But in a setting where there's fifty or sixty parties to the same contract, and the way



it's honored is going to be structurally the same for all of them, any one party's expectations about what that entails doesn't strike me as informative about what reasonable performance would be. They could easily have a too narrow a view, or for that matter too strong a view.

**Q Do you believe that the regulatory nature of the contract in the DOE program affects the -- your efficiency conclusions, and your desire to impose efficiency upon the parties?**

MR. SHAPIRO: Objection. Vague.

THE WITNESS: Let me take off my coat.

I guess I'm not sure what you mean by the regulatory nature. The fact that there's a governmental body that's on the other side of the contract? Is that --

BY MR. EKMAN:

**Q Yeah, and the fact that this is a larger -- you know, the purpose of this is to -- at least as I understand it, is to deal with the long-term issue of stored and spent fuel. And it's a government program. It's not a party**



**selling a house or a car or even a, you know, service between a lawyer and their client, but rather in a grander regulatory scheme, in a government program.**

**Does that affect whether sort of the rules of efficiency should apply equally?**

MR. SHAPIRO: Objection. Vague.

THE WITNESS: I think the public nature of the problem and the fact that it's being solved jointly for lots of parties actually increases the relevance of a socially efficient solution as being what was reasonable to expect.

As I mentioned earlier, a private contract can be as wacky as anyone wants it to be, if a -- if each side is satisfied with the deal. And anyone else can look at it and say that's ridiculous, I would have never signed that contract. But if both parties like it and they were dealing at arms-length with, you know, fair and accurate information, their presences can still be to enter it. And that's efficient, because they're both gaining something.



When you have a situation like this, where parties are going to pick up the tab for a social program in which they participate as one of the beneficiaries, I think it's strongly incumbent on the provider of the service to pursue an efficient solution.

BY MR. EKMAN:

**Q Are all government programs efficient?**

A Well, we have to be a little careful about before the fact, after the fact, by design, or so on.

My personal belief is that the government generally tries to do things in a pretty efficient way. They may run into preference-satisfying constraints that say lots of people have different visions of what is necessary to fulfill political constraints on the program. But I don't think they're set up with the intent of being inefficient and of ignoring known efficiency opportunities.

**Q On page 4, on page 4, underneath aggregate acceptance rate in a non-breach world,**



1700 Pennsylvania Avenue, N.W.
Washington, D.C. 20006
JABS REPORTING, INC.
www.jabsreporting.com
(202) 296-6102
(888) 805-5227

146

**you say, I rely -- and then dot, dot, dot --**
A Uh-huh.
**Q -- on evidence that it would be feasible and responsible to accept spent fuel at a rate consistent with those needs -- referring back to the economic needs of purchasers.**
A Yes.
**Q What's the basis for that statement?**
A Well, there's two kinds of parts to it. One, in the evidence regarding their economic need is the must-move analysis that I compiled. So that is the data that was public and widely consistent to describe the time frame over which spent fuel ought to be removed from the reactors, or from the storage of the reactors.
The evidence that it would have been feasible and responsible to accept spent fuel at those rates largely comes from other government witnesses for the Plaintiffs who were involved in the program, or who have been involved in the industry in waste management, and from DOE studies about their own assessment of what would be

147

efficient approaches to solving the problem.
**Q And the individuals would be people like Mr. Bartlett, Mr. Mills, Mr. Stuart?**
A Correct.
**Q Anyone else you can think of?**
A Well, there's some people who aren't directly witnesses, whose correspondences and so on support those analyses. There was a letter between Mr. Dreyfus and Mr. Kadak explaining that exchanges would be encouraged and supported. Nancy Slater provided similar reassurances that PWR and BWR fuels would be handled by the program equally.
There were various other documents that are consistent with it, where there's not a witness actually participating.
**Q You're not an expert at DOE's spent fuel wast management program, are you?**
A Well, it's a pretty vaguely defined term.
**Q Do you consider yourself to be an expert in DOE's spent fuel management program?**

148

A I know more about it than the average layman.
**Q So do I.**
**Does that make you an expert, in your opinion?**
A No. I guess not.
**Q Other than these cases, have you performed any work concerning the standard contract?**
A No.
**Q Were you ever retained by any other utilities in these cases?**
MR. SHAPIRO: Objection. Vague.
THE WITNESS: Just the ones that you've seen in testimonial situations.
BY MR. EKMAN:
**Q All right. At the bottom of page 4 there is a reference to full core reserve.**
**Do you see that?**
A Uh-huh.
**Q Now, your model is run off the assumption that all utilities operate with a**

149

**single full core reserve policy; is that right?**
A That's the constraint I imposed on for approval.
**Q And fuel becomes -- for operating reactors, fuel becomes a must-move the year before the utility would encroach on full core reserve, a single full core reserve?**
A That's right. They have to retain a single full core reserve.
**Q What analysis have you conducted to determine whether the single full core reserve assumption corresponds to actual practices at nuclear facilities?**
A I haven't done any audit or statistical sampling to find out how uniform that practice is.
**Q Why did you choose it?**
A It's fairly widely recurring description of industry practice in many of the documents I relied upon, and also the opinion of the parties in the case.
**Q So the opinion of the parties in the case, you're talking about Pacific Gas & Electric?**



1700 Pennsylvania Avenue, N.W.
Washington, D.C. 20006

JABS REPORTING, INC.
www.jabsreporting.com

(202) 296-6102
(888) 805-5227

154

A Yes.
**Q To your knowledge, is there any company, who when given a choose between -- in terms of regulating its power and who's going to provide it, when given a choice, shuts down its nuclear power first, as opposed to its coal assets or its natural gas assets, or other assets that it uses to generate energy?**
A Under what circumstances are we talking? Just for the shear sake of turning off power plants?
**Q Just for the sake that -- yeah, you don't need the power. It's a light power usage.**
A I'm not aware of anybody who prioritizes in the order you've suggested. Usually, you keep your nukes on as much as you can.
**Q They're the last to go down?**
A Well, last under when it's purely a economic choice. If you're getting into safety regulations from the NRC, they may be the first to go down, even though they're the most valuable thing your on your fleet.

155

**Q From a safety perspective, since you mention it, do you know if, in general, fuel can -- a reactor can simply be shut down and fuel can be left in a reactor core indefinitely?**
A I don't know a mechanism for doing that. I don't know that there's no such way of doing it. But I'm not familiar with the way of doing that.
**Q Do you know how long Humbolt Bay's fuel sat in its reactor after it shut down for the last time?**
A I don't recall.
**Q All right. On page 5, in that top paragraph, there is a reference to decommissioning. It talks about how after five years a plant can, therefore, be decommissioned and its pool costs can be avoided.**
**Do you see that?**
A Yeah. Actually, I refer to the decommissioning in the pool itself. But that's all right.
**Q Ultimately, we're talking -- ultimately, the facility can't be decommissioned until the**

156

**pool's decommissioned?**
A Right.
**Q Do you know if all shutdown utilities -- and by all shutdown utilities, I'm talking about the ten that were currently shut down -- if they had the financial wherewithal to actually decommission after five years?**
A I haven't studied that.
**Q Now, on note two, there is a statement concerning re-racking.**
**Do you see that?**
A Yes.
**Q Now, as in Yankee, you do not consider re-racking as a potential alternative to increased space; is that right?**
A That's correct.
**Q And if you did assume re-racking, what that would do is potentially reduce the bids, the cost of the bids or the value of the bids, for operating reactors who are facing space constraints; is that right?**
A Yes. To the extent they have a

157

re-racking option, the re-rackers would bid less and conceivably drop out of their position that they might have otherwise had in the purchase queue.
**Q And one of the reasons you don't use that is because obtaining the information needed for that kind of input would be fairly difficult.**
**Would you agree with that?**
A It does get to be quite a bit more specific about the engineering configuration and the rack configuration at each site. So it would add another layer of information requirements.
**Q Have you seen any studies, for instance, for Diablo Canyon concerning its ability to re-rack?**
A No. I haven't seen any.
**Q In any event, you end by saying, However, this approach to re-racking lends conservatism to my results. Because if lower costs are available to purchasers other than PG&E, that would make it easier for PG&E to have its spent fuel removed sooner.**

158

**Do you see that?**
A Yes.
**Q Now, ultimately, PG&E can't have its fuel removed any earlier than you currently have it; isn't that right?**
A I don't mean here that it would be actually removed earlier, because it's removed as soon as it's must-move, in my analysis with exchanges at least. But it would be potentially cheeper for Humbolt Bay to buy exchanges to move their '99 requirements back to '98; or more in a highly constrained world, easier for Diablo Canyon to afford exchanges it would need.
**Q Does Diablo Canyon need any exchanges in your -- based on your rate?**
A No. That's a -- the rate I project, the OFF rates, are sufficient to take Diablo Canyon out. It does use some exchanges in the ESM model to simply get a more rational schedule of withdrawal -- of removal that is on site, but not much.
**Q And how does it do that? Does it buy more?**

159

A It sells off some of the 2004's, I think, that it starts wit, and swaps them out for 2007.
**Q And you haven't talked to anyone at PG&E to confirm that that's actually what they would have done at Diablō Canyon?**
MR. SHAPIRO: Objection. Vague.
THE WITNESS: I think I've mentioned before I haven't have had any conversations with PG&E managers about this problem.
BY MR. EKMAN:
**Q All right. You understand that any amounts that PG&E has to pay to get out in '98 for Humbolt Bay work as an offset to the government in this case?**
A That would be consistent with my understanding, is that they reduced damages.
**Q So if the marginal bidder price was reduced for whatever reason, the price or the amount at offset to the government would decrease?**
A That's correct. Because in a

160

performance world, it would have been even easier for Humbolt Bay to have solved its problem without bearing an extra cost.
**Q Right. And if the cost on the flip side actually increase considerably above what Mr. Knight says and the margin -- and therefore the marginal bid price was higher in 1998, that would increase the offset to the government; is that right?**
A Yes. Could.
**Q And, in fact, we already talked about the binomial potential of defining your market. The only purpose that the cost component serves is to determine the amount of money Humbolt Bay would have to pay in this case to get out in 1998?**
A Well, if -- in this case all we're interested in is the timing and cost to Humbolt Bay and Diablo Canyon. But to solve that, I want to have a vision of what the whole industry process could have looked like.
And so there's lots of other utilities whose position is being determined in the model to

161

show that they would have been at the front of the rate or at the back end. But the only ones that are claiming anything here are just Humbolt Bay and Diablo Canyon.
**Q All right. In the second sentence of the first paragraph, you're defining -- you mention that there are essentially no incremental costs as long as the inventory does not exceed a pool's capacity, or until five years beyond reactor shutdown; is that right?**
A Yes.
**Q And what's the basis for that statement?**
A Well, it's based on my understanding of the structure of the cost, which is that it doesn't have any volumetric or avoidable elements to it. All that is happening during that five-year period is you're waiting for time to pass so you can move on. Those costs would be borne in the same way, in a breach and non-breach world. But you'd still wait those five years. And you'd still bear the same waiting costs.
**Q This is the idea that the wet pool O&M**

**costs don't change materially if there are a thousand assemblies or 500 or 250; is that a fair statement?**
A That's part of it. But it's also that if I -- whatever they are for me, if I have a thousand assemblies, I'm still going to have a thousand assemblies when I'm on a full pool or a shutdown. And I'm going to have to just wait my fife years. And it's the same number of assemblies and the same kind of waiting, the same kind of oversight and administration in a breach and non-breach world. So it's not incremental to the government's performance during those five years.
**Q And your model doesn't ascribe value to, for instance, a shutdown facility in that example, removing 200, 200, 200, 200, and the last 200 in the fifth -- you know, after five years?**
A That's right. I treat that as though the basic cost is fixed throughout that time.
**Q Now, that paragraph goes on to define two must-move situations. One you call full pool**



**must-move. And the second you call shutdown must-move.**
**Do you see that?**
A I do.
**Q Isn't there a third must-move condition that isn't in this paragraph?**
A There's pre-existing ISFIS must-move.
**Q And what is that condition?**
A There's about eight or so utilities in the country that are -- that have operating reactors that also have already hit a full pool constraint prior to 1998. And so they built ISFIS's. And that'd like to clear those out, because they continue to bear fixed O&M for those sites, as well. So it's sort of like a full pool, except it's a -- or it's another kind of must-move.
**Q And if you turn the page to page 6 of your report.**
**This is a depiction, figure one of the -- of what we're calling the must-move mountain; is that right?**



A Yes.
**Q And there is something new here that was not in, I recall, the must-move mountain in Yankee, which is a darker yellow line that begins in '98 and goes out to 2040.**
**It's very thin, but do you see that?**
A I do. It -- the data isn't new to -- relative to the Yankee analysis --
**Q The picture --**
A -- just the -- near the separation of it from the other data elements used.
**Q And that thin, dark yellow line, that is ISFIS must-move fuel?**
A Correct.
**Q Now, your model assumes storage requirements. I think you said it's a '95 document, with information that's current as of '93; is that right?**
A I believe 12 -- December of '93 was the last year of actual data in that document. The rest is projections.
**Q Do you know that, in fact, it's eight**



**ISFIS's that are accounted for in your model, and not some other number?**
A Not off the top of my head. But I can find that out for you.
**Q All right. And you understand that there are other utilities -- there are ISFIS's that were constructed in the time frame leading up to ninety -- in the '96, '97 time frame; is that right?**
A Yes.
**Q All right. I'll represent to you, at least in our analysis, that there are a total of five utilities that have ISFIS's prior to 1995: Calvert Cliffs; Oconee, that's O-C-O-N-E-E; Palisades; Robinson II; and Surry.**
**Do any of those names ring a bell to you?**
A Yes.
**Q And I'll also represent to you that there are five more that were built prior to 1998 that are not treated as ISFIS must-move in your model: Prairie Island, Point Beach, Arkansas**



1700 Pennsylvania Avenue, N.W.
Washington, D.C. 20006

JABS REPORTING, INC.
www.jabsreporting.com

(202) 296-6102
(888) 805-5227

170

separately, based on whichever has the higher willingness to pay. So if you can clear and get it, or if you can bid them separately and get them both out, too. So it's not a constraint. It's a result.

**Q All right. Well, let me separate out the ISFIS and the wet pull, the full pool must-move for the moment and just talk about full pool must-move.**

A Okay.

**Q In almost every one of the years where these folks bid, they're biding on both: Full pool, and ISFIS.**

A Okay.

**Q So the reason -- and this is a question -- the reason that a company that's right up against one full core beginning in 1998, we would see them bid, if not every year almost every year, is because your model is just removing enough to keep them out of full core reserve for the next year; and so they may find themselves slipping back, and therefore have to bid almost**

171

**every year for allocations to keep their wet pool from encroaching on one full core?**

A That's plausible.

**Q You're aware -- you have a fewer number of shutdown reactors in this model than you did in the Yankee model, right?**

A In the early years.

**Q And are you aware though that there are ten bidders in those first five years who are -- who by 1998 were shut down reactors?**

A There are ten bidders not yet shut down, who were shut down by '98?

**Q Who were shut down by '98 total?**

A But who were not already shut down at all, or who were --

**Q Who are not treated as -- some are treated as shutdown in your model, some are not. In Yankee, they were all treated as shutdown.**

A Right.

**Q In this model, it's a split.**

A Right. Because we have older data. And they hadn't announced their shutdown.

172

**Q But we know that, ultimately, there are ten facilities shut down by 1998 prematurely; is that right?**

A That sounds about right.

**Q Would it surprise you if -- and I did the math on this yesterday -- would it surprise you if I told you that slightly more than 5,000 of the 6,073 MTU's of must-move fuel in the first five years are purchased by the 20 utilities we talked about: The ten who ultimately did shut down, as well as the ten who ultimately constructed ISFIS's by 1998? Would that type of scale surprise you?**

A No. Not on its face. Again, we've got -- I'd have to review the data. But I think many of those early shutdown units were fairly small. So they have, again, a fairly small denominator to drive up their bid.

And, similarly, we talked about the full pools that keep hitting their full core reserve threshold. They also can avoid a lot per ton by having their fuel taken away. So they sound like

173

the right kind of parties to be at the early use of the acceptances.

**Q Why do you consider spent nuclear fuel that is located on ISFIS that is built prior to 1998 -- actually, it's the five a year in your model -- why do you consider that must-move?**

A Well, the utility is -- or the nuclear owner is continuing to bear avoidable maintenance costs for that facility over time, which would go away if the fuel was moved. My whole definition is not that it is fuel which is creating an operating problem at the utility, but simply that it's fuel that imposes avoidable costs on the owner.

And when you hit the point where you're needing more space to store, or you are sustaining use of space that you otherwise wouldn't have to, that becomes a must-move situation. If you're just filling up space that you would have to keep that isn't yet fully utilized, that's not a must-move situation.

**Q Now, your model is based again -- we**