178

THE WITNESS: I don't see why they would do it.
BY MR. EKMAN:
**Q Why not?**
A I don't see the advantage. I have to bid what I could avoid, if I have to pay for these rights in the first place. But I'm not -- but I could deepen the slack at one facility while continuing to bear the costs at the other. It seems to me I've solved the problem backwards. I'm not avoiding any costs. And I'm removing costs where I don't -- where I can't save any money. I mean removing casks where I can't save any money.
**Q And that's because you ascribe no value to additional reserve in the wet pool?**
A Well, you already have a certain amount of reserve at the ISFIS anyway. And that is the part where you are reflecting your avoidable costs in the way you bid that. So I don't see -- I'd have to think about it some more. But I don't see the advantage in your strategy.

179

**Q Did you talk to -- you didn't talk to any of the five facilities who are considered ISFIS must-move to see if, in fact, they have a desire to dismantle their ISFIS's at all?**
A No.
**Q Did you ask PG&E whether at Diablo Canyon, when DOE ultimately does show up, assuming sufficient slack in the wet pool, whether it will deliver fuel out of its wet pool, or whether it will remove the cask from its ISFIS first?**
A I don't know. I didn't talk to them about it.
**Q Would the presence of an ISFIS on site, an existing ISFIS with a licensed cask, potentially protect a utility from an unforeseen event?**
A It depends on how you're operating your pool. As is, I guess it gives you -- if there's some kind of pool failure event, it would give you the opportunity to move out of the pool to the ISFIS.
**Q Do you know if the rate payers in**

180

**California have expressed any preference to dry storage over wet storage?**
A I have no idea.
**Q Would that matter? What if I told you that PG&E's rate payers have expressed a preference for dry storage at both Diablo Canyon and at Humbolt Bay?**
A I'd need know a lot about what you mean by express any preference. How does a rate payer express his preference for a particular kind of solution?
**Q Presumably, I don't want to pay the fees for the other one; presumably, by having the rate commission ultimately authorize the construction of an ISFIS?**
A Well, he might be doing that because he wants to keep the nuclear plants operating and/or decommission Humbolt Bay as much as possible. So I don't see that -- that doesn't prove that he prefers dry to wet.
**Q You haven't looked into that issue, though?**

181

A It's not a very well defined problem. Rate payers don't express their views for engineering solutions. They express their frustration with rate increases pretty much. Sometimes they'll propose huge alternatives for supply plants, but only in response to rate proposals almost -- almost exclusively.
**Q Ultimately, rate payers are typically represented by, for instance in California, the absence of rate payer advocates; in other words, a separate entity?**
A Or intervener groups.
**Q Or intervener groups?**
A Yes.
**Q And you don't know the positions intervener groups have taken in the state of California concerning ISFIS versus wet storage?**
A No. I don't.
**Q Is it your position that rate payers don't have views about the storage of spent nuclear fuel?**
MR. SHAPIRO: Objection. Vague.

186

as we mentioned before, delayed until some future date, as must-move, until a technological solution was fusible.
**Q Certainly the folks wouldn't -- if it was not technologically feasible to take it, people would not have paid money for allocations associated with that fuel; is that right?**
A It would not have made sense for those parties to be accelerating their desire to have people show up at their site and move fuel that couldn't be moved. They'd be more likely to be sellers of any OFF rights they had in the early years. And somebody who did have movable fuel would jump up earlier in the queue.
**Q All right. On page 6, you mention what you called the relative predictability of operations over time.**
**Do you see that?**
A Yes.
**Q Has any utility prematurely or unexpectedly shut down, to your knowledge?**
MR. SHAPIRO: Objection. Vague.

187

THE WITNESS: Has any utility shut down a nuclear plant prematurely?
BY MR. EKMAN:
**Q Yeah.**
A TMI II was shut down pretty early.
**Q Connecticut Yankee?**
A Uh-huh. Yes.
**Q Maine Yankee?**
A Yes.
**Q Those were all prematurely shut down?**
A Not in the sense that TMI II was. But they were shut down sooner than the economic -- initially expectations had hoped.
**Q And unlike TMI, they weren't shut down for accident reasons, but rather for business reasons?**
A Yes.
**Q And you're not aware of any utility that prematurely shut down because of the breach by the Department of Energy of the standard contract, right?**
A Not that I know of.

188

**Q Do you know why SMUD shut down prematurely?**
A Not in tight detail. I recall there was some concerns about operating, safety, and economics of fixing those problems, so shut down earlier than it expected to last, as well.
**Q Do you understand that the rate payers actually -- the citizens actually voted to shut it down?**
A I think that's right.
**Q Getting back to figure one. We talked about this a lot. And, again, I'm not going to duplicate what we talked about at trial.**
**But this must-move mountain assumes no license renewal; is that right?**
A That's right.
**Q And the effect of that is that beginning in 2012, if you assume license renewal for currently opperating reactors, the blue part is going to drop in terms of its slope; is that right?**
A That's right. There's an acceleration

189

in around 2016 due to plants shutting down after their 40-year lives had ended. If those are extended 20 years, then the blue line tends to hug the yellow a little bit more. And the full pools start to grow sooner.
**Q The full pool, under that scenario, would increase a bit. The slope of the full pool is going to increase under that hypothetical?**
A Yes. A little.
**Q Does it increase as much as the -- will the slope be equal in that hypothetical, the overall slope of the mountain?**
A Certainly not initially, because the shutdowns are a much bigger increase in the must-move amounts per year than the increment that would otherwise fill a pool each year, or each 18 months.
**Q Now, at trial I actually asked you if you're familiar with what percentage of the utilities were predicted to extend their licenses. You said that 60 to 70 percent was what you had heard.**

194

A Right.
**Q And are you aware whether Maine Yankee needed that re-rack just to get to DOE acceptance?**
MR. SHAPIRO: Objection. Vague.
THE WITNESS: I don't know what to get to DOE acceptance --
BY MR. EKMAN:
**Q In other words, get to its first allocations, even under a 3,000 range?**
MR. SHAPIRO: Objection. Vague.
THE WITNESS: Well, Maine Yankee was contemplating re-racking in a non-performance world. So it had nothing to do whether they were going to get up to their entitlement that they would have had in a performance world, or whether they could have gotten by without it. They were simply trying to figure out how to make economic sense of the world they were in.
BY MR. EKMAN:
**Q All right. Now, in this case, you relied on the 1994 spent fuel storage requirements report; is that right?**

195

A 1995.
**Q 1995; is that right?**
A Yes.
**Q In the Yankee, you relied on NAC?**
A Yes.
**Q And you said there were concerns about the proprietary nature of the NAC data?**
A Yes.
**Q What was proprietary about the NAC data?**
**Or why did you believe that it was potentially proprietary?**
A Well, I think this was explored at the time. I don't recall all the details. But this was a data set that NAC had developed and was under their control. They used it for commercial purposes of a variety of kinds. And we didn't have any authority to use it a second time.
**Q Why did you pick the '95 document, as opposed to say an earlier document, like a '92 document?**
A Well, we know that the data is -- in the '95 document is about a year, a little bit more

196

than a year old. It's published in mid '95 and ends with '93 data. And so that puts me back about 60 months before the beginning of the program. So that's about the time when people would have been formulating their interest in DCS's and exchanges. So it's representative -- it's a good representative year for that purpose.
**Q But, ultimately, wouldn't DOE, given that 1991 was the date that it was supposed to declare its intentions, wouldn't DOE have been designing the program around data that would have been available in the 1990 timeframe?**
A Well, DOE was designing the program, in a way, throughout all of the '80s. From 1983 on they were in design mods for various kinds of solutions.
If they had been in a performance world performance, their '91 data would have described a different environment than the one they projected, where they were hoping to have an MRS that might supply 10,000 tons worth of rice over the first 11 or 12 years. So they were all -- there was a lot

197

of planning going on.
I'm not relying on one year being the period in which the non-breach world would have suddenly resolved what exactly all of the expectations and circumstances were going to look like. Because in a world of fulfilling the requirements for moving must-move fuel in an efficient way, we would have had a very similar outlook over several years in a row.
So I'm taking an illustrative year. Another one could have been okay in the non-breach world, but this is a good one, too.
**Q Do you know how many of your shutdowns would have been eliminated as shutdowns if you would have moved it all the way back to 1990, for example?**
**Certainly Yankee Rowe is one.**
A I don't know. I haven't looked at that.
**Q Do you consider 1991 to be a non-performance world?**
MR. SHAPIRO: Objection. Vague.
THE WITNESS: Well, we already talked

50 (Pages 194 to 197)

198

about this. I don't -- my suspicion is most people would have been quite worried about non-performance by 1991. But, of course, it wasn't fOte accompli that there would be no performance by 1998. That only was event by 1998. But I wouldn't be surprised if a lot of people were getting anxious.

MR. EKMAN: Let's take a break.

(Recess)

BY MR. EKMAN:

**Q Just to make sure the record is clear in this case, something we talked about in Yankee.**

**You believe that the exchanges market would have begun developing in the early 1990; is that right, after the 1991 ACR and APR were issued?**

A After an ACR and APR were issued in conformance with the scale, the program that I'm talking about, yes.

**Q And then over how long would the market have operated?**

A Well, I don't know of any reason why it

199

couldn't have operated over a substantial portion of the life of the program. Because as we've been discussing, there are adjustments to people's needs that arise over time. Somebody can shut down early. Somebody can extend and not need their rights that they previously thought they needed.

So they'll be a -- a sort of a rebalancing function that's required periodically, even if everybody at some point in time feels comfortable there'll be some exchanges that are needed later on to keep them comfortable.

**Q Do you know when, at what point in time, all the folks in the first three years would have needed to have completed their transactions?**

A I would say most parties would probably want to have closed down their transactions two to three years in advance of the time when they would become must-move, because they would be otherwise going to have to pursue some other solution that might take a couple years to arrange.

**Q Now, in the Yankee version of your**

200

**model, all three of them are considered shutdown, correct?**

A Yes.

**Q And all of them get their fuel removed by 2002; is that right?**

A Yeah. And it might even be 2001, I forget. But it's 2001 or '2.

**Q And Yankee Rowe gets its fuel removed in 1999?**

A I think that's right.

**Q Now, here, Yankee actually moves up a year to 1998 is that right?**

A I believe that's also right.

**Q And then the other two are bidding as full pools?**

A Correct.

**Q And not as shutdowns?**

A Right. Part of the reason Yankee Rowe moves up is because there's less competition at the front end.

**Q And you haven't, at least in this model, you haven't endeavored to try to figure out when**

201

**the CY and MY, Connecticut Yankee and Maine Yankee, would have been out, based upon their subsequent --**

A As operating pools? Or do you mean in a --

**Q In a shut --**

A -- if they then shut down with -- no. I haven't done that. That's sort of a blend of the analysis I've done and a re-analysis a year or so later to see if anybody would then value the things differently than they did the time before, resolved. So I haven't done an iterative solution to the model like that.

**Q All right. Now, given that -- well, do you believe there could be multiple but-for worlds?**

A This is a very metaphysical question here.

**Q It is indeed.**

A Well, not for our purposes. There has to be a clarity to what we think is a good representation of what it could have been like.

206

**You would agree, though, that the notice, the difference, could be the difference between making a claim for -- that involves 5 to 10 million dollars in costs versus that does not contain a claim for 5 or 10 million dollars in cost associated with that extra year, depending on how it's treated?**
A If it's a full year, yeah, it could be that much.
**Q All right. Note four, you just noted that the license removal issue does not affect your clients in this case; is that right?**
A I'm not sure what your question is.
**Q Well, that's what it says, it doesn't --**
A Right. But what are you asking about that, besides what it says?
**Q I have follow-up. That was my question.**
A Oh, okay.
**Q However, the license removal will affect the curve, the overall curve of the must-move power?**
A Yes. If there's more renewals, then the

207

shutdown portion of the curve is pushed out.
**Q Now, in page 7 you discuss at the top the rate at which the must-move mountain climbs for the first twenty years; is that right?**
A Uh-huh.
**Q And that is the must-move mountain in figure one?**
A That's right.
**Q Not a license renewal must-move mountain?**
A The reference here is to the figure one version, right.
**Q So given that fact, a rate lower than 3,000 would actually meet the must-move mountain over the first twenty years, at least; is that right?**
A We need to be a bit more specific. The -- I'd have to look at a graph to see if that's true. I think it would still not fully meet the must-move needs in the very first few years, in any event, because we're -- I've assumed a ramping that's below that initial bump.

208

But it's -- it certainly would get the -- the lower the shutdown becomes, then the more that's pushed out into the future, the less you need in the first twenty years.
**Q Do you know if --**
A The less you need per year.
**Q Sorry.**
**Do you know if A 900 MTU rate of acceptance in the first twelve years of the program that ramped up to 3,000 thereafter, whether that rate would have kept up with at least full pool must-move, assuming licensure?**
A I think I've done sensitivities on that. And I recollect it being pretty close. But I couldn't say that it's exactly on.
MR. EKMAN: Let's mark that.
(Deposition Exhibit No. 2 was marked for identification.)
BY MR. EKMAN:
**Q Mr. Graves, you've been handed Exhibit 2, which is a graphical depiction that we created for this discussion. I think you'll remember we**

209

**had something similar at trial at the Yankee case. But I just want to talk about it with you here. And let me explain what we've done. First of all, we have assumed license renewal.**
A Okay.
**Q And, as you can see, the affect of that is indeed the shutdown part of the mountain declines in slope.**
**Do you see that?**
A Yes.
**Q And as you said, the full pool increases in slope?**
A Yes.
**Q And that's consistent with what you would have expected?**
A Right.
**Q Additionally, we have used your base case in this case, assuming only shutdowns that were shut down as of the 1995 systems requirement report. Okay?**
A Okay.
**Q So Maine Yankee and CY are not included**

210

**in this analysis.**
A Right.
**Q We've also, as you can see, removed that narrow band of ISFIS must-move fuel. Okay?**
A Where is it? Is it just gone?
**Q It's just gone.**
A On the theory that none of that is movable, or --
**Q Correct.**
A Okay. Ever?
**Q Well, we haven't added it in anywhere. And we'll break that up.**
**But if this graphical depiction is correct -- and this is a 900 rate that begins to ramp up in 2010 to 3,000 -- it appears that that rate, other than a little shutdown fuel from '98 to 2000 that is not accommodated, it actually appears to follow the slope of this must-move mountain -- again, as depicted on this chart -- almost exactly.**
**Do you see that? Would you agree with that?**

211

A Just for clarification, can you tell me what's happening in 2010 through '14? Is that the -- my ramp to 3,000 at that point?
**Q It's the 1800 speed, the 1990 PETSE rate.**
A So it's 1800 tons a year?
**Q Yeah, up to 3,000.**
A Okay. So with a mixture of recent thoughts on license renewal, but outdated -- now outdated thoughts on shutdown, the red -- and this other acceptance rate, you pretty much hug the must-move requirement, assuming the pre '95 -- or the pre-existing ISFIS's are also taken off the table.
**Q Now, at a minimum, it certainly covers full pool must-move?**
A It appears to, yes.
**Q And, in fact, it could, if we added that thin yellow band, it could cover full pool must-move and ISFIS must-move, just in that event, not shutdown must-move?**
A It would be pretty close. That looks

212

plausible.
**Q Do you know if the -- you talked about policy documents that talk about trying to -- I'll use your words -- were trying to avoid facilities incurring costs associated with must-move fuel.**
**You say that kind of concept has appeared in documents you've reviewed?**
A Yes.
**Q And have you heard it stated that it is -- the goal of the program was to avoid the construction of additional at-reactor storage beginning in 1998?**
A I recall there are a couple documents that focus on that aspect. I don't recall those being stated to be the goal of the program, but they're analyzing that question.
**Q Do you know if, in talking about the construction of additional at-reactor storage, that -- and let's assume that that is -- that that was a stated goal -- that that was meant to encompass the pre-existing shutdown fuel?**
A My understanding of the term is, if

213

we're talking about the same thing, is simply looking at the question of voiding the construction of new ISFIS's, not the question of dealing with every ISFIS that exists already.
**Q And if this graph is accurate; in other words, if we haven't monkeyed around with it, if this is accurate, this rate would preclude the need for the construction of additional at-reactor storage in the aggregate; again, assuming that there is some -- potentially assuming there is some exchanging going on; is that right?**
A With respect to full pool must-move alone, yes, this rate is sufficient to keep those guys comfortable, as you say with exchanges, and with the presumption that that's enough of a goal for the program, that that's satisfying a reasonable performance objective.
**Q And that also threw in the word in the aggregate.**
**Have you ever heard that phrase used in connection with the -- in these DOE documents?**
A I don't recall specifically, but I think

**based upon its ability to change its revenue stream by .1 percent?**

A Utilities don't base their -- or at least shouldn't base their decisions on the revenue leverage that they can create from those things. Utilities make decisions all the time to change out capacitors or bearings or fuel handling equipment that's worth a few hundred thousand dollars for the sake of saving, you know, two times that amount over the next five to ten years after that.

So in this case, you have to decide to give up the piece of paper in exchange for a few hundred thousand -- up to a few hundred thousand dollars from somebody else, with virtually no down-side. In a world where you're confident of the ongoing of the program, that's a no-brainer. It's an easy decision to make.

It's not big, but it -- relative to revenues, but, in aggregate, everyone in the utility making those kinds of decisions again and again saves lots of money.



**Q And I mean ultimately, given the -- given the relatively small amount of money that any of these utilities can make in those first few years, would you agree that the money itself -- or the money's just really a -- the monies a cherry; it's not what's going to drive the decision-making?**

MR. SHAPIRO: Objection. Vague.

THE WITNESS: In the analysis that I did, where everyone participates and puts no risk premium or hesitancy premium in their bids, that's true. The money turns out to be quite low. There are lots of people saving a lot more money than the cost of the exchanges in this program. You can buy exchanges for 10,000 dollars and have half a million dollars of savings per ton if you're actually experiencing times a lot of tons. So it's possible to have several million dollars of benefits from participating as a buyer.

If it turned out that the cherries weren't enough to get people to start talking at the price levels that I've got, people would raise



their willingness to pay, and I think attract them and still have a lot of savings from inducing participation in exchanges.

BY MR. EKMAN:

**Q Can you explain to me why say Portland was -- let me ask it this way. Let's use utilities I know.**

**Can you tell me why Southern Nuclear would want to save Pacific Gas & Electric money?**

MR. SHAPIRO: Objection. Vague.

THE WITNESS: You don't enter into any of these transactions any more than you do in any other commercial exchange, because of your hope for the satisfaction and enjoyment of the counter party. You do this for yourself. You're making some money at what you deem to be a low risk or low opportunity cost on that -- retaining that right that you could have otherwise had.

In fact, it may be that you're saving yourself money, if, as we just discussed, you would say, boy, if I don't get rid of these rights and find somebody who wants them, DOE's gonna keep



showing up at my darn doorstep every year saying, okay, it's your turn again, which 14 tons do you want taken out this year.

You know, son of a gun. I don't want 14 tons. Please come back in five years and take out a 120 tons at once. That's when I need you. I don't need you today. And as a result, you're costing me -- if you cost me a couple of days of operations, for a nuclear power plant that could be a million dollars in revenues in a single day easily, or on that order.

And so I could have lots of reasons for not wanting you around that don't show up in the price that I get paid by PG&E for giving up my right that's more of a nuisance to me than a benefit.

BY MR. EKMAN:

**Q I mean, ultimately, if that's true, if part of what you're doing is avoiding the nuisance, conceivably the price component of this market is totally irrelevant; isn't that right?**

MR. SHAPIRO: Objection. Vague.

254

THE WITNESS: It's conceivable. It --
the price component allows me to rank who seems to have the most acute must-move problems, and say they would be the ones who would be the buyers. I don't know who -- which of the sellers would regard themselves as facing the greatest nuisance. And so, you know, they might be willing to trade at even lower prices than -- I haven't simulated the nuisance function.
BY MR. EKMAN:
**Q And, I mean, you get much lower than the prices in the model that you currently have. And for these utilities -- I mean, at some point it becomes Monopoly money. It's not real money to them. It's too small.**
**Would you agree with that?**
MR. SHAPIRO: Objection. Vague.
THE WITNESS: It's too small for what? Too small to --
BY MR. EKMAN:
**Q Too small to dictate decisions. In other words, you know, I did the analysis with**

255

**what I make. And, you know, it'd be the -- in the .1 percent example for PG&E, it would be me making decisions to save 120 bucks. For you, it's probably a bit more. But not a lot of money. You know, 120 bucks, I'm probably going to have other things that are going to drive it rather than just the 120 bucks. And I guess it sounds like that's what you're saying.**
A That's right. I'm saying for the sellers, they could easily have unobserved benefits, private benefits, from selling, from decelerating their position, and that are quite valuable. And they're perfectly happy to just give away the right.
There's -- the power markets have similar experience in other settings. There's people who bid zero as the price they offer their energy at night into power pools so that they won't get turned off. And the literally would take zero if need be. You don't expect that they'll end up taking zero. But there have been times when prices have even gone negative over

256

night.
**Q And in your model --**
A And people still run their power plants at a loss, for the sake of not having an inconvenience of turning them off. So it's not an unfamiliar concept in the industry.
**Q And, in fact, your model goes to effectively zero, and yet -- in 2001, yet trades are still being executed?**
A Sure. Or rights are being allocated effectively to the must-move guys, in the world where we now have enough slack to clear the market. I don't know who's giving to whom, because I haven't bothered to define a slate of traders. But it could be done.
**Q All right. And the price decreases each year, right, from '98 to 2000?**
A It does in the base case. That's why I built the enhanced ESM, though. In the event that it doesn't, I need a mechanism for setting a price that's different.
**Q But the base case is the expert report**

257

**case?**
A Yes.
**Q So by 2000, on a per in to you basis, there's less money to be made than in 1998?**
A Yes.
**Q So by that point in time, the trade, to the extent money's at all a factor, it would be even less in 2000 than it was in '98; is that right?**
A Sure. That's right.
**Q Your next sentence states, The OFF acceptance priority is highly inefficient and would impose substantial avoidable costs on purchasers.**
**I think we've talked about the second part of that a lot?**
A Uh-huh.
**Q What is the basis for your statement that OFF is highly inefficient, outside of the avoidable cost issue, which --**
A Right. There's -- outside of the avoidable cost, the element if it that I think is



1700 Pennsylvania Avenue, N.W.
Washington, D.C. 20006

JABS REPORTING, INC.
www.jabsreporting.com

(202) 296-6102
(888) 805-5227

inefficient is that it tends to impose nuisance costs that we just talked about that aren't modeled in my valuation of the benefits from trade at utilities that would otherwise have to accept removals on prior to the need arising.

And it drives the program towards fragmented pickups, which will involve extra transportation, partial cask filling, things like that that are totally unnecessary if you consolidate more and align the removal schedules with the requirements.

**Q Now, to fill casks, you wouldn't necessarily need as expansive a program as you've -- a trading program as you've depicted here; is that right?**

A That's right.

**Q Is OFF -- are the OFF allocations any more or less efficient than your must-move -- full pool must-move allocations?**

A I didn't actually simulate any full pool allocations. You mean they happen to be the guys that mostly into the ESM, or --



**Q No. I mean in term of how full pool must-move is dealt with on a year-by-year basis, in terms of the size of the allocations on a year-by-year basis, as your model depicts it, do you know if that's any more or less efficient than the manner in which OFF allocates slots?**

A I'm still having a little trouble figuring out what you're getting at. My model -- just try paraphrasing. My model doesn't make a distinction between full pool and shutdown, in terms of potential priority in buying or rescheduling rights. So if it happens that a shutdown pool is willing to pay more than a full pool, they will. And they'll get ahead. So in that regard, that has to be more efficient.

If you're question is what if I just said let's just satisfy the full pool guys as they become full, and then I want to compare that to OFF, I haven't analyzed that. My guess is that satisfying full pool would be more efficient than OFF, because there's no necessary relationship between OFF and any kind of must-move condition.



So at least partly catering to must-move requirements would probably reduce costs. But it's an empirical question. Because, in principle, you could be harming some shutdown pools that would otherwise buy out under their OFF schedules.

**Q And let me rephrase that? I'm not trying to hose shutdown reactors here.**

A Okay.

**Q I'm trying to include them in this analysis.**

A Uh-huh.

**Q What I'm wondering is for the years in which -- which is every year -- you have full pool must-move folks bidding, right?**

A Yes.

**Q In every year?**

A Uh-huh.

**Q Are those allocations for full pool must-move, separate and apart from the ones that may be allocated as shutdown, separate and apart from those that are allocated ISFIS, are those**



**allocations any more or any less efficient on a -- from a pickup basis, from a program pick up basis, than simply OFF, for those same types of reactors?**

MR. SHAPIRO: Objection. Vague.

THE WITNESS: I would say certainly they're more efficient. Absolutely. Because, again, they're going to come when the guy needs it, as opposed to just sometime when he -- when DOE happened to be in the neighborhood. They -- I guess that's the main reason. They're tightly coordinated. And they also assure satisfying all the ones who are willing to pay.

The OFF rights may help you defer your full pool requirements. But they may get behind, in which case you fail, which doesn't happen in my model.

BY MR. EKMAN:

**Q All right. You mentioned nuisance costs. We talked a little bit about that.**

**Do you know if any operating utility has made a claim in these cases, in these spent fuel cases, asserting that they would not have wanted**



1700 Pennsylvania Avenue, N.W.
Washington, D.C. 20006

JABS REPORTING, INC.
www.jabsreporting.com

(202) 296-6102
(888) 805-5227

278

happen.
**Q Well, let's talk about that chart. Because, unfortunately, that was new to me at trial. And I didn't have the courage to ask a lot of questions I didn't know the answers to. So I'm going to ask them here.**
A Okay.
**Q Let's talk about your assumption.**
**According to this chart -- first of all, the OFF allocation is based upon the 1995 data; is that right?**
A The OFF is based on the discharges that had already been reflected through the end of 1993, and then the discharges that would be projected based on the SFR from 1995 on.
**Q So, for example, in this chart, unlike in the Yankee chart, Maine Yankee and CY kick in somewhere later than 1998 as shutdown; is that right?**
A Yes. That's right. With spectacular glasses, we could probably find them. So Haddamneck is. Connecticut Yankee, that's about

279

twenty -- about a third of the way down.
**Q 2011 or so?**
A 2011, yeah.
**Q 2012?**
A Uh-huh.
**Q The shutdown pool operation, the number of plant years, 198.**
**In fact, that 198 assumes no license renewal, right?**
A That's right.
**Q And even if I were to eliminate from the category the Connecticut Yankees, Maine Yankees of the world, and assumed that there would have been extended storage; in other words, go back to your Yankee chart, there's going to be a number of years here that at least through 2027 are not going to be present; is that right, under OFF?**
A Repeat again for me what we eliminated.
**Q Well, I'm trying to assume that Maine Yankee may go back, you know --**
A To being shut down.
**Q -- to being shut down.**

280

A Okay.
**Q Let's assume that those go back to being shut down. So that would take care of a couple of the blue bars, which, you know, may still be present. Haddamneck, for example would be one.**
**But for the rest of the utilities, all these blue bars, or most of them that begin in the 2012 timeframe, these potentially all go away; isn't that right?**
A If they all -- yeah, if they all license renew and they extend out and they don't hit full pool along the way, yes.
**Q So, in fact, the number of shutdown pool operation years, at least through 2027 might not be 198, but rather would be -- you know, if I wanted to be most favorable, add up the original numbers from the Yankee for all the pre '98 shutdowns?**
A Yes. It could be different. And at any given point in time, if I was an agent trying to get this going, I would go out and tell people, you know, this is what could happen to you. And

281

you're going to be facing lots of costs if you don't swap out of this. Now, they can say, well, maybe we won't. Maybe we'll life extend. But on the other hand, they may say, you know, you're right. Why don't I swap out.
**Q So it is --**
A But if I do life extend, I don't need them until even later. So I might as well give them to somebody now.
**Q It is possible then that the three years compared to the 198 -- the one -- the three isn't going anywhere; that's not going to get reduced?**
A Right. Unless you have a different relationship between the capacity and the amount of must-move.
**Q But the 198 might drop?**
A It might. You're right.
**Q And, actually, in Yankee I think the ESM would have actually been a little bit more than that; because Maine Yankee and CY would have been included in the shutdown pool operations; is that right? Do you know?**

COPY

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

\- - - - - - - - - - - - - - - - - x

PACIFIC GAS AND ELECTRIC COMPANY, :

:

Plaintiff, : No. 04-0074C

:

v. : Volume II

:

UNITED STATES OF AMERICA, :

:

Defendant. :

\- - - - - - - - - - - - - - - - - x

Washington, D.C.

Wednesday, January 25, 2006

Continued Deposition of:

FRANK C. GRAVES,

called for examination by counsel for the Defendant, at the Offices of Greengerg Traurig, 800 Connecticut Avenue, N.W., Suite 500, Washington, D.C., before Barbara A. Huber, court reporter and notary public in and for the District of Columbia, and commencing at 9:30 a.m., when were present on behalf of the respective parties:

BY MR. EKMAN:
Q Exhibit 4, Mr. Graves, is what's called a memorandum of agreement between joint interveners -- and you can see the list -- and Pacific Gas & Electric. And you can read as much or as little of this as you want.
But you can see that it's been signed by the interveners, as well as by an individual named Richard Locke, listed as an attorney for PG&E, and an individual named James Shiffer, who I think I actually deposed in this case?
A I see that.
Q And this actually circles back on a topic we talked about yesterday, as well. But you can see that in paragraph one, PG&E is agreeing to ship its fuel assemblies as soon as DOE has a repository available, or until some other facility is available to accept them, and that PG&E will pursue the highest DOE priority for the removal of the Humbolt Bay spent fuel assemblies.
Do you see that?
A Yes.



Q And would you characterize -- I characterize this as a desire of the folks of Eureka, California, certainly, that at least these folks, to get the fuel out as soon as possible.
Is that a fair characterization?
MR. SHAPIRO: Objection. Vague.
THE WITNESS: It seems to be an alignment of interest between the utility its -- and some of its -- some specific interveners to do just that, to get rid of the waste as soon as possible.
BY MR. EKMAN:
Q Are you familiar with the Redwood Alliance? Have you ever heard?
A I might have seen it in a California proceeding. But I don't remember the details of their membership.
Q All right. And then the last -- actually, to circle back on something we talked about yesterday. In paragraph three, PG&E is agreeing, at the end of that paragraph, to re-examine the possibility of utilizing dry cask



storage if and when such a storage option becomes available for a site such as Humbolt Bay power plant unit 3.
Do you see that?
A I see it.
Q So this appear to, at least for Humbolt Bay, to state a preference for getting the materials out of the wet pool and into dry storage?
A Apparently, yes.
Q Have you seen Exhibit 4 before?
A I have not.
Q Now, in areas of the country where -- again, under the assumption that there are areas that might support trading versus areas that might opposing trading.
In the areas that support trading, participation is not going to increase over and above the participation set forth in your ESM model; is that right?
MR. SHAPIRO: Objection. Vague.
THE WITNESS: As -- I have simulated, in



a sense, everyone being willing to participate in the ESM model. So I can't have more potential sellers than that, if, of course, it turns out that everyone doesn't exchange in every year. So you don't need to have everybody participating to accomplish considerable improvements in the schedule. But if only a portion of the country participates, that would be a smaller sample -- a smaller population of sellers.
BY MR. EKMAN:
Q In making its decision, do you know if PG&E takes into account its stakeholders in their preferences?
And by stakeholders, that includes the rate payers as well as its shareholders.
A Absolutely.
MR. SHAPIRO: Objection.
BY MR. EKMAN:
Q Have you investigated what the opinions of the stakeholders are, including the rate payers, concerning the presence of spent nuclear fuel in Eureka San Luis Obispo?

542

MR. SHAPIRO: Objection. Vague.
BY MR. EKMAN:
**Q Or I should say can it discourage participation?**
MR. SHAPIRO: Objection. Vague.
THE WITNESS: Well, I suppose it can. But there has to be a mechanism whereby it creates an unfair advantage. It can't just be the case that we say some people know more than others. So what. There's brokers who know -- or there's people who study financial companies very closely. And they're intensely involved. And they make livings trading stocks.
And there's others of us who just buy one -- buy stocks from time to time. And we don't have nearly as much information as the deep heavy traders. And it doesn't cause us to say it, gall darn it, I'm not going to get into this. There's an information asymmetry here.
What -- there has to be some unfair way of dealing with it, like insider trading, where the CEO makes some trades in the deal in a way

543

that he doesn't -- that he has information that no one else can or could have. And then that creates a perception of unfairness in the market that maybe discourages other people from participating.
I don't see such a gap in this. I don't see any party saying I know -- I have insider information about this program that gives me a special advantage that will discourage other people from dealing with me, or discourage anybody from dealing with me period.
BY MR. EKMAN:
**Q I mean, you don't account for information differences between the parties in your model, right?**
A In a way, what I account for is the information pretty much everybody could have. This is, in a sense, the public information surrounding the program. Everybody could have private information or private beliefs about their own costs and about the credibility of the program. And that might cause them to be willing to pay a little more or a little less than I've

544

shown. But they can all have pretty much this much information.
**Q And you'd agree that the cost information for these utilities, to the extent it existed, would have likely been proprietary?**
A Sure. Absolutely. Just like every shoe store's cost information is proprietary.
**Q Now, in the breach world, you would agree that there are a large number -- there have been a fair number of cask purchases across the industry; is that a fair statement?**
MR. SHAPIRO: Objection. Vague.
THE WITNESS: I think casks have been used in purchases, yes, in pretty substantial numbers.
BY MR. EKMAN:
**Q There's a fair number of utilities who in the breach world have cask cost experience that they might not have had in the non-breach world, right?**
A I guess that's an advantage, yes. They have a little more knowledge of cask costs than we

545

would.
**Q In the breach world, would you agree that some of the information that, as we sit here, appears to be fairly readily available based on personal experience of utilities, might not have been available in the breach world due to the fact that very few utilities would have ever have needed that type of equipment, for instance, casks?**
**Or sorry. The non-breach world. It would not have been available in the non-breach world. I'm sorry. I misspoke.**
A Well, we do have some operating experience, for instance, with ISFIS's. And probably several of them are breach-induced. And some of the casks that are on them were breach-induced.
On the other hand, you know, an ISFIS is not a nuclear submarine. It's basically a secure place to put casks and keep an eye on them. So I don't think there's extraordinary complexity to making a good guess about what they're worth and



1700 Pennsylvania Avenue, N.W.
Washington, D.C. 20006

JABS REPORTING, INC.
www.jabsreporting.com

(202) 296-6102
(888) 805-5227