No. 04-0075C
(Judge Hewitt)

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

PACIFIC GAS & ELECTRIC COMPANY,

Plaintiff,

v.

UNITED STATES,

Defendant.

DEFENDANT'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

HAROLD D. LESTER, JR.
Assistant Director

JOHN C. EKMAN
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, NW
Washington, D.C. 20530
Tel: (202) 353-0897
Fax: (202) 307-2503

OF COUNSEL:

JANE K. TAYLOR
Office of General Counsel
U.S. Department of Energy
1000 Independence Ave., S.W.
Washington, D.C. 20585

SCOTT R. DAMELIN
JOSHUA E. GARDNER
SHARON A. SNYDER
Civil Division
Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530

May 3, 2006

Attorneys for Defendant

# TABLE OF CONTENTS

**PAGE(S)**


SUMMARY OF ARGUMENT . . . . . . . . . . 1

STATEMENT OF FACTS . . . . . . . . . . 8

I. THE ORIGINAL PROVISIONS OF THE NUCLEAR WASTE POLICY ACT . . . . . . . . . . 8

II. THE DEPARTMENT OF ENERGY'S PROMULGATION OF THE "STANDARD CONTRACT FOR DISPOSAL OF SPENT NUCLEAR FUEL AND/OR HIGH-LEVEL RADIOACTIVE WASTE" THROUGH NOTICE AND COMMENT RULEMAKING IN THE FEDERAL REGISTER . . . . . . . . . . 9

A. The Proposed Rule . . . . . . . . . . 9

B. Public Comments . . . . . . . . . . 11

C. The Final Rule . . . . . . . . . . 13

III. PG&E'S EXECUTION OF ITS STANDARD CONTRACT . . . . . . . . . . 16

IV. ISSUANCE OF THE MISSION PLAN AND ITS AMENDMENT . . . . . . . . . . 16

V. THE 1987 AMENDMENTS TO THE NUCLEAR WASTE POLICY ACT . . . 18

VI. DOE'S ISSUANCE OF ANNUAL CAPACITY REPORTS . . . . . . . . . . 19

A. The 1987 Through 1990 Annual Capacity Reports . . . . . . . . . . 19

B. The 1991 Annual Capacity Report . . . . . . . . . . 20

C. The 1992 Through 1995 Annual Capacity Reports . . . . . . . . . . 22

VII. PROGRAM DOCUMENTS REFLECT PLANNED ACCEPTANCE AT AN MRS FACILITY . . . . . . . . . . 23

A. Program Reassessment And 1991 Draft Mission Plan Amendment . . . . 23

B. Preliminary Estimates Of The Total-System Life Cycle Cost For The Restructured Program . . . . . . . . . . 24

VIII. INDUSTRY SUBMISSION OF DELIVERY COMMITMENT SCHEDULES . . . . . 26

IX. PG&E'S ISFSI SCHEDULES AT HUMBOLDT BAY AND DIABLO CANYON REPEATEDLY HAVE MET WITH DELAY . . . . . 28

DISCUSSION . . . . . 31

I. PG&E BEARS THE BURDEN OF ESTABLISHING ALL ELEMENTS OF ITS CLAIM, INCLUDING LIABILITY, CAUSATION, FORESEEABILITY, AND REASONABLE CERTAINTY . . . . . 31

A. PG&E Has The Burden Of Proving All Elements Of Its Case . . . . . 31

B. PG&E's Burden Includes Its Obligation To Establish A Reasonable "But For" World Against Which To Measure Whether DOE's Delay "Caused" It To Incur Incremental Costs . . . . . 33

C. PG&E Has The Burden Of Demonstrating That Its Claimed Damages Were Foreseeable . . . . . 35

D. PG&E Must Prove Its Damages With Reasonable Certainty . . . . . 36

E. After Establishing The Legal And Factual Predicates To Damages, PG&E Must Demonstrate That Its Actions Mitigated Those Damages . . . . . 37

II. PG&E HAS FAILED TO MEET ITS BURDEN OF ESTABLISHING CAUSATION FOR ITS CLAIMED DAMAGES . . . . . 38

A. PG&E Has Failed To Meet Its Burden Of Establishing The "But For" World . . . . . 38

B. PG&E's Causation Theory Fails Because It Cannot Meet Its Burden Of Proving That DOE Was Obligated To Accept SNF At An Annual Rate Of 3,000 MTU . . . . . 42

1. PG&E Cannot Establish That DOE Was Obligated To Accept SNF At A Rate Sufficient To Preclude The Need For Additional At-Reactor Storage And Some "Backlog" Of Utility-Stored SNF . . . . . 42

2. PG&E Cannot Rely Upon Program Planning Documents To Establish The Government's Obligation To Accept SNF At An Annual Rate Of 3,000 MTU . . . . . 47

3. Mr. Graves' Opinions Concerning "Economic Efficiencies" Gained Through The Implementation Of An Acceptance Rate Of 3,000 MTU Are Irrelevant And Unsupported . . . . . . . . . . . . . . . 51

B. Causation And Resultant Damages Should Be Determined Against The Acceptance Obligations Developed Pursuant To The Schedule Mechanism In The Contract . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

1. The Acceptance Schedule Was Established In The Dealings Between The Parties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

2. Some Of The Decisions Issued Concerning The Rate Of Acceptance Incorrectly Analyze The Standard Contract Schedule Provisions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

C. PG&E Cannot Establish The Necessary Causal Link Between Certain Of Its Claimed Storage Costs And DOE's Delay . . . . . . . . . . . . . . . . . . 61

1. The Rate Of Acceptance Affects Causation . . . . . . . . . . . . . . . . 61

2. PG&E Cannot Meet Its Burden Of Establishing Exchanges . . . . 62

3. PG&E Would Have Incurred Costs Associated With The Storage Of GTCC Waste In The "But For" World . . . . . . . . . . . . . . . . . . 66

4. PG&E's Damages Claim Fails To Account For Failed Fuel . . . . 67

5. PG&E Cannot Establish Causation For Costs Associated With The Ventilation Stack Removal Project At Humboldt Bay . . . . . 68

6. PG&E Cannot Establish Causation For Certain Costs It Allegedly Incurred For Internal Labor And "Overheads" . . . . . . . . . . . . . . 69

7. Additional Adjustments Must Be Made To PG&E's Claim . . . . 71

8. PG&E's Claim Should Be Reduced To Account For Costs That It Would Have Incurred In The "But For" World . . . . . . . . . . . . . 72

III. PG&E'S DAMAGES CLAIM CONTAINS COSTS THAT WERE NOT FORESEEABLE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

IV. PG&E'S CLAIMED DAMAGES MUST BE REDUCED BY AT LEAST $6.2 MILLION BASED UPON ITS FAILURE TO ESTABLISH CERTAIN COSTS WITH REASONABLE CERTAINTY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

V. PG&E HAS FAILED PROPERLY TO MITIGATE DAMAGES . . . . . . . . . . . 78

VI. PG&E'S CLAIMS FOR COSTS INCURRED BEFORE 1998 ARE BARRED BY THE APPLICABLE STATUTE OF LIMITATIONS . . . . . . . . . . . . . . . . . . 81

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83

## TABLE OF AUTHORITIES

**CASES** **PAGE(S)**

AES Tech. Sys., Inc. v. Coherent Radiation,
583 F.2d 933 (7th Cir. 1978) . . . . . 70

Abbott Labs. v. Brennan,
952 F.2d 1346 (Fed. Cir. 1992) . . . . . 34

Alaska Pulp Corp. v. United States,
59 Fed. Cl. 400 (2004) . . . . . 32

Autotrol Corp. v. Cont'l Water Sys. Corp,
918 F.2d 689 (7th Cir. 1990) . . . . . 70

Aviation Contractor Employees, Inc. v. United States,
945 F.2d 1568 (Fed. Cir. 1991) . . . . . 60

Barrow Utils. & Elec. Co. v. United States,
20 Cl. Ct. 113 (1990) . . . . . 36

Bel Pre Health Care Center, Inc. v. United States,
24 Cl. Ct. 495 (1991), aff'd, 980 F.2d 745 (Fed. Cir. 1992) . . . . . 58

Big Horn Coal Co. v. Commonwealth Edison Co.,
852 F.2d 1259, 1267 (10th Cir. 1988) . . . . . 63

Bluebonnet Sav. Bank, F.S.B. v. United States,
339 F.3d 1341 (Fed. Cir. 2003) . . . . . 32, 35, 61

Bluebonnet Sav. Bank, F.S.B. v. United States,
67 Fed. Cl. 231 (2005) . . . . . 35, 39, 73

Bohac v. Department of Agric.,
239 F.3d 1334 (Fed. Cir. 2001) . . . . . 35, 74

Boyajian v. United States,
423 F.2d 1231 (Ct. Cl. 1970) . . . . . 69

Branhill Realty Co. v. Montgomery Ward & Co.,
60 F.2d 922 (2d Cir. 1932) . . . . . 51

Brice v. Secretary of Health & Human Servs.,
240 F.3d 1367 (Fed. Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81

Brinson v. Linda Rose Joint Venture,
53 F.3d 1044 (9th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

California Fed. Bank v. United States,
395 F.3d 1263 (Fed. Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

City of Tacoma, Dep't of Public Utilities v. United States,
31 F.3d 1130 (Fed. Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

Coast Fed. Bank, FSB v. United States,
48 Fed. Cl. 402 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35, 39, 73

Columbia First Bank v. United States,
60 Fed. Cl. 97 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Commercial Metals Co. v. United States,
176 Ct. Cl. 343 (1966) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

Commonwealth Edison Co. v. United States,
56 Fed. Cl. 652 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55, 56

Coyle's Pest Control, Inc. v. Cuomo,
154 F.3d 1302 (Fed. Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

David Nassif Assocs. v. United States,
214 Ct. Cl. 407, 557 F.2d 249 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58, 59

Department of Energy v. Westland,
565 F.2d 685 (CCPA 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

Fawick Corp. v. United States,
149 Ct. Cl. 623 (1960) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33, 40

Fraas Surgical Mfg. Co. v. United States,
215 Ct. Cl. 820, 571 F.2d 34 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

Glendale Fed. Bank, FSB v. United States,
239 F.3d 1374 (Fed. Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35, 39

Hi-Shear Technology Corp. v. United States,
356 F.3d 1372 (Fed. Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

Indiana Michigan Power Co. v. Department of Energy,
88 F.3d 1272 (D.C. Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

Indiana Michigan Power Co. v. United States,
57 Fed. Cl. 88 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55, 56, 57

Indiana Michigan Power Co. v. United States,
422 F.3d 1369 (Fed. Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

J.D. Hedin Constr. Co. v. United States,
197 Ct. Cl 782, 456 F.2d 1315 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Julius Goldman's Egg City v. United States,
697 F.2d 1051 (Fed. Cir. 1983), cert. denied, 464 U.S. 814 (1983) . . . . . . . . . . . . . . . 46

Koby v. United States,
54 Fed. Cl. 493 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

LaSalle Talman Bank, F.S.B. v. United States,
45 Fed. Cl. 64 (1999) , rev'd on other grounds, 317 F.3d 1363 (Fed. Cir. 2003) . . . . . 37

Landmark Land Co. v. Federal Deposit Insur. Corp.,
256 F.3d 1365 (Fed. Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

Maine Yankee Atomic Power Co. v. United States,
225 F.3d 1336 (Fed. Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Marketing & Mgmt. Information, Inc. v. United States,
62 Fed. Cl. 126 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

Massengill v. Guardian Mgt. Co.,
19 F.3d 196 (5th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

Mays v. Trump Indiana, Inc.,
255 F.3d 351 (7th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

McAbee Constr, Inc. v. United States,
97 F.3d 1431 (Fed. Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

Menne v. Celotex Corp.,
861 F.2d 1453 (10th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Modern Sys. Tech. Corp. v. United States,
979 F.2d 200 (Fed. Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

Myerle v. United States,
33 Ct. Cl. 1 (1897) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32, 33

National By-Products, Inc. v. United States,
186 Ct. Cl 546, 405 F.2d 1256 (1969) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

Neeley v. Bankers Trust Co. of Tex.,
757 F.2d 621 (5th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

Northern Helex Co. v. United States,
207 Ct. Cl. 862, 524 F.2d 707 (1975), cert. denied, 429 U.S. 866 (1976) . . . . . 33, 35, 74

Omni Corp. v. United States,
41 Fed. Cl. 585 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

Point Productions A.G. v. Sony Music Entertainment, Inc.,
215 F. Supp. 2d 336 (S.D.N.Y. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Prudential Ins. Co. v. United States,
801 F.2d 1295 (Fed. Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35, 74

Quiman, S.A. de C.V. v. United States,
39 Fed. Cl. 171 (1997), aff'd, 178 F.3d 1313 (Fed. Cir. 1999) . . . . . . . . . . . . . . . . 33, 34

Ramsey v. United States,
121 Ct. Cl. 426, 101 F. Supp. 353 (1951) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Ridge Runner Forestry v. Veneman,
28 F.3d 1058 (Fed. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

Robinson v. United States,
305 F.3d 1330 (Fed. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37, 78

Roseburg Lumber Co. v. Madigan,
978 F.2d 660 (Fed. Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32, 36, 75

S.W. Eng'g Co. v. Cajun Elec. Power Coop.,
915 F.2d 972 (5th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

Sacramento Municipal Utility Dist. v. United States,
No. 98-488, 2006 WL 950218 (Mar. 31, 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

San Carlos Irrig. & Drainage Dist. v. United States,
111 F.3d 1557 (Fed. Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33, 40

San Carlos Irrig. & Drainage Dist. v. United States,
877 F.2d 957 (Fed. Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Selman v. United States,
204 Ct. Cl. 675, 498 F.2d 1354 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

Shann v. Dunk,
84 F.3d 73 (2d Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

Shyface v. Secretary of Health and Human Servs.,
165 F.3d 1344 (Fed. Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Southern Pac. Co. v. Darnell-Taenzer Lumber Co.,
245 U.S. 531 (1918) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Tennessee Valley Authority v. United States,
69 Fed. Cl. 515 (2006), appeal pending 2006-5073
(Fed. Cir. docketed Apr. 19, 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

Transamerica Equip. Leasing Corp. v. Union Bank,
426 F.2d 273 (9th Cir. 1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

United States Fidelity & Guaranty Co. v. United States,
230 Ct. Cl. 355, 676 F.2d 622 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

United States Steel Corp. v. United States,
618 F. Supp. 496 (CIT 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

Wells Fargo Bank v. United States,
88 F.3d 1012 (Fed. Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34, 36, 75

White v. Delta Constr. Int'l, Inc.,
285 F.3d 1040 (Fed. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

Willems Indus., Inc. v. United States,
155 Ct. Cl. 360, 295 F.2d 822 (1961) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

Willred Co. v. Westmoreland Metal Mfg. Co.,
200 F. Supp. 59 (E.D. Pa. 1961) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

Wilner v. United States,
23 Cl. Ct. 241 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

Wilson v. Marquette Elecs., Inc.,
630 F.2d 575 (8th Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

**BOARD DECISIONS**

McDonnell Douglas Corp.,
ASBCA No. 26747, 83-1 BCA ¶ 16,377 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

Rapid City Indian Health Advisory Bd. of Directors,
ASBCA No. 26641, 83-1 BCA ¶ 16,311 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

Thomas W. Yoder Co.,
VABCA No. 997, 74-1 BCA ¶ 10,424 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

**STATUTES AND REGULATIONS**

10 C.F.R. § 961.11 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

48 Fed. Reg. 16590 (Apr. 18, 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 47

48 Fed. Reg. 5458 (Feb. 4, 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10, 14

Low-Level Waste Policy Amendments Act of 1985,
42 U.S.C. §§ 2021b-2021i . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

Nuclear Waste Policy Act of 1982,
Pub. L. 97-425, 96, Stat. 2201 (codified at 42 U.S.C. §§ 10101-10270 (1982)) . . . passim

S. Rep. No. 100-152 (Sept. 1, 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

## MISCELLANEOUS

W. Keeton, et al., Prosser and Keaton on the Law of Torts 266-68 (5th ed. 1984) . . . . . . . . . . 34

Restatement (Second) of Contracts § 211 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

Restatement (Second) of Contracts, § 351, cmt. a . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

Restatement (Second) of Contracts § 352, cmt. a . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| PACIFIC GAS & ELECTRIC COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES,<br><br>Defendant. | No. 04-0074C into which has been consolidated No. 04-0075C<br>(Judge Hewitt) |

DEFENDANT'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW

Pursuant to this Court's order dated March 24, 2006, defendant, the United States, respectfully submits the following memorandum of contentions of fact and law.

SUMMARY OF ARGUMENT

This case involves a damages claim by plaintiff, Pacific Gas & Electric Company ("PG&E"), for $96.4 million in costs that it allegedly has incurred through December 31, 2004, at its Diablo Canyon and Humboldt Bay nuclear power plants associated with the storage of spent nuclear fuel ("SNF"). PG&E's claim includes costs for, among other things, wet pool storage operations at Humboldt Bay; the design, licensing, and fabrication of dry storage facilities at both Diablo Canyon and Humboldt Bay; and the licensing and fabrication of additional spent fuel storage racks in the cask pit areas of the two wet pools at Diablo Canyon. PG&E also seeks damages for amounts paid in the 1990s for the yet-to-be-constructed Private Fuel Storage ("PFS") facility in Utah, certain costs associated with the take down and reconstruction of the ventilation stack at Humboldt Bay, and costs incurred in the mid-to-late 1990s associated with the study of SNF storage options at Diablo Canyon. PG&E contends that the Government is liable for all of these costs because the need for additional storage was caused

by the Government's failure to begin accepting SNF from commercial nuclear reactors on January 31, 1998, pursuant to the "Standard Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste" ("Standard Contract") between the Department of Energy ("DOE") and PG&E.

As an initial matter, we recognize that the Court has not made any specific findings in this case regarding whether DOE's delay in beginning SNF acceptance constituted a breach of the Standard Contract or whether, based upon any such breach, DOE is liable for damages. In light of the current posture of this case, any decisions regarding breach and liability may be informed by the trial evidence relating to the meaning of the contract terms and the extent to which the contract terms created specific performance obligations. We note, however, that PG&E has made various arguments in its pre-trial brief challenging the Government's position that the Standard Contract, which originally did not specifically define the rate with which DOE was required to accept SNF after beginning that acceptance on January 31, 1998, was sufficiently definitized through DOE's issuance of the 1991 Annual Capacity Report, followed by the 1992 submission and approval of delivery commitment schedules, to create an enforceable schedule against which damages can be measured. Specifically, PG&E has argued that it is simply too speculative to create a "but for" world (that is, a world in which DOE timely began SNF acceptance in 1998) or, alternatively, that DOE was somehow obligated contractually to accept SNF from the nuclear industry at a rate of 3,000 MTUs per year, even though no such term is contained in the express language of the contract. To the extent that the Court rejects the Government's arguments that the parties sufficiently definitized the contract through their agreements in 1991 and 1992, a serious question would arise regarding the enforceability of the

Standard Contract, given that one of the most essential parts of the Standard Contract would be rendered wholly indefinite. The evidence at trial will establish that the parties' agreements in 1992 essentially definitized the previously undefined schedule for continued SNF acceptance. However, if this Court disagrees with that position, the result will be the creation of a contract to which the parties did not mutually agree at the time of contract formation or through a contract amendment. To the extent that the Court finds the schedule terms of the Standard Contract undefined and indefinite, it cannot impose liability based upon obligations that are not contained in the contract itself.

Nevertheless, assuming that the parties sufficiently definitized the schedule for SNF acceptance in 1991 and 1992, and assuming that PG&E can establish DOE's liability for a partial breach of contract, PG&E's damages claim is characterized by overreaching, as well as by its inability to recognize material failures to mitigate costs, and its pre-trial brief is founded upon the incorrect legal premise that PG&E lacks any burden of proving the Government's legal responsibilities in the "but for" world. Indeed, PG&E abdicates any responsibility for establishing that its damages accurately reflect the difference between the costs that PG&E actually incurred and the costs that PG&E would have incurred had DOE begun performance upon an industry-wide basis in 1998. Although PG&E may be entitled to compensation for certain costs associated with the storage of SNF that it incurred after 1998, the trial evidence will show its damages claim is grossly in excess of the costs that it actually incurred as a result of DOE's partial breach of the Standard Contract.

At trial, PG&E bears the burden of proving that its damages were foreseeable, were caused by DOE's partial breach, and are reasonably certain. As part of that legal obligation,

PG&E must establish that it properly has accounted for costs that would have been incurred had DOE performed beginning in 1998. PG&E also must show that its actions were actually intended to mitigate its damages. This legal burden is real, and PG&E must do more at trial than simply identify costs that it has incurred in connection with the storage of SNF and shift to the Government the burden of disproving foreseeability, causation, and reasonable certainty. PG&E apparently intends to characterize all of its claimed costs as "mitigation efforts" in an attempt to place the burden on the Government to disprove their reasonableness, without ever establishing as an initial matter that the need for these efforts was actually caused by DOE's delay and would not have been necessary in the "but for" world. It has not basis for avoiding its own need to meet its own burden of proof.

PG&E's claim requires significant adjustment based upon PG&E's inability to establish its burden of proof. First, PG&E cannot establish causation for at least many of its claimed costs. In its brief, PG&E asserts that all of Humboldt Bay's SNF would have been removed by DOE in 1998, the first year of industry-wide acceptance, and that DOE would have accepted the first SNF from Diablo Canyon beginning in 2006. These "fuel out dates" are premised upon the incorrect contention that the Standard Contract obligated DOE to accept SNF at a rate that would exceed the industry-wide generation rate and work off the backlog of SNF stored at commercial nuclear reactors. Indeed, during contract formation, DOE expressly rejected language requested by utilities and industry advocates that would have tied the acceptance rate to the annual generation rate and to a reduction of the backlog. Based upon the myriad uncertainties associated with the development of a first-of-a-kind program and performance under a contract 15 years removed from its execution, the Standard Contract contains neither a defined

acceptance rate nor an objective measurement for performance. In fact, the Standard Contract expressly recognizes this uncertainty, and states "[t]he provisions of this contract have been developed in the light of uncertainties necessarily attendant upon long-term contracts." 10 C.F.R. § 961.11, Art. XV. Instead, the Standard Contract contains a mechanism for the development of an acceptance rate in the early 1990s – a point in time when DOE would have a clearer picture both as to its expected available facility and the capacity of the system in 1998.

At trial, we expect to show that the proper rate of acceptance for the Court to apply in evaluating damages claims is that which was developed pursuant to the terms of the Standard Contract and in accordance with the constraints upon DOE's acceptance of SNF imposed by Congress. As required by the Standard Contract, this rate was first set forth in the 1991 Annual Capacity Report. Based upon PG&E's allocations pursuant to this rate and the oldest-fuel-first acceptance queue established by the Standard Contract, PG&E would have required additional on-site storage at Diablo Canyon prior to DOE's first acceptance no earlier than 2011 and PG&E would have been obligated to pay for all wet storage costs at Humboldt Bay through at least 2001, not 1998, as asserted in its claim.

PG&E's assertion of a 1998 fuel out date at Humboldt Bay requires both the implementation of its acceptance rate and the Court's acceptance of a factually unsupported opinion that a perfect market for the exchange of approved DOE acceptance allocations would have developed among the utilities in the years leading up to the commencement of acceptance of SNF by DOE in 1998. The Government will demonstrate that the exchange market opinion articulated by PG&E's expert, Frank Graves, factually is unsupported (and, in fact, is contradicted by the evidence), lacks support from other "representative" markets, ignores critical

economic considerations such as financial and political risk, and relies upon fundamentally flawed financial inputs relating to industry costs. Upon analysis, Mr. Graves' opinion should not form the basis for any causation determination that PG&E would have obtained DOE acceptance rights from other utilities in a manner that improved PG&E's position in the acceptance queue, thereby increasing its damages claim. Moreover, because PG&E cannot establish the adjustment to its claim that it admits is needed under its exchanges theory with admissible evidence, it cannot meet its burden of proof, and the exchanges theory fails both as a matter of fact and law.

Additionally, PG&E's claim requires adjustment for certain activities that were not caused by DOE's partial breach and for costs avoided as a result of the partial breach. These adjustments include costs associated with activities that would have been performed by PG&E in the "but for" world (i.e., loading SNF to DOE, ventilation stack removal) and costs that are not supported by admissible evidence (i.e., certain internal labor and overhead costs).

Second, PG&E cannot recover costs that were not foreseeable at the time of contracting. These costs include those associated with the dual purpose cask technology that PG&E has licensed and plans to purchase at both of its facilities. This technology did not exist at the time of contracting, is substantially more expensive than the storage-only technology that existed at the time of contracting, and usurps a contractual obligation imposed upon DOE to provide transportation packages to the utilities. Indeed, PG&E's defense of the Government's significant adjustment for SNF loading costs in the "but for" world is premised upon the assumption that DOE will not accept for transportation and disposal, under the Standard Contract, the transportable storage systems that PG&E has purchased.

Third, the Government will present substantial evidence that PG&E has failed properly to

mitigate its damages. For example, PG&E was at fault for significant delays in the construction of an Independent Spent Fuel Storage Installation ("ISFSI" or "dry storage") at Humboldt Bay, which caused significant delays in PG&E's removal of its SNF from its wet pool. Despite having an obligation to mitigate damages beginning in 1994, PG&E repeatedly placed its interests at Diablo Canyon first and failed properly and timely to pursue dry storage licensing, construction, and loading at Humboldt Bay, even when it possessed the operational flexibility to do so. Had PG&E properly mitigated damages, its SNF at Humboldt Bay would have been loaded to dry storage by 2002, rather than its projected (and ever-changing) date of 2009, thereby eliminating at least seven years of expensive wet pool operations and maintenance ("O&M") costs from damages (both past and prospective). This failure to mitigate counsels that costs associated with the Humboldt Bay ISFSI are not recoverable as a consequence of its failure to mitigate. Additionally, PG&E's delays in constructing its ISFSI at Diablo Canyon significantly have increased, rather than mitigated, the alleged damages owing the Government. PG&E should bear the cost increases associated with its failures.

Finally, PG&E's attempt to recover amounts paid in connection with the Private Fuel Storage ("PFS") facility in Utah is flawed because the PFS venture was not foreseeable and did not constitute reasonable mitigation. These costs were for a highly speculative venture that had little chance – applying foresight at the time that the decision to invest in PFS was made – of providing PG&E with an appropriate or available alternative option for the storage of SNF. See Indiana Michigan Power Co. v. United States, 422 F.3d 1369, 1376 (Fed. Cir. 2005) (affirming this Court's finding that amounts paid to PFS did not constitute reasonable mitigation because the investment was speculative and the cost unforeseeable).

PG&E's brief is characterized by its attempt to evade any responsibility to establish the "but for" world where the characteristics of that world would serve to decrease its damages. Instead, PG&E simply asserts that the "but for" world is too speculative to establish. Yet, where a causation theory underlying the "but for" world works to increase PG&E's damages – such as PG&E's exchanges theory and the various contentions of its experts as to how DOE would have performed in a manner that works to PG&E's benefit – the "but for" world is all but certain in PG&E's mind. PG&E cannot have it both ways. If PG&E cannot meet its burden of proof – and, upon many elements of its claim, it cannot – its damages claim fails.

## STATEMENT OF FACTS

### I. THE ORIGINAL PROVISIONS OF THE NUCLEAR WASTE POLICY ACT

On January 7, 1983, the Nuclear Waste Policy Act of 1982 ("NWPA"), Pub. L. 97-425, 96 Stat. 2201 (codified at 42 U.S.C. §§ 10101-10270 (1982)), was enacted. In its statement of the statutory purposes underlying the NWPA, Congress identified the following four objectives: developing repositories to ensure the protection of the public and the environment from the hazards posed by SNF and high level radioactive waste ("HLW"); establishing Federal responsibility and policy for the disposal of SNF and HLW; defining the relationship between the Federal Government and state governments regarding SNF and HLW disposal; and establishing a Nuclear Waste Fund, financed by the utilities, to pay for the costs of the DOE program. Id. § 10131(b).

The NWPA defines a specific process by which the Secretary of Energy, the President of the United States, and the United States Congress would determine a site for a repository for the permanent deep geologic disposal of SNF. See 42 U.S.C. §§ 10132, 10134, 10135. Congress

also included in the NWPA provisions allowing the Secretary to study the possibility of creating Monitored Retrievable Storage ("MRS") facilities, with Congress finding that "long-term storage of high-level radioactive waste or spent nuclear fuel in monitored retrievable storage facilities is an option for providing safe and reliable management of such waste or spent fuel." 42 U.S.C. § 10161(a)(1) (1982).[1]

In addition, the NWPA authorized the Secretary to enter into contracts with the owners and generators of SNF of domestic origin for "the acceptance of title, subsequent transportation, and disposal of such [SNF]." 42 U.S.C. § 10222(a)(1) (1982). The contracts had to "provide for payment to the Secretary of fees . . . sufficient to offset expenditures" described elsewhere in the statute. Id.

## II. THE DEPARTMENT OF ENERGY'S PROMULGATION OF THE "STANDARD CONTRACT FOR DISPOSAL OF SPENT NUCLEAR FUEL AND/OR HIGH-LEVEL RADIOACTIVE WASTE" THROUGH NOTICE AND COMMENT RULEMAKING IN THE FEDERAL REGISTER

### A. The Proposed Rule

On February 4, 1983, the Department of Energy ("DOE"), in furtherance of its obligations under the NWPA, published a notice of proposed rulemaking in the Federal Register, proposing terms for the Standard Contract. See 48 Fed. Reg. 5458 (Feb. 4, 1983). The proposed Standard Contract provided a mechanism for determining the order in which, and the rate at which, the contract holders' SNF would be accepted. As for the order of SNF acceptance, the

[1] By July 1, 1985, the Secretary was to "complete a detailed study of the need for and feasibility of, and shall submit to the Congress a proposal for, the construction of one or more monitored retrievable storage facilities for high-level radioactive waste and spent nuclear fuel." Id. § 10161(b)(1).

Standard Contract proposed that DOE would issue an "acceptance priority ranking" ("APR") of SNF and/or HLW, through which SNF and/or HLW would receive acceptance priority based generally upon its age. Id. at 5464 (Art. VI.B.3). Although the proposed Standard Contract did not identify a specific rate by which DOE would accept contract holders' SNF, it provided for DOE's issuance of documents for planning purposes to assist in the eventual definitization of the specific rate and order of SNF acceptance and disposal. Id. at 5463 (Art. V.B.5 & Art. V.B.6). The proposed contract further provided that, following DOE's issuance of planning documents, rates of SNF acceptance, as well as the specific order of SNF acceptance from particular contract holders, would be defined through the contract holders' submission, and DOE's approval, of delivery commitment schedules ("DCSs"). Id. at 5462. The proposed Standard Contract also provided for the contract holders' submission of Final Delivery Schedules ("FDSs"), which would take the annual allocation defined in an approved DCS and refine it to reflect as closely as possible the month(s) and day(s) upon which acceptance of particular SNF would occur. Id. at 5463 (Art. IV.C). The term "DOE facility" in the proposed Standard Contract referred to a permanent repository for disposal of the SNF and/or HLW. Id. at 5462 (Art. I.11). The proposed rule provided for written comments to be submitted by March 7, 1983. Id. at 5458.

B. Public Comments

DOE received numerous comments in response to the proposed rule.[2] A number of the comments recognized that the Standard Contract did not establish a specific rate at which DOE must accept SNF, and sought to have such a rate included. The Edison Electric Institute ("EEI"), an association of the nuclear power industry to which PG&E belonged, requested as follows:

> The contract should include a recognition that DOE will design its facilities with the capacity to receive SNF/HLW at a rate commensurate with the amount of SNF/HLW then being generated together with the accumulated backlog of SNF/HLW. We believe that DOE should be able to take delivery of SNF/HLW equal to that year's generation plus a reasonable share of the backlog. While the contract may not be the appropriate place to commit DOE to a specific numerical receiving rate, DOE should recognize, at least qualitatively, the need to have adequate annual receiving capacity to handle industry needs.

DX 2.034, Attachment A at 2 (ARC0010334).

Other utilities submitted similar comments seeking firm commitments regarding the rate of SNF acceptance. For example, Tennessee Valley Authority ("TVA") submitted a comment, stating that "a commitment to do no more than start accepting deliveries by 1998 is empty and meaningless without setting forth some reasonable minimum rate of acceptance which corresponds to the purposes of the Act." DX 2.063 at 5 (ARC0010537). Although TVA recognized that, "under the priority ranking system in the draft contract, it would be difficult at

[2] Contrary to the assertion in PG&E's brief that the industry was largely uninvolved in the formulation of the Standard Contract, Pl. Br. 9, the evidence will show that utilities and their representatives had significant involvement with and input in the NWPA and the Standard Contract and affirmatively requested – and received – certain terms for inclusion in the final Standard Contract, including the term concerning exchanges of approved DCSs. Simply because the utilities failed to obtain every term that they sought in the Standard Contract does not diminish their role in the formation of that contract. Indeed, we submit that it is common for a party to a contract not to receive every term it desires.

the time contracts are executed to give each Purchaser assurances of delivery acceptance at any specific rate," it suggested that "[t]his could, however, be done on an industry wide basis." Id. TVA suggested that DOE add a contract provision to provide that "DOE shall start accepting delivery of SNF or HLW not later than January 31, 1998, at not less than the annual rate [at which] SNF and/or HLW is then being produced from civilian nuclear power plants covered by contracts . . . ." Id. DOE also received comments seeking a commitment for DOE to accept SNF at the rates set forth in the Mission Plan that DOE was to prepare in accordance with statutory requirements for ultimate submission to Congress, for its review and consideration. For instance, Florida Power & Light Company, expressly stated that DOE should create a mandatory obligation that would require DOE to accept SNF and HLW at the rates identified in the Mission Plan, once that plan was approved by Congress. DX 2.043, attachment 1 at 1 (ARC0010439).

PG&E submitted its 31-page comment to DOE on March 4, 1983. DX 2.60. PG&E's comments requested the inclusion of the language from Section 302(a)(5)(A) of the NWPA that, "[f]ollowing commencement of operation of a repository, DOE shall take title to the SNF and/or HLW of the Purchaser as expeditiously as practicable upon the request of the Purchaser." DX 2.60, at 11; see 42 U.S.C. § 10222(a)(5)(A). This language ultimately was included in the Standard Contract in a "Whereas" clause. PG&E's comments also reflect minor changes to the DCS provision (requesting that a provision be included requiring DOE to approve or disapprove a resubmitted DCS within 30 days) (DX 2.60, at 6), a request for an exchanges provision (id. at 7), a request for reallocation of acceptance to other purchasers in the event a Purchaser is unable to deliver SNF to DOE upon the OFF schedule (id. at 9), and a request to withhold one-third of the annual receiving capacity for newer operating plants (id. at 13-14). PG&E also requested the

inclusion of a provision to account for delay, upon the grounds that, "[s]ince waste disposal is a cooperative effort which is funded by a common fund, there should be no monetary liability of damages for delay either by a Purchaser or DOE." Id. at 20. Finally, PG&E requested a provision that sought the ability to modify the terms of the contract based upon the fact that "[t]he provisions of this contract have been developed in the light of the uncertainties necessarily attendant to long-term contracts." Id. at 28. Unlike some other utilities, PG&E did not expressly incorporate EEI's comments upon the draft Standard Contract and did not seek language tying DOE's acceptance obligation to the generation rate, backlog of SNF, or at-reactor storage requirements.

EEI also suggested that "[t]he definition of 'DOE Facility' (Article I.11) should be broadened to include destinations other than the repository." DX. 2.034, Attachment A at 4 (ARC0010336). EEI stated that "[t]he contract does not recognize the possibility that DOE might send SNF/HLW to an intermediate location (such as a monitored retrievable storage facility) before it goes to a repository" and, "[t]o accommodate this, the definition of 'DOE Facility' should be broadened." Id. at 5 (ARC0010337); see DX 2.014 (ARC0010180) (change to contract language "would implicitly recognize DOE's option to reprocess SNF or to utilize Monitored Retrievable Storage prior to permanent disposal"); DX 2.069 (ARC0010625) ("[t]his change would recognize the possibility of DOE shipping SNF/HLW to an intermediate storage facility such as a monitored retrievable storage facility").

### C. The Final Rule

On April 18, 1983, DOE issued the Standard Contract as a final rule. The final rule, as promulgated, made certain modifications to the Standard Contract as set forth in the proposed

rule. Although the proposed rule provided that "services provided to the Purchaser by DOE under this contract are related to disposal of SNF," 48 Fed. Reg. at 5462, that "disposal" was defined as emplacement in a permanent repository, id., and that such "disposal" services would begin by January 31, 1998, id., the final Standard Contract eliminated any requirement for DOE to begin SNF "disposal" in a permanent repository by January 31, 1998. Instead, the final Standard Contract only required DOE to begin SNF acceptance by January 31, 1998, after the commencement of "facility" operations. 10 C.F.R. § 961.11, Art. II. The "facility" to which the final Standard Contract refers is either a permanent repository to be constructed pursuant to the NWPA or such other facility to which SNF might be shipped by DOE prior to its transportation to a permanent repository. Id. § 961.11, Art. I.10. As the preamble to the final rule expressly recognized, the final Standard Contract would not obligate DOE to have an operational permanent repository by January 31, 1998:

> The definition of "DOE facility" (Article I.10) was expanded to expressly state, in accordance with the Act, that there may be an interim storage facility (or facilities) which DOE may utilize prior to emplacement in a repository.

48 Fed. Reg. 16590, 16591 (Apr. 18, 1983).

DOE did not adopt the suggestion of EEI and many of the utilities to incorporate into the contract a requirement that DOE accept SNF at a rate equal to the annual generation rate plus some additional amount to reduce the accumulated backlog. The Government will show at trial that DOE determined it could not obligate itself to satisfy such a commitment because the number of uncertainties concerning the development of the program, the development of the contemplated disposal facilities, and the potential capabilities for accepting SNF that could be developed by 1998. Accordingly, DOE specifically declined to create any commitment to accept

SNF beginning in 1998 at a specific minimum rate or based upon any mandatory minimum criteria. Instead, the contract provided that the acceptance rate would be developed later through the promulgation of the 1991 ACR.

The utilities acknowledged that DOE rejected their requests regarding the inclusion of a qualitative description of the acceptance rate in both internal memoranda and correspondence with DOE.[3] For example, TVA noted that its request regarding the acceptance rate term had been rejected:

> DOE did not accept TVA's suggestion that DOE should start accepting delivery of SNF and HLW in 1998 at a rate not less than that which they are being produced by the civilian nuclear power industry as a whole.

DX 64, Attachment 2 at 3 (TV1471) (TVA memorandum, dated May 24, 1983); see also DX 81 at 1 (Yankee Atomic memorandum, dated January 20, 1984). Similarly, in a letter to Robert Morgan of DOE, EEI complained that the Standard Contract as promulgated lacked "standards or milestones for DOE's performance . . . ." DX 72, Attachment 1 at 1 (SN011049).[4] Finally,

---

[3] PG&E asserts that the utilities shared the same understanding concerning DOE's obligation to accept SNF at a rate that would accommodate discharges after 1998 and work off the backlog. Pl. Br. 11. PG&E is mistaken. In fact, utilities in these cases have taken different positions concerning DOE's obligations. Southern Nuclear Operating Company, Georgia Power Company, and Alabama Power Company asserted a DOE contractual obligation that was tied to "no additional at-reactor storage" and timely decommissioning (defined by the Southern Nuclear plaintiffs as decommissioning within five years of shutdown) – an obligation that cannot be satisfied with a 3,000 MTU rate. In contrast, Tennessee Valley Authority accepted the rate set forth in the 1991 ACR and argued that the rate in 2008 would ramp-up immediately from 900 MTU to 3,000 MTU.

[4] DOE likewise did not adopt Florida Power & Light Company's request that DOE add a contract clause obligating DOE to accept SNF and/or HLW under "the schedule and capacities detailed in the approved 1984 DOE Mission Plan . . . ." DX 5.043, Attachment 1 at 1 (ARC00010439).

the Standard Contract contained an integration clause, which precluded reliance upon any representation, promise, or condition not expressly incorporated into the contract:

> This contract, which consists of Articles I through XXII and Appendices A through G, annexed hereto and made a part hereof, contains the entire agreement between the parties with respect to the subject matter hereof. Any representation, promise, or condition not incorporated in this contract shall not be binding on either party. No course of dealing or usage of trade or course of performance shall be relevant to explain or supplement any provision contained in this contract.

10 C.F.R. § 961.11, Art. XXII.[5]

III. PG&E'S EXECUTION OF ITS STANDARD CONTRACT

On June 30, 1983, PG&E executed the Standard Contract with DOE. The Standard Contract covered the SNF generated at Diablo Canyon and Humboldt Bay. This Standard Contract contained essentially the same terms and conditions as the final rule promulgated by DOE on April 14, 1983. See DX 1.

IV. ISSUANCE OF THE MISSION PLAN AND ITS AMENDMENT

In June 1985, DOE issued and submitted to Congress the Mission Plan, in accordance with the requirements of 42 U.S.C. § 10221, which was to "provide an informational basis sufficient to permit informed decisions to be made in carrying out the repository program and the research, development, and demonstration programs required under this chapter." 42 U.S.C. § 10221(a). In the 1985 Mission Plan, DOE projected for informational purposes that an initial permanent repository would begin operations in 1998 and that a second permanent repository

---

[5] The Standard Contract also included a "Disputes" clause that provided a mandatory administrative mechanism for the resolution of disputes arising under the contract. 10 C.F.R. § 961.11, Art. XVI.A.

would commence operations in 2006. DX 90 at 25-26 (HQR0031129-30). The schedules contained in the Mission Plan projected annual SNF generation rates from utilities nationwide of approximately 3,000 MTU in 1998 and increasing by 2007 to over 4,000 MTU per year. Id.[6] The Mission Plan noted that these schedules were "only an approximation of how the system may operate and is subject to considerable variation. The DOE will further define and specify the system acceptance parameters as the program progresses." DX 90 at 29 (HQR0031133). The Mission Plan further advised:

> Under the terms of the contracts for disposal services that have been signed between the DOE and the utilities, an annual capacity report with projected annual receiving capacities and rankings will be issued by the DOE beginning in 1987. In 1991, the DOE will begin to publish firm waste-acceptance schedules for individual reactors, including shipment allocations.

Id.

In the 1987 Mission Plan Amendment, submitted to Congress in June 1987, DOE recommended deferral of the date contemplated for operation of the first repository from 1998 to 2003, with the second repository becoming operational by 2023. The Mission Plan Amendment reflected DOE's recognition that acceptance beginning in 1998 could not begin at a permanent repository. DOE explained that its recommendation was based upon experience gained in the program, a budget decrease for Fiscal Year 1987, and budget uncertainty for Fiscal ear 1988. However, DOE noted that it could nonetheless begin waste acceptance in 1998 at an MRS facility.[7] DX 114 at 6 (HQR0031634). The 1987 Mission Plan Amendment acknowledged the

---

[6] Today, utilities discharge approximately 2,000 MTU of SNF per year.

[7] The ability to start accepting waste in 1998 at an MRS facility was dependent upon congressional authorization. See 42 U.S.C. § 10161(b)-(c) (1982).

importance of the Annual Capacity Report that would be issued in 1991 – namely, that it would be used as the basis for the DCS process. DX 114 at 60 (HQR0031687).

V. THE 1987 AMENDMENTS TO THE NUCLEAR WASTE POLICY ACT

On December 22, 1987, after DOE submitted the 1987 Mission Plan Amendment, Congress amended the NWPA "to redirect the program for the management and disposal of spent nuclear fuel and high-level radioactive waste under the [NWPA]." S. Rep. No. 100-152, at 1 (Sept. 1, 1987). The Senate Committee on Energy and Natural Resources reported, in considering legislation to amend the NWPA, that "[t]he schedules included in the NWPA have proven to be overly ambitious" and that "[t]his has been largely due to the need to provide additional time for completion of necessary technical work and additional time for public participation." Id. at 5. The committee reported that, "[i]n the four and a half years since passage of the NWPA, it has become clear that the program laid out in the Act will take longer to complete than was anticipated and that completion will be at much greater cost." Id. It further reported that, "[i]n addition to cost and schedule considerations, a number of other circumstances have changed since passage of the NWPA," including that, "as we approach major decision points in the nuclear waste program, there will be great potential for political opposition . . . ." Id.

The 1987 amendments to the NWPA directed DOE to characterize a single site, at Yucca Mountain in Nevada, for development of a permanent repository and to terminate activities at all other sites. 42 U.S.C. § 10172(a). The 1987 amendments also authorized the Secretary to site, construct, and operate one, but only one, MRS facility. 42 U.S.C. § 10162(b). However, the 1987 amendments provided that "construction of [the MRS] facility may not begin until the

Commission has issued a license for the construction of a repository under section 115(d)." 42 U.S.C. § 10168(d)(1). Finally, they also provided that "the quantity of [SNF] at the site of such facility at any one time may not exceed 10,000 metric tons of heavy metal until a repository under this Act first accepts [SNF]." Id. § 10168(d)(3).[8]

## VI. DOE'S ISSUANCE OF ANNUAL CAPACITY REPORTS

### A. The 1987 Through 1990 Annual Capacity Reports

Beginning in 1987, in compliance with the NWPA and the language of the Standard Contract, DOE issued an "Annual Capacity Report." As each of these ACRs expressly stated, "[a]s specified in the Contract, the ACR is for planning purposes only and thus is not contractually binding on either DOE or the Purchasers." DX 113 at 2 (HQR0012713), DX 130 at 1 (HQR0012617), DX 162 at 2 (HQR0012494) ("projections in this initial report are based on current plans and best available information; they are not contractually binding"). Further, each of the ACRs from 1987 through 1990 contained the following, or substantially similar, language:

> Beginning in 1991, the ACR acceptance ranking will be converted into an Annual Priority Ranking for receipt of SNF/HLW. In 1992, based on this priority ranking, the Purchasers will submit to DOE for approval, Delivery Commitment Schedules identifying the SNF/HLW that Purchasers propose to deliver to the DOE waste management system (WMS). Once approved, these schedules will become the basis for Final Delivery Schedules to be submitted by the Purchasers not less than 12 months before the date of DOE's anticipated acceptance of title to the SNF/HLW and subsequent transport to a DOE facility.

---

[8] The 1987 amendments to the NWPA also established the Office of the Nuclear Waste Negotiator. 42 U.S.C. § 10242(a). That office was to seek to enter into negotiations with states and Indian tribes to "attempt to reach a proposed agreement" with them through which a state or Indian tribe "would agree to host a repository or [MRS] facility with such State or reservation." Id. § 10243(a). The authorization for that office expired in 1994, id. § 10250, without any agreements with any states or Indian tribes.

DX 113 at 2 (HQR0012713), DX 130 at 2 (HQR0012618), DX 162 at 2 (HQR0012494).

### B. The 1991 Annual Capacity Report

In December 1991, DOE issued its "Annual Capacity Report" for that year, DOE-RW-331P. DX 187 at 1-2 (HQR0012362-HQR0012363). The 1991 ACR was significant because it was the last ACR that would be issued before the contract holders were to begin submitting DCSs beginning January 1, 1992. See 10 C.F.R. § 961.11, Art. V.B.1. In that regard, the 1991 ACR provided that, "[b]eginning in January 1992, the Purchasers may submit Delivery Commitment Schedules (DCS) to DOE identifying the range of SNF that the Purchasers propose to deliver to the Federal Waste Management System (FWMS) beginning sixty-three months thereafter." DX 187 at 2 (HQR0012363). It also stated that "[t]he Purchasers' allocations for each delivery year are presented in Tables A.1 through A.10 in Appendix A, and should be used as the basis for submitting DCSs." Id. at 2, 7.

As dictated by the Standard Contract, the 1991 ACR specified the rate of acceptance for the first 10 years of the DOE program, beginning in 1998. Specifically, the 1991 ACR specified the following acceptance rate:

TABLE 2.1

Projected Waste Acceptance Rates for Spent Nuclear Fuel

| Year | | SNF (MTU) |
|---|---|---|
| 1998 | | 400 |
| 1999 | | 600 |
| 2000 | | 900 |
| 2001 | | 900 |
| 2002 | | 900 |
| 2003 | | 900 |
| 2004 | | 900 |
| 2005 | | 900 |
| 2006 | | 900 |
| 2007 | | 900 |
| 2008 | | 900 |
| | TOTAL | 8,200 |

DX 187 at 5 (HQR0012366). This rate was created with the knowledge that no permanent repository would be available by January 31, 1998. Id. at 4 (HQR0012365). Instead, "the waste acceptance projections used in this ACR are representative of a FWMS [Federal Waste Management System] configuration authorized by the NWPA, which includes a Monitored Retrievable Storage (MRS) facility." Id. In particular, the rates were "consistent with the 10,000 MTU storage capacity limit contained in the NWPA for an MRS facility before a repository starts operation." Id. DOE noted, however, that the schedule assumed that the schedule linkages between the MRS construction and repository construction authorization would be eliminated. Id.

In a memorandum dated December 20, 1991, Ronald A. Milner, Associate Director for Storage and Transportation, stated in a memorandum to John Bartlett, Director, Office of Civilian Radioactive Waste Management, as follows:

> The 1991 ACR assumes that FWMS [Federal Waste Management

> System] operations commence in 1998 and the system configuration is that authorized by the Nuclear Waste Policy Amendments Act of 1987, specifically a Monitored Retrievable Storage facility with a 10,000 MTU storage limit prior to repository operations.
>
> The 1991 ACR differs from previously published ACRs for two reasons. First, while the information in the ACR has traditionally been used for planning purposes only, the allocations in the 1991 ACR will also serve as the basis for submission of Delivery Commitment Schedules (DCS) by the Contract holders. These DCSs, which will provide planning information for waste acceptance activities, may be submitted to the Department as early as January 1, 1992.

DX 195.

The utility industry recognized the importance of the 1991 ACR in the determination of delivery commitments for performance beginning in 1998. See, e.g., DX 196 at 2 and 3 (SN169910) (UWASTE memorandum explaining that the ACR and APR "are necessary to properly complete the DCS forms"); DX 199 at 2 (SN170373) (same); DX 119 at 8 (YDK038298) (UNWMG memorandum describing the 1991 ACR as "contractually binding").

C. The 1992 Through 1995 Annual Capacity Reports

The 1992 ACR, which was issued in May 1993, contained the same acceptance rates as the 1991 ACR. DX 245 at 4 (HQR 0012324). The 1992 ACR also provided that, "[d]uring the first ten years following projected commencement of the Civilian Radioactive Waste Management System (CRWMS) operation, the total quantity of SNF that could be accepted is projected to be 8,200 MTU." DX 121 at v (HQR 0012319). It stated that "[t]his is consistent with the storage capacity licensing conditions imposed on an MRS facility by the NWPA." Id.

In 1995, DOE issued a combined APR and ACR, to "establish[] the order in which the Department allocates the projected acceptance capacity for commercial [SNF]" and to appl[y]

projected nominal acceptance rates for the system to the priority ranking in the APR, resulting in individual allocations for the owners and generators expressed in metric tons per uranium (MTU)." DX 308 at 1 (PDCP0034616). The 1995 ACR contained substantially similar SNF acceptance rates as the 1991 and 1992 ACRs, identifying a projected nominal waste acceptance rate of 8,200 for the first 10 years of SNF acceptance. Id. at 4 (PDCP0034619). The 1995 ACR also contained the following statement:

> The ACR (see Appendix B) applies a 10-year projected nominal waste acceptance rate to the APR, resulting in individual capacity allocations. In the previous ACR, the projected nominal acceptance rate was based on the assumption of SNF acceptance beginning in 1998 at a Monitored Retrievable Storage facility prior to repository operations. Due to the uncertainty associated with the date of commencement of operation of the waste management system, the annual nominal waste acceptance rates are presented by year(s) of operation of the system rather than by specific calendar year(s). The projected nominal acceptance rates also reflect the capacity limit imposed by the Act on such a storage facility prior to repository operations. These projected nominal waste acceptance rates are presented in Table 1. The Department will continue to process DCS submittals on an annual basis.

Id. at 3-4 (emphasis added). The 1995 ACR further provided that the capacity allocations listed in the ACR "form the basis for the Purchasers' submittal" of DCSs. Id. at 1.

## VII. PROGRAM DOCUMENTS REFLECT PLANNED ACCEPTANCE AT AN MRS FACILITY

### A. Program Reassessment And 1991 Draft Mission Plan Amendment

In November 1989, the Secretary of Energy submitted a report to Congress regarding DOE's reassessment of the program. In this report, DOE stated that it would be unable to begin operations at a permanent repository until 2010, because there was insufficient time to perform the scientific investigation necessary. DX 142 at ix-x (DB0001450-51). However, DOE also

stated that it planned "to work with Congress to modify the current linkages between the repository and the MRS facility and to embark on an aggressive program to develop an integrated MRS facility for spent fuel." Id. DOE further advised that, "if the linkages [were] modified, it [was] likely that waste acceptance at an MRS facility could begin by 1998 or soon thereafter." Id.

In September 1991, DOE issued another Draft Mission Plan amendment, which provided further details upon the "action plan" set forth in the Secretary's 1989 Reassessment. DX 183 at HQR0030799. In accordance with the 1989 Reassessment, the 1991 Draft Mission Plan Amendment reaffirmed DOE's plans to begin performance in 1998 at an MRS.

> To achieve the objective of timely and adequate waste acceptance, we plan to develop an MRS facility that is to start waste acceptance in 1998. To make this possible, the President's legislative package for the National Energy Strategy includes a provision to repeal the schedule linkages established in the Nuclear Waste Policy Amendments of 1987 (Amendments Act). This could also be achieved by congressional enactment of a negotiated siting agreement reached through the efforts of the Nuclear Waste Negotiator.

Id. at 18 (HQR0030825). The schedule set forth in the 1991 Mission Plan Amendment showed acceptance by DOE up to the 10,000 MTU limit upon the MRS until the repository began operations in 2010. Id. at 205-206. The evidence at trial will demonstrate that PG&E actively supported the MRS and accepted the acceptance limitations associated with that facility. Indeed, the focus of PG&E's efforts in the 1990s was upon the commencement of DOE acceptance and not upon the rate at which DOE would accept SNF from the contract holders.

### B. Preliminary Estimates Of The Total-System Life Cycle Cost For The Restructured Program

DOE's anticipation of performance at an MRS was also reflected in the cost analyses that

it performed around the time of the 1991 ACR to support the adequacy of fees collected for the Nuclear Waste Fund. The fee paid by utilities, 1 mil per kilowatt hour, was established by Congress in enacting the NWPA. 42 U.S.C. § 10222(a)(2). Pursuant to the NWPA, DOE is required annually to assess whether the fees collected pursuant to statute are adequate to fund all of the efforts necessary to implement the NWPA. 42 U.S.C. § 10222(a)(4). The Secretary is to advise Congress if the fee is found to be inadequate. Id. To determine whether the fee is adequate, DOE first prepares a Total System Life Cycle Cost report, in which it projects the total cost of the program. This total system cost projection is based upon the projected number of years that the program is estimated to operate, projected transportation requirements, projected interest rates, and other factors. See, e.g., PX 331 and PX 185. The current program plans, including acceptance rate projections, type and location of receiving facilities, and scope of the transportation program, are the basis for the total cost estimate.

In its Preliminary Estimates of the Total System Life Cycle Cost For The Restructured Program: An Addendum to the May 1989 Analysis of the Total Life Cycle Cost for the Civilian Radioactive Waste Management Program, December 1990 ("1990 PETSLCC"), DOE utilized a schedule that was explicitly based upon acceptance starting at an MRS. DX 163. The first ten years are identical to the ACR schedule, with the exception of the second year of acceptance, where the 1990 PETSLCC contemplates that 400 MTU rather than 600 MTU of SNF would be accepted. Id. This schedule also shows what DOE anticipated the transition from a repository to an MRS would look like. Id. In year eleven and year twelve of acceptance, 900 MTU would be accepted at a permanent repository. In years thirteen through seventeen 1,800 MTU would be accepted. And only in year eighteen (2015) would the system accept 3,000 MTU. Id.

## VIII. INDUSTRY SUBMISSION OF DELIVERY COMMITMENT SCHEDULES

By letter dated March 4, 1992, the DOE contracting officer issued a letter to PG&E and other utilities, along with the instructions for the submission of DCSs. DX 201. The contracting officer stated that "[t]he allocations in the 1991 Annual Capacity Report (ACR) should be the basis for the DCS submittals." Id. The accompanying instructions provided that purchasers could "begin submitting to the Department of Energy (DOE) Delivery Commitment Schedules (DCS) that identify all spent nuclear fuel (SNF) the Purchasers plan to deliver to DOE beginning 63 months thereafter." Id. The instructions stated that "[t]he DCS provides the Purchasers with the opportunity to inform DOE of their plans for utilizing their allocations of projected Federal waste management system (FWMS) acceptance capacity." Id. They further provided that, "[f]or each allocation listed in the 1991 ACR (or subsequent ACRs, as appropriate), a Purchaser must submit at least one DCS for that allocation at least 63 months prior to the date that the allocation occurs (e.g., if a Purchaser has an allocation in 1998, a DCS must be submitted for that allocation by September 30, 1992)." Id. The instructions also required that the utilities list upon the DCSs the method of delivery to DOE (truck, barge, or rail) and fuel handling crane capacities.

The DCS instructions were developed with the full participation of the nuclear industry. See, e.g., DX 91 at 3 (SN169940) (UWASTE memorandum advising members that DOE had issued the draft DCS instructions and that the Standard Contract Task Force would meet to develop comments); DX 181 (Minutes of Standard Contract Task Force meeting, during which members met with DOE to discuss and provide comments upon the draft DCS instructions); DX 185 at 3 (SN169920) (UWASTE memorandum advising members that Standard Contract Task

Force had provided comments to DOE upon another draft of the DCS instructions); see DX 145 (Minutes of High-Level Waste/Spent Fuel Storage Working Group Meeting stating that "[b]y 1/1/92, each utility is required to submit a DCS to DOE" and that the task force would be "following this closely."). After DOE issued the instructions, utilities met with DOE again to discuss the instructions. DX 202.

Recognizing the need to submit DCSs to claim allocations, many utilities submitted timely DCSs that were approved by DOE. For example, Wisconsin Electric Power Company ("WEPCO") submitted DCSs for all of its allocations in the first ten years of acceptance in 1992. Eight other utilities also submitted DCSs for all of their allocations in the first ten years of contract performance after 1998. Moreover, every utility with an allocation in 1998 and 1999, with the exception of one utility, submitted a DCS for that allocation. All of those DCSs were approved by DOE. All but two utilities with allocations in 2000 submitted DCSs that were approved by DOE.

On August 25, 1992, PG&E submitted to DOE four DCSs for Humboldt Bay, identifying separate allocations for the years 1998, 1999, 2000, and 2001 of the program. DX 224. The allocations identified in these four DCSs encompassed all of the 390 SNF assemblies stored at Humboldt Bay.[9] In its DCSs, PG&E requested truck transportation of its SNF by DOE and that DOE provide to PG&E 25-ton casks.[10] By letter dated November 13, 1992, DOE informed PG&E that it had disapproved the four DCSs because they had been incorrectly completed. DX

[9] Diablo Canyon did not possess any allocations in the first 10 years of DOE's program.

[10] Under the Standard Contract, DOE is required to provide the casks for transport of the utilities' SNF from the utilities' sites to a disposition site.

234. As a result, on November 24, 1992, PG&E submitted four revised DCSs. DX 235. As with its first submittals, PG&E requested shipment by truck within the 25-ton limit. On March 10, 1993, DOE approved the revised DCSs.

Both the original and revised DCSs submitted by PG&E comported with the rate of acceptance set forth in the 1991 ACR and reflected PG&E's allocations under that rate. PG&E's decision documents reflect its plans to submit DCSs consistent with DOE's instructions, as well as a lack of objection to DOE's instructions. Ultimately, PG&E neither challenged nor objected (formally or informally) to DOE's instructions concerning the submittal of DCSs.

## IX. PG&E'S ISFSI SCHEDULES AT HUMBOLDT BAY AND DIABLO CANYON REPEATEDLY HAVE MET WITH DELAY

PG&E began planning for dry storage at Humboldt Bay and Diablo Canyon in 1995, although it began studying storage expansion options for Diablo Canyon in 1992. Pl. Br. 16, 19. As part of that plan, PG&E analyzed the potential costs associated with dry storage in contrast to maintaining its SNF in the Humboldt Bay wet pool. Unlike at Diablo Canyon, an operational facility that continues to generate SNF, PG&E is not required to operate its wet pool at Humboldt Bay as long as the SNF remains in that pool. If the SNF is removed from the pool (i.e., to an ISFSI), and if no other waste is present in the wet pool, the operations and maintenance ("O&M") costs for the wet pool can be terminated. In its financial analyses, PG&E recognized that the cost savings associated with an ISFSI are obtained based upon the savings realized in ISFSI O&M costs as compared with the more expensive wet pool O&M costs. Over time, the significant up-front licensing, design, construction, and procurement expenses

associated with dry storage are recovered through the realized yearly reductions in O&M costs.[11] However, the longer the ISFSI takes to be loaded and/or the greater the up-front cost – both of which are anticipated – the longer the period of DOE non-performance is needed to recover the up-front expenses.

By 1996, PG&E decided to proceed with an ISFSI at Humboldt Bay. Pl. Br. 19. The Government will show that early schedules presented to PG&E management assumed loading of SNF to the Humboldt Bay ISFSI no later than 2002, thereby allowing recovery of the capital costs for the ISFSI to begin by 2003 through reduced annual O&M. At the beginning of the project, PG&E determined that, to recover as much money as possible, Humboldt Bay should lead Diablo Canyon's efforts to construct an ISFSI. However, PG&E soon altered those plans, largely ceasing work upon the Humboldt Bay ISFSI project to focus internal resources upon the ISFSI to be constructed at Diablo Canyon. Moreover, PG&E limited spending at Humboldt Bay, pending approval of the expenditures by the California Public Utility Commission ("CPUC"). See Pl. Br. 19. PG&E could have expended money without CPUC approval to facilitate the advancement of the Humboldt Bay ISFSI project. Although PG&E recognized the possibility that it would seek reimbursement of amounts expended from the Government in litigation, it did not want to proceed with ISFSI expenditures without the CPUC's agreement to build those costs into PG&E's rate base. At no time did PG&E consider the mitigation of costs to the Government in its SNF storage planning. Additionally, PG&E failed to obtain and utilize resources that would have allowed both projects to go forward simultaneously. As a result, PG&E increased the amount of time that Humboldt Bay's SNF remains in wet storage, thereby

[11] PG&E would have incurred no up-front capital costs if it had elected to continue wet storage of its SNF until DOE acceptance.

increasing its damages.

Significantly, early in the ISFSI licensing process, PG&E determined that Diablo Canyon needed an "insurance policy" in the event that dry storage was not licensed and constructed by 2006 – the date upon which PG&E projected that full core reserve would be lost in the Unit 1 wet pool. In response, PG&E undertook rack additions in the Unit 1 and Unit 2 wet pools that would, once installed, extend PG&E's full core reserve in each pool by two operating cycles (or, roughly, three years each). PG&E currently plans to install both racks into the pools – because PG&E does not expect to load to the ISFSI in time to maintain full core reserve in either unit – and is charging the Government approximately $2.5 million in past costs and expects to charge an additional $5 million in future costs for that project.[12]

However, once PG&E elected to extend full core reserve through 2010 and 2012 at Diablo Canyon Units 1 and 2 through the rack addition (with the understanding the costs for that expansion would be charged as damages here), PG&E continued to proceed with the Diablo Canyon ISFSI at the expense of Humboldt Bay. Ultimately, PG&E plans to load Diablo Canyon's ISFSI beginning in 2008, even though the additional racks would provide three-to-four additional years of storage in each unit. In contrast, Humboldt Bay's SNF currently is scheduled to be loaded in 2009 – though additional delays are possible. As a result, expensive wet pool O&M costs continue to accrue indefinitely.

[12] Based upon the commencement of storage expansion activities in 1995 at Diablo Canyon, we will present evidence at trial that the cask pit racks are not reasonable mitigation, as Diablo Canyon should have been able – over an 11-year period – to license, construct, and load its ISFSI, thereby avoiding the need for this significant expense altogether.

# DISCUSSION[13]

## I. PG&E BEARS THE BURDEN OF ESTABLISHING ALL ELEMENTS OF ITS CLAIM, INCLUDING LIABILITY, CAUSATION, FORESEEABILITY, AND REASONABLE CERTAINTY

### A. PG&E Has The Burden Of Proving All Elements Of Its Case

"To recover for breach of contract, a party must allege and establish: (1) a valid contract between the parties, (2) an obligation or duty arising out of the contract, (3) a breach of that duty, and (4) damages caused by the breach." San Carlos Irrig. & Drainage Dist. v. United States, 877 F.2d 957, 959 (Fed. Cir. 1989). We acknowledge that, in Maine Yankee Atomic Power Co. v. United States, 225 F.3d 1336 (Fed. Cir. 2000), the United States Court of Appeals for the Federal Circuit held that, at least in the SNF cases at issue there and where the plaintiffs had paid all of their fees, DOE's failure to begin accepting SNF from the nuclear utility contract holders by January 31, 1998, constituted a breach of contract. Nevertheless, as we discussed in the summary of our argument earlier in this brief and as we will discuss below, PG&E has raised arguments in its pre-trial brief that, if accepted, would call into question the entire enforceability of the Standard Contract because, under PG&E's arguments, the contract would be missing an essential term that, in its absence, would render the contract too indefinite to enforce. Given that PG&E must establish a valid contract between the parties, adoption of its arguments regarding the contract terms may preclude a liability finding.

Nevertheless, even if the Court finds liability in this case, PG&E still must prove all of

[13] PG&E's pre-trial brief contains seven "issues of fact" that it believes the Court must decide. Pl. Br. 22. The Government responds to those "issues of fact" and the faulty legal bases underlying those "facts" through its factual and legal arguments herein. We do not present our own "issues of fact" in the manner set out by PG&E for the purposes of this pre-trial presentation, and we strongly disagree with the factual and legal premises of the identified "issues of fact."

the remaining elements of its damages claims. As the United States Court of Appeals for the Federal Circuit recently recognized, the mere fact of DOE's breach of the Standard Contract does not "perforce" make all of a utility's costs "to store its SNF recompensable: [a plaintiff] must prove foreseeability, causation, and reasonableness," Indiana Michigan Power Co. v. United States, 422 F.3d 1369, 1376 (Fed. Cir. 2005), and it must prove these three elements "by a preponderance of the evidence." Alaska Pulp Corp. v. United States, 59 Fed. Cl. 400, 413-14 (2004). According to the precedent of this circuit, PG&E bears the burden of introducing clear proof that it was injured as a direct result of DOE's delay in accepting its SNF. Myerle v. United States, 33 Ct. Cl. 1, 27 (1897). Further, the "measure of damages to be applied in the particular case is irrelevant until the claimant has established the fact of losses that were the natural and proximate result of the breach of contract." Willems Indus., Inc. v. United States, 155 Ct. Cl. 360, 376, 295 F.2d 822, 831 (1961). "Absent tangible proof of damages, [a party] may not recover for an alleged injury." Roseburg Lumber Co. v. Madigan, 978 F.2d 660, 667 (Fed. Cir. 1992).

The parties agree that "[t]he remedy for breach of contract is damages sufficient to place the injured party in as a good a position as it would have been had the breaching party fully performed." Pl. Br. 23 (citing Indiana Michigan, 422 F.3d at 1373). Conversely, "the non-breaching party should not be placed in a better position through the award of damages than if there had been no breach."[14] Bluebonnet Sav. Bank, F.S.B. v. United States, 339 F.3d 1341, 1344-45 (Fed. Cir. 2003) (citing White v. Delta Constr. Int'l, Inc., 285 F.3d 1040, 1043 (Fed.

---

[14] To the extent that PG&E asserts that the "but for" world is speculative and, therefore, not susceptible of proof, and given PG&E's burden of proof, it is unclear how PG&E will meet that burden.

Cir. 2002) ("the non-breaching party 'should on no account get more than would have accrued if the contract had been performed.'" ). Although "the effort is made to put the injured party in as good a position as that in which he would have been put by full performance of the contract," that effort must be "at the least cost to the defendant and without charging him with harms that he had no sufficient reason to foresee when he made the contract." Northern Helex Co. v. United States, 207 Ct. Cl. 862, 875, 524 F.2d 707, 713 (1975) (emphasis added) (quoting Restatement of Contracts § 329 cmt. e), cert. denied, 429 U.S. 866 (1976).

B. PG&E's Burden Includes Its Obligation To Establish A Reasonable "But For" World Against Which To Measure Whether DOE's Delay "Caused" It To Incur Incremental Costs

PG&E must establish that, "but for" the breach of contract, the asserted harm would not have been suffered. Fawick Corp. v. United States, 149 Ct. Cl. 623, 637 (1960); see San Carlos Irrigation & Drainage Dist. v. United States, 111 F.3d 1557, 1563 (Fed. Cir. 1997) ("[a] plaintiff must show that but for the breach, the damages alleged would not have been suffered" (emphasis added)). PG&E also must introduce clear proof that it was injured as a direct result of the defendant's breach. Myerle, 33 Ct. Cl. at 27 (1897); Quiman, S.A. de C.V. v. United States, 39 Fed. Cl. 171, 183 (1997), aff'd, 178 F.3d 1313 (Fed. Cir. 1999). "For a damage to be direct there must appear no intervening incident . . . ; the cause must produce the effect inevitably and naturally, not possibly nor even probably." Ramsey v. United States, 121 Ct. Cl. 426, 434, 101 F. Supp. 353, 357 (1951). "There must not be two steps between cause and damage." Myerle, 33 Ct. Cl. at 27.

In its pre-trial brief, PG&E asserts that causation is established if it shows that the breach is a "substantial factor" in its increased costs. Pl. Br. 28 (citing Bluebonnet Sav. Bank v. United

States, 266 F.3d 1348, 1356 (Fed. Cir. 2001)). However, the Federal Circuit has rejected the idea that the "substantial factor" test somehow differs in substance from the "but for" tests that the Court has historically required for establishing causation, clarifying that the "but for" test, not the "substantial factor" test, is still the required burden for a plaintiff to prove causation. California Federal Bank v. United States, 395 F.3d 1363, 1367-68 (Fed. Cir. 2005). Further, the "substantial factor" test finds its roots in tort law. W. Keeton, et al., Prosser and Keaton on the Law of Torts 266-68 (5th ed. 1984). The well-established contract law test for causation in contract cases before this Court is whether the claimed damages were "attributable solely to," J.D. Hedin Constr. Co. v. United States, 197 Ct. Cl. 782, 808, 456 F.2d 1315, 1330 (1972), and, thus, "directly related" to, the breach. Wells Fargo Bank v. United States, 88 F.3d 1012, 1022 (Fed. Cir. 1996); see Southern Pac. Co. v. Darnell-Taenzer Lumber Co., 245 U.S. 531, 533-34 (1918) ("[t]he general tendency of the law, in regard to damages at least, is not to go beyond the first step").[15]

Further, to prove causation, PG&E must establish the "but for" world so that the Court

---

[15] PG&E's suggestion that the Court should apply a lesser standard conflicts with this Court's precedent. Even in tort cases, the substantial factor test has not "replaced the need for *each* liable defendant to be a but-for *and* substantial contributor to the indivisible injury," Menne v. Celotex Corp., 861 F.2d 1453, 1461 (10th Cir. 1988), and the courts have made clear that, when the claimed damages could have resulted from multiple factors, the plaintiff "must establish that the breach alone would have been sufficient" to cause the claimed damage and that it would not have occurred "but for" the breach. Point Productions A.G. v. Sony Music Entertainment, Inc., 215 F. Supp. 2d 336, 344 (S.D.N.Y. 2002). This United States Court of Appeals for the Federal Circuit requires application of both tests, even in the tort context. Shyface v. Secretary of Health and Human Servs., 165 F.3d 1344, 1352 (Fed. Cir. 1999). Thus, the "substantial factor" test may only be applied in place of a "but for" test if doing so would "generally yield identical results." Abbott Labs. v. Brennan, 952 F.2d 1346, 1352-53 (Fed. Cir. 1992). Indeed, the Court in Columbia First Bank v. United States, 60 Fed. Cl. 97 (2004), determined that, under the "substantial factor" test, the plaintiff must still prove that the "breaching provisions directly and primarily caused the . . . damages it seeks." Id. at 105.

can identify whether PG&E's claimed damages are, in fact, incremental to DOE's partial breach. A plaintiff cannot recover as damages from the government any costs that it would have incurred regardless of DOE's breach of contract. See Bluebonnet Sav. Bank, 339 F.3d at 1345 ("[t]o derive the proper amount for the damages award the costs resulting from the breach must be reduced by the costs, if any that the plaintiffs would have experienced absent a breach."). Generally, a plaintiff must establish a plausible "but-for world" as part of its causation analysis. Bluebonnet Sav. Bank, FSB v. United States, 67 Fed. Cl. 231, 238-39 (2005) (plaintiffs must establish plausible "but-for world" as part of causation analysis); see Coast Fed. Bank, FSB v. United States, 48 Fed. Cl. 402, 403 n.25 (2000) (plaintiffs bear burden of propounding realistic "but for" scenario); Glendale Fed. Bank, FSB v. United States, 239 F.3d 1374, 1380 (Fed. Cir. 2001) (plaintiffs bear burden of demonstrating "what might have been . . . ."). Without establishing that "but for" world, PG&E leaves the Court with no mechanism by which to determine whether PG&E's claimed costs were incremental to the Government's partial breach.

### C. PG&E Has The Burden Of Demonstrating That Its Claimed Damages Were Foreseeable

PG&E also must establish that its damages were foreseeable. Indiana Michigan, 422 F.3d at 1376. Foreseeability is measured based upon what the parties contemplated at the time of contract formation, rather than from the date of breach. See Northern Helex, 207 Ct. Cl. 682, 524 F.2d at 714; Bohac v. Department of Agric., 239 F.3d 1334, 1340 (Fed. Cir. 2001); Prudential Ins. Co. v. United States, 801 F.2d 1295, 1300 (Fed. Cir. 1986) (affirming trial court's finding of no foreseeability when plaintiff landlord claimed damages for losses of leased property in excess of what Government leased from plaintiff in Government tenant holdover of lease). As part of the foreseeability determination, PG&E must demonstrate that both the

magnitude and type of damages were foreseeable at the time of contract formation. See Landmark Land Co. v. Federal Deposit Insur. Corp., 256 F.3d 1365, 1378 (Fed. Cir. 2001) (affirming trial court's denial of damages because the magnitude of damages was not foreseeable); Wells Fargo, 88 F.3d at 1024-25 (rejecting remote and conjectural damages claim because type of damages were not foreseeable at time of contract formation). "The mere circumstance that some loss was foreseeable, or even that some loss of the same general kind was foreseeable, will not suffice if the loss that actually occurred was not foreseeable." Restatement (Second) of Contracts, § 351, cmt. a (cited in Landmark Land, 256 F.3d at 1378).

### D. PG&E Must Prove Its Damages With Reasonable Certainty

PG&E also has the burden to establish "reasonable certainty" as to each item within its damages claims. Wells Fargo, 88 F.3d at 1023; see Restatement (Second) of Contracts § 352 cmt. a ("[a] party cannot recover damages for breach of a contract for loss beyond the amount that the evidence permits to be established with reasonable certainty"). To support its claim, PG&E must provide appropriate documentary or other support from its records to establish its damages claims. See Roseburg Lumber, 978 F.2d at 667 (plaintiff must provide adequate support for claimed costs). A contractor's failure to present any documentary support for its assertions that it incurred costs, precluding the Government from verifying that the costs were incurred and the reasons for their incurrence, precludes any recovery of those costs. Barrow Utils. & Elec. Co. v. United States, 20 Cl. Ct. 113, 121 (1990). Without proper records, PG&E's cannot meet its burden of establishing reasonable certainty.

E. After Establishing The Legal And Factual Predicates To Damages, PG&E Must Demonstrate That Its Action Mitigated Those Damages

PG&E's pre-trial brief conflates the concepts of mitigation and damages, which are distinct legal concepts. If PG&E fails to meet its burden of establishing causation, foreseeability, or reasonable certainty for any of its alleged damages, a mitigation analysis is unnecessary as the factual predicate to the obligation to mitigate – "damage" – would not exist.

If PG&E satisfies its burden of proving causation, foreseeability, and reasonable certainty for any of its categories of costs, the general rule in any damages claim is that "a party cannot recover damages for loss that he could have avoided by reasonable efforts." Robinson v. United States, 305 F.3d 1330, 1333 (Fed. Cir. 2002) (quoting Restatement (Second) of Contracts § 350, cmt. b) (emphasis in original). Under Indiana Michigan, PG&E was obligated to begin mitigating any alleged damages in May 1994. Indiana Michigan, 422 F.3d at 1375. PG&E also must attempt to mitigate any potential damages "at the least cost to the defendant." LaSalle Talman Bank, F.S.B. v. United States, 45 Fed. Cl. 64, 111 (1999) (quoting Northern Helex, 207 Ct. Cl. 862, 524 F.2d at 713), rev'd on other grounds, 317 F.3d 1363 (Fed. Cir. 2003). The least-cost principle "precludes rewarding a plaintiff for undertaking a form of mitigation that is considerably more costly than other available means of mitigation." Id. To determine whether an attempt at mitigation was appropriate, courts consider whether a reasonable person, in light of the known facts and circumstances, would have taken steps to avoid certain damages. Koby v. United States, 54 Fed. Cl. 493, 497 (2002).

## II. PG&E HAS FAILED TO MEET ITS BURDEN OF ESTABLISHING CAUSATION FOR ITS CLAIMED DAMAGES

### A. PG&E Has Failed To Meet Its Burden Of Establishing The "But For" World

Assuming that PG&E establishes liability here (which will be discussed below), PG&E cannot meet its burden of establishing that all of its claimed damages were caused by DOE's partial breach of contract. As discussed above, to determine causation, this Court must measure PG&E's actions in the "but for" world against the actions undertaken in the actual world. PG&E has the burden to demonstrate the incremental difference between these two worlds. For example, the rate of acceptance that DOE was contractually obligated to meet beginning in 1998 is a primary causal link. This Court's determination of rate dictates the date upon which PG&E, in the "but for" world, would no longer have needed wet storage at Humboldt Bay. The rate also determines whether the costs associated with certain activities in which PG&E engaged concerning SNF storage are PG&E's responsibility or whether DOE may be found responsible for those costs as a damage. PG&E's exchanges theory likewise goes to causation: that is, PG&E's responsibility for SNF storage costs after 1998 is determined, in part, by the Court's determination of whether the exchanges market advanced here by PG&E would have occurred. Likewise, issues concerning GTCC and failed fuel, as well as adjustments needed to account for activities that PG&E would have undertaken in the "but for" world, also relate directly to the issue of causation.

In its pre-trial brief, PG&E attempts to shift the burden of proof concerning causation to the Government in two ways. First, PG&E asserts that the rate of acceptance goes to mitigation and not causation and argues that the Government bears the burden of establishing the rate.

However, the rate of acceptance, which defines when responsibility for particular SNF assemblies transfers from PG&E to DOE in the "but for" world, is at the heart of causation. Indeed, the rate of acceptance is the baseline upon which damages in this case are measured, as it represents how DOE would have been contractually obligated to perform in the "but for" world. It is only by determining DOE's minimum performance required by the Standard Contract and the costs that PG&E would have incurred in that "but for" world that the Court may determine what damages, if any, PG&E suffered as a result of DOE's delay in accepting SNF.

An examination of different rate scenarios clearly demonstrates the nexus between the contractual rate of acceptance and damages. If DOE would not have removed all of Humboldt Bay's SNF until 2001 or later, costs incurred by PG&E before that date were not caused by DOE's partial breach and are not damages. Likewise, if DOE would not have begun accepting SNF from Diablo Canyon until 2011 in the "but for" world, DOE is not responsible for storage costs until that date. As previously discussed, a plaintiff cannot recover as damages from the Government any costs that it would have incurred regardless of DOE's breach of contract. See Bluebonnet, 339 F.3d at 1345 ("[t]o derive the proper amount for the damages award the costs resulting from the breach must be reduced by the costs, if any that the plaintiffs would have experienced absent a breach."). To prove that particular costs are the result of and are incremental to a breach, a plaintiff must establish a plausible "but-for world" as part of its causation analysis. See, e.g., Bluebonnet, 67 Fed. Cl. at 238-39 (plaintiffs must establish plausible "but-for world" as part of causation analysis); Coast Fed. Bank, 48 Fed. Cl. at 403 n.25 (plaintiffs bear burden of propounding realistic "but for" scenario); Glendale, 239 F.3d at 1380 (plaintiffs bear burden of demonstrating "what might have been . . . ."). Without

establishing that "but for" world, PG&E leaves the Court with no mechanism by which to determine whether damages were incremental to the breach. Consequently, the burden to prove the rate in the "but for" world, as part of proving causation, squarely falls upon PG&E.[16]

PG&E essentially argues that the Court must assume that all of its claimed costs are incremental to DOE's delay and that the Government, not PG&E, must prove that, absent the delay, PG&E would still have incurred those costs and, further, that the Government must prove that PG&E was able to avoid other costs that, absent DOE's delay, it would have incurred. See Pl. Br. 43. PG&E's argument is wrong as a matter of law, as well as logic, and is belied by PG&E's own presentation of its damages claim. PG&E's assertion that the Government bears the burden of establishing that costs are not incremental is contradicted by the Federal Circuit and Court of Claims' decisions in San Carlos Irrigation, 111 F.3d at 1563, and Fawick Corp., 149 Ct. Cl. at 637. Both San Carlos and Fawick stand for the proposition that the plaintiff in a

---

[16] The sole basis for PG&E's conclusion that the Government bears the burden of demonstrating the "but for" world are two recent Court of Federal Claims decisions, Tennessee Valley Authority v. United States, 69 Fed. Cl. 515 (2006), appeal pending, No. 2006-5073 (Fed. Cir. docketed Apr. 19, 2006), and Sacramento Municipal Utility District v. United States, 98-488C, 2006 WL 950218 (Fed. Cl. Mar. 31, 2006). In TVA, the Court held that the Government had the burden of proving that TVA's actions to mitigate DOE's partial breach were unreasonable. 69 Fed. Cl. at 528. However, the Court applied this principal to the demonstration of the "but for" world, stating that, "[b]ecause the government seeks to limit the non-breaching party's recovery for mitigation, the government bears the burden of proof." Id. at 530. The Court in SMUD relied upon this statement in TVA for its determination that the Government bears the burden to establish certain aspects of the "but for" world. The Government respectfully disagrees with these conclusions. The Court in TVA appears to conflate the Government's burden of disproving the reasonableness of the plaintiff's mitigation with the plaintiff's burden to demonstrate the incrementality of its claimed damages – a demonstration that only can be done by establishing the difference in costs between the "but for" and the actual worlds. In fact, the determination of the "but for" world has little relationship to the reasonableness of particular mitigation, but, rather, relates to the determination of whether an activity is a "damage" in the first instance. The decisions in TVA and SMUD plainly conflict with established Federal Circuit precedent.

breach of contract case bears the burden of establishing that the costs it incurred would not have been incurred but for the breach.

Further, the well-established principle that PG&E has the burden of establishing the "but for" world is supported by the analysis that Professor Cornell – PG&E's damages expert – purported to conduct in this case:

> I have relied on a standard approach to determining damages in a breach of contract claim, which is to compare PG&E's actual costs to the costs PG&E would have incurred "but for" the breach. Damages are the costs incurred by PG&E as a result of breach.
>
> * * * *
>
> Calculating the incremental cost of the breach necessarily requires me to identify the costs that would have been incurred by PG&E absent the breach.[17]

Rep. of Brad Cornell, ¶¶ 10, 16.[18]

PG&E's view of the speculativeness of the "but for" world is both mercurial and situational, depending solely upon whether it is seeking to <u>increase</u> its damages or to <u>avoid decreases</u> in its damages based upon the "but for" world. In fact, when PG&E is seeking to <u>increase</u> its damages, the "but for" world appears to be anything but speculative. It is only when the Government challenges the inclusion of non-incremental costs in PG&E's damages claim – and seeks to eliminate those costs from damages – that PG&E asserts that the Government has

---

[17] Although Professor Cornell admits in his report that the "but for" world must be established to determine damages, as we will demonstrate at trial, Dr. Cornell failed to analyze the "but for" world costs that he concedes should be excluded from PG&E's damages claim.

[18] At trial, we will demonstrate that Professor Cornell's involvement in the preparation of PG&E's analysis was cursory, at best. Indeed, Professor Cornell largely, if not entirely, accepted the conclusions of PG&E's fact witnesses regarding the incremental nature of PG&E's costs with little or no analysis.

the burden of proving the "but for" world and that such a world is overly speculative. For example, the Government will offer at trial the opinion of Warren Brewer, a nuclear engineer with almost 30 years experience, concerning the type of casks that PG&E would have needed to load had DOE begun SNF acceptance upon an industry-wide basis. Mr. Brewer's conclusion is based upon contemporaneous documents and an analysis of PG&E's facilities prior to the modifications that it made in preparation for dual-purpose dry storage. To the extent PG&E claims that such an analysis is "overly speculative," PG&E simply wants to have it both ways. Indeed, if the "but for" world truly is "overly speculative," as PG&E appears to contend, this Court has no basis upon which to award PG&E damages, as it will have no baseline for determining which of PG&E's claimed damages were caused by DOE's partial breach.

### B. PG&E's Causation Theory Fails Because It Cannot Meet Its Burden Of Proving That DOE Was Obligated To Accept SNF At An Annual Rate Of 3,000 MTU

#### 1. PG&E Cannot Establish That DOE Was Obligated To Accept SNF At A Rate Sufficient To Preclude The Need For Additional At-Reactor Storage And Some "Backlog" Of Utility-Stored SNF

In its brief, PG&E has identified the base assumption upon which its damages claim depends. Specifically, PG&E ties its damages to the assertion that DOE contractually obligated itself to accept SNF and/or HLW at a rate that (1) would eliminate the need for utilities to provide additional on-site storage after January 31, 1998, and (2) would reduce the backlog of SNF and/or HLW already stored by utilities up until that deadline. Pl. Br. 11. Based upon the application of this alleged contractual term, PG&E concludes that DOE was obligated to accept SNF beginning in 1998 at an annual rate of 3,000 Metric Tons Uranium ("MTU"), after a short five-year "ramp-up" period. Id. PG&E fails, however, to establish that this two-part test and

resultant rate of acceptance were incorporated into the Standard Contract as obligations or that the "test" and rate even are supported by the alleged "intent" of the NWPA.

PG&E's entire argument regarding the rate of acceptance rests upon this Court's consideration of extra-contractual evidence that post-dates the formation of the Standard Contract. As a matter of law, with respect to the introduction of parol evidence at trial concerning the parties' intent, the Standard Contract contains an integration clause, which expressly provides that the written language in the Standard Contract "contains the entire agreement between the parties with respect to the subject matter hereof." 10 C.F.R. § 961.11, Art. XXII(A). The contract further provides that "[a]ny representation, promise, or condition not incorporated in this contract shall not be binding on either party" and that "[n]o course of dealing or usage of trade or course of performance shall be relevant to explain or supplement any provision contained in this contract." Id. PG&E's interpretation of the Standard Contract, which reads into the agreement selective alleged program hopes and goals over a 20-year period, completely eradicates the integration clause. Although "parol evidence 'must be admissible on the issue of the extent to which a written agreement is integrated, for . . . the writing cannot prove its own integration,'" McAbee Constr, Inc. v. United States, 97 F.3d 1431, 1434 (Fed. Cir. 1996) (quoting Sylvania Elec. Prods., Inc. v. United States, 198 Ct. Cl. 106, 458 F.2d 994, 1006 (1972)), the fact that the Standard Contract contains an integration clause makes PG&E's burden of establishing a lack of integration "extremely heavy." Id. Additionally, because the Standard Contract was promulgated through notice-and-comment rulemaking, any parol evidence should consist solely of the record of administrative rulemaking, in accordance with the proper means of interpreting regulations. PG&E's efforts to introduce extensive deposition and trial testimony

and documents to identify the contractual intent evidenced by the language of the Standard Contract are legally unsupported.

Additionally, much of the "evidence" upon which PG&E apparently intends to rely to support the alleged intent of the Standard Contract and the NWPA is not even admissible for that purpose. For example, PG&E has designated the deposition testimony of Lake Barrett, former Deputy Director of the Office of Civilian Radioactive Waste Management ("OCRWM"), as evidence of the "intent" of Congress in promulgating the NWPA. PG&E intends to offer testimony of Messrs. Loring Mills and Christopher Warner for a similar purpose.[19] This method of discerning the intent of these documents is inadmissible, because even the opinions of individuals who actually participated in the legislative process are irrelevant to a proper interpretation of the requirements of a statute. See, e.g., Selman v. United States, 204 Ct. Cl. 675, 685 n.6, 498 F.2d 1354, 1359 n.6 (1974) (affidavit of a United States Senator concerning particular legislation was "without evidentiary value" because "no member of a legislature, outside of the legislature, is empowered to speak with authority for that body"); accord Department of Energy v. Westland, 565 F.2d 685, 690-91 (CCPA 1977); United States Steel Corp. v. United States, 618 F. Supp. 496, 500 n.5 (CIT 1985).[20]

---

[19] The Government has filed a motion *in limine* concerning the testimony of Messrs. Mills and Warner concerning the intent of Congress in passing the NWPA or the DOE in promulgating the Standard Contract. The grounds for excluding the testimony of Messrs. Mills and Warner should be applied to any similar "factual" testimony.

[20] Mr. Barrett was not involved with the program at the time of the enactment of the NWPA, and Mr. Warner was not employed at PG&E during the contract formation period. Even if extrinsic evidence was allowed, PG&E should not be allowed to rely upon the beliefs of various individuals who began working with the NWPA long after Congress enacted it as to the meaning that Congress presumably intended when it passed the Act as evidence of the obligations to be imposed upon DOE for the measurement of damages.

Alternatively, if the Court allows the presentation of parol evidence concerning the intent of the parties to the Standard Contract, the evidence at trial will contradict PG&E's assertions that the parties intended that DOE would create an acceptance rate that satisfied PG&E's "two-part test." DOE published the Standard Contract at issue here as a "proposed rule" in the Federal Register. 48 Fed. Reg. 5458 (Feb. 4, 1983). In response to that proposed rule, several nuclear utilities and industry groups, including PG&E, submitted comments requesting, among other things, that DOE place into the Standard Contract an obligation requiring DOE to accept SNF at a pre-determined minimum rate, to adopt as contractual obligations the acceptance rates that would be identified in the statutorily-required Mission Plan, or to accept SNF "at a rate commensurate with the amount of [SNF] then being generated together with the accumulated backlog of [SNF]." See, e.g., DX 2.063 at 5 (ARC0010537). Although DOE "carefully reviewed and fully considered" the comments in its formulation of the final rule (48 Fed. Reg. 16,590, 16,590 (Apr. 18, 1983)), DOE specifically and intentionally excluded from the contract any contractual obligations to meet a pre-determined acceptance rate because it could not know, in 1983, the scope and extent of the technical and other obstacles that it would face in attempting to develop an operational repository.

Nuclear utilities – including PG&E – consistently understood that the Standard Contract did not contain those terms. In interpreting the requirements of a contract, the behavior of parties before the "advent of controversy" is often more revealing than the contract language alone. Omni Corp. v. United States, 41 Fed. Cl. 585, 591 (1998). "A principle of contract interpretation is that the contract must be interpreted in accordance with the parties' understanding as shown by their conduct before the controversy." Julius Goldman's Egg City v.

United States, 697 F.2d 1051, 1058 (Fed. Cir. 1983), cert. denied, 464 U.S. 814 (1983). Here, the history of the notice-and-comment rulemaking itself is clear in evidencing that DOE did not obligate itself to satisfy PG&E's two-part test and that the nuclear utilities were well aware of that fact. In other utilities' internal documents from 1983 and 1984, soon after the Standard Contract was executed, those utilities indicated that DOE had not obligated itself in the contract to satisfy a minimum performance rate, and witnesses from other utilities have previously testified at trial that they understood that DOE had never agreed to satisfy any specific rate of acceptance. See, e.g, DX 64, attachment 2 at 3 (TV1471); DX 81 at 1.[21] Moreover, in correspondence with DOE soon after the publication of the final rule, but prior to the execution of the Standard Contract by individual utilities, the utilities complained about the fact that DOE had not included any additional performance obligations in the contract. DX 61 at 1-2. Clearly, the industry's "understanding" that DOE had some minimum acceptance rate obligation was created after disputes about timely SNF acceptance began. Moreover, this Court will be presented with evidence from PG&E's internal documents which belie the contention that PG&E believed that a minimum acceptance obligation was contained in the Standard Contract or that

[21] Although resort to parol evidence is neither necessary nor appropriate in interpreting an unambiguous contract, particularly one with an integration clause, to the extent that parol evidence is deemed relevant or admissible in interpreting the terms of the Standard Contract, the standardized nature of the contract at issue here requires interpretation of its terms in a uniform manner as applied to all contract holders, not simply PG&E, "without regard to [a particular contract holder's individual] knowledge or understanding of the standard terms of the writing." Restatement (Second) of Contracts § 211 (1981). Accordingly, to the extent that parol evidence is admissible here, review of other contract holders' understandings of the contract requirements is as relevant as a review of PG&E's understanding.

meeting such a standard was even a requirement of the program.[22] The contemporaneous evidence should preclude any reading of PG&E's two-part test into the Standard Contract.

2. PG&E Cannot Rely Upon Program Planning Documents To Establish The Government's Obligation To Accept SNF At An Annual Rate Of 3,000 MTU

Unable to demonstrate that the Standard Contract requires that DOE accept at a 3,000 MTU rate, PG&E apparently intends to prove that the 3,000 MTU rate is somehow a contractual obligation because it has appeared in numerous DOE planning documents. Pl. Br. 10-11. However, the documents upon which PG&E relies to evidence DOE's "intent" to eventually accept 3,000 MTUs of SNF upon an annual basis generally depend upon the existence of an operational repository. Yet, the Standard Contract does not require DOE to begin SNF acceptance at a repository. Indeed, by 1987, the only method of performance available to DOE by 1998 was the MRS facility. The language of the Standard Contract explicitly contemplates that DOE may accept SNF either at a repository or at "such other facility(ies) to which [SNF] and/or [HLW] may be shipped by DOE prior to its transportation to a disposal facility." 10 C.F.R. § 961.11, Art. I.10. In fact, between the proposed rule and the final rule, the definition of the type of "facility" to which DOE could deliver SNF was expanded to expressly state, in accordance with the [NWPA], that there may be an interim storage facility (or facilities) which DOE may utilize prior to emplacement in a repository." 48 Fed. Reg. 16590, 16591 (Apr. 18,

---

[22] An example of this evidence includes PG&E's decision, in the mid-1990s, to pay nearly $1 million to DOE to reclassify the final date of discharge of SNF that was left in its Humboldt Bay reactor following shutdown in 1976 and that was not finally discharged, as defined by the Standard Contract, until 1984. See Pl. Br. 6. The expenses associated with reclassification were justified by the conclusion that all of Humboldt Bay's SNF would be accepted by DOE within the first four years of acceptance (and not the first one or two years (depending upon the application of the 3,000 rate and exchanges), as assumed in PG&E's claim).

1983). Pursuant to the rationale of the United States Court of Appeals for the District of Columbia Circuit in Indiana Michigan Power Co. v. Department of Energy, 88 F.3d 1272 (D.C. Cir. 1996), and as PG&E acknowledged in its response to the Government's summary judgment motion upon its takings claim (see Order, dated April 25, 2006, at 6), DOE was not obligated to have an operational repository by January 31, 1998, precluding any argument that DOE was somehow obligated to accept SNF at the rates it had hoped to satisfy for SNF acceptance at a repository. Because DOE was entitled to accept SNF at a facility other than a repository, PG&E's reliance upon planning documents relating to SNF acceptance at a repository is meaningless.

Moreover, the planning documents upon which PG&E intends to rely uniformly and expressly indicate that they are "not contractually binding," that they do not establish acceptance rates that create mandatory obligations, and that they were only for planning purposes.[23] See, e.g., DX 90 (in 1985 Mission Plan, DOE expressly represented that "[i]t should be emphasized that this schedule is only an approximation of how the system may operate and is subject to considerable variation" and that "DOE will further define and specify the system acceptance parameters as the program progresses"). In citing to the Mission Plan, PG&E is required to cherry-pick certain components of that plan and ignore fundamental assumptions – such as the projected generation rate (consistently in excess of 3,000 MTU), number of operational repositories in the system (2), and the projected annual acceptance rate (6,000 MTUs). Id.

---

[23] While relying upon certain aspects of these program documents, PG&E ignores the slower ramp-up rates to 3,000 MTUs than assumed in its claim contained in many of these documents. Once again, PG&E selectively references statements that support its damages claim, while ignoring statements either that contradict its underlying causation theory or that would reduce its damages.

Likewise, each Annual Capacity Report issued between 1987 and 1990 expressly advised contract holders that, in 1991, but not before, DOE would begin publishing firm individual utility acceptance schedules in accordance with the contracts, including shipment allocations.[24]

Likewise, various Total System Life Cycle Cost reports and Fee Adequacy studies that DOE has prepared throughout the program do not support the imposition of a 3,000 MTU rate of acceptance. The purpose of the fee adequacy studies (required by the NWPA) and total system life cycle cost analyses is solely to determine whether the fees paid into the Nuclear Waste Fund are sufficient to pay for the costs of the entire program. The acceptance rate is only one of many assumptions necessary to determine the total cost of the program. The acceptance rate is used to determine the length of time that the DOE acceptance facilities will need to operate. The TSLCC reports incorporate the program assumptions, including acceptance rate, as they exist at the time that they are prepared. For example, in early studies, DOE planned to perform at two repositories, with a cumulative acceptance rate of 6,000, not the 3,000 MTU rate upon which PG&E relies. PX 185 at 12 (PNL0202529) and PX 331 at 2-4 (PNL0201505). In the later studies cited by plaintiffs, DOE planned to perform at a repository beginning in 2010. PX 341 at

---

[24] Importantly, the 1985 Mission Plan was created pursuant to a statutory requirement for submission to Congress. 42 U.S.C. § 10221(b)(3). After DOE submitted the 1985 Mission Plan and a 1987 Mission Plan Amendment to Congress, Congress enacted the 1987 amendments to the NWPA, presumably after considering DOE's Mission Plan submissions and evaluating the state of DOE's program. As it was entitled to do, Congress significantly modified the scope of the program at that time, limiting DOE's focus for development of a repository to one site, Yucca Mountain, and establishing linkages between a Monitored Retrievable Storage ("MRS") facility and a repository. 42 U.S.C. §§ 10133, 10161-69. PG&E's reliance upon documents prepared for Congress that relate to possible circumstances and scenarios that could have existed prior to congressional review of and action upon those pre-amendment planning documents does not support its argument that DOE has somehow obligated itself to accept SNF at a 3,000 MTU rate, regardless of whether a repository is available.

13-15 and PX 338 at 1-3. Notably, PG&E does not cite to the 1990 PETSLCC, which shows performance at an MRS at a steady-state rate of 900 MTU until a repository opens with no ramp-up to 3,000 until 2015. DX 163 at A-1 to A-3.

PG&E can identify no language by which DOE somehow agreed or even suggested that the acceptance rates in any planning documents which DOE issued were contractually binding or constituted anything other than DOE's hopes and goals for its program. In National By-Products, Inc. v. United States, 186 Ct. Cl. 546, 405 F.2d 1256 (1969), the Court of Claims recognized that, "[b]efore a representation can be contractually binding, it must be in the form of a promise or undertaking . . . and not a mere statement of intention, opinion, or prediction." Id. at 558-59, 405 F.2d at 1263. In a dispute involving whether the Government had contractually agreed that it would build a right-bank levee, the Court in National By-Products determined that, although the Government's representative had represented during contract negotiations "that in its then view the right-bank dike would eventually come into being," such "a representation, without more, would not indicate the Government's commitment to build it, or its guarantee that it would be built." Id. at 570-71, 405 F.2d at 1270. "Rather, the representation would simply mirror the Government's current belief, opinion or prediction, even its fervent hope that this would occur," which could not constitute a contractual obligation upon the Government's part. Id. at 571, 405 F.2d at 1270; see id. at 570, 575, 405 F.2d at 1269, 1272 ("we attribute the Corps' activity in later acting as a catalyst for local action to provide right-bank protection to its public-minded concern with the problem . . . and not to any feeling of *contractual* liability" (italics in original)); see Commercial Metals Co. v. United States, 176 Ct. Cl. 343, 349 (1966) ("the Railroad's historical practice – which has not been incorporated in any written pronouncement

for the information of the public – could not modify the plain language of the sales contract between the plaintiff and the Railroad . . . ."); Branhill Realty Co. v. Montgomery Ward & Co., 60 F.2d 922, 923 (2d Cir. 1932) (although parties discussed lessee's use of leased premises as chain store, lessee "did not bind itself so to do" in the contract, so that lessee "might, at its option, use them either for a chain store or for any lawful purpose"). Because DOE has never obligated itself to satisfy a 3,000 MTU acceptance rate, the Court cannot incorporate such a requirement into the Standard Contract. Consequently, PG&E has failed to satisfy its burden regarding the 3,000 MTU steady-state rate of acceptance.

3. Mr. Graves' Opinions Concerning "Economic Efficiencies" Gained Through The Implementation Of An Acceptance Rate Of 3,000 MTU Are Irrelevant And Unsupported

Even if PG&E could establish the existence of the two-part qualitative test, which it cannot, PG&E cannot prove that an annual steady-state rate of 3,000 MTU is necessary to satisfy that purported requirement. At trial, PG&E will offer the testimony of Frank Graves concerning the "economic efficiencies" under the 3,000 MTU rate of acceptance.[25] First, the issue in this case is not what is "economically efficient" or, even, "economically reasonable." The issue is the rate that DOE contractually obligated itself to satisfy. Second, Mr. Graves has had no involvement in the Standard Contract or DOE's SNF acceptance program and, therefore, no basis to comment upon the capacities of that program in either the "but for" or actual worlds. Third, the Government will demonstrate that far lower rates of acceptance would meet the alleged two-part requirement. Indeed, intrinsic to Mr. Graves' analysis are fundamental assumptions which, when changed to reflect certain realities, work to dramatically alter the

[25] The Government has moved to exclude Mr. Graves' opinions and testimony.

conclusions concerning the "economically reasonable" rate of acceptance. Mr. Graves' testimony concerning the rate of acceptance should not form the basis for any conclusion that DOE contractually obligated itself to the rate of acceptance advocated by PG&E in this litigation.

B. Causation And Resultant Damages, Should Be Determined Against The Acceptance Obligations Developed Pursuant To The Schedule Mechanism In The Contract

1. The Acceptance Schedule Was Established In The Dealings Between The Parties

Although PG&E asks the Court to impose into the Standard Contract an obligation for DOE to accept 3,000 MTUs of SNF every year soon after 1998, the Court, to do so would have to ignore the actual language of the Standard Contract. That language, instead of creating an obligation to accept 3,000 MTU per year, contains a scheduling provision that ultimately allows DOE to select the appropriate SNF acceptance rate, subject only to a review for abuse of discretion by the Energy Board of Contract Appeals ("EBCA"). Pursuant to this scheduling mechanism, DOE issued the 1991 ACR and requested DCSs from utilities, many of which it then approved, thereby defining the schedule of performance beginning in 1998. If the Court disregards these provisions and the actions of the parties in accordance with these provisions, the Court is left with no method by which to assess damages arising from DOE's delay.

Instead of agreeing to a specific minimum acceptance rate or creating standards that would obligate DOE to satisfy a minimum rate, the Standard Contract recognizes the uncertainties inherent in the development of the waste management program and, accordingly, creates a contractual mechanism for the development of a specific acceptance schedule that establishes, in essence, a two-phase process. First, the Standard Contract's schedule terms seek

to obtain the agreement of the parties to a specific schedule for the acceptance of an individual contract holder's SNF and HLW. Pursuant to the terms of the Standard Contract, DOE was to issue, beginning not later than July 1, 1987, "an annual capacity report [("ACR")] for planning purposes," identifying "projected annual receiving capacity" at any DOE facilities and annual acceptance ranking for acceptance of contract holders' SNF and/or HLW for the first 10 years "following the projected commencement of operation of the initial DOE facility." 10 C.F.R. § 961.11, Art. IV.B.5(b). Subsequently, beginning on April 1, 1991, DOE was to issue "an annual acceptance priority ranking" ("APR") for receipt of the contract holders' SNF, "based on the age of SNF and/or HLW as calculated from [its] date of discharge." Id., Art. IV.B.5(a).

Second, the contract holder, "[a]fter DOE has issued its proposed acceptance priority ranking" on April 1, 1991, and no earlier than January 1, 1992, would submit a delivery commitment schedule ("DCS") identifying "all SNF and/or HLW the [contract holder] wishes to deliver to DOE beginning sixty-three (63) months thereafter," for DOE's approval or disapproval. 10 C.F.R. § 961.11, Art. V.B.1 (emphasis added). If DOE approves the DCS, the parties have effectively agreed and defined the amount of SNF that DOE will accept from that contract holder 63 months later. Id. If DOE disapproves the first DCS submission, the contract holder is entitled to make a second DCS submission, again for DOE's approval or disapproval. Id. If DOE approves the second DCS submission, the parties have, as stated above, effectively defined the amount of SNF that DOE will accept from that contract holder 63 months later. Id. If DOE disapproves the second submission, DOE responds with its own proposed schedule, which the contract holder may accept or, alternatively, may attempt to negotiate with DOE. Id., Art. V.B.2. The contract holder may then submit its dispute to the contracting officer for a

decision, the contracting officer issues a decision on the schedule, and the contracting officer's final decision upon the DCS "shall be final and conclusive" until, within 90 days, the contract holder appeals to the Energy Board of Contract Appeals. Id., Art. XVI.A; see McDonnell Douglas Corp., ASBCA No. 26747, 83-1 BCA ¶ 16,377, at 81,421 (1983) (boards of contract appeals "[h]istorically and traditionally" assumed jurisdiction over non-monetary "disputes as to the interpretation of contract provisions and determination of the rights and obligations of the parties under the provisions of the contract"). The EBCA's review of DOE's discretionary decision would not be de novo, but, instead, the "contracting officer's discretionary authority [could] be overturned only by a showing that it was arbitrary, capricious or otherwise an abuse of discretion." Rapid City Indian Health Advisory Bd. of Directors, ASBCA No. 26641, 83-1 BCA ¶ 16,311, at 81,084 (1983); see United States Fidelity & Guaranty Co. v. United States, 230 Ct. Cl. 355, 365-70, 676 F.2d 622, 628-31 (1982); Fraas Surgical Mfg. Co. v. United States, 215 Ct. Cl. 820, 828-29, 571 F.2d 34, 39 (1978).[26]

DOE and the utilities acted in accordance with these provisions to develop the schedule for waste acceptance beginning in 1998. As we anticipate establishing at trial, the rates of SNF acceptance identified in the 1991 ACR were predicated upon the requirements of the 1987 NWPA amendments, which precluded DOE from accepting more than 10,000 MTUs of SNF for

---

[26] As one of the boards of contract appeals has explained, where a challenge to an agency's decision under a contract "tests the validity of the Contracting Officer's exercise of his judgment and discretion in a matter which by the terms of the contract itself is made discretionary with him," and the board is "reviewing a contractually-provided judgmental decision of the Contracting Officer," the board's review is limited to whether the contracting officer's discretionary decision was in bad faith, was unreasonable, or was arbitrary or capricious. Thomas W. Yoder Co., VABCA No. 997, 74-1 BCA ¶ 10,424, at 49,250-51 (1974). Were the board to engage in a de novo review of the discretionary decision, it would infringe upon the contracting officer's "legal right to exercise his discretion." Id.

storage at an MRS prior to the operation of a Federal repository. 42 U.S.C. § 10168(d)(1). When developing the 1991 ACR, and anticipating operation of a repository in 2010, DOE divided the 10,000 MTU acceptance limitation across the 12-year period from 1998 (when it anticipated that MRS operations would begin) to 2010.[27]

DOE then drafted, with the assistance of the utilities, the instructions for the submission of DCSs. See, e.g., DX 91, 99, 110, 181, and 196. After the instructions were issued, numerous utilities submitted DCSs that were then approved by DOE. In fact, PG&E submitted its four DCSs for all of Humboldt Bay's SNF consistent with the 1991 ACR and without complaint.

### 2. Some Of The Decisions Issued Concerning The Rate Of Acceptance Incorrectly Analyze The Standard Contract Schedule Provisions

PG&E relies upon the Court's decisions in Commonwealth Edison Co. v. United States, 56 Fed. Cl. 652 (2003), and Indiana Michigan Power Co. v. United States, 57 Fed. Cl. 88 (2003), in support of its rate argument.[28] In Commonwealth Edison, this Court rejected the Government's arguments upon a motion for partial summary judgment that the schedule

[27] In fact, PG&E's proposal to obligate DOE to accept 3,000 MTUs of SNF annually after a five-year ramp-up period would have placed DOE in direct conflict with the statutory limitations imposed by the 1987 amendments to the NWPA, which precluded DOE from accepting more than 10,000 MTUs of SNF prior to the operation of a repository. As discussed above, in 1989, DOE informed nuclear utility contract holders that it did not anticipate that a Federal repository would be available until 2010, but that it anticipated being able to begin SNF acceptance at an MRS in 1998.

[28] The Court's decision in Indiana Michigan upon the Government's motion for summary judgment regarding the rate of acceptance was not necessary to the appeal to the Federal Circuit. The Federal Circuit dismissed the Government's cross-appeal of the decision, stating that the "trial court's rate calculation determination was not necessary to the judgment." Indiana Michigan Power Co. v. United States, 04-5139 (Fed. Cir. Oct. 13, 2004) (unpublished opinion).

provisions contained in the Standard Contract provide the mechanism for determining the SNF acceptance schedule. Yet, this Court did not explain the manner in which SNF acceptance would, or will, work absent reference to that schedule mechanism. Finding that the DCS process did not limit the contract holder's damages or limit its right to the acceptance of larger amounts of SNF than identified in those DCSs, the Court found that the DCS process was only "non-binding and preliminary." Id. at 663. However, without the DCS process, the Standard Contract contains no requirement that the contract holder notify DOE of the amount of SNF it wants DOE to take in any particular year (either in advance or upon the day that acceptance is desired); no notice of the location, date, or time for that acceptance within a particular year; and no notice of the characteristics of the SNF that will need to be accepted at that time or the size of the cask that DOE will have to procure to transport the SNF. If the DCSs were not binding, uncertainty surrounding the exchanges of approved DCSs – a causation theory that underlies PG&E's damages claim – would be compounded.[29]

In Indiana Michigan, the Court of Federal Claims stated that its "obligation is to provide a rate of [SNF] acceptance that the Department of Energy would have employed in absence of the breach." 57 Fed. Cl. at 100 (emphasis added). With all due respect, that focuses upon the wrong question. The issue presented requires a determination of the rate of SNF acceptance pursuant that DOE was contractually obligated to satisfy in the "but for" world. DOE cannot be held financially responsible in damages for a failure to take actions that it might have elected voluntarily to perform, even though it was not required to do so. The only damages that the

[29] In fact, at trial, we will show that PG&E's theory of liability necessarily assumes that DCSs are binding commitments.

Court can properly award are those based upon DOE's breach of its obligation to perform actions that it was contractually obligated to perform. Accordingly, the Court's finding in Indiana Michigan that "[n]othing in the record supports the collection rate that defendant would use – 900 metric tons per year," id. at 98, is not only factually incorrect, but also irrelevant to the identification of the rate at which DOE was contractually obligated to accept SNF.

If the trial court's decisions in Commonwealth Edison and Indiana Michigan eliminate the existing schedule terms from the Standard Contract, the Court is left with no mechanism in the Standard Contract for determining the quantity of SNF that DOE would have accepted, when DOE would have accepted that SNF, and from which utility the SNF would have been accepted had DOE begun timely performance. Further, given that PG&E and the other utilities still expect performance upon the Standard Contract, DOE also is left with no mechanism for determining when, how, or where DOE will accept SNF and/or HLW in the future. The Standard Contract does not contain a specific rate of acceptance because of the uncertainties that existed at the time of contract formation in a program that was to be implemented 15 years later. Instead, the contract contains a mechanism for determining the rate of acceptance at a later time, as the program, and its capacity limitations, are further defined. This mechanism was implemented in 1991 and worked until 1995, when DOE finally announced that it could not meet the 1998 acceptance date at the MRS. Going forward, DOE will use the mechanism that generated the 1991 ACR and subsequent DCS submission and approval process to define the rate of acceptance in the future.[30]

---

[30] DOE clearly plans to use ACRs and DCSs to define DOE's acceptance obligations in the future. By letter dated July 28, 2004, DOE's contracting officer, David Zabransky, issued a new ACR and DCS instructions and requested that PG&E and other utilities

The Court of Claims has previously observed that, "[n]ormally, the task of supplying a missing, but essential, term (for an agreement otherwise sufficiently specific to be enforceable) is the function of the court." David Nassif Assocs. v. United States, 214 Ct. Cl. 407, 423, 557 F.2d 249, 258 (1977). However, the limitation upon the Court's ability to supply its own term is clearly stated: "for an agreement otherwise sufficiently specific to be enforceable." Id.

A court cannot make contracts for the parties. To be valid and enforceable, "a contract must have both consideration to ensure mutuality of obligation . . . and sufficient definiteness so as to 'provide a basis for determining the existence of a breach and for giving an appropriate remedy.'" Ridge Runner Forestry v. Veneman, 28 F.3d 1058, 1061 (Fed. Cir. 2002) (citations omitted). If an agreement is missing one or more essential terms, an agreement to agree upon those terms is unenforceable because it lacks mutuality of intent and sufficient definiteness to determine the rights and liabilities of the parties. See Modern Sys. Tech. Corp. v. United States, 979 F.2d 200, 204 (Fed. Cir. 1992); Bel Pre Health Care Center, Inc. v. United States, 24 Cl. Ct. 495, 496 (1991) ("[i]f an essential term, such as the quantity term, has been omitted then there can be no basis for deciding whether the agreement has been broken; the definiteness necessary for enforceability is lacking"), aff'd, 980 F.2d 745 (Fed. Cir. 1992) (table); Transamerica Equip. Leasing Corp. v. Union Bank, 426 F.2d 273, 274 (9th Cir. 1970) ("[w]here an agreement is not sufficiently definite to enable a court to give it an exact meaning or where an essential element is reserved for future agreement of both parties, a legal obligation cannot result"). "Courts refuse to enforce agreements that contain indefinite promises or terms they deem essential because judicial clarification of the uncertainty entails great danger of creating intentions and

submit DCSs in anticipation of performance in 2010. This process was later suspended.

expectations that the parties themselves never entertained." Neeley v. Bankers Trust Co. of Tex., 757 F.2d 621, 628-29 (5th Cir. 1985); see Mays v. Trump Indiana, Inc., 255 F.3d 351, 357-58 (7th Cir. 2001) ("mere agreement to agree does not a binding contract make" without agreement upon "all essential terms that are to be incorporated in the document"); Shann v. Dunk, 84 F.3d 73, 78-81 (2d Cir. 1996) ("[w]e believe the issue of Shann's liability for the deferred payments was of such importance that, if the district court finds the parties failed to agree on it, the court would be required to void the contract for absence of an essential term").

Obviously, as indicated in the Court of Claims' decision in Nassif, certain terms of a contract that are "essential" to it in some respects may, in certain circumstances, be identified by the Court, which must consider what "the parties would have agreed upon at the time of their initial . . . negotiations . . . ." David Nassif, 214 Ct. Cl. at 376, 644 F.2d at 7.[31] However, at a certain point, the missing term becomes so essential to the formation of the contract that the Court, if it supplies the missing term itself, creates a contract to which the parties had never agreed. In this case, the "missing" term that PG&E seeks to have the Court impose upon the Standard Contract is one of the central aspects of the Standard Contract and materially increases the past damages that PG&E could recover. Moreover, the Court's ruling upon the acceptance term will likely control the future damages to which PG&E may be entitled. This enormous variance in the effect of the acceptance schedule term upon the parties' rights, obligations, and damages cannot be said to be minor and, in fact, is one of the most essential terms of the Standard Contract. To the extent that the Court disagrees with our demonstration that the

---

[31] Here, the evidence will show that the term was offered by the utilities and rejected by DOE.

schedule provisions of the Standard Contract and the approved DCSs identify the parties' obligations in this case, the Court cannot merely impose its own view of a reasonable schedule term. A rejection of the our position would effectively render the Standard Contract too indefinite to enforce. See Massengill v. Guardian Mgt. Co., 19 F.3d 196, 202 (5th Cir. 1994) ("When a writing does not show the parties' agreement on a minor contract term, the reviewing court may supply a reasonable interpretation. . . . *But essential contract terms may not be supplied by a court*. 'If any essential term is left unresolved, there is simply no contract and no obligation on the parties.'" (emphasis added; citation omitted; applying Mississippi law)); see also Coyle's Pest Control, Inc. v. Cuomo, 154 F.3d 1302, 1306 (Fed. Cir. 1998) (refusing to read "reasonable" term into contract, court found contract unenforceable as indefinite quantity contract because it lacked minimum quantity term).[32]

The Standard Contract provides a mechanism for establishing the SNF acceptance schedule, including the rate of SNF acceptance. As we will establish at trial, the parties followed that mechanism for a significant period of time. As a result, a schedule exists that the Court should view as the contractual "schedule" for purposes of assessing damages. Absent the Court's reliance upon that prior schedule, we cannot identify any basis upon which the Court could justify its imposition of its own schedule into this contract.

---

[32] It is true that the appellate court has found that a contract term which allows for future negotiation "impliedly places an obligation on the parties to negotiate in good faith," Aviation Contractor Employees, Inc. v. United States, 945 F.2d 1568, 1572 (Fed. Cir. 1991), and that, where the contract and applicable regulations provide guidelines for negotiations of future agreements, the Court may "determine whether or not the government negotiated according to the contract." City of Tacoma, Dep't of Public Utilities v. United States, 31 F.3d 1130, 1132 (Fed. Cir. 1994). However, that review does not provide the Court with the ability to create a contract for the parties where the "missing" terms are so essential to the central purpose of the contract that the absence of the terms renders the contract too indefinite to enforce.

C. PG&E Cannot Establish The Necessary Causal Link Between Certain Of Its Claimed Storage Costs And DOE's Delay

As discussed above, PG&E cannot recover any of its alleged damages unless it establishes that it would not have incurred those costs had DOE timely begun SNF acceptance. See Bluebonnet, 339 F.3d at 1344-45 (citing White, 285 F.3d at 1043). To the contrary, "the non-breaching party 'should on no account get more than would have accrued if the contract had been performed.'" White, 285 F.3d at 1043 (quoting DPJ Co. v. FDIC, 30 F.3d 247, 250 (1st Cir. 1994)).

1. The Rate Of Acceptance Affects Causation

In its pre-trial brief, PG&E contends that the costs incurred for wet pool operations at Humboldt Bay from 1999-2004, for dry storage at Humboldt Bay and Diablo Canyon, for additional racks at Diablo Canyon, and for a variety of other alleged SNF-related activities all are the result of DOE's failure to begin timely performance upon its Standard Contract for these facilities. However, as discussed above, this contention is based upon the unsupportable claim that DOE was obligated to perform at a 3,000 MTU annual acceptance rate after an aggressive five-year ramp-up period and the Court's acceptance of PG&E's unsupported exchanges theory. If the Court properly finds that the Government was only obligated to accept the amounts of SNF set forth in the 1991 ACR against which the utilities submitted DCSs or rejects PG&E's hypothetical exchanges theory, PG&E's claim for the costs of wet storage from 1999-2001 and the costs associated with additional capacity at Diablo Canyon, among other costs, are reduced or eliminated.

2. PG&E Cannot Meet Its Burden Of Establishing Exchanges

At trial, PG&E will offer the highly speculative and factually unsupported model prepared by Mr. Graves which asserts that a perfect market for the exchange of acceptance allocations would have developed prior to the acceptance of any SNF by DOE that would have resulted in Humboldt Bay's SNF being removed more quickly than under the OFF acceptance queue established by the Standard Contract. The Government will demonstrate at trial, through the testimony of its economics expert Dr. Jonathan Neuberger and through the cross-examination of Mr. Graves, that his theory fails as a matter of fact, economic theory, and law.[33] Upon examination, Mr. Graves' model is based upon pure speculation and, in fact, is often based upon assumed facts that conflict with reality. For example, while PG&E contends that "many other utilities would have engaged in exchanges" (Pl. Br. 11), Mr. Graves failed to speak to a single utility – including his own clients – in preparing his opinion, and the exchanges theory has been a primary litigation theory for only four utilities (including PG&E), all of which were prematurely shutdown reactors represented in their SNF cases by PG&E's counsel here. Moreover, Mr. Graves ignores material considerations relating to financial and political risk, as well as basic issues affecting market performance. Indeed, Mr. Graves' demand-side market completely ignores the important supply side of that market to reach his conclusions. His alleged market finds no theoretical support in "similar" markets which exhibited significantly less participation than Mr. Graves models here. Further, the efficiencies gained from Mr.

[33] Any contention that PG&E would have been granted priority over other utilities as a shutdown facility is factually unsupported and belied by the evidence that will be offered at trial. In fact, DOE consistently rejected priority for shutdown reactors based upon strong industry opposition to the granting of priority.

Graves' model are over-stated and rely upon assumptions that, if altered, fundamentally affect his conclusions.

Another assumption in Mr. Graves' model is that DOE would approve every exchange request presented to it. Under the Standard Contract, contract holders may not merely exchange approved DCSs at their own whim. To the contrary, the Standard Contract provides that contract holders will have the right to exchange approved DCSs, "provided, however, that DOE shall, in advance, have the right to approve or disapprove, *in its sole discretion*, any such exchanges." 10 C.F.R. § 961.11, Art. V.E. For Mr. Graves' model to succeed, DOE would have to exercise its discretion in favor of approval of every single exchange request submitted. Yet, DOE would have no obligation to do so. The Standard Contract does not contain, and DOE has not developed, any standards or factors that DOE is required to consider in exercising its discretion, rendering its ability to disapprove exchange requests extremely broad, if not unfettered. See Brinson v. Linda Rose Joint Venture, 53 F.3d 1044, 1049 (9th Cir. 1995) (in response to claim of breach of good faith and fair dealing, providing extremely broad and deferential review to contracting party's decision, which was within its "sole discretion" pursuant to contract language, to ensure that court did not "add a term to the Contract" that was not otherwise there).[34]

---

[34] It could be argued that the manner in which this contract provision is written precludes any duty of good faith and fair dealing as it applies to DOE's decision to approve or disapprove any particular exchange request. See Big Horn Coal Co. v. Commonwealth Edison Co., 852 F.2d 1259, 1267 (10th Cir. 1988) ("it is possible to so draw a contract as to leave decisions absolutely to the uncontrolled discretion of one of the parties and in such a case the issue of good faith is irrelevant") (quoting Tymshare, Inc. v. Covell, 727 F.2d 1145, 1153 (D.C. Cir. 1984)).

In light of this extremely broad discretion, and given that no contract holder has ever submitted an exchange request to DOE for decision, this Court, as a matter of law, cannot base a damages award upon an assumption that DOE would have approved every single exchange request. In Marketing & Management Information, Inc. v. United States, 62 Fed. Cl. 126 (2004), this Court recently considered a plaintiff's claim that, because it was "foreseeable" that the Government "would have" exercised two option years if it had not breached the contract at issue, the Court should include the two option years in its damages award. There, the contract provided the Government with, as the Court described it, "sole discretion" to decide whether to exercise the two option years and that, as a result, it "would have been under no contractual obligation" to exercise its discretion in favor of extending the contract. Id. at 130. Citing to the Federal Circuit's decision in Hi-Shear Technology Corp. v. United States, 356 F.3d 1372 (Fed. Cir. 2004), this Court recognized that "[t]he plain import of the Federal Circuit's decision is that, as a matter of law, damages for unexercised option years are unrecoverable." Marketing, 62 Fed. Cl. at 131. Accordingly, the Court limited the plaintiff "to damages flowing from the base period," finding that "breach damages for the two option years would be inherently speculative." Id. at 130-31. It concluded that, "[b]ecause the defendant and plaintiff were only bound for the three-year base period, awarding damages . . . for the two option years would result in putting plaintiff in a better position than had the agency simply completed its three-year obligation." Id. at 130.

The same rationale applies to the discretion that DOE would have in reviewing exchange requests. Like option clauses, DOE's right to approve or disapprove exchange requests is, under the plain language of the contract, "in its sole discretion." Neither before or since the partial

breach of contract at issue here has any contract holder ever submitted an exchange request to DOE, and the Standard Contract does not contain any criteria or factors that limit or define DOE's exercise of its discretionary decision to approve, or disapprove, exchange requests. PG&E has not identified any criteria that the Court could use in evaluating what DOE "would have been" required to do had it been presented with exchange requests in exercising its sole discretion. In accordance with the Marketing Court's analysis, the Court cannot base a damages award upon speculation about the manner in which DOE might have exercised its discretion in response to exchange requests.

In any event, even though DOE has not yet developed criteria for its review of exchange requests, the testimony at trial will make clear that not every exchange request could automatically be approved and will identify the problems that may arise with exchange requests, if any, that may be submitted.

Finally, while PG&E acknowledges that the exchanges modeled by Mr. Graves would have required it to pay some unknown utility for the allocations – a necessary reduction in PG&E's claim that is recognized, but not quantified, by Professor Cornell,[35] PG&E's damages expert – PG&E lacks any admissible evidence to establish what that reduction would be. Without proof of the amount that these exchanges would have cost PG&E, the opinion itself is irrelevant as PG&E cannot obtain the financial benefits of its exchanges theory without

[35] The Government has filed a protective motion *in limine* concerning Professor Cornell's opinions based upon arguments advanced by PG&E in its motions *in limine*.

providing to the Court admissible evidence of the amounts that PG&E would have paid to obtain that benefit.[36]

3. PG&E Would Have Incurred Costs Associated With The Storage Of GTCC Waste In The "But For" World

In its damages claim, PG&E has failed to account for costs that it would have incurred in the "but for" world associated with the storage of Greater-Than-Class-C low-level radioactive waste ("GTCC"). These avoided costs must be eliminated from PG&E's damages claim. DOE has a statutory obligation to develop a plan for the disposal of commercially-generated GTCC, pursuant to the Low-Level Waste Policy Amendments Act of 1985, 42 U.S.C. §§ 2021b-2021i ("LLWPAA"). However, that statute does not require DOE to develop or implement an acceptance and disposal plan by any particular date. See Sacramento Municipal Utility Dist. v. United States, No. 98-488, 2006 WL 950218 (Fed. Cl. Mar. 31, 2006) (explaining that LLWPAA does not identify any specific deadline upon which DOE must dispose of commercial utility GTCC or by which Government must enter disposal agreement). Further, the statute requires that "the beneficiaries of the activities resulting in the generation of [GTCC] bear all reasonable costs of disposing of such wastes," id. § 2021c(b)(3)(E), and no utility has yet contracted for or paid for the disposal of its GTCC. PG&E admits that it possesses GTCC waste and will generate significant additional GTCC during decommissioning. Accordingly, at the present time, PG&E is legally responsible for the continued storage of its GTCC waste for the indefinite future. Additionally, the fact that PG&E's SNF eventually may be loaded to the Humboldt Bay ISFSI

[36] Originally, PG&E had identified an expert witness who would testify to the cost components of Mr. Graves' model which allow Mr. Graves' model to generate the necessary reduction. That expert was not identified upon PG&E's witness list and will not be testifying at trial.

does not establish causation for all of PG&E's alleged increased storage and ISFSI construction costs resulting from DOE's SNF acceptance delay.

PG&E's assertion that DOE "would have" accepted GTCC waste concurrently with PG&E's SNF, outside of any contractual obligation, is predicated upon a fundamental misstatement of fact and constitutes pure speculation, particularly because the amount that PG&E will have to pay for that disposal has not yet been established and PG&E has not yet contracted or paid for that disposal. So long as PG&E has to store any GTCC waste on-site, it will be required to incur significant costs for that storage that are duplicative of the costs that it would have to incur if it was storing only SNF. Costs that PG&E would have incurred in the "but for" world associated with GTCC storage must be eliminated from any damages award.[37]

4. PG&E's Damages Claim Fails To Account For Failed Fuel

PG&E's damages claim fails to account for the presence of failed fuel at Humboldt Bay – some of it grossly failed. As a result, PG&E has failed to meet its burden that its failed fuel would have been accepted upon the standard OFF queue. To the extent that failed fuel would not have been accepted upon the OFF queue, PG&E cannot establish that costs it would have

[37] The Court in SMUD recently reached an identical conclusion regarding the non-incremental nature of certain fixed and variable ISFSI costs based upon the presence of GTCC waste. In SMUD, the owner of a shutdown commercial utility claimed that the presence of GTCC waste had no impact upon its claimed damages. Just as in this case, the Government in SMUD explained that, because the O&M costs associated with the ISFSI is independent of the number of assemblies, the presence of GTCC waste resulted in the plaintiff's incurrence of the same O&M costs in the "but for" world as in the actual world. Similarly, the Government explained that, because SMUD planned to load one of its 22 casks with GTCC, the costs associated with the ISFSI pad should be reduced by the costs associated with the GTCC construction, loading, and storage. The Court in SMUD agreed with the Government's argument and reduced the plaintiff's damages claim accordingly.

incurred in connection with the storage of its failed fuel properly are recoverable here as damages.

The Standard Contract provides three broad classifications of fuel: (1) Standard Fuel; (2) Nonstandard Fuel; and (3) Failed Fuel. See DX 1, App. E, ¶ A. Although DOE is required to accept and dispose of failed fuel and nonstandard fuel under the Standard Contract, DOE is not necessarily obligated to accept them under the same schedule as standard fuel. Instead, DOE is entitled effectively to remove other than standard fuel (including failed fuel) from the "oldest fuel first" priority ranking for acceptance of SNF and, at its discretion, to delay its acceptance. Id. Art. VI.A.2(b).

PG&E concedes that it possesses failed fuel at Humboldt Bay. If it is determined that failed fuel requires special handling, its acceptance by DOE may have been delayed, as permitted by the Standard Contract. Thus, "but for" DOE's delay in beginning SNF acceptance, PG&E could still have been required to store failed fuel for an indefinite period of time at its Humboldt Bay facility and, therefore, cannot recover costs resulting from its storage of failed fuel. These costs will be set forth at trial and must be removed from damages.

5. PG&E Cannot Establish Causation For Costs Associated With The Ventilation Stack Removal Project At Humboldt Bay

PG&E's claim includes costs associated with a ventilation stack removal project at Humboldt Bay that were allegedly incremental to DOE's failure to perform under the Standard Contract. These costs allegedly are related to increased costs associated with the removal of the initial ventilation stack and with the construction of a shorter ventilation stack. As with its other claims, PG&E bears the burden of establishing the incremental nature of the costs it seeks as damages. However, the evidence demonstrates that these costs did not result from DOE's

breach. Instead, for a variety of reasons – including personnel safety – the ventilation stack removal project would have been completed in the same manner and at the same cost regardless of the timing of DOE's performance. Moreover, PG&E has significant evidentiary issues with respect to the admissibility of testimony concerning these allegedly incremental costs that will be addressed during cross-examination of PG&E's witnesses.

6. PG&E Cannot Establish Causation For Certain Costs It Allegedly Incurred For Internal Labor And "Overheads"

PG&E cannot meet its burden of establishing causation with respect to certain costs associated with internal labor and "overheads." There is substantial evidence that many of these costs would have been incurred even if DOE performed under the Standard Contract. Additionally, significant evidentiary issues exist with respect to the admissibility of PG&E's allocated overheads and other support costs added into the claim in connection with internal labor.

As part of its claim, PG&E has included all internal labor costs that were billed to any allegedly damages-related project. These costs were added to the claim without regard to the job duties of the employees performing the tasks, to the scheduling of the tasks, or to the amount of time spent by each employee upon a damages-related project. Instead, any time that was billed to a project was charged to the damages claim as well. "It is settled . . . that a contractor is not entitled to recover 'expenses which would properly have been incurred regardless of the [breach].'" Boyajian v. United States, 423 F.2d 1231, 1236 (Ct. Cl. 1970) (quoting Saddler v. United States, 287 F.2d 411, 415 (Ct. Cl. 1961)). Rather, PG&E only may recover for labor performed by its employees to the extent that it can show that these labor costs represent an

incremental cost to PG&E. See also Wilner v. United States, 23 Cl. Ct. 241, 258, 262-63 (1991) (allowing recovery for hours that would not have been worked but for the delay).

Consistent with this principle, salaries or wages generally may represent an incremental cost or damage under two circumstances. First, an employer may recover where the employer actually pays his employee increased wages because of the breach. In this regard, the United States Court of Appeals for the Eighth Circuit has refused to award such damages to a corporate employer where there was no evidence that its employee "requested payment, that payment was made, or that the parties intended such a payment to be made" for the additional time he had worked because of the breach. Wilson v. Marquette Elecs., Inc., 630 F.2d 575, 586 (8th Cir. 1980) (rejecting claim that $40,000 in "lost time" for employee labor was recoverable because no showing that company lost any money because of time employee was forced to spend upon project); see also AES Tech. Sys., Inc. v. Coherent Radiation, 583 F.2d 933, 943 (7th Cir. 1978) (plaintiff not entitled to damages where breach did not "prohibit . . . employees from working on other projects"). Second, courts have generally sustained recovery for employees' lost time only where the plaintiff has foregone other contractual opportunities. Thus, recovery is only available where "salary and other overhead items allocated as a bookkeeping matter to a broken contract would in fact have been recovered in a substitute contract." Autotrol Corp. v. Cont'l Water Sys. Corp., 918 F.2d 689, 693 (7th Cir. 1990) (Posner J.); 22 Am. Jur. 2d *Damages* § 416 (2004); accord S.W. Eng'g Co. v. Cajun Elec. Power Coop., 915 F.2d 972, 978-979 (5th Cir. 1990); Willred Co. v. Westmoreland Metal Mfg. Co., 200 F. Supp. 59, 66 (E.D. Pa. 1961). It is a question for the fact-finder to determine whether such a contract reasonably could have been acquired. Autotrol, 918 F.2d at 693. Here, this type of damage award is wholly inappropriate where PG&E cannot demonstrate any alternative, profitable responsibilities to which it could

have allocated its employees but for the Government's breach. Cf. id. (noting that "[t]here was testimony that Autotrol's controls division was consistently overbooked with new projects and had a consistent record of profitability. . . .").

At trial, the Government will show that PG&E's damages claim misstates the incremental nature of certain personnel charges and of PG&E's overhead and unallocated charges. Additionally, PG&E has provided no evidence concerning the work that would have been performed by these employees had they not been engaged in the damages-related projects. These costs are not incremental simply because PG&E so asserts. Instead, PG&E bears the burden of establishing that each of the costs asserted in damages is incremental to DOE's partial breach and must do so with admissible evidence. As a matter of fact, and in part because of the lack of admissibility of much of its evidence related to internal labor costs and overheads, PG&E will not be able to meet that burden.

7. Additional Adjustments Must Be Made To PG&E's Claim

The Government, through the fact and expert witnesses, will present evidence of numerous additional adjustments that must be made to PG&E's damages claim. These adjustments include adjustments related to costs allegedly incurred in 2004 that have not, in fact, been incurred even today; costs for which support either does not exist or has not been provided; costs that are unrelated to DOE's partial breach; and additional costs that would have been incurred in the "but for" world.[38] The additional adjustments to PG&E's claim total millions of dollars.

---

[38] These adjustments are set forth in the expert reports of R. Larry Johnson, the Government's accounting and damages expert, and Warren Brewer, the Government's technical expert. These costs include, among others, the following activities: (1) a used fuel document discrepancy that originated in 1968; (2) visual inspection of fuel; and (3) fossil security.

Additionally, the evidence will show that the significant damages allegedly tied to internal labor either are not incremental or are unsupported by admissible evidence. Instead, the Government will present evidence that only certain internal labor charges should, depending upon the Court's conclusions regarding mitigation at Humboldt Bay, pass through to damages and that the remaining charges for internal labor, allocated costs, and other support costs are not incremental or lack admissible evidentiary support. Finally, PG&E has failed to meet its burden of establishing that it has not obtained financial benefits from the delay in decommissioning.

8. PG&E's Claim Should Be Reduced To Account For Costs That It Would Have Incurred In The "But For" World

PG&E should not be placed in a better position than it would have been had DOE performed under the Standard Contract. As a result, costs that PG&E has avoided must be deducted from any damages award. The single largest deduction here is the costs that PG&E would have incurred to load SNF to DOE casks in the "but for" world. PG&E's damages expert, Dr. Cornell, has assumed for purposes of PG&E's damages claim that the cost of loading SNF from its ISFSI to DOE in the actual world will be the same as the cost of loading SNF to DOE had performance begun upon an industry-wide basis in 1998. However, as we will demonstrate at trial, based upon the physical limitations at PG&E's Humboldt Bay facility in the "but for" world, had DOE performed in 1998, PG&E would either have to have: (1) loaded small truck casks, at a significantly higher cost than the large Holtec casks it loaded in the actual world; or (2) modified its facilities to enable it to handle large casks. PG&E wants to have it both ways, and has included in its damages claim <u>all</u> plant modifications without providing a deduction for the increased loading costs associated with loading smaller casks. In any event, PG&E's claim

for ISFSI-related damages at Humboldt Bay contradicts Professor Cornell's opinions concerning the magnitude of future loading costs compared to those costs in the "but for" world.

As discussed above, PG&E has the burden of demonstrating the scope of activities in the "but for" world and that the costs it incurred in the actual world are incremental to DOE's delay in acceptance. Bluebonnet, 67 Fed. Cl. at 238-39 (plaintiffs must establish plausible "but-for world" as part of causation analysis); see Coast Fed., 48 Fed. Cl. at, 403 n.25 (plaintiffs bear burden of propounding realistic "but for" scenario). Ignoring this burden altogether, PG&E instead contends in its pre-trial brief that, because DOE has only partially breached the Standard Contract, and PG&E continues to expect performance by DOE, PG&E has only deferred its loading costs, suggesting that it will have to re-load its SNF when DOE provides a transportation cask. Pl. Br. 42. PG&E claims that it pursued the more costly dual-purpose dry storage over storage-only dry storage to minimize the amount of SNF handling required and to facilitate decommissioning by removing the SNF from the Humboldt Bay spent fuel pool, thereby allowing for decommissioning of the Humboldt Bay spent fuel pool. To the extent that PG&E now claims that it will have to re-handle its SNF by reloading its SNF into DOE-provided transportation casks (and presumably build a new spent fuel pool to facilitate such re-handling), this argument simply reflects the unreasonableness of PG&E's claimed mitigation by the usurpation of DOE's contractual obligations.

At trial, we will present the testimony of Warren Brewer, a nuclear engineer with over 20 years of experience in estimating the costs associated with the handling and storage of SNF. Based upon PG&E's own contemporaneous documents concerning the capability of Humboldt Bay to handle only small truck casks without costly facility modifications in the "but for" world, Mr. Brewer will offer expert testimony that the cost of loading SNF to DOE in the "but for"

world would be $6.4 million dollars. This amount should be deducted from PG&E's damages claim, as it is a cost that PG&E would have incurred in the "but for" world that it avoided in the actual world. See California Fed., 395 F.3d at 1268 (holding that non-breaching party may not "be awarded more than it would have received if the contract had been performed").

## III. PG&E'S DAMAGES CLAIM CONTAINS COSTS THAT WERE NOT FORESEEABLE

As explained above, PG&E must establish that its damages were foreseeable (Indiana Michigan, 422 F.3d at 1376) based upon what the parties contemplated at the time of contract formation, rather than from the date of breach. See Northern Helex Co. v. United States, 207 Ct. Cl. 682, 524 F.2d 707, 714 (1975); Bohac v. Department of Agric., 239 F.3d 1334, 1340 (Fed. Cir. 2001); Prudential Ins. Co. v. United States, 801 F.2d 1295, 1300 (Fed. Cir. 1986).

PG&E's pursuit of the dual-purpose Hi-STAR storage system – a system that is designed and licensed for transportation and that costs considerably more than storage-only systems – was not reasonably foreseeable at the time of contract formation in 1983, as dual-purpose dry storage had not yet been developed.[39] Indeed, this is precisely what the Court concluded in denying the SNF plaintiff in SMUD damages associated with its dual-purpose dry storage facility:

> On June 14, 1983, when DOE executed the Standard Contract with SMUD, it was a matter of public record that nuclear utilities in the United States had growing SNF inventory. In addition, by that time, dry storage was considered a viable alternative to wet

[39] PG&E's use of dual-purpose technology also is unreasonable. Under the Standard Contract, DOE is required to provide transportation casks under the Standard Contract suitable for use within the DOE acceptance program. Moreover, the technology purchased by PG&E currently is not an acceptable waste form under the Standard Contract. In short, DOE is being asked in this case to pay for technology that DOE has no contractual obligation to utilize. DOE should not be required to pay for that usurpation. Further, dual-purpose dry storage is significantly more expensive than storage-only dry storage. Those expenses, therefore, also are unreasonable.

> storage. There is no evidence in the record, however, that the Government anticipated or was aware on June 14, 1983 that any breach of the Standard Contact might require the Government to be responsible for the cost of "dual-purpose" dry storage. At the time, the NRC was more than a decade away from issuing the requisite licence for a utility to implement a "dual-purpose" system.
>
> For these reasons, the court has determined that SMUD established that it was "reasonably foreseeable" to DOE, on June 14, 1993, that if performance could not be commenced by January 31, 1998, SMUD would be required to make interim arrangements to store the SNF. The record establishes that DOE could have foreseen that such interim arrangements might involve dry storage, but not "dual-purpose" dry storage.

Sacramento Municipal Utility District, No. 98-488, 2006 WL 950218 (Fed. Cl. Mar. 31, 2005) (emphasis supplied). The Court's reasoning in SMUD applies with equal force in this case. Obviously, if in 1983 dual-purpose dry storage was more than a decade away, DOE could not have reasonably foreseen the specific type of storage that PG&E is claiming as damages in this litigation. See Wells Fargo, 88 F.3d at 1024-25. Because PG&E's purported mitigation was not reasonably foreseeable at the time of contract formation, PG&E's claim for damages associated with the Hi-STAR technology should be rejected.[40]

IV. PG&E'S CLAIMED DAMAGES MUST BE REDUCED BY AT LEAST $6.2 MILLION BASED UPON ITS FAILURE TO ESTABLISH CERTAIN COSTS WITH REASONABLE CERTAINTY

As set forth above, PG&E has the burden to provide appropriate documentary or other support from its records to establish its damages claims. See Roseburg Lumber Co. v. Madigan, 978 F.2d 660, 667 (Fed. Cir. 1992). In connection with discovery in this case, the Government requested invoices and work orders that related to costs incurred in connection with activities,

[40] At Diablo Canyon, PG&E is purchasing Hi-STORM casks which are licensed only for the storage of SNF.

such as the Diablo Canyon ISFSI, that PG&E claimed as damages. While PG&E largely satisfied that request, there remains at least $6.2 million in costs for which the Government never has received any documentary support. PG&E employees acknowledge that support for at least $4 million of this amount does not exist because the costs were not incurred in 2004 and, indeed, have not been incurred to date.[41] The documentary support is significant because, without it, we are unable to determine whether the costs actually were incurred or whether the activities charged through to damages relate to activities properly included in damages. Because it is PG&E's burden to establish appropriate support for all of its claimed costs, the Court should disallow recovery for any costs that PG&E failed properly to support during discovery.[42]

Additionally, PG&E's damages claim seeks costs totaling $900,000 associated with its early pursuit of an off-site Private Fuel Storage ("PFS") facility. As a matter of law, the Federal Circuit's Indiana Michigan decision precludes recovery of PG&E's contributions in PFS. The issue of the recoverability of amounts paid to PFS squarely was addressed by the Federal Circuit. In finding that PFS-related costs were not recoverable, the Federal Circuit did not simply uphold the trial court's findings of fact. Instead, the Federal Circuit held:

> The credited evidence also showed that the utility's investment in the private storage facility was speculative and that the high cost of

---

[41] The $4,000,000, associated with escalation under PG&E's contract with Holtec and sales tax upon that escalation, was moved by Professor Cornell from 2005 (as set forth in PG&E's initial disclosures) to 2004 (as set forth in his expert report). However, as of March 31, 2006, those amounts still had not been paid.

[42] PG&E asserts that, because the cost information comes from its "reliable" SAP system, the damages it claims are reasonably certain. Pl. Br. 34. However, as evidenced by the $4 million error in the damages claim, not all of the costs included in Professor Cornell's expert report actually came from the SAP system. Moreover, the SAP system simply records costs. It is not a substitute for examination of invoices and work orders so that a determination of incrementality of particular activities can be made.

> the venture was unforeseeable. * * * While DOE should have foreseen that its breach would force Indiana Michigan to find alternate storage for its SNF, it is not liable for such a speculative venture and unforeseeable costs.

Indiana Michigan, 422 F.3d at 1376. Because foreseeability is measured from the perspective of the defendant, and given that Indiana Michigan's contract with DOE is materially identical to the contracts at issue here, Indiana Michigan is dispositive of the plaintiffs' claim for costs associated with PFS. Likewise, the Federal Circuit's conclusion that the PFS effort was "speculative" should bar any claim for those costs here.

Outside of the dispositive precedent precluding recovery for PFS, PG&E cannot establish that PFS constituted reasonable mitigation. Indeed, based upon the uncertainties concerning licensing, financing, construction, and transportation, among myriad other issues – uncertainties that were known at the time of PG&E invested in PFS – PG&E's investment in PFS fails to meet the reasonableness standards set forth by the Court.[43]

Finally, as set forth in the Government's motion *in limine* concerning the testimony of Mr. Graves, PG&E's inability to offer admissible evidence of the deduction required by Mr. Graves' hypothetical exchanges model renders that causation argument impermissibly speculative and the resulting damages not reasonably certain.

---

[43] PG&E notes in its brief that, since Indiana Michigan, PFS obtained an NRC license. Pl. Br. 33. There are two problems with this statement. First, the license was not received until 2005 – at least nine years after PG&E committed to on-site dry storage at its facilities. Second, PG&E fails to mention that, in 2005, two of the primary members of PFS withdrew their involvement in that effort.

## V. PG&E HAS FAILED PROPERLY TO MITIGATE DAMAGES

As discussed above, the general rule in any damages claim is that "a party cannot recover damages for loss that he could have avoided by reasonable efforts." Robinson v. United States, 305 F.3d 1330, 1333 (Fed. Cir. 2002) (quoting Restatement (Second) of Contracts § 350, cmt. b) (emphasis in original). Here, regardless of the rate of acceptance applied by this Court, PG&E has failed to undertake certain reasonable mitigation actions resulting in significantly higher costs that now are sought as damages.

PG&E undertook its ISFSI projects at Humboldt Bay and Diablo Canyon in a manner and upon a schedule that failed, in all material respects, to mitigate its damages. Indeed, PG&E acknowledges that its actions concerning the two ISFSIs were undertaken without regard to the mitigation of damages to the Government. Under Indiana Michigan, PG&E was obligated to begin mitigation efforts in 1994. PG&E did not begin its alleged mitigation efforts until 1995.[44] Under the initial design, licensing, and construction schedules for ISFSIs, upon which PG&E based its decision to proceed with ISFSIs at both sites, Humboldt Bay's ISFSI was to be loaded no later than 2002 and loading to Diablo Canyon's ISFSI was to begin in 2006, prior to the loss of full core reserve in the Unit 1 wet pool. Today, no SNF has been loaded to either ISFSI and the physical structures at Humboldt Bay have yet to be constructed. In fact, Diablo Canyon will not begin loading its ISFSI until the 2008 time frame, and Humboldt Bay's ISFSI loading likely will be delayed beyond the current 2009 schedule.

---

[44] PG&E's pre-trial brief asserts that it began to review storage options at Diablo Canyon in 1992 and performed a study in 1993 concerning SNF storage expansion alternatives for Diablo Canyon. Pl. Br. 16. As further evidence of its delay, PG&E, in its pre-trial brief, admits that, from an operational perspective, "it would not be necessary . . . to choose a storage technology until 1999." Id. Those six lost years – and the time lost after 1999 – loom large in any mitigation analysis.

The testimony by the Government's expert scheduling witness, John McGrath, will show the evolution of schedule delays incurred by PG&E in the development of dry cask storage at both Diablo Canyon and Humboldt Bay. Utilizing critical path methodology, Mr. McGrath will analyze the delays in numerous critical path activities and will offer opinions regarding the affect of these delays upon PG&E's schedule for dry cask storage at both plants. Mr. McGrath also will address PG&E's need to install the cask pit racks in Diablo Canyon two wet pools as a result of its failure to complete dry cask storage upon schedule. Mr. McGrath's critical path analysis will assist in demonstrating PG&E's complete failure in its obligation to mitigate damages, as PG&E still has not loaded a single SNF assembly into dry cask storage at Humboldt Bay or Diablo Canyon.

PG&E began planning for dry storage in 1995. However, by 2001, the Humboldt Bay ISFSI project largely had been shelved in favor of Diablo Canyon. After deciding to add racks to the Unit 1 and 2 wet pools at Diablo Canyon – racks that extended full core reserve through 2010 and 2012, respectively – PG&E continued to defer work upon the Humboldt Bay ISFSI. PG&E, though charging the Government with the full cost of the rack additions, ultimately will take advantage of only one year of extended storage when three to four years of additional storage could have been realized. Moreover, had PG&E timely proceeded with the Diablo Canyon ISFSI, the rack additions would have been unnecessary.

Based upon PG&E's damages claim, originally asserted through 2015, PG&E expects to claim more than $76 million associated with wet pool operations from 2002-2009, with at least an additional $8.5 million every year the ISFSI is delayed beyond 2009. The Government also is being asked to pay approximately $9.8 million in past costs associated with the Humboldt Bay ISFSI and PG&E anticipates that, through cask loading, the ISFSI will cost at least $40 million –

a number that likely will increase based upon escalation provisions in PG&E's contract with Holtec. Based upon the assumption in PG&E's initial disclosures that the difference in O&M costs between wet and dry storage is approximately $5 million and assuming a 2009 loading schedule, it will take PG&E at least eight years (until at least 2017) to recover the costs of the ISFSI and actually mitigate damages, ignoring the potential for cost increases, delays in loading beyond 2009, and the time value of money which works to extend the amount of time needed to recoup the up-front ISFSI costs.[45] In contrast, had the ISFSI been operational in 2002, as initially planned, and assuming the O&M cost differential in PG&E's initial disclosures, the up-front ISFSI costs would have been recovered in O&M savings no later than 2010.

Not only has PG&E failed to mitigate costs at both of its facilities, based upon the uncertainties in cost and schedule, and PG&E's delays to date, PG&E will be unable to establish that the ISFSI constitutes mitigation and the Government affirmatively will establish that the Humboldt Bay ISFSI, under its current schedule, does not constitute reasonable mitigation. In this case, the Court should find that the Humboldt Bay ISFSI does not constitute proper mitigation and eliminate those costs in their entirety.[46]

---

[45] The Government anticipates presenting evidence that the estimates of ISFSI O&M costs may be lower than the costs that ultimately are realized. If that is true, because the yearly savings associated with ISFSI O&M would be decreased, it will take PG&E even longer to recover the capital costs associated with the ISFSI.

[46] Alternatively, the Court could find that wet pool O&M costs beginning no later – and, perhaps, earlier – than 2002 are the obligation of PG&E, and not the Government.

## VI. PG&E'S CLAIMS FOR COSTS INCURRED BEFORE 1998 ARE BARRED BY THE APPLICABLE STATUTE OF LIMITATIONS

Although PG&E filed both its original and amended complaints in January 2004, it is claiming damages in this case beginning in 1995. As the Federal Circuit recognized in Indiana Michigan, the applicable statute of limitations concerning damages claims in the SNF partial breach cases is six years from the date that a damage was incurred. Indiana Michigan, 422 F.3d at 1378 (citing 28 U.S.C. § 2501 (2000)). Indeed, the Federal Circuit explained that "[t]he statute of limitations is jurisdictional in nature and, as an express limitation on the waiver of sovereign immunity, may not be waived." Id. (citing Hart v. United States, 910 F.2d 815, 818-19 (Fed. Cir. 1990)). Further, the purpose of the statute of limitations is to provide fairness to the defendant "who might otherwise be presented with stale claims after evidence is lost and memories have faded." See Brice v. Secretary of Health & Human Servs., 240 F.3d 1367, 1375-76 (Fed. Cir. 2001). Based upon the applicable six-year statute of limitations in this case, PG&E is limited to damages incurred as of January 1998 – six years prior to the filing of its original and amended complaints.

In its pre-trial brief, PG&E contends that, because the statute of limitations bars claims and not damages, and because its claim accrued on January 31, 1998, when the Government did not meet its industry-wide obligation to perform, PG&E had no claim to assert before 1998. As a result, PG&E contends that it has satisfied the six-year statute of limitations by filing its lawsuit within six years of 1998. Pl. Br. 35. PG&E correctly notes that, for purposes of the statute of limitations, "a cause of action accrues [only] when all the events have occurred that fix the defendant's alleged liability and entitle the plaintiff to institute the action." Indiana Michigan, 422 F.3d at 1378. However, as the Federal Circuit also explained, utilities had an

obligation to take mitigatory actions after "the government unequivocally announced in 1994 that it would not meet its contractual obligations beginning in 1998." Id. at 1375. Indeed, PG&E has claimed approximately $400,000 as mitigation damages in this case that it incurred in 1995.

Had PG&E filed its lawsuit by 2001 – as the overwhelming majority of SNF plaintiffs had done – there would be no statute of limitations issue concerning the recovery of costs incurred in 1995. However, by electing to wait another three years to file its complaint, PG&E has run afoul of the applicable statute of limitations in this case. Under PG&E's logic, it could file suit in 2004 and claim costs it purportedly incurred nine years earlier. Of course, the purpose of the statute of limitations – to avoid stale claims – would be entirely frustrated if PG&E were correct.[47] Consequently, PG&E's recovery of damages that pre-date January 1998 should be denied.[48]

---

[47] Indeed, the staleness of PG&E's claim is demonstrated by its own damages submission in this case. PG&E has provided absolutely no documentary support for approximately $400,000 in claimed costs allegedly incurred in 1995. This is because, given the age of the claim, the supporting information no longer exists.

[48] As we will demonstrate at trial, even absent the statute of limitations, there are additional flaws with the pre-1998 costs that PG&E has claimed as damages in this case.

## CONCLUSION

For the reasons outlined above, the Government respectfully requests that the Court enter judgment in the Government's favor.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/ Harold D. Lester, Jr.
HAROLD D. LESTER, JR.
Assistant Director

OF COUNSEL:

JANE K. TAYLOR
Office of General Counsel
U.S. Department of Energy
1000 Independence Ave., S.W.
Washington, D.C. 20585

SCOTT R. DAMELIN
JOSHUA E. GARDNER
SHARON SNYDER
Civil Division
Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530

s/John C. Ekman
JOHN C. EKMAN
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, NW
Washington, D.C. 20530
Tel: (202) 353-0897
Fax: (202) 307-2503

May 3, 2006

Attorneys for Defendant

CERTIFICATE OF FILING

I hereby certify that on this 3rd day of May, 2006, a copy of foregoing "DEFENDANT'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ John C. Ekman