No. 04-0074C
into which has been consolidated No 04-0075C
Judge Hewitt

Electronically filed on May 11, 2006

---

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---

PACIFIC GAS & ELECTRIC COMPANY,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

---

# PACIFIC GAS & ELECTRIC'S SECOND MOTION TO COMPEL THE PRODUCTION OF DOCUMENTS WITHHELD UNDER THE "DELIBERATIVE PROCESS" PRIVILEGE

---

JERRY STOUCK
Greenberg Traurig, LLP
800 Connecticut Avenue, NW
Suite 500
Washington, DC 20006
(202) 331-3173 phone
(202) 261-4751 fax
Counsel for Plaintiff
Pacific Gas & Electric Company

Of Counsel:

ROBERT L. SHAPIRO
Greenberg Traurig, LLP

# TABLE OF CONTENTS

PAGE

I. THE COURT HAS RECOGNIZED THAT THE DELIBERATIVE PROCESS PRIVILEGE IS A QUALIFIED PRIVILEGE THAT IS SUPERSEDED BY A SHOWING THAT PG&E'S EVIDENTIARY NEED OUTWEIGHS THE HARM THAT DISCLOSURE MAY CAUSE THE GOVERNMENT ..................... 4

II. THE PROBATIVE VALUE OF THE GTCC-RELATED DOCUMENTS OUTWEIGHS ANY POSSIBLE AGENCY HARM TO THE GOVERNMENT ..................... 7

III. DOCUMENTS CONCERNING RATE AND SCHEDULE ISSUES, WHICH ARE COMPARABLE TO DOCUMENTS THE COURT HAS ORDERED RELEASED ..... 14

IV. DOCUMENTS CONCERNING (1) SPENT FUEL STORAGE COSTS AND (2) DOE PROPOSALS TO MODIFY OR AMEND THE SPENT FUEL CONTRACTS ............. 23

V. NOW THAT THE COURT HAS THE STILL-WITHHELD DOCUMENTS IN CAMERA, IT CAN AND SHOULD REJECT UNFOUNDED CLAIMS OF ATTORNEY-CLIENT PRIVILEGE OVER THESE DOCUMENTS ............................. 25

## APPENDIX

Exhibit A - Table of Challenges ..................... A1-A39

Exhibit B - May 9, 2006 Letter from Harold Lester ..................... A40-A45

Exhibit C - May 10, 2006 Letter from Harold Lester ..................... A46-A49

Exhibit D - (Second) May 10, 2006 Letter from Harold Lester ..................... A50-A58

TABLE OF AUTHORITIES

*Alaska v. United States*, 16 Cl. Ct. 5 (1988) .................................................................. 5

*Commonwealth Edison Co. v. United States*, 56 Fed Cl. 652 (2003) .................................... 22

*In re Sealed Case*, 121 F.3d 729 (D.C. Cir. 1997)...................................................................... 6

*Marriott Int'l Resorts v. United States*, 437 F.3d 1302 (Fed. Cir. 2006).................................. 6

*Pacific Gas & Elec. Co. v. United* States, 70 Fed. Cl. 128 (2006) ................................... 5, 6, 8

*Texaco Puerto Rico, Inc. v. Department of Consumer Affairs*, 60 F.3d 867 (1st Cir. 1995).... 7

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

Filed Electronically May 11, 2006

| | | |
|---|---|---|
| PACIFIC GAS & ELECTRIC COMPANY, Plaintiff, | ) | |
| v. | ) | No. 04-0074C, into which has been consolidated No. 04-0075C (Judge Hewitt) |
| UNITED STATES OF AMERICA, Defendant. | ) | |

**PACIFIC GAS & ELECTRIC'S SECOND MOTION TO COMPEL THE PRODUCTION OF DOCUMENTS <u>WITHHELD UNDER THE "DELIBERATIVE PROCESS" PRIVILEGE</u>**

Plaintiff Pacific Gas & Electric Company ("PG&E") moves this Court pursuant to RCFC 37(a)(2) to compel the government to produce 209 responsive documents that the government continues to withhold from disclosure due to its "deliberative process" privilege claims. The government's stance is inconsistent with the express directions and other "guidance" in the Court's April 27, 2006 Order as to how the parties should resolve this discovery dispute by determining where PG&E's "evidentiary need outweighs . . . the harm of disclosure . . . to the defendant." 4/27/06 Order at 7.

Pursuant to the Court's April 27 Order, the government has produced the 29 "example" documents "regarding the potential rate of acceptance by the government of SNF from nuclear utilities – which could be helpful in determining the rate of acceptance the government would have used had it begun to perform the parties' contract on January 31, 2006." *Id.* at 14, 15 (two places). The Court ordered these documents, which it characterized as "examples," produced because they are "highly relevant to this litigation and

that there may be no other way for plaintiff to obtain evidence that serves the same purpose as these documents." *Id.* at 8. The Court's Order gave the parties "guidance" so that they could "analogize [from] these examples to disputed documents not mentioned in this Order" as to what additional documents the Court believed the government should produce. Based upon this "guidance," PG&E sent its May 5, 2006 letter requesting release of a significant number of documents closely related to the 29 "example" documents the Court ordered produced. In response, the government has refused to release any documents covered by any of its employee declarations except Mr. Milner's, and has agreed to release less than all of the documents addressed in Mr. Milner's declaration that should be released pursuant to the "guidance" in the Court's April 27 Order.

The Court's 4/27/06 Order also recognizes that if the government "takes a 'litigation position' in this case that the continued storage of GTCC waste at PG&E's storage facilities after January 31, 1998 would obviate or reduce damages' claimed by plaintiff, then plaintiff's evidentiary need for production of documents related to GTCC waste and described in the Virgilio Declaration, the Marcinowski Declaration, or any other declaration before the court, *see, e.g.*, Milner Decl. at 29, would potentially outweigh defendant's interest in maintaining the confidentiality of these documents." *Id.* at 13. Since the April 27 Order, the government has taken such a litigation position in its pretrial brief at pp. 66-67. In its May 5 letter, PG&E requested the government to release the GTCC waste-related documents it is still withholding under its deliberative process privilege claims. In response, the government has refused to release *any* of these documents.

The government responded to PG&E's May 5 letter in three letters, one dated May 9 and two dated May 10, 2006 (copies attached as Exhibits B at A40-A45, C at A46-A49 & D

at A50-A58). As noted above, in the first two letters the government refused to voluntarily release any documents described in any of its employee declarations other than Mr. Milner's, and specifically refused to release any GTCC waste-related documents. In its second May 10 letter, the government, while reiterating its disagreement with the Court's April 27 Order, did agree that based on the guidance in that Order, documents covered by Mr. Milner's declaration with the following "reference numbers" on PG&E's "Table of Challenges" accompanying its original motion to compel (a copy of the Table is attached as Exhibit A at A1-A39 for ease of reference) should be produced:

> 118, 119, 122, 124, 125, 127, 135, 138, 140, 143, 145, 146, 188-89, 190-96, 202-03, 205, 207-08, 212-16, 220, 224, 226, 233, 236, 238, 240-46, 248-49, 54, 256, 262, 264, 266-70, 272, 274-84, 287, 290, 311, 313, 319, 322, 333-36, 341, 346, 348, 350, 361, 363–66, 378.

Exh. D at A51.

That letter also states on pp. 2-3 (A51-A52): "[b]ecause we do not want to create any opportunity for any SNF plaintiff, or any plaintiff in other current of future litigation with DOE, to have any grounds for arguing that the Government somehow waived any privilege claims relating to the rate of SNF acceptance, we request that you ask the Court for an order compelling the production of these documents," subject to any appropriate other claims of privilege. Accordingly, PG&E hereby requests that the Court enter an order directing the release of the documents listed above, which are also listed on p. 2 of the government's attached second May 10 letter, subject to redactions for any proper claims of another privilege.

In its responsive letters, the government pointed out that certain of the documents requested in PG&E's May 5, 2006, letter had been previously produced by the government. In an effort to get the May 5 letter to the government before the weekend, it was drafted in

some haste and sent out the same day as PG&E first received copies of the 29 "example" documents the Court ordered released. For that reason, the May 5 letter both requests some documents that the government had previously produced and also omitted to request documents that should be released pursuant to the Court's April 27 Order and are therefore now covered by this motion. This motion should now provide the government with a full statement of PG&E's position as to all documents still in dispute. PG&E remains available to discuss the release of additional documents now that both parties have stated their positions. However, given the government's May 9 and May 10 letters, PG&E believes it is very unlikely the parties will be able to reach agreement on the release of the documents addressed in this Motion and, given the imminence of trial, PG&E therefore respectfully requests a prompt ruling on the documents covered by this motion.

The 209 documents that are the subject of this Motion are discussed and described below using the same "reference numbers" as in the Table of Challenges accompanying PG&E's original motion to compel, Exh. A at A1-A39 attached hereto.

## ARGUMENT

### I. THE COURT HAS RECOGNIZED THAT THE DELIBERATIVE PROCESS PRIVILEGE IS A QUALIFIED PRIVILEGE THAT IS SUPERSEDED BY A SHOWING THAT PG&E'S EVIDENTIARY NEED OUTWEIGHS THE HARM THAT DISCLOSURE MAY CAUSE THE GOVERNMENT

In its April 27 Order the Court recognized that the deliberative process privilege is a qualified privilege and even those documents that the Court has determined are subject to that privilege nevertheless must be produced if PG&E can make "a showing of evidentiary need . . . that outweighs the harm that disclosure of such information may cause to the defendant.'" 4/27/06 Order at 7 (citing [*Pacific Gas & Elec. Co. v. United States*, 70 Fed. Cl. 128, 134 (2006)] (quoting *Alaska v. United States*, 16 Cl. Ct. 5, 11 (1988)). The Court

determined that that showing had been made with respect to 29 "example" documents. The Court also gave "guidance" to the parties on how to resolve this discovery dispute which the government has chosen to ignore.

The government's own privilege log descriptions and the declarations from government officials that the government provided to the Court (and recently to PG&E in redacted form) show that many of the still-withheld documents subject to this Motion are highly probative on key disputed issues – like the government's plans for disposition of GTCC waste, the rate of spent fuel acceptance and other contract "schedule" issues. The probative value of these documents outweighs any possible agency harm from disclosure, particularly since disclosure would occur under the protective order governing this case, the terms of which both assure continued confidentiality and strictly limit use of the disclosed documents. In short, the documents that are the subject of this Motion should be produced because, as set forth below, PG&E's (and the Court's) substantial evidentiary need for these documents is overriding.

PG&E believes that its need for the remaining disputed documents, as will be outlined below, should appropriately be characterized as "compelling." But contrary to the insinuation in the government's letters articulating its positions regarding these documents, the correct standard for determining whether PG&E is entitled to the disputed documents is an ordinary balancing test with no "thumb on the scale" or other presumption favoring the government.

As mentioned above, in its primary March 14, 2006 Opinion (published as *Pacific Gas & Electric Co. v. United States*, 70 Fed. Cl. 128 (2006)) addressing the government's deliberative process privilege claims, the Court correctly noted the articulation in *Alaska* of

the standard for determining when a party seeking documents subject to the deliberative process privilege is entitled to them as a straightforward balancing test. The Court also cited *Marriott Int'l Resorts v. United States*, 437 F.3d 1302, 1307 (Fed. Cir. 2006), where the Federal Circuit observed that a showing of "compelling need" can overcome a deliberative process privilege claim. The Court's April 27 Order repeated its cites to both *Alaska* and *Marriott*. The government invokes repetition of the "compelling need" language from *Marriott* as if PG&E may only obtain the disputed documents if its need for them rises to this level.

That is not the law. As this Court is aware, *Marriott* addressed the requirements for properly asserting the deliberative process privilege, not the standard for determining a private party's right to a document withheld under the deliberative process privilege. *Marriott* simply did not address the balancing test involved here. Thus, the cryptic articulation in *Marriott* is *dicta* and should be given little weight. That articulation is no doubt correct, in that a showing of compelling need should entitle the requesting party the documents at issue, but the case does not stand for the proposition that *only* a showing of compelling need will be deemed sufficient in all instances.

Moreover, there is no indication that the Federal Circuit in *Marriott* intended to move away from the balancing test standard noted in *Alaska* and the other cases cited in the Court's March 14 Opinion. To the contrary, *Marriott* cites *In re Sealed Case*, 121 F.3d 729, 737 (D.C. Cir. 1997). *See Marriott*, 437 F.3d at 1307. That case emphasizes that the balancing test must be a flexible one conducted on a case-by-case basis. Indeed, the D.C. Circuit in turn cited *Texaco Puerto Rico, Inc. v. Department of Consumer Affairs*, 60 F.3d 867, 885 (1st Cir. 1995), for the proposition that where documents may reveal government

misconduct, the balancing almost always tips in favor of disclosure. Here, as will be explained below, it appears that many of the disputed documents may indicate government misconduct, not in the sense of a violation of law, but in the sense of inappropriate behavior – in the present case, placing parochial government interests in limiting its litigation exposure to the spent fuel claims before this Court over the public's interest in a sound, efficient policy for the disposition of spent nuclear fuel and GTCC waste.

## II. THE PROBATIVE VALUE OF THE GTCC-RELATED DOCUMENTS OUTWEIGHS ANY POSSIBLE AGENCY HARM TO THE GOVERNMENT

The first group of documents for which PG&E's evidentiary need is clear pertains to the government's plans for disposition of GTCC waste. Despite the Court's recent guidance, the government continues to withhold on deliberative process privilege grounds 124 documents addressing various issues pertaining to GTCC waste. These documents are listed in Exh. A attached hereto as document Nos. 2, 12-13, 16-18, 51-53, 55-59, 62-68, 71-77, 80-103, 186-187, 289, 300-301, 384-386, 391-392, 396, 400-434, 436-459, 462 and 464. In its April 27 Order, the Court recognized that "these documents could be highly relevant to this litigation . . . such that plaintiff may have a substantial evidentiary need for their disclosure that outweighs defendant's interest in their confidentiality." 4/27/06 Order at 12.

As the Court is aware, PG&E's position is that the parties' contract covers GTCC waste. *See* PG&E Memorandum of Contentions of Law and Fact ("PG&E Pretrial Mem.") at 51-55. Alternatively, PG&E is entitled to show that even if the contract does not cover that waste, DOE was planning to and would have removed PG&E's GTCC waste with its spent fuel absent the breach. Accordingly, citing Judge Merow's August 25, 2003 Order in *Yankee Atomic Elec. Co. v. United States*, No. 98-126C, which directed the release of more than 50 GTCC waste-related documents that the government had withheld on deliberative

process grounds, the Court "agree[d] that, if defendant takes a 'litigation position' in this case that the continued storage of GTCC waste at PG&E's storage facilities after January 31, 1998 'would obviate or reduce damages' claimed by plaintiff, then plaintiff's evidentiary need for production of documents related to GTCC waste . . . would potentially outweigh defendant's interest in maintaining the confidentiality of these documents." 4/27/06 Order at 13. The Court also reiterated that the government's confidentiality interest is "diminished" by the restrictive protective order entered in this case. *Id*. at 14 n.9 (quoting *PG&E v. United States*, [70 Fed. Cl. 128, 142 n. 12]).

In the government's pretrial brief filed May 5, 2006, the government outlines, albeit only in a cursory way, the "litigation position" that this Court and Judge Merow referred to, namely, "that the continued presence of GTCC waste on a reactor site, requiring storage and security costs, would obviate or reduce damages." *Id*. at 13 (quoting August 25, 2003 Order in *Yankee Atomic* at 2). *See* Defendant's Memorandum of Contentions of Law and Fact at 66-67 ("Gov't Pretrial Br.") Accordingly, as Judge Merow held and this Court has also indicated, PG&E's evidentiary need for these GTCC waste-related documents is both "substantial," *see* 4/27/06 Order at 12, and overriding. The essential basis for that conclusion is set forth in Judge Merow's Order cited by this Court:

> [T]he Government's plans with respect to its obligation . . . to dispose of GTCC, must be *fully* disclosed to enable the court to make a finding(s) on the validity of this defense defendant asserts. It appears there may only be inchoate plans, or recommended plans, but it is concluded that unless defendant abandons its GTCC defense against monetary claims in this matter, there exists a compelling necessity for the production of *all* documentation which can contribute to an evidentiary finding as to whether GTCC material will be left on a reactor site after SNF and/or HLW is removed.

4/27/06 Order at 13 (quoting August 25, 2003 Order in *Yankee Atomic* at 2-3) (emphasis added). The "full" disclosure of "all" pertinent GTCC waste-related documentation that

Judge Merow directed would require production of the documents at issue here, which for the most part (if not entirely) have been generated subsequent to the date of Judge Merow's Order and, thus, subsequent to the date of the GTCC waste-related documents he ordered released. Absent production of the additional and subsequently-created documents at issue here, the documents Judge Merow ordered released will stand as a partial and incomplete record on the issues.

Moreover, for reasons explained in PG&E's motion to compel, at pp. 18-21, recent documents are particularly pertinent to the GTCC waste-related issues before the Court, because until recently it was crystal clear that DOE planned to dispose of commercial utility GTCC waste at the Yucca Mountain repository, along with utility spent fuel. It is undisputed, and indeed acknowledged by the government in its pretrial brief, that "DOE has a statutory obligation to develop a plan for the disposal of commercially-generated GTCC, pursuant to the Low-Level Waste Policy Amendments Act of 1985, 42 U.S.C. §§ 2021b-2021i ("1985 Act")." Gov't Pretrial Br. at 66. Pursuant to that statutory duty, DOE published a long line of program documents setting forth its plans to dispose of utility GTCC waste at the Yucca Mountain repository. *See, e.g.,* PG&E Exh. 238, DOE's Sept. 1995 "Greater-Than-Class C Low-Level Waste Program Management Plan," at i ("Executive Summary. The Greater-Than-Class C (GTCC) Program strategy has been reviewed and revised to address the legislative mandate for the U.S. Department of Energy (DOE) to provide disposal for GTCC LLW . . . . The long-term objective of the strategy is to establish the disposition of all GTCC in a repository. . . . The long-term efforts will be accomplished cooperatively with personnel from DOE-RW (*i.e.,* the DOE spent fuel program]."); PG&E Exh. 302, DOE's Dec. 1999 "Greater-Than-Class C Low-level Radioactive Waste Program

Management Plan" at 3 ("DOE's long-term solution for the disposal of GTCC LLW is the same as that for spent nuclear fuel, therefore a reasonable solution is the standard canister to be used for spent fuel."). Indeed, the long-time acting director of the DOE spent fuel program, Lake Barrett, testified that it was his "expectation" that DOE would accept and remove utility GTCC waste "at the same time, contemporaneously" as the utility's spent fuel. *See* PG&E's Deposition and Trial Testimony Designations, 5/15/02 Barrett Depo. Tr. at 395-96.

Despite the clarity of that record, since this litigation commenced the government has argued that DOE has no plans at all for disposal of utility GTCC waste. Moreover, there is significant evidence that the government's spent fuel litigation counsel has attempted to influence agency actions in this regard, to advance the government's litigation position. As but one example, the April 11, 2006 Declaration of Martin J. Virgilio now before the Court reveals, in a passage the government initially attempted to hide through redaction (referring to one withheld e-mail):

> This one-page e-mail exchange involved the request for, and granting of, a new internal agency due date for the agency response to the Kadak letter [following originally redacted] because of a request for a meeting from DOE and the U.S. Department of Justice (DOJ) to discuss the NRC's response. The e-mail exchange asserts that *the NRC's Office of the General Counsel ("OGC") was prepared to concur in the letter as prepared by the agency and as already reviewed by OGC, but that the agency was postponing its final response to Dr. Kadak due to DOE's and DOJ's meeting request.*

4/11/06 Decl. of Martin J. Virgilio at 15-16 (emphasis added). PG&E is not aware that DOJ has any programmatic responsibility for GTCC waste disposal.

These considerations establish that PG&E has a substantial and overriding evidentiary need for all the GTCC waste-related documents that the government continues to withhold – both to assure a complete record by providing PG&E access to newly-created GTCC waste

documents, and to allow PG&E to discover into the reasons why DOE's previously clear plans to dispose of GTCC waste along with spent fuel at the Yucca Mountain repository have purportedly become "unclear" since this litigation commenced. Several examples underscore PG&E's overriding evidentiary need. First, as the Court noted in its April 27 Order, "[m]any of the documents in the Marcinowski Affidavit relate to the pre-decisional and deliberative process that precedes a decision (not yet made) by DOE as to the steps to be taken to prepare and complete an Environmental Impact Statement (EIS) for GTCC waste." 4/27/06 Order at 12-13. The government argued in the *Yankee Atomic* case that DOE's plans for utility GTCC waste might be "changed" in that EIS, and until the EIS is complete such plans are "unclear." PG&E has a substantial evidentiary need to explore the veracity and credibility of those arguments.[1]

Second, as the Court also noted in its April 27 Order, "[m]any of the documents in the Virgilio Affidavit relate to the pre-decisional and deliberative process that preceded a decision by NRC as to whether to redefine GTCC waste as high-level waste (HLW)." 4/27/06 Order at 12. The government argued in the *Yankee Atomic* case that NRC's failure to redefine GTCC waste as HLW showed that GTCC waste does not fit the definition of HLW contained in the DOE spent fuel contract. For reasons explained in PG&E's pretrial brief, the DOE contract definition of HLW does cover utility GTCC waste, in view of a 1989 NRC Rule that required – and still requires – "permanent isolation" of such waste. Indeed, in

[1] That DOE's plans for utility GTCC waste may have changed would not be surprising, because given DOE's breach of its spent fuel contract obligations, there is no particular reason, and certainly no exigency, for DOE to finalize plans for disposition of utility GTCC waste. Given DOE's breach, both waste forms must remain in on-site storage at utility reactor sites. Had DOE performed as required by January 31, 1998, however, the record is clear (as summarized above) that DOE would have taken both waste forms to Yucca Mountain.

promulgating that Rule, the NRC stated that it would “obviate any need to reclassify certain GTCC wastes as HLW and would “achieve[] the same purpose” as formally declaring the waste to be HLW. *See* PG&E’s Pretrial Mem. at 51-53 (quoting 54 Fed. Reg. at 22,579). Nonetheless, PG&E has a substantial evidentiary need for documents pertaining to NRC’s more recent consideration whether or not to reclassify GTCC waste as HLW, in part because the government may yet be expected to argue here (as it did in *Yankee Atomic*) that the NRC’s failure to formally declare GTCC waste as HLW has some contractual relevance, and in part to explore DOJ’s apparent participation in or attempt to influence NRC in this regard. The quote above from Mr. Virgilio’s declaration, to the effect that a request for a meeting by DOJ and DOE discouraged NRC from issuing a letter that its Office of General Counsel had otherwise approved, concerned an NRC response to a suggestion that NRC reclassify GTCC waste as HLW.

A third category of highly relevant GTCC waste-related documents is described in the government's first May 10 letter to PG&E as "documents relating to the development of a response to a petition for rulemaking that Portland General Electric Co. ("Portland") submitted regarding the interim storage of GTCC waste that eventually resulted in a final rule published at 66 Fed. Reg. 51823 (Oct. 11, 2001)." Exh. C at A48. The government identifies these as documents 437, 438, 439, 440 443, 444, 450, 452, 456, 458 and 464 on PG&E's Table of Challenges, but other documents may be in this category also. According to the government's letter:

> [a]lthough these documents certainly relate to GTCC waste, the issue involved in Portland's petition does not have any relevance to the particular issues in PG&E's case, particularly beyond the actual final rule that the NRC ultimately issued. . . . The GTCC matters that [the documents] discuss must actually relate to an issue in this case for them to be relevant and before we can

> evaluate whether PG&E would have a 'compelling need' for them in this case. . . .[P]lease identify for us the relevance of these documents . . .

Exh. C, at A48.

The government's position on these documents is frivolous, and outrageous. The Portland rulemaking is directly relevant to GTCC waste licensing matters that are squarely at issue in this case – and the government knows it. The government's own "expert" Mr. Brewer gives an opinion concerning NRC licensing of GTCC waste storage that relies explicitly, and solely, not on the "final rule" the government suggests is singularly controlling, but rather on his "interpretation" of the NRC's response to a question posed in the explanatory material accompanying that same rule in the Federal Register. *See* Expert Report of Warren K. Brewer at 23-24 (quoting 66 Fed Reg. 51823, 51829 (Oct. 11, 2001)). In response, PG&E's rebuttal expert Mr. Meisner explains in his expert report that, and why, Mr. Brewer's reliance on the NRC commentary is entirely misplaced.[2] As shown by the government's privilege log entries describing the documents relating to this rulemaking that the government is withholding, those documents very likely will provide additional insights into the reasons for and implications of the rulemaking. For example, doc. no. 463 (not listed in the government's letter, but obviously related to this rulemaking) is described on the government's privilege log as a "memorandum regarding options for the interim storage of Greater-Than-Class-C waste from commercial reactors." That – *i.e.,* options for interim storage of GTCC waste – is one of the key disputed issues addressed by Mr. Brewer and Mr. Meisner. Unless PG&E obtains discovery of these documents, it may be deprived of

[2] Mr. Brewer has no NRC licensing experience whatsoever; Mr. Meisner, conversely, has many years of first-hand NRC licensing experience, including experience with the issues addressed in the Portland licensing proceeding and experience with NRC licensing of storage facilities for both high-level and low-level radioactive waste.

documents from the NRC itself that bolster Mr. Meisner's rebuttal to Mr. Brewer. Indeed, it would be unreasonable and completely unfair to allow Mr. Brewer to offer his opinion based solely on his "interpretation" of the NRC's Federal Register commentary, while denying PG&E access to NRC documents of at least equal – and possibly greater – probative value. These documents should be produced.

To the extent that a small number of the GTCC waste-related documents covered by this Motion and still withheld by the government may not fall squarely into one of the categories discussed above (*i.e.,* relating to the EIS, to NRC reclassification of GTCC waste or to the Portland rulemaking), these additional documents appear from the government's privilege log descriptions to be closely related and/or to address other aspects of DOE's plans for utility GTCC waste. Those additional documents thus fall squarely within Judge Merow's recognition of the need for "full" production of "all" GTCC waste planning documents, and also must be produced to avoid having only a partial record on these issues.

## III. DOCUMENTS CONCERNING RATE AND SCHEDULE ISSUES, WHICH ARE COMPARABLE TO DOCUMENTS THE COURT HAS ORDERED RELEASED

In its April 27 Order, the Court determined that:

> documents regarding the potential rate of acceptance by the government of SNF from nuclear utilities – which could be helpful in determining the rate of acceptance the government would have used had it began to perform the Standard Contract on January 31, 1998 – are *highly relevant* to this litigation and that there may be no other way for plaintiff to obtain evidence that serves the same purpose as these documents. See *Ferrell*, 177 F.R.D. at 429; *First Heights Bank, FSB v. United States*, 46 Fed. Cl. 312, 322 (2000).

4/27/06 Order at 14 (emphasis added). The Court also determined, expressly, "that plaintiff's evidentiary need for these documents outweighs the harm that their disclosure may cause to defendants." *Id*. at 15. As a result, the Court ordered the government to produce 29 documents as "examples" so that the parties could "analogize [from] these examples to

disputed documents not mentioned in this Order" as to what additional documents the Court believed the government should produce.

The Court ordered the government to produce Document Nos. 114, 116, 120, 121, 126, 147, 148, 149, 194, 234, 239, 247, 250, 288, 339, 343, and 345 that were described in the Milner declaration as:

> copies of slides addressing the impact of high receipt rates on waste site inventories that were used for a graphic presentation for group discussion of options regarding the design and operation of a repository at Yucca Mountain and the effect of those options upon SNF inventories. These documents were produced in response to Under Secretary Card's request for an analysis of how DOE could accelerate the process of waste acceptance once the program began operations.

*Id*. at 14 (quoting Milner Decl. at 53). The Court also ordered the government to produce Document Nos. 117, 144 and 344 that were described in the Milner declaration as:

> draft written answers to questions raised involving a presentation to Under Secretary Card regarding waste acceptance rates and system costs and OCRWM's plans for transportation.

*Id*. at 15 (quoting Milner Decl. at 54). Finally, the Court ordered the government to produce Document Nos. 128, 133, 134, 139, 142, 328, 330, 360 and 380 that were described in the Milner declaration as:

> presentations titled 'Impacts of Accelerated Waste Acceptance' and similar documents provid[ing] information requested by Under Secretary Card in connection with policy decisions to be made within DOE regarding waste acceptance.

*Id* (quoting Milner Decl. at 55).

The documents that the Court ordered the government to produce share a common thread – the contested issue concerning the rate at which and schedule on which DOE would have accepted shipments of spent nuclear fuel absent DOE's breach. In some cases the government's privilege log and/or the government employee declarations describe these

documents using the terms “rate of acceptance,” or “receipt rates,” or “shutdown priority” expressly, in some cases (as in the examples quoted above) they mention “options regarding the design and operation of a repository at Yucca Mountain and the effect of those options upon SNF inventories” or “policy decisions to be made within DOE regarding waste acceptance.” But in all cases where such descriptors are used – as the Court has already “determined” – the documents are highly relevant such that PG&E’s evidentiary need “outweighs” the government’s confidentiality interest, and the documents therefore should be produced.

It bears emphasis that the 29 documents the Court ordered released as "examples" are, indeed, highly relevant to key issues in this case. In other words, the Court was right to conclude, without need for additional briefing, that PG&E's evidentiary need for these documents plainly outweighs any government interest in their confidentiality. For example, doc. no. 239 is a May 25, 2002 DOE study entitled "Impact of High Receipt Rates on Waste Site Inventories." As stated on p. 2, the "purpose" of that study is to "[a]nalyze the near term impacts . . . of increasing CSNF [commercial spent nuclear fuel] receipt rates in order to empty shut-down reactor sites, avoid new at-reactor dry storage, and reduce the amount of CSNF in storage at operating reactors." This document thus demonstrates that even after the breach in 1998, DOE not only continued to *acknowledge* that the objectives of the DOE spent fuel program are precisely what other evidence shows and PG&E also contends they are – *i.e.,* to "empty shut-down reactor sites, avoid new at-reactor dry storage, and reduce the amount of CSNF in storage at operating reactors" – but also that DOE continued to take substantial steps, like exploring "high receipt rates," to try to *achieve* those objectives. As another example, doc. no. 380 is a DOE study entitled "A Preliminary Evaluation of High

Receipt Rates from Utilities." As noted on p. 4, that document examines three specific "high receipt rates" – 5,000 MTU/yr, 6,300 MTU/yr, and 10,000 MTU/yr – and also assumes (at p. 3) that "[p]riority is given to emptying shut down reactor sites." If DOE believed those high rates and shut down priority were reasonable and achievable even after the breach, then plainly this document provides powerful support for PG&E's position that a 3,000 MTU/yr pickup rate and shutdown plant priority was "reasonable" before the breach.

There is every reason to believe that PG&E has a comparably strong, and overriding, evidentiary need for *all* the other documents on the government's privilege log that that address acceptance rates, repository design, shutdown priority and the like. Indeed, the Court seemingly recognized as much when it characterized the 29 documents it ordered released as "examples." As noted at the outset, however, although the government has begrudgingly accepted that the Court's April 27 Order does require production of many additional documents, the government is still refusing to release yet other documents that, according descriptions in the government's privilege log or employee declarations, address the same types of "rate and schedule related" subjects as the 29 "example" documents discussed in the April 27 Order. Given the Court's direction "to analogize these examples to disputed documents not mentioned in [the] Order," 4/27/06 Order at 8, the additional documents PG&E now seeks should be produced and PG&E has thus filed this motion to compel their production. PG&E has grouped these documents into four categories, as follows:

1. Twenty documents that the government is still withholding clearly involve what the Court has termed the "highly relevant" rate of acceptance issue, *see* 4/27/06 Order at 14 and 15, because the government's privilege log and/or the government employee's declaration describing the documents use words, like "rate," "waste acceptance,"

"accelerated receipt," "scheduling" and/or "shutdown priority" in describing these documents.[3] As shown by the examples noted above on p. 15, these same words are used in the government employee declarations to describe a number of the documents the Court ordered released. These same words are also used in the government's privilege log entries for a number of the documents that the Court ordered released. *See, e.g.,* Exh. A, Table of Challenges at A10-A12, doc. nos. 128, 139, 142. As such, each of these 19 additional documents also "could be helpful in determining the rate of acceptance the government would have used had it began to perform …" 4/27/06 Order at 14 and 15. Following are several examples of descriptions from the government's privilege log of still-withheld documents which substantiate PG&E's claim of overriding evidentiary need for these documents:

- "Draft memo re: options for *expedited acceptance*, interim storage, and compensating utilities . . . " Ref. No. 170 (emphasis added).

- "[A]nalysis of *acceptance and shipment scenarios* for repository . . ." Ref. No. 132 (emphasis added).

- "E-mail forwarding information and analysis conducted for input to presentation to Under Secretary Card regarding *waste acceptance* rates and system costs . . ." Ref. No. 349 (emphasis added).

[3] These documents, with some "example" descriptions from the government's privilege log, are doc. nos. 132, 167, 170, 223 ("costs of various options relating to acceptance at a repository"), 255 ("pros and cons of various concepts relating to an option for SNF acceptance"), 285, 286 ("e-mails discussing the financial modeling for waste acceptance"), 320, 323-327 (*e.g.,* 325 is "draft of whitepaper regarding waste acceptance and transportation"), 330 ("draft presentation to Undersecretary Card regarding acceptance rates and system costs"), 340, 347 ("information and analysis . . . regarding waste acceptance rates and system costs"), 349 (same as 347), 362 ("[p]resentation to Undersecretary Card regarding program strategy, waste acceptance and transportation"), 381 ("[g]raphs and tables regarding the effect of options regarding the rate of SNF acceptance"), 260 ("memorandum analyzing the pros and cons of an option for SNF acceptance.")

Because, as the Court has recognized, the rate of acceptance issue is "highly relevant" to the issues in this litigation, PG&E's evidentiary need for these documents outweighs the government's interest in confidentiality, just as the Court expressly determined with respect to the 29 "example" documents in the April 27 Order. Moreover, these additional twenty documents cannot legitimately be distinguished from the documents that the government itself acknowledges have to be released given the guidance in the April 27 Order. As but one example of the government's untenable attempt at line-drawing, it acknowledges the Court's April 27 Order should lead to release of doc nos. 262 and 264, described on the Table of Challenges at A23, respectively, as "e-mails with comments regarding the effect of an option for SNF acceptance" and "e-mails regarding an internal memorandum analyzing an option for SNF acceptance," but the government does not acknowledge that the April 27 Order also requires release of doc no. 260, described as "memorandum analyzing the pros and cons of an option for SNF acceptance." Notably, the government also acknowledges the Court's April 27 Order requires release of doc. no. 143, described as "[w]hite paper concerning shipments from shutdown sites".

For all these reasons, the Court should order the release of the additional documents discussed in this section and identified in footnote 3.

2. Fifty-four documents that the government is still withholding also clearly involve what the Court has termed the "highly relevant" rate of acceptance issue, because the government's privilege log and/or the government employee's declaration describing the documents, while not explicitly mentioning "rate of acceptance" or similar terms, do show that that these documents address the same subjects as other documents the Court has ordered released because it correctly found the documents to be related to the rate of acceptance

issue.[4] Subjects addressed by these still-withheld documents include, for example, "the pros and cons of various concepts relating to the operation and construction of a repository and their budgetary effect" (no. 229; *see* 225, 227), "group discussions regarding budgetary costs associated with an option for SNF acceptance at the repository" (no. 129), "drafts of a graphic presentation regarding repository design options" (no. 263), "the operation of the waste management system" (no. 331) and the like. These same words or concepts are used in the government's privilege log entries for a number of the documents that the Court ordered released. *See, e.g.,* Table of Challenges doc. nos. 114 ("[g]raphic presentation and slides from the presentation for a group discussion of options regarding the design and operation of a repository of [sic] Yucca Mountain and the effect of those options on SNF inventories"), 116 (similar), 126 (similar), 120 "[s]lides used in a presentation . . . regarding the costs of options for the design and operation of a repository at Yucca Mountain"), 121 (" e-mails and notes discussing the pros and cons of storage options for receipt of SNF at Yucca Mountain"). As such, each of the fifty-four additional still-withheld documents listed in footnote 4 also "could be helpful in determining the rate of acceptance the government would have used had it began to perform …" 4/27/06 Order at 14 and 15.

---

[4] These documents, with some "example" descriptions from the government's privilege log and other commentary, are doc. nos. 115 (email re: "graphic presentation for group discussion of options regarding the design and operation of a repository at Yucca Mountain"), 125, 129, 136 ("graphic presentation regarding repository design options"), 137 ("[w]hite paper" re: "repository design options"), 141 (same subject as 136-37), 197-201, 204, 206, , 209-11, 217-19, 221-22, 225, 227-32, 235, 237, 257-61, 263, 271, 273, 291 & 295 (documents regarding "legislative proposals for OCRWM transportation and waste acceptance system), 303, 315, 317-18 (same subject as 319, which government released), 320-21 & 323-24 (also same subject as 319, which the government released), 331, 332 (same subject as 319), 338 & 340 (documents re: presentation on "OCRWM transportation and waste acceptance system"), 382 (documents "regarding the design of a repository"), 383 (same subject as 382).

PG&E is mindful that a small number of the documents in the category discussed here, for example doc. nos. 228, 231, 258, were mentioned by the Court in its April 27 Order as documents for which "it is not readily apparent to the court" why PG&E's evidentiary need outweighs the government's confidentiality interest. It is possible that in camera review of these three documents reveals they are not relevant. However, these three documents are described in the government's privilege log, respectively, as follows: " [s]preadsheet analyzing the cost of various options relating to the construction and operation of a repository;" "[g]raph used for discussion regarding the budgetary costs associated with an option for SNF acceptance at a repository;" "draft of internal memorandum re: business case and program budget decision analyzing the pros and cons of an option for SNF acceptance." These descriptions do indicate that these documents address the "highly relevant" rate of acceptance issue, and indeed, as discussed in the preceding paragraph, the Court expressly so found and thus "determined" that PG&E's evidentiary need was overriding with respect to numerous others documents addressing exactly these same subjects. As additional examples not mentioned in the preceding paragraph of documents the Court ordered released that, according to the government's privilege log descriptions, address the same subjects as the documents discussed and being sought here, *see* doc nos. 239 ("graphic presentation for group discussion of options regarding the design and operation of a repository at Yucca Mountain"), 247 (similar), 250 ( similar, and also addressing "effect of those options on SNF inventories"). The Court ordered those documents (as well as the comparably-described documents in the preceding paragraph) produced as "examples," and the documents sought here and listed in footnote 4 should be produced for the same reasons.

Indeed, among the documents the government has acknowledged should be released are doc nos. 313 and 311, described on the privilege log, respectively, as "[e]mail forwarding information and analysis conducted for input to presentation to Under Secretary Card regarding waste acceptance rates and system costs," and "answers and updates to congressional questions regarding OCRWM's FY03 budget." So PG&E's evidentiary need for documents described in this section is established not only by the Court's determination to release many other documents addressing the same subjects, but also by the government's own acknowledgement that comparably-described documents concerning "system costs" and DOE "budget" matters are releasable.

3. Five documents still withheld by the government concern DOE's 2004 Annual Capacity Report/Annual Priority Report ("ACR/APR") and the Delivery Commitment Schedules ("DCS") related thereto.[5] In its pretrial brief the government relies on DCSs and ACR/APRs from the 1990s, but, in addition to ignoring this Court's rejection of the same arguments in *Commonwealth Edison Co. v. United States*, 56 Fed Cl. 652, 666 (2003), the government fails to inform the Court that it encouraged a new round of DCSs in 2004, and directed that they be based on the 2004 ACR/APR, which projects a 3000 MTU/yr pickup rate for utility spent fuel. Documents relating to the 2004 ACR/APR and DCSs are plainly relevant to the rate issue and specifically to the government's arguments based on prior, now superseded versions of those documents. These documents are "highly relevant" should be produced.

4. Two still-withheld documents address, in the words of the government's privilege log description for one, doc. no. 109, DOE's "market driven acquisition approach for

[5] These documents are nos. 387-90 and 368.

OCRWM's [*i.e.*, DOE's Office of Civilian Radioactive Waste Management, the spent fuel program] fulfillment of the NWPA's provisions related to the acceptance, transportation, & storage of SNF." *See* doc no. 108 ('described in log as "DOE action memo re: . . . "the market driven acquisition approach for OCRWM's fulfillment of the NWPA's provisions related to the acceptance, transportation, & storage of SNF"). These documents are highly relevant to the rate and schedule issue, and particularly to PG&E's claim, also supported by other evidence, that a "reasonable" schedule for spent fuel pickups would be an economically efficient schedule. *See* PG&E's Pretrial Mem. at 10-12. The government has never stated a position in this case on what it believes a "reasonable" pickup schedule would be. However, if what DOE is actually doing is pursuing a "market driven approach" to "fulfillment of the NWPA's provisions related to acceptance . . . of SNF" – as these two still-withheld documents apparently show – then that would obviously be powerful support additional support for PG&E's position that the spent fuel pickup schedule should be economically efficient. "Market driven" and "economically efficient" are virtual synonyms. These two documents are as "highly relevant" as other documents pertaining to the rate and schedule for DOE pickups of spent fuel, and should be produced just as the Court has directed for other documents relevant to that issue.

## IV. DOCUMENTS CONCERNING (1) SPENT FUEL STORAGE COSTS AND (2) DOE PROPOSALS TO MODIFY OR AMEND THE SPENT FUEL CONTRACTS

In addition to the "rate and schedule related documents" discussed above, there are a small number of documents that do not address the same subjects as documents the Court ordered released, but that nevertheless are highly relevant and probative on key disputed issues in this case, such that PG&E has a substantial and overriding evidentiary need for these documents also.

First is one document that, according to the government's privilege log, addresses spent fuel storage costs in the context of the DOE spent fuel program. *See* doc no. 123 ("E-mail and graph re utilities' estimates of at-reactor storage costs. This documents were prepared as part of a study analyzing the costs and benefits of building a repository at Yucca Mountain."). Plainly this document addresses a key disputed issue in this case, and PG&E is entitled to discovery into the government's analysis of spent fuel storage costs. Conversely, it is difficult to see how the government could have a substantial confidentiality interest, or indeed any legitimate confidentiality interest, in a document addressing spent fuel storage costs.

Finally, the government is still withholding two documents that discuss a "proposed approach to initiating modifications to the utility disposal contract." *See* doc nos. 367, 369. Mr. Milner's declaration reveals that these proposals came from Mr. Zabransky, DOE's contracting officer for its spent fuel contracts, and reflect "Mr. Zabransky's recommendations and opinions regarding the terms to be modified if modifications are undertaken." *See* 3/31/06 Milner Decl. at 37. PG&E is mindful that the Court, in its April 27 Order, stated "it is not readily apparent to the court why plaintiff has a 'compelling need' for the[se] documents." *See* 4/27/06 Order at 10. The reason is straightforward: by definition a document discussing "possible contract modifications" to be proposed by DOE will discuss DOE's interpretation and understanding of the *current* contract terms and perceived deficiencies in those terms. PG&E submits that there could hardly be anything more relevant in a contract case, particularly where contract terms are disputed, than an opposing parties' expressed understanding of the current contract terms and possible deficiencies in those terms.

It is no wonder the government wants to conceal DOE's own understanding of the spent fuel contract from PG&E, but it also seems clear the government has no significant interest in keeping such contract interpretations confidential – apart from its litigation interest, which plainly should not and cannot be credited in this context. These documents should be produced.

## V. NOW THAT THE COURT HAS THE STILL-WITHHELD DOCUMENTS IN CAMERA, IT CAN AND SHOULD REJECT UNFOUNDED CLAIMS OF ATTORNEY CLIENT PRIVILEGE OVER THESE DOCUMENTS

In its letters of May 9 and 10 refusing to voluntarily produce any of the documents it is still withholding on deliberative process grounds, the government asserts that a number of the documents at issue here are also subject to the attorney-client privilege. In many instances, however, the government's privilege log makes clear that that privilege claim is unfounded, to say the least. Over and over the government's privilege log reflects a claim of attorney-client privilege merely because an otherwise ordinary document, not authored by a lawyer, is "under legal review." *See, e.g.,* doc. nos. 196, 202, 212, 220, 233, 251, 254, 268 287, 290, 402 and 403. Just as the Court rejected PG&E's claims of privilege where lawyer's "review" or other involvement in a document did not satisfy the elements of the narrow attorney-client privilege, *see* Order of April 14, 2006 at 4, so too the Court should reject the government's similarly unfounded claims based solely on "legal review" of otherwise discoverable documents.

PG&E acknowledges that in some cases the government's privilege log notes that the documents in question "also discuss" communications between DOE and the department of justice regarding the SNF litigation. *See, e.g.,* doc nos. 276, 280, 285. That formulation – "also discusses" – clearly implies the ability to separate and redact privileged material, which

the government should do. But the Court should reject the government's claim of attorney-client privilege where the only asserted basis is that the document in question is – or was – "under legal review."

CONCLUSION

For the reasons set forth in the Court's April 27 Order and above, the Court should direct the government to produce to PG&E all of the documents listed on Exhibit A hereto. Given the imminence of trial, the Court should further order that these documents be produced to PG&E as soon as possible, and not later than 5 pm EDT, May 17.

Dated: May 11, 2006

Respectfully submitted,

s/ Jerry Stouck
Jerry Stouck
Greenberg Traurig, LLP
800 Connecticut Avenue, NW
Suite 500
Washington, DC 20006
(202) 331-3173 Phone
(202) 261-4751 Fax
Counsel for Plaintiff
Pacific Gas & Electric Company

Of Counsel:

Robert L. Shapiro
Greenberg Traurig, LLP