No. 04-0074C, into which has been
consolidated No. 04-0075C
(Judge Hewitt)

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

PACIFIC GAS & ELECTRIC COMPANY,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

# DEFENDANT'S RESPONSE TO PLAINTIFF'S MOTION TO EXCLUDE TESTIMONY OF JONATHAN A. NEUBERGER

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

HAROLD D. LESTER, JR.
Assistant Director

JOHN C. EKMAN
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, NW
Washington, D.C. 20530
Tel: (202) 353-0897
Fax: (202) 307-2503

Attorneys for Defendant

OF COUNSEL:

JANE K. TAYLOR
Office of General Counsel
U.S. Department of Energy
1000 Independence Ave., S.W.
Washington, D.C. 20585

SCOTT R. DAMELIN
JOSHUA E. GARDNER
SHARON A. SNYDER
Trial Attorneys
Civil Division
Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530

May 15, 2006

# TABLE OF CONTENTS

**PAGE(S)**

SUMMARY OF ARGUMENT . . . . . . . . . . 1

ARGUMENT . . . . . . . . . . 2

I. STANDARD FOR ADMISSIBILITY OF EXPERT TESTIMONY . . . . . . . . . . 2

II. DR. NEUBERGER'S EXPERIENCE AND QUALIFICATIONS . . . . . . . . . . 6

III. DR. NEUBERGER'S OPINIONS . . . . . . . . . . 8

A. Mr. Graves' Model And Opinions . . . . . . . . . . 9

B. Dr. Neuberger's Economic Critique Of Mr. Graves' Model . . . . . . . . . . 12

C. Professor Cornell's Opinions . . . . . . . . . . 19

D. Dr. Neuberger's Critique Of Professor Cornell's Opinions . . . . . . . . . . 20

IV. DR. NEUBERGER'S OPINIONS ARE BOTH RELEVANT AND RELIABLE . . . . . . . . . . 22

A. Dr. Neuberger's Economic Critique Of The Graves Model Is Both Relevant And Reliable . . . . . . . . . . 22

B. Dr. Neuberger's Critique Of Professor Cornell's Opinions Is Both Relevant And Reliable . . . . . . . . . . 30

1. Dr. Neuberger's Economic Analysis Concerning Whether Professor Cornell Appropriately Considered Labor Overheads Does Not Constitute A Legal Conclusion . . . . . . . . . . 30

2. Dr. Neuberger Has The Requisite Expertise To Offer An Economic Opinion Concerning Professor Cornell's Treatment Of Decommissioning In Professor Cornell's Presentation Of PG&E's Damages Claim . . . . . . . . . . 35

C. Dr. Neuberger's Opinions Based Upon The DOE Model Are The Appropriate Subject Of Expert Testimony . . . . . . . . . . 37

CONCLUSION . . . . . . . . . . 39

## TABLE OF AUTHORITIES

**CASES** **PAGE(S)**

Alaska Pulp Corp. v. United States,
59 Fed. Cl. 400 (2004) . . . . . . . . . . 22

Beech Aircraft Corp. v. Rainey,
488 U.S. 153 (1988) . . . . . . . . . . 6

Betterbox Communications Ltd. v. BB Technologies, Inc.,
300 F.3d 325 (3d Cir. 2002) . . . . . . . . . . *passim*

Bluebonnet Sav. Bank, v. United States,
67 Fed. Cl. 231 (2005) . . . . . . . . . . 12, 23

California Fed. Bank v. United States,
54 Fed. Cl. 704 (2002), aff'd, 395 F.3d 1263 (Fed. Cir. 2005) . . . . . . . . . . 22

Coast Fed. Bank v. United States,
49 Fed. Cl. 53 (2001) . . . . . . . . . . 12, 23

Columbia First Bank v. United States,
60 Fed. Cl. 97 (2004) . . . . . . . . . . 23

Daubert v. Merrill Dow Pharm., Inc.,
509 U.S. 579 (1993) . . . . . . . . . . 2

Deal v. Hamilton County Bd. of Educ.,
392 F.3d 840 (6th Cir. 2004) . . . . . . . . . . 2

Fawick Corp. v. United States,
149 Ct. Cl. 623 (1960) . . . . . . . . . . 23

First Tennessee Bank Nat. Assoc. v. Barreto,
268 F.3d 319 (6th Cir. 2001) . . . . . . . . . . 4, 25

First Union Nat. Bank v. Benham,
423 F.3d 855 (8th Cir. 2005) . . . . . . . . . . 5, 25

Forrest v. Beloit Corp.,
424 F.3d 344 (3d Cir. 2005) . . . . . . . . . . 6

Greene v. Safeway Stores, Inc.,
210 F.3d 1237 (10th Cir. 2000) . . . . . . . . . . 34

**TABLE OF AUTHORITIES (con't)**

**CASES** **PAGE(S)**

Indiana Michigan Power Co. v. United States,
60 Fed. Cl. 639 (2004), aff'd, 422 F.3d 1369 (Fed. Cir. 2005) . . . . . . . . . . . . . . . . *passim*

Kumho Tire Co. v. Carmichael,
526 U.S. 137 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Living Designs, Inc. v. E.I. Dupont De Nemours & Co.,
431 F.3d 353 (9th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Micro Chem., Inc. v. Lextron, Inc.,
317 F.3d 1387 (Fed. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

Pizel v. Monaco Coach Corp.,
374 F. Supp. 2d 653 (N.D. Ind. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Rink v. Cheminova, Inc.,
400 F.3d 1286 (11th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Sacramento Municipal Utility District v. United States,
98-488, 2006 WL 950128 (Fed. Cl. Mar. 31, 2006) . . . . . . . . . . . . . . . . . . . . . . . . 9, 35

San Carlos Irrigation & Drainage Dist. v. United States,
111 F.3d 1557 (Fed. Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 22

Seaboard Lumber Co. v. United States,
48 Fed. Cl. 814 (2001), aff'd, 308 F.3d 1283 (Fed. Cir. 2002) . . . . . . . . . . . . . . . . . . . 22

Seaboard Lumber Co. v. United States,
308 F.3d 1283 (Fed. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Southern Nat. Corp. v. United States,
57 Fed. Cl. 294 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 23

Tennessee Valley Authority v. United States,
69 Fed. Cl. 515 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34, 38

Tyler v. Union Oil Co.,
304 F.3d 379 (5th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

United States v. Lopez-Lopez,
282 F.3d 1 (1st Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

## TABLE OF AUTHORITIES (con't)

**CASES** **PAGE(S)**

United States v. Mamah,
332 F.3d 475 (7th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

United States v. Taylor,
239 F.3d 994 (9th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

United States v. Urbina,
431 F.3d 305 (8th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

United States v. Young,
316 F.3d 649 (7th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

University of Colorado Foundation v. American Cyanamid Co.,
342 F.3d 1298 (Fed. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Wahl v. Carrier Manufacturing Co.,
511 F.2d 209 (7th Cir. 1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Zenith Electronics Corp. v WH-TV Broadcasting Corp.,
395 F.3d 416 (7th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

## REGULATIONS

10 C.F.R. 96.11 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

## FEDERAL RULES OF EVIDENCE

Fed. R. Evid. 702 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5

# INDEX TO APPENDIX

Jonathan Neuberger Deposition Transcript Excerpts,
Pacific Gas & Electric Co. v. United States, No. 04-0074 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Brad Cornell Deposition Transcript Excerpts,
Pacific Gas & Electric Co. v. United States, No. 04-0074 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Jonathan Neuberger Trial Transcript Excerpts,
Southern Nuclear Operating Co. v. United States, No. 98-614C (Fed. Cl. Oct. 27, 2005) . . . . . 30

Excepts From Report of Brad Cornell,
Pacific Gas & Electric Co. v. United States, No. 04-0074 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| PACIFIC GAS & ELECTRIC COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 04-0074C, into which has been |
| | ) | consolidated No. 04-0075C |
| THE UNITED STATES, | ) | (Judge Hewitt) |
| | ) | |
| Defendant. | ) | |

DEFENDANT'S RESPONSE TO PLAINTIFF'S MOTION
TO EXCLUDE TESTIMONY OF JONATHAN A. NEUBERGER

Pursuant to Rule 16 of the Rules of this Court ("RCFC"), defendant, the United States, responds to the motion that Pacific Gas & Electric Company ("PG&E") filed, seeking to exclude the expert testimony of the Government's economist, Dr. Jonathan Neuberger.

SUMMARY OF ARGUMENT

PG&E has offered a scattershot of arguments concerning the expert testimony of the Government's economist, Dr. Neuberger. However, even a cursory review of Dr. Neuberger's opinions reveals that they are both relevant and reliable. Indeed, PG&E's motion to exclude the expert testimony of Dr. Neuberger is simply its latest attempt to improperly shift the burden of demonstrating the "but for" world from PG&E to the Government. PG&E's primary criticism of Dr. Neuberger is that, although he offers an economic critique of the significant deficiencies contained in Mr. Graves' hypothetical exchanges model, which itself purports to model an economic marketplace, Dr. Neuberger has not offered an alternative model that cures these deficiencies. Yet, it is Mr. Graves' – and not Dr. Neuberger's – obligation to provide a sufficient depiction of the "but for" world. If Mr. Graves fails to satisfy this obligation, PG&E's causation theory fails. Dr. Neuberger, applying well-established and reliable economic principles, provides the Court with a useful basis for understanding the significant deficiencies contained

within Mr. Graves' hypothetical exchanges model.

Further, Dr. Neuberger's critique of Professor Cornell's conclusions concerning whether certain costs are incremental to the Government's delay in SNF acceptance do not intrude upon the province of the Court, but, rather, offer a helpful economic framework for evaluating the validity of PG&E's damages claim. Indeed, Dr. Neuberger simply applies Professor Cornell's own principle for determining whether a particular cost is incremental and then opines that Professor Cornell has failed to follow that principle with respect to certain costs. Finally, Dr. Neuberger's use of the DOE acceptance model to project PG&E's acceptance rights in the "but for" world is proper expert testimony, and has been recognized as such by this Court. In short, PG&E's complaints concerning Dr. Neuberger's opinions are without merit, and this Court should reject PG&E's motion to exclude his opinions in this case.

## ARGUMENT

### I. STANDARD FOR ADMISSIBILITY OF EXPERT TESTIMONY

The United States Court of Appeals for the Federal Circuit has explained that, under the Supreme Court's decision in Daubert v. Merrill Dow Pharm., Inc., 509 U.S. 579 (1993), the Court has an obligation to screen expert testimony for both relevance and reliability. Seaboard Lumber Co. v. United States, 308 F.3d 1283, 1301 (Fed. Cir. 2002). Although the standard articulated by the Supreme Court in Daubert must be met even in non-jury cases such as this one, Seaboard Lumber Co., 308 F.3d at 1302, the "'gatekeeper' doctrine was designed to protect juries and is largely irrelevant in the context of bench trials." Deal v. Hamilton County Bd. of Educ., 392 F.3d 840, 852 (6th Cir. 2004). Further, "the trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system." Micro Chem., Inc. v. Lextron,

Inc., 317 F.3d 1387, 1392 (Fed. Cir. 2003) (citing Advisory Committee Note to Federal Rule of Evidence 702).

Although the Supreme Court in Kumho Tire Co. v. Carmichael, 526 U.S. 137 (1999), expanded the Court's gatekeeping function under Daubert from "scientific" testimony to all expert testimony, the Court concluded that, in cases not involving scientific testimony, "[t]he factors identified in Daubert may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of the testimony." Id. at 150. In that circumstance, the Supreme Court explained that "the relevant reliability concerns may focus upon personal knowledge or experience." Id.; see Betterbox Communications Ltd. v. BB Technologies, Inc., 300 F.3d 325, 329 (3d Cir. 2002) (affirming the trial court's admittance of a marketing expert who opined upon the likelihood of confusion between two trademarks, and concluding that testimony was based upon the witness's "personal knowledge or experience . . . rather than a methodology that satisfies the Daubert factors"); Living Designs, Inc. v. E.I. Dupont De Nemours & Co., 431 F.3d 353, 368 n.14 (9th Cir. 2005) ("Concerning the reliability of non-scientific testimony such as [Berly's], the 'Daubert factors . . . simply are not applicable to this kind of testimony, whose reliability depends heavily on the knowledge and experience of the expert, rather than the methodology or theory behind it") (citation omitted) (emphasis in original); United States v. Young, 316 F.3d 649, 657 (7th Cir. 2002) (affirming admission of psychiatric mental health nurse who offered testimony concerning domestic abuse victim's recantation, concluding that her methodology was reliable based upon her extensive experience and review of relevant documents in the case).

The United States Court of Appeals for the Sixth Circuit has explained the distinction in

the sufficiency of expert methodology between scientific and non-scientific expert testimony:

> Contrary to First Tennessee's argument, the fact that Iorlano's opinions may not have been subjected to the crucible of peer review, or that their validity has not been confirmed through empirical analysis, does not render them unreliable and inadmissible. In United States v. Jones, 107 F.3d 1147, 1158 (6th Cir.), cert. denied, 521 U.S. 1127, 117 S. Ct. 2527, 138 L. Ed.2d 1027 (1997), this court recognized that the four specific factors utilized in Daubert may be of limited utility in the context of non-scientific expert testimony. We noted that "[i]f [the Daubert] framework were to be extended to outside the scientific realm, many types of relevant and reliable expert testimony – that derived substantially from practical experience – would be excluded. Such a result would turn Daubert, a case intended to relax the admissibility requirements for expert evidence, on its head." Id. at 1158. Indeed, even the Berry court itself recognized that "[t]he distinction between scientific and non-scientific expert testimony is a critical one[,]" and that Daubert is "only of limited help" in assessing technical or experiential expertise.

First Tennessee Bank Nat. Assoc. v. Barreto, 268 F.3d 319, 334-35 (6th Cir. 2001) (rejecting application of Daubert reliability factors to banking expert's opinion concerning prudent lending practices because expert testimony "derived largely from [expert's] own practical experiences throughout forty years in the banking industry"). Ultimately, the inquiry under Rule 702 is a flexible one, Daubert, 509 U.S. at 594, and trial courts "have substantial discretion in deciding how to test an expert's reliability." Rink v. Cheminova, Inc., 400 F.3d 1286, 1292 (11th Cir. 2005) (citation omitted).

Under Rule 702, an expert witness must possess "specialized knowledge" regarding the area of testimony. Fed. R. Evid. 702. As then-Judge Alito, writing on behalf of the United States Court of Appeals for the Third Circuit, explained in discussing the requisite specialized knowledge necessary to qualify as an expert under Rule 702:

> "The basis for this specialized knowledge 'can be practical experience as well as academic training and credentials,'" and "[w]e have interpreted the specialized knowledge requirement liberally." However, "'at a minimum, a proffered expert witness . . . must possess skill or knowledge greater than the average layman . . . .'"

Betterbox Communications, 300 F.3d at 327-28 (citations omitted) (affirming admittance of marketing expert on the issue of the likelihood of confusion in certain trademarks based upon his experience in the field).

Under Rule 702, a witness may qualify as an expert "based on his own knowledge, skill, experience, training or education." First Union Nat. Bank v. Benham, 423 F.3d 855, 862 (8th Cir. 2005) (citing Fed. R. Evid. 702). Further, the factual basis for an expert's opinion goes to the credibility of the testimony rather than the admissibility, and it is up to PG&E, the party challenging the admissibility of Dr. Neuberger's testimony, to examine the factual basis for the opinions through cross-examination. Id.; see Tyler v. Union Oil Co., 304 F.3d 379, 393 (5th Cir. 2002) (holding that attempt to show that expert's underlying data were unreliable is an issue to resolve upon cross-examination at trial). Indeed, where the parties' experts rely upon conflicting sets of facts, "it is not the role of the trial court to evaluate the correctness of facts underlying one expert's testimony" in determining whether they have appropriate expertise. Micro Chem., 317 F.3d at 1392.[1]

Further, pursuant to Federal Rule of Evidence 704, expert testimony is not objectionable

---

[1] This situation is to be distinguished from an expert who issues opinions that lack any arguable factual support, a situation which may be a proper basis for the exclusion of that expert's opinions. See United States v. Mamah, 332 F.3d 475, 477-478 (7th Cir. 2003) (affirming exclusion of sociologist and anthropologist as experts because they based their opinions upon insufficient facts or data).

simply because it embraces an ultimate issue to be decided by the fact-finder. See Beech Aircraft Corp. v. Rainey, 488 U.S. 153, 169 (1988) (recognizing that Federal Rules of Evidence 702 through 705 "permit experts to testify in the form of an opinion, and without any exclusion of opinions on 'ultimate issues'"); United States v. Urbina, 431 F.3d 305, 311 (8th Cir. 2006) (affirming admission of expert testimony concerning *modus operandi* of drug traffickers because "a court can allow opinion testimony if the expert's specialized knowledge is helpful to the [fact-finder] to understand the evidence or determine a fact in issue, even if the opinion embraces an ultimate issue to be decided by the [fact-finder]"); Forrest v. Beloit Corp., 424 F.3d 344, 353 (3d Cir. 2005) (affirming expert testimony from biomechanical engineer that presence of a guard would have prevented plaintiff's injury, because expert may offer testimony concerning ultimate issue in case).

At bottom, the Court must find that an expert's specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue. United States v. Lopez-Lopez, 282 F.3d 1, 14 (1st Cir. 2002) (affirming admittance of expert on the *modus operandi* of individuals importing drugs into the United States because expert's testimony was not within fact-finder's common knowledge); United States v. Taylor, 239 F.3d 994, 998 (9th Cir. 2001) (affirming admittance of academic expert on the relationship between pimps and prostitutes because, "[b]y and large, the relationship between pimps and prostitutes is not the subject of common knowledge").

## II. DR. NEUBERGER'S EXPERIENCE AND QUALIFICATIONS

The Government is offering Dr. Neuberger as an expert in the fields of economics and economic damages. This Court has repeatedly qualified Dr. Neuberger in these areas. See

Southern Nuclear Operating Co. v. United States, No.98-614C (Fed. Cl. Oct. 27, 2005) (Def. A.31, Tr.2021:5-10)[2] (noting that he has been qualified as an expert in the Court of Federal Claims on three separate occasions, and in the United States District Court for the Northern District of California once, as an expert in the areas of economics, economic damages, and corporate finance); see generally Indiana Michigan Power Co. v. United States, 60 Fed. Cl. 639 (2004), aff'd, 422 F.3d 1369 (Fed. Cir. 2005).

Dr. Neuberger, a senior vice president at Economists Incorporated, an economics consulting firm, has almost 20 years of experience conducting economic analyses and possesses a Ph.D. in economics from Johns Hopkins University. Pl. A.47, Neuberger Op., PXE006 0043.[3] Dr. Neuberger's areas of expertise include, among other areas, economic damages, commercial and financial litigation analysis, microeconomics and financial analysis, and statistics and econometrics. Pl. A.47, Neuberger Op., PXE006 0043. From 1988 to 1994, Dr. Neuberger was an economist with the Federal Reserve Bank of San Francisco. Neuberger Op., PXE006 0043. Since then, Dr. Neuberger has worked as an economic consultant at Deloitte & Touche, Benderley Economic Associates, LECG, Inc., Bates & White, and, most recently, Economists Incorporated. Pl. A.47, Neuberger Op., PXE006 0043.

With respect to Dr. Neuberger's work analyzing damages claims, Dr. Neuberger has been qualified as a testifying expert in multiple breach of contract cases involving both private companies and Federal agencies. Pl. A.48, Neuberger Op., PXE006 0044. Dr. Neuberger has analyzed companies in a variety of different industries, including aerospace and defense, electric

---

[2] "Def. A.__" refers to the appendix attached to this response.

[3] "Pl. A __" refers to the appendix attached to PG&E's motion to exclude.

power generation, telecommunications, timber, financial services, and, significantly for purposes of this litigation, nuclear power generation. Pl. A.48, Neuberger Op., PXE006 0044. Dr. Neuberger also has designed, developed, and implemented an opinion survey concerning loss of asset values on behalf of a private client in the civil aviation industry and has designed, developed, and implemented surveys of consumer and business banking customers. Pl. A.48, A.50, Neuberger Op., PXE006 0044, 0046. In addition, Dr. Neuberger has designed, developed, and implemented models of risk measurement to assist banks and other institutions to manage multiple types of business risk, including market, interest rate, and operational risks, and has co-authored a chapter in a risk-management handbook prepared by the Casualty Actuarial Society. Pl. A.51, Neuberger Op., PXE006 0047. Dr. Neuberger has worked with models that involve uncertain events and the presence of risk aversion and has expertise in understanding how certain types of risks and external pressures may be modeled. Def. A.19, Tr.252:17-253:1. Dr. Neuberger has published dozens of articles on a variety of topics, including market imperfections, interest rate competition, risk management, and analysis of market impacts. Pl. A.53-A.55, Neuberger Op., PXE006 0049-51. In addition, Dr. Neuberger has served as a Visiting Assistant Professor of Economics at Mills College, in Oakland, California, and has taught classes in both economics and finance. Pl. A.11, Neuberger Op., ¶12.

## III. DR. NEUBERGER'S OPINIONS

Dr. Neuberger has analyzed certain aspects of the models used by Frank Graves and Brad Cornell, two experts retained by PG&E to establish and quantify PG&E's damages in this case, and has offered economic critiques of these models and their resulting conclusions. Notably, PG&E barely even references Mr. Graves, his model, or his conclusions in its motion to exclude

Dr. Neuberger's testimony. However, to fully appreciate Dr. Neuberger's opinions, the Court must first understand the nature of Mr. Graves' model and his opinions, as well as those of Professor Cornell.

A. <u>Mr. Graves' Model And Opinions</u>

Under the Standard Contract, acceptance rights are determined by an "oldest fuel first" ("OFF") basis, with the oldest discharged fuel receiving the earliest acceptance rights by the Department of Energy. 10 C.F.R. 961.11, Art. VI, B.1.(a). Mr. Graves believes that the OFF priority ranking is economically inefficient because it fails to take into account the costs that utilities face to store spent nuclear fuel ("SNF"), and he asserts the application of OFF would result in many utilities having to incur otherwise avoidable storage costs. To remedy what he views as an inefficient contractual acceptance mechanism, Mr. Graves has created a model that purports to simulate the trading, or exchange, of approved Delivery Commitment Schedules ("DCSs") between contract holders in the "but for" world.[4]

To determine how this hypothetical exchanges market would have operated in the "but for" world, Mr. Graves utilizes two separate models. The first is his so-called "must move" model, in which Mr. Graves utilizes storage and discharge data as of 1993 from every

[4] Under the Standard Contract, utilities may exchange approved DCSs subject to DOE's right, in its "sole discretion," to approve or disapprove any proposed exchange. 10 C.F.R. 96.11, Art. V.E. The mere fact that DOE has the discretion to disapprove exchange requests renders PG&E's exchanges theory speculative. <u>See</u>, <u>e.g.</u>, <u>San Carlos Irrigation & Drainage Dist. v. United States</u>, 111 F.3d 1557, 1563 (Fed. Cir. 1997). This Court recently rejected another SNF plaintiff's contention that exchanges would have occurred in the "but for" world because the contention was impermissibly speculative. <u>See</u> <u>Sacramento Municipal Utility District v. United States</u>, 98-488, 2006 WL 950218 (Fed. Cl. Mar. 31, 2006) ("To accept SMUD's position [regarding exchanges], the court would need to speculate about whether SMUD would have been successful in trading SMUD's acceptance priority with another utility or convincing DOE to accept SMUD's SNF early. The law does not permit the court to do so").

commercial nuclear facility in the United States in an effort to account for the then-existing storage capacities of each facility. Pl. A.13-A.14, Neuberger Op. ¶20. Based upon this set of data, Mr. Graves determines when a particular utility is in a "must move" situation based upon whether that utility would have to incur incremental storage costs to address its SNF storage capacity limitations.[5] Pl. A.14-A.15, Neuberger Op. ¶¶21-23. Based upon certain critical assumptions contained in Mr. Graves' "must move" model, he then identifies for each nuclear facility when it would face a "must move" situation and how much SNF must be moved to alleviate that situation. Mr. Graves utilizes his "must move"analysis for two purposes: (1) he uses the slope and shape of the "must move" mountain of SNF to justify a 3,000 MTU steady-state rate of acceptance; and (2) he uses the "must move" analysis as an input to the second component of his model, the "Economic Sequence Model" ("ESM"). Pl. A.15, Neuberger Op. ¶¶25-26.

The ESM combines the timing and quantity of SNF in each "must move" situation with estimates of the incremental at-reactor storage costs of addressing that situation. Pl. A.15, Neuberger Op. ¶26. Notably, Mr. Graves created the ESM for purposes of the SNF litigation during the Yankee Atomic case, another SNF case involving shutdown nuclear utilities. In addition, rather than conduct any empirical studies of nuclear utilities and their willingness to exchange acceptance rights, Mr. Graves simply assumes such demand based upon the storage costs that he believes utilities would desire to avoid. Mr. Graves bases the estimates of avoidable storage costs upon the opinion of another expert, Roderick Knight, who provided

[5] The term "must move" is a term created by Mr. Graves and does not appear in either the Standard Contract or the Nuclear Waste Policy Act.

averages of estimates (rather than actual, incurred costs) concerning the operation and maintenance ("O&M") costs of a wet pool and a dry storage facility ("Independent Spent Fuel Storage Installation," or "ISFSI"), the cost of building an ISFSI, and the per-cask costs of adding another cask at an existing ISFSI. Pl. A.15, Neuberger Op. ¶26. Although the ESM endeavors to determine avoidable storage costs in the "but for" world, Mr. Knight derived his estimated cost figures from four decommissioning cost studies conducted in the 2002 time frame and escalated those costs to 2005 dollars. Notably, although Mr. Knight was deposed in this case, PG&E decided not to present Mr. Knight as an expert witness at trial, raising a substantial issue concerning Mr. Graves' ability to offer an opinion on incremental storage costs or the admissibility of Mr. Graves' opinions based upon the outputs of the ESM model.

Based upon the outputs of the ESM, Mr. Graves concludes that the majority of the cost of storing "must move" SNF could have been avoided in the "but for" world through the exchange of approved DCSs between contract holders. Pl. A.16, Neuberger Op. ¶27. Mr. Graves' opinion concerning a hypothetical exchanges market is based upon an assumption that all contract holders would have participated in the market and that all contract holders with early DOE acceptance rights would have offered all of those rights to the market. Id. Mr. Graves also assumes that every utility with "must move" SNF bids on rights based on average per-MTU avoidable storage costs and that the lowest price that clears the market is the marginal price at which all trades are conducted in that year. Id. Mr. Graves hypothesizes that those utilities which bid at or above the market-clearing price will accelerate their position in the DOE acceptance queue through exchanges, while those which per-MTU avoidable costs fall below the market-clearing price will be unsuccessful in trading in that year will incur the costs to address

their "must move" condition and will re-enter the market the following year. Id.

Further, Mr. Graves assumes that the suppliers of acceptance rights are "price takers" and will sell their current rights at whatever marginal bid price clears the market. Pl. A.16, Neuberger Op. ¶28. Mr. Graves also hypothesizes that the trading of these acceptance rights will occur at prices greater than zero for only the first three years of the program – beginning in 1998 – and then predicts that the bid prices for exchanging acceptance rights approach zero because the supply of acceptance rights exceed the demand for these rights. Pl. A.16, Neuberger Op. ¶29. Mr. Graves concludes that the marginal bid price that PG&E would have paid in the "but for" world to accelerate its position in the DOE acceptance queue, based upon Mr. Knight's estimates, would be $1.5 million.[6] Professor Cornell opines in his report that this number should be deducted from PG&E's claimed damages.

B. Dr. Neuberger's Economic Critique Of Mr. Graves' Model

Dr. Neuberger has offered an economic opinion that Mr. Graves' hypothetical model does not capture numerous fundamental features of a trading market and provides an incomplete and overly simplistic depiction of the market forces and incentives that would affect the operation of such a market. Pl. A.17, Neuberger Op. ¶33. Consequently, Dr. Neuberger opines that "it is difficult to give credence to Mr. Graves' predictions regarding how this market would function and, more directly, how it would impact the situation that the plaintiff would have faced in the but-for world." Id.

[6] Despite PG&E's obligation to identify costs that it would have incurred in the "but for" world, see Bluebonnet Sav. Bank, v. United States, 67 Fed. Cl. 231, 238 (2005); Southern Nat. Corp. v. United States, 57 Fed. Cl. 294, 306 (2003); Coast Fed. Bank v. United States, 49 Fed. Cl. 53, 55 (2001), there is no admissible evidence to support this reduction in this case.

Dr. Neuberger offers specific criticisms of the significant flaws in Mr. Graves' model. First, Dr. Neuberger opines that Mr. Graves' hypothetical model relies upon questionable and unsupported assumptions. For example, Dr. Neuberger questions Mr. Graves reliance upon Mr. Knight's 2002 decommissioning cost estimates as the basis for Mr. Graves' conclusion as to the avoidable costs utilities would have faced in the "but for" world. Pl. A.18-A.19, Neuberger Op. ¶¶38-40. Dr. Neuberger explains that Mr. Graves' reliance upon four decommissioning cost studies that post-date January 1998 raises substantial issues concerning statistical significance:

> Statistical theory suggests that, in drawing inferences about an underlying population from a sample, a larger sample size generally increases the likelihood that the sample reflects the true population average. In most cases, as sample size increases, the greater the precision of the point estimate of the average. In this case, Mr. Knight provides a sample of only four cost studies. Without knowledge of the true distribution of those costs, however, it is difficult to know if the four studies chosen by Mr. Knight are truly indicative of relevant average industry costs. In the absence of some rather extreme assumptions about how these costs are distributed, a sample size of four does not provide much statistical power for drawing inferences about the industry average.

Pl. A.19, Neuberger Op. ¶40.

Dr. Neuberger also opines that the use of Mr. Knight's cost estimate averages as a basis for determining avoidable costs is particularly improper given that Mr. Knight's estimates reflect <u>2005</u> dollars, while Mr. Graves purports to model a market that allegedly would have begun to develop in the mid-1990s. Def. A.3, Tr.49:1-8. As Dr. Neuberger explained regarding the problem with Mr. Graves' reliance upon these cost estimates:

> Well, you've got costs in 2005 being applied to must-move situations or trading situations that purportedly would have taken place in the mid-1990s. And certainly with just general inflation, it's not clear that those costs would have been relevant back then. Even Mr. Knight, when asked in his deposition, should these cost

> estimates be used for 1998, he said, no, you ought to – you ought to discount them to account for the passage of inflation between those years.

Def. A.4, Tr.50:10-20. However, Mr. Graves failed to discount Mr. Knight's numbers. Def. A.4, Tr.50:21-51:1. In addition, Dr. Neuberger explained that although Mr. Graves is attempting to model the avoidable costs at operating reactors, decommissioning cost studies only estimate costs for dry storage facilities after the particular plant shuts down. Def. A.10, Tr.171:5-173:14; Def. A.11, Tr.176:19-177:2.[7] Further, Dr. Neuberger opines that, because the decommissioning cost studies upon which Mr. Knight and, in turn, Mr. Graves rely evince a wide degree of variability in terms of the various cost elements based upon the site-specific nature of decommissioning cost estimates, "[s]imply averaging numbers that have high variances doesn't necessarily tell you whether that's a representative number, and if those numbers were drawn from very site specific or different methodologies, you may not know anything about either distribution or the industry as a whole." Def. A.12, Tr.190:5-11.

Dr. Neuberger also critiques Mr. Graves' hypothetical model for failing properly to consider various issues that influence the size and slope of Mr. Graves' "must move" mountain that Mr. Graves uses to justify the "efficiency" of a 3,000 MTU rate of SNF acceptance. For example, Dr. Neuberger explains that Mr. Graves' model fails to account for license extensions. Pl. A.19, Neuberger Op. ¶41. Mr. Graves' model assumes that all utilities operate until the end of their original operating licenses and that all fuel becomes "must move" fuel five years after

---

[7] As we will demonstrate at trial, the operation and maintenance cost associated with an ISFSI at an operating nuclear facility is substantially different than the operation and maintenance cost associated with an ISFSI at a shut down facility. Mr. Graves' model fails to account for this fact.

the expiration of these licenses. Id. The significance of this assumption is that Mr. Graves' opinion concerning the "efficiency" of a 3,000 MTU rate is predicated upon the slope of his "must move" mountain. When the slope decreases, rates substantially less than 3,000 MTU stay ahead of the "must move" mountain, if it is assumed that utilities obtain license extensions from the Nuclear Regulatory Commission ("NRC"). Pl. A.21, Neuberger Op. ¶¶46-47. Indeed, Dr. Neuberger opines that, if license extensions are assumed in Mr. Graves' model, a steady-state acceptance rate of 900 MTU per year through 2010, with a ramp-up to 3,000 MTU thereafter, would stay ahead of annual cumulative discharges and remove some portion of the backlog – the two criteria against which Mr. Graves measures "efficiency." Pl. A.21, Neuberger Op. ¶¶46-47; Def. A.9, Tr.144:11-18.

Dr. Neuberger opines that Mr. Graves' failure to consider license extensions ignores the reality that approximately three-quarters of all nuclear reactors have either received, have under review, or have filed letters of intent with the NRC to obtain license extensions. Pl. A.19-A.20, Neuberger Op. ¶42. Dr. Neuberger explains that obtaining a license extension makes economic sense for a nuclear plant because nuclear power constitutes a relatively low-cost source of electricity and provides utilities with additional operational options. Pl. A.20, Neuberger Op. ¶43. Further, Dr. Neuberger opines that obtaining a license extension is unrelated to the Government's delay of SNF acceptance and would have been just as desirable in the "but for" world as in the actual world. Id.

Similarly, Dr. Neuberger opines that Mr. Graves' model fails to account for wet pool reracks after 1995 and improperly assumes a uniform full core reserve policy across all utilities. Pl. A.22, Neuberger Op. ¶¶48-50. Dr. Neuberger notes that Mr. Graves' improper assumptions

are significant because they directly affect when a particular utility has a "must move" condition under Mr. Graves' hypothetical model. Id.; Def. A.13, Tr.209:10-13 ("I'm suggesting that to the extent that individual utilities vary from that one full core reserve assumption, then the model is mischaracterizing their must-move needs").

Dr. Neuberger also offers an economic critique of the numerous issues that Mr. Graves completely failed to consider in his hypothetical economic marketplace. Dr. Neuberger opines that Mr. Graves' characterization of his hypothetical exchange market is incomplete and, therefore, unlikely to produce reliable predictions concerning trading volumes or prices because Mr. Graves ignores all factors relevant to a utility's participation in the market but the avoidable cost in determining demand for acceptance rights. Pl. A.22-A.23, Neuberger Op. ¶¶51-52. Specifically, Dr. Neuberger explains that Mr. Graves' model completely ignores issues such as risk aversion, uncertainty, and political, regulatory, and community pressure. Pl. A.23, Neuberger Op. ¶52. Further, Dr. Neuberger explained that Mr. Graves' model focuses on the demand side of exchanges and completely ignores factors affecting the supply side of the market:

> In my view, the depiction of the demand side of this exchanges market is incomplete. There's stuff left out. There are factors and influences that are left out.
>
> Willingness to pay that avoidable cost factor, I would expect, would be part of the demand for exchanges. No such analysis is done on the supply side. In my view, many of the factors that would influence demand would also influence supply. They might also influence the willingness to participate in the market.
>
> So you need some understanding of what individual utilities are going to do, much like what [Mr. Graves] has done on the willingness to pay side. And without that, you don't know how this exchanges market would work. You don't know how any

> individual utility could either accelerate or decelerate.
>
> The market is incomplete. You've got a partial characterization of one side of the market. We have no characterization or a big assumption about what the other side of that market looks like. My critique is both of those things: one, the demand side is incompletely characterized; and B – or two, that the supply side is pretty much ignored. And the participation decision is also ignored; it's simply assumed.

Def. A.20-A.21, Tr.301:13-302:17; Neuberger Op. ¶53.

Dr. Neuberger provides a more complete characterization of a hypothetical exchanges market by demonstrating how the inclusion of both supply and demand factors affect Mr. Graves' model:

> Suppliers place a range of values on their current acceptance rights, just as potential purchasers do on the demand side. As above, some utilities would choose not to offer any of their current rights because the costs and risks of selling them are too great. Others might agree to sell if the offering price was sufficiently high. The result, shown in the top panel of Figure 5, is the identification of a more typical upward-sloping supply curve (labeled S"), depicting the prices suppliers would require to offer rights to the trading market. In this setting, equilibrium involves lower trading volumes and higher prices than those identified by Mr. Graves. Moreover, in the absence of a utility-by-utility analysis of the value of acceptance rights among suppliers, or at the very least knowledge of how these valuations are distributed, it is impossible to estimate how this more complete depiction of the market would affect any individual utility's ability to purchase DOE acceptance rights and thus to reduce its SNF storage costs in the but-for world.

Pl. A.25, Neuberger Op. ¶60.

Dr. Neuberger also criticizes Mr. Graves for unrealistically assuming that all utilities have perfect information concerning every other utility's "must move" needs and associated costs. Pl. A.26, Neuberger Op. ¶63. Dr. Neuberger opines that Mr. Graves' assumption is

unrealistic because, even in the "but for" world where DOE performed on an industry-wide basis beginning in 1998, there would have been significant uncertainty regarding future events that could affect a utility's operations and spent fuel storage needs, and these uncertainties would exert unknown influences upon Mr. Graves' model. Pl. A.26-A.27, Neuberger Op. ¶64. Uncertainties could result in utilities that act differently than Mr. Graves' model predicts, with the result being that prices for allocations could move in any direction from year to year, rather than fall every year as Mr. Graves hypothesizes. Pl. A.28, Neuberger Op. ¶68.[8]

Dr. Neuberger also opines that, by focusing solely upon avoidable costs, Mr. Graves fails to consider the effect of utility risk management and utility strategic behavior in his model:

> The management of uncertainty and risk would manifest itself in any number of ways that could affect the output of Mr. Graves' model. A risk-averse utility, for example, may choose to reduce the risk of shutdown by increasing the reserve in its spent fuel pool. With differing degrees of risk aversion, owners of operating reactors could adopt a range of reserve assumptions in the but-for world that would modify their "must move" conditions in the Graves model and produce incentives and results that are at odds with his predictions.

Pl. A.30, Neuberger Op. ¶73. Further, Dr. Neuberger criticizes Mr. Graves' assumption that every utility is aware of every other utility's cost structure and willingness to pay for current acceptance rights, explaining that this assumption fails to account for the fact that utilities conceal elements of their cost structures for competitive reasons. Pl. A.31, Neuberger Op. ¶77. Dr. Neuberger also critiques Mr. Graves' opinion that prices for exchanges fall to zero after the third year of trading and explains that Mr. Graves fails to consider the inherent value to utilities

[8] Dr. Neuberger testified that he has the expertise to develop a model that properly considers these important factors and discussed a potential methodology for the development of such a model at his deposition. Def. A.7, Tr.80:6-81:17.

in possessing approved DCSs. Pl. A.32, Neuberger Op. ¶81. This failure is a result of Mr. Graves' lack of consideration of risk and uncertainty. Pl. A.32, Neuberger Op. ¶82.

Dr. Neuberger also opines that Mr. Graves' reliance upon other economic markets for support for his hypothetical exchanges market has limited relevance. Pl. A.32, Neuberger Op. ¶83. For example, Mr. Graves refers to the market for emissions rights as a market that he believes acts analogously to his hypothetical exchanges market. Dr. Neuberger explains that the market for emissions rights has many features that differ substantially from the market proposed by Mr. Graves for the exchange of DOE acceptance rights, such as the difference in the underlying good being sold, the resultant impact of market failure, the nature of uncertainty, and the size of the markets. Pl. A.33-A.34, Neuberger Op. ¶¶85-90. In fact, Dr. Neuberger notes that Mr. Graves' early predictions concerning the volume and prices at which emissions trading rights would occur were incorrect. Pl. A.34-A.35, Neuberger Op. ¶¶91-93.

C. Professor Cornell's Opinions

Professor Cornell has offered two separate opinions concerning his evaluation of incremental costs that are relevant to this motion. First, Professor Cornell opines that all of PG&E's direct and certain of its indirect labor overheads constitute incremental costs as a matter of economics that may be recoverable as damages in this case. Pl. A.39, Neuberger Op. ¶104. Professor Cornell's conclusion is based upon PG&E's internal cost-accounting system, which contains various cost categories related to breach-related activities. Id. These cost-accounting categories also include time spent by PG&E employees that spend some of their time working on breach-related projects (*i.e.*, direct labor costs). Id. In addition, PG&E's cost-accounting system includes various cost "burdens," such as pensions, insurance, meals, and other costs attributable

to an employee's time (*i.e.*, indirect labor costs). Professor Cornell concludes that all direct labor costs, regardless of the amount of time or level of activity that a particular employee spends on a breach-related project, constitutes an incremental cost to PG&E. Professor Cornell also concludes that, with respect to indirect labor costs, certain of these costs are unaffected by the Government's delay and, therefore, are not incremental. Pl. A.40, Neuberger Op. ¶107. With respect to other indirect labor costs, Professor Cornell concludes that, to the extent these resources comprising indirect labor are "congested," meaning that there is a scarcity of a particular resource, a portion of these "congested" resources are incremental and, therefore, should be allowable as damages. Id.

Second, Professor Cornell attempts to determine the effect of PG&E's decommissioning efforts upon its damages claim. Pl. A.77-A.78. Specifically, Professor Cornell notes that decommissioning will occur independent of the Government's delay. Pl. A.78. However, because Professor Cornell concludes that the cost and timing of decommissioning in the future is uncertain, "the most reasonable assumption that can be made at this juncture is that the present value of these costs will be approximately the same for both the actual and 'but for' worlds." Id. Professor Cornell explains that, "[i]n making this assumption, I am effectively assuming that the rising costs of such decommissioning activities anticipated by PG&E is offset by the discount rate." Id.

D. Dr. Neuberger's Critique Of Professor Cornell's Opinions

Dr. Neuberger offers two economic critiques of Professor Cornell's opinions concerning incremental costs. First, Dr. Neuberger criticizes Professor Cornell's reliance upon cost accounting project codes to determine whether a direct labor cost is incremental, rather than an

analysis to determine whether PG&E actually hired additional personnel, paid overtime to its personnel because of their work on breach-related projects, or would have reduced staff in the absence of the Government's delay in performance. Pl. A.39-A.40, Neuberger Op. ¶105. Further, Dr. Neuberger criticizes Professor Cornell's evaluation of "congested" indirect labor resources, as a matter of economics, explaining that Professor Cornell's reliance upon cost allocation from PG&E's accounting systems, without any other detailed analysis of specific incurred costs, provides an insufficient basis to determine whether such indirect labor is, in fact, an incremental cost to PG&E. Pl. A.40-A.41, Neuberger Op. ¶¶107-109.

Second, Dr. Neuberger opines that Professor Cornell has inconsistently treated decommissioning costs versus other future damages that Professor Cornell estimated in his report. Pl. A.41, Neuberger Op. ¶110. In the course of estimating future damages in this case, Professor Cornell projected time series of cost indices, including general inflation and specific cost measures as delineated in contracts with PG&E's dry storage vendors. Pl. A.42, Neuberger Op. ¶112. Dr. Neuberger notes that, under Professor Cornell's own methodology, many of these indices actually grow more slowly than the relevant discount rate. Id. Dr. Neuberger opines that, if similar assumptions were applied to PG&E's decommissioning efforts, the Government's delay actually will provide a net benefit to PG&E, and this net benefit may be appropriate to deduct from any damages that PG&E may receive in this case. Pl. A.42, Neuberger Op. ¶¶112-113.

## IV. DR. NEUBERGER'S OPINIONS ARE BOTH RELEVANT AND RELIABLE

### A. Dr. Neuberger's Economic Critique Of The Graves Model Is Both Relevant And Reliable

PG&E's primary challenge to Dr. Neuberger's testimony is that, although he has offered an economic critique of Mr. Graves' hypothetical "but for" world model, he has not offered an alternative model. Pl. Mot. 2. PG&E asserts that, because Dr. Neuberger has not developed an alternative model, his opinions that Mr. Graves' model produces unreliable results is based upon conjecture and speculation. Pl. Mot. 2, 5. PG&E's criticism of Dr. Neuberger's opinions is without merit.

First, PG&E cites to no legal authority for its contention that it is improper for an expert to offer a critique of a damages model without offering an alternative model. Indeed, contrary to PG&E's novel and unsupported contention, courts have routinely allowed expert critiques of damages models without offering an alternative model. See generally California Fed. Bank v. United States, 54 Fed. Cl. 704 (2002) (accepting defendant's expert's critique of plaintiff's damages model without requiring defendant's expert to offer alternative model), aff'd, 395 F.3d 1263 (Fed. Cir. 2005); Seaboard Lumber Co. v. United States, 48 Fed. Cl. 814 (2001) (accepting experts' critiques of Government's expert's damages model in counterclaim without requiring experts to offer alternative model), aff'd, 308 F.3d 1283 (Fed. Cir. 2002).

Second, PG&E's complaints about Dr. Neuberger's opinions fail to recognize that the burden of demonstrating the "but for" world for purposes of establishing an entitlement to the recovery of damages falls squarely upon PG&E, and not the Government. Alaska Pulp Corp. v. United States, 59 Fed. Cl. 400, 413-14 (2004); San Carlos Irrigation & Drainage Dist. v. United States, 111 F.3d 1557, 1563 (Fed. Cir. 1997) ("[a] plaintiff must show that but for the breach, the

damages alleged would not have been suffered") (emphasis added); Fawick Corp. v. United States, 149 Ct. Cl. 623, 637 (1960) (holding that the loss must be one which the non-breaching party can show that, "but for" the breach of contract, would not have been suffered); Bluebonnet Sav. Bank, 67 Fed. Cl. at 238 (holding that, "because plaintiffs in this case are seeking expectancy damages, it is incumbent upon them to establish a plausible 'but for' world"); Southern Nat., 57 Fed. Cl. at 306 (rejecting plaintiffs' argument in Winstar case that they were not required to provide detailed evidence of the but-for world to recover expectancy damages); Coast Fed., 49 Fed. Cl. at 55 (holding that "[w]ith respect to explaining its expectancy damages . . . plaintiff bears the burden of propounding a realistic but-for scenario . . ."). To the extent that Mr. Graves' model lacks sufficient evidentiary support or otherwise lacks credibility, the Government need not offer an alternative damages model. See Columbia First Bank v. United States, 60 Fed. Cl. 97, 107-08 (2004) (rejecting plaintiff's expert's damages model because it was not based upon sufficient factual evidence, did not use assumptions that were "moored in that factual evidence," and was not credible).

Third, PG&E's contention that Dr. Neuberger has presented no methodology other than his "intangible economic beliefs" in his critique of the Graves model, and that the absence of a quantitative analysis is fatal to Dr. Neuberger's expert opinions, is without legal or factual merit. Pl. Mot. 5, 9. Dr. Neuberger explained in his deposition that he is offering a qualitative economic analysis of Mr. Graves' model rather than a quantitative analysis:

> [T]he nature of my critique here is more from an economic theory standpoint: Does this model follow fundamental economic principles; are there any aspects of the alleged or purported markets that would develop that – that were left out of the model, that were omitted from the model; were any of those factors important . . .

Def. A.2, Tr.36:21-37:6. Indeed, Dr. Neuberger explained the methodology that he employed in offering his economic critique of Mr. Graves' hypothetical exchanges model:

> In my view, Mr. Graves' model is incomplete at best. It omits many factors that would influence the incentives to exchange. I applied fundamental economic principles and theory to look at the model that was provided by Mr. Graves and to conduct a review based on my understanding of economic theory and economic principles, whether that model was a reliable depiction of what likely would have happened.
>
> * * *
>
> I applied economic theory to Mr. Graves' methodology, and based on my understanding and my experience and my education in economics, it is my belief that Mr. Graves' model omits many factors that would affect the demand and supply of exchanges, the incentive to exchange and, therefore, does not produce reliable estimates of what would have happened in a nonbreach world.
>
> * * *
>
> You could probably call it anything you want: market analysis, applying economic principles to markets, supply and demand analysis. It's basically applied microeconomic analysis.
>
> Economists are trained to understand the workings of the market, and I applied my understanding to this particular framework and asked is this model capturing factors that would affect the demand and supply of exchanges in the but-for world. And in my view, it captures some of those aspects, but omits many others.

Def. A.5, Tr.70:16-71:2; 71:9-16; 72:6-16. Dr. Neuberger also explained the difference in methodology between the creation of a model and the critique of a model:

> And if I had gone through the exercise of developing my own model, I think I would have needed to be very explicit about methodological assumptions and methodological approaches. Here, what I've primarily done is to critique the model that Mr. Graves provided based on my understanding of the economic principles and economic theory, and that's a pretty standard

> approach that economists use when critiquing models produced by others.
>
> And this type of application of economic principles to critique a model, in this case a model that's used to support damages claim, is something that I've done at trial before, and it's – it's always been accepted. I've never had any analysis that I've done along these lines rejected by a court for lack of a sound methodology.
>
> So it still may not be a satisfactory response from your perspective, but I'm using the same analytical tools that I've used in a number of cases when I was asked to critique a model produced by a plaintiff or by an opposing party.

Def. A.8, Tr.134:6-135:5.

Dr. Neuberger's methodology, based upon his significant experience applying well-established economic principles, is more than sufficient to allow him to offer expert opinions in this case. See First Tennessee, 268 F.3d at 334-35 (accepting expert testimony based upon "[expert's] own practical experiences throughout forty years in the banking industry"); First Union, 423 F.3d at 862 (allowing for qualification of expert based upon "knowledge, skill, experience, training or education"); Betterbox Communications, 300 F.3d at 329 (affirming expert testimony based upon "personal knowledge or experience . . . rather than a methodology that satisfies the Daubert factors"). Indeed, rather than *ipse dixit*, as PG&E suggests, Dr. Neuberger explained that his critiquing methodology is subject to replication by other experts, and provides the Court with a basis for determining the reliability of Dr. Neuberger's opinions:

> I mean, you know, what would a trained economist do when looking at a model like this? I think they would do the same kinds of things I did; namely, what factors affect the market; what [does] this market capture; you know, what are the elements of the market, market supply, market demand. In this case, participation as well, that would be relevant that maybe are in the model or aren't in the model.

> And I think a lot of the same approaches and techniques would be used by another economist critiquing this approach.
>
> So would – would the results be identical? Would the steps be exactly identical? Maybe not. I do think the outcome would be very similar.

Def. A.8, Tr.136:6-21; Def. A.16, Tr.235:2-14 ("[M]y expectation would be that in critiquing a colleague's model, you would get a lot of overlap").[9] Further, Dr. Neuberger explained how the reliability of his methodology could be tested:

> My methodology relies on applying fundamental economic principles to this particular market. Based on my critique to those comments, does that – does the critique that I make make economic sense, whether to an economist or to a layperson? Is there validity to the critique that I make of Mr. Graves' model?

---

[9] PG&E's reliance upon Indiana Michigan Power Co. v. United States, 60 Fed. Cl. 639 (2004), aff'd, 422 F.3d 1369 (Fed. Cir. 2005), and Zenith Electronics Corp. v WH-TV Broadcasting Corp., 395 F.3d 416 (7th Cir. 2005), as a basis for the exclusion of Dr. Neuberger's testimony is misplaced. Pl. Mot. 9. In Indiana Michigan, the Court rejected the testimony of one of plaintiff's experts, Eileen Supko, concerning her predicted date upon which DOE would begin acceptance of SNF at a permanent Federal repository. 60 Fed. Cl. at 646-47. The Court rejected this testimony because the purported expert simply relied upon published budgetary figures in reaching her conclusion, finding that a "non-expert could obtain and comment upon such figures." Id. at 647. Further, the Court concluded that Ms. Supko's speculative prediction did not present a "'methodology' that could be used by experts in such a field." Id. In contrast to Ms. Supko's speculative predictions concerning the opening of a permanent Federal repository, Dr. Neuberger's critique of Mr. Graves' hypothetical exchanges model is predicated upon the application of well-accepted economic principles.

In Zenith Electronics, the court of appeals affirmed the exclusion of an expert concerning a company's lost profits where that expert conducted no analysis and instead relied upon "nothing but a bottom line." 395 F.3d at 418-20. Dr. Neuberger, unlike the expert in Zenith, is offering far more than a "bottom line" and has offered comprehensive economic opinions detailing the numerous, significant issues that Mr. Graves either improperly considered or failed to consider altogether. Indeed, experts such as Dr. Neuberger may be qualified to testify based upon personal experience and knowledge to the extent that personal experience and knowledge are reliable. See Pizel v. Monaco Coach Corp., 374 F. Supp. 2d 653, 655 (N.D. Ind. 2005). Here, there can be little doubt that Dr. Neuberger's education and nearly 20 years of conducting economic evaluations constitutes a reliable basis for his opinions in this case.

> Do the things that I say are omitted from the model or the factors that aren't considered, does that make economic sense and does someone feel that those would be relevant in this particular market?
>
> So I think it's – it's a function of is the critique reasonable; is it based on sound economic principles; does it – does it seem relevant; and do the factors that I've suggested aren't incorporated in Mr. Graves' model, are they important? And if they are, then there are problems with Mr. Graves' analysis.
>
> I think it's a logical methodology more than anything else. You know, do the – does the critique seem reasonable, well though out and on point?

Def. A.6, Tr.75:6-76:5. Simply put, Dr. Neuberger's opinions have a sufficient indicia of reliability to qualify him as an expert in this case.

PG&E next contends that Dr. Neuberger lacked any degree of confidence in his opinions and that this lack of confidence is evidenced by the use of the word "may" in his opinions. Pl. Mot. 6. Contrary to PG&E's assertion, Dr. Neuberger unequivocally stated that he was "very confident" that Mr. Graves' model produces unreliable results, even without developing a counter-model, based upon his understanding of economics. Def. A.7, Tr.78:6-15. Indeed, Dr. Neuberger explained that, "once you begin to incorporate [the various factors discussed in his report], it <u>would</u> change the results of the model." Def. A.14, Tr.229:2-4 (emphasis added). Dr. Neuberger further explained the qualitative effect of Mr. Graves' failure to produce a proper model:

> Applying economic logic to the elements of supply and demand in this market, in my view, <u>would lead to very different results.</u>
>
> I don't think it is appropriate just to ignore these other elements. The resulting model that ignores these other elements, I find it very difficult to put any credence in the predictions.

> These other factors, in my view as an economist, are relevant to demand and supply and to participation in this market, and it is my belief, based on my training as an economist and my understanding of the economics of the nuclear power industry, that these other factors would be relevant and important and would lead to different results.

Def. A.14, Tr.229:15-230:8 (emphasis added); Def. A.18, Tr.242:20-21 ("It's my belief that all of these factors are important and would affect the market"). Further, Dr. Neuberger explained the use of the word "may" in his expert report:

> The sum total of all of those things may wash each other out, such that we get a result exactly like Mr. Graves, but a framework which omits those elements doesn't tell you anything about how those influences would [ ] act or how they would interact.
>
> So my point is it isn't sufficient simply to wave your hands and say none of that stuff matters here, let's look at this model. In my view, you've got to do it in the context of the model. The model needs to be richened – if that's a word, made more rich – to incorporate these other factors. Then you've got a model that says, okay, now we can shock sensitivity. Now we can see how risk averse individual utilities are. We can make certain assumptions about the impact of social and political risk.
>
> Simply leaving it out and then saying, oh, well, it wouldn't affect the model is not – there's no analytical basis for doing that or for saying that.
>
> And in my view, all that stuff, all that additional uncertainty and risk aversion and the impact or the pressure provided by social and political groups, I believe, would affect this market. This model doesn't tell us anything about how those factors would interact.
>
> Now, as I said – and that's why you see the "may" on all of these things. It may end up that for certain utilities it doesn't matter, and you get something close to Mr. Graves' model; but we have no basis for revealing that.

Def. A.17, Tr.240:3-241:12 (emphasis added). There simply is no basis for PG&E's contention that Dr. Neuberger has not offered a sufficiently definitive opinion in this case.

PG&E next contends that Dr. Neuberger's opinions critiquing Mr. Graves' hypothetical exchanges model are not reliable because they are "the product of speculation and hypothesis rather than 'sufficient facts and data' and 'reliable principles and methods.'" Pl. Mot. 8. PG&E has it backwards. It is Mr. Graves who has based his opinions upon insufficient facts and data and who has failed properly to consider significant factors in his model, and Dr. Neuberger's opinion simply attempts to alert the Court to these substantial deficiencies based upon the application of well-established, reliable economic principles. Indeed, in creating his model, Mr. Graves spoke to no utilities – including PG&E – as to their willingness to participate in his hypothetical exchanges market. As Dr. Neuberger repeatedly stated in both his expert report and his deposition, "reliable principles and methods" of economic modeling require consideration of a variety of factors, and Mr. Graves completely failed to consider these factors in his model.

Finally, PG&E claims that Dr. Neuberger's opinions are of no help to the Court because Dr. Neuberger opines that it is impossible to estimate how a more complete depiction of the market would affect any individual utility's ability to purchase DOE acceptance rights. Pl. Mot. 6. However, that is precisely why Dr. Neuberger's opinions are helpful to the Court in this case. One of Dr. Neuberger's opinions in this case is that Mr. Graves' model is deficient for a variety of reasons and that, based upon these deficiencies, the Graves' model tells the Court little, if anything, as to how an exchanges market would have operated in the "but for" world. Dr. Neuberger seeks to offer the Court a framework for evaluating the validity and reliability of Mr. Graves' hypothetical exchanges model. Based upon Dr. Neuberger's critique, the Court will be able to understand the significant errors and omissions contained in Mr. Graves' model and analysis and why the model fails to meet PG&E's burden of proof. Absent a reliable

"exchanges" model, this Court should rely upon the contractual mechanism for allocating acceptance rights, referred to in the Standard Contract as OFF. Consequently, Dr. Neuberger's testimony is both relevant and helpful to the Court in understanding the significant deficiencies contained in Mr. Graves' model.[10]

### B. Dr. Neuberger's Critique Of Professor Cornell's Opinions Is Both Relevant And Reliable

#### 1. Dr. Neuberger's Economic Analysis Concerning Whether Professor Cornell Appropriately Considered Labor Overheads Does Not Constitute A Legal Conclusion

PG&E next contends that Dr. Neuberger's opinion that Professor Cornell has not established that certain of PG&E's claimed damages constitute incremental costs "is of no assistance to the Court because such a conclusion is no more than a legal interpretation which is the exclusive province of this Court." Pl. Mot. 11. PG&E's argument is pure sophistry.

First, Dr. Neuberger is not offering any legal conclusion, but, rather, is offering an economic opinion that Professor Cornell has failed to abide by his own standard for determining whether a cost is incremental to the Government's delay in SNF acceptance. As Professor Cornell explained in his expert report:[11]

---

[10] Indeed, after Dr. Neuberger offered his economic critique of Mr. Graves' model, Mr. Graves submitted a rebuttal report in which he endeavored to incorporate into his model or otherwise respond to many of Dr. Neuberger's criticisms. However, as we will demonstrate at trial, Mr. Graves' "modeling" of the issues such as political risk and uncertainty lack any empirical support, and Mr. Graves only "models" each of these issues separately, rather than considering the collective effects that these issues may have upon the results of his model. Regardless of the serious deficiencies in Mr. Graves' revised analysis, the fact that such a revised analysis was conducted supports the conclusion that Dr. Neuberger's economic critique is relevant and reliable and warrants serious consideration by the Court.

[11] As we will demonstrate at trial, although Professor Cornell claims that damages constitute the incremental difference between the "but for" and actual worlds, Professor Cornell

> I have relied on a standard approach to determining damages in a breach of contract claim, which is to compare PG&E's actual costs to the costs PG&E would have incurred "but for" the breach. Damages are the costs incurred by PG&E as a result of the breach.
>
> * * *
>
> Calculating the incremental cost of the breach necessarily requires me to identify the costs that would have been incurred by PG&E absent the breach. Two approaches are possible. One is to calculate the costs of PG&E's entire Humboldt and Diablo Canyon operations with the breach and without the breach (assuming no change in revenue between scenarios). In this case, damages are the difference in costs between under each scenario. There are no changes in revenues that have to be considered in the "but for" analysis because there is no change in output at either plant as a result of the breach. This approach is unnecessarily broad in scope.
>
> * * *
>
> As a more direct and practical approach, I estimate incremental "but for" costs recognizing first that only a subset of PG&E's costs are sensitive to DOE's breach, and second, as discussed above, in all but two of the seven categories, "but for" costs are zero. . . .

Def. A.33-A.36, Rep. of B. Cornell, ¶¶ 10, 16, 17 (footnote omitted).[12] Indeed, as Professor Cornell explained in his deposition, "[t]hose were two – they certainly had my fingerprints on them, because one of the things I said right from the beginning to Mr. Stouck and in conversations with Mr. Kapus and certainly with my staff was 'We got to figure out what's true incremental costs here.'" Def. A.29, Tr.56:10-21 (Cornell). See Pl. A.79 (table listing Professor Cornell's identification of "incremental cost of DOE breach"). As evidenced by PG&E's own

failed to engage in any analysis to determine whether a claimed cost truly was incremental to the Government's delay in SNF acceptance from PG&E.

[12] "Rep. of B. Cornell ¶ __" refers to the expert report prepared by Brad Cornell, dated November 10, 2005, portions of which are attached as an exhibit to this response.

experts, PG&E essentially argues that it is appropriate for its expert to offer an opinion that certain costs are incremental, but that it is inappropriate for the Government's expert to challenge that conclusion. PG&E's desire to have it both ways simply highlights the lack of merit in PG&E's motion.

Dr. Neuberger has offered an economic critique of Professor Cornell's analysis concerning the determination of incremental costs and has provided an economic framework to assist the Court in determining whether PG&E's overhead labor costs that it has claimed as damages are incremental. Pl. A.39, Neuberger Op. ¶104. As Dr. Neuberger explained in his report, Professor Cornell simply relies upon PG&E's internal cost-accounting data to measure breach-related costs. Id. However, this internal cost-accounting data also includes time spent by PG&E employees working on the ISFSI projects as a direct charge to these cost accounts. Id. Dr. Neuberger opined that, as a matter of economics:

> Such employee time, however may not be consistent with the concept of incremental costs. If an employee's compensation is unaffected by the specific activities he or she performs, then including some of that employee's compensation in damages may not reflect a cost to PG&E that is truly incremental to the breach.

Id. Dr. Neuberger then explained the difference in the definition of a "cost" from a cost accounting perspective versus a "cost" in a damages context, explaining that, from an economic damages perspective,

> if the employee's total compensation is unaffected by the specific tasks that employee performs, the company incurs no incremental costs if that employee is working on the ISFSI project versus some non-breach activity. Unless it can be shown that the company hired additional personnel, or paid overtime to employees because of their work on a breach-related project, there are no incremental employee-related damages. In my view, much of the direct labor charged to PG&E's breach-related projects should be re-evaluated

> from a damages perspective, rather than relying on the project codes in the company's internal cost-accounting system.

Pl. A.39-A.40, Neuberger Op. ¶105. Dr. Neuberger offered the following example to illustrate his point:

> So suppose, for example, – I'll give you a hypothetical example here. Suppose a particular employee spends 10 percent of his time on a breach-related activity and 90 percent of his time on nonbreach-related activities. In the PG&E cost accounting system and in Mr. – or Dr. Cornell's damages system estimate, 10 percent of that employee's salary in that year is assigned to the breach.
>
> In fact, that employee could have had 10 percent slack in the activity that he did. Maybe he wasn't busy 90 percent of the time. If that's the case, then there's been no cost imposed on PG&E in terms of incremental cost.
>
> Alternatively, if that person spends a couple of extra hours every week getting his nonbreach work done, but doesn't get paid overtime for it, PG&E isn't out any extra costs. There's no incremental cost associated with the individual working a couple of extra hours, so there are categories.
>
> So with respect to labor, for example, I think – though Professor Cornell talks about it a little bit, I think there's simply an assumption that any time spent on a breach-related project must be a breach. And I don't think that's necessarily the case.

Def. A.26, Tr.525:11-526:17.

Indeed, Dr. Neuberger unequivocally testified that he was offering an opinion as a matter of economics, rather than offering a legal opinion. Def. A.26, Tr.549:17-550:19. Dr. Neuberger is simply offering an opinion that, under Professor Cornell's own criterion for determining whether a cost is incremental, certain costs identified by Professor Cornell do not meet this criterion as a matter of economics. Def. A.26, Tr.524:9-11. Plainly, Dr. Neuberger is not offering any legal opinions concerning PG&E's ability to recover labor costs, but, rather, is

providing the Court with a useful economic framework in which to consider Professor Cornell's opinions that certain costs are incremental to the Government's delay in performance.

Second, contrary to PG&E's suggestion, courts routinely allow for expert testimony concerning whether a particular activity claimed as a damage is incremental to the breach. For example, in Indiana Michigan Power Co. v. United States, 60 Fed. Cl. 639 (2004), aff'd, 422 F.3d 1369 (Fed. Cir. 2005), this Court considered the testimony of the Government's technical expert, Ed Abbott, concerning whether certain activities, such as plaintiff's 1993 rerack of its spent fuel pool, were incremental to the costs that the plaintiff allegedly incurred as a result of the Government's delay in SNF acceptance. Id. at 656-57.[13]

Indeed, PG&E's reference to the Court's decision in Tennessee Valley Authority v. United States, 69 Fed. Cl. 515 (2006) ("TVA"), appeal pending, No. 2006-5073 (Fed. Cir. docketed Apr. 19, 2006), actually refutes PG&E's contention that it is inappropriate to offer expert testimony concerning the incremental nature of claimed costs. In TVA, this Court considered testimony from the Government's technical expert, Warren Brewer, an expert that the Government expects to present in this case, that certain activities included in plaintiff's damages claim were required in the "but for" world and, therefore, were not incremental to the

---

[13] Indeed, the determination by an expert concerning whether a cost or activity is incremental to a particular breach is not limited to the spent fuel cases. See University of Colorado Foundation v. American Cyanamid Co., 342 F.3d 1298, 1312 (Fed. Cir. 2003) (expert economist performed analysis calculating incremental profits that were attributable to the right to exclude generic vitamin competition); Greene v. Safeway Stores, Inc., 210 F.3d 1237, 1243 (10th Cir. 2000) (accounting expert testified concerning incremental increase in stock price); Wahl v. Carrier Manufacturing Co., 511 F.2d 209, 213 (7th Cir. 1975) (noting plaintiff's expert accountant's failure to make a detailed analysis of all the operations and costs of the company that would have been necessary to a determination of incremental costs).

Government's delay. Id. at 535 (discussing testimony of Mr. Brewer concerning analysis conducted by plaintiff that would have been conducted in but-for world).

Although the Court in TVA did not agree with the Government's legal position regarding the non-recovery of internal labor costs, the Court in TVA did not hold that expert testimony could not be presented to assist the Court in determining whether a particular plaintiff's inclusion of internal labor costs constituted an incremental cost to the plaintiff. In fact, the Court in TVA allowed testimony from the Government's expert accountant, Stephen Kiraly, on this exact issue. PG&E also ignores the Court's more recent decision in another SNF case, Sacramento Municipal Utility District v. United States, No. 98-488, 2006 WL 950128 (Fed. Cl. Mar. 31, 2006), which not only rejected the plaintiff's factual contention that all of its labor overheads constituted an incremental cost, but relied upon Mr. Kiraly to determine which of plaintiff's employees spent the majority of their time working on its dry storage project and, therefore, constituted an incremental cost. Consequently, PG&E's reliance upon the Court's decision in TVA simply reinforces the appropriateness of expert testimony to assist the Court in understanding whether a particular activity or cost is incremental to the Government's delay.

2. Dr. Neuberger Has The Requisite Expertise To Offer An Economic Opinion Concerning Professor Cornell's Treatment Of Decommissioning In Professor Cornell's Presentation Of PG&E's Damages Claim

PG&E next contends that Dr. Neuberger's opinion criticizing Professor Cornell's treatment of decommissioning costs is inadmissible because (1) he lacks the qualifications to offer this opinion; (2) the opinion is the product of speculation and unfounded assumptions; and (3) the opinion is not based upon "sufficient facts or data." Pl. Mot. 12. PG&E has mischaracterized Dr. Neuberger's opinion.

Dr. Neuberger has offered an economic critique of Professor Cornell's treatment of decommissioning costs related to the Humboldt Bay facility in PG&E's damages claim. Specifically, Professor Cornell omits the costs associated with decommissioning Humboldt Bay from the damages claim based upon his assumption that the costs of decommissioning escalate at the same rate as the relevant discount rate, thereby cancelling each other out and resulting in identical present value costs in both the "but for" and actual worlds. Pl. A.78. Dr. Neuberger explained the general economic proposition that, if decommissioning costs escalate at a rate slower than PG&E's cost of capital, DOE's delay in SNF acceptance may actually reduce the present value cost of decommissioning Humboldt Bay and provide a net benefit to PG&E and its ratepayers. Pl. A.42, Neuberger Op. ¶111.

Contrary to PG&E's assertion that Dr. Neuberger has not analyzed any relevant data (Pl. Mot. 13), in considering whether that general economic proposition has merit in this context, Dr. Neuberger reviewed the cost projections upon which Professor Cornell relies for estimating future damages. Pl. A.42, Neuberger Op. ¶111. In fact, Professor Cornell's own projections of the escalation of costs reveals that those costs would escalate more slowly than PG&E's cost of capital. Consequently, Dr. Neuberger explained that, if Professor Cornell's indices were applied to Humboldt Bay's decommissioning costs, the cost to decommission would grow more slowly than the discount rate, resulting in a net benefit to PG&E arising from any breach-related delays. Id. Although PG&E appears to take issue with the appropriateness of relying upon these cost indices to project the estimated future cost to decommission Humboldt Bay, PG&E's real complaint goes to the weight that the Court should give to Dr. Neuberger's opinion rather than the admissibility of this opinion at trial. Micro Chem., 317 F.3d at 1392 ("it is not the role of the

trial court to evaluate the correctness of facts underlying one expert's testimony" in determining whether the expert's opinion is admissible).

C. Dr. Neuberger's Opinions Based Upon The DOE Model Are The Appropriate Subject Of Expert Testimony

PG&E's last challenge to Dr. Neuberger's testimony is his opinions concerning the results of the DOE model. Pl. Mot. 14.[14] Specifically, Dr. Neuberger has run the DOE model using the acceptance rates contained in the 1991 Annual Capacity Report published by DOE for the first twelve years of the DOE program, which ultimately ramp up to a 900 MTU steady-state rate of acceptance, and then uses a 3,000 MTU steady state acceptance rate beginning in 2015. Pl. A.43, Neuberger Op. ¶114. Based upon these assumptions, Dr. Neuberger opines that DOE would have accepted the last of Humboldt Bay's SNF in 2001, and DOE would have accepted the first of Diablo Canyon's SNF in 2012. Pl. A.44, Neuberger Op. ¶118. Dr. Neuberger's opinions concerning PG&E's acceptance rights are then used by the Government's damages expert, Larry Johnson, to estimate PG&E's damages. Def. A.25, Tr.515:13-18.

---

[14] As Dr. Neuberger explained in his report,

> [t]he DOE model is a tool developed by the agency for predicting SNF discharges for each nuclear facility and allocating DOE acceptance rights. This model is sufficiently flexible to enable simulation under alternative aggregate acceptance rates. SNF discharges and storage rights allocation are calculated in the DOE model in two steps: first, a model to project SNF is run; second, given the projected discharges, a second model is run to determine the allocation for each individual reactor. These allocations are established using DOE's OFF priority ranking rules, and are subject to overall industry acceptance rates.

Pl. A.43, Neuberger Op. ¶115.

PG&E asserts that, because Dr. Neuberger did not create the DOE model, but rather simulated its results based upon a specific rate of acceptance, Dr. Neuberger's opinions concerning the output of this model are inappropriate. Pl. Mot. 14. Notably, PG&E provides no legal support for the proposition that an expert must create his own model to offer opinions concerning the results of that model. Indeed, the Government is aware of no such legal rule. In fact, Dr. Neuberger has repeatedly used the DOE model to offer opinions concerning a particular utility's acceptance rights under OFF. Def. A.23-A.24, Tr.510:22-511:4 ("I know in Indiana Michigan and Southern Nuclear, I used the model to derive discharge schedules and – and allocation rights, and the plaintiffs' experts did the same kind of things with a proprietary model . . .").[15]

Dr. Neuberger has evaluated Mr. Graves' model and offered an opinion that, if Mr. Graves properly modeled license extensions, the 1991 ACR rate would satisfy Mr. Graves' extra-contractual criteria concerning the "must move mountain." Dr. Neuberger has run the DOE model to determine the effect upon PG&E's acceptance rights and, consequently, PG&E's entitlement to damages based upon the 1991 ACR rate of acceptance. This analysis is plainly of assistance to the Court, as neither Mr. Graves, nor any other PG&E witness, has offered any alternative acceptance scenario in this case regarding the acceptance rights for PG&E's facilities. Simply put, PG&E's suggestion that Dr. Neuberger's opinions concerning the DOE model are improper is without merit.

[15] The Government also has presented the outputs of the DOE model through another expert economist, Dr. Raymond Hartman. See Tennessee Valley Authority, 69 Fed. Cl. at 527 n.14 (discussing testimony of Dr. Hartman, presented by the Government, concerning plaintiff's acceptance rights under DOE model).

CONCLUSION

For the foregoing reasons, the Government respectfully requests that the Court deny PG&E's motion to exclude the expert testimony of Dr. Neuberger.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/ Harold D. Lester, Jr.
HAROLD D. LESTER, JR.
Assistant Director

OF COUNSEL:

JANE K. TAYLOR
Office of General Counsel
U.S. Department of Energy
1000 Independence Ave., S.W.
Washington, D.C. 20585

SCOTT R. DAMELIN
JOSHUA E. GARDNER
SHARON A. SNYDER
Trial Attorneys
Civil Division
Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530

s/John C. Ekman by Joshua E. Gardner
JOHN C. EKMAN
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, NW
Washington, D.C. 20530
Tel: (202) 353-0897
Fax: (202) 307-2503

May 15, 2006

Attorneys for Defendant