look at, you know, one of these assumptions; you've got to look at them in a group. You know, let's say you have a four-legged stool and you take one leg away and, you know, you still got three legs, it's going to stand up; you take another leg away, it's going to fall over.

I think you've got to look at some of these assumptions in concert and see what they're combined effect would have, and you could do different simulations of that. I did not, however.

Q You don't know, do you, the prevalence of utilities using full core offloads or something different than -- than one full core offload, do you?

A Other than my direct experience in the Indiana-Michigan case and what I was told about one of the other spent fuel cases, I don't know what the distribution of reserve policies is across the industry. I haven't conducted that pool or done that research.

Q What about the DOE model that -- that you've used? What -- what full core offload is



used in that model?

A That's a good question. I don't know offhand.

Q You haven't conducted any analysis to determine how the results of Mr. Graves' analysis would change or a different assumption about full core reserve were used, have you?

A Other than the intuition I just provided, no.

Q You can't say that Mr. Graves' assumption regarding full core reserve is unreasonable, can you?

MR. GARDNER: Objection; vague.

THE WITNESS: I don't have a basis for saying one reserve policy versus another is reasonable or not. All I'm suggesting is that there -- there are utilities out there, just by my limited experience, that maintain reserves or have stated their reserves or something other than one full core.

BY MR. SHAPIRO:

Q You testified as an expert in the



Indiana-Michigan case?

A I did.

Q And in that case, based upon some information you were supplied by ABZ, didn't you conclude that a single full core reserve is prudent and sufficient?

A Based on input from ABZ, I simulated the damages model used in that case using one full core reserve. During the course of trial, however, and actually during the course of trial, Indiana-Michigan changed its full core reserve policy, and the nuclear fuel engineer at the plant testified to that. And I was there -- I was there the day that testimony was given.

Q But didn't you testify at Indiana-Michigan that you thought that a single full core reserve would be prudent and sufficient?

MR. GARDNER: Objection; asked and answered.

THE WITNESS: I'm not saying it wouldn't be. Yes, I used a full -- one full core reserve based on Mr. Abbott's testimony. I used a



one full core reserve assumption in my simulation of the damages model, despite Indiana-Michigan's testimony to the contrary.

What I'm trying to say here is that this model is predicated on some reasonable or accurate representation of the full core reserve policies of utilities of nuclear power plants and uses that assumption to characterize their must-move needs.

I'm suggesting that to the extent that individual utilities vary from that one full core reserve assumption, then the model is mischaracterizing their must-move needs.

BY MR. SHAPIRO:

Q We'll get to this in more detail a little later on.

You refer in your expert witness report to a number of ways in which you believe that utilities might have been reluctant to trade away early acceptance allocations; correct?

A Yes.

Q So would one way of characterizing that

Page 226

the exchange provision be put into the standard contract with the Department of Energy, aren't you?

A That's my understanding.

Q Why do you think utilities asked that that right to exchange be put into the contract?

MR. GARDNER: Objection; calls for speculation.

THE WITNESS: I don't know why utilities did it.

BY MR. SHAPIRO:

Q You don't have any idea?

MR. GARDNER: Same objection.

THE WITNESS: I wasn't around at the time. I haven't talked to utilities about what their motivation was. Again, I would be speculating. Presumably, they wanted a little bit of flexibility in the pickup schedule.

BY MR. SHAPIRO:

Q Why would that flexibility be desirable to a utility? As an economist, why would you -- why do you think utilities would want that flexibility?

Page 227

MR. GARDNER: Objection; calls for speculation.

THE WITNESS: One reason could be reducing costs. There could be other reasons.

BY MR. SHAPIRO:

Q You are aware that the Department of Energy agreed with the utilities to put the exchange provision into the contract; correct?

A I know it's in there, so I would assume it agreed.

Q Why -- why do you think that the Department of Energy agreed to put that provision into the contract?

MR. GARDNER: Objection; lack of foundation. Objection; calls for speculation.

THE WITNESS: I have no idea. I have no idea.

BY MR. SHAPIRO:

Q Economics doesn't tell you anything as to why the Department of Energy might have agreed to put an exchange provision into the contract?

MR. GARDNER: Same objections.

Page 228

THE WITNESS: I'm not aware of DOE's deliberations on this point. If indeed it's correct as you represent, that the utilities wanted it in there, DOE may have felt it was appropriate to meet that particular demand. I understand there were other things the utilities wanted in the standard contract that DOE wasn't willing to provide.

So, you know, I -- I can't put myself -- or offer any expert opinions about what was DOE's motivation, but -- I'll let my answer stand as it is.

BY MR. SHAPIRO:

Q You say that Mr. Graves' model is unlikely to produce any reliable predictions of trading volumes of prices?

A Yes.

Q What methodology have you employed to reach that conclusion?

A The methodology of considering the characterization of this market; acknowledging that there may be other motivations, other factors

Page 229

influencing the incentive to trade that are omitted from Mr. Graves' model; and that once you begin to incorporate some of these factors, it would change the results of the model.

Q But given you haven't done any quantitative analyses to look at the impacts of these other considerations that you feel Mr. Graves should have included in his model, how do you know that it's likely that those other factors would have changed the -- the results of Mr. Graves' model?

MR. GARDNER: Objection to the extent it mischaracterizes Dr. Neuberger's previous testimony.

THE WITNESS: Applying economic logic to the elements of supply and demand in this market, in my view, would lead to very different results.

I don't think it's appropriate just to ignore these other elements. The resulting model that ignores these other elements, I find it very difficult to put any credence in the predictions.

Page 230

These other factors, in my view as an economist, are relevant to demand and supply and to participation in this market, and it is my belief, based on my training as an economist and my understanding of the economics of the nuclear power industry, that these other factors would be relevant and important and would lead to different results.

BY MR. SHAPIRO:

Q But you haven't used the methodology to reach your conclusion that Mr. Graves' model is unlikely to produce reliable predictions of trading volumes in market prices. You haven't used the methodology that can be replicated with any reliability by other economists, have you?

A Other than the application of fundamental economic principles and economic theory, which I believe any other economist would do, I haven't gone through the exercise of creating my own model that would incorporate the various factors that I think are important here.

That doesn't mean that a model that

Page 231

ignores them is -- necessarily tells us anything about trades. But I had neither the time -- the time nor the assignment to go through that process of creating an alternative model.

Q But economists who look at fundamental economic principles don't -- when they look at a problem, they don't always agree, do they?

A No. Like any two people, economists can disagree, sure.

Q Mr. Graves' analysis has, in fact, produced predictions of trading volumes and prices; true?

A He does make certain predictions, yes.

Q You can't say that those predictions are, in fact, wrong, can you?

A Under it -- an extensive set of assumptions, which I don't think would have applied, you might get the same result. Once you start incorporating the aspects that I talk about in my report, I believe you would get very different results.

Q I'm not sure how to interpret your last

Page 232

statement. Are you saying that Mr. Graves' predictions about trading volumes and prices are wrong?

A I don't believe that that's what would have happened in the but-for world. Moreover, I don't think that Mr. Graves' model is sufficiently rich in terms of its characterization of this market to provide any insight to that, to actual trading volumes and prices.

Q Where in your expert witness report do you say that the trading -- trading volumes and prices opined to by Mr. Graves would not have happened in the but-for world?

A I may not have said it exactly in those words; but in reference to any number of elements of the economic sequence model, I suggest that a model that incorporates those factors could lead to very different results than Mr. Graves predicts.

Q The statement that something could happen could just as well mean that it could not happen, couldn't it?

A Well, we are dealing with a

Page 233

hypothetical world here, right? So there's a certain amount of speculation that goes on to establish a position or a damages estimate.

Mr. Graves has said this is the way things would happen. In my view, things would not have happened that way.

Q By how much do you think Mr. Graves is off?

MR. GARDNER: Objection; vague.

THE WITNESS: It's unclear to me that any trading would take place, frankly, in the early years anyway.

BY MR. SHAPIRO:

Q You're not prepared to say by how much Mr. Graves is off in his -- in his results?

A I don't have a quantitative measure to say this one is wrong, this one is wrong, that one is right, that one is wrong. So I can't say quantitatively by how much he's off.

Q Similarly, you have a statement in your expert witness report that Mr. Graves' model fails to provide any meaningful insights into the

behavior of the market and the ability of any individual utility to trade for early DOE acceptance rights.
Do you recall that?
A Yes.
Q What methodology did you employ to reach that conclusion?
A The same application of economic logic with which I've critiqued his model.
Q Is there a name for that methodology?
A We can go around in circles about this. I think it's the application of economics, economic theory, critiquing the assumptions and structure of models that I've done any number of times, that you see in every graduate program in economics around the country and that I've done previously in previous litigation.
Q I guess that's part of what I'm getting at. Let's say you have a -- a critique of an economics program, a graduate school, and you had two economists critiquing a colleague's analysis.
You can get 10 different critiques,



couldn't you?
A My suspicion would be there would be extensive overlap of the critique. Everybody brings their own expertise to bear on that subject, but my experience in grad school certainly suggests that the nature of the critiques are largely similar. There's a lot of overlaps.
Somebody might -- because of their own research, might bring in a critique that somebody else didn't think of who wasn't aware of the current state of the literature in that area.
But my expectation would be that in critiquing a colleague's model, you would get a lot of overlap.
Q But in advance, you don't know -- if you're simply critiquing the model, you don't know what you're going to get?
MR. GARDNER: Objection; vague.
THE WITNESS: What you're going to get in terms of criticism?
BY MR. SHAPIRO:
Q In terms of criticism, how many



different kinds of criticism or the range of criticisms.
MR. GARDNER: Objection; compound.
THE WITNESS: A priori.
BY MR. SHAPIRO:
Q It's fundamentally different, isn't it, simply critiquing a model from performing, let's say, a sensitivity analysis that if you asked 10 economists to perform a sensitivity analysis of results by varying them by the same criteria by the same amount, if they do that work competently, you expect each economist to get the same sensitivity analysis; correct?
A It depends a little on the nature of the sensitivity analyses. If you're dealing with models under uncertainty, you're typically going to simulate the model under various random numbers generated to reflect risk or uncertainty. The nature of the distribution of those random numbers could be different by different people, so you might end up with different numbers.
I believe it is fundamentally a



different problem or a different activity to critique a model or to simulate a model. In my view, this model has sufficient flaws that merely conducting sensitivity analyses isn't enough. You need to look at a new structure. You need to build a new model that would -- if, in fact, what you're looking for is predictions, you need to build a new model.
Q You also assert, Dr. Neuberger, that many of the factors that you say Mr. Graves ignores would materially affect the outcomes predicted in his trading market.
What's the basis of that statement?
A One aspect of my critique relates to participation. The participation decision has been assumed away; it is assumed that everybody participates. Now, I know that in the context of Mr. Graves' model or his -- in the context of his sensitivity analyses, he has taken out certain buyers from the process, but participation by sellers is also relevant in the presence of uncertainty, in the presence of political pressure,

Page 238

in the -- in the presence of pressure from other stakeholders.

It is my belief that many utilities would not participate on the sell side of this market at all and, depending upon the distribution of that participation, it may be that those utilities that decide not to participate at all are those that have all the rights in '98, '99 and 2000. So you might get no trading occurring in those years.

Q Let me direct your attention to a particular paragraph of your report that I'm looking to in this regard, Paragraph 36.

A You're going backwards. Okay.

Q In this paragraph, you say that many of the factors Mr. Graves ignores would materially affect the outcomes predicted in his nascent trading market?

A Yes.

Q Which factors are you referring to specifically?

A Uncertainty; risk management; the

Page 239

influence of social and political pressures, I believe, would affect aspects of this market on the demand side on the supply side and on the participation in the market. And so --

Q We'll get to this in a little bit, your individual opinions regarding those issues. And I believe in each of them, you say that -- for example, political considerations, that they may have influenced the behavior of utilities in the nonbreach world. But each of those factors is introduced with a "may."

How can you conclude if each of those factors may have influenced utilities individually, that if you put those factors together that they then would have materially affected the outcome of Mr. Graves' model when you put them together?

A I don't think it's merely -- I don't think it's sufficient to merely exclude all of those factors from the model. I do believe those influences would affect incentives to trade and to participate in a trading market.

Q But how do you know that --

Page 240

A Let me finish.

Q Okay.

A The sum total of all of those things may wash each other out, such that we get a result exactly like Mr. Graves, but a framework which omits those elements doesn't tell you anything about how those influences would -- would act or how they would interact.

So my point is it isn't sufficient simply to wave your hands and say none of that stuff matters; here, let's look at this model. In my view, you've got to do it in the context of the model. The model needs to be richened -- if that's a word, made more rich -- to incorporate these other factors. Then you've got a model that says, okay, now we can shock sensitivity. Now we can see how risk averse individual utilities are. We can make certain assumptions about the impact of social and political risk.

Simply leaving it out and then saying, oh, well, it wouldn't affect the model is not -- there's no analytical basis for doing that or for

Page 241

saying that.

And in my view, all that stuff, all that additional uncertainty and risk aversion and the impact or the pressure provided by social and political groups, I believe, would affect this market. This model doesn't tell us anything about how those factors would interact.

Now, as I said -- and that's why you see the "may" on all of these things. It may end up that for certain utilities, it doesn't matter, and you get something close to Mr. Graves' model; but we have no basis for revealing that.

Q But notwithstanding, then, your statement that these various factors, like risk, that you've mentioned that Mr. Graves does not specifically model, notwithstanding your statement that those factors would have affected the outcomes predicted in Mr. Graves' market, you haven't attempted to quantify such changes?

A As I previously -- previously testified, no. I do think they matter, though. Not quantifying them is one thing. Considering,

through economic logic, whether they would affect the model is another.

Q And since you haven't quantified the effect of the factors that you criticize Mr. Graves for not considering, you're not even sure that they would ultimately affect the outcomes predicted by Mr. Graves because, for example, as you point out, these -- these other factors might have washed each other out?

A The reason I said "may" was for that possibility. I've not done the modeling, so I don't know how with -- with a reasonable degree of certainty, how they would exactly interact.

It is my belief as an economist that these factors would affect the operations of a trading market and, therefore, a model that ignores them doesn't tell you what the predictions would be in a market that does incorporate these factors. The tool isn't sufficient for the job.

It's my belief that all of these factors are important and would affect the market. This model doesn't incorporate them; therefore, it



doesn't tell us anything about how those factors would affect the market.

Q You said in your last response a couple of times that these factors, such as risks, that Mr. Graves doesn't specifically model would affect the market, but your statement in Paragraph 36 says that these factors would actually affect the outcome.

In hindsight, is your statement in Paragraph 36 a little too strong given that you haven't done the -- the analysis to enable you to -- to say anything about the outcomes of the effect of these other factors?

A I don't think it's too strong.

Q Do you have an opinion as to whether Mr. Graves is wrong regarding his prediction that in the nonbreach world, DOE would have removed the last of Humboldt Bay's spent fuel in 1998?

THE WITNESS: Would you repeat the question, please?

(The reporter read the record as requested.)



THE WITNESS: I don't have enough information to offer that opinion. It's entirely possible under any number of simulations, I suppose, the Humboldt Bay still could have gotten out -- I'm not sure -- no, I don't believe this model tells us whether they would or not.

BY MR. SHAPIRO:

Q You say -- and I'm specifically referring to Paragraph 52 of your report -- that a utility may desire acceptance rights beyond its must-move needs?

A Yes.

Q But you haven't attempted to model such behavior to determine how prevalent, if at all, it would have been that utilities would have -- would have had a desire for acceptance beyond the must-move needs in the nonbreach world, have you?

A I have not done that modeling and neither has Mr. Graves, although he talks about in his deposition want-to-move fuel as opposed to just must-move fuel, but it certainly isn't in the model.



Q And, indeed, you can't even say that utilities would have had such behavior desiring acceptance beyond their must-move needs in the nonbreach world. You simply say may.

A In the presence of some of the factors I've talked about, like uncertainty, risk aversion, social and political pressure, I believe it is likely -- more likely than not that utilities would have demands over and above their must-move needs as Mr. Graves defines them.

Q Would the desire for acceptance beyond must-move needs that you refer to in Paragraph 52 of your report, would that apply to both shutdown reactors and -- and those that experience full pool must move?

A It certainly could. I think the want-to-move notion probably is more relevant for operating reactors than for shutdowns. Yeah, I think the demand functions might be very different for shutdown reactors than for operating reactors.

Q Again, in Paragraph 52 of your -- of your expert witness report, Exhibit 1 to your

be much higher than Mr. Graves' models -- in fact, he hasn't modeled that cost of decelerating at all -- could be far greater than the prices that utilities would receive for selling early rights.

And so, again, I get back to this notion that you've got to look at the supply side of this market, you can't just assume it away; and you've got to look at participation, you can't assume that away either. There are factors influencing the incentives to participate and the incentive to supply early rights, and this model doesn't deal with those factors.

Q You don't have any expertise in -- to the extent political pressures facing utilities, do you?

A I've certainly read enough documents in the news or in, you know, various spent fuel litigation that communities do impose conditions on nuclear power plants.

Q Do you consider yourself an expert in that area?

A No more so than any other citizen.



Q Do you have any expertise that would enable you to predict that the political pressures that you've articulated that nuclear utilities are facing from your reading of the news in the breach world would have been just as extensive in the nonbreach world?

A I don't think those pressures would have gone away in the nonbreach world.

Q What expertise do you have to offer that opinion?

A Nuclear fuel is nuclear fuel. It's the same in the breach world as the nonbreach world. I can't imagine that just because DOE was putting in place the steps to begin taking that fuel away, that all those pressures would go away. I mean, that's a -- that's a question of logic, not necessarily of expertise.

I also recognize that those political pressures could vary by region. Some regions might say, hey, it's okay, you know, sure, you can decelerate, we love having the stuff around. Others might say, no, we don't want it.



Q My question was what expertise do you have to offer opinions as to how political pressures may have been different on utilities in the nonbreach world?

MR. GARDNER: Objection; asked and answered.

THE WITNESS: If I were modeling this market, my experience as an economist tells me that I would want to model the impact of political pressure. It's my belief as an economist that the direction that political pressure would have would mitigate against decelerators.

BY MR. SHAPIRO:

Q Do you have any expertise on political pressures on utilities beyond that of the average person?

A I certainly have expertise as an economist working with models under uncertainty and in the presence of risk aversion. I believe that in that context, I have some expertise in understanding how certain types of pressure might be modeled, how it might affect a system of



equations that's trying to model a market.

I don't have particular expertise in how political pressure would be in the nonbreach world compared to the breach world, but it is my belief that those pressures wouldn't have simply disappeared in the nonbreach world.

MR. GARDNER: Off the record.

(Recess.)

BY MR. SHAPIRO:

Q Dr. Neuberger, you have noted one of your criticisms of Mr. Graves' analysis is that he focuses on the demand for spent fuel acceptance assuming that the supply of DOE acceptance rights is -- is inelastic to the price?

A I mean, there are other aspects of that, but yes.

Q But isn't the supply of DOE acceptance rights, in fact, inelastic to the price of exchanges because utilities can't hoard acceptance allocations from one year to the next?

A The supply of DOE acceptance rights is provided to the market by whatever the aggregate

Page 298

So, sure, there might be some stakeholders who would prefer them to get rid of rights they don't need right now. Quantitatively, I don't think that would be a particularly big impact, but it might -- it conceivably could be.

Q Well, again focusing right now just on PG&E, which is regulated by the California Public Utilities Commission, you don't have any experience or expertise in working with the California Public Utilities Commission to know what kinds of concerns tend to influence that body, do you?

A I do not; that's correct. I do know that prudence is one consideration at public utility commissions, and the commission might consider it prudent for them to move fuel out before they actually face a must-move situation. It could -- you know, it could cut that way. I don't -- it could cut the other way, I suppose. You know, I think just ignoring the point is not --

Q You don't have the expertise to know which way it would cut in terms of the concerns of a public utility's commission about prudence as to

Page 299

whether a utility should trade away or hold on to early acceptance allocations that it doesn't otherwise need?

A I haven't done that analysis. I believe that I have some expertise in quantifying various influences. You know, given enough data and given enough opportunity, I might be able to come up with a way to measure that, but I have not done it.

Q And in your career, have you ever, as an economist, looked at the -- the likely reaction to a public utility's commission to various actions by a regulated utility?

A At various points in time, I've reviewed transcripts of public utility hearings, but I don't consider myself an expert in the deliberations of public utility commissions or how they would react to something like this.

Q Let me turn your attention, Dr. Neuberger, to Paragraph 60 of your expert witness report. You say that it's necessary to have a utility-by-utility analysis of the value of

Page 300

acceptance rights; true?

A I think that would inform you about the shape of a supply curve and would also inform you about participation. That may not be practical to know every single -- what every single utility is going to do.

My point here is that you need to know if those institutions or those facilities that decide not to participate in the exchanges market are exactly the ones who would supply PG&E with early rights or other utilities with early rights.

I mean, if those guys drop out of the market, then PG&E is stuck with its OFF allocations, as are everybody else in those early years.

Q Doesn't Mr. Graves' analysis effectively conduct a utility-by-utility analysis by looking at the willingness to pay of -- of each utility?

A On the demand side, yes, not on the supply side. On the supply side, everybody is assumed to play, everybody participates, and that's

Page 301

what this point is here. Among suppliers -- I talk about a utility-by-utility analysis among suppliers of exchange rights. So we got a downward sloping demand curve based on his utility-by-utility analysis. We have nothing comparable on the supply side.

Q Is -- your complaint that Mr. Graves doesn't analyze utilities on the supply side, isn't it really a complaint that Mr. Graves should look at criteria other than simply the willingness to pay as measured by the -- the costs of storing the spent fuel in the absence of DOE performance?

A In my view, the depiction of the demand side of this exchanges market is incomplete. There's stuff left out. There are factors and influences that are left out.

Willingness to pay that avoidable cost factor, I would expect, would be part of the demand for exchanges. No such analysis is done on the supply side. In my view, many of the factors that would influence demand would also influence supply. They might also influence the willingness to

Page 302

participate in the market.

So you need some understanding of what individual utilities are going to do, much like what he's done on the willingness to pay side. And without that, you don't know how this exchanges market would work. You don't know how any individual utility could either accelerate or decelerate.

The market is incomplete. You've got a partial characterization of one side of the market. We have no characterization or a big assumption about what the other side of that market looks like. My critique is both of those things: one, the demand side is incompletely characterized; and B -- or two, that the supply side is pretty much ignored. And the participation decision is also ignored; it's simply assumed.

Q Other than the -- the costs of storing spent fuel, what -- what, in your view, is affecting the supply side other than the various anxieties that you've articulated: concern about the DOE program, concern about presence of spent

Page 303

fuel? Besides those anxieties and the costs of spent fuel, what else affects supply?

A The market may be more complex than even I'm suggesting, but I do believe that the price of trades would matter; the price -- you know, bid prices would matter. I believe that all of the risks that a utility faces would affect both demand and supply for exchanges.

I believe that -- you know, you're calling them anxieties. I call them uncertainty and risk. I think those are relevant and I think they would affect the supply side or the willingness of utilities to supply early rights to an exchanges market.

Q And you have not made any effort to model how uncertainty in risk, as you used those terms, would affect supply in the nonbreach world for a market of -- of spent fuel exchange allocations?

A I haven't quantified it, but I've expressed my beliefs in a quantitative -- or sorry, a qualitative way about how those influences would

Page 304

affect supply in this market. But I've not performed the actual modeling exercise.

Q And you're not sure, as you sit here today, how you would go about undertaking that modeling exercise?

MR. GARDNER: Objection; mischaracterizes Dr. Neuberger's previous testimony.

THE WITNESS: I have some pretty good ideas of how I would go about it, but I haven't done it.

BY MR. SHAPIRO:

Q How would you go about it?

A Do we have another 18 hours to talk about it? I mean, it's a huge project. I admit it's a complex problem.

Q Well, let's talk about it in at least --

A I talked about using random variables to represent certain types of risks and the costs they might impose. I talked about using Monte Carlo simulations to see how it would affect

Page 305

individual institutions' decisions in the context of a demand and supply for exchanges market.

I think all of those tools would be beneficial or could be potentially brought to bear in a rigorous modeling exercise; all right? I haven't done that.

MR. SHAPIRO: Why don't we go off the record for a minute.

(Whereupon, signature not having been waived, the deposition adjourned at 5:22 p.m. to reconvene on Tuesday, March 7, 2006.)

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| PACIFIC GAS & ELECTRIC COMPANY | : | No. 04-0074C, into Which has been consolidated No. 04-0075C |
| Plaintiff, | : | |
| vs. | : | January 27, 2006 |
| THE UNITED STATES | : | Volume II |
| Defendant. | : | Pgs. 310 - 568 |

Washington, D.C.

Tuesday, March 7, 2006

Continued Deposition of

JONATHAN A. NEUBERGER

called for further oral examination by counsel for Plaintiff, pursuant to notice, at the Law Offices of Greenberg Traurig, 800 Connecticut Avenue, N.W., Suite 500, Washington, D.C. 20006, before Cindy L. Sebo, RMR, CRR, CSR, RPR, Capital Reporting Company, Notary Public in and for the District of Columbia, continued at 9:35 a.m., when were present on behalf of the respective parties:

perfectly consistent. You know, I think my critique of the markets and participation is perfectly consistent with the notion that in emission markets, you had overcompliance, a lot less trading than what was expected, lower prices than was expected -- were expected -- was expected.

So -- so, if anything, I think the experience in the emissions market supports many of my conclusions, not contradicts them.

Q Well, if utilities, in your view, are going to overcomply by building more ISFSIs or otherwise adding to at reactor storage capacity, wouldn't that actually free up more early acceptance allocations into -- into the exchanges market?

A It depends on who does that building. You know, again, if it's -- if it's done by facilities that would have been demanders of those rights in the early years, then they wouldn't have that demand. So I think it depends on the distribution of how different utilities respond and how they express this so-called overcompliance.



Q We'll change subjects once again to the -- I want to focus for a few minutes on the -- what you call the DOE model.

A Okay.

Q Let me focus your attention to Paragraph 114 of your expert witness report.

A Yes.

Q Now, you describe a rate of acceptance that you were asked to use by the Department of Justice?

A Correct.

Q And near the end of that description, you say that that rate of acceptance ramped up after 2009 from 900 MTU to 3,000 MTU.

A Yes.

Q Can you describe for us that ramp-up from 900 MTU to 3,000 MTU?

A I don't have it off the top of my head. I think it goes 900, 1200, 1800, 2000, 2400, then 3,000. So it takes like five years. So by 2015, you hit 3,000.

Q What's the basis for that ramp-up that



you use in operating the DOE model from 900 MTU to 3,000 MTU?

A That was -- those were the numbers I was given by DOJ counsel.

Q So you're not saying that any part of the acceptance rate that you were asked to model by DOJ counsel is economically appropriate, are you?

A That's beyond the scope of my assignment in this case.

Q Beyond running the DOE model, are you, as an expert, vouching for the correctness of the -- the structure of the DOE model?

MR. GARDNER: Objection; vague.

THE WITNESS: Again, I am familiar with the model. I understand basically how it works. I'm not an expert in DOE's purposes for using the model the way that -- I'm not an expert in the way DOE built the model.

All I can tell you is I've worked with the model before. I understand how it works. I understand how you change assumptions like an acceptance rate; but I am not here to offer any



expert opinions about whether that's a good model, a bad model, the right model, the wrong model.

It's my understanding that that's the model that will be used for generating OFF-based acceptance rights when the time comes; but other than that, I'm not an expert in that in this field.

BY MR. SHAPIRO:

Q So you can't say that the DOE model is structured correctly so as to accurately project utilities' discharges of spent fuel or their -- their must-move fuel needs?

MR. GARDNER: Objection; vague. Objection; form.

THE WITNESS: Those are two very different things. Must move is Mr. Graves' concept. OFF, as I understand it, is a DOE concept. And it's my understanding that this model was intended, designed, developed for the purpose of allocating acceptance rights based on OFF. So I have no reason to think that it isn't perfectly capable of doing that.

I know in Indiana-Michigan and

Page 511

Southern Nuclear, I used that model to derive discharge schedules and -- and allocation rights, and the plaintiffs's expert in that case did the same kinds of things with a proprietary model, and that the two models produced virtually identical results.

So at least one industry expert outside of DOE seems to think that the two models are -- are virtually identical.

So I have no basis to say it's a bad model or a good model, but it does seem to do the task for which it was designed.

BY MR. SHAPIRO:

Q You haven't undertaken to examine the structure of the DOE model to satisfy yourself that it is going to accurately generate oldest fuel first allocations for acceptance under various acceptance rates?

MR. GARDNER: Objection; vague.

THE WITNESS: I haven't conducted that analysis of the DOE model, but I have no reason to believe that it doesn't accurately do that job.

Page 512

BY MR. SHAPIRO:

Q Now, in Paragraph 118 of your expert witness report, you state that upon operation of the DOE model at the acceptance rate that Department of Justice counsel asked you to use, that Humboldt Bay would have the last of its spent fuel removed in 2001 assuming no exchanges; correct?

A Correct.

Q But you have no basis for excluding all exchanges from the nonbreach world, do you?

A The exchanges market was a different issue for this portion of my analysis. I was asked to determine OFF rights under an alternative acceptance rate, not considering any exchanges. And for that purpose, I used the DOE model.

And the DOE model indicated that under that assumed acceptance rate scenario, Humboldt Bay has its last fuel removed in 2001. And the conclusion, I think, stands on its own. It does not assume any changes.

Q Well, you've opined that, in your view,

Page 513

in the nonbreach world, the results of the exchanges market might be different -- would be different, you have opined, than the results shown by Mr. Graves, because you don't think the exchanges market would be as efficient as he's depicted it.

But you can't say that and haven't said that that efficiency would reach a 100 percent level, such that there would be no exchanges leaving Humboldt Bay in the strict oldest fuel first position, are you?

MR. GARDNER: Objection; form.

THE WITNESS: And I would suggest you've kind of mischaracterized my testimony as well. Mr. Graves reaches -- or relies on a particular efficiency standard to underlie his model. I have argued that various factors omitted from the model would change the operations of the market, but an exchanges market model that incorporated all of those different aspects of uncertainty, risk and other factors, would itself or could itself be efficient. It could be

Page 514

perfectly efficient in the presence of uncertainty and risk and these other factors.

My point has been that that efficient allocation is going to be different than if you exclude uncertainty risk and all those other factors.

So I'm not suggesting that an exchanges market couldn't function or would necessarily lead to inefficient outcomes. I think that market could be perfectly efficient, but under certain constraints and under certain conditions, risks, uncertainty, all these other factors that will be present in the nonbreach world.

And so you were kind of saying that my arguments were that you would be -- you'd have some inefficient allocation. Well, that's not the case. You could conceivably have an efficient allocation. It's just going to be a different one, you know, if you incorporate risk uncertainty and those other factors versus Mr. Graves' model, which doesn't.

Now, I have not assumed exchanges in running the DOE model. Exchanges could conceivably

still take place in a but-for world, and it is certainly possible that Humboldt Bay would still get out a year earlier. But for this portion of my report, I was given a very simple assignment: Run the DOE model and tell us when Humboldt Bay gets out under this alternative acceptance rate scenario.

BY MR. SHAPIRO:

Q What's your understanding as to why you were asked to -- to run the scenario you've noted in Paragraphs 114 through 118 of your expert witness report?

A I believe that DOE -- DOJ had the expectation that Mr. Johnson, the damages expert, would provide an estimate of damages under an alternative acceptance rate scenario. And my manipulation of the DOE model provided him with certain inputs.

Q Yet, you're not offering an opinion that, in your expert view, that -- let's take Diablo Canyon for a change -- in your expert view, that in the nonbreach world, Diablo Canyon would



have had the first of its spent fuel removed in 2012?

A Under an OFF allocation, that's when Diablo first gets its first allocation, plain and simple. That's the extent of the conclusion.

Q Let me turn back to Humboldt Bay for a moment. You referred a couple of times to Humboldt Bay getting out a year earlier, and I just want to confirm that we have the same understanding of that that you agree that, at bottom, the difference between exchanges or no exchanges, assuming an acceptance rate that ramps up to 3,000 MTU per year for Humboldt Bay, is Humboldt Bay having the last of its spent fuel removed in 1998 with exchanges versus 1999 with absolutely no exchanges?

A That's --

MR. GARDNER: Objection; vague.

THE WITNESS: -- that's consistent with my understanding. Under an OFF allocation of rights in the absence of exchanges, assuming Mr. Graves' acceptance rate scenario, Humboldt Bay



gets out in 1999 with exchanges. Mr. Graves predicts they will get out in 1998.

BY MR. SHAPIRO:

Q In Paragraphs 114 through 118 of your expert witness report, you note the results of running the DOE model under a particular acceptance rate scenario that Department of Justice counsel asked you to use.

Are you able or are you aware of any other runs of the DOE model by Mr. Gurrea or others with whom you have worked at different rates of -- of acceptance?

A In other cases, I have run different acceptance rate scenarios.

Q Why have you run different acceptance rate scenarios of the DOE model in different cases?

A For a number of reasons: One was to generate results that were consistent with acceptance rate scenarios that plaintiffs were using and -- so, for example, in Indiana-Michigan, plaintiff relied on predictions about OFF rights from Ms. Supko's model. I was asked to use



basically the same acceptance rate scenario she did, but to use the DOE model to generate OFF allocations. And then I did a damages analysis based on those allocations.

So depending upon the case, I have run a number of different scenarios through the DOE model to determine the allocation of rights based on OFF.

Q In any of those instances which you've used different acceptance rates in the DOE model, have you purported to provide an expert opinion as to the appropriateness of the acceptance rate that you were using?

A No, because that's beyond the scope of my expertise. I'm not an expert on DOE's program or acceptance rates.

Q We'll switch subjects -- before I do, one more question on the model.

Do you know, Dr. Neuberger, whether the DOE model reflects the early shutdowns that are reflected in Mr. Graves' analysis?

MR. GARDNER: Objection; vague.