Page 523

everywhere and in all cases.

Q I will try to clarify something from your last answer. Although you reviewed work by Mr. Johnson, you, yourself, haven't done analysis that would enable you, as an expert, to say that Professor Cornell has not accurately isolated incremental costs, have you?

MR. GARDNER: Objection; mischaracterizes Dr. Neuberger's previous testimony.

THE WITNESS: There are some instances that I did identify, and I'll give you one example, and that's with respect to depreciation.

At his deposition, Professor Cornell was asked if depreciation should be included in damages as an incremental cost, and he said no. During the course of that deposition, it was pointed out to him that the claim does, in fact, include charges for depreciation. He expressed some surprise at that, but didn't go so far as to say, well, let's take that out.

So I am aware, as I said, of some

Page 524

instances where the concept of incremental costs was not carried out in every case and in every instance.

And really, the purpose of my critique here is more general, more conceptual that certain categories of costs -- and again, I haven't done the analysis to make sure that this was done consistently or that -- that it's always the case -- but just the certain categories of costs, conceptually, in my view, don't meet his criterion of incremental costs.

So I'm aware of certain instances and I'm aware of what Professor Cornell said in his report and at his deposition about you really want to isolate incremental costs. In my view, that incremental cost concept wasn't carried out consistently across every element of damages.

BY MR. SHAPIRO:

Q Well, in what elements of damages can you say, as an expert, that the incremental costs concept was not carried out in Professor Cornell's work beyond the depreciation example you previously

Page 525

offered?

A Any PG&E employee who assigned work to a breach-related project code. For those instances, whatever proportion of their time for that year was allocated in their internal cost accounting system to the breach activities. That proportion of their salary was considered an incremental cost.

In fact, that activity -- that employee may not be representing any incremental costs to the institution. So suppose, for example -- I'll give you a hypothetical example here. Suppose a particular employee spends 10 percent of his time on a breach-related activity and 90 percent of his time on nonbreach-related activities. In the PG&E cost accounting system and in Mr. -- or Professor Cornell's damages system estimate, 10 percent of that employee's salary in that year is assigned to the breach.

In fact, that employee could have had 10 percent slack in the activity that he did. Maybe he wasn't busy 90 percent -- or 100 percent

Page 526

of the time. Maybe he was really only busy 90 percent of the time. If that's the case, then there's been no cost imposed on PG&E in terms of incremental cost.

Alternatively, if that person spends a couple of extra hours every week getting his nonbreach work done, but doesn't get paid overtime for it, PG&E isn't out any extra costs. There's no incremental cost associated with the individual working a couple of extra hours, so there are categories.

So with respect to labor, for example, I think -- though Professor Cornell talks about it a little bit, I think there's simply an assumption that any time spent on a breach-related project must be a breach. And I don't think that's necessarily the case.

Q And I want to come back and will come back to what I'll summarize as the -- the PG&E labor issue, but my question -- and I still want to get to this -- is your complete list of all the areas in which you believe that Professor Cornell's

Page 547

Q But haven't you lost the opportunity to use that overhead just as you've lost the opportunity to use the employee's time as -- as measured by their -- their wages for some other productive purpose within the company?

A I don't think you have lost that overhead in that concept. I mean, you've still -- you still might be spending that money, you still would have bought that PC, you still would have had the desk there regardless of what that person is doing.

Yeah, if you're doing an internal cost accounting comparison, you know, for managerial accounting purposes, you want to fully burden all of the costs associated with the project to see if it's worth doing. That's different than damages.

Q How would you describe the -- the concept of opportunity costs?

A It's the next best use of that person's time or, in this context, whatever else they would be doing if they weren't working on breach projects.

Page 548

Q Let me turn your attention to Paragraph 109 of your report.

In Paragraph 109 of your expert witness report, you say that if costs cannot be measured in a reasonably accurate way, that they should be excluded from a reliable measure of damages?

A Yes, I see that.

Q What do you mean by "reasonable accurate" in this context?

A If you don't have much confidence that you've been able to measure the costs of a breach, it seems to me -- or components of a breach, then there's no way for the court to determine if they're really reliable or not.

The point I'm trying to make here relates to overheads and the allocation of overheads, these indirect costs. Professor Cornell directed his staff to direct PG&E to do this kind of congestion analysis, and only indirect costs that are directly attributable to a breach project or involve congested resources should be included in damages. And the stuff that is either

Page 549

uncongested -- or I guess there are five categories, and I forget what the last two were.

My point here is that the congestion is simply assumed, and it's assumed to be constant and it's assumed to be the same. But, in fact, the nature of that congestion could be very different, and simply measuring it using one methodology, I think, may not be very accurate.

And if you can't get an accurate measure of costs, then it's reasonable to exclude it from damages. If you're just throwing a bunch of costs out there without real justification for whether they're truly incremental, I think they should be excluded from damages. You need to have some reasonable measure of accuracy in order to include those costs in a damages claim.

Q In making that statement, are you offering a legal opinion or an opinion as a matter of economics?

A Economics.

Q Where is that concept discussed in economics?

Page 550

A Well, I guess I would say it's economics damages. I mean, what -- what's appropriate for damages? Well, I can make up a whole lot of costs, you know, in the face of a breach and throw them into a damages pot. Does that mean they should be in damages? I don't think so. I certainly wouldn't want to testify to them.

And here, I'm saying that it's not at all clear to me that congestion has been accurately measured, and if you can't measure those costs accurately, then maybe they should be excluded from damages. That's just my -- that would certainly be my approach to estimating damages, and it's -- it's consistent with every case that I've worked in and every expert I've talked to.

There's probably a legal component to it, but as an economist who estimates damages, I certainly wouldn't feel comfortable with cost categories that I couldn't measure.

Q Going back to your use of the phrase "reasonably accurate," so if Professor Cornell is reasonably confident that he's able to -- to

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| PACIFIC GAS & ELECTRIC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 04-0074C |
| | ) | Volume I |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

THE DEPOSITION OF BRADFORD CORNELL was taken on behalf of the Defendant at 9:36 a.m. on Wednesday, January 18, 2006, at 1055 East Colorado Boulevard, Suite 420, Pasadena, California, before SERENA WONG, CSR 10250, RPR, Certified Shorthand Reporter for the State of California.



BARKLEY Court Reporters

Q Do you know how that was communicated to him, provided to him?
A Some of it may have been electronics. Some of it may have been hard copy. I didn't really ask him about that.
Q And ultimately, the spreadsheets that you would be relying upon for your analysis would be the ones that Mr. Burgess ultimately created?
A Yes.
Q Just taking a step back conceptually, we talked a little bit earlier about valuation. Is there a difference between the valuation of damages and measuring damages in your mind? Or --
A The only difference would be valuation implies to me reducing it to one number, an amount by which I could pay you, and that would settle the claim. Measurement of damages may include different things at different points in time that haven't been collapsed through a single number.
Q All right. How does -- in terms of a past cost, for example, past incurred cost, if you -- because, obviously, you would agree that your report does contain significant past incurred cost. Is that fair?
A Yes.



Q In terms of a past incurred cost where there is no time value of money being factored in as we have here, is the assembly of all of the past cost information -- is that, in your mind, valuation or is that measurement or is it reporting or is it something else?
A Well, it's mostly reporting, but there are a couple issues that arise in a damage context that you need to think about economically. Perhaps the most important is incremental cost. If you're only -- if you're only interested in the cost associated with a certain activity, you have to isolate the cost related to that activity, which, when you have a big company like PG&E that's integrated and all, may require some work.
Another thing that you'd have to worry about or at least address or think about is whether the costs were reasonable. For instance, I have a computer system that runs certain lights in my house. And I asked that the clock be reset. And an individual showed up, and he had all the wrong equipment, so it ended up taking him an immense amount of time to set the clock. He then charged me $445 to set the clock. I didn't think that was reasonable, and therefore -- it wasn't the true economic cost. That also reflected major screwups on



the part of the provider.
So you at least have to raise the question of whether the costs were necessary economic costs in addition to whether they were incremental. So even though they're past, it doesn't mean you can necessarily just dump them all into a spreadsheet and add them up.
Q And we're going to talk, obviously, more about both of those. But let's start with incremental costs.
In looking at your report, there were a couple areas that appeared to have your fingerprints on them. One was the treatment of allocated costs, and the other was treatment of overheads.
A Those were two -- they certainly had my fingerprints on them, because one of the things I said right from the beginning to Mr. Stouck and in conversations with Mr. Kapus and certainly with my staff was, "We got to figure out what's true incremental costs here." And Matt Burgess and Mark Burkman spent quite a bit of time working with the company attempting to solve that problem.
And one of the solutions, as you'll see, is Appendix B, beginning on page 41. Yes, it's B. There was other work done in addition to B, but that's all the effort, getting back the incremental cost from the PG&E



system, which is not really designed precisely for tha purpose.
Q It's an accounting system, not a damages system?
A Right, that's correct.
Q In looking at incremental costs and separating out the detailed analysis -- that's my word, "detailed analysis" -- concerning allocated costs and overheads, do you know if there were any costs that CRA eliminated from the claim, based on the fact that it -- that you all determined it was nonincremental or not incremental?
A Well, that was the back-and-forth between Burgess and Burkman and Kapus and his people, was working out both the overheads and elements of the activity costs which needed to be netted out. CRA was very involved in that process.
Q Do you know -- the next topic you mentioned was reasonableness, which would you agree is a consideration in looking at a damages claim?
A I'd agree it's a consideration.
Q And why is it a consideration?
A Well, if the damaged party did not act rationally or appropriately in dealing with the dama the law may say they don't get the recovery in full

Page 1934

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

SOUTHERN NUCLEAR OPERATING )
COMPANY, ALABAMA POWER )
COMPANY, and GEORGIA POWER ) NO. 98-614C
COMPANY, )
Plaintiffs, )
v. )
THE UNITED STATES, )
Defendant )

Courtroom Number 5
Court of Federal Claims
717 Madison Place NW
Washington, D.C.

Thursday, October 27, 2005

VOLUME 9

The parties met, pursuant to the notice of the Judge, at 9:00 a.m.

BEFORE THE HONORABLE JAMES F. MEROW

Page 1935

APPEARANCES:
ON BEHALF OF THE PLAINTIFFS:
M. STANFORD BLANTON, ESQ.
K.C. HAIRSTON, ESQ.
S. ALLEN BAKER, JR., ESQ.
Balch & Bingham
1710 Sixth Avenue North
Birmingham, Alabama 35203
(205) 226-3417
and
RONALD A. SCHECHTER, ESQ.
Arnold & Porter
555 12th Street, Northwest
Washington, DC 20004
ON BEHALF OF THE DEFENDANT:
JOHN EKMAN, ESQ.
HEIDE HERRMANN, ESQ.
MARIAN SULLIVAN, ESQ.
JOSHUA E. GARDNER, ESQ.
ALAN LO RE, ESQ.
STEPHEN FINN, ESQ.
U.S. Department of Justice
1100 L Street, Northwest
Washington, DC 20530
** Index appears at end of transcript **

Page 1936

P R O C E E D I N G S

JUDGE MEROW: Please be seated. Sorry for the delay. An hour and 15 minutes is apparently not enough for commuting. Well, Ms. Sullivan?
MS. SULLIVAN: Good morning, Your Honor. Unless Mr. Blanton has anything, we have our next witness.
MR. BLANTON: Nothing from us, Your Honor.
MS. SULLIVAN: Your Honor, the government calls David Zebransky to the stand, please.

DAVID K. ZEBRANSKY
was sworn and testified as follows:
EXAMINATION
BY MS. SULLIVAN:
Q All set?
A Sure.
Q Okay. Good morning, Mr. Zebransky. Could you state your full name for the record, please?
A My name is David K. Zebransky.
Q Mr. Zebransky, where are you currently employed?
A I'm employed by the U.S. Department of Energy in Washington, DC.

Page 1937

Q And what office do you work in at the Department of Energy?
A I work in the Office of Civilian and Radioactive Waste Management and in that office, in the Office of Systems Analysis and Strategy Development.
Q And what position do you hold in that office?
A I'm currently a nuclear industry specialist.
Q And what are your responsibilities as a nuclear industry specialist?
A To provide technical input and -- on nuclear issues to my boss on issues of strategy development and systems analysis.
Q And to whom do you report?
A To Mr. Christopher Kouts.
Q Are you also the contracting officer for the standard contracts between DOE and the nuclear utilities?
A Yes, I am.
Q When did you become the contracting officer?
A I believe around July of 2002.
Q Have you also served as the technical

Page 2018

So on the one hand, the economic issues spanned those industries. On the other hand, where there were industry-specific factors, I educated myself through my own research efforts and also by talking to individuals who had direct industry experience.

Q Dr. Neuberger, have you been involved in other types of business consulting?

A I have.

Q Can you give some examples?

A Sure. Second category of work I've done over the last 11 or so years has been what I'll call general business consulting, and that's included some strategy consulting, you know, working with companies to develop strategies, to structure their business operations in ways that address different aspects of those strategies and just to provide general consulting support to those companies.

Q Have you performed any business valuations?

A Yes, over the years I've done quite a few business valuations. This has included valuations of publicly traded companies as well as privately held companies, small and large. It's included valuing divisions within companies, also valuing specific

Page 2019

assets within those companies.

I've also done a fair bit of valuation of intellectual property assets, like patents and copyrights, and I've done that in the context of litigation and outside of litigation.

Q Have you also been involved in the business of litigation consulting?

A I have. For the last seven or eight years, my -- the focus of my business activities has been in litigation consulting, and in that area, I have provided applied economic analyses for companies engaged in litigation.

Q Can you give an example -- give me a general idea of the kinds of cases on which you provided consulting services?

A Sure. Again here it's a fairly broad range of types of cases. I have been involved in breach-of-contract cases like this one. I have been involved in antitrust cases alleging price fixing or other anticompetitive matters. I've worked in a fair number of securities litigation cases. I've also worked in intellectual property lawsuits, like patent or copyright infringement cases.

Q I asked you this earlier, but for another segment of the work you perform, in litigation -- in

Page 2020

the context of litigation, what kinds of industries have you been -- have the cases involved?

A Again, these cases have spanned a fairly broad range of industries, including telecommunications, financial services, aerospace companies, timber companies, nuclear power generators, pharmaceutical companies, really quite a broad range.

Q And what types of clients have you represented?

A I've worked for several different government agencies, so obviously, I've done work on behalf of the Department of Justice. I've also performed litigation-related analyses for the Securities and Exchange Commission and the Internal Revenue Service. I've worked for -- through various law firms that have brought me in pretty broad range of corporations, including some fairly large pharmaceutical companies, some large telecommunications companies and really quite a few others. I can't think of any off the top of my head.

Q And how many cases have you worked on?

A I would estimate over the last seven or eight years, probably somewhere in the range of 50 to 75 cases.

Q Have you ever testified before?

Page 2021

A I have.

Q How many times?

A I've testified either at deposition or at trial on 12 previous occasions.

Q Have you ever been qualified as an expert witness?

A Yes, I've been qualified as an expert on three previous occasions in the Court of Federal Claims and on one occasion in Federal District Court in the Northern District of California.

Q In those cases, in what areas were you qualified as an expert?

A I have been qualified as an expert in economics, in economic damages and in corporate finance.

Q Can you again generally describe some of the cases, obviously other than this one, in which you've offered expert testimony?

A Yes. I testified earlier this year in the Court of Federal Claims in the case of Precision Pine and Timber versus the United States. That was before Judge George Miller.

I testified last year in the Indiana Michigan case. I was the government's damages expert in that case before Judge Hodges. I also testified

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| PACIFIC GAS AND ELECTRIC COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | No. 04-74C<br>(into which has been consolidated<br>No. 04-75C)<br>(Judge Hewitt) |

**Expert Report of Brad Cornell (11/10/2005)**

## I. Qualifications

(1) I am a Visiting Professor of Finance at the California Institute of Technology. I am also a Senior Consultant to CRA International (CRA). I earned a M.S. degree in Statistics from Stanford University in 1974 and earned my Ph.D. degree in Financial Economics also from Stanford University in 1975.

(2) Since 1975, I have taught a variety of courses, including courses involving corporate valuation, the law and finance of corporate acquisitions and restructuring, corporate financial theory, and securities valuation and investments. Prior to joining the Cal Tech faculty, I was Director of the Bank of America Research Center at the Anderson Graduate School of Management at the University of California, Los Angeles (UCLA). At UCLA, I twice served as Vice-Chairman of the Anderson School and twice served as Chairman of the Finance Department. I have also taught

2003, $96.6 million through 2004, $128.2 million through 2005, $172.9 million through 2006, $202.5 million through 2007 and $273.7 million through 2012. These figures reflect damages to PG&E because of the government's failure to remove spent fuel from both Humboldt Bay and Diablo Canyon power plants consistent with contractual obligations as claimed by PG&E. Damages are calculated through several potential end dates that may be decided by the Court. For this analysis, the end of 2007 is assumed to be the time at which damages will be awarded. The end of 2012 is assumed to be the earliest point in time at which the government may pick up PG&E's spent fuel. Additional damages will result should the government fail to remove spent fuel from PG&E's plants by that time.

**IV. Documents Relied On**

(9) The documents that I considered to calculate damages are listed in Appendix C.

**V. Methodology and Results**

(10) I have relied on a standard approach to determining damages in a breach of contract claim, which is to compare PG&E's actual costs to the costs PG&E would have incurred "but for" the breach. Damages are the costs incurred by PG&E as a result of breach. The relevant period for this comparison is the early 1990s through December 2012. The start date is the time at which PG&E determined that there existed sufficient uncertainty as to whether the DOE would perform for it to be necessary to

begin planning and devoting valuable resources for additional spent fuel management beyond the contractual date for removal by the government. Counsel has asked me to determine damages over various end dates because of uncertainty as to the appropriate period over which damages may be claimed. I have not calculated any pre-judgment interest, as I understand such interest is not legally available in this case. I have applied discounting to incremental costs from 2008 onwards. All costs are calculated on a pre-tax basis because the award itself will be taxed.

(11) I have reviewed PG&E's costs in seven separate activities related to spent fuel storage and management:

1. Humboldt SAFSTOR;[1]
2. Humboldt Independent Spent Fuel Storage Installation (ISFSI);
3. Humboldt Stack Removal;
4. Diablo Canyon ISFSI;
5. Diablo Canyon Temporary Racks;
6. Diablo Canyon Storage Options Study; and
7. Offsite Storage Evaluations.

(12) Based on discussions with PG&E's staff and review of cost analyses prepared by PG&E, it is my opinion that these categories reasonably characterize the elements of damage PG&E has or expects to incur as a

[1] SAFSTOR is not an acronym. It is defined in the NRC's Information Digest, 2004-2005 Edition (NUREG-1350, Vol. 16, Rev. 1) as, "A method of decommissioning in which the nuclear facility is placed and maintained in such condition that the nuclear facility can be safely stored and subsequently decontaminated (deferred decontamination) to levels that permit release for unrestricted use." See http://www.nrc.gov/reading-rm/doc-collections/nuregs/staff/sr1350/v17/sr1350v17.pdf (visited November 1, 2005).

ventilation discharge from the Humboldt Bay plant. The incremental cost of the breach to PG&E with respect to stack removal costs is the cost of undertaking these additional steps.

(15) But for the breach, some costs for Humboldt SAFSTOR would still have been incurred. PG&E is damaged only to the extent that SAFSTOR costs, as a result of the breach, are made larger or made to last longer (or both). In the "but for" scenario, the government would have removed spent nuclear fuel in 1998. Absent the breach, SAFSTOR costs after 1998 would have been zero because spent fuel would have been removed and the decommissioning of Humboldt Bay would have commenced. SAFSTOR costs up to 1998 are the same with or without the breach. The incremental cost of the breach to PG&E in this activity is therefore all SAFSTOR costs incurred from 1999 onwards.

**A. "But For" Costs Implicit In Other Damages Calculations**

(16) Calculating the incremental cost of the breach necessarily requires me to identify the costs that would have been incurred by PG&E absent the breach. Two approaches are possible. One is to calculate the costs of PG&E's entire Humboldt and Diablo Canyon operations with the breach and without the breach (assuming no change in revenues between scenarios). In this case, damages are the difference in costs under each scenario. There are no changes in revenues that have to be considered in the "but for" analysis because there is no change in output at either plant as a result of the breach. This approach is unnecessarily broad in scope.

(17) As a more direct and practical approach, I estimate incremental "but for" costs recognizing first that only a subset of PG&E's costs are sensitive to DOE's breach, and second, as discussed above, in all but two of the seven cost categories, "but for" costs are zero.[2] Narrowing the scope in this way simplifies the analysis tremendously without any reduction in accuracy. My staff inquired about system-wide benefits to PG&E of breach, in particular whether breach projects produced any incoming revenue streams for PG&E or reduced costs elsewhere in the organization, but PG&E's staff were unable to point to any benefits.

**B. Measuring Costs**

(18) Information necessary to develop cost estimates was gathered through a process of communication between PG&E and my staff. This process occurred over a seven month period beginning March 2005, commencing with a series of conference calls that involved numerous PG&E parties and consultants who were knowledgeable about the operations of the two power plants, and/or were familiar with the costs and activities involved in the storing of spent fuel. These parties included personnel in budgeting and risk management at PG&E, managers in charge of projects directly related to the government's breach, and PG&E's outside consultants. In these initial calls, my staff developed an understanding of the obligations of the various parties and the amounts and timing of expenditures with and but for the breach. My staff received files primarily from Robert Kapus,

[2] Storage cost studies, design and construction of the two ISFSIs and the Diablo Canyon temporary rack would not have been required had DOE met its obligation in a timely manner. However, some stack removal and SAFSTOR costs would have been incurred without breach.

incremental costs through various earlier dates, using the methodology summarized above and discussed throughout this report.

Brad Cornell

Brad Cornell
Los Angeles, California
November 10, 2005

CERTIFICATE OF SERVICE

I hereby certify that on this 15th day of May, 2006, a copy of foregoing "DEFENDANT'S RESPONSE TO PLAINTIFF'S MOTION TO EXCLUDE TESTIMONY OF JONATHAN A. NEUBERGER" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/Joshua E. Gardner