No. 04-0074C
into which has been consolidated
No. 04-0075C
Judge Hewitt

(Filed Electronically, May 15, 2006)

---

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---

PACIFIC GAS & ELECTRIC COMPANY,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

---

# PACIFIC GAS & ELECTRIC'S OPPOSITION TO THE GOVERNMENT'S MOTION *IN LIMINE* REGARDING TESTIMONY CONCERNING THE MEANING OF THE NUCLEAR WASTE POLICY AND THE STANDARD CONTRACT

---

JERRY STOUCK
Greenberg Traurig, LLP
800 Connecticut Avenue, NW
Suite 500
Washington, DC 20006
(202) 331-3173 phone
(202) 261-4751 fax
*Counsel for Plaintiff*
Pacific Gas & Electric Company

Of Counsel:
ROBERT L. SHAPIRO
Greenberg Traurig, LLP

TABLE OF CONTENTS

I. TESTIMONY BY MESSRS. WARNER AND MILLS IS RELEVANT AND IMPORTANT TO EXPLAIN THE MEANING OF THE OPEN TERM IN THE PARTIES' CONTRACT PERTAINING TO RATE AND SCHEDULE OF ACCEPTANCE ..... 3

A. The Rate And Schedule Under Which DOE Will Accept PG&E's SNF Is An Open Term In The Contract. ..... 3

B. This Court Has Already Ruled, Correctly, That Extrinsic Evidence Related To The Intent Of The Parties – Including Legislative Intent – Is Necessary And Appropriate To Interpret The Parties' Contract. ..... 4

C. The Government's Arguments for Precluding Mssrs. Mills and Warner Are Legally Wrong and Would Deny The Court Relevant and Important Evidence Regarding the Contract's Open Rate and Schedule Term. ..... 6

II. THE TESTIMONY OF MESSRS. MILLS AND WARNER IS EXACTLY THE KIND OF EVIDENCE THAT *COMMONWEALTH EDISON* AND *ROEDLER* RECOGNIZE AS "NECESSARY" AND "APPROPRIATE" TO AID IN CONSTRUING THE OPEN RATE AND SCHEDULE TERM OF THE PARTIES' CONTRACT ..... 8

A. Mr. Mills May Testify Regarding, Among Others, PG&E's Intent And Understanding Of The Contract ..... 9

B. Mr. Warner May Also Testify To Issues Relating To The NWPA And The Contract ..... 10

IV. CONCLUSION ..... 11

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Beta Sys. v. United States*, 838 F.2d 1179, 1185 (Fed. Cir. 1988)................................................ 4

*Commonwealth Edison Co. v. United States*, 56 Fed. Cl. 652 (2003)................................. passim

*David Nassif Assocs. v. United States*, 557 F.2d 249 (Ct.Cl. 1977) ............................................ 2

*David Nassif Assocs. v. United States*, 644 F.2d 4 (Ct.Cl. 1981) ................................................. 2

*Department of Energy v. Westland*, 565 F.2d 685 (C.C.P.A. 1977)............................................. 8

*Firestone Tire & Rubber Co. v. United States*, 444 F.2d 547 (Ct. Cl. 1971) ................................ 5

*Gardner and N. Roofing and Siding Corp. v. Board of Gov. of the Fed. Reserve Sys.*, 646 F2d. 838 (D.C. Cir 1972); ........................................................................................................ 8

*Gould Inc. v. United States*, 935 F.2d 1271 (Fed. Cir. 1991) ....................................................... 4

*Metric Constructors, Inc. v. NASA*, 169 F.3d 747 (Fed. Cir. 1999).............................................. 6

*Mobil Oil Exploration & Producing Southeast, Inc. v. United States*, 530 U.S. 604 (2000)......... 7

*National Sch. of Aeronautics, Inc. v. United States*, 142 F. Supp. 933 (Ct. Cl. 1956) .................. 8

*Roedler v. United States*, 225 F.3d 1347, 1352 (Fed.Cir. 2001).......................................... passim

*Sacramento Municipal Utility District v. United States*, 63 Fed. Cl. 495 (2005).......................... 6

*Selman v. United States*, 204 Ct. Cl. 675 (1974) ............................................................................ 7

*Sylvania Elec. Prods., Inc. v. United States*, 458 F.2d 994 (Ct. Cl. 1972) .................................... 6

*United States Steel Corp. v. United States*, 618 F. Supp. 496 (C.I.T. 1985) ................................. 8

## OTHER AUTHORITIES

Fed. R. Evid. 801(d)(2).............................................................................................................. 11

Restatement (Second) Contracts § 204............................................................................................ 2

Restatement (Second) of Contracts § 212......................................................................................... 6

Restatement (Second) of Contracts § 213......................................................................................... 6

# INDEX TO APPENDICES

Transcript of *Yankee Atomic Elec. Co. v. United States*, No. 98-126C, July 12, 2004 ......... A1-A9

Deposition of Christopher Warner, August 3, 2005 .......................................................... A10-A16

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

Filed Electronically on May 15, 2006

| | | |
|---|---|---|
| PACIFIC GAS & ELECTRIC COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | ) | No. 04-0074C, into which has been consolidated No. 04-0075C (Judge Hewitt) |

**PACIFIC GAS & ELECTRIC'S OPPOSITION TO THE GOVERNMENT'S MOTION *IN LIMINE* REGARDING TESTIMONY CONCERNING THE MEANING OF THE NUCLEAR WASTE POLICY AND THE STANDARD CONTRACT**

The government's motion to exclude the testimony of PG&E's witnesses, Loring Mills and Christopher Warner, is based on a fundamental misunderstanding of the parol evidence rule, the law applicable to interpreting a contract with the government that implements a statute, and the scope and purpose of Messrs. Mills' and Warner's proposed testimony. At bottom, the government is attempting to keep from the Court important evidence on an issue central to this case – namely, the parties' understanding and intent, embodied in their contract ("Contract"), that nuclear utilities would fund the government's spent nuclear fuel and high-level radioactive waste ("SNF") program and, in return, the DOE would begin accepting the utilities' SNF by January 31, 1998 and would continue to accept SNF in a manner that would allow utilities to avoid additional at-reactor storage costs after 1998 while reducing the existing SNF backlog (as of 1998) within a reasonable time. Testimony about those matters, which Messrs. Mills and Warner will provide, is both necessary and appropriate in this case.

Indeed, this Court has already ruled, in *Commonwealth Edison Co. v. United States*, 56 Fed. Cl. 652 (2003), that a plaintiff utility may rely upon extrinsic evidence regarding the parties' intent and understanding of the DOE spent fuel contracts. *See id*. at 667 (noting "fact-specific inquiry *necessary* to determine the intent of Congress and the parties") (emphasis added). Like the DOE contracts generally, PG&E's Contract has an open term regarding the rate and schedule under which DOE will accept PG&E's SNF. Therefore, as *Commonwealth Edison* also recognizes, the Court must enforce "a term which is reasonable in the circumstances." *See id.* at 662 (citing Restatement (Second) Contracts § 204).

A reasonable term "in the circumstances" depends upon the purpose and objectives of the contract, as well as the intent and understanding of the contracting parties. *See, e.g., id.* at 662, 667; *see also* PG&E's Memorandum of Contentions of Fact and Law ("PG&E's Pretrial Mem.") at 39-40 (discussing, *e.g.*, *David Nassif Assocs. v. United States*, 557 F.2d 249 (Ct. Cl. 1977) & 644 F.2d 4 (Ct. Cl. 1981)). Evidence of the Contract's purpose and objectives, and of the parties' intent and understanding, is therefore both relevant and important. Moreover, in *Roedler v. United States*, 225 F.3d 1347 (Fed. Cir. 2001), which involved another of the DOE spent fuel contracts involved here, the Federal Circuit specifically held that "[f]or determination of contractual and beneficial intent when, as here, the contract implements a statutory enactment, it is *appropriate* to inquire into the governing statute and its purpose." *Id.* at 1352 (emphasis added).

Accordingly, as set forth in both *Commonwealth Edison* and *Roedler*, the Court should allow PG&E to present the testimony of Messrs. Mills and Warner discussing the background, purpose and goals of the Contract in order to demonstrate the parties' understanding and intent regarding a reasonable rate and schedule for DOE's acceptance of PG&E's spent fuel. The fact

that their testimony touches upon events leading up to passage of the Nuclear Waste Policy Act of 1982 ("NWPA") does not preclude the testimony; to the contrary, under *Roedler* that background makes the testimony of Messrs. Mills and Warner particularly relevant and important in construing the Contract involved here, given that the Contract "implements a statutory enactment." *Id.* In fact, by recognizing that extrinsic evidence is "necessary to determine the intent of congress and the parties," *Commonwealth Edison*, 56 Fed. Cl. at 652, and that "inquir[y] into the governing statute and its purpose" is "appropriate" in construing the DOE contracts, *Roedler* 225 F.3d at 1352, *Commonweatlh Edison* and *Roedler* foreclose the government's arguments in its Motion that the parol evidence rule or the integration clause in the Contract prohibit PG&E from presenting evidence such as the proposed testimony of Messrs. Mills and Warner. The government's arguments have already been rejected. Its motion should, therefore, be denied.

## I. TESTIMONY BY MESSRS. WARNER AND MILLS IS RELEVANT AND IMPORTANT TO EXPLAIN THE MEANING OF THE OPEN TERM IN THE PARTIES' CONTRACT PERTAINING TO RATE AND SCHEDULE OF ACCEPTANCE

### A. The Rate And Schedule Under Which DOE Will Accept PG&E's SNF Is An Open Term In The Contract.

The Contract does not specify a particular rate or schedule of acceptance, a fact the government readily admits. Motion at 9. This Court reached the same conclusion in *Commonwealth Edison*, 56 Fed. Cl. at 662, finding that the parties did not include a term in the Contract governing the schedule or rate of acceptance. As such, it is undisputed that the Contract has an open term that must be explained or clarified. Messrs. Mills and Warner should be allowed to testify on this basis alone.

Despite the Court's ruling in *Commonwealth Edison*, the government argues that the Contract contains no open terms because it contains a "contractual mechanism" to determine the

rate and schedule of acceptance. Specifically, it claims that DOE's 1991 Annual Capacity Report ("ACR") and the Delivery Commitment Schedules ("DCS") submitted by utilities in response determined the rate and schedule applicable to this Contract. Motion at 9-10 (citing the Contract, Art. V.B.5). The Court has already rejected this exact argument in *Commonwealth Edison*: "[t]his mechanism does not create a contractually binding obligation for either party." 56 Fed. Cl. at 663.[1] The Court could not have been more clear. Yet, the government apparently believes that if it keeps arguing the same points over and over, eventually the Court will change its mind or, worse, simply neglect or forget about its previous rulings.

B. This Court Has Already Ruled, Correctly, That Extrinsic Evidence Related To The Intent Of The Parties – Including Legislative Intent – Is Necessary And Appropriate To Interpret The Parties' Contract.

As noted at the outset, this Court already ruled in *Commonwealth Edison* that extrinsic evidence must be admitted to aid in a "fact-specific inquiry necessary to determine the *intent of Congress and the parties.*" 56 Fed. Cl. at 667. *See id at*. 662 (quoting *Gould Inc. v. United States*, 935 F.2d 1271, 1274 (Fed. Cir. 1991) and *Beta Sys. v. United States*, 838 F.2d 1179, 1185 (Fed. Cir. 1988), for the primacy of determining the parties' intent when interpreting a contract) (emphasis added). The Court in *Commonwealth Edison* considered at length deposition testimony of DOE officials involved with the SNF program, who confirmed that the purpose and goals of the NWPA and the DOE contracts included preventing the need for at-reactor storage and reducing the backlog of SNF. *Id.* at 666. (Much of that testimony is in the record here as well, through deposition designations). Similarly, the Court considered the legislative history of the NWPA itself and concluded that it, too, supported the utility's position. *Id.*

[1] The Court's conclusion is supported by the language in the Contract, stating that the ACR is only for "planning purposes" and provides that PG&E may submit a DCS identifying all the SNF it "wishes to deliver to DOE" regardless of the amounts listed in the ACR. Contract, Art. V.

This Court's decision in *Commonwealth Edison* followed the Federal Circuit's holding in *Roedler* that "it is appropriate to inquire into the governing statute and its purpose" when interpreting a contract that implements a statute. *Roedler,* 255 F.3d at 1352. There, too, the contract in question was a DOE spent fuel contract and the statute in question was the NWPA. Utility ratepayers had sued the government claiming to be third-party beneficiaries of the contract and, in light of DOE's breach, demanded restitution of the sums they had paid as a result of the utility's contract with DOE to accept SNF. *Id.* at 1350. The Court, combining the "fundamental precept of common law that the intention of the parties to a contract control its interpretation" with the notion that the United States should be treated like any other private party to a commercial contract, found that is was "appropriate" to consider extrinsic evidence, including evidence of the "purpose" of the "governing statute" – the NWPA. *Roedler*, 255 F.3d at 1351-52. *See also Firestone Tire & Rubber Co. v. United States,* 444 F.2d 547, 551(Ct. Cl. 1971) ("As far back as the turn of the 19th century, it has been a fundamental precept of common law that the intention of the parties to a contract control its interpretation. This bedrock of contractual analysis . . . has attained an even greater measure of significance in the complex field of Government contracts.").

Here, the testimony of Messrs. Mills and Warner is precisely the type of evidence this Court and the Federal Circuit have already ruled is appropriate to consider in construing DOE's spent fuel contract. The testimony of Messrs. Mills and Warner goes to the purpose and goals of the DOE spent fuel contracts and of the NWPA they implement. This will include testimony about the parties' intent to prevent additional at-reactor storage costs and to reduce the already-existing backlog of SNF, both critical factors in the Court's interpretation of the PG&E Contract here to supply a reasonable rate and schedule of acceptance.

C. The Government's Arguments for Precluding Messrs. Mills and Warner Are Legally Wrong and Would Deny The Court Relevant and Important Evidence Regarding the Contract's Open Rate and Schedule Term

As shown by *Commonwealth Edison* and *Roedler*, the government vastly overstates the parol evidence rule in seeking to exclude all extrinsic evidence on the basis of the Contract's integration clause. Motion at 8-9. *See* Contract Art. XXII. The purpose of the rule is to exclude prior, inconsistent agreements. Restatement (Second) of Contracts § 213. A contract with a missing or open term is, by definition, only partially integrated and, thus, subject to extrinsic evidence. *Id.* at § 210. Moreover, while extrinsic evidence is not admissible to *modify* the terms of an integrated agreement, it is admissible "in aid of the interpretation of ambiguous or uncertain clauses in written agreements." *Sylvania Elec. Prods., Inc. v. United States*, 458 F.2d 994, 1005 (Ct. Cl. 1972). The Restatement stresses that "meaning can almost never be plain except in a context . . . . Any determination of meaning or ambiguity should only be made in the light of the relevant evidence of the situation and relations of the parties, the subject matter of the transaction, preliminary negotiations and statements made therein, usages of trade, and the course of dealing between the parties." Restatement (Second) of Contracts § 212, Comment b. *See also Metric Constructors, Inc. v. NASA*, 169 F.3d 747, 752 (Fed. Cir. 1999) (stating that "[b]efore arriving at a legal reading of a contract provision, a court *must* consider the context and intentions of the parties") (emphasis added). Here, where PG&E and DOE left the rate and schedule term open, parol evidence is certainly admissible to help the Court supply a reasonable term according to the parties' intent and "purpose" of the "governing statute." *Roedler*, 225 F.3d at 1352.

In arguing otherwise, the government quotes the Court's decision in *Sacramento Municipal Utility District v. United States*, 63 Fed. Cl. 495 (2005) ("*SMUD*"). *See* Motion at 9. Unfortunately, that quote does not support the government's bid to exclude extrinsic evidence

with regard to the Contract's open term pertaining to rate and schedule of acceptance. The government's quote is taken from the following context:

> The Government also argues that SMUD's DCSs did not require the acceptance of SNF until the beginning of 2001. Therefore, the Government claims that SMUD interpreted the DOE Standard Contract as requiring DOE to begin accepting SMUD's SNF in 2001. *See* Gov't Supp. Resp. at 12. As a matter of law, what SMUD thought about the DOE Standard Contract is irrelevant since the DOE Standard Contract has an integration clause "the agreement is completely integrated." See *McAbee Construction, Inc. v. United States*, 97 F.3d 1431, 1434 (Fed.Cir.1996) . . . . Therefore, as a matter of law, the Government's contractual obligation to begin disposing of SNF and/or HLW from utilities no later than January 31, 1998 is established in the DOE Standard Contract.

*Id.* at 505-06. PG&E does not dispute that the Contract is integrated with regard to the date DOE was to commence performance. That term is clearly stated in the Contract, in contrast to the rate and schedule term which is left completely open. What is more, the government is plainly grasping at straws when it quotes to the Court a passage in which its proposed interpretation of the DOE contract was rejected out of hand.

Finally, the parol evidence rule applies no differently where the United States is a party to the Contract. It is axiomatic that "a contract with the United States is to be construed and the rights and duties of the parties determined by application of the same principles of law as if the contract were between private individuals . . . ." *Roedler v. DOE*, 255 F.3d 1347, 1351-52 (Fed. Cir.), *cert. denied*, 122 S. Ct. 648 (2001) (*citing Mobil Oil Exploration & Producing Southeast, Inc. v. United States*, 530 U.S. 604, 608 (2000)).

The government's Motion also fails because it presumes, in large part, that Messrs. Mills and Warner will engage in statutory construction, when PG&E's focus is on interpreting the terms of the Contract. Thus, the following cases cited by the government, *see* Motion at 6, are irrelevant because they address the role of legislative intent in statutory construction rather than contract interpretation: *Selman v. United States*, 204 Ct. Cl. 675 (1974) (interpreting the

statutory pay-grade provisions pertaining to JAG officers); *National Sch. of Aeronautics, Inc. v. United States*, 142 F. Supp. 933 (Ct. Cl. 1956) (rejecting the admission of testimony by a senator regarding the intent of Congress to make legislation retroactive where the version enacted did not include such language); *Gardner and North Roofing and Siding Corp. v. Board of Gov. of the Fed. Reserve Sys.*, 646 F2d. 838 (D.C. Cir 1972) (interpreting the scope of Truth-in-Lending laws); *Department of Energy v. Westland*, 565 F.2d 685 (C.C.P.A. 1977) (affirming prior ruling on the basis of *stare decisis* despite plaintiff's attempt to offer testimony of a legislator regarding the meaning of the underlying statute); *United States Steel Corp. v. United States*, 618 F. Supp. 496 (C.I.T. 1985) (denying witness's post-enactment statements offered to show that the statute in question was passed inadvertently).

Unlike the above cases cited by the government and dealing with statutory interpretation, precedent in this Court and the Federal Circuit involving the interpretation of contracts that implement a statute (*e.g., Commonwealth Edison* and *Roedler*) demonstrates that extrinsic evidence, including evidence of legislative "purpose," is admissible to aid the Court in interpreting such contracts. That is particularly so where, as here, the Contract not only implements a statute, but also contains an open term that requires a "reasonable" interpretation based on the facts and circumstances leading to the Contract and the underlying statute it implements.

## II. THE TESTIMONY OF MESSRS. MILLS AND WARNER IS EXACTLY THE KIND OF EVIDENCE THAT *COMMONWEALTH EDISON* AND *ROEDLER* RECOGNIZE AS "NECESSARY" AND "APPROPRIATE" TO AID IN CONSTRUING THE OPEN RATE AND SCHEDULE TERM OF THE PARTIES' CONTRACT

Both Messrs. Mills and Warner will explain that Congress in enacting the NWPA and DOE and utilities in developing the "Standard Contract" intended to address a problem. That problem was the continued accumulation of SNF at the sites of commercial nuclear reactors.

Congress, DOE and utilities intended that the DOE program would solve this problem by January 31, 1998. In particular, the intent was that by that time, DOE would have a sufficient waste acceptance program in place such that no utility would have to incur otherwise avoidable spent fuel storage costs due to the continued accumulation of SNF at its site. Messrs. Mills and Warner will also explain other facts and circumstances leading to the enactment of the NWPA that similarly provide context for understanding the intent of DOE and utilities with respect to what a "reasonable" rate and schedule for SNF acceptance should be "in the circumstances."

This is exactly the kind of testimony that *Commonwealth Edison* and *Roedler* correctly recognize to be "necessary" and "appropriate" to aid in construing the open term of the parties' Contract.[2]

A. Mr. Mills May Testify Regarding, Among Others, PG&E's Intent And Understanding Of The Contract

Mr. Mills will testify to facts and circumstances leading to the enactment of the NWPA and the development of the DOE spent fuel contracts, as well as the purpose and objectives of key provisions of the Contract and statute. As vice president of EEI, an industry group representing investor-owned utilities, Mr. Mills was personally and substantially involved in the development of the NWPA and the Standard Contract in 1983 and can, therefore, testify to facts that demonstrate the goals and purposes of both. Mr. Mills has personal knowledge of the utility industry's intent and understanding of the DOE contracts and will testify to that as well. The industry's intent and understanding, as well as the objectives of the NWPA and the DOE contracts, are among the significant "circumstances" that must be considered in determining a

[2] At trial in *Yankee Atomic Elec. Co. v. United States*, No. 98-126C, Mr. Mills gave testimony comparable to that he will give in this case, and Judge Merow overruled government objections to the testimony comparable to the objections set forth in the government's Motion here. *See,e.g*, 7/12/04 *Yankee Atomic* trial transcript at 271:10-272:5, 275:24-278:18, 282:7-287:2, 290:16-292:21, 295:14-298:4. *See* Appendix A at A1-9. Mr. Warner, a PG&E employee, did not testify in *Yankee Atomic.*

"reasonable" contractual rate and schedule for SNF acceptance. Mr. Mills' testimony will also show PG&E's intent and understanding of the contract because, as a member of EEI, PG&E's intent and understanding was closely aligned with – if not identical to – that of EEI. Additionally, Mr. Mills' can testify to the government's intent and understanding, based on his frequent interactions with (and admissions of) government officials during the time period encompassing enactment of the NWPA and promulgation of the Standard Contract. Like the utility industry's intent, understanding, and objectives, including those of PG&E, the government's intent, understanding, and objectives regarding the NWPA and the Standard Contract – as communicated to Mr. Mills and other industry representatives – are "circumstances" that must be considered in determining a "reasonable" contractual rate and schedule for SNF acceptance.

B. Mr. Warner May Also Testify To Issues Relating To The NWPA And The Contract

Mr. Warner also has personal knowledge of – and may testify to – both PG&E's and the government's understandings of the Standard Contract, including PG&E's Contract. *See e.g.* Deposition of Christopher Warner, August 3, 2005, 100:9-101:8, 111:21-112:16, App. A at A11-16. Mr. Warner will testify about PG&E's understanding of the parties' Contract based on his work as PG&E's in-house counsel responsible for regulatory compliance and, later, chief counsel for nuclear power generation. In those capacities, Mr. Warner has dealt continuously with the Contract on behalf of PG&E and has represented PG&E's position before DOE numerous times. Moreover, as associate minority counsel for the House of Representatives Energy and Commerce Committee from 1981-1983, Mr. Warner was a senior staff member and

was one of the main drafters of the NWPA.[3] Further, from 1983-85, Mr. Warner worked at DOE as a legislative liaison to Congress. In that capacity, he worked on various matters pertaining to the implementation of the NWPA and the DOE spent fuel contracts. Based on those experiences, Mr. Warner can testify about facts and circumstances surrounding the enactment of the NWPA and the development and implementation of the DOE spent fuel contracts, which are directly relevant to the parties' objectives as well as their understanding and intent about what a "reasonable" rate and schedule for SNF acceptance should be. *See, e.g.*, Dep. 87:25-98:25. Based on this accumulated personal experience knowledge, Mr. Warner – like Mr. Mills – will present precisely the type of evidence that *Commonwealth Edison* and *Roedler* recognize is "necessary" and "appropriate" to aid in construction of the open rate and schedule term of PG&E's Contract.

## IV. <u>CONCLUSION</u>

The government attempts to distract this Court from its own clear precedent in *Commonwealth Edison*, as well as that of the Federal Circuit in *Roedler*, which recognize that, to interpret *this* Contract, the Court must engage in a "fact specific inquiry necessary to determine the intent of Congress and the parties." *Commonwealth Edison*, 56 Fed. Cl. at 667. Both this Court and Federal Circuit allow extrinsic evidence for this purpose, including facts showing the goals of and circumstances leading to the NWPA and the DOE contracts that implement it. *Id.*; *Roedler,* 255 F.3d at 1351-52. Here, both Mr. Mills and Mr. Warner should be allowed to testify about those facts based on their personal involvement in the development of the NWPA and the

[3] Earlier in its Motion, when addressing the issues of statutory interpretation, the government seeks to preclude testimony regarding the intent of Congress as hearsay. *See* Motion at 7. The statements of Congress and DOE, however, are admissions of a party opponent and are not hearsay under Fed. R. Evid. 801(d)(2). Consequently, both Mr. Mills and Mr. Warner may offer testimony about conversations they had with government representatives.

DOE contracts (and Mr. Warner's role as PG&E's counsel responsible for DOE spent fuel contract matters).

For these reasons, the Court should deny the government's Motion *in limine* to exclude testimony regarding meaning of the NWPA and the Standard Contract.

Dated: May 15, 2006

Respectfully submitted,

s/Jerry Stouck

JERRY STOUCK
Greenberg Traurig, LLP
800 Connecticut Avenue, NW, Suite 500
Washington, DC 20006
(202) 331-3173 Phone
(202)261-4751 Fax
*Counsel for Plaintiff*
Pacific Gas & Electric Company

Of Counsel:
Robert L. Shapiro
Greenberg Traurig, LLP

# APPENDIX A

**Yankee Atomic v. U.S. No.: 98-126C July 12, 2004**

**Heritage Reporting Corporation**

**Page 1 to Page 302**

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

*HERITAGE REPORTING CORPORATION*
*1220 L Street, N.W.*
*Suite 600*
*Washington, DC 20005*
*Phone: 202-628-4888*
*FAX: 202-371-0935*

Page 269

Q That moment being 1976?
A 1976.
Q And what were the fuel cycle issues?
A The fuel cycle issues related to the uranium enrichment program, the fact that the cost of uranium had jumped in value to a great extent. And there was concern about what they were going to do with the spent fuel that was being generated at the nuclear plants.
Q And what was – what was EEI's role after you arrived with respect to representing the nuclear utility members?
A My personal function was to listen to the utilities, to identify their particular interest and relate that interest – relay that interest to various areas within the federal government, including the Department of Energy. At that time, it was ERDA. It was not yet the Department of Energy. And to the Nuclear Regulatory Commission. And to share this information where appropriate staff members in Congress.
Q Okay. And what – can you just give us a progression of the titles or the positions that you held at EEI.
A Yes. Over the time I was with EEI, I

Page 270

started out as the manager of the fuel – nuclear fuels. I then became director of nuclear fuels, then director of nuclear activities, and then vice president of nuclear activities.
Q All right. And just briefly, we'll get into this further later, but what was your involvement with the Nuclear Waste Policy Act?
A I was very much involved in discussions with the Department of Energy and with – in discussions with staff members in both the Senate and the House during the development of that legislation.
Q All right. Again, briefly, because we will be getting further into it later, perhaps tomorrow morning, what was your involvement briefly in developing the DOE spent fuel contracts?
A Well, the spent fuel contracts were one of the requirements of the Nuclear Waste Policy Act. And I was instrumental in arranging for the utilities to come together to evaluate the regulation that was being proposed as a regulation and to provide – draft the comments and submit those comments to the Department of Energy in response to their proposed contract.
Q All right. And how long did you work for EEI?

Page 271

A I worked for EEI from 1976 until 1993.
Q And what have you done since then?
A I have done a little of consulting work on nuclear activities since then, but not a great deal of work in that regard. I do enjoy my activity of teaching computer classes at Chesapeake College.
Q Okay. And a little sailing; is that right? A little sailing?
A Yes. I do enjoy my 16-foot Hobie Cat.
Q All right. Now, in the – let's turn to events leading up to the Nuclear Waste Policy Act. In the years, really, from the beginning of commercial and nuclear power in this country, say, in the late '50s, mid to late '50s, up until the early '70s, what would nuclear utilities typically due with their spent nuclear fuel.
A It was planned right from the start in the '50s –
MR. MILLER: Objection, Your Honor. Foundation.
PRESIDING JUDGE: Ask why he would know.
MR. STOUCK: I thought he already testified to that.
BY MR. STOUCK:
Q Why would you know the answer to the

Page 272

question.
A Because I started working in the nuclear industry in 1958. And the activity that I was involved in related to the commercial nuclear fuel cycle.
Q Okay. And were you specifically involved with the answer to the last question, the planned reprocessing?
A I was aware of the preprocessing activity and the plan for the utilities and the plan of the federal government. It was not just the utilities. It was supported by the federal government, the Atomic Energy Commission at that time, that the spent fuel from nuclear power plants would be reprocessed at reprocessing plants to recycle the energy values that were still in the spent fuel once they became spent fuel.
Q Right. And you may have just answered what was going to be my next question. Let me ask it and see if there is more you want to add. What is reprocessing?
A Reprocessing is the step in the nuclear fuel cycle which the spent fuel, which is no longer useful for producing energy in the nuclear power plants, is then dissolved, and the nuclear waste products, the

A2

Page 273

high radioactive fission products are separated from the uranium and plutonium, which are useful from an energy standpoint.

The nuclear waste products, radioactive waste products are set aside. The plan was that the uranium and the plutonium would be recycled into new fuel and reinserted into nuclear power plants.

Q Okay. And is that what you refer to as the fuel cycle?

A That was a step in the fuel cycle, yes.

Q Okay. And what other – describe this fuel cycle you've mentioned a couple of times. I just figured we'd get it out.

A It starts with uranium being procured, uranium being enriched, uranium them being fabricated into fuel assembles. The fuel assemblies being placed in a nuclear power plant. The fuel assemblies coming from the nuclear power plant going to the reprocessing plant where the energy values of uranium and plutonium are recovered and fabricated again into nuclear fuel assemblies and put back into the nuclear power plant. That was the cycle.

Q Were there companies in the United States that were reprocessing spent nuclear fuels in the 1970s or that had plans to?

Page 274

A There was one organization, Nuclear Fuel Services Corporation, which did reprocess spent fuel from 1966 to 1972 at West Valley, New York.

The General Electric Company had constructed a plant in Morris, Illinois to do the reprocessing; however, it did not get put into service.

Another company was – had designed and were constructing the larger nuclear – not larger plant, reprocessing plant at Barnwell, the Barnwell plant in South Carolina.

Q All right.

A So there were three very active plans for reprocessing.

Q Okay. And what happened to these three companies' reprocessing plans or programs?

A Well, the West Valley program was a demonstration facility that operated from 1966 to '72. Its capacity was too small to be economically viable. So they shut the plant down in 1972 with the full intention of modifying it. And the engineering was completed to modify that plant to increase its capacity to what was considered to be a commercial activity.

However, it – it did not continue through on that particular program because of various

Page 275

difficulties of achieving the licensing under the Nuclear Regulatory Commission.

As for the General Electric plant, which was constructed, and they – they operated it without using spent fuel, they operated it with nonradioactive materials, and had considerable technical difficulties with the plant, and decided it was not economical to proceed there. That was in the early to mid '70s.

The Barnwell plant proceeded to want to go forward. And it was expected to go forward until, in 1977, President Carter at the time stated in April of 1977 that reprocessing of civilian nuclear fuel would be indefinitely deferred.

Q All right.

A That put a crimp in their program, and they were unable to really go forward at that time.

Q And following that government pronouncement, how did the nuclear utility industry react to that indefinite deferment?

A Well, it was a concern at that point because we now could not see how to close that fuel cycle. And we also did not know what was going to happen to the spent nuclear fuel.

Q Do you know whether – well, strike that. Well, without reprocessing, what were the

Page 276

nuclear utilities supposed to do with the spent nuclear fuel they were generating?

A Well, it had – from the very beginning of the commercial nuclear program in the United States, it was always understood that the federal government would be responsible for the disposal of waste from the program.

MR. MILLER: Objection, Your Honor. Foundation as to the witness' knowledge concerning what was always understood.

BY MR. STOUCK:

Q How do you know that, Mr. Mills?

PRESIDING JUDGE: You better explore understood by whom.

MR. STOUCK: Okay. Let's start with that.

BY MR. STOUCK:

Q Understood by whom?

A This was understood by me. And it was a very well understood arrangement within the federal government at that time within the Atomic Energy Commission, as well as within the industry, that they would be responsible because of the concern of high-level waste and safety – long-term safety that they would be responsible for that.

That was not necessarily true for spent

fuel. We didn't know whether that would be applicable to the spent fuel itself at that time. We knew it did for high-level waste. But within the spent fuel – and it was anticipated that the high-level waste was not separated. But since it was not separated, then it raised the question what is to be done with the spent fuel.

MR. MILLER: Your Honor, the same objection. I don't believe that answer establishes the witness' foundation to opine about this subject matter. And – and we would object to relevance about the whole line of reprocessing and what to do in lieu of reprocessing.

PRESIDING JUDGE: I'll overrule the objection. I think the witness has been qualified as knowledgeable about the industry at the time and through his activities and can express his view of the matter in that regard. So you may continue, Mr. Stouck.

MR. MILLER: I'm sorry, Your Honor. The scope of Rule 701, as I understand it, which was amended substantially in 2000, is that, if Mr. Mills is going to give his opinion about – about what the industry believed needed to be done or, you know, thought they were going to do with spent fuel, it



seems to me that it – it has to be within the limits of Rule 701; that is, he has to talk about facts, facts which were the subject of his first-hand knowledge or observation and matters that require no specialized knowledge.

And there's still been no foundation. He's not testifying about facts. He's talking about what the industry's opinion was about what it was going to do with its spent nuclear fuel.

MR. STOUCK: That's not true, Your Honor. He is testifying about facts. He was there. He was the principal Washington representative of the largest trade association in this area. He had an understanding. His members had an understanding. And he's testifying about it.

PRESIDING JUDGE: I agree. I'll overrule the objection. It goes to weight. You may continue, Mr. Stouck.

MR. STOUCK: Thank you, Your Honor.

BY MR. STOUCK:

Q Well, what was to happen with the spent nuclear fuel, Mr. Mills after President Carter essentially said –

A At the time that President Carter made his announcement in April of '77 that reprocessing of



commercial fuel was indefinitely deferred, there was also a proposal by the administration to establish away-from-reactor storage facilities for spent fuel. That was proposed by the administration. There was also at that point a program initiated within, let's see, it's still ERDA for the next few months. The program was initiated for an environmental impact statement to address that particular question, what should be done with the spent fuel and the high-level nuclear waste.

Q Okay. And did you have any involvement with this environmental impact statement?

A Yes. I was following it very closely, visiting with personnel in the Department of Energy. I – I attended all of the public meetings in the development of that environmental impact statement.

Q And –

A And followed it very closely.

Q Okay. And what – do you recall when it was finalized or issued?

A It was finalized, I believe, in 1978 or '79. I am not sure just what the date was when that was completed.

Q And what was the result of that EIS?

A That EIS had evaluated nine different



options of how to dispose of spent fuel and high-level waste.

Q Okay.

A And the recommendation that came down through that environment impact statement was that it should go in deep underground geologic repositories.

Q Do you recall other options that were considered in that EIS?

A Yes. There were a number of options. Deep seabed disposal. Even one of the options was considered shooting it off into space. Deep well disposal. There were other options there. I cannot relate all nine of them at this point.

Q Okay. Can you summarize at all the basis for the recommendation of geologic disposal?

A The purpose here was to isolate these wastes – nuclear radioactive waste for an extended period of time and the – and to do it in a controlled manner.

And the apparent – the apparent ability to do that or the ability, as we saw it or they saw it at that time to do it, was in stable geologic formations and to do so in deep underground stable geologic formations.

Q Apart from the N3 processing, was there

A 4

Page 281

another development or other developments during this period that focused attention on the problems that nuclear facilities were having with spent nuclear fuel?

A Well, there were other problems at that particular time. The one that became most vivid was the Three Mile Island accident which occurred in March of 1979 which made nuclear energy a very vivid concern in many quarters.

Q All right. Now, during the – this period preceding the Nuclear Waste Policy Act, did you visit with ERDA, the Department of Energy officials about these fuel cycle matters, spent fuel disposition matters?

A Yes. During – excuse me. During the time that the – excuse me again. During the time that the environmental impact statement was being developed, Department of Energy also had a program going forward looking at the various choices, and there were staff people working on that particular issue in addition to working on the environmental impact statement. And, yes, I had many conversations with these individuals during that period of time.

Q This is at the Department of Energy?

A That is correct.

Page 282

Q Okay. And what was the focus of that effort, that staff effort?

A To identify where there were geologic – actually, geologic deposits, salt, rock, duff, where were these locations that might serve as a disposal area for spent fuel.

Q Okay. And was – what happened next in terms of the development of what became a Nuclear Waste Policy Act? We have the EIS. We have the staff effort going on at DOE. What –

A Well, at the end of the preparation of the EIS, the Department of Energy felt that they had authority to proceed.

MR. MILLER: Objection, Your Honor. Foundation as to, you know, what the Department of Energy felt they had the foundation for. He can't speak for DOE here, Your Honor.

MR. STOUCK: He can speak to what DOE officials told him. So why don't you tell us that.

MR. MILLER: That's hearsay, Your Honor.

PRESIDING JUDGE: He can express his view of what the policy was at that time.

THE WITNESS: Through conversations, my own personal conversations with employees of the Department of Energy –

Page 283

MR. MILLER: Same objection, Your Honor, as to hearsay matters.

MR. STOUCK: The testimony is his understanding, I think.

PRESIDING JUDGE: That's right. You're asking for his understanding –

MR. STOUCK: Yes.

PRESIDING JUDGE: – of what the –

MR. STOUCK: I thought – if I didn't ask that, that's what I meant to get at.

BY MR. STOUCK:

Q So what was your understanding of what happened next after the EIS and the staff –

A My understanding was that, once the decision was made to go with geologic repositories, a mechanism needed to be put in place that would make sure that that was the national policy. And this was – I participated in discussions on this with the industry, utility individuals and others in the government. And the consensus came down that we really should try to seek legislation to codify this particular requirement.

Q Okay. And how did that legislation develop?

A Over a – it really developed over a period of about 4 years, starting at the completion of the

Page 284

EIS.

And it was – here I can say because I was participating at the time of the Department of Energy was suggesting to the Congress and we, as the utilities, were also suggesting to the Congress and to various committees and were testifying to the fact that we believed it appropriate to have a nuclear waste policy established.

This was developed in the period of 1979 and 1980. And, in fact, the question was related to the disposal of all radioactive waste from commercial facilities. High-level waste, low-level waste. There were to be no orphan wastes. And that legislation that was drafted during 1980 was brought and actually a portion of it was passed by Congress in December of 1980.

MR. MILLER: Objection, Your Honor. Relevance.

PRESIDING JUDGE: I'll overrule the objection. You may continue.

MR. STOUCK: Thank you.

THE WITNESS: The – the Nuclear Waste Policy Act, as drafted in 1980, did not make it all the way through Congress.

What happened at the last – near the end of

A 5

the session in 1980, there were objections to including the disposal of high-level waste in that particular legislation. So that the legislation that was passed in 1980 was the low-level waste Policy Act. That did not complete the story that we were attempting to do, and that is to have we, the utilities, and the industry –

MR. MILLER: Once again, Your Honor, we'd object to the witness' foundation. He's not competent to testify about the statute. The statute is what it is. And his interpretation of the statute is not competent to interpret the law or the NWPA in 1980 or this – this witness also is not competent to talk about the legislative history of any statutes regardless of whether he opines that they became the basis for the NWPA or not.

MR. STOUCK: He was involved in the industry at that time, Your Honor. It seems to me I can't think of what could be more relevant to the development of a contract than the need for it, the purpose of it, the origins of it. That's why we're here.

PRESIDING JUDGE: I don't think this is going to lead to any big problem that requires all these objections. This is almost a direct quote from



the 4th Circuit opinion and the early-on case dealing with the history of all of this development. I'm recognizing the whole steps as he goes through. So this has been found by Courts before. And I just overrule the objection.

You may go forward.

MR. MILLER: Your Honor, we'd enter a standing objection then to the witness' testimony in this regard.

BY MR. STOUCK:

Q Let me try to pick up the thread, Mr. Mills. You mentioned objections to high-level waste. Were those from utilities? Were those objections from utilities?

A No. Those were from – from other than the utilities. Again, this is what I was told.

MR. MILLER: Objection. Hearsay, Your Honor.

BY MR. STOUCK:

Q Any other – any other way you know that the defense – where were the objections coming from? I just want to go back – and we'll deal with the objection if we can't establish the nonhearsay basis for it. I think you said –

A It was the defense side of the Department of



Energy that objected to the high-level waste elements that were in that legislation.

Q You said that's what you were told. Is there any other way, conversations that you had that understanding?

A It was well known at that time. But I don't know what the other particular inputs would have been in that regard.

Q Okay. But in any event, the utility industry at that time was not objecting to dealing with high-level waste in the '80s statute?

A No. We were disappointed that it was not included in that particular legislation. And we continued to urge through testimonies that – I prepared many of the testimonies for utility officers, utility company office members to encourage Congress and several committees to continue to work on the legislation to address all of the nuclear waste issues that related to the civilian nuclear reactor program.

Q Did you have – during the course – well, what happened next? How did you get from that statute to what was eventually enacted?

A Through continual emphasis by various officers of electric utility companies with their members of Congress. We pushed for and carried the



message to Congress that this was needed. And eventually, we – they did – Congress did pass the Nuclear Waste Policy Act in December of 1982.

Q Now, did you, yourself, have any involvement in the development of the so-called 1-mill fee that was established by the statute.

A Yes. I was very interested in establishing that particular number

Q Okay. Tell us about that.

A In the conversations with the Department of Energy and with other members of the nuclear industry, it was understood that the cost, the probable cost – and this was a guesstimate at this time because it was a long-term program – could not be estimated over an easy great detail, that that particular cost was considered to be less than 1 mill per kilowatt hour. There were others that were advising Congress at the time – I was well aware of it – that were saying, no, this is not enough. It's just another subsidy by the federal government for the nuclear industry.

I personally had been responsible for arranging a study that would address the question of what the nuclear utilities would have to do and what it would cost if they were to store this spent fuel

A 6

for 100 years. I was well aware of what that estimate
would be. That estimate was close to the 1 mill per
kilowatt hour. Thus, I suggested and I encouraged our
members to support the concept that it be included as
1 mill per kilowatt hour in the legislation.
Q And did that gain acceptance in the
industry?
A Yes, it did.
Q Okay. Do you know why?
A There was considerable concern about what
was to be done with the spent fuel and how it was to
be paid for.
At that point, it appeared to the industry
to be an unfunded liability. And they did not have an
opportunity to include this unfunded liability in
their rate considerations.
This appeared to provide a mechanism to
address that unfunded liability. And it was
encouraged to achieve that – that was one of the
reasons it was encouraging to include that in that
legislation.
Q Was there any concern the amount was too
high?
A There were some people that thought the
amount was too high, yes. There were – there were a



number of the utility folks who thought that number
was higher than it should be.
But it appeared to be a reasonable number
and an understandable number. And we wanted no excuse
for the program to be delayed as a result of funds not
being available.
MR. STOUCK: All right. I would just like
to take a 1-minute break or 30-second break if I may,
Your Honor.
PRESIDING JUDGE: Sure.
MR. STOUCK: I want to turn to the first
exhibit, Your Honor, and I notice I do not have a book
for the witness, so if I may approach.
PRESIDING JUDGE: Sure.
BY MR. STOUCK:
Q Mr. Mills, if you would turn to tab 1 of
this book, I think you will find a copy of the Nuclear
Waste Policy Act. Do you see that?
A Yes, I do.
Q Okay. Would you please, on this version of
the statute, turn to page 51, which is – actually
it's kind of in the middle of section 302.
A Yes.
Q And the subsection I'm interested in is
302(a)(5)(B). It's about halfway down 51. (5)(B).



There is the provision which provides that the
contracts entered under this section shall provide
that, in return for the payment of fees – and I'm
paraphrasing – beginning not later than January 31,
1998, the Secretary will dispose of high-level
radioactive waste and spent nuclear fuel. Do you see
that?
A Yes, I do.
Q Okay. How does this date become a part of
the statute?
MR. MILLER: Your Honor, once again, I'm not
able to understand, one, the relevance of this. And
we would have to enter our continuing objection to the
witness testifying about the meaning of the statute.
The meaning of the statute is a parlance for the
Court. It's a legal question. And how it – besides
the fact that it's irrelevant as to how January 31st,
1998 became a part of the statute.
MR. STOUCK: Your Honor, there's only one
party in the courtroom that's been putting forth a
theory of what a reasonable schedule – pickup
schedule would be, and that's us.
And this will lead, along with lots of other
evidence that you're going to hear, to what a
reasonable schedule would be.



PRESIDING JUDGE: If the witness has
personal knowledge as to the origin of the date that
he could testify to, I will listen to the testimony.
If he has personal knowledge.
THE WITNESS: I do have personal knowledge
for establishing that particular date. Through my own
participation with the electric utilities and with the
staff in Congress that were drafting this particular
legislation.
MR. MILLER: Your Honor, I just ask once
again if you'll allow us to maintain a standing
objection.
PRESIDING JUDGE: Of course. Of course.
MR. MILLER: Thank you, Your Honor.
PRESIDING JUDGE: Sure.
BY MR. STOUCK:
Q Okay. And how did this date become part of
the statute?
A The anticipated time by my – by the utility
industry to achieve this particular task was 10 years
based on the experience that we had at that time.
Q Excuse me for interrupting. The task being?
A To achieve the location and operation – the
start operation of a nuclear waste repository.
There were other bodies that objected to

that time and thought it would take a lot longer. And this particular date was established as a compromise between the 10 years – remember this was 1982 – the 10 years being 1992 versus a longer time that was well beyond that. And the date of 1998 became an understood reasonable time frame for this to be achieved.

Q Who was advocating for the longer date?

A The anti-nuclear organizations.

Q And did the Department of Energy have a view about the length of time that would be needed to build a repository?

A Based on my interaction, my personal interaction –

MR. MILLER: Objection. Foundation, Your Honor.

PRESIDING JUDGE: If you have knowledge.

THE WITNESS: My personal exchange of information with individuals who are working on this program in the Department of Energy. They believed that it could have been done within 10 years. That was their position at that time as they stated to me.

PRESIDING JUDGE: Do you remember any particular individuals you dealt with.

THE WITNESS: There was a Frank Kaufman at



that point, a Wade Ballard. I believe Mike Lawrence also indicated it at that time. This was as the Nuclear Waste Policy Act was being developed.

BY MR. STOUCK:

Q Did Congress have a view about the date, Mr. Mills?

A Well, Congress –

MR. MILLER: Same objection, Your Honor. Foundation as to Congress' knowledge or view about the date.

MR. STOUCK: I'll withdraw that.

PRESIDING JUDGE: That's getting afar –

MR. STOUCK: I'll withdraw that one.

PRESIDING JUDGE: There are a number of congressmen involved.

MR. STOUCK: It's been a long day.

MR. LESTER: Your Honor, if I can interrupt, do we have a time we were going to break? We were going to break at 6:00. We're already after 6:00.

PRESIDING JUDGE: All right.

MR. STOUCK: Let me –

PRESIDING JUDGE: Pick an appropriate period of time you want to take a break on this, and we'll adjourn.

MR. STOUCK: I am getting a little tired



myself. It's been a long day. Let me look for a good place to break.

THE COURT: We're sort of running a sauna today. I talked to the maintenance people one, two, three times now, but I'll try again.

MR. STOUCK: Let me – I think I see a place coming up that would be a good place to break.

PRESIDING JUDGE: Okay.

MR. STOUCK: A few more minutes, Your Honor.

BY MR. STOUCK:

Q Mr. Mills, the '98 date was established by the statute, right?

A That is correct.

Q Okay. Now, at that time, when this statute was enacted, was there an understanding in the utility industry about the amount of on-site storage capacity that utilities would need between the time of the passage of the act and the '98 date?

A Yes. That was directly discussed within the utilities and myself that – and it was accepted as an understanding at that time that the utilities would be responsible for storage on site of all spent fuel. And they had to provide the capacity for storing that on site for all spent fuel up until that date of January 31, 1998.



Q Okay. And then what would happen?

A It was understood by the utilities at that time that they would not have any responsibility for costs, additional costs for additional facilities for storage of spent fuel beyond that date.

Q Did the Department of Energy share that understanding about the date?

MR. MILLER: Same objection, Your Honor. Foundation.

PRESIDING JUDGE: Well, if you bring out any particular individuals that you dealt with at Energy.

THE WITNESS: Yes. Frank Kaufman. I'm not sure who the Assistant Secretary of Energy was at that particular time. But I personally spoke to these individuals. And these were – that was identified as the understanding for why the utilities would be willing to pay the money up front, to make sure that the program was in place so that the costs after 1998 were taken care of.

BY MR. STOUCK:

Q You had discussions about the '98 date issue?

A Very definitely.

Q Did you have discussions on Capitol Hill about that issue?

A8

Page 297

A Yes, we did. I did.
Q Do you recall any specificity about those, the Capitol Hill discussions about the '98 date?
A Well, there were several committees on Capitol Hill. Both the environment and energy committees on the Senate side and the House side. And there were conversations going on on a regular basis with these staffs on many issues of the Nuclear Waste Policy Act. And that was one that was discussed. And I personally discussed it with several staff members.
Q Okay. Now, did the Nuclear Waste Policy Act set forth a schedule of deadlines for repository development? Do you recall?
A Yes, it did.
Q Okay.
MR. MILLER: Objection. Legal conclusion, Your Honor.
MR. STOUCK: It's a foundational question, actually. We're about to look at it, Your Honor.
PRESIDING JUDGE: I overrule it. He just talked about what the – what was in the statute itself.
MR. STOUCK: Right.
BY MR. STOUCK:
Q Now, take a look at page 9 of the same copy

Page 298

of the statute, if you will, Mr. Mills.
PRESIDING JUDGE: Page 9?
MR. STOUCK: Yes. Section 112.
THE WITNESS: Yes.
BY MR. STOUCK:
Q Do you see under 112(a), guidelines. Do you see that –
A Yes.
Q – at the top of the page.
A Yes.
Q And, again, I'll paraphrase because it's here in the document. But not later than 180 days after the date of enactment of this Act, following consultation with people and so forth, the Commission shall issue general guidelines for the recommendation of sites for repositories. Do you see that?
A Yes.
Q Okay. And then under (b), just these are examples, I'm just – to set up a question I want to ask you about these. Subsequent to such nominations, the Secretary shall recommend to the President three of the nominated sites not later than January 1, 1995 for characterization as candidate sites.
A Yes, I see that.
Q And (c), again another example, not later –

Page 299

one of these deadlines. Not later than July 1, 1989, the Secretary shall nominate five sites and recommend – and make recommendations for the development of those sites and so forth.
A Yes. I see that.
Q Okay. Now, with respect to those statutory deadlines, what was the purpose of those? What was your understanding about the purpose of those deadlines?
A I had conversations on these particular aspects of the legislation. And the purpose of those particular dates was to verify that the program would go forward on a robust basis to achieve what was being called for in the legislation.
MR. STOUCK: If it's okay with the Court, why don't we stop here.
PRESIDING JUDGE: Okay. We'll adjourn at this point and reconvene at 10:00 a.m. tomorrow morning.
MR. STOUCK: Thank you, Your Honor.
(Whereupon, at 6:10 p.m., the hearing was adjourned, to be reconvened at 10 a.m. on Tuesday, July 13, 2004.)

Page 300

C O N T E N T S

WITNESS DIRECT CROSS REDIRECT RECROSS
LORING MILLS 263

AFTERNOON SESSION: 165

E X H I B I T S

EXHIBIT NO. MARKED RECEIVED
PX-17 54
PX-23 59
PX-88 60
PX-124 61
PX-127 63
PX-633 72
PX-678 79
PX-683 79
PX-793 80
PX-856 82
PX-870 83
PX-873 89
PX-899 86
PX-951 88
PX-971 91
PX-1053 91
PX-1069 91

A 9

# CONDENSED TRANSCRIPT & WORD INDEX

## DEPOSITION OF CHRIS WARNER

## PG & E VS. UNITED STATES

## AUGUST 3, 2005

BARKLEY
Court Reporters

(310) 207.8000 Los Angeles
(949) 955.0400 Orange County
(415) 433.5777 San Francisco
(916) 922.5777 Sacramento
(408) 885.0550 San Jose
(951) 686.0606 Inland Empire
(818) 702.0202 San Fernando Valley
(858) 455.5444 San Diego
(760) 322.2240 Palm Springs

utilities?
A. No. My boss was the ranking member, Jim Broyhill. And I guess it would be fair to say I was working on behalf of the republican members of the committee.
Q. All right. You said that the electric industry supported your bill; is that right?
A. Yes. I mean, in the general sense that you had ANEC and EEI supporting the passage through the Energy and Commerce Committee of the Broyhill Bill and then ultimately supporting vigorously the Udall/Broyhill Bill on the House floor.
Q. And did the electric industry support the final bill that was ultimately voted on and approved by the House and Senate?
A. Yes.
Q. You used a phrase which just hit me and I want an explanation of what you meant.
You said in connection with the 1 mill/kwh -- and that's 1 m-i-l slash kwh, that's how it's spelled out.
A. I think two L's.
Q. Two L's? Sorry. You're right.
MR. STOUCK: Is it two L's?
THE WITNESS: (Witness nodding head.)

Page 81

BY MR. EKMAN:
Q. You mentioned something called "statutory contract terms."
A. I did not mean to draw a legal conclusion, but -- and again, I'm sure you're familiar with the language in the statute, but the statute has the phrasing of in return for payment of the 1 mill/kwh fee, the government shall do X, Y, and Z by a date certain.
And I can tell you as one who drafted -- in my memory, as I drafted that language, I am sure that in any legislative -- there would be no history of me drafting the language, first of all, and second of all, since it was a joint staff effort of three or four staffers, I think everyone could take credit for it.
But certainly the -- in my opinion, the legislative purpose of the Nuclear Waste Policy Act, including that provision, was to ensure that in return for the utilities and their customers funding full costs -- providing for full-cost recovery of the program, the Federal government undertook to provide certain specific services by certain specific dates.
Q. All right. And you say you're not

Page 82

providing a legal conclusion, but you were serving as a lawyer at this time during the drafting process; is that right?
A. My title was associate minority counsel. I can't -- similar to other types of functions, I can't tell you in a legal sense how the lawyer's role as counsel to a House committee or Senate committee for that matter jives directly with being lawyer versus being drafter or being advisor to a legislator.
Q. There was certainly a legal component?
A. Yes. I mean, the drafting was legal drafting.
Q. You understand -- or do you understand that the Nuclear Waste Policy Act is not itself executing?
A. If what you mean in a sense is that it authorized and required the executive branch to do certain things, yes.
Q. And by "do certain things," one of those things was to authorize the Secretary of Energy to enter into contracts with nuclear reactors?
A. Yes, in accordance with the terms of the statute.
Q. Right. And then circling back on the

Page 83

statutory contract terms, you understand that -- was one of the terms that was required by the Nuclear Waste Policy Act the 1 mill/kwh fee?
A. Yes.
Q. And was one of the terms that was required by the Nuclear Waste Policy Act the January 31, 1998 date of acceptance?
A. Yes.
Q. Can you tell me, do you know who picked the January 31, 1998 date?
A. This really goes back to refreshing my memory. I can't tell you exactly why we picked January 31st, 1998. I can tell you that picking a date was intentional. I would have to say that at that time my recollection is that various schedules were floating around that backed up from a particular date and certain people would say -- would say, "We want a date of 'X' for final acceptance of waste to repository," and other people would say, "We want a date of 'Y'."
And there was various testimony. I'm sure it's in the legislative history of where people said, "Here's the schedule we believe we could follow." And it keyed off of activities to implement the act or the legislation that were the

Page 84

execution of the program, and in particular, deadlines for characterization.

I believe if you go back to the Nuclear Waste Policy Act, before it was amended in 1987, there were other deadlines in the act with regard to beginning with a set of states to be selected for further characterization of repository; narrowing down those states, those sites to maybe two or three; and then the Secretary of Energy, by a date certain, picking a site.

That all got overtaken in the '87 amendments, but there were other deadlines. And I think the January 31st '98 date was intended to be consistent with the other deadlines and with the idea that there would be a date certain for actually the government delivering services under the program.

Q. Did you have any involvement in the '87 amendments?

A. No. I mean, I was at FERC at the time. I was aware of the amendments. I had no formal involvement. I certainly retained friends and associates on the Energy and Commerce Committee as well as on the Senate Energy Committee and I suspect I would have talked informally with them,



but I had no formal role in the '87 amendments.

Q. Do you have any recollection of what the Department of Energy's position was on the January 31, 1998 date?

A. I don't think they ever took a position, if I recall. I think true to form, in terms of complex legislation, oftentimes an executive branch department has more of the broad goals in mind for getting legislation and to the extent there's uncertainty over it, there's even a majority in favor of legislation, the department will generally defer to the legislative drafters on the specifics. In that case, I recall the Department of Energy did not actively participate in any drafting.

Q. And ultimately the date of acceptance as well as the 1 mill fee were statutory terms that were imposed upon the ultimate contract --

A. Yes.

Q. -- that was entered into between DOE and the utilities?

A. Yes.

Q. In 1981 to '83, when you were picking a date for DOE performance, did you actually think DOE could begin waste acceptance by that date?

A. I have to tell you that I think there was



a certain controversy among members that I was representing on that being too late, that one of the key issues was reactors running out of on-site storage and had the potential to run out of that storage before '98. And so there was a lot of anxiety and ultimately compromise over that language of the deadlines.

Q. When you drafted that -- and I say "you" as one of the chief drafters of the act, did you have an understanding that that date, once entered into a contract, would ultimately, if not met, would be a trigger for liability?

A. You're asking me for a legal conclusion and so I want to be careful. I can tell you as a policy intent in terms of what the government would be obligated to do, that was the intent.

I mean, part of it is that in -- the in-return-for language was drafted in -- to sound in contract in terms of obligations and exchange because of the fact that this was one of the first and more unique self-funded programs in the history of the Federal government considering the size of the program, considering the projections on the amount of dollars that were going to be collected in the 1 mill/kwh feet -- that particular provision



was very vital, in our opinion, to ensuring that utilities and their customers did not just simply send money to the government as a tax, but the government was going to adhere to certain contractual and statutory obligations.

Q. All right. And just going forward, I do have more questions about this I'm going to ask. When I'm asking for any legal issues, I'm not intending to ask you about legal advice you may have provided since being employed by PG&E.

A. I understand.

Q. I'm asking you for legal conclusions, to the extent that's what I'm seeking, during the relative time period, which would be prior to the --

A. Yes.

Q. You stated in your answer that -- you identified two key goals of the legislation. The first one is that no reactor would have to shut down because of space limitations?

A. Yes.

Q. And then the second one was that utilities would not incur additional storage cost, at-reactor storage costs associated with the storage of spent nuclear fuel?

conceded -- actually, in a statutory sense assuming responsibility and one of the other issues in the legislative debate that was also important was transfer of title to the waste because at one point in the debates over the years the issue was the Federal government doesn't want to accept title to civilian nuclear waste. Having this legislation actually require the Federal government to take title as soon as possible was a very large goal of utilities and their customers.

And then, finally, No. -- well, you have No. 3 in the Purposes, which is, again, the state's rights issue. And No. 4 was also the full-cost recovery tradeoff.

Q. There is -- and you did make a caveat, and then you just thumbed through this, obviously, during your answer. I do want you -- in essence, if you need to read this, please read it to refresh your recollection.

MR. STOUCK: The whole thing?

BY MR. EKMAN:

Q. No, the Purposes and Findings. And if there's another section I'm missing that is responsive to my question that you recall, you can let me know. Obviously, I can't change the act



sitting here in a deposition. It says what it says.

A. I can tell you without going through the act that as a drafter of it the purposes and the policies and the intentions are not merely embodied in the Findings and Purposes section, but they are part of the entire act.

You have to look at the entire act. And we've already discussed the statutory contractual language provisions. And in my opinion, those are very much a statement of the intentions of Congress with regard to the obligation of the Federal government to take and to fulfill its obligations on a very strict deadline.

Q. And I would agree with you on that point, which leads me to question: Is there a statutory contract term, as you've used that phrase, in the Standard Contract that requires the Standard Contract to retain a provision that states that no reactor is to be forced to shut down based upon this accumulation of spent nuclear fuel in its pools?

A. I think it's embodied in the overall intent of the legislation, including the choice dates, such as the 1998 date.



Q. I'm not going to mark this either because its lengthy and we all know what it is. Have you ever looked at the Standard Contract?

A. Yes.

Q. Can you tell me, is there a term in that contract that goes to that first key goal of legislation and requires acceptance in a manner that would preclude reactor shutdown based upon storage concerns?

A. I think the Article II, Scope says it very well, because that's the embodiment of the January 31st, 1998 date; and that is:

"The service is to be provided by DEO shall begin not later than January 31st, 1998 and shall continue until such time as all SNF and/or HLW from the civilian nuclear power reactor specified in Appendix A has been disposed of."

Q. And that's the key negotiation that goes to key goal number one that you identified, the no reactor shutdown?

A. I think it goes to the goals of no reactor shutdown, no further accumulation of spent fuel at additional cost to the utilities, and you know,



again, I would basically say that you look at this Scope and you look at the cost recovery provisions of the contract and they both hearken back to the same provisions of the statute that basically say, "In return for full cost recovery where utility customers will pay for this program in full; the Federal government, by a date certain, will take title and accept spent fuel and high-level waste."

Q. How much fuel was the Federal government required to take by a date certain?

A. Well, you're asking me under the statute or under the contract?

Q. Let's start with the statute?

A. I think there was an initial -- going back to my recollection, there was an initial sealing on the amount of metric tons to be stored at a repository.

Q. So there's an aggregate limit?

A. Yeah, I think there may be an aggregate limit.

Q. Does that aggregate limit get accepted on January 31st, 1998 or over a period of time?

A. I think the intent of Congress and certainly based on my knowledge of the legislation was the intent was that DOE, as expeditiously as

possible, no later than January 31st, 1998 take title and accept the spent fuel.

Obviously, there are practicalities involved in how fast you take title, how fast you transport, how fast you go forward in a practical sense. But the statute was very clear in providing a very broad, in my opinion, obligation on the part of DOE to meet a deadline.

And I know -- I certainly wasn't privy to these discussions in my DOE role and I suppose ultimately you may ask me about what PG&E's views were, but I do know that there were -- there was a lot of testimony and a lot of material put on the record during the legislation and during the initial implementation regarding the ability of DOE to accept spent fuel on a schedule that indicated that no utility would basically suffer or shut down, no utility would need to create what the environmentalists called little localized nuclear waste dumps through dry cast storage or through other means and that the 1998 date was a very reasonable date given that it was 15 years after enactment of the legislation and the legislation itself had gone through a vetting process in Congress where the various interim deadlines were



considered to be reasonable.

Q. And you would agree -- and again, you pointed me to parts that you believe embody these goals. You would agree there is no express statement in the Nuclear Waste Policy Act that relates to, for instance, the shutdown issue that you provided?

A. I believe the 1998 date is an express provision that governs and has behind it the avoidance of shutdown, the avoidance of creating a whole bunch of localized nuclear waste dumps through new at-reactor utility facilities.

Remember, one of the other key controversies was whether the Federal government was going to create at-reactor storage facilities. And that was a very key controversy in the legislative debate and Moe Udall and others basically said, "We don't need at-reactor storage because we're going to have a Federal repository program and it's better for the environment and better for the public if we have centralized disposal in one repository. And these dates are reasonable. These dates will lead to the Federal government, on a timely basis, accepting spent fuel from all the utilities."



Q. At the time the Nuclear Waste Policy Act was enacted in 1983, did all then operating utilities have sufficient capacity in their wet pools to survive through to 1998 without any capacity additions?

A. I'm not sure they all did. I think there may have been some that were running out prior to '98. I think there were some that were going to be perhaps needing to rerack.

I think that they're -- and again, subject to recollection and checking, I think at that time there were some utilities -- I don't think dry cast storage technology had yet -- I'm not an expert -- had surfaced.

There were some utilities that were threatening to try and ship spent fuel from reactor to reactor in kind of exchanges among reactors. There were utilities that were lobbying for Federal at-reactor storage facilities and the dominant debate over away-from-reactor storage facilities or at-reactor storage facilities was that leaders in the environmental community, including Moe Udall, said, "We don't want a whole bunch of localized nuclear waste dumps around the country, with or without the Federal government in charge."



"What we do want is a centralized repository. This schedule is reasonable. The Federal government can take spent fuel by this date and ensure that, no, we don't create those localized dumps and that we have no reactors shutting down."

Q. And when you say "localized dumps," does continued wet storage constitute a localized dump?

A. No. I think what people were worried about is that utilities or the Federal government or both would start to develop regional spent fuel storage facilities that didn't provide the incentive for the Federal government to have centralized storage and disposal.

Q. Now, one of the other key goals you talked about is this no additional at-reactor storage cost after a certain date?

A. Yes.

Q. What date?

A. Again, the January 31st '98 date, in my opinion, was a compromise between those who wanted the Federal government to take title as quickly as possible, which could have been immediately, including those who wanted the Federal government to have a role away-from-reactor storage that might

be more temporary or to even take title right at the nuclear power plant sites and those that wanted more of a centralized repository by a date certain.
And the compromise was the '98 date was considered reasonable for the Federal government to do a centralized repository storage and disposal.
Q. So the utilities, then, would have to -- to the extent there were additional costs prior to 1998 would be obligated to pay for those additional costs?
A. Yes, although I can't really address the hypothetical that if a utility had, before January 31st '98, run into a crisis where it might have had to shut down its reactor because it lacked on-site storage capacity and whether the Federal government, under the rubric of this program, which really put the Federal government in a statutory legal responsibility form day one, then the Federal government may have been able to and may have actually intended to try to also deal with any near term problems between the date of enactment and January 31st, 1998.
Q. Do you know if that was a statutory contract term that was imposed on the Standard Contract by the Nuclear Waste Policy Act?

Page 105

A. I don't know if it was. I think it goes to the overall comprehensiveness of the legislation.
Q. Can you point me to a provision, either in the Findings and Purposes, or elsewhere in the Nuclear Waste Policy Act that expressly states that the goal of the Nuclear Waste Policy Act is that utilities will not have to incur additional at-reactor storage costs after January 31, 1998?
A. I think it's embodied in the contract language as well as the accumulation language that I mentioned.
Q. Is that express language contained anywhere in the Standard Contract; do you know?
A. Well, the Standard Contract has the '98 date, as you know, and it also has the full-cost recovery provision and it has the take-title provision.
So I think those items in the -- I think in Article II of the Scope with the '98 date. And then I think the, again, unique, first-of-its-kind comprehensive full-cost recovery divisions embody the in-return-for language from the statute.
Q. Let me ask this: Did you ever, in drafting this, write express language on any of

Page 106

these key goals; that is either the shutdown reactor or this no additional at-reactor storage, was that express language ever in any of the drafts of the bill that you wrote?
A. I can't recollect.
Q. You would agree that certainly that language, express language could have been included in the Nuclear Waste Policy Act?
A. It could have been. I think it is in what I said about in return for the fee we're going to take the waste by a date certain. Again, subject to check, I'd have to go back as you would, to go back through the legislative history, look at the forms of the bills, look at the testimony before the committees, look at the floor debate, but subject to checking on all that, I think that the intent of the legislation embodied in the full-cost recovery in-return-for date certain acceptance of spent fuel embodies not only the avoid shutdown goal, but also the avoid additional costs besides the 1 mill/kwh fee.
Q. But you would agree that you could have? I understand you're tying it all together, but you would agree you could have written that expressly?
A. You could have, would have put any

Page 107

language in here, yes.
Q. You could have made it crystal clear if that had been written; is that a fair statement?
A. Yes, but getting back to the contractual language that is in there, that contractual language is pretty crystal clear.
Q. Where in the contract does it say that under the contract, utilities will not be responsible for the cost of additional at-reactor storage after January 31, 1998?
A. Well, I think there's just the normal contractual interpretation here, which is that if DOE does not comply with its obligation in return for the fees paid, there would be breached damages.
Q. And that's implied because of the contract?
A. Well, not just implied, expressed.
Q. Expressed. All right. Let me take you back to the Findings and Purpose section?
A. Okay.
Q. You cited under Findings, subsection five for this tradeoff that you talked about, the 1 mill/kwh fee that the utilities agreed to.
Do you recall that?
A. Yes. I think really it's 5 and then No. 4

Page 108

and the Purposes.

Q. And I'll agree that No. 4 certainly deals with the nuclear waste fund. But No. 5 -- and I want to read it into the record and then get a different explanation.

It says:

"The generators and owners of high-level radioactive waste and spent nuclear fuel have the primary responsibility to provide for and the responsibility to pay the cost of the interim storage of such waste and spent fuel until such waste and spent fuel is accepted by the Secretary of Energy in accordance with the provisions of this chapter."

Did I read that correctly?

A. Yes.

Q. That seems to say to me not that this is a tradeoff for the 1 mill/kwh fee for the full-cost recovery of the program, but rather that up until the Department of Energy accepts the spent nuclear fuel, the utilities have the obligation to pay the cost associated with the storage of that fuel.



Now, if that's wrong, as one of the chief drafters of this legislation, please tell me why my interpretation of that language is incorrect?

A. No, I think you're right to this extent. The statute set the January 31st, 1998 date and as I mentioned, for better or for worse.

Some interested parties would have liked the date to be earlier; some interested parties would have liked the date to have been later. Obviously, we compromised. The January 31st date is in the statute. Just as, obviously, up until the time that DOE fulfills its obligations under the statute, the utilities are going to be responsible for they're own on-site storage.

This, I think -- I'd have to basically concede to you that this provision would have been cited legally as a bar to DOE accepting spent fuel outside of the program and the statute on its own before January 31st '98. But remember, January 31st '98 was a deadline. It was not the earliest DOE could begin accepting, it was the latest DOE could begin accepting.

The whole idea was utilities were responsible until DOE fulfills its program obligations, its contractual obligations, and those



obligations are by no later than January 31 '98.

Q. There is no contractual obligation that said before January 31, '98?

A. No, no contractual obligation before, but there certainly was an expectation that that was the latest and DOE could potentially accept spent fuel and take title before that date.

Q. And if you would go to the Standard Contract and Article II Scope says:

"The services to be provided by DOE under this contract shall begin, after commencement of facility operations, not later than January 31, 1998 and shall continue until such time as all SNF and/or HLW from the civilian nuclear power reactors," dot, dot, dot "has been disposed of."

Do you see that?

A. Yes.

Q. So is it your understanding that under this contract DOE wasn't supposed to accept everybody's waste by January 31, but rather it was to begin the process of waste acceptance from utilities beginning on that date?



A. No, I think that provision could be interpreted to require DOE, within the realm of what's possible, to accept everyone's waste beginning January 31st, 1998.

And by the realm of possible, I mean if it's feasible to begin accepting waste from everybody under a reasonable schedule, including the take-title provision, they could do so.

Q. When you say "reasonable schedule," do you understand there is a schedule of waste acceptance -- for waste acceptance from utilities in the Standard Contract?

MR. STOUCK: Objection; form. It's vague.

THE WITNESS: I'm not sure what you're saying, because the '98 date is in the contract and it's a hard date.

BY MR. EKMAN:

Q. It's a commencement date.

A. It's a date for accepting spent fuel from utilities.

Q. I want to make sure I understand --

A. It doesn't say commencement. It says shall begin accepting spent fuel no later than January 31st, 1998.

Q. And shall continue to accept spent fuel,