No. 04-0074C
into which has been consolidated
No. 04-0075C
Judge Hewitt

(Filed Electronically, May 15, 2006)

---

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---

PACIFIC GAS & ELECTRIC COMPANY,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

---

PACIFIC GAS & ELECTRIC'S OPPOSITION TO THE GOVERNMENT'S MOTION *IN LIMINE* TO EXCLUDE CERTAIN EXPERT TESTIMONY AT TRIAL

---

JERRY STOUCK
Greenberg Traurig, LLP
800 Connecticut Avenue, NW
Suite 500
Washington, DC 20006
(202) 331-3173 phone
(202) 261-4751 fax
*Counsel for Plaintiff*
Pacific Gas & Electric Company

Of Counsel:
ROBERT L. SHAPIRO
Greenberg Traurig, LLP

TABLE OF CONTENTS

I. MR. GRAVES IS WELL QUALIFIED AND WILL PRESENT SUPPORTABLE TESTIMONY CONCERNING THE RATE OF ACCEPTANCE....................................2

A. Mr. Graves Is Well Qualified to Testify About The Reasonable Rate Of Acceptance3

B. Because Mr. Graves's Methodology Is Reasonable And Based On Valid Data, It Is Reliable And, Thus, Should Be Considered By The Court .......................................4

II. THE GOVERNMENT'S OBJECTIONS TO MR. GRAVES'S MODEL OF EXCHANGES ARE EQUALLY WITHOUT MERIT ......................................................6

A. Mr. Graves's Model Is Fundamentally Sound, And Is Based On Proven Data..........8

1. The Government Cannot Exclude Mr. Graves's Model On the Grounds That It Is Not Based On "Real World" Experience .............................................8

2. Mr. Graves Relies On Facts In The Record – Not Mere Speculation.................11

B. Mr. Graves Properly Tested His Analysis Against Various Countervailing Factors14

III. THAT PG&E'S MOTIONS TO EXCLUDE GOVERNMENT EXPERTS SHOULD BE GRANTED PROVIDES NO BASIS FOR EXCLUDING PG&E'S EXPERT WITNESSES, WHOSE OPINIONS ARE RELIABLE AND WELL-FOUNDED. .........17

A. Professor Cornell's Testimony is Admissible.........................................................17

B. Ivan Stuart's and Michael Meisner's Testimony is Admissible ...............................19

IV. CONCLUSION..........................................................................................................20

# INDEX TO APPENDICES

Deposition Transcript of Warren K. Brewer February 23, 2006 .......................................... A1-3

Deposition Transcript of Warren K. Brewer February 23, 2006 ..........................................A4-16

Expert Witness Report of Frank C. Graves And Appendices......................................Appendix B

Rebuttal Report of Frank C. Graves And Appendices.................................................Appendix C

PG&E Exhibit 147 .........................................................................................................Appendix D

TABLE OF AUTHORITIES

FEDERAL CASES

*Ace Federal Reporters, Inc. v. Barram,* 226 F.3d 1329 (Fed. Cir. 2000)......................9,10

*Commonwealth Edison Co. v. United States*, 56 Fed. Cl. 652 (2003)................................3

*Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993).............................................9

*Energy Capital Corp. v. United States*, 302 F.3d 1314 (Fed. Cir. 2002)..........................10

*Fifth Third Bank of Western Ohio v. United States,* 55 Fed. Cl. 223 (2003).....................10

*Indiana Michigan Power Co. v. United States*, 57 Fed. Cl. 88 (2003)...............................3

*Kumho Tire Co. v. Carmichael,* 526 U.S. 137 (1999) .......................................................9

*Lippe v. Bairnco Corp.*, 288 B.R. 678 (S.D.N.Y. 2003)..................................................19

*Locke v. United States,* 283 F.2d 521 (Ct. Cl. 1960) .................................................10, 11

*Micro Chemical, Inc. v. Lextron, Inc.*, 317 F.3d 1387 (Fed. Cir. 2003)...........................14

*S. Nat'l Corp. v. United States*, 57 Fed. Cl. 294 (2003) ............................................10, 11

*Sacramento Municipal Util. Dist. v. United States,* No. 98-488C (2006) .........................18

*Tennessee Valley Authority v. United States*, 69 Fed. Cl. 515 (2006)..............................18

*Westfed Holdings, Inc. v. United States,* 55 Fed. Cl. 544 (2003) .....................................12

*Yankee Atomic v. United States*, 2004 WL 1535686, No. 98-126C (Fed. Cl. June 28, 2004).............................................................................................*Passim*

FEDERAL RULES

Fed. R. Evid. 401 ...............................................................................................................9

Fed. R. Evid. 702 ......................................................................................................9, 14,19

Fed. R. Evid. 703 .............................................................................................................12

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

Filed Electronically on May 15, 2006

| | |
|---|---|
| PACIFIC GAS & ELECTRIC COMPANY, Plaintiff, v. UNITED STATES OF AMERICA, Defendant. | No. 04-074C, into which has been consolidated No. 04-075C (Judge Hewitt) |

**PACIFIC GAS & ELECTRIC'S OPPOSITION TO THE GOVERNMENT'S MOTION *IN LIMINE* TO EXCLUDE CERTAIN EXPERT TESTIMONY AT TRIAL**

The government moves to preclude PG&E from presenting evidence from one of its experts, Frank Graves. The government's motion is nothing more than a dressed up and slightly modified version of its motion *in limine* filed in *Yankee Atomic Elec. Co. v. United States*, No. 98-126C (Fed. Cl.), in which the government also sought to exclude similar testimony by Mr. Graves; that motion was soundly rejected by Judge Merow. 2004 WL 1535686 (Fed. Cl. June 28, 2004). For the reasons expressed by Judge Merow in that case, as well for the additional reasons provided below, this Court should reject the government's renewed attempt to block useful, credible and relevant expert testimony from being admitted at trial.

The government also moves, "as a protective matter," to exclude the testimony of PG&E's other expert witnesses, Brad Cornell, Ivan Stuart and Michael Meisner, "to the extent that the Court agrees with PG&E's contentions raised in its motions *in limine* filed against all of the Government's expert witnesses." Government's Motion *in Limine* to Exclude Certain Expert Testimony at Trial ("Govt. Mot.") at 1. The defects in the proposed testimony of the government's expert witnesses are not present with respect to PG&E's expert witnesses.

Additionally, the bases upon which PG&E's expert witnesses rely to formulate their opinions are, in large measure, different from and wholly unconnected to those of the government's expert witnesses. Thus, the Court should reject the government's "what's good for the goose is good for the gander" gambit. Each expert witnesses stands or falls on his own merit. Moreover, the government's request here is not even appropriate for a motion *in limine*. Either the government requests the Court to exclude these expert witnesses or it does not. The government cannot have it both ways.

## I. MR. GRAVES IS WELL QUALIFIED AND WILL PRESENT SUPPORTABLE TESTIMONY CONCERNING THE RATE OF ACCEPTANCE

Mr. Graves provides an economic analysis of what a reasonable rate of acceptance would have been in order for DOE to have had complied with its obligations under the Nuclear Waste Policy Act ("NWPA") and the contract it had entered into with PG&E in 1983. This issue of what is a reasonable rate of acceptance is one of the most crucial issues in dispute in this case. Not only is Mr. Graves competent and well qualified to provide such an economic analysis, he is the *only* witness who will testify at trial about this issue. The government does not even take a position as to what a reasonable rate is or could have been. For the government to argue that Mr. Graves's testimony is irrelevant or somehow does not concern a fundamental issue in this case is completely without merit.

Likewise, the government's claims that Mr. Graves's testimony is unreliable and/or irrelevant also miss the mark. Mr. Graves's testimony is supported by underlying data and other evidence which will be explained at trial. His testimony is based on supportable data and valid assumptions regarding the non-breach world.

A. Mr. Graves Is Well Qualified To Testify About The Reasonable Rate Of Acceptance

The government's weak hand is laid bare at the very outset of its brief when it asserts that Mr. Graves "is not qualified to testify as an expert concerning the pace . . . on which DOE would have and should have been accepting PG&E's spent nuclear fuel . . . under the parties' contract" and his testimony has no connection to any fundamental issues in dispute in this case. Govt. Motion at 16 (internal quotes omitted). To the contrary, Mr. Graves is highly qualified to provide the economic analysis that supports his opinions, and he has substantial experience in the electric utility industry.

Moreover, the determination of a reasonable rate of acceptance is central to this case. As noted by Judge Merow in *Yankee Atomic*, Mr. Graves's testimony is critical because "[t]he government's argument that it was obliged to pick up only a minimum amount of fuel, or only fuel for which there was an approved delivery commitment has been rejected." *Yankee Atomic*, 2004 WL 1535686 at *1 (citing *Commonwealth Edison Co. v. United States*, 56 Fed. Cl. 652, 663 (2003); *Indiana Michigan Power Co. v. United States*, 57 Fed. Cl. 88, 97-98 (2003)). In other words, Mr. Graves's testimony is necessary to provide the Court with some parameters as to what rate of acceptance should have been provided absent the breach.

As detailed in Mr. Graves's initial expert report, Mr. Graves is well qualified to provide an economic analysis of the non-breach (i.e. the "but for") world related to spent nuclear fuel. Expert Witness Report of Frank C. Graves ("Expert Report") at 2, App. B2. Mr. Graves has over 20 years experience in assisting utilities in the design and implementation of long-range planning, investment and operating policies, including market design and performance evaluations, capacity expansion and network modeling, estimation of incremental costs, price forecasting, financial simulation and valuation assessments. *Id*. Indeed, Mr. Graves was

qualified as an expert witness in *Yankee Atomic* by Judge Merow on the same topics as those being covered here – rate of acceptance and exchange market modeling. 2004 WL 1535686 at *7.

The government raises a red herring when it asserts that Mr. Graves is unqualified because he is not testifying concerning DOE's specific performance obligations under the Standard Contract. Govt. Mot. at 16. Mr. Graves is not a contract expert. PG&E need not and does not intend to establish precisely how much spent fuel DOE would have removed from utilities each year starting in 1998 or exactly the order in which DOE would accept such waste. Rather, Mr. Graves provides an economic analysis of what a reasonable rate of acceptance of spent nuclear fuel ("SNF") would have been had DOE complied with its obligation to begin acceptance of SNF by 1998. Mr. Graves's testimony will demonstrate that there is a rate of acceptance that is consistent with one of the primary goals of the NWPA; namely that, beginning in 1998, no utility would have to incur avoidable at-reactor spent fuel storage costs. As such, Mr. Graves's testimony is both relevant and helpful to the Court.

B. Because Mr. Graves's Methodology Is Reasonable And Based On Valid Data, It Is Reliable And, Thus, Should Be Considered By The Court

In one sweeping and conclusory paragraph, the government charges that Mr. Graves's methodology in connection with the reasonableness of his projected rate of acceptance is "unreliable" because "simple, factually-supported adjustments to his assumptions would modify the conclusions he generates." Govt. Mot. at 17. However, the government fails to analyze those underlying assumptions and fails to articulate, let alone demonstrate, how and to what extent adjustments to those assumptions impact Mr. Graves's findings. As noted by Mr. Graves in his rebuttal report, "the mere ability to name such possible problems does not establish that they are present in this context or material to my analysis or conclusions." Rebuttal Report of

Frank C. Graves ("Rebuttal Report") at 2, App. C2. Indeed, Mr. Graves thoroughly refuted virtually all of the issues raised by the government in its motion in his rebuttal report, yet the government does not even acknowledge that report in its motion.

The government's argument is untenable because Mr. Graves performed sensitivity analyses in his rebuttal report which answer the government's criticisms. In that report, Mr. Graves stated: "In fact, I have addressed almost all of Dr. Neuberger's [one of the government's witnesses] issues in my analyses. In particular, the several sensitivity analyses I have run are precisely the kind of analysis needed to address alternative assumptions about costs, program parameters and the potential effects of risk, sociopolitical factors, etc." Rebuttal Report at 2, App. C2. Upon running these factors through sensitivity analyses, Mr. Graves concluded that many of the issues raised by Dr. Neuberger and in the government's motion are either irrelevant or their effects are immaterial to Mr. Graves's results. *Id.* For example, the government argues that his results would change if Mr. Graves were to alter the following assumptions: that many utilities had obtained 20 year extensions to their operating licenses or that utilities reracked their wet storage pools, thus "expending the available SNF storage in those pools and deferring any need for a separate dry storage." Govt. Mot. at 3-4, 17. But Mr. Graves explained in his rebuttal report that accounting for license life extensions would not alter his conclusions regarding when DOE would have removed spent fuel from PG&E's nuclear plants absent the breach. Rebuttal Report at 7-10, App. C7-C10. He also explained that his decision not to differentiate between re-racking and expansion of a utility's storage capacity through the addition of dry storage could only serve to push back his estimated dates for when DOE would have removed PG&E's spent fuel absent the breach. *Id.* at 16, App. C16. In short, Mr. Graves applied a simplifying and conservative assumption.

Moreover, even if the government has a valid complaint about the assumptions underlying Mr. Graves's methodology (which it does not), a motion *in limine* is not the proper mechanism to challenge Mr. Graves or PG&E. The government will have every opportunity to challenge Mr. Graves's testimony, along with his methodology and underlying assumptions, during its cross examination of this witness at trial. *See, e.g.*, *Yankee Atomic*, 2004 WL 1535686 at *5 ("Graves's opinion will be subjected to scrutiny at trial; it will not be excluded at pre-trial.").

Further, although the government takes issue with Mr. Graves's methodology and conclusions as to when PG&E's spent fuel would have been removed absent the breach, the government does not offer a competing methodology or an alternative, non-breach spent fuel removal dates. The government's case is completely devoid of expert testimony as to what is or would have been a reasonable rate and schedule of acceptance in the non-breach world.

## II. THE GOVERNMENT'S OBJECTIONS TO MR. GRAVES'S MODEL OF EXCHANGES ARE EQUALLY WITHOUT MERIT

In a re-hash of the arguments it made to Judge Merow in *Yankee Atomic*, the government once again seeks to exclude Mr. Graves's modeling of the market for exchanges (*i.e.*, swaps) of spent fuel acceptance slots. As Judge Merow did, this Court should summarily reject the government's arguments.

Mr. Graves bases his economic model on the straightforward economic principle that profit-seeking companies, like utilities, will act in their economic self interests. Thus, as explained by Mr. Graves in his expert witness reports and as he will testify at trial, utilities would have been willing to pay for exchanges for early acceptance allocations in order to avoid spent fuel storage costs. Expert Report at 7-10, 12-13, App. B7-B10, B12-B13.

Mr. Graves accepts that, under the Standard Contract, initial allocations, or slots, for pick-up are based on oldest fuel first ("OFF"). *Id.* at 11, App. B11. *See* Contract, Art. VI.B.1(a). However, subject to DOE approval, slots could be exchanged among utilities. *Id.*, Art. V.E. Mr. Graves has fashioned an economic model of the market for these acceptance slots. A utility would have the economic incentive to buy an earlier swap allocation at a price less than the cost to store the fuel. Conversely, a utility would be motivated to sell a swap allocation and accept a later place in the queue if the exchange price was greater than its storage costs. *Id.* ("In the non-breach world, [utilities] would have used exchanges to improve on the initial OFF acceptance allocation until they reached a good approximation of the economically efficient allocation, because they face substantial incentives to do so.").

Although the government raises all sorts of issues in challenging Mr. Graves's exchange model – as part of its darts-against-the-wall strategy – the core of its position is as follows: (i) Mr. Graves's model is speculative, based on "overly-simplistic economic theory," which lacks any evidentiary foundation (Govt. Mot. at 12, 18, 22); (ii) Mr. Graves's reliance on a perfectly competitive market place or "invisible hand" theory is unsupported (Govt. Mot. at 22-24); and (iii) Mr. Graves's model fails to take into account various countervailing factors which would materially impact his results, such as particular utilities' risk aversion and socio-political considerations (Govt. Mot. at 26-27).[1] As shown below, none of these arguments has any merit and, more to the point, none provides any basis for excluding Mr. Graves's opinions.

---

[1] In addition, the government raises a number of other issues that are simply beside the point. For example, the government charges that "[b]efore preparing his model, Mr. Graves failed to contact any utility – including PG&E – to determine the viability of or evidentiary foundation for an exchanges market that might have developed absent DOE's delay in beginning SNF acceptance." Govt. Mot. at 22. Contrary to the government's suggestion, Mr. Graves is not required to perform a survey of the nuclear utility industry as a pre-condition to rendering an expert opinion on spent fuel exchanges.

A. Mr. Graves's Model Is Fundamentally Sound, And Is Based On Proven Data

Mr. Graves's report provides a reasonable estimate, based on established economic principles, of how an exchange process would have influenced the timing and sequence of DOE's acceptance of PG&E's spent fuel. Significantly, the government has elected not to present at trial any evidence of a competing estimate of how the exchange process would have worked absent the breach. And perhaps more importantly for its present motion, the government has elected not to present at trial any quantification or other specification of the impact, *if any*, of the supposed flaws it claims inhabit Mr. Graves's analysis.

As explained in his expert report, Mr. Graves's model of exchanges is based upon ordinary market structure and price formation principles throughout the economy, whereby market participants pay up to their avoidable storage costs for improving their position in the acceptance sequence. *See* Expert Report at 11, App. B11. ("In the non-breach world, [utilities] would have used exchanges to improve on the initial [oldest fuel first] acceptance allocation until they reached a good approximation of the economically efficient allocation, because they face substantial incentives to do so . . . . By pursuing exchanges with each other, [utilities] in the aggregate could save hundreds of millions of dollars by avoiding unnecessary at-reactor storage costs."). Mr. Graves's model is fundamentally sound and is entitled to be admitted into evidence.

1. The Government Cannot Exclude Mr. Graves's Model On the Grounds That It Is Not Based On "Real World" Experience

The government's contention that Mr. Graves's model of exchanges is speculative because he has failed to establish a "realistic and complete 'but for' world" is inconsistent with binding precedent governing acceptance of economic analyses of non-breach worlds. That precedent requires merely that the analysis be reasonable, not that it be "complete," which

according to the government apparently means quantifying every conceivable influence on a market.

Expert testimony "assist[s] the trier of fact to understand the evidence or to determine a fact in issue." Fed.R.Evid. 702. As the Supreme Court has observed, "[t]his condition goes primarily to relevance." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 591 (1993). Relevant evidence is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed.R.Evid. 401. "The Rule's basic standard of relevance is thus a liberal one." *Daubert*, 509 U.S. at 587. With respect to expert testimony, the inquiry is "whether the reasoning or methodology underlying the testimony is scientifically valid and [ ] whether that reasoning or methodology can properly be applied to the facts at issue." *Id.* at 592-93. This inquiry is necessarily "a flexible one, one based on the uniqueness of the circumstances present." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999).

Applying these principles guiding the admissibility of expert testimony, Judge Merow in *Yankee Atomic* denied the government's request that Mr. Graves be excluded from testifying because his analysis and opinion lacked "real world" experience. *Yankee Atomic*, 2004 WL 1535686 at *3. Judge Merow ruled that it was insufficient as a matter of law to exclude Mr. Graves's testimony at trial "because [he] does not identify which utilities would trade or sell to plaintiffs." *Id.* Judge Merow also added: "[p]roof of damages need not always specify transactions that would have occurred but for the breach." *Id.* (citing *Energy Capital Corp. v. United States*, 302 F.3d 1314, 1329 (Fed. Cir. 2002); *Ace Federal Reporters, Inc. v. Barram*, 226 F.3d 1329, 1333 (Fed. Cir. 2000); *Locke v. United States*, 283 F.2d 521, 524-25 (Ct. Cl. 1960)).

The Federal Circuit and its predecessor court have made clear that a plaintiff's proof of damages need not specify exactly which transactions would have transpired absent a government breach. *Energy Capital*, 302 F.3d at 1329 (affirming award of damages based on lost profits from loaning money without identifying exactly what loans would have been made absent the breach); *Ace Federal Reporters*, 226 F.3d at 1333 (approving award of damages for hearing transcription services without any specification of which hearings plaintiffs would have transcribed absent the breach); *Locke*, 283 F.2d at 524-25 (approving award of damages for lost typewriter-repair business without requiring proof of exactly which typewriters plaintiff would have repaired absent the breach).

In response, the government asserts that this Court has previously rejected damage models because they fail to identify specific transactions that would have been engaged in absent the breach. *See* Govt. Mot. at 19-20, citing, *inter alia*, *Fifth Third Bank of Western Ohio v. United States*, 55 Fed. Cl. 223 (2003) and *S. Nat'l. Corp. v. United States*, 57 Fed. Cl. 294 (2003). The government has misread those decisions. As Judge Miller (the Judge in both cases) explained her *Fifth Third* decision in *S. Nat'l.*, the plaintiff's damage expert, "was not faulted for failing to name names; rather . . . he did not identify any type or category of activity, opportunity, or investment [in which the plaintiff would have engaged absent the breach]." 57 Fed. Cl. at 304. That is not the situation here, where Mr. Graves's analysis makes clear the type of activity – exchanges for earlier acceptance allocations, based on established economic principles – in which PG&E would have engaged absent the breach.

Moreover, the inherent difficulty in modeling the non-breach market for exchanges should not operate to the benefit of the government whose actions (or lack of actions) have made that proof difficult. As noted by Judge Merow in *Yankee Atomic*:

> Defendants' contract breach is established. That breach prevented the very market the government assails as speculative – the lack of real market data on the sale of allocation slots for the storage of spent nuclear fuel. By partially breaching the contract, defendant cannot exclude Graves's opinion on the grounds that there is no market data. There is no market data because the government's breach thwarted this possibility.

*Yankee Atomic*, 2004 WL 1535686 at *4, *accord Locke* , 283 F. 2d at 521 (Ct. Cl. 1960) ("The defendant who has wrongfully broken a contract should not be permitted to reap advantage for his own wrong by insisting on proof which by reason of his breach is unobtainable."). The government's gripe about the purported lack of "real world" experience in Mr. Graves's model is akin to the boy who kills his parents and then pleads for mercy before the court because he is an orphan. The government hardly is in a position to fault PG&E for not having what the government considers enough "real world" data.

2. <u>Mr. Graves Relies On Facts In The Record – Not Mere Speculation</u>

Mr. Graves's exchange model and opinion generally are based on supportable data and valid assumptions. In making its argument, the government ignores whole sections of Mr. Graves's expert report, his entire rebuttal report, as well as entire portions of his deposition testimony. Upon even a cursory glance of the record, it becomes readily apparent that Mr. Graves relied on objectively reasonable facts and assumptions. The fact that the government may not agree with all of those facts and assumptions does not make them wrong or otherwise render Mr. Graves's opinion inadmissible.

A few examples of data relied upon by Mr. Graves demonstrate the deficiencies in the government's argument. For fuel storage costs, Mr. Graves relies upon publicly-available data related to historical and forecasted nuclear reactor operators, including DOE data on spent fuel pool storage capacities, inventories and projected spent fuel discharge data. *See* Expert Report at 6, App. B6 (citing *e.g.*, *Spent Fuel Storage Requirements 1994-2042*, U.S. DOE, Office of

Civilian Radioactive Waste Management, June 1995; *Analysis of the Total System Life Cycle Cost of Civilian Radioactive Waste Management Program*, U.S. DOE, December 19998, May 2001, DOE/RW-0510).

In addition, Mr. Graves used representative spent fuel storage costs provided by an expert familiar with such costs. The government objects to Mr. Graves's use of data generated by this expert because he is not going to testify at trial. The government's objection here is misplaced because Fed. R. Evid. 703 does not require that an expert rely upon admissible evidence in rendering his opinion. *See, e.g.*, *Westfed Holdings, Inc. v. United States*, 55 Fed. Cl. 544, 568, n. 39 (2003) ("An expert may testify based upon documents not admitted into evidence but those underlying documents may not then be admitted into evidence merely because the expert relied on them in forming his opinion.") (Judge Hewitt), *aff'd in part and rev'd in part on other grounds*, 407 F.3d 1352 (Fed. Cir. 2005). Furthermore, Mr. Graves testified in his deposition that he reviewed the analysis upon which his cost inputs are based and found it to be sound. Deposition Transcript of Frank C. Graves, January 24, 2006 ("Graves Tr.") at 60:8 -67:6, App. A9-16. In addition, as Mr. Graves explained in his rebuttal report, his model is not sensitive to the precise amounts of those cost inputs and there is substantial additional support for the general spent fuel storage costs Mr. Graves uses. Rebuttal Report at 10-11, App. C10-C11.

With respect to the acceptance rate and whether the 3,000 MTU/year steady state was feasible, Mr. Graves relies upon the opinions of Dr. John Bartlett and Ivan Stuart, together with DOE's own planning documents. Expert Report at 7-8, App. B7-B8. Mr. Graves states in his report that "[a]ll of the many DOE planning documents and studies that I am aware of, beginning with the 1985 Mission Plan and continuing through today, use a steady-state acceptance rate of 3,000 MTU/year at a geologic repository." Mr. Graves also cites to Dr. Bartlett and Mr. Stuart in

establishing that "it would have been technically feasible and programmatically reasonable for the waste disposal program to load spent fuel at a rate of 3,000 MTU/year and transport it at this rate to an interim and/or permanent facility." *Id.* at 7-8 and Appendix 1, List of Information and Documents Considered in Forming Opinions, App. B7-B8 and B23-B26.

The government's objections are really not to the facts and assumptions underlying Mr. Graves's opinion, but rather to the application of those facts and assumptions to Mr. Graves's economic principles and methodology. As noted by the court in *Yankee Atomic*, the government's objections are appropriate for cross examination at trial, not as part of a motion *in limine*. 2004 WL 1535686 at * 3, 5. All of the cases cited by the government in support of its argument related to experts who relied on either non-existent data or facts that were indisputedly wrong. Govt. Mot. at 21-22. Just because the government asserts (with absolutely no evidentiary support) that a fact or an assumption is wrong, does not render the testimony based on such fact or assumption inadmissible. As the Federal Circuit counseled in *Micro Chemical, Inc. v. Lextron, Inc.*, 317 F.3d 1387 (Fed. Cir. 2003), the court does not exclude expert testimony because of factual disputes:

> Defendants confuse the requirement for sufficient facts and data with the necessity for a reliable foundation in principles and method, and end up complaining that [the expert's testimony] was not based on 'reliable facts'. . . . When, as here, the parties' experts rely on conflicting sets of facts, it is not the role of the trial court to evaluate the correctness of the facts underlying one expert's testimony . . . . When facts are in dispute, experts sometimes reach different conclusions based on competing versions of the facts. The emphasis in the amendment on 'sufficient facts or data' is not intended to authorize a trial court to exclude an expert's testimony on the ground that the court believes one version of the facts and not the other.

317 F.3d at 1392 (citing Advisory Committee note to Fed. R. Evid. 702).

Likewise, the government's objections to purported inconsistencies in the analyses performed by Mr. Graves in the *Yankee Atomic* case and his analyses in this case are, at best,

proper topics to be addressed in cross examination at trial, not as part of a motion *in limine*. Govt. Mot. at 24-26. In any event, the government's argument is wholly irrelevant. The ultimate point of Mr. Graves's analysis in this case is his determination of when PG&E's fuel would have been removed absent the government's breach. There is no indication whatsoever that his analysis changed from the *Yankee Atomic* case to this case. In fact, Mr. Graves's expert report in the present case does not even address when the *Yankee*-plaintiffs' fuel would have been removed absent the breach. Moreover, the government appears to make up numbers out of thin air. In Table 1 on page 25 of the government's motion, the government presents what it purports to be a comparative analysis of spent fuel volume acceptance rates between the Yankee utilities and PG&E. However, the government's table is a completely inscrutable, as evidenced by the fact that the government fails to cite to any source from which it relied upon to generate the volume quantities in that table. As such, the Court should disregard the government's argument to the extent it involves the data presented in Table 1.[2]

B. Mr. Graves Properly Tested His Analysis Against Various Countervailing Factors

The government also objects to Mr. Graves's exchange model on the grounds that he failed to take into account various countervailing or alternative factors, and in doing so, he relied

[2] PG&E acknowledges that Mr. Graves testified at his deposition that some of the cost data upon which he relied upon in *Yankee Atomic* was no longer available, which thus required Mr. Graves to use different data in this case. However, Mr. Graves testified that the use of this different data had no material impact on his analysis. *See, e.g.*, Graves Tr. at 31:9-13, App. A5 (Q: And there were changes between the two models; is this right? A: A little bit. But they're very similar in order and timing of results for when people get out."). As explained by Mr. Graves in his deposition, in the *Yankee Atomic* case, he relied on data generated by the NAC International, which, for various reasons, was no longer available to use at the time Mr. Graves prepared his report in his case. Graves Tr. at 32:13-33:17, App. A6-A7. As a result, some of the data concerning fuel storage costs came from different years. *Id.* at 32:4-34:1, App. A6-8. Again, to the extent the government believes Mr. Graves's use of slightly different cost data is a significant issue, the government may seek to cross examine Mr. Graves at trial on this issue.

on the faulty economic theory of perfect market competition or the "invisible hand" theory of economics.

Contrary to the government's assertions, Mr. Graves's model is not premised on a perfectly competitive market, in which is "assumptions are all consistent with the 'invisible hand' theory and perfect competition." Govt. Mot. at 22. Rather, Mr. Graves considered certain countervailing factors and determined them to be irrelevant or performed a sensitivity analysis as to other certain such factors and concluded them to be immaterial to his conclusions. In his rebuttal report, Mr. Graves addressed the government's issues by running several sensitivity analyses with respect to a wide range of alternative factors. Rebuttal Report at 2, App. C2. In all, Mr. Graves addressed and analyzed the following factors in his rebuttal report, all of which resulted in no material impact to Mr. Graves's conclusions: (i) uncertainty, risk aversion and sociopolitical factors; (ii) license extensions and acceptance rates; (iii) storage costs estimates; (iv) information possessed by a utility regarding storage needs and costs of other utilities; (v) the prices of the exchanges over time; (vi) strategic behavior by the utilities; (vi) utilities' full core reserve policies; (vii) re-racking; and (viii) efficiency gains. Rebuttal Report at 3-17, App. C3-C17. In all instances, Mr. Graves concluded that these alternative factors either were irrelevant to his analysis or did not materially affect his opinion relating to the hypothetical exchange market. In any event, these matters are, at most, topics for cross examination, not a basis for excluding Mr. Graves's testimony.

The government also asserts that Mr. Graves failed to consider the prospect that the government would deny exchange requests. Although DOE has the discretion under its contract with PG&E (and all other contracting utilities) to approve or disapprove requested exchanges, "discretion may not be exercised arbitrarily or capriciously." *Yankee Atomic*, 2004 WL 1535686

at *3. Indeed, Mr. Graves testified that he had assumed that DOE would act fairly when evaluating a request for an exchange. Graves Tr. at 240:19-241:1. On this issue, the Court should following Judge Merow's ruling in *Yankee Atomic*: "DOE's right to approve the exchanges on which Graves [sic] opinion rests, does not render his opinion inadmissible on that basis. Good faith action may be presumed." 2004 WL 1535686 at *3. The factual record also confirms that DOE would act reasonably in approving exchange requests. *See* PG&E Exh. 47 (April 8, 1983 Memo transmitting Standard Contract for publication in Federal Register, Tab D) at 1 ("The majority of utilities commented that they should have 'exchange' or 'swapping' rights . . . . [T]his poses no great problem to us, and consequently we have accepted this suggestion. It will require our approval, and we intend to be reasonable."), App. D1.

In sum, the government has presented no valid or proper basis for excluding Mr. Graves' opinions. Its motion therefore should be denied.

## III. THERE IS NO BASIS TO EXCLUDE PG&E'S EXPERT WITNESSES IN THE EVENT THE COURT GRANTS PG&E'S MOTION TO EXCLUDE THE OPINIONS OF THE GOVERNMENT'S EXPERT WITNESSES

As part of this motion *in limine*, the government requests, "as a protective matter," that, *if* the Court rules in favor of PG&E and excludes the testimony of the government's expert witnesses, Warren Brewer and Jonathan Neuberger, then PG&E's other expert witnesses, Professor Brad Cornell, Ivan Stuart and Michael Meisner, should also be excluded from testifying at trial. Not only is the government's request inappropriate for a motion *in limine* (the government either should move to exclude PG&E's expert witnesses or not), its request falls far short of what is required to exclude expert opinion. PG&E's experts provide opinions that are substantially different from and based upon wholly independent facts, data, experience and assumptions than those of the government's expert witnesses. Put simply, each of the opinions

expressed by these expert witnesses should stand or fall on their own merit. Because the government has failed to present an affirmative and independent request to exclude the testimony of Messrs. Cornell, Stuart and Meisner and because the government is out of time to do so, the Court should deny the government's alternative request for relief.

A. Professor Cornell's Testimony Is Admissible

The government's contention that Professor Cornell's testimony will be the same as Warren Brewer's and Jonathan Neuberger's as to the incremental nature of PG&E's costs is simply wrong. Govt. Mot. at 29. Moreover, the government's arguments are vague, as they are insufficient on their face in explaining any proper reason to exclude the testimony of PG&E's expert witnesses.

Professor Cornell's testimony, along with the data and assumptions upon which he relies, are completely different from that of Messrs. Brewer and Neuberger. The reasons articulated in PG&E's motion *in limine* to exclude the testimony of Messrs. Brewer and Neuberger have no application to Professor Cornell.

Professor Cornell is an economist who will testify about particular economic measures of damages. In particular, Professor Cornell analyzes PG&E's internal labor costs and certain allocated costs. Messrs. Brewer's and Neuberger's proposed testimony is quite different. For example, Mr. Brewer is not an economist and he offers no economic analysis comparable to Professor Cornell's. Notwithstanding his lack of proper credentials, Mr. Brewer will opine that the costs incurred by PG&E would have been incurred regardless of DOE's breach, therefore, they do not constitute damages. *See* Expert Witness Report of Warren K. Brewer at 1-2. PG&E seeks to exclude Mr. Brewer's testimony because is he not qualified to testify about the costs in question. In addition, Mr. Brewer's testimony is inadmissible because, as even he acknowledged

at his deposition, he does not know what work was involved in some of these cost items in the breach world. *See, e.g.*, Deposition Transcript of Warren Brewer, February 23, 2006 at 109:1-5; 132:9-19, App. A2,A3. Thus, his opinions about what "would have" happened in the non-breach world are not based on proper facts and data. As a result, Mr. Brewer provides unsupportable and speculative testimony, much of which are legal conclusions. These defects in Mr. Brewer's background and analysis are simply not present with respect to Professor Cornell.

Although Dr. Neuberger is an economist, his opinions are entirely conclusory. Dr. Neuberger offers nothing more than *ipse dixit* on these issues. Professor Cornell, in contrast, has analyzed the issues addressed in his expert report.

B. Ivan Stuart's And Michael Meisner's Testimony Is Admissible

The government's assertion that, if the Court excludes Mr. Neuberger's testimony because he has not offered an alternative economic model to Mr. Graves's exchange model, the Court should also exclude the testimony of Messrs. Stuart and Meisner is without merit. The government's argument demonstrates a complete lack of understanding of the differences between expert testimony based on personal experience and expert testimony based on methodology.[3]

[3] In addition, the government incorrectly states that PG&E "bears the burden of demonstrating all costs that it would have incurred in the 'but for' world . . . ." Govt. Mot. at 30. PG&E is not required to prove any specific cost or event in the "but for" world in order to prove causation. What matters to causation in this case is that DOE would have removed PG&E's spent fuel in a reasonable time starting by no later than January 1998, not precisely when DOE would have done so or how much or what exact costs PG&E would have incurred in the "but for" world. *See, e.g.*, *Sacramento Municipal Util. Dist. v. United States*, No. 98-488C (March 31, 2006), Slip op. at 41-49 (finding causation established as a matter of fact, without discussing the rate or schedule for DOE acceptance in the "but for" world); *Tennessee Valley Authority v. United States*, 69 Fed. Cl. 515, 523 (2006). *See generally* PG&E's Memorandum of Contentions of Fact and Law at 31-32, 37-41.

Messrs. Stuart and Meisner are experts because of their substantial personal experience with the subject matter of their expert testimony. As "experience-based experts," neither is required to offer a model to substantiate their opinions. By contrast, Mr. Neuberger is a "methodology-type expert," who is required to provide a model to substantiate his opinions because he does not have the personal experience to do so. *See* Fed.R.Evid. 702, Advisory Committee notes on 2000 amendments, quoted in *Lippe v. Bairnco Corp*., 288 B.R. 678, 686 (S.D.N.Y. 2003) (in excluding plaintiff's damages expert because he made no effort to show how his experience was applied to analyze the facts in that case, distinguished between "experience-based" and "methodology-type" experts). As such, the defect in Mr. Neuberger's opinion – his lack of a model – precludes his economic testimony, which purports to be methodology-based, but does not preclude the experience-based expert testimony of Messrs. Stuart and Meisner.[4]

IV. CONCLUSION

This Court should follow the ruling of Judge Merow in *Yankee Atomic* and allow in the expert testimony by Frank Graves. Mr. Graves is well qualified to present testimony concerning the rate of acceptance and the exchange market that would have existed in the non-breach world. His opinions are based on sound economic principles, and are supported by data, facts and valid assumptions. As was the case in *Yankee Atomic*, the government here will have every opportunity to cross examine Mr. Graves at trial. A motion *in limine* is simply not the correct mechanism to challenge Mr. Graves. The government's motion is also the incorrect mechanism to *possibly* exclude the testimony of Professor Cornell and Messrs. Stuart and Meisner. The

[4] Another problem with Mr. Neuberger is not just that he did not develop an alternative model, but that he did not provide real opinions. Therefore, his testimony is irrelevant. His expert report and deposition testimony is replete with things that "may" and "could" be at issue. PG&E's Motion To Exclude Testimony of Jonathan A. Neuberger at 6-7. In contrast, Messrs. Stuart and Meisner reach real conclusions.

government either should seek to exclude these witnesses or not; it cannot have it both ways. Furthermore, the government, in its rather cursory treatment of this issue in its motion, falls far short of establishing a basis upon which this Court can or should exclude these witnesses from testifying at trial.

For these reasons, the Court should deny the government's Motion *in limine* to exclude the expert testimony of Frank Graves, Professor Brad Cornell, Ivan Stuart and Michael Meisner.

Dated: May 15, 2006

Respectfully submitted,

s/Jerry Stouck

JERRY STOUCK
Greenberg Traurig, LLP
800 Connecticut Avenue, NW, Suite 500
Washington, DC 20006
(202) 331-3173 Phone
(202)261-4751 Fax
*Counsel for Plaintiff*
Pacific Gas & Electric Company

Of Counsel:
Robert L. Shapiro
Greenberg Traurig, LLP

# APPENDIX A

UNITED STATES COURT OF FEDERAL CLAIMS

PACIFIC GAS & ELECTRIC COMPANY,)
Plaintiff, )
v. ) No. 04-0074C
UNITED STATES OF AMERICA, )
Defendant. )

- - - - - - - - - - - -

DEPOSITION OF WARREN K. BREWER

VOLUME I

Thursday, February 23, 2006

The deposition of WARREN K. BREWER was convened on Thursday, February 23, 2006, commencing at 9:43 AM, at the offices of GREENBERG TRAURIG LLP, 800 Connecticut Avenue, N.W., Suite 500, Washington, D.C., before Cheryl A. Lord, Registered Professional Reporter, Certified Realtime Reporter, and Notary Public for the District of Columbia.

Page 106

A. That was the intent.
Q. But it never came to fruition?
A. There was never anything produced by ABZ in terms of reports or any kind of written documents about it.
MR. STOUCK: Can we go off the record for a second?
(Recess.)
BY MR. STOUCK:
Q. While I'm thinking of it, Mr. Brewer, you testified in the TVA case at deposition and trial.
Correct?
A. M-hm, yeah.
Q. Have you testified in any other spent nuclear fuel cases?
A. I have not.
Q. Have you been disclosed as an expert witness in any other spent nuclear fuel case?
Do you know?
A. I do not believe so, no.
Q. All right. Let's look at your

Page 107

report, then, exihibit 1 here.
I'm on page -- it's the documents relied on -- B 2. The Bates numbers end in 0038.
A. Okay.
Q. This is a complete -- it says, documents relied on.
Is this a complete list of documents you considered in forming the opinions that are expressed here?
MR. GARDNER: Objection --
BY MR. STOUCK:
Q. Is there a difference between -- is relied-on documents a smaller category than the documents that you considered?
MR. GARDNER: Objection, vague.
A. I reviewed more documents than are here. These are the documents upon which these opinions are based.
BY MR. STOUCK:
Q. So upon which these opinions are based.
In other words, in order to express

Page 108

the opinions set forth in this report, you need to refer to one or more of these documents?
Is that what that means?
I'm trying to find out what "relied on" means.
A. I think that these documents listed here will be documents that are referred to in the opinions either as having some important piece of information or something about the opinion.
Q. Okay. So again in order to express -- could you express all of the opinions in this report without relying on any of these documents?
In order to express the opinions set forth in your report, you need these documents, maybe just for a little tiny piece of it, but you couldn't say what you say in this report without having these documents to point to in one case or another?
MR. GARDNER: Objection, form.
A. Let me just clarify that.

Page 109

In a lot of cases, I could express the opinion that is here without one of these documents, but in the absence of citing the document, it would simply be, I'm saying, I know that because I know that.
BY MR. STOUCK:
Q. I see.
A. Okay.
Q. Sometimes it's support for your opinions?
A. I think that's a fair characterization.
Q. Okay. All right.
Now, are there any documents you wanted to review or requested that you were not able -- in order to express these opinions that you were not able to obtain for whatever reason?
A. I have a bit of a problem with the question for the following reason: I am unaware of any document, a specific document or documents that I would have requested or did request that I didn't get.





A 2

claim where you have a different view than PG&E of whether those costs are recoverable in this case?
MR. GARDNER: Objection to the extent it mischaracterizes Mr. Brewer's expert report.
A. Well --
BY MR. STOUCK:
Q. And "different view" means you thought the amounts were wrong or not incremental or not supported.
A. And to the extent that you say it that way, I think that's true.
Recoverability to me at least is an issue of law, and that's not my purview.
Q. Your report addresses all the cost items in PG&E's damages claim where you have a different view than PG&E of whether the costs are reasonable or incremental or supported; is that correct?
MR. GARDNER: Again objection to the extent it mischaracterizes Mr. Brewer's expert



report.
A. I would modify that in one way, and that is that it's all the cases where I have a different view in that something is not supported, not incremental, or not reasonable, and I felt that I had a reasonable basis to make such an opinion and state such an opinion.
There may have been -- and I know from other cases where I may have believed at some level that there was a comment to be made, but I also believed I could not create a comment with sufficient support to be convincing.
BY MR. STOUCK:
Q. Okay. And I think you sort of refer to that concept in your report?
A. I think I say that.
Q. Let's turn to page 2 if we can.
MR. GARDNER: Of exhibit 1?
MR. STOUCK: Yes.
I'm sorry.
BY MR. STOUCK:
Q. Okay. Page 2.



You say -- you identified instances -- this really carries over from 1.
First, I've identified -- quote -- I've identified instances where the errors are the result of inclusion of costs that are not incremental.
Do you see that?
A. Yes, I do.
Q. Okay. What expertise do you rely on in determining whether or not particular claimed costs are incremental?
A. By, incremental, I think that's what I really say in the footnote that's there. It's simply a matter that I am making the assessment that this activity in the simplest sense would have been necessary in order to deliver fuel to DOE had they begun picking up fuel in 1998, and therefore, it's an activity that have would occurred independent of the breach.
Q. Okay. Anything else that you mean by your concept of incremental in this report other than that the cost would have been incurred



anyway in delivering the fuel to DOE if it had one in 1998?
A. In general the answer is no.
But let me make a distinction that's always important to make here.
In addressing that something is not incremental, it does not necessarily mean that the exact identical activity would have been performed, but something of a similar magnitude or essentially identical cost would have been performed.
So I know that's a rather fine point, but it is important, because I'm not necessarily saying that it's identical in the 2.
Q. Yeah.
And footnote 3 sort of addresses this concept a little bit, not the concept you just mentioned, but the concept of incremental.
It says that it's the result of failure of the costs -- it is incremental if it's a result of the failure of DOE to begin spent fuel acceptance from the industry in 1998.





A3

CERTIFIED COPY

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

\- - - - - - - - - - - - - - - - - x

PACIFIC GAS AND ELECTRIC COMPANY, :
:
Plaintiff, : No. 04-0074C
:
v. : Volume I
:
UNITED STATES OF AMERICA, :
:
Defendant. :

\- - - - - - - - - - - - - - - - - x

Washington, D.C.
Tuesday, January 24, 2006

Deposition of:

FRANK C. GRAVES,

called for examination by counsel for the Defendant, at the Offices of Greenberg Traurig, 800 Connecticut Avenue, N.W., Suite 500, Washington, D.C., before Barbara A. Huber, court reporter and notary public in and for the District of Columbia, and commencing at 9:30 a.m., when were present on behalf of the respective parties:

**at least closely approximate the results of the Yankee model?**

A Sure. Absolutely.

**Q You weren't expecting, for example, wholesale change, with shutdowns being pushed way back in the queue and operating reactors being moved up ahead?**

A That's correct.

**Q And there were changes between the two models; is that right?**

A A little bit. But they're very similar in order and timing of results for when people get out.

**Q Certainly the net results for at least Humbolt Bay haven't changed substantially from the two models?**

A That's correct.

**Q After you were retained, what did you -- how did you go about performing the modeling?**

A Well, the main problem was to construct the must-move schedule again and the economic sequencing, but based on a slightly different set

of data in this case. So we had to -- I suppose the initial problem was getting and formatting data to fit the model structure.

**Q Why was it determined that a slightly different set of data needed to be used in this case, as opposed to the data that was used in the Yankee case?**

A Well, there were a couple of reasons. The one reason was that in the previous case, there had been various kinds of debate or discussion between the government and Plaintiffs regarding what date was the right reference point for thinking about performance. In the Yankee case, I had relied on NAC data, Nuclear Assurance Corporation data, NAC data, that had been developed roughly in 1998 for most of the projected discharges and inventory balance analysis.

And there was some concern raised, which I didn't find actually undermined the results of my testimony. But it was a source of discussion about whether that was too proximal to the time

frame of the performance for that to have been the expectations.

So we went back to the '95 SFSR, spent fuel storage requirements document from DOE, to get the discharge and inventory data this time, which basically moves the source data back to about -- December 1993 is the last date of the actual data. And then the less is projected by DOE from that form.

Now, that's a source that would be more public, in a sense, than an NAC data and earlier, so perhaps eliminating some of that controversy. But it also turns out that NAC wasn't going to participate in this case. And it wasn't clear that their data was -- that there were proprietary concerns about using their data again. So we had to use an alternative source.

**Q Do you know why NAC wasn't going to participate in this case?**

A I have a general understanding that they perceived a business conflict because of strong interests in other government contracting related

to spent fuel.

**Q Other than changing the reference point, the time frame for the data, were there any other changes that you can think of to the data that was used to generate the output of your model?**

A Well, in addition, the cost data is different. Now, not relying on data from Rod Knight. And though quite similar, the values for O&M costs and new ISFIS development are a bit different than we estimated before, in part because he has reflected -- I understand he's reflected post-911 changes in the complexity of those problems in his analysis.

**Q Is it your testimony then that you believe that the NAC data then was pre-9/11?**

A As I recall, that's the case. It had not -- it reflected cost experience that occurred prior to the 9/11 terrorist events, and so I think did not reflect heightened security and other kinds of changes and process that may have occurred since then.

**Q Any other changes that you can think of?**

if it's available. So you try to use -- no one willfully restricts their sample down to a smaller set that is feasible, unless they have some reason to believe that elements of it are not really drawn from the true population. So you take twenty if you had twenty. If somebody told you, you could get fifty, I'd say take it.

**Q You said you reviewed Mr. Knight's report in this case?**

A Yes.

**Q Did you review it prior to submitting your expert report?**

A Yes, or at least a draft of it.

**Q All right. Do you know how many utilities Mr. Knight used to create his averages?**

A I think about four, maybe five, or some of the cost items.

**Q Do you have any opinion as to whether that's a statistically valid sample size, given what Mr. Knight's trying to measure?**

A I just want to be a little careful about the term "statistically valid sample size." There

really isn't -- that isn't a term of art in statistics to say that a sample size is statistically valid.

There are statistically valid inferences that you can make about the sample, which the validity of which depends on the size of the sample. So I may be able to say this sample is different from some other sample with some degree of confidence. And that is a valid inference if -- and I decide that based on whether the differences are large compared to the variation in the elements in my samples.

The sample sizes themselves aren't valid or not. They simply determine whether statistics measuring the characteristics of those samples are valid.

**Q All right. Let me ask that. And I appreciate that clarification. Let me ask it then a different way.**

**Given the sample size that Mr. Knight used, do you think that the average that results from that sample size is valid?**

MR. SHAPIRO: Objection. Vague.

THE WITNESS: So by "valid," we'd have to be asking is it a good indicator of the mean for the population. I'm sure it's not a perfect indicator, because there's many other -- that is, I'm sure it won't equal the population mean exactly.

On the other hand, it's -- if I was a pure frequency strict constructionist statistician, I would say, well, there's four points. And then I have an unbiased estimate of the mean from those four points. It may be noisy in that it's not a very precise estimate, but it's unbiased. And that's -- but at least I have no reason to move it up or down in other directions.

On the other hand, in this case we have Mr. Knight, who is an expert in the industry and who himself knows something about the character of both those plants that are in his sample and the ones that he -- that otherwise occur in the population. So I don't -- it's validity as an indicator of the industry characteristics I think

stems from his expertise more than from the sample size.

BY MR. EKMAN:

**Q Do you know if he had access to more data than was provided in his expert report; in other words, could he have increased the sample size?**

A I don't know.

**Q Do you know if he had access to any of the data in his report?**

A Well, he obviously used it. So in that sense, he surely had access to the data. I'm not sure what you're getting at.

**Q Do you know how Mr. Knight's cost estimates compare, for the activity that he's estimating, compare to PG&E's claim in this case?**

A Very roughly. I've seen -- after I prepared my testimony, I saw a draft or a copy of Mr. Cornell's report. And as I recall, the numbers were within a couple million dollars by category of the costs that Mr. Knight had represented.

Q Do you know how Mr. Knight's cost estimates compare to other claims that the government -- or that have been litigated fully before -- in the court of claims for these activities, the ISFIS construction for example?

A I don't.

Q Do you know what forms the basis for Mr. Knight's estimates concerning dry storage operations and maintenance costs?

A As I recall, again, there's four or five utilities from whom he's taken operating or projected experience and calculated their annual costs.

Q And let me ask this.

Do you understand that he took the O&M cost from decommissioning studies, took all his costs from decommissioning studies?

A I don't know if that's true or not.

Q But you did read his report?

A I did.

Q I'll represent to you that he relied on decommissioning studies.

A Okay.

Q Do you understand why decommissioning studies are performed?

Just "yes" or "no."

A Generally, sure.

Q And do you understand that generally that the purpose of decommissioning studies is to account for costs that a facility would incur after it has ceased its operations during the decommissioning of that facility?

A Sure. That's consistent with my understanding.

Q And so, for example, Mr. Knight provides an input for dry storage operations and maintenance costs to your model; is that right?

A Yes.

Q And it's roughly 6-and-a-half million dollars, I think?

A I think that's right.

Q Do you know if that average or that mean is based on the assumption that the facility itself has now shut down, and that all spent fuel

**has been transferred to the ISFIS?**

A I don't know whether he's found cases that fit that or not. They're just utility one, two, three for me, in the data that I've seen. And I don't know what the characteristics of the site was, or the problem at the time.

**Q Okay. Do you know if Diablo Canyon has any operations or maintenance costs associated with the ISFIS that it purports it's going to build?**

A Again, I haven't studied their claim. But I would imagine that they do.

**Q And do you know if those costs are -- you know, once the ISFIS comes on-line, if those costs are in the 6-and-a-half million dollar range?**

A I don't recall.

**Q If I told you they were in the half million dollar range, would that number surprise you?**

A It's lower than I would have expected, but it's -- there may be other details to that

that I'd have to study, like how our overhead's accounted for, and what's being described as an O&M cost as opposed to some other kind of -- you know, certain costs could be capitalized opposed to expensed, or amortized as opposed to expended in one period.

**Q Is it possible that operations and maintenance costs for an ISFIS and an operational reactor are different and lower than operational costs for a stand-alone ISFIS at a shutdown reactor.**

A Can I hear the question again?

**Q I'll repeat it. Let me just rephrase it.**

**Do you know if dry storage and O&M are costs, ISFIS O&M costs, vary depending on whether a facility is operational versus whether a facility is shut down?**

**And I'm going to ask you to assume that all fuel in the shutdown case is now out of the wet pool and on the ISFIS.**

A And the question is O&M costs?

# APPENDIX B

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| PACIFIC GAS AND ELECTRIC COMPANY<br>Plaintiff,<br>v.<br>UNITED STATES OF AMERICA<br>Defendant. | No. 04-0074C, into which has been consolidated No. 04-0075C (Judge Hewitt) |

EXPERT WITNESS REPORT OF FRANK C. GRAVES

## I. Introduction and Approach

I have been asked to prepare this report to describe what would have been reasonable performance by the United States government in accepting spent nuclear fuel and high-level radioactive waste (together, spent fuel) under the terms of its 1983 contract with the Plaintiff, the Pacific Gas and Electric Company (PG&E). PG&E owns two nuclear plants, Humboldt Bay and Diablo Canyon, both covered by the contract with the government (via the U.S. Department of Energy, DOE) for spent fuel removal. It is well known and accepted that the government has not satisfied the obligations of that contract, having failed to remove spent fuel from any utility. I describe in this report a reasonable description of how the government would have performed in the hypothetical non-breach world where it did satisfy its contract obligations. In particular, I characterize the schedule of spent fuel acceptance from the two PG&E plants in that non-breach environment.

In reaching my conclusions, I have considered information contained in a number of documents related to spent fuel storage and disposal, the DOE spent fuel program, and

publicly available information on nuclear power plants. I have also considered representative estimates of spent fuel storage costs provided by Roderick Knight of Knight Cost Engineering Services, LLC, and testimonies of Dr. John Bartlett and Mr. Ivan Stuart regarding what level of program performance would be feasibility and reasonable. Appendix 1 provides a complete listing of the data and information I considered in forming my opinions.

I have over twenty years experience in assisting utilities in the design and implementation of long-range planning, investment, and operating policies, and in assisting their counsel with regulatory compliance and policy review. My work has involved market design and performance evaluations, capacity expansion and network modeling, investment and contract prudence reviews, estimation of marginal costs, price forecasting, design and pricing of new services, and financial simulation and valuation assessments. I have testified on the economics of electric and gas industry restructuring before the FERC and State regulatory commissions on numerous topics, including market entry, antitrust, retail and wholesale transmission access, power contract interpretations, service unbundling, new services, and cost of capital. I have testified in state and federal courts regarding contract disputes and compliance with environmental regulations. I recently testified regarding the government's failure to remove spent nuclear fuel in a similar case involving the Yankee Atomic, Maine Yankee and Connecticut Yankee nuclear plants. I am the author of several papers on approaches to and the impacts of restructuring of the electric and gas industries in the U.S., and I am a member of professional societies for mathematics, electrical engineering, and energy economics. I received an M.S. with a concentration in finance from the M.I.T. Sloan School of Management in 1980, and a B.A. in Mathematics from Indiana University in 1975. Additional detail on my experience and qualifications to offer the opinions included in this report is set out in Appendix 2. Appendices 3 and 4 list the cases in which I have testified as an expert at trial or by deposition during the preceding four years, and my publications for the preceding ten years. The Brattle Group is being paid $475 per hour for my time working on this matter.

### I.A. Approach to Modeling Non-Breach Spent Fuel Acceptance

PG&E's contract is one of approximately sixty such contracts, based on a standard form (the Standard Contract, or Contract) signed around the same time between the government and owners of U.S. commercial nuclear reactors (Purchasers, in the Standard Contract). Each Contract provides that the U.S. government, represented by the DOE, will remove Purchaser's spent nuclear fuel and high-level radioactive waste (HLW) from their nuclear facilities, in exchange for payments based on the amount of power generated by the nuclear reactors and designed to cover the full costs of the program.[1] In aggregate, these Contracts cover spent nuclear fuel disposal from all U.S. commercial reactors.

The Standard Contract does not spell out a timetable for the schedule of spent fuel acceptance from individual Purchasers or facilities, nor indeed for the overall program. The Contract does specify that the DOE would begin acceptance by January 31, 1998. Article IV.B.5 creates an initial priority ranking for acceptance under a paradigm known as Oldest Fuel First (OFF), which allocates the earliest acceptance priority to the oldest spent fuel. The Contract also contemplated, in Article V.E, that Purchasers could exchange their positions in the acceptance order. Finally, the Contract specifies that spent fuel must cool for at least 5 years, after which it becomes eligible for pickup. In this context, the schedule of non-breach spent fuel acceptance at any particular facility depends on the performance of the overall program, and the schedule of acceptance from other facilities. Conceptually, the problem can be separated into two parts:

1. Pace of acceptance: the aggregate rate at which the spent fuel program accepts spent fuel.
2. Sequence of acceptance: The allocation of the program's aggregate acceptance among individual Purchasers and facilities (the acceptance priority).

Despite the Contract's lack of specificity, economic logic can be used to characterize the

1 Throughout the remainder of this report, I focus on spent nuclear fuel and do not consider high-level radioactive waste (HLW) separately. This is because HLW quantities are sufficiently small and similar in character to spent fuel that their inclusion would not alter my conclusions.