non-breach program, addressing both pace and sequence. This characterization is based on the timing of Purchasers' economic needs for spent fuel removal and evidence that a program capable of reasonably serving those needs would have been economically reasonable and technically achievable. The importance of implementing the DOE program in an efficient manner, in terms of pace and sequence, is reflected in many DOE spent fuel program documents. This need and expectation was testified to by John Bartlett, former Director of the DOE spent fuel program, during the summer 2004 trial in the Yankee cases, and it is consistent with mitigating the financial burden on Purchasers, who are responsible for the total costs of the spent fuel program.

## II. Aggregate Acceptance Rate in the Non-Breach World

To determine the acceptance rate in the non-breach world, I rely on evidence regarding Purchasers' economic need for spent fuel removal, and on evidence that it would be feasible and reasonable to accept spent fuel at a rate consistent with those needs. This latter evidence comes in part from the DOE's plans for the spent fuel program over time, and it is corroborated by other sources.

### II.A. The Economic Need for Spent Fuel Removal – Must Move Analysis

To identify Purchasers' economic needs for spent fuel removal, it is first necessary to understand the basic economics of spent fuel storage. An operating nuclear reactor must have a spent fuel pool, and the costs of operating that pool (e.g., security, engineering and maintenance) are essentially fixed, i.e., independent of the quantity of fuel in the pool. Any individual pool can accommodate only a limited amount of spent fuel because of physical space limits and how the fuel is arranged in the pool. I understand that almost all operating nuclear plants make it a practice to reserve sufficient space in the pool to accommodate the discharge of all the fuel in the reactor core in case of emergency – a so-called Full Core Reserve or Full Core Offload Capability (FCR or FCOC). Thus the available storage capacity in an operating plant's pool is the total pool capacity minus FCR, minus the inventory of spent fuel already stored in the pool.

If an operating plant runs out of storage space in its pool and has additional spent fuel discharges to accommodate, then either some spent fuel must be removed from the site (e.g., delivered to the DOE under the spent fuel program), or substantial incremental cost must be incurred to create additional at-reactor storage capacity (e.g., installing a dry storage facility).[2] When a plant shuts down, the pool must continue to operate for some time, until the last fuel discharged becomes cool enough for handling (5 years, under the Standard Contract). After that time, the pool can be decommissioned and ongoing pool operating costs can be avoided, if/when the spent fuel is removed.

This leads to an economic concept for understanding how the government's spent fuel program would have worked in the non-breach world. Spent fuel storage imposes essentially no <u>incremental</u> (avoidable) cost, as long as the spent fuel inventory does not exceed a pool's capacity, or until 5 years beyond reactor shutdown. However, once 1) pool storage limits are reached, or 2) the plant has been shut down for at least 5 years, the plant owner begins to incur incremental costs from adding or maintaining storage capacity. This results in an economic need to remove spent fuel, which I refer to as a "Must Move" condition. That is, a facility is in a Must Move condition if it needs to remove spent fuel in order to avoid significant incremental storage costs. I label the two circumstances that lead to a Must Move condition as Full Pool Must Move (FPMM), when an operating facility runs out of pool space, or Shutdown Must Move (SDMM), five years after shutdown when all the spent fuel can be removed.

I have performed an analysis of the Must Move needs of each commercial nuclear power plant in the U.S. This analysis determines, for each facility, when spent fuel storage requirements will begin to impose significant incremental costs, and how much spent fuel would have to be removed by what time to avoid that incremental cost. Reliable data on

---

2 In some circumstances, it may be possible to create additional capacity in a pool, for instance by re-racking the spent fuel assemblies in an arrangement of greater density. Though re-racking can be less costly than dry storage, it also incurs a substantial expense. I do not consider re-racking in my analyses, in part because it is difficult to obtain data on the potential for re-racking at individual sites. However, this approach to re-racking lends conservatism to my results, because if lower-cost alternatives are available to Purchasers other than PG&E, that would make it easier for PG&E to have its spent fuel removed sooner.

historical and forecasted nuclear reactor operations is readily available, due to extremely detailed record-keeping and the relative predictability of operations over time, making it straightforward to develop a quantitative model of future Must Move requirements. This analysis is based on DOE data on spent fuel pool storage capacities, inventories and projected spent fuel discharge data.[3] For each nuclear facility, the Must Move analysis tracks the amount of spent fuel initially present at the facility, the amount and timing of additional spent fuel discharges, and the spent fuel pool storage capacity (net of FCR), to determine when each facility reaches one of the two possible Must Move conditions. The aggregate results of my Must Move analysis – the industry-wide quantities of spent fuel that will incur avoidable economic cost, distinguished according to the two categories – are illustrated in Figure 1.[4]




3 *Spent Fuel Storage Requirements 1994-2042*, US Department of Energy, Office of Civilian Radioactive Waste Management, June 1995. Minor adjustments were made to this data to eliminate implied premature shutdowns for several reactors, for which there was no apparent basis.

4 The DOE data on which this analysis is based assumes that reactors retire at the end of their original license lives. (This assumption does not to affect my results for PG&E's plants; the sensitivity of my results to this and other assumptions is discussed later.) The narrow band at the top of the Full Pool Must Move area corresponds to pre-1998 FPMM spent fuel, which is treated slightly differently from other FPMM in later analyses.



B6

**Figure 1: Aggregate Must Move Spent Fuel**

The aggregate quantity of Must Move spent fuel starts in 1998 at several thousand metric tons (MTU), climbs at around 1,000 to 2,000 MTU/year for about the first twenty years, and climbs at over 3,000 MTU/year for about the next twenty years as large numbers of plants shut down.[5] With regard to these needs, an economically appropriate non-breach acceptance rate would accommodate the average Must Move needs, would start early enough so it is not overwhelmed by the higher needs in later years, and would stay somewhat ahead of aggregate Must Move needs. A rate that did not satisfy these criteria would impose unnecessary costs and risks on nuclear plant owners and their customers.

### II.B. Feasibility of Acceptance Rate

Recognizing the economic need to remove spent fuel, another important consideration in judging the overall reasonableness of an acceptance rate is whether it is technically feasible and economically reasonable to implement it throughout the entire program. This includes whether the rate is reasonable with respect to loading spent fuel at reactor sites, transporting it to the permanent repository (possibly by way of an interim storage facility), and emplacing the waste in the permanent repository. A good starting point for understanding what rate would be technically feasible and reasonable in this context is the planning that occurred for the DOE spent fuel program itself.

All of the many DOE planning documents and studies that I am aware of, beginning with the 1985 Mission Plan and continuing through today, use a steady-state acceptance rate of 3,000 MTU/year at a geologic repository.[6] All the program plans also show repository acceptance beginning at a lower rate and ramping up to the 3,000 MTU/year steady state rate in 3-6 years. This long history of using a ramp-to-3,000 MTU/year acceptance rate in program planning is consistent with the fact that this rate is feasible and reasonable

5 Spent fuel quantities are often measured in units of metric tons of uranium (MTU), reflecting the mass of uranium in the original fuel.

6 The acceptance rate of the overall program may differ from this, e.g., if there are additional facilities such as a second repository or an interim storage facility, and/or if a repository is substantially delayed relative to the start of the program.

throughout the entire waste management system. Ivan Stuart confirms that it would have been technically feasible and programmatically reasonable for the waste disposal program to load spent fuel at a rate of 3,000 MTU/year from reactors and transport it at this rate to an interim and/or permanent facility. Dr. John Bartlett similarly testifies that this rate is reasonable for emplacing spent fuel in a permanent repository, corresponding to one 10 MTU cask per day, 300 days per year. He also confirms that it would be feasible and reasonable for the program to ramp up to the 3,000 MTU/year steady state acceptance rate within three years.

### II.C. Acceptance Rate Conclusion

Among the program planning acceptance rates that ramp up to 3,000 MTU/year, several slightly different ramp-up profiles have been used. For my numerical analyses to characterize non-breach acceptance, I use the rate shown in Table 1. This particular rate first appeared, to my knowledge, in the Draft 1988 Mission Plan.[7] This acceptance rate, beginning in 1998, satisfies the criteria I specified above and so is economically appropriate with respect to the industry's aggregate need to remove spent fuel.

| | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 Forward |
|---|---|---|---|---|---|---|---|
| Acceptance (MTU) | 1,200 | 1,200 | 2,000 | 2,000 | 2,700 | 3,000 | 3,000 |

Source: Draft 1988 Mission Plan; 1990 Annual Capacity Report

**Table 1: Aggregate Non-Breach DOE Acceptance Rate**

7 In the Draft 1988 Mission Plan, this acceptance rate began in 2003, which is clearly inconsistent with the Contract requirement that acceptance begin in 1998. The 1990 version of the DOE Annual Capacity Report, a periodic publication that projected program acceptance for planning purposes, used the same acceptance rate, but starting in 1998, as the basis for its Upper Bounding Case.




**Figure 2: Non-Breach Acceptance Rate and Must Move Spent Fuel (Supply and Demand for Spent Fuel Acceptance)**

Figure 2 compares graphically this DOE acceptance rate (the supply of spent fuel acceptance) with my results for the quantity of Must-Move spent fuel (the demand for spent fuel acceptance). As can be seen, this acceptance rate is reasonable with respect to Must Move needs. Starting with a modest backlog of Must Move spent fuel at the start of the program in 1998, this acceptance rate would make it possible to work down the backlog within a few years and to get somewhat ahead of the actual economic need to remove spent fuel, staying ahead thereafter. That aggregate headroom provides a buffer for dealing with later years in which Must Move fuel is generated at a faster rate than the program's acceptance rate, as well as for the possibility that actual Must Move needs might differ from the forecast. Just on the basis of comparing this acceptance rate with aggregate Must Move needs, it can be seen that all facilities, including the PG&E plants, could have all of their Must Move needs served (and thus incur no incremental spent fuel storage costs) from about 2001 forward, when cumulative supply exceeds demand.

This acceptance rate is also consistent with overall program efficiency, which is of course an important public policy goal in any context, but particularly here since the Purchasers are required to pay the full cost of the program. While I have not formally analyzed how overall program cost is influenced by the aggregate acceptance rate, other analyses have concluded that the most efficient program acceptance rate would be 3,000 MTU/year or more. Several studies, including some performed for the DOE, have found that at-reactor storage costs are the only program costs that vary substantially with acceptance rate, and at-reactor costs are minimized at an acceptance rate of 3,000 to 5,000 MTU/year.[8]

This result makes intuitive sense as well. The overall program must eventually accept, transport and dispose of all spent fuel. Broadly speaking, repository size and development costs are driven by the total amount of spent fuel that must eventually be disposed, not the rate at which it is accepted. Total loading and transportation costs are primarily determined by the quantity of spent fuel and the distance it must be moved, not by the acceptance rate.[9] Pre-closure operating costs are minimized by loading the repository expeditiously and at a steady rate, but not faster than the spent fuel is created and can be ready to move. Since at-reactor storage costs are the only costs that vary substantially with the acceptance rate, a rate that minimizes at-reactor costs will also approximately minimize overall program costs.

## III. Sequence of Acceptance in the Non-Breach World

Although the Contract does not explicitly identify the sequence in which spent fuel would actually be accepted, its provisions, in particular the initial OFF acceptance priority and the exchange mechanism, create the basis for understanding how a reasonably efficient

8 E.g., *Civilian Radioactive Waste Management System Throughput Rate Analysis*, August 17, 1993, prepared for U.S. Department of Energy by System Analysis, Civilian Radioactive Waste Management System Management and Operating Contractor. See also McKee, R. W. and H. D. Huber, "Determination of Cost Effective Waste Management System Receipt Rates," Pacific Northwest Laboratory, from the Proceedings of the High Level Radioactive Waste Management Conference, Las Vegas, NV, April 28 - May 3, 1991.

9 Costs can also be affected by the extent to which shipments are consolidated, as I address later. This issue is separate from the question of the aggregate acceptance rate.

sequence would have been achieved.[10] With the OFF acceptance priority creating a well-defined initial property right for spent fuel removal services, Purchasers could exchange their allocations to redistribute acceptance priority and improve efficiency.[11] While the DOE does have the right to approve exchanges, its position was that Purchasers themselves would "optimize" the acceptance sequence, without direct involvement by the DOE.

In the non-breach world, Purchasers would have used exchanges to improve on the initial OFF acceptance allocation until they reached a good approximation of the economically efficient allocation, because they face substantial incentives to do so. The OFF acceptance priority is highly inefficient and would impose substantial avoidable costs on Purchasers. In brief, the problem with OFF is that it disperses removal priority for a given facility steadily across many years of plant operation and retirement, when the economic need for removal is typically far more concentrated in time. Accordingly, removal according to OFF priority would be entirely inadequate for some facilities, and unnecessary for others. By pursuing exchanges with each other, Purchasers in the aggregate could save hundreds of millions of dollars by avoiding unnecessary at-reactor storage costs. Exchanges are entirely voluntary so they would be pursued insofar as they are in Purchasers' individual interest, making many Purchasers better off and none worse off. Attractive exchanges would also be readily identifiable and easily achieved. It is quite straightforward to determine the allocation and need for spent fuel removal – much as I have done in this proceeding. (Indeed, such analysis is much easier than determining supply and demand in many other markets that perform quite well.) It requires the type

10 In addition to the OFF and Exchange provisions, the Contract also raises shutdown priority, emergency deliveries, and failed fuel as issues that may affect acceptance priority. Article VI.B.1 states that priority "may" be granted to shut down facilities, though does not say how that determination would be made. Article V.D makes allowance to accept emergency deliveries. In my analyses, I do not consider these alternative allocations of acceptance priority. Shutdown priority rights are ambiguous, and would affect only the initial priority allocation, not the economically efficient allocation. The need for emergency deliveries may not materialize, and would likely be small relative to the overall program, so would not substantially change the result in any case. Regarding failed fuel, the contract arguably allows it to be accepted on an adjusted schedule, if it is not feasible to accept it on the same schedule as non-failed fuel. I am aware of no such technical feasibility issues. Experience has shown that failed fuel has not created substantially different technical requirements for placement in dry storage, as evidenced by testimony from Michael Meisner, Chief Nuclear Officer of Maine Yankee Atomic Power Co., during that company's summer 2004 spent fuel hearing. I am not aware of any evidence to suggest that DOE has been planning to accept failed fuel on a different schedule than other spent fuel. Thus I treat failed fuel the same as non-failed fuel.

11 The exact mechanism by which exchanges would have occurred was never developed, because the program never progressed to that stage.

of analyses that I describe below – a determination of the initial OFF priority allocation, and analysis of spent fuel storage capacities and requirements at individual facilities to determine economic needs. This analytic simplicity means that Purchasers who desired to exchange acceptance priority in the non-breach world could have easily identified potential buyers and sellers of acceptance priority, along with the approximate prices (which might be zero) at which they would be willing to transact.

### III.A. Determining the Economically Efficient Sequence

I have developed a model, the Economic Sequence Model (ESM), that determines the efficient sequence of spent fuel removal, given the Must Move needs of individual facilities and the program's acceptance rate as determined above. This model closely approximates the results I would expect to observe under exchanges of OFF acceptance allocations among Purchasers. The ESM is in principle very simple. In each year it begins with the Must Move needs of each facility, determines the storage costs that could be avoided if those needs were met (using representative spent fuel storage costs provided by Rod Knight), and ranks the facilities according to their economic priority for removing spent fuel. This economic priority ranking is based on the facilities' "willingness to pay", or avoidable annual costs, for spent fuel removal on a cost-per-MTU basis (because exchanges would occur on an MTU-for-MTU basis). In economic terms, this ranking creates the demand curve for spent fuel acceptance. The ESM then allocates the available acceptance in that year according to this economic priority ranking – i.e., it allocates acceptance to those who need it most, matching supply (total annual acceptance) to demand.[12] If any Must Move needs are unmet in a given year, they are carried over to the following year (because that fuel is still Must Move) and combined with new Must Move needs, and the process is repeated, year after year.

The ESM determines the economically efficient acceptance sequence, given the overall program acceptance rate. In reality, exchanges might not reach this precise sequence.

---

12 Consistent with the efficient use of transportation resources, the ESM includes a constraint that acceptance must be allocated so as to completely fill each transport cask.



B12

However, they would achieve approximately this sequence, because any substantially different sequence would incur considerable unnecessary storage costs. The avoidable costs could be millions to tens of millions of dollars each year for a single facility. To avoid these unnecessary costs, Purchasers would be keenly motivated to identify and carry out additional exchanges until essentially all advantageous exchanges had been made – that is, until the revised allocation reached a good approximation of the efficient allocation, minimizing at-reactor storage costs. Since information regarding the allocations and likely needs of potential exchange counterparties is readily available, there is ample opportunity for Purchasers to identify and perform essentially all advantageous exchanges well in advance of the fuel removal dates.

The ESM results show that the program could and would have served the vast majority of Must Move needs once the program began. All Full Pool Must Move needs would have been served when needed; i.e., starting in 1998, all plants at risk of running out of pool space would have had enough spent fuel removed to avoid developing a new dry storage facility or adding to an existing one. A few plants with existing dry storage facilities or shutdown pools would continue to operate them and incur incremental storage costs for up to a couple of years, in order to accommodate the greater economic needs of others. However, beginning about 2001 and thereafter, all Must Move needs of all types would be served as soon as they arose, and the program would begin to get ahead of immediate needs. This is the same basic result that was observed previously by comparing the aggregate Must Move quantity with total acceptance in Figure 2. Must Move needs would continue to arise after 2001, but with proper allocation, there would be sufficient acceptance to serve all those needs, plus remove additional spent fuel that was not yet incurring any incremental storage cost.

Purchasers would not give away allocation rights freely in the early years when not all Must Move fuel could be served, since in those years, potentially unserved Purchasers would be willing to pay up to their avoidable costs. The ESM determines the market value or price of early acceptance priority as the willingness to pay of the marginal Purchaser in that year (where the marginal Purchaser is the first whose Must Move needs

could not be entirely served in a particular year). This is consistent with trading results expected in microeconomic theory, which observes that prices are set by the intersection of the aggregate willingness to pay curve (the demand curve) with the supply curve.[13] Figure 3 illustrates the resulting market value (price) of acceptance allocations for each year.




Note: Value of acceptance allocations goes to (approximately) zero in 2001 and remains zero thereafter.

**Figure 3: Market Value of Acceptance Allocations from the Economic Sequence Model**

The ESM results show that acceptance allocations start at an initial value of $102,000/MTU in 1998 and then drop quickly to zero in 2001. This reflects the fact that in the first few years, cumulative acceptance is below the aggregate Must Move need, causing the resource (spent fuel acceptance) to be scarce and valuable. Beginning in 2001 and beyond, total acceptance exceeds the immediate need for spent fuel removal –

13 Here, the "supply curve" is vertical in each year at that year's annual acceptance, since the program would be run with fixed, pre-specified annual acceptance quantities that are not affected by price.

i.e., supply exceeds demand – and the value accordingly goes to zero.[14] Since the Standard Contract contemplated exchanges (i.e., swaps) of acceptance allocations rather than independent purchases and sales, each Purchaser wanting to acquire a different acceptance schedule would exchange away some of their existing allocation and acquire the same quantity in a different year, paying or receiving the net difference in value.

### III.B. Implications for PG&E Plants

From the results described in the previous section, it is possible to identify when PG&E's plants (indeed, any plant) would have had spent fuel removed in the non-breach world – this is just the efficient re-allocation of acceptance rights identified by the ESM.

For Humboldt Bay, in order to facilitate removing spent fuel and decommissioning the nuclear unit in the non-breach world, PG&E would have advanced acceptance as much as was economical. Its initial acceptance allocations under OFF (at the acceptance rate I use) would have occurred in 1998 (13 MTU) and 1999 (16 MTU).[15] Of course, Humboldt Bay would have preferred to remove all its spent fuel in 1998 and thereby avoid another year of unproductive expenditures on spent fuel storage. The ESM results show that Humboldt Bay's avoided costs would place it among those willing to pay for accelerated removal in 1998, as shown in Table 2. That is, it would have been economical for Humboldt Bay to pay to exchange all of its 1999 allocations for 1998 allocations at the market price, removing all 29 MTU of its spent fuel promptly in 1998 and terminating its spent fuel pool O&M and other site maintenance costs sooner. The ESM results show that exchanging the 1999 OFF allocations for 1998 allocations would have imposed a net exchange cost of $1.4 million in 2005 present value.[16] Even if Humboldt Bay's spent fuel were removed on a strict OFF basis, only one year's

---

14 This is not to say that exchanges beyond 2001 would occur at precisely $0/MTU; there could be some nominal price to reflect administrative and convenience costs. But since there is an excess supply, the price would be essentially zero.

15 Strictly speaking, the allocations are associated with PG&E, not Humboldt Bay, and PG&E's allocations are not distinguished between Humboldt Bay and Diablo Canyon. However, since all of Humboldt Bay's OFF allocations and Must Move needs occur well in advance of any of Diablo Canyon's allocations or needs, the two plants' acceptance can be treated separately.

16 This is equal to the quantity of acceptance allocations exchanged (16 MTU) times the difference in value between 1998 and 1999 (approximately $68,000/MTU), which is $1.1 million in 1998. This value is moved forward to 2005 at a risk-free interest rate of 3.6% to yield the 2005 value of $1.4 million.

incremental pool operating cost would have been incurred in the non-breach world.

| *Year* | *Must Move Needs (MTU)* | *OFF Priority Allocation (MTU)* | *ESM Priority Allocation (MTU)* | *Difference (Unserved Must Move Needs under ESM) (MTU)* |
|---|---|---|---|---|
| 1998 | 29 | 13 | 29 | 0 |
| 1999 | 0 | 16 | 0 | 0 |
| 2000 | 0 | 0 | 0 | 0 |
| 2001 | 0 | 0 | 0 | 0 |
| 2002 | 0 | 0 | 0 | 0 |
| 2003 | 0 | 0 | 0 | 0 |
| **Total Payments for Exchanges (PV in 2005 Dollars): $1.4 Million** | | | | |

Note: Humboldt Bay has no further Must Move needs after removal of its approximately 29 MTU of spent fuel.

**Table 2: Summary of Non-Breach Spent Fuel Removal – Humboldt Bay**

Diablo Canyon, being an operating plant with adequate space in its pools for several years beyond 1998, would have had no immediate need to remove its spent fuel in the non-breach world. Diablo Canyon's initial acceptance allocations under OFF begin to accrue in 2004 (47 MTU) and continue thereafter, averaging about 70 MTU/year, as shown in Table 3. Diablo Canyon's cumulative OFF allocations are always ahead of (earlier than) its Must Move needs, so it would not have needed to use exchanges to advance its fuel removal position. Thus, even if DOE removed Diablo Canyon's spent fuel strictly on an OFF basis, its pool would not have filled up, and PG&E would not have incurred any incremental storage costs there. In fact, Diablo Canyon could afford to delay its acceptance by a couple of years relative to its initial OFF allocations. By the time Diablo Canyon's OFF allocations had begun to arise, though, the value of acceptance rights would have gone to essentially zero, and it would not have had an opportunity to profit meaningfully from exchanges. (Diablo Canyon may have engaged in some exchanges nonetheless to improve the convenience of its allocation schedule.)

| *Year* | *Must Move Needs (MTU)* | *OFF Priority Allocation (MTU)* | *ESM Priority Allocation (MTU)* | *Difference (Unserved Must Move Needs under ESM) (MTU)* |
|---|---|---|---|---|
| 1998 | 0 | 0 | 0 | 0 |
| 1999 | 0 | 0 | 0 | 0 |
| 2000 | 0 | 0 | 0 | 0 |
| 2001 | 0 | 0 | 0 | 0 |
| 2002 | 0 | 0 | 0 | 0 |
| 2003 | 0 | 0 | 0 | 0 |
| 2004 | 0 | 47 | 0 | 0 |
| 2005 | 0 | 65 | 0 | 0 |
| 2006 | 0 | 69 | 0 | 0 |
| 2007 | 42 | 94 | 51 | 0 |
| 2008 | 0 | 78 | 0 | 0 |
| 2009 | 74 | 74 | 65 | 0 |
| 2010 | 38 | 75 | 38 | 0 |
| 2011 | 36 | 39 | 36 | 0 |
| 2012 | 74 | 111 | 74 | 0 |
| 2013 | 0 | 39 | 0 | 0 |
| 2014 | 74 | 112 | 74 | 0 |
| 2015 | 38 | 0 | 38 | 0 |
| 2016 | 36 | 113 | 36 | 0 |
| **Total Payments for Exchanges (PV in 2005 Dollars): $0** | | | | |

Note: Diablo Canyon's Must Move needs beyond 2016 continue to be met by the efficient allocation of acceptance priority.

**Table 3: Summary of Non-Breach Spent Fuel Removal –Diablo Canyon**

### III.C. Inefficiency of OFF and Incentives for Efficient Acceptance Priority

It is unreasonable to expect that the OFF allocation, or any allocation similar to it, would actually have been used by DOE, because it is extraordinarily inefficient, and there are enormous gains to be had by reallocating acceptance through exchanges. Figure 4 illustrates how much better the ESM allocation addresses Must Move needs, compared with the OFF allocation. With each row corresponding to a nuclear facility and each column to a year, this figure shows a shaded cell to indicate an unserved Must Move need at a given facility in a given year, with the color of the shading indicating the nature of

the unserved need (e.g., full pool or shutdown). As can be seen, the ESM allocation has unserved removal needs at only a few facilities, and only in the first three years. It entirely avoids adding more spent fuel to an existing or new dry storage facility. The OFF acceptance schedule, by contrast, would entail the unnecessary construction of several new dry storage facilities after 1998, and require extended operation of many wet and dry storage facilities for many years.[17] Based on the representative storage costs applied in the ESM, the OFF allocation could impose as much as $2.7 billion in incremental storage costs, vs. only about $0.1 billion with the ESM allocation – a difference of about $2.6 billion.[18]

17 This is based on a facility-level allocation of OFF; actually OFF allocations are assigned at the Purchaser level. Some Purchasers with multiple facilities may choose a different allocation across those facilities.

18 Cost estimates are in present value to 2005. These costs are approximate, but do offer a reasonable estimate of magnitude of storage costs involved. A 1989 study found that a "modified shutdown priority" for acceptance, very similar to the ESM allocation, would approximate the result of exchanges, and could save approximately $1.3 million in at-reactor storage costs as compared with OFF priority. See *Spent Fuel Acceptance Scenarios Devoted to Shutdown Reactors: A Preliminary Analysis*, Pacific Northwest Laboratory, October 1989.




| ESM | | OFF |
|---|---|---|
| 3 | Shutdown Pool Operation (Plant-Years) | 198 |
| 8 | Dry Storage-Operation Only (Plant-Years) | 71 |
| 0 | Dry Storage-Add Spent Fuel (Plant - Years) | 41 |
| 0 | New Dry Storage Facilities | 8 |
| **11** | **Total Unserved Plant-Years** | **318** |
| 7 | Total Unserved Plants | 52 |

**Figure 4: Unserved Must Move Needs under ESM and OFF Allocations**

The most important benefit of reallocating acceptance according to economic need is the ability to avoid unnecessary at-reactor storage costs. But exchanges would also have other benefits. One is that while an OFF acceptance allocation would entail accepting essentially arbitrary and usually small amounts of spent fuel from many different Purchasers in each year, exchanges would tend to consolidate acceptance into fewer, larger batches, or "campaigns". This would likely simplify logistics and reduce costs both at reactors and in transportation, relative to the OFF allocation, and so I would

expect that the DOE itself would have actively encouraged such exchanges. Ivan Stuart supports the proposition that campaigns are a more efficient way to accept spent fuel, as does a study directed specifically at this question.[19] Figure 5 illustrates the number of facilities and the quantities of acceptance under both the ESM and OFF allocations. As can be seen, ESM entails fewer, larger acceptances than the OFF allocation.[20] In the first three years of the program, the ESM allocation would involve pickups at 61 facilities per year, averaging 72 MTU. In contrast, in these first three years OFF entails pickups at 100 facilities, averaging 44 MTU per pickup. The discrepancy increases further in years 2001 and beyond when the ESM allocation, having dealt with all backlogged Must Move needs and having slack acceptance capacity, would facilitate even more substantial campaigns.[21]




| ESM | | 1998 - 2000 | OFF | |
|---|---|---|---|---|
| 61 | Sites | Total Site Visits | 100 | Sites |
| 72 | MTU | Average Pick-up/Site Visit | 44 | MTU |

**Figure 5: Acceptance Campaigns Under ESM and OFF Allocations**

19 J.W. Doman and T.E. Tehan, "Significance of Campaigned Spent Fuel Shipments", High Level Radioactive Waste Management, 1993.

20 Again, based on a facility-level rather than Purchaser-level OFF allocation.

21 It is not possible to make a direct comparison in later years, because the allocation of program slack (over 1,000 MTU in 2001, almost 2,000 MTU in 2002 and continuing throughout the program) is not specified by the ESM.

## IV. Sensitivity Analyses and Conclusion

In the non-breach world, both Humboldt Bay and Diablo Canyon would have had spent fuel removed promptly when needed after the 1998 start date for contract performance, and would have avoided incurring any incremental spent fuel storage costs beyond 1998. Performing several sensitivity analyses, I found these results unchanged. An acceptance rate that is somewhat different (i.e., a different ramp-up to the 3,000 MTU/year steady state acceptance) would not change my conclusions. Indeed, even aggregate acceptance rates that are substantially lower and delayed – rates that would not be reasonable non-breach acceptance rates – yield the same result for PG&E's plants, though not necessarily for others.

Experience has shown that reactors do not necessarily retire at the end of their original license lives; some have shut down early and most others are now expected to receive license extensions. Testing the effect of this, I found that it would not change the timing of spent fuel removal from PG&E's plants. Other sensitivity analyses, e.g., with different storage costs, show that my results are not affected by reasonable variation in other assumptions. In fact, even if exchanges were not to occur at all and acceptance was based on OFF priority, the results for the PG&E facilities would be almost unchanged. This is because PG&E's OFF allocations closely match its Must Move needs, a circumstance that many other facilities do not share. These sensitivity analyses show that my conclusions regarding the PG&E facilities are extraordinarily robust.

Respectfully submitted,

November 10, 2005

Frank C. Graves
Principal

**Appendix 1**
**List of Information and Documents Considered in Forming Opinions**

1. U.S. Department of Energy Contract No. DE-CR01-83NE44402, Contract for Disposal of Spent Nuclear Fuel and/or High Level Radioactive Waste (June 30, 1983).

2. *Nuclear Waste Policy Act of 1982*, as presented in 42 USC Chapter 108 – Nuclear Waste Policy, 1/6/97.

3. *Nuclear Waste Policy Amendments Act of 1987*, as presented in 42 USC Chapter 108 – Nuclear Waste Policy, 1/6/97.

4. *Mission Plan for the Civilian Radioactive Waste Management Program*, U.S. DOE, June 1985, DOE/RW-0005.

5. *OCRWM Mission Plan Amendment*, June 1987, US DOE, DOE/RW-0128.

6. *Draft 1988 Mission Plan Amendment*, June 1988 US DOE, DOE/RW-1087.

7. *Report to Congress on Reassessment of the Civilian Radioactive Waste Management Program*, November 1989, US DOE, DOE/RW-0247.

8. *The DOE Position on the MRS Facility*, U.S. DOE, June 1989, DOE/RW-0239.

9. *MRS Systems Study Task G Report – The Role and Functions of Surface Storage of Radioactive Material in the Federal Waste Management System*, Pacific Northwest Laboratory, Apr. 1989.

10. *MRS System Study Summary Report*, U.S. DOE, June 1989, DOE/RW-0235.

11. *Annual Capacity Report*, U.S. DOE. (1987, 1988, Draft 1989, 1990, 1991, 1992.)

12. *1992 Acceptance Pricing Ranking*, U.S. DOE, May 1993, Revision 1.

13. *Acceptance Priority Ranking & Annual Capacity Report*, U.S. DOE, (1995, 2004).

14. *Spent Fuel Storage Requirements 1994-2042*, U.S. DOE, June 1995, DOE/RW-0431-Rev.1.

15. *Viability Assessment of a Repository at Yucca Mountain*, US DOE, December 1998, DOE/RW-0508.

16. *Analysis of the Total System Life Cycle Cost of the Civilian Radioactive Waste Management Program*, U.S. DOE, December 1998, May 2001, DOE/RW-0510.

17. *Civilian Radioactive Waste Management System Requirements Document*, U.S. DOE, Revision 05, January 1999; Revision 06, September 2004.

18. *Civilian Radioactive Waste Management System, Waste Acceptance System Requirements Document,* U.S. DOE, Revision 4, January 2002.

19. *Civilian Radioactive Waste Management Program Plan*, U.S. DOE, Revision 3, February 2000.

20. *Civilian Radioactive Waste Management System Throughput Rate Analysis*, August 17, 1993, Prepared for U.S. Department of Energy, Prepared by System Analysis, Civilian Radioactive Waste Management System Management and Operating Contractor.

21. *Spent Fuel Acceptance Scenarios Devoted to Shutdown Reactors: A Preliminary Analysis*, Pacific Northwest Laboratory, October 1989.

22. "Significance of Campaigned Spent Fuel Shipments" by J.W. Doman and T.E. Tehan, published in Volulme I of High Level Radioactive Waste Management, Proceedings of the Fourth Annual International Conference, Las Vegas, Nevada, April 26-30, 1993.

23. Gottlieb, Peter and W. Bailey III, F. Emami, L.M. Ford, and J.F. King, "Throughput Study for the Civilian Radioactive Waste Management System," from the Proceedings of the High Level Radioactive Waste Management Conference, Las Vegas, NV, April 12-16, 1992.

24. McKee, R.W. and H.D. Huber, "Determination of Cost Effective Waste Management System Receipt Rates," Pacific Northwest Laboratory, from the Proceedings of the High Level Radioactive Waste Management Conference, Las Vegas, NV, April 28-May 3, 1991.

25. S.R. Rod, "Cost Estimates of Operating Onsite Spent Fuel Pools After Final Reactor Shutdown," Pacific Northwest Laboratory, August 1991.

26. *Spent Nuclear Fuel Discharges from U.S. Reactors 1993*, February 1995, Energy Information Administration, Department of Energy.

27. *2005 – 2006 Information Digest, NUREG-1350, Volume 17*. United States Nuclear Regulatory Commission. July 2005.

28. *License Expiration, Capacity and Generation for U.S. Nuclear Power Plants,* Nuclear Energy Institute, April 2005. Available at www.nei.org.

29. *2002 Summary of U.S. Generating Company In-Pool Spent Fuel Storage Capability Projected Year That Full Core Discharge Capability is Lost.* Energy Resources International, June 2002. Available at www.nei.org

30. *2002 Form 10-K/A.* PG&E Corporation, Pacific Gas and Electric Company. Securities and Exchange Commission.

31. *Issuance of Amendments for Diablo Canyon Nuclear Power Plant, Unit No. 1 (TAC No. M84006) and Unit No. 2 (TAC No. M84007).* Available at www.nrc.gov. March 1, 1995.

32. *Dresden – Issuance of Amendment (TAC No. MA5414).* Available at www.nrc.gov. August 24, 2000.

33. *Draft Issuance of Amendment to Facility Operating License No. NPF-29 Grand Gulf Nuclear Station, Unit 1 (TAC No. M92993).* Available at www.nrc.gov. December 21, 1998.

34. *Palisades Plant – Issuance of Amendment Re: Revision to Operating License Expiration Date (TAC No. MA8753)*, December 14, 2000. Available at www.nrc.gov.

35. *Change to Operating License Expiration Date to Reflect Facility Construction Time, Peach Bottom Atomic Power Station, Units 2 and 3 (TAC Nos. M83762 and M83763)*, March 28, 1994. Available at www.nrc.gov.

36. *Amendment Application Nos. 195 and 180, Supplement 1 Proposed Change to the Operating License Expiration Date San Onofre Nuclear Generating Station Units 2 and 3*, February 24, 2000. Available at www.nrc.gov.

37. *San Onofre Nuclear Generating Station (Songs), Units 2 and 3 – Issuance of Amendments Re: Extend License Expiration Date (TAC Nos. MA7348 and MA7349)*, March 9, 2000. Available through www.nrc.gov.

38. *Turkey Point Units 3 and 4 – Issuance of Amendments Re: Radiological Effluent Releases – 10 CFR 20 Requirements (TAC Nos. M82921 and M82922)*, April 20, 1994. Available at www.nrc.gov.

39. *Amendment No. 158 to Facility Operating License for Fort Calhoun*, Nuclear Regulatory Commission.

40. Gross Domestic Product Implicit Price Deflator, from Federal Reserve Bank of St. Louis Economic Research database, October 28, 2005.

41. Blue Chip Economic Indicators, October 10, 2005.

42. Cost of Capital Yearbook, Ibbotson Associates (2001, 2005).

43. Yields on Treasury Securities released on 10/24/2005 (Federal Reserve Bank of St. Louis).

44. Yankee Atomic v. United States, 98-126C, Trial Transcript (Testimonies of Dr. John Bartlett, Michael Meisner and Ivan Stuart).

45. Settlement Agreement between Exelon and DOE in lawsuits No. 98-621C, No. 04-102C, No. 04-103C, No. 04-104C, dated August 5, 2004.

46. Letter from Daniel Dreyfus, OCRWM Director, to Dr. Andrew Kodak, President and CEO of Yankee Atomic, dated September 28, 1995.

47. Communication with David Vosburg (PG&E) regarding Diablo Canyon's current spent fuel storage needs.

48. *Deposition of Nancy Slater*, April 21, 1999.

49. *John W. Bartlett Expert Witness Report*

50. *Ivan F. Stuart Expert Witness Report*

51. *Roderick Knight Expert Witness Report*

## Frank C. Graves

Mr. Graves assists corporations, often regulated utilities, in the design and implementation of long-range planning, investment, and operating policies, and he assists their counsel with regulatory compliance and litigation support. He has extensive experience with electric utility capacity expansion and network modeling, investment and contract prudence reviews, estimation of marginal costs, design and pricing of new services, financial simulation, risk management and valuation techniques. He has testified before the FERC and state regulatory commissions, as well as in federal court, on the economics of gas and electric industry restructuring, breach of contract disputes, cost of service, risk management for supply procurement, and adequacy of market competition. He received an M.S. with a concentration in finance from the M.I.T. Sloan School of Management in 1980, and a B.A. in Mathematics from Indiana University in 1975.

### REPRESENTATIVE CONSULTING EXPERIENCE

*Regulated Industry Restructuring*

- As a result of vertical unbundling, many utilities must procure a substantial portion of their power from resources they do not own or operate. Market prices for such supplies are quite volatile. In addition, utilities may face future customer switching to or from their supply service, especially if they are acting as provider of last resort (POLR). This problem is a blending of risk management with the traditional least-cost Integrated Resource Planning (IRP). Regulatory standards for findings of prudence in such a hybrid environment are often not well understood or articulated, leaving utilities at risk for cost disallowances that can jeopardize their credit-worthiness. Mr. Graves has assisted several utilities in devising updated procurement mechanisms and associated regulatory guidelines that clarify the conditions for approval of plans, in order to make possible the expedited procurement of power from wholesale market suppliers.

- There is a strong tendency in electric restructuring to impose "provider of last resort" (POLR) transitional supply obligations on the incumbent distcos. Unfortunately, POLR obligations that are extremely protective of customers harm the development of competitive retail power markets and can impose extreme, viability-threatening costs or risks on distcos. Mr. Graves developed policy papers and tutorials on this problem for the Edison Electric Institute, and advised several utilities on the design and valuation of alternative POLR specifications and coverage strategies.

- As a means of unbundling to retain ownership but not control of generation, some utilities turned to divesting output contracts. Mr. Graves was involved in the design and approval of such agreements for an entire fleet of generation. The work entailed estimating and projecting cost functions that were likely to track the future marginal and total costs of the units, and analysis of the financial risks the plant operator would bear from the output pricing formula. Testimony on risks under this form of restructuring was presented.

- Mr. Graves worked with the executive committees of several utilities in designing regulatory strategies for influencing the pace and procedures associated with the transition to retail electric access. These have also included comprehensive business strategies and integrated planning tools for service unbundling and pricing, incentive ratemaking, corporate reorganization, market forecasting, asset valuation, and risk management.

- Mr. Graves contributed to the design and pricing of unbundled services on several natural gas pipelines. To identify attractive alternatives, the marginal costs of possible changes in a pipeline's service mix were quantified by simulating the least-cost operating practices subject to the network's physical and contractual constraints. Such analysis helped one pipeline to justify a zone-based rate design for its firm transportation service. Another pipeline used this technique to demonstrate that unintended degradations of system performance and increased costs could ensue from certain proposed unbundlings that were insensitive to system operations.

- For several natural gas pipeline companies, Mr. Graves evaluated the cost of equity capital in light of the requirements of FERC Order 636 to unbundle and reprice pipeline services. In addition to traditional DCF and risk positioning studies, the risk implications of different degrees of financial leverage (debt capitalization) were modeled and quantified. Aspects of rate design and cost allocation between services that also affect pipeline risk were considered.

- Mr. Graves assisted several utilities in forecasting market prices, revenues, and risks for generation assets being shifted from regulated cost recovery to competitive, deregulated wholesale power markets. Such studies have facilitated planning decisions, such as whether to divest generation or retain it, and have been used as the basis for quantifying stranded costs associated with

restructuring in regulatory hearings. Mr. Graves' work in this area has helped several utilities develop long term planning models for managing their generation assets in a competitive market.

*Market Competition*

- Regulatory and legal approvals of utility mergers require evidence that the combined entity will not have undue market power and that it will create operating synergies that produce benefits for electric customers. Mr. Graves assisted several utilities in evaluating the competitive impacts of potential mergers and acquisitions. He has identified ways in which transmission constraints reduce the number and type of suppliers, along with mechanisms for incorporating physical flow limits in FERC Delivered Price Test for mergers.

- A major concern associated with electric utility industry restructuring is whether or not generation markets are adequately competitive. Because of the state-dependent nature of transmission transfer capability between regions, itself a function of generation use, the quality of competition in the wholesale generation markets can vary significantly and may be susceptible to market power abuse by dominant suppliers. Mr. Graves helped one of the largest ISOs in the U.S. develop market monitoring procedures to detect and discourage market manipulations that would impair competition.

- Vertical market power arises when sufficient control of an upstream market creates a competitive advantage in a downstream market. It is possible for this problem to arise in power supply, in settings where the likely marginal generation is dependent on very few fuel suppliers who also have economic interests in the local generation market. Mr. Graves analyzed this problem in the context of the California gas and electric markets and filed testimony to explain the magnitude and manifestations of the problem.

- The increased use of transmission congestion pricing has created interest in merchant transmission facilities. Mr. Graves assisted a developer with testimony on the potential impacts of a proposed line on market competition for transmission services and adjacent generation markets. He also assisted in the design of the process for soliciting and ranking bids to buy tranches of capacity over the line.

- Many regions have misgivings about whether the preconditions for retail electric access are truly in place. In one such region, Mr. Graves assisted a group of industrial customers with a critique of retail restructuring proposals to demonstrate that the locally weak transmission grid made adequate competition among numerous generation suppliers very implausible.

*Electric and Gas Transmission*

- For the electric utility regulatory commission of Colombia, S.A., Mr. Graves led a study to assess the inadequacies in the physical capabilities and economic incentives to manage voltages at adequate levels. The *Brattle* team developed minimum reactive power support obligations and supplement reactive power acquisition mechanisms for generators, transmission companies, and distribution companies.

- On behalf of the Electric Power Research Institute (EPRI), Mr. Graves wrote a primer on how to define and measure the cost of electric utility transmission capacity for better planning, pricing, and regulatory policies. The text covers the basic electrical engineering of power circuits, utility practices to exploit transmission economies of scale, means of assuring system stability, economic dispatch subject to transmission constraints, and the estimation of marginal costs of transmission. The implications for a variety of policy issues are also discussed.

- The natural gas pipeline industry is wedged between competitive gas production and competitive resale of gas delivered to end users. In principle, the resulting basis differentials between locations around the pipeline ought to provide efficient usage and expansion signals, but traditional pricing rules prevent the pipeline companies from participating in the marginal value of their own services. Mr. Graves worked to develop alternative pricing mechanisms and service mixes for pipelines that would provide more dynamically efficient signals and incentives.

- Mr. Graves analyzed the spatial and temporal patterns of marginal costs on gas and electric utility transmission networks using optimization models of production costs and network flows. These results were used by one natural gas transmission company to design receipt-point-based transmission service tariffs, and by another to demonstrate the incremental costs and uneven

distribution of impacts on customers that would result from a proposed unbundling of services.

*Utility Operations*

- Several utilities with coal-fired power plants are facing allegations from the U.S. EPA that they have conducted past maintenance on these plants which should be deemed "major modifications", thereby triggering New Source Review standards for air quality controls. Mr. Graves has helped one such utility assess limitations on the way in which GADS data can be used retrospectively to quantify comparisons between past actual and projected future emissions. For another utility, Mr. Graves developed estimates of changes in emissions before and after repairs using production costing simulations. In both cases, testimony was presented.

- The U.S. Government is contractually obligated to dispose of spent nuclear fuel at commercial reactors after January 1998, but it has not fulfilled this duty. As a result, nuclear facilities that are shutdown or facing full spent fuel pools are facing burdensome costs and risks. Mr. Graves prepared testimony on the incremental costs being borne by three nuclear operating companies with shutdown units as a result of this federal failure to perform.

- Capturing the full value of hydroelectric generation assets in a competitive power market is heavily dependent on operating practices that astutely shift between real power and ancillary services markets, while still observing a host of non-electric hydrological constraints. Mr. Graves led studies for several major hydro generation owners in regard to forecasting of market conditions and corresponding hydro schedule optimization. He has also designed transfer pricing procedures that create an internal market for diverting hydro assets from real power to system support services firms that do not yet have explicit, observable market prices.

- The impacts of transmission open access and generation competition on utility financial health are well documented. In addition, there substantial impacts on fuel suppliers, due to revised dispatch, repowerings and retirements, changes in expansion mix, and altered load shapes and load growth under more competitive pricing. For EPRI, Mr. Graves contributed to a study that projected changes in fuel use within and between ten large power market

regions spanning the country under different scenarios for the pace and success of restructuring.

- Mr. Graves led a gas distribution company in the development of an incentive ratemaking system to replace all aspects of its traditional cost of service regulation. The base rates (for non-fuel operating and capital costs) were indexed on a price-cap basis (RPI-X), while the gas and upstream transportation costs allowances were tied to optimal average annual usage of a reference portfolio of supply and transportation contracts. The gas program also included numerous adjustments to the gas company's rate design, such as designing new standby rates so that customer choice will not be distorted by pricing inefficiencies.

- An electric utility with several out-of-market independent power contracts wanted to determine the value of making those plants dispatchable and to devise a negotiating strategy for restructuring the IPP agreements. Mr. Graves developed a range of forecasts for the delivered price of natural gas to this area of the country. Alternative ways of sharing the potential dispatch savings were proposed as incentives for the IPPs to renegotiate their utility contracts.

- For an electric utility considering the conversion of some large oil-fired units to natural gas, Mr. Graves conducted a study of the advantages of alternative means of obtaining gas supplies and gas transportation services. A combination of monthly and daily spot gas supplies, interruptible pipeline transportation over several routes, gas storage services, and "swing" (contingent) supply contracts with gas marketers was shown to be attractive. Testimony was presented on why the additional services of a local distribution company would be unneeded and uneconomic.

- A power engineering firm entered into a contract to provide operations and maintenance services for a cogenerator, with incentives fees tied to the unit's availability and operating cost. When the fees increased due to changes in the electric utility tariff to which they were tied, a dispute arose. Mr. Graves provided analysis and testimony on the avoided costs associated with improved cogeneration performance under a variety of economic scenarios and under several alternative utility tariffs.

- Mr. Graves helped several pipelines design incentive pricing mechanisms for recovering their expected costs and reducing their regulatory burdens. Among these have been Automatic Rate Adjustment Mechanisms (ARAMs) for indexation of operations and maintenance expenses, construction-cost variance-sharing for routine capital expenditures that included a procedure for eliciting unbiased estimates of future costs, and market-based prices capped at replacement costs when near-term future expansion was an uncertain but probable need.

- For a major industrial gas user, he prepared a critique of the transportation balancing charges proposed by the local gas distribution company. Those charges were shown to be arbitrarily sensitive to the measurement period as well as to inconsistent attribution of storage versus replacement supply costs to imbalance volumes. The tariff design, a commodity charge on a per-cash-in/cash-out at spot market gas prices with penalties for very deep imbalances, or an incremental storage inventory and withdrawal capacity used on-peak, were shown to be cheaper, more efficient, and less complex to administer. This analysis helped the parties reach a settlement based on the cash-in/cash-out design.

- The Clean Air Act Amendment authorized electric utilities to trade emission allowances (EAs) as part of their approach to complying with $SO_2$ emissions reductions targets. For the Electric Power Research Institute (EPRI), Mr. Graves developed multi-stage planning models to illustrate how the considerable uncertainty surrounding future EA prices justifies waiting to invest in irreversible control technologies, such as scrubbers or SCRs, until the present value cost of such investments is significantly below that projected from relying on EAs.

- For an electric utility with a troubled nuclear plant, Mr. Graves presented testimony on the economic benefits likely to ensue from a major reorganization. The plant was to be spun off to a jointly-owned subsidiary that would sell available energy back to the original owner under a contract indexed to industry unit cost experience. This proposal afforded a considerable reduction of risk to ratepayers in exchange for a reasonable, but highly uncertain prospect of profits for new investors. Testimony compared the incentive benefits and potential conflicts under this arrangement to the

outcomes foreseeable from more conventional incentive ratemaking arrangements.

- Mr. Graves helped design Gas Inventory Charge (GIC) tariffs for interstate pipelines seeking to reduce their risks of not recovering the full costs of multi-year gas supply contracts. The costs of holding supplies in anticipation of future, uncertain demand were evaluated with models of the pipeline's supply portfolio that reveal how many non-production costs (demand charges, take-or-pay penalties, reservation fees, or remarketing costs for released gas) would accrue under a range of demand scenarios. The expected present value of these costs provided a basis for the GIC tariff.

- Mr. Graves performed a review and critique of a state energy commission's assessment of regional natural gas and electric power markets in order to determine what kinds of pipeline expansion into the area was economic. A proposed facility under review for regulatory approval was found to depend strongly on uneconomic bypass of existing pipelines and LDCs. In testimony, modular expansion of existing pipelines was shown to have significantly lower costs and risks.

- For several electric utilities with generation capacity in excess of target reserve margins, Mr. Graves designed and supervised market analyses that compared the marginal operating costs of all power plants not needed to meet target reserves to the marginal costs for 50 to 100 neighboring utilities. These cost curves were then overlaid on the corresponding curve for the client utility to identify which neighbors were competitors and which were potential customers. The strength of their relative threat or attractiveness could be quantified by the present value of the product of the amount, duration, and differential cost of capacity that was displaceable by the client utility.

- Mr. Graves specified algorithms for the enhancement of the EPRI EGEAS generation expansion optimization model, to capture the first-order effects of financial and regulatory constraints on the preferred generation mix.

- For a major electric power wholesaler, Mr. Graves developed a framework for estimating how pricing policies affect the relative attractiveness of capacity expansion alternatives. Traditional cost-recovery pricing rules can significantly distort the choice between two otherwise equivalent capacity