plans, if one includes a severe "front end load" while the other does not. Price-demand feedback loops in simulation models and quantification of consumer satisfaction measures were used to appraise the problem. This "value of service" framework was generalized for the Electric Power Research Institute.

- For a large gas and electric utility, Mr. Graves participated in coordinating and evaluating the design of a strategic and operational planning system. This included computer models of all aspects of utility operations, from demand forecasting through generation planning to financing and rate design. Efforts were split between technical contributions to model design and attention to organizational priorities and behavioral norms with which the system had to be compatible.

- For a major electronic and semiconductor firm, Mr. Graves critiqued and refined a proposed procedure for ranking the attractiveness of research and development projects. Aspects of risk peculiar to research projects were emphasized over the standards used for budgeting an already proven commercial venture.

- For an oil and gas exploration and production firm, Mr. Graves developed a framework for identifying what industry groups were most likely to be interested in natural gas supply contracts featuring atypical risk-sharing provisions. These provisions, such as price indexing or performance requirements contingent on market conditions, are a form of product differentiation for the producer, allowing it to obtain a price premium for the insurance-like services.

- For a natural gas distribution company, Mr. Graves established procedures for redefining customer classes and for repricing gas services according to customers' similarities in load shape, access to alternative gas supplies, expected growth, and need for reliability. In this manner, natural gas service was effectively differentiated into several products, each with price and risk appropriate to a specific market. Planning tools were developed for balancing gas portfolios to customer group demands.

- For a Midwestern electric utility, Mr. Graves extended a regulatory *pro forma* financial model to capture the contractual and tax implications of canceling

and writing off a nuclear power plant in mid-construction. This possibility was then appraised relative to completion or substitution alternatives from the viewpoints of shareholders (market value of common equity) and ratepayers (present value of revenue requirements).

- For a corporate venture capital group, Mr. Graves conducted a market-risk assessment of investing in a gas exploration and production company with contracts to an interstate pipeline. The pipeline's market growth, competitive strength, alternative suppliers, and regulatory exposure were appraised to determine whether its future would support the purchase volumes needed to make the venture attractive.

- For a natural gas production and distribution company, he developed a strategic plan to integrate the company's functional policies and to reposition its operations for the next five years. Decision analysis concepts were combined with marginal cost estimation and financial *pro forma* simulation to identify attractive and resilient alternatives. Recommendations included target markets, supply sources, capital budget constraints, rate design, and a planning system. A two-day planning conference was conducted with the client's executives to refine and internalize the strategy.

- For the New Mexico Public Service Commission, he analyzed the merits of a corporate reorganization of the major New Mexico gas production and distribution company. State ownership of the company as a large public utility was considered but rejected on concerns over efficiency and the burdening of performance risks onto state and local taxpayers.

*Financial Analysis*

- As a tax-revenue enhancement measure, the IRS was considering a plan to recapture deferred taxes associated with generation assets that were divested or reorganized during state restructurings for retail access. Mr. Graves prepared a white paper demonstrating the unfairness and adverse consequences of such a plan, which was instrumental in eliminating the proposal.

- The energy and telecom industries have been plagued by scandals regarding alleged trading and accounting misrepresentations, such as wash trades, manipulations of mark-to-market valuations, premature recognition of revenues, and improper use of off-balance sheet entities. In many cases, this

conduct has preceded or caused financial collapse and subsequent shareholder suits. Mr. Graves lead research on accounting and financial evidence for such misconduct, including event studies of the stock price movements around the time of the contested practices, and reconstruction of accounting and economic justifications for the way asset values and revenues were recorded.

- Recent gas price increases in the U.S. put several natural gas and electric utilities in the position of having to counter claims that they should have hedged more of their fuel supplies at times in the past. Mr. Graves developed testimony to rebut this hindsight criticism and risk management techniques for fuel (and power) procurement for utilities to apply in the future to avoid prudence challenges.

- A large public power agency was concerned about its debt capacity in light of increasing competitive pressures to allow its resale customers to use alternative suppliers. Mr. Graves lead a team that developed an Economic Balance Sheet representation of the agency's electric assets and liabilities in market value terms, which was analyzed across several scenarios to determine safe levels of debt financing. In addition, new service pricing and upstream supply contracting arrangements were identified to help reduce risks.

- Wholesale generating companies intuitively realize that there are considerable differences in the financial risk of different kinds of power plant projects, depending on fuel type, length and duration of power purchase agreements, and tightness of local markets. However, they often are unaware of how if at all to adjust the hurdle rates applied to valuation and development decisions. Mr. Graves lead a Brattle analysis of risk-adjusted discount rates for generation; very substantial adjustments were found to be necessary.

- A major telecommunications firm was concerned about when and how to reenter the Pacific rim for wireless ventures following the economic collapse of that region in 1997-99. Mr. Graves lead an engagement to identify prospective local partners with a governance structure that made it unlikely for them to divert capital from the venture if markets went soft. He also helped specify contracting and financing structures that create incentives for the venture to remain together should it face financial distress, while offering strong returns under good performance.

- There are many risks associated with operations in a foreign country, related to the stability of its currency, its macro economy, its foreign investment policies, and even its political system. Mr. Graves has assisted firms facing these new dimensions to assess the risks, identify strategic advantages, and choose an appropriate, risk-adjusted hurdle rate for the market conditions and contracting terms they will face.

- The glut of generation capacity that helped usher in electric industry restructuring in the US led to asset devaluations in many places, even where no retail access was allowed. In some cases, this has led to bankruptcy, especially of a few large rural electric cooperatives. Mr. Graves assisted one such coop with its long term financial modeling and rate design under its plan of reorganization, which was approved. Testimony was provided on cost-of-service justifications for the new generation and transmission prices, as well as on risks to the plan from potential environmental liabilities.

- Power plants often provide a significant contribution to the property tax revenues of the townships where they are located. A common valuation policy for such assets has been that they are worth at least their book value, because that is the foundation for their cost recovery under cost-of-service utility ratemaking. However, restructuring throws away that guarantee, requiring reappraisal of these assets. Traditional valuation methods, *e.g.*, based on the replacement costs of comparable assets, can be misleading because they do not consider market conditions. Mr. Graves testified on such matters on behalf of the owners of a small, out-of-market coal unit in Massachusetts.

- Stranded costs and out-of-market contracts from restructuring can affect municipalities and cooperatives as well as investor-owned utilities. Mr. Graves assisted one debt-financed utility in an evaluation of its possibilities for reorganization, refinancing, and re-engineering to improve financial health and to lower rates. Sale and leaseback of generation, fuel contract renegotiation, targeted downsizing, spin-off of transmission, and new marketing programs were among the many components of the proposed new business plan.

- As a means of reducing supply commitment risk, some utilities have solicited offers for power contracts that grant the right but not the obligation to take

power at some future date at a predetermined price, in exchange for an initial option premium payment. Mr. Graves assisted several of these utilities in the development of valuation models for comparing the asking prices to fair market values for option contracts. In addition, he has helped these clients develop estimates of the critical option valuation parameters, such as trend, volatility, and correlations of the future prices of electric power and the various fuel indexes proposed for pricing the optional power.

- For the World Bank and several investor-owned electric utilities, Mr. Graves presented tutorial seminars on applying methods of financial economics to the evaluation of power production investments. Techniques for using option pricing to appraise the value of flexibility (such as arises from fuel switching capability or small plant size) were emphasized. He has applied these methods in estimating the value of contingent contract terms in fuel contracts (such as price caps and floors) for natural gas pipelines.

- Mr. Graves prepared a review of empirical evidence regarding the stock market's reaction to alternative dividend, stock repurchase, and stock dividend policies for a major electric utility. Tax effects, clientele shifting, signaling, and ability to sustain any new policies into the future were evaluated. A one-time stock repurchase, with careful announcement wording, was recommended.

- For a division of a large telecommunications firm, Mr. Graves assisted in a cost benchmarking study, in which the costs and management processes for billing, service order and inventory, and software development were compared to the practices of other affiliates and competitors. Unit costs were developed at a level far more detailed than the company normally tracked, and numerical measures of drivers that explained the structural and efficiency causes of variation in cost performance were identified. Potential costs savings of 10-50 percent were estimated, and procedures for better identification of inefficiencies were suggested.

- For an electric utility seeking to improve its plant maintenance program, Mr. Graves directed a study on the incremental value of a percentage point decrease in the expected forced outage rate at each plant owned and operated by the company. This defined an economic priority ladder for efforts to reduce outage that could be used in lieu of engineering standards for each

plant's availability. The potential savings were compared to the costs of alternative schedules and contracting policies for preventive and reactive maintenance, in order to specify a cost reduction program.

- Mr. Graves conducted a study on the risk-adjusted discount rate appropriate to a publicly-owned electric utility's capacity planning. Since revenue requirements (the amounts being discounted) include operating costs in addition to capital recovery costs, the weighted average cost of capital for a comparable utility with traded securities may not be the correct rate for every alternative or scenario. The risks implicit in the utility's expansion alternatives were broken into component sources and phases, weighted, and compared to the risks of bonds and stocks to estimate project-specific discount rates and their probable bounds.

## PROFESSIONAL MEMBERSHIPS

IEEE Power Engineering Society
Mathematical Association of America
American Finance Association
International Association for Energy Economics
Energy Modeling Forum (Stanford University)

## EXPERT TESTIMONY

Direct testimony before the Illinois Commerce Commission on behalf of Midwest Generation EME, LLC, Docket No. 05-0159, June 8, 2005, regarding the appropriate load caps for a POLR auction.

Affidavit to the Federal Energy Regulatory Commission on behalf of Dominion Energy, Inc., Docket No. EC05-43-000, April 11, 2005, regarding unmitigated market power concerns arising from the Exelon – PSEG Merger.

Expert and rebuttal reports and oral testimonies before the American Arbitration Association on behalf of Liberty Electric Power, LLC, Case No. 70 198 4 00228 04, December 2004, regarding damages under termination of a long-term tolling contract.

Oral direct and rebuttal testimony before the United States Court of Federal Claims on behalf of Connecticut Yankee Atomic Power Company, Docket No. 98-154 C, July 2004 (direct) and August 2004 (rebuttal), regarding non-performance of the U.S. Department of Energy in accepting spent nuclear fuel under the terms of its contract.

Direct, supplemental and rebuttal testimony before the Public Service Commission of Wisconsin, on behalf of Wisconsin Public Service Corporation and Wisconsin Power and Light Company, Docket No. 05-EI-136, February 27, 2004 (direct), May 4, 2004 (supplemental) and May 28, 2004 (rebuttal) in regard to the benefits of the proposed sale of the Kewaunee nuclear power plant.

Direct and rebuttal testimony before the Public Utility Commission of Texas on behalf of CenterPoint Energy Houston Electric LLC, Reliant Energy Retail Services LLC, and Texas Genco LP, Docket No. 29526, March 2004 (direct) and June 2004 (rebuttal), in regard to the effect of Genco separation agreements and financial practices on stranded costs and on value of control premiums implicit in Texas Genco Stock price.

Rebuttal and additional testimony before the Illinois Commerce Commission, on behalf of Peoples Gas Light and Coke Company, Docket No. 01-0707, November 2003 (rebuttal) and January 2005 (additional rebuttal), in regard to prudence of gas contracting and hedging practices.

Rebuttal testimony before the State Office of Administrative Hearings on behalf of Texas Genco and CenterPoint Energy, Docket No. 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, October 23, 2003, regarding proposed exclusion of part of CenterPoint's purchased power costs on grounds of including "imputed capacity" payments in price.

Rebuttal testimony before the Federal Energy Regulatory Commission (FERC) on behalf of Ameren Energy Generating Company and Union Electric Company, Docket No. EC03-53-000, October 6, 2003, in regard to evaluation of transmission limitations and generator responsiveness in generation procurement.

Rebuttal testimony before the New Jersey Board of Public Utilities on behalf of Jersey Central Power & Light Company, Docket No. ER02080507, March 5, 2003, regarding the prudence of JCP&L's power purchasing strategy to cover its provider-of-last-resort obligation.

Oral testimony (February 17, 2003) and expert report (April 1, 2002) before the United States District Court, Southern District of Ohio, Eastern Division on behalf of Ohio Edison Company and Pennsylvania Power Company, Civil Action No. C2-99-1181, regarding coal plant maintenance projects alleged to trigger New Source Review.

Expert Report before the United States District Court on behalf of Duke Energy Corporation, Docket No. 1:00CV1262, September 16, 2002, regarding forecasting changes in air pollutant emissions following coal plant maintenance projects.

Direct testimony before the Public Utility Commission of Texas on behalf of Reliant Energy, Inc., Docket No. 26195, July 2002, regarding the appropriateness of Reliant HL&P's gas contracting, purchasing and risk management practices, and standards for assessing HL&P's gas purchases.

Direct and rebuttal testimonies before the Public Utilities Commission of the State of California on behalf of Southern California Edison, Application No. R. 01-10-024, May 1, 2002, and June 5, 2002, regarding Edison's proposed power procurement and risk management strategy, and the regulatory guidelines for reviewing its procurement purchases.

Rebuttal testimony before the Texas Public Utility Commission on behalf of Reliant Resources, Inc., Docket No. 24190, October 10, 2001, regarding the good-cause exception to the substantive rules that Reliant Resources, Inc. and the staff of the Public Utility Commission sought in their Provider of Last Resort settlement agreement.

Direct testimony before the Federal Energy Regulatory Commission (FERC) on behalf of Northeast Utilities Service Company, Docket No. ER01-2584-000, July 13, 2001, in regard to competitive impacts of a proposed merchant transmission line from Connecticut to Long Island.

Direct testimony before the Vermont Public Service Board on behalf of Vermont Gas Systems, Inc., Docket No. 6495, April 13, 2001, regarding Vermont Gas System's proposed risk management program and deferred cost recovery account for gas purchases.

Affidavit on behalf of Public Service Company of New Mexico, before the Federal Energy Regulatory Commission (FERC), Docket No. ER96-1551-000, March 26, 2001, to provide an updated application for market based rates.

Affidavit on behalf of the New York State Electric and Gas Corporation, April 19, 2000, before the New York State Public Service Commission, *In the Matter of Customer Billing Arrangements*, Case 99-M-0631.

Supplemental Direct and Reply Testimonies of Frank C. Graves and A. Lawrence Kolbe (jointly) on behalf of Southern California Edison Company, Docket Nos. ER97-2355-00, ER98-1261-000, ER98-1685-000, November 1, 1999, regarding risks and cost of capital for transmission services.

Expert report before the United States Court of Federal Claims on behalf of Connecticut Yankee Atomic Power Company, *Connecticut Yankee Atomic Power Company, Plaintiff v. United States of America*, No. 98-154 C, June 30, 1999, regarding non-performance of the U.S. Department of Energy in accepting spent nuclear fuel under the terms of its contract.

Expert report before the United States Court of Federal Claims on behalf of Maine Yankee Atomic Power Company, *Maine Yankee Atomic Power Company, Plaintiff v. United States of America*, No. 98-474 C, June 30, 1999, regarding the damages from non-performance of the U.S. Department of Energy in accepting spent nuclear fuel and high-level waste under the terms of its contract.

Expert report before the United States Court of Federal Claims on behalf of Yankee Atomic Electric Company, *Yankee Atomic Electric Company, Plaintiff v. United States of America*, No.

98-126 C, June 30, 1999, regarding the damages from non-performance of the U.S. Department of Energy in accepting spent nuclear fuel and high-level waste under the terms of its contract.

Prepared direct testimony before the Federal Energy Regulatory Commission on behalf of National Rural Utilities Cooperative Finance Corporation, Inc., *Cities of Anaheim and Riverside, California v. Deseret Generation & Transmission Cooperative*, Docket No. EL97-57-001, March 1999, regarding cost of service for rural cooperatives versus investor-owned utilities, and coal plant valuation.

Expert report and oral examination before the Independent Assessment Team for industry restructuring appointed by the Alberta Energy and Utilities Board on behalf of TransAlta Utilities Corporation, January 1999, regarding the cost of capital for generation under long-term, indexed power purchase agreements.

Oral testimony before the Commonwealth of Massachusetts Appellate Tax Board on behalf of Indeck Energy Services of Turners Falls, Inc., *Turners Falls Limited Partnership, Appellant vs. Town of Montague, Board of Assessors, Appellee*, Docket Nos. 225191-225192, 233732-233733, 240482-240483, April 1998, regarding market conditions and revenues assessment for property tax basis valuation.

Direct and joint supplemental testimony before the Pennsylvania Public Utility Commission on behalf of Pennsylvania Electric Company and Metropolitan Edison Company, No. R-00974009, *et al.*, December 1997, regarding market clearing prices, inflation, fuel costs, and discount rates.

Direct Testimony before the Pennsylvania Public Utilities Commission on behalf of UGI Utilities, Inc., Docket No. R-00973975, August 1997, regarding forecast of market clearing energy and capacity prices.

Testimony before the Public Utilities Commission of the State of California on behalf of the Southern California Edison Company, No. 96-10-038, August 1997, regarding anticompetitive implications of the proposed Pacific Enterprises/ENOVA mergers.

Direct and supplemental testimony before the Kentucky Public Service Commission on behalf of Big Rivers Electric Corporation, No. 97-204, June 1997, regarding wholesale generation and transmission rates under the bankruptcy plan of reorganization.

Affidavit before the Federal Energy Regulation Commission on behalf of the Southern California Edison Company in Docket No. EC97-12-000, March 28, 1997, filed as part of motion to intervene and protest the proposed merger of Enova Corporation and Pacific Enterprises.

Direct, rebuttal, and supplemental rebuttal testimony before the State of New Jersey Board of Public Utilities on behalf of GPU Energy, No. EO97070459, February 1997, regarding market clearing prices, inflation, fuel costs, and discount rates.

Oral direct testimony before the State of New York on behalf of Niagara Mohawk Corporation in *Philadelphia Corporation, et al., v. Niagara Mohawk*, No. 71149, November 1996, regarding interpretation of low-head hydro IPP contract quantity limits.

Oral direct testimony before the State of New York on behalf of Niagara Mohawk Corporation in *Black River Limited Partnership v. Niagara Mohawk Power Corporation*, No. 94-1125, July 1996, regarding interpretation of IPP contract language specifying estimated energy and capacity purchase quantities.

Oral direct testimony on behalf of *Eastern Utilities Associates* before the Massachusetts Department of Public Utilities, No. 96-100 and 2320, July 1996, regarding issues in restructuring of Massachusetts electric industry for retail access.

Affidavit before the Kentucky Public Service Commission on behalf of *Big Rivers Electric Corporation* in PSC Case No. 94-032, June 1995, regarding modifications to an environmental surcharge mechanism.

Rebuttal testimony on behalf of utility in *Eastern Energy Corporation v. Commonwealth Electric Company*, American Arbitration Association, No. 11 Y 198 00352 04, March 1995, regarding lack of net benefits expected from a terminated independent power project.

Direct testimony before the Pennsylvania Public Utility Commission on behalf of Pennsylvania Power & Light Company in *Pennsylvania Public Utility Commission et al. v. UGI Utilities, Inc.*, Docket No. R-932927, March 1994, regarding inadequacies in the design and pricing of UGI's proposed unbundling of gas transportation services.

Direct testimony before the Pennsylvania Public Utility Commission, on behalf of Interstate Energy Company, *Application of Interstate Energy Company for Approval to Offer Services in the Transportation of Natural Gas*, Docket No. A-140200, October 1993, and rebuttal testimony, March 1994.

Direct testimony before the Pennsylvania Public Utility Commission, on behalf of Procter & Gamble Paper Products Company, *Pennsylvania Public Utility Commission v. Pennsylvania Gas and Water Company*, Docket No. R-932655, September 1993, regarding PG&W's proposed charges for transportation balancing.

Oral rebuttal testimony before the American Arbitration Association, on behalf of Babcock and Wilcox, File No. 53-199-00127-92, May 1993, regarding the economics of an incentive clause in a cogeneration operations and maintenance contract.

Answering testimony before the Federal Energy Regulatory Commission, on behalf of CNG Transmission Corporation, Docket No. RP88-211-000, March 1990, regarding network marginal costs associated with the proposed unbundling of CNG.

Direct testimony before the Federal Energy Regulatory Commission, on behalf of Consumers Power Company *et al.*, concerning the risk reduction for customers and the performance incentive benefits from the creation of *Palisades Generating Company*, Docket No. ER89-256-000, October 1989, and rebuttal testimony, Docket No. ER90-333-000, November 1990.

Direct testimony before the New York Public Service Commission, on behalf of Consolidated Natural Gas Transmission Corporation, *Application of Empire State Pipeline for Certificate of Public Need*, Case No. 88-T-132, June 1989, and rebuttal testimony, October, 1989.

**PUBLICATIONS, PAPERS AND PRESENTATIONS**

"The New Role of Regulators in Portfolio Selection and Approval" (with Joseph B. Wharton), presented at EUCI Resource and Supply Planning Conference, New Orleans, November 4, 2004.

"Disincentives to Utility Investment in the Current World of Competitive Regulation," (with August Baker), prepared for the Edison Electric Institute (EEI), October, 2004.

"Power Procurement for Second-Stage Retail Access" (with Greg Basheda), presented at Illinois Commerce Commission's 'Post 2006 Symposium', Chicago, IL, April 29, 2004.

"Utility Investment and the Regulatory Compact," (with August Baker), presented to NMSU Center for Public Utilities Advisory Council, Santa Fe, New Mexico, March 23, 2004.

"How Transmission Grids Fail," presented to NARUC Staff Subcommittee on Accounting and Finance, Spring 2004 Meeting, Scottsdale, Arizona, March 22, 2004

"Resource Planning & Procurement in Restructured Electricity Markets," presented to NARUC Winter Committee Meetings, Washington, D.C., March 9, 2004.

"Resource Planning and Procurement in Evolving Electricity Markets," (with James A. Read and Joseph B. Wharton), white paper for Edison Electric Institute (EEI), January 31, 2004.

"Analysis of Alternative Standards for Reactive Power and Voltage Support Services for Colombia" (with Martin L. Baughman and W. Mack Grady),in *IEEE Transactions on Power Systems*.

"Transmission Management in the Deregulated Electric Industry – A Case Study on Reactive Power" (with Judy W. Chang and Dean M. Murphy), *The Electricity Journal*, Volume 16, Issue 8, October, 2003.

"Flaws in the Proposed IRS Rule to Reinstate Amortization of Deferred Tax Balances Associated with Generation Assets Reorganized in Industry Restructuring," (with Michael J. Vilbert), white paper for Edison Electric Institute (EEI) to the IRS, July 25, 2003.



B45

"Resource Planning & Procurement in Restructured Electricity Markets" (with James A. Read and Joseph B. Wharton), presented at Northeast Mid-Atlantic Regional Meeting of Edison Electrical Institute, Philadelphia, PA, May 6, 2003 and at Midwest Regional Meeting, Chicago, IL, June 18, 2003.

"New Directions for Safety Net Service – Pricing and Service Options" (with Joseph B. Wharton), white paper for Edison Electric Institute (EEI), May 2003.

"Volatile Markets Demand Change in State Regulatory Evaluation Policies," (with Steven H. Levine), chapter 20 of *Electric & Natural Gas Business: Understanding It!*, edited by Robert E. Willett, Financial Communications Company, Houston, TX, February 2003, pp. 377-405.

"New York Power Authority Hydroelectric Project Production Rates," report prepared for NYPA (New York Power Authority) on the embedded costs of production of ancillary services at the Niagara and St. Lawrence hydroelectric projects, 2001-2006, January 22, 2003.

"Regulatory Policy Should Encourage Hedging Programs" (with Steven H. Levine), *Natural Gas*, Volume 19, Number 4, November 2002.

"Measuring Gas Market Volatility - A Survey" (with Paolo Coghe and Manuel Costescu), presented at the Stanford Energy Modeling Forum, Washington, D.C., June 24, 2002.

"Unbundling and Rebundling Retail Generation Service: A Tale of Two Transitions" (with Joseph B. Wharton), presented at the Edison Electric Institute Conference on Unbundling/Rebundling Utility Generation and Transmission, New Orleans, LA, February 25, 2002.

"Regulatory Design for Reactive Power and Voltage Support Services" (with Judy W. Chang), prepared for Comision de Regulacion de Energia y Gas, Bogotá, Colombia, December 2001.

"Provider of Last Resort Service Hindering Retail Market Development" (with Joseph B. Wharton), *Natural Gas*, Volume 18, Number 3, October 2001.

"Strategic Management of POLR Obligations" presented at Edison Electric Institute and the Canadian Electricity Association Conference, New Orleans, LA, June 5, 2001.

"Measuring Progress Toward Retail Generation Competition" (with Joseph B. Wharton) Edison Electric Institute E-Forum presentation, May 16, 2001.

"International Review of Reactive Power Management" (with Judy W. Chang), presented to Comision de Regulacion de Energia y Gas, Bogotá, Colombia, May 4, 2001.

"POLR and Progress Towards Retail Competition - Can Kindness Kill the Market?" (with Joseph B. Wharton), presented at the NARUC Winter Committee Meeting, Washington, D.C.,

February 27, 2001.

"What Role for Transitional Electricity Price Protections After California?" presented to the Harvard Electricity Policy Group, 24th Plenary Session, San Diego, CA, February 1, 2001.

"Estimating the Value of Energy Storage in the United States: Some Case Studies" (with Thomas Jenkin, Dean Murphy and Rachel Polimeni) prepared for the Conference on Commercially Viable Electricity Storage, London, England, January 31, 2001.

"PBR Designs for Transcos: Toward a Competitive Framework" (with Steven Stoft), *The Electricity Journal*, Volume 13, Number 7, August/September 2000.

"Capturing Value with Electricity Storage in the Energy and Ancillary Service Markets" (with Thomas Jenkin, Dean Murphy and Rachel Polimeni) presented at EESAT, Orlando, Florida, September 18, 2000.

"Implications of ISO Design for Generation Asset Management" (with Edo Macan and David A. Andrade), presented at the Center for Business Intelligence's Conference on Pricing Power Products & Services, Chicago, Illinois, October 14-15, 1999.

"Residual Service Obligations Following Industry Restructuring" (with James A. Read, Jr.), paper and presentation at the Edison Electric Institute Economic Regulation and Competition Committee Meeting, Longboat Key, Florida, September 26-29, 1999. Also presented at EEI's 1999 Retail Access Conference: *Making Retail Competition Work*, Chicago, Illinois, September 30-October 1, 1999.

"Opportunities for Electricity Storage in Deregulating Markets" (with Thomas Jenkin and Dean Murphy), *The Electricity Journal*, October 1999.

*How Competitive Market Dynamics Affect Coal, Nuclear and Gas Generation and Fuel Use – A 10 Year Look Ahead* (with L. Borucki, R. Broehm, S. Thumb, and M. Schaal), Final Report, May 1999, TR-111506 (Palo Alto, CA: Electric Power Research Institute, 1999).

"Price Caps for Standard Offer Service: A Hidden Stranded Cost" (with Paul Liu), *The Electricity Journal*, Volume 11, Number 10, December 1998.

*Mechanisms for Evaluating the Role of Hydroelectric Generation in Ancillary Service Markets* (with R.P. Broehm, R.L. Earle, T.J. Jenkin, and D.M. Murphy), Final Report, November 1998, TR-111707 (Palo Alto, CA: Electric Power Research Institute, 1998).
"PJM Market Competition Evaluation White Paper," (with Philip Hanser), prepared for PJM, L.L.C., October, 1998.

"The Role of Hydro Resources in Supplying System Support and Ancillary Services," presented at the EPRI Generation Assets Management Conference, Baltimore, Maryland, July 13-15, 1998.

Published in *EPRI Generation Assets Management 1998 Conference: Opportunities and Challenges in the Electric Marketplace*, Proceedings, November 1998, TR-111345 (Palo Alto, CA: EPRIGEN, Inc., 1998).

"Regional Impacts of Electric Utility Restructuring on Fuel Markets" (with S.L. Thumb, A.M. Schaal, L.S. Borucki, and R. Broehm), presented at the EPRI Generation Assets Management Conference, Baltimore, Maryland, July 13-15, 1998. Published in *EPRI Generation Assets Management 1998 Conference: Opportunities and Challenges in the Electric Marketplace*, Proceedings, November 1998, TR-111345 (Palo Alto, CA: EPRIGEN, Inc., 1998).

*Energy Market Impacts of Electric Industry Restructuring: Understanding Wholesale Power Transmission and Trading* (with S.L. Thumb, A.M. Schaal, L.S. Borucki, and R. Broehm), Final Report, March 1998, EPRI TR-108999, GRI-97/0289 (Palo Alto, CA: Electric Power Research Institute, 1998).

"Pipeline Pricing to Encourage Efficient Capacity Resource Decisions"(with Paul R. Carpenter and Matthew P. O'Loughlin), filed on behalf of Columbia Gas Transmission Corporation and Columbia Gulf Transmission Company, with their comments on *Financial Outlook for the Natural Gas Pipeline Industry*, FERC Docket No. PL98-2-000, February 1998.

"One-Part Markets for Electric Power: Ensuring the Benefits of Competition" (with E. Grant Read, Philip Q Hanser, and Robert L. Earle), Chapter 7 in *Power Systems Restructuring: Engineering and Economics*, M. Ilić, F. Galiana, and L. Fink, eds. (Boston: Kluwer Academic Publishers, 1998, reprint 2000), pp. 243-280.

"Railroad and Telecommunications Provide Prior Experience in 'Negotiated Rates'" (with Carlos Lapuerta), *Natural Gas*, July 1997.

"Considerations in the Design of ISO and Power Exchange Protocols: Procurement Bidding and Market Rules" (with J.P. Pfeifenberger), presented at the Electric Utility Consultants Bulk Power Markets Conference, Vail, Colorado, June 3-4, 1997.

"The Economics of Negative Barriers to Entry: How to Recover Stranded Costs and Achieve Competition on Equal Terms in the Electric Utility Industry" (with William B. Tye), Electric Industry Restructuring, *Natural Resources Journal*, Volume 37, No. 1,Winter 1997.

"Capacity Prices in a Competitive Power Market" (with James A. Read), *The Virtual Utility: Accounting, Technology & Competitive Aspects of the Emerging Industry*, S. Awerbuch and A. Preston, eds. (Boston: Kluwer Academic Publishers, 1997), pages 175-192.
"Stranded Cost Recovery and Competition on Equal Terms" (with William B. Tye), *Electricity Journal*, Volume 9, Number 10, December 1996.

"Basic and Enhanced Services for Recourse and Negotiated Rates in the Natural Gas Pipeline Industry" (with Paul R. Carpenter, Carlos Lapuerta, and Matthew P. O'Loughlin), filed on behalf

of Columbia Gas Transmission Corporation and Columbia Gulf Transmission Company, in its *Comments on Negotiated Rates and Terms of Service*, FERC Docket No. RM96-7, May 29, 1996.

"Premium Value for Hydro Power in a Deregulated Industry? Technical Opportunities and Market Structure Effects," presented to the *EPRI Hydro Steering Committee Conference*, Chattanooga, Tennessee, April 19, 1996, and to the *EPRI Energy Storage Benefits Workshop*, New Orleans, Louisiana, May 22, 1996.

"Distributed Generation Technology in a Newly Competitive Electric Power Industry" (with Johannes P. Pfeifenberger, Paul R. Ammann, and Gary A. Taylor), presented at the *American Power Conference*, Illinois Institute of Technology, April 10, 1996.

"A Framework for Operations in the Competitive Open Access Environment" (with Marija D. Ilić, Lester H. Fink, Albert M. DiCaprio), *Electricity Journal*, Volume 9, Number 3, April 1996.

"Prices and Procedures of an ISO in Supporting a Competitive Power Market" (with Marija Ilić), presented at the *Restructuring Electric Transmission Conference*, Denver, Colorado, September 27, 1995.

"Potential Impacts of Electric Restructuring on Fuel Use," EPRI *Fuel Insights*, Issue 2, September 1995.

"Optimal Use of Ancillary Generation Under Open Access and its Possible Implementation" (with Maria Ilić), *M.I.T. Laboratory for Electromagnetic and Electronic Systems Technical Report*, LEES TR-95-006, August 1995.

"Estimating the Social Costs of PUHCA Regulation" (with Paul R. Carpenter), submitted to the Security and Exchange Commission's *Request for Comments on Modernization of the Regulation of Public Utility Holding Companies*, SEC File No. S7-32-93, February 6, 1995.

*A Primer on Electric Power Flow for Economists and Utility Planners*, TR-104604, The Electric Power Research Institute, EPRI Project RP2123-19, January 1995.

"Impacts of Electric Industry Restructuring on Distributed Utility Technology," presented to the Electric Power Research Institute/National Renewable Energy Laboratory/Florida Power Corporation *Conference on Distributed Generation*, Orlando, Florida, August 24, 1994.

Pricing Transmission and Power in the Era of Retail Competition" (with Johannes P. Pfeifenberger), presented at the Electric Utility Consultants' *Retail Wheeling Conference*, Beaver Creek, Colorado, June 21, 1994.

"Pricing of Electricity Network Services to Preserve Network Security and Quality of Frequency Under Transmission Access" (with Dr. Marija Ilić, Paul R. Carpenter, and Assef Zobian),

Response and Reply comments to the Federal Energy Regulatory Commission in is *Notice of Technical Conference on Transmission Pricing*, Docket No. RM-93-19-000, November 1993 and January 1994.

"Evaluating and Using CAAA Compliance Cost Forecasts," presented at the *EPRI Workshop on Clean Air Response*, St. Louis, Missouri, November 17 and Arlington, Virginia, November 19, 1992.

"Beyond Valuation—Organizational and Strategic Considerations in Capital Budgeting for Electric Utilities," presented at *EPRI Capital Budgeting Notebook Workshop*, New Orleans, Louisiana, April 9-10, 1992.

"Unbundling, Pricing, and Comparability of Service on Natural Gas Pipeline Networks" (with Paul R. Carpenter), as appendix to Comments on FERC Order 636 filed by Interstate Natural Gas Association of America, November 1991.

"Estimating the Cost of Switching Rights on Natural Gas Pipelines" (with James A. Read, Jr. and Paul R. Carpenter), presented at the M.I.T. Center for Energy Policy Research, "Workshop on New Methods for Project and Contract Evaluation," March 2-4, 1988; and in *The Energy Journal*, Volume 10, Number 4, October 1989.

"Demand-Charge GICs Differ from Deficiency-Charge GICs" (with Paul R. Carpenter), *Natural Gas*, August 1989.

"What Price Unbundling?" (with P.R. Carpenter), *Natural Gas*, June 1989.

"Price-Demand Feedback," presented at *EPRI Capital Budgeting Seminar*, San Diego, California, March 2-3, 1989.

"Applications of Finance to Electric Power Planning," presented at the World Bank, *Seminar on Risk and Uncertainty in Power System Planning*, October 13, 1988.

"Planning for Electric Utilities: The Value of Service" (with James A. Read, Jr.), in *Moving Toward Integrated Value-Based Planning*, Electric Power Research Institute, 1988.

"Valuation of Standby Charges for Natural Gas Pipelines" (with James A. Read, Jr. and Paul R. Carpenter), presented to M.I.T. Center for Energy Policy Research, October, 1987.

**Appendix 3**
**Disclosure of Deposition and Testimony of Frank Graves During the Past Four Years**

1. Direct testimony before the Illinois Commerce Commission on behalf of Midwest Generation EME, LLC, Docket No. 05-0159, June 8, 2005, regarding the appropriate load caps for a POLR auction.

2. Affidavit to the Federal Energy Regulatory Commission on behalf of Dominion Energy, Inc., Docket No. EC05-43-000, April 11, 2005, regarding unmitigated market power concerns arising from the Exelon – PSEG Merger.

3. Expert and rebuttal reports and oral testimonies before the American Arbitration Association on behalf of Liberty Electric Power, LLC, Case No. 70 198 4 00228 04, December 2004, regarding damages under termination of a long-term tolling contract.

4. Oral direct and rebuttal testimony before the United States Court of Federal Claims on behalf of Connecticut Yankee Atomic Power Company, Docket No. 98-154 C, July 2004 (direct) and August 2004 (rebuttal), regarding non-performance of the U.S. Department of Energy in accepting spent nuclear fuel under the terms of its contract.

5. Direct, supplemental and rebuttal testimony before the Public Service Commission of Wisconsin, on behalf of Wisconsin Public Service Corporation and Wisconsin Power and Light Company, Docket No. 05-EI-136, February 27, 2004 (direct), May 4, 2004 (supplemental) and May 28, 2004 (rebuttal) in regard to the benefits of the proposed sale of the Kewaunee nuclear power plant.

6. Direct and rebuttal testimony before the Public Utility Commission of Texas on behalf of CenterPoint Energy Houston Electric LLC, Reliant Energy Retail Services LLC, and Texas Genco LP, Docket No. 29526, March 2004 (direct) and June 2004 (rebuttal), in regard to the effect of Genco separation agreements and financial practices on stranded costs and on value of control premiums implicit in Texas Genco Stock price.

7. Rebuttal and additional testimony before the Illinois Commerce Commission, on behalf of Peoples Gas Light and Coke Company, Docket No. 01-0707, November 2003 (rebuttal) and January 2005 (additional rebuttal), in regard to prudence of gas contracting and hedging practices.

8. Rebuttal testimony before the State Office of Administrative Hearings on behalf of Texas Genco and CenterPoint Energy, Docket No. 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, October 23, 2003, regarding proposed exclusion of part of CenterPoint's purchased power costs on grounds of including "imputed capacity" payments in price.

9. Rebuttal testimony before the Federal Energy Regulatory Commission (FERC) on behalf of Ameren Energy Generating Company and Union Electric Company, Docket No. EC03-53-000, October 6, 2003, in regard to evaluation of transmission limitations and generator responsiveness in generation procurement.

10. Rebuttal testimony before the New Jersey Board of Public Utilities on behalf of Jersey Central Power & Light Company, Docket No. ER02080507, March 5, 2003, regarding the prudence of JCP&L's power purchasing strategy to cover its provider-of-last-resort obligation.

11. Oral testimony (February 17, 2003) and expert report (April 1, 2002) before the United States District Court, Southern District of Ohio, Eastern Division on behalf of Ohio Edison Company and Pennsylvania Power Company, Civil Action No. C2-99-1181, regarding coal plant maintenance projects alleged to trigger New Source Review.

12. Expert Report before the United States District Court on behalf of Duke Energy Corporation, Docket No. 1:00CV1262, September 16, 2002, regarding forecasting changes in air pollutant emissions following coal plant maintenance projects.

13. Direct testimony before the Public Utility Commission of Texas on behalf of Reliant Energy, Inc., Docket No. 26195, July 2002, regarding the appropriateness of Reliant HL&P's gas contracting, purchasing and risk management practices, and standards for assessing HL&P's gas purchases.

14. Direct and rebuttal testimonies before the Public Utilities Commission of the State of California on behalf of Southern California Edison, Application No. R. 01-10-024, May 1, 2002, and June 5, 2002, regarding Edison's proposed power procurement and risk management strategy, and the regulatory guidelines for reviewing its procurement purchases.

15. Rebuttal testimony before the Texas Public Utility Commission on behalf of Reliant Resources, Inc., Docket No. 24190, October 10, 2001, regarding the good-cause exception to the substantive rules that Reliant Resources, Inc. and the staff of the Public Utility Commission sought in their Provider of Last Resort settlement agreement.

16. Direct testimony before the Federal Energy Regulatory Commission (FERC) on behalf of Northeast Utilities Service Company, Docket No. ER01-2584-000, July 13, 2001, in regard to competitive impacts of a proposed merchant transmission line from Connecticut to Long Island.

17. Direct testimony before the Vermont Public Service Board on behalf of Vermont Gas Systems, Inc., Docket No. 6495, April 13, 2001, regarding Vermont Gas System's proposed risk management program and deferred cost recovery account for gas purchases.

18. Affidavit on behalf of Public Service Company of New Mexico, before the Federal Energy Regulatory Commission (FERC), Docket No. ER96-1551-000, March 26, 2001, to provide an updated application for market based rates.

## Appendix 4
## Disclosure of Publications of Frank Graves During the Past Ten Years

1. "Disincentives to Utility Investment in the Current World of Competitive Regulation," (with August Baker), prepared for the Edison Electric Institute (EEI), October, 2004.

2. "Resource Planning and Procurement in Evolving Electricity Markets," (with James A. Read and Joseph B. Wharton), white paper for Edison Electric Institute (EEI), January 31, 2004.

3. "Analysis of Alternative Standards for Reactive Power and Voltage Support Services for Colombia" (with Martin L. Baughman and W. Mack Grady), in *IEEE Transactions on Power Systems*.

4. "Transmission Management in the Deregulated Electric Industry – A Case Study on Reactive Power" (with Judy W. Chang and Dean M. Murphy), *The Electricity Journal*, Volume 16, Issue 8, October, 2003.

5. "Flaws in the Proposed IRS Rule to Reinstate Amortization of Deferred Tax Balances Associated with Generation Assets Reorganized in Industry Restructuring," (with Michael J. Vilbert), white paper for Edison Electric Institute (EEI) to the IRS, July 25, 2003.

6. "New Directions for Safety Net Service – Pricing and Service Options" (with Joseph B. Wharton), white paper for Edison Electric Institute (EEI), May 2003.

7. "Volatile Markets Demand Change in State Regulatory Evaluation Policies," (with Steven H. Levine), chapter 20 of *Electric & Natural Gas Business: Understanding It!*, edited by Robert E. Willett, Financial Communications Company, Houston, TX, February 2003, pp. 377-405.

8. "New York Power Authority Hydroelectric Project Production Rates," report prepared for NYPA (New York Power Authority) on the embedded costs of production of ancillary services at the Niagara and St. Lawrence hydroelectric projects, 2001-2006, January 22, 2003.

9. "Regulatory Policy Should Encourage Hedging Programs" (with Steven H. Levine), *Natural Gas*, Volume 19, Number 4, November 2002.

10. "Provider of Last Resort Service Hindering Retail Market Development" (with Joseph B. Wharton), *Natural Gas*, Volume 18, Number 3, October 2001.

11. "PBR Designs for Transcos: Toward a Competitive Framework" (with Steven Stoft), *The Electricity Journal*, Volume 13, Number 7, August/September 2000.

12. "Opportunities for Electricity Storage in Deregulating Markets" (with Thomas Jenkin and Dean Murphy), *The Electricity Journal*, October 1999.

13. *How Competitive Market Dynamics Affect Coal, Nuclear and Gas Generation and Fuel Use – A 10 Year Look Ahead* (with L. Borucki, R. Broehm, S. Thumb, and M. Schaal), Final Report, May 1999, TR-111506 (Palo Alto, CA: Electric Power Research Institute, 1999).

14. "Price Caps for Standard Offer Service: A Hidden Stranded Cost" (with Paul Liu), *The Electricity Journal*, Volume 11, Number 10, December 1998.

15. *Mechanisms for Evaluating the Role of Hydroelectric Generation in Ancillary Service Markets* (with R.P. Broehm, R.L. Earle, T.J. Jenkin, and D.M. Murphy), Final Report, November 1998, TR-111707 (Palo Alto, CA: Electric Power Research Institute, 1998).

16. "PJM Market Competition Evaluation White Paper," (with Philip Hanser), prepared for PJM, L.L.C., October, 1998.

17. *Energy Market Impacts of Electric Industry Restructuring: Understanding Wholesale Power Transmission and Trading* (with S.L. Thumb, A.M. Schaal, L.S. Borucki, and R. Broehm), Final Report, March 1998, EPRI TR-108999, GRI-97/0289 (Palo Alto, CA: Electric Power Research Institute, 1998).

18. "One-Part Markets for Electric Power: Ensuring the Benefits of Competition" (with E. Grant Read, Philip Q Hanser, and Robert L. Earle), Chapter 7 in *Power Systems Restructuring: Engineering and Economics*, M. Ilić, F. Galiana, and L. Fink, eds. (Boston: Kluwer Academic Publishers, 1998, reprint 2000), pp. 243-280.

19. "Railroad and Telecommunications Provide Prior Experience in 'Negotiated Rates'" (with Carlos Lapuerta), *Natural Gas*, July 1997.

20. "The Economics of Negative Barriers to Entry: How to Recover Stranded Costs and Achieve Competition on Equal Terms in the Electric Utility Industry" (with William B. Tye), Electric Industry Restructuring, *Natural Resources Journal*, Volume 37, No. 1,Winter 1997.

21. "Capacity Prices in a Competitive Power Market" (with James A. Read), *The Virtual Utility: Accounting, Technology & Competitive Aspects of the Emerging Industry*, S. Awerbuch and A. Preston, eds. (Boston: Kluwer Academic Publishers, 1997), pages 175-192.

22. "Stranded Cost Recovery and Competition on Equal Terms" (with William B. Tye), *Electricity Journal*, Volume 9, Number 10, December 1996.

23. "A Framework for Operations in the Competitive Open Access Environment" (with Marija D. Ilić, Lester H. Fink, Albert M. DiCaprio), *Electricity Journal*, Volume 9,

Number 3, April 1996.

24. "Potential Impacts of Electric Restructuring on Fuel Use," EPRI *Fuel Insights*, Issue 2, September 1995.

25. "Optimal Use of Ancillary Generation Under Open Access and its Possible Implementation" (with Maria Ilić), *M.I.T. Laboratory for Electromagnetic and Electronic Systems Technical Report*, LEES TR-95-006, August 1995.

26. *A Primer on Electric Power Flow for Economists and Utility Planners*, TR-104604, The Electric Power Research Institute, EPRI Project RP2123-19, January 1995.

# APPENDIX C

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| PACIFIC GAS AND ELECTRIC COMPANY<br>Plaintiff,<br>v.<br>UNITED STATES OF AMERICA<br>Defendant. | No. 04-0074C, into which has been consolidated No. 04-0075C (Judge Hewitt) |

REBUTTAL REPORT OF FRANK C. GRAVES

## 1. INTRODUCTION

This rebuttal report responds to criticisms directed at my expert witness report (November 10, 2005) and supporting analyses, made by Dr. Jonathan Neuberger in his report of January 27, 2006.[1] Dr. Neuberger claims that my analysis is "overly simplistic" and "fails to capture many of the fundamental drivers" that would affect a market for exchanges, and that it thus produces unreliable results. Broadly, he criticizes my analysis for:

- Relying on questionable, unsupported assumptions;
- Incompletely characterizing the trading market;
- Ignoring sociopolitical concerns;
- Ignoring uncertainty and risk.

[1] My qualifications and compensation have not changed from those set out in my initial expert witness report in this case. My testimony, depositions and publications are also unchanged, except for additions noted in Appendix 1.

Dr. Neuberger does identify a number of economic issues that might, in principle, have the potential to affect my analysis. However, his criticisms are purely conceptual, hypothetical and speculative. Despite his assertion in deposition that it would be possible to model and quantify the issues he identifies, and in fact claiming that he is qualified to analyze them, he has made no attempt to do so, saying that this was "beyond the scope" of his assignment.

Dr. Neuberger claims that my results are unreliable because my analysis did not consider the issues he raised. In fact, I have addressed almost all of Dr. Neuberger's issues in my analyses. In particular, the several sensitivity analyses I have run are precisely the kind of analysis needed to address alternative assumptions about costs, program parameters and the potential effects of risk, sociopolitical factors, etc. In this rebuttal report, I examine the issues raised by Dr. Neuberger, evaluating whether they arise in the context of non-breach spent fuel acceptance and how they might affect my conclusions. Section 2 discusses Dr. Neuberger's primary concerns. For many of these issues, I explain how my sensitivity analysis cases place an upper bound on their potential effects; I refer to the results of these cases by number in the discussion. The sensitivity analyses I have performed are presented together and compared in greater detail in Section 3. In Section 4, I present my overall conclusions regarding Dr. Neuberger's critiques. Briefly, I find that many of the issues raised by Dr. Neuberger can be shown to be irrelevant to this situation. Of those that might potentially be relevant (and also for several that are not), their effects on my results are immaterial, and would not alter my conclusions regarding the PG&E plants.

## 2. DR. NEUBERGER'S CRITICISMS

Much of Dr. Neuberger's criticism focuses on identifying hypothetical problems and market frictions that could (and sometimes do) arise virtually anywhere. However, the mere ability to name such possible problems does not establish that they are present in this context or material to my analysis or conclusions. Indeed, Dr. Neuberger made no

attempt to analyze, model or quantify the extent of the factors he cites, or their potential effect on my results. Every market experiences some degree of departure from perfect, economically idealized prices and allocation. Yet such markets work quite well for many goods and services in our economy, and it is often possible to forecast their performance effectively with models that assume a high degree of efficiency. I have assessed the potential effects of the factors Dr. Neuberger cites, and as the sensitivity analyses described below show, my results are extremely robust to the kinds of market imperfections that he raises, making his criticisms entirely moot.

### 2.1 UNCERTAINTY, RISK AVERSION AND SOCIOPOLITICAL FACTORS

One of Dr. Neuberger's primary points, in V.B-D of his report, is that several factors besides avoidable storage costs could affect supply and demand of acceptance right exchanges. He identifies risk aversion, uncertainty, and political, regulatory and community pressure as potential barriers to exchanging spent fuel acceptance allocations. He claims that these factors might make Purchasers attach value to acceptance rights prior to having an actual Must Move situation, and thus might make the holders of OFF allocations unwilling to exchange them away. According to Dr. Neuberger, this would cause the market to reach a different solution than I have modeled, or perhaps to break down altogether, leaving Purchasers with the OFF allocation (Neuberger ¶ 61). He is suggesting that Purchasers would have expected the program to fail, and they would have planned for and persistently operated in anticipation of that failure. This would have caused a very inefficient outcome to occur even if the program itself performed well, imposing very high (and otherwise avoidable) spent fuel storage costs on Purchasers and leading to little or no damages.

First, to the extent that any of Dr. Neuberger's hypothesized intangible effects on desire or willingness to participate might affect the value of exchanges, these factors would likely apply at least as much to potential buyers (those with current Must Move needs in excess of their OFF rights) as to potential sellers (those with OFF rights in excess of needs). That is, if potential sellers valued rights highly, making them reluctant to

exchange, potential buyers would have correspondingly high or higher intangible values, making them even more eager to exchange. On top of any such intangible effect, potential buyers, but not sellers, would place additional value on acceptance due to the tangible economic benefit of avoidable storage costs, hence be willing to pay to overcome sellers' reluctance. Dr. Neuberger's intangible value, if present, might increase the price of exchanges, but would not change the ultimate allocation. Dr. Neuberger conceded in deposition that the factors that would increase the price that sellers require could also raise what buyers would be willing to pay.

Second, intangible concerns would not arise at random, but would occur, if at all, in particular circumstances. For instance, a facility approaching a full pool condition within a few years might want to avoid the possibility of disrupting operations, and so it may prefer not to wait until the last moment to resolve its Must Move needs. But because expanding storage capacity requires only a few years, such a concern would, at most, advance the facility's desire to remove spent fuel a few years ahead of its actual full pool condition.[2] I address this with sensitivity analyses in Section 3, modeling this effect with several differing levels of severity (see Cases 16, 17 and 18). On the other hand, an operating facility ten years from a full pool condition would not have the same desire to remove fuel now. It would see little advantage to removing fuel 10 years early, rather than 5 years in advance of its need – there is no plausible difference in storage cost or risk between these cases that would favor early removal. (To the contrary, there might be an advantage to consolidating several years of early OFF rights to have all that fuel removed at once, say in 5 years, and avoid multiple deliveries.) Similarly, a facility with an upcoming shutdown condition would not want removal before its Must Move date, regardless of uncertainty or political factors, because the fuel cannot all be removed earlier (it is not all 5-years cool). Removing some portion of the fuel earlier would be

[2] This likely overstates the effect. Even if all the facilities wanted to avoid any possibility of interfering with operations, some would need less leadtime. Diablo Canyon, for instance, has the ability to install temporary racks that will buy it an additional two fuel cycles (about 3 years) with a modest leadtime, so even if it were infinitely risk averse with regard to running out of pool space, it would not insist on having spent fuel removed very far in advance. Similar interim solutions may be available for others.

pointless, since the pool must operate as long as any fuel remains. Dr. Neuberger conceded that a facility facing an imminent full pool condition would have a very different demand for early removal than a facility approaching a shutdown condition or one with more distant full pool concerns. This contradicts his hypothesis that risk aversion might be so extreme as to imply a near-absolute unwillingness on the part of all Purchasers to exchange any OFF rights. Further, an absolute unwillingness to exchange is also inconsistent with the fact that the Purchasers worked actively to put the exchange provision into the Standard Contract.[3] If they were entirely unwilling to exchange, they would have seen no value in having an exchange provision, and would not have bothered to negotiate it.

Third, the uncertainty that Dr. Neuberger imagines will make Purchasers unwilling to trade away early OFF rights requires that they have a very unusual set of expectations for the program's performance. It requires Purchasers to believe that early acceptance rights will be honored, but that later rights will not. If they believe the program will always work, then they would be willing to exchange early rights. If they believe it will never work, exchanges don't matter because neither early nor late rights will be honored. If they believe it might falter initially but then recover, then exchanging away early, unnecessary rights might be doubly advantageous, so as to avoid being directly involved in the early problems. Only if Purchasers believe that the program will function well in the early years, and break down later, can uncertainty increase the value of early rights and make Purchasers reluctant to trade them away. But this is at odds with normal expectations for a complex engineering program such as this. If there are major problems, they tend to arise immediately. With time, problems tend to be resolved, or perhaps not. It is unusual, and would be unusual to expect, for a program to perform well for a while and then fail later. Particularly here, for purposes of evaluating contract breach, it is unreasonable to project that performance would initially succeed but then later fail.

[3] This is reflected in DOE's statements in the Final Rule accepting the utilities' requests to add the exchange provision to the contract. 48 Fed. Reg. 16590, 16592 (April 18, 1983). Also, see testimony of Loring Mills at the Yankee trial, transcript pp. 355-56, July 13, 2004.

Even if this curious belief structure were widespread, it would be unlikely to hamper exchanges, due to the first point above – the uncertainty premium for early rights would be recognized by potential buyers as well as sellers, and buyers have additional value from avoiding storage costs, maintaining the incentives for exchanges. To make his argument work, Dr. Neuberger must hypothesize that somehow, those Purchasers who have excess early OFF allocations just happen to have this odd belief structure, while others with needs greater than their OFF rights have more typical beliefs. This is simply not credible.

As for sociopolitical concerns, Dr. Neuberger's discussion implausibly assumes that these would always favor removing as much spent fuel as possible, as soon as possible, regardless of the storage situation at the site (Neuberger, ¶ 56-57). In fact, it is likely that political concerns would generally be aligned with economic incentives. It is natural to expect that sociopolitical pressures would oppose the creation of an additional spent fuel storage facility (e.g., dry storage) or unnecessarily extended operation (prolonged shutdown operation), and thus support removals that prevent such situations. For example, in a 1987 agreement with several intervenors, PG&E agreed to "reasonably pursue the highest DOE priority for the removal of the Humboldt Bay Power Plant Unit 3 spent fuel assemblies." (See Appendix 2.) That is, the intervenors were anxious to have all the shut-down fuel removed with highest priority. On the other hand, partial fuel removal would be unlikely to satisfy sociopolitical concerns, because the perceived risks of spent fuel storage are likely to be all-or-nothing, like economic costs. Arbitrarily-timed OFF removals require additional fuel movements and the attendant perceived risks, but do nothing to prevent a new storage facility, eliminate the presence of spent fuel altogether, or avoid prolonged post-shutdown fuel storage. Thus sociopolitical pressures would tend to promote removals in economic Must Move situations, but might oppose arbitrary removals when no Must Move condition is imminent. This would reinforce the economic incentives, encouraging exchanges rather than hampering them.

Dr. Neuberger's attempt to illustrate the potential effect of uncertainty, risk and sociopolitical factors in his Exhibits 4 and 5 fails on several levels. To begin, as became clear at his deposition, he misinterprets my analysis. He believes I model demand for exchanges and that I assume all rights are offered for exchange at zero price. This is incorrect – my model calculates total demand for acceptance (i.e., all Must Move fuel; demand for exchanges is demand for acceptance net of the demand met by Purchasers' initial OFF allocations). My treatment of supply is perfectly consistent with how I characterize demand.

Dr. Neuberger is correct that if some OFF holders with unneeded rights nonetheless either insisted on a substantial positive price to exchange or withheld those rights altogether, then the supply curve would shift left and/or upwards as he shows illustratively in his Exhibits 4 (lower) and 5 (upper). He failed in his report to recognize, but conceded at deposition, that factors that might shift the supply curve upward (corresponding to potential sellers requiring a higher price) would also raise the demand curve. Demand would likely shift at least as much as supply – those with imminent removal needs would be at least as anxious about uncertainties and sociopolitical factors as those without. The net effect of this joint shift in supply and demand curves might increase the price at which exchanges would transact, but unless sellers' assessment of value somehow increased by more than buyers', it would not prevent the transactions.

### 2.2 License Extension and Acceptance Rate

Dr. Neuberger claims that I have ignored the possibility of license extensions, and that if I had included them, the "mountain" of Must Move spent fuel would be delayed, which in turn would support a lower or delayed acceptance rate. Dr. Neuberger shows in his Exhibit 3 a delayed Must Move mountain that assumes license extensions. This is based on an Alternate Case modeled in my original workpapers, but Dr. Neuberger has made several unsupportable adjustments to it, eliminating Must Move spent fuel from existing

early shutdowns and from pre-1998 ISFSIs.[4] Dr. Neuberger's Exhibit 3 inconsistently combines current (2006) expectations regarding license renewal with outdated (1994) information about early shutdowns.[5] Despite having taken the trouble to remove known shutdowns from my Alternate Case in his Exhibit 3, he nonetheless stated at deposition that these shutdowns were included in own his analysis with the DOE model. He also conceded at deposition that pre-1998 ISFSI spent fuel would actually be Must Move. By excluding these two types of Must Move fuel in his Exhibit 3, he developed an artificially diminished Must Move curve that his low acceptance rate can (just barely) keep up with. Even with these unjustifiable reductions, there would be absolutely no slack in his program to accommodate any uncertainty or allow any reasonable margin for flexibility for at least 14 years, though some slack is a necessary part of reasonable planning. Without his erroneous reductions to Must Move spent fuel, it is even more clear that his lower acceptance rate is not reasonable. Rebuttal Figure 1 below shows an internally consistent Must Move curve that reflects license extensions, and puts back existing early shutdowns and ISFSI Must Move. It shows that Dr. Neuberger's lower acceptance rate does not keep up with Must Move needs – it takes eighteen years for the program to catch up, leaving at least some Purchasers unserved during this entire time.

---

[4] My Alternate Case reflects information as of about 2005, assuming widespread license extensions and reflecting early shutdowns through 2005; the Base Case reflects 1993 information – no license extensions, and only those early shutdowns that had occurred as of 1993.

[5] In deposition, Dr. Neuberger at first did not know whether the shutdowns had been excluded; after confirming that they had, he could not explain why.