


Figure 1: Must Move Spent Fuel with License Extension,
vs. Dr. Neuberger's Low Acceptance Rate

Notwithstanding his unwarranted Must Move adjustments, the most telling point of Dr. Neuberger's argument here is that it supports both of the foundational premises of my analyses. First, just as I conclude that aggregate acceptance should generally keep pace with Must Move quantities, Dr. Neuberger clearly tries to draw an acceptance rate that keeps up with what he identifies as demand; he implicitly concedes that an acceptance rate would not be reasonable if it were below the Must Move curve (though in fact his rate is, when the Must Move curve is properly drawn). Second, an integral part of the judgment that acceptance should keep pace with needs must be that available acceptance capacity will actually be allocated to the fuel that is Must Move, via exchanges or some other mechanism. Unless acceptance is allocated according to need, there is little point in having any particular relationship between the acceptance rate and aggregate needs. Thus by addressing the problem with the same approach I used, Dr. Neuberger is fundamentally supporting my conclusions about the non-breach acceptance rate and the



C9

efficient reallocation of acceptance rights. My ultimate conclusions about the fuel removal schedules of the PG&E plants follow naturally.

Finally, Dr. Neuberger did not bother to evaluate whether his dramatically lower acceptance rate would actually affect the fuel removal schedule for the PG&E plants. I have examined this and found that, regardless of whether this lower acceptance rate is reasonable from an overall program perspective, if exchanges occurred, the lower rate does not change the timing of spent fuel removal for the PG&E plants (see Case 18).

### 2.3 Storage Cost Estimates

Dr. Neuberger claims that the storage cost estimates used in my model are "crucial" to its predictions, but that the estimates provided by Roderick Knight are derived from a small sample of potentially unrepresentative sites, and are thus of "uncertain relevance" (Neuberger ¶ 38-40). In fact, the cost estimates provided by Mr. Knight are broadly consistent with other available sources.[6] Even if the Knight parameters are not precise estimates of industry average costs, and further, even if there is substantial cost diversity among facilities, my results are unaffected. Any reasonable cost parameters yield essentially the same result, and even dramatically different costs or extreme cost diversity would at most cause acceptance schedules for a few plants to shift up or back a year.

This robustness occurs because the economic sequence results are driven primarily by the quantities and timing of Must Move spent fuel relative to the acceptance rate; storage costs turn out to be a second-order factor with little effect on the results. The efficient priority ranking is determined by willingness to pay – the avoidable costs per MTU. In my model, the numerator, avoidable costs, varies only by a factor of 3 to 13, while the

[6] For example, Mr. Knight estimates annual pool O&M costs of $11.6 million in 2005 dollars. Pool O&M costs were estimated in 1999 for the Yankee trial to be $8 million ($9.5 million in 2005 dollars), and a 1991 PNL study found average pool O&M costs to be about $4 million ($5.7 million in 2005 dollars). (S.R. Rod, "Cost Estimates of Operating Onsite Spent Fuel Pools After Final Reactor Shutdown," Pacific Northwest Laboratory, August 1991.) Both of these other estimates were made prior to September 11, 2001; security costs have increased substantially since then, reducing the apparent differences.

denominator, the quantity of spent fuel, varies by a factor of 30 to 120, depending on the year considered.[7] Because the denominator is roughly ten times more variable, it largely determines the rank ordering and the sequence of removal; the costs in the numerator have far less effect. Accordingly, uncertainty in the accuracy or precision of the cost estimates is of low importance. I have performed a number of sensitivity analyses (Cases 2 through 14 below) looking at many different variants on the cost parameters, including values well beyond the ranges found by Mr. Knight, and cost diversity across sites. These analyses show, as expected, that storage costs have very limited effect overall, and no effect on the fuel removal schedule for the PG&E plants.

### 2.4 Information and Uncertainty

Dr. Neuberger criticizes my analysis (Neuberger ¶ 63) for assuming that every utility has perfect information on the storage needs and costs of other utilities. While I do believe that much of this information, particularly regarding storage needs, would be readily available, that is neither an assumption of my analysis nor a requirement for my results. All I assume is that each utility knows its own costs (which I approximate with generic estimates in my model), and bids to buy or sell acceptance rights based on those costs. In a given year, a Purchaser will buy rights if the market price is below its own value for them, and will sell any allocation it has if market price is above its own value. The market price depends on the aggregate supply-demand balance, but utilities need not know in advance what that will be. Certainly, in a new market, some transactions may take place at prices different from the "efficient" price. Most of these will just represent a good deal for one party and a bad deal for the other. Some might occasionally cause inefficient reallocation, but even then, the rights can be exchanged again – there will be incentive, and no barriers, to continue exchanging until the (approximately) efficient allocation is reached.

[7] Variation is the maximum value divided by the minimum value in a given year.

Dr. Neuberger makes the sweeping assertion that "uncertainty would exert unknown influences" on the market for acceptance rights (Neuberger ¶ 65).[8] He goes on to say (¶ 66) that my model assumes "that utilities would have had perfect foresight and perfect confidence that the program would operate flawlessly", implying that anything short of absolute certainty would cause exchanges to collapse. To the contrary, neither this nor any other market requires such certainty to function – rational economic planning and reasonable expectations are not based on paralysis by uncertainty and doomsday scenarios. Virtually every market faces some of the factors identified by Dr. Neuberger. For example, markets for energy, metals, agricultural products, consumer goods, etc. all involve substantial uncertainty and risk, including external events, technological and regulatory performance, uncertainty in demand and supply, incomplete knowledge of others' costs, sociopolitical factors, and/or strategic behavior. Yet these markets generally perform reasonably well, and certainly do not collapse entirely with no exchanges. It is also possible to model them effectively without representing every such friction explicitly.

He also criticizes as a consequence of perfect information my result that prices fall in each year. This demonstrates his fundamental misunderstanding of both the economics of the situation and my model. It is economic forces that make prices decline over time. Earlier acceptance can avoid substantial costs that later acceptance cannot, at least for some Purchasers, while the opposite is not true. This makes early rights inherently more valuable, at least up to the point in time where all current needs can be satisfied. The price of allocations in different years (determined at one point in time) should not increase, precisely because earlier acceptance has potentially more value in some circumstances.[9] Until this pattern prevails, additional advantageous exchanges are available, encouraging further trading, and that is what my model simulates.

---

[8] Dr. Neuberger's report states that "uncertainty would exert unknown and largely unknowable influences." At deposition he disavowed "largely unknowable" , saying that the effect of uncertainty could be known if it were investigated, though he has not done that.

[9] Strictly, the price of allocations should not increase faster than the relevant discount rate. I.e., the present value of the price should not increase. I account for this in my model.

### 2.5 Zero Price

Dr. Neuberger criticizes the fact that my analyses show the price of exchanges would go to approximately zero after the first few years. He claims that "these rights are simply too valuable to be given away." First, I am not suggesting that acceptance rights have zero value or would be given away. They are of course extremely valuable, and Purchasers have paid substantial amounts for them (over $250,000/MTU) via the Nuclear Waste Fund. The "zero price" that seems to concern Dr. Neuberger is just my conclusion that when acceptance rights are allocated efficiently, once it is possible to satisfy all Purchasers' timing requirements (i.e., once program acceptance has caught up with aggregate Must Move needs), the value of those rights does not change over time. For example, 2006 rights would not be appreciably more valuable than 2007 rights, given that rights could and would be reallocated to meet the 2006 and 2007 needs of all facilities. In this situation, parties could exchange rights that simply alter the timing (not the fact) of their removal rights at essentially no cost.

Further, it is important to understand that low prices are the result of the ability to exchange acceptance timing; they are not established in the absence of exchanges. Prior to making exchanges, some parties would be willing in principle to pay a very large amount to exchange, as reflected by their high willingness to pay in my model. Rebuttal Figure 2 below shows the willingness to pay curves (the demand curves for acceptance) for the first several years of the program. It shows that some facilities are willing to pay very high prices for early removal, but because there is much more potential supply than demand at these prices, the marginal or market-clearing prices (illustrated by the triangles near the horizontal axis in the figure) are much lower in the first few years and go to essentially zero thereafter.

This is analogous to the fact that a person without drinking water would be willing to pay an extraordinarily high price for it, but (at least in most situations) people actually get water at low cost because there is an ample supply. The low price does not prevent reallocation – it results from the ability to reallocate. Even though some people are very thirsty right now (i.e., in a "must-drink" situation), if there is ample water to quench

everyone's thirst now and later, then the price of water will not change over time. In a shortage situation (e.g., the aftermath of a natural disaster that disrupts water supplies), the value and price of clean water can get very high, and will fall back over time as supplies are restored and catch up with demand.




*Note:* For all years beyond 2000, marginal price is zero.

Figure 2: Annual Bid Curves from Economic Sequence Model (Base Case)

### 2.6 Strategic Behavior

Dr. Neuberger raises the possibility of strategic behavior (anticompetitive behavior, or the exercise of market power), suggesting that potential sellers might withhold acceptance rights from the market to drive up their price, and that this might distort the resulting allocation. As an example of this, Dr. Neuberger raises the so-called "last trade" problem, whereby a single holdout can capture or destroy the value of an entire series of trades. That issue can be important in situations where a single holdout can actually threaten a multi-transaction deal, such as when the last property holder on a block can hold hostage a developer wanting to erect a skyscraper there. But this situation does not arise here, because any of a number of suppliers can satisfy the needed "last trade," unlike the situation with a unique parcel of real estate. Also, trades can be arranged simultaneously, so there need not even be a "last" trade. There is no supplier of

acceptance rights who could hold a monopoly on a critically needed asset – this undermines the ability of suppliers to engage in strategic behavior. For example, in 1998, Humboldt Bay needs to acquire 16 MTU of acceptance rights, from one or a combination of the potential sellers. There are 11 potential sellers – Purchasers with OFF rights in excess of their own Must Move needs – who each have more than 16 MTU to sell (plus a few with smaller amounts). In total, they have almost 700 MTU of rights to exchange, averaging 50 MTU each, and as much as 180 MTU. With this many potential sellers to choose from and this much supply, Humboldt Bay would find it straightforward to identify a willing seller.

Further, strategic behavior requires a market that is functional at some level, with the good being exchanged in some meaningful quantities, since an aspiring strategic seller benefits not by preventing transactions but by ensuring they occur, albeit at an inflated price. Since most buyers, and particularly the PG&E plants, are willing to pay many times the clearing price (as illustrated in Figure 2 above), even if strategic behavior were able to increase price substantially, it would not have a meaningful effect on the resulting allocation. Even withholding 70% of total supply, an astounding exercise of market power that would require widespread collusion and result in a many-fold increase in price, does not affect the timing of the PG&E plants' spent fuel removals (see Case 18).

### 2.7 Full Core Reserve Policy

Dr. Neuberger suggests that some nuclear operators may choose to operate with a pool reserve policy different from the one-FCR policy that I assume, apparently based on his experience in the Indiana Michigan case, in which the plaintiff claimed a one-and-one-third FCR policy. He is concerned that this may affect Must Move amounts by reducing the amount of effective space in spent fuel pools (he did not recognize that if this occurred, it would make irrelevant his previous concern that uncertainty and risk might entirely shut down exchanges). My assumption of one FCR is consistent with the DOE's own 1995 SFSR study, and reflects common (though perhaps not universal) operating

policy at nuclear plants. However, even a much more conservative 3-FCR policy at every facility would not affect my conclusions (see Case 16).

### 2.8 RE-RACKING

Dr. Neuberger points out that I have not considered the possibility of re-racking, but he incorrectly concludes that this mischaracterizes nuclear plants' Must Move condition. Although re-racking, where feasible, can be more cost-effective than dry storage, it still imposes a substantial cost. The existence of a re-racking option at a given facility that is nearing a full pool condition does not change the fact that the facility has a Must Move problem. A Must Move condition means that a substantial incremental cost will be incurred if fuel is not removed; it does not depend on whether the cost is imposed by dry storage, re-racking or some other technological option.[10] Since re-racking is not an option for the PG&E plants (Humboldt Bay is shutdown, and the re-rack at Diablo Canyon in the 1980s is already reflected in my data), leaving out the re-rack option for other facilities cannot affect the result for these plants. As Dr. Neuberger conceded at his deposition, including the re-rack option might lower other facilities' willingness to pay; the effect, if any, would be to make rights available at lower cost to PG&E.

### 2.9 OVERSTATED EFFICIENCY GAINS

Dr. Neuberger claims that I have overstated the efficiency gains of exchanges compared with OFF priority. He argues, correctly, that if I had accounted for license extensions, this would reduce the amount of shutdown Must Move spent fuel in 2015-2025. But recalculating the efficiency gain from exchanges while incorporating license extensions, the cost savings drops only modestly, from $2.6 billion to about $2.3 billion (this can be seen in the sensitivity analyses below by comparing the performance of Cases 15 and 19). On the other hand, if I use the much lower acceptance rate that Dr. Neuberger did in the only case he analyzed, the efficiency gain from exchanges swells to about $5 billion. All

[10] Omitting the re-rack option might misestimate the incremental storage costs in the model, but as discussed previously, the results are very insensitive to the storage cost parameters.

that Dr. Neuberger's argument really shows is that in any particular scenario, the efficiency gain due to exchanges is driven primarily by the extent of OFF's inefficiency in that scenario. My fundamental point is that regardless of which scenario is modeled, the exchange allocation performs much better than OFF priority– so much so that exchanges to capture this advantage would be very likely.

## 3. SENSITIVITY ANALYSES

Throughout the previous sections, I referred to sensitivity analyses that address Dr. Neuberger's issues. These analyses also serve to demonstrate the robustness of my results more generally. This section lays out those results systematically. By analyzing Dr. Neuberger's concerns to understand the potential magnitude of their effect, I am not necessarily agreeing that they are legitimate concerns, because in many cases I have shown them to be irrelevant to the situation at hand. Still, it is instructive to explore the hypothetical "what if" question, since doing so shows that most of these factors would have little or no effect even if they were present.

My sensitivity analyses examine a number of issues: storage costs, license extensions, changes in the supply and/or demand for removal rights (including the effect of uncertainty, risk aversion, and sociopolitical factors), a greatly reduced acceptance rate, and OFF priority. For each of these issues and some combinations, I determine the year by which Humboldt Bay would have the last of its spent fuel removed, and when and whether Diablo Canyon would have unserved Must Move spent fuel and need to expand its storage capacity. I also determine the cost of exchanges for each of the plants, where relevant. Rebuttal Figure 3 summarizes the results for the PG&E plants in tabular form. Case 1 is simply the Base Case results from my Expert Witness Report, repeated here for comparison. Cases 2 through 14 look at sensitivity to differing storage costs. Cases 15 through 21 are structural sensitivities that examine issues that might affect the timing of Must Move fuel, supply and demand for removal rights, the acceptance rate and/or the priority scheme. All of the sensitivity cases examined here (excluding Case 1) also

reflect license extensions and early shutdowns, though the results are essentially the same with my Base Case assumption of original license lives.

| | | | Case [1] | HB Fuel Out [2] | DC Unserved Must Move [3] | HB Exchange Costs (2005 $mil PV) [4] | DC Exchange Costs (2005 $mil PV) [5] |
|---|---|---|---|---|---|---|---|
| Base | | 1 | Base Case (from Report) | 1998 | (never) | 1.36 | 0 |
| Cost Sensitivities | Double | 2 | Double Pool O&M Cost | 1998 | (never) | 1.53 | 0 |
| Cost Sensitivities | Double | 3 | Double Dry O&M Cost | 1998 | (never) | 1.64 | 0 |
| Cost Sensitivities | Double | 4 | Double Dry Setup Cost | 1998 | (never) | 0.91 | 0 |
| Cost Sensitivities | Double | 5 | Double Cask Cost | 1998 | (never) | 0.91 | 0 |
| Cost Sensitivities | Halve | 6 | Halve Pool O&M Cost | 1998 | (never) | 0.84 | 0 |
| Cost Sensitivities | Halve | 7 | Halve Dry O&M Cost | 1998 | (never) | 0.88 | 0 |
| Cost Sensitivities | Halve | 8 | Halve Dry Setup Cost | 1998 | (never) | 0.91 | 0 |
| Cost Sensitivities | Halve | 9 | Halve Cask Cost | 1998 | (never) | 0.88 | 0 |
| Cost Sensitivities | Randomize | 10 | Randomize Costs - Random Draw A | 1998 | (never) | 1.43 | 0 |
| Cost Sensitivities | Randomize | 11 | Randomize Costs - Random Draw B | 1998 | (never) | 1.16 | 0 |
| Cost Sensitivities | Randomize | 12 | Randomize Costs - Random Draw C | 1998 | (never) | 1.36 | 0 |
| Cost Sensitivities | Randomize | 13 | Randomize Costs - Random Draw D | 1998 | (never) | 1.12 | 0 |
| Cost Sensitivities | Randomize | 14 | Randomize Costs - Random Draw E | 1998 | (never) | 1.12 | 0 |
| Structural Sensitivities | | 15 | License Extension and Early Shutdown | 1998 | (never) | 0.91 | 0 |
| Structural Sensitivities | | 16 | Advanced FPMM | 1998 | (never) | 1.58 | 0 |
| Structural Sensitivities | | 17 | Early-Bid FPMM | 1998 | (never) | 2.53 | 6.76 |
| Structural Sensitivities | | 18 | Low Acceptance Rate | 1998 | (never) | 6.06 | 29.79 |
| Structural Sensitivities | | 19 | OFF Priority | 1999 | (never) | n/a | n/a |
| Structural Sensitivities | | 20 | OFF Priority and Low Acceptance Rate | 2001 | 2007 and Beyond | n/a | n/a |
| Structural Sensitivities | | 21 | No Acceptance Before 2010 (Breach) | 2010 or Later | 2007 and Beyond | n/a | n/a |

*Note:* All cases other than Case 1 assume license extensions and existing early shutdowns.

Figure 3: Summary of Sensitivity Analyses

### 3.1 COST SENSITIVITIES

The sensitivity analyses on storage costs in Cases 2 through 14 examine the effect of storage costs that might be substantially different from the average cost estimates provided by Mr. Knight (other factors are the same as in my Base Case, except for reflecting license extension and existing early shutdowns). There are four categories of cost in my model: Pool O&M, Dry O&M, Dry Setup, and Cask Cost. I modeled the effect of doubling (in Cases 2 through 5) or halving (in Cases 6 through 9) each of the four cost categories, one at a time. The cost ranges in these sensitivity analyses – 50% below to 100% above the average estimates – are much broader than the ranges Mr. Knight found, which were at most 27% below to 39% above his average across all categories. Nonetheless, I found that these cost sensitivity cases did not affect the fuel

removal schedule for either of the PG&E plants; some of them do modestly affect Humboldt Bay's exchange costs.

Going further, in Cases 10 through 14 I modeled substantial cost diversity across facilities (i.e., different facilities have differing storage costs, and thus have different willingness to pay when they are otherwise in the same circumstance). I did this by randomly and independently doubling, halving or leaving unchanged each of the four categories of storage costs at each of the facilities modeled (i.e., each cost category at each facility was independently assigned a multiplier of 0.5, 1.0 or 2.0). I did this five times with independently-drawn random assignments for the multipliers. In all five of these cases, there was no change to the fuel removal schedule for either of the PG&E plants. As before, there is a modest effect on Humboldt Bay's exchange costs.

In all of these storage cost sensitivity runs, there are some minor changes in the fuel removal schedules of a few plants, because changes in costs cause minor changes in the willingness to pay ranking. A plant that was just above the margin in a given year in the Base Case sometimes slips below the margin in a sensitivity run, getting out a year later, or one that was below the margin moves above it and gets out a year earlier. This never occurs for the PG&E plants because they have relatively small fuel quantities and thus high willingness to pay. Since they are high in the bid ranking, not near the margin, they are not affected by even substantially different or diverse storage costs.

### 3.2 Structural Sensitivities

The remaining sensitivity cases are structural in nature. To compare overall program performance under each of these cases, Rebuttal Figure 4 takes the same approach used in Figure 4 of my Expert Witness Report. It displays the unserved Must Move needs of each facility in each year as a colored cell, given the parameters of the sensitivity case. Here, I illustrate just the period through 2009, since that is of greatest interest. The general quality of overall program performance in each case is easily observed – it is essentially inversely related to the amount of color on the grid.




| | Case 1 | Case 15 | Case 16 | Case 17 | Case 18 | Case 19 | Case 20 | Case 21 |
|---|---|---|---|---|---|---|---|---|
| Pool O&M (Plt.-Yrs) | 3 | 3 | 7 | 17 | 60 | 90 | 119 | 113 |
| Dry O&M (Plt.-Yrs) | 8 | 7 | 11 | 14 | 30 | 58 | 91 | 134 |
| Dry - Add Fuel (Plt.-Yrs) | 0 | 0 | 13 | 17 | 37 | 36 | 138 | 235 |
| New Dry Facilities | 0 | 0 | 0 | 0 | 0 | 8 | 23 | 36 |
| Total Unserved Plt-Yrs | 11 | 10 | 31 | 48 | 127 | 192 | 371 | 518 |
| Total Unserved Plants | 7 | 7 | 16 | 14 | 17 | 30 | 49 | 60 |
| Estimated Incremental Storage Costs | | | | | | | | |
| 1998-2030 (2005$bil PV) | $0.1 | $0.1 | $0.4 | $0.5 | $1.6 | $2.4 | $6.6 | $6.8 |
| 1998-2009 (2005$bil PV) | $0.1 | $0.1 | $0.4 | $0.5 | $1.3 | $2.1 | $3.8 | $5.3 |

Figure 4: Unserved Must Move Spent Fuel under Sensitivity Cases

Case 15 looks at the effects of 20-year license extensions for all currently-operating plants, and is otherwise the same as the Base Case. As discussed above, I look at the combined effect of license extensions and existing early shutdowns here. Like the Base Case, Case 15 shows good program performance and low additional storage cost of $0.1 billion through 2030. It does involve one extra year (to 2001) with some unserved Must Move needs, due to the added Must Move fuel from the several early shutdown plants. It does not change when the PG&E plants would have had their fuel removed. All the remaining sensitivity cases, as well as the cost sensitivity cases above, also use the same reactor lives assumption, so Case 15 is actually the one on which all others are based.

Case 16, Advanced FPMM, shows the effect of advancing Full Pool Must Move quantities by three years for all facilities. This is one way to reflect Dr. Neuberger's concern that uncertainty, risk and/or sociopolitical factors might make Purchasers place value on acceptance prior to reaching a Must Move condition (equivalently, that utilities might choose to hold more than one FCR in their pools – this case corresponds to an approximately 3-FCR policy at all facilities). As discussed previously, shutdown Must Move fuel is not accelerated, since it cannot (all) be removed early. The pattern of unserved Must Move in Case 16 is similar to but slightly worse than in Case 15 because the accelerated FPMM displaces some actual Must Move fuel. The last unserved Must Move is delayed by two additional years to 2003, and additional storage cost increases to $0.4 billion. Exchange costs for Humboldt Bay increase modestly, but the fuel removal schedules for the PG&E plants are not affected.

Case 17 offers a different and more extreme way to model Dr. Neuberger's concern that uncertainty, etc. might cause Purchasers to want to remove fuel before reaching a Must Move condition. In this case, in addition to bidding for acceptance rights for the year in which its fuel actually reaches Full Pool Must Move status, a facility also submits bids in prior years. For acceptance in the three years prior to an actual FPMM condition, it bids 60% of its future avoidable costs; for acceptance in the three years prior to that, it bids 20% of its future avoidable cost. (Of course, if an earlier bid wins, the corresponding later bids are withdrawn.) In this case, some Must Move fuel remains unserved for an

additional four years (to 2005), since to a greater extent than in the previous case, the accelerated FPMM fuel displaces some fuel that is actually Must Move, delaying that fuel's removal. Additional storage cost, at $0.5 billion, is slightly higher than the previous case. Humboldt Bay's exchange cost increases in this case, but the timing of the PG&E plants' spent fuel removal is not affected.

For the sake of argument, I have also tested an even stronger version of Dr. Neuberger's hypothesized widespread aversion to exchanging early rights. Ignoring the implausibility of an extreme reluctance to exchange and just considering its effect, it could look a lot like a reduced overall acceptance rate – cutting supply without reducing demand. That is, a given acceptance rate with half the Purchasers unwilling to exchange would be similar to an acceptance rate only half as large, but with all Purchasers exchanging.[11] Case 18 evaluates the effect of a dramatically lower acceptance rate – Dr. Neuberger's augmented 1991 ACR rate at 900 MTU/year. This corresponds to 70% of acceptance rights being withheld from exchanges for the first 12 years of the program. (Alternatively, this case reflects what would happen if the augmented 1991 ACR rate were the actual acceptance rate, despite having shown above that Dr. Neuberger's rationale for this rate is flawed.) Overall program performance is considerably worse in this case. Additional storage costs are $1.6 billion, and 17 facilities are left with unserved Must Move problems, including some until 2016. Still, even with severely limited exchanges, Humboldt Bay has its fuel removed in 1998, though exchanges are significantly more costly. (In fact, even if 90% of rights were to be withheld from exchanges in 1998, Humboldt Bay still would be likely to have its spent fuel removed on the same schedule, because it is in the top 10% of willingness to pay in 1998.) Diablo Canyon never experiences an unserved Must Move condition; its first removal is in 2007, though it must purchase some rights to accelerate the delayed OFF rights it has in this case.

[11] In fact, a 50% acceptance rate is more restrictive than a 50% aversion to exchange, since the latter case the un-exchanged rights are actually used by the OFF holders and so reduce their own demand in the current and subsequent years.

Case 19 reflects the OFF priority allocation with no exchanges at all. This is an unrealistic case corresponding to the most extreme possible interpretation of Dr. Neuberger's concerns about uncertainty and sociopolitical factors, where all Purchasers are absolutely unwilling to exchange any OFF rights, regardless of how far in advance of Must Move needs they might be. This case shows substantially worse performance, with estimated additional storage costs of $2.4 billion, and nearly half of all facilities (30 of 79) with unserved Must Move continuing for many years. Interestingly, OFF priority performs substantially worse than the very low acceptance rate (with exchanges) of Case 18; efficient allocation outweighs the disadvantage of a lower acceptance rate. This fundamental inefficiency of OFF and the resulting incentive for exchanges are the primary reasons that being stuck with OFF is implausible. But despite acceptance being generally allocated very inefficiently, the OFF allocations of the PG&E plants happen to be similar to their Must Move needs, so their result is essentially unchanged. Humboldt Bay is delayed by a single year (to 1999) relative to the Base Case, and Diablo Canyon still has its spent fuel removed in time to avoid installing dry storage.

Case 20, combining OFF priority with a very low overall acceptance rate (the case Dr. Neuberger modeled), is far worse than the sum of its inefficient parts borne separately. It incurs $6.6 billion in additional storage costs through 2030 (with unserved Must Move spent fuel continuing well beyond 2030) and leaves 70 out of 79 facilities with unserved Must Move at some point, 49 of them prior to 2010. Here the result does change substantially for the PG&E plants: Humboldt Bay's fuel removal is delayed until 2001, and Diablo Canyon has unserved Must Move spent fuel starting as soon as it has any Must Move fuel, in 2007. However, this extreme case is not a reasonable characterization of the non-breach world. It is unrealistic in part because it combines several elements that are individually implausible non-breach descriptors and are even less credible in combination (e.g., OFF priority would be even less likely to be followed in a situation with very low overall acceptance, since the economic pressure for efficient allocation would be even greater). What makes this even more implausible as a characterization of the non-breach world is the fact that it describes almost the same

outcome that is actually being achieved now, in the breach world, with absolutely no acceptance.

Primarily for comparison with Dr. Neuberger's Case 20, I also examine in Case 21 the actual, breach world, entailing no acceptance at all until 2010 (though acceptance may not start even then).[12] The breach case entails $6.8 billion in costs through 2030 ($5.3 billion through 2009) and leaves 60 facilities unserved. The previous Case 20, Low Acceptance and OFF, has $6.6 billion in additional storage costs (97% of breach case costs), and leaves 70 out of 79 facilities unserved (worse than the breach case, which at least has efficient performance once it starts). Even in just the period prior to 2010, Dr. Neuberger's Case 20 has $3.8 billion in additional storage costs (72% of breach case costs in that same period), and 49 unserved facilities. Since a Low Acceptance and OFF scenario is essentially the same, in terms of how well it solves the industry-wide storage problem, as the current breach case, it cannot be a plausible description of the non-breach world.

## 4. CONCLUSIONS

Dr. Neuberger raises a number of concerns regarding my characterization of non-breach spent fuel acceptance, but they are all purely hypothetical and speculative, and he made no attempt to ascertain their presence in this context or their effect if they were present. I have analyzed the potential effect of these factors, and find that with even the most extreme interpretation, they do not alter my conclusions.

Dr. Neuberger did analyze (though does not endorse) the most extreme case possible: a very low acceptance rate combined with OFF priority. I have shown that this is not a plausible description of the non-breach world, and that program performance in this

---

[12] In evaluating this case, I reflect a prompt ramp-up to 3000 MTU starting in 2010, and exchanges of acceptance priority to make the program operate efficiently as of its late start date.

scenario is essentially equivalent to performance in the actual breach world. I have also shown that any less extreme case (e.g., very low participation, massive withholding of exchanges, or OFF with a reasonable acceptance rate), while it might not be plausible as a non-breach description, would yield essentially the same results I found initially for the PG&E plants. Thus, giving due consideration to the issues raised by Dr. Neuberger, I still conclude with high confidence that in the non-breach world, Humboldt Bay would have had its spent fuel removed in 1998, and Diablo Canyon would have had sufficient fuel removed to avoid the need for additional storage capacity.

Respectfully submitted,

March 10, 2006

Frank C. Graves

**Appendix 1**
**Updates to Disclosure of Deposition, Testimony, and Publications of Frank C. Graves**
**(since November 10, 2005)**

1. Direct testimony before the United States District Court Southern District of Texas Houston Division on behalf of Deutsche Bank Entities, Docket No. H-01-3624, February 2006, regarding Deutsche Bank Entities' opposition to Enron Corp's amended motion for class certification.

2. Expert report and direct testimony before the United States Court of Federal Claims on behalf of Pacific Gas and Electric Company, Docket No. 04-0074C, into which has been consolidated No. 04-0075C, November 2005, regarding the non-performance of the U.S. Department of Energy in accepting spent nuclear fuel under the terms of its contract.

Graves 4

Appendix 2
Memorandum of Agreement, dated 8 June 1987,
between Joint Intervenors and Pacific Gas and Electric

MEMORANDUM OF AGREEMENT

In consideration for the Joint Intervenors, GAYE M. BARR, LEAGUE OF WOMEN VOTERS OF HUMBOLDT COUNTY, DANIEL E. HAUSER, BARRY KEENE, DOUGLAS H. BOSCO, WESLEY CHESBRO, THE REDWOOD ALLIANCE, RALPH KRAUS and NONA KRAUS (hereinafter the Intervenors) agreeing to withdraw their opposition to Pacific Gas and Electric Company's (hereinafter Licensee) request for modification of their possession-only license in NRC Docket case. No. 50-133 OLA, Licensee agrees to comply in good faith with the following terms and conditions of settlement:

1. Licensee agrees to ship the spent fuel assemblies presently stored at the Humboldt Bay Power Plant Unit 3 to the Department of Energy (hereinafter DOE) as soon as the DOE has a repository or some other facility in operation capable of receiving the spent fuel assemblies under the terms of the existing contract entered into between the Licensee and DOE on June 30, 1983, or such other successor agreement as may be entered into between Licensee and DOE or its successors or assigns, and the DOE indicates its readiness to accept the spent fuel assemblies.

Licensee further agrees to reasonably pursue the highest DOE priority for the removal of the Humboldt Bay Power Plant Unit 3 spent fuel assemblies.

2. Pacific Gas and Electric Company agrees to carry out the process of final decommissioning of Humboldt Bay Unit 3 following the removal of the spent fuel assemblies and any other high or intermediate level waste from the Unit 3 site. Commence-

C28



PHBP0028867

Appendix 2
Memorandum of Agreement, dated 8 June 1987,
between Joint Intervenors and Pacific Gas and Electric

ment of actual decommissioning activities will be subject to receipt of appropriate approvals from the Nuclear Regulatory Commission ("NRC"), and the availability of decommissioning funds based upon California Public Utility Commission ("CPUC") action. If the cost of decommissioning at this earlier time exceeds funds then authorized by the CPUC for decommissioning of Humboldt Bay Unit 3, then the Intervenors agree not to oppose the Licensee's request before the CPUC for additional funds to pay for the cost of decommissioning.

3. Finally, Licensee and the Intervenors acknowledge that at the present time, no DOE repository exists that can accept the spent fuel assemblies presently stored at the Humboldt Bay Power Plant Unit 3, and that no such DOE facility may exist for a number of years. It is further understood by the parties to this agreement that the NRC has authorized Dry Cask Storage as a means of interim storage in the absence of a DOE repository, but such an option is not yet authorized by the NRC for sites such as Humboldt Bay Power Plant Unit 3.

The Licensee agrees to reexamine the possibility of utilizing Dry Cask Storage, if and when such a storage option becomes available for sites such as Humboldt Bay Power Plant Unit 3.

4. Licensee further agrees to publicly commit to the foregoing terms of settlement.

This agreement was entered into on the 8th day of June, 1987, at [illegible], California.

// // //

**Appendix 2**
**Memorandum of Agreement, dated 8 June 1987,**
**between Joint Intervenors and Pacific Gas and Electric**

Signed on behalf of Licensee
PACIFIC GAS AND ELECTRIC COMPANY

BY: James D. Shiffer

BY: Richard F. Locke
RICHARD LOCKE
Attorney for Pacific Gas and Electric Company

Signed on behalf of the
JOINT INTERVENORS

DOUGLAS BOSCO

DAN HAUSER

Barry Keene
BARRY KEENE

Gayle M. Barr
GAYE M. BARR

Gayle M. Barr
LEAGUE OF WOMEN VOTERS OF HUMBOLDT COUNTY

REDWOOD ALLIANCE

C30

Appendix 2
Memorandum of Agreement, dated 8 June 1987,
between Joint Intervenors and Pacific Gas and Electric

WESLEY CHESBRO

NONA KRAUS

RALPH KRAUS

BY:
SCOTT E. FIELDER
Attorney for the Joint
Intervenors

C31



PHBP0028870

# APPENDIX D

12.1

DOE F 1325.8
(7-79)

U.S. DEPARTMENT OF ENERGY

# memorandum

DATE April 8, 1983

REPLY TO ATTN OF: S-10

SUBJECT: ACTION MEMORANDUM: Final Rulemaking on Standard Contract for Nuclear Waste Disposal

TO: The Secretary

BACKGROUND:

A critical item in implementing the Nuclear Waste Policy Act is the waste disposal contract that will be signed between DOE and the industry. These contracts must be signed and in place by June 30, 1983. Key assumptions and responsibilities are listed under Tab A. Section-by-section analyses of the contract are lised under Tab B. Key dates for implementation are listed under Tab C.

DISCUSSION:

We followed the requirements of the Administrative Procedures Act in implementing and executing the contract. This involved publishing the contract in the Federal Register, having a 30-day comment period, holding a public hearing, incorporating comments, and publishing a final contract in the Federal Register. There were 85 sets of comments received during the comment period. Comments were received from nuclear power utilities, nuclear power vendors, environmentalists, consumer protection associations, State and Federal agencies, and individual members of the public. Comments have been reviewed throughout the Department, and subsequently, we have incorporated within the contract recommendations as we deemed appropriate. Eight general policy issues arose from the comments and we appropriately resolved these issues (Tab D).

CONCLUSION:

The attached Rulemaking is ready for publication in the Federal Register.

RECOMMENDATION:

That the Secretary approve below.

Robert L. Morgan
Project Director
Nuclear Waste Policy Act
Project Office

APPROVED: Donald Paul Hodel

DISAPPROVED: ____________________

DATE: April 11, 1983

Attachments

Tab A - Key Assumptions and Responsibilities
Tab B - Section-by-Section Analysis of Contract
Tab C - Key Dates
Tab D - Policy Issues

TAB A

## Disposal Fund Contract

**Key Assumptions**

- o The disposal contract must be signed by 6-30-83, or owners and generators of spent fuel lose the opportunity to dispose of their nuclear waste with DOE.
- o Contract covers:
  - disposal of existing waste ($/KG) and future waste (1 mill/KWHR).
- o Contracts will be "standard" and little "negotiation" is expected.

**DOE Responsibilities**

- o Establish acceptance priority ranking based on age of fuel.
- o Review and approve delivery schedules.
- o Transport:
  - assume title at facility.
  - arrange for shipping cask.
- o Handle and dispose:
  - per NRC approved standards and procedures.
- o Establish fees and collection/financial procedures:
  - 180 days from enactment to establish fee collection procedures.
  - payment for existing fuel either collected over 10 years or one lump sum payment at time of fuel delivery.
  - fee reviewed annually and Congress notified of changes.

**Utility Responsibilities**

- o Remit fee: revenues expected to begin between July and September 1983.
- o Forecast shipments.
  - quantity from specific powerplant.
  - fiscal year of delivery.
- o Prepare for transportation.
  - per applicable regulatory requirements.
  - describe material.

**NRC Requirements**

- o NRC shall not issue or renew a license for a nuclear power reactor unless:
  - the utility has signed a contract with DOE for disposal services, or
  - DOE affirms that a utility is actively and in good faith negotiating with DOE for a contract.

TAB B (1.)

## Section by Section Contract Analysis

Introduction and Recitals - Sets forth the authorities and the basic parameters for the contract.

Definitions - Sets forth the terms used throughout the contract and provides the meanings for them. Wherever possible the terms defined and used in the contract are those contained in Section 2 of the Nuclear Waste Policy Act (P.L. 97-425).

Scope of Contract - For the transportation and subsequent disposal by DOE of spent nuclear fuel and/or high-level radioactive waste of domestic origin from civilian nuclear power reactors. The contract services shall commence not later than January 31, 1998, and continue until disposal of all SNF and/or HLW accepted by DOE hereunder.

Delivery/Acceptance of SNF and/or HLW - Sets forth the procedures for advance notification to DOE by the Purchaser of all discharge rates and proposed deliveries of SNF and/or HLW under this contract, and sets forth the procedures by which DOE will accept the SNF/HLW. Appendices A, B, and C set forth the form and content of the notification.

Responsibilities of Parties - Sets forth the required actions and areas of responsibility of the Purchaser and DOE.

Criteria for Disposal - Sets forth the requirement for accurate and detailed technical information to be provided to DOE by the Purchaser, and establishes DOE's method and procedures for accepting SNF/HLW. Appendices D and E provide the necessary technical information and guidance. DOE shall verify the Purchaser's information prior to acceptance. Coverage is given to the circumstances where it is determined by DOE, both prior to and subsequent to acceptance, of improperly described fuel and waste.

Title - Title to all SNF and/or HLW shall pass to DOE as soon as possible after commencement of operation of a disposal repository developed under the Act and upon acceptance by DOE at the Purchaser's site (Section 302(a)(1) and 302(a)(5)(A)).

Fees and Terms of Payment - Sets forth the procedures for payment of fees; differentiates between fuel generating electricity prior to 90 days after enactment and that of after 90 days from the date of enactment; states that annually fees will be reassessed and changes published in Federal Register and sent to Congress as the Act requires. Also discusses the late payment procedures and that interest will be charged on late fees. Also sets forth DOE right to audit whether the Purchaser is paying the correct amount of fee.

TAB B1



<u>Delays</u> - In the event of unavoidable delays by DOE or the Purchaser, the parties will reschedule deliveries as necessary, to accommodate the delay. In the event of avoidable delays, charges and schedules will be equitably adjusted to cover any additional costs incurred by the Party not responsible for the delay.

TAB C

## Contract Development and Execution

### Key Actions and Dates

| | | |
|---|---|---|
| February 4 | - | Draft was published in Federal Register/APA process began |
| March 3 | - | Held Public Hearing |
| March 7 - April 6 | - | Incorporated comments |
| April 13 | - | Publish contract in Federal Register and mail to utilities - contract effective upon publication |
| April 13 - June 6 | - | Execution interactions with utilities |
| June 3 | - | Brief Secretary on contract execution progress |
| June 7 - 17 | - | Contract signature period for utilities |
| June 20 - 30 | - | DOE signature period |

TAB D

POLICY ISSUES ADDRESSED
DURING NUCLEAR WASTE CONTRACT COMMENT PERIOD

1. Spent Nuclear Fuel "Exchange" Rights

The majority of utilities commented that they should have "exchange" or "swapping" rights to ship their SNF and/or HLW to our repository. After consideration, aside from some complex record keeping, this poses no great problem to us, and consequently, we have accepted this suggestion. It will require our approval, and we intend to be reasonable.

2. "Credits" to the Waste Fund/or Utilities

The vast majority of utilities suggested that "credits" be given to the Fund for the value of reprocessed material and for cost savings measures that they have personally taken--potentially resulting in cost savings to the waste program. Such measures may include rod consolidation, or utilities providing their own shipping casks.

We have considered this issue, and reached a decision to "defer" establishing a position at this time until reprocessing becomes a reality and the types of efficiency credits and their values are better calculable vis-à-vis our program and its costs. For example, recognizing that there is not a private sector reprocessing enterprise at this time, calculating such reprocessing cost savings and potential "credits" is not realistic. Also, savings from rod consolidation would be difficult to predict now at this time.

3. Fee Structure for Existing SNF (Fuel Value $1.5-2.0 Billion)

Our method for calculating the fee for existing SNF (that is retroactive fuel in basins) is essentially based on fuel

burn-up levels that equal an industry wide average charge of 1 mill per KWH, as required by the Act. It is equitable to the majority of the affected owners and generators of SNF or HLW. The vast majority of the utilities endorse our approach. However, there are a few groups who did take exception and may challenge our approach. They are: General Electric, TVA, and possibly Commonwealth Edison. These groups, overall, have low burn-up fuel, and will be charged a disproportionately higher rate than other groups on their overall fuel inventory. We have gone to a four tier approach to partially alleviate the problem.

4. <u>Fee Structure For In-Core Fuel as of Midnight April 6,1983. (Fuel Value $200-300 Million)</u>

There are several possibilities for calculating this fee. The initial option in our February 4, 1983 rule had a method based on a three tier cost approach. This approach was unacceptable to the majority of the utilities. We have recognized the substance of their comments, and have altered the fee calculation methodology to a formula based approach which is more acceptable to most utilities/vendors.

5. <u>Fee Adjustment for Retrospective Fuel (in Basins) Not Retroactive</u>

The law, as many commenters have pointed out, stipulates that only the 1 mill fee for prospectively generated electricity should be adjusted. Our February 4 rule stipulated that the one time fee for existing spent fuel or HLW would also be adjusted according to the kilogram equivalency rate in effect at the time a utility would make a lump sum payment to DOE for disposing of their fuel. For example, if the 1983 dollars/kilogram equivalent to the 1 mill is $176, it could conceivably be $350 in 1993, as adjusted.

Recognizing the comments and in reading the Act closely, we will not adjust the fee for existing spent fuel but will charge utilities/vendors interest on the outstanding balance from April 7, 1983, until payment is made. This type of adjustment will be agreeable to the majority of the utilities, however, one vendor (Westinghouse) may challenge the concept.

6. Kilowatt Hours Generated - "Net Vs Gross"

The majority of utilities favor kilowatt hours generated, to be measured "net at the busbar." This would allow utilities to essentially discount station uses for power generation, although such cost would ultimately be passed onto the customers anyway through PUC rulings. Conversely, others have suggested that kilowatt hours generated be measured at the plant's turbine output meter, in effect providing a gross generation measurement. This would immediately capture all station uses, and in effect would levy fees upon a utility for 100 percent of nuclear power generation versus an average of 96.5 percent of generation as would be measured under the net method.

Recognizing these factors, and the intent of the Act that DOE provide disposal services for <u>all</u> <u>nuclear</u> <u>waste</u> resulting from commercial generating capabilities, we have decided to use the gross measurement for the kilowatt hours generated that will be subject to the 1 mill fee.

7. Utilities "Rights" to "Audit" the Waste Disposal Fund

The utilities expressed a firm desire to have "audit rights" for them written into the contract. In essence,

they would like management, economy/efficiency, program objectives, and financial audit rights over the waste management fund.

Out of sheer history, there is clearly no precedents for the private sector to audit the Federal Government. Additionally, the utilities will be able to get programmatic access from several other sources:

DOE IG,
GAO,
OMB,
Legislatively mandated waste fund report on an annual basis to the Congress, and
a private sector "big 8" accounting firm.

Therefore, this suggestion was denied.

8. Late Payment Penalty (Quarterly Treasury Rate Plus 6 Percent)

The majority of the utilities commented that this rate was too excessive a penalty. We cannot accept these comments because we want to encourage utilities to make timely payments, and, therefore, the penalty should be stiff. We, therefore, have decided to remain with this rate.