No. 04-0074C,
into which has been consolidated No. 04-0075C
(Judge Hewitt)

---

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---

PACIFIC GAS & ELECTRIC COMPANY,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

---

DEFENDANT'S RESPONSE TO PACIFIC GAS & ELECTRIC'S
MOTION *IN LIMINE* TO EXCLUDE R. LARRY JOHNSON'S EXPERT TESTIMONY

---

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

HAROLD D. LESTER, JR.
Assistant Director

JOHN C. EKMAN
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Telephone: (202) 353-0897
Facsimile: (202) 307-2503

Attorneys for Defendant

OF COUNSEL:

JANE K. TAYLOR
Office of General Counsel
U.S. Department of Energy
1000 Independence Avenue, S.W.
Washington, D.C. 20585

SCOTT R. DAMELIN
JOSHUA E. GARDNER
SHARON A. SNYDER
Civil Division
Department of Justice
Washington, D.C. 20530

May 15, 2006

TABLE OF CONTENTS

PAGE


SUMMARY OF ARGUMENT ..... 1

ARGUMENT ..... 3

I. STANDARD FOR ADMISSIBILITY OF EXPERT TESTIMONY ..... 3

II. MR. JOHNSON'S EXPERT OPINIONS ..... 7

III. MR. JOHNSON'S EXPERIENCE AND QUALIFICATIONS ..... 9

IV. MR. JOHNSON'S OPINIONS REFLECT HIS SPECIALIZED KNOWLEDGE OF ACCOUNTING AND DAMAGES ..... 10

A. Mr. Johnson's Opinions Are Relevant To A Determination Of The "But For" World ..... 10

B. Mr. Johnson Offered Numerous Expert Accounting and Damages Opinions That Resulted in Substantial Deductions From Plaintiff's Damages Claim And Demonstrated Significant Flaws in Professor Cornell's Analysis ..... 12

C. Mr. Johnson's Expert Testimony Regarding PG&E's Internal Labor Costs Is Based Upon His Specialized Knowledge Of Accounting Practices And Detailed Analysis Of PG&E's Documentation and Testimony ..... 15

D. Mr. Johnson's Expert Testimony Does Not Intrude On The Province Of The Court And Provides The Court With Useful And Relevant Opinions Based Upon His Extensive Professional Experience ..... 20

E. Mr. Johnson Properly Monetized and Deducted Costs From PG&E's Damages Claim Based Upon The Expert Opinions Offered By The Government's Expert Witnesses, Mr. Brewer And Dr. Neuberger, And Instructions From Counsel ..... 22

TABLE OF CONTENTS (cont'd)

PAGE

V. MR. JOHNSON CONDUCTED A COMPREHENSIVE ANALYSIS OF PG&E'S DAMAGES CLAIM, SUPPORTING DOCUMENTATION, AND DEPOSITION TESTIMONY TO SUPPORT HIS EXPERT OPINIONS ..... 25

CONCLUSION ..... 26

TABLE OF AUTHORITIES

CASES PAGE(S)

Beech Aircraft Corp. v. Rainey,
488 U.S. 153 (1988) .......... 21

Betterbox Communications Ltd. v. BB Technologies, Inc.,
300 F.3d 325 (3d Cir. 2002) .......... 4, 6

Bluebonnet Savings Bank, FSB v. United States,
67 Fed. Cl. 231 (2005) .......... 11, 12

Coast Federal Bank, FSB v. United States,
48 Fed. Cl. 402 (2000) .......... 12

Daubert v. Merrill Dow Pharmaceuticals, Inc.,
509 U.S. 579 (1993) .......... 3

Deal v. Hamilton County Bd. of Educ.,
392 F.3d 840 (6th Cir. 2004) .......... 4

Fawick Corp. v. United States,
149 Ct. Cl. 623 (1960) .......... 12

First Tennessee Bank National Associates v. Barreto,
268 F.3d 319 (6th Cir. 2001) .......... 5

First Union National Bank v. Benham,
423 F.3d 855 (8th Cir. 2005) .......... 6

Forrest v. Beloit Corp.,
424 F.3d 344 (3d Cir. 2005) .......... 21

Glendale Federal Bank, FSB v. United States,
239 F.3d 1374 (Fed. Cir. 2001) .......... 12

Indiana Michigan Power Co. v. United States,
60 Fed. Cl. 639 (2004), aff'd, 422 F.3d 1369 (Fed. Cir. 2005) .......... 11

Inwood Laboratories, Inc. v. Ives Laboratories, Inc.,
456 U.S. 844 (1982) .......... 21, 22

TABLE OF AUTHORITIES (cont'd)

CASES PAGE(S)

Kumho Tire Co. v. Carmichael,
526 U.S. 137 (1999) .......... 4

Living Designs, Inc. v. E.I. Dupont De Nemours & Co.,
431 F.3d 353 (9th Cir. 2005) .......... 4

Micro Chemical, Inc. v. Lextron, Inc.,
317 F.3d 1387 (Fed. Cir. 2003) .......... 4, 6

Rink v. Cheminova, Inc.,
400 F.3d 1286 (11th Cir. 2005) .......... 5

San Carlos Irrigation & Drainage District v. United States,
111 F.3d 1557 (Fed. Cir. 1997) .......... 12

Seaboard Lumber Co. v. United States,
308 F.3d 1283 (Fed. Cir. 2002) .......... 4

Tyler v. Union Oil Co.,
304 F.3d 379 (5th Cir. 2002) .......... 6

United States v. Jones,
107 F.3d 1147 (6th Cir.), cert. denied, 521 U.S. 1127 (1997) .......... 5

United States v. Lopez-Lopez,
282 F.3d 1 (1st Cir. 2002) .......... 7

United States v. Mamah,
332 F.3d 475 (7th Cir. 2003) .......... 7

United States v. Urbina,
431 F.3d 305 (8th Cir. 2006) .......... 21

United States v. Young,
316 F.3d 649 (7th Cir. 2002) .......... 5

# INDEX TO APPENDIX

Portions of Trial Testimony of R. Larry Johnson,
Southern Nuclear Operating Co. v. United States, No. 98-614C (Fed. Cl.) .................................. 1

Portions of Report of Brad Cornell,
Pacific Gas & Electric Co. v. United States, No. 04-0074C (Fed. Cl.) ......................................... 6

Portions of Deposition of Brad Cornell,
Pacific Gas & Electric Co. v. United States, No. 04-0074C (Fed. Cl.) ....................................... 11

Portions of Deposition Testimony of R. Larry Johnson,
Pacific Gas & Electric Co. v. United States, No. 04-0074C (Fed. Cl.) ....................................... 15

Portions of Deposition Testimony of Robert Kapus,
Pacific Gas & Electric Co. v. United States, No. 04-0074C (Fed. Cl.) ....................................... 19

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| PACIFIC GAS & ELECTRIC COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 04-0074C, into which has been |
| | ) | consolidated No. 04-0075C |
| THE UNITED STATES, | ) | (Judge Hewitt) |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S RESPONSE TO PACIFIC GAS & ELECTRIC'S MOTION *IN LIMINE* TO EXCLUDE R. LARRY JOHNSON'S EXPERT TESTIMONY**

Pursuant to Rule 16 of the Rules of the Court of Federal Claims ("RCFC"), defendant, the United States, responds to the motion filed by the plaintiff, Pacific Gas & Electric Company ("PG&E"), seeking to exclude the expert testimony of the Government's expert accounting and damages witness, R. Larry Johnson.

SUMMARY OF ARGUMENT

PG&E's motion to exclude the Government's accounting and damages expert fails to overcome the fact that Mr. Johnson is an expert qualified to testify regarding accounting and damages matters and that Mr. Johnson performed significant and relevant analysis upon this matter – analysis that PG&E's damages expert failed to perform. The seriousness of PG&E's motion can best be summarized with language from its own motion: that "[a]ll that Mr. Johnson really adds is his hyperactive penchant for elementary subtraction." Pl. Br. 13. PG&E's hyperbole leveled against Mr. Johnson cannot survive scrutiny. Indeed, Mr. Johnson brings to his opinions in this case his 38 years of accounting experience as a certified public accountant, and he repeatedly has been qualified as an accounting and damages expert (having testified in numerous trials and arbitrations, including two spent nuclear fuel trials) and has offered testimony in approximately 75 other cases.

In its motion *in limine*, PG&E argues that Mr. Johnson's opinions and testimony provide nothing useful to the Court and, to the extent that PG&E acknowledges that Mr. Johnson is offering helpful testimony, that the testimony intrudes upon the Court's role as trier-of-fact. Interestingly, PG&E's arguments here ignore that its own "damages" expert – an economist with no accounting background – will be offering his opinions concerning the "incremental" nature of PG&E's damages that, if PG&E is correct, equally intrude upon the Court's role at trial. As a result, if this Court accepts PG&E's arguments and grants the motion to exclude Mr. Johnson's testimony, the testimony of Professor Brad Cornell must also be excluded from trial.[1]

A review of Mr. Johnson's expert opinions, set forth in his expert report and deposition testimony, reveals that they are relevant, supportable, and reliable and that his opinions will prove useful to the Court, without intruding upon the Court's province to weigh the evidence presented at trial and reach legal and factual conclusions regarding that evidence.

Mr. Johnson's opinions that certain costs are not incremental to the partial breach of the Department of Energy ("DOE") or are not supported by the evidence as a matter of accounting do not invade the Court's role in determining the weight and credibility of the evidence. Instead, Mr. Johnson's opinions offer a comprehensive and understandable framework for evaluating the validity and bases of PG&E's damages claim. Further, contrary to PG&E's repeated assertions, Mr. Johnson applies well-established and reliable accounting principles to his analysis and

[1] On May 1, 2006, the Government filed a motion to exclude certain testimony at trial. In that motion, and as a protective matter, the Government moved to strike Professor Cornell's testimony for the reasons ultimately set forth by PG&E against Mr. Johnson (and the Government's other witnesses). That motion provides a basis for this Court to exclude Professor Cornell if it agrees with PG&E's arguments here.

provides the Court with a basis for understanding and assessing the significant deficiencies and inconsistencies contained within PG&E's damages claim and Professor Cornell's opinions.

Finally, Mr. Johnson's reliance upon the expert testimony of other Government expert witnesses, including Dr. Jonathan Neuberger and Warren Brewer, as well as his reliance on assumptions provided by Government counsel, does not invalidate his expert testimony, as this Court has recognized in other cases. Although certain activities undertaken by Mr. Johnson, when viewed in a narrow and discrete manner and out of the context of his overall expert opinion, can be viewed as the basic subtraction or addition of certain dollar amounts, PG&E's motion fundamentally mischaracterizes Mr. Johnson's overall expert opinion. Among his other opinions, Mr. Johnson monetized the opinions of other Government experts – Dr. Jonathan Neuberger and Warren Brewer – as well as certain assumptions made by counsel for the Government, to account for certain costs, that, at the very least, must be deducted from PG&E's damages claim.

In sum, PG&E's multiple complaints concerning Mr. Johnson's expert testimony are without merit, and this Court should deny PG&E's motion to exclude his expert testimony in this case.

## ARGUMENT

### I. STANDARD FOR ADMISSIBILITY OF EXPERT TESTIMONY

The United States Court of Appeals for the Federal Circuit has explained that, under the Supreme Court's decision in Daubert v. Merrill Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), the Court has an obligation to screen expert testimony for both relevance and reliability. Seaboard Lumber Co. v. United States, 308 F.3d 1283, 1301 (Fed. Cir. 2002). Although the

standard articulated by the Supreme Court in Daubert must be met even in non-jury cases such as this one, Seaboard Lumber Co., 308 F.3d at 1302, the "'gatekeeper' doctrine was designed to protect juries and is largely irrelevant in the context of bench trials." Deal v. Hamilton County Bd. of Educ., 392 F.3d 840, 852 (6th Cir. 2004). Further, "the trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system." Micro Chem., Inc. v. Lextron, Inc., 317 F.3d 1387, 1392 (Fed. Cir. 2003) (citing Advisory Committee Note to Federal Rule of Evidence 702).

Although the Supreme Court in Kumho Tire Co. v. Carmichael, 526 U.S. 137 (1999), expanded the Court's gatekeeping function under Daubert from "scientific" testimony to all expert testimony, the Court concluded that, in cases not involving scientific testimony, "[t]he factors identified in Daubert may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of the testimony." Id. at 150. In that circumstance, the Supreme Court explained that "the relevant reliability concerns may focus upon personal knowledge or experience." Id.; see Betterbox Communications Ltd. v. BB Technologies, Inc., 300 F.3d 325, 329 (3d Cir. 2002) (affirming the trial court's admittance of a marketing expert who opined upon the likelihood of confusion between two trademarks, and concluding that testimony was based upon the witness's "personal knowledge or experience . . . rather than a methodology that satisfies the Daubert factors"); Living Designs, Inc. v. E.I. Dupont De Nemours & Co., 431 F.3d 353, 368 n.14 (9th Cir. 2005) ("Concerning the reliability of non-scientific testimony such as [Berly's], the 'Daubert factors . . . simply are not applicable to this kind of testimony, whose reliability depends heavily on the knowledge and experience of the expert, rather than the methodology or theory behind it") (citation omitted) (emphasis in

original); United States v. Young, 316 F.3d 649, 657 (7th Cir. 2002) (affirming admission of psychiatric mental health nurse who offered testimony concerning domestic abuse victim's recantation, concluding that her methodology was reliable based upon her extensive experience and review of relevant documents in the case).

The United States Court of Appeals for the Sixth Circuit has explained the distinction in the sufficiency of expert methodology between scientific and non-scientific expert testimony:

> In United States v. Jones, 107 F.3d 1147, 1158 (6th Cir.), cert. denied, 521 U.S. 1127, 117 S. Ct. 2527, 138 L. Ed.2d 1027 (1997), this court recognized that the four specific factors utilized in Daubert may be of limited utility in the context of non-scientific expert testimony. We noted that "[i]f [the Daubert] framework were to be extended to outside the scientific realm, many types of relevant and reliable expert testimony – that derived substantially from practical experience – would be excluded. Such a result would turn Daubert, a case intended to relax the admissibility requirements for expert evidence, on its head." Id. at 1158. Indeed, even the Berry court itself recognized that "[t]he distinction between scientific and non-scientific expert testimony is a critical one[,]" and that Daubert is "only of limited help" in assessing technical or experiential expertise.

First Tennessee Bank Nat. Assoc. v. Barreto, 268 F.3d 319, 334-35 (6th Cir. 2001) (rejecting application of Daubert reliability factors to banking expert's opinion concerning prudent lending practices because expert testimony "derived largely from [expert's] own practical experiences throughout forty years in the banking industry"). Ultimately, the inquiry under Rule 702 is a flexible one, Daubert, 509 U.S. at 594, and trial courts "have substantial discretion in deciding how to test an expert's reliability." Rink v. Cheminova, Inc., 400 F.3d 1286, 1292 (11th Cir. 2005) (citation omitted).

Under Rule 702, an expert witness must possess "specialized knowledge" regarding the area of testimony. Fed. R. Evid. 702. The United States Court of Appeals for the Third Circuit,

in discussing the requisite specialized knowledge necessary to qualify as an expert under Rule 702, explained:

> "The basis for this specialized knowledge 'can be practical experience as well as academic training and credentials,'" and "[w]e have interpreted the specialized knowledge requirement liberally." However, "'at a minimum, a proffered expert witness . . . must possess skill or knowledge greater than the average layman . . . .'"

Betterbox Communications, 300 F.3d at 327-28 (citations omitted) (affirming admittance of marketing expert on the issue of the likelihood of confusion in certain trademarks based upon his experience in the field).

Under Rule 702, a witness may qualify as an expert "based on his own knowledge, skill, experience, training or education." First Union Nat. Bank v. Benham, 423 F.3d 855, 862 (8th Cir. 2005) (citing Fed. R. Evid. 702). Further, the factual basis for an expert's opinion goes to the credibility of the testimony rather than the admissibility, and it is up to PG&E, the party challenging the admissibility of Mr. Johnson's testimony, to examine the factual basis for his opinions through cross-examination. Id.; see Tyler v. Union Oil Co., 304 F.3d 379, 393 (5th Cir. 2002) (holding that attempt to show that expert's underlying data were unreliable is an issue to resolve upon cross-examination at trial). Indeed, where the parties' experts rely upon conflicting sets of facts, "it is not the role of the trial court to evaluate the correctness of facts underlying one expert's testimony" in determining whether they have appropriate expertise. Micro Chem., Inc. v. Lextron, Inc., 317 F.3d 1387, 1392 (Fed. Cir. 2003).[2] Ultimately, the Court must find that

[2] This situation is to be distinguished from an expert who issues opinions that lack any arguable factual support, a situation which may be a proper basis for the exclusion of that expert's opinions. See United States v. Mamah, 332 F.3d 475, 477-478 (7th Cir. 2003) (affirming exclusion of sociologist and anthropologist as experts because they based their

an expert's specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue. United States v. Lopez-Lopez, 282 F.3d 1, 14 (1st Cir. 2002) (affirming admittance of expert on the *modus operandi* of individuals importing drugs into the United States because expert's testimony was not within fact-finder's common knowledge).

II. MR. JOHNSON'S EXPERT OPINIONS

Mr. Johnson has offered expert opinions in this case based upon his 38 years of experience as a certified public accountant. Significantly, PG&E does not question Mr. Johnson's expertise to provide accounting or damages-related opinion testimony, but, instead, challenges the actual opinions that he has provided. Mr. Johnson's expert opinions may be grouped into four categories. First, Mr. Johnson has offered opinions that PG&E's damages expert, Professor Cornell, lacked a basis for concluding that the costs which he identified as PG&E's damages resulting from DOE's delay are properly recoverable as damages; Mr. Johnson critiques Professor Cornell for failing to understand and document PG&E's cost accounting data and procedures; for failing to inspect invoices or other support for PG&E's asserted past costs; for failing to conduct a detailed analysis of spreadsheets or electronic models created by PG&E employees, Celerity Consulting Group ("Celerity"),[3] or his own staff; for placing undue reliance on the work product of PG&E's employees as part of his analysis; and for placing undue reliance

---

opinions upon insufficient facts or data).

[3] The Celerity Consulting Group, retained by PG&E in this litigation, was responsible for assembling binders of supporting documents (including spreadsheets, invoices and contracts) related to the past costs included in PG&E's damages claim. Celerity also performed calculations to quantify non-incremental costs that have been included in PG&E's category of damages called "PG&E labor."

on the calculations and analyses of Celerity without any review or even basic understanding of Celerity's work product. Pl. A.7-A.11, A.19-A.26, Johnson Op. 5-9, 17-25.[4]

Second, Mr. Johnson concluded that PG&E's claimed damages contain costs that are not incremental to DOE's partial breach, that certain costs are based on erroneous assumptions, and that certain costs, as a matter of accounting, are not supported by adequate details or documentation. Pl. A.12-A.27, Johnson Op. 10-25. Third, Mr. Johnson monetized particular expert opinions offered by the Government's other expert witnesses, Mr. Brewer and Dr. Neuberger, who identified certain activities and items that were improperly included as damages; Mr. Johnson monetized those activities and items, in order to identify actual dollar costs for those items, and deducted those costs from PG&E's damages claim as part of his overall damages analysis. Pl. A.12-A.18, A.27-A.28, Johnson Op. 10-16, 25-26. Finally, based upon instructions from counsel that four different items should be removed from PG&E's damages claim, Mr. Johnson monetized and deducted from PG&E's damages claim the costs related to those four items. Pl. A.11, A.12, A.16-A.17, Johnson Op. 9, 11, 14-15.[5]

## III. MR. JOHNSON'S EXPERIENCE AND QUALIFICATIONS

The Government has offered Mr. Johnson as an expert in the fields of accounting and damages. This Court has repeatedly qualified Mr. Johnson in these areas. See Southern Nuclear Operating Co. v. United States, No.98-614C (Fed. Cl. Oct. 27, 2005) (Def. A.2-A.5, Tr.2184:11-

---

[4] "Pl. A. __" refers to the appendix attached to PG&E's motion *in limine*. Johnson Op., ___" refers to the expert report authored by Mr. Johnson this case, dated April 13, 2006, which is attached as an exhibit to PG&E's motion *in limine*.

[5] On April 13, 2006, Mr. Johnson issued a revised report to incorporate documentation received by PG&E after the date Mr. Johnson's filed his initial report.

2187:11)[6] (noting that he has been qualified as an expert in the Court of Federal Claims on numerous occasions, including both Winstar and spent nuclear fuel cases, in the area of the "appropriate support for the measurement of the damages that were being asserted" by plaintiffs); see generally Yankee Atomic Electric Company v. United States, No. 98-126C (Fed. Cl.), Connecticut Yankee Atomic Power Co. v. United States, No. 98-154C (Fed. Cl.), and Maine Yankee Atomic Power Co. v. United States, No. 98-474C (Fed. Cl.).

Mr. Johnson has been the Chief Executive Officer of VERIS Consulting, LLC, since 2000 and was Managing Partner of the accounting firm of Johnson, Lambert & Company from 1986 to 2005. Pl. A.30, Johnson Op. 28. Mr. Johnson also worked for Ernst & Whinney for 18 years and was admitted to partnership in 1978. Id. From 1994 to 1997, Mr. Johnson was a member of the Accounting Standards Executive Committee of the American Institute of Certified Public Accountants, which was the highest authority in the United States accounting profession with responsibility for industry-specific accounting and reporting matters. Pl. A.31, Johnson Op. at 29. Mr. Johnson brings an extensive specialized knowledge of accounting and damages analysis to this case, supported by over four years of particular experience in the assessment of accounting and damages in the spent nuclear fuel cases.

[6] "Def. A.__" refers to the appendix filed with this response.

## IV. MR. JOHNSON'S OPINIONS REFLECT HIS SPECIALIZED KNOWLEDGE OF ACCOUNTING AND DAMAGES

### A. Mr. Johnson's Opinions Are Relevant To A Determination Of The "But For" World

Mr. Johnson has, through 38 years of professional accounting experience and substantial involvement in litigation-related matters, developed the specialized knowledge that will help this Court, as the trier of fact, understand the evidence presented at trial and determine the facts in issue. Mr. Johnson is not offering any legal conclusions, but, rather, is offering an expert accounting opinion that certain costs included in PG&E's damages claim are not incremental to DOE's partial breach of the Standard Contract. Mr. Johnson also offers the opinion that Professor Cornell failed to adhere to his own standard for determining whether a cost is incremental to the Government's delay in SNF acceptance and, therefore, incorrectly includes certain costs as damages. As Professor Cornell explained in his expert report:[7]

> I have relied on a standard approach to determining damages in a breach of contract claim, which is to compare PG&E's actual costs to the costs PG&E would have incurred "but for" the breach. Damages are the costs incurred by PG&E as a result of the breach.
>
> * * *
>
> Calculating the incremental cost of the breach necessarily requires me to identify the costs that would have been incurred by PG&E absent the breach. Two approaches are possible. One is to calculate the costs of PG&E's entire Humboldt and Diablo Canyon operations with the breach and without the breach (assuming no change in revenue between scenarios). In this case, damages are the difference in costs between under each scenario. There are no changes in revenues that have to be considered in the "but for"

---

[7] As we will demonstrate at trial, although Professor Cornell claims that damages constitute the incremental difference between the "but for" and actual worlds, Professor Cornell failed to engage in any analysis to determine whether a claimed cost truly was incremental to the Government's delay in SNF acceptance from PG&E.

> analysis because there is no change in output at either plant as a result of the breach. This approach is unnecessarily broad in scope.
>
> * * *
>
> As a more direct and practical approach, I estimate incremental "but for" costs recognizing first that only a subset of PG&E's costs are sensitive to DOE's breach, and second, as discussed above, in all but two of the seven categories, "but for" costs are zero. . . .

Def. A.7, A.9-A.10, Rep. of B. Cornell, ¶¶ 10, 16, 17 (footnote omitted).

As evidenced by PG&E's own experts, PG&E essentially argues that it is appropriate for <u>its</u> expert to offer an opinion that certain costs are incremental, but that it is inappropriate for the Government's expert to challenge that conclusion. PG&E's desire to have it both ways highlights the lack of merit in PG&E's motion and emphasizes that Mr. Johnson's specialized knowledge would assist the Court in its examination of the evidence. Courts routinely allow for expert testimony concerning whether a particular activity claimed as a damage is incremental to the breach. For example, in <u>Indiana Michigan Power Co. v. United States</u>, 60 Fed. Cl. 639 (2004), <u>aff'd</u>, 422 F.3d 1369 (Fed. Cir. 2005), this Court considered the testimony of the Government's technical expert, Ed Abbott, concerning whether certain activities, such as plaintiff's spent fuel pool rerack, were incremental to the costs that the plaintiff allegedly incurred as a result of the Government's delay in SNF acceptance. <u>Id.</u> at 656-57.

PG&E's complaints about Mr. Johnson's opinions fail to recognize that the burden of demonstrating the "but for" world for purposes of establishing an entitlement to the recovery of damages rests with PG&E, and not the Government. <u>Bluebonnet Sav. Bank, FSB v. United States</u>, 67 Fed. Cl. 231, 238-39 (2005) (plaintiffs must establish plausible "but-for world" as part of causation analysis); <u>Coast Fed. Bank, FSB v. United States</u>, 48 Fed. Cl. 402, 403 n.25 (2000)

(plaintiffs bear burden of propounding realistic “but for” scenario); see Glendale Fed. Bank, FSB v. United States, 239 F.3d 1374, 1380 (Fed. Cir. 2001) (plaintiffs bear burden of demonstrating “what might have been . . . .”);San Carlos Irrigation & Drainage Dist. v. United States, 111 F.3d 1557, 1563 (Fed. Cir. 1997) ("[a] plaintiff must show that but for the breach, the damages alleged would not have been suffered") (emphasis added); Fawick Corp. v. United States, 149 Ct. Cl. 623, 637 (1960) (holding that the loss must be one which the non-breaching party can show that, "but for" the breach of contract, would not have been suffered). Mr. Johnson’s expert testimony regarding the “but for” world addresses a significant deficiency in PG&E’s case and ultimately quantifies and monetizes the costs that should be removed from PG&E’s damages claims as a result of such an analysis.

### B. Mr. Johnson Offered Numerous Expert Accounting and Damages Opinions That Resulted in Substantial Deductions From Plaintiff’s Damages Claim And Demonstrated Significant Flaws in Professor Cornell’s Analysis

Mr. Johnson, based upon his accounting experience and detailed review of PG&E’s damages claim and supporting documentation, offered a number of specific opinions regarding the improper inclusion of certain costs in PG&E’s damages claim. First, Mr. Johnson identified approximately $3.7 million in escalation charges related to certain costs that were purportedly incurred by PG&E pursuant to a contract with Holtec International, Inc.[8] Pl. A.19, Johnson Op. 17. However, based upon his detailed review of the relevant cost data, supporting documentation, and deposition testimony of PG&E employee, Robert Kapus, Mr. Johnson determined that none of this escalation claimed as damages was actually incurred as set forth in

[8] PG&E entered into contracts with Holtec for the design, licensing, and fabrication of dry cask storage systems for Humboldt Bay and Diablo Canyon.

Professor Cornell's opinion. Id. As a result, Mr. Johnson removed this $3.7 million in claimed costs from PG&E's damages claim. Id.

Second, at the time of his initial January 27, 2006 expert report and based upon his review and analysis of PG&E's accounting records and damages spreadsheets, Mr. Johnson discovered that PG&E's damages claim contained a serious accounting discrepancy that resulted in the improper inclusion of $6.5 million in damages related to Humboldt Bay SAFSTOR and the Diablo Canyon dry storage project. More specifically, Mr. Johnson concluded that the non-labor related costs identified by Professor Cornell as damages exceeded, by $6.5 million, the total for non-labor related costs that were included on the summary damages schedules and documentation prepared and compiled by Celerity.[9] Mr. Johnson deducted the $6.5 million from PG&E's damages claim.[10] After Mr. Johnson submitted his report, PG&E provided additional information that reduced the amount of the accounting discrepancy. Pl. A.25-A.27, Johnson Op. 23-25. Despite additional testimony by Mr. Kapus, Mr. Johnson was unable to reconcile the discrepancy. Pl. A.26-A.27, Johnson Op. at 24-25. When Mr. Johnson issued his April 13, 2006 expert report, he ultimately reduced PG&E's damages claim by $2.15 million because of the accounting discrepancy. Id.

Third, Mr. Johnson concluded that certain non-labor overhead costs were not incremental to the breach and should be removed from PG&E's damages claim. Pl. A.20-A.23, Johnson Op.

---

[9] For his damages analysis, Professor Cornell purportedly relied upon the work performed by Celerity, yet admitted that neither his staff nor he ever received or reviewed the binders of supporting documents prepared by Celerity. Def. A.12-A.13, Deposition of Bradford Cornell, Tr. 277-278 (Jan. 19, 2006).

[10] This $6.5 million figure includes the amounts that Mr. Johnson removed for unsupported escalation.

19-21. Mr. Johnson reviewed Professor Cornell's effort to identify and "back out" (or remove) from the damages claim certain allocated costs – representing non-labor-related overhead charges – that are embedded in all of PG&E's labor charges. Id. Professor Cornell attempted to remove certain allocated costs to isolate PG&E labor and overhead costs that he asserts are incremental. However, based upon his review of Professor Cornell's analysis, Mr. Johnson concluded that Professor Cornell failed to perform the analysis required to quantify the non-incremental overheads, that Professor Cornell lacked sufficient documentation and understanding of the cost categories to perform such an analysis, and that Professor Cornell relied upon Celerity, rather than his own staff and himself, to perform the backouts. Id. As a result, Professor Cornell was unable to explain the calculation of these non-incremental support costs. Mr. Johnson's opinions here, based upon his accounting and damages experience, eliminated the total "backed out" amount of $2.091 million that PG&E included in its damages claim. Pl. A.22, Johnson Op. at 20.

However, Mr. Johnson went one step further. To properly separate the non-labor costs from the damages claimed for PG&E labor, Mr. Johnson conducted his own analysis of these labor costs and of supporting PG&E documentation. Mr. Johnson reviewed contemporaneously prepared PG&E documents and identified the portion of PG&E's internal labor charges that represented salaries, benefits and payroll taxes versus other non-labor overheads that were allocated to PG&E labor. Pl. A.22-23, Johnson Op. at 20-21. Mr. Johnson identified the portion of internal PG&E labor costs that represents these other non-labor related overheads and made a resulting net deduction to PG&E's damages claim. Id.

Fourth, Mr. Johnson concluded that so-called "Other Support Costs" – totaling millions of dollars – were improperly included in PG&E's damages claim. Pl. A.23-A.25, Johnson Op. 21-23. Professor Cornell included various employee benefit and overhead costs in the damages claim that he described as "Other Support Costs." Based upon Mr. Johnson's review of the data used by PG&E and his accounting and damages-related experience, Mr. Johnson concluded that Professor Cornell did not endeavor to understand the source of the information used for his analysis and failed to critically analyze the reasonableness of his results. Id. Mr. Johnson also concluded that substantial components of these support costs – components that drove the calculations that ultimately determine what passes through to damages – were not, as a matter of accounting and damages, incremental to DOE's breach. Further, Mr. Johnson determined that Professor Cornell calculation of the "Other Support Costs" was unnecessarily based upon estimated values, despite the fact that Betty Phillips, a PG&E employee, provided testimony that actual values existed and could have been used. Pl. A.24, Johnson Op. at 22. Mr. Johnson opined that Professor Cornell failed reasonably to calculate the value of the "Other Support Costs " that he asserted should be included as damages, and Mr. Johnson removed $4.25 million in "support costs" from damages. Pl. A.21, A.23-A.25, Johnson Op. at 19, 21-23.

C. Mr. Johnson's Expert Testimony Regarding PG&E's Internal Labor Costs Is Based Upon His Specialized Knowledge of Accounting Practices And Detailed Analysis Of PG&E's Documentation and Testimony

PG&E asserts that Mr. Johnson provides no basis to support his opinion that certain costs related to PG&E internal labor charges should be removed from the damages claim. PG&E's criticism again is misplaced. Mr. Johnson analyzed and ultimately deducted certain internal labor costs from PG&E's damages claim that relate to work performed by PG&E employees for

Humboldt Bay SAFSTOR operations, the Humboldt Bay and Diablo Canyon ISFSI projects, and the Diablo Canyon temporary cask pit rack project.

Mr. Johnson explained that "costs recoverable as an element of damages include only those that would not have been incurred but for the partial breach" and that "the damages calculated by Dr. Cornell fail to meet the incremental standard." Pl. A.12, Johnson Op. at 10. Because of the lack of documentation produced by PG&E prior to the issuance of his initial expert report, Mr. Johnson was unable to conduct an analysis of the internal labor costs claimed by PG&E as damages against the Government. Subsequent to the issuance of his initial report, PG&E provided documentation related to its internal labor. In his April 13, 2006 expert report, Mr. Johnson explained that:

> Based on my analysis of the additional documentation provided, it is clear that PG&E has claimed damages for all internal hours charged to asserted breach projects, without regard to or analysis of whether the cost represented an additional cost to the company as a consequence of the breach or whether the cost would have been incurred but for the breach.

Pl. A.10-A.11, Johnson Op. 8-9. Mr. Johnson also noted that the information provided was incomplete in several respects. Id. Based upon the documentation provided by PG&E, coupled with the testimony of PG&E's own employees, Mr. Johnson conducted an analysis as to the incremental nature of these internal labor costs, an analysis that PG&E failed to conduct in this case.

Contrary to PG&E's assertion that "he provides no basis to support his opinion that these costs should be excluded," Pl. Mot. 11, Mr. Johnson explained that he needed to determine whether the labor cost represented an additional cost to the company or whether the cost would have been incurred but for the breach. PG&E's position in this litigation appears to be that, if

any internal labor was charged to any category or activity claimed as damages at Humboldt Bay or Diablo Canyon, all such internal labor costs are properly included in damages. As the Government has repeatedly argued throughout this litigation, PG&E fails to recognize that it has the burden of proof to establish the incremental nature of all costs claimed as damages against the Government. Given its failure to do so, Mr. Johnson's expert testimony has provided the Court with a straightforward and reasonable analysis to identify incremental and non-incremental labor costs.

Mr. Johnson's treatment of labor costs for Humboldt Bay SAFSTOR, the Humboldt Bay and Diablo Canyon ISFSIs, and the Diablo Canyon temporary rack project are fully explained in his expert report and deposition testimony. In analyzing PG&E's internal labor charges, Mr. Johnson identified an important distinction between PG&E's two nuclear facilities. Humboldt Bay SAFSTOR involves the continuing operations and maintenance of a shutdown nuclear facility that has not operated since 1976. Pl. A.12-A.14, Johnson Op. 10-12. The Humboldt Bay labor force is also responsible for the operations and maintenance of two fossil fuel units. Id. As Mr. Johnson recognized, some Humboldt Bay employees split and charge their time between the fossil and nuclear units. Pl. A.12-A.15, Johnson Op. 10-13. Mr. Johnson relied upon the testimony of Mr. Kapus, who testified that approximately 65 percent of the hours worked at Humboldt Bay related to nuclear SAFSTOR activities, as compared to fossil generation activities. Pl. A.12, Johnson Op. 10 (citing Deposition of Robert Kapus, Tr. 24, Def. A.20). This testimony was consistent with the hourly labor information that PG&E eventually produced. Pl. A.12, Johnson. Op. 10. As Mr. Johnson explained:

> The SAFSTOR activity is a unique activity that would not occur except for the breach and there are no other activities going on that

> would be large users of time such as the generation of power. There are other activities going on at the facility. But you can measure and I believe reasonably determine that there would be a number of people that would not be necessary at that facility except for SAFSTOR and that's what we attempted to do. Similarly we looked at the ISFSI and said if someone's not devoted substantial full time at any point in time to this activity by definition then they are doing – the majority of what they're doing is something else and so therefore these people are not incremental.

Def. A.18, Deposition of R. Larry Johnson, Tr. 630:6-20 (May 9, 2006).

For the Humboldt Bay ISFSI project, Mr. Johnson again relied upon Mr. Kapus' testimony and the documentation that PG&E produced. As a result, Mr. Johnson deducted from damages all internal labor charges related to the Humboldt Bay ISFSI project with two exceptions: (1) employees who spent all or substantially all of their time on the ISFSI project, or (2) employees who worked on both the ISFSI project and on SAFSTOR. When questioned as to why his analysis regarding Humboldt Bay labor was reasonable, Mr. Johnson testified:

> Because the fundamental notion is that there are a substantial number of employees employed in the SAFSTOR activities who by their very nature are incremental but we didn't do that by employee, we did that in an overall aggregateation to say that there's roughly 65 people that would not be there were it not for the breach related activities associated with SAFSTOR.
>
> When we look at the implication of SAFSTOR to the ISFSI related costs we could have gone back to employee by employee but we didn't do that in measuring the SAFSTOR to begin with. So I simply adopted something that I think is generous. I think it's reasonable but in the range of generosity.
>
> It's the most generous from the standpoint of the plaintiff's interpretation that can be made, that if somebody spent any time on SAFSTOR the time they spent on the ISFSI is includable without regard to the measurement of those hours.

Def. A.16, Deposition of R. Larry Johnson, Tr. 587:17-588:12 (May 9, 2006).

On the other hand, Diablo Canyon is an operating nuclear facility, and the normal power generating activities that take place at Diablo Canyon are not incremental to the breach. As Mr. Johnson concluded, within his overall analysis of what should be considered an incremental cost, "time spent on the Diablo Canyon ISFSI project by employees who are primarily employed to work on power generating activities is also not incremental to the breach." Pl. A.17, Johnson Op. 15. Ultimately, while Mr. Johnson concluded that the labor costs for employees who were identified as "full-time dedicated" to the ISFSI project should not be deducted from the claimed damages, he also concluded that labor costs associated with other Diablo Canyon employees who were not dedicated to the ISFSI project must be removed, "as these costs would have been incurred by PG&E pursuant to normal power generating activities." Id. This same analysis when applied to internal labor costs related to the Diablo Canyon Temporary rack project yielded the same conclusion. Pl. A.18, Johnson Op. at. 16.

Mr. Johnson's expert testimony provides a clear, reasonable, and supportable basis for both deducting and including certain internal labor costs in PG&E's damages claim. All of Mr. Johnson's opinions were identified and included in his expert report, and were fully vetted by PG&E's counsel through deposition testimony. To the extent that PG&E disagrees with Mr. Johnson's conclusions, that is better left to cross-examination, not to a motion to strike.

D. Mr. Johnson's Expert Testimony Does Not Intrude On The Province Of The Court And Provides The Court With Useful and Relevant Opinions Based Upon His Extensive Professional Experience

Mr. Johnson's expert testimony is not objectionable simply because it addresses or analyzes an ultimate issue to be decided by the fact-finder. PG&E's contention that Mr. Johnson is invading the province of the Court – by assessing the evidence to conclude that certain of PG&E's claimed costs are not incremental, erroneously asserted, or not supported – is without merit. Pl. Mot. 10. Mr. Johnson offered a number of opinions that required him to review and analyze cost data and documentation, as well as the deposition testimony of PG&E employees.

For example, regarding Humboldt Bay security costs, Mr. Johnson concluded those costs were "not incremental because they would have been spent on industrial security necessary to protect the fossil units there." Pl. A.13-A.14, Johnson Op. 11-12. Relying upon the testimony of PG&E employee Robert Kapus, and having conducted an extensive review and analysis of PG&E's damages claim and supporting documentation, Mr Johnson concluded:

> PG&E has included security costs in its damages related to fossil power generating activities for the years 1999 through 2004 even though the fossil operation at Humboldt Bay would have required industrial security regardless of the breach. Consequently, the amounts incurred for fossil related industrial security for the years 1999 through 2004 should be removed from damages claimed for Humboldt Bay security costs.

Pl. A.14, Johnson Op. 12. Mr. Kapus testified that the amounts attributable to fossil security at Humboldt Bay in 2005 were between $400,000 and $500,000, but also indicated that the fossil security costs for 1999 through 2004 would be lower. Def. A.21-A.26, Deposition of Robert Kapus, Tr. 83-88. In 1999, Humboldt Bay incurred security costs of $329,000. Def. A.24. Mr. Johnson deescalated the industrial security costs from 2005 levels to prior years, and then

removed the costs consistent with Mr. Kapus' testimony. Pl. A.13-A.14, Johnson Op. 11-12. This analysis resulted in Mr. Johnson's opinion that $2.049 million should be deducted from PG&E's damages claim. Pl. A.12-A.15, Johnson Op. at 10-13.

Pursuant to Federal Rule of Evidence 704, expert testimony is not objectionable simply because it embraces an ultimate issue to be decided by the fact-finder. See Beech Aircraft Corp. v. Rainey, 488 U.S. 153, 169 (1988) (recognizing that Federal Rules of Evidence 702 through 705 "permit experts to testify in the form of an opinion, and without any exclusion of opinions on 'ultimate issues'"); United States v. Urbina, 431 F.3d 305, 311 (8th Cir. 2006) (affirming admission of expert testimony concerning *modus operandi* of drug traffickers because "a court can allow opinion testimony if the expert's specialized knowledge is helpful to the [fact-finder] to understand the evidence or determine a fact in issue, even if the opinion embraces an ultimate issue to be decided by the [fact-finder]"); Forrest v. Beloit Corp., 424 F.3d 344, 353 (3d Cir. 2005) (affirming expert testimony from biomechanical engineer that presence of a guard would have prevented plaintiff's injury, because expert may offer testimony concerning ultimate issue in case). Interestingly, the one case that PG&E cites to support its assertion that Mr. Johnson "intrudes on the sole province of the Court," Inwood Laboratories, Inc. v. Ives Laboratories, Inc., 456 U.S. 844 (1982), does not even address expert witness testimony. Instead, the case addresses the general proposition that "[d]etermining the weight and credibility of the evidence is the special province of the trier of fact," id. at 856, but provides absolutely no guidance on how or under what circumstances expert testimony would violate the special province of the trier of fact.[11] Ultimately, the Court must make the decision as to whether PG&E met its burden of

[11] In Inwood, the court of appeals had reversed a district court's ruling because the appellate court held that the trial court failed to give sufficient weight to certain evidence offered

proof to establish that all the costs claimed as damages are incremental to the breach. Mr. Johnson's expert testimony, contrary to PG&E's assertion, does not invade the province of the Court, and his specialized knowledge of accounting and damages will provide great assistance to the Court through his analysis of PG&E's evidence.

E. Mr. Johnson Properly Monetized and Deducted Costs From PG&E's Damages Claim Based Upon The Expert Opinions Offered By The Government's Expert Witnesses, Mr. Brewer And Dr. Neuberger, And Instructions From Counsel

PG&E accuses Mr. Johnson of simply "parroting" the expert opinions of Mr. Brewer and Dr. Neuberger, and instructions from Government counsel, and then deducting the costs for certain non-incremental and unsupported activities identified by the experts and counsel. Pl. Mot. 5-10. PG&E asserts that Mr. Johnson fails to bring any "specialized knowledge" to the analysis and concludes that "it does not qualify as expert testimony." Pl. Mot. 9. PG&E's characterization of Mr. Johnson's expert testimony is incorrect.

As explained in Section III of this response, Mr. Johnson's expert testimony is based upon his specialized knowledge of accounting and damages issues developed over almost four decades of practice. The Court's inquiry must focus upon the question of whether Mr. Johnson's specialized knowledge will help the Court to understand the evidence, including whether certain costs are incremental to the breach and the quantification or monetization of such costs. Although certain individual steps undertaken by Mr. Johnson as part of his work in this case involve the basic deduction or addition of certain costs in PG&E's damages claim, Mr.

by a plaintiff. The Supreme Court concluded that, "[b]y rejecting the District Court's findings simply because it would have given more weight to evidence of mislabeling than did the trial court, the Court of Appeals erred. Determining the weight and credibility of the evidence is the special province of the court." Inwood, 456 U.S. at 856.

Johnson's expert testimony provides a valuable and reliable addition to this case, by providing the Court with a roll-up or aggregation of PG&E's damages claims and the deductions to that claim asserted by the Government. Mr. Johnson's application of the opinions of other expert witnesses and monetization of those opinions provides the Court with a reliable and comprehensive assessment of the detailed elements of the PG&E's damages claim that will be missing from PG&E's case-in-chief.

For example, Mr. Brewer identified numerous activities conducted at PG&E's nuclear facilities that he concluded were not incremental to the breach, including, but not limited to, PG&E's visual inspection of the spent fuel stored in the Humboldt Bay wet pool and an investigation by PG&E to resolve a "used fuel documentation discrepancy" involving the spent fuel at Humboldt Bay. In both cases, Mr. Johnson reviewed Mr. Brewer's expert opinion, but also identified deposition testimony from PG&E employees that was consistent with Mr. Brewer's opinion. Pl. A.14-A.15, Johnson Op. 12-13. In each case, Mr. Johnson then monetized Mr. Brewer's opinions regarding these non-incremental activities and deducted the costs from PG&E's damages claim. Pl. A.12, A.15, Johnson Op. at 10, 13.

Mr. Johnson also properly applied instructions from Government counsel, for purposes of his damages analysis, that certain activities and costs should be deducted from PG&E's damages claim. Although failing to cite any legal authority for its criticism, set forth in all of three sentences of its motion, PG&E claims that "at no point does Mr. Johnson offer any opinion, let alone one based on 'specialized knowledge.'" Pl. Mot. 9-10. As described in detail above, Mr. Johnson's extensive experience in accounting and damages analysis will assist the trier of fact to understand the evidence and determine the facts at issue. Mr. Johnson's expert testimony and

opinions regarding the monetization of certain deductions, even when taken at the direction of counsel, provides the Court with a helpful, relevant, and comprehensive assessment of PG&E's damages claim.

For example, Mr. Johnson was instructed by counsel to assume that an exchange of acceptance allocations was not possible, despite PG&E's assertion that it would have engaged in such an exchange at some market price. Pl. A.13, Johnson Op. 11. As a result of this assumption, and contrary to PG&E's litigation position, Humboldt Bay would not have been able to remove all of it spent nuclear fuel in 1998. Consequently, PG&E would have incurred all costs for SAFSTOR at its Humboldt Bay facility through the year 1999 in the "but for" world (assuming PG&E's asserted annual rate of acceptance). Based upon counsel's instruction, Mr. Johnson reviewed the relevant cost data and supporting documentation that PG&E produced and made an adjustment of $3.812 million to PG&E's damages claim that provides an offset in the "but for" world for all 1999 SAFSTOR costs. Both PG&E and Professor Cornell failed to undertake such an analysis. Mr. Johnson's expert testimony on this and other similar matters will provide helpful and relevant testimony to the Court. Mr. Johnson's testimony will provide the Court with a comprehensive assessment of PG&E's damages claim and the Government's proposed deductions from that claim.

## V. MR. JOHNSON CONDUCTED A COMPREHENSIVE ANALYSIS OF PG&E'S DAMAGES CLAIM, SUPPORTING DOCUMENTATION, AND DEPOSITION TESTIMONY TO SUPPORT HIS EXPERT OPINIONS

Mr. Johnson concluded that Professor Cornell failed to investigate and verify the accuracy of the data contained in PG&E and Celerity-generated documents, simply accepted cash flow sheets prepared by PG&E employees in connection with this litigation, and adopted those cost figures as his own. Pl. A.8-A.9, Johnson Op. 6-7. Mr. Johnson also determined that Professor Cornell "failed to examine and investigate documentation that was provided by PG&E in support of the historical costs incurred" and that Professor Cornell "failed to review the invoices provided by PG&E to ascertain whether the costs claimed related to the storage of spent nuclear fuel and whether those costs were incurred as a consequence of the DOE's partial breach." Pl. A.8, Johnson Op. at 6. PG&E attempts to characterize Mr. Johnson's analysis as suffering from the same flaws and defects as Professor Cornell's analysis, but, once again, PG&E mischaracterizes the record.

In analyzing PG&E's damages claim, Mr. Johnson and his staff undertook an extensive financial audit of PG&E's claims and of the supporting documentation. Pl. A.5-A.6, A.37-A.39, Johnson Op. 3-4, 35-37. The purpose of the audit and analysis was to determine whether costs were incurred from an accounting perspective and, if incurred, whether the costs were incremental to DOE's delay. Id. During the audit, Mr. Johnson and his staff, operating under his direct supervision, reviewed the thousands of documents produced by PG&E in connection with its initial disclosures and requested thousands of additional supporting financial records. Id. The information that Mr. Johnson requested included employee time records, contracts, purchase orders, and invoices for damages-related activities. Id. In addition, Mr. Johnson reviewed

deposition transcripts and expert reports. Id. Overall, the analysis that Mr. Johnson conducted was detailed and comprehensive and provides a solid and reasonable basis for his expert testimony.

## CONCLUSION

For the foregoing reasons, the Government respectfully requests that the Court deny PG&E's motion *in limine* to exclude the expert testimony of Mr. Johnson.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/ Harold D. Lester, Jr.
HAROLD D. LESTER, JR.
Assistant Director

s/John C. Ekman
JOHN C. EKMAN
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, NW
Washington, D.C. 20530
Tel: (202) 353-0897
Fax: (202) 307-2503

OF COUNSEL:

JANE K. TAYLOR
Office of General Counsel
U.S. Department of Energy
1000 Independence Ave., S.W.
Washington, D.C. 20585

SCOTT R. DAMELIN
JOSHUA E. GARDNER
SHARON A. SNYDER
Trial Attorneys
Civil Division
Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530

May 15, 2006

Attorneys for Defendant