# Appendix

# UNITED STATES
# COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| SOUTHERN NUCLEAR OPERATING | : | |
| COMPANY, ALABAMA POWER | : | |
| COMPANY, and GEORGIA POWER | : | NO. 98-614C |
| COMPANY, | : | |
| Plaintiffs | : | |
| vs. | : | |
| THE UNITED STATES, | : | |
| Defendant. | : | |

Pages: 2174 through 2335

Place: Washington, D.C.

Date: January 30, 2006

**HERITAGE REPORTING CORPORATION**
*Official Reporters*
1220 L Street, N.W., Suite 600
Washington, D.C. 20005-4018
(202) 628-4888
hrc@concentric.net

designed to do confidential surveys, again, where organizations want to outsource a process by which they gather information about membership groups, they might go outside their organization. And Veris has a practice devoted to providing that type of service as well.

Q. All right. On how many cases, and this is outside of simply testifying, but in how many cases have you worked since founding Veris?

A. Over that now I guess five-year period, I would expect it was around 100.

Q. Now, has your litigation work and experience focused on damages analyses?

A. Yeah, a substantial portion of what Veris does, and what I specifically do, is dealing with either creation of damages assertions and models to reflect what I believe to be economic harm caused by actions of particular parties or, alternatively, to consider what someone else has asserted is the appropriate measure of damage to consider, and evaluate whether I believe that those assertions are conceptually correct and whether they are supported by appropriate evidence.

That takes a wide range of kinds of assignments, typically resulting in creation of but-for worlds, so one can see the difference between what was and what would have been.

And also deals sometimes frequently with looking at evidence to support assertions, separate and apart from the creation of a but-for world, and sometimes it is a combination of both.

Q. Can you describe the type of assignments on which you have worked at Veris?

A. Yeah. They have covered a wide range of industries, from financial services, insurance, Winstar-related cases, broadband communications cases, various types of real estate.

I think it covers probably eight or ten more different types of circumstances where the focus would be whether and to what extent there is evidence that there has been economic harm caused by a particular asserted conduct.

Q. Have you ever testified before as an expert?

A. Yes.

Q. And have you testified in both state

and federal courts?

A. Yes. I have testified in federal courts in New Jersey, the District of Columbia, and Louisiana, at least. And I have testified in state courts, probably six or seven different states, ranging from Pennsylvania to Connecticut to Illinois, Ohio, and a few others that I don't recall as I sit here.

Q. Do you know how many times you have testified?

A. At trial probably seven or eight. At arbitration, probably a similar number. And then at deposition, a substantially greater number than either of those.

Q. Have you ever been qualified as an expert witness?

A. Yes.

Q. What courts have qualified you as an expert?

A. Federal courts in the jurisdictions I just mentioned, most recently in New Jersey, as well as this Court.

Q. And in what case or cases has this Court certified you as an expert, qualified you as an expert?

A. I have testified in this Court in a couple of Winstar-related cases, specifically Transohio and Apel Fed. I have also testified in this Court in the so-called Yankee case, which involves three companies, the Yankee Atomic, Connecticut Yankee, and Maine Yankee.

Q. In what areas were you qualified to testify in connection with the Yankee case?

A. The appropriate support for the measurement of the damages that were being asserted by those plaintiffs.

Q. Has all your testifying work been on behalf of the government?

A. No, not by a long shot. I have probably done substantially more work in the non-governmental sector and it has probably been slightly greater for plaintiffs than for defendants.

Q. You have talked generally about your involvement in Winstar and certainly in Yankee. What are some other examples, some of the previous cases on which you have provided testimony or in which you provided testimony?

A. A very large insurance insolvency in which I testified in federal court in New

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| PACIFIC GAS AND ELECTRIC COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | No. 04-74C<br>(into which has been consolidated No. 04-75C)<br>(Judge Hewitt) |

**Expert Report of Brad Cornell (11/10/2005)**

I. **Qualifications**

(1) I am a Visiting Professor of Finance at the California Institute of Technology. I am also a Senior Consultant to CRA International (CRA). I earned a M.S. degree in Statistics from Stanford University in 1974 and earned my Ph.D. degree in Financial Economics also from Stanford University in 1975.

(2) Since 1975, I have taught a variety of courses, including courses involving corporate valuation, the law and finance of corporate acquisitions and restructuring, corporate financial theory, and securities valuation and investments. Prior to joining the Cal Tech faculty, I was Director of the Bank of America Research Center at the Anderson Graduate School of Management at the University of California, Los Angeles (UCLA). At UCLA, I twice served as Vice-Chairman of the Anderson School and twice served as Chairman of the Finance Department. I have also taught

2003, $96.6 million through 2004, $128.2 million through 2005, $172.9 million through 2006, $202.5 million through 2007 and $273.7 million through 2012. These figures reflect damages to PG&E because of the government's failure to remove spent fuel from both Humboldt Bay and Diablo Canyon power plants consistent with contractual obligations as claimed by PG&E. Damages are calculated through several potential end dates that may be decided by the Court. For this analysis, the end of 2007 is assumed to be the time at which damages will be awarded. The end of 2012 is assumed to be the earliest point in time at which the government may pick up PG&E's spent fuel. Additional damages will result should the government fail to remove spent fuel from PG&E's plants by that time.

## IV. Documents Relied On

(9) The documents that I considered to calculate damages are listed in Appendix C.

## V. Methodology and Results

(10) I have relied on a standard approach to determining damages in a breach of contract claim, which is to compare PG&E's actual costs to the costs PG&E would have incurred "but for" the breach. Damages are the costs incurred by PG&E as a result of breach. The relevant period for this comparison is the early 1990s through December 2012. The start date is the time at which PG&E determined that there existed sufficient uncertainty as to whether the DOE would perform for it to be necessary to

begin planning and devoting valuable resources for additional spent fuel management beyond the contractual date for removal by the government. Counsel has asked me to determine damages over various end dates because of uncertainty as to the appropriate period over which damages may be claimed. I have not calculated any pre-judgment interest, as I understand such interest is not legally available in this case. I have applied discounting to incremental costs from 2008 onwards. All costs are calculated on a pre-tax basis because the award itself will be taxed.

(11) I have reviewed PG&E's costs in seven separate activities related to spent fuel storage and management:

1. Humboldt SAFSTOR;[1]
2. Humboldt Independent Spent Fuel Storage Installation (ISFSI);
3. Humboldt Stack Removal;
4. Diablo Canyon ISFSI;
5. Diablo Canyon Temporary Racks;
6. Diablo Canyon Storage Options Study; and
7. Offsite Storage Evaluations.

(12) Based on discussions with PG&E's staff and review of cost analyses prepared by PG&E, it is my opinion that these categories reasonably characterize the elements of damage PG&E has or expects to incur as a

[1] SAFSTOR is not an acronym. It is defined in the NRC's Information Digest, 2004-2005 Edition (NUREG-1350, Vol. 16, Rev. 1) as, "A method of decommissioning in which the nuclear facility is placed and maintained in such condition that the nuclear facility can be safely stored and subsequently decontaminated (deferred decontamination) to levels that permit release for unrestricted use." See http://www.nrc.gov/reading-rm/doc-collections/nuregs/staff/sr1350/v17/sr1350v17.pdf (visited November 1, 2005).

ventilation discharge from the Humboldt Bay plant. The incremental cost of the breach to PG&E with respect to stack removal costs is the cost of undertaking these additional steps.

(15) But for the breach, some costs for Humboldt SAFSTOR would still have been incurred. PG&E is damaged only to the extent that SAFSTOR costs, as a result of the breach, are made larger or made to last longer (or both). In the "but for" scenario, the government would have removed spent nuclear fuel in 1998. Absent the breach, SAFSTOR costs after 1998 would have been zero because spent fuel would have been removed and the decommissioning of Humboldt Bay would have commenced. SAFSTOR costs up to 1998 are the same with or without the breach. The incremental cost of the breach to PG&E in this activity is therefore all SAFSTOR costs incurred from 1999 onwards.

**A. "But For" Costs Implicit In Other Damages Calculations**

(16) Calculating the incremental cost of the breach necessarily requires me to identify the costs that would have been incurred by PG&E absent the breach. Two approaches are possible. One is to calculate the costs of PG&E's entire Humboldt and Diablo Canyon operations with the breach and without the breach (assuming no change in revenues between scenarios). In this case, damages are the difference in costs under each scenario. There are no changes in revenues that have to be considered in the "but for" analysis because there is no change in output at either plant as a result of the breach. This approach is unnecessarily broad in scope.

(17) As a more direct and practical approach, I estimate incremental "but for" costs recognizing first that only a subset of PG&E's costs are sensitive to DOE's breach, and second, as discussed above, in all but two of the seven cost categories, "but for" costs are zero.[2] Narrowing the scope in this way simplifies the analysis tremendously without any reduction in accuracy. My staff inquired about system-wide benefits to PG&E of breach, in particular whether breach projects produced any incoming revenue streams for PG&E or reduced costs elsewhere in the organization, but PG&E's staff were unable to point to any benefits.

**B. Measuring Costs**

(18) Information necessary to develop cost estimates was gathered through a process of communication between PG&E and my staff. This process occurred over a seven month period beginning March 2005, commencing with a series of conference calls that involved numerous PG&E parties, and consultants who were knowledgeable about the operations of the two power plants, and/or were familiar with the costs and activities involved in the storing of spent fuel. These parties included personnel in budgeting and risk management at PG&E, managers in charge of projects directly related to the government's breach, and PG&E's outside consultants. In these initial calls, my staff developed an understanding of the obligations of the various parties and the amounts and timing of expenditures with and but for the breach. My staff received files primarily from Robert Kapus,

[2] Storage cost studies, design and construction of the two ISFSIs and the Diablo Canyon temporary rack would not have been required had DOE met its obligation in a timely manner. However, some stack removal and SAFSTOR costs would have been incurred without breach.

CERTIFIED COPY

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| PACIFIC GAS & ELECTRIC, Plaintiff, vs. THE UNITED STATES, Defendants. | CASE NO. 04-0074C |

VOLUME II

DEPOSITION OF BRADFORD CORNELL

January 19, 2006

213506

BARKLEY Court Reporters

(310) 207.8000 Los Angeles (916) 922.5777 Sacramento (818) 702.0202 San Fernando Valley
(949) 955.0400 Orange County (408) 885.0550 San Jose (858) 455.5444 San Diego
(415) 433.5777 San Francisco (951) 686.0606 Inland Empire (760) 322.2240 Palm Springs

nearest dollar.

A Okay.

Q Based on this, it looks like this SAP report, we've interpreted it as capturing all costs associated with 2000 for this particular order number. And you can see, by the way, the order number is 2007487.

A Yes, I see that.

MR. STOUCK: Can I see it on the screen again, the sum of the nonlabor costs for 2000?

MR. EKMAN: Yeah. It's actually that. There is nothing below that line.

MR. STOUCK: $37899.34. Okay.

Q BY MR. EKMAN: Which is --

A I didn't know the function. When you highlight a row, it automatically shows the sum at the bottom?

MR. COUCHMAN: Yeah.

Q BY MR. EKMAN: In terms of support for these underlying numbers -- I understand that you said yesterday that you didn't look at specific items of suppport, but you thought your staff did do that. I mean, you were relying on PG&E and Celerity to provide the support information for these costs?

A Yes.

Q And do you know if Celerity produced binders

of supporting cost information?
A To CRA?
Q To CRA.
A I don't think they did, but I'm not sure.
Q And do you know if they produced them to government?
A No, I don't know that.
Q I'll tell you that they did produce it to us, and that's what we're going to use as the basis for some of these questions. You haven't seen the Celerity binders then?
A No.
Q All right. Can we take a minute?
MR. STOUCK: Sure.
(Brief recess.)
Q BY MR. EKMAN: In an effort to shortcircuit what is a considerable number of questions, let me ask this.
Do you know if your staff reviewed any of the Celerity binders?
A I'm quite certain that we never even got them.
Q All right. Then let me ask one more question -- one more set of questions again to see if I can avoid asking unnecessary questions. At Exhibit 19, we've got

A No, I don't believe so.
Q Does the final back-out calculation rely on the work that Celerity generated?
A Yes.
(The document referred to was marked for identification by the court reporter as Defendant's Exhibit 25 and is attached hereto.)
Q BY MR. EKMAN: Professor Cornell, you've been handed Exhibit 25, which is a tab called "Celerity Back-Outs." We're actually going to put this on the screen because it is difficult to read in paper form.
I'm wondering if you've ever seen Exhibit 25 before.
A No.
Q And just as an example, do you know -- let's take media relations, for example. This is year 2000. Do you know what these different line items mean?
Let's start with "SAP Claim Basis." Do you know what that means?
A No. I've never seen the document before, so this is pretty much Greek to me.
Q And do you know if any of these categories, any of these line items, include costs for PG&E as a whole as opposed to simply costs related to the damages claim of their nuclear facilities?

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| PACIFIC GAS & ELECTRIC COMPANY | : | |
| Plaintiff, | : | |
| v. | : | Case No.: 04-074c |
| UNITED STATES OF AMERICA, | : | |
| Defendant. | : | Volume 3 |

Washington, D.C.
May 9th, 2006

Deposition of:

LARRY JOHNSON,

called for oral examination by counsel for Plaintiff, pursuant to notice, at the offices of Greenberg Traurig, LLP, 800 Connecticut Avenue, N.W., Suite 500, Washington, D.C., beginning at 8:35 a.m, before Teague Gibson of Capital Reporting, a Notary Public.

* * * * *

spent a hundred hours, you still would have included his labor time in Humboldt ISFSI?

A I think that would be a very liberal application. That would be including the out of bounds of any reasonable notion of includable labor and I adopted that as simply a reasonable, albeit liberal, construction of how to do this. It wasn't something where we required the majority of the person's time be in SAFSTOR if they were charging only a small amount of time to ISFSI. There was a bright line that said simply if they worked on SAFSTOR to the extent they then worked on the ISFSI project, that ISFSI related hours would be includable as damages.

Q Why? Why did you think that was reasonable?

A Because the fundamental notion is that there are a substantial number of employees employed in the SAFSTOR activities who by their very nature are incremental but we didn't do that by employee, we did that in an overall aggregation to say there's roughly 65 people that would not be there were it

not for the breach related activities associated with SAFSTOR. When we then look at the implication of SAFSTOR to the ISFSI related costs we could have gone back to employee by employee but we didn't do that in measuring the SAFSTOR to begin with. So I simply adopted something that I think is generous. I think it's reasonable but in the range of generosity. It's the most generous from the standpoint of the plaintiff interpretation that can be made that if somebody spent any time on SAFSTOR the time they spent on the ISFSI is includable without regard to the measurement of those hours.

Q Your view is that if someone spent any time on SAFSTOR that is a reasonable basis for concluding that the time that same person devoted to the Humboldt ISFSI is incremental to the breach?

A That is the result of what I did and I think in aggregate it works out to be reasonable even by person, but I'm certain that you could identify an individual employee where there is a small number of hours in each activity and substantially more hours in something unrelated to

different from what I did in the others, but it's different because there's different facts and circumstances.

Q The different facts and circumstances are what?

A The SAFSTOR activity is a unique activity that would not occur except for the breach and there are no other activities going on that would be large users of time such as the generation of power. There are other activities going on at that facility. But you can measure and I believe reasonably determine that there would be a number of people that would not be necessary at that facility except for SAFSTOR and that's what we attempted to do. Similarly we looked at the ISFSI and said if someone's not devoted substantial full time at any point in time to this activity by definition then they are doing -- the majority of what they're doing is something else and so therefore those people are not incremental.

Q Do you think it would be reasonable to use a full-time equivalent approach to the Diablo ISFSI

CERTIFIED COPY

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| PACIFIC GAS & ELECTRIC COMPANY, | ) | |
| Plaintiff(s), | ) | No. 04-0074C, into which has been consolidated No. 04-0075C |
| vs. | ) | |
| THE UNITED STATES, | ) | |
| Defendant(s). | ) | |

DEPOSITION OF ROBERT KAPUS - VOLUME I

SEPTEMBER 28, 2005

207535

BARKLEY Court Reporters

| Los Angeles | Orange County | San Francisco | San Diego | Inland Empire | Palm Springs | San Fernando Valley | San Jose |
|---|---|---|---|---|---|---|---|
| (310) 207.8000 | (949) 955.0400 | (415) 433.5777 | (858) 455.5444 | (909) 686.0606 | (760) 322.2240 | (818) 702.0202 | (408) 885.0550 |

time. They are only there during the outage. And as far as when their scope of work is done, they are gone.

Q. Are there always going to be contractors during a planned outage at some level?

A. During a planned outage, most of the time no. During a major outage, yes.

Q. And one of the things that you talked about is that part of your job is to determine the employee percentages at the fossil unit versus on the nuclear side and the maintenance of the wet pool; is that right?

A. With the help of the department manager.

Q. If we can't do this generally, I'll do it by department, but let's start generally.

What is today -- or this year, I guess would be a better way to say it, what is the split between nuclear and fossil?

MR. SHAPIRO: Objection. Vague.

THE WITNESS: The nuclear side is about 65 to 70 percent of the workforce.

Q. BY MR. EKMAN: And how many employees are there?

A. Just over a hundred.

Q. Why is the nuclear so high, given that it is not operating?

A. Security.

Q. How many -- all right. How many of the 100 employees

THE WITNESS: No.
Q. BY MR. EKMAN: So you need to rely on people with technical knowledge?
MR. SHAPIRO: Objection. Vague.
THE WITNESS: Yes.
Q. BY MR. EKMAN: All right. Did Mr. Kahler participate in the budgeting, the initial budgeting?
A. Yes.
Q. Did Mr. Willis?
A. Not that I recall.
Q. What technical knowledge is Mr. Kahler bringing to that kind of budget, to the vent stack budget?
A. I am not sure.
Q. What expertise do you bring to budgeting?
A. Knowing the types of costs that should be included in it, and questioning the information that I am provided.
Q. All right. Sitting here today, do you know -- you can't identify all the work that Bechtel performed on that project; is that right?
A. I can or cannot?
Q. Can't, cannot.
A. No, I can.
Q. You can. Okay. What work did Bechtel perform on the stack removal project?
A. Oh, I'm sorry. I misunderstood your previous

question. You're asking me while I'm sitting here can I?

Q. Yes.

A. No.

Q. Okay. Since you can't do it while you're sitting here, what would you need to look at in order to determine the work that Bechtel performed?

A. To the contract requests that we submitted to them with their scopes of work.

Q. Anything else?

A. SAPs to determine the dollars, yes.

Q. And in determining what costs -- in order to determine the costs that were associated with the three incremental activities, did you review those items for Bechtel?

A. Yes.

Q. And why did you review those items for Bechtel?

A. To fully understand the scopes of work that they provided.

Q. The invoices that are behind -- they begin at 25005, and they go through to 25009. These do not contain descriptions of the work that's associated with each invoice; is that right?

A. That is correct.

Q. How are you able to identify that these invoices were related to one of the incremental activities that you

identified?

A. The item numbers on the purchase order would relate to a scope of work that we awarded them, the item No. 24 or item No. 27, whatever the item numbers are in that particular order.

Q. But weren't all item 24s related to the vent removal project?

A. For a specific scope, yes.

Q. Well, what specific scope is related to item 24?

A. I would have to go review the documentation for it. I don't recall offhand.

Q. Did you charge -- did you -- is item 24 -- are all charges to item 24 listed on Exhibit 1?

A. Yes.

Q. All charges to item 24?

A. Yes.

Q. Let me make sure that that's clear. Are there any charges that were made to item 24 that are not included on Exhibit 1?

A. No.

Q. And where would I find the item 24 scope of work, like a description of that?

A. It would be in contract files, or it could possibly be in my files, also.

Q. Are there any items on this list that aren't item 24?

MR. SHAPIRO: Objection. Vague.
Q. BY MR. EKMAN: On the contracts?
A. Yes. I mean, there's only one line to this reference to Bechtel, line item 24 on their particular PO, purchase order. All the rest are different line items, different contracts.
Q. The reason I am asking about item 24 is that Bruce Norton, his invoices talked about item 24.
A. Bruce Norton is a different contractor.
Q. So is it just coincidence, then, that it is item 24 for both?
A. Yes, yes. Bruce Norton has a different PO number than Bechtel.
Q. So, then, item 24 is not a PG&E number that's used universally for all contracts that were performed in connection with the vent stack?
A. That is correct.
Q. Were there any Bechtel charges, and you'll notice there's -- well, there's a second set, too. There's actually three different Bechtel charges on this page. Were all Bechtel charges included on Exhibit 1?
MR. SHAPIRO: Objection. Vague.
THE WITNESS: I would have to look at the entire listing of all the contract scopes that were on the project to see if there was other scope. I imagine there was.

Q. BY MR. EKMAN: All right. Go to tab 5. Tab 5, again, this is Bechtel. It is four charges that total nearly $17,000. Do you see that?

A. Yes, I do.

Q. The description is "Stack Removal Project." These particular items relate to item No. 25?

A. Yes.

Q. Do you know what item No. 25 is?

A. I would have to review SAP documents and the contract to give you an exact definition.

Q. Do you know if you included all item 25 charges on Exhibit 1 for Bechtel?

A. Yes.

Q. That were incurred over the course of the project?

A. Yes.

Q. And sitting here today, you don't know if there are any item numbers that related to that vent stack project that were not passed on, or not included on Exhibit 1; is that right?

A. That's correct.

Q. And you can't tell me, then, the basis for why item 25 is -- you determined that that was an incremental cost? You would have to go look at them?

A. I would have to go review documentation.

Q. All right. Item 6, tab 6 begins with a printout

25024, total amounts $986, accounting for two separate charges. Do you see that?

A. Yes, I do.

Q. The description here for Robert Kennedy in Exhibit 1 is "Soil Pressure Loads on Rad waste walls."

A. That's correct.

Q. Why was that work that would not have been performed had there been no fuel in the pool?

A. The Rad waste facility that's been referred to here would have been -- most likely been empty, and, therefore, you wouldn't have to evaluate the wall crushing.

Q. Do you know when in the decommissioning plan the Rad waste building is slated to be emptied?

A. I would have to look at the study to be sure.

Q. Do you have an understanding that decommissioning generates additional radioactive waste?

A. Yes.

Q. So you don't know if the plan, then, was to have all that out of that building and shipped off site prior to the demolition of the vent stack?

A. Not without reviewing the study itself.

Q. But I could rely on the decommissioning study and the timeline in that study for that information?

A. Yes.

Q. The chart for this Robert Kennedy mentions something

CERTIFICATE OF SERVICE

I hereby certify that on this 15th day of May, 2006, a copy of foregoing "DEFENDANT'S RESPONSE TO PACIFIC GAS & ELECTRIC'S MOTION *IN LIMINE* TO EXCLUDE R. LARRY JOHNSON'S EXPERT TESTIMONY" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ John C. Ekman