Page 568

we were going to serve, and we, and that could have affected our ability.
If somebody wanted a BWR truck cask, and we had ordered, you know, too many of the other kind based on the information provided in the DCS, because the utilities were acting on the DCS, so were we, so that was the intent.
BY MR. NESLIN:
Q. So if, if sufficient casks were available to accommodate the exchange, would this criteria be met, to your mind?
A. No. I used that as an example. To says receiving facilities, there may have been other characteristics that, that could have influenced that.
Q. Okay. What, can you think of what those characteristics would be?
A. Well, beyond just the casks, you had to have the, the infrastructure to serve that.
Some utilities may only be able to accommodate a truck operation as opposed to a rail, and so, you know, that's an example.
Q. Let me ask this then. If you had sufficient casks and if the utilities involved in the exchange and the facility had sufficient

Page 569

infrastructure to accommodate the exchange, would this criteria be satisfied?
A. Could I extend your analysis one step in answering?
Q. Certainly.
A. If the information on a DCS of the two DCSs between two utilities that were approved by us came to us and they were identical, then it would be met. Then that criteria would be met.
Q. By information, what information are you referring to?
A. Can we go back to the DCS, please?
Q. Yes.
MR. HANDWERKER: The instructions.
MR. NESLIN: The instructions.
THE WITNESS: Yes. That's the form I'm thinking of.
MR. HANDWERKER: Thirty-four.
THE WITNESS: You can see on the form under 2.0 -- I'm looking at the actual form itself -- it asks things like number of assemblies and type, PWR, BWR, proposed shipping mode, type cask required, including maximum loading lifting weight.
Those, those are the types of things

Page 570

that I'm referring to.
There are others? There are two. The date of discharge potentially could be important.
BY MR. NESLIN:
Q. Mr. Brownstein, would they have to be identical, or would the transportation system and receiving facilities simply have to have the capacity to accommodate the exchanged spent nuclear fuel?
A. We were talking about this one.
MR. BANES: Go ahead.
THE WITNESS: This one criteria; no, I used identical as an example, as an extreme.
No, they would not have to be identical.
BY MR. NESLIN:
Q. So they could involve different number of fuel assemblies?
MR. BANES: Objection. Calls for speculation.
THE WITNESS: I really, it really does call for speculation because we had never gotten that, that far, that detailed, to my recollection.

Page 571

We were never faced with a DCS exchange process, and I would be speculating about the answer, you know, specific intricacies.
BY MR. NESLIN:
Q. Mr. Brownstein, would it be your testimony that you don't recall DOE considering the specific details of how these criteria might apply to a given exchange?
A. No. What I'm saying is you're asking if, if, if there was a one-assembly difference, would that affect it?
That's getting down to a gradation that we never got to.
We did consider a number of things, but that's a fine gradation.
Q. Let me ask it a different way. Would the fact that there is a different --
A. Okay.
Q. Number of fuel assemblies automatically lead an exchange request not to be approved?
A. If that was the only difference, that would not be an automatic disapproval in my mind.

Page 572

Q. The fact that a, if requested, exchange might involve a different size or type of fuel assembly wouldn't automatically lead it to be disapproved to your mind?
A. Well, that could because that could affect the cask, the availability of the cask.
Other certain, certain facilities have, you know, for example, very long fuel, and that could affect it.
Q. Would the fact that a proposed exchange might involve DCSs which involve different modes of shipment, would that necessarily lead to, a requested exchange to be denied?
A. It could, but not necessarily.
Q. I would like to direct you to lines 30 and 31.
A. I just want to clarify all these questions you're asking me were all hypotheticals?
Q. I'm asking you a series of hypothetical questions, sir.
I'm asking for your opinion on how they would apply.
A. Right.

Page 573

Q. Lines 30 and 31 state that the exchange, another criteria in the exchange will not impact WMS performance in a way that would delay acceptance of waste from other purchasers.
What does that mean to you?
MR. BANES: Objection -- lack of foundation.
Calls for speculation. Go ahead.
THE WITNESS: The best way I can try to explain it is by example, if that's okay with you.
If a utility were to give us failed fuel, that might influence the decision.
BY MR. NESLIN:
Q. And why would that influence the decision?
A. Again, hypothetically, there would probably be a preference in the early stages of system operation to, to try to use standard fuel to minimize the opportunity for, for us having to employ some contingencies.
In other words, failed fuel, we might have to do some repackaging that we would have rather not have done on the opening day.
Q. Would, would that necessarily delay

Page 574

the acceptance of waste from other purchasers?
A. It could, but not necessarily. It was a concern.
There may have been other concerns associated with that criteria that at this moment, I can't recall.
Q. Do you recall the basis of these criteria?
A. Well, the basis of the criteria was that PNL was, was tasked to think about this and develop suggestions to the department.
It was a normal course of business, and so I viewed this as contractor input to the department that, you know, certainly the department did not take a position.
One, as I said, hadn't gone through to my knowledge, you know, the necessary concurrence and evaluation by a range of people within RW that would need to have, you know, evaluated it.
Q. Evaluated it for what purpose?
A. Of whether that was appropriate or acceptable to the department; in other words, this is not departmental policy.
Q. You're saying that for something to be

Page 575

adopted as department policy, additional people would have to review it and approve it?
A. What I'm saying is that a contractor product is not departmental policy.
Q. How would a contractor product become departmental policy?
A. One way it would become that would be for it to be issued under DOE letterhead.
Q. By issue, what do you mean?
A. Number of ways -- issued could be instructions or it could be a report.
It could be a letter by a program official or, or contracting officer.
Those are three ways.
Q. So if it were incorporated into a DOE document or a DOE letter, then it could become departmental position, departmental position?
A. Sure.
Q. How was this information, this report used, do you recall, by the department, used by the department?
A. I don't recall.
Q. Do you recall whether you did anything in response to this report?
A. That's a good question. There are 14

years between the report and now, and I just don't recall.
(There was a pause in the proceedings.)
MR. NESLIN: Can we go off the record for a second?
(A discussion was held off the record.)
MR. NESLIN: Mark that as 51.
(Brownstein Exhibit No. 51 was marked for identification.) ^
BY MR. NESLIN:
Q. You've been handed what's been marked as Exhibit 51 to your exhibit -- to your deposition.
This is a document entitled, "Guidebook for Standard Contract for Disposal," stamped preliminary draft.
MR. BANES: Do you have several copies of that?
MR. NESLIN: Yeah. Sorry, counsel.
MR. BANES: No problem. Is this 51?
MR. NESLIN: Fifty-one.
BY MR. NESLIN:



Q. Mr. Brownstein, are you familiar with this document?
A. You have to give me a chance at least to glance at it.
(The witness reviewed the document.)
THE WITNESS: I don't recall, I do not recall ever seeing this before.
BY MR. NESLIN:
Q. Do you recall any discussion at OCRWM about preparing a guidebook for the standard contract?
A. Guidebook does not ring any bells. I have no recollection of that.
Q. This includes information, turning to the Table of Contents, this includes information on the ACR issue resolution process?
A. Yes.
Q. On the Delivery Commitment Schedule process, on the delivery commitment, on the Delivery Commitment Schedule exchanges?
A. Um-hm.
Q. Do you recall any discussion at OCRWM about providing written guidance on those issues collectively in a document of this sort, whether it was called guidebook or not?



A. As I testified, we had something called this ACR resolution process with the utilities, and there were a number of issues that were identified, and those would be subject to, you know, discussions at meetings.
I would normally have requested a contractor to prepare such things as suggested -- well, analysis of the issue, and potentially suggested positions for DOE recommendations, so these issues are familiar to me.
Responding to your question, I never saw it in this form or this guidebook, but as I have testified previously, contractors may have worked on this as a way to present this to me, but I don't recall the document.
Q. Mr. Brownstein, I've just looked at several pages, for example.
A. Sure.
Q. Pages 1 and 2, 3, have numbering along the left side of the text?
A. The left? You're talking about these?
Q. Yes.
A. Yeah. Yes.
Q. But by these, you're pointing to the



numbers along the left side of the page?
A. Yes.
Q. Does that begin --
MR. BANES: Page, on page 2017.
BY MR. NESLIN:
Q. Does that indicate anything to you about the, who might have prepared this document?
A. As I have testified before, this was a characteristic normally employed by PNL.
Q. If I could ask you to turn to page 37? This would be Bates Number CTR-001-2050 in the lower right-hand corner.
A. Okay.
Q. I would ask you to review lines 13 through 20 on the page.
(The witness reviewed the document.)
THE WITNESS: Okay. I'm sorry. You said to 30?
BY MR. NESLIN:
Q. Thirteen through 20.
A. I have read that, yes; 1 through 28, I didn't.
MR. BANES: Just note for the record line 21 and 22 don't seem to be readable.

Q. Do you recall discussing that issue with the utility representatives?
A. Yes, I do.
Q. And were all the utility representatives in agreement on that issue?
A. I believe consensus, consensus implies to me not in unanimity.
Q. Do you have any recollection of what portion of the utilities agreed with that view?
A. No. When they would discuss the issues, they would have their own private meetings and present to us things like a consensus view.
What their internal conversations were, you know, I have no idea.
Q. This states DOE concurred with that view.
Was that accurate?
A. No. As I have testified before, this is a, this is a contractor document, and they are proposing that DOE concur with that, but because, as I testified because, it says so in a contractor document doesn't make it so.
It makes it so what DOE, a DOE official puts in a letterhead, you know,

official correspondence or an official report or in testimony, something like that, not, a DOE policy is not made through a contractor document.

Q. And to your knowledge, DOE did not formally adopt a policy on this issue?

A. To the best of my recollection, the sentence that you pointed out in the Manion letter, the previous one, was the department's policy.

Q. Just for purposes of clarity, that was the sentence that read the department has not determined whether or not priority will be accorded shutdown reactors or if priority is granted, under what specific circumstances?

A. Yeah. That was the, that was the official line.

Again, we were trying to reach closure on these issues, but I have answered your question.

Q. With respect to Phase 2, the document states that when the waste management system receipt rate exceeds the aggregate purchasers' annual discharge rates, and all purchasers can be assured that they will not need additional

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - - - - - x

YANKEE ATOMIC ELECTRIC COMPANY :
(98-126C) (Merow, S.J.) :
CONNECTICUT YANKEE ATOMIC POWER COMPANY :
(98-154C) (Merow, S.J.) :
MAINE YANKEE ATOMIC POWER COMPANY :
(98-474C) (Merow, S.J.) :
Plaintiffs, :
v. :
THE UNITED STATES, :
Defendant. :

- - - - - - - - - - - - - - - - - - - - - x

Washington, D.C.
Thursday, May 23, 2002

Deposition of ALAN BROWNSTEIN, a witness herein, called for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to agreement, the witness being duly sworn by JAN A. WILLIAMS, a Notary Public in and for the District of Columbia, taken at the offices of Spriggs & Hollingsworth, 1350 I Street, N.W., Washington, D.C., 20005-3305, at 8:40 a.m., Thursday, May 23, 2002, the proceedings being taken down by Stenotype by JAN A. WILLIAMS, RPR, and transcribed under her direction.

Page 138

BY MR. STOUCK:
Q. At the time the list was developed which I think was about the time of the '90 or '91 --
A. No.
Q. When was it?
A. The list of 34 issues?
Q. Yes.
A. My recollection is that was done earlier.
Q. Much earlier?
A. Yeah.
Q. Whatever time it was developed, at that time RW thought that those issues had to be resolved before the department could commence acceptance of spent fuel pursuant to the contracts; is that right?
MR. CRAWFORD: Objection to the foundation; objection to the extent it calls for a legal conclusion.
THE WITNESS: We thought it was important. I don't think anybody made the distinction between important versus, if it did not happen, could we not move forward.
BY MR. STOUCK:
Q. Okay. That's fair. I understand that and I thank you for that clarification.
Take a look at page 4 of Exhibit 35. And

Page 139

there's a paragraph numbered 12 there. Do you see that?
A. Yes.
Q. It's a proposed change to the definition of high-level radioactive waste. Would you please review that and I've got a question for you about it or two maybe. Let me ask the question, it might help you as you read it.
A. Okay.
Q. The question is going to be, aside from what you read on this piece of paper, do you have a recollection of proposals to change the definition of high-level radioactive waste in a way that would affect GTCC? You know, if you read this, I think you will see that this is a proposal to change it in a way that would affect GTCC waste. But independent of this do you recall that there were proposals to change the contract in that manner?
MR. CRAWFORD: Let me object just to best evidence.
BY MR. STOUCK:
Q. Would you answer the question.
A. By who? I mean this is --
Q. By RW. I mean this is a proposal --
A. Oh, no oh, no.

Page 140

Q. You don't recall that?
A. No, no, wait a second.
Q. What am I not understanding?
A. This is a contractor document. Contractors make suggestions and recommendations to the department all the time. Because a contractor says something doesn't mean, you know, the department either wanted it or agrees with it. This was a contractor input.
Q. I understand that. That's fair enough. And this contractor input apparently is suggesting or at least describing a change to the definition of high-level radioactive waste?
A. That's correct.
Q. Do you know -- maybe I don't have to preface it by saying independent of this document. Even not independent of this document, do you know whether that kind of change was ever discussed, making that change was ever discussed within RW; that is, a change to the standard contract to the meaning of the term high-level radioactive waste that would affect coverage of GTCC?
A. We talked about this subject before and there was testimony before. And I think you asked a similar question. I told you --

Page 141

Q. Well --
A. There were two people I talked about.
Q. Okay.
A. And this was something that I didn't believe in, didn't accept, and, you know, I had discussions with two people as I recall. Probably staff too.
Q. I thought what you said you didn't believe in or accept before was that GTCC was covered by the contract. This is a little bit different question which is do you recall whether there were any discussions that you were part of or any effort at RW to amend the contract in a manner that would affect GTCC waste? That's what I'm asking now.
A. Sorry. As I recall, when I read this, I may have discussed it with Nancy and my staff. But I know that I did not take this thing forward because I didn't believe --
Q. What is it that you didn't believe?
A. I didn't believe that we should or needed to make a change to the contract.
Q. Because it was clear in your mind that it wasn't covered?
A. That's correct.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
-----------------x
YANKEE ATOMIC ELECTRIC COMPANY; : Case Nos. 98-126C,
CONNECTICUT YANKEE ATOMIC POWER : 98-154C, 98-474C,
COMPANY; MAINE YANKEE ATOMIC : 98-483C, 98-484C,
POWER COMPANY; FLORIDA POWER & : 98-485C, 98-486C,
LIGHT COMPANY; NORTHERN STATES : 98-488C, 98-614C,
POWER COMPANY; DUKE POWER, a : 98-621C, 99-447C,
Division of DUKE ENERGY CORP.; : 00-440C, 00-695C,
INDIANA MICHIGAN POWER COMPANY; : 00-703C, 01-115C,
SACRAMENTO MUNICIPAL UTILITY : 01-116C, 01-249C
-----------------X
(Caption continued on the next page)

Continued Deposition of LAKE H. BARRETT
Washington, D. C.
Friday, May 10, 2002
8:06 a.m.

Job No.: 11792-11
Pages 1104 to 1437, Volume 5
Reported by: Diane Gomez, RPR



DISTRICT; SOUTHERN NUCLEAR :
OPERATING COMPANY, et al.; :
COMMONWEALTH EDISON COMPANY; :
BOSTON EDISON COMPANY; GPU :
NUCLEAR, INCORPORATED; WISCONSIN :
ELECTRIC POWER COMPANY; POWER :
AUTHORITY OF THE STATE OF NEW :
YORK; OMAHA PUBLIC POWER DISTRICT;:
NEBRASKA PUBLIC POWER DISTRICT; :
and TENNESSEE VALLEY AUTHORITY, :
Plaintiffs :
v. :
THE UNITED STATES, :
Defendant :
-----------------X



Continued Deposition of LAKE H. BARRETT, held at the offices of:

ARNOLD & PORTER
555 12th Street, Northwest
Washington, D. C. 20004
(202) 942-5000

Pursuant to agreement, before Diane Gomez, Registered Professional Reporter and Notary Public in and for the District of Columbia.



APPEARANCES

ON BEHALF OF PLAINTIFFS FLORIDA POWER & LIGHT COMPANY, NORTHERN STATES POWER COMPANY, DUKE POWER, INDIANA MICHIGAN POWER COMPANY, BOSTON EDISON COMPANY, GPU NUCLEAR, INC., POWER AUTHORITY OF THE STATE OF NEW YORK, OMAHA PUBLIC POWER DISTRICT, and NEBRASKA PUBLIC POWER DISTRICT:
DEVON E. HEWITT, ESQUIRE
SHAW PITTMAN LLP
1650 Tysons Boulevard
McLean, Virginia 22102-4859
(703) 847-5097

ON BEHALF OF PLAINTIFF SACRAMENTO MUNICIPAL UTILITY DISTRICT:
HOWARD CAYNE, ESQUIRE
ARNOLD & PORTER
555 12th Street, Northwest
Washington, D. C. 20004-1206
(202) 942-5000

because of short-cooled fuel"?
MS. HERRMANN: Objection. Speculation.
A **No.**
Q Do you understand the term "derate"?
A **I understand the term as I use it. How the author is using it I don't know.**
Q How would you use it?
A **It is to reduce the design capacity or reduce the output.**
Q And do you understand the term "short-cooled fuel"?
A **Yes.**
Q What does that mean?
A **Lower megawatt days per metric ton on the fuel.**
Q Based on the understanding of those two terms you just expressed, if the author of that sentence used those two terms in the way you just explained them, do you understand this sentence?
MS. HERRMANN: Objection. Speculation.
A **No.**
**(Deposition Exhibit Barrett 57 was marked**



**for identification and was attached to the transcript.)**
Q Mr. Barrett, the court reporter has handed you a document marked for identification as Exhibit 57. It is captioned Determination of Cost-effective Waste Management Receipt Rates. It is by R.W. McKee, M-c-K-e-e. It starts at Bates PA-221971. And it continues through PA-221980. Do you have that document before you?
A **I believe so. I can't read the Bates number at the bottom, but go ahead. Yes.**
Q And you'll see that the first two pages of this consecutively-Bates-numbered document appear to be the same other than the fact that the first page looks as if a buck slip covered over a portion of the left-hand column, correct?
A **Correct.**
Q Do you know a person named R.W. McKee?
A **No.**
Q Have you ever heard of that person?
A **I've heard the name.**
Q Are you familiar with Pacific Northwest



Laboratory?
A **Yes.**
Q What is Pacific Northwest Laboratory?
A **It's a contractor in Richland, Washington.**
Q Were those contractors relied on often by the Department of Energy in connection with the development, design, and construction of the waste management system?
MS. HERRMANN: Objection. Vague.
A **We use them as advisors and analysts for the waste management system.**
Q Do you continue to so use them through today?
A **No.**
Q Through when did you use them?
A **Through the late eighties.**
Q There's also another name at the top of the first page, H.D. Huber, H-u-b-e-r. Do you know that individual?
A **No.**
Q Did you ever rely on the work of Pacific Northwest Laboratory?



MS. HERRMANN: Objection. Vague.
A **I used it as input.**
Q For what purposes?
A **For advice on systems analysis.**
Q Did you ever personally assign work out to be performed by Pacific Northwest Laboratory?
A **I don't remember me personally, but my staff did.**
Q Did you authorize your staff to assign work out to Pacific Northwest Laboratory?
A **Yes.**
Q I take it then you considered the work of Pacific Northwest Laboratory to be competent?
A **Yes.**
Q I turn your attention to page Bates number PA-221972. It's the second page of the document. Actually, returning to the first page, do you see the buck slip on the first page? It says, '91 HLRWM conference papers, volume two, "high priority."
A **I see it.**
Q Is that your writing?
A **No.**

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

\- - - - - - - - - - - - - - - - - - - - x
YANKEE ATOMIC ELECTRIC COMPANY, :
(98-126C) :
CONNECTICUT YANKEE ATOMIC POWER COMPANY :
(98-154C) :
MAINE YANKEE ATOMIC POWER COMPANY :
(98-474C) :
FLORIDA POWER & LIGHT COMPANY :
(98-483C) :
NORTHERN STATES POWER COMPANY :
(98-484C) :
DUKE POWER, A Division of DUKE :
ENERGY CORP. (98-485C) :
INDIANA MICHIGAN POWER COMPANY :
(98-486C) :
SACRAMENTO MUNICIPAL UTILITY DISTRICT :
(98-488C) :
SOUTHERN NUCLEAR OPERATING COMPANY, :
et al., (98-614C) :
COMMONWEALTH EDISON COMPANY :
(98-621C) :
BOSTON EDISON COMPANY :
(99-447C) :
GPU NUCLEAR, INCORPORATED :
(00-440C) :
WISCONSIN ELECTRIC POWER COMPANY, :
(00-697C) :
POWER AUTHORITY OF THE STATE OF :
NEW YORK (00-703C) :
OMAHA PUBLIC POWER DISTRICT :
(01-115C) :
NEBRASKA PUBLIC POWER DISTRICT :
(01-116C) :
TENNESSEE VALLEY AUTHORITY :
(01-249C) :
Plaintiffs, :
v. :
UNITED STATES OF AMERICA, :
Defendant. :
\- - - - - - - - - - - - - - - - - - - - x

Washington, D.C.
Friday, May 3, 2002

Continued Deposition of RONALD MILNER, a witness herein, called for examination by counsel for

Page 404

Plaintiffs in the above-entitled matter, pursuant to notice, the witness being previously duly sworn by CATHERINE S. BOYD, Notary Public in and for the Commonwealth of Virginia, taken at the offices of Shaw Pittman, 1650 Tysons Boulevard, McLean, Virginia, at 9:15 a.m., Friday, May 3, 2002, and the proceedings being taken down by Stenotype by CYNTHIA R. SIMMONS, RMR, CRR, and transcribed under her direction.

Page 405

APPEARANCES:

On behalf of the Plaintiffs Florida Power & Light Company, Northern States Power Company, Duke Power, Indiana Michigan Power Company, Boston Edison Company, GPU Nuclear, Inc., Power Authority of the State of New York, Omaha Public Power District, and Nebraska Public Power District:
ALEX D. TOMASZCZUK, ESQ.
DANIEL S. HERZFELD, ESQ.
Shaw Pittman LLP
1650 Tysons Boulevard
McLean, Virginia 22102-4859
(703) 770-7940

On behalf of the Plaintiffs Yankee Atomic, Maine Yankee and Connecticut Yankee:
PETER SKALABAN, JR., ESQ.
Spriggs & Hollingsworth
1350 I Street, N.W.
Ninth Floor
Washington, D. C. 20005-3305
(202) 898-5821

Page 406

APPEARANCES (Continued):

On behalf of the Plaintiff Wisconsin Electric Power Company:
DONALD J. CARNEY, ESQ.
Perkins Coie LLP
607 Fourteenth Street, N.W.
Washington, D. C. 20005-2011
(202) 434-1690

On behalf of the Plaintiff Southern Nuclear Power:
RONALD A. SCHECHTER, ESQ.
Arnold & Porter
555 Twelfth Street, N.W.
Washington, D.C. 20004-1206
(202) 942-5160

On behalf of the Plaintiff Sacramento Municipal Utility District:
DAVID S. NESLIN, ESQ.
Arnold & Porter
370 Seventeenth Street, Suite 4500
Denver, Colorado 80202-1370
(303) 863-2301

Page 407

APPEARANCES (Continued):

On behalf of the Plaintiff Commonwealth Edison Company:
CHRISTOPHER P. TOMPKINS, ESQ.
Jenner & Block, LLP
One IBM Plaza
Chicago, Illinois 60611-7603
(312) 222-9350

On behalf of the Defendant:
RUSSELL A. SHULTIS, ESQ.
HEIDE L. HERRMANN, ESQ.
United States Department of Justice
Civil Division
1100 L Street, N.W.
Washington, D. C. 20530
(202) 305-7561

Page 440

A. No.
(Milner Exhibit No. 53 was marked for identification.)
BY MR. NESLIN:
Q. Mr. Milner, you've been handed what's Exhibit 53 to your deposition. This is a March 31st, 1994 letter from James Blandford to you. And an attachment consisting of a preliminary draft of a document captioned, DCS Exchange Network, Software Recommendation.
Are you familiar with this document?
A. I don't recall it specifically, no.
Q. Cover letter states that the attached report provides a recommendation for software on the DCS Exchange Network which will be a computer-based, menu-driven system providing information on approved Delivery Commitment Schedules for their use in assessing opportunities for DCS exchanges with other purchasers.
Do you recall the DOE or its contractors doing any work on a DCS exchange network?
A. What I recall is in general terms a program considering whether or not it should take an active role in encouraging exchanges or simply react to utility requests. And if it ultimately chose to

Page 441

take an active role, how might that be accomplished.
Q. Who at the Department was involved in that consideration?
A. Well, I guess it would have been myself, members of my staff, the director of the program.
Q. Who on your staff?
A. At this point in time, Alan Brownstein, I see two staff members, one name crossed out and the other one, I can't recall what point in time which one left or which one was there, but one of the two, either Nancy Slater or Mary Payton were staff members.
Q. Anyone else?
A. Not that I can recall offhand.
Q. During what period would the Department have been considering this question?
A. In March 31st, 1994.
Q. Do you, sitting here today do you recall over what period of time that consideration extended?
A. No, I don't.
Q. And did the Department reach a decision as to whether it should take an active role in encouraging exchanges or simply respond to utilities?
MR. SHULTIS: Objection, Mr. Milner's not a 30(b)(6) witness.

Page 442

THE WITNESS: I don't recall the Department ever actually taking a position. In essence it became a moot point because we never received a request.
BY MR. NESLIN:
Q. And is it your understanding that you never received a request in part because of the uncertainties that arose in the 1990s as to when a repository would become operational?
MR. SHULTIS: Objection, calls for speculation.
THE WITNESS: I have no such understanding.
BY MR. NESLIN:
Q. Do you believe that, is it your opinion that the uncertainties and delays associated with the start-up date for a repository had no effect on utilities' actions in deciding whether to submit exchange requests?
MR. SHULTIS: Same objection.
THE WITNESS: No, I don't have that opinion. I have no idea why none were submitted.
BY MR. NESLIN:
Q. In considering how the Department might take an active role, what sorts of actions did you

Page 443

consider?
A. I recall maintaining a list of approved DCS's and looking at that list versus utilities which we might be aware were running out of pool space which had a lower priority ranking than another which had sufficient pool space.
And, you know, the potential of in essence brokering something between the two utilities.
Q. And do you recall any consideration of developing a computerized system for providing information among utilities on approved DCSes?
A. I do now reading this.
Q. But you don't have any independent recollection beyond this document?
A. No, I don't.
Q. If I could turn you to the first page of the attached draft report. Do you know whether this report was ever finalized?
A. I don't recall whether it was or not. In any event this is a contractor report which would never relate to a position the Department took, simply input data to it.
Q. You say it would never relate to a position?
A. It would never reflect, I'm sorry; not

Page 444

relate, it would never reflect the Department's position, it would simply input data to it.
Q. The Department would have to subsequently take a separate position which might or might not approve or reflect what the contractor recommended?
A. The Department would take a position based on information from a number of sources including its contractor's input.
Q. I see the last sentence of the second paragraph on this page states that, the next to the last sentence, "Based on the preliminary evaluations of the cost, complexity, maintenance requirements, and the accuracy and timeliness of the information provided through these various options, the Department has decided to develop a PC-based electronic bulletin board system, the DCS exchange network."
A. I'm sorry; what paragraph are you reading from?
Q. The second paragraph under introduction, sir.
A. Okay.
Q. The next to the last sentence. You see it states that the Department has decided to develop a PC-based electronic bulletin board system?

Page 445

A. Okay, yes.
Q. Do you know, did the Department ever make such a decision?
A. I don't recall that.
Q. Do you know why the contractor would have included a statement like this?
MR. SHULTIS: Calls for speculation.
THE WITNESS: No, I don't.
BY MR. NESLIN:
Q. In your opinion, did the Department have an interest in providing this kind of information to purchasers to assist them in assessing exchange opportunities?
A. To the best of my recollection the Department certainly considered providing that information, I don't know I would characterize it as interest.
Q. It's something the Department considered doing?
A. Yes. Oftentimes the Department considered a number of things, and discussed that with industry representatives, and no longer considered it based on their input.
Q. Do you recall receiving any input from the industry indicating they weren't interested in a

Page 446

system of this sort?
A. On that specific issue, I don't recall, no.
MR. SHULTIS: Are we moving on to a different document, Dave?
MR. NESLIN: Yeah.
MR. SHULTIS: Do you think we could take a break, please?
MR. NESLIN: If you'd like to, sure.
(Recess.)
BY MR. NESLIN:
Q. Mr. Milner, before we get to another document, let me ask you just a couple of follow-up questions. You mentioned that you had, in considering the exchange provision, you had maintained a list of approved DCS's and compared those to utilities which might be needing more pool space?
A. We certainly maintained a list of approved DCS's, I don't recall whether we actually ever got into any analysis of looking at utilities that might be potential exchanges, I don't recall that.
Q. You don't recall --
A. No.
Q. -- that comparison?

Page 447

A. No.
Q. I thought that you testified that you also considered the potential for brokering exchanges between utilities?
A. Yeah, as a concept, yes.
Q. What do you mean, what do you mean by as a concept?
A. We were -- well, looking at the concept of was it appropriate for the Department to do that sort of thing.
Q. What was your opinion?
A. My personal opinion was that it potentially could serve a useful purpose if the utilities desired such an activity.
Q. And what do you mean by useful purpose, what would that purpose be?
A. Well, certainly one purpose could have been if one utility that was needing to build a dry storage that was farther down in the queue, and another utility that had a higher priority that either didn't at that particular time or perhaps even life of plant storage, which I don't recall anybody was that high in the queue that they had life of plant, but you could preclude the need for constructing dry storage if such an exchange were

Page 1826

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

------------------------------x
SACRAMENTO MUNICIPAL UTILITY :
DISTRICT, :
:NO. 98-488C
Plaintiff :
vs. :
UNITED STATES, :
Defendant. :
------------------------------ :

Courtroom 5
National Courts Building
715 Madison Place
Washington, D.C.

Tuesday, March 29, 2005

VOLUME 7

The parties met, pursuant to the notice of the Judge at 9:00 a.m.

BEFORE THE HONORABLE SUSAN G. BRADEN

Page 1827

APPEARANCES:

ON BEHALF OF PLAINTIFF:
DAVID S. NESLIN, ESQ.
TIMOTHY R. MACDONALD, ESQ.
Arnold & Porter LLP
370 Seventeenth Street
Suite 4500
Denver, Colorado 80202-1370
(303) 863-2301

HOWARD N. CAYNE, ESQ.
Arnold & Porter LLP
555 Twelfth Street, N.W.
Washington, D.C. 20004-1206
(202) 942-5656

Page 1828

APPEARANCES (Continued:)

ON BEHALF OF THE DEFENDANT:
ALAN J. LO RE, ESQ.
JOSHUA E. GARDNER, ESQ.
TODD J. COCHRAN, ESQ.
SCOTT DAMELIN, ESQ.
RUSSELL SHULTIS, ESQ.
ELIZABETH THOMAS, ESQ.
U.S. Department of Justice
1100 L Street, N.W.
Washington, D.C. 20036

ALSO PRESENT:
STEVEN M. COHN, ESQ.
STEVE J. REDEKER
THOMAS POLLOG

***Index appears at end of transcript***

Page 1829

P R O C E E D I N G S

THE COURT: Let's go.
Whereupon--
DAVID ZABRANSKY
a witness, called for examination, having previously been duly sworn, was examined and testified further as follows:
CROSS-EXAMINATION (Resumed)
BY MR. CAYNE:
Q. Good morning, Mr. Zabransky.
A. Good morning.
Q. I'd like to turn your attention to Plaintiff's Exhibit 121. I believe that will be in the first binder, one out of three. Do you have that document before you, sir?
A. Yes, I see it.
Q. And is this document a memorandum from you to -- was this a memorandum from you, sir?
A. It's an e-mail from me to Mr. -- I believe it's Auke Piersma.
Q. And who is that person?
A. Mr. Piersma used to be with a group called Public Citizen.
Q. And there's also a CC?
A. Yes.

Page 2110

one entity. So, essentially, the vast majority of contracting that the program does in order to conduct its activities, both at the repository, through the transportation, the waste acceptance area, for instance, and other areas, systems area, for instance, that I manage, are also done by Bechtel SAIC Corporation, with the help of subcontractors.

Q. Now, in terms of your job, how do you use the contractors that you reference, both the M&O and subcontractors?

A. Well, we have an annual task statement with them under which they do individual studies for us, and when there are specific guidance that we want to give them about a specific report, we will issue a technical direction letter asking them to conduct a certain study for us, and then they provide those studies, and we review them, provide comments, and that's essentially their role.

Q. Are those considered deliverables under this contract?

A. Yes, they are.

Q. Now, how does DOE – I assume, are these written products that you're referencing as studies?

A. That's correct.

Q. How does DOE regard these types of reports

Page 2111

prepared by contractors?

A. They're essentially the view of the contractor, and unless the Department issues its own report under its own letterhead, with the DOE stamp, as well as a document number, that's not DOE position or DOE policy.

THE COURT: Right. You're just getting advice?

THE WITNESS: Right, that's correct.

BY MR. DAMELIN:

Q. And in terms of, I think you said putting it on DOE letterhead or the equivalent of that, who makes that decision regarding a contractor report or study or document?

A. It's typically a DOE official, and that's routed through our senior management, and a decision is made that that document is acceptable and will be issued under a DOE letterhead. Let me give you an example. For instance, when we went through the site recommendation process, we went through many, many drafts of documents that were related to the Secretary's recommendation.

And those drafts were prepared by contractors, but it wasn't until the Department issued those final documents that became part of the

Page 2112

site recommendation that we adopted and we accepted the language in those reports, and therefore, it was issued under a DOE identification number, and it was considered a DOE document.

Q. Within OCRWM, who is responsible for setting policy regarding the Civilian Radioactive Waste Management Program?

A. It's the director of the program.

Q. Now, your description of, I guess, the type of approval needed for – or that you view for contractor reports or documents, would that also apply to verbal statements by contractors?

A. Verbal statements by contractors have no binding influence on the department. It's just their views of the world as they see it.

Q. Now, Mr. Kouts, you had mentioned, I believe, in your description of your background, the first position or job that you had within OCRWM related to an MRS proposal to Congress. Can you describe for the Court what your job entailed in that position?

A. Okay. Section 141 of the Nuclear Waste Policy Act basically requested the Department submit a proposal on monitored retrievable storage to the Congress for its consideration, so when I joined the

Page 2113

program, there was a small MRS team that was tasked with putting together that proposal. And that's – my specific responsibilities had to do with the needs and feasibility analysis of the, of the MRS, which was contained in volume two of the proposal.

That volume two was an environmental assessment, which was also required by Congress, the needs and feasibility analysis, which was also required by Congress, and a program plan, which was volume three of that. So those were basically my responsibilities. I worked as a member of that team.

Q. And was that team part, or included as part of OCRWM?

A. Yes, it was a small group that worked for an office director within OCRWM at that time.

Q. And just so I'm clear, the Section 141 you reference, that was to the Nuclear Waste Policy Act?

A. That's correct.

Q. Now, as part of this team that you mentioned you were working on, what steps did DOE take to address the MRS provision of the Nuclear Waste Policy Act?

A. Well, the, the, there was fairly specific guidance given in Section 141. They requested a combination of at least five facilities and the – or