No. 04-0074C,
into which has been consolidated No. 04-0075C
(Judge Hewitt)

---

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---

PACIFIC GAS & ELECTRIC COMPANY,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

---

DEFENDANT'S OPPOSITION TO PACIFIC GAS & ELECTRIC COMPANY'S MOTION TO EXCLUDE TESTIMONY OF JOHN R. McGRATH

---

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

HAROLD D. LESTER, JR.
Assistant Director

JOHN C. EKMAN
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Telephone: (202) 353-0897
Facsimile: (202) 307-2503

OF COUNSEL:

JANE K. TAYLOR
Office of General Counsel
U.S. Department of Energy
1000 Independence Avenue, S.W.
Washington, D.C. 20585

JOSHUA E. GARDNER
SCOTT R. DAMELIN
SHARON A. SNYDER
Civil Division
Department of Justice
Washington, D.C. 20585

May 16, 2006

Attorneys for Defendant

# TABLE OF CONTENTS

PAGE

DEFENDANT'S OPPOSITION TO PACIFIC GAS & ELECTRIC'S MOTION TO EXCLUDE TESTIMONY FROM JOHN R. McGRATH .................................... 1

SUMMARY OF ARGUMENT .................................................................................... 1

BACKGROUND .................................................................................................... 2

I. THE GOVERNMENT'S MITIGATION DEFENSE ........................................... 2

II. MR. McGRATH'S EXPERT OPINIONS .......................................................... 7

III. MR. McGRATH'S QUALIFICATIONS .......................................................... 12

ARGUMENT ....................................................................................................... 15

I. STANDARD FOR ADMISSIBILITY OF EXPERT TESTIMONY .................. 15

II. MR. McGRATH'S OPINIONS ARE BASED UPON WIDELY ACCEPTED AND WELL-RECOGNIZED METHODS OF SCHEDULE AND DELAY ANALYSIS ......................................................... 18

III. MR. McGRATH IS QUALIFIED TO PROFFER EXPERT TESTIMONY UPON SCHEDULE AND DELAY ANALYSIS ............................................... 20

IV. MR. McGRATH'S TESTIMONY IS RELEVANT AND HELPFUL TO THE COURT ......................................................................................... 23

CONCLUSION .................................................................................................... 25

# TABLE OF AUTHORITIES

CASES PAGE(S)

Ace Construction, Inc. v. United States,
70 Fed. Cl. 253 (2006) .......... 7

Betterbox Communications Ltd. v. BB Technologies, Inc.,
300 F.3d 325 (3d Cir. 2002) .......... 16, 17, 24

Christiansen v. City of Tulsa,
332 F.3d 1270 (10th Cir. 2003) .......... 24

DaSilva v. American Brands, Inc.,
845 F.2d 356 (1st Cir. 1988) .......... 21

Daubert v. Merrill Dow Pharmaceuticals, Inc.,
509 U.S. 579 (1993) .......... 15, 16

Deal v. Hamilton County Board of Education,
392 F.3d 840 (6th Cir. 2004) .......... 16

George Sollitt Construction Co. v. United States,
64 Fed. Cl. 229 (2005) .......... 19

Haney v. United States,
230 Ct. Cl. 148, 676 F.2d 584 (1982) .......... 8, 18, 19

Home Savings of America, FSB v. United States,
399 F.3d 1341 (Fed. Cir. 2005) .......... 3, 4

Indiana Michigan Power Co. v. United States,
422 F.3d 1369, 1375 (Fed. Cir. 2005) .......... 3

Kumho Tire Co. v. Carmichael,
526 U.S. 137 (1999) .......... 16

LaSalle Talman Bank, F.S.B. v. United States,
45 Fed. Cl. 64 (1999) , rev'd on other grounds,
317 F.3d 1363 (Fed. Cir. 2003) .......... 4

Living Designs, Inc. v. E.I. Dupont De Nemours & Co.,
431 F.3d 353 (9th Cir. 2005) .......... 16

TABLE OF AUTHORITIES (cont'd)

CASES PAGE(S)

Massachusetts Bay Transportation Authority v. United States,
254 F.3d 1367 (Fed. Cir. 2001) .......... 19

Mendenhall v. Cedarapids, Inc.,
5 F.3d 1557 (Fed. Cir. 1993) .......... 24

Micro Chemical, Inc. v. Lextron, Inc.,
317 F.3d 1387 (Fed. Cir. 2003) .......... 16

Morrison Knudsen Corp. v. Fireman's Fund Insurance Co.,
175 F.3d 1221 (10th Cir.1999) .......... 18, 19

Northern Helex Co. v. United States,
207 Ct. Cl. 862, 524 F.2d 707 (1975) .......... 4

Nutrition 21 v. United States,
930 F.2d 867 (Fed. Cir.1991) .......... 24

PCL Construction Services, Inc. v. United States,
47 Fed. Cl. 745 (2000), aff'd, 96 Fed. Appx. 672 (2004) .......... 19

R.P. Wallace, Inc. v. United States,
63 Fed. Cl. 402 (2004) .......... 18, 19

Robinson v. United States,
305 F.3d 1330 (Fed. Cir. 2002) .......... 3, 4, 25

Rondout Valley Central School District v. Coneco Corp.,
321 F. Supp. 2d 469 (N.D.N.Y. 2004) .......... 21, 22, 23

Sacramento Municipal Utility District v. United States,
No. 98-488C, 2006 WL 950218 (Fed. Cl. March 31, 2006) .......... 1, 12, 21, 24

Seaboard Lumber Co. v. United States,
308 F.3d 1283 (Fed. Cir. 2002) .......... 15, 16

Stagl v. Delta Air Lines, Inc.,
117 F.3d 76 (2d Cir. 1997) .......... 20

TABLE OF AUTHORITIES (cont'd)

CASES PAGE(S)

Sunshine Construction & Engineering v. United States,
64 Fed. Cl. 346 (2005) ........................................ 19

T.C. Bateson Construction Co. v. United States,
162 Ct. Cl. 145, 319 F.2d 135 (1963) ........................................ 4

Tennessee Valley Authority v. United States,
69 Fed. Cl. 515 (2006), appeal pending, No. 2006-5073 (Fed. Cir.) .................... 4

United States v. Lopez-Lopez,
282 F.3d 1 (1st Cir. 2002) ........................................ 17

United States v. Young,
316 F.3d 649 (7th Cir. 2002) ........................................ 17

Wilner v. United States,
23 Cl. Ct. 241 (1991) ........................................ 8

Wilner v. United States,
26 Cl. Ct. 260 (1992), vacated on other grounds, 24 F.3d 1397 (Fed. Cir. 1997) ......... 7, 8

REGULATIONS

10 C.F.R. § 961.11 ........................................ 2

MISCELLANEOUS

M. Berger, "Evidentiary Framework," Reference Manual on Scientific Evidence .................... 21

Restatement (Second) of Contracts § 350 cmt. b ........................................ 3, 4, 25

INDEX TO APPENDIX

PAGE(S)

Deposition of John R. McGrath, March 14, 2006 .......... 1-9

Curriculum Vitae, John McGrath, February 6, 2006 .......... 10-13

Deposition of L. Jearl Strickland, August 18, 2005 .......... 14-15

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| PACIFIC GAS & ELECTRIC COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 04-0074C, into which has been |
| | ) | consolidated No. 04-0075C |
| THE UNITED STATES, | ) | (Judge Hewitt) |
| | ) | |
| Defendant. | ) | |

DEFENDANT'S OPPOSITION TO PACIFIC GAS & ELECTRIC COMPANY'S MOTION TO EXCLUDE TESTIMONY FROM JOHN R. McGRATH

Defendant, the United States, respectfully responds to the motion to exclude the testimony of defendant's expert, John R. McGrath, that plaintiff, Pacific Gas & Electric Company ("PG&E"), filed on April 18, 2006.

## SUMMARY OF ARGUMENT

PG&E challenges the opinions and testimony of Mr. McGrath in three ways. First, PG&E asserts that Mr. McGrath's testimony is not relevant because it is a mere recitation of the facts and is, therefore, not helpful to the court. Second, PG&E argues that Mr. McGrath is not qualified to perform any schedule analysis of the PG&E dry cask storage projects because he lacks specialized knowledge. Finally, PG&E alleges that Mr. McGrath applies no methodology to the facts of the case, but, instead, that Mr. McGrath simply observes and reports facts.

PG&E's motion should be denied because Mr. McGrath is well qualified pursuant to Federal Rule of Evidence ("FRE") 702 to proffer expert opinions concerning the schedule and delays associated with the dry cask storage projects at the Humboldt Bay Power Plant ("Humboldt Bay") and the Diablo Canyon Power Plant ("Diablo Canyon"). In fact, Mr. McGrath recently was qualified as a schedule and delay expert in Sacramento Municipal Utility District v. United States, No. 98-488C, 2006 WL 950218, at n.36 (Fed. Cl. March 31, 2006),

another spent nuclear fuel ("SNF") case tried before this Court. Further, in forming his opinions, Mr. McGrath applied the well-recognized and widely accepted Critical Path Method ("CPM") of analysis to the specific facts and evidence in this case. Finally, and contrary to PG&E's assertions, Mr. McGrath's opinions are directly relevant to the issues before this Court, as they demonstrate the many years of delays in the Diablo Canyon and Humboldt Bay dry cask storage projects – delays which have increased the damages claimed by plaintiff in this litigation.

## BACKGROUND

### I. THE GOVERNMENT'S MITIGATION DEFENSE

Before analyzing Mr. McGrath's opinions, it is important for the Court to understand the manner in which those opinions relate to the Government's defense of PG&E's $92 million damages claim. As discussed in more detail in our pre-trial brief, the nuclear utilities in the spent nuclear fuel ("SNF") cases, including PG&E, have claimed that they have incurred damages as a result of the delay by the Department of Energy ("DOE") in beginning SNF acceptance pursuant to the "Standard Contract For Disposal Of Spent Nuclear Fuel And/Or High-Level Radioactive Waste," 10 C.F.R. § 961.11. PG&E has asserted that it has incurred damages for extended SNF storage at two different nuclear reactor sites. With regard to its Diablo Canyon reactor, PG&E claims that, because of DOE's delay, PG&E was going to run out of storage space in its wet SNF storage pools there and that, to preclude the need for it to shutdown its nuclear reactors when it ran out of space to store newly generated SNF, it had to construct an Independent Spent Fuel Storage Installation ("ISFSI"), or dry storage facility, at its

Diablo Canyon reactor site.[1] With regard to its Humboldt Bay reactor, which is shutdown and no longer generating new SNF, it claims that it needed to construct an ISFSI because annual operating and maintenance costs at an ISFSI are less than those for continued wet storage pool and because it wanted to decommission its reactor.[2] Accordingly, PG&E claims that it is constructing ISFSIs at both facilities in an effort to mitigate its damages resulting from DOE's delay.

Generally, "[o]nce a party has reason to know that performance by the other party will not be forthcoming, . . . he is expected to take such affirmative steps as are appropriate in the circumstances to avoid loss by making substitute arrangements or otherwise." Restatement (Second) of Judgments § 350 cmt. b, quoted in Indiana Michigan Power Co. v. United States, 422 F.3d 1369, 1375 (Fed. Cir. 2005). In mitigating damages, the non-breaching party must "make those efforts that are fair and reasonable under the circumstances." Home Savings of Am., FSB v. United States, 399 F.3d 1341, 1353 (Fed. Cir. 2005) (quoting Robinson v. United

---

[1] Generally, as long as there is available space in the wet storage pool associated with an operating nuclear reactor, there are no incremental costs associated with DOE's delay in SNF acceptance relating to continued SNF storage. A nuclear utility must incur the same operating and maintenance costs to maintain its wet storage pool regardless of whether the pool contains one SNF assembly or 100 SNF assemblies. However, when the wet pool runs out of storage space, the nuclear utility must either shut down its reactor (because it will have nowhere to place new SNF that is generated by the continuing production of nuclear power) or find an alternative means of SNF storage for the excess SNF in its wet storage pool. Here, PG&E claims that, because it was going to run out of available SNF storage space in its wet pool at Diablo Canyon, it had to identify and plan for an alternative means of storing its SNF: specifically, constructing an ISFSI, or dry storage facility, at its reactor site.

[2] As we will establish at trial, given the unreasonable delays that PG&E has experienced upon the Humboldt Bay ISFSI – all of which are directly attributable to PG&E's management decisions – the premise for PG&E's ISFSI at Humboldt Bay largely has been eviscerated, both from a mitigation and a prompt decommissioning perspective.

States, 305 F.3d 1330, 1333 (Fed. Cir. 2002)); see Restatement (Second) of Contracts § 350 cmt. b ("[a]s a general rule, a party cannot recover damages for loss that he could have avoided by reasonable efforts"). Nevertheless, the non-breaching party "is expected to take such affirmative steps as are appropriate in the circumstances to avoid loss . . . ." Restatement (Second) of Contracts § 350 cmt. b (emphasis added); see Robinson, 305 F.3d at 1334 ("in the circumstances of this case reasonable efforts in the form of affirmative steps are required to mitigate damages and . . . relative costs in time and money are primary factors to consider in assessing reasonableness"). Further, the non-breaching party must attempt to mitigate any potential damages "at the least cost to the defendant," LaSalle Talman Bank, F.S.B. v. United States, 45 Fed. Cl. 64, 111 (1999) (quoting Northern Helex Co. v. United States, 207 Ct. Cl. 862, 524 F.2d 707, 713 (1975)), rev'd on other grounds, 317 F.3d 1363 (Fed. Cir. 2003), or in a reasonable business manner. Home Savings, 399 F.3d at 1353. The least-cost principle "precludes rewarding a plaintiff for undertaking a form of mitigation that is considerably more costly than other available means of mitigation." LaSalle, 45 Fed. Cl. at 111. Nevertheless, "the burden of proof with respect to a plaintiff's asserted failure to mitigate damages rests upon the defendant who asserts it." T.C. Bateson Constr. Co. v. United States, 162 Ct. Cl. 145, 319 F.2d 135, 160 (1963); see Tennessee Valley Auth. v. United States, 69 Fed. Cl. 515, 523 (2006) ("government bears the burden of showing that TVA's mitigation efforts were unreasonable").

Here, PG&E claims that the Government should pay for all of the costs that it has incurred in constructing dry storage facilities at its Diablo Canyon and Humboldt Bay reactor sites, as well as continuing wet storage costs at its Humboldt Bay facility. However, the evidence at trial will show that PG&E, apparently presuming that the Government would cover

any costs associated with its dry storage projects and its continuing wet pool storage costs at Humboldt Bay, diverted resources from its dry storage project at Humboldt Bay and failed to provide appropriate attention to and take appropriate and reasonable action with regard to its dry storage projects, with the result that millions of dollars in needless costs, associated with completely avoidable delays, were incurred.

Although PG&E's early schedules planned for loading the Humboldt Bay ISFSI by 2003 and the Diablo Canyon ISFSI by 2005, no SNF has been loaded to either ISFSI, and the physical structures at Humboldt Bay have yet to be constructed. Under current schedules, Diablo Canyon will not begin loading its ISFSI until the 2008 time frame, and the Humboldt Bay ISFSI loading likely will be delayed beyond the current 2009 schedule. As we will establish at trial, because the Government is being asked to pay the costs of the Humboldt Bay ISFSI and the continuing wet storage of SNF until it finally is loaded to that ISFSI, every day of delay comes at a significant cost to the Government. Indeed, based upon PG&E's damages claim, each year of delay brings additional damages allegations totaling between $8.0 and $10.5 million.

At Diablo Canyon, the delays in that project have resulted in substantial expenditures for temporary racks for Diablo Canyon's two wet pools – costs that would have been avoided had PG&E loaded its first casks to the ISFSI in the 2005 time frame. Mr. McGrath's opinions include a discussion of the schedule for the temporary rack project at Diablo Canyon. His discussion, in connection with the Diablo Canyon ISFSI schedule and delay analysis, is important to the Government's contention that the temporary racks failed, in all material respects, to mitigate PG&E's damages. At Diablo Canyon, the racks should have been unnecessary under the operative construction schedule for the Diablo Canyon ISFSI – a fact that

will be established through Mr. McGrath's testimony. However, the evidence will demonstrate that, once PG&E made the determination to proceed with the temporary racks, it failed to utilize the additional capacity gained from those racks (for which the Government is being asked to pay) – capacity that allows Diablo Canyon's reactors to operate without any cask loading activities to the ISFSI until after 2010 – by reallocating resources to the Humboldt Bay ISFSI effort. As a result, the Government received no benefit from those temporary racks in the form of mitigated costs. Mr. McGrath's testimony is relevant and helpful upon the scheduling aspects of the temporary racks in the larger context of his schedule and delay analysis for Humboldt Bay and Diablo Canyon.

The Government should not be responsible for "every" cost associated with PG&E's dry storage projects, with the installation of racks (which could have been avoided), and with duplicative costs at Humboldt Bay for continuing wet storage that PG&E could have avoided had it devoted appropriate attention to the dry storage project there and had it not diverted resources from that project. By failing to make appropriate business decisions regarding those projects, but instead assuming that the Government would simply be responsible for every cost incurred regardless of whether that cost could reasonably have been avoided or reduced, PG&E failed properly to mitigate damages, and the Government should not be responsible for those avoidable costs.

Mr. McGrath's testimony is relevant to all delays that occurred in these projects beginning in 1999.[3] As explained below, Mr. McGrath conducted an analysis of PG&E's ISFSI

[3] The material delays prior to 1999 are not the subject of Mr. McGrath's critical path analysis. We intend to introduce evidence at trial regarding the pre-1999 delays to the ISFSI projects at both facilities and the effect that those delays have had upon PG&E's alleged

construction projects, identifying the original "as-planned" project baselines, the actual or "as-built" schedules, the delays that occurred throughout these projects, and the causes of these delays. By identifying those delays in its projects that PG&E caused, Mr. McGrath assists us in establishing which of PG&E's claimed mitigation costs are unreasonable and could have been avoided through reasonable action upon the part of PG&E.

## II. MR. McGRATH'S EXPERT OPINIONS

Mr. McGrath is an expert in the well-recognized field of schedule and delay analysis. As it relates to construction projects, the critical path "is the longest path through a project and thus defines the total duration of the project." Ace Constr., Inc. v. United States, 70 Fed. Cl. 253, 294 n.46 (2006). A critical path and delay analysis is performed, at least in part, to determine whether a project has progressed efficiently:

> It frequently has the purpose of project management. And the primary role in analyzing the schedule is to use that schedule to manage a project and to make sure that you're working on the activities that are critical to the timely completion of the project. Time is of the essence. And managing the schedule allows you to apply the resources in the correct areas and make sure the work is being done in a most efficient manner to save money, to save time.

McGrath Dep., 17:20-18:7 (A5).[4] One day of delay along the critical path of a project causes the completion date of a project to be extended by one day. Wilner v. United States, 26 Cl. Ct. 260, 262 (1992), vacated on other grounds, 24 F.3d 1397 (Fed. Cir. 1997). A delay relating to a specific activity upon the project is not a critical path delay if it would not impact the project completion date:

---

damages in this case.

[4] "A__" refers to the appendix attached to this response.

> [T]he critical path method is an efficient way of organizing and scheduling a complex project which consists of numerous inter-related separate small projects. Each subproject is identified and classified as to the duration and precedence of the work. (E.g., one could not carpet an area until the flooring is down and the flooring cannot be completed until the underlying electrical and telephone conduits are installed.) The data is then analyzed, usually by computer, to determine the most efficient schedule for the entire project. Many subprojects may be performed at any time within a given period without any effect on the completion of the entire project. However, some items of work are given no leeway and must be performed on schedule; otherwise, the entire project will be delayed. These latter items of work are on the "critical path." A delay, or acceleration, of work along the critical path will affect the entire project . . .

Wilner v. United States, 23 Cl. Ct. 241, 244-45 (1991) (quoting Haney v. United States, 230 Ct. Cl. 148, 168, 676 F.2d 584, 595 (1982)).

"Essential to a determination that an activity belongs on the critical path of a project is an understanding of how that activity affects the other activities." Wilner, 26 Cl. Ct. at 263. To make this determination, the Court "must have before it evidence that establishes the critical path of plaintiff's project." Id. To analyze the efficiency of a particular project, Mr. McGrath compares the actual "as-built" schedule to the baseline or "as-planned" schedule. McGrath Dep., 20:11-19 (A5). Mr. McGrath's analysis ultimately determines the projects' critical paths and identifies instances in which the "as-planned" schedule differed from the "as-built" schedule and further identifies the reasons that PG&E did not meet its "as-planned" schedules for its two ISFSI projects. Id., 20:11- 30:1 (A5-A8).[5]

---

[5] In general, an entity might not meet its baseline schedule because of mistaken resource allocation, internal or external pressures, or actions or inactions that caused the as-built variance from the baseline schedule. Id.

Mr. McGrath will offer several opinions regarding the critical path of the ISFSI projects at Diablo Canyon and Humboldt Bay. First, Mr. McGrath will offer an opinion concerning which project schedules, of the multitude that exist for both projects, constitute the "as-planned" schedules for each ISFSI project. McGrath Report 8-9 (PG&E App. 11-12).[6] Following a review of thousands of pages of PG&E project documents and publicly-available records from the Nuclear Regulatory Commission ("NRC"), Mr. McGrath determined that the schedules presented by PG&E to the NRC during April 1999 meetings were a "reasonable benchmark for measuring progress and delay in the implementation of dry storage at Humboldt Bay Power Plant and Diablo Canyon Power Plant." McGrath Dep., 28:21-29:2 (A7-A8); McGrath Report 8-9 (PG&E App. A11-12).

Additionally, Mr. McGrath concluded that the April 1999 schedules were appropriately characterized as baseline schedules because "both Humboldt Bay and Diablo Canyon had authorized and funded initial dry storage project activities, which included the solicitation and selection of a cask system vendor and the development and submittal of the necessary license applications to the NRC for review." McGrath Report, 8 (PG&E App. 11). Mr. McGrath also determined that these baseline schedules were consistent with schedule requirements stipulated in the Humboldt Bay and Diablo Canyon contracts with Holtec International, the supplier of the dry storage system components for both Humboldt Bay and Diablo Canyon. Id., 9 (A12).

Second, having identified the "as-planned" and "as-built" schedules for each project, Mr. McGrath will offer opinions concerning the identification of critical path activities within those

[6] For the convenience of the Court, references to Mr. McGrath's expert report are to the appendix attached to PG&E's motion in limine.

schedules. Once those critical path activities are identified, Mr. McGrath next offers opinions concerning delays in those activities by comparing the "as-built" with the "as-planned" schedules. As a result of his analysis, Mr. McGrath concluded that PG&E experienced significant delays in the development of the ISFSIs at Humboldt Bay and Diablo Canyon. For example, under the "as-planned" schedule, PG&E initially planned to complete the construction of its ISFSI at Humboldt Bay, and transfer all SNF to that ISFSI, by the end of 2003. McGrath Report 9-10 (PG&E App. 12-13). However, PG&E currently plans to complete the Humboldt Bay ISFSI and transfer SNF by the end of 2009 – a six-year delay over the "as-planned" schedule.[7] Id.

Based upon his identification and analysis of the critical path activities, Mr. McGrath attributed the delay primarily to the action – or, more significantly, inaction – of PG&E. For example, and among other delays identified by Mr. McGrath, PG&E experienced significant delays in submitting the Part 72 license application for Humboldt Bay to the NRC because of PG&E's decision to suspend work upon the Humboldt Bay ISFSI to focus instead upon the Diablo Canyon ISFSI project. Id., 22 (PG&E App. 22). Mr. McGrath identified further delays (in excess of a year) that were caused by "the protracted period of limited progress on Humboldt Bay dry storage development due to the priority of [Diablo Canyon] license completion activities, holds for additional funding requests through the CPUC, and extended negotiations of the Holtec contract." Id., 25 (PG&E App. 28). He identified an additional seven-month delay

---

[7] Based upon the damages assertions in PG&E's initial disclosures, and assuming, as PG&E does, that the Government is responsible for all ISFSI design, licensing, and construction costs, the six-year delay identified by Mr. McGrath results in more than $50 million in additional damages against the Government. To the extent additional delays ultimately are realized, those delays allegedly come at an additional cost of approximately $9.0 million per year.

attributable to "the transition of staff from [Diablo Canyon], the completion of additional seismic hazards analyses, and the final negotiations of the Holtec cask system contract." Id., 26 (PG&E App. 29).[8]

With respect to the Diablo Canyon ISFSI project, Mr. McGrath determined, based upon his schedule and delay analysis, that the "as-planned" schedule for the Diablo Canyon ISFSI provided for completion of the ISFSI and commencement of transfer of fuel from the spent fuel pool to the ISFSI in early 2005. Id., 10 (PG&E App. 13). However, PG&E currently plans to load that ISFSI beginning in 2007. Id., 10 (PG&E App. 13).[9] Mr. McGrath determined that the Diablo Canyon ISFSI experienced a two-year delay, despite the shift in focus from the Humboldt Bay ISFSI project to the Diablo Canyon ISFSI project. Id. Mr. McGrath attributes that delay to delays in completing the part 72 license for the Diablo Canyon ISFSI. Id., 13-18 (PG&E App. 16-21). Mr. McGrath also attributed a delay to PG&E's late selection and authorization of Holtec as the cask vendor for the dry fuel storage project. Id., 12-13 (PG&E App. 15-16).

Finally, Mr. McGrath's opinions include a discussion of the temporary rack additions that PG&E is installing in the two wet pools at Diablo Canyon. Mr. McGrath's discussion of the schedule of that project, within the ISFSI project as a whole, is important to the Government's contention that the rack additions failed to mitigate PG&E's damages. Mr. McGrath's testimony

---

[8] While this response does not include all of Mr. McGrath's identified delays upon the two projects, Mr. McGrath also identified delays associated with delays in the Administrative Law Judge's decision concerning the Humboldt Bay project, an extended site selection process that was caused by PG&E, and PG&E's decision to withhold certain funding until approval was obtained to expend ratepayer reimbursed funds from the California Public Utility Commission ("CPUC") . Id., 7 (PG&E App. 7).

[9] We anticipate that evidence will be presented which demonstrates that a 2007 loading date is ambitious, given the current schedules.

will establish that, at Diablo Canyon, the temporary racks should have been unnecessary under the operative ISFSI construction schedule. However, the Government will establish through a presentation of the current Diablo Canyon ISFSI schedules that, once PG&E made the determination to proceed with the temporary racks, it failed to utilize the additional capacity gained from those racks (for which the Government is being asked to pay), by reallocating resources to the Humboldt Bay ISFSI effort. Mr. McGrath's testimony is relevant and helpful upon the scheduling aspects of the temporary racks in the larger context of his delay and schedule analysis for Humboldt Bay and Diablo Canyon.

## III. MR. McGRATH'S QUALIFICATIONS[10]

The Government is offering Mr. McGrath as an expert in schedule and delay analysis. This Court qualified Mr. McGrath as an expert in this area in SMUD, 2006 WL 950218, at n.36. For the SMUD trial, Mr. McGrath prepared an expert report which detailed a schedule and delay analysis that he performed in connection with SMUD's dry cask storage project.[11] In that case, and as he did here, Mr. McGrath analyzed the project records and data, as well as other contemporaneous records, to understand and analyze the scheduling of the dry cask storage project and the delays associated with the project. McGrath Dep., 16:6-29:11(A4-A8). Mr. McGrath's testimony concerning schedule and delay analysis is not limited to these SNF cases.

---

[10] Mr. McGrath's Curriculum Vitae is attached hereto as part of the Appendix, A10-A13. It was not included in PG&E's appendix.

[11] The Court in SMUD was critical of Mr. McGrath's failure to render an opinion as to the reasonableness of the three relevant delays in that case. SMUD, 2006 WL 950218 at *55. As we explain later, and given the nature of the contractual relationship between the Government and PG&E (and, in that case, SMUD), we believe that the Court, and not Mr. McGrath, should decide the reasonableness of PG&E's conduct relating to the construction of PG&E's ISFSIs.

Indeed, Mr. McGrath has been qualified as a scheduling and delay expert, and utilized CPM, in McDonnell Douglas Corp. & Gen'l Dynamics Corp. v. United States, No. 91-1240C (Fed. Cl. 2001).[12]

Mr. McGrath's educational and employment background also support his expertise in construction scheduling and critical path analysis. Mr. McGrath earned a B.S. in Aerospace Engineering and a Master of Business Administration from the University of Colorado. McGrath CV (A11); McGrath Dep., 6:9-22 (A2). At the University of Colorado, his studies focused upon cost accounting, finance, information systems, and production management. Id. Mr. McGrath is a member of the Project Management Institute, an association that includes schedule and delay experts. McGrath Dep., 10:12-12:15 (A3). Mr. McGrath was employed with McDonnell Douglas Corporation for approximately three years. McGrath Dep., 7:1-12 (A2). During his employment with McDonnell Douglas, Mr. McGrath developed work plans, schedules, manpower plans, and budgets for the utilization and operations directorate of the International Space Station program. McGrath CV at 1 (A11); McGrath Dep., 7:3-12 (A2). Since that time, Mr. McGrath has consulted upon schedule and delay issues for over 14 years, first with The Barrington Consulting Group (now Navigant Consulting, Inc.) and currently with the consulting firm Contract Solutions LLC. McGrath CV at 1 (A11). His clients have included various Government agencies and Government contractors. McGrath CV at 2-3 (A12-A13).[13]

---

[12] Mr. McGrath provided an expert report and deposition testimony as a schedule and delay expert in GASA, Inc. v. United States, No. 01-642 (Fed. Cl. 2003). That case has not yet proceeded to trial.

[13] Mr. McGrath's work, as detailed in his CV, includes a variety of projects including: (i) schedule productivity analysis for the dismantlement, removal, and decontamination of uranium enrichment equipment by DOE contractor; (ii) schedule and cost impacts for second

While Mr. McGrath does not have significant experience in the nuclear industry, PG&E's assertion that such experience is required is mistaken.[14] Mr. McGrath is performing a schedule and delay analysis of a construction project using his specialized expertise, PG&E's project schedules, and other available documents. The subject matter of the construction project – whether aerospace, defense, building, Government contracts, or ISFSIs – is not material to the analysis. Moreover, as Mr. McGrath testified, he is qualified, based upon his construction scheduling expertise, to develop a schedule for an ISFSI project, given that the type of schedule analysis that applies to regular construction projects is equally applicable to ISFSI construction projects. McGrath Dep., 29:12-30:22 (A8). PG&E has failed to identify anything that is unique to the nuclear industry – as opposed to the aerospace industry, for example – that would preclude an individual with specialized scheduling expertise from offering schedule-related opinions here.[15]

PG&E asserts that there is no specialized knowledge that Mr. McGrath offers to the Court and that he relies only upon logic, suggesting that anyone could conduct the analysis that Mr. McGrath has conducted. Pl. Br., 4, 11. However, as Mr McGrath has explained, although

---

source production of the U.S. Navy's Forward Looking Infrared Pod for the F/A-18 aircraft; (iii) request for equitable adjustment associated with $130 million military facility for the U.S. Army and Israeli Defense Forces; (iv) delay analysis associated with design defects regarding underground piping and site conditions for replacement of military family housing; and (v) equitable adjustment associated with the construction of the U.S. Embassy in Angola. McGrath CV at 2-3 (A12-A13). Mr. Mcgrath's experience is detailed more fully in his CV.

[14] L. Jearl Strickland, the project manager for the Diablo Canyon ISFSI, is not a nuclear engineer. Instead, he is a civil engineer who, like Mr. McGrath, has a graduate degree in business administration. Deposition of L. Jearl Strickland, 31:19-32:21 (A15).

[15] Interestingly, while criticizing Mr. McGrath's alleged lack of expertise, PG&E's brief does not dispute the accuracy of Mr. McGrath's schedule analysis or the conclusions of that analysis.

his analysis includes elements of common sense, it also includes an understanding and application of principles associated with scheduling and delay analysis that require education, training, and experience:

> Well, common sense is part of what I used, of course, but my scheduling expertise is really what I used to perform the analyses, to perform each of the steps of the analysis and develop the opinions that are presented in the report.
>
> It's a schedule analysis and a delay analysis, which, in my opinion, does take some training and some experience and some education to perform. It's certainly – the foundation of scheduling is certainly logic-driven and it's – in that regard is – you know, it should make sense and it should make common sense when it's presented correctly.

McGrath Dep. 37:18-38:8 (A9). Mr. McGrath's education, extensive hands-on work, and consulting experience in the area of schedule and delay analysis provide him with the qualifications necessary to opine upon issues relevant to this case.

## ARGUMENT

### I. STANDARD FOR ADMISSIBILITY OF EXPERT TESTIMONY

Because the standard for admissibility has been briefed numerous times in connection with the pretrial motions filed by PG&E, a complete rehashing of that standard is unnecessary here. Instead, this Court may rely upon the analysis contained in any of the Government's three other responses to PG&E's motions to strike expert witnesses. However, it should be noted that, under the Supreme Court's decision in Daubert v. Merrill Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), the Court has an obligation to screen expert testimony for both relevance and reliability. Seaboard Lumber Co. v. United States, 308 F.3d 1283, 1301 (Fed. Cir. 2002). Although the standard articulated by the Supreme Court in Daubert must be met even in non-jury

cases such as this one, Seaboard Lumber Co., 308 F.3d at 1302, the "'gatekeeper' doctrine was designed to protect juries and is largely irrelevant in the context of bench trials." Deal v. Hamilton County Bd of Educ., 392 F.3d 840, 852 (6th Cir. 2004). Further, "the trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system." Micro Chemical, Inc. v. Lextron, Inc., 317 F.3d 1387, 1392 (Fed. Cir. 2003) (citing Advisory Committee Note to Federal Rule of Evidence 702).

Finally, although the Supreme Court in Kumho Tire Co. v. Carmichael, 526 U.S. 137 (1999), expanded the Court's gatekeeping function under Daubert from "scientific" testimony to all expert testimony, the Court concluded that, in cases not involving scientific testimony, "[t]he factors identified in Daubert may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of the testimony." Id. at 150. In that circumstance, the Supreme Court explained that "the relevant reliability concerns may focus upon personal knowledge or experience." Id.; see Betterbox Communications Ltd. v. BB Technologies, Inc., 300 F.3d 325, 329 (3d Cir. 2002) (affirming the trial court's admittance of a marketing expert who opined upon the likelihood of confusion between two trademarks, and concluding that testimony was based upon the witness's "personal knowledge or experience . . . rather than a methodology that satisfies the Daubert factors"); Living Designs, Inc. v. E.I. Dupont De Nemours & Co., 431 F.3d 353, 368 n.14 (9th Cir. 2005) ("Concerning the reliability of non-scientific testimony such as [Berly's], the 'Daubert factors . . . simply are not applicable to this kind of testimony, whose reliability depends heavily on the knowledge and experience of the expert, rather than the methodology or theory behind it") (citation omitted) (emphasis in original); United States v. Young, 316 F.3d 649, 657 (7th Cir. 2002) (affirming admission of

psychiatric mental health nurse who offered testimony concerning domestic abuse victim's recantation, concluding that her methodology was reliable based upon her extensive experience and review of relevant documents in the case).

Under FRE 702, an expert witness must possess "specialized knowledge" regarding the area of testimony. FRE 702. The United States Court of Appeals for the Third Circuit, in discussing the requisite specialized knowledge necessary to qualify as an expert under FRE 702, explained:

> "The basis for this specialized knowledge 'can be practical experience as well as academic training and credentials,'" and "[w]e have interpreted the specialized knowledge requirement liberally." However, "'at a minimum, a proffered expert witness . . . must possess skill or knowledge greater than the average layman . . . .'"

Betterbox Communications, 300 F.3d at 327-28 (citations omitted) (affirming admittance of marketing expert upon the issue of the likelihood of confusion in certain trademarks based upon his experience in the field). Ultimately, the Court must find that an expert's specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue. United States v. Lopez-Lopez, 282 F.3d 1, 14 (1st Cir. 2002) (affirming admittance of expert upon the *modus operandi* of individuals importing drugs into the United States because expert's testimony was not within fact-finder's common knowledge).

## II. MR. McGRATH'S OPINIONS ARE BASED UPON WIDELY ACCEPTED AND WELL-RECOGNIZED METHODS OF SCHEDULE AND DELAY ANALYSIS

PG&E asserts that Mr. McGrath's opinions are not based upon specialized knowledge, but rather display "simple mathematics."[16] Pl. Br., 10. PG&E's representation of Mr. McGrath's analysis and opinions is a gross misstatement of the work that Mr. McGrath conducted. Indeed, based upon applicable case law in this Court, PG&E's "simple math" assertion represents a clear misunderstanding of Critical Path Methodology and of schedule and delay analysis.

Critical Path Methodology, or CPM, is a term of art for a method of scheduling and administering construction projects:

> [A] term of art for a method of scheduling and administering construction contracts. The Court of Claims has explained that CPM enables contractors performing complex projects to identify a critical path of tasks that must each be completed before work on other tasks can proceed. A delay on the critical path will thus delay the entire project.

Morrison Knudsen Corp. v. Fireman's Fund Ins. Co., 175 F.3d 1221, 1232 (10th Cir.1999); accord R.P. Wallace, Inc. v. United States, 63 Fed. Cl. 402, 408-09 n.10 (2004); Haney v. United States, 676 F.2d 584, 595 (Ct. Cl. 1982). Critical Path Methodology "is an efficient way of organizing and scheduling a complex project which consists of numerous interrelated separate small projects." Haney, 676 F.2d at 595. "Generally, any amount of delay to an activity on the

---

[16] Mr. McGrath is the second Government expert against whom PG&E has leveled this unsupported allegation. However, PG&E fails to explain how the identification of "as-planned" schedules, critical path activities, and delay – in contrast to the calculation of months of delay following upon Mr. McGrath's schedule and delay analysis – are based upon "simple mathematics."

critical path results in the same delay to the project's completion, because those activities define the project's path and chain of activities." Sunshine Constr. & Eng'g v. United States, 64 Fed. Cl. 346, 353 (2005) (citations omitted). The Critical Path Method "provides a useful and well-developed nomenclature and analytic framework for expert testimony." Morrison Knudsen, 175 F.3d at 1233.

The Critical Path Method has been recognized and utilized as an appropriate means of schedule and delay analysis in this Court in many cases involving construction projects. See, e.g. Massachusetts Bay Transp. Auth. v. United States, 254 F.3d 1367, 1376 (Fed. Cir. 2001) (trial court considered testimony from Critical Path Method experts); Sunshine Constr., 64 Fed. Cl. at 358-59 (critical path method is an established way to document delay); R.P. Wallace, 63 Fed. Cl. at 408-09 (both sides relied heavily upon experts who used critical path method); PCL Constr. Serv., Inc. v. United States, 47 Fed. Cl. 745, 801 (2000) (critical path method is an established way to document delay), aff'd, 96 Fed. Appx. 672 (2004); Haney, 676 F.2d at 595-96 (plaintiff presented critical path expert testimony at trial establishing cumulative effect of each delay upon the entire project). Indeed, contrary to PG&E's assertions, this Court has found that an "established way to document delay is through the use of Critical Path Method (CPM) schedules and an analysis of the effects, if any, of . . . events upon the critical path of the project." George Sollitt Constr. Co. v. United States, 64 Fed. Cl. 229, 240 (2005). The Critical Path Method clearly is well-accepted in this Court and others and is routinely applied by experts to analyze and explain the causes for delays in construction projects.

In his report and testimony, Mr. McGrath explains how he applied the Critical Path Method to reach his opinions. Mr. McGrath relied upon the actual project documentation and

contemporaneous documents produced by PG&E personnel involved in the two ISFSI projects. As discussed above, Mr. McGrath identified the "as-planned" schedule and established the "as-built" schedule. Next, Mr. McGrath identified the critical path activities for which any resulting delay would delay the projects as a whole. Significantly, PG&E's motion does not contend that Mr. McGrath incorrectly identified the critical path activities associated with the ISFSI projects. Upon identifying the appropriate schedules and critical path activities, Mr. McGrath compared the actual work to the "as-planned" work, using the Critical Path Methodology, to identify delays and to assign root causes for those delays. As Mr. McGrath stated in his deposition, "[i]n other words, [I focus] on the milestones and events that were ultimately responsible for the duration of the project and compar[e] those to the baseline activities . . . and analyz[e] those variances for root causes and descriptions to illustrate the reasons for the delays or accelerations or periods of recovery." McGrath Dep., 20:20-21:4 (A5-A6).

PG&E's assertions that Mr. McGrath does not apply any cogent methodology in his report are clearly incorrect. Instead, Mr. McGrath applied the well-recognized Critical Path Method to PG&E's ISFSI project schedules to determine the existence of and reason for any delays in those projects. Indeed, because determining the existence, duration, and cause of delay is outside the competence of a lay person, expert testimony is not only appropriate but necessary. Mr. McGrath's testimony, therefore, should not be excluded.

## III. MR. McGRATH IS QUALIFIED TO PROFFER EXPERT TESTIMONY UPON SCHEDULE AND DELAY ANALYSIS

Federal Rule of Evidence 702 provides that a witness may be qualified as an expert by "knowledge, skill, experience, training or education." The decision as to whether a witness is qualified as an expert under this rule lies within the broad discretion of the court. Stagl v. Delta

Air Lines, Inc., 117 F.3d 76, 81 (2d Cir. 1997). Moreover, in deciding whether a witness is qualified to render an expert opinion, the Court "should consider all relevant qualifications." DaSilva v. American Brands, Inc., 845 F.2d 356, 361 (1st Cir. 1988). Because evidence is presumed admissible, the utility of an expert's testimony should be resolved in favor of admissibility. Rondout Valley Cent. School Dist. v. Coneco Corp., 321 F. Supp.2d 469, 474 (N.D.N.Y. 2004).

PG&E argues that Mr. McGrath is not qualified to testify as an expert upon schedule and delay analysis here because, it claims, he does not have "specialized knowledge." Pl. Br., 6-7, 10. To ascertain whether a proposed expert is qualified to act as a witness, "[t]he court should determine whether the proffered expert has minimal educational or experiential qualification in a field that is relevant to a subject which will assist the trier of fact." M. Berger, "Evidentiary Framework," Reference Manual on Scientific Evidence, at 38, 55. Mr. McGrath has significant expertise in the field of schedule and delay analysis to qualify him as an expert here. In fact, as discussed above, Mr. McGrath has been qualified as a schedule and delay expert in another SNF case and in one other non-SNF cases in this Court. SMUD, 2006 WL 950218, at n.36; McDonnell Douglas Corp. v. United States, No. 91-1204C (Fed. Cl. 2001). Over the past 14 years, Mr. McGrath has provided assistance to both owners and contractors in the fields of construction, aerospace, and defense. He has performed analyses for schedule delays, change order evaluation, and project management. His prior work with Boeing provided him with substantial experience developing work plans, schedules, manpower plans, and budgets.

Moreover, Mr. McGrath testified that he possesses the expertise to develop a schedule for a project such as the dry cask storage projects at Diablo Canyon and Humboldt Bay. McGrath

Dep., 30:2-22 (A8). Based upon his experience developing schedules and critical paths for a variety of construction projects, Mr. McGrath has the knowledge to review and analyze the documentation and testimony regarding the Diablo Canyon and Humboldt Bay ISFSI projects and to provide expert testimony regarding the project schedules and delays.

Finally, PG&E's attempts to disqualify Mr. McGrath because of his lack of nuclear experience are unavailing. As discussed above, schedule and delay analysis is not limited to a particular industry, and its application is not limited to experts in particular industries. PG&E has identified no support for the conclusion that the Government must identify an expert in nuclear-related construction schedule and delay analysis. Indeed, case law would not support that conclusion. For example, in Rondout, although the defendant claimed that the plaintiff's expert could not testify concerning the project because he did not have experience in the cogeneration units at issue in that lawsuit, the district court rejected this approach as overly rigid:

> As [plaintiff's expert] concedes, in some limited respect, he may not be the quintessential expert in the narrow, esoteric field of developing cogeneration systems for school system. Yet, he does draw our attention to his overall experience with such principles, construction thereof, and the valuation of such types of systems. . . His education and experience are sufficient enough to provide an opinion in this case and, in our assessment, he is qualified to the extent of being able to educate a fact finder about such broad design, construction, maintenance, and economic principles and forces, and the interplay among these principles as they may be relevant to this case. . . As long as the expert has experience to support his opinion, explains how such experience leads to the expert's conclusion and demonstrates how the experience is reliably applied to the facts at hand, he should not be required to satisfy an overly narrow and rigid test in order to be considered an expert in a case such as this.

Rondout, 321 F.Supp.2d at 475. Mr. McGrath applied his knowledge and expertise in the field of schedule and delay analysis to PG&E's ISFSI projects. To the extent that PG&E believes a

lack of nuclear experience is relevant, it can elicit that upon cross-examination. Yet, Mr. McGrath's opinions are admissible because he is qualified as an expert in schedule and delay analysis and has applied his experience reliably to the facts of this case.

IV. MR. McGRATH'S TESTIMONY IS RELEVANT AND HELPFUL TO THE COURT

Throughout its brief, PG&E suggests that Mr. McGrath has nothing to offer this Court and that the analysis he has conducted could have been conducted by anyone. Pl. Br., 1, 4, 7, 11-12. PG&E asserts that Mr. McGrath's opinion is based upon nothing more than a review of the record. Moreover, because Mr. McGrath does not opine about the reasonableness of PG&E-caused delays, PG&E argues that his testimony must be excluded.[17] Id. As previously addressed, the assertion that the schedule and delay analysis that Mr. McGrath performed could have been performed by anyone is contradicted by the analysis that Mr. McGrath performed and by the expertise that he applied to his analysis. Mr. McGrath's knowledge of construction scheduling and delay is directly applicable to the dry fuel storage projects at Diablo Canyon and Humboldt Bay, to the Government's efforts to identify and allocate the causes and extent of particular delays in PG&E's construction projects, and to the Government's associated effort to identify and quantify millions of dollars in damages that PG&E, exercising any reasonable business judgment and taken appropriate affirmative steps to mitigate costs, should not have

[17] As the Court is aware, PG&E has moved to strike the three other Government expert witnesses upon the ground that they provided opinions that encroached upon the province of the Court. Based upon the breadth of PG&E's motions in limine and the inconsistencies in some of the arguments that it has made, we can only assume that, had Mr. McGrath opined upon the reasonableness of PG&E's conduct relating to the delays in the dry cask storage projects at Humboldt Bay and Diablo Canyon, PG&E would have moved to strike him upon the ground that reasonableness was a decision for the Court alone.

incurred. Mr. McGrath's ability to identify baseline and "as-built" schedules, his ability to identify the critical path activities within those schedules, and his ability to review the numerous revised schedules over the period of many years to determine the existence, nature, cause, and extent of any delays also will assist this Court in determining critical facts at issue in this case. See McGrath Dep., 38:15-39:1 (A9). All of these activities required Mr. McGrath to apply "skill or knowledge greater than the average layman." Betterbox Communications, 300 F.3d at 327-28.

In challenging the relevancy of Mr. McGrath's testimony, PG&E also complains that he failed to determine whether PG&E's conduct and the resulting delays were reasonable. Pl. Br., 35 (citing SMUD, 2006 WL 950218, at *51). PG&E asserts that, because Mr. McGrath has failed to provide specific opinions concerning the reasonableness of delays caused by PG&E, his testimony must be excluded because it is not relevant to any issues of the case. However, whether PG&E's conduct in delaying the construction of its ISFSIs by many years was reasonable is a legal issue for the Court to decide based upon the presentation of the factual evidence (of which Mr. McGrath's opinion is one part). Under FRE 702, it is axiomatic that an expert witness may not provide testimony upon legal issues before the Court because such testimony does not assist the trier of fact. "An expert's opinion on the ultimate legal conclusion is neither required nor indeed 'evidence' at all." Mendenhall v. Cedarapids, Inc., 5 F.3d 1557, 1574 (Fed. Cir. 1993) (citing Nutrition 21 v. United States, 930 F.2d 867, 871 n.2 (Fed. Cir.1991)); Christiansen v. City of Tulsa, 332 F.3d 1270, 1283 (10th Cir. 2003) ("[g]enerally, an expert may not state his or her opinion as to legal standards nor may he or she state legal conclusions drawn by applying the law to the facts").

Ultimately, the Court must determine, after reviewing all the facts and expert opinions regarding the construction of the ISFSIs at Diablo Canyon and Humboldt Bay, if PG&E properly mitigated its damages. See, e.g., Robinson v. United States, 305 F.3d 1330, 1333 (Fed. Cir. 2002) (quoting Restatement (Second) of Contracts § 350, cmt. b) (emphasis in original). Part of that determination involves determining if the substantial and costly delays upon those projects were reasonable. Mr. McGrath will provide expert analysis concerning the baseline and "as-built" schedules, the critical path activities, delays, and the root causes of those delays. However, it is within the purview of the Court to determine whether the delays were reasonable: that is, whether PG&E took the necessary steps to mitigate its damages, and if not mitigated, the manner in which PG&E's damages are affected. Mr. McGrath's testimony will assist in that ultimate effort.

## CONCLUSION

For the foregoing reasons, the Government respectfully requests that this Court deny PG&E's motion to exclude the testimony of John R. McGrath.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/ Harold D. Lester, Jr.
HAROLD D. LESTER, JR.
Assistant Director

OF COUNSEL:

JANE K. TAYLOR
Office of General Counsel
U.S. Department of Energy
1000 Independence Ave., S.W.
Washington, D.C. 20585

SCOTT R. DAMELIN
JOSHUA E. GARDNER
SHARON A. SNYDER
Civil Division
Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530

May 16, 2006

s/ John C. Ekman
JOHN C. EKMAN
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, NW
Washington, D.C. 20530
Tel: (202) 353-0897
Fax: (202) 307-2503

Attorneys for Defendant