# Appendix

1

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---------------------------------x

PACIFIC GAS & ELECTRIC )
COMPANY, ) No. 04-0074C into
Plaintiff, ) which has been
v. ) consolidated No.
UNITED STATES OF AMERICA, ) 04-075C
Defendant. ) (Judge Hewitt)

---------------------------------x

Deposition of JOHN R. MCGRATH
Washington, D.C.
Tuesday, March 14, 2006
9:35 a.m.

Job No.: 1-74325
Pages 1 - 192
Reported By: Joan V. Cain

2

Deposition of JOHN R. MCGRATH, held at the law offices of:

GREENBERG TRAURIG
Suite 500
800 Connecticut Avenue
Washington, D.C. 20006
(202) 331-3100

Pursuant to Notice, before Joan V. Cain, Certified Court Reporter and Notary Public in and for the District of Columbia.

3

A P P E A R A N C E S

ON BEHALF OF PLAINTIFF:
ROBERT L. SHAPIRO, ESQUIRE
GREENBERG TRAURIG, LLP
Suite 500
800 Connecticut Avenue, Northwest
Washington, D.C. 20006
Telephone: (202) 331-3100

ON BEHALF OF DEFENDANT:
SHARON A. SNYDER, ESQUIRE
UNITED STATES DEPARTMENT OF JUSTICE
CIVIL DIVISION
1100 L Street, Northwest
Washington, D.C. 20530
Telephone: (202) 307-0277

4

C O N T E N T S


| EXAMINATION OF JOHN R. MCGRATH | PAGE |
|---|---|
| By Mr. Shapiro | 5 |


E X H I B I T S

(Attached to the Transcript.)


| McGRATH DEPOSITION EXHIBITS | PAGE |
|---|---|
| 1 Schedule Analysis With Cover Letter, 2/6/06 | 7 |
| 2 PowerPoint Presentation, 4/14/99 | 87 |
| 3 PowerPoint Presentation, 4/14/99 | 94 |
| 4 PowerPoint Presentation, 4/22/99 | 101 |
| 5 PowerPoint Presentation, 4/22/99 | 101 |
| 6 ISFSI Project Charter Document | 120 |
| 7 Key Document Chronology | 186 |

PROCEEDINGS
JOHN R. McGRATH
having been sworn, testified as follows:
EXAMINATION BY COUNSEL FOR PLAINTIFF
BY MR. SHAPIRO:
Q Would you state your name for the record, please.
A **John R. McGrath, M-c-G-r-a-t-h.**
Q Mr. McGrath, what is your area of expertise that's pertinent to the opinions you're offering in this case?
A **Schedule and delay analysis.**
Q What's schedule and delay analysis?
A **What is it?**
Q Yes.
A **It's the analysis of, normally, a project schedule, which involves the interrelationships of activities which form together to make up a project schedule. And there's several different forms of schedule analysis or delay analysis. A delay analysis would be a comparison of an actual schedule versus a baseline or a planned schedule which would**



**identify the delays and variances between those two items.**
Q What makes you an expert in schedule and delay analysis?
A **Generally, my education and work experience.**
Q What about your education makes you an expert in scheduling delay analysis?
A **I have a bachelor of science in aerospace engineering, and an engineering degree allows me to understand the concepts -- technical concepts sometimes that are involved in forming a schedule, planning a schedule, or developing a schedule or analyzing a schedule.**
**And I have a master's in business administration, which covers a variety of the topics, obviously. But it primarily covers areas like project management and industrial engineering, which is managing projects, managing business units, and things that involve schedules as an integral part of either operating a company or operating or managing a particular project.**



Q What about your work history makes you an expert in schedule and delay analysis?
A **Well, generally, I've been working with schedules since I started work at McDonnell Douglas in 1988 developing schedules, managing schedules, creating inputs to schedules, and, you know, operating the portions of my responsibilities on the project and operating to a schedule.**
**And since 1992, I've been analyzing schedules in a consulting capacity, both forensically and prospectively in different capacities.**
MR. SHAPIRO: Mark this as Exhibit 1.
(McGrath Deposition Exhibit 1 was marked for identification and was attached to the deposition transcript.)
BY MR. SHAPIRO:
Q Mr. McGrath, you've been handed what's been marked as Exhibit 1 to your deposition. Would you tell us what it is, please.
A **This is the expert report I prepared in this matter, the PG&E matter, which has a cover**



**letter attached from the Department of Justice, a 28-page report, and exhibits in Attachment 1, which is my CV.**
Q Let me address your attention to Attachment 1 for a moment. The information contained in your CV, is that still correct and up to date?
A **I believe so, yes.**
Q In looking at your work experience, none of that has been for an electric utility, has it?
A **On page 1 of my CV or in --**
Q Well, I'm asking in general about your work history. Has any of it been for an electric utility?
A **Not -- only in a consulting capacity on a previous engagement regarding electric utility, not -- no personal experience working for an electric utility.**
Q That prior engagement was the work for the Department of Justice in the SMUD case?
A **That's correct.**
Q None of your prior work history has been in

9

the nuclear industry, has it?
A Personally, no.
Q Let me ask about your work at McDonnell Douglas. That work did not involve electric generation issues, did it?
A No.
Q And your work at McDonnell Douglas did not involve nuclear issues, did it?
A No.
Q Your work at Barrington, that did not involve electric generation issues, did it?
A My personal work was as a schedule analyst for Barrington, not -- I don't recall working on any electric generation projects during that time.
Q And your work at Barrington did not involve any work with the nuclear industry, did it?
A No.
Q You have an engineering degree, but you're not a professional engineer, are you?
A I'm not.
Q And you're not a certified public accountant?

10

A That's correct.
Q And you're not a certified managerial accountant?
A That's correct.
Q Do you have any certification from Construction Management Association?
A No.
Q Do you have any certification from an organization dealing with construction scheduling and delays?
A No.
Q Do you have any sort of credential attesting to your expertise in scheduling -- schedule and delay analysis?
A I'm a member of the Project Management Institute and the American Institute of Aeronautics and Astronautics, and my work experience in -- stands as my best credential for those qualifications.
Q What's the Project Management Institute?
A It's a -- it's a society of professionals in project management fields. It's a trade

11

association, if you will, that -- they govern -- they do credential and certification programs for people in the project management industry.
Q Are you certified by that organization?
A No.
Q Have you ever sought certification by the Project Management Institute?
A No.
Q Why not?
A I don't have one clear reason, sitting here right now, that I recall. It hasn't been a priority for me.
Q Do you consider schedule and delay analysis to be a recognized field of expertise?
A Yes.
Q Who recognizes schedule and delay analysis to be a recognized area of expertise?
A The industries that I work in: the government contract industries, the construction industries, the court system, I believe -- the federal court system, the various adjudication venues, courts and hearing boards. I don't have a

12

good word for that but the litigation field.
Q Is there a particular organization that schedule and delay analysis experts tend to be members of?
A I don't think there's one -- particular one. There are several that are prominent such as the Project Management Institute.
Q Is there a particular publication or publications that experts in the field of schedule and delay analysis tend to read, follow, publish articles in?
A PMI, the Project Management Institute, publishes a magazine which would probably qualify as a response to your question. And I'm sure there are others. I can't think of one right now.
Q Are there any recognized treatises in the field of schedule and delay analysis?
A There are many publications and historical articles, books, you know, many things. I would have to -- you'd have to qualify the term "recognized."
Q Well, can you think of any particular book

13

that you would cite as the bible of schedule and delay analysis?
A There's several books on critical path methodology scheduling, scheduling techniques, publications by major software, publishers of scheduling software. I can't think of one single book or such at this time.
Q Why did you leave Barrington Consulting?
A I left Barrington for no one specific reason, just personal reasons. And at the time, Barrington was being acquired by Navigant Consulting. And for me, it was a good time to change. I wanted to move back to Colorado where my family was, and Barrington did not have an office in Denver.
So a combination of personal reasons, primarily. Nothing against Barrington or Navigant. It was just a personal move.
Q What percentage of your work at Contract Solutions has been for the federal government?
A It varies by time period.

14

Q Overall, how long have you been at Contract Solutions?
A Six years.
Q And over that six-year period, what percentage of your work has been for the government -- federal government?
A My personal work?
Q Yes.
A More than 50 percent. Slightly more, probably. I would have to estimate, obviously, but maybe 60 percent.
Q And as a firm, what percentage of Contract Solutions' business has been for the federal government over that same period?
A Again, I'd have to estimate, but I would put it somewhere around -- not the same, probably slightly more than half of federal government work and the other half private industry, the other 40 percent or so.
Q What about in the last three years, what percentage of your personal work has been for the federal government?

15

A I'd probably put it close to 50/50. Fifty percent.
Q And what percentage of Contract Solutions' work has been for the federal government over the past three years?
A Estimating, again, probably 60 percent.
Q Other than the -- your work on the SMUD case which you mentioned a few minutes ago, you have not had any consulting experience with the electric utility industry, have you?
A That's correct.
Q And other than the SMUD case, you have not had any consulting experience with the nuclear industry, have you?
A I have -- I have worked on one other case related to the nuclear industry. It was a decontamination and decommissioning project of a uranium enrichment facility.
Q Which facility is that?
A It's called the East Tennessee Technology Park in Oak Ridge, Tennessee.
Q You have never authored any publication

16

addressing the electric utility industry?
A That's correct.
Q You've never authored any publication addressing the nuclear industry?
A That's correct.
Q Let me ask you a few questions about your work in the SMUD case. How would you characterize what you did in the SMUD case?
A I wrote an expert report which put forth my opinions on the schedule and delay analysis of the -- of SMUD's project to implement dry storage at their Rancho Seco facility in California. That was the product I produced.
I'd characterize my work as a review of the project records and project data and the contemporaneous records to analyze all the issues related to the scheduling of their dry cask storage project, which included a delay analysis.
Q What were your conclusions in the SMUD case?
A Well, I had several. I'd have to ask you to be a little more specific as to which

conclusions.
Q The conclusions you reached in the SMUD case about the schedule for implementation of SMUD's ISFSI project.
A There were several years of delay in the implementation of the Rancho Seco dry cask storage project when you compared the actual schedule of work to the original contract schedule that was in place. And those delays had a variety of root causes, and those were my primary opinions.
Q About how many hours did you spend working on the SMUD case?
A I'd have to estimate because I don't know the number, if that's okay. And -- probably somewhere around 300 hours.
Q Let me switch subjects again and ask you a few questions about schedule and delay analysis.
What is the purpose of schedule and delay analysis?
A It could have several purposes. It frequently has the purpose of project management. And the primary role in analyzing the schedule is to



use that schedule to manage a project and to make sure that you're working on the activities that are critical to the timely completion of the project. Time is of the essence. And managing the schedule allows you to apply the resources in the correct areas and make sure the work is being done in a most efficient manner to save money, to save time.
You frequently use schedule analysis to analyze changes or impacts to a schedule that were unforeseen at the time of planning a project, for example. So it's useful in analyzing change orders or contractual changes to a project that have changed the scope in some manner and identifying what impacts those changes or those change orders would have on the project schedule, so you can accommodate a modification to the contract if you need to or a modification to the schedule or a replan.
And then it's also useful forensically to look back at the prosecution of work on a particular project to identify how efficient a project was compared to an original plan or compared to some



other baseline.
Q What do you mean when you say you compare the efficiency, I think was the word you used, of the project prosecution to a baseline?
A I mean, the ability of the entity to meet the projections in their schedule, to meet their activity duration, and to meet their milestone commitments as planned.
Q So when you use the term "efficiency" in this context, you're not referring at all to the level of resources being devoted by the organization prosecuting the schedule?
A Resources used could be a part of that. I wasn't using the term "efficiency" as the term of art in my last response. I was just using it as the general term to describe the way a schedule was actually -- the way a section of work was actually performed versus how it was planned to be performed.
Q Well, that's something I want to make sure I understand. When you're doing the comparison of a baseline schedule to the actual performance, are you looking at any aspect of actual performance other



than the extent to which it met that baseline schedule?
A Well, I certainly looked at the reasons why it did or did not meet, you know, whether it surpassed or exceeded their original plans or, you know, whether they bettered their original plans and the reasons for that. And those reasons could include resource allocations or other events or outside events, internal events, actions, or inactions that caused those variances to exist.
Q How do you perform a schedule and delay analysis?
A General -- well, every project is unique, obviously, but generally, the steps you would take are to identify the baseline schedule or planned schedule and then identify or establish the as-built schedule or the actual schedule of work and then conduct a comparison of the actual work to the planned work using critical path methodology.
In other words, focusing on the milestones and events that were ultimately responsible for the duration of the project and comparing those to the

21

planned baseline activities for those events and then analyzing those variances for root causes and descriptions to illustrate the reasons for the delays or accelerations or periods of recovery that you may have.

Q You've referred to something called "critical path methodology." What's critical path methodology?

A Critical path methodology is the methodology, a schedule analysis methodology and schedule management methodology, which allocates logical relationships or assigns logical relationships between activities as well as durations for activities into the schedule. And it can tell you the interrelationships between the activities within a project schedule, which then you can use to evaluate different aspects of the schedule such as when will the project complete and when would it complete if you changed certain parameters and things like that.

Q In a field such as the one you're examining in this case in an aspect of construction for a

22

nuclear power plant which you are not necessarily expert, how do you go about identifying the critical path of that project?

MS. SNYDER: Objection.

Go ahead.

A The first step would be to identify a schedule, and each schedule can have a critical path if it's a logic-driven schedule. And obviously, to develop the as-built schedule for a project such as this, there's a lot of documentation that you have to review and develop an as-built schedule, sometimes called a take-off or some kind of accounting of all the work done in various different areas over a period of time.

The critical path of that schedule is the longest path within that activity chain which ultimately determines the total length of the project. And the critical path is determined by testing the schedule for certain logical relationships between activities.

Obviously, the project documentation accounts for what the controlling activities are at

23

certain times, and you know, you can perform certa' tests on the schedule to identify which activities are critical within that schedule.

BY MR. SHAPIRO:

Q What kind of tests do you perform?

A You look at the -- you can run the activity schedule from the end of the project back to the beginning or from the beginning through the end to determine which activities ultimately determine the last milestone, project completion milestone, and then, looking backward from that activity, which activities prevented that activity from starting earlier or caused that activity to start later than it actually did and then identify those activities and keep working backwards to the beginning of the project.

And in the alternative, working forward, you start at the beginning of the project and identify the activities that were actually performed first and which activities -- those activities were predecessors to and controlled their start dates and then the duration of those activities and working

24

forward to the end of the project to ultimately determine what the critical path of the project was.

Q When a field such as, again, nuclear facility construction, which you don't have actual experience or education or training on how that field works, how do you go about understanding the logical relationship of that construction project to enable you to create a critical path for that project?

A Primarily, through the project records, the personnel involved in the project that creates the schedules, that create the logic, that actually perform the work in the sequence that they do perform the work.

Q So in essence, you're relying on the documentation created by those that are experts in the construction of a nuclear facility from which you make your judgments as to what parts of the project are critical or not?

MS. SNYDER: Objection, calls for speculation.

Go ahead.

A In essence, I do rely extensively on the project documentation and the actual contemporaneous documents produced by the people scheduling and working the project.
BY MR. SHAPIRO:
Q So in essence, the schedule and delay analysis is comparing a baseline projected schedule to the actual experience of an organization performing that project?
A In regards to the PG&E case or in general?
Q In general.
A Well, that could be one aspect of schedule analysis in general. As I mentioned earlier, there's several -- there can be several reasons you'd utilize a schedule analysis but --
Q What about in the PG&E case?
A In this case, that's essentially the analysis that I performed.
Q And to the extent an event takes longer than was forecast in the initial schedule, you don't have any means of determining whether the initial projection was too optimistic or the implementation



of the project was too slow, do you?
A Well, a determination of whether the actual performance was too slow would be made by the comparison of the two activities or events and it would depend on the actual circumstances versus the planned. As far as the planned schedule being too "optimistic" -- I think is the term you used -- it would depend on the circumstances of the plan.
Q I'm not sure I understood your last answer. Let me just come up with a very simple hypothetical. Let's say you look at an initial forecast that says an event's supposed to take a year to complete. In actual experience, the event took two years to complete. Do you have any means of judging whether that extra year was the result of performance that was inadequate in some way as opposed to a forecasted schedule that was unrealistic or too optimistic?
MS. SNYDER: Objection, vague. Ambiguous. Incomplete hypothetical.
A Okay. I think I can -- I think I understand your question in a couple parts. First,



the hypothetical situation where the activity was planned to take one year, I would certainly look to the surrounding evidence, the schedule produced before or after that schedule, the circumstances that went into the production of that -- of the development of that particular schedule to determine whether or not there was a concern about the reasonableness of that schedule, whether it was factually or logically inadequate in some way patently and, you know, to resolve concerns about the quality of that schedule first.
The second part about -- if the actual -- hypothetically, if the actual activity took an additional year, I -- having satisfied myself of the reasonableness of the baseline in that particular case, I would look to the contemporaneous evidence as to the reasons for that delay, the reasons for that variance in actual versus planned and I would use the evidence that exists to determine the reasons for the variance if it was not due to the fact that the original plan was -- was unreasonable.
It could be that the variance was



completely due to an unreasonable plan. It could be that the plan was very reasonable and the variance was due to actions or activities that happened in the performance of the actual part of that schedule.
BY MR. SHAPIRO:
Q Now, in this case, in PG&E's case, you did not set out to determine whether the initial forecasted baseline schedule that you used was reasonable or not, did you?
A I did review -- I did review that topic on that schedule.
Q Can you point to me in your expert witness report where you analyzed whether the initial forecasted schedule was reasonable or not?
A I will check if there's something in there about that.
On page 8, Bates PXE 0100011, in the first sentence of that first paragraph, I characterize the planned schedule in the first sentence. I determine that the schedules produced on or about April 1999 are a reasonable benchmark for measuring progress and delay in the implementation of dry storage at

**Humboldt Bay Power Plant and Diablo Canyon Power Plant.**

Q So you're saying you have the expertise to make a judgment as to how long it should take to construct a dry storage facility at a nuclear power plant?

**A No, I'm not saying that. I'm saying that I reviewed the contemporaneous evidence at the time and rely on the schedules produced by the personnel at PG&E as a reasonable benchmark for the planned duration of this project, these projects.**

Q So you don't have the expertise to make a judgment as to how long it should take to construct a dry storage facility at a nuclear power plant?

**A I possibly have expertise to do that. If I was tasked with actually developing the schedule for this project or another project, I would develop that schedule using my scheduling expertise. I would also, of course, gather many inputs from many qualified people on the actual data and assumptions and everything else that would go into the creation of that schedule, but I did not create the baseline**



**schedule in this project.**

Q Well, absent input from knowledgeable and expert individuals, you wouldn't yourself have the means of putting together the various inputs into a complete schedule for constructing a dry storage facility at a nuclear power plant, would you?

MS. SNYDER: Objection, mischaracterizes his testimony.

**A Are you asking me as a hypothetical?**

**BY MR. SHAPIRO:**

Q Yes.

**A It wouldn't be unusual for me to be asked to develop a schedule. If I was, you know, hired by a nuclear utility for that purpose, I would set about doing that and I would use various resources to perform that analysis and to actually develop that schedule.**

**Sitting here right now, I'm not exactly -- sure exactly what I would do, but it's -- that is something that I would be qualified to do if asked to do so, given the right resources and support to accomplish that.**



Q Let's turn to page 10 of your expert witness report. Do you see at the top there at page 10 of your report there's an Exhibit A? Exhibit A lists the milestones that you've identified for development of dry storage facilities at PG&E's nuclear power plants.

**A I see the chart. The Exhibit A reference is actually referring to the graphic in the back of the report, and the chart on top of page 10 is essentially a tabular format of that graphic.**

Q So page -- the chart at the top of page 10 reflects milestones for the development of dry storage facilities at PG&E's nuclear power plants?

**A Yes.**

Q Now, you yourself don't know how long it should take to select a cask vendor for a dry storage facility, do you?

**A Not necessarily. I rely on the documents produced by PG&E that identified those durations.**

Q The next milestone listed in your chart is submitting a license application under 10 CFR Part 72, correct?



**A Correct.**

Q You yourself don't have the expertise sufficient to determine how long it should take to develop a license application under 10 CFR Part 72, do you?

**A No. Again, I relied on the documents that PG&E produced and developed that estimated that activity and its duration.**

Q The next milestone listed is getting a license granted under 10 CFR Part 72, correct?

**A Yes.**

Q You yourself don't have the expertise to judge how long one should expect for the actual grant of a license under 10 CFR Part 72, correct?

**A Correct. I used the PG&E estimates and the NRC inputs that they considered to determine the duration of that activity.**

Q And once licenses are granted, you don't have expertise to determine yourself how long it should take to actually construct the dry storage facility, do you?

**A I didn't develop that part of the schedule.**

documents to actual experience as reflected in documents?

MS. SNYDER: Objection, asked and answered.

A I could go through the report with you and possibly identify things that may be responsive to that. I would hope that common sense is the prevailing theme in the analysis that I have done. So I agree with you that it's important and the prevailing theme in the type of work I do, but I'm not sure I can -- I'm not sure exactly what you're looking for as far as my response.

BY MR. SHAPIRO:

Q Well, you didn't, at least in PG&E's case, apply any specialized knowledge or skill, did you, to reach your conclusions? You only used that common sense, correct?

MS. SNYDER: Objection, asked and answered.

A Well, common sense is part of what I used, of course, but my scheduling expertise is really what I used to perform the analysis, to perform each of the steps of the analysis and develop the opinions that are presented in the report.



It's a schedule analysis and a delay analysis, which, in my opinion, does take some training and some experience and some education to perform. It's certainly -- the foundation of scheduling is certainly logic-driven and it's -- in that regard is -- you know, it should make sense and it should make common sense when it's presented correctly.

BY MR. SHAPIRO:

Q Why couldn't the Court itself look at the same documents that you looked at and compare an initial forecasted schedule to the actual experience at a later time and compare how those two differ?

A I presume the Court could do that at some level and perhaps will. And the usefulness of my analysis in that regard would be to, you know, do a lot of the legwork and roll up my sleeves, if you will, and perform the document review and the collation of documents and sifting and sorting of different types of evidence to put everything together into a package. I had a database of over 33,000 documents to review as part of my work in



preparing this report.

So I don't disagree that the Court could do that in some respects. I'm presenting that -- the analysis and the support for that analysis in some respects so that a third party or some other party can do that.

Q Well, now that you've sifted through the documents, couldn't the government's counsel that you're working with simply present the documents that you've determined are the relevant documents and offer those to the Court for the Court to simply compare the forecasted schedule to the actual experience?

A I can't speculate on what the government's counsel will or will not do.

Q I'm asking as a theoretical matter. Wouldn't that work? Couldn't the government counsel simply take the documents that you've identified as reflecting a forecasted schedule and an actual experience schedule and offer those to the court for the Court to compare the dates on the two documents?

MS. SNYDER: Objection, asked and answered



Calls for speculation.

A Theoretically, I'm sure that they could -- the government's counsel could do that.

BY MR. SHAPIRO:

Q And if the government's counsel did that, then the Court could adequately compare the forecasted schedule to the -- to the actual experience to see the variances, correct?

MS. SNYDER: Objection, asked and answered. Calls for speculation.

A That is correct. In my opinion, that would not give you -- wouldn't be that illuminating as to any of the detail beneath that high-level comparison. But the comparison in that manner certainly could be done, and theoretically anyone could do that.

BY MR. SHAPIRO:

Q What's the detail that you feel would be missing from that comparison?

A Well, the detail is what's in my report as far as illustrating the reasons and the causes for the variances that are identified in the scheduling.