# APPENDIX

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - - - - x

YANKEE ATOMIC ELECTRIC COMPANY :
(98-126C)(Merow, S.J.) :
CONNECTICUT YANKEE ATOMIC POWER COMPANY :
(98-154C)(Merow, S.J.) :
MAINE YANKEE ATOMIC POWER COMPANY :
(98-474C)(Merow, S.J.) :
Plaintiffs, :
v. :
THE UNITED STATES, :
Defendant. :

- - - - - - - - - - - - - - - - - - - - x

Washington, D.C.
Wednesday, May 22, 2002

Continued deposition of THOMAS POLLOG, a witness herein, called for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to agreement, the witness having been previously duly, taken at the offices of Spriggs & Hollingsworth, 1350 I Street, N.W., Washington, D.C., 20005-3305, at 9:40 a.m., Wednesday, May 22, 2002, and the proceedings being taken down by Stenotype by JAN A. WILLIAMS, RPR, and transcribed under her direction.

Page 591

A. It's a timing issue. And again it comes down largely to budget. If we had unlimited resources in the initial years of operation of a repository, we could handle both wet and dry, failed, unfailed material, then there probably wouldn't be a problem.
But, if our budget is limited and we have to streamline our operations to only accept a certain amount of materials in the early years, then there can be a delay and we push this material possibly back to later in the acceptance period.
Q. Would that delay in acceptance reduce the exposures, the worker dose levels, that type of thing?
A. Potentially.
Q. Are you unsure about that?
A. No. It could have -- again there's trade-offs. The longer you wait for the material, the less radioactive material is there because it's encased. That's the good. But the bad is, the longer you wait, the material if it's degraded may degrade further. So it may be in worse shape when you actually receive it and more prone to dispersion.
Q. Now, on page 2-5 it talks in the next paragraph, it's a little 2, it says spent SNF

Page 592

assemblies that fall within the class F-1 and F-2 definitions set forth above could also be accepted on the same scheduling basis as standard fuel assemblies provided they're encapsulated in cans meeting the recommended requirements in appendix C. Do you have an understanding of what the class F-1 and F-2 definitions are?
A. Yes.
Q. Are those the ones provided in the contract?
A. Appendix E of the contract, yes.
Q. If you would take a look at appendix C to this report, the specifications. It has a Bates number of HQR 034-1146. Now, in view of that paragraph little 2 on page 2-5, Bates No. HQR 034-1044, did you understand the authors of this report to be saying that, if the failed fuel class F-1 and class F-2 failed fuel was encapsulated in canisters meeting the recommended requirements here in appendix C, that that failed fuel could be accepted on the same scheduling basis as standard fuel?
MR. CRAWFORD: Objection, best evidence.
THE WITNESS: Yes, I believe that's what the author intended.

Page 593

BY MR. SKALABAN:
Q. Did you disagree with this when you -- with that little paragraph 2 when you received this report, do you recall having any disagreement with that conclusion?
MR. CRAWFORD: Objection to the extent it assumes facts not in evidence.
THE WITNESS: I don't recall what my reaction was to this report.
BY MR. SKALABAN:
Q. Now, does appendix C appear to be specifications for canisters of failed fuel?
MR. CRAWFORD: Objection, best evidence.
THE WITNESS: I'm sorry, I didn't hear what word you said, did you say specification?
BY MR. SKALABAN:
Q. Specifications or criteria for canisters for use in connection with failed fuel acceptance.
MR. CRAWFORD: Objection, vague, compound.
THE WITNESS: Yes.
BY MR. SKALABAN:
Q. Do you know what DOE did with these criteria that's here in appendix C?
MR. CRAWFORD: Objection, vague.
THE WITNESS: Not specifically.

Page 594

MR. SKALABAN:
Q. Do you have any general understanding of what happened with these criteria?
MR. CRAWFORD: Objection, asked and answered; objection to the extent it calls for speculation.
THE WITNESS: I don't have any specific recollection of what we did with this. However, I mean I could imagine what we may have done with reports like this that we typically received from contractors.
BY MR. SKALABAN:
Q. Which is what?
A. Probably we would review it in-house, possibly send it out to other interested parts of the RW organization for review, possibly solicit comments, possibly meet with the author to discuss it, get comments.
Q. Do you remember meeting with anyone at Oak Ridge or Martin Marietta regarding this report at all?
A. I know -- I can recall of no specific meeting with anyone from Oak Ridge or Martin Marietta about this report.
Q. And for the record would you explain what

the relationship of Oak Ridge or Martin Marietta was to the program at this time?
A. Yes, they were one of our contractors.
Q. And Martin Marietta was a contractor who operated Oak Ridge National Laboratory?
A. I believe that's correct.
Q. And Oak Ridge is a DOE laboratory?
A. Yes.
Q. It says, if you look at Bates page 1030, that's HQR 034-1030, it says prepared by E.R. Johnson. It also indicates it's prepared by Oak Ridge National Labs.
MR. CRAWFORD: Well, it says it's prepared for Oak Ridge which is also described in the forward.
BY MR. SKALABAN:
Q. Okay. What was E.R. Johnson's relationship to the program?
MR. CRAWFORD: Objection, asked and answered.
THE WITNESS: He had several. He was a direct contractor to the waste acceptance team at that point in time. And he was also a subcontractor to at least shown by here Oak Ridge National Lab, Martin Marietta, and he may have been to other organizations, but I am not aware of that at any



time. But it wouldn't surprise me.
BY MR. SKALABAN:
Q. Who are your main contacts, and again I'm asking about this general time frame, '90, '91, who were your main contacts at E.R. Johnson that you worked with?
MR. CRAWFORD: Objection, asked and answered.
THE WITNESS: Billy Cole which was the main contact. Minor contacts would have been E.R. Johnson, Barry McLeod. I believe that was it. Possibly Bill Teer, but I'm not sure when he came on board. It was somewhere in the latter part of my time with waste acceptance in the '90, '91, time period.
BY MR. SKALABAN:
Q. I want to make sure I just understand what you just said. Mr. Teer used to work for E.R. Johnson and then joined RW at some point?
A. No.
Q. Okay.
A. Mr. Teer was with another company, I believe TN, and came to E.R. Johnson in the latter part of that '90, '91, time period, when I was working on waste acceptance.



Q. Now, turning back to the external distribution list of DOE, there's a list of people here on Bates No. HQR 34-1154. And the specific names begin with Mr. Barrett. Do you remember out of this list, was there anyone in particular who was -- any of these people at RW in particular had sort of an expertise or was a lead in considering failed fuel issues?
MR. CRAWFORD: Objection, vague.
THE WITNESS: No.
BY MR. SKALABAN:
Q. Do you have any recollection of who would have been the point person at DOE for reviewing this report, addressing this report, and/or doing something with this report?
MR. CRAWFORD: Objection, vague, compound.
THE WITNESS: My guess is Mr. Brownstein.
BY MR. SKALABAN:
Q. I want to make sure I understand your prior testimony correctly. The conclusion that's reflected in little 2 on page 2-5, HQR 034-1044, you don't remember any conversations with anyone at DOE or at the contractor regarding the conclusions set forth in this paragraph?
A. You're on paragraph 2 now on page 2-5?



Q. Yes.
A. Not in the context of reviewing this report.
Q. How about outside the context of reviewing this report?
A. I believe --
MR. CRAWFORD: Objection, vague.
THE WITNESS: -- we probably had conversations in general about that, the waste acceptance group -- excuse me. It was logistics and utility interface group at that time, the predecessor to the waste acceptance.
BY MR. SKALABAN:
Q. Talking about accepting failed fuel that's canisterized to a particular spec on the same schedule as standard fuel?
A. Yes.
Q. And do you recall what the opinions of your colleagues were in the utility interface and logistics group?
MR. CRAWFORD: Objection, asked and answered.
THE WITNESS: Generally speaking, yes.
BY MR. SKALABAN:
Q. And what were they?

CONDENSED TRANSCRIPT

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

YANKEE ATOMIC ELECTRIC COMPANY,

Plaintiff,

vs. No. 98-126C, 98-145C, 98-474C

UNITED STATES OF AMERICA,

Defendant.

---

DEPOSITION OF DARRELL NEWMAN
Taken on behalf of the Plaintiff
April 17, 2002

\- - -

BE IT REMEMBERED THAT, pursuant to the Washington Rules of Civil Procedure, the deposition of Darrell Newman was taken before Marta M. Rice, a Certified Shorthand Reporter, and a Notary Public for the State of Washington, on April 17, 2002, commencing at the hour of 10:20 a.m., the proceedings being reported at the Hampton Inn, 486 Bradley Boulevard, Richland, Washington.

**NAEGELI REPORTING CORPORATION**

Portland, OR
(503) 227-1544

Spokane, WA
(509) 838-6000

Seattle, WA
(206) 622-3376

Coeur d'Alene, ID
(208) 667-1163

National: (800) 528-3335

www.naegelireporting.com

Fax: (503) 227-7123

Corporate Office: 2020 US Bancorp Tower, 111 S.W. Fifth Avenue, Portland, OR 97204

and then I transferred to the reactor physics department and performed reactor experiments with test reactors for the next ten years or so.
Q. And what type of reactor experiments were you doing at that time?
A. I was doing reactor experiments to determine the neutron multiplication factor in various reactor lattices in various configurations so that theoretical physicists could verify their models.
Q. And you were doing that from approximately what time period?
A. From, say, 1967 through 1975 or '76, something like that.
Q. Now, did any of that work involve spent nuclear fuel at all?
A. Not up to that point. Around 1974 I started working with spent nuclear fuel.
Q. And in 1974 when you began to work with spent nuclear fuel, what were you doing, sir?
A. I was doing some gamma scanning of spent fuel assemblies in pool site examinations at various reactors.
Q. What reactors?
A. Yankee Row was one of them, Oyster



Creek, Big Rock Point, and several others. I don't recall, off the top of my head, but they were the commercial nuclear power plants.
Q. So were they commercial nuclear power plants? You just mentioned, I believe, three of them. Did they hire Battelle to do this service?
A. Battelle had a contract with the Exxon Nuclear Company to provide technical services and research and development. And this was a part of this private contract that Battelle had with Exxon Nuclear that I conducted these services for them.
Q. About what period of time were you working on that?
A. I did that until about, let's see, probably about 1978. Between '74 and '78 I would say.
Q. And what was the purpose of the gamma scanning?
A. The purpose was to determine the condition of fuel after it's been irradiated in the reactor and to determine if there are any failures in the fuel cladding. At that time there was a problem with fuel densifying, and



the cladding would neck down in certain areas and would be potentials for fuel failure, if they were continued to operate in a reactor. And we solved those problems over that period of time. And so that's no longer a problem.
Q. And what would happen? Did you find -- in some of these plants, did you find fuel that was failing or subject to this problem?
A. Yes. We found some fuel that was -- either had failed or had incipient failures that would -- or failures would occur if the fuel was continued to operate for additional periods.
Q. And where would the issues with the fuel arise? Would it be on the fuel rod cladding or where was the --
A. It was on the fuel rod cladding. In areas where the stack of fuel pellets had densified, some of them would move downward as the stack shortened. And if a pellet was cocked above it in the cladding where it couldn't move down, then you would have a void space in the cladding. Where it's under high pressure in the reactor, that cladding could neck down and cause the cladding to be weakened.
Q. I see. And what would happen with the



fuel rods in question where this densification would occur?
A. Well, if the fuel rods did actually fail, the cladding in the reactor, some of the radioactive products inside the fuel would get out into the water coolant, and that would contaminate the water coolant. And that system, then, would have to be cleaned up. And that would have been an expense for the utility and cause some down time.
Q. And what would happen to the fuel rods which had some sort of failure?
A. The failed rods could be pulled out of the fuel bundles and be replaced with either dummies or replacement fuel rods.
Q. So if I'm correct, that takes us up time wise approximately -- you were working on that from around '74 to '78?
A. Yeah, something like that.
Q. Did you do anything in that time period with spent fuel?
A. Not in that time period. It was just basically doing pool site examinations of spent fuel.
Q. How would you actually do the scanning?



NAEGELI REPORTING CORPORATION
Portland, OR (503) 227-1544
Seattle, WA (206) 622-3376
Spokane, WA (509) 838-6000
Coeur d'Alene, ID (208) 667-1163
Phone: (800) 528-3335 www.naegelireporting.com Fax: (503) 227-7123
Corporate Office: 2020 US Bancorp Tower, 111 S.W. Fifth Avenue, Portland, OR 97204

Q. Thank you. And if I ask you a question and you provide an answer, and later on in the course of the deposition you realize that your answer is incomplete or inaccurate in some way, can you let me know so that we can correct things?
A. Yes, that will work.
Q. Where were you born Mr. Newman?
A. I was born in Fort Knox, Kentucky.
Q. And where did you grow up?
A. I grew up in the state of Kansas.
Q. And where did you go to college, Mr. Newman?
A. I went to college at Kansas State University in Manhattan, Kansas. And the University of Washington in Seattle.
Q. Did you get your BA from which of those institutions?
A. I got my bachelor of science in nuclear engineering from Kansas State and master of science in nuclear engineering from the University of Washington.
Q. Did you have any minors in college?
A. Minor in chemical engineering at Kansas State.



Q. What was the first job you took after graduating from college?
A. I took a job with the General Electric Company here at Hanford as an engineer in external radiological physics.
Q. And what year was that?
A. 1963.
Q. And what were your duties and responsibilities for General Electric?
A. I was doing research and development on film badge dosimeters (Phonetic) that we were upgrading here at the Hanford site.
Q. And can you tell me what a film badge dosimeter is?
A. Film badge dosimeter is the device that you wear on your pocket to measure the amount of external radiation that your body is exposed to.
Q. And how long did you work in that position?
A. I worked for about four or five months, before I was called into active duty in the U. S. Army.
Q. And what did you do while you were in the army?



A. I was second lieutenant in the ordinance corps at Aberdeen Proving Grounds, Maryland.
Q. How long were you there, sir?
A. I was there for about six months, before I was transferred to Fort Riley, Kansas.
Q. And what did you do at Fort Riley?
A. Fort Riley I was a company commander of an ordinance company in the first infantry division.
Q. And after that what did you do?
A. I was discharged from the army in the summer of 1965, and I returned to Hanford, to the Hanford laboratories which then came under the operation of Battelle.
Q. Do you have an understanding of why the transfer from GE to Battelle?
A. GE lost the contract for the Hanford laboratories under the Atomic Energy Commission's prime contract, but the labs were put up for bid, and Battelle won the bid to operate the laboratory for the Atomic Energy Commission at that time.
Q. And what does Battelle do at the Hanford labs generally?
A. Battelle operates the Pacific Northwest



Laboratory. It's now the Pacific Northwest National Laboratory. But at the time, it didn't have the national designation. But they -- the laboratory performed research and development for now the Department of Energy and it's predecessors, which were the Energy Research and Development Administration and the Atomic Energy Commission.
Q. So when you returned in the summer of '95 to Hanford --
A. '65.
Q. Oh, I'm sorry. Thank you for correcting me. In the summer of 1965 to Hanford, you were working for Battelle?
A. I was working for Battelle.
Q. And what was your position at Battelle?
A. I was an engineer at the plutonium critical mass laboratory.
Q. What did you do at that laboratory, sir?
A. I did experiments with plutonium in various forms to determine how much mass it took to make it critical assembly.
Q. And how long did you work on that project?
A. I worked on that for a couple of years,

227

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
----------------- x
YANKEE ATOMIC ELECTRIC COMPANY; : Case Nos. 98-126C,
CONNECTICUT YANKEE ATOMIC POWER : 98-154C, 98-474C,
COMPANY; MAINE YANKEE ATOMIC : 98-483C, 98-484C,
POWER COMPANY; FLORIDA POWER & : 98-485C, 98-486C,
LIGHT COMPANY; NORTHERN STATES : 98-488C, 98-614C,
POWER COMPANY; DUKE POWER, a : 98-621C, 99-447C,
Division of DUKE ENERGY CORP.; : 00-440C, 00-695C,
INDIANA MICHIGAN POWER COMPANY; : 00-703C, 01-115C,
SACRAMENTO MUNICIPAL UTILITY : 01-116C, 01-249C
----------------- X
(Caption continued on the next page)

Continued Deposition of DAVID ZABRANSKY
Washington, D.C.
Thursday, April 18, 2002
9:44 a.m.

Job No.: 112597-2
Pages 227 through 459, Volume 2
Reported by: Diane Gomez, RPR

228

DISTRICT; SOUTHERN NUCLEAR :
OPERATING COMPANY, et al.; :
COMMONWEALTH EDISON COMPANY; :
BOSTON EDISON COMPANY; GPU :
NUCLEAR, INCORPORATED; WISCONSIN :
ELECTRIC POWER COMPANY; POWER :
AUTHORITY OF THE STATE OF NEW :
YORK; OMAHA PUBLIC POWER DISTRICT;:
NEBRASKA PUBLIC POWER DISTRICT; :
and TENNESSEE VALLEY AUTHORITY, :
Plaintiffs :
v. :
THE UNITED STATES, :
Defendant :
----------------- X

229

Continued Deposition of DAVID ZABRANSKY, held at the offices of:

ARNOLD & PORTER
555 12th Street, Northwest
Washington, D.C. 20004
(202) 942-5000

Pursuant to agreement, before Diane Gomez, Registered Professional Reporter and Notary Public of the District of Columbia.

230

APPEARANCES

ON BEHALF OF PLAINTIFFS FLORIDA POWER & LIGHT COMPANY, NORTHERN STATES POWER COMPANY, DUKE POWER, INDIANA MICHIGAN POWER COMPANY, BOSTON EDISON COMPANY, GPU NUCLEAR, INC., POWER AUTHORITY OF THE STATE OF NEW YORK, OMAHA PUBLIC POWER DISTRICT, and NEBRASKA PUBLIC POWER DISTRICT:

ALEX D. TOMASZCZUK, ESQUIRE
SHAW PITTMAN LLP
1650 Tysons Boulevard
McLean, Virginia 22102-4859
(703) 847-5097

ON BEHALF OF PLAINTIFF SACRAMENTO MUNICIPAL UTILITY DISTRICT:

JEFFREY L. HANDWERKER, ESQUIRE
ARNOLD & PORTER
555 12th Street, Northwest
Washington, D.C. 20004-1206
(202) 942-5000

A 7

you're revealing advice of counsel that was provided to you as a Wisconsin Electric employee, Mr. Zabransky. And I'm instructing you as counsel for Wisconsin Electric that they haven't waived that privilege. Do you understand me?

THE WITNESS: I understand.

MR. OEHLER: Thank you.

MR. OLSEN: On the record, if in fact the reason a document has been filled out like it was because the lawyer told him to, how would you have Mr. Zabransky make that noted on the record?

MR. OEHLER: I think that the best way is to say I have been instructed by Wisconsin Electric, counsel, that I cannot answer that question.

MR. CRAWFORD: That's what he said.

MR. OEHLER: Actually, he didn't. I'm not saying he can't answer the question. That's different from the answer Mr. Zabransky just gave.

THE WITNESS: I understand.

Q What happens if some of the fuel that is within the range of the fuel that Wisconsin Electric has identified on its DCS that DOE has approved turns



out to be failed fuel?

MR. OLSEN: Objection to the extent it calls for a legal conclusion, and objection, vague.

**A Well, the DCS per the instructions assumes the delivery of standard fuel. So we submitted these, we basically told the department we were going to submit, provide standard fuel in these quantities and this range. It would have been our obligation pursuant to the contract to let them know if we were going to have to submit nonstandard fuel pursuant to Appendix E and provide in accordance with the contract -- basically Article 6.2.B of the contract covers what a purchaser does if it needs to deliver other than standard fuel.**

Q I think you testified yesterday that you were involved in the early nineties in the ACR issues resolution process? Did I say that right?

**A Yes.**

Q Let me show you what's been marked as Exhibit 31.

(Deposition Exhibit Zabransky 31 was marked for identification and was attached to the



transcript.)

MR. BLANTON: Give one to counsel.

Q Do you recognize that document?

**A Not specifically, no.**

Q Does this appear to you to be a DOE document?

**A Given the text in the third paragraph on the first page, it appear to me to be a document created by the M&O at the time.**

Q Okay. That would be DOE's M&O?

**A DOE's contractor.**

Q And M&O means what?

**A Management and operating.**

Q Okay. The first sentence of that document says "The standard disposal contract which defined the spent nuclear fuel and high-level radioactive waste acceptance process was unfortunately developed in such a way that the terms and conditions contained numerous omissions, inconsistencies, ambiguities, and contradictions." Did you ever hear anybody describe the standard contract that way in the course of the ACR issues resolution process?



**A I don't recall the specific use of all those words that way.**

Q Any of them?

**A I think there was a -- it's fair to say that a discussion of the contract was one that required interpretation and review. You had to look at it; you had to understand it. But it wasn't a simple contract. It also -- but it was no more complicated than many other nuclear fuel contracts.**

Q Were you ever in the presence of DOE officials when anybody discussed the contract and the gist of the conversation was, Gee, we read the contract, and we can't tell exactly what happens?

**A I don't recall that conversation -- a conversation like that.**

Q Okay. Who was DOE's M&O contractor in December 31 of 1991, do you know?

**A I believe that would have been what was TRW Environmental and Safety Systems, TESS.**

Q Okay. What does an M&O contractor do with respect to the spent nuclear fuel program?

**A They provide technical and management**

support.
Q Do you think that the standard contract has any omissions that needed to be filled in through the ACR issues resolution process?
**A I'm not sure I would find any omissions. It has a lot of -- for both parties, a lot of clauses that give discretion to each party on different issues, and it would be nice to know how parties intended to use discretion, and that's an omission.**
Q How about inconsistencies?
**A The only term that I would classify from memory as an inconsistency could be or would be the provision that allows a trading of a DCS I believe up to six months prior to delivery as opposed to someone with an FDS or exchange provision of the contract.**
Q Could you explain? And I feel lik you were trying to start and wanted to look at the contract, which is fine, but could you explain to me how that's inconsistent?
**A I said it appears to be an inconsistency. Purchaser shall have the right to determine -- Article 5.E of the contract. I won't read it, but it gives**



**the purchasers the right to submit exchange of approved DCSs not less than six months prior to the delivery date specified in the purchaser's approved DCS. And there's a requirement in Article 5.C that says an FDS is due 12 months prior to the delivery date specified therein. So the apparent inconsistency could be that a DCS exchange could occur after the requirement to approve the FDS, which could have extinguished the DCS in essence. So whether or not that's really an inconsistency, I don't know. It's an apparent one that needed to be looked at.**
Q Was that ever resolved in the ACR issues resolution process?
**A No. As I said yesterday, I don't think anything was ever resolved in the process.**
Q In order to avoid asking you that particular question about each one of these, if you recall an issue that was ever resolved that was addressed in the ACR resolution process, will you tell me?
**A What do you mean by "resolved"?**
Q Same thing I meant when you just said it



wasn't resolved.
**A Let me talk about what you mean by resolved because resolved as I used it meant that DOE and the industry agreed and went away and there was some kind of documented agreement. We had a couple of issues within the industry group we reached consensus on and transmitted to DOE, but whether DOE accepted them and it was formally agreed that were done, no, that never occurred.**
Q When I use the term "resolved" I mean both the industry and DOE went away with the same understanding about how something was supposed to work.
**A In that case I think the answer is no.**
Q Are you aware of any other inconsistencies in the standard contract other than Article 5.E?
**A Not that I can think of, no.**
Q Are you aware of any ambiguities in the standard contract?
MR. OLSEN: Objection to the extent it calls for a legal conclusion.
**A No, I don't think I would call it an**



**ambiguity.**
Q How about contradictions, are you aware of any contradictions in the standard contract?
**A No, I don't know what the writer of this document was referring to.**
Q You see the issues that are listed there. There are 34.
**A Uh-huh.**
Q In looking at that list, do those appear to be the same issues that you remember being issues for the ACR resolution process?
**A They appear to be.**
Q Can you describe what issue number two is?
**A Yes.**
Q What is that?
**A That is an issue that early on the question was brought up -- this is early on -- since allocations under the contract are accrued to a purchaser on an oldest-first basis, it was DOE's expectation that fuel would actually be delivered on an oldest-fuel-first basis, or was that just a process or method for allocating acceptance capacity.**

# DOE NEWS

FOR IMMEDIATE RELEASE

September 16, 1998

## DOE ANNOUNCES COMPETITION FOR IDAHO CONTRACT

The Department of Energy (DOE) announced today that it will seek competitive offers for the management and operations contract at the Idaho National Engineering and Environmental Laboratory (INEEL). The department's contract with Lockheed Martin Idaho Technologies Co. (LMITCO), the current contractor, expires on Sept. 30, 1999.

"Competition allows us to test the market place and get the best value for the taxpayers. We are interested in receiving proposals from as many qualified bidders as possible, to help us meet the current and future challenges at the INEEL. We anticipate a spirited competition among a number of qualified firms and we invite any and all qualified applicants to bid," said John Wilcynski, manager of DOE's Idaho Operations Office.

When the department originally awarded the INEEL contract to LMITCO in 1994, DOE sought to consolidate and integrate site-wide operations, which were then run by five different contractors. "LMITCO has been successful in some areas, but there are other areas where improvement and greater initiative are necessary," said Wilcynski.

The current contractor employs about 5,800 people at the INEEL. Key missions include basic and applied research in a wide range of areas as well as nuclear reactor operation, environmental restoration and waste management, and national security programs.

Wilcynski emphasized that the department expects a speedy competition as well as a smooth transition. DOE will retain the same single contractor business model for the acquisition and plans to maintain the workforce and mission stability. "Our highest priorities are to maintain and enhance the department's long term commitment to this lab, to meet the cleanup agreements and to assure safety of the workforce," added Wilcynski.

The department expects to issue a request for proposals for the INEEL contract within 60 days, and it will be announced in the Commerce Business Daily. The department also expects to have the procurement completed by the end of July, 1999. The contract will be for five years, with an option for five more.

--DOE-ID--

Media contact: Brad Bugger, (208) 526-0833, buggerbp@inel.gov

98-70

** U.S. Department of Energy * Idaho Operations Office * 785 DOE Place * Idaho Falls, ID 83401-1562 **

Pacific Northwest National Laboratory
*...delivering breakthrough science and technology*

# About the Lab



Welcome to the Pacific Northwest National Laboratory (PNNL), one of nine U.S. Department of Energy multiprogram national laboratories.

At PNNL, we deliver breakthrough science and technology to meet key national needs. We also apply our capabilities to meet selected environmental, energy, health and national security objectives, strengthen the economy, and support the education of future scientists and engineers.

PNNL is managed by DOE's Office of Science, but we perform work for many DOE offices as well as other government agencies.

Battelle has operated PNNL for DOE and its predecessors since 1965. A unique feature of Battelle's contract with DOE allows our staff to work for private industry.

To learn more about PNNL, see our Science to Solutions(pdf) brochure.

Thank you for visiting our home page, and if you have questions or comments, please contact us.

---

**Webmaster:** webmaster@pnl.gov
**Reviewed:** August 2005

**Yankee Atomic v. U.S. No.: 98-126C July 14, 2004**

**Page 574 to Page 793**

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

*HERITAGE REPORTING CORPORATION*
*1220 L Street, N.W.*
*Suite 600*
*Washington, DC 20005*
*Phone: 202-628-4888*

Page 614

BY MR. SHAPIRO:
Q Dr. Bartlett, behind tab 1 is a document that's been received in evidence as Plaintiffs' Exhibit 175. It's titled: Civilian Radioactive Waste Management System Throughput Rate Analysis. Prepared for Department of Energy by the management and operations contractor. And, as Ms. Herrmann pointed out, it has a date on it of August 17th, 1993.
A Uh-huh.
Q Let me ask you, first, do you recognize this document?
A Oh, yes.
Q Was this document completed during your tenure as director?
A It was not completed, but it was written during – it takes time to prepare these.
Q And is this the sort of study that you were referring to when you said that there were studies and program documents that support a 3,000 MTU acceptance rate?
A Yes, it is.
Q Do you recall the conclusion of this particular study, Dr. Bartlett?
A Well, if I may read the conclusion – based on the foregoing considerations.

Page 615

Q I'm sorry to interrupt, Dr. Bartlett. If you could tell us first where you're reading from.
A I'm reading from page IX in the document, where it says Conclusions.
Q Okay. I'm sorry to interrupt. If you would like to continue.
A Under Conclusions, it says: Based on the foregoing considerations, the preferred range of throughput rates is from 3,000 MTU per year to 4,000 MTU per year.
Q What is your understanding of that conclusion, Dr. Bartlett?
A My understanding is that is an appropriate assessment based on the look at alternatives that was part of this effort, that this is the appropriate rate at which the system should be operated at steady state.
Q When you say appropriate, what do you mean by appropriate?
A That it is the most effective, most cost effective, in particular, with respect to costs incurred to do the operations and costs imposed on the utilities.
Q Dr. Bartlett, as I mentioned when I described the cover of this document, it was prepared

Page 616

by the management and operations contractor at that time. When you were director, to what extent did you and OCRWM rely upon studies prepared by the management and operations contractor such as this one?
A All of the work is done by the – by the support contractors. That's what they're there for. The Department of Energy has – OCRWM itself has about 65 employees. The program has about 5,000 employees, if you look at it this way. These are contractor people.
The M&O organizes all of them, but it includes activities within Sandia National Laboratories, Los Alamos National Laboratory, Livermore National Laboratory, the US Geological Survey.
And a lot of the engineering is done by, at our time, the TRW Systems, M&O contractor, management and operations contractor.
The work is done by those folks. And the job of the DOE people is to oversight that, do the program planning, give them guidance and direction for what their activities should be.
Q And when you were director, Dr. Bartlett, to what extent was the M&O authorized by the Department to make statements concerning the subjects addressed

Page 617

in studies such as Plaintiffs' Exhibit 175?
A They have full authority to accomplish and report this work.
Q Dr. Bartlett, when you were director of OCRWM, did you consider a 3,000 metric ton acceptance rate to be reasonable in light of the program's objectives?
A Yes, I did.
Q Did you consider when you were director, Dr. Bartlett, whether any other rates of acceptance might be reasonable in addition to 3,000 metric tons?
A Well, if you go much above 3,000, then essentially what you've done is established excess capacity that doesn't get used. It's like leaving an airplane sitting at the dock rather than having it flying. And so you don't need to make the expense or have excessive capability.
On the other hand, if you don't have enough, if you don't have the 3,000, then you're not doing your job with respect to taking this spent fuel from the reactors at an appropriate rate to avoid their occurring costs for additional storage.
Q If I could ask you just to explain a little bit more the first of those instances. If you have excess capacity, what do you mean by excess capacity?

ornl

ORNL/Sub/86-SA094/5
JAI-325

OAK RIDGE
NATIONAL
LABORATORY

MARTIN MARIETTA

# Acceptance of Failed SNF Assemblies by the Federal Waste Management System

Plaintiff's
Exhibit
131
04-74C(04-75C)

OPERATED BY
MARTIN MARIETTA ENERGY SYSTEMS, INC.
FOR THE UNITED STATES
DEPARTMENT OF ENERGY

This report has been reproduced directly from the best available copy.

Available to DOE and DOE contractors from the Office of Scientific and Technical Information, P.O. Box 62, Oak Ridge, TN 37831; prices available from (615) 576-8401, FTS 626-8401.

Available to the public from the National Technical Information Service, U.S. Department of Commerce, 5285 Port Royal Rd., Springfield, VA 22161.
NTIS price codes—Printed Copy: A07 Microfiche A01

This report was prepared as an account of work sponsored by an agency of the United States Government. Neither the United States Government nor any agency thereof, nor any of their employees, makes any warranty, express or implied, or assumes any legal liability or responsibility for the accuracy, completeness, or usefulness of any information, apparatus, product, or process disclosed, or represents that its use would not infringe privately owned rights. Reference herein to any specific commercial product, process, or service by trade name, trademark, manufacturer, or otherwise, does not necessarily constitute or imply its endorsement, recommendation, or favoring by the United States Government or any agency thereof. The views and opinions of authors expressed herein do not necessarily state or reflect those of the United States Government or any agency thereof.

# SOME ALTERNATIVES FOR DOE ACCEPTANCE AND STORAGE OF SPENT FUEL IN 1998 AND 1999

T. W. Wood
R. I. Smith
E. R. Johnson[a]
N. B. McLeod[a]

September 1990

Pacific Northwest Laboratory
Richland, Washington 99352

(a) E. R. Johnson Associates, Inc.
Oakton, Virginia.

Plaintiff's
Exhibit
135
04-74C(04-75C)

## DISCLAIMER

This report was prepared as an account of work sponsored by an agency of the United States Government. Neither the United States Government nor any agency thereof, nor Battelle Memorial Institute, nor any of their employees, makes **any warranty, expressed or implied, or assumes any legal liability or responsibility for the accuracy, completeness, or usefulness of any information, apparatus, product, or process disclosed, or represents that its use would not infringe privately owned rights.** Reference herein to any specific commercial product, process, or service by trade name, trademark, manufacturer, or otherwise does not necessarily constitute or imply its endorsement, recommendation, or favoring by the United States Government or any agency thereof, or Battelle Memorial Institute. The views and opinions of authors expressed herein do not necessarily state or reflect those of the United States Government or any agency thereof.

PACIFIC NORTHWEST LABORATORY
*operated by*
BATTELLE MEMORIAL INSTITUTE
*for the*
UNITED STATES DEPARTMENT OF ENERGY
*under Contract DE-AC06-76RLO 1830*

DRAFT

# AT-REACTOR SPENT FUEL STORAGE REQUIREMENTS WITH AND WITHOUT ACCEPTANCE RIGHTS TRADING

R. W. McKee
J. S. Pomykala
J. J. Tawil
A. F. Rosenfeld
M. E. Schutz

August 1987

Prepared for
the U.S. Department of Energy
under Contract DE-AC06-76RLO 1830

Pacific Northwest Laboratory
Richland, Washington 99352

Plaintiff's Exhibit 103 04-74C(04-75C)

5
EXHIBIT
5-8-02

| Name | Approved | Date |
|---|---|---|
| AJ Boegel | [signature] | 8 Sept 87 |
| JL Braitman | [signature] | 9/11/87 |
| | | |
| | | |

Battelle

Pacific Northwest Laboratories
P.O. Box 999
Richland, Washington U.S.A. 99352
Telephone (509)
Telex 15-2874

September 8, 1987

Mr. Michael S. Karol, Director
Storage and Transportation Division
U.S. Department of Energy
Richland Operations Office
Richland, WA 99352

bcc: ME Schutz, JS Pomykala, JJ Tawil, AF Rosenfeld, JL Braitman, AJ Boegel, LL Clark, BM Cole, JM Creer, GM Holter, RA Libby, File/LB, RW McKee, GW McNair, TP Sovers, MR Shay, TW Wood, MK White, RI Smith, FP Roberts

Dear Mr. Karol:

SUBMITTAL OF DRAFT REPORT ON ACCEPTANCE RIGHTS ALLOCATION

Enclosed are six copies of a draft report titled "At-Reactor Spent Fuel Storage Requirements With and Without Acceptance Rights Trading."

The Standard Contract (10 CFR 961) between DOE and the nuclear utilities includes a provision allowing reactor sites to trade spent fuel acceptance rights subject to DOE approval. A site needing early storage relief might be able to trade (exchange) some of its later acceptance rights with another site having early acceptance rights and excess storage capacity. This report presents results of an analysis of reactor storage requirements for spent fuel and the effects and possible benefits of trading spent-fuel acceptance rights among reactor sites. The scope of the analysis considers reactor storage requirements both with and without acceptance rights trading and the selection of storage options and costs to meet these requirements as influenced by cost uncertainties.

This report concludes that the potential savings from trading at individual sites appears to be sufficient to attract significant interest from the utilities once acceptance schedules are firmly established. Most sites that can benefit from trading can save at lest $1 million and several sites could save over $10 million in avoided storage facility costs.

This report completes the only deliverables for the Acceptance Rights Allocation Project for FY-87. If it meets with your approval, please transmit four copies to Jack Hale at DOE-HQ. We can supply additional copies if needed.

If you need additional information, please feel free to contact me or the Project Manager, R. W. McKee (376-1309).

Very truly yours,

[signature]

Gordon H. Beeman, Manager
Systems Integration Program

GHB:RWM:ief

Enclosures
cc: DE Kenyon, DOE-RL w/enc
DL Sours, DOE-RL w/o enc

Plaintiff's Exhibit 105 04-74C(04-75C)

PNL-144-1715

DRAFT

# AT-REACTOR SPENT FUEL STORAGE REQUIREMENTS WITH AND WITHOUT ACCEPTANCE RIGHTS TRADING

R. W. McKee
J. S. Pomykala
J. J. Tawil
A. F. Rosenfeld
M. E. Schutz

August 1987

Prepared for
the U.S. Department of Energy
under Contract DE-AC06-76RLO 1830

Pacific Northwest Laboratory
Richland, Washington 99352

SAV
5/13/89

4E-069

Jeff Williams
Beth Darrough
Western Representative
Dave Dippold

DRAFT

# Spent Fuel Acceptance Scenarios Devoted to Shutdown Reactors - A Preliminary Analysis

T.W. Wood
* D.G. Dippold
S.M. Short

* Office of Transportation Systems Planning
Nuclear Systems Group
Battelle Memorial Institute

May 1989

Prepared for the U.S. Department of Energy
Under Contract DE-AC06-76RLO 1830

Pacific Northwest Laboratory
Operated for the U.S. Department of Energy
by Battelle Memorial Institute

Plaintiff's
Exhibit
115
04-74C(04-75C)

CTR0002662

PNL-7143
UC-812

# Spent Fuel Acceptance Scenarios Devoted to Shutdown Reactors: A Preliminary Analysis

T. W. Wood
A. M. Plummer
D. G. Dippold
S. M. Short

October 1989

Prepared for the U.S. Department of Energy
under Contract DE-AC06-76RLO 1830

Pacific Northwest Laboratory
Operated for the U.S. Department of Energy
by Battelle Memorial Institute

PNL-7143

Plaintiff's
Exhibit
124
04-74C(04-75C)

HQ0013950

DRAFT

PNL-xxxx
UC-xxx

# Cost Estimates of Operating On-Site Spent Fuel Pools after Final Reactor Shutdown

S. R. Rod

November, 1990

Prepared for the U.S. Department of Energy
under Contract DE-AC06-76RLO 1830

Pacific Northwest Laboratory
Operated for the U.S. Department of Energy
by Battelle Memorial Institute

DRAFT

HQ0013579

Plaintiff's
Exhibit
138
04-74C(04-75C)

PNL-7778
UC-812

# Cost Estimates of Operating Onsite Spent Fuel Pools After Final Reactor Shutdown

S. R. Rod

August 1991

Prepared for the U.S. Department of Energy
under Contract DE-AC06-76RLO 1830

Pacific Northwest Laboratory
Operated for the U.S. Department of Energy
by Battelle Memorial Institute

PNL-7778

Battelle

Plaintiff's
Exhibit
151
04-74C(04-75C)

## DISCLAIMER

This report was prepared as an account of work sponsored by an agency of the United States Government. Neither the United States Government nor any agency thereof, nor Battelle Memorial Institute, nor any of their employees, makes any warranty, expressed or implied, or assumes any legal liability or responsibility for the accuracy, completeness, or usefulness of any information, apparatus, product, or process disclosed, or represents that its use would not infringe privately owned rights. Reference herein to any specific commercial product, process, or service by trade name, trademark, manufacturer, or otherwise does not necessarily constitute or imply its endorsement, recommendation, or favoring by the United States Government or any agency thereof, or Battelle Memorial Institute. The views and opinions of authors expressed herein do not necessarily state or reflect those of the United States Government or any agency thereof.

PACIFIC NORTHWEST LABORATORY
*operated by*
BATTELLE MEMORIAL INSTITUTE
*for the*
UNITED STATES DEPARTMENT OF ENERGY
*under Contract DE-AC06-76RLO 1830*

Printed in the United States of America

Available to DOE and DOE contractors from the
Office of Scientific and Technical Information, P.O. Box 62, Oak Ridge, TN 37831;
prices available from (615) 576-8401. FTS 626-8401.

Available to the public from the National Technical Information Service,
U.S. Department of Commerce, 5285 Port Royal Rd., Springfield, VA 22161.

White Paper
August 1992

# EFFECTS OF EXCHANGES OF DELIVERY COMMITMENT SCHEDULES ON THE CRWMS TRANSPORTATION SYSTEM

Prepared for:
The U.S. Department of Energy
Office of Civilian Radioactive Waste Management
by the Transportation Operations Project Office
Oak Ridge National Laboratory

Martin Marietta Energy Systems, Inc.
P.O. Box 2008
Oak Ridge, Tennessee 37831

Science Applications International Corporation
P.O. Box 2501
Oak Ridge, Tennessee 37831

TO05D.91

Plaintiff's Exhibit 172 04-74C(04-75C)

HQ0006653

HQR-004-0225

A00000000-01717-5700-00022 Rev 02
WBS 9.2.1.2
QA: N/A

**Civilian Radioactive Waste Management System**
**Management & Operating Contractor**

# CRWMS Modular Design/Construction and Operation Options Report

**Revision 02**

**December 18, 1998**

Prepared for:

U.S. Department of Energy
Office of Civilian Radioactive Waste Management
1000 Independence Avenue, S.W.
Washington, DC 20585

Prepared by:

TRW Environmental Safety Systems Inc.
2650 Park Tower Drive
Suite 800
Vienna, Virginia 22180

Under Contract Number
DE-AC08-91RW00134

HQ0013792

Plaintiff's
Exhibit
280
04-74C(04-75C)

PNL-SA-12955

# ROLE OF TRANSPORTATION IN THE UTILITIES' MANAGEMENT OF SPENT FUEL STORAGE

Darrell F. Newman

For presentation at
Fuel Cycle Conference '85
March 12-15, 1985
New Orleans, Louisiana

Work supported by
the U.S. Department of Energy
under Contract DE-AC06-76RLO 1830

Pacific Northwest Laboratory
Richland, Washington 99352
Operated by Battelle Memorial Institute

Plaintiff's
Exhibit
468
04-74C(04-75C)

PNL-XXXX
UC-85

Note to Editor -

Dave, this is a little rougher than I expected, and I have asked Max & Bob to hold up on review until the next version is available. Also note that the final two figures were not included, and apparently still need to go to graphics.

Thanks, Tom

# SPENT FUEL ACCEPTANCE SCENARIOS DEVOTED TO SHUTDOWN REACTORS: A PRELIMINARY ANALYSIS

PS I have also made some editorial as based on GHB's review of this draft & will try to expedite his sign-off.

T. W. Wood
A. R. Plummer[a]
D. G. Dippold[a]
S. M. Short

July 1989

Prepared for
the U.S. Department of Energy
under Contract DE-AC06-76RLO 1830

Pacific Northwest Laboratory
Richland, Washington 99352

(a) Office of Transportation Systems Planning
Nuclear Systems Group
Battelle Memorial Institute

Plaintiff's
Exhibit
486
04-74C(04-75C)

PNL-170-1529

TRW

TRW Environmental
Safety Systems Inc.

2650 Park Tower Drive, Suite 800
Vienna, VA 22180
703.204.8500

SN 76000

QA: N/A

February 10, 1995
VA.WA.DAW.2/95.027

Mr. Samuel Rousso
Director, Waste Acceptance, Storage and Transportation, RW-40
Office of Civilian Radioactive Waste Management
U.S. Department of Energy
1000 Independence Avenue S.W.
Washington, DC 20585

Dear Mr. Rousso:

Subject: DE-AC01-91RW-00134; Waste Acceptance Support: *Preliminary Draft DCS Exchange Evaluation Criteria Development Report* (WAD-95-03-00, WBS 3.3.1.1.2, Activity No. 335308)

The enclosed subject report combines the four chapters previously prepared into a single document and incorporates all comments received to date from each system element. This draft is in response to a DOE/RW request for FY 1995 Waste Acceptance Support, WBS 3.3.1.1.2 - Pre-Acceptance Operations.

A key activity in development of the DCS Exchange Evaluation Criteria is consideration of the impacts of exchanges on all elements of the CRWMS. The enclosed report is being given a wide distribution to alert other elements of Waste Acceptance activities.

If you have any questions or require further information, please contact Douglas Williamson at 703.204.8918.

Sincerely,

James B. Blandford
Deputy Assistant General Manager,
Office of Waste Acceptance, Storage and Transportation

Plaintiff's Exhibit 524 04-74C(04-75C)

JBB:DAW:as

Enclosure: (1)

TRW Inc.

Printed on recycled paper

CTR-003-2212

QA: N/A

# Evaluation of Delivery Commitment Schedules (DCS) Exchange Requests

**Preliminary Draft**

February 10, 1995

Prepared for:

U.S. Department of Energy
Office of Civilian Radioactive Waste Management
1000 Independence Avenue, S.W.
Washington, D.C. 20585

Prepared by:

TRW Environmental Safety Systems Inc.
2650 Park Tower Drive
Suite 800
Vienna, Virginia 22180

Under Contract Number
DE-AC01-91RW00134

CTR-003-2214

# Standard Contract Issue Resolution Process

## An Overview and Status

David C. Jones
E. R. Johnson Assoc., Inc.

Nancy S. Montgomery
U.S. Department of Energy

Billy M. Cole
E. R. Johnson Assoc., Inc.

April 29, 1993
1993 International High-Level Radioactive
Waste Management Conference
Las Vegas, Nevada

Plaintiff's
Exhibit
181
04-74C(04-75C)

CTR-003-0001

Nancy H. Slater April 21, 1999

*Page 1 to Page 205*

CONDENSED TRANSCRIPT AND CONCORDANCE
*PREPARED BY:*

*ALDERSON REPORTING CO. INC.*
*1111 14th St, N.W.*
*4th Floor*
*Washington, DC 20005*
*Phone: 1-800-FOR-DEPO*
*FAX: 1-800-367-3310*

**Page 121**

Q. Did your view get general agreement at DOE?
A. Yes.
Q. And, as far as you understand, what is the current DOE view on accepting fuel?
A. I couldn't speak for the current view.
Q. But at least, as of the time you left the waste acceptance office, that was the view of that office?
A. Yes.
Q. If I understand correctly, this is part of the issue of what is nonstandard fuel?
A. Right.
Q. Can you characterize then, at the time you were in that waste acceptance office, what was DOE's view as to what nonstandard fuel was or is?
A. You're stretching my recollection now. I don't honestly recall. I'd have to go back and look at definitions within the contract.
Q. After you got to DOE, how often do you recall there being meetings between DOE and utilities on this ACR resolution process?
A. I don't recall a number, I really don't.

**Page 122**

Q. But they were pretty much on an ad hoc basis?
A. Yes.
Q. Just to clarify what I mean by ad hoc, you didn't have quarterly meetings?
A. Once a month or once a week, no.
Q. Just when an issue came up that was ripe for being addressed?
A. It was addressed.
(Slater Exhibit No. 6 was marked for identification.)
BY MR. SHAPIRO:
Q. Ms. Slater, you've just been handed what we've had marked as Slater Exhibit 6. Do you recognize this document?
A. Vaguely.
Q. Can you tell us what it is?
A. Can you give me a moment to refresh my memory.
Q. Sure.
A. Okay. Without reading through the entire paper, yes, this is a general summary of the ACR issue resolution process, the nature and scope of the issues that require interpretation, classification, resolution, and a brief address on

**Page 123**

certain of those issues of what that is likely to be.
Q. Did you draft this document?
A. No, I did not.
Q. Do you recall who did?
A. Yes, Dave Jones did.
Q. You would have reviewed this document?
A. Yes.
Q. And there are three names at the top of the first page of Exhibit 6. Mr. Jones, you, and Mr. Cole?
A. Billy Cole, yes.
Q. What was Mr. Jones' and Mr. Cole's roles?
A. They were consultants to the -- I guess it was logistics to our branch or our division depending on whether or not we had been renamed at that point. But yes.
Q. Exhibit 6 was a document written by Mr. Jones, the contractor, on behalf of your division?
A. No. It was a document that was authored on behalf of E.R. Johnson Associates for presentation at a conference. And in general we have a DOE author on papers like this. We then

**Page 124**

have the right to review. And so that's the way this works. No, this was not authored at the request of DOE.
Q. Do you recall what the purpose of the conference was or the nature of the paper?
A. No, I do not.
Q. So you would have reviewed this document, Exhibit 6, as the DOE author to check for accuracy from DOE's perspective?
A. Yes.
Q. Do you see I guess at the bottom of the first page, there looks to be a page number, 757?
A. Yes.
Q. Which suggests this might have been part of a larger compilation?
A. The proceedings from the meeting perhaps.
Q. That was the question I was going to ask, do you know what this might be from a compilation of?
A. I would speculate that it is from a compilation. Which compilation I couldn't say.
Q. In your role as the reviewing author for DOE, is that a fair characterization of your role with respect to this document?

DRAFT

# AT-REACTOR SPENT FUEL STORAGE REQUIREMENTS WITH AND WITHOUT ACCEPTANCE RIGHTS TRADING

R. W. McKee
J. S. Pomykala
J. J. Tawil
A. F. Rosenfeld
M. E. Schutz

August 1987

Prepared for
the U.S. Department of Energy
under Contract DE-AC06-76RLO 1830

Pacific Northwest Laboratory
Richland, Washington 99352

Plaintiff's Exhibit 103 04-74C(04-75C)

5
EXHIBIT
5-8-02

## ACKNOWLEDGMENTS

The authors would like to express their appreciation and thanks to several individuals who made significant contributions to this report including: T. W. Wood who originally recognized the need for this study and instigated its initiation; to J. M. Reilly, (now with the U.S. Department of Agriculture) who was responsible for some of the early study efforts; to N. B. McLeod, E. R. Johnson Associates, who provided us with an analysis of reactor pool reracking costs; to L. G. Wattenburger, Boeing Computer Services Richland, and his graphic arts team for their excellent graphics work; and to M. M. Hale and her word processing team for their excellent support and forebearance through the numerous revisions and rewrites of sections of this report.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - X

YANKEE ATOMIC ELECTRIC :
COMPANY, et al., :
Plaintiffs, :
v. : Case No.
THE UNITED STATES, : 98-126C-987 4C
Defendant. :

- - - - - - - - - - - - - - - X

Washington, D.C.
Wednesday, May 8, 2002

Deposition of THOMAS WOOD, a witness herein, called for examination by counsel for Plaintiffs Yankee Atomic, Maine Yankee and Connecticut Yankee, in the above-entitled matter, pursuant to notice, the witness being duly sworn by CYNTHIA R. SIMMONS, a Notary Public in and for the District of Columbia, taken at the offices of Spriggs & Hollingsworth, 1350 I Street, N.W., Washington, D.C., at 2:00 p.m., Wednesday, May 8, 2002, and the proceedings being taken down by Stenotype by CYNTHIA R. SIMMONS, RMR, CRR, and transcribed under her direction.

Page 70

THE WITNESS: Yes.
BY MR. KRNCEVIC:
Q. Did you receive any direction from the Department of Energy that there was a different purpose other than performing pursuant to the standard contract?
A. The purpose of our work included setting reasonable design and requirements for the system, that includes cases in which the standard contract is interpreted in a lot of different ways, or conceivably departed from in some measure. And so that motivation transcends the specific focus on the contract if I understand the question. Does that answer the question?
Q. Well, what other motivations would there be in the spent fuel system?
MR. LESTER: Objection, vague. Asked and answered.
THE WITNESS: Just to conduct the disposal mission. Maybe I'm making a distinction you're not making. The overall conduct of the disposal mission is laid out in the Nuclear Waste Policy Act.
(Exhibit No. 5 was marked for identification.)
BY MR. KRNCEVIC:

Page 71

Q. I know this is a big document. To assist you I can limit the areas I'm going to ask you questions about. They'll all be in section 2 and 3.
A. Okay.
Q. Okay. I actually lied. I just wanted to point out that under the acknowledgments they recognize, this is Exhibit number 5, recognizes, T.W. Wood who originally recognized the need for this study and instigated its initiation.
Are you familiar with this report at all?
A. Yes.
Q. Could you just read the title of Exhibit 5?
A. At-Reactor Spent Fuel Storage Requirements With and Without Acceptance Rights Trading.
Q. Were you involved at all in the preparation of this report?
A. Not in the preparation. I was involved in the scoping or formulation of the problem that led to this report.
Q. When you say scoping and formulation of the problem, what specifically does that entail?
A. The issues raised in summary fashion in the earlier documents we discussed really were analyzed in more depth here. I was consulted about

Page 72

the motivation for the study and the essential features of the problem when this study was being put together.
Q. Is this a study that PNNL undertook on its own?
A. No.
Q. Was it commissioned by the Department of Energy?
A. Yes.
Q. To what extent did you offer consultation on this?
A. I don't remember the details of the process. I know that I was aware of the conduct of the study and generally had access to the authors.
Q. Do you know what the motivation of this study was?
MR. LESTER: Objection, foundation.
THE WITNESS: I guess I had better since it was my idea. The motivation was to understand more thoroughly and more precisely how a market in spent fuel acceptance rights would affect the economics and logistics of the spent fuel management problem at reactors and at DOE.
BY MR. KRNCEVIC:
Q. Would it be fair to say that the

Page 73

Department of Energy was concerned enough about the problem in order to commission a follow-up study of this nature?
MR. LESTER: Objection, foundation.
THE WITNESS: You could draw that conclusion, yeah.
BY MR. KRNCEVIC:
Q. Speaking of conclusions, I'd like to draw your attention to page 2.16, and under conclusions, if you could just read the first bullet point there.
A. The savings potential for acceptance rights trading at individual sites appears to be sufficient to attract significant interest from the utilities once acceptance schedules are firmly established. Potential avoided storage facility costs amount to over $1 million for 70 percent of sites benefitting from trading and greater than $10 million for 10 to 20 percent of the sites that would benefit.
Q. Okay. I'd like to take those sentences one at a time. What did you -- what did the people who -- strike that.
Do you agree with the assessment of that first sentence?
A. Yes.

Page 74

Q. Why?
A. $140 million is sufficient savings to get the interest of utility executives, in my experience.
Q. To your knowledge, once Department of Energy received this report, did they come to the same conclusion?
MR. LESTER: Objection, foundation.
THE WITNESS: Don't know. Don't know.
BY MR. KRNCEVIC:
Q. How does this conclusion relate to the process of trading acceptance rights?
MR. LESTER: Objection, foundation.
THE WITNESS: Well, it goes to whether it would ever happen. The question from DOE's perspective, would this be a real thing or not, and this is the point of the statement.
BY MR. KRNCEVIC:
Q. Why did they want to know whether it would be a real thing or not, if you know?
MR. LESTER: Objection, foundation.
THE WITNESS: You know, my opinion on that is the same one I gave earlier and it's that they had an interest in the fuel that actually gets delivered at any point in time which could be altered by the trading process.

Page 75

BY MR. KRNCEVIC:
Q. Did you ever have any discussions with DOE personnel relating to this aspect of fuel trading?
A. Sure.
Q. Do you remember the substance of those discussions?
MR. LESTER: Objection, vague.
THE WITNESS: Not specifically, not outside, you know, the general topical content of these reports.
— BY MR. KRNCEVIC:
Q. Do you remember any of the opinions expressed by Department of Energy officials?
A. No.
Q. Did they ever direct you to take any action as far as preparing additional studies to look into the trading of acceptance rights?
A. I don't believe so. I believe this was probably the last analysis but I'm not entirely certain.
Q. Who did you have those discussions with at the Department of Energy?
A. Carl Conner and Alan Brownstein principally. Perhaps Keith Klein on occasion.
Q. These would be the same general contacts

Page 76

you've had throughout the process?
A. Right.
Q. Did you ever look into the fact, you or anyone at PNL as to the method by which fuel would be accepted by the government? And let me break that down. In other words, if different parties were trading spaces in the acceptance pecking order, was -- did you ever, you or anyone at PNL ever look into whether it would be more efficient for fuel to be picked up all at once, like go to a plant and the entire plant's fuel be picked up, or whether it would be more efficient to make periodic trips back?
MR. LESTER: Objection, vague.
THE WITNESS: Well, that's an issue independent of whether fuel is, the rights are traded, so I don't understand the connection to rights trading.
BY MR. KRNCEVIC:
Q. If the rights are, a certain point, a position on, a rank in time, would it, would the rights, the allocation of those rights not be affected as far as grouping them all together, grouping a spot in the order all together?
MR. LESTER: Objection, vague, foundation.
THE WITNESS: Still don't understand.

Page 77

BY MR. KRNCEVIC:
Q. How do you, based on your knowledge of the situation, how do you account for the difference between 120 million and 140 million, 120 in costs if the MRS is established or 140 million if no MRS is established?
MR. LESTER: Objection, foundation, vague.
THE WITNESS: The MRS solves part of the problem. There's less incentive to trade if the system has an MRS.
BY MR. KRNCEVIC:
Q. Why is there less incentive?
A. There's less additional at-reactor storage that would generate costs that can be avoided by trading. The motivation for trading comes from incremental costs and there are fewer of those with an MRS in the system.
Q. Did you ever have any discussions as to the effect of these incentives on the trading process with Department of Energy officials?
A. Yes.
Q. Who would those people be?
A. Same folks I mentioned earlier.
Q. Would you remember any of the substance of any of those conversations?