# APPENDIX B

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

Filed Electronically on May 22, 2006

| | | |
|---|---|---|
| PACIFIC GAS & ELECTRIC COMPANY, Plaintiff, v. UNITED STATES OF AMERICA, Defendant. | ) | No. 04-0074C, into which has been consolidated No. 04-0075C (Judge Hewitt) |

**A. Supplemental Deposition Designations**

| Deponent | Date | Page(s) From | Page(s) To |
|---|---|---|---|
| **Robert A. Campbell** | (Maine Yankee) 6/13/02 | 11:6 | 19:21 |
| **Susan Klein** | (Maine Yankee) 4/24/02 | 11:10 | 12:15 |
| **Nancy N. Slater** | (Maine Yankee) 4/21/99 | 5:25 | 7:12 |
| **Victor Trebules, Jr.** | (Maine Yankee) 4/19/02 | 10:21 | 12:4 |

**B. Supplemental Designations of Prior Trial Testimony**

| Witness | Date | Page(s) From | Page(s) To |
|---|---|---|---|
| **David Huizenga** | (Maine Yankee) 8/10/04 | 4370:18 | 4372:22 |
| **Christopher Kouts** | (TVA) | 1385:20 | 1386:6 |

| Witness | Date | Page(s) From | To |
|---|---|---|---|
| | 7/11/05 | | |
| **David Zabransky** | (Maine Yankee) 8/5/04 | 4110:15 | 4112:3 |

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

----------------------------------------X

YANKEE ATOMIC ELECTRIC COMPANY, CONNECTICUT YANKEE ATOMIC POWER COMPANY, MAINE YANKEE ATOMIC POWER COMPANY,

Plaintiffs,

CASE NO. 98-126C 98-154C 98-474C

vs.

UNITED STATES OF AMERICA,

Defendant.

----------------------------------------X

Washington, D.C.

Thursday, June 13, 2002

Deposition of ROBERT ALLEN CAMPBELL

a witness, called for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to notice, the witness being duly sworn, taken at the offices of Spriggs & Hollingsworth, 1350 I Street, N.W., Suite 1010, Washington, D.C, at 9:32 a.m, on Thursday, June 13, 2002, and the proceedings being taken down by Stenotype by CINDY L. SEBO, and transcribed under her direction.



B3

Page 6

PROCEEDINGS
Whereupon,
ROBERT ALLEN CAMPBELL,
residing at 5271 Harbor Cove Lane, Powder Springs, Georgia 30127, called for examination by counsel for Plaintiffs and having been duly sworn by the Notary Public, was examined and testified as follows:
EXAMINATION BY COUNSEL FOR THE PLAINTIFFS
BY MR. SKALABAN:
Q Okay. On the record. Mr. Campbell, would you please state your full name and address, home address, for the record?
A It's Robert Allen Campbell, 5271 Harbor Cove Lane, Powder Springs, Georgia 30127.
Q My name is Pete Skalaban. I represent --
MR. SKALABAN: Off the record.
BY MR. SKALABAN:
Q I represent Yankee Atomic Electric Company, Connecticut Yankee Atomic Power Company and Maine Yankee Atomic Power Company in the spent fuel litigation.
Have you ever had your deposition taken before?
A No.

Page 7

Q Okay. Have you ever given any sworn testimony under penalty of perjury before?
A Yes.
Q And what was that -- what was that context?
A I was a witness in a civil case.
Q Okay. Is that the only time you've given sworn testimony before?
A Yes.
Q And I assume the civil case had nothing to do with spent fuel?
A No.
Q Do you have some understanding of what's going to happen today?
A Yes.
Q Can you tell me what that understanding is?
A You're going to ask me questions about this -- well, you're going to ask me whatever questions you ask me, and I'm going to answer them. I mean --
Q Fair enough. Procedurally, how it works is I will be asking you questions, and you are required to give me full and truthful answers to those questions. Is that okay?

Page 8

A Yes.
Q The court reporter is taking down everything that is said here. So it's important that you audibly express your answer, because it becomes very difficult to pick up nods of the head, that type of thing. Is that okay?
A Okay.
Q If you don't understand one of my questions, would you please let me know, so I can clarify the question, and that way we can be sure and have a common ground for my questions and your answers; is that fair?
A Yes.
Q Okay. Where did you go to college?
A I went to Georgia Tech for undergrad and Johns Hopkins for graduate school.
Q And what year did you graduate from Georgia Tech?
A 1987.
Q And what was your degree in?
A Electrical engineering.
Q Did you have any kind of a minor?
A No.
Q Okay. And when did you begin Johns Hopkins?

Page 9

A 1995, I finished in 1998.
Q And you were full-time at Johns Hopkins?
A No, I was going at night.
Q What did you do from the time period 1987 to 1995?
A 1987 to 1992, I was an officer in the United States Navy, and from 1992 to -- did you say '95 --
Q Yes, sir.
A -- I worked for the Department of Energy.
Q And what did you do as an officer of the Navy? What were the types of things you worked on?
A I was an officer on a nuclear power attack submarine. I supervised the operation of the nuclear reactor, supervised operation of a submarine. I had mechanics who reported to me.
Q Did any of your work in that context involve spent nuclear fuel?
A Yes.
Q And can you tell me about how your work as an officer in the Navy involved spent nuclear fuel?
A Towards the end of my tour, we decommissioned the first submarine I was on. We offloaded the fuel and loaded it up onto a rail





B4

car, and I did that again on another submarine.
Q So if I understand you correctly, twice you decommissioned reactors on spent fuel and loaded it up onto rail cars?
A Yes.
Q Do you know where the spent fuel was being transported by rail to?
A The Department of Energy's Idaho National Engineering Laboratory.
Q Is that -- is that the full extent of your involvement with spent fuel while you were with the Navy?
A Yes.
Q How about when you were with the Navy from '87 to '92, did you have any involvement with Greater-Than-Class C waste?
A No.
Q And do you understand what I mean when I say Greater-Than-Class C waste?
A Yes.
Q Can you just explain that -- what Greater-Than-Class C waste means to you for the -- can you explain that for the record?
A Yes. The Nuclear Regulatory Commission has a regulation, Part 61, which defines Class A, B



and C which can go to commercial low-level waste disposal sites.
Class C has an upper limit, and it's -- it's in two tables in the regulation, and if you exceed that limit, it's then Greater-Than-Class C.
Q And if I understand correctly, your work with the Navy did not involve GTCC --
A Yes.
Q -- is that correct?
A Yes. I did not work with Greater-Than-Class C in the Navy.
Q Thank you. And then in 1992, you joined the Department of Energy?
A Yes.
Q What was your position with the Department of Energy at that time?
A I was a nuclear engineer program manager.
Q And what was the program you were managing?
A Well, basically everyone is called a program manager. So I was dealing with what's called off-site waste, which was anything -- any materials or waste that was outside the Department of Energy complex, maybe on loan to a university or to a private company, that needed to come back, I



worked on. And I also worked on the acceptance of Greater-Than-Class C sealed sources.
Q And what branch of the Department of Energy did you begin work at as a program manager in '92?
A The Office of Environmental Management.
Q And what EM number is that, that office?
A They've reorganized a couple times. It was EM32 then.
Q Okay. And what was the title of that branch of the office?
A It was -- that was the Office of Waste Operations.
Q And, in general, what were the areas of responsibility of EM32, the Office of Waste Operations?
A That office was responsible for any waste management activities at all DOE sites.
Q So, organizationally, your -- I guess you would call it an office -- EM32 is called an office?
A Yes.
Q So the EM32 office underneath it had different programs?
A Yes. There were three different



divisions.
Q Okay. And can you explain for me what those three different divisions were?
A Eastern, central and western. So it was just a geographic split of the country.
Q And you were associated with which of those?
A Eastern, although I wasn't limited to working on stuff in that region. I just -- they had to put everybody in a division.
Q Okay. Okay. What regions did you work on, or was it just national?
A The whole country.
Q Okay. So if I understand correctly, Office of Waste Operations had management activities for waste at all DOE sites, what you focused on was off-site waste?
A Yes.
Q Okay. Now, what part of EM32 dealt with waste at DOE sites?
A Well, each of those divisions had DOE sites in that region of the country. And so each of those divisions dealt with the waste at the sites in their region.
Q And who did you report to when you were

Page 14

at EM32?
A The eastern division director.
Q Okay. And who was that?
A Wayne Nobles.
Q And who was the head of EM32, in general?
A Larry Harmon.
Q And who did Mr. Harmon report to?
A He reported to Mr. Steve Cowan.
Q And what was Mr. Cowan's title?
A He was the associate deputy assistant secretary for waste management.
Q Do you know, who did Mr. Cowan report to?
A He reported to Jill Lytle, which is L-y-t-l-e, and she was the deputy assistant secretary for waste management.
Q So at this time, would sealed sources in general be the primary responsibility of Mr. Harmon at EM32?
A I'm sorry. Repeat the question.
Q Sure. I believe you testified one of the things that you worked on was sealed sources, GTCC sealed sources?
A Yes.
Q And that was within the -- that was one of the areas of responsibility for EM32 generally?

Page 15

A Yes.
Q And if I understand correctly, Mr. Harmon was head of the EM32 and would have been dealing with sealed sources, that was part of his responsibility too?
A Yes.
Q Okay. Now, I'm trying to make sure I understand just the organizational framework.
Now, Mr. Cowan, the associate deputy assistant secretary for waste management, what other offices were underneath him at that time, 1992?
A All -- well, all the other offices. There was -- I guess, it went -- there was a 33, a 34, a 35, I think. It's been a while. I don't remember exactly the layout of the rest of the offices.
Q Okay. And how about 33, what was your understanding of what 33 did, EM33?
A That was -- I don't remember.
Q How about EM34, what about that?
A EM34 was the Waste Isolation Pilot Plate office.
Q And for the record, can you explain what WIPP did? W-I-P-P.

Page 16

MS. HERRMANN: Objection, foundation.
THE WITNESS: The Waste Isolation Pilot Plant office was working at that time on completing -- completing the work necessary to open that disposal facility.
BY MR. SKALABAN:
Q Okay. And what was the function of WIPP, what was its mission?
MS. HERRMANN: Same objection.
THE WITNESS: WIPP is a disposal facility for transuranic -- Defense transuranic waste.
MR. SKALABAN: Can we go off the record for just one moment?
MS. HERRMANN: Yes.
(Discussion off the record.)
BY MR. SKALABAN:
Q How about EM35, what was their mission?
MS. HERRMANN: Objection, foundation.
THE WITNESS: EM35 was basically technical and programmatic support and analysis.
BY MR. SKALABAN:
Q What were the types of subjects or areas that they would work on?
MS. HERRMANN: Same objection.
THE WITNESS: Basically, they -- each

Page 17

type of radioactive waste that we dealt with, there was a program manager for that waste type and they developed plans and programmatic documents and analysis for each waste type.
BY MR. SKALABAN:
Q And for GTCC waste, who was dealing with developing programmatic plans from EM35 in that 1992 time frame?
A Terry Plummer.
Q Given that you were working on sealed sources, did you have interactions with Mr. Plummer in the '92 time frame?
A Yes.
Q Can you tell me what -- just in general terms, what was your work on sealed sources in the '92 time frame, what you did?
A We had reached an agreement with the Nuclear Regulatory Commission, if they had licensees who had sealed sources that the NRC had determined it was problematic for some reason, they would send us a letter asking us to accept them and they would evaluate. And my job is to find a place -- to figure out how to go get them and find a place to put them.
Q Who was the agreement reached with with

Page 18

NRC; who was involved in formulating that agreement that you referred to?
MS. HERRMANN: Objection, foundation.
THE WITNESS: I don't know who was involved in formulating the agreement. The agreement was reached prior to my starting work there. The person who signed the document for the NRC was Robert Bernario, and the person who signed the document for DOE was Leo Duffy.
BY MS. HERRMANN:
Q And do you know what Mr. Bernario's position was with the NRC?
A He was the director of the Office of Nuclear Materials Safety and Safeguards, I believe.
Q I believe you said he was at the NRC. Do you know, has he left, to your knowledge?
A Yes, he has retired.
Q And who is Mr. Leo Duffy?
A He was the assistant secretary for environmental management.
Q So that would be Jill Lytle's boss?
A Yes.
Q Did you have -- in this '92 time frame, did you have occasion to work with people at the NRC on sealed source issues?

Page 19

A Yes.
Q Who did you work with at the NRC on sealed sources?
A Mr. Doug Broaddus.
Q Can you spell that for the record, if you know?
A B-r-o-a-d-d-u-s.
Q Okay. Thank you.
Anyone else?
A He was the primary person on sealed sources.
Q And do you know what part of NRC he worked for?
A Office of Nuclear Materials Safety and Safeguards, the Division of Industrial and Medical Nuclear Safety.
Q Now, you testified that in working on sealed sources, one of the things you did was to find a place to put them. Did you find a place to put them; can you tell me about that, please?
A Yes.
Q Okay.
A Early on, we basically took -- I basically found the nearest DOE site and arranged for sources to be transported to the -- to the

Page 20

nearest facility that was able to accept them.
Q And that would be accepting them for storage?
A Yes.
Q Had any sealed sources actually been disposed of?
MS. HERRMANN: Objection, foundation.
THE WITNESS: We've not disposed of any Greater-Than-Class C sealed sources, no.
BY MR. SKALABAN:
Q And just for the record, just so it's clear, do you understand what I mean when I say disposed of?
A I believe so.
Q Okay. For purposes of the record, can you explain your understanding of what disposing of a Greater-Than-Class C source means?
A Well, disposal would be some kind of permanent place you would put something and never go get it again, as opposed to storage, which is the intent would be to -- to retrieve it one day.
We do not have any Greater-Than-Class C disposal, so the way you framed the question was -- my understanding of Greater-Than-Class C disposal -- since we don't have that, I don't know

Page 21

what that's going to be.
Q You stated that early on the sealed sources would go to the nearest DOE sites. What were some of those sites that sealed sources would be taken to?
A We sent sources to the Mound Plant in Ohio, the Hanford site in Washington, and the Los Alamos National Laboratory in New Mexico.
Q Are there any other -- are these all DOE sites?
A Yes.
Q Are there any other sites that you can think of that sealed sources were taken to early on?
A Yes. We had one request from the NRC that was for a large source on a piece of medical equipment that actually could be reused. And so we -- I entered into for -- the Department entered into a contract with a company to go remove the source from the medical equipment.
This was a little different, in that most of the time the source was just in a source holder, and that's all there was.
We didn't want to have to deal with this piece of medical equipment, which had a lot of





B7

Page 1

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
-----------------------------------------X
YANKEE ATOMIC ELECTRIC COMPANY :
(98-126C)(Merow, S.J.) :
CONNECTICUT YANKEE ATOMIC POWER COMPANY :
(98-154C)(Merow, S.J.) :
MAINE YANKEE ATOMIC POWER COMPANY :
(98-474C)(Merow, S.J.) :
FLORIDA POWER & LIGHT COMPANY :
(98-483C)(Wilson, J.) :
NORTHERN STATES POWER COMPANY :
(98-484C)(Wiese, J.) :
DUKE POWER, a Division of DUKE ENERGY CORP.:
(98-485C)(Sypolt, J.) :
INDIANA MICHIGAN POWER COMPANY :
(98-486C)(Hodges, J.) :
SACRAMENTO MUNICIPAL UTILITY DISTRICT :
(98-488C)(Yock, S.J.) :
SOUTHERN NUCLEAR OPERATING COMPANY, et al. :
(98-614C)(Merow, S.J.) :
COMMONWEALTH EDISON COMPANY :
(98-621C)(Hewitt, J.) :
BOSTON EDISON COMPANY :
(99-447C) (Allegra, J.) :
GPU NUCLEAR, INCORPORATED :
(00-440C)(Bush, J.) :
WISCONSIN ELECTRIC POWER COMPANY : VOLUME
(00-697C)(Merow, S.J.) : I
POWER AUTHORITY OF THE STATE OF NEW YORK :
(00-703C)(Damich, J.) :
OMAHA PUBLIC POWER DISTRICT :
(01-115C)(Bush, J.) :
NEBRASKA PUBLIC POWER DISTRICT :Discovery
(01-116C)(Sypolt, J.) :Judge:
TENNESSEE VALLEY AUTHORITY :(Judge
(01-249C)(Bruggink, J.) :Sypolt)
Plaintiffs, :PAGES
v. :1 - 274

Page 2

THE UNITED STATES, :
Defendant. :
-----------------------------------------X

Deposition of Susan Klein
Washington, DC
Wednesday, April 24, 2002

Reported by: Denise Dobner Vickery, RMR, CRR
JOB NO. 144539

Page 3

April 24, 2002
9:37 A.M.

Deposition of Susan Klein, held at the offices of:

Jenner & Block
601 13th Street, NW
12th Floor
Washington, DC 20005

Pursuant to notice, before Denise Dobner Vickery, a Registered Merit Reporter, Notary Public of the District of Columbia.

Page 4

APPEARANCES:

Jenner & Block
For the Plaintiff COMMONWEALTH EDISON
One IBM Plaza
Chicago, IL 60611-7603
(312) 222-9350
BY: Norman M. Hirsch, Esq.

Shaw Pittman Potts & Trowbridge
For the Plaintiffs NORTHERN STATES POWER COMPANY, et al.
1650 Tysons Boulevard
McLean, VA 22102-4859
(703) 770-7962
BY: Alex D. Tomaszczuk, Esq.

Balch & Bingham LLP
For the Plaintiffs SOUTHERN NUCLEAR OPERATING COMPANY, et al.
1275 Pennsylvania Avenue, NW, Tenth Floor
Washington, DC 20004

Page 9

Thereupon,

SUSAN KLEIN

was called for examination, and, after having been duly sworn or affirmed, was examined and testified as follows:

EXAMINATION BY COUNSEL FOR THE PLAINTIFF,
COMMONWEALTH EDISON

BY MR. HIRSCH:

Q. Ms. Klein, my name is Norm Hirsch. I'm a lawyer at Jenner & Block in Chicago. I represent Commonwealth Edison Company. I'm going to be asking you some questions today.

If you don't understand a question I've asked, please tell me and I'll try and rephrase it. Otherwise, I'll assume you understood my question.

A. (Nods head).

Q. If you need a break at any point today, please let me know and we'll stop and take a break.

A. (Nods head).

Q. Mr. Zabransky -- I'm sorry.

A. That's okay. You got Zabransky on your brain.

Q. Move from the last deposition.

Page 10

Ms. Klein, are you aware that there's a protective order in the spent nuclear fuel cases?

A. I think there is, yes.

Q. All right. What I'm going to do is I'm going to hand you a copy of the protective order and I'd like you to take a minute to look at it.

A. Okay.

MR. HIRSCH: Mark that as Exhibit 1.

(Thereupon, the reporter marked for identification Deposition Exhibit No. 1.)

THE WITNESS: (Pause). Okay. I don't fully understand it at this point, but I've read through it.

BY MR. HIRSCH:

Q. Okay. Would you generally agree to abide by the terms in the protective order, Ms. Klein?

A. If something is labeled confidential, yes, I will keep it confidential.

Q. Okay. All right. That's fine.

Ms. Klein, I've handed you what's been marked as Klein Deposition Exhibit 1 or I'm handing you that document, which is the notice of deposition that was

Page 11

issued on April 18th for today's Rule 30(b)(6) deposition. And if you look on the exhibit page, you'll see four topics. That's page 5. You see those topics?

A. Yes, I see those topics.

Q. And you understand you're supposed to be the Rule 30(b)(6) designated Department of Energy witness for these four topics?

A. Yes.

Q. What's your current position, Ms. Klein?

A. I'm a senior policy adviser to the Director and Deputy Director of the Office of Civilian Radioactive Waste Management at the Department of Energy.

Q. And how long have you been the senior policy adviser?

A. For about three years.

Q. So, since about 1999?

A. Yes. I was transferred there but detailed back to general counsel for a couple years.

Q. When was your detail back to General Counsel's Office?

Page 12

A. I think it was '97 that I was transferred to RW, but I was detailed back to general counsel to work with the general counsel at the time on any legal issues and then later on it was limited to issues involving this litigation.

Q. Okay. We'll get back to that in a second. But who do you report to as the senior policy adviser?

A. Lake Barrett. Ron Milner and Lake Barrett.

Q. And Mr. Barrett's current title is?

A. Deputy Director of the Office of Civilian Radioactive Waste Management.

Q. And Mr. Milner's title is?

A. He's the COO, the Chief Operating Officer of the Office of Civilian Radioactive Waste Management at DOE.

Q. And is the Office of Civilian Radioactive Waste Management otherwise known by its acronym as OCRWM?

A. OCRWM, yes, and actually with regard to Ron, I think now I just report to Lake. I was reporting to Ron when he was also Acting Deputy, but now that Margaret is here, to just correct the record. I don't

Nancy H. Slater April 21, 1999

*Page 1 to Page 205*

CONDENSED TRANSCRIPT AND CONCORDANCE
*PREPARED BY:*

*ALDERSON REPORTING CO. INC.*
*1111 14th St, N.W.*
*4th Floor*
*Washington, DC 20005*
*Phone: 1-800-FOR-DEPO*
*FAX: 1-800-367-3310*

**Page 5**

waste acceptance.
Q. And let me tell you just briefly procedurally how it will work. I'll be asking you a series of questions and you will be expected to answer the questions. As we discussed even before we went on the record, the court reporter is taking everything down and we'll get a written transcript of everything that's said today. Do you understand that?
A. Yes.
Q. And it will also be helpful for the court reporter's purposes so we get a clean transcript if you will respond as you just did.
A. Verbally.
Q. A nice verbal answer, yes or no or whatever the appropriate response might be.
A. I understand.
Q. Also I would ask, if you don't understand one of my questions, you're not sure what I'm asking in one of my questions, if you would please ask me to rephrase it rather than trying to answer a question you're not sure what the question is.
A. Will do.
Q. I appreciate that. Where do you work?

**Page 6**

A. At the U.S. Department of Energy in the Office of Civilian Radioactive Waste Management in the Regulatory Coordination Division.
Q. What's your job title there?
A. Team leader.
Q. And what are you a team leader of?
A. The entire division basically. I serve in lieu of a deputy division director. And we deal with the regulatory concerns between the program and the Nuclear Regulatory Commission, the EPA, National Academy of Science, and dealings with the Nuclear Waste Technical Review Board.
Q. When you say you deal with regulatory concerns of EPA, NRC, and the other agencies, what do you do on a day-to-day basis vis-a-vis the NRC?
A. Let's see, a typical example would be the fact that we are involved in developing safeguards and security policy guidelines for the eventual acceptance and disposal of a variety of waste forms. And those policy guidelines will be translated into actual waste acceptance criteria by another group.
And the waste owners will then have to

**Page 7**

assure that the waste they deliver falls within the boundary parameters established by the guidelines with one exception, there will be no new requirements imposed on the utilities because the standard contract is quite clear in terms of what can be asked for and what cannot.
Q. And so you're constantly working with EPA, NRC in developing various guidelines that they're going to be using?
A. Right, reporting on progress in the program and quality assurance issues, things like that.
Q. How many people are in this division?
A. I don't know, I have to count. Six.
Q. And who heads up the division?
A. Alan Brownstein, he's the division director.
Q. And what is this the division of?
A. Regulatory Coordination.
Q. It's the Regulatory Coordination Division. Is this a division of a larger office?
A. It would be the office of -- we have reorganized, we have new names for everything. But it would be the program management and integration function.

**Page 8**

Q. What is the program management and integration function?
A. These are in one division the budget folks, in another division the information management folks, it might be human resource folks in another division. And we are the division -- the only division within that group that has any technical or policy responsibilities. There is a separate office, there are two offices, in the other office is acceptance and transportation integration.
Q. And who heads up the program management and integration office?
A. Let's see, that would be Dwight Shelor.
Q. How long have you been a team leader in the Regulatory Coordination Division?
A. Let's see, I moved in late '95. About three and a half years, almost four years.
Q. Since that move three and a half, four years ago, have there been any other reorganizations within your office?
A. Within my particular Office of Program Management?
Q. Well, let me start with the Regulatory

Page 1

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
-------------------------------------------X
YANKEE ATOMIC ELECTRIC COMPANY :
(98-126C)(Merow, S.J.) :
CONNECTICUT YANKEE ATOMIC POWER COMPANY :
(98-154C)(Merow, S.J.) :
MAINE YANKEE ATOMIC POWER COMPANY :
(98-474C)(Merow, S.J.) :
FLORIDA POWER & LIGHT COMPANY :
(98-483C)(Wilson, J.) :
NORTHERN STATES POWER COMPANY :
(98-484C)(Wiese, J.) :
DUKE POWER, a Division of DUKE ENERGY CORP.:
(98-485C)(Sypolt, J.) :
INDIANA MICHIGAN POWER COMPANY :
(98-486C)(Hodges, J.) :
SACRAMENTO MUNICIPAL UTILITY DISTRICT :
(98-488C)(Yock, S.J.) :
SOUTHERN NUCLEAR OPERATING COMPANY, et al. :
(98-614C)(Merow, S.J.) :
COMMONWEALTH EDISON COMPANY :
(98-621C)(Hewitt, J.) :
BOSTON EDISON COMPANY :
(99-447C) (Allegra, J.) :
GPU NUCLEAR, INCORPORATED :
(00-440C)(Bush, J.) :
WISCONSIN ELECTRIC POWER COMPANY :
(00-697C)(Merow, S.J.) :
POWER AUTHORITY OF THE STATE OF NEW YORK :VOLUME
(00-703C)(Damich, J.) : I
OMAHA PUBLIC POWER DISTRICT :
(01-115C)(Bush, J.) :
NEBRASKA PUBLIC POWER DISTRICT :Discovery
(01-116C)(Sypolt, J.) :Judge:
TENNESSEE VALLEY AUTHORITY :(Judge
(01-249C)(Bruggink, J.) :Sypolt)
Plaintiffs, :PAGES
v. :1 - 241

Page 2

THE UNITED STATES, :
Defendant. :
-------------------------------------------X

Deposition of Victor W. Trebules, Jr.
Washington, DC
Wednesday, April 17, 2002

Reported by: Denise Dobner Vickery, RMR, CRR
JOB NO. 144458

Page 3

April 17, 2002
9:32 A.M.

Deposition of Victor W. Trebules, Jr., held at the offices of:

Jenner & Block
601 13th Street, NW
12th Floor
Washington, DC 20005

Pursuant to notice, before Denise Dobner Vickery, a Registered Merit Reporter, Notary Public of the District of Columbia.

Page 4

APPEARANCES:

Jenner & Block
For the Plaintiff COMMONWEALTH EDISON
One IBM Plaza
Chicago, IL 60611-7603
(312) 222-9350
BY: Theodore T. Eidukas, Esq.

Shaw Pittman Potts & Trowbridge
For the Plaintiffs NORTHERN STATES POWER COMPANY, et al.
1650 Tysons Boulevard
McLean, VA 22102-4859
(703) 770-7962
BY: Devon E. Hewitt, Esq.

Arnold & Porter
For the Plaintiffs SOUTHERN NUCLEAR OPERATING COMPANY, et al.
555 Twelfth Street, NW
Washington, DC 20004-1206

answer them as best you can.
A. Okay.
Q. If at any time you don't understand a question, it's probably because I've misphrased it or I'm not making any sense. So, just stop me, ask me to ask the question again or rephrase the question so it makes sense to you.
A. (Nods head).
Q. Also, because the court reporter can only take down what we say and not any gestures or physical answers like nods of the head, you know, in other words, what I'm saying, your answers have to be verbal.
And also because she can only take down what one person is saying at any one time, it's important that I try not to talk over your answers and, you know, wait until I finish the questions just so that she can get down exactly what's been said and there's not two people trying to talk at one time.
A. (Nods head).
Q. So that the record is accurate.
A. Okay.
Q. And if at any time you need a break for



whatever reason, as long as a question is not pending, I would be more than happy to accommodate you in taking a break.
A. (Nods head).
Q. Could you just quickly just describe your education after high school.
A. All right. I went to Ohio University for five years. I got a degree in engineering and a bachelor's degree in physics. I then did graduate work at Lehigh University in Bethlehem, Pennsylvania. I got a master's degree in mechanical engineering.
Q. And when did you receive that final degree?
A. 1972 I graduated from Lehigh.
Q. And that was the master's?
A. Yes. Master's degree in mechanical engineering.
Q. Okay. When did you first -- strike that.
Do you presently work for the Department of Energy?
A. Yes, I do.
Q. Okay. When did you first -- when did you start working for the Department of Energy?



A. Actually, I started working for the Atomic Energy Commission in 1972, which became the Energy Research and Development Administration, which became the Department of Energy. I don't remember the exact year ERDA became the Department of Energy. I think it was about -- I don't remember.
Q. Okay. But you were there when the Department of Energy was first formed it sounds like?
A. Yes. Yes.
Q. What was your first position in the Department of Energy?
A. The Department of Energy or the Atomic Energy Commission?
Q. I'm going to start with the Department of Energy.
A. Okay. Again, I don't remember exactly when name changed, but I spent the first five years working for the Pittsburgh Naval Reactors Office after I graduated from college, and then I transferred to the Atomic Energy Commission headquarters in Germantown, Maryland and I worked in the Office of Nuclear Energy Programs.



Q. In the Office of Nuclear Energy Programs, did your responsibilities include the handling of spent nuclear fuel at that time?
A. The handling of spent. No, we never handled any spent nuclear fuel.
Q. All right. I will rephrase that. Did your responsibilities include the disposal of spent nuclear fuel?
A. We did planning for activities involving radioactive waste and spent nuclear fuel. We never actually handled, though, any material.
Q. Could you briefly describe what the planning you did entailed that involved the disposal of radioactive waste and spent nuclear fuel.
MR. SHULTIS: Objection. Could we get a little more specific on the time period we're talking about here? I think that's important.
MR. EIDUKAS: I'm talking of the time period where you were at the Office of Nuclear Energy Programs, and I believe the witness has said he doesn't know a specific date when he was doing this.
BY MR. EIDUKAS:

**Yankee Atomic Electric v. U.S Nos. 98-126C, 98-154C, 98-474C August 10, 2004**

**Heritage Reporting Corporation**

**Page 4365 to Page 4613**

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

*HERITAGE REPORTING CORPORATION*
*1220 L Street, N.W.*
*Suite 600*
*Washington, DC 20005*
*Phone: 202-628-4888*
*FAX: 202-371-0935*

JUDGE MEROW: That's the last response?
MR. STOUCK: I think that's right.
MR. LESTER: I guess my only concern would be if we're talking about having counter-counter-designations. I'm not sure that's provided for in the rules. but I don't know what the Plaintiff is intending in terms of a response. If it's just dealing with the objections that were raised. that's fine. I don't have any problem with that. If it's adding additional testimony. I might have a little concern about that.
MR. STOUCK: I think. Your Honor. although we're not going to have any additional testimony on the subjects addressed in our original designations. we do have some views that some of the reported counter-designations are outside the scope of the designations. To that extent. whether we'll actually counter counter those or whether we'll just point out they're improperly designated. I'm not sure we decided yet. In any event. I don't think there's much of that. It's mostly response to their objections. I believe.
JUDGE MEROW: Let's do the best we can. and I'll consider them when they're in. And if you have to do more. then we'll have to consider that at



the time.
MR. STOUCK: And we would certainly be reasonable about that, Your Honor, but for now –
JUDGE MEROW: Won't take any precipitous action, then, one way or the other. Okay.
MR. STOUCK: Thank you.
JUDGE MEROW: Thank you, sir, for the notice. I'll reserve ruling on 1972 until I hear from Mr. Lester.
MR. LESTER: Thank you, Your Honor.
JUDGE MEROW: Okay.
MS. HERRMANN: The government calls Mr. David Huizenga.
DAVID HUIZENGA
was sworn and testified as follows:
DIRECT EXAMINATION
BY MS. HERRMANN:
Q Good morning. Would you introduce yourself to the Court, please.
A My name is David Gary Huizenga.
Q Mr. Huizenga, who is your employer?
A Department of Energy.
Q How long have you worked for DOE?
A Since March of 1990.
Q What is your current position at DOE?



A I'm the assistant deputy administrator for the Office of International Material Protection and Cooperation.
Q How long have you held that position?
A Approximately two years.
Q What office is that? I'm sorry, did I interrupt you?
A I'm just trying to get the – the – the timing exactly right. Since November of 2002, so a little less than two years.
Q Fair enough. What office is that within?
A That is within – within the Office of Advanced Nuclear Nonproliferation.
Q And is Defense Nuclear Nonproliferation part of NNSA?
A Yes, it is.
Q What is NNSA?
A National Nuclear Security Administration.
Q That's all within the umbrella of DOE?
A That's one of the two main arms of the Department of Energy.
Q What are your responsibilities as assistant deputy administrator?
A My current responsibilities focus mostly



on protecting highly enriched uranium and plutonium in Russia and other countries of the former Soviet Union.
Q What position did you hold before your current one, before November of 2002?
A From February of 2002 to November, I was an associate assistant deputy administrator in the Office of International Nuclear Safety and Cooperation.
Q And was that still within Defense Nuclear Nonproliferation?
A Yes, it was.
Q What were your responsibilities in that position?
A In that regard, it was primarily to improve the safety of the Chernobyl-style reactors in the former Soviet Union.
Q I think you told me you started that position in February of 2002.
A That's correct.
Q What did you do before that?
A Before that I was a deputy assistant secretary in the Office of Environmental Management.
Q What is the Office of Environmental Management?
A It's one of the assistant secretary

# UNITED STATES
# COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| TENNESSEE VALLEY AUTHORITY, | ) | |
| Plaintiff, | ) | Case No. 01-249C |
| v. | ) | |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

Pages: 1264 through 1560

Place: Washington, D.C.

Date: July 11, 2005

**HERITAGE REPORTING CORPORATION**
*Official Reporters*
1220 L Street, N.W., Suite 600
Washington, D.C. 20005-4018
(202) 628-4888
hrc@concentric.net

us for just one moment, we're going to hand out binders.

THE COURT: Certainly.

MR. LO RE: Your Honor, I promise that we won't discuss every page of every document here. You can see there are four binders total. There are many large program documents. Thank you, Your Honor. My only observation here is that the legal profession, having handed out now six binders, or four binders four times, is the legal profession is certainly not very sympathetic to the forest of the United States or the world, I guess.

THE COURT: It's all recycled paper.

MR. LO RE: I hope so.

DIRECT EXAMINATION

BY MR. LO RE:

Q. Mr. Kouts, could you please state your full name for the record?

A. Christopher Alexander Kouts.

Q. Mr. Kouts, where are you currently employed?

A. I'm currently employed with the Office of Civilian Radioactive Waste Management at the Department of Energy.

Q. And what is your current position in that

office, sir?

A. I'm director of the Office of Systems Analysis and Strategy Development.

Q. How long have you been in that position?

A. On an acting basis, October of 2002, and on a permanent basis, it was July of 2003.

Q. Could you describe for the Court, Mr. Kouts, your responsibility as the director of Office of Systems Analysis and Strategy Development?

A. The systems analysis portion of it is to basically conduct analyses to make sure that the Waste Management System as the Department envisions it, that's the repository, the transportation component, and the waste acceptance component operate effectively and efficiently.

In addition to that, I have other responsibilities, including the waste acceptance component of the program, which is the management of the standard contract with utilities, interaction with the defense aspects of -- the defense waste programs within the Department to make sure that those materials are appropriately, are being appropriately packaged and developed for the repository.

In addition, I have safeguards and security

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

YANKEE ATOMIC ELECTRIC COMPANY, )
CONNECTICUT YANKEE ATOMIC POWER )Case Nos.:
COMPANY, and MAINE YANKEE ATOMIC ) 98-126C
POWER COMPANY, ) 98-154C
Plaintiffs, ) 98-474C
)
THE UNITED STATES, )
Defendant. )

Courtroom 5
National Courts Building
717 Madison Place, N.W.
Washington, D.C.

Thursday, August 5, 2004
Volume 18

The parties met, pursuant to the notice of the Judge, at 10:00 a.m.

BEFORE: THE HONORABLE JAMES F. MEROW



APPEARANCES:

ON BEHALF OF YANKEE ATOMIC ELECTRIC COMPANY, CONNECTICUT YANKEE ATOMIC POWER COMPANY and MAINE YANKEE ATOMIC POWER COMPANY:

JERRY STOUCK, ESQ.
ROBERT SHAPIRO, ESQ.
PETER J. SKALABAN, JR., ESQ.
VIVEK K. HATTI, ESQ
Spriggs & Hollingsworth
1350 I Street, N.W.
Washington, D.C. 20005
(202) 898-5800

ON BEHALF OF YANKEE ATOMIC ELECTRIC COMPANY, CONNECTICUT YANKEE ATOMIC POWER COMPANY:

MERRILL J. ATKINS, ESQ.
Assisting General Counsel
19 Midstate Drive
Auburn, Massachusetts 01560
(508) 721-3042

(Appearances Continued on the Next Page.)



APPEARANCES CONTINUED:

ON BEHALF OF MAINE YANKEE ATOMIC POWER COMPANY:

JOSEPH D. FAY, ESQ.
General Counsel
Maine Yankee
321 Old Ferry Road
Wiscasset, Maine 04578
(207) 882-5603

On Behalf of the Defendant:

HAROLD LESTER, JR., ESQ.
JOHN EKMAN, ESQ.
MARIAN E. SULLIVAN, ESQ.
HEIDE L. HERRMANN, ESQ.
R. ALAN MILLER, ESQ.
KEVIN B. CRAWFORD, ESQ.
RUSSELL SHULTIS, ESQ.
U.S. Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530
(202) 305-7562

***Index appears at end of transcript***



P R O C E E D I N G S

\- - - - -

MS. SULLIVAN: Good morning, Your Honor. We're ready to call our next witness unless there's anything we need to handle preliminarily.
THE COURT: Okay.
MS. SULLIVAN: The government calls David Zabransky.
Whereupon--

DAVID ZABRANSKY

a witness, called for examination, having been duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. SULLIVAN:
Q. Good morning, Mr. Zabransky. Are you currently employed at the Department of Energy?
A. Yes, I am.
Q. And to what office within the Department of Energy are you currently assigned?
A. I'm in the Office of Civilian Radioactive Waste Management, and I work in the Office of Systems Analysis and Strategy Development within that office.
Q. What are your current responsibilities?
A. I report to Chris Kouts, and I work on issues related to the standard contract, other

Page 4111

technical issues on commercial waste acceptance. waste acceptance issues, and I serve as the contracting officer for the standard contracts.
Q. You testified you report to Mr. Kouts. Do you know who Mr. Kouts reports to?
A. Yes. Mr. Kouts reports to Ted Garrish, the deputy director.
Q. And to whom does Mr. Garrish report?
A. Mr. Garrish reports to Dr. Choo, the director of the program.
Q. When did you become the contracting officer?
A. I believe it was in July of 2002.
Q. Have you also served as the technical representative to the contracting officer?
A. Yes. I have.
Q. And when did you serve as the technical representative to the contracting officer?
A. From, I believe, around 1995 through July of 2002.
Q. And what were your responsibilities as the contracting officer's technical representative?
A. To provide technical advice to the contracting officer on issues relating to administration of the standard contract.

Page 4112

Q. When did you join DOE?
A. I came to DOE in 1994, I believe July of 1994.
Q. Prior to joining DOE, where were you employed?
A. I was employed by Wisconsin Electric Power Company in Milwaukee, Wisconsin.
Q. How long were you employed by Wisconsin Electric Power Company?
A. I started there in 1978 and left in 1994.
Q. What was your position at Wisconsin Electric Power Company when you left?
A. When I left Wisconsin Electric in 1994, I was the manager of nuclear fuel services.
Q. Did your responsibilities as manager of nuclear fuel services include administering Wisconsin Electric's standard contract with Department of Energy?
A. Yes, my responsibilities were for all the contracts that the nuclear power department had for fuel and fuel disposal, as well as analysis of fuel designs and storage of spent fuel at Point Beach.
Q. Mr. Zabransky, do you hold a Bachelor's degree?
A. Yes, I do.

Page 4113

Q. In what?
A. I have a Bachelor's in Civil Engineering from Marquette University in Milwaukee, Wisconsin.
Q. And when did you receive that degree?
A. 1980.
Q. As part of your duties at Wisconsin Electric Power Company, were you familiar with the annual capacity reports and acceptance priority ranks issued by DOE?
A. Yes, I was.
Q. What did you understand to be the purpose of those documents?
A. The purpose of the documents, as I understood it, was to set forth the acceptance allocations to each contract holder the Department was going to have in its facilities for disposal of spent fuel.
Q. At the time you were at Wisconsin Electric, were you also familiar with what are known as delivery commitment schedules or DCSes?
A. Yes, I was.
Q. And what did you understand to be the function of a DCS?
A. When I was at Wisconsin Electric, it was my understanding that DCSes, delivery commitment

Page 4114

schedules, were the mechanism, the contractual mechanism, by which utilities took the allocations that were allocated to them and conveyed to DOE that they wanted that service, what particular reactor and what year and what range of fuel, and made a commitment to the government to provide that fuel for pickup.
Q. And at the time you were at Wisconsin Electric, were you responsible for completing DCSes and submitting them to DOE on behalf of Wisconsin Electric?
A. My organization was responsible for preparing the DCSes, and they were subsequently submitted by my organization. They were signed off by a vice president of nuclear power, but we did all the work for the preparation and transmittal of those documents.
Q. Thank you. Can we have Defendant's Exhibit 24, please?
MS. SULLIVAN: May I approach, Your Honor?
THE COURT: Yes, sure.
BY MS. SULLIVAN:
Q. Mr. Zabransky, you've been handed what's been marked as Defendant's Exhibit 24. Do you recognize this document?