No. 04-0074C
into which has been consolidated
No. 04-0075C
Judge Hewitt

(Filed Electronically, May 22, 2006)

---

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---

PACIFIC GAS & ELECTRIC COMPANY,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

---

# PACIFIC GAS & ELECTRIC'S MOTION TO HAVE THE COURT GIVE FULL CONSIDERATION TO CERTAIN DOCUMENTARY EVIDENCE RELATING TO REASONABLE PERFORMANCE AND GTCC WASTE

---

JERRY STOUCK
Greenberg Traurig, LLP
800 Connecticut Avenue, NW
Suite 500
Washington, DC 20006
(202) 331-3173 phone
(202) 261-4751 fax
*Counsel for Plaintiff*
Pacific Gas & Electric Company

Of Counsel:
ROBERT L. SHAPIRO
Greenberg Traurig, LLP

# TABLE OF CONTENTS

Page

I. PG&E MUST HAVE SUFFICIENT OPPORTUNITY TO PRESENT EVIDENCE SUPPORTING REASONABLE DOE PERFORMANCE AND DOE'S PLANS TO ACCEPT GTCC .......... 4

A. PG&E Must Have Sufficient Opportunity To Present Evidence of Reasonable DOE Performance .......... 4

B. PG&E Should Have Sufficient Opportunity To Present Evidence That The Contract Covered Disposal Of GTCC Or, Alternatively, That DOE Was Planning On Picking Up GTCC Along With Spent Fuel .......... 7

II. THE COURT SHOULD ADMIT PG&E'S "HIGHLY RELEVANT" AND HIGHLY PROBATIVE EVIDENCE AND GIVE IT DUE CONSIDERATION EVEN IF A WITNESS DOES NOT "SPECIFICALLY POINT[ IT] OUT" BECAUSE DOING SO GOES TO THE COURT'S CENTRAL ROLE AS FACT-FINDER AND SUPPORTS ITS FURTHER INTERESTS OF FAIR NOTICE AND JUDICIAL ECONOMY .......... 8

A. The Government Has Fair Notice Of PG&E's Position Because It Has Previously Litigated These Issues On Substantially the Same Evidence .......... 9

B. Judicial Economy Is Best Served By Admitting Such Evidence And Granting It Due Consideration Even If Witness Does Not Specifically Point Out Sections Of The Document At Trial .......... 10

C. The Court Should Grant This Relief On Grounds of Fundamental Fairness .......... 11

III. CONCLUSION .......... 12

TABLE OF AUTHORITIES

**Federal Cases**

*Commonwealth Edison Co. v. United States*, 56 Fed C1. 652 (2003) .......................................... 4

*Commonwealth Edison*, 56 Fed. Cl. at 666..................................................................... 6

*David Nassif Assocs. v. United States*, 557 F.2d 249 (Ct. Cl. 1977) ............................................ 4

*David Nassif Assocs. v. United States*,644 F.2d 4 (Ct. Cl. 1981) ................................................ 4

*Japanese Elec. Prods. Antitrust Litig.*, 723 F.2d 238 (3rd Cir. 1983) .......................................... 2

*John Paul Mitchell Sys. v. Quality King Distribs.*, 106 F. Supp. 2d 462 (S.D.N.Y. 2000) ............ 2

*Yankee Atomic Electric Co. v. United States*, 98-126C, 2004 WL 1535688 (Fed. Cl. June 28, 2004) ........................................................................................................... 9

**<u>Rules</u>**

RCFC 33 .......................................................................................................... 2

Fed. R. Ev. 401 ................................................................................................ 11

Fed. R. Ev. 402 ................................................................................................ 11

Fed. R. Ev. 403 ................................................................................................ 11

Fed. R. Ev. 801(d)(2) ........................................................................................ 2

Fed. R. Ev. 901 ................................................................................................ 11

# INDEX TO APPENDICES

Documentary Evidence Pertaining to Reasonable Performance ....................................Appendix A

Documentary Evidence Pertaining to GTCC................................................ Appendix B (*pending*)

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

Filed Electronically on May 22, 2006

| | | |
|---|---|---|
| PACIFIC GAS & ELECTRIC COMPANY,<br>Plaintiff,<br>v.<br>UNITED STATES OF AMERICA,<br>Defendant. | ) | No. 04-0074C, into which has been consolidated No. 04-0075C (Judge Hewitt) |

PACIFIC GAS & ELECTRIC'S MOTION TO HAVE THE COURT GIVE FULL CONSIDERATION TO CERTAIN DOCUMENTARY EVIDENCE RELATING TO REASONABLE PERFORMANCE AND GTCC WASTE

In light of the Court's May 4, 2006 Order, PG&E moves this Court to give full consideration to certain documentary evidence even if specific portions of such documents are not "specifically pointed out" by a witness at trial. *See* Order of May 4, 2006 at 2. Specifically, this documentary evidence relates to (1) what reasonable performance (*i.e.*, a reasonable acceptance rate and schedule) DOE should have provided absent the breach (the "Reasonable Performance Issue"), and (2) whether DOE was required to remove, and whether it would have removed, PG&E's greater-than-class-C waste ("GTCC") concurrent with its spent fuel absent the breach (the "GTCC Issue"). PG&E requests this relief because (a) the number and complexity of the issues to be tried combined with (b) the short trial time and, most recently, (c) the Court's stated preference that exhibits be introduced via live witness testimony converge to unduly restrict the Court's access to "highly relevant" and highly probative evidence regarding the Rate of Acceptance and GTCC issues. *See* Order of May 15, 2006 at 4 (granting PG&E's Second

Motion to Compel). These issues are critical to PG&E's claim, and justice dictates that it have sufficient opportunity to present its evidence supporting its position.

PG&E expects to introduce much documentary evidence through specific references during the course of direct testimony and cross examination.[1] But the procedures specified in the Court's May 4, 2006, Order may restrict PG&E's ability to present fully its evidence that DOE has held a consistent position on both Rate of Acceptance and GTCC Issues for the life of PG&E's contract with the government (the "Contract"). Overwhelming evidence will show that 3,000 MTU (Metric Tonnes of Uranium) is a reasonable rate of acceptance for the Court to apply to the open term in the Contract, in part, by demonstrating that DOE consistently utilized the 3,000 MTU rate in its planning and other key documents, believing it to be in accord with the purpose and intent of the Nuclear Waste Policy Act of 1982 ("NWPA") and the Contract. Similarly, compelling documentary evidence will demonstrate that a reasonable schedule of spent fuel removal from utilities would have made ample use of exchanges of spent fuel acceptance allocations in order to optimize DOE's schedule of acceptance. Further, evidence will show that, for the past twenty years, DOE has consistently maintained that it would accept

[1] The documentary evidence to which this Motion refers is compiled in Appendices A and B and is fully admissible. The government authenticated the documents by producing them in response to PG&E's discovery requests. RCFC 33. *See In re Japanese Elec. Prods. Antitrust Litig.*, 723 F.2d 238, 286 (3rd Cir. 1983) (stating that documents produced during the course of litigation pursuant to a discovery order in the underlying proceeding came from a source where the documents "were likely to be kept" and that "[n]o more evidence was needed to establish a prima facie case of authenticity"); *John Paul Mitchell Sys. v. Quality King Distribs.*, 106 F. Supp. 2d 462, 472 (S.D.N.Y. 2000) ("[T]he act of production implicitly authenticated the documents."). Further, as official documents these exhibits are admissions under Fed. R. Evid. 801(d)(2). *See e.g.* PG&E's Response To Defendant's Motion *In Limine* To Exclude From Trial Documents Prepared By Government Contractors at 10-16 (May 19, 2006).

PG&E wishes to make this Motion available to the Court before tomorrow's pretrial conference; therefore, it submits this filing with Appendix A, which is complete. PG&E will complete Appendix B and provide it to the Court tomorrow, May 23, 2006.

GTCC concurrent with SNF and store both at a deep geologic repository. The strength of this evidence comes not just from DOE's admission in one or two documents, but from the consistency of statements in documents spanning the life of the Contract. Here, the abundance of such consistent evidence strongly supports PG&E's position, but, ironically, also impacts PG&E's ability to present its case effectively due to the limited trial time and the Court's preference that a witness "specifically point[] out" relevant parts of each document.

Granting this Motion would be consistent with the Court's statement during the May 4, 2006, telephone status conference that it does not want parties "spin-doctoring evidence *for the first time* in post-trial briefs." The government has litigated both of the Reasonable Performance and GTCC Issues in prior trials involving utilities suing for breach of the DOE spent fuel contracts, like the one here. PG&E has already indicated in its Contentions of Fact and Law, filed April 10, 2006, that it will adopt a position similar to prior claimants, in particular Yankee Atomic, Connecticut Yankee, and Maine Yankee, and even use substantially the same evidence. Notwithstanding that, PG&E here provides notice afresh to both the Court and the government of all documents relating to both the Rate of Acceptance and GTCC issues that it will/may seek to have admitted and requests that, once the documents are admitted, the Court accord each exhibit due consideration, even if time does not permit a witness to discuss each and "specifically point[] out" relevant passages. *See* Appendix A (Reasonable Performance Issue documents); Appendix B (GTCC Issue documents).

The Court's interest in judicial economy and fundamental fairness further support granting this Motion. The Court should grant this Motion to allow the parties to focus their efforts at trial on presenting evidence best conveyed through live testimony, while simultaneously highlighting for the Court that portion of the, admittedly, extensive record which

contains "highly relevant" documentary evidence. Moreover, PG&E reasonably assumed that it could move exhibits into evidence without a witness; requiring PG&E to significantly alter its trial strategy just weeks before trial, after both parties have submitted final witness and exhibit lists, would unfairly restrict its ability to present evidence of these critical issues. Thus, this Court should grant PG&E's documentary evidence on the Issues of Reasonable Performance and GTCC due consideration even if it is not "specifically pointed out" by a witness.

## I. PG&E MUST HAVE SUFFICIENT OPPORTUNITY TO PRESENT EVIDENCE SUPPORTING REASONABLE DOE PERFORMANCE AND DOE'S PLANS TO ACCEPT GTCC

### A. PG&E Must Have Sufficient Opportunity To Present Evidence of Reasonable DOE Performance

The parties agree that the Contract does not specify the rate at which DOE will accept PG&E's spent fuel. PG&E's Contentions of Fact and Law at 37-38 ("Contentions of Fact & Law"); Govt. Motion *In Limine* to Exclude Testimony Concerning the Meaning of the NWPA and the Standard Contract at 9 ("Indeed the Standard Contract does not contain a numerical rate or schedule of SNF acceptance."). As this Court recognized in *Commonwealth Edison Co. v. United States*, 56 Fed C1. 652 (2003), it must fill in this open term in the Contract with a reasonable rate of acceptance based on the parties' intent as well as the purpose of both the Contract and the governing statute, the NWPA. *Commonwealth Edison*, 56 Fed. Cl. at 662 (citing *David Nassif Assocs. v. United States*, 557 F.2d 249 (Ct. Cl. 1977) & 644 F.2d 4 (Ct. Cl. 1981), for the proposition that the Court must supply a missing term in the Contract).[2]

The NWPA and the Contract have two important purposes: to prevent utilities from incurring avoidable at-reactor storage costs and reducing the backlog of spent fuel that utilities were already storing. *See, e.g.*, Proceedings of the 1983 Civilian Radioactive Waste

[2] For more information, see PG&E's Response to Defendant's Motion *In Limine* to Exclude Testimony Concerning the Meaning of the NWPA and the Standard Contract at 9.

Management Information Meeting, December 12-15, 1983, Program Overview by Robert Morgan (the first acting director of the DOE spent fuel disposition program), PG&E Exh. 60. Substantial evidence will demonstrate that, throughout the life of the Contract, the parties considered performance at an acceptance rate of 3,000 MTU with use of exchanges to be reasonable for fulfilling both of these purposes. PG&E will present documentary evidence that DOE formulated the 3,000 MTU rate of acceptance pursuant to the purposes of the NWPA, even before entering into the 1983 Contract with PG&E. *See* Projected Costs for Mined Geologic Repositories for Disposal of Commercial Nuclear Waste" (Dec. 1982), PG&E Exh. 654; "Fiscal Implications of a 1-Mil/Kwh Waste Management Fee" (Dec. 1982), PG&E Exh 653. PG&E will show that DOE relied on the 3,000 MTU rate when entering the Contract with PG&E in 1983. 1983 Draft Mission Plan, PG&E Exh. 59; "Report on Financing the Disposal of Commercial Nuclear Fuel and Processing High-Level Radioactive Waste" (June 1983), PG&E Exh.51, 55. And it will show that a 3,000 MTU rate has consistently been the planning basis for the DOE program ever since to:

- Calculate the vast majority of Annual Capacity Reports required by the Contract. *See e.g.* Acceptance Capacity Ranking and Annual Priority Report ("ACR/APR"), 1990 (PG&E Exh.140); July 2004 (PG&E Exh. 377);[3] "Annual Capacity Report Briefing for OCRWM Executive Committee" (Nov. 1986), PG&E Exh. 652.

- Calculate reports required by statute. *See e.g.* 1985 Mission Plan, PG&E Exh.81; "Nuclear Waste Fund Fee Adequacy: An Assessment" (July 1984) PG&E Exh. 72; Proceedings of the 1983 Civilian Radioactive Waste Management Information Meeting, December 12-15, 1983, Program Overview by Robert Morgan (the first acting director of the DOE spent fuel disposition program), PG&E Exh. 267.

- Generate nearly all other planning documents up to the present day. *See e.g.* "Analysis of Total System Life Cycle Cost Report" (May 2001), PG&E Exh. 333.

[3] The 1987 ACR/APR, PG&E Exhs. 96 & 101, presented a slightly lower rate of 2650, but was consistent with other ACR/APRs overall.

Indeed, all DOE planning documents forecasting delivery to a permanent repository are based on a rate of acceptance around 3,000 MTU.[4]

Similarly, DOE's correspondence shows it has always understood that the utilities intended to utilize the exchange provision in the Contract. *See e.g.* "Letter to Andrew C. Kadak from Dr. Daniel A. Dreyfus of DOE Regarding Exchange Process and Priority Acceptance to Shut Down Reactors" (Sept. 28, 1995), PGE Exh. 233; "Letter to The Secretary of Energy from Robert Morgan at DOE" (Apr. 9, 1983), PG&E Exh. 47; "Letter to Robert Morgan at DOE from Florida Power & Light Co. Regarding Initial Comments on DOE Draft Contract" (Feb. 8, 1983), PG&E Exh. 457.

The above cited exhibits represent only a token of the abundant evidence supporting PG&E's claim that DOE has consistently maintained since before it executed the Contract that 3,000 MTU was a reasonable rate of acceptance and understood that the utilities intended to utilize the exchange provision in the Contract. Due to the importance of the Issue and the strength of PG&E's evidence, this Court should admit at trial and give due consideration to PG&E's documentary evidence about the Reasonable Performance Issue, even if not specifically discussed by a live witness.

---

[4] In response, the government may offer only a handful of planning documents that state a lower rate of acceptance, 900 MTU; it admits, however, that these rates are based on the 10,000 MTU limit set in 1987 for a Monitered Retrievable Storage ("MRS") facility, a project which was never executed. Defendant's Memorandum of Contentions of Fact and Law at 21. *See* Annual Capacity Report, 1991-1995, PG&E Exh. 150,182.221. *See Commonwealth Edison*, 56 Fed. Cl. at 666 ("The court does not agree with the defendant that it is entitled to limit its damages based upon an optional disposal method [the MRS] of which it did not avail itself.").

B. PG&E Should Have Sufficient Opportunity To Present Evidence That The Contract Covered Disposal Of GTCC Or, Alternatively, That DOE Was Planning On Picking Up GTCC Along With Spent Fuel

PG&E believes that it has a strong legal position that GTCC is covered by the Contract.[5] However, even if the Contract did not cover GTCC, PG&E will present substantial documentary and other evidence showing that, pursuant to DOE's obligation under the Low-Level Waste Policy Amendment Act of 1985 ("LLWPAA") to dispose of utilities' GTCC, DOE has continuously intended to fulfill its obligation to dispose of utility GTCC pursuant to the LLWPAA by accepting and disposing of it along with utility spent fuel in a deep geologic repository. Pursuant to that LLWPAA, DOE committed to Congress that it would take GTCC waste "as needed" starting in 1989. *See* 1987 Report to Congress on Recommendations for Management of GTCC Low-Level Radioactive Waste at 4-2 (making commitment), PG&E Exh.349; Jan. 23, 2001 GTCC Program Planning Meeting Materials, Attachment 3 ("DOE did not meet its commitment [to Congress] to begin accepting GTCC waste for storage by February 1989"), PG&E Exh. 381. Moreover, overwhelming evidence, including a series of detailed DOE planning documents, shows that DOE long planned to implement the 1985 Act by disposing of utility GTCC waste at the Yucca Mountain repository. *See e.g.*, DOE's Sept. 1995 "Greater-Than-Class-C Low-Level Waste Program Management Plan," at i ("Executive Summary. The Greater-Than-Class C (GTCC), Program strategy has been reviewed and revised to address the legislative mandate for the U.S. Department of Energy (DOE) to provide disposal for GTCC LLW [Low Level Waste] . . . . The long-term objective of the strategy is to establish the disposition of all GTCC in a repository. . . . The long-term efforts will be accomplished cooperatively with personnel from DOE-RW (*i.e.*, the DOE spent fuel program]."), PG&E Exh.

[5] PG&E maintains that GTCC, comprised mainly of highly radioactive reactor internals, constitutes high-level radioactive waste ("HLW") and is, therefore, covered by the Contract. Contract, Art. I. 12(b)

238; DOE's Dec. 1999 "Greater-Than-Class C Low-level Radioactive Waste Program Management Plan" at 3 ("DOE's long-term solution for the disposal of GTCC LLW is the same as that for spent nuclear fuel, therefore a reasonable solution is the standard canister to be used for spent fuel."), PG&E Exh. 400.

Indeed, the government even acknowledges in its pretrial brief that "DOE has a statutory obligation to develop a plan for the disposal of commercially-generated GTCC, pursuant to the Low-Level Waste Policy Amendments Act of 1985, 42 U.S.C. §§ 2021b-2021i." Government's Pretrial Brief at 66. That evidence, together with the small quantity of GTCC waste existing at the few shutdown reactors, indicates strongly that if DOE had performed as required beginning in 1998, it would have removed the utility GTCC waste for disposal at Yucca Mountain along with utility spent fuel, regardless of "technical" contract coverage. Again, because the GTCC Issue is a feature of PG&E's claim best supported by showing DOE's consistent position through the admission of numerous documents spanning the life of the Contract, the Court should admit at trial and give due consideration to PG&E's documentary evidence about the GTCC Issue, even if not specifically discussed by a witness.

## II. THE COURT SHOULD ADMIT PG&E'S "HIGHLY RELEVANT" AND HIGHLY PROBATIVE EVIDENCE AND GIVE IT DUE CONSIDERATION EVEN IF A WITNESS DOES NOT "SPECIFICALLY POINT[ IT] OUT" BECAUSE DOING SO GOES TO THE COURT'S CENTRAL ROLE AS FACT-FINDER AND SUPPORTS ITS FURTHER INTERESTS OF FAIR NOTICE AND JUDICIAL ECONOMY

When coupled with the limited time allotted for trial, the Court's requirement that exhibits be "specifically pointed out" by a witness places PG&E in a bind. PG&E does not want to waste valuable trial time using witnesses as mere vehicles to move into evidence this voluminous record of DOE's consistently-held positions regarding the 3,000 MTU rate of acceptance, its knowledge of the utilities' ability and intent to exchange acceptance allocations, and its plans and intentions for accepting GTCC by picking it up along with SNF and storing

both at a deep geologic repository. On the other hand, such evidence is important to PG&E's case and cannot be overlooked. Ironically, this wealth of evidence supporting PG&E's position complicates its ability to effectively present its case.

PG&E appreciates the Court's concerns that allowing parties to introduce evidence without a witness potentially permits counsel to "spin-doctor" such evidence for the first time in post-trial briefs, violating the Court's notions of fair notice and judicial economy. May 4, 2006 teleconference call. *See* Order of May 4, 2006 at 2. In this instance, however, the very same evidence PG&E intends to offer has been used against the government in previous spent fuel litigation, to show the consistency of DOE's positions regarding the Reasonable Performance and GTCC Issues, so the government cannot argue surprise at its use here. *See e.g. Yankee Atomic Electric Co. v. United States*, 98-126C, 2004 WL 1535688 (Fed. Cl. June 28, 2004). Further, moving these documents into evidence with a witness is not productive because the witness would add little insight by way of his or her testimony. Thus, in this case, the Court's interests in fair notice and judicial economy would be best served by having this Court admit and give due consideration to this evidence, without a witness "specifically point[ing] out" every relevant document.

### A. The Government Has Fair Notice Of PG&E's Position Because It Has Previously Litigated These Issues On Substantially the Same Evidence

Neither PG&E's positions on the Reasonable Performance or GTCC Issues nor any of the evidence supporting them come as a surprise to the government because these issues have been litigated in other spent fuel cases and based, in at least one case, on the very same evidence. In *Yankee Atomic*, the government was represented by the same lead counsel as in the present case. Here, both the list of exhibits in Appendices A and B and the points for which PG&E seeks to reply on them are almost identical to the exhibits noted by Yankee Atomic in its post-trial

proposed findings of fact. Yankee Atomic detailed its legal position, nearly identical to PG&E's, and used much of the same evidence that PG&E intends to present here. The government cannot claim surprise at facing the same arguments made on the same evidence.

Further, the Court recently compelled the government to release additional "highly relevant" documents relating to both the Reasonable Performance issues because PG&E had a "compelling necessity." May 14, 2006 Order at 2. It will come as no surprise to the government that PG&E seeks to admit at least some of this evidence at trial. The addition of these documents only serves to underscore the abundance of evidence supporting PG&E's position on both the Reasonable Performance and GTCC issues and adds to the difficulty PG&E faces in presenting its evidences within the time limits of the trial.

Notwithstanding the fact that the government is fully aware both of PG&E's position and the evidence it intends to use, PG&E renews this notice by attaching Appendices A and B listing all exhibits that it may offer at trial and which it asks the Court to duly consider even if individual witnesses do not "specifically point out" relevant passages. The appendices "specifically [point] out" the evidence by describing the exhibit, making "reference to an exhibit number, and to one or more specific page numbers within, or otherwise identifiable portion of, the exhibit, together with an indication of how the evidence supports or disproves the a fact in issue," related to the Reasonable Performance or GTCC Issues. App. B and C. PG&E provides this information in advance of trial, so that the government is on notice of its position and can prepare a response.

B. Judicial Economy Is Best Served By Admitting Such Evidence And Granting It Due Consideration Even If Witness Does Not Specifically Point Out Sections Of The Document At Trial

As this Court well knows, introducing documents into evidence through witness testimony is time consuming. Here, witness testimony would add little because the pertinence of

the documents is clear on their face. The Court's interest in conducting a speedy and efficient trial is best served by having these documents admitted into evidence without a witness and according them appropriate consideration, while allowing the parties to reserve their limited time at trial to focus on evidence best presented by live testimony – that based on the witnesses' personal knowledge or expertise.

C. The Court Should Grant This Relief On Grounds of Fundamental Fairness

The Court's preference for having documents admitted into evidence through witness testimony would unfairly burden PG&E unless this Court grants PG&E the relief it seeks here. The Court expressed its preference concerning procedures for the admission of documentary evidence for the first time in its May 4, 2006 Order, just four weeks prior to trial. By then, PG&E had already developed a significant portion of its testimony as well as its strategy for presenting evidence, much of it reasonably predicated on the ability to have substantial portions of its documentary evidence admitted without the use of a witness.[6] The Court's position would require PG&E to revisit much of this work and may prevent PG&E from having adequate opportunity to present its case.

Further, the Court's stated its preference after both parties submitted their final witness list as well as all objections to witnesses. Thus, the Court's own scheduling order could prevent PG&E from altering the witness testimony as needed to comply with the Court's preference. In

[6] PG&E reasonably believed that it could move evidence into the record without witness testimony based on the Fed R. Ev. and practice in other cases has been that. As reflected by the authorities noted in footnote 1 above and Fed. R. Ev. 901, establishing authenticity does not require a witness. Further, Fed. R. Ev. 401 and 402 do not require a witness to establish relevance. Indeed, R. 402 states clearly that all relevant evidence "is admissible." And while R. 403 provider for exclusion of some relevant evidence, the absence of a sponsoring witness is not a ground for exclusion provided for in that rule. More generally, counsel's experience has been that this and other courts routinely give full consideration of exhibits without a sponsoring witness. For example, this Court has allowed other utilities suing DOE on the same contract to enter evidence without the use of a witness. *See Yankee Atomic*, 98-126C.

light of this, the Court should not penalize that portion of PG&E's documentary evidence regarding Reasonable Performance and GTCC that is not "specifically pointed out" by a witness.

## III. CONCLUSION

For the reasons stated above, PG&E respectfully requests that this Court give due consideration to PG&E's documentary evidence – specifically that related to the Reasonable Performance and GTCC Issues – without requiring that such evidence be "specifically pointed out" by a witness at trial.

Dated: May 22, 2006

Respectfully submitted,

s/Jerry Stouck

JERRY STOUCK
Greenberg Traurig, LLP
800 Connecticut Avenue, NW, Suite 500
Washington, DC 20006
(202) 331-3173 phone
(202)261-4751 fax
*Counsel for Plaintiff*
Pacific Gas & Electric Company

Of Counsel:
Robert L. Shapiro
Greenberg Traurig, LLP

CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served by electronic mail, this 22nd day of May, 2006, upon the following:

John C. Ekman
Trial Attorney
Commercial Litigation Branch
Civil Division
United States Department of Justice
Eighth Floor
1100 L Street, N.W.
Washington, DC 20530

s/Jerry Stouck
JERRY STOUCK
Greenberg Traurig, LLP
800 Connecticut Avenue, NW, Suite 500
Washington, DC 20006
(202) 331-3173 phone
(202)261-4751 fax
*Counsel for Plaintiff*
Pacific Gas & Electric Company

# APPENDIX A

**Appendix A - Documents Pertaining to the Reasonable Performance Issue**

| EXH | LOCATION | TITLE | PIN CITE | DESCRIPTION (*Quotes in Italics*) |
|---|---|---|---|---|
| 1 | CTR0002007-CTR0002058; CTR-001-2009 to CTR-001-2060 | CONTRACT GUIDEBOOK | CTR00020748 | *The exchange process was incorporated into the final Contract the request of numerous comentators to the final draft. . . The importance of the Exchange process is becoming more apparent as the projected early receipt rates result in insufficient annual capacity allocations to avoid additional at-reactor storage by some Purchasers.* |
| 2 | PA-222512 | SIGNIFICANCE OF CAMPAIGNED SPENT FUEL SHIPMENTS | PA-222515 to PA-222516 | Suggesting that the ACR be modified to accommodate shipping campaigns. |
| 4 | HQ0013659 to HQ0013676 | SPENT FUEL STORAGE REQUIREMENTS FOR NUCLEAR UTILITIES AND OCRWM | HQ0013670 | *The design spent fuel acceptance rate (3,000 MTU/yr.) assumed for a repository dates to the initiation of the OCRWM program. At that time, studies (Dippold 1984) showed that a system acceptance rate of 4,000-6,000 MTU per year tended to minimize discounted system costs by reaching an appropriate trade-off between capital costs associated with throughput capacity and operations costs associated with extended operating periods. This system. rate was allocated to each of two repositories then assumed to operate substantially in parallel, and the first repository rate established as a formal design basis (DOE 1986). Later studies (Clark et al 1986) confirmed that economic considerations favored a system acceptance rate of between 3,000 and 6,000 MTU/year. While the trade-off for detemination of the repository emplacement rate requires re-examination in light of the 2010 start date for the first repository, the basic economic logic is the same, and studies are now underway to determine the preferred annual emplacement rate. The question of acceptance rate requirements prior to operation of the repository is logically separable from the emplacement rate question, depending primarily on the relative economics of centralized and at-reactor storage, and is also being studied. Since acceptance at the previously planned rate of 3,000 MTU per year, beginning in 1998, in conjunction with the current repository schedule, will create large storage requirements, a lower acceptance rate may be desirable initially.* |

**Appendix A - Documents Pertaining to the Reasonable Performance Issue**

| EXH | LOCATION | TITLE | PIN CITE | DESCRIPTION (*Quotes in Italics*) |
|---|---|---|---|---|
| 5 | HQ0013760 to HQ0013769 | SPENT FUEL STORAGE REQUIREMENTS FOR NUCLEAR UTILITIES AND OCRWM | HQ0013670 | *The design spent fuel acceptance rate (3,000 MTU/yr.) assumed for a repository dates to the initiation of the OCRWM program. At that time, studies (Dippold 1984) showed that a system acceptance rate of 4,000-6,000 MTU per year tended to minimize discounted system costs by reaching an appropriate trade-off between capital costs associated with throughput capacity and operations costs associated with extended operating periods. This system. rate was allocated to each of two repositories then assumed to operate substantially in parallel, and the first repository rate established as a formal design basis (DOE 1986). Later studies (Clark et al 1986) confirmed that economic considerations favored a system acceptance rate of between 3,000 and 6,000 MTU/year. While the trade-off for detemination of the repository emplacement rate requires re-examination in light of the 2010 start date for the first repository, the basic economic logic is the same, and studies are now underway to determine the preferred annual emplacement rate. The question of acceptance rate requirements prior to operation of the repository is logically separable from the emplacement rate question, depending primarily on the relative economics of centralized and at-reactor storage, and is also being studied. Since acceptance at the previously planned rate of 3,000 MTU per year, beginning in 1998, in conjunction with the current repository schedule, will create large storage requirements, a lower acceptance rate may be desirable initially.* |
| 15 | PA222554 - PA222559 | THROUGHPUT STUDY FOR THE CIVILIAN RADIOACTIVE WASTE MGMT SYSTEM | PA-222558 | Considering various rates of acceptance to compare to the "Reference Strategy Rate" of 3,000 MTU. These range from 2,000-6,000. The study concludes that 3,000MTU yeilds the lowest system costs. |
| 30 | DOE/ET-0075 | SPENT FUEL STORAGE REQUIREMENTS THE NEED FOR AWAY FROM REACTOR STORAGE | DOE/ET-0075 | Outlining the burnup and capacity limitations at current US & foreign reactors, setting the timeline for needed away from reactor storage. |
| 31 | DOE/NE-0002 | SPENT FUEL STORAGE REQUIREMENTS THE NEED FOR AWAY FROM REACTOR STORAGE | DOE/NE-0002 | Outlining the burnup and capacity limitations at current US & foreign reactors, setting the timeline for needed away from reactor storage. |
| 34 | DOE/SR-0007 | SPENT FUEL STORAGE REQUIREMENTS AN UPDATE OF DOE/NE 0002 | DOE/SR-0007 | Considering the need for away-from-reactor storage based on the limitations of re-racking and private transshipment. |
| 35 | PA-100903 to PA-100986 | SPENT FUEL REQUIREMENTS AN UPDATE OF DOE SR 0007 | PA-100903 to PA-100986 | Considering the need for away-from-reactor storage based on the limitations of re-racking and private transshipment. |

**Appendix A - Documents Pertaining to the Reasonable Performance Issue**

| EXH | LOCATION | TITLE | PIN CITE | DESCRIPTION (*Quotes in Italics*) |
|---|---|---|---|---|
| 40 | HQZ.19881108.6775.0001 to HQZ.19881108.6775.0004 | [DUQUESNE LIGHT CO COMMENTS] | HQZ.19881108.6775.0003 | *Article IV - Delivery of SN? and/or RIM: Some consideration must be given in ranking priority to accepting fuel in such a manner as to prevent utilities from being required to increase on-site storage capacity by permitting some trading of allocations.* |
| 41 | HQZ.19881109.0017.0001 to HQZ.19881109.0017.0004 | CONTRACT FOR DISPOSAL OF SPENT NUCLEAR FUEL AND OR HIGH LEVEL RADIOACTIVE WASTE | HQZ.19881109.0017.0001 | *The inclusion of provisions to allow the exchange - or swap of delivery commitments among the Purchasers.* |
| 42 | HQZ.19881109.0015.0002 to HQZ.19881109.0015.0005 | CONTRACT FOR DISPOSAL OF SPENT NUCLEAR FUEL AND OR HIGH LEVEL RADIOACTIVE WASTE 48 F R 5458 FRIDAY FEBRUARY 4 1983 10 CFR 961[02/04/83] | HQZ.19881109.0017.0003 | *Article IV. should be expanded to allow £Jr the exchange of delivery increments among the purchasers with the app:oval of DOE. Article V. Responsibilities of the Parties; The Language of Article V.A.l.(a) should include the stipulation expressed in Appendix D that the annual forecast is for planning purposes and not a firm commitment. Article IV.A.l.(h) allows a penalty of unilateral rescheduling to be assessment by DOE for errors of form and content the annual forecast. Since the annual forecast is for planning and not a firm commitment on either party, the penalty is unreasonable and should be reserved.* |
| 43 | HQZ.19881109.0027.0001 to HQZ.19881109.0027.0014 | GRAND GULF NUCLEAR STATION UNITS 1 AND 2 FILE 0321 15162 N155.0 L860.0 COMMENTS RE STANDARD CONTRACT FOR DISPOSAL OF SPENT NUCLEAR FUEL AND OR HIGH LEVEL RADIOACTIVE WASTE APOB30210 | HQZ.19881109.0027.0005 | *24. Article IV, general comment - We suggest adding an Article IV.E to address "Exchanges." We believe holders of contracts should be permitted to exchange approved Delivery Commitment Schedules so long as DOE is informed of and consents to such exchanges* |

**Appendix A - Documents Pertaining to the Reasonable Performance Issue**

| EXH | LOCATION | TITLE | PIN CITE | DESCRIPTION (*Quotes in Italics*) |
|---|---|---|---|---|
| | | | HQZ.19881109.0027.0006 | 36. Article V.B.6, general comment - As pointed out in comment number 21. we believe an acceptance ranking based solely on the age of SNF/HLW is inappropriate. We suggest instead an allocation system which would equitably distribute DOE storage capacity and give it on a priority basis to those nuclear power plants exhausting their site storage capacity |
| 45 | HQZ.19881109.0139.0001 to HQZ.19881109.0139.0007 | CONTRACT FOR DISPOSAL OF SPENT NUCLEAR FUEL AND OR HIGH LEVEL RADIOACTIVE WASTE 48 FR 5458 FRIDAY FEBRUARY 4 1983 10 CFR 961 [02/04/1983] | HQZ.19881109.0139.0004 | *4. Delivery Flexibility*<br>*It is particularly important that the contract provide the opportunity for the Purchasers to swap delivery commitments. Such flexibility should be extended to the Purchaser up to the point of setting ~he final delivery schedule. We would consent to DOE approval of each delivery swap provided that the approval is not unreasonably withheld.*<br>*5. Spent Fuel Acceptance Priority Ranking*<br>*The proposed acceptance priority ranking system Is too restrictive. A Purchaser should not be required to deliver its oldest spent fuel first. As long as it meets the established minimum cooling time, the Purchaser should have the right to choose the order in which fuel is delivered for disposal. Priority should be given to reactors that are running out of storage space and to those which have been permanently shut down, if requested by Purchasers.* |

**Appendix A - Documents Pertaining to the Reasonable Performance Issue**

| EXH | LOCATION | TITLE | PIN CITE | DESCRIPTION (*Quotes in Italics*) |
|---|---|---|---|---|
| 46 | HQZ.19881109.0137.0001 to HQZ.19881109.0137.0003 | DRAFT DOE UTILITY STANDARD WASTE DISPOSAL CONTRACT | HQZ.19881109.0137.0002 | *Acceptance Priority Ranking System. Article VI.B.3 (Priority of Shipping Spent Fuel): BG&E agrees with EEI's comment that the system should allow for swapping of fuel assembly delivery dates with other utilities. BG&E further agree. that allotments should be based on a combination of the age of the fuel in storage end the amount of fuel in storage. EEI did not specify how the amount of spent nuclear fuel should be determined. BG&E recommends that the amount be determined through consideration of both the weight and the volume of the spent fuel. BG&E's concern here is that since it intends to consolidate fuel by placing twice the number of fuel rods in the space of the conventional fuel assembly, it should get credit for the. decrease in volume. There should be positive incentives to decrease the volume because it decreases the number of shipments over public roads and decreases the amount of land required for waste storage.* |
| 47 | ZAB-001-0892 to ZAB-001-0902 | STANDARD CONTRACT DRAFT DOCUMENTS | ZAB-001-0899 | *1. Spent Nuclear Fuel "Exchange" Rights*<br>*The majority of utilities commented that they should have "exchange" or "swapping" rights to ship their SNF and/or HLW to our repository. After consideration, aside from some complex record keeping, this poses no great problem to us, and consequently, we have accepted this suggestion. It will require our approval, and we intend to be reasonable.* |
| 50 | YDK023784 to YDK023789; WNC-0000047 to WNC-0000052 | EDISON ELECTRIC INSTITUTE TASK GROUP ON WASTE CONTRACT MEETING NOTES MAY 12 1983 WASHINGTON DC [05/12/1983] | WNC-0000048 | Reflects an understanding that DOE would not unnecessarily withhold approval of exchanges of shipping "slots" |
| 51 | PA-17759 to PA-17816 | REPORT ON FINANCING THE DISPOSAL OF COMMERCIAL SPENT NUCLEAR FUEL AND PROCESSED HIGH LEVEL RADIOACTIVE WASTE | PA-17772 to PA-17773 | Showing the key assumption of 3,000 MTU acceptance rate following five year ramp up at each of two repositories. |

**Appendix A - Documents Pertaining to the Reasonable Performance Issue**

| EXH | LOCATION | TITLE | PIN CITE | DESCRIPTION (*Quotes in Italics*) |
|---|---|---|---|---|
| 55 | PA-178238 to PA-178295; PNL-020-2513 to PNL-020-2569 | REPORT ON FINANCING THE DISPOSAL OF COMMERCIAL SPENT NUCLEAR FUEL AND PROCESSED HIGH LEVEL RADIOACTIVE WASTE | PA-178250 | *3 REFERENCE CASE*<br>*3.1 Assumptions*<br>*The key assumptions used to estimate and project life-cycle program costs under the reference case are listed in Table 3-1. These assumptions apply to either of two options: a) spent fuel disposal; or b) reprocessing waste disposal. The assumptions were developed in response to program changes occurring since the last DOE report on disposal fees published in October 1980.*<br>*3.2 Facility Schedule and Material Flows*<br>*Table 3-2 depicts Installed nuclear capacity growth, electricity generation, and spent fuel discharges between the years 1983-2014. These estimates were prepared by EIA and represent a moderately high growth pattern for nuclear energy. EIA's projections are used in this report because the agency is responsible for developing comprehensive and objective date. EIA's date are widely used and are considered as an authoritative source of Information regarding energy programs. Obviously, however, the projections used In this report are subject to revision and refinement. Changes In projections will be analyzed in subsequent reports.* |
| 57 | PNL-173-1282 to PNL-173-1288 | MISSION PLAN STRATEGY | PNL-173-1283 | *Waste Acceptance ScheduleAs an Initial planning base, DOE will accept spent fuel in the quantities indicated In Table . Shipment allocations will be made on a quarterly basis. The central criteria for this schedule is: *an acceptance rate during the first 5 years such that no utility would have to build additional storage facilities after 1998. * an acceptance rate after the first 5 years equivalent to the actual rate of utility discharge of spent fuel each year.* |
| 59 | CTR-042-1065 to CTR-042-1190 | CIVILIAN RADIOACTIVE WASTE MANAGEMENT PROGRAM MISSION PLAN. VOLUME I. OVERVIEW AND CURRENT PROGRAM PLANS [DRAFT] | CTR-42-1072 | *DOE'S draft Mission Plans, and the 1985 Mission Plan, all set forth acceptance rates of 3000 MTU year.* |
| 60 | SN069588 to SN069592 and SN069599 to SN069600 | PROCEEDINGS OF THE 1983 CIVILIAN RADIOACTIVE WASTE MANAGEMENT INFORMATION MEETING | SN069593 to SN069594 | Reflects DOE's intent to accept spent fuel so that utilities would not incur avoidable at-reactor storage costs and in order to work off the back-log of spent fuel. |
| 61 | SN069588 to SN070015 | PROCEEDINGS OF THE 1983 CIVILIAN RADIOACTIVE WASTE MANAGEMENT INFORMATION MEETING | SN0669775 | DOE's purpose was to be efficient in the M&O, Construction, etc. |
| | | | | SN0669941 |

**Appendix A - Documents Pertaining to the Reasonable Performance Issue**

| EXH | LOCATION | TITLE | PIN CITE | DESCRIPTION (*Quotes in Italics*) |
|---|---|---|---|---|
| | | | | SN0669961 |
| 66 | MOV.19990831.0022-0001 to MOV.19990831.0022-0037 | MEMORANDUM RE: DRAFT MISSION PLAN | MOV.19990831.0022-0001 to MOV.19990831.0022-0002 | Reflects DOE's intent to accept spent fuel so that utilities would not incur avoidable at-reactor storage costs and in order to work off the back-log of spent fuel. |
| | | | MOV.19990831.0022-0040 to MOV.19990831.0022-0043 | Reflects DOE's intent to accept spent fuel so that utilities would not incur avoidable at-reactor storage costs and in order to work off the back-log of spent fuel; notes DOE's expectation of exchanges and 3,000 MTU acceptance rate. |
| 68 | Milner Dep. Ex. 21; Morgan Dep. Ex. 11; Zabransky Dep. Ex. 8; Isaacs Dep. Ex. 4; Trebules Dep. Ex. 5; Head Dep. Ex. 19 | MISSION PLAN FOR THE CIVILIAN RADIOACTIVE WASTE MANAGEMENT PROGRAM | P683 at 2-2 (1984 Draft) | *DOE'S draft Mission Plans, and the 1985 Mission Plan, all set forth acceptance rates of 3000 MTU year.* |
| 69 | PNL-020-1491 to PNL-020-1657 | PRELIMINARY ANALYSIS OF THE TOTAL SYSTEM LIFE CYCLE COST OF THE COMMERCIAL HIGH-LEVEL RADIOACTIVE WASTE DISPOSAL PROGRAM | PNL-020-1504 | *Two repositories are assumed to be constructed to accommodate the 134,000 MTU quantity of spent fuel in the Reference Case. The capacity for the first repository will be 70,000 MTU, while the second repository capacity will be 64,000 MTU. The design receipt rate for each repository is 1800 MTU per year for the first five years of operation, and 3000 MTU per year thereafter. Repository start-up dates adhere to the schedule contained in the December 1983 draft Mission Plan"), that is, 1998 for the first repository and 2003 for the second.* |

**Appendix A - Documents Pertaining to the Reasonable Performance Issue**

| EXH | LOCATION | TITLE | PIN CITE | DESCRIPTION (*Quotes in Italics*) |
|---|---|---|---|---|
| | | | PNL-020-1510 | In the Reference Case, the first repository starts receiving waste in 1998 at a rate of 1800 MTU per year. In 2003, the second repository starts receiving waste at 1800 MTU per year, while the first repository's receipt rate increases to 3000 MTU per year. By 2008, both repositories receive waste at the 3000 MTU annual rate. As Table 2.4 indicates, the first repository operates for 26 years (1998 through 2023) at 100 percent of the design receipt rate until its 70,000 MTU capacity is filled. However, the second repository requires 33 years (2003 through 2035) of operation to reach its capacity of 64,000 MTU. |
| 72 | PA-177336 to PA-177349 | NUCLEAR WASTE FUND FEE ADEQUACY AN ASSESSMENT SECOND ANNUAL REPORT | PA-177342 | *DOE has used the 3000 MTU rate in its fee adequacy reports.* |
| 73 | DG-000038 to DG-000062 | COMMENTS ON THE DRAFT MISSION PLAN DATED APRIL 1984 [04/00/84] | DG-000038 | *1. It should be noted that to eliminate the need for additional at-reactor storage after January 31, 1998, the initial lwast acceptance rate for 1998 should be about 2,800 MTU plus some amount up to 683 MTU, depsnding on the extent Federal Interim Storage is utilized.* |
| 75 | DOE/RW-0007 | TRANSPORTATION BUSINESS PLAN STRATEGY OPTIONS DOCUMENT | DOE/RW-0007 at 5 | Utilizing 3000 MTU as the base rate for each of two permanent repositories. |
| 76 | PNL-030-0035 to PNL-030-0070 | ACCEPTANCE RATE CONSIDERATIONS FOR REVISING UTILITY DISPOSAL CONTRACTS (10CFR961) | PNL-030-0045 to PNL-030-0046 | *Chart Showing minimum acceptance rates with and without re-racking.* |
| 78 | DER-003-0966 to DER-003-0983; HQR-042-1221 to HQR-042-1234; 000121 to 000136 | NUCLEAR FUND FEE ADEQUACY AN ASSESSMENT | DER-003-972 | *DOE has used the 3000 MTU rate in its fee adequacy reports.* |

**Appendix A - Documents Pertaining to the Reasonable Performance Issue**

| EXH | LOCATION | TITLE | PIN CITE | DESCRIPTION (*Quotes in Italics*) |
|---|---|---|---|---|
| 80 | DOE/RW-0024 | ANALYSIS OF THE TOTAL SYSTEM LIFE CYCLE COST FOR THE CIVILIAN RADIOACTIVE WASTE MANAGEMENT PROGRAM | DOE/RW-0024 at 2-3 | *DOE periodically published Total System Life Cycle Costs analyses ("TSLCC"), which were for the purposes of estimating the costs of its spent fuel and HLW acceptance program. From 1984-2001 DOE'S TSLCCs all calculate program costs based on a 3000 MTU acceptance rate that is preceded by a brief ramp-up period.* |
| 81 | HQ0005264 to HQ0005796 and PA-140696 to PA-141779 | MISSION PLAN FOR THE CIVILIAN RADIOACTIVE WASTE MANAGEMENT PROGRAM | HQ0005307 | *(1985 Mission Plan) (showing spent fuel acceptance beginning prior to 1998 and acceptance of 3000 MTU in 1998).* |
| 82 | DOE/RW-0005 | MISSION PLAN FOR THE CIVILIAN RADIOACTIVE WASTE MANAGEMENT PROGRAM VOLUME 1 PART 1 OVERVIEW AND CURRENT PROGRAM PLANS PART 2 INFORMATION REQUIRED BY THE NUCLEAR WASTE POLICY ACT OF 1982 [00/00/82] | DOE/RW-0005 at 26 | Utilizing 3000 MTU as the base rate for each of two permanent repositories. |
| 86 | DOE/RW-0046 | TRANSPORTATION BUSINESS PLAN | DOE/RW-0046 at 12 | Discussing the number of rail or truck shipments required to achieve a 3000 MTU/yr acceptance rate. |
| 87 | PNL-023-0467 to PNL-023-0515; YA Opp. To Defendant's Motion for SJ Re Rate of SNF Acceptance YA518 | NUCLEAR WASTE POLICY ACT. NUCLEAR WASTE FUND FEE ADEQUACY: AN ASSESSMENT | PNL-023-0474 | *DOE has used the 3000 MTU rate in its fee adequacy reports.* |
| 88 | PNL046-0701 to PNL046-0727 | ALLOCATION OF DOE NUCLEAR WASTE ACCEPTANCE CAPACITY AND UTILITY BEHAVIOR: OVERVIEW AND STATUS [DRAFT - CONTROLLED DISTRIBUTION ONLY] | PNL-046-0710 | *The DOE's primary scheduling concern is to assure an even load on the system to minimze the amount of excess capacity.* |
| 89 | | ANALYSIS OF THE TOTAL SYSTEM LIFE CYCLE COST FOR THE CIVILIAN RADIOACTIVE WASTE MANAGEMENT PROGRAM VOLUME 1 THE ANALYSIS AND ITS RESULT | P976 at 14 (1986); | *DOE periodically published Total System Life Cycle Costs analyses ("TSLCC"), which were for the purposes of estimating the costs of its spent fuel and HLW acceptance program. From 1984-2001 DOE'S TSLCCs all calculate program costs based on a 3000 MTU acceptance rate that is preceded by a brief ramp-up period.* |

**Appendix A - Documents Pertaining to the Reasonable Performance Issue**

| EXH | LOCATION | TITLE | PIN CITE | DESCRIPTION (*Quotes in Italics*) |
|---|---|---|---|---|
| 91 | DOE/RW-0128 | DRAFT MISSION PLAN AMENDMENT | DOE/RW-0128 at 36 | *The spent fuel acceptance rate for the whole system remains at 3000 MTU.* |
| 96 | PA-103067 to PA-103151 | ANNUAL CAPACITY REPORT | PA-103077 | *The Standard Contracts required DOE, beginning not later than July 1, 1987 to issue an annual capacity report ("ACR") for planning purposes setting forth the projected annual receiving capacity for the DOE facility or facilities. In the 1980s, those reports used an annual steady-state acceptance rate at or near 3000 MTV year.* |
| 97 | HQ0005797 to HQ0006319 | OCRWM MISSION PLAN AMENDMENT | HQ0005865 | *The spent fuel acceptance rate for the whole system remains at 3000 MTU.* |
| | | | HQ0005864 | *The [Second] Repository is currently designed for an annual receipt of 3000 MTU for commercial spent fuel and 400 MTU for high-level waste.* |
| 98 | PA-176705 to PA-176998 | ANALYSIS OF THE TOTAL SYSTEM LIFE CYCLE COST FOR THE CIVILIAN RADIOACTIVE WASTE MANAGEMENT PROGRAM VOLUME 1 THE ANALYSIS AND ITS RESULT | PA-176734 | *DOE periodically published Total System Life Cycle Costs analyses ("TSLCC"), which were for the purposes of estimating the costs of its spent fuel and HLW acceptance program. From 1984-2001 DOE'S TSLCCs all calculate program costs based on a 3000 MTU acceptance rate that is preceded by a brief ramp-up period.* |
| 101 | HQ0000257 to HQR0000276 | ANNUAL CAPACITY REPORT | HQ0000266 | Chart showing anticipated acceptance rate ramping up to 2650. |
| 105 | PNL-144-1715 to PNL-144-1871 | SUBMITTAL OF DRAFT REPORT ON ACCEPTANCE RIGHTS ALLOCATION;; AT-REACTOR SPENT FUEL STORAGE REQUIREMENTS WITH AND WITHOUT ACCEPTANCE RIGHTS TRADING[DRAFT] | PNL-144-1834 | *DOE periodically published Total System Life Cycle Costs analyses ("TSLCC"), which were for the purposes of estimating the costs of its spent fuel and HLW acceptance program. From 1984-2001 DOE'S TSLCCs all calculate program costs based on a 3000 MTU acceptance rate that is preceded by a brief ramp-up period.* |
| 106 | PNL-102-0359 to PNL-102-0377 | PROPOSED ASSUMPTIONS AND CASE LIST FOR 1988 TSLCC | PNL-102-0369 | *DHLW or CHLW will be received at the rate of 400 MTU equivalent when the repository is at full operations (3000 MTU spent fuel.)* |

**Appendix A - Documents Pertaining to the Reasonable Performance Issue**

| EXH | LOCATION | TITLE | PIN CITE | DESCRIPTION (*Quotes in Italics*) |
|---|---|---|---|---|
| 108 | PNL-046-0002 to PNL-046-0169 | MEMORANDUM FROM M.S. KAROL TO H.J. HALE RE AT REACTOR STORAGE | PNL-046-0002 | *This report concludes that the potential savings from trading at individual sites appears to be sufficient to attract significant interest from the utilities once acceptance rights are firmly established.* |
| 110 | PNL-108-0507 to PNL-108-0531 | ASSUMPTIONS FOR 1988 TSLCC | PNL-108-0520, PNL-108-0530 | Chart showing anticipated acceptance rate ramping up to 3000 MTU spent fuel and 400 HLW. |
| 113 | HQ0004864 to HQ0004972 | DRAFT 1988 [00/00/1988] MISSION PLAN AMENDMENT | HQ0004980 | *The facilities completed in phase 2 [deep gologic respository] will reach their annual design rate of 3000 MTHM in the year 2008, at which time the phase 1 facilities [MRS]  will start accepting high-level waste at an annual rate of 400 MHTM.* |
| 114 | PNL-098-1106 to PNL-098-1144 | FUNCTIONAL DESCRIPTION FOR THE DELIVERY COMMITMENT SCHEDULE PROCESSING, APPROVAL, AND MANAGEMENT CONTROL SYSTEM - RESOURCE MANAGEMENT PROGRAMS - MILESTONES 1046-A, B, C, D | PNL-098-1108 | *Several acceptance issues exist due to ambiguities in the Contract. These issues need to be resolved by DOE and/or cooperativelywith the Purchasers prior to finalizing the DCS process and procedures.* |
| | | | PNL-098-1113 | Using the 3000 MTU rate to set the DCS approval guidelines. |
| 115 | CTR0002662 to CTR0002715; CTR-001-2664 to CTR-001-2717 | DRAFT SPENT FUEL ACCEPTANCE SCENARIOS DEVOTED TO SHUTDOWN REACTORS A PRELIMINARY ANALYSIS | CTR0002673 | *It was assumed that all of the 88 ,760 MTU of spent fuel projected to be generated under the 1998 EIA no-new-orders case could be accepted at a continuous rate of 3000 MTU per year once the first repository was fully operational.* |
| 116 | DOE/RW-0236 | ANALYSIS OF THE TOTAL SYSTEM LIFE CYCLE COST FOR THE CIVILIAN RADIOACTIVE WASTE MANAGEMENT PROGRAM | PA-177176 | *DOE periodically published Total System Life Cycle Costs analyses ("TSLCC"), which were for the purposes of estimating the costs of its spent fuel and HLW acceptance program. From 1984-2001 DOE'S TSLCCs all calculate program costs based on a 3000 MTU acceptance rate that is preceded by a brief ramp-up period.* |
| 119 | IDF-004-3294 to IDF-004-3443 | MRS SYSTEM STUDY SUMMARY REPORT | IDF-004-3300 | Listing the reduction, by 50%, of the need for at-reactor storage as a principle reason for developing an MRS. |

**Appendix A - Documents Pertaining to the Reasonable Performance Issue**

| EXH | LOCATION | TITLE | PIN CITE | DESCRIPTION (*Quotes in Italics*) |
|---|---|---|---|---|
| | | | IDF-004-3322 | Chart showing 3000 MTU as the assumed rate of acceptance for each of the first and second repositories, separate from the MRS. |
| 123 | CTR0002642-CTR0002656 | LETTER FROM MCDUFFIE TO SUTEY WASTE DISPOSAL CONTRACTS ANALYSIS PROGRAM MILESTONE 1037 B SUBMIT FINAL SHUTDOWN REACTOR PRIORITY DISCUSSION PAPER | CTR0002642-CTR0002656 | Comparing the costs of OFF acceptance shedules vs. exchange-based schedules. |
| 124 | HQ0013950 to HQ0013995 | SPENT FUEL ACCEPTANCE SCENARIOS DEVOTED TO SHUTDOWN REACTORS A PRELIMINARY ANALYSIS | HQ0013970 | Chart demonstrating that acceptance rates in excess of 3000 MTU are possible with the use of rail casks. |
| | | | HQ0013974, HQ0013976 | Demonstrating that OFF-based schedule underutilizes shipping capacity and is "infeasible" when compared to 3000 MTU reference scenario. |
| 125 | DB0001441 to DB0001474 | REPORT TO CONGRESS ON REASSESSMENT OF THE CIVILIAN RADIOACTIVE WASTE MANAGEMENT PROGRAM | DB-0001468 | The MRS Review Commission recommended that the Congress authorize the construction of a Federal Emergency Storage facilitiy with a capacity limit of 2,000 metric tons of uranium; authorize the construction of a User-Funded Interim Storage facility with a capacity limit of 5,000 metric tons of uranium; and reconsider the need for additional interim storage in the year 2000 |
| 126 | PA-172230 to PA-172424 and HQR-036-3992 to HQR-036-4185 | NUCLEAR WASTE IS THERE A NEED FOR FEDERAL INTERIM STORAGE | PA-172233 | authorize the construction of a User-Funded Interim Storage facility with a capacity limit of 5,000 metric tons of uranium; and reconsider the need for additional interim storage in the year 2000 |

| EXH | LOCATION | TITLE | PIN CITE | DESCRIPTION (*Quotes in Italics*) |
|---|---|---|---|---|
| 129 | HQ0015292 to HQ0015293; HQR-008-0575 to HQR-008-0576 | COMPARISON OF OFF AND FCR ALLOCATION | HQ0015293 | If the acceptance capacity of the Federal Waste Management System (FWMS) is limited in the early years of operations, and the Purchasers agree to utilize this limited capacity to minimize the requirements for additional at-reactor dry storage, an allocation scheme based on maintenance of full core reserve (FCR) could be implemented. The FWMS acceptance capacity at an MRS starting limited operations in 1998 would have to be about 600 MTU/yr for the first 5 year-s of operations and about 1100 MTU/yr for the next 7 years in order to avoid the need for additional at-reactor storage at any site until a repository becomes operational in 2010. (The peak annual storage requirement is projected to be about 1400 MTU in 2013.) |
| 133 | HQ0015217 to HQ0015251 | ACR ISSUE RESOLUTION PROCESS | HQ0015227 | Delivery Commitment Schedule exchange procedures |
| 135 | PNL-022-0448 to PNL-022-0501 | SOME ALTERNATIVES FOR DOE ACCEPTANCE AND STORAGE OF SPENT FUEL IN 1998 AND 1999 | PNL-022-0479 | Costs of each alternative greater than 1200MTU/year oldest fuel first scenarios |
| 137 | CTR0002333-CTR0002335 | SHIPPING RATES FOR THE ACR | CTR0002333 | The transportation system should be allowed to grown in a rational manner. The shipping rates during the first few years should start low and grow with time. This will allow the system to learn from its early operations without either incurring excessive costs or not being able to satisfy commitments because of overly aggressive, overly optimistic planning. It should be remembered that the total MTU of commercial SNF shipments since 1954 is only 1851 MTU and the most shipped in one year was 228 MTU. Since we will have to operate a zero defect system. a reasonable rampup would be a wise decision. |
| 140 | HQ0003367 to HQ0003490 | ANNUAL CAPACITY REPORT | HQ0003379 | (1990 ACR: Upper bounding rate 3000 MTU rate). |

| EXH | LOCATION | TITLE | PIN CITE | DESCRIPTION (*Quotes in Italics*) |
|---|---|---|---|---|
| | | [DECEMBER 1990[12/00/1990]] | | |
| 141 | DOE/RW-0295 | PRELIMINARY ESTIMATES OF THE TOTAL SYSTEM COST FOR THE RESTRUCTURED PROGRAM AN ADDENDUM TO THE MAY 1989[05/00/89] ANALYSIS OF THE TOTAL SYSTEM LIFE CYCLE COST FOR THE CIVILIAN RADIOACTIVE WASTE MANAGEMENT PROGRAM | P248 at 2 (1990 Addendum to 1989 TSLCC); | DOE periodically published Total System Life Cycle Costs analyses ("TSLCC"), which were for the purposes of estimating the costs of its spent fuel and HLW acceptance program. From 1984-2001 DOE'S TSLCCs all calculate program costs based on a 3000 MTU acceptance rate that is preceded by a brief ramp-up period. |
| 144 | | DETERMINATION OF COST EFFECTIVE WASTE MGMT SYSTEM RECEIPT RATES | PA-221972 | Comprehensive logisitics and cost analysis has been carried out to determine if therea re potential benefits to the high-level waste management system for receipt rates other than the current 3,000 MTU/yr design-basis receipt rate. |
| 145 | CTR0002188 to CTR0002212; CTR-001-2190 to CTR-001-2214 | ALTERNATIVE ALLOCATION STRATEGIES DRAFT ISSUE PAPER | CTR0002194 | For example, if the Time Period is set at two years and the amount of spent fuels capable of being handled in those two years is 1,500 MTUs, delivery rights would be allocated to Purchasers for that two year period based on the OFF principle until the total amount of spent fuel reaches the 1,500 MTU limit. |
| 153 | HQ0004633 to HQ0004634 | COORDINATION OF SYSTEM THROUGHPUT RATE STUDY | HQ0004633 | In various OCRWM docuinents, the waste acceptance rate at steady-state operation was assumed at about 3000 MTU per year. |
| 154 | HQ0004629 to HQ0004631 | COMMENTS ON SCENARIOS FOR SYSTEM THROUGHPUT RATE STUDY | HQ0004630 | The reference case scenario assumptions are unclear. It is stated that the MRS has a 2 year ramp-up to a rate of 3000 MT, but the graph shows a rate of about 1000 MT per year for 2000 - 2009 after a 2 year ramp-up, with a subsequent rate of 3000. Thus, the described assumptions on MRS rate are incomplete. |
| 155 | HQ0004974-HQ0005263 | DRAFT MISSION PLAN AMENDMENT | HQ0005260 | Waste acceptance schedule for MRS and repository (3000MTU by 2015) |

**Appendix A - Documents Pertaining to the Reasonable Performance Issue**

| EXH | LOCATION | TITLE | PIN CITE | DESCRIPTION (*Quotes in Italics*) |
|---|---|---|---|---|
| 158 | HQ0003588 to HQ0003650 | ANNUAL CAPACITY REPORT | HQ0003597 | The acceptance rates in Table 2.1 do not reflect the MRS facility schedule linkages with the repository development that were imposed by the NWPA, but are consistent with the 10,000 MTU storage capacity limit contained in the NWPA for an MRS facility before a repository starts operation. |
| 159 | HQ0006854 to HQ0006889 | 1991[00/00/1991] ACCEPTANCE PRIORITY RANKING | HQ0006857 | The 1991 APR details the order in which DOE will allocate Federal waste acceptance capacity. As required by the Standard Contract, the ranking is based on the age of permanently discharged spent nuclear fuel (SNF), with the owners of the oldest SNF, on an industry-wide basis, given the highest priority. |
| 165 | | THROUGHPUT STUDY FOR THE CIVILIAN RADIOACTIVE WASTE MGMT SYSTEM | EXP-001-0311 | 3000 MTU/yr Reference Scenario |
| 170 | CTR0061048 to CTR0061057 | PRELIMINARY DRAFT OCRWM POSITION | CTR0061054 | Exceptions to OFF |
| 176 | CTR0061065 to CTR0061078 | PRELIMINARY DRAFT OCRWM POSITION ISSUES 001 002 APPLICATION OF THE OLDEST FUEL FIRST OFF PRINCIPLE | CTR0061078 | Adjustments to the Delivery Queue |
| 177 | HQR-038-0090 to HQR-038-0093; HQR-010-1626 to HQR-010-1629 | [ENCLOSING SUMMARY OF INFORMATION ON NEW STRATEGY TO PROVIDE SNF INTERIM STORAGE IN 1998] | HQR0380091 | Start of spent fuel disposal at a repository by 2010 |
| 182 | HQ0002314 to HQ0002355 | 1992[00/00/1992] ANNUAL CAPACITY REPORT REVISION 1 | HQ0002322 | The acceptance rates in Table 2.1 are nominal and do not reflect the MRS facility schedule linkages with the repository development that were imposed by the NWPA, but are consistent with the 10,000 MTU storage capacity limit contained in the NWPA for an MRS facility before a repository starts operation. These acceptance rates assume commencement of facility operations in 1998. If the current linkages between MRS facility construction and repository construction authorization are maintained, it is estimated that facility operations and initial acceptance of SNF by DOE," could not start until at least 2007. |

**Appendix A - Documents Pertaining to the Reasonable Performance Issue**

| EXH | LOCATION | TITLE | PIN CITE | DESCRIPTION (*Quotes in Italics*) |
|---|---|---|---|---|
| 185 | Diablo Canyon Power Plant | PRELIMINARY EVALUATION OF SPENT FUEL STORAGE TECHNOLOGIES FOR DIABLO CANYON POWER PLANT | PDCP0001693 | MRS capacity would be limited to only 10,000 MTU and therefore DCPP spent fuel disposal may not occur prior to opening of the federal repository |
| 187 | YMP-001-0377 to YMP-001-0585 | CIVILIAN RADIOACTIVE WASTE MANAGEMENT SYSTEM THROUGHPUT RATE ANALYSIS [UNDER CONTRACT NUMBER DEAC0191RW00134 REV 2 CRWMS M AND O DOCUMENT NUMBER A00000000017170200000002] | YMP-001-0457 | In the 1980s and 1990s, the aggregate amount of spent fuel discharges at commercial nuclear reactors could be projected to be about 2000 MTU per year starting in 1998. |
| | | | YMP-001-0454 | (an annual acceptance rate of 3000 to. 5000 MTU would minimize program costs). |
| 190 | HQR-060-1810 to HQR-060-1826 | DOE MANAGEMENT STRATEGY AND PLAN FOR THE INTERIM STORAGE OF SPENT FUEL | HQR0601817 | Key Planning assumption that repository will be available in 2010 |
| 193 | HQR-036-1057 to HQR-036-1066 | STATEMENT OF RONALD A. MILNER ASSOCIATE DIRECTOR FOR STORAGE AND TRANSPORTATION OFFICE OF CIVILIAN RADIOACTIVE WASTE MANAGEMENT BEFORE MN STATE LEGISLATURE COMMITTEE ON JOBS, ENERGY, AND COMMUNITY DEVELOPMENT | HQR-036-1079 to HQR-036-1060 | DOE periodically published Total System Life Cycle Costs analyses ("TSLCC"), which were for the purposes of estimating the costs of its spent fuel and HLW acceptance program. From 1984-2001 DOE'S TSLCCs all calculate program costs based on a 3000 MTU acceptance rate that is preceded by a brief ramp-up period. |
| 213 | Diablo Canyon Power Plant | [Desc: Department of Energys May 25 1994 Notice of Inquiry on Waste Acceptance Issues] | PDCP0012642 | Attempts by the Nuclear Waste Negotiator to site a voluntary monitored retreivable storage facility have not been successful. |
| 214 | HQR-057-1467 to HQR-057-1492 | DRAFT TSLCC 1995 ASSUMPTION PACKAGE | HQR0571482 | Reposity Waste Acceptance Rates (3000 MTU/year by 2014) |
| 221 | HQ0002243 to HQ0002312 | ACCEPTANCE PRIORITY RANKING AND ANNUAL CAPACITY REPORT | HQ002248 | Projected Nominal Waste Acceptance Rates (prior to repository operations) |

**Appendix A - Documents Pertaining to the Reasonable Performance Issue**

| EXH | LOCATION | TITLE | PIN CITE | DESCRIPTION (*Quotes in Italics*) |
|---|---|---|---|---|
| 237 | PA-176202 to PA-176266 | ANALYSIS OF THE TOTAL SYSTEM LIFE CYCLE COST OF THE CIVILIAN RADIOACTIVE WASTE MANAGEMENT PROGRAM | PA-176217 | DOE periodically published Total System Life Cycle Costs analyses ("TSLCC"), which were for the purposes of estimating the costs of its spent fuel and HLW acceptance program. From 1984-2001 DOE'S TSLCCs all calculate program costs based on a 3000 MTU acceptance rate that is preceded by a brief ramp-up period. |
| 254 | HQR-038-0304 to HQR-038-0306 | ROUTING AND TRANSMITTAL SLIP [ATTACHING REPORT INFORMATION IN BILLION DOLLAR BASE ON VARIOUS OPERATING ASSUMPTIONS] | HQR0380306 | Addition of an MRS facility that begins operations concurrently wth the repository would have little effet on the inventory of spent fule at reactors that have been shut down |
| 260 | MPA009925 to MPA009943 | CIVILIAN RADIOACTIVE WASTE MANAGEMENT SYSTEM TOTAL SYSTEM DESCRIPTION REV 0 | MPA0110313 | Waste receipt rates at the repository (3000 MTU/year by 2014) |
| 265 | CTR-027-0001 to CTR-027-0085 | 1996 ACCEPTANCE PRIORITY RANKING AND ANNUAL CAPACITY REPORT | CTR0270006 | Projected Nominal Waste Acceptance Rates (prior to repository operations) |
| 279 | HQR-036-0006 to HQR-036-0086 | ANALYSIS OF THE TOTAL SYSTEM LIFE CYCLE COST OF THE CIVILIAN RADIOACTIVE WASTE MANAGEMENT PROGRAM | HQR0360032 | Acceptance Rates of Commercial Spent Nuclear Fuel (3000 MTU/year by 2014) |
| 281 | HQO.19990112.0001.0001 to HQO.19990112.0001.0050 | CIVILIAN RADIOACTIVE WASTE MANAGEMENT SYSTEM REQUIREMENTS DOCUMENT REVISION 05 A00000000000811170800003 | HQO.19990112.0001.0021 | (1999 Civilian Radioactive Waste Management System Requirements Document, Revision 5, projecting this ramp-up rate at centralized interim storage facility); a central storage facility was the sort of facility OCRWM was principally considering using during Dr. Bartlett's tenure as director in light of the repository schedule. |
| 282 | HQR257 0286 to HQR257 0288 | DEVELOPMENT OF THE APR AND ACR | HQR2570288 | System capacity prior to repository operations (max of 900 MTU/year) |
| 307 | HQR-058-0749 to HQR-058-0806; HQR-058-0816 to HQR-058-0873 | CIVILIAN RADIOACTIVE WASTE MANAGEMENT SYSTEM REQUIREMENTS DOCUMENT REVISION 05 DCN 01 (A00000000-00811-1708-00003) | HQR0580781 | CISF Receipt Rates (3000 MTHM/year starting year 6) |

**Appendix A - Documents Pertaining to the Reasonable Performance Issue**

| EXH | LOCATION | TITLE | PIN CITE | DESCRIPTION (*Quotes in Italics*) |
|---|---|---|---|---|
| 309 | HQR257 0414 to HQR257 0415 | EMAIL FROM ZABRANSKY TO DANIEL RE SNF ACCEPTANCE RATES | HQR2570415 | buildup of repository operation to 3000/year |
| 333 | PA-224097 to PA-224174 | ANALYSIS OF THE TOTAL SYSTEM LIFE CYCLE COST OF THE CIVILIAN RADIOACTIVE WASTE MANAGEMENT PROGRAM DOE/RW-0533 | PA-224134 | DOE periodically published Total System Life Cycle Costs analyses ("TSLCC"), which were for the purposes of estimating the costs of its spent fuel and HLW acceptance program. From 1984-2001 DOE'S TSLCCs all calculate program costs based on a 3000 MTU acceptance rate that is preceded by a brief ramp-up period. |
| 348 | DOE/RW-0351 | CIVILIAN RADIOACTIVE WASTE MANAGEMENT WASTE ACCEPTANCE SYSTEM REQUIREMENTS | DOE/RW-0351 at 46 | Projected Acceptance Schedule for Commercial SNF shows 3,000 MTU/Year starting in 2014 |
| 357 | HQR145-0001 to HQR145-0056 | CIVILIAN RADIOACTIVE WASTE MANAGEMENT SYSTEM REQUIREMENTS DOCUMENT REVISION 05 | HQR1450024 | CRWMS Receipt Rates (3000 MTU/year starting 2014) |
| 468 | PNL-075-1488 to PNL-075-1500 | ROLE OF TRANSPORTATION IN THE UTILITIES' MANAGEMENT OF SPENT FUEL STORAGE | PNL-075-1469 | Reflects understanding that utilities would need to use dry cask storage that would potentially be transportable. |
| 479 | MOF063968 to MOF063973 | [UPDATED PLAN FOR DISPOSAL OF NATIONS COMMERCIAL AND DEFENSE HIGH LEVEL RADIOACTIVE WASTE] | MOF0252070 | Limit of 70,000 MTUs would be reached sometime after 2025 if the annual rate of uranium placement averaged 3,000 MTU |
| 486 | PNL-170-1529 to PNL-170-1575 | SPENT FUEL ACCEPTANCE SCENARIOS DEVOTED TO SHUTDOWN REACTORS: A PRELIMINARY ANALYSIS | PNL-170-1540 | Study assumes ramp up of acceptance to 3000 MTU/year by 2008 |
| 493 | DB0001486 to DB0001514, EDB-001-1487 to EDB-001-1515; HQ0002795 to HQ0002825, HQR-002-0004 to HQR-002-0034 | PRELIMINARY DRAFT OF THE 1990 ANNUAL CAPACITY REPORT ACR [00/00/90] | DB001498 | Projected Waste Acceptance Rate For SNF for Upper Bounding Case (3000 MTU/year by 2003) |
| 501 | HQR-003-0798 to HQR-003-1004; | DRAFT MISSION PLAN AMENDMENT | HQR0030826 | MRS Facility will hold 10,000 MTU before reposity becomes active |

**Appendix A - Documents Pertaining to the Reasonable Performance Issue**

| EXH | LOCATION | TITLE | PIN CITE | DESCRIPTION (*Quotes in Italics*) |
|---|---|---|---|---|
| 502 | HQR-059-3018 to HQR-059-3024 | SYSTEM THROUGHPUT STUDY AND MRS SYSTEM ISSUE ASSESSMENT PROJECT | HQR0593018 | Study discusses the direction and magnitude of a change, if any in the currently assumed 3000 MTU/year steady-state throughput rate |
| 508 | HQ0000095 to HQ0000099 | PROPOSED OCRWM POSITION | HQ0000095 to HQ0000096 | Notes DOE position on the Contract's meaning regarding proposed Delivery Commitment Schedules as well as the ambiguity in the Contract. |
| 510 | FI-115711 to FI-115713; HQ0011213 to HQ0011215, HQR-006-0711 to HQR-006-0713 | ACTION RESPONSE TO YANKEE ATOMICS DELIVERY COMMITMENT SCHEDULES AND REQUEST FOR PRIORITY ACCEPTANCE | HQR-006-0715 | Reflects the denial and futility of the utilities' request for approval of Delivery Commitment Schedule seeking a larger acceptance allocation than provided in DOE's planning documents. |
| 536 | DOE/RW-0458, Revision 1 | DRAFT CIVILIAN RADIOACTIVE WASTE MANAGEMENT PROGRAM PLAN REVISION 1 | | Phase II Interim storage facility would be capable of handling 3000 MTU/year |
| 570 | HQR-040-1663 to HQR-040-1682; YA Opp. To Defendant's Motion for SJ Re Rate of SNF Acceptance YA3119 | AMENDMENT TO CONTRACT DE-CR01-83 NE44405 BETWEEN DOE AND PECO ENERGY COMPANY | HQR0401675 | Repository to accept 3000 MTU/year by 2014 |
| 585 | HQR239 0228 | MODULAR CONSTRUCTION AND OPERATION DECISION | HQR2390228 | With development of underground will allow waste emplacement to be quickly ramped up to 3000 MTU/year |
| 586 | HQR2390699 to HQR2390784 | | HQR2390759 | Estimated Schedule for Acceptance of Commercial SNF will reach 3000 MTU/ year in 2014 |
| 591 | HQR2390031 to HQR2390086 | | HQR2390054 | CRWMS Receipt Rates (3000 MTU/year starting 2014) |