IN THE UNITED STATES COURT OF FEDERAL CLAIMS

Filed Electronically on May 30, 2006

| | | |
|---|---|---|
| PACIFIC GAS & ELECTRIC COMPANY,<br>Plaintiff,<br>v.<br>UNITED STATES OF AMERICA,<br>Defendant. | ) | No. 04-0074C, into which has been consolidated No. 04-0075C<br>(Judge Hewitt) |

NOTICE OF FILING PG&E'S SUPPLEMENTAL DEPOSITION AND TRIAL TESTIMONY DESIGNATIONS

Pursuant to the Court's Post-Pretrial Order of May 25, 2006, PG&E submits supplemental deposition and prior trial testimony designations for certain witnesses. As directed by the Court, the designations below, together with the testimony previously designated by PG&E, provide adequate foundation to "establish the relationship of the witness to the substance of the testimony" for the following witnesses: Robert Campbell, Susan Klein, Nancy Slater, Victor Trebules, and David Huizenga. Transcript of Pretrial Conference, May 23, 2006, at 25:9-10 ("Tr."). These supplemental designations are as follows:

| **Name** | **Date** | **Designation** |
|---|---|---|
| Robert Campbell: | 6/13/02 | 11:6 - 19:21 |
| Susan Klein: | 4/24/02 | 11:10 - 23:15 |
| Nancy Slater: | 4/22/99 | 5:25 - 11:3<br>14:13 - 15:13<br>19:21 - 23:17 |
| Victor Trebules: | 4/19/02 | 10:21 - 19:17 |
| Huizenga: | 8/14/04 | 4370:18 - 4374:5 |

Copies of these designated transcript pages are attached at Appendix A.

Further, pursuant to the Court's May 25, 2006, Order, PG&E intends to file all designated transcript pages prior to trial as part of the parties' Joint Notice of Deposition Designations.

Dated: May 30, 2006

Respectfully submitted,

s/ Jerry Stouck

JERRY STOUCK
Greenberg Traurig, LLP
800 Connecticut Avenue, NW
Suite 500
Washington, DC 20006
(202) 331-3173 Phone
(202) 261-4751 Fax
*Counsel for Plaintiff*
Pacific Gas & Electric Company

Of Counsel:
Robert L. Shapiro
Greenberg Traurig, LLP

# APPENDIX A

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

-----------------------------------------X

YANKEE ATOMIC ELECTRIC
COMPANY, CONNECTICUT
YANKEE ATOMIC POWER
COMPANY, MAINE YANKEE
ATOMIC POWER COMPANY,

Plaintiffs, CASE NO.

vs. 98-126C

98-154C

UNITED STATES OF AMERICA, 98-474C

Defendant.

-----------------------------------------X

Washington, D.C.

Thursday, June 13, 2002

Deposition of ROBERT ALLEN CAMPBELL a witness, called for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to notice, the witness being duly sworn, taken at the offices of Spriggs & Hollingsworth, 1350 I Street, N.W., Suite 1010, Washington, D.C, at 9:32 a.m, on Thursday, June 13, 2002, and the proceedings being taken down by Stenotype by CINDY L. SEBO, and transcribed under her direction.

Page 10

car, and I did that again on another submarine.
Q So if I understand you correctly, twice you decommissioned reactors on spent fuel and loaded it up onto rail cars?
A Yes.
Q Do you know where the spent fuel was being transported by rail to?
A The Department of Energy's Idaho National Engineering Laboratory.
Q Is that -- is that the full extent of your involvement with spent fuel while you were with the Navy?
A Yes.
Q How about when you were with the Navy from '87 to '92, did you have any involvement with Greater-Than-Class C waste?
A No.
Q And do you understand what I mean when I say Greater-Than-Class C waste?
A Yes.
Q Can you just explain that -- what Greater-Than-Class C waste means to you for the -- can you explain that for the record?
A Yes. The Nuclear Regulatory Commission has a regulation, Part 61, which defines Class A, B

Page 11

and C which can go to commercial low-level waste disposal sites.
Class C has an upper limit, and it's -- it's in two tables in the regulation, and if you exceed that limit, it's then Greater-Than-Class C.
Q And if I understand correctly, your work with the Navy did not involve GTCC --
A Yes.
Q -- is that correct?
A Yes. I did not work with Greater-Than-Class C in the Navy.
Q Thank you. And then in 1992, you joined the Department of Energy?
A Yes.
Q What was your position with the Department of Energy at that time?
A I was a nuclear engineer program manager.
Q And what was the program you were managing?
A Well, basically everyone is called a program manager. So I was dealing with what's called off-site waste, which was anything -- any materials or waste that was outside the Department of Energy complex, maybe on loan to a university or to a private company, that needed to come back, I

Page 12

worked on. And I also worked on the acceptance of Greater-Than-Class C sealed sources.
Q And what branch of the Department of Energy did you begin work at as a program manager in '92?
A The Office of Environmental Management.
Q And what EM number is that, that office?
A They've reorganized a couple times. It was EM32 then.
Q Okay. And what was the title of that branch of the office?
A It was -- that was the Office of Waste Operations.
Q And, in general, what were the areas of responsibility of EM32, the Office of Waste Operations?
A That office was responsible for any waste management activities at all DOE sites.
Q So, organizationally, your -- I guess you would call it an office -- EM32 is called an office?
A Yes.
Q So the EM32 office underneath it had different programs?
A Yes. There were three different

Page 13

divisions.
Q Okay. And can you explain for me what those three different divisions were?
A Eastern, central and western. So it was just a geographic split of the country.
Q And you were associated with which of those?
A Eastern, although I wasn't limited to working on stuff in that region. I just -- they had to put everybody in a division.
Q Okay. Okay. What regions did you work on, or was it just national?
A The whole country.
Q Okay. So if I understand correctly, Office of Waste Operations had management activities for waste at all DOE sites, what you focused on was off-site waste?
A Yes.
Q Okay. Now, what part of EM32 dealt with waste at DOE sites?
A Well, each of those divisions had DOE sites in that region of the country. And so each of those divisions dealt with the waste at the sites in their region.
Q And who did you report to when you were

Page 14

at EM32?
A The eastern division director.
Q Okay. And who was that?
A Wayne Nobles.
Q And who was the head of EM32, in general?
A Larry Harmon.
Q And who did Mr. Harmon report to?
A He reported to Mr. Steve Cowan.
Q And what was Mr. Cowan's title?
A He was the associate deputy assistant secretary for waste management.
Q Do you know, who did Mr. Cowan report to?
A He reported to Jill Lytle, which is L-y-t-l-e, and she was the deputy assistant secretary for waste management.
Q So at this time, would sealed sources in general be the primary responsibility of Mr. Harmon at EM32?
A I'm sorry. Repeat the question.
Q Sure. I believe you testified one of the things that you worked on was sealed sources, GTCC sealed sources?
A Yes.
Q And that was within the -- that was one of the areas of responsibility for EM32 generally?

Page 15

A Yes.
Q And if I understand correctly, Mr. Harmon was head of the EM32 and would have been dealing with sealed sources, that was part of his responsibility too?
A Yes.
Q Okay. Now, I'm trying to make sure I understand just the organizational framework.
Now, Mr. Cowan, the associate deputy assistant secretary for waste management, what other offices were underneath him at that time, 1992?
A All -- well, all the other offices. There was -- I guess, it went -- there was a 33, a 34, a 35, I think. It's been a while. I don't remember exactly the layout of the rest of the offices.
Q Okay. And how about 33, what was your understanding of what 33 did, EM33?
A That was -- I don't remember.
Q How about EM34, what about that?
A EM34 was the Waste Isolation Pilot Plate office.
Q And for the record, can you explain what WIPP did? W-I-P-P.

Page 16

MS. HERRMANN: Objection, foundation.
THE WITNESS: The Waste Isolation Pilot Plant office was working at that time on completing -- completing the work necessary to open that disposal facility.
BY MR. SKALABAN:
Q Okay. And what was the function of WIPP, what was its mission?
MS. HERRMANN: Same objection.
THE WITNESS: WIPP is a disposal facility for transuranic -- Defense transuranic waste.
MR. SKALABAN: Can we go off the record for just one moment?
MS. HERRMANN: Yes.
(Discussion off the record.)
BY MR. SKALABAN:
Q How about EM35, what was their mission?
MS. HERRMANN: Objection, foundation.
THE WITNESS: EM35 was basically technical and programmatic support and analysis.
BY MR. SKALABAN:
Q What were the types of subjects or areas that they would work on?
MS. HERRMANN: Same objection.
THE WITNESS: Basically, they -- each

Page 17

type of radioactive waste that we dealt with, there was a program manager for that waste type and they developed plans and programmatic documents and analysis for each waste type.
BY MR. SKALABAN:
Q And for GTCC waste, who was dealing with developing programmatic plans from EM35 in that 1992 time frame?
A Terry Plummer.
Q Given that you were working on sealed sources, did you have interactions with Mr. Plummer in the '92 time frame?
A Yes.
Q Can you tell me what -- just in general terms, what was your work on sealed sources in the '92 time frame, what you did?
A We had reached an agreement with the Nuclear Regulatory Commission, if they had licensees who had sealed sources that the NRC had determined it was problematic for some reason, they would send us a letter asking us to accept them and they would evaluate. And my job is to find a place -- to figure out how to go get them and find a place to put them.
Q Who was the agreement reached with with

Page 18

NRC; who was involved in formulating that agreement that you referred to?
MS. HERRMANN: Objection, foundation.
THE WITNESS: I don't know who was involved in formulating the agreement. The agreement was reached prior to my starting work there. The person who signed the document for the NRC was Robert Bernario, and the person who signed the document for DOE was Leo Duffy.
BY MS. HERRMANN:
Q And do you know what Mr. Bernario's position was with the NRC?
A He was the director of the Office of Nuclear Materials Safety and Safeguards, I believe.
Q I believe you said he was at the NRC. Do you know, has he left, to your knowledge?
A Yes, he has retired.
Q And who is Mr. Leo Duffy?
A He was the assistant secretary for environmental management.
Q So that would be Jill Lytle's boss?
A Yes.
Q Did you have -- in this '92 time frame, did you have occasion to work with people at the NRC on sealed source issues?

Page 19

A Yes.
Q Who did you work with at the NRC on sealed sources?
A Mr. Doug Broaddus.
Q Can you spell that for the record, if you know?
A B-r-o-a-d-d-u-s.
Q Okay. Thank you.
Anyone else?
A He was the primary person on sealed sources.
Q And do you know what part of NRC he worked for?
A Office of Nuclear Materials Safety and Safeguards, the Division of Industrial and Medical Nuclear Safety.
Q Now, you testified that in working on sealed sources, one of the things you did was to find a place to put them. Did you find a place to put them; can you tell me about that, please?
A Yes.
Q Okay.
A Early on, we basically took -- I basically found the nearest DOE site and arranged for sources to be transported to the -- to the

Page 20

nearest facility that was able to accept them.
Q And that would be accepting them for storage?
A Yes.
Q Had any sealed sources actually been disposed of?
MS. HERRMANN: Objection, foundation.
THE WITNESS: We've not disposed of any Greater-Than-Class C sealed sources, no.
BY MR. SKALABAN:
Q And just for the record, just so it's clear, do you understand what I mean when I say disposed of?
A I believe so.
Q Okay. For purposes of the record, can you explain your understanding of what disposing of a Greater-Than-Class C source means?
A Well, disposal would be some kind of permanent place you would put something and never go get it again, as opposed to storage, which is the intent would be to -- to retrieve it one day.
We do not have any Greater-Than-Class C disposal, so the way you framed the question was -- my understanding of Greater-Than-Class C disposal -- since we don't have that, I don't know

Page 21

what that's going to be.
Q You stated that early on the sealed sources would go to the nearest DOE sites. What were some of those sites that sealed sources would be taken to?
A We sent sources to the Mound Plant in Ohio, the Hanford site in Washington, and the Los Alamos National Laboratory in New Mexico.
Q Are there any other -- are these all DOE sites?
A Yes.
Q Are there any other sites that you can think of that sealed sources were taken to early on?
A Yes. We had one request from the NRC that was for a large source on a piece of medical equipment that actually could be reused. And so we -- I entered into for -- the Department entered into a contract with a company to go remove the source from the medical equipment.
This was a little different, in that most of the time the source was just in a source holder, and that's all there was.
We didn't want to have to deal with this piece of medical equipment, which had a lot of

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
-------------------------------------------X
YANKEE ATOMIC ELECTRIC COMPANY :
(98-126C)(Merow, S.J.) :
CONNECTICUT YANKEE ATOMIC POWER COMPANY :
(98-154C)(Merow, S.J.) :
MAINE YANKEE ATOMIC POWER COMPANY :
(98-474C)(Merow, S.J.) :
FLORIDA POWER & LIGHT COMPANY :
(98-483C)(Wilson, J.) :
NORTHERN STATES POWER COMPANY :
(98-484C)(Wiese, J.) :
DUKE POWER, a Division of DUKE ENERGY CORP.:
(98-485C)(Sypolt, J.) :
INDIANA MICHIGAN POWER COMPANY :
(98-486C)(Hodges, J.) :
SACRAMENTO MUNICIPAL UTILITY DISTRICT :
(98-488C)(Yock, S.J.) :
SOUTHERN NUCLEAR OPERATING COMPANY, et al. :
(98-614C)(Merow, S.J.) :
COMMONWEALTH EDISON COMPANY :
(98-621C)(Hewitt, J.) :
BOSTON EDISON COMPANY :
(99-447C) (Allegra, J.) :
GPU NUCLEAR, INCORPORATED :
(00-440C)(Bush, J.) :
WISCONSIN ELECTRIC POWER COMPANY : VOLUME
(00-697C)(Merow, S.J.) : I
POWER AUTHORITY OF THE STATE OF NEW YORK :
(00-703C)(Damich, J.) :
OMAHA PUBLIC POWER DISTRICT :
(01-115C)(Bush, J.) :
NEBRASKA PUBLIC POWER DISTRICT :Discovery
(01-116C)(Sypolt, J.) :Judge:
TENNESSEE VALLEY AUTHORITY :(Judge
(01-249C)(Bruggink, J.) :Sypolt)
Plaintiffs, :PAGES
v. :1 - 274



THE UNITED STATES, :
Defendant. :
-------------------------------------------X

Deposition of Susan Klein
Washington, DC
Wednesday, April 24, 2002

Reported by: Denise Dobner Vickery, RMR, CRR
JOB NO. 144539



April 24, 2002
9:37 A.M.

Deposition of Susan Klein, held at the offices of:

Jenner & Block
601 13th Street, NW
12th Floor
Washington, DC 20005

Pursuant to notice, before Denise Dobner Vickery, a Registered Merit Reporter, Notary Public of the District of Columbia.



APPEARANCES:

Jenner & Block
For the Plaintiff COMMONWEALTH EDISON
One IBM Plaza
Chicago, IL 60611-7603
(312) 222-9350
BY: Norman M. Hirsch, Esq.

Shaw Pittman Potts & Trowbridge
For the Plaintiffs NORTHERN STATES POWER COMPANY, et al.
1650 Tysons Boulevard
McLean, VA 22102-4859
(703) 770-7962
BY: Alex D. Tomaszczuk, Esq.

Balch & Bingham LLP
For the Plaintiffs SOUTHERN NUCLEAR OPERATING COMPANY, et al.
1275 Pennsylvania Avenue, NW, Tenth Floor
Washington, DC 20004

Thereupon,

SUSAN KLEIN

was called for examination, and, after having been duly sworn or affirmed, was examined and testified as follows:

EXAMINATION BY COUNSEL FOR THE PLAINTIFF, COMMONWEALTH EDISON

BY MR. HIRSCH:

Q. Ms. Klein, my name is Norm Hirsch. I'm a lawyer at Jenner & Block in Chicago. I represent Commonwealth Edison Company. I'm going to be asking you some questions today.

If you don't understand a question I've asked, please tell me and I'll try and rephrase it. Otherwise, I'll assume you understood my question.

A. (Nods head).

Q. If you need a break at any point today, please let me know and we'll stop and take a break.

A. (Nods head).

Q. Mr. Zabransky -- I'm sorry.

A. That's okay. You got Zabransky on your brain.

Q. Move from the last deposition.



Ms. Klein, are you aware that there's a protective order in the spent nuclear fuel cases?

A. I think there is, yes.

Q. All right. What I'm going to do is I'm going to hand you a copy of the protective order and I'd like you to take a minute to look at it.

A. Okay.

MR. HIRSCH: Mark that as Exhibit 1.

(Thereupon, the reporter marked for identification Deposition Exhibit No. 1.)

THE WITNESS: (Pause). Okay. I don't fully understand it at this point, but I've read through it.

BY MR. HIRSCH:

Q. Okay. Would you generally agree to abide by the terms in the protective order, Ms. Klein?

A. If something is labeled confidential, yes, I will keep it confidential.

Q. Okay. All right. That's fine.

Ms. Klein, I've handed you what's been marked as Klein Deposition Exhibit 1 or I'm handing you that document, which is the notice of deposition that was



issued on April 18th for today's Rule 30(b)(6) deposition. And if you look on the exhibit page, you'll see four topics. That's page 5. You see those topics?

A. Yes, I see those topics.

Q. And you understand you're supposed to be the Rule 30(b)(6) designated Department of Energy witness for these four topics?

A. Yes.

Q. What's your current position, Ms. Klein?

A. I'm a senior policy adviser to the Director and Deputy Director of the Office of Civilian Radioactive Waste Management at the Department of Energy.

Q. And how long have you been the senior policy adviser?

A. For about three years.

Q. So, since about 1999?

A. Yes. I was transferred there but detailed back to general counsel for a couple years.

Q. When was your detail back to General Counsel's Office?



A. I think it was '97 that I was transferred to RW, but I was detailed back to general counsel to work with the general counsel at the time on any legal issues and then later on it was limited to issues involving this litigation.

Q. Okay. We'll get back to that in a second. But who do you report to as the senior policy adviser?

A. Lake Barrett. Ron Milner and Lake Barrett.

Q. And Mr. Barrett's current title is?

A. Deputy Director of the Office of Civilian Radioactive Waste Management.

Q. And Mr. Milner's title is?

A. He's the COO, the Chief Operating Officer of the Office of Civilian Radioactive Waste Management at DOE.

Q. And is the Office of Civilian Radioactive Waste Management otherwise known by its acronym as OCRWM?

A. OCRWM, yes, and actually with regard to Ron, I think now I just report to Lake. I was reporting to Ron when he was also Acting Deputy, but now that Margaret is here, to just correct the record. I don't

know how important that is but --
Q. I'm sorry.
A. -- to be perfectly accurate, right now I report to Lake, not to Ron.
Q. Okay.
A. Okay.
Q. And when did you stop reporting to Ron Milner?
A. When Margaret Chu became the Director.
Q. You also report to Ms. Chu?
A. Yes, I do.
Q. Now, it is my understanding that you're a lawyer; is that correct?
A. Yes.
Q. And when did you graduate from college, Ms. Klein?
A. 1971.
Q. And where did you go to law school?
A. Case Western Reserve in Cleveland, Ohio.
Q. And when did you graduate from Case Western?
A. 1974.
Q. And can you give me just a rough outline of what your employment has been after you got out of law



school?
A. I went to work for the United States General Accounting Office. Worked there for three years.
Q. So, from 1974 to?
A. To 1977.
Q. Okay.
A. I wrote decisions of the controller general. And then I left the General Counsel's Office there and went to what was at the time FEA, the Federal Energy Administration, for three months until it became the Department of Energy in 1977.
Q. And have you been at the Department of Energy from 1977 to the present?
A. Yes.
Q. And can you give me the outline of your employment history at the Department of Energy?
A. I worked in general counsel for a couple years. I can't remember the exact number. I don't know how much detail you want, but then from there I went to conservation and at the time it was called conservation and solar. Worked on the residential conservation service program.



Q. Roughly when was that?
A. I think it was probably '80, 1980. I'm not sure. And then 1984, I believe it was, I came to work in the nuclear area. It was when Ronald Reagan was elected. If that was '84, that's when it was.
Q. And what department did you work in in the nuclear?
A. At the time it was called Assistant General Counsel for International Development and Defense Programs.
Q. And what were your responsibilities in that position?
A. The Price Anderson Act, transportation of nuclear materials, the Low Level Waste Policy Act of 1980. That was generally my areas -- those were generally my areas.
Q. And who did you report to when you were in that position?
A. Leon Silverstorm.
Q. And who was he?
A. The Assistant General Counsel for IDDP, International Development and Defense Programs.



Q. Did you have any involvement in the passage of the Nuclear Waste Policy Act of 1982?
A. My office handled it, but it was not under me. There was another lawyer in the office handling it, but she would report on it in staff meetings.
Q. And what office was that at the time?
A. International Development -- well, it might have changed its name. That office changed its name many times. I'm not sure what its name was, but it was the same general group of lawyers. We were reorganized. We became Nuclear Affairs and later on Civilian Nuclear Programs. The defense part was taken out, but...
Q. Okay.
A. I don't remember the exact name during that period.
Q. So there was another lawyer in this Nuclear Affairs Office --
A. Uh-huh.
Q. -- better term, who worked on the Nuclear Waste Policy Act?
A. Yes.

Q. And who was that?
A. Amy Shamora.
Q. Is she still with the Department of Energy?
A. Last I heard, she went back to GAO. We had both actually worked at GAO together, but I don't know if she's retired or what.
Q. And so I wasn't sure. Did you do any work in terms of the Nuclear Waste Policy Act?
A. After its passage, yes.
Q. Okay.
A. Not before its passage.
Q. I see. What kind of work did you do in connection with the Nuclear Waste Policy Act?
A. Price Anderson issues and transportation issues at this time. Later on I did much more, but that's all I did right after passage. I did not work on the standard contract.
Q. Okay.
A. I guess I shouldn't answer your questions before you ask them.
Q. That's fine. When you say you worked on transportation issues, what kind of issues did you



work? What do you mean by that?
A. Well, generally I worked on transportation issues within the department. Our own transportation of nuclear materials, which was under the defense program area, and I interpreted the Department of Transportation regulations and the NRC regulations and our exemption under the Atomic Energy Act. It was really with Price Anderson that I worked with the people in OCRWM.
Q. Okay. So, how long did you work as that in that Assistant General Counsel position?
A. Until I came to RW and I became the Assistant General Counsel of that division eventually.
Q. And when did you become the Assistant General Counsel for RW?
A. I don't remember. I was in that position acting. I came to RW in about -- what did I say? '97. I'd say around '92. I mean, I can -- yeah, '92, approximately.
Q. So, just so I'm clear, from 1984 to roughly 1992 you were in this position as Assistant General Counsel in this office whose name changed but --



A. No.
Q. I'm sorry. Go ahead.
A. I wasn't the Assistant General Counsel from '84 until '92. I was an attorney in that office.
Q. All right. Okay.
A. From '92 to '97 approximately I was the Assistant General Counsel.
Q. All right. For RW?
A. Which means --
Q. In RW; is that right?
A. No. It's in the general --
Q. All right.
A. It's in the General Counsel's Office. We had many clients and RW was one of them, but actually at a certain point in time the whole RW program was moved to the Assistant General Counsel for Environment because we were doing the environmental assessments was the biggest part of the project, and so it was moved there for several years. It was taken out of that office and moved there and then it was moved back to that office.
Q. So, from this period 1984 to 1982 -- '92 --



excuse me -- you were an attorney in this office?
A. Yes.
Q. Of the Assistant General Counsel?
A. That's right.
Q. Whose responsibilities included nuclear affairs?
A. Yes. Absolutely. That's correct.
Q. All right. And when you moved into the position in 1992 of Assistant General Counsel, who did you report to?
A. Jerry Pruzan. He was the deputy general counsel for -- I don't know what they called it -- programs or something.
Q. What did your responsibilities include as the Assistant General Counsel during that period starting in 1992?
A. Interpretation of the Atomic Energy Act. Interpretation of the Nuclear Waste Policy Act. Interpretation of the Low Level Waste Policy Act. And in those capacities, there were many offices that I supported. Environment, safety and health, OCRWM, nuclear energy.

Q. Who did Mr. Pruzan report to?
A. The general counsel.
Q. And that was?
A. I think that was Farrell. I'm not positive.
Q. Farrell?
A. Mike Farrell. I'm not sure. It also was Steve Wakefield. I don't remember.
Q. And how long were you in that position as Assistant General Counsel?
A. I think about five years. I'm not sure, but I think about five years.
Q. So, roughly from 1992 to 1997?
A. Uh-huh. Now, later on I reported to other people. I'm just -- at that time I reported to Jerry Pruzan when I first became.
Q. All right. When you -- as you went along from '92 to '97, who else did you report to?
A. Frank Bay.
Q. Who's he?
A. He was a political appointee. He was and that Jerry Pruzan. They were all political appointees. So they came and went.



Q. I see. All right.
A. And then Mark Schroeder and then --
Q. These people had the title of?
A. Deputy.
Q. Deputy general counsel?
A. For something. It changed around a lot, but... And then after Mark Schroeder was Mary Anne Sullivan, not Marian but Mary Anne Sullivan.
Q. Right. Anybody else that you reported to during that period?
A. Not that I can remember.
Q. And what was Mary Anne Sullivan's title?
A. At the time she was deputy general counsel for something like environment and security. Something like that. And then she became the General Counsel later.
Q. Okay. Now, what position did you take in 1997?
A. The senior policy adviser to RW.
Q. And that's the position you're in now?
A. Yes.
Q. Now, you mentioned that you had a detail?



A. Uh-huh.
Q. Somewhere during this period '97 to the present?
A. Uh-huh.
Q. And when was that detail?
A. 1997 till the end of 1999.
Q. Okay. And what was your detail? What was the position you held?
A. Okay. I was -- I had moved physically. Well, I think the first year I didn't. I don't remember now. But anyway I reported to Mary Anne Sullivan with regard to legal issues, and then when time allowed, I worked on my senior policy adviser hat for Lake Barrett. But I was technically an employee of RW for payroll purposes, et cetera.
Q. All right.
A. And then eventually that changed. So that I didn't work on all legal issues. I just worked on issues related to the spent fuel litigation.
Q. And when did you start working exclusively on issues related to the spent fuel litigation?
A. I don't remember. I think it was the last



six months of that period.
Q. So, probably in 1999?
A. Yes. But during that whole period, I worked on the spent fuel litigation.
Q. From '97 to --
A. Yes.
Q. -- '99?
And you say during that detail you reported to Mary Anne Sullivan?
A. Yes. For legal issues I reported to Mary Anne Sullivan.
Q. Okay. And her title at that time was? Had she become --
A. General Counsel.
Q. -- General Counsel?
A. I believe for most of that time anyway.
Q. Was there a particular reason that you were given about why you should serve on the detail?
A. There was nobody else to do it.
Q. I see. All right. Well, were you perceived as having special expertise in the area?
A. Yes. Absolutely.

00001

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - X

YANKEE ATOMIC ELECTRIC :
COMPANY, :
Plaintiff, : Case No. 98-126C
v. : Senior Judge
: Merow
THE UNITED STATES, :
Defendant. :

- - - - - - - - - - - - - - - X

Washington, D.C.
Wednesday, April 21, 1999

Deposition of NANCY H. SLATER, a witness herein, called for examination by counsel for Plaintiff in the above-entitled matter, pursuant to agreement, the witness being duly sworn by JAN A. WILLIAMS, a Notary Public in and for the District of Columbia, taken at the offices of Spriggs & Hollingsworth, 1350 I Street, N.W., Washington, D.C., at 10:10 a.m., Wednesday, April 21, 1999, and the proceedings being taken down by Stenotype by JAN A. WILLIAMS, RPR, and transcribed under her direction.

00005

waste acceptance.

Q. And let me tell you just briefly procedurally how it will work. I'll be asking you a series of questions and you will be expected to answer the questions. As we discussed even before we went on the record, the court reporter is taking everything down and we'll get a written transcript of everything that's said today. Do you understand that?

A. Yes.

Q. And it will also be helpful for the court reporter's purposes so we get a clean transcript if you will respond as you just did.

A. Verbally.

Q. A nice verbal answer, yes or no or whatever the appropriate response might be.

A. I understand.

Q. Also I would ask, if you don't understand one of my questions, you're not sure what I'm asking in one of my questions, if you would please ask me to rephrase it rather than trying to answer a question you're not sure what the question is.

A. Will do.

Q. I appreciate that. Where do you work?

00006

A. At the U.S. Department of Energy in the Office of Civilian Radioactive Waste Management in the Regulatory Coordination Division.

Q. What's your job title there?

A. Team leader.

Q. And what are you a team leader of?

A. The entire division basically. I serve in lieu of a deputy division director. And we deal with the regulatory concerns between the program and the Nuclear Regulatory Commission, the EPA, National Academy of Science, and dealings with the Nuclear Waste Technical Review Board.

Q. When you say you deal with regulatory concerns of EPA, NRC, and the other agencies, what do you do on a day-to-day basis vis-a-vis the NRC?

A. Let's see, a typical example would be the fact that we are involved in developing safeguards and security policy guidelines for the eventual acceptance and disposal of a variety of waste forms. And those policy guidelines will be translated into actual waste acceptance criteria by another group.

And the waste owners will then have to

00007

assure that the waste they deliver falls within the boundary parameters established by the guidelines with one exception, there will be no new requirements imposed on the utilities because the standard contract is quite clear in terms of what can be asked for and what cannot.

Q. And so you're constantly working with EPA, NRC in developing various guidelines that they're going to be using?

A. Right, reporting on progress in the program and quality assurance issues, things like that.

Q. How many people are in this division?

A. I don't know, I have to count. Six.

Q. And who heads up the division?

A. Alan Brownstein, he's the division director.

Q. And what is this the division of?

A. Regulatory Coordination.

Q. It's the Regulatory Coordination Division. Is this a division of a larger office?

A. It would be the office of -- we have reorganized, we have new names for everything. But it would be the program management and integration function.

00008

Q. What is the program management and integration function?

A. These are in one division the budget folks, in another division the information management folks, it might be human resource folks in another division. And we are the division -- the only division within that group that has any technical or policy responsibilities. There is a separate office, there are two offices, in the other office is acceptance and transportation integration.

Q. And who heads up the program management and integration office?

A. Let's see, that would be Dwight Shelor.

Q. How long have you been a team leader in the Regulatory Coordination Division?

A. Let's see, I moved in late '95. About three and a half years, almost four years.

Q. Since that move three and a half, four years ago, have there been any other reorganizations within your office?

A. Within my particular Office of Program Management?

Q. Well, let me start with the Regulatory

00009

Coordination Division. Has there been any reorganization within that division?

A. Yes, because, in fact, we had a RIF last year. And we RIF'd two people out of the division, one of whom was a team leader. Our roles and responsibilities did not change.

Q. When you had two team leaders, was there any division as to what the two team leaders were leading?

A. Yes.

Q. What were the two team leaders leading at that point?

A. The other team leader was leading environmental regulatory issues and issues dealing with the Nuclear Waste Technical Review Board. And my function was primarily Nuclear Regulatory Commission interface.

Q. And now you're basically team leader for all of them?

A. Doing it all.

Q. In that same three and a half to four year time span since you've been in your current position, has there been any other reorganization at the office, the Office of Program Management and Integration?

00010

A. Yes, as a matter of fact, up until December -- actually January 1 of this year, the two offices would have had two associate directors. One retired and so the remaining office director now manages both. That was Dwight Shelor.

Q. And who was the associate director that left?

A. Samuel Rousso.

Q. Before Mr. Rousso left, how did they have it divided up?

A. Mr. Rousso would have had program management and Mr. Shelor had acceptance and transportation. Let's see. Yes, that's right.

Q. Maybe I misunderstood. So this is within the Office of Program Management and Integration that's now headed up by Mr. Shelor?

A. There were two offices. Samuel Rousso headed the management group, basically management functions, Dwight Shelor headed the acceptance and transportation group. Samuel Rousso retired. Both offices continue to exist. But now Dwight Shelor manages both.

Q. I see. And above the office level the next thing you get to is the Office of Civilian

00011

Radioactive Waste Management itself?

A. Is the deputy director and the director, it's the highest level.

Q. And has there been any other organizations within the -- reorganizations within the whole RW organization besides the ones that you've just mentioned in the last three and a half to four years?

A. To be honest with you, I try not to keep track of that. We play musical chairs. And I believe that the systems integration group may have moved from program management to acceptance and transportation.

Q. Three and a half years ago, when you came into your current position, what position did you have previously?

A. Prior to that I was the team leader in waste acceptance.

Q. And waste acceptance was part of what division at that time?

A. Well, it was a division, waste acceptance was a division.

Q. And who was director of the division at that time?

A. We had acting directors. I served as

00014

division?

A. Let's see. I joined DOE in August 1991. And at that time we had branch chiefs. And Alan Brownstein was the branch chief. I honestly do not remember precisely when the department decided it would no longer have branch chiefs, it would rename them and it would create division directors and team leaders.

And I would have to guess -- I'd have to go back and look to make sure, but my recollection is it might have been around 1993, 1994.

Q. What is a team leader?

A. Team leader is responsible for individual contributions, being a subject matter expert in some areas or a particular area, responsible for managing the entire team, eliminating obstacles, giving people a fresh look by stepping outside the box they're standing in, trying to solve the problem. So they're a little bit of both, technical worker and manager.

Q. But technically a team leader is not a supervisor?

A. No, no. Unfortunately you have the responsibilities but not the privileges of

00015

writing evaluations, signing leave slips, that kind of thing.

Q. That position is that of the division director?

A. Right.

Q. When you were team leader of waste acceptance roughly somewhere around 1993 to '95, who was on your team?

A. I have to do this by going around the room. Phil Smith, Bill Floyd, Mary Lee Payton, Kristin Svinicki, John Vlahakis, and I would consider my secretary to be part of the team as well, Deborah Evans.

Q. Were there any changes in the team during your tenure as team leader?

A. Yes. In fact, we hired Dave Zabransky. And, when Dave came into the division, we reorganized the division with two team leaders and divided the work load up.

Q. Why did that happen?

A. It was certainly a more efficient way to operate. And, to be quite frank, I was overloaded with too much work.

Q. When did that reorganization take place?

00019

A. An office, right.
Q. What office would it have been part of?
A. I don't know, I think they may have called it the waste acceptance storage and transportation office. But again I don't commit things like that to memory. I feel there are organization charts that I can go pull to look it up.
Q. And, between 1991 and 1993, Mr. Brownstein was the branch chief?
A. Yes.
Q. And after 1993 Mr. Brownstein became division director?
A. Director.
Q. And, between '91 and '93, do you recall who was the division director?
A. Jim Carlson.
Q. And then who was the office director above Mr. Carlson?
A. Ron Milner.
Q. What were your duties in this 1991 to 1993 period when you were an industrial specialist?
A. I was involved in the preparation of the annual capacity report, the acceptance

00020

priority ranking, answering questions both internal and external about the terms and conditions of the contract. Let's see. And whatever else may have arisen at the time.

I know, when we came in, we were on the tail end of a rulemaking, net versus gross, as sold was that clarification. So I wrapped part of that up. I believe I terminated a couple of nonutility contracts at the contract holder's request because they either no longer had the material or had, in fact, in one case I believe sold it to the government.

Q. Do you remember any other issues you worked on during that period?

A. '91 to '93, I think we began to discuss delivery commitment schedules at that point. Would that be about right? That would be about right.

Q. That would also have included exchange of approved delivery commitment schedules?

A. Actually my recollection is that we discussed exchanges not concurrently, because there was the opportunity to do that a little later. And it was more important given the timing requirement in the contract to have that

00021

guidance issue.

Q. And guidance as to what to do with the delivery commitment schedules themselves?

A. How to fill them out, instructions. I believe, if I'm not incorrect, that that's an OMB reviewed form. And you know that process, that takes time and there must be instructions on how to complete the form.

Q. What was the time concern?

A. I believe the contract requires delivery commitment schedules to be submitted by the purchaser 63 months in advance of the year in which they have an allocation. So back it out from 1998, and they would have been submitting in '92, late '92.

Q. Are there any other issues that you recall working on in the '91 to '93 period?

A. Let's see. I know we addressed priority for shutdown reactors. And nothing else comes to mind right now.

Q. What about the period '93 to '95, what issues did you work on?

A. During that time period, I believe I worked on delivery commitment schedule exchanges, many of the same things from '91 and '93, the

00022

acceptance, priority ranking, the annual capacity report, DCS review and approval.

We began conversations about final delivery schedules and what would be included in those, safeguards and security, and that was policy development. I know that I worked on numerous reviews of system baseline documents, system requirements documents primarily from a waste acceptance standpoint. And I know we kept working on priority for shutdown reactors.

Q. Let me ask you to clarify what you mean by just a couple of these categories. Safeguards and security, what was involved with safeguards and security?

A. NRC regulations require that a licensee have in place a safeguards and security system. And that means physical security as in physical protection. And that physical protection is based on the attractiveness of the material, would someone want to steal it to make a bomb.

They also require as another subelement material control and accounting. That is that, if you as a utility tell me that you're giving me ten MTU, you have to provide me with some documentation to give me confidence that you are;

00023

because, once I accept it, I'm going to have to swear and affirm to the NRC that I've got ten MTU.

And what we were working with the utilities to do, and it was an iterative process, it was lots of help and lot of involvement from the utility as well, was a process that would not impose an undo burden on them to do something that they weren't currently doing.

For example, they would address material control and accounting issues through calculation, burnup, for example, but they would not measure. And measurements would have been an operational impact. So we were looking for ways to get what we needed to accomplish without disrupting their operations. So there were lots of people talking to each other about that.

Q. You said you reviewed a number of what you called system baseline or system requirements documents. What's a system baseline document?

A. I guess the simplest way to describe it would be that these are the overall driving requirements for the design and operation of a repository. They are, in fact, obtained from legislation, regulation, and that's probably the

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

```
--------------------------------------------X
YANKEE ATOMIC ELECTRIC COMPANY                  :
(98-126C)(Merow, S.J.)                          :
CONNECTICUT YANKEE ATOMIC POWER COMPANY         :
(98-154C)(Merow, S.J.)                          :
MAINE YANKEE ATOMIC POWER COMPANY               :
(98-474C)(Merow, S.J.)                          :
FLORIDA POWER & LIGHT COMPANY                   :
(98-483C)(Wilson, J.)                           :
NORTHERN STATES POWER COMPANY                   :
(98-484C)(Wiese, J.)                            :
DUKE POWER, a Division of DUKE ENERGY CORP.     :
(98-485C)(Sypolt, J.)                           :
INDIANA MICHIGAN POWER COMPANY                  :
(98-486C)(Hodges, J.)                           :
SACRAMENTO MUNICIPAL UTILITY DISTRICT           :
(98-488C)(Yock, S.J.)                           :
SOUTHERN NUCLEAR OPERATING COMPANY, et al.      :
(98-614C)(Merow, S.J.)                          :
COMMONWEALTH EDISON COMPANY                     :
(98-621C)(Hewitt, J.)                           :
BOSTON EDISON COMPANY                           :
(99-447C) (Allegra, J.)                         :
GPU NUCLEAR, INCORPORATED                       :
(00-440C)(Bush, J.)                             :
WISCONSIN ELECTRIC POWER COMPANY                :
(00-697C)(Merow, S.J.)                          :
POWER AUTHORITY OF THE STATE OF NEW YORK        :VOLUME
(00-703C)(Damich, J.)                           :  I
OMAHA PUBLIC POWER DISTRICT                     :
(01-115C)(Bush, J.)                             :
NEBRASKA PUBLIC POWER DISTRICT                  :Discovery
(01-116C)(Sypolt, J.)                           :Judge:
TENNESSEE VALLEY AUTHORITY                      :(Judge
(01-249C)(Bruggink, J.)                         :Sypolt)
                  Plaintiffs,                   :PAGES
v.                                              :1 - 241
```



```
THE UNITED STATES,                              :
                  Defendant.                    :
--------------------------------------------X
```

Deposition of Victor W. Trebules, Jr.

Washington, DC

Wednesday, April 17, 2002

Reported by: Denise Dobner Vickery, RMR, CRR

JOB NO. 144458



April 17, 2002

9:32 A.M.

Deposition of Victor W. Trebules, Jr., held at the offices of:

Jenner & Block
601 13th Street, NW
12th Floor
Washington, DC 20005

Pursuant to notice, before Denise Dobner Vickery, a Registered Merit Reporter, Notary Public of the District of Columbia.



APPEARANCES:

Jenner & Block
For the Plaintiff COMMONWEALTH EDISON
One IBM Plaza
Chicago, IL 60611-7603
(312) 222-9350
BY: Theodore T. Eidukas, Esq.

Shaw Pittman Potts & Trowbridge
For the Plaintiffs NORTHERN STATES POWER COMPANY, et al.
1650 Tysons Boulevard
McLean, VA 22102-4859
(703) 770-7962
BY: Devon E. Hewitt, Esq.

Arnold & Porter
For the Plaintiffs SOUTHERN NUCLEAR OPERATING COMPANY, et al.
555 Twelfth Street, NW
Washington, DC 20004-1206

answer them as best you can.
A. Okay.
Q. If at any time you don't understand a question, it's probably because I've misphrased it or I'm not making any sense. So, just stop me, ask me to ask the question again or rephrase the question so it makes sense to you.
A. (Nods head).
Q. Also, because the court reporter can only take down what we say and not any gestures or physical answers like nods of the head, you know, in other words, what I'm saying, your answers have to be verbal.
And also because she can only take down what one person is saying at any one time, it's important that I try not to talk over your answers and, you know, wait until I finish the questions just so that she can get down exactly what's been said and there's not two people trying to talk at one time.
A. (Nods head).
Q. So that the record is accurate.
A. Okay.
Q. And if at any time you need a break for



whatever reason, as long as a question is not pending, I would be more than happy to accommodate you in taking a break.
A. (Nods head).
Q. Could you just quickly just describe your education after high school.
A. All right. I went to Ohio University for five years. I got a degree in engineering and a bachelor's degree in physics. I then did graduate work at Lehigh University in Bethlehem, Pennsylvania. I got a master's degree in mechanical engineering.
Q. And when did you receive that final degree?
A. 1972 I graduated from Lehigh.
Q. And that was the master's?
A. Yes. Master's degree in mechanical engineering.
Q. Okay. When did you first -- strike that.
Do you presently work for the Department of Energy?
A. Yes, I do.
Q. Okay. When did you first -- when did you start working for the Department of Energy?



A. Actually, I started working for the Atomic Energy Commission in 1972, which became the Energy Research and Development Administration, which became the Department of Energy. I don't remember the exact year ERDA became the Department of Energy. I think it was about -- I don't remember.
Q. Okay. But you were there when the Department of Energy was first formed it sounds like?
A. Yes. Yes.
Q. What was your first position in the Department of Energy?
A. The Department of Energy or the Atomic Energy Commission?
Q. I'm going to start with the Department of Energy.
A. Okay. Again, I don't remember exactly when name changed, but I spent the first five years working for the Pittsburgh Naval Reactors Office after I graduated from college, and then I transferred to the Atomic Energy Commission headquarters in Germantown, Maryland and I worked in the Office of Nuclear Energy Programs.



Q. In the Office of Nuclear Energy Programs, did your responsibilities include the handling of spent nuclear fuel at that time?
A. The handling of spent. No, we never handled any spent nuclear fuel.
Q. All right. I will rephrase that. Did your responsibilities include the disposal of spent nuclear fuel?
A. We did planning for activities involving radioactive waste and spent nuclear fuel. We never actually handled, though, any material.
Q. Could you briefly describe what the planning you did entailed that involved the disposal of radioactive waste and spent nuclear fuel.
MR. SHULTIS: Objection. Could we get a little more specific on the time period we're talking about here? I think that's important.
MR. EIDUKAS: I'm talking of the time period where you were at the Office of Nuclear Energy Programs, and I believe the witness has said he doesn't know a specific date when he was doing this.
BY MR. EIDUKAS:

Q. Mr. Trebules, if you can specify a date that you were working on the planning for the disposal of radioactive waste and spent nuclear fuel while at the Office of Nuclear Energy Programs, that would be helpful.

A. Let me try to clarify what I think you asked. I don't remember exactly when ERDA switched over to the Department of Energy. My guess, that was sometime in the 1980s. But in 1977, I joined the Office of Nuclear Energy Programs, which may have been part of ERDA or, you know, Atomic Energy Commission or ERDA or Department of Energy. It was 1977 and at that time I was involved in the planning activities for nuclear energy programs, which included breeder reactor development like the Clinch River breeder reactor, and I was responsible for preparing what was called the Fish and Energy Program Plan for the Department of Energy, which included some at that time it was called fuel cycle activities, which included handling of radioactive waste.

Q. Did that planning for the handling of nuclear radioactive waste that you just described, did that



involve planning for the disposal of those wastes in a deep geologic repository?

MR. SHULTIS: Objection, relevance.

BY MR. EIDUKAS:

Q. Generally, when your lawyer objects --

MR. SHULTIS: You still have to answer.

BY MR. EIDUKAS:

Q. You still have to answer unless he instructs you not to, if you're able to.

A. As best as I could remember, we did in the Fish and Energy Program document talk about reactor development and waste activities, and it did include I believe reprocessing at that time. This was prior to the ban on reprocessing and ultimate disposal of radioactive waste.

Q. Did those plans that you worked on go so far as to discuss the design of a repository? Did it get that specific?

MR. SHULTIS: Objection, relevance.

THE WITNESS: As best as I could remember, I don't believe we got involved in the -- at least I didn't get involved in the design of repositories for



the disposal of waste. My primary area of emphasis at that time was on reactor development. As I said, the Clinch River breeder reactor and, for example, Whitewater breeder reactor.

BY MR. EIDUKAS:

Q. At some point did your position at either ERDA or the Department of Energy change?

MR. SHULTIS: Objection, vague.

THE WITNESS: I had a number of activities during my career. As I mentioned, I stayed in the Office of Nuclear Energy Programs for a while and then soon after the passage of the Nuclear Waste Policy Act, about a year or two after the act was passed, then I joined the Office of Civilian Radioactive Waste Management.

BY MR. EIDUKAS:

Q. When you joined the Office of Civilian Radioactive Waste Management, you say a year or two after the act was passed, so we're talking somewhere in the 1983-1984 time frame?

A. That's correct.

Q. What was your first position at the Office of



Radioactive Waste Management?

A. I don't remember the title of my first position. It was probably program analyst or something like that, but I'm not exactly sure.

Q. What did that position entail? What were your responsibilities in that position?

A. First major assignment I could remember was coordinating the preparation of the mission plan for the Civilian Radioactive Waste Management Program.

Q. Was there anything else that your role entailed in that position?

MR. SHULTIS: Objection, vague.

THE WITNESS: That preparation of the mission plan was pretty much a full-time activity for a number of years. So there might have been other minor assignments I was given, but, you know, overall it was primarily the mission plan.

BY MR. EIDUKAS:

Q. Okay. Did there come a time when your position at the Office of Civilian Radioactive Waste Management changed from program analyst working on the mission plan?

Page 17

MR. SHULTIS: Objection, vague.

THE WITNESS: I had a number of different assignments in the Office of Civilian Radioactive Waste Management over the nearly 20 years that I've worked in that program.

BY MR. EIDUKAS:

Q. I guess what I'm trying to get at is I'd like to have just a brief chronology of the different positions you've been in with dates, if possible.

So you started out as a program analyst in the Office of Civilian Radioactive Waste Management in the approximately 1983-1984 time frame. What I'd like you to do is going forward to the present with dates, if possible, just state the various positions you've held in the OCRWM.

A. Okay. Around the 1984-'85 time frame, as I said, I believe I was a program analyst. I think in 1985 or '86 I became the senior technical adviser and technical assistant to the Director of Office of Civilian Radioactive Waste Management. I don't remember the exact time frame, but when Admiral Watkins became Secretary of Energy, I was detailed to his

Page 18

office for I think little over half a year as an adviser to the Secretary.

I then came back into the Office of Civilian Radioactive Waste Management I think in 1990 or 1991, and I was the Acting Director of what was called the M&O Management Division with responsibility to bring on board the M&O contractor for the program. I think that was 1991. About the a year or two after that, I became the Director of the Storage Division. The primary responsibility was to work on a proposed monitored retrievable storage facility.

A few years after that, I became the Director of the Program Management Division. And let's see. About four years ago I transferred out to Las Vegas to the Yucca Mountain site characterization office, and I'm currently the Director of the Office of Project Control.

Q. Did you have any involvement in the drafting of the Nuclear Waste Policy Act?

MR. SHULTIS: Objection, asks for legal conclusion.

BY MR. EIDUKAS:

Page 19

Q. My question was whether or not you had any involvement in actually writing or preparing the text of the Act.

A. Not that I could remember.

Q. At the time that the Act was being -- and when I say the Act, I'm referring to the Nuclear Waste Policy Act of 1982. At the time that Act was being drafted, did you have discussions with people who were involved in drafting that Act?

MR. SHULTIS: Objection, vague.

THE WITNESS: I don't believe so. I obviously talked to people in the department, you know, who were talking to people, you know, involved in nuclear energy activities, but I don't know that I've ever had any conversations with anyone that was actually involved in drafting the Nuclear Waste Policy Act.

BY MR. EIDUKAS:

Q. Okay. Do you have an understanding as to what the intent of the Nuclear Waste Policy Act is?

MR. SHULTIS: Objection, asks for legal conclusion.

Page 20

THE WITNESS: I'm not sure what you mean by intent of the Nuclear Waste Policy Act. Obviously I was familiar with some of the provisions and some of the requirements. As I said, my main job when I was in the Office of Civilian Radioactive Waste Management was to prepare the mission plan. That was clearly required by the Nuclear Waste Policy Act.

BY MR. EIDUKAS:

Q. I'll try to clarify what I mean. Do you have an understanding of what the primary purpose of the Nuclear Waste Policy Act is?

MR. SHULTIS: Objection, asks for legal conclusion.

THE WITNESS: My understanding of the Nuclear Waste Policy Act is that it laid out a blueprint for this country to follow to provide for the management and disposal of spent nuclear fuel and high level radioactive waste with a number of specific provisions.

BY MR. EIDUKAS:

Q. Are you familiar with the term standard contract?

Yankee Atomic Electric v. U.S Nos. 98-126C, 98-154C, 98-474C August 10, 2004

Heritage Reporting Corporation

Page 4365 to Page 4613

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

*HERITAGE REPORTING CORPORATION*
*1220 L Street, N.W.*
*Suite 600*
*Washington, DC 20005*
*Phone: 202-628-4888*
*FAX: 202-371-0935*

JUDGE MEROW: That's the last response?

MR. STOUCK: I think that's right.

MR. LESTER: I guess my only concern would be if we're talking about having counter-counter-designations. I'm not sure that's provided for in the rules, but I don't know what the Plaintiff is intending in terms of a response. If it's just dealing with the objections that were raised, that's fine. I don't have any problem with that. If it's adding additional testimony, I might have a little concern about that.

MR. STOUCK: I think, Your Honor, although we're not going to have any additional testimony on the subjects addressed in our original designations, we do have some views that some of the reported counter-designations are outside the scope of the designations. To that extent, whether we'll actually counter counter those or whether we'll just point out they're improperly designated, I'm not sure we decided yet. In any event, I don't think there's much of that. It's mostly response to their objections, I believe.

JUDGE MEROW: Let's do the best we can, and I'll consider them when they're in. And if you have to do more, then we'll have to consider that at



the time.

MR. STOUCK: And we would certainly be reasonable about that, Your Honor, but for now –

JUDGE MEROW: Won't take any precipitous action, then, one way or the other. Okay.

MR. STOUCK: Thank you.

JUDGE MEROW: Thank you, sir, for the notice. I'll reserve ruling on 1972 until I hear from Mr. Lester.

MR. LESTER: Thank you, Your Honor.

JUDGE MEROW: Okay.

MS. HERRMANN: The government calls Mr. David Huizenga.

DAVID HUIZENGA

was sworn and testified as follows:

DIRECT EXAMINATION

BY MS. HERRMANN:

Q Good morning. Would you introduce yourself to the Court, please.

A My name is David Gary Huizenga.

Q Mr. Huizenga, who is your employer?

A Department of Energy.

Q How long have you worked for DOE?

A Since March of 1990.

Q What is your current position at DOE?



A I'm the assistant deputy administrator for the Office of International Material Protection and Cooperation.

Q How long have you held that position?

A Approximately two years.

Q What office is that? I'm sorry, did I interrupt you?

A I'm just trying to get the – the – the timing exactly right. Since November of 2002, so a little less than two years.

Q Fair enough.

What office is that within?

A That is within – within the Office of Advanced Nuclear Nonproliferation.

Q And is Defense Nuclear Nonproliferation part of NNSA?

A Yes, it is.

Q What is NNSA?

A National Nuclear Security Administration.

Q That's all within the umbrella of DOE?

A That's one of the two main arms of the Department of Energy.

Q What are your responsibilities as assistant deputy administrator?

A My current responsibilities focus mostly



on protecting highly enriched uranium and plutonium in Russia and other countries of the former Soviet Union.

Q What position did you hold before your current one, before November of 2002?

A From February of 2002 to November, I was an associate assistant deputy administrator in the Office of International Nuclear Safety and Cooperation.

Q And was that still within Defense Nuclear Nonproliferation?

A Yes, it was.

Q What were your responsibilities in that position?

A In that regard, it was primarily to improve the safety of the Chernobyl-style reactors in the former Soviet Union.

Q I think you told me you started that position in February of 2002.

A That's correct.

Q What did you do before that?

A Before that I was a deputy assistant secretary in the Office of Environmental Management.

Q What is the Office of Environmental Management?

A It's one of the assistant secretary

offices within the Department of Energy that deals with primarily cleanup of nuclear materials and other wastes associated with the cold war legacy.

Q What did you personally do as deputy assistant secretary for the Office of Integration at this position?

A There are dozens of sites across the – the US, and our office was responsible for coordinating policy issues relative to different types of activities that might be taking place at those sites in conjunction with the radioactive cleanup.

Q How long did you hold that position?

A Approximately two years.

Q So that would have been 2000 to 2002?

A That's correct.

Q Did your job as deputy assistant secretary include responsibility for greater-than-Class C radioactive waste?

A Yes, it did.

Q For shorthand purposes, can we refer to that as GTCC?

A That would be good.

Q What responsibility did you have for GTCC?

A My office was responsible, as I indicated, for policy issues and so to the extent that we were



pursuing a policy with respect to disposal and management of greater-than-Class C waste, we were in the very early stages of forming some options and alternatives that would ultimately be analyzed in an environmental impact statement.

Q While you were deputy assistant secretary, did you actually have responsibility for making policy with regard to the storage or disposal of GTCC?

A No, we were responsible for developing alternatives that would be ultimately presented to the decision-maker to actually establish the policy.

Q Who would be the decision-maker who could establish the policy for GTCC?

A I don't think that that was entirely decided relative to who, for instance, would sign a record of decision associated with an environmental impact statement, but it could, perhaps, be the assistant secretary or the undersecretary or the Secretary of Energy herself.

Q I want to sort of define what we're talking about so that everybody has a clear understanding. What exactly is GTCC?

A The Nuclear Regulatory Commission has established a category of wastes which are generally in the A, B and C categories. There's limits on



radionucleide concentrations associated with those categories, and to the extent some wastes have radionucleide concentrations that are higher than the Class C limits, that would be the greater-than-Class C wastes.

Q Are there different kinds of GTCC?

A It's a broad range of different types of Class C wastes from small sealed sources that – that are used for medical purposes, for instance, or industrial purposes, to the nuclear utility wastes associated with power reactors, and I think that we had a kind of a catch-all process waste category to – that was a – a third category.

Q Sort of an "other" category?

A That's my understanding.

Q Speaking of – of GTCC in general, what is your understanding as to DOE's responsibility with regard to GTCC?

A I believe the Low-Level Waste Policy Amendments Act ascribed responsibility for disposal of GTCC waste to the Department of Energy.

Q You talked a little bit about, I think, what you called sealed sources.

A Uh-huh.

Q Do I remember that right?



A Uh-huh.

Q Has DOE accepted any sealed sources for disposal?

A For the past few years, Department of Energy has been accepting orphaned or abandoned sources from commercial entities, and they have been packaged up and transported and stored at the Los Alamos National Laboratory in New Mexico.

Q You said they have been stored at Los Alamos. Does that mean they have been disposed of, or are they just in storage there?

A When I left the position, they – to my knowledge, we hadn't disposed of any. They were all being stored. And I don't know since February of 2002 whether they've actually progressed beyond that or not.

Q Why has DOE been accepting sealed – sealed sources for storage?

A For security reasons and safety reasons as well, the – there are times when small operations would no longer find a use for the nuclear material and not really have a clear understanding of what to do with it, so we would be called at times from the Nuclear Regulatory Commission identifying that one of their users had a sealed source in a – in a shed in