IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| PACIFIC GAS & ELECTRIC COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES,<br><br>Defendant. | No. 04-0074C into which has been consolidated No. 04-0075C<br>(Judge Hewitt) |

DEFENDANT'S MOTION TO COMPEL DISCOVERY CONCERNING DOCUMENT PRODUCED BY PLAINTIFF ON MAY 24, 2006

Pursuant to Rules 16 and 37 of the Rules of the Court of Federal Claims, defendant, the United States, respectfully requests that the Court enter an order requiring the production of David L. Duke for a deposition concerning a document produced by plaintiff, Pacific Gas & Electric Company ("PG&E"), to the Government for the first time on May 24, 2006. In the alternative, we ask for an order barring the affirmative use of this document by PG&E at trial, but allowing the Government to use the document upon cross-examination of PG&E witnesses.

STATEMENT OF FACTS

On May 24, 2006, after the completion of the pretrial conference, the Government was informed that PG&E wished to remove a document from its privilege log for use with PG&E witness Larry Womack at trial. Thereafter, at 6:22 p.m. on May 24, 2006, the Government received a copy of the document via facsimile. Letter from J. Stouck to J. Ekman, dated May 24, 2006 (A.1-A.27).[1] The circumstances surrounding the production of this previously withheld document are troubling for several reasons. The document, a report prepared by David L. Duke,

[1] "A.__" refers to the appendix attached to this motion.

entitled "considerations for the Dry Cask Storage of Spent Nuclear Fuel at the Humboldt Bay Power Plant," dated December 1991, originally was listed upon PG&E's privilege log as an attachment to a letter from counsel to Mr. Duke. See excerpt from PG&E's Revised Privilege Log, at Ref. No. 316 (A.29); Letter from T. Monroe to J. Ekman, dated May 26, 2006 (A.30). In reviewing PG&E's extensive privilege logs, the Government overlooked the attachment, which was identified in the description field. In connection with the production of the document, the Government learned that PG&E referenced the contents of the document – without citation to the document – in its April 10, 2006, pretrial memorandum of contentions of fact and law. Specifically, in its pretrial memorandum, PG&E wrote as follows:

> In December 1991, PG&E had another study of its options for storing HBPP's spent nuclear fuel conducted. That study concluded that dry cask storage was still not an option for HBPP.

Pl. Br. 5. However, plaintiff's pretrial memorandum did not specifically reference the document to which it was referring. As of April 10, 2006, the Government had not been provided with a copy of the formerly "privileged" – and withheld – document.[2]

Inexplicably, PG&E did not produce the previously withheld document to the Government even though it was referenced in PG&E's pretrial brief. Instead, PG&E waited 45 days before informing the Government of the document's existence and of its intent to rely upon the document at trial. More significantly, PG&E waited until the conclusion of the pretrial conference, on May 24, 2006, before informing the Government about the existence of this

---

[2] PG&E clearly had notice of this document, its intent to use the document, and the fact that it was not privileged in advance of April 10, 2006. At the deposition of Brad Cornell, counsel for PG&E informed the Government that the document was not produced because counsel believed that the document was upon PG&E's exhibit list. However, it remains unclear when PG&E learned that the document never had been produced.

document. Despite our request, we have not received any explanation for PG&E's failure to apprise the Court and the Government of its existence at the pretrial conference. See Letter from J. Ekman to J. Stouck, dated May 25, 2006 (A.32-33).

Although it is unclear why this document is significant to PG&E's claim, upon review of the document, it became clear that it supports several of the defenses raised by the Government to PG&E's litigation positions. For example, PG&E asserts that the construction of the Humboldt Bay dry cask storage facility was caused by the delay by the Department of Energy ("DOE") in beginning spent nuclear fuel ("SNF") acceptance and served to mitigate PG&E's mitigation of damages. Specifically, PG&E claims that, because the annual costs associated with running a dry storage facility are significantly less than the annual costs of running a wet storage pool utilizing the SAFSTOR operations that PG&E has in place, PG&E reasonably "mitigated" its damages from DOE's delay by constructing dry storage and that the perceived annual operations savings justified the anticipated construction costs, in excess of $50 million, for the dry storage facility. PG&E also asserts that all labor hours charged to allegedly breach-related projects are recoverable.

The document produced by PG&E is relevant to these issues. First, the document raises significant questions concerning whether the dry storage facility at Humboldt Bay is, in any reasonable way, mitigation of damages and includes statements that are material to PG&E's claim for all labor costs charged to Humboldt Bay SAFSTOR and to the question of reasonable mitigation. In his report, Mr. Duke writes:

> The operational cost of a dry storage facility would tend to be somewhat less than for a spent fuel pool. The more passive nature of storage and better containment of radioactivity should reduce maintenance, laundry and radioactive waste disposal costs. A

> security staff would continue to be needed, as would personnel to monitor for radiological hazards. With the advent of SAFSTOR the level of effort required to maintain HBPP Unit 3 has been reduced to the point that no plant staffing reductions would be expected from the implementation of dry storage.

A.15 (PHBP0091655). This statement is significant for two reasons. Because of the delays in the Humboldt Bay dry storage project, the Government intends to demonstrate (as set forth in our pretrial memorandum) that, even assuming PG&E's litigation position that the prospective future operations and maintenance costs are substantially reduced with the move to dry cask storage, dry storage will not mitigate PG&E's damages. However, Mr. Duke's study calls into question PG&E's baseline assumption that dry cask storage will yield $5 million per year in savings over continued SAFSTOR operations. In fact, if implementation of dry storage will eliminate only certain maintenance, laundry, and radioactive waste disposal costs, the benefits of moving to dry storage significantly are reduced. In that event, it will take PG&E many more years before the up-front costs of dry storage – for which the Government is being asked to pay – are covered by savings in annual operations and maintenance costs associated with dry cask storage. Moreover, the statement raises questions concerning the claim that the time of PG&E employees charged to SAFSTOR is an incremental cost to the company. Instead, this document supports a finding that many of the employees would be employed by PG&E even if no spent nuclear fuel was present on-site, particularly given PG&E's contention that many of the employees who charge time to SAFSTOR would not be employed by PG&E absent the maintenance of the wet pool.

Second, the study supports a finding that the reason for PG&E's movement to dry storage is not to mitigate damages (a fact that will be established at trial), but, rather, because of a 1987

agreement between PG&E and a group of intervenors which required PG&E "to reexamine the possibility of utilizing Dry Cask Storage, if and when such a storage option becomes available for sites such as HBPP." A.3 (PHBP0091643). If the reason for going to dry storage truly is driven by an agreement between PG&E and certain intervenors – and not as a method of mitigating damages, as PG&E asserts in its claim – the viability of PG&E's claim for these costs is diminished. Third, the study contains language relevant to the manner in which PG&E anticipates shipping the spent fuel from its site from dry cask storage, and includes a reference – in the same time period as the 1991 Annual Capacity Report – to shipment to an MRS. A.7 (PHBP0091647); A.11 (PHBP0091651).[3] This assertion conflicts with PG&E's litigation position concerning both the costs of future loading to DOE from the ISFSI (used to block millions of dollars in "but for" world costs) and is further support for the conclusion that PG&E understood that the MRS – and the associated rate of acceptance – constituted acceptable performance by DOE, provided that acceptance commenced by January 31, 1998.

As set forth above, the Government never has seen this document and never deposed Mr. Duke, who was never disclosed as a person with knowledge of issues relevant to this case. If we are not able to depose Mr. Duke – and given that no witness currently is identified upon either party's list who was copied upon this newly-produced document – we will be unable to determine the bases for these statements which relate to material issues in this case.

---

[3] The estimates for the cost of dry storage at Humboldt Bay also are significantly higher in this study than in future analyses that were used to justify proceeding with dry storage. See A.14 (PHBP0091654). Had Mr. Duke's estimates – which still are more than 50 percent lower than PG&E's currently anticipated costs – been used by PG&E, it is unclear whether PG&E could have proceeded with dry storage.

## ARGUMENT

Here, because of the inexplicably late production of this document, our available means of relief appear limited. Because PG&E delayed more than 45 days in producing this document to the Government, PG&E effectively has restricted the Government's access to witnesses with whom this document – and the material statements therein – could be explored. Following receipt of this document, we sought an explanation as to (i) why the document previously was not produced, (ii) the approximate date upon which the document came into counsel's possession, and (iii) the reasons that the document was not produced immediately on April 10, 2006. A.32-33. Although we received a response noting the document's location upon the privilege log (A.30), and a general statement that counsel for PG&E believed that the document was listed upon PG&E's exhibit list, we have received no response to our other reasonable inquiries.

Through this motion, we seek the following relief. First, given that PG&E turned over the document with allegedly privileged marginalia from counsel, we believe that any privilege that may exist concerning the cover letter from counsel to PG&E has been waived, and we ask that the cover letter immediately be produced. See GFI, Inc. v. Franklin Corp., 265 F.3d 1268, 1272-73 (Fed. Cir. 2001) ("When a party voluntarily waives attorney-client privilege, that waiver extends to all communications pertaining to the subject matter of the communications."). Second, we ask that Court order the deposition of Mr. Duke in Washington, D.C., prior to the commencement of trial. The timing is particularly important given that Mr. Womack, the witness with whom PG&E intends to discuss this study, is scheduled to testify beginning on June 7, 2006. Among other things, we want to know the bases for the statements contained in the

study and, particularly given that the document likely exists in a file separate and apart from the allegedly privileged cover letter, if other similar studies, or other documents, were prepared by Mr. Duke that also were not produced to the Government during discovery.[4] Third, to the extent that a deposition is not allowed, we ask that the Court enter an order precluding PG&E from referencing the documents or eliciting testimony concerning the reasons for this study (as set forth in its pretrial memorandum). However, given several statements contained in the study that support certain of the Government's theories in this case, we ask that the Court allow the Government to use this document with witnesses that, under normal circumstances, may not be percipient witnesses for the purposes of this document.

## CONCLUSION

For the foregoing reasons, the Government respectfully requests that the Court enter an order (i) compelling PG&E to produce the cover letter from PG&E's counsel that accompanied the document upon PG&E's privilege log, (ii) compelling PG&E to produce Mr. Duke in Washington, D.C., for a deposition prior to the commencement of trial, and (iii) to the extent that a deposition is not allowed, precluding PG&E from referencing the document or eliciting testimony concerning the reasons for this study, while allowing the Government to use this document with witnesses that, under normal circumstances, may not be percipient witnesses for the purposes of this document.

---

[4] We also are interested in determining whether Mr. Duke ever was asked to turn over relevant files to counsel for PG&E.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/ Harold D. Lester, Jr.
HAROLD D. LESTER, JR.
Assistant Director

OF COUNSEL:

JANE K. TAYLOR
Office of General Counsel
U.S. Department of Energy
1000 Independence Ave., S.W.
Washington, D.C. 20585

SCOTT DAMELIN
SHARON SNYDER
JOSHUA E. GARDNER
ALAN LO RE
Civil Division
Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530

s/John C. Ekman
JOHN C. EKMAN
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, NW
Washington, D.C. 20530
Tel: (202) 353-0897
Fax: (202) 307-2503

May 31, 2006

Attorneys for Defendant