IN THE UNITED STATES COURT OF FEDERAL CLAIMS

Filed Electronically on June 1, 2006

| | |
|---|---|
| PACIFIC GAS & ELECTRIC COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | No. 04-0074C, into which has been consolidated No. 04-0075C<br>(Judge Hewitt) |

NOTICE OF FILING PG&E'S COUNTER-DESIGNATIONS TO DEFENDANT'S DEPOSITION DESIGNATIONS OF JAMES D. SHIFFER

Pursuant to the Court's Post-Pretrial Order of May 25, 2006, PG&E submits counter-designations to the Defendant's deposition testimony designations for James Shiffer. *See* Pre-Trial Order at 2, ¶ 3.

PG&E's cross designations are as follows (Copies of these designated transcript pages are attached at Appendix A):

| Deponent | Date | Page(s) From | To |
|---|---|---|---|
| **James Shiffer** | (PG&E) 7/28/05 | 15:18 | 16:25 |
| | | 18:3 | 18:8 |
| | | 19:15 | 19:18 |
| | | 32:2 | 32:18 |
| | | 76:18 | 77:4 |
| | | 85:14 | 86:1 |
| | | 87:25 | 88:6 |
| | | 88:18 | 89:21 |
| | | 91:6 | 91:20 |
| | | 96:25 | 97:23 |
| | | 106:6 | 106:23 |
| | | 108:2 | 108:12 |
| | | 123:24 | 124:25 |
| | | 129:15 | 131:1 |

Furthermore, PG&E notes for the record that it maintains its objections to DX7, DX122, and DX175 as set forth in its objections to Defendant's Exhibit List and also maintains its objections to questions as reflected in the deposition transcript.

Dated: June 1, 2006

Respectfully submitted,

s/ Jerry Stouck
JERRY STOUCK
Greenberg Traurig, LLP
800 Connecticut Avenue, NW
Suite 500
Washington, DC 20006
(202) 331-3173 Phone
(202) 261-4751 Fax
*Counsel for Plaintiff*
Pacific Gas & Electric Company

Of Counsel:
Robert L. Shapiro
Greenberg Traurig, LLP

# APPENDIX A

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| PACIFIC GAS & ELECTRIC COMPANY ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| -vs- ) | No. 04-0074C, which |
| ) | has been consolid- |
| THE UNITED STATES, ) | ated No. 04-0075C |
| ) | (Judge Hewitt) |
| Defendant. ) | |
| ___________________________________) | |

DEPOSITION OF JAMES D. SHIFFER

DATE: July 28, 2005
TIME: 9:11 a.m.
LOCATION: PG&E Building
77 Beale Street
Conference Room 303
San Francisco, California

REPORTED BY: Joanmarie Torreano, CSR, CRR, CRP
Certified Shorthand Reporter
License Number C-6504

By that let me explain what that means. You know, the plant, as you can tell, was many, many years delayed getting into operation, and in that time frame you had a lot of events like the TMI things and -- for example, and so the facilities that were originally designed, assuming that the plant was going to go into operation in 1973 or whatever it was, in a lot of cases were kind of obsolete.

I mean it was -- at one point in time, for example, we thought it would take two or three hundred people to run the plant. When we actually started up we had 2,000 people to run the plant. So office space and things like that. A lot of those kinds of facilities, office space, training facilities, laboratory facilities were upgraded after we went into operation and that all had to be budgeted and put in place. So those are the kinds of things.

Q. How about the wet pool?
A. The --
Q. The wet pools at Diablo Canyon, were there any modifications to those from the original design to the -- I guess right around the operational startup?
A. Well, other than the reracking, I can't think of any.
Q. And why was the reracking needed in the late

1980s?

A. Well, because we were aware that the government had changed its policy and was no longer accepting fuel to be reprocessed, and the original design of the spent nuclear fuel pool was done on the assumption that you would take fuel off site, you know, maybe a year or so after that had been discharged and reprocess it. So you really only had a very small amount of storage space.

Once it became apparent that that was, you know, that was no longer going to be the case, that you were going to be required to store it on site for many, many years, then we had to expand the storage capability of the pools.

Q. All right. After that position you go and become senior vice president and general manager of the Nuclear Power Generation Business Unit. Do you see that?

A. Yes.

Q. And that was only for a year, year and a half; is that right?

A. Yes.

Q. In this role did you have any involvement in the operations of the Diablo Canyon facility?

A. Well, I had the same role fundamentally that I had had when I was vice president.

A. In 1990 I don't recall any. I think we pretty much finished what we were doing.

Q. By 1991 you go up to executive vice president, and in the description it states that you were initially responsible for three of PG & E's five business units.

Have we now -- are you now in a different position than you were as a senior vice president --

A. Yes.

Q. -- of the nuclear power generation unit?

A. Yes. Now instead of having any direct responsibility for Diablo Canyon I simply supervised my presented -- successor as senior vice president.

Q. Who was your successor?

A. Greg Rueger.

Q. Did you, in this capacity, have any responsibility for Humboldt Bay?

A. Only in the sense that Humboldt Bay was part of the nuclear business unit that rolled up to me.

Q. Would your involvement -- would you characterize your involvement as a high-level involvement?

A. Very high level as it relates to Humboldt Bay.

Q. And I don't want to compare Humboldt Bay and Diablo Canyon, but if I was to ask you independently if you considered your involvement during this time period

at Diablo Canyon to be high level, what would your answer be?

A. We're now talking about the time from 1991 to '93 when I'm executive --

Q. Yes.

A. It's very -- it's high level, but Diablo Canyon is obviously a much bigger element than Humboldt Bay.

Q. Because it's operating?

A. Because it's operating and it's also much greater -- larger facility.

Q. Do you recall if during this time period, '91 to '93, there were any expansion activities at Diablo Canyon?

A. Not that I'm aware of.

Q. After that you spend, again, it's '94 to '95, chairman, president and chief executive officer of PG & E Enterprises?

A. That's correct.

Q. In reading this description, it seemed to be another sort of fundamental change in the organization that you're with, and I'm just wondering, first of all, is that a correct statement that I just made? That you're now doing different stuff from what you're doing executive V.P. and below?

A. Yes.

A. Mr. Schuyler.
Q. I noticed when I was looking at this that this letter is not signed by Mr. Raggio. Do you see that?
A. Yeah, I see that.
Q. Yet it looks like, based on this stamp in the upper right-hand corner of the first page, that this letter or memo was circulated around nuclear plant operations at PG & E. Is that a fair characterization?
A. Well, it appears to have been circulated to EDW, which is Ed Weeks, and AWM, which is Al Metcalf.
Q. Is there a -- I notice there's also a number up in the top corner, 62.6224. Do you know what that is?
A. No, I have no idea.
Q. Just based on what you see on this letter, do you have any reason to believe that you weren't actually copied on this particular letter?
A. No, as far as I can assume, a copy was sent to me.
Q. All right. If you just look at paragraph 5 under comments, it's number 5.
A. Uh-huh.
Q. Says that "the plan is to be decommissioned rather than maintained as is. We believe the SAFSTOR mode with future decom is preferable to immediate decom."

during the contract formation process?
A. Not me personally; you know, I had people that tried to keep abreast of what was going on, generally speaking, but I don't think we were really involved in any great degree.
Q. Do you know, was there any PG & E employee who was responsible for, let's say, keeping up with the Standard Contract during this time period, the early 1980s?
A. I can't remember any specific individual. I mean if there was it would have been on just attendance at industry meetings, you know, that kind of thing, pretty superficial involvement.
Q. Since the execution of the -- are you aware that Pacific Gas & Electric signed what I'm calling the Standard Contract with the Department of Energy?
A. Yes.
Q. Since the execution of the Standard Contract, was it ever part of your job to deal with issues that arose under the Standard Contract with the Department of Energy?
A. Well, I don't remember any specific detailed issues, but I mean, you know, the idea that the DOE was going to start taking fuel in the late '90s obviously impacted what we had to do at Diablo Canyon to prepare

for that. So I mean it wasn't, you know, legal involvement with the contract, but just knowledge of when we were going to get -- when DOE was going to take our fuel.

Q. And how did that impact Diablo Canyon?

A. Well, we had to -- as I indicated previously, you know, the spent fuel pool was originally designed as if we would off load a load of spent fuel and a year or two later it would be taken off site for reprocessing, and now we were going to have to store fuel for, you know, many years.

Q. Do you have any understanding of what Pacific Gas & Electric's obligations are under the Standard Contract?

A. Only that we were responsible for the fuel prior to the time that DOE took it off of our hands and said that we had to provide for storage and that kind of thing.

Q. Do you know if Pacific Gas & Electric had any payment obligations under the Standard Contract?

A. Oh, yeah, we had to make payments into the fund that was supposed to fund, you know, the high level waste.

Q. The Nuclear -- have you heard of the Nuclear Waste Fund?

A. Right. Absolutely.
Q. So this would have been something that was written by your staff but that you signed off on because of your capacity at the plant at that time?
A. My -- 1983 I was in the general office but I was a manager reporting to Mr. Schuyler so I would have signed it off and sent it to him, right.
Q. As opposed to having one of your reports assign something to Mr. Schuyler?
A. Yes, that's right.
Q. All right. And you would have reviewed the letter prior to sending it?
A. Yeah.
Q. And just on page 2 I notice there is a reference to "Provide additional S&F storage capacity at DCPP." Do you see that?
A. You mean the additional reports required? "Five years prior to DOE's" -- wait a minute.
Q. Well, actually, the one right above that.
A. "To ensure that DCP addresses DCPP's interim spent fuel -- nuclear fuel storage requirements." Yes.
Q. What is that referencing?
A. That's ultimately referencing the reracking.
Q. Well, and again, that's the reracking in the late 1980s, mid to late '80s?

A. Mid to late '80s, right.
Q. Do you know who prepared the attachments to this letter?
A. No, I have no idea.
Q. Is it -- is it fair to say that you did not prepare the summary of the Nuclear Waste Policy Act that's attached to this letter?
A. Right.
Q. Would you have read the summary at this time, prior to sending it to Mr. Schuyler?
A. Probably.
Q. Do you recall reading that summary?
A. I don't specifically recall it, but that was my tendency.
Q. And just to make sure the record's clear. The letter says attachments at the bottom of the second page, which indicates to me that the letter and the attachments would have been sent to Mr. Schuyler at that time?
A. Correct.
Q. You can put that aside.
(Defendant's Exhibit 4 was marked for identification.)
MR. STOUCK: Thank you. Number 4; right?
MR. EKMAN: Number 4.

Q. All right. Exhibit 4 is a letter from you to Mr. Schuyler, dated May 25, 1983. It deals with a variety of issues but focuses really on Diablo Canyon. Have I correctly identified this letter?

A. Yes.

Q. Were the reasons that you would have been sending this letter to Mr. Schuyler the same for Exhibit 4 as for Exhibit 3?

A. Yes.

Q. And again, I note at the bottom of the second page there's a note SD Kamdar. Does that indicate that Mr. Kamdar prepared this letter for your signature?

A. Yes.

Q. Who is Mr. Kamdar at this time?

A. His name was Suresh Kamdar, but again, he was -- again, I don't recall exactly what position he held, but he would have been in that -- probably the group that we were talking about with the previous one.

Q. Just have a couple questions about this letter, just to see what you remember.

The third paragraph of the letter discusses dry cask storage as possible solution for future storage issues at Diablo Canyon. Do you see that?

A. Yeah.

Q. At this time do you recall what the status of

dry cask storage was in the -- in the industry as a whole, in terms of its availability?
A. At this time I think it sort of alludes to that in the next sentence or two; that it was just starting to be an alternative that was going through a licensing process at other plants.
Q. Do you know if at this time high density storage racks had been -- had been licensed for use at nuclear facilities?
A. It's my understanding, once again, that some utilities had already reracked, yes. In fact, I think it -- it alludes to that in that same paragraph, Devco having previously reracked both north and Surrey plants.
Q. And you believe that would have been with the high density technology?
A. Right. Comparable to what we were looking at.
Q. Do you know why you were discussing -- in the 1983 time frame, why you would have been sending a letter to Mr. Schuyler that discusses the possibility of ultimately using dry storage for the storage of spent nuclear fuel?
A. Well, I mean we just talked about this Nuclear Waste Policy Act and contracts having been signed in this general time frame, and so it's natural to assume

that he was asking, okay, what do you think we ought to do.
Q. I notice in the subject line it says "Question on Dry Cask Storage." That's the subject?
A. Uh-huh.
Q. Do you know, would that have been a question that Mr. Schuyler had asked?
A. I don't know. I can guess, but I don't know.
Q. In the last paragraph of that first page there is a statement that says: "The Nuclear Waste Policy Act of 1983 promises to relieve long-term storage needs at the sites."
Do you see that?
A. Yes.
Q. Do you know what -- do you know what was meant by the words "long-term storage needs"?
A. Well, I mean not specifically. I assume it means, you know long-term storage, storage beyond -- it's, particularly at Diablo Canyon, storage beyond the first refueling outage, you know, since we didn't have much storage capacity.
Q. And then the rest of that paragraph states, "But the repositories for permanent storage are not scheduled to be opened until the late 1990s. Acceptance dates for Diablo spent fuel shipments could

space in the fuel -- or in the pool, excuse me.

And so that would have -- you know, if you rerack with something over 1,000 storage spaces, it's going to take you out until the late 1990s or early 2000s before you run out of space.

Q. All right. And do you know why -- the paragraph before that we talked about noted that the repositories for permanent storage are not scheduled to open until the late 1990s. Do you see that?

A. Yes.

Q. If that had been the case, do you know why Diablo Canyon would have needed to look at long-term solutions prior to the opening of those Federal repositories?

A. I mean we had a -- we had a spent fuel pool that would take one discharge, plus one core off load, so that's going to get us through a year and a half of operation; right? And so we're going to run out of space in the mid, you know, 1980s, so even to get to the 1990s we're going to have to do something.

Q. Then the last paragraph actually, though, as I read it, assumes that the rerack has been performed and then goes on to state that or appears to state that there will still be a need to look at long-term solutions in the mid 1990s, and I'm just wondering if

to utilize at Diablo Canyon."
Do you see that?
A. Yes.
Q. Do you know what the proposed dates is?
A. Well, I know what -- I don't know what it was at the time they were going through this negotiation. It ended up being 1998, as I remember.
Q. So it's the date of commencement of acceptance?
A. Right.
Q. Do you know whose handwriting is at the bottom of this first page? There's a note "or rod consolidation utility owned cask," etcetera?
A. No.
Q. If you could turn to page 2. There's a heading right at the top "Priority and Allocations." Do you see that?
A. Yes.
Q. If you can take a look at that paragraph, but my question is: Do you have an understanding as to what priority means?
A. Well, my understanding would be that that's the sequence in which DOE is going to be taking fuel from the different plants around the country.
Q. Have you ever heard the term "priority for

shut down reactors"?
A. No.
Q. Other than speculating?
A. Yeah, I can speculate what it means, but I don't recall.
Q. And any speculation on what it means is based on the fact that that's just plain English?
A. Right.
Q. You don't have any specific knowledge about any priority provisions that may or may not be in the Standard Contract?
A. Not in any depth, because I know that's an issue, but I didn't read the contract, so I don't remember.
Q. That paragraph also mentions an emergency requirement. Are you familiar at all with whether the Standard Contract provides anything for emergency deliveries of spent nuclear fuel to DOE?
A. No, I'm not that -- I'm not familiar with it.
Q. So you don't have an understanding then of what sort of circumstances might allow an emergency delivery?
A. No.
Q. If you could turn to the -- there's an attachment dated July 13th, 1983. And this actually

PG & E, dated May 20, 1991. And attached to it is a letter to Mr. Barrett, who's listed as the contract administrator for PG & E at this time from Carol Rueter, listing you as a copy.

A. Uh-huh.

Q. And then I will represent to you that what's attached is something called "The draft acceptance priority ranking, May 1991." It is not the entire priority ranking, as it is a voluminous document. It's just a sample.

My first question is: If I were to -- do you know what the 1991 annual capacity report is? Have you ever heard of that before?

A. (No audible response.)

Q. Have you ever heard of -- oh, sorry.

A. No.

Q. Have you ever heard of an annual capacity report just generally?

A. Not really.

Q. Do you know what an annual priority ranking is, outside of your review of this document?

A. Again, outside of my understanding of English and generally what was going on, no.

Q. Do you know why you would have been copied on this letter from the Department of Energy to

A. No.
Q. And you didn't have any -- you don't recall being involved in any decision making concerning PG & E's response to this particular letter from Ms. Rueter?
A. I don't have any personal recollection of it, no.
Q. Do you have any understanding of a provision in the Standard Contract that concerns the exchanges of -- of acceptance allocations among nuclear utilities?
A. No.
Q. Are you familiar with the term "failed fuel"?
A. Well, yes, I believe so.
Q. Okay.
A. Unless you mean something different than what I know.
Q. All right. Well, maybe I do, but let me ask, what is your understanding of what failed fuel is?
A. Well, my understanding of it is it's fuel that the cladding has perforated by -- through one mechanism or another, which allows the release of more radioactive materials than you would otherwise expect.
Q. Do you know if Humboldt Bay has any failed fuel, as you would characterize it?

they wanted Humboldt Bay to do in connection with decommissioning -- let me actually ask this. First of all, this is in relation to the decommissioning plan for Humboldt; is that right?

A. Yes, uh-huh.

Q. And what did the intervenors specifically want Humboldt Bay -- do you recall what did they want Humboldt Bay to agree to in connection with decommissioning?

A. Well, I mean really what they wanted us to do is remove all radioactive materials and put the site back in pre Humboldt Bay condition and, you know, we told them that we would -- we'd love to do that too, but it's just not feasible at the present time.

Q. Why wasn't it feasible?

A. Because we have the spent fuel and there's no place to put it and that's, you know, that's where we mentioned, alluded to, you know, well, couldn't you take it down to Diablo Canyon or something like that, which was kind of a non starter, you know, but we said -- so after I explained to them that that was never going to go anywhere, you know, they said well, what about dry cask storage.

We said well, again, it's not licensed anywhere and stuff like this, you know, it's going to

take a while to do that kind of thing, but we'll look into it when the time comes. So parted as friends I guess, best I can say.

Q. Was part of the point of this agreement to have the intervenors withdraw their opposition to the decommissioning plan?

A. I don't remember the details anymore of what extent they had intervened or opposed it or anything like that. I just remember that we went up and we talked to them and tried to explain to them some of the realities of the business and they may -- it may have caused them to withdraw some motion, but I don't remember what they had done specifically.

Q. What's the Redwood Alliance?

A. Well, again, just a group of environmental -- you know, tended to intervene in these kinds of things in that area.

Q. Would you characterize them as anti-nuclear, an anti-nuclear organization?

A. Well, I would characterize them as pro environment. I mean, I don't want to call them anti-nuclear, but probably they were or a lot of them were.

Q. They're an environmentalists group?

A. They're environmental, yeah.

settlement.
A. Oh, okay.
Q. First of all, based on your review of this letter, does that refresh your recollection as to whether the settlement agreement at 11 was in exchange for them dropping objections that they had filed with respect to PG & E's request for a license amendment?
A. Well, I still don't remember it very well, but by reading the letter it appears that that's a response to this.
Q. You have no reason to doubt that Mr. Fielder was misstating the current posture of that proceeding, do you?
A. No.
Q. The only question about this letter that I have, and it does predate the final agreement, in paragraph 3, number 3; do you see that?
A. Uh-huh.
Q. Again, this relates to this dry cask storage issue and it ends by stating: "By placing the fuel in dry cask storage all risk of a liquid spill from the spent fuel pool during extended storage would be at an end."
Do you see that?
A. Yes.

Q. Up to this point, 1987, had Humboldt Bay had problems with -- had any liquid spills from its spent nuclear fuel?

A. No, there was no liquid spills from its spent nuclear fuel, but the -- the pool is a concrete pool and it has a stainless steel liner to make it leak tight. We had discovered some leaks in the stainless steel liner that allowed some of the water to leak out of the pool and we -- we corrected that, so there wasn't a spill, but there had been a little bit of water leakage.

Q. Since you're more familiar with these environmentalist groups than I am, is it a fair characterization, based on your involvement in this, that these groups that were acting as intervenors, these people as intervenors were concerned about the safety of extended storage in the wet pool?

A. Yes, I'm sure they were, and I'm sure that they would also have been concerned about the safety of extended storage in a dry cask storage, they're just, you know --

Q. They seem to be choosing which one they're less concerned about?

A. Well, that's -- yeah, that's the way it is, but I mean whatever the latest proposal is they'll have

a concern about it. That's my experience.

Q. Do you share -- based on your experience at Pacific Gas & Electric and your knowledge of Humboldt Bay, do you share the intervenors' concerns about extended storage of spent fuel in Humboldt Bay's wet pool?

A. No, not really. I mean first I think the thing is, you know, structurally sound, you know, earthquake proof and if you can remember a previous comment you made or question you asked me that fuel is so old that even if it was dry it wouldn't melt or anything like that.

So I mean you'd have to refill it to keep the radiation level down, but it's not a meltdown probability. So I don't have a great deal more concern about storing it in a wet pool than storing it any other way.

(Defendant's Exhibit 13 was marked for identification.)

BY MR. EKMAN:

I've handed you what's been marked as Exhibit 13, and this is a situation -- since it's a little bit longer letter, you're welcome to read it or can read it as I ask questions, if you think you need to read it.

But specifically this letter is a May 20th,