# Defendant

# Capital Reporting Company

**Page 250**

1  A   I believe one of Chris' responsibilities
2  is lead for preparing that requirements document we
3  talked about, which in a sense is requirements to
4  drive the design.  So in that particular aspect,
5  yes.
6      Q   Would you expect that Mr. Kouts
7  understands the basic design of the repository?
8          MS. HERRMANN:  Objection.  Foundation.
9          THE WITNESS:  Chris overall is very
10 understanding of the key design and aspects of the
11 program.
12 BY MR. STOUCK:
13     Q   And would you expect that that would have
14 been true both before and after the implementation
15 of the phased approach that we were just talking
16 about, that he would have a, you know, reasonably
17 good understanding of the basic design features?
18     A   Chris has a very long history in the
19 program, very knowledgable of current and past
20 practices.
21     Q   Under the current design plans for the
22 repository is it correct that this third facility,

**Page 251**

1  the canister handling facility -- is that the third
2  facility?
3      A   That's not correct, the --
4      Q   The second facility?
5      A   The second facility is the canister
6  handling facility.
7      Q   Right.  Thanks.
8          Is it correct that bare fuel -- I think
9  you may have told me this before -- that facility
10 would have no capability to handle bare fuel from
11 any source; is that right?
12     A   That's correct.
13     Q   Canisters only?
14     A   Canisters only.
15     Q   That's what I thought.  Okay.
16         Do you know what GTCC waste is, greater
17 than Class C waste?
18     A   I know overall the terminology of what it
19 means.
20     Q   At a high level what's your understanding
21 of that?
22     A   It's -- most of my previous understanding

**Page 252**

1  is from the earlier program I was involved in on
2  the sealed sources, but I'm not really currently
3  involved in greater than Class C.  It's not, that
4  I'm aware of, covered in our license application.
5      Q   I'm not asking you that, I'm asking you
6  whether you know what it is.
7      A   At a high level I know the definition,
8  but I'm not --
9      Q   What's the definition?
10     A   Greater than Class C waste, it's sealed
11 sources.  A number of various types of materials,
12 as I understand, don't have a disposal pack yet.
13     Q   It's radioactive waste that has
14 activation levels higher than Class C waste in the
15 NRC regulations; is that right?
16     A   That's correct.
17     Q   That's part of your understanding?
18     A   Right.
19     Q   Now, are you aware that there is material
20 inside commercial nuclear reactors sometimes called
21 reactor internals, that's activated metal, that is
22 greater than Class C and if, you know, if taken

**Page 253**

1  out -- when nuclear power plants are
2  decommissioned, the material near the core of the
3  reactor becomes GTCC waste?  Do you know that?
4          MS. HERRMANN:  Objection.  Foundation.
5          THE WITNESS:  I'm not aware of that.
6  BY MR. STOUCK:
7      Q   You're not aware of that at all?
8      A   I haven't dealt with that to date.
9      Q   That's a different issue.
10         Do you know that that material comes out?
11     A   No, I'm not aware of that.
12     Q   So that might be true, it might not be
13 true?  You don't know?
14     A   I don't know.
15     Q   Now, are you aware that there are some
16 parts of a spent fuel assembly, a commercial spent
17 fuel assembly, which if separated from the
18 assembly, in other words, not the rods but some of
19 the other parts of the spent fuel assembly, that if
20 separated would themselves be GTCC?
21     A   I'm not aware of that.
22     Q   Do the current design plans for Yucca

# Defendant

## Capital Reporting Company

Page 250

1      A    I believe one of Chris' responsibilities
2   is lead for preparing that requirements document we
3   talked about, which in a sense is requirements to
4   drive the design.  So in that particular aspect,
5   yes.
6      Q    Would you expect that Mr. Kouts
7   understands the basic design of the repository?
8            MS. HERRMANN:  Objection.  Foundation.
9            THE WITNESS:  Chris overall is very
10  understanding of the key design and aspects of the
11  program.
12  BY MR. STOUCK:
13     Q    And would you expect that that would have
14  been true both before and after the implementation
15  of the phased approach that we were just talking
16  about, that he would have a, you know, reasonably
17  good understanding of the basic design features?
18     A    Chris has a very long history in the
19  program, very knowledgable of current and past
20  practices.
21     Q    Under the current design plans for the
22  repository is it correct that this third facility,

Page 251

1   the canister handling facility -- is that the third
2   facility?
3      A    That's not correct, the --
4      Q    The second facility?
5      A    The second facility is the canister
6   handling facility.
7      Q    Right.  Thanks.
8            Is it correct that bare fuel -- I think
9   you may have told me this before -- that facility
10  would have no capability to handle bare fuel from
11  any source; is that right?
12     A    That's correct.
13     Q    Canisters only?
14     A    Canisters only.
15     Q    That's what I thought.  Okay.
16          Do you know what GTCC waste is, greater
17  than Class C waste?
18     A    I know overall the terminology of what it
19  means.
20     Q    At a high level what's your understanding
21  of that?
22     A    It's -- most of my previous understanding

Page 252

1   is from the earlier program I was involved in on
2   the sealed sources, but I'm not really currently
3   involved in greater than Class C.  It's not, that
4   I'm aware of, covered in our license application.
5      Q    I'm not asking you that, I'm asking you
6   whether you know what it is.
7      A    At a high level I know the definition,
8   but I'm not --
9      Q    What's the definition?
10     A    Greater than Class C waste, it's sealed
11  sources.  A number of various types of materials,
12  as I understand, don't have a disposal pack yet.
13     Q    It's radioactive waste that has
14  activation levels higher than Class C waste in the
15  NRC regulations; is that right?
16     A    That's correct.
17     Q    That's part of your understanding?
18     A    Right.
19     Q    Now, are you aware that there is material
20  inside commercial nuclear reactors sometimes called
21  reactor internals, that's activated metal, that is
22  greater than Class C and if, you know, if taken

Page 253

1   out -- when nuclear power plants are
2   decommissioned, the material near the core of the
3   reactor becomes GTCC waste?  Do you know that?
4            MS. HERRMANN:  Objection.  Foundation.
5            THE WITNESS:  I'm not aware of that.
6   BY MR. STOUCK:
7      Q    You're not aware of that at all?
8      A    I haven't dealt with that to date.
9      Q    That's a different issue:
10          Do you know that that material comes out?
11     A    No, I'm not aware of that.
12     Q    So that might be true, it might not be
13  true?  You don't know?
14     A    I don't know.
15     Q    Now, are you aware that there are some
16  parts of a spent fuel assembly, a commercial spent
17  fuel assembly, which if separated from the
18  assembly, in other words, not the rods but some of
19  the other parts of the spent fuel assembly, that if
20  separated would themselves be GTCC?
21     A    I'm not aware of that.
22     Q    Do the current design plans for Yucca

64 (Pages 250 to 253)

Page 254

1 Mountain contemplate receipt of any GTCC waste?

2    A    I'm not aware that GTCC waste is included

3 in our current license application, which would

4 mean it's not planned to be received.

5    Q    The current design plans for Yucca

6 Mountain do not contemplate receipt of GTCC waste?

7    A    I'm not aware that our current design

8 plans, which are part of the license application,

9 include greater than Class C.

10   Q    Well, let's take the license application

11 out of it.  Do the current --

12   A    Design plans are part of the license

13 application.  They go hand and hand.

14   Q    Is there any aspect of the design plans

15 for Yucca Mountain that is not part of the license

16 application?

17   A    Design work that we're currently doing

18 for Yucca Mountain, most all of that's included in

19 the license application.

20   Q    And you've told me before that you were

21 trying, and I understood you to say you were trying

22 hard, I'm not sure you used that word, but it was

Page 255

1 an objective to stay within the boundaries of the

2 final EIS in preparing the license application; is

3 that right?

4    A    As far as the environmental impacts and

5 operations, that's correct.

6    Q    That is something you're trying to do or

7 the organization is trying to do?

8    A    That's correct.

9    Q    Do you know that the final Environmental

10 Impact Statement for the Yucca Mountain repository

11 concluded that it was a reasonably foreseeable

12 action that there would be disposal at Yucca

13 Mountain of commercial GTCC waste, these activated

14 materials, metal materials that I'm referring to?

15 Do you know that that is part of the final EIS for

16 Yucca Mountain?

17        MS. HERRMANN:  Objection.  Assumes facts

18 not in evidence.

19        THE WITNESS:  I haven't been aware of

20 that directly, no.

21 BY MR. STOUCK:

22   Q    You're not aware of that at all?

Page 256

1    A    I'm not aware of it.

2    Q    Never heard of that before if it's true?

3    A    I mean I may have heard it before, but

4 it's not currently in my license application and

5 design and I'm not aware I've heard of this in the

6 past.

7    Q    If that's true, you don't know; is that

8 right?

9        MS. HERRMANN:  Objection.  Vague.

10 BY MR. STOUCK:

11   Q    Are you familiar with the final EIS?

12   A    Familiar with it, but I'm not into every

13 aspect of it.  I am not aware of the greater than

14 Class C areas that you discussed.

15   Q    You're trying to conform the license

16 application to the final Environmental Impact

17 Statement?

18   A    Let me clarify what we're doing.  We're

19 trying to keep the license application within the

20 environmental impacts that were assessed --

21 environmental impacts that were assessed within the

22 final Environmental Impact Statement.

Page 257

1    Q    Well, the transportation cask numbers

2 that we looked at earlier today, I thought you told

3 me then that those numbers came from the

4 Environmental Impact Statement; is that right?

5    A    I believe that's correct.

6    Q    So that transportation cask data that was

7 on that page is within the meaning of this answer

8 you just gave me, one of the ways in which you're

9 trying to stay within the Environmental Impact

10 Statement is by using the transportation cask

11 projections that were also in the Environmental

12 Impact Statement; is that right?

13   A    That's correct.  I mean what you're

14 trying to do is to set a range so you can assess

15 the environmental impacts, but everything in that

16 document doesn't necessarily become a policy and

17 carried through to a license application.

18   Q    Well, who suggested that?  Did I say

19 that?

20   A    No.

21   Q    I'm not asking that.  I'm asking if you

22 know that the Environmental Impact Statement, the

# Defendant

# Capital Reporting Company

## Page 318

1 bit of redirect. I will take about five minutes to
2 review my notes.
3 　　　　MR. STOUCK: Okay.
4 　　　　(Brief recess)
5 　　EXAMINATION BY COUNSEL FOR DEFENDANT
6 BY MS. HERRMANN:
7 　　Q　I just have a few questions for you,
8 Mr. Arthur.
9 　　　　First of all, let me ask you this: Is it
10 part of your job to know what the standard contract
11 requires?
12 　　A　No.
13 　　Q　Do you know whether DOE is required under
14 the standard contract to accept dual-purpose
15 canisters at the utility sites?
16 　　A　No.
17 　　Q　You talked a little bit during your
18 deposition today about DOE's technical baseline.
19 Do you recall that?
20 　　A　That's correct, I do recall that.
21 　　Q　And you talked about DOE's plan to cut
22 open canisters with fuel, do you recall that?

## Page 319

1 　　A　Yes.
2 　　Q　Do you know whether DOE is required under
3 the standard contract, as it's currently written,
4 to accept spent nuclear fuel in canisters from
5 utilities?
6 　　A　Again, I'm not involved in the standard
7 contract.
8 　　Q　If DOE does cut open canisters at the
9 disposal facility, do you know who will pay for it?
10 　　A　No.
11 　　Q　Do you know whose responsibility the
12 empty canisters would be once the spent fuel is
13 taken out?
14 　　A　No.
15 　　Q　Do you have any idea what would happen to
16 the canisters, the empty canisters once the fuel is
17 removed?
18 　　A　I believe in our current license
19 application that would have to be dealt with as
20 low-level waste.
21 　　Q　Do you know who would pay to dispose of
22 that?

## Page 320

1 　　A　No, I don't.
2 　　Q　Do you have any idea at what rate DOE is
3 obligated to accept spent nuclear fuel from the
4 utilities?
5 　　A　No.
6 　　　　MR. STOUCK: That's beyond the scope of
7 the direct, but I won't object.
8 　　　　MS. HERRMANN: Well, actually I want to
9 just respond to that only because you argued to the
10 judge today that the reason you were talking about
11 future events is because it had an impact on rates,
12 so I don't think it is.
13 　　　　MR. STOUCK: It had an impact on the
14 reasonableness of the schedules, but, fine, hey,
15 you know what? Ask him whatever you want.
16 BY MS. HERRMANN:
17 　　Q　Mr. Arthur, is acceptance from utilities
18 at utility sites part of your job?
19 　　A　No.
20 　　Q　I want to ask you a little bit about
21 failed fuel because you've talked about it today.
22 Do you have any reason to know whether failed fuel

## Page 321

1 is to be accepted under the same schedule as
2 standard fuel by DOE?
3 　　A　No, I'm not into that particular aspect.
4 As I mentioned earlier today, I'm involved as far
5 as the planning and dealing with materials at the
6 repository.
7 　　Q　Mr. Stouck also talked to you about
8 greater than Class C waste, GTCC. Do you know
9 whether GTCC is covered by the standard contract?
10 　　A　No.
11 　　Q　Do you know whether the NRC has
12 determined by rule that GTCC requires permanent
13 isolation?
14 　　A　I'm not aware of that.
15 　　Q　And just a couple questions about Pacific
16 Gas & Electric.
17 　　A　Say that again.
18 　　Q　Sure.
19 　　A　Ask your question. Let me just pick up
20 with the written transcript here.
21 　　Q　Sure. I asked you whether you knew if
22 the NRC had determined by rule that GTCC requires

# Lake Barrett

# Plaintiff

1

1          IN THE UNITED STATES COURT OF FEDERAL CLAIMS

2     - - - - - - - - - - - - - - - x

3     YANKEE ATOMIC ELECTRIC COMPANY;    : Case Nos. 98-126C,

4     CONNECTICUT YANKEE ATOMIC POWER     : 98-154C, 98-474C,

5     COMPANY; MAINE YANKEE ATOMIC        : 98-483C, 98-484C,

6     POWER COMPANY; FLORIDA POWER &      : 98-485C, 98-486C,

7     LIGHT COMPANY; NORTHERN STATES      : 98-488C, 98-614C,

8     POWER COMPANY; DUKE POWER, a        : 98-621C, 99-447C,

9     Division of DUKE ENERGY CORP.;      : 00-440C, 00-695C,

10    INDIANA MICHIGAN POWER COMPANY;     : 00-703C, 01-115C,

11    SACRAMENTO MUNICIPAL UTILITY        : 01-116C, 01-249C

12    - - - - - - - - - - - - - - - X

13    (Caption continued on the next page)

14

15              Deposition of LAKE H. BARRETT

16                   Washington, D. C.

17                Monday, April 22, 2002

18                      9:31 a.m.

19

20    Job No.: 11792-4

21    Pages 1 through 272, Volume 1

22    Reported by:  Diane Gomez, RPR



# L.A.D. REPORTING COMPANY, INC.

**1100 Connecticut Avenue, NW • Suite 1150, Washington, D.C. 20036 • 202.861.3410**
Fax: 202.861.3425 • 800.292.4789 • Website: ladreporting.com • E-mail: lisa@ladreporting.com

NATIONWIDE COURT REPORTERS AND VIDEOGRAPHERS

2

1    DISTRICT; SOUTHERN NUCLEAR              :

2    OPERATING COMPANY, et al.;              :

3    COMMONWEALTH EDISON COMPANY;            :

4    BOSTON EDISON COMPANY; GPU              :

5    NUCLEAR, INCORPORATED; WISCONSIN        :

6    ELECTRIC POWER COMPANY; POWER           :

7    AUTHORITY OF THE STATE OF NEW           :

8    YORK; OMAHA PUBLIC POWER DISTRICT;      :

9    NEBRASKA PUBLIC POWER DISTRICT;         :

10   and TENNESSEE VALLEY AUTHORITY,         :

11          Plaintiffs                       :

12   v.                                      :

13   THE UNITED STATES,                      :

14          Defendant                        :

15   - - - - - - - - - - - - - - - X

16

17

18

19

20

21

22

Case 1:04-cv-00074-ECH   Document 286-2   Filed 06/04/06   Page 12 of 35
DEPOSITION OF LAKE H. BARRETT, VOLUME I
CONDUCTED ON MONDAY, APRIL 22, 2002

3 (Pages 9 to 12)

9

1          E X H I B I T S   C O N T I N U E D
2              (Retained by counsel.)
3   BARRETT DEPOSITION EXHIBIT                    PAGE
4    6  June 1987 annual capacity report      201
5    7  Nuclear Waste Fund Adequacy           220
6       Assessment dated March 1986
7    8  Draft mission plan amendment          223
8       dated January 1987
9    9  Annual capacity report issued by      245
10      the Office of Civilian Radioactive
11      Waste Management in June 1988
12   10  Section 10165 of Title 42            246
13   11  Section 10168 of Title 42            246
14   12  Draft 1988 mission plan amendment    262
15
16
17
18
19
20
21
22

10

1          P R O C E E D I N G S
2              LAKE H. BARRETT
3   having been duly sworn, testified as follows:
4   EXAMINATION BY COUNSEL FOR PLAINTIFF
5   SACRAMENTO MUNICIPAL UTILITY DISTRICT
6   BY MR. CAYNE:
7       Q  Good morning, Mr. Barrett.
8       A  Good morning.
9       Q  Have you been deposed before?
10      A  No.
11      Q  First time?
12      A  Yes.
13      Q  Has your counsel explained to you the
14   process?
15      A  Sort of.
16      Q  I will ask you questions, you give me your
17   best answer. If you don't understand my question,
18   please feel free to ask me to repeat the question or
19   clarify it.
20      A  Okay.
21      Q  What is your current position, Mr. Barrett?
22      A  I'm the deputy director of the Office of

11

1   Civilian Radioactive Waste Management.
2       Q  For how many years have you been employed
3   by the Department of Energy?
4       A  Since mid-'85 in various different
5   positions.
6       Q  And prior to 1985 what was your position?
7       A  I worked for the Nuclear Regulatory
8   Commission since the end of '74 in various positions.
9       Q  Have you participated, Mr. Barrett, in the
10   preparation of the briefs filed in the various spent
11   nuclear fuel cases?
12      A  No.
13      Q  Have you reviewed briefs filed by the
14   Department of Justice in this case prior to being
15   filed?
16      A  No.
17      Q  Have you ever reviewed any briefs filed in
18   this case?
19      A  No.
20      Q  By this case I'm right now referring to the
21   case of Sacramento Municipal Utility District versus
22   the United States.

12

1       A  Briefs are the briefs, you know, legal
2   proceedings before the court, right?
3       Q  Yes. motions to dismiss?
4       A  No. No. I've seen them but I never
5   reviewed them.
6       Q  Either before or after the filing?
7       A  After. I've never seen one before.
8       Q  And have you reviewed -- am I correct that
9   you have not reviewed the briefs or legal pleadings
10   filed in any other case involving spent nuclear fuel?
11          MR. CRAWFORD: Objection.
12      A  Not to my recollection.
13          MR. CRAWFORD: Objection. Vague. You can
14   answer.
15      Q  How did you prepare for today's deposition?
16      A  Kevin and some of the associates came to
17   see me Friday.
18      Q  How long did you spend with them?
19      A  Oh, I don't know, a couple -- we did some
20   of the morning and some in the afternoon. A couple of
21   hours in the morning, an hour and a half in the
22   afternoon, something like that.

# Defendant

DEPOSITION OF LAKE H. BARRETT, VOLUME 1
CONDUCTED ON MONDAY, APRIL 22, 2002

1 (Pages 1 to 4)

**Page 1**

```
 1    IN THE UNITED STATES COURT OF FEDERAL CLAIMS
 2  - - - - - - - - - - - - - - - x        :        :
 3  YANKEE ATOMIC ELECTRIC COMPANY;  : Case Nos. 98-126C,
 4  CONNECTICUT YANKEE ATOMIC POWER   : 98-154C, 98-474C,
 5  COMPANY; MAINE YANKEE ATOMIC      : 98-483C, 98-484C,
 6  POWER COMPANY; FLORIDA POWER &    : 98-485C, 98-486C,
 7  LIGHT COMPANY; NORTHERN STATES    : 98-488C, 98-614C,
 8  POWER COMPANY; DUKE POWER, a      : 98-621C, 99-447C,
 9  Division of DUKE ENERGY CORP.;    : 00-440C, 00-695C,
10  INDIANA MICHIGAN POWER COMPANY;   : 00-703C, 01-115C,
11  SACRAMENTO MUNICIPAL UTILITY      : 01-116C, 01-249C
12  - - - - - - - - - - - - - - - X
13  (Caption continued on the next page)
14
15       Deposition of LAKE H. BARRETT
16            Washington, D. C.
17         Monday, April 22, 2002
18              9:31 a.m.
19
20  Job No.: 11792-4
21  Pages 1 through 272, Volume 1
22  Reported by: Diane Gomez, RPR
```

**Page 2**

```
 1  DISTRICT; SOUTHERN NUCLEAR      :
 2  OPERATING COMPANY, et al.;      :
 3  COMMONWEALTH EDISON COMPANY;    :
 4  BOSTON EDISON COMPANY; GPU      :
 5  NUCLEAR, INCORPORATED; WISCONSIN :
 6  ELECTRIC POWER COMPANY; POWER   :
 7  AUTHORITY OF THE STATE OF NEW   :
 8  YORK; OMAHA PUBLIC POWER DISTRICT; :
 9  NEBRASKA PUBLIC POWER DISTRICT;  :
10  and TENNESSEE VALLEY AUTHORITY,  :
11        Plaintiffs                :
12  v.                              :
13  THE UNITED STATES,              :
14        Defendant                 :
15  - - - - - - - - - - - - - - - X
16
17
18
19
20
21
22
```

**Page 3**

```
 1       Deposition of LAKE H. BARRETT, held at the
 2  offices of:
 3
 4       ARNOLD & PORTER
 5       555 12th Street, Northwest
 6       Washington, D. C. 20004
 7       (202) 942-5000
 8
 9
10
11
12
13       Pursuant to agreement, before Diane Gomez,
14  Registered Professional Reporter and Notary Public in
15  and for the District of Columbia.
16
17
18
19
20
21
22
```

**Page 4**

```
 1              A P P E A R A N C E S
 2  ON BEHALF OF PLAINTIFFS FLORIDA POWER & LIGHT
 3  COMPANY, NORTHERN STATES POWER COMPANY, DUKE
 4  POWER, INDIANA MICHIGAN POWER COMPANY, BOSTON
 5  EDISON COMPANY, GPU NUCLEAR, INC., POWER AUTHORITY
 6  OF THE STATE OF NEW YORK, OMAHA PUBLIC POWER
 7  DISTRICT, and NEBRASKA PUBLIC POWER DISTRICT:
 8       DEVON E. HEWITT, ESQUIRE
 9       SHAW PITTMAN LLP
10       1650 Tysons Boulevard
11       McLean, Virginia 22102-4859
12       (703) 847-5097
13
14  ON BEHALF OF PLAINTIFF SACRAMENTO MUNICIPAL
15  UTILITY DISTRICT:
16       JEFFREY L. HANDWERKER, ESQUIRE
17       HOWARD CAYNE, ESQUIRE
18       RONALD A. SCHECHTER, ESQUIRE
19       ARNOLD & PORTER
20       555 12th Street, Northwest
21       Washington, D. C. 20004-1206
22       (202) 942-5000
```

DEPOSITION OF LAKE H. BARRETT, VOLUME I
CONDUCTED ON MONDAY, APRIL 22, 2002

10 (Pages 37 to 40)

---

37

Q  Correct?

MR. CRAWFORD: Objection, asked and answered. Objection, argumentative.

A  That's true.

Q  And, similarly, it was not your opinion in 1986, that a repository could not be operational by 1998, correct?

MR. CRAWFORD: Objection, form. Objection, vague.

A  You're asking what I thought —

MR. CRAWFORD: Objection, foundation, too. Go ahead.

A  Are you asking what I thought in 1986, or are you asking what I think looking back over history?

Q  I'm asking that you put yourself in the shoes of Lake Barrett in 1986.

MR. CRAWFORD: Objection, foundation.

A  Okay. We went to '86. Before we were — your line of questioning was going to mid-'84. You want to go to '86 now?

Q  Yes, sir.

A  In '86 I was working for the Department of

---

38

Energy, okay, so I had different knowledge. So the question is in 1986 did I think something. Now tell me what that something was again.

Q  In 1986 was it your opinion that a repository could not be operational -- a repository for the disposal and storage of spent nuclear fuel could not be operational by 1998?

A  I don't recall what I thought in 1986. Because in 1986 I was at the Department of Energy in a systems job probably, and the colleagues down the hall were working the repository. I did not. I don't recall what the repository schedule was in 19 — what I personally thought in 1986.

Q  When did you join the Department of Energy?

A  Summer of '85 or spring of '85.

Q  What was your position between the summer of '84 and the spring of '85?

A  I was the branch chief of the engineering branch in the office — the Division of Waste Management in the Office of Nuclear Materials Safety and Safeguards of the Nuclear Regulatory Commission.

Q  Please describe for me your

---

39

responsibilities in that position.

A  I was responsible for engineering for uranium mill tailings, low-level waste disposal sites and high-level waste disposal sites for the Nuclear Regulatory Commission is what my duties were.

Q  Did you work with issues relating to the disposal of spent nuclear fuel in that position?

A  Yes.

Q  And can you describe for me your work on those issues?

A  It was the engineering aspects of repository reviews for all media, including the development of branch technical positions and regulatory guidance and the regulations for high-level waste is what you asked about.

Q  I asked about spent nuclear fuel.

A  Well, okay, spent nuclear fuel and high-level waste.

Q  Using the term "spent nuclear fuel" to cover both?

A  Right.

Q  Did you work with officials at the

---

40

Department of Energy in this position?

A  Yes.

Q  And which offices did you work?

A  With the office that I'm presently in.

Q  Do you recall which individuals at the Department of Energy you worked with during this period?

A  Specific names, Ben Rusche is the only name that comes to mind, who was the director who I worked for years ago in the seventies.

Q  When did you work for him in the seventies?

A  Mid-seventies is the best I can recall.

Q  Was that Electric Boat?

A  No, at the Nuclear Regulatory Commission. So it would have been like '75, '76. He was the director of the Office of Reactor Regulation in the mid-seventies in the Nuclear Regulatory Commission, and he was the first confirmed director of the Office of Civilian Radioactive Waste Management. So he was one I know I talked to, but I did not talk much to the DOE people when I served at NMSS between — that short period from mid-'84 to mid-'85.

---

# Defendant

Case 1:04-cv-00074-ECH   Document 286-2   Filed 06/04/06   Page 17 of 35
DEPOSITION OF LAKE H. BARRETT, VOLUME 1
CONDUCTED ON MONDAY, APRIL 22, 2002

11 (Pages 41 to 44)

**41**

1    Q  How long did you work for Mr. Rusche?  Was
2  it approximately a year?
3    A  At the Nuclear Regulatory Commission?
4    Q  Yes.
5    A  I don't remember, a couple of years.
6    Q  And did you report directly to him?
7    A  No.  He was twice removed.  He was my
8  boss's boss.  Maybe my boss's boss's boss.  I can't
9  remember the structure.
10    Q  Did you ever meet with him or work with him
11  directly during the period '75, '76?
12    A  Repeat the question.
13    Q  Did you ever work directly with him during
14  that period?
15    A  Directly with him.  I was in contact with
16  him on various issues that we mutually worked upon.  I
17  mean, I did not report to him.  I mean, he was my
18  boss's boss or something.
19    Q  Did you believe that he was competent in
20  his field of expertise?
21    A  Very.
22    Q  Why do you say very?

**42**

1    A  Because he was a very knowledgeable
2  individual in my opinion.
3    Q  In what field was he knowledgeable?
4    A  In nuclear matters.
5    Q  Such as?
6    A  Regulatory safety, which is what we did.
7    Q  Did you ever speak with him in the period
8  following the period during which you worked with him
9  and the summer of 1984?
10    A  Yes.  In spring of '79 we worked together.
11  I didn't work for him at Three Mile Island.  He was
12  brought in as a temporary manager for Metropolitan
13  Edison, and I worked for the Nuclear Regulatory
14  Commission.  So we were -- we worked on the
15  stabilization of Three Mile Island Unit 2 for several
16  months.
17    Q  So he was in private industry at that
18  point?
19    A  Correct.
20    Q  Did you continue during that period to find
21  him competent in nuclear matters?
22    A  Yes.

**43**

1    Q  Did you continue to describe him as very
2  competent?
3    A  Yes.
4    Q  When did you next deal with him?
5    A  Pardon?
6    Q  When did you next deal with Mr. -- how do
7  you say his name?
8    A  Rusche.
9    Q  Rusche.
10    A  Well, he became my -- when I came to the
11  Department of Energy in the spring of '85 he was my
12  boss's boss.
13    Q  How did it come to be that you left the NRC
14  and went to the Department of Energy in 1985?
15    A  Somebody told me that a fellow named Roger
16  Hilley who worked for Ben Rusche wanted someone like
17  myself there, and we had a phone call and asked me to
18  come down and talk and one thing led to another and I
19  transferred.
20    Q  Do you recall who had that initial
21  communication with you?
22    A  No.

**44**

1    Q  Did you speak with Mr. Rusche before you
2  took your position?
3    A  I don't remember.  Probably did but I just
4  don't remember.
5    Q  What was your initial position at the
6  Department of Energy?
7    A  Division director, systems and
8  transportation or something to that effect.
9    Q  And what did that position involve?
10    A  I was responsible for the development of
11  the transportation systems to move spent fuel and
12  high-level waste to the DOE facilities from their
13  current locations was the primary job, and also for
14  the systems engineering for the entire program.
15    Q  Entire program you're referring to what?
16    A  The civilian and all the different sites
17  that we were looking at, the systems engineering
18  requirements documents and the systems engineering
19  structure for all of the civilian radioactive waste
20  management program.
21    Q  To whom did you report when you held this
22  position?

Case 1:04-cv-00074-ECH Document 286-2 Filed 06/04/06 Page 18 of 35
DEPOSITION OF LAKE H. BARRETT, VOLUME I
CONDUCTED ON MONDAY, APRIL 22, 2002

12 (Pages 45 to 48)

45

1   A  Roger Hilley.
2   Q  And he reported to Mr. Rusche?
3   A  Correct.
4   Q  Are you familiar with the acronym MRS?
5   A  Yes.
6   Q  What does that stand for?
7   A  Monitored retrievable storage facility.
8   Q  Were you involved with monitored
9   retrievable storage facilities during this period?
10   A  Secondarily, yes. Insofar as in the --
11   that was the facility that the transportation --
12       MR. CRAWFORD: Objection. Let me object
13   here and -- the objection is to vagueness. What
14   period are you referring to?
15       MR. CAYNE: First I'm going to object for
16   the record to counsel continuing to cut off the
17   witness while he's in the process of answering a
18   question. And I believe the witness has answered my
19   question.
20       MR. CRAWFORD: Then I didn't cut him off.
21   Q  For how long did you hold this position?
22   A  I don't recall.

46

1   Q  Two or three years?
2   A  Probably.
3   Q  Were you involved in issues relating to the
4   siting and development of a repository during this
5   period?
6   A  In a general sense. I did not have direct
7   line responsibility for repository development. That
8   was another group.
9   Q  But you said in a general sense. What did
10   you mean?
11   A  I would hear in staff meetings in various
12   work we did together the general state of where the
13   repository programs were, but I had no direct, you
14   know, responsibility in that area.
15   Q  You were a division director, correct?
16   A  Correct. In the storage and something,
17   whatever Hilley's organization title was. Which was
18   not the repository. That was a completely different
19   office did the repository. We were storage and
20   transportation systems I think was the name of our
21   office.
22   Q  Were you involved in issues relating to the

47

1   rate at which spent nuclear fuel would be accepted for
2   disposal during your time as director of this
3   division?
4   A  Probably. I don't -- probably.
5   Q  You don't recall?
6   A  I don't recall detailed discussions
7   regarding the acceptance rates. I know that we had
8   acceptance rates in various documents for the
9   repository and for the proposed MRS, which was not
10   authorized at that time, for planning purposes.
11   Q  Were you an advocate of the MRS during this
12   period?
13       MR. CRAWFORD: Objection, vague.
14   A  Advocate. I would say that I thought an
15   MRS was -- we were proposing an MRS to Congress, and,
16   yes, I was an advocate. I thought that would have
17   made a much better system if we had it.
18   Q  Why were you of that view?
19   A  Because -- one of the reasons was we were
20   striving to meet the '98 removal date to the best of
21   our ability, and an MRS circa early -- let's see in
22   the late eighties the MRS we proposed to do it because

48

1   the repository date was post -- somewhere in that
2   period it was post-1998. So, yeah, it was post-1998
3   in the mid-eighties. So the MRS was our primary means
4   to remove fuel by 1998.
5   Q  You referred to the '98 removal date a
6   moment ago. Do you recall that?
7   A  Yes.
8   Q  What were you referring to when you
9   referred to the '98 removal date?
10   A  The statute said that -- had a January 1998
11   target date in it for removal of the fuel. We were
12   trying to meet that to the best of our ability.
13   Q  And what was it that you were trying to
14   accomplish by January 1998?
15   A  To accept fuel into the federal disposal
16   system, which we were proposing to include an MRS in,
17   that mid -- I'm trying to get the years straight.
18   Yeah, mid-eighties. '86 we made a proposal.
19   Q  How much fuel were you attempting to accept
20   at that point?
21   A  I don't recall the numbers, but I would
22   have to go back and look in the records. I don't

**49**

1  recall specific receipt rates.

2      Q   Were you attempting to accept more than a

3  single spent nuclear fuel assembly?

4      A   Yes.

5      Q   Was it ever the intent of your office to be

6  able to accept a single spent fuel assembly by January

7  31st, 1998?

8          MR. CRAWFORD: Objection, vague. Objection

9  to the extent it might call for a legal conclusion.

10     A   From a systems perspective it was our

11  intention to build a system that would take more than

12  one fuel assembly.

13     Q   From a systems perspective was it ever your

14  intention to build a system that would take only -- be

15  able to take only a single fuel assembly by January

16  31st, 1998?

17     A   That was never our intention, to do just

18  one fuel assembly.

19     Q   Was it ever the intention of your office at

20  any time subsequent to the period in which you held

21  the position -- was it director of --

22     A   Division director.

**50**

1      Q   Was it ever the position of your office

2  subsequent to that time that the goal would be to be

3  in a position to accept a single spent fuel assembly

4  by January 31st, 1998?

5          MR. CRAWFORD: Objection, vague.

6  Objection, foundation, and objection to the extent it

7  calls for a legal conclusion.

8      A   It was never our plans to take one fuel

9  assembly to my recollection.

10     Q   Do you recall ever having any discussions

11  internally whether the acceptance of a single fuel

12  assembly would satisfy the department's obligations

13  under the contract, the standard contract?

14     A   I never recall any discussions from a

15  systems perspective about the contract, so, no, I

16  don't recall ever having a discussion.

17     Q   What do you mean from a systems

18  perspective?

19     A   We were -- our job was to develop the

20  systems to receive the material, and we never, to my

21  recollection, we never discussed about a system that

22  would receive one fuel assembly. Okay. We always

**51**

1  talked about more.

2      Q   From a systems perspective was it ever your

3  intention to design a system that could only accept

4  900 MTUs of spent nuclear fuel per year?

5          MR. CRAWFORD: Objection, vague.

6  Objection, foundation. Objection to the extent it

7  calls for a legal conclusion.

8      A   Repeat the question.

9      Q   From a systems perspective was it ever your

10  intention to design a system that could only accept

11  900 MTUs of spent nuclear fuel per year?

12     A   There's different things happened as a

13  function of time, okay. What time are you referring

14  to?

15     Q   In 1986.

16     A   In '86, no.

17     Q   In 1986 how many MTUs per year did you

18  attempt to design a system to accept?

19     A   I don't recall a specific number, but it

20  was -- I don't recall a specific number. It's in the

21  records.

22     Q   Would 3,000 refresh your recollection?

**52**

1      A   That's probably about right.

2      Q   And how did you come to the 3,000 number?

3          MR. CRAWFORD: Objection, foundation.

4      A   I'd have to go back and look at records,

5  which I have not done. It is the evolution of the

6  design receipt rates for the first repository, second

7  repository, the MRS in the system. My recollection is

8  the MRS was to receive 3,000 tons a year circa that

9  time prior to the amendments act, which was in excess

10  of the generation rate of around 2,000.

11     Q   That was important, wasn't it, that it be

12  in excess of the generation rate?

13         MR. CRAWFORD: Objection, vague.

14     A   Well, important? Yes, in my opinion it was

15  significant that you design a system to remove the

16  backlog of materials that were accumulating under the

17  intent of the act.

18     Q   And why was that significant in your view?

19     A   Because the concept of a Nuclear Waste

20  Policy Act was to -- for the federal government to

21  take the materials from the high-level waste and spent

22  fuel sites into federal custody.

# Plaintiff

Case 1:04-cv-00074-ECH Document 286-2 Filed 06/04/06 Page 21 of 35
DEPOSITION OF LAKE H. BARRETT, VOLUME II
CONDUCTED ON MONDAY, APRIL 22, 2002

13 (Pages 49 to 52)

49

1   recall specific receipt rates.
2       Q   Were you attempting to accept more than a
3   single spent nuclear fuel assembly?
4       A   Yes.
5       Q   Was it ever the intent of your office to be
6   able to accept a single spent fuel assembly by January
7   31st, 1998?
8       MR. CRAWFORD:  Objection, vague.  Objection
9   to the extent it might call for a legal conclusion.
10      A   From a systems perspective it was our
11  intention to build a system that would take more than
12  one fuel assembly.
13      Q   From a systems perspective was it ever your
14  intention to build a system that would take only -- be
15  able to take only a single fuel assembly by January
16  31st, 1998?
17      A   That was never our intention, to do just
18  one fuel assembly.
19      Q   Was it ever the intention of your office at
20  any time subsequent to the period in which you held
21  the position -- was it director of --
22      A   Division director.

50

1       Q   Was it ever the position of your office
2   subsequent to that time that the goal would be to be
3   in a position to accept a single spent fuel assembly
4   by January 31st, 1998?
5       MR. CRAWFORD:  Objection, vague.
6   Objection, foundation, and objection to the extent it
7   calls for a legal conclusion.
8       A   It was never our plans to take one fuel
9   assembly to my recollection.
10      Q   Do you recall ever having any discussions
11  internally whether the acceptance of a single fuel
12  assembly would satisfy the department's obligations
13  under the contract, the standard contract?
14      A   I never recall any discussions from a
15  systems perspective about the contract, so, no, I
16  don't recall ever having a discussion.
17      Q   What do you mean from a systems
18  perspective?
19      A   We were -- our job was to develop the
20  systems to receive the material, and we never, to my
21  recollection, we never discussed about a system that
22  would receive one fuel assembly.  Okay.  We always

51

1   talked about more.
2       Q   From a systems perspective was it ever your
3   intention to design a system that could only accept
4   900 MTUs of spent nuclear fuel per year?
5       MR. CRAWFORD:  Objection, vague.
6   Objection, foundation.  Objection to the extent it
7   calls for a legal conclusion.
8       A   Repeat the question.
9       Q   From a systems perspective was it ever your
10  intention to design a system that could only accept
11  900 MTUs of spent nuclear fuel per year?
12      A   There's different things happened as a
13  function of time, okay.  What time are you referring
14  to?
15      Q   In 1986.
16      A   In '86, no.
17      Q   In 1986 how many MTUs per year did you
18  attempt to design a system to accept?
19      A   I don't recall a specific number, but it
20  was -- I don't recall a specific number.  It's in the
21  records.
22      Q   Would 3,000 refresh your recollection?

52

1       A   That's probably about right.
2       Q   And how did you come to the 3,000 number?
3       MR. CRAWFORD:  Objection, foundation.
4       A   I'd have to go back and look at records,
5   which I have not done.  It is the evolution of the
6   design receipt rates for the first repository, second
7   repository, the MRS in the system.  My recollection is
8   the MRS was to receive 3,000 tons a year circa that
9   time prior to the amendments act, which was in excess
10  of the generation rate of around 2,000.
11      Q   That was important, wasn't it, that it be
12  in excess of the generation rate?
13      MR. CRAWFORD:  Objection, vague.
14      A   Well, important?  Yes, in my opinion it was
15  significant that you design a system to remove the
16  backlog of materials that were accumulating under the
17  intent of the act.
18      Q   And why was that significant in your view?
19      A   Because the concept of a Nuclear Waste
20  Policy Act was to -- for the federal government to
21  take the materials from the high-level waste and spent
22  fuel sites into federal custody.

53

1        Q    And based on that concept it was

2    significant or material that you be able to design a

3    system to remove the backlog of materials that were

4    accumulating, correct?

5        A    Within a reasonable -- within a reasonable

6    sense, correct.

7        Q    What do you mean by within a reasonable

8    sense?

9        A    Well, you can -- there is no automatic

10    number that you would calculate.  The higher the

11    numbers, the more the complexity of the system, the

12    more the system costs.  So there was a balance, and we

13    did studies that I recall in a general sense as to

14    what would be the appropriate receipt rates for

15    planning designing purposes.

16        Q    The goal was to make the take rate high

17    enough so that you could eliminate the backlog within

18    a reasonable amount of time without making the rate so

19    high that the complexities would send the cost through

20    the ceiling, correct?

21        MR. CRAWFORD:  Objection, vague.

22    Objection, foundation.

54

1     A    In a general sense.

2     Q    Again, what do you mean when you say in a

3  general sense?

4     A    We did not -- you all get into the

5  contract.  We did not consider the contract issues at

6  that time, so we were balancing the size of the

7  system, the uncertainties of an MRS would or wouldn't

8  be approved, the repositories, where they might be,

9  how many we would have.  So it was a complicated

10  balancing of many interests, and so to -- it would be

11  inappropriate to say that we had a numerical number to

12  move the backlog or anything like that because I don't

13  recall anything like that.

14     Q    You didn't have a numerical number to move

15  the backlog but you had a goal to move the backlog,

16  correct?

17     A    Within a reasonable --

18          MR. CRAWFORD:  Objection, vague.

19     A    Within a reasonable sense, yes.  In a

20  general sense I mean.

21     Q    And in establishing these goals you were

22  considering the requirements, of course, of the

55

1    Nuclear Waste Policy Act of 1982, correct?

2         MR. CRAWFORD:  Objection, foundation.

3         A    We knew that the general policy laid out in

4    the act for the federal, you know, intention to

5    dispose of the nation's waste and spent fuel.

6         Q    And you understood the policy behind the

7    act would call for the elimination of the backlog of

8    spent nuclear fuel within a reasonable amount of time,

9    correct?

10        MR. CRAWFORD:  Objection.  Foundation.

11        A    Reduction as opposed to elimination.  As

12   long as they operate, you don't eliminate it.  So

13   reduction, yes.

14        Q    And just explain what you meant by as long

15   as they operate you don't eliminate it?

16        A    Well, when -- when reactors operate, there

17   is always going to be some inventory of spent fuel

18   there.  We were working to minimize the backlog and

19   reduce the backlog that was at the sites.

20        Q    So in order to be able to minimize the

21   backlog, the acceptance rate would have to be at some

22   level higher than the rate at which spent nuclear fuel

56

1    was being produced, correct?

2          MR. CRAWFORD:  Objection to the form.

3    Objection, vague.

4          A    Our intention was to design a system that

5    would reduce the backlog to a reasonable sense.

6          Q    And in order for that to happen, as a

7    matter of mathematics or simple equation, the

8    acceptance rate would have to be something in excess

9    of the rate at which new spent nuclear fuel was being

10   created, correct?

11         MR. CRAWFORD:  Objection to the extent it

12   mischaracterizes his prior testimony.

13         A    In a general sense, yes.

14         Q    And in 1986 you believed that the 3,000

15   take rate that you were targeting at that point would

16   accomplish the goals you have been alluding to,

17   correct?

18         MR. CRAWFORD:  Objection.

19         Q    And the goal I'm referring to is the

20   reduction of the built up backlog.

21         MR. CRAWFORD:  Objection to the foundation.

22   Objection to the extent it mischaracterizes his prior

57

1    testimony.

2        A    Yes.

3        Q    Can you describe for me how the department

4    actually arrived at the 3,000 number?

5        A    I don't --

6        MR. CRAWFORD:  Objection, foundation.

7        A    I don't recall how it was done.

8        Q    Do you recall the general issues that were

9    considered?

10       A    No more than what I've just said to you

11   before.

12       Q    Well, would you please state for me your

13   understanding of the issues that were considered in

14   establishing the 3,000 rate.

15       A    The 3,000 number was there prior to my -- I

16   didn't do the 3,000 number.  My understanding of my

17   predecessor's was that 3,000 --

18       MR. CRAWFORD:  I'm going to object to the

19   extent the question calls for speculation.

20       MR. CAYNE:  Again, I'm going to object to

21   counsel's continuing the interruption of the witness.

22       Q    Please continue.

Case 1:04-cv-00074-ECH   Document 286-2   Filed 06/04/06   Page 27 of 35
DEPOSITION OF LARRY H. BARRETT, VOLUME I
CONDUCTED ON MONDAY, APRIL 22, 2002

15 (Pages 57 to 60)

**57**

1  testimony.
2      A  Yes.
3      Q  Can you describe for me how the department
4  actually arrived at the 3,000 number?
5      A  I don't --
6          MR. CRAWFORD: Objection, foundation.
7      A  I don't recall how it was done.
8      Q  Do you recall the general issues that were
9  considered?
10     A  No more than what I've just said to you
11  before.
12     Q  Well, would you please state for me your
13  understanding of the issues that were considered in
14  establishing the 3,000 rate.
15     A  The 3,000 number was there prior to my -- I
16  didn't do the 3,000 number.  My understanding of my
17  predecessor's was that 3,000 --
18         MR. CRAWFORD: I'm going to object to the
19  extent the question calls for speculation.
20         MR. CAYNE: Again, I'm going to object to
21  counsel's continuing the interruption of the witness.
22     Q  Please continue.

**58**

1      A  That my predecessors did some of these
2  balances of performance, reduction of the inventory,
3  the cost and the complexities and the siting and had
4  as a planning purpose the 3,000 number.
5      Q  Did you consider political factors in
6  coming up with the 3,000 number?
7          MR. CRAWFORD: Well, let me object to the
8  extent it assumes facts not in evidence.  Objection to
9  foundation.
10     A  Political, no.  Not political.  There was
11  policy regarding Congress would or would not approve
12  an MRS and those sorts of things.  And schedules.
13     Q  Was the 3,000 MTU take rate related to the
14  Department of Energy's estimate of the utilities'
15  discharge rate?
16         MR. CRAWFORD: Objection, foundation.
17  Objection, speculation.
18     A  I personally don't know.  I assume -- I
19  don't know.
20     Q  You assumed what?
21     A  That when they -- the production rate at
22  the time was around 2,000.  So I assumed that the

**59**

1  3,000 that existed was chosen in consideration with
2  the production rate, you know, the cost and the
3  transportation and the other issues involved.
4      Q  So based on your prior testimony,
5  Mr. Barrett, the 3,000 rate would be consistent with
6  your understanding of the intent of the act to reduce
7  over a reasonable period of time the backlog of spent
8  nuclear fuel throughout the nation, correct?
9          MR. CRAWFORD: Objection, speculation.
10  Objection, foundation.
11     A  Yes.
12         MR. CRAWFORD: Can we take a break here.
13         MR. CAYNE:  Certainly.
14         (There is a recess from the record.)
15     Q  Mr. Barrett, how long did you hold the
16  director position that you discussed?
17     A  The division director?
18     Q  Yes.
19     A  I don't recall.  Somewhere -- when I first
20  came to the department, so that would have been '85,
21  spring of '85 until I was assigned to be QA director I
22  think.  I don't know, a couple of years.

**60**

1      Q  I'm sorry?
2      A  A couple of years.
3      Q  Assigned to be what director?
4      A  I became QA director.
5      Q  Quality assurance?
6      A  Quality assurance.  But I wasn't sure if
7  that was a detail or an assignment.
8      Q  That would have been in what year?
9      A  '87, '88.
10     Q  Who did you report to in that position --
11     A  The office of the director, which then I
12  believe was acting director was Ed Kay.
13     Q  When did Mr. Rusche leave?
14     A  '87ish.  I think it was before the act was
15  amended, so '86, '87.
16     Q  Did he retire?
17     A  He left.  That's all I remember.  I think
18  he -- I don't know if he retired from federal service
19  or what he did, but he left.
20     Q  And Mr. Kay took over at that time?
21     A  As the acting.
22     Q  In either of the two positions you've

# Defendant

Case 1:04-cv-00074-ECH   Document 286-2   Filed 06/04/06   Page 29 of 35
DEPOSITION OF LAKE H. BARRETT, VOLUME I
CONDUCTED ON MONDAY, APRIL 22, 2002

17 (Pages 65 to 68)

65

1   was in QA, so I personally, the QA office was, very
2   little impact. I had no personal involvement in the
3   linkages then.
4        Q  But in your position you did attend, did
5   you not, staff meetings in which the linkages were
6   discussed, correct?
7        A  Probably did. I just don't recall the
8   specifics. But I'm sure there was general discussion
9   about many things that happened in the amendments act.
10       Q  Well, based on your general recollection of
11  the discussions in which you personally participated,
12  Mr. Barrett, how did the linkages imposed by the '87
13  act affect the administration of the program?
14           MR. CRAWFORD:  Objection, foundation.
15  Objection, speculation.
16       A  Given that the MRS was basically linked and
17  disapproved as we had proposed it and we had only one
18  site, there was a lot of discussion about how we could
19  best design the program to be successful, and which
20  success included doing all we could do to meet the '98
21  date.
22       Q  And, again, when you say meet the '98 date,

66

1   you're referring to what?
2        A  To be able to move fuel into the federal
3   system with a target of January '98.
4        Q  And in your view did the '87 act have the
5   effect of reducing the take rate?
6           MR. CRAWFORD:  Objection, foundation.
7        A  Yes, it did. Because the only way at the
8   time for '98 would have been -- to receive the
9   material in '98 was with an MRS, and the MRS could
10  only be achieved in 1998 through a volunteer site,
11  through congressional approval of a volunteer site.
12  And that there were linkages in the statute, and
13  that's when the discussion started about the change to
14  the 900, which was caused by the statutory linkages.
15       Q  So is it your testimony that it was the
16  statutory linkages imposed by the '87 legislation that
17  reduced the annual acceptance rate from 3,000 MTUs to
18  900 MTUs?
19           MR. CRAWFORD:  Objection to the extent it
20  calls for a legal conclusion. Objection, foundation.
21       A  The linkages imposed by law complicated the
22  receipt rates and work was done, and the specifics of

67

1   it I don't recall, regarding how we could best operate
2   the program with those congressionally mandated
3   linkages.
4        Q  But I'm not sure if you answered my
5   question. Did those linkages have the effect of
6   reducing the take rate, which I understand you to have
7   testified was 3,000 prior to the '87 amendments, to
8   the 900 level that subsequently followed?
9           MR. CRAWFORD:  Objection to the foundation.
10  Objection to the extent it mischaracterizes prior
11  testimony. Objection to the extent it calls for a
12  legal conclusion.
13       A  We still -- my recollection is we still
14  kept the 3,000 ton receipt design, but we had to
15  reconcile the fact that we would hit the limits, and
16  it was -- my recollection is I just don't remember
17  what we did and how we did balance those.
18       Q  What did you mean, Mr. Barrett, when you
19  just referred to the 3,000 MTU receipt design?
20       A  You would have to look at the document --
21  the systems documents circa '87, '88. I believe they
22  still had 3,000 ton receipt for a volunteer MRS but

68

1   acknowledge the fact that that would have to be
2   addressed as related to linkages.
3        Q  So if I understand correctly based on
4   your -- well, let me step back a second.
5           The word "design," what are you referring
6   to when you say receipt design. What design are you
7   referring to?
8        A  The MRS, which would be the first ability
9   to receive materials, was the receipt rate design was
10  3,000 tons per year is my recollection. I would have
11  to check that. I haven't gone over any old documents.
12  Was 3,000. So the designing of the transportation
13  system, the design of the hot cells and receiving
14  facilities was a nominal 3,000 ton capability per
15  year.
16       Q  When you use the word "nominal," what do
17  you mean?
18       A  That the normal operational rate of receipt
19  was designed 3,000 tons per year of the MRS.
20       Q  A few moments ago you answered a question
21  and you stated we had to reconcile the fact that we
22  would hit the limits. Do you recall that?

DEPOSITION OF LAKE H. BARRETT, VOLUME I
CONDUCTED ON MONDAY, APRIL 22, 2002

18 (Pages 69 to 72)

69

1    A  Uh-huh.
2    Q  What did you mean when you stated "we would
3  hit the limits"?
4    A  The linkages in the amendments act were
5  such that you could not operate at 3,000 tons per year
6  very long before you hit the statutory limits, and we
7  had to look at — my recollection is that we had to
8  look at how that all would work.  For example, you
9  would not want the system to operate at a high rate
10  and then stop to reconcile that.
11    Q  Why is it that you could not operate at the
12  3,000 ton per year very long before you hit the
13  statutory limits?
14    A  The statute had linkages that said you
15  could not receive more than certain tonnages for
16  certain events.  I don't recall the details of what
17  they were, but there was a 10,000 ton limit and there
18  was something else that you couldn't do.  And that was
19  tied to the repository.
20    Q  How many years would it take after
21  licensing of the repository for the repository to be
22  built?

70

1        MR. CRAWFORD:  Objection to foundation.
2  Objection to the extent it calls for speculation.
3    A  Repeat the question again, please.
4    Q  Based on your projections, after licensing
5  of a repository how many years do you project that it
6  would take the repository to become operational?
7        MR. CRAWFORD:  Same objection.
8    A  When you say after licensing, you mean upon
9  receipt of a construction authorization?
10    Q  Yes.
11    A  Depends on the design of the facility.
12    Q  With respect to the facility that you had
13  under design in the 1987 time frame, how many years
14  after receiving construction authorization would the
15  repository become operational?
16        MR. CRAWFORD:  Objection, vague.
17  Objection, foundation.
18    A  I don't recall the repository construction
19  schedule circa '88/'89.  I just don't recall it.
20    Q  Would five years be a good approximation?
21        MR. CRAWFORD:  Objection to the vagueness
22  of it and objection to the foundation.  Objection to

71

1  the extent it calls for speculation.
2    A  Five years probably was what was in the
3  records then.
4    Q  And with respect to the repository under
5  design today, how many years do you project that it
6  will take for that repository to become operational
7  after receipt of the necessary construction
8  authorization?
9        MR. CRAWFORD:  Objection to the foundation.
10    A  It depends upon what the design
11  configuration is of the repository, and also the
12  degree of preparatory work that we're allowed to do
13  prior to the construction authorization.
14    Q  Do you have current projections with
15  respect to the repository under consideration by the
16  department today?
17        MR. CRAWFORD:  Objection, vague.
18    A  Today's proposal and plan is if we see
19  budgets and if things go according to -- as we would
20  wish them to, if we change to a modular construction
21  approach, it is possible to be receiving material in
22  basically a two to three-year period.

72

1    Q  After receiving construction authorization?
2    A  Correct.
3    Q  And your best recollection of that period
4  from the 1987 time frame would have been five years
5  back then, correct?
6        MR. CRAWFORD:  Objection to the extent it
7  mischaracterizes prior testimony.
8    A  As it related to the plans of a repository
9  at that time, five years was probably right.
10    Q  Had the MRS that you proposed to Congress
11  in 1987 been approved, how long would the construction
12  of that facility have taken from start to receipt of
13  spent nuclear fuel?
14        MR. CRAWFORD:  Objection, vague.
15    A  I don't recall that.
16    Q  I'm trying to refresh your recollection.
17  Would two years be a good estimate of that time frame?
18        MR. CRAWFORD:  Objection, vague.
19    A  I'd have to go -- MRS schedules are 15
20  years old in my brain.  I don't remember what the MRS
21  schedules were at all.
22    Q  The MRS would have taken less time than the

# Defendant

77

1    MR. CRAWFORD: Objection to the foundation.
2 Objection, assumes facts not in evidence.
3    A  Please restate that question.
4    Q  As a matter of design and systems
5 engineering, would it have been possible for a
6 repository to accept spent nuclear fuel at a beginning
7 rate in excess of 400 MTUs?
8    A  Yes.
9    Q  And as a matter of design and system
10 engineering would it have been possible for a
11 repository to begin the acceptance of spent nuclear
12 fuel at an annual MTU rate of 1,800?
13    MR. CRAWFORD: Objection, vague.
14    A  When you use the word "possible" versus
15 practicable there's a difference. You ask possible,
16 the answer is yes. With time and money you can do
17 almost anything.
18    Q  Do you believe it would not have been
19 practicable?
20    A  It would have been hard to go from zero to
21 1800 in my opinion. Possible, yes.
22    Q  Well, the ramp-up rate you referred to was

78

1 five years, correct?
2    MR. CRAWFORD: Objection, vague.
3    A  Yes, but not starting at 1800 the first
4 year.
5    Q  Would it have been practicable for the
6 ramp-up rate to occur in a period of less than five
7 years?
8    MR. CRAWFORD: Objection, vague.
9 Objection, foundation.
10    A  You could.
11    Q  For example, would it be practicable for
12 the ramp-up rate to take place within a period of
13 three years?
14    MR. CRAWFORD: Objection, vague. Objection
15 to the foundation. Objection to the extent it calls
16 for speculation.
17    A  These are all degrees of more difficult and
18 less difficult practicalities.
19    Q  You used the word "practicable" and that's
20 simply what I'm asking you. Would it have been
21 practicable for the ramp-up rate to have occurred
22 within a three-year period, the ramp-up to have

79

1 occurred within a three-year period?
2    MR. CRAWFORD: Objection. Same objections.
3    A  It's possible. These are different degrees
4 of practicality on how quickly you ramp up under what
5 circumstances. I don't remember — I don't recall
6 what the rates were circa '87. Given the national
7 mood and concerns about things nuclear, it's not very
8 practicable today I believe to ramp up in less than
9 three years to 3,000. Not to say it could not be
10 done.
11    Q  Putting aside issues of national mood and
12 concerns, as a matter of systems engineering and
13 design would it have been practicable to have the
14 ramp-up occur within a three-year period?
15    MR. CRAWFORD: Objection, vague. Objection
16 to the foundation. Objection to the extent it calls
17 for speculation.
18    A  I don't know. I would have to look at all
19 the economics, the cash flow, the preparations for
20 institutional aspects of transportation. You know, I
21 don't know if it would be practicable or not.
22    Q  So sitting here today you can only state,

80

1 am I correct, that it might have been practicable for
2 the ramp-up to have occurred within three years,
3 correct?
4    MR. CRAWFORD: Objection to the extent it
5 mischaracterizes his prior testimony. Objection,
6 asked and answered. Objection, vague. Objection,
7 foundation. Objection, to the extent it assumes facts
8 not in evidence.
9    A  It's possible.
10    Q  Are you aware, Mr. Barrett, whether the
11 fees that the utilities were required to pay under the
12 standard contract were developed or determined based
13 on a particular acceptance rate and ramp-up schedule?
14    MR. CRAWFORD: Objection, lack of
15 foundation. Objection to the extent it calls for
16 speculation.
17    A  It's my understanding the monies paid by
18 the utilities were a function of the kilowatt hours of
19 nuclear energy delivered, not on the system design
20 that we're doing.
21    Q  You don't believe the fees had any relation
22 to the system design?

Case 1:04-cv-00074-ECH   Document 286-2   Filed 06/04/06   Page 33 of 35
DEPOSITION OF LAKE H. BARRETT, VOLUME I
CONDUCTED ON MONDAY, APRIL 22, 2002

21 (Pages 81 to 84)

81

1.    A   Not to my recollection.
2      Q   For how long did you hold your position in
3   quality assurance?
4      A   I don't know, a year or so.
5      Q   What position did you next take on?
6      A   I don't remember my official titles.  I
7   became responsible for programmatic aspects of the
8   repository.  I became responsible for programmatic
9   aspects of the MRS facility.  And I was responsible
10  for business development contracts for awhile.
11     Q   And when did you take on those
12  responsibilities?
13        MR. CRAWFORD:  Objection.  Asked and
14  answered.
15     A   I don't know, '88, '89, until I was sent by
16  Admiral Watkins to defense programs in the spring of
17  '90.
18     Q   And what were your duties when you were
19  responsible for the programmatic aspects of the
20  repository?
21     A   Project manager of Yucca Mountain project
22  at the time reported to me.

82

1      Q   Were you required to appear before Congress
2   during this period?
3      A   Not that I recall.  I might have but I
4   don't remember it.
5      Q   Were you involved in the development of
6   acceptance rates during this period?
7      A   Not to the degree that I remember.  I might
8   have been.
9      Q   Wouldn't you have been if you were
10  responsible for the programmatic aspects of the
11  repository?
12        MR. CRAWFORD:  Objection, argumentative.
13     A   I don't -- you know, I was responsible for
14  the programmatic aspects.  If we ever did anything
15  regarding acceptance rates at that time, I don't
16  recall doing anything.
17     Q   Do you recall if you were involved in the
18  establishment or analysis of acceptance rates prior to
19  your next position in 1990?
20     A   I don't recall anything.  I might have.
21     Q   We'll go through some documents later to
22  refresh your recollection, but I just -- a lot of

83

1   documents actually.
2      A   Whatever.
3      Q   I just want to know what you recall.
4        MR. CRAWFORD:  Objection.  Form.
5      A   14 years ago.  I don't remember specific
6   documents at this time.
7      Q   What was the position you took in 1990?
8        MR. CRAWFORD:  Objection, form.  Objection.
9   vague.
10     A   I was detailed initially and then
11  transferred to the Office of Defense Programs.  I was
12  the -- what was my title?  I don't know.  I was
13  director of the Rocky Flats program office.
14     Q   And what responsibilities did that position
15  involve?
16     A   It was the restart of the Rocky Flats
17  nuclear weapons production plant after the FBI raid.
18     Q   Did you have continuing responsibilities
19  for or involvement with the spent nuclear fuel program
20  during this period?
21     A   None whatsoever.
22     Q   For how long did you hold this position?

84

1      A   Until January of '93.
2      Q   And in January 1993 what position did you
3   take?
4      A   Admiral Watkins made me acting director of
5   RW.
6      Q   And RW stands for?
7      A   Offices of Civilian Radioactive Waste
8   Management.
9      Q   And what were your duties in that position?
10        MR. CRAWFORD:  Objection, vague.
11  Objection, lack of foundation.
12     A   The duties of the director of the Office of
13  Radioactive Waste Management.
14     Q   You ran the program at that point, correct?
15     A   That's correct.
16     Q   And have you basically held that position
17  either as acting director, director, or deputy
18  director through today?
19        MR. CRAWFORD:  Objection, vague.
20     A   I was never the director.  I was either the
21  acting director or the deputy director.
22     Q   And today you are the deputy director,

# Defendant

81

1    A  Not to my recollection.
2    Q  For how long did you hold your position in
3  quality assurance?
4    A  I don't know, a year or so.
5    Q  What position did you next take on?
6    A  I don't remember my official titles. I
7  became responsible for programmatic aspects of the
8  repository. I became responsible for programmatic
9  aspects of the MRS facility. And I was responsible
10  for business development contracts for awhile.
11    Q  And when did you take on those
12  responsibilities?
13      MR. CRAWFORD: Objection. Asked and
14  answered.
15    A  I don't know, '88, '89, until I was sent by
16  Admiral Watkins to defense programs in the spring of
17  '90.
18    Q  And what were your duties when you were
19  responsible for the programmatic aspects of the
20  repository?
21    A  Project manager of Yucca Mountain project
22  at the time reported to me.

82

1    Q  Were you required to appear before Congress
2  during this period?
3    A  Not that I recall. I might have but I
4  don't remember it.
5    Q  Were you involved in the development of
6  acceptance rates during this period?
7    A  Not to the degree that I remember. I might
8  have been.
9    Q  Wouldn't you have been if you were
10  responsible for the programmatic aspects of the
11  repository?
12      MR. CRAWFORD: Objection, argumentative.
13    A  I don't -- you know, I was responsible for
14  the programmatic aspects. If we ever did anything
15  regarding acceptance rates at that time, I don't
16  recall doing anything.
17    Q  Do you recall if you were involved in the
18  establishment or analysis of acceptance rates prior to
19  your next position in 1990?
20    A  I don't recall anything. I might have.
21    Q  We'll go through some documents later to
22  refresh your recollection, but I just -- a lot of

83

1  documents actually.
2    A  Whatever.
3    Q  I just want to know what you recall.
4      MR. CRAWFORD: Objection. Form.
5    A  14 years ago. I don't remember specific
6  documents at this time.
7    Q  What was the position you took in 1990?
8      MR. CRAWFORD: Objection, form. Objection,
9  vague.
10    A  I was detailed initially and then
11  transferred to the Office of Defense Programs. I was
12  the -- what was my title? I don't know. I was
13  director of the Rocky Flats program office.
14    Q  And what responsibilities did that position
15  involve?
16    A  It was the restart of the Rocky Flats
17  nuclear weapons production plant after the FBI raid.
18    Q  Did you have continuing responsibilities
19  for or involvement with the spent nuclear fuel program
20  during this period?
21    A  None whatsoever.
22    Q  For how long did you hold this position?

84

1    A  Until January of '93.
2    Q  And in January 1993 what position did you
3  take?
4    A  Admiral Watkins made me acting director of
5  RW.
6    Q  And RW stands for?
7    A  Offices of Civilian Radioactive Waste
8  Management.
9    Q  And what were your duties in that position?
10      MR. CRAWFORD: Objection, vague.
11  Objection, lack of foundation.
12    A  The duties of the director of the Office of
13  Radioactive Waste Management.
14    Q  You ran the program at that point, correct?
15    A  That's correct.
16    Q  And have you basically held that position
17  either as acting director, director, or deputy
18  director through today?
19      MR. CRAWFORD: Objection, vague.
20    A  I was never the director. I was either the
21  acting director or the deputy director.
22    Q  And today you are the deputy director,