# Plaintiff

DEPOSITION OF LAKE H. BARRETT, VOLUME 1
CONDUCTED ON MONDAY, APRIL 22, 2002

29 (Pages 113 to 116)

---

113

1    A  Probably.
2    Q  And in 1987 did you personally read the
3  amendments to the Nuclear Waste Policy Act?
4    A  I'm sure -- well, did I sit down and
5  actually read it?  I mean, I dealt with it a lot, but
6  yes, I'm sure I read most of it at one time or
7  another.
8    Q  In 1985 when you took on your position at
9  DOE did you read the standard contract?
10   A  No, actually I didn't.
11   Q  Have you ever read the standard contract
12  subsequently?
13   A  Cover to cover, no.
14   Q  Have you read portions of it?
15   A  Yes.
16   Q  What portions have you read?
17     MR. CRAWFORD:  Objection, vague.
18   A  I don't know.  I would have to go -- you
19  know -- the '98 date, the section.  I mean I -- I
20  don't know.  I would have to look.
21   Q  Do you think you read at least
22  three-quarters of the contract?

---

114

1     MR. CRAWFORD:  Objection.  Asked and
2  answered.  Objection, vague.
3    A  I doubt I've read --
4     MR. CRAWFORD:  Objection, foundation.
5    A  I doubt I've read three quarters of that
6  contract.
7    Q  Do you think you read at least half of that
8  contract?
9     MR. CRAWFORD:  Objection, asked and
10  answered.  Objection, vague.  Objection, burdensome.
11   A  I don't know.
12   Q  Is it possible you did?
13     MR. CRAWFORD:  Objection, asked and
14  answered.  Objection, vague, burdensome.
15   A  I just don't know how much of it I read.
16   Q  So it is possible that you have not read
17  half of the provisions of the standard contract,
18  correct, sir?
19     MR. CRAWFORD:  Objection, argumentative.
20  Objection, asked and answered.  Objection, vague,
21  burdensome.
22   A  Possible.

---

115

1    Q  Is it possible that you've read less than a
2  quarter of the provisions, sir?
3     MR. CRAWFORD:  Objection, argumentative,
4  burdensome.  Objection, asked and answered.
5    A  I don't know.
6    Q  So it is possible that you, in your years
7  at the Department of Energy or before, have read
8  personally less than 25 percent of the provisions of
9  the standard contract, correct?
10     MR. CRAWFORD:  Objection, argumentative.
11  Objection, foundation.  Objection, asked and answered.
12   A  I probably read more than a quarter of it.
13   Q  Are you certain?
14     MR. CRAWFORD:  Objection, argumentative.
15   Q  Are you certain?
16     MR. CRAWFORD:  Objection, argumentative.
17   A  No, I'm not certain.
18   Q  I would like to return to paragraph three
19  on the top of page seven.  Have you had a chance to
20  read that?
21   A  Yes.
22   Q  Can you explain that objective to me?

---

116

1    A  That was an objective, okay, to receive
2  waste in 1998 and along with the acceptance schedule
3  it's -- in accordance with the acceptance schedule
4  provided in the standard contract, okay.  So that was
5  the goal.
6    Q  And you're comfortable with that goal?
7     MR. CRAWFORD:  Objection.
8    A  It wasn't mine.  It wasn't my goal.
9    Q  But you understand that was a goal of the
10  program?
11   A  Yeah.
12   Q  In 1985, correct?
13   A  That's correct.
14   Q  And what acceptance schedule did the
15  standard disposal contract provide for?
16     MR. CRAWFORD:  Objection, foundation.
17  Objection to the extent it calls for speculation.
18   A  I think the contract references other
19  documents that references things, and I don't
20  specifically know.
21   Q  So is it your testimony that it provided
22  for a schedule but you don't sitting here today know

117

1    what that schedule is?
2          MR. CRAWFORD: Objection. Argumentative.
3      A  The receipt rate of January -- excuse me,
4    the receipt date of January 31, 1998, clearly was
5    always a goal. Okay. Regarding the acceptance rate
6    of so many tons year one, year two, year three, okay,
7    you know, that has changed over time. My focus has
8    always been to create a siting process that got us a
9    site to allow us to have the -- a reasonable receipt
10   rate going toward the steady state 3,000 tons per
11   year, and that's where my focus has always been, not
12   on contract details. Okay. I am not a lawyer, I'm an
13   engineer, okay, so I have not gone into the contract
14   in any great detail at all.
15         Okay, now regarding your question here
16   about the acceptance schedule in the contract,
17   actually I don't recall seeing a metric ton per year
18   in the contract.
19     Q  Let me step back a second, Mr. Barrett.
20   You just referred to a reasonable receipt rate going
21   toward the steady state 3,000 tons per year.
22     A  Right.

118

1      Q  "That's where my focus has always been."
2    Do you recall that testimony?
3      A  That's what I just said I think.
4      Q  Does that continue to be your focus to this
5    very day, sir?
6      A  Yes.
7      Q  And does that continue to be the focus of
8    the Department of Energy's spent nuclear fuel program?
9          MR. CRAWFORD: Objection to the form.
10   Objection to the foundation. Objection, vague.
11     A  We are still trying to perform under the
12   Nuclear Waste Policy Act to receive the waste into the
13   federal system as soon as we can under the constraints
14   of the law. So, yes, that remains my goal and the
15   organization's goal.
16     Q  Again, just so the record is clear, your
17   goal and the organization's goal is to achieve a
18   reasonable receipt rate going towards the steady state
19   of 3,000 tons per year, correct?
20         MR. CRAWFORD: Objection to the extent it
21   mischaracterizes prior testimony. Objection,
22   foundation. Objection, vague.

119

1      A  That has been our goal to do that.
2      Q  And it continues to be your goal today,
3    correct?
4      A  Correct.
5      Q  And it was your goal in 1985, correct?
6      A  Correct.
7      Q  And it was the goal of the department in
8    1982 when the standard contracts were signed, correct?
9          MR. CRAWFORD: Objection, vague.
10   Objection, calls for speculation. Objection to the
11   extent it mischaracterizes his prior testimony.
12     A  I wasn't there in '82 so I don't know about
13   '82, but in '85 and today it has always been our
14   intent to try to do what we can from a technical point
15   of view to receive the materials at a reasonable rate.
16     Q  And the reasonable rate is the rate that
17   would ramp up -- is a rate that would ramp up towards
18   3,000 MTUs per year, correct?
19         MR. CRAWFORD: Objection, vague. And
20   foundation.
21     Q  I believe your counsel cut you off. What
22   was your answer, sir?

120

1      A  That has been our intent.
2      Q  Let's go back to paragraph three, page
3    seven. You referred to January 31st, 1998, as being a
4    goal. Was it something more, wasn't it a contractual
5    commitment and a statutory command?
6          MR. CRAWFORD: Objection, argumentative.
7    Objection, best evidence. Objection to the extent it
8    calls for a legal conclusion.
9      A  As an engineer, okay, and as a program
10   administrator, okay, and dependent on what the
11   contract said or what courts said, we were always
12   trying to achieve that goal.
13     Q  And why did you establish that goal for
14   yourself?
15     A  Because --
16     Q  And your department?
17     A  It was set in the law, okay, that our goal
18   was to try to create a facility and to create a system
19   that would meet that goal of January 31st, 1998, to
20   start to receive fuel. And it has always been an
21   important objective and goal.
22     Q  To start to receive fuel on January 31st,

---

**121**

1  1998, at a ramp-up level that would -- in a reasonable
2  amount of time and at a 3,000 per year MTU acceptance
3  rate, correct?
4      MR. CRAWFORD: Objection to the form.
5  Objection to the mischaracterization of prior
6  testimony. Objection to the extent it assumes facts
7  not in evidence.
8      A  It was a systems goal to receive the
9  material at a reasonable rate, okay, of which the
10  3,000, ramp up to 3,000 tons was a reasonable rate.
11  It was never a -- in my opinion it was never a legal
12  requirement to do 3,000 tons per year.
13      Q  You base the goal on the statute, correct?
14  That's what you've testified to, correct?
15      A  Yes.
16      Q  Back to paragraph three --
17      A  Excuse me. Let me go back to that. When
18  you say the statute does not say 3,000, okay, that was
19  a judgment part. It is the receipt in January 31,
20  1998, is in the statute. The rate to my knowledge is
21  not in the statute.
22      Q  So why did you set the 3,000 MTU goal?

---

**122**

1      A  That was a --
2      MR. CRAWFORD: Objection to the fact that
3  that question assumes facts not in evidence.
4      A  That was in our judgment a reasonable rate,
5  steady state rate to move up to under the
6  circumstances we were in.
7      Q  Paragraph three. I'm not certain I
8  understand your testimony. I'm still unclear what
9  you're referring to with respect to the acceptance
10  schedule. You see that language, acceptance schedule
11  in paragraph three?
12      A  You asked me to interpret this paragraph
13  three which I never wrote.
14      MR. CRAWFORD: He's asking you whether you
15  see that.
16      A  Do I see it? I see that line.
17      Q  And what do you understand that to be
18  referring to? What acceptance schedule did the
19  standard disposal contract provide for?
20      MR. CRAWFORD: Objection to the foundation
21  of the question and objection, best evidence.
22      A  I don't know because I do not recall an

---

**123**

1  acceptance schedule in the contract itself. So I
2  would have -- I don't know what this means.
3      MR. CAYNE: It's 12:30. Let's break for a
4  one-hour lunch.
5      (A luncheon recess is taken.)

---

**124**

1      AFTERNOON SESSION
2  BY MR. CAYNE:
3      Q  Good afternoon, Mr. Barrett. Who are the
4  individuals that report directly to you in your
5  position as deputy director?
6      A  Now?
7      Q  Yes.
8      A  Dr. Russell Dyer, project manager Yucca
9  Mountain project; Sandra Waisley who is the acting
10  director of the U.S.A. subprogram administration; and
11  Mr. Jeffrey Williams who is the acting director of
12  office of waste acceptance and transportation
13  international or technology -- technology and QA
14  director. Mr. Ron Murthey, and Mr. Ronald Milner who
15  is the chief operating officer.
16      Q  Do you work with Mr. David Zabransky?
17      A  Yes.
18      Q  And what position does he hold?
19      A  I think he is now the acting director of
20  transportation and waste acceptance.
21      Q  And in that capacity to whom does he
22  report?

# Defendant

113

1    A  Probably.
2    Q  And in 1987 did you personally read the
3  amendments to the Nuclear Waste Policy Act?
4    A  I'm sure -- well, did I sit down and
5  actually read it?  I mean, I dealt with it a lot, but
6  yes, I'm sure I read most of it at one time or
7  another.
8    Q  In 1985 when you took on your position at
9  DOE did you read the standard contract?
10    A  No, actually I didn't.
11    Q  Have you ever read the standard contract
12  subsequently?
13    A  Cover to cover, no.
14    Q  Have you read portions of it?
15    A  Yes.
16    Q  What portions have you read?
17      MR. CRAWFORD:  Objection, vague.
18    A  I don't know.  I would have to go -- you
19  know -- the '98 date, the section.  I mean I -- I
20  don't know.  I would have to look.
21    Q  Do you think you read at least
22  three-quarters of the contract?

114

1      MR. CRAWFORD:  Objection.  Asked and
2  answered.  Objection, vague.
3    A  I doubt I've read --
4      MR. CRAWFORD:  Objection, foundation.
5    A  I doubt I've read three quarters of that
6  contract.
7    Q  Do you think you read at least half of that
8  contract?
9      MR. CRAWFORD:  Objection, asked and
10  answered.  Objection, vague.  Objection, burdensome.
11    A  I don't know.
12    Q  Is it possible you did?
13      MR. CRAWFORD:  Objection, asked and
14  answered.  Objection, vague, burdensome.
15    A  I just don't know how much of it I read.
16    Q  So it is possible that you have not read
17  half of the provisions of the standard contract,
18  correct, sir?
19      MR. CRAWFORD:  Objection, argumentative.
20  Objection, asked and answered.  Objection, vague,
21  burdensome.
22    A  Possible.

115

1    Q  Is it possible that you've read less than a
2  quarter of the provisions, sir?
3      MR. CRAWFORD:  Objection, argumentative,
4  burdensome.  Objection, asked and answered.
5    A  I don't know.
6    Q  So it is possible that you, in your years
7  at the Department of Energy or before, have read
8  personally less than 25 percent of the provisions of
9  the standard contract, correct?
10      MR. CRAWFORD:  Objection:  Objection,
11  Objection, foundation.  Objection, asked and answered.
12    A  I probably read more than a quarter of it.
13    Q  Are you certain?
14      MR. CRAWFORD:  Objection, argumentative.
15    Q  Are you certain?
16      MR. CRAWFORD:  Objection, argumentative.
17    A  No, I'm not certain.
18    Q  I would like to return to paragraph three
19  on the top of page seven.  Have you had a chance to
20  read that?
21    A  Yes.
22    Q  Can you explain that objective to me?

116

1    A  That was an objective, okay, to receive
2  waste in 1998 and along with the acceptance schedule
3  it's -- in accordance with the acceptance schedule
4  provided in the standard contract, okay.  So that was
5  the goal.
6    Q  And you're comfortable with that goal?
7      MR. CRAWFORD:  Objection.
8    A  It wasn't mine.  It wasn't my goal.
9    Q  But you understand that was a goal of the
10  program?
11    A  Yeah.
12    Q  In 1985, correct?
13    A  That's correct.
14    Q  And what acceptance schedule did the
15  standard disposal contract provide for?
16      MR. CRAWFORD:  Objection, foundation.
17  Objection to the extent it calls for speculation.
18    A  I think the contract references other
19  documents that references things, and I don't
20  specifically know.
21    Q  So is it your testimony that it provided
22  for a schedule but you don't sitting here today know

Case 1:04-cv-00074-ECH   Document 286-3   Filed 06/04/06   Page 7 of 28
DEPOSITION OF LAKE H. BARRETT, VOLUME I
CONDUCTED ON MONDAY, APRIL 22, 2002

30 (Pages 117 to 120)

---

117

1  what that schedule is?
2      MR. CRAWFORD: Objection. Argumentative.
3      A  The receipt rate of January -- excuse me,
4  the receipt date of January 31, 1998, clearly was
5  always a goal. Okay. Regarding the acceptance rate
6  of so many tons year one, year two, year three, okay,
7  you know, that has changed over time. My focus has
8  always been to create a siting process that got us a
9  site to allow us to have the -- a reasonable receipt
10 rate going toward the steady state 3,000 tons per
11 year, and that's where my focus has always been, not
12 on contract details. Okay. I am not a lawyer, I'm an
13 engineer, okay, so I have not gone into the contract
14 in any great detail at all.
15     Okay, now regarding your question here
16 about the acceptance schedule in the contract,
17 actually I don't recall seeing a metric ton per year
18 in the contract.
19     Q  Let me step back a second, Mr. Barrett.
20 You just referred to a reasonable receipt rate going
21 toward the steady state 3,000 tons per year.
22     A  Right.

---

118

1      Q  "That's where my focus has always been."
2  Do you recall that testimony?
3      A  That's what I just said I think.
4      Q  Does that continue to be your focus to this
5  very day, sir?
6      A  Yes.
7      Q  And does that continue to be the focus of
8  the Department of Energy's spent nuclear fuel program?
9      MR. CRAWFORD: Objection to the form.
10 Objection to the foundation. Objection, vague.
11     A  We are still trying to perform under the
12 Nuclear Waste Policy Act to receive the waste into the
13 federal system as soon as we can under the constraints
14 of the law. So, yes, that remains my goal and the
15 organization's goal.
16     Q  Again, just so the record is clear, your
17 goal and the organization's goal is to achieve a
18 reasonable receipt rate going towards the steady state
19 of 3,000 tons per year, correct?
20     MR. CRAWFORD: Objection to the extent it
21 mischaracterizes prior testimony. Objection,
22 foundation. Objection, vague.

---

119

1      A  That has been our goal to do that.
2      Q  And it continues to be your goal today,
3  correct?
4      A  Correct.
5      Q  And it was your goal in 1985, correct?
6      A  Correct.
7      Q  And it was the goal of the department in
8  1982 when the standard contracts were signed, correct?
9      MR. CRAWFORD: Objection, vague.
10 Objection, calls for speculation. Objection to the
11 extent it mischaracterizes his prior testimony.
12     A  I wasn't there in '82 so I don't know about
13 '82, but in '85 and today it has always been our
14 intent to try to do what we can from a technical point
15 of view to receive the materials at a reasonable rate.
16     Q  And the reasonable rate is the rate that
17 would ramp up -- is a rate that would ramp up towards
18 3,000 MTUs per year, correct?
19     MR. CRAWFORD: Objection, vague. And
20 foundation.
21     Q  I believe your counsel cut you off. What
22 was your answer, sir?

---

120

1      A  That has been our intent.
2      Q  Let's go back to paragraph three, page
3  seven. You referred to January 31st, 1998, as being a
4  goal. Was it something more, wasn't it a contractual
5  commitment and a statutory command?
6      MR. CRAWFORD: Objection, argumentative.
7  Objection, best evidence. Objection to the extent it
8  calls for a legal conclusion.
9      A  As an engineer, okay, and as a program
10 administrator, okay, and dependent on what the
11 contract said or what courts said, we were always
12 trying to achieve that goal.
13     Q  And why did you establish that goal for
14 yourself?
15     A  Because --
16     Q  And your department?
17     A  It was set in the law, okay, that our goal
18 was to try to create a facility and to create a system
19 that would meet that goal of January 31st, 1998, to
20 start to receive fuel. And it has always been an
21 important objective and goal.
22     Q  To start to receive fuel on January 31st,

---

# Plaintiff

149

1    MR. CRAWFORD: Objection. Lack of
2 foundation.
3    Q  You see B, the waste receipt rate?
4    A  Uh-huh.

5    Q  Are you familiar with the basis for the
6 3,000 MTU per year receipt rate in 1985?
7    MR. CRAWFORD: Objection, asked and
8 answered. Objection, foundation.
9    A  I'm familiar with it. It was established
10 before my arrival or personal participation in
11 establishing that number. It seemed like a reasonable
12 number to me then as it does today.
13    Q  Has there ever been a time since you've
14 been at the Department of Energy that a 3,000 MTU per
15 year rate did not seem reasonable?
16    MR. CRAWFORD: Objection, vague.
17 Objection, asked and answered. Objection, lack of
18 foundation.
19    A  As this is used in this case, as an
20 assumption for an operating facility rate and
21 capacity, it was a reasonable number.
22    Q  In C, do I understand this correctly that

150

1 after two years the MRS would have been operating at
2 full -- at the full acceptance rate?
3    MR. CRAWFORD: Objection, vague.
4    A  That's what it says. I never thought it
5 was that fast, but that's what it says.
6    Q  Do you have any basis to disagree with the
7 statement in C?
8    A  I think going from zero to 3,000 in a
9 two-year period is extremely challenging and
10 questionable to go that fast.
11    Q  Do you believe that the individuals in the
12 Office of Civilian Radioactive Waste Management
13 program were careless in establishing this two-year
14 ramp-up period?
15    MR. CRAWFORD: Objection, foundation.
16 Objection, speculation.
17    A  I don't believe they were careless at all.
18 I believe that's overaggressive in my judgment based
19 on what history has shown us how difficult nuclear
20 facility creation implementation is.
21    Q  Would you believe it to be overly
22 aggressive in 1985?

151

1    MR. CRAWFORD: Objection, foundation.
2    A  I don't think I ever really tuned in on it.
3    Q  Did you ever have discussions with anyone
4 in your office concerning the reasonableness of the
5 two-year ramp-up period?
6    A  Not that I recall.
7    Q  Who would have made the final decision in
8 your office to authorize the two-year ramp-up period?
9    MR. CRAWFORD: Objection, vague.
10 Objection, foundation.
11    A  That would have been Roger Hilley who is
12 responsible for that office.
13    Q  Do you believe he was a competent
14 individual?
15    A  Yes, I do.
16    Q  Do you believe he had good professional
17 judgment?
18    MR. CRAWFORD: Objection, foundation.
19    A  As a senior manager, yes.
20    Q  Did you find him to be overly aggressive in
21 his administration of the program?
22    MR. CRAWFORD: Objection, foundation.

152

1 Objection, vague.
2    A  No.
3    Q  Can you turn your attention to page 26.
4 You see page 26 consists of a chart. Would you take a
5 moment to refresh your recollection concerning its
6 contents.
7    A  Okay.
8    Q  Are you familiar with this chart?
9    A  Vaguely.
10    Q  Have you seen the column labeled Spent
11 Fuel, the fourth column to the right?
12    A  There's four, four, four, four, nine, 18?
13    Q  Right.
14    A  Yeah.
15    Q  Are you familiar with the basis for the
16 projection that the ramp-up would go from 400 to 900
17 at the third year?
18    A  I'm sorry, repeat the question.
19    Q  Are you familiar with the basis, technical
20 or otherwise, for the determination that the
21 acceptance rate would ramp up from 400 to 900 between
22 the third and the fourth year of the acceptance of the

# Defendant

Case 1:04-cv-00074-ECH Document 286-3 Filed 06/04/06 Page 11 of 28
DEPOSITION OF LAKE H. BARRETT, VOLUME I
CONDUCTED ON MONDAY, APRIL 22, 2002

38 (Pages 149 to 152)

149

1     MR. CRAWFORD: Objection. Lack of
2 foundation.
3     Q You see B, the waste receipt rate?
4     A Uh-huh.
5     Q Are you familiar with the basis for the
6 3,000 MTU per year receipt rate in 1985?
7     MR. CRAWFORD: Objection, asked and
8 answered. Objection, foundation.
9     A I'm familiar with it. It was established
10 before my arrival or personal participation in
11 establishing that number. It seemed like a reasonable
12 number to me then as it does today.
13     Q Has there ever been a time since you've
14 been at the Department of Energy that a 3,000 MTU per
15 year rate did not seem reasonable?
16     MR. CRAWFORD: Objection, vague.
17 Objection, asked and answered. Objection, lack of
18 foundation.
19     A As this is used in this case, as an
20 assumption for an operating facility rate and
21 capacity, it was a reasonable number.
22     Q In C, do I understand this correctly that

150

1 after two years the MRS would have been operating at
2 full -- at the full acceptance rate?
3     MR. CRAWFORD: Objection, vague.
4     A That's what it says. I never thought it
5 was that fast, but that's what it says.
6     Q Do you have any basis to disagree with the
7 statement in C?
8     A I think going from zero to 3,000 in a
9 two-year period is extremely challenging and
10 questionable to go that fast.
11     Q Do you believe that the individuals in the
12 Office of Civilian Radioactive Waste Management
13 program were careless in establishing this two-year
14 ramp-up period?
15     MR. CRAWFORD: Objection, foundation.
16 Objection, speculation.
17     A I don't believe they were careless at all.
18 I believe that's overaggressive in my judgment based
19 on what history has shown us how difficult nuclear
20 facility creation implementation is.
21     Q Would you believe it to be overly
22 aggressive in 1985?

151

1     MR. CRAWFORD: Objection, foundation.
2     A I don't think I ever really tuned in on it.
3     Q Did you ever have discussions with anyone
4 in your office concerning the reasonableness of the
5 two-year ramp-up period?
6     A Not that I recall.
7     Q Who would have made the final decision in
8 your office to authorize the two-year ramp-up period?
9     MR. CRAWFORD: Objection, vague.
10 Objection, foundation.
11     A That would have been Roger Hilley who is
12 responsible for that office.
13     Q Do you believe he was a competent
14 individual?
15     A Yes, I do.
16     Q Do you believe he had good professional
17 judgment?
18     MR. CRAWFORD: Objection, foundation.
19     A As a senior manager, yes.
20     Q Did you find him to be overly aggressive in
21 his administration of the program?
22     MR. CRAWFORD: Objection, foundation.

152

1 Objection, vague.
2     A No.
3     Q Can you turn your attention to page 26.
4 You see page 26 consists of a chart. Would you take a
5 moment to refresh your recollection concerning its
6 contents.
7     A Okay.
8     Q Are you familiar with this chart?
9     A Vaguely.
10     Q Have you seen the column labeled Spent
11 Fuel, the fourth column to the right?
12     A There's four, four, four, four, nine, 18?
13     Q Right.
14     A Yeah.
15     Q Are you familiar with the basis for the
16 projection that the ramp-up would go from 400 to 900
17 at the third year?
18     A I'm sorry, repeat the question.
19     Q Are you familiar with the basis, technical
20 or otherwise, for the determination that the
21 acceptance rate would ramp up from 400 to 900 between
22 the third and the fourth year of the acceptance of the

# Plaintiff

00196

1   A  Positions by decision group, current

2 status?

3   Q  Yes.  You see under Decisions Group it has

4 aggregate acceptance, the first entry, system study on

5 technical basis under review confirms 3,000 MTU per

6 year?

7   A  I see it.

8   Q  That's consistent with your testimony

9 today, correct, that --

10     MR. CRAWFORD:  Objection.

11     MR. CAYNE:  Could I finish, counsel.

12     MR. CRAWFORD:  Sorry.

13   Q  That's consistent with your testimony today

14 that in 1986 your office was projecting a 3,000 MTU

15 per year acceptance rate, correct?

16     MR. CRAWFORD:  Objection, vague.

17   A  Seems consistent.

18   Q  Do you know what the, or are you familiar

19 with the system study that is being referred to in

20 this entry?

21   A  Not the specific one.

22   Q  Do you have a general understanding of the

OF LAKE H. BARRETT, VOLUME I
CONDUCTED ON MONDAY, APRIL 20, 2002
Case 1:04-cv-00074-ECH   Document 286-3   Filed 06/04/08   Page 14 of 28

50 (Pages 197 to 200)

197

1  system study being referred to here?
2      MR. CRAWFORD: Objection. Asked and
3  answered.
4      A  There were various studies done in the
5  eighties and also in the very early nineties on system
6  performance rate, you know, what the costs were,
7  schedules were, plausibility of them.
8      Q  And these system studies looked at system
9  issues, correct?
10     A  Yes.
11     Q  And am I correct that each one of these
12 studies to which you've just referred confirmed an
13 acceptance rate, an aggregate acceptance rate of 3,000
14 MTU per year?
15     MR. CRAWFORD: Well, objection, vague.
16     A  I think it's overstated to say it confirmed
17 it. It showed that, you know, at 2,000 it does this,
18 at 3,000 it does that, 4,000 it does something
19 different. I don't know if they actually reached an
20 absolute confirmation that 3,000 was the exact number,
21 but generally they supported the system rate of 3,000
22 was a reasonable rate.

198

1      Q  So it's your understanding or your
2  knowledge that each of the various system studies to
3  which you just referred that were undertaken in the --
4  from the mid-1980s to I think you said the mid-1990s,
5  supported an acceptance rate of 3,000 MTU per year,
6  correct?
7      MR. CRAWFORD: Objection, vague.
8  Objection, assumes facts not in evidence. Objection,
9  mischaracterizes prior testimony.
10     A  Yes.
11     Q  I'll ask you to turn to page HQ 0002909 of
12 this same exhibit.
13     A  Okay.
14     Q  Do you see under the second entry,
15 allocation of acceptance under consequences of
16 decisions, it says "allocation required to plan
17 maximum storage at some sites." Do you see that
18 statement?
19     A  I see it.
20     Q  Do you understand that statement?
21     A  No.
22     Q  Do you understand that statement to refer

199

1  to the need of the utilities to have significant
2  advanced knowledge of the allocation rankings in order
3  to store the fuel in the most efficient manner?
4      MR. CRAWFORD: Objection, speculation.
5  Objection to the extent it assumes facts not in
6  evidence. Objection to the foundation.
7      A  Could be. I don't know.
8      Q  Do you have any knowledge of the
9  considerations that utilities undertake in attempting
10 to maximize their storage capacity, their existing
11 storage capacity?
12     A  Yes.
13     Q  And what considerations are necessary to be
14 undertaken by a utility to do that?
15     A  Safety considerations, economic
16 considerations, future site use and decommissioning
17 schedules, all sorts of issues a utility needs to
18 consider to make decisions about how best to store the
19 fuel.
20     Q  And is one of the issues they need
21 knowledge about the priority queue?
22     A  The likely --

200

1      MR. CRAWFORD: Objection, foundation.
2      A  The likely removal time for the Department
3  of Energy is an important part of that consideration.
4      Q  So the failure to provide the utility with
5  that information could cost the utility to store fuel
6  in a less than optimal manner, correct?
7      MR. CRAWFORD: Objection, speculation.
8  Objection, foundation. Objection to the extent it
9  assumes facts not in evidence.
10     A  The removal date would be the important
11 thing to the utility planner regarding where you are
12 in your allocation as a subset. The most important
13 part is the when will the federal facility be capable
14 to receive material. So the allocation to me is a
15 secondary issue compared to the rate of development of
16 receiving facility, which is the primary
17 consideration.
18     Q  You said the most important part. The most
19 important part to what?
20     A  For a utility deciding what they should do
21 with their storage. The most important -- one of the
22 more important aspects of a utility decision will be

DEPOSITION OF LAKE H. BARRETT, VOLUME I
CONDUCTED ON MONDAY, APRIL 22, 2002
Case 1:04-cv-00074-ECH Document 28-3 Filed 06/04/06 Page 15 of 28

68 (Pages 269 to 272)

269

**ACKNOWLEDGMENT OF DEPONENT**

2    I, Lake H. Barrett, do hereby acknowledge that I

3    have read and examined the foregoing testimony, and

4    the same is a true, correct and complete transcription

5    of the testimony given by me and any corrections

6    appear on the attached Errata sheet signed by me.

7

8    6/27/02

9    (DATE)        (SIGNATURE)

10

11

12

13

14

15

16

17

18

19

20

21

22

271

**ERRATA SHEET**

2    IN RE: YANKEE ATOMIC v. UNITED STATES

3    RETURN BY: _____

4    PAGE  LINE  CORRECTION AND REASON

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22    (DATE)      (SIGNATURE)

270

**CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC**

1    I, Diane Gomez, Registered Professional Reporter,

3    the officer before whom the foregoing proceedings were

4    taken, do hereby certify that the foregoing transcript

5    is a true and correct record of the proceedings; that

6    said proceedings were taken by me stenographically and

7    thereafter reduced to typewriting under my

8    supervision; and that I am neither counsel for,

9    related to, nor employed by any of the parties to this

10    case and have no interest, financial or otherwise, in

11    its outcome.

12    IN WITNESS WHEREOF, I have hereunto set my hand

13    and affixed my notarial seal this 25th day of April,

14    2002.

15    My commission expires:

16    June 14, 2005

17

18

19    _____

20    NOTARY PUBLIC IN AND FOR

21    THE DISTRICT OF COLUMBIA

272

**ERRATA SHEET CONTINUED**

2    IN RE: YANKEE ATOMIC v. UNITED STATES

3    RETURN BY: _____

4    PAGE  LINE  CORRECTION AND REASON

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22    (DATE)      (SIGNATURE)

271

1          E R R A T A    S H E E T

2      IN RE:  YANKEE ATOMIC v. UNITED STATES

3   RETURN BY: _____ MAY 2 7 2002 _____

4   PAGE      LINE      CORRECTION AND REASON

5   16/       14        they → there

6   ____      ____      _____

7   ____      ____      _____

8   ____      ____      _____

9   ____      ____      _____

10  ____      ____      _____

11  ____      ____      _____

12  ____      ____      _____

13  ____      ____      _____

14  ____      ____      _____

15  ____      ____      _____

16  ____      ____      _____

17  ____      ____      _____

18  ____      ____      _____

19  ____      ____      _____

20  ____      ____      _____

21  6/25/02                        _____

22    (DATE)                          (SIGNATURE)

# Defendant

Case 1:04-cv-000[illegible]PEOSITION OF [illegible]RETRIEVE[illegible]08/04/06 Page 18 of 28
CONDUCTED ON MONDAY, APRIL 22, 2002

61 (Pages 241 to 244)

241

1    Energy recommended it, but go ahead.
2         Q   And it was this linkage that caused the
3    ultimate failure of the MRS proposal, correct?
4         MR. CRAWFORD: Objection to the extent it
5    calls for speculation. Objection to the foundation.
6         A   No.
7         Q   It hindered the continuation of the MRS
8    proposal, correct?
9         MR. CRAWFORD: Objection. Same objections.
10        A   No. I don't think so. Let me rephrase it.
11   I don't think so.
12        Q   I thought you testified this morning that
13   the congressional enactment in 1987 was a large reason
14   why the MRS proposal never was implemented. Is that
15   not correct?
16        A   That is correct.
17        Q   And you indicated that this is similar to
18   one of the linkages Congress enacted, this being the
19   linkage referred to on page 58 of Exhibit 8?
20        A   No.
21        Q   I'm sorry. No, you did not say --
22        A   I'm answering your question no.

242

1         Q   Okay. I misheard you then. I thought you
2    testified this linkage was similar to what
3    Congress enacted?
4         A   Yes.
5         Q   You did testify to that?
6         A   Yes.
7         Q   And did this linkage have an effect on the
8    ability to proceed with the MRS proposal?
9         A   In a minor way.
10        Q   And what was that?
11        A   It limited the usefulness, but it was
12   almost immaterial in the change in '94.
13        Q   Was there another linkage that had a more
14   adverse effect on the program?
15        A   Not a linkage.
16        Q   What resulted in the failure to proceed
17   with the MRS program?
18        A   Failure to --
19        MR. CRAWFORD: Objection, asked and
20   answered.
21        A   Failure to give the grants to the Indian
22   tribes who wanted to pursue a proposal.

243

1         Q   Had Congress enacted the grants that you
2    just referred to in 1984, when would an MRS facility
3    have been able to commence operations?
4         MR. CRAWFORD: Objection to the extent it
5    calls for speculation.
6         A   There were no grants in '84.
7         Q   In '94?
8         A   Now rephrase your question.
9         Q   With respect to the grants that you
10   referenced a few moments ago that Congress failed to
11   enact in 1994, I'm asking you to assume that those
12   grants had in fact been authorized. Had those grants
13   been authorized in 1994, when could an MRS have
14   commenced operations?
15        MR. CRAWFORD: Objection to the extent it
16   calls for speculation.
17        A   It was still possible to do it in '98, and
18   that was my testimony in the spring of '93.
19        Q   Your testimony to Congress?
20        A   Yes.
21        Q   And did that testimony give consideration
22   to the linkages in the 1987 legislation?

244

1         A   I believe it did.
2         Q   And taking into account the linkages
3    imposed by the '87 legislation. it's your testimony
4    that if Congress had enacted -- authorized the grants
5    in 1994 the MRS would have. could have commenced
6    operations by January 31st. 1998. correct?
7         MR. CRAWFORD: Objection to the foundation.
8         A   I go back here on these things. I think
9    what had to happen was I think they had to change the
10   linkages in the proposal, which is what the plan was
11   with the Mescaleros and the Goshoots, was that they
12   would propose the change to the linkages. So I think
13   the linkages had to be modified for performance in
14   '98. The plan was to do that in the proposal to
15   Congress because it would take Congress to act on it.
16   So the linkages may have had to change. I would have
17   to go back and look at what the linkages were which I
18   don't recall now.
19        Q   So your best recollection is that the 1994
20   proposal to which you referred would have required two
21   things, that certain grants be authorized and that the
22   linkages enacted in 1987 be amended or repealed?

DEPOSITION OF LAKE H. BARRETT, VOLUME I
Case 1:04-cv-00047... Document 286-3 Filed 05/04/06 Page 19 of 28
CONDUCTED ON MONDAY, APRIL 22, 2002

62 (Pages 245 to 248)

**245**

1     A  Yes. And that was the -- that was the
2 plan. In calendar '93, in the FY '94 budget proposal,
3 that the Indian nations would present a proposal that
4 would change the linkages and be able to operate in
5 1998. And the denial of Congress to develop those
6 proposals led to -- and there was no chance of
7 modifying the linkages nor getting the site in any
8 practical sense was -- led to the inability or the
9 unlikelihood of meeting the '98 date.
10     Q  But it was your view, am I correct, in 1993
11 that had Congress acted differently, had Congress
12 authorized the grants, had Congress repealed the
13 linkages, then the MRS facility could have commenced
14 operations on or before January 31st, 1998, correct?
15     A  Correct. That's my recollection.
16     MR. CRAWFORD: Let's take a break.
17     MR. CAYNE: Sure.
18     (There is a recess from the record.)
19     (Deposition Exhibit Barrett 9 was marked
20 for identification and was retained by counsel.)
21     Q  Mr. Barrett, going back to our previous
22 line of discussion, do you recall that you testified

**246**

1 that the linkages to which we were referring would
2 have had very little effect on the ultimate failure of
3 the MRS proposal? Do you recall that?
4     A  Yes.
5     MR. CRAWFORD: Objection.
6     Q  To the extent you've refreshed your
7 recollection on that proposal and the implications of
8 the linkages, would you want to amend in any way that
9 answer?
10     A  Refresh me on the two linkages.
11     Q  Well, the linkage that I was referring to
12 was the linkage that was proposed in the DOE report.
13     A  I never knew DOE ever proposed a linkage,
14 but the linkage -- the linkages in my mind are the
15 ones in Congress. There's two of them.
16     Q  I will hand them to you, sir.
17     A  And then we'll come back and clear this --
18 well, we'll come back to this since your question is
19 on those linkages, though.
20     (Deposition Exhibits Barrett 10 and Barrett
21 11 were marked for identification and were retained by
22 counsel.)

**247**

1     Q  Mr. Barrett, you've been handed two
2 additional exhibits marked for identification as
3 Exhibit 10, which is a copy of Section 10165 of Title
4 42 and Exhibit 11, which is a copy of Section 10168
5 also Title 42. Do you have those two before you?
6     A  Yes.
7     Q  And I understand you're reviewing these
8 copies of the statutes now to refresh your
9 recollection on the linkages about which you've
10 testified?
11     A  Correct.
12     MR. CRAWFORD: It might help if you would
13 direct him to some part of it.
14     A  On ten?
15     Q  Yes.
16     A  The linkage is B, the secretary may not
17 select the site under subsection A until the secretary
18 recommends a repository.
19     Q  Okay.
20     A  That in a -- and the reason I said that the
21 failure of the grants was the primary reason why we
22 would not do it was the proposal to Congress would be

**248**

1 the Indian nation in that case proposing to be the
2 site, volunteering to be the site which would negate
3 the secretary selecting a site. So the lack of a
4 volunteer, you know, agreed to by Congress was more
5 important than this limitation B.
6     Q  Could I also ask you to look at section
7 little d of Exhibit 11.
8     A  Yeah, I was doing ten and then we'll do --
9 so that's ten.
10     And the concept in the proposal would be to
11 modify this linkage as well. If the --
12     Q  This linkage being sub (d)?
13     A  Sub (d), correct.
14     Q  Of 11?
15     A  D of 11, would be to modify these as well,
16 at least -- (d)(1) would be that they would propose to
17 change the one that they could start construction
18 prior to construction authorization for the repository
19 but (d)(2) would remain.
20     Q  What about (d)(3)?
21     A  (D)(3) would remain.
22     Q  With the 10,000 limit?

Case 1:04-cv-00074-ECH Document 286-3 Filed 06/04/06 Page 20 of 28
DEPOSITION OF LAKE BARRETT, VOLUME 1
CONDUCTED ON MONDAY, APRIL 22, 2002

63 (Pages 249 to 252)

249

1     A Right. And (d)(4) would remain. And they
2 were not limiting as to starting in '98. But (d)(1)
3 of Exhibit 11 would be modified by the proposal as
4 would B of Exhibit 10. This was in a proposal to
5 Congress by the Native American nations that would
6 volunteer. But there was never any indication to my
7 recollection that they would change the mass limits of
8 Exhibit 11 (d)(2), (3) and (4). That was the premise
9 that we were working on circa '93 for the proposal.
10     So I answered the primary reason for the
11 ability to meet the '98 date in early '93 was a
12 proposal to modify those two linkages. So in my mind
13 in my original answer was the lack of -- the
14 congressional refusal to go forward with those
15 proposals was the primary reason that the MRS was not
16 available in 1998. Not the linkages per se. Because
17 if we had a volunteer, in my judgment, those linkages
18 would have been modified by Congress if it was
19 acceptable to the volunteer host.
20     Q But without modifying linkages that you've
21 identified, the proposal could not have gone forward,
22 correct?

250

1     A Without -- these linkages prevent us from
2 going forward without a volunteer to change the
3 linkage.
4     Q And linkage (d)(1) in Exhibit 11 is
5 similar, is it not, to the linkage proposed by the
6 Department of Energy in the last Exhibit 9 that we
7 were referring to a few moments ago?
8     MR. CRAWFORD: Objection, vague.
9 Objection, foundation, and objection to assumes facts
10 not in evidence.
11     A The proposal from the Department of Energy
12 that's in one of these things here which I guess would
13 have been 9. You tell me where it was because that's
14 where we started.
15     Q I'm sorry. Exhibit 8.
16     MR. CRAWFORD: The last paragraph or last
17 section.
18     A 58?
19     Q Yes.
20     A I was unaware, and I don't know if this is
21 really true or not, that he did this, although it says
22 it here, that the Department of Energy proposed that.

251

1 The working hypothesis that I had in '93, because I
2 was not intimately involved in the policy aspects in
3 the eighties, was that this was imposed by Congress,
4 which it was.
5     Q This being?
6     A The linkage that you could not -- that the
7 MRS could not start receiving fuel. This was
8 congressionally imposed. There's no number of volumes
9 in here in the DOE -- I didn't know DOE had proposed
10 anything to Congress regarding linkages. I was aware
11 that they had dialogues about a concern that the MRS
12 be -- appear to be a replacement for the repository
13 and that there needed to be ties. I did not know the
14 department went so far as to make a congressional
15 recommendation.
16     Q You believe that they made that
17 recommendation to make it even clearer that the MRS
18 was not a replacement for the repository?
19     MR. CRAWFORD: Objection to the foundation.
20 Objection to speculation.
21     A I don't know. I don't know what those who
22 did this at that time did or didn't do. I was not in

252

1 a policy role in the 1980s.
2     Q So prior to today you were not aware,
3 Mr. Barrett, that the Department of Energy had made
4 any proposals to Congress with respect to the linkages
5 we have been discussing, correct?
6     A That's correct.
7     Q And sitting here today you do not know why
8 the Department of Energy made the proposal with
9 respect to the linkage, the proposed linkage
10 referenced on page 58 of Exhibit 8, correct?
11     A I do not know.
12     Q So my question is correct, yes?
13     MR. CRAWFORD: Objection. Asked and
14 answered.
15     A State your question again.
16     Q I just want the record to be clear, sir.
17     A Well, state your question again. Let's see
18 if I can try to give a yes or no.
19     Q And sitting here today you do not know why
20 the Department of Energy made the proposal with
21 reference to the linkage, the proposed linkage
22 referenced on page 58 of Exhibit 8, correct?

# Defendant

DEPOSITION OF LAKE H. BARRETT, VOLUME 2
CONDUCTED ON TUESDAY, APRIL 23, 2002

1 (Pages 273 to 276)

273

1    IN THE UNITED STATES COURT OF FEDERAL CLAIMS
2    - - - - - - - - - - - - - - - - x
3    YANKEE ATOMIC ELECTRIC COMPANY;   : Case Nos. 98-126C.
4    CONNECTICUT YANKEE ATOMIC POWER   : 98-154C, 98-474C.
5    COMPANY; MAINE YANKEE ATOMIC       : 98-483C, 98-484C,
6    POWER COMPANY; FLORIDA POWER &     : 98-485C, 98-486C,
7    LIGHT COMPANY; NORTHERN STATES     : 98-488C, 98-614C,
8    POWER COMPANY; DUKE POWER, a        : 98-621C, 99-447C.
9    Division of DUKE ENERGY CORP.;     : 00-440C, 00-695C.
10   INDIANA MICHIGAN POWER COMPANY;    : 00-703C, 01-115C.
11   SACRAMENTO MUNICIPAL UTILITY       : 01-116C, 01-249C
12   - - - - - - - - - - - - - - - - x
13   (Caption continued on next page)
14
15       Continued Deposition of LAKE H. BARRETT
16              Washington, D. C.
17           Tuesday, April 23, 2002
18                9:36 a.m.
19
20   Job No.: 11792-5
21   Pages 273 through 526, Volume 2
22   Reported by: Diane Gomez, RPR

274

1    DISTRICT; SOUTHERN NUCLEAR         :
2    OPERATING COMPANY, et al.;         :
3    COMMONWEALTH EDISON COMPANY;       :
4    BOSTON EDISON COMPANY; GPU          :
5    NUCLEAR, INCORPORATED; WISCONSIN   :
6    ELECTRIC POWER COMPANY; POWER      :
7    AUTHORITY OF THE STATE OF NEW      :
8    YORK; OMAHA PUBLIC POWER DISTRICT;:
9    NEBRASKA PUBLIC POWER DISTRICT;    :
10   and TENNESSEE VALLEY AUTHORITY,    :
11              Plaintiffs              :
12   v.                                 :
13   THE UNITED STATES,                 :
14              Defendant               :
15   - - - - - - - - - - - - - - - - X
16
17
18
19
20
21
22

275

1       Continued Deposition of LAKE H. BARRETT, held
2    at the offices of:
3
4       ARNOLD & PORTER
5       555 12th Street, Northwest
6       Washington, D. C. 20004
7       (202) 942-5000
8
9
10
11
12
13       Pursuant to agreement, before Diane Gomez,
14   Registered Professional Reporter and Notary Public in
15   and for the District of Columbia.
16
17
18
19
20
21
22

276

1           A P P E A R A N C E S
2    ON BEHALF OF PLAINTIFFS FLORIDA POWER & LIGHT
3    COMPANY, NORTHERN STATES POWER COMPANY, DUKE
4    POWER, INDIANA MICHIGAN POWER COMPANY, BOSTON
5    EDISON COMPANY, GPU NUCLEAR, INC., POWER AUTHORITY
6    OF THE STATE OF NEW YORK, OMAHA PUBLIC POWER
7    DISTRICT, and NEBRASKA PUBLIC POWER DISTRICT:
8       DEVON E. HEWITT, ESQUIRE
9       SHAW PITTMAN LLP
10      1650 Tysons Boulevard
11      McLean, Virginia 22102-4859
12      (703) 893-0527
13
14   ON BEHALF OF PLAINTIFF SACRAMENTO MUNICIPAL
15   UTILITY DISTRICT:
16      JEFFREY L. HANDWERKER, ESQUIRE
17      HOWARD CAYNE, ESQUIRE
18      RONALD A. SCHECHTER, ESQUIRE
19      ARNOLD & PORTER
20      555 12th Street, Northwest
21      Washington, D. C. 20004-1206
22      (202) 942-5000

Case 1:04-cv-00074-ECH Document 286-3 Filed 06/04/06 Page 23 of 28
DEPOSITION OF LAKE H. BARRETT, VOLUME 2
CONDUCTED ON TUESDAY, APRIL 23, 2002

39 (Pages 425 to 428)

425

1  consternation about what constitutes an emergency. So
2  neither of those in my recollection did I consider
3  practical. And we didn't pursue them.
4      Q  What did you mean by that last statement,
5  "The MRS review commission recommendations are viewed
6  as an interim solution to a problem that requires
7  long-range planning and thought"?
8      A  That their recommendations didn't make any
9  sense but we were being nice about it.
10     (Deposition Exhibit Barrett 17 was marked
11  for identification and was retained by counsel.)
12     Q  The court reporter has handed you,
13  Mr. Barrett, a document marked for identification as
14  Exhibit 17, which is encaptioned Nuclear Waste. Is
15  there a need for federal interim storage by the U.S.
16  monitored retrievable storage review commission?
17  November '89, bearing Bates numbers PA-172230 through
18  PA-172270. Do you have that document before you?
19     A  Yes.
20     Q  And let me tell you that this document is
21  an excerpt from the entire -- of the entire report
22  issued by the U.S. monitored retrievable storage

427

1  for an MRS to be operational more than three years
2  before the repository." Do you see that statement?
3      A  Yes.
4      Q  Do you agree with that statement?
5      MR. CRAWFORD: Objection. Asked and
6  answered.
7      A  In general, yes.
8      Q  Do you agree with it as stated here to be
9  accurate and correct?
10     A  It's a judgment call.
11     MR. CRAWFORD: Same objection.
12     A  I don't disagree with it -- I don't
13  disagree with that statement.
14     (Deposition Exhibit Barrett 18 was marked
15  for identification and was retained by counsel.)
16     Q  Mr. Barrett, the court reporter has handed
17  you a document marked for identification as Exhibit
18  18. Do you have that before you?
19     A  Yes.
20     Q  This document is the report to Congress on
21  reassessment of the civilian radioactive waste
22  management program dated November 1989 issued by the

426

1  review commission.
2      Did you ever have an opportunity to review
3  this document in the course of the performance of your
4  duties as an official at the Department of Energy?
5      A  I believe so.
6      Q  Let me turn your attention to page bearing
7  Bates number PA-172244.
8      A  Okay.
9      Q  I'd like to ask you to read the passage,
10  the paragraph that begins at the very bottom of the
11  left-hand column of that page starting, "However, the
12  schedule linkage." Do you see that?
13     A  Yes.
14     Q  Could you read that paragraph up to
15  including number five.
16     A  I've read that.
17     Q  Okay. Let me ask you to focus your
18  attention to the first statement of that section,
19  specifically, "However, the schedule linkage presently
20  in the NWPAA (MRS construction may not begin until the
21  Nuclear Regulatory Commission issues a license with a
22  construction of a repository) would make it impossible

428

1  U.S. Department of Energy, Office of Civilian
2  Radioactive Waste Management bearing Bates numbers
3  PA-163156 through PA-163188. Did you have any role in
4  the preparation of this report?
5      A  I think so.
6      Q  What was your role, Mr. Barrett?
7      A  I don't specifically remember the details.
8  I remember we did this. This was part of Admiral
9  Watkins', you know, review of this. So I know I was
10  involved in it. I don't remember what my title was
11  then. I was one of the acting office directors. Not
12  the entire program office but one of them.
13     Q  Do you know whether you would have been a
14  drafter or a reviewer of this document?
15     A  I did not draft it. I was a reviewer. I
16  was a participant in its generation and development.
17     Q  In your position would you have been
18  required to approve of or sign off on this document
19  prior to its final issuance?
20     A  I don't remember if I signed this or not.
21     Q  You might have?
22     A  I might have. I wasn't the final, because

Case 1:04-cv-00074-ECH   Document 286-3   Filed 06/04/06   Page 24 of 28
DEPOSITION OF LAKE H. BARRETT, VOLUME 2
CONDUCTED ON TUESDAY, APRIL 23, 2002

40 (Pages 429 to 432)

429

1   I was not -- November '89. I was still there but I
2   was not the act -- Sam Ruosso would have been the
3   director, so Sam would have signed this.
4       Q  But would it be a fair statement that it is
5   likely that you would have been the person who would
6   have had to sign off on this document prior to its
7   final issuance?
8           MR. CRAWFORD: Objection to foundation.
9       A  Sam ran things administratively loser than
10  I do. I don't know if I would have signed this or
11  not. I mean, under my regime I would have to sign it.
12  I don't know if I signed it, but I was a participant
13  in it.
14      Q  You might have signed it?
15      A  I might have signed it. But I might not
16  have.
17      Q  I would like to turn your attention to
18  page -- you see page ten?
19      A  Yes.
20      Q  In connection with your participation in
21  the preparation of this report, would you have
22  reviewed and analyzed the content of this referenced

431

1   That's my recollection of what it was.
2       Q  How did the MRS commission report that we
3   just reviewed affect your analysis with respect to
4   your review of Figure 1 on page ten?
5           MR. CRAWFORD: Well, let me just -- I'll
6   object to the foundation of that and to the form of
7   the question about the statement made by counsel that
8   we just reviewed the MRS commission report. I mean,
9   you certainly asked the witness questions about it.
10          MR. CAYNE: I object to counsel's testimony
11  and speaking objections. They're improper.
12      Q  Could you please respond to the question,
13  Mr. Barrett.
14          MR. CRAWFORD: I was speaking to you.
15      A  Repeat the question, please.
16      Q  Certainly. How did the report issued by
17  the MRS commission affect your analysis of what
18  appears in Exhibit 18 as Figure 1?
19          MR. CRAWFORD: Objection, foundation.
20  Objection, vague.
21      A  What the primary premise in this Figure 1
22  is is a volunteer MRS that would have a proposal to

430

1   schedule for restructure program, Figure 1?
2       A  I would have been involved in it. So,
3   yeah, I would have reviewed it probably, yes.
4       Q  And would you have been in agreement with
5   its contents before this report was issued?
6       A  Organizationally I would have been. I'm
7   not sure what my personal opinion was versus the
8   organization's. I just don't recall. I don't recall
9   I had a big disagreement or anything with it.
10      Q  So you believe that as an organizational
11  matter you would have signed off on the contents of
12  Figure 1, correct?
13      A  I would have supported it, yes.
14      Q  Let's just walk through -- first, can you
15  explain to me what this Figure 1 represents?
16      A  In '89 we reviewed the program, where it
17  was in light of the amendments act, in light of the
18  MRS commission report, and basically restructured the
19  program to a degree around the new repository date
20  which now went to 2010 whereas before it had been
21  2003. We reviewed that and this was the new, the new
22  revised adjusted program based on those events.

432

1   Congress which would change the linkages which would
2   allow us to receive waste in 1998. It does not have
3   in it the user-funded facility. It does not have in
4   it the emergency facility that they recommended.
5       Q  You said it would have a proposal to
6   Congress.
7       A  Right.
8       Q  A proposal to Congress would not be
9   sufficient to allow the overall process referenced in
10  Figure 1 to go forward, correct?
11      A  A proposal from a volunteer site where the
12  proposer agreed to the linkages, where the linkages
13  were invented to protect the MRS site would surely
14  have been approved by Congress in my opinion. So if
15  we had a volunteer site, I thought it would be very
16  easy -- Congress would readily approve the change in
17  the linkages if it was satisfactory to the volunteer.
18      Q  So you are confident that federal
19  legislation would have been enacted and signed by the
20  President approving any volunteer that came along that
21  was willing to allow the siting of an MRS facility on
22  its property?

Case 1:04-cv-00074-ECH   Document 286-3   Filed 06/04/06   Page 25 of 28
DEPOSITION OF LAKE H. BARRETT, VOLUME 2
CONDUCTED ON TUESDAY, APRIL 23, 2002

41 (Pages 433 to 436)

---

433

1    A  Did I use the word "confident"?
2    Q  That's my question, sir.
3    A  No, I'm asking you, did I use the word
4  "confident"?
5    Q  I don't recall. My question is are you
6  confident that federal legislation in fact would have
7  been enacted and signed by the President approving any
8  volunteer that came along that was willing to allow
9  the siting and operation of an MRS facility on its
10  property?
11    A  I would say --
12      MR. CRAWFORD: Objection, vague.
13    A  -- high probability of success. I would
14  not use the word "confident."
15    Q  What do you base your conclusion that there
16  would be a high probability of success? Let me ask
17  this, have you ever participated in the legislative
18  process?
19    A  Yes.
20    Q  By providing testimony to Congress?
21    A  Yes.
22    Q  And in 1987 did you -- you are aware in

---

434

1  1987 that there was an effort to obtain legislation
2  that failed, correct? An effort to obtain legislation
3  by the Department of Energy that failed when Congress
4  imposed linkages that the Department of Energy did not
5  like, correct?
6    A  Correct.
7    Q  But, nevertheless, you sitting here today
8  are confident that if you went back to Congress for
9  legislation to approve a volunteer that came along
10  that was willing to allow the siting of an MRS
11  repository, that Congress would enact and the
12  President would sign into law legislation that would
13  authorize that siting and operation in a form that you
14  would find satisfactory?
15      MR. CRAWFORD: Objection. Vague.
16    A  I believe that would have a reasonably high
17  chance of success, because the difference being
18  between the two cases is the MRS was proposed to be in
19  Tennessee, which was vigorously opposed by the State
20  of Tennessee and its elected officials, whereas if we
21  had a volunteer site, the premise is that they would
22  not be opposing it because they wouldn't have

---

435

1  volunteered. So there would be a very different
2  legislative outcome of the two cases.
3    Q  What states -- an Indian tribe could have
4  been a volunteer, correct?
5    A  Correct.
6    Q  And would it have been just Indian tribes
7  located in certain states?
8    A  No. It could be an Indian tribe federally
9  recognized.
10    Q  Are you aware that there are Indian tribes
11  today located in the State of Connecticut?
12    A  Yes.
13    Q  And are you aware that the Indian tribes in
14  the State of Connecticut run gambling casinos?
15      MR. CRAWFORD: Objection. Relevance.
16    Q  Are you aware of that?
17    A  Yes, I am.
18    Q  Well, let me ask you to assume that the
19  Indian tribe in the State of Connecticut receives
20  investment advice from its Wall Street bankers that
21  you guys can make more money siting an MRS facility
22  than competing with Donald Trump in Atlantic City. Do

---

436

1  you understand the situation I'm posing to you?
2    A  Yes.
3      MR. CRAWFORD: I object to that.
4    Q  And let me assume the Indian tribe came
5  into your office and said, Mr. Barrett, we're here to
6  volunteer. Let's get moving. We want to set up an
7  MRS facility in our tribe location, which is within
8  spitting distance of Stamford, Westport and Greenwich,
9  Connecticut. But it's our land, our property and we
10  think we would be doing good for the United States of
11  America so we're ready to move. If you had a proposal
12  like that, that would be the type of volunteer you're
13  talking about, correct? The tribe would be
14  volunteering to enter into an agreement with the
15  United States to site and operate an MRS facility on
16  its sovereign land in the State of Connecticut. That
17  would constitute a volunteer under your hypothetical,
18  correct?
19    A  No. You invented some totally
20  hypothetical, incredible situation and I wouldn't
21  consider that credible.
22    Q  I'm asking you if a tribe from the State of

---

# Defendant

Case 1:04-cv-00074-ECH   Document 286-3   Filed 06/04/06   Page 27 of 28
DEPOSITION OF LAKE H. BARRETT, VOLUME 2
CONDUCTED ON TUESDAY, APRIL 23, 2002

43 (Pages 441 to 444)

441

1  calls for speculation.
2      A  I believe they could have and would have.
3      Q  And do you believe then that the political
4  establishment, using your phraseology, of the State of
5  New York, would also support the siting and operation
6  of an MRS facility in the Adirondack Mountains in New
7  York State?
8          MR. CRAWFORD:  Objection to the extent it
9  calls for speculation.
10     A  They may not have vigorously opposed it.
11     Q  And on what do you base that testimony?
12     A  Since you're asking me to speculate on
13  these line of questions, it's my opinion based on
14  working with organizations and political
15  establishment.
16     Q  Do you know who the senators were of the
17  State of New York at the time of the proposals
18  referenced in Exhibit 18?
19     A  I don't know specifically, but it was
20  Senator Moynihan I think and I forget the other one.
21  I think a republican.
22     Q  And do you believe that Senator Moynihan,

442

1  Senator D'Amato would have supported the establishment
2  and operation of an MRS facility in the Adirondacks in
3  1989 or after?
4          MR. CRAWFORD:  Objection.  Speculation.
5      A  I didn't use the word "support."  I said
6  not vigorously oppose.  I don't think they would
7  support it.
8      Q  Do you think they would not vigorously
9  oppose it?
10     A  I think it would have been more difficult
11  for them to oppose a sovereign Indian nation who
12  volunteered to do a national service arrangement.  I
13  think it would have been a better situation certainly
14  than was in Tennessee.
15     Q  And why would it be better than Tennessee?
16     A  Because you would have a sovereign Indian
17  nation standing up and saying I would go along with
18  this.
19     Q  Have there been any sovereign Indian
20  nations in Nevada or elsewhere that have offered or
21  expressed interest in the siting of an MRS facility or
22  a permanent repository?

443

1      A  Yes.
2      Q  And where did that occur?
3      A  New Mexico, Oregon and Utah.
4      Q  And were those -- have those proposals been
5  advanced -- are those proposals still under
6  consideration?
7      A  No.
8      Q  And why not?
9      A  Because Congress didn't provide the funding
10  in FY '94 to go forward and develop it.
11     Q  And did the local politicians of each one
12  of those states that you just referenced, New Mexico,
13  Oregon and Utah, oppose the siting of an MRS or
14  repository within their state borders?
15     A  Not to my knowledge.
16     Q  You don't think the state officials
17  challenged it?
18         MR. CRAWFORD:  Objection.  Asked and
19  answered.
20     A  I don't recall them.
21     Q  Why did Congress not provide funding?
22     A  The -- I don't know who started it, but

444

1  clearly the Senate and House of Representatives
2  canceled the funding before it got going.
3      Q  What was the proposal before the Congress
4  in 1994 that was not funded?
5      A  The proposal was to provide grants to those
6  three -- the tribes to develop proposals to Congress,
7  and Congress did not provide that funding for us to be
8  able to do that.
9      Q  When did the process begin that led to the
10  consideration of those proposals?  Was it in '92 or
11  '93?
12     A  It started in, you know, earlier than that.
13  Probably '89, '90.  '89 I think.
14     Q  Was there ever a time between '89 and '94
15  when Congress failed to provide the funding that you
16  believed that those three proposals or one of those
17  three proposals would likely be approved by the United
18  States Congress?
19     A  Say that again.
20     Q  Did you ever believe that any of the three
21  proposals involving the States of New Mexico, was it
22  Utah, and Oregon would be approved by Congress?

Case 1:04-cv-00074-ECH   Document 286-3   Filed 06/04/06   Page 28 of 28
DEPOSITION OF LAKE H. BARRETT, VOLUME 2
CONDUCTED ON TUESDAY, APRIL 23, 2002

44 (Pages 445 to 448)

**445**

1    A   If the process was allowed to proceed, yes,
2  I had -- I believed it could happen.
3    Q   You believe what?
4    A   I believed it could happen, it could be
5  approved.
6    Q   And you believed that firmly enough to
7  invest a lot of personal energy and energy of your
8  department and office in pursuing those possibilities,
9  correct?
10   MR. CRAWFORD:  Objection to the form of the
11  question.  Objection to the foundation.
12   Q   Correct?
13   A   Yes.  Yes, that was the only alternative I
14  had under the act to be able to meet the '98 date, so
15  I pursued it with all the energy I could.
16   Q   And you thought you had a reasonable
17  possibility of success, correct?
18   A   Yes.
19   Q   And you thought wrong, didn't you?
20   A   History turned out that that wasn't the way
21  it's going to be.
22   Q   It's not easy to get fair legislation, is

**446**

1  it?
2    MR. CRAWFORD:  Objection to the vagueness
3  of that.
4    A   That particular issue never even got to be
5  considered.  I think you're surmising that if the
6  proposal had been laid before Congress what was going
7  to happen and you're speculating on that.  But I
8  wouldn't speculate like you are.
9    Q   But what you saw is sometimes you can't
10  even get your proposal before Congress?
11   A   That's correct.  That was cut off before
12  the proposal was ever given to them.
13   Q   Not only do you have to get Congress to
14  approve your proposal, you have to get Congress to
15  look at it, right?
16   A   Say that again.
17   Q   Let me ask you, on page ten of Exhibit 18,
18  you see on the top column under program element, it
19  goes out to 2010.
20   A   Yes.
21   Q   Does it go out to 2010 because that was the
22  projected date of repository -- the first date of --

**447**

1  the projected date of repository operations?
2    A   Yes.
3    Q   What was the process that led to the
4  extension of that date, the delay of that date out to
5  2010?
6    A   I don't remember the details as to what
7  happened with the schedules, but it's my recollection
8  that when you put together the site characterization
9  plan implementation and the processes spelled under
10  the act, and that it was going to take until 2010 to
11  emplace fuel.
12   Q   Was there a formal process within the
13  Department of Energy that was undertaken that led to
14  the determination that this projection should be
15  delayed to 2010?
16   A   There was a review done by the staff in the
17  program that came up with the schedule you see on
18  Figure 1.
19   Q   And who would have been involved, what
20  offices would have been involved in that review?
21   A   Pretty much all the offices in the program.
22   Q   Who would have signed off on that

**448**

1  determination to delay the projected start date of the
2  permanent repository?
3    A   You know, Mr. Ruosso, who I think was the
4  acting director at the time; Mr. Peters, who was the
5  deputy director.  I was involved.  I might have signed
6  off on it.  Then there were dozens of other staff
7  people involved.
8    Q   Let me ask you to look, it's towards the
9  middle of this document.  1997 it states "start
10  construction 1/1/97."  Do you see that?
11   A   Yes.
12   Q   You see that that refers, does it not, to
13  the start -- what type of construction is that
14  referring to?  Construction of what?
15   A   That's the MRS facility.
16   Q   And how long does this Figure 1 indicate it
17  would take for the completion of that facility from
18  start to finish?
19   A   Construction?
20   Q   Yes.  Construction and to be placed in a
21  position that it would be ready to receive spent
22  nuclear fuel.