# Defendant

Case 1:04-cv-00074-ECH   Document 286-4   Filed 06/04/06   Page 2 of 29
DEPOSITION OF LAKE H. BARRETT, VOLUME 2
CONDUCTED ON TUESDAY, APRIL 23, 2002

48 (Pages 461 to 464)

461

1    Q   And the premise that I put on it you
2  understand to be that the law remained as it stood on
3  February 5th -- federal law remained as it stood on
4  February 5th, 1990, correct?
5        MR. CRAWFORD: Objection. Vague.
6    A   Under that premise what you say is true.
7    Q   What I say is that under that premise the
8  MRS could not begin to accept spent nuclear fuel until
9  approximately October 2006 according to your
10 calculations, correct?
11       MR. CRAWFORD: Objection. Asked and
12 answered.
13   A   With your assumptions, yes.
14   Q   The only -- when you say your assumptions,
15 what are you referring to? Are you simply referring
16 to the fact that -- strike that. What assumption are
17 you referring to?
18   A   You make the statement there would be no
19 change in the linkages. The premise that we had for
20 January '98 was that there would be a change in the
21 linkage which could accompany any year with the
22 appropriations process, and it could be changed. In

462

1  that time period, in the 1990s and eighties it was
2  very -- relatively simple to change statute regarding
3  this program, because Bennett Johnston ran both
4  authorized and appropriations committee and that's how
5  he made the amendment in '87. And he could have done
6  it like that.
7    Q   You're confident of that?
8    A   Confident? I believe that that was a very
9  plausible scenario, and that's why we adopted that as
10 an approach for the program.
11   Q   Was Senator Johnston able to push through
12 the legislation desired by the Department of Energy in
13 1987?
14   A   No.
15   Q   He was unsuccessful that time around?
16   A   Correct. Because it wasn't done in
17 appropriations.
18   Q   You believe that the congressmen, senators
19 should have followed different legislative procedures
20 in order to accomplish the goals of the Department of
21 Energy at that time, correct?
22   A   No. There's a lot of flexibility for the

463

1  legislative branch to do what they wish to do.
2    Q   Let me ask you, back to Exhibit 19. You
3  indicated that this projection was based on the
4  premise that federal law would be amended, correct?
5    A   Correct.
6    Q   And specifically the linkages would be
7  repealed or modified, correct?
8    A   Correct.
9    Q   If that assumption was being made, why was
10 there not also a proposal to increase the statutory
11 MTU limit of 10,000 to a higher figure such as 15,000
12 or greater?
13   A   I don't recall exactly why the program at
14 the time chose to deal with the linkage and not with
15 the mass limits.
16   Q   You have no knowledge of that issue?
17   A   Say your question again.
18   Q   I'm asking why -- let me step back. The
19 projections and proposals referenced on Exhibit 19
20 assume the enactment of federal legislation, correct?
21   A   Correct.
22   Q   In light of the fact that your office was

464

1  assuming that the law was changed, why wasn't your
2  office also assuming that that change in law would
3  increase the MTU limit that I believe that the
4  Department of Energy had initially opposed in 1987?
5    A   My -- I don't know if it's speculation, but
6  my belief, okay, when this was discussed was that
7  there had to be a balance in the eyes of the volunteer
8  that they had some protections. We did not make it an
9  issue to remove all elements like the metric tonnage
10 limits as well as the time linkages, because the thing
11 that was most important to us was that we start moving
12 materials of reasonable quantity, of which 10,000 tons
13 was a reasonable quantity, as soon as we could with
14 '98. So we did not -- my recollection is we did not
15 try to remove everything because it would have been
16 harder to ever get a volunteer or to get it through
17 the political process, that we chose to leave the
18 linkages and not make the linkages a statutory
19 initiative like we did the time linkages, because it
20 was secondary and would have detracted our ability to
21 ever get it approved by Congress as you asked earlier.
22       So in my mind, as I recall this, was we

Case 1:04-cv-00074-ECH  Document 286-4  Filed 06/04/06  Page 3 of 29
DEPOSITION OF LAKE H. BARRETT, VOLUME 2
CONDUCTED ON TUESDAY, APRIL 23, 2002

49 (Pages 465 to 468)

465

1 chose not to try to force the tonnage, as we chose to
2 really address the time linkage. Because it was a
3 secondary -- of secondary importance relative to the
4 time. So that is why we left the metric tonnage
5 there. Although we initially never wanted the metric
6 ton limits, they were a fact and they were law at that
7 time, period. So we were trying to make the best of a
8 bad statutory situation we found ourself in with the
9 '87 amendment.
10     Q  Did the Department of Energy have a
11 congressional lobbyist in 1990?
12     A  We don't have lobbyists.
13     Q  Do you have officials whose primary duty is
14 dealing with the federal legislature?
15     A  We have an Office of Congressional Affairs.
16     Q  And who was that office run by in 1990?
17     A  I don't recall.
18     Q  Do you frequently deal with that office?
19     A  No.
20     Q  Did you deal with that office in 1990?
21     A  Probably.
22     Q  But maybe not?

466

1     A  I don't remember.
2     Q  Do you recall whether in 1990 you sought
3 advice from that office on the likelihood of federal
4 legislation being enacted to modify or amend the
5 statutory linkages?
6     A  I don't remember the Office of
7 Congressional Affairs really ever being in tune with
8 much of this at all. This was done primarily with
9 Secretary Watkins' office.
10     Q  But the Office of Congressional Affairs did
11 deal with congressmen, senators on a daily basis,
12 correct?
13     A  I don't know what they did.
14     Q  You don't know the function?
15     A  I know -- no, I don't.
16     Q  And I take it you never involved that
17 office in discussions relating to efforts to cause
18 Congress to consider the repeal or amendment of the
19 linkages, correct?
20     MR. CRAWFORD: Objection. Foundation.
21     A  There were probably some congressional
22 affairs staffers around at meetings.

467

1     Q  But you're not sure?
2     A  I'm not sure.
3     Q  And you don't recall ever having a
4 conversation with the head of that office or any
5 staffer relating to the likelihood of congressional
6 legislation -- the likelihood that congressional
7 legislation would be enacted to modify or repeal the
8 statutory linkages, correct?
9     MR. CRAWFORD: Objection to the foundation.
10 Objection to the form of the question.
11     Q  Correct?
12     A  I don't recall any ones that I did. Sam
13 Ruosso or Frank Peters, who were my superiors, might
14 well but I didn't. That I recall. I know there were
15 staffers around. I never recall having a meaningful
16 discussion with somebody from that office who really
17 knew anything.
18     Q  And don't recall ever having such a
19 conversation in 1990 or any other time, correct?
20     MR. CRAWFORD: Objection to the form of the
21 question. Objection to the foundation.
22     A  You're talking about 1990.

468

1     Q  Did you ever have a conversation with
2 anyone from that office concerning the issue of
3 congressional legislation to amend or repeal the
4 linkages at any time, 1990 or at any time prior to or
5 subsequent to 1990?
6     MR. CRAWFORD: Objection to the form and
7 foundation.
8     A  Probably did in '93ish. But not in 1990.
9 I don't recall any in 1990, '89 or 1990.
10     Q  Can you recall a specific discussion in
11 '93ish?
12     MR. CRAWFORD: Objection to the form.
13 Objection to the foundation.
14     Q  Or do you just think you might have had
15 such conversations?
16     A  No, I know in '93, '93 was different
17 because I was now -- a change of time. I was acting
18 director in '93. So I can't remember who it was but
19 there was -- and I did have discussions with that
20 office regarding all my testimony and dealing with
21 stuff with Secretary O'Leary, so, yeah, I worked with
22 that office but I don't remember like who was in

# Defendant

1 (Pages 527 to 530)

---

527

1       IN THE UNITED STATES COURT OF FEDERAL CLAIMS
2    - - - - - - - - - - - - - - - - x
3    YANKEE ATOMIC ELECTRIC COMPANY;   : Case Nos. 98-126C,
4    CONNECTICUT YANKEE ATOMIC POWER   : 98-154C, 98-474C,
5    COMPANY; MAINE YANKEE ATOMIC      : 98-483C, 98-484C,
6    POWER COMPANY; FLORIDA POWER &    : 98-485C, 98-486C,
7    LIGHT COMPANY; NORTHERN STATES    : 98-488C, 98-614C,
8    POWER COMPANY; DUKE POWER. a      : 98-621C, 99-447C,
9    Division of DUKE ENERGY CORP.:    : 00-440C. 00-695C,
10   INDIANA MICHIGAN POWER COMPANY;   : 00-703C, 01-115C,
11   SACRAMENTO MUNICIPAL UTILITY      : 01-116C, 01-249C
12   - - - - - - - - - - - - - - - X
13   (Caption continued on the next page)
14
15        Continued Deposition of LAKE H. BARRETT
16               Washington, D. C.
17            Friday, April 26, 2002
18                  8:10 a.m.
19
20   Job No.: 11792-8
21   Pages 527 through 825. Volume 3
22   Reported by:  Diane Gomez, RPR

---

528

1    DISTRICT; SOUTHERN NUCLEAR        :
2    OPERATING COMPANY, et al.;        :
3    COMMONWEALTH EDISON COMPANY;      :
4    BOSTON EDISON COMPANY; GPU        :
5    NUCLEAR, INCORPORATED; WISCONSIN  :
6    ELECTRIC POWER COMPANY; POWER     :
7    AUTHORITY OF THE STATE OF NEW     :
8    YORK; OMAHA PUBLIC POWER DISTRICT;:
9    NEBRASKA PUBLIC POWER DISTRICT;   :
10   and TENNESSEE VALLEY AUTHORITY,   :
11           Plaintiffs                :
12   v.                                :
13   THE UNITED STATES,                :
14           Defendant                 :
15   - - - - - - - - - - - - - - - X
16
17
18
19
20
21
22

---

529

1        Continued Deposition of LAKE H. BARRETT, held
2    at the offices of:
3
4        ARNOLD & PORTER
5        555 12th Street, Northwest
6        Washington, D. C. 20004
7        (202) 942-5000
8
9
10
11
12
13     Pursuant to agreement, before Diane Gomez,
14   Registered Professional Reporter and Notary Public in
15   and for the District of Columbia.
16
17
18
19
20
21
22

---

530

1              A P P E A R A N C E S
2    ON BEHALF OF PLAINTIFFS FLORIDA POWER & LIGHT
3    COMPANY, NORTHERN STATES POWER COMPANY, DUKE
4    POWER, INDIANA MICHIGAN POWER COMPANY, BOSTON
5    EDISON COMPANY, GPU NUCLEAR, INC., POWER AUTHORITY
6    OF THE STATE OF NEW YORK, OMAHA PUBLIC POWER
7    DISTRICT, and NEBRASKA PUBLIC POWER DISTRICT:
8        DEVON E. HEWITT, ESQUIRE
9        SHAW PITTMAN LLP
10       1650 Tysons Boulevard
11       McLean, Virginia 22102-4859
12       (703) 847-5097
13
14   ON BEHALF OF PLAINTIFF SACRAMENTO MUNICIPAL
15   UTILITY DISTRICT:
16       HOWARD CAYNE, ESQUIRE
17       JEFFREY L. HANDWERKER, ESQUIRE
18       RONALD A. SCHECHTER, ESQUIRE
19       ARNOLD & PORTER
20       555 12th Street, Northwest
21       Washington, D. C. 20004-1206
22       (202) 942-5000

Case 1:04-cv-00074-ECH   Document 286-4   Filed 06/04/06   Page 6 of 29
DEPOSITION OF LAKE H. BARRETT, VOLUME 3
CONDUCTED ON FRIDAY, APRIL 26, 2002

54 (Pages 739 to 742)

739

1  readiness for earlier transportation should a site for
2  federal interim storage become available sooner than a
3  repository." I believe that's the only part in here
4  on the MRS.
5      Q  You believe that's the only reference in
6  this document to an MRS?
7      A  My quick scan here, my recollection was I
8  don't remember anything else. Somebody else may have
9  read it closely.
10     Q  Turn your attention to page one, Bates
11  174286.
12     A  I'm sorry, page one?
13     Q  Page one on the bottom, paragraph one.
14     A  Okay.
15     Q  On the end of the introduction section it
16  states that "By 1993 it became clear that continuation
17  of the program in accordance with the then-current
18  approach was no longer a viable option." Do you see
19  that?
20     A  Yes.
21         MR. CRAWFORD: Where is that?
22         MR. CAYNE: Last sentence of the

740

1  introduction.
2      A  Yes, I see it.
3      Q  What was the then-current approach that's
4  being referred to in that statement?
5      A  That was the volunteer MRS that would --
6  had a reasonable chance of success for 1998. That was
7  no longer a viable option.
8      Q  So that was no longer a viable option?
9      A  I would have used the word "unlikely," but
10  it's certainly not the central premise for waste
11  acceptance anymore.
12     Q  The department used the word "viable,"
13  correct?
14     A  That's what it says.
15     Q  And you would have seen this document
16  before it was issued, correct?
17     A  Yes.
18     Q  And I assume you were in the chain of
19  command that had to approve this document?
20     A  I was responsible, I'm sure. I don't know
21  if I ever signed it off or not.
22     Q  You would have been satisfied with the

741

1  language of this document, correct, before it became
2  final?
3      A  Yes.
4         MR. CRAWFORD: Objection, asked and
5  answered. Argumentative.
6      A  I would have accepted those words there.
7      Q  The words being "no longer a viable
8  option," correct?
9         MR. CRAWFORD: Objection, asked and
10  answered. Argumentative.
11     Q  Correct?
12         MR. CRAWFORD: Objection, asked and
13  answered, argumentative.
14     A  Correct.
15     Q  Page four, please, bottom of page four.
16  The first sentence. "When the Nuclear Waste Policy
17  Act was enacted, it was envisioned that the department
18  would have had a facility available in 1998 to accept
19  waste for disposal, and the department entered into
20  contracts with utilities on that basis." Do you see
21  that?
22     A  Yes.

742

1      Q  What does that mean, that the department
2  entered into contracts with utilities on the basis
3  that it would have a facility available in '98 to
4  accept waste for disposal?
5         MR. CRAWFORD: Objection to the extent it
6  calls for speculation.
7      A  Just what it says.
8      Q  Do you understand what that means?
9      A  The act says we should have a contract
10  within the time frame, and they put those contracts
11  together under the limited time there in '83, '84.
12  The base operating premise was it would have a
13  facility ready to accept in 1998.
14     Q  The time the contract was signed or
15  contracts were signed in 1983, that is what the
16  government and the nuclear utilities intended?
17         MR. CRAWFORD: Objection --
18     Q  Correct?
19         MR. CRAWFORD: -- to the extent it calls
20  for speculation. Objection to the extent it calls for
21  a legal conclusion.
22     A  I wasn't there. I wasn't involved in a

Case 1:04-cv-00074-ECH  Document 286-4  Filed 06/04/06  Page 7 of 29
DEPOSITION OF LAKE H. BARRETT, VOLUME 3
CONDUCTED ON FRIDAY, APRIL 26, 2002

55 (Pages 743 to 746)

743

1  program then, so I don't know what they envisioned.
2      Q  But is that your understanding?
3          MR. CRAWFORD: Objection to the extent it
4  calls for speculation.  Objection to the extent it
5  calls for a legal conclusion.
6      A  Yes.
7      Q  Page nine, please.  Under Waste Acceptance
8  Storage and Transportation Approach, towards the
9  bottom of the page it says, The main aspects of the
10  approach for waste acceptance storage and
11  transportation are to" -- and it gives then six
12  separate entries on pages nine and ten.  Do you see
13  that?
14      A  Yes.
15      Q  And specifically on the top of page ten,
16  the first line it says "Because more detailed work
17  would not be useful until a specific site has been
18  selected, no development work is included in the
19  current plan."  Do you see that?
20      A  Yes.
21      Q  Is that referring to an MRS facility?
22      A  Site-specific MRS facility is what that

744

1  refers to.
2      Q  And again by "site-specific MRS facility,"
3  specifically what are you referring to?
4      A  The actual siting of a facility.  If we did
5  generic work was the previous sentence.  We did
6  generic work for a generic facility.  It could be
7  sited anywhere.  So if a site develops through some
8  political process, we would be able to quickly build
9  such a facility to receive fuel as quickly as
10  possible.
11      Q  And at this time the department did not
12  think that to be a viable option, correct?
13          MR. CRAWFORD: Objection.  Best evidence.
14      A  There was a low probability.
15      Q  Low probability did you say?
16      A  Yes.
17      Q  And, in fact, such a specific site never
18  did become available through today?
19      A  Correct.
20      (Deposition Exhibit Barrett 37 was marked
21  for identification and was retained by counsel.)
22      Q  Exhibit 36, under Fiscal -- on page 14,

745

1  under Fiscal Year 2000 it states that "The site
2  recommendation will be submitted in a report to the
3  President in 2000."  Correct?
4          MR. CRAWFORD: Objection, vague.
5      A  Yes, it says that.
6      Q  And the page before to which that refers,
7  the caption of that page is Major Milestones for
8  Program Success.  Do you see that, page 13?
9      A  I see the chart.
10      Q  So according to this chart, the
11  recommendation, the site recommendation to the
12  President was one of the major milestones for program
13  success, correct?
14      A  Yes.
15      Q  And that milestone, in fact, has occurred
16  two years later than planned for in the radioactive
17  management program plan set forth in Exhibit 36,
18  correct?
19      A  Close.
20      Q  What's close?  It occurred two years after
21  the date, correct?
22      A  Including FY '02, but depending on when in

746

1  the year, a little less than two years.
2      Q  Is it fair to say that as of now the
3  program is at least a little less than two years
4  behind schedule, as reflected by the major milestones
5  for program success?
6      A  As defined back in '94, yes.
7      Q  The court reporter has handed you a
8  document marked for identification as Exhibit 37.  It
9  is a memorandum, Subject: Total life cycle cost 1995
10  assumptions package from Ronald A. Milner, Director,
11  Office of Program Management and Integration, bearing
12  Bates HQR-057-1493 through HQR-057-1569.  Do you have
13  that document before you?
14      A  Yes.
15      Q  Could you please turn to page Bates number
16  14 -- oh, this is -- it says RW-30 in the top left
17  corner.  Do you see that?
18      A  Yes.
19      Q  Could you please refer to Bates 057-1498.
20  First, what would your involvement in this, in the
21  preparation or review of this document have been?
22      A  I would have signed off on a final total

# Defendant

1 (Pages 826 to 829)

---

826

1    IN THE UNITED STATES COURT OF FEDERAL CLAIMS
2    - - - - - - - - - - - - - - - x
3    YANKEE ATOMIC ELECTRIC COMPANY;  : Case Nos. 98-126C,
4    CONNECTICUT YANKEE ATOMIC POWER  : 98-154C, 98-474C,
5    COMPANY; MAINE YANKEE ATOMIC     : 98-483C, 98-484C,
6    POWER COMPANY; FLORIDA POWER &   : 98-485C, 98-486C,
7    LIGHT COMPANY; NORTHERN STATES   : 98-488C, 98-614C,
8    POWER COMPANY; DUKE POWER, a     : 98-621C, 99-447C,
9    Division of DUKE ENERGY CORP.;   : 00-440C, 00-695C,
10   INDIANA MICHIGAN POWER COMPANY;  : 00-703C, 01-115C,
11   SACRAMENTO MUNICIPAL UTILITY     : 01-116C, 01-249C
12   - - - - - - - - - - - - - - - X
13       (Caption continued on the next page)
14
15       Deposition of LAKE H. BARRETT, VOLUME 4
16              Washington, D.C.
17            Wednesday, May 8, 2002
18                 9:31 a.m.
19
20   Job No.: 11792-10
21   Pages: 826 through 1103
22   Reported by: Diane Gomez, RPR

---

827

1    DISTRICT; SOUTHERN NUCLEAR       :
2    OPERATING COMPANY, et al.;       :
3    COMMONWEALTH EDISON COMPANY;     :
4    BOSTON EDISON COMPANY; GPU       :
5    NUCLEAR, INCORPORATED; WISCONSIN :
6    ELECTRIC POWER COMPANY; POWER    :
7    AUTHORITY OF THE STATE OF NEW    :
8    YORK; OMAHA PUBLIC POWER DISTRICT; :
9    NEBRASKA PUBLIC POWER DISTRICT;  :
10   and TENNESSEE VALLEY AUTHORITY,  :
11        Plaintiffs                  :
12   v.                               :
13   THE UNITED STATES,               :
14        Defendant                   :
15   - - - - - - - - - - - - - - - X
16
17
18
19
20
21
22

---

828

1        Deposition of LAKE H. BARRETT, VOLUME 4,
2    held at the offices of:
3
4        ARNOLD & PORTER
5        555 12th Street, Northwest
6        Washington, D.C.  20004
7        (202) 942-5000
8
9
10
11
12
13       Pursuant to agreement, before Diane Gomez,
14   Registered Professional Reporter and Notary Public of
15   the District of Columbia.
16
17
18
19
20
21
22

---

829

1        A P P E A R A N C E S
2    ON BEHALF OF PLAINTIFFS FLORIDA POWER & LIGHT
3    COMPANY, NORTHERN STATES POWER COMPANY, DUKE
4    POWER, INDIANA MICHIGAN POWER COMPANY, BOSTON
5    EDISON COMPANY, GPU NUCLEAR, INC., POWER AUTHORITY
6    OF THE STATE OF NEW YORK, OMAHA PUBLIC POWER
7    DISTRICT, and NEBRASKA PUBLIC POWER DISTRICT:
8        ALEX D. TOMASZCZUK, ESQUIRE
9        SHAW PITTMAN LLP
10       1650 Tysons Boulevard
11       McLean, Virginia  22102-4859
12       (703) 847-5097
13
14
15   ON BEHALF OF PLAINTIFF SACRAMENTO MUNICIPAL
16   UTILITY DISTRICT:
17       HOWARD CAYNE, ESQUIRE
18       ARNOLD & PORTER
19       555 12th Street, Northwest
20       Washington, D.C.  20004-1206
21       (202) 942-5000
22

---

Case 1:04-cv-00074-ECH Document 286-4 Filed 06/04/06 Page 10 of 29
DEPOSITION OF LAKE H. BARRETT, VOLUME 4
CONDUCTED ON WEDNESDAY, MAY 8, 2002

29 (Pages 938 to 941)

938

1 executive branch, and we followed that.
2  Q So the position advanced by your office was
3 consistent with the administration policy that you
4 just stated, correct?
5  MS. HERRMANN: Same objections.
6  A We accepted that, and we followed that as a
7 member of the administration.
8  MR. CAYNE: We're going to the next
9 document. It's 11:55. Why don't we break for an hour
10 lunch now, and we'll return at one.
11  (There is a discussion off the record.)
12  (A luncheon recess is taken.)
13
14
15
16
17
18
19
20
21
22

939

1  AFTERNOON SESSION
2  Q Mr. Barrett, between the time of the last
3 session of this deposition and today did you discuss
4 your testimony with any person?
5  A No.
6  Q Did you review any documents in preparation
7 for today's session of the deposition?
8  A No.
9  Q Did you have any conversations with counsel
10 following the completion of the last session and the
11 beginning of today's session?
12  A Just to set up the date for today.
13  Q Do you recall, Mr. Barrett, that you
14 testified today that the obligation rate is not equal
15 to the system operating capacity?
16  A Yes.
17  Q What is the basis for that testimony?
18  A In designing any system, from an
19 engineering point of view you design the system to
20 meet or exceed the system requirements. In this
21 case -- not case. In this situation designing the
22 system -- I don't want to confuse this with legal

940

1 cases. We want to design the system to operate at a
2 rate that exceeds the requirements. The requirements
3 that we have are a combination of many factors, which
4 one of them is in the contract, as I understand,
5 relates to the ACR which is the four, six, 900 number.
6 We want to exceed that by a substantial margin. Which
7 design rate of -- our present reference rate of
8 four, six, 12, 2,000, 3,000, does that.
9  Q Your testimony on that point is
10 inconsistent with the position taken by the Department
11 of Energy in 1987, isn't it?
12  MS. HERRMANN: Objection. Foundation.
13  A Not that I know of.
14  Q Your testimony that the obligation rate
15 would not equal the system operating capacity, isn't
16 that inconsistent with the position taken by the
17 department in 1987?
18  MS. HERRMANN: Objection. Foundation.
19  A Not that I know of.
20  Q Let me turn your attention to Exhibit 6 of
21 this deposition, page ten, which bears Bates --
22  A Hold on now. Six? Do you want me to find

941

1 it?
2  Q Yes.
3  MR. CAYNE: I'll just state for the record
4 that I'm turning the witness' attention to PA-103165.
5  A What page number should I be at?
6  Q Page ten. Bates 103165.
7  A Okay.
8  Q Under Section 3.2 there is the following
9 statement: "The waste acceptance schedule presented
10 in this ACR represents the projected WMS capacity
11 available for allocation to the purchasers. The
12 projected WMS capacity equals the system operating
13 capacity," and then you see it continues.
14  A I see it.
15  Q That statement is inconsistent with the
16 testimony you just gave, is it not?
17  MS. HERRMANN: Objection. Asked and
18 answered.
19  A Yes, I think so.
20  Q Who was responsible for issuing this annual
21 capacity report? Was it your predecessor?
22  A I don't think it was me. Yeah, Ben Rusche,

# Defendant

Case 1:04-cv-00074-ECH Document 286-4 Filed 06/04/06 Page 12 of 29
DEPOSITION OF DALE E. BARRETT, VOLUME I
CONDUCTED ON WEDNESDAY, MAY 8, 2002

32 (Pages 950 to 953)

950

1    Q  What lower receipt rate studies were you
2  just referring to?
3    A  Oh, I don't know.  Some of those ones you
4  had back here.
5    Q  Could you go through the exhibits and
6  please identify for me which ones you were referring
7  to.
8    A  Which one is that OMB one that had the --
9  all the 2007, 2010, 2000 whatevers?  Not this one.
10   Q  You mean Exhibit 42?
11   A  43 I think.
12   Q  43?
13   A  I think 43 had some lower receipt rates in
14 it.
15   Q  And those lower receipt rates in Exhibit 43
16 were based upon what?
17   A  Funding constraints.
18   Q  Funding constraints imposed by Congress?
19   A  Yes.
20   Q  Did Congress impose such funding
21 constraints?
22   A  They certainly have.

951

1    Q  When were those funding constraints
2  imposed?
3    MS. HERRMANN:  Can we just give him a
4  minute to get what he's looking at.
5    A  About every year.  For the last five years.
6  We've been funding-constrained by Congress for the
7  last five years.
8    Q  Those funding constraints had an ability
9  (sic) on your office's capability to begin the
10 acceptance of spent nuclear fuel on a timely basis?
11   MS. HERRMANN:  Objection.  Calls for a
12 legal conclusion.
13   A  They've slowed us down.
14   Q  Substantially?
15   A  Months.
16   Q  Years?
17   A  If you add them all up, probably a year or
18 so.
19   Q  Getting back to the ACR, what is the
20 relevance of an ACR with an acceptance rate of 400,
21 600, 900 MTUs per year in today's environment where
22 there is a stand-alone repository?

952

1    MS. HERRMANN:  Objection.  Vague, calls for
2  a legal conclusion.
3    A  I don't know.
4    Q  Is there any?
5    MS. HERRMANN:  Same objections.
6    A  Only as it relates to the legalities of
7  contracts.
8    Q  The 400, 600, 900 MTUs standard was
9  pertinent in the context where an MRS would have gone
10 into effect in 1998 and have been in operation for ten
11 to 12 years prior to repository, correct?
12   A  That's my understanding.
13   Q  And that's the only circumstance in which a
14 400, 600, 900 MTU take-rate had any relevance,
15 correct?
16   A  That was the basis at that time.
17   Q  At that time, you're referring to what
18 time?
19   A  Back in the eighties when that was -- late
20 eighties, early nineties when that was established,
21 that's correct.
22   Q  So in the late eighties, early nineties

953

1  when the 400, 600, 900 MTU take-rate was established,
2  the only relevance that take-rate had was in the
3  context where an MRS would commence operations in 1998
4  and would operate by itself for ten to 12 years prior
5  to the time that a repository, a permanent repository,
6  began operations, correct?
7    A  Correct.
8    Q  Back to Exhibit 6.  WMS stands for waste
9  management system, correct, on page ten of Exhibit 6?
10   A  I think so.
11   Q  And what is the waste management system?
12   MS. HERRMANN:  Objection.  Foundation.
13   Q  You've used that term, haven't you?
14   A  I generally don't.
15   Q  Have you ever heard it used?
16   A  Yes.
17   Q  Do you have an understanding what it means?
18   A  I think that was the overall -- yes.  I
19 think I do.  I think it was the overall system as they
20 described it back at that time.
21   Q  And the overall system as described back at
22 that time involved what?

Case 1:04-cv-00074-ECH   Document 286-4   Filed 06/04/06   Page 13 of 29
DEPOSITION OF LAKE H. BARRETT, VOLUME 4
CONDUCTED ON WEDNESDAY, MAY 8, 2002

33 (Pages 954 to 957)



954

1    A  A repository, a transportation, an MRS.
2    Q  What is system operating capacity?
3    A  I don't know how they used it in this
4  document.
5    Q  How do you use it?
6    A  I use it as that's what you really expect
7  to operate at.
8    Q  Okay.  Using the term "system operating
9  capacity" as you just defined it --
10    A  Okay.
11    Q  -- and the term "WMS" as you just defined
12  it also, do you agree with this statement on page ten?
13    MS. HERRMANN:  Which statement?
14    Q  That the projected WMS capacity equals the
15  system operating capacity?
16    A  What was the question, do I agree with it?
17    Q  Yes.
18    A  No.
19    Q  Why don't you agree with that?
20    A  Because I believe that the system operating
21  capacity should exceed the system operating
22  requirement.  It would appear to me in this, back in

955

1  '87 they were setting the system operating capacity
2  exactly equal to the requirement, which I think is the
3  wrong way to design a system.
4    Q  But that is what the Department of Energy
5  did in 1987?
6    A  I don't know what they did in '87.  I
7  wasn't involved in this.
8    Q  Did you ever discuss this issue with your
9  predecessor?
10    A  The issue of what?
11    Q  The issue of setting the operating capacity
12  exactly equal to the requirement.
13    A  No.  Not that I recall.  Let me phrase it
14  that way.
15    (Deposition Exhibit Barrett 45 was marked
16  for identification and retained by Counsel.)
17
18    Q  The court reporter, Mr. Barrett, has handed
19  you a document marked for identification as Exhibit
20  45, bearing HQR-025-5075 --
21    MS. HERRMANN:  Can I get one of those?
22    Q  -- through 5139.

956

1    A  50?
2    Q  5075.
3    A  Down the bottom here?
4    Q  Yeah, bottom right.
5    A  I got 176202.
6    MS. HERRMANN:  We're not looking at the
7  same document.
8    Q  The Bates numbers I just read into the
9  record are wrong.  The correct Bates numbers are
10  PA-176202 through PA-176266.  The document is called
11  Analysis of Total System Life Cycle Cost of Civilian
12  Radioactive Waste Management Program dated September
13  1995.  Do you have that document before you?
14    A  I do.
15    Q  Would you turn to page five.  What was the
16  purpose of this document?
17    MS. HERRMANN:  Objection.  Foundation.
18    A  This is the total life-cycle cost analysis
19  that we do periodically to determine -- to estimate
20  the total cost of the system so we can do a fee
21  adequacy report as to the adequacy of the charge to
22  the utilities.

957

1    Q  Now, in 1995, in September 1995 your office
2  in performing the total system life-cycle cost
3  analyses assumed there would not be a monitored
4  retrievable storage facility, correct?
5    A  I have to check what the time is.
6  September '95 we probably did not assume there was an
7  MRS.  I don't know what this document says.
8    Q  Well, I refer your attention to page five,
9  the third-to-the-last paragraph on page five.
10    A  Okay.  Does not.
11    Q  Could you turn to page eight.
12    A  Yes.
13    Q  What does Table 1-2 represent?
14    MS. HERRMANN:  Objection.  Foundation.
15    A  It says "monitored geologic disposal system
16  receipt/emplacement rates."
17    Q  What were the rates reflected on Table --
18  how were the rates reflected on Table 1-2 determined?
19    MS. HERRMANN:  Objection.  Foundation.
20    A  I don't know.
21    Q  You have no idea?
22    A  No.

# Defendant

Case 1:04-cv-00074-ECH   Document 286-4   Filed 06/04/06   Page 15 of 29
DEPOSITION OF JARED GARRETT CORMAN
CONDUCTED ON WEDNESDAY, MAY 8, 2002

35 (Pages 962 to 965)

962

1  about the nuclear waste negotiator, correct?
2      A   Yes.
3      Q   And am I correct that the activities of the
4  nuclear waste negotiator were terminated in 1995?
5      A   I don't know the exact date, but somewhere
6  in the mid-nineties.
7      Q   Were they terminated at that point?
8      MS. HERRMANN: Objection. Foundation.
9      A   I believe the term of office of
10 Mr. Stallings, the last negotiator, expired by
11 statute.
12     Q   Do you know why his mandate was not
13 renewed?
14     MS. HERRMANN: Objection. Foundation,
15 speculation, calls for a legal conclusion.
16     A   No.
17     Q   What effect did the termination of the
18 Office of Nuclear Waste Negotiator have on the
19 planning activities of your office?
20     MS. HERRMANN: Objection. Foundation.
21     A   Not appreciable that I recall.
22     Q   Did it have any effect on your

963

1  consideration, for example, of the viability of an MRS
2  facility?
3      A   No, because -- not to my recollection,
4  because the viability of an MRS facility was, you
5  know, negative based on the budget enactment of FY
6  '94.
7      Q   So would you agree that the MRS facility
8  was effectively dead prior to the time that the Office
9  of the Nuclear Waste Negotiator terminated?
10     A   I don't know when the term -- the office
11 actually terminated. So I don't know. You said '95.
12 I don't know when the negotiator officially
13 terminated.
14     Q   Take a look at page 33 of Exhibit 45. I
15 refer you to paragraph 4.7.
16     A   Uh-huh.
17     Q   Does that indicate that the negotiator's
18 activities terminated in 1995?
19     A   It looks like it.
20     Q   But based on that would you agree that the
21 viability -- that an MRS facility was nonviable
22 significantly before the time the Nuclear Waste

964

1  Negotiator's Office terminated?
2      A   Well, in my opinion the MRS siting was not
3  viable once the Congress act on the FY '94
4  appropriations prohibiting me from providing grants to
5  the Indian tribes. That's in my mind when it became
6  not viable. Exactly when a negotiator terminated I
7  don't remember.
8      Q   Do you remember we discussed the 1995 ACR
9  in the last session of the deposition?
10     A   Not really.
11     Q   Do you recall discussing it at all?
12     A   We had -- there were multiple ACRs of
13 different dates. So that much I remember we talked
14 about, but the '95 one versus other dates I don't
15 recall.
16     Q   You're referring to Exhibit 39?
17     A   39. I have it.
18     Q   Take a moment to look through it and see if
19 it refreshes your recollection that we discussed it
20 during the last session of this deposition.
21     A   What's the question? I see an ACR.
22     Q   Do you recall that we discussed this ACR?

965

1      A   Yes.
2      Q   What was the purpose of the 1995 ACR?
3      MS. HERRMANN: Objection. Foundation,
4  calls for a legal conclusion.
5      A   Something that relates to the contract.
6      Q   Do you have any more knowledge about the
7  purpose of the 1995 ACR?
8      A   No.
9      Q   Did your office use the 1995 ACR for any
10 purpose?
11     MS. HERRMANN: Objection. Asked and
12 answered.
13     A   I'm sure people in the office used it,
14 okay.
15     Q   For what purpose?
16     A   For whatever they used it for. I don't
17 know.
18     Q   You didn't use it for any purpose?
19     A   Does this have the table in it that I do
20 use?
21     Q   Which table are you referring to?
22     A   The only thing I'm familiar with in this is

Case 1:04-cv-00074-ECH   Document 286-4   Filed 06/04/06   Page 16 of 29
DEPOSITION OF LAKE H. BARRETT, VOLUME 4
CONDUCTED ON WEDNESDAY, MAY 8, 2002

36 (Pages 966 to 969)

966

1 page six, Table 2. That's the only thing I ever
2 personally used out of this document.
3   Q   The only thing you ever used is the summary
4 of the purchaser's annual allocations?
5   A   Right.
6   Q   And for what purpose did you use that
7 chart?
8   A   I used that to have an understanding of
9 which utilities had what allocations in the year one,
10 year two, year three, year four. For policy reasons
11 is why I wanted to know.
12   Q   What policy reasons?
13   A   Just if I ever have to talk to various
14 executors from various companies where they stood in
15 the queue.
16   Q   Look at page four, please.
17   A   Yes.
18   Q   Did you use the table on page four for any
19 purpose?
20   A   No.
21   Q   None at all?
22   A   No.

967

1   Q   What was your position in March 1995?
2   A   I think I was the deputy director.
3   Q   Who prepared the table on page four?
4     MS. HERRMANN: Objection. Foundation.
5   A   I don't know. Some people in the waste
6 acceptance area.
7   Q   People who worked for you?
8   A   Yes.
9   Q   For what purpose?
10     MS. HERRMANN: Objection. Foundation.
11   A   Part of what they consider the business of
12 the office, which I agreed with.
13   Q   You agreed with what?
14   A   Them doing what they felt they needed to
15 do.
16   Q   In March 1995 you did not expect to be
17 picking up spent nuclear fuel at the rates referenced
18 in Table 1, correct?
19     MS. HERRMANN: Objection. Vague.
20   A   Repeat the question again.
21   Q   In March 1995 you did not expect that the
22 Department of Energy would be picking up spent nuclear

968

1 fuel at the rates reflected on Table 1?
2     MS. HERRMANN: Same objection.
3   A   It was my desire and intention that we
4 would pick up in year two, three, four a rate higher
5 than this.
6   Q   But there was no, in 1995 there was no
7 expectation in the Office of Civilian Radioactive
8 Waste Management that spent fuel would, in fact, be
9 picked up at the rates reflected at Table 1, correct?
10     MS. HERRMANN: Objection. Foundation.
11   A   Did you say no expectation?
12   Q   Right. In March 1995, at which time, as
13 you've testified, the MRS was not viable, your office
14 did not expect that spent fuel would be picked up at
15 the rates reflected on Table 1, correct?
16     MS. HERRMANN: Same objection.
17   A   I ask you to clarify the word "expect." I
18 didn't know what to expect. It was our intention and
19 desire with all our energies to pick it up at a rate
20 that we desired to pick it up, which was a higher
21 rate than this.
22   Q   That was the rate that moved up to 3,000

969

1 MTUs per year, correct?
2   A   That was our desire, that was our goal, and
3 we strived to do that. What actually would happen we
4 did not know. So my expectation was very uncertain.
5     So you asked to say what I expect. The
6 expectation, I have to say that I don't know what to
7 expect. We were trying to run it as high as we could
8 run it.
9   Q   But you had various -- your office, the
10 Office of Civilian Radioactive Waste Management
11 Control, had various plans that it followed pursuant
12 to which your activities were conducted, correct? You
13 had various plans?
14   A   We had plans and goals in trying to achieve
15 the intent of the act.
16   Q   Right. And in 1995, March of 1995, there
17 was not a plan in effect that would have called for
18 the acceptance of spent fuel at the rates reflected in
19 Table 1, correct?
20   A   Correct.
21   Q   In fact, the plan that was in place in 1995
22 called for the acceptance of spent fuel at a rate that

Plaintiff

Case 1:04-cv-00074-ECH   Document 288-4   Filed 06/04/06   Page 18 of 29
DEPOSITION OF LAKE H. BARRETT, VOLUME 4
CONDUCTED ON WEDNESDAY, MAY 8, 2002

1 (Pages 826 to 829)

826

1    IN THE UNITED STATES COURT OF FEDERAL CLAIMS
2    - - - - - - - - - - - - - - - x
3    YANKEE ATOMIC ELECTRIC COMPANY;  : Case Nos. 98-126C,
4    CONNECTICUT YANKEE ATOMIC POWER  : 98-154C, 98-474C,
5    COMPANY; MAINE YANKEE ATOMIC    : 98-483C, 98-484C,
6    POWER COMPANY; FLORIDA POWER &   : 98-485C, 98-486C,
7    LIGHT COMPANY; NORTHERN STATES   : 98-488C, 98-614C,
8    POWER COMPANY; DUKE POWER, a     : 98-621C, 99-447C,
9    Division of DUKE ENERGY CORP.;   : 00-440C, 00-695C,
10   INDIANA MICHIGAN POWER COMPANY;  : 00-703C, 01-115C,
11   SACRAMENTO MUNICIPAL UTILITY     : 01-116C, 01-249C
12   - - - - - - - - - - - - - - - X
13       (Caption continued on the next page)
14
15       Deposition of LAKE H. BARRETT, VOLUME 4
16            Washington, D.C.
17          Wednesday, May 8, 2002
18              9:31 a.m.
19
20   Job No.: 11792-10
21   Pages: 826 through 1103
22   Reported by:  Diane Gomez, RPR

827

1    DISTRICT; SOUTHERN NUCLEAR        :
2    OPERATING COMPANY, et al.;        :
3    COMMONWEALTH EDISON COMPANY;      :
4    BOSTON EDISON COMPANY; GPU        :
5    NUCLEAR, INCORPORATED; WISCONSIN  :
6    ELECTRIC POWER COMPANY; POWER     :
7    AUTHORITY OF THE STATE OF NEW     :
8    YORK; OMAHA PUBLIC POWER DISTRICT;:
9    NEBRASKA PUBLIC POWER DISTRICT;   :
10   and TENNESSEE VALLEY AUTHORITY,   :
11          Plaintiffs       :
12   v.                      :
13   THE UNITED STATES,               :
14          Defendant        :
15   - - - - - - - - - - - - - - - X
16
17
18
19
20
21
22

828

1        Deposition of LAKE H. BARRETT, VOLUME 4,
2    held at the offices of:
3
4        ARNOLD & PORTER
5        555 12th Street, Northwest
6        Washington, D.C.  20004
7        (202) 942-5000
8
9
10
11
12
13       Pursuant to agreement, before Diane Gomez,
14   Registered Professional Reporter and Notary Public of
15   the District of Columbia.
16
17
18
19
20
21
22

829

1    A P P E A R A N C E S
2    ON BEHALF OF PLAINTIFFS FLORIDA POWER & LIGHT
3    COMPANY, NORTHERN STATES POWER COMPANY, DUKE
4    POWER, INDIANA MICHIGAN POWER COMPANY, BOSTON
5    EDISON COMPANY, GPU NUCLEAR, INC., POWER AUTHORITY
6    OF THE STATE OF NEW YORK, OMAHA PUBLIC POWER
7    DISTRICT, and NEBRASKA PUBLIC POWER DISTRICT:
8        ALEX D. TOMASZCZUK, ESQUIRE
9        SHAW PITTMAN LLP
10       1650 Tysons Boulevard
11       McLean, Virginia  22102-4859
12       (703) 847-5097
13
14
15   ON BEHALF OF PLAINTIFF SACRAMENTO MUNICIPAL
16   UTILITY DISTRICT:
17       HOWARD CAYNE, ESQUIRE
18       ARNOLD & PORTER
19       555 12th Street, Northwest
20       Washington, D.C.  20004-1206
21       (202) 942-5000
22

1050

1    Q   No. My question is with respect to this
2  statement: When the nuclear waste policy was enacted,
3  policy act was enacted, it was envisioned that the
4  department would have a repository available for
5  permanent waste disposal in 1998, and the department
6  entered into contracts with the utility to begin
7  accepting waste in 1998 on that basis. Is that
8  statement consistent with your understanding?
9    A   Yes.
10       MS. HERRMANN: Objection. Foundation,
11  calls for a legal conclusion.
12    A   Yes.
13    Q   On page three could you please turn to the
14  first paragraph on the top of the page. Do you see
15  that?
16    A   Yes.
17    Q   Why would continued on-site storage of
18  spent fuel threaten the orderly operation of the
19  nation's civilian nuclear reactors?
20       MS. HERRMANN: Objection. Foundation.
21       You can take time to read it if you need
22  to.

1051

1       THE WITNESS: Yeah.
2    A   You're referring to a phrase in this
3  paragraph?
4    Q   I'm looking at the last sentence of the
5  first full paragraph on page three. Do you see that?
6    A   The last sentence. I see the last
7  sentence.
8    Q   And my question is how or why would the
9  continued on-site storage of spent fuel threaten the
10  orderly operation of the nation's civilian nuclear
11  reactors?
12       MS. HERRMANN: Objection. Foundation.
13    A   The example of this would be the Prairie
14  Island situation.
15    Q   And please explain to me that example.
16    A   Where due to local state -- state law they
17  had difficulty getting storage and may have to shut
18  the reactor down.
19    Q   Are there any other situations that you're
20  familiar with which at-reactor storage could threaten
21  the orderly operation of nuclear reactors?
22    A   No specific ones.

1052

1    Q   Do you believe that to be generally a
2  concern?
3    A   Yes.
4    Q   Do you recall I asked you about an Upton
5  Bill, U-p-t-o-n, the last session of this deposition?
6    A   Vaguely.
7    Q   Could you please turn to what's marked as
8  page one, Bates number 0579 of this exhibit.
9       MS. HERRMANN: The next page in our copy,
10  right, counsel?
11    A   Policy options, option one?
12    Q   Yes, that's the page.
13    A   I see it.
14    Q   It's Option 4. I'm sorry.
15    A   Option 4?
16    Q   Yes. The bottom of the page is Bates
17  number 0579.
18       MS. HERRMANN: Our Bates numbers are cut
19  off so we're going to need a better reference.
20       MR. CAYNE: It's Option 4.
21    A   Yes, I see the page.
22       MS. HERRMANN: For the record, a good

1053

1  number of these pages are numbered page number one and
2  page number two, so that's not going to help.
3    A   Just so you know, ten minutes from now I
4  need to go.
5    Q   It's 3:45.
6    A   Oh, I'm a whole hour off. Sorry about
7  that.
8       MS. HERRMANN: Wishful thinking.
9    Q   I'd like to turn your attention to towards
10  the bottom of the page there's a paragraph that begins
11  "start of waste acceptance." Do you see that?
12    A   Yeah, I see the paragraph.
13    Q   Would you please read that.
14    A   Okay.
15    Q   Have you read that passage?
16    A   Yes.
17    Q   Now, the reference to the storage facility
18  here is to an interim storage facility, correct?
19       MS. HERRMANN: Objection. Foundation.
20    A   That's my understanding.
21    Q   And just for the record, let me just read
22  the statement so it's clear what we're talking about.

Page 402

1    lookout for that.

2              (Thereupon, at 1:30 p.m., the taking of

3    the instant deposition ceased.)

4

5

6

7

8

9    _____

10            Signature of the Witness

11

12   SUBSCRIBED AND SWORN to before me this _____ day of

13   6/27_____, 20 02.

14

15

16

17

18   _____

19            NOTARY PUBLIC

20                        Pat L. Austin
                          Notary Public, District of Columbia
21   My Commission Expires:   My Commission Expires 05-14-2006

22

23

24

25

ERRATA SHEET FOR THE TRANSCRIPT OF:

Notice Date: May 16, 2002
(     Name: Yankee Atomic vs. United States
Case Number:  98-126C-987 4C
Dep. Date:  May 15, 2002
Deponent:  Lake Barrett (cont)
Place:  Washington DC
Ref. No.:  4269-4

CORRECTIONS:

| Page | Line | Now Reads | Should Read | Reasons Therefore |
|------|------|-----------|-------------|-------------------|
| 333 | 22 | he | he was *add* | |
| 337 | 23 | signed | assigned him | |
| 337 | 18 | fuel | full | |

Signature of Deponent

6/20/02

Date of Signature

# Plaintiff

Case 1:04-cv-00074-ECH   Document 288-4   Filed 06/04/06   Page 23 of 29
DEPOSITION OF LAKE H. BARRETT, VOLUME 4,
CONDUCTED ON WEDNESDAY, MAY 8, 2002

1 (Pages 826 to 829)

826

1     IN THE UNITED STATES COURT OF FEDERAL CLAIMS
2     - - - - - - - - - - - - - - - - - x
3     YANKEE ATOMIC ELECTRIC COMPANY;   : Case Nos. 98-126C,
4     CONNECTICUT YANKEE ATOMIC POWER   : 98-154C, 98-474C,
5     COMPANY; MAINE YANKEE ATOMIC      : 98-483C, 98-484C,
6     POWER COMPANY; FLORIDA POWER &    : 98-485C, 98-486C,
7     LIGHT COMPANY; NORTHERN STATES    : 98-488C, 98-614C,
8     POWER COMPANY; DUKE POWER, a      : 98-621C, 99-447C,
9     Division of DUKE ENERGY CORP.;    : 00-440C, 00-695C,
10    INDIANA MICHIGAN POWER COMPANY;   : 00-703C, 01-115C,
11    SACRAMENTO MUNICIPAL UTILITY      : 01-116C, 01-249C
12    - - - - - - - - - - - - - - - - X
13        (Caption continued on the next page)
14
15        Deposition of LAKE H. BARRETT, VOLUME 4
16              Washington, D.C.
17           Wednesday, May 8, 2002
18              9:31 a.m.
19
20    Job No.: 11792-10
21    Pages: 826 through 1103
22    Reported by: Diane Gomez, RPR

827

1     DISTRICT; SOUTHERN NUCLEAR        :
2     OPERATING COMPANY, et al.;        :
3     COMMONWEALTH EDISON COMPANY;      :
4     BOSTON EDISON COMPANY; GPU        :
5     NUCLEAR, INCORPORATED; WISCONSIN  :
6     ELECTRIC POWER COMPANY; POWER     :
7     AUTHORITY OF THE STATE OF NEW     :
8     YORK; OMAHA PUBLIC POWER DISTRICT; :
9     NEBRASKA PUBLIC POWER DISTRICT;   :
10    and TENNESSEE VALLEY AUTHORITY,   :
11            Plaintiffs        :
12    v.                        :
13    THE UNITED STATES,        :
14            Defendant         :
15    - - - - - - - - - - - - - - - - X
16
17
18
19
20
21
22

828

1         Deposition of LAKE H. BARRETT, VOLUME 4,
2     held at the offices of:
3
4         ARNOLD & PORTER
5         555 12th Street, Northwest
6         Washington, D.C.  20004
7         (202) 942-5000
8
9
10
11
12
13        Pursuant to agreement, before Diane Gomez,
14    Registered Professional Reporter and Notary Public of
15    the District of Columbia.
16
17
18
19
20
21
22

829

1         A P P E A R A N C E S
2     ON BEHALF OF PLAINTIFFS FLORIDA POWER & LIGHT
3     COMPANY, NORTHERN STATES POWER COMPANY, DUKE
4     POWER, INDIANA MICHIGAN POWER COMPANY, BOSTON
5     EDISON COMPANY, GPU NUCLEAR, INC., POWER AUTHORITY
6     OF THE STATE OF NEW YORK, OMAHA PUBLIC POWER
7     DISTRICT, and NEBRASKA PUBLIC POWER DISTRICT:
8         ALEX D. TOMASZCZUK, ESQUIRE
9         SHAW PITTMAN LLP
10        1650 Tysons Boulevard
11        McLean, Virginia  22102-4859
12        (703) 847-5097
13
14
15    ON BEHALF OF PLAINTIFF SACRAMENTO MUNICIPAL
16    UTILITY DISTRICT:
17        HOWARD CAYNE, ESQUIRE
18        ARNOLD & PORTER
19        555 12th Street, Northwest
20        Washington, D.C.  20004-1206
21        (202) 942-5000
22

1050

1    Q  No.  My question is with respect to this
2  statement:  When the nuclear waste policy was enacted,
3  policy act was enacted, it was envisioned that the
4  department would have a repository available for
5  permanent waste disposal in 1998, and the department
6  entered into contracts with the utility to begin
7  accepting waste in 1998 on that basis.  Is that
8  statement consistent with your understanding?
9    A  Yes.
10    MS. HERRMANN:  Objection.  Foundation,
11  calls for a legal conclusion.
12    A  Yes.
13    Q  On page three could you please turn to the
14  first paragraph on the top of the page.  Do you see
15  that?
16    A  Yes.
17    Q  Why would continued on-site storage of
18  spent fuel threaten the orderly operation of the
19  nation's civilian nuclear reactors?
20    MS. HERRMANN:  Objection.  Foundation.
21    You can take time to read it if you need
22  to.

1051

1    THE WITNESS:  Yeah.
2    A  You're referring to a phrase in this
3  paragraph?
4    Q  I'm looking at the last sentence of the
5  first full paragraph on page three.  Do you see that?
6    A  The last sentence.  I see the last
7  sentence.
8    Q  And my question is how or why would the
9  continued on-site storage of spent fuel threaten the
10  orderly operation of the nation's civilian nuclear
11  reactors?
12    MS. HERRMANN:  Objection.  Foundation.
13    A  The example of this would be the Prairie
14  Island situation.
15    Q  And please explain to me that example.
16    A  Where due to local state -- state law they
17  had difficulty getting storage and may have to shut
18  the reactor down.
19    Q  Are there any other situations that you're
20  familiar with which at-reactor storage could threaten
21  the orderly operation of nuclear reactors?
22    A  No specific ones.

1052

1    Q  Do you believe that to be generally a
2  concern?
3    A  Yes.
4    Q  Do you recall I asked you about an Upton
5  Bill, U-p-t-o-n, the last session of this deposition?
6    A  Vaguely.
7    Q  Could you please turn to what's marked as
8  page one, Bates number 0579 of this exhibit.
9    MS. HERRMANN:  The next page in our copy,
10  right, counsel?
11    A  Policy options, option one?
12    Q  Yes, that's the page.
13    A  I see it.
14    Q  It's Option 4.  I'm sorry.
15    A  Option 4?
16    Q  Yes.  The bottom of the page is Bates
17  number 0579.
18    MS. HERRMANN:  Our Bates numbers are cut
19  off so we're going to need a better reference.
20    MR. CAYNE:  It's Option 4.
21    A  Yes, I see the page.
22    MS. HERRMANN:  For the record, a good

1053

1  number of these pages are numbered page number one and
2  page number two, so that's not going to help.
3    A  Just so you know, ten minutes from now I
4  need to go.
5    Q  It's 3:45.
6    A  Oh, I'm a whole hour off.  Sorry about
7  that.
8    MS. HERRMANN:  Wishful thinking.
9    Q  I'd like to turn your attention to towards
10  the bottom of the page there's a paragraph that begins
11  "start of waste acceptance."  Do you see that?
12    A  Yeah, I see the paragraph.
13    Q  Would you please read that.
14    A  Okay.
15    Q  Have you read that passage?
16    A  Yes.
17    Q  Now, the reference to the storage facility
18  here is to an interim storage facility, correct?
19    MS. HERRMANN:  Objection.  Foundation.
20    A  That's my understanding.
21    Q  And just for the record, let me just read
22  the statement so it's clear what we're talking about.

Lake H. Barrett   CONTAINS CONFIDENTIAL INFORMATION PURSUANT TO THE PROTECTIVE ORDER - VOLUME II   May 13, 2002
Washington, D.C.

Page 402

```
 1    lookout for that.

 2              (Thereupon, at 1:30 p.m., the taking of

 3    the instant deposition ceased.)

 4

 5

 6

 7

 8

 9

10                         Signature of the Witness

11

12    SUBSCRIBED AND SWORN to before me this _____ day of

13    _____6/27_____, 2002.

14

15

16

17

18

19                         NOTARY PUBLIC

20                              Pat L. Austin
                               Notary Public, District of Columbia
21    My Commission Expires:  My Commission Expires 05-14-2006

22

23

24

25
```

ERR... A SHEET FOR THE TRANSCRIPT OF:

Notice Date:  May 16, 2002
(    Name:  Yankee Atomic vs. United States
C... Number:  98-126C-987 4C
Dep. Date:  May 15, 2002
Deponent:  Lake Barrett (cont)
Place:  Washington DC
Ref. No.:  4269-4

CORRECTIONS:

| Page | Line | Now Reads | Should Read | Reasons Therefore |
|------|------|-----------|-------------|-------------------|
| 333 | 22 | he | he was (add) | |
| 337 | 23 | signed | assigned him | |
| 337 | 18 | fuel | full | |

Signature of Deponent

6/20/02

Date of Signature

# Defendant

DEPOSITION OF LAKE H. BARRETT, VOLUME 5
CONDUCTED ON FRIDAY, MAY 10, 2002

1 (Pages 1104 to 1107)

1104

1   IN THE UNITED STATES COURT OF FEDERAL CLAIMS
2   - - - - - - - - - - - - - - - - - x
3   YANKEE ATOMIC ELECTRIC COMPANY;  : Case Nos. 98-126C,
4   CONNECTICUT YANKEE ATOMIC POWER  : 98-154C, 98-474C,
5   COMPANY; MAINE YANKEE ATOMIC    : 98-483C, 98-484C,
6   POWER COMPANY; FLORIDA POWER &   : 98-485C, 98-486C,
7   LIGHT COMPANY; NORTHERN STATES   : 98-488C, 98-614C,
8   POWER COMPANY; DUKE POWER, a     : 98-621C, 99-447C,
9   Division of DUKE ENERGY CORP.;   : 00-440C, 00-695C,
10  INDIANA MICHIGAN POWER COMPANY;  : 00-703C, 01-115C,
11  SACRAMENTO MUNICIPAL UTILITY     : 01-116C, 01-249C
12  - - - - - - - - - - - - - - - X
13  (Caption continued on the next page)
14
15      Continued Deposition of LAKE H. BARRETT
16          Washington, D. C.
17          Friday, May 10, 2002
18              8:06 a.m.
19
20  Job No.: 11792-11
21  Pages 1104 to 1437, Volume 5
22  Reported by: Diane Gomez, RPR

1105

1   DISTRICT; SOUTHERN NUCLEAR       :
2   OPERATING COMPANY, et al.;       :
3   COMMONWEALTH EDISON COMPANY;     :
4   BOSTON EDISON COMPANY; GPU       :
5   NUCLEAR, INCORPORATED; WISCONSIN :
6   ELECTRIC POWER COMPANY; POWER    :
7   AUTHORITY OF THE STATE OF NEW    :
8   YORK; OMAHA PUBLIC POWER DISTRICT;:
9   NEBRASKA PUBLIC POWER DISTRICT;  :
10  and TENNESSEE VALLEY AUTHORITY,  :
11      Plaintiffs    :
12  v.                :
13  THE UNITED STATES,               :
14      Defendant    :
15  - - - - - - - - - - - - - - - X
16
17
18
19
20
21
22

1106

1       Continued Deposition of LAKE H. BARRETT, held
2   at the offices of:
3
4       ARNOLD & PORTER
5       555 12th Street, Northwest
6       Washington, D. C.  20004
7       (202) 942-5000
8
9
10
11
12
13       Pursuant to agreement, before Diane Gomez,
14   Registered Professional Reporter and Notary Public in
15   and for the District of Columbia.
16
17
18
19
20
21
22

1107

1           A P P E A R A N C E S
2   ON BEHALF OF PLAINTIFFS FLORIDA POWER & LIGHT
3   COMPANY, NORTHERN STATES POWER COMPANY, DUKE
4   POWER, INDIANA MICHIGAN POWER COMPANY, BOSTON
5   EDISON COMPANY, GPU NUCLEAR, INC., POWER AUTHORITY
6   OF THE STATE OF NEW YORK, OMAHA PUBLIC POWER
7   DISTRICT, and NEBRASKA PUBLIC POWER DISTRICT:
8       DEVON E. HEWITT, ESQUIRE
9       SHAW PITTMAN LLP
10      1650 Tysons Boulevard
11      McLean, Virginia  22102-4859
12      (703) 847-5097
13
14
15   ON BEHALF OF PLAINTIFF SACRAMENTO MUNICIPAL
16   UTILITY DISTRICT:
17      HOWARD CAYNE, ESQUIRE
18      ARNOLD & PORTER
19      555 12th Street, Northwest
20      Washington, D. C.  20004-1206
21      (202) 942-5000
22

Case 1:04-cv-00074-ECH   Document 286-4   Filed 06/04/06   Page 29 of 29
DEPOSITION OF LAKE H. BARRETT, VOLUME 5
CONDUCTED ON FRIDAY, MAY 10, 2002

12 (Pages 1148 to 1151)

1148

1 because of short-cooled fuel"?
2      MS. HERRMANN: Objection. Speculation.
3    A  No.
4    Q  Do you understand the term "derate"?
5    A  I understand the term as I use it. How the
6 author is using it I don't know.
7    Q  How would you use it?
8    A  It is to reduce the design capacity or
9 reduce the output.
10   Q  And do you understand the term
11 "short-cooled fuel"?
12   A  Yes.
13   Q  What does that mean?
14   A  Lower megawatt days per metric ton on the
15 fuel.
16   Q  Based on the understanding of those two
17 terms you just expressed, if the author of that
18 sentence used those two terms in the way you just
19 explained them, do you understand this sentence?
20      MS. HERRMANN: Objection. Speculation.
21   A  No.
22      (Deposition Exhibit Barrett 57 was marked

1149

1 for identification and was attached to the
2 transcript.)
3    Q  Mr. Barrett, the court reporter has handed
4 you a document marked for identification as Exhibit
5 57. It is captioned Determination of Cost-effective
6 Waste Management Receipt Rates. It is by R.W. McKee,
7 M-c-K-e-e. It starts at Bates PA-221971. And it
8 continues through PA-221980. Do you have that
9 document before you?
10   A  I believe so. I can't read the Bates
11 number at the bottom, but go ahead. Yes.
12   Q  And you'll see that the first two pages of
13 this consecutively-Bates-numbered document appear to
14 be the same other than the fact that the first page
15 looks as if a buck slip covered over a portion of the
16 left-hand column, correct?
17   A  Correct.
18   Q  Do you know a person named R.W. McKee?
19   A  No.
20   Q  Have you ever heard of that person?
21   A  I've heard the name.
22   Q  Are you familiar with Pacific Northwest

1150

1 Laboratory?
2    A  Yes.
3    Q  What is Pacific Northwest Laboratory?
4    A  It's a contractor in Richland, Washington.
5    Q  Were those contractors relied on often by
6 the Department of Energy in connection with the
7 development, design, and construction of the waste
8 management system?
9      MS. HERRMANN: Objection. Vague.
10   A  We use them as advisors and analysts for
11 the waste management system.
12   Q  Do you continue to so use them through
13 today?
14   A  No.
15   Q  Through when did you use them?
16   A  Through the late eighties.
17   Q  There's also another name at the top of the
18 first page, H.D. Huber, H-u-b-e-r. Do you know that
19 individual?
20   A  No.
21   Q  Did you ever rely on the work of Pacific
22 Northwest Laboratory?

1151

1      MS. HERRMANN: Objection. Vague.
2    A  I used it as input.
3    Q  For what purposes?
4    A  For advice on systems analysis.
5    Q  Did you ever personally assign work out to
6 be performed by Pacific Northwest Laboratory?
7    A  I don't remember me personally, but my
8 staff did.
9    Q  Did you authorize your staff to assign work
10 out to Pacific Northwest Laboratory?
11   A  Yes.
12   Q  I take it then you considered the work of
13 Pacific Northwest Laboratory to be competent?
14   A  Yes.
15   Q  I turn your attention to page Bates number
16 PA-221972. It's the second page of the document.
17 Actually, returning to the first page, do you see the
18 buck slip on the first page? It says, '91 HLRWM
19 conference papers, volume two, "high priority."
20   A  I see it.
21   Q  Is that your writing?
22   A  No.