# Plaintiff

1105

1   DISTRICT; SOUTHERN NUCLEAR          :

2   OPERATING COMPANY, et al.;          :

3   COMMONWEALTH EDISON COMPANY;        :

4   BOSTON EDISON COMPANY; GPU          :

5   NUCLEAR, INCORPORATED; WISCONSIN    :

6   ELECTRIC POWER COMPANY; POWER       :

7   AUTHORITY OF THE STATE OF NEW       :

8   YORK; OMAHA PUBLIC POWER DISTRICT;  :

9   NEBRASKA PUBLIC POWER DISTRICT;     :

10  and TENNESSEE VALLEY AUTHORITY,     :

11            Plaintiffs                :

12  v.                                  :

13  THE UNITED STATES,                  :

14            Defendant                 :

15  - - - - - - - - - - - - - - - X

16

17

18

19

20

21

22

Case 1:04-cv-00074-ECH Document 286-5 Filed 06/04/06 Page 3 of 31
Lake H. Barrett CONTAINS CONFIDENTIAL INFORMATION PURSUANT TO THE PROTECTIVE ORDER May 14, 2002
Washington, D.C.

Page 1

1           IN THE UNITED STATES COURT OF FEDERAL CLAIMS

2       - - - - - - - - - - - - - - - X

3       YANKEE ATOMIC ELECTRIC          :      _TIFIED COPY

4       COMPANY, CONNECTICUT YANKEE     :

5       ATOMIC POWER COMPANY, MAINE     :

6       YANKEE ATOMIC POWER COMPANY,    : Case No. 98-126C,

7                      Plaintiff,       : 98-154C, 98-474C

8              vs.                      : (Senior Judge Merrow)

9       UNITED STATES OF AMERICA,       :

10                     Defendant.       : Volume I

11      - - - - - - - - - - - - - - - X

12                          Washington, D.C.

13                          Tuesday, May 14, 2002

14              Deposition of LAKE H. BARRETT, a

15      witness herein, called for examination by counsel

16      for the Plaintiffs in the above-entitled matter,

17      pursuant to notice, the witness being duly sworn,

18      taken at the offices of Spriggs & Hollingsworth,

19      1350 Eye Street, N.W., Washington, D.C.,

20      commencing at 9:30 a.m., Tuesday, May 14, 2002,

21      and the proceedings being taken down by Stenotype

22      by CAPPY HALLOCK, RPR-CRR, and transcribed under

23      her direction.

24              CONTAINS CONFIDENTIAL INFORMATION

25              PURSUANT TO THE PROTECTIVE ORDER

1163

1    fine.

2        Q    Do you disagree with any other aspect of

3    the statement?

4        A    No.

5        Q    Again I'm starting with the beginning

6    receipt rates ranging from 1500 to 6,000, that entire

7    statement, do you disagree with any other aspect of

8    it?

9        A    No.

10       Q    But you do disagree with the statement that

11   there is not a clearly documented rationale for 3,000

12   MTU per year receipt rate, correct?

13       A    Correct.

14       Q    Because you believe that there is, in fact,

15   a clearly documented rationale for a 3,000 MTU per

16   year receipt rate, correct?

17       A    Yes.

18       Q    And could you explain to me that rationale

19   that you believe has been clearly documented by the

20   department?

21       A    There was one in the old mission plans.  It

22   basically was that the rate of 3,000 tons per year

1164

1    exceeded a generation rate of a nominal 2,000 tons per

2    year and allowed a catchup of a thousand tons per year

3    delta.  And for where the program was at that time

4    that was sufficient, and I felt that was sufficient at

5    that time.

6         Q    Sufficient to do what?

7         A    Sufficient as a design basis for the

8    facility.  I didn't want to basically put resources,

9    inasmuch as I was involved in this, into further

10   refinements and expenditures of money on fine-tuning

11   when we needed to focus on do we have a site and can

12   we ever do this.

13        Q    And fine-tuning, for example, whether it

14   should be higher than 3,000?

15        A    Correct.

16        Q    And when you just stated "allowed a catchup

17   of a thousand tons per year delta," what did that

18   statement refer to?

19        A    The receipt rate of a nominal 3,000 tons

20   per year steady state when the generation rate was

21   approximately 2,000 tons per year.  The system

22   capacity and take-rate was exceeding the generation

1165

1    rate in the nation.

2         Q    Why was that important?

3         A    Because we would like to catch up and, you

4    know, remove the waste that had been accumulating at

5    whatever the start date of the facility would be.

6         Q    Did you consider that to be your mission

7    under this statute, the 1982 Nuclear Waste Policy Act?

8              MS. HERRMANN:   Objection.   Vague, calls for

9    a legal conclusion.

10        A    Repeat the question again.

11        Q    You stated "We would like to catch up and,

12   you know, remove the waste that had been accumulating

13   at whatever the start date of the facility would be."

14   Do you recall that statement?

15        A    Yes.

16        Q    Why would you have liked to have caught up,

17   as you stated in that answer?

18        A    Because waste existed in the United States,

19   both commercial waste and defense waste, and we were

20   to start, either be it '98 or some other date, there

21   would be an inventory existing, and you wanted to work

22   off that inventory as soon as practicable.

1166

1    Q    Why did you want to work off that inventory

2    of spent nuclear fuel as soon as practicable?

3    A    Because I believe that's the intent of the

4    act.

5    Q    By "the act" you're referring to the

6    Nuclear Waste Policy Act of 1982?

7    A    Correct.

8    MR. CAYNE:    It's 9:18.  Let's take a short

9    break.

10    MS. HERRMANN:    Okay.

11    (There is a recess from the record.)

12    (Deposition Exhibit Barrett 58 was marked

13    for identification and was attached to the

14    transcript.)

15    Q    Mr. Barrett, the court reporter has handed

16    you a document marked for identification as Exhibit

17    58.  It's a parametrics analysis for future program

18    costs scenarios bearing Bates number HQR-022-0001

19    through 0030.  On the front page it says November 5th,

20    1999, Stephen Goldberg with the DOE CBO staff, draft.

21    Do you have that document before you?

22    A    Yes.

# Plaintiff

1332

1  reference to a variety of DOE documents.  My question
2  is do you have an understanding of the term
3  "steady-state rate"?
4      A  I believe so.
5      Q  What's your understanding of that term?
6      A  Basically constant over time.
7      Q  I believe you testified that there is a
8  relationship between the 3,000 MTU annual steady-state
9  rate and either the discharge rate or generation rate.
10  Is that correct?
11      A  There's a difference.
12      Q  Is there a relationship between the two?
13      A  Discharge rate is what it is.  Utilities
14  control that.  The receipt rate, which is what you
15  call 3,000, is something that is variable, but
16  depending upon the system we design to build, we can
17  vary that.  So there's no direct relationship between
18  the two.
19      Q  My understanding from your testimony -- and
20  please correct me if I'm wrong -- was that the 3,000
21  MTU steady-state rate or receipt rate as you just used
22  that term, was chosen in part because it exceeded the

1333

1  discharge rate or the generation rate by utilities.
2  Is that right?
3      A  Correct.
4      Q  What other factors went into choosing a
5  3,000 MTU receipt rate?
6      A  The 3,000 rate that we have was established
7  before I was ever involved in the program.  It's my
8  understanding that it was looked at then as a proper
9  balance for total life-cycle costs as well as
10  near-term cash flow requirements and performance.  If
11  you make the number too high, then you have -- you
12  would quickly work off the backlog, and then you would
13  have a lot of idle capacity.  If it was too low, you
14  would have reactors needing to put in dry storage, and
15  3,000, based on an early 1980s, seemed like a
16  reasonable number to use.
17      Q  Do you know if there were any studies that
18  talked about the 3,000 rate being a reasonable number
19  to use?
20      A  I don't know of any that were done back
21  then, but I'm told there were some done.  I never had
22  reason to ever look.  There were some -- we went

1334

1  through some of them here that were done in the middle
2  eighties and some done in the early nineties that
3  would say that you can run them at a higher rate.  And
4  you can run them at a higher rate and there are puts
5  and takes on costs and performance.
6      Q  And am I right in understanding that the
7  3,000 steady-state rate has been used as the
8  steady-state rate in the majority of design documents
9  for the facility that DOE will eventually use to take
10  and emplacement spent nuclear fuel?
11      A  Yes, it's around 3,000.
12      Q  And am I also right in understanding that
13  the 3,000 steady-state rate has been the rate that is
14  used in the majority of documents issued by DOE with
15  regard to total system life-cycle costs?
16      A  Correct.
17      Q  With regard to those documents, the
18  documents issued in connection with estimating total
19  system life-cycle costs, what is that document
20  supposed to reflect, the TSLCC document?
21      A  Our best estimates of what the costs would
22  be, you know, year by year for the program.  And to

1335

1  determine those you would have some assumption as to
2  what the receipt rate would be, and we used 3,000.
3      Q  And is the receipt rate of 3,000 used
4  because that's what your intention at the time you
5  issued that TSLCC report, is that the intention at
6  that time, to use that rate for whatever facility you
7  would have running when you begin to accept spent
8  nuclear fuel?
9      MS. HERRMANN:  Objection.  Foundation.
10      A  At steady state, yes.
11      Q  Do you have an understanding of what the
12  term "waste management system" is?
13      A  Yes.
14      Q  What's your understanding of that term?
15      A  That would be the transportation system to
16  remove it from the reactors.  It would be an MRS if
17  there were to be an MRS, and it would be the
18  repository, or repositories if we have more than one.
19      Q  With regard to the transportation system,
20  other than the RFP that we've discussed just a couple
21  of hours ago, were there any other documents that
22  talked about the acceptance rate or the physical

# Defendant

Case 1:04-cv-00074-ECH   Document 286-5   Filed 06/04/06   Page 11 of 31
DEPOSITION OF LAKE H. BARRETT, VOLUME 5
CONDUCTED ON FRIDAY, MAY 10, 2002

58 (Pages 1332 to 1335)

1332

1  reference to a variety of DOE documents. My question
2  is do you have an understanding of the term
3  "steady-state rate"?
4      A  I believe so.
5      Q  What's your understanding of that term?
6      A  Basically constant over time.
7      Q  I believe you testified that there is a
8  relationship between the 3,000 MTU annual steady-state
9  rate and either the discharge rate or generation rate.
10  Is that correct?
11      A  There's a difference.
12      Q  Is there a relationship between the two?
13      A  Discharge rate is what it is. Utilities
14  control that. The receipt rate, which is what you
15  call 3,000, is something that is variable, but
16  depending upon the system we design to build, we can
17  vary that. So there's no direct relationship between
18  the two.
19      Q  My understanding from your testimony -- and
20  please correct me if I'm wrong -- was that the 3,000
21  MTU steady-state rate or receipt rate as you just used
22  that term, was chosen in part because it exceeded the

1333

1  discharge rate or the generation rate by utilities.
2  Is that right?
3      A  Correct.
4      Q  What other factors went into choosing a
5  3,000 MTU receipt rate?
6      A  The 3,000 rate that we have was established
7  before I was ever involved in the program. It's my
8  understanding that it was looked at then as a proper
9  balance for total life-cycle costs as well as
10  near-term cash flow requirements and performance. If
11  you make the number too high, then you have -- you
12  would quickly work off the backlog, and then you would
13  have a lot of idle capacity. If it was too low, you
14  would have reactors needing to put in dry storage, and
15  3,000, based on an early 1980s, seemed like a
16  reasonable number to use.
17      Q  Do you know if there were any studies that
18  talked about the 3,000 rate being a reasonable number
19  to use?
20      A  I don't know of any that were done back
21  then, but I'm told there were some done. I never had
22  reason to ever look. There were some -- we went

1334

1  through some of them here that were done in the middle
2  eighties and some done in the early nineties that
3  would say that you can run them at a higher rate. And
4  you can run them at a higher rate and there are puts
5  and takes on costs and performance.
6      Q  And am I right in understanding that the
7  3,000 steady-state rate has been used as the
8  steady-state rate in the majority of design documents
9  for the facility that DOE will eventually use to take
10  and emplacement spent nuclear fuel?
11      A  Yes, it's around 3,000.
12      Q  And am I also right in understanding that
13  the 3,000 steady-state rate has been the rate that is
14  used in the majority of documents issued by DOE with
15  regard to total system life-cycle costs?
16      A  Correct.
17      Q  With regard to those documents, the
18  documents issued in connection with estimating total
19  system life-cycle costs, what is that document
20  supposed to reflect, the TSLCC document?
21      A  Our best estimates of what the costs would
22  be, you know, year by year for the program. And to

1335

1  determine those you would have some assumption as to
2  what the receipt rate would be, and we used 3,000.
3      Q  And is the receipt rate of 3,000 used
4  because that's what your intention at the time you
5  issued that TSLCC report, is that the intention at
6  that time, to use that rate for whatever facility you
7  would have running when you begin to accept spent
8  nuclear fuel?
9          MS. HERRMANN: Objection. Foundation.
10      A  At steady state, yes.
11      Q  Do you have an understanding of what the
12  term "waste management system" is?
13      A  Yes.
14      Q  What's your understanding of that term?
15      A  That would be the transportation system to
16  remove it from the reactors. It would be an MRS if
17  there were to be an MRS, and it would be the
18  repository, or repositories if we have more than one.
19      Q  With regard to the transportation system,
20  other than the RFP that we've discussed just a couple
21  of hours ago, were there any other documents that
22  talked about the acceptance rate or the physical

# Defendant

1340

1  answered.
2      A  It was, you know, a relatively small
3  amount. We had also gotten information -- we also put
4  the transportation RFP which had the higher rates in
5  it, and we thought we could get that extra out of the
6  system. So we have always strived to perform at this
7  high-as-possible, high-as-practicable rate we could
8  operate at, so that's why.
9      Q  Is it your testimony that the highest
10  practicable rate that you could perform at for year
11  2011 would be 600 MTUs on an annual basis?
12      A  We didn't really look hard to try to
13  raise -- to see if we could raise that or the 1200 to
14  1300. I felt that was a lower priority item and
15  didn't try to push it much. Didn't push it at all.
16      Q  Do you know whether the acceptance rates
17  that are included in this document are the same
18  acceptance rates that are included in the 1995 TSLCC
19  report?
20      MS. HERRMANN: Objection. Best evidence.
21      A  I thought we just described it a little
22  bit. The 300 to 400. Other than that, I think

1341

1  they're the same.
2      Q  If you would take a look at Barrett Exhibit
3  45, which is the 1995 TSLCC document. And in
4  particular I direct your attention to page eight.
5      A  Yes.
6      Q  And I think you're absolutely right that
7  these rates are almost exactly the rates in the 1998
8  TSLCC but for the 2010 where you accurately noticed
9  that it's 300 MTUs in the 1995 TSLCC.
10      When this document was issued in 1995, was
11  this DOE's intention with regard to the acceptance
12  rate it would implement when it began to take spent
13  nuclear fuel from utilities in 2010?
14      MS. HERRMANN: Objection. Foundation.
15  Mr. Barrett is not a 30(b)(6) witness.
16      A  Restate that question again, please.
17      MS. HEWITT: Can you read it back.
18      (The record is read.)
19      MS. HERRMANN: Same objection.
20      A  This was a cost report. The primary focus
21  was, you know, to do a cost estimate for total
22  life-cycle cost. This was not primarily a waste

1342

1  acceptance operating-type document. It should reflect
2  what the system was at that time.
3      Regarding when we reviewed this document,
4  when I reviewed the document, I was not paying much
5  attention to if it was 300, 400, 600, or whatever.
6  This should reflect what the repository design numbers
7  were, and I just don't know what they were at the
8  time. So the only reason I'm going through this is
9  you asked this was the primary DOE document for
10  acceptance rates. It really wasn't. It should have
11  been the systems requirements documents for the
12  repository of whatever were in place in 1995. If
13  there was 100 percent alignment between those
14  documents I honestly don't know.
15      Q  Table 1-2 that we're talking about is
16  entitled MGDS Receipt/Emplacement Rates. What does
17  the acronym MGDS stand for, do you know?
18      A  Mine geologic disposal system I believe.
19      Q  Do you know whether or not the rates that
20  are included in this document are different from the
21  rates that were included in the 1995 APR ACR that was
22  published around the same time?

1343

1      MS. HERRMANN: Objection. Best evidence.
2      A  I think that the '95 ACR has the
3  four-six-nine constant in it.
4      Q  I think you're right, but if you would like
5  to look at it, that's Exhibit 39.
6      A  Well, that's different than these.
7      Q  It is different?
8      A  Yes.
9      Q  Why was there a difference in rates
10  published in two separate documents that were
11  published around the same time?
12      A  This is a performance document on what we
13  thought we could perform at. That has something to do
14  with the contract.
15      Q  So is it your testimony that DOE could
16  perform at a rate that's different than what it was
17  supposed to perform under the contract?
18      MS. HERRMANN: Objection. Relevance.
19      A  Yes.
20      Q  Why don't you take a look at Exhibit 39,
21  which is the 1995 APR ACR.
22      A  Okay.

# Defendant

Case 1:04-cv-00074-ECH   Document 286-5   Filed 06/04/06   Page 15 of 31
DEPOSITION OF LAKE H. BARRETT, VOLUME 5
CONDUCTED ON FRIDAY, MAY 10, 2002

61 (Pages 1344 to 1347)

1344

1    Q  I'm going to refer your attention to Table
2  1 on page four.
3    A  Yes.
4    Q  The table is entitled Projected Nominal
5  Waste Acceptance Rates for Spent Nuclear Fuel.  My
6  first question is -- and you've used this term quite a
7  bit as well -- what does the term "nominal" mean when
8  the DOE uses it in its documents?
9    A  Not an exact number.  To me the word
10  "nominal" -- I don't know what the authors of this
11  document meant.  When I hear the word "nominal" or
12  when I use the word "nominal" it's sort of an average
13  number.  It might be more; it might be less, but it's
14  in that order of magnitude.
15    Q  Now, this table sets forth projected waste
16  acceptance rates for a period of ten years, correct?
17    A  It appears to.
18    Q  Do you know why it only sets forth
19  projected acceptance rates for ten years?
20    A  No.
21    MS. HERRMANN:  Objection.  Speculation.
22    Q  Do you know what the acceptance rate would

1345

1  have been in year 11?
2    MS. HERRMANN:  Objection.  Speculation.
3    A  No.
4    Q  Do you have any understanding of whether or
5  not this ACR APR indicates that DOE will take spent
6  nuclear fuel from utilities at a steady-state rate of
7  900 MTUs per year for the life of the program?
8    MS. HERRMANN:  Objection.  Best evidence.
9  Speculation.
10    A  Repeat the question, please.
11    (The record is read.)
12    A  I don't know a relationship between this
13  table and what we'll actually perform at.
14    Q  Well, do you know what the purpose of
15  issuing this table was?
16    MS. HERRMANN:  Objection.  Speculation.
17    A  No.
18    Q  Would an annual acceptance rate of 900
19  MTUs, if implemented by DOE, preclude the need of
20  utilities to make arrangements for additional on-site
21  storage after 1998?
22    MS. HERRMANN:  Objection.  Speculation.

1346

1    A  I don't know.
2    Q  How would you figure that out?
3    A  You would need to -- to calculate that you
4  would need to project what the pool overflow rates
5  would be, would know performance.  You would need to
6  then figure out how would the 900, or whatever rate we
7  were going to perform at, how that would be allocated
8  under the contract relationships.  And then you could
9  determine who had pool overflows and who did not.
10    Q  Does DOE have information on what you call
11  pool overflow rates?
12    A  We have data reported by utilities in their
13  859 reports that you could derive that from.
14    Q  Do you know whether or not that
15  consideration, pool overflow, quote/unquote, was a
16  factor in arriving at acceptance rates in this
17  document?
18    A  I don't know.  I don't think so.
19    Q  Do you know whether pool overflow was a
20  consideration in developing any acceptance rate in any
21  of the acceptance capacity reports issued by DOE?
22    A  Not that I know of.

1347

1    Q  Were pool overflow rates a consideration in
2  developing the 3,000 steady-state rate used for the
3  design of the repository?
4    MS. HERRMANN:  Objection.  Speculation.
5    A  Not specifically, but in a gross national
6  sense, yes.
7    Q  And how in a gross national sense?
8    A  By setting the performance rate of
9  nominally 3,000 being higher than the production rate
10  of 2,000, that would give a thousand tons per year
11  working off the backlog which should re-present if
12  there was appropriate distribution amongst the
13  contract holders' pool over -- anymore pool overflows.
14    Q  Do you have an understanding of whether DOE
15  ever established a minimum acceptance rate that would
16  accomplish the need for eliminating pool overflow by
17  utilities after 1998?
18    A  Not specifically.  The only reason I'm
19  pausing, as I recall somewhere having a discussion
20  with staff that the pool overflow rate in the teens,
21  you know, post-2010, was something in the neighborhood
22  of 500 tons per year if there was no -- if we did not

Case 1:04-cv-00074-ECH   Document 286-5   Filed 06/04/06   Page 16 of 31
DEPOSITION OF LAKE H. BARRETT, VOLUME 5
CONDUCTED ON FRIDAY, MAY 10, 2002

62 (Pages 1348 to 1351)

1348

1  perform at all.
2      Q  And do you recall at all what that figure
3  of 500 tons was based on?
4      A  Based on somebody's guesstimate of what
5  they realistically thought the pool overflows would be
6  in the 2010 to 2015 time frame.
7      Q  And was the pool overflow figure that was
8  cited to you, 500 metric tons per year, did that
9  reflect an aggregate number based on all the
10  utilities, do you know?
11      A  My recollection was that was a national
12  number.  You couldn't really do it on a -- we didn't
13  have the data to do it on a utility-by-utility number
14  very clearly.
15      Q  Well, did the utilities report individually
16  with respect to them this data on their RW 859
17  documents that they submitted to DOE?
18      A  I don't know exactly what's on an 859.  I
19  think that's being derived from the 859s.
20      Q  We spoke a little earlier today about the
21  viability assessment.  Do you recall that
22  conversation?

1349

1      A  Vaguely.
2      Q  And the conversation centered around a
3  reference case for a repository that would be
4  available in 2010 that was actually described in the
5  viability assessment that was published I think by DOE
6  in 1998.  Is that correct?
7      A  I believe so.
8      Q  And if I remember correctly, the reference
9  case is a repository that is -- I think you described
10  as a nonmodular system.  Is that right?
11      A  Correct.
12      Q  What are the major milestones that are left
13  between now, May 2002, and 2010 that have to be
14  accomplished before the repository and nonmodular
15  repository can take spent nuclear fuel?
16      MS. HERRMANN:  Objection.  Foundation.
17      A  Have to prepare the license application, go
18  through the licensing process of the NRC, receive a
19  construction authorization, construct it, receive an
20  operating license, build the transportation system,
21  both the hardware aspects of it and the institutional
22  aspects of the transportation system, and then be

1350

1  ready to operate in 2010.
2      Q  What is a reasonable estimate of time that
3  it would take to construct a nonmodular repository?
4      MS. HERRMANN:  Objection.  Speculation.
5      A  Under normal circumstances a building like
6  that would be approximately five years.
7      Q  And what's a reasonable time or a
8  reasonable estimate of time that it would take to get
9  your license approved to build such a facility?
10      MS. HERRMANN:  Same objection.
11      A  The statute says three years.
12      Q  Do you consider that reasonable?
13      A  It could be tight.
14      Q  Why?
15      A  Well, I think the hearings will be
16  difficult for the NRC to complete within that time
17  period, but it's doable.
18      Q  And I believe you said in addition to the
19  licensing and the construction there are concerns
20  about building a transportation system as well and
21  getting an operating license.  Is that correct?  Those
22  are two additional milestones?

1351

1      A  Two additional milestones.  I didn't use
2  the word "concerns."
3      Q  But they are two additional milestones?
4      A  They are milestones, yes.
5      Q  And is the time to get an operating license
6  the same as the time to get your -- for a licensing
7  procedure, is that the same milestone or are those two
8  separate actions?
9      A  What I refer to in a general sense as the
10  operating license is actually an amendment to our
11  license that we would receive when we get the
12  construction authorization.  So it's a license
13  amendment, which should take less time than the
14  original licensing proceeding itself.
15      Q  And how long would that licensing amendment
16  take?
17      MS. HERRMANN:  Speculation.
18      A  It will take a couple of years.  The actual
19  operating license proceeding will probably start just
20  about when the construction authorization is given.
21      Q  From what you said it does not appear
22  likely that DOE will accomplish all these milestones

# Plaintiff

DEPOSITION OF LAKE H. BARRETT, VOLUME 5
CONDUCTED ON FRIDAY, MAY 10, 2002

67 (Pages 1368 to 1371)

1368

1    A    The higher the rate of performance the
2  better.
3    Q    That doesn't answer the question of whether
4  or not the rate --
5    A    I couldn't understand the question.  Repeat
6  the question.
7    Q    At least you told me that.
8    A    All right.  I thought that was your
9  question, but try again.
10   Q    My understanding is that one of the goals
11 of the Civilian Radioactive Waste Management Program
12 was to design a system that could take spent nuclear
13 fuel at a rate that would eliminate the need for
14 utilities to provide for additional on-site storage
15 after January 31st, 1998.  Is that correct?
16   A    No.
17   Q    What is not correct about that statement?
18   A    I never considered the design of the system
19 to solely try to avoid spent-fuel pool overflows.  I
20 tried to design the system to be as large as you could
21 reasonably make it to avoid not only spent-fuel
22 overflows but pool rerackings to allow shut-down

1369

1  reactors to empty their sites.  For all those other
2  reasons in addition to.  So the way you phrased it I
3  don't think is correct.
4    Q    Thank you for clarifying.  It actually did
5  clarify a misimpression I had, so I'm glad I asked the
6  question.
7         And is it your testimony that prior to you
8  actually coming to the Office of Civilian Radioactive
9  Waste Management DOE had established that a
10 steady-state rate of 3,000 MTUs on an annual basis
11 would achieve all those objectives that you just
12 specified in your prior answer?
13        MS. HERRMANN:  Objection.  Foundation.
14   A    In a general sense, yes.
15   Q    At any point during your tenure at OCRWM
16 did you have a reason to disagree with that rate that
17 was selected, the 3,000 MTU steady-state rate on an
18 annual basis?
19   A    Never paid much attention to it.  Because
20 all my energies were focused on trying to get a system
21 that could run as soon as practicable.
22   Q    But in your tenure at the program did you

1370

1  ever see any evidence that would indicate that that
2  3,000 MTU rate was not sufficient to address all of
3  those needs as you specified a couple of answers ago?
4    A    I saw no reason nor saw no reports that
5  said 3,000 was a bad choice.  There were some studies
6  done in the late eighties, also in the early nineties
7  that, you know, it didn't say there was an obvious
8  better number.  That 2,000 was better or 4,000 was
9  better.  And 3,000 appeared to be okay.  So I didn't
10 pay much attention.  So I was satisfied.  It wasn't
11 conscious per se.  I saw no reason why I should change
12 it.  Let's phrase it that way.
13   Q    And I'll take it a step further.  Do you
14 believe that the 3,000 annual steady-state rate is a
15 reasonable rate for DOE to plan to use in terms of
16 taking spent nuclear fuel from utilities?
17   A    I think it's a reasonable rate.  There may
18 be better rates that if we -- if the nation gets a
19 little clearer that we're going to really perform I
20 think we will refine that number and we may, based on
21 events of September 11th, maybe it will be raised.
22   Q    And would you agree that the 3,000 annual

1371

1  steady-state rate is a rate that is consistent with
2  achieving the objectives that you enumerated earlier?
3    A    Generally so, yes.
4    Q    In your opinion would a steady-state rate
5  of 2,000 MTUs on an annual basis be consistent with
6  achieving those same objectives?
7    A    I would think that's low.
8    Q    Why?
9    A    Because that's about what the generation
10 rate is, and if we start with that, matching the
11 generation rate at 2010 -- if we steady state at 2010,
12 all the fuel that's in dry storage and a lot of the
13 shut-down reactors, it will be difficult to avoid new
14 storages or prolong decommissionings.
15   Q    And what would your opinion be if an annual
16 steady-state rate was chosen that was around 1,000
17 MTUs per year?
18        MS. HERRMANN:  Objection.  Speculation.
19   A    For performance aspect it would be better,
20 you know, better than none, but not as good as 2,000
21 and not as good as 3,000.
22   Q    Would you believe that a steady-state

# Plaintiff

Page 1

```
 1          IN THE UNITED STATES COURT OF FEDERAL CLAIMS

 2     - - - - - - - - - - - - - - X

 3     YANKEE ATOMIC ELECTRIC           :    ...TIFIED COPY

 4     COMPANY, CONNECTICUT YANKEE      :

 5     ATOMIC POWER COMPANY, MAINE      :

 6     YANKEE ATOMIC POWER COMPANY,     :  Case No. 98-126C,

 7                        Plaintiff,    :  98-154C, 98-474C

 8          vs.                         :  (Senior Judge Merrow)

 9     UNITED STATES OF AMERICA,        :

10                        Defendant.    :  Volume I

11     - - - - - - - - - - - - - - X

12                          Washington, D.C.

13                          Tuesday, May 14, 2002

14          Deposition of LAKE H. BARRETT, a

15     witness herein, called for examination by counsel

16     for the Plaintiffs in the above-entitled matter,

17     pursuant to notice, the witness being duly sworn,

18     taken at the offices of Spriggs & Hollingsworth,

19     1350 Eye Street, N.W., Washington, D.C.,

20     commencing at 9:30 a.m., Tuesday, May 14, 2002,

21     and the proceedings being taken down by Stenotype

22     by CAPPY HALLOCK, RPR-CRR, and transcribed under

23     her direction.

24               CONTAINS CONFIDENTIAL INFORMATION

25                PURSUANT TO THE PROTECTIVE ORDER
```

Lake H. Barrett CONTAINS CONFIDENTIAL INFORMATION PURSUANT TO THE PROTECTIVE ORDER   May 14, 2002
Washington, D.C.

Page 62

1  gets finalized?
2           MS. HERRMANN:  Objection.
3       A.   The approach for steady state, yes.
4       Q.   What about the approach for other
5  issues that you mentioned?
6           MS. HERRMANN:  Objection.  Vague and
7  overbroad.
8       Q.   I guess I don't understand.  What do
9  you mean by approach for steady state?  I guess I
10  don't understand what that means.
11      A.   Five or six years into operation there
12  is a pretty clear understanding by the industry on
13  what the risks are and what the rewards are, and
14  that a free market competition we believe would be
15  successful.  For the initial startup where the
16  contractor would have to have substantial capital
17  costs with uncertainties regarding legalities or
18  startup issues, licensing, may require government
19  assistance maybe in terms of hardware or other
20  considerations.
21          Those are the issues that we would
22  look at as we would revise and improve the RFP.
23      Q.   Thank you.
24          (Discussion off the record.)
25          BY MR. STOUCK:

Page 63

1       Q.   Let me show you, hand you, Mr.
2  Barrett, a copy of what was previously marked as
3  Exhibit Number 40 to your deposition.
4           Do you have that?
5       A.   I do.
6       Q.   Okay.  This is the 1992 Annual
7  Capacity Report dated March '93, right?
8       A.   Yes.
9       Q.   And turn to Page 8.
10      A.   Yes.
11      Q.   What is that?
12      A.   Table 3.1 of the '92 ACR.
13      Q.   What is your understanding of what the
14  table shows?
15      A.   It's the annual allocations as they
16  existed in '92 -- I don't know if they changed or
17  not later -- by contract holder for who had what
18  allocations for year one, year two, year three.
19      Q.   On oldest fuel first basis; is that
20  right?
21      A.   Yes, that's my understanding.
22      Q.   Now, putting aside the factor that
23  these allocations may have changed -- if they have
24  changed from '92 to the present, would you agree
25  that the change would be relatively minor, that

Page 64

1  most of the sequencing would remain the same?
2       A.   They should be minor.
3       Q.   So they would be substantially the
4  same today, there might be some minor variations?
5       A.   Correct.
6       Q.   Putting aside those minor variations,
7  is it your understanding that when the program
8  starts to operate in 2010, or some other time,
9  that this listing of allocations of oldest fuel
10  first is going to be the actual sequence in which
11  the Department picks up spent fuel from the
12  various contract holders?
13          MS. HERRMANN:  Objection.
14          THE WITNESS:  Could I have that again?
15          (The record was read as requested.)
16      A.   I doubt it.
17          BY MR. STOUCK:
18      Q.   And why do you doubt it?
19      A.   Because from a practical matter, the
20  numbers on some of the contract holders are not an
21  efficient size or, for example, Consolidated
22  Edison has 2.9 tons, Dairyland 0.7 tons, and it
23  would not be very efficient to pick up such
24  small amounts for either the Department of
25  Energy's contractor nor the utility itself to

Page 65

1  prepare for shipping such small amounts, so most
2  likely there will be some arrangement such as more
3  efficient sizes as determined through a process
4  yet to be worked out.
5       Q.   When you say more efficient sizes, are
6  you referring to fuel casks, filling up casks?
7       A.   Correct, cask campaigns.
8       Q.   So you are referring to filling up
9  casks, but that's not all you are referring to?
10      A.   Correct.
11      Q.   So in addition to filling up casks you
12  are referring to cask campaigns?
13      A.   Correct.
14      Q.   And what do you mean by cask
15  campaigns?
16      A.   From a practical point of view
17  primarily for the utility, but also somewhat for
18  the Department of Energy that you would establish,
19  a term that's sometimes used, bite size, the
20  campaign size of how much tonnage you would take
21  in a campaign that would be scheduled to be
22  consistent with the reactor's operating cycle or
23  the situation at the contract holder which would
24  be mutually beneficial for both parties.
25      Q.   Okay.  Could you just clarify or

17 (Pages 62 to 65)

# Plaintiff

Lake H. Barrett CONTAINS CONFIDENTIAL INFORMATION PURSUANT TO THE PROTECTIVE ORDER   May 14, 2002
Washington, D.C.

Page 70

1  issues possibly.  Possibly one utility has got
2  pool overflow issues, another has a
3  decommissioning issue.  Another has maybe a policy
4  or political issue about moving fuel.  So those,
5  all those issues would have to be dealt with, and
6  they may -- it may not be to everyone's advantage
7  to do something like that.  We just don't know
8  that.
9      Q.    And what is the "something like that"?
10     A.    To have exchanges or allocations
11  recommended by the RSC.
12     Q.    Okay.  Well, let's see if you agree
13  with this:  Those matters that you just referred
14  to might pose impediments to an optimal, in other
15  words most efficient utilization of capacity, but
16  that's not inconsistent with utilization of a
17  system capacity being made as a goal more
18  efficient than what would result if the schedule
19  were to follow the sequence that is shown on Page
20  8 of Exhibit 40, right?
21         THE WITNESS:  Can I have that question
22  again?
23         MR. STOUCK:  Would you read it back,
24  please?
25         (The record was read as requested.)

Page 71

1      A.    Yes.
2          BY MR. STOUCK:
3      Q.    Okay.
4          Do you think there is any possibility
5  that when the spent fuel acceptance program
6  commences operations in 2010, or at some other
7  time, that the actual sequence of pickup of spent
8  nuclear fuel will be the sequence -- putting aside
9  the minor variations that we referred to
10  previously -- do you think there is any
11  possibility that the actual sequence will be the
12  sequence that is shown on this OFF array on Page
13  40?
14         MS. HERRMANN:  Objection.
15  Speculation.
16     A.    Yes.
17     Q.    You do?
18     A.    Yes.
19     Q.    Okay.  Can you quantify the
20  possibility?
21         MS. HERRMANN:  Objection.
22  Speculation.
23     A.    No.
24     Q.    If that sequence were to be followed
25  in actuality, do you believe that the costs would

Page 72

1  be greater or less than the costs of a system that
2  includes some -- included some amount of campaign
3  pickups?
4          MS. HERRMANN:  Objection.
5  Speculation.
6      A.    Greater.
7      Q.    Okay.
8          So it would be in the utility's
9  interests to avoid that greater cost through some
10  kind of rearrangement of the sequence; would you
11  agree with that?
12         MS. HERRMANN:  Objection.  Foundation.
13     A.    From a cost perspective, yes.
14     Q.    Okay, and it would be in DOE's
15  interest from a cost perspective to promote some
16  rearrangement of the sequencing to be more
17  cost-effective, right?
18     A.    Within the extent of the law, yes.
19     Q.    And is the reason that you believe it
20  is possible that the actual sequence for pickup
21  would be the sequence that is shown on Page 8 of
22  Exhibit 40 is -- the reason that you believe that
23  is a possibility, that contractual matters and
24  issues and disputes on the utility side would
25  require that that schedule be maintained if those

Page 73

1  issues and disputes could not be worked out; do
2  you think that's a possibility?
3          MS. HERRMANN:  Objection.
4          Can I have that question back?
5          (The record was read as requested.)
6          MS. HERRMANN:  Objection.  Foundation.
7  Vague.  Calls for a legal conclusion.
8  Speculation.
9      A.    Yes.
10         BY MR. STOUCK:
11     Q.    Any other reason other than the
12  inability of the utilities with or without the
13  Department's help to work out those issues, is
14  there any other reason that you think it's
15  possible that the schedule that is shown on Page 8
16  of Exhibit 40 would be the actual sequence for
17  pickup?
18         MS. HERRMANN:  Objection.
19  Speculation.
20     A.    That's the main reason.
21     Q.    Okay.  That's the only reason you can
22  think of right now?
23     A.    That's the only one I can think of
24  right now.
25     Q.    Okay.

19 (Pages 70 to 73)

# Plaintiff

Page 118

1  facts not in evidence.
2      A.  I don't recall that being a major
3  factor when we discussed the pros and cons of
4  shifting.
5      Q.  Okay.  Major factor was just
6  philosophically better to do it through the
7  private sector?
8      A.  Primarily, and also budget, changed the
9  budget profiles.
10     Q.  Okay.  The thinking is it is going to
11 be more cost-effective to do it through the
12 private sector?
13     A.  We felt that it would be.
14     Q.  Okay.  Thank you.
15         This is another document that is kind
16 of bulky.  Let's see how we go, but I don't really
17 want to mark this unless we can't avoid it.  It's
18 a thick document, but I have a couple short
19 questions.
20         This is a document that is entitled
21 Defendant's Responses to Utility Plaintiffs Joint
22 First Set of Interrogatories, and my first
23 question is, have you ever seen this document?
24     A.  Not that I recall.
25     Q.  On Page 77 -- it is dated October 9,

Page 119

1  2001, but my question, at least my first question
2  is on Page 77 at the top it says Interrogatory
3  Number 50.
4         Do you see that?
5      A.  Yes.
6      Q.  Interrogatories are written questions
7  that lawyers ask -- you know, that lawyers ask
8  opposing parties in litigation and responses are
9  given in writing, so we asked these questions of
10 the government.  We asked these questions of the
11 government, the United States, and we got these
12 answers.  Interrogatory Number 50, let me read it.
13 It says, "Identify the three individuals within
14 DOE with the most knowledge of the schedule DOE
15 would have followed had it begun to take SNF from
16 purchasers by January 31, 1998 pursuant to the
17 Standard Contract."
18         Do you see that?
19     A.  Yes.
20     Q.  If you look at the bottom of the page
21 there is a couple of paragraphs here of objections
22 and what-not.  But at the bottom we have got -- we
23 have more than three names in response, but the
24 first name, Mr. Barrett, is yours.  Is that
25 correct?

Page 120

1      A.  Yes.
2      Q.  Do you consider yourself to be
3  knowledgeable about "the schedule DOE would have
4  followed had it begun to take SNF from purchasers
5  by January 31, 1998 pursuant to the contract."
6          MS. HERRMANN:  Objection.  Vague.
7      A.  I suppose I have as much knowledge as
8  many.
9      Q.  As many?  Your last word was M-A-N-Y;
10 is that what you said?
11     A.  Yes.
12     Q.  What schedule --
13     A.  I never said I know as much as one
14 might know.  I know it from a policy point of
15 view.
16     Q.  Could you give testimony under oath
17 about the schedule that DOE would have followed
18 had it taken SNF from purchasers by January 1998?
19          MS. HERRMANN:  Objection.  Vague.
20     A.  I will answer questions under oath, if
21 I can.
22     Q.  What schedule would DOE have followed
23 had it begun to take SNF from purchasers by
24 January 31, 1998 pursuant to this contract?
25          MS. HERRMANN:  Objection.  Foundation.

Page 121

1  Mr. Barrett is not here as a 30(b)(6) witness.
2      A.  We would have operated our system at
3  our plant which was, you know, whatever the
4  operation rate which transiented and leveled
5  out at 3,000 metric tons per year after five
6  years.  That's what we were planning to do.
7      Q.  That's what you would have done?
8      A.  That's what we would have done if we
9  could have gotten the, you know, the sites
10 approved, et cetera.
11     Q.  And in what sequence -- do you happen
12 to know, can you just generally tell me a ramp-up
13 rate up to that 3,000 ton rate that might have
14 been realistic?
15          MS. HERRMANN:  Objection.  Foundation.
16     A.  I don't know what system we are
17 referring to or what time because those are
18 changes as a function of time.  So if you give us
19 the time frame --
20     Q.  The government has told us that you are
21 one of the most knowledgeable people about how
22 the schedule would have been referenced.  I'm not
23 asking about any documents.  I'm asking what the
24 schedule would have been.
25          You already told me it would have

# Defendant

Page 1

```
 1        IN THE UNITED STATES COURT OF FEDERAL CLAIMS

 2     - - - - - - - - - - - - - - - X

 3     YANKEE ATOMIC ELECTRIC          :

 4     COMPANY, CONNECTICUT YANKEE     :

 5     ATOMIC POWER COMPANY, MAINE     :

 6     YANKEE ATOMIC POWER COMPANY,    : Case No. 98-126C,

 7                      Plaintiff,     : 98-154C, 98-474C

 8              vs.                    : (Senior Judge Merrow)

 9     UNITED STATES OF AMERICA,       :

10                      Defendant.     : Volume I

11     - - - - - - - - - - - - - - - X

12                      Washington, D.C.

13                      Tuesday, May 14, 2002

14             Deposition of LAKE H. BARRETT, a

15     witness herein, called for examination by counsel

16     for the Plaintiffs in the above-entitled matter,

17     pursuant to notice, the witness being duly sworn,

18     taken at the offices of Spriggs & Hollingsworth,

19     1350 Eye Street, N.W., Washington, D.C.,

20     commencing at 9:30 a.m., Tuesday, May 14, 2002,

21     and the proceedings being taken down by Stenotype

22     by CAPPY HALLOCK, RPR-CRR, and transcribed under

23     her direction.

24             CONTAINS CONFIDENTIAL INFORMATION

25               PURSUANT TO THE PROTECTIVE ORDER
```

Lake H. Barrett CONTAINS CONFIDENTIAL INFORMATION PURSUANT TO THE PROTECTIVE ORDER  May 14, 2002
Washington, D.C.

Page 126

1  You are familiar -- I know you have
2  given some testimony about this already, so I will
3  try not to be duplicative.  You are familiar with
4  greater than Class C waste, sometimes called GTCC?
5  A.  Yes.
6  Q.  Do you know whether there currently
7  exists, Mr. Barrett, alternatives for the
8  disposition of -- for the disposal of GTCC wastes,
9  alternatives to disposal at Yucca Mountain
10  currently?
11  MS. HERRMANN:  Objection.  Foundation.
12  Speculation.
13  A.  Yes.
14  Q.  Okay.  You know are there?
15  A.  Yes.
16  Q.  What are the alternatives that are
17  currently available for disposal of GTCC wastes?
18  A.  You can get an exemption from the NRC,
19  I believe.  Special approval from the NRC.
20  Q.  To do what?
21  A.  Dispose of it in a near-surface
22  facility.
23  Q.  Okay.
24  A.  Also you could request from the NRC
25  special approval for a facility other than Yucca

Page 127

1  Mountain.
2  Q.  Like, you mean close-to-surface
3  facility or --
4  A.  Intermediate depth, bore hole
5  emplacement.
6  Q.  Okay.  Anything else?
7  A.  Those are the ones that come to mind.
8  Q.  Those are two alternatives to disposal
9  at Yucca Mountain for GTCC wastes --
10  A.  Yes.
11  Q.  -- that are currently available?
12  A.  Yes.
13  Q.  Do you know whether any utility has
14  obtained a special exemption from the NRC to
15  dispose of GTCC wastes at a near-surface facility?
16  MS. HERRMANN:  Objection.  Speculation.
17  A.  I don't know if it is phrased exactly
18  that way, but the Trojan reactor vessel was
19  disposed of at Hanford on a NRC approval process.
20  Q.  And that contained GTCC wastes?
21  A.  Greater than Class C like wastes.
22  Q.  And was it in some respect in which it
23  was not like greater than Class C wastes?
24  A.  It gets very complicated with the rules
25  and radioactive concentration per gram or per

Page 128

1  volume over what volume or weight material you
2  use, so there is some discretion and latitude in
3  the definitions on how it is applied.
4  Q.  Okay, but in your mind that reactor
5  vessel from Trojan was comparable to GTCC wastes?
6  MS. HERRMANN:  Objection.  Vague.
7  Calls for a legal conclusion.
8  A.  Some pieces of metal inside that vessel
9  might have been called greater than Class C wastes
10  under different circumstances than that.
11  Q.  Okay.  How do you know about this
12  Trojan episode?  Were you involved personally?
13  A.  No.
14  Q.  How do you know about it?
15  A.  Trade, industry trade information.
16  Q.  Do you know of any other examples of a
17  utility obtaining a special exception from the NRC
18  for disposal of GTCC wastes in a near-surface
19  facility?
20  A.  Not off -- no.
21  Q.  Well, do you know -- do you know for
22  sure one way or the other whether there are any
23  other examples?
24  A.  There have been concepts of -- a term
25  DOE would use is special case wastes, which is

Page 129

1  greater than Class C wastes being disposed of in
2  hundred meter deep bore holes, Nevada test site
3  and other such special arrangements, but those are
4  not NRC certified though one could -- there was
5  plans by some companies to dispose of greater than
6  Class C sources in a similar facility in a NRC
7  licensed facility in Texas or New Mexico.
8  Q.  Do you know which company that was?
9  A.  No, I don't recall.
10  Q.  Now these one hundred foot poles that
11  you mentioned, or bores -- I forget the exact
12  phrase you used -- was that defense waste?
13  A.  I believe it was.  It may have been R&D
14  waste, but there are one hundred meter bore holes.
15  Q.  So you think there are other examples
16  other than the Trojan example of approval, whether
17  by the NRC or otherwise, for the disposal of GTCC
18  wastes in other than a geologic depository, but
19  aside from the example in Texas where you don't
20  know the name of the utility, you can't think of
21  any others but you think there are others?
22  A.  It's possible.  You asked if there are
23  any.  There are some possible concepts.
24  Q.  My question was, as you sit there you
25  don't know for a fact that Trojan is the only

33 (Pages 126 to 129)

Page 130

1  example?
2      A.  Right.
3      Q.  There may be others, you just can't
4  think of any?
5      A.  Right.
6      Q.  Now, you also mentioned, going back to
7  the first answer about alternatives to geologic
8  disposal for GTCC wastes, you also mentioned some
9  intermediate depth disposal option.  Can you tell
10 me a little more about that option?
11     A.  That would be the one hundred meter
12 deep bore holes type arrangement.
13     Q.  And again, that was not defense
14 waste -- has that actually been used by any
15 utility for GTCC wastes?
16     A.  I don't know about a utility.  It has
17 been used for disposal of GTCC like wastes over
18 the past 30 years, none recently, but it used to
19 be reasonably common.
20     Q.  Okay.  If it wasn't utilities, was it
21 defense wastes?
22     A.  I believe it was R&D wastes.
23     Q.  R&D wastes.  Forgive me, I think you
24 said that before.  I'm trying to write and think
25 and ask questions, and I apologize.

Page 131

1      R&D wastes that was government-owned or
2  university-owned or --
3      A.  It was government disposal
4  responsibility.  Exactly whose waste it was or
5  where it came from I don't know.
6      Q.  But in your opinion both of those
7  disposal options, that is near-surface facility
8  pursuant to an exemption from the NRC or
9  otherwise, or this one hundred foot intermediate
10 depth disposal, in your opinion those options are
11 available to utilities today for the disposition
12 of their commercial greater than Class C wastes?
13     A.  It is 100 meter, not foot.
14     Q.  Okay.
15     A.  I don't know how available it is, but
16 you asked were there any possible alternatives.
17 Those are possible alternatives.  Availability I
18 don't know.
19     Q.  My question was alternatives, not
20 possible, but available alternatives.  Does that
21 cause you to change your answer?  Are those
22 available alternatives?
23     A.  They are alternatives, not particularly
24 easily done, but possible.
25     Q.  If you were one of my clients, if you

Page 132

1  were Yankee Atomic Electric Company and you had
2  some GTCC wastes, would you be pursuing the
3  possibility of disposing of that GTCC wastes in
4  one of these two alternatives that you have
5  identified?
6      MS. HERRMANN:  Objection.  Speculation.
7      A.  Yes.
8      Q.  Okay, why?
9      A.  Well, they have material that they need
10 to put somewhere, and if it was possible they
11 could have disposed of it with a reactive vessel.
12 I'm not saying they could have, but it was
13 possible.
14     Q.  Would DOE support an effort by Yankee
15 Atomic Electric Company to dispose of its GTCC
16 wastes in one of these alternative manners that
17 you have outlined for us today?
18     MS. HERRMANN:  Objection.  Foundation.
19 Speculation.
20     A.  I don't know.
21     Q.  Who would know?  Who would we ask if we
22 wanted to obtain such work?
23     A.  I don't know.
24     Q.  You don't know?
25     A.  No.

Page 133

1      Q.  Okay.  Is there anyone that you would
2  go to if you were Yankee Atomic Electric Company
3  to discuss that subject?
4      MS. HERRMANN:  Asked and answered.
5  Speculation.
6      A.  No.
7      Q.  There is no one or you don't know who
8  it is?
9      A.  I don't know who it is, and I don't
10 know how you would do it with the government if
11 one were tied up in litigation on the matter.
12     Q.  Okay.  If there were no litigation
13 going on is there then someone that you would go
14 to?
15     MS. HERRMANN:  Speculation.
16     A.  If it wasn't for all litigation, I
17 would -- you know, I would think that the
18 environmental management group who is responsible
19 for that could talk about potentials.
20     Q.  And who is in charge of environmental
21 management?
22     A.  Jesse Robison is the assistant
23 secretary.
24     Q.  Does he have a deputy?
25     A.  She.

Alderson Reporting Company, Inc.
1111 14th Street, N.W. Suite 400  1-800-FOR-DEPO Washington, DC 20005

Page 134

1    Q.  She have a deputy?  Thank you.
2    A.  Yes.
3    Q.  Who is that?
4    A.  James Owendoff, I believe.
5    Q.  Currently?
6    A.  Yes.
7    Q.  Now, within RW is there someone who has
8  primary responsibility for the subject of GTCC
9  disposal?
10    A.  All materials that we would accept or
11  discussion about materials that we could or
12  couldn't accept, the responsibility is with
13  Mr. Zabransky.
14    Q.  And that's the generally the waste
15  acceptance area?
16    A.  Correct.
17    Q.  And he's in charge of that right now?
18    A.  Yes.
19    Q.  If Yankee Atomic Electric Company is
20  unable to arrange one of these alternatives, or
21  some other alternative, any alternative disposal
22  option for its GTCC waste, and if the spent nuclear
23  fuel program commences waste acceptance in 2010,
24  do you believe that DOE will accept for disposal
25  Yankee Atomic's GTCC wastes?

Page 135

1    MS. HERRMANN:  Objection.  Foundation.
2  Speculation, calls for a legal conclusion.
3    A.  I don't know.
4    Q.  You don't know.  Okay.  You have no
5  opinion whether that will happen under the
6  assumptions that I laid out?  You have no opinion
7  one way or the other?
8    MS. HERRMANN:  Same objections.  Asked
9  and answered.
10    A.  Your assumptions again were?
11    Q.  Number one, Yankee Atomic is not able
12  to arrange any alternative disposal option such as
13  the ones you suggested, or maybe some other
14  options, that is one, and two is the program
15  otherwise commences acceptance of SNF in 2010.  Do
16  you have an opinion whether or do you know -- not
17  an opinion, do you know whether DOE will in those
18  circumstances accept Yankee Atomic's GTCC wastes?
19    A.  No.
20    Q.  You don't know?
21    A.  I don't know.  I do not know if we will
22  accept it or not.
23    Q.  Okay.  Why was the disposal of GTCC
24  wastes in a geologic repository studied and
25  discussed in the Environmental Impact Statement?

Page 136

1    MS. HERRMANN:  Objection.  Foundation.
2    A.  Under CEQ guidelines it was a
3  reasonable foreseeable alternative that was
4  appropriate to be evaluated.  It also received
5  comments from the scoping process that we should
6  evaluate the disposal of greater than Class C and
7  therefore we did.
8    Q.  What was it about the CEQ's guidelines
9  that made it appropriate to evaluate that?
10    A.  I don't know that CEQ guidelines.  It
11  was my understanding that, if it were a reasonably
12  foreseeable situation in the future, that it
13  should be evaluated, similar to disposing of all
14  the waste at Yucca Mountain was another one we
15  looked at, as well as special case waste from
16  Rocky Flats we looked at.  Because it is possible
17  that the repository could dispose of the greater
18  than Class C.
19    Q.  In your opinion would that be a good
20  idea?
21    MS. HERRMANN:  Objection.  Vague.
22  Would what be a good idea?
23    MR. STOUCK:  You can answer.
24    MS. HERRMANN:  If you understand the
25  question.

Page 137

1    A.  Well, the question was would disposing
2  of greater than Class C in a repository be a good
3  idea.  And I would say, from a technological
4  perspective, I think it would be a good idea.
5  From a contractual, legal, economic, microeconomic
6  meaning who pays, which entity pays what and that
7  sort of thing, I'm not sure it is doable.
8    BY MR. STOUCK:
9    Q.  Let's sort out contractual from
10  economic if we can, okay?  Let's just talk about
11  the economics of it.  Okay?  There is a
12  contractual dispute about what, as you know,
13  undoubtedly, in this litigation, whether or not
14  DOE is obligated under the Standard Contract to
15  accept the greater than Class C, so let's put that
16  issue
17  aside.  Why -- did you say it would not be a good
18  idea or might not be a good idea?
19    A.  Might not.
20    Q.  Why might it not be a good idea from a
21  microeconomic point of view?
22    MS. HERRMANN:  Objection.  Foundation.
23  Speculation.
24    A.  This gets back to the original Act, was
25  for high-level radioactive waste, spent fuel, or

35 (Pages 134 to 137)

Lake H. Barrett CONTAINS CONFIDENTIAL INFORMATION PURSUANT TO THE PROTECTIVE ORDER   May 14, 2002
Washington, D.C.

Page 138

1    any other highly radioactive material that the NRC
2    so specified, that's what we are authorized to do,
3    and then the mill per kilowatt hour fees paid
4    cover spent fuel, to handle the waste, not
5    necessarily the greater than Class C.
6        So you end up with an issue of equities
7    amongst the contract holders, especially when
8    certain ones are closed and not paying into the
9    funds versus the ones that are, and it becomes
10   equity issues.
11       Q.   And the closed ones are generally the
12   ones that have GTCC waste at least in available
13   forms, right?
14       A.   Currently have.  I think all of them
15   may in the future.
16       Q.   Isn't this fee question the same
17   question whether it is covered by the contract or
18   not?
19       MS. HERRMANN:  Objection.  Calls for a
20   legal conclusion.
21       Q.   If it is covered by the contract, GTCC
22   waste, then the fee that was paid under the
23   contract covers the disposition of GTCC wastes,
24   right?
25       MS. HERRMANN:  Objection.  Calls for a

Page 139

1    legal conclusion.
2        A.   I don't know.  That's a legal matter.
3    I have no opinion on that.
4        Q.   Now, these other alternatives that you
5    mentioned, the special exception from the NRC for
6    the near-surface disposal or the one hundred meter
7    depth disposal for GTCC wastes, are those
8    alternatives technically feasible?
9        A.   Technically feasible.
10       Q.   Are they economically -- well, strike
11   that.
12       Are they economically feasible?
13       A.   Could be.
14       Q.   Okay.  What do you mean could be?
15       A.   It depends on how easy it is to
16   establish one of those.  I mean, it could be if in
17   the case of Trojan it worked.  You also could have
18   cases where it would be prohibitively expensive to
19   possibly do it depending on what arrangements were
20   made.  Siting of a facility for the one hundred
21   meter depth bore hole might be prohibitively
22   expensive, and it may be reasonable costs.  I don't
23   know.
24       Q.   Do you know if Trojan paid a fee to
25   dispose of its reactor vessel with possible GTCC

Page 140

1    inside at Hanford?
2        A.   Yes.
3        Q.   Paid the fee to the government?
4        A.   No.  They paid a fee.
5        Q.   Who did they pay the fee to?
6        A.   The operator of the facility, which I
7    think is U.S. Ecology.
8        Q.   Okay.  Thank you.
9        Now, tell me what effect this
10   litigation has had on RW's consideration of
11   whether or not to accept GTCC wastes for disposal
12   in the repository.
13       MS. HERRMANN:  Objection.  Vague,
14   foundation.
15       And let me caution you, if this requires
16   disclosure of communication between you and
17   counsel you should not answer.
18       A.   All the litigation issues have just
19   made it very complex to make decisions that are in
20   shades of gray such as our authority to dispose of
21   the greater than Class C waste, as well as the
22   financial equities between the government and the
23   individual contract holders, so that has made it
24   more difficult to reach closure on this matter.
25       Q.   When you say has made it more difficult,

Page 141

1    has this litigation caused the consideration by RW
2    of whether or not to accept GTCC wastes for
3    disposal in the repository to cease?  Has the
4    litigation caused consideration to essentially
5    stop or is consideration of that matter ongoing?
6        A.   As I said, it just makes it much more
7    complex.
8        Q.   Well, is consideration of disposing of
9    GTCC waste in the repository currently ongoing
10   within RW or has that consideration essentially
11   stopped because of the litigation?
12       A.   It is being addressed.  It is in the
13   FEIS, but there is very little progress I think
14   toward resolution of the issue due to the
15   complexities that we talked about.
16       Q.   Which is the litigation?
17       A.   And current litigation, possible future
18   litigation and the whole legalities of the
19   situation.
20       Q.   Primarily the litigation and the legal
21   issue of whether GTCC waste is covered or not by
22   the contract?
23       MS. HERRMANN:  Objection to the extent
24   that it mischaracterizes his testimony.
25       Q.   Is that what you are referring to?

36 (Pages 138 to 141)