# Plaintiff

Page 138

1    any other highly radioactive material that the NRC
2    so specified, that's what we are authorized to do,
3    and then the mill per kilowatt hour fees paid
4    cover spent fuel, to handle the waste, not
5    necessarily the greater than Class C.
6         So you end up with an issue of equities
7    amongst the contract holders, especially when
8    certain ones are closed and not paying into the
9    funds versus the ones that are, and it becomes
10   equity issues.
11        Q.   And the closed ones are generally the
12   ones that have GTCC waste at least in available
13   forms, right?
14        A.   Currently have. I think all of them
15   may in the future.
16        Q.   Isn't this fee question the same
17   question whether it is covered by the contract or
18   not?
19        MS. HERRMANN: Objection. Calls for a
20   legal conclusion.
21        Q.   If it is covered by the contract, GTCC
22   waste, then the fee that was paid under the
23   contract covers the disposition of GTCC wastes,
24   right?
25        MS. HERRMANN: Objection. Calls for a

Page 140

1    inside at Hanford?
2         A.   Yes.
3         Q.   Paid the fee to the government?
4         A.   No. They paid a fee.
5         Q.   Who did they pay the fee to?
6         A.   The operator of the facility, which I
7    think is U.S. Ecology.
8         Q.   Okay. Thank you.
9         Now, tell me what effect this
10   litigation has had on RW's consideration of
11   whether or not to accept GTCC wastes for disposal
12   in the repository.
13        MS. HERRMANN: Objection. Vague,
14   foundation.
15        And let me caution you, if this requires
16   disclosure of communication between you and
17   counsel you should not answer.
18        A.   All the litigation issues have just
19   made it very complex to make decisions that are in
20   shades of gray such as our authority to dispose of
21   the greater than Class C waste, as well as the
22   financial equities between the government and the
23   individual contract holders, so that has made it
24   more difficult to reach closure on this matter.
25        Q.   When you say has made it more difficult,

Page 139

1    legal conclusion.
2         A.   I don't know. That's a legal matter.
3    I have no opinion on that.
4         Q.   Now, these other alternatives that you
5    mentioned, the special exception from the NRC for
6    the near-surface disposal or the one hundred meter
7    depth disposal for GTCC wastes, are those
8    alternatives technically feasible?
9         A.   Technically feasible.
10        Q.   Are they economically -- well, strike
11   that.
12        Are they economically feasible?
13        A.   Could be.
14        Q.   Okay. What do you mean could be?
15        A.   It depends on how easy it is to
16   establish one of those. I mean, it could be if in
17   the case of Trojan it worked. You also could have
18   cases where it would be prohibitively expensive to
19   possibly do it depending on what arrangements were
20   made. Siting of a facility for the one hundred
21   meter depth bore hole might be prohibitively
22   expensive, and it may be reasonable costs. I don't
23   know.
24        Q.   Do you know if Trojan paid a fee to
25   dispose of its reactor vessel with possible GTCC

Page 141

1    has this litigation caused the consideration by RW
2    of whether or not to accept GTCC wastes for
3    disposal in the repository to cease? Has the
4    litigation caused consideration to essentially
5    stop or is consideration of that matter ongoing?
6         A.   As I said, it just makes it much more
7    complex.
8         Q.   Well, is consideration of disposing of
9    GTCC waste in the repository currently ongoing
10   within RW or has that consideration essentially
11   stopped because of the litigation?
12        A.   It is being addressed. It is in the
13   FDIS, but there is very little progress I think
14   toward resolution of the issue due to the
15   complexities that we talked about.
16        Q.   Which is the litigation?
17        A.   And current litigation, possible future
18   litigation and the whole legalities of the
19   situation.
20        Q.   Primarily the litigation and the legal
21   issue of whether GTCC waste is covered or not by
22   the contract?
23        MS. HERRMANN: Objection to the extent
24   that it mischaracterizes his testimony.
25        Q.   Is that what you are referring to?

36 (Pages 138 to 141)

# Defendant

Page 138

1. any other highly radioactive material that the NRC
2. so specified, that's what we are authorized to do,
3. and then the mill per kilowatt hour fees paid
4. cover spent fuel, to handle the waste, not
5. necessarily the greater than Class C.
6.     So you end up with an issue of equities
7. amongst the contract holders, especially when
8. certain ones are closed and not paying into the
9. funds versus the ones that are, and it becomes
10. equity issues.
11.     Q.  And the closed ones are generally the
12. ones that have GTCC waste at least in available
13. forms, right?
14.     A.  Currently have.  I think all of them
15. may in the future.
16.     Q.  Isn't this fee question the same
17. question whether it is covered by the contract or
18. not?
19.     MS. HERRMANN:  Objection.  Calls for a
20. legal conclusion.
21.     Q.  If it is covered by the contract, GTCC
22. waste, then the fee that was paid under the
23. contract covers the disposition of GTCC wastes,
24. right?
25.     MS. HERRMANN:  Objection.  Calls for a

Page 139

1. legal conclusion.
2.     A.  I don't know.  That's a legal matter.
3. I have no opinion on that.
4.     Q.  Now, these other alternatives that you
5. mentioned, the special exception from the NRC for
6. the near-surface disposal or the one hundred meter
7. depth disposal for GTCC wastes, are those
8. alternatives technically feasible?
9.     A.  Technically feasible.
10.     Q.  Are they economically -- well, strike
11. that.
12.     Are they economically feasible?
13.     A.  Could be.
14.     Q.  Okay.  What do you mean could be?
15.     A.  It depends on how easy it is to
16. establish one of those.  I mean, it could be if in
17. the case of Trojan it worked.  You also could have
18. cases where it would be prohibitively expensive to
19. possibly do it depending on what arrangements were
20. made.  Siting of a facility for the one hundred
21. meter depth bore hole might be prohibitively
22. expensive, and it may be reasonable costs.  I don't
23. know.
24.     Q.  Do you know if Trojan paid a fee to
25. dispose of its reactor vessel with possible GTCC

Page 140

1. inside at Hanford?
2.     A.  Yes.
3.     Q.  Paid the fee to the government?
4.     A.  No.  They paid a fee.
5.     Q.  Who did they pay the fee to?
6.     A.  The operator of the facility, which I
7. think is U.S. Ecology
8.     Q.  Okay.  Thank you.
9.     Now, tell me what effect this
10. litigation has had on RW's consideration of
11. whether or not to accept GTCC wastes for disposal
12. in the repository.
13.     MS. HERRMANN:  Objection.  Vague,
14. foundation.
15.     And let me caution you, if this requires
16. disclosure of communication between you and
17. counsel you should not answer.
18.     A.  All the litigation issues have just
19. made it very complex to make decisions that are in
20. shades of gray such as our authority to dispose of
21. the greater than Class C waste, as well as the
22. financial equities between the government and the
23. individual contract holders, so that has made it
24. more difficult to reach closure on this matter.
25.     Q.  When you say has made it more difficult,

Page 141

1. has this litigation caused the consideration by RW
2. of whether or not to accept GTCC wastes for
3. disposal in the repository to cease?  Has the
4. litigation caused consideration to essentially
5. stop or is consideration of that matter ongoing?
6.     A.  As I said, it just makes it much more
7. complex.
8.     Q.  Well, is consideration of disposing of
9. GTCC waste in the repository currently ongoing
10. within RW or has that consideration essentially
11. stopped because of the litigation?
12.     A.  It is being addressed.  It is in the
13. FEIS, but there is very little progress I think
14. toward resolution of the issue due to the
15. complexities that we talked about.
16.     Q.  Which is the litigation?
17.     A.  And current litigation, possible future
18. litigation and the whole legalities of the
19. situation.
20.     Q.  Primarily the litigation and the legal
21. issue of whether GTCC waste is covered or not by
22. the contract?
23.     MS. HERRMANN:  Objection to the extent
24. that it mischaracterizes his testimony.
25.     Q.  Is that what you are referring to?

Alderson Reporting Company, Inc.
1111 14th Street, N.W. Suite 400  1-800-FOR-DEPO  Washington, DC 20005

Page 142

1    A.  And also covered by the Act.
2    Q.  And also covered by the Act, but that's
3  what you are referring to when you talk about
4  complexities?
5    A.  Those are the complexities, yes.
6    Q.  Those are the complexities?
7    A.  Those are the major complexities.
8    Q.  Are there any others that have led it
9  to be very difficult to address the matter at this
10  time?
11    A.  I haven't thought about it. I'm sure
12  there are others. The state of Nevada comes to
13  mind.
14    Q.  But the major ones are this litigation
15  and the legal question about whether GTCC waste is
16  covered or not by the contract?
17    A.  And also if we are -- if we are
18  authorized to dispose of -- authorized under law,
19  clearly, to dispose of highly radioactive waste.
20       I can argue that greater than Class C
21  is low-level waste and not high-level waste and
22  therefore we are not authorized to dispose of it.
23  That's a complicated matter that is currently
24  being litigated, and if it wasn't being litigated
25  there would be debate amongst lawyers and

Page 143

1  politicians if we are authorized to dispose of it
2  or not.
3    Q.  I understand your testimony to be that
4  absent litigation over the question of whether
5  GTCC should or should not be disposed of in the
6  repository, absent that litigation, RW would be
7  more actively and with less difficulty considering
8  that matter; is that right?
9       MS. HERRMANN:  Objection to the extent
10  it mischaracterizes his testimony. Speculation.
11    A.  We might have.
12    Q.  Okay, then there must be some other
13  factor other than the litigation that is
14  inhibiting the act of consideration, and I would
15  like to know what that factor is.
16    A.  The authorization question, are we
17  authorized under the law to dispose of what is
18  essentially low-level waste in a high-level waste
19  repository. That will be a question that will be
20  very likely litigated independent of the current
21  litigation.
22    Q.  Okay. That's your view.
23    A.  Yes.
24    Q.  Why do you think that? Why do you
25  think that there is some question about whether or

Page 144

1  not GTCC is covered by the contract that is not
2  going to be resolved in this -- I mean your
3  distinction is between the statute and the
4  contract; is that what you're saying?
5    A.  Yes. It's not just a contract issue
6  that is at issue here, it is also are we
7  authorized to dispose of low-level waste in the
8  high-level waste repository.
9    Q.  Assume that that question is exactly
10  the same question that is being litigated in this
11  case. Just assume that. You don't have to
12  agree with it, just assume it. Okay?
13    A.  Go ahead.
14    Q.  Then is litigation over that question,
15  combined question, I'm to assume they are -- I'm
16  telling you to assume they are the same thing. Is
17  that the factor that is inhibiting and making more
18  difficult RW's consideration of whether or not to
19  put GTCC waste into the repository?
20       MS. HERRMANN:  Speculation in all
21  capital letters, calls for a legal conclusion, and
22  assumes facts not in evidence.
23    A.  I don't know. It's confusing to me.
24    Q.  Okay. But in any event, this
25  litigation is having some depressive effect on

Page 145

1  RW's consideration of the matter?
2       MS. HERRMANN:  Asked and answered about
3  eighteen times.
4    A.  Yes.
5       MR. STOUCK:  Can you mark this for me,
6  please.
7            (Barrett Deposition Exhibit
8            No. 82 was marked for
9            identification.)
10       (Discussion off the record.)
11       BY MR. STOUCK:
12    Q.  You have been handed a document that is
13  marked Exhibit Number 82, Mr. Barrett. This is a
14  printout from an electronic database of a
15  publication, at least a portion of the publication
16  entitled Nuclear Waste News. The date is Thursday
17  March 14, 2002.
18       Do you see that?
19    A.  I see it.
20    Q.  Do you know what that publication is?
21    A.  I don't know.
22    Q.  Okay. You don't know? If you read it,
23  is that because -- is that because if you read it
24  you don't read it in this electronic format? You
25  don't recognize it?

37 (Pages 142 to 145)

# Plaintiff

Page 1

1        IN THE UNITED STATES COURT OF FEDERAL CLAIMS

2    - - - - - - - - - - - - - - X

3    YANKEE ATOMIC ELECTRIC              :

4    COMPANY, CONNECTICUT YANKEE         :

5    ATOMIC POWER COMPANY, MAINE         :

6    YANKEE ATOMIC POWER COMPANY,        : Case No. 98-126C,

7                    Plaintiff,          : 98-154C, 98-474C

8            vs.                         : (Senior Judge Merrow)

9    UNITED STATES OF AMERICA,           :

10                   Defendant.  : Volume I

11   - - - - - - - - - - - - - X

12                           Washington, D.C.

13                           Tuesday, May 14, 2002

14            Deposition of LAKE H. BARRETT, a

15   witness herein, called for examination by counsel

16   for the Plaintiffs in the above-entitled matter,

17   pursuant to notice, the witness being duly sworn,

18   taken at the offices of Spriggs & Hollingsworth,

19   1350 Eye Street, N.W., Washington, D.C.,

20   commencing at 9:30 a.m., Tuesday, May 14, 2002,

21   and the proceedings being taken down by Stenotype

22   by CAPPY HALLOCK, RPR-CRR, and transcribed under

23   her direction.

24           CONTAINS CONFIDENTIAL INFORMATION

25           PURSUANT TO THE PROTECTIVE ORDER

# ERRATA SHEET FOR THE TRANSCRIPT OF:

**Notice Date:** May 16, 2002
**Case Name:** Yankee Atomic vs. United States
**Case Number:** 98-126C-987 4C
**Dep. Date:** ~~May 15, 2002~~ 5/14/02
**Deponent:** Lake Barrett (cont)
**Place:** Washington DC
**Ref. No.:** 4269-4

## CORRECTIONS:

| Page | Line | Now Reads | Should Read | Reasons Therefore |
|------|------|-----------|-------------|-------------------|
| 68 | 9 | the appyinte | for appyinte | ? |
| 132 | 11 | resctive | reaction | ? |
| 136 | 10 | that | what | ? |
| 141 | 13 | FDIS | FEIS | This happens several times so please fix late |
| 224 | 24 | management | packages | ? |
| ? | 17 | 97 | 07 | ? |

_Signature of Deponent_

6/26/12

# Plaintiff

Lake H. Barrett CONTAINS CONFIDENTIAL INFORMATION PURSUANT TO THE PROTECTIVE ORDER   May 14, 2002
Washington, D.C.

Page 174

1      MS. HERRMANN: Objection. Vague.
2  Speculation.
3      Q.  That that could have been done?
4      A.  It could have been done.
5      Q.  Okay.
6      A.  It technically could have been done.
7      Q.  Now, you again -- some of these things
8  I know we touched on earlier, I'm just attacking
9  it from a different angle here.
10      You mentioned earlier today shipping
11  campaigns. Do you recall that?
12      A.  Yes.
13      Q.  Now, would you agree that there are
14  advantages to shipping campaigns versus moving
15  over only a small number of assemblies at a time?
16      A.  Yes.
17      Q.  Would you agree that one of the
18  important advantages of shipping campaigns is that
19  efficiencies in transportation operations tend to
20  be realized?
21      MS. HERRMANN: Objection. Vague.
22      A.  Yes.
23      Q.  Okay, and would you agree that
24  repetitive operations such as cask handling,
25  loading, decontamination, receipt and turnaround

Page 175

1  are all more efficiently accomplished per cycle in
2  a campaign versus individual cask transport?
3      MS. HERRMANN: Objection. Vague,
4  compound.
5      A.  Yes.
6      Q.  Okay. Good.
7      Now, also earlier today I believe you
8  testified that you thought it was possible -- we
9  looked at I think it was Page 8 from one of the
10  ACRs which had the oldest fuel first queue, if you
11  will. Do you recall that?
12      A.  Yes.
13      Q.  And the question was, do you think it's
14  possible that when DOE commences fuel acceptance
15  in 2010 or some other time that that queue, with
16  minor variations that we put to one side for
17  purposes of the earlier question and I will put
18  aside here, did you think it was possible that
19  that queue would be the actual sequence of pickup
20  of spent fuel. Do you recall that?
21      A.  Yes.
22      Q.  And you said you thought that was
23  possible?
24      A.  It was possible. Unlikely.
25      Q.  Unlikely. That would be my next

Page 176

1  question. We are back to that now.
2      Now, would you agree that an acceptance
3  sequence that strictly followed the OFF queue, if
4  you will -- do you understand that reference?
5      A.  Yes.
6      Q.  -- would be economically inefficient?
7      MS. HERRMANN: Objection. Vague.
8      A.  Not as economical nor efficient as
9  other alignments might be.
10      Q.  Okay. It would be relatively
11  economical and efficient, relative to some other
12  alignments.
13      A.  Yes.
14      Q.  Can you think of any -- do you know of
15  any -- would there be some alignments that might
16  be even less economically efficient than the OFF
17  queue?
18      A.  Well, I suppose you could make them
19  less efficient. You could spread them out.
20  Everybody has a right to go smaller amounts or
21  something like that, but it's just speculative.
22      Q.  Do you think it would make any economic
23  sense to follow that queue for the actual sequence
24  of pickup?
25      MS. HERRMANN: Objection. Vague.

Page 177

1      A.  The one that is in that table?
2      Q.  Yes.
3      A.  Do I think it would -- what is the
4  question?
5      Q.  Would it be economically sensible.
6      A.  Yes, it could be sensible. I mean, it
7  is not desirable, but, all things considered, if
8  there is a strict adherence to certain
9  interpretations of the contract, you could do it.
10      Q.  Okay. Your answer is it would be
11  sensible, because it might be required by the
12  contract?
13      A.  Yes.
14      Q.  But that's not -- that's different from
15  economical sense. It would be economically
16  relatively inefficient you already testified?
17      A.  It could be inefficient.
18      Q.  It would be inefficient?
19      A.  It would be inefficient.
20      Q.  I think much earlier today we looked at
21  the mission plan and there was an objective in the
22  mission plan to conduct the program in a
23  cost-effective manner; do you recall that?
24      A.  Yes.
25      Q.  And that is still one of the objectives

Alderson Reporting Company, Inc.
1111 14th Street, N.W. Suite 400  1-800-FOR-DEPO Washington, DC 20005

# Plaintiff

Page 178

1 of the program?
2     A. Yes.
3     Q. What is your understanding of the
4 relationship between the objective of economic
5 efficiency and the fuel cost recovery nature of
6 the contract?
7     MS. HERRMANN: Objection. Calls for a
8 legal conclusion.
9     A. I believe it is the federal
10 government's responsibility to prepare a
11 cost-effective system to minimize the costs on the
12 waste generators for societal good.
13     Q. Is that related to the -- do you
14 understand the term fuel cost recovery?
15     MS. HERRMANN: Objection. Calls for a
16 legal conclusion.
17     A. I believe I do.
18     Q. What is your understanding?
19     A. That the cost for -- the costs incurred
20 by this program are fully paid for by the waste
21 generators, in this case the utility contract
22 holders and the defense activities of the
23 Department of Energy.
24     Q. And is that related to what you just
25 testified was -- I think you just testified was

Page 179

1 DOE's responsibility to implement this program in
2 a cost-effective manner?
3     A. Yes.
4     MS. HERRMANN: Objection. Calls for a
5 legal conclusion.
6     Q. And I'm asking you to explain to me
7 what your understanding of the relationship is
8 between, on the one hand, the fuel cost recovery
9 nature of the contract and, on the other hand, the
10 DOE responsibility to conduct the program in an
11 economical and efficient way?
12     MS. HERRMANN: Objection. Calls for a
13 legal conclusion.
14     A. I'm not understanding the question yet.
15     Q. Okay. Maybe I should ask, is there a
16 relationship --
17     A. Between --
18     Q. -- the fuel cost recovery nature of the
19 contract, as you just explained it, and the
20 responsibility that DOE has to proceed in an
21 economically cost-effective way.
22     MS. HERRMANN: Objection. Calls for a
23 legal conclusion.
24     A. I don't see the relationship there at
25 all.

Page 180

1     Q. The notion is you are spending the
2 utilities' money. Maybe there is some obligation
3 to spend it in a cost-effective manner.
4     MS. HERRMANN: Is that a question?
5     Q. Yes. I mean is that --
6     MS. HERRMANN: Objection. Calls for a
7 legal conclusion.
8     Q. Is that right? Do you know whether
9 that's correct?
10     A. We are always trying to do it in a
11 cost-effective manner, whose ever money it is.
12     Q. Okay.
13     A. Fuel cost recovery is fuel cost
14 recovery, efficient or inefficient.
15     Q. So in your mind the responsibility, as
16 you phrased it, for DOE to proceed in an economical
17 way is not necessarily related at all to the fuel
18 cost recovery nature of the contract?
19     A. Correct.
20     Q. You would do it in an economically
21 efficient manner regardless?
22     A. Yes.
23     Q. All right.
24     Do you believe that exchanges of
25 acceptance allocations would have added to the

Page 181

1 efficiency of the spent fuel acceptance schedule?
2     MS. HERRMANN: Objection. Speculation.
3     A. Don't know.
4     Q. Don't know?
5     Okay, can you explain why you don't
6 know to me.
7     A. It could have helped the efficiency, it
8 could have detracted from the efficiency,
9 depending on what the exchange was and the details
10 of it.
11     Q. How could it have detracted from the
12 efficiency?
13     A. It could have further fractionated it.
14 It could have put difficulties in as far as what
15 fuel was received from where, may have brought
16 difficult transportation sites into play much
17 earlier than otherwise would have happened.
18     Q. Okay. Well, do you believe that DOE
19 would have approved exchanges that had those
20 consequences?
21     MS. HERRMANN: Objection. Speculation.
22 Foundation.
23     A. I don't know.
24     Q. Can you think of a reason why DOE would
25 have approved an exchange that would have made the

46 (Pages 178 to 181)

# Plaintiff

Page 242

```
 1          IN THE UNITED STATES COURT OF FEDERAL CLAIMS

 2     - - - - - - - - - - - - - x

 3     YANKEE ATOMIC ELECTRIC         :

 4     COMPANY, MAINE YANKEE ATOMIC   :

 5     POWER CO., and CONNECTICUT     :

 6     YANKEE ATOMIC POWER CO.,       : Case No. 98-126C,

 7               Plaintiffs,   : 98-474C, 98-154C

 8          vs.                : (Senior Judge Merrow)

 9     UNITED STATES OF AMERICA,      :

10               Defendant.   : VOLUME II

11     - - - - - - - - - - - - - -X

12                         Washington, D.C.

13                         Wednesday, May 15, 2002

14     Deposition of LAKE H. BARRETT, a witness herein,

15     called for examination by counsel for Defendant in

16     the above-entitled matter, pursuant to notice, the

17     witness being previously duly sworn, taken at the

18     offices of Spriggs & Hollingsworth, 1350 Eye

19     Street, N.W., Washington, D.C., commencing at 9:05

20     a.m., Wednesday, May 15, 2002, and the proceedings

21     being taken down by Stenotype by CAPPY HALLOCK,

22     RPR-CRR, and transcribed under her direction.

23

24          CONTAINS CONFIDENTIAL INFORMATION

25          PURSUANT TO THE PROTECTIVE ORDER
```

Lake H. Barrett   CONTAINS CONFIDENTIAL INFORMATION PURSUANT TO THE PROTECTIVE ORDER- VOLUME II   May 15, 2002
Washington, D.C.

Page 339

1    A.  I don't recall.  I have lots of
2  meetings with Yankee -- there were quite a few
3  people included with the Yankees, and I don't
4  remember.
5    Q.  Do you recall telling anyone at Yankee
6  Atomic, you know, shortly, sometime not long after
7  this denial letter, that you were receptive to
8  suggestions on a process for allocation of
9  priority under the contract which DOE could
10  follow?
11    MS. HERRMANN:  Objection.  Vague.
12    A.  I might have.
13    Q.  Okay.
14    Do you think -- were you sympathetic to
15  Yankee's predicament at the time?  In other words,
16  to its desire to move this spent fuel off of its
17  site so that it could complete the decommissioning
18  activities which had been initiated?
19    MS. HERRMANN:  Objection.  Vague.
20    A.  Yes.
21    Q.  Why?
22    A.  I felt that it was in the nation's
23  interests to support utilities like Yankee who
24  were trying to clean up their sites and return
25  that real estate to useful societal purpose in

Page 340

1  that we should try to move the fuel off as quickly
2  as we practically could, consistent with sound
3  national policies.
4    Q.  Good.  That's what you thought, you
5  know, in your working life at RW?
6    A.  Yes.
7    Q.  Okay.  But because of these other
8  factors we have discussed previously, either the
9  time wasn't right or whatever to actually grant
10  the priority at that time?
11    MS. HERRMANN:  Objection as to the
12  characterization.
13    Q.  Even though you were sympathetic to
14  their predicament?
15    A.  I was sympathetic to their predicament.
16  Sympathy did not drive the decision to grant it.
17    Q.  Because of the other factors that we
18  discussed previously, is that what led you to deny
19  it?
20    A.  Correct.
21    Q.  Okay.
22    MR. STOUCK:  Would you mark this as
23  Number 101 (sic), please.
24    (Barrett Deposition Exhibit
25    No. 102 was marked for

Page 341

1    identification.)
2    MS. HERRMANN:  Exhibit 102.
3    BY MR. STOUCK:
4    Q.  Actually, Mr. Barrett, this one I will
5  tell you is a collection of documents.  I
6  believe -- yes, they are consecutively numbered,
7  out of Yankee Atomic's files.  But there is at
8  least a couple of documents here, so let me just
9  identify them for the record as follows.
10    The cover page is a letter from
11  Mr. Grube to you dated October 7, 1993.  Then
12  there looks like a two-page document, "suggestions
13  of How DOE Should Implement the Granting of
14  Priority Acceptance of Spent Fuel from Permanently
15  Shutdown Plants," and then the fifth and sixth
16  page is a memorandum dated October 1993, a memo
17  from Mr. Grube to Dr. Kadek, and the Bates numbers
18  are YOF006635-6640 -- excuse me, then there is
19  a last page which is all part of the same
20  collection, October 19, 1993, a letter from you to
21  Mr. Grube.  Okay?
22    Would you please -- could we just take
23  a short break here while you are reviewing this
24  document?  I will come back and ask you a couple
25  of questions about it.

Page 342

1    (Recess taken -- 11:45 a.m.)
2    (After recess -- 11:55 a.m.)
3    BY MR. STOUCK:
4    Q.  Have you had a chance to review this
5  collection of documents?
6    A.  I have.
7    Q.  Let's start with the letter to you
8  dated October 7.  It's the first page of the
9  exhibit --
10    MR. STOUCK:  What is the number on
11  this exhibit again?
12    THE REPORTER:  102.
13    Q.  This is letter from Mr. Grube thanking
14  you for spending time at a meeting on September
15  20th, right?
16    A.  Yes.
17    Q.  Do you recall the meeting now?
18    A.  No.
19    Q.  Do you know if the meeting happened?
20    A.  Probably.
21    Q.  Okay.  Well, did you review this entire
22  exhibit?
23    A.  Yes.
24    Q.  Okay.  Well, the last page is a letter
25  from you, right, signed by you, right?

Alderson Reporting Company, Inc.
1111 14th Street, N.W. Suite 400  1-800-FOR-DEPO Washington, DC 20005

# Defendant

```
 1        IN THE UNITED STATES COURT OF FEDERAL CLAIMS

 2   - - - - - - - - - - - - - x

 3   YANKEE ATOMIC ELECTRIC          :

 4   COMPANY, MAINE YANKEE ATOMIC :

 5   POWER CO., and CONNECTICUT      :

 6   YANKEE ATOMIC POWER CO.,        : Case No. 98-126C,

 7              Plaintiffs,   : 98-474C, 98-154C

 8          vs.               : (Senior Judge Merrow)

 9   UNITED STATES OF AMERICA,       :

10              Defendant.    : VOLUME II

11   - - - - - - - - - - - - - -X

12                        Washington, D.C.

13                        Wednesday, May 15, 2002

14   Deposition of LAKE H. BARRETT, a witness herein,

15   called for examination by counsel for Defendant in

16   the above-entitled matter, pursuant to notice, the

17   witness being previously duly sworn, taken at the

18   offices of Spriggs & Hollingsworth, 1350 Eye

19   Street, N.W., Washington, D.C., commencing at 9:05

20   a.m., Wednesday, May 15, 2002, and the proceedings

21   being taken down by Stenotype by CAPPY HALLOCK,

22   RPR-CRR, and transcribed under her direction.

23

24        CONTAINS CONFIDENTIAL INFORMATION

25        PURSUANT TO THE PROTECTIVE ORDER
```

Page 339

1    A.  I don't recall.  I have lots of
2  meetings with Yankee -- there were quite a few
3  people included with the Yankees, and I don't
4  remember.
5    Q.  Do you recall telling anyone at Yankee
6  Atomic, you know, shortly, sometime not long after
7  this denial letter, that you were receptive to
8  suggestions on a process for allocation of
9  priority under the contract which DOE could
10  follow?
11    MS. HERRMANN:  Objection.  Vague.
12    A.  I might have.
13    Q.  Okay.
14    Do you think -- were you sympathetic to
15  Yankee's predicament at the time?  In other words,
16  to its desire to move this spent fuel off of its
17  site so that it could complete the decommissioning
18  activities which had been initiated?
19    MS. HERRMANN:  Objection.  Vague.
20    A.  Yes.
21    Q.  Why?
22    A.  I felt that it was in the nation's
23  interests to support utilities like Yankee who
24  were trying to clean up their sites and return
25  that real estate to useful societal purpose in

Page 340

1  that we should try to move the fuel off as quickly
2  as we practically could, consistent with sound
3  national policies.
4    Q.  Good.  That's what you thought, you
5  know, in your working life at RW?
6    A.  Yes.
7    Q.  Okay.  But because of these other
8  factors we have discussed previously, either the
9  time wasn't right or whatever to actually grant
10  the priority at that time?
11    MS. HERRMANN:  Objection as to the
12  characterization.
13    Q.  Even though you were sympathetic to
14  their predicament?
15    A.  I was sympathetic to their predicament.
16  Sympathy did not drive the decision to grant it.
17    Q.  Because of the other factors that we
18  discussed previously, is that what led you to deny
19  it?
20    A.  Correct.
21    Q.  Okay.
22    MR. STOUCK:  Would you mark this as
23  Number 101 (sic), please.
24    (Barrett Deposition Exhibit
25    No. 102 was marked for

Page 341

1    identification.)
2    MS. HERRMANN:  Exhibit 102.
3    BY MR. STOUCK:
4    Q.  Actually, Mr. Barrett, this one I will
5  tell you is a collection of documents.  I
6  believe -- yes, they are consecutively numbered,
7  out of Yankee Atomic's files.  But there is at
8  least a couple of documents here, so let me just
9  identify them for the record as follows.
10    The cover page is a letter from
11  Mr. Grube to you dated October 7, 1993.  Then
12  there looks like a two-page document, "suggestions
13  of How DOE Should Implement the Granting of
14  Priority Acceptance of Spent Fuel from Permanently
15  Shutdown Plants," and then the fifth and sixth
16  page is a memorandum dated October 1993, a memo
17  from Mr. Grube to Dr. Kadek, and the Bates numbers
18  are YOF006635-6640 -- excuse me, then there is
19  a last page which is all part of the same
20  collection, October 19, 1993, a letter from you to
21  Mr. Grube.  Okay?
22    Would you please -- could we just take
23  a short break here while you are reviewing this
24  document?  I will come back and ask you a couple
25  of questions about it.

Page 342

1    (Recess taken -- 11:45 a.m.)
2    (After recess -- 11:55 a.m.)
3    BY MR. STOUCK:
4    Q.  Have you had a chance to review this
5  collection of documents?
6    A.  I have.
7    Q.  Let's start with the letter to you
8  dated October 7.  It's the first page of the
9  exhibit --
10    MR. STOUCK:  What is the number on
11  this exhibit again?
12    THE REPORTER:  102.
13    Q.  This is letter from Mr. Grube thanking
14  you for spending time at a meeting on September
15  20th, right?
16    A.  Yes.
17    Q.  Do you recall the meeting now?
18    A.  No.
19    Q.  Do you know if the meeting happened?
20    A.  Probably.
21    Q.  Okay.  Well, did you review this entire
22  exhibit?
23    A.  Yes.
24    Q.  Okay.  Well, the last page is a letter
25  from you, right, signed by you, right?

26 (Pages 339 to 342)

# Plaintiff

Lake H. Barrett   CONTAINS CONFIDENTIAL INFORMATION PURSUANT TO THE PROTECTIVE ORDER- VOLUME II   May 15, 2002
Washington, D.C.

Page 395

1    Q.  First is standard and second is failed?
2        MS. HERRMANN:  You can have it read
3  again.
4        MR. STOUCK:  Yes, read it again.
5        (The record was read as requested.)
6    A.  Can you define expectation a little bit
7  or not?
8        BY MR. STOUCK:
9    Q.  Well, I will accept a definition from
10  you if you are uncertain about the word.  I mean,
11  do you think it's going to happen that way?
12        MS. HERRMANN:  Same objections.
13    A.  When all is said and done, my
14  expectation, what I really think will happen is
15  when it moves along it will move together --
16  contemporary, it will all move contemporary,
17  that's the failed fuel and the standard fuel.
18    Q.  Now, a different question:  Is it your
19  expectation that when the Department of Energy
20  commences the acceptance of Yankee Atomic's spent
21  fuel, it will accept at the same time
22  contemporaneously Yankee Atomic's GTCC and remove
23  it away from the site?
24        MS. HERRMANN:  Objection.  Foundation.
25  Speculation.

Page 396

1    A.  When all extraneous legal matters are
2  finally resolved my expectation is the greater
3  than Class C waste will go at the same time,
4  contemporaneously, at the same time.
5    Q.  And why is it -- let's start, take them
6  one at a time.  Why do you expect that the failed
7  fuel, putting aside what you refer to as the
8  extraneous matters, at the end of the day the
9  failed fuel will go contemporaneously with the
10  standard fuel?  Why do you think that's likely to
11  happen?
12        MS. HERRMANN:  Foundation.
13  Speculation.
14    A.  Because it is my understanding that the
15  physical configuration of the spent fuel at
16  Yankees are somewhat similar to normal spent fuel
17  handling, so there is none that I know of -- there
18  are no sneak technical reasons why it could not be
19  accepted into the system.  And that, from a common
20  sense point of view, we should resolve these, you
21  know, other legality matters, and if you have a
22  campaign you want to move all the fuel at once.
23    Q.  And would you give the same answer if I
24  asked you the same question about the basis for
25  your expectation that GTCC would move

Page 397

1  contemporaneously with the spent fuel?
2        MS. HERRMANN:  Objection.  Foundation.
3  Speculation.
4    A.  It is similar, but more complex,
5  because there is a lot of administrative matters
6  that have to happen regarding the authorization of
7  greater than Class C, so it is not as simple --
8  you are dealing with another class of materials,
9  but when all is said and done, at the end of the
10  day, I believe that should go at the same time.
11    Q.  With respect to GTCC, if I limited the
12  question to removal from the site at the same
13  time, then would you agree that these additional
14  complexities that you referred to would not come
15  into play because those complexities relate to
16  disposal and placement?
17        Do you understand my question?
18        MS. HERRMANN:  Objection.
19    Q.  If I were to ask a different question
20  about whether you expect the GTCC to be removed
21  from the Yankee site --
22    A.  By whom?
23    Q.  By the Department of Energy,
24  contemporary with the spent fuel without regard
25  to where the GTCC goes, would you give

Page 398

1  substantially the same answer that you gave with
2  failed fuel?  In other words, these complexities,
3  the complexities that you referred to with respect
4  to the GTCC, you said the bottom line was
5  essentially the same, but there was more
6  complexities, because it is a different class of
7  materials.
8    A.  Correct.
9    Q.  My question is do those complexities
10  concern only destination for the GTCC and
11  emplacement in the repository or disposal in the
12  repository, or do those complexities also bear on
13  the question of what happens at the Yankee site
14  and the removal of GTCC from the Yankee site?
15        MS. HERRMANN:  Objection.  Calls for a
16  legal conclusion.
17    A.  Those additional complexities primarily
18  have to do with the government's authority or
19  nonauthority and where the government is going to
20  put it under what, legislation, et cetera.  It has
21  little to do with anything at the Yankee site.
22    Q.  And also, just for completeness, I
23  limited my questions at the outset to failed fuel
24  and GTCC and the timing of their removal from the
25  Yankee Atomic site, but if I were to ask you the

40 (Pages 395 to 398)

# Plaintiff

Page 399

1  same questions about those matters with respect to
2  Connecticut Yankee and Maine Yankee, would you
3  give me the same answers?
4      MS. HERRMANN: Same objections.
5      A.  I don't -- I knew -- I think I know
6  more about the configurations at the Yankee Rowe
7  site. I don't know enough to be as conclusive as I was
8  don't know enough to be as conclusive as I was
9  about Maine Yankee or Connecticut Yankee.
10     Q.  Okay. As you can be about Yankee
11  Atomic?
12     A.  Right.
13     Q.  What is it about the configurations
14  that you would need to know to compare? Are we
15  talking about cask configurations, crane
16  configurations, transportational issues or what
17  are we talking about -- or what are you talking
18  about?
19     A.  The ability to handle failed fuel, does
20  it handle like a normal fuel assembly or is it
21  unique in 10-ton canisters which are much more
22  complex to handle. If we have to go in and vacuum
23  out fuel pieces from a 10-ton canister, that's a
24  significant consideration. That's not the case at
25  Yankee Rowe is my understanding. That may or may

Page 400

1  not be the case at other sites.
2      Q.  Anything else that you can think of --
3  if I wanted to find out if the answer you gave
4  for Yankee Atomic also applied to Maine Yankee and
5  Connecticut Yankee for failed fuel, what other
6  things would I look out for to see if your answer
7  applies there?
8      A.  That's the only one I can think of.
9      Q.  With respect to GTCC, likewise if I
10  wanted to find out if your answer for Yankee
11  Atomic applied to the other two sites, what
12  factors would bear on whether or not the answer
13  did apply?
14     A.  If they have packaged it such that it
15  is relatively standard handling, meaning like a
16  spent fuel assembly, the same should apply at the
17  other sites.
18     MR. STOUCK: Okay. Mr. Barrett, thank
19  you for your testimony over these many days. I
20  have no further questions. I will tell you that
21  it has been our practice, meaning the plaintiffs
22  in these cases -- there are some disputes between
23  the parties that are ongoing about the production
24  of documents, some of them are privileged, et
25  cetera. There are some things we want from the

Page 401

1  government we have not gotten, and we are reserving
2  the right to if and when we get those things -- if
3  the court rules our way and says we are entitled
4  to them or if other documents that should have
5  been provided by now come forward later and we
6  want to ask witnesses about those, we are reserving
7  the right to do that. So I'm informing you about
8  that.
9      MS. HERRMANN: We oppose that
10  reservation of rights.
11     MR. STOUCK: Subject to that
12  possibility, I have no further questions. Again I
13  would like to thank you very much for the time and
14  patience that you have shown here. It has been
15  helpful to all of us.
16     THE REPORTER: Signature?
17     MS. HERRMANN: He wants to read and
18  sign.
19     MR. STOUCK: I am going to -- we are
20  going to disassemble these transcripts, Exhibit 92
21  and 100, and only insert the pages as we discussed,
22  but, if it turns out on review of the testimony
23  that we did not include one of the pages, we may
24  have to make adjustments later. Is that okay?
25     MS. HERRMANN: We will all be on the

Page 402

1  lookout for that.
2      (Thereupon, at 1:30 p.m., the taking of
3  the instant deposition ceased.)
4
5
6
7
8
9
10     _____
11         Signature of the Witness
12  SUBSCRIBED AND SWORN to before me this _____ day of
13  _____, 20 ___.
14
15
16
17
18     _____
19         NOTARY PUBLIC
20
21  My Commission Expires: _____
22
23
24
25

41 (Pages 399 to 402)

# Alan Brownstein

# Plaintiff

00001

1  IN THE UNITED STATES COURT OF FEDERAL CLAIMS

2 - - - - - - - - - - - - - - - - - - - -x

3 YANKEE ATOMIC ELECTRIC COMPANY          :

4 (98-126C)(Merow, S.J.)              :

5 CONNECTICUT YANKEE ATOMIC POWER COMPANY  :

6 (98-154C)(Merow, S.J.)              :

7 FLORIDA POWER & LIGHT COMPANY          :

8 (98-483C)(Wilson, J.)            :

9 NORTHERN STATES POWER COMPANY          :

10 (98-484C)(Wiese,J.)              :

11 DUKE POWER, A Division of            :

12 DUKE ENERGY CORP.              :

13 (98-485C)(Sypolt,J.)              :

14 INDIANA MICHIGAN POWER COMPANY          :

15 (98-486C)(Hodges, J.)            :

16 SACRAMENTO MUNICIPAL UTILITY DISTRICT   :

17 (98-488C)(Yock, S.J.)            :

18 SOUTHERN NUCLEAR OPERATING COMPANY,    :

19 et al.                :

20 (98-488C)(Yock, S.J.)            :

21 COMMONWEALTH EDISON COMPANY          :

22 (98-621C)(Hewitt, J.)            :

23 BOSTON EDISON COMPANY            :

24 (99-447C)(Allegra, J.)            :

25 GPU NUCLEAR, INCORPORATED          :

**Brownstein, Alan Vol. 1-Coord. Pl4/9/02        Page 1**

00002

1 (00-440C)(Bush, J.)                    :

2 WISCONSIN ELECTRIC POWER COMPANY        :

3 (00-697C)(Merow, S.J.)              :

4 POWER AUTHORITY OF THE STATE OF NEW YORK :

5 (00-703C)(Damich, J.)              :

6 OMAHA PUBLIC POWER DISTRICT             :

7 (01-115C)(Bush, J.)                :

8 NEBRASKA PUBLIC POWER DISTRICT         :

9 (01-116C)(Sypolt, J.)              :

10 TENNESSEE VALLEY AUTHORITY            :

11 (01-249C)(Bruggink, J.)            :

12      Plaintiffs,              :

13 v.                         :Discovery

14 THE UNITED STATES,              :Judge:

15      Defendant.          :(Judge

16 - - - - - - - - - - - - - - - - - -xSypolt)

17          McLean, Virginia

18          Tuesday, April 9, 2002

19          Deposition of ALAN BROWNSTEIN, a

20 witness, called for examination by counsel for

21 Plaintiffs in the above-entitled matter,

22 pursuant to notice, the witness being duly sworn

23 by CATHERINE S. BOYD, a Notary Public in and for

24 the Commonwealth of Virginia, taken at the

25 offices of Shaw Pittman, LLP, 1650 Tysons

**Brownstein, Alan Vol. 1-Coord. Pl4/9/02          Page 2**

00009

1        PROCEEDINGS

2 Whereupon,

3        ALAN BROWNSTEIN,

4 was called as a witness by counsel for

5 Plaintiffs, and having been duly sworn by the

6 Notary Public, was examined and testified as

7 follows:

8        EXAMINATION BY COUNSEL FOR PLAINTIFFS

9        FLORIDA POWER AND LIGHT COMPANY,

10       NORTHERN STATES POWER COMPANY, DUKE

11       POWER, INDIANA MICHIGAN POWER COMPANY,

12       BOSTON EDISON COMPANY, GPU NUCLEAR,

13       INCORPORATED, POWER AUTHORITY OF THE

14       STATE OF NEW YORK, OMAHA PUBLIC POWER

15       DISTRICT, NEBRASKA PUBLIC POWER

16       DISTRICT:

17       BY MR. TOMASZCZUK:

18    Q.  Mr. Brownstein, would you state your

19 name for the record, please?

20    A.  Alan Brownstein.

21    Q.  And by whom are you employed, sir?

22    A.  Department of Energy.

23    Q.  And what is your title?

24    A.  I'm a director of the Regulatory

25 Coordination Division, and I'm on detail right

00010

1 now as a special advisor to the, special, senior

2 policy advisor to the director.

3    Q.  You said director of regulatory

4 enforcement division?

5    A.  Regulatory Coordination.

6    Q.  And I'm sorry -- senior policy

7 advisor?

8    A.  Right, to the director; that's a

9 detail right now.

10   Q.  To the director of OCRWM?

11   A.  Of OCRWM.

12   Q.   And that is all within the Department

13 of Energy, correct?

14   A.  Right.  Um-hm.

15   Q.  My name is Alex Tomaszczuk.  We met

16 prior to going on the record.

17      I'm counsel for various of the utility

18 plaintiffs in this case.

19      I'm going to ask some questions about

20 your knowledge with respect to the management of

21 spent nuclear fuel.

22      If you don't understand my question,

23 please tell me, and I'll try and rephrase it so

24 that --

25   A.  Okay.

# Defendant

Page 242

```
 1      IN THE UNITED STATES COURT OF FEDERAL CLAIMS

 2    - - - - - - - - - - - - - - - - - - - - - -x

 3    YANKEE ATOMIC ELECTRIC COMPANY                      :

 4    (98-126C)(Merow, S.J.)                              :

 5    CONNECTICUT YANKEE ATOMIC POWER COMPANY             :

 6    (98-154C)(Merow, S.J.)                              :

 7    FLORIDA POWER & LIGHT COMPANY                       :

 8    (98-483C)(Wilson, J.)                               :

 9    NORTHERN STATES POWER COMPANY                       :

10    (98-484C)(Wiese, J.)                                :

11    DUKE POWER, A Division of

12    DUKE ENERGY CORP.                                   :

13    (98-485C)(Sypolt, J.)                               :

14    INDIANA MICHIGAN POWER COMPANY                      :

15    (98-486C)(Hodges, J.)                               :

16    SACRAMENTO MUNICIPAL UTILITY DISTRICT               :

17    (98-488C)(Yock, S.J.)                               :

18    SOUTHERN NUCLEAR OPERATING COMPANY,                 :

19    et al.                                              :

20    (98-488C)(Yock, S.J.)                               :

21    COMMONWEALTH EDISON COMPANY                         :

22    (98-621C)(Hewitt, J.)                               :

23    BOSTON EDISON COMPANY                               :

24    (99-447C)(Allegra, J.)                              :

25    GPU NUCLEAR, INCORPORATED                           :
```

Alan Brownstein
McLean, VA
April 10, 2002

**Page 243**

```
 1  (00-440C)(Bush, J.)                :
 2  WISCONSIN ELECTRIC POWER COMPANY    :
 3  (00-697C)(Merow, S.J.)              :
 4  POWER AUTHORITY OF THE STATE OF NEW YORK :
 5  (00-703C)(Damich, J.)               :
 6  OMAHA PUBLIC POWER DISTRICT         :
 7  (01-115C)(Bush, J.)                 :
 8  NEBRASKA PUBLIC POWER DISTRICT      :
 9  (01-116C)(Sypolt, J.)               :
10  TENNESSEE VALLEY AUTHORITY          :
11  (01-249C)(Bruggink, J.)             :
12       Plaintiffs,                    :
13  v.                          :Discovery
14  THE UNITED STATES,            :Judge:
15       Defendant.          :(Judge
16  - - - - - - - - - - - - - - - -xSypolt)
17            McLean, Virginia
18          Wednesday, April 10, 2002
19       Continued deposition of ALAN
20  BROWNSTEIN, a witness, recalled for examination
21  by counsel for Plaintiffs in the above-entitled
22  matter, pursuant to notice, the witness being
23  previously duly sworn by CATHERINE S. BOYD, a
24  Notary Public in and for the Commonwealth of
25  Virginia, taken at the offices of Shaw Pittman,
```

**Page 244**

```
 1  LLP, 1650 Tysons Boulevard, McLean, Virginia
 2  22102-4859, at 9:26 a.m., Wednesday, April 10,
 3  2002, and the proceedings being taken down by
 4  Stenotype by CATHERINE S. BOYD and transcribed
 5  under her direction.
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 245**

```
 1  APPEARANCES:
 2
 3     On behalf of the Plaintiffs Florida Power &
 4  Light Company, Northern States Power
 5  Company, Duke Power, Indiana Michigan Power
 6  Company, Boston Edison Company, GPU
 7  Nuclear, Incorporated, Power Authority of
 8  the State of New York, Omaha Public Power
 9  District, Nebraska Public Power District:
10     ALEX D. TOMASZCZUK, ESQ.
11     DANIEL S. HERZFELD, ESQ.
12     Shaw Pittman, LLP
13     1650 Tysons Boulevard
14     McLean, Virginia 22102-4859
15     (703) (770-7901)
16
17  On behalf of Plaintiff Sacramento Municipal
18  Utility District:
19     DAVID S. NESLIN, ESQ.
20     Arnold & Porter
21     370 Seventeenth Street, Suite 4500
22     Denver, Colorado 80202-1370
23     (303) 863-2301
24
25
```

**Page 246**

```
 1     APPEARANCES (Continued)
 2     On behalf of Plaintiffs Southern Nuclear
 3  Operating Company, Alabama Power Company,
 4  Georgia Power Company:
 5     JEFFREY L. HANDWERKER, ESQ.
 6     Arnold & Porter
 7     555 Twelfth Street, N.W.
 8     Washington, D.C. 20004-1206
 9     (202) 942-6101
10
11  On behalf of Plaintiff Wisconsin Electric
12  Power Company:
13     DONALD J. CARNEY, ESQ.
14     Perkins Coie, LLP
15     607 Fourteenth Street, N.W.
16     Washington, D.C. 20005-2011
17     (202) 434-1675
18
19  On behalf of Plaintiff Commonwealth Edison
20  Company:
21     NORMAN M. HIRSCH, ESQ.
22     Jenner & Block, LLC
23     One IBM Plaza
24     Chicago, Illinois 60611-7603
25     (312) 222-9350
```

2 (Pages 243 to 246)

Alan Brownstein
McLean, VA
April 10, 2002

**Page 287**

1 the line numbers on the sides of the page, the
2 style and the issues, so I'm sure that PNL did
3 it.
4 Q. Okay. Did — was it prepared at your
5 request?
6 A. Most likely.
7 Q. Okay. At page 1, at the end of the
8 first paragraph, there is a sentence which
9 reads, quote, "Unlike the Annual Capacity
10 Report, which was for planning purposes only,
11 the order in which SNF is listed in the
12 Acceptance Priority Ranking is the order in
13 which DOE is contractually bound to allocate
14 annual waste acceptance capacity to the
15 Purchasers"?
16 A. Correct.
17 Q. Was that a true statement?
18 MR. BANES: Objection. Calls for a
19 legal conclusion.
20 THE WITNESS: As I testified before,
21 it was our understanding that the Annual
22 Capacity Report is clearly stated as for
23 planning purposes and to be replaced, our
24 interpretation, to be replaced by the APR.
25 The APR did not use those words, so it

**Page 288**

1 had, you know, in my view, it had meaning beyond
2 for planning purposes.
3 Whether contractually bound, these are
4 the words that he used.
5 I'm not sure I accepted that at the
6 time. I would have to go back to, we would have
7 to look to see how I changed that or didn't
8 change it for the APR, but in terms of the
9 spirit, that was the major distinction between
10 the ACR and the APR.
11 BY MR. TOMASZCZUK:
12 Q. You're not sure whether you would
13 agree with those terms contractually bound or
14 not?
15 A. Well —
16 MR. BANES: Objection — asked and
17 answered.
18 THE WITNESS: Contractually bound is a
19 legal term.
20 It's, this is not a legal document.
21 We were using that at the time to distinguish
22 between the planning purposes, and again, as I
23 testified yesterday, there was, there was a real
24 concern that as we started this process, that
25 data on which these allocations were going to be

**Page 289**

1 generated were, were going to have importance to
2 both the utilities and to us, and if that data
3 were to change in the future, that was going to
4 cause perturbations, and we wanted to try to
5 impart to the utilities and to the people who
6 worked with us that they had to really pay
7 attention to the data on which the allocations
8 were going to be based on.
9 That's what I was trying to do.
10 That's the, that's to me the major difference.
11 That's what I meant by contractually bound.
12 BY MR. TOMASZCZUK:
13 Q. In the second paragraph, there is a
14 reference to informal discussions were held with
15 the purchasers' representatives detailing the
16 advantages of delaying the APR and DCS process.
17 Did you participate in any such
18 discussions?
19 A. I'm sure I did.
20 Q. And what in your mind were the
21 advantages to the purchasers of delaying the APR
22 and DCS process?
23 A. My general answer to you is, is the
24 issues that are depicted in the remainder of
25 this paper were, were in our minds, real issues

**Page 290**

1 of which answers had not been, you know,
2 mutually agreed to informally or formally.
3 We thought these issues needed to be
4 addressed to come to some mutual understanding,
5 and we, we needed to do that, and so that
6 was the advantage of delaying the process.
7 Q. Would that have benefited the
8 purchasers in some way?
9 A. I certainly believe it would have
10 benefited both sides.
11 Q. And what specifically would be the
12 benefit to the purchasers of such a delay?
13 A. Let me give you an example.
14 Q. Okay.
15 A. If we issued the allocations, as time
16 went on, those allocations were used for the DCS
17 process.
18 The contract allows DCSs with the
19 department's approval to be exchanged.
20 If we went through that entire
21 process, it is conceivable a market could have
22 developed of which DCSs had some value among the
23 utilities, and those trades occurred, and
24 subsequent to that, a or several utilities
25 changed the data on which those allocations were

13 (Pages 287 to 290)

Alan Brownstein

McLean, VA

April 10, 2002

**Page 291**

1  based could have caused perturbations really to
2  the utilities, some to us.
3       That's an example.
4       Q.  Since you raised the subject,
5  exchanges are mentioned here as the fourth issue
6  to be addressed in the APR?
7       A.  Right.
8       Q.  And the first sentence under the issue
9  says purchasers have the right to exchange
10  approved DCSs subject to DOE approval?
11      A.  Correct.
12      Q.  Did you agree with that statement?
13      A.  Yes, I did.
14      MR. BANES:  Objection.  Calls for a
15  legal conclusion.
16      THE WITNESS:  Sorry.  Yes, I do.
17      BY MR. TOMASZCZUK:
18      Q.  Going back to the first page, the
19  draft briefing paper goes on to state this
20  option, and I presume that's the option of
21  delaying the APR and DCS process, was rejected
22  because of the purchasers' perceived need not to
23  support any action that could be viewed as
24  acquiescing on the 1998 date?
25      A.  Correct.

**Page 293**

1       We discussed many issues associated
2  with the contract, some of which are listed in
3  this paper.
4       When we had those discussions with the
5  technical people, as I recall it, they
6  understood, you know, a host of implementation
7  problems, and as I recall it, were sympathetic
8  to the need to try to resolve those, you know,
9  before we moved on.
10      They went back, as I understand it,
11  after our meetings to their respective
12  management and to their legal counsel, and came
13  back and said something to the order of while we
14  understand, we have been advised not to proceed
15  down that course.
16      This is many years ago, but that's how
17  I recall the, the events.
18      Q.  And did any of those utility personnel
19  explain that to you or tell you anything further
20  about that?
21      A.  My only recollection is for whatever
22  the reason that I remember, they came back and
23  said there was a group or an individual, I don't
24  recall, that Jay Silberg, they had reviewed the
25  issue with Jay Silberg, and he had advised them

**Page 292**

1       Q.  And is that statement consistent with
2  your understanding of the rejection of this
3  option?
4       A.  Yes, it is.
5       Q.  The purchasers were concerned that
6  they not take any action that could be viewed as
7  extending the 1998 date in the contract?
8       A.  Yes.
9       Q.  Do you know why?
10      MR. BANES:  Objection — lack of
11  foundation.
12      Calls for speculation.
13      BY MR. TOMASZCZUK:
14      Q.  Let me go back.  Did you have any
15  discussions with utility representatives
16  concerning this issue?
17      A.  I did.
18      Q.  And you understood the utility
19  representatives to advise you that they were not
20  willing to take actions that could be perceived
21  as acquiescing on an extension of the January
22  31, 1998 date?
23      A.  We referred to the ACR issue
24  resolution process yesterday, and these were
25  basically staff-to-staff technical discussions.

**Page 294**

1       in part because of, you know, legal concerns,
2  not to do that, again, to the best of my
3  recollection.
4       Q.  Okay.
5       (There was a pause in the
6  proceedings.)
7       BY MR. TOMASZCZUK:
8       Q.  There is a reference here at the
9  bottom of page 1 to an option for dealing with
10  the waste acceptance rate issue as I understand
11  it?
12      A.  Correct.
13      Q.  And it refers to the need or desire to
14  allow the purchasers to cooperatively avoid
15  out-of-pool storage requirements based on RW-859
16  data?
17      A.  Correct.
18      Q.  Do you see that?
19      A.  Yes, I do.
20      Q.  Was it DOE's intention at the time to
21  structure the program such that purchasers would
22  avoid out-of-pool storage requirements based on
23  RW-859 data?
24      MR. BANES:  Objection — vague.
25      THE WITNESS:  In my mind, there's a

14 (Pages 291 to 294)