# Defendant

```
 1        IN THE UNITED STATES COURT OF FEDERAL CLAIMS
 2    - - - - - - - - - - - - - - - - - - - - - -x
 3    YANKEE ATOMIC ELECTRIC COMPANY                   :
 4    (98-126C)(Merow, S.J.)                           :
 5    CONNECTICUT YANKEE ATOMIC POWER COMPANY          :
 6    (98-154C)(Merow, S.J.)                           :
 7    FLORIDA POWER & LIGHT COMPANY                    :
 8    (98-483C)(Wilson, J.)                            :
 9    NORTHERN STATES POWER COMPANY                    :
10    (98-484C)(Wiese,J.)                              :
11    DUKE POWER, A Division of                        :
12    DUKE ENERGY CORP.                                :
13    (98-485C)(Sypolt,J.)                             :
14    INDIANA MICHIGAN POWER COMPANY                   :
15    (98-486C)(Hodges, J.)                            :
16    SACRAMENTO MUNICIPAL UTILITY DISTRICT            :
17    (98-488C)(Yock, S.J.)                            :
18    SOUTHERN NUCLEAR OPERATING COMPANY,              :
19    et al.                                           :
20    (98-488C)(Yock, S.J.)                            :
21    COMMONWEALTH EDISON COMPANY                      :
22    (98-621C)(Hewitt, J.)                            :
23    BOSTON EDISON COMPANY                            :
24    (99-447C)(Allegra, J.)                           :
25    GPU NUCLEAR, INCORPORATED                        :
```

April 11, 2002

...an Brownstein        McLean, VA

---

Page 468

1  (00-440C)(Bush, J.)
2  WISCONSIN ELECTRIC POWER COMPANY
3  (00-697C)(Merow, S.J.)
4  POWER AUTHORITY OF THE STATE OF NEW YORK
5  (00-703C)(Damich, J.)
6  OMAHA PUBLIC POWER DISTRICT
7  (01-115C)(Bush, J.)
8  NEBRASKA PUBLIC POWER DISTRICT
9  (01-116C)(Sypolt, J.)
10  TENNESSEE VALLEY AUTHORITY
11  (01-249C)(Bruggink, J.)
12       Plaintiffs,
13  v.  :Discovery
14  THE UNITED STATES,  :Judge:
15       Defendant.  :(Judge
16  - - - - - - - - - - - - - - - - - -xSypolt)
17      McLean, Virginia
18      Thursday, April 11, 2002
19      Continued deposition of ALAN
20  BROWNSTEIN, a witness, recalled for examination
21  by counsel for Plaintiffs in the above-entitled
22  matter, pursuant to notice, the witness being
23  previously duly sworn by CATHERINE S. BOYD, a
24  Notary Public in and for the Commonwealth of
25  Virginia, taken at the offices of Shaw Pittman,

---

Page 469

1  LLP, 1650 Tysons Boulevard, McLean, Virginia
2  22102-4859, at 9:38 a.m., Thursday, April 11,
3  2002, and the proceedings being taken down by
4  Stenotype by CATHERINE S. BOYD and transcribed
5  under her direction.
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

Page 470

1  APPEARANCES:
2
3  On behalf of the Plaintiffs Florida Power &
4  Light Company, Northern States Power
5  Company, Duke Power, Indiana Michigan Power
6  Company, Boston Edison Company, GPU
7  Nuclear, Incorporated, Power Authority of
8  the State of New York, Omaha Public Power
9  District, Nebraska Public Power District:
10     ALEX D. TOMASZCZUK, ESQ.
11     DANIEL S. HERZFELD, ESQ.
12     Shaw Pittman, LLP
13     1650 Tysons Boulevard
14     McLean, Virginia  22102-4859
15     (703) 770-7901)
16
17  On behalf of Plaintiff Sacramento Municipal
18  Utility District:
19     DAVID S. NESLIN, ESQ.
20     Arnold & Porter
21     370 Seventeenth Street, Suite 4500
22     Denver, Colorado  80202-1370
23     (303) 863-2301
24
25

---

Page 471

1  APPEARANCES:  (Continued)
2    On behalf of Plaintiffs Southern Nuclear
3    Operating Company, Alabama Power, Georgia
4    Power:
5     JEFFREY L. HANDWERKER, ESQ.
6     Arnold & Porter
7     555 Twelfth Street, N.W.
8     Washington, D.C.  20004-1206
9     (202) 942-6101
10
11    On behalf of Plaintiff Wisconsin Electric
12    Power Company:
13     DONALD J. CARNEY, ESQ.
14     Perkins Coie, LLP
15     607 Fourteenth Street, N.W.
16     Washington, D.C.  20005-2011
17     (202) 434-1675
18
19    On behalf of Plaintiff Commonwealth Edison
20    Company:
21     NORMAN M. HIRSCH, ESQ.
22     Jenner & Block, LLC
23     One IBM Plaza
24     Chicago, Illinois  60611-7603
25     (312) 222-9350

Alan Brownstein

McLean, VA

April 11, 2002

Page 564

1     If there wasn't, it would go through
2 the normal course of internal reviews.
3     That's how I recollect it.
4     Q.  Would others at DOE have reviewed
5 drafts PNL prepared as well?
6     A.  As I testified yesterday, you know, my
7 office evolved from sort of a one-man place to,
8 to a branch and then a division.
9     I have to go back and think about
10 whether in 1988, I was still a one man, or I had
11 staff.
12     If I had staff at that time, they
13 would review it, yes.
14     Q.  Do you recall reviewing this attached
15 document?
16     A.  I don't have a specific recollection
17 of that.
18     Q.  If I could ask you to turn to page 6
19 of the attachment, and would you review lines 24
20 through 31?
21     (The witness reviewed the document.)
22     THE WITNESS:  Okay.
23     BY MR. NESLIN:
24     Q.  Mr. Brownstein, 24 through 32 state
25 exchange requests should be approved if, and

Page 565

1 then they set forth in bullets five criteria.
2     Would you agree that an exchange
3 should be approved if it meets these criteria?
4     MR. BANES:  Objection.  Calls for a
5 legal conclusion.
6     THE WITNESS:  Those were important
7 criteria.
8     There may be other things that we
9 would want to have considered, and I don't
10 recall those now, but, but these, these criteria
11 were appropriate.
12     I agree with them.
13     BY MR. NESLIN:
14     Q.  Let me ask again if an exchange
15 request meets these four criteria, should it be
16 approved?
17     MR. BANES:  Objection -- asked and
18 answered.
19     THE WITNESS:  I think I did answer
20 that, and the reason for the hesitation is upon
21 review of this, and upon discussion with others
22 in the department ranging from the contracting
23 officer, my peers, my superiors, we may have --
24 it's conceivable that this, these
25 contractor-proposed criteria may have evolved,

Page 566

1 been modified, added to, deleted.
2     BY MR. NESLIN:
3     Q.  Do you recall discussing these
4 criteria with anyone else at the department,
5 these criteria set forth on page 6?
6     A.  I don't have a specific recollection
7 of that.
8     Q.  Do you recall discussing them with the
9 contractor PNL?
10     A.  The only way I can answer you is I
11 don't specifically recall, but that's not saying
12 that I did not.
13     Q.  Do you recall discussing these
14 criteria with anyone at the utility, at the
15 utility?
16     A.  I can't recall whether in the ACR
17 initial resolution process, which was subsequent
18 to this date, whether we discussed, you know,
19 that issue or not.
20     I don't specifically recall, but
21 again, I don't want to testify that I absolutely
22 never did.
23     Q.  Let me direct you to lines 28 through
24 29.
25     That sets forth as one of the criteria

Page 567

1 that the transportation system and receiving
2 facilities have the capacity to meet the revised
3 commitments?
4     A.  Yes.
5     Q.  What does that mean to you?
6     A.  Okay.
7     MR. BANES:  Objection.  Calls for
8 speculation, and lack of foundation.
9     Go ahead.
10     THE WITNESS:  Okay.  When the DCSs
11 were approved, I believe we -- we can go back to
12 it, but I believe one of the pieces of
13 information that we requested from the utilities
14 was that the type of transportation cask that
15 would be required.
16     One of the concerns we had in this
17 criteria, as I recall, is -- let's take an
18 example.
19     If we had approved, you know, let's
20 say we had approved 90 percent of our DCSs for
21 a, they would accommodate PWR rail casks.
22     If somebody wanted to do, you know,
23 exchanges at the last minute, we may have gone
24 through the procurement process to procure the
25 type of casks to be available for who we thought

Alan Brownstein

McLean, VA

April 11, 2002

Page 568

1  we were going to serve, and we, and that could
2  have affected our ability.
3        If somebody wanted a BWR truck cask,
4  and we had ordered, you know, too many of the
5  other kind based on the information provided in
6  the DCS, because the utilities were acting on
7  the DCS, so were we, so that was the intent.
8        BY MR. NESLIN:
9        Q.  So if, if sufficient casks were
10  available to accommodate the exchange, would
11  this criteria be met, to your mind?
12        A.  No.  I used that as an example.  To
13  says receiving facilities, there may have been
14  other characteristics that, that could have
15  influenced that.
16        Q.  Okay.  What, can you think of what
17  those characteristics would be?
18        A.  Well, beyond just the casks, you had
19  to have the, the infrastructure to serve that.
20        Some utilities may only be able to
21  accommodate a truck operation as opposed to a
22  rail, and so, you know, that's an example.
23        Q.  Let me ask this then.  If you had
24  sufficient casks and if the utilities involved
25  in the exchange and the facility had sufficient

Page 569

1  infrastructure to accommodate the exchange,
2  would this criteria be satisfied?
3        A.  Could I extend your analysis one step
4  in answering?
5        Q.  Certainly.
6        A.  If the information on a DCS of the two
7  DCSs between two utilities that were approved by
8  us came to us and they were identical, then it
9  would be met.  Then that criteria would be met.
10        Q.  By information, what information are
11  you referring to?
12        A.  Can we go back to the DCS, please?
13        Q.  Yes.
14        MR. HANDWERKER:  The instructions.
15        MR. NESLIN:  The instructions.
16        THE WITNESS:  Yes.  That's the form
17  I'm thinking of.
18        MR. HANDWERKER:  Thirty-four.
19        THE WITNESS:  You can see on the form
20  under 2.0 -- I'm looking at the actual form
21  itself -- it asks things like number of
22  assemblies and type, PWR, BWR, proposed shipping
23  mode, type cask required, including maximum
24  loading lifting weight.
25        Those, those are the types of things

Page 570

1  that I'm referring to.
2        There are others?  There are two.  The
3  date of discharge potentially could be
4  important.
5        BY MR. NESLIN:
6        Q.  Mr. Brownstein, would they have to be
7  identical, or would the transportation system
8  and receiving facilities simply have to have the
9  capacity to accommodate the exchanged spent
10  nuclear fuel?
11        A.  We were talking about this one.
12        MR. BANES:  Go ahead.
13        THE WITNESS:  This one criteria; no, I
14  used identical as an example, as an extreme.
15        No, they would not have to be
16  identical.
17        BY MR. NESLIN:
18        Q.  So they could involve different number
19  of fuel assemblies?
20        MR. BANES:  Objection.  Calls for
21  speculation.
22        THE WITNESS:  I really, it really does
23  call for speculation because we had never gotten
24  that, that far, that detailed, to my
25  recollection.

Page 571

1        We were never faced with a DCS
2  exchange process, and I would be speculating
3  about the answer, you know, specific
4  intricacies.
5        BY MR. NESLIN:
6        Q.  Mr. Brownstein, would it be your
7  testimony that you don't recall DOE considering
8  the specific details of how these criteria might
9  apply to a given exchange?
10        A.  No.  What I'm saying is you're asking
11  if, if, if there was a one-assembly difference,
12  would that affect it?
13        That's getting down to a gradation
14  that we never got to.
15        We did consider a number of things,
16  but that's a fine gradation.
17        Q.  Let me ask it a different way.  Would
18  the fact that there is a different --
19        A.  Okay.
20        Q.  Number of fuel assemblies
21  automatically lead an exchange request not to be
22  approved?
23        A.  If that was the only difference, that
24  would not be an automatic disapproval in my
25  mind.

Alderson Reporting Company, Inc.
1111 14th Street, N.W. Suite 400  1-800-FOR-DEPO Washington, DC 20005

Alan Brownstein

McLean, VA

April 11, 2002

## Page 572

1    Q.  The fact that a, if requested,
2  exchange might involve a different size or type
3  of fuel assembly wouldn't automatically lead it
4  to be disapproved to your mind?
5    A.  Well, that could because that could
6  affect the cask, the availability of the cask.
7       Other certain, certain facilities
8  have, you know, for example, very long fuel, and
9  that could affect it.
10    Q.  Would the fact that a proposed
11  exchange might involve DCSs which involve
12  different modes of shipment, would that
13  necessarily lead to, a requested exchange to be
14  denied?
15    A.  It could, but not necessarily.
16    Q.  I would like to direct you to lines 30
17  and 31.
18    A.  I just want to clarify all these
19  questions you're asking me were all
20  hypotheticals?
21    Q.  I'm asking you a series of
22  hypothetical questions, sir.
23       I'm asking for your opinion on how
24  they would apply.
25    A.  Right.

## Page 573

1    Q.  Lines 30 and 31 state that the
2  exchange, another criteria in the exchange will
3  not impact WMS performance in a way that would
4  delay acceptance of waste from other purchasers.
5       What does that mean to you?
6    MR. BANES:  Objection -- lack of
7  foundation.
8       Calls for speculation.  Go ahead.
9    THE WITNESS:  The best way I can try
10  to explain it is by example, if that's okay with
11  you.
12       If a utility were to give us failed
13  fuel, that might influence the decision.
14    BY MR. NESLIN:
15    Q.  And why would that influence the
16  decision?
17    A.  Again, hypothetically, there would
18  probably be a preference in the early stages of
19  system operation to, to try to use standard fuel
20  to minimize the opportunity for, for us having
21  to employ some contingencies.
22       In other words, failed fuel, we might
23  have to do some repackaging that we would have
24  rather not have done on the opening day.
25    Q.  Would, would that necessarily delay

## Page 574

1  the acceptance of waste from other purchasers?
2    A.  It could, but not necessarily.  It was
3  a concern.
4       There may have been other concerns
5  associated with that criteria that at this
6  moment, I can't recall.
7    Q.  Do you recall the basis of these
8  criteria?
9    A.  Well, the basis of the criteria was
10  that PNL was, was tasked to think about this and
11  develop suggestions to the department.
12       It was a normal course of business,
13  and so I viewed this as contractor input to the
14  department that, you know, certainly the
15  department did not take a position.
16       One, as I said, hadn't gone through to
17  my knowledge, you know, the necessary
18  concurrence and evaluation by a range of people
19  within RW that would need to have, you know,
20  evaluated it.
21    Q.  Evaluated it for what purpose?
22    A.  Of whether that was appropriate or
23  acceptable to the department; in other words,
24  this is not departmental policy.
25    Q.  You're saying that for something to be

## Page 575

1  adopted as department policy, additional people
2  would have to review it and approve it?
3    A.  What I'm saying is that a contractor
4  product is not departmental policy.
5    Q.  How would a contractor product become
6  departmental policy?
7    A.  One way it would become that would be
8  for it to be issued under DOE letterhead.
9    Q.  By issue, what do you mean?
10    A.  Number of ways -- issued could be
11  instructions or it could be a report.
12       It could be a letter by a program
13  official or, or contracting officer.
14       Those are three ways.
15    Q.  So if it were incorporated into a DOE
16  document or a DOE letter, then it could become
17  departmental position, departmental position?
18    A.  Sure.
19    Q.  How was this information, this report
20  used, do you recall, by the department, used by
21  the department?
22    A.  I don't recall.
23    Q.  Do you recall whether you did anything
24  in response to this report?
25    A.  That's a good question.  There are 14

28 (Pages 572 to 575)

Page 576

1  years between the report and now, and I just
2  don't recall.
3           (There was a pause in the
4  proceedings.)
5           MR. NESLIN: Can we go off the record
6  for a second?
7           (A discussion was held off the
8  record.)
9           MR. NESLIN: Mark that as 51.
10          (Brownstein Exhibit No. 51
11          was marked for
12          identification.) ^
13  BY MR. NESLIN:
14    Q.  You've been handed what's been marked
15  as Exhibit 51 to your exhibit -- to your
16  deposition.
17          This is a document entitled,
18  "Guidebook for Standard Contract for Disposal,"
19  stamped preliminary draft.
20          MR. BANES: Do you have several copies
21  of that?
22          MR. NESLIN: Yeah. Sorry, counsel.
23          MR. BANES: No problem. Is this 51?
24          MR. NESLIN: Fifty-one.
25  BY MR. NESLIN:

Page 577

1    Q.  Mr. Brownstein, are you familiar with
2  this document?
3    A.  You have to give me a chance at least
4  to glance at it.
5           (The witness reviewed the document.)
6           THE WITNESS: I don't recall, I do not
7  recall ever seeing this before.
8           BY MR. NESLIN:
9    Q.  Do you recall any discussion at OCRWM
10  about preparing a guidebook for the standard
11  contract?
12    A.  Guidebook does not ring any bells. I
13  have no recollection of that.
14    Q.  This includes information, turning to
15  the Table of Contents, this includes information
16  on the ACR issue resolution process?
17    A.  Yes.
18    Q.  On the Delivery Commitment Schedule
19  process, on the delivery commitment, on the
20  Delivery Commitment Schedule exchanges?
21    A.  Um-hm.
22    Q.  Do you recall any discussion at OCRWM
23  about providing written guidance on those issues
24  collectively in a document of this sort, whether
25  it was called guidebook or not?

Page 578

1    A.  As I testified, we had something
2  called this ACR resolution process with the
3  utilities, and there were a number of issues
4  that were identified, and those would be subject
5  to, you know, discussions at meetings.
6           I would normally have requested a
7  contractor to prepare such things as
8  suggested -- well, analysis of the issue, and
9  potentially suggested positions for DOE
10  recommendations, so these issues are familiar to
11  me.
12          Responding to your question, I never
13  saw it in this form or this guidebook, but as I
14  have testified previously, contractors may have
15  worked on this as a way to present this to me,
16  but I don't recall the document.
17    Q.  Mr. Brownstein, I've just looked at
18  several pages, for example.
19    A.  Sure.
20    Q.  Pages 1 and 2, 3, have numbering along
21  the left side of the text?
22    A.  The left? You're talking about these?
23    Q.  Yes.
24    A.  Yeah. Yes.
25    Q.  But by these, you're pointing to the

Page 579

1  numbers along the left side of the page?
2    A.  Yes.
3    Q.  Does that begin --
4           MR. BANES: Page, on page 2017.
5           BY MR. NESLIN:
6    Q.  Does that indicate anything to you
7  about the, who might have prepared this
8  document?
9    A.  As I have testified before, this was a
10  characteristic normally employed by PNL.
11    Q.  If I could ask you to turn to page 37?
12  This would be Bates Number CTR-001-2050 in
13  the lower right-hand corner.
14    A.  Okay.
15    Q.  I would ask you to review lines 13
16  through 20 on the page.
17          (The witness reviewed the document.)
18          THE WITNESS: Okay. I'm sorry. You
19  said to 30?
20          BY MR. NESLIN:
21    Q.  Thirteen through 20.
22    A.  I have read that, yes; 1 through 28, I
23  didn't.
24          MR. BANES: Just note for the record
25  line 21 and 22 don't seem to be readable.

29 (Pages 576 to 579)

# Defendant

Page 1

```
 1            IN THE UNITED STATES COURT OF FEDERAL CLAIMS

 2    - - - - - - - - - - - - - - - - - - - X

 3    YANKEE ATOMIC ELECTRIC COMPANY              :

 4    (98-126C)(Merow, S.J.)                      :

 5    CONNECTICUT YANKEE ATOMIC POWER COMPANY :

 6    (98-154C)(Merow, S.J.)                      :

 7    MAINE YANKEE ATOMIC POWER COMPANY           :

 8    (98-474C)(Merow, S.J.)                      :

 9                          Plaintiffs,           :

10         v.                                     :

11    THE UNITED STATES,                          :

12                          Defendant.            :

13    - - - - - - - - - - - - - - - - - - - X

14                          Washington, D.C.

15                          Thursday, May 23, 2002

16            Deposition of ALAN BROWNSTEIN, a witness

17    herein, called for examination by counsel for

18    Plaintiffs in the above-entitled matter, pursuant to

19    agreement, the witness being duly sworn by JAN A.

20    WILLIAMS, a Notary Public in and for the District of

21    Columbia, taken at the offices of Spriggs &

22    Hollingsworth, 1350 I Street, N.W., Washington, D.C.,

23    20005-3305, at 8:40 a.m., Thursday, May 23, 2002, the

24    proceedings being taken down by Stenotype by JAN A.

25    WILLIAMS, RPR, and transcribed under her direction.
```

Alan Brownstein                                                          May 23, 2002
                              Washington, D.C.

---

**Page 2**

1   APPEARANCES:
2
3       On behalf of the Plaintiffs:
4       JERRY R. STOUCK, ESQ.
5       Spriggs & Hollingsworth
6       1350 I Street, N.W.
7       Washington, D.C.  20005-3305
8       202-898-5800
9
10      On behalf of the Defendant:
11      KEVIN B. CRAWFORD, ESQ.
12      RUSSELL A. SHULTIS, ESQ.
13      U.S. Department of Justice
14      Civil Division
15      1100 L Street, N.W., Room 12128
16      Washington, D.C.  20530
17      202-305-9640
18
19
20
21
22
23
24
25

---

**Page 3**

1           CONTENTS
2   WITNESS        EXAMINATION BY COUNSEL FOR
3   ALAN BROWNSTEIN          PLAINTIFFS
4   By Mr. Stouck          4
5
6       Afternoon Session - Page 143
7
8           EXHIBITS
9   BROWNSTEIN EXHIBIT NO.          PAGE NO.
10  77 - Condensed testimony of Alan Brownstein,
11      pages 1 through 781          6
12  78 - Memo dated 7/23/84 with attachments    37
13  79 - Proceedings of the 1983 Civilian
14      Radioactive Waste Management Information
15      Meeting, December 12-15, 1983    42
16  80 - Memo dated 4/8/83 with attachments    55
17  81 - Proposed Rules, Nuclear Regulatory
18      Commission, 10 CFR Part 61, Disposal of
19      Radioactive Wastes, 5/18/88      81
20  82 - U.S. Department of Energy, Contract for
21      Disposal of Spent Nuclear Fuel and/or
22      High-Level Radioactive Waste      157
23
24
25

---

**Page 4**

1           PROCEEDINGS
2   Whereupon,
3           ALAN BROWNSTEIN,
4   was called as a witness by counsel for Plaintiffs,
5   and having been duly sworn by the Notary Public, was
6   examined and testified as follows:
7       EXAMINATION BY COUNSEL
8           FOR PLAINTIFFS
9       BY MR. STOUCK:
10      Q.   Good morning, Mr. Brownstein. I'm Jerry
11  Stouck, we met briefly before the deposition started.
12  I represent three utility companies in this
13  litigation, Yankee Atomic Electric Company,
14  Connecticut Yankee Atomic Power Company, and Maine
15  Yankee Atomic Power Company.
16          And I know you have some familiarity with
17  the litigation because you were deposed for three
18  days I think in the so-called common proceedings. I
19  want to start by asking you some questions about your
20  prior testimony just for clarification.
21      A.   Sure.
22      Q.   And maybe some supplementation. So I'm
23  going to hand you and I think we'll mark as -- well,
24  hold on. We're going to start numbering the exhibits
25  with the next number in the common deposition just so

---

**Page 5**

1   we don't get confused and we may use some of those
2   prior exhibits today.
3           I believe the last number according to the
4   transcript I have is No. 76. So let's go ahead and
5   mark this 77. And furthermore I've got a copy for
6   you guys. We'll do what we did with Mr. Barrett when
7   we went through a similar exercise.
8           I've got the entire transcript from the
9   three days. I'm not going to ask you about every
10  page. What I would like to do is, when I do ask a
11  question, I would like you to put a checkmark on that
12  page and then the official exhibit will consist of
13  only those pages that were actually asked about.
14          Is that okay with you guys? I mean I'll
15  introduce the whole transcript.
16          MR. CRAWFORD: No, I definitely want to
17  avoid introducing the whole transcript.
18          MR. STOUCK: Because you just get into
19  circularity. And we'll have an agreement that, if
20  for some reason on reviewing the transcript we
21  realize that we didn't mistakenly disassemble the
22  transcript, we'll just put in as Exhibit 77 the pages
23  that he was actually asked about. But we'll try to
24  do that is we sit here so we don't have to fix it
25  later.

Alderson Reporting Company, Inc.
1111 14th Street, N.W. Suite 400  1-800-FOR-DEPO Washington, DC 20005

Page 98

1 utilities.
2     And, since they were allowed to trade
3 subject to DOE's approval, if we did not reach
4 consensus on some of these 34, 36 implementation
5 issues, the department would have to be, you know,
6 making decisions, you know, on those. And we thought
7 it would be better to try to do that as best we could
8 together.
9     Q.  So, in other words, if I'm
10 understanding -- I see now. Are you saying that, as
11 a predicate or sort kind of prerequisite for the DCS
12 exchange process, it would have been helpful to have
13 some or all of the open 34 issues resolved prior to
14 the development of a market for DCS exchanges because
15 some of those issues involved technical matters that
16 would be better to have nailed down before the
17 exchanges started taking place; is that what you're
18 saying?
19     MR. CRAWFORD:  Objection, vague.
20     THE WITNESS:  Certainly not all of those
21 issues but a subset of those, yes.
22     BY MR. STOUCK:
23     Q.  You wanted to nail those down first so as
24 to make the -- so as to promote a better function of
25 the DCS exchange market?

Page 99

1     MR. CRAWFORD:  Objection, vague.
2     THE WITNESS:  In order to carry out those
3 phases of the contract, referring to the APR and the
4 DCS, we would have had to make some decisions; for
5 example, you know, instructions. Okay. And, you
6 know, there were real questions as I recall now, you
7 know, back on the table.
8     And, if we had not reached some sort of
9 consensus agreement in order to go forward, the
10 department would have had to make some judgments
11 about that and move forward.
12     BY MR. STOUCK:
13     Q.  Judgments about?
14     A.  Whatever, we would have to go through the
15 questions.
16     Q.  Let's stick with these exchanges. Are you
17 saying here -- this is the example you gave at the
18 last deposition. Are you saying that it would be
19 more difficult for the DCS exchange market to develop
20 and work smoothly --
21     A.  No.
22     Q.  -- if the issues were not resolved before
23 that market happened, is that what you were saying?
24 You say that's not what you're saying?
25     A.  No.

Page 100

1     Q.  Then what are you saying here?
2     A.  I'm saying that, if there were questions
3 on the table that both sides recognized there were
4 real questions, if we did not together reach some
5 consensus and move forward, if the process wasn't
6 delayed, clearly we would -- the department would
7 have to, you know, reach whatever decisions it was
8 going to reach in implementing that. And that's what
9 I was referring to.
10     Q.  Well, how does that relate to the DCS
11 exchange process? That's what I'm not understanding.
12 And it may relate to other things and that's fine.
13     A.  For instance, I'm going back to your
14 exhibit. And I haven't read the thing through. But
15 No. 3 is changes in the allocation. If we did not --
16 and there's an issue here and there are options.
17     If we together with utilities did not
18 select an option in order to carry out the process,
19 we would have picked one, the department would have
20 picked one. The allocation queue is, you know, a
21 prerequisite to getting to a DCS.
22     Q.  Which in turn is a prerequisite to an
23 exchange?
24     A.  To an exchange.
25     Q.  What about the criteria the department

Page 101

1 would use for approving or disapproving exchanges?
2     A.  That would be something that, you know,
3 the utilities I think would want to understand and
4 work with us on. Without that we were prepared as we
5 did move ahead. We were just trying to do it in a
6 more cooperative fashion. That's my best
7 recollection.
8     Q.  Okay. Well, look at this testimony at the
9 bottom of page 290. You know, maybe I'm
10 misinterpreting, but I thought what you were saying
11 there was that, if you went -- it says, if you went
12 through the entire process, it's conceivable a market
13 could have developed of which DCSs had some value
14 amongst the utilities and those trades occur and
15 subsequent to that a or several utilities change the
16 data on which allocations were based could have
17 caused perturbations really to the utilities, some to
18 us. That's an example. Do you see that?
19     A.  Yes, I do.
20     Q.  So I took that to mean that your
21 expressing the view that, in order to either
22 eliminate or minimize the prospect that the data on
23 which -- I really took that to mean, and maybe this
24 is -- this is what I'm asking about, to mean if the
25 data on which the exchanges were based might change

26 (Pages 98 to 101)

# Plaintiff

00001

1    IN THE UNITED STATES COURT OF FEDERAL CLAIMS

2 - - - - - - - - - - - - - - - - - - - X

3 YANKEE ATOMIC ELECTRIC COMPANY        :

4 (98-126C)(Merow, S.J.)            :

5 CONNECTICUT YANKEE ATOMIC POWER COMPANY :

6 (98-154C)(Merow, S.J.)            :

7 MAINE YANKEE ATOMIC POWER COMPANY      :

8 (98-474C)(Merow, S.J.)            :

9            Plaintiffs,   :

10    v.                :

11 THE UNITED STATES,           :

12            Defendant.   :

13 - - - - - - - - - - - - - - - - - - - X

14            Washington, D.C.

15            Thursday, May 23, 2002

16      Deposition of ALAN BROWNSTEIN, a witness

17 herein, called for examination by counsel for

18 Plaintiffs in the above-entitled matter, pursuant to

19 agreement, the witness being duly sworn by JAN A.

20 WILLIAMS, a Notary Public in and for the District of

21 Columbia, taken at the offices of Spriggs &

22 Hollingsworth, 1350 I Street, N.W., Washington, D.C.,

23 20005-3305, at 8:40 a.m., Thursday, May 23, 2002, the

24 proceedings being taken down by Stenotype by JAN A.

25 WILLIAMS, RPR, and transcribed under her direction.

**Brownstein, Alan-Plt Fact 5/23/02**            **Page 1**

00104

1 the contract, the DOE would make adjustments from

2 time to time in the queue, if you will, the APR

3 ranking, based on reinserted fuel; is that right?

4    A.   Yes.  And that was -- as I recall that was

5 one of the issues.  To get in the queue, it had to be

6 based on the date of final discharge.  Utilities

7 could have, you know, subsequent to its, you know,

8 final discharge date decided for other reasons to

9 reinsert that fuel.  And then that fuel which created

10 the place in the queue was no longer -- no longer

11 there.  So what do we do.  That was an issue.

12    Q.   Was that issue ever resolved?

13    A.   To the best of my recollection somewhere,

14 whether it was in the APR or some instructions, I

15 think we addressed it.  I don't recall offhand, but I

16 think we addressed the subject.  I don't remember the

17 details.  It was published, whatever we did.

18    Q.   Now, you said earlier, when we were

19 talking -- when we were discussing exchanges, that

20 you were aware or the department was aware that these

21 approved DCSs had different value to different

22 utilities?

23    A.   Well, what I said was could have.

24    Q.   Okay.  What do you mean by that, why did

25 you have an understanding, why did the department

**Brownstein, Alan-Plt Fact 5/23/02          Page 104**

00105

1 have the understanding that the approved DCSs could

2 have different value to different utilities?

3      MR. CRAWFORD: Objection, compound; and

4 objection, vague; objection, foundation.

5      THE WITNESS: If you take two utilities

6 that had, you know, different places in the queue,

7 their situations on, for instance, their cost of

8 storage could have been different. I'll give you a

9 couple of examples.

10      Maybe one utility had an early allocation

11 that would have been easy for them to rerack or, you

12 know, they had already made the capital costs for a

13 storage facility or had excess storage capacity

14 within their pool.

15      The value -- we believed the value of that

16 place in the queue to that utility was less than a

17 utility that, if they did not receive the services in

18 that particular year, they would have had to make a

19 major capital expense. So you can see a natural

20 imbalance to the utilities themselves and the value

21 of receiving fuel at any particular time.

22      And, if there was that imbalance, we

23 assumed, certainly the contract allowed for, you

24 know, a market to develop. And we were going to then

25 be a part of that because the contract required us to

**Brownstein, Alan-Plt Fact 5/23/02          Page 105**

00106

1 approve it, when the government has to approve it.

2       We wanted to be careful how we, quote,

3 interfered with the marketplace.  And there were

4 these issues, these technical issues that, if we

5 resolved together, would have -- again, since these

6 were primarily equity issues, not issues of key

7 importance to us, we wanted to do as little as

8 possible in interfering with the market.  That was my

9 rationale in how these -- how this subject developed.

10       BY MR. STOUCK:

11   Q.   And that was a subject that you, that

12 being a subject of exchanges of DCSs, approved DCSs,

13 that was something you certainly had responsibility

14 for?

15   A.   Yes.

16   Q.   And you wanted to be careful in not

17 interfering too much with this marketing DCS

18 exchanges because, as a general proposition, you know

19 markets are good, you wanted to allow the utilities

20 to pursue presumably their self interest in making

21 economic exchanges; is that what was behind it or was

22 there something else behind it?

23       MR. CRAWFORD:  Objection, compound.

24       THE WITNESS:  Markets are efficient.  And

25 the efficiency of that market increases with the

**Brownstein, Alan-Plt Fact 5/23/02**          **Page 106**

00107

1    I don't remember.  That was done

2 under my direction, but I don't remember when.

3    MR. BANES:  There is a date on it.

4    BY MR. TOMASZCZUK:

5    Q.  There appears to be a date in the

6 upper right-hand corner of 21 April 1987.

7    Having said that, I can also say that

8 there are lots of other dates, but those appear

9 on the chart itself as opposed to an annotation

10 in the upper right-hand corner.

11    A.  May I --

12    Q.  Please; absolutely.

13    (The witness reviewed the document.)

14    THE WITNESS:  Okay.  So this was

15 available to me at the time that we prepared

16 this.

17    I doubt it would have been substantive

18 input since the only relationship, as it says,

19 that there is an ACR due in July of '87, so it

20 would have very limited input to this document,

21 as I recall.

22    Again, I have to review that.

23    BY MR. TOMASZCZUK:

24    Q.  And I'm sorry if I asked you this

25 before, but did you prepare this Star Wars

# Defendant

**Page 110**

1  both were possible, you know, reach a consensus, it's
2  not that the department could not act. The
3  department could act. It would have made its
4  decisions.
5     BY MR. STOUCK:
6     Q.  Here's the thing, I'm not trying to be
7  critical, I'm just trying to find out what did happen.
8  And the approval criteria, exchange approval criteria
9  were never finalized, right? I mean I think that's
10  what you testified to. Tell me. I see you pausing.
11    A.  You're talking about the ACR issue
12  resolution process. Issues were never finalized?
13  That would be a correct statement.
14    Q.  Now I'm talking about criteria for
15  approval of exchanges of DCSs. There was an effort
16  underway at some point in all these documents to
17  develop specific -- and I could show it to you, if it
18  becomes important, to develop criteria to guide DOE
19  in determining whether or not to approve exchanges?
20    A.  Right.
21    Q.  And it's my understanding, my recollection
22  from the testimony that I have heard that those
23  criteria were never finalized?
24    A.  I think that's correct.
25    Q.  Okay. And I thought you agreed with me

**Page 111**

1  that that was an example of the kind of thing that,
2  despite your efforts and your motives to as I
3  understood the testimony remove impediments from the
4  marketplace, to promote the smooth functioning with
5  this market, this failure to, you know, failure,
6  again I'm not being critical, but the fact that those
7  exchange criteria were never finalized is an example
8  of something I thought you agreed, that, you know, I
9  used word impediment, that if those criteria had been
10  finalized or those exchange approval criteria, that
11  would have furthered the smooth functioning of this
12  marketplace in DCSs that we're talking about.
13    You do you agree with that and the fact
14  that it, therefore, was something that could have
15  been done to make it even better than the things that
16  you were able to accomplish?
17    MR. CRAWFORD: Objection, compound.
18    THE WITNESS: That's a long question. As
19  I recall we evaluated different alternatives,
20  different criteria. There was no -- let me make it
21  clear for the record. No one ever gave us a DCS --
22  an approved DCS for an exchange.
23    So we had in our desk drawer something
24  that we were prepared to use. Now, whether it was
25  finalized, well, no one ever had to sign off it

**Page 112**

1  because it never became --
2     BY MR. STOUCK:
3     Q.  I see. Now I understand. That's fine.
4  Do you know why there were never any exchanges of
5  DCSs submitted for approval?
6     MR. CRAWFORD: Objection to the extent it
7  calls for speculation.
8     THE WITNESS: No. I mean because that was
9  something that the utilities had the right to do on
10  their own to submit to us. And why they never did I
11  don't know.
12    BY MR. STOUCK:
13    Q.  Do you have an opinion about it?
14    A.  No.
15    Q.  No understanding of why it has happened,
16  but there have not apparently been any exchanges
17  submitted for approval?
18    MR. CRAWFORD: Objection, asked and
19  answered.
20    THE WITNESS: I don't know. All I know is
21  they had the right. And we needed -- it was my
22  responsibility to be prepared for that should it
23  occur.
24    BY MR. STOUCK:
25    Q.  And you could not testify about the

**Page 113**

1  reasons why utilities had not submitted exchanges for
2  approval; is that right?
3     MR. CRAWFORD: Objection, argumentative;
4  objection, asked and answered.
5     THE WITNESS: No, I testified why I think
6  a market could develop just a few minutes ago. Why
7  it didn't I have no idea. I don't know, I just flat
8  out don't know.
9     BY MR. STOUCK:
10    Q.  Okay. Now, in this same testimony I have
11  directed your attention to from the prior deposition,
12  I think we moved on to 293 now, you said you thought
13  there were advantages to delaying, but the utilities
14  didn't want to delay; is that right? I mean is that
15  a brief summary of for whatever this is on page 293,
16  line 21, my only recollection is for whatever reason
17  they came back and said -- well --
18    A.  Let me just review that for a second.
19    Q.  Okay. It's actually on 292 I guess, line
20  5.
21    A.  Yes.
22    Q.  You thought there were advantages to
23  delay, but the purchasers for whatever reason did not
24  want a delay according to this question and answer,
25  it says they were concerned that they not take any

# Defendant

Alan Brownstein                                                                    May 23, 2002

Washington, D.C.

Page 138

1      BY MR. STOUCK:
2      Q.   At the time the list was developed which I
3  think was about the time of the '90 or '91 --
4      A.   No.
5      Q.   When was it?
6      A.   The list of 34 issues?
7      Q.   Yes.
8      A.   My recollection is that was done earlier.
9      Q.   Much earlier?
10     A.   Yeah.
11     Q.   Whatever time it was developed, at that
12  time RW thought that those issues had to be resolved
13  before the department could commence acceptance of
14  spent fuel pursuant to the contracts; is that right?
15         MR. CRAWFORD: Objection to the
16  foundation; objection to the extent it calls for a
17  legal conclusion.
18         THE WITNESS: We thought it was important.
19  I don't think anybody made the distinction between
20  important versus, if it did not happen, could we not
21  move forward.
22         BY MR. STOUCK:
23     Q.   Okay. That's fair. I understand that and
24  I thank you for that clarification.
25         Take a look at page 4 of Exhibit 35. And

Page 139

1  there's a paragraph numbered 12 there. Do you see
2  that?
3      A.   Yes.
4      Q.   It's a proposed change to the definition
5  of high-level radioactive waste. Would you please
6  review that and I've got a question for you about it
7  or two maybe. Let me ask the question, it might help
8  you as you read it.
9      A.   Okay.
10     Q.   The question is going to be, aside from
11  what you read on this piece of paper, do you have a
12  recollection of proposals to change the definition of
13  high-level radioactive waste in a way that would
14  affect GTCC? You know, if you read this, I think you
15  will see that this is a proposal to change it in a
16  way that would affect GTCC waste. But independent of
17  this do you recall that there were proposals to
18  change the contract in that manner?
19         MR. CRAWFORD: Let me object just to best
20  evidence.
21         BY MR. STOUCK:
22     Q.   Would you answer the question.
23     A.   By who? I mean this is --
24     Q.   By RW. I mean this is a proposal --
25     A.   Oh, no oh, no.

Page 140

1      Q.   You don't recall that?
2      A.   No, no, wait a second.
3      Q.   What am I not understanding?
4      A.   This is a contractor document.
5  Contractors make suggestions and recommendations to
6  the department all the time. Because a contractor
7  says something doesn't mean, you know, the department
8  either wanted it or agrees with it. This was a
9  contractor input.
10     Q.   I understand that. That's fair enough.
11  And this contractor input apparently is suggesting or
12  at least describing a change to the definition of
13  high-level radioactive waste?
14     A.   That's correct.
15     Q.   Do you know -- maybe I don't have to
16  preface it by saying independent of this document.
17  Even not independent of this document, do you know
18  whether that kind of change was ever discussed,
19  making that change was ever discussed within RW; that
20  is, a change to the standard contract to the meaning
21  of the term high-level radioactive waste that would
22  affect coverage of GTCC?
23     A.   We talked about this subject before and
24  there was testimony before. And I think you asked a
25  similar question. I told you --

Page 141

1      Q.   Well --
2      A.   There were two people I talked about.
3      Q.   Okay.
4      A.   And this was something that I didn't
5  believe in, didn't accept, and, you know, I had
6  discussions with two people as I recall. Probably
7  staff too.
8      Q.   I thought what you said you didn't believe
9  in or accept before was that GTCC was covered by the
10  contract. This is a little bit different question
11  which is do you recall whether there were any
12  discussions that you were part of or any effort at RW
13  to amend the contract in a manner that would affect
14  GTCC waste? That's what I'm asking now.
15     A.   Sorry. As I recall, when I read this, I
16  may have discussed it with Nancy and my staff. But I
17  know that I did not take this thing forward because I
18  didn't believe --
19     Q.   What is it that you didn't believe?
20     A.   I didn't believe that we should or needed
21  to make a change to the contract.
22     Q.   Because it was clear in your mind that it
23  wasn't covered?
24     A.   That's correct.
25

Alderson Reporting Company, Inc.
1111 14th Street, N.W. Suite 400  1-800-FOR-DEPO Washington, DC 20005

# Defendant

Page 246

```
 1           IN THE UNITED STATES COURT OF FEDERAL CLAIMS

 2   - - - - - - - - - - - - - - - - - - - - X

 3   YANKEE ATOMIC ELECTRIC COMPANY              :

 4   (98-126C)(Merow, S.J.)                      :

 5   CONNECTICUT YANKEE ATOMIC POWER COMPANY :

 6   (98-154C)(Merow, S.J.)                      :

 7   MAINE YANKEE ATOMIC POWER COMPANY           :

 8   (98-474C)(Merow, S.J.)                      :

 9                       Plaintiffs,            :

10        v.                                     :

11   THE UNITED STATES,                          :

12                       Defendant.             :

13   - - - - - - - - - - - - - - - - - - - - X

14                       Washington, D.C.

15                       Friday, June 14, 2002

16           Continued deposition of ALAN BROWNSTEIN, a

17   witness herein, called for examination by counsel for

18   Plaintiffs in the above-entitled matter, pursuant to

19   agreement, the witness being previously duly sworn,

20   taken at the offices of Spriggs & Hollingsworth, 1350

21   I Street, N.W., Washington, D.C., 20005-3305, at

22   8:40 a.m., Friday, June 14, 2002, the proceedings

23   being taken down by Stenotype by JAN A. WILLIAMS,

24   RPR, and transcribed under her direction.

25
```

Alan Brownstein                                                      June 14, 2002
                        Washington, D.C.

---

Page 247

1   APPEARANCES:
2
3       On behalf of the Plaintiffs:
4           JERRY R. STOUCK, ESQ.
5           Spriggs & Hollingsworth
6           1350 I Street, N.W.
7           Washington, D.C. 20005-3305
8           202-898-5800
9
10      On behalf of the Defendant:
11          KEVIN B. CRAWFORD, ESQ.
12          RUSSELL A. SHULTIS, ESQ.
13          U.S. Department of Justice
14          Civil Division
15          1100 L Street, N.W., Room 12128
16          Washington, D.C. 20530
17          202-305-9640
18
19
20
21
22
23
24
25

---

Page 249

1       E X H I B I T S (Continued)
2   BROWNSTEIN EXHIBIT NO.              PAGE NO.
3
4   96 - Memo undated                    334
5   97 - Memo dated 6/14/93              340
6   98 - Letter dated 6/10/93            366
7   99 - Letter dated 7/15/93            368
8   100 - Memo dated 7/8/93              370
9   101 - Letter dated 7/26/93 with attachment   372
10  102 - Letter dated 2/4/92            377
11  103 - Letter dated 4/6/92            380
12  104 - Letter dated 4/25/94 with attachment   382
13  105 - Letter dated 9/28/95           383
14  106 - Memo dated 3/28/91 with attachments    408
15  107 - Questions for Senator Mathews  410
16  108 - Letter dated 10/19/90 with attachment  413
17  109 - Letter dated 8/22/91 with attachment   419
18
19
20
21
22
23
24
25

---

Page 248

1           CONTENTS
2   WITNESS        EXAMINATION BY COUNSEL FOR
3   ALAN BROWNSTEIN            PLAINTIFFS
4   By Mr. Stouck          250
5                       DEFENDANT
6   By Mr. Crawford        437
7   Afternoon Session - Page 377
8       E X H I B I T S
9   BROWNSTEIN EXHIBIT NO.              PAGE NO.
10  83 - Defendant's Witness List        251
11  84 - Withdrawn by counsel            259
12  84 - Preliminary Draft, DCS Review Process,
13      10/13/92                         261
14  85 - Letter dated 12/22/92 with attachments   272
15  86 - Letter dated 3/13/97            290
16  87 - Letter dated 9/25/92 with attachments   294
17  88 - Letter dated 12/1/92 with attachments   298
18  89 - Attachment                      304
19  90 - Letter dated 1/7/93 with attachments    307
20  91 - Letter dated 4/8/93 with attachments    308
21  92 - Informal Memorandum             321
22  93 - Letter dated 4/28/93            328
23  94 - Agenda for Conference Call with DOE on
24      Delivery Commitment Schedules, 5/12/93   333
25  95 - Memo undated                    334

---

Page 250

1           P R O C E E D I N G S
2   Whereupon,
3           ALAN BROWNSTEIN,
4   the witness on the stand at the time of recess,
5   having been previously duly sworn, was further
6   examined and testified as follows:
7           EXAMINATION BY COUNSEL
8           FOR PLAINTIFFS (RESUMED)
9   BY MR. STOUCK:
10      Q.   Good morning, Mr. Brownstein.
11      A.   Good morning.
12      Q.   Welcome back.  Thanks for coming back.  As
13  I mentioned very briefly before we started here, I
14  have some more questions for you obviously.  And,
15  because your deposition has been a little bit
16  fragmented in time, no fault of yours, with your
17  first few days and then May 23rd and then today and
18  because I've been busy with other depositions, I have
19  tried hard to limit the amount of duplication there
20  may be today; but we may have a little.
21      If we get into an area that we've covered
22  before, I apologize and I will certainly try to keep
23  that to a minimum.  I realized last night when I was
24  getting ready for today that there may be a little
25  more of that than is ideal, but it's not because I

---

Alderson Reporting Company, Inc.
1111 14th Street, N.W. Suite 400 1-800-FOR-DEPO Washington, DC 20005

Alan Brownstein                                                                 June 14, 2002

Washington, D.C.

Page 251

1   want to ask you the same questions.
2           Would you mark this as the next exhibit,
3   please.
4           MR. CRAWFORD: For the record you may
5   always remind Mr. Stouck if he begins to duplicate
6   and he'll take note of that I'm sure.
7           MR. STOUCK: Absolutely.
8           (Brownstein Exhibit No. 83 was
9           marked for identification.)
10  BY MR. STOUCK:
11      Q.   Mr. Brownstein, you've been handed a
12  document that's been marked Exhibit No. 83. This is
13  a document entitled Defendant'S Witness List which
14  has been prepared by the Department of Justice under
15  a court order in the -- well, this one is in the
16  Yankee Atomic case, but we've got something similar
17  in the Connecticut Yankee and Maine Yankee cases.
18          This is a list of folks the government may
19  call as witnesses at the trial of this action. If
20  you turn to page 2, you'll see your name.
21      A.   Yes.
22      Q.   Did you know prior to right now that you
23  might be called as a witness at the trial of this
24  action?
25      A.   Yes.

Page 252

1       Q.   You discussed that with counsel?
2           MR. CRAWFORD: Well, I'll object to that
3   and I'll instruct him not to answer that.
4   BY MR. STOUCK:
5       Q.   The question then is how do you know that,
6   who told you that?
7       A.   Discussions with the Department of Justice
8   attorneys.
9       Q.   And for how long have you known that?
10      A.   I think -- in one of our conversations,
11  from one of the depositions, I think I asked the
12  question about the next steps.
13      Q.   This is a brief description as you'll see
14  under your name of the topics that the government has
15  told you they may call you to give testimony about.
16  And would you just take a look at it. I want to ask
17  you a couple questions about the subjects.
18      A.   Okay.
19      Q.   Remind me when you started working on
20  waste acceptance at the Department of Justice?
21      A.   September 1985.
22      Q.   Now --
23      A.   Department of Energy.
24      Q.   Department of Energy, thank you. I take
25  it that prior to September of 1985 you would have no

Page 253

1   personal knowledge about any of these subjects,
2   implementation of standard contract, priority for
3   shutdown reactors, how the Department of Justice was
4   handling that?
5       A.   That's correct.
6       Q.   And when did you stop working on waste
7   acceptance matters?
8       A.   March of 1995.
9       Q.   Subsequent to that time, you would have
10  had no personal knowledge of these topics; is that
11  right?
12      A.   Hallway conversations with people, but I
13  didn't stay very much connected with it.
14      Q.   You would not be able to testify about
15  what the Department of Energy was doing in these
16  areas subsequent to the time you stopped working on
17  them; is that right?
18      A.   I think that's fair.
19      Q.   The exchange approval process which is the
20  last mentioned subtopic, if you will, here, I thought
21  you told me previously that -- I showed you some
22  documents or I asked you some questions about
23  exchange approval criteria.
24          And I thought the testimony from you was
25  that those kinds of documents and that thinking about

Page 254

1   exchange approval, this is delivery commitment
2   exchanges, thinking about criteria under which those
3   would be approved, it was clearly done by the
4   contractor and their documents reflecting that.
5           But, when it got to your desk, you never
6   really acted on the pursuit of the development of
7   these exchange approval criteria; is that a fair
8   recollection of what you told me?
9           MR. CRAWFORD: Objection, asked and
10  answered.
11          THE WITNESS: I'm not sure what you mean
12  by acted on.
13  BY MR. STOUCK:
14      Q.   They were never implemented, they were
15  never finalized?
16      A.   That's true.
17      Q.   Was there ever an exchange approval
18  process at the Department of Energy while you were
19  working on waste acceptance matters that was anything
20  other than proposals for how the process would work?
21          MR. CRAWFORD: Objection.
22  BY MR. STOUCK:
23      Q.   In other words, was the process of
24  exchange approvals ever implemented?
25          MR. CRAWFORD: Objection, vague.

3 (Pages 251 to 254)

Alan Brownstein                                                    June 14, 2002
                            Washington, D.C.

---

**Page 255**

1      THE WITNESS: We never received an
2  exchange request.
3      BY MR. STOUCK:
4      Q.   Was there a process in place at the
5  Department of Energy during your tenure in working on
6  waste acceptance matters for approval of exchange
7  requests that might be submitted?
8      MR. CRAWFORD: Objection, vague.
9      THE WITNESS: There was not one approved
10 by my management.
11     BY MR. STOUCK:
12     Q.   And lastly, just the only other question I
13 have about this description of what you might testify
14 about, there's a reference there to schedule
15 negotiations.  And the context is it says
16 Mr. Brownstein will provide testimony concerning the
17 government's implementation of the standard contract
18 including acceptance rates, priority for shutdown
19 reactors, and a number of other things and also
20 including according to this statement schedule
21 negotiations.  Do you see that?
22     A.   I see it.
23     Q.   Do you know what that means?
24     MR. CRAWFORD: Objection to the extent it
25 calls for speculation.

---

**Page 256**

1      THE WITNESS: Well, I don't know who wrote
2  that so I would have to be guessing, speculating on
3  what it could mean.
4      BY MR. STOUCK:
5      Q.   Were there during your tenure in this
6  period we just blocked, from September '85 to March
7  of '95, were there schedule negotiations that took
8  place between the Department of Energy and any one or
9  more utility purchasers?
10     MR. CRAWFORD: Objection, vague.
11     THE WITNESS: I'm really not sure what
12 schedule negotiations means here.  I don't recall
13 negotiations between us and utilities on schedules.
14     BY MR. STOUCK:
15     Q.   Is there a reason why -- well, you
16 understand the word schedule in this context,
17 schedule for acceptance?
18     A.   Well, I'm not sure that I do.  I mean I
19 can interpret it different ways.
20     Q.   What other interpretation would there be
21 in the context of this then schedule for acceptance?
22     A.   Schedule negotiations could -- someone
23 could interpret that to mean the actual DCS or FDS
24 process.  You negotiate, if you will, as outlined in
25 the contract.  For example, in the FDS, where you

---

**Page 257**

1  were a year beforehand, you start scheduling real
2  dates.
3      One could interpret that as negotiations
4  within the context of the contract.  That's why I'm
5  not sure who wrote this and what was meant by that.
6  But that's an interpretation.
7      Q.   But there were not such negotiations that
8  occurred because my understanding is there were no
9  such negotiations that took place?
10     A.   Correct.
11     Q.   Okay.  Outside the context of -- well, can
12 you think of any other meanings that this might have?
13 I mean would there be negotiations that could take
14 place in the context of delivery commitment
15 schedules?
16     MR. CRAWFORD: Objection, overbroad.
17     THE WITNESS: There was again broad
18 interpretation.  One utility, perhaps one you
19 represent, had objected to -- we had disapproved
20 their DCS.  And, at one point in time, they had come
21 and had discussions with us and the contracting
22 officer.  One could interpret that to mean
23 negotiations.
24     BY MR. STOUCK:
25     Q.   That was Yankee Atomic?

---

**Page 258**

1      A.   Yeah.
2      Q.   On the subject of priority for shutdowns,
3  general shutdowns?
4      A.   Well, that was one of the subjects, yes.
5      Q.   What were the others, can you think of
6  others?
7      A.   Well, it was -- we had disapproved their
8  delivery commitment schedule.  And certainly
9  shutdowns were a part of that.
10     Q.   And so that's an example of something that
11 could be embraced within in term that somebody else
12 wrote on Exhibit 83 of schedule negotiations?
13     A.   Yeah, that's -- I mean it can be
14 interpreted many ways.  I have given you two or three
15 examples.
16     Q.   And, listen, my situation is this, they
17 hand me that piece of paper and they say you're going
18 to testify about this.  I'm trying to find out what
19 it is.
20     A.   That's how I interpret it.
21     Q.   All right.  Let me look at it first.
22     In the course of your work on waste
23 acceptance matters at the Department of Energy,
24 Mr. Brownstein, have you been involved in studies or
25 analyses of the -- well, have you been involved in

---

4 (Pages 255 to 258)

# Robert Campbell

# Plaintiff

Page 1

1        IN THE UNITED STATES COURT OF FEDERAL CLAIMS

2  ------------------------------------------X

   YANKEE ATOMIC ELECTRIC

3  COMPANY, CONNECTICUT

   YANKEE ATOMIC POWER

4  COMPANY, MAINE YANKEE

   ATOMIC POWER COMPANY,

5

                    Plaintiffs,           CASE NO.

6        vs.                              98-126C

                                          98-154C

7  UNITED STATES OF AMERICA,     98-474C

8

                  Defendant.

9  ------------------------------------------X

10                      Washington, D.C.

11                      Thursday, June 13, 2002

12        Deposition of ROBERT ALLEN CAMPBELL

13  a witness, called for examination by counsel for

14  Plaintiffs in the above-entitled matter, pursuant

15  to notice, the witness being duly sworn, taken at

16  the offices of Spriggs & Hollingsworth, 1350 I

17  Street, N.W., Suite 1010, Washington, D.C, at 9:32

18  a.m, on Thursday, June 13, 2002, and the

19  proceedings being taken down by Stenotype by CINDY

20  L. SEBO, and transcribed under her direction.

21

22

23

24

25

00009

1    A   1995, I finished in 1998.

2    Q   And you were full-time at Johns Hopkins?

3    A   No, I was going at night.

4    Q   What did you do from the time period 1987

5 to 1995?

6    A   1987 to 1992, I was an officer in the

7 United States Navy, and from 1992 to -- did you say

8 '95 --

9    Q   Yes, sir.

10    A   -- I worked for the Department of Energy.

11    Q   And what did you do as an officer of the

12 Navy?  What were the types of things you worked on?

13    A   I was an officer on a nuclear power

14 attack submarine.  I supervised the operation of

15 the nuclear reactor, supervised operation of a

16 submarine.  I had mechanics who reported to me.

17    Q   Did any of your work in that context

18 involve spent nuclear fuel?

19    A   Yes.

20    Q   And can you tell me about how your work

21 as an officer in the Navy involved spent nuclear

22 fuel?

23    A   Towards the end of my tour, we

24 decommissioned the first submarine I was on.  We

25 offloaded the fuel and loaded it up onto a rail

**Campbell, Robert Vol. 1-Plt Fact 6/13/0**          **Page 9**

00010

1 car, and I did that again on another submarine.

2    Q   So if I understand you correctly, twice

3 you decommissioned reactors on spent fuel and

4 loaded it up onto rail cars?

5    A   Yes.

6    Q   Do you know where the spent fuel was

7 being transported by rail to?

8    A   The Department of Energy's Idaho National

9 Engineering Laboratory.

10    Q   Is that -- is that the full extent of

11 your involvement with spent fuel while you were

12 with the Navy?

13    A   Yes.

14    Q   How about when you were with the Navy

15 from '87 to '92, did you have any involvement with

16 Greater-Than-Class C waste?

17    A   No.

18    Q   And do you understand what I mean when I

19 say Greater-Than-Class C waste?

20    A   Yes.

21    Q   Can you just explain that -- what

22 Greater-Than-Class C waste means to you for the --

23 can you explain that for the record?

24    A   Yes.  The Nuclear Regulatory Commission

25 has a regulation, Part 61, which defines Class A, B

**Page 10**

1  car, and I did that again on another submarine.
2      Q   So if I understand you correctly, twice
3  you decommissioned reactors on spent fuel and
4  loaded it up onto rail cars?
5      A   Yes.
6      Q   Do you know where the spent fuel was
7  being transported by rail to?
8      A   The Department of Energy's Idaho National
9  Engineering Laboratory.
10     Q   Is that -- is that the full extent of
11 your involvement with spent fuel while you were
12 with the Navy?
13     A   Yes.
14     Q   How about when you were with the Navy
15 from '87 to '92, did you have any involvement with
16 Greater-Than-Class C waste?
17     A   No.
18     Q   And do you understand what I mean when I
19 say Greater-Than-Class C waste?
20     A   Yes.
21     Q   Can you just explain that -- what
22 Greater-Than-Class C waste means to you for the --
23 can you explain that for the record?
24     A   Yes.  The Nuclear Regulatory Commission
25 has a regulation, Part 61, which defines Class A, B

**Page 11**

1  and C which can go to commercial low-level waste
2  disposal sites.
3          Class C has an upper limit, and it's --
4  it's in two tables in the regulation, and if you
5  exceed that limit, it's then Greater-Than-Class C
6      Q   And if I understand correctly, your work
7  with the Navy did not involve GTCC --
8      A   Yes.
9      Q   -- is that correct?
10     A   Yes.  I did not work with
11 Greater-Than-Class C in the Navy.
12     Q   Thank you.  And then in 1992, you joined
13 the Department of Energy?
14     A   Yes.
15     Q   What was your position with the
16 Department of Energy at that time?
17     A   I was a nuclear engineer program manager.
18     Q   And what was the program you were
19 managing?
20     A   Well, basically everyone is called a
21 program manager.  So I was dealing with what's
22 called off-site waste, which was anything -- any
23 materials or waste that was outside the Department
24 of Energy complex, maybe on loan to a university or
25 to a private company, that needed to come back, I

**Page 12**

1  worked on.  And I also worked on the acceptance of
2  Greater-Than-Class C sealed sources.
3      Q   And what branch of the Department of
4  Energy did you begin work at as a program manager
5  in '92?
6      A   The Office of Environmental Management.
7      Q   And what EM number is that, that office?
8      A   They've reorganized a couple times.  It
9  was EM32 then.
10     Q   Okay.  And what was the title of that
11 branch of the office?
12     A   It was -- that was the Office of Waste
13 Operations.
14     Q   And, in general, what were the areas of
15 responsibility of EM32, the Office of Waste
16 Operations?
17     A   That office was responsible for any waste
18 management activities at all DOE sites.
19     Q   So, organizationally, your -- I guess you
20 would call it an office -- EM32 is called an
21 office?
22     A   Yes.
23     Q   So the EM32 office underneath it had
24 different programs?
25     A   Yes.  There were three different

**Page 13**

1  divisions.
2      Q   Okay.  And can you explain for me what
3  those three different divisions were?
4      A   Eastern, central and western.  So it was
5  just a geographic split of the country.
6      Q   And you were associated with which of
7  those?
8      A   Eastern, although I wasn't limited to
9  working on stuff in that region.  I just -- they
10 had to put everybody in a division.
11     Q   Okay.  Okay.  What regions did you work
12 on, or was it just national?
13     A   The whole country.
14     Q   Okay.  So if I understand correctly,
15 Office of Waste Operations had management
16 activities for waste at all DOE sites, what you
17 focused on was off-site waste?
18     A   Yes.
19     Q   Okay.  Now, what part of EM32 dealt with
20 waste at DOE sites?
21     A   Well, each of those divisions had DOE
22 sites in that region of the country.  And so each
23 of those divisions dealt with the waste at the
24 sites in their region.
25     Q   And who did you report to when you were

4 (Pages 10 to 13)

Page 14

1  at EM32?
2      A   The eastern division director.
3      Q   Okay.  And who was that?
4      A   Wayne Nobles.
5      Q   And who was the head of EM32, in general?
6      A   Larry Harmon.
7      Q   And who did Mr. Harmon report to?
8      A   He reported to Mr. Steve Cowan.
9      Q   And what was Mr. Cowan's title?
10     A   He was the associate deputy assistant
11  secretary for waste management.
12     Q   Do you know, who did Mr. Cowan report to?
13     A   He reported to Jill Lytle, which is
14  L-y-t-l-e, and she was the deputy assistant
15  secretary for waste management.
16     Q   So at this time, would sealed sources in
17  general be the primary responsibility of Mr. Harmon
18  at EM32?
19     A   I'm sorry.  Repeat the question.
20     Q   Sure.  I believe you testified one of the
21  things that you worked on was sealed sources, GTCC
22  sealed sources?
23     A   Yes.
24     Q   And that was within the -- that was one
25  of the areas of responsibility for EM32 generally?

Page 15

1      A   Yes.
2      Q   And if I understand correctly, Mr. Harmon
3  was head of the EM32 and would have been dealing
4  with sealed sources, that was part of his
5  responsibility too?
6      A   Yes.
7      Q   Okay.  Now, I'm trying to make sure I
8  understand just the organizational framework.
9          Now, Mr. Cowan, the associate deputy
10  assistant secretary for waste management, what
11  other offices were underneath him at that time,
12  1992?
13     A   All -- well, all the other offices.
14  There was -- I guess, it went -- there was a 33, a
15  34, a 35, I think.  It's been a while.  I don't
16  remember exactly the layout of the rest of the
17  offices.
18     Q   Okay.  And how about 33, what was your
19  understanding of what 33 did, EM33?
20     A   That was -- I don't remember.
21     Q   How about EM34, what about that?
22     A   EM34 was the Waste Isolation Pilot Plate
23  office.
24     Q   And for the record, can you explain what
25  WIPP did?  W-I-P-P.

Page 16

1          MS. HERRMANN:  Objection, foundation.
2          THE WITNESS:  The Waste Isolation Pilot
3  Plant office was working at that time on
4  completing -- completing the work necessary to open
5  that disposal facility.
6  BY MR. SKALABAN:
7      Q   Okay.  And what was the function of WIPP,
8  what was its mission?
9          MS. HERRMANN:  Same objection.
10         THE WITNESS:  WIPP is a disposal facility
11  for transuranic -- Defense transuranic waste.
12         MR. SKALABAN:  Can we go off the record
13  for just one moment?
14         MS. HERRMANN:  Yes.
15         (Discussion off the record.)
16  BY MR. SKALABAN:
17     Q   How about EM35, what was their mission?
18         MS. HERRMANN:  Objection, foundation.
19         THE WITNESS:  EM35 was basically
20  technical and programmatic support and analysis.
21  BY MR. SKALABAN:
22     Q   What were the types of subjects or areas
23  that they would work on?
24         MS. HERRMANN:  Same objection.
25         THE WITNESS:  Basically, they -- each

Page 17

1  type of radioactive waste that we dealt with, there
2  was a program manager for that waste type and they
3  developed plans and programmatic documents and
4  analysis for each waste type.
5  BY MR. SKALABAN:
6      Q   And for GTCC waste, who was dealing with
7  developing programmatic plans from EM35 in that
8  1992 time frame?
9      A   Terry Plummer.
10     Q   Given that you were working on sealed
11  sources, did you have interactions with Mr. Plummer
12  in the '92 time frame?
13     A   Yes.
14     Q   Can you tell me what -- just in general
15  terms, what was your work on sealed sources in the
16  '92 time frame, what you did?
17     A   We had reached an agreement with the
18  Nuclear Regulatory Commission, if they had
19  licensees who had sealed sources that the NRC had
20  determined it was problematic for some reason, they
21  would send us a letter asking us to accept them and
22  they would evaluate.  And my job is to find a
23  place -- to figure out how to go get them and find
24  a place to put them.
25     Q   Who was the agreement reached with with

5 (Pages 14 to 17)

Robert L. Campbell

June 13, 2002

Washington, D.C.

Page 18

1    NRC; who was involved in formulating that agreement
2    that you referred to?
3        MS. HERRMANN: Objection, foundation.
4        THE WITNESS: I don't know who was
5    involved in formulating the agreement. The
6    agreement was reached prior to my starting work
7    there. The person who signed the document for the
8    NRC was Robert Bernario, and the person who signed
9    the document for DOE was Leo Duffy.
10   BY MS. HERRMANN:
11       Q   And do you know what Mr. Bernario's
12   position was with the NRC?
13       A   He was the director of the Office of
14   Nuclear Materials Safety and Safeguards, I believe.
15       Q   I believe you said he was at the NRC. Do
16   you know, has he left, to your knowledge?
17       A   Yes, he has retired.
18       Q   And who is Mr. Leo Duffy?
19       A   He was the assistant secretary for
20   environmental management.
21       Q   So that would be Jill Lytle's boss?
22       A   Yes.
23       Q   Did you have -- in this '92 time frame,
24   did you have occasion to work with people at the
25   NRC on sealed source issues?

Page 19

1        A   Yes.
2        Q   Who did you work with at the NRC on
3    sealed sources?
4        A   Mr. Doug Broaddus.
5        Q   Can you spell that for the record, if you
6    know?
7        A   B-r-o-a-d-d-u-s.
8        Q   Okay. Thank you.
9            Anyone else?
10       A   He was the primary person on sealed
11   sources.
12       Q   And do you know what part of NRC he
13   worked for?
14       A   Office of Nuclear Materials Safety and
15   Safeguards, the Division of Industrial and Medical
16   Nuclear Safety.
17       Q   Now, you testified that in working on
18   sealed sources, one of the things you did was to
19   find a place to put them. Did you find a place to
20   put them; can you tell me about that, please?
21       A   Yes.
22       Q   Okay.
23       A   Early on, we basically took -- I
24   basically found the nearest DOE site and arranged
25   for sources to be transported to the -- to the

Page 20

1    nearest facility that was able to accept them.
2        Q   And that would be accepting them for
3    storage?
4        A   Yes.
5        Q   Had any sealed sources actually been
6    disposed of?
7        MS. HERRMANN: Objection, foundation.
8        THE WITNESS: We've not disposed of any
9    Greater-Than-Class C sealed sources, no.
10   BY MR. SKALABAN:
11       Q   And just for the record, just so it's
12   clear, do you understand what I mean when I say
13   disposed of?
14       A   I believe so.
15       Q   Okay. For purposes of the record, can
16   you explain your understanding of what disposing of
17   a Greater-Than-Class C source means?
18       A   Well, disposal would be some kind of
19   permanent place you would put something and never
20   go get it again, as opposed to storage, which is
21   the intent would be to -- to retrieve it one day.
22           We do not have any Greater-Than-Class C
23   disposal, so the way you framed the question was --
24   my understanding of Greater-Than-Class C
25   disposal -- since we don't have that, I don't know

Page 21

1    what that's going to be.
2        Q   You stated that early on the sealed
3    sources would go to the nearest DOE sites. What
4    were some of those sites that sealed sources would
5    be taken to?
6        A   We sent sources to the Mound Plant in
7    Ohio, the Hanford site in Washington, and the Los
8    Alamos National Laboratory in New Mexico.
9        Q   Are there any other -- are these all DOE
10   sites?
11       A   Yes.
12       Q   Are there any other sites that you can
13   think of that sealed sources were taken to early
14   on?
15       A   Yes. We had one request from the NRC
16   that was for a large source on a piece of medical
17   equipment that actually could be reused. And so
18   we -- I entered into for -- the Department entered
19   into a contract with a company to go remove the
20   source from the medical equipment.
21           This was a little different, in that most
22   of the time the source was just in a source holder,
23   and that's all there was.
24           We didn't want to have to deal with this
25   piece of medical equipment, which had a lot of

6 (Pages 18 to 21)