# Defendant

Page 409

1    A   In terms of measurement of radioactivity
2  and in a measurement scale such as roentgens or
3  millirems, yes.
4    Q   Now, can you explain for me why you don't
5  think it's highly radioactive within the meaning of
6  the high-level waste definition?
7        MS. HERRMANN:  Objection, calls for a
8  legal conclusion, relevance.
9        THE WITNESS:  Because the U.S. Nuclear
10  Regulatory Commission has undertaken a rulemaking
11  to say that it's not highly radioactive in the
12  context of high-level waste.
13  BY MR. SKALABAN:
14    Q   I want to make sure I understand this.
15  They haven't undertaken a rulemaking, in your view,
16  defining it as high-level waste; is that the
17  problem, or are you relying on the actual
18  radioactivity levels?  That's what I'm trying to
19  drive at.
20        MS. HERRMANN:  Objection,
21  mischaracterization of prior testimony --
22        THE WITNESS:  No.
23        MS. HERRMANN:  -- calls for a legal
24  conclusion, foundation.
25        THE WITNESS:  No.  What I said was the

Page 410

1  U.S. Nuclear Regulatory Commission has issued a
2  final rule defining what high-level waste is, and
3  they have excluded Greater-Than-Class C from that
4  definition.
5  BY MR. SKALABAN:
6    Q   Now, we were talking about the 13-year
7  time period to identify -- to identify and have
8  ready a disposal path for Greater-Than-Class C
9  waste, the period from 1985 to 1998.
10        Now, if the Department of Energy was
11  going to build a disposal facility using some of
12  the existing sites, such as Hanford, Los Alamos,
13  would that lower the estimated time that a disposal
14  facility could be made available --
15        MS. HERRMANN:  Objection, speculation.
16  BY MR. SKALABAN:
17    Q   -- for GTCC nuclear utility activated
18  metal?
19        MS. HERRMANN:  Objection, speculation.
20        THE WITNESS:  Not necessarily.
21  BY MR. SKALABAN:
22    Q   And why do you say not necessarily?
23        MS. HERRMANN:  Same objection.
24        THE WITNESS:  Typically the Department of
25  Energy, when looking for a site to build a

Page 411

1  facility, start with its own sites.  The difference
2  would only be in -- if a site were selected that
3  the Department of Energy didn't already own, it
4  would simply be the difference -- the difference
5  would be in acquiring the rights to that land, you
6  might have to submit legislation for a Land
7  Withdrawal Act.
8        But I don't think that is going -- that
9  in and of itself, the acquisition process, I don't
10  think would be the time -- although it will take
11  some time, I don't think that would be the major
12  delaying factor in developing such a facility.
13  BY MR. SKALABAN:
14    Q   Well, if you're going to build a disposal
15  site in the area of a community that's already used
16  to and accustomed to having nuclear utility --
17  nuclear material stored or disposed of, wouldn't
18  that likely decrease the level of opposition and
19  make it easier from a political standpoint to
20  implement a GTCC disposal site in the 13-year
21  period we've been talking about?
22        MS. HERRMANN:  Objection, speculation.
23        THE WITNESS:  No, I don't think so.
24  BY MR. SKALABAN:
25    Q   And why is that?

Page 412

1        MS. HERRMANN:  Same objection.
2        THE WITNESS:  Well, look at Yucca
3  Mountain.  The United States Atomic Energy
4  Commission, the Department of Energy, tested
5  nuclear weapons in the State of Nevada for 30
6  years.
7        The State of Nevada is no more open to
8  the Yucca Mountain being a nuclear waste repository
9  after having those activities taking place than
10  they would be without those activities taking
11  place.
12  BY MR. SKALABAN:
13    Q   If in 1998 the Department is taking spent
14  fuel for either storage or disposal, do you think
15  that the Department would have left GTCC waste at
16  reactor sites when all of the spent fuel has been
17  removed from a reactor site if it had the
18  capability to store or dispose of spent fuel?
19        MS. HERRMANN:  Objection, speculation.
20        THE WITNESS:  I have no -- I have no
21  idea.
22  BY MR. SKALABAN:
23    Q   Well, do you think that would be a sound
24  policy if you have storage and disposal available
25  for spent fuel, spent fuel is being removed to the

43 (Pages 409 to 412)

Robert L. Campbell                                                    June 14, 2002
Washington, D.C.

---

Page 413

1  storage or disposal facility, you have
2  decommissioned reactors that have completely rid
3  themselves of spent fuel through the available
4  storage or disposal facilities beginning in 1998,
5  would that also make sense for the Department to
6  take the GTCC contemporaneously so that the utility
7  can finish its decommissioning?
8       MS. HERRMANN: Objection, vague as to
9  sound policy and make sense.
10      THE WITNESS: Without the ability to look
11  at the policy decision for leaving the
12  Greater-Than-Class C there, I have no idea whether
13  it would be a good or a bad policy decision,
14  because I wouldn't have any knowledge of the
15  reasons they made such a decision in this
16  hypothetical situation.
17 BY MR. SKALABAN:
18      Q   All right. And in view of our scenario
19  or hypothetical, can you think of any policy
20  reasons for leaving nuclear utility activated metal
21  at the site of decommissioned reactors if beginning
22  in 1998 the Department of Energy has begun and
23  completed the removal of all of the spent fuel at
24  the decommissioned reactor site?
25      MS. HERRMANN: Objection, speculation.

---

Page 414

1       THE WITNESS: Yes.
2  BY MR. SKALABAN:
3       Q   And what would those policy reasons
4  justifying that decision be?
5       MS. HERRMANN: Same objection.
6       THE WITNESS: The one I can think of is
7  if the legislation authorizing the spent nuclear
8  fuel storage or disposal did not -- prohibited or
9  did not authorize the storage or disposal of
10  Greater-Than-Class C waste.
11 BY MR. SKALABAN:
12      Q   Outside of the legislation, can you think
13  of a policy reason that would justify leaving
14  Greater-Than-Class C waste at the site of
15  decommissioned reactors after the spent fuel has
16  been removed for storage or disposal by the
17  Department of Energy?
18      MS. HERRMANN: Objection, speculation,
19  relevance.
20      THE WITNESS: Yes.
21 BY MR. SKALABAN:
22      Q   What other policy justification can you
23  think of?
24      A   That the license issued by the
25  appropriate regulatory agency disallowed that

---

Page 415

1  activity or if Congress didn't appropriate the
2  funding for that activity.
3       Q   Can you think of any other policy
4  justification other than funding, licensing
5  incapabilities and legislation?
6       MS. HERRMANN: Objection, speculation,
7  relevance.
8       THE WITNESS: No, I can't think of any.
9  BY MR. SKALABAN:
10      Q   In your various conversations and
11  dealings with the NRC, has the NRC ever given you
12  any indication that it would be an acceptable or a
13  desirable policy to leave Greater-Than-Class C
14  waste at the site of decommissioned reactors once
15  the spent fuel has been removed?
16      MS. HERRMANN: Objection, vague.
17      THE WITNESS: No.
18 BY MR. SKALABAN:
19      Q   Has anyone in any of the conversations
20  you've ever been involved in with the Department of
21  Energy -- and we've talked about many of them, but
22  I'm not limiting it to the ones we've talked
23  about -- have any of the conversations that you've
24  been involved with with members of the Department
25  of Energy, has anyone ever expressed to you that it

---

Page 416

1  would be sound policy or desirable to leave
2  Greater-Than-Class C waste at the site of
3  decommissioned reactors after the spent fuel has
4  been removed?
5       MS. HERRMANN: Objection, vague as to
6  sound policy and desirable.
7       THE WITNESS: I do not remember any such
8  conversation.
9  BY MR. SKALABAN:
10      Q   From a transportation perspective, prior
11  to 1998, did the technology exist to transport
12  nuclear utility activated metal for storage or
13  disposal?
14      A   That's not my area of expertise, but I
15  believe it did.
16      Q   Has the Government ever moved either
17  Greater-Than-Class C waste or material comparable
18  under a DOE or Defense classification system of
19  Greater-Than-Class C waste, has it ever moved it
20  prior to 1998?
21      MS. HERRMANN: Objection, foundation,
22  speculation, vague.
23      THE WITNESS: Yes.
24 BY MR. SKALABAN:
25      Q   What do you think the effect of the

---

44 (Pages 413 to 416)

# Plaintiff

Page 413

1 storage or disposal facility, you have
2 decommissioned reactors that have completely rid
3 themselves of spent fuel through the available
4 storage or disposal facilities beginning in 1998,
5 would that also make sense for the Department to
6 take the GTCC contemporaneously so that the utility
7 can finish its decommissioning?
8     MS. HERRMANN: Objection, vague as to
9 sound policy and make sense.
10     THE WITNESS: Without the ability to look
11 at the policy decision for leaving the
12 Greater-Than-Class C there; I have no idea whether
13 it would be a good or a bad policy decision,
14 because I wouldn't have any knowledge of the
15 reasons they made such a decision in this
16 hypothetical situation.
17 BY MR. SKALABAN:
18     Q    All right. And in view of our scenario
19 or hypothetical, can you think of any policy
20 reasons for leaving nuclear utility activated metal
21 at the site of decommissioned reactors if beginning
22 in 1998 the Department of Energy has begun and
23 completed the removal of all of the spent fuel at
24 the decommissioned reactor site?
25     MS. HERRMANN: Objection, speculation.

Page 414

1     THE WITNESS: Yes.
2 BY MR. SKALABAN:
3     Q    And what would those policy reasons
4 justifying that decision be?
5     MS. HERRMANN: Same objection.
6     THE WITNESS: The one I can think of is
7 if the legislation authorizing the spent nuclear
8 fuel storage or disposal did not -- prohibited or
9 did not authorize the storage or disposal of
10 Greater-Than-Class C waste.
11 BY MR. SKALABAN:
12     Q    Outside of the legislation, can you think
13 of a policy reason that would justify leaving
14 Greater-Than-Class C waste at the site of
15 decommissioned reactors after the spent fuel has
16 been removed for storage or disposal by the
17 Department of Energy?
18     MS. HERRMANN: Objection, speculation,
19 relevance.
20     THE WITNESS: Yes.
21 BY MR. SKALABAN:
22     Q    What other policy justification can you
23 think of?
24     A    That the license issued by the
25 appropriate regulatory agency disallowed that

Page 415

1 activity or if Congress didn't appropriate the
2 funding for that activity.
3     Q    Can you think of any other policy
4 justification other than funding, licensing
5 incapabilities and legislation?
6     MS. HERRMANN: Objection, speculation,
7 relevance.
8     THE WITNESS: No, I can't think of any.
9 BY MR. SKALABAN:
10     Q    In your various conversations and
11 dealings with the NRC, has the NRC ever given you
12 any indication that it would be an acceptable or a
13 desirable policy to leave Greater-Than-Class C
14 waste at the site of decommissioned reactors once
15 the spent fuel has been removed?
16     MS. HERRMANN: Objection, vague.
17     THE WITNESS: No.
18 BY MR. SKALABAN:
19     Q    Has anyone in any of the conversations
20 you've ever been involved in with the Department of
21 Energy -- and we've talked about many of them, but
22 I'm not limiting it to the ones we've talked
23 about -- have any of the conversations that you've
24 been involved with with members of the Department
25 of Energy, has anyone ever expressed to you that it

Page 416

1 would be sound policy or desirable to leave
2 Greater-Than-Class C waste at the site of
3 decommissioned reactors after the spent fuel has
4 been removed?
5     MS. HERRMANN: Objection, vague as to
6 sound policy and desirable.
7     THE WITNESS: I do not remember any such
8 conversation.
9 BY MR. SKALABAN:
10     Q    From a transportation perspective, prior
11 to 1998, did the technology exist to transport
12 nuclear utility activated metal for storage or
13 disposal?
14     A    That's not my area of expertise, but I
15 believe it did.
16     Q    Has the Government ever moved either
17 Greater-Than-Class C waste or material comparable
18 under a DOE or Defense classification system of
19 Greater-Than-Class C waste, has it ever moved it
20 prior to 1998?
21     MS. HERRMANN: Objection, foundation,
22 speculation, vague.
23     THE WITNESS: Yes.
24 BY MR. SKALABAN:
25     Q    What do you think the effect of the

44 (Pages 413 to 416)

# Plaintiff



**Page 441**

1  January 8th, 2001?
2      A  I believe so.
3      Q  Did you -- this paper was dated June 28,
4  1995. Do you see that?
5      A  Yes.
6      Q  First of all, what is your understanding
7  of this paper?  What is this paper?
8      A  It is a paper that goes over the
9  statutory and regulatory issues that are involved
10  with codisposal of Greater-Than-Class C waste with
11  high-level radioactivity.
12      Q  I can represent, but it's based on the
13  Bates number, that this was something that was
14  produced to us from the DOE's files.  Who was the
15  author of this paper, do you know?
16      MS. HERRMANN:  Objection, foundation,
17  speculation.
18      THE WITNESS:  Unless it states it on the
19  paper, I do not know.
20  BY MR. SKALABAN:
21      Q  Do you recall reviewing this paper?
22      A  I have looked at it.  I do not believe I
23  have read it in its entirety.
24      Q  Why did you cause to have this paper sent
25  from EM22 in Germantown to you -- 509 is Atlanta?

**Page 442**

1      A  The 509 number is an E-fax number, so
2  it's actually in Washington State, I think.  The
3  number's got nothing to do with how the fax gets to
4  me.
5      Q  Okay.  So why did you cause this fax to
6  be sent to you from Germantown to wherever you were
7  at the time?
8      MS. HERRMANN:  Objection.  It assumes
9  facts not in evidence.
10      THE WITNESS:  I don't remember.
11  BY MR. SKALABAN:
12      Q  Did someone send it to you, or do you
13  remember requesting a paper?
14      A  I don't believe that the time period
15  lines up with the document production; plus, if
16  they had had this document in EM22, they wouldn't
17  have send it in order for me to produce it for this
18  purpose.  That wouldn't have been necessary.  I
19  don't know.  My assumption is that someone wanted
20  me to look at it.  I don't recall requesting it.
21  BY MR. SKALABAN:
22      Q  And you don't recall who caused it to be
23  sent to you?
24      A  No.
25      Q  Does this paper accurately reflect the

**Page 443**

1  NWPA definition of high-level waste?  And I'm
2  referring to 246 and 247, in particular, part B,
3  where it says high-level radioactive waste means
4  part B, other highly radioactive material that the
5  Commission, consistent with existing law,
6  determines by rule requires permanent isolation.
7      MS. HERRMANN:  Objection, calls for a
8  legal conclusion.  The NWPA is the best evidence of
9  its contents, of its provisions.
10      THE WITNESS:  I can't -- without the
11  Nuclear Waste Policy Act in front of me, I can't
12  tell you whether that's an accurate reflect of what
13  it says.  It sounds correct to me.
14  BY MR. SKALABAN:
15      Q  Let's look at the discussion section.  It
16  says here that the term permanent isolation -- and
17  I'm looking at the very first bullet point on Bates
18  page 0247 -- the term permanent isolation is not
19  defined in the NWPA but can be implied from the
20  context of the law to mean deep geologic disposal.
21      Do you agree with that statement?
22      MS. HERRMANN:  Objection, calls for a
23  legal conclusion.
24      THE WITNESS:  I wasn't aware that the
25  permanent isolation was not in the Nuclear Waste

**Page 444**

1  Policy Act, and I've not -- I don't believe I've
2  read enough of the Nuclear Waste Policy Act to be
3  able to imply something from the context of the
4  Act.  I'm not -- I've not looked at that before, so
5  I do not know.
6  BY MR. SKALABAN:
7      Q  Is that a concept that you're familiar
8  with at all, any awareness of the permanent
9  isolation is the equivalent of deep geologic
10  disposal?
11      MS. HERRMANN:  Objection.  It assumes
12  facts not in evidence.  It calls for a legal
13  conclusion.
14      THE WITNESS:  I don't believe I've ever
15  tried to juxtapose those two in this manner before,
16  but I assume I've -- they mean the same thing.
17  That would be my assumption all along is that those
18  two would have been synonomous.
19  BY MR. SKALABAN:
20      Q  Just as a general understanding as
21  someone working in the nuclear material field and
22  as someone that works in the industry and works at
23  DOE, your general understanding of that permanent
24  isolation would be the equivalent to deep geologic
25  disposal?

Alderson Reporting Company, Inc.
1111 14th Street, N.W. Suite 400 1-800-FOR-DEPO Washington, DC 20005

**Page 445**

1    MS. HERRMANN: Objection, calls for a
2  legal conclusion.
3    THE WITNESS: Yes.
4  BY MR. SKALABAN:
5    Q  In the second bullet point, it says
6  numerous provisions in the NWPA show that the term
7  high-level radioactive waste is not limited to
8  DOE-generated waste.
9    Do you see that?
10   A  Yes.
11   Q  Do you agree with that statement?
12    MS. HERRMANN: Objection, calls for a
13  legal conclusion.
14    THE WITNESS: Again, I've not read the
15  Nuclear Waste Policy Act in its entire, especially
16  the sections on high-level radioactive waste. But
17  my assumption is is that it was not limited to
18  DOE-generated weapons-related waste. It was
19  broader than that.
20  BY MR. SKALABAN:
21   Q  Is that assumption just based on kind of
22  a working knowledge of the law from having worked
23  at DOE and in the area of the industry?
24   A  Yes.
25   Q  What about the next statement, it was

**Page 446**

1  intended to include commercially-generated
2  radioactive waste, not otherwise defined as spent
3  fuel, from nuclear power plants.
4    Do you agree with that statement?
5    MS. HERRMANN: Objection, calls for a
6  legal conclusion.
7    THE WITNESS: No, I don't agree with that
8  statement.
9  BY MR. SKALABAN:
10   Q  And why do you disagree with that
11  statement?
12   A  Inasmuch as I think that the Nuclear
13  Waste Policy -- well, inasmuch as that I'm not a
14  lawyer and I'm taking some guesses here based on my
15  working knowledge, there has been high-level
16  radioactive waste produced commercially, case in
17  point, the West Valley demonstration point, that
18  waste will -- is destined for the repository, to
19  the best of my knowledge.
20    So I think that the high-level
21  radioactive waste portions of the Act were included
22  to -- were intended to include
23  commercially-generated high-level waste.
24    I think that the statement
25  commercially-generated radioactive waste is too

**Page 447**

1  vague to say that the Nuclear Waste Policy Act
2  intended to include all commercially-generated
3  radioactive waste.
4    Q  The next few bullet points deal with the
5  development of the definition of high-level
6  radioactive waste in the NWPA.
7    Are you familiar with the different
8  iterations of the definition of high-level
9  radioactive waste that are being referred to here?
10  Is that familiar to you?
11   A  No, I'm not familiar with it.
12   Q  The next paragraph it says that the
13  radioactive waste that Congress believed might be
14  considered high-level -- and, I'm sorry. Let me
15  clarify. Back up.
16    HQR073-0248, the first full bullet point,
17  so it's the next page, there's a discussion here in
18  this last bullet point before you get to the
19  heading 10 CFR Part 60, it says that the
20  radioactive waste that Congress believed might be
21  considered high-level radioactive waste for
22  purposes of the NWPA may be the waste that exceeds
23  the concentration limits in 10 CFR Part 61, for
24  near-surface disposal.
25    Would you agree with that statement? I

**Page 448**

1  would like you to read the rest of the paragraph.
2    MS. HERRMANN: While he does that, I will
3  object that it calls for a legal conclusion. Also
4  speculation as to what Congress believed.
5    THE WITNESS: I don't know enough about
6  the previous versions of waste legislation that
7  were in existence prior to my working at DOE to
8  really answer these questions.
9    I've -- my exposure to this legislation
10  is after these -- after it was amended yet again
11  after this. So I've got no real knowledge of what
12  was going on back in the early '80s on this
13  subject, not enough to form an opinion as to the
14  accuracy or whether I agree or not with this
15  statement.
16  BY MR. SKALABAN:
17   Q  Can you look at the top, the sort of
18  subbullet page HQR073-0248, there's a discussion
19  that begins the final NWPA version does not require
20  any official designation, as such, that particular
21  radioactive waste is formally defined as high-level
22  radioactive waste. It goes on to say that the NWPA
23  language merely requires that the waste (regardless
24  of whatever other legal or administrative
25  categorization it may have) be found by the NRC to

52 (Pages 445 to 448)

# Defendant

Page 455

```
1              IN THE UNITED STATES COURT OF FEDERAL CLAIMS

2      - - - - - - - - - - - - - - X

3      YANKEE ATOMIC ELECTRIC              :

4      COMPANY, et al.,                    :

5              Plaintiffs,                 :

6          v.                             :    Case Nos.

7      THE UNITED STATES,                  :    98-126C, 98-154C,

8              Defendant.                  :    98-474C

9      - - - - - - - - - - - - - - X

10                          Washington, D.C.

11                          Wednesday, January 29, 2003

12              Continued deposition of ROBERT ALLEN

13     CAMPBELL, a witness herein, called for examination by

14     counsel for Plaintiffs Yankee Atomic, Maine Yankee

15     and Connecticut Yankee, in the above-entitled matter,

16     pursuant to notice, the witness being duly sworn by

17     MARY GRACE CASTLEBERRY, a Notary Public in and for

18     the District of Columbia, taken at the offices of

19     Spriggs & Hollingsworth, 1350 I Street, N.W.,

20     Washington, D.C., at 9:30 a.m., Wednesday, January

21     29, 2003, and the proceedings being taken down by

22     Stenotype by MARY GRACE CASTLEBERRY, RPR, and

23     transcribed under her direction.

24

25
```

Robert Allen Campbell                                                    January 29, 2003
                              Washington, D.C.

---

Page 456

1   APPEARANCES:
2
3       On behalf of the Plaintiffs Yankee Atomic,
4   Maine Yankee and Connecticut Yankee:
5       PETER J. SKALABAN, JR., ESQ.
6       JERRY R. STOUCK, ESQ.
7       ROBERT SHAPIRO, ESQ.
8       Spriggs & Hollingsworth
9       1350 I Street, N.W.
10      Washington, D.C. 20005-3305
11      (202) 898-5821
12
13      On behalf of the Defendant:
14      HEIDE L. HERRMANN, ESQ.
15      KEVIN B. CRAWFORD, ESQ.
16      United States Department of Justice
17      Civil Division
18      1100 L Street, N.W.
19      Washington, D.C. 20530
20      (202) 514-7300
21
22
23
24
25

---

Page 458

1   E X H I B I T S (Continued)
2   CAMPBELL EXHIBIT NO.                    PAGE NO.
3   19 - Document entitled Development of        528
4       Long-term Disposition Option for Excess
5       Radioactive Sealed Sources
6   20 - Informal note from Campbell to Huizenga  533
7   21 - Presentation slides            542
8   22 - GTCC LLW Presentation            552
9   23 - Document entitled Co-disposal of GTCC    555
10      Waste with cover letter
11  24 - Three documents Bates numbered HQR    558
12      1430057 to 1430073
13  25 - Document entitled, Greater Than Class C  564
14      Low Level Radioactive Waste Program
15      Management Plan dated 9/99
16  26 - Document Bates numbered HQR 1310013    567
17  27 - Meeting agenda             568
18  28 - List of meeting attendees        573
19  29 - Section of environmental impact statement 581
20      by Idaho operations office
21  30 - Letter from New England governors to    584
22      Secretary of Energy
23  31 - E-mail from Hanson to Campbell      589
24  32 - Teleconference call summary      606
25

---

Page 457

CONTENTS

1
2   WITNESS            EXAMINATION BY COUNSEL FOR
3   ROBERT ALLEN CAMPBELL        PLAINTIFFS
4   By Mr. Skalaban            463, 633
5   By Ms. Herrmann            632
6
7       Afternoon Session - 538
8
9       E X H I B I T S
10  CAMPBELL EXHIBIT NO.              PAGE NO.
11  11 - Document, Greater Than Class C
12      Low Level Waste (GTCC)        493
13  12 - Memo, 2/18/94            495
14  13 - Greater than Class C low level    503
15      radioactive waste characterization,
16      estimated volumes, radionuclide
17      activities and other characteristics
18  14 - Memo from Hanson to Campbell    506
19  15 - Presentation slides        509
20  16 - Summary Report, June 1995, Technical    510
21      Issues Associated with Disposal of Utility
22      Generated GTCC Using Yankee Rowe
23      Decommissioning as a Typical Study Case
24  17 - Letter, 8/30/00        514
25  18 - E-mail with attached agenda    518

---

Page 459

1   E X H I B I T S (Continued)
2   CAMPBELL EXHIBIT NO.              PAGE NO.
3   33 - Draft of the 1999 greater than Class C  616
4       management strategy
5   34 - Presentation by DOE, Office of      618
6       Environmental Management, plans for
7       the management of greater than Class C
8       waste
9   35 - Series of E-mails            622
10  36 - NIRC/DOE Management Meeting, 1/16/02    623
11  37 - E-mail from Campbell to Rudzinski with   624
12      two attachments
13  38 - E-mail thread w/attachment, Memorandum
14      for the Secretary of Energy      629
15
16
17
18
19
20
21
22
23
24
25

2 (Pages 456 to 459)

Robert Allen Campbell

January 29, 2003

Washington, D.C.

Page 464

1    A.   I'm fine.
2    Q.   Since we talked last, which was June 14th
3   of last year, has there been any resolution or
4   movement on the issue that we talked about of whether
5   the program responsibilities for nuclear utility
6   greater than Class C waste would be moved from EM to
7   OCRWM?
8        MS. HERRMANN:  I'll just caution the
9   witness only to answer the question insofar as it
10  doesn't reveal communications between himself and
11  lawyers.
12       THE WITNESS:  No.
13       BY MR. SKALABAN:
14   Q.   Is that issue still being discussed by DOE
15  management?
16   A.   I don't know.
17   Q.   And let me ask you, is the answer you just
18  gave me about no, there has been no movement on this
19  issue, was that affected at all by your counsel's
20  instruction that she just gave you, that answer?
21   A.   No.
22   Q.   And for the record to be clear, where are
23  the program responsibilities for nuclear utility
24  greater than Class C waste right now within DOE?
25   A.   In the Office of Environmental Management.

Page 465

1    Q.   Are you still spending about 50 percent of
2   your time on GTCC matters?
3    A.   Yes.
4    Q.   Who else is currently working with you on
5   GTCC-related issues?
6    A.   Working with me?  No one.
7    Q.   Is anyone supporting your work on GTCC?
8   Personnel.  I'm looking for names.
9    A.   Are you asking for something different
10  than when we went through this before?
11   Q.   The current status, what the current
12  status is, who is working on GTCC issues in addition
13  to yourself at the Department of Energy at this time?
14   A.   For sealed sources and the recovery effort
15  in the Department of Energy, it is Joel Grimm at the
16  Albuquerque office.  Other than that, other than our
17  management in terms of how we work on anything, there
18  isn't anyone else who works for DOE.
19   Q.   Are there any contractors who are doing
20  work on GTCC waste for DOE at the present time?
21   A.   Yes.
22   Q.   And who are they, sir?
23   A.   The sealed source recovery at Los Alamos.
24  There are a number of employees in that program.
25   Q.   Who are the contractors?  What are the

Page 466

1   names of the organizations?
2    A.   I'm sorry?
3    Q.   What are the names of the organizations,
4   the names of the contractors that are supporting the
5   GTCC sealed source recovery effort?
6    A.   I don't remember the name of the
7   organization because they just organized and it's a
8   strange name that didn't make sense.  But Lee Leonard
9   is the manager, Shelby Leonard works on the program,
10  Andy Tompkins, and there are four other people, but I
11  don't remember their names right now.
12   Q.   Now, putting aside GTCC sealed sources,
13  are there any contractors supporting efforts to work
14  on acceptance, storage or disposal of nuclear utility
15  GTCC waste?
16   A.   No.
17   Q.   And now that we're in 2003, looking back
18  in 2002, through the entire year of 2002, has DOE
19  taken any steps at all to advance the storage or
20  disposal of nuclear utility GTCC waste?
21       MS. HERRMANN:  Objection, vague,
22  foundation.
23       THE WITNESS:  I don't know.
24       BY MR. SKALABAN:
25   Q.   You're not aware of any steps?

Page 467

1        MS. HERRMANN:  Same objections.
2        THE WITNESS:  No.
3        BY MR. SKALABAN:
4    Q.   And how about for the limited part of this
5   year, January 2003, have there been any steps taken
6   by DOE that you're aware of to advance the storage or
7   disposal of nuclear utility GTCC waste?
8        MS. HERRMANN:  Objection, vague,
9   foundation.
10       THE WITNESS:  No.
11       BY MR. SKALABAN:
12   Q.   What is the current status of the
13  environmental impact statement that you had talked
14  about a little bit when we were together the last
15  time?  What's the current status of the environmental
16  impact statement to explore the methods of disposing
17  of GTCC waste?
18   A.   We're not doing an environmental impact
19  statement right now.
20   Q.   And if I correctly recall, that had been
21  something that DOE was planning to do, is that
22  correct?
23       MS. HERRMANN:  Objection, foundation.
24       BY MR. SKALABAN:
25   Q.   Tell me about the environmental impact

4 (Pages 464 to 467)

# Plaintiff

Page 455

1           IN THE UNITED STATES COURT OF FEDERAL CLAIMS

2     - - - - - - - - - - - - - X

3     YANKEE ATOMIC ELECTRIC              :

4     COMPANY, et al.,                    :

5               Plaintiffs,               :

6         v.                              :   Case Nos.

7     THE UNITED STATES,                  :   98-126C, 98-154C,

8               Defendant.                :   98-474C

9     - - - - - - - - - - - - - X

10                        Washington, D.C.

11                        Wednesday, January 29, 2003

12               Continued deposition of ROBERT ALLEN

13    CAMPBELL, a witness herein, called for examination by

14    counsel for Plaintiffs Yankee Atomic, Maine Yankee

15    and Connecticut Yankee, in the above-entitled matter,

16    pursuant to notice, the witness being duly sworn by

17    MARY GRACE CASTLEBERRY, a Notary Public in and for

18    the District of Columbia, taken at the offices of

19    Spriggs & Hollingsworth, 1350 I Street, N.W.,

20    Washington, D.C., at 9:30 a.m., Wednesday, January

21    29, 2003, and the proceedings being taken down by

22    Stenotype by MARY GRACE CASTLEBERRY, RPR, and

23    transcribed under her direction.

24

25

Robert Allen Campbell
Washington, D.C.
January 29, 2003



**Page 492**

1    THE WITNESS: I wanted to identify the
2  litigation as a sensitivity to ensure that the
3  various people who looked at this document would be
4  aware that the topic being considered had litigation
5  associated with it.
6    BY MR. SKALABAN:
7    Q.  Now, did any comments you received in
8  preparing this document indicate that it could not go
9  to the office -- that this responsibility could not
10  go to the Office of Civilian Radioactive Waste
11  Management because of the litigation?
12    MS. HERRMANN: Objection, compound.
13    THE WITNESS: Could you repeat the
14  question?
15    MR. SKALABAN: Can you read it back?
16    THE REPORTER: "Question: Did any
17  comments you received in preparing this document
18  indicate that this responsibility could not go to the
19  Office of Civilian Radioactive Waste Management
20  because of the litigation?"
21    THE WITNESS: No.
22    BY MR. SKALABAN:
23    Q.  Did anyone discuss that topic with you
24  while you were preparing this recommendation section
25  or this recommendation memo?

**Page 493**

1    MS. HERRMANN: Objection, vague.
2    THE WITNESS: No.
3    BY MR. SKALABAN:
4    Q.  And you haven't heard anything at all
5  about the status of that decision?
6    A.  No.
7    (Campbell Exhibit No. 11 was
8    marked for identification.)
9    BY MR. SKALABAN:
10    Q.  If you could just take a few moments,
11  Mr. Campbell, and review this document and tell me if
12  you're familiar with it.
13    A.  No, I'm not.
14    Q.  So you've never seen this document before?
15    A.  I do not believe so.
16    Q.  Now, recognizing that you haven't worked
17  or don't recall working with this document before, do
18  you see the reference on the second page of it about
19  some remarks made by Mr. Bernero to the ACNW
20  regarding GTCC waste?
21    A.  Yes, I see that.
22    Q.  And it's reported here that Mr. Bernero
23  said to Mr. Duffy that you don't want another set of
24  requirements as some people in DOE asked us to do.
25  Do you see that? Take a few moments to read that

**Page 494**

1  paragraph.
2    A.  All right.
3    Q.  Are there any efforts within DOE to
4  develop any kind of an intermediate disposal capacity
5  for GTCC waste? And when I say intermediate disposal
6  capacity, I mean something less than geologic
7  disposal.
8    MS. HERRMANN: Objection, foundation,
9  speculation.
10    THE WITNESS: I don't know.
11    BY MR. SKALABAN:
12    Q.  To your knowledge, no?
13    MS. HERRMANN: Same objections.
14    THE WITNESS: I don't know.
15    BY MR. SKALABAN:
16    Q.  Has DOE ever made any proposals to NRC to
17  dispose of GTCC waste in a facility other than
18  geologic disposal?
19    MS. HERRMANN: Objection, foundation,
20  speculation.
21    THE WITNESS: I don't know.
22    BY MR. SKALABAN:
23    Q.  You are not aware of any such proposals,
24  is that correct?
25    MS. HERRMANN: Asked and answered,

**Page 495**

1  foundation, speculation.
2    THE WITNESS: I'm not aware of any.
3    (Campbell Exhibit No. 12 was
4    marked for identification.)
5    BY MR. SKALABAN:
6    Q.  In particular, if I can call your
7  attention to the first paragraph.
8    A.  All right.
9    Q.  What is your understanding of the extent
10  the utility-generated nonfuel-bearing component waste
11  will be accepted by RW as part of the standard
12  contract?
13    MS. HERRMANN: Objection, foundation,
14  speculation, calls for a legal conclusion.
15    THE WITNESS: Could you repeat the
16  question?
17    MR. SKALABAN: Can you read that back?
18    THE REPORTER: "Question: What is your
19  understanding of the extent the utility-generated
20  nonfuel-bearing component waste will be accepted by
21  RW as part of the standard contract?"
22    BY MR. SKALABAN:
23    Q.  What is your understanding of the extent
24  that RW will accept greater than Class C waste that
25  are nonfuel-bearing components under the DOE spent

11 (Pages 492 to 495)

# Defendant

Robert Allen Campbell                                                      January 29, 2003
Washington, D.C.

Page 532

1   overbroad, foundation, calls for a legal conclusion.
2        THE WITNESS:  First of all, I certainly
3   don't know what all the requirements are, but I do
4   know that they are required to conduct periodic leak
5   tests, conduct periodic inventories, undergo periodic
6   inspections and provide certain reports.  Beyond
7   that, I'm not aware of the specific requirements.
8        BY MR. SKALABAN:
9        Q.   Do you have any idea of the costs
10  associated with maintaining these sources on the
11  licensees?  Is that something that ever came up in
12  your work?
13       A.   I don't have a good idea of the specific
14  per source cost, but that issue has come up.
15       Q.   And how has it come up?
16       A.   It has come up in the context of impacts
17  to the licensees due to a lack of acceptance of these
18  sources by the Department.
19       Q.   Do you have a rough sense of what the
20  average annual costs are associated with maintaining
21  these GTCC waste sealed sources?
22       MS. HERRMANN:  Objection, vague,
23  foundation, speculation.
24       THE WITNESS:  No, I don't.
25       BY MR. SKALABAN:

Page 533

1        Q.   Do the licensees have to maintain armed
2   security to protect the GTCC sealed sources?
3        MS. HERRMANN:  Objection, foundation,
4   speculation, calls for a legal conclusion.
5        THE WITNESS:  My understanding is that
6   licenses are granted based on the amount and types of
7   material that the licensee possesses.  While I've not
8   heard of that for sealed sources, it's certainly a
9   possibility.
10            (Campbell Exhibit No. 20 was
11            marked for identification.)
12       BY MR. SKALABAN:
13       Q.   Mr. Campbell, can you please identify this
14  document, Exhibit 20, that I've handed you?  Can you
15  identify this document, please?
16       A.   It is an informal note from myself to
17  Mr. David Huizenga, subject, invitation to speak at
18  the American Nuclear Society executive conference on
19  nuclear facility decommissioning and used fuel
20  management, and the title being, engaging in exchanging
21  for safety, how to share in a competitive environment.
22       Q.   And is this a document that you provided
23  Mr. Huizenga?
24       A.   Yes.
25       Q.   And it's a document you prepared?

Page 534

1        A.   Yes.
2        Q.   Did Mr. Huizenga go on to talk at the
3   American Nuclear Society conference?
4        A.   No.
5        Q.   Why didn't he go and speak at that
6   conference?
7        MS. HERRMANN:  Objection, speculation.
8        BY MR. SKALABAN:
9        Q.   To your knowledge?
10       A.   I don't know.
11       Q.   Did you ever talk to him about it?
12       A.   No.
13       Q.   Take a look here at the last paragraph on
14  the first page of Exhibit 20.
15       A.   Okay.
16       Q.   Take a moment to review that.
17       A.   Okay.
18       Q.   Now, here you wrote that the presentation
19  should stress the fact that DOE has no plans to leave
20  GTCC at utilities beyond the date by which DOE begins
21  to accept spent fuel.  Do you see that?
22       A.   Yes.
23       Q.   Was that true at the time?
24       MS. HERRMANN:  Objection, foundation,
25  speculation.

Page 535

1        BY MR. SKALABAN:
2        Q.   That DOE had no plans to leave GTCC at
3   utilities beyond the date by which DOE begins to
4   accept spent fuel?
5        MS. HERRMANN:  Objection, foundation,
6   speculation.
7        THE WITNESS:  Could you read back the
8   question for me?
9        THE REPORTER:  "Question:  Was that true
10  at the time, that DOE had no plans to leave GTCC at
11  utilities beyond the date by which DOE begins to
12  accept spent fuel?"
13       THE WITNESS:  I don't know.
14       BY MR. SKALABAN:
15       Q.   So why did you write to Mr. Huizenga that
16  the presentation should stress the fact that DOE has
17  no plans to leave GTCC at utilities beyond the date
18  by which DOE begins to accept spent fuel?
19       A.   Because that was my opinion of what DOE's
20  plans should be.
21       Q.   And so you don't know whether or not a
22  different opinion was held at DOE?
23       MS. HERRMANN:  Objection, foundation,
24  speculation.
25       THE WITNESS:  No, I don't have any way of

21 (Pages 532 to 535)

# Plaintiff

Robert Allen Campbell
Washington, D.C.
January 29, 2003

Page 544

1 THE REPORTER: "Question: Have you ever
2 been involved in any presentations to the NRC, either
3 giving them yourself or assisting in the preparation
4 of them, of any presentations to the Advisory
5 Committee on Nuclear Waste?"
6 THE WITNESS: Yes.
7 BY MR. SKALABAN:
8 Q. Can you tell me about that?
9 A. I was invited to give a presentation to
10 the Advisory Committee on Nuclear Waste. I prepared
11 a presentation and then my presentation was canceled
12 so I never gave it.
13 Q. And how were you invited? Who invited you
14 to give that presentation?
15 A. As I remember, Jim Kennedy from the NRC
16 called me and asked me to do that.
17 Q. And when was this?
18 A. To the best of my memory, it was sometime
19 in the first half of 2001. I'm not positive, though.
20 Q. When was the meeting of the Advisory
21 Committee on Nuclear Waste? When was that scheduled?
22 A. I don't know.
23 Q. Did you actually prepare your
24 presentation?
25 A. Yes.

Page 545

1 Q. When was it canceled? Canceled right
2 before you gave it or was scheduled to give it? Let
3 me ask you this. When were you scheduled to provide
4 the presentation?
5 A. I do not remember the exact date.
6 Q. Okay. Well, ballpark the date. What do
7 you think, in terms of the ballpark timing?
8 A. I think it was the first part of 2001.
9 Maybe it was the first part of 2002. I don't
10 remember at this point exactly.
11 Q. Was it the summer? Was it this year,
12 summer of 2002?
13 MS. HERRMANN: Objection, asked and
14 answered.
15 THE WITNESS: I just don't remember. I'm
16 sorry.
17 BY MR. SKALABAN:
18 Q. What happened to your presentation?
19 MS. HERRMANN: Objection, vague.
20 THE WITNESS: I'm not sure I know what you
21 mean.
22 BY MR. SKALABAN:
23 Q. Did you prepare slides?
24 A. Yes.
25 Q. Did you prepare any other material besides

Page 546

1 slides?
2 A. No, I don't believe so.
3 Q. Now, the slides you prepared, did you
4 provide them to counsel here to give to us in
5 discovery?
6 A. I made them available for discovery, yes.
7 But I did not give them specifically to counsel here.
8 Q. When you said made them available for
9 discovery, you turned them over to someone who was
10 working on -- or pointed it out to someone who was
11 working on collecting documents?
12 A. Yes.
13 Q. Now, what were you planning to communicate
14 to the Advisory Committee on Nuclear Waste in your
15 presentation? What were the major themes?
16 A. The presentation was going to center on
17 what DOE's plans were for greater than Class C at
18 that time.
19 Q. And it's your testimony you don't remember
20 if that's 2001 or 2002?
21 MS. HERRMANN: Asked and answered.
22 THE WITNESS: That's correct.
23 BY MR. SKALABAN:
24 Q. And what were the plans -- what were DOE's
25 plans that you were planning to communicate to the

Page 547

1 Advisory Committee on Nuclear Waste?
2 MS. HERRMANN: Objection, foundation,
3 asked and answered.
4 THE WITNESS: Without looking at the
5 presentation, I'm not remembering clearly. This
6 remembers to my having difficulty remembering the
7 exact date as well, as to what those plans would have
8 been. So I would need to look at the presentation
9 again to clarify in my mind exactly what I said.
10 BY MR. SKALABAN:
11 Q. What do you recall DOE's plans being in
12 2001 and 2002 for GTCC waste disposal?
13 MS. HERRMANN: Objection, foundation,
14 asked and answered.
15 THE WITNESS: Our plans in 2001 were to do
16 an environmental impact statement. The plan in 2002
17 was that effort was placed on hold until decisions
18 were made.
19 BY MR. SKALABAN:
20 Q. And when you say until decisions are made,
21 are you referring to the process of deciding what
22 part of DOE would take responsibility for the EIS?
23 MS. HERRMANN: Objection, foundation,
24 asked and answered in the previous two days of
25 Mr. Campbell's deposition.

Alderson Reporting Company, Inc.
1111 14th Street, N.W. Suite 400 1-800-FOR-DEPO Washington, DC 20005

# Plaintiff



Robert Allen Campbell
January 29, 2003
Washington, D.C.

**Page 604**

1    BY MR. SKALABAN:
2    Q.  We've talked about this morning?
3    A.  I know that's under discussion. I don't
4 know how many discussions.
5    Q.  Does that deal with the transfer of any
6 more responsibility other than the conduct of the
7 EIS?
8    MS. HERRMANN:  Objection, foundation.
9    BY MR. SKALABAN:
10   Q.  In your understanding?
11   MS. HERRMANN:  Same objection.
12   THE WITNESS:  I'm not sure I'm following
13 your question. Could you repeat it?
14   MR. SKALABAN:  Could you read it back?
15   THE REPORTER:  "Question: Does that deal
16 with the transfer of any more responsibility other
17 than the conduct of the EIS?"
18   THE WITNESS:  What do you mean by that,
19 when you say does that?
20   BY MR. SKALABAN:
21   Q.  As you understand it, the issue under
22 discussion involves the transfer of the
23 responsibility for a possible EIS to another office
24 within DOE out of Environmental Management, correct?
25   A.  That is an issue under discussion, yes.

**Page 605**

1    Q.  Now, in your understanding, if that moves
2 forward, what role if any will the Office of
3 Environmental Management still have with respect to
4 nuclear utility GTCC waste, as you understand it?
5    MS. HERRMANN:  Objection, foundation,
6 speculation.
7    THE WITNESS:  I don't know.
8    BY MR. SKALABAN:
9    Q.  Has anyone ever talked to you about what
10 roles the Office of Environmental Management would
11 likely still have if this transfer goes forward?
12   A.  No.
13   MR. SKALABAN:  Let's mark this as Exhibit
14 32.
15   BY MR. SKALABAN:
16   Q.  Before we do that, were there any other
17 discussions -- have you been involved in any other
18 efforts since the time period of May 2001 to prepare
19 people at DOE higher in the management chain for
20 discussions with the NRC, other than the Jessie
21 Roberson discussion we've just been talking about?
22   MS. HERRMANN:  Objection, foundation.
23   THE WITNESS:  Yes.
24   BY MR. SKALABAN:
25   Q.  Can you tell me what that involved?

**Page 606**

1    A.  Since September 11th, there has been a lot
2 of meetings at a lot of different levels of
3 management above me concerning sealed sources, dirty
4 bombs and related issues that I've prepared my
5 management for in a variety of different ways.
6    Q.  Let's limit it to nuclear -- anything
7 related to nuclear utility GTCC waste, GTCC waste at
8 commercial nuclear power plants. Have you been
9 involved in any -- preparing your management for any
10 meetings with NRC relating -- people higher than you
11 in the DOE management chain for meetings that related
12 to or would recover nuclear utility GTCC? Do you
13 understand my question? I'm trying to limit the
14 sealed sources and that kind of thing, put that
15 aside.
16   A.  Other than what we've already discussed,
17 I'm not remembering any other discussions.
18   MR. SKALABAN:  Let's mark this as Exhibit
19 32.
20       (Campbell Exhibit No. 32 was
21       marked for identification.)
22   BY MR. SKALABAN:
23   Q.  Mr. Campbell, I've handed you Exhibit 32
24 which is Bates Number HQR 2510213. Is this
25 teleconference call summary something you prepared?

**Page 607**

1    A.  No.
2    Q.  Have you ever seen this document before?
3    A.  It does not look familiar to me.
4    Q.  Do you see in the first sentence it makes
5 reference to a teleconference call that was held
6 Thursday, June 22nd, 1999 at 11:30 a.m. and do you
7 see that you are listed as one of the attendees of
8 the call?
9    A.  Yes.
10   Q.  Who is MaryJane Wisenbaker?
11   A.  She was a DOE headquarters Office of
12 Environmental Management employee.
13   Q.  Was she above you or below you or equal to
14 you in the management chain at EM?
15   A.  Equal to.
16   Q.  And it says here, "Greg Duggan presented
17 an overview of the proposed strategy which will focus
18 in the following three areas." First of all, who was
19 Greg Duggan?
20   A.  Greg is a DOE Idaho employee.
21   Q.  And did he work on greater than Class C
22 waste issues?
23   A.  Yes.
24   Q.  And was he involved in helping formulate a
25 proposed strategy for greater than Class C waste?

39 (Pages 604 to 607)

Robert Allen Campbell

January 29, 2003

Washington, D.C.

Page 608

1    A.   I believe so, yes.
2    Q.   Now, there is a list of key points that
3  came from the discussion. Three points down, it
4  said, "Mark Frei indicated that there is an
5  understanding between GC, RW and EM that GTCC waste
6  will go to the repository."
7         And do you recall, Mr. Campbell, a
8  teleconference where Mark Frei indicated that there
9  is an understanding between the Office of Civilian
10  Radioactive Waste Management, the Office of
11  Environmental Management and the Office of General
12  Counsel that GTCC waste will go to the repository?
13    A.   I recall this conference call, yes.
14    Q.   And you recall that being discussed?
15    A.   I believe so, yes.
16    Q.   Do you recall Mr. Frei indicating that
17  there is an understanding between GC, RW and EM that
18  GTCC waste will go to the repository?
19    A.   Yes.
20    Q.   And what did Mr. Frei say about that
21  understanding?
22    A.   I don't remember specifically.
23    Q.   Did you have any understanding of what
24  this understanding entails between GC, RW and EM?
25         MS. HERRMANN:  Objection to the

Page 609

1  foundation, speculation.
2         THE WITNESS:  No.
3         BY MR. SKALABAN:
4    Q.   Now, underneath that, there is a bullet
5  point that says, "Options other than the repository
6  are considered politically undesirable in light of
7  overall DOE waste management objectives." Do you see
8  that?
9    A.   Yes.
10    Q.   Can you explain to me what's meant by that
11  sentence?
12         MS. HERRMANN:  Objection, foundation,
13  speculation.
14         THE WITNESS:  No.
15         BY MR. SKALABAN:
16    Q.   So participating in this conference call,
17  it's not clear to you what's being referred to?
18         MS. HERRMANN:  Same objections.
19         BY MR. SKALABAN:
20    Q.   Do you have any idea what's being referred
21  to?
22         MS. HERRMANN:  Same objections.
23         THE WITNESS:  I can't explain this
24  sentence on this call summary. In participating on
25  the conference call, I do remember Mr. Frei

Page 610

1  discussing politics associated with this.
2         BY MR. SKALABAN:
3    Q.   What did he say about it?
4    A.   In reference to the second bullet on this
5  page where it says, "Mark specifically noted that
6  borehole disposal of GTCC waste in Nevada was not an
7  option," was his main concern relating to politics.
8    Q.   So his concern was that politically,
9  borehole disposal of GTCC waste in Nevada was not an
10  option?
11         MS. HERRMANN:  Objection to the extent it
12  mischaracterizes his testimony, foundation.
13         THE WITNESS:  That was his opinion in June
14  of 1999, yes.
15         BY MR. SKALABAN:
16    Q.   Now, did he say anything more about this
17  understanding between GC, RW and EM, that GTCC waste
18  will go to the repository?  Did he give any more
19  information about it other than what's indicated
20  here, that there is that understanding?
21    A.   My memory of this is that he directed
22  Mr. Duggan to not pursue any other disposal options
23  other than that at that time.
24    Q.   Did he say why, other than this -- did he
25  say the reason was because there was this

Page 611

1  understanding?
2    A.   I don't remember his reasons why.
3    Q.   Do you know if this understanding is still
4  in effect?
5         MS. HERRMANN:  Objection, foundation,
6  speculation.
7         THE WITNESS:  Could you read back the
8  question?
9         BY MR. SKALABAN:
10    Q.   I'm sorry, let me rephrase it. Do you
11  know whether this understanding between GC, RW and EM
12  that GTCC waste will go to the repository is still in
13  effect?
14         MS. HERRMANN:  Objection, foundation,
15  speculation.
16         THE WITNESS:  As I answered earlier, I'm
17  not aware of such an understanding, so no.
18         BY MR. SKALABAN:
19    Q.   What you're aware of is what Mr. Frei
20  stated at the meeting, that there was that
21  understanding?
22    A.   That he said there was that understanding
23  was all that I know of that.
24    Q.   Did he give any indication of who that
25  understanding was formed between? For example, was

40 (Pages 608 to 611)

# Plaintiff

Robert Allen Campbell

January 29, 2003

Washington, D.C.

Page 612

1  it an understanding formed between Lake Barrett,
2  himself and someone else?  Do you understand who --
3  did he give any indication of who had formed that
4  understanding?
5      A.  No, he did not.
6      Q.  Now, with reference to the sentence that
7  Mark Frei made the point that he was not interested
8  in pursuing long term disposal options other than the
9  repository, were there other reasons given, other
10  than what's indicated here which -- did he specify
11  any reasons that you recall?
12      A.  Not that I remember, no.
13      Q.  How about this.  Do you remember what this
14  bullet point is referring to?  "There was general
15  acceptance of near-term efforts to reclassify waste
16  or to exercise exceptions or concentration average to
17  get GTCC disposed."
18      MS. HERRMANN:  Objection, foundation,
19  speculation.
20      THE WITNESS:  Yes, I remember that.
21      BY MR. SKALABAN:
22      Q.  Can you tell me what that bullet point is
23  referring to?
24      MS. HERRMANN:  Same objections.
25      BY MR. SKALABAN:

Page 613

1      Q.  Please explain.
2      A.  The proposed strategy which Mr. Duggan was
3  presenting, one of the things they were going to try
4  to do was to look into more precise characterization
5  of waste to see if it could be classified as
6  something other than greater than Class C and,
7  therefore, if that would open up a disposal option.
8  They were also going to look at concentration
9  averaging to see if that provided any outlets.
10      Q.  Now, in addition to talking about trying
11  to more precisely characterize waste and to use
12  concentration averaging, were there any other -- and
13  I don't want to put words in your mouth but let me
14  make sure I understand that.  When you're referring
15  to that precise characterization, the concentration
16  averaging, you're talking about Mr. Duggan is
17  proposing these as potential methods to reduce the
18  amount of GTCC waste that needs to be disposed of?
19      A.  No.
20      Q.  So explain to me what the role of those
21  two techniques would be, or these two actions,
22  concentration averaging, precise characterization,
23  what role was being proposed for them?
24      A.  This proposal was what the greater than
25  Class C program at Idaho was going to pursue.

Page 614

1      Q.  They were going to pursue with respect to
2  what?  Was the proposed strategy that Mr. Duggan was
3  presenting in this conference call, was that for the
4  management of all greater than Class C waste?
5      MS. HERRMANN:  Objection, foundation.
6      THE WITNESS:  Yes, I believe it was.
7      BY MR. SKALABAN:
8      Q.  And so how would the precise
9  characterization or concentration averaging, what was
10  he -- I'm trying to understand the link or the role
11  that those two actions or items would play in the
12  plan being proposed by Mr. Duggan, or the strategy
13  being proposed by Mr. Duggan?
14      A.  Under bullet 1, it says, provide for near
15  term and long term disposal options.  Since there is
16  no greater than Class C disposal facilities
17  available, near term options would involve
18  characterization or concentration averaging efforts.
19      Q.  That could be used immediately?
20      A.  Yes.
21      Q.  And then longer term options would be
22  providing a disposal path for waste that can't be
23  disposed of using techniques like more precise
24  characterization or concentration averaging, correct?
25      A.  Yes, that's what bullet 1 indicates, or

Page 615

1  item 1.
2      Q.  And the longer term disposal option would
3  be putting it in the repository?
4      MS. HERRMANN:  Objection, foundation.
5      THE WITNESS:  My memory is that Mr. Duggan
6  presented a broader approach than that and that
7  according to the paper, Mr. Frei said no and left the
8  instruction that the only thing that would be pursued
9  at that point was the repository.
10      BY MR. SKALABAN:
11      Q.  Has Mr. Frei provided any additional
12  guidance or any further guidance since that time
13  about what should be pursued?
14      A.  Not that I'm aware of.
15      MR. SKALABAN:  Let's go off the record
16  here.
17      (Discussion off the record.)
18      (Robert Shapiro enters deposition room.)
19      (Whereupon, a conference call was
20  commenced with the court.)
21      BY MR. SKALABAN:
22      Q.  Mr. Campbell, we were talking about the
23  presentation to the Advisory Committee on Nuclear
24  Waste.  Do you still have the presentation you
25  prepared, the one that was canceled for -- that was

41 (Pages 612 to 615)

# Defendant

Robert Allen Campbell                                            January 29, 2003
Washington, D.C.

Page 624

1  review while it was in preparation.
2      Q.  Do you remember having any comments on the
3  greater than Class C waste disposal section?
4      A.  No, I don't remember making any comments.
5      Q.  Did DOE prepare this or did NRC?
6          MS. HERRMANN:  Objection, foundation,
7  speculation.
8          THE WITNESS:  I don't know.
9          BY MR. SKALABAN:
10     Q.  You don't have any idea from providing
11 comments whether it was originally a DOE document?
12         MS. HERRMANN:  Asked and answered.
13         THE WITNESS:  I do not know who prepared
14 the original.
15         BY MR. SKALABAN:
16     Q.  Were you involved in any NRC/DOE
17 management meeting on January 16th, 2002?
18     A.  No, I was not.
19              (Campbell Exhibit No. 37 was
20              marked for identification.)
21         BY MR. SKALABAN:
22     Q.  Is this document a version of the policy
23 analysis paper you and I talked about in your first
24 deposition?
25     A.  No.

Page 625

1      Q.  Can you tell me what this document is?
2      A.  This is an E-mail from myself to Suzanne
3  Rudzinski that had two attachments to it and what is
4  an informal note from Patty Bubar to Jessie
5  Roberson that describes the greater than Class C
6  policy paper, but that policy paper is not part of
7  what you handed me.
8      Q.  And what was the purpose of the informal
9  note that's attached here?
10         MS. HERRMANN:  Objection, foundation,
11 speculation.
12         THE WITNESS:  All documents going to
13 Jessie Roberson require an informal note from the
14 person forwarding the document to her, giving a brief
15 description of what this is, why she needs to look at
16 it, what action she may need to take, et cetera.
17         MS. HERRMANN:  Pete, before you ask your
18 next question, ours looks different than yours.
19         MR. SKALABAN:  Do you have a 16433 and 34?
20         MS. HERRMANN:  No.  We must just be
21 missing two pages, then.
22         THE WITNESS:  Mine said 16432, 35, 36.
23         MR. CRAWFORD:  There was a little copying
24 glitch.
25         MR. SKALABAN:  So you're missing 34 and --

Page 626

1          MS. HERRMANN:  33.
2          MR. CRAWFORD:  So you've got a draft
3  version of the informal note and a --
4          MR. SKALABAN:  And a final.  It looks like
5  a final version.
6          BY MR. SKALABAN:
7      Q.  It appears to be a copying error,
8  Mr. Campbell, and you don't have 33 and 34 in front
9  of you. Let's look at 35 and 36.  Are these
10 Ms. Bubar's comments on this informal note?
11         MS. HERRMANN:  Objection, foundation.
12         THE WITNESS:  As best I can tell, yes.
13         BY MR. SKALABAN:
14     Q.  Now, is this a summary of the conclusions?
15 What's the main purpose of the informal note?
16         MS. HERRMANN:  Objection, foundation,
17 speculation, asked and answered.
18         THE WITNESS:  The purpose of the informal
19 note is to let her know that what's attached is a
20 policy paper.  And this summarizes what's in the
21 policy paper and hits the salient issues and
22 summarizes the recommendations.
23         BY MR. SKALABAN:
24     Q.  Now, here there is a reference to program
25 ownership. Do you see where it says "Recommendation:

Page 627

1  The issues and recommendations are fully analyzed and
2  supported in the attached policy paper, but the
3  bottom line recommendations are provided below"?  Do
4  you see that?
5      A.  Yes.
6      Q.  "Program ownership:  The nuclear utility
7  activated metal portion of GTCC waste should be
8  transferred to RW."  Is that the recommendation being
9  made to Jessie Roberson at the time?
10         MS. HERRMANN:  Objection, foundation,
11 speculation, asked and answered.
12         THE WITNESS:  On this particular iteration
13 of this draft, yes.
14         BY MR. SKALABAN:
15     Q.  How about the final version, do you know?
16 Was that recommendation still there when this --
17         MS. HERRMANN:  Same --
18         BY MR. SKALABAN:
19     Q.  When this finally went to Jessie Roberson,
20 was that recommendation still made?
21         MS. HERRMANN:  Same objections and best
22 evidence.
23         THE WITNESS:  The last version I saw, that
24 was the recommendation.
25         BY MR. SKALABAN:

Alderson Reporting Company, Inc.
1111 14th Street, N.W. Suite 400 1-800-FOR-DEPO Washington, DC  20005

# Defendant

Robert Allen Campbell             January 29, 2003

Washington, D.C.

**Page 632**

1   A. I don't know.
2   Q. I think we are completed for today.
3     MS. HERRMANN: I just have a couple, just
4 to take care of them now in case we don't come back.
5     MR. SKALABAN: Okay.
6     EXAMINATION BY COUNSEL FOR DEFENDANT
7     BY MS. HERRMANN:
8   Q. Mr. Campbell, do you make policy for the
9 Department of Energy?
10   A. No.
11   Q. Do you make policy for the Office of
12 Environmental Management?
13   A. No.
14   Q. Do you make any policy with regard to the
15 storage, disposal or handling of GTCC?
16   A. No.
17     MS. HERRMANN: That's it for me.
18     MR. SKALABAN: Can you read back those
19 three questions to me?
20     THE REPORTER: "Question: Do you make
21 policy for the Department of Energy?"
22     "Question: Do you make policy for the
23 Office of Environmental Management?"
24     "Question: Do you make any policy with
25 regard to the storage, disposal or handling of GTCC?"

**Page 633**

1   FURTHER EXAMINATION BY COUNSEL FOR PLAINTIFFS
2     BY MR. SKALABAN:
3   Q. Who makes policy for the Department of
4 Energy?
5     MS. HERRMANN: Objection, foundation.
6     THE WITNESS: My assumption is the
7 Secretary of Energy.
8     BY MR. SKALABAN:
9   Q. Who makes policy for the Office of
10 Environmental Management?
11     MS. HERRMANN: Objection, foundation.
12     THE WITNESS: The Assistant Secretary for
13 Environmental Management.
14     BY MR. SKALABAN:
15   Q. And who is that now?
16   A. Jessie Roberson.
17   Q. And since you've been working on GTCC
18 activities, has it always been Jessie Roberson?
19   A. No.
20   Q. Who was it before Jessie?
21   A. It was Carolyn Huntoon was the previous
22 Assistant Secretary. It's possible Mr. Jim Owendorf
23 was acting between Administrations. I don't have a
24 clear recollection.
25   Q. Now, who makes policy on the storage or

**Page 634**

1 disposal or handling of GTCC waste?
2     MS. HERRMANN: Objection, foundation.
3     THE WITNESS: My management.
4     BY MR. SKALABAN:
5   Q. And who is that?
6   A. I think it would depend on the specific
7 aspects of the policy.
8   Q. Who currently would you say is making
9 policy on the storage or disposal or handling of GTCC
10 waste?
11     MS. HERRMANN: Same objection.
12     THE WITNESS: Jessie Roberson and higher
13 than her in the Department of Energy.
14     BY MR. SKALABAN:
15   Q. If there are questions that arise
16 regarding greater than Class C waste within the
17 Department of Energy, are you one of the lead
18 contacts within DOE for answering those questions?
19     MS. HERRMANN: Objection, speculation,
20 vague.
21     THE WITNESS: I don't know.
22     BY MR. SKALABAN:
23   Q. Is there anyone who spends more time
24 within DOE than yourself on greater than Class C
25 waste issues?

**Page 635**

1     MS. HERRMANN: Objection, speculation.
2     THE WITNESS: I don't know.
3     BY MR. SKALABAN:
4   Q. Do you believe there is anyone who may be?
5     MS. HERRMANN: Objection, speculation.
6     THE WITNESS: I would have no way of
7 knowing how much time other people spend doing
8 whatever it is they're doing.
9     BY MR. SKALABAN:
10   Q. You have no idea, it's your testimony
11 under oath that you have no idea whether anyone else
12 spends more time than you?
13     MS. HERRMANN: Objection, speculation,
14 asked and answered.
15     THE WITNESS: I said I have no way of
16 knowing.
17     BY MR. SKALABAN:
18   Q. Who do you think could potentially spend
19 more time than you do on greater than Class C waste
20 issues at DOE?
21     MS. HERRMANN: Objection, speculation.
22     THE WITNESS: Again, my answer is I have
23 no way of knowing.
24     BY MR. SKALABAN:
25   Q. Can you identify anybody who might?

46 (Pages 632 to 635)

# Susan Klein

# Plaintiff

**Susan Klein**

Page 1

```
 1    IN THE UNITED STATES COURT OF FEDERAL CLAIMS
 2    ------------------------------------------X
      YANKEE ATOMIC ELECTRIC COMPANY            :
 3    (98-126C)(Merow, S.J.)                     :
      CONNECTICUT YANKEE ATOMIC POWER COMPANY    :
 4    (98-154C)(Merow, S.J.)                     :
      MAINE YANKEE ATOMIC POWER COMPANY          :
 5    (98-474C)(Merow, S.J.)                     :
      FLORIDA POWER & LIGHT COMPANY              :
 6    (98-483C)(Wilson, J.)                      :
      NORTHERN STATES POWER COMPANY              :
 7    (98-484C)(Wiese, J.)                       :
      DUKE POWER, a Division of DUKE ENERGY CORP.:
 8    (98-485C)(Sypolt, J.)                      :
      INDIANA MICHIGAN POWER COMPANY             :
 9    (98-486C)(Hodges, J.)                      :
      SACRAMENTO MUNICIPAL UTILITY DISTRICT      :
10    (98-488C)(Yock, S.J.)                      :
      SOUTHERN NUCLEAR OPERATING COMPANY, et al. :
 1    (98-614C)(Merow, S.J.)                     :
      COMMONWEALTH EDISON COMPANY                :
12    (98-621C)(Hewitt, J.)                      :
      BOSTON EDISON COMPANY                      :
13    (99-447C) (Allegra, J.)                    :
      GPU NUCLEAR, INCORPORATED                  :
14    (00-440C)(Bush, J.)                        :
      WISCONSIN ELECTRIC POWER COMPANY           : VOLUME
15    (00-697C)(Merow, S.J.)                     :   I
      POWER AUTHORITY OF THE STATE OF NEW YORK   :
16    (00-703C)(Damich, J.)                      :
      OMAHA PUBLIC POWER DISTRICT                :
17    (01-115C)(Bush, J.)                        :
      NEBRASKA PUBLIC POWER DISTRICT             :Discovery
18    (01-116C)(Sypolt, J.)                      :Judge:
      TENNESSEE VALLEY AUTHORITY                 :(Judge
19    (01-249C)(Bruggink, J.)                    :Sypolt)
20                    Plaintiffs,               :PAGES
21    V.                                         :1 - 274
 2
```

Page 2

1    THE UNITED STATES,                          :

2              Defendant.                        :

3    ------------------------------------------X

4

5

6

7

8

9           Deposition of Susan Klein

10              Washington, DC

11         Wednesday, April 24, 2002

12

13

14

15

16

17

18

19

20

21   Reported by:   Denise Dobner Vickery, RMR, CRR

22   JOB NO.   144539

# Susan Klein

## Page 9

```
 1        Thereupon,
 2                     SUSAN KLEIN
 3   was called for examination, and, after having been duly
 4   sworn or affirmed, was examined and testified as
 5   follows:
 6        EXAMINATION BY COUNSEL FOR THE PLAINTIFF,
 7        COMMONWEALTH EDISON
 8   BY MR. HIRSCH:
 9        Q.   Ms. Klein, my name is Norm Hirsch.  I'm a
10   lawyer at Jenner & Block in Chicago.  I represent
11   Commonwealth Edison Company.  I'm going to be asking
12   you some questions today.
13             If you don't understand a question I've asked,
14   please tell me and I'll try and rephrase it.
15   Otherwise, I'll assume you understood my question.
16        A.   (Nods head).
17        Q.   If you need a break at any point today, please
18   let me know and we'll stop and take a break.
19        A.   (Nods head).
20        Q.   Mr. Zabransky -- I'm sorry.
21        A.   That's okay.  You got Zabransky on your brain.
22        Q.   Move from the last deposition.
```

## Page 10

```
 1             Ms. Klein, are you aware that there's a
 2   protective order in the spent nuclear fuel cases?
 3        A.   I think there is, yes.
 4        Q.   All right.  What I'm going to do is I'm going
 5   to hand you a copy of the protective order and I'd like
 6   you to take a minute to look at it.
 7        A.   Okay.
 8             MR. HIRSCH:  Mark that as Exhibit 1.
 9             (Thereupon, the reporter marked for
10   identification Deposition Exhibit No. 1.)
11             THE WITNESS:  (Pause).  Okay.  I don't
12   fully understand it at this point, but I've read
13   through it.
14   BY MR. HIRSCH:
15        Q.   Okay.  Would you generally agree to abide by
16   the terms in the protective order, Ms. Klein?
17        A.   If something is labeled confidential, yes, I
18   will keep it confidential.
19        Q.   Okay.  All right.  That's fine.
20             Ms. Klein, I've handed you what's been marked
21   as Klein Deposition Exhibit 1 or I'm handing you that
22   document, which is the notice of deposition that was
```

## Page 11

```
 1   issued on April 18th for today's Rule 30(b)(6)
 2   deposition.  And if you look on the exhibit page,
 3   you'll see four topics.  That's page 5.  You see
 4   those topics?
 5        A.   Yes, I see those topics.
 6        Q.   And you understand you're supposed to be the
 7   Rule 30(b)(6) designated Department of Energy witness
 8   for these four topics?
 9        A.   Yes.
10        Q.   What's your current position, Ms. Klein?
11        A.   I'm a senior policy adviser to the Director
12   and Deputy Director of the Office of Civilian
13   Radioactive Waste Management at the Department of
14   Energy.
15        Q.   And how long have you been the senior policy
16   adviser?
17        A.   For about three years.
18        Q.   So, since about 1999?
19        A.   Yes.  I was transferred there but detailed
20   back to general counsel for a couple years.
21        Q.   When was your detail back to General Counsel's
22   Office?
```

## Page 12

```
 1        A.   I think it was '97 that I was transferred to
 2   RW, but I was detailed back to general counsel to work
 3   with the general counsel at the time on any legal
 4   issues and then later on it was limited to issues
 5   involving this litigation.
 6        Q.   Okay.  We'll get back to that in a second.
 7   But who do you report to as the senior policy adviser?
 8        A.   Lake Barrett.  Ron Milner and Lake Barrett.
 9        Q.   And Mr. Barrett's current title is?
10        A.   Deputy Director of the Office of Civilian
11   Radioactive Waste Management.
12        Q.   And Mr. Milner's title is?
13        A.   He's the COO, the Chief Operating Officer of
14   the Office of Civilian Radioactive Waste Management at
15   DOE.
16        Q.   And is the Office of Civilian Radioactive
17   Waste Management otherwise known by its acronym as
18   OCRWM?
19        A.   OCRWM, yes, and actually with regard to Ron, I
20   think now I just report to Lake.  I was reporting to
21   Ron when he was also Acting Deputy, but now that
22   Margaret is here, to just correct the record.  I don't
```

3 (Pages 9 to 12)