# Plaintiff

Page 9

Thereupon,

SUSAN KLEIN

2

3 was called for examination, and, after having been duly

4 sworn or affirmed, was examined and testified as

5 follows:

6 EXAMINATION BY COUNSEL FOR THE PLAINTIFF,

7 COMMONWEALTH EDISON

8 BY MR. HIRSCH:

9 Q. Ms. Klein, my name is Norm Hirsch. I'm a

10 lawyer at Jenner & Block in Chicago. I represent

11 Commonwealth Edison Company. I'm going to be asking

12 you some questions today.

13 If you don't understand a question I've asked,

14 please tell me and I'll try and rephrase it.

15 Otherwise, I'll assume you understood my question.

16 A. (Nods head).

17 Q. If you need a break at any point today, please

18 let me know and we'll stop and take a break.

19 A. (Nods head).

20 Q. Mr. Zabransky -- I'm sorry.

21 A. That's okay. You got Zabransky on your brain.

22 Q. Move from the last deposition.

Page 10

1 Ms. Klein, are you aware that there's a

2 protective order in the spent nuclear fuel cases?

3 A. I think there is, yes.

4 Q. All right. What I'm going to do is I'm going

5 to hand you a copy of the protective order and I'd like

6 you to take a minute to look at it.

7 A. Okay.

8 MR. HIRSCH: Mark that as Exhibit 1.

9 (Thereupon, the reporter marked for

10 identification Deposition Exhibit No. 1.)

11 THE WITNESS: (Pause). Okay. I don't

12 fully understand it at this point, but I've read

13 through it.

14 BY MR. HIRSCH:

15 Q. Okay. Would you generally agree to abide by

16 the terms in the protective order, Ms. Klein?

17 A. If something is labeled confidential, yes, I

18 will keep it confidential.

19 Q. Okay. All right. That's fine.

20 Ms. Klein, I've handed you what's been marked

21 as Klein Deposition Exhibit 1 or I'm handing you that

22 document, which is the notice of deposition that was

Page 11

1 issued on April 18th for today's Rule 30(b)(6)

2 deposition. And if you look on the exhibit page,

3 you'll see four topics. That's page 5. You see

4 those topics?

5 A. Yes, I see those topics.

6 Q. And you understand you're supposed to be the

7 Rule 30(b)(6) designated Department of Energy witness

8 for these four topics?

9 A. Yes.

10 Q. What's your current position, Ms. Klein?

11 A. I'm a senior policy adviser to the Director

12 and Deputy Director of the Office of Civilian

13 Radioactive Waste Management at the Department of

14 Energy.

15 Q. And how long have you been the senior policy

16 adviser?

17 A. For about three years.

18 Q. So, since about 1999?

19 A. Yes. I was transferred there but detailed

20 back to general counsel for a couple years.

21 Q. When was your detail back to General Counsel's

22 Office?

Page 12

1 A. I think it was '97 that I was transferred to

2 RW, but I was detailed back to general counsel to work

3 with the general counsel at the time on any legal

4 issues and then later on it was limited to issues

5 involving this litigation.

6 Q. Okay. We'll get back to that in a second.

7 But who do you report to as the senior policy adviser?

8 A. Lake Barrett. Ron Milner and Lake Barrett.

9 Q. And Mr. Barrett's current title is?

10 A. Deputy Director of the Office of Civilian

11 Radioactive Waste Management.

12 Q. And Mr. Milner's title is?

13 A. He's the COO, the Chief Operating Officer of

14 the Office of Civilian Radioactive Waste Management at

15 DOE.

16 Q. And is the Office of Civilian Radioactive

17 Waste Management otherwise known by its acronym as

18 OCRWM?

19 A. OCRWM, yes, and actually with regard to Ron, I

20 think now I just report to Lake. I was reporting to

21 Ron when he was also Acting Deputy, but now that

22 Margaret is here, to just correct the record. I don't

3 (Pages 9 to 12)

Page 13

1  know how important that is but --
2      Q.   I'm sorry.
3      A.   -- to be perfectly accurate, right now I
4  report to Lake, not to Ron.
5      Q.   Okay.
6      A.   Okay.
7      Q.   And when did you stop reporting to Ron Milner?
8      A.   When Margaret Chu became the Director.
9      Q.   You also report to Ms. Chu?
10     A.   Yes, I do.
11     Q.   Now, it is my understanding that you're a
12 lawyer; is that correct?
13     A.   Yes.
14     Q.   And when did you graduate from college,
15 Ms. Klein?
16     A.   1971.
17     Q.   And where did you go to law school?
18     A.   Case Western Reserve in Cleveland, Ohio.
19     Q.   And when did you graduate from Case Western?
20     A.   1974.
21     Q.   And can you give me just a rough outline of
22 what your employment has been after you got out of law

Page 15

1      Q.   Roughly when was that?
2      A.   I think it was probably '80, 1980.  I'm not
3  sure.  And then 1984, I believe it was, I came to work
4  in the nuclear area.  It was when Ronald Reagan was
5  elected.  If that was '84, that's when it was.
6      Q.   And what department did you work in in the
7  nuclear?
8      A.   At the time it was called Assistant General
9  Counsel for International Development and Defense
10 Programs.
11     Q.   And what were your responsibilities in that
12 position?
13     A.   The Price Anderson Act, transportation of
14 nuclear materials, the Low Level Waste Policy Act of
15 1980.  That was generally my areas -- those were
16 generally my areas.
17     Q.   And who did you report to when you were in
18 that position?
19     A.   Leon Silverstorm.
20     Q.   And who was he?
21     A.   The Assistant General Counsel for IDDP,
22 International Development and Defense Programs.

Page 14

1  school?
2      A.   I went to work for the United States General
3  Accounting Office.  Worked there for three years.
4      Q.   So, from 1974 to?
5      A.   To 1977.
6      Q.   Okay.
7      A.   I wrote decisions of the controller general.
8  And then I left the General Counsel's Office there and
9  went to what was at the time FEA, the Federal Energy
10 Administration, for three months until it became the
11 Department of Energy in 1977.
12     Q.   And have you been at the Department of Energy
13 from 1977 to the present?
14     A.   Yes.
15     Q.   And can you give me the outline of your
16 employment history at the Department of Energy?
17     A.   I worked in general counsel for a couple
18 years.  I can't remember the exact number.  I don't
19 know how much detail you want, but then from there I
20 went to conservation and at the time it was called
21 conservation and solar.  Worked on the residential
22 conservation service program.

Page 16

1      Q.   Did you have any involvement in the passage of
2  the Nuclear Waste Policy Act of 1982?
3      A.   My office handled it, but it was not under me.
4  There was another lawyer in the office handling it, but
5  she would report on it in staff meetings.
6      Q.   And what office was that at the time?
7      A.   International Development -- well, it might
8  have changed its name.  That office changed its name
9  many times.  I'm not sure what its name was, but it
10 was the same general group of lawyers.  We were
11 reorganized.  We became Nuclear Affairs and later on
12 Civilian Nuclear Programs.  The defense part was taken
13 out, but...
14     Q.   Okay.
15     A.   I don't remember the exact name during that
16 period.
17     Q.   So there was another lawyer in this Nuclear
18 Affairs Office --
19     A.   Uh-huh.
20     Q.   -- better term, who worked on the Nuclear
21 Waste Policy Act?
22     A.   Yes.

**Susan Klein**

Page 17

1   Q.   And who was that?

2   A.   Amy Shamora.

3   Q.   Is she still with the Department of Energy?

4   A.   Last I heard, she went back to GAO.   We had

5   both actually worked at GAO together, but I don't know

6   if she's retired or what.

7   Q.   And so I wasn't sure.   Did you do any work in

8   terms of the Nuclear Waste Policy Act?

9   A.   After its passage, yes.

10  Q.   Okay.

11  A.   Not before its passage.

12  Q.   I see.   What kind of work did you do in

13  connection with the Nuclear Waste Policy Act?

14  A.   Price Anderson issues and transportation

15  issues at this time.   Later on I did much more, but

16  that's all I did right after passage.   I did not work

17  on the standard contract.

18  Q.   Okay.

19  A.   I guess I shouldn't answer your questions

20  before you ask them.

21  Q.   That's fine.   When you say you worked on

22  transportation issues, what kind of issues did you

Page 18

1   work?   What do you mean by that?

2   A.   Well, generally I worked on transportation

3   issues within the department.   Our own transportation

4   of nuclear materials, which was under the defense

5   program area, and I interpreted the Department of

6   Transportation regulations and the NRC regulations and

7   our exemption under the Atomic Energy Act.   It was

8   really with Price Anderson that I worked with the

9   people in OCRWM.

10  Q.   Okay.   So, how long did you work as that in

11  that Assistant General Counsel position?

12  A.   Until I came to RW and I became the Assistant

13  General Counsel of that division eventually.

14  Q.   And when did you become the Assistant General

15  Counsel for RW?

16  A.   I don't remember.   I was in that position

17  acting.   I came to RW in about -- what did I say?

18  '97.   I'd say around '92.   I mean, I can -- yeah,

19  '92, approximately.

20  Q.   So, just so I'm clear, from 1984 to roughly

21  1992 you were in this position as Assistant General

22  Counsel in this office whose name changed but --

Page 19

1   A.   No.

2   Q.   I'm sorry.   Go ahead.

3   A.   I wasn't the Assistant General Counsel from

4   '84 until '92.   I was an attorney in that office.

5   Q.   All right.   Okay.

6   A.   From '92 to '97 approximately I was the

7   Assistant General Counsel.

8   Q.   All right.   For RW?

9   A.   Which means --

10  Q.   In RW; is that right?

11  A.   No.   It's in the general --

12  Q.   All right.

13  A.   It's in the General Counsel's Office.   We had

14  many clients and RW was one of them, but actually at a

15  certain point in time the whole RW program was moved to

16  the Assistant General Counsel for Environment because

17  we were doing the environmental assessments was the

18  biggest part of the project, and so it was moved there

19  for several years.   It was taken out of that office

20  and moved there and then it was moved back to that

21  office.

22  Q.   So, from this period 1984 to 1982 -- '92 --

Page 20

1   excuse me -- you were an attorney in this office?

2   A.   Yes.

3   Q.   Of the Assistant General Counsel?

4   A.   That's right.

5   Q.   Whose responsibilities included nuclear

6   affairs?

7   A.   Yes.   Absolutely.   That's correct.

8   Q.   All right.   And when you moved into the

9   position in 1992 of Assistant General Counsel, who did

10  you report to?

11  A.   Jerry Pruzan.   He was the deputy general

12  counsel for -- I don't know what they called it --

13  programs or something.

14  Q.   What did your responsibilities include as the

15  Assistant General Counsel during that period starting

16  in 1992?

17  A.   Interpretation of the Atomic Energy Act.

18  Interpretation of the Nuclear Waste Policy Act.

19  Interpretation of the Low Level Waste Policy Act.   And

20  in those capacities, there were many offices that I

21  supported.   Environment, safety and health, OCRWM,

22  nuclear energy.

**Esquire Deposition Services**

Susan Klein

Page 21

1    Q.   Who did Mr. Pruzan report to?

2    A.   The general counsel.

3    Q.   And that was?

4    A.   I think that was Farrell.  I'm not positive.

5    Q.   Farrell?

6    A.   Mike Farrell.  I'm not sure.  It also was

7    Steve Wakefield.  I don't remember.

8    Q.   And how long were you in that position as

9    Assistant General Counsel?

10   A.   I think about five years.  I'm not sure, but

11   I think about five years.

12   Q.   So, roughly from 1992 to 1997?

13   A.   Uh-huh.  Now, later on I reported to other

14   people.  I'm just -- at that time I reported to Jerry

15   Pruzan when I first became.

16   Q.   All right.  When you -- as you went along

17   from '92 to '97, who else did you report to?

18   A.   Frank Bay.

19   Q.   Who's he?

20   A.   He was a political appointee.  He was and

21   that Jerry Pruzan.  They were all political

22   appointees.  So they came and went.

Page 22

1    Q.   I see.  All right.

2    A.   And then Mark Schroeder and then --

3    Q.   These people had the title of?

4    A.   Deputy.

5    Q.   Deputy general counsel?

6    A.   For something.  It changed around a lot,

7    but...  And then after Mark Schroeder was Mary Anne

8    Sullivan, not Marian but Mary Anne Sullivan.

9    Q.   Right.  Anybody else that you reported to

10   during that period?

11   A.   Not that I can remember.

12   Q.   And what was Mary Anne Sullivan's title?

13   A.   At the time she was deputy general counsel for

14   something like environment and security.  Something

15   like that.  And then she became the General Counsel

16   later.

17   Q.   Okay.  Now, what position did you take in

18   1997?

19   A.   The senior policy adviser to RW.

20   Q.   And that's the position you're in now?

21   A.   Yes.

22   Q.   Now, you mentioned that you had a detail?

Page 22

1    A.   Uh-huh.

2    Q.   Somewhere during this period '97 to the

3    present?

4    A.   Uh-huh.

5    Q.   And when was this detail?

6    A.   1997 till the end of 1999.

7    Q.   Okay.  And what was your detail?  What was

8    the position you held?

9    A.   Okay.  I was -- I had moved physically.

10   Well, I think the first year I didn't.  I don't

11   remember now.  But anyway I reported to Mary Anne

12   Sullivan with regard to legal issues, and then when

13   time allowed, I worked on my senior policy adviser hat

14   for Lake Barrett.  But I was technically an employee

15   of RW for payroll purposes, et cetera.

16   Q.   All right.

17   A.   And then eventually that changed.  So that I

18   didn't work on all legal issues.  I just worked on

19   issues related to the spent fuel litigation.

20   Q.   And when did you start working exclusively on

21   issues related to the spent fuel litigation?

22   A.   I don't remember.  I think it was the last

Page

1    six months of that period.

2    Q.   So, probably in 1999?

3    A.   Yes.  But during that whole period, I worked

4    on the spent fuel litigation.

5    Q.   From '97 to --

6    A.   Yes.

7    Q.   -- '99?

8         And you say during that detail you reported to

9    Mary Anne Sullivan?

10   A.   Yes.  For legal issues I reported to Mary Anne

11   Sullivan.

12   Q.   Okay.  And her title at that time was?  Had

13   she become --

14   A.   General Counsel.

15   Q.   -- General Counsel?

16   A.   I believe for most of that time anyway.

17   Q.   Was there a particular reason that you were

18   given about why you should serve on the detail?

19   A.   There was nobody else to do it.

20   Q.   I see.  All right.  Well, were you perceived

21   as having special expertise in the area?

22   A.   Yes.  Absolutely.

Esquire Deposition Services

1-800-441-3376

# Defendant

# Susan Klein

**Page 1**

```
 1   IN THE UNITED STATES COURT OF FEDERAL CLAIMS
 2   ------------------------------------------X
     YANKEE ATOMIC ELECTRIC COMPANY              :
 3   (98-126C)(Merow, S.J.)                       :
     CONNECTICUT YANKEE ATOMIC POWER COMPANY      :
 4   (98-154C)(Merow, S.J.)                       :
     MAINE YANKEE ATOMIC POWER COMPANY            :
 5   (98-474C)(Merow, S.J.)                       :
     FLORIDA POWER & LIGHT COMPANY                :
 6   (98-483C)(Wilson, J.)                        :
     NORTHERN STATES POWER COMPANY                :
 7   (98-484C)(Wiese, J.)                         :
     DUKE POWER, a Division of DUKE ENERGY CORP.  :
 8   (98-485C)(Sypolt, J.)                        :
     INDIANA MICHIGAN POWER COMPANY               :
 9   (98-486C)(Hodges, J.)                        :
     SACRAMENTO MUNICIPAL UTILITY DISTRICT        :
10   (98-488C)(Yock, S.J.)                        :
     SOUTHERN NUCLEAR OPERATING COMPANY, et al.   :
11   (98-614C)(Merow, S.J.)                       :
     COMMONWEALTH EDISON COMPANY                  :
12   (98-621C)(Hewitt, J.)                        :
     BOSTON EDISON COMPANY                        :
13   (99-447C)(Allegra, J.)                       :
     GPU NUCLEAR, INCORPORATED                    :
14   (00-440C)(Bush, J.)                          :
     WISCONSIN ELECTRIC POWER COMPANY             : VOLUME
15   (00-697C)(Merow, S.J.)                       :  I
     POWER AUTHORITY OF THE STATE OF NEW YORK     :
16   (01-703C)(Damich, J.)                        :
     OMAHA PUBLIC POWER DISTRICT                  :
17   (01-115C)(Bush, J.)                          :
     NEBRASKA PUBLIC POWER DISTRICT               :Discovery
18   (01-116C)(Sypolt, J.)                        :Judge
     TENNESSEE VALLEY AUTHORITY                   :(Judge
19   (01-249C)(Bruggink, J.)                      :Sypolt)
20            Plaintiffs,                         :PAGES
21   V.                                           :1 - 274
22
```

**Page 2**

```
 1   THE UNITED STATES,                  :
 2            Defendant.                  :
 3   ------------------------------------------X
 4
 5
 6
 7
 8
 9            Deposition of Susan Klein
10                 Washington, DC
11            Wednesday, April 24, 2002
12
13
14
15
16
17
18
19
20
21   Reported by:  Denise Dobner Vickery, RMR, CRR
22   JOB NO.   144539
```

**Page 3**

```
 1
 2
 3
 4
 5                                April 24, 2002
 6                                9:37 A.M.
 7
 8   Deposition of Susan Klein, held at the offices of:
 9
10       Jenner & Block
11       601 13th Street, NW
12       12th Floor
13       Washington, DC 20005
14
15   Pursuant to notice, before Denise Dobner Vickery, a
16   Registered Merit Reporter, Notary Public of the
17   District of Columbia.
18
19
20
21
22
```

**Page 4**

```
 1   APPEARANCES:
 2
 3   Jenner & Block
 4   For the Plaintiff COMMONWEALTH EDISON
 5       One IBM Plaza
 6       Chicago, IL 60611-7603
 7       (312) 222-9350
 8   BY: Norman M. Hirsch, Esq.
 9
10   Shaw Pittman Potts & Trowbridge
11   For the Plaintiffs NORTHERN STATES POWER COMPANY,
12   et al.
13       1650 Tysons Boulevard
14       McLean, VA 22102-4859
15       (703) 770-7962
16   BY: Alex D. Tomaszczuk, Esq.
17
18   Balch & Bingham LLP
19   For the Plaintiffs SOUTHERN NUCLEAR OPERATING COMPANY,
20   et al.
21       1275 Pennsylvania Avenue, NW, Tenth Floor
22       Washington, DC 20004
```

# Susan Klein

**Page 57**

1  role the DCS forms that are filled out by the utilities

2  play in terms of the Radioactive Waste Management

3  Program?

4          MS. POWELL:  The same objection, beyond

5  the scope, but you can answer.

6          THE WITNESS:  Could you repeat that.

7  Sounds like the same question, but I know there's a

8  different word in there.

9  BY MR. HIRSCH:

10     Q.  I guess what I'm just getting at, Ms. Klein,

11  is:  After the forms are submitted and they're

12  approved, what does the DOE do with the forms?  What

13  function do they serve?  That's what I'm getting at.

14     A.  They become the legally binding commitment of

15  the department.

16     Q.  Do they have any role in DOE's planning of the

17  spent nuclear fuel program?

18         MS. POWELL:  Same objection, beyond the

19  scope, but you can answer to your personal knowledge.

20         THE WITNESS:  Yes.

21  BY MR. HIRSCH:

22     Q.  And what role is this?

**Page 58**

1          MS. POWELL:  Same objection.  You can

2  answer.

3          THE WITNESS:  I'm thinking, actually.

4  I'm thinking because we have -- we're planning for a

5  greater acceptance rate once we begin operation, but

6  those were the planning rates based on an MRS, which

7  was limited by statute to 10,000 metric tons.

8  BY MR. HIRSCH:

9     Q.  So, is it my understanding that the DOE is now

10  currently planning for a higher acceptance rate than

11  the acceptance rate upon which the DCS forms were

12  originally submitted; is that correct?

13     A.  We're planning for that, but it's for planning

14  purposes, yes.

15     Q.  All right.  We're getting into one of the

16  other topics, but what is the rate that the DOE is

17  currently planning on accepting spent nuclear fuel?

18     A.  400 the first year of operation of a

19  repository.  600 -- just to be sure -- the next year.

20  1200 the year thereafter.  2,000 the year thereafter.

21  3,000 the following year and then a steady state 3,000

22  for 10-year period.  I mean, that whole thing covers

**Page 59**

1  10 years.

2     Q.  Will you look back at Klein Deposition Exhibit

3  2.

4     A.  Uh-huh.

5     Q.  You see on the first page of the general

6  instructions?

7     A.  Uh-huh.

8     Q.  It says on the When to Submit part, and I'm

9  reading the last I think sentence.  "For each

10  allocation listed in the 1991 ACR or subsequent ACRs as

11  appropriate, a purchaser must submit at least one DCS

12  for the allocation of at least 63 months prior to the

13  date that the allocation occurs (e.g., if a purchaser

14  has an allocation in 1998, a DCS must be submitted for

15  that allocation by September 30, 1992)."

16         Is it correct that utilities were supposed to

17  submit a DCS form at least 63 months before the utility

18  had an allocation in the latest ACR report from the

19  DOE?

20     A.  Yes.

21         MS. POWELL:  Beyond the scope, but you can

22  answer.

**Page 60**

1          THE WITNESS:  Oh.

2          MS. POWELL:  No, you can answer.

3          THE WITNESS:  Yes.

4  BY MR. HIRSCH:

5     Q.  And I think that you've said earlier that the

6  1990 -- or strike that.

7         You recall that the 1991 ACR had an acceptance

8  rate that was based on a ramp-up up to 900 metric tons

9  for the first 10 years?

10         MS. POWELL:  Objection, beyond the scope.

11         THE WITNESS:  I don't know that.

12         MS. POWELL:  But you can answer.

13         THE WITNESS:  I don't know whether it was

14  in 1991.  I know -- I don't know what was in 1991.

15  BY MR. HIRSCH:

16     Q.  Do you know what the 1995 ACR --

17     A.  Yes.

18     Q.  -- had in terms of acceptance rates?

19         MS. POWELL:  Let me -- I'm going to object

20  as to beyond the scope.  Just give me a moment.

21         THE WITNESS:  I will be --

22         MS. POWELL:  It's beyond the scope, but

# Plaintiff

# Susan Klein

1  you can answer to your personal knowledge.

2  BY MR. HIRSCH:

3      Q.   And what was the acceptance rate in the 1995

4  ACR report from the DOE?

5              MS. POWELL:  Same objection.  You can

6  answer.

7              THE WITNESS:  Okay.   400 the first year,

8  600 the second year, 900 the third year, and then

9  steady state 900, and that was just through the first

10  10 years of operation.

11  BY MR. HIRSCH:

12     Q.   So when the utilities started submitting DCS

13  forms, they were relying on whether they had an

14  allocation in what was then I guess the 1991 ACR; is

15  that correct?

16             MS. POWELL:  Objection, beyond the scope.

17  You can answer.

18             THE WITNESS:  Yes, I think.   Yeah.

19  BY MR. HIRSCH:

20     Q.   And I take it from your -- strike that?

21             Referring to the 1995 ACR rates that you just

22  recited, I take it from your earlier testimony that the

1  D OE is not planning on using those rates in terms of

2  when it starts accepting spent nuclear fuel?

3      A.   No.   Well, once there's an operational

4  repository, we are planning to use the larger rates

5  that were -- that I have mentioned.  I don't know if

6  we'll be accepting it outside of a repository.   That's

7  yet to be.   It depends upon your definition of accept I

8  guess.

9      Q.   Do you know when the last time the DOE used

10  the acceptance rates in the 1995 ACR for planning

11  purposes?

12             MS. POWELL:  Object to beyond the scope.

13  You can answer to your personal knowledge.

14             THE WITNESS:  No, I don't.

15  BY MR. HIRSCH:

16     Q.   I --

17     A.   I don't know.

18     Q.   Let me say, I don't think this one is beyond

19  the scope because I think it relate to the acceptance

20  rate question.

21             Well, I take it from your answer that the DOE

22  is not currently planning on using the acceptance rates

1  stated in the 1995 ACR; is that correct?

2      A.   We are planning to use the larger rates for an

3  operational repository.  If for some other reason we

4  would accept it in a different way, we view the 4, 6, 9

5  as the binding legal obligation.

6      Q.   And why is the 400, 600, 900 considered to be

7  a binding legal obligation?

8              MS. POWELL:  Object again, beyond the

9  scope.   You can answer.

10             THE WITNESS:  Those are the rates in the

11  1995 ACR upon which the current DCSs are based and the

12  department views the DCSs as the binding legal

13  obligation of the department.

14  BY MR. HIRSCH:

15     Q.   You mean the approved DCS is binding?

16     A.   Approved.   Yes, thank you.   Approved.

17     Q.   Will you look at page 2 of the general

18  instructions, Ms. Klein.

19     A.   Yes.

20     Q.   And in particular, I'd like you to look at

21  paragraph 7(b) of the instructions.

22     A.   Uh-huh.

1      Q.   You see where it says:  "Once a purchaser has

2  an allocation, any SNF owned by the purchaser can be

3  designated for delivery against that allocation.   The

4  DCS does not restrict the purchaser to deliver the

5  specified SNF that was the basis for the allocation."

6              Do those instructions reflect that once a

7  utility had a place in the ACR cue by virtue of the age

8  of its spent nuclear fuel, it could supply any spent

9  nuclear fuel from any reactor as long as it met the

10  basic contract requirements?

11             MS. POWELL:  Objection to beyond the

12  scope.   You can answer.

13             THE WITNESS:  Yes, any of their own

14  reactors.

15  BY MR. HIRSCH:

16     Q.   Their.   You mean the utilities' own reactors?

17     A.   I mean that utility's reactor, yeah.

18     Q.   All right.   Now, is it also correct that in

19  terms of the DCS instructions that utilities did not

20  have to identify specific fuel assemblies in responding

21  to the DCS instructions?

22             MS. POWELL:  Same objection, but you can

# Plaintiff

# Susan Klein

Page 169

1    Q.   All right.   And have you been involved in
2  discussions at DOE about when the license application
3  is going to be submitted?
4    A.   Yes.
5    MS. POWELL:   Again, just answer with
6  respect to outside of any privileged conversation.
7    THE WITNESS:   (Nods head).
8  BY MR. HIRSCH:
9    Q.   And when is it your understanding that the
10  license application is going to be submitted?
11    A.   2004.
12    Q.   When in 2004?
13    A.   I would guess maybe December just because it
14  says the end, but there is discussion of moving it up
15  if possible.   There is discussion.
16    Q.   But as best you can tell, the current plan
17  would be to submit the license application around
18  December '04; is that correct?
19    A.   Yes.
20    Q.   All right.   Now, would you look at page 45 of
21  the document.   Hopefully I'll have the right --
22    A.   That's the page we're on.

Page 170

1    Q.   Yeah.
2    A.   Okay.
3    Q.   Little further down.   Actually, let me refer
4  you to a different page.   Page 3 of the document.
5    A.   Not the letter but the document?
6    Q.   Not the letter but the report.
7    A.   Okay.
8    Q.   I apologize.   You see the statement in the
9  second or the first full paragraph on page 3 that says:
10  "In short, even if the Yucca Mountain recommendation
11  were accepted today, an estimated minimum of eight more
12  years lies ahead before the site would become
13  operational."
14    A.   Uh-huh.
15    Q.   Do you know what the term estimated minimum of
16  eight more years means?
17    MS. POWELL:   Object to beyond the scope,
18  but if you know, answer.
19  BY MR. HIRSCH:
20    Q.   That's right within the scope.
21    A.   I can guess what the purpose was of saying
22  that, but I can't tell you.   I just know 2010.   That

Page 171

1  gets you to 2010.
2    Q.   All right.   Well, you reviewed a draft of
3  this document; is that correct?
4    A.   Yes.   I understand the audience that this
5  particular sentence was addressed to and that was --
6    Q.   Who --
7    A.   -- that we're not going to start tomorrow
8  transporting spent fuel around the country.   We have
9  time to work out these issues.   That was the impetus
10  itself behind these kind of statements.
11    Q.   Well, does the DOE have an estimate of the
12  maximum amount of time that it would take for the site
13  to become operational?
14    A.   I don't think so.   We have an estimated date
15  of 2010.   That's our date.
16    Q.   But that's referred to as the minimum date,
17  isn't it, here?
18    A.   Well, it is they say minimum date there.
19  That's what it says, an estimated minimum.
20    Q.   Will you look at page 6 of the document.   You
21  see in the paragraph right above the 3 heading?
22    A.   Uh-huh.

Page 172

1    Q.   There's a statement there that:   "The NWPA by
2  its terms contemplated that the entire process of
3  siting, licensing, and constructing a repository would
4  have been completed more than four years ago, by
5  January 31, 1998."   You see that statement?
6    A.   I do.
7    Q.   Do you agree that the Nuclear Waste Policy Act
8  contemplated that process of siting, licensing, and
9  constructing a repository would have been completed by
10  January 1998?
11    MS. POWELL:   I object, beyond the scope
12  and to the extent it calls for a legal conclusion.
13  You can answer.
14    THE WITNESS:   I'm thinking.   Yes.
15  BY MR. HIRSCH:
16    Q.   Ms. Klein, will you look at page 40 -- excuse
17  me -- 19 in the back.
18    A.   19?
19    Q.   Right.   Last paragraph, first sentence says:
20  "This is not an insignificant point" --
21    A.   Wait a minute.   Where are you?
22    Q.   I'm sorry.   Last --

43 (Pages 169 to 172)

Plaintiff

# Susan Klein

Page 193

1    MS. POWELL:  I understand.

2    MR. HIRSCH:  So I do want it understood
3  that if I don't respond to every single one, I'm not
4  agreeing with your position.

5  BY MR. HIRSCH:

6    Q.  But go ahead and answer.

7    A.  I don't know the answer.  I already forgot
8  the question.  But when you said it, I know I didn't
9  know the answer.

10    MR. HIRSCH:  All right.  Let's read it
11  back.

12    (Requested material was read.)

13    THE WITNESS:  No, I don't know.

14    MR. HIRSCH:  Let's mark this 16.

15    (Thereupon, the reporter marked for
16  identification Deposition Exhibit No. 16.)

17  BY MR. HIRSCH:

18    Q.  Ms. Klein, I've shown you what's been marked
19  as Klein Deposition Exhibit 16, which is a document
20  titled Analysis of the Total System Life Cycle Cost of
21  the Civilian Radioactive Waste Management Program.
22  It's dated May 2001 and it's apparently RW publication

Page 194

1  or DOE/RW.  It has a designation 0533.

2    A.  Yes.

3    Q.  Let me just ask you.  What does the 0533
4  represent?

5    A.  I have absolutely no idea.

6    Q.  That's fine.

7    A.  I'm sure it's a way to find the document
8  somewhere.  I don't know.

9    Q.  Incidentally, I didn't ask you this before.
10  Do the different offices in OCRWM have different
11  designation numbers?

12    A.  This means OCRWM, RW, but, yeah, I mean there
13  are.  There's -- but I don't think that's related to
14  this.

15    Q.  No.  I'm changing the subject just for a
16  minute.

17    A.  There's RW 40 and there's RW 50 and I don't
18  know which one is which.

19    Q.  All right.  What's the designation of the
20  office that you're in now?

21    A.  RW 2 is how I -- my little routing symbol.

22    Q.  All right.  Okay.

Page 195

1    A.  Which means I report directly to the Deputy
2  Director.  He's RW 2.  Margaret is RW 1.

3    Q.  Okay.  Do you recognize Klein Deposition
4  Exhibit 16 as the May 2001 total system life cycle cost
5  report put out by OCRWM?

6    A.  Yeah.  I mean, it's labeled that way.  I'm
7  not real familiar with the document, but...

8    Q.  Did you review the document before it was
9  issued?

10    A.  I may have.

11    MS. POWELL:  Object.  It's beyond the
12  scope, but answer.

13    THE WITNESS:  I may have reviewed pieces
14  of it.  I didn't review the whole thing.

15  BY MR. HIRSCH:

16    Q.  Will you look at page 3-8 at the bottom.

17    A.  Yes.

18    Q.  And in particular this with some cost
19  assumptions.  Do you see this?

20    A.  Cost by phase.

21    Q.  Right.

22    A.  Yeah.  Historical, future, yes.

Page 196

1    Q.  All right.  Now, let me just ask you in
2  general.  Is one of the purposes of the total system
3  life cycle cost reports to determine the total cost of
4  the Nuclear Waste Disposal Program?

5    MS. POWELL:  Objection.

6    THE WITNESS:  Yeah.

7    MS. POWELL:  Beyond the scope, but --

8    THE WITNESS:  Yes.

9    MS. POWELL:  -- you can answer.

10  BY MR. HIRSCH:

11    Q.  And is one of the reasons that that's done to
12  make a determination whether the fees that are being
13  charged to the utilities are sufficient?

14    A.  I think that's --

15    MS. POWELL:  Same objection.  Go ahead.

16    THE WITNESS:  I think that's required by
17  the statute that we do that, yes.

18  BY MR. HIRSCH:

19    Q.  All right.  Now, going back to the bullet
20  points on page 3-8 of Exhibit 16.

21    A.  Uh-huh.

22    Q.  Does this show a construction phase for the

# Plaintiff

## Susan Klein

**Page 229**

1   and Roe?

2          MS. POWELL:  Same objection, but you can

3   answer.

4          THE WITNESS:  I only know this from

5   hearsay, but I mean overhearing people who are involved

6   in this talk about it, but they were to do an

7   independent review of the program.  I'm not sure what

8   their whole scope was.

9   BY MR. HIRSCH:

10      Q.   And do you know when -- was there a written

11  report from Burns and Roe?

12          MS. POWELL:  Same objection.  You can

13  answer.

14          THE WITNESS:  I believe there was.

15  BY MR. HIRSCH:

16      Q.   And did that report conclude that the DOE

17  would take approximately five and a half years to

18  construct the facility?

19          MS. POWELL:  Same objection.

20          THE WITNESS:  I don't know.

21  BY MR. HIRSCH:

22      Q.   That's what the GAO testimony seems to

**Page 231**

1   BY MR. HIRSCH:

2      Q.   Will you look at page 10 of the report or the

3   testimony, Klein Deposition Exhibit 20.  Do you see at

4   the very top of that page there's a statement in there:

5   "In its August 2001 report on alternative means for

6   financing and managing the program, DOE stated that

7   unless the program's funding is increased, the budget

8   might become the 'determining factor' whether DOE will

9   be able to accept wastes in 2010."

10          Were you aware or are you aware, Ms. Klein,

11  that the DOE has taken that position?

12          MS. POWELL:  Object to beyond the scope,

13  but you can answer.

14          THE WITNESS:  I worked on that report and

15  I remember emphasizing how important the budget is.  I

16  don't remember if we said it was the determining factor

17  or not, but yes, the budget is a big issue.

18  BY MR. HIRSCH:

19      Q.   And is it correct that it's a big issue

20  because if the DOE doesn't get enough money, it can't

21  open the repository in 2010?

22      A.   That's true.

**Page 230**

1   indicate, isn't that?

2      A.   That's what the GAO testimony indicates.  We

3   do not agree with GAO on many things about the

4   repository program.

5          MR. HIRSCH:  I'm going to make a request

6   that the Burns and Roe report be produced.  I don't

7   think we've gotten that produced.  We couldn't find

8   it.

9          MS. SULLIVAN:  I'm going to suggest that

10  you at the end of Ms. Klein's deposition, since we have

11  a list growing, that you send me a letter.

12  BY MR. HIRSCH:

13      Q.   The report goes on to say:  "Bechtel

14  anticipates a five-year period of construction between

15  the receipt of construction authorization from NRC and

16  the opening of the repository."  Are you aware of such

17  an estimate by Bechtel that it would take five years to

18  construct the facility?

19          MS. POWELL:  Same objection, beyond the

20  scope, but you can answer.

21          THE WITNESS:  No, I'm not aware of

22  one.  (Witness conferring with counsel.)

**Page 232**

1      Q.   Would that report that I guess is referenced

2   in the footnote 7 show what the annual level of

3   appropriations the DOE needs to open a repository on

4   time?

5      A.   I don't believe so.

6          MS. POWELL:  I was going to say, beyond

7   the scope but if you know.

8          THE WITNESS:  It's public.  You can get

9   that on our Web site and you could see.  That's why I

10  don't think it would have a bunch of numbers in it.

11  BY MR. HIRSCH:

12      Q.   Are you aware that there is a time line on the

13  DOE Web site regarding Yucca Mountain?

14          MS. POWELL:  Objection, beyond the scope,

15  but you can answer.

16          THE WITNESS:  I don't know that there's

17  still one on there, but that doesn't surprise me I

18  guess.

19          (Thereupon, the reporter marked for

20  identification Deposition Exhibit No. 21.)

21  BY MR. HIRSCH:

22      Q.   Ms. Klein, I've handed you what's been marked

# Plaintiff

## Susan Klein

Page 237

1    A.    Start permit -- permanent closure.   No, it's
2    21.  Excuse me.
3    Q.    2010.
4    A.    I'm looking at the wrong place.   "If
5    licensed, first possible waste acceptance" 2010.
6    Q.    So that's an assumption that if the facility
7    is licensed by the NRC, that's the first possible waste
8    acceptance that can occur?
9    A.    At the repository.
10   Q.    Right.
11   A.    We can't accept it if it's not licensed.   We
12   can't accept spent fuel at the repository without a
13   license to possess nuclear material.
14   Q.    And you know what the term first possible
15   waste acceptance is supposed to mean?
16          MS. POWELL:  Object, but if you know.
17          THE WITNESS:  I think it says first
18   possible.   I have to look it up.   I mean, first
19   possible.
20   BY MR. HIRSCH:
21   Q.    It also implies that it might not be accepted
22   in 2010, doesn't it?

Page 239

1    A.    Yeah, I would -- well, it hasn't been
2    discussed that I know of that, I've known about in a
3    long time.   The 2007 has not been discussed, no.
4    Q.    And does the fact that it's not been discussed
5    reflect that it's not under consideration?
6    A.    No.   The new director is looking at all
7    possibilities, and she's talking to people about
8    accelerating.
9    Q.    Are you aware of any current proposal of the
10   DOE to begin accepting spent nuclear fuel before 2010?
11   A.    Repeat that.   Do you have objection in?
12   Repeat the beginning of it.   I'm sorry.
13   Q.    Let me restate it.   Are you aware of any
14   current proposal by the DOE to begin accepting fuel
15   earlier than 2010?
16   A.    No.
17   Q.    Going back to the question I guess I asked you
18   a little earlier.   Is there a DOE document that you've
19   seen that reflects a range of acceptance dates starting
20   in 2010 and including -- or strike that?
21          Have you reviewed a document at DOE which
22   reflects this range to start removing spent nuclear

Page 238

1          MS. POWELL:  Object.  The document speaks
2    for itself, but you can answer.
3          THE WITNESS:  A lot of things could
4    happen.   An earthquake could come.  We could have
5    another 9/11.   I don't know.
6    BY MR. HIRSCH:
7    Q.    Is there a DOE document which reflects a range
8    of possible dates that the DOE will start accepting
9    fuel from utilities under standard contract?
10   A.    Earlier.  Much earlier we were hoping for a
11   2007 date, but in the last several years it's been
12   2010.   But that was even -- that was just a pie in the
13   sky the 2007, but that was kind of --
14   Q.    The 2007 date was a pie in the sky date?
15   A.    It was a hope.  It was something that we would
16   have liked to do, but it required NRC.   It required a
17   lot of regulatory action that we weren't sure we could
18   get.   So I don't know that we ever published it.   It
19   was just we were struggling with trying to figure out
20   how to meet our waste acceptance obligation.
21   Q.    All right.  The 2007 projected acceptance date
22   is dead at this point, isn't it?

Page 240

1    fuel from the utilities starting in 2010 and extending
2    to some later date?
3          MS. POWELL:  Objection, vague, but if you
4    can answer.
5          THE WITNESS:  Yeah, I don't understand the
6    question.   I think I know what you're asking, but
7    it's -- try one more time.
8    BY MR. HIRSCH:
9    Q.    All right.  I will.  Does the DOE have a
10   current estimate that shows that it could start
11   removing fuel spent nuclear fuel in 2010 and then
12   projects out other possible start dates later than
13   2010?
14   A.    No, not that I'm aware of.
15          MR. HIRSCH:  Why don't we take five
16   minutes here.
17          (Recess, 4:00 to 4:09 p.m.)
18   BY MR. HIRSCH:
19   Q.    Ms. Klein, I think we got into this a little
20   earlier, but let me just ask you.  What is the
21   Department of Energy's current estimate of the rate
22   that it will begin removing spent nuclear fuel under

60 (Pages 237 to 240)

**Esquire Deposition Services**                    **1-800-441-3376**

# Plaintiff

## Susan Klein

Page 245

1    A.   My --

2         MS. POWELL:   Well --

3         THE WITNESS:   You don't have to say

4    anything.   I'm just waiting for you to have the

5    opportunity.

6         My understanding is that at the time we

7    came up with that figure, that was approximately the

8    utility discharge rate and that we took 70,000 metric

9    tons and divided it by 25.   Both those reasons gave us

10   the 3,000 and then we had 4, 6, 12, too, as a ramp-up

11   period, less transportation and all that.

12   BY MR. HIRSCH:

13   Q.   Let's talk about the first reason for a

14   minute.   The utility discharge -- strike that.

15        The DOE had looked at the utility discharge

16   rate?

17   A.   That's what I was informed of.   I didn't

18   personally do that.

19   Q.   And is it correct generally that the 3,000

20   metric ton rate would equal the discharge rate plus

21   some amount to get rid of the backlog of spent nuclear

22   fuel?

Page 246

1         MS. POWELL:   I'm just going to note for

2    the record that we offered Mr. Pollog on I think -- I

3    think that you're talking about this topic, but you can

4    answer.

5         THE WITNESS:   I don't remember.   I wasn't

6    told about the backlog.   I was informed that it was

7    based on 3,000 was at the time the average utility

8    discharge rate.   So...

9    BY MR. HIRSCH:

10   Q.   It was your understanding that the --

11   A.   I don't know about the backlog issue at all.

12   Q.   All right.

13   A.   About that that accounted for a backlog.

14   Q.   Is it your understanding that the 3,000 rate

15   would keep up with the utility discharge rate?

16   A.   Yes.

17   Q.   Is that correct?

18   A.   Uh-huh.

19   Q.   And then I guess you mentioned the other

20   reason or rationale.   I'm sorry.   What was the second

21   rationale?

22   A.   70,000 metric tons, which is how much we're

Page 247

1    authorized to put in the first repository, divided by

2    the life of the repository, which is 25 years.

3    Q.   Gives you about 3,000 metric tons a year?

4    A.   Uh-huh.

5    Q.   Given both of those reasons, are you aware of

6    any reason why the DOE would run the repository at

7    Yucca Mountain at a rate less than 3,000 metric tons?

8         MS. POWELL:   Object to beyond the scope,

9    but you can answer.

10        THE WITNESS:   I understand there are lots

11   of ramp-up issues.   There's transportation issues.

12   There's utility interface issues.   Casks.   I mean,

13   that could affect it, but that was our planning and

14   what we'd like to do is be able to do that at 3,000.

15   But I know there's lots of things that need to be

16   worked out.

17   BY MR. HIRSCH:

18   Q.   Well, assuming that all the ramp-up issues are

19   resolved including transportation?

20   A.   Uh-huh.

21   Q.   Are you aware of any reason why the DOE

22   wouldn't operate the facility at a 3,000 metric ton

Page 248

1    rate --

2    A.   No, I'm not.

3    Q.   -- over the life of the facility?

4    A.   No, I'm not aware of any reason we would not

5    do that.

6    Q.   All right.   You got or we saw this maybe a

7    little earlier.   In order to open by 2010, does the

8    DOE need to essentially build a rail line from the

9    existing rail line in Nevada to the repository?

10        MS. POWELL:   Objection, beyond the scope,

11   but you can answer.

12        THE WITNESS:   That's one of the

13   possibilities is building a rail line.   The other is

14   to have -- I know one of the counties wanted to have

15   some sort of system through there.   I think it's

16   Lincoln County, Nevada.   To have a transportation truck

17   centrally located site.   So we haven't made the

18   decision yet.   Mostly rail is our preferred

19   alternative, but we haven't decided the routes and the

20   methods.

21   BY MR. HIRSCH:

22   Q.   So, well, is there -- is it correct that

# Plaintiff

Page 275

```
 1   IN THE UNITED STATES COURT OF FEDERAL CLAIMS
 2   --------------------------------------------X
     YANKEE ATOMIC ELECTRIC COMPANY                  :
 3   (98-126C)(Merow, S.J.)                          :
     CONNECTICUT YANKEE ATOMIC POWER COMPANY         :
 4   (98-154C)(Merow, S.J.)                          :
     MAINE YANKEE ATOMIC POWER COMPANY               :
 5   (98-474C)(Merow, S.J.)                          :
     FLORIDA POWER & LIGHT COMPANY                   :
 6   (98-483C)(Wilson, J.)                           :
     NORTHERN STATES POWER COMPANY                   :
 7   (98-484C)(Wiese, J.)                            :
     DUKE POWER, a Division of DUKE ENERGY CORP.:
 8   (98-485C)(Sypolt, J.)                           :
     INDIANA MICHIGAN POWER COMPANY                  :
 9   (98-486C)(Hodges, J.)                           :
     SACRAMENTO MUNICIPAL UTILITY DISTRICT           :
10   (98-488C)(Yock, S.J.)                           :
     SOUTHERN NUCLEAR OPERATING COMPANY, et al. :
11   (98-614C)(Merow, S.J.)                          :
     COMMONWEALTH EDISON COMPANY                     :
12   (98-621C)(Hewitt, J.)                           :
     BOSTON EDISON COMPANY                           :
13   (99-447C) (Allegra, J.)                         :
     GPU NUCLEAR, INCORPORATED                       :
14   (00-440C)(Bush, J.)                             :
     WISCONSIN ELECTRIC POWER COMPANY                : VOLUME
15   (00-697C)(Merow, S.J.)                          :   II
     POWER AUTHORITY OF THE STATE OF NEW YORK :
16   (00-703C)(Damich, J.)                           :
     OMAHA PUBLIC POWER DISTRICT                     :
17   (01-115C)(Bush, J.)                             :
     NEBRASKA PUBLIC POWER DISTRICT             :Discovery
18   (01-116C)(Sypolt, J.)                      :Judge:
     TENNESSEE VALLEY AUTHORITY                 :(Judge
19   (01-249C)(Bruggink, J.)                    :Sypolt)
20              Plaintiffs,                     :PAGES
21   V.                                         :275 - 533
22
```

Page 276

```
 1   THE UNITED STATES,                              :

 2              Defendant.                            :

 3   -----------------------------------------------X

 4

 5

 6

 7

 8

 9             Deposition of Susan Klein

10                Washington, DC

11           Thursday, April 25, 2002

12

13

14

15

16

17

18

19

20

21   Reported by:   Denise Dobner Vickery, RMR, CRR

22   JOB NO.   144540
```

## Susan Klein (vol 2)

Page 283

```
 1          (Thereupon, the reporter marked for
 2    identification Deposition Exhibit No. 26.)
 3       Thereupon,
 4                  SUSAN KLEIN
 5    was called for examination, and, after having been
 6    previously sworn or affirmed, was examined and
 7    testified as follows:
 8    EXAMINATION BY COUNSEL FOR THE PLAINTIFF,
 9    COMMONWEALTH EDISON
10    BY MR. HIRSCH:
11       Q.   Good morning, Ms. Klein.
12       A.   Good morning.
13       Q.   Do you understand you're still under oath?
14       A.   Yes.
15       Q.   All right.
16          MS. SULLIVAN:  Excuse me.  Mr. Hirsch,
17    before we start today, Ms. Klein would like to clarify
18    something that she testified about yesterday if she
19    might.
20          MR. HIRSCH:  Okay.
21          THE WITNESS:  I went back to my office and
22    checked the record and as to the rates that we would
```

Page 284

```
 1    pick up for, they are the same as in the VA that you
 2    showed me.  You probably want to know what exhibit
 3    number that is.  And that is in our current
 4    requirements document that the 3,000 continues
 5    throughout the years as stated in the VA.  The
 6    viability assessment.
 7    BY MR. HIRSCH:
 8       Q.   All right.
 9       A.   I think it's now -- that looks like it could
10    be it.
11          MS. SULLIVAN:  22.
12    BY MR. HIRSCH:
13       Q.   Volume 2 of the viability assessment.
14          MS. SULLIVAN:  22.
15          THE WITNESS:  Let's see.  It was a page
16    you showed me.  Page 3.  Yes, that's correct.
17    BY MR. HIRSCH:
18       Q.   Well, let's hopefully clarify that a little
19    bit.  Why don't you look at Klein Deposition Exhibit
20    22, which is --
21       A.   A new one?
22       Q.   No.
```

Page 285

```
 1       A.   No.
 2       Q.   The one we were just looking at.  The volume
 3    2 of the DOE viability assessment from December of '98.
 4       A.   Okay.  Uh-huh.
 5       Q.   And in particular, I think we were looking
 6    yesterday at the table on page 3-2.
 7       A.   Yes.
 8       Q.   And --
 9       A.   Those are approximately.  I think there was a
10    1900 not an 1800 in our requirements document.
11       Q.   Okay.
12       A.   But they're based on -- they're based on these
13    receipt rates, annual repository receipt rates in Table
14    3-1.
15       Q.   And this table shows a receipt rate of 3,000
16    starting in 2014 and I guess running until 2032 on
17    this --
18       A.   Yes.
19       Q.   -- table?
20       A.   That's correct.
21       Q.   And I'm sorry.  Your clarification after
22    checking with your office this morning with respect to
```

Page 286

```
 1    the rate was what?
 2       A.   Was that the rate here in this Volume 2 of the
 3    VA, Exhibit 22, in Table 3-1 is the correct rate for
 4    our planning purposes.  What we plan, how we plan, the
 5    rate at which we plan to accept spent fuel at the
 6    repository.
 7       Q.   And that is a rate that would ramp up to 3,000
 8    by 2014 and continue on at 3,000 until 2032; is that
 9    correct?
10       A.   Yes, that's correct.  2033.  Through 2032.
11       Q.   I think you mentioned in your previous answer
12    a system requirements document put out by the DOE?
13       A.   Yes.
14          MR. HIRSCH:  We've previously marked an
15    exhibit which we'll get back to.  Let's go ahead and
16    look at that.  27.
17          (Thereupon, the reporter marked for
18    identification Deposition Exhibit No. 27.)
19          THE WITNESS:  Yes.
20    BY MR. HIRSCH:
21       Q.   Ms. Klein?
22       A.   Yes.
```

# Plaintiff

## Susan Klein (vol 2)

Page 291

1  says.
2     Q.  All right.  But at least until the utility
3  discharge rate goes down, it's the DOE's expectation,
4  is it not, that they're going to continue to pick up
5  3,000 metric tons?
6     A.  That is the expectation for planning purposes,
7  yes.
8     Q.  Does the DOE consider a 3,000 metric ton
9  acceptance rate to be a reasonable rate to run the
10 spent nuclear fuel program at?
11    A.  I would -- yes.
12    Q.  All right.  Will you look at Klein Deposition
13 Exhibit -- the one we just marked and then went on
14 past -- 26.
15    A.  Okay.
16    Q.  In particular, what I'd like to refer you to
17 is page 6 of Exhibit 26.
18    A.  Yes.
19    Q.  You have that there.  This page 6 is what I
20 think is labeled as a Time-Phased Cost Summary in
21 Constant 1998 Dollars for the DOE spent nuclear fuel
22 program.  You see that?

Page 292

1     A.  Yes, I do.
2     Q.  All right.  Have you seen this time line
3  before?
4     A.  Not that I remember.
5     Q.  Does this time line show the construction
6  period for the repository taking approximately five
7  years.
8         MS. SULLIVAN:  Objection, document speaks
9  for itself.
10        THE WITNESS:  It says 2005 to 2010 under
11 construction -- above the word construction.
12 BY MR. HIRSCH:
13    Q.  All right.  So that's about five years?
14    A.  That looks like five years to me.
15    Q.  And that timetable assumes that the DOE would
16 have obtained a license by 2005, does it not?
17        MS. SULLIVAN:  Objection, document --
18 BY MR. HIRSCH:
19    Q.  Let me clarify rephrase the question.  That
20 time line assumes that the DOE would have obtained a
21 license from the NRC to begin construction in 2005,
22 does it not?

Page 293

1         MS. SULLIVAN:  Same objection.  Document
2  speaks for itself.
3         THE WITNESS:  Yes.  We can't begin
4  construction until we get a license from the NRC.
5  BY MR. HIRSCH:
6     Q.  And that date is shown on this time line as
7  2005.
8         MS. SULLIVAN:  Same objection.
9         THE WITNESS:  I don't see that, but I see
10 construction starts in 2005.  We have to have a
11 construction authorization licensing.  It says 2002
12 to -- I mean, I don't quite understand these, what all
13 these little things are, but I agree.  I mean, in
14 order to begin construction, we need a construction
15 authorization from the Commission.
16 BY MR. HIRSCH:
17    Q.  All right.  I think you mentioned yesterday
18 at some point that the DOE had gotten a report from
19 Bechtel along the lines -- or strike that.
20        I think you mentioned yesterday that the DOE
21 had some kind of estimate that the facility could be
22 built in two years.  Do you recall that?

Page 294

1     A.  I don't know if I said that came from the BSC
2  document.  Yes, but there were -- yeah, there is a
3  possibility that once we get the construction
4  authorization, we could construct a facility sufficient
5  to receive waste in two years.  There is a -- I don't
6  know if there's -- if it's in a particular planning
7  document, but what I said was that BSC relooked at
8  their figures and they have come up with a baseline of
9  the repository accepting waste in 2010.
10    Q.  Well, that's what I was hoping to find out.
11 To the best of your knowledge, is there a document from
12 Bechtel, Bechtel whatever their name, BSC, whatever we
13 want to call them.
14    A.  Uh-huh.
15    Q.  That says that Bechtel can in two years build
16 a facility sufficient to start receiving waste?
17        MS. SULLIVAN:  Objection, beyond the
18 scope.  You can answer.
19        THE WITNESS:  I don't know what the time
20 frames are within there.  I don't know whether it's
21 shortened the time to get the license application.  I
22 don't know, and I would assume there is a document, but

**Esquire Deposition Services**

# Plaintiff

## Susan Klein (vol 2)

Page 339

1  doesn't have very much knowledge about that facility or
2  how it operate or how it's projected to operate.
3          And so I think on issues like that that
4  related to the specifics of how the DOE would be in a
5  position to start performing in 2010, I think it's our
6  position that she's not -- on some of those issues
7  she's not really knowledgeable about those issues.
8          MS. SULLIVAN: Anything else?
9          MR. HIRSCH: I think that was the
10 principal concern that we had about that.  Specifics of
11 how the DOE would be in position to start performing in
12 2010, particularly in light of the testimony that
13 Ms. Klein gave that the DOE isn't likely to get a
14 license application granted to build a facility until
15 the end of '97 or '98.
16         MR. TOMASZCZUK: 2007.
17         MR. HIRSCH: I'm sorry.  2007, 2008.
18         MS. SULLIVAN: Okay.  We have nothing that
19 we need to clarify.
20         EXAMINATION BY COUNSEL FOR THE PLAINTIFFS
21         NORTHERN STATES POWER COMPANY, ET AL.
22 BY MR. TOMASZCZUK:

Page 340

1     Q.   Ms. Klein, my name is Alex Tomaszczuk.  I'm
2  counsel for various utility plaintiffs which have
3  pending cases at Court of Federal Claims.
4          I have a few follow-up questions to ask you
5  based on the testimony that I've heard so far.  I'll
6  compliment Mr. Hirsch.  He was very thorough.  I
7  wouldn't say this in his presence, but since he stepped
8  out, he was very thorough and I think I have only a
9  relatively few number of questions for you.
10         The same ground rules apply that Mr. Hirsch
11 expressed to you at the outset of your deposition.  If
12 for some reason you don't understand my question,
13 please let me know that I'll try and rephrase it so
14 that there's common ground and so that we understand
15 your testimony, okay?
16    A.   Yes.
17    Q.   I would like you if you can to identify for me
18 all the assumptions on which your testify that DOE will
19 begin performance in 2010.
20    A.   The assumptions?
21    Q.   Yes.
22    A.   The assumption is that we would have a

Page 341

1  designation by Congress of the site.  That we will
2  have a construction authorization from the Commission,
3  and that we will have a license to receive by -- to
4  receive nuclear material by 2010.  All those things
5  have to be accomplished.
6     Q.   If I understood your answer, there were three
7  basic assumptions on which DOE's ability to meet 2010
8  is based.  The first was the designation of the site;
9  is that correct?
10    A.   Uh-huh.  Yes.
11    Q.   And the second assumption was the obtaining of
12 an authorization for construction?
13    A.   Yes.
14    Q.   And the third was receiving a license to
15 operate?
16    A.   Yes.
17    Q.   Okay.
18    A.   Those are the three major assumptions.
19    Q.   Are there any other assumptions on which DOE's
20 ability to meet the 2010 date is based?
21    A.   Well, we do need to get funding.  We need to
22 -- there can be no injunctions against us by a court.

Page 342

1  I mean, I could go on about, you know, how the
2  assumptions one has, how they got to work.  I think by
3  court, right.
4     Q.   What I'm asking you to do is identify them to
5  the best of your ability.
6     A.   Every one of them?  I don't think I'm capable
7  of identifying every one of them.  There are big
8  differences between what we plan and hope to happen and
9  what we assume, but I mean we would like to have an
10 alternative means of financing and managing the
11 program, but I don't know that that's a required
12 amended order for us to meet the 2010 date.  But that
13 would certainly ease our burden if we could get
14 government cooperation and have our funding mechanism
15 changed.  That is a high priority for the program in
16 order to succeed.  I think those are the assumptions
17 that I can think of, I mean.  Those are the
18 assumptions.
19    Q.   All right.  The two that you identified in
20 your -- in the continuation of your answer was first
21 funding and second no injunctions as I understood your
22 testimony?

# Plaintiff

# Susan Klein (vol 2)

**Page 351**

1  is the Nuclear Waste Disposal Fund and the other is the

2  Defense Waste Disposal Fund.  Some of it is

3  appropriated for the purpose of disposing of defense

4  waste.  But we all use all that money for the program.

5  BY MR. TOMASZCZUK:

6  Q.  You testified in response to some of the

7  questions posed by Mr. Hirsch that DOE expected for

8  planning purposes when it begins performance to ramp up

9  to 3,000 MTU rate and stay at that steady state rate

10  for a number of years.  Do you recall that testimony?

11  A.  Yes, I do.

12  Q.  And that's reflected in various documents

13  that Mr. Hirsch showed you yesterday and today as well?

14  A.  Yes.

15  Q.  And you used that term planning purposes in

16  your answer?

17  A.  Yes.

18  Q.  That intention of DOE to ramp up to the 3,000

19  MTU rate, is that being used by DOE for purposes other

20  than planning purposes?

21  A.  No, not that I know of.

22  Q.  Is that 3,000 MTU rate the rate that DOE was

**Page 35?**

1  you referred to?

2  A.  Well, page 4-14 has the -- actually 4-13 says

3  assumptions about.  These are the assumptions on waste

4  acceptance.  The table that's on page 4-14.  That's

5  what I based my answer on.

6  Q.  All right.  Can I just direct your attention

7  also to the letter, which is the third page in Exhibit

8  16.  It's the third page.  I think you passed it.

9  A.  Not the iii page you mean.  Where is it?

10  There we go.

11  Q.  And you're welcome to read the entire letter.

12  I was going to direct your attention to the third

13  paragraph, first sentence.

14  A.  Okay.  I've read the third paragraph, yes.

15  Q.  All right.  Could you read the first sentence

16  for me out loud.

17  A.  "The TLSCC analysis provides the basis for

18  assessment of the adequacy of the Nuclear Waste Fund

19  fee as required by the NWPA."

20  Q.  And that's in a letter from Mr. Barrett,

21  right, to the readers?

22  A.  That's correct.

**Page 352**

1  to use to determine if the fees are sufficient?

2  MS. SULLIVAN:  Objection, beyond the

3  scope.  Answer if you know.

4  THE WITNESS:  I don't know.  I'd have to

5  look at the TSLCC to know.

6  BY MR. TOMASZCZUK:

7  Q.  Would you do so.  If you need to refer to a

8  document to answer the question, that's fine.  TSLCC,

9  Number 16.

10  A.  That's the most recent one.  I have a few of

11  them here.  And would you repeat the question?

12  MR. TOMASZCZUK:  Ms. Reporter, could you

13  read it back.

14  (Requested material was read.)

15  THE WITNESS:  (Pause).  I haven't found

16  it.  I'm working on it.

17  BY MR. TOMASZCZUK:

18  Q.  That's all right.  Take your time.

19  A.  It appears from this document that those are

20  the rates that we assumed in determining the cost of

21  the program.

22  Q.  And did you have a page of the document that

**Page 354**

1  Q.  All right.  So, DOE is using the 3,000 MTU

2  rate for the purposes of determining adequacy of the

3  fee, correct?

4  MS. SULLIVAN:  Objection, beyond the scope

5  and also the document speaks for itself.  You can

6  answer the question.

7  THE WITNESS:  Yes.

8  BY MR. TOMASZCZUK:

9  Q.  They're using that rate basically to design

10  the facility that they're planning to build at Yucca

11  Mountain; is that right?

12  A.  Yes.

13  Q.  They're using it in any number of documents

14  that we've seen here over the last couple of days,

15  correct?

16  A.  Yes.

17  Q.  Wouldn't it be fair to say, Ms. Klein, that

18  the lower rate that DOE is using, that is, the rate

19  that goes up to 900 MTU and stops there, is being used

20  for one purpose and that is for this litigation?

21  MS. SULLIVAN:  Objection, beyond the

22  scope.  You can answer as to your personal opinion.