# Defendant

## Susan Klein (vol 2)

Page 275

```
1   IN THE UNITED STATES COURT OF FEDERAL CLAIMS
2   --------------------------------------------X
    YANKEE ATOMIC ELECTRIC COMPANY               :
3   (98-126C)(Merow, S.J.)                        !
    CONNECTICUT YANKEE ATOMIC POWER COMPANY       :
4   (98-154C)(Merow, S.J.)                        :
    MAINE YANKEE ATOMIC POWER COMPANY             :
5   (98-474C)(Merow, S.J.)                        :
    FLORIDA POWER & LIGHT COMPANY                 :
6   (98-483C)(Wilson, J.)                         :
    NORTHERN STATES POWER COMPANY                 :
7   (98-484C)(Wiese, J.)                          :
    DUKE POWER, a Division of DUKE ENERGY CORP.   :
8   (98-485C)(Sypolt, J.)                         :
    INDIANA MICHIGAN POWER COMPANY                :
9   (98-486C)(Hodges, J.)                         :
    SACRAMENTO MUNICIPAL UTILITY DISTRICT         :
10  (98-488C)(Yock, S.J.)                         :
    SOUTHERN NUCLEAR OPERATING COMPANY, et al.    :
11  (98-614C)(Merow, S.J.)                        :
    COMMONWEALTH EDISON COMPANY                   :
12  (98-621C)(Hewitt, J.)                         :
    BOSTON EDISON COMPANY                         :
13  (99-447C)(Allegra, J.)                        :
    GPU NUCLEAR, INCORPORATED                     :
14  (00-440C)(Bush, J.)                           :
    WISCONSIN ELECTRIC POWER COMPANY              : VOLUME
15  (00-697C)(Merow, S.J.)                        : II
    POWER AUTHORITY OF THE STATE OF NEW YORK      :
16  (00-703C)(Damich, J.)                         :
    OMAHA PUBLIC POWER DISTRICT                   :
17  (01-115C)(Bush, J.)                           :
    NEBRASKA PUBLIC POWER DISTRICT                :Discovery
18  (01-116C)(Sypolt, J.)                         :Judge:
    TENNESSEE VALLEY AUTHORITY                    :(Judge
19  (01-249C)(Bruggink, J.)                       :Sypolt)
20            Plaintiffs,                         :PAGES
21  v.                                            :275 - 533
22
```

Page 276

```
1   THE UNITED STATES,                 :
2            Defendant.                :
3   --------------------------------------------X
4
5
6
7
8
9           Deposition of Susan Klein
10                Washington, DC
11          Thursday, April 25, 2002
12
13
14
15
16
17
18
19
20
21  Reported by:  Denise Dobner Vickery, RMR, CRR
22  JOB NO.   144540
```

Page 277

```
1
2
3
4
5                            April 25, 2002
6                            9:54 A.M.
7
8   Deposition of Susan Klein, held at the offices of:
9
10     Jenner & Block
11     601 13th Street, NW
12     12th Floor
13     Washington, DC 20005
14
15  Pursuant to notice, before Denise Dobner Vickery, a
16  Registered Merit Reporter, Notary Public of the
17  District of Columbia.
18
19
20
21
22
```

Page 278

```
1   APPEARANCES:
2
3   Jenner & Block
4   For the Plaintiff COMMONWEALTH EDISON
5      One IBM Plaza
6      Chicago, IL 60611-7603
7      (312) 222-9350
8   BY: Norman M. Hirsch, Esq.
9
10  Shaw Pittman Potts & Trowbridge
11  For the Plaintiffs NORTHERN STATES POWER COMPANY,
12  et al.
13     1650 Tysons Boulevard
14     McLean, VA 22102-4859
15     (703) 770-7962
16  BY: Alex D. Tomaszczuk, Esq.
17
18  Balch & Bingham LLP
19  For the Plaintiffs SOUTHERN NUCLEAR OPERATING COMPANY,
20  et al.
21     1275 Pennsylvania Avenue, NW, Tenth Floor
22     Washington, DC 20004
```

1 (Pages 275 to 278)

## Susan Klein (vol 2)

Page 351

1  is the Nuclear Waste Disposal Fund and the other is the
2  Defense Waste Disposal Fund.  Some of it is
3  appropriated for the purpose of disposing of defense
4  waste.  But we use all that money for the program.
5  BY MR. TOMASZCZUK:
6     Q.  You testified in response to some of the
7  questions posed by Mr. Hirsch that DOE expected for
8  planning purposes when it begins performance to ramp up
9  to 3,000 MTU rate and stay at that steady state rate
10  for a number of years.  Do you recall that testimony?
11    A.  Yes, I do.
12    Q.  And that's reflected in various documents
13  that Mr. Hirsch showed you yesterday and today as well?
14    A.  Yes.
15    Q.  And you used that term planning purposes in
16  your answer.
17    A.  Yes.
18    Q.  That intention of DOE to ramp up to the 3,000
19  MTU rate, is that being used by DOE for purposes other
20  than planning purposes?
21    A.  No, not that I know of.
22    Q.  Is that 3,000 MTU rate the rate that DOE was

Page 352

1  to use to determine if the fees are sufficient?
2     MS. SULLIVAN:  Objection, beyond the
3  scope.  Answer if you know.
4     THE WITNESS:  I don't know.  I'd have to
5  look at the TSLCC to know.
6  BY MR. TOMASZCZUK:
7     Q.  Would you do so.  If you need to refer to a
8  document to answer the question, that's fine.  TSLCC,
9  Number 16.
10    A.  That's the most recent one.  I have a few of
11  them here.  And would you repeat the question?
12    MR. TOMASZCZUK:  Ms. Reporter, could you
13  read it back.
14    (Requested material was read.)
15    THE WITNESS:  (Pause).  I haven't found
16  it.  I'm working on it.
17  BY MR. TOMASZCZUK:
18    Q.  That's all right.  Take your time.
19    A.  It appears from this document that those are
20  the rates that we assumed in determining the cost of
21  the program.
22    Q.  And did you have a page of the document that

Page 353

1  you referred to?
2     A.  Well, page 4-14 has the -- actually 4-13 says
3  assumptions about.  These are the assumptions on waste
4  acceptance.  The table that's on page 4-14.  That's
5  what I based my answer on.
6     Q.  All right.  Can I just direct your attention
7  also to the letter, which is the third page in Exhibit
8  16.  It's the third page.  I think you passed it.
9     A.  Not the iii page you mean.  Where is it?
10  There we go.
11    Q.  And you're welcome to read the entire letter.
12  I was going to direct your attention to the third
13  paragraph, first sentence.
14    A.  Okay.  I've read the third paragraph, yes.
15    Q.  All right.  Could you read the first sentence
16  for me out loud.
17    A.  "The TLSCC analysis provides the basis for
18  assessment of the adequacy of the Nuclear Waste Fund
19  fee as required by the NWPA."
20    Q.  And that's in a letter from Mr. Barrett,
21  right, to the readers?
22    A.  That's correct.

Page 354

1     Q.  All right.  So, DOE is using the 3,000 MTU
2  rate for the purposes of determining adequacy of the
3  fee, correct?
4     MS. SULLIVAN:  Objection, beyond the scope
5  and also the document speaks for itself.  You can
6  answer the question.
7     THE WITNESS:  Yes.
8  BY MR. TOMASZCZUK:
9     Q.  They're using that rate basically to design
10  the facility that they're planning to build at Yucca
11  Mountain; is that right?
12    A.  Yes.
13    Q.  They're using it in any number of documents
14  that we've seen here over the last couple of days,
15  correct?
16    A.  Yes.
17    Q.  Wouldn't it be fair to say, Ms. Klein, that
18  the lower rate that DOE is using, that is, the rate
19  that goes up to 900 MTU and stops there, is being used
20  for one purpose and that is for this litigation?
21    MS. SULLIVAN:  Objection, beyond the
22  scope.  You can answer as to your personal opinion.

## Susan Klein (vol 2)

Page 355

1  Oh, also to the extent it calls for legal conclusion.
2  THE WITNESS: That seems to be a legal
3  conclusion, but I'm thinking, though, whether this is
4  only for this litigation.  I would say no.
5  BY MR. TOMASICZUK:
6  Q.  What other purpose is it using that for?
7  MS. SULLIVAN:  Objection, beyond the
8  scope.
9  THE WITNESS: We have always thought of
10 the DCSs -- approved DCSs as our legal obligation even
11 before the litigation.  So that's why I would say no.
12 But we do use it for purposes of determining our legal
13 obligation and -- yeah.
14 BY MR. TOMASICZUK:
15 Q.  Did you want to add to your answer or are you
16 finished?
17 A.  No.
18 MR. TOMASICZUK: Ms. Reporter, I'd like to
19 mark as Klein Exhibit 32 a set of documents which were
20 attached to the government's Motion for Summary
21 Judgment on the spent nuclear fuel acceptance rate and
22 these are a series of DCSs -- since you've just

Page 356

1  referred to DCSs in your answer -- and related
2  correspondence from one of my clients, Duke Energy
3  Corporation.
4  (Thereupon, the reporter marked for
5  identification Deposition Exhibit No. 32.)
6  MS. SULLIVAN: I'm sorry.  Exhibit?
7  THE WITNESS: 32.
8  MR. TOMASICZUK: 32 I believe.
9  THE WITNESS: Yes.
10 BY MR. TOMASICZUK:
11 Q.  Have you seen any of those pages of that
12 document before today?
13 A.  I've seen some of them, yes.
14 Q.  Okay.  And it appears to reflect as I
15 represented, a series of DCS forms and letters back
16 from the DOE to Duke, correct?
17 A.  Yes.
18 Q.  Can I direct your attention, Ms. Klein, to the
19 DCS which has the page number Bates number 0297 at the
20 bottom.  It's about I guess --
21 A.  I have it.
22 Q.  -- five, six pages back.

Page 357

1  A.  I have it.
2  Q.  All right.  And this appears to be a DCS form
3  and in Section 4.0 the "Approved" box is checked,
4  correct, at the bottom of the page?
5  A.  Yes, it is.
6  Q.  And do you know whether that's Mr. Zabransky's
7  signature?
8  A.  It kind of looks like it.  It is hard to
9  tell, but I think that he was the person to sign that
10 during -- what year was this?  199 -- when was this?
11 Q.  This looks like 1995.
12 A.  '5.  Yes.
13 Q.  Can I direct your attention about a third of
14 the way down.
15 A.  Yes.
16 Q.  And you see there's two asterisks on the
17 right-hand side of the page with some text which
18 follows?
19 A.  Yes, I do.
20 Q.  All right.  And can you read that for me,
21 that text?
22 A.  "The proposed delivery date is dependent upon

Page 358

1  the existence of an operational repository or an
2  interim storage facility constructed under the" -- and
3  I assume it says "Act."  I can't read it and I assume
4  it means the Nuclear Waste Policy Act.
5  Q.  Do you know the source of that notation on
6  this page?
7  A.  No, I don't.
8  Q.  Do you know whether you drafted that notation?
9  A.  I did not.  I don't remember drafting that
10 notation.
11 Q.  Do you know whether somebody within OCRWM
12 drafted it?
13 A.  No, I don't know.
14 Q.  Do you know whether someone within the DOE
15 Office of General Counsel drafted it?
16 A.  No, I don't.  I don't remember this being
17 done, actually.  I'm not saying it wasn't directed by
18 the Office of General Counsel.  It could have been,
19 but I don't remember.
20 Q.  You don't recall any discussions with anyone
21 at OCRWM concerning the insertion of this notation on
22 this DCS?

# Plaintiff

# Susan Klein (vol 2)

Page 387

1 rate specified in the ACR or the APR for that time
2 period.
3 BY MR. TOMASZCZUK:
4    Q.   Well, I think the rate issue is dealt with in
5 Interrogatory number 93, if I understand it.  I was
6 asking you about 92.
7    A.   Oh, sorry.  I'm sorry.  DOE does not contend
8 that it has no obligation.
9         MS. SULLIVAN:  Could I ask the reporter to
10 read the pending question back again, please.
11         (Requested material was read.)
12         MS. SULLIVAN:  Objection, the document
13 speaks for itself.  Objection, beyond the scope.  You
14 can answer the question.  But I would direct the
15 witness not to testify as to any attorney-client
16 communications regarding the preparation of this
17 Interrogatory response.
18         THE WITNESS:  I'm going to ask you to
19 repeat the question one more time.  I'm sorry.
20         (Requested material was read.)
21         THE WITNESS:  That's not what it says.
22 It says we -- we have not made that contention that it

Page 388

1 has no obligation, but I don't know that we have ever
2 said that we have that obligation as a department
3 beyond the 10-year period.
4 BY MR. TOMASZCZUK:
5    Q.   Well, I commend you for dancing on that high
6 wire, but maybe you can just tell me what this answer
7 is communicating to me because, frankly, I don't
8 understand it.
9         MS. SULLIVAN:  Objection.
10 BY MR. TOMASZCZUK:
11    Q.   What is DOE's position with respect to its
12 obligation to accept spent nuclear fuel from purchasers
13 beyond the 10 years of allocations addressed in the
14 ACR?  Can you explain that to me what is DOE's
15 position because I don't understand it in this answer.
16         MS. SULLIVAN:  Objection, the document
17 speaks for itself.  Objection to the extent it calls
18 for a legal conclusion.  Objection, it's beyond the
19 scope.  You can answer the question.
20         And I would note for the record that to
21 the extent the utility plaintiffs have questions about
22 these Interrogatories, a proper vehicle would be a

Page 389

1 letter, perhaps a motion with the court, but Ms. Klein
2 is here to testify as to her personal knowledge.  If
3 she can.
4         THE WITNESS:  I don't know that the DOE
5 has at this time a position on that.
6 BY MR. TOMASZCZUK:
7    Q.   Do you have a position?
8    A.   I do.
9    Q.   Can you tell me what it is?
10    A.   My own personal position?  Yes.
11    Q.   Yes?
12    A.   Yes, we have an obligation.
13         MR. TOMASZCZUK:  Ms. Klein, I don't have
14 any further questions at this time.
15         I am going to adjourn your deposition
16 because there are some pending issues with respect to
17 the government's privilege log and documents contained
18 thereon.  There were also some instructions not to
19 answer both from questions posed by Mr. Hirsch as well
20 as some questions posed by me, and we're going to
21 reserve the right to look at that and potentially call
22 you back.

Page 390

1         And subject to that reservation of rights
2 to bring you back, I'm going to adjourn.  I want to
3 thank you for your time and participation.  It's a
4 pleasure meeting you.
5         Are you all going to have questions?
6         MS. SULLIVAN:  No.
7         (Recess, 12:37 to 1:36 p.m.)
8         (Mr. Tomaszczuk not present.)
9              AFTERNOON SESSION
10 EXAMINATION BY COUNSEL FOR THE PLAINTIFFS,
11 SOUTHERN NUCLEAR OPERATING COMPANY, ET AL.
12 BY MS. REMINGTON:
13    Q.   Good afternoon.  My name is Kristi Remington
14 and I represent the Southern Company, and as my
15 colleagues have instructed you earlier --
16    A.   I'm sorry.  I can't hear you.
17    Q.   It's one of my problems.  If you can't hear
18 me, please let me know.  I don't always talk loud
19 enough.
20    A.   Okay.
21    Q.   If you don't understand any of my questions,
22 please ask me to restate and I will.  It's just so we

29 (Pages 387 to 390)

# Plaintiff

# Susan Klein (vol 2)

Page 435

1  contract?

2      A.   I believe in this process, which we call the

3  ACR resolution process, utilities raised issues and the

4  department addressed them.   I don't know what all the

5  issues were.   That could have been one of them, and in

6  that case we would have looked at it, but other than

7  that I don't know.   Maybe we did look at it in that

8  context.   As a request from a utility company.

9      Q.   Sitting here today, do you recall DOE

10  considering changing the definition of high-level

11  waste?

12      A.   No, I do not recall.

13      Q.   Is the Federal government responsible for

14  disposing of greater than Class C waste?

15      A.   Yes, it is.

16      Q.   Would you look at the definition of high-level

17  waste in the standard contract, Exhibit 38,

18  specifically I'd ask you to turn to page 589.

19      A.   Yes.

20      Q.   Number 12.   The term high-level waste means?

21      A.   Uh-huh.

22      Q.   You see there under B it states:   "Other

Page 436

1  highly radioactive material that the Commission,

2  consistent with existing law, determines by rule

3  requires permanent isolation."

4      A.   Uh-huh.

5      Q.   You see that?

6      A.   Yes, I do.

7      Q.   Do you know why that was put in the standard

8  contract?

9      A.   It's in the statute.   I believe comes directly

10  from the Nuclear Waste Policy Act.

11      Q.   And does this provision leave the Nuclear

12  Regulatory Commission the decision whether to determine

13  if material requires permanent isolation such that it's

14  covered by the standard contract?

15          MS. SULLIVAN:   Objection to the extent it

16  calls for a legal conclusion.   Objection, the document

17  speaks for itself.   Objection, vague.   You can answer

18  if you know.

19          THE WITNESS:   Well, I think it gives --

20  they have to determine that it's other highly

21  radioactive material and determine by rule that it

22  requires permanent isolation.   And there is another

Page 437

1  way.   Congress could legislate that we would put GTCC

2  in repository or give us authority either by NRC rule

3  or by legislation.   There are -- those are the two

4  methods that I see that it could become included under

5  the standard contract.

6  BY MR. MACDONALD:

7      Q.   If the NRC determines that material requires

8  permanent isolation, is it covered by the standard

9  contract?

10          MS. SULLIVAN:   Objection to the extent it

11  calls for legal conclusion.

12          THE WITNESS:   I would say they have to

13  find that it's other highly radioactive material and

14  determined by rule that it requires permanent

15  isolation.

16  BY MR. MACDONALD:

17      Q.   What do you understand the term other highly

18  radioactive material to mean?

19          MS. SULLIVAN:   Objection, document speaks

20  for itself.   Objection to the extent it calls for a

21  legal conclusion.

22          THE WITNESS:   I just know from reading the

Page 438

1  rulemaking that NRC did several years ago, had an

2  advanced notice of proposed rulemaking and then a

3  proposed and then a final that it had a very difficult

4  time finding that this was highly radioactive.

5  BY MR. MACDONALD:

6      Q.   Finding that?

7      A.   That GTCC was always highly radioactive.

8  That was one of the things they discussed in the

9  preamble.

10      Q.   When you said they had a very difficult time

11  finding that GTCC was always highly radioactive, could

12  some GTCC be highly radioactive?

13      A.   I believe that's true.   I believe some is

14  highly radioactive.

15      Q.   Do you understand the term other highly

16  radioactive material to have a formal definition?

17      A.   I don't --

18          MS. SULLIVAN:   Objection to the extent it

19  calls for a legal conclusion.

20          THE WITNESS:   I don't know.   I don't know

21  of one.

22  BY MR. MACDONALD:

# Defendant

## Susan Klein (vol 2)

Page 435

```
1   contract?
2       A.   I believe in this process, which we call the
3   ACR resolution process, utilities raised issues and the
4   department addressed them.   I don't know what all the
5   issues were.   That could have been one of them, and in
6   that case we would have looked at it, but other than
7   that I don't know.   Maybe we did look at it in that
8   context.   As a request from a utility company.
9       Q.   Sitting here today, do you recall DOE
10  considering changing the definition of high-level
11  waste?
12      A.   No, I do not recall.
13      Q.   Is the Federal government responsible for
14  disposing of greater than Class C waste?
15      A.   Yes, it is.
16      Q.   Would you look at the definition of high-level
17  waste in the standard contract, Exhibit 38,
18  specifically I'd ask you to turn to page 589.
19      A.   Yes.
20      Q.   Number 12.   The term high-level waste means?
21      A.   Uh-huh.
22      Q.   You see there under B it states:   "Other
```

Page 436

```
1   highly radioactive material that the Commission,
2   consistent with existing law, determines by rule
3   requires permanent isolation."
4       A.   Uh-huh.
5       Q.   You see that?
6       A.   Yes, I do.
7       Q.   Do you know why that was put in the standard
8   contract?
9       A.   It's in the statute.   I believe comes directly
10  from the Nuclear Waste Policy Act.
11      Q.   And does this provision leave the Nuclear
12  Regulatory Commission the decision whether to determine
13  if material requires permanent isolation such that it's
14  covered by the standard contract?
15           MS. SULLIVAN:   Objection to the extent it
16  calls for a legal conclusion.   Objection, the document
17  speaks for itself.   Objection, vague.   You can answer
18  if you know.
19           THE WITNESS:   Well, I think it gives —
20  they have to determine that it's other highly
21  radioactive material and determine by rule that it
22  requires permanent isolation.   And there is another
```

Page 437

```
1   way.   Congress could legislate that we would put GTCC
2   in repository or give us authority either by NRC rule
3   or by legislation.   There are — those are the two
4   methods that I see that it could become included under
5   the standard contract.
6   BY MR. MACDONALD:
7       Q.   If the NRC determines that material requires
8   permanent isolation, is it covered by the standard
9   contract?
10           MS. SULLIVAN:   Objection to the extent it
11  calls for legal conclusion.
12           THE WITNESS:   I would say they have to
13  find that it's other highly radioactive material and
14  determined by rule that it requires permanent
15  isolation.
16  BY MR. MACDONALD:
17      Q.   What do you understand the term other highly
18  radioactive material to mean?
19           MS. SULLIVAN:   Objection, document speaks
20  for itself.   Objection to the extent it calls for a
21  legal conclusion.
22           THE WITNESS:   I just know from reading the
```

Page 438

```
1   rulemaking that NRC did several years ago, had an
2   advanced notice of proposed rulemaking and then a
3   proposed and then a final that it had a very difficult
4   time finding that this was highly radioactive.
5   BY MR. MACDONALD:
6       Q.   Finding that?
7       A.   That GTCC was always highly radioactive.
8   That was one of the things they discussed in the
9   preamble.
10      Q.   When you said they had a very difficult time
11  finding that GTCC was always highly radioactive, could
12  some GTCC be highly radioactive?
13      A.   I believe that's true.   I believe some is
14  highly radioactive.
15      Q.   Do you understand the term other highly
16  radioactive material to have a formal definition?
17      A.   I don't —
18           MS. SULLIVAN:   Objection to the extent it
19  calls for a legal conclusion.
20           THE WITNESS:   I don't know.   I don't know
21  of one.
22  BY MR. MACDONALD:
```

**Esquire Deposition Services**          **1-800-441-3376**

# Plaintiff

Page 439

1    Q.   Do you know if DOE has ever formulated a
2  position as to whether there's a formal definition for
3  the term other highly radioactive material?
4    A.   I don't believe we have.
5    Q.   What does the phrase requires permanent
6  isolation mean?
7    MS. SULLIVAN:  Objection to the extent it
8  calls for legal conclusion.  Objection, document
9  speaks for itself.
10   THE WITNESS:  That's a good question.
11 It's a very good question.  I think it's pretty vague.
12 I don't know.  It would be for NRC to determine in our
13 rulemaking.
14 BY MR. MACDONALD:
15   Q.   Would disposal in a permanent repository
16 constitute -- strike that.
17        Would disposal in a deep geologic repository
18 constitute permanent isolation?
19   MS. SULLIVAN:  Objection, vague.
20 Objection to the extent it calls for legal conclusion.
21   THE WITNESS:  Even if it would, it doesn't
22 say that NRC has determined that it requires it.  But I

Page 440

1  would say if you put it in a repository and we're going
2  to leave -- one of our plans is to leave ours open for
3  300 years, I guess after 300 years hopefully it's
4  permanent isolation.  But the requirement is they have
5  to determine by rule that it requires permanent
6  isolation.  So that to me is different than saying if
7  you put it in the repository.  That doesn't mean that
8  NRC has determined that it's required.  But it is --
9  that's all.
10 BY MR. MACDONALD:
11   Q.   I'm not sure that that exactly answered my
12 question.
13   A.   Okay.  Ask it again, please.
14   Q.   Would disposal constitute -- strike that.
15        Would disposal in a deep geologic repository
16 constitute permanent isolation, in your view?
17   MS. SULLIVAN:  Objection, vague.
18   THE WITNESS:  I guess so, yeah.  I would
19 hope it would be isolated and it wouldn't leak out.
20   MR. MACDONALD:  I'd like to mark as
21 Exhibit 40.
22        (Thereupon, the reporter marked for

Page 441

1  identification Deposition Exhibit No. 40.)
2  BY MR. MACDONALD:
3    Q.   Ms. Klein, I've had marked as Exhibit 40 a
4  document with a Bates label DF-101718 and at the top
5  it's entitled "Draft DOE Position on the Acceptance of
6  Nonfuel Assembly Hardware Under the 10 CFR 961 Standard
7  Contract."  Do you have that before you?
8    A.   Yes, I do.
9    Q.   If I could direct your attention to the third
10 bullet point.
11   A.   Yes.
12   Q.   Which states:  "Some of the NFA hardware is
13 not GTCC and thus may qualify for shallow land burial
14 and some will be GTCC waste.  However, as it now
15 stands, DOE appears to be obligated to accept all such
16 wastes under the Standard Contract, regardless of
17 radiological classification."
18   A.   I see that, yes.
19   Q.   Do you agree that some of the NFA hardware
20 will be GTCC waste?
21   A.   First of all --
22   MS. SULLIVAN:  Objection, vague.

Page 442

1    THE WITNESS:  I just want to point out, I
2  believe this was written by a contractor JAI.  This is
3  not a DOE document that I'm aware of.  May qualify for
4  shallow land burial.  Would you ask the question
5  again.  I'm sorry.
6  BY MR. MACDONALD:
7    Q.   Would you agree with the statement that some
8  NFA hardware will be GTCC waste?
9    A.   If it falls under the definition in the
10 standard contract.  I would say it is not GTCC waste
11 as far as the definition that the NRC and DOE would
12 use.  Even though it might have radionuclide
13 concentrations above Class C.  It would be spent fuel
14 under the definition in this contract if it falls under
15 that definition.
16   Q.   Despite the fact that it would also be
17 considered GTCC correct?
18   A.   Well, I would say it couldn't be both, but
19 it's not low-level waste.  So that exceeds the
20 concentrations in the NRC regs.  It would be spent
21 fuel.  So it couldn't be low-level waste.  And now
22 we're talking definitional issues here.  But the

# Plaintiff

# Susan Klein (vol 2)

Page 447

1  but I believe that Barnwell, South Carolina. It's a
2  licensed facility.  It might be licensed under the
3  state.  I'm not sure, but they get their authority
4  through the Commission and they have GTCC buried in
5  Barnwell, South Carolina I believe.
6      Q.  Is it your testimony that the NRC has licensed
7  DOE to dispose of GTCC somewhere other than a deep
8  geologic repository?
9      A.  No, not DOE.  NRC doesn't license us to
10  dispose of GTCC.  I'm sorry.  Barnwell is a
11  commercial facility.
12     Q.  Is DOE authorized to dispose of GTCC waste
13  anywhere other than a deep geologic repository?
14         MS. SULLIVAN:  Objection, beyond the
15  scope.  You can answer.
16         THE WITNESS:  DOE presently isn't
17  authorized to dispose of it in any place but a licensed
18  facility and we have no licensed facility, but if we
19  sought a license for other than a deep geologic
20  repository, I believe the Commission would entertain
21  it.  But we don't have.  We have not sought such a
22  license and they have not yet entertained it.  So I

Page 448

1  don't know.
2  BY MR. MACDONALD:
3      Q.  Do you know if DOE is considering a proposal
4  to the NRC to dispose of GTCC somewhere other than
5  Yucca Mountain?
6      A.  Not at this time.
7      Q.  If you take a look at Klein Exhibit 40, which
8  you may still have before you.  That's the draft
9  letter, the draft position from JAI.
10     A.  Yes.
11     Q.  I would direct your attention to the second
12  bullet point, which states that:  "The regulations of
13  the Nuclear Regulatory Commission issued subsequent to
14  the Standard Contract, require that low-level
15  radioactive wastes that contain concentrations of
16  radionuclides that exceed the limits for Class C waste
17  as defined in 10 CFR 61.55 must be disposed of in a
18  repository."  Do you see that?
19     A.  I see that sentence, yes.
20     Q.  And you'd agree with that statement, correct?
21     A.  No, I would not agree with that statement.
22     Q.  What aspect of that statement would you

Page 449

1  disagree with?
2      A.  I think that it requires further words.  It
3  requires, unless the Commission approves alternative
4  disposal methods.
5      Q.  Would that be the next sentence, which states:
6  "It is noted that the regulations do not preclude the
7  possibility of disposal of such greater than Class C
8  wastes in other ways so long as such disposal is
9  approved by NRC."
10     A.  If I had this for review and I was in General
11  Counsel, I would not permit those two sentences to be
12  that way and stand alone.  I would say one conditions
13  the other and the first stand-alone sentence is not
14  accurate by itself.
15     Q.  And the first sentence is not accurate because
16  if the NRC approves of disposal other than geologic
17  repository?
18     A.  Uh-huh.
19     Q.  GTCC waste could be disposed --
20     A.  Uh-huh.
21     Q.  -- in that other place?
22     A.  That's correct.

Page 450

1      Q.  And as of yet, the NRC has not approved of an
2  another place, correct?
3      A.  That is correct.
4         MR. MACDONALD:  Exhibit 41.
5      (Thereupon, the reporter marked for
6  identification Deposition Exhibit No. 41.)
7  BY MR. MACDONALD:
8      Q.  Mrs. Klein, I've had marked as Exhibit 41 a
9  document with Bates range CTR-001-1510 through 1552
10  entitled "Proposed Contract Changes Revision 0 April
11  13, 1992."  Do you have that document before you?
12     A.  Yes, I do.
13     Q.  If I could direct your attention to the fourth
14  page of the document.  Bates number 1513.
15     A.  Yes.
16     Q.  And if you would take a look at the numbered
17  paragraph 12, specifically the 4 stars and the word
18  change that states:  For purposes of this contract
19  delete "(b) other highly radioactive material that the
20  Commission, consistent with existing law, determines by
21  rule requires permanent isolation."  Do you see that?
22     A.  Yes, I do.

44 (Pages 447 to 450)

# Defendant

## Susan Klein (vol 2)

**Page 487**

1  to.

2          MS. POWELL:  Object, the document speaks

3  for itself, but...

4          THE WITNESS:  I don't know what it's

5  referring to.

6  BY MR. MACDONALD:

7      Q.  Do you have any idea what the document is

8  referring to when it states that "The standard contract

9  mandates acceptance of a small portion of GTCC" waste?

10         MS. POWELL:  Same objection?

11         THE WITNESS:  My guess -- it's only my

12  guess -- it's a misinterpretation of the nonfuel

13  bearing components part of our definition of spent

14  nuclear fuel, but that's the only thing I could guess

15  that they mean by that.  But it's a misinterpretation.

16  BY MR. MACDONALD:

17     Q.  And this you're suggesting is a

18  misinterpretation as of 1996?

19     A.  Oh, yes.  I would say as of -- yeah, because

20  it's spent -- because the standard contract has never

21  called for accepting any portion of GTCC LLW.  Only

22  spent fuel and high-level waste.

**Page 488**

1      Q.  Even though this appears to be a document

2  produced by the Yucca Mountain project that states that

3  the standard contract mandates that the waste

4  management system accept a small portion of GTCC waste?

5          MS. POWELL:  I'm going to object.  I don't

6  think that's what Ms. Klein testified it appeared, but

7  you can answer.

8          THE WITNESS:  That's correct.  It just

9  says YMP and I would say that it says not for public

10  distribution.  I think somebody made a determination

11  that they weren't comfortable with what's in here.

12  They didn't want the public to see it.  So I don't

13  know whether they think the whole thing is

14  inappropriate or a particular sentence is or what.

15  But this is clearly not a position paper of anybody.

16  Because it's a working draft, not for public

17  distribution.

18  BY MR. MACDONALD:

19     Q.  Ms. Klein, if I can also now refer you to

20  page -- the same page we're on, page 10 of Exhibit 45.

21  In the Background section about five or six lines down,

22  there is the statement:  "In May 1989, the NRC ruled

**Page 489**

1  that GTCC low-level waste must be disposed of in a deep

2  geologic repository, unless disposal elsewhere has been

3  approved by the NRC."  Do you see where I'm reading?

4      A.  Yes, I do.

5      Q.  And we discussed this concept a little while

6  ago.  Is this a better formulation, one that you would

7  agree with?

8      A.  Well, I don't remember the date of the rule.

9  So, but the NRC ruled that GTCC low-level waste, unless

10  disposal elsewhere has been approved by the NRC.  That

11  sounds correct to me.

12     Q.  The statement sounds correct?

13     A.  Yes.

14     Q.  Setting aside whether or not the date was

15  actually May of 1989 but that the NRC ruled that GTCC

16  low-level waste must be disposed of in a deep geologic

17  repository, unless disposal elsewhere has been approved

18  by the NRC, correct?

19     A.  Yes.

20     Q.  And I believe you already testified to this,

21  but I just wanted to make sure I understood.  DOE --

22  strike that.

**Page 490**

1          NRC has not approved of disposal anywhere

2  other than the repository as of today; is that correct?

3      A.  Well, has not approved of the department

4  disposal anywhere.  Any commercial, yes.  As I said

5  before, I think in Barnwell, South Carolina there's

6  some disposal of greater than Class C waste in a

7  shallow land burial and that is a licensed facility,

8  but other than that I'm not aware of anything.

9      Q.  Let me rephrase my question.

10     A.  Okay.

11     Q.  Because I keep mixing up.  I'm not asking my

12  question clearly enough.  So I apologize for that.

13         As of today April 2002, the NRC has not

14  approved of DOE disposing any commercial GTCC anywhere

15  other than a repository, correct?

16     A.  Yes, but they also haven't approved it in a

17  repository either.  But yes, that's correct.

18     Q.  They haven't approved of it anywhere period?

19     A.  Period.  This is true.

20     Q.  Although they have published a rule requiring

21  DOE to dispose of GTCC -- commercial GTCC at the

22  repository unless they approve of another location?

## Susan Klein (vol 2)

1  A.   I hate to be a stickler here, but I wouldn't
2  quite word it that way.
3     Q.   I'm sorry.  How would you word it?
4     A.   I'm sorry.  Well, first of all, I don't
5  believe they mentioned DOE in their rule per se, but
6  they just have a rule for what's required to dispose of
7  GTCC and they said they must be -- if it's to be
8  disposed of, it's to be disposed of in deep geologic
9  repository.  Or an alternative approved by the
10  Commission, but they don't say the repository.  To me
11  that means something because we do not have authority
12  right now to put it in the repository.  The one that
13  we're looking at right now, and that would require some
14  other action.  We do not have authority to put it in
15  there now.  I don't think there's any question about
16  that.
17     Q.   There isn't any -- there isn't a repository
18  right now?
19     A.   That's correct.  That's true.
20     Q.   And DOE has not made any proposal to the NRC
21  for disposing of commercial GTCC anywhere other than
22  the repository?

1     A.   Yes, I do.
2     Q.   Please take a minute to review that document
3  and let me know when you've had a chance to review it.
4     A.   I've read it.
5     Q.   Could you identify -- well, first, the
6  document lists several people participating in the
7  telephone conference call, including Mary Jane
8  Wisenbaker, Rob Campbell, Joe Coleman, Larry Ball, Mark
9  Frei, F-r-e-i, Greg Duggan, Sandy Birk and Bob Hanson.
10  Do you know -- we've already spoken about Mr. Campbell.
11  Do you know the other people listed as being on this
12  conference call?
13     A.   I know Joe Coleman and I know Mark Frei and I
14  believe I have spoken to Mary Jane Wisenbaker.
15     Q.   Could you tell me who first Ms. Wisenbaker is?
16     A.   I believe she works for EM.  I think most of
17  these people work for the Environmental Management
18  group in DOE.  But I can't remember.  I have spoken
19  to Mary Jane, but I can't remember.  I told you who
20  Rob Campbell is.
21     Q.   When you say EM, you're referring to?
22     A.   It's within --

1     A.   That's true.  They also haven't proposed to
2  put it in a repository either, yes.
3     Q.   But you're aware of studies suggesting -- DOE
4  studies suggesting that the most economical place to
5  put commercial GTCC is in the repository?
6     A.   I can't cite you any studies, but that's an
7  understanding I have from conversations with people
8  that it could be economical to put it in the repository
9  when we are authorized to do that.
10     Q.   And it would be difficult to get -- to site
11  another repository for disposal of GTCC, correct?
12     A.   Yes, that is correct.
13        (Discussion off the record.)
14        MR. MACDONALD:  46.
15        (Thereupon, the reporter marked for
16  identification Deposition Exhibit No. 46.)
17  BY MR. MACDONALD:
18     Q.   Ms. Klein, I've had marked as Exhibit 46 a
19  document entitled "Teleconference Call Summary."  It
20  is Bates page SNL-001-0227 and it refers to a
21  teleconference call held on June 22, 1999.  Do you
22  have that before you?

1     Q.   Environmental --
2     A.   It's within the Department of Energy and it's
3  called Environmental Management.  We call it
4  Environmental Management.  I think it's a longer name.
5  It's in charge of the cleanup of DOE facilities, and
6  they also have historically been in charge of the
7  low-level waste programs.
8     Q.   And Mark Frei you said?
9     A.   Mark Frei.
10     Q.   You said is who?
11     A.   He's in the Environmental Management group.
12     Q.   Have you spoken with him before?
13     A.   Yes.
14     Q.   On what issues have you spoken with Mr. Frei
15  about?
16     A.   I don't know if I've actually spoken to him
17  about this issue.  Mostly I have seen him in the hall
18  and said hello and talked to him about his transfer and
19  where he -- I mean, I don't remember discussing
20  anything substantive with him in years.  He used to be
21  in my Office of Civilian Office Radioactive Waste
22  Management.

**55 (Pages 491 to 494)**

# Plaintiff

# Susan Klein (vol 2)

Page 491

1    A.   I hate to be a stickler here, but I wouldn't
2  quite word it that way.
3    Q.   I'm sorry.   How would you word it?
4    A.   I'm sorry.   Well, first of all, I don't
5  believe they mentioned DOE in their rule per se, but
6  they just have a rule for what's required to dispose of
7  GTCC and they said they must be -- if it's to be
8  disposed of, it's to be disposed of in deep geologic
9  repository.   Or an alternative approved by the
10 Commission, but they don't say the repository.   To me
11 that means something because we do not have authority
12 right now to put it in the repository.   The one that
13 we're looking at right now, and that would require some
14 other action.   We do not have authority to put it in
15 there now.   I don't think there's any question about
16 that.
17   Q.   There isn't any -- there isn't a repository
18 right now?
19   A.   That's correct.   That's true.
20   Q.   And DOE has not made any proposal to the NRC
21 for disposing of commercial GTCC anywhere other than
22 the repository?

Page 492

1    A.   That's true.   They also haven't proposed to
2  put it in a repository either, yes.
3    Q.   But you're aware of studies suggesting -- DOE
4  studies suggesting that the most economical place to
5  put commercial GTCC is in the repository?
6    A.   I can't cite you to any studies, but that's an
7  understanding I have from conversations with people
8  that it could be economical to put it in the repository
9  when we are authorized to do that.
10   Q.   And it would be difficult to get -- to site
11 another repository for disposal of GTCC, correct?
12   A.   Yes, that is correct.
13        (Discussion off the record.)
14        MR. MACDONALD:   46.
15        (Thereupon, the reporter marked for
16 identification Deposition Exhibit No. 46.)
17 BY MR. MACDONALD:
18   Q.   Ms. Klein, I've had marked as Exhibit 46 a
19 document entitled "Teleconference Call Summary."   It
20 is Bates page SNL-001-0227 and it refers to a
21 teleconference call held on June 22, 1999.   Do you
22 have that before you?

Page 493

1    A.   Yes, I do.
2    Q.   Please take a minute to review that document
3  and let me know when you've had a chance to review it.
4    A.   I've read it.
5    Q.   Could you identify -- well, first, the
6  document lists several people participating in the
7  telephone conference call, including Mary Jane
8  Wisenbaker, Rob Campbell, Joe Coleman, Larry Ball, Mark
9  Frei, F-r-e-i, Greg Duggan, Sandy Birk and Bob Hanson.
10 Do you know -- we've already spoken about Mr. Campbell.
11 Do you know the other people listed as being on this
12 conference call?
13   A.   I know Joe Coleman and I know Mark Frei and I
14 believe I have spoken to Mary Jane Wisenbaker.
15   Q.   Could you tell me who first Ms. Wisenbaker is?
16   A.   I believe she works for EM.   I think most of
17 these people work for the Environmental Management
18 group in DOE.   But I can't remember.   I have spoken
19 to Mary Jane, but I can't remember.   I told you who
20 Rob Campbell is.
21   Q.   When you say EM, you're referring to?
22   A.   It's within --

Page 494

1    Q.   Environmental --
2    A.   It's within the Department of Energy and it's
3  called Environmental Management.   We call it
4  Environmental Management.   I think it's a longer name.
5  It's in charge of the cleanup of DOE facilities, and
6  they also have historically been in charge of the
7  low-level waste programs.
8    Q.   And Mark Frei you said?
9    A.   Mark Frei.
10   Q.   You said is who?
11   A.   He's in the Environmental Management group.
12   Q.   Have you spoken with him before?
13   A.   Yes.
14   Q.   On what issues have you spoken with Mr. Frei
15 about?
16   A.   I don't know if I've actually spoken to him
17 about this issue.   Mostly I have seen him in the hall
18 and said hello and talked to him about his transfer and
19 where he -- I mean, I don't remember discussing
20 anything substantive with him in years.   He used to be
21 in my Office of Civilian Office Radioactive Waste
22 Management.

**Esquire Deposition Services**

## Susan Klein (vol 2)

Page 495

1    Q.   Mr. Frei used to work in OCRWM?

2    A.   Yes.

3    Q.   Do you know when he transferred to DOE's

4  Environmental Management?

5    A.   No, I don't know.

6    Q.   You've identified Ms. Wisenbaker,

7  Mr. Campbell, Mr. Frei.  Is there anyone else on that

8  list?

9    A.   I know Joe Coleman.  He used to be head of

10  the low-level waste program when I was their lawyer.

11  I don't know whether he still works for DOE.  He could

12  be a contractor now.  I don't know.  I haven't talked

13  to him in years.

14    Q.   Any of the other people?

15    A.   I don't know the other names, no.

16    Q.   And we were just talking about the difficulty

17  in siting another repository for disposal of GTCC

18  waste.  Do you remember our discussion just a few

19  minutes ago?

20    A.   Yes, I do.

21    Q.   If you look down at the bullets, the fourth

22  bullet on Exhibit 46 states that:  "Options other than

Page 496

1  the repository are considered politically undesirable

2  in light of overall DOE waste management objectives."

3  Do you see that?

4    A.   I do see that, yes.

5    Q.   Is that consistent with your view in your

6  prior testimony that we just talked about?

7    A.   Well, I would say this is EM's view as I

8  understand EM's view to be.  It has at times been RW's

9  view.  I don't know that it's RW's view right now,

10  but...

11    Q.   Do you have any reason to disagree with this

12  statement?

13    A.   Well, as you stated, it would be difficult to

14  site another disposal facility for greater than Class

15  C.  So, politically undesirable.  Those aren't words

16  that I like to use.  But it would be difficult.  I

17  think that's fair to say.

18    Q.   It would be difficult to --

19    A.   Site a greater than.

20    Q.   -- site a greater than Class C repository?

21    A.   Uh-huh.  It would be difficult.

22    Q.   The bullet point just above the one we're

Page 497

1  talking about states:  "Mark Frei indicated that there

2  is an understanding between GCRW and EM that GTCC waste

3  will go to the repository."  Do you see where I'm

4  reading?

5    A.   I do.

6    Q.   RW obviously refers to the Office of

7  Civilian -- OCRWM?

8    A.   Yes.

9    Q.   The Office of Civilian Radioactive Waste

10  Management?

11    A.   That's correct.

12    Q.   EM is DOE's Environmental Management?

13    A.   That's correct.

14    Q.   And GC.  Do you know what that refers to?

15    A.   General Counsel.

16    Q.   Do you know whether there is an understanding

17  between the General Counsel's Office, RW and EM that

18  GTCC waste will go to the repository?  Is that your

19  understanding?

20    A.   I think there's an understanding that if we

21  were required to do so, authorized to do so and there

22  was a method to pay for it, we would do that, but

Page 498

1  there's no written understanding that I'm aware of.

2    Q.   When you say that "we were required to do so,"

3  what do you mean?

4    A.   If Congress passed a law and said take GTCC in

5  the repository, we wouldn't necessarily object to that

6  legislation, for example.  We would not object to that

7  legislation as long as there was a way for generators

8  to pay for it.

9    Q.   It wouldn't require a Congressional statute to

10  have GTCC go to the repository, would it?

11    A.   Either that or NRC by rule under those

12  particular terms.  I think it's either a NRC rule or a

13  statute, and I personally think it will eventually be a

14  statute, but I think it will be legislation.

15    Q.   And do you know if RW, EM and the General

16  Counsel's Office all have an understanding that there

17  will either be a statute or a NRC rule that GTCC will

18  go to the repository?

19    A.   Well, I think at the levels and the people

20  that I spoke to, yes.  I don't know if you asked

21  somebody in the staff.  I don't know how educated they

22  are to the issue.

**Esquire Deposition Services**

## Susan Klein (vol 2)

Page 499

1    Q.    At the high-level --
2    A.    Yes, I think.
3    Q.    -- policy level, all three branches, General
4  Counsel, OCRWM and EM have an understanding that GTCC
5  waste will ultimately go to the repository?
6    A.    If it's authorized.   If, but that it first
7  must be authorized.
8    Q.    And do all three branches believe that it will
9  be authorized?
10    A.    Well, I don't know whether each individual
11  believes, but I believe that we will need new
12  legislation after the site is designated, and we have a
13  whole series of issues that need to be resolved by
14  legislation and that will be on the list.   So it's one
15  of many.   I think that it will -- if the site is
16  designated, I think we'll get legislation that will
17  take care of other cats and dogs.
18    Q.    Among the cats and dogs would be the disposal
19  of GTCC waste in the repository?
20    A.    Yes.
21    Q.    At the bottom of Exhibit 46, there's a
22  handwritten notation, "Keep generic per Millington."

Page 500

1  That's what it looks like to me.
2    A.    That's what it looks like to me, too.
3    Q.    Do you know who Millington is?
4    A.    Well, this looks like an EM document and I
5  don't know anyone in EM named Millington.   There is a
6  woman at Yucca Mountain named Mellington, but -- so I
7  don't know.
8           MR. MACDONALD:   47.
9           (Thereupon, the reporter marked for
10  identification Deposition Exhibit No. 47.)
11  BY MR. MACDONALD:
12    Q.    Ms. Klein, I've had marked as Exhibit 47 a
13  document entitled "Issue Paper, Maine Yankee Request
14  for DOE to Observe Loading of GTCC Waste."   The Bates
15  number on the bottom of this document is difficult to
16  follow, but it at least is SFEE 110701.   Do you have
17  that document before you?
18    A.    I do.
19    Q.    Please take as much time as you need to look
20  at the document, but I'm going to ask you about page 2
21  of this document.
22    A.    Okay.   (Pause).   Okay.   I have read it.

Page 501

1    Q.    Ms. Klein, I'd like to direct your attention
2  to page 2 of Exhibit 47.   Specifically under the
3  heading DOE's Obligation.
4    A.    Yes.
5    Q.    And the second sentence states:   "In the
6  February 1987 report to Congress required by Public Law
7  99-240, DOE committed to providing acceptance and
8  storage of GTCC waste prior to disposal being
9  available.   By 1989 DOE has failed to provide the
10  acceptance and storage of this waste per our commitment
11  to Congress and DOE has not lived up to its
12  responsibilities under Public Law 99-240."   Do you see
13  where I'm reading?
14    A.    I do.
15    Q.    Do you know -- first, is this -- do you know
16  whether this February 1987 report to Congress required
17  by Public Law 99-240 is the report that you mentioned
18  earlier in your testimony today?
19    A.    Yes, I believe it is.
20    Q.    And as I recall, you reviewed that report
21  sometime either when it came out in February of 1987;
22  is that correct?

Page 502

1    A.    I reviewed it in draft before it was submitted
2  to Congress and I've looked at it since.   I've
3  reviewed it since several times.
4    Q.    And do you recollect that in that report,
5  which you looked at in draft form and subsequently in
6  final form, that DOE committed to providing acceptance
7  and storage of GTCC waste by 1989?
8    A.    I wouldn't characterize it as DOE committed to
9  providing acceptance and storage, but we did say that
10  we would provide for -- I don't remember the exact
11  word.   I'd have to look at it.   We implied that we
12  would do something sooner on storage and that we
13  were -- and, well, in the meantime -- we were working
14  on the disposal issue, but in the meantime we would be
15  coming up with a plan for storage.
16    Q.    And why would you not use the word committed?
17    A.    It was in a report to Congress as DOE's
18  intention at the time, not a plan.   It wasn't a
19  commitment of.   It depends.   Legally I wouldn't use the
20  word committed.   But we did tell Congress that we
21  planned to do that.
22    Q.    And when you say that, you mean provide

# Plaintiff

## Susan Klein (vol 2)

Page 523

MR. MACDONALD: Exhibit 49.

(Thereupon, the reporter marked for identification Deposition Exhibit No. 49.)

(Discussion off the record.)

THE WITNESS: I don't know where it is. Do you? Somewhere in here we say.

BY MR. MACDONALD:

Q. If it will help, if it gets us out of here earlier, I will refer us to page 0005 at the bottom, which I believe is the fifth page of the document on the left-hand column, the first full paragraph. And this is referring to Exhibit 49 for the record, the April 18, 1983 Federal Register Notice Publication of the final version of the standard contract.

A. Okay. I have read it. It does say, "This type of priority is necessary to prevent reactors from waiting 20 to 30 years to be decommissioned after they finish generating electricity." You have a question that I'm supposed to be answering? I'm sorry. I forgot where we were.

Q. I believe you were previously testifying that -- strike that.

Page 524

My question is: Was the reason this provision was included, the priority shutdown provision, that is because it was necessary to prevent reactors from waiting 20 or 30 years to be decommissioned?

A. Yes.

Q. And DOE included this provision despite the fact that four commenters recommended the deletion of the provision?

A. Yes, that's correct.

Q. And as you explained I believe earlier, acceptance of fuel from a shutdown reactor would allow that reactor to go to green fields I believe is the word that you used; is that correct?

A. Yes, it would. In most cases, it would allow them to go to green fields, yes.

Q. If DOE had begun accepting fuel in 1998 at a 3,000 MTU rate or a ramp-up, a reasonable ramp-up to a 3,000 MTU rate, do you have an opinion as to whether DOE could have given priority to shutdown reactors without harming or prejudicing the rights of operating utilities.

Page 525

MS. POWELL: Object to beyond the scope, but you can answer.

THE WITNESS: It could have given. I think that would be policy considerations that would be looked at, but it would make it certainly --

BY MR. MACDONALD:

Q. Would have made it easier?

A. Much easier, yes.

(Discussion off the record.)

(Thereupon, the reporter marked for identification Deposition Exhibit No. 50.)

BY MR. MACDONALD:

Q. Ms. Klein, I've just marked -- had marked for you Exhibit 50, which is a memo dated June 28, 1991 from P. N. McDuffie and S. A. Vance to D. C. Langstaff and A. B. Brownstein. Do you have that there before you?

A. Yes, I do.

Q. I believe we discussed earlier Mr. Vance, Scott Vance, who you know; is that right?

A. That's correct.

Q. And Mr. A. B. Brownstein is Alan Brownstein;

Page 526

is that right?

A. Yes.

Q. And you are familiar with Mr. Brownstein?

A. Yes, I am.

Q. And D. C. Langstaff, is that Dave Langstaff?

A. I don't know D. C. Langstaff.

Q. You don't know D. C. Langstaff?

A. I have no idea.

Q. But Mr. Brownstein works -- currently works for OCRWM; is that correct?

A. That's correct.

Q. And he worked for OCRWM in 1991; is that correct?

A. Yes.

Q. To the best of your knowledge?

A. Yes. Sorry.

Q. The subject of this memo is "Recommended DOE positions on 17 contract implementation issues"?

A. Yes.

Q. Please look at as much -- look at as much of the document as you need to, but I'm going to ask you questions about page 5. The first issue at the top of

63 (Pages 523 to 526)

Page 274

1    ESQUIRE DEPOSITION SERVICES

     1020 19TH STREET, NORTHWEST

2    SUITE 620

     WASHINGTON, D.C.    20036

3                    ERRATA SHEET

     Case Name:  Yankee Atomic Electric Co., et al. V.

4        The United States

     Witness Name:  Susan Klein

5    Deposition Date:  April 24, 2002

     Job No.:   144539       4/25/02

6

     Page No.    Line No.    Change from          to

7      14          17      general counsel     general law

8      17           2      Shamora             Shinamura

9      19          17      assessment was      assessment, which was

10     21          21      then               sio was

11     23          13      on                 in

12     29          21      I know             No

13     32          15      Elkin was          Elkin, to

14     34          14      now else           else now

15     36           2      alyssa             Elissa

16     36           7      Alyssa             Elissa

17     38          10      Alyssa             Elissa

18     39           2      that               if that

19     39          14      Olson              Olsen

20     49           7      privilege          privileged

21     54          19      one                queue

22        Signature                           Date
                                              5-17-02

Esquire Deposition Services              1-800-441-3376

Susan Klein

Page 274

1    ESQUIRE DEPOSITION SERVICES

     1020 19TH STREET, NORTHWEST

2    SUITE 620

     WASHINGTON, D.C.   20036

3                   ERRATA SHEET

     Case Name:  Yankee Atomic Electric Co., et al. V.

4        The United States

     Witness Name:  Susan Klein

5    Deposition Date:  April 24, 2002

     Job No.:  144539    4/25/02

6

| Page No. | Line No. | Change from | to |
|----------|----------|-------------|-----|
| 7   58  | 22 | for | for a |
| 8   69  | 14 | on | at |
| 9   77  | 8  | electve | collective |
| 10  86  | 16 | Bernstein | Bernstein |
| 11  86  | 22 |  | " |
| 12  88  | 5  | time from they | time from? They |
| 13  88  | 20 | was | worked |
| 14  92  | 17 | Mark | Marc |
| 15  93  | 5  | " | " |
| 16  93  | 20 | " | " |
| 17  97  | 1  | as | at |
| 18  110 | 20 | suction is yes | vecting yes |
| 19  117 | 4  | Pard | Pardon |
| 20  118 | 17 | Calinder | calendar year |
| 21  119 | 1  | to be just | to just |

22    Signature                      Date
                                      5-23-02

Page 274

1   ESQUIRE DEPOSITION SERVICES

    1020 19TH STREET, NORTHWEST

2   SUITE 620

    WASHINGTON, D.C.   20036

3                        ERRATA SHEET

    Case Name:  Yankee Atomic Electric Co., et al. V.

4       The United States

    Witness Name:  Susan Klein

5   Deposition Date:  April 24, 2002

    Job No.:   144539        4/25/02

6

    Page No.   Line No.   Change from            To

7    128         12        never         have never

8    133         13        are           were

9    133         18        were          was

10   134          5        Marc          Marc

11   135         13        may we        may

12   142         15        circumstance   "circumstances

13   147         14        changing       changing"

                           reevaluate     reevaluate

14   156          1        privilege      privileged

15   158          6                       question

16   160         16        they           we

17   164          3        Mountain       Mountain Project

18   165          9        It's not -- after   It's not. After

19   165          9        effect         effect,

20   165         20        plan is to     plan, to

21   166          2        plan           plan --

22      Signature    Susan E. Klein          Date
                                             5/23/02

Susan Klein

**Page 274**

1   ESQUIRE DEPOSITION SERVICES

    1020 19TH STREET, NORTHWEST

2   SUITE 620

    WASHINGTON, D.C.   20036

3                  ERRATA SHEET

    Case Name:  Yankee Atomic Electric Co., et al. V.

4       The United States

    Witness Name:  Susan Klein

5   Deposition Date:  April 24, 2002

    Job No.:  144539          4/25/02

6

| | Page No. | Line No. | Change from | To |
|---|---|---|---|---|
| 7 | 166 | 3 | week 2004 | week -2004- |
| 8 | 166 | 3 | Buyer | Barton |
| 9 | 166 | 10 | at. They | at -- They |
| 10 | 168 | 11 | to. | to meet. |
| 11 | 166 | 13 | proess, door | proess door |
| 12 | 171 | 18 | it in They | it is -They |
| 13 | 174 | 2 | that's | that |
| 14 | 179 | 13 | ase | answer |
| 15 | 179 | 14 | WIP | WIPP |
| 16 | 179 | 17 | plan | plant |
| 17 | 180 | 5 | Transatlantic | transuranic |
| 18 | 180 | 7 | plan | plant |
| 19 | 180 | 14 | Transatlantic | transuranic |
| 20 | 180 | 18 | Class C dgues | Class C; dgues that |
| 21 | 181 | 6 | dove | there |

22      Signature _____     Date 5 23 02

Susan Klein

**Page 274**

1   ESQUIRE DEPOSITION SERVICES

    1020 19TH STREET, NORTHWEST

2   SUITE 620

    WASHINGTON, D.C.   20036

3                   ERRATA SHEET

    Case Name:  Yankee Atomic Electric Co., et al. V.

4       The United States

    Witness Name:  Susan Klein

5   Deposition Date:  April 24, 2002

    Job No.:   144539          4/25/02

6

| | Page No. | Line No. | Change from | To |
|---|---|---|---|---|
| 7 | 184 | 11 | there | there, |
| 8 | 200 | 10 | we would work on | would work at |
| 9 | 201 | 21 | Ones in a | Ones at a |
| 10 | 210 | 17 | Offices | Office |
| 11 | 212 | 5 | appropriates | coordinated |
| 12 | 212 | 6 | So, who | So, who? |
| 13 | 213 | 18 | this is the | this The |
| 14 | 215 | 18 | site. | see it. |
| 15 | 227 | 5 | Jack | Jeff |
| 16 | 224 | 7 | Budget is | Budget. It is |
| 17 | 237 | 5 | acceptance 2010. | acceptance 2010." |
| 18 | 238 | 12 | just a pie | just pie |
| 19 | 238 | 13 | sky the | sky, the |
| 20 | 238 | 19 | just we | just -- we |
| 21 | 239 | 2 | of that, | of, that |

22      Signature    _Susan Klein_           Date  5-23-02

**Esquire Deposition Services**          **1-800-441-3376**

Susan Klein

**Page 274**

```
1    ESQUIRE DEPOSITION SERVICES
     1020 19TH STREET, NORTHWEST
2    SUITE 620
     WASHINGTON, D.C.   20036
3                  ERRATA SHEET
     Case Name:  Yankee Atomic Electric Co., et al. V.
4         The United States
     Witness Name:  Susan Klein
5    Deposition Date:  April 24, 2002
     Job No.:   144539        4/25/02
6
```

| | Page No. | Line No. | Change from | To: |
|---|---|---|---|---|
| 7 | 244 | 5 | that's the | that's not the |
| 8 | 245 | 10 | too | two |
| 9 | 245 | 11 | less | for |
| 10 | 246 | 7 | 3,000 was | 3,000, which was |
| 11 | 248 | 13 | possibilities is building | possibilities, building |
| 12 | 257 | 19 | DOE pays | DOE, it pays. |
| 13 | 262 | 10 | but doesn't is | but that doesn't it is |
| 14 | 264 | 3 | is | it is |
| 15 | 264 | 19 | make | I could make. |
| 16 | 266 | 14 | M&O hire | the M&O |
| 17 | 266 | 15 | Policy & See | BSC |
| 18 | 267 | 2 | he's in the | he's the |
| 19 | 268 | 7 | Semmelane | Semmelin |
| 20 | 288 | 8 | really | really what |
| 21 | 288 | 8 | is | is : |

```
22        Signature   Sue Efu           Date
                                        5-23-02
```

**Susan Klein**

*Page 274*

1    ESQUIRE DEPOSITION SERVICES

     1020 19TH STREET, NORTHWEST

2    SUITE 620

     WASHINGTON, D.C.   20036

3                    ERRATA SHEET

     Case Name:  Yankee Atomic Electric Co., et al. V.

4        The United States

     Witness Name:  Susan Klein

5    Deposition Date:  April 24, 2002

     Job No.:  144539          4/25/02

6

| | Page No. | Line No. | Change from | To: |
|---|---|---|---|---|
| 7 | 293 | 11 | licensing | license |
| 8 | 302 | 15 | is | about |
| 9 | 303 | 11 | Donna | Don |
| 10 | 306 | 6 | construction | construction authorization |
| 11 | 307 | 11 | is | it |
| 12 | 315 | 11 | true | two |
| 13 | 315 | 11 | had been | had to be |
| 14 | 321 | 19 | paid | pardon |
| 15 | 323 | 16 | what | not what |
| 16 | 337 | 1 | cue | queue |
| 17 | 337 | 10 | " | " |
| 18 | 342 | 1 | now | all |
| 19 | 342 | 2 | they | they've |
| 20 | 342 | 2 | by court | that's |
| 21 | 342 | 3 | court | it |

22   Signature                              Date

        Jen Klein                           5-23-02

**Susan Klein**

**Page 274**

1    ESQUIRE DEPOSITION SERVICES

     1020 19TH STREET, NORTHWEST

2    SUITE 620

     WASHINGTON, D.C.    20036

3                        ERRATA SHEET

     Case Name:  Yankee Atomic Electric Co., et al. V.

4        The United States

     Witness Name:  Susan Klein

5    Deposition Date:  April 24, 2002

     Job No.:   144539          4/25/02

6

| Page No. | Line No. | Change from | To |
|---|---|---|---|
| 7 342 | 11 | required | requirement |
| 8 342 | 12 | amended | in |
| 9 342 | 14 | cooperation | corporation |
| 10 348 | 15 | management | Management sub |
| 11 348 | 8 | much practical | much as practicable |
| 12 348 | 10 | they're | those |
| 13 350 | 9 | call | call it. |
| 14 359 | 13 | And | in |
| 15 364 | 8 | Logs depends | logs, it depends |
| 16 364 | 9 | in the near future | "in the near future" |
| 17 367 | 8 | things | requests |
| 18 367 | 16 | Jervis | Gervis. |
| 19 382 | 4 | existing provision in | the existing provision |
| 20 382 | 18 | binding commitment | "binding commitment" is |
| 21 392 | 13 | that | what are |

22       Signature _____        Date 5-27-02

**Susan Klein**

**Page 274**

1    ESQUIRE DEPOSITION SERVICES

    1020 19TH STREET, NORTHWEST

2    SUITE 620

    WASHINGTON, D.C.   20036

3                    ERRATA SHEET

    Case Name:  Yankee Atomic Electric Co., et al. V.

4        The United States

    Witness Name:  Susan Klein

5    Deposition Date:  April 24, 2002

    Job No.:   144539      4/25/02

6

| Page No. | Line No. | Change from | To |
|---|---|---|---|
| 7  | 396 | 12 | ~~to~~ That | That's |
| 8  | 398 | 4  | he | "We |
| 9  | 398 | 5  | views. | views." |
| 10 | 400 | 3  | cue | queue |
| 11 | 401 | 13 | That it | Let |
| 12 | 401 | 16 | cue | queue, |
| 13 | 401 | 16 | as | is |
| 14 | 402 | 2  | for | for a |
| 15 | 404 | 10 | Well | We'll |
| 16 | 404 | 22 | on -- | on what |
| 17 | 404 | 22 | but | but not |
| 18 | 406 | 16 | also | also have, |
| 19 | 406 | 16 | EPA rules | EPA rules, |
| 20 | 406 | 16 | NRC rules, | NRC rules, |
| 21 | 411 | 2  | agreement | the agreement |

22       Signature _____        Date 5-23-0__

**Susan Klein**

**Page 274**

1    ESQUIRE DEPOSITION SERVICES

     1020 19TH STREET, NORTHWEST

2    SUITE 620

     WASHINGTON, D.C.    20036

3                    ERRATA SHEET

     Case Name:  Yankee Atomic Electric Co., et al. V.

4       The United States

     Witness Name:  Susan Klein

5    Deposition Date:  April 24, 2002

     Job No.:   144539           4/25/02

6

| Page No. | Line No. | Change from | To |
|---|---|---|---|
| 7  411 | 8  | notice | it |
| 8  411 | 22 | owred | own |
| 9  412 | 1  | was | is |
| 10 414 | 11 | worked | weren't |
| 11 415 | 1  | WIP | WIPP |
| 12 416 | 12 | and not a | and a |
| 13 416 | 13 | engineery | engineer or |
| 14 416 | 14 | of it is | of it — is |
| 15 418 | 47 | it's | it's — |
| 16 418 | 5  | up with a | up a |
| 17 424 | 18 | Collaboration | ellaboration |
| 18 429 | 3  | I read | I've read |
| 19 429 | 14 | not. | not. |
| 20 434 | 9  | believe comes | believe it |
| 21 437 | 2  | in reporting | in the depository |

22       Signature _____          Date  5-23-02

**Page 274**

1   ESQUIRE DEPOSITION SERVICES

    1020 19TH STREET, NORTHWEST

2   SUITE 620

    WASHINGTON, D.C.   20036

3                   ERRATA SHEET

    Case Name:  Yankee Atomic Electric Co., et al. V.

4       The United States

    Witness Name:  Susan Klein

5   Deposition Date:  April 24, 2002

    Job No.:  144539        4/25/02

6

| Page No. | Line No. | Change from | To |
|----------|----------|-------------|-----|
| 437 | 14 | determine | determine a |
| 439 | 12 | our called, III | ) called IA I, |
| 443 | 14 | the | a |
| 445 | 21 | as definite order | pursuant to |
| 445 | 22 | 10 CFR | ) 10 CFR Part 61 |
| 445 | 22 | approved | are approved |
| 452 | 3 | it as this is true | it, that's true |
| 484 | 15 | NRC, it is | NRC is saying it is |
| 4?5 | 12 | false | false - |
| 465 | 13 | grgh | grgh (??) |
| 465 | 13 | can't | do |
| 466 | 14 | Shore | Shoreham |
| 466 | 15 | identification | identifying |
| 469 | 3 | the line | line |
| 469 | 5 | in EEI | in the EEI |

22   Signature   _[signature]_          Date  5-24-02

**Susan Klein**

Page 274

1   ESQUIRE DEPOSITION SERVICES

   1020 19TH STREET, NORTHWEST

2   SUITE 620

   WASHINGTON, D.C.   20036

3                  ERRATA SHEET

   Case Name:  Yankee Atomic Electric Co., et al. V.

4         The United States

   Witness Name:  Susan Klein

5   Deposition Date:  April 24, 2002

   Job No.:  144539      _4/25/02_

6

| Page No. | Line No. | Change from | To |
|---|---|---|---|
| 469 | 8 | Bower | Bauer |
| 471 | 7 | Bower | Bauer. |
| 471 | 8 | OCRWM 2. " | OCRWM. " |
| 473 | 6 | at think GTU | in that Hyde |
| 477 | 10 | the EY | that EY |
| 477 | 15 | it and in | it in |
| 483 | 7 8 | WMP | YMP |
| 485 | 2 ½ | repository. On | repository on |
| 491 | 9 | Because the 1985 | Because before the 1985 act |
| 511 | 11 | was rulemaking | was the rulemaking |
| 521 | 22 | believe | believed |
| 529 | 13 | was | is |
| 530 | 15 | cue | queue |
| 530 | 16 | | |

21

22      Signature _____     Date
                                       5-29-02

# Ronald Milner

# Plaintiff

Ronald A. Miles
McLean, VA
May 1, 2002

Page 1

1        IN THE UNITED STATES COURT OF FEDERAL CLAIMS

2    - - - - - - - - - - - - - - - - - - - - -x

3    YANKEE ATOMIC ELECTRIC COMPANY              :

4    (98-126C)(Merow, S.J.)                      :

5    CONNECTICUT YANKEE ATOMIC POWER COMPANY     :

6    (98-154C)(Merow, S.J.)                      :

7    FLORIDA POWER & LIGHT COMPANY               :

8    (98-483C)(Wilson, J.)                       :

9    NORTHERN STATES POWER COMPANY               :

10   (98-484C)(Wiese,J.)                         :

11   DUKE POWER, A Division of

12   DUKE ENERGY CORP.                           :

13   (98-485C)(Sypolt,J.)                        :

14   INDIANA MICHIGAN POWER COMPANY              :

15   (98-486C)(Hodges, J.)                       :

16   SACRAMENTO MUNICIPAL UTILITY DISTRICT       :

17   (98-488C)(Yock, S.J.)                       :

18   SOUTHERN NUCLEAR OPERATING COMPANY,         :

19   et al.                                      :

20   (98-488C)(Yock, S.J.)                       :

21   COMMONWEALTH EDISON COMPANY                 :

22   (98-621C)(Hewitt, J.)                       :

23   BOSTON EDISON COMPANY                       :

24   (99-447C)(Allegra, J.)                      :

25   GPU NUCLEAR, INCORPORATED                   :

Ronald A. Milner

May 1, 2002

McLean, VA

Page 2

```
 1   (00-440C)(Bush, J.)              :
 2   WISCONSIN ELECTRIC POWER COMPANY      :
 3   (00-697C)(Merow, S.J.)           :
 4   POWER AUTHORITY OF THE STATE OF NEW YORK :
 5   (00-703C)(Damich, J.)            :
 6   OMAHA PUBLIC POWER DISTRICT          :
 7   (01-115C)(Bush, J.)              :
 8   NEBRASKA PUBLIC POWER DISTRICT       :
 9   (01-116C)(Sypolt, J.)            :
10   TENNESSEE VALLEY AUTHORITY           :
11   (01-249C)(Bruggink, J.)          :
12         Plaintiffs,               :
13   v.                   :Discovery
14   THE UNITED STATES,           :Judge:
15         Defendant.          :(Judge
16   - - - - - - - - - - - - - - - - - -xSypolt)
17             McLean, Virginia
18           Wednesday, May 1, 2002
19         Deposition of RONALD A. MILNER, a
20   witness, called for examination by counsel for
21   Plaintiffs in the above-entitled matter,
22   pursuant to notice, the witness being duly sworn
23   by CATHERINE S. BOYD, a Notary Public in and for
24   the Commonwealth of Virginia, taken at the
25   offices of Shaw Pittman, LLP, 1650 Tysons
```

Page 3

```
 1   Boulevard, McLean, Virginia  22102-4859, at 9:30
 2   a.m., Wednesday, May 1, 2002, and the
 3   proceedings being taken down by Stenotype by
 4   CATHERINE S. BOYD and transcribed under her
 5   direction.
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1   APPEARANCES:
 2
 3      On behalf of the Plaintiffs Florida Power &
 4   Light Company, Northern States Power
 5   Company, Duke Power, Indiana Michigan Power
 6   Company, Boston Edison Company, GPU
 7   Nuclear, Incorporated, Power Authority of
 8   the State of New York, Omaha Public Power
 9   District, Nebraska Public Power District:
10      ALEX D. TOMASZCZUK, ESQ.
11      DANIEL S. HERZFELD, ESQ.
12      Shaw Pittman, LLP
13      1650 Tysons Boulevard
14      McLean, Virginia 22102-4859
15      (703) (770-7901)
16
17      On behalf of Plaintiff Sacramento Municipal
18   Utility District:
19      DAVID S. NESLIN, ESQ.
20      Arnold & Porter
21      370 Seventeenth Street, Suite 4500
22      Denver, Colorado 80202-1370
23      (303) 863-2301
24
25
```

Page 5

```
 1   APPEARANCES:  (Continued)
 2      On behalf of Plaintiffs Southern Nuclear
 3   Operating Company, Alabama Power Company,
 4   Georgia Power Company:
 5      RONALD A. SCHECHTER, ESQ.
 6      Arnold & Porter
 7      555 Twelfth Street, N.W.
 8      Washington, D.C.  20004-1206
 9      (202) 942-5160
10
11      On behalf of Plaintiff Wisconsin Electric
12   Power Company:
13      DONALD J. CARNEY, ESQ.
14      Perkins Coie, LLP
15      607 Fourteenth Street, N.W.
16      Washington, D.C.  20005-2011
17      (202) 434-1675
18
19      On behalf of Plaintiff Commonwealth Edison
20   Company:
21      CHRISTOPHER P. TOMPKINS, ESQ.
22      Jenner & Block, LLC
23      One IBM Plaza
24      Chicago, Illinois  60611-7603
25      (312) 222-9350
```

2 (Pages 2 to 5)

Ronald A. Milner

May 1, 2002

McLean, VA

Page 10

1  ask you some questions about your knowledge
2  concerning issues which underlie those cases.
3      If at any time you don't understand my
4  question, let me know, and I'll try and rephrase
5  it so that we have a common understanding as to
6  my question and your answer.
7      A.  Okay.
8      Q.  Any time you want to take a break,
9  just say so, and we'll be happy to take a break.
10     I would prefer that it not be while a
11 question is pending, but after you have answered
12 the question, if you want to break, just speak
13 up, and we'll be happy to accommodate that.
14     A.  Great.
15     Q.  There is a protective order that has
16 been entered in these cases, and have you had
17 occasion to read it?
18     A.  No, I haven't.
19     Q.  Okay.  I'm going to hand you a copy
20 and ask you to take a moment and read it.  It
21 concerns certain material which has been
22 designated as confidential, and through the
23 course of the examination, I may hand you some
24 documents which fall within the scope of that
25 protective order.

Page 11

1      I would ask you to take a moment and
2  read the protective order.
3      It basically requires that you're
4  going to treat that information as confidential
5  and limited to —
6      A.  Okay.
7      Q.  These cases, and matters relating
8  thereto and for no other purpose, but take a
9  moment and read it if you will.
10     (The witness reviewed the document.)
11     BY MR. TOMASZCZUK:
12     Q.  Mr. Milner, have you read the order?
13     A.  Yes, I have.
14     Q.  And do you understand it?
15     A.  Yes.
16     Q.  You do you agree to comply with its
17 provisions?
18     A.  Yes.
19     MR. TOMASZCZUK:  All right.  Counsel,
20 any objection to proceeding on that basis?
21     MR. SHULTIS:  No.
22     BY MR. TOMASZCZUK:
23     Q.  Mr. Milner, what is your present
24 position at DOE?
25     A.  My present position is Chief Operating

Page 12

1  Officer for the Civilian Radioactive Waste
2  Program.
3      Q.  And how long have you held that
4  position?
5      A.  About two and a half years.
6      Q.  And to whom do you report?
7      A.  Lake Barrett, who is the deputy
8  director.
9      Q.  And how many people report to you as
10 the Chief Operating Officer?
11     A.  I guess approximately 150 federal
12 staff.
13     Q.  Are there contractors that report to
14 you also?
15     A.  Not directly, but there are
16 contractors in the organization.
17     Q.  Can you describe for me your duties as
18 the, what I'll refer to as the COO for OCRWM?
19     A.  Okay.  Basically it's to manage the
20 operational aspect of the program.
21     Q.  What do you mean by operational
22 aspect?
23     Can you tell me what you mean by that
24 term?
25     A.  Day-to-day operations of the program,

Page 13

1  administrative principally.
2      Q.  All right.  When you say
3  administrative, do you mean you're primarily
4  involved in personnel matters, or am I
5  misunderstanding what you mean by that term?
6      A.  Personnel matters, contractual
7  matters.
8      Q.  When you say contractual matters, what
9  do you mean by that?
10     A.  Matters relating to our support
11 service contracts, our contract with our M&O.
12     Q.  What is your educational background?
13     A.  I'm a mechanical engineer by
14 education.
15     Q.  Okay.  From what institution did you
16 obtain a degree?
17     A.  University of Mississippi.
18     Q.  And that was a Bachelor of Science
19 Degree?
20     A.  A Bachelors and a Masters.
21     Q.  What year did you obtain your
22 Bachelors Degree?
23     A.  1966.
24     Q.  And in what year did you obtain your
25 Masters Degree?

4 (Pages 10 to 13)