# Defendant

Ronald A. Milner                                                    May 1, 2002

McLean, VA

Page 1

1       IN THE UNITED STATES COURT OF FEDERAL CLAIMS

2    - - - - - - - - - - - - - - - - - - - - - -x

3    YANKEE ATOMIC ELECTRIC COMPANY                    :

4    (98-126C)(Merow, S.J.)                            :

5    CONNECTICUT YANKEE ATOMIC POWER COMPANY           :

6    (98-154C)(Merow, S.J.)                            :

7    FLORIDA POWER & LIGHT COMPANY                     :

8    (98-483C)(Wilson, J.)                             :

9    NORTHERN STATES POWER COMPANY                     :

10   (98-484C)(Wiese,J.)                               :

11   DUKE POWER, A Division of                         :

12   DUKE ENERGY CORP.                                 :

13   (98-485C)(Sypolt,J.)                              :

14   INDIANA MICHIGAN POWER COMPANY                    :

15   (98-486C)(Hodges, J.)                             :

16   SACRAMENTO MUNICIPAL UTILITY DISTRICT             :

17   (98-488C)(Yock, S.J.)                             :

18   SOUTHERN NUCLEAR OPERATING COMPANY,               :

19   et al.                                            :

20   (98-488C)(Yock, S.J.)                             :

21   COMMONWEALTH EDISON COMPANY                       :

22   (98-621C)(Hewitt, J.)                             :

23   BOSTON EDISON COMPANY                             :

24   (99-447C)(Allegra, J.)                            :

25   GPU NUCLEAR, INCORPORATED                         :

Ronald A. Milner                                                                May 1, 2002

McLean, VA

| Page 2 | Page 4 |
|---|---|

**Page 2**

1    (00-440C)(Bush, J.)                    :
2    WISCONSIN ELECTRIC POWER COMPANY        :
3    (00-697C)(Merow, S.J.)                  :
4    POWER AUTHORITY OF THE STATE OF NEW YORK :
5    (00-703C)(Damich, J.)                   :
6    OMAHA PUBLIC POWER DISTRICT             :
7    (01-115C)(Bush, J.)                     :
8    NEBRASKA PUBLIC POWER DISTRICT          :
9    (01-116C)(Sypolt, J.)                   :
10   TENNESSEE VALLEY AUTHORITY              :
11   (01-249C)(Bruggink, J.)                 :
12        Plaintiffs,         :
13   v.                       :Discovery
14   THE UNITED STATES,              :Judge:
15        Defendant.          :(Judge
16   - - - - - - - - - - - - - - - -xSypolt)
17             McLean, Virginia
18             Wednesday, May 1, 2002
19        Deposition of RONALD A. MILNER, a
20   witness, called for examination by counsel for
21   Plaintiffs in the above-entitled matter,
22   pursuant to notice, the witness being duly sworn
23   by CATHERINE S. BOYD, a Notary Public in and for
24   the Commonwealth of Virginia, taken at the
25   offices of Shaw Pittman, LLP, 1650 Tysons

**Page 4**

1    APPEARANCES:
2
3        On behalf of the Plaintiffs Florida Power &
4    Light Company, Northern States Power
5    Company, Duke Power, Indiana Michigan Power
6    Company, Boston Edison Company, GPU
7    Nuclear, Incorporated, Power Authority of
8    the State of New York, Omaha Public Power
9    District, Nebraska Public Power District:
10       ALEX D. TOMASZCZUK, ESQ.
11       DANIEL S. HERZFELD, ESQ.
12       Shaw Pittman, LLP
13       1650 Tysons Boulevard
14       McLean, Virginia  22102-4859
15       (703) (770-7901)
16
17       On behalf of Plaintiff Sacramento Municipal
18   Utility District:
19       DAVID S. NESLIN, ESQ.
20       Arnold & Porter
21       370 Seventeenth Street, Suite 4500
22       Denver, Colorado  80202-1370
23       (303) 863-2301
24
25

**Page 3**

1    Boulevard, McLean, Virginia 22102-4859, at 9:30
2    a.m., Wednesday, May 1, 2002, and the
3    proceedings being taken down by Stenotype by
4    CATHERINE S. BOYD and transcribed under her
5    direction.
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**Page 5**

1    APPEARANCES:  (Continued)
2        On behalf of Plaintiffs Southern Nuclear
3    Operating Company, Alabama Power Company,
4    Georgia Power Company:
5        RONALD A. SCHECHTER, ESQ.
6        Arnold & Porter
7        555 Twelfth Street, N.W.
8        Washington, D.C.  20004-1206
9        (202) 942-5160
10
11       On behalf of Plaintiff Wisconsin Electric
12   Power Company:
13       DONALD J. CARNEY, ESQ.
14       Perkins Coie, LLP
15       607 Fourteenth Street, N.W.
16       Washington, D.C.  20005-2011
17       (202) 434-1675
18
19       On behalf of Plaintiff Commonwealth Edison
20   Company:
21       CHRISTOPHER P. TOMPKINS, ESQ.
22       Jenner & Block, LLC
23       One IBM Plaza
24       Chicago, Illinois  60611-7603
25       (312) 222-9350

2 (Pages 2 to 5)

Ronald A. Milner                                                          May 1, 2002

McLean, VA

---

**Page 26**

1        MR. SHULTIS: Objection -- vague.
2        THE WITNESS: I don't know that I
3    could call out any particular area.
4        BY MR. TOMASZCZUK:
5        Q.  Are there aspects of the Civilian
6    Radioactive Waste Program with which you're not
7    familiar?
8        MR. SHULTIS: The same objection.
9        THE WITNESS: Probably.
10        BY MR. TOMASZCZUK:
11        Q.  Do you know what they are?
12        A.  I would be hard pressed to call it
13    out.
14        Q.  The reason I ask the question, Mr.
15    Milner, is you have been in the office of OCRWM
16    for a long time, and I'm trying to find out
17    areas where you might have particular expertise
18    and knowledge, and if there are some, it would I
19    think speed things along if you could identify
20    those for me.
21        If you can't, then I will have to
22    assume that all areas are fair game and I'll
23    proceed accordingly.
24        Are there any areas that you feel you
25    have particular expertise or knowledge in?

---

**Page 27**

1        A.  No, I wouldn't say so.
2        Q.  In preparation for your deposition
3    here today, did you review any documents?
4        A.  No, I did not.
5        Q.  Did you speak with anyone concerning
6    your deposition?
7        A.  Very briefly with the two Justice
8    Department attorneys.
9        Q.  Other than counsel for the Department
10    of Justice, did you speak with anyone concerning
11    your deposition?
12        A.  No, not concerning the deposition.
13        Q.  Did you speak with anyone at OCRWM
14    concerning their deposition?
15        A.  No.
16        Q.  Did you speak with anyone at OCRWM
17    concerning any topics or issues on which you
18    thought I might ask you about?
19        A.  No.
20        MR. SHULTIS: Objection — asked and
21    answered.
22        BY MR. TOMASZCZUK:
23        Q.  Are you familiar with the standard
24    contract for disposal that's at issue in these
25    cases, for disposal of spent nuclear fuel and

---

**Page 28**

1    high-level radioactive waste?
2        A.  Yes.
3        Q.  Did you have any role to play in the
4    drafting of this, what I'll refer to as the
5    standard contract?
6        A.  No, I did not.
7        Q.  It had already been executed at the
8    time you became an OCRWM employee?
9        A.  Correct.
10        Q.  At the time you became an OCRWM
11    employee, did you have occasion to read the
12    contract?
13        A.  Yes.
14        Q.  At the time that you became an OCRWM
15    employee, did you read any other documents?
16        A.  I'm not sure I understand that
17    question.
18        Q.  Okay.  I understood you became a
19    branch chief at OCRWM in, in or about 1984?
20        A.  Um-hm.
21        Q.  Right.  And you have testified you
22    have read the standard contract?
23        A.  Um-hm.
24        Q.  At or about that time, correct?
25        A.  Um-hm.

---

**Page 29**

1        Q.  Did you read any other documents
2    relating to OCRWM or its programs at that time?
3        A.  Relating to OCRWM, yes.
4        Q.  Okay.  And what were they?
5        A.  The most recent total system life
6    cycle cost report, final draft of the Mission
7    Plan, most recent fee adequacy analysis report.
8        Q.  Why did you read those documents?
9        A.  Those are items under my
10    responsibility.
11        Q.  Do I understand it correctly that at
12    the time you became the branch chief, a total
13    systems life cycle cost report had already been
14    prepared?
15        A.  Yes.
16        Q.  All right.  I'm going to refer to that
17    as a TSLCC report.
18        A.  Much easier.
19        Q.  Right — certainly easier to say.  And
20    what was the -- you said, I believe you have
21    testified that you had read the final draft of
22    the Mission Plan.
23        Had a final Mission Plan been prepared
24    at the time you became the branch chief?
25        A.  No, it had not.

---

Alderson Reporting Company, Inc.
1111 14th Street, N.W. Suite 400  1-800-FOR-DEPO Washington, DC 20005

# Plaintiff

Page 70

1    Q.  Do you recall seeing this Table 2-1
2  before today?
3    A.  I don't recall it, no.
4    Q.  It shows under the column first
5  repository acceptance, a spent nuclear fuel
6  acceptance rate starting in 1998 of 1800 metric
7  tons?
8    A.  Correct.
9    Q.  And maintaining at that 1800 metric
10  ton rate for five years, correct?
11    A.  Correct.
12    Q.  And then ramping up to 3,000 metric
13  tons?
14    A.  Correct.
15    Q.  And then continuing at a steady-state
16  rate of 3,000 metric tons for roughly 20 years I
17  think?
18    A.  Correct.
19    Q.  And does that column accurately
20  reflect DOE's intentions at this time with
21  respect to spent nuclear fuel acceptance rate
22  commencing in 1998?
23    MR. SHULTIS:  Objection.  Calls for a
24  legal conclusion.
25    Also Mr. Milner is not a 30(b)(6)

Page 71

1  witness.
2    MR. TOMASZCZUK:  I don't want my
3  silence to be construed as acquiescence in the
4  notion that I can't ask him these questions
5  because he is not a 30(b)(6) witness.
6    I don't know what --
7    MR. SHULTIS:  You're asking about
8  DOE's intention or position.
9    Mr. Milner has not been designated as
10  a witness who is qualified to speak to DOE's
11  position.
12    MR. TOMASZCZUK:  Oh, I understand that
13  Mr. Milner has been at OCRWM for 18 years and is
14  the Chief Operating Officer, and if he is not
15  qualified to answer these questions, I don't
16  know who would be, but in any event, your
17  objection is noted for the record.
18    MR. SHULTIS:  The people we designated
19  for those responses is qualified, but you can
20  answer.
21    THE WITNESS:  At the point this draft
22  was prepared, December of 1983, I was not with
23  the program.
24    I don't know what the department's
25  intent was.

Page 72

1    BY MR. TOMASZCZUK:
2    Q.  Did you have any understanding about
3  the data reflected on this table at or about the
4  time you read it?
5    MR. SHULTIS:  Same objections.
6    THE WITNESS:  I don't understand the
7  question.
8    BY MR. TOMASZCZUK:
9    Q.  Did you have any understanding as to
10  what information was being conveyed by the data
11  on this table at or about the time you became an
12  OCRWM employee and looked at this document?
13    MR. SHULTIS:  The same objections --
14  asked and answered.
15    The document speaks for itself.
16    THE WITNESS:  I don't recall seeing
17  this specific table.
18    I can look at it now and see what's on
19  it.
20    BY MR. TOMASZCZUK:
21    Q.  Okay.  This table goes on to, under
22  the column remaining backlog MTU, do you see
23  that?
24    A.  Yes.
25    Q.  In the right-hand side?  It shows a

Page 73

1  pre-1998 backlog of 40,809 metric tons?
2    A.  Yes.
3    Q.  Correct?  And that number basically
4  decreases over time, and the table shows a
5  backlog as of 2020 of 23,775 metric tons, right?
6    A.  Correct.
7    Q.  Showing that the backlog is being
8  reduced over time?
9    A.  Correct.
10    Q.  And was that a fair statement of DOE's
11  intentions at or about this time, to work off
12  the backlog of spent nuclear fuel that utilities
13  were storing?
14    MR. SHULTIS:  Objection.  Calls for a
15  legal conclusion, and Mr. Milner is not a
16  30(b)(6) witness.
17    THE WITNESS:  Well, at this specific
18  point in time, I don't know what the
19  department's intent was.
20    At the point I joined the program, my
21  understanding of the intent was to work off the
22  backlog.
23    (There was a pause in the
24  proceedings.)
25    MR. TOMASZCZUK:  Mr. Milner, I'm going

Alderson Reporting Company, Inc.
1111 14th Street, N.W. Suite 400  1-800-FOR-DEPO Washington, DC 20005

# Plaintiff

Ronald R. Milner

McLean, VA

May 2, 2002

Page 197

```
 1      IN THE UNITED STATES COURT OF FEDERAL CLAIMS

 2   - - - - - - - - - - - - - - - - - - - - -x

 3   YANKEE ATOMIC ELECTRIC COMPANY            :

 4   (98-126C)(Merow, S.J.)                    :

 5   CONNECTICUT YANKEE ATOMIC POWER COMPANY   :

 6   (98-154C)(Merow, S.J.)                    :

 7   FLORIDA POWER & LIGHT COMPANY             :

 8   (98-483C)(Wilson, J.)                     :

 9   NORTHERN STATES POWER COMPANY             :

10   (98-484C)(Wiese,J.)                       :

11   DUKE POWER, A Division of                 :

12   DUKE ENERGY CORP.                         :

13   (98-485C)(Sypolt,J.)                      :

14   INDIANA MICHIGAN POWER COMPANY            :

15   (98-486C)(Hodges, J.)                     :

16   SACRAMENTO MUNICIPAL UTILITY DISTRICT     :

17   (98-488C)(Yock, S.J.)                     :

18   SOUTHERN NUCLEAR OPERATING COMPANY,       :

19   et al.                                    :

20   (98-488C)(Yock, S.J.)                     :

21   COMMONWEALTH EDISON COMPANY               :

22   (98-621C)(Hewitt, J.)                     :

23   BOSTON EDISON COMPANY                     :

24   (99-447C)(Allegra, J.)                    :

25   GPU NUCLEAR, INCORPORATED                 :
```

**Page 198**

1  (00-440C)(Bush, J.)                    :
2  WISCONSIN ELECTRIC POWER COMPANY        :
3  (00-697C)(Merow, S.J.)                  :
4  POWER AUTHORITY OF THE STATE OF NEW YORK :
5  (00-703C)(Damich, J.)                   :
6  OMAHA PUBLIC POWER DISTRICT             :
7  (01-115C)(Bush, J.)                     :
8  NEBRASKA PUBLIC POWER DISTRICT          :
9  (01-116C)(Sypolt, J.)                   :
10 TENNESSEE VALLEY AUTHORITY              :
11 (01-249C)(Bruggink, J.)                 :
12         Plaintiffs,                     :
13 v.                          :Discovery
14 THE UNITED STATES,          :Judge:
15     Defendant.              :(Judge
16 - - - - - - - - - - - - - - - -xSypolt)
17          McLean, Virginia
18       Thursday, May 2, 2002
19    Continued deposition of RONALD A.
20 MILNER, a witness, recalled for examination by
21 counsel for Plaintiffs in the above-entitled
22 matter, pursuant to notice, the witness being
23 duly sworn by CATHERINE S. BOYD, a Notary Public
24 in and for the Commonwealth of Virginia, taken
25 at the offices of Shaw Pittman, LLP, 1650 Tysons

**Page 199**

1  Boulevard, McLean, Virginia  22102-4859, at 9:51
2  a.m., Thursday, May 2, 2002, and the proceedings
3  being taken down by Stenotype by CATHERINE S.
4  BOYD and transcribed under her direction.

**Page 200**

1  APPEARANCES:
2
3      On behalf of the Plaintiffs Florida Power &
4  Light Company, Northern States Power
5  Company, Duke Power, Indiana Michigan Power
6  Company, Boston Edison Company, GPU
7  Nuclear, Incorporated, Power Authority of
8  the State of New York, Omaha Public Power
9  District, Nebraska Public Power District:
10     ALEX D. TOMASZCZUK, ESQ.
11     DANIEL S. HERZFELD, ESQ.
12  Shaw Pittman, LLP
13  1650 Tysons Boulevard
14  McLean, Virginia  22102-4859
15  (703) (770-7901)
16
17  On behalf of Plaintiff Sacramento Municipal
18  Utility District:
19     DAVID S. NESLIN, ESQ.
20  Arnold & Porter
21  370 Seventeenth Street, Suite 4500
22  Denver, Colorado  80202-1370
23  (303) 863-2301
24
25

**Page 201**

1  APPEARANCES:  (Continued)
2  On behalf of Plaintiffs Southern Nuclear
3  Operating Company, Alabama Power Company,
4  Georgia Power Company:
5     RONALD A. SCHECHTER, ESQ.
6  Arnold & Porter
7  555 Twelfth Street, N.W.
8  Washington, D.C.  20004-1206
9  (202) 942-5160
10
11  On behalf of Plaintiff Wisconsin Electric
12  Power Company:
13     SUZETTE W. DERREVERE, ESQ.
14  Perkins Coie, LLP
15  607 Fourteenth Street, N.W.
16  Washington, D.C.  20005-2011
17  (202) 434-1609
18
19  On behalf of Plaintiff Commonwealth Edison
20  Company:
21     CHRISTOPHER P. TOMPKINS, ESQ.
22  Jenner & Block, LLC
23  One IBM Plaza
24  Chicago, Illinois  60611-7603
25  (312) 222-9350

2 (Pages 198 to 201)

Page 214

1  published by OCRWM which would have stated or
2  suggested different repository receipt rates?
3      A.  At that point in time, not that I can
4  recall.
5      Q.  Is it fair to assume that if there
6  were such accounts, you would have known about
7  them?
8      A.  Yes.  I think that would be true.
9      MR. TOMASZCZUK:  Ms. Reporter, could
10 you mark as Milner 24 the Volume 1 of the TSLCC
11 analysis dated April 1986?
12         (Milner Exhibit No. 24
13             was marked for
14             identification.)
15 BY MR. TOMASZCZUK:
16     Q.  Mr. Milner, are you familiar with this
17 exhibit Milner No. 24?
18     A.  I believe I would have been, yes.
19     Q.  And did you have a role in the
20 preparation of this document?
21     A.  Likely I would have.
22     Q.  And can you state for me what that
23 role would have been?
24     A.  Again, it would have been a review and
25 approval.

Page 215

1      Q.  You would have reviewed it, edited
2  drafts, and approved the final version?
3      A.  Correct.
4      Q.  I have to say with the benefit of
5  hindsight sitting here sixteen years later that
6  these reports suggest to me that they were
7  prepared with a great deal of thought and care.
8          Is that a sort of a fair
9  characterization do you think?
10     A.  We certainly attempted to do that at
11 that time.
12     Q.  And they also reflect in my layman's
13 view a substantial amount of detail about the
14 costs and anticipated costs of the system?
15     A.  Correct.
16     Q.  Can I direct your attention to page
17 14.
18         And this table at page 14, Table 2-2,
19 identifies key assumptions for the TSLCC
20 analysis, right?
21     A.  Correct.
22     Q.  And directing your attention to the
23 repository design receipt rate there in the
24 middle of the page?
25     A.  Um-hm.  Yes.

Page 216

1      Q.  This would appear to indicate to me
2  that the repository design receipt rate that DOE
3  intended at the time was 3,000 metric tons per
4  year of spent fuel and 400 metric tons
5  equivalent per year of defense high-level waste?
6      A.  That's correct.  It does indicate that
7  it would begin, Phase 1 facility of the
8  repository would begin at a rate of 400, but
9  steady state to 3,000.
10     Q.  And does the text here accurately
11 reflect DOE's intentions at the time with
12 respect to repository design receipt rate?
13     MR. SHULTIS:  Objection.  Calls for a
14 legal conclusion.
15     Mr. Milner is not a 30(b)(6) witness.
16     THE WITNESS:  Again, judging that it
17 was, by the fact that it was listed as an
18 assumption, that would have been the program's
19 goal at that time.
20 BY MR. TOMASZCZUK:
21     Q.  Are you aware of any other documents
22 published in or about April of 1986 when this
23 report was issued that would indicate a
24 different intention by DOE with respect to
25 repository design receipt rates?

Page 217

1      MR. SHULTIS:  Objection.  Calls for a
2  legal conclusion.
3      Mr. Milner is not a 30(b)(6) witness.
4      THE WITNESS:  At this point in time, I
5  don't recall any I was aware of at that point in
6  time.
7  BY MR. TOMASZCZUK:
8      Q.  Isn't it true, Mr. Milner, that the
9  DOE's intentions with respect to repository
10 design receipt rates have stayed constant over
11 the years at 3,000 metric tons?
12     MR. SHULTIS:  Objection.  Calls for a
13 legal conclusion.
14     Mr. Milner is not a 30(b)(6) witness.
15     THE WITNESS:  It indicates that the
16 steady-state rate stayed at 3,000, yes.
17 BY MR. TOMASZCZUK:
18     Q.  And that hasn't changed the same in 16
19 years, has it?
20     MR. SHULTIS:  The same objection.
21     THE WITNESS:  Would appear not to
22 have.
23     MR. TOMASZCZUK:  Give me just one
24 second.
25     THE WITNESS:  Sure.

6 (Pages 214 to 217)

# Defendant

Ronald A. Milner

McLean, VA

May 2, 2002

Page 197

1      IN THE UNITED STATES COURT OF FEDERAL CLAIMS

2    - - - - - - - - - - - - - - - - - - - - - - -x

3    YANKEE ATOMIC ELECTRIC COMPANY                    :

4    (98-126C)(Merow, S.J.)                            :

5    CONNECTICUT YANKEE ATOMIC POWER COMPANY           :

6    (98-154C)(Merow, S.J.)                            :

7    FLORIDA POWER & LIGHT COMPANY                     :

8    (98-483C)(Wilson, J.)                             :

9    NORTHERN STATES POWER COMPANY                     :

10   (98-484C)(Wiese,J.)                               :

11   DUKE POWER, A Division of                         :

12   DUKE ENERGY CORP.                                 :

13   (98-485C)(Sypolt,J.)                              :

14   INDIANA MICHIGAN POWER COMPANY                    :

15   (98-486C)(Hodges, J.)                             :

16   SACRAMENTO MUNICIPAL UTILITY DISTRICT             :

17   (98-488C)(Yock, S.J.)                             :

18   SOUTHERN NUCLEAR OPERATING COMPANY,               :

19   et al.                                            :

20   (98-488C)(Yock, S.J.)                             :

21   COMMONWEALTH EDISON COMPANY                       :

22   (98-621C)(Hewitt, J.)                             :

23   BOSTON EDISON COMPANY                             :

24   (99-447C)(Allegra, J.)                            :

25   GPU NUCLEAR, INCORPORATED                         :

Ronald A. Milner                                                      May 2, 2002
                              McLean, VA

---

Page 198

```
 1   (00-440C)(Bush, J.)                :
 2   WISCONSIN ELECTRIC POWER COMPANY    :
 3   (00-697C)(Merow, S.J.)              :
 4   POWER AUTHORITY OF THE STATE OF NEW YORK :
 5   (00-703C)(Damich, J.)               :
 6   OMAHA PUBLIC POWER DISTRICT         :
 7   (01-115C)(Bush, J.)                 :
 8   NEBRASKA PUBLIC POWER DISTRICT      :
 9   (01-116C)(Sypolt, J.)               :
10   TENNESSEE VALLEY AUTHORITY          :
11   (01-249C)(Bruggink, J.)             :
12        Plaintiffs,                    :
13   v.                         :Discovery
14   THE UNITED STATES,                :Judge:
15        Defendant.            :(Judge
16   - - - - - - - - - - - - - - -xSypolt)
17            McLean, Virginia
18            Thursday, May 2, 2002
19        Continued deposition of RONALD A.
20   MILNER, a witness, recalled for examination by
21   counsel for Plaintiffs in the above-entitled
22   matter, pursuant to notice, the witness being
23   duly sworn by CATHERINE S. BOYD, a Notary Public
24   in and for the Commonwealth of Virginia, taken
25   at the offices of Shaw Pittman, LLP, 1650 Tysons
```

Page 199

```
 1   Boulevard, McLean, Virginia  22102-4859, at 9:51
 2   a.m., Thursday, May 2, 2002, and the proceedings
 3   being taken down by Stenotype by CATHERINE S.
 4   BOYD and transcribed under her direction.
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 200

```
 1   APPEARANCES:
 2
 3      On behalf of the Plaintiffs Florida Power &
 4   Light Company, Northern States Power
 5   Company, Duke Power, Indiana Michigan Power
 6   Company, Boston Edison Company, GPU
 7   Nuclear, Incorporated, Power Authority of
 8   the State of New York, Omaha Public Power
 9   District, Nebraska Public Power District:
10      ALEX D. TOMASZCZUK, ESQ.
11      DANIEL S. HERZFELD, ESQ.
12      Shaw Pittman, LLP
13      1650 Tysons Boulevard
14      McLean, Virginia  22102-4859
15      (703) (770-7901)
16
17   On behalf of Plaintiff Sacramento Municipal
18   Utility District:
19      DAVID S. NESLIN, ESQ.
20      Arnold & Porter
21      370 Seventeenth Street, Suite 4500
22      Denver, Colorado  80202-1370
23      (303) 863-2301
24
25
```

Page 201

```
 1   APPEARANCES:  (Continued)
 2      On behalf of Plaintiffs Southern Nuclear
 3   Operating Company, Alabama Power Company,
 4   Georgia Power Company:
 5      RONALD A. SCHECHTER, ESQ.
 6      Arnold & Porter
 7      555 Twelfth Street, N.W.
 8      Washington, D.C.  20004-1206
 9      (202) 942-5160
10
11   On behalf of Plaintiff Wisconsin Electric
12   Power Company:
13      SUZETTE W. DERREVERE, ESQ.
14      Perkins Coie, LLP
15      607 Fourteenth Street, N.W.
16      Washington, D.C.  20005-2011
17      (202) 434-1609
18
19   On behalf of Plaintiff Commonwealth Edison
20   Company:
21      CHRISTOPHER P. TOMPKINS, ESQ.
22      Jenner & Block, LLC
23      One IBM Plaza
24      Chicago, Illinois  60611-7603
25      (312) 222-9350
```

2 (Pages 198 to 201)

Ronald A. Milner

McLean, VA

May 2, 2002

**Page 390**

1   Shelor's office that prepared it?
2       A.  I believe so.
3       Q.  Now at some point in time, you came
4   back to that office, that is, the Office of
5   Waste Acceptance, Storage and Transportation, is
6   that right?
7       A.  That's correct.
8       Q.  But that would have been after this
9   APR/ACR was published?
10      A.  I believe it was.
11      Q.  Notwithstanding the fact that your
12  office didn't publish this, did you have
13  occasion to review this and sign off on it
14  before it was published?
15      A.  I don't recall specifically, but it's
16  likely that I would have concurred in it.
17      Q.  Can I ask you to look at page 1 of the
18  document?  And the second paragraph is what I'm
19  going to ask you a few questions about.
20          There is a reference to the APR and
21  the ACR?
22      A.  Um-hm.
23      Q.  And then there is a sentence in the
24  middle of the paragraph which states the ACR
25  applies projected nominal acceptance rates for

**Page 391**

1   the system to the priority ranking and the APR,
2   resulting in individual allocations for the
3   owners and generators expressed in metric tons
4   of uranium.
5           Do you have an understanding of what
6   is meant by the phrase nominal acceptance rates
7   in that sentence.
8       A.  No.  I don't know.
9       Q.  Did you have any discussions with any
10  OCRWM employees concerning what was meant by
11  that phrase nominal acceptance rates?
12      A.  Not that I recall.
13      Q.  The last sentence of this paragraph
14  states as specified in the standard contract,
15  the ACR is for planning purposes only and thus
16  is not contractually binding on either DOE or
17  the purchasers, right?
18          That's what it says?
19      A.  That's correct.
20      Q.  Did I understand your testimony
21  earlier, Mr. Milner, to be that the DCSs
22  represented a binding commitment of the parties?
23      A.  That was my opinion, yes.
24      Q.  And the DCSs as indicated by this
25  paragraph, are based on the capacity allocations

**Page 392**

1   as listed in the ACR, right?
2       A.  Correct.
3       Q.  Can you explain to me how it is that
4   if the ACRs which form the basis for the DCSs
5   are not binding, that the DCSs are binding?
6           MR. SHULTIS:  Objection.  Calls for a
7   legal opinion.
8           THE WITNESS:  The DCSs were submitted
9   by the utilities to the department based upon
10  the information in the ACR, the allocations.
11          Then the department would either
12  approve or disapprove those, and if approved,
13  then in my opinion, that became a binding
14  agreement.
15          A utility could certainly choose to
16  submit a DCS which reflected lower amounts than
17  were contained in the ACR.
18  BY MR. TOMASZCZUK:
19      Q.  Is there any reason of which you're
20  aware why a utility would do that?
21      A.  None that I know of.
22      Q.  Wouldn't it be in the utility's
23  interest to try and put as much fuel as they
24  could in the DCS to get that fuel moved off
25  site?

**Page 393**

1       MR. SHULTIS:  Calls for speculation.
2       THE WITNESS:  If I were a utility fuel
3   manager, I would have.
4   BY MR. TOMASZCZUK:
5       Q.  Can I ask you to look back at the DCS
6   instructions?
7           We looked at those this afternoon —
8   43.
9           And in particular, I was going to ask
10  you to look at, Mr. Milner, paragraph 7C.
11          (The witness reviewed the document.)
12  BY MR. TOMASZCZUK:
13      Q.  And this paragraph reflects in the
14  first sentence that the rates in the ACR provide
15  an approximation and are for planning purposes,
16  right?
17      A.  Correct.
18      Q.  And then the next sentence, there is
19  an assumption stated that the waste management
20  system will begin acceptance of spent nuclear
21  fuel in 1998, correct?
22      A.  Correct.
23      Q.  And then there is this third sentence
24  in the event that such circumstances change, all
25  DCSs previously approved by DOE may need to be

Alderson Reporting Company, Inc.
1111 14th Street, N.W. Suite 400  1-800-FOR-DEPO Washington, DC 20005

# Defendant

Ronald Milner                                                                    May 3, 2002
                            McLean, VA

Page 403

```
 1          IN THE UNITED STATES COURT OF FEDERAL CLAIMS
 2  - - - - - - - - - - - - - - - - - - - X
 3  YANKEE ATOMIC ELECTRIC COMPANY,          :
    (98-126C)                                 :
 4  CONNECTICUT YANKEE ATOMIC POWER COMPANY   :
    (98-154C)                                 :
 5  MAINE YANKEE ATOMIC POWER COMPANY         :
    (98-474C)                                 :
 6  FLORIDA POWER & LIGHT COMPANY             :
    (98-483C)                                 :
 7  NORTHERN STATES POWER COMPANY             :
    (98-484C)                                 :
 8  DUKE POWER, A Division of DUKE            :
    ENERGY CORP. (98-485C)                    :
 9  INDIANA MICHIGAN POWER COMPANY            :
    (98-486C)                                 :
10  SACRAMENTO MUNICIPAL UTILITY DISTRICT     :
    (98-488C)                                 :
11  SOUTHERN NUCLEAR OPERATING COMPANY,       :
    et al., (98-614C)                         :
12  COMMONWEALTH EDISON COMPANY               :
    (98-621C)                                 :
13  BOSTON EDISON COMPANY                     :
    (99-447C)                                 :
14  GPU NUCLEAR, INCORPORATED                 :
    (00-440C)                                 :
15  WISCONSIN ELECTRIC POWER COMPANY,         :
    (00-697C)                                 :
16  POWER AUTHORITY OF THE STATE OF           :
    NEW YORK (00-703C)                        :
17  OMAHA PUBLIC POWER DISTRICT               :
    (01-115C)                                 :
18  NEBRASKA PUBLIC POWER DISTRICT            :
    (01-116C)                                 :
19  TENNESSEE VALLEY AUTHORITY                :
    (01-249C)                                 :
20              Plaintiffs,                   :
         v.                                   :
21  UNITED STATES OF AMERICA,                 :
                Defendant.                    :
22  - - - - - - - - - - - - - - - - - - - X
                        Washington, D.C.
23                      Friday, May 3, 2002
24          Continued Deposition of RONALD MILNER, a
25  witness herein, called for examination by counsel for
```

Ronald Milner

May 3, 2002

McLean, VA

**Page 404**

1  Plaintiffs in the above-entitled matter, pursuant to
2  notice, the witness being previously duly sworn by
3  CATHERINE S. BOYD, Notary Public in and for the
4  Commonwealth of Virginia, taken at the offices of
5  Shaw Pittman, 1650 Tysons Boulevard, McLean,
6  Virginia, at 9:15 a.m., Friday, May 3, 2002, and the
7  proceedings being taken down by Stenotype by CYNTHIA
8  R. SIMMONS, RMR, CRR, and transcribed under her
9  direction.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**Page 406**

1  APPEARANCES (Continued):
2
3  On behalf of the Plaintiff Wisconsin Electric
4  Power Company:
5  DONALD J. CARNEY, ESQ.
6  Perkins Coie LLP
7  607 Fourteenth Street, N.W.
8  Washington, D. C. 20005-2011
9  (202) 434-1690
10
11  On behalf of the Plaintiff Southern Nuclear
12  Power:
13  RONALD A. SCHECHTER, ESQ.
14  Arnold & Porter
15  555 Twelfth Street, N.W.
16  Washington, D.C. 20004-1206
17  (202) 942-5160
18
19  On behalf of the Plaintiff Sacramento Municipal
20  Utility District:
21  DAVID S. NESLIN, ESQ.
22  Arnold & Porter
23  370 Seventeenth Street, Suite 4500
24  Denver, Colorado 80202-1370
25  (303) 863-2301

**Page 405**

1  APPEARANCES:
2  On behalf of the Plaintiffs Florida
3  Power & Light Company, Northern States
4  Power Company, Duke Power, Indiana Michigan
5  Power Company, Boston Edison Company, GPU
6  Nuclear, Inc., Power Authority of the State
7  of New York, Omaha Public Power District, and
8  Nebraska Public Power District:
9  ALEX D. TOMASZCZUK, ESQ.
10  DANIEL S. HERZFELD, ESQ.
11  Shaw Pittman LLP
12  1650 Tysons Boulevard
13  McLean, Virginia 22102-4859
14  (703) 770-7940
15
16  On behalf of the Plaintiffs Yankee Atomic, Maine
17  Yankee and Connecticut Yankee:
18  PETER SKALABAN, JR., ESQ.
19  Spriggs & Hollingsworth
20  1350 I Street, N.W.
21  Ninth Floor
22  Washington, D. C. 20005-3305
23  (202) 898-5821
24
25

**Page 407**

1  APPEARANCES (Continued):
2
3  On behalf of the Plaintiff Commonwealth
4  Edison Company:
5  CHRISTOPHER P. TOMPKINS, ESQ.
6  Jenner & Block, LLP
7  One IBM Plaza
8  Chicago, Illinois 60611-7603
9  (312) 222-9350
10
11  On behalf of the Defendant:
12  RUSSELL A. SHULTIS, ESQ.
13  HEIDE L. HERRMANN, ESQ.
14  United States Department of Justice
15  Civil Division
16  1100 L Street, N.W.
17  Washington, D. C. 20530
18  (202) 305-7561
19
20
21
22
23
24
25

2 (Pages 404 to 407)

Ronald Milner
McLean, VA
May 3, 2002

Page 416

1    Q.    Again, any questions at all, please let me
2    know.  If you don't understand my question, please
3    let me know.  Is that fair?
4    A.    That's fair.
5    Q.    And if you disagree with any assumption in
6    my question, please advise me.
7    A.    Okay.
8    Q.    If I could ask you to turn to Exhibit 3 to
9    your deposition, that's the standard contract.  Do
10   you have it in front of you now?
11   A.    I do.
12   Q.    If I could ask you to turn to page 16593.
13   If you'd look in the first column, the first full
14   paragraph that begins, Article VI.B.3(b), do you see
15   that?
16   A.    I do.
17   Q.    Could you read that paragraph?
18   A.    Article VI.B --
19   Q.    You don't need to read it out loud.  You
20   can just read it to yourself.
21   A.    Okay.
22   Q.    Are you familiar with this language?
23   A.    Vaguely, yes.
24   Q.    Do you think you've reviewed it in the
25   past?

Page 417

1    A.    Not this specific language.  I have
2    reviewed it after the contract was final, after the
3    registered notice was final.
4    Q.    You're familiar with the concept of the
5    Department having the right to grant priority to shut
6    down reactors?
7          MR. SHULTIS:  Objection as to
8    characterization.
9          THE WITNESS:  I'm familiar with that, yes.
10         BY MR. NESLIN:
11   Q.    It states here that, in the second
12   sentence, this type of priority is necessary to
13   prevent reactors from waiting 20 or 30 years to be
14   commissioned -- decommissioned after they've finished
15   generating electricity.  Do you understand that DOE
16   had a goal of avoiding reactors from experiencing
17   such delays?
18         MR. SHULTIS:  Objection, Mr. Milner is not
19   a 30(b)(6) witness.
20         THE WITNESS:  My recollection was that the
21   Department preferred not to prohibit giving priority
22   to shutdown reactors.
23         BY MR. NESLIN:
24   Q.    Well, this paragraph states that certain
25   commenters had recommended that a provision allowing

Page 418

1    for such priority be deleted, that the Department had
2    not accepted that recommendation because again it
3    states that this type of priority is necessary to
4    prevent reactors from waiting 20 or 30 years to be
5    decommissioned after they finish generating
6    electricity.
7          And, again, my question is, was avoiding
8    that kind of delay a goal or objective of the
9    Department?
10         MR. SHULTIS:  Objection, same objection.
11         THE WITNESS:  No, and again, my
12   recollection of the situation is that the Department
13   preferred not to preclude the ability to give some
14   priority to shutdown reactors.  But of course we are
15   reading from the preamble to the rule and discussing
16   how comments were addressed.
17         BY MR. NESLIN:
18   Q.    That's correct.  Did the Department have
19   any interest in the timely decommissioning of
20   shutdown reactors?
21   A.    It did.
22         MR. SHULTIS:  Same objection.
23         BY MR. NESLIN:
24   Q.    That was an interest of the Department's?
25   A.    It was an interest, yes.

Page 419

1    Q.    The Department, would it be fair to say
2    that the Department had an objective of allowing
3    shutdown reactors to decommission in a timely manner?
4          MR. SHULTIS:  Same objection.
5          THE WITNESS:  Well, again, I think it was
6    more a case that the Department preferred not to
7    preclude that ability.
8          BY MR. NESLIN:
9    Q.    What do you mean by not preclude that
10   ability?
11   A.    The Department did not as I recall have an
12   objective to give priority to shutdown reactors, it
13   simply preferred not to preclude that ability in the
14   future.
15   Q.    My question isn't about asking granting
16   priority, my question is simply did the Department
17   have an objective of allowing shutdown reactors to
18   decommission in a timely manner?
19         MR. SHULTIS:  Same objection.
20         THE WITNESS:  It did, yes.
21         BY MR. NESLIN:
22   Q.    And would that remain an objective of the
23   Department's today?
24   A.    I believe so.
25   Q.    If we could turn to page 16606, do you see

5 (Pages 416 to 419)

# Plaintiff

Page 403

```
 1          IN THE UNITED STATES COURT OF FEDERAL CLAIMS
 2    - - - - - - - - - - - - - - - - - - - - - - X
 3    YANKEE ATOMIC ELECTRIC COMPANY,              :
      (98-126C)                                    :
 4    CONNECTICUT YANKEE ATOMIC POWER COMPANY      :
      (98-154C)                                    :
 5    MAINE YANKEE ATOMIC POWER COMPANY            :
      (98-474C)                                    :
 6    FLORIDA POWER & LIGHT COMPANY                :
      (98-483C)                                    :
 7    NORTHERN STATES POWER COMPANY                :
      (98-484C)                                    :
 8    DUKE POWER, A Division of DUKE               :
      ENERGY CORP. (98-485C)                       :
 9    INDIANA MICHIGAN POWER COMPANY               :
      (98-486C)                                    :
10    SACRAMENTO MUNICIPAL UTILITY DISTRICT        :
      (98-488C)                                    :
11    SOUTHERN NUCLEAR OPERATING COMPANY,          :
      et al., (98-614C)                            :
12    COMMONWEALTH EDISON COMPANY                  :
      (98-621C)                                    :
13    BOSTON EDISON COMPANY                        :
      (99-447C)                                    :
14    GPU NUCLEAR, INCORPORATED                    :
      (00-440C)                                    :
15    WISCONSIN ELECTRIC POWER COMPANY,            :
      (00-697C)                                    :
16    POWER AUTHORITY OF THE STATE OF              :
      NEW YORK (00-703C)                           :
17    OMAHA PUBLIC POWER DISTRICT                  :
      (01-115C)                                    :
18    NEBRASKA PUBLIC POWER DISTRICT               :
      (01-116C)                                    :
19    TENNESSEE VALLEY AUTHORITY                   :
      (01-249C)                                    :
20              Plaintiffs,                        :
           v.                                      :
21    UNITED STATES OF AMERICA,                    :
              Defendant.                           :
22    - - - - - - - - - - - - - - - - - - - - - - X
                           Washington, D.C.
23                     Friday, May 3, 2002
24         Continued Deposition of RONALD MILNER, a
25    witness herein, called for examination by counsel for
```

Ronald Milner

May 3, 2002

McLean, VA

Page 404

1  Plaintiffs in the above-entitled matter, pursuant to
2  notice, the witness being previously duly sworn by
3  CATHERINE S. BOYD, Notary Public in and for the
4  Commonwealth of Virginia, taken at the offices of
5  Shaw Pittman, 1650 Tysons Boulevard, McLean,
6  Virginia, at 9:15 a.m., Friday, May 3, 2002, and the
7  proceedings being taken down by Stenotype by CYNTHIA
8  R. SIMMONS, RMR, CRR, and transcribed under her
9  direction.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 406

1  APPEARANCES (Continued):
2
3      On behalf of the Plaintiff Wisconsin Electric
4  Power Company:
5          DONALD J. CARNEY, ESQ.
6          Perkins Coie LLP
7          607 Fourteenth Street, N.W.
8          Washington, D. C. 20005-2011
9          (202) 434-1690
10
11      On behalf of the Plaintiff Southern Nuclear
12  Power:
13          RONALD A. SCHECHTER, ESQ.
14          Arnold & Porter
15          555 Twelfth Street, N.W.
16          Washington, D.C. 20004-1206
17          (202) 942-5160
18
19      On behalf of the Plaintiff Sacramento Municipal
20  Utility District:
21          DAVID S. NESLIN, ESQ.
22          Arnold & Porter
23          370 Seventeenth Street, Suite 4500
24          Denver, Colorado 80202-1370
25          (303) 863-2301

Page 405

1  APPEARANCES:
2      On behalf of the Plaintiffs Florida
3  Power & Light Company, Northern States
4  Power Company, Duke Power, Indiana Michigan
5  Power Company, Boston Edison Company, GPU
6  Nuclear, Inc., Power Authority of the State
7  of New York, Omaha Public Power District, and
8  Nebraska Public Power District:
9          ALEX D. TOMASZCZUK, ESQ.
10          DANIEL S. HERZFELD, ESQ.
11          Shaw Pittman LLP
12          1650 Tysons Boulevard
13          McLean, Virginia 22102-4859
14          (703) 770-7940
15
16      On behalf of the Plaintiffs Yankee Atomic, Maine
17  Yankee and Connecticut Yankee:
18          PETER SKALABAN, JR., ESQ.
19          Spriggs & Hollingsworth
20          1350 I Street, N.W.
21          Ninth Floor
22          Washington, D. C. 20005-3305
23          (202) 898-5821
24
25

Page 407

1  APPEARANCES (Continued):
2
3      On behalf of the Plaintiff Commonwealth
4  Edison Company:
5          CHRISTOPHER P. TOMPKINS, ESQ.
6          Jenner & Block, LLP
7          One IBM Plaza
8          Chicago, Illinois 60611-7603
9          (312) 222-9350
10
11      On behalf of the Defendant:
12          RUSSELL A. SHULTIS, ESQ.
13          HEIDE L. HERRMANN, ESQ.
14          United States Department of Justice
15          Civil Division
16          1100 L Street, N.W.
17          Washington, D. C. 20530
18          (202) 305-7561
19
20
21
22
23
24
25

2 (Pages 404 to 407)

Ronald Milner
May 3, 2002
McLean, VA

Page 416

1    Q.   Again, any questions at all, please let me
2    know.  If you don't understand my question, please
3    let me know.  Is that fair?
4    A.   That's fair.
5    Q.   And if you disagree with any assumption in
6    my question, please advise me.
7    A.   Okay.
8    Q.   If I could ask you to turn to Exhibit 3 to
9    your deposition, that's the standard contract.  Do
10   you have it in front of you now?
11   A.   I do.
12   Q.   If I could ask you to turn to page 16593.
13   If you'd look in the first column, the first full
14   paragraph that begins, Article VI.B.3(b), do you see
15   that?
16   A.   I do.
17   Q.   Could you read that paragraph?
18   A.   Article VI.B --
19   Q.   You don't need to read it out loud.  You
20   can just read it to yourself.
21   A.   Okay.
22   Q.   Are you familiar with this language?
23   A.   Vaguely, yes.
24   Q.   Do you think you've reviewed it in the
25   past?

Page 417

1    A.   Not this specific language.  I have
2    reviewed it after the contract was final, after the
3    registered notice was final.
4    Q.   You're familiar with the concept of the
5    Department having the right to grant priority to shut
6    down reactors?
7         MR. SHULTIS:  Objection as to
8    characterization.
9         THE WITNESS:  I'm familiar with that, yes.
10        BY MR. NESLIN:
11   Q.   It states here that, in the second
12   sentence, this type of priority is necessary to
13   prevent reactors from waiting 20 or 30 years to be
14   commissioned -- decommissioned after they've finished
15   generating electricity.  Do you understand that DOE
16   had a goal of avoiding reactors from experiencing
17   such delays?
18        MR. SHULTIS:  Objection, Mr. Milner is not
19   a 30(b)(6) witness.
20        THE WITNESS:  My recollection was that the
21   Department preferred not to prohibit giving priority
22   to shutdown reactors.
23        BY MR. NESLIN:
24   Q.   Well, this paragraph states that certain
25   commenters had recommended that a provision allowing

Page 418

1    for such priority be deleted, that the Department had
2    not accepted that recommendation because again it
3    states that this type of priority is necessary to
4    prevent reactors from waiting 20 or 30 years to be
5    decommissioned after they finish generating
6    electricity.
7         And, again, my question is, was avoiding
8    that kind of delay a goal or objective of the
9    Department?
10        MR. SHULTIS:  Objection, same objection.
11        THE WITNESS:  No, and again, my
12   recollection of the situation is that the Department
13   preferred not to preclude the ability to give some
14   priority to shutdown reactors.  But of course we are
15   reading from the preamble to the rule and discussing
16   how comments were addressed.
17        BY MR. NESLIN:
18   Q.   That's correct.  Did the Department have
19   any interest in the timely decommissioning of
20   shutdown reactors?
21   A.   It did.
22        MR. SHULTIS:  Same objection.
23        BY MR. NESLIN:
24   Q.   That was an interest of the Department's?
25   A.   It was an interest, yes.

Page 419

1    Q.   The Department, would it be fair to say
2    that the Department had an objective of allowing
3    shutdown reactors to decommission in a timely manner?
4         MR. SHULTIS:  Same objection.
5         THE WITNESS:  Well, again, I think it was
6    more a case that the Department preferred not to
7    preclude that ability.
8         BY MR. NESLIN:
9    Q.   What do you mean by not preclude that
10   ability?
11   A.   The Department did not as I recall have an
12   objective to give priority to shutdown reactors, it
13   simply preferred not to preclude that ability in the
14   future.
15   Q.   My question isn't about asking granting
16   priority, my question is simply did the Department
17   have an objective of allowing shutdown reactors to
18   decommission in a timely manner?
19        MR. SHULTIS:  Same objection.
20        THE WITNESS:  It did, yes.
21        BY MR. NESLIN:
22   Q.   And would that remain an objective of the
23   Department's today?
24   A.   I believe so.
25   Q.   If we could turn to page 16606, do you see

5 (Pages 416 to 419)

# Defendant

Ronald Milner                                                        May 3, 2002
McLean, VA

Page 432

1  submittal timing procedures and approval process.
2       Is that accurate?
3       MR. SHULTIS: Objection, go ahead. I'm
4  sorry.
5       THE WITNESS: Well, I don't recall not
6  having been directly involved in the issue resolution
7  process. But certainly we believed that the
8  clarification was necessary in the exchange process.
9       BY MR. NESLIN:
10  Q.   And why was that?
11  A.   You know, apparently we believed at the
12  time that there were some areas that needed
13  clarification, some ambiguities.
14  Q.   Is that a recollection that you have or is
15  that your inference from the material on this page?
16  A.   Probably a little of both.
17  Q.   Do you recall were there ambiguities or
18  issues that the Department wished to clarify that are
19  not listed on this page?
20       MR. SHULTIS: Objection, Mr. Milner is not
21  a 30(b)(6) witness.
22       THE WITNESS: I don't recall.
23       BY MR. NESLIN:
24  Q.   If you could turn to the next page,
25  HQR0060154. I ask you to read lines 2 through 6.

Page 433

1  Mr. Milner, this indicates that under the contract,
2  DCS's could be exchanged between different utilities?
3       MR. SHULTIS: Objection as to
4  characterization.
5       THE WITNESS: In reading this I believe
6  this was a proposed position, a draft position that
7  our M&O had submitted. But my understanding is under
8  the contract certainly utilities could exchange
9  DCS's.
10       BY MR. NESLIN:
11  Q.   And is it also your understanding that
12  under the contract DSC's could be exchanged or
13  modified within a utility?
14       MR. SHULTIS: Objection, calls for a legal
15  conclusion.
16       THE WITNESS: I don't recall that in the
17  contract.
18       BY MR. NESLIN:
19  Q.   If I could ask you to turn back to Exhibit
20  3. Turn to page 16601, bottom of the third column.
21  Article Roman V, E, Exchanges. The first sentence
22  reads, "Purchaser shall have the right to determine
23  which SNF and/or HLW is delivered to DOE."
24       Would that allow purchasers to exchange
25  within a utility?

Page 434

1       MR. SHULTIS: Objection, calls for a legal
2  conclusion.
3       THE WITNESS: I guess in my opinion I
4  wouldn't view that as an exchange. My view had
5  always been that a utility once it reached its place
6  in the queue could ship whatever fuel it wanted to,
7  not necessarily just the oldest fuel that it had. As
8  long as it was older than five years.
9       BY MR. NESLIN:
10  Q.   What if a utility has several generating
11  stations and wished to shift the generating station?
12       MR. SHULTIS: Same objection. Calls for
13  speculation.
14       THE WITNESS: My recollection was that it
15  wasn't limited to a reactor site, that the utility
16  had a right in the queue when it chose.
17       BY MR. NESLIN:
18  Q.   If I could take you back to Exhibit 52,
19  still on the same page.
20  A.   Okay.
21  Q.   Lines 29 through 32, there's a sentence
22  that states DOE will evaluate the exchange request in
23  accordance with the projected DOE transportation
24  capabilities and the projected available civilian
25  radioactive waste management systems acceptance

Page 435

1  capacity for the indicated delivery years.
2       Is that accurate in your opinion?
3  A.   In my opinion, yes.
4  Q.   The Department would evaluate an exchange
5  request with reference to the systems transportation
6  capabilities?
7       MR. SHULTIS: Objection, Mr. Milner is not
8  30(b)(6) witness.
9       THE WITNESS: In my opinion, yes.
10       BY MR. NESLIN:
11  Q.   And the system's acceptance capacity for
12  the year in question?
13       MR. SHULTIS: Same objection.
14       THE WITNESS: Correct.
15       BY MR. NESLIN:
16  Q.   Do you recall discussing with others at
17  the Department what criteria that the Department
18  would use in reviewing exchange requests?
19  A.   I don't recall any specific discussions,
20  certainly there were issues that you would have to
21  look at for an exchange request, and I think reading
22  further on in this proposed position statement gives
23  an indication of some of them. If one utility with
24  an approved DCS was intending to ship 20-year-old
25  fuel and an exchange request came through where

9 (Pages 432 to 435)

Ronald Milner                                                                    May 3, 2002
                                    McLean, VA

Page 436

1  another utility was going to ship five-year-old fuel,
2  that would certainly make a difference in our
3  transportation abilities.
4      Q.  And why is that?
5      A.  Younger fuel, hotter fuel.
6      Q.  So that would be a consideration that DOE
7  would look at?
8      A.  Correct.
9          MR. SHULTIS:  Objection, Mr. Milner is not
10  a 30(b)(6) witness.
11         BY MR. NESLIN:
12     Q.  But the fact that the fuel might involve
13  different ages wouldn't preclude an exchange from
14  being proposed?
15         MR. SHULTIS:  Same objection.
16         THE WITNESS:  Well, in my opinion it
17  wouldn't necessarily preclude it.  In the example I
18  gave it could certainly affect the quantity at any
19  one time.
20         BY MR. NESLIN:
21     Q.  And the fact that -- I didn't wish to cut
22  you off?
23     A.  Using a hypothetical case if the
24  Department had one transport cask available at the
25  time, an unlikely situation, and all of a sudden a

Page 437

1  change was made from 20-year-old to five-year-old
2  fuel, that cask certainly would have the ability to
3  carry less fuel at five years old than it would at
4  20.
5      Q.  Let me ask it another way.  If an exchange
6  request would be consistent with the Department's
7  transportation capabilities and acceptance capacity
8  for the delivery year, is it your opinion that it
9  should have been approved?
10         MR. SHULTIS:  Objection, calls for
11  speculation.  Also Mr. Milner is not a 30(b)(6)
12  witness.
13         THE WITNESS:  Well, since we never did
14  receive any change requests, I can't indicate, but in
15  my opinion that would have been the case, yes, it
16  should have been approved.
17         BY MR. NESLIN:
18     Q.  If I could turn you to the next page,
19  HQR-006-0155.  You see there's a proposed contract
20  revision which is set forth in lines 19 through 30.
21  It's your recollection that the contract was never
22  revised in this matter, was it?
23         MR. SHULTIS:  Objection, calls for a legal
24  opinion.
25         THE WITNESS:  I don't recall that it had

Page 438

1  been revised, no.
2          BY MR. NESLIN:
3      Q.  Do you recall the Department ever adopting
4  a position statement on the DCS exchange process?
5          MR. SHULTIS:  Objection, Mr. Milner's not
6  a 30(b)(6) witness.
7          THE WITNESS:  I don't recall a position
8  statement, no.
9          BY MR. NESLIN:
10     Q.  Do you recall any further work being done
11  on this proposed position statement?
12     A.  No, I don't recall.
13     Q.  Do you recall the Department taking other
14  work on the exchange process?
15     A.  Not that I can recall.
16     Q.  Sitting here today, you can't recall any
17  other analysis or assessment that the Department did
18  of the exchange process under the contract?
19         MR. SHULTIS:  Asked and answered.
20         THE WITNESS:  Not offhand, no.
21         BY MR. NESLIN:
22     Q.  If I could direct you to page HQR0060162.
23  Mr. Milner, this is another proposed OCWRM position
24  on issues 019, 021, and 024, nonfuel and structural
25  components.

Page 439

1      Do you recall receiving or reviewing this
2  in the past?
3          MR. SHULTIS:  Objection, asked and
4  answered.
5          THE WITNESS:  No, I don't recall.
6          BY MR. NESLIN:
7      Q.  Do you recall the Department ever taking
8  any work relating to a position statement on nonfuel
9  and structural components?
10     A.  No, I don't.
11     Q.  Do you recall the Department considering
12  any amendments to the contract to address nonfuel or
13  structural components?
14         MR. SHULTIS:  Asked and answered.
15         THE WITNESS:  Other than the indication in
16  this document that it was under consideration, no, I
17  don't recall specifically.
18         BY MR. NESLIN:
19     Q.  Other than what's set forth in this
20  document?
21     A.  Correct.
22     Q.  You have no recollection?
23     A.  No, I don't.
24     Q.  And reviewing this document doesn't
25  refresh your memory?

10 (Pages 436 to 439)

# Defendant

Ronald Milner                                                                    May 3, 2002
McLean, VA

Page 452

1    Q.   And the members of your staff would have
2  been Mr. Brownstein and Ms. Slater and/or Ms. Payton?
3    A.   Including them, yes.
4    Q.   Others?
5    A.   There were others on the staff, I don't
6  recall at the time which ones they were.
7    Q.   If I could direct you to page
8  CTR-001-1306. Under heading III, Time Phased Review
9  Criteria, I'd like to ask you to review the first
10  paragraph.
11         You see it states in the second sentence
12  that, "These sets of review criteria will be time
13  phased with the time dependency being linked to when
14  the DCS exchange request is received by the
15  Department." What does that mean to you, time
16  phased?
17         MR. SHULTIS:  Objection, foundation.
18  Calls for speculation.
19         THE WITNESS:  Reading these words at this
20  point in time, my opinion would be that we would be
21  looking at dealing with exchange requests in the
22  order they were received.
23         BY MR. NESLIN:
24    Q.   Do you recall any consideration by the
25  Department that different criteria might apply

Page 453

1  depending upon how far along the waste management
2  system planning and procurement had progressed?
3         MR. SHULTIS:  Objection, assumes facts not
4  in evidence. Mr. Milner's not a 30(b)(6) witness.
5         THE WITNESS:  I'm sorry, would you repeat
6  that, I'm not sure I understand that question.
7         BY MR. NESLIN:
8    Q.   Let me ask it a different way. Do you
9  recall the Department considering using different
10  criteria for reviewing an exchange request depending
11  upon how far along the waste management system
12  planning and procurement had progressed?
13         MR. SHULTIS:  Same objection.
14         BY MR. NESLIN:
15    Q.   In other words that if an exchange request
16  were made very early in the system before final
17  planning or procurement decisions had been made, the
18  criteria might be in one form, but other criteria
19  might apply if decisions had been made regarding
20  system planning or procurement?
21    A.   No, I don't recall that.
22    Q.   Let me ask you to turn to the next page,
23  page 1307, under heading VI, First Set of Time Phased
24  Review Criteria?
25    A.   Uh-huh.

Page 454

1    Q.   The third from the last sentence states,
2  that in fact since the facility, the waste disposal
3  facility locations and system designs are still being
4  evaluated, it could be argued that there would be no
5  impact to the system of any DCS exchanges at this
6  time. Do you see that language?
7         MR. SHULTIS:  Objection. I don't.
8         THE WITNESS:  I found it here. I'm going
9  to read it in context.
10         BY MR. NESLIN:
11    Q.   Let me restate my question. This
12  paragraph states that in fact since the facility
13  locations and system designs are still being
14  evaluated, it could be argued that there would be no
15  impact to the system of any DCS exchanges at this
16  time.
17         Would you agree that there would be no
18  impact to the system of a DCS exchange if as of March
19  1994 the facility locations and system designs were
20  still being evaluated?
21    A.   I think at that point in time there was no
22  known reason why there would be any impact. For
23  example the designs were early enough along that
24  presumably you could have adjusted designs if there
25  had been any impact. But that can't be said with

Page 455

1  certainty because you just simply didn't know.
2    Q.   So if the system could be adjusted at that
3  point to address the requirements of an exchange, did
4  that make it more likely that an exchange would be
5  approved by the Department?
6         MR. SHULTIS:  Objection, Mr. Milner's not
7  a 30(b)(6) witness. Calls for speculation.
8         THE WITNESS:  I guess my personal opinion
9  would be if you could adjust the system design at
10  whatever point an exchange request was received and
11  that change in design didn't impact the system
12  adversely in another way, such as cost or schedule,
13  yeah, that probably would have made it more likely.
14         BY MR. NESLIN:
15    Q.   Under that circumstance, the Department
16  should approve an exchange?
17         MR. SHULTIS:  Same objections.
18         BY MR. NESLIN:
19    Q.   In your opinion?
20    A.   Well, that would not have been the sole
21  criteria, I don't believe. But that would certainly
22  have been factored in.
23         (Milner Exhibit No. 55 was
24         marked for identification.)
25         BY MR. NESLIN:

14 (Pages 452 to 455)

# Defendant

Ronald Milner                                                                    May 3, 2002
McLean, VA

Page 464

1  such a review occurring with respect to the
2  development of exchange criteria?
3      MR. SHULTIS: Same objection.
4      THE WITNESS: I don't specifically recall.
5  Presumably there were departmental reviews of drafts
6  of criteria.
7      BY MR. NESLIN:
8      Q.  But sitting here today you don't recall
9  who might have been involved in those reviews?
10     A.  No. Or even if they occurred. But
11 presumably they did.
12     Q.  If I could turn you to page 0010. You see
13 a couple bullets at the bottom of the page,
14 Mr. Milner?
15     A.  Yes.
16     Q.  The sentence preceding the bullet states
17 that, "Consequently, several questions must be
18 answered to determine if an exchange request can be
19 approved. The foremost being do the proposed changes
20 adversely impact the system's ability to meet the
21 commitments made on other DCS's, and have the designs
22 or procurements in any of the CRWMS elements been
23 based on the original DCS's, and if so will approval
24 of the exchange request adversely affect them."
25     Would you agree that those were the

Page 465

1  foremost questions that need to be answered by the
2  Department in determining whether to approve an
3  exchange request?
4      MR. SHULTIS: Objection, Mr. Milner's not
5  a 30(b)(6) witness.
6      THE WITNESS: In my opinion they would be
7  at least two of the more important ones.
8      BY MR. NESLIN:
9      Q.  Can you think sitting here today of other
10 important considerations?
11     MR. SHULTIS: Same objection.
12     THE WITNESS: Not offhand.
13     BY MR. NESLIN:
14     Q.  So if a proposed exchange wouldn't
15 adversely impact the system's ability to meet the
16 commitments made on other DCS's, and wouldn't
17 adversely affect the designs or procurements of the
18 waste management system elements, is it your opinion
19 it should be approved by the Department?
20     A.  It would be my opinion that it shouldn't
21 be disapproved at that point.
22     Q.  If it weren't disapproved, wouldn't it be
23 approved?
24     A.  No, because there may be other criteria
25 that you would look at.

Page 466

1      Q.  Are there other criteria that you can
2  identify sitting here that would be important to that
3  question?
4      MR. SHULTIS: Asked and answered.
5      THE WITNESS: No.
6      BY MR. NESLIN:
7      Q.  If I could ask you to turn to page 0021.
8  The third paragraph, if I could ask you to review the
9  third paragraph on that page. The second sentence
10 states that, "Whereas the review could be terminated
11 after the first failed review criteria, performing a
12 complete review will provide the purchaser with as
13 much information as possible for preparing a revised
14 exchange request, if desired."
15     Do you see that language?
16     A.  Yes.
17     Q.  Was it important to the Department to
18 provide purchasers with information on why an
19 exchange request might be disapproved so that they
20 could attempt to correct the problem and resubmit?
21     MR. SHULTIS: Objection, Mr. Milner's not
22 a 30(b)(6) witness.
23     THE WITNESS: In my personal opinion it
24 would have been important, sure.
25     BY MR. NESLIN:

Page 467

1      Q.  And in your opinion, would the Department
2  have done so?
3      MR. SHULTIS: Same objection, calls for
4  speculation.
5      THE WITNESS: In my opinion it would have,
6  I believe.
7      BY MR. NESLIN:
8      Q.  The last sentence of, the last two
9  sentences state that, "Furthermore, the review
10 process will aid DOE in identifying patterns of
11 change in purchaser servicing capabilities or
12 desires. These trends will provide DOE with an early
13 indication of the need to change existing
14 procurements." Do you see that language?
15     A.  Yes, I do.
16     Q.  Would you agree with those statements?
17     A.  Yeah, I would agree.
18     Q.  On the next page, page 16, there's a
19 figure?
20     A.  Which?
21     Q.  Page CTR0010022?
22     A.  22, yes.
23     Q.  Figure 1. See, this suggests?
24     A.  You switched page references on me, so --
25     Q.  I apologize. Figure 1 indicates that in

17 (Pages 464 to 467)

# Defendant

Ronald Milner

May 3, 2002

McLean, VA

**Page 492**

1   Rudy and others from Yankee Rowe.
2       Q.   By that issue you mean the issue of?
3       A.   Priority for Yankee Rowe.
4       Q.   The second paragraph of the letter in the
5   second sentence states that you, meaning Mr. Barrett,
6   indicated during our discussion that you would be
7   receptive to suggestions on a process for allocation
8   of priority under the contract which DOE could follow
9   with public notice or through a rulemaking.
10       Do you recall Mr. Barrett encouraging
11   Yankee Atomic to suggest a process for granting
12   priority to shutdown reactors?
13       A.   I don't recall him encouraging it. I
14   recall him being willing to have a discussion of the
15   public rulemaking process.
16       Q.   This is the rulemaking process that you've
17   referred to earlier in your testimony?
18       A.   Yes. Which, as I recall, did not actually
19   take place.
20       Q.   Do you recall having previously received
21   or reviewed the attachment to this letter?
22       A.   No.
23       Q.   Let me ask you to turn to the second page
24   of the attachment. Would you review the suggested
25   process language? Do you recall having reviewed

**Page 493**

1   these or similar criteria for making decisions on
2   whether to grant priority to shutdown reactors?
3       A.   No, I don't.
4       Q.   Do you have an opinion sitting here today
5   as to whether these criteria would be appropriate for
6   making that decision?
7       A.   Well, I guess in my view sitting here
8   looking at this today some of these don't appear to
9   be criteria so much as statements of opinion.
10       Q.   Do you disagree with certain of these,
11   sir?
12       A.   I do.
13       Q.   Do you disagree with the first item, that
14   granting priority can be shown to be less costly --
15       A.   I do.
16       Q.   -- to the Department's waste management
17   system?
18       A.   I do.
19       Q.   Why do you disagree with that?
20       A.   Because I can't envision how granting the
21   priority would be less costly.
22       Q.   What would the additional cost be for
23   granting priority?
24       A.   Huh?
25       Q.   What would the additional cost be for

**Page 494**

1   granting priority?
2       A.   I don't know where there would be
3   additional cost. I can't see where the cost would be
4   reduced.
5       Q.   Well, the cost to the utilities in
6   question, the shutdown utility would certainly be
7   reduced?
8       A.   Yes, it would. I think that's what's
9   being reflected in number 3.
10       Q.   And with respect to number 2, item 2,
11   granting priority can be shown to involve a shipment
12   of small enough quantities of spent fuel compared to
13   the overall DOE acceptance rate so as not to
14   jeopardize the timely removal of spent fuel from
15   other sites, or other compensation should be
16   provided.
17       Do you disagree with that?
18       A.   I do.
19       Q.   And why do you disagree with that?
20       A.   Any amount of fuel that you accepted from
21   a shutdown by granting priority would certainly
22   impact other utilities in the queue.
23       Q.   But this refers to jeopardizing the timely
24   removal of spent fuel from other sites. Would such
25   an impact necessarily jeopardize the timely removal

**Page 495**

1   of spent fuel from other sites?
2       A.   I believe it would. If over some period
3   of time the Department were to -- according to the
4   priority ranking, the ACR of 1995, since that
5   combined both, one utility would expect to have X
6   number of MTUs removed from their reactor within some
7   specified time period. So if a portion of that
8   allocation was given to another reactor, it would not
9   be as timely.
10       Q.   But would a portion of that allocation
11   have to be given to another reactor if in fact the
12   receipt rate exceeded the discharge rate?
13       A.   Certainly.
14       Q.   Why do you say that?
15       A.   Any time there's a finite amount of fuel
16   being accepted, and that finite amount of fuel is
17   allocated amongst the utilities in the queue,
18   whatever that number may be, if you reallocate that,
19   a portion of that, to other utilities farther down in
20   the queue, you're certainly impacting that.
21       Q.   Would you disagree with criterion 3 here
22   that granting priority can be shown to avoid the
23   establishment of an otherwise unneeded reactor site
24   storage facility?
25       A.   I don't completely agree with that.

24 (Pages 492 to 495)

Ronald Milner

McLean, VA

May 3, 2002

---

**Page 496**

1    Q.    And how do you disagree with it?
2    A.    If a reactor is shutting down, presumably
3    it has all of its spent fuel stored on site either in
4    the pool or dry storage or a combination thereof.
5    That storage exists when the reactor shuts down.
6    Since no more fuel is being generated by the reactor
7    I'm not sure what additional storage would be
8    established.
9    Q.    Would you agree that it would avoid the
10   need to continue an otherwise unneeded reactor site
11   storage facility?
12   A.    I would.
13   Q.    And the next item states that granting
14   priority can be shown to be clearly cost effective
15   for consumers from the standpoint of timely
16   decommissioning?
17   A.    I would agree with that.
18   Q.    And the last item is that granting
19   priority can be shown to support the national policy
20   of efficient operation of the country's waste
21   management system.
22   A.    I can neither agree or disagree with that.
23   I'm not quite sure what that means.
24   Q.    You don't understand --
25   A.    Correct.

---

**Page 497**

1    Q.    -- the criteria?
2    A.    Correct.
3    Q.    Do you know whether you or Mr. Barrett
4    responded to this letter by Mr. Grube?
5    A.    I don't recall for certain, I don't
6    believe we did.
7    Q.    Do you know whether the Department has
8    ever adopted any criteria for making decisions on
9    shutdown reactors?
10   MR. SHULTIS:  Objection, asked and
11   answered.
12   THE WITNESS:  I don't recall.  I don't
13   believe.
14   BY MR. NESLIN:
15   Q.    You're not aware of it?
16   MR. SHULTIS:  Same objection.
17   THE WITNESS:  I'm not aware of it, no.
18   BY MR. NESLIN:
19   Q.    Do you believe you would have been aware
20   of it if such criteria had been developed?
21   A.    I think I would have.
22   (Milner Exhibit No. 62 was
23   marked for identification.)
24   BY MR. NESLIN:
25   Q.    Mr. Milner, Exhibit 62 is a letter from

---

**Page 498**

1    you to Dr. Andrew Kadak dated June 16th, 1994.  Are
2    you familiar with this letter?
3    A.    I vaguely remember this letter, yes.
4    Q.    Did you draft this letter?
5    A.    I don't believe I did.
6    Q.    But you would have reviewed and approved
7    it?
8    A.    Certainly.
9    Q.    And the purpose of this letter was to
10   respond to certain questions that Yankee Atomic had
11   raised with the Department?
12   A.    Apparently so, yes.
13   Q.    Is that your recollection?
14   A.    Yes.
15   Q.    In the second paragraph of the first page,
16   the first sentence reads that, "In designing the
17   waste management system, the Department and the
18   nuclear utilities share mutual goals of initiating
19   federal acceptance of spent nuclear fuel as soon as
20   possible and accommodating economic and physical
21   situations confronting utilities such as yours."
22   What did you mean by mutual goals of
23   initiating federal acceptance of spent nuclear fuel
24   as soon as possible?
25   A.    I think both the Federal Government, the

---

**Page 499**

1    program and the utilities had a goal of taking fuel
2    off the sites as soon as possible, to begin to take
3    fuel off the sites as soon as possible.
4    Q.    And what did you mean by accommodating
5    economic and physical situations confronting
6    utilities such as yours?
7    A.    I think there was a goal to at least
8    mitigate the economic situation relative to cost of
9    storage, but I don't know what physical situation
10   meant.
11   Q.    What was meant by utilities such as yours?
12   Were you referring to shutdown, utilities with
13   shutdown reactors?
14   A.    I don't recall.  Likely that would have
15   been the case.
16   Q.    So you've testified that Department had an
17   interest in mitigating the economic situation
18   confronting such utilities.  What do you mean by
19   mitigating the economic situation for them?
20   A.    Well, I don't know that -- hypothetically
21   I don't know whether the condition of the economic
22   situation could be totally alleviated, but
23   potentially at least you could mitigate it.
24   Q.    How?
25   A.    Well, I guess one example I might think of

---

Alderson Reporting Company, Inc.
1111 14th Street, N.W. Suite 400  1-800-FOR-DEPO  Washington, DC 20005