# Defendant

# Capital Reporting Company

Page 118

1    Q.   When you make your comment that you could have
2    done it in your head in 30 seconds, would that
3    statement apply equally to sending fuel to dry storage
4    at Diablo Canyon?
5    A.   No, to wet storage is what I'm talking about.
6    Q.   And that is primarily based upon the fact that
7    the fuel assemblies are different sizes and require
8    different rack systems?
9    A.   Well, that's -- that's a technical reason, but
10   then there's licensing reasons and everything else, you
11   know; that you open up a quagmire of issues probably
12   when you start sending fuel around.  You have
13   transportation issues and -- but physically they're a
14   different size and totally different design, so...
15   Q.   Do you have an opinion as to whether it is or
16   was possible to send dry storage casks, dry storage
17   transportation casks from Humboldt Bay to Diablo
18   Canyon, where they would be stored at Diablo Canyon's
19   ISFSI?
20   A.   I'm not -- I don't know.  That never got very
21   far that I'm aware of, so I don't know what the answer
22   to that is.
23                (Defendant's Exhibit 10 was
24                marked for identification.)
25   BY MR. EKMAN:

Page 119

1    Q.   I've handed you what's been marked as Exhibit
2    10, and I'm marking this for a very limited reason.
3    It's a 1989 letter from Mr. Nelson to you, dated
4    August 10th, 1989.  If you could take a quick look at
5    the letter.
6    A.   You want me to read it in detail here?
7    Q.   You don't need -- well, let me ask your
8    question, then you can read whatever you feel you need
9    to read in order to answer it.  The last sentence --
10        All right.  I think we just realized that
11   we're missing the response, although these numbers are
12   consecutive.
13        Let me ask this question:  In just reviewing
14   this first letter, does that jog your memory at all as
15   to whether you were involved in the issue of shipment
16   of assemblies in dry storage to Diablo Canyon?
17   A.   It's not an issue that ever occupied very much
18   of my thought and time, I'll tell you that.
19   Q.   Hopefully we could find the attachment for
20   Mr. Nelson's deposition.  Thank you.
21        MR. EKMAN:  Can we take a break?
22        (Lunch taken:  12:23 p.m. until 1:15 p.m.)
23
24
25

Page 120

1              P R O C E E D I N G S
2
3        EXAMINATION BY MR. EKMAN (Resumed)
4    Q.   Mr. Shiffer, over the course of your career at
5    Pacific Gas & Electric, did you have any role in -- and
6    by "role" I mean active role in any proceedings before
7    the NRC?  And I mean that generally.
8    A.   Yes.
9    Q.   What kinds of proceedings did you have an
10   active role in, what types?
11   A.   Well, we had hearings on topics such as the
12   emergency plan, adequacy of our quality assurance
13   program, adequacy of our training programs for
14   operators.  I think I also testified or I was part of
15   the panel that testified on the reracking, if I can
16   remember correctly; waste discharge hearings.  I don't
17   know, just a myriad of topics like that.
18   Q.   What is a waste discharge hearing?
19   A.   Chemical wastes and that kind of stuff, not
20   nuclear waste.
21   Q.   Did you have any active role that you recall
22   in the -- in any proceedings before the NRC concerning
23   Humboldt's Unit 3 decommissioning plan?
24   A.   I don't recall any on Humboldt.
25   Q.   Again, over the course of your role at PG & E

Page 121

1    did you have any role, active role in any proceedings
2    before FERC?
3    A.   No.
4    Q.   And how about before -- is it the C.U.C.,
5    California Utilities Commission?
6        MR. STOUCK:  C.P.U.C.
7        THE WITNESS:  C.P.U.C., California Public
8    Utilities Commission.
9    BY MR. EKMAN:
10   Q.   Did you have any active role in any matters
11   pending before them over your career?
12   A.   I don't recall any in front of the C.P.U.C.  I
13   had an active role in the California Coastal
14   Commission.  Again, that involved chemical waste
15   discharges and stuff like that.
16                (Defendant's Exhibit 11 was
17                marked for identification.)
18   BY MR. EKMAN:
19   Q.   Exhibit 11 is a cover letter from Richard
20   Locke to Scott Fielder, Esquire, dated July 20, 1987
21   and attaches a memorandum of agreement dated June 8th,
22   1987, with several signatures, both on behalf of
23   Pacific Gas, as well as on behalf of joint intervenors.
24        First of all, have I correctly identified this
25   document?

31 (Pages 118 to 121)

## Capital Reporting Company

Page 122

1    A.    Yes.

2    Q.    Who is Mr. Locke?

3    A.    He's an attorney with PG & E.

4    Q.    Did you have an opportunity to look through

5 this short settlement agreement?

6    A.    Just now I did, yeah, glanced at it.

7    Q.    Your signature appears on page 3 of the

8 agreement; is that right?

9    A.    Yes.

10    Q.    As is Mr. Locke's.  Do you recall the issues

11 that prompted this settlement agreement?

12    A.    Well, I mean basically it was a -- it

13 was a desire by these, you know, environmentalists and

14 intervenor people at -- in that area to completely get

15 all of the radioactive materials and things out of --

16 out of that site and, you know, put the site back in

17 pristine condition.

18         And so we went up and talked to them and

19 explained to them that that wasn't totally possible at

20 the present time, and we put together this memorandum

21 of understanding.

22    Q.    Were you involved in the conversations with

23 these intervenors?

24    A.    Yes.

25    Q.    And do you recall what -- so what specifically

Page 123

1 they wanted Humboldt Bay to do in connection with

2 decommissioning -- let me actually ask this.  First of

3 all, this is in relation to the decommissioning plan

4 for Humboldt; is that right?

5    A.    Yes, uh-huh.

6    Q.    And what did the intervenors specifically want

7 Humboldt Bay -- do you recall what did they want

8 Humboldt Bay to agree to in connection with

9 decommissioning?

10    A.    Well, I mean really what they wanted us to do

11 is remove all radioactive materials and put the site

12 back in pre Humboldt Bay condition and, you know, we

13 told them that we would -- we'd love to do that too,

14 but it's just not feasible at the present time.

15    Q.    Why wasn't it feasible?

16    A.    Because we have the spent fuel and there's no

17 place to put it and that's, you know, that's where we

18 mentioned, alluded to, you know, well, couldn't you

19 take it down to Diablo Canyon or something like that,

20 which was kind of a non starter, you know, but we

21 said -- so after I explained to them that that was

22 never going to go anywhere, you know, they said well,

23 what about dry cask storage.

24         We said well, again, it's not licensed

25 anywhere and stuff like this, you know, it's going to

Page 124

1 take a while to do that kind of thing, but we'll look

2 into it when the time comes.  So parted as friends I

3 guess, best I can say.

4    Q.    Was part of the point of this agreement to

5 have the intervenors withdraw their opposition to the

6 decommissioning plan?

7    A.    I don't remember the details anymore of what

8 extent they had intervened or opposed it or anything

9 like that.  I just remember that we went up and we

10 talked to them and tried to explain to them some of the

11 realities of the business and they may -- it may have

12 caused them to withdraw some motion, but I don't

13 remember what they had done specifically.

14    Q.    What's the Redwood Alliance?

15    A.    Well, again, just a group of environmental --

16 you know, tended to intervene in these kinds of things

17 in that area.

18    Q.    Would you characterize them as anti-nuclear,

19 an anti-nuclear organization?

20    A.    Well, I would characterize them as pro

21 environment.  I mean, I don't want to call them

22 anti-nuclear, but probably they were or a lot of them

23 were.

24    Q.    They're an environmentalists group?

25    A.    They're environmental, yeah.

Page 125

1    Q.    Why would you have signed this agreement on

2 behalf of PG & E at this time?

3    A.    Well, I was either vice president or senior

4 vice president, I forget which year.  I guess I was

5 vice president of the nuclear group, so that's why.

6    Q.    So you would have had authority then to bind

7 the company to the extent --

8    A.    Right.

9    Q.    -- that this agreement is at all binding?

10    A.    Right.

11    Q.    Do you know who drafted this agreement?

12    A.    My recollection is that Dick Locke worked on

13 it.  It may have been in conjunction with some of them

14 too.  I didn't personally draft it.

15    Q.    Do you know if you reviewed drafts of it?

16    A.    I don't recall anymore.

17    Q.    In the first paragraph, the number 1 term

18 states: "Licensee agrees to ship the spent fuel

19 assemblies presently stored at the Humboldt Bay Power

20 Plant, Unit 3, to the Department of Energy, hereinafter

21 DOE, as soon as the DOE has a repository or some other

22 facility in operation capable of receiving the spent

23 fuel assemblies under the terms of the existing

24 contract entered into between the licensee and DOE on

25 June 30, 1983."

32 (Pages 122 to 125)

# Plaintiff

Page 123

1    they wanted Humboldt Bay to do in connection with

2    decommissioning -- let me actually ask this.  First of

3    all, this is in relation to the decommissioning plan

4    for Humboldt; is that right?

5        A.   Yes, uh-huh.

6        Q.   And what did the intervenors specifically want

7    Humboldt Bay -- do you recall what did they want

8    Humboldt Bay to agree to in connection with

9    decommissioning?

10       A.   Well, I mean really what they wanted us to do

11   is remove all radioactive materials and put the site

12   back in pre Humboldt Bay condition and, you know, we

13   told them that we would -- we'd love to do that too,

14   but it's just not feasible at the present time.

15       Q.   Why wasn't it feasible?

16       A.   Because we have the spent fuel and there's no

17   place to put it and that's, you know, that's where we

18   mentioned, alluded to, you know, well, couldn't you

19   take it down to Diablo Canyon or something like that,

20   which was kind of a non starter, you know, but we

21   said -- so after I explained to them that that was

22   never going to go anywhere, you know, they said well,

23   what about dry cask storage.

24           We said well, again, it's not licensed

25   anywhere and stuff like this, you know, it's going to

1    take a while to do that kind of thing, but we'll look

2    into it when the time comes.  So parted as friends I

3    guess, best I can say.

4         Q.    Was part of the point of this agreement to

5    have the intervenors withdraw their opposition to the

6    decommissioning plan?

7         A.    I don't remember the details anymore of what

8    extent they had intervened or opposed it or anything

9    like that.  I just remember that we went up and we

10   talked to them and tried to explain to them some of the

11   realities of the business and they may -- it may have

12   caused them to withdraw some motion, but I don't

13   remember what they had done specifically.

14        Q.    What's the Redwood Alliance?

15        A.    Well, again, just a group of environmental --

16   you know, tended to intervene in these kinds of things

17   in that area.

18        Q.    Would you characterize them as anti-nuclear,

19   an anti-nuclear organization?

20        A.    Well, I would characterize them as pro

21   environment.  I mean, I don't want to call them

22   anti-nuclear, but probably they were or a lot of them

23   were.

24        Q.    They're an environmentalists group?

25        A.    They're environmental, yeah.

# Defendant

# Capital Reporting Company

Page 122

1    A.    Yes.

2    Q.    Who is Mr. Locke?

3    A.    He's an attorney with PG & E.

4    Q.    Did you have an opportunity to look through

5  this short settlement agreement?

6    A.    Just now I did, yeah, glanced at it.

7    Q.    Your signature appears on page 3 of the

8  agreement; is that right?

9    A.    Yes.

10    Q.    As is Mr. Locke's.  Do you recall the issues

11  that prompted this settlement agreement?

12    A.    Well, yes.  I mean basically it was a -- it

13  was a desire by these, you know, environmentalists and

14  intervenor people at -- in that area to completely get

15  all of the radioactive materials and things out of --

16  out of that site and you, know, put the site back in

17  pristine condition.

18          And so we went up and talked to them and

19  explained to them that that wasn't totally possible at

20  the present time, and we put together this memorandum

21  of understanding.

22    Q.    Were you involved in the conversations with

23  these intervenors?

24    A.    Yes.

25    Q.    And do you recall what -- so what specifically

Page 123

1  they wanted Humboldt Bay to do in connection with

2  decommissioning -- let me actually ask this.  First of

3  all, this is in relation to the decommissioning plan

4  for Humboldt; is that right?

5    A.    Yes, uh-huh.

6    Q.    And what did the intervenors specifically want

7  Humboldt Bay -- do you recall what did they want

8  Humboldt Bay to agree to in connection with

9  decommissioning?

10    A.    Well, I mean really what they wanted us to do

11  is remove all radioactive materials and put the site

12  back in pre Humboldt Bay condition and, you know, we

13  told them that we would -- we'd love to do that too,

14  but it's just not feasible at the present time.

15    Q.    Why wasn't it feasible?

16    A.    Because we have the spent fuel and there's no

17  place to put it and that's, you know, that's where we

18  mentioned, alluded to, you know, well, couldn't you

19  take it down to Diablo Canyon or something like that,

20  which was kind of a non starter, you know, but we

21  said -- so after I explained to them that that was

22  never going to go anywhere, you know, they said well,

23  what about dry cask storage.

24          We said well, again, it's not licensed

25  anywhere and stuff like this, you know, it's going to

Page 124

1  take a while to do that kind of thing, but we'll look

2  into it when the time comes.  So parted as friends I

3  guess, best I can say.

4    Q.    Was part of the point of this agreement to

5  have the intervenors withdraw their opposition to the

6  decommissioning plan?

7    A.    I don't remember the details anymore of what

8  extent they had intervened or opposed it or anything

9  like that.  I just remember that we went up and we

10  talked to them and tried to explain to them some of the

11  realities of the business and they may -- it may have

12  caused them to withdraw some motion, but I don't

13  remember what they had done specifically.

14    Q.    What's the Redwood Alliance?

15    A.    Well, again, just a group of environmental --

16  you know, tended to intervene in these kinds of things

17  in that area.

18    Q.    Would you characterize them as anti-nuclear,

19  an anti-nuclear organization?

20    A.    Well, I would characterize them as pro

21  environment.  I mean, I don't want to call them

22  anti-nuclear, but probably they were or a lot of them

23  were.

24    Q.    They're an environmentalists group?

25    A.    They're environmental, yeah.

Page 125

1    Q.    Why would you have signed this agreement on

2  behalf of PG & E at this time?

3    A.    Well, I was either vice president or senior

4  vice president, I forget which year.  I guess I was

5  vice president of the nuclear group, so that's why.

6    Q.    So you would have had authority then to bind

7  the company to the extent --

8    A.    Right.

9    Q.    -- that this agreement is at all binding?

10    A.    Right.

11    Q.    Do you know who drafted this agreement?

12    A.    My recollection is that Dick Locke worked on

13  it.  It may have been in conjunction with some of them

14  too.  I didn't personally draft it.

15    Q.    Do you know if you reviewed drafts of it?

16    A.    I don't recall anymore.

17    Q.    In the first paragraph, the number 1 term

18  states:  "Licensee agrees to ship the spent fuel

19  assemblies presently stored at the Humboldt Bay Power

20  Plant, Unit 3, to the Department of Energy, hereinafter

21  DOE, as soon as the DOE has a repository or some other

22  facility in operation capable of receiving the spent

23  fuel assemblies under the terms of the existing

24  contract entered into between the licensee and DOE on

25  June 30, 1983."

32 (Pages 122 to 125)

# Capital Reporting Company

Page 126

```
1              Do you see that?
2      A.    Yeah.
3      Q.    Then the sentence continues -- continues on.
4  Do you know why there's language that -- why the "as
5  soon as DOE has a repository or some other facility in
6  operation" is qualified by the -- under the language
7  "under the terms of the existing contract"?
8              MR. STOUCK:  Objection to form.  It's vague,
9  but you may answer if you understand it.
10             THE WITNESS:  Well, I mean basically what
11 we're telling them is we have a contract with DOE and
12 we can't unilaterally ship these fuel assemblies, we
13 have to follow the contract and the capabilities to
14 take the fuel.
15 BY MR. EKMAN:
16     Q.    And again, this is a recognition of the fact
17 that the DOE repository or the date of operation may or
18 may not be the first year in which Humboldt Bay's fuel
19 is removed under that contract; correct?
20     A.    That's correct.
21     Q.    And then that term or that paragraph -- what I
22 mean by that is paragraph 1 ends:  "Licensee further
23 agrees to reasonably pursue the highest DOE priority
24 for the removal of the Humboldt Bay Power Plant, Unit
25 3, spent fuel assemblies."
```

Page 127

```
1              Do you see that?
2      A.    Yes.
3      Q.    Do you know what -- do you have an
4  understanding of what that obligated PG & E to do at
5  this time and then going forward?
6      A.    Not beyond what it just says.
7      Q.    Then on paragraph 3 on the second page of that
8  agreement it ends by saying, "The licensee agrees to
9  re-examine the possibility of utilizing dry cask
10 storage, if and when such a storage option becomes
11 available for sites such as Humboldt Bay Power Plant,
12 Unit 3."
13             Do you see that?
14     A.    Yes.
15     Q.    After this agreement was signed did PG & E do
16 anything to -- was there a continual examination of the
17 availability of dry storage or -- well, let me start
18 there.
19     A.    I don't remember the details.  I know we had
20 people that kept abreast of what was going on in the
21 industry on a more or less continuous basis, but I
22 can't point to any specific study that we did
23 immediately after this.
24     Q.    Do you know, based on your experience, when
25 dry cask storage suitable for use in Humboldt Bay
```

Page 128

```
1  became available on the marketplace?
2      A.    No, I don't have that date on the top of my
3  head.
4              Through with that one?
5      Q.    Yup.
6              MR. STOUCK:  Thank you.
7              (Defendant's Exhibit 12 was
8              marked for identification.)
9  BY MR. EKMAN:
10     Q.    This is Exhibit 12, which is an April 10th,
11 1987 letter from a Scott Fielder to Bruce Norton, care
12 of Richard Locke, and concerning the Humboldt Bay NRC
13 license amendment proceeding, Docket Number 50-1333.
14             First of all, have I correctly identified this
15 letter?
16     A.    Yes.
17     Q.    And I see that you're copied on this letter?
18     A.    Yeah, you want me to read it in detail here?
19     Q.    If you want.  It's a fairly short letter.
20     A.    Which one preceded which one here?
21     Q.    Actually, the exhibit I showed you is the last
22 in the line.
23     A.    I was inferring that by reading this that this
24 proceeded that, but anyway.
25     Q.    I went out of order because you signed the
```

Page 129

```
1  settlement.
2      A.    Oh, okay.
3      Q.    First of all, based on your review of this
4  letter, does that refresh your recollection as to
5  whether the settlement agreement at 11 was in exchange
6  for them dropping objections that they had filed with
7  respect to PG & E's request for a license amendment?
8      A.    Well, I still don't remember it very well, but
9  by reading the letter it appears that that's a response
10 to this.
11     Q.    You have no reason to doubt that Mr. Fielder
12 was misstating the current posture of that proceeding,
13 do you?
14     A.    No.
15     Q.    The only question about this letter that I
16 have, and it does predate the final agreement, in
17 paragraph 3, number 3; do you see that?
18     A.    Uh-huh.
19     Q.    Again, this relates to this dry cask storage
20 issue and it ends by stating:  "By placing the fuel in
21 dry cask storage all risk of a liquid spill from the
22 spent fuel pool during extended storage would be at an
23 end."
24             Do you see that?
25     A.    Yes.
```

# Plaintiff

**Capital Reporting Company**

Page 129

1   settlement.

2        A.   Oh, okay.

3        Q.   First of all, based on your review of this

4   letter, does that refresh your recollection as to

5   whether the settlement agreement at 11 was in exchange

6   for them dropping objections that they had filed with

7   respect to PG & E's request for a license amendment?

8        A.   Well, I still don't remember it very well, but

9   by reading the letter it appears that that's a response

10  to this.

11       Q.   You have no reason to doubt that Mr. Fielder

12  was misstating the current posture of that proceeding,

13  do you?

14       A.   No.

15       Q.   The only question about this letter that I

16  have, and it does predate the final agreement, in

17  paragraph 3, number 3; do you see that?

18       A.   Uh-huh.

19       Q.   Again, this relates to this dry cask storage

20  issue and it ends by stating:  "By placing the fuel in

21  dry cask storage all risk of a liquid spill from the

22  spent fuel pool during extended storage would be at an

23  end."

24            Do you see that?

25       A.   Yes.

**Capital Reporting Company**

1      Q.    Up to this point, 1987, had Humboldt Bay had

2   problems with -- had any liquid spills from its spent

3   nuclear fuel?

4      A.    No, there was no liquid spills from its spent

5   nuclear fuel, but the -- the pool is a concrete pool

6   and it has a stainless steel liner to make it leak

7   tight.  We had discovered some leaks in the stainless

8   steel liner that allowed some of the water to leak out

9   of the pool and we -- we corrected that, so there

10  wasn't a spill, but there had been a little bit of

11  water leakage.

12     Q.    Since you're more familiar with these

13  environmentalist groups than I am, is it a fair

14  characterization, based on your involvement in this,

15  that these groups that were acting as intervenors,

16  these people as intervenors were concerned about the

17  safety of extended storage in the wet pool?

18     A.    Yes, I'm sure they were, and I'm sure that

19  they would also have been concerned about the safety of

20  extended storage in a dry cask storage, they're just,

21  you know --

22     Q.    They seem to be choosing which one they're

23  less concerned about?

24     A.    Well, that's -- yeah, that's the way it is,

25  but I mean whatever the latest proposal is they'll have

**Capital Reporting Company**

1    a concern about it.  That's my experience.

2        Q.    Do you share -- based on your experience at

3    Pacific Gas & Electric and your knowledge of Humboldt

4    Bay, do you share the intervenors' concerns about

5    extended storage of spent fuel in Humboldt Bay's wet

6    pool?

7        A.    No, not really.  I mean first I think the

8    thing is, you know, structurally sound, you know,

9    earthquake proof and if you can remember a previous

10   comment you made or question you asked me that fuel is

11   so old that even if it was dry it wouldn't melt or

12   anything like that.

13            So I mean you'd have to refill it to keep the

14   radiation level down, but it's not a meltdown

15   probability.  So I don't have a great deal more concern

16   about storing it in a wet pool than storing it any

17   other way.

18                    (Defendant's Exhibit 13 was

19                     marked for identification.)

20   BY MR. EKMAN:

21            I've handed you what's been marked as Exhibit

22   13, and this is a situation -- since it's a little bit

23   longer letter, you're welcome to read it or can read it

24   as I ask questions, if you think you need to read it.

25            But specifically this letter is a May 20th,

# Defendant

1    Q.   Up to this point, 1987, had Humboldt Bay had
2    problems with -- had any liquid spills from its spent
3    nuclear fuel?
4    A.   No, there was no liquid spills from its spent
5    nuclear fuel, but the -- the pool is a concrete pool
6    and it has a stainless steel liner to make it leak
7    tight.  We had discovered some leaks in the stainless
8    steel liner that allowed some of the water to leak out
9    of the pool and we -- we corrected that, so there
10   wasn't a spill, but there had been a little bit of
11   water leakage.
12   Q.   Since you're more familiar with these
13   environmentalist groups than I am, is it a fair
14   characterization, based on your involvement in this,
15   that these groups that were acting as intervenors,
16   these people as intervenors were concerned about the
17   safety of extended storage in the wet pool?
18   A.   Yes, I'm sure they were, and I'm sure that
19   they would also have been concerned about the safety of
20   extended storage in a dry cask storage, they're just,
21   you know --
22   Q.   They seem to be choosing which one they're
23   less concerned about?
24   A.   Well, that's -- yeah, that's the way it is,
25   but I mean whatever the latest proposal is they'll have

1    a concern about it.  That's my experience.
2    Q.   Do you share -- based on your experience at
3    Pacific Gas & Electric and your knowledge of Humboldt
4    Bay, do you share the intervenors' concerns about
5    extended storage of spent fuel in Humboldt Bay's wet
6    pool?
7    A.   No, not really.  I mean first I think the
8    thing is, you know, structurally sound, you know,
9    earthquake proof and if you can remember a previous
10   comment you made or question you asked me that fuel is
11   so old that even if it was dry it wouldn't melt or
12   anything like that.
13         So I mean you'd have to refill it to keep the
14   radiation level down, but it's not a meltdown
15   probability.  So I don't have a great deal more concern
16   about storing it in a wet pool than storing it any
17   other way.
18         (Defendant's Exhibit 13 was
19          marked for identification.)
20   BY MR. EKMAN:
21         I've handed you what's been marked as Exhibit
22   13, and this is a situation -- since it's a little bit
23   longer letter, you're welcome to read it or can read it
24   as I ask questions, if you think you need to read it.
25         But specifically this letter is a May 20th,

1    1987 letter to Mr. Fielder, and that's F-i-e-l-d-e-r,
2    from Mr. Locke, responding to the April 10th letter
3    that we just took a look at.
4          First of all, have I correctly identified the
5    letter?
6    A.   Yes.
7    Q.   And on the third page of this letter you are
8    listed as a cc or bcc actually.  Do you see that?
9    A.   Okay.  Yeah.
10   Q.   I just have a couple questions about some of
11   the language just to confirm my understanding of it.
12         On page 2 -- and just so you know, if you want
13   to read, this relates to the paragraph on the first
14   page that appears to be a revision to the first
15   paragraph on Exhibit 12 that Mr. Fielder proposed, but
16   my question is the paragraph explained in the revision
17   ends by saying:  "Under these circumstances, PG & E
18   will not incur any additional costs and will be assured
19   that the schedule for shipments will be in accordance
20   with priorities established by DOE, over which PG & E
21   has no control."
22         Do you see that at the top of the page?
23   A.   Uh-huh.
24   Q.   Again, is that consistent with our earlier
25   discussion about the manner in which acceptance

1    allocations are going to be provided under the contract
2    with DOE?
3    A.   You'll have to let me read the thing.
4    Q.   Please do.
5    A.   Okay.  Now, what was your question?
6    Q.   My question is just with respect to that
7    sentence and particularly the statement that the
8    schedule for shipments is something that PG & E does
9    not have control over.
10         Is that consistent with our -- we've discussed
11   it I think several times today that there is an
12   acceptance queue that's set by the contract and
13   ultimately it's your understanding that y'all are in
14   the queue where you're in the queue?
15   A.   Right.  I agree.
16   Q.   The last paragraph, and you can just read to
17   yourself, your final condition concerning dry cask
18   storage.  Do you see that?
19   A.   Yes.
20   Q.   If you could just read that to yourself.
21   A.   Okay.
22   Q.   Do you know where Mr. Locke would have gotten
23   the information concerning estimated costs associated
24   with dry storage, assumptions about operations and
25   maintenance costs?  Do you know where he would have

# Defendant

# Capital Reporting Company

Page 134

1  gotten that kind of information?
2      A.  I can't say specifically.  I mean, I'm sure he
3  got it from, you know, some studies that must have been
4  done, you know, in these job estimates and things.  I
5  don't know about specifically for Humboldt Bay,
6  however.  I couldn't tell you.
7      Q.  You didn't provide that information to
8  Mr. Locke?
9      A.  Somebody in my organization may have provided
10  it to him, but I didn't personally.
11      Q.  And you say that there's a possibility that
12  there were studies.  Do you specifically recall whether
13  there were any studies at this time?
14      A.  No, I don't specifically recall.  It's just
15  that there were studies going on all the time of
16  everything under the sun basically, so it wouldn't
17  surprise me if there was a study, but I don't
18  specifically recall one.
19          (Defendant's Exhibit 14 was
20          marked for identification.)
21  BY MR. EKMAN:
22      Q.  I've handed you what's been marked as Exhibit
23  14 to your deposition, and it's a handwritten document
24  entitled "For Reply to Immediate Inquiry, Draft, Re
25  Settlement Reached in Humboldt Bay Decommissioning

Page 135

1  Proceedings."
2          Have I correctly identified this document?
3      A.  It appears that you have.
4      Q.  I see that at the bottom of it there's a name
5  G.C. Sarkisian?
6      A.  George Sarkisian.
7      Q.  Who is Mr. Sarkisian in the 1987 time frame?
8      A.  I remember the name, and I'm trying to place
9  him in the organization.  My recollection, and I could
10  be wrong, but my recollection is that he was a lower
11  level person in the public relations or the media
12  department.
13      Q.  Do you recognize the handwriting on this?
14      A.  No.
15      Q.  Would you know what Mr. Sarkisian's
16  handwriting would look like if you saw it?
17      A.  No.  No.
18      Q.  You don't know what the -- at the top of this
19  page there's a note on the fax line, "SLBI hearings."
20  Do you know what that is?
21      A.  I'm sorry, SL --
22      Q.  Yeah, it's in the fax line.
23      MR. STOUCK:  Right at the top.
24  BY MR. EKMAN:
25      Q.  Says "SLBI hearings."

Page 136

1      A.  No, I don't know what that means.  I -- just
2  to try to help you though, there is a group called the
3  ASLB, which is the Atomic Safety and Licensing Board,
4  so maybe this is safety licensing board, but I don't
5  know what the "I" would be.  The ASLB was Atomic Safety
6  and Licensing Board as part of the NRC.
7          (Defendant's Exhibit 15 was
8          marked for identification.)
9  BY MR. EKMAN:
10      Q.  I've handed you what's been marked as Exhibit
11  15, which is a letter dated December 18th, 1986, from
12  you to Mr. Varga with the NRC, regarding additional
13  information on spent nuclear fuel reracking.
14          Have I correctly identified the document?
15      A.  Yes.
16      Q.  And is that your signature on page 2?
17      A.  Yes.
18      Q.  And I see that there -- there's no -- doesn't
19  appear to be another author off to the left below your
20  signature.  Does that mean that you likely wrote this
21  letter yourself?
22      A.  Yeah, I don't know why there's no other
23  signature, but I'm sure that I did not write the
24  letter.
25      Q.  One of your staff would have written it?

Page 137

1      A.  Yeah, one of my staff.
2      Q.  Now, this concerns the spent nuclear fuel
3  reracking at Diablo Canyon that you were involved with;
4  is that right?
5      A.  Yes.
6      Q.  There's an attachment to this letter, variety
7  of attachments?
8      A.  Uh-huh.
9      Q.  Do you know who would have prepared this
10  document?
11      A.  It would have been the engineering group,
12  working in conjunction with the licensing group.
13      Q.  Would you have reviewed this in your capacity,
14  this enclosure, prior to sending it to the NRC?
15      A.  Yes, I'm sure I read it, uh-huh.
16      Q.  And obviously, if there was anything incorrect
17  that stood out to you, you would have fixed it?
18      A.  Right.
19      Q.  If you could go to Table 1, which is page 17
20  of the enclosure.  It's entitled "Estimated Personnel
21  Doses For Wet Spent Fuel Reracking."  See that?
22      A.  Yes.
23      Q.  There's an assumption down here at the bottom,
24  "Assumption 1, says length of reracking job estimated
25  at nine weeks, 40 hours per week per shift two shifts

Page 138

1   per day."
2           Do you see that?
3       A.   Yes.
4       Q.   Is that a standard or was that at the time a
5   standard shift for Diablo Canyon?
6       A.   Well, it's hard for me to answer that
7   question, because there's all manner of standard
8   shifts, depending upon what your position in the
9   organization is.  I mean the standard shift for an
10  individual is a 40-hour workday -- but, of course, in
11  certain positions, in particular, operators and stuff,
12  it's a 24-hour-seven-day-a-week thing.
13          So this I -- well, I'd have to read the whole
14  document to know exactly, but I mean presumably they
15  were going to -- 40 hours per week is a standard shift,
16  two shifts a day.  Okay.  You know, it's either one,
17  two or three shifts a day, so two shifts a day I guess.
18      Q.   Do you recall how many shifts -- did Diablo
19  Canyon have three shifts a day?
20      A.   It did in operations, but like in most
21  maintenance and, you know, things like that, it was one
22  shift a day, but a few people would hang over to handle
23  problems that might occur in the middle of the night or
24  something like that.
25      Q.   When you said for operations folks it's a

Page 139

1   seven-day-a-week 24-hour-a-day job I assume you're
2   talking about people you who had -- salaried folks
3   who had managerial responsibility at the plant?
4       A.   No, I mean I'm talking about the physical
5   force operators who have to sit in the control room and
6   man the controls.
7       Q.   They're there all the time?
8       A.   Somebody's there all the time, right, a person
9   like myself.  One of the management would have had a
10  normal day shift job, and as I said, most maintenance
11  people we had on the day shift, 40 hours per week, but
12  we kept, you know, skeleton crews in the evenings
13  and for problems that arose in the middle of the night.
14      Q.   And did the operators -- would they have
15  worked eight hours?  Would you need three shifts of
16  operators --
17      A.   Yes.
18      Q.   -- to go through all 24 hours?
19      A.   Yes.
20      Q.   And if you could look at Figure -- Figure 1 is
21  I think a then current version of the rack
22  configuration in the wet pool, is that right, of Unit
23  1?
24      A.   Yes.
25      Q.   And then the next page, Figure 2, it says it's

Page 140

1   a layout of new high density racks, Unit 1 shown?
2       A.   Right.
3       Q.   Do you see that?
4       A.   Yes.
5       Q.   Is this what the pool actually ultimately
6   looked like following the rerack?
7       A.   Yes.
8       Q.   And is the cask pit area this bottom left-hand
9   corner with the X?
10      A.   Yes.
11      Q.   And I see that there are some empty spaces in
12  a few other locations around the pool.  What are those
13  for?
14      A.   Well, these things in the -- in the upper
15  left-hand corner are, as I recall, the spaces that we
16  set aside for storage of non fuel type things that we
17  might have to put in the pool.
18      Q.   And then what about the -- you know, I see two
19  gaps that are in the third row over.  I see two gaps,
20  one at the top and one at the bottom.  Do you know what
21  that is?
22      A.   I don't specifically remember, but there was
23  some -- you know, there was piping and stuff like this
24  that would get in the way.  It's probably that kind of
25  thing.  I will say though that when you look at that

Page 141

1   picture you can see we filled up the pool pretty much.
2           (Defendant's Exhibit 16 was
3           marked for identification.)
4   BY MR. EKMAN:
5       Q.   Mr. Shiffer, I've handed you what I've marked
6   as Exhibit 16, which is a memo from a G.C. Wu, W-u, to
7   you dated June 9th, 1987.
8           First of all, again, have I correctly
9   identified this document?
10      A.   Yes.
11      Q.   Who was Mr. Wu at this time, in relation to
12  you?
13      A.   George Wu, he was in the licensing group.
14      Q.   Which again reported to you?
15      A.   It reported to me, yeah, as the group that
16  interfaced with the industry and with the regulators.
17      Q.   All right.  It attaches a summary, reports to
18  be a summary of a meeting with the Department of Energy
19  that's entitled "Spent Fuel Storage Technical Exchange
20  Meeting held in Germantown, Maryland, May 13th, 1987."
21          My first question is:  Do you know why Mr. Wu
22  would have been forwarding a summary of that meeting to
23  you?
24      A.   No, other than to keep me informed.
25      Q.   And I actually didn't see -- although Mr. Wu

36 (Pages 138 to 141)

# Defendant

# Capital Reporting Company

Page 146

1    A.    Yes, unless you were going to be seeing him.
2  He refers at the end here if I'm going to be attending
3  some meeting in Arizona in mid January, so if you're
4  going to see him next week, you may have just responded
5  verbally to him, I don't know.
6    Q.    Do you know Mr. Kadak?
7    A.    Yeah.
8    Q.    And when he says -- well, let me ask this --
9  do you recall meeting him at a C.E.O. meeting in
10 Arizona around that same time period?
11   A.    No.   I met him earlier in meetings, chief
12 nuclear officer meetings type of thing, mostly in
13 Atlanta I believe.   As I indicated, by 1995 I think I
14 was off doing other things and I wouldn't have attended
15 any meeting like that.
16   Q.    In your dis-cussions-and again, I know we
17 talked about this earlier.   In your discussions, in
18 your meetings -- let me ask this:  When you met
19 Mr. Kadak, did you ever talk to him or did you just
20 introduce yourself and move on?
21   A.    Well, he was -- oh, I'm sure -- I mean, I've
22 talked to him.   I mean he was a -- the chief nuclear
23 officer, again, that's his title.   We didn't use that
24 term in those days, but he would have been the chief
25 nuclear officer back at Yankee Atomic Plant or

Page 147

1  something like this and, you know, industry leaders get
2  together periodically and discuss issues, so I've met
3  him at those kinds of things.   I'm not a good friend of
4  his, but I've met him lots of times.
5    Q.    I know we briefly talked about this earlier,
6  whether the concept of Yankee Atomic exchanging
7  acceptance allocations came up, with Pacific Gas &
8  Electric that is?
9    A.    Well, not with me particularly.   Not with me
10 specifically.
11   Q.    Do you know if it came up with someone else?
12   A.    At all?   No, I don't.
13         (Defendant's Exhibit 18 was
14          marked for identification.)
15 BY MR. EKMAN:
16   Q.    Mr. Shiffer, I've handed you what's been
17 marked as Exhibit 18.   You don't need to read it,
18 although you're welcome to.   I'm asking you this in the
19 event that I've missed something and avoiding having to
20 call you back at some point.
21         This is an E-mail.   It's from
22 pwm3@pad@mtrlpbcctr, and it's to a variety of people,
23 including, it appears, you in that first line.
24   A.    Uh-huh.
25   Q.    The to line, do you see that?

Page 148

1    A.    Yeah.
2    Q.    My question is:  If we have E-mails such as
3  this that have your E-mail address, indicate your
4  E-mail address, is it a reasonable assumption -- is it
5  reasonable to believe that you did receive the E-mail?
6    A.    I would assume so.   I used to get E-mails.
7    Q.    And your E-mail here obviously reflects your
8  then current title.   Did your E-mail address change
9  over time?
10   A.    I have no idea.
11   Q.    You have no reason to -- if your name or
12 E-mail address is in a letter you have no reason to
13 believe that you did not receive that E-mail?
14   A.    No, I would assume I received it, but I
15 couldn't tell you what my E-mail address was.
16   Q.    All right.
17         (Defendant's Exhibit 19 was
18          marked for identification.)
19 BY MR. EKMAN:
20   Q.    Mr. Shiffer, before you read the whole
21 document, again, I only have a couple questions about
22 this.   It's mostly just to make sure that I
23 authenticate the document so that I can eventually use
24 them if I decide they're relevant.
25   A.    Uh-huh.

Page 149

1    Q.    What I've handed you has been marked Exhibit
2  19, which is a July 6th, 1990 letter from you.   It
3  appears to be the Nuclear Management and Resources
4  Council in Washington D.C.   Have I correctly identified
5  this document?
6    A.    Yes.
7    Q.    First of all, do you know what the Nuclear
8  Management and Resources Council was?
9    A.    I'm getting these all confused but it's,
10 again, one of these things that's like the, you know,
11 Edison Electric Institute and what was the other one?
12 I forget the name, but they kept changing the names of
13 these things, so it was one of these industry lobbying
14 efforts I guess.
15   Q.    And who signed this letter on behalf of you?
16   A.    Brian Dettman.
17   Q.    And who was he?
18   A.    He was my administrative assistant at that
19 time.
20   Q.    Would you have written this letter?
21   A.    No.
22   Q.    Do you know -- then with respect to the
23 attachment, would you have written the attachment?
24   A.    No.
25   Q.    Do you know who would have at this time

38 (Pages 146 to 149)

## Capital Reporting Company

1  written this attachment?

2     A.  No, I'm sure it was somebody in our
3  engineering group, but who it might have been, I have
4  no idea.  It could have been in our licensing group,
5  too, they handled a lot of this kind of stuff.

6     Q.  If you could go to page 2 of that document and
7  read -- you can read yourself the questions and
8  responses to 6 and 7 on page 2 of the attachment.

9     A.  Okay.

10    Q.  Do you know why at this time it was
11  anticipated that Diablo Canyon would construct -- would
12  be constructing an above-ground dry storage facility?

13        MR. STOUCK:  Wait a minute.  Can we have that
14  question back, please?

15        (The record was read as follows:

16        "Q.  Do you know why at this time it

17            was anticipated that Diablo Canyon would

18            construct -- would be constructing an

19            above-ground dry storage facility?")

20        THE WITNESS:  Only that, you know, if we
21  weren't able to ship our fuel off site we were going to
22  have to do something, you know, in the 21st century.

23  BY MR. EKMAN:

24    Q.  And would you have -- again, would you have
25  read this document prior to sending it on your demand?

1     A.  Well, I don't specifically remember reading
2  it.  I mean, I tried to read as much as I could, but I
3  don't recall this one in particular.

4     Q.  You don't have any reason to believe it wasn't
5  sent though?

6     A.  That it wasn't sent?

7     Q.  Yeah.

8     A.  Oh, no, I'm sure that it was sent.

9        (Recess taken:  2:16 p.m. until 2:24 p.m.)

10  BY MR. EKMAN:

11    Q.  Did Diablo Canyon have a spent fuel management
12  plan?  Do you recall?

13    A.  Not -- not some stand-alone document that I
14  can recall.

15    Q.  Was it part of another document or other
16  documents?

17    A.  Once we completed the reracking and we kind of
18  put that on the back burner, I don't recall anything
19  specific.

20    Q.  How about a strategic plan, a strategic plan
21  related to spent fuel management?

22    A.  There was a -- you know, there was an annual
23  business plan and spent fuel may have been mentioned
24  from time to time, but I don't -- I don't remember a
25  specific strategic plan for spent fuel, again, during

1  the times that I was involved.

2     Q.  And you would not have prepared such a plan
3  during the times in which you were involved at Diablo
4  Canyon?

5     A.  No, because reracking took care of the problem
6  to a certain extent, at that point in time.

7     Q.  And you don't recall any of those kinds of
8  plans that you were involved in, say, in the mid 1990s?

9     A.  In the mid 1990s I definitely don't because I
10  was off doing other things.

11    Q.  All right.  If you could just go back to this
12  article, I just had a couple follow-up questions on
13  that.

14    A.  Sure.

15    Q.  Go back to that second page.

16    A.  Second page.

17    Q.  And that column I was asking you about.

18        When was the first refueling outage, do you
19  remember the year, for Humboldt Bay?

20        MR. STOUCK:  For Humboldt Bay?

21  BY MR. EKMAN:

22    Q.  For Humboldt Bay.

23    A.  It would probably -- I don't remember the
24  exact year, but I can only assume it was about a year
25  after we went into operation, so it would have been in

1  1964 or '65.

2     Q.  All right.  Now, you stated that these bloody
3  stumps, as you call them, were sent off site for
4  reprocessing ultimately; is that right?

5     A.  That's correct.

6     Q.  Do you know if Humboldt Bay recovered all of
7  the broken rods, all of the pellets, or if any pellets
8  were left either in the reactor or in the wet pool?

9     A.  Oh, I'm sure that there was pellets left in
10  the -- probably in the reactor and certainly in the
11  pool.

12    Q.  All right.  So in other words, there are --
13  there were pellets that were present that were not sent
14  off site for reprocessing?

15    A.  That's correct.

16    Q.  Are you aware of a recent investigation of
17  missing pieces of spent fuel assemblies at Humboldt
18  Bay?

19    A.  Yes.

20    Q.  And how are you aware of that investigation?

21    A.  Because the people from Humboldt called me up
22  and asked me what I could remember from 1968 or
23  whatever it was.

24    Q.  And why do you say -- what's significant about
25  1968?

Page 154

1    A.   Well, it may not have been 1968, it may have
2  been early '70s, but I mean basically, there was
3  apparently an experiment that was going to be run where
4  some of these broken fuel assemblies or something
5  were -- they were looking at different ways to ship
6  them or something, and apparently they asked for a
7  piece of one of these fuel assemblies.
8         So it was cut out of the fuel assembly and was
9  going to be sent off site, but then they decided it
10  wasn't necessary and so they kept it in the pool, but
11  apparently it wasn't very well marked as to where they
12  put it in the pool, so they were asking if I could
13  remember what they did with it, which I couldn't.
14    Q.   Do all of the little pellets of -- I say
15  "little," I shouldn't say that.  Do all the pellets
16  ultimately have to be removed from a wet pool in order
17  to drain it and decommission it, decontaminate it,
18  decommission it?
19    A.   Yes.
20    Q.   What did you tell the folks from Humboldt Bay
21  when they called you concerning this issue?
22    A.   Well, that I really wasn't involved that much
23  in that particular little operation.  I told them the
24  names of a couple of people who probably were and
25  that's basically about it.  And they asked -- you know,

Page 155

1  I wasn't a great deal of help to them I don't think.
2    Q.   Who did you tell them might be of more help?
3    A.   Fellow by the name of John Gisclon.
4    Q.   How do you spell that?
5    A.   G-i-s-c-l-o-n.
6    Q.   And who is Mr. Gisclon?
7    A.   Well, he's an engineer who took over for me at
8  Humboldt Bay when I started going off doing Diablo
9  Canyon things.  And so I think he was the person that
10  was doing more of that kind of thing at that time frame
11  than I was.  I was really off doing Diablo Canyon stuff
12  by that time.
13    Q.   Was there anyone else that you told them might
14  have that information?
15    A.   Well, I gave them the names of several people
16  who I remembered worked there.  Most of them they
17  already knew and they already contacted them so I
18  just --
19    Q.   Do you remember who they were?
20    A.   Oh, fellow by the name of Don Bakens, who was
21  a maintenance man.
22    Q.   How do you spell that?
23    A.   B-a-c-k-e-n-s.
24    Q.   Okay.
25    A.   I think one of the old operators, Dick Leach,

Page 156

1  L-e-a-c-h.  Few names that I could remember.  Randy
2  Parker.
3    Q.   Who's that?
4    A.   Randy Parker.  These are just names that I
5  could remember from that era that might remember
6  something that I didn't remember.
7    Q.   Were you contacted at all by the NRC
8  concerning this issue?
9    A.   No.
10    Q.   Any regulatory agency contacted you?
11    A.   No.
12    Q.   Just the people from Humboldt Bay?
13    A.   Right.
14    Q.   And what did they tell -- I mean what did they
15  tell you was -- when they called you, got you on the
16  phone, what did they tell you was the reason for the
17  call?
18    A.   That they were, you know, they were cleaning
19  up the pool and consolidating waste, you know, not fuel
20  assemblies, but other waste that was in there and that
21  somehow they had lost track of where this 13-inch or
22  whatever it is, 13-inch segment of one fuel rod had
23  gotten to.
24    Q.   Outside of that 13-inch piece that you're
25  talking about, did they tell you that there were other

Page 157

1  things that were missing or needed to be accounted for
2  in the pool?
3    A.   No, that was the only one that I can remember
4  that they told me was missing.
5    Q.   Did you review any reports that were
6  ultimately prepared by PG & E concerning this matter?
7    A.   No.
8    Q.   Were you ever contacted again by PG & E
9  concerning this matter?
10    A.   Well, I think I got called a couple of times.
11  Most recent time was by Bruce Norton, who was working
12  on it.  I don't remember what he asked me specifically,
13  other than there was a chance that the NRC might call
14  me up and ask me questions or something.
15    Q.   And they didn't?
16    A.   They haven't so far.
17    Q.   When was that call with Mr. Norton?
18    A.   Oh, I don't know, couple months ago I guess.
19    Q.   Who is Bruce Norton?  What's his job?
20    A.   Bruce Norton is a private attorney that PG & E
21  has used on nuclear matters for years.  He was involved
22  in the Diablo licensing.
23    Q.   And who called you?  Is Mr. Norton the only
24  one you've had contacts with concerning this issue?
25    A.   No, the current plant manager I believe.

40 (Pages 154 to 157)

# Nancy Slater

# Plaintiff

00001

1    IN THE UNITED STATES COURT OF FEDERAL CLAIMS

2 - - - - - - - - - - - - - - - X

3 YANKEE ATOMIC ELECTRIC          :

4 COMPANY,                        :

5        Plaintiff,       :  Case No. 98-126C

6     v.                   :  Senior Judge

7                          :   Merow

8 THE UNITED STATES,              :

9        Defendant.        :

10 - - - - - - - - - - - - - - X

11                 Washington, D.C.

12 .              Wednesday, April 21, 1999

13         Deposition of NANCY H. SLATER, a

14 witness herein, called for examination by counsel

15 for Plaintiff in the above-entitled matter,

16 pursuant to agreement, the witness being duly

17 sworn by JAN A. WILLIAMS, a Notary Public in and

18 for the District of Columbia, taken at the

19 offices of Spriggs & Hollingsworth, 1350 I

20 Street, N.W., Washington, D.C., at 10:10 a.m.,

21 Wednesday, April 21, 1999, and the proceedings

22 being taken down by Stenotype by JAN A. WILLIAMS,

23 RPR, and transcribed under her direction.

24

25

**Slater, Nancy H. Vol. 1-Plt Fact4/21/99          Page 1**

00005

1 waste acceptance.

2    Q.   And let me tell you just briefly

3 procedurally how it will work.  I'll be asking

4 you a series of questions and you will be

5 expected to answer the questions.  As we

6 discussed even before we went on the record, the

7 court reporter is taking everything down and

8 we'll get a written transcript of everything

9 that's said today.  Do you understand that?

10    A.   Yes.

11    Q.   And it will also be helpful for the

12 court reporter's purposes so we get a clean

13 transcript if you will respond as you just did.

14    A.   Verbally.

15    Q.   A nice verbal answer, yes or no or

16 whatever the appropriate response might be.

17    A.   I understand.

18    Q.   Also I would ask, if you don't

19 understand one of my questions, you're not sure

20 what I'm asking in one of my questions, if you

21 would please ask me to rephrase it rather than

22 trying to answer a question you're not sure what

23 the question is.

24    A.   Will do.

25    Q.   I appreciate that.  Where do you work?

**Slater, Nancy H. Vol. 1-Plt Fact4/21/99**          **Page 5**

00006

1    A.   At the U.S. Department of Energy in the

2 Office of Civilian Radioactive Waste Management

3 in the Regulatory Coordination Division.

4    Q.   What's your job title there?

5    A.   Team leader.

6    Q.   And what are you a team leader of?

7    A.   The entire division basically.  I serve

8 in lieu of a deputy division director.  And we

9 deal with the regulatory concerns between the

10 program and the Nuclear Regulatory Commission,

11 the EPA, National Academy of Science, and

12 dealings with the Nuclear Waste Technical Review

13 Board.

14    Q.   When you say you deal with regulatory

15 concerns of EPA, NRC, and the other agencies,

16 what do you do on a day-to-day basis vis-a-vis

17 the NRC?

18    A.   Let's see, a typical example would be

19 the fact that we are involved in developing

20 safeguards and security policy guidelines for the

21 eventual acceptance and disposal of a variety of

22 waste forms.  And those policy guidelines will be

23 translated into actual waste acceptance criteria

24 by another group.

25         And the waste owners will then have to

00007

1 assure that the waste they deliver falls within

2 the boundary parameters established by the

3 guidelines with one exception, there will be no

4 new requirements imposed on the utilities because

5 the standard contract is quite clear in terms of

6 what can be asked for and what cannot.

7    Q.   And so you're constantly working with

8 EPA, NRC in developing various guidelines that

9 they're going to be using?

10    A.   Right, reporting on progress in the

11 program and quality assurance issues, things like

12 that.

13    Q.   How many people are in this division?

14    A.   I don't know, I have to count.  Six.

15 .   Q.   And who heads up the division?

16    A.   Alan Brownstein, he's the division

17 director.

18    Q.   And what is this the division of?

19    A.   Regulatory Coordination.

20    Q.   It's the Regulatory Coordination

21 Division.  Is this a division of a larger office?

22    A.   It would be the office of -- we have

23 reorganized, we have new names for everything.

24 But it would be the program management and

25 integration function.

00008

1    Q.   What is the program management and

2 integration function?

3     A.   These are in one division the budget

4 folks, in another division the information

5 management folks, it might be human resource

6 folks in another division.  And we are the

7 division -- the only division within that group

8 that has any technical or policy

9 responsibilities.  There is a separate office,

10 there are two offices, in the other office is

11 acceptance and transportation integration.

12    Q.   And who heads up the program management

13 and integration office?

14    A.   Let's see, that would be Dwight

15 Shelor.

16 ·  Q.   How long have you been a team leader in

17 the Regulatory Coordination Division?

18    A.   Let's see, I moved in late '95.  About

19 three and a half years, almost four years.

20    Q.   Since that move three and a half, four

21 years ago, have there been any other

22 reorganizations within your office?

23    A.   Within my particular Office of Program

24 Management?

25 ·  Q.   Well, let me start with the Regulatory

00009

1 Coordination Division.  Has there been any

2 reorganization within that division?

3    A.   Yes, because, in fact, we had a RIF

4 last year.  And we RIF'd two people out of the

5 division, one of whom was a team leader.  Our

6 roles and responsibilities did not change.

7    Q.   When you had two team leaders, was

8 there any division as to what the two team

9 leaders were leading?

10    A.   Yes.

11    Q.   What were the two team leaders leading

12 at that point?

13    A.   The other team leader was leading

14 environmental regulatory issues and issues

15 dealing with the Nuclear Waste Technical Review

16 Board.  And my function was primarily Nuclear

17 Regulatory Commission interface.

18    Q.   And now you're basically team leader

19 for all of them?

20    A.   Doing it all.

21    Q.   In that same three and a half to four

22 year time span since you've been in your current

23 position, has there been any other reorganization

24 at the office, the Office of Program Management

25 and Integration?

00010

1    A.   Yes, as a matter of fact, up until

2  December -- actually January 1 of this year, the

3  two offices would have had two associate

4  directors.  One retired and so the remaining

5  office director now manages both.  That was

6  Dwight Shelor.

7    Q.   And who was the associate director that

8  left?

9    A.   Samuel Rousso.

10    Q.   Before Mr. Rousso left, how did they

11  have it divided up?

12    A.   Mr. Rousso would have had program

13  management and Mr. Shelor had acceptance and

14  transportation.  Let's see.  Yes, that's right.

15    Q.   Maybe I misunderstood.  So this is

16  within the Office of Program Management and

17  Integration that's now headed up by Mr. Shelor?

18    A.   There were two offices.  Samuel Rousso

19  headed the management group, basically management

20  functions, Dwight Shelor headed the acceptance

21  and transportation group.  Samuel Rousso

22  retired.  Both offices continue to exist.  But

23  now Dwight Shelor manages both.

24    Q.   I see.  And above the office level the

25  next thing you get to is the Office of Civilian

00011

1  Radioactive Waste Management itself?

2    A.  Is the deputy director and the

3  director, it's the highest level.

4    Q.  And has there been any other

5  organizations within the -- reorganizations

6  within the whole RW organization besides the ones

7  that you've just mentioned in the last three and

8  a half to four years?

9    A.  To be honest with you, I try not to

10  keep track of that.  We play musical chairs.  And

11  I believe that the systems integration group may

12  have moved from program management to acceptance

13  and transportation.

14    Q.  Three and a half years ago, when you

15  came into your current position, what position

16  did you have previously?

17    A.  Prior to that I was the team leader in

18  waste acceptance.

19    Q.  And waste acceptance was part of what

20  division at that time?

21    A.  Well, it was a division, waste

22  acceptance was a division.

23    Q.  And who was director of the division at

24  that time?

25    A.  We had acting directors.  I served as

# Plaintiff

00014

1 division?

2    A.   Let's see.  I joined DOE in August

3 1991.  And at that time we had branch chiefs.

4 And Alan Brownstein was the branch chief.  I

5 honestly do not remember precisely when the

6 department decided it would no longer have branch

7 chiefs, it would rename them and it would create

8 division directors and team leaders.

9        And I would have to guess -- I'd have

10 to go back and look to make sure, but my

11 recollection is it might have been around 1993,

12 1994.

13    Q.   What is a team leader?

14    A.   Team leader is responsible for

15 individual contributions, being a subject matter

16 expert in some areas or a particular area,

17 responsible for managing the entire team,

18 eliminating obstacles, giving people a fresh look

19 by stepping outside the box they're standing in,

20 trying to solve the problem.  So they're a little

21 bit of both, technical worker and manager.

22    Q.   But technically a team leader is not a

23 supervisor?

24    A.   No, no.  Unfortunately you have the

25 responsibilities but not the privileges of

00015

1 writing evaluations, signing leave slips, that

2 kind of thing.

3    Q.   That position is that of the division

4 director?

5    A.   Right.

6  .  Q.   When you were team leader of waste

7 acceptance roughly somewhere around 1993 to '95,

8 who was on your team?

9    A.   I have to do this by going around the

10 room.  Phil Smith, Bill Floyd, Mary Lee Payton,

11 Kristin Svinicki, John Vlahakis, and I would

12 consider my secretary to be part of the team as

13 well, Deborah Evans.

14    Q.   Were there any changes in the team

15 during your tenure as team leader?

16    A.   Yes.  In fact, we hired Dave

17 Zabransky.  And, when Dave came into the

18 division, we reorganized the division with two

19 team leaders and divided the work load up.

20    Q.   Why did that happen?

21    A.   It was certainly a more efficient way

22 to operate.  And, to be quite frank, I was

23 overloaded with too much work.

24 ·  Q.   When did that reorganization take

25 place?