# Plaintiff

00019

1    A.   An office, right.

2    Q.   What office would it have been part of?

3    A.   I don't know, I think they may have

4 called it the waste acceptance storage and

5 transportation office.  But again I don't commit

6 things like that to memory.  I feel there are

7 organization charts that I can go pull to look it

8 up.

9    Q.   And, between 1991 and 1993,

10 Mr. Brownstein was the branch chief?

11   A.   Yes.

12   Q.   And after 1993 Mr. Brownstein became

13 division director?

14   A.   Director.

15   Q.   And, between '91 and '93, do you recall

16 who was the division director?

17   A.   Jim Carlson.

18   Q.   And then who was the office director

19 above Mr. Carlson?

20   A.   Ron Milner.

21   Q.   What were your duties in this 1991 to

22 1993 period when you were an industrial

23 specialist?

24   A.   I was involved in the preparation of

25 the annual capacity report, the acceptance

00020

1 priority ranking, answering questions both

2 internal and external about the terms and

3 conditions of the contract. Let's see. And

4 whatever else may have arisen at the time.

5        I know, when we came in, we were on the

6 tail end of a rulemaking, net versus gross, as

7 sold was that clarification. So I wrapped part

8 of that up. I believe I terminated a couple of

9 nonutility contracts at the contract holder's

10 request because they either no longer had the

11 material or had, in fact, in one case I believe

12 sold it to the government.

13    Q.  Do you remember any other issues you

14 worked on during that period?

15    A.  '91 to '93, I think we began to discuss

16 delivery commitment schedules at that point.

17 Would that be about right? That would be about

18 right.

19    Q.  That would also have included exchange

20 of approved delivery commitment schedules?

21    A.  Actually my recollection is that we

22 discussed exchanges not concurrently, because

23 there was the opportunity to do that a little

24 later. And it was more important given the

25 timing requirement in the contract to have that

00021

1 guidance issue.

2    Q.  And guidance as to what to do with the

3 delivery commitment schedules themselves?

4    A.  How to fill them out, instructions.  I

5 believe, if I'm not incorrect, that that's an OMB

6 reviewed form.  And you know that process, that

7 takes time and there must be instructions on how

8 to complete the form.

9    Q.  What was the time concern?

10    A.  I believe the contract requires

11 delivery commitment schedules to be submitted by

12 the purchaser 63 months in advance of the year in

13 which they have an allocation.  So back it out

14 from 1998, and they would have been submitting in

15 '92, late '92.

16    Q.  Are there any other issues that you

17 recall working on in the '91 to '93 period?

18    A.  Let's see.  I know we addressed

19 priority for shutdown reactors.  And nothing else

20 comes to mind right now.

21    Q.  What about the period '93 to '95, what

22 issues did you work on?

23    A.  During that time period, I believe I

24 worked on delivery commitment schedule exchanges,

25 many of the same things from '91 and '93, the

00022

1 acceptance, priority ranking, the annual capacity

2 report, DCS review and approval.

3        We began conversations about final

4 delivery schedules and what would be included in

5 those, safeguards and security, and that was

6 policy development. I know that I worked on

7 numerous reviews of system baseline documents,

8 system requirements documents primarily from a

9 waste acceptance standpoint. And I know we kept

10 working on priority for shutdown reactors.

11    Q.  Let me ask you to clarify what you mean

12 by just a couple of these categories. Safeguards

13 and security, what was involved with safeguards

14 and security?

15    A.  NRC regulations require that a licensee

16 have in place a safeguards and security system.

17 And that means physical security as in physical

18 protection. And that physical protection is

19 based on the attractiveness of the material,

20 would someone want to steal it to make a bomb.

21        They also require as another subelement

22 material control and accounting. That is that,

23 if you as a utility tell me that you're giving me

24 ten MTU, you have to provide me with some

25 documentation to give me confidence that you are;

00023

1 because, once I accept it, I'm going to have to

2 swear and affirm to the NRC that I've got ten

3 MTU.

4        And what we were working with the

5 utilities to do, and it was an iterative process,

6 it was lots of help and lot of involvement from

7 the utility as well, was a process that would not

8 impose an undo burden on them to do something

9 that they weren't currently doing.

10        For example, they would address

11 material control and accounting issues through

12 calculation, burnup, for example, but they would

13 not measure.  And measurements would have been an

14 operational impact.  So we were looking for ways

15 to get what we needed to accomplish without

16 disrupting their operations.  So there were lots

17 of people talking to each other about that.

18     Q.  You said you reviewed a number of what

19 you called system baseline or system requirements

20 documents.  What's a system baseline document?

21     A.  I guess the simplest way to describe it

22 would be that these are the overall driving

23 requirements for the design and operation of a

24 repository.  They are, in fact, obtained from

25 legislation, regulation, and that's probably the

**Slater, Nancy H. Vol. 1-Plt Fact4/21/99        Page 23**

# Defendant

Nancy H. Slater                    April 22, 1999

*Page 206 to Page 312*

CONDENSED TRANSCRIPT AND CONCORDANCE
*PREPARED BY:*

*ALDERSON REPORTING CO. INC.*
*1111 14th St, N.W.*
*4th Floor*
*Washington, DC  20005*
*Phone:  1-800-FOR-DEPO*
*FAX:  1-800-367-3310*

## Page 206

1) IN THE UNITED STATES COURT OF FEDERAL CLAIMS

2) - - - - - - - - - - - - - - X

3) YANKEE ATOMIC ELECTRIC

4) COMPANY,

5)        Plaintiff,      : Case No. 98-126C

6)        v.              : Senior Judge

7)                        : Merow

8) THE UNITED STATES,

9)        Defendant.      :

- - - - - - - - - - - - - - X

                Washington, D.C.

                Thursday, April 22, 1999

3)     Continued deposition of NANCY H.

4) SLATER, a witness herein, called for examination

5) by counsel for Plaintiff in the above-entitled

6) matter, pursuant to agreement, the witness being

7) previously duly sworn, taken at the offices of

8) Spriggs & Hollingsworth, 1350 I Street, N.W.,

9) Washington, D.C., at 2:10 p.m., Thursday, April

0) 22, 1999, and the proceedings being taken down by

1) Stenotype by JAN A. WILLIAMS, RPR, and

2) transcribed under her direction.

4)

5)

## Page 207

2) APPEARANCES:

3)    On behalf of the Plaintiff:

4)       ROBERT L. SHAPIRO, ESQ.

5)       SUSAN SACHS, ESQ.

6)       Spriggs & Hollingsworth

        1350 I Street, N.W.

        Washington, D.C. 20005-3305

        (202) 898-5854

    On behalf of the Defendant:

       MARIAN E. SULLIVAN, ESQ.

       Trial Attorney

       Commercial Litigation Branch

       U.S. Department of Justice

       1100 L Street, N.W.

       Room 10150

       Washington, D.C. 20530

       (202) 307-6289

## Page 208

(1)              C O N T E N T S

(2) WITNESS        EXAMINATION BY COUNSEL FOR

(3) NANCY H. SLATER         PLAINTIFF

(4) By Mr. Shapiro      209

(5)

(6)              E X H I B I T S

(7) SLATER EXHIBIT NO.              PAGE NO.

(8) 17 - Memo dated 8/5/94      209

(9) 18 - Memo dated 5/16/90 with attachments    215

(10) 19 - Letter dated 2/10/95 with attachments   221

(11) 20 - Memo dated 6/24/93         233

(12) 21 - Letter dated 6/24/93         249

(13) 22 - Contract for Disposal of Spent Nuclear

(14)    Fuel and/or High-Level Radioactive Waste

(15)    dated 6/22/83              254

(16) 23 - Acceptance Priority Ranking & Annual

(17)    Capacity Report dated March 1995    275

(18) 24 - Complaint               306

(19)

(20)

(21)

(22)

(23)

(24)

(25)

## Page 209

(1)              P R O C E E D I N G S

(2) Whereupon,

(3)          NANCY H. SLATER,

(4) the witness on the stand at the time of recess,

(5) having been previously duly sworn, was further

(6) examined and testified as follows:

(7)          EXAMINATION BY COUNSEL

(8)       FOR PLAINTIFF - RESUMED

(9)       BY MR. SHAPIRO:

(10)    Q.  Ms. Slater, we're here for the

(11) continuation of your deposition. You understand

(12) you're still under oath?

(13)    A.  Yes.

(14)    Q.  Do you understand that?

(15)    A.  Yes, I do.

(16)    Q.  You may recall at the end of yesterday

(17) we were talking about exchanges of approved

(18) delivery commitment schedules?

(19)    A.  Yes.

(20)    Q.  I want to just have a few more

(21) questions on that subject. Let me have another

(22) document marked and show it to you.

(23)         (Slater Exhibit No. 17 was

(24)          marked for identification.)

(25)    BY MR. SHAPIRO:

## Page 210

(2) Q. Ms. Slater, you've been given what's

(2) been marked as Slater Exhibit 17. Take a look at

(3) that document and tell us if you recognize it?

(4) A. Without reviewing it in detail, yes.

(5) Q. Can you tell us what Slater Exhibit 17

(6) is?

(7) A. The program had envisioned that there

(8) would need to be some idea of what actual

(9) operations for the entire system would look

(10) like. That included waste acceptance,

(11) transportation, perhaps storage at some point,

(12) and then the repository.

(13)    The transportation division was

(14) focusing on a transportation concept of

(15) operations. And we were focusing on a waste

(16) acceptance concept of operations.

(17)    The M&O had drafted a document that

(18) described what that concept would involve. And I

(19) had asked that Scott Vance who works for JAI

(20) review that draft generated by the M&O and

(21) provide me with his comments on topics that were

(22) particularly relevant to the waste acceptance

(23) process and the standard contract, because again

(24) this was an opportunity to make sure that no

requirements were to be imposed on utilities that

## Page 211

(1) were not entirely consistent with the standard

(2) contract.

(3) Q. Let me make sure I understand.

(4) Mr. Vance was looking at two things separate or

(5) in combination, he was looking at concept of

(6) operations draft for the acceptance and

(7) transportation plan and then he was also looking

(8) at the exchange process. Was he looking at those

(9) two things together?

(10) A. He needed to look at the exchange

(11) process to assure that the concept of operations

(12) did not contradict anything that was in the

(13) exchange process document. So the focus of the

(14) review was the concept of operations. And you

(15) would use as the basis for your review the

(16) standard contract and then documents that

(17) supported the contract.

(18) Q. So Mr. Vance worked for JAI. Was he an

(19) engineer or what sort of role does he play?

(20) A. Yes, he is, I believe he's a nuclear

(21) engineer that graduated from MIT.

(22) Q. And he was one of the consultants that

(23) you would occasionally go to to ask for advice

( ) such as this?

(25) A. Yes.

## Page 212

(1) Q. Let me point you to a particular page

(2) of the document, page 3. The top paragraph on

(3) that page, in the middle of that paragraph,

(4) there's a sentence that begins approved DCS's are

(5) the basis for the establishment of the

(6) transportation system performance requirements.

(7) Do you see that?

(8) A. Yes.

(9) Q. And then he says, once this baseline

(10) system is established, the ability to

(11) approve/disapprove an exchange request should be

(12) very straightforward and involves answer to the

(13) simple question can we accomplish this new

(14) proposed delivery using the system that we

(15) designed for the original delivery?

(16) A. Yes.

(17) Q. Does that statement in Mr. Vance's

(18) memorandum, Slater Exhibit 17, is that consistent

(19) with your understanding of how RW was intending

(20) the exchange process to work?

(21) A. I'm not going to speak for everyone in

(22) RW, but I will speak for myself. And it is

(23) consistent with my understanding of how that

(24) process would work.

(25)    As we discussed yesterday, it is

## Page 213

(1) possible, if two utilities exchange slots in the

(2) queue, one owning a PWR, one owning a BWR, that

(3) twice as much fuel could be delivered. That

(4) would obviously affect transportation because you

(5) could conceivably need twice as many casks.

(6)    And you might have to procure

(7) additional casks. There's a lead time on

(8) procurements. And so it would conceivably be

(9) possible, if enough exchanges were submitted, to

(10) entirely disrupt the transportation operation.

(11) You might not have sufficient resources allocated

(12) to perform the actual acceptance and

(13) transportation.

(14) Q. You said you were speaking for

(15) yourself, not necessarily all of RW.

(16) A. Yes.

(17) Q. Are you aware of anyone in RW who had a

(18) different view of how the exchange process would

(19) work?

(20) A. Not specifically.

(21) Q. Generally are you aware?

( ) A. Not generally either.

(23) Q. To the best of your understanding, is

(24) the view that you have with respect to this

(25) concept of the exchange process, is it consistent

## Page 214

(1)   . what was generally held at least within the
(2)  utility interface branch where you worked?
(3)      A.   At the time this was done, I think I
(4)  would have been in it that sense. So, when
(5)  you're asking if it was consistent with the
(6)  branch's or the division's perspective, it would
(7)  have been my perspective; and yes, it is
(8)  consistent with my perspective. So this is not
(9)  something that I recall anyone having specific
(10)   decision-making involvement other than me.
(11)      Q.   Why was the baseline as it was called
(12)  here the basis system that was being used based
(13)  upon the delivery commitment schedules as opposed
(14)  to an expectation of what expected exchange
(15)  requests would look like?
(16)      A.   Let me see if I understand the
(17)  question. At the time this was generated, we had
(18)  received delivery commitment schedules. Those
(19)  were absolute quantitative and easily analyzed.
(20)        The other involves prediction. And
(21)  your guess would be equally as valid as my guess
(22)  as to what exchanges would occur between which
(23)  utilities. You cannot in my opinion procure,
(24)  plan for, and operate a system based on that type
(25)   projection, particularly when you have in your

## Page 215

(1)  hands approved DCS's.
(2)      MR. SHAPIRO:   Let me show you another
(3)  document.
(4)        (Slater Exhibit No. 18 was
(5)        marked for identification.)
(6)      BY MR. SHAPIRO:
(7)      Q.   Ms. Slater, you've been handed what
(8)  we've had marked as Slater Exhibit 18. Do you
(9)  recognize this document?
(10)      A.   Not offhand. And I note that the date
(11)  on it is approximately a year and a quarter
(12)  before I came to DOE. Would you mind if I took a
(13)  moment to look at it?
(14)      Q.   Definitely take a look.
(15)      A.   Okay.
(16)      Q.   Now that you've had a chance to review
(17)  it, do you recognize the document better?
(18)      A.   Not specifically, no. But I recognize
(19)  the topics discussed in the document.
(20)      Q.   Let me ask then at least about the
(21)  people mentioned in the cover. It says it's a
(22)  memo from Pat McDuffie. Do you know who Pat
(23)  McDuffie is?
(24)      A.   Pat McDuffie was a consultant at PNL,
(25)  now retired as I understand it.

## Page 216

(1)      Q.   Do you know what her role would have
(2)  been around May 16, 1990, the date on Slater
(3)  Exhibit 18?
(4)      A.   His role.
(5)      Q.   His role.
(6)      A.   No, I don't, because I was not there at
(7)  the time. I have no idea what his particular
(8)  role was.
(9)      Q.   What was his role when you were working
(10)  in that office?
(11)      A.   An advisor on various standard contract
(12)  issues, primarily to Alan Brownstein.
(13)      Q.   And then it says on Slater Exhibit 18
(14)  that the memo was written to A.B. Brownstein. I
(15)  assume that's Alan Brownstein?
(16)      A.   That's Alan Brownstein.
(17)      Q.   And D.C. Langstaff. Do you know who
(18)  that is?
(19)      A.   That's Dave Langstaff. And I cannot
(20)  recall what his affiliation is.
(21)      Q.   Maybe this is purely as a matter of
(22)  curiosity, but it seems to have a header on it
(23)  that says don't say it, write it. Did someone in
(24)  particular tend to put that on their memoranda?
(25)      A.   No. I've seen that before, but I don't

## Page 217

(1)  recall who would have done that.
(2)        (Discussion off the record.)
(3)      BY MR. SHAPIRO:
(4)      Q.   Ms. Slater, the first page of Slater
(5)  Exhibit 18 is sort of a cover memo and then
(6)  there's a document entitled The DCS Exchange
(7)  Process. And I'd like to point your attention to
(8)  the second page of that document.
(9)      A.   Okay.
(10)      Q.   On this page the lines are numbered.
(11)  And, if you look at line 5, the sentence that
(12)  begins at the end of line 5, it says, "If the
(13)  Purchasers who find themselves at the limit of
(14)  their pool storage capacity are not those who can
(15)  anticipate timely delivery of SNF to the WMS,
(16)  they will have to develop alternative storage
(17)  capacity."
(18)        And then it says, "This shortcoming of
(19)  the OFF allocation method was recognized when the
(20)  Contract was written. In an effort to minimize
(21)  this shortcoming, and at the request of the
(22)  Purchasers, DOE included in the Contract a
(23)  provision for the exchange of approved DCSs among
(24)  Purchasers." Do you see that?
(25)      A.   Yes.

# Defendant

### Page 222

(1)    A. Yes, I do.  May I have a moment to look

(2) through it?

(3)    Q. Definitely.

(4)    A. Okay.

(5)    Q. Can you tell us what Slater Exhibit 19

is?

(7)    A. In our parlance it appears to be a

(8) preliminary draft of a process by which we would

(9) evaluate delivery commitment schedule exchanges

(10) for their impacts on the total system.  And that

(11) would include waste acceptance, transportation,

(12) storage and disposal to the extent that those

(13) portions of the system were sufficiently

(14) developed to be able to evaluate those impacts.

(15)    Q. You said this document is titled a

(16) preliminary draft.  Do you have a recollection or

a sense from looking at this document and its

transmittal letter how far along in the process

this draft was?

(20)    A. I do not recall.  But it would be my

(21) belief that we were perhaps three-quarters of the

way through the process.  Generally speaking a

document that's submitted formally like this is

being submitted for a formal review, if you

So you're close.

### Page 223

(1)    Q. Would the individual components to do

an acceptance transportation and whatever other

appropriate components, would they have already

seen parts of the document or are they seeing it

for the first time?

(5)    A. I couldn't speak to that, I don't

know.  For example, I can speak for waste

acceptance.  We would have likely seen the waste

acceptance portion.

(9)    Q. If you could turn to page 20 of Slater

Exhibit 19.  I would point your attention to the

last paragraph on page 20, the first sentence of

that paragraph that says, based on approved

delivery commitment schedules, transportation

would have developed a cask procurement strategy

which will result in a cask fleet of the required

size and for each planning horizon.

Is this then that same concept we've

been discussing, that, when looking at whether or

not to approve a proposed exchange of delivery

commitment schedules, that you would first look

at a transportation plan based upon trying to

e the original delivery commitment

s.   .ules, not anticipating exchanges?

A. You would look at whether or not you

### Page 224

(1) could accommodate a change.  You would first look

(2) at whether or not the DCS exchange itself met the

(3) conditions set out in the DCS exchange procedure

(4) in terms of no more MTU being requested than

(5) being allocated.

(6)    And then you would assess various

(7) impacts on various parts of the system with an

(8) eye towards accommodating, if possible, and I

(9) know that we wrote this in at least one document,

(10) perhaps recommending alternative ways to

(11) accomplish what the utility wished to

(12) accomplish.

(13)    Q. If you could explain that, the idea

(14) would be that, if DOE had to reject a particular

(15) exchange, DOE would take it upon itself to offer

(16) up an alternative?

(17)    A. Not in the sense of a precise

(18) alternative but in the sense that, for example,

(19) if the MTU allocation, if they had -- let's see,

(20) this will get into another topic.

(21)    We've talked about the plus or minus 20

(22) percent and the theory that you want a full cask,

(23) not a half full cask.  If they actually submitted

(24) for less than the allocation because they

(25) believed that they could not submit at the

### Page 225

(1) allocation because it would be rounded down, we

(2) would tell them submit the full allocation

(3) because it will likely be rounded up.  So we

(4) would send it back to them and say you're really

(5) entitled to more, resubmit your DCS exchange.

(6)    Q. When you say rounded up or rounded

(7) down, you mean rounded up to the next full cask?

(8)    A. Full cask, right.  If they had -- if

(9) they were one assembly short in a full cask,

(10) then, at the time of acceptance, it was

(11) understood that we would permit them to include

(12) the additional assembly and debit their next

(13) year's allocation for that amount.

(14)    Q. We might have covered this yesterday.

(15) But, just to make clear, the reason for allowing

(16) rounding to a full cask is that it was just more

(17) efficient to use full casks rather than partial

(18) casks?

(19)    A. System efficiencies, yes.

(20)    Q. And the reason for that is you have to

(21) move the cask anyway so you might as well move it

(22) full, it's the same amount of trouble to move it

(23) full or half full?

(24)    A. Yes.

(25)    Q. Let me go back to Slater Exhibit 19,

## Page 226

1  that page on the transportation issue. Perhaps
.)  if you could take a look at that whole page and
(3)  let me try to rephrase my question. What I'm
(4)  trying to get at is, by the time this issue got
(5)  to this level of draft, was the plan still to
(6)  base the decision on whether or not to approve a
(7)  proposed exchange of delivery commitment
(8)  schedules on the transportation plan that would
(9)  have been created based on the queue as opposed
(10)  to a transportation plan based on anticipated
(11)  exchanges?
(12)     A.  Yes, it would have been based on
(13)  approved delivery commitment schedules.
(14)     Q.  Do you recall any discussions or
(15)  considerations at this stage of the process on
(16)  transportation plan or acceptance plan or any
(17)  other plan for that matter being based upon
(18)  anticipated exchanges as opposed to approved
(19)  delivery commitment schedules?
(20)     A.  I don't recall myself having any
(21)  significant thoughts about that, because my
(22)  intention was that it be based on approved
(23)  DCS's. I cannot speak for the transportation
(24)  people.
(25)     Q.  You just don't know what was going on

## Page 227

(1)  with them?
(2)     A.  Right.
(3)     Q.  And, other than Bill Teer who you
(4)  mentioned earlier, you can't tell us anyone else
(5)  we might talk to who might be able to give us
(6)  more information on that issue, on what was being
(7)  done in the transportation area?
(8)     A.  I seem to recall that Jim Carlson at
(9)  DOE might have been involved.
(10)     Q.  Anyone else?
(11)     A.  I can't recall.
(12)     Q.  Now, is your recollection that
(13)  ultimately a final draft was developed of this
(14)  document, evaluation of delivery commitment
(15)  schedule exchange requests?
(16)     A.  I believe it was.
(17)     Q.  Do you have a sense of when that final
(18)  document was prepared?
(19)     A.  No, I really don't.
(20)     Q.  This draft says it was prepared by
(21)  TRW. It would have been your expectation that
(22)  the final would also been prepared by TRW?
(23)     A.  Yes.
(     Q.  And the transmittal letter for that
(     draft is from a James Blandford at TRW. Do you

## Page 228

(1)  recall Mr. Blandford?
(2)     A.  Yes, I do.
(3)     Q.  Was he directly involved in that
(4)  project?
(5)     A.  Not directly. He would probably have
(6)  been the equivalent of Sam Rousso who was our
(7)  office director. So there were probably – there
(8)  was at least one, if not two levels of
(9)  supervision below Mr. Blandford.
(10)     Q.  Who at TRW would have been most
(11)  directly involved in putting together the final
(12)  document?
(13)     A.  I believe it would have been Bill Teer
(14)  and Jim Clark.
(15)     Q.  Let's turn to a different subject. We
(16)  touched on this a little bit yesterday. You said
(17)  that utilities beginning 63 months prior to
(18)  January 31, 1998, had to submit their initial
(19)  proposed delivery commitment schedules?
(20)     A.  Yes.
(21)     Q.  Do you recall that amongst those was
(22)  Yankee Atomic?
(23)     A.  I vaguely recall that. I don't
(24)  really – I couldn't give you the details.
(25)     Q.  Do you recall that Yankee Atomic,

## Page 229

(1)  that's Yankee Atomic Electric Company, requested
(2)  to deliver more spent fuel in the first few years
(3)  of the program starting after January 31, 1998,
(4)  than was provided for in their allocation in the
(5)  annual priority report?
(6)     A.  Yes, I do.
(7)     Q.  And do you recall there was a number of
(8)  pieces of correspondence back and forth between
(9)  DOE and Yankee Atomic on that issue?
(10)     A.  Yes.
(11)     Q.  What was your role in that process?
(12)     A.  I was responsible at the time for
(13)  performing an initial review, higher level review
(14)  of the DCS's when they came in. I would have
(15)  been responsible for communicating to the
(16)  utility, drafting the letter that would go back
(17)  to the utility that would explain why their DCS
(18)  was being rejected. A specific basis for that
(19)  rejection would have been provided.
(     Those letters would have been reviewed
(21)  by the contracting officer. And I don't recall
(22)  who signed the letters.
(23)     Q.  Who else would have been involved in
(     that process?
(     A.  Our M&O would have been involved in

# Plaintiff

00206

1   IN THE UNITED STATES COURT OF FEDERAL CLAIMS

2 - - - - - - - - - - - - - - X

3 YANKEE ATOMIC ELECTRIC       :

4 COMPANY,              :

5     Plaintiff,    : Case No. 98-126C

6   v.          : Senior Judge

7             :  Merow

8 THE UNITED STATES,       :

9     Defendant.   :

10 - - - - - - - - - - - - - - X

11             Washington, D.C.

12             Thursday, April 22, 1999

13       Continued deposition of NANCY H.

14 SLATER, a witness herein, called for examination

15 by counsel for Plaintiff in the above-entitled

16 matter, pursuant to agreement, the witness being

17 previously duly sworn, taken at the offices of

18 Spriggs & Hollingsworth, 1350 I Street, N.W.,

19 Washington, D.C., at 2:10 p.m., Thursday, April

20 22, 1999, and the proceedings being taken down by

21 Stenotype by JAN A. WILLIAMS, RPR, and

22 transcribed under her direction.

23

24

25

00289

1 such consideration of campaigning?

2    A.  I don't recall who specifically was in

3 the transportation group at that time.  In fact,

4 I'm having a tough time recalling who the

5 transportation division director was.  I really

6 don't know.

7    Q.  Going back to this table 2 in Slater

8 Exhibit 23, other than the notion of campaigning,

9 do you recall any other ways in which DOE or

10 utilities for that matter might have expected

11 that actual acceptances of spent fuel might occur

12 in an order different than what is depicted on

13 this table?

14    A.  Plus or minus 20 percent rounding,

15 campaigning, DCS exchanges, because, if exchanges

16 occurred, although the amount wouldn't change,

17 the individual utility that would be serviced in

18 that year would.  So that would have represented

19 a departure from what's published in here.

20    Q.  And it was generally anticipated that

21 there would be some amount of DCS exchanges?

22    A.  Yes, I did anticipate that there would

23 be some amount of DCS exchanges.

24    Q.  You said that was your expectation.  To

25 what extent did you understand that that

# Defendant

Nancy Slater Thompson                                          June 13, 2002
Washington, D.C.

Page 1

1        IN THE UNITED STATES COURT OF FEDERAL CLAIMS

2    - - - - - - - - - - - - - - - - X

3    YANKEE ATOMIC ELECTRIC              :

4    COMPANY, MAINE YANKEE ATOMIC       :

5    POWER CO., and CONNECTICUT         :

6    YANKEE ATOMIC POWER CO.,           : Case No. 98-126C

7                      Plaintiffs : 98-474C, 98-154C

8            -v-                        : (Senior Judge

9                                       :  Merrow)

10   UNITED STATES OF AMERICA,          :

11              Defendant               :

12   - - - - - - - - - - - - - - - X

13

14                         Washington, D.C.

15                         Thursday, June 13, 2002

16            Deposition of NANCY SLATER THOMPSON, a

17   witness herein, called for examination by counsel

18   for the Plaintiff in the above-entitled matter,

19   pursuant to notice, the witness being duly sworn,

20   taken at the offices of Spriggs & Hollingsworth,

21   1350 I Street, N.W., Washington, D.C., at 9:40

22   a.m., Thursday, June 13, 2002, and the proceedings

23   being taken down in Stenotype by DEBORAH K.

24   WILKINS, RPR, and transcribed under her direction.

25

Nancy Slater Thompson                                        June 13, 2002
                          Washington, D.C.

---

**Page 2**

| | |
|---|---|
| 1 | APPEARANCES: |
| 2 | |
| 3 | On behalf of the Plaintiffs: |
| 4 | ROBERT L. SHAPIRO, ESQ. |
| 5 | Spriggs & Hollingsworth |
| 6 | 1350 I Street, N.W. |
| 7 | Washington, D.C. 20005-3305 |
| 8 | (202) 898-5839 |
| 9 | |
| 10 | On behalf of the Defendant: |
| 11 | MARIAN E. SULLIVAN, ESQ. |
| 12 | Commercial Litigation Branch |
| 13 | Civil Division |
| 14 | U.S. Department of Justice |
| 15 | 1100 L Street, N.W. |
| 16 | Washington, D.C. 20530 |
| 17 | (202) 305-7594 |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

---

**Page 3**

CONTENTS

WITNESS                    EXAMINATION
NANCY SLATER THOMPSON
    By Mr. Shapiro              4
    By Ms. Sullivan           149
    By Mr. Shapiro            153

        Afternoon Session - Page 67

        E X H I B I T S

Ex.No.    Description              Page
1    December, 1990 ACR            17
2    6-22-83 contract              25
3    March, 1995 APR and ACR       32
4    June, 1987 ACR                47
5    June, 1988 ACR                67
6    December, 1991 ACR            69
7    May, 1993 ACR                 84
8    March, 1993 ACR               86
9    9-28-95 letter, Dreyfus to Kadak  113
10   Instructions for Completing the
     Appendix C - Delivery Commitment
     Schedule                     127
11   Review Record                139

---

**Page 4**

PROCEEDINGS
- - - -

3   Whereupon,
4         NANCY SLATER THOMPSON,
5   was called as a witness by counsel for Plaintiff,
6   and having been duly sworn, was examined and
7   testified as follows:
8         EXAMINATION BY COUNSEL FOR PLAINTIFF:
9   BY MR. SHAPIRO:
10        Q.   Would you state your name for the
11  record, please?
12        A.   Nancy Slater Thompson.
13        Q.   Ms. Slater Thompson, my name is Robert
14  Shapiro.  As you recall I deposed you, gee --
15        A.   Some time ago.
16        Q.   -- a couple years ago now in these
17  cases, and they are still going on.  I won't have
18  to go back over the procedures, I have your
19  deposition, and I think you understand what we are
20  doing today.  It also saves -- I mean, we are not
21  going to cover the same material the same way
22  again, either.  I just have a couple, I guess,
23  catch-up items to make sure I understand what's
24  happened with your background in the last couple
25  years, and I have some additional topics I want to

---

**Page 5**

1   cover with you today.
2         What is your current position?
3         A.   I am the acting division director of
4   the regulatory coordination division.
5         Q.   How long have you been in that
6   position?
7         A.   I have been in that position since
8   January of 2001.
9         Q.   What was your position before that
10  one?
11        A.   Team leader in the regulatory
12  coordination division.
13        Q.   How did your duties change when you
14  moved from the team leader position to the acting
15  director position?
16        A.   In the main, I believe that most of
17  the technical and policy-related duties that I had
18  been performing didn't change, but I have now
19  assumed responsibility for personnel actions.
20        Q.   Are there any other teams in that
21  division other than the one in which you were team
22  leader?
23        A.   No, there are not.
24        Q.   How many people are in that division?
25        A.   There are, including details, four in

---

2 (Pages 2 to 5)

Nancy Slater Thompson                                    June 13, 2002

Washington, D.C.

Page 114

1    Does that statement comport with your
2 understanding of how the exchange provision was
3 supposed to work?
4    MS. SULLIVAN: Objection. Foundation.
5    A. Yes, it is. It's consistent with my
6 understanding that the exchange process would
7 permit the utilities to alter their slot in the
8 cue. And in the case of Yankee, who had requested
9 priority for shutdown reactor acceptance, the
10 exchange provision which they were encouraged to
11 use would permit them to alter their slot in the
12 cue.
13    Q. It was the department's belief at
14 least in 1995 that the exchange provision would
15 have worked and actually have enabled a utility
16 like Yankee Atomic to alter their space in the
17 cue?
18    MS. SULLIVAN: Objection, vague.
19 Objection, compound.
20    A. Conceptually, yes, the exchange
21 process could result in a utility's ability to
22 alter their slot in the cue.
23    Q. What about practically?
24    MS. SULLIVAN: Objection. Vague.
25    Q. I asked that because you used the word

Page 115

1 conceptually. Were you using the word
2 conceptually to distinguish from practically?
3    A. This will take us back to my
4 utilities' side of the table.
5    From a practical standpoint, I believe
6 most of the older utilities in my opinion would
7 have been unlikely to engage in exchanges. I
8 believe it would have been possible for Yankee to
9 exchange with some of the younger utilities, but
10 I do seem to recall when asked by me directly
11 whether or not they had attempted to in fact
12 conduct an exchange, the answer was no.
13    Q. Do you think the Yankee Atomic would
14 have been able to have exchanged with younger
15 utilities because the younger utilities would have
16 had less need for early acceptance of their spent
17 fuel?
18    MS. SULLIVAN: Objection, vague.
19 Objection, calls for speculation.
20    A. My opinion, it would be more likely
21 that they could effect a trade with a utility that
22 had made provisions for additional storage or that
23 had no particular need for additional storage.
24    Q. If Yankee Atomic had actually sought
25 out such exchanges, do you think that they would

Page 116

1 have been successful in getting utilities without
2 need for immediate spent fuel acceptance to
3 exchange with them?
4    MS. SULLIVAN: Objection, calls for
5 speculation. Objection, vague.
6    A. I think that's so predictive that I
7 couldn't possibly predict the outcome of those
8 conversations. It's within the realm of
9 possibilities.
10    Q. Did the department have any view as to
11 the likelihood of the success that Yankee Atomic
12 might experience in seeking out exchanges in 1995?
13    A. I'm not aware of any.
14    Q. Would it have made sense for the
15 department to tell Yankee Atomic that it could use
16 the exchange provision to optimize their spent
17 fuel acceptance schedule if in fact the department
18 thought that Yankee Atomic wouldn't be successful
19 in attempting to use the exchange provision in
20 that manner?
21    MS. SULLIVAN: Objection,
22 argumentative. Objection, calls for speculation.
23    A. I think the letter speaks for itself,
24 it encourages them to avail themselves of
25 contractually mandated privilege, the outcome of

Page 117

1 which could not be predicted until the effort had
2 been made.
3    Q. I will recommend to you, Ms. Slater
4 Thompson, that a few years after this letter was
5 sent Yankee Atomic did make an effort to find
6 exchange partners and that that effort proved
7 unsuccessful, nobody offered to exchange with
8 them. Why do you think Yankee Atomic was
9 unsuccessful in finding exchange partners in -- I
10 believe it was roughly the 1998 time frame.
11    MS. SULLIVAN: Objection, calls for
12 speculation. Objection to your characterization
13 of the facts as incomplete.
14    A. I really don't know.
15    Q. Can you speculate as to why you think
16 that would have been?
17    A. Without knowing the complete context
18 of the exchange conversations that went on, no.
19    Q. I will represent to you there really
20 weren't conversations, there was a written request
21 for proposals, and Yankee Atomic didn't get
22 responses back.
23    MS. SULLIVAN: Is there a question?
24    Q. You said you wanted to know the
25 context of the discussion; that's the extent of

30 (Pages 114 to 117)

# Defendant

Page 122

1  speculation. Objection, compound. Objection,
2  foundation.
3     A.   I am not sure I really understand your
4  question, to be honest.
5     Q.   Did you understand before what I meant
6  by campaign shipments of spent fuel?
7     A.   Yes.
8     Q.   To make sure we are on the same page,
9  what's your understanding of what a campaign
10 shipment of spent fuel is?
11    A.   At the time that I was in the industry
12 as well as during the time when I was at DOE, my
13 understanding of the term campaign was at one
14 point, for example, you might wish to -- for
15 example, you have a list of utilities you have in
16 your one, it may be all over the map in terms of
17 where they are in the country. You might wish to
18 define campaign in terms of during that calendar
19 year of acceptance I will go to the southeast and
20 pick all the southeastern reactor fuel up first
21 which people have an allocation in that year and
22 then I will move to the northeast, but the nature
23 of the campaign would tend to argue against I go
24 from Georgia to Illinois to Texas to New York to
25 California and that kind of thing, so campaigning

Page 123

1  is an efficiency consideration.
2     Q.   A considering being that it is less
3  efficient to pick up small amounts of spent fuel,
4  relatively small amounts of spent fuel, from the
5  utility multiple times as opposed to picking up a
6  relatively larger amount of spent fuel from a
7  utility a fewer number of times?
8     MS. SULLIVAN: Objection, vague.
9  Objection, asked and answered to the extent we
10 went into this in the previous deposition.
11    You can answer.
12    A.   I think in the context I just
13 discussed it with you actually, it would be in the
14 context, for example, of weather-related concerns.
15 Campaign, I might not want to go pick things up in
16 Illinois and New York in the middle of the winter
17 and I might want to pick fuel up during the middle
18 of the winter in the south, and so again a matter
19 of efficiency. I know at one point there was
20 consideration, and I believe we have discussed
21 this before, that you might in fact wish on a
22 3-year rolling front to pick up the first year's
23 fuel, you might have room for the second year's
24 fuel, you would debit additional allocations
25 against that, and theoretically in year 2 you

Page 124

1  wouldn't come back to that utility. So there are
2  aspects of campaigning that deal with many
3  factors, and actually that again is not my area of
4  expertise. This is kind of like the acceptance
5  rates and the utility of those.
6     Frankly, the group that would find the
7  information most useful would be in
8  transportation, which is not my responsibility,
9  and I think that extends, for example, to the
10 DCSs. That's why when you asked the question do I
11 have any knowledge of what the department would
12 use it for, not really, not my area. Campaigning
13 is really not my area, either.
14    Q.   Focusing back on exchanges, proposed
15 exchanges of approved delivery commitment
16 schedules, I believe you did testify that when you
17 were at the department you did work on
18 consideration of how the department would go about
19 evaluating proposed exchanges.
20    A.   That's correct.
21    Q.   It was the department's intent to
22 approve proposed exchanges to the extent
23 practicable?
24    MS. SULLIVAN: Objection, vague.
25 Objection, foundation.

Page 125

1     A.   Practicable is a very broad word, but
2  if, for example, a utility wanted to exchange with
3  another utility with exactly the same age fuel,
4  the same type fuel, reasonably close locations,
5  the same number of MTU, I would say that would be
6  practicable. I don't think it was the
7  department's intention, nor mine, to hinder that
8  process.
9     Q.   Would it be reasonable to say that the
10 department intended to minimize the number of
11 proposed exchanges that it would have to
12 disapprove?
13    MS. SULLIVAN: Objection, vague.
14    A.   I don't think we had a specific
15 intention to minimize or maximize. I think it was
16 our intention to accommodate, to the extent
17 practicable, all reasonable requests to exchange.
18    Q.   Let's switch subjects to failed fuel,
19 something that I think you mentioned briefly
20 before. I believe that you mentioned before that
21 you had at least a vague recollection of an
22 understanding that acceptance by the department of
23 failed fuel might be delayed. Am I remembering
24 that correctly?
25    A.   Correct.

32 (Pages 122 to 125)

# Plaintiff

Nancy Slater Thompson

Washington, D.C.

June 13, 2002

Page 1

1        IN THE UNITED STATES COURT OF FEDERAL CLAIMS

2   - - - - - - - - - - - - - - - X

3   YANKEE ATOMIC ELECTRIC                :

4   COMPANY, MAINE YANKEE ATOMIC          :

5   POWER CO., and CONNECTICUT            :

6   YANKEE ATOMIC POWER CO.,              : Case No. 98-126C

7                       Plaintiffs :  98-474C, 98-154C

8            -v-                          : (Senior Judge

9                                         :  Merrow)

10  UNITED STATES OF AMERICA,             :

11           Defendant                    :

12  - - - - - - - - - - - - - - - X

13

14                   Washington, D.C.

15                   Thursday, June 13, 2002

16           Deposition of NANCY SLATER THOMPSON, a

17  witness herein, called for examination by counsel

18  for the Plaintiff in the above-entitled matter,

19  pursuant to notice, the witness being duly sworn,

20  taken at the offices of Spriggs & Hollingsworth,

21  1350 I Street, N.W., Washington, D.C., at 9:40

22  a.m., Thursday, June 13, 2002, and the proceedings

23  being taken down in Stenotype by DEBORAH K.

24  WILKINS, RPR, and transcribed under her direction.

25

Page 122

1  speculation. Objection, compound. Objection,
2  foundation.
3      A.    I am not sure I really understand your
4  question, to be honest.
5      Q.    Did you understand before what I meant
6  by campaign shipments of spent fuel?
7      A.    Yes.
8      Q.    To make sure we are on the same page,
9  what's your understanding of what a campaign
10  shipment of spent fuel is?
11      A.    At the time that I was in the industry
12  as well as during the time when I was at DOE, my
13  understanding of the term campaign was at one
14  point, for example, you might wish to -- for
15  example, you have a list of utilities you have in
16  your one, it may be all over the map in terms of
17  where they are in the country. You might wish to
18  define campaign in terms of during that calendar
19  year of acceptance I will go to the southeast and
20  pick all the southeastern reactor fuel up first
21  which people have an allocation in that year and
22  then I will move to the northeast, but the nature
23  of the campaign would tend to argue against I go
24  from Georgia to Illinois to Texas to New York to
25  California and that kind of thing, so campaigning

Page 123

1  is an efficiency consideration.
2      Q.    A considering being that it is less
3  efficient to pick up small amounts of spent fuel,
4  relatively small amounts of spent fuel, from the
5  utility multiple times as opposed to picking up a
6  relatively larger amount of spent fuel from a
7  utility a fewer number of times?
8      MS. SULLIVAN: Objection, vague.
9  Objection, asked and answered to the extent we
10  went into this in the previous deposition.
11      You can answer.
12      A.    I think in the context I just
13  discussed it with you actually, it would be in the
14  context, for example, of weather-related concerns.
15  Campaign, I might not want to go pick things up in
16  Illinois and New York in the middle of the winter
17  and I might want to pick fuel up during the middle
18  of the winter in the south, and so again a matter
19  of efficiency. I know at one point there was
20  consideration, and I believe we have discussed
21  this before, that you might in fact wish on a
22  3-year rolling front to pick up the first year's
23  fuel, you might have room for the second year's
24  fuel, you would debit additional allocations
25  against that, and theoretically in year 2 you

Page 124

1  wouldn't come back to that utility. So there are
2  aspects of campaigning that deal with many
3  factors, and actually that again is not my area of
4  expertise. This is kind of like the acceptance
5  rates and the utility of those.
6      Frankly, the group that would find the
7  information most useful would be in
8  transportation, which is not my responsibility,
9  and I think that extends, for example, to the
10  DCSs. That's why when you asked the question do I
11  have any knowledge of what the department would
12  use it for, not really, not my area. Campaigning
13  is really not my area, either.
14      Q.    Focusing back on exchanges, proposed
15  exchanges of approved delivery commitment
16  schedules, I believe you did testify that when you
17  were at the department you did work on
18  consideration of how the department would go about
19  evaluating proposed exchanges.
20      A.    That's correct.
21      Q.    It was the department's intent to
22  approve proposed exchanges to the extent
23  practicable?
24      MS. SULLIVAN: Objection, vague.
25  Objection, foundation.

Page 125

1      A.    Practicable is a very broad word, but
2  if, for example, a utility wanted to exchange with
3  another utility with exactly the same age fuel,
4  the same type fuel, reasonably close locations,
5  the same number of MTU, I would say that would be
6  practicable. I don't think it was the
7  department's intention, nor mine, to hinder that
8  process.
9      Q.    Would it be reasonable to say that the
10  department intended to minimize the number of
11  proposed exchanges that it would have to
12  disapprove?
13      MS. SULLIVAN: Objection, vague.
14      A.    I don't think we had a specific
15  intention to minimize or maximize. I think it was
16  our intention to accommodate, to the extent
17  practicable, all reasonable requests to exchange.
18      Q.    Let's switch subjects to failed fuel,
19  something that I think you mentioned briefly
20  before. I believe that you mentioned before that
21  you had at least a vague recollection of an
22  understanding that acceptance by the department of
23  failed fuel might be delayed. Am I remembering
24  that correctly?
25      A.    Correct.

32 (Pages 122 to 125)

# Victor Trebules

# Plaintiff

**Victor W. Trebules, Jr.**

### Page 1

```
 1   IN THE UNITED STATES COURT OF FEDERAL CLAIMS
 2   ------------------------------------------X
     YANKEE ATOMIC ELECTRIC COMPANY           :
 3   (98-126C)(Merow, S.J.)                    :
     CONNECTICUT YANKEE ATOMIC POWER COMPANY   :
 4   (98-154C)(Merow, S.J.)                    :
     MAINE YANKEE ATOMIC POWER COMPANY         :
 5   (98-474C)(Merow, S.J.)                    :
     FLORIDA POWER & LIGHT COMPANY             :
 6   (98-483C)(Wilson, J.)                     :
     NORTHERN STATES POWER COMPANY             :
 7   (98-484C)(Wiese, J.)                      :
     DUKE POWER, a Division of DUKE ENERGY CORP.:
 8   (98-485C)(Sypolt, J.)                     :
     INDIANA MICHIGAN POWER COMPANY            :
 9   (98-486C)(Hodges, J.)                     :
     SACRAMENTO MUNICIPAL UTILITY DISTRICT     :
10   (98-488C)(Yock, S.J.)                     :
     SOUTHERN NUCLEAR OPERATING COMPANY, et al.:
11   (98-614C)(Merow, S.J.)                    :
     COMMONWEALTH EDISON COMPANY               :
12   (98-621C)(Hewitt, J.)                     :
     BOSTON EDISON COMPANY                     :
13   (99-447C) (Allegra, J.)                   :
     GPU NUCLEAR, INCORPORATED                 :
14   (00-440C)(Bush, J.)                       :
     WISCONSIN ELECTRIC POWER COMPANY          :
15   (00-697C)(Merow, S.J.)                    :
     POWER AUTHORITY OF THE STATE OF NEW YORK  :VOLUME
16   (00-703C)(Damich, J.)                     : I
     OMAHA PUBLIC POWER DISTRICT               :
17   (01-115C)(Bush, J.)                       :Discovery
     NEBRASKA PUBLIC POWER DISTRICT            :Judge)
18   (01-116C)(Sypolt, J.)                     :(Judge
     TENNESSEE VALLEY AUTHORITY                :Sypolt)
19   (01-249C)(Bruggink, J.)                   :PAGES
20             Plaintiffs,                     :1 - 241
21   V.
22
```

### Page 2

```
 1   THE UNITED STATES,                    :

 2              Defendant.                  :

 3   ------------------------------------------X

 4

 5

 6

 7

 8

 9        Deposition of Victor W. Trebules, Jr.

10               Washington, DC

11          Wednesday, April 17, 2002

12

13

14

15

16

17

18

19

20

21   Reported by:  Denise Dobner Vickery, RMR, CRR

22   JOB NO.  144458
```

### Page 3

```
 1

 2

 3

 4

 5                              April 17, 2002

 6                                9:32 A.M.

 7

 8   Deposition of Victor W. Trebules, Jr., held at the

 9   offices of:

10

11        Jenner & Block

12        601 13th Street, NW

13        12th Floor

14        Washington, DC 20005

15

16   Pursuant to notice, before Denise Dobner Vickery, a

17   Registered Merit Reporter, Notary Public of the

18   District of Columbia.

19

20

21

22
```

### Page 4

```
 1   APPEARANCES:

 2

 3   Jenner & Block

 4   For the Plaintiff COMMONWEALTH EDISON

 5        One IBM Plaza

 6        Chicago, IL 60611-7603

 7        (312) 222-9350

 8   BY: Theodore T. Eidukas, Esq.

 9

10   Shaw Pittman Potts & Trowbridge

11   For the Plaintiffs NORTHERN STATES POWER COMPANY,

12   et al.

13        1650 Tysons Boulevard

14        McLean, VA 22102-4859

15        (703) 770-7962

16   BY: Devon E. Hewitt, Esq.

17

18   Arnold & Porter

19   For the Plaintiffs SOUTHERN NUCLEAR OPERATING COMPANY,

20   et al.

21        555 Twelfth Street, NW

22        Washington, DC 20004-1206
```

1 (Pages 1 to 4)

## Page 9

1  answer them as best you can.

2      A.   Okay.

3      Q.   If at any time you don't understand a

4  question, it's probably because I've misphrased it or

5  I'm not making any sense.  So, just stop me, ask me to

6  ask the question again or rephrase the question so it

7  makes sense to you.

8      A.   (Nods head).

9      Q.   Also, because the court reporter can only take

10  down what we say and not any gestures or physical

11  answers like nods of the head, you know, in other

12  words, what I'm saying, your answers have to be verbal.

13          And also because she can only take down what

14  one person is saying at any one time, it's important

15  that I try not to talk over your answers and, you know,

16  wait until I finish the questions just so that she can

17  get down exactly what's been said and there's not two

18  people trying to talk at one time.

19      A.   (Nods head).

20      Q.   So that the record is accurate.

21      A.   Okay.

22      Q.   And if at any time you need a break for

## Page 10

1  whatever reason, as long as a question is not pending,

2  I would be more than happy to accommodate you in taking

3  a break.

4      A.   (Nods head).

5      Q.   Could you just quickly just describe your

6  education after high school.

7      A.   All right.  I went to Ohio University for

8  five years.  I got a degree in engineering and a

9  bachelor's degree in physics.  I then did graduate

10  work at Lehigh University in Bethlehem, Pennsylvania.

11  I got a master's degree in mechanical engineering.

12      Q.   And when did you receive that final degree?

13      A.   1972 I graduated from Lehigh.

14      Q.   And that was the master's?

15      A.   Yes.  Master's degree in mechanical

16  engineering.

17      Q.   Okay.  When did you first -- strike that.

18          Do you presently work for the Department of

19  Energy?

20      A.   Yes, I do.

21      Q.   Okay.  When did you first -- when did you

22  start working for the Department of Energy?

## Page 11

1      A.   Actually, I started working for the Atomic

2  Energy Commission in 1972, which became the Energy

3  Research and Development Administration, which became

4  the Department of Energy.  I don't remember the exact

5  year ERDA became the Department of Energy.  I think it

6  was about -- I don't remember.

7      Q.   Okay.  But you were there when the Department

8  of Energy was first formed it sounds like?

9      A.   Yes.  Yes.

10      Q.   What was your first position in the Department

11  of Energy?

12      A.   The Department of Energy or the Atomic Energy

13  Commission?

14      Q.   I'm going to start with the Department of

15  Energy.

16      A.   Okay.  Again, I don't remember exactly when

17  name changed, but I spent the first five years working

18  for the Pittsburgh Naval Reactors Office after I

19  graduated from college, and then I transferred to the

20  Atomic Energy Commission headquarters in Germantown,

21  Maryland and I worked in the Office of Nuclear Energy

22  Programs.

## Page 12

1      Q.   In the Office of Nuclear Energy Programs, did

2  your responsibilities include the handling of spent

3  nuclear fuel at that time?

4      A.   The handling of spent.  No, we never handled

5  any spent nuclear fuel.

6      Q.   All right.  I will rephrase that.  Did your

7  responsibilities include the disposal of spent nuclear

8  fuel?

9      A.   We did planning for activities involving

10  radioactive waste and spent nuclear fuel.  We never

11  actually handled, though, any material.

12      Q.   Could you briefly describe what the planning

13  you did entailed that involved the disposal of

14  radioactive waste and spent nuclear fuel.

15          MR. SHULTIS:  Objection.  Could we get a

16  little more specific on the time period we're talking

17  about here?  I think that's important.

18          MR. EIDUKAS:  I'm talking of the time

19  period where you were at the Office of Nuclear Energy

20  Programs, and I believe the witness has said he doesn't

21  know a specific date when he was doing this.

22  BY MR. EIDUKAS:

3 (Pages 9 to 12)

Page 13

```
 1        Q.   Mr. Trebules, if you can specify a date that
 2   you were working on the planning for the disposal of
 3   radioactive waste and spent nuclear fuel while at the
 4   Office of Nuclear Energy Programs, that would be
 5   helpful.
 6        A.   Let me try to clarify what I think you asked.
 7   I don't remember exactly when ERDA switched over to the
 8   Department of Energy.   My guess, that was sometime in
 9   the 1980s.   But in 1977, I joined the Office of
10   Nuclear Energy Programs, which may have been part of
11   ERDA or, you know, Atomic Energy Commission or ERDA or
12   Department of Energy.   It was 1977 and at that time I
13   was involved in the planning activities for nuclear
14   energy programs, which included breeder reactor
15   development like the Clinch River breeder reactor, and
16   I was responsible for preparing what was called the
17   Fish and Energy Program Plan for the Department of
18   Energy, which included some at that time it was called
19   fuel cycle activities, which included handling of
20   radioactive waste.
21        Q.   Did that planning for the handling of nuclear
22   radioactive waste that you just described, did that
```

Page 15

```
 1   the disposal of waste.   My primary area of emphasis at
 2   that time was on reactor development.   As I said, the
 3   Clinch River breeder reactor and, for example,
 4   Whitewater breeder reactor.
 5   BY MR. EIDUKAS:
 6        Q.   At some point did your position at either ERDA
 7   or the Department of Energy change?
 8             MR. SHULTIS:   Objection, vague.
 9             THE WITNESS:   I had a number of activities
10   during my career.   As I mentioned, I stayed in the
11   Office of Nuclear Energy Programs for a while and then
12   soon after the passage of the Nuclear Waste Policy Act,
13   about a year or two after the act was passed, then I
14   joined the Office of Civilian Radioactive Waste
15   Management.
16   BY MR. EIDUKAS:
17        Q.   When you joined the Office of Civilian
18   Radioactive Waste Management, you say a year or two
19   after the act was passed, so we're talking somewhere in
20   the 1983-1984 time frame?
21        A.   That's correct.
22        Q.   What was your first position at the Office of
```

Page 14

```
 1   involve planning for the disposal of those wastes in a
 2   deep geologic repository?
 3             MR. SHULTIS:   Objection, relevance.
 4   BY MR. EIDUKAS:
 5        Q.   Generally, when your lawyer objects --
 6             MR. SHULTIS:   You still have to answer.
 7   BY MR. EIDUKAS:
 8        Q.   You still have to answer unless he instructs
 9   you not to, if you're able to.
10        A.   As best as I could remember, we did in the
11   Fish and Energy Program document talk about reactor
12   development and waste activities, and it did include I
13   believe reprocessing at that time.   This was prior to
14   the ban on reprocessing and ultimate disposal of
15   radioactive waste.
16        Q.   Did those plans that you worked on go so far
17   as to discuss the design of a repository?   Did it get
18   that specific?
19             MR. SHULTIS:   Objection, relevance.
20             THE WITNESS:   As best as I could remember,
21   I don't believe we got involved in the -- at least I
22   didn't get involved in the design of repositories for
```

Page 16

```
 1   Radioactive Waste Management?
 2        A.   I don't remember the title of my first
 3   position.   It was probably program analyst or
 4   something like that, but I'm not exactly sure.
 5        Q.   What did that position entail?   What were
 6   your responsibilities in that position?
 7        A.   First major assignment I could remember was
 8   coordinating the preparation of the mission plan for
 9   the Civilian Radioactive Waste Management Program.
10        Q.   Was there anything else that your role
11   entailed in that position?
12             MR. SHULTIS:   Objection, vague.
13             THE WITNESS:   That preparation of the
14   mission plan was pretty much a full-time activity for a
15   number of years.   So there might have been other minor
16   assignments I was given, but, you know, overall it was
17   primarily the mission plan.
18   BY MR. EIDUKAS:
19        Q.   Okay.   Did there come a time when your
20   position at the Office of Civilian Radioactive Waste
21   Management changed from program analyst working on the
22   mission plan?
```

Victor W. Trebules, Jr.

**Page 17**

1      MR. SHULTIS:  Objection, vague.

2          THE WITNESS:  I had a number of different

3   assignments in the Office of Civilian Radioactive Waste

4   Management over the nearly 20 years that I've worked in

5   that program.

6   BY MR. EIDUKAS:

7      Q.   I guess what I'm trying to get at is I'd like

8   to have just a brief chronology of the different

9   positions you've been in with dates, if possible.

10         So you started out as a program analyst in the

11  Office of Civilian Radioactive Waste Management in the

12  approximately 1983-1984 time frame.  What I'd like you

13  to do is going forward to the present with dates, if

14  possible, just state the various positions you've held

15  in the OCRWM.

16     A.   Okay.   Around the 1984-'85 time frame, as I

17  said, I believe I was a program analyst.   I think in

18  1985 or '86 I became the senior technical adviser and

19  technical assistant to the Director of Office of

20  Civilian Radioactive Waste Management.   I don't

21  remember the exact time frame, but when Admiral Watkins

22  became Secretary of Energy, I was detailed to his

**Page 18**

1   office for I think little over half a year as an

2   adviser to the Secretary.

3          I then came back into the Office of Civilian

4   Radioactive Waste Management I think in 1990 or 1991,

5   and I was the Acting Director of what was called the

6   M&O Management Division with responsibility to bring on

7   board the M&O contractor for the program.   I think

8   that was 1991.   About the a year or two after that, I

9   became the Director of the Storage Division.   The

10  primary responsibility was to work on a proposed

11  monitored retrievable storage facility.

12         A few years after that, I became the Director

13  of the Program Management Division.   And let's see.

14  About four years ago I transferred out to Las Vegas to

15  the Yucca Mountain site characterization office, and

16  I'm currently the Director of the Office of Project

17  Control.

18     Q.   Did you have any involvement in the drafting

19  of the Nuclear Waste Policy Act?

20         MR. SHULTIS:  Objection, asks for legal

21  conclusion.

22  BY MR. EIDUKAS:

**Page 19**

1      Q.   My question was whether or not you had any

2   involvement in actually writing or preparing the text

3   of the Act.

4      A.   Not that I could remember.

5      Q.   At the time that the Act was being -- and when

6   I say the Act, I'm referring to the Nuclear Waste

7   Policy Act of 1982.  At the time that Act was being

8   drafted, did you have discussions with people who were

9   involved in drafting that Act?

10         MR. SHULTIS:  Objection, vague.

11         THE WITNESS:  I don't believe so.   I

12  obviously talked to people in the department, you know,

13  who were talking to people, you know, involved in

14  nuclear energy activities, but I don't know that I've

15  ever had any conversations with anyone that was

16  actually involved in drafting the Nuclear Waste Policy

17  Act.

18  BY MR. EIDUKAS:

19     Q.   Okay.   Do you have an understanding as to

20  what the intent of the Nuclear Waste Policy Act is?

21         MR. SHULTIS:  Objection, asks for legal

22  conclusion.

**Page 20**

1          THE WITNESS:  I'm not sure what you mean

2   by intent of the Nuclear Waste Policy Act.   Obviously

3   I was familiar with some of the provisions and some of

4   the requirements.   As I said, my main job when I was

5   in the Office of Civilian Radioactive Waste Management

6   was to prepare the mission plan.   That was clearly

7   required by the Nuclear Waste Policy Act.

8   BY MR. EIDUKAS:

9      Q.   I'll try to clarify what I mean.   Do you have

10  an understanding of what the primary purpose of the

11  Nuclear Waste Policy Act is?

12         MR. SHULTIS:  Objection, asks for legal

13  conclusion.

14         THE WITNESS:  My understanding of the

15  Nuclear Waste Policy Act is that it laid out a

16  blueprint for this country to follow to provide for the

17  management and disposal of spent nuclear fuel and high

18  level radioactive waste with a number of specific

19  provisions.

20  BY MR. EIDUKAS:

21     Q.   Are you familiar with the term standard

22  contract?

5 (Pages 17 to 20)

# Defendant

# Victor W. Trebules, Jr.

Page 1

```
 1   IN THE UNITED STATES COURT OF FEDERAL CLAIMS
 2   -------------------------------X
     YANKEE ATOMIC ELECTRIC COMPANY          :
 3   (98-126C)(Merow, S.J.)                  :
     CONNECTICUT YANKEE ATOMIC POWER COMPANY :
 4   (98-154C)(Merow, S.J.)                  :
     MAINE YANKEE ATOMIC POWER COMPANY       :
 5   (98-474C)(Merow, S.J.)                  :
     FLORIDA POWER & LIGHT COMPANY           :
 6   (98-483C)(Wilson, J.)                   :
     NORTHERN STATES POWER COMPANY           :
 7   (98-484C)(Wiese, J.)                    :
     DUKE POWER, a Division of DUKE ENERGY CORP.:
 8   (98-485C)(Sypolt, J.)                   :
     INDIANA MICHIGAN POWER COMPANY          :
 9   (98-486C)(Hodges, J.)                   :
     SACRAMENTO MUNICIPAL UTILITY DISTRICT   :
10   (98-488C)(Yock, S.J.)                   :
     SOUTHERN NUCLEAR OPERATING COMPANY, et al. :
11   (98-614C)(Merow, S.J.)                  :
     COMMONWEALTH EDISON COMPANY             :
12   (98-621C)(Hewitt, J.)                   :
     BOSTON EDISON COMPANY                   :
13   (99-447C) (Allegra, J.)                 :
     GPU NUCLEAR, INCORPORATED               :
14   (00-440C)(Bush, J.)                     :
     WISCONSIN ELECTRIC POWER COMPANY        :
15   (00-697C)(Merow, S.J.)                  :
     POWER AUTHORITY OF THE STATE OF NEW YORK :VOLUME
16   (00-703C)(Damich, J.)                   : I
     OMAHA PUBLIC POWER DISTRICT             :
17   (01-115C)(Bush, J.)                     :
     NEBRASKA PUBLIC POWER DISTRICT          :Discovery
18   (01-116C)(Sypolt, J.)                   :(Judge
     TENNESSEE VALLEY AUTHORITY              :(Judge
19   (01-249C)(Bruggink, J.)                 :Sypolt)
20               Plaintiffs,                 :PAGES
21   V.                                      :1 - 241
22
```

Page 2

```
 1   THE UNITED STATES,                      :
 2               Defendant.                  :
 3   -------------------------------X
 4
 5
 6
 7
 8
 9        Deposition of Victor W. Trebules, Jr.
10                 Washington, DC
11             Wednesday, April 17, 2002
12
13
14
15
16
17
18
19
20
21   Reported by:   Denise Dobner Vickery, RMR, CRR
22   JOB NO.   144458
```

Page 3

```
 1
 2
 3
 4
 5                          April 17, 2002
 6                          9:32 A.M.
 7
 8   Deposition of Victor W. Trebules, Jr., held at the
 9   offices of:
10
11        Jenner & Block
12        601 13th Street, NW
13        12th Floor
14        Washington, DC 20005
15
16   Pursuant to notice, before Denise Dobner Vickery, a
17   Registered Merit Reporter, Notary Public of the
18   District of Columbia.
19
20
21
22
```

Page 4

```
 1   APPEARANCES:
 2
 3   Jenner & Block
 4   For the Plaintiff COMMONWEALTH EDISON
 5        One IBM Plaza
 6        Chicago, IL 60611-7603
 7        (312) 222-9350
 8   BY: Theodore T. Eidukas, Esq.
 9
10   Shaw Pittman Potts & Trowbridge
11   For the Plaintiffs NORTHERN STATES POWER COMPANY,
12   et al.
13        1650 Tysons Boulevard
14        McLean, VA 22102-4859
15        (703) 770-7962
16   BY: Devon E. Hewitt, Esq.
17
18   Arnold & Porter
19   For the Plaintiffs SOUTHERN NUCLEAR OPERATING COMPANY,
20   et al.
21        555 Twelfth Street, NW
22        Washington, DC 20004-1206
```

1 (Pages 1 to 4)

## Victor W. Trebules, Jr.

Page 13

1  Q.  Mr. Trebules, if you can specify a date that
2  you were working on the planning for the disposal of
3  radioactive waste and spent nuclear fuel while at the
4  Office of Nuclear Energy Programs, that would be
5  helpful.
6  A.  Let me try to clarify what I think you asked.
7  I don't remember exactly when ERDA switched over to the
8  Department of Energy.  My guess, that was sometime in
9  the 1980s.  But in 1977, I joined the Office of
10  Nuclear Energy Programs, which may have been part of
11  ERDA or, you know, Atomic Energy Commission or ERDA or
12  Department of Energy.  It was 1977 and at that time I
13  was involved in the planning activities for nuclear
14  energy programs, which included breeder reactor
15  development like the Clinch River breeder reactor, and
16  I was responsible for preparing what was called the
17  Fish and Energy Program Plan for the Department of
18  Energy, which included some at that time it was called
19  fuel cycle activities, which included handling of
20  radioactive waste.
21  Q.  Did that planning for the handling of nuclear
22  radioactive waste that you just described, did that

Page 14

1  involve planning for the disposal of those wastes in a
2  deep geologic repository?
3  MR. SHULTIS:  Objection, relevance.
4  BY MR. EIDUKAS:
5  Q.  Generally, when your lawyer objects --
6  MR. SHULTIS:  You still have to answer.
7  BY MR. EIDUKAS:
8  Q.  You still have to answer unless he instructs
9  you not to, if you're able to.
10  A.  As best as I could remember, we did in the
11  Fish and Energy Program document talk about reactor
12  development and waste activities, and it did include I
13  believe reprocessing at that time.  This was prior to
14  the ban on reprocessing and ultimate disposal of
15  radioactive waste.
16  Q.  Did those plans that you worked on go so far
17  as to discuss the design of a repository?  Did it get
18  that specific?
19  MR. SHULTIS:  Objection, relevance.
20  THE WITNESS:  As best as I could remember,
21  I don't believe we got involved in the -- at least I
22  didn't get involved in the design of repositories for

Page 15

1  the disposal of waste.  My primary area of emphasis at
2  that time was on reactor development.  As I said, the
3  Clinch River breeder reactor and, for example,
4  Whitewater breeder reactor.
5  BY MR. EIDUKAS:
6  Q.  At some point did your position at either ERDA
7  or the Department of Energy change?
8  MR. SHULTIS:  Objection, vague.
9  THE WITNESS:  I had a number of activities
10  during my career.  As I mentioned, I stayed in the
11  Office of Nuclear Energy Programs for a while and then
12  soon after the passage of the Nuclear Waste Policy Act,
13  about a year or two after the act was passed, then I
14  joined the Office of Civilian Radioactive Waste
15  Management.
16  BY MR. EIDUKAS:
17  Q.  When you joined the Office of Civilian
18  Radioactive Waste Management, you say a year or two
19  after the act was passed, so we're talking somewhere in
20  the 1983-1984 time frame?
21  A.  That's correct.
22  Q.  What was your first position at the Office of

Page 16

1  Radioactive Waste Management?
2  A.  I don't remember the title of my first
3  position.  It was probably program analyst or
4  something like that, but I'm not exactly sure.
5  Q.  What did that position entail?  What were
6  your responsibilities in that position?
7  A.  First major assignment I could remember was
8  coordinating the preparation of the mission plan for
9  the Civilian Radioactive Waste Management Program.
10  Q.  Was there anything else that your role
11  entailed in that position?
12  MR. SHULTIS:  Objection, vague.
13  THE WITNESS:  That preparation of the
14  mission plan was pretty much a full-time activity for a
15  number of years.  So there might have been other minor
16  assignments I was given, but, you know, overall it was
17  primarily the mission plan.
18  BY MR. EIDUKAS:
19  Q.  Okay.  Did there come a time when your
20  position at the Office of Civilian Radioactive Waste
21  Management changed from program analyst working on the
22  mission plan?

Esquire Deposition Services

# Defendant

# Victor W. Trebules, Jr.

**Page 41**

1 just re-ask the question. Do you know whether it is
2 the Department of Energy's position that it entered
3 into contracts with utilities to begin accepting waste
4 in 1998 on the basis that it would have a repository
5 available for permanent waste disposal in 1998?
6     MR. SHULTIS: Same objections.
7     THE WITNESS: As I understand your
8 question, the Department of Energy did enter into
9 contracts and the date I believe you indicated was
10 correct, 1983, on the basis that it planned to have a
11 repository or it was planning to have a repository in
12 operation by 1998.
13 BY MR. EIDUKAS:
14     Q. I'm done with that document. If you want to
15 put that aside. You just want to turn it over. That
16 way.
17     MR. SHULTIS: Keep in order.
18 BY MR. EIDUKAS:
19     Q. Keep in order if you have to refer back to
20 something in the future.
21     Do you know what the parties to the standard
22 contract intended with respect to how fast spent

**Page 42**

1 nuclear fuel would be taken by the Department of
2 Energy?
3     MR. SHULTIS: Objection. It asks for a
4 legal conclusion, vague, asks for speculation.
5     THE WITNESS: Yeah. I do not know what
6 the parties had intended in terms of the rate of waste
7 acceptance. If you're referring to the utilities, I
8 do not know that.
9 BY MR. EIDUKAS:
10     Q. Okay. Do you know what the DOE intended with
11 respect to the rate of waste acceptance?
12     MR. SHULTIS: Objection, asks for a legal
13 conclusion, speculative.
14     THE WITNESS: I would have to answer that
15 as follows. I know what the plans were that the
16 Department of Energy was working on to develop the
17 facilities because I was primarily responsible for
18 developing those plans. We had planned or our
19 objective was to try to have the facilities, primarily
20 the repository, online in operation by 1998. But,
21 again, those were plans.
22 BY MR. EIDUKAS:

**Page 43**

1     Q. And I'm sorry, were you done with your answer?
2     A. Yes.
3     Q. Okay. When you're referring to working on
4 those plans in that answer, what time frame are you
5 talking about?
6     A. The early schedules that we prepared indicated
7 that we had hoped to have the repository in operation
8 by 1998, but we clearly I guess the word would be
9 identified caveats or issues or uncertainties
10 associated with that because we, again, as I had
11 indicated before, we recognized the schedules were
12 optimistic and success oriented was the phrase we used
13 to describe them. And we had also identified, as I
14 think I indicated before, schedules for the MRS
15 facility, if that were to eventually be authorized by
16 Congress, that showed that that could go into operation
17 at least by 1998, perhaps a year or two earlier.
18     Q. Okay. I think — well, I think I may have
19 misphrased my question. What I was trying to get at
20 was: What was the time frame that you were working on
21 the plans you had referred to? Are you referring to
22 the mission plan, or is this something earlier than

**Page 44**

1 that?
2     A. It was the mission plan again. We worked on
3 that in 1984, and I think we published it after a round
4 of public review and comment. I think we published it
5 in June of 1985.
6     Q. Okay. And I think you said that you
7 personally at least were primarily involved in the
8 planning for the designing of the facility. Did I
9 understand you correctly?
10     A. No, not the design. I was responsible for
11 developing the overall plan, which included design,
12 included some of the siting issues, some of the
13 permitting issues, some of the institutional issues
14 that we had to deal with, as well as the bulk of the
15 activity at that time, though, was the scientific
16 programs that we had to conduct.
17     Q. Okay. Do you have knowledge as to be what
18 rate of acceptance of spent fuel the repository was
19 designed to operate at this time?
20     MR. SHULTIS: Objection, asks for legal
21 conclusion.
22     THE WITNESS: Again, going back to the

11 (Pages 41 to 44)

# Victor W. Trebules, Jr.

Page 45

1   mission plan of some 17 years ago, we had put in the
2   mission plan what were called waste acceptance
3   schedules, which were again planning targets of what we
4   thought the system could do if it were developed, you
5   know, in total as we had laid it out.   Starting in
6   1998 with one repository operating.   We had laid out
7   what we thought were practical waste acceptance rates.
8         What I mean by that is it allowed for a
9   ramp-up.   I think the number that we started with was
10  for the first repository, for example, 400 metric tons
11  and then it increased.   I don't remember the other
12  numbers, but it increased 400 to 600 up to a rate of
13  about 3,000 metric tons per year for a single
14  repository, but at that time we also had authorization
15  to pursue a second repository.   That was a provision
16  in the Nuclear Waste Policy Act that we laid out waste
17  acceptance schedules for that two-repository system.
18  BY MR. EIDUKAS:
19        Q.   Do you have any knowledge about whether there
20  were waste acceptance schedules prepared or proposed
21  prior to the mission plan?
22              MR. SHULTIS:   Objection, asks for

Page 46

1   speculation.
2              THE WITNESS:   No, I have no knowledge of
3   any waste acceptance schedules proposed prior to the
4   mission plan.
5   BY MR. EIDUKAS:
6         Q.   Just so I'm clear on the scope of your
7   knowledge or your involvement, is it correct to say
8   that your first involvement or encounter with waste
9   acceptance schedules was when you began working on the
10  mission plan in about 1984?
11              MR. SHULTIS:   Objection, mischaracterizes
12  witness's testimony.
13              THE WITNESS:   Could you repeat the
14  question, please.
15  BY MR. EIDUKAS:
16        Q.   Sure.   I'll rephrase it.   I'm trying to make
17  sure I understand whether or not your first involvement
18  with waste acceptance schedules in connection with the
19  Nuclear Waste Policy Act and the standard contract was
20  when you began working on the mission plan in, I
21  believe you said, 1984?
22        A.   I don't remember the exact date, but I think I

Page 47

1   joined the Civilian Radioactive Waste Management
2   Program in 1984.   And my first assignment was working
3   on the mission plan and in that mission plan we did
4   include proposed waste acceptance schedules.
5         Q.   But you personally didn't work on waste
6   acceptance schedules prior to that time?   This is what
7   I'm asking.
8         A.   I do not remember working on any waste
9   acceptance schedules prior to that time.
10        Q.   When you joined the Office of Civilian
11  Radioactive Waste Management and you said you were
12  assigned to work on the mission plan, at that time had
13  there already — had work already been done on
14  preparing the mission plan?
15              MR. SHULTIS:   Objection, asks for
16  speculation.
17  BY MR. EIDUKAS:
18        Q.   If you know.
19        A.   I honestly don't remember.   I know it was a
20  provision of the Nuclear Waste Policy Act, which I
21  believe was passed by the Congress in December of '82,
22  signed by the President in January '83.   As I said, I

Page 48

1   joined the program in '84.   I don't remember if people
2   had worked on that before I did, but I know that when I
3   joined the program, that was the first assignment I was
4   given.
5              MR. EIDUKAS:   I'm going to go ahead and
6   mark this as Number 3 and for the record I'm having
7   marked Bates MS 069588 —
8              MR. STOUCK:   528?
9              MR. EIDUKAS:   I'm sorry.
10             MR. STOUCK:   I didn't hear.
11             MR. EIDUKAS:   I'm sorry.   I'll repeat.
12  It's actually three pages.   The first page is Bates
13  number SN 069588D and then it skips some Bates numbers
14  and then you have SN 069599 through 600.   It's a
15  document entitled "Proceedings of the 1983 Civilian
16  Radioactive Waste Management Information Meeting,"
17  December 12th through 15th, 1983 in Washington, DC and
18  the date of the actual document is February 1984.
19             (Thereupon, the reporter marked for
20  identification Deposition Exhibit No. 3.)
21  BY MR. EIDUKAS:
22        Q.   Mr. Trebules, as you can see, this is three

12 (Pages 45 to 48)