# Defendant

# Victor Trebules

```
 1          In the U.S. Court of Federal Claims
 2    ------------------------------x
 3    Yankee Atomic Electric Co.,      :
 4    et al                            :
 5                                     : NO. 98-126C
 6              v.                     :   98-154C
 7                                     :   98-474C
 8    United States of America         :
 9    ------------------------------x
10              April 19, 2002
11    DEPOSITION OF:
12              Victor W. Trebules, Jr.
13    a witness, called by counsel pursuant to notice,
14    commencing at 9:00 a.m., which was taken at
15    Spriggs and Hollingsworth, 1350 I St., NW,
16    Washington, DC
17
18
19
20
21
22
```

**Page 2**

```
 1              Appearances
 2    Jerry Stouck, Esq.
 3    Spriggs and Hollingsworth
 4    1350 I Street, NW
 5    Washington, DC 20005-3305
 6    for Yankee
 7
 8    Russell A. Shultis, Esq.
 9    Heide L. Herrmann, Esq.
10    U.S. Dept. of Justice, Civil Division
11    Commercial Litigation Branch
12    1100 L Street, NW
13    Washington, DC 20530
14    for the government
15
16    Richard Johnson, Esq.
17    Jenner and Block
18    for Commonwealth Edison
19
20
21
22
```

**Page 3**

```
 1
 2              INDEX OF EXAMINATIONS
 3    WITNESS              D    C    RD    RC
 4    Victor W. Trebules, Jr..4
 5              Index of Exhibits
 6         (Exhibits maintained by counsel)
 7    Description                      Page
 8    exhibit number 22.. . . . . . . . . . . 39
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
```

**Page 4**

```
 1              (Morning Session)
 2              Stipulations
 3         (It is stipulated and agreed by and
 4    between counsel for the respective parties that
 5    the reading and signing of this transcript by the
 6    witness are not waived.
 7              It is further stipulated and agreed
 8    that the filing of this transcript with the clerk
 9    of the court be and the same is hereby waived.)
10         *    *    *    *    *
11
12    Whereupon,
13
14              Victor W. Trebules, Jr.
15
16    was called for examination by counsel and,
17    having been previously sworn, was recalled
18    and testified as follows:
19
20    DIRECT EXAMINATION:
21    BY MR. STOUCK:
22         Q.   Good morning, Mr. Trebules.  Would you
```

# Victor Trebules

Page 5

1   agree that at the time that you were working on the
2   plan in 1984 and 1985 it was an objective of the
3   spent fuel program that that program be operated in
4   an economically efficient manner?
5        MR. SHULTIS:  Objection as to
6   "economically efficient."  It's vague.
7        A.   I believe we said words to that effect in
8   the mission plan, that's correct.
9        Q.   Why was that an objective?
10       A.   To the best of my recollection, I think
11  we used phrases like fiduciary responsibility.
12  People working in the program felt that they had an
13  obligation to try to execute the program
14  efficiently and effectively.
15       Q.   Why was that an objective?
16       A.   We knew the program was going to cost a
17  lot of money over its lifetime.
18       I guess it's my opinion that the people
19  felt they ought to try to be efficient in carrying
20  out that program.
21       Q.   Let's pull out the mission plan which I
22  think is exhibit six, if you would, please.

Page 6

1        A.   Okay.
2        Q.   Take a look at page six, please, which is
3   Bates CE14813.  It's a listing of goals and
4   objectives.  We discussed this earlier.
5        Number four, do you see that?  "The
6   program must be conducted in a cost effective
7   manner with full cost recovery."
8        Do you see that?
9        A.   Yes.
10       Q.   What does "full cost recovery" mean?
11       MR. SHULTIS:  Objection to the extent
12  it's calling for a legal conclusion.
13       A.   It was my understanding that the Nuclear
14  Waste Policy Act had a provision that the owners
15  and generators of the spent nuclear fuel and the
16  radioactive waste would pay for the cost of the
17  program.  It would not be funded by taxpayer money.
18  It would be funded by the owners and generators of
19  the waste.
20       The Act initially established a rate of
21  one mill per kilowatt hour for the nuclear
22  utilities which would go into a nuclear waste fund

Page 7

1   and the government would draw on that money plus
2   any other monies, for example monies for the
3   disposal of defense high level waste, and that
4   would cover the cost of the program.
5        Q.   Is that concept of full cost recovery
6   related to the objective of economic efficiency?
7        MR. SHULTIS:  Same objection.
8        A.   To the best of my understanding, it is.
9        Q.   What's the relationship, if you would
10  just explain that?
11       MR. SHULTIS:  The same objection.
12       A.   Not being an economist, I guess I would
13  explain it in more or less layman's terms.
14       The people working in the program knew
15  they had a source of funds, that was the nuclear
16  waste fund, and any appropriations to cover the
17  disposal of defense high level waste.
18       They wanted to conduct the activities, the
19  scientific characterization, the design and the
20  engineering aspects essentially at minimum cost, do
21  the necessary, minimum necessary, but sufficient
22  work to develop the facilities, the geologic

Page 8

1   depository and the transportation system to manage
2   and dispose of the radioactive waste.
3        Q.   Is it your understanding at the time of
4   this mission plan, at the time this mission plan
5   was written, these words we've been looking at, is
6   it your understanding that this objective of
7   economic efficiency was a requirement for the
8   program?
9        MR. SHULTIS:  Objection to the degree
10  it's calling for a legal conclusion.
11       A.   I don't ever remember back then some 16,
12  17, 18 years ago it being described as a
13  requirement.
14       My recollection is, as exhibit six states,
15  it was a policy goal that guided DOE's
16  implementation of that program.
17       I don't ever remember the terms
18  requirement when it came to conducting the program
19  in a cost effective manner.
20       Q.   Let's turn to page 37.  Under mission
21  3.1.4, mission and objectives, do you see that?
22       A.   Yes.

2 (Pages 5 to 8)

# David Zabransky

# Defendant

DEPOSITION OF DAVID ZABRANSKY
CONDUCTED ON WEDNESDAY, APRIL 17, 2002

1 (Pages 1 to 4)

**1**

1    IN THE UNITED STATES COURT OF FEDERAL CLAIMS

2  - - - - - - - - - - - - - - - - - x

3    YANKEE ATOMIC ELECTRIC COMPANY;  : Case Nos. 98-126C,

4    CONNECTICUT YANKEE ATOMIC POWER  : 98-154C, 98-474C,

5    COMPANY; MAINE YANKEE ATOMIC     : 98-483C, 98-484C,

6    POWER COMPANY; FLORIDA POWER &   : 98-485C, 98-486C,

7    LIGHT COMPANY; NORTHERN STATES   : 98-488C, 98-614C,

8    POWER COMPANY; DUKE POWER, a     : 98-621C, 99-447C,

9    Division of DUKE ENERGY CORP.;   : 00-440C, 00-695C,

10   INDIANA MICHIGAN POWER COMPANY;  : 00-703C, 01-115C,

11   SACRAMENTO MUNICIPAL UTILITY     : 01-116C, 01-249C

12  - - - - - - - - - - - - - - - X

13   (Caption continued on the next page)

14

15         Deposition of DAVID ZABRANSKY

16              Washington, D.C.

17           Wednesday, April 17, 2002

18                 9:38 a.m.

19

20   Job No.: 12597-1

21   Pages 1 through 226, Volume 1

22   Reported by: Diane Gomez, RPR

**2**

1    DISTRICT; SOUTHERN NUCLEAR      :

2    OPERATING COMPANY, et al.;      :

3    COMMONWEALTH EDISON COMPANY;    :

4    BOSTON EDISON COMPANY; GPU      :

5    NUCLEAR, INCORPORATED; WISCONSIN :

6    ELECTRIC POWER COMPANY; POWER   :

7    AUTHORITY OF THE STATE OF NEW   :

8    YORK; OMAHA PUBLIC POWER DISTRICT; :

9    NEBRASKA PUBLIC POWER DISTRICT;  :

10   and TENNESSEE VALLEY AUTHORITY,  :

11        Plaintiffs                 :

12   v.                              :

13   THE UNITED STATES,              :

14        Defendant                  :

15  - - - - - - - - - - - - - - - - X

16

17

18

19

20

21

22

**3**

1         Deposition of DAVID ZABRANSKY, held at the

2    offices of:

3

4    ARNOLD & PORTER

5    555 12th Street, Northwest

6    Washington, D.C.  20004

7    (202) 942-5000

8

9

10

11

12

13        Pursuant to agreement, before Diane Gomez,

14   Registered Professional Reporter and Notary Public of

15   the District of Columbia.

16

17

18

19

20

21

22

**4**

1         A P P E A R A N C E S

2    ON BEHALF OF PLAINTIFFS FLORIDA POWER & LIGHT

3    COMPANY, NORTHERN STATES POWER COMPANY, DUKE

4    POWER, INDIANA MICHIGAN POWER COMPANY, BOSTON

5    EDISON COMPANY, GPU NUCLEAR, INC., POWER AUTHORITY

6    OF THE STATE OF NEW YORK, OMAHA PUBLIC POWER

7    DISTRICT, and NEBRASKA PUBLIC POWER DISTRICT:

8       ALEX D. TOMASZCZUK, ESQUIRE

9       SHAW PITTMAN LLP

10      1650 Tysons Boulevard

11      McLean, Virginia  22102-4859

12      (703) 847-5097

13

14

15   ON BEHALF OF PLAINTIFF SACRAMENTO MUNICIPAL

16   UTILITY DISTRICT:

17      JEFFREY L. HANDWERKER, ESQUIRE

18      ARNOLD & PORTER

19      555 12th Street, Northwest

20      Washington, D.C.  20004-1206

21      (202) 942-5000

22

**149**

1  based on this meeting?
2      A  That's what it says.
3      Q  Am I reading that correctly?
4      A  That's what it appears to say.
5      Q  Do you have any idea what you meant by
6  using the term "significant quantities" in 1998 --
7          MR. CRAWFORD: Objection.
8      Q  -- as used in the minutes marked Zabransky
9  Exhibit 17?
10         MR. CRAWFORD: Objection. Assumes facts
11  not in evidence.
12     A  I wouldn't know the specific number that I
13  meant at that point in time, but it would have been,
14  from my perspective at that point in time, enough so
15  that I wouldn't have had trouble at my plant. That
16  was my concern.
17     Q  And trouble, define how --
18     A  Having to do with spent fuel that I didn't
19  need to deal with. That was my position, the
20  company's position in 1987.
21     Q  Having to add storage space outside your
22  pool?

**150**

1      A  That was the industry position, yes.
2      Q  And you agreed with it?
3      A  Sure. Yes.
4          (Deposition Exhibit Zabransky 18 was marked
5      for identification and was attached to the
6      transcript.)
7      Q  Mr. Zabransky, I'm going to hand you what's
8  been marked as Zabransky Exhibit 18 which is page 411
9  through -- what? I can't tell.
10     A  417, 18, 19?
11     Q  I can't tell. It's a letter, the signature
12  sign is John J. Kearney, Senior Vice President, Edison
13  Electric Institute, a letter to Ben C. Rusche on the
14  draft mission plan amendment. Take a second and
15  review that if you want to.
16     A  In its entirety?
17         MR. CRAWFORD: Let's get on the record just
18  kind of where this thing was pulled out of.
19         MR. HANDWERKER: It's from the 1987 mission
20  plan, June '87 mission plan amendment. It's 411
21  through 418 of the comments.
22     Q  If it helps you, I'm not going to ask you

**151**

1  anything after page four -- well, wait a minute.
2  Maybe I will.
3          MR. CRAWFORD: Don't tie yourself down.
4          MR. BLANTON: As a matter of fact, I think
5  I will.
6          (There is a recess from the record.)
7      Q  Have you had a chance to review number 18,
8  Exhibit 18 to your deposition, Mr. Zabransky?
9      A  Yes, sir.
10     Q  Is this letter the letter that resulted
11  from the meeting that we just talked about that was
12  Exhibit 17 to your deposition? It refers to comments
13  that were transmitted to DOE on April 3, 1987?
14     A  It appears to be.
15     Q  Do you know if you, in connection with your
16  work with the UNWMG, participated in drafting these
17  comments?
18     A  I did not participate in drafting these
19  comments.
20     Q  Did you review and comment on the comments
21  before they went in?
22     A  I would have, yes.

**152**

1      Q  Okay. Do you recall whether you disagreed
2  with any of these comments?
3      A  I did not, to my knowledge, disagree with
4  any comments as far as I'm aware.
5      Q  On page 417 of the comments they say "A
6  significant change between the mission plan DMPA" --
7  which I assume refers to the draft mission plan
8  amendment -- "occurs in the magnitude, time of, and
9  rate at which DOE will accept spent fuel." Do you see
10  that?
11     A  Uh-huh.
12     Q  Do you recall any discussions about the
13  content of that particular paragraph among the UNWMG
14  members?
15     A  Not specifically about that particular
16  paragraph, no.
17     Q  Are you aware of whether what is expressed
18  in this paragraph is generally the same subject matter
19  as what you discussed in the meeting on March 25th,
20  1987, as chairman of the Program Strategy and Schedule
21  Task Force?
22     A  I have no reason to believe it isn't a

DEPOSITION OF DAVID ZABRANSKY
CONDUCTED ON WEDNESDAY, APRIL 17, 2002

39 (Pages 153 to 156)

153

1  draft letter that was discussed.
2  Q  Okay. Well, and what I'm talking about are
3  the problems with the draft mission plan this
4  identifies. Would that have been part of your
5  discussion on the --
6  A  I have no specific recollection of that.
7  Q  Okay. Do you have any reason to think it
8  would not have been?
9  A  I have no reason to think it would not have
10  been.
11  Q  On page 412, the second page of the letter,
12  the comments address a five-year slippage in the first
13  repository operations day. Do you see that?
14  A  What's the side bar number there?
15  Q  Two and three over there in the brackets.
16  A  I see, yes.
17  Q  Okay. The middle of that paragraph the
18  comments say "This change can be acceptable to the
19  electric utilities if and only if DOE makes a more
20  substantial and achievable commitment to begin taking
21  spent fuel in January 1998 as required under the NWPA
22  and the standard contract."

154

1  A  Yes.
2  Q  Do you recall at that time what you
3  believed the DOE contractual commitment to be other
4  than --
5  MR. CRAWFORD: Objection.
6  Go ahead.
7  MR. BLANTON: Go ahead.
8  MR. CRAWFORD: Well, no. You finish the
9  question.
10  Q  -- other than to accept fuel in January
11  1998?
12  MR. CRAWFORD: Well, objection. Assumes
13  facts not in evidence, foundation, relevance. It's
14  vague.
15  A  Specifically with the contractual
16  commitment, no, I don't recall beyond the fact that I
17  believe we believed we were advised by counsel that
18  there was a contractual commitment to begin accepting
19  in 1998.
20  Q  Was the issue of the quantity of fuel that
21  they would accept part of that commitment, in your
22  judgment?

155

1  A  The reason for the sternly worded letter
2  was our concern that there appeared to be no
3  commitment to the quantity of fuel and that we were
4  upset and wanted them to commit to a large quantity of
5  fuel but we saw no such commitment.
6  Q  In the draft mission plan amendment?
7  A  Anywhere.
8  Q  Would a commitment to accept spent fuel in
9  1998, without some commitment to accept a sufficient
10  quantity to relieve the utilities of its storage
11  problems as you referred to a second ago, have been of
12  any real use to the utilities?
13  A  Yes.
14  Q  In what way?
15  A  Ultimately even with respect to -- without
16  regard to the amount of storage required, they need to
17  dispose of the spent fuel.
18  Q  But that implies, doesn't it, that they're
19  going to pick up all of it?
20  A  Eventually, yes. That's a necessity.
21  That's of value to the utilities, as you asked me.
22  Q  Is there some period of time in your

156

1  judgment beyond which that process becomes
2  unreasonable?
3  MR. CRAWFORD: Objection. Speculation.
4  Q  How long is it supposed to take to pick up
5  the spent fuel?
6  MR. CRAWFORD: Objection. Vague.
7  A  I don't have an answer. I don't know.
8  Q  In your judgment would 80 years to clear
9  out spent fuel from a reactor site be consistent with
10  DOE's commitment and obligation under the contract?
11  MR. CRAWFORD: Objection. Argumentative.
12  Lack of foundation, speculative, vague.
13  A  I don't believe the contract contains a
14  commitment with respect to rate.
15  Q  So is the answer to my question no, it's
16  not unreasonable for DOE to extend the period of
17  performance under the contract for 80 years?
18  MR. CRAWFORD: Objection to the extent it
19  calls for a legal conclusion and all the other
20  objections to the first question.
21  A  If that's how long it takes to remove the
22  spent fuel, that's how long it takes to remove the

# Defendant

DEPOSITION OF DAVID ZABRANSKY
CONDUCTED ON WEDNESDAY, APRIL 17, 2002

40 (Pages 157 to 160)

---

157

1   spent fuel.
2        Q   Look at page 414 of the document.  Talking
3   about monitored retrievable storage facility.
4        A   Uh-huh.
5        Q   The last sentence of that paragraph says
6   "Now the MRS is more important to NWPA implementation
7   because it is the only feasible way that DOE can meet
8   its 1998 statutory and contractual obligation."
9            Why was the MRS important to the DOE's
10  ability to meet its contractual obligation?
11       MR. CRAWFORD:  Objection.  Foundation.
12       A   Why did the industry say this -- why was
13  that the industry position?  Is that what you're
14  asking me?
15       Q   Well, do you think that's not correct now?
16  Do you think the position you took in 1987 is not
17  correct?
18       A   But this -- okay.  Why did the industry
19  believe in 1998 or at that point in time why the only
20  way to meet the contractual and statutory obligation
21  was to have an MRS?
22       Q   Did you believe that then?

---

158

1        A   Yes, I did.
2        Q   Why?
3        A   Because there was no way they could have
4   built a repository by 1998 at this point in time.
5        Q   Would it have made any sense to have a
6   repository or an MRS and accept fuel at such a small
7   rate that it took decades to remove it from the plant
8   sites?
9        MR. CRAWFORD:  Objection to the extent it
10  assumes facts not in evidence.
11       A   It wouldn't have made sense to the
12  industry, no.
13       Q   Would it have made sense to anyone?  Would
14  it have made sense to DOE?
15       A   No.
16       Q   Doesn't the longer you take to remove the
17  fuel the more it costs?
18       A   I can't make that conclusion.
19       Q   Certainly the longer you operate a
20  repository and MRS the more it costs to operate.  Is
21  that a fair statement?
22       A   That could be a fair statement, but there's

---

159

1   a lot of facts that need to be considered.
2        Q   All other things being equal, it costs less
3   to run one for 40 years than to run one for 90?
4        MR. CRAWFORD:  Objection to the extent it
5   calls for speculation.
6        A   Speculating that all other things are being
7   equal, that would be a true statement.  But all other
8   things are never equal.
9        Q   Was there anything that caused you to agree
10  with the comments in the draft mission plan or in
11  these EEI comments other than the fact that you happen
12  to work in the electric utility industry?
13       A   I'm not sure what you're asking me.  Is
14  there anything that caused me --
15       Q   I'm asking did you come to the conclusion
16  that these comments were correct based on your own
17  judgment or just based on the fact that that's what
18  your employer thought?
19       A   Given the information I had available to
20  me, I believed these comments.  I still do believe
21  these comments given the information I had available
22  to me.

---

160

1        Q   Are you aware of any information that you
2   have now that you didn't have then that calls these
3   comments into question?
4        MR. CRAWFORD:  Objection.  Vague.
5        A   My personal opinion is that these comments
6   were valid then, and as customer of DOE, as a member
7   of the industry, this was my industry position as to
8   what they should be doing pursuant to our
9   relationship.
10       Q   I guess my question is, Mr. Zabransky,
11  don't take this the wrong way, but were you posturing
12  or did you really believe what was in here?
13       A   I believe these things, sure.
14       Q   And do you believe them now?
15       A   Do I believe specifically which comments
16  now?
17       Q   Do you believe at the time these were
18  written that all the -- do you believe now that at the
19  time these were written they were all valid comments?
20       MR. CRAWFORD:  Objection.  Vague.
21       A   I believe now that at the time these were
22  written these were all valid comments.

---

# Defendant

DEPOSITION OF DAVID ZABRANSKY
CONDUCTED ON WEDNESDAY, APRIL 17, 2002

41 (Pages 161 to 164)

161

1    Q  Do you know how long the repository
2  receiving facilities at Yucca Mountain are designed to
3  operate?
4    A  At this time we haven't finalized a design.
5  There are design requirements that appear in the
6  systems requirements documents that give the designers
7  guidance as to how long they must have the facility
8  operational.  Those are -- it's also predicated on the
9  fact that the contracts run as long as the nuclear
10  plants run, if not longer.  So as soon as we know how
11  long you're going to run nuclear plants, we can then
12  have an idea how long the facilities have to operate.
13    Q  Well, is there any assumption in the system
14  requirements regarding how long after the last plant
15  shuts down the repository is scheduled to operate?
16    A  There are assumptions in the systems
17  requirements documents for planning bases that
18  postulate the length of operation assuming a beginning
19  of acceptance of a repository in 2010.  I do not know
20  specifically what those numbers are.
21    Q  Okay.  I don't remember whether you told me
22  or not.  Are you aware of anything that -- any facts

162

1  now that makes these comments on April 3, 1987,
2  inaccurate?
3    MR. CRAWFORD: Objection.  Vague.
4  Objection, relevance.
5    A  Facts now that are in existence that
6  weren't in existence at this point in time where that
7  there is an MRS linkage.  MRS couldn't be constructed
8  as these comments suggested.
9    Q  Okay.  And you're referring to -- okay,
10  anything else before I ask follow-up on that?
11    A  Other comments in here, if you want to go
12  specifically one by one, with respect to quantities
13  and things like that are no longer valid.  But --
14    Q  Why are they no longer valid?
15    A  Because the industry no longer projects
16  it's going to generate 79,000 tons of spent fuel.
17    Q  They project less now?
18    A  A more now.
19    Q  More?
20    A  So, I mean, this document is 15 years old.
21  It was valid then.  Certain assumptions that went into
22  its preparation are no longer valid.

163

1    Q  Okay.  The linkages that you're referring
2  to that would have prevented the MRS development in
3  the way it's suggested in Zabransky 18, are you
4  referring to the linkages in the Nuclear Waste Policy
5  Act amendments of 1987?
6    A  That's correct.
7    Q  Other than the Nuclear Waste Policy Act
8  amendments of 1987, is there any other reason why an
9  MRS could not be developed the way it's envisioned to
10  have been -- it should be developed in Zabransky 18?
11    A  By 1998 as envisioned here, all -- were
12  there no linkages, there still would be the issue of
13  siting and development of a facility, just as there is
14  with a repository.
15    Q  Okay.  But I thought I understood you to
16  say that it could not be developed because of the
17  linkages.
18    A  And again this presumed -- this called for
19  an MRS by '98.  Even without linkages there's no
20  assurance one could have been developed by '98.
21    Q  No assurance, but as I understand your
22  testimony the linkages made development of an MRS as

164

1  envisioned in Zabransky 18 impossible?
2    A  That's correct.
3    Q  Okay.  Is there anything else other than
4  the linkages that make it impossible, to your
5  knowledge?
6    A  Not that I'm aware of, no.
7    Q  And again the linkages we're talking about
8  are the ones contained in the 1987 amendments to the
9  Nuclear Waste Policy Act?
10    A  Correct.
11    MR. CRAWFORD: Are you going to move on to
12  another exhibit at this point?
13    MR. BLANTON: Let me see.
14    Yeah.
15    MR. CRAWFORD: Okay.
16    MR. BLANTON: Kind of the same general
17  subject but another exhibit.
18    MR. CRAWFORD: Let's give Dave a break.
19    (There is a recess from the record.)
20    (Deposition Exhibit Zabransky 19 was marked
21  for identification and was attached to the
22  transcript.)

# Defendant

DEPOSITION OF DAVID ZABRANSKY, VOL. 2
CONDUCTED ON THURSDAY, APRIL 18, 2002

1 (Pages 227 to 230)

227

1    IN THE UNITED STATES COURT OF FEDERAL CLAIMS
2    - - - - - - - - - - - - - - - - - x
3    YANKEE ATOMIC ELECTRIC COMPANY;  : Case Nos. 98-126C,
4    CONNECTICUT YANKEE ATOMIC POWER  : 98-154C, 98-474C,
5    COMPANY; MAINE YANKEE ATOMIC      : 98-483C, 98-484C,
6    POWER COMPANY; FLORIDA POWER &   : 98-485C, 98-486C,
7    LIGHT COMPANY; NORTHERN STATES   : 98-488C, 98-614C,
8    POWER COMPANY; DUKE POWER, a     : 98-621C, 99-447C,
9    Division of DUKE ENERGY CORP.;   : 00-440C, 00-695C,
10   INDIANA MICHIGAN POWER COMPANY;  : 00-703C, 01-115C,
11   SACRAMENTO MUNICIPAL UTILITY     : 01-116C, 01-249C
12   - - - - - - - - - - - - - - - - - X
13   (Caption continued on the next page)
14
15        Continued Deposition of DAVID ZABRANSKY
16              Washington, D.C.
17           Thursday, April 18, 2002
18                 9:44 a.m.
19
20   Job No.: 112597-2
21   Pages 227 through 458, Volume 2
22   Reported by: Diane Gomez, RPR

228

1    DISTRICT; SOUTHERN NUCLEAR     :
2    OPERATING COMPANY, et al.;     :
3    COMMONWEALTH EDISON COMPANY;   :
4    BOSTON EDISON COMPANY; GPU     :
5    NUCLEAR, INCORPORATED; WISCONSIN :
6    ELECTRIC POWER COMPANY; POWER  :
7    AUTHORITY OF THE STATE OF NEW  :
8    YORK; OMAHA PUBLIC POWER DISTRICT;:
9    NEBRASKA PUBLIC POWER DISTRICT; :
10   and TENNESSEE VALLEY AUTHORITY, :
11          Plaintiffs             :
12   v.                            :
13   THE UNITED STATES,            :
14          Defendant             :
15   - - - - - - - - - - - - - - - - - X
16
17
18
19
20
21
22

229

1         Continued Deposition of DAVID ZABRANSKY, held
2    at the offices of:
3
4         ARNOLD & PORTER
5         555 12th Street, Northwest
6         Washington, D.C. 20004
7         (202) 942-5000
8
9
10
11
12
13       Pursuant to agreement, before Diane Gomez,
14   Registered Professional Reporter and Notary Public of
15   the District of Columbia.
16
17
18
19
20
21
22

230

1        A P P E A R A N C E S
2    ON BEHALF OF PLAINTIFFS FLORIDA POWER & LIGHT
3    COMPANY, NORTHERN STATES POWER COMPANY, DUKE
4    POWER, INDIANA MICHIGAN POWER COMPANY, BOSTON
5    EDISON COMPANY, GPU NUCLEAR, INC., POWER AUTHORITY
6    OF THE STATE OF NEW YORK, OMAHA PUBLIC POWER
7    DISTRICT, and NEBRASKA PUBLIC POWER DISTRICT:
8        ALEX D. TOMASZCZUK, ESQUIRE
9        SHAW PITTMAN LLP
10       1650 Tysons Boulevard
11       McLean, Virginia 22102-4859
12       (703) 847-5097
13
14
15   ON BEHALF OF PLAINTIFF SACRAMENTO MUNICIPAL
16   UTILITY DISTRICT:
17       JEFFREY L. HANDWERKER, ESQUIRE
18       ARNOLD & PORTER
19       555 12th Street, Northwest
20       Washington, D.C. 20004-1206
21       (202) 942-5000
22

DEPOSITION OF DAVID ZABRANSKY, VOL. 2
CONDUCTED ON THURSDAY, APRIL 18, 2002

17 (Pages 291 to 294)

291

1    A  That to me would be a system that would
2  have one purpose being storage, one purpose being
3  transport, and would be comprised of the inner
4  canister as we just talked about, the overpack for
5  storage, whether it's horizontal or vertical, and an
6  additional overpack for transport.
7    Q  The overpack for storage being the concrete
8  cylinder you described a minute ago?
9    A  Concrete cylinder or a mausoleum, whatever.
10    Q  Okay.  And is there an additional overpack
11  or a different overpack for transportation with the
12  dual-purpose cask?
13    A  For that kind of system it's a different
14  overpack.  There's also dual-purpose casks that don't
15  have canisters, that are just transportable and
16  storable.
17    Q  Okay.  From a technical standpoint does the
18  type of -- and I'm limiting myself to standard fuel
19  right now.  From a technical standpoint does the type
20  of dry storage system being used by a utility have any
21  impact on DOE in terms of receiving that utility's
22  spent fuel?

292

1    MR. OLSEN:  Objection.  Vague.
2    A  The type of storage should have no impact
3  on the integrity or quality of the spent fuel that,
4  when removed from the cask, DOE would receive.
5    Q  Okay.  Is it DOE's current plan to remove
6  fuel from the casks rather than to use the casks,
7  assuming they're licensed for transport?
8    A  It's DOE current plan to accept spent fuel,
9  not to accept the containers that they're stored in.
10    Q  Okay.  Does that mean that DOE will need to
11  procure a transport system for the spent fuel?
12    MR. OLSEN:  Objection to the extent it
13  calls for a legal conclusion.
14    Q  Technically.  I'm trying to understand how
15  the process work?
16    A  The answer is yes, and let me amplify the
17  last question.  The department has had discussions
18  with utilities and has corresponded with utilities and
19  expressed its programmatic intent to discuss including
20  in a contract amendment dual-purpose systems licensed
21  for storage and transport as acceptable waste forms,
22  and the department intends to do that.  In a contract

293

1  amendment.
2    So those casks, when the contract is
3  amended, it's our intent to have -- the program has
4  expressed that intent and to then include those as
5  acceptable waste forms under the contract.
6    Q  Okay.  What difference does it make to the
7  utility whether or not DOE accepts those systems, the
8  storage systems in use by the utility as a waste form
9  or not?
10    A  The difference it makes to the utility is
11  the same difference it makes to the department is that
12  if the department doesn't take them the utility will
13  have to unload that material and dispose of that cask.
14    Q  Okay.
15    A  If the department takes them we will have
16  to unload that material and dispose of that cask.
17    Q  Okay.  Is that because the casks at the
18  current time are not licensed for disposal?
19    A  They're not licensed for disposal.
20    Q  What is the status of the contract
21  amendment process by which the contract would be
22  amended to specify that the storage systems would be

294

1  accepted as spent fuel?
2    A  We've never had -- at this point we've
3  never had discussions with the utilities on that
4  issue.
5    Q  I'm sorry, I must have misunderstood your
6  earlier testimony.  I thought you said that you had
7  decided to amend the contract?
8    A  We offered to enter into discussions to
9  amend the contract.
10    Q  Has any decision been made by DOE with
11  respect to amending the contract to accept the dry
12  storage systems?
13    A  We've offered to enter into discussions to
14  amend the contract, but we haven't done it yet.
15    Q  And the reason for my question, you said
16  you offered to discuss it but not offered to amend it.
17  Do you see the distinction in my question?
18    A  I think I would have to read the letter
19  that was sent out in 1993.  It's available to
20  everybody.  It says offer to begin -- offer to
21  initiate the contract modification to include this.
22  But, again, we need to look at that.  We haven't

295

1  spec'd out what we need. Some of these canisters will
2  have an impact on the system. Some, should we go down
3  this path and enter into an amendment, may be
4  standard; some may be nonstandard. Haven't yet
5  determined what those criteria would be.
6      (Deposition Exhibit Zabransky 33 was marked
7  for identification and was attached to the
8  transcript.)
9      Q  Mr. Zabransky, we've marked Exhibit 33 to
10 your deposition, a 1987 annual capacity report. Did
11 you have any responsibilities either at Wisconsin
12 Electric or for the UNWMG for reviewing or commenting
13 on this document?
14     A  I don't recollect.
15     Q  Do you recall having seen the document
16 before?
17     A  I've seen the document before.
18     Q  Do you recall having seen it at or about
19 the time it was issued?
20     A  I'm sure -- I'm sure I saw it when it was
21 issued.
22     Q  In the time you've been at the Department

296

1  of Energy have you had any occasion to use this
2  document in the course of your duties?
3      A  This document?  No.
4      Q  On the first page of the document under
5  Summary.
6      A  Okay.
7      Q  The second paragraph says "The system
8  configuration used as the basis for this report is
9  defined in the plan amendment. It includes a
10 monitored retrievable storage facility as an integral
11 system component." Do you know how the
12 waste-management system as described in this ACR in
13 June of 1987 was designed?
14     A  What do you mean "designed?"
15     Q  From an operational standpoint. And in
16 what way was an MRS facility an integral system
17 component, for instance?
18     A  I don't recollect the details of what DOE
19 had planned for that design, no.
20     Q  Well, when I say "design" I'm not talking
21 about technical design. I'm talking about what
22 function was the MRS supposed to serve.

297

1      A  I don't recollect.
2      Q  Okay. At the point in time of this
3  document, were there any linkages between MRS
4  development, any statutory linkages between MRS
5  development and repository development?
6          MR. OLSEN: Objection to the extent it
7  calls for a legal conclusion.
8      A  I don't recollect.
9      Q  On page two of the document, the last
10 sentence in the first paragraph that actually begins
11 on page one says "As specified in the contract, the
12 ACR is for planning purposes only and thus is not
13 contractually binding on either DOE or the
14 purchasers." As a person involved with the utility
15 nuclear waste management group, what significance did
16 you place on the ACR?
17     A  The significance I placed on it at that
18 point in time was that it gave me an indication under
19 what the planning basis was here as to what fuel --
20 which fuel I could expect to be removed from my plant
21 as a planning basis. So it gave me, gave Wisconsin
22 Electric, an indication of what this system meant for

298

1  Wisconsin Electric, how many assemblies would leave
2  Point Beach in what year as a planning basis.
3      Q  What did you take it to mean that the ACR
4  was not contractually binding on DOE?
5      A  That I couldn't rely upon them to do this.
6      Q  What did you take it to mean that it was
7  not contractually binding on the purchaser?
8      A  That they couldn't make me do this, provide
9  that fuel.
10     Q  Anything else?
11     A  That's it.
12     Q  Did you take it to mean that the purchasers
13 weren't bound to the acceptance rates in the document?
14         MR. OLSEN: Objection to the extent it
15 calls for a legal conclusion.
16     A  I didn't draw that conclusion.
17     Q  Did you draw the opposite conclusion, that
18 the purchasers were bound to the acceptance rates in
19 the document?
20     A  Didn't draw that conclusion.
21         MR. OLSEN: Again, the same objection, that
22 it calls for a legal conclusion.

# Defendant

DEPOSITION OF DAVID ZABRANSKY, VOLUME 3
CONDUCTED ON FRIDAY, APRIL 19, 2002

1 (Pages 460 to 463)

---

460

1    IN THE UNITED STATES COURT OF FEDERAL CLAIMS
2    - - - - - - - - - - - - - x
3    YANKEE ATOMIC ELECTRIC COMPANY;   : Case Nos. 98-126C,
4    CONNECTICUT YANKEE ATOMIC POWER  : 98-154C, 98-474C,
5    COMPANY; MAINE YANKEE ATOMIC     : 98-483C, 98-484C,
6    POWER COMPANY; FLORIDA POWER &   : 98-485C, 98-486C,
7    LIGHT COMPANY; NORTHERN STATES   : 98-488C, 98-614C,
8    POWER COMPANY; DUKE POWER, a     : 98-621C, 99-447C,
9    Division of DUKE ENERGY CORP.;   : 00-440C, 00-695C,
10   INDIANA MICHIGAN POWER COMPANY;  : 00-703C, 01-115C,
11   SACRAMENTO MUNICIPAL UTILITY     : 01-116C, 01-249C
12   - - - - - - - - - - - - X
13   (Caption continued on the next page)
14
15        Continued Deposition of DAVID ZABRANSKY
16             Washington, D. C.
17           Friday, April 19, 2002
18               10:03 a.m.
19
20   Job No.: 12597-3
21   Pages 460 through 722 – Volume 3
22   Reported by: Diane Gomez, RPR

---

461

1    DISTRICT; SOUTHERN NUCLEAR       :
2    OPERATING COMPANY, et al.;       :
3    COMMONWEALTH EDISON COMPANY;     :
4    BOSTON EDISON COMPANY; GPU       :
5    NUCLEAR, INCORPORATED; WISCONSIN :
6    ELECTRIC POWER COMPANY; POWER    :
7    AUTHORITY OF THE STATE OF NEW    :
8    YORK; OMAHA PUBLIC POWER DISTRICT;:
9    NEBRASKA PUBLIC POWER DISTRICT;  :
10   and TENNESSEE VALLEY AUTHORITY,  :
11          Plaintiffs        :
12   v.                       :
13   THE UNITED STATES,        :
14          Defendant         :
15   - - - - - - - - - - - - - X
16
17
18
19
20
21
22

---

462

1        Continued Deposition of DAVID ZABRANSKY, held
2    at the offices of:
3
4        ARNOLD & PORTER
5        555 12th Street, Northwest
6        Washington, D. C. 20004
7        (202) 942-5000
8
9
10
11
12
13        Pursuant to agreement, before Diane Gomez,
14   Registered Professional Reporter and Notary Public in
15   and for the District of Columbia.
16
17
18
19
20
21
22

---

463

1        A P P E A R A N C E S
2    ON BEHALF OF PLAINTIFFS FLORIDA POWER & LIGHT
3    COMPANY, NORTHERN STATES POWER COMPANY, DUKE
4    POWER, INDIANA MICHIGAN POWER COMPANY, BOSTON
5    EDISON COMPANY, GPU NUCLEAR, INC., POWER AUTHORITY
6    OF THE STATE OF NEW YORK, OMAHA PUBLIC POWER
7    DISTRICT, and NEBRASKA PUBLIC POWER DISTRICT:
8        ALEX D. TOMASZCZUK, ESQUIRE
9        SHAW PITTMAN LLP
10       1650 Tysons Boulevard
11       McLean, Virginia 22102-4859
12       (703) 847-5097
13
14
15   ON BEHALF OF PLAINTIFF SACRAMENTO MUNICIPAL
16   UTILITY DISTRICT:
17       JEFFREY L. HANDWERKER, ESQUIRE
18       ARNOLD & PORTER
19       555 12th Street, Northwest
20       Washington, D. C. 20004-1206
21       (202) 942-5000
22

---

DEPOSITION OF DAVID ZABRANSKY, VOLUME 3
CONDUCTED ON FRIDAY, APRIL 19, 2002

45 (Pages 636 to 639)

636

1      Q  Mr. Zabransky, in Exhibit 5, can I direct
2   your attention to page six.  Given the department's
3   decision to suspend the DCS approval process in or
4   about February or March of 1997, was there any need
5   for any utility to submit DCS approval forms after
6   that date?
7         MS. SULLIVAN:  Objection, vague.  Objection
8   to the extent it calls for a legal conclusion.
9      A  I don't know that the department ever told
10  utilities not to continue to submit.  So whether there
11  was need or not was up to the utility from their
12  perspective.
13     Q  The Department of Energy did tell utilities
14  in or about March 13th, 1997, that they were -- that
15  it, the Department of Energy, was no longer going to
16  act upon DCS forms.  Isn't that true?
17     A  At that time, yes.
18     Q  And has that direction changed since March
19  13th, 1997?
20        MS. SULLIVAN:  Objection, vague.
21     A  That position has not changed.
22     Q  And has the department approved any DCS

637

1   forms submitted after March 13th, 1997?
2      A  Not to my knowledge.
3      Q  And you would know if they had, would you
4   not?
5      A  I would hope I would.
6      Q  Now, I understood your testimony to be that
7   DOE's current intention is to begin contract
8   performance in 2010?
9      A  That's DOE's current plans.
10     Q  And if I could direct your attention to
11  page six of Exhibit 5, do you have that?
12     A  Yes.
13     Q  So in interpreting this table, is it fair
14  that year one should now be read to mean year 2010?
15        MS. SULLIVAN:  Objection to the extent it
16  calls for a legal conclusion.
17     A  That's a way of interpreting this table.
18     Q  Is there any other way to interpret it?
19     A  I'm sure there are.  I don't know.
20     Q  Can you tell me what they are?
21     A  Interpret year one to be any year you want
22  but I don't know how else -- it seems reasonable from

638

1   your statement that year one was the first year of
2   operations.
3      Q  And your testimony is, as I understand it,
4   that DOE's current intention is to begin performance
5   in 2010?
6         MS. SULLIVAN:  Objection to the extent it
7   calls for a legal conclusion.
8      A  That's DOE's current plans, are repository
9   plans commence in 2010.
10     Q  And you would agree this the last APR ACR
11  that was published by DOE, correct?
12     A  Yes, I would agree with that.
13     Q  Are you aware of any other guidance,
14  instruction, memoranda or other information provided
15  by DOE to the utilities concerning how to utilize this
16  table and the instructions for purposes of determining
17  when to submit a DCS?
18     A  No, I'm not.
19     Q  Do you have an understanding of the term
20  "nonbreach world."
21        MS. SULLIVAN:  Objection to the extent it
22  calls for a legal conclusion.  And it's also beyond

639

1   the scope but I'll allow him to answer.
2      A  I have heard the term used, and I believe I
3   have an understanding of it.
4      Q  Can you tell me, sir, what your
5   understanding of it is?
6         MS. SULLIVAN:  Objection to the extent it
7   calls for a legal conclusion.  You can answer the
8   question.
9      A  My understanding is what would have
10  happened had DOE not breached its obligation to begin
11  performance in 1998.
12     Q  And do you have an understanding, sir, as
13  to what rate DOE would use for acceptance of spent
14  nuclear fuel in the nonbreach world?
15        MS. SULLIVAN:  Objection to the extent it
16  calls for a legal conclusion.  You can answer the
17  question.
18     A  Had DOE begun performance in '98 as
19  originally anticipated, at an interim storage
20  facility, it would have been the rates in the ACR.
21     Q  You understand the term "nonbreach world"
22  to assume an interim storage facility?

DEPOSITION OF DAVID ZABRANSKY, VOLUME 3
CONDUCTED ON FRIDAY, APRIL 19, 2002

46 (Pages 640 to 643)

640

1    MS. SULLIVAN: Objection to the extent it
2  calls for a legal conclusion.
3    A  DOE's plans for 1998 performance included,
4  required the use of an interim storage facility.
5    Q  Did that change at some point in time?
6    A  Not —
7    MS. SULLIVAN: Objection, vague.
8    A  Not for 1998 performance.
9    MR. TOMASZCZUK: I just want to look at my
10  notes.
11    Q  Mr. Zabransky, could you identify for me
12  all of the assumptions on which you relied or do rely
13  in your understanding of the term "nonbreach world."
14    MS. SULLIVAN: Objection to the extent it
15  calls for a legal conclusion. Objection as to
16  relevance. You can answer the question.
17    A  In my understanding it would have been that
18  DOE had performed in accordance with the contract at
19  its facility which I believe would have been in
20  interim storage before a repository and would have
21  been in accordance with the DCSs in the contract.
22  That were approved.

641

1    Q  And those approved DCSs were subject to a
2  20 percent adjustment, right?
3    MS. SULLIVAN: Objection to the extent it
4  calls for a legal conclusion. You may answer.
5    A  The contract allows the purchaser to adjust
6  the DCSs plus or minus 20 percent.
7    Q  I don't have any further questions at this
8  time, Mr. Zabransky. I'm going to reserve the right
9  to call you back based on some instructions not to
10  answer, number one. And second, based on certain
11  documents which have been designated by the government
12  as privileged as to which we have a dispute with the
13  government. And subject to that right, I want to
14  thank you for your time and cooperation, and as
15  Mr. Oehler has correctly pointed out, we have just
16  gotten some documents as well that we have not had a
17  chance to review prior to the taking of your
18  deposition. I want thank you for your time.
19  Depositions can be tedious and litigation is a tough
20  business. I appreciate your cooperation.
21    EXAMINATION BY COUNSEL FOR PLAINTIFF
22    SACRAMENTO MUNICIPAL UTILITY DISTRICT

642

1  BY MR. MACDONALD:
2    Q  Mr. Zabransky, good afternoon. My name is
3  Tim Macdonald. We met earlier off the record the last
4  couple today of days. I represent Sacramento
5  Municipal Utility District, another one of the
6  plaintiffs in this litigation. I'll refer to them as
7  SMUD as lots of people do. I assume you've heard that
8  acronym before?
9    A  Yes, I have.
10    Q  When you were speaking with Mr. Tomaszczuk
11  he was asking you about assumptions for your view of
12  what would happen in the nonbreach world. Do you
13  recall that testimony?
14    A  I recollect, yes.
15    Q  And I believe your testimony was that as
16  one of the assumptions performance would have to be
17  consistent with the contract. Is that correct?
18    MS. SULLIVAN: Objection to the extent it
19  calls for a legal conclusion.
20    A  Yes, I guess that's one of my assumptions.
21    Q  Is another one of your assumptions that
22  performance would have to be consistent with the

643

1  statute?
2    MS. SULLIVAN: Objection to the extent it
3  calls for a legal conclusion.
4    A  I believe we would have to be consistent
5  with the statute from what I know about legal things,
6  but, yeah.
7    Q  Mr. Tomaszczuk also asked you a series of
8  questions about communications you had with his
9  collection of clients.
10    A  Yes.
11    Q  And I would like to ask you the same
12  question with respect to SMUD. So I think the first
13  question was whether you remember having conversations
14  with SMUD employees while you were at WEPCO about
15  matters relating to performance under the standard
16  contract?
17    A  I don't recollect a conversation with SMUD
18  employees when I was at WEPCO.
19    Q  The second question then is while you have
20  been an employee of DOE have you had or do you
21  recollect having conversations with SMUD employees
22  regarding issues related to the performance under the

# Defendant

Page 208

```
 1   IN THE UNITED STATES COURT OF FEDERAL CLAIMS

 2   - - - - - - - - - - - - - - X

 3   YANKEE ATOMIC ELECTRIC        :

 4   COMPANY, MAINE YANKEE ATOMIC  :

 5   POWER CO., and CONNECTICUT    :

 6   YANKEE ATOMIC POWER CO.,      : Case No. 98-126C,

 7              Plaintiff,  : 98-474C, 98-154C

 8        vs.                      : (Senior Judge Merrow)

 9   UNITED STATES OF AMERICA,     :

10              Defendant. :

11   - - - - - - - - - - - - - - X

12                   Washington, D.C.

13                   Thursday, June 6, 2002

14        Deposition of DAVE ZABRANSKY, Volume

15   II, a witness herein, called for examination by

16   counsel for the Plaintiff in the above-entitled

17   matter, pursuant to notice, the witness being duly

18   sworn, taken at the offices of Spriggs &

19   Hollingsworth, 1350 I Street, N.W., Washington,

20   D.C., commencing at 9:32 a.m., Thursday, June 6,

21   2002, and the proceedings being taken down by

22   Stenotype by CAPPY HALLOCK, RPR-CRR, and

23   transcribed under her direction.

24        CONTAINS CONFIDENTIAL INFORMATION

25        PURSUANT TO THE PROTECTIVE ORDER
```

Dave Zabransky CONTAIN CONFIDENTIAL INFORMATION PURSUANT TO THE PROTECTIVE ORDER   June 6, 2002
Washington, D.C.

**Page 229**

1  A.   I don't know how to answer that
2  question.
3  Q.   I'm asking what you think.
4  A.   I have no idea what people would do.
5  As many people as there are out there, I don't
6  know what they all think.
7  Q.   What do you think WEPCO would have
8  done?
9  MR. CRAWFORD: Objection, calls for
10 speculation. Objection, assumes facts not in
11 evidence.
12 A.   I think WEPCO would have done what
13 WEPCO did. They understood the basis for
14 prioritization and acted accordingly. WEPCO
15 didn't like the quantities but WEPCO signed up for
16 the quantities, bought as many as it could as soon
17 as it could.
18 Q.   Didn't WEPCO do that in part because
19 it didn't have confidence that the department was
20 going to be able to accept spent fuel when WEPCO
21 really needed the department to do that?
22 MR. CRAWFORD: Objection, calls for
23 speculation.
24 A.   I think WEPCO signed up for that for
25 the reason it saw it as a binding commitment, and

**Page 230**

1  it was concerned that the department would some
2  day stop approving these documents and wanted them
3  signed before they came to their senses.
4  Q.   I'm asking you to suppose a different
5  world.
6  A.   I can't suppose a different world. I
7  don't know what would have happened and I can't
8  speculate about things I have not thought about.
9  Q.   I'm asking you to think about it right
10 now.
11 A.   I will try.
12 MR. CRAWFORD: Indulge Mr. Shapiro.
13 THE WITNESS: I will indulge him to
14 the extent that I can.
15 Q.   If WEPCO had not had a concern that
16 the department would stop approving delivery
17 commitment schedules, if WEPCO didn't have a
18 concern that the department would not be picking
19 up spent fuel at a rate of, let's say, 3,000
20 metric tons per year from utilities, if it didn't
21 have those concerns, do you think WEPCO would have
22 asked for all of its spent fuel to be picked up as
23 soon as possible?
24 MR. CRAWFORD: Objection to the extent
25 it assumes facts not in evidence. Objection to

**Page 231**

1  the speculation.
2  A.   I don't know what WEPCO would have
3  done. I would not have recommended that WEPCO
4  take such an action.
5  Q.   Take what action?
6  A.   To request that all its spent fuel be
7  picked up immediately.
8  Q.   Why wouldn't you have recommended
9  that?
10 A.   Because it makes no sense either.
11 Q.   Why doesn't it make any sense for a
12 utility to have all of its spent fuel picked up
13 immediately?
14 A.   Assuming our group, and utilities are
15 a group, everybody wanted to go first, and in that
16 idiot fashion no one would go anywhere. It didn't
17 make sense. Everybody had their allocation but it
18 was the world we had to live with. Utilities that
19 didn't buy into that acted differently. We didn't
20 act that way at WEPCO.
21 Q.   I'm not sure you are understanding my
22 hypothetical --
23 A.   That's probably true.
24 Q.   -- So let me try to rephrase and make
25 it simpler.

**Page 232**

1  Other than a concern that it will not
2  be able to get the department to pick up its spent
3  fuel at a later time, why would a utility want to
4  have the department come to pick up its spent fuel
5  earlier if the presence of that spent fuel in its
6  pool is not causing that utility any marginal
7  cost?
8  A.   Again, you will have to ask those
9  utilities who did that. I can't speculate what
10 their motivation was. I never could figure out
11 their actions. Ask those utilities. Don't ask me
12 to speculate. I never could figure it out.
13 Q.   So you're saying you don't see a
14 reason why a utility would be anxious to have the
15 Department of Energy pick up its spent fuel early
16 if the utility otherwise had confidence that the
17 department would later come to pick up the spent
18 fuel when the utility needed to have the spent
19 fuel picked up?
20 MR. CRAWFORD: Objection. Calls for
21 speculation --
22 Don't speak over me. Wait until I
23 finish. Then you can respond to Mr. Shapiro.
24 Objection to the extent it calls for
25 speculation.

7 (Pages 229 to 232)

# Defendant

Dave Zabransky - CONTAIN CONFIDENTIAL INFORMATION PURSUANT TO THE PROTECTIVE ORDER - June 6, 2002
Washington, D.C.

Page 233

1      Go ahead.
2      A.    Again, we are sitting here saying why
3  would someone act that way?  The way I acted, I
4  signed a deal.  The deal says it works this way.
5  We worked that way.  It said there was a line, we
6  got in line.
7      Q.    That's where I'm not sure you
8  understand my hypothetical.  You got in line
9  because you were concerned that the department was
10 not going to accommodate everyone in line on a
11 timely basis.
12     MR. CRAWFORD:  Objection to the
13 extent it mischaracterizes the prior testimony.
14     A.    I didn't say that.  How do you draw
15 that from what I said?  What are you trying to say
16 that I said?
17     Q.    Why were you, and I assume you were
18 talking about WEPCO, why was WEPCO anxious to get
19 in line as early as possible?
20     A.    To get in line.  We were in line.
21 You're in line from the basis of discharging fuel,
22 so I'm not sure what you are alluding to.
23     Q.    I thought you said that's the way your
24 understanding was that the system was set up and
25 you got in line?

Page 234

1      A.    We were in line.  You were in line
2  pursuant to being in the contract.  You don't get
3  in line, you are in line.  You got in line when
4  you signed the contract.
5      Q.    We will move on.
6      Another thing we covered yesterday,
7  Mr. Zabransky, was the acceptance rates in the
8  Annual Capacity Report, and if you recall, you
9  distinguished between the acceptance rates in
10 documents such as the program plan versus
11 acceptance rates in an Annual Capacity Report.
12 You said one would be -- the one in a program plan
13 would simply be a plan of what the system might be
14 capable of doing, but it was your opinion that the
15 projections in the Annual Capacity Report should
16 reflect what you referred to as dependable
17 performance.
18     Do you recall that testimony?
19     MR. CRAWFORD:  Objection to the extent
20 it mischaracterizes his prior testimony.
21     A.    I think what I was trying to refer to
22 or trying to state was the fact that when the
23 contracting officer chose a document to bind the
24 government, which I believe they were doing, they
25 should base it on the maximum dependable capacity,

Page 235

1  not on an engineer's planned capacity, so even
2  though the APR or the ACR was a planning document,
3  when it was utilized for the basis of the DCSs, it
4  became a commitment document, and the contracting
5  officer needed to exercise judgment that that was
6  the right amount to commit to.  Apparently they
7  did.
8      Q.    Well, you're aware that earlier Annual
9  Capacity Reports used acceptance rates that were
10 consistent with the planning documents that went
11 right up to 3,000 BTU.  Are you saying that was
12 ill-advised?
13     MR. CRAWFORD:  Objection to the lack
14 of foundation.  Objection in that it calls for
15 speculation.  And objection, it may call for a
16 legal conclusion.
17     A.    I'm saying they were never used by the
18 contracting officer for the submittal or approval
19 of DCSs.
20     Q.    Is it your understanding that the
21 department made a decision to reduce the amounts
22 of spent fuel in its projections in the Annual
23 Capacity Reports once those could be used for the
24 purpose of submitting delivery commitment
25 schedules?

Page 236

1      MR. CRAWFORD:  Objection to the lack
2  of foundation and to the extent it calls for
3  speculation.
4      A.    I was not there.  I don't know why
5  they do what they do.
6      Q.    Well, for the 1995 Annual Capacity
7  Report, is it your understanding that a lower
8  acceptance rate was put in that report in order to
9  limit the government's commitments to utilities?
10     MR. CRAWFORD:  Objection, asked and
11 answered.  Objection, lack of foundation.
12 Objection, speculation.
13     A.    Again, as I stated yesterday, the
14 numbers in the '95 report were carried over from
15 the previous report, and I'm not aware of any
16 discussion about changing them.
17     Q.    Other than yourself, are you aware of
18 anyone else at DOE that shares your view that the
19 Annual Capacity Report should reflect what you
20 term as dependable performance projections as
21 opposed to projections consistent with the
22 department's current plans for spent fuel
23 receiving facilities?
24     MR. CRAWFORD:  Objection to the extent
25 it mischaracterizes the prior testimony.

(Pages 233 to 236)

# Defendant

Page 281

1   I guess, and I'm not sure when it ceased.
2       Q.   During your tenure in the waste
3   acceptance team, has your office done work
4   studying exchanges of approved delivery schedules?
5       A.   I think work was done after I came,
6   but it wasn't done for me.
7       Q.   Who would that have been done for?
8       A.   I believe Ms. Slater looked at that.
9       Q.   Did you have any involvement in the
10  work that was done for Ms. Slater?
11      A.   Not to any great degree. I remember
12  on a tangential basis it was going on, but I
13  really didn't get involved in it too much of the
14  time.
15      Q.   You said a moment ago that you
16  believed that DOE would try to facilitate
17  exchanges if the DOE was otherwise accepting
18  waste. Why do you believe that DOE would try to
19  facilitate exchanges?
20      A.   Well, I think it has always been DOE's
21  stated position, and back in the old days, I mean
22  at one point DOE went as far as developing the --
23  an electronic bulletin board to try to facilitate
24  exchanges so utilities could see who had what
25  approved DCSs.

Page 282

1       Q.   When did DOE develop this electronic
2   bulletin board?
3       A.   That was probably in the '94 time
4   frame. I'm not sure exactly when in that time
5   frame.
6       Q.   And the intent of the bulletin board
7   was to facilitate exchanges by making information
8   available to utilities as to what was available to
9   be exchanged?
10      A.   It was to basically make available the
11  approved DCSs so people would know, you know, what
12  was available to exchange with.
13      Q.   If you believe that DOE would have
14  tried to facilitate exchanges, do you believe that
15  DOE would have approved most of the exchanges that
16  would have been proposed by utilities?
17      MR. CRAWFORD: Objection, vague.
18  Objection to the extent it calls for speculation.
19      A.   I can't speculate without knowing the
20  circumstances of the specific exchanges.
21      Q.   Do you have an understanding as to
22  what would cause DOE to disapprove a proposed
23  exchange?
24      MR. CRAWFORD: Objection to the lack
25  of foundation and to the vagueness and to the

Page 283

1   extent it calls for speculation.
2       A.   I mean, part of the process would
3   be -- first of all, the contracting officer
4   retains sole discretion to approve any exchange,
5   but to the extent there would be a technical
6   implication it would have to consider whether or
7   not the exchange could be accomplished without
8   adversely affecting the operation of the facility
9   or other contractholders.
10      Q.   Well, you mentioned the contracting
11  officer retains sole discretion. What do you see
12  as the significance of the contracting officer's
13  retention of sole discretion to approve or not
14  approve exchanges?
15      A.   I don't know. It is in the contract.
16  We would have to ask the contracting officer.
17      Q.   Why did you preface your last answer
18  with that part of the contract?
19      A.   Because I was quoting from the
20  contract, I believe. I will go back and check.
21      Q.   I think the phrase sole discretion is
22  in there somewhere.
23      A.   Um-hmm.
24      Q.   Is it your understanding that the
25  contracting officer would exercise that discretion

Page 284

1   to approve proposed delivery commitment schedules
2   to the extent that they would not cause technical
3   problems that would adversely affect the
4   operations of the facility or other
5   contractholders?
6       MR. CRAWFORD: Objection to the
7   vagueness of that, and to the lack of foundation.
8   Objection to the extent it calls for a legal
9   conclusion.
10      A.   I can't speak to what criteria the
11  contracting officer would use beyond the technical
12  attributes that I would consider.
13      Q.   What technical attributes would you
14  consider?
15      A.   As I just mentioned, whether or not
16  the exchange could physically be accomplished
17  without adversely impacting the operation of the
18  system or other contractholders.
19      Q.   How would an exchange adversely affect
20  the waste acceptance system?
21      MR. CRAWFORD: Objection to the
22  vagueness and to the lack of foundation.
23      A.   Again, I didn't say all exchanges
24  would. It depends on the specifics of the
25  exchange.

(Pages 281 to 284)

Dave Zabransky CONTAIN CONFIDENTIAL INFORMATION PURSUANT TO THE PROTECTIVE ORDER   June 6, 2002
Washington, D.C.

Page 285

1    Q.   Any exchange.  What are you thinking
2  of that a potential exchange, why would an
3  exchange adversely affect the waste acceptance
4  system?
5    A.   Speculating as to what could happen,
6  given that an exchange would come in at any time,
7  and the system was, with a certain capacity was
8  expecting to get a certain number of casks the
9  following year, whatever period it might be, and
10  the exchange came in and now it is double that
11  number of casks, that would adversely affect the
12  operations of the system.  It may not be able to
13  be accommodated.
14    Q.   How would an exchange result in a need
15  to double the number of casks?
16    A.   We went from ten rail casks to 50
17  truck casks because the exchange was between a
18  utility that can only ship truck casks and one
19  that can ship rail casks, so without knowing the
20  specifics I can't answer the question.
21    Q.   Well, let me just go through the
22  possibilities.  You mentioned a potential cask
23  issue.  Can you think of any other technical
24  problems that might be posed by a potential
25  proposed exchange?

Page 286

1    MR. CRAWFORD:  I will objection to the
2  extent it calls for speculation and to foundation.
3    A.   Again, further speculation could be
4  that waste packages had already been procured for
5  the fuels to be delivered under one regime and
6  under the exchange different waste packages were
7  required.  I don't know what could happen.
8  Without reviewing the circumstances at the time
9  the exchange was requested, I can't answer as to
10  whether it would be acceptable or not.
11    Q.   You mentioned waste packages and a
12  transportation cask.  Can you think of any other
13  potential technical problems that would be imposed
14  by a proposed exchange?
15    MR. CRAWFORD:  Let me object to the
16  overbroadness of that, and to the extent it
17  mischaracterizes what he previously testified to.
18    A.   I mean, I'm giving you speculation as
19  to what items may have to be considered and could
20  be in the way of an exchange.  Other things that
21  could happen is the exchange could be between
22  different geographic parts of the country where
23  training has not yet occurred or in sufficient
24  time before the shipment to allow us to transport
25  in accordance with the provisions to transport.

Page 287

1    Q.   Any other potential problems?
2    MR. CRAWFORD:  Again, object to the
3  overbroadness of that, vagueness of it.
4  Objection to the extent it requires -- to the
5  extent it calls for speculation.
6    A.   Because of the different locations of
7  plants, distances, time traveled, there might not
8  be enough casks to service that facility at that
9  time.  Another one would be that the casks
10  requested were already committed to service
11  someplace else and could not be available within
12  that time, so most of these are logistic in
13  nature.  Until you know what you are dealing with
14  you can't pass judgment on it.
15    Q.   I want to see if I have all the issues
16  that you can think of right now.  Not necessarily
17  an exhaustive list but what you can think of right
18  now, what logistical issues that might come up
19  that would cause a technical problem with
20  approving a proposed exchange.
21    A.   And again those -- responding to your
22  question, those are the ones I can think of right
23  now but I also believe it is impossible to think
24  of right now even exhaustively things that could
25  happen over the next 20, 30 years that would be

Page 288

1  new issues so there is no way to come up with an
2  exhaustive list to cover items in the future.
3    Q.   One of the items you mentioned was how
4  different waste packages might have been procured.
5  I'm not sure what you mean by -- what is a waste
6  package as opposed to a transportation cask?
7    A.   A waste package is what is used for
8  disposal.
9    Q.   DOE's current plan is to use different
10  waste packages for different spent fuel?
11    A.   Different spent fuel has different
12  physical characteristics, and you couldn't use the
13  same waste package.
14    Q.   Ultimately DOE will need the
15  appropriate number of various kinds of waste
16  packages to handle all the waste that is in the
17  stream to come to come to Yucca Mountain; isn't that true?
18    A.   Ultimately.
19    Q.   But you're saying that to handle some
20  proposed exchanges they might need more of a
21  particular type of waste package sooner than they
22  might have otherwise predicted, and then they
23  might not have the right kind of waste package
24  available?
25    A.   That could be an outcome, yes.

21 (Pages 285 to 288)

Dave Zabransky CONFIDENTIAL INFORMATION PURSUANT TO THE PROTECTIVE ORDER    June 6, 2002
Washington, D.C.

Page 289

1    Q.    Is that the problem that you were
2 referring to when you said there could be a
3 problem with the waste package that might cause a
4 technical problem to accommodate an exchange?
5    A.    Correct.
6    Q.    You mentioned training in the region
7 where the fuel is supposed to come from. What is
8 the potential problem with training? I'm not sure
9 what you're referring to there.
10    A.    The DOE is obligated to provide
11 funding for emergency response training a certain
12 number of years prior to the shipments. If it had
13 not been done, shipments couldn't occur.
14    Q.    Is DOE planning to conduct this
15 required training in different parts of the
16 country at different times?
17    A.    I think DOE is planning on doing the
18 training at the appropriate time, recognizing that
19 training people who aren't going to use it, who
20 will leave those positions is wasted, Since it is
21 mostly volunteer organizations that will get
22 trained and you have turnover rates, so you try to
23 track the training to your need. And there is a
24 requirement for continuing training.
25    Q.    Who is being trained?

Page 290

1    A.    Emergency responders. The Act
2 requires DOE to train, for funds and equipment for
3 emergency responders. The states will also
4 require certain training prior to allowing nuclear
5 fuels to traverse their territories.
6    Q.    You said DOE would plan to do such
7 training at what you termed an appropriate time.
8 DOE has to at least conduct such training prior to
9 the first delivery of spent fuel from a utility in
10 a particular region?
11    A.    And continuing training is to be
12 provided.
13    Q.    So even if there were no exchanges of
14 a utility's spent fuel allocation, DOE would need
15 to do the requisite training to remove fuel from
16 the utility consistent with where that utility is
17 in the oldest fuel first queue to make deliveries
18 to DOE?
19    A.    At some point, yes. But if it is
20 somebody who is in the twentieth year, it makes no
21 sense to do it the fifth year before operations.
22    Q.    But if a utility otherwise has an
23 allocation in the first year, but is merely
24 exchanging to get more allocations in that first
25 year, then that exchange would not necessarily

Page 291

1 implicate this potential concern that you have
2 raised about regional training?
3    A.    That's why every exchange has to be
4 reviewed on its own individual merits. There are
5 no generalities.
6    Q.    I don't think you quite answered my
7 question, about if a utility had an allocation in
8 the first year, and that if the utility was merely
9 exchanging for a greater allocation in that year,
10 that wouldn't affect DOE's training obligation, at
11 least with respect to that utility with that year
12 one allocation, would it?
13    A.    With that specific utility and with
14 that specific condition, probably not.
15    Q.    Another potential concern you
16 mentioned was transportation of the casks. I'm
17 not sure, what is the nature of the logistical
18 concern there?
19    MR. CRAWFORD: Objection vague.
20    A.    A certain number of casks will be
21 procured to meet a certain need within certain
22 turnaround times. It takes longer to move the
23 casks from the east coast to Nevada than it does
24 from the west coast to Nevada. To the extent
25 exchanges move it more to the east coast with

Page 292

1 short notice there may not be sufficient casks to
2 service everybody else after that exchange because
3 the casks have already been committed for the
4 year.
5    Q.    In general you need fewer casks if
6 larger transportation campaigns are used to ship
7 spent fuel?
8    A.    No --
9    MR. CRAWFORD: Objection. Vague.
10    A.    No. You may need more casks for
11 larger campaigns.
12    Q.    How could that be?
13    A.    Because a utility can only load a
14 certain number of casks a week, and if you are
15 waiting for a campaign you will let them sit there
16 until you fill the last cask, so it may actually
17 require more casks, not less.
18    Q.    Do you have any expectation as to the
19 extent to which you believe that DOE will be able
20 to resolve these logistical concerns -- I'm sorry,
21 I think was the word that you used -- in order to
22 approve proposed exchanges of approved delivery
23 commitment schedules?
24    MR. CRAWFORD: Objection to the
25 foundation. Objection, assumes facts not in

_ (Pages 289 to 292)

Page 293

1  evidence. Objection to the extent it calls for
2  speculation.
3      A.    And I'm not sure, when you say DOE
4  resolved these issues, what do you mean?
5      Q.    The issues that you have raised, since
6  they are capable of being anticipated, aren't they
7  capable of being addressed such that when a
8  proposed exchange is actually put in DOE would be
9  prepared to accommodate the exchange?
10     MR. CRAWFORD: Objection to the extent
11 it mischaracterized what he said, and objection to
12 the extent it calls for speculation or assumes
13 facts not in evidence.
14     A.    And again depending on when an
15 exchange is requested and what the exchange is, if
16 you're asking me can the department, can anybody
17 buy enough of everything, having it sitting around
18 uselessly until somebody decides at the last
19 minute, sure. Would that be right? No. There
20 are budget constraints. It depends on when the
21 request occurs and what the request is, and I
22 can't envision all the circumstances in the future
23 in order to get it addressed.
24     Q.    Well, you said the department would
25 not want to buy a lot of extra casks and other

Page 294

1  material in anticipation of exchanges uselessly,
2  particularly if such exchanges don't happen.
3  Wouldn't the department be able to model and
4  predict with some fair amount of reliability what
5  exchanges would likely be proposed?
6      MR. CRAWFORD: Objection to the
7  foundation. Objection to the extent it calls for
8  speculation.
9      A.    I don't think so. I can't model how
10 utilities will act for their own self-interest.
11     Q.    You could model to determine who
12 likely would want spent fuel at particular times,
13 couldn't you?
14     A.    I can't model individual
15 self-interests. I also need to be accountable to
16 other contractholders who continue to pay for
17 expenditures that are not used.
18     Q.    Let's do it one question at a time.
19 My question is you could model which utilities
20 would want spent fuel removed at particular times,
21 couldn't you?
22     MR. CRAWFORD: Objection to the extent
23 it calls for speculation. Object to the
24 foundation. Objection to the extent it assumes
25 facts not in evidence.

Page 295

1      A.    No, I can't. I can't model as to what
2  utilities might want to do.
3      Q.    My question is, you could model to
4  determine which utilities would need spent fuel
5  removed in order the avoid otherwise incurring
6  additional costs.
7      MR. CRAWFORD: Objection. Asked and
8  answered.
9      A.    I can't model -- I can model what
10 utility inventories might be. I can't model as to
11 what the behaviors would be. And again one thing
12 I think you are missing, it is not as simple as a
13 cask for this type or that type. Each fuel may
14 require a different type of cask from the same
15 facility.
16     Q.    A different transportation cask?
17     A.    Yes.
18     Q.    Well, let me go back to the discussion
19 we were just having where you were saying you
20 can't predict self-interest. Are you saying that
21 in such a model it wouldn't be reasonable to
22 presume that utilities would act in their economic
23 self-interest in order to minimize their costs and
24 maximize their profits?
25     MR. CRAWFORD: Objection to the

Page 296

1  vagueness of that.
2      A.    For a perception model to work I would
3  not only have to model who needed it early but who
4  would be willing to give it up later, because it
5  has to be a trade, and I can't model the infinite
6  number of variables that would come to that
7  scenario unless I modeled everything possible.
8  I'm not sure what the purpose would be. When a
9  trade is proposed it can be evaluated. The sooner
10 it is proposed, the easier the evaluation.
11     Q.    Well, the Department of Energy, you
12 are aware, has done studies to determine which
13 utilities are likely to run out of pool space at
14 various times.
15     A.    I'm aware of that, yes.
16     Q.    Wouldn't those studies also show which
17 utilities have plenty of pool space at given
18 times?
19     MR. CRAWFORD: Objection to the facts.
20     A.    Yes.
21     Q.    Wouldn't the utilities with ample pool
22 space be likely sellers of allocations during
23 those time periods when they have plenty of space?
24     MR. CRAWFORD: Objection to the
25 vagueness. Objection to the extent it calls for

23 (Pages 293 to 296)