# Plaintiff

Page 1

```
 1        IN THE UNITED STATES COURT OF FEDERAL CLAIMS

 2

          ---------------------------------:
 3   PACIFIC GAS & ELECTRIC COMPANY,       :
                                           :
 4                Plaintiff,               :
                                           :
 5        vs.                              : No. 04-074C into
                                           : which has been
 6   UNITED STATES OF AMERICA,             : consolidated No.
                                           : 04-075C
 7                Defendant.               :
          ---------------------------------:
 8
                                   Washington, D.C.
 9
                           Tuesday, November 1, 2005
10
     Deposition of:
11

12                DAVID ZABRANSKY

13   called for oral examination by counsel for

14   Plaintiff, pursuant to notice, at Greenberg,

15   Traurig, L.L.P., 800 Connecticut Avenue, Northwest,

16   Suite 500, Washington, D.C., before Shari R.

17   Broussard, a Notary Public in and for the District

18   of Columbia, beginning at 9:29 a.m., when were

19   present on behalf of the respective parties:

20

21

22
```

00012

1    (PG&E Z/P Exhibit Number 2

2    was marked for identification.)

3    MR. STOUCK:  Here's a copy for you, Alan.

4    MR. LO RE:  Thank you.

5  BY MR. STOUCK:

6    Q    Mr. Zabransky, you've been handed what's

7  been marked as Exhibit Number 2, which consists of

8  a letter on Department of Energy letterhead May 19,

9  1997 to Judith Sellers at PG&E, from Beth Tomasoni

10  identified as contracting officer, forwarding a

11  document called Office of Civilian Radioactive

12  Waste Management Spent Nuclear Fuel Verification

13  Plan, March 1997.  Is that what you have?

14    A    That's what it appears to be, yes.

15    Q    Have you seen this plan before?

16    A    Yes, I have.

17    Q    What is it?

18    A    As it's titled, the spent fuel -- Spent

19  Nuclear Fuel Verification Plan, Rev 0, dated

20  March 1997.

21    Q    What is the purpose of this plan?

22    MR. LO RE:  Objection.  Calls for

**ZABRANSKY, David 11-1-05**                    **Page 12**

# Plaintiff

**Page 18**

1  their intent, yes.

2  Q  At that time do you know whether DOE had

3  any intent one way or the other as to whether those

4  canisters would be opened again after they were

5  sealed at the purchaser's site?

6  A  Well, at that time they didn't exist, so

7  I don't think DOE had any intent or plans

8  whatsoever about them that I recollect.  It was

9  merely a potential that was being investigated and

10  that was the intent of those investgations.  They

11  didn't exist.

12  Q  Well, did DOE have any -- excuse me for

13  one second.  Let's go off the record.  There's one

14  more document.

15  (Discussion off the record)

16  BY MR. STOUCK:

17  Q  Was there any part of DOE's planning for

18  the program in this March '97 time frame that

19  involved plans for whether or not these containers,

20  if used, would be reopened at the disposal

21  facility?

22  MR. LO RE:  Objection, calls for

**Page 19**

1  speculation.  Objection, compound.  You may answer.

2  THE WITNESS:  Can you clarify what you

3  just asked me?

4  BY MR. STOUCK:

5  Q  Yeah.  Well, subsequent to 1997 DOE did

6  plan to reopen these containers at the repository

7  site; isn't that right?

8  A  Well, I think chronologically I think

9  prior to this point in time when these first came

10  up in the late '80s, early '90s, I think DOE had

11  expressed an opinion or sent letters to people that

12  talked about the use of dual-purpose casks, and

13  that had gone on.  At some point in time the

14  requirements documents were -- included the

15  capability of opening canisters or casks and

16  repackaging them at the repository facilities, but

17  that would, you know, as would be required should

18  DOE accept them and because they wouldn't have

19  disposal.  So those were eventually at some point

20  included in the requirements documents.  I don't

21  know exactly when those were --

22  Q  The "those" in your sentence --

**Page 20**

1  A  The requirement that the facilities be

2  capable of some limited capability of repackaging

3  canisters.

4  Q  You're talking about the reactor sites?

5  A  No, the repositories.

6  Q  Repository.  And, in fact, there was a

7  design that was developed to include that

8  capability at the repository site, correct?

9  A  It was a requirement for the contractor

10  to develop such a design.  I'm not sure it was ever

11  finalized at this point.

12  Q  Well, I didn't ask whether it was

13  finalized.  I've seen pictures of a canister at a

14  handling facility.  Have you seen those?

15  A  I've seen pictures.  I don't know the

16  design.

17  Q  Well, that's part of the plans though, we

18  agree with that, at some point subsequent to 1997?

19  A  Yes.

20  Q  So, therefore, subsequent to the time of

21  this document it was a part of DOE's plan to reopen

22  at least some of these containers; is that correct?

**Page 21**

1  MR. LO RE:  Objection.  Mischaracterizes

2  the prior testimony.  You may answer.

3  BY MR. STOUCK:

4  Q  I think we're quibbling over whether the

5  plans were finalized.

6  A  No, I think we're quibbling over whether

7  DOE's intent to actually do it or to have the

8  facility to decide to do it.  It was going to have

9  the facilities should it decide to implement the

10  provisions necessary to accept such canisters.

11  BY MR. STOUCK:

12  Q  Fine.  At the time of this document,

13  Exhibit Number 2, was that same thing part of DOE's

14  plans?  I mean had the thinking progressed far

15  enough where DOE was planning at the time of this

16  document to have the capability to open the

17  containers if it wanted to?

18  A  Yes, the capability would have been there

19  consistent with earlier discussions that DOE had

20  had with the industry, yes.

21  Q  But the purpose of this document though

22  that's in front of you was to provide guidance for

6 (Pages 18 to 21)

**Capital Reporting Company**

Page 22

1  verification of the spent fuel before it was put
2  into the containers in the event that they
3  ultimately were not going to be reopened at the
4  repository site; isn't that correct?
5      A    No.
6      Q    That's not correct?
7      A    That's not correct.
8      Q    What's wrong with that statement?
9      A    It was to provide guidance to allow for
10  verification at the time of receipt so that should
11  DOE and the utilities have concluded whatever
12  arrangements were necessary to make these
13  acceptable waste forms and that DOE had then agreed
14  to pick them up, that the lack of a verification
15  activity physically taking place wouldn't prevent
16  that from happening.
17      Q    Well, I think that's what I just said.
18  In case it was decided that the containers were not
19  going to be reopened --
20      A    No, they always have to be reopened.
21      Q    They always have to be reopened.
22      A    At the repository.

Page 23

1      Q    Why is that?
2      A    They're not disposable.
3      Q    Then I'm not understanding what the
4  purpose of the plan was.  This plan was to provide
5  verification before they went into the cans even
6  though they were going to be reopened and it would
7  have been possible to verify the spent fuel?
8      A    Afterwards.
9      Q    Afterwards?
10     A    After DOE receives it.  This would just
11  say that DOE could receive without physically
12  verifying the contents that it was receiving.
13     Q    Ah, I see.  Okay.
14          Did you have any role in the development
15  of this Exhibit 2 document?
16     A    I believe I was -- participated in the
17  development of this document, yes.
18     Q    What was your role specifically?
19     A    I believe I provided input and guidance
20  to the contractors that were developing this
21  document.  For instance, I believe that it was my
22  position that we should be able to rely upon the

Page 24

1  documentation that the utilities had in lieu of,
2  physical verification, in lieu of canisters should
3  we decide to accept those, that that shouldn't be
4  the impediment for acceptance.
5      Q    What would be the impediment for
6  acceptance in your view in 1997?  If you had a view
7  about that, what was your view about what might,
8  let me put it this way, might be an impediment to
9  acceptance, if not the lack of verification?
10     A    Well, the impediment to acceptance I
11  believe is that the contract doesn't cover the
12  acceptance of the canisters.
13     Q    Is that a particular impediment in your
14  view?  It sounds like a legal issue.
15     A    I would say it's a legal issue.
16     Q    So we change the contract to make them
17  acceptable?
18     A    And DOE has said that, yes.
19     Q    There's no technical impediment to
20  accepting these canisters; is that correct?
21          MR. LO RE:  Objection.  Calls for
22  speculation.

Page 25

1          THE WITNESS:  Well, at this point there
2  is.  I mean the mere fact at this point there is no
3  facility licensed to accept them makes it more than
4  a legal impediment.  It makes it a physical
5  impediment at this point.
6  BY MR. STOUCK:
7      Q    A facility could be licensed to accept
8  these containers; isn't that correct?
9      A    I can't speak to what the NRC may or may
10  not license.
11     Q    The Department of Energy could ask the
12  NRC to license a facility that would accommodate
13  the receipt of these dual-purpose containers; is
14  that correct?
15     A    The receipt and reopening and
16  repackaging, yes, they could, yes.
17     Q    There's no technical reason why DOE could
18  not ask the NRC to license a facility that would
19  accommodate the receipt and disposal perhaps in
20  some overpack but disposal of these containers as
21  well; isn't that right?  I mean are you aware of
22  any impediment?

7 (Pages 22 to 25)

# Plaintiff

00027

1  conclusion; in other words, was there a final

2  analysis done that led DOE to conclude that there

3  was no way that these containers could be disposed

4  of or was the analysis, the alternative would be,

5  you know, some analysis was done, but it never

6  really got to a final answer one way or the other?

7      A   I don't how final it got to, but, you

8  know, using the comparator ever could be -- it's

9  not something that anybody would ever say, but as

10  currently envisioned they don't meet the long-term

11  disposability requirements for Yucca Mountain that

12  the Department intends to license.

13      Q   So if brought to the repository, they

14  would have to be reopened?

15      A   That would be the current plan should we

16  take them in.

17      Q   Oh, that would be the current plan as of

18  now should we take them in?

19      A   It's been the plan for several years.

20      Q   And that's still the plan today if you

21  should take them?

22      A   That's the requirement that has been

**ZABRANSKY, David 11-1-05**                    **Page 27**

Page 26

1    A    Yeah.

2    Q    Do you have any reason why DOE would not

3 or could not ask NRC to license such a disposal?

4    A    Well, it's my understanding that the

5 disposability of these is technically right now not

6 something we know how to do.

7    Q    Well, you know --

8    A    We could ask for lots of things, but we

9 don't have a basis for saying why they would be

10 disposable.

11    Q    But if it's a path that DOE wanted to

12 pursue?

13    A    No, I'm not saying it couldn't be

14 pursued.  We don't know how to do it technically.

15 There's no way to make these disposable because DOE

16 is currently picking --

17    Q    Has the disposability of these containers

18 been studied by DOE?

19    A    I believe it has.

20    Q    In overpacks?

21    A    Yes.

22    Q    And did those studies come to a complete

Page 27

1 conclusion; in other words, was there a final

2 analysis done that led DOE to conclude that there

3 was no way that these containers could be disposed

4 of or was the analysis, the alternative would be,

5 you know, some analysis was done, but it never

6 really got to a final answer one way or the other?

7    A    I don't how final it got to, but, you

8 know, using the comparator ever could be -- it's

9 not something that anybody would ever say, but as

10 currently envisioned they don't meet the long-term

11 disposability requirements for Yucca Mountain that

12 the Department intends to license.

13    Q    So if brought to the repository, they

14 would have to be reopened?

15    A    That would be the current plan should we

16 take them in.

17    Q    Oh, that would be the current plan as of

18 now should we take them in?

19    A    It's been the plan for several years.

20    Q    And that's still the plan today if you

21 should take them?

22    A    That's the requirement that has been

Page 28

1 placed on the contractor, to design such a

2 facility.  Whether it could be licensed is another

3 question.

4    Q    When was that requirement placed on the

5 contractor, approximately?

6    A    I don't recall.  It's been there for

7 years.  I don't know exactly when it went on.

8    Q    So that, you know, plan or potential plan

9 to reopen these dual-purpose containers at the

10 repository is not affected by the recently

11 announced or revived idea of having standardized

12 containers developed by DOE; is that right?

13    MR. LO RE:  I'm going to object to this

14 question on the grounds that it is clearly outside

15 the scope of discovery in this matter.  As Judge

16 Hewitt has made perfectly clear, discovery is to be

17 cut off of on the date of plaintiff's complaint,

18 which I believe is January '04, so I'm going to

19 object to this question and ask you to withdraw it.

20 BY MR. STOUCK:

21    Q    I'm not going to withdraw it.  I'll come

22 at it from a different angle.  But he's the one who

Page 29

1 brought up the subject.  He's the one who has

2 already testified to that.  It's literally my last

3 question on this line.

4    MR. LO RE:  You said you were going to

5 come at it from a different angle.

6    MR. STOUCK:  Well, I will try to, surely.

7 If this doesn't satisfy -- that's going to come

8 later in the outline.  If we can have an answer

9 now, I would appreciate it.

10    I think he's already signaled what the

11 answer is.  It's really just confirmation of what's

12 already implied by the last answer.

13    MR. LO RE:  Would you read that back?

14    MR. STOUCK:  Well, if you don't mind,

15 would you read back the last question and answer?

16    (The reporter read the record as

17    requested.)

18    MR. STOUCK:  And I think, again, it's

19 still the plan today I think the answer to the

20 question is.

21    MR. LO RE:  That's fine, if you want to

22 ask whether it's still the plan today.

8 (Pages 26 to 29)

**Capital Reporting Company**

---

Page 30

```
1           MR. STOUCK:  Well, I asked him if it's
2   still the plan today and he said yes, a potential
3   plan.
4   BY MR. STOUCK:
5       Q    If you accept the containers, the plan is
6   to reopen them at the repository; is that correct?
7       A    That's the plan today.
8       Q    May I infer by logic then that that plan
9   is not affected by the recently -- well, whatever
10  recent announcements DOE has made on any subject?
11          MR. LO RE:  Well, to the extent you're
12  asking him about the recent changes --
13          MR. STOUCK:  Alan, you're drawing a line
14  that's not tenable.  He just answered a question
15  that had to do with something today, current.  You
16  can't cut it off at the time of the complaint, so I
17  would just like him to confirm that there's been no
18  effect on these plans by the recent announcement.
19  I mean I'm sorry to get argumentative about it, but
20  I'm not asking an extensive number of questions
21  about today's plans.  I'm just asking really a
22  clean-up question about something that's already
```

Page 31

```
1   been covered, so I'd like to have an answer and
2   what I'd really like to do is move on so I can get
3   the witness out of here.
4           THE WITNESS:  That's still the plan
5   today.
6   BY MR. STOUCK:
7       Q    And not affected by the recently
8   announced revival of a standardized container idea?
9   Is that a reasonable inference?
10          MR. LO RE:  I'm going to place the same
11  objection, Jerry, and I think you've gotten the
12  answer that you were looking for twice.
13          MR. STOUCK:  Well, are you instructing
14  him not to answer?
15          MR. LO RE:  I am lodging the objection.
16  I think you've gotten your answer.  I'm asking you
17  to move on.  If you're not going to move on, we'll
18  take it up, we'll address it.
19          MR. STOUCK:  Are you instructing him not
20  to answer?
21          MR. LO RE:  You're asking him to testify
22  --
```

Page 32

```
1           MR. STOUCK:  Just tell me yes or no.  Are
2   you instructing him not to --
3           MR. LO RE:  To the extent you are asking
4   him about events that occurred after January,
5   whenever your complaint was filed, January of '04,
6   I'll instruct him not to answer.  Having said that,
7   I believe that you got the answer that you were
8   looking for.
9           MR. STOUCK:  Mark this as Exhibit Number
10  3.
11          (PG&E Z/P Exhibit Number 3
12          was marked for identification.)
13  BY MR. STOUCK:
14      Q    Mr. Zabransky, you've been handed what's
15  been marked as Exhibit Number 3 to this deposition.
16  It's a letter dated March 18, 1983 on Department of
17  Energy letterhead to Mr. J.E. Barrett, Contract
18  Administrator, Pacific Gas & Electric Company, from
19  the contracting officer, forwarding what appear to
20  be approved delivery commitment schedule forms.  Do
21  you see that?
22      A    I see that.
```

Page 33

```
1       Q    Do you agree with my description of what
2   this exhibit is?
3       A    That's what it appears to be, yes.
4       Q    And if you take a look back at Exhibit
5   1 -- do you still have that before you -- and you
6   see the delivery commitment schedule forms that are
7   attached to Exhibit 1 are signed by Mr. Stock, not
8   me, a different Mr. Stock, and dated 8/24/92, the
9   ones that are attached to Exhibit Number 3 were
10  signed by Mr. Stock and dated apparently by him on
11  November 24?  Do you see that?
12      A    I see that.
13      Q    So that's consistent with what we were
14  calling previously a back and forth.  Maybe there
15  were some mistakes or discrepancies and they had to
16  be redone; is that right?
17      A    I don't know what happened between this
18  one and that one.  I wasn't at DOE for either of
19  these.
20      Q    You do have an understanding that there
21  was some back and forth about mistakes or whatever?
22      A    There was correspondence.  I don't know
```

9 (Pages 30 to 33)

# Plaintiff

**Page 126**

1  DOE that more documentation or more information was

2  needed?

3      A    I don't recall specifically.

4      Q    You don't recall?

5      A    No.

6      Q    You don't recall discussing that with

7  PG&E?

8      A    Other than this concept in general.

9      Q    I think that does it for this exhibit,

10  let me just make sure, unless you have something

11  else you want to tell me, which I'm always happy to

12  have.

13      A    No.

14      Q    The last very bullet on page six it says

15  "DOE" -- are you with me?

16      A    Uh-huh.

17      Q    -- "DOE recommends we not concern

18  ourselves with an MPC spec at this time because

19  there is too much uncertainty.  Concentrate on

20  getting a revised contract that allows DPC priority

21  acceptance."  Do you see that?

22      A    I see that.

**Page 127**

1      Q    Is that something that, you know, you

2  would have said or does that reflect your views at

3  that time?

4      A    Well, the first sentence I agree with,

5  that we didn't have an MPC spec, we had just

6  withdrawn an MPC spec, so there's no help we could

7  give them on that issue at that time.  The second

8  sentence, that might be their conclusion.

9      Q    You can't say that you would have told

10  them that?

11      A    I can't say I would have told them that,

12  no.

13      Q    But if one of them said that you told

14  them that, you couldn't dispute it either?

15      A    I couldn't dispute it either.

16      Q    Let's then move on to number -- oh.

17      A    Seventeen?

18      Q    Since it's the same meeting, a bunch of

19  minutes, I just have one or two questions here.

20      MR. LO RE:  Counsel, before we do that I

21  just want to note for the record on what is stamped

22  as page four of the exhibit we just looked at,

**Page 128**

1  PHB0033309, is a blank sheet, and I am assuming,

2  based on the numbering, that that was just simply

3·  left blank by whoever created the document, it's

4  not that the material has been removed for any

5  privilege or anything.

6      MR. STOUCK:  Thank you for that.  I did

7  notice that myself yesterday when I was looking at

8  this.  Page three has question number four, page

9  five has question number five, so I agree with your

10  interpretation, but I don't know.  We all know how

11  the return button works on the Word documents.

12      MR. LO RE:  Yeah, and my point is only

13  nothing has been removed for privilege or anything

14  like that.

15      MR. STOUCK:  That is my understanding as

16  well, that what you have is what I have.

17  BY MR. STOUCK:

18      Q    On Exhibit Number 17, which has a

19  different date at the top, but it says November

20  11th, I believe this is the same meeting.  I think

21  that may be an automatic date.  Let's see.  Well,

22  actually I have no questions about that.  I'm

**Page 129**

1  sorry.  Let's just leave it for the record though.

2  Can we take a short break off the record for a

3  moment?

4      (Brief recess)

5  BY MR. STOUCK:

6      Q    Do you, Mr. Zabransky, recall now, with

7  whatever amount of time you've had to refresh and

8  look at these documents we've been discussing, any

9  subsequent meetings with PG&E?

10      A    No, I don't.

11      Q    You don't recall whether or not there was

12  a follow-up to the meeting we've been discussing?

13      A    I don't recall at this point in time, no.

14      Q    Well, let's go back off because I was

15  hoping that the document would fly in.

16      (PG&E Z/P Exhibit Numbers 19 and 20

17  were marked for identification.)

18  BY MR. STOUCK:

19      Q    Mr. Zabransky, what's been marked as

20  Exhibit Number 19 is an e-mail that says it's sent

21  Tuesday, January 25, 2000, "Subject:  DOE Meeting

22  Minutes 1/18/00," and then the first sentence says,

33 (Pages 126 to 129)

Page 130

1   "Attached are the meeting minutes of the 1/18/00

2   meeting between PG&E and DOE to discuss possible

3   standard contract renegotiation."  Do you see that?

4       A   I see that, yes.

5       Q   And then the minutes are attached

6   identifying as attendees you, Mr. Pollog, and

7   Mr. Burgoyne, and from PG&E Mr. Moulia, Judy

8   Sellers, and Mr. Willis.  Do you see that?

9       A   I do.

10      Q   Still no recollection?

11      A   No.

12      Q   Any recollection of discussing specific

13  contract amendments with PG&E and --

14      A   No.

15      Q   Then I'll just ask you a couple questions

16  here.  It says, as a result, you know, following

17  next steps, second bullet, "Discuss the issue of

18  possible renegotiation with potentially interested

19  parties."

20          Do you know whether DOE was interested in

21  renegotiating the contract or making revisions to

22  PG&E's contract at that time?  Do you recall that?

Page 131

1       A   I think we were willing to discuss it

2   with anybody.  I don't recall PG&E specifically.

3       Q   You don't recall specifically whether

4   there was any level of interest or how much

5   interest there was, if any, or, you know, how far

6   it went, if there were discussions?

7       A   With PG&E specifically?

8       Q   Yes.

9       A   No.  I don't know who JUV or SCE refer to

10  at this point.

11      Q   All righty.  Fine.

12          If you go back to page 0007, Attachment

13  1, it is identified as an agenda, first bullet --

14  are you there?

15      A   Okay.

16      Q   -- "Review (and explore in greater

17  detail) DOE needed revisions to SC," standard

18  contract.  Do you see that?

19      A   I see that, yes.

20      Q   Do you know what's referred to here as

21  "DOE needed revisions to standard contract"?

22      A   Well, again, I think we talked earlier

Page 132

1   that, again, I don't think we prepared this agenda,

2   this wasn't prepared by PG&E, but DOE was willing

3   to talk about contract modifications before we

4   talked about fuel selection, scheduling, more data,

5   those types of issues.

6       Q   If you look on the next page, it says,

7   "What DOE wants."  There's the fuel temperature

8   issue, there's the 12-month notification issue,

9   there's the training and procedural requirements, a

10  similar list of what we saw on the notes from the

11  prior meeting.

12      A   That's correct.

13      Q   Those would have been topics that DOE

14  would have had some level of interest in discussing

15  in terms of a contract modification?

16      A   At that point in time DOE was willing to

17  discuss that, yes.

18      Q   The second page of this exhibit, which

19  0003 are the Bates numbers, under the 12-month

20  notification issue it says, "DOE offered up two

21  proposals."  Do you see that?

22      A   That's what it says.

Page 133

1       Q   "The second of which they appeared to

2   prefer:".  Do you see it says that?

3       A   That's what it says yes.

4       Q   Let me read number two.  "An arrangement

5   in which the licensee would consolidate annual

6   shipping allocations over some period and process

7   to be determined.  DOE would only need to

8   coordinate a periodic rather than annual shipping

9   campaign from a particular facility.  This would be

10  significantly more efficient from a mobilization

11  and transportation coordination perspective - all

12  of which are DOE responsibilities."  Do you see

13  that?

14      A   Yes, and I don't agree with it.

15      Q   You don't agree with it?

16      A   No.

17      Q   That was not DOE's view at that time?

18      A   No.

19      Q   That was not your view at the time?

20      A   I didn't say that.

21      Q   Okay.

22      A   I don't believe -- I believe that that

34 (Pages 130 to 133)

## Capital Reporting Company

Page 134

1  view is appropriate, but I don't believe those are
2  all benefits that accrue to DOE.
3      Q    Strike the last --
4      A    I said all of these.
5      Q    These are not all the benefits that
6  accrue to DOE; is that what you're saying?
7      A    No, I'm saying all the benefits don't
8  accrue to DOE.
9      Q    Some benefits accrue to the utility?
10     A    Absolutely.
11     Q    Was it DOE's view at that time that this
12  was a preferred course to follow?
13     A    I don't know that we had a preferred
14  view.  I think that's a mis -- I don't recall that
15  A or B, one or two was more preferred.  I think DOE
16  was -- would be willing to discuss either.  I think
17  the other clarification was that, in general, that
18  two referred to was taking allocations that would
19  have appeared over let's say a five-year period
20  once a year and aggregating them into one place but
21  not necessarily at the utility's desire.
22     Q    Aggregating them.  What about aggregating

Page 135

1  them into one year?
2      A    That's right, but it may mean that DOE
3  takes all five fuels in the fifth year and that's
4  what -- that was what the discussion was to be
5  about there.
6      Q    And your view is that would have had
7  benefits over the strict oldest fuel first system?
8      A    That would have had benefits to both
9  parties, to take those and make them campaigns that
10  would have had benefits, yes.
11     Q    You don't recall discussing that
12  specifically at this January 2000 meeting?
13     A    No, I don't recall the meeting
14  specifically.
15     Q    So, therefore, it very well may have been
16  discussed, as these notes reflect?
17     A    It may have been discussed, but I would
18  be surprised that -- again, I don't recall ever
19  discussing in any form -- I've explained how DOE
20  thought about it.  How they took it was another
21  issue.
22     Q    I'm not asking you -- I appreciate that

Page 136

1  you can't speak for these people.
2      A    Right.
3      Q    But you do agree with the DOE that there
4  would have been benefits to concentrated campaign
5  pick-ups, you know, maybe not in the first year,
6  you know, the example you gave, you may be able to
7  move back rather than move up but rather than come
8  every year, you do agree there were benefits to
9  coming once rather than five times, other things
10  being equal?
11     A    If they can work out for both parties,
12  yes.
13     Q    Thank you very much.
14          Let's try to keep this short here as I
15  can.  Fuel heat, page two, would you take a look
16  under number three, Mr. Zabransky, and just in the
17  interest of speeding this up can you read those two
18  paragraphs that are on page 0004 and just tell me
19  if these two paragraphs are consistent with what
20  you told me a few moments ago about this allocation
21  of responsibilities issue?  In other words, if the
22  allocation was clear, if I understood your

Page 137

1  testimony, the allocation of responsibility was
2  clear, but there needs to be a lot more or at least
3  some more detail about exactly what each party is
4  going to do?
5      A    I think this better reflects it.  It
6  talks about the fact that it is really getting down
7  to issues such as when are they going to be
8  staffed, so --
9      Q    This better reflects your understanding
10  of this issue?
11     A    Yes, it does.
12     Q    Just one question on the next page, 005,
13  under Appendix E, "Standard Fuel."
14     A    Uh-huh.
15     Q    Are you with me there?  The second
16  paragraph where it says "Comments," do you see
17  that?
18     A    Uh-huh.
19     Q    "DOE agreement on the characteristics of
20  canisterized fuel which will qualify it as
21  'standard' is on the surface a difficult issue for
22  them because of the moving target of Yucca

35 (Pages 134 to 137)

# Defendant

Page 1

1        IN THE UNITED STATES COURT OF FEDERAL CLAIMS

2

--------------------------------:

3   PACIFIC GAS & ELECTRIC COMPANY,   :

4                  Plaintiff,          :

5          vs.                         : No. 04-074C into
                                       : which has been
6   UNITED STATES OF AMERICA,          : consolidated No.
                                       : 04-075C
7                  Defendant.          :

--------------------------------:

8

                              Washington, D.C.

9

                    Tuesday, November 1, 2005

10

     Deposition of:

11

12                  DAVID ZABRANSKY

13   called for oral examination by counsel for

14   Plaintiff, pursuant to notice, at Greenberg,

15   Traurig, L.L.P., 800 Connecticut Avenue, Northwest,

16   Suite 500, Washington, D.C., before Shari R.

17   Broussard, a Notary Public in and for the District

18   of Columbia, beginning at 9:29 a.m., when were

19   present on behalf of the respective parties:

20

21

22

Page 130

1 "Attached are the meeting minutes of the 1/18/00

2 meeting between PG&E and DOE to discuss possible

3 standard contract renegotiation." Do you see that?

4 A I see that, yes.

5 Q And then the minutes are attached

6 identifying as attendees you, Mr. Pollog, and

7 Mr. Burgoyne, and from PG&E Mr. Moulia, Judy

8 Sellers, and Mr. Willis. Do you see that?

9 A I do.

10 Q Still no recollection?

11 A No.

12 Q Any recollection of discussing specific

13 contract amendments with PG&E and --

14 A No.

15 Q Then I'll just ask you a couple questions

16 here. It says, as a result, you know, following

17 next steps, second bullet, "Discuss the issue of

18 possible renegotiation with potentially interested

19 parties."

20 Do you know whether DOE was interested in

21 renegotiating the contract or making revisions to

22 PG&E's contract at that time? Do you recall that?

Page 131

1 A I think we were willing to discuss it

2 with anybody. I don't recall PG&E specifically.

3 Q You don't recall specifically whether

4 there was any level of interest or how much

5 interest there was, if any, or, you know, how far

6 it went, if there were discussions?

7 A With PG&E specifically?

8 Q Yes.

9 A No. I don't know who JUV or SCE refer to

10 at this point.

11 Q All righty. Fine.

12 If you go back to page 0007, Attachment

13 1, it is identified as an agenda, first bullet --

14 are you there?

15 A Okay.

16 Q -- "Review (and explore in greater

17 detail) DOE needed revisions to SC," standard

18 contract. Do you see that?

19 A I see that, yes.

20 Q Do you know what's referred to here as

21 "DOE needed revisions to standard contract"?

22 A Well, again, I think we talked earlier

Page 132

1 that, again, I don't think we prepared this agenda,

2 this wasn't prepared by PG&E, but DOE was willing

3 to talk about contract modifications before we

4 talked about fuel selection, scheduling, more data,

5 those types of issues.

6 Q If you look on the next page, it says,

7 "What DOE wants." There's the fuel temperature

8 issue, there's the 12-month notification issue,

9 there's the training and procedural requirements, a

10 similar list of what we saw on the notes from the

11 prior meeting.

12 A That's correct.

13 Q Those would have been topics that DOE

14 would have had some level of interest in discussing

15 in terms of a contract modification?

16 A At that point in time DOE was willing to

17 discuss that, yes.

18 Q The second page of this exhibit, which

19 0003 are the Bates numbers, under the 12-month

20 notification issue it says, "DOE offered up two

21 proposals." Do you see that?

22 A That's what it says.

Page 133

1 Q "The second of which they appeared to

2 prefer:". Do you see it says that?

3 A That's what it says yes.

4 Q Let me read number two. "An arrangement

5 in which the licensee would consolidate annual

6 shipping allocations over some period and process

7 to be determined. DOE would only need to

8 coordinate a periodic rather than annual shipping

9 campaign from a particular facility. This would be

10 significantly more efficient from a mobilization

11 and transportation coordination perspective - all

12 of which are DOE responsibilities." Do you see

13 that?

14 A Yes, and I don't agree with it.

15 Q You don't agree with it?

16 A No.

17 Q That was not DOE's view at that time?

18 A No.

19 Q That was not your view at the time?

20 A I didn't say that.

21 Q Okay.

22 A I don't believe -- I believe that that

34 (Pages 130 to 133)

# Defendant

## Capital Reporting Company

Page 134

1  view is appropriate, but I don't believe those are
2  all benefits that accrue to DOE.
3      Q    Strike the last --
4      A    I said all of these.
5      Q    These are not all the benefits that
6  accrue to DOE; is that what you're saying?
7      A    No, I'm saying all the benefits don't
8  accrue to DOE.
9      Q    Some benefits accrue to the utility?
10     A    Absolutely.
11     Q    Was it DOE's view at that time that this
12 was a preferred course to follow?
13     A    I don't know that we had a preferred
14 view.  I think that's a mis -- I don't recall that
15 A or B, one or two was more preferred.  I think DOE
16 was -- would be willing to discuss either.  I think
17 the other clarification was that, in general, that
18 two referred to was taking allocations that would
19 have appeared over let's say a five-year period
20 once a year and aggregating them into one place but
21 not necessarily at the utility's desire.
22     Q    Aggregating them.  What about aggregating

Page 135

1  them into one year?
2      A    That's right, but it may mean that DOE
3  takes all five fuels in the fifth year and that's
4  what -- that was what the discussion was to be
5  about there.
6      Q    And your view is that would have had
7  benefits over the strict oldest fuel first system?
8      A    That would have had benefits to both
9  parties, to take those and make them campaigns that
10 would have had benefits, yes.
11     Q    You don't recall discussing that
12 specifically at this January 2000 meeting?
13     A    No, I don't recall the meeting
14 specifically.
15     Q    So, therefore, it very well may have been
16 discussed, as these notes reflect?
17     A    It may have been discussed, but I would
18 be surprised that -- again, I don't recall ever
19 discussing in any form -- I've explained how DOE
20 thought about it.  How they took it was another
21 issue.
22     Q    I'm not asking you -- I appreciate that

Page 136

1  you can't speak for these people.
2      A    Right.
3      Q    But you do agree with the DOE that there
4  would have been benefits to concentrated campaign
5  pick-ups, you know, maybe not in the first year,
6  you know, the example you gave, you may be able to
7  move back rather than move up but rather than come
8  every year, you do agree there were benefits to
9  coming once rather than five times, other things
10 being equal?
11     A    If they can work out for both parties,
12 yes.
13     Q  . Thank you very much.
14         Let's try to keep this short here as I
15 can.  Fuel heat, page two, would you take a look
16 under number three, Mr. Zabransky, and just in the
17 interest of speeding this up can you read those two
18 paragraphs that are on page 0004 and just tell me
19 if these two paragraphs are consistent with what
20 you told me a few moments ago about this allocation
21 of responsibilities issue?  In other words, if the
22 allocation was clear, if I understood your

Page 137

1  testimony, the allocation of responsibility was
2  clear, but there needs to be a lot more or at least
3  some more detail about exactly what each party is
4  going to do?
5      A    I think this better reflects it.  It
6  talks about the fact that it is really getting down
7  to issues such as when are they going to be
8  staffed, so --
9      Q    This better reflects your understanding
10 of this issue?
11     A    Yes, it does.
12     Q    Just one question on the next page, 005,
13 under Appendix E, "Standard Fuel."
14     A    Uh-huh.
15     Q    Are you with me there?  The second
16 paragraph where it says "Comments," do you see
17 that?
18     A    Uh-huh.
19     Q    "DOE agreement on the characteristics of
20 canisterized fuel which will qualify it as
21 'standard' is on the surface a difficult issue for
22 them because of the moving target of Yucca

35 (Pages 134 to 137)

# Lake Barrett

# Plaintiff

# UNITED STATES
# COURT OF FEDERAL CLAIMS

TENNESSEE VALLEY AUTHORITY,    )

                    Plaintiff,)  Case No.

v.                      )  01-249C

THE UNITED STATES,         )

                    Defendant.)

Pages:    751 through 1014

Place:    Chattanooga, Tennessee

Date:     June 24, 2005

## HERITAGE REPORTING CORPORATION
*Official Reporters*
1220 L Street, N.W., Suite 600
Washington, D.C. 20005-4018
(202) 628-4888
hrc@concentric.net

818

1            MR. SMALL:  Your Honor, for purposes of

2       clarity of the record, I will, of course, announce

3       the name of the witness and the source of them prior

4       to beginning.  The first testimony will be the

5       testimony of Lake H. Barrett, which was conducted in

6       consolidated discovery in a number of spent nuclear

7       fuel cases, including the TVA case, and the date of

8       the deposition, Your Honor, was April 2002, reading

9       from April 22nd, 2002:

10               "Lake H. Barrett, having been duly sworn,

11       testified as follows:

12               "What is your current position,

13       Mr. Barrett?

14               "ANSWER:  I'm the deputy director of the

15       Office of Civilian Radioactive Waste Management."

16            MS. SHEA:  Do I need to use the answer, or

17       can I just answer the question when you read it, when

18       you say question, and answer?

19            MR. SMALL:  I'll ask the question and you

20       can just --

21            MS. SHEA:  I don't have to say, "Answer"?

22            MR. SMALL:  You don't have to say answer.

23            MS. SHEA:  Okay.

24            MR. SMALL:  "QUESTION:  For how many years

25       have you been employed by the Department of Energy.

# Plaintiff

1           "ANSWER:  Since mid-'85 in various

2    different positions.

3           "QUESTION:  And prior to 1985, what was

4    your position?

5           "ANSWER:  I worked for the Nuclear

6    Regulatory Commission since end of '74 in various

7    positions.

8           "QUESTION:  Can you describe for me your

9    educational background?

10           "ANSWER:  B.S. degree in mechanical

11    engineering, University of Connecticut, '67; MS

12    mechanical engineering, nuclear, '72; did business

13    courses, '72, '73, '74.

14           "QUESTION:  So based on your prior

15    testimony, Mr. Barrett, the 3,000 rate would be

16    consistent with your understanding of the intent of

17    the Act and to reduce, over a reasonable period of

18    time, the backlog of spent nuclear fuel throughout

19    the nation, correct?

20           "ANSWER:  Yes."

21           MR. LO RE:  Objection.

22           THE COURT:  Mr. Lo Re?

23           MR. LO RE:  Objection, based on relevance,

24    as we've stated before and I will put on record

25    generally again, Your Honor, we believe that any

# Plaintiff

824

1          MR. LO RE:  And could you ask the witness

2    to wait until the objection is lodged?

3          THE COURT:  If Mr. Lo Re stands, Ms. Shea,

4    if you'd just wait?

5          MR. LO RE:  Thank you, Ms. Shea.

6    Objection, Your Honor, vague and, in addition,

7    assumes facts not in evidence.

8          THE COURT:  Well, the latter point is

9    certainly true.  Insofar as this proceeding is

10   concerned, it doesn't seem to be based upon his

11   deposition, however, and the Court will overrule the

12   objection.

13         MR. SMALL:  Ms. Shea, if you will read the

14   answer?

15         MS. SHEA:  "ANSWER:  Yes."

16         MR. SMALL:  Skipping to page 349, line 8.

17         "QUESTION:  To your knowledge, Mr. Barrett,

18   have all TSLCC or fee adequacy studies issued on or

19   after 1982 assumed a 3,000, paren, MTU acceptance

20   rate or a repository design receipt rate?"

21         MR. LO RE:  Objection, lack of foundation,

22   best evidence.

23         THE COURT:  Why do you say, refer to the

24   best evidence rule, Mr. Lo Re?

25         MR. LO RE:  Because, Your Honor, the

1      question refers to the specific TSLCC reports and

2      those documents obviously are the best evidence of

3      what is contained therein.

4             THE COURT:  That's true, but on the other

5      hand, obviously, Mr. Barrett has personal knowledge

6      of those documents.  He testified earlier that he

7      had.

8             MR. LO RE:  Your Honor, if I may on that?

9             THE COURT:  Yes, certainly.

10            MR. LO RE:  To the extent Mr. Barrett may

11     have an opinion and that opinion is proved correct or

12     incorrect by the document, I believe it is simply the

13     document that determines the accuracy of the issue,

14     and frankly, I think Mr. Barrett's testimony in this

15     regard is superfluous.

16            THE COURT:  Well, except that what he does

17     is refer in the -- or what the question refers to is

18     fee adequacy studies issued on or after 1982, and he

19     would have knowledge about the whole spectrum of

20     studies, and the Court will allow the question

21     accordingly.

22            MR. LO RE:  Thank you, Your Honor.

23            MR. SMALL:  Ms. Shea, if you would read the

24     answer?

25            "ANSWER:  Some had more.

1              "QUESTION:  Some had more.  Which ones had

2      more?

3              "ANSWER:  Ones that had two repositories in

4      it had higher rates than 3,000.

5              "QUESTION:  What was the highest annual

6      aggregate rate of any of the TSLCC or fee adequacy

7      studies that you're referring to?"

8              MR. LO RE:  Again, Your Honor, objection,

9      best evidence.

10             THE COURT:  I suppose one could go through

11     all the reports of the studies, this just seems to be

12     a more efficient way to get at it.  Overruled.

13             MR. SMALL:  Please read the answer.

14             "ANSWER:  Some of the earlier ones,

15     pre-'87, had two repositories at steady state which

16     were run higher; at nominal, 6,000 tons."

17             "QUESTION:  Per year?

18             "ANSWER:  Per year.  All recent ones since

19     '87 or so, to my knowledge, are basically steady

20     state at 3,000.

21             "QUESTION:  And by recent ones -- I'm

22     sorry.

23             "ANSWER:  In the 1990s, the TSLCCs had a

24     steady -- had a state steady receipt rate at 3,000

25     tons per year."

# Plaintiff

1  we can do a fee adequacy report as to the adequacy of

2  the charge to the utilities."

3          Skipping to page 958, line 1:

4          "QUESTION:  Did you have any involvement in

5  the preparation of Exhibit 45?

6          "ANSWER:  Probably, I probably signed off

7  on it.

8          "QUESTION:  And take your time to review

9  the document to refresh your recollection, but I'd

10  like to discuss how these rates were determined by

11  the Department of Energy, the rates in table 1-2.

12          "ANSWER:  These would have been the, you

13  know, the repository receipt rates that we used at

14  that time.  They're not dissimilar to the 3,000

15  metric tons steady state rate that we've always had

16  for the repository.  I don't know what more detail

17  you wish."

18          Skipping to a succeeding date in the

19  deposition, May 10th, 2002, page 1163, line 10:

20          "QUESTION:  But you do disagree with the

21  statement that there is not a clearly documented

22  rationale for 3,000 MTU per year receipt rate,

23  correct?

24          "ANSWER:  Correct.

25          "CORRECT:  Because you believe that there

1    is in fact a clearly documented rationale for a 3,000

2    MTU per year receipt rate, correct?

3              "ANSWER:  Yes.

4              "QUESTION:  And could you explain to me

5    that rationale that you believe has been clearly

6    documented by the Department?

7              "ANSWER:  There was one in the old mission

8    plans.  It basically was that the rate of 3,000 tons

9    per year exceeded a generation rate of a nominal

10   2,000 tons per year and allowed a catchup of 1,000

11   tons per year delta, and for where the program was at

12   that time, that was sufficient, and I felt that was

13   sufficient at that time."

14             Page 1164, line 16:

15             "QUESTION:  And when you just stated

16   'allowed a catchup of 1,000 tons per year delta,'

17   what did that statement refer to?

18             "ANSWER:  The receipt of a nominal 3,000

19   tons per year steady state when the generation rate

20   was approximately 2,000 tons per year.  The system

21   capacity and take rate was exceeding the generation

22   rate in the nation.

23             "QUESTION:  Why was that important?

24             "ANSWER:  Because we would like to catch up

25   and, you know, remove the waste that had been

1      accumulating at whatever the start date of the

2      facility would be."

3           Page 1165, line 16:

4           "QUESTION:  Why would you have liked to

5      have caught up, as you stated in that answer?

6           "ANSWER:  Because waste existed in the

7      United States, both commercial waste and defense

8      waste, and we were to start, either be it '98 or some

9      other date, there would be an inventory existing, and

10     you wanted to work off that inventory as soon as

11     practicable.

12          "QUESTION:  Why did you want to work off

13     that inventory of spent nuclear fuel as soon as

14     practicable?

15          "ANSWER:  Because I believe that's the

16     intent of the Act.

17          "QUESTION:  By, 'the Act,' you're referring

18     to the Nuclear Waste Policy Act of 1982?

19          "ANSWER:  Correct."

20          Page 1331, line 7:

21          "QUESTION:  You used a term often in your

22     testimony, the term 'generation rate.'  Do you recall

23     using that term?

24          "ANSWER:  Yes.

25          "QUESTION:  What does that term mean?

1          "ANSWER:   To me, that's the amount of spent

2     fuel that the nation's nuclear power reactors

3     produced per year, which is approximately 2,000 tons

4     per year.

5          "QUESTION:   Has it always been

6     approximately 2,000 tons per year?

7          "ANSWER:   I think it's been pretty close.

8          "QUESTION:   Is that the same meaning or

9     definition that you would give to the term 'discharge

10    rate'?

11         "ANSWER:   Yes.

12         "QUESTION:   We had talked quite a bit about

13    a steady state rate of 3,000 MTUs per year with

14    reference to a variety of DOE documents.   My question

15    is, do you have an understanding of the term 'steady

16    state'?

17         "ANSWER:   I believe so.

18         "QUESTION:   What's your understanding of

19    that term?

20         "ANSWER:   Basically, constant over time.

21         "QUESTION:   I believe you testified that

22    there's a relationship between the 3,000 MTU annual

23    steady state rate and either the discharge rate or

24    generation rate, is that correct?

25         "ANSWER:   There's a difference.

```
1              "QUESTION:   Is there a relationship between

2      the two?

3              "ANSWER:   Discharge rate is what it is.

4      Utilities control that.   The receipt rate, which is

5      what you call 3,000, is something that is variable,

6      but depending upon the system we designed to build,

7      we can vary that, so there's no direct relationship

8      between the two.

9              "QUESTION:   My understanding from your

10     testimony, and please correct me if I am wrong, was

11     that the 3,000 MTU steady state rate or receipt rate,

12     as you just used that term, was chosen in part

13     because it exceeded the discharge rate or the

14     generation rate by utilities, is that right?

15             "ANSWER:   Correct.

16             "QUESTION:   What other factors went into

17     choosing a 3,000 MTU receipt rate?

18             "ANSWER:   The 3,000 rate that we have was

19     established before I was ever involved in the

20     program.   It's my understanding that it was looked at

21     then as a proper balance for total life cycle cost,

22     as well as near term cash flow requirements and

23     performance.   If you make the number too high, then

24     you have, you would quickly work off the backlog, and

25     then you would have a lot of idle capacity.   If it
```

838

1   was too low, you would have reactors needing to put

2   in dry storage, and 3,000, based on the early 1980s,

3   seemed like a reasonable number to use."

4          Skipping to page 1334, line 6:

5          "QUESTION:  And am I right in understanding

6   that the 3,000 steady state rate has been used as the

7   steady state rate in the majority of design documents

8   for the facility that DOE eventually, will eventually

9   use to take an emplacement of spent nuclear fuel?

10         "ANSWER:  Yes, it's around 3,000.

11         "QUESTION:  And am I also right in

12  understanding that the 3,000 steady state rate has

13  been the rate that is used in the majority of

14  documents issued by DOE with regard to total system

15  life cycle costs?

16         "ANSWER:  Correct.

17         "QUESTION:  With regard to those documents,

18  the documents issued in connection with estimating

19  total system life cycle costs, what is that document

20  supposed to reflect, the TSLCC document?

21         "ANSWER:  Our best estimates of what the

22  cost would be, you know, year-by-year for the

23  program, and to determine those, you would have some

24  assumption as to what the receipt rate would be, and

25  we used 3,000.