# Plaintiff

## Page 4525

(1) general counsel or someone – that conclusion would
(2) have come from someone other than you?
(3)     A   In the – in the preparation for this
(4) letter, that would have come out of some other shop,
(5) probably GC.
(6)     Q   Okay. All right. Just a couple of –
(7) couple more here to wrap this up. This is Plaintiff's
(8) Exhibit 1907. Actually, this one's paper-clipped
(9) rather than stapled. I don't have an explanation for
(10) that.
(11) Plaintiff's 1907 is a document, that first
(12) page says informal note, date, January 29, 2001, to
(13) Jesse Roberson from Dave Huizenga EM20, subject,
(14) management of greater-than-Class C waste within the
(15) Department of Energy. Do you see that?
(16)     A   I do.
(17)     Q   And the last sentence of the paragraph
(18) there on the first page says: The attached memorandum
(19) offers recommendations on whether EM should continue
(20) to manage this program and, if not, what action should
(21) be taken to transfer it to another program office
(22) within DOE.
(23) Do you see that?
(24)     A   I do.
(25)     Q   And actually, I believe just before the

## Page 4526

(1) break we were talking about some documents that had
(2) been prepared within EM making recommendations on
(3) transferring to another program office. Do you see
(4) that? I mean, do you recall that before the break?
(5)     A   I do, I do.
(6)     Q   This is one of those papers?
(7)     A   Yes, it would have been.
(8)     Q   That you prepared?
(9)     A   My staff prepared. I didn't actually
(10) initial this, but I presume I – I sent this to Jesse,
(11) but as I indicated, Patty was doing a lot of work in
(12) this regard, but –
(13)     Q   Take a look – but you did also testify, I
(14) believe, that Ms. Roberson was eager to reduce EM's
(15) functions to its core mission of cleaning up the cold
(16) war legacy and to essentially jettison or transfer
(17) programs unrelated to that, is that correct?
(18)     A   That's accurate.
(19)     Q   Take a look at the last page of this
(20) document, page 5, and let me just again read some of
(21) this. It says in the first new sentence there – it
(22) starts at the very top. EM should give up the program
(23) because it is outside the scope of EM's cleanup and
(24) closure mission.
(25) Actually, just for completeness, let's go

## Page 4527

(1) back one page to the very bottom where it says program
(2) ownership. Do you see that?
(3)     A   Yes.
(4)     Q   EM has been responsible for GTCC program
(5) since 1989. Right?
(6)     A   Uh-huh.
(7)     Q   On July 13, 2000, then-secretary
(8) Richardson directed the assistant secretary for
(9) Environmental Management to accelerate the recovery of
(10) sources and eliminate the backlog in four years. One
(11) could argue that EM should give up the program because
(12) it is outside the scope of EM's cleanup and closure
(13) mission.
(14) Do you see that?
(15)     A   I do.
(16)     Q   Ownership of some or all of the GTCC
(17) program could be transferred to another part of DOE;
(18) however, no other part of DOE has storage and disposal
(19) of waste as its primary function with the exception of
(20) the Office of Civilian Radioactive Waste Management,
(21) RW.
(22) Do you see that?
(23)     A   I do.
(24)     Q   And that was true at the time as set forth
(25) in this memo?

## Page 4528

(1)     A   Yes.
(2)     Q   Only one – I'll continue reading. Only
(3) one element of GTCC waste fits well with RW's
(4) missions, functions and capabilities, and one –
(5) excuse me. Only one element of GTCC waste fits well
(6) with RW's missions functions and capabilities is – I
(7) think there's a diction problem in the sentence – is
(8) the nuclear utility-activated metal.
(9) Do you see that?
(10)     A   I do.
(11)     Q   This waste is generated by RW's customers.
(12) It is managed in the same manner as SNF. Do you see
(13) that?
(14)     A   Yes, I do.
(15)     Q   And that is certainly true at that time,
(16) correct?
(17)     A   Yes.
(18)     Q   Activated metal is a component of SNF and
(19) has been analyzed for in the repository performance.
(20) Do you see that?
(21)     A   I do.
(22)     Q   The activated metal could be shipped to
(23) the repository along with SNF. Going beyond the
(24) activated metal could be problematic for RW.
(25) Do you see that?

## Page 4529

(1)   A   I do.

(2)   Q   Since they do not firmly accept waste from

(3)   any licensee, requiring RW to accept all or some GTCC

(4)   waste at this point would be problematic given the

(5)   ongoing litigation with the nuclear utilities over the

(6)   fact that it is not currently accepting even the SNF.

(7)   Do you see that?

(8)   A   I do.

(9)   Q   Then it goes on. Rather than to read the

(10)  whole thing, those were your views at that time,

(11)  January 29, 2002?

(12)  A   Yes.

(13)  Q   And then the recommendation here, it says:

(14)  Due to the fact that the transuranic portion of GTCC

(15)  could be disposed of at WIPP if legal barriers were

(16)  removed, and due to the fact that the high-activity

(17)  low-level waste cesium and strontium can likely be

(18)  disposed in existing facilities, EM should retain

(19)  responsibility for this portion of GTCC, even though

(20)  it falls outside the strict definition of cleanup and

(21)  closure of EM sites.

(22)  Do you see that?

(23)  A   Give me just one second.

(24)  Q   Sure.

(25)  A   Okay.

## Page 4530

(1)   Q   See that?

(2)   A   I do.

(3)   Q   The last sentence under recommendation,

(4)   quote: The nuclear utility-activated metal portion of

(5)   GTCC should be transferred to RW, close quote.

(6)   That was your view at the time?

(7)   A   I presume it was. You know, to be honest

(8)   with you, I don't know whether this memo was ever

(9)   transmitted to Jesse Roberson or not, but – nor –

(10)  nor whether it was ever actually finished, but this

(11)  represents the views of my staff, and personally, I

(12)  was not – was not very supportive of transferring any

(13)  of this staff from EM because I had, in a sense, been

(14)  a big proponent of doing the environmental impact

(15)  statement.

(16)  So I'm hesitating just slightly on this

(17)  because some of these things are contrary to what my

(18)  personal views were, but I knew what my management

(19)  was – was interested in.

(20)  Q   And that's what's reflected on this paper?

(21)  A   What my management was interested in?

(22)  Q   Yes.

(23)  A   Yes. Well –

(24)  Q   Could I have 1346, please?

(25)  A   – let me make sure. I want to make sure

## Page 4531

(1)   we don't misunderstand each other.

(2)   If you're asking me whether I knew exactly

(3)   whether Jesse wanted to take this kind of a split or

(4)   not, I'm – I'm not sure that that was reviewed, she

(5)   just didn't want anything to do with this subject.

(6)   Q   Which is the nuclear utility-activated

(7)   waste?

(8)   A   The GTCC in general.

(9)   Q   GTCC in general?

(10)  A   Right.

(11)  Q   Okay. And there were recommendations at

(12)  some level within EM to transfer that to RW for the

(13)  reasons stated on this page?

(14)  A   At some level.

(15)  Q   My statement is correct?

(16)  A   Yes.

(17)  Q   Okay. Let's take a look at 1346. I do

(18)  believe this is the last document. I know there have

(19)  been a lot out here. This is Plaintiffs 1346, a

(20)  document entitled prejudicial draft issue paper,

(21)  proposed greater-than-Class C waste, environmental

(22)  impact statement. Do you see that?

(23)  A   I do.

(24)  Q   This document is discussing – well, in

(25)  the introduction it says: The Office of Environmental

## Page 4532

(1)   Management is considering the preparation of an

(2)   environmental impact statement for management of

(3)   Class C waste. This paper provides background, and so

(4)   forth. Do you see that?

(5)   A   I do.

(6)   Q   This is the type of document that would

(7)   have been prepared in your office or by your staff in

(8)   connection with the EIS that you were promoting –

(9)   A   Yes.

(10)  Q   – in that – in the 2000 to 2002 time

(11)  frame?

(12)  A   Yes.

(13)  Q   And do you know whether this document was

(14)  prepared by your staff in that time frame?

(15)  A   I believe Charlie Head had something to do

(16)  with this. I don't know whether Rob was helping him

(17)  or not.

(18)  Q   Okay.

(19)  MS. HERRMANN:   Pardon me, Your Honor.

(20)  before Mr. Stouck asks another question, I just want

(21)  to mention that Plaintiff's Exhibit 1346 is yet

(22)  another document that was not on Plaintiff's will-use

(23)  exhibit list.

(24)  MR. STOUCK:   Right. Your Honor, I

(25)  actually thought of that at 10 o'clock last night when

# Plaintiff

BSA

## Page 4533

(1) we were putting this together, and I noticed another

(2) letter from Marian Sullivan giving us the courtesy of

(3) notice that they would be using tomorrow a – may use

( ) the document with Mr. Milner. Given the hour and the

(5) fact that her letter was on direct and this is cross,

(6) I did not take the time to note the letter.

(7)     MS. HERRMANN:     And I think that's really

(8) just my point. When we realized we were going to use

(9) the exhibit not on the will-use list, we do give

(10) plaintiffs the courtesy of notice. That has not been

(11) afforded of in a lot of instances during this trial.

(12)     JUDGE MEROW:     Well, the policy is that you

(13) should provide notice, so –

(14)     MR. STOUCK:     Your Honor, again, I did

(15) think of this last night, as I just said, and it was

(16) at 10 o'clock, and I remember I was sitting at my desk

(17) and I hadn't eaten dinner and I wanted to get home.

(18)     MS. HERRMANN:     I was near my fax machine

(19) at 10 o'clock last night, Your Honor. I would have

(20) received notice if it had been given.

(21)     MR. STOUCK:     Our real position is we're

(22) not required to on cross-examination, and I – I don't

(23) want to be committed to that.

(24)     BY MR. STOUCK:

(25)     Q     Here's another document that's virtually

## Page 4534

(1) identical – excuse me. Here's another document –

(2)     MR. LESTER:     Your Honor, if I could

(3) just – the point is about exhibits, it's not about

(4) impeachment documents. We have talked about this

(5) before.

(6) It is common courtesy and it was

(7) established procedure in this case that documents that

(8) would be moved in as exhibits would be identified.

(9) That is not about impeachment.

(10) Mr. Stouck can pull out any documents for

(11) impeachment he wants but he's already told us that

(12) they're going to try to introduce all these documents.

(13) It is both common courtesy and established

(14) procedure that the other side would be notified of

(15) documents that were being moved on the to-use list.

(16)     JUDGE MEROW:     Well, that's understood, and

(17) Mr. Stouck realizes he thought about it, so for the

(18) future, if it's possible, notification should be

(19) given.

(20)     MR. STOUCK:     Appreciate that, Your Honor.

(21) Just for the record, I distributed Plaintiff's 1913,

(22) which is virtually identical, which is on our will-use

(23) list.

(24)     MR. LESTER:     For the record, I'm told by

(25) the person keeping track of our exhibits today that

## Page 4535

(1) there are nine documents that have been moved from the

(2) may-use list that we were not notified about as being

(3) moved onto the will-use list that have been used

(4) today.

(5)     MR. STOUCK:     Correspondence back and forth

(6) from Maine Yankee, Your Honor, is most of it, but

(7) we'll deal with that when we do move them into

(8) evidence. But thank you, Mr. Lester, for that

(9) information.

(10) Here's another document that is virtually

(11) the same as the one that the witness is looking at.

(12) It's Plaintiff's 1913. It was on the will-use list.

(13) We will endeavor to give notice in the future, and

(14) that is certainly a courteous thing to do.

(15)     BY MR. STOUCK:

(16)     Q     But back to the document that – the one

(17) that you were first looking at, Mr. Huizenga,

(18) Plaintiff's 1346, do you have that?

(19)     A     I do.

(20)     Q     This would – was sort of preparatory to

(21) moving forward with the EIS? In other words, at the

(22) beginning of the process that you testified about just

(23) within the last hour, this was starting up in that time

(24) frame and this – this document would have been

(25) prepared in connection with the starting up of the

## Page 4536

(1) EIS?

(2)     A     Yes, it would.

(3)     Q     If you turn to – and the – it's kind of

(4) funny, but you have to look at the very bottom right.

(5) It says page 3 of 10.

(6)     A     Okay.

(7)     Q     Under activated metal disposal

(8) alternatives, do you see that?

(9)     A     Yes.

(10)     Q     Number one, the high-level waste/spent

(11) fuel repository: The activated metal in GTCC waste is

(12) the same activated metal which is a component of SNF,

(13) so it is already analyzed for in the performance of

(14) the repository and would pose no technical difficulty

(15) in including this waste form.

(16) Do you see that?

(17)     A     I do.

(18)     Q     That was the views at least of your staff

(19) if not higher in EM at that time?

(20)     A     Yes, I believe that – this was certainly

(21) the view of – of Charles Head.

(22)     Q     Who was responsible for preparing this

(23) document?

(24)     A     He was a – yes, he was a staff member to

(25) me.

Page 4537

(1)   Q    Then it says the additional –

(2)   A    I believe he was responsible. I don't
know that his name is on this but I know that he was
working this issue.

(5)   Q    The next sentence says: The additional
(6) volume is small to insignificant when compared to the
(7) volume of SNF and HLW planned for the repository.
(8) Do you see that?

(9)   A    Yes.

(10)   Q    Okay. And then just for completeness,
(11) since we're here, it says: The option would require a
(12) legislative change to implement, as the Nuclear Waste
(13) Policy Act does not specify GTCC waste as a candidate
(14) waste form for the repository.
(15) Do you see that?

(16)   A    Yes.

(17)   Q    These were all views that were being
(18) worked up in connection with the EIS that you wanted
(19) to have prepared in the 2002 fiscal year?

(20)   A    Yes.

(21)   Q    Charles Head, what was his title? Was he
(22) a technical advisor?

(23)   A    Yes, he was.

(24)   Q    He would understand the technical issues
(25) involved with GTCC waste?

Page 4538

(1)   A    He had a pretty good understanding.

(2)   Q    Now, you are not aware, Mr. Huizenga, are
(3) you, of any other substantial credible option for
(4) disposal of nuclear utility GTC waste other than the
(5) repository, correct?

(6)   A    I – I'm not aware that the material
(7) couldn't be put in a deep geologic repository or a
(8) intermediate-depth bore hole, so if you're asking me
(9) explicitly do I think that the only option for GTCC
(10) waste for utilities is repository, the answer is
(11) actually no.

(12)   Q    The answer's no.
(13) You testified at your deposition, though,
(14) did you not, that you were not aware of any other
(15) substantial credible options for nuclear utility GTCC
(16) waste. Do you recall that?

(17)   A    Yes, but I – I don't think suggesting
(18) that I'm not aware of any others leads to a conclusion
(19) that that's the only option. Those are not the same
(20) thing. I might not be aware of – I – I have been
(21) away from this for two years now and we were in the
(22) beginning stages of analyzing alternatives, and I
(23) guess I don't want to make too much of this.
I'm not suggesting it might not be a
reasonable alternative, but if you're implying that I

Page 4539

(1)   would have known of all reasonable alternatives at the
(2) time, that – that would not be a true statement.

(3)   Q    Here's what I want. Excuse me. I did not
(4) mean to interrupt. Here is what I'm implying,
(5) Mr. Huizenga. You gave a deposition in this case on
(6) April 30, 2004. Do you recall that?

(7)   A    I do.

(8)   Q    Three months ago.

(9)   A    Yes.

(10)   Q    You testified under oath that you're not
(11) aware of any other substantial credible options for
(12) nuclear utility GTCC waste other than the repository.

(13)   A    Yes.

(14)   MS. HERRMANN:    Pardon me, your Honor.
(15) Could we have a page number, please?

(16)   MR. STOUCK:    He's – I'm not sure we need
(17) it, Your Honor. He just is about to agree with me
(18) that he did testify to that.

(19)   MS. HERRMANN:    If Mr. Stouck is about
(20) to – has already read a deposition testimony into the
(21) record, I'd kind of like to know where it is. Is that
(22) a problem, Mr. Stouck?

(23)   MR. STOUCK:    Yeah. I'd like to have an
(24) answer to my question.

(25)   BY MR. STOUCK:

Page 4540

(1)   Q    You did give that testimony?

(2)   MS. HERRMANN:    Your Honor, I object that
(3) I'm not being given a page number. This is
(4) ridiculous.

(5)   MR. LESTER:    Let's have a quick page
(6) number.

(7)   JUDGE MEROW:    Well, the rule says counsel
(8) is entitled to it, if not the witness.

(9)   BY MR. STOUCK:

(10)   Q    Take a look at page 75, please.

(11)   A    This is tab 2?

(12)   Q    Tab 2.

(13)   A    What line?

(14)   Q    Page 75, line 12. Were there any
(15) substantial credible other options that you are aware
(16) of – that you are aware – there's no "of," it's a
(17) transcription mistake I think – that you are aware
(18) for nuclear utility GTCC waste?

(19) Ms. Herrmann objected and you gave the
(20) following answer: I am not aware of any others.
(21) Correct?

(22)   A    And I am currently unaware of any others,
(23) but my point I think I'm trying to make is if you're
(24) trying to draw a conclusion from that that there are
(25) no others, you didn't ask that question.

# Defendant

**Page 4541**

(1)  Q    Okay. And lastly, I think, aside from

(2)  your – your understanding about the current status of

(3)  the EIS is what, that you don't know what the status

(4)  is?

(5)  A    I honestly don't.

(6)  Q    So you have no understanding of what will

(7)  happen to the Department of Energy program for GTCC

(8)  waste in the future, correct?

(9)  A    I have not followed the details.

(10)  Q    And you don't know whether or not this

(11)  litigation that we're engaged in here today, this

(12)  lawsuit, influenced the decision of the department to

(13)  transfer the EIS to the Office of Environmental Safety

(14)  and Health rather than to the spent fuel program,

(15)  correct?

(16)  A    That would really surprise me because I –

(17)  I think I would have been involved in those

(18)  discussions at the time, and I remember the entire

(19)  driver behind this was in conjunction with Jesse's

(20)  top-to-bottom review. She did a review of all the

(21)  programs, and those that didn't – she didn't believe

(22)  fell clearly within the scope of her mission, she was

(23)  trying to move on to other programs, but I don't

(24)  recall any discussion whatsoever of moving this part

(25)  of the program, not only because she didn't think it

**Page 4542**

(1)  was part of her program, but because of litigation.

(2)  Q    So you're testifying it was not because of

(3)  the litigation? Is that your testimony?

(4)  A    I'm testifying that to my knowledge, it

(5)  had nothing to do with litigation to move it outside

(6)  of – of EM. It was in conjunction with the

(7)  top-to-bottom review.

(8)  Q    Fair enough. My question was a little

(9)  different.

(10)  My question was not where it came from, my

(11)  question is where it went. And let me ask it again.

(12)  You don't know one way – one way or the other, do

(13)  you, that this litigation – whether this

(14)  litigation – excuse me.

(15)  You don't know one way or the other

(16)  whether this litigation influenced the decision to

(17)  transfer the EIS to the Office of Environmental Safety

(18)  and Health rather than to the spent fuel program, do

(19)  you?

(20)  A    I do – I do not know, no.

(21)  MR. STOUCK:    That's all, Your Honor.

(22)  Thank you very much, Mr. Huizenga, for a little more

(23)  time than I actually anticipated, but I do appreciate

(24)  your time in this.

(25)  MS. HERRMANN:    Thank you, Your Honor.

**Page 4543**

(1)  REDIRECT EXAMINATION

(2)  BY MS. HERRMANN:

(3)  Q    Mr. Huizenga, I appreciate your patience.

(4)  You have been up here for a little over four and a

(5)  half hours now so I'm going to get you out of here as

(6)  fast as I possibly can. Just a couple things that we

(7)  need to clear up based upon your cross-examination.

(8)  If you could go back to the binder that

(9)  had your deposition in it and go back to page 75 under

(10)  that tab 2 of your deposition.

(11)  A    I have it.

(12)  Q    I think we've all learned a valuable

(13)  lesson today about why the rules do require that

(14)  attorneys be given the page number of the deposition

(15)  that's being used in your cross-examination.

(16)  You were asked by Mr. Stouck about

(17)  testimony that you gave on page 75 of your deposition.

(18)  If you go up to page 74, which is just up a little

(19)  further in that same column on the right –

(20)  A    Yes.

(21)  Q    – and look at line 12 of – of that page,

(22)  the line numbers are in parentheses there.

(23)  A    I see it.

(24)  Q    And if you'd read with me, I see your

(25)  testimony as: I think as the records reflect, you can

**Page 4544**

(1)  see there were several different options ultimately

(2)  still under consideration.

(3)  Do you see that?

(4)  A    I do.

(5)  Q    Okay. Now, go down back to page 75, where

(6)  you were asked at line 2, question: Well, in your

(7)  recollection, during tenure, was there any option that

(8)  was significantly substantial for nuclear utilities

(9)  for GTCC waste other than the spent fuel repository?

(10)  Do you see that?

(11)  A    I do.

(12)  Q    And you answered: Other than what's

(13)  presented in this report, I don't remember any other

(14)  activity that was specifically identifying that is the

(15)  best option for nuclear utilities GTCC waste.

(16)  Do you see that?

(17)  A    I do.

(18)  Q    So do you know of options that were being

(19)  considered other than disposal in a spent nuclear fuel

(20)  repository for nuclear utility GTCC waste?

(21)  A    There were several other alternatives that

(22)  were being looked at, including near-surface disposal

(23)  and intermediate-depth disposal. NEPA requires no

(24)  action, but that wasn't our intention, but I remember

(25)  those two off the top of my head.

Page 4545

(1)    Q    Okay. Now, looking down at the actual
(2)  question and answer that Mr. Stouck read, if you look
(3)  at page – I'm sorry, line 12 on page 75, you were
(4)  asked by Mr. Skalaban: Were there any substantial
(5)  credible other options that you are aware for nuclear
(6)  utility GTCC waste?
(7)  When you answered "no" to that question at
(8)  line 16, what were you referring to?
(9)    A    Give me just one second here.
(10)   Q    Sure. Take all the time you need.
(11)   A    Well, I was referring to this general set
(12) of options that were being looked at.
(13)   Q    So when you said no, there are no other
(14) options, you meant other than the ones that you had
(15) talked about earlier?
(16)   A    That's correct.
(17)   Q    Okay. You can put that away for now, sir.
(18) We – we were looking at a document
(19) earlier today which told us that GTCC – I believe the
(20) quote was not generally suitable for shallow land
(21) disposal. Do you recall that?
(22)   A    I do.
(23)   Q    Does "not generally suitable for shallow
(24) land disposal" mean that GTCC has to go into a deep
(25) geologic repository?

Page 4546

(1)    A    No. As we just discussed a moment ago,
(2)  there were other options similar to deep –
(3)  intermediate-level bore hole disposal, that was also
(4)  an option.
(5)    Q    Okay. Would you take out Plaintiff's
(6)  Exhibit 1654? I know you have an awfully big pile of
(7)  exhibits in front of you. This one is titled
(8)  teleconference call summary.
(9)    A    1654?
(10)   Q    Yes.
(11)   A    I got it.
(12)   Q    We're putting it up on the screen for you
(13) here if that makes it easier.
(14)   A    Okay.
(15)   Q    Have you ever seen Exhibit 1654 before?
(16)   A    Not before a few minutes ago when we
(17) looked at it earlier today.
(18)   Q    Okay. Mr. Stouck asked you about a
(19) line – actually, the third bullet point down near the
(20) bottom of the page about an understanding between GC,
(21) RW and EM, the GTCC waste will go to the repository.
(22) Do you recall that?
(23)   A    I see that.
(24)   Q    If there had been a formal agreement
(25) between GC, RW and EM that GTCC waste will go to the

Page 4547

(1)  repository, would you have been aware of it?
(2)    A    I certainly believe so.
(3)    Q    Were you aware of any such agreement?
(4)    A    I was not.
(5)    Q    Would you look now at Plaintiff's
(6)  Exhibit 1724? And to help you out, that's a – I
(7)  guess it looks like a draft. It's not on actual
(8)  letterhead, but it seems to resemble a letter.
(9)    A    Okay, I'll work off the screen here.
(10)   Q    Can you see that okay?
(11)   A    Yes.
(12)   Q    Okay. Mr. Stouck asked you some questions
(13) about this.
(14) Do you know whether this letter or any
(15) later iteration was actually sent out under Secretary
(16) Abraham's signature?
(17)   A    I never saw a final version of this
(18) letter.
(19)   Q    I want to point you now to Plaintiff's
(20) Exhibit 1848. It says "talking points" up at the top.
(21)   A    Are you going to show it to me or do you
(22) want me to find it?
(23)   Q    I don't think we have it on our program so
(24) I'm afraid I'm going to have to ask you to hunt
(25) through the pile.

Page 4548

(1)    A    And the number was?
(2)    Q    1848.
(3)  JUDGE MEROW:    Here it is.
(4)  MS. HERRMANN:    Thank you, Your Honor.
(5)  THE WITNESS:    Okay, go ahead.
(6)  BY MS. HERRMANN:
(7)    Q    You got 1848 in front of you?
(8)    A    Yes, yes, I do.
(9)    Q    Mr. Stouck asked you some questions about
(10) this document. Have you ever seen it before?
(11)   A    Not except for earlier today.
(12)   Q    Do you know who wrote it?
(13)   A    I do not.
(14)   Q    Okay. I'm going to ask you now to pull
(15) out two documents and take a look at both of them.
(16) They are Plaintiff's Exhibit 1047 and 1619.
(17)   A    And give me a hint.
(18)  MR. STOUCK:    Could you identify –
(19)   A    Yeah, what am I looking for?
(20)  MS. HERRMANN:    Sure, absolutely.
(21)  BY MS. HERRMANN:
(22)   Q    Plaintiff's Exhibit 1047 purports to be
(23) recommendations for management of greater-than-Class C
(24) low-level radioactive waste, February 1987.
(25)   A    Got it.

Page 4549

(1)    Q    Okay. And Plaintiff's Exhibit 1619
(2) purports to be a May 24, 2001 letter from Mr. Huizenga
(3) to Mr. Zinke.
(4)    MR. STOUCK:    May 24?
(5)    MS. HERRMANN:    It was in one of your
(6) packets.
(7)    JUDGE MEROW:    It was part of the package.
(8) 1617 is the front document.
(9)    A    You want to get started while I look for
(10) it?
(11)    BY MS. HERRMANN:
(12)    Q    I kind of need you to look at the
(13) document, sir.
(14)    A    I'll have to learn to keep track of things
(15) here. Okay.
(16)    Q    Paper-intensive situation. Okay, so
(17) you've got 1047 and 1619 in front of you?
(18)    A    I do.
(19)    Q    Okay. In 1047, if you turn to – it's
(20) actually the third page of the document. The Bates
(21) number at the bottom right-hand corner is 525.
(22)    A    This is the letter from Secretary
(23) Harrington?
(24)    Q    Exactly.
(25) And Mr. Stouck pointed out a sentence in

Page 4550

(1) the second paragraph on that page, last sentence of
(2) the paragraph, which reads: The Department of Energy
(3) plans to provide management and storage services for
(4) greater-than-Class C low-level waste on a contingent
(5) basis until such disposal options are available.
(6) Do you see that?
(7)    A    Yes, I do.
(8)    Q    When this document referred to storage
(9) services for greater-than-Class C low-level waste,
(10) what was that referring to?
(11)    A    Well, it was referring basically on a –
(12) as it's indicated, a contingent basis. We – we have
(13) been for some time storing the sealed sources at
(14) Los Alamos, so we – we followed up on this in that
(15) instance.
(16)    Q    Okay. So this was – this was the storage
(17) of sealed sources?
(18)    MR. STOUCK:    Objection, Your Honor.
(19)    A    This was a broad statement that included
(20) sealed sources and we acted on the sealed sources.
(21)    BY MS. HERRMANN:
(22)    Q    Okay. Now, if you look at Exhibit 1619,
(23) the last sentence in the first paragraph there which
(24) begins "consistent with." Are you with me?
(25)    A    Yes.

Page 4551

(1)    Q    Okay. That sentence reads: Consistent
(2) with the department's policy for commercially owned
(3) spent nuclear fuel, the department has no plans at
(4) this time to develop centralized interim storage for
(5) greater-than-Class C GTCC waste from commercial power
(6) reactors since this waste can be stored safely at the
(7) reactor sites until a permanent disposal facility is
(8) developed.
(9) Do you see that?
(10)    A    I do.
(11)    Q    Mr. Stouck testified that this was a
(12) change in policy for DOE from the sentence that I read
(13) on Exhibit 1047 to the sentence that I just read on
(14) Exhibit 1619.
(15) Do you see a change in policy there, sir?
(16)    A    I think what this – the – Harrington's
(17) letter indicated that when we needed to, we would
(18) actually take action, so for the orphaned sources and
(19) abandoned sources we followed up and we didn't believe
(20) that there was a need to for the utility wastes.
(21)    Q    I'm going to ask you, Mr. Huizenga, to put
(22) another two exhibits in front of you. I'd like you to
(23) take out Plaintiff's Exhibit 1614, which is titled at
(24) the top DOE/GTCC meeting agenda, and Plaintiff's
(25) Exhibit 1200, which has Maine Yankee letterhead up at

Page 4552

(1) the top and is a November 30, 2000 letter. I'll give
(2) you a second to get those out.
(3)    A    November 30th letter?
(4)    Q    That also was part of a packet of
(5) exhibits, if that helps.
(6)    JUDGE MEROW:    1614?
(7)    MS. HERRMANN:    1614 and 1200.
(8)    MR. STOUCK:    What's 1200?
(9)    MS. HERRMANN:    The November 30, 2000
(10) letter to Mr. Huizenga from George Zinke.
(11)    MR. STOUCK:    Okay, thank you.
(12)    A    That was from Zinke?
(13)    BY MS. HERRMANN:
(14)    Q    Yes. Should have Maine Yankee in big
(15) letters right at the top of it.
(16)    A    Okay, all right.
(17)    Q    Do you have that in front of you?
(18)    A    Yes.
(19)    Q    So you've got 1614 and 1200?
(20)    A    Yes.
(21)    Q    Great. Look first at Exhibit 1614,
(22) DOE/GTCC meeting agenda.
(23)    A    All right.
(24)    Q    Before Mr. Stouck showed it to you today,
(25) had you ever seen this?

Page 4553

(1)   A   No, I had not.

(2)   Q   Did you attend the meeting that this
refers to?

(4)   A   No, I did not.

(5)   Q   Okay. This – this meeting and the packet
of letters that you were given, just remind us. This
all related to the issue of whether DOE would observe
the loading of GTCC for Maine Yankee, is that right?

(9)   A   That's correct.

(10)   Q   Were there any other issues that those
letters were about?

(12)   A   That was the primary focus.

(13)   Q   Okay. Now, Mr. Stouck pointed out to you
on this meeting agenda that you have not seen that DOJ
was listed on here, is that correct?

(16)   A   I see that.

(17)   Q   Okay. And that there were people from
general counsel listed on this agenda as well, is that
right?

(20)   A   That's correct.

(21)   Q   Do you know, Mr. Huizenga, whether Spriggs
and Hollingsworth, the Yankee's attorneys, had any
role in the November 30, 2000 letter from Maine Yankee
to DOE?

(25)   A   No.

Page 4554

(1)   Q   Go now to Plaintiff's Exhibit 1200.
That's the November 30th, 2000 letter.

(3)   A   All right.

(4)   Q   Now, this letter, this would have been
sent 20 days, I think, before the December 20th
meeting that's referred to in Plaintiff's
Exhibit 1614. Is that right?

(8)   A   Yes.

(9)   Q   Okay. One of the things – Mr. Stouck
pointed out a lot of issues in this document, but one
of the things he did not point you to and I'd like to
point out is page 4 of the letter, the very last page
of Plaintiff's Exhibit 1200.

(14)   A   I have it.

(15)   Q   If you look at the bottom of that page,
the CC at the bottom, do you see that?

(17)   A   I do.

(18)   Q   The very bottom name there is Robert L.
Shapiro, Spriggs and Hollingsworth. Do you see that?

(20)   A   Yes, I do.

(21)   Q   Do you know why Mr. Shapiro was copied on
this letter?

(23)   A   No, I do not.

(24)   Q   Do you know whether Mr. Shapiro had any
role in the preparation of this letter?

Page 4555

(1)   A   No.

(2)   Q   Okay. Mr. Stouck pointed out a couple
things in this letter, a lot of legal conclusions that
were made in this letter, but I want to point you to
page 3 under the heading DOE responsibility under its
contract.

(7)   A   I have it.

(8)   Q   Okay. And the second sentence in that
paragraph begins: This matter should be resolved
through pending litigation. Our disagreement on this
legal issue should not interfere with the practical
benefit of any DOE inspection occurring during the
present loading. Are you with me?

(14)   A   I've got it.

(15)   Q   Okay. Skipping down now, there's a
sentence that begins "specifically."

(17)   A   Yes.

(18)   Q   Do you see that? And that sentence says:
Specifically, Maine Yankee will not attempt to use
DOE's action as evidence that GTCC waste is covered by
its contract with DOE in its breach of contract
action. Maine Yankee is willing to enter into a
formal litigation stipulation on this issue.
Do you see that?

(25)   A   Yes, I do.

Page 4556

(1)   Q   Mr. Stouck didn't point that out to you
during your cross-examination, though, right?

(3)   A   I don't believe so.

(4)   Q   Okay.

(5)   MS. HERRMANN:   One moment, Your Honor.

(6)   JUDGE MEROW:   Sure.

(7)   MS. HERRMANN:   We're finished, Your Honor.

(8)   MR. STOUCK:   Just a couple more questions
for you, Mr. Huizenga.

(10)   RECROSS-EXAMINATION

(11)   BY MR. STOUCK:

(12)   Q   Despite Ms. Herrmann's best efforts, I'm
not sure she has clarified things here about your
testimony, so I just want to clarify.
If you would, let's get to the bottom of
page 75 because, frankly, I thought you had it right
the first time. Let's take a look at Plaintiff's
1298, which is the report under the memorandum with
your name on it, the 1999 program management plan for
GTCC waste. See if you can find that.

(21)   A   This is the one Ms. Mustin signed on? Is
that what I'm looking for?

(23)   Q   This is the one that, yeah – it's your
signature block. That person signed for you is what
you said.

# Plaintiff

04559

1   Q   Of your deposition, line 14.

2   A   Got it.

3   Q   It says -- take a look at page 13,

referring to this document.

    A   Okay.

6   Q   Now let's take a look at page 13.

7   A   Okay.

8   Q   The -- you were asked about some of the

9   things I asked you about earlier here, and looking at

10  your deposition, I realize we got a couple things

11  going on here.

12      But continuing on that line 14, it says --

13  Mr. Skalaban said: Paraphrasing a little bit but

14  follow along at the top the last paragraph, the GTCC

15  will continue negotiations to reach agreement with

16  DUERW and disposal of GTCC single repository. This

17  task will provide two needed results.

18      Do you recall looking at this last couple

19  lines of page 13 earlier today with me?

20  A   Okay.

21  Q   We talked about it earlier today in this

22  courtroom.

23  A   Uh-huh.

24  Q   Do you recall that?

25  A   Yes, I recall.

TRIAL TRANSCRIPT 8/10/04   Page 4559

---

04560

1   Q   And you were asked about -- apparently

2   asked about the same lines at your deposition, right?

3   A   Yes.

4   Q   It's on page 74: Does that indicate what

5   the experts, the technical experts that DOE hired to

6   prepare this plan, recommended? That's on page 74.

7       And you -- you said on line 6: That was

8   clearly their intention, right? Do you see that in

9   your deposition?

10  A   Yes, I do.

11  Q   And then the next question: In your

12  understanding, those forms that they were recommending

13  to go to the repository would include nuclear utility

14  GTCC waste?

15  A   Right.

16  Q   And you answered: They analyzed nuclear

17  utility GCC waste as indicated on page 2, waste source

18  nuclear utilities table 1. Let's see if we can find

19  that. I think, as the records reflect, you'll see

20  there were several different options ultimately under

21  consideration.

22  A   Right.

23  Q   Okay. Then we skip down to the questions

24  that we focused attention on on page 57. Well, in

25  your recollection during your tenure, was there any

TRIAL TRANSCRIPT 8/10/04   Page 4560

---

04561

1   option that was significantly substantial for nuclear

2   utilities for GTCC waste other than the spent fuel

3   repository? Do you see that?

4   A   Yes.

5   Q   And your answer was: Other than what's

6   presented in this report, I don't remember any other

7   activity that was specifically identifying that as the

8   best option for nuclear utilities GTCC waste.

9   A   I see that.

10  Q   Then the question that I think led to all

11  this: Were there any substantial credible other

12  options that you were aware for nuclear utility GTCC

13  waste?

14      And your answer was: No, I am not aware

15  of any others.

16      Do you see that?

17  A   I do.

18  Q   That was your testimony at your

19  deposition?

20  A   Yes.

21  Q   Okay. Lastly, if you would turn back just

    to the question about 1200. I'm sorry.

    A   Just so that we try to put this to rest,

24  because we have been through this several times now,

25  the -- just because the fact that I was unaware of any

TRIAL TRANSCRIPT 8/10/04   Page 4561

---

04562

1   other don't -- doesn't mean there weren't any other,

2   but it does reflect my understanding of the issue. Is

3   that clear?

4   Q   Yeah, I think you said that, but there

5   weren't any others than -- well, let's just leave it

6   at that.

7       Let's go to Plaintiff's 1200 because --

8   just on this letter. Again, just in the interests of

9   a clear record, take a look at -- actually, I will say

10  for the record I thought I hadn't referred to the long

11  list of CC's here, but I guess the record -- I didn't

12  name Shapiro specifically. Take a look at page 3.

13      JUDGE MEROW: Just to follow up on that,

14  though, you're -- the DOE, you were pretty -- you were

15  a pretty aware person in this -- on this issue,

16  weren't you?

17      THE WITNESS: Yeah. Your Honor, the point

18  I'm trying to make here is I think I'm being asked

19  to --

20      JUDGE MEROW: Well, you can't rule out all

21  possible --

22      THE WITNESS: No, no, nor do I want to

23  suggest that there are some completely off-the-wall

24  unreasonable alternatives. But we were very early in

25  the planning process of doing a very thorough analysis

TRIAL TRANSCRIPT 8/10/04   Page 4562

04563

1 of options.

2          BUT for me to have -- I was unaware of any

3 other ones, but for me to have presumed that nothing

4  else would have come up -- I can remember discussions,

5  for instance, of if you let some of these wastes,

6 either the -- the sealed sources or the utility

7 wastes, remain in safe storage for some period of

8 time, their radioactive levels would -- would be

9 reduced and that would provide additional options that

10 perhaps weren't available -- available to you if you

11 were taking the option -- action immediately.

12          So within that context, there were many

13 different discussions going on at the staff level that

14 would have led ultimately to some clearer

15 understanding of what reasonable alternatives would

16 be.  So I feel like I'm being kind of -- trying to be

17 forced into a corner and suggesting this was the

18 only -- I want to go on record as saying that this

19 certainly appears to be a reasonable alternative, but

20 there may well have been other alternatives that would

21 have evolved through the normal discussions and

22 preparation for the EIS.

23          JUDGE MEROW:  So the law of unintended

24 consequences always develops.

25          THE WITNESS:  You mean taking too long to

TRIAL TRANSCRIPT 8/10/04  Page 4563

---

04564

1 get a job done?  Might have provided some additional

2 options.

3          JUDGE MEROW:  When you plan one thing, it

4 sometimes results in two other problems.

5          THE WITNESS:  Yeah.

6 BY MR. STOUCK:

7     Q    You keep referring to -- just curious

8 about this.  We discussed this early in the process,

9 Mr. Huizenga.  The Low-Level Waste Amendments Act was

10 passed in 1985, correct?

11    A    That's correct.

12    Q    And in -- your testimony is that on

13 August 10, 2004, DOE -- let's take it back to 2002.

14 When you left, DOE is still early in the process of

15 figuring out what to do?

16    A    When I left, they were early in the

17 process.  I don't know how far along they got, but

18 you're preaching -- preaching to the choir here.  This

19 is something I wanted to make happen.

20    Q    Okay.  Page 3, just -- I think

21 Ms. Herrmann -- I know Ms. Herrmann left one sentence

22 out, and just -- it's in the document.  It's in the

23 record, it's in the record, but just for the

24 transcript record, let's take a look at this DOE

25 responsibility under its contract paragraph, if we

TRIAL TRANSCRIPT 8/10/04  Page 4564

---

04565

1 can.

2          JUDGE MEROW:  Is that 1200?

3          MR. STOUCK:  Yeah, page 3.

4          THE WITNESS:  All right.

5 BY MR. STOUCK:

6     Q    I'd like you to agree that I'm reading

7 this correctly.  There's a reference -- are you on

8 page 3?

9     A    I am.

10    Q    Start with the second sentence.  Well, the

11 first sentence:  Under its contract, DOE's

12 responsible, according to Mr. Zinke, for GTCC waste.

13          But then he acknowledged in the next

14 sentence:  This matter should be resolved through

15 pending litigation.

16          Do you see that?

17    A    I do.

18    Q    And then:  Our disagreement on this legal

19 issue should not interfere with the practical benefit

20 of any DOE inspection occurring during the present

21  loading.

          Do you see that?

22    A    Yes, I do.

24    Q    And you were asked to read that by

25 Ms. Herrmann, correct?  Do you recall that?

TRIAL TRANSCRIPT 8/10/04  Page 4565

---

04566

1     A    I do.

2     Q    And then the next sentence says this:  If

3 DOE inspects the loading of Maine Yankee's GTCC waste

4 that is currently scheduled for the week of

5 January 22, 2001, Maine Yankee will not hold that

6 action against DOE.

7          Do you see that?

8     A    I do.

9     Q    I believe that's the sentence that was not

10 read previously.  We can check the transcript on that.

11 And then it continues:  Specifically, Maine Yankee

12 will not attempt to use DOE's action as evidence that

13 GTCC waste was covered by its contract with DOE in its

14 breach of contract action.  Do you see that?

15    A    Yes, I do.

16    Q    Then there's a reference to the formal

17 litigation stipulation, right?

18    A    I've got it.

19          MR. STOUCK:  Thank you again for your

20 time.  And I have no further questions, Your Honor.

21 We do have some exhibit issues that we would like to

22 deal with.

23          MS. HERRMANN:  Before we get into that,

24 just because I'd like for Mr. Huizenga to get to be

25 excused, I have no further questions for him, but

TRIAL TRANSCRIPT 8/10/04  Page 4566

# Defendant

Page 4565

(1)  can.

(2)     JUDGE MEROW:   Is that 1200?

(3)     MR. STOUCK:   Yeah, page 3.

(4)     THE WITNESS:   All right.

(5)     BY MR. STOUCK:

(6)     Q   I'd like you to agree that I'm reading

(7)  this correctly. There's a reference – are you on

(8)  page 3?

(9)     A   I am.

(10)    Q   Start with the second sentence. Well, the

(11)  first sentence: Under its contract, DOE's

(12)  responsible, according to Mr. Zinke, for GTCC waste.

(13)  But then he acknowledged in the next

(14)  sentence: This matter should be resolved through

(15)  pending litigation.

(16)  Do you see that?

(17)    A   I do.

(18)    Q   And then: Our disagreement on this legal

(19)  issue should not interfere with the practical benefit

(20)  of any DOE inspection occurring during the present

(21)  loading.

(22)  Do you see that?

(23)    A   Yes, I do.

(24)    Q   And you were asked to read that by

(25)  Ms. Herrmann, correct? Do you recall that?

Page 4566

(1)    A   I do.

(2)    Q   And then the next sentence says this: If

(3)  DOE inspects the loading of Maine Yankee's GTCC waste

(4)  that is currently scheduled for the week of

(5)  January 22, 2001, Maine Yankee will not hold that

(6)  action against DOE.

(7)  Do you see that?

(8)    A   I do.

(9)    Q   I believe that's the sentence that was not

(10)  read previously. We can check the transcript on that.

(11)  And then it continues: Specifically, Maine Yankee

(12)  will not attempt to use DOE's action as evidence that

(13)  GTCC waste was covered by its contract with DOE in its

(14)  breach of contract action. Do you see that?

(15)    A   Yes, I do.

(16)    Q   Then there's a reference to the formal

(17)  litigation stipulation, right?

(18)    A   I've got it.

(19)    MR. STOUCK:   Thank you again for your

(20)  time. And I have no further questions, Your Honor.

(21)  We do have some exhibit issues that we would like to

(22)  deal with.

(23)    MS. HERRMANN:   Before we get into that,

(24)  just because I'd like for Mr. Huizenga to get to be

(25)  excused, I have no further questions for him, but

Page 4567

(1)  there is one section of his deposition that I'd like him to

(2)  read into the record for completeness on the issue

(3)  that we were talking about.

(4)     JUDGE MEROW:   Sure, you may read it.

(5)     MS. HERRMANN:   Pardon me?

(6)     JUDGE MEROW:   You may read it.

(7)     MS. HERRMANN:   Oh, wonderful. That will

(8)  make it quicker.

(9)  REDIRECT EXAMINATION

(10)  BY MS. HERRMANN:

(11)    Q   If you look on page 159, Mr. Huizenga,

(12)  that's again under page 2 – I'm sorry, tab 2,

(13)  starting at line 10, Mr. Huizenga was asked: What

(14)  were the options for disposal that you considered

(15)  there? The repository and what other ones?

(16)  Mr. Huizenga answered: A near-surface

(17)  disposal along with other low-level waste and

(18)  intermediate-depth bore holes were other options.

(19)  Did I read that correctly Mr. Huizenga?

(20)    A   Yes, you did.

(21)    MS. HERRMANN:   That's all I wanted to do,

(22)  Your Honor.

(23)    JUDGE MEROW:   Any further questions?

(24)    MR. STOUCK:   I don't think so, Your Honor,

(25)  although – excuse me for just one second before we

Page 4568

(1)  close this out. On the exhibits, Your Honor, I

(2)  think –

(3)     MS. HERRMANN:   Can we excuse the witness

(4)  before we get into this?

(5)     MR. STOUCK:   That's what I wanted to get

(6)  to, if you don't mind. That's fine with us as long as

(7)  we have an agreement that if we need him on some of

(8)  these exhibits, we'll bring him back. You'll bring

(9)  him back just to get these exhibits talked about.

(10)  Otherwise, let's –

(11)    MS. HERRMANN:   Your Honor, I'm confused as

(12)  to why exactly, if the plaintiffs needed Mr. Huizenga

(13)  on their exhibits, they didn't do what they needed to

(14)  do during his cross-examination. That's – I don't

(15)  understand that.

(16)    MR. STOUCK:   I think – I'm not – the

(17)  Court might have questions and there might be

(18)  questions about what was said. I guess, frankly, I

(19)  think there are things in the transcript from this

(20)  morning, a lot of things in the transcript that are

(21)  relevant to the admissibility or may be relevant, let

(22)  me put it that way, to the admissibility or

(23)  authentication of some of these documents, and I think

(24)  the process will go a lot more smoothly if we can take

(25)  a look at that transcript and try to work out what we

# Susan Klein

# Plaintiff

# UNITED STATES
# COURT OF FEDERAL CLAIMS

| | |
|---|---|
| TENNESSEE VALLEY AUTHORITY, | ) |
| Plaintiff, | ) Case No. |
| v. | ) 01-249C |
| THE UNITED STATES, | ) |
| Defendant. | ) |

Pages:   751 through 1014

Place:   Chattanooga, Tennessee

Date:    June 24, 2005

## HERITAGE REPORTING CORPORATION
*Official Reporters*
1220 L Street, N.W., Suite 600
Washington, D.C. 20005-4018
(202) 628-4888
hrc@concentric.net

Susan Klein TVA  6·24·05

871

1    into evidence testimony from the April 24, 2002

2    deposition of Susan Klein in consolidated discovery

3    of various spent nuclear fuel cases, including the

4    Tennessee Valley Authority case.

5         THE COURT:  Please proceed.

6         MR. SMALL:  "Susan Klein was called for

7    examination, and after having been duly sworn or

8    affirmed, was examined or testified as follows:"

9         Page 11, line 10:

10        "QUESTION:  What is your current position,

11   Ms. Klein?

12        "ANSWER:  I'm a senior policy advisor to

13   the director and deputy director of the Office of

14   Civilian Radioactive Waste Management at the

15   Department of Energy.

16        "QUESTION:  And how long have you been the

17   senior policy advisor?

18        "ANSWER:  For about three years.

19        "QUESTION:  So since about 1999?

20        "ANSWER:  Yes, I was transferred there, but

21   detailed back to general counsel for a couple of

22   years.

23        "QUESTION:  When was your detail back to

24   general counsel's office?

25        "ANSWER:  I think it was '97 that I was

872

```
 1    transferred to RW, but I was detailed back to general

 2    counsel to work with the general counsel at the time

 3    on many legal issues, and then later on, it was

 4    limited to issues involving this litigation.

 5              "QUESTION:  But who do you report to as the

 6    senior policy advisor?

 7              "ANSWER:  Lake Barrett -- Ron Milner and

 8    Lake Barrett.

 9              "QUESTION:  And Mr. Barrett's current title

10    is?

11              "ANSWER:  Deputy director of the Office of

12    Civilian Radioactive Waste Management.

13              "QUESTION:  And Mr. Milner's title is?

14              "ANSWER:  He's the COO, the chief operating

15    officer of the Office of Civilian Radioactive Waste

16    Management at DOE."

17              Skipping to page 13, line 17:

18              "QUESTION:  And where did you go to law

19    school?

20              "ANSWER:  Case-Western Reserve in Lakeland,

21    Ohio.

22              "QUESTION:  And when did you graduate from

23    Case-Western?

24              "ANSWER:  1974."

25              Skipping to page 14, line 12:
```

# Plaintiff

874

1     of the nuclear waste disposal program?

2          "ANSWER:  Yeah.

3          "QUESTION:  And is one of the reasons that

4     that's done to make a determination whether the fees

5     that are being charged to the utilities are

6     sufficient?

7          "ANSWER:  I think that's required by the

8     statute that we do that, yes."

9          Skipping to page 291, line 8:

10         "QUESTION:  Does the DOE consider a 3,000

11    metric ton acceptance rate to be a reasonable rate to

12    run the spent nuclear fuel program at?

13         "ANSWER:  I would, yes."

14         Skipping to page 351, line 6:

15         "QUESTION:  You testified in response to

16    some of the questions posed by Mr. Hirsch that DOE

17    expected, for planning purposes, enhanced performance

18    to ramp-up to 3,000 MTU rate and stay at that steady

19    state rate for a number of years.  Do you recall that

20    testimony?

21         "ANSWER:  Yes, I do.

22         "QUESTION:  And that's reflected in various

23    documents that Mr. Hirsch showed you yesterday and

24    today as well?

25         "ANSWER:  Yes.

# Christopher Kouts

# Plaintiff

# UNITED STATES
# COURT OF FEDERAL CLAIMS

| | |
|---|---|
| TENNESSEE VALLEY AUTHORITY, | ) |
| Plaintiff, | ) Case No. 01-249C |
| v. | ) |
| THE UNITED STATES, | ) |
| Defendant. | ) |

Pages:   1264 through 1560

Place:   Washington, D.C.

Date:    July 11, 2005

## HERITAGE REPORTING CORPORATION
*Official Reporters*
1220 L Street, N.W., Suite 600
Washington, D.C.  20005-4018
(202) 628-4888
hrc@concentric.net

1385

1   us for just one moment, we're going to hand out

2   binders.

3            THE COURT:  Certainly.

4            MR. LO RE:  Your Honor, I promise that we

5   won't discuss every page of every document here.  You

6   can see there are four binders total.  There are many

7   large program documents.  Thank you, Your Honor.  My

8   only observation here is that the legal profession,

9   having handed out now six binders, or four binders

10  four times, is the legal profession is certainly not

11  very sympathetic to the forest of the United States

12  or the world, I guess.

13           THE COURT:  It's all recycled paper.

14           MR. LO RE:  I hope so.

15                    DIRECT EXAMINATION

16  BY MR. LO RE:

17       Q.    Mr. Kouts, could you please state your full

18  name for the record?

19       A.    Christopher Alexander Kouts.

20       Q.    Mr. Kouts, where are you currently

21  employed?

22       A.    I'm currently employed with the Office of

23  Civilian Radioactive Waste Management at the

24  Department of Energy.

25       Q.    And what is your current position in that

                    Heritage Reporting Corporation
                         (202) 628-4888

1386

```
 1      office, sir?
 2           A.    I'm director of the Office of Systems
 3      Analysis and Strategy Development.
 4           Q.    How long have you been in that position?
 5           A.    On an acting basis, October of 2002, and on
 6      a permanent basis, it was July of 2003.
 7           Q.    Could you describe for the Court,
 8      Mr. Kouts, your responsibility as the director of
 9      Office of Systems Analysis and Strategy Development?
10           A.    The systems analysis portion of it is to
11      basically conduct analyses to make sure that the
12      Waste Management System as the Department envisions
13      it, that's the repository, the transportation
14      component, and the waste acceptance component operate
15      effectively and efficiently.
16                In addition to that, I have other
17      responsibilities, including the waste acceptance
18      component of the program, which is the management of
19      the standard contract with utilities, interaction
20      with the defense aspects of -- the defense waste
21      programs within the Department to make sure that
22      those materials are appropriately, are being
23      appropriately packaged and developed for the
24      repository.
25                In addition, I have safeguards and security
```

# Plaintiff

# UNITED STATES
# COURT OF FEDERAL CLAIMS

TENNESSEE VALLEY AUTHORITY,          )

                     Plaintiff,     ) Case No. 01-249C

v.                                   )

THE UNITED STATES,                   )

                     Defendant.    )

Pages:     1561 through 1810

Place:     Washington, D.C.

Date:      July 12, 2005

## HERITAGE REPORTING CORPORATION
*Official Reporters*
1220 L Street, N.W., Suite 600
Washington, D.C. 20005-4018
(202) 628-4888
hrc@concentric.net

1579

1    Q.    I don't think I've asked you this question,

2    but if I have, I apologize, and I'll say, just say

3    that it's nothing more than I'm asking a second time,

4    and I do apologize if I have.  Has the Department

5    ever published a document where it indicated it was

6    going to pick up spent nuclear fuel at the rate of

7    900 metric tons a year for the life of the program?

8         MR. LO RE:  Your Honor, that's been asked

9    and answered, and I just, rather than put it as an

10   objection, I would just point out that I believe the

11   question was already asked and answered.

12        THE COURT:  Yes, but applying the three

13   strikes rule, I'm not sure it's been asked a third

14   time.  The objection is overruled.

15        THE WITNESS:  No.

16   BY MR. SMALL:

17   Q.    Has the Department ever published a

18   document indicating that it was going to use a 2,100

19   metric ton per year rate for the life of the program?

20   A.    No.

21   Q.    Now, when I say for the life of the

22   program, I of course did not mean to imply that there

23   would not be a short ramp-up period of, say, five

24   years at the beginning, and I assume that in

25   answering those questions, you made that assumption