# Ronald Milner

# Plaintiff

**Page 4614**

```
( 1)     IN THE UNITED STATES COURT OF FEDERAL CLAIMS
( 2)
( 3) YANKEE ATOMIC ELECTRIC      )  Case Nos.
( 4) COMPANY. CONNECTICUT YANKEE )  98-126C
( 5) ATOMIC POWER COMPANY. and MAINE )  98-154C
( 6) YANKEE ATOMIC POWER COMPANY. )  98-474C
( 7)          Plaintiffs.       )
( 8)      v.                    )
( 9) THE UNITED STATES.         )
(10)          Defendant.        )
(11)
(12)          Courtroom Number 5
(13)
(14)          National Courts Building
(15)          717 Madison Street. Northwest
(16)          Washington. D.C.
(17)
(18)          Wednesday. August 11. 2004
(19)
(20)          VOLUME 21
(21)
(22)     The parties met. pursuant to the notice of the
(23) Judge. at 10:06 a.m.
(24)
(25)     BEFORE: THE HONORABLE JAMES F. MEROW
```

**Page 4615**

```
( 1) APPEARANCES:
( 2) ON BEHALF OF YANKEE ATOMIC ELECTRIC COMPANY.
( 3) CONNECTICUT YANKEE ATOMIC POWER COMPANY and MAINE
( 4) YANKEE ATOMIC POWER COMPANY:
( 5)     JERRY STOUCK. ESQ.
( 6)     ROBERT SHAPIRO. ESQ.
( 7)     SPRIGGS & HOLLINGSWORTH
( 8)     1350 I Street. N.W.
( 9)     Washington. DC 20005
(10)     (202) 898-5800
(11)
(12) ON BEHALF OF THE UNITED STATES:
(13)     HAROLD LESTER. JR.. ESQ.
(14)     JOHN EKMAN. ESQ.
(15)     MARIAN E. SULLIVAN. ESQ.
(16)     HEIDE L. HERRMANN. ESQ.
(17)     U.S. Department of Justice
(18)     1100 L Street. N.W.
(19)     (202) 305-7562
(20)
(21) *** Index appears at end of transcript ***
(22)
(23)
(24)
(25)
```

**Page 4616**

```
( 1)            P R O C E E D I N G S
( 2)
( 3)          JUDGE MEROW: Ms. Herrmann?
( 4)          MS. HERRMANN: Ready to continue with
( 5) Mr. Buchheit. Your Honor?
( 6)          MR. STOUCK: I've got a couple of
( 7) preliminary points if I could mention it. Your Honor.
( 8)          JUDGE MEROW: Sure.
( 9)          MR. STOUCK: One is we do want to get to
(10) the exhibits that came up yesterday. We do want to
(11) get to the exhibits from yesterday. I've looked at
(12) the transcript and we're certainly ready to deal with
(13) those. We're not proposing at this moment because we
(14) would like to get finished with Mr. Buchheit. but
(15) either between witnesses or at the end of the day.
(16)          JUDGE MEROW: Fine.
(17)          MR. STOUCK: That's number one. Number
(18) two. also. I would like today to address the
(19) counterclaim. the motion to amend the counterclaim.
(20) which we've given some thought to.
(21)          Thirdly. one thing I need to take care of
(22) right now. on the question of notice and documents. as
(23) I was looking back over the transcript thinking about
(24) the exhibit issues. I noticed that little colloquy and
(25) I just didn't want there to be any remaining .
```

**Page 4617**

```
( 1) misunderstanding. We certainly have worked well. you
( 2) know. for six years and don't want to run into a
( 3) misunderstanding now. There's really two rules: one
( 4) is disclosure and the other is cross-examination.
( 5)          There certainly may be documents that we
( 6) want to show the government's witnesses that we don't
( 7) want to show the government's lawyers the night before
( 8) and. you know. unless we get some different direction.
( 9) we're not intending to do that. and I just don't want
(10) to be vilified again if that comes up. because I think
(11) it might.
(12)          JUDGE MEROW: Okay.
(13)          MR. LESTER: I think we addressed this
(14) several times. The issue here is the difference
(15) between impeachment documents and documents which the
(16) plaintiffs are going to ask be introduced as
(17) substantive evidence. We did not play this kind of
(18) game when we were doing our cross-examination. We
(19) didn't pull out unidentified exhibits and then just
(20) sort of pop them in during the cross-examination. then
(21) say please admit this as a substantive exhibit. We
(22) didn't do that.
(23)          We identified our exhibits. and if and
(24) when we identified that there's an exhibit on our
(25) may-use list that we're going to want to introduce as
```

**Page 4710**

(1) memo to which the plaintiffs have referred that

(2) Mr. Rusch had – that has Mr. Rusch's name on it in

(3) fact somehow goes with the concurrence on the prior

(4) page.

(5) With that understanding, we will not

(6) object to this series of documents being admitted as a

(7) single exhibit.

(8)     JUDGE MEROW:    Well, okay. Then with that

(9) explanation, Plaintiff's Exhibit 1972 is admitted into

(10) evidence.

(11)     (PX Exhibit 1972 was received in

(12) evidence.)

(13)     MR. LESTER:    I've been told, Your Honor,

(14) the prior exhibit the plaintiffs had tried to

(15) introduce was Plaintiff's Exhibit 1951, and I

(16) understand that that exhibit's being withdrawn and

(17) that it will not be admitted here.

(18)     MR. SHAPIRO:    That's correct, Your Honor.

(19) That was subsumed within the larger one.

(20)     JUDGE MEROW:    Okay. 1951 is considered

(21) withdrawn. Does that take up our prelunch – anything

(22) else?

(23)     MR. STOUCK    Take up the other matters at

(24) the end of the day.

(25)     JUDGE MEROW:    Fair enough. We'll break

---

(1)     A    Yes, I am.

(2)     Q    What is your current position?

(3)     A    Chief operating officer.

(4)     Q    What are your responsibilities as chief

(5) operating officer?

(6)     A    I assist the deputy director for strategy

(7) and program development in the day-to-day management

(8) of that office.

(9)     Q    And do you report to the deputy director?

(10)     A    Yes, I do.

(11)     Q    And who is the department director?

(12)     A    Ted Gerrish.

(13)     Q    Does anybody report to you?

(14)     A    Not directly.

(15)     Q    How long have you served as chief

(16) operating officer?

(17)     A    In total, about four years.

(18)     Q    When did you first join the Office of

(19) Civilian Radioactive Waste Management?

(20)     A    I believe it was April of '84.

(21)     Q    What was your first position? And I'm

(22) going to refer to it as RW, if that's all right.

(23)     A    Okay.

(24)     Q    What was your first position with RW?

(25)     A    I was the branch chief of the

---

### Page 4711

(1) for lunch. And what time?

(2)     MR. LESTER:    I'm told Mr. Milner cannot be

(3) here until 2 o'clock, so if we could resume at 2, that

(4) would be great.

(5)     JUDGE MEROW:    Okay, we'll resume at

(6) 2 o'clock.

(7)     (Luncheon recess taken from 12:40 p.m.

(8) through 2:06 p.m.)

(9)     - AFTERNOON SESSION -

(10)     MS. SULLIVAN:    Government's ready to call

(11) its next witness.

(12)     JUDGE MEROW:    Fine.

(13)     MS. SULLIVAN:    We call Ronald Milner to

(14) the stand, please.

(15)     (The witness was sworn.)

(16)     MS. SULLIVAN:    Thank you, Your Honor.

(17) RONALD MILNER

(18) was sworn and testified as follows:

(19) DIRECT EXAMINATION

(20)     BY MS. SULLIVAN:

(21)     Q    Good afternoon, Mr. Milner.

(22)     A    Good afternoon.

(23)     Q    Mr. Milner, are you currently employed in

(24) the Office of Civilian Radioactive Waste Management at

(25) the Department of Energy?

---

### Page 4713

(1) organization.

(2)     Q    What were your responsibilities in that

(3) position?

(4)     A    Preparation of total system life cycle

(5) cost, adequacy analyses and the first mission plan.

(6)     Q    What position did you next hold in RW?

(7)     A    I was a division director.

(8)     Q    And what were your responsibilities in

(9) that position?

(10)     A    Budget, human resources, total system life

(11) cycle costs, fee adequacy analyses.

(12)     Q    And what position did you next hold in RW?

(13)     A    Next, I was first acting director and then

(14) permanent director of the Office of Storage and

(15) Transportation.

(16)     Q    And do you remember when you became acting

(17) director of the Office of Storage and Transportation?

(18)     A    Roughly 1990.

(19)     Q    And how long did you serve as director of

(20) the Office of Storage and Transportation?

(21)     A    About four years.

(22)     Q    What were your responsibilities as acting

(23) and then director of the Office of Storage and

(24) Transportation?

(25)     A    Management of the MRS monitor to treatable

---

# Plaintiff

(1)  reactors will be granted?

(2)     A   Well, I mean, at that time we were

(3)  discussing what – what possible amendments there

(4)  might be to the – to the contract through the issue

(5)  resolution process, which was a – a lengthy

(6)  discussion between the department and utilities.

(7)  The standard contract gives priority to

(8)  oldest fuel first, and consideration was given, again

(9)  in collaboration and discussion with the utilities, as

(10) to whether that should be changed or in any way

(11) modified. And in 1990 I believe we had not concluded

(12) that process so then had not made any determination as

(13) to whether we would or would not change the contract.

(14) Ultimately, the determination was made not to change

(15) the contract and to continue with oldest fuel first as

(16) a priority.

(17)     Q   So it's your understanding, Mr. Milner,

(18) that the contract would have to be changed in order to

(19) provide the option of providing priority to shutdown

(20) reactors?

(21)     A   Well, I believe the contract says that –

(22) that you may give priority to shutdown reactors but

(23) it – it does state oldest fuel first as the main

(24) consideration, I believe.

(25)     Q   Let me go back to my initial question. So

---

(1)  although it is not under active discussion.

(2)  That was your truthful testimony,

(3)  Mr. Milner?

(4)     A   It was.

(5)     Q   You can't think of any other reason other

(6)  than equity to other utilities why the Department of

(7)  Energy would be unwilling to grant priority to

(8)  shutdown reactors. True?

(9)     A   I think that's the principal reason,

(10) equity, yes. I can't think of any others offhand, no.

(11)     Q   Granting shutdown priority avoids the need

(12) to continue otherwise unneeded reactor site storage or

(13) shutdown reactors?

(14)     A   It does.

(15)     Q   And granting shutdown priority can be

(16) shown to be clearly cost-effective for consumers from

(17) the standpoint of timely decommission. True?

(18)     A   Certainly – certainly cost-effective for

(19) the consumers of – of that particular utility.

(20)     Q   And in your opinion, the department would

(21) have looked favorably on exchange requests from

(22) shutdown reactors?

(23)     A   Yes, I think in general terms, I think –

(24) I think we would have. Certainly would have to see

(25) the – the terms of an exchange request but we never

---

Page 4775

(1)  the option is – is there in the contract – and I'm

(2)  reading focusing on what the department's plans are

(3)  with respect to that option in – in the contract.

(4)  And isn't it true that there has been no

(5)  final decision on whether or not such priority will be

(6)  granted? Is that not true?

(7)     A   Yes, I think that is not true, that –

(8)  that we have determined that we will – we use oldest

(9)  fuel first as the means for establishing the queue,

(10) and have.

(11)     Q   Let me go back to your – your deposition

(12) once again, Mr. Milner. Tab 3, May 3rd, page 474.

(13) Have you found that page, Mr. Milner?

(14)     A   Yes, sir, I have.

(15)     Q   If you would look on – starting on line

(16) 23, were you not asked the following question and gave

(17) the following answer?

(18) Question: Are you saying that the

(19) department's not decided whether or not it would

(20) accord priority to a shutdown reactor, or are you

(21) saying that the department has decided that it would

(22) not grant priority to any shutdown reactors?

(23) Objection by Mr. Shultis.

(24) And your answer: Well, I think that there

(25) has been no final decision as to whether or not,

---

Page 4777

(1)  received any.

(2)     Q   Finally on this topic, Mr. Milner, it's –

(3)  in your opinion, just taken in isolation and without

(4)  other considerations, it would be desirable not to

(5)  have utilities who have completed decommissioning to

(6)  have to incur operations and maintenance expenses for

(7)  20 years to watch over spent fuel casks on their

(8)  sites?

(9)     A   Certainly, I would think that would be

(10) desirable.

(11)     Q   You mentioned a couple times, Mr. Milner,

(12) that – I think it came up in your direct testimony

(13) that you don't recall utilities asking about exchanges

(14) of approved delivery commitment schedules. I want to

(15) ask you just a few questions about that topic.

(16) First of all, if an exchange request were

(17) consistent with the department's transportation

(18) capabilities and acceptance capacity for a given

(19) delivery year in your opinion, that request would have

(20) been approved. True?

(21)     A   I think so, yeah. Again, you'd have to

(22) look at the specifics of a request but yes, I wouldn't

(23) see why it would not be.

(24)     Q   You recall maintaining a list of approved

(25) delivery commitment schedules and comparing it to a

---

# Defendant

BSA

Case 1:04-cv-00074-ECH   Document 286-23   Filed 06/04/06   Page 8 of 27
Yankee Atomic Electric v. U.S.   Nos.: 98-126C, 98-154C, 98-474C   August 11, 2004

XMAX(1/1)

## Page 4614

```
( 1)       IN THE UNITED STATES COURT OF FEDERAL CLAIMS
( 2)
        YANKEE ATOMIC ELECTRIC    )  Case Nos.
        COMPANY, CONNECTICUT YANKEE )  98-126C
        ATOMIC POWER COMPANY, and MAINE )  98-154C
( 6) YANKEE ATOMIC POWER COMPANY. )  98-474C
( 7)             Plaintiffs.       )
( 8)         v.                    )
( 9) THE UNITED STATES,            )
(10)             Defendant.        ).
(11)
(12)             Courtroom Number 5
(13)
(14)             National Courts Building
(15)             717 Madison Street. Northwest
(16)             Washington. D.C.
(17)
(18)             Wednesday, August 11, 2004
(19)
(20)             VOLUME 21
(21)
(22)      The parties met. pursuant to the notice of the
(23) Judge. at 10:06 a.m.
(24)
(25)      BEFORE:  THE HONORABLE JAMES F. MEROW
```

## Page 4615

```
( 1) APPEARANCES:
( 2) ON BEHALF OF YANKEE ATOMIC ELECTRIC COMPANY.
( 3) CONNECTICUT YANKEE ATOMIC POWER COMPANY and MAINE
( 4) YANKEE ATOMIC POWER COMPANY:
( 5)      JERRY STOUCK. ESQ.
( 6)      ROBERT SHAPIRO. ESQ.
( 7)      SPRIGGS & HOLLINGSWORTH
( 8)      1350 I Street. N.W.
( 9)      Washington. DC 20005
(10)      (202) 898-5800
(11)
(12) ON BEHALF OF THE UNITED STATES:
(13)      HAROLD LESTER. JR.. ESQ.
(14)      JOHN EKMAN. ESQ.
(15)      MARIAN E. SULLIVAN. ESQ.
(16)      HEIDE L. HERRMANN. ESQ.
(17)      U.S. Department of Justice
(18)      1100 L Street. N.W.
(19)      (202) 305-7562
(20)
(21)      *** Index appears at end of transcript ***
(22)
(23)
(24)
(25)
```

## Page 4616

```
( 1)             P R O C E E D I N G S
( 2)
( 3)      JUDGE MEROW:  Ms. Herrmann?
( 4)      MS. HERRMANN:  Ready to continue with
( 5) Mr. Buchheit. Your Honor?
( 6)      MR. STOUCK:  I've got a couple of
( 7) preliminary points if I could mention it. Your Honor.
( 8)      JUDGE MEROW:  Sure.
( 9)      MR. STOUCK:  One is we do want to get to
(10) the exhibits that came up yesterday.  We do want to
(11) get to the exhibits from yesterday.  I've looked at
(12) the transcript and we're certainly ready to deal with
(13) those.  We're not proposing at this moment because we
(14) would like to get finished with Mr. Buchheit, but
(15) either between witnesses or at the end of the day.
(16)      JUDGE MEROW:  Fine.
(17)      MR. STOUCK:  That's number one. Number
(18) two. also. I would like today to address the
(19) counterclaim. the motion to amend the counterclaim.
(20) which we've given some thought to.
(21)      Thirdly. one thing I need to take care of
(22) right now. on the question of notice and documents. as
(23) I was looking back over the transcript thinking about
(24) the exhibit issues. I noticed that little colloquy and
(25) I just didn't want there to be any remaining
```

## Page 4617

```
( 1) misunderstanding.  We certainly have worked well. you
( 2) know. for six years and don't want to run into a
( 3) misunderstanding now. There's really two rules: one
( 4) is disclosure and the other is cross-examination.
( 5)      There certainly may be documents that we
( 6) want to show the government's witnesses that we don't
( 7) want to show the government's lawyers the night before
( 8) and. you know. unless we get some different direction.
( 9) we're not intending to do that. and I just don't want
(10) to be vilified again if that comes up. because I think
(11) it might.
(12)      JUDGE MEROW:  Okay.
(13)      MR. LESTER:  I think we addressed this
(14) several times.  The issue here is the difference
(15) between impeachment documents and documents which the
(16) plaintiffs are going to ask be introduced as
(17) substantive evidence.  We did not play this kind of
(18) game when we were doing our cross-examination.  We
(19) didn't pull out unidentified exhibits and then just
(20) sort of pop them in during the cross-examination.  We
(21) say please admit this as a substantive exhibit.  We
(22) didn't do that.
(23)      We identified our exhibits. and if and
(24) when we identified that there's an exhibit on our
(25) may-use list that we're going to want to introduce as
```

## Page 4790

(1) of that deposition. If you could review those pages
(2) to yourself, you don't need to read those into the
(3) record.
(4)    A   Yes, okay.
(5)    Q   Thank you. Having reviewed those pages,
(6) do you now recall whether you could recall at your
(7) deposition whether the DCSs could be adjusted up or
(8) down by 20 percent?
(9)    A   Well, from this, apparently at my
(10) deposition I did not recall that plus or minus
(11) 20 percent adjustment. The attorney pointed that out
(12) to me and I recognized that at that time.
(13)    Q   And the question about the binding nature
(14) of the DCSs was in the context of that 20 percent
(15) provision, correct?
(16)    A   The plus or minus 20 percent.
(17)    Q   Thank you.
(18) Could you go to tab 3 of the deposition
(19) binder, page 474?
(20)    A   Okay.
(21)    Q   Mr. Shapiro read the question and answer
(22) that begins on line 23 of page 74.
(23) Could you read the material that's set
(24) forth at lines 1 through 21 of that – on that page
(25) into – out loud?

## Page 4791

(1)    A   Question: If I could direct your
(2) attention to the third paragraph on the first page,
(3) the second sentence states that the department has not
(4) determined whether or not priority would be accorded
(5) shutdown reactors or if priority is granted under what
(6) specific circumstances. Was that accurate as of 1990?
(7) Mr. Shultis, objection. Mr. Milner's not
(8) a 30(b)(6) witness.
(9) The witness: I suspect it probably was.
(10) Mr. Neslin: That's your recollection
(11) sitting here today?
(12) Mr. Shultis: Same objection.
(13) The witness: Yes.
(14) By Mr. Neslin: Would that be accurate to
(15) the –
(16) Mr. Shultis: Same objection.
(17) The witness: I think at this point in
(18) time today, the department has not decided to give
(19) priority to shutdown reactors.
(20)    Q   Thank you.
(21) And similarly, Mr. Milner, could you go to
(22) page 419 of that same deposition?
(23)    A   Okay.
(24)    Q   Mr. Milner, I believe Mr. Shapiro read the
(25) question and answer that begin on page 418, line 18.

## Page 4792

(1) Could you read the question and answer that follows
(2) that exchange beginning on line 1, page 419 through
(3) line 7?
(4)    A   Question: The department – would it be
(5) fair to say that the department had an objective of
(6) allowing shutdown reactors to decommission in a timely
(7) manner?
(8) Mr. Shultis: Same objection.
(9) The witness: Well, again, I think it was
(10) more a case that the department preferred not to
(11) preclude that ability.
(12)    Q   Could you continue to line 14?
(13)    A   By Mr. Neslin, question: What do you mean
(14) by "not preclude that ability"?
(15) Answer: The department did not, as I
(16) recall, have an objective to give priority to shutdown
(17) reactors, it simply preferred not to preclude that
(18) ability in the future.
(19)    Q   And your use of the word "objective" on
(20) line 12 of that deposition, is that – your use of
(21) that term then is the same as your – how you define
(22) "objective" today?
(23)    A   Yes, yes.
(24)    Q   Mr. Milner, you were asked by Mr. Shapiro
(25) whether it was DOE's goal to remove spent nuclear fuel

## Page 4793

(1) from shutdown reactors to prevent long-term storage.
(2) Do you recall that testimony?
(3)    A   Yes, uh-huh.
(4)    Q   Okay. Would that be goal – would that
(5) goal be implemented if it came at the expense of
(6) operating reactors?
(7)    A   No, absolutely not.
(8)    MS. SULLIVAN:   One moment, Your Honor.
(9)    JUDGE MEROW:   Sure.
(10)    MS. SULLIVAN:   Nothing further, Your
(11) Honor.
(12)    MR. SHAPIRO:   We have nothing further,
(13) Your Honor.
(14)    JUDGE MEROW:   Well, Mr. Milner, I don't
(15) know if you can answer this, but under the current
(16) posture of the VOICE program, is it subject to being
(17) shut down by executive branch action at this point or
(18) would that require legislation?
(19)    THE WITNESS:   I believe it would require
(20) legislation.
(21)    JUDGE MEROW:   You're committed to file a
(22) license application at this point?
(23)    THE WITNESS:   Yes, sir. Yes, sir.
(24)    JUDGE MEROW:   Okay. Any questions?
(25)    MS. SULLIVAN:   Nothing further, Your

# Plaintiff

# UNITED STATES
# COURT OF FEDERAL CLAIMS

TENNESSEE VALLEY AUTHORITY,    )

              Plaintiff,) Case No.

v.                   ) 01-249C

THE UNITED STATES,       )

             Defendant.)

Pages:    751 through 1014

Place:    Chattanooga, Tennessee

Date:    June 24, 2005

## HERITAGE REPORTING CORPORATION
*Official Reporters*
1220 L Street, N.W., Suite 600
Washington, D.C. 20005-4018
(202) 628-4888
hrc@concentric.net

863

1      Mr. Small?

2                 MR. SMALL:  The date was August 11, 2004,

3      Your Honor.

4                 THE COURT:  Thank you.

5                 MR. SMALL:  "QUESTION:  Mr. Milner, are you

6      currently employed in the Office of Civilian

7      Radioactive Waste Management at the Department of

8      Energy?

9                 "ANSWER:  Yes, I am.

10                "QUESTION:  What is your current position?

11                "ANSWER:  Chief operating officer.

12                "QUESTION:  When did you first join the

13     Office of Civilian Radioactive Waste Management?

14                "ANSWER:  I believe it was April of '84."

15                Skipping, skipping ahead to, I believe,

16     page 4716, line 24:

17                "QUESTION:  Mr. Milner, do you recognize

18     the document that I've handed to you and put up on

19     the computer screen?

20                "ANSWER:  Yes, I do.

21                "QUESTION:  Could you identify it for the

22     Court, please?

23                "ANSWER:  It's the original 1985 mission

24     plan for the program.

25                "QUESTION:  Were you responsible for the

1      preparation of this document?

2              "ANSWER:  I was responsible for developing

3      and issuing this document."

4                      Skipping ahead to page 4725, line 11:

5              "QUESTION:  Mr. Milner, in your various

6      positions within DOE, have you had responsibility for

7      preparing total system life cycle costs?

8              "ANSWER:  Yes, I have.

9              "QUESTION:  Have you also had

10     responsibility for preparing what are referred to as

11     fee adequacy studies?

12             "ANSWER:  Yes.

13             "QUESTION:  Could you please -- strike

14     that.

15                     Could you explain to the Court what a total

16     system life cycle cost is, or a TSLCC?

17             "ANSWER:  It was a, an estimate at any

18     given time of, of the total cost of, of the entire

19     Waste Management System from identifying sites,

20     characterizing sites, through construction, operation

21     of the system, and, and ultimately decommissioning.

22             "QUESTION:  Decommissioning of what?

23             "ANSWER:  Of the repository facilities.

24             "QUESTION:  What is a fee adequacy study?

25             "ANSWER:  The fee adequacy studies using

865

1    the, the cost estimates as a basis attempted to

2    analyze whether or not the fee that was being paid by

3    the utilities was adequate to cover the, the costs.

4          "QUESTION:  Why is a TSLCC or total system

5    life cycle cost report prepared?

6          "ANSWER:  Well, one, it's, it's good to

7    keep track of the estimate of the program costs, but

8    principally is, is input to the fee adequacy

9    analysis.

10         "QUESTION:  And why are fee adequacy

11    studies prepared?

12         "ANSWER:  They are mandated by the Act."

13         Skipping ahead to page 4748, line 16:

14         "QUESTION:  Now, it's true that the

15    Department of Energy's intentions with respect to the

16    repository designed receipt rates have stayed

17    constant pretty much to the present day, 3,000 MTU

18    per year?

19         "ANSWER:  I am sorry, would you repeat

20    that?

21         "QUESTION:  It's true, is it not, that the

22    Department of Energy's intentions with respect to the

23    repository design receipt rates have stayed constant

24    to the present day, 3,000 MTU per year?

25         "ANSWER:  Yes, uh-huh.

1          "QUESTION:  And that that 3,000 MTU steady

2   state acceptance rate has been used fairly

3   consistently in the OCRWM published documents,

4   correct?

5          "ANSWER:  As far as the steady state rate,

6   yes.

7          "QUESTION:  And that's a reasonable rate?

8          "ANSWER:  Yes, I think so."

9          Your Honor, we are now going to the May 1,

10  2002 deposition of Ronald A. Milner, page 12, line 9:

11         "QUESTION:  And how many people report to

12  you as the chief operating officer?

13         "ANSWER:  I guess approximately 150 federal

14  staff.

15         "QUESTION:  Can you describe for me your

16  duties as the, what I'll refer to as the COO for

17  OCRWM?

18         "ANSWER:  Okay.  Basically, it's to manage

19  the operational aspect of the program."

20         Page 60, line 5:

21         "QUESTION:  And you're serving as chief

22  operating officer, correct?

23         "ANSWER:  Correct.

24         "QUESTION:  And in that capacity, you're

25  responsible for all of OCRWM's publications?

# Plaintiff

870

1       "ANSWER:  Certainly, to the utility that

2  would have had to build the dry storage."

3           Skipping to page 266, and to May 8 in the

4  deposition, line 23:

5           "QUESTION:  Has it been the objective of

6  OCRWM to operate the Waste Management System in a way

7  that can achieve maximum efficiency?

8           "ANSWER:  Yes.

9           "QUESTION:  And that's been an objective

10  throughout your time in RW?

11          "ANSWER:  Yeah, I believe it has.

12          "QUESTION:  And when you consider

13  efficiency in operating the Waste Management System,

14  is it also proper, in your view, to take into account

15  utility costs?

16          "ANSWER:  My personal opinion, that should

17  be a consideration."

18          Your Honor, that concludes our readings

19  from Mr. Milner's testimony.

20          THE COURT:  Mr. Lo Re, will the government

21  also have counterdesignations?

22          MR. LO RE:  Yes, Your Honor, and we'd like

23  to put those in on Monday.

24          THE COURT:  Thank you.

25          MR. SMALL:  Your Honor, we would next offer

# Thomas Pollog

# Plaintiff

Page 3888

( 1)          IN THE UNITED STATES COURT OF FEDERAL CLAIMS
( 2)
( 3)   YANKEE ATOMIC ELECTRIC COMPANY,        )
( 4)   CONNECTICUT YANKEE ATOMIC POWER        )Case Nos.:
( 5)   COMPANY. and MAINE YANKEE ATOMIC       ) 98-126C
( 6)   POWER COMPANY.                          ) 98-154C
( 7)               Plaintiffs.                 ) 98-474C
( 8)                                          )
( 9)   THE UNITED STATES.                      )
(10)               Defendant.                  )
(11)
(12)                  Courtroom 5
(13)                  National Courts Building
(14)                  717 Madison Place. N.W.
(15)                  Washington. D.C.
(16)
(17)                  Wednesday. August 4. 2004
(18)                  Volume 17
(19)
(20)          The parties met. pursuant to the notice of
(21)   the Judge. at 10:00 a.m.
(22)
(23)          BEFORE: THE HONORABLE JAMES F. MEROW
(24)
(25)

Page 3889

( 1)   APPEARANCES:
( 2)        ON BEHALF OF YANKEE ATOMIC ELECTRIC COMPANY.
( 3)   CONNECTICUT YANKEE ATOMIC POWER COMPANY and MAINE
( 4)   YANKEE ATOMIC POWER COMPANY:
( 5)        JERRY STOUCK. ESQ.
( 6)        ROBERT SHAPIRO. ESQ.
( 7)        PETER J. SKALABAN. JR.. ESQ.
( 8)        VIVEK K. HATTI. ESQ
( 9)        Spriggs & Hollingsworth
(10)        1350 I Street. N.W.
(11)        Washington. D.C. 20005
(12)        (202) 898-5800
(13)
(14)   ON BEHALF OF YANKEE ATOMIC ELECTRIC COMPANY.
(15)   CONNECTICUT YANKEE ATOMIC POWER COMPANY:
(16)        MERRILL J. ATKINS. ESQ.
(17)        Assisting General Counsel
(18)        19 Midstate Drive
(19)        Auburn. Massachusetts 01560
(20)        (508) 721-3042
(21)
(22)
(23)        (Appearances Continued on the Next Page.)
(24)
(25)

Page 3890

( 1)   APPEARANCES CONTINUED:
( 2)
( 3)        ON BEHALF OF MAINE YANKEE ATOMIC POWER COMPANY:
( 4)             JOSEPH D. FAY. ESQ.
( 5)             General Counsel
( 6)             Maine Yankee
( 7)             321 Old Ferry Road
( 8)             Wiscasset. Maine 04578
( 9)             (207) 882-5603
(10)
(11)        On Behalf of the Defendant:
(12)             HAROLD LESTER. JR.. ESQ.
(13)             JOHN EKMAN. ESQ.
(14)             MARIAN E. SULLIVAN. ESQ.
(15)             HEIDE L. HERRMANN. ESQ.
(16)             R. ALAN MILLER. ESQ.
(17)             KEVIN B. CRAWFORD. ESQ.
(18)             RUSSELL SHULTIS. ESQ.
(19)             U.S. Department of Justice
(20)             1100 L Street. N.W.
(21)             Washington. D.C. 20530
(22)             (202) 305-7562
(23)
(24)   ***Index appears at end of transcript***
(25)

Page 3891

( 1)                  P R O C E E D I N G S
( 2)
( 3)        THE COURT:  Another witness today?
( 4)        MR. STOUCK:  Your Honor. I've got a couple
( 5)   of preliminary matters very briefly. if I may.  Sorry
( 6)   to interrupt. but it's really just for the record. if
( 7)   I can just stay here.  Mr. Lester mentioned a couple
( 8)   of days ago that we had filed a list of all of the
( 9)   documents that had been admitted -- exhibits that had
(10)   been admitted by the Court. either because they were
(11)   on one or the other exhibit list and not objected to
(12)   and. therefore. admitted at the pretrial conference.
(13)   or because they were admitted during the course of
(14)   our case.
(15)        And he said that he thought the list was
(16)   fine. if I recall correctly. except there were four
(17)   documents on there that he. I'm not exactly sure what
(18)   he said. my recollection is they may have been on the
(19)   government's list and so forth. but they wanted to
(20)   withdraw them. and I said I'd take a look at that.
(21)        And I just want to address that because
(22)   the. I've looked at the documents. a couple of them
(23)   are contracts. one is a contract between Yankee
(24)   Atomic and Duke Engineering. that's Defendant's 261.
(25)   one is a contract between Maine Yankee and Securitas.

## Page 3992

(1) A F T E R N O O N  S E S S I O N

(2) (2:04 p.m.)

(3) MR. STOUCK: Your Honor, thank you for

(4) that. I do hope we can be a little more efficient.

(5) I'm just using the last couple minutes of break here.

(6) Finishing off the efficiency.

(7) THE COURT: Okay, fine.

(8) BY MR. STOUCK:

(9) Q. Good afternoon, Mr. Pollog.

(10) A. Good afternoon.

(11) Q. Just one, perhaps, minor point that I

(12) wanted to clear up from this morning before we move

(13) on. You told me this morning that the contracting

(14) officer had a responsibility for making

(15) determinations about what the standard contract

(16) meant. Do you recall that?

(17) A. Yes.

(18) Q. You told me at your deposition, or you told

(19) us, Mr. Skalaban's here with me, at your deposition

(20) in May of 2002, that it was Mr. Brownstein who had

(21) the responsibility to make any determinations on what

(22) provisions of the contract meant. Do you recall

(23) that?

(24) MS. SULLIVAN: Objection. Can we ask the

(25) witness be shown the statement?

## Page 3993

(1) MR. STOUCK: I'm asking him if he recalls

(2) it. If he recalls it and says yes, then I think

(3) we're done.

(4) THE WITNESS: Not specifically, I don't

(5) recall that.

(6) BY MR. STOUCK:

(7) Q. You don't recall that testimony?

(8) A. I don't explicitly recall making that

(9) statement in my deposition.

(10) Q. Let's show it to you then. In fact, there

(11) might be some more testimony, so in an abundance of

(12) caution, I will hand out the whole package now.

(13) There's a number of depositions, transcripts here,

(14) Mr. Pollog. If you would take a look behind tab

(15) five -- I'm sorry, that's wrong, behind tab four, on

(16) page 63, bottom of 63, the last line of page 60. If

(17) you can let me know when you're there?

(18) A. Can you repeat those pages for me again?

(19) Q. Tab four, page 63.

(20) A. Yes, I'm there.

(21) Q. You see there are four on the page, it's

(22) actually page 17, but page 63 of the deposition, do

(23) you see that?

(24) A. Yes.

(25) Q. Line 25, "Was part of your function, in

## Page 3994

(1) working with Mr. Brownstein on these matters, was

(2) part of your function reading and trying to

(3) understand the standard contract?

(4) "Yes.

(5) "Did you have responsibility to issue or

(6) make any determinations on what the provision of the

(7) contract meant?"

(8) And your answer was on line nine, "No,

(9) Mr. Brownstein may have asked my opinion, but he was

(10) the branch chief for logistics and utility interface

(11) that was responsible for making the determinations."

(12) Do you see that?

(13) A. Yes, I do.

(14) Q. That was your testimony?

(15) A. Apparently so.

(16) Q. That was your testimony then?

(17) A. Yes, it was.

(18) Q. Okay. Now, let's talk a little bit more

(19) about DCSes. Is it correct that DOE received some

(20) DCS and FDS submittals from utilities in the '98,

(21) '99, 2001 time frame?

(22) A. Yes, we did.

(23) Q. And DOE wrote back to those utilities

(24) saying it was not approving any DCSes or FDSes at

(25) that time, right?

## Page 3995

(1) A. Some words to that effect, yes.

(2) Q. And you were not involved in discussions

(3) about whether to continue processing DCSes in the

(4) fall of '96 or '97?

(5) A. No, I was not.

(6) Q. Right. But you were involved, to some

(7) extent, your duties and responsibilities for the

(8) waste acceptance and transportation division did

(9) involve, to some extent, processing DCSes, is that

(10) right?

(11) A. To some minor extent, yes.

(12) Q. Okay. Do you know when the Department

(13) stopped processing or stopped reviewing and approving

(14) DCSes or FDSes?

(15) A. I believe I do.

(16) Q. When was that?

(17) A. I believe it was either the end of 1996 or

(18) in the very beginning of 1997.

(19) Q. And your understanding is that the

(20) Department of Energy stopped processing these DCS and

(21) FDS submittals to limit its contractual liability,

(22) isn't that right?

(23) MS. SULLIVAN: Objection, legal conclusion.

(24) THE WITNESS: I'm not sure.

(25) THE COURT: What's the objection?

Page 3996

(1)   MS. SULLIVAN:   It was asking for a legal
(2)   conclusion.
(3)   THE COURT:   Oh.
(4)   MR. STOUCK:   I asked for his understanding.
(5)   THE COURT:   If you have an understanding,
(6)   you can answer. I'll overrule the objection.
(7)   THE WITNESS:   I wasn't told that, I don't
(8)   believe, by anybody, but that was my understanding of
(9)   the situation.
(10)   BY MR. STOUCK:
(11)   Q.   That was your understanding?
(12)   A.   I believe that was.
(13)   Q.   Were you told anything at the time about
(14)   why the Department of Energy had decided to stop
(15)   processing and approving DCSes and FDSes?
(16)   A.   I believe so.
(17)   Q.   Pardon me?
(18)   A.   I believe so.
(19)   Q.   Yeah, you were told that counsel told the
(20)   Department to stop doing that, is that right?
(21)   A.   I believe counsel advised the Office of
(22)   Civilian Radioactive Waste Management and the
(23)   contracting officer to do that, yes.
(24)   Q.   Counsel told Mr. Zabransky to do that, and
(25)   Mr. Zabransky told you that counsel had told him to

Page 3997

(1)   do that, is that right?
(2)   A.   I said I believe they advised us to do it,
(3)   not told us to do that.
(4)   Q.   Okay. Counsel advised Mr. Zabransky to
(5)   stop processing these documents, and Mr. Zabransky
(6)   told you that counsel had advised him of that?
(7)   A.   I don't know if counsel advised
(8)   Mr. Zabransky or other program personnel in RW
(9)   directly. I don't know how the conversation between
(10)   counsel and the Office of Civilian Radioactive Waste
(11)   Management actually occurred, but the bottom line is
(12)   Mr. Zabransky told me that, on advice of counsel,
(13)   we're going to stop processing them. I don't know if
(14)   he was told directly by counsel or through his
(15)   superiors.
(16)   Q.   But in any event, the advice came from
(17)   counsel?
(18)   A.   Yes.
(19)   Q.   And the purpose was to limit the
(20)   Department's liability?
(21)   A.   That was my understanding.
(22)   Q.   And you have no personal view on whether
(23)   stopping the DCS process was a proper thing to do
(24)   under the contract, right?
(25)   A.   No, I do not have any personal view.

Page 3998

(1)   Q.   And Mr. Zabransky also told you that the
(2)   Department of Energy would not publish an ACR in 1997
(3)   because it probably would never be approved by the
(4)   Office of General Counsel, isn't that correct?
(5)   A.   I believe that is correct.
(6)   Q.   Now, we were talking about a sentence in
(7)   the instructions before lunch, the business about if
(8)   these circumstances changed, they could be
(9)   reevaluated. Do you recall that? It's Exhibit
(10)   Number 030.001, if you want to get that in front of
(11)   you and take a look at it.
(12)   I want to ask you one or two more questions
(13)   about that sentence. This is on page two, the last
(14)   sentence of 7C, I believe. Do you recall that?
(15)   A.   Yes, I recall that conversation we had this
(16)   morning.
(17)   Q.   Do you know what the Department of Energy
(18)   was attempting to convey to contract holders through
(19)   that sentence?
(20)   A.   I have no specific recollection of what we
(21)   were intending to convey in 1992 when we wrote that
(22)   sentence, no.
(23)   Q.   Do you know why the sentence was placed in
(24)   the instructions?
(25)   A.   I don't recall at this time why it was

Page 3999

(1)   placed in the instructions in 1992.
(2)   Q.   Did you know in 1992?
(3)   A.   I may have.
(4)   Q.   But you can't tell us today?
(5)   A.   I don't recall right now why we did that in
(6)   1992, no.
(7)   Q.   And you didn't recall at your deposition,
(8)   which was two years ago, either, right?
(9)   A.   I don't recall if I recalled in my
(10)   deposition two years ago or not.
(11)   Q.   Well, let's find out. Take a look at tab
(12)   five, page, I believe it's 328, but it might be 329,
(13)   let me just take a look, 330, excuse me, line 10.
(14)   Let me know when you're there behind tab five.
(15)   A.   I am there.
(16)   Q.   "You have no recollection of any
(17)   discussions about this sentence, and why it appeared
(18)   in the DCS instructions?" Do you see that?
(19)   A.   Yes, I do.
(20)   Q.   And your answer was, "No," correct?
(21)   A.   That's correct.
(22)   Q.   So you didn't recall it then, you don't
(23)   recall it today?
(24)   A.   That is correct.
(25)   Q.   Right, thanks. This is just for the

# Plaintiff

04087

1  do this.  The Court has asked a number of

2  questions about --

3          THE COURT:  By the way, I should have

4  mentioned, whenever I ask a question, counsel can

5  object.

6          MR. LESTER:  Now, you tell us.

7          THE COURT:  I should have mentioned that

8  before, but I know that sometimes you don't

9  deliberately go into a subject for good reasons, and

10  if I ask a question that both counsel, for good

11  reasons, don't want covered, I expect an objection in

12  that regard.

13          MS. SULLIVAN:  They're all good questions,

14  Your Honor.

15          THE COURT:  In the future, please ask.

16          MR. STOUCK:  They're the best questions,

17  Your Honor, along with the fact that we don't have to

18  stand up, Your Honor.

19  BY MR. STOUCK:

20      Q.   Just on the funding issue, which the Court

21  has asked about over a number of days, I think many

22  people in this room understand this, and it's not

23  particularly controversial, and maybe the Court

24  understands this as well, but maybe we can do it this

25  way.

TRIAL TRANSCRIPT 8/4/04   Page 4087

04088

1          On the nuclear, the collections into the

2  Nuclear Waste Fund since 1983, Mr. Pollog, and I

3  don't know if you're the best person to do this, but

4  since it's come up, do you know approximately the

5  total amount that's come into the Fund since 1983?

6      A.   I think so.

7      Q.   And I realize you may not have been

8  prepared for it, but approximately how much has been

9  collected?

10      A.   I think it's approximately $20 billion.

11      Q.   Does that include interest or not interest?

12      A.   I don't know the answer to that.  I think

13  it does, but I'm not positive about that.

14      Q.   And I'm certainly not up on the latest on

15  this.  The numbers I had in mind were like $9 billion

16  in fees and 5 or 6 in interest, but the numbers are

17  out there somewhere.  But I guess my real question

18  is, do you know, I mean, you do know that not all of

19  that has been appropriated to this program?

20      A.   Yes, I am quite aware of that.

21      Q.   Do you know how much of the total amount

22  that's been collected approximately has not been

23  appropriated to this program?

24      A.   Approximately, I'd say it's less than half.

25      Q.   Less than half has been appropriated to the

TRIAL TRANSCRIPT 8/4/04   Page 4088

04089

1  program?

2      A.   That's my best recollection, but I'm not

3  the expert on that.

4      Q.   Billions and billions of collections from

5  the utilities have not been appropriated to this

6  program?

7      A.   That's my understanding.

8      Q.   And then just on the -- do you know what

9  happens to that money?

10      A.   Not really.

11          THE COURT:  It's like Social Security, I

12  guess.

13          MR. STOUCK:  What's that?

14          THE COURT:  It's like Social Security.

15          MR. STOUCK:  And the Court may understand

16  that.  I thought since the questions had come up, we

17  would just put it in the record.  That's certainly my

18  understanding.

19  BY MR. STOUCK:

20      Q.   Is that your understanding?

21      A.   It's something like the Social Security

22  trust Fund, I believe.

23      Q.   Now, on this question of the canisters that

24  the Court raised, what's the basis for your

25  understanding that a contract amendment would be the

TRIAL TRANSCRIPT 8/4/04   Page 4089

04090

1  answer?  Is there something in the contract that says

2  that?

3      A.   Well, the contract doesn't currently state

4  anything regarding canistered multi-element canister

5  material.  It only discusses bare spent nuclear fuel.

6      Q.   Does the word "bare" appear in the

7  contract?

8      A.   I'm not sure.  I think it does, but I'm not

9  positive.

10      Q.   Well, do you know whether canisters are

11  addressed in the contract one way or the other?

12      A.   I do not believe the word "canister" is in

13  the contract.

14      Q.   So it's silent about that matter?

15      A.   That is my understanding, yes.

16      Q.   All right.  Do you know that Ivan Itkin --

17  do you know who Ivan Itkin was?

18      A.   Yes, I do.

19      Q.   And do you know that Ivan Itkin gave

20  assurances to the governor of Maine, in connection

21  with some correspondence involving Maine Yankee, that

22  the contracts did in fact cover canistered fuel?

23      A.   No, I'm not familiar with that.

24      Q.   You're not aware of that?

25      A.   I'm not familiar with what you just said.

TRIAL TRANSCRIPT 8/4/04   Page 4090

# Plaintiff

01826
```
 1                    1826
 2    IN THE UNITED STATES COURT OF FEDERAL CLAIMS
 3   --------------------x
 4   SACRAMENTO MUNICIPAL UTILITY   :
 5   DISTRICT,
 6                        :NO. 98-488C
 7        Plaintiff          :
 8        vs.               :
 9   UNITED STATES,           :
10        Defendant.    :     :
11   --------------------:
12          Courtroom 5
13       National Courts Building
14       715 Madison Place
15       Washington, D.C.
16
17       Tuesday, March 29, 2005
18
19          VOLUME 7
20
21    The parties met, pursuant to the notice of the
22   Judge at 9:00 a.m.
```
SMUD v. US 3-29-05  Vol. 7      Page 1826

01827
```
 1                    1827
 2   APPEARANCES:
 3    ON BEHALF OF PLAINTIFF:
 4       DAVID S. NESLIN, ESQ.
 5       TIMOTHY R. MACDONALD, ESQ.
 6       Arnold & Porter LLP
 7       370 Seventeenth Street
 8       Suite 4500
 9       Denver, Colorado 80202-1370
10       (303) 863-2301
11
12       HOWARD N. CAYNE, ESQ.
13       Arnold & Porter LLP
14       555 Twelfth Street, N.W.
15       Washington, D.C. 20004-1206
16       (202) 942-5656
17
18
19
20
21
22
```
SMUD v. US 3-29-05  Vol. 7      Page 1827

01828
```
 1                    1828
 2   APPEARANCES (Continued:)
 3
 4    ON BEHALF OF THE DEFENDANT:
 5       ALAN J. LO RE, ESQ.
 6       JOSHUA E. GARDNER, ESQ.
 7       TODD J. COCHRAN, ESQ.
 8       SCOTT DAMELIN, ESQ.
 9       RUSSELL SHULTIS, ESQ.
10       ELIZABETH THOMAS, ESQ.
11       U.S. Department of Justice
12       1100 L Street, N.W.
13       Washington, D.C.  20036
14
15   ALSO PRESENT:
16       STEVEN M. COHN, ESQ.
17       STEVE J. REDEKER
18       THOMAS POLLOG
19
20   ***Index appears at end of transcript***
21
22
```
SMUD v. US 3-29-05  Vol. 7      Page 1828

01829
```
 1                    1829
 2          P R O C E E D I N G S
 3          - - - - -
 4       THE COURT:  Let's go.
 5   Whereupon--
 6          DAVID ZABRANSKY
 7   a witness, called for examination, having previously been
 8   duly sworn, was examined and testified further as follows:
 9          CROSS-EXAMINATION (Resumed)
10   BY MR. CAYNE:
11   Q.   Good morning, Mr. Zabransky.
12   A.   Good morning.
13   Q.   I'd like to turn your attention to
14   Plaintiff's Exhibit 121.  I believe that will be in
15   the first binder, one out of three.  Do you have that
16   document before you, sir?
17   A.   Yes, I see it.
18   Q.   And is this document a memorandum from you
19   to -- was this a memorandum from you, sir?
20   A.   It's an e-mail from me to Mr. -- I believe
21   it's Auke Piersma.
22   Q.   And who is that person?
```
SMUD v. US 3-29-05  Vol. 7      Page 1829

02025

2025

2 Department of Energy in 1988, did you understand that

3 the five-year delay in the plan start of the waste

4 management operations at DOE would increase

5 purchasers' need for at-reactor storage?

6     THE COURT: Counsel?

7     MR. GARDNER: Your Honor, I'd object,

8 assumes facts not yet in evidence.

9     THE COURT: I don't know that that's the

10 right objection.

11     MR. GARDNER: He, I think Mr. Pollog

12 testified he's not aware of, when he started,

13 that there was a five-year delay.

14     THE COURT: Right. And, I mean, I think

15 there are many things probably in this document that

16 are useful to you, Counsel, if you want to have him

17 read certain provisions in for emphasis, that's fine

18 with me, but if that's what it says, then I'm going

19 to take it that's what the situation is. It doesn't

20 make any difference what his view is. He wasn't

21 there. He didn't bind the Department. I assume this

22 is a document that binds the Department, reflects

23 their best information and judgment at the time.

24     If you want him to read something to

25 emphasize it, I think that's fine, but otherwise, I

26 would move to a document where he was at DOE, then

02026

2026

2 you can go through the same exercise. Do you see

3 what I'm saying?

4     MR. MACDONALD: Very well, Your Honor.

5     THE COURT: But, you know, if you want to

6 emphasize some points to me from the document, or you

7 can do it during argument later on or in a brief, you

8 don't need him for the document, is what I'm saying.

9 BY MR. MACDONALD:

10   Q. Mr. Pollog, to your knowledge, there is no

11 group within DOE today that disagrees that a 3000-ton

12 rate is the appropriate rate to use as a steady state

13 acceptance rate, isn't that correct?

14     THE COURT: I'm going to sustain the

15 objection which is coming, I am sure, unless the

16 bureaucracy has changed, that there are people on

17 every floor of every department, someplace, that

18 disagree with something that's been done. It doesn't

19 make any difference what a group of people within the

20 bureaucracy think. The issue is, what is the

21 official Department position?

22     MR. MACDONALD: Well, Your Honor --

23     THE COURT: Or those in the position of

24 authority to bind the Department.

25     MR. MACDONALD: I understand that, Your

26 Honor, I think the question includes those within

02027

2027

2 Mr. Pollog's knowledge. He has testified on this,

3 this very topic previously.

4     THE COURT: Do you know whether, do you

5 know if there are people within the Department that

6 disagree with the Department's official position?

7     THE WITNESS: Well, I can't speak for

8 everybody, but I don't know of anyone who raised

9 objections to that.

10     THE COURT: All right.

11 BY MR. MACDONALD:

12   Q. Who disagrees with the 3000-ton rate as the

13 appropriate steady state rate?

14   A. Just, are you talking about right now or

15 throughout the history of the program?

16   Q. Let's start with right now, sir.

17   A. Okay. Right now, I know of no one who

18 disagrees with that rate.

19   Q. And do you know of anyone throughout the

20 life of the program, sir?

21   A. Nothing comes to mind, but I am sure at

22 some point in time, someone disagreed with that. For

23 example, when we put together the '91 ACR, we used a

24 lower rate because we thought it was more appropriate

25 for acceptance at a MRS. I guess the question sort

26 of brings to mind, are you talking about a

02028

2028

2 repository-based system or an MRS-based system, or

3 some combination thereof?

4     It's a very broad question, and without

5 more information, I can't really refine my answer

6 very well for you.

7   Q. Sir, when you prepared the 1991, when you

8 were involved in the preparation of the 1991 ACR, was

9 it DOE's plan to operate its facilities on a 900-ton

10 steady state basis?

11   A. It was DOE's plans for the year 1998

12 through 2010 -- or, excuse me, 2007, to operate at a

13 4, 6, 9 continuous rate, yes.

14   Q. Let's take a look at the 1991 ACR, sir.

15 Mr. Gardner asked you a series of questions about it.

16 It's Defendant's Exhibit 290 in your original binder.

17   A. You said in the Defendant's binder?

18   Q. The binder that Mr. Gardner provided to

19 you.

20   A. It's not in yours?

21   Q. That's correct. And let me clean one

22 answer, one thing up, Mr. Pollog, in your last

23 answer, you specified that it was DOE's plan to

24 operate at the 4, 6, 9 number through 2007. What was

25 DOE's plan at the time, in your view, as to how it

26 would operate after 2007, sir?