# Plaintiff

02031

2031

2  A.  Certain provisions of it, yes, that's

3  correct.

4  Q.  Let me review, the schedule set forth on

5  this page five of the 1991 ACR was inconsistent with

6  the 1987 amendments, correct?

7  A.  It was inconsistent with at least one of

8  the provisions of the 1987 Nuclear Waste Policy

9  Amendments Act, yes.

10  Q.  And what provision is that, sir?

11  A.  I believe that was the provision that

12  restricted start of operations of the MRS to not

13  before construction authorization issuance by the

14  Nuclear Regulatory Commission.

15  Q.  And if this ACR were to reflect a schedule

16  fully consistent with the 1987 amendments, it would

17  show zero acceptance until 2007, is that right?

18  A.  I believe that's correct, yes.

19  Q.  And that's because a repository had been

20  delayed until at least 2010 at this point?

21  A.  I believe that's correct too.  If I might

22  adjust one point to that, that's assuming no other

23  legislation was passed in the interim.

24  Q.  So the schedule set forth on page five of

25  the 1991 ACR would require a change in the law in

26  order to be accomplished, is that right?

02032

2032

2  A.  Yes, that's correct.

3  Q.  In preparing this schedule, Mr. Pollog, the

4  Department of Energy only assumed that the schedule

5  restriction would be abolished by Congress, is that

6  right, as opposed to the capacity limitation?

7  A.  Probably, I think that's correct.  I'm

8  trying to think -- there's several restrictions in

9  the Nuclear Waste Policy Act.  I'm trying to remember

10  of any other restrictions that were imposed besides

11  the schedule one we were assuming at the time, but I

12  don't believe so, but I don't -- I believe you're

13  correct.

14  THE COURT:  We spent a little bit of time

15  with the prior witness, and you were in the room,

16  talking about the restrictions that Congress placed

17  on it, so I thought, you know, do you have any

18  recollection?

19  THE WITNESS:  No, Your Honor.

20  THE COURT:  He had about five or six things

21  he ticked off.

22  THE WITNESS:  Exactly, Your Honor, I was

23  just going through my head right now of other

24  restrictions, and I was trying to remember --

25  THE COURT:  But there were others?

26  THE WITNESS:  Yes, and I was trying to

02033

2033

2  remember if we assumed anything else.  I don't

3  believe we did.

4  BY MR. MACDONALD:

5  Q.  Mr. Pollog, you don't know why the

6  Department of Energy, in promulgating the schedule

7  set forth on page five of the 1991 ACR, assumed that

8  only the schedule linkage would be abolished, do you?

9  THE COURT:  I think the question is kind of

10  confusing.  Why don't you say, do you, do you know?

11  You started out, "You don't know."

12  MR. MACDONALD:  Very well, let me just

13  rephrase that.

14  THE COURT:  It's confusing the way it's

15  phrased.

16  BY MR. MACDONALD:

17  Q.  Mr. Pollog, do you know why --

18  THE COURT:  There you go.

19  BY MR. MACDONALD:

20  Q.  -- the Department of Energy assumed that

21  only the schedule linkage would be abolished by

22  Congress in publishing the schedule set forth on page

23  five of the 1991 ACR?

24  A.  I believe so.

25  Q.  Why is that, sir?

26  A.  Because the schedule linkage, if it was

02034

2034

2  abolished, would allow us to start waste acceptance

3  in 1998.

4  Q.  Let me ask a follow-up question.  Why did

5  the Department of Energy assume that only the

6  schedule linkage would be abolished, sir?

7  A.  Because we saw that as one of the main

8  impediments to accepting waste in 1998 at an MRS.

9  Q.  Sir, you don't know how important the

10  schedule linkage was when it was passed by Congress

11  in the 1987 amendments, correct?

12  THE COURT:  Important to whom?

13  MR. GARDNER:  Objection.

14  THE COURT:  Well, I -- okay.

15  MR. GARDNER:  I was going to say objection,

16  speculation, and vague.  I'm not quite sure what

17  Mr. Macdonald's getting at.  If he's trying to ask

18  any point to Congress, obviously, Mr. Pollog can't

19  testify to that.

20  THE COURT:  Right.  And the, we know from

21  the prior witness that there were a handful of

22  different restrictions, and if you can use the word

23  "restriction," rather than "linkage," in your

24  questions, I think that's certainly helpful to me

25  when I go back to look at it, and probably any other

26  human being in the world that doesn't speak in

# Plaintiff

02037

1                              2037

2  knew for sure they weren't going anywhere, they

3  weren't coming to get the waste.

4          MR. MACDONALD:  And if I could just turn

5  the witness' attention to page four of this same

6  exhibit, Number 290, the 1991 ACR?

7  BY MR. MACDONALD:

8      Q.  And Mr. Gardner, I think, had you read the

9  entire paragraph, the middle paragraph on page four

10  into the record, Mr. Pollog, I'd like to focus your

11  attention on the last sentence of that paragraph, and

12  I'd ask you to read that into the record, sir.

13      A.  Certainly.  "If the current linkages

14  between MRS facility construction and repository

15  construction authorization are maintained, it is

16  estimated that commencement of facility operations

17  and initial acceptance of spent nuclear fuel by DOE

18  could not start until at least 2007."

19      Q.  And you were responsible in getting the

20  concurrence chain completed on the 1991 ACR, is that

21  correct, Mr. Pollog?

22      A.  Yes, that's correct.

23      Q.  Your boss at the time was Mr. Alan

24  Brownstein, is that right?

25      A.  Yes, that's correct.

26      Q.  He was ultimately responsible for issuing

02038

1                              2038

2  this document, is that right?

3      A.  Yes, it fell under his responsibility as

4  the branch chief, certain functions or tasks, so

5  management would look to him, upper management would

6  look to him to complete his tasks.

7      Q.  Did Mr. Brownstein ever tell you that the

8  reason for including the 900-ton rate, we were just

9  discussing in the 1991 ACR, was to limit the

10  Department of Energy's obligations to pick up waste

11  from utilities, sir?

12      A.  No.

13      Q.  Did anyone else ever tell you that, sir?

14      A.  No.

15      Q.  Mr. Pollog, was it DOE's plan for an MRS to

16  become a long-term substitute for the repository?

17          MR. GARDNER:  Your Honor, my only

18  objection, if we could just be clear as to time

19  frames, it might help out for the record.

20  BY MR. MACDONALD:

21      Q.  At any time, sir?

22      A.  I don't believe so.

23      Q.  In 1989, DOE slipped the start date for the

24  repository from 2003 until 2010, is that right?

25      A.  I believe that's correct.  I'm not sure of

26  the exact day and month, but it's approximately

02039

1                              2039

2  correct, yes.  I don't recall a specific time frame

3  going back that far.

4      Q.  Let's take a look, Mr. Pollog, at

5  Plaintiff's Exhibit 169, which is a November — it's

6  in the cross binder.

7      A.  Can you give me that number once again,

8  Counselor?

9      Q.  It is 169, Mr. Pollog, and for the record,

10  this is a November 1989 report to Congress on

11  reassessment of the Civilian Radioactive Waste

12  Management Program.  Have you seen this document

13  before, sir?

14      A.  Probably.  I have no specific recollection

15  of seeing it, but since I was employed there at the

16  time, I probably saw a version of it, or a final

17  version of it.

18      Q.  If I could turn your attention to VII?

19  It's Bates page 1448 at the bottom.

20      A.  Can you give me the Bates number again,

21  please?  I'm getting confused with the Roman numbers.

22      Q.  It is 1448.  And if I could direct your

23  attention to the fourth paragraph and ask you to read

24  the second and third sentences into the record, sir?

25      A.  Starting with, "For the first time"?

26      Q.  Correct.

02040

1                              2040

2      A.  "For the first time since the passage of

3  the Nuclear Waste Policy Act, the program has put

4  together a schedule based on a realistic assessment

5  of activities, duration, and past experience.  The

6  schedule shows significant slip for the expected part

7  of repository operations from the year 2003 to

8  approximately 2010."

9      Q.  Mr. Pollog, if you would turn to page 12 of

10  this 1989 reassessment.

11      A.  This is Bates 1463, is that right?

12      Q.  That's correct.  And before I ask you a

13  question on this page, sir, did you have any role in

14  the, putting together a schedule based on a realistic

15  assessment of the activities, durations, and past

16  experience that's referenced in this exhibit?

17      A.  Nothing that I recall.

18      Q.  On page 12, sir, the first full paragraph

19  begins, "If a site cannot be obtained."  Do you see

20  that?

21      A.  Yes, I do.

22      Q.  If you'd look at the sentence, the second

23  sentence states, "If the current statutory linkages

24  to the repository are maintained, an additional delay

25  of five years would result with start-up estimated at

26  2007 for the basic MRS facility."  Do you see that?

# Plaintiff

02049
1                    2049
2    A.   Yes.
3    Q.   Whatever that capacity is?
4    A.   Correct.
5    Q.   And I believe you testified about this
6 earlier, but let me be clear, your current plans are
7 to have a capacity of 3000 tons acceptance, is that
8 right, per year?
9    A.   I believe the repository is being designed
10 for a steady state acceptance rate of 3000 metric
11 tons per year, yes.
12    Q.   Sir, that's not going to be a precise
13 amount every year, right at 3000, is it?
14    A.   I don't know, I mean, I don't know the
15 answer to that, probably not, but close.
16    Q.   Likely, it could be 3100, one year; 2950,
17 another year, sir?
18         MR. GARDNER: Your Honor, I'm just going to
19 object --
20         THE COURT: Sustained.
21         MR. GARDNER: Thank you.
22 BY MR. MACDONALD:
23    Q.   Mr. Pollog, I'd like to direct your
24 attention to Plaintiff's Exhibit 3 --
25         THE COURT: Just to clarify, I mean, he
26 didn't choose those numbers, you chose the numbers.

02050
1                    2050
2 He said he thought it would vary, is that fair?
3         THE WITNESS: Mr. Macdonald thought it
4 would vary?
5         THE COURT: No, that you thought it would
6 vary, but you didn't put any numbers on it.  He put
7 numbers on it.
8         THE WITNESS: I'm not understanding, Your
9 Honor, I'm sorry.
10         THE COURT: Let's go back to that again
11 then.
12         MR. MACDONALD: Very well.  If I could ask
13 a few more questions to clarify that, Your Honor?
14         THE COURT: You want to ask me questions?
15         MR. MACDONALD: No, no.  I wasn't sure if
16 you were preparing your own questions, Your Honor.
17 If not, I'll ask --
18         THE COURT: I don't prepare mine.  They
19 just kind of pop out.  It's a sloppy area of the
20 transcript.  Let's see if we can clean it up here.
21 BY MR. MACDONALD:
22    Q.   Sir, how would the number vary?
23         THE COURT: Would the number vary, first of
24 all, yes or no?
25         THE WITNESS: Well, I think it's very
26 difficult to say right now because there's many

02051
1                    2051
2 issues involved, like the contract allows a plus or
3 minus 20 percent --
4         THE COURT: Okay.
5         THE WITNESS: -- change.  There was issues
6 like cask rounding, and how exactly we're going to
7 deal with all these issues, but I think it's an
8 approximate average of what we may see in any given
9 time period.  It may be 2975 in one year, it may be
10 3100 another year.  Yeah, it can vary based upon
11 several things going on in operating a system.  All
12 the details will be worked out, I hope, in the
13 future.
14 BY MR. MACDONALD:
15    Q.   Sir, the Department of Energy did not issue
16 an ACR or APR in 1996 or '97, did it?
17    A.   No, we did not.
18    Q.   Were you told why the Department of Energy
19 did not issue an ACR or APR in 1997, sir?
20    A.   Yes, I believe so.
21    Q.   What were you told?
22    A.   I believe Mr. Zabransky told me we'd
23 probably get it -- not get it approved by all the
24 people that would have to approve it on a concurrence
25 chain.
26    Q.   Who would that include, sir?

02052
1                    2052
2    A.   Oh, it would include many parts of the
3 Department of Energy, the contracting officer's
4 office, the office of general counsel, different
5 parts of the RW program, maybe even some other
6 departments, such as department of environmental
7 management, it would depend on who we put on the
8 concurrence chain.
9         But other parts of the organization besides
10 the Office of Civilian Radioactive Waste Management
11 would have had to concur on that final document.
12    Q.   And why did you believe that you would be
13 able to get it signed by the concurrence chain,
14 sir?
15         MR. GARDNER: Your Honor, I just want to
16 interpose an objection and admonish the witness to
17 the extent there's attorney-client issues that are
18 present here, that he not divulge those
19 communications.
20         THE COURT: You've been so advised.
21         THE WITNESS: Okay.  Could you repeat the
22 question for me, please?
23         MR. MACDONALD: Could you read the question
24 back, please?
25         (The reporter read the record as
26 requested.)

# Plaintiff

# UNITED STATES
# COURT OF FEDERAL CLAIMS

TENNESSEE VALLEY AUTHORITY,          )
                           Plaintiff,)  Case No.

v.                                   )  01-249C

THE UNITED STATES,                   )

                         Defendant.)

Pages:     751 through 1014

Place:     Chattanooga, Tennessee

Date:      June 24, 2005

## HERITAGE REPORTING CORPORATION
*Official Reporters*
1220 L Street, N.W., Suite 600
Washington, D.C. 20005-4018
(202) 628-4888
hrc@concentric.net

908

1       testimony on August 4, 2004, trial testimony in the

2       Yankee Atomic cases in this court.

3               "Thomas E. Pollog, a witness called for

4       examination, having been duly sworn, was examined and

5       testified as follows:

6               "QUESTION:  Mr. Pollog, are you currently

7       employed at the Department of Energy?

8               "ANSWER:  Yes, I am.

9               "QUESTION:  And to what office within the

10      Department of Energy are you currently assigned?

11              "ANSWER:  I work in the Office of Civilian

12      Radioactive Waste Management, the Office of Systems

13      Analysis and Strategy Development.

14              "QUESTION:  What are your current

15      responsibilities?

16              "ANSWER:  Generally, I'm assigned to

17      implement a standard contract between the Department

18      of Energy and the contract holders.

19              "QUESTION:  How long have you been in your

20      current position?

21              "ANSWER:  Approximately eight years.

22              "QUESTION:  So when did you join the

23      office?

24              "ANSWER:  The office I'm currently in, that

25      office was formed in October of 2002, but my

1    responsibilities were the same in the prior

2    organization.

3           "QUESTION:  When did you join the prior

4    organization?

5           "ANSWER:  September of 1996.

6           "QUESTION:  Prior to September of 1996, did

7    you serve in the office that had responsibility for

8    the waste acceptance function at DOE?

9           "ANSWER:  Yes, I did.  In 1990, '91, and

10   early '92, I was in the office that performs the same

11   functions.

12          "QUESTION:  Mr. Pollog, do you also serve

13   as the contracting officer's technical

14   representative?

15          "ANSWER:  Yes, I do, in an unofficial

16   capacity.

17          "QUESTION:  When did you assume the

18   responsibilities of the contracting officer's

19   technical representation?

20          "ANSWER:  When Mr. Zabransky assumed the

21   responsibilities of the contracting officer, which I

22   believe was in the summer of 2002, I was unofficially

23   assigned the responsibilities of the contracting

24   officer's technical representative.

25                 Page 3919, line 19:

# Plaintiff

916

1    nuclear fuel cases, including this case, on April

2    11th, 2002.  Page five, "Thomas Pollog, called as a

3    witness herein, having been first duly sworn, was

4    examined and testified as follows:"

5            Page 95, line 16:

6            "QUESTION:  When these documents -- I think

7    you testified that DOE could determine the excess

8    storage that was needed for SNF by utilities, is that

9    right?

10           "ANSWER:  I would say DOE was able to

11   approximate how much out of pool, what excess would

12   have been.

13           "QUESTION:  Excess of what a utility could

14   store in their pool" --

15           Excuse me, Your Honor, I just read part of

16   Mr. Pollog's answer.  I apologize.

17           THE COURT:  If you would just reiterate

18   what the question was and then --

19           MR. SMALL:  Yes, Your Honor, we'll just

20   restart that question.

21           THE COURT:  Thank you.

22           MR. SMALL:  "QUESTION:  From these

23   documents, I think you testified that DOE could

24   determine the excess storage that was needed for SNF

25   by utilities, is that right?

917

1        "ANSWER:  I would say DOE was able to

2   approximate how much out of pool, what the excess

3   would have been.

4        "QUESTION:  Continue, please.

5        "ANSWER:  Excess of what a utility could

6   store in their pool."

7        THE COURT:  Mr. Lo Re.

8        MR. LO RE:  I'm sorry, I was anticipating.

9   Please --

10       THE COURT:  You're quick.  It's good to be

11   quick.

12       MR. SMALL:  "QUESTION:  And so how is that

13   information used by DOE?"

14       MR. LO RE:  Your Honor, I'm going to raise

15   a relevance objection here and a foundation objection

16   that, again, I can't tell from this record even what

17   Mr. Pollog is addressing.

18       THE COURT:  The Court has a clue.

19   Overruled.

20       MR. SMALL:  "ANSWER:  It had various

21   issues, I would guess, over periods of time, when --

22       "QUESTION:  How was it used, for example,

23   in regards to developing an acceptance rate?

24       "ANSWER:  There were points in time that

25   one of the goals of the program was to develop a

918

1    system where the acceptance rates would account --

2    would alleviate a purchaser's need to have storage

3    outside of their pools.

4          "QUESTION:  At what point in time was this

5    the goal of the program?

6          "ANSWER:  I believe in the mid-80s."

7          Your Honor, that concludes the testimony of

8    Mr. Pollog that we're offering.

9          THE COURT:  Mr. Lo Re, do you have

10    counterdesignations?

11          MR. LO RE:  Your Honor, I believe we will

12    be having counterdesignations.

13          THE COURT:  Thank you.

14          MR. LO RE:  Thank you, Your Honor.

15          MR. SMALL:  Finally, Your Honor, we have

16    one remaining witness that we would offer through

17    prior testimony.  That would be testimony of

18    Mr. David Zabransky.  We begin with testimony given

19    on August 5, 2004 in the Yankee Atomic trial in this

20    court.

21          THE COURT:  Mr. Zabransky, you must get

22    used to hearing your trial testimony, not just

23    reading it, but hearing it.

24          MR. ZABRANSKY:  First time for this.

25          THE COURT:  First time you heard it?

# Plaintiff

# UNITED STATES
# COURT OF FEDERAL CLAIMS

---

TENNESSEE VALLEY AUTHORITY,          )

                  Plaintiff,          ) Case No. 01-249C

v.                                   )

THE UNITED STATES,                   )

                 Defendant.          )

Pages:  1264 through 1560

Place:  Washington, D.C.

Date:   July 11, 2005

---

## HERITAGE REPORTING CORPORATION
*Official Reporters*
1220 L Street, N.W., Suite 600
Washington, D.C. 20005-4018
(202) 628-4888
hrc@concentric.net

1365

1    would reflect in-pool storage?

2              "ANSWER:  I believe it would be the in-pool

3    spent fuel storage document, there was one document,

4    I'm not sure, may have been a second one, I don't

5    recall.  One was entitled, at least one was called

6    spent fuel storage requirements."

7              MS. SNYDER:  And then shifting to

8    designations for context, continuing on that page.

9              "QUESTION:  Okay.  From these documents, I

10   think you testified that DOE could determine the

11   excess storage that was needed for SNF by utilities,

12   is that right?

13             "ANSWER:  I would say DOE was able to

14   approximate how much out of pool, what the excess

15   would have been.

16             "QUESTION:  And so --

17             "ANSWER:  Excess of what a utility could

18   store in their pool.

19             "QUESTION:  And so how was that information

20   used by DOE?

21             "ANSWER:  It had various uses, I would

22   guess, over periods of time, when.

23             "QUESTION:  How was it used, for example,

24   in regards to developing an acceptance rate?

25             "ANSWER:  There were points in time that

1366

1    one of the goals of the program was to develop a

2    system where the acceptance rates would account --

3    would alleviate the purchaser's need to have storage

4    outside of their pool.

5         "QUESTION:  And what point in time was this

6    the goal of the program?

7         "ANSWER:  I believe in the mid-'80s."

8         MS. SNYDER:  And then shifting to

9    counterdesignations.

10        "QUESTION:  Mid-'80s?

11        "ANSWER:  Yeah.

12        "QUESTION:  Was there a different goal

13   before the mid-'80s?

14        "ANSWER:  I don't know.

15        "QUESTION:  Was this DOE's goal when it

16   signed the standard contract?

17        "ANSWER:  I don't know.

18        "QUESTION:  Was there a different goal

19   after the mid-'80s?

20        "ANSWER:  I would say so, yes.

21        "QUESTION:  And what was that goal after

22   the mid-'80s?

23        "ANSWER:  Well, essentially, what happened

24   was these acceptance rates that were generated in

25   mid-'80s were based on several goals.  One was to

1367

1    alleviate the need for excessive storage capacity for

2    utilities.  Also, we looked at the, as I described

3    earlier, the 70,000 metric tons of the reactor and

4    divided it by what we thought was the anticipated

5    lifetime of the facility and came up with the 3,000.

6    They were fairly approximate for a while.

7              After the mid-'80s, these 3,000 MTU rates

8    sort of became our design objectives.  So I'm not

9    saying our goal changed, per se, but we didn't

10   reflect it as a goal of the program anymore.

11             "QUESTION:  Was there a new goal for the

12   program?

13             "ANSWER:  Regarding?

14             "QUESTION:  The acceptance rate.

15             "ANSWER:  Eventually, there was, yes.

16             "QUESTION:  What was that goal?

17             "ANSWER:  Well, that would have been -- we

18   had new constraints put on us regarding the Nuclear

19   Waste Policy Amendments Act.  I will refer to it as

20   the NWPAA for future discussion, if that's okay.

21             "QUESTION:  And how did that affect, I

22   guess, goal of the acceptance rates?

23             "ANSWER:  Eventually, it would reduce it

24   significant ly.

25             "QUESTION:  Is there a -- is it your

# David Zabransky

# Plaintiff

04107
```
 1        IN THE UNITED STATES COURT OF FEDERAL CLAIMS
 2
 3   YANKEE ATOMIC ELECTRIC COMPANY,    )
     CONNECTICUT YANKEE ATOMIC POWER    ) Case Nos.:
 5   COMPANY, and MAINE YANKEE ATOMIC   ) 98-126C
 6   POWER COMPANY,         ) 98-154C
 7        Plaintiffs,       ) 98-474C
 8                          )
 9   THE UNITED STATES,     )
10        Defendant.        )
11
12        Courtroom 5
13        National Courts Building
14        717 Madison Place, N.W.
15        Washington, D.C.
16
17        Thursday, August 5, 2004
18        Volume 18
19
20        The parties met, pursuant to the notice of
21   the Judge, at 10:00 a.m.
22
23   BEFORE:  THE HONORABLE JAMES F. MEROW
24
25
```
**TRIAL TRANSCRIPT 8/5/04        Page 4107**

04108
```
 1   APPEARANCES:
 2   ON BEHALF OF YANKEE ATOMIC ELECTRIC COMPANY,
 3   CONNECTICUT YANKEE ATOMIC POWER COMPANY and MAINE
 4   YANKEE ATOMIC POWER COMPANY:
 5        JERRY STOUCK, ESQ.
 6        ROBERT SHAPIRO, ESQ.
 7        PETER J. SKALABAN, JR., ESQ.
 8        VIVEK K. HATTI, ESQ
 9        Spriggs & Hollingsworth
10        1350 I Street, N.W.
11        Washington, D.C. 20005
12        (202) 898-5800
13
14   ON BEHALF OF YANKEE ATOMIC ELECTRIC COMPANY,
15   CONNECTICUT YANKEE ATOMIC POWER COMPANY:
16        MERRILL J. ATKINS, ESQ.
17        Assisting General Counsel
18        19 Midstate Drive
19        Auburn, Massachusetts 01560
20        (508) 721-3042
21
22
23        (Appearances Continued on the Next Page.)
24
25
```
**TRIAL TRANSCRIPT 8/5/04        Page 4108**

04109
```
 1   APPEARANCES CONTINUED:
 2
 3   ON BEHALF OF MAINE YANKEE ATOMIC POWER COMPANY:
 4        JOSEPH D. FAY, ESQ.
 5        General Counsel
 6        Maine Yankee
 7        321 Old Ferry Road
 8        Wiscasset, Maine 04578
 9        (207) 882-5603
10
11   On Behalf of the Defendant:
12        HAROLD LESTER, JR., ESQ.
13        JOHN EKMAN, ESQ.
14        MARIAN E. SULLIVAN, ESQ.
15        HEIDE L. HERRMANN, ESQ.
16        R. ALAN MILLER, ESQ.
17        KEVIN B. CRAWFORD, ESQ.
18        RUSSELL SHULTIS, ESQ.
19        U.S. Department of Justice
20        1100 L Street, N.W.
21        Washington, D.C. 20530
22        (202) 305-7562
23
24   ***Index appears at end of transcript***
25
```
**TRIAL TRANSCRIPT 8/5/04        Page 4109**

04110
```
 1            PROCEEDINGS
 2            - - - - -
 3   MS. SULLIVAN:  Good morning, Your Honor.
 4   We're ready to call our next witness unless there's
 5   anything we need to handle preliminarily.
 6   THE COURT:  Okay.
 7   MS. SULLIVAN:  The government calls David
 8   Zabransky.
 9   Whereupon--
10            DAVID ZABRANSKY
11   a witness, called for examination, having been duly sworn,
12   was examined and testified as follows:
13        DIRECT EXAMINATION
14   BY MS. SULLIVAN:
15   Q.  Good morning, Mr. Zabransky.  Are you
16   currently employed at the Department of Energy?
17   A.  Yes, I am.
18   Q.  And to what office within the Department of
19   Energy are you currently assigned?
20   A.  I'm in the Office of Civilian Radioactive
21   Waste Management, and I work in the Office of Systems
22   Analysis and Strategy Development within that office.
23   Q.  What are your current responsibilities?
24   A.  I report to Chris Kouts, and I work on
25   issues related to the standard contract, other
```
**TRIAL TRANSCRIPT 8/5/04        Page 4110**

04111

1 technical issues on commercial waste acceptance,

2 waste acceptance issues, and I serve as the

3 contracting officer for the standard contracts.

4    Q.    You testified you report to Mr. Kouts.  Do

5 you know who Mr. Kouts reports to?

6    A.    Yes, Mr. Kouts reports to Ted Garrish, the

7 deputy director.

8    Q.    And to whom does Mr. Garrish report?

9    A.    Mr. Garrish reports to Dr. Choo, the

10 director of the program.

11    Q.    When did you become the contracting

12 officer?

13    A.    I believe it was in July of 2002.

14    Q.    Have you also served as the technical

15 representative to the contracting officer?

16    A.    Yes, I have.

17    Q.    And when did you serve as the technical

18 representative to the contracting officer?

19    A.    From, I believe, around 1995 through July

20 of 2002.

21    Q.    And what were your responsibilities as the

22 contracting officer's technical representative?

23    A.    To provide technical advice to the

24 contracting officer on issues relating to

25 administration of the standard contract.

**TRIAL TRANSCRIPT 8/5/04            Page 4111**

04112

1    Q.    When did you join DOE?

2    A.    I came to DOE in 1994, I believe July of

3 1994.

4    Q.    Prior to joining DOE, where were you

5 employed?

6    A.    I was employed by Wisconsin Electric Power

7 Company in Milwaukee, Wisconsin.

8    Q.    How long were you employed by Wisconsin

9 Electric Power Company?

10    A.    I started there in 1978 and left in 1994.

11    Q.    What was your position at Wisconsin

12 Electric Power Company when you left?

13    A.    When I left Wisconsin Electric in 1994, I

14 was the manager of nuclear fuel services.

15    Q.    Did your responsibilities as manager of

16 nuclear fuel services include administering Wisconsin

17 Electric's standard contract with Department of

18 Energy?

19    A.    Yes, my responsibilities were for all the

20 contracts that the nuclear power department had for

21 fuel and fuel disposal, as well as analysis of fuel

22 designs and storage of spent fuel at Point Beach.

23    Q.    Mr. Zabransky, do you hold a Bachelor's

24 degree?

25    A.    Yes, I do.

**TRIAL TRANSCRIPT 8/5/04**          **Page 4112**

# Plaintiff

04117

1 months prior to 1998, and that's really when the

2 process was started by the government.

3    Q.    Turning now to your time at DOE, when you

4 came to DOE, did you have responsibility for

5 reviewing and approving DCSes submitted by utilities?

6    A.    When I became the COTR in 1995, I acted as

7 the individual that reviewed them and gave the

8 contracting officer technical recommendations as to

9 whether they should be approved or not.

10    Q.    And when would you recommend approval of

11 DCSes?

12    A.    The DCSes were approved as long as they

13 were complete and the allocations put forth on them

14 were consistent with the allocations in the ACRs that

15 provided the allocation to the utility.  So

16 generally, it was a review of completeness and

17 compliance with the allocation size.

18    Q.    Did you recommend approval or disapproval

19 of all DCSes that were submitted after you became the

20 COTR?

21    A.    I think there were a few that were

22 eventually approved or initially not approved because

23 of numbering errors or other administrative errors,

24 but beyond that, yes, they were all generally

25 approved through the period of time that we processed

         TRIAL TRANSCRIPT 8/5/04    Page 4117

04118

1 them.

2    Q.    Was there a time at which DOE stopped

3 processing these DCSes?

4    A.    Yes, I believe it was in early '97.  It's

5 hard to remember the exact year that the Department

6 stopped processing DCSes.  We did acknowledge that we

7 had received them, but we no longer processed them.

8 We neither approved or disapproved them.

9    Q.    Who made the decision to stop processing

10 DCSes?

11    A.    I think the decision was made by the

12 contracting officer on the advice of counsel.

13    Q.    Can we pull up DX-29.002?

14    MS. SULLIVAN:  One moment, Your Honor.

15    THE COURT:  Sure.

16    MS. SULLIVAN:  Your Honor, this is two

17 exhibits with multiple pages.  I'd like to provide

18 copies to the Court.

19 BY MS. SULLIVAN:

20    Q.    Mr. Zabransky, I've actually handed you

21 copies of what have been marked as Defendant's

22 Exhibit 29.002 and 29.003.  Do you recognize these

23 documents?

24    A.    I do.

25    Q.    Do you recognize these documents to be a

         TRIAL TRANSCRIPT 8/5/04    Page 4118

04119

1 set of DCS submittals from Maine Yankee?

2    A.    Yes, 29.002 is a set of submittals from

3 Maine Yankee to the Department of Energy, in

4 September of '92, for allocations for Maine Yankee.

5    Q.    And what is 29.003?

6    A.    29.003 is the approved DCSes being sent

7 back by the contracting officer to Maine Yankee.

8    Q.    Okay.  And you were not involved in the

9 processing of these DCSes?

10    A.    I was not at DOE at the time, no.

11    Q.    And just based on your review of the

12 document, is it your understanding that Maine Yankee

13 submitted DCSes for all of its allocations in the

14 first 10 years in 1992?

15    A.    From review of this document and review of

16 the '91 ACR, this appears to be a DCS for each of the

17 allocations that Maine Yankee had in the '91 time

18 frame that they could have submitted in 1992, yes.

19    Q.    Okay.  And looking at 29.003, is it your

20 understanding that these DCSes were approved by DOE?

21    A.    Looking at the exhibit, yes, they all seem

22 to have been approved by DOE.

23    Q.    Thank you.  Mr. Zabransky, are you familiar

24 with the former industry organization known as the

25 Utility Nuclear Waste Management Group?

         TRIAL TRANSCRIPT 8/5/04    Page 4119

04120

1    A.    I am familiar with the organization known

2 as the Utility Nuclear Waste Management Group, also

3 known as UNWMG.

4    Q.    Was Wisconsin Electric a member of UNWMG

5 while you were there?

6    A.    Yes, Wisconsin Electric was a member of

7 UNWMG when I was employed at Wisconsin Electric.

8    Q.    And did you represent Wisconsin Electric at

9 meetings of UNWMG?

10    A.    I was a representative of Wisconsin

11 Electric at meetings of UNWMG, yes, I was.

12    Q.    What did you understand to be the purpose

13 of UNWMG?

14    A.    UNWMG was a organization within, I believe,

15 Edison Electric Institute that was set up to work on

16 issues related to nuclear waste disposal, interfaces

17 with DOE.  It was an organization to facilitate

18 industry involvement on those topics.

19    Q.    Are you familiar with the process commonly

20 referred to as the ACR issue resolution process?

21    A.    Yes, I am.

22    Q.    What was the ACR issue resolution process?

23    A.    The ACR issue resolution process was a

24 group, subgroup that was set up within the UNWMG, a

25 high-level waste working group, which focused on

         TRIAL TRANSCRIPT 8/5/04    Page 4120

# Defendant

Yankee Atomic Electric v. U.S   Nos.: 98-126C, 98-154C, 98-474C     August 5, 2004

Heritage Reporting Corporation

**Page 4107 to Page 4238**

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

*HERITAGE REPORTING CORPORATION*
*1220 L Street, N.W.*
*Suite 600*
*Washington, DC   20005*
*Phone:   202-628-4888*
*FAX:   202-371-0935*

## Page 4127

(1) designed to accept MESCs?

(2)     A.   Yes, they do.

    Q.   Why is that?

    A.   The requirements documents require the

(5) contractor designing the facilities and developing

(6) the license application to include the capability in

(7) the facilities to handle multi-element sealed

(8) canisters, so that if the Department were to execute

(9) these contract amendments, we'd be able to actually

(10) implement them.

(11)     Q.   Can we highlight the fifth paragraph of

(12) this letter on the second page? Could you read that

(13) portion of the letter, please?

(14)     A.   "It is our current expectation that after

(15) receipt at the repository, dual purpose systems will

(16) be opened and the spent nuclear fuel removed for

(17) placement in a waste disposal package, unless the

(18) internal canister can be demonstrated and Nuclear

(19) Regulatory Commission licensed as part of the final

(20) waste disposal package assembly.

(21) Therefore, in order for a dual purpose

(22) system to be classified as standard, we anticipate

(23) that, at a minimum, it must provide that the spent

(24) nuclear fuel stored allows for its unloading and

(25) handling like an intact fuel assembly.

## Page 4128

(1) Dual purpose systems that cannot be

(2) unloaded and handled in the same manner as an intact

(3) assembly will be classified as nonstandard under the

(4) terms of the contract."

(5)     Q.   The first sentence refers to, discusses the

(6) waste disposal package and the NRC, or the NRC

(7) license. Is that part of the technical analysis to

(8) which you were just discussing?

(9)     A.   That's one of the issues that has to get

(10) looked at, as to whether this canister can be

(11) directly disposable, or if it needs to be reopened

(12) and repackaged when it's received at the repository.

(13)     Q.   Has a decision been made as to the schedule

(14) upon which DOE will accept MESCs?

(15)     A.   No, I'm not aware that any decision has

(16) been made on the schedule as to which we would accept

(17) MESCs.

(18)     Q.   And when can a schedule for the acceptance

(19) of MESCs be determined?

(20)     A.   As I said, I think before, until we get the

(21) license and the utilities actually licensed, and we

(22) know what its capabilities are, and we know if there

(23) are any technical limitations or technical

specifications that limit our ability to open cans or

facility limitations as to how many cans we can open

## Page 4129

(1) at once, we won't be in a position to determine what

(2) schedule we can work on.

(3)     Q.   And the license that you're referring to,

(4) when does DOE expect to receive that license?

(5)     A.   You really wouldn't know the final details

(6) of that until you receive the license to receive and

(7) possess right before the repository was ready to

(8) open. I'm not sure what the schedule is for that

(9) without reviewing other documents, but it's

(10) subsequent to the receipt of the construction

(11) authorization.

(12)     Q.   Was the subject of MESCs part of the ACR

(13) issue resolution process?

(14)     A.   I believe it was, yes.

(15)     Q.   Why was that?

(16)     A.   It was an issue that the utilities

(17) identified, and I think DOE mutually agreed with the

(18) utilities that it needed resolution because they

(19) didn't appear to be covered under the contract.

(20)     Q.   Could we go back to Plaintiffs' Exhibit 81?

(21) Which we don't have on computer. Could I direct your

(22) attention to the page that is Bates-numbered ending

(23) in 1703?

(24)     A.   Yes.

(25)     Q.   And could you read the issues stated there?

## Page 4130

(1)     A.   The issue stated there is, "Should Appendix

(2) E be amended to include multi-element sealed

(3) canisters as either a standard or nonstandard SNF

(4) classification."

(5)     Q.   And I think you've already explained this.

(6) This document contains issues that the industry

(7) wanted to discuss with DOE?

(8)     A.   It contained issues, and it contained

(9) industry positions that we thought DOE should adopt.

(10)     Q.   While you were at Wisconsin Electric, did

(11) you understand that MESCs were not an acceptable

(12) waste form, pursuant to the contract?

(13)     A.   That was my understanding, yes.

(14)     Q.   What is the effect of the – or do you have

(15) an understanding as to what the effect of the fact

(16) that MESCs are currently not an acceptable waste form

(17) would have upon utilities?

(18)     A.   Well, it's my understanding that if the

(19) issue isn't resolved through a contract amendment,

(20) that the effect of MESCs not being an acceptable

(21) waste form would be that the utilities would either

(22) have to remove the fuel from those canisters and put

(23) it in the DOE provided transportation casks as their

(24) fuel or amend their contracts to allow it as a

(25) acceptable waste form.

# Plaintiff

04204

1 choose the best option it had, isn't that correct?

2     A.     Well, utility, when you say,

3 "individually," I mean, if someone is going to

4 exchange, they have to exchange with somebody else.

5 they would look at -- a utility who needed to move

6 up would look at, I need to move up, and optimize its

7 options, which could be move up, buy a place in line

8 or add storage.

9         So it had spent fuel management need.  It

10 could optimize implementation of its need as it saw

11 fit, which could be either exchange it with another

12 utility or developing additional storage capacity.

13     Q.     So each individual utility would view

14 optimization differently.  Isn't that your

15 understanding of what is meant in Dr. Dreyfus'

16 letter?

17     A.     I think they're in the best position to

18 decide what makes best sense for them from that

19 perspective, yes.

20     Q.     And you still believe the exchange

21 provision can work, don't you?

22     A.     I believe it can work in a mature

23 performing system, yes.

24     Q.     And you still believe, as Dr. Dreyfus

25 indicated in Plaintiffs' Exhibit 145, in his letter,

04205

1 that the exchange provision would allow utilities to

2 optimize allocation of waste capacity, don't you?

3     A.     Yes.

4     Q.     In fact, it's been your belief that the

5 exchange provision would work much like pollution

6 offset credits, isn't that correct?

7     A.     That's one type of model that I think I've

8 said before might be a way this could work, yes.

9     Q.     People will buy, sell, trade -- a willing

10 seller will find a willing buyer, and an exchange

11 will be proffered, the deal will be accepted, isn't

12 that correct?

13     A.     Between those two, yes.

14     Q.     And it's your belief that buyers and

15 sellers of swaps would incur little, if any,

16 brokerage fee for arranging those trades, isn't that

17 correct?

18     A.     Whether a broker gets involved or not, I

19 don't know.  I mean, that's something up to the

20 utilities.  If they want to do it themselves, that's

21 fine.  In the old days, going back a decade, brokers

22 were very active in the uranium exchange market and

23 the enrichment exchange market.  I don't know whether

24 they're that active today.  I haven't kept pace with

25 it.

04206

1     Q.     In fact, it's your understanding that

2 brokers aren't doing too well today in the uranium

3 markets, isn't that true?

4     A.     That's what I've heard from talking with

5 friends, but I haven't done any specific research.

6         THE COURT:  Well, you're actually

7 interpreting the contract, perhaps, maybe certain

8 circumstances are a little different from the

9 wording, like Oldest Fuel First actual acceptance.

10 Do you believe you could interpret the contract to

11 permit DOE to compel exchanges to have

12 cost-efficiency in the process?

13         THE WITNESS:  I haven't thought about that

14 previously, being at DOE.  I, my personal opinion --

15         THE COURT:  In the way you approve ACRs --

16 I mean, approve DCSes, rather.

17         THE WITNESS:  We haven't acted that way.

18 We've basically approved DCSes that met the

19 requirements of being within the allocation and left

20 the rest of it up to utilities to decide what made

21 sense for them, as opposed to DOE trying to move the

22 system one way or another, because I don't know that

23 we'd be in the best position to decide what was in

24 the best interest for each utility.

25         THE COURT:  I was thinking of your

04207

1 transportation system that you'd have to develop for

2 transportation to Yucca Mountain, might be the

3 exchanges would be crucial to developing an efficient

4 transportation system.

5         THE WITNESS:  I think it's fair to say,

6 Your Honor, that without, as laid out in the ACRs and

7 as followed up in the Oldest Fuel First, it doesn't

8 necessarily go to the most efficient transportation

9 system, but it's the system that, in the absence of

10 somebody exchanging with each other, we're going to

11 have to live with.

12         I think the scheduling process that's laid

13 out doesn't always lend itself to the most efficient

14 operation of the system.

15 BY MR. SHAPIRO:

16     Q.     So if utilities exchanged, Mr. Zabransky,

17 that might actually result in a more efficient

18 transportation system that will be actually easier

19 for the Department to accommodate?

20     A.     If the circumstances of the exchange were

21 to that effect, it could, yes.

22     Q.     You can't think of any reason, can you,

23 Mr. Zabransky, why a utility wouldn't participate in

24 a market for approved delivery commitment schedules

25 if the DOE acceptance system was otherwise up and

# Plaintiff

01464

```
 1                        1464
 2      IN THE UNITED STATES COURT OF FEDERAL CLAIMS
 3      ------------------------x
 4   SACRAMENTO MUNICIPAL UTILITY    :
 5   DISTRICT,                       :
 6                           :NO. 98-488C
 7        Plaintiff          :
 8        vs.                :
 9   UNITED STATES,                  :
10        Defendant.         :
11      ------------------------x
12                 Courtroom 5
13               National Courts Building
14               715 Madison Place
15               Washington, D.C.
16
17               Monday, March 28, 2005
18
19                 VOLUME 6
20
21      The parties met, pursuant to the notice of the Judge
22   at 9:39 a.m.
23
24      BEFORE THE HONORABLE SUSAN G. BRADEN
25
26
```

01465

```
 1                        1465
 2   APPEARANCES:
 3     ON BEHALF OF PLAINTIFF:
 4        DAVID S. NESLIN, ESQ.
 5        TIMOTHY R. MACDONALD, ESQ.
 6        Arnold & Porter LLP
 7        370 Seventeenth Street
 8        Suite 4500
 9        Denver, Colorado 80202-1370
10        (303) 863-2301
11
12        HOWARD N. CAYNE, ESQ.
13        Arnold & Porter LLP
14        555 Twelfth Street, N.W.
15        Washington, D.C. 20004-1206
16        (202) 942-5656
17
18
19
20
21
22
23
24
25
26
```

01466

```
 1                        1466
 2   APPEARANCES (Continued:)
 3
 4     ON BEHALF OF THE DEFENDANT:
 5        ALAN J. LO RE, ESQ.
 6        JOSHUA E. GARDNER, ESQ.
 7        TODD J. COCHRAN, ESQ.
 8        SCOTT DAMELIN, ESQ.
 9        RUSSELL SHULTIS, ESQ.
10        ELIZABETH THOMAS, ESQ.
11        U.S. Department of Justice
12        1100 L Street, N.W.
13        Washington, D.C.  20036
14
15   ALSO PRESENT:
16        STEVEN M. COHN, ESQ.
17        STEVE J. REDEKER
18        THOMAS POLLOG
19
20   **Index appears at end of transcript***
21
22
23
24
25
26
```

01467

```
 1                        1467
 2                 PROCEEDINGS
 3                 - - - -
 4        THE CLERK:  All rise.  The United States
 5   Court of Federal Claims is now in session, the
 6   Honorable Susan G. Braden presiding.
 7        MR. LO RE:  Your Honor, I know the
 8   Plaintiffs are going to put on Ms. Supko.  It looks
 9   like Mr. Neslin may have some housekeeping matters,
10   we do also.
11        MR. NESLIN:  Your Honor, we have an
12   additional demonstrative to add to our demonstrative
13   book, Number 78.
14        THE COURT:  And you'll be working with
15   this, this morning?
16        MR. NESLIN:  I don't believe this morning.
17   This is actually a chart from Mr. Stuart's expert
18   report we may be referring to later during the day or
19   this week.
20        THE COURT:  Well, it's going to be
21   interesting to know why it's relevant.
22        MR. NESLIN:  It relates to Mr. Stuart's
23   opinion regarding campaigning that was the subject of
24   some of his testimony Friday.
25        THE COURT:  It doesn't really matter what
26   happens in the U.K. and France.
```

01805

1805

2   Q.   Thank you.

3        THE COURT:  And this document was prepared

4   after there was a lawsuit filed?

5        THE WITNESS:  It continues to be prepared

6   today.

7        THE COURT:  Right.  So it's unlikely that

8   you would have him talking to the enemy in that

9   sense.

10  BY MR. CAYNE:

11  Q.   Did your office, Mr. Zabransky, use the

12  information of the type reflected in Plaintiff's

13  Exhibit 675 to determine the Department's potential

14  liability to the utilities for the breach of

15  contract?

16       THE COURT:  Sustained.

17       MR. LO RE:  Thank you, Your Honor.

18       MR. CAYNE:  Your Honor, may I, for the

19  record, ask why that objection was sustained?

20       THE COURT:  You just asked him a legal

21  question, to determine the Department's potential

22  liability.  They're arguing they had no liability.

23       MR. CAYNE:  Your Honor, let me get to the

24  next document then, and the Court will see where I'm

25  going.

26       THE COURT:  All right.

---

01806

1806

2   BY MR. CAYNE:

3   Q.   Mr. Zabransky, could you please turn to

4   Plaintiff's Exhibit 626?  Are you there, sir?

5   A.   Yes, I'm there.

6   Q.   And the first page says, "Parametric

7   Analysis For Future Program Costs Scenarios,"

8   September 16th, 1999.

9   A.   Okay.

10  Q.   And it has Lake Barrett's name, correct?

11  A.   Correct.

12  Q.   And was he the acting director of the, your

13  department at this time?

14  A.   Yes, he was.

15  Q.   Okay.  And if I could turn your

16  attention --

17       THE COURT:  Have you seen the document

18  before?

19       THE WITNESS:  I recall a document, I'm not

20  sure it was this one, but I recall a document like

21  this that was used to brief OMB.

22       THE COURT:  Okay.

23  BY MR. CAYNE:

24  Q.   To brief who?

25  A.   OMB.

26  Q.   Mr. Zabransky, take whatever time you need

---

01807

1807

2   to look at the document to refresh your recollection,

3   but what I want to ask you about, the information I'd

4   like to ask you about appears on page 21, are you

5   there?

6   A.   Yes, okay.

7   Q.   Okay.  This says, "Take title cost

8   assumptions," and there is an entry for dry storage

9   facility start-up, do you see that, 10 million

10  dollars?

11  A.   Now, you're on page?

12  Q.   21, Bates number 5090.

13  A.   I don't have that on my 21.

14       THE COURT:  I don't either.  The witness

15  and I have the same document.

16       MR. CAYNE:  I'm on Exhibit 625, Your Honor.

17       THE WITNESS:  626, you said.

18  BY MR. CAYNE:

19  Q.   Then I misspoke, I apologize, Plaintiff's

20  Exhibit 625, sorry, sir, and Bates number 5090.

21  A.   So we're on page 21 of this document?

22  Q.   Yes.

23  A.   Okay.

24  Q.   Are you there?  And then you see it says,

25  "Take title cost assumptions"?

26  A.   Yes.

---

01808

1808

2   Q.   Now, how did your office use the

3   information in this document, particularly on this

4   page, to brief OMB or for any other purpose?

5        MR. LO RE:  Your Honor, I'm going to object

6   on foundation grounds.  Mr. Zabransky has not

7   testified that he is familiar with where these data

8   came from.  I believe he said --

9        THE COURT:  We can ask some questions about

10  it then.  Why don't you do that?

11  BY MR. CAYNE:

12  Q.   Mr. Zabransky, and, again, as I said, feel

13  free to look at the whole document to put it into

14  context, but my first question is, where did the

15  information on page 21 come from?  For example, it

16  says, "10 million dollars for dry storage facility

17  start-up."  Do you see that?

18  A.   Yes.

19  Q.   Where did that figure come from?

20  A.   I believe, quite frankly, Mr. Pollog,

21  myself, based upon advice we received from other

22  parties, like our contractors, decided this was an

23  appropriate number, based upon my past experience and

24  what I was reading things were costing in the paper.

25  Q.   So dry storage facility start-up, that

26  entry refers to what?

01809

1809

2   A.  Building a facility.

3   Q.  What kind of a facility?

4   A.  A dry storage facility, this is a very

5 general, not specific exercise.  This is, this was

6 done to try to at the time, as you pointed out

7 earlier, Secretary Richardson was interested in a

8 take title proposal.  This was fleshing out what it

9 might cost to take title, so it was done, by

10 necessity, very generally.

11   Q.  And am I correct, sir, and I don't think I

12 have the document here, but if you don't recall, I'll

13 get the document tomorrow, did you prepare similar

14 analyses in earlier years with different and lower

15 figures?

16   A.  I don't recall.  These figures, we adjusted

17 periodically.

18   Q.  Okay.  And how often did you prepare this

19 chart?

20   A.  This is the only time I did this chart.

21   Q.  Well, you said you adjusted periodically, I

22 thought.

23   A.  Well, you asked me if my estimates or

24 assumptions as to what it costs to adjust to -- if

25 some of these are adjusted, and the answer is, they

26 would be, based upon what we're observing people are

---

01810

1810

2 saying they're paying for things in papers and other

3 things.

4   Q.  Do you see the next entry, "Dry Storage

5 Operations"?  What is that referring to?

6   A.  That's the cost to operate a stand-alone

7 dry storage facility, and this was a DOE kind of

8 cost.  We looked at this as DOE take title, so as I

9 recall, that's what we estimated it would take us to

10 maintain the facility.

11   Q.  So in other words, to put it in context, if

12 DOE had settled this litigation by taking title to

13 Rancho Seco, if these numbers had applied to that,

14 this would mean your estimate was it would take 5

15 million dollars to operate the Rancho Seco dry

16 storage facility, the ISFSI?

17     MR. LO RE:  Objection, Your Honor, calls

18 for speculation, assumes facts not in evidence.

19     THE WITNESS:  No, I didn't say that.  I

20 said that's what we figured DOE's costs would be,

21 recognizing that DOE does nothing as cheaply as the

22 private sector.

23 BY MR. CAYNE:

24   Q.  Do you see the next entry, "Storage Casks"?

25   A.  Uh-huh.

26   Q.  $100 per KG?

---

01811

1811

2   A.  Yes.

3   Q.  Now, I had to check this myself, I'm

4 embarrassed, but am I correct that an MTU is equal to

5 1000 KG?

6   A.  Yes.

7   Q.  Okay.  So what would the costs for storage

8 casks be if you were looking at 229 MTU under this,

9 under these assumptions?

10   A.  I'd have to get a calculator.  I recall it

11 was like a -- boy --

12   Q.  I'll get a calculator, sir.

13   A.  Then you can calculate it.

14     MR. CAYNE:  Your Honor, may I hand the

15 witness a calculator?

16     THE COURT:  Sure.

17 BY MR. CAYNE:

18   Q.  Under this assumption, this is from

19 2002, Mr. Zabransky -- excuse me, 1999, from

20 September 16th, 1999, based on this assumption of

21 $100 per KG, how much would it cost to build,

22 construct storage casks capable of holding 229 metric

23 ton units?

24   A.  Well, let's see, if I did that right, it's

25 100 times 1000, times -- is that right?  So $100 per

26 kilogram, times 1000 kilograms per metric ton, times

---

01812

1812

2 229, 2 point -- that's too many zeros.  $22,900,000,

3 I believe.

4   Q.  And so then the total under those, under

5 these assumptions on Exhibit 625, as of September

6 1999, the total assumed cost to start up a dry

7 storage facility, together with storage casks to

8 hold -- sufficient to hold 229 metric ton units,

9 would be a little north of 32 million dollars, as of

10 1999, correct?

11   A.  Yes.

12   Q.  Okay.  And do you recall, the information

13 for your estimates on the storage cask costs, who

14 developed that information?

15   A.  Again, I think myself and Mr. Pollog, based

16 upon information we obtained from contractors and

17 what we had read in papers and other filings, this

18 was a good average number, and it included building

19 incremental pads and everything else.  So it wasn't

20 just the storage cask, per se, it was just a general

21 number, since this isn't any specific analysis to any

22 specific type of cask, any specific facility, any

23 specific location.

24   Q.  But you said it was a good, what was your

25 phrase, good average number?

26   A.  General number, it was a good number for --

01813

1                                    1813

2          THE COURT: It's a back of an envelope

3  number he's doing, basically, for the purposes of

4  bean counters at OMB.

5          THE WITNESS: Yes.

6  BY MR. CAYNE:

7      Q.   But the contractors you spoke to, who were

8  the contractors?

9      A.   I would have spoken to Mr. Benz and --

10  probably Mr. Benz at that point in time.

11      Q.   You said you looked at filings?

12      A.   We had looked at FERC filings from other

13  people, and we had looked at, in the past, I had

14  bought casks, I had designed and had filed for a

15  facility, so I had some general knowledge of this.

16      Q.   So in 1999, you thought this was a

17  reasonable rough calculation of the costs to build a

18  dry storage facility and storage casks to hold, as we

19  said in my example, 229 metric ton units, correct?

20      A.   Yes.

21      Q.   Thank you. Could you turn to the next

22  page, please, page 22?

23      A.   Okay.

24      Q.   Bates 5091.

25      A.   Yes.

26      Q.   Do you see there are a number of the top

01814

1                                    1814

2  of the chart says, "Cumulative Take Title (MTUs)," do

3  you see that?

4      A.   Yes.

5      Q.   And there are a number of lines?

6      A.   Yes.

7      Q.   The bottom line says, "ACR Cumulative"?

8      A.   Yes.

9      Q.   First, can you explain to me what this

10  chart is? And then we can break down what these

11  individual lines are.

12      A.   Okay. These, this is the chart that goes

13  to show that, under a scenario where DOE would take

14  title, under different acceptance rates or different

15  take title rates, how much it would ultimately take

16  title to.

17      Q.   What is the line, "ACR Cumulative"?

18               (6:00 p.m.)

19          THE WITNESS: That's 46999 for 10 years, and

20  no more, it's 8200 tons.

21  BY MR. CAYNE:

22      Q.   And what is, "ACR-E Cumulative"?

23      A.   That's 46999999 extended, ad nauseam.

24      Q.   Well, why does the first entry end -- not

25  go up after, it looks like 2007, am I reading that

26  right?

01815

1                                    1815

2      A.   Yes, because it stops in 2007.

3      Q.   And why does it stop in 2007?

4      A.   Because that's all that was published in

5  the ACR.

6      Q.   Was it your view that the Department's

7  obligation didn't go beyond that?

8      A.   This is an illustrative example.

9          MR. LO RE: Objection, Your Honor.

10          THE COURT: Sustained.

11  BY MR. CAYNE:

12      Q.   Mr. Zabransky, what is, did you already say

13  what the top line is? If you did, I apologize.

14      A.   The top line?

15      Q.   The line for, "Utility Legal Claim

16  Cumulative"?

17      A.   That was the claim that utilities had made

18  in litigation, that the rates should be the rates

19  used in DOE planning documents.

20      Q.   And what's, "Fitzgerald Cumulative"?

21      A.   That was a rate put forth by Senator

22  Fitzgerald at one point in time.

23      Q.   Rate put forth in what context, do you

24  know?

25      A.   I don't know if he had proposed legislation

26  or he was talking about proposed legislation.

01816

1                                    1816

2      Q.   Then can you turn to the next page?

3      A.   Yes.

4      Q.   Are you there?

5          THE COURT: This "Cumulative Take Title"?

6          MR. CAYNE: Yes, Your Honor, page 5092.

7          THE WITNESS: Yes.

8  BY MR. CAYNE:

9      Q.   Can you tell me how this chart differs from

10  the one preceding? There seems to be a few

11  additional entries.

12      A.   There's only one additional entry.

13      Q.   Okay.

14      A.   And that was a -- starting in 2010, at the

15  rates that were in DOE's planning documents, assuming

16  Yucca Mountain began operations in 2010.

17      Q.   And what does "VA" stand for?

18      A.   Viability assessment.

19      Q.   And what's viability assessment?

20      A.   That was a document that was prepared

21  around 1999 demonstrating the viability of Yucca

22  Mountain, to assess the viability of Yucca Mountain.

23      Q.   Can you turn to the next page, please?

24      A.   Yes.

25      Q.   Bates number 5093, and can you identify the

26  additional line or lines that appear on this page?

# Plaintiff

01826
```
1                      1826
2     IN THE UNITED STATES COURT OF FEDERAL CLAIMS
3     ------------------------x
4  SACRAMENTO MUNICIPAL UTILITY    :
5  DISTRICT,                       :
6                      :NO. 98-488C
7       Plaintiff     :
8     vs.             :
9  UNITED STATES,     :
10      Defendant.    :
11 ------------------------:
12            Courtroom 5
13            National Courts Building
14            715 Madison Place
15            Washington, D.C.
16
17            Tuesday, March 29, 2005
18
19            VOLUME 7
20
21    The parties met, pursuant to the notice of the
22 Judge at 9:00 a.m.
23
24    BEFORE THE HONORABLE SUSAN G. BRADEN
25
26            SMUD v. US 3-29-05  Vol. 7       Page 1826
```

01827
```
1                      1827
2  APPEARANCES:
3    ON BEHALF OF PLAINTIFF:
4       DAVID S. NESLIN, ESQ.
5       TIMOTHY R. MACDONALD, ESQ.
6       Arnold & Porter LLP
7       370 Seventeenth Street
8       Suite 4500
9       Denver, Colorado 80202-1370
10      (303) 863-2301
11
12      HOWARD N. CAYNE, ESQ.
13      Arnold & Porter LLP
14      555 Twelfth Street, N.W.
15      Washington, D.C. 20004-1206
16      (202) 942-5656
17
18
19
20
21
22
23
24
25
26            SMUD v. US 3-29-05  Vol. 7       Page 1827
```

01828
```
1                      1828
2  APPEARANCES (Continued:)
3
4    ON BEHALF OF THE DEFENDANT:
5       ALAN J. LO RE, ESQ.
6       JOSHUA E. GARDNER, ESQ.
7       TODD J. COCHRAN, ESQ.
8       SCOTT DAMELIN, ESQ.
9       RUSSELL SHULTIS, ESQ.
10      ELIZABETH THOMAS, ESQ.
11      U.S. Department of Justice
12      1100 L Street, N.W.
13      Washington, D.C. 20036
14
15   ALSO PRESENT:
16      STEVEN M. COHN, ESQ.
17      STEVE J. REDEKER
18      THOMAS POLLOG
19
20   ***index appears at end of transcript***
21
22
23
24
25
26            SMUD v. US 3-29-05  Vol. 7       Page 1828
```

01829
```
1                      1829
2            P R O C E E D I N G S
3             - - - - -
4       THE COURT:  Let's go.
5   Whereupon--
6            DAVID ZABRANSKY
7  a witness, called for examination, having previously been
8  duly sworn, was examined and testified further as follows:
9            CROSS-EXAMINATION (Resumed)
10 BY MR. CAYNE:
11   Q.   Good morning, Mr. Zabransky.
12   A.   Good morning.
13   Q.   I'd like to turn your attention to
14 Plaintiff's Exhibit 121.  I believe that will be in
15 the first binder, one out of three.  Do you have that
16 document before you, sir?
17   A.   Yes, I see it.
18   Q.   And is this document a memorandum from you
19 to -- was this a memorandum from you, sir?
20   A.   It's an e-mail from me to Mr. -- I believe
21 it's Anke Piersma.
22   Q.   And who is that person?
23   A.   Mr. Piersma used to be with a group called
24 Public Citizen.
25   Q.   And there's also a CC?
26   A.   Yes.         SMUD v. US 3-29-05  Vol. 7       Page 1829
```

01913

1          1913

2    Q.   Were you, yourself, an official at the

3    Department of Energy at this time?

4    A.   I was an eight-month employee at the

5    Department of Energy, so, no, I was not an official

6    at the Department of Energy.

7    Q.   What was the basis for your opinion, sir?

8    A.   Because I felt they had an obligation

9    before I came to the Department of Energy and I saw

10   this as a way of trying to manage an obligation, if

11   you had an obligation and you had a question about

12   meeting it, you didn't make it bigger than you had

13   to.  Now, that's what I would have done, but that was

14   my opinion.

15   Q.   What do you mean you thought they had an

16   obligation before?  You felt they had what obligation

17   before?

18   A.   I think I testified yesterday that when I

19   was at Wisconsin Electric, we thought there was

20   a obligation on the part of the Department of Energy

21   to begin picking up fuel in 1998.

22   Q.   And at that time, did you believe the

23   obligation was at a level of 3000 MTU?

24   A.   No, I didn't.  I believe it was what we

25   signed up to in the DCSes, sir.

26   Q.   Sir, did you believe, back when you were at

SMUD v. US 3-29-05  Vol. 7                     Page 1913

01914

1          1914

2    Wisconsin Power, that a reasonable acceptance rate

3    would have been a rate that reflected the aggregate

4    rate of discharges of the industry, plus some amount

5    of work off?

6    A.   Absolutely.

7    Q.   And what does that mean, in your mind?

8    A.   What it equates to simply is about 3000

9    metric tons a year, sir, I believe that would have

10   been a reasonable acceptance rate.

11   Q.   So you believe that a reasonable acceptance

12   rate was 3000 MTU per year, correct?

13   A.   I believe that.

14   Q.   Thank you, sir.  And turning to transcript

15   page 4167, you indicated that you weren't sure

16   whether there were any other reasons, other than to

17   limit liability, that --

18        THE COURT:  Sustained.

19        MR. LO RE:  Thank you, Your Honor.

20   BY MR. CAYNE:

21   Q.   Mr. Zabransky --

22        THE COURT:  I don't see the word

23   "liability" anywhere on the page, counsel.

24   BY MR. CAYNE:

25   Q.   Mr. Zabransky, am I correct, and does this

26   transcript, particularly page 4167, refresh your

SMUD v. US 3-29-05  Vol. 7                     Page 1914

01915

1          1915

2    recollection that at the time of the Yankee trial,

3    you were unable to identify any reasons for the

4    Department's use of the acceptance chart in the 1995

5    ACR, other than constituting an effort to minimize

6    the Department's obligations?

7    A.   Again, that was my opinion.  I couldn't

8    recall any other specific reasons.

9        THE COURT:  I see you, Mr. Lo Re, do you

10   want to talk about something?  I mean, I think he

11   corrected his characterization of the witness'

12   testimony.  That was my problem.

13       MR. LO RE:  That's fine.

14       THE COURT:  Do you have an additional

15   problem?

16       MR. LO RE:  That's fine.  I am just going

17   to state for the record that I think we are passing

18   the refresh the witness' recollection.

19       THE COURT:  He's trying to impeach him, I

20   know that.

21       MR. LO RE:  Clearly, Your Honor.  Thank

22   you.

23       THE COURT:  I mean, typically, what you do

24   is, you know, is that you ask him what he knows.  If

25   he says he doesn't remember, then you read the

26   question and the answers as they appear in the

SMUD v. US 3-29-05  Vol. 7                     Page 1915

01916

1          1916

2    transcript, and you ask him, do you remember giving,

3    being asked that question and giving that answer?

4    You've kind of slopped over the formalities here.

5    But why don't you continue with your next question?

6        MR. CAYNE:  Thank you, Your Honor.  I'd

7    like to turn the witness' attention to Plaintiff's

8    Demonstrative number 33.  I'm going to put it on the

9    overhead.

10   BY MR. CAYNE:

11   Q.   Do you have that document, Mr. Zabransky?

12       THE COURT:  It's the big black binder.

13   It's the one that has the plastic.  That's the

14   acceptance rate announcements and teeny-weeny print

15   at the bottom.  Let me know if you can read it

16   because I can't.

17   BY MR. CAYNE:

18   Q.   Mr. Zabransky, do you have the exhibit in

19   front of you?

20   A.   Yes, I do.

21       THE COURT:  Do you have a magnifying glass?

22   I really cannot see the bottom print at all.  If you

23   don't, I'll bring one.  No, I've got glasses, that's

24   not the issue.  I read better with the glasses off.

25   For distance, it's fine.

26       MR. CAYNE:  I can read the entries into the

SMUD v. US 3-29-05  Vol. 7                     Page 1916