# John Arthur

# Plaintiff

00001

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

----------------------------------:

PACIFIC GAS & ELECTRIC COMPANY, :
:
Plaintiff, :
:
vs. : No. 04-074C into
: which has been
UNITED STATES OF AMERICA, : consolidated No.
: 04-075C
Defendant. :

----------------------------------:

Washington, D.C.

Thursday, September 22, 2005

Deposition of:

W. JOHN ARTHUR, III

called for oral examination by counsel for Plaintiff, pursuant to notice, at Greenberg, Traurig, L.L.P., 800 Connecticut Avenue, Northwest, Suite 500, Washington, D.C., before Shari R. Broussard, a Notary Public in and for the District of Columbia, beginning at 9:41 a.m., when were present on behalf of the respective parties:

MR. ELAM: Bobbie Elam, associate, Greenberg, Traurig.

BY MR. STOUCK:

Q And I'm Jerry Stouck also from Greenberg, Traurig.

Mr. Arthur, good morning. We met briefly before the deposition started and I want to welcome you to Washington and tell you that we very much appreciate your time today. I know you're a busy official with the Government and we do appreciate it.

A Thank you.

MR. STOUCK: Also, before we get started I wanted to say to Ms. Herrmann that you sent a letter to me a couple days ago taking some positions about what was or was not fair grounds here and asking for a response if I disagreed.

First of all, I was very busy the last couple of days, so I'm sorry I didn't respond before then, but I didn't want to, you know, get into the habit of always responding to those letters.



We don't agree with the positions that you took, but if we have some disputes about it here today, I'm sure we can find a way to resolve them. I'm sorry I didn't respond to you, but I just wanted to let you know that the lack of response from me did not indicate agreement necessarily with the contents of the letter.

MS. HERRMANN: Understood, and we can just see what happens.

BY MR. STOUCK:

Q Mr. Arthur, have you been deposed before?

A A number of years ago, yes.

Q How long ago?

A It's probably 15 or so.

Q Just once?

A Possibly twice. As I remember, it was one in two of my previous federal jobs.

Q Did those depositions have anything to do with the spent nuclear fuel program at the Department of Energy?

A No.

Q Have you testified at trial, in court?



A No.

Q You've testified, I see, at some Nuclear Waste Technical Review Board hearings; is that correct?

A That's correct, I've testified before that, as well as recently before Congressman Porter at the congressional committee.

Q Is that on one occasion?

A Yes, that's correct.

Q And that's the only time you've testified before Congress?

A I've supported testimony and answered questions but not as a direct witness.

Q In addition to those instances we've just both enumerated, is there any other testimony, sworn testimony that you've given to any body, administrative body, court or Nuclear Regulatory Commission, or any lawyer that you can recall?

A Not that I'm recalling.

Q What is your title again?

A I'm a Deputy Director for Office of Repository Development.



Q When were you appointed that position?

A December of -- let's see -- 2002.

Q By whom?

A It's not an appointment. I'm actually a career federal employee, so I reported to Dr. Margaret Chu, who was the Director of OCRWM.

Q Did she select you for your current position?

A That is correct.

Q You're the head of the Office of Repository Development; is that correct?

A That's correct.

Q How many DOE employees are in that office?

A Approximately 95.

Q And what's the annual budget of the office?

A Our budget --

Q Approximate.

A The total program budget -- of the total program budget we have approximately $450 million.

Q And can you list the principal two or

# Plaintiff

Page 10

three contractors that work for your office?
A Principal contractors directly to the Department of Energy are Bechtel SAIC, which is a management and operating contractor, we have Booz Allen Hamilton, which is a technical assistance contractor, and then we additionally have one other firm, Navarro Consulting, which provides quality assurance support.
Q And what are the principal responsibilities of the office?
A Of my DOE office?
Q Yes.
A Principal responsibilities, I'm accountable for, first of all, performance -- head of contracting authority for the Office of Civilian Radioactive Waste Management. Our office is accountable for development and preparation of a license application for the repository. We're accountable for License Support Network, development and certification, and then oversight to the contractors that are doing all of our engineering, design and other planning.

Page 11

Q Engineering and design for the repository?
A Right, long-term planning, yes.
Q The engineering and design of the repository that your office is responsible for would include both surface and underground facilities or portions of the repository project?
A Correct, everything that's required for -- in support of the license application.
Q That's your office. What about your personal responsibilities? What do you do?
A My personal responsibilities, I am the certifying official for the License Support Network, I'm accountable for the management administration of our overall office, as I mentioned earlier, I am the head of contracting authority for the Office of Civilian Radioactive Waste Management, and then I oversee and supervise a number of our senior executives and senior officials.
Q You are familiar with the Department's current plans for design of the repository

Page 12

facility?
A That is correct.
Q Are you familiar with the history of plans for the repository design, the Department's plans for repository design?
A Not the total history. More recent during my tenure I'm aware of some of the transitions we made.
Q Which, again, your tenure started when? I'm sorry.
A December of 2002.
Q And with respect to design of the repository facilities, and when I say "design" of the facilities, I'm including both surface and underground, what's the major activity that's happening right now? What is going on with the repository design, you know, today, this month, this quarter?
A We're continuing to develop our -- mature our design in support of a license application for all of our surface facilities, both the nuclear facilities as well as all the nonnuclear and

Page 13

support facilities. We're continuing all of our work to mature the subsurface design, all of the underground aspects, as well as a continuation of development of the prototype for the actual waste package container and its design also.
Q Would you say that the design of the surface facilities is substantially complete?
A No.
Q Would you say that the design of the underground facilities is substantially complete?
A The design of -- first of all, I would say no, it is not substantially complete. It is more mature, developed further than the actual surface facilities.
Q Okay.
A But none of those are yet nearing any final design aspects.
Q Why -- well, before I come back to why the underground is ahead of surface, on a scale of one to a hundred with respect to the surface facilities where zero is no design, a blank piece of paper on a drawing board, and a hundred is the

# Defendant

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

PACIFIC GAS & ELECTRIC COMPANY,

Plaintiff,

vs.

UNITED STATES OF AMERICA,

Defendant.

No. 04-074C into which has been consolidated No. 04-075C

Washington, D.C.

Thursday, September 22, 2005

Deposition of:

W. JOHN ARTHUR, III

called for oral examination by counsel for Plaintiff, pursuant to notice, at Greenberg, Traurig, L.L.P., 800 Connecticut Avenue, Northwest, Suite 500, Washington, D.C., before Shari R. Broussard, a Notary Public in and for the District of Columbia, beginning at 9:41 a.m., when were present on behalf of the respective parties:

Page 78

Q The facility is being designed to accommodate the different casks that may be involved; is that correct?
MS. HERRMANN: Objection. Vague.
BY MR. STOUCK:
Q I'm not asking about his testimony. Again, this is just sort of a predicate. I'm not asking what he said, I'm asking what you think. I just want to be clear about that. I'm really not asking you what he said.
A I'm going to answer again. I think I've tried to answer that before. In the materials that are received in the repository, and that's what we're covering under the license application, that's my area of responsibility, as received at the repository by train or truck, I'm dealing in these various facilities we can talk about to be able to handle the various spent nuclear fuel, DOE materials, and Naval reactors materials.
Q Commercial spent nuclear fuel in your last answer?
A Correct.

Page 79

Q Let me just ask a more specific question again without regard to this transcript.
A Uh-huh.
Q Do you understand what a dual-purpose cask is, a dual-purpose container for spent nuclear fuel in a commercial reactor?
A Somewhat. I've heard the terminology used quite a bit.
Q What is a dual-purpose container?
A As I understand in interpretations I've heard, it means for storage as well as transportation.
Q Do you understand the distinction or do you have an understanding -- I'm not asking you to be an expert on this. Do you have an understanding of the difference, with respect to a dual-purpose container, between a canister and a cask?
A I'm not an expert in that particular area.
Q Do you have any understanding of that difference?
A Define cask.

Page 80

Q Well, cask, transportation cask or storage cask. My understanding is that the canister is the internal basket that holds the assembly.
A Right.
Q That's your understanding?
A That's correct.
Q Certainly I realize you're not an expert. And then there could be a storage overpack which would be called a cask --
A Right.
Q -- or a transportation --
A Transportation cask.
Q Let's go with that terminology recognizing you're not an expert.
Do you know whether the surface facilities at the repository are being designed to accommodate all of the different canisters in use that might come from different commercial nuclear reactors around the country?
MS. HERRMANN: Objection. Vague.
THE WITNESS: Again, now, within the

Page 81

areas of planning our license application, now that's the area -- basis I'm speaking to you today, on our design supporting that, our current plans are for the materials in canisters and the various fuels received at the repository to have varying facilities to deal with that through a number of three different nuclear facilities I'll talk about.
BY MR. STOUCK:
Q So the design objective is to accommodate all of the different canisters that are in use at commercial nuclear reactors; is that correct?
MS. HERRMANN: Objection. Vague, asked and answered.
THE WITNESS: I'm going to redefine that for the requirements that I have in our OCRWM requirements document, that's the area I'm dealing with in the license application. I do not deal in standard contracts and other key areas, so I'm talking from as received at the repository.
BY MR. STOUCK:
Q And the answer is yes from that perspective?

Page 82

MS. HERRMANN: Objection. Vague.
BY MR. STOUCK:
Q Do you want to know the question again?
A Right.
Q I'm just asking you about design, repository design. That's your job; is that correct?
A I mean "all" is a very broad term is what I want to make real clear.
Q Excuse me?
A You're using the term "all" a lot and what I'm saying is as I receive it in the repository, we will have the facilities to deal with that, be it normal or off-normal type fuel, so --
Q In canisters?
A In varying types of canisters. But when you say "all," I'm not going to speculate on the definition -- your definition of "all."
Q I really want to find out what you're telling me, which is there might be some kind of canister in use out there that for whatever reason

Page 83

does not fit within the design parameters of the facility and so you don't want to be here saying all, all, all, but certainly most, and the great majority of canisters in use, the design objectives of the facility are to accommodate the great majority of canisters in use at commercial nuclear reactors; is that correct?
MS. HERRMANN: Objection. Vague.
THE WITNESS: That is correct.
BY MR. STOUCK:
Q As well as bare fuel?
MS. HERRMANN: Same objection.
THE WITNESS: We will have capabilities that deal with the bare fuel at our facility.
BY MR. STOUCK:
Q And I do appreciate, you know, this is a, by its nature, this is a place where we need to be as, you know, careful and precise as possible, so I absolutely encourage that and that's what I want from you.
Turn to page 86, please, of this transcript. Mr. Richard Craun is speaking at least

Page 84

according to the transcript, is that correct, on line four. Do you see that?
A Rick Craun, yes.
Q What is his position, Mr. Arthur?
A Rick is, as I mentioned earlier, is the acting manager in our Office of Project Management & Engineering.
Q And, again, let me ask the question and then you can look at whatever additional portions of this you want. Let me ask the question then. I want to read starting on page nine, "At this point in time the surface facilities are designed, the dry transfer facility specifically has a design feature to allow us to, if received, to cut those canisters open and offload that fuel assembly by assembly." Do you see that?
A I do.
Q Have I read it correctly?
A You've read it correctly.
Q Now, my question for you is, is that true with respect to canisters from commercial utilities?

Page 85

MS. HERRMANN: Objection. Vague.
THE WITNESS: Just let me clarify your question. Can our dry transfer facility have the capability to cut canisters?
BY MR. STOUCK:
Q Yeah.
A The basic planning we are implementing now is to have that done in that facility.
Q Canisters generally including Navy, DOE, and commercial canisters; is that correct?
A Currently it's not our plan to cut or remove Navy canisters but other canisters will have that capability as required in a dry transfer facility.
Q Including commercial canisters?
A That capability will be there.
Q Thank you.
I appreciate that, but just that raises a question for me at the bottom on page 22 where Mr. -- is it Crown or Craun?
A Craun.
Q -- Craun says, "The canister handling

# Plaintiff

Page 94

waste -- the title of that is "Waste Forms and Waste Packages." Do you see that?

A Yes, I do.

Q And in the bottom right it says it's not to scale and, in any event, I certainly assume you're not an expert on these casks either, but is it fair, I mean, to say, you know, picking up on the discussion we had about the transcript, this portrays the various kinds of canisters and other containers and bare fuel that the repository is being designed to accept; is that correct?

MS. HERRMANN: Objection. Foundation and speculation.

THE WITNESS: In the context it's used here it just shows the various array of containers and casks and canisters that are either currently or plan to be in use.

BY MR. STOUCK:

Q And accepted at the repository? I mean without necessarily pinning you down, I appreciate, you know, maybe there's one here that for some reason won't be, but in general --

Page 95

A In general, that's correct.

Q Including commercial SNF canisters, of course, as the label indicates?

MS. HERRMANN: Same objections.

THE WITNESS: As I mentioned earlier several times, it is our plan to handle, including canisters, as received at the repository.

BY MR. STOUCK:

Q Thank you.

Including commercial SNF canisters?

MS. HERRMANN: I'm going to say objection, asked and answered and also vague.

THE WITNESS: The answer is yes.

BY MR. STOUCK:

Q Thanks a lot.

Let's see where I want to go now. Well, this presentation, according to my associate, is on the OCRWM Web site. Do you know that?

A I know we have a Web site. I don't look at it on a regular basis. I have people that manage that for me.

Q You have no reason to doubt what my

Page 96

associate is telling me?

A If you got it there, I trust your judgment.

Q So these kinds of things are publicly available; would you agree with that?

MS. HERRMANN: Objection. Foundation, speculation.

THE WITNESS: I'm taking your statement that you got that off our Web site.

BY MR. STOUCK:

Q Well, I mean do you know?

A Do I --

Q If presentations are made to the Nuclear Waste Technical Review Board, materials like this that we just discussed are typically, maybe there are a few exceptions, but typically available to the public?

A Most all of our presentations in total for this project that are made in public forums are posted on our Web site. We try to make the public aware of public presentations.

Q Thank you.

Page 97

Let's go to a different exhibit. I'm going to copy Alan at the very beginning and give the wrong impression and take my jacket off, but please do so. I should have offered you to do it sooner.

Do you know, Mr. Arthur, whether as part of the planning for the Yucca Mountain facility and program that's being managed by the people on Exhibit 1 at the senior level, you know, among other people, as part of the planning for the repository and the program, the Department of Energy, OCRWM is doing anything -- I'm just keeping it broad initially to find out if you know -- doing anything to encourage utilities that do put their fuel into canisters, into dry storage canisters, to document the contents of the canisters? Are you familiar at all with that or do you know whether anything of that nature is going on?

MS. HERRMANN: Objection.

BY MR. STOUCK:

Q Even if it's not directly under your -- you know, it may be someone else's responsibility,

# Defendant

but I'm just asking you if you have any understanding of whether that's going on.

MS. HERRMANN: Objection. Foundation, vague.

THE WITNESS: The understanding I have is, as I said earlier, my responsibility is not in the interface, you know, on waste acceptance and dealing with the standard contract with the utilities. That occurs under Chris Kouts' office.

I do understand that we have various databases on materials that are available and that's about my extent of knowledge on it.

Again, mostly, I want to reaffirm, I've said several times today, my dealings come with what we have in the license application and what will be received at the repository.

BY MR. STOUCK:

Q Right. So I just want to understand that a little more. I know you've said that several times.

What you're telling me with respect to the received at the repository part is that you



have no responsibility for what is going to be received at the repository or, for example, the schedule? I mean that's, you know, it's obvious that's an issue. You know, who's coming first, who's coming second or any other aspect of how it's going to get there you don't have responsibility for; your job is when it gets there, what are we going to do with it?

A That's correct, and the only additional statement I make on that, we will be required in our license application to document types of materials and do the necessary safety analysis, but I do not deal on that front end of waste acceptance.

Q Right, I understand that and I don't intend to ask you about things that -- well, you know, there's a difference between being responsible for something or having any understanding of it.

A Right.

Q So I guess does the license application -- let me just put it that way, you've



emphasized that as one of the focuses of your attention -- does the license application deal with this question at all of what's inside canisters that may show up at the facility?

MS. HERRMANN: Objection. Vague.

THE WITNESS: It is true. I mean our license application, we have to -- we're going to deal with a large number of bare fuel assemblies, so in our safety analysis we have to have various knowledge of the characteristics in order to do the safety analysis and proper facility design.

BY MR. STOUCK:

Q Some of these canisters are welded shut, do you know that, what I'm talking about?

A I'm aware of that.

Q Is it your understanding that whatever knowledge OCRWM needs or wants of the content of those sealed canisters, welded canisters, in terms of how many assemblies, characteristics of the assemblies, whatever knowledge OCRWM needs or wants about the content of those sealed canisters is available or will be available to OCRWM through



this database or some database that you referenced before? Is that a general understanding that you have?

MS. HERRMANN: Objection. Foundation, speculation.

THE WITNESS: From my particular perspective right now I do have the necessary information I need on the contents of that because we are performing our preclosure safety analysis, so I have the adequate information. I'm not aware of the particular source where it comes from.

BY MR. STOUCK:

Q Okay. That was my next question.

What about internally? How do you know you have the information you need, just to be clear, about the content of sealed canisters that may be coming into the facility? You say you have the knowledge you need about that.

A Our preclosure safety analysis, and I don't think I earlier said today what that is.

Q Okay. That might be helpful.

A That is for the operating life of the

# Plaintiff

Page 102

repository, the safety analysis versus the longer term postclosure, which is the 10,000 year plus time frame.

We do right now have adequate information on the source terms, types of materials because we are performing that analysis. Now, I have experts below me that know exactly what documents it came from, but we are doing our safety analysis, including dealing with a large amount of bare fuel.

Q And canister fuel?

A That material will be received in canisters and that material will be removed, bare fuel will be removed from the canisters.

Q I just want to make sure I understand what you're saying. I don't know that I do, so I'm not trying to -- I thought you said that you have or your office has the information that you need at present about the characteristics of spent nuclear fuel that may come to the repository in sealed canisters. Is that what you said to me?

A My answer to you earlier was that we do have adequate information now to document the

Page 103

necessary information for our preclosure safety analysis. To do that I have to have knowledge of characteristics of the various fuel assemblies since we're actually going to be removing them from those canisters and placing them into a waste package. My technical baseline currently doesn't show disposal of canisters other than our DOE and Navy canisters.

Q And that information that you have enough of for purposes of your postclosure safety analysis, does it or does it not include information about the content of sealed canisters that may come to the repository from commercial utilities?

A It's the same question as earlier. I haven't changed my answer. We are doing our analysis, so I have experts below me who can verify the specifics. But I believe we have adequate information right now because we're going to have to deal with it in a bare fuel capacity.

Q Again, forgive me, you know, lawyers have a way of making distinctions about things and I

Page 104

just want to make sure that the answer you just gave me includes information about the content of sealed canisters that may come to the repository from commercial reactors. Does it?

MS. HERRMANN: I think he's answered the question several times.

THE WITNESS: Yes, it does.

BY MR. STOUCK:

Q Thank you. I appreciate that.

But you yourself don't know where that information would come from?

A I don't get into the level of that particular detail.

Q But you do understand, I take it, that I believe it would be kind of a logical implication of that, that somewhere in OCRWM, somewhere in the Department there is information about the content of sealed canisters that may come from commercial reactors; is that correct?

MS. HERRMANN: Objection. Foundation, speculation.

THE WITNESS: Again, I don't know the

Page 105

source of who receives it, where it comes from. I operate based on requirements that come down from the Level 1 OCRWM requirements document to me.

BY MR. STOUCK:

Q But someone has that information; is that correct?

MS. HERRMANN: Same objection.

THE WITNESS: I deal with those requirements that come down to me and that's how we translate it through the contract and our license application.

BY MR. STOUCK:

Q Do you know whether or not somewhere in OCRWM, somewhere, I'm not asking where, do you know whether or not somewhere in OCRWM there is information about the content of sealed canisters that may come to the repository from commercial reactors?

MS. HERRMANN: Same objections.

THE WITNESS: I'm just not aware of where it is specifically. We have a number of databasees and I don't get into that level of detail.

# Defendant

Page 114

earlier, it would be in our office of either systems analysis or you might go back to the author, to Ronald. I'm just not engaged in that level of detail today.

BY MR. STOUCK:

Q That's fine. I appreciate it.

And, again, just also if you recall, I previously asked you whether you were aware of any efforts that OCRWM was taking to -- please read. I don't mean to interrupt you. Let me know when you're ready for another question.

A That's fine.

Q Remember I asked you prior to looking at this document whether you knew whether OCRWM is doing anything today to give guidance to the utilities about how they should document or whether they should document the content, in other words, the characteristics, identity of assemblies that they put inside sealed canisters? Do you remember that question or those questions?

A Yes, I do.

Q Well, now let me ask you having looked at

Page 115

this, does this refresh any recollection or bring to your mind any awareness at all of similar activity that may be going on today to encourage utilities or ask them to do something with respect to documentation of the content of their dry storage canisters?

MS. HERRMANN: Objection. Foundation, speculation.

THE WITNESS: And the document you gave me I've read about a page or a paragraph thus far, so having not read the rest, I mean the only area I want to clarify is, as I mentioned earlier today about failed fuel and bare fuel having the right facilities to deal with various areas.

Right now we have a keen interest on any failed fuel or damaged fuel to make sure we have the right facilities to deal with that at Yucca Mountain, so we are trying to determine certain information on that. But how that's being gathered I don't know. I just want to clarify that.

BY MR. STOUCK:

Q With respect to intact fuel, for example,

Page 116

or other waste?

A Right.

Q No, that's good. I appreciate that and that's actually a good segue into what may be, I hope probably will be but no guarantees, the last exhibit before lunch. So let's see if we can make that happen. Let's try to keep this in order.

I'm going to show you a document that relates to failed fuel. So as a predicate to that, Mr. Arthur, can you tell me generally why it is that at the present time there is this interest in failed fuel?

A First of all, our interest right now on the failed fuel has to deal with, and in my definition I mean the failed fuel would be fuel that the cladding is damaged, where also, as we've been made aware over the last year, there could be small pinhole leaks that actually get oxidized under higher temperatures. And most of the interest there, as I talked about earlier, are in that particular area right now and so that's where we have a lot of interest, because we have recent

Page 117

reports that have been brought to our attention that show at higher temperatures various pinhole leaks get oxidized and that could be issues for us in a hot cell, especially when we're dealing with large volumes of fuel assemblies. So we're working that right now. That's one of the areas I talked about our design where we're making some modifications.

Q Can you be more specific about the identity of one or more reports that speak to this issue, you know, who prepared it, dates?

A Couple areas and I have to follow-up on specifics, but these are reports I believe we've made public and in the program. There was one that was done by our contractor, Bechtel SAIC, back in the March 2005 time frame that actually took some earlier reports -- you need to go over that to get the references on them.

Q Yeah.

A It will give you a chain of documents -- that actually showed this to be an issue and so that's what's causing some of the design

Page 118

modifications and evaluations that we're currently doing.

Q Was there any study, you know, subsequent to, you know, additional analysis of the issue or the problem subsequent to the March '05 Bechtel SAIC study?

A There's been a lot of evaluation after that study, I mean internal reviews to make sure that we're knowledgable that our facilities can accommodate the various bare fuel assemblies we're going to have to deal with.

Q Is it true that one of the things that came to light in connection with that study was that there may be pinhole leaks that are present in fuel arriving at the repository that cannot or have not been detected in advance? Is that one of the issues?

A That is one of the possible issues. We still don't have the full knowledge of whether that's correct or not, but we're trying to get the necessary information.

Q But the study you referenced suggested

Page 119

that may be the case?

A That is correct.

Q And prompted further analysis of the issue?

A That's correct. And I might add on that that it's a very small amount of the overall. If you look at our life-cycle projections of the repository, we're talking about 225,000 assemblies that could be handled in bare fuel. We're talking probably less than 5,000 that could have this particular condition.

Q Assume it turns out to be true, this pinhole leak issue, what kinds of modifications to the facility might then, you know, what are you looking at to sort of deal with it?

A The first of our goal is to know ahead of time versus opening one and having that issue. So as much knowledge as we have on the front end prior to receipt, that's important to us and we want to be able to deal with that particular fuel, be it 4,000 assemblies, 2,000 or 5,000 in what I call an off-normal condition, so we would have a regular

Page 120

routine operation that most of those facilities deal with.

In these particular areas it may require us to inert with a particular gas like nitrogen the particular hot cell we're actually going to deal with these in order to prevent that oxidation. So that's why it's very important for us to have that kind of knowledge.

Q Are those design modifications going to be made before the license application is submitted?

A We're currently -- the contractor, Bechtel SAIC, has recently provided a proposal of new information to me. My staff is currently addressing that. We have started some efforts to be ready to deal with that particular issue.

Q So your current plan is to try to work this into the license application?

A That is correct.

Q Also in your prior answer, you can look at it if you want, but, you know, modern technology, the reporter here is taking down, as

Page 121

you know, everything that's being said and we've got this gizmo that puts it right up on my screen and so I can see what at least she thinks you said. Your answer was "The first of our goal is to know ahead of time versus opening one and having that issue, so as much knowledge as we have on the front end prior to" -- opening one. I took you to be referring to one of these sealed canisters that I've mentioned; is that right?

A When we open a canister, that's correct, that we want to have as much knowledge on the beginning and the basis I go back with is the good knowledge of what's going on over in Cogema in LaHague, France. They've dealt with about, and this is referenced in some reports, about a third or 25 percent of what our repository will deal with on their fuel capability. They have very good knowledge of what that material is if it's damaged and it's handled in a particular manner, so they know when they receive it at LaHague, and we're trying to follow a similar process here, to know ahead of time so we don't open one or remove a fuel

# Plaintiff

Page 118

modifications and evaluations that we're currently doing.

Q Was there any study, you know, subsequent to, you know, additional analysis of the issue or the problem subsequent to the March '05 Bechtel SAIC study?

A There's been a lot of evaluation after that study, I mean internal reviews to make sure that we're knowledgable that our facilities can accommodate the various bare fuel assemblies we're going to have to deal with.

Q Is it true that one of the things that came to light in connection with that study was that there may be pinhole leaks that are present in fuel arriving at the repository that cannot or have not been detected in advance? Is that one of the issues?

A That is one of the possible issues. We still don't have the full knowledge of whether that's correct or not, but we're trying to get the necessary information.

Q But the study you referenced suggested

Page 119

that may be the case?

A That is correct.

Q And prompted further analysis of the issue?

A That's correct. And I might add on that that it's a very small amount of the overall. If you look at our life-cycle projections of the repository, we're talking about 225,000 assemblies that could be handled in bare fuel. We're talking probably less than 5,000 that could have this particular condition.

Q Assume it turns out to be true, this pinhole leak issue, what kinds of modifications to the facility might then, you know, what are you looking at to sort of deal with it?

A The first of our goal is to know ahead of time versus opening one and having that issue. So as much knowledge as we have on the front end prior to receipt, that's important to us and we want to be able to deal with that particular fuel, be it 4,000 assemblies, 2,000 or 5,000 in what I call an off-normal condition, so we would have a regular

Page 120

routine operation that most of those facilities deal with.

In these particular areas it may require us to inert with a particular gas like nitrogen the particular hot cell we're actually going to deal with these in order to prevent that oxidation. So that's why it's very important for us to have that kind of knowledge.

Q Are those design modifications going to be made before the license application is submitted?

A We're currently -- the contractor, Bechtel SAIC, has recently provided a proposal of new information to me. My staff is currently addressing that. We have started some efforts to be ready to deal with that particular issue.

Q So your current plan is to try to work this into the license application?

A That is correct.

Q Also in your prior answer, you can look at it if you want, but, you know, modern technology, the reporter here is taking down, as

Page 121

you know, everything that's being said and we've got this gizmo that puts it right up on my screen and so I can see what at least she thinks you said. Your answer was "The first of our goal is to know ahead of time versus opening one and having that issue, so as much knowledge as we have on the front end prior to" -- opening one. I took you to be referring to one of these sealed canisters that I've mentioned; is that right?

A When we open a canister, that's correct, that we want to have as much knowledge on the beginning and the basis I go back with is the good knowledge of what's going on over in Cogema in LaHague, France. They've dealt with about, and this is referenced in some reports, about a third or 25 percent of what our repository will deal with on their fuel capability. They have very good knowledge of what that material is if it's damaged and it's handled in a particular manner, so they know when they receive it at LaHague, and we're trying to follow a similar process here, to know ahead of time so we don't open one or remove a fuel

00120

routine operation that most of those facilities deal with.

In these particular areas it may require us to inert with a particular gas like nitrogen the particular hot cell we're actually going to deal with these in order to prevent that oxidation. So that's why it's very important for us to have that kind of knowledge.

Q Are those design modifications going to be made before the license application is submitted?

A We're currently -- the contractor, Bechtel SAIC, has recently provided a proposal of new information to me. My staff is currently addressing that. We have started some efforts to be ready to deal with that particular issue.

Q So your current plan is to try to work this into the license application?

A That is correct.

Q Also in your prior answer, you can look at it if you want, but, you know, modern technology, the reporter here is taking down, as

# Defendant

Page 122

assembly and have an issue in our hot cell. That's why we're trying to apply the necessary safety mitigations.

Q Open one, again, I think that's great and I'm glad you're doing it, but open one meaning open a canister?

A A bare fuel assembly, a canister be opened, that's correct.

Q Either one?

A That's the only way you're going to get the bare fuel, is to open the canister.

Q And so, again, at kind of a high level, is it generally the intent of the current surface design to deal with the fuel, aside from Navy fuel, to deal with commercial and DOE fuel there in some fashion?

A I've answered this earlier. Let me go back and make sure we're clear on this. It's not our intent to open Navy canisters. They come in and are used as is.

Q Okay. Got it.

A The Department of Energy, the high-level

Page 123

waste, we believe those canisters will be placed in a waste package. For the spent nuclear fuel our current technical basis -- baseline shows it will actually remove that material from the canister and actually place it into the waste package, so because of that is why our knowledge of that -- any damaged fuel is very important.

Q I appreciate that and, again, when you say "spent nuclear fuel" in your last answer, you mean commercial spent nuclear fuel; is that correct?

A That's correct.

Q Let's try one more exhibit.

(Arthur Exhibit Number 5 was marked for identification.)

BY MR. STOUCK:

Q Mr. Arthur, you've been handed what has been marked as Exhibit Number 5 to this deposition. It is an almost three-quarter inch sheet of papers with the title "Commercial Spent Nuclear Fuel Handling in Air Study" dated March 2005, prepared for U.S. Department of Energy, Office of Civilian

Page 124

Radioactive Waste Management by Bechtel SAIC Company, L.L.C. Do you see that?

A Yes, I do.

Q That's what you have?

A Yes.

Q Is this the ~~study that~~ you're referring to?

A It is.

Q I mean assuming it's a complete copy?

A (Nodding.)

Q No tricks in this deposition.

This study was authorized by the Department of Energy; is that correct?

A It is correct. I issued what we call a technical direction letter to Bechtel SAIC I believe it was October 29th of 2004 to look at this kind of issue.

Q You yourself did that?

A Yes, I did. I believe I signed it. It's either me or my contracting officer.

Q And it was at your direction?

A Based on I or my staff's evaluation,

Page 125

Department of Energy's direction.

Q And is there something or some set of things that prompted your staff and your office and you to believe that this study should be commissioned and undertaken?

A What drove us to issue that letter in October, and I think there's a series of events even before that, was knowledge that in high temperature conditions there were certain evidence out there and information that various pinhole -- very small holes through the cladding could create oxidation at high temperature, so that's what drove us to direct Bechtel SAIC to do an evaluation.

Q Do you know how or where or when that information came in? Was this something that came from Cogema, for example, or do you know?

A I'm not aware of the source, but we do have a trail of documents that are available to look at that. It's been underway. I mean this discussion has occurred for a little over a year now.

Q This trail of documents that you just

# Plaintiff

Page 134

stamp on and take the stamp off?
A She does have the authority. She's a derivative classifier for our office, so she has the capability to do that.
Q Does she need any approval from a higher level to do that?
A I'm not aware that she does.
Q So you would expect that she probably did both of these things on her own, maybe she consulted with some people, but she was the one who took this off?
MS. HERRMANN: Objection. Foundation, speculation.
THE WITNESS: Again, that's her signature there, so --
BY MR. STOUCK:
Q So yes?
A Yes.
Q Have you read this report?
A I have read it one time. I'm not a technical expert at all on this. I have a list of people who prepared it that are, but I am aware of

Page 135

this report.
Q Well, I promise you I won't ask you about a lot of things, but one thing I promise I won't ask you about is the mathematical formulas that are throughout this thing that apparently have something to do with -- I don't know what they have to do with, physics, but I do have some questions for you.
You read it and there are people in your organization that if you had a question about something in here, you -- who would you go to? I mean if you really wanted to understand some of the details of this, you know, who would you rely on?
A For the specifics on this report I'd go back actually to my senior staff, Rick Craun or Paul Harrington, or more specifically the individuals that prepared it that are listed on page -- I guess it's not a page number but the signatures on file page there, page three.
Q Right, and those are Bechtel people or are they?
A I'm looking down. You have -- most all

Page 136

of them are Bechtel people as I understand except for the D. Equilbec, I'll give you the spelling on, who's with Cogema. He's one of the subcontractors I mentioned earlier.
Q Okay. I think it's obvious to me from this study, but let me just ask, I mean the existence of this study makes clear that some amount of the spent nuclear fuel that arrives at the Yucca Mountain repository will be failed fuel or damaged fuel, as defined in here; is that right?
A That's correct, as listed in the first paragraph of the executive summary.
Q The first paragraph says about 4 percent, something like that. It doesn't say it quite that way, but it says it in a backwards way; is that right?
MS. HERRMANN: Objection to the characterization of the document.
THE WITNESS: Let's clarify what the report says.
BY MR. STOUCK:
Q Sure.

Page 137

A It says that 96 percent, again I'm just reading what's written here, it's estimated that 96 percent of the commercial fuel assemblies will have intact cladding and should not experience fuel oxidation. The balance of the assemblies would have varying amounts of damage.
Q. Okay.
A Which a small percent could have about four-tenths of a percent and that's where I derived the number, as I said earlier, about 4 to 5,000 out of 225,000.
Q And that number, though, those assemblies that you just referred to, are those the ones with the, I'll call them, see if you understand this, the invisible pinhole leaks, the pinhole leaks that can't be detected? Is that that category?
A That's in this report that we're talking about. That small percentage are the ones that potentially have an issue that could cause that oxidation that I discussed earlier.
Q And that issue is kind of the focus or at least one of the principal focuses of this study?

# Plaintiff

Page 194

is a presidentially-appointed board that advises Secretary of Energy and Congress on the Yucca Mountain project. So one is more geared at DOE and the other is geared at NRC.

BY MR. STOUCK:

Q Back to this Exhibit Number 8, please, just on page 32. This is not your presentation, but some of this material we've covered to some extent before, although it was a meeting almost two years later I think, so I just want to make sure that we also touch on some of this stuff in the January 2003 time frame.

If you look at the table of contents on page three, Mr. Williams, Jeff Williams is giving a part of the program that's titled on the table of contents "Operating the Waste Management System (waste acceptance, packaging, transportation, repackaging, emplacement)." Do you see that? Have you looked at that?

A On page 32, uh-huh.

Q Take a look at page three --

A Oh, three. I'm sorry.

Page 195

Q -- for a second. I'm going to ask you a question on page 32, but I'm just trying to orient you.

A All right. I'm with you.

Q It says there the title of Mr. Williams' talk. Do you see that?

A Yes, I do.

Q I'm sorry for going back and forth.

Now, where does Mr. Williams fit in, or where did he at that time, in the organization, if you know?

A It was January 2003 and I know he was working under, you know, Ted Garrish in Washington. I can't recall whether it was -- we can go back to an organizational chart at the time, but he was involved in the waste management aspects that currently are held by Chris Kouts.

Q Thank you.

Now let's go back to page 32. On line 18 he's referring to a slide that's apparently part of a presentation that I guess, I imagine, would be part of your package since you have the exhibits.

Page 196

Do you see that, "The next slide"?

A Yes, I do.

Q And then there's a reference to the standard contract, but what I'm interested in for now is on line 22. It says, "There's no other facility that's out there that's planning to pick up failed fuel. There's no failed fuel repository. We're it." And that is certainly true today, I mean that's consistent with some of the things we've talked about earlier, right?

MS. HERRMANN: Objection. Calls for a legal conclusion.

THE WITNESS: Well, I understand the statement. As I said earlier, our basic intent is to receive and deal with those materials that were received at the repository, so in that context I agree with the statement.

BY MR. STOUCK:

Q What about --

A I'm going to clarify something because you started -- let's go back one time. You started that last question at line 22, "There's no other

Page 197

facility"?

Q Yes.

A You know, my point in agreeing with that part of the statement is, you know, as I mentioned in my last response, but I'm not aware of what other facilities are out there that are dealing with failed fuel. I believe some utilities are probably dealing with that every day, so I'm not going to comment on that first sentence. But the last one, our goal is to try to receive and deal with those materials that are shipped to Yucca Mountain.

Q And there's certainly no other failed fuel repository for commercial fuel anyway, in terms of the repository, that is consistent with disposal?

A There's only one repository.

Q I don't want to belabor that too much, but there is another question I have for you which sort of sets off -- let me find it.

There's a document that has a title something like -- it has requirements in the title.

# Plaintiff

Page 202

said "legal weight equivalent."
MR. STOUCK: Thank you.
MS. HERRMANN: You're welcome.
BY MR. STOUCK:
Q That last long sentence that apparently I misread one word of, is that still the planning objective for the repository facility today?
A That's a broad statement and I can't say that word for word that's exactly what our performance objective is for a repository.
As we said earlier, multiple-purpose canisters do not exist, so I'm trying to look -- I mean broadly we have acceptance capability as broad as possible and I can't say verbatim that matches up to my current requirements document. I believe we'll be looking at that a little later.
Q But in general would you agree with the statement that Mr. Williams made here?
MS. HERRMANN: Objection. Vague.
BY MR. STOUCK:
Q I mean, again, I'm not going to come back -- there may be one kind of cask that you

Page 203

can't quite accommodate, but in general is it a planning objective for the repository facility and repository operations to have flexibility to receive by multiple modes of transportation and to receive any or almost any of the different casks that exist or may be developed from commercial utilities?
MS. HERRMANN: Objection. Vague.
THE WITNESS: In the broad context it's correct, we want to be flexible in both transportation and receiving.
BY MR. STOUCK:
Q Flexible and comprehensive; would you agree with that?
MS. HERRMANN: Objection. Vague.
BY MR. STOUCK:
Q Comprehensive in your ability to receive by different modes of transportation and different types of canisters?
A Right, as long as, again, as it's within the bounds of our license application specifications, that's correct.

Page 204

Q But your license application is being designed to provide for this flexibility in terms of transportation mode and comprehensiveness of acceptance of different kinds of canisters, correct?
A That is correct.
Q And one example of that, I mean see if you agree with this, the South Texas Long Fuel -- do you know what that is?
A I've heard of it. I'm not an expert on that particular cask.
Q But apparently, as I understand it, there's something that's a little bit distinctive about the fuel from that one facility. Is that generally your understanding?
A I'm not specifically aware of that.
Q You're not aware of that?
A Right.
Q I mean what do you think is meant by the inclusion of the South Texas Long Fuel transportation cask?
A We'd have to ask --

Page 205

MS. HERRMANN: Objection. Foundation, speculation. Go ahead.
THE WITNESS: I'd have to ask Jeff Williams. He made the statement. Then, as I say, I go back to the original statement we're trying to build a license application with broad flexibility, but I'm not the one to comment on the South Texas Long Gas.
BY MR. STOUCK:
Q That's fine and, again, I would expect, see if you agree with this, that the reason for that is that there's a number of different kinds of canisters out there and the fundamental mission is to, you know, accept spent fuel from all these different commercial facilities? Is that why you're trying to be broad and as comprehensive as possible in your plan?
MS. HERRMANN: Objection. Vague.
THE WITNESS: As I mentioned this morning, I mean I'm trying to have flexibility to deal with those materials that are transported to our repository and handle everything in a safe

# Plaintiff

Page 226

though other things may have been looked at while you were there, you know, that this dual-purpose canister direct disposal was not a primary planning objective at any time during your tenure? That's my question.

A I'm not aware that direct disposal of dual-purpose canisters was in our technical baseline during my tenure.

Apparently here's a feasibility evaluation. Again, I'm going to have to sit and read it for a hour to look at all of the conclusions of what happened, but it was not, you know, added to our technical baseline as a result of this feasibility report.

Q Your recollection is it was not added at any time during the course of your tenure as the head of --

A I'm not aware that the license application for either December of '04 that was planned or where we are today includes any disposal of those canisters.

Q Thank you very much for that. Let's see

Page 227

if we can continue to move forward.

Actually I think I had one question inside this one before I go to my next document, which is if you look at page 12 --

MS. HERRMANN: Of which exhibit?

BY MR. STOUCK:

Q Oh, I'm sorry. This is Exhibit 11, page 12. There's a Section 3.2, "Operational Handling of DPCs."

MS. HERRMANN: We only have up to Exhibit 10.

THE WITNESS: You've got to give me another exhibit.

(Discussion of the record)

BY MR. STOUCK:

Q It's the report entitled "The Potential of Using Commercial Dual-Purpose Canisters for Direct Disposal," we've been talking about, Exhibit 10 to this deposition, page 12.

The first sentence there under 3.2 -- are you with me? I'm going to read it into the record. Are you with me, Mr. Arthur?

Page 228

A Yes, I am.

Q "The CRWMS Requirements Document, Section 3.2.1.E. requires the repository to be able to handle all DPCs," and then there's a reference, do you see that --

A Yes, I do.

Q -- referring to dual-purpose canisters?

A That's correct.

Q Is this the requirements document that we were referring to earlier today?

A Yes, it is, but you did also ask me if it had been revised. I believe there's been one revision to this since that time.

Q Do you know if the current requirements document requires the repository to be able to handle all dual-purpose canisters?

A I believe that is correct.

Q And so, therefore, for reasons we discussed earlier, that would be something that in the course of preparing the license application you would want to follow through with?

A That's correct.

Page 229

Q Let's move on to Exhibit Number 11. Here's Exhibit Number 11. Unfortunately this is, again, a colossal document and I have one question I think about one page, so --

(Arthur Exhibit Number 11 was marked for identification.)

MR. STOUCK: I had a request from my esteemed counterpart to include the entire documents as exhibits and I always do whenever Government Counsel asks me to.

MR. LO RE: I didn't say I disagree with the tactic, I just said it's a bad ratio.

BY MR. STOUCK:

Q Mr. Arthur, you've been handed what's been labeled Exhibit Number 11 to this deposition. It is a transcript of the Nuclear Waste Technical Review Board meeting or session on January 20, 2004. There's also a title on the front cover that says "Repository Design Update Panel on the Engineered System." Is that what you have?

A That's correct.

Q And you were present at this meeting,

# Defendant

Page 238

the larger facility will, the dry transfer facility.

Q Let's talk about the first facility in terms of capability to handle the bare -- I'm talking only about commercial spent nuclear fuel, bare versus canister, would have equal capability or be able to handle, you know, as in 50/50 or is it contemplated that it would have the capability to handle more canistered fuel or more bare fuel, that first facility?

A It will have the capability to handle both as received and as I push it through the operations. I'm really not at a point today to say how that goes. It's how we receive it at the repository.

Q But overall both canistered and bare would be relatively small?

A That's correct.

Q And that's what you meant by "minimal" here?

A Right.

Q I see. Thank you.

Page 239

Now let's talk about the same thing about the second facility will handle with respect to commercial spent nuclear fuel, will be able to handle both canistered and bare fuel or the second facility is only a canister handling facility?

A The second facility, I think that's what Mr. Harrington is referring to on line 10, is the canister handling facility, which will be essentially when you bring in a canister and put it right into the waste package or if it's a canister that has to be put out onto the aging pad, it then will be handled, but most of that will be Navy and Department of Energy materials coming through the canister handling facility.

Q That's the second facility?

A That's the second.

Q Canisters that can go directly into a waste package without opening?

A That's correct, or if it had to be actually placed out into an aging, you know, storage pad, capability that can handle about any canister.

Page 240

Q Including commercial?

A That's correct.

Q Just going back to the first facility that's contemplated under the current plans, it would, although the overall capacity is relatively small, within whatever capacity that first facility has, it would have the capability to receive canistered commercial spent fuel, open the canisters and deal with it; is that correct?

A It currently has a capability to handle and hold it, but not -- it doesn't have a cutting capability.

Q And how long has that been part of the, you know, design, planning design of the surface facility?

A I don't know the specific time, but I mean the fuel handling facility, as I mentioned a little bit earlier today, is one of the facilities we're right now trying to modify to the old -- small amount of failed fuel, so that's where I actually look at the -- we have a hot cell as part of it. That's where actual bare fuel, that

Page 241

capability will occur. If I mention nitrogen purging had to occur, it will occur in the fuel handling facility. But we don't currently have cutting capabilities in the operation.

Q So the first of these three facilities that would be capable of receiving commercial canistered spent nuclear fuel would be the third one, that's welded, that's welded?

A Welded.

Q Welded canistered commercial spent nuclear fuel?

A Currently I believe that's correct, yes.

Q Approximately how long after the inception of the repository operations would it be between the operation of the time that the first facility in this phased approach starts operating and the time that the third facility starts operating?

MS. HERRMANN: Objection. Speculation.

THE WITNESS: And a lot of that depends on the budgets. Right now most of our priorities are into the first two facilities for design and

engineering and, you know, we are going to do a parallel construction and operations as part of our licensing aspects, but our goal would be to get that dry transfer facility on as soon as possible and I -- I don't have any range of dates right now. It depends on what our budget outlays are. It's a very large facility.

BY MR. STOUCK:

Q The dry transfer facility is the third facility?

A It's the third current facility planned, nuclear facility. I mean there's going to be other support facilities.

Q Receiving facility, waste receiving facility?

A Right.

Q I mean we're talking about a year, two years, five years, ten years, or just all you can say is it's, you know, as rapidly as we can do it?

MS. HERRMANN: Objection. Speculation.

BY MR. STOUCK:

Q Or can you even say that? I mean would



you agree it would be as soon as we can get it done, trying to get this done?

A I mean our goal is to try to get done as soon as possible, but for constructability the manpower and workforce and the dollars that we know will be realistically available, it's just -- it's going to be highly improbable to be able to construct all three of those at one time, so we're going with a phased approach.

Q Right. That's why you went to the phased approach?

A The phased approach was to build our concept on the first facility learned and move ahead and apply those lessons learned in a later facility but also to do something reasonable from the budget outlays, to have flexibility in the facilities and be able to construct and operate at the same time.

Q And when was this phased approach, you know, sort of implemented?

A It was early '04, and that was a transition I was talking about earlier. One time



we were looking at one large facility and then we decided to go with a phased approach. It was in the late '03 or early '04 time frame. That's why in this talk we were talking about a transition essentially.

Q But, again, you can't give me any estimate or characterization of the time period between the opening of the first facility and the third as far as your current planning goes?

MS. HERRMANN: Objection. Speculation, asked and answered.

THE WITNESS: No, but I can tell you that in the license application we will be required to show the various plans for construction, you know, schedules and areas associated with the construction, authorization license and we're still working through that.

BY MR. STOUCK:

Q There will be a schedule in the license application for the timing or chronology of construction of all three of these facilities that we've been talking about?



A Based on our licensing approach we're required to have on out-year construction schedule to show the regulator what our current plans will be for construction and that's what we're currently looking at right now.

Q And an out-year construction schedule, just to make clear, that would be something, if I looked at it, there would be some dates on there, at least target dates for when the first facility opens, when the second facility opens, and when the third facility opens?

A There will be plan dates when the license application goes in, that's correct.

Q So the current draft of the license application has, whatever the current thinking is for what those dates should be I guess, there's some draft somewhere that has that chronology in there?

A That's primarily one of the last sections we're actually developing. I mean we're actually right now trying to work through this fuel in air issue to make any modifications. We're still doing