# Plaintiff

**A Probably.**
Q And in 1987 did you personally read the amendments to the Nuclear Waste Policy Act?
**A I'm sure -- well, did I sit down and actually read it? I mean, I dealt with it a lot, but yes, I'm sure I read most of it at one time or another.**
Q In 1985 when you took on your position at DOE did you read the standard contract?
**A No, actually I didn't.**
Q Have you ever read the standard contract subsequently?
**A Cover to cover, no.**
Q Have you read portions of it?
**A Yes.**
Q What portions have you read?
MR. CRAWFORD: Objection, vague.
**A I don't know. I would have to go -- you know -- the '98 date, the section. I mean I -- I don't know. I would have to look.**
Q Do you think you read at least three-quarters of the contract?



MR. CRAWFORD: Objection. Asked and answered. Objection, vague.
**A I doubt I've read --**
MR. CRAWFORD: Objection, foundation.
**A I doubt I've read three quarters of that contract.**
Q Do you think you read at least half of that contract?
MR. CRAWFORD: Objection, asked and answered. Objection, vague. Objection, burdensome.
**A I don't know.**
Q Is it possible you did?
MR. CRAWFORD: Objection, asked and answered. Objection, vague, burdensome.
**A I just don't know how much of it I read.**
Q So it is possible that you have not read half of the provisions of the standard contract, correct, sir?
MR. CRAWFORD: Objection, argumentative. Objection, asked and answered. Objection, vague, burdensome.
**A Possible.**



Q Is it possible that you've read less than a quarter of the provisions, sir?
MR. CRAWFORD: Objection, argumentative, burdensome. Objection, asked and answered.
**A I don't know.**
Q So it is possible that you, in your years at the Department of Energy or before, have read personally less than 25 percent of the provisions of the standard contract, correct?
MR. CRAWFORD: Objection, argumentative. Objection, foundation. Objection, asked and answered.
**A I probably read more than a quarter of it.**
Q Are you certain?
MR. CRAWFORD: Objection, argumentative.
Q Are you certain?
MR. CRAWFORD: Objection, argumentative.
**A No, I'm not certain.**
Q I would like to return to paragraph three on the top of page seven. Have you had a chance to read that?
**A Yes.**
Q Can you explain that objective to me?



**A That was an objective, okay, to receive waste in 1998 and along with the acceptance schedule it's -- in accordance with the acceptance schedule provided in the standard contract, okay. So that was the goal.**
Q And you're comfortable with that goal?
MR. CRAWFORD: Objection.
**A It wasn't mine. It wasn't my goal.**
Q But you understand that was a goal of the program?
**A Yeah.**
Q In 1985, correct?
**A That's correct.**
Q And what acceptance schedule did the standard disposal contract provide for?
MR. CRAWFORD: Objection, foundation. Objection to the extent it calls for speculation.
**A I think the contract references other documents that references things, and I don't specifically know.**
Q So is it your testimony that it provided for a schedule but you don't sitting here today know

117

what that schedule is?
MR. CRAWFORD: Objection. Argumentative.
A **The receipt rate of January -- excuse me, the receipt date of January 31, 1998, clearly was always a goal. Okay. Regarding the acceptance rate of so many tons year one, year two, year three, okay, you know, that has changed over time. My focus has always been to create a siting process that got us a site to allow us to have the -- a reasonable receipt rate going toward the steady state 3,000 tons per year, and that's where my focus has always been, not on contract details. Okay. I am not a lawyer, I'm an engineer, okay, so I have not gone into the contract in any great detail at all.**
**Okay, now regarding your question here about the acceptance schedule in the contract, actually I don't recall seeing a metric ton per year in the contract.**
Q Let me step back a second, Mr. Barrett. You just referred to a reasonable receipt rate going toward the steady state 3,000 tons per year.
A **Right.**

118

Q "That's where my focus has always been." Do you recall that testimony?
A **That's what I just said I think.**
Q Does that continue to be your focus to this very day, sir?
A **Yes.**
Q And does that continue to be the focus of the Department of Energy's spent nuclear fuel program?
MR. CRAWFORD: Objection to the form. Objection to the foundation. Objection, vague.
A **We are still trying to perform under the Nuclear Waste Policy Act to receive the waste into the federal system as soon as we can under the constraints of the law. So, yes, that remains my goal and the organization's goal.**
Q Again, just so the record is clear, your goal and the organization's goal is to achieve a reasonable receipt rate going towards the steady state of 3,000 tons per year, correct?
MR. CRAWFORD: Objection to the extent it mischaracterizes prior testimony. Objection, foundation. Objection, vague.

119

A **That has been our goal to do that.**
Q And it continues to be your goal today, correct?
A **Correct.**
Q And it was your goal in 1985, correct?
A **Correct.**
Q And it was the goal of the department in 1982 when the standard contracts were signed, correct?
MR. CRAWFORD: Objection, vague. Objection, calls for speculation. Objection to the extent it mischaracterizes his prior testimony.
A **I wasn't there in '82 so I don't know about '82, but in '85 and today it has always been our intent to try to do what we can from a technical point of view to receive the materials at a reasonable rate.**
Q And the reasonable rate is the rate that would ramp up -- is a rate that would ramp up towards 3,000 MTUs per year, correct?
MR. CRAWFORD: Objection, vague. And foundation.
Q I believe your counsel cut you off. What was your answer, sir?

120

A **That has been our intent.**
Q Let's go back to paragraph three, page seven. You referred to January 31st, 1998, as being a goal. Was it something more, wasn't it a contractual commitment and a statutory command?
MR. CRAWFORD: Objection, argumentative. Objection, best evidence. Objection to the extent it calls for a legal conclusion.
A **As an engineer, okay, and as a program administrator, okay, and dependent on what the contract said or what courts said, we were always trying to achieve that goal.**
Q And why did you establish that goal for yourself?
A **Because --**
Q And your department?
A **It was set in the law, okay, that our goal was to try to create a facility and to create a system that would meet that goal of January 31st, 1998, to start to receive fuel. And it has always been an important objective and goal.**
Q To start to receive fuel on January 31st,

1998, at a ramp-up level that would -- in a reasonable amount of time and at a 3,000 per year MTU acceptance rate, correct?

MR. CRAWFORD: Objection to the form. Objection to the mischaracterization of prior testimony. Objection to the extent it assumes facts not in evidence.

**A It was a systems goal to receive the material at a reasonable rate, okay, of which the 3,000, ramp up to 3,000 tons was a reasonable rate. It was never a -- in my opinion it was never a legal requirement to do 3,000 tons per year.**

Q You base the goal on the statute, correct? That's what you've testified to, correct?

**A Yes.**

Q Back to paragraph three --

**A Excuse me. Let me go back to that. When you say the statute does not say 3,000, okay, that was a judgment part. It is the receipt in January 31, 1998, is in the statute. The rate to my knowledge is not in the statute.**

Q So why did you set the 3,000 MTU goal?



**A That was a --**

MR. CRAWFORD: Objection to the fact that that question assumes facts not in evidence.

**A That was in our judgment a reasonable rate, steady state rate to move up to under the circumstances we were in.**

Q Paragraph three. I'm not certain I understand your testimony. I'm still unclear what you're referring to with respect to the acceptance schedule. You see that language, acceptance schedule in paragraph three?

**A You asked me to interpret this paragraph three which I never wrote.**

MR. CRAWFORD: He's asking you whether you see that.

**A Do I see it? I see that line.**

Q And what do you understand that to be referring to? What acceptance schedule did the standard disposal contract provide for?

MR. CRAWFORD: Objection to the foundation of the question and objection, best evidence.

**A I don't know because I do not recall an**



**acceptance schedule in the contract itself. So I would have -- I don't know what this means.**

MR. CAYNE: It's 12:30. Let's break for a one-hour lunch.

(A luncheon recess is taken.)



AFTERNOON SESSION

BY MR. CAYNE:

Q Good afternoon, Mr. Barrett. Who are the individuals that report directly to you in your position as deputy director?

**A Now?**

Q Yes.

**A Dr. Russell Dyer, project manager Yucca Mountain project; Sandra Waisley who is the acting director of the U.S.A. subprogram administration; and Mr. Jeffrey Williams who is the acting director of office of waste acceptance and transportation international or technology -- technology and QA director. Mr. Ron Murthey, and Mr. Ronald Milner who is the chief operating officer.**

Q Do you work with Mr. David Zabransky?

**A Yes.**

Q And what position does he hold?

**A I think he is now the acting director of transportation and waste acceptance.**

Q And in that capacity to whom does he report?

# Defendant

A Probably.
Q And in 1987 did you personally read the amendments to the Nuclear Waste Policy Act?
A **I'm sure -- well, did I sit down and actually read it? I mean, I dealt with it a lot, but yes, I'm sure I read most of it at one time or another.**
Q In 1985 when you took on your position at DOE did you read the standard contract?
A **No, actually I didn't.**
Q Have you ever read the standard contract subsequently?
A **Cover to cover, no.**
Q Have you read portions of it?
A **Yes.**
Q What portions have you read?
MR. CRAWFORD: Objection, vague.
A **I don't know. I would have to go -- you know -- the '98 date, the section. I mean I -- I don't know. I would have to look.**
Q Do you think you read at least three-quarters of the contract?



MR. CRAWFORD: Objection. Asked and answered. Objection, vague.
A **I doubt I've read --**
MR. CRAWFORD: Objection, foundation.
A **I doubt I've read three quarters of that contract.**
Q Do you think you read at least half of that contract?
MR. CRAWFORD: Objection, asked and answered. Objection, vague. Objection, burdensome.
A **I don't know.**
Q Is it possible you did?
MR. CRAWFORD: Objection, asked and answered. Objection, vague, burdensome.
A **I just don't know how much of it I read.**
Q So it is possible that you have not read half of the provisions of the standard contract, correct, sir?
MR. CRAWFORD: Objection, argumentative. Objection, asked and answered. Objection, vague, burdensome.
A **Possible.**



Q Is it possible that you've read less than a quarter of the provisions, sir?
MR. CRAWFORD: Objection, argumentative, burdensome. Objection, asked and answered.
A **I don't know.**
Q So it is possible that you, in your years at the Department of Energy or before, have read personally less than 25 percent of the provisions of the standard contract, correct?
MR. CRAWFORD: Objection, argumentative. Objection, foundation. Objection, asked and answered.
A **I probably read more than a quarter of it.**
Q Are you certain?
MR. CRAWFORD: Objection, argumentative.
Q Are you certain?
MR. CRAWFORD: Objection, argumentative.
A **No, I'm not certain.**
Q I would like to return to paragraph three on the top of page seven. Have you had a chance to read that?
A Yes.
Q Can you explain that objective to me?



A **That was an objective, okay, to receive waste in 1998 and along with the acceptance schedule it's -- in accordance with the acceptance schedule provided in the standard contract, okay. So that was the goal.**
Q And you're comfortable with that goal?
MR. CRAWFORD: Objection.
A **It wasn't mine. It wasn't my goal.**
Q But you understand that was a goal of the program?
A **Yeah.**
Q In 1985, correct?
A **That's correct.**
Q And what acceptance schedule did the standard disposal contract provide for?
MR. CRAWFORD: Objection, foundation. Objection to the extent it calls for speculation.
A **I think the contract references other documents that references things, and I don't specifically know.**
Q So is it your testimony that it provided for a schedule but you don't sitting here today know

what that schedule is?
MR. CRAWFORD: Objection. Argumentative.
A **The receipt rate of January -- excuse me, the receipt date of January 31, 1998, clearly was always a goal. Okay. Regarding the acceptance rate of so many tons year one, year two, year three, okay, you know, that has changed over time. My focus has always been to create a siting process that got us a site to allow us to have the -- a reasonable receipt rate going toward the steady state 3,000 tons per year, and that's where my focus has always been, not on contract details. Okay. I am not a lawyer, I'm an engineer, okay, so I have not gone into the contract in any great detail at all.**
**Okay, now regarding your question here about the acceptance schedule in the contract, actually I don't recall seeing a metric ton per year in the contract.**
Q Let me step back a second, Mr. Barrett. You just referred to a reasonable receipt rate going toward the steady state 3,000 tons per year.
A **Right.**



Q "That's where my focus has always been." Do you recall that testimony?
A **That's what I just said I think.**
Q Does that continue to be your focus to this very day, sir?
A **Yes.**
Q And does that continue to be the focus of the Department of Energy's spent nuclear fuel program?
MR. CRAWFORD: Objection to the form. Objection to the foundation. Objection, vague.
A **We are still trying to perform under the Nuclear Waste Policy Act to receive the waste into the federal system as soon as we can under the constraints of the law. So, yes, that remains my goal and the organization's goal.**
Q Again, just so the record is clear, your goal and the organization's goal is to achieve a reasonable receipt rate going towards the steady state of 3,000 tons per year, correct?
MR. CRAWFORD: Objection to the extent it mischaracterizes prior testimony. Objection, foundation. Objection, vague.



A **That has been our goal to do that.**
Q And it continues to be your goal today, correct?
A **Correct.**
Q And it was your goal in 1985, correct?
A **Correct.**
Q And it was the goal of the department in 1982 when the standard contracts were signed, correct?
MR. CRAWFORD: Objection, vague. Objection, calls for speculation. Objection to the extent it mischaracterizes his prior testimony.
A **I wasn't there in '82 so I don't know about '82, but in '85 and today it has always been our intent to try to do what we can from a technical point of view to receive the materials at a reasonable rate.**
Q And the reasonable rate is the rate that would ramp up -- is a rate that would ramp up towards 3,000 MTUs per year, correct?
MR. CRAWFORD: Objection, vague. And foundation.
Q I believe your counsel cut you off. What was your answer, sir?



A **That has been our intent.**
Q Let's go back to paragraph three, page seven. You referred to January 31st, 1998, as being a goal. Was it something more, wasn't it a contractual commitment and a statutory command?
MR. CRAWFORD: Objection, argumentative. Objection, best evidence. Objection to the extent it calls for a legal conclusion.
A **As an engineer, okay, and as a program administrator, okay, and dependent on what the contract said or what courts said, we were always trying to achieve that goal.**
Q And why did you establish that goal for yourself?
A **Because --**
Q And your department?
A **It was set in the law, okay, that our goal was to try to create a facility and to create a system that would meet that goal of January 31st, 1998, to start to receive fuel. And it has always been an important objective and goal.**
Q To start to receive fuel on January 31st,

# Plaintiff

MR. CRAWFORD: Objection. Lack of foundation.
Q You see B, the waste receipt rate?
A **Uh-huh.**
Q Are you familiar with the basis for the 3,000 MTU per year receipt rate in 1985?
MR. CRAWFORD: Objection, asked and answered. Objection, foundation.
A **I'm familiar with it. It was established before my arrival or personal participation in establishing that number. It seemed like a reasonable number to me then as it does today.**
Q Has there ever been a time since you've been at the Department of Energy that a 3,000 MTU per year rate did not seem reasonable?
MR. CRAWFORD: Objection, vague. Objection, asked and answered. Objection, lack of foundation.
A **As this is used in this case, as an assumption for an operating facility rate and capacity, it was a reasonable number.**
Q In C, do I understand this correctly that



after two years the MRS would have been operating at full -- at the full acceptance rate?
MR. CRAWFORD: Objection, vague.
A **That's what it says. I never thought it was that fast, but that's what it says.**
Q Do you have any basis to disagree with the statement in C?
A **I think going from zero to 3,000 in a two-year period is extremely challenging and questionable to go that fast.**
Q Do you believe that the individuals in the Office of Civilian Radioactive Waste Management program were careless in establishing this two-year ramp-up period?
MR. CRAWFORD: Objection, foundation. Objection, speculation.
A **I don't believe they were careless at all. I believe that's overaggressive in my judgment based on what history has shown us how difficult nuclear facility creation implementation is.**
Q Would you believe it to be overly aggressive in 1985?



MR. CRAWFORD: Objection, foundation.
A **I don't think I ever really tuned in on it.**
Q Did you ever have discussions with anyone in your office concerning the reasonableness of the two-year ramp-up period?
A **Not that I recall.**
Q Who would have made the final decision in your office to authorize the two-year ramp-up period?
MR. CRAWFORD: Objection, vague. Objection, foundation.
A **That would have been Roger Hilley who is responsible for that office.**
Q Do you believe he was a competent individual?
A **Yes, I do.**
Q Do you believe he had good professional judgment?
MR. CRAWFORD: Objection, foundation.
A **As a senior manager, yes.**
Q Did you find him to be overly aggressive in his administration of the program?
MR. CRAWFORD: Objection, foundation.



Objection, vague.
A **No.**
Q Can you turn your attention to page 26. You see page 26 consists of a chart. Would you take a moment to refresh your recollection concerning its contents.
A **Okay.**
Q Are you familiar with this chart?
A **Vaguely.**
Q Have you seen the column labeled Spent Fuel, the fourth column to the right?
A **There's four, four, four, four, nine, 18?**
Q Right.
A **Yeah.**
Q Are you familiar with the basis for the projection that the ramp-up would go from 400 to 900 at the third year?
A **I'm sorry, repeat the question.**
Q Are you familiar with the basis, technical or otherwise, for the determination that the acceptance rate would ramp up from 400 to 900 between the third and the fourth year of the acceptance of the

# Defendant

149

MR. CRAWFORD: Objection. Lack of foundation.
Q You see B, the waste receipt rate?
A **Uh-huh.**
Q Are you familiar with the basis for the 3,000 MTU per year receipt rate in 1985?
MR. CRAWFORD: Objection, asked and answered. Objection, foundation.
A **I'm familiar with it. It was established before my arrival or personal participation in establishing that number. It seemed like a reasonable number to me then as it does today.**
Q Has there ever been a time since you've been at the Department of Energy that a 3,000 MTU per year rate did not seem reasonable?
MR. CRAWFORD: Objection, vague. Objection, asked and answered. Objection, lack of foundation.
A **As this is used in this case, as an assumption for an operating facility rate and capacity, it was a reasonable number.**
Q In C, do I understand this correctly that

150

after two years the MRS would have been operating at full -- at the full acceptance rate?
MR. CRAWFORD: Objection, vague.
A **That's what it says. I never thought it was that fast, but that's what it says.**
Q Do you have any basis to disagree with the statement in C?
A **I think going from zero to 3,000 in a two-year period is extremely challenging and questionable to go that fast.**
Q Do you believe that the individuals in the Office of Civilian Radioactive Waste Management program were careless in establishing this two-year ramp-up period?
MR. CRAWFORD: Objection, foundation. Objection, speculation.
A **I don't believe they were careless at all. I believe that's overaggressive in my judgment based on what history has shown us how difficult nuclear facility creation implementation is.**
Q Would you believe it to be overly aggressive in 1985?

151

MR. CRAWFORD: Objection, foundation.
A **I don't think I ever really tuned in on it.**
Q Did you ever have discussions with anyone in your office concerning the reasonableness of the two-year ramp-up period?
A **Not that I recall.**
Q Who would have made the final decision in your office to authorize the two-year ramp-up period?
MR. CRAWFORD: Objection, vague. Objection, foundation.
A **That would have been Roger Hilley who is responsible for that office.**
Q Do you believe he was a competent individual?
A **Yes, I do.**
Q Do you believe he had good professional judgment?
MR. CRAWFORD: Objection, foundation.
A **As a senior manager, yes.**
Q Did you find him to be overly aggressive in his administration of the program?
MR. CRAWFORD: Objection, foundation.

152

Objection, vague.
A **No.**
Q Can you turn your attention to page 26. You see page 26 consists of a chart. Would you take a moment to refresh your recollection concerning its contents.
A **Okay.**
Q Are you familiar with this chart?
A **Vaguely.**
Q Have you seen the column labeled Spent Fuel, the fourth column to the right?
A **There's four, four, four, four, nine, 18?**
Q Right.
A **Yeah.**
Q Are you familiar with the basis for the projection that the ramp-up would go from 400 to 900 at the third year?
A **I'm sorry, repeat the question.**
Q Are you familiar with the basis, technical or otherwise, for the determination that the acceptance rate would ramp up from 400 to 900 between the third and the fourth year of the acceptance of the

# Plaintiff

00196

A Positions by decision group, current status?

Q Yes. You see under Decisions Group it has aggregate acceptance, the first entry, system study on technical basis under review confirms 3,000 MTU per year?

A I see it.

Q That's consistent with your testimony today, correct, that --

MR. CRAWFORD: Objection.

MR. CAYNE: Could I finish, counsel.

MR. CRAWFORD: Sorry.

Q That's consistent with your testimony today that in 1986 your office was projecting a 3,000 MTU per year acceptance rate, correct?

MR. CRAWFORD: Objection, vague.

A Seems consistent.

Q Do you know what the, or are you familiar with the system study that is being referred to in this entry?

A Not the specific one.

Q Do you have a general understanding of the

system study being referred to here?
MR. CRAWFORD: Objection. Asked and answered.
**A There were various studies done in the eighties and also in the very early nineties on system performance rate, you know, what the costs were, schedules were, plausibility of them.**
Q And these system studies looked at system issues, correct?
**A Yes.**
Q And am I correct that each one of these studies to which you've just referred confirmed an acceptance rate, an aggregate acceptance rate of 3,000 MTU per year?
MR. CRAWFORD: Well, objection, vague.
**A I think it's overstated to say it confirmed it. It showed that, you know, at 2,000 it does this, at 3,000 it does that, 4,000 it does something different. I don't know if they actually reached an absolute confirmation that 3,000 was the exact number, but generally they supported the system rate of 3,000 was a reasonable rate.**



Q So it's your understanding or your knowledge that each of the various system studies to which you just referred that were undertaken in the -- from the mid-1980s to I think you said the mid-1990s, supported an acceptance rate of 3,000 MTU per year, correct?
MR. CRAWFORD: Objection, vague. Objection, assumes facts not in evidence. Objection, mischaracterizes prior testimony.
**A Yes.**
Q I'll ask you to turn to page HQ 0002909 of this same exhibit.
**A Okay.**
Q Do you see under the second entry, allocation of acceptance under consequences of decisions, it says "allocation required to plan maximum storage at some sites." Do you see that statement?
**A I see it.**
Q Do you understand that statement?
**A No.**
Q Do you understand that statement to refer



to the need of the utilities to have significant advanced knowledge of the allocation rankings in order to store the fuel in the most efficient manner?
MR. CRAWFORD: Objection, speculation. Objection to the extent it assumes facts not in evidence. Objection to the foundation.
**A Could be. I don't know.**
Q Do you have any knowledge of the considerations that utilities undertake in attempting to maximize their storage capacity, their existing storage capacity?
**A Yes.**
Q And what considerations are necessary to be undertaken by a utility to do that?
**A Safety considerations, economic considerations, future site use and decommissioning schedules, all sorts of issues a utility needs to consider to make decisions about how best to store the fuel.**
Q And is one of the issues they need knowledge about the priority queue?
**A The likely --**



MR. CRAWFORD: Objection, foundation.
**A The likely removal time for the Department of Energy is an important part of that consideration.**
Q So the failure to provide the utility with that information could cost the utility to store fuel in a less than optimal manner, correct?
MR. CRAWFORD: Objection, speculation. Objection, foundation. Objection to the extent it assumes facts not in evidence.
**A The removal date would be the important thing to the utility planner regarding where you are in your allocation as a subset. The most important part is the when will the federal facility be capable to receive material. So the allocation to me is a secondary issue compared to the rate of development of receiving facility, which is the primary consideration.**
Q You said the most important part. The most important part to what?
**A For a utility deciding what they should do with their storage. The most important -- one of the more important aspects of a utility decision will be**

ACKNOWLEDGMENT OF DEPONENT

I, Lake H. Barrett, do hereby acknowledge that I have read and examined the foregoing testimony, and the same is a true, correct and complete transcription of the testimony given by me and any corrections appear on the attached Errata sheet signed by me.

6/27/02 ______________________
(DATE) (SIGNATURE)



CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC

I, Diane Gomez, Registered Professional Reporter, the officer before whom the foregoing proceedings were taken, do hereby certify that the foregoing transcript is a true and correct record of the proceedings; that said proceedings were taken by me stenographically and thereafter reduced to typewriting under my supervision; and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal this 25th day of April, 2002.

My commission expires:
June 14, 2005

______________________
NOTARY PUBLIC IN AND FOR
THE DISTRICT OF COLUMBIA



ERRATA SHEET

IN RE: YANKEE ATOMIC v. UNITED STATES

RETURN BY: ______________________

PAGE LINE CORRECTION AND REASON

______________________ ______________________
(DATE) (SIGNATURE)



ERRATA SHEET CONTINUED

IN RE: YANKEE ATOMIC v. UNITED STATES

RETURN BY: ______________________

PAGE LINE CORRECTION AND REASON

______________________ ______________________
(DATE) (SIGNATURE)

# ERRATA SHEET

IN RE: YANKEE ATOMIC v. UNITED STATES

RETURN BY: MAY 27 2002

| PAGE | LINE | CORRECTION AND REASON |
|---|---|---|
| 161 | 14 | they → there |

6/20/02 (DATE)

(SIGNATURE)

# Defendant

**Energy recommended it, but go ahead.**
Q And it was this linkage that caused the ultimate failure of the MRS proposal, correct?
MR. CRAWFORD: Objection to the extent it calls for speculation. Objection to the foundation.
**A No.**
Q It hindered the continuation of the MRS proposal, correct?
MR. CRAWFORD: Objection. Same objections.
**A No. I don't think so. Let me rephrase it. I don't think so.**
Q I thought you testified this morning that the congressional enactment in 1987 was a large reason why the MRS proposal never was implemented. Is that not correct?
**A That is correct.**
Q And you indicated that this is similar to one of the linkages Congress enacted, this being the linkage referred to on page 58 of Exhibit 8?
**A No.**
Q I'm sorry. No, you did not say --
**A I'm answering your question no.**



Q Okay. I misheard you then. I thought you testified that this linkage was similar to what Congress enacted?
**A Yes.**
Q You did testify to that?
**A Yes.**
Q And did this linkage have an effect on the ability to proceed with the MRS proposal?
**A In a minor way.**
Q And what was that?
**A It limited the usefulness, but it was almost immaterial in the change in '94.**
Q Was there another linkage that had a more adverse effect on the program?
**A Not a linkage.**
Q What resulted in the failure to proceed with the MRS program?
**A Failure to --**
MR. CRAWFORD: Objection, asked and answered.
**A Failure to give the grants to the Indian tribes who wanted to pursue a proposal.**



Q Had Congress enacted the grants that you just referred to in 1984, when would an MRS facility have been able to commence operations?
MR. CRAWFORD: Objection to the extent it calls for speculation.
**A There were no grants in '84.**
Q In '94?
**A Now rephrase your question.**
Q With respect to the grants that you referenced a few moments ago that Congress failed to enact in 1994, I'm asking you to assume that those grants had in fact been authorized. Had those grants been authorized in 1994, when could an MRS have commenced operations?
MR. CRAWFORD: Objection to the extent it calls for speculation.
**A It was still possible to do it in '98, and that was my testimony in the spring of '93.**
Q Your testimony to Congress?
**A Yes.**
Q And did that testimony give consideration to the linkages in the 1987 legislation?



**A I believe it did.**
Q And taking into account the linkages imposed by the '87 legislation, it's your testimony that if Congress had enacted -- authorized the grants in 1994 the MRS would have, could have commenced operations by January 31st, 1998, correct?
MR. CRAWFORD: Objection to the foundation.
**A I go back here on these things. I think what had to happen was I think they had to change the linkages in the proposal, which is what the plan was with the Mescaleros and the Goshoots, was that they would propose the change to the linkages. So I think the linkages had to be modified for performance in '98. The plan was to do that in the proposal to Congress because it would take Congress to act on it. So the linkages may have had to change. I would have to go back and look at what the linkages were which I don't recall now.**
Q So your best recollection is that the 1994 proposal to which you referred would have required two things, that certain grants be authorized and that the linkages enacted in 1987 be amended or repealed?

245

A Yes. And that was the -- that was the plan. In calendar '93, in the FY '94 budget proposal, that the Indian nations would present a proposal that would change the linkages and be able to operate in 1998. And the denial of Congress to develop those proposals led to -- and there was no chance of modifying the linkages nor getting the site in any practical sense was -- led to the inability or the unlikelihood of meeting the '98 date.
Q But it was your view, am I correct, in 1993 that had Congress acted differently, had Congress authorized the grants, had Congress repealed the linkages, then the MRS facility could have commenced operations on or before January 31st, 1998, correct?
A Correct. That's my recollection.
MR. CRAWFORD: Let's take a break.
MR. CAYNE: Sure.
(There is a recess from the record.)
(Deposition Exhibit Barrett 9 was marked for identification and was retained by counsel.)
Q Mr. Barrett, going back to our previous line of discussion, do you recall that you testified

246

that the linkages to which we were referring would have had very little effect on the ultimate failure of the MRS proposal? Do you recall that?
A Yes.
MR. CRAWFORD: Objection.
Q To the extent you've refreshed your recollection on that proposal and the implications of the linkages, would you want to amend in any way that answer?
A Refresh me on the two linkages.
Q Well, the linkage that I was referring to was the linkage that was proposed in the DOE report.
A I never knew DOE ever proposed a linkage, but the linkage -- the linkages in my mind are the ones in Congress. There's two of them.
Q I will hand them to you, sir.
A And then we'll come back and clear this -- well, we'll come back to this since your question is on those linkages, though.
(Deposition Exhibits Barrett 10 and Barrett 11 were marked for identification and were retained by counsel.)

247

Q Mr. Barrett, you've been handed two additional exhibits marked for identification as Exhibit 10, which is a copy of Section 10165 of Title 42 and Exhibit 11, which is a copy of Section 10168 also Title 42. Do you have those two before you?
A Yes.
Q And I understand you're reviewing these copies of the statutes now to refresh your recollection on the linkages about which you've testified?
A Correct.
MR. CRAWFORD: It might help if you would direct him to some part of it.
A On ten?
Q Yes.
A The linkage is B, the secretary may not select the site under subsection A until the secretary recommends a repository.
Q Okay.
A That in a -- and the reason I said that the failure of the grants was the primary reason why we would not do it was the proposal to Congress would be

248

the Indian nation in that case proposing to be the site, volunteering to be the site which would negate the secretary selecting a site. So the lack of a volunteer, you know, agreed to by Congress was more important than this limitation B.
Q Could I also ask you to look at section little d of Exhibit 11.
A Yeah, I was doing ten and ~~then~~ we'll do -- so that's ten.
And the concept in the proposal would be to modify this linkage as well. If the --
Q This linkage being sub (d)?
A Sub (d), correct.
Q Of 11?
A D of 11, would be to modify these as well, at least -- (d)(1) would be that they would propose to change the one that they could start construction prior to construction authorization for the repository but (d)(2) would remain.
Q What about (d)(3)?
A (D)(3) would remain.
Q With the 10,000 limit?

249

A Right. And (d)(4) would remain. And they were not limiting as to starting in '98. But (d)(1) of Exhibit 11 would be modified by the proposal as would B of Exhibit 10. This was in a proposal to Congress by the Native American nations that would volunteer. But there was never any indication to my recollection that they would change the mass limits of Exhibit 11 (d)(2), (3) and (4). That was the premise that we were working on circa '93 for the proposal.
So I answered the primary reason for the ability to meet the '98 date in early '93 was a proposal to modify those two linkages. So in my mind in my original answer was the lack of -- the congressional refusal to go forward with those proposals was the primary reason that the MRS was not available in 1998. Not the linkages per se. Because if we had a volunteer, in my judgment, those linkages would have been modified by Congress if it was acceptable to the volunteer host.
Q But without modifying linkages that you've identified, the proposal could not have gone forward, correct?

250

A Without -- these linkages prevent us from going forward without a volunteer to change the linkage.
Q And linkage (d)(1) in Exhibit 11 is similar, is it not, to the linkage proposed by the Department of Energy in the last Exhibit 9 that we were referring to a few moments ago?
MR. CRAWFORD: Objection, vague. Objection, foundation, and objection to assumes facts not in evidence.
A The proposal from the Department of Energy that's in one of these things here which I guess would have been 9. You tell me where it was because that's where we started.
Q I'm sorry. Exhibit 8.
MR. CRAWFORD: The last paragraph or last section.
A 58?
Q Yes.
A I was unaware, and I don't know if this is really true or not, that he did this, although it says it here, that the Department of Energy proposed that.

251

The working hypothesis that I had in '93, because I was not intimately involved in the policy aspects in the eighties, was that this was imposed by Congress, which it was.
Q This being?
A The linkage that you could not -- that the MRS could not start receiving fuel. This was congressionally imposed. There's no number of volumes in here in the DOE -- I didn't know DOE had proposed anything to Congress regarding linkages. I was aware that they had dialogues about a concern that the MRS be -- appear to be a replacement for the repository and that there needed to be ties. I did not know the department went so far as to make a congressional recommendation.
Q You believe that they made that recommendation to make it even clearer that the MRS was not a replacement for the repository?
MR. CRAWFORD: Objection to the foundation. Objection to speculation.
A I don't know. I don't know what those who did this at that time did or didn't do. I was not in

252

a policy role in the 1980s.
Q So prior to today you were not aware, Mr. Barrett, that the Department of Energy had made any proposals to Congress with respect to the linkages we have been discussing, correct?
A That's correct.
Q And sitting here today you do not know why the Department of Energy made the proposal with respect to the linkage, the proposed linkage referenced on page 58 of Exhibit 8, correct?
A I do not know.
Q So my question is correct, yes?
MR. CRAWFORD: Objection. Asked and answered.
A State your question again.
Q I just want the record to be clear, sir.
A Well, state your question again. Let's see if I can try to give a yes or no.
Q And sitting here today you do not know why the Department of Energy made the proposal with reference to the linkage, the proposed linkage referenced on page 58 of Exhibit 8, correct?

# Defendant

273

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
----------------x
YANKEE ATOMIC ELECTRIC COMPANY; : Case Nos. 98-126C,
CONNECTICUT YANKEE ATOMIC POWER : 98-154C, 98-474C,
COMPANY; MAINE YANKEE ATOMIC : 98-483C, 98-484C,
POWER COMPANY; FLORIDA POWER & : 98-485C, 98-486C,
LIGHT COMPANY; NORTHERN STATES : 98-488C, 98-614C,
POWER COMPANY; DUKE POWER, a : 98-621C, 99-447C,
Division of DUKE ENERGY CORP.; : 00-440C, 00-695C,
INDIANA MICHIGAN POWER COMPANY; : 00-703C, 01-115C,
SACRAMENTO MUNICIPAL UTILITY : 01-116C, 01-249C
----------------X
(Caption continued on next page)

Continued Deposition of LAKE H. BARRETT
Washington, D. C.
Tuesday, April 23, 2002
9:36 a.m.

Job No.: 11792-5
Pages 273 through 526, Volume 2
Reported by: Diane Gomez, RPR

274

DISTRICT; SOUTHERN NUCLEAR :
OPERATING COMPANY, et al.; :
COMMONWEALTH EDISON COMPANY; :
BOSTON EDISON COMPANY; GPU :
NUCLEAR, INCORPORATED; WISCONSIN :
ELECTRIC POWER COMPANY; POWER :
AUTHORITY OF THE STATE OF NEW :
YORK; OMAHA PUBLIC POWER DISTRICT;:
NEBRASKA PUBLIC POWER DISTRICT; :
and TENNESSEE VALLEY AUTHORITY, :
Plaintiffs :
v. :
THE UNITED STATES, :
Defendant :
-----------------X

275

Continued Deposition of LAKE H. BARRETT, held at the offices of:

ARNOLD & PORTER
555 12th Street, Northwest
Washington, D. C. 20004
(202) 942-5000

Pursuant to agreement, before Diane Gomez, Registered Professional Reporter and Notary Public in and for the District of Columbia.

276

APPEARANCES

ON BEHALF OF PLAINTIFFS FLORIDA POWER & LIGHT COMPANY, NORTHERN STATES POWER COMPANY, DUKE POWER, INDIANA MICHIGAN POWER COMPANY, BOSTON EDISON COMPANY, GPU NUCLEAR, INC., POWER AUTHORITY OF THE STATE OF NEW YORK, OMAHA PUBLIC POWER DISTRICT, and NEBRASKA PUBLIC POWER DISTRICT:

DEVON E. HEWITT, ESQUIRE
SHAW PITTMAN LLP
1650 Tysons Boulevard
McLean, Virginia 22102-4859
(703) 893-0527

ON BEHALF OF PLAINTIFF SACRAMENTO MUNICIPAL UTILITY DISTRICT:

JEFFREY L. HANDWERKER, ESQUIRE
HOWARD CAYNE, ESQUIRE
RONALD A. SCHECHTER, ESQUIRE
ARNOLD & PORTER
555 12th Street, Northwest
Washington, D. C. 20004-1206
(202) 942-5000

**consternation about what constitutes an emergency. So neither of those in my recollection did I consider practical. And we didn't pursue them.**

Q What did you mean by the last statement, "The MRS review commission recommendations are viewed as an interim solution to a problem that requires long-range planning and thought"?

**A That their recommendations didn't make any sense but we were being nice about it.**

**(Deposition Exhibit Barrett 17 was marked for identification and was retained by counsel.)**

Q The court reporter has handed you, Mr. Barrett, a document marked for identification as Exhibit 17, which is encaptioned Nuclear Waste. Is there a need for federal interim storage by the U.S. monitored retrievable storage review commission? November '89, bearing Bates numbers PA-172230 through PA-172270. Do you have that document before you?

**A Yes.**

Q And let me tell you that this document is an excerpt from the entire -- of the entire report issued by the U.S. monitored retrievable storage



review commission.

Did you ever have an opportunity to review this document in the course of the performance of your duties as an official at the Department of Energy?

**A I believe so.**

Q Let me turn your attention to page bearing Bates number PA-172244.

**A Okay.**

Q I'd like to ask you to read the passage, the paragraph that begins at the very bottom of the left-hand column of that page starting, "However, the schedule linkage." Do you see that?

**A Yes.**

Q Could you read that paragraph up to including number five.

**A I've read that.**

Q Okay. Let me ask you to focus your attention to the first statement of that section, specifically, "However, the schedule linkage presently in the NWPAA (MRS construction may not begin until the Nuclear Regulatory Commission issues a license with a construction of a repository) would make it impossible



for an MRS to be operational more than three years before the repository." Do you see that statement?

**A Yes.**

Q Do you agree with that statement?

MR. CRAWFORD: Objection. Asked and answered.

**A In general, yes.**

Q Do you agree with it as stated here to be accurate and correct?

**A It's a judgment call.**

MR. CRAWFORD: Same objection.

**A I don't disagree with it -- I don't disagree with that statement.**

**(Deposition Exhibit Barrett 18 was marked for identification and was retained by counsel.)**

Q Mr. Barrett, the court reporter has handed you a document marked for identification as Exhibit 18. Do you have that before you?

**A Yes.**

Q This document is the report to Congress on reassessment of the civilian radioactive waste management program dated November 1989 issued by the



U.S. Department of Energy, Office of Civilian Radioactive Waste Management bearing Bates numbers PA-163156 through PA-163188. Did you have any role in the preparation of this report?

**A I think so.**

Q What was your role, Mr. Barrett?

**A I don't specifically remember the details. I remember we did this. This was part of Admiral Watkins', you know, review of this. So I know I was involved in it. I don't remember what my title was then. I was one of the acting office directors. Not the entire program office but one of them.**

Q Do you know whether you would have been a drafter or a reviewer of this document?

**A I did not draft it. I was a reviewer. I was a participant in its generation and development.**

Q In your position would you have been required to approve of or sign off on this document prior to its final issuance?

**A I don't remember if I signed this or not.**

Q You might have?

**A I might have. I wasn't the final, because**

**I was not -- November '89. I was still there but I was not the act -- Sam Ruosso would have been the director, so Sam would have signed this.**
Q But would it be a fair statement that it is likely that you would have been the person who would have had to sign off on this document prior to its final issuance?
MR. CRAWFORD: Objection to foundation.
**A Sam ran things administratively loser than I do. I don't know if I would have signed this or not. I mean, under my regime I would have to sign it. I don't know if I signed it, but I was a participant in it.**
Q You might have signed it?
**A I might have signed it. But I might not have.**
Q I would like to turn your attention to page -- you see page ten?
**A Yes.**
Q In connection with your participation in the preparation of this report, would you have reviewed and analyzed the content of this referenced



schedule for restructure program, Figure 1?
**A I would have been involved in it. So, yeah, I would have reviewed it probably, yes.**
Q And would you have been in agreement with its contents before this report was issued?
**A Organizationally I would have been. I'm not sure what my personal opinion was versus the organization's. I just don't recall. I don't recall I had a big disagreement or anything with it.**
Q So you believe that as an organizational matter you would have signed off on the contents of Figure 1, correct?
**A I would have supported it, yes.**
Q Let's just walk through -- first, can you explain to me what this Figure 1 represents?
**A In '89 we reviewed the program, where it was in light of the amendments act, in light of the MRS commission report, and basically restructured the program to a degree around the new repository date which now went to 2010 whereas before it had been 2003. We reviewed that and this was the new, the new revised adjusted program based on those events.**



**That's my recollection of what it was.**
Q How did the MRS commission report that we just reviewed affect your analysis with respect to your review of Figure 1 on page ten?
MR. CRAWFORD: Well, let me just -- I'll object to the foundation of that and to the form of the question about the statement made by counsel that we just reviewed the MRS commission report. I mean, you certainly asked the witness questions about it.
MR. CAYNE: I object to counsel's testimony and speaking objections. They're improper.
Q Could you please respond to the question, Mr. Barrett.
MR. CRAWFORD: I was speaking to you.
**A Repeat the question, please.**
Q Certainly. How did the report issued by the MRS commission affect your analysis of what appears in Exhibit 18 as Figure 1?
MR. CRAWFORD: Objection, foundation. Objection, vague.
**A What the primary premise in this Figure 1 is is a volunteer MRS that would have a proposal to**



**Congress which would change the linkages which would allow us to receive waste in 1998. It does not have in it the user-funded facility. It does not have in it the emergency facility that they recommended.**
Q You said it would have a proposal to Congress.
**A Right.**
Q A proposal to Congress would not be sufficient to allow the overall process referenced in Figure 1 to go forward, correct?
**A A proposal from a volunteer site where the proposer agreed to the linkages, where the linkages were invented to protect the MRS site would surely have been approved by Congress in my opinion. So if we had a volunteer site, I thought it would be very easy -- Congress would readily approve the change in the linkages if it was satisfactory to the volunteer.**
Q So you are confident that federal legislation would have been enacted and signed by the President approving any volunteer that came along that was willing to allow the siting of an MRS facility on its property?

A Did I use the word "confident"?
Q That's my question, sir.
A No, I'm asking you, did I use the word "confident"?
Q I don't recall. My question is are you confident that federal legislation in fact would have been enacted and signed by the President approving any volunteer that came along that was willing to allow the siting and operation of an MRS facility on its property?
A I would say --
MR. CRAWFORD: Objection, vague.
A -- high probability of success. I would not use the word "confident."
Q What do you base your conclusion that there would be a high probability of success? Let me ask this, have you ever participated in the legislative process?
A Yes.
Q By providing testimony to Congress?
A Yes.
Q And in 1987 did you -- you are aware in



1987 that there was an effort to obtain legislation that failed, correct? An effort to obtain legislation by the Department of Energy that failed when Congress imposed linkages that the Department of Energy did not like, correct?
A Correct.
Q But, nevertheless, you sitting here today are confident that if you went back to Congress for legislation to approve a volunteer that came along that was willing to allow the siting of an MRS repository, that Congress would enact and the President would sign into law legislation that would authorize that siting and operation in a form that you would find satisfactory?
MR. CRAWFORD: Objection. Vague.
A I believe that would have a reasonably high chance of success, because the difference being between the two cases is the MRS was proposed to be in Tennessee, which was vigorously opposed by the State of Tennessee and its elected officials, whereas if we had a volunteer site, the premise is that they would not be opposing it because they wouldn't have



volunteered. So there would be a very different legislative outcome of the two cases.
Q What states -- an Indian tribe could have been a volunteer, correct?
A Correct.
Q And would it have been just Indian tribes located in certain states?
A No. It could be an Indian tribe federally recognized.
Q Are you aware that there are Indian tribes today located in the State of Connecticut?
A Yes.
Q And are you aware that the Indian tribes in the State of Connecticut run gambling casinos?
MR. CRAWFORD: Objection. Relevance.
Q Are you aware of that?
A Yes, I am.
Q Well. let me ask you to assume that the Indian tribe in the State of Connecticut receives investment advice from its Wall Street bankers that you guys can make more money siting an MRS facility than competing with Donald Trump in Atlantic City. Do



you understand the situation I'm posing to you?
A Yes.
MR. CRAWFORD: I object to that.
Q And let me assume the Indian tribe came into your office and said, Mr. Barrett, we're here to volunteer. Let's get moving. We want to set up an MRS facility in our tribe location, which is within spitting distance of Stamford, Westport and Greenwich, Connecticut. But it's our land, our property and we think we would be doing good for the United States of America so we're ready to move. If you had a proposal like that, that would be the type of volunteer you're talking about, correct? The tribe would be volunteering to enter into an agreement with the United States to site and operate an MRS facility on its sovereign land in the State of Connecticut. That would constitute a volunteer under your hypothetical, correct?
A No. You invented some totally hypothetical, incredible situation and I wouldn't consider that credible.
Q I'm asking you if a tribe from the State of

# Defendant

calls for speculation.
A I believe they could have and would have.
Q And do you believe then that the political establishment, using your phraseology, of the State of New York, would also support the siting and operation of an MRS facility in the Adirondack Mountains in New York State?
MR. CRAWFORD: Objection to the extent it calls for speculation.
A They may not have vigorously opposed it.
Q And on what do you base that testimony?
A Since you're asking me to speculate on these line of questions, it's my opinion based on working with organizations and political establishment.
Q Do you know who the senators were of the State of New York at the time of the proposals referenced in Exhibit 18?
A I don't know specifically, but it was Senator Moynihan I think and I forget the other one. I think a republican.
Q And do you believe that Senator Moynihan,



Senator D'Amato would have supported the establishment and operation of an MRS facility in the Adirondacks in 1989 or after?
MR. CRAWFORD: Objection. Speculation.
A I didn't use the word "support." I said not vigorously oppose. I don't think they would support it.
Q Do you think they would not vigorously oppose it?
A I think it would have been more difficult for them to oppose a sovereign Indian nation who volunteered to do a national service arrangement. I think it would have been a better situation certainly than was in Tennessee.
Q And why would it be better than Tennessee?
A Because you would have a sovereign Indian nation standing up and saying I would go along with this.
Q Have there been any sovereign Indian nations in Nevada or elsewhere that have offered or expressed interest in the siting of an MRS facility or a permanent repository?



A Yes.
Q And where did that occur?
A New Mexico, Oregon and Utah.
Q And were those -- have those proposals been advanced -- are those proposals still under consideration?
A No.
Q And why not?
A Because Congress didn't provide the funding in FY '94 to go forward and develop it.
Q And did the local politicians of each one of those states that you just referenced, New Mexico, Oregon and Utah, oppose the siting of an MRS or repository within their state borders?
A Not to my knowledge.
Q You don't think the state officials challenged it?
MR. CRAWFORD: Objection. Asked and answered.
A I don't recall them.
Q Why did Congress not provide funding?
A The -- I don't know who started it, but



clearly the Senate and House of Representatives canceled the funding before it got going.
Q What was the proposal before the Congress in 1994 that was not funded?
A The proposal was to provide grants to those three -- the tribes to develop proposals to Congress, and Congress did not provide that funding for us to be able to do that.
Q When did the process begin that led to the consideration of those proposals? Was it in '92 or '93?
A It started in, you know, earlier than that. Probably '89, '90. '89 I think.
Q Was there ever a time between '89 and '94 when Congress failed to provide the funding that you believed that those three proposals or one of those three proposals would likely be approved by the United States Congress?
A Say that again.
Q Did you ever believe that any of the three proposals involving the States of New Mexico, was it Utah, and Oregon would be approved by Congress?

**A If the process was allowed to proceed, yes, I had -- I believed it could happen.**
Q You believe what?
**A I believed it could happen, it could be approved.**
Q And you believed that firmly enough to invest a lot of personal energy and energy of your department and office in pursuing those possibilities, correct?
MR. CRAWFORD: Objection to the form of the question. Objection to the foundation.
Q Correct?
**A Yes. Yes, that was the only alternative I had under the act to be able to meet the '98 date, so I pursued it with all the energy I could.**
Q And you thought you had a reasonable possibility of success, correct?
**A Yes.**
Q And you thought wrong, didn't you?
**A History turned out that that wasn't the way it's going to be.**
Q It's not easy to get fair legislation, is



it?
MR. CRAWFORD: Objection to the vagueness of that.
**A That particular issue never even got to be considered. I think you're surmising that if the proposal had been laid before Congress what was going to happen and you're speculating on that. But I wouldn't speculate like you are.**
Q But what you saw is sometimes you can't even get your proposal before Congress?
**A That's correct. That was cut off before the proposal was ever given to them.**
Q Not only do you have to get Congress to approve your proposal, you have to get Congress to look at it, right?
**A Say that again.**
Q Let me ask you, on page ten of Exhibit 18, you see on the top column under program element, it goes out to 2010.
**A Yes.**
Q Does it go out to 2010 because that was the projected date of repository -- the first date of --



the projected date of repository operations?
**A Yes.**
Q What was the process that led to the extension of that date, the delay of that date out to 2010?
**A I don't remember the details as to what happened with the schedules, but it's my recollection that when you put together the site characterization plan implementation and the processes spelled under the act, and that it was going to take until 2010 to emplace fuel.**
Q Was there a formal process within the Department of Energy that was undertaken that led to the determination that this projection should be delayed to 2010?
**A There was a review done by the staff in the program that came up with the schedule you see on Figure 1.**
Q And who would have been involved, what offices would have been involved in that review?
**A Pretty much all the offices in the program.**
Q Who would have signed off on that



determination to delay the projected start date of the permanent repository?
**A You know, Mr. Ruosso, who I think was the acting director at the time; Mr. Peters, who was the deputy director. I was involved. I might have signed off on it. Then there were dozens of other staff people involved.**
Q Let me ask you to look, it's towards the middle of this document. 1997 it states "start construction 1/1/97." Do you see that?
**A Yes.**
Q You see that that refers, does it not, to the start -- what type of construction is that referring to? Construction of what?
**A That's the MRS facility.**
Q And how long does this Figure 1 indicate it would take for the completion of that facility from start to finish?
**A Construction?**
Q Yes. Construction and to be placed in a position that it would be ready to receive spent nuclear fuel.