# Defendant

461

Q And the premise that I put on it you understand to be that the law remained as it stood on February 5th -- federal law remained as it stood on February 5th, 1990, correct?
MR. CRAWFORD: Objection. Vague.
A **Under that premise what you say is true.**
Q What I say is that under that premise the MRS could not begin to accept spent nuclear fuel until approximately October 2006 according to your calculations, correct?
MR. CRAWFORD: Objection. Asked and answered.
A **With your assumptions, yes.**
Q The only -- when you say your assumptions, what are you referring to? Are you simply referring to the fact that -- strike that. What assumption are you referring to?
A **You make the statement there would be no change in the linkages. The premise that we had for January '98 was that there would be a change in the linkage which could accompany any year with the appropriations process, and it could be changed. In**

462

**that time period, in the 1990s and eighties it was very -- relatively simple to change statute regarding this program, because Bennett Johnston ran both authorized and appropriations committee and that's how he made the amendment in '87. And he could have done it like that.**
Q You're confident of that?
A **Confident? I believe that that was a very plausible scenario, and that's why we adopted that as an approach for the program.**
Q Was Senator Johnston able to push through the legislation desired by the Department of Energy in 1987?
A **No.**
Q He was unsuccessful that time around?
A **Correct. Because it wasn't done in appropriations.**
Q You believe that the congressmen, senators should have followed different legislative procedures in order to accomplish the goals of the Department of Energy at that time, correct?
A **No. There's a lot of flexibility for the**

463

**legislative branch to do what they wish to do.**
Q Let me ask you, back to Exhibit 19. You indicated that this projection was based on the premise that federal law would be amended, correct?
A **Correct.**
Q And specifically the linkages would be repealed or modified, correct?
A **Correct.**
Q If that assumption was being made, why was there not also a proposal to increase the statutory MTU limit of 10,000 to a higher figure such as 15,000 or greater?
A **I don't recall exactly why the program at the time chose to deal with the linkage and not with the mass limits.**
Q You have no knowledge of that issue?
A **Say your question again.**
Q I'm asking why -- let me step back. The projections and proposals referenced on Exhibit 19 assume the enactment of federal legislation, correct?
A **Correct.**
Q In light of the fact that your office was

464

assuming that the law was changed, why wasn't your office also assuming that that change in law would increase the MTU limit that I believe that the Department of Energy had initially opposed in 1987?
A **My -- I don't know if it's speculation, but my belief, okay, when this was discussed was that there had to be a balance in the eyes of the volunteer that they had some protections. We did not make it an issue to remove all elements like the metric tonnage limits as well as the time linkages, because the thing that was most important to us was that we start moving materials of reasonable quantity, of which 10,000 tons was a reasonable quantity, as soon as we could with '98. So we did not -- my recollection is we did not try to remove everything because it would have been harder to ever get a volunteer or to get it through the political process, that we chose to leave the linkages and not make the linkages a statutory initiative like we did the time linkages, because it was secondary and would have detracted our ability to ever get it approved by Congress as you asked earlier.**
**So in my mind, as I recall this, was we**

465

**chose not to try to force the tonnage, as we chose to really address the time linkage. Because it was a secondary -- of secondary importance relative to the time. So that is why we left the metric tonnage there. Although we initially never wanted the metric ton limits, they were a fact and they were law at that time, period. So we were trying to make the best of a bad statutory situation we found ourself in with the '87 amendment.**

Q Did the Department of Energy have a congressional lobbyist in 1990?

A **We don't have lobbyists.**

Q Do you have officials whose primary duty is dealing with the federal legislature?

A **We have an Office of Congressional Affairs.**

Q And who was that office run by in 1990?

A **I don't recall.**

Q Do you frequently deal with that office?

A **No.**

Q Did you deal with that office in 1990?

A **Probably.**

Q But maybe not?

466

A **I don't remember.**

Q Do you recall whether in 1990 you sought advice from that office on the likelihood of federal legislation being enacted to modify or amend the statutory linkages?

A **I don't remember the Office of Congressional Affairs really ever being in tune with much of this at all. This was done primarily with Secretary Watkins' office.**

Q But the Office of Congressional Affairs did deal with congressmen, senators on a daily basis, correct?

A **I don't know what they did.**

Q You don't know the function?

A **I know -- no, I don't.**

Q And I take it you never involved that office in discussions relating to efforts to cause Congress to consider the repeal or amendment of the linkages, correct?

MR. CRAWFORD: Objection. Foundation.

A **There were probably some congressional affairs staffers around at meetings.**

467

Q But you're not sure?

A **I'm not sure.**

Q And you don't recall ever having a conversation with the head of that office or any staffer relating to the likelihood of congressional legislation -- the likelihood that congressional legislation would be enacted to modify or repeal the statutory linkages, correct?

MR. CRAWFORD: Objection to the foundation. Objection to the form of the question.

Q Correct?

A **I don't recall any ones that I did. Sam Ruosso or Frank Peters, who were my superiors, might well but I didn't. That I recall. I know there were staffers around. I never recall having a meaningful discussion with somebody from that office who really knew anything.**

Q And don't recall ever having such a conversation in 1990 or any other time, correct?

MR. CRAWFORD: Objection to the form of the question. Objection to the foundation.

A **You're talking about 1990.**

468

Q Did you ever have a conversation with anyone from that office concerning the issue of congressional legislation to amend or repeal the linkages at any time, 1990 or at any time prior to or subsequent to 1990?

MR. CRAWFORD: Objection to the form and foundation.

A **Probably did in '93ish. But not in 1990. I don't recall any in 1990, '89 or 1990.**

Q Can you recall a specific discussion in '93ish?

MR. CRAWFORD: Objection to the form. Objection to the foundation.

Q Or do you just think you might have had such conversations?

A **No, I know in '93, '93 was different because I was now -- a change of time. I was acting director in '93. So I can't remember who it was but there was -- and I did have discussions with that office regarding all my testimony and dealing with stuff with Secretary O'Leary, so, yeah, I worked with that office but I don't remember like who was in**

# Defendant

8/k



527

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

-----------------x

YANKEE ATOMIC ELECTRIC COMPANY; : Case Nos. 98-126C,
CONNECTICUT YANKEE ATOMIC POWER : 98-154C, 98-474C,
COMPANY; MAINE YANKEE ATOMIC : 98-483C, 98-484C,
POWER COMPANY; FLORIDA POWER & : 98-485C, 98-486C,
LIGHT COMPANY; NORTHERN STATES : 98-488C, 98-614C,
POWER COMPANY; DUKE POWER, a : 98-621C, 99-447C,
Division of DUKE ENERGY CORP.; : 00-440C, 00-695C,
INDIANA MICHIGAN POWER COMPANY; : 00-703C, 01-115C,
SACRAMENTO MUNICIPAL UTILITY : 01-116C, 01-249C

-----------------X

(Caption continued on the next page)

Continued Deposition of LAKE H. BARRETT
Washington, D. C.
Friday, April 26, 2002
8:10 a.m.

Job No.: 11792-8
Pages 527 through 825, Volume 3
Reported by: Diane Gomez, RPR

528

DISTRICT; SOUTHERN NUCLEAR :
OPERATING COMPANY, et al.; :
COMMONWEALTH EDISON COMPANY; :
BOSTON EDISON COMPANY; GPU :
NUCLEAR, INCORPORATED; WISCONSIN :
ELECTRIC POWER COMPANY; POWER :
AUTHORITY OF THE STATE OF NEW :
YORK; OMAHA PUBLIC POWER DISTRICT;:
NEBRASKA PUBLIC POWER DISTRICT; :
and TENNESSEE VALLEY AUTHORITY, :
Plaintiffs :
v. :
THE UNITED STATES, :
Defendant :

-----------------X

529

Continued Deposition of LAKE H. BARRETT, held at the offices of:

ARNOLD & PORTER
555 12th Street, Northwest
Washington, D. C. 20004
(202) 942-5000

Pursuant to agreement, before Diane Gomez, Registered Professional Reporter and Notary Public in and for the District of Columbia.

530

APPEARANCES

ON BEHALF OF PLAINTIFFS FLORIDA POWER & LIGHT COMPANY, NORTHERN STATES POWER COMPANY, DUKE POWER, INDIANA MICHIGAN POWER COMPANY, BOSTON EDISON COMPANY, GPU NUCLEAR, INC., POWER AUTHORITY OF THE STATE OF NEW YORK, OMAHA PUBLIC POWER DISTRICT, and NEBRASKA PUBLIC POWER DISTRICT:

DEVON E. HEWITT, ESQUIRE
SHAW PITTMAN LLP
1650 Tysons Boulevard
McLean, Virginia 22102-4859
(703) 847-5097

ON BEHALF OF PLAINTIFF SACRAMENTO MUNICIPAL UTILITY DISTRICT:

HOWARD CAYNE, ESQUIRE
JEFFREY L. HANDWERKER, ESQUIRE
RONALD A. SCHECHTER, ESQUIRE
ARNOLD & PORTER
555 12th Street, Northwest
Washington, D. C. 20004-1206
(202) 942-5000

739

**readiness for earlier transportation should a site for federal interim storage become available sooner than a repository." I believe that's the only part in here on the MRS.**
Q You believe that's the only reference in this document to an MRS?
A **My quick scan here, my recollection was I don't remember anything else. Somebody else may have read it closely.**
Q Turn your attention to page one, Bates 174286.
A **I'm sorry, page one?**
Q Page one on the bottom, paragraph one.
A **Okay.**
Q On the end of the introduction section it states that "By 1993 it became clear that continuation of the program in accordance with the then-current approach was no longer a viable option." Do you see that?
A **Yes.**
MR. CRAWFORD: Where is that?
MR. CAYNE: Last sentence of the

740

introduction.
A **Yes, I see it.**
Q What was the then-current approach that's being referred to in that statement?
A **That was the volunteer MRS that would -- had a reasonable chance of success for 1998. That was no longer a viable option.**
Q So that was no longer a viable option?
A **I would have used the word "unlikely," but it's certainly not the central premise for waste acceptance anymore.**
Q The department used the word "viable," correct?
A **That's what it says.**
Q And you would have seen this document before it was issued, correct?
A **Yes.**
Q And I assume you were in the chain of command that had to approve this document?
A **I was responsible, I'm sure. I don't know if I ever signed it off or not.**
Q You would have been satisfied with the

741

language of this document, correct, before it became final?
A **Yes.**
MR. CRAWFORD: Objection, asked and answered. Argumentative.
A **I would have accepted those words there.**
Q The words being "no longer a viable option," correct?
MR. CRAWFORD: Objection, asked and answered. Argumentative.
Q Correct?
MR. CRAWFORD: Objection, asked and answered, argumentative.
A **Correct.**
Q Page four, please, bottom of page four. The first sentence. "When the Nuclear Waste Policy Act was enacted, it was envisioned that the department would have had a facility available in 1998 to accept waste for disposal, and the department entered into contracts with utilities on that basis." Do you see that?
A **Yes.**

742

Q What does that mean, that the department entered into contracts with utilities on the basis that it would have a facility available in '98 to accept waste for disposal?
MR. CRAWFORD: Objection to the extent it calls for speculation.
A **Just what it says.**
Q Do you understand what that means?
A **The act says we should have a contract within the time frame, and they put those contracts together under the limited time there in '83, '84. The base operating premise was it would have a facility ready to accept in 1998.**
Q The time the contract was signed or contracts were signed in 1983, that is what the government and the nuclear utilities intended?
MR. CRAWFORD: Objection --
Q Correct?
MR. CRAWFORD: -- to the extent it calls for speculation. Objection to the extent it calls for a legal conclusion.
A **I wasn't there. I wasn't involved in a**

**program then, so I don't know what they envisioned.**
Q But is that your understanding?
MR. CRAWFORD: Objection to the extent it calls for speculation. Objection to the extent it calls for a legal conclusion.
A Yes.
Q Page nine, please. Under Waste Acceptance Storage and Transportation Approach, towards the bottom of the page it says. The main aspects of the approach for waste acceptance storage and transportation are to" -- and it gives then six separate entries on pages nine and ten. Do you see that?
A Yes.
Q And specifically on the top of page ten, the first line it says "Because more detailed work would not be useful until a specific site has been selected, no development work is included in the current plan." Do you see that?
A Yes.
Q Is that referring to an MRS facility?
**A Site-specific MRS facility is what that**



**refers to.**
Q And again by "site-specific MRS facility," specifically what are you referring to?
**A The actual siting of a facility. If we did generic work was the previous sentence. We did generic work for a generic facility. It could be sited anywhere. So if a site develops through some political process, we would be able to quickly build such a facility to receive fuel as quickly as possible.**
Q And at this time the department did not think that to be a viable option, correct?
MR. CRAWFORD: Objection. Best evidence.
**A There was a low probability.**
Q Low probability did you say?
**A Yes.**
Q And, in fact, such a specific site never did become available through today?
**A Correct.**
**(Deposition Exhibit Barrett 37 was marked for identification and was retained by counsel.)**
Q Exhibit 36, under Fiscal -- on page 14,



under Fiscal Year 2000 it states that "The site recommendation will be submitted in a report to the President in 2000." Correct?
MR. CRAWFORD: Objection, vague.
**A Yes, it says that.**
Q And the page before to which that refers, the caption of that page is Major Milestones for Program Success. Do you see that, page 13?
**A I see the chart.**
Q So according to this chart, the recommendation, the site recommendation to the President was one of the major milestones for program success, correct?
**A Yes.**
Q And that milestone, in fact, has occurred two years later than planned for in the radioactive management program plan set forth in Exhibit 36, correct?
**A Close.**
Q What's close? It occurred two years after the date, correct?
**A Including FY '02, but depending on when in**



**the year, a little less than two years.**
Q Is it fair to say that as of now the program is at least a little less than two years behind schedule. as reflected by the major milestones for program success?
**A As defined back in '94, yes.**
Q The court reporter has handed you a document marked for identification as Exhibit 37. It is a memorandum, Subject: Total life cycle cost 1995 assumptions package from Ronald A. Milner, Director, Office of Program Management and Integration, bearing Bates HQR-057-1493 through HQR-057-1569. Do you have that document before you?
**A Yes.**
Q Could you please turn to page Bates number 14 -- oh, this is -- it says RW-30 in the top left corner. Do you see that?
**A Yes.**
Q Could you please refer to Bates 057-1498. First. what would your involvement in this, in the preparation or review of this document have been?
**A I would have signed off on a final total**

# Defendant

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

------------------x

YANKEE ATOMIC ELECTRIC COMPANY; : Case Nos. 98-126C,
CONNECTICUT YANKEE ATOMIC POWER : 98-154C, 98-474C,
COMPANY; MAINE YANKEE ATOMIC : 98-483C, 98-484C,
POWER COMPANY; FLORIDA POWER & : 98-485C, 98-486C,
LIGHT COMPANY; NORTHERN STATES : 98-488C, 98-614C,
POWER COMPANY; DUKE POWER, a : 98-621C, 99-447C,
Division of DUKE ENERGY CORP.; : 00-440C, 00-695C,
INDIANA MICHIGAN POWER COMPANY; : 00-703C, 01-115C,
SACRAMENTO MUNICIPAL UTILITY : 01-116C, 01-249C

------------------X

(Caption continued on the next page)

Deposition of LAKE H. BARRETT, VOLUME 4
Washington, D.C.
Wednesday, May 8, 2002
9:31 a.m.

Job No.: 11792-10
Pages: 826 through 1103
Reported by: Diane Gomez, RPR



DISTRICT; SOUTHERN NUCLEAR :
OPERATING COMPANY, et al.; :
COMMONWEALTH EDISON COMPANY; :
BOSTON EDISON COMPANY; GPU :
NUCLEAR, INCORPORATED; WISCONSIN :
ELECTRIC POWER COMPANY; POWER :
AUTHORITY OF THE STATE OF NEW :
YORK; OMAHA PUBLIC POWER DISTRICT;:
NEBRASKA PUBLIC POWER DISTRICT; :
and TENNESSEE VALLEY AUTHORITY, :
Plaintiffs :
v. :
THE UNITED STATES, :
Defendant :

------------------X



Deposition of LAKE H. BARRETT, VOLUME 4, held at the offices of:

ARNOLD & PORTER
555 12th Street, Northwest
Washington, D.C. 20004
(202) 942-5000

Pursuant to agreement, before Diane Gomez, Registered Professional Reporter and Notary Public of the District of Columbia.



APPEARANCES

ON BEHALF OF PLAINTIFFS FLORIDA POWER & LIGHT COMPANY, NORTHERN STATES POWER COMPANY, DUKE POWER, INDIANA MICHIGAN POWER COMPANY, BOSTON EDISON COMPANY, GPU NUCLEAR, INC., POWER AUTHORITY OF THE STATE OF NEW YORK, OMAHA PUBLIC POWER DISTRICT, and NEBRASKA PUBLIC POWER DISTRICT:

ALEX D. TOMASZCZUK, ESQUIRE
SHAW PITTMAN LLP
1650 Tysons Boulevard
McLean, Virginia 22102-4859
(703) 847-5097

ON BEHALF OF PLAINTIFF SACRAMENTO MUNICIPAL UTILITY DISTRICT:

HOWARD CAYNE, ESQUIRE
ARNOLD & PORTER
555 12th Street, Northwest
Washington, D.C. 20004-1206
(202) 942-5000

938

**executive branch, and we followed that.**
Q So the position advanced by your office was consistent with the administration policy that you just stated, correct?
MS. HERRMANN: Same objections.
A **We accepted that, and we followed that as a member of the administration.**
MR. CAYNE: We're going to the next document. It's 11:55. Why don't we break for an hour lunch now, and we'll return at one.
(There is a discussion off the record.)
(A luncheon recess is taken.)

939

AFTERNOON SESSION
Q Mr. Barrett, between the time of the last session of this deposition and today did you discuss your testimony with any person?
A **No.**
Q Did you review any documents in preparation for today's session of the deposition?
A **No.**
Q Did you have any conversations with counsel following the completion of the last session and the beginning of today's session?
A **Just to set up the date for today.**
Q Do you recall, Mr. Barrett, that you testified today that the obligation rate is not equal to the system operating capacity?
A **Yes.**
Q What is the basis for that testimony?
A **In designing any system, from an engineering point of view you design the system to meet or exceed the system requirements. In this case -- not case. In this situation designing the system -- I don't want to confuse this with legal**

940

**cases. We want to design the system to operate at a rate that exceeds the requirements. The requirements that we have are a combination of many factors, which one of them is in the contract, as I understand, relates to the ACR which is the four, six, 900 number. We want to exceed that by a substantial margin. Which the design rate of -- our present reference rate of four, six, 12, 2,000, 3,000, does that.**
Q Your testimony on that point is inconsistent with the position taken by the Department of Energy in 1987, isn't it?
MS. HERRMANN: Objection. Foundation.
A **Not that I know of.**
Q Your testimony that the obligation rate would not equal the system operating capacity, isn't that inconsistent with the position taken by the department in 1987?
MS. HERRMANN: Objection. Foundation.
A **Not that I know of.**
Q Let me turn your attention to Exhibit 6 of this deposition, page ten, which bears Bates --
A **Hold on now. Six? Do you want me to find**

941

**it?**
Q Yes.
MR. CAYNE: I'll just state for the record that I'm turning the witness' attention to PA-103165.
A **What page number should I be at?**
Q Page ten. Bates 103165.
A **Okay.**
Q Under Section 3.2 there is the following statement: "The waste acceptance schedule presented in this ACR represents the projected WMS capacity available for allocation to the purchasers. The projected WMS capacity equals the system operating capacity," and then you see it continues.
A **I see it.**
Q That statement is inconsistent with the testimony you just gave, is it not?
MS. HERRMANN: Objection. Asked and answered.
A **Yes, I think so.**
Q Who was responsible for issuing this annual capacity report? Was it your predecessor?
A **I don't think it was me. Yeah, Ben Rusche,**

# Defendant

950

Q What lower receipt rate studies were you just referring to?
**A Oh, I don't know. Some of those ones you had back here.**
Q Could you go through the exhibits and please identify for me which ones you were referring to.
**A Which one is that OMB one that had the -- all the 2007, 2010, 2000 whatevers? Not this one.**
Q You mean Exhibit 42?
**A 43 I think.**
Q 43?
**A I think 43 had some lower receipt rates in it.**
Q And those lower receipt rates in Exhibit 43 were based upon what?
**A Funding constraints.**
Q Funding constraints imposed by Congress?
**A Yes.**
Q Did Congress impose such funding constraints?
**A They certainly have.**

951

Q When were those funding constraints imposed?
MS. HERRMANN: Can we just give him a minute to get what he's looking at.
**A About every year. For the last five years. We've been funding-constrained by Congress for the last five years.**
Q Those funding constraints had an ability (sic) on your office's capability to begin the acceptance of spent nuclear fuel on a timely basis?
MS. HERRMANN: Objection. Calls for a legal conclusion.
**A They've slowed us down.**
Q Substantially?
**A Months.**
Q Years?
**A If you add them all up, probably a year or so.**
Q Getting back to the ACR, what is the relevance of an ACR with an acceptance rate of 400, 600, 900 MTUs per year in today's environment where there is a stand-alone repository?

952

MS. HERRMANN: Objection. Vague, calls for a legal conclusion.
**A I don't know.**
Q Is there any?
MS. HERRMANN: Same objections.
**A Only as it relates to the legalities of contracts.**
Q The 400, 600, 900 MTUs standard was pertinent in the context where an MRS would have gone into effect in 1998 and have been in operation for ten to 12 years prior to repository, correct?
**A That's my understanding.**
Q And that's the only circumstance in which a 400, 600, 900 MTU take-rate had any relevance, correct?
**A That was the basis at that time.**
Q At that time, you're referring to what time?
**A Back in the eighties when that was -- late eighties, early nineties when that was established, that's correct.**
Q So in the late eighties, early nineties

953

when the 400, 600, 900 MTU take-rate was established, the only relevance that take-rate had was in the context where an MRS would commence operations in 1998 and would operate by itself for ten to 12 years prior to the time that a repository, a permanent repository, began operations, correct?
**A Correct.**
Q Back to Exhibit 6. WMS stands for waste management system, correct, on page ten of Exhibit 6?
**A I think so.**
Q And what is the waste management system?
MS. HERRMANN: Objection. Foundation.
Q You've used that term, haven't you?
**A I generally don't.**
Q Have you ever heard it used?
**A Yes.**
Q Do you have an understanding what it means?
**A I think that was the overall -- yes. I think I do. I think it was the overall system as they described it back at that time.**
Q And the overall system as described back at that time involved what?

A A repository, a transportation, an MRS.
Q What is system operating capacity?
A I don't know how they used it in this document.
Q How do you use it?
A I use it as that's what you really expect to operate at.
Q Okay. Using the term "system operating capacity" as you just defined it --
A Okay.
Q -- and the term "WMS" as you just defined it also, do you agree with this statement on page ten?
MS. HERRMANN: Which statement?
Q That the projected WMS capacity equals the system operating capacity?
A What was the question, do I agree with it?
Q Yes.
A No.
Q Why don't you agree with that?
A Because I believe that the system operating capacity should exceed the system operating requirement. It would appear to me in this, back in



'87 they were setting the system operating capacity exactly equal to the requirement, which I think is the wrong way to design a system.
Q But that is what the Department of Energy did in 1987?
A I don't know what they did in '87. I wasn't involved in this.
Q Did you ever discuss this issue with your predecessor?
A The issue of what?
Q The issue of setting the operating capacity exactly equal to the requirement.
A No. Not that I recall. Let me phrase it that way.
(Deposition Exhibit Barrett 45 was marked for identification and retained by Counsel.)

Q The court reporter, Mr. Barrett, has handed you a document marked for identification as Exhibit 45, bearing HQR-025-5075 --
MS. HERRMANN: Can I get one of those?
Q -- through 5139.



A 50?
Q 5075.
A Down the bottom here?
Q Yeah, bottom right.
A I got 176202.
MS. HERRMANN: We're not looking at the same document.
Q The Bates numbers I just read into the record are wrong. The correct Bates numbers are PA-176202 through PA-176266. The document is called Analysis of Total System Life Cycle Cost of Civilian Radioactive Waste Management Program dated September 1995. Do you have that document before you?
A I do.
Q Would you turn to page five. What was the purpose of this document?
MS. HERRMANN: Objection. Foundation.
A This is the total life-cycle cost analysis that we do periodically to determine -- to estimate the total cost of the system so we can do a fee adequacy report as to the adequacy of the charge to the utilities.



Q Now, in 1995, in September 1995 your office in performing the total system life-cycle cost analyses assumed that there would not be a monitored retrievable storage facility, correct?
A I have to check what the time is. September '95 we probably did not assume there was an MRS. I don't know what this document says.
Q Well, I refer your attention to page five, the third-to-the-last paragraph on page five.
A Okay. Does not.
Q Could you turn to page eight.
A Yes.
Q What does Table 1-2 represent?
MS. HERRMANN: Objection. Foundation.
A It says "monitored geologic disposal system receipt/emplacement rates."
Q What were the rates reflected on Table -- how were the rates reflected on Table 1-2 determined?
MS. HERRMANN: Objection. Foundation.
A I don't know.
Q You have no idea?
A No.

# Defendant

about the nuclear waste negotiator, correct?
A Yes.
Q And am I correct that the activities of the nuclear waste negotiator were terminated in 1995?
A I don't know the exact date, but somewhere in the mid-nineties.
Q Were they terminated at that point?
MS. HERRMANN: Objection. Foundation.
A I believe the term of office of Mr. Stallings, the last negotiator, expired by statute.
Q Do you know why his mandate was not renewed?
MS. HERRMANN: Objection. Foundation, speculation, calls for a legal conclusion.
A No.
Q What effect did the termination of the Office of Nuclear Waste Negotiator have on the planning activities of your office?
MS. HERRMANN: Objection. Foundation.
A Not appreciable that I recall.
Q Did it have any effect on your



consideration, for example, of the viability of an MRS facility?
A No, because -- not to my recollection, because the viability of an MRS facility was, you know, negative based on the budget enactment of FY '94.
Q So would you agree that the MRS facility was effectively dead prior to the time that the Office of the Nuclear Waste Negotiator terminated?
A I don't know when the term -- the office actually terminated. So I don't know. You said '95. I don't know when the negotiator officially terminated.
Q Take a look at page 33 of Exhibit 45. I refer you to paragraph 4.7.
A Uh-huh.
Q Does that indicate that the negotiator's activities terminated in 1995?
A It looks like it.
Q But based on that would you agree that the viability -- that an MRS facility was nonviable significantly before the time the Nuclear Waste



Negotiator's Office terminated?
A Well, in my opinion the MRS siting was not viable once the Congress act on the FY '94 appropriations prohibiting me from providing grants to the Indian tribes. That's in my mind when it became not viable. Exactly when a negotiator terminated I don't remember.
Q Do you remember we discussed the 1995 ACR in the last session of the deposition?
A Not really.
Q Do you recall discussing it at all?
A We had -- there were multiple ACRs of different dates. So that much I remember we talked about, but the '95 one versus other dates I don't recall.
Q You're referring to Exhibit 39?
A 39. I have it.
Q Take a moment to look through it and see if it refreshes your recollection that we discussed it during the last session of this deposition.
A What's the question? I see an ACR.
Q Do you recall that we discussed this ACR?



A Yes.
Q What was the purpose of the 1995 ACR?
MS. HERRMANN: Objection. Foundation, calls for a legal conclusion.
A Something that relates to the contract.
Q Do you have any more knowledge about the purpose of the 1995 ACR?
A No.
Q Did your office use the 1995 ACR for any purpose?
MS. HERRMANN: Objection. Asked and answered.
A I'm sure people in the office used it, okay.
Q For what purpose?
A For whatever they used it for. I don't know.
Q You didn't use it for any purpose?
A Does this have the table in it that I do use?
Q Which table are you referring to?
A The only thing I'm familiar with in this is

966

**page six, Table 2. That's the only thing I ever personally used out of this document.**
Q The only thing you ever used is the summary of the purchaser's annual allocations?
A **Right.**
Q And for what purpose did you use that chart?
A **I used that to have an understanding of which utilities had what allocations in the year one, year two, year three, year four. For policy reasons is why I wanted to know.**
Q What policy reasons?
A **Just if I ever have to talk to various executors from various companies where they stood in the queue.**
Q Look at page four, please.
A **Yes.**
Q Did you use the table on page four for any purpose?
A **No.**
Q None at all?
A **No.**

967

Q What was your position in March 1995?
A **I think I was the deputy director.**
Q Who prepared the table on page four?
MS. HERRMANN: Objection. Foundation.
A **I don't know. Some people in the waste acceptance area.**
Q People who worked for you?
A **Yes.**
Q For what purpose?
MS. HERRMANN: Objection. Foundation.
A **Part of what they consider the business of the office, which I agreed with.**
Q You agreed with what?
A **Them doing what they felt they needed to do.**
Q In March 1995 you did not expect to be picking up spent nuclear fuel at the rates referenced in Table 1, correct?
MS. HERRMANN: Objection. Vague.
A **Repeat the question again.**
Q In March 1995 you did not expect that the Department of Energy would be picking up spent nuclear

968

fuel at the rates reflected on Table 1?
MS. HERRMANN: Same objection.
A **It was my desire and intention that we would pick up in year two, three, four a rate higher than this.**
Q But there was no, in 1995 there was no expectation in the Office of Civilian Radioactive Waste Management that spent fuel would, in fact, be picked up at the rates reflected at Table 1, correct?
MS. HERRMANN: Objection. Foundation.
A **Did you say no expectation?**
Q Right. In March 1995, at which time, as you've testified, the MRS was not viable, your office did not expect that spent fuel would be picked up at the rates reflected on Table 1, correct?
MS. HERRMANN: Same objection.
A **I ask you to clarify the word "expect." I didn't know what to expect. It was our intention and desire with all our energies to pick it up at a rate that we desired to pick it up, which was a higher rate than this.**
Q That was the rate that moved up to 3,000

969

MTUs per year, correct?
A **That was our desire, that was our goal, and we strived to do that. What actually would happen we did not know. So my expectation was very uncertain.**
**So you asked to say what I expect. The expectation, I have to say that I don't know what to expect. We were trying to run it as high as we could run it.**
Q But you had various -- your office, the Office of Civilian Radioactive Waste Management Control, had various plans that it followed pursuant to which your activities were conducted, correct? You had various plans?
A **We had plans and goals in trying to achieve the intent of the act.**
Q Right. And in 1995, March of 1995, there was not a plan in effect that would have called for the acceptance of spent fuel at the rates reflected in Table 1, correct?
A **Correct.**
Q In fact, the plan that was in place in 1995 called for the acceptance of spent fuel at a rate that

# Plaintiff

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
-----------------x
YANKEE ATOMIC ELECTRIC COMPANY; : Case Nos. 98-126C,
CONNECTICUT YANKEE ATOMIC POWER : 98-154C, 98-474C,
COMPANY; MAINE YANKEE ATOMIC : 98-483C, 98-484C,
POWER COMPANY; FLORIDA POWER & : 98-485C, 98-486C,
LIGHT COMPANY; NORTHERN STATES : 98-488C, 98-614C,
POWER COMPANY; DUKE POWER, a : 98-621C, 99-447C,
Division of DUKE ENERGY CORP.; : 00-440C, 00-695C,
INDIANA MICHIGAN POWER COMPANY; : 00-703C, 01-115C,
SACRAMENTO MUNICIPAL UTILITY : 01-116C, 01-249C
-----------------X
(Caption continued on the next page)

Deposition of LAKE H. BARRETT, VOLUME 4
Washington, D.C.
Wednesday, May 8, 2002
9:31 a.m.

Job No.: 11792-10
Pages: 826 through 1103
Reported by: Diane Gomez, RPR



DISTRICT; SOUTHERN NUCLEAR :
OPERATING COMPANY, et al.; :
COMMONWEALTH EDISON COMPANY; :
BOSTON EDISON COMPANY; GPU :
NUCLEAR, INCORPORATED; WISCONSIN :
ELECTRIC POWER COMPANY; POWER :
AUTHORITY OF THE STATE OF NEW :
YORK; OMAHA PUBLIC POWER DISTRICT;:
NEBRASKA PUBLIC POWER DISTRICT; :
and TENNESSEE VALLEY AUTHORITY, :
Plaintiffs :
v. :
THE UNITED STATES, :
Defendant :
-----------------X



Deposition of LAKE H. BARRETT, VOLUME 4, held at the offices of:

ARNOLD & PORTER
555 12th Street, Northwest
Washington, D.C. 20004
(202) 942-5000

Pursuant to agreement, before Diane Gomez, Registered Professional Reporter and Notary Public of the District of Columbia.



APPEARANCES

ON BEHALF OF PLAINTIFFS FLORIDA POWER & LIGHT COMPANY, NORTHERN STATES POWER COMPANY, DUKE POWER, INDIANA MICHIGAN POWER COMPANY, BOSTON EDISON COMPANY, GPU NUCLEAR, INC., POWER AUTHORITY OF THE STATE OF NEW YORK, OMAHA PUBLIC POWER DISTRICT, and NEBRASKA PUBLIC POWER DISTRICT:
ALEX D. TOMASZCZUK, ESQUIRE
SHAW PITTMAN LLP
1650 Tysons Boulevard
McLean, Virginia 22102-4859
(703) 847-5097

ON BEHALF OF PLAINTIFF SACRAMENTO MUNICIPAL UTILITY DISTRICT:
HOWARD CAYNE, ESQUIRE
ARNOLD & PORTER
555 12th Street, Northwest
Washington, D.C. 20004-1206
(202) 942-5000

Q No. My question is with respect to this statement: When the nuclear waste policy was enacted, policy act was enacted, it was envisioned that the department would have a repository available for permanent waste disposal in 1998, and the department entered into contracts with the utility to begin accepting waste in 1998 on that basis. Is that statement consistent with your understanding?
A Yes.
MS. HERRMANN: Objection. Foundation, calls for a legal conclusion.
A Yes.
Q On page three could you please turn to the first paragraph on the top of the page. Do you see that?
A Yes.
Q Why would continued on-site storage of spent fuel threaten the orderly operation of the nation's civilian nuclear reactors?
MS. HERRMANN: Objection. Foundation.
You can take time to read it if you need to.



THE WITNESS: Yeah.
**A You're referring to a phrase in this paragraph?**
Q I'm looking at the last sentence of the first full paragraph on page three. Do you see that?
**A The last sentence. I see the last sentence.**
Q And my question is how or why would the continued on-site storage of spent fuel threaten the orderly operation of the nation's civilian nuclear reactors?
MS. HERRMANN: Objection. Foundation.
**A The example of this would be the Prairie Island situation.**
Q And please explain to me that example.
**A Where due to local state -- state law they had difficulty getting storage and may have to shut the reactor down.**
Q Are there any other situations that you're familiar with which at-reactor storage could threaten the orderly operation of nuclear reactors?
**A No specific ones.**



Q Do you believe that to be generally a concern?
**A Yes.**
Q Do you recall I asked you about an Upton Bill, U-p-t-o-n, the last session of this deposition?
**A Vaguely.**
Q Could you please turn to what's marked as page one, Bates number 0579 of this exhibit.
MS. HERRMANN: The next page in our copy, right, counsel?
**A Policy options, option one?**
Q Yes, that's the page.
**A I see it.**
Q It's Option 4. I'm sorry.
**A Option 4?**
Q Yes. The bottom of the page is Bates number 0579.
MS. HERRMANN: Our Bates numbers are cut off so we're going to need a better reference.
MR. CAYNE: It's Option 4.
**A Yes, I see the page.**
MS. HERRMANN: For the record, a good



number of these pages are numbered page number one and page number two, so that's not going to help.
**A Just so you know, ten minutes from now I need to go.**
Q It's 3:45.
**A Oh, I'm a whole hour off. Sorry about that.**
MS. HERRMANN: Wishful thinking.
Q I'd like to turn your attention to towards the bottom of the page there's a paragraph that begins "start of waste acceptance." Do you see that?
**A Yeah, I see the paragraph.**
Q Would you please read that.
**A Okay.**
Q Have you read that passage?
**A Yes.**
Q Now, the reference to the storage facility here is to an interim storage facility, correct?
MS. HERRMANN: Objection. Foundation.
**A That's my understanding.**
Q And just for the record, let me just read the statement so it's clear what we're talking about.

lookout for that.

(Thereupon, at 1:30 p.m., the taking of the instant deposition ceased.)

[signature]
Signature of the Witness

SUBSCRIBED AND SWORN to before me this ______ day of 6/27, 2002.

[signature]
NOTARY PUBLIC

My Commission Expires: Pat L. Austin
Notary Public, District of Columbia
My Commission Expires 05-14-2006

ERR...A SHEET FOR THE TRANSCRIPT OF:

Notice Date: May 16, 2002
Case Name: Yankee Atomic vs. United States
Case Number: 98-126C-987 4C
Dep. Date: May 15, 2002
Deponent: Lake Barrett (cont)
Place: Washington DC
Ref. No.: 4269-4

CORRECTIONS:

| Page | Line | Now Reads | Should Read | Reasons Therefore |
|---|---|---|---|---|
| 333 | 22 | he | he was (add) | |
| 337 | 23 | signed | assigned him | |
| 337 | 18 | fuel | full | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

[signature]
Signature of Deponent

6/20/02
Date of Signature

# Plaintiff

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

-----------------x

YANKEE ATOMIC ELECTRIC COMPANY; : Case Nos. 98-126C,
CONNECTICUT YANKEE ATOMIC POWER : 98-154C, 98-474C,
COMPANY; MAINE YANKEE ATOMIC : 98-483C, 98-484C,
POWER COMPANY; FLORIDA POWER & : 98-485C, 98-486C,
LIGHT COMPANY; NORTHERN STATES : 98-488C, 98-614C,
POWER COMPANY; DUKE POWER, a : 98-621C, 99-447C,
Division of DUKE ENERGY CORP.; : 00-440C, 00-695C,
INDIANA MICHIGAN POWER COMPANY; : 00-703C, 01-115C,
SACRAMENTO MUNICIPAL UTILITY : 01-116C, 01-249C

-----------------X

(Caption continued on the next page)

Deposition of LAKE H. BARRETT, VOLUME 4
Washington, D.C.
Wednesday, May 8, 2002
9:31 a.m.

Job No.: 11792-10
Pages: 826 through 1103
Reported by: Diane Gomez, RPR



DISTRICT; SOUTHERN NUCLEAR :
OPERATING COMPANY, et al.; :
COMMONWEALTH EDISON COMPANY; :
BOSTON EDISON COMPANY; GPU :
NUCLEAR, INCORPORATED; WISCONSIN :
ELECTRIC POWER COMPANY; POWER :
AUTHORITY OF THE STATE OF NEW :
YORK; OMAHA PUBLIC POWER DISTRICT;:
NEBRASKA PUBLIC POWER DISTRICT; :
and TENNESSEE VALLEY AUTHORITY, :
Plaintiffs :
v. :
THE UNITED STATES, :
Defendant :

-----------------X



Deposition of LAKE H. BARRETT, VOLUME 4, held at the offices of:

ARNOLD & PORTER
555 12th Street, Northwest
Washington, D.C. 20004
(202) 942-5000

Pursuant to agreement, before Diane Gomez, Registered Professional Reporter and Notary Public of the District of Columbia.



APPEARANCES

ON BEHALF OF PLAINTIFFS FLORIDA POWER & LIGHT COMPANY, NORTHERN STATES POWER COMPANY, DUKE POWER, INDIANA MICHIGAN POWER COMPANY, BOSTON EDISON COMPANY, GPU NUCLEAR, INC., POWER AUTHORITY OF THE STATE OF NEW YORK, OMAHA PUBLIC POWER DISTRICT, and NEBRASKA PUBLIC POWER DISTRICT:
ALEX D. TOMASZCZUK, ESQUIRE
SHAW PITTMAN LLP
1650 Tysons Boulevard
McLean, Virginia 22102-4859
(703) 847-5097

ON BEHALF OF PLAINTIFF SACRAMENTO MUNICIPAL UTILITY DISTRICT:
HOWARD CAYNE, ESQUIRE
ARNOLD & PORTER
555 12th Street, Northwest
Washington, D.C. 20004-1206
(202) 942-5000

Q No. My question is with respect to this statement: When the nuclear waste policy was enacted, policy act was enacted, it was envisioned that the department would have a repository available for permanent waste disposal in 1998, and the department entered into contracts with the utility to begin accepting waste in 1998 on that basis. Is that statement consistent with your understanding?
A Yes.
MS. HERRMANN: Objection. Foundation, calls for a legal conclusion.
A Yes.
Q On page three could you please turn to the first paragraph on the top of the page. Do you see that?
A Yes.
Q Why would continued on-site storage of spent fuel threaten the orderly operation of the nation's civilian nuclear reactors?
MS. HERRMANN: Objection. Foundation.
You can take time to read it if you need to.



THE WITNESS: Yeah.
**A You're referring to a phrase in this paragraph?**
Q I'm looking at the last sentence of the first full paragraph on page three. Do you see that?
**A The last sentence. I see the last sentence.**
Q And my question is how or why would the continued on-site storage of spent fuel threaten the orderly operation of the nation's civilian nuclear reactors?
MS. HERRMANN: Objection. Foundation.
**A The example of this would be the Prairie Island situation.**
Q And please explain to me that example.
**A Where due to local state -- state law they had difficulty getting storage and may have to shut the reactor down.**
Q Are there any other situations that you're familiar with which at-reactor storage could threaten the orderly operation of nuclear reactors?
**A No specific ones.**



Q Do you believe that to be generally a concern?
**A Yes.**
Q Do you recall I asked you about an Upton Bill, U-p-t-o-n, the last session of this deposition?
**A Vaguely.**
Q Could you please turn to what's marked as page one, Bates number 0579 of this exhibit.
MS. HERRMANN: The next page in our copy, right, counsel?
**A Policy options, option one?**
Q Yes, that's the page.
**A I see it.**
Q It's Option 4. I'm sorry.
**A Option 4?**
Q Yes. The bottom of the page is Bates number 0579.
MS. HERRMANN: Our Bates numbers are cut off so we're going to need a better reference.
MR. CAYNE: It's Option 4.
**A Yes, I see the page.**
MS. HERRMANN: For the record, a good



number of these pages are numbered page number one and page number two, so that's not going to help.
**A Just so you know, ten minutes from now I need to go.**
Q It's 3:45.
**A Oh, I'm a whole hour off. Sorry about that.**
MS. HERRMANN: Wishful thinking.
Q I'd like to turn your attention to towards the bottom of the page there's a paragraph that begins "start of waste acceptance." Do you see that?
**A Yeah, I see the paragraph.**
Q Would you please read that.
**A Okay.**
Q Have you read that passage?
**A Yes.**
Q Now, the reference to the storage facility here is to an interim storage facility, correct?
MS. HERRMANN: Objection. Foundation.
**A That's my understanding.**
Q And just for the record, let me just read the statement so it's clear what we're talking about.

lookout for that.

(Thereupon, at 1:30 p.m., the taking of the instant deposition ceased.)

Signature of the Witness

SUBSCRIBED AND SWORN to before me this ______ day of 6/27, 2002.

NOTARY PUBLIC

Pat L. Austin
Notary Public, District of Columbia
My Commission Expires 05-14-2006

My Commission Expires:

ERR...A SHEET FOR THE TRANSCRIPT OF:

Notice Date: May 16, 2002
C... Name: Yankee Atomic vs. United States
Ca... Number: 98-126C-987 4C
Dep. Date: May 15, 2002
Deponent: Lake Barrett (cont)
Place: Washington DC
Ref. No.: 4269-4

CORRECTIONS:

| Page | Line | Now Reads | Should Read | Reasons Therefore |
|---|---|---|---|---|
| 333 | 22 | he | he was (add) | |
| 337 | 23 | signed | assigned him | |
| 337 | 18 | fuel | full | |

Signature of Deponent

6/20/02

Date of Signature

# Defendant

1104

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
-----------------x
YANKEE ATOMIC ELECTRIC COMPANY; : Case Nos. 98-126C,
CONNECTICUT YANKEE ATOMIC POWER : 98-154C, 98-474C,
COMPANY; MAINE YANKEE ATOMIC : 98-483C, 98-484C,
POWER COMPANY; FLORIDA POWER & : 98-485C, 98-486C,
LIGHT COMPANY; NORTHERN STATES : 98-488C, 98-614C,
POWER COMPANY; DUKE POWER, a : 98-621C, 99-447C,
Division of DUKE ENERGY CORP.; : 00-440C, 00-695C,
INDIANA MICHIGAN POWER COMPANY; : 00-703C, 01-115C,
SACRAMENTO MUNICIPAL UTILITY : 01-116C, 01-249C
-----------------X
(Caption continued on the next page)

Continued Deposition of LAKE H. BARRETT
Washington, D. C.
Friday, May 10, 2002
8:06 a.m.

Job No.: 11792-11
Pages 1104 to 1437, Volume 5
Reported by: Diane Gomez, RPR

1105

DISTRICT; SOUTHERN NUCLEAR :
OPERATING COMPANY, et al.; :
COMMONWEALTH EDISON COMPANY; :
BOSTON EDISON COMPANY; GPU :
NUCLEAR, INCORPORATED; WISCONSIN :
ELECTRIC POWER COMPANY; POWER :
AUTHORITY OF THE STATE OF NEW :
YORK; OMAHA PUBLIC POWER DISTRICT;:
NEBRASKA PUBLIC POWER DISTRICT; :
and TENNESSEE VALLEY AUTHORITY, :
Plaintiffs :
v. :
THE UNITED STATES, :
Defendant :
-----------------X

1106

Continued Deposition of LAKE H. BARRETT, held at the offices of:

ARNOLD & PORTER
555 12th Street, Northwest
Washington, D. C. 20004
(202) 942-5000

Pursuant to agreement, before Diane Gomez, Registered Professional Reporter and Notary Public in and for the District of Columbia.

1107

APPEARANCES

ON BEHALF OF PLAINTIFFS FLORIDA POWER & LIGHT COMPANY, NORTHERN STATES POWER COMPANY, DUKE POWER, INDIANA MICHIGAN POWER COMPANY, BOSTON EDISON COMPANY, GPU NUCLEAR, INC., POWER AUTHORITY OF THE STATE OF NEW YORK, OMAHA PUBLIC POWER DISTRICT, and NEBRASKA PUBLIC POWER DISTRICT:
DEVON E. HEWITT, ESQUIRE
SHAW PITTMAN LLP
1650 Tysons Boulevard
McLean, Virginia 22102-4859
(703) 847-5097

ON BEHALF OF PLAINTIFF SACRAMENTO MUNICIPAL UTILITY DISTRICT:
HOWARD CAYNE, ESQUIRE
ARNOLD & PORTER
555 12th Street, Northwest
Washington, D. C. 20004-1206
(202) 942-5000

1148

because of short-cooled fuel"?
MS. HERRMANN: Objection. Speculation.
A **No.**
Q Do you understand the term "derate"?
A **I understand the term as I use it. How the author is using it I don't know.**
Q How would you use it?
A **It is to reduce the design capacity or reduce the output.**
Q And do you understand the term "short-cooled fuel"?
A **Yes.**
Q What does that mean?
A **Lower megawatt days per metric ton on the fuel.**
Q Based on the understanding of those two terms you just expressed, if the author of that sentence used those two terms in the way you just explained them, do you understand this sentence?
MS. HERRMANN: Objection. Speculation.
A **No.**
**(Deposition Exhibit Barrett 57 was marked**

1149

**for identification and was attached to the transcript.)**
Q Mr. Barrett, the court reporter has handed you a document marked for identification as Exhibit 57. It is captioned Determination of Cost-effective Waste Management Receipt Rates. It is by R.W. McKee, M-c-K-e-e. It starts at Bates PA-221971. And it continues through PA-221980. Do you have that document before you?
A **I believe so. I can't read the Bates number at the bottom, but go ahead. Yes.**
Q And you'll see that the first two pages of this consecutively-Bates-numbered document appear to be the same other than the fact that the first page looks as if a buck slip covered over a portion of the left-hand column, correct?
A **Correct.**
Q Do you know a person named R.W. McKee?
A **No.**
Q Have you ever heard of that person?
A **I've heard the name.**
Q Are you familiar with Pacific Northwest

1150

Laboratory?
A **Yes.**
Q What is Pacific Northwest Laboratory?
A **It's a contractor in Richland, Washington.**
Q Were those contractors relied on often by the Department of Energy in connection with the development, design, and construction of the waste management system?
MS. HERRMANN: Objection. Vague.
A **We use them as advisors and analysts for the waste management system.**
Q Do you continue to so use them through today?
A **No.**
Q Through when did you use them?
A **Through the late eighties.**
Q There's also another name at the top of the first page, H.D. Huber, H-u-b-e-r. Do you know that individual?
A **No.**
Q Did you ever rely on the work of Pacific Northwest Laboratory?

1151

MS. HERRMANN: Objection. Vague.
A **I used it as input.**
Q For what purposes?
A **For advice on systems analysis.**
Q Did you ever personally assign work out to be performed by Pacific Northwest Laboratory?
A **I don't remember me personally, but my staff did.**
Q Did you authorize your staff to assign work out to Pacific Northwest Laboratory?
A **Yes.**
Q I take it then you considered the work of Pacific Northwest Laboratory to be competent?
A **Yes.**
Q I turn your attention to page Bates number PA-221972. It's the second page of the document. Actually, returning to the first page, do you see the buck slip on the first page? It says, '91 HLRWM conference papers, volume two, "high priority."
A **I see it.**
Q Is that your writing?
A **No.**