# Plaintiff

DISTRICT; SOUTHERN NUCLEAR :
OPERATING COMPANY, et al.; :
COMMONWEALTH EDISON COMPANY; :
BOSTON EDISON COMPANY; GPU :
NUCLEAR, INCORPORATED; WISCONSIN :
ELECTRIC POWER COMPANY; POWER :
AUTHORITY OF THE STATE OF NEW :
YORK; OMAHA PUBLIC POWER DISTRICT; :
NEBRASKA PUBLIC POWER DISTRICT; :
and TENNESSEE VALLEY AUTHORITY, :
Plaintiffs :
v. :
THE UNITED STATES, :
Defendant :
- - - - - - - - - - - - - - - - - X

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - x

YANKEE ATOMIC ELECTRIC :
COMPANY, CONNECTICUT YANKEE :
ATOMIC POWER COMPANY, MAINE :
YANKEE ATOMIC POWER COMPANY, : Case No. 98-126C,
Plaintiff, : 98-154C, 98-474C
vs. : (Senior Judge Merrow)
UNITED STATES OF AMERICA, :
Defendant. : Volume I

- - - - - - - - - - - - - - - - x

..TIFIED COPY

Washington, D.C.
Tuesday, May 14, 2002

Deposition of LAKE H. BARRETT, a witness herein, called for examination by counsel for the Plaintiffs in the above-entitled matter, pursuant to notice, the witness being duly sworn, taken at the offices of Spriggs & Hollingsworth, 1350 Eye Street, N.W., Washington, D.C., commencing at 9:30 a.m., Tuesday, May 14, 2002, and the proceedings being taken down by Stenotype by CAPPY HALLOCK, RPR-CRR, and transcribed under her direction.

CONTAINS CONFIDENTIAL INFORMATION
PURSUANT TO THE PROTECTIVE ORDER

fine.

Q Do you disagree with any other aspect of the statement?

A No.

Q Again I'm starting with the beginning receipt rates ranging from 1500 to 6,000, that entire statement, do you disagree with any other aspect of it?

A No.

Q But you do disagree with the statement that there is not a clearly documented rationale for 3,000 MTU per year receipt rate, correct?

A Correct.

Q Because you believe that there is, in fact, a clearly documented rationale for a 3,000 MTU per year receipt rate, correct?

A Yes.

Q And could you explain to me that rationale that you believe has been clearly documented by the department?

A There was one in the old mission plans. It basically was that the rate of 3,000 tons per year

exceeded a generation rate of a nominal 2,000 tons per year and allowed a catchup of a thousand tons per year delta. And for where the program was at that time that was sufficient, and I felt that was sufficient at that time.

Q Sufficient to do what?

A Sufficient as a design basis for the facility. I didn't want to basically put resources, inasmuch as I was involved in this, into further refinements and expenditures of money on fine-tuning when we needed to focus on do we have a site and can we ever do this.

Q And fine-tuning, for example, whether it should be higher than 3,000?

A Correct.

Q And when you just stated "allowed a catchup of a thousand tons per year delta," what did that statement refer to?

A The receipt rate of a nominal 3,000 tons per year steady state when the generation rate was approximately 2,000 tons per year. The system capacity and take-rate was exceeding the generation

rate in the nation.

Q Why was that important?

A Because we would like to catch up and, you know, remove the waste that had been accumulating at whatever the start date of the facility would be.

Q Did you consider that to be your mission under this statute, the 1982 Nuclear Waste Policy Act?

MS. HERRMANN: Objection. Vague, calls for a legal conclusion.

A Repeat the question again.

Q You stated "We would like to catch up and, you know, remove the waste that had been accumulating at whatever the start date of the facility would be." Do you recall that statement?

A Yes.

Q Why would you have liked to have caught up, as you stated in that answer?

A Because waste existed in the United States, both commercial waste and defense waste, and we were to start, either be it '98 or some other date, there would be an inventory existing, and you wanted to work off that inventory as soon as practicable.

Q Why did you want to work off that inventory of spent nuclear fuel as soon as practicable?

A Because I believe that's the intent of the act.

Q By "the act" you're referring to the Nuclear Waste Policy Act of 1982?

A Correct.

MR. CAYNE: It's 9:18. Let's take a short break.

MS. HERRMANN: Okay.

(There is a recess from the record.)

(Deposition Exhibit Barrett 58 was marked for identification and was attached to the transcript.)

Q Mr. Barrett, the court reporter has handed you a document marked for identification as Exhibit 58. It's a parametrics analysis for future program costs scenarios bearing Bates number HQR-022-0001 through 0030. On the front page it says November 5th, 1999, Stephen Goldberg with the DOE CBO staff, draft. Do you have that document before you?

A Yes.

# Plaintiff

reference to a variety of DOE documents. My question is do you have an understanding of the term "steady-state rate"?

A **I believe so.**

Q What's your understanding of that term?

A **Basically constant over time.**

Q I believe you testified that there is a relationship between the 3,000 MTU annual steady-state rate and either the discharge rate or generation rate. Is that correct?

A **There's a difference.**

Q Is there a relationship between the two?

A **Discharge rate is what it is. Utilities control that. The receipt rate, which is what you call 3,000, is something that is variable, but depending upon the system we design to build, we can vary that. So there's no direct relationship between the two.**

Q My understanding from your testimony -- and please correct me if I'm wrong -- was that the 3,000 MTU steady-state rate or receipt rate as you just used that term, was chosen in part because it exceeded the



discharge rate or the generation rate by utilities. Is that right?

A **Correct.**

Q What other factors went into choosing a 3,000 MTU receipt rate?

A **The 3,000 rate that we have was established before I was ever involved in the program. It's my understanding that it was looked at then as a proper balance for total life-cycle costs as well as near-term cash flow requirements and performance. If you make the number too high, then you have -- you would quickly work off the backlog, and then you would have a lot of idle capacity. If it was too low, you would have reactors needing to put in dry storage, and 3,000, based on an early 1980s, seemed like a reasonable number to use.**

Q Do you know if there were any studies that talked about the 3,000 rate being a reasonable number to use?

A **I don't know of any that were done back then, but I'm told there were some done. I never had reason to ever look. There were some -- we went**



**through some of them here that were done in the middle eighties and some done in the early nineties that would say that you can run them at a higher rate. And you can run them at a higher rate and there are puts and takes on costs and performance.**

Q And am I right in understanding that the 3,000 steady-state rate has been used as the steady-state rate in the majority of design documents for the facility that DOE will eventually use to take and emplacement spent nuclear fuel?

A **Yes, it's around 3,000.**

Q And am I also right in understanding that the 3,000 steady-state rate has been the rate that is used in the majority of documents issued by DOE with regard to total system life-cycle costs?

A **Correct.**

Q With regard to those documents, the documents issued in connection with estimating total system life-cycle costs, what is that document supposed to reflect, the TSLCC document?

A **Our best estimates of what the costs would be, you know, year by year for the program. And to**



**determine those you would have some assumption as to what the receipt rate would be, and we used 3,000.**

Q And is the receipt rate of 3,000 used because that's what your intention at the time you issued that TSLCC report, is that the intention at that time, to use that rate for whatever facility you would have running when you begin to accept spent nuclear fuel?

MS. HERRMANN: Objection. Foundation.

A **At steady state, yes.**

Q Do you have an understanding of what the term "waste management system" is?

A **Yes.**

Q What's your understanding of that term?

A **That would be the transportation system to remove it from the reactors. It would be an MRS if there were to be an MRS, and it would be the repository, or repositories if we have more than one.**

Q With regard to the transportation system, other than the RFP that we've discussed just a couple of hours ago, were there any other documents that talked about the acceptance rate or the physical

# Defendant

reference to a variety of DOE documents. My question is do you have an understanding of the term "steady-state rate"?
A **I believe so.**
Q What's your understanding of that term?
A **Basically constant over time.**
Q I believe you testified that there is a relationship between the 3,000 MTU annual steady-state rate and either the discharge rate or generation rate. Is that correct?
A **There's a difference.**
Q Is there a relationship between the two?
A **Discharge rate is what it is. Utilities control that. The receipt rate, which is what you call 3,000, is something that is variable, but depending upon the system we design to build, we can vary that. So there's no direct relationship between the two.**
Q My understanding from your testimony -- and please correct me if I'm wrong -- was that the 3,000 MTU steady-state rate or receipt rate as you just used that term, was chosen in part because it exceeded the



discharge rate or the generation rate by utilities. Is that right?
A **Correct.**
Q What other factors went into choosing a 3,000 MTU receipt rate?
A **The 3,000 rate that we have was established before I was ever involved in the program. It's my understanding that it was looked at then as a proper balance for total life-cycle costs as well as near-term cash flow requirements and performance. If you make the number too high, then you have -- you would quickly work off the backlog, and then you would have a lot of idle capacity. If it was too low, you would have reactors needing to put in dry storage, and 3,000, based on an early 1980s, seemed like a reasonable number to use.**
Q Do you know if there were any studies that talked about the 3,000 rate being a reasonable number to use?
A **I don't know of any that were done back then, but I'm told there were some done. I never had reason to ever look. There were some -- we went**



**through some of them here that were done in the middle eighties and some done in the early nineties that would say that you can run them at a higher rate. And you can run them at a higher rate and there are puts and takes on costs and performance.**
Q And am I right in understanding that the 3,000 steady-state rate has been used as the steady-state rate in the majority of design documents for the facility that DOE will eventually use to take and emplacement spent nuclear fuel?
A **Yes, it's around 3,000.**
Q And am I also right in understanding that the 3,000 steady-state rate has been the rate that is used in the majority of documents issued by DOE with regard to total system life-cycle costs?
A **Correct.**
Q With regard to those documents, the documents issued in connection with estimating total system life-cycle costs, what is that document supposed to reflect, the TSLCC document?
A **Our best estimates of what the costs would be, you know, year by year for the program. And to**



**determine those you would have some assumption as to what the receipt rate would be, and we used 3,000.**
Q And is the receipt rate of 3,000 used because that's what your intention at the time you issued that TSLCC report, is that the intention at that time, to use that rate for whatever facility you would have running when you begin to accept spent nuclear fuel?
MS. HERRMANN: Objection. Foundation.
A **At steady state, yes.**
Q Do you have an understanding of what the term "waste management system" is?
A **Yes.**
Q What's your understanding of that term?
A **That would be the transportation system to remove it from the reactors. It would be an MRS if there were to be an MRS, and it would be the repository, or repositories if we have more than one.**
Q With regard to the transportation system, other than the RFP that we've discussed just a couple of hours ago, were there any other documents that talked about the acceptance rate or the physical

# Defendant

1340

answered.
A It was, you know, a relatively small amount. We had also gotten information -- we also put the transportation RFP which had the higher rates in it, and we thought we could get that extra out of the system. So we have always strived to perform at this high-as-possible, high-as-practicable rate we could operate at, so that's why.
Q Is it your testimony that the highest practicable rate that you could perform at for year 2011 would be 600 MTUs on an annual basis?
A We didn't really look hard to try to raise -- to see if we could raise that or the 1200 to 1300. I felt that was a lower priority item and didn't try to push it much. Didn't push it at all.
Q Do you know whether the acceptance rates that are included in this document are the same acceptance rates that are included in the 1995 TSLCC report?
MS. HERRMANN: Objection. Best evidence.
A I thought we just described it a little bit. The 300 to 400. Other than that, I think

1341

they're the same.
Q If you would take a look at Barrett Exhibit 45, which is the 1995 TSLCC document. And in particular I direct your attention to page eight.
A Yes.
Q And I think you're absolutely right that these rates are almost exactly the rates in the 1998 TSLCC but for the 2010 where you accurately noticed that it's 300 MTUs in the 1995 TSLCC.
When this document was issued in 1995, was this DOE's intention with regard to the acceptance rate it would implement when it began to take spent nuclear fuel from utilities in 2010?
MS. HERRMANN: Objection. Foundation. Mr. Barrett is not a 30(b)(6) witness.
A Restate that question again, please.
MS. HEWITT: Can you read it back.
(The record is read.)
MS. HERRMANN: Same objection.
A This was a cost report. The primary focus was, you know, to do a cost estimate for total life-cycle cost. This was not primarily a waste

1342

acceptance operating-type document. It should reflect what the system was at that time.
Regarding when we reviewed this document, when I reviewed the document, I was not paying much attention to if it was 300, 400, 600, or whatever. This should reflect what the repository design numbers were, and I just don't know what they were at the time. So the only reason I'm going through this is you asked this was the primary DOE document for acceptance rates. It really wasn't. It should have been the systems requirements documents for the repository of whatever were in place in 1995. If there was 100 percent alignment between those documents I honestly don't know.
Q Table 1-2 that we're talking about is entitled MGDS Receipt/Emplacement Rates. What does the acronym MGDS stand for, do you know?
A Mine geologic disposal system I believe.
Q Do you know whether or not the rates that are included in this document are different from the rates that were included in the 1995 APR ACR that was published around the same time?

1343

MS. HERRMANN: Objection. Best evidence.
A I think that the '95 ACR has the four-six-nine constant in it.
Q I think you're right, but if you would like to look at it, that's Exhibit 39.
A Well, that's different than these.
Q It is different?
A Yes.
Q Why was there a difference in rates published in two separate documents that were published around the same time?
A This is a performance document on what we thought we could perform at. That has something to do with the contract.
Q So is it your testimony that DOE could perform at a rate that's different than what it was supposed to perform under the contract?
MS. HERRMANN: Objection. Relevance.
A Yes.
Q Why don't you take a look at Exhibit 39, which is the 1995 APR ACR.
A Okay.

# Defendant

1344

Q I'm going to refer your attention to Table 1 on page four.
A Yes.
Q The table is entitled Projected Nominal Waste Acceptance Rates for Spent Nuclear Fuel. My first question is -- and you've used this term quite a bit as well -- what does the term "nominal" mean when the DOE uses it in its documents?
A Not an exact number. To me the word "nominal" -- I don't know what the authors of this document meant. When I hear the word "nominal" or when I use the word "nominal" it's sort of an average number. It might be more; it might be less, but it's in that order of magnitude.
Q Now, this table sets forth projected waste acceptance rates for a period of ten years, correct?
A It appears to.
Q Do you know why it only sets forth projected acceptance rates for ten years?
A No.
MS. HERRMANN: Objection. Speculation.
Q Do you know what the acceptance rate would

1345

have been in year 11?
MS. HERRMANN: Objection. Speculation.
A No.
Q Do you have any understanding of whether or not this ACR APR indicates that DOE will take spent nuclear fuel from utilities at a steady-state rate of 900 MTUs per year for the life of the program?
MS. HERRMANN: Objection. Best evidence. Speculation.
A Repeat the question, please.
(The record is read.)
A I don't know a relationship between this table and what we'll actually perform at.
Q Well, do you know what the purpose of issuing this table was?
MS. HERRMANN: Objection. Speculation.
A No.
Q Would an annual acceptance rate of 900 MTUs, if implemented by DOE, preclude the need of utilities to make arrangements for additional on-site storage after 1998?
MS. HERRMANN: Objection. Speculation.

1346

A I don't know.
Q How would you figure that out?
A You would need to -- to calculate that you would need to project what the pool overflow rates would be, would know performance. You would need to then figure out how would the 900, or whatever rate we were going to perform at, how that would be allocated under the contract relationships. And then you could determine who had pool overflows and who did not.
Q Does DOE have information on what you call pool overflow rates?
A We have data reported by utilities in their 859 reports that you could derive that from.
Q Do you know whether or not that consideration, pool overflow, quote/unquote, was a factor in arriving at acceptance rates in this document?
A I don't know. I don't think so.
Q Do you know whether pool overflow was a consideration in developing any acceptance rate in any of the acceptance capacity reports issued by DOE?
A Not that I know of.

1347

Q Were pool overflow rates a consideration in developing the 3,000 steady-state rate used for the design of the repository?
MS. HERRMANN: Objection. Speculation.
A Not specifically, but in a gross national sense, yes.
Q And how in a gross national sense?
A By setting the performance rate of nominally 3,000 being higher than the production rate of 2,000, that would give a thousand tons per year working off the backlog which should re-present if there was appropriate distribution amongst the contract holders' pool over -- anymore pool overflows.
Q Do you have an understanding of whether DOE ever established a minimum acceptance rate that would accomplish the need for eliminating pool overflow by utilities after 1998?
A Not specifically. The only reason I'm pausing, as I recall somewhere having a discussion with staff that the pool overflow rate in the teens, you know, post-2010, was something in the neighborhood of 500 tons per year if there was no -- if we did not

**perform at all.**
Q And do you recall at all what that figure of 500 tons was based on?
**A Based on somebody's guesstimate of what they realistically thought the pool overflows would be in the 2010 to 2015 time frame.**
Q And was the pool overflow figure that was cited to you, 500 metric tons per year, did that reflect an aggregate number based on all the utilities, do you know?
**A My recollection was that was a national number. You couldn't really do it on a -- we didn't have the data to do it on a utility-by-utility number very clearly.**
Q Well, did the utilities report individually with respect to them this data on their RW 859 documents that they submitted to DOE?
**A I don't know exactly what's on an 859. I think that's being derived from the 859s.**
Q We spoke a little earlier today about the viability assessment. Do you recall that conversation?



**A Vaguely.**
Q And the conversation centered around a reference case for a repository that would be available in 2010 that was actually described in the viability assessment that was published I think by DOE in 1998. Is that correct?
**A I believe so.**
Q And if I remember correctly, the reference case is a repository that is -- I think you described as a nonmodular system. Is that right?
**A Correct.**
Q What are the major milestones that are left between now, May 2002, and 2010 that have to be accomplished before the repository and nonmodular repository can take spent nuclear fuel?
MS. HERRMANN: Objection. Foundation.
**A Have to prepare the license application, go through the licensing process of the NRC, receive a construction authorization, construct it, receive an operating license, build the transportation system, both the hardware aspects of it and the institutional aspects of the transportation system, and then be**



**ready to operate in 2010.**
Q What is a reasonable estimate of time that it would take to construct a nonmodular repository?
MS. HERRMANN: Objection. Speculation.
**A Under normal circumstances a building like that would be approximately five years.**
Q And what's a reasonable time or a reasonable estimate of time that it would take to get your license approved to build such a facility?
MS. HERRMANN: Same objection.
**A The statute says three years.**
Q Do you consider that reasonable?
**A It could be tight.**
Q Why?
**A Well, I think the hearings will be difficult for the NRC to complete within that time period, but it's doable.**
Q And I believe you said in addition to the licensing and the construction there are concerns about building a transportation system as well and getting an operating license. Is that correct? Those are two additional milestones?



**A Two additional milestones. I didn't use the word "concerns."**
Q But they are two additional milestones?
**A They are milestones, yes.**
Q And is the time to get an operating license the same as the time to get your -- for a licensing procedure, is that the same milestone or are those two separate actions?
**A What I refer to in a general sense as the operating license is actually an amendment to our license that we would receive when we get the construction authorization. So it's a license amendment, which should take less time than the original licensing proceeding itself.**
Q And how long would that licensing amendment take?
MS. HERRMANN: Speculation.
**A It will take a couple of years. The actual operating license proceeding will probably start just about when the construction authorization is given.**
Q From what you said it does not appear likely that DOE will accomplish all these milestones

# Plaintiff

**A The higher the rate of performance the better.**
Q That doesn't answer the question of whether or not the rate --
**A I couldn't understand the question. Repeat the question.**
Q At least you told me that.
**A All right. I thought that was your question, but try again.**
Q My understanding is that one of the goals of the Civilian Radioactive Waste Management Program was to design a system that could take spent nuclear fuel at a rate that would eliminate the need for utilities to provide for additional on-site storage after January 31st, 1998. Is that correct?
**A No.**
Q What is not correct about that statement?
**A I never considered the design of the system to solely try to avoid spent-fuel pool overflows. I tried to design the system to be as large as you could reasonably make it to avoid not only spent-fuel overflows but pool rerackings to allow shut-down**



**reactors to empty their sites. For all those other reasons in addition to. So the way you phrased it I don't think is correct.**
Q Thank you for clarifying. It actually did clarify a misimpression I had, so I'm glad I asked the question.
And is it your testimony that prior to you actually coming to the Office of Civilian Radioactive Waste Management DOE had established that a steady-state rate of 3,000 MTUs on an annual basis would achieve all those objectives that you just specified in your prior answer?
MS. HERRMANN: Objection. Foundation.
**A In a general sense, yes.**
Q At any point during your tenure at OCRWM did you have a reason to disagree with that rate that was selected, the 3,000 MTU steady-state rate on an annual basis?
**A Never paid much attention to it. Because all my energies were focused on trying to get a system that could run as soon as practicable.**
Q But in your tenure at the program did you



ever see any evidence that would indicate that that 3,000 MTU rate was not sufficient to address all of those needs as you specified a couple of answers ago?
**A I saw no reason nor saw no reports that said 3,000 was a bad choice. There were some studies done in the late eighties, also in the early nineties that, you know, it didn't say there was an obvious better number. That 2,000 was better or 4,000 was better. And 3,000 appeared to be okay. So I didn't pay much attention. So I was satisfied. It wasn't conscious per se. I saw no reason why I should change it. Let's phrase it that way.**
Q And I'll take it a step further. Do you believe that the 3,000 annual steady-state rate is a reasonable rate for DOE to plan to use in terms of taking spent nuclear fuel from utilities?
**A I think it's a reasonable rate. There may be better rates that if we -- if the nation gets a little clearer that we're going to really perform I think we will refine that number and we may, based on events of September 11th, maybe it will be raised.**
Q And would you agree that the 3,000 annual



steady-state rate is a rate that is consistent with achieving the objectives that you enumerated earlier?
**A Generally so, yes.**
Q In your opinion would a steady-state rate of 2,000 MTUs on an annual basis be consistent with achieving those same objectives?
**A I would think that's low.**
Q Why?
**A Because that's about what the generation rate is, and if we start with that, matching the generation rate at 2010 -- if we steady state at 2010, all the fuel that's in dry storage and a lot of the shut-down reactors, it will be difficult to avoid new storages or prolong decommissionings.**
Q And what would your opinion be if an annual steady-state rate was chosen that was around 1,000 MTUs per year?
MS. HERRMANN: Objection. Speculation.
**A For performance aspect it would be better, you know, better than none, but not as good as 2,000 and not as good as 3,000.**
Q Would you believe that a steady-state

# Plaintiff

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

\- - - - - - - - - - - - - - - X

YANKEE ATOMIC ELECTRIC :
COMPANY, CONNECTICUT YANKEE :
ATOMIC POWER COMPANY, MAINE :
YANKEE ATOMIC POWER COMPANY, : Case No. 98-126C,
Plaintiff, : 98-154C, 98-474C
vs. : (Senior Judge Merrow)
UNITED STATES OF AMERICA, :
Defendant. : Volume I

\- - - - - - - - - - - - - - - X

...TIFIED COPY

Washington, D.C.
Tuesday, May 14, 2002

Deposition of LAKE H. BARRETT, a witness herein, called for examination by counsel for the Plaintiffs in the above-entitled matter, pursuant to notice, the witness being duly sworn, taken at the offices of Spriggs & Hollingsworth, 1350 Eye Street, N.W., Washington, D.C., commencing at 9:30 a.m., Tuesday, May 14, 2002, and the proceedings being taken down by Stenotype by CAPPY HALLOCK, RPR-CRR, and transcribed under her direction.

CONTAINS CONFIDENTIAL INFORMATION
PURSUANT TO THE PROTECTIVE ORDER

Page 62

gets finalized?
MS. HERRMANN: Objection.
A. The approach for steady state, yes.
Q. What about the approach for other issues that you mentioned?
MS. HERRMANN: Objection. Vague and overbroad.
Q. I guess I don't understand. What do you mean by approach for steady state? I guess I don't understand what that means.
A. Five or six years into operation there is a pretty clear understanding by the industry on what the risks are and what the rewards are, and that a free market competition we believe would be successful. For the initial startup where the contractor would have to have substantial capital costs with uncertainties regarding legalities or startup issues, licensing, may require government assistance maybe in terms of hardware or other considerations.
Those are the issues that we would look at as we would revise and improve the RFP.
Q. Thank you.
(Discussion off the record.)
BY MR. STOUCK:

Page 63

Q. Let me show you, hand you, Mr. Barrett, a copy of what was previously marked as Exhibit Number 40 to your deposition.
Do you have that?
A. I do.
Q. Okay. This is the 1992 Annual Capacity Report dated March '93, right?
A. Yes.
Q. And turn to Page 8.
A. Yes.
Q. What is that?
A. Table 3.1 of the '92 ACR.
Q. What is your understanding of what the table shows?
A. It's the annual allocations as they existed in '92 -- I don't know if they changed or not later -- by contract holder for who had what allocations for year one, year two, year three.
Q. On oldest fuel first basis; is that right?
A. Yes, that's my understanding.
Q. Now, putting aside the factor that these allocations may have changed -- if they have changed from '92 to the present, would you agree that the change would be relatively minor, that

Page 64

most of the sequencing would remain the same?
A. They should be minor.
Q. So they would be substantially the same today, there might be some minor variations?
A. Correct.
Q. Putting aside those minor variations, is it your understanding that when the program starts to operate in 2010, or some other time, that this listing of allocations of oldest fuel first is going to be the actual sequence in which the Department picks up spent fuel from the various contract holders?
MS. HERRMANN: Objection.
THE WITNESS: Could I have that again?
(The record was read as requested.)
A. I doubt it.
BY MR. STOUCK:
Q. And why do you doubt it?
A. Because from a practical matter, the numbers on some of the contract holders are not an efficient size or, for example, Consolidated Edison has 2.9 tons, Dairyland 0.7 tons, and it would not be very efficient to pick up such small amounts for either the Department of Energy's contractor nor the utility itself to

Page 65

prepare for shipping such small amounts, so most likely there will be some arrangement such as more efficient sizes as determined through a process yet to be worked out.
Q. When you say more efficient sizes, are you referring to fuel casks, filling up casks?
A. Correct, cask campaigns.
Q. So you are referring to filling up casks, but that's not all you are referring to?
A. Correct.
Q. So in addition to filling up casks you are referring to cask campaigns?
A. Correct.
Q. And what do you mean by cask campaigns?
A. From a practical point of view primarily for the utility, but also somewhat for the Department of Energy that you would establish, a term that's sometimes used, bite size, the campaign size of how much tonnage you would take in a campaign that would be scheduled to be consistent with the reactor's operating cycle or the situation at the contract holder which would be mutually beneficial for both parties.
Q. Okay. Could you just clarify or



Alderson Reporting Company, Inc.
1111 14th Street, N.W. Suite 400 1-800-FOR-DEPO Washington, DC 20005

# Plaintiff

Page 70

issues possibly. Possibly one utility has got pool overflow issues, another has a decommissioning issue. Another has maybe a policy or political issue about moving fuel. So those, all those issues would have to be dealt with, and they may -- it may not be to everyone's advantage to do something like that. We just don't know that.

Q. And what is the "something like that"?

A. To have exchanges or allocations recommended by the RSC.

Q. Okay. Well, let's see if you agree with this: Those matters that you just referred to might pose impediments to an optimal, in other words most efficient utilization of capacity, but that's not inconsistent with utilization of a system capacity being made as a goal more efficient than what would result if the schedule were to follow the sequence that is shown on Page 8 of Exhibit 40, right?

THE WITNESS: Can I have that question again?

MR. STOUCK: Would you read it back, please?

(The record was read as requested.)

Page 71

A. Yes.

BY MR. STOUCK:

Q. Okay.

Do you think there is any possibility that when the spent fuel acceptance program commences operations in 2010, or at some other time, that the actual sequence of pickup of spent nuclear fuel will be the sequence -- putting aside the minor variations that we referred to previously -- do you think there is any possibility that the actual sequence will be the sequence that is shown on this OFF array on Page 40?

MS. HERRMANN: Objection. Speculation.

A. Yes.

Q. You do?

A. Yes.

Q. Okay. Can you quantify the possibility?

MS. HERRMANN: Objection. Speculation.

A. No.

Q. If that sequence were to be followed in actuality, do you believe that the costs would

Page 72

be greater or less than the costs of a system that includes some -- included some amount of campaign pickups?

MS. HERRMANN: Objection. Speculation.

A. Greater.

Q. Okay.

So it would be in the utility's interests to avoid that greater cost through some kind of rearrangement of the sequence; would you agree with that?

MS. HERRMANN: Objection. Foundation.

A. From a cost perspective, yes.

Q. Okay, and it would be in DOE's interest from a cost perspective to promote some rearrangement of the sequencing to be more cost-effective, right?

A. Within the extent of the law, yes.

Q. And is the reason that you believe it is possible that the actual sequence for pickup would be the sequence that is shown on Page 8 of Exhibit 40 is -- the reason that you believe that is a possibility, that contractual matters and issues and disputes on the utility side would require that that schedule be maintained if those

Page 73

issues and disputes could not be worked out; do you think that's a possibility?

MS. HERRMANN: Objection.

Can I have that question back?

(The record was read as requested.)

MS. HERRMANN: Objection. Foundation. Vague. Calls for a legal conclusion. Speculation.

A. Yes.

BY MR. STOUCK:

Q. Any other reason other than the inability of the utilities with or without the Department's help to work out those issues, is there any other reason that you think it's possible that the schedule that is shown on Page 8 of Exhibit 40 would be the actual sequence for pickup?

MS. HERRMANN: Objection. Speculation.

A. That's the main reason.

Q. Okay. That's the only reason you can think of right now?

A. That's the only one I can think of right now.

Q. Okay.

# Plaintiff

Page 118

facts not in evidence.
A. I don't recall that being a major factor when we discussed the pros and cons of shifting.
Q. Okay. Major factor was just philosophically better to do it through the private sector?
A. Primarily, and also budget, changed the budget profiles.
Q. Okay. The thinking is it is going to be more cost-effective to do it through the private sector?
A. We felt that it would be.
Q. Okay. Thank you.
This is another document that is kind of bulky. Let's see how we go, but I don't really want to mark this unless we can't avoid it. It's a thick document, but I have a couple short questions.
This is a document that is entitled Defendant's Responses to Utility Plaintiffs Joint First Set of Interrogatories, and my first question is, have you ever seen this document?
A. Not that I recall.
Q. On Page 77 -- it is dated October 9,

Page 119

2001, but my question, at least my first question is on Page 77 at the top it says Interrogatory Number 50.
Do you see that?
A. Yes.
Q. Interrogatories are written questions that lawyers ask -- you know, that lawyers ask opposing parties in litigation and responses are given in writing, so we asked these questions of the government. We asked these questions of the government, the United States, and we got these answers. Interrogatory Number 50, let me read it. It says, "Identify the three individuals within DOE with the most knowledge of the schedule DOE would have followed had it begun to take SNF from purchasers by January 31, 1998 pursuant to the Standard Contract."
Do you see that?
A. Yes.
Q. If you look at the bottom of the page there is a couple of paragraphs here of objections and what-not. But at the bottom we have got -- we have more than three names in response, but the first name, Mr. Barrett, is yours. Is that correct?

Page 120

A. Yes.
Q. Do you consider yourself to be knowledgeable about "the schedule DOE would have followed had it begun to take SNF from purchasers by January 31, 1998 pursuant to the contract."
MS. HERRMANN: Objection. Vague.
A. I suppose I have as much knowledge as many.
Q. As many? Your last word was M-A-N-Y; is that what you said?
A. Yes.
Q. What schedule --
A. I never said I know as much as one might know. I know it from a policy point of view.
Q. Could you give testimony under oath about the schedule that DOE would have followed had it taken SNF from purchasers by January 1998?
MS. HERRMANN: Objection. Vague.
A. I will answer questions under oath, if I can.
Q. What schedule would DOE have followed had it begun to take SNF from purchasers by January 31, 1998 pursuant to this contract?
MS. HERRMANN: Objection. Foundation.

Page 121

Mr. Barrett is not here as a 30(b)(6) witness.
A. We would have operated our system at our plant which was, you know, whatever the operation rate which transiented and leveled out at 3,000 metric tons per year after five years. That's what we were planning to do.
Q. That's what you would have done?
A. That's what we would have done if we could have gotten the, you know, the sites approved, et cetera.
Q. And in what sequence -- do you happen to know, can you just generally tell me a ramp-up rate up to that 3,000 ton rate that might have been realistic?
MS. HERRMANN: Objection. Foundation.
A. I don't know what system we are referring to or what time because those are changes as a function of time. So if you give us the time frame --
Q. The government has told us that you are one of the most knowledgeable people about how the schedule would have been referenced. I'm not asking about any documents. I'm asking what the schedule would have been.
You already told me it would have

# Defendant

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

\- - - - - - - - - - - - - - - X

YANKEE ATOMIC ELECTRIC :
COMPANY, CONNECTICUT YANKEE :
ATOMIC POWER COMPANY, MAINE :
YANKEE ATOMIC POWER COMPANY, : Case No. 98-126C,
Plaintiff, : 98-154C, 98-474C
vs. : (Senior Judge Merrow)
UNITED STATES OF AMERICA, :
Defendant. : Volume I

\- - - - - - - - - - - - - - - X

Washington, D.C.
Tuesday, May 14, 2002

Deposition of LAKE H. BARRETT, a witness herein, called for examination by counsel for the Plaintiffs in the above-entitled matter, pursuant to notice, the witness being duly sworn, taken at the offices of Spriggs & Hollingsworth, 1350 Eye Street, N.W., Washington, D.C., commencing at 9:30 a.m., Tuesday, May 14, 2002, and the proceedings being taken down by Stenotype by CAPPY HALLOCK, RPR-CRR, and transcribed under her direction.

CONTAINS CONFIDENTIAL INFORMATION
PURSUANT TO THE PROTECTIVE ORDER

Page 126

You are familiar -- I know you have given some testimony about this already, so I will try not to be duplicative. You are familiar with greater than Class C waste, sometimes called GTCC?
A. Yes.
Q. Do you know whether there currently exists, Mr. Barrett, alternatives for the disposition of -- for the disposal of GTCC wastes, alternatives to disposal at Yucca Mountain currently?
MS. HERRMANN: Objection. Foundation. Speculation.
A. Yes.
Q. Okay. You know are there?
A. Yes.
Q. What are the alternatives that are currently available for disposal of GTCC wastes?
A. You can get an exemption from the NRC, I believe. Special approval from the NRC.
Q. To do what?
A. Dispose of it in a near-surface facility.
Q. Okay.
A. Also you could request from the NRC special approval for a facility other than Yucca

Page 127

Mountain.
Q. Like, you mean close-to-surface facility or --
A. Intermediate depth, bore hole emplacement.
Q. Okay. Anything else?
A. Those are the ones that come to mind.
Q. Those are two alternatives to disposal at Yucca Mountain for GTCC wastes --
A. Yes.
Q. -- that are currently available?
A. Yes.
Q. Do you know whether any utility has obtained a special exemption from the NRC to dispose of GTCC wastes at a near-surface facility?
MS. HERRMANN: Objection. Speculation.
A. I don't know if it is phrased exactly that way, but the Trojan reactor vessel was disposed of at Hanford on a NRC approval process.
Q. And that contained GTCC wastes?
A. Greater than Class C like wastes.
Q. And was it in some respect in which it was not like greater than Class C wastes?
A. It gets very complicated with the rules and radioactive concentration per gram or per

Page 128

volume over what volume or weight material you use, so there is some discretion and latitude in the definitions on how it is applied.
Q. Okay, but in your mind that reactor vessel from Trojan was comparable to GTCC wastes?
MS. HERRMANN: Objection. Vague. Calls for a legal conclusion.
A. Some pieces of metal inside that vessel might have been called greater than Class C wastes under different circumstances than that.
Q. Okay. How do you know about this Trojan episode? Were you involved personally?
A. No.
Q. How do you know about it?
A. Trade, industry trade information.
Q. Do you know of any other examples of a utility obtaining a special exception from the NRC for disposal of GTCC wastes in a near-surface facility?
A. Not off -- no.
Q. Well, do you know -- do you know for sure one way or the other whether there are any other examples?
A. There have been concepts of -- a term DOE would use is special case wastes, which is

Page 129

greater than Class C wastes being disposed of in hundred meter deep bore holes, Nevada test site and other such special arrangements, but those are not NRC certified though one could -- there was plans by some companies to dispose of greater than Class C sources in a similar facility in a NRC licensed facility in Texas or New Mexico.
Q. Do you know which company that was?
A. No, I don't recall.
Q. Now these one hundred foot poles that you mentioned, or bores -- I forget the exact phrase you used -- was that defense waste?
A. I believe it was. It may have been R&D waste, but there are one hundred meter bore holes.
Q. So you think there are other examples other than the Trojan example of approval, whether by the NRC or otherwise, for the disposal of GTCC wastes in other than a geologic depository, but aside from the example in Texas where you don't know the name of the utility, you can't think of any others but you think there are others?
A. It's possible. You asked if there are any. There are some possible concepts.
Q. My question was, as you sit there you don't know for a fact that Trojan is the only

Page 130

example?
A. Right.
Q. There may be others, you just can't think of any?
A. Right.
Q. Now, you also mentioned, going back to the first answer about alternatives to geologic disposal for GTCC wastes, you also mentioned some intermediate depth disposal option. Can you tell me a little more about that option?
A. That would be the one hundred meter deep bore holes type arrangement.
Q. And again, that was not defense waste -- has that actually been used by any utility for GTCC wastes?
A. I don't know about a utility. It has been used for disposal of GTCC like wastes over the past 30 years, none recently, but it used to be reasonably common.
Q. Okay. If it wasn't utilities, was it defense wastes?
A. I believe it was R&D wastes.
Q. R&D wastes. Forgive me, I think you said that before. I'm trying to write and think and ask questions, and I apologize.

Page 131

R&D wastes that was government-owned or university-owned or --
A. It was government disposal responsibility. Exactly whose waste it was or where it came from I don't know.
Q. But in your opinion both of those disposal options, that is near-surface facility pursuant to an exemption from the NRC or otherwise, or this one hundred foot intermediate depth disposal, in your opinion those options are available to utilities today for the disposition of their commercial greater than Class C wastes?
A. It is 100 meter, not foot.
Q. Okay.
A. I don't know how available it is, but you asked were there any possible alternatives. Those are possible alternatives. Availability I don't know.
Q. My question was alternatives, not possible, but available alternatives. Does that cause you to change your answer? Are those available alternatives?
A. They are alternatives, not particularly easily done, but possible.
Q. If you were one of my clients, if you

Page 132

were Yankee Atomic Electric Company and you had some GTCC wastes, would you be pursuing the possibility of disposing of that GTCC wastes in one of these two alternatives that you have identified?
MS. HERRMANN: Objection. Speculation.
A. Yes.
Q. Okay, why?
A. Well, they have material that they need to put somewhere, and if it was possible they could have disposed of it with a reactive vessel. I'm not saying they could have, but it was possible.
Q. Would DOE support an effort by Yankee Atomic Electric Company to dispose of its GTCC wastes in one of these alternative manners that you have outlined for us today?
MS. HERRMANN: Objection. Foundation. Speculation.
A. I don't know.
Q. Who would know? Who would we ask if we wanted to obtain such work?
A. I don't know.
Q. You don't know?
A. No.

Page 133

Q. Okay. Is there anyone that you would go to if you were Yankee Atomic Electric Company to discuss that subject?
MS. HERRMANN: Asked and answered. Speculation.
A. No.
Q. There is no one or you don't know who it is?
A. I don't know who it is, and I don't know how you would do it with the government if one were tied up in litigation on the matter.
Q. Okay. If there were no litigation going on is there then someone that you would go to?
MS. HERRMANN: Speculation.
A. If it wasn't for all litigation, I would -- you know, I would think that the environmental management group who is responsible for that could talk about potentials.
Q. And who is in charge of environmental management?
A. Jesse Robison is the assistant secretary.
Q. Does he have a deputy?
A. She.

Page 134

Q. She have a deputy? Thank you.
A. Yes.
Q. Who is that?
A. James Owendoff, I believe.
Q. Currently?
A. Yes.
Q. Now, within RW is there someone who has primary responsibility for the subject of GTCC disposal?
A. All materials that we would accept or discussion about materials that we could or couldn't accept, the responsibility is with Mr. Zabransky.
Q. And that's the generally the waste acceptance area?
A. Correct.
Q. And he's in charge of that right now?
A. Yes.
Q. If Yankee Atomic Electric Company is unable to arrange one of these alternatives, or some other alternative, any alternative disposal option for its GTCC waste, and if the spent nuclear fuel program commences waste acceptance in 2010, do you believe that DOE will accept for disposal Yankee Atomic's GTCC wastes?

Page 135

MS. HERRMANN: Objection. Foundation. Speculation, calls for a legal conclusion.
A. I don't know.
Q. You don't know. Okay. You have no opinion whether that will happen under the assumptions that I laid out? You have no opinion one way or the other?
MS. HERRMANN: Same objections. Asked and answered.
A. Your assumptions again were?
Q. Number one, Yankee Atomic is not able to arrange any alternative disposal option such as the ones you suggested, or maybe some other options, that is one, and two is the program otherwise commences acceptance of SNF in 2010. Do you have an opinion whether or do you know -- not an opinion, do you know whether DOE will in those circumstances accept Yankee Atomic's GTCC wastes?
A. No.
Q. You don't know?
A. I don't know. I do not know if we will accept it or not.
Q. Okay. Why was the disposal of GTCC wastes in a geologic repository studied and discussed in the Environmental Impact Statement?

Page 136

MS. HERRMANN: Objection. Foundation.
A. Under CEQ guidelines it was a reasonable foreseeable alternative that was appropriate to be evaluated. It also received comments from the scoping process that we should evaluate the disposal of greater than Class C and therefore we did.
Q. What was it about the CEQ's guidelines that made it appropriate to evaluate that?
A. I don't know that CEQ guidelines. It was my understanding that, if it were a reasonably foreseeable situation in the future, that it should be evaluated, similar to disposing of all the waste at Yucca Mountain was another one we looked at, as well as special case waste from Rocky Flats we looked at. Because it is possible that the repository could dispose of the greater than Class C.
Q. In your opinion would that be a good idea?
MS. HERRMANN: Objection. Vague. Would what be a good idea?
MR. STOUCK: You can answer.
MS. HERRMANN: If you understand the question.

Page 137

A. Well, the question was would disposing of greater than Class C in a repository be a good idea. And I would say, from a technological perspective, I think it would be a good idea. From a contractual, legal, economic, microeconomic meaning who pays, which utility pays what and that sort of thing, I'm not sure it is doable.
BY MR. STOUCK:
Q. Let's sort out contractual from economic if we can, okay? Let's just talk about the economics of it. Okay? There is a contractual dispute about what, as you know, undoubtedly, in this litigation, whether or not DOE is obligated under the Standard Contract to accept the greater than Class C, so let's put that issue aside. Why -- did you say it would not be a good idea or might not be a good idea?
A. Might not.
Q. Why might it not be a good idea from a microeconomic point of view?
MS. HERRMANN: Objection. Foundation. Speculation.
A. This gets back to the original Act, was for high-level radioactive waste, spent fuel, or

Page 138

any other highly radioactive material that the NRC so specified, that's what we are authorized to do, and then the mill per kilowatt hour fees paid cover spent fuel, to handle the waste, not necessarily the greater than Class C.
So you end up with an issue of equities amongst the contract holders, especially when certain ones are closed and not paying into the funds versus the ones that are, and it becomes equity issues.
Q. And the closed ones are generally the ones that have GTCC waste at least in available forms, right?
A. Currently have. I think all of them may in the future.
Q. Isn't this fee question the same question whether it is covered by the contract or not?
MS. HERRMANN: Objection. Calls for a legal conclusion.
Q. If it is covered by the contract, GTCC waste, then the fee that was paid under the contract covers the disposition of GTCC wastes, right?
MS. HERRMANN: Objection. Calls for a

Page 139

legal conclusion.
A. I don't know. That's a legal matter. I have no opinion on that.
Q. Now, these other alternatives that you mentioned, the special exception from the NRC for the near-surface disposal or the one hundred meter depth disposal for GTCC wastes, are those alternatives technically feasible?
A. Technically feasible.
Q. Are they economically -- well, strike that.
Are they economically feasible?
A. Could be.
Q. Okay. What do you mean could be?
A. It depends on how easy it is to establish one of those. I mean, it could be if in the case of Trojan it worked. You also could have cases where it would be prohibitively expensive to possibly do it depending on what arrangements were made. Siting of a facility for the one hundred meter depth bore hole might be prohibitively expensive, and it may be reasonable costs. I don't know.
Q. Do you know if Trojan paid a fee to dispose of its reactor vessel with possible GTCC

Page 140

inside at Hanford?
A. Yes.
Q. Paid the fee to the government?
A. No. They paid a fee.
Q. Who did they pay the fee to?
A. The operator of the facility, which I think is U.S. Ecology
Q. Okay. Thank you.
Now, tell me what effect this litigation has had on RW's consideration of whether or not to accept GTCC wastes for disposal in the repository.
MS. HERRMANN: Objection. Vague, foundation.
And let me caution you, if this requires disclosure of communication between you and counsel you should not answer.
A. All the litigation issues have just made it very complex to make decisions that are in shades of gray such as our authority to dispose of the greater than Class C waste, as well as the financial equities between the government and the individual contract holders, so that has made it more difficult to reach closure on this matter.
Q. When you say has made it more difficult,

Page 141

has this litigation caused the consideration by RW of whether or not to accept GTCC wastes for disposal in the repository to cease? Has the litigation caused consideration to essentially stop or is consideration of that matter ongoing?
A. As I said, it just makes it much more complex.
Q. Well, is consideration of disposing of GTCC waste in the repository currently ongoing within RW or has that consideration essentially stopped because of the litigation?
A. It is being addressed. It is in the FEIS, but there is very little progress I think toward resolution of the issue due to the complexities that we talked about.
Q. Which is the litigation?
A. And current litigation, possible future litigation and the whole legalities of the situation.
Q. Primarily the litigation and the legal issue of whether GTCC waste is covered or not by the contract?
MS. HERRMANN: Objection to the extent that it mischaracterizes his testimony.
Q. Is that what you are referring to?