# Plaintiff

Page 138

any other highly radioactive material that the NRC so specified, that's what we are authorized to do, and then the mill per kilowatt hour fees paid cover spent fuel, to handle the waste, not necessarily the greater than Class C.
So you end up with an issue of equities amongst the contract holders, especially when certain ones are closed and not paying into the funds versus the ones that are, and it becomes equity issues.
Q. And the closed ones are generally the ones that have GTCC waste at least in available forms, right?
A. Currently have. I think all of them may in the future.
Q. Isn't this fee question the same question whether it is covered by the contract or not?
MS. HERRMANN: Objection. Calls for a legal conclusion.
Q. If it is covered by the contract, GTCC waste, then the fee that was paid under the contract covers the disposition of GTCC wastes, right?
MS. HERRMANN: Objection. Calls for a

Page 139

legal conclusion.
A. I don't know. That's a legal matter. I have no opinion on that.
Q. Now, these other alternatives that you mentioned, the special exception from the NRC for the near-surface disposal or the one hundred meter depth disposal for GTCC wastes, are those alternatives technically feasible?
A. Technically feasible.
Q. Are they economically -- well, strike that.
Are they economically feasible?
A. Could be.
Q. Okay. What do you mean could be?
A. It depends on how easy it is to establish one of those. I mean, it could be if in the case of Trojan it worked. You also could have cases where it would be prohibitively expensive to possibly do it depending on what arrangements were made. Siting of a facility for the one hundred meter depth bore hole might be prohibitively expensive, and it may be reasonable costs. I don't know.
Q. Do you know if Trojan paid a fee to dispose of its reactor vessel with possible GTCC

Page 140

inside at Hanford?
A. Yes.
Q. Paid the fee to the government?
A. No. They paid a fee.
Q. Who did they pay the fee to?
A. The operator of the facility, which I think is U.S. Ecology
Q. Okay. Thank you.
Now, tell me what effect this litigation has had on RW's consideration of whether or not to accept GTCC wastes for disposal in the repository.
MS. HERRMANN: Objection. Vague, foundation.
And let me caution you, if this requires disclosure of communication between you and counsel you should not answer.
A. All the litigation issues have just made it very complex to make decisions that are in shades of gray such as our authority to dispose of the greater than Class C waste, as well as the financial equities between the government and the individual contract holders, so that has made it more difficult to reach closure on this matter.
Q. When you say has made it more difficult,

Page 141

has this litigation caused the consideration by RW of whether or not to accept GTCC wastes for disposal in the repository to cease? Has the litigation caused consideration to essentially stop or is consideration of that matter ongoing?
A. As I said, it just makes it much more complex.
Q. Well, is consideration of disposing of GTCC waste in the repository currently ongoing within RW or has that consideration essentially stopped because of the litigation?
A. It is being addressed. It is in the FDIS, but there is very little progress I think toward resolution of the issue due to the complexities that we talked about.
Q. Which is the litigation?
A. And current litigation, possible future litigation and the whole legalities of the situation.
Q. Primarily the litigation and the legal issue of whether GTCC waste is covered or not by the contract?
MS. HERRMANN: Objection to the extent that it mischaracterizes his testimony.
Q. Is that what you are referring to?

# Defendant

Page 138

any other highly radioactive material that the NRC so specified, that's what we are authorized to do, and then the mill per kilowatt hour fees paid cover spent fuel, to handle the waste, not necessarily the greater than Class C.
So you end up with an issue of equities amongst the contract holders, especially when certain ones are closed and not paying into the funds versus the ones that are, and it becomes equity issues.
Q. And the closed ones are generally the ones that have GTCC waste at least in available forms, right?
A. Currently have. I think all of them may in the future.
Q. Isn't this fee question the same question whether it is covered by the contract or not?
MS. HERRMANN: Objection. Calls for a legal conclusion.
Q. If it is covered by the contract, GTCC waste, then the fee that was paid under the contract covers the disposition of GTCC wastes, right?
MS. HERRMANN: Objection. Calls for a

Page 139

legal conclusion.
A. I don't know. That's a legal matter. I have no opinion on that.
Q. Now, these other alternatives that you mentioned, the special exception from the NRC for the near-surface disposal or the one hundred meter depth disposal for GTCC wastes, are those alternatives technically feasible?
A. Technically feasible.
Q. Are they economically -- well, strike that.
Are they economically feasible?
A. Could be.
Q. Okay. What do you mean could be?
A. It depends on how easy it is to establish one of those. I mean, it could be if in the case of Trojan it worked. You also could have cases where it would be prohibitively expensive to possibly do it depending on what arrangements were made. Siting of a facility for the one hundred meter depth bore hole might be prohibitively expensive, and it may be reasonable costs. I don't know.
Q. Do you know if Trojan paid a fee to dispose of its reactor vessel with possible GTCC

Page 140

inside at Hanford?
A. Yes.
Q. Paid the fee to the government?
A. No. They paid a fee.
Q. Who did they pay the fee to?
A. The operator of the facility, which I think is U.S. Ecology
Q. Okay. Thank you.
Now, tell me what effect this litigation has had on RW's consideration of whether or not to accept GTCC wastes for disposal in the repository.
MS. HERRMANN: Objection. Vague, foundation.
And let me caution you, if this requires disclosure of communication between you and counsel you should not answer.
A. All the litigation issues have just made it very complex to make decisions that are in shades of gray such as our authority to dispose of the greater than Class C waste, as well as the financial equities between the government and the individual contract holders, so that has made it more difficult to reach closure on this matter.
Q. When you say has made it more difficult,

Page 141

has this litigation caused the consideration by RW of whether or not to accept GTCC wastes for disposal in the repository to cease? Has the litigation caused consideration to essentially stop or is consideration of that matter ongoing?
A. As I said, it just makes it much more complex.
Q. Well, is consideration of disposing of GTCC waste in the repository currently ongoing within RW or has that consideration essentially stopped because of the litigation?
A. It is being addressed. It is in the FEIS, but there is very little progress I think toward resolution of the issue due to the complexities that we talked about.
Q. Which is the litigation?
A. And current litigation, possible future litigation and the whole legalities of the situation.
Q. Primarily the litigation and the legal issue of whether GTCC waste is covered or not by the contract?
MS. HERRMANN: Objection to the extent that it mischaracterizes his testimony.
Q. Is that what you are referring to?

Page 142

A. And also covered by the Act.
Q. And also covered by the Act, but that's what you are referring to when you talk about complexities?
A. Those are the complexities, yes.
Q. Those are the complexities?
A. Those are the major complexities.
Q. Are there any others that have led it to be very difficult to address the matter at this time?
A. I haven't thought about it. I'm sure there are others. The state of Nevada comes to mind.
Q. But the major ones are this litigation and the legal question about whether GTCC waste is covered or not by the contract?
A. And also if we are -- if we are authorized to dispose of -- authorized under law, clearly, to dispose of highly radioactive waste.
I can argue that greater than Class C is low-level waste and not high-level waste and therefore we are not authorized to dispose of it. That's a complicated matter that is currently being litigated, and if it wasn't being litigated there would be debate amongst lawyers and

Page 143

politicians if we are authorized to dispose of it or not.
Q. I understand your testimony to be that absent litigation over the question of whether GTCC should or should not be disposed of in the repository, absent that litigation, RW would be more actively and with less difficulty considering that matter; is that right?
MS. HERRMANN: Objection to the extent it mischaracterizes his testimony. Speculation.
A. We might have.
Q. Okay, then there must be some other factor other than the litigation that is inhibiting the act of consideration, and I would like to know what that factor is.
A. The authorization question, are we authorized under the law to dispose of what is essentially low-level waste in a high-level waste repository. That will be a question that will be very likely litigated independent of the current litigation.
Q. Okay. That's your view.
A. Yes.
Q. Why do you think that? Why do you think that there is some question about whether or

Page 144

not GTCC is covered by the contract that is not going to be resolved in this -- I mean your distinction is between the statute and the contract; is that what you're saying?
A. Yes. It's not just a contract issue that is at issue here, it is also are we authorized to dispose of low-level waste in the high-level waste repository.
Q. Assume that that question is exactly the same question that is being litigated in this case. Just assume that. You don't have to agree with it, just assume it. Okay?
A. Go ahead.
Q. Then is litigation over that question, combined question, I'm to assume they are -- I'm telling you to assume they are the same thing. Is that the factor that is inhibiting and making more difficult RW's consideration of whether or not to put GTCC waste into the repository?
MS. HERRMANN: Speculation in all capital letters, calls for a legal conclusion, and assumes facts not in evidence.
A. I don't know. It's confusing to me.
Q. Okay. But in any event, this litigation is having some depressive effect on

Page 145

RW's consideration of the matter?
MS. HERRMANN: Asked and answered about eighteen times.
A. Yes.
MR. STOUCK: Can you mark this for me, please.
(Barrett Deposition Exhibit No. 82 was marked for identification.)
(Discussion off the record.)
BY MR. STOUCK:
Q. You have been handed a document that is marked Exhibit Number 82, Mr. Barrett. This is a printout from an electronic database of a publication, at least a portion of the publication entitled Nuclear Waste News. The date is Thursday March 14, 2002.
Do you see that?
A. I see it.
Q. Do you know what that publication is?
A. I don't know.
Q. Okay. You don't know? If you read it, is that because -- is that because if you read it you don't read it in this electronic format? You don't recognize it?

# Plaintiff

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

\- - - - - - - - - - - - - - - X

YANKEE ATOMIC ELECTRIC :
COMPANY, CONNECTICUT YANKEE :
ATOMIC POWER COMPANY, MAINE :
YANKEE ATOMIC POWER COMPANY, : Case No. 98-126C,
Plaintiff, : 98-154C, 98-474C
vs. : (Senior Judge Merrow)
UNITED STATES OF AMERICA, :
Defendant. : Volume I

\- - - - - - - - - - - - - - - X

Washington, D.C.

Tuesday, May 14, 2002

Deposition of LAKE H. BARRETT, a witness herein, called for examination by counsel for the Plaintiffs in the above-entitled matter, pursuant to notice, the witness being duly sworn, taken at the offices of Spriggs & Hollingsworth, 1350 Eye Street, N.W., Washington, D.C., commencing at 9:30 a.m., Tuesday, May 14, 2002, and the proceedings being taken down by Stenotype by CAPPY HALLOCK, RPR-CRR, and transcribed under her direction.

CONTAINS CONFIDENTIAL INFORMATION

PURSUANT TO THE PROTECTIVE ORDER

ERRATA SHEET FOR THE TRANSCRIPT OF:

Notice Date: May 16, 2002
Case Name: Yankee Atomic vs. United States
Case Number: 98-126C-987 4C
Dep. Date: ~~May 15, 2002~~ 5/14/02
Deponent: Lake Barrett (cont)
Place: Washington DC
Ref. No.: 4269-4

CORRECTIONS:

| Page | Line | Now Reads | Should Read | Reasons Therefore |
|---|---|---|---|---|
| 68 | 9 | the appropriate | for appropriate | ? |
| 132 | 11 | reactive | reactor | ? |
| 136 | 10 | that | what | ? |
| 141 | 13 | FDIS | FEIS | This happens several times so please fix late |
| 224 | 24 | management | packages | ? |
| [illegible] | 17 | 97 | 07 | ? |

Signature of Deponent

6/20/02

# Plaintiff

Page 174

MS. HERRMANN: Objection. Vague. Speculation.
Q. That that could have been done?
A. It could have been done.
Q. Okay.
A. It technically could have been done.
Q. Now, you again -- some of these things I know we touched on earlier, I'm just attacking it from a different angle here.
You mentioned earlier today shipping campaigns. Do you recall that?
A. Yes.
Q. Now, would you agree that there are advantages to shipping campaigns versus moving over only a small number of assemblies at a time?
A. Yes.
Q. Would you agree that one of the important advantages of shipping campaigns is that efficiencies in transportation operations tend to be realized?
MS. HERRMANN: Objection. Vague.
A. Yes.
Q. Okay, and would you agree that repetitive operations such as cask handling, loading, decontamination, receipt and turnaround

Page 175

are all more efficiently accomplished per cycle in a campaign versus individual cask transport?
MS. HERRMANN: Objection. Vague, compound.
A. Yes.
Q. Okay. Good.
Now, also earlier today I believe you testified that you thought it was possible -- we looked at I think it was Page 8 from one of the ACRs which had the oldest fuel first queue, if you will. Do you recall that?
A. Yes.
Q. And the question was, do you think it's possible that when DOE commences fuel acceptance in 2010 or some other time that that queue, with minor variations that we put to one side for purposes of the earlier question and I will put aside here, did you think it was possible that that queue would be the actual sequence of pickup of spent fuel. Do you recall that?
A. Yes.
Q. And you said you thought that was possible?
A. It was possible. Unlikely.
Q. Unlikely. That would be my next

Page 176

question. We are back to that now.
Now, would you agree that an acceptance sequence that strictly followed the OFF queue, if you will -- do you understand that reference?
A. Yes.
Q. -- would be economically inefficient?
MS. HERRMANN: Objection. Vague.
A. Not as economical nor efficient as other alignments might be.
Q. Okay. It would be relatively economical and efficient, relative to some other alignments.
A. Yes.
Q. Can you think of any -- do you know of any -- would there be some alignments that might be even less economically efficient than the OFF queue?
A. Well, I suppose you could make them less efficient. You could spread them out. Everybody has a right to go smaller amounts or something like that, but it's just speculative.
Q. Do you think it would make any economic sense to follow that queue for the actual sequence of pickup?
MS. HERRMANN: Objection. Vague.

Page 177

A. The one that is in that table?
Q. Yes.
A. Do I think it would -- what is the question?
Q. Would it be economically sensible.
A. Yes, it could be sensible. I mean, it is not desirable, but, all things considered, if there is a strict adherence to certain interpretations of the contract, you could do it.
Q. Okay. Your answer is it would be sensible, because it might be required by the contract?
A. Yes.
Q. But that's not -- that's different from economical sense. It would be economically relatively inefficient you already testified?
A. It could be inefficient.
Q. It would be inefficient?
A. It would be inefficient.
Q. I think much earlier today we looked at the mission plan and there was an objective in the mission plan to conduct the program in a cost-effective manner; do you recall that?
A. Yes.
Q. And that is still one of the objectives

# Plaintiff

Page 178

of the program?
A. Yes.
Q. What is your understanding of the relationship between the objective of economic efficiency and the fuel cost recovery nature of the contract?
MS. HERRMANN: Objection. Calls for a legal conclusion.
A. I believe it is the federal government's responsibility to prepare a cost-effective system to minimize the costs on the waste generators for societal good.
Q. Is that related to the -- do you understand the term fuel cost recovery?
MS. HERRMANN: Objection. Calls for a legal conclusion.
A. I believe I do.
Q. What is your understanding?
A. That the cost for -- the costs incurred by this program are fully paid for by the waste generators, in this case the utility contract holders and the defense activities of the Department of Energy.
Q. And is that related to what you just testified was -- I think you just testified was

Page 179

DOE's responsibility to implement this program in a cost-effective manner?
A. Yes.
MS. HERRMANN: Objection. Calls for a legal conclusion.
Q. And I'm asking you to explain to me what your understanding of the relationship is between, on the one hand, the fuel cost recovery nature of the contract and, on the other hand, the DOE responsibility to conduct the program in an economical and efficient way?
MS. HERRMANN: Objection. Calls for a legal conclusion.
A. I'm not understanding the question yet.
Q. Okay. Maybe I should ask, is there a relationship --
A. Between --
Q. -- the fuel cost recovery nature of the contract, as you just explained it, and the responsibility that DOE has to proceed in an economically cost-effective way.
MS. HERRMANN: Objection. Calls for a legal conclusion.
A. I don't see the relationship there at all.

Page 180

Q. The notion is you are spending the utilities' money. Maybe there is some obligation to spend it in a cost-effective manner.
MS. HERRMANN: Is that a question?
Q. Yes. I mean is that --
MS. HERRMANN: Objection. Calls for a legal conclusion.
Q. Is that right? Do you know whether that's correct?
A. We are always trying to do it in a cost-effective manner, whose ever money it is.
Q. Okay.
A. Fuel cost recovery is fuel cost recovery, efficient or inefficient.
Q. So in your mind the responsibility, as you phrased it, for DOE to proceed in an economical way is not necessarily related at all to the fuel cost recovery nature of the contract?
A. Correct.
Q. You would do it in an economically efficient manner regardless?
A. Yes.
Q. All right.
Do you believe that exchanges of acceptance allocations would have added to the

Page 181

efficiency of the spent fuel acceptance schedule?
MS. HERRMANN: Objection. Speculation.
A. Don't know.
Q. Don't know?
Okay, can you explain why you don't know to me.
A. It could have helped the efficiency, it could have detracted from the efficiency, depending on what the exchange was and the details of it.
Q. How could it have detracted from the efficiency?
A. It could have further fractionated it. It could have put difficulties in as far as what fuel was received from where, may have brought difficult transportation sites into play much earlier than otherwise would have happened.
Q. Okay. Well, do you believe that DOE would have approved exchanges that had those consequences?
MS. HERRMANN: Objection. Speculation. Foundation.
A. I don't know.
Q. Can you think of a reason why DOE would have approved an exchange that would have made the

# Plaintiff

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

\- - - - - - - - - - - - - - x

YANKEE ATOMIC ELECTRIC :
COMPANY, MAINE YANKEE ATOMIC :
POWER CO., and CONNECTICUT :
YANKEE ATOMIC POWER CO., : Case No. 98-126C,
Plaintiffs, : 98-474C, 98-154C
vs. : (Senior Judge Merrow)
UNITED STATES OF AMERICA, :
Defendant. : VOLUME II

\- - - - - - - - - - - - - - -X

Washington, D.C.
Wednesday, May 15, 2002

Deposition of LAKE H. BARRETT, a witness herein, called for examination by counsel for Defendant in the above-entitled matter, pursuant to notice, the witness being previously duly sworn, taken at the offices of Spriggs & Hollingsworth, 1350 Eye Street, N.W., Washington, D.C., commencing at 9:05 a.m., Wednesday, May 15, 2002, and the proceedings being taken down by Stenotype by CAPPY HALLOCK, RPR-CRR, and transcribed under her direction.

CONTAINS CONFIDENTIAL INFORMATION
PURSUANT TO THE PROTECTIVE ORDER

Page 339

A. I don't recall. I have lots of meetings with Yankee -- there were quite a few people included with the Yankees, and I don't remember.
Q. Do you recall telling anyone at Yankee Atomic, you know, shortly, sometime not long after this denial letter, that you were receptive to suggestions on a process for allocation of priority under the contract which DOE could follow?
MS. HERRMANN: Objection. Vague.
A. I might have.
Q. Okay.
Do you think -- were you sympathetic to Yankee's predicament at the time? In other words, to its desire to move this spent fuel off of its site so that it could complete the decommissioning activities which had been initiated?
MS. HERRMANN: Objection. Vague.
A. Yes.
Q. Why?
A. I felt that it was in the nation's interests to support utilities like Yankee who were trying to clean up their sites and return that real estate to useful societal purpose in

Page 340

that we should try to move the fuel off as quickly as we practically could, consistent with sound national policies.
Q. Good. That's what you thought, you know, in your working life at RW?
A. Yes.
Q. Okay. But because of these other factors we have discussed previously, either the time wasn't right or whatever to actually grant the priority at that time?
MS. HERRMANN: Objection as to the characterization.
Q. Even though you were sympathetic to their predicament?
A. I was sympathetic to their predicament. Sympathy did not drive the decision to grant it.
Q. Because of the other factors that we discussed previously, is that what led you to deny it?
A. Correct.
Q. Okay.
MR. STOUCK: Would you mark this as Number 101 (sic), please.
(Barrett Deposition Exhibit No. 102 was marked for

Page 341

identification.)
MS. HERRMANN: Exhibit 102.
BY MR. STOUCK:
Q. Actually, Mr. Barrett, this one I will tell you is a collection of documents. I believe -- yes, they are consecutively numbered, out of Yankee Atomic's files. But there is at least a couple of documents here, so let me just identify them for the record as follows.
The cover page is a letter from Mr. Grube to you dated October 7, 1993. Then there looks like a two-page document, "suggestions of How DOE Should Implement the Granting of Priority Acceptance of Spent Fuel from Permanently Shutdown Plants," and then the fifth and sixth page is a memorandum dated October 1993, a memo from Mr. Grube to Dr. Kadek, and the Bates numbers are YOF006635-6640 -- excuse me, then there is a last page which is all part of the same collection, October 19, 1993, a letter from you to Mr. Grube. Okay?
Would you please -- could we just take a short break here while you are reviewing this document? I will come back and ask you a couple of questions about it.

Page 342

(Recess taken -- 11:45 a.m.)
(After recess -- 11:55 a.m.)
BY MR. STOUCK:
Q. Have you had a chance to review this collection of documents?
A. I have.
Q. Let's start with the letter to you dated October 7. It's the first page of the exhibit --
MR. STOUCK: What is the number on this exhibit again?
THE REPORTER: 102.
Q. This is letter from Mr. Grube thanking you for spending time at a meeting on September 20th, right?
A. Yes.
Q. Do you recall the meeting now?
A. No.
Q. Do you know if the meeting happened?
A. Probably.
Q. Okay. Well, did you review this entire exhibit?
A. Yes.
Q. Okay. Well, the last page is a letter from you, right, signed by you, right?

# Defendant

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - x

YANKEE ATOMIC ELECTRIC :
COMPANY, MAINE YANKEE ATOMIC :
POWER CO., and CONNECTICUT :
YANKEE ATOMIC POWER CO., : Case No. 98-126C,
Plaintiffs, : 98-474C, 98-154C
vs. : (Senior Judge Merrow)
UNITED STATES OF AMERICA, :
Defendant. : VOLUME II

- - - - - - - - - - - - - - - x

Washington, D.C.
Wednesday, May 15, 2002

Deposition of LAKE H. BARRETT, a witness herein, called for examination by counsel for Defendant in the above-entitled matter, pursuant to notice, the witness being previously duly sworn, taken at the offices of Spriggs & Hollingsworth, 1350 Eye Street, N.W., Washington, D.C., commencing at 9:05 a.m., Wednesday, May 15, 2002, and the proceedings being taken down by Stenotype by CAPPY HALLOCK, RPR-CRR, and transcribed under her direction.

CONTAINS CONFIDENTIAL INFORMATION
PURSUANT TO THE PROTECTIVE ORDER

A. I don't recall. I have lots of meetings with Yankee -- there were quite a few people included with the Yankees, and I don't remember.

Q. Do you recall telling anyone at Yankee Atomic, you know, shortly, sometime not long after this denial letter, that you were receptive to suggestions on a process for allocation of priority under the contract which DOE could follow?

MS. HERRMANN: Objection. Vague.

A. I might have.

Q. Okay.

Do you think -- were you sympathetic to Yankee's predicament at the time? In other words, to its desire to move this spent fuel off of its site so that it could complete the decommissioning activities which had been initiated?

MS. HERRMANN: Objection. Vague.

A. Yes.

Q. Why?

A. I felt that it was in the nation's interests to support utilities like Yankee who were trying to clean up their sites and return that real estate to useful societal purpose in



that we should try to move the fuel off as quickly as we practically could, consistent with sound national policies.

Q. Good. That's what you thought, you know, in your working life at RW?

A. Yes.

Q. Okay. But because of these other factors we have discussed previously, either the time wasn't right or whatever to actually grant the priority at that time?

MS. HERRMANN: Objection as to the characterization.

Q. Even though you were sympathetic to their predicament?

A. I was sympathetic to their predicament. Sympathy did not drive the decision to grant it.

Q. Because of the other factors that we discussed previously, is that what led you to deny it?

A. Correct.

Q. Okay.

MR. STOUCK: Would you mark this as Number 101 (sic), please.

(Barrett Deposition Exhibit No. 102 was marked for



identification.)

MS. HERRMANN: Exhibit 102.

BY MR. STOUCK:

Q. Actually, Mr. Barrett, this one I will tell you is a collection of documents. I believe -- yes, they are consecutively numbered, out of Yankee Atomic's files. But there is at least a couple of documents here, so let me just identify them for the record as follows.

The cover page is a letter from Mr. Grube to you dated October 7, 1993. Then there looks like a two-page document, "suggestions of How DOE Should Implement the Granting of Priority Acceptance of Spent Fuel from Permanently Shutdown Plants," and then the fifth and sixth page is a memorandum dated October 1993, a memo from Mr. Grube to Dr. Kadek, and the Bates numbers are YOF006635-6640 -- excuse me, then there is a last page which is all part of the same collection, October 19, 1993, a letter from you to Mr. Grube. Okay?

Would you please -- could we just take a short break here while you are reviewing this document? I will come back and ask you a couple of questions about it.



(Recess taken -- 11:45 a.m.)

(After recess -- 11:55 a.m.)

BY MR. STOUCK:

Q. Have you had a chance to review this collection of documents?

A. I have.

Q. Let's start with the letter to you dated October 7. It's the first page of the exhibit --

MR. STOUCK: What is the number on this exhibit again?

THE REPORTER: 102.

Q. This is letter from Mr. Grube thanking you for spending time at a meeting on September 20th, right?

A. Yes.

Q. Do you recall the meeting now?

A. No.

Q. Do you know if the meeting happened?

A. Probably.

Q. Okay. Well, did you review this entire exhibit?

A. Yes.

Q. Okay. Well, the last page is a letter from you, right, signed by you, right?

# Plaintiff

Page 395

Q. First is standard and second is failed?
MS. HERRMANN: You can have it read again.
MR. STOUCK: Yes, read it again.
(The record was read as requested.)
A. Can you define expectation a little bit or not?
BY MR. STOUCK:
Q. Well, I will accept a definition from you if you are uncertain about the word. I mean, do you think it's going to happen that way?
MS. HERRMANN: Same objections.
A. When all is said and done, my expectation, what I really think will happen is when it moves along it will move together -- contemporary, it will all move contemporary, that's the failed fuel and the standard fuel.
Q. Now, a different question: Is it your expectation that when the Department of Energy commences the acceptance of Yankee Atomic's spent fuel, it will accept at the same time contemporaneously Yankee Atomic's GTCC and remove it away from the site?
MS. HERRMANN: Objection. Foundation. Speculation.

Page 396

A. When all extraneous legal matters are finally resolved my expectation is the greater than Class C waste will go at the same time, contemporaneously, at the same time.
Q. And why is it -- let's start, take them one at a time. Why do you expect that the failed fuel, putting aside what you refer to as the extraneous matters, at the end of the day the failed fuel will go contemporaneously with the standard fuel? Why do you think that's likely to happen?
MS. HERRMANN: Foundation. Speculation.
A. Because it is my understanding that the physical configuration of the spent fuel at Yankees are somewhat similar to normal spent fuel handling, so there is none that I know of -- there are no sneak technical reasons why it could not be accepted into the system. And that, from a common sense point of view, we should resolve these, you know, other legality matters, and if you have a campaign you want to move all the fuel at once.
Q. And would you give the same answer if I asked you the same question about the basis for your expectation that GTCC would move

Page 397

contemporaneously with the spent fuel?
MS. HERRMANN: Objection. Foundation Speculation.
A. It is similar, but more complex, because there is a lot of administrative matters that have to happen regarding the authorization of greater than Class C, so it is not as simple – you are dealing with another class of materials, but when all is said and done, at the end of the day, I believe that should go at the same time.
Q. With respect to GTCC, if I limited the question to removal from the site at the same time, then would you agree that these additional complexities that you referred to would not come into play because those complexities relate to disposal and placement?
Do you understand my question?
MS. HERRMANN: Objection.
Q. If I were to ask a different question about whether you expect the GTCC to be removed from the Yankee site --
A. By whom?
Q. By the Department of Energy, contemporaneous with the spent fuel without regard to where the GTCC goes, would you give

Page 398

substantially the same answer that you gave with failed fuel? In other words, these complexities, the complexities that you referred to with respect to the GTCC, you said the bottom line was essentially the same, but there was more complexities, because it is a different class of materials.
A. Correct.
Q. My question is do those complexities concern only destination for the GTCC and emplacement in the repository or disposal in the repository, or do those complexities also bear on the question of what happens at the Yankee site and the removal of GTCC from the Yankee site?
MS. HERRMANN: Objection. Calls for a legal conclusion.
A. Those additional complexities primarily have to do with the government's authority or nonauthority and where the government is going to put it under what, legislation, et cetera. It has little to do with anything at the Yankee site.
Q. And also, just for completeness, I limited my questions at the outset to failed fuel and GTCC and the timing of their removal from the Yankee Atomic site, but if I were to ask you the

# Plaintiff

Page 399

same questions about those matters with respect to Connecticut Yankee and Maine Yankee, would you give me the same answers?
MS. HERRMANN: Same objections.
A. I don't -- I knew -- I think I know more about the configurations at the Yankee Rowe site. I don't know what is being considered or I don't know enough to be as conclusive as I was about Maine Yankee or Connecticut Yankee.
Q. Okay. As you can be about Yankee Atomic?
A. Right.
Q. What is it about the configurations that you would need to know to compare? Are we talking about cask configurations, crane configurations, transportational issues or what are we talking about -- or what are you talking about?
A. The ability to handle failed fuel, does it handle like a normal fuel assembly or is it unique in 10-ton canisters which are much more complex to handle. If we have to go in and vacuum out fuel pieces from a 10-ton canister, that's a significant consideration. That's not the case at Yankee Rowe is my understanding. That may or may

Page 400

not be the case at other sites.
Q. Anything else that you can think of -- if I wanted to find out if the answer you gave for Yankee Atomic also applied to Maine Yankee and Connecticut Yankee for failed fuel, what other things would I look out for to see if your answer applies there?
A. That's the only one I can think of.
Q. With respect to GTCC, likewise if I wanted to find out if your answer for Yankee Atomic applied to the other two sites, what factors would bear on whether or not the answer did apply?
A. If they have packaged it such that it is relatively standard handling, meaning like a spent fuel assembly, the same should apply at the other sites.
MR. STOUCK: Okay. Mr. Barrett, thank you for your testimony over these many days. I have no further questions. I will tell you that it has been our practice, meaning the plaintiffs in these cases -- there are some disputes between the parties that are ongoing about the production of documents, some of them are privileged, et cetera. There are some things we want from the

Page 401

government we have not gotten, and we are reserving the right to if and when we get those things -- if the court rules our way and says we are entitled to them or if other documents that should have been provided by now come forward later and we want to ask witnesses about those, we are reserving the right to do that. So I'm informing you about that.
MS. HERRMANN: We oppose that reservation of rights.
MR. STOUCK: Subject to that possibility, I have no further questions. Again I would like to thank you very much for the time and patience that you have shown here. It has been helpful to all of us.
THE REPORTER: Signature?
MS. HERRMANN: He wants to read and sign.
MR. STOUCK: I am going to -- we are going to disassemble these transcripts, Exhibit 92 and 100, and only insert the pages as we discussed, but, if it turns out on review of the testimony that we did not include one of the pages, we may have to make adjustments later. Is that okay?
MS. HERRMANN: We will all be on the

Page 402

lookout for that.
(Thereupon, at 1:30 p.m., the taking of the instant deposition ceased.)

____________________
Signature of the Witness

SUBSCRIBED AND SWORN to before me this ____ day of ____________, 20__.

____________________
NOTARY PUBLIC

My Commission Expires: __________

# Alan Brownstein

# Plaintiff

00001

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - - - - -x

YANKEE ATOMIC ELECTRIC COMPANY :

(98-126C)(Merow, S.J.) :

CONNECTICUT YANKEE ATOMIC POWER COMPANY :

(98-154C)(Merow, S.J.) :

FLORIDA POWER & LIGHT COMPANY :

(98-483C)(Wilson, J.) :

NORTHERN STATES POWER COMPANY :

(98-484C)(Wiese,J.) :

DUKE POWER, A Division of :

DUKE ENERGY CORP. :

(98-485C)(Sypolt,J.) :

INDIANA MICHIGAN POWER COMPANY :

(98-486C)(Hodges, J.) :

SACRAMENTO MUNICIPAL UTILITY DISTRICT :

(98-488C)(Yock, S.J.) :

SOUTHERN NUCLEAR OPERATING COMPANY, :

et al. :

(98-488C)(Yock, S.J.) :

COMMONWEALTH EDISON COMPANY :

(98-621C)(Hewitt, J.) :

BOSTON EDISON COMPANY :

(99-447C)(Allegra, J.) :

GPU NUCLEAR, INCORPORATED :

00002

(00-440C)(Bush, J.) :
WISCONSIN ELECTRIC POWER COMPANY :
(00-697C)(Merow, S.J.) :
POWER AUTHORITY OF THE STATE OF NEW YORK :
(00-703C)(Damich, J.) :
OMAHA PUBLIC POWER DISTRICT :
(01-115C)(Bush, J.) :
NEBRASKA PUBLIC POWER DISTRICT :
(01-116C)(Sypolt, J.) :
TENNESSEE VALLEY AUTHORITY :
(01-249C)(Bruggink, J.) :
Plaintiffs, :
v. :Discovery
THE UNITED STATES, :Judge:
Defendant. :(Judge
- - - - - - - - - - - - - - - - - - - -xSypolt)

McLean, Virginia
Tuesday, April 9, 2002

Deposition of ALAN BROWNSTEIN, a witness, called for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to notice, the witness being duly sworn by CATHERINE S. BOYD, a Notary Public in and for the Commonwealth of Virginia, taken at the offices of Shaw Pittman, LLP, 1650 Tysons

00009

PROCEEDINGS

Whereupon,

ALAN BROWNSTEIN,

was called as a witness by counsel for Plaintiffs, and having been duly sworn by the Notary Public, was examined and testified as follows:

EXAMINATION BY COUNSEL FOR PLAINTIFFS FLORIDA POWER AND LIGHT COMPANY, NORTHERN STATES POWER COMPANY, DUKE POWER, INDIANA MICHIGAN POWER COMPANY, BOSTON EDISON COMPANY, GPU NUCLEAR, INCORPORATED, POWER AUTHORITY OF THE STATE OF NEW YORK, OMAHA PUBLIC POWER DISTRICT, NEBRASKA PUBLIC POWER DISTRICT:

BY MR. TOMASZCZUK:

Q. Mr. Brownstein, would you state your name for the record, please?

A. Alan Brownstein.

Q. And by whom are you employed, sir?

A. Department of Energy.

Q. And what is your title?

A. I'm a director of the Regulatory Coordination Division, and I'm on detail right

00010

now as a special advisor to the, special, senior policy advisor to the director.

Q. You said director of regulatory enforcement division?

A. Regulatory Coordination.

Q. And I'm sorry -- senior policy advisor?

A. Right, to the director; that's a detail right now.

Q. To the director of OCRWM?

A. Of OCRWM.

Q. And that is all within the Department of Energy, correct?

A. Right. Um-hm.

Q. My name is Alex Tomaszczuk. We met prior to going on the record.

I'm counsel for various of the utility plaintiffs in this case.

I'm going to ask some questions about your knowledge with respect to the management of spent nuclear fuel.

If you don't understand my question, please tell me, and I'll try and rephrase it so that --

A. Okay.

# Defendant

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
- - - - - - - - - - - - - - - - - - - - -x
YANKEE ATOMIC ELECTRIC COMPANY :
(98-126C) (Merow, S.J.) :
CONNECTICUT YANKEE ATOMIC POWER COMPANY :
(98-154C) (Merow, S.J.) :
FLORIDA POWER & LIGHT COMPANY :
(98-483C) (Wilson, J.) :
NORTHERN STATES POWER COMPANY :
(98-484C) (Wiese, J.) :
DUKE POWER, A Division of :
DUKE ENERGY CORP. :
(98-485C) (Sypolt, J.) :
INDIANA MICHIGAN POWER COMPANY :
(98-486C) (Hodges, J.) :
SACRAMENTO MUNICIPAL UTILITY DISTRICT :
(98-488C) (Yock, S.J.) :
SOUTHERN NUCLEAR OPERATING COMPANY, :
et al. :
(98-488C) (Yock, S.J.) :
COMMONWEALTH EDISON COMPANY :
(98-621C) (Hewitt, J.) :
BOSTON EDISON COMPANY :
(99-447C) (Allegra, J.) :
GPU NUCLEAR, INCORPORATED :

(00-440C)(Bush, J.) :
WISCONSIN ELECTRIC POWER COMPANY :
(00-697C)(Merow, S.J.) :
POWER AUTHORITY OF THE STATE OF NEW YORK :
(00-703C)(Damich, J.) :
OMAHA PUBLIC POWER DISTRICT :
(01-115C)(Bush, J.) :
NEBRASKA PUBLIC POWER DISTRICT :
(01-116C)(Sypolt, J.) :
TENNESSEE VALLEY AUTHORITY :
(01-249C)(Bruggink, J.) :
Plaintiffs, :
v. :Discovery
THE UNITED STATES, :Judge:
Defendant. :(Judge
---------------------xSypolt)

McLean, Virginia
Wednesday, April 10, 2002

Continued deposition of ALAN BROWNSTEIN, a witness, recalled for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to notice, the witness being previously duly sworn by CATHERINE S. BOYD, a Notary Public in and for the Commonwealth of Virginia, taken at the offices of Shaw Pittman,



LLP, 1650 Tysons Boulevard, McLean, Virginia 22102-4859, at 9:26 a.m., Wednesday, April 10, 2002, and the proceedings being taken down by Stenotype by CATHERINE S. BOYD and transcribed under her direction.



APPEARANCES:

On behalf of the Plaintiffs Florida Power & Light Company, Northern States Power Company, Duke Power, Indiana Michigan Power Company, Boston Edison Company, GPU Nuclear, Incorporated, Power Authority of the State of New York, Omaha Public Power District, Nebraska Public Power District:
ALEX D. TOMASZCZUK, ESQ.
DANIEL S. HERZFELD, ESQ.
Shaw Pittman, LLP
1650 Tysons Boulevard
McLean, Virginia 22102-4859
(703) (770-7901)

On behalf of Plaintiff Sacramento Municipal Utility District:
DAVID S. NESLIN, ESQ.
Arnold & Porter
370 Seventeenth Street, Suite 4500
Denver, Colorado 80202-1370
(303) 863-2301



APPEARANCES (Continued)

On behalf of Plaintiffs Southern Nuclear Operating Company, Alabama Power Company, Georgia Power Company:
JEFFREY L. HANDWERKER, ESQ.
Arnold & Porter
555 Twelfth Street, N.W.
Washington, D.C. 20004-1206
(202) 942-6101

On behalf of Plaintiff Wisconsin Electric Power Company:
DONALD J. CARNEY, ESQ.
Perkins Coie, LLP
607 Fourteenth Street, N.W.
Washington, D.C. 20005-2011
(202) 434-1675

On behalf of Plaintiff Commonwealth Edison Company:
NORMAN M. HIRSCH, ESQ.
Jenner & Block, LLC
One IBM Plaza
Chicago, Illinois 60611-7603
(312) 222-9350

Page 287

the line numbers on the sides of the page, the style and the issues, so I'm sure that PNL did it.

Q. Okay. Did -- was it prepared at your request?

A. Most likely.

Q. Okay. At page 1, at the end of the first paragraph, there is a sentence which reads, quote, "Unlike the Annual Capacity Report, which was for planning purposes only, the order in which SNF is listed in the Acceptance Priority Ranking is the order in which DOE is contractually bound to allocate annual waste acceptance capacity to the Purchasers"?

A. Correct.

Q. Was that a true statement?

MR. BANES: Objection. Calls for a legal conclusion.

THE WITNESS: As I testified before, it was our understanding that the Annual Capacity Report is clearly stated as for planning purposes and to be replaced, our interpretation, to be replaced by the APR.

The APR did not use those words, so it

Page 288

had, you know, in my view, it had meaning beyond for planning purposes.

Whether contractually bound, those are the words that he used.

I'm not sure I accepted that at the time. I would have to go back to, we would have to look to see how I changed that or didn't change it for the APR, but in terms of the spirit, that was the major distinction between the ACR and the APR.

BY MR. TOMASZCZUK:

Q. You're not sure whether you would agree with those terms contractually bound or not?

A. Well --

MR. BANES: Objection -- asked and answered.

THE WITNESS: Contractually bound is a legal term.

It's, this is not a legal document. We were using that at the time to distinguish between the planning purposes, and again, as I testified yesterday, there was, there was a real concern that as we started this process, that data on which these allocations were going to be

Page 289

generated were, were going to have importance to both the utilities and to us, and if that data were to change in the future, that was going to cause perturbations, and we wanted to try to impart to the utilities and to the people who worked with us that they had to really pay attention to the data on which the allocations were going to be based on.

That's what I was trying to do. That's the, that's to me the major difference. That's what I meant by contractually bound.

BY MR. TOMASZCZUK:

Q. In the second paragraph, there is a reference to informal discussions were held with the purchasers' representatives detailing the advantages of delaying the APR and DCS process.

Did you participate in any such discussions?

A. I'm sure I did.

Q. And what in your mind were the advantages to the purchasers of delaying the APR and DCS process?

A. My general answer to you is, is the issues that are depicted in the remainder of this paper were, were in our minds, real issues

Page 290

of which answers had not been, you know, mutually agreed to informally or formally.

We thought these issues needed to be addressed to come to some mutual understanding, and we, we needed time to do that, and so that was the advantage of delaying the process.

Q. Would that have benefited the purchasers in some way?

A. I certainly believe it would have benefited both sides.

Q. And what specifically would be the benefit to the purchasers of such a delay?

A. Let me give you an example.

Q. Okay.

A. If we issued the allocations, as time went on, those allocations were used for the DCS process.

The contract allows DCSs with the department's approval to be exchanged.

If we went through that entire process, it is conceivable a market could have developed of which DCSs had some value among the utilities, and those trades occurred, and subsequent to that, a or several utilities changed the data on which those allocations were

Page 291

based could have caused perturbations really to the utilities, some to us.
That's an example.
Q. Since you raised the subject, exchanges are mentioned here as the fourth issue to be addressed in the APR?
A. Right.
Q. And the first sentence under the issue says purchasers have the right to exchange approved DCSs subject to DOE approval?
A. Correct.
Q. Did you agree with that statement?
A. Yes, I did.
MR. BANES: Objection. Calls for a legal conclusion.
THE WITNESS: Sorry. Yes, I do.
BY MR. TOMASZCZUK:
Q. Going back to the first page, the draft briefing paper goes on to state this option, and I presume that's the option of delaying the APR and DCS process, was rejected because of the purchasers' perceived need not to support any action that could be viewed as acquiescing on the 1998 date?
A. Correct.

Page 292

Q. And is that statement consistent with your understanding of the rejection of this option?
A. Yes, it is.
Q. The purchasers were concerned that they not take any action that could be viewed as extending the 1998 date in the contract?
A. Yes.
Q. Do you know why?
MR. BANES: Objection -- lack of foundation.
Calls for speculation.
BY MR. TOMASZCZUK:
Q. Let me go back. Did you have any discussions with utility representatives concerning this issue?
A. I did.
Q. And you understood the utility representatives to advise you that they were not willing to take actions that could be perceived as acquiescing on an extension of the January 31, 1998 date?
A. We referred to the ACR issue resolution process yesterday, and these were basically staff-to-staff technical discussions.

Page 293

We discussed many issues associated with the contract, some of which are listed in this paper.
When we had those discussions with the technical people, as I recall it, they understood, you know, a host of implementation problems, and as I recall it, were sympathetic to the need to try to resolve those, you know, before we moved on.
They went back, as I understand it, after our meetings to their respective management and to their legal counsel, and came back and said something to the order of while we understand, we have been advised not to proceed down that course.
This is many years ago, but that's how I recall the, the events.
Q. And did any of those utility personnel explain that to you or tell you anything further about that?
A. My only recollection is for whatever the reason that I remember, they came back and said there was a group or an individual, I don't recall, that Jay Silberg, they had reviewed the issue with Jay Silberg, and he had advised them

Page 294

in part because of, you know, legal concerns, not to do that, again, to the best of my recollection.
Q. Okay.
(There was a pause in the proceedings.)
BY MR. TOMASZCZUK:
Q. There is a reference here at the bottom of page 1 to an option for dealing with the waste acceptance rate issue as I understand it?
A. Correct.
Q. And it refers to the need or desire to allow the purchasers to cooperatively avoid out-of-pool storage requirements based on RW-859 data?
A. Correct.
Q. Do you see that?
A. Yes, I do.
Q. Was it DOE's intention at the time to structure the program such that purchasers would avoid out-of-pool storage requirements based on RW-859 data?
MR. BANES: Objection -- vague.
THE WITNESS: In my mind, there's a