# Defendant

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - - - - -x

YANKEE ATOMIC ELECTRIC COMPANY :
(98-126C)(Merow, S.J.) :
CONNECTICUT YANKEE ATOMIC POWER COMPANY :
(98-154C)(Merow, S.J.) :
FLORIDA POWER & LIGHT COMPANY :
(98-483C)(Wilson, J.) :
NORTHERN STATES POWER COMPANY :
(98-484C)(Wiese, J.) :
DUKE POWER, A Division of :
DUKE ENERGY CORP. :
(98-485C)(Sypolt, J.) :
INDIANA MICHIGAN POWER COMPANY :
(98-486C)(Hodges, J.) :
SACRAMENTO MUNICIPAL UTILITY DISTRICT :
(98-488C)(Yock, S.J.) :
SOUTHERN NUCLEAR OPERATING COMPANY, :
et al. :
(98-488C)(Yock, S.J.) :
COMMONWEALTH EDISON COMPANY :
(98-621C)(Hewitt, J.) :
BOSTON EDISON COMPANY :
(99-447C)(Allegra, J.) :
GPU NUCLEAR, INCORPORATED :

Page 468

(00-440C)(Bush, J.) :
WISCONSIN ELECTRIC POWER COMPANY :
(00-697C)(Merow, S.J.) :
POWER AUTHORITY OF THE STATE OF NEW YORK :
(00-703C)(Damich, J.) :
OMAHA PUBLIC POWER DISTRICT :
(01-115C)(Bush, J.) :
NEBRASKA PUBLIC POWER DISTRICT :
(01-116C)(Sypolt, J.) :
TENNESSEE VALLEY AUTHORITY :
(01-249C)(Bruggink, J.) :
Plaintiffs, :
v. :Discovery
THE UNITED STATES, :Judge:
Defendant. :(Judge
--------------------xSypolt)

McLean, Virginia
Thursday, April 11, 2002

Continued deposition of ALAN BROWNSTEIN, a witness, recalled for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to notice, the witness being previously duly sworn by CATHERINE S. BOYD, a Notary Public in and for the Commonwealth of Virginia, taken at the offices of Shaw Pittman,

Page 469

LLP, 1650 Tysons Boulevard, McLean, Virginia 22102-4859, at 9:38 a.m., Thursday, April 11, 2002, and the proceedings being taken down by Stenotype by CATHERINE S. BOYD and transcribed under her direction.

Page 470

APPEARANCES:

On behalf of the Plaintiffs Florida Power & Light Company, Northern States Power Company, Duke Power, Indiana Michigan Power Company, Boston Edison Company, GPU Nuclear, Incorporated, Power Authority of the State of New York, Omaha Public Power District, Nebraska Public Power District:
ALEX D. TOMASZCZUK, ESQ.
DANIEL S. HERZFELD, ESQ.
Shaw Pittman, LLP
1650 Tysons Boulevard
McLean, Virginia 22102-4859
(703) 770-7901)

On behalf of Plaintiff Sacramento Municipal Utility District:
DAVID S. NESLIN, ESQ.
Arnold & Porter
370 Seventeenth Street, Suite 4500
Denver, Colorado 80202-1370
(303) 863-2301

Page 471

APPEARANCES: (Continued)
On behalf of Plaintiffs Southern Nuclear Operating Company, Alabama Power, Georgia Power:
JEFFREY L. HANDWERKER, ESQ.
Arnold & Porter
555 Twelfth Street, N.W.
Washington, D.C. 20004-1206
(202) 942-6101

On behalf of Plaintiff Wisconsin Electric Power Company:
DONALD J. CARNEY, ESQ.
Perkins Coie, LLP
607 Fourteenth Street, N.W.
Washington, D.C. 20005-2011
(202) 434-1675

On behalf of Plaintiff Commonwealth Edison Company:
NORMAN M. HIRSCH, ESQ.
Jenner & Block, LLC
One IBM Plaza
Chicago, Illinois 60611-7603
(312) 222-9350

Page 564

If there wasn't, it would go through the normal course of internal reviews.

That's how I recollect it.

Q. Would others at DOE have reviewed drafts PNL prepared as well?

A. As I testified yesterday, you know, my office evolved from sort of a one-man place to, to a branch and then a division.

I have to go back and think about whether in 1988, I was still a one man, or I had staff.

If I had staff at that time, they would review it, yes.

Q. Do you recall reviewing this attached document?

A. I don't have a specific recollection of that.

Q. If I could ask you to turn to page 6 of the attachment, and would you review lines 24 through 31?

(The witness reviewed the document.)

THE WITNESS: Okay.

BY MR. NESLIN:

Q. Mr. Brownstein, 24 through 32 state exchange requests should be approved if, and

Page 565

then they set forth in bullets five criteria.

Would you agree that an exchange should be approved if it meets these criteria?

MR. BANES: Objection. Calls for a legal conclusion.

THE WITNESS: Those were important criteria.

There may be other things that we would want to have considered, and I don't recall those now, but, but these, these criteria were appropriate.

I agree with them.

BY MR. NESLIN:

Q. Let me ask again if an exchange request meets these four criteria, should it be approved?

MR. BANES: Objection -- asked and answered.

THE WITNESS: I think I did answer that, and the reason for the hesitation is upon review of this, and upon discussion with others in the department ranging from the contracting officer, my peers, my superiors, we may have -- it's conceivable that this, these contractor-proposed criteria may have evolved,

Page 566

been modified, added to, deleted.

BY MR. NESLIN:

Q. Do you recall discussing these criteria with anyone else at the department, these criteria set forth on page 6?

A. I don't have a specific recollection of that.

Q. Do you recall discussing them with the contractor PNL?

A. The only way I can answer you is I don't specifically recall, but that's not saying that I did not.

Q. Do you recall discussing these criteria with anyone at the utility, at the utility?

A. I can't recall whether in the ACR initial resolution process, which was subsequent to this date, whether we discussed, you know, that issue or not.

I don't specifically recall, but again, I don't want to testify that I absolutely never did.

Q. Let me direct you to lines 28 through 29.

That sets forth as one of the criteria

Page 567

that the transportation system and receiving facilities have the capacity to meet the revised commitments?

A. Yes.

Q. What does that mean to you?

A. Okay.

MR. BANES: Objection. Calls for speculation, and lack of foundation.

Go ahead.

THE WITNESS: Okay. When the DCSs were approved, I believe we -- we can go back to it, but I believe one of the pieces of information that we requested from the utilities was that the type of transportation cask that would be required.

One of the concerns we had in this criteria, as I recall, is -- let's take an example.

If we had approved, you know, let's say we had approved 90 percent of our DCSs for a, they would accommodate PWR rail casks.

If somebody wanted to do, you know, exchanges at the last minute, we may have gone through the procurement process to procure the type of casks to be available for who we thought

Page 568

we were going to serve, and we, and that could have affected our ability.
If somebody wanted a BWR truck cask, and we had ordered, you know, too many of the other kind based on the information provided in the DCS, because the utilities were acting on the DCS, so were we, so that was the intent.
BY MR. NESLIN:
Q. So if, if sufficient casks were available to accommodate the exchange, would this criteria be met, to your mind?
A. No. I used that as an example. To says receiving facilities, there may have been other characteristics that, that could have influenced that.
Q. Okay. What, can you think of what those characteristics would be?
A. Well, beyond just the casks, you had to have the, the infrastructure to serve that.
Some utilities may only be able to accommodate a truck operation as opposed to a rail, and so, you know, that's an example.
Q. Let me ask this then. If you had sufficient casks and if the utilities involved in the exchange and the facility had sufficient

Page 569

infrastructure to accommodate the exchange, would this criteria be satisfied?
A. Could I extend your analysis one step in answering?
Q. Certainly.
A. If the information on a DCS of the two DCSs between two utilities that were approved by us came to us and they were identical, then it would be met. Then that criteria would be met.
Q. By information, what information are you referring to?
A. Can we go back to the DCS, please?
Q. Yes.
MR. HANDWERKER: The instructions.
MR. NESLIN: The instructions.
THE WITNESS: Yes. That's the form I'm thinking of.
MR. HANDWERKER: Thirty-four.
THE WITNESS: You can see on the form under 2.0 -- I'm looking at the actual form itself -- it asks things like number of assemblies and type, PWR, BWR, proposed shipping mode, type cask required, including maximum loading lifting weight.
Those, those are the types of things

Page 570

that I'm referring to.
There are others? There are two. The date of discharge potentially could be important.
BY MR. NESLIN:
Q. Mr. Brownstein, would they have to be identical, or would the transportation system and receiving facilities simply have to have the capacity to accommodate the exchanged spent nuclear fuel?
A. We were talking about this one.
MR. BANES: Go ahead.
THE WITNESS: This one criteria; no, I used identical as an example, as an extreme.
No, they would not have to be identical.
BY MR. NESLIN:
Q. So they could involve different number of fuel assemblies?
MR. BANES: Objection. Calls for speculation.
THE WITNESS: I really, it really does call for speculation because we had never gotten that, that far, that detailed, to my recollection.

Page 571

We were never faced with a DCS exchange process, and I would be speculating about the answer, you know, specific intricacies.
BY MR. NESLIN:
Q. Mr. Brownstein, would it be your testimony that you don't recall DOE considering the specific details of how these criteria might apply to a given exchange?
A. No. What I'm saying is you're asking if, if, if there was a one-assembly difference, would that affect it?
That's getting down to a gradation that we never got to.
We did consider a number of things, but that's a fine gradation.
Q. Let me ask it a different way. Would the fact that there is a different --
A. Okay.
Q. Number of fuel assemblies automatically lead an exchange request not to be approved?
A. If that was the only difference, that would not be an automatic disapproval in my mind.

Page 572

Q. The fact that a, if requested, exchange might involve a different size or type of fuel assembly wouldn't automatically lead it to be disapproved to your mind?
A. Well, that could because that could affect the cask, the availability of the cask.
Other certain, certain facilities have, you know, for example, very long fuel, and that could affect it.
Q. Would the fact that a proposed exchange might involve DCSs which involve different modes of shipment, would that necessarily lead to, a requested exchange to be denied?
A. It could, but not necessarily.
Q. I would like to direct you to lines 30 and 31.
A. I just want to clarify all these questions you're asking me were all hypotheticals?
Q. I'm asking you a series of hypothetical questions, sir.
I'm asking for your opinion on how they would apply.
A. Right.

Page 573

Q. Lines 30 and 31 state that the exchange, another criteria in the exchange will not impact WMS performance in a way that would delay acceptance of waste from other purchasers.
What does that mean to you?
MR. BANES: Objection -- lack of foundation.
Calls for speculation. Go ahead.
THE WITNESS: The best way I can try to explain it is by example, if that's okay with you.
If a utility were to give us failed fuel, that might influence the decision.
BY MR. NESLIN:
Q. And why would that influence the decision?
A. Again, hypothetically, there would probably be a preference in the early stages of system operation to, to try to use standard fuel to minimize the opportunity for, for us having to employ some contingencies.
In other words, failed fuel, we might have to do some repackaging that we would have rather not have done on the opening day.
Q. Would, would that necessarily delay

Page 574

the acceptance of waste from other purchasers?
A. It could, but not necessarily. It was a concern.
There may have been other concerns associated with that criteria that at this moment, I can't recall.
Q. Do you recall the basis of these criteria?
A. Well, the basis of the criteria was that PNL was, was tasked to think about this and develop suggestions to the department.
It was a normal course of business, and so I viewed this as contractor input to the department that, you know, certainly the department did not take a position.
One, as I said, hadn't gone through to my knowledge, you know, the necessary concurrence and evaluation by a range of people within RW that would need to have, you know, evaluated it.
Q. Evaluated it for what purpose?
A. Of whether that was appropriate or acceptable to the department; in other words, this is not departmental policy.
Q. You're saying that for something to be

Page 575

adopted as department policy, additional people would have to review it and approve it?
A. What I'm saying is that a contractor product is not departmental policy.
Q. How would a contractor product become departmental policy?
A. One way it would become that would be for it to be issued under DOE letterhead.
Q. By issue, what do you mean?
A. Number of ways -- issued could be instructions or it could be a report.
It could be a letter by a program official or, or contracting officer.
Those are three ways.
Q. So if it were incorporated into a DOE document or a DOE letter, then it could become departmental position, departmental position?
A. Sure.
Q. How was this information, this report used, do you recall, by the department, used by the department?
A. I don't recall.
Q. Do you recall whether you did anything in response to this report?
A. That's a good question. There are 14

Page 576

years between the report and now, and I just
don't recall.
(There was a pause in the
proceedings.)
MR. NESLIN: Can we go off the record
for a second?
(A discussion was held off the
record.)
MR. NESLIN: Mark that as 51.
(Brownstein Exhibit No. 51
was marked for
identification.) ^
BY MR. NESLIN:
Q. You've been handed what's been marked
as Exhibit 51 to your exhibit -- to your
deposition.
This is a document entitled,
"Guidebook for Standard Contract for Disposal,"
stamped preliminary draft.
MR. BANES: Do you have several copies
of that?
MR. NESLIN: Yeah. Sorry, counsel.
MR. BANES: No problem. Is this 51?
MR. NESLIN: Fifty-one.
BY MR. NESLIN:

Page 577

Q. Mr. Brownstein, are you familiar with
this document?
A. You have to give me a chance at least
to glance at it.
(The witness reviewed the document.)
THE WITNESS: I don't recall, I do not
recall ever seeing this before.
BY MR. NESLIN:
Q. Do you recall any discussion at OCRWM
about preparing a guidebook for the standard
contract?
A. Guidebook does not ring any bells. I
have no recollection of that.
Q. This includes information, turning to
the Table of Contents, this includes information
on the ACR issue resolution process?
A. Yes.
Q. On the Delivery Commitment Schedule
process, on the delivery commitment, on the
Delivery Commitment Schedule exchanges?
A. Um-hm.
Q. Do you recall any discussion at OCRWM
about providing written guidance on those issues
collectively in a document of this sort, whether
it was called guidebook or not?

Page 578

A. As I testified, we had something
called this ACR resolution process with the
utilities, and there were a number of issues
that were identified, and those would be subject
to, you know, discussions at meetings.
I would normally have requested a
contractor to prepare such things as
suggested -- well, analysis of the issue, and
potentially suggested positions for DOE
recommendations, so these issues are familiar to
me.
Responding to your question, I never
saw it in this form or this guidebook, but as I
have testified previously, contractors may have
worked on this as a way to present this to me,
but I don't recall the document.
Q. Mr. Brownstein, I've just looked at
several pages, for example.
A. Sure.
Q. Pages 1 and 2, 3, have numbering along
the left side of the text?
A. The left? You're talking about these?
Q. Yes.
A. Yeah. Yes.
Q. But by these, you're pointing to the

Page 579

numbers along the left side of the page?
A. Yes.
Q. Does that begin --
MR. BANES: Page, on page 2017.
BY MR. NESLIN:
Q. Does that indicate anything to you
about the, who might have prepared this
document?
A. As I have testified before, this was a
characteristic normally employed by PNL.
Q. If I could ask you to turn to page 37?
This would be Bates Number CTR-001-2050 in
the lower right-hand corner.
A. Okay.
Q. I would ask you to review lines 13
through 20 on the page.
(The witness reviewed the document.)
THE WITNESS: Okay. I'm sorry. You
said to 30?
BY MR. NESLIN:
Q. Thirteen through 20.
A. I have read that, yes; 1 through 28, I
didn't.
MR. BANES: Just note for the record
line 21 and 22 don't seem to be readable.

# Defendant

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - - - - X

YANKEE ATOMIC ELECTRIC COMPANY :
(98-126C)(Merow, S.J.) :
CONNECTICUT YANKEE ATOMIC POWER COMPANY :
(98-154C)(Merow, S.J.) :
MAINE YANKEE ATOMIC POWER COMPANY :
(98-474C)(Merow, S.J.) :
Plaintiffs, :
v. :
THE UNITED STATES, :
Defendant. :

- - - - - - - - - - - - - - - - - - - - X

Washington, D.C.
Thursday, May 23, 2002

Deposition of ALAN BROWNSTEIN, a witness herein, called for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to agreement, the witness being duly sworn by JAN A. WILLIAMS, a Notary Public in and for the District of Columbia, taken at the offices of Spriggs & Hollingsworth, 1350 I Street, N.W., Washington, D.C., 20005-3305, at 8:40 a.m., Thursday, May 23, 2002, the proceedings being taken down by Stenotype by JAN A. WILLIAMS, RPR, and transcribed under her direction.

APPEARANCES:

On behalf of the Plaintiffs:
JERRY R. STOUCK, ESQ.
Spriggs & Hollingsworth
1350 I Street, N.W.
Washington, D.C. 20005-3305
202-898-5800

On behalf of the Defendant:
KEVIN B. CRAWFORD, ESQ.
RUSSELL A. SHULTIS, ESQ.
U.S. Department of Justice
Civil Division
1100 L Street, N.W., Room 12128
Washington, D.C. 20530
202-305-9640



CONTENTS


WITNESS EXAMINATION BY COUNSEL FOR
ALAN BROWNSTEIN PLAINTIFFS
By Mr. Stouck 4

Afternoon Session - Page 143


EXHIBITS


BROWNSTEIN EXHIBIT NO. PAGE NO.
77 - Condensed testimony of Alan Brownstein, pages 1 through 781 6
78 - Memo dated 7/23/84 with attachments 37
79 - Proceedings of the 1983 Civilian Radioactive Waste Management Information Meeting, December 12-15, 1983 42
80 - Memo dated 4/8/83 with attachments 55
81 - Proposed Rules, Nuclear Regulatory Commission, 10 CFR Part 61, Disposal of Radioactive Wastes, 5/18/88 81
82 - U.S. Department of Energy, Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste 157




PROCEEDINGS

Whereupon,

ALAN BROWNSTEIN,

was called as a witness by counsel for Plaintiffs, and having been duly sworn by the Notary Public, was examined and testified as follows:

EXAMINATION BY COUNSEL
FOR PLAINTIFFS

BY MR. STOUCK:

Q. Good morning, Mr. Brownstein. I'm Jerry Stouck, we met briefly before the deposition started. I represent three utility companies in this litigation, Yankee Atomic Electric Company, Connecticut Yankee Atomic Power Company, and Maine Yankee Atomic Power Company.

And I know you have some familiarity with the litigation because you were deposed for three days I think in the so-called common proceedings. I want to start by asking you some questions about your prior testimony just for clarification.

A. Sure.

Q. And maybe some supplementation. So I'm going to hand you and I think we'll mark as -- well, hold on. We're going to start numbering the exhibits with the next number in the common deposition just so



we don't get confused and we may use some of those prior exhibits today.

I believe the last number according to the transcript I have is No. 76. So let's go ahead and mark this 77. And furthermore I've got a copy for you guys. We'll do what we did with Mr. Barrett when we went through a similar exercise.

I've got the entire transcript from the three days. I'm not going to ask you about every page. What I would like to do is, when I do ask a question, I would like you to put a checkmark on that page and then the official exhibit will consist of only those pages that were actually asked about.

Is that okay with you guys? I mean I'll introduce the whole transcript.

MR. CRAWFORD: No, I definitely want to avoid introducing the whole transcript.

MR. STOUCK: Because you just get into circularity. And we'll have an agreement that, if for some reason on reviewing the transcript we realize that we didn't mistakenly disassemble the transcript, we'll just put in as Exhibit 77 the pages that he was actually asked about. But we'll try to do that is we sit here so we don't have to fix it later.

Page 98

utilities.
And, since they were allowed to trade subject to DOE's approval, if we did not reach consensus on some of these 34, 36 implementation issues, the department would have to be, you know, making decisions, you know, on those. And we thought it would be better to try to do that as best we could together.
Q. So, in other words, if I'm understanding -- I see now. Are you saying that, as a predicate or sort kind of prerequisite for the DCS exchange process, it would have been helpful to have some or all of the open 34 issues resolved prior to the development of a market for DCS exchanges because some of those issues involved technical matters that would be better to have nailed down before the exchanges started taking place; is that what you're saying?
MR. CRAWFORD: Objection, vague.
THE WITNESS: Certainly not all of those issues but a subset of those, yes.
BY MR. STOUCK:
Q. You wanted to nail those down first so as to make the -- so as to promote a better function of the DCS exchange market?

Page 99

MR. CRAWFORD: Objection, vague.
THE WITNESS: In order to carry out those phases of the contract, referring to the APR and the DCS, we would have had to make some decisions; for example, you know, instructions. Okay. And, you know, there were real questions as I recall now, you know, back on the table.
And, if we had not reached some sort of consensus agreement in order to go forward, the department would have had to make some judgments about that and move forward.
BY MR. STOUCK:
Q. Judgments about?
A. Whatever, we would have to go through the questions.
Q. Let's stick with these exchanges. Are you saying here -- this is the example you gave at the last deposition. Are you saying that it would be more difficult for the DCS exchange market to develop and work smoothly --
A. No.
Q. -- if the issues were not resolved before that market happened, is that what you were saying? You say that's not what you're saying?
A. No.

Page 100

Q. Then what are you saying here?
A. I'm saying that, if there were questions on the table that both sides recognized there were real questions, if we did not together reach some consensus and move forward, if the process wasn't delayed, clearly we would -- the department would have to, you know, reach whatever decisions it was going to reach in implementing that. And that's what I was referring to.
Q. Well, how does that relate to the DCS exchange process? That's what I'm not understanding. And it may relate to other things and that's fine.
A. For instance, I'm going back to your exhibit. And I haven't read the thing through. But No. 3 is changes in the allocation. If we did not -- and there's an issue here and there are options.
If we together with utilities did not select an option in order to carry out the process, we would have picked one, the department would have picked one. The allocation queue is, you know, a prerequisite to getting to a DCS.
Q. Which in turn is a prerequisite to an exchange?
A. To an exchange.
Q. What about the criteria the department

Page 101

would use for approving or disapproving exchanges?
A. That would be something that, you know, the utilities I think would want to understand and work with us on. Without that we were prepared as we did move ahead. We were just trying to do it in a more cooperative fashion. That's my best recollection.
Q. Okay. Well, look at this testimony at the bottom of page 290. You know, maybe I'm misinterpreting, but I thought what you were saying there was that, if you went -- it says, if you went through the entire process, it's conceivable a market could have developed of which DCSs had some value amongst the utilities and those trades occur and subsequent to that a or several utilities change the data on which allocations were based could have caused perturbations really to the utilities, some to us. That's an example. Do you see that?
A. Yes, I do.
Q. So I took that to mean that your expressing the view that, in order to either eliminate or minimize the prospect that the data on which -- I really took that to mean, and maybe this is -- this is what I'm asking about, to mean if the data on which the exchanges were based might change

# Plaintiff

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - - - - X

YANKEE ATOMIC ELECTRIC COMPANY :
(98-126C)(Merow, S.J.) :
CONNECTICUT YANKEE ATOMIC POWER COMPANY :
(98-154C)(Merow, S.J.) :
MAINE YANKEE ATOMIC POWER COMPANY :
(98-474C)(Merow, S.J.) :
Plaintiffs, :
v. :
THE UNITED STATES, :
Defendant. :

- - - - - - - - - - - - - - - - - - - - X

Washington, D.C.
Thursday, May 23, 2002

Deposition of ALAN BROWNSTEIN, a witness herein, called for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to agreement, the witness being duly sworn by JAN A. WILLIAMS, a Notary Public in and for the District of Columbia, taken at the offices of Spriggs & Hollingsworth, 1350 I Street, N.W., Washington, D.C., 20005-3305, at 8:40 a.m., Thursday, May 23, 2002, the proceedings being taken down by Stenotype by JAN A. WILLIAMS, RPR, and transcribed under her direction.

00104

the contract, the DOE would make adjustments from time to time in the queue, if you will, the APR ranking, based on reinserted fuel; is that right?

A. Yes. And that was -- as I recall that was one of the issues. To get in the queue, it had to be based on the date of final discharge. Utilities could have, you know, subsequent to its, you know, final discharge date decided for other reasons to reinsert that fuel. And then that fuel which created the place in the queue was no longer -- no longer there. So what do we do. That was an issue.

Q. Was that issue ever resolved?

A. To the best of my recollection somewhere, whether it was in the APR or some instructions, I think we addressed it. I don't recall offhand, but I think we addressed the subject. I don't remember the details. It was published, whatever we did.

Q. Now, you said earlier, when we were talking -- when we were discussing exchanges, that you were aware or the department was aware that these approved DCSs had different value to different utilities?

A. Well, what I said was could have.

Q. Okay. What do you mean by that, why did you have an understanding, why did the department

00105

have the understanding that the approved DCSs could have different value to different utilities?

MR. CRAWFORD: Objection, compound; and objection, vague; objection, foundation.

THE WITNESS: If you take two utilities that had, you know, different places in the queue, their situations on, for instance, their cost of storage could have been different. I'll give you a couple of examples.

Maybe one utility had an early allocation that would have been easy for them to rerack or, you know, they had already made the capital costs for a storage facility or had excess storage capacity within their pool.

The value -- we believed the value of that place in the queue to that utility was less than a utility that, if they did not receive the services in that particular year, they would have had to make a major capital expense. So you can see a natural imbalance to the utilities themselves and the value of receiving fuel at any particular time.

And, if there was that imbalance, we assumed, certainly the contract allowed for, you know, a market to develop. And we were going to then be a part of that because the contract required us to

00106

approve it, when the government has to approve it.

We wanted to be careful how we, quote, interfered with the marketplace. And there were these issues, these technical issues that, if we resolved together, would have -- again, since these were primarily equity issues, not issues of key importance to us, we wanted to do as little as possible in interfering with the market. That was my rationale in how these -- how this subject developed.

BY MR. STOUCK:

Q. And that was a subject that you, that being a subject of exchanges of DCSs, approved DCSs, that was something you certainly had responsibility for?

A. Yes.

Q. And you wanted to be careful in not interfering too much with this marketing DCS exchanges because, as a general proposition, you know markets are good, you wanted to allow the utilities to pursue presumably their self interest in making economic exchanges; is that what was behind it or was there something else behind it?

MR. CRAWFORD: Objection, compound.

THE WITNESS: Markets are efficient. And the efficiency of that market increases with the

00107

I don't remember. That was done under my direction, but I don't remember when.

MR. BANES: There is a date on it.

BY MR. TOMASZCZUK:

Q. There appears to be a date in the upper right-hand corner of 21 April 1987.

Having said that, I can also say that there are lots of other dates, but those appear on the chart itself as opposed to an annotation in the upper right-hand corner.

A. May I --

Q. Please; absolutely.

(The witness reviewed the document.)

THE WITNESS: Okay. So this was available to me at the time that we prepared this.

I doubt it would have been substantive input since the only relationship, as it says, that there is an ACR due in July of '87, so it would have very limited input to this document, as I recall.

Again, I have to review that.

BY MR. TOMASZCZUK:

Q. And I'm sorry if I asked you this before, but did you prepare this Star Wars

# Defendant

Page 110

both were possible, you know, reach a consensus, it's not that the department could not act. The department could act. It would have made its decisions.
BY MR. STOUCK:
Q. Here's the thing, I'm not trying to be critical, I'm jut trying to find out what did happen. And the approval criteria, exchange approval criteria were never finalized, right? I mean I think that's what you testified to. Tell me. I see you pausing.
A. You're talking about the ACR issue resolution process. Issues were never finalized? That would be a correct statement.
Q. Now I'm talking about criteria for approval of exchanges of DCSs. There was an effort underway at some point in all these documents to develop specific -- and I could show it to you, if it becomes important, to develop criteria to guide DOE in determining whether or not to approve exchanges?
A. Right.
Q. And it's my understanding, my recollection from the testimony that I have heard that those criteria were never finalized?
A. I think that's correct.
Q. Okay. And I thought you agreed with me

Page 111

that that was an example of the kind of thing that, despite your efforts and your motives to as I understood the testimony remove impediments from the marketplace, to promote the smooth functioning with this market, this failure to, you know, failure, again I'm not being critical, but the fact that those exchange criteria were never finalized is an example of something I thought you agreed, that, you know, I used word impediment, that if those criteria had been finalized or those exchange approval criteria, that would have furthered the smooth functioning of this marketplace in DCSs that we're talking about.
You do you agree with that and the fact that it, therefore, was something that could have been done to make it even better than the things that you were able to accomplish?
MR. CRAWFORD: Objection, compound.
THE WITNESS: That's a long question. As I recall we evaluated different alternatives, different criteria. There was no -- let me make it clear for the record. No one ever gave us a DCS -- an approved DCS for an exchange.
So we had in our desk drawer something that we were prepared to use. Now, whether it was finalized, well, no one ever had to sign off it

Page 112

because it never became --
BY MR. STOUCK:
Q. I see. Now I understand. That's fine. Do you know why there were never any exchanges of DCSs submitted for approval?
MR. CRAWFORD: Objection to the extent it calls for speculation.
THE WITNESS: No. I mean because that was something that the utilities had the right to do on their own to submit to us. And why they never did I don't know.
BY MR. STOUCK:
Q. Do you have an opinion about it?
A. No.
Q. No understanding of why it has happened, but there have not apparently been any exchanges submitted for approval?
MR. CRAWFORD: Objection, asked and answered.
THE WITNESS: I don't know. All I know is they had the right. And we needed -- it was my responsibility to be prepared for that should it occur.
BY MR. STOUCK:
Q. And you could not testify about the

Page 113

reasons why utilities had not submitted exchanges for approval; is that right?
MR. CRAWFORD: Objection, argumentative; objection, asked and answered.
THE WITNESS: No, I testified why I think a market could develop just a few minutes ago. Why it didn't I have no idea. I don't know, I just flat out don't know.
BY MR. STOUCK:
Q. Okay. Now, in this same testimony I have directed your attention to from the prior deposition, I think we moved on to 293 now, you said you thought there were advantages to delaying, but the utilities didn't want to delay; is that right? I mean is that a brief summary of for whatever this is on page 293, line 21, my only recollection is for whatever reason they came back and said -- well --
A. Let me just review that for a second.
Q. Okay. It's actually on 292 I guess, line 5.
A. Yes.
Q. You thought there were advantages to delay, but the purchasers for whatever reason did not want a delay according to this question and answer, it says they were concerned that they not take any

# Defendant

Page 138

BY MR. STOUCK:
Q. At the time the list was developed which I think was about the time of the '90 or '91 --
A. No.
Q. When was it?
A. The list of 34 issues?
Q. Yes.
A. My recollection is that was done earlier.
Q. Much earlier?
A. Yeah.
Q. Whatever time it was developed, at that time RW thought that those issues had to be resolved before the department could commence acceptance of spent fuel pursuant to the contracts; is that right?
MR. CRAWFORD: Objection to the foundation; objection to the extent it calls for a legal conclusion.
THE WITNESS: We thought it was important. I don't think anybody made the distinction between important versus, if it did not happen, could we not move forward.
BY MR. STOUCK:
Q. Okay. That's fair. I understand that and I thank you for that clarification.
Take a look at page 4 of Exhibit 35. And

Page 139

there's a paragraph numbered 12 there. Do you see that?
A. Yes.
Q. It's a proposed change to the definition of high-level radioactive waste. Would you please review that and I've got a question for you about it or two maybe. Let me ask the question, it might help you as you read it.
A. Okay.
Q. The question is going to be, aside from what you read on this piece of paper, do you have a recollection of proposals to change the definition of high-level radioactive waste in a way that would affect GTCC? You know, if you read this, I think you will see that this is a proposal to change it in a way that would affect GTCC waste. But independent of this do you recall that there were proposals to change the contract in that manner?
MR. CRAWFORD: Let me object just to best evidence.
BY MR. STOUCK:
Q. Would you answer the question.
A. By who? I mean this is --
Q. By RW. I mean this is a proposal --
A. Oh, no oh, no.

Page 140

Q. You don't recall that?
A. No, no, wait a second.
Q. What am I not understanding?
A. This is a contractor document. Contractors make suggestions and recommendations to the department all the time. Because a contractor says something doesn't mean, you know, the department either wanted it or agrees with it. This was a contractor input.
Q. I understand that. That's fair enough. And this contractor input apparently is suggesting or at least describing a change to the definition of high-level radioactive waste?
A. That's correct.
Q. Do you know -- maybe I don't have to preface it by saying independent of this document. Even not independent of this document, do you know whether that kind of change was ever discussed, making that change was ever discussed within RW; that is, a change to the standard contract to the meaning of the term high-level radioactive waste that would affect coverage of GTCC?
A. We talked about this subject before and there was testimony before. And I think you asked a similar question. I told you --

Page 141

Q. Well --
A. There were two people I talked about.
Q. Okay.
A. And this was something that I didn't believe in, didn't accept, and, you know, I had discussions with two people as I recall. Probably staff too.
Q. I thought what you said you didn't believe in or accept before was that GTCC was covered by the contract. This is a little bit different question which is do you recall whether there were any discussions that you were part of or any effort at RW to amend the contract in a manner that would affect GTCC waste? That's what I'm asking now.
A. Sorry. As I recall, when I read this, I may have discussed it with Nancy and my staff. But I know that I did not take this thing forward because I didn't believe --
Q. What is it that you didn't believe?
A. I didn't believe that we should or needed to make a change to the contract.
Q. Because it was clear in your mind that it wasn't covered?
A. That's correct.

# Defendant

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - - - - X

YANKEE ATOMIC ELECTRIC COMPANY :

(98-126C)(Merow, S.J.) :

CONNECTICUT YANKEE ATOMIC POWER COMPANY :

(98-154C)(Merow, S.J.) :

MAINE YANKEE ATOMIC POWER COMPANY :

(98-474C)(Merow, S.J.) :

Plaintiffs, :

v. :

THE UNITED STATES, :

Defendant. :

- - - - - - - - - - - - - - - - - - - - X

Washington, D.C.

Friday, June 14, 2002

Continued deposition of ALAN BROWNSTEIN, a witness herein, called for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to agreement, the witness being previously duly sworn, taken at the offices of Spriggs & Hollingsworth, 1350 I Street, N.W., Washington, D.C., 20005-3305, at 8:40 a.m., Friday, June 14, 2002, the proceedings being taken down by Stenotype by JAN A. WILLIAMS, RPR, and transcribed under her direction.

Page 247

APPEARANCES:

On behalf of the Plaintiffs:
JERRY R. STOUCK, ESQ.
Spriggs & Hollingsworth
1350 I Street, N.W.
Washington, D.C. 20005-3305
202-898-5800

On behalf of the Defendant:
KEVIN B. CRAWFORD, ESQ.
RUSSELL A. SHULTIS, ESQ.
U.S. Department of Justice
Civil Division
1100 L Street, N.W., Room 12128
Washington, D.C. 20530
202-305-9640

Page 248

CONTENTS


| WITNESS | EXAMINATION BY COUNSEL FOR |
|---|---|
| ALAN BROWNSTEIN | PLAINTIFFS |
| By Mr. Stouck | 250 |
| | DEFENDANT |
| By Mr. Crawford | 437 |

Afternoon Session - Page 377


EXHIBITS


| BROWNSTEIN EXHIBIT NO. | PAGE NO. |
|---|---|
| 83 - Defendant's Witness List | 251 |
| 84 - Withdrawn by counsel | 259 |
| 84 - Preliminary Draft, DCS Review Process, 10/13/92 | 261 |
| 85 - Letter dated 12/22/92 with attachments | 272 |
| 86 - Letter dated 3/13/97 | 290 |
| 87 - Letter dated 9/25/92 with attachments | 294 |
| 88 - Letter dated 12/1/92 with attachments | 298 |
| 89 - Attachment | 304 |
| 90 - Letter dated 1/7/93 with attachments | 307 |
| 91 - Letter dated 4/8/93 with attachments | 308 |
| 92 - Informal Memorandum | 321 |
| 93 - Letter dated 4/28/93 | 328 |
| 94 - Agenda for Conference Call with DOE on Delivery Commitment Schedules, 5/12/93 | 333 |
| 95 - Memo undated | 334 |


Page 249

EXHIBITS (Continued)


| BROWNSTEIN EXHIBIT NO. | PAGE NO. |
|---|---|
| 96 - Memo undated | 334 |
| 97 - Memo dated 6/14/93 | 340 |
| 98 - Letter dated 6/10/93 | 366 |
| 99 - Letter dated 7/15/93 | 368 |
| 100 - Memo dated 7/8/93 | 370 |
| 101 - Letter dated 7/26/93 with attachment | 372 |
| 102 - Letter dated 2/4/92 | 377 |
| 103 - Letter dated 4/6/92 | 380 |
| 104 - Letter dated 4/25/94 with attachment | 382 |
| 105 - Letter dated 9/28/95 | 383 |
| 106 - Memo dated 3/28/91 with attachments | 408 |
| 107 - Questions for Senator Mathews | 410 |
| 108 - Letter dated 10/19/90 with attachment | 413 |
| 109 - Letter dated 8/22/91 with attachment | 419 |


Page 250

PROCEEDINGS

Whereupon,

ALAN BROWNSTEIN,

the witness on the stand at the time of recess, having been previously duly sworn, was further examined and testified as follows:

EXAMINATION BY COUNSEL FOR PLAINTIFFS (RESUMED)

BY MR. STOUCK:

Q. Good morning, Mr. Brownstein.

A. Good morning.

Q. Welcome back. Thanks for coming back. As I mentioned very briefly before we started here, I have some more questions for you obviously. And, because your deposition has been a little bit fragmented in time, no fault of yours, with your first few days and then May 23rd and then today and because I've been busy with other depositions, I have tried hard to limit the amount of duplication there may be today; but we may have a little.

If we get into an area that we've covered before, I apologize and I will certainly try to keep that to a minimum. I realized last night when I was getting ready for today that there may be a little more of that than is ideal, but it's not because I

Page 251

want to ask you the same questions.
Would you mark this as the next exhibit, please.
MR. CRAWFORD: For the record you may always remind Mr. Stouck if he begins to duplicate and he'll take note of that I'm sure.
MR. STOUCK: Absolutely.
(Brownstein Exhibit No. 83 was marked for identification.)
BY MR. STOUCK:
Q. Mr. Brownstein, you've been handed a document that's been marked Exhibit No. 83. This is a document entitled Defendant'S Witness List which has been prepared by the Department of Justice under a court order in the -- well, this one is in the Yankee Atomic case, but we've got something similar in the Connecticut Yankee and Maine Yankee cases.
This is a list of folks the government may call as witnesses at the trial of this action. If you turn to page 2, you'll see your name.
A. Yes.
Q. Did you know prior to right now that you might be called as a witness at the trial of this action?
A. Yes.

Page 252

Q. You discussed that with counsel?
MR. CRAWFORD: Well, I'll object to that and I'll instruct him not to answer that.
BY MR. STOUCK:
Q. The question then is how do you know that, who told you that?
A. Discussions with the Department of Justice attorneys.
Q. And for how long have you known that?
A. I think -- in one of our conversations, from one of the depositions, I think I asked the question about the next steps.
Q. This is a brief description as you'll see under your name of the topics that the government has told you they may call you to give testimony about. And would you just take a look at it. I want to ask you a couple questions about the subjects.
A. Okay.
Q. Remind me when you started working on waste acceptance at the Department of Justice?
A. September 1985.
Q. Now --
A. Department of Energy.
Q. Department of Energy, thank you. I take it that prior to September of 1985 you would have no

Page 253

personal knowledge about any of these subjects, implementation of standard contract, priority for shutdown reactors, how the Department of Justice was handling that?
A. That's correct.
Q. And when did you stop working on waste acceptance matters?
A. March of 1995.
Q. Subsequent to that time, you would have had no personal knowledge of these topics; is that right?
A. Hallway conversations with people, but I didn't stay very much connected with it.
Q. You would not be able to testify about what the Department of Energy was doing in these areas subsequent to the time you stopped working on them; is that right?
A. I think that's fair.
Q. The exchange approval process which is the last mentioned subtopic, if you will, here, I thought you told me previously that -- I showed you some documents or I asked you some questions about exchange approval criteria.
And I thought the testimony from you was that those kinds of documents and that thinking about

Page 254

exchange approval, this is delivery commitment exchanges, thinking about criteria under which those would be approved, it was clearly done by the contractor and their documents reflecting that.
But, when it got to your desk, you never really acted on the pursuit of the development of these exchange approval criteria; is that a fair recollection of what you told me?
MR. CRAWFORD: Objection, asked and answered.
THE WITNESS: I'm not sure what you mean by acted on.
BY MR. STOUCK:
Q. They were never implemented, they were never finalized?
A. That's true.
Q. Was there ever an exchange approval process at the Department of Energy while you were working on waste acceptance matters that was anything other than proposals for how the process would work?
MR. CRAWFORD: Objection.
BY MR. STOUCK:
Q. In other words, was the process of exchange approvals ever implemented?
MR. CRAWFORD: Objection, vague.

Page 255

THE WITNESS: We never received an exchange request.
BY MR. STOUCK:
Q. Was there a process in place at the Department of Energy during your tenure in working on waste acceptance matters for approval of exchange requests that might be submitted?
MR. CRAWFORD: Objection, vague.
THE WITNESS: There was not one approved by my management.
BY MR. STOUCK:
Q. And lastly, just the only other question I have about this description of what you might testify about, there's a reference there to schedule negotiations. And the context is it says Mr. Brownstein will provide testimony concerning the government's implementation of the standard contract including acceptance rates, priority for shutdown reactors, and a number of other things and also including according to this statement schedule negotiations. Do you see that?
A. I see it.
Q. Do you know what that means?
MR. CRAWFORD: Objection to the extent it calls for speculation.

Page 256

THE WITNESS: Well, I don't know who wrote that so I would have to be guessing, speculating on what it could mean.
BY MR. STOUCK:
Q. Were there during your tenure in this period we just blocked, from September '85 to March of '95, were there schedule negotiations that took place between the Department of Energy and any one or more utility purchasers?
MR. CRAWFORD: Objection, vague.
THE WITNESS: I'm really not sure what schedule negotiations means here. I don't recall negotiations between us and utilities on schedules.
BY MR. STOUCK:
Q. Is there a reason why -- well, you understand the word schedule in this context, schedule for acceptance?
A. Well, I'm not sure that I do. I mean I can interpret it different ways.
Q. What other interpretation would there be in the context of this then schedule for acceptance?
A. Schedule negotiations could -- someone could interpret that to mean the actual DCS or FDS process. You negotiate, if you will, as outlined in the contract. For example, in the FDS, where you

Page 257

were a year beforehand, you start scheduling real dates.
One could interpret that as negotiations within the context of the contract. That's why I'm not sure who wrote this and what was meant by that. But that's an interpretation.
Q. But there were not such negotiations that occurred because my understanding is there were no such negotiations that took place?
A. Correct.
Q. Okay. Outside the context of -- well, can you think of any other meanings that this might have? I mean would there be negotiations that could take place in the context of delivery commitment schedules?
MR. CRAWFORD: Objection, overbroad.
THE WITNESS: There was again broad interpretation. One utility, perhaps one you represent, had objected to -- we had disapproved their DCS. And, at one point in time, they had come and had discussions with us and the contracting officer. One could interpret that to mean negotiations.
BY MR. STOUCK:
Q. That was Yankee Atomic?

Page 258

A. Yeah.
Q. On the subject of priority for shutdowns, general shutdowns?
A. Well, that was one of the subjects, yes.
Q. What were the others, can you think of others?
A. Well, it was -- we had disapproved their delivery commitment schedule. And certainly shutdowns were a part of that.
Q. And so that's an example of something that could be embraced within in term that somebody else wrote on Exhibit 83 of schedule negotiations?
A. Yeah, that's -- I mean it can be interpreted many ways. I have given you two or three examples.
Q. And, listen, my situation is this, they hand me that piece of paper and they say you're going to testify about this. I'm trying to find out what it is.
A. That's how I interpret it.
Q. All right. Let me look at it first.
In the course of your work on waste acceptance matters at the Department of Energy, Mr. Brownstein, have you been involved in studies or analyses of the -- well, have you been involved in

# Robert Campbell

# Plaintiff

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

----------------------------------------X

YANKEE ATOMIC ELECTRIC COMPANY, CONNECTICUT YANKEE ATOMIC POWER COMPANY, MAINE YANKEE ATOMIC POWER COMPANY,

Plaintiffs,

vs.

CASE NO. 98-126C 98-154C 98-474C

UNITED STATES OF AMERICA,

Defendant.

----------------------------------------X

Washington, D.C.

Thursday, June 13, 2002

Deposition of ROBERT ALLEN CAMPBELL a witness, called for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to notice, the witness being duly sworn, taken at the offices of Spriggs & Hollingsworth, 1350 I Street, N.W., Suite 1010, Washington, D.C, at 9:32 a.m, on Thursday, June 13, 2002, and the proceedings being taken down by Stenotype by CINDY L. SEBO, and transcribed under her direction.

00009

A 1995, I finished in 1998.

Q And you were full-time at Johns Hopkins?

A No, I was going at night.

Q What did you do from the time period 1987 to 1995?

A 1987 to 1992, I was an officer in the United States Navy, and from 1992 to -- did you say '95 --

Q Yes, sir.

A -- I worked for the Department of Energy.

Q And what did you do as an officer of the Navy? What were the types of things you worked on?

A I was an officer on a nuclear power attack submarine. I supervised the operation of the nuclear reactor, supervised operation of a submarine. I had mechanics who reported to me.

Q Did any of your work in that context involve spent nuclear fuel?

A Yes.

Q And can you tell me about how your work as an officer in the Navy involved spent nuclear fuel?

A Towards the end of my tour, we decommissioned the first submarine I was on. We offloaded the fuel and loaded it up onto a rail

00010
car, and I did that again on another submarine.
Q So if I understand you correctly, twice you decommissioned reactors on spent fuel and loaded it up onto rail cars?
A Yes.
Q Do you know where the spent fuel was being transported by rail to?
A The Department of Energy's Idaho National Engineering Laboratory.
Q Is that -- is that the full extent of your involvement with spent fuel while you were with the Navy?
A Yes.
Q How about when you were with the Navy from '87 to '92, did you have any involvement with Greater-Than-Class C waste?
A No.
Q And do you understand what I mean when I say Greater-Than-Class C waste?
A Yes.
Q Can you just explain that -- what Greater-Than-Class C waste means to you for the -- can you explain that for the record?
A Yes. The Nuclear Regulatory Commission has a regulation, Part 61, which defines Class A, B

car, and I did that again on another submarine.
Q So if I understand you correctly, twice you decommissioned reactors on spent fuel and loaded it up onto rail cars?
A Yes.
Q Do you know where the spent fuel was being transported by rail to?
A The Department of Energy's Idaho National Engineering Laboratory.
Q Is that -- is that the full extent of your involvement with spent fuel while you were with the Navy?
A Yes.
Q How about when you were with the Navy from '87 to '92, did you have any involvement with Greater-Than-Class C waste?
A No.
Q And do you understand what I mean when I say Greater-Than-Class C waste?
A Yes.
Q Can you just explain that -- what Greater-Than-Class C waste means to you for the -- can you explain that for the record?
A Yes. The Nuclear Regulatory Commission has a regulation, Part 61, which defines Class A, B



and C which can go to commercial low-level waste disposal sites.
Class C has an upper limit, and it's -- it's in two tables in the regulation, and if you exceed that limit, it's then Greater-Than-Class C
Q And if I understand correctly, your work with the Navy did not involve GTCC --
A Yes.
Q -- is that correct?
A Yes. I did not work with Greater-Than-Class C in the Navy.
Q Thank you. And then in 1992, you joined the Department of Energy?
A Yes.
Q What was your position with the Department of Energy at that time?
A I was a nuclear engineer program manager.
Q And what was the program you were managing?
A Well, basically everyone is called a program manager. So I was dealing with what's called off-site waste, which was anything -- any materials or waste that was outside the Department of Energy complex, maybe on loan to a university or to a private company, that needed to come back, I



worked on. And I also worked on the acceptance of Greater-Than-Class C sealed sources.
Q And what branch of the Department of Energy did you begin work at as a program manager in '92?
A The Office of Environmental Management.
Q And what EM number is that, that office?
A They've reorganized a couple times. It was EM32 then.
Q Okay. And what was the title of that branch of the office?
A It was -- that was the Office of Waste Operations.
Q And, in general, what were the areas of responsibility of EM32, the Office of Waste Operations?
A That office was responsible for any waste management activities at all DOE sites.
Q So, organizationally, your -- I guess you would call it an office -- EM32 is called an office?
A Yes.
Q So the EM32 office underneath it had different programs?
A Yes. There were three different



divisions.
Q Okay. And can you explain for me what those three different divisions were?
A Eastern, central and western. So it was just a geographic split of the country.
Q And you were associated with which of those?
A Eastern, although I wasn't limited to working on stuff in that region. I just -- they had to put everybody in a division.
Q Okay. Okay. What regions did you work on, or was it just national?
A The whole country.
Q Okay. So if I understand correctly, Office of Waste Operations had management activities for waste at all DOE sites, what you focused on was off-site waste?
A Yes.
Q Okay. Now, what part of EM32 dealt with waste at DOE sites?
A Well, each of those divisions had DOE sites in that region of the country. And so each of those divisions dealt with the waste at the sites in their region.
Q And who did you report to when you were

Page 14

at EM32?
A The eastern division director.
Q Okay. And who was that?
A Wayne Nobles.
Q And who was the head of EM32, in general?
A Larry Harmon.
Q And who did Mr. Harmon report to?
A He reported to Mr. Steve Cowan.
Q And what was Mr. Cowan's title?
A He was the associate deputy assistant secretary for waste management.
Q Do you know, who did Mr. Cowan report to?
A He reported to Jill Lytle, which is L-y-t-l-e, and she was the deputy assistant secretary for waste management.
Q So at this time, would sealed sources in general be the primary responsibility of Mr. Harmon at EM32?
A I'm sorry. Repeat the question.
Q Sure. I believe you testified one of the things that you worked on was sealed sources, GTCC sealed sources?
A Yes.
Q And that was within the -- that was one of the areas of responsibility for EM32 generally?

Page 15

A Yes.
Q And if I understand correctly, Mr. Harmon was head of the EM32 and would have been dealing with sealed sources, that was part of his responsibility too?
A Yes.
Q Okay. Now, I'm trying to make sure I understand just the organizational framework.
Now, Mr. Cowan, the associate deputy assistant secretary for waste management, what other offices were underneath him at that time, 1992?
A All -- well, all the other offices. There was -- I guess, it went -- there was a 33, a 34, a 35, I think. It's been a while. I don't remember exactly the layout of the rest of the offices.
Q Okay. And how about 33, what was your understanding of what 33 did, EM33?
A That was -- I don't remember.
Q How about EM34, what about that?
A EM34 was the Waste Isolation Pilot Plate office.
Q And for the record, can you explain what WIPP did? W-I-P-P.

Page 16

MS. HERRMANN: Objection, foundation.
THE WITNESS: The Waste Isolation Pilot Plant office was working at that time on completing -- completing the work necessary to open that disposal facility.
BY MR. SKALABAN:
Q Okay. And what was the function of WIPP, what was its mission?
MS. HERRMANN: Same objection.
THE WITNESS: WIPP is a disposal facility for transuranic -- Defense transuranic waste.
MR. SKALABAN: Can we go off the record for just one moment?
MS. HERRMANN: Yes.
(Discussion off the record.)
BY MR. SKALABAN:
Q How about EM35, what was their mission?
MS. HERRMANN: Objection, foundation.
THE WITNESS: EM35 was basically technical and programmatic support and analysis.
BY MR. SKALABAN:
Q What were the types of subjects or areas that they would work on?
MS. HERRMANN: Same objection.
THE WITNESS: Basically, they -- each

Page 17

type of radioactive waste that we dealt with, there was a program manager for that waste type and they developed plans and programmatic documents and analysis for each waste type.
BY MR. SKALABAN:
Q And for GTCC waste, who was dealing with developing programmatic plans from EM35 in that 1992 time frame?
A Terry Plummer.
Q Given that you were working on sealed sources, did you have interactions with Mr. Plummer in the '92 time frame?
A Yes.
Q Can you tell me what -- just in general terms, what was your work on sealed sources in the '92 time frame, what you did?
A We had reached an agreement with the Nuclear Regulatory Commission, if they had licensees who had sealed sources that the NRC had determined it was problematic for some reason, they would send us a letter asking us to accept them and they would evaluate. And my job is to find a place -- to figure out how to go get them and find a place to put them.
Q Who was the agreement reached with with



Alderson Reporting Company, Inc.
1111 14th Street, N.W. Suite 400 1-800-FOR-DEPO Washington, DC 20005

NRC; who was involved in formulating that agreement that you referred to?
MS. HERRMANN: Objection, foundation.
THE WITNESS: I don't know who was involved in formulating the agreement. The agreement was reached prior to my starting work there. The person who signed the document for the NRC was Robert Bernario, and the person who signed the document for DOE was Leo Duffy.
BY MS. HERRMANN:
Q And do you know what Mr. Bernario's position was with the NRC?
A He was the director of the Office of Nuclear Materials Safety and Safeguards, I believe.
Q I believe you said he was at the NRC. Do you know, has he left, to your knowledge?
A Yes, he has retired.
Q And who is Mr. Leo Duffy?
A He was the assistant secretary for environmental management.
Q So that would be Jill Lytle's boss?
A Yes.
Q Did you have -- in this '92 time frame, did you have occasion to work with people at the NRC on sealed source issues?



A Yes.
Q Who did you work with at the NRC on sealed sources?
A Mr. Doug Broaddus.
Q Can you spell that for the record, if you know?
A B-r-o-a-d-d-u-s.
Q Okay. Thank you.
Anyone else?
A He was the primary person on sealed sources.
Q And do you know what part of NRC he worked for?
A Office of Nuclear Materials Safety and Safeguards, the Division of Industrial and Medical Nuclear Safety.
Q Now, you testified that in working on sealed sources, one of the things you did was to find a place to put them. Did you find a place to put them; can you tell me about that, please?
A Yes.
Q Okay.
A Early on, we basically took -- I basically found the nearest DOE site and arranged for sources to be transported to the -- to the



nearest facility that was able to accept them.
Q And that would be accepting them for storage?
A Yes.
Q Had any sealed sources actually been disposed of?
MS. HERRMANN: Objection, foundation.
THE WITNESS: We've not disposed of any Greater-Than-Class C sealed sources, no.
BY MR. SKALABAN:
Q And just for the record, just so it's clear, do you understand what I mean when I say disposed of?
A I believe so.
Q Okay. For purposes of the record, can you explain your understanding of what disposing of a Greater-Than-Class C source means?
A Well, disposal would be some kind of permanent place you would put something and never go get it again, as opposed to storage, which is the intent would be to -- to retrieve it one day.
We do not have any Greater-Than-Class C disposal, so the way you framed the question was -- my understanding of Greater-Than-Class C disposal -- since we don't have that, I don't know



what that's going to be.
Q You stated that early on the sealed sources would go to the nearest DOE sites. What were some of those sites that sealed sources would be taken to?
A We sent sources to the Mound Plant in Ohio, the Hanford site in Washington, and the Los Alamos National Laboratory in New Mexico.
Q Are there any other -- are these all DOE sites?
A Yes.
Q Are there any other sites that you can think of that sealed sources were taken to early on?
A Yes. We had one request from the NRC that was for a large source on a piece of medical equipment that actually could be reused. And so we -- I entered into for -- the Department entered into a contract with a company to go remove the source from the medical equipment.
This was a little different, in that most of the time the source was just in a source holder, and that's all there was.
We didn't want to have to deal with this piece of medical equipment, which had a lot of