# Defendant

A In terms of measurement of radioactivity and in a measurement scale such as roentgens or millirems, yes.

Q Now, can you explain for me why you don't think it's highly radioactive within the meaning of the high-level waste definition?

MS. HERRMANN: Objection, calls for a legal conclusion, relevance.

THE WITNESS: Because the U.S. Nuclear Regulatory Commission has undertaken a rulemaking to say that it's not highly radioactive in the context of high-level waste.

BY MR. SKALABAN:

Q I want to make sure I understand this. They haven't undertaken a rulemaking, in your view, defining it as high-level waste; is that the problem, or are you relying on the actual radioactivity levels? That's what I'm trying to drive at.

MS. HERRMANN: Objection, mischaracterization of prior testimony --

THE WITNESS: No.

MS. HERRMANN: -- calls for a legal conclusion, foundation.

THE WITNESS: No. What I said was the



U.S. Nuclear Regulatory Commission has issued a final rule defining what high-level waste is, and they have excluded Greater-Than-Class C from that definition.

BY MR. SKALABAN:

Q Now, we were talking about the 13-year time period to identify -- to identify and have ready a disposal path for Greater-Than-Class C waste, the period from 1985 to 1998.

Now, if the Department of Energy was going to build a disposal facility using some of the existing sites, such as Hanford, Los Alamos, would that lower the estimated time that a disposal facility could be made available --

MS. HERRMANN: Objection, speculation.

BY MR. SKALABAN:

Q -- for GTCC nuclear utility activated metal?

MS. HERRMANN: Objection, speculation.

THE WITNESS: Not necessarily.

BY MR. SKALABAN:

Q And why do you say not necessarily?

MS. HERRMANN: Same objection.

THE WITNESS: Typically the Department of Energy, when looking for a site to build a



facility, start with its own sites. The difference would only be in -- if a site were selected that the Department of Energy didn't already own, it would simply be the difference -- the difference would be in acquiring the rights to that land, you might have to submit legislation for a Land Withdrawal Act.

But I don't think that is going -- that in and of itself, the acquisition process, I don't think would be the time -- although it will take some time, I don't think that would be the major delaying factor in developing such a facility.

BY MR. SKALABAN:

Q Well, if you're going to build a disposal site in the area of a community that's already used to and accustomed to having nuclear utility -- nuclear material stored or disposed of, wouldn't that likely decrease the level of opposition and make it easier from a political standpoint to implement a GTCC disposal site in the 13-year period we've been talking about?

MS. HERRMANN: Objection, speculation.

THE WITNESS: No, I don't think so.

BY MR. SKALABAN:

Q And why is that?



MS. HERRMANN: Same objection.

THE WITNESS: Well, look at Yucca Mountain. The United States Atomic Energy Commission, the Department of Energy, tested nuclear weapons in the State of Nevada for 30 years.

The State of Nevada is no more open to the Yucca Mountain being a nuclear waste repository after having those activities taking place than they would be without those activities taking place.

BY MR. SKALABAN:

Q If in 1998 the Department is taking spent fuel for either storage or disposal, do you think that the Department would have left GTCC waste at reactor sites when all of the spent fuel has been removed from a reactor site if it had the capability to store or dispose of spent fuel?

MS. HERRMANN: Objection, speculation.

THE WITNESS: I have no -- I have no idea.

BY MR. SKALABAN:

Q Well, do you think that would be a sound policy if you have storage and disposal available for spent fuel, spent fuel is being removed to the



Alderson Reporting Company, Inc.
1111 14th Street, N.W. Suite 400 1-800-FOR-DEPO Washington, DC 20005

Page 413

storage or disposal facility, you have decommissioned reactors that have completely rid themselves of spent fuel through the available storage or disposal facilities beginning in 1998, would that also make sense for the Department to take the GTCC contemporaneously so that the utility can finish its decommissioning?

MS. HERRMANN: Objection, vague as to sound policy and make sense.

THE WITNESS: Without the ability to look at the policy decision for leaving the Greater-Than-Class C there, I have no idea whether it would be a good or a bad policy decision, because I wouldn't have any knowledge of the reasons they made such a decision in this hypothetical situation.

BY MR. SKALABAN:

Q All right. And in view of our scenario or hypothetical, can you think of any policy reasons for leaving nuclear utility activated metal at the site of decommissioned reactors if beginning in 1998 the Department of Energy has begun and completed the removal of all of the spent fuel at the decommissioned reactor site?

MS. HERRMANN: Objection, speculation.

Page 414

THE WITNESS: Yes.

BY MR. SKALABAN:

Q And what would those policy reasons justifying that decision be?

MS. HERRMANN: Same objection.

THE WITNESS: The one I can think of is if the legislation authorizing the spent nuclear fuel storage or disposal did not -- prohibited or did not authorize the storage or disposal of Greater-Than-Class C waste.

BY MR. SKALABAN:

Q Outside of the legislation, can you think of a policy reason that would justify leaving Greater-Than-Class C waste at the site of decommissioned reactors after the spent fuel has been removed for storage or disposal by the Department of Energy?

MS. HERRMANN: Objection, speculation, relevance.

THE WITNESS: Yes.

BY MR. SKALABAN:

Q What other policy justification can you think of?

A That the license issued by the appropriate regulatory agency disallowed that

Page 415

activity or if Congress didn't appropriate the funding for that activity.

Q Can you think of any other policy justification other than funding, licensing incapabilities and legislation?

MS. HERRMANN: Objection, speculation, relevance.

THE WITNESS: No, I can't think of any.

BY MR. SKALABAN:

Q In your various conversations and dealings with the NRC, has the NRC ever given you any indication that it would be an acceptable or a desirable policy to leave Greater-Than-Class C waste at the site of decommissioned reactors once the spent fuel has been removed?

MS. HERRMANN: Objection, vague.

THE WITNESS: No.

BY MR. SKALABAN:

Q Has anyone in any of the conversations you've ever been involved in with the Department of Energy -- and we've talked about many of them, but I'm not limiting it to the ones we've talked about -- have any of the conversations that you've been involved with with members of the Department of Energy, has anyone ever expressed to you that it

Page 416

would be sound policy or desirable to leave Greater-Than-Class C waste at the site of decommissioned reactors after the spent fuel has been removed?

MS. HERRMANN: Objection, vague as to sound policy and desirable.

THE WITNESS: I do not remember any such conversation.

BY MR. SKALABAN:

Q From a transportation perspective, prior to 1998, did the technology exist to transport nuclear utility activated metal for storage or disposal?

A That's not my area of expertise, but I believe it did.

Q Has the Government ever moved either Greater-Than-Class C waste or material comparable under a DOE or Defense classification system of Greater-Than-Class C waste, has it ever moved it prior to 1998?

MS. HERRMANN: Objection, foundation, speculation, vague.

THE WITNESS: Yes.

BY MR. SKALABAN:

Q What do you think the effect of the

# Plaintiff

Page 413

storage or disposal facility, you have decommissioned reactors that have completely rid themselves of spent fuel through the available storage or disposal facilities beginning in 1998, would that also make sense for the Department to take the GTCC contemporaneously so that the utility can finish its decommissioning?

MS. HERRMANN: Objection, vague as to sound policy and make sense.

THE WITNESS: Without the ability to look at the policy decision for leaving the Greater-Than-Class C there; I have no idea whether it would be a good or a bad policy decision, because I wouldn't have any knowledge of the reasons they made such a decision in this hypothetical situation.

BY MR. SKALABAN:

Q All right. And in view of our scenario or hypothetical, can you think of any policy reasons for leaving nuclear utility activated metal at the site of decommissioned reactors if beginning in 1998 the Department of Energy has begun and completed the removal of all of the spent fuel at the decommissioned reactor site?

MS. HERRMANN: Objection, speculation.

Page 414

THE WITNESS: Yes.

BY MR. SKALABAN:

Q And what would those policy reasons justifying that decision be?

MS. HERRMANN: Same objection.

THE WITNESS: The one I can think of is if the legislation authorizing the spent nuclear fuel storage or disposal did not -- prohibited or did not authorize the storage or disposal of Greater-Than-Class C waste.

BY MR. SKALABAN:

Q Outside of the legislation, can you think of a policy reason that would justify leaving Greater-Than-Class C waste at the site of decommissioned reactors after the spent fuel has been removed for storage or disposal by the Department of Energy?

MS. HERRMANN: Objection, speculation, relevance.

THE WITNESS: Yes.

BY MR. SKALABAN:

Q What other policy justification can you think of?

A That the license issued by the appropriate regulatory agency disallowed that

Page 415

activity or if Congress didn't appropriate the funding for that activity.

Q Can you think of any other policy justification other than funding, licensing incapabilities and legislation?

MS. HERRMANN: Objection, speculation, relevance.

THE WITNESS: No, I can't think of any.

BY MR. SKALABAN:

Q In your various conversations and dealings with the NRC, has the NRC ever given you any indication that it would be an acceptable or a desirable policy to leave Greater-Than-Class C waste at the site of decommissioned reactors once the spent fuel has been removed?

MS. HERRMANN: Objection, vague.

THE WITNESS: No.

BY MR. SKALABAN:

Q Has anyone in any of the conversations you've ever been involved in with the Department of Energy -- and we've talked about many of them, but I'm not limiting it to the ones we've talked about -- have any of the conversations that you've been involved with with members of the Department of Energy, has anyone ever expressed to you that it

Page 416

would be sound policy or desirable to leave Greater-Than-Class C waste at the site of decommissioned reactors after the spent fuel has been removed?

MS. HERRMANN: Objection, vague as to sound policy and desirable.

THE WITNESS: I do not remember any such conversation.

BY MR. SKALABAN:

Q From a transportation perspective, prior to 1998, did the technology exist to transport nuclear utility activated metal for storage or disposal?

A That's not my area of expertise, but I believe it did.

Q Has the Government ever moved either Greater-Than-Class C waste or material comparable under a DOE or Defense classification system of Greater-Than-Class C waste, has it ever moved it prior to 1998?

MS. HERRMANN: Objection, foundation, speculation, vague.

THE WITNESS: Yes.

BY MR. SKALABAN:

Q What do you think the effect of the

# Plaintiff

January 8th, 2001?
A I believe so.
Q Did you -- this paper is dated June 28, 1995. Do you see that?
A Yes.
Q First of all, what is your understanding of this paper? What is this paper?
A It is a paper that goes over the statutory and regulatory issues that are involved with codisposal of Greater-Than-Class C waste with high-level radioactivity.
Q I can represent, but it's based on the Bates number, that this was something that was produced to us from the DOE's files. Who was the author of this paper, do you know?
MS. HERRMANN: Objection, foundation, speculation.
THE WITNESS: Unless it states it on the paper, I do not know.
BY MR. SKALABAN:
Q Do you recall reviewing this paper?
A I have looked at it. I do not believe I have read it in its entirety.
Q Why did you cause to have this paper sent from EM22 in Germantown to you -- 509 is Atlanta?



A The 509 number is an E-fax number, so it's actually in Washington State, I think. The number's got nothing to do with how the fax gets to me.
Q Okay. So why did you cause this fax to be sent to you from Germantown to wherever you were at the time?
MS. HERRMANN: Objection. It assumes facts not in evidence.
THE WITNESS: I don't remember.
BY MR. SKALABAN:
Q Did someone send it to you, or do you remember requesting a paper?
A I don't believe that the time period lines up with the document production; plus, if they had had this document in EM22, they wouldn't have send it in order for me to produce it for this purpose. That wouldn't have been necessary. I don't know. My assumption is that someone wanted me to look at it. I don't recall requesting it.
BY MR. SKALABAN:
Q And you don't recall who caused it to be sent to you?
A No.
Q Does this paper accurately reflect the



NWPA definition of high-level waste? And I'm referring to 246 and 247, in particular, part B, where it says high-level radioactive waste means part B, other highly radioactive material that the Commission, consistent with existing law, determines by rule requires permanent isolation.
MS. HERRMANN: Objection, calls for a legal conclusion. The NWPA is the best evidence of its contents, of its provisions.
THE WITNESS: I can't -- without the Nuclear Waste Policy Act in front of me, I can't tell you whether that's an accurate reflect of what it says. It sounds correct to me.
BY MR. SKALABAN:
Q Let's look at the discussion section. It says here that the term permanent isolation -- and I'm looking at the very first bullet point on Bates page 0247 -- the term permanent isolation is not defined in the NWPA but can be implied from the context of the law to mean deep geologic disposal.
Do you agree with that statement?
MS. HERRMANN: Objection, calls for a legal conclusion.
THE WITNESS: I wasn't aware that the permanent isolation was not in the Nuclear Waste



Policy Act, and I've not -- I don't believe I've read enough of the Nuclear Waste Policy Act to be able to imply something from the context of the Act. I'm not -- I've not looked at that before, so I do not know.
BY MR. SKALABAN:
Q Is that a concept that you're familiar with at all, any awareness of the permanent isolation is the equivalent of deep geologic disposal?
MS. HERRMANN: Objection. It assumes facts not in evidence. It calls for a legal conclusion.
THE WITNESS: I don't believe I've ever tried to juxtapose those two in this manner before, but I assume I've -- they mean the same thing. That would be my assumption all along is that those two would have been synonomous.
BY MR. SKALABAN:
Q Just as a general understanding as someone working in the nuclear material field and as someone that works in the industry and works at DOE, your general understanding of that permanent isolation would be the equivalent to deep geologic disposal?

Page 445

MS. HERRMANN: Objection, calls for a legal conclusion.
THE WITNESS: Yes.
BY MR. SKALABAN:
Q In the second bullet point, it says numerous provisions in the NWPA show that the term high-level radioactive waste is not limited to DOE-generated weapons-related waste.
Do you see that?
A Yes.
Q Do you agree with that statement?
MS. HERRMANN: Objection, calls for a legal conclusion.
THE WITNESS: Again, I've not read the Nuclear Waste Policy Act in its entire, especially the sections on high-level radioactive waste. But my assumption is is that it was not limited to DOE-generated weapons-related waste. It was broader than that.
BY MR. SKALABAN:
Q Is that assumption just based on kind of a working knowledge of the law from having worked at DOE and in the area of the industry?
A Yes.
Q What about the next statement, it was

Page 446

intended to include commercially-generated radioactive waste, not otherwise defined as spent fuel, from nuclear power plants.
Do you agree with that statement?
MS. HERRMANN: Objection, calls for a legal conclusion.
THE WITNESS: No, I don't agree with that statement.
BY MR. SKALABAN:
Q And why do you disagree with that statement?
A Inasmuch as I think that the Nuclear Waste Policy -- well, inasmuch as that I'm not a lawyer and I'm taking some guesses here based on my working knowledge, there has been high-level radioactive waste produced commercially, case in point, the West Valley demonstration point, that waste will -- is destined for the repository, to the best of my knowledge.
So I think that the high-level radioactive waste portions of the Act were included to -- were intended to include commercially-generated high-level waste.
I think that the statement commercially-generated radioactive waste is too

Page 447

vague to say that the Nuclear Waste Policy Act intended to include all commercially-generated radioactive waste.
Q The next few bullet points deal with the development of the definition of high-level radioactive waste in the NWPA.
Are you familiar with the different iterations of the definition of high-level radioactive waste that are being referred to here? Is that familiar to you?
A No, I'm not familiar with it.
Q The next paragraph it says that the radioactive waste that Congress believed might be considered high-level -- and, I'm sorry. Let me clarify. Back up.
HQR073-0248, the first full bullet point, so it's the next page, there's a discussion here in this last bullet point before you get to the heading 10 CFR Part 60, it says that the radioactive waste that Congress believed might be considered high-level radioactive waste for purposes of the NWPA may be the waste that exceeds the concentration limits in 10 CFR Part 61, for near-surface disposal.
Would you agree with that statement? I

Page 448

would like you to read the rest of the paragraph.
MS. HERRMANN: While he does that, I will object that it calls for a legal conclusion. Also speculation as to what Congress believed.
THE WITNESS: I don't know enough about the previous versions of waste legislation that were in existence prior to my working at DOE to really answer these questions.
I've -- my exposure to this legislation is after these -- after it was amended yet again after this. So I've got no real knowledge of what was going on back in the early '80s on this subject, not enough to form an opinion as to the accuracy or whether I agree or not with this statement.
BY MR. SKALABAN:
Q Can you look at the top, the sort of subbullet page HQR073-0248, there's a discussion that begins the final NWPA version does not require any official designation, as such, that particular radioactive waste is formally defined as high-level radioactive waste. It goes on to say that the NWPA language merely requires that the waste (regardless of whatever other legal or administrative categorization it may have) be found by the NRC to



Alderson Reporting Company, Inc.
1111 14th Street, N.W. Suite 400 1-800-FOR-DEPO Washington, DC 20005

# Defendant

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - - X

YANKEE ATOMIC ELECTRIC :
COMPANY, et al., :
Plaintiffs, :
v. : Case Nos.
THE UNITED STATES, : 98-126C, 98-154C,
Defendant. : 98-474C

- - - - - - - - - - - - - - - - - - X

Washington, D.C.
Wednesday, January 29, 2003

Continued deposition of ROBERT ALLEN CAMPBELL, a witness herein, called for examination by counsel for Plaintiffs Yankee Atomic, Maine Yankee and Connecticut Yankee, in the above-entitled matter, pursuant to notice, the witness being duly sworn by MARY GRACE CASTLEBERRY, a Notary Public in and for the District of Columbia, taken at the offices of Spriggs & Hollingsworth, 1350 I Street, N.W., Washington, D.C., at 9:30 a.m., Wednesday, January 29, 2003, and the proceedings being taken down by Stenotype by MARY GRACE CASTLEBERRY, RPR, and transcribed under her direction.

APPEARANCES:

On behalf of the Plaintiffs Yankee Atomic, Maine Yankee and Connecticut Yankee:
PETER J. SKALABAN, JR., ESQ.
JERRY R. STOUCK, ESQ.
ROBERT SHAPIRO, ESQ.
Spriggs & Hollingsworth
1350 I Street, N.W.
Washington, D.C. 20005-3305
(202) 898-5821

On behalf of the Defendant:
HEIDE L. HERRMANN, ESQ.
KEVIN B. CRAWFORD, ESQ.
United States Department of Justice
Civil Division
1100 L Street, N.W.
Washington, D.C. 20530
(202) 514-7300



CONTENTS


| WITNESS | EXAMINATION BY COUNSEL FOR PLAINTIFFS |
|---|---|
| ROBERT ALLEN CAMPBELL | |
| By Mr. Skalaban | 463, 633 |
| By Ms. Herrmann | 632 |

Afternoon Session - 538


EXHIBITS


| CAMPBELL EXHIBIT NO. | PAGE NO. |
|---|---|
| 11 - Document, Greater Than Class C Low Level Waste (GTCC) | 493 |
| 12 - Memo, 2/18/94 | 495 |
| 13 - Greater than Class C low level radioactive waste characterization, estimated volumes, radionuclide activities and other characteristics | 503 |
| 14 - Memo from Hanson to Campbell | 506 |
| 15 - Presentation slides | 509 |
| 16 - Summary Report, June 1995, Technical Issues Associated with Disposal of Utility Generated GTCC Using Yankee Rowe Decommissioning as a Typical Study Case | 510 |
| 17 - Letter, 8/30/00 | 514 |
| 18 - E-mail with attached agenda | 518 |




EXHIBITS (Continued)


| CAMPBELL EXHIBIT NO. | PAGE NO. |
|---|---|
| 19 - Document entitled Development of Long-term Disposition Option for Excess Radioactive Sealed Sources | 528 |
| 20 - Informal note from Campbell to Huizenga | 533 |
| 21 - Presentation slides | 542 |
| 22 - GTCC LLW Presentation | 552 |
| 23 - Document entitled Co-disposal of GTCC Waste with cover letter | 555 |
| 24 - Three documents Bates numbered HQR 1430057 to 1430073 | 558 |
| 25 - Document entitled, Greater Than Class C Low Level Radioactive Waste Program Management Plan dated 9/99 | 564 |
| 26 - Document Bates numbered HQR 1310013 | 567 |
| 27 - Meeting agenda | 568 |
| 28 - List of meeting attendees | 573 |
| 29 - Section of environmental impact statement by Idaho operations office | 581 |
| 30 - Letter from New England governors to Secretary of Energy | 584 |
| 31 - E-mail from Hanson to Campbell | 589 |
| 32 - Teleconference call summary | 606 |




EXHIBITS (Continued)


| CAMPBELL EXHIBIT NO. | PAGE NO. |
|---|---|
| 33 - Draft of the 1999 greater than Class C management strategy | 616 |
| 34 - Presentation by DOE, Office of Environmental Management, plans for the management of greater than Class C waste | 618 |
| 35 - Series of E-mails | 622 |
| 36 - NIRC/DOE Management Meeting, 1/16/02 | 623 |
| 37 - E-mail from Campbell to Rudzinski with two attachments | 624 |
| 38 - E-mail thread w/attachment, Memorandum for the Secretary of Energy | 629 |

Page 464

A. I'm fine.
Q. Since we talked last, which was June 14th of last year, has there been any resolution or movement on the issue that we talked about of whether the program responsibilities for nuclear utility greater than Class C waste would be moved from EM to OCRWM?
MS. HERRMANN: I'll just caution the witness only to answer the question insofar as it doesn't reveal communications between himself and lawyers.
THE WITNESS: No.
BY MR. SKALABAN:
Q. Is that issue still being discussed by DOE management?
A. I don't know.
Q. And let me ask you, is the answer you just gave me about no, there has been no movement on this issue, was that affected at all by your counsel's instruction that she just gave you, that answer?
A. No.
Q. And for the record to be clear, where are the program responsibilities for nuclear utility greater than Class C waste right now within DOE?
A. In the Office of Environmental Management.

Page 465

Q. Are you still spending about 50 percent of your time on GTCC matters?
A. Yes.
Q. Who else is currently working with you on GTCC-related issues?
A. Working with me? No one.
Q. Is anyone supporting your work on GTCC? Personnel. I'm looking for names.
A. Are you asking for something different than when we went through this before?
Q. The current status, what the current status is, who is working on GTCC issues in addition to yourself at the Department of Energy at this time?
A. For sealed sources and the recovery effort in the Department of Energy, it is Joel Grimm at the Albuquerque office. Other than that, other than our management in terms of how we work on anything, there isn't anyone else who works for DOE.
Q. Are there any contractors who are doing work on GTCC waste for DOE at the present time?
A. Yes.
Q. And who are they, sir?
A. The sealed source recovery at Los Alamos. There are a number of employees in that program.
Q. Who are the contractors? What are the

Page 466

names of the organizations?
A. I'm sorry?
Q. What are the names of the organizations, the names of the contractors that are supporting the GTCC sealed source recovery effort?
A. I don't remember the name of the organization because they just organized and it's a strange name that didn't make sense. But Lee Leonard is the manager, Shelby Leonard works on the program, Andy Tompkins, and there are four other people, but I don't remember their names right now.
Q. Now, putting aside GTCC sealed sources, are there any contractors supporting efforts to work on acceptance, storage or disposal of nuclear utility GTCC waste?
A. No.
Q. And now that we're in 2003, looking back in 2002, through the entire year of 2002, has DOE taken any steps at all to advance the storage or disposal of nuclear utility GTCC waste?
MS. HERRMANN: Objection, vague, foundation.
THE WITNESS: I don't know.
BY MR. SKALABAN:
Q. You're not aware of any steps?

Page 467

MS. HERRMANN: Same objections.
THE WITNESS: No.
BY MR. SKALABAN:
Q. And how about for the limited part of this year, January 2003, have there been any steps taken by DOE that you're aware of to advance the storage or disposal of nuclear utility GTCC waste?
MS. HERRMANN: Objection, vague, foundation.
THE WITNESS: No.
BY MR. SKALABAN:
Q. What is the current status of the environmental impact statement that you had talked about a little bit when we were together the last time? What's the current status of the environmental impact statement to explore the methods of disposing of GTCC waste?
A. We're not doing an environmental impact statement right now.
Q. And if I correctly recall, that had been something that DOE was planning to do, is that correct?
MS. HERRMANN: Objection, foundation.
BY MR. SKALABAN:
Q. Tell me about the environmental impact



Alderson Reporting Company, Inc.
1111 14th Street, N.W. Suite 400 1-800-FOR-DEPO Washington, DC 20005

# Plaintiff

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - x

YANKEE ATOMIC ELECTRIC :
COMPANY, et al., :
Plaintiffs, :
v. : Case Nos.
THE UNITED STATES, : 98-126C, 98-154C,
Defendant. : 98-474C

- - - - - - - - - - - - - - - x

Washington, D.C.
Wednesday, January 29, 2003

Continued deposition of ROBERT ALLEN CAMPBELL, a witness herein, called for examination by counsel for Plaintiffs Yankee Atomic, Maine Yankee and Connecticut Yankee, in the above-entitled matter, pursuant to notice, the witness being duly sworn by MARY GRACE CASTLEBERRY, a Notary Public in and for the District of Columbia, taken at the offices of Spriggs & Hollingsworth, 1350 I Street, N.W., Washington, D.C., at 9:30 a.m., Wednesday, January 29, 2003, and the proceedings being taken down by Stenotype by MARY GRACE CASTLEBERRY, RPR, and transcribed under her direction.

Page 492

THE WITNESS: I wanted to identify the litigation as a sensitivity to ensure that the various people who looked at this document would be aware that the topic being considered had litigation associated with it.
BY MR. SKALABAN:
Q. Now, did any comments you received in preparing this document indicate that it could not go to the office -- that this responsibility could not go to the Office of Civilian Radioactive Waste Management because of the litigation?
MS. HERRMANN: Objection, compound.
THE WITNESS: Could you repeat the question?
MR. SKALABAN: Can you read it back?
THE REPORTER: "Question: Did any comments you received in preparing this document indicate that this responsibility could not go to the Office of Civilian Radioactive Waste Management because of the litigation?"
THE WITNESS: No.
BY MR. SKALABAN:
Q. Did anyone discuss that topic with you while you were preparing this recommendation section or this recommendation memo?

Page 493

MS. HERRMANN: Objection, vague.
THE WITNESS: No.
BY MR. SKALABAN:
Q. And you haven't heard anything at all about the status of that decision?
A. No.
(Campbell Exhibit No. 11 was marked for identification.)
BY MR. SKALABAN:
Q. If you could just take a few moments, Mr. Campbell, and review this document and tell me if you're familiar with it.
A. No, I'm not.
Q. So you've never seen this document before?
A. I do not believe so.
Q. Now, recognizing that you haven't worked or don't recall working with this document before, do you see the reference on the second page of it about some remarks made by Mr. Bernero to the ACNW regarding GTCC waste?
A. Yes, I see that.
Q. And it's reported here that Mr. Bernero said to Mr. Duffy that you don't want another set of requirements as some people in DOE asked us to do. Do you see that? Take a few moments to read that

Page 494

paragraph.
A. All right.
Q. Are there any efforts within DOE to develop any kind of an intermediate disposal capacity for GTCC waste? And when I say intermediate disposal capacity, I mean something less than geologic disposal.
MS. HERRMANN: Objection, foundation, speculation.
THE WITNESS: I don't know.
BY MR. SKALABAN:
Q. To your knowledge, no?
MS. HERRMANN: Same objections.
THE WITNESS: I don't know.
BY MR. SKALABAN:
Q. Has DOE ever made any proposals to NRC to dispose of GTCC waste in a facility other than geologic disposal?
MS. HERRMANN: Objection, foundation, speculation.
THE WITNESS: I don't know.
BY MR. SKALABAN:
Q. You are not aware of any such proposals, is that correct?
MS. HERRMANN: Asked and answered,

Page 495

foundation, speculation.
THE WITNESS: I'm not aware of any.
(Campbell Exhibit No. 12 was marked for identification.)
BY MR. SKALABAN:
Q. In particular, if I can call your attention to the first paragraph.
A. All right.
Q. What is your understanding of the extent the utility-generated nonfuel-bearing component waste will be accepted by RW as part of the standard contract?
MS. HERRMANN: Objection, foundation, speculation, calls for a legal conclusion.
THE WITNESS: Could you repeat the question?
MR. SKALABAN: Can you read that back?
THE REPORTER: "Question: What is your understanding of the extent the utility-generated nonfuel-bearing component waste will be accepted by RW as part of the standard contract?"
BY MR. SKALABAN:
Q. What is your understanding of the extent that RW will accept greater than Class C waste that are nonfuel-bearing components under the DOE spent

# Defendant

Page 532

overbroad, foundation, calls for a legal conclusion.
THE WITNESS: First of all, I certainly don't know what all the requirements are, but I do know that they are required to conduct periodic leak tests, conduct periodic inventories, undergo periodic inspections and provide certain reports. Beyond that, I'm not aware of the specific requirements.
BY MR. SKALABAN:
Q. Do you have any idea of the costs associated with maintaining these sources on the licensees? Is that something that ever came up in your work?
A. I don't have a good idea of the specific per source cost, but that issue has come up.
Q. And how has it come up?
A. It has come up in the context of impacts to the licensees due to a lack of acceptance of these sources by the Department.
Q. Do you have a rough sense of what the average annual costs are associated with maintaining these GTCC waste sealed sources?
MS. HERRMANN: Objection, vague, foundation, speculation.
THE WITNESS: No, I don't.
BY MR. SKALABAN:

Page 533

Q. Do the licensees have to maintain armed security to protect the GTCC sealed sources?
MS. HERRMANN: Objection, foundation, speculation, calls for a legal conclusion.
THE WITNESS: My understanding is that licenses are granted based on the amount and types of material that the licensee possesses. While I've not heard of that for sealed sources, it's certainly a possibility.
(Campbell Exhibit No. 20 was marked for identification.)
BY MR. SKALABAN:
Q. Mr. Campbell, can you please identify this document, Exhibit 20, that I've handed you? Can you identify this document, please?
A. It is an informal note from myself to Mr. David Huizenga, subject, invitation to speak at the American Nuclear Society executive conference on nuclear facility decommissioning and used fuel management, and the title being, engaging in exchanging for safety, how to share in a competitive environment.
Q. And is this a document that you provided Mr. Huizenga?
A. Yes.
Q. And it's a document you prepared?

Page 534

A. Yes.
Q. Did Mr. Huizenga go on to talk at the American Nuclear Society conference?
A. No.
Q. Why didn't he go and speak at that conference?
MS. HERRMANN: Objection, speculation.
BY MR. SKALABAN:
Q. To your knowledge?
A. I don't know.
Q. Did you ever talk to him about it?
A. No.
Q. Take a look here at the last paragraph on the first page of Exhibit 20.
A. Okay.
Q. Take a moment to review that.
A. Okay.
Q. Now, here you wrote that the presentation should stress the fact that DOE has no plans to leave GTCC at utilities beyond the date by which DOE begins to accept spent fuel. Do you see that?
A. Yes.
Q. Was that true at the time?
MS. HERRMANN: Objection, foundation, speculation.

Page 535

BY MR. SKALABAN:
Q. That DOE had no plans to leave GTCC at utilities beyond the date by which DOE begins to accept spent fuel?
MS. HERRMANN: Objection, foundation, speculation.
THE WITNESS: Could you read back the question for me?
THE REPORTER: "Question: Was that true at the time, that DOE had no plans to leave GTCC at utilities beyond the date by which DOE begins to accept spent fuel?"
THE WITNESS: I don't know.
BY MR. SKALABAN:
Q. So why did you write to Mr. Huizenga that the presentation should stress the fact that DOE has no plans to leave GTCC at utilities beyond the date by which DOE begins to accept spent fuel?
A. Because that was my opinion of what DOE's plans should be.
Q. And so you don't know whether or not a different opinion was held at DOE?
MS. HERRMANN: Objection, foundation, speculation.
THE WITNESS: No, I don't have any way of

# Plaintiff

Page 544

THE REPORTER: "Question: Have you ever been involved in any presentations to the NRC, either giving them yourself or assisting in the preparation of them, of any presentations to the Advisory Committee on Nuclear Waste?"
THE WITNESS: Yes.
BY MR. SKALABAN:
Q. Can you tell me about that?
A. I was invited to give a presentation to the Advisory Committee on Nuclear Waste. I prepared a presentation and then my presentation was canceled so I never gave it.
Q. And how were you invited? Who invited you to give that presentation?
A. As I remember, Jim Kennedy from the NRC called me and asked me to do that.
Q. And when was this?
A. To the best of my memory, it was sometime in the first half of 2001. I'm not positive, though.
Q. When was the meeting of the Advisory Committee on Nuclear Waste? When was that scheduled?
A. I don't know.
Q. Did you actually prepare your presentation?
A. Yes.

Page 545

Q. When was it canceled? Canceled right before you gave it or was scheduled to give it? Let me ask you this. When were you scheduled to provide the presentation?
A. I do not remember the exact date.
Q. Okay. Well, ballpark the date. What do you think, in terms of the ballpark timing?
A. I think it was the first part of 2001. Maybe it was the first part of 2002. I don't remember at this point exactly.
Q. Was it the summer? Was it this year, summer of 2002?
MS. HERRMANN: Objection, asked and answered.
THE WITNESS: I just don't remember. I'm sorry.
BY MR. SKALABAN:
Q. What happened to your presentation?
MS. HERRMANN: Objection, vague.
THE WITNESS: I'm not sure I know what you mean.
BY MR. SKALABAN:
Q. Did you prepare slides?
A. Yes.
Q. Did you prepare any other material besides

Page 546

slides?
A. No, I don't believe so.
Q. Now, the slides you prepared, did you provide them to counsel here to give to us in discovery?
A. I made them available for discovery, yes. But I did not give them specifically to counsel here.
Q. When you said make them available for discovery, you turned them over to someone who was working on -- or pointed it out to someone who was working on collecting documents?
A. Yes.
Q. Now, what were you planning to communicate to the Advisory Committee on Nuclear Waste in your presentation? What were the major themes?
A. The presentation was going to center on what DOE's plans were for greater than Class C at that time.
Q. And it's your testimony you don't remember if that's 2001 or 2002?
MS. HERRMANN: Asked and answered.
THE WITNESS: That's correct.
BY MR. SKALABAN:
Q. And what were the plans -- what were DOE's plans that you were planning to communicate to the

Page 547

Advisory Committee on Nuclear Waste?
MS. HERRMANN: Objection, foundation, asked and answered.
THE WITNESS: Without looking at the presentation, I'm not remembering clearly. This remembers to my having difficulty remembering the exact date as well, as to what those plans would have been. So I would need to look at the presentation again to clarify in my mind exactly what I said.
BY MR. SKALABAN:
Q. What do you recall DOE's plans being in 2001 and 2002 for GTCC waste disposal?
MS. HERRMANN: Objection, foundation, asked and answered.
THE WITNESS: Our plans in 2001 were to do an environmental impact statement. The plan in 2002 was that effort was placed on hold until decisions were made.
BY MR. SKALABAN:
Q. And when you say until decisions are made, are you referring to the process of deciding what part of DOE would take responsibility for the EIS?
MS. HERRMANN: Objection, foundation, asked and answered in the previous two days of Mr. Campbell's deposition.

# Plaintiff

Page 604

BY MR. SKALABAN:
Q. We've talked about that this morning?
A. I know that's under discussion. I don't know how many discussions.
Q. Does that deal with the transfer of any more responsibility other than the conduct of the EIS?
MS. HERRMANN: Objection, foundation.
BY MR. SKALABAN:
Q. In your understanding?
MS. HERRMANN: Same objection.
THE WITNESS: I'm not sure I'm following your question. Could you repeat it?
MR. SKALABAN: Could you read it back?
THE REPORTER: "Question: Does that deal with the transfer of any more responsibility other than the conduct of the EIS?"
THE WITNESS: What do you mean by that, when you say does that?
BY MR. SKALABAN:
Q. As you understand it, the issue under discussion involves the transfer of the responsibility for a possible EIS to another office within DOE out of Environmental Management, correct?
A. That is an issue under discussion, yes.

Page 605

Q. Now, in your understanding, if that moves forward, what role if any will the Office of Environmental Management still have with respect to nuclear utility GTCC waste, as you understand it?
MS. HERRMANN: Objection, foundation, speculation.
THE WITNESS: I don't know.
BY MR. SKALABAN:
Q. Has anyone ever talked to you about what roles the Office of Environmental Management would likely still have if this transfer goes forward?
A. No.
MR. SKALABAN: Let's mark this as Exhibit 32.
BY MR. SKALABAN:
Q. Before we do that, were there any other discussions -- have you been involved in any other efforts since the time period of May 2001 to prepare people at DOE higher in the management chain for discussions with the NRC, other than the Jessie Roberson discussion we've just been talking about?
MS. HERRMANN: Objection, foundation.
THE WITNESS: Yes.
BY MR. SKALABAN:
Q. Can you tell me what that involved?

Page 606

A. Since September 11th, there has been a lot of meetings at a lot of different levels of management above me concerning sealed sources, dirty bombs and related issues that I've prepared my management for in a variety of different ways.
Q. Let's limit it to nuclear -- anything related to nuclear utility GTCC waste, GTCC waste at commercial nuclear power plants. Have you been involved in any -- preparing your management for any meetings with NRC relating -- people higher than you in the DOE management chain for meetings that related to or would recover nuclear utility GTCC? Do you understand my question? I'm trying to limit the sealed sources and that kind of thing, put that aside.
A. Other than what we've already discussed, I'm not remembering any other discussions.
MR. SKALABAN: Let's mark this as Exhibit 32.
(Campbell Exhibit No. 32 was marked for identification.)
BY MR. SKALABAN:
Q. Mr. Campbell, I've handed you Exhibit 32 which is Bates Number HQR 2510213. Is this teleconference call summary something you prepared?

Page 607

A. No.
Q. Have you ever seen this document before?
A. It does not look familiar to me.
Q. Do you see in the first sentence it makes reference to a teleconference call that was held Thursday, June 22nd, 1999 at 11:30 a.m. and do you see that you are listed as one of the attendees of the call?
A. Yes.
Q. Who is MaryJane Wisenbaker?
A. She was a DOE headquarters Office of Environmental Management employee.
Q. Was she above you or below you or equal to you in the management chain at EM?
A. Equal to.
Q. And it says here, "Greg Duggan presented an overview of the proposed strategy which will focus in the following three areas." First of all, who was Greg Duggan?
A. Greg is a DOE Idaho employee.
Q. And did he work on greater than Class C waste issues?
A. Yes.
Q. And was he involved in helping formulate a proposed strategy for greater than Class C waste?

A. I believe so, yes.
Q. Now, there is a list of key points that came from the discussion. Three points down, it said, "Mark Frei indicated that there is an understanding between GC, RW and EM that GTCC waste will go to the repository."
And do you recall, Mr. Campbell, a teleconference where Mark Frei indicated that there is an understanding between the Office of Civilian Radioactive Waste Management, the Office of Environmental Management and the Office of General Counsel that GTCC waste will go to the repository?
A. I recall this conference call, yes.
Q. And you recall that being discussed?
A. I believe so, yes.
Q. Do you recall Mr. Frei indicating that there is an understanding between GC, RW and EM that GTCC waste will go to the repository?
A. Yes.
Q. And what did Mr. Frei say about that understanding?
A. I don't remember specifically.
Q. Did you have any understanding of what this understanding entails between GC, RW and EM?
MS. HERRMANN: Objection to the



foundation, speculation.
THE WITNESS: No.
BY MR. SKALABAN:
Q. Now, underneath that, there is a bullet point that says, "Options other than the repository are considered politically undesirable in light of overall DOE waste management objectives." Do you see that?
A. Yes.
Q. Can you explain to me what's meant by that sentence?
MS. HERRMANN: Objection, foundation, speculation.
THE WITNESS: No.
BY MR. SKALABAN:
Q. So participating in this conference call, it's not clear to you what's being referred to?
MS. HERRMANN: Same objections.
BY MR. SKALABAN:
Q. Do you have any idea what's being referred to?
MS. HERRMANN: Same objections.
THE WITNESS: I can't explain this sentence on this call summary. In participating on the conference call, I do remember Mr. Frei



discussing politics associated with this.
BY MR. SKALABAN:
Q. What did he say about it?
A. In reference to the second bullet on this page where it says, "Mark specifically noted that borehole disposal of GTCC waste in Nevada was not an option," was his main concern relating to politics.
Q. So his concern was that politically, borehole disposal of GTCC waste in Nevada was not an option?
MS. HERRMANN: Objection to the extent it mischaracterizes his testimony, foundation.
THE WITNESS: That was his opinion in June of 1999, yes.
BY MR. SKALABAN:
Q. Now, did he say anything more about this understanding between GC, RW and EM, that GTCC waste will go to the repository? Did he give any more information about it other than what's indicated here, that there is that understanding?
A. My memory of this is that he directed Mr. Duggan to not pursue any other disposal options other than that at that time.
Q. Did he say why, other than this -- did he say the reason was because there was this



understanding?
A. I don't remember his reasons why.
Q. Do you know if this understanding is still in effect?
MS. HERRMANN: Objection, foundation, speculation.
THE WITNESS: Could you read back the question?
BY MR. SKALABAN:
Q. I'm sorry, let me rephrase it. Do you know whether this understanding between GC, RW and EM that GTCC waste will go to the repository is still in effect?
MS. HERRMANN: Objection, foundation, speculation.
THE WITNESS: As I answered earlier, I'm not aware of such an understanding, so no.
BY MR. SKALABAN:
Q. What you're aware of is what Mr. Frei stated at the meeting, that there was that understanding?
A. That he said there was that understanding was all that I know of that.
Q. Did he give any indication of who that understanding was formed between? For example, was

# Plaintiff

Page 612

it an understanding formed between Lake Barrett, himself and someone else? Do you understand who -- did he give any indication of who had formed that understanding?
A. No, he did not.
Q. Now, with reference to the sentence that Mark Frei made the point that he was not interested in pursuing long term disposal options other than the repository, were there other reasons given, other than what's indicated here which -- did he specify any reasons that you recall?
A. Not that I remember, no.
Q. How about this. Do you remember what this bullet point is referring to? "There was general acceptance of near-term efforts to reclassify waste or to exercise exceptions or concentration average to get GTCC disposed."
MS. HERRMANN: Objection, foundation, speculation.
THE WITNESS: Yes, I remember that.
BY MR. SKALABAN:
Q. Can you tell me what that bullet point is referring to?
MS. HERRMANN: Same objections.
BY MR. SKALABAN:

Page 613

Q. Please explain.
A. The proposed strategy which Mr. Duggan was presenting, one of the things they were going to try to do was to look into more precise characterization of waste to see if it could be classified as something other than greater than Class C and, therefore, if that would open up a disposal option. They were also going to look at concentration averaging to see if that provided any outlets.
Q. Now, in addition to talking about trying to more precisely characterize waste and to use concentration averaging, were there any other -- and I don't want to put words in your mouth but let me make sure I understand that. When you're referring to that precise characterization, the concentration averaging, you're talking about Mr. Duggan is proposing these as potential methods to reduce the amount of GTCC waste that needs to be disposed of?
A. No.
Q. So explain to me what the role of those two techniques would be, or these two actions, concentration averaging, precise characterization, what role was being proposed for them?
A. This proposal was what the greater than Class C program at Idaho was going to pursue.

Page 614

Q. They were going to pursue with respect to what? Was the proposed strategy that Mr. Duggan was presenting in this conference call, was that for the management of all greater than Class C waste?
MS. HERRMANN: Objection, foundation.
THE WITNESS: Yes, I believe it was.
BY MR. SKALABAN:
Q. And so how would the precise characterization or concentration averaging, what was he -- I'm trying to understand the link or the role that those two actions or items would play in the plan being proposed by Mr. Duggan, or the strategy being proposed by Mr. Duggan?
A. Under bullet 1, it says, provide for near term and long term disposal options. Since there is no greater than Class C disposal facilities available, near term options would involve characterization or concentration averaging efforts.
Q. That could be used immediately?
A. Yes.
Q. And then longer term options would be providing a disposal path for waste that can't be disposed of using techniques like more precise characterization or concentration averaging, correct?
A. Yes, that's what bullet 1 indicates, or

Page 615

item 1.
Q. And the longer term disposal option would be putting it in the repository?
MS. HERRMANN: Objection, foundation.
THE WITNESS: My memory is that Mr. Duggan presented a broader approach than that and that according to the paper, Mr. Frei said no and left the instruction that the only thing that would be pursued at that point was the repository.
BY MR. SKALABAN:
Q. Has Mr. Frei provided any additional guidance or any further guidance since that time about what should be pursued?
A. Not that I'm aware of.
MR. SKALABAN: Let's go off the record here.
(Discussion off the record.)
(Robert Shapiro enters deposition room.)
(Whereupon, a conference call was commenced with the court.)
BY MR. SKALABAN:
Q. Mr. Campbell, we were talking about the presentation to the Advisory Committee on Nuclear Waste. Do you still have the presentation you prepared, the one that was canceled for -- that was

# Defendant

review while it was in preparation.
Q. Do you remember having any comments on the greater than Class C waste disposal section?
A. No, I don't remember making any comments.
Q. Did DOE prepare this or did NRC?
MS. HERRMANN: Objection, foundation, speculation.
THE WITNESS: I don't know.
BY MR. SKALABAN:
Q. You don't have any idea from providing comments whether it was originally a DOE document?
MS. HERRMANN: Asked and answered.
THE WITNESS: I do not know who prepared the original.
BY MR. SKALABAN:
Q. Were you involved in any NRC/DOE management meeting on January 16th, 2002?
A. No, I was not.
(Campbell Exhibit No. 37 was marked for identification.)
BY MR. SKALABAN:
Q. Is this document a version of the policy analysis paper you and I talked about in your first deposition?
A. No.



Q. Can you tell me what this document is?
A. This is an E-mail from myself to Suzanne Rudzinski that had two attachments to it and what is here is an informal note from Patty Bubar to Jessie Roberson that describes the greater than Class C policy paper, but that policy paper is not part of what you handed me.
Q. And what was the purpose of the informal note that's attached here?
MS. HERRMANN: Objection, foundation, speculation.
THE WITNESS: All documents going to Jessie Roberson require an informal note from the person forwarding the document to her, giving a brief description of what this is, why she needs to look at it, what action she may need to take, et cetera.
MS. HERRMANN: Pete, before you ask your next question, ours looks different than yours.
MR. SKALABAN: Do you have a 16433 and 34?
MS. HERRMANN: No. We must just be missing two pages, then.
THE WITNESS: Mine said 16432, 35, 36.
MR. CRAWFORD: There was a little copying glitch.
MR. SKALABAN: So you're missing 34 and --



MS. HERRMANN: 33.
MR. CRAWFORD: So you've got a draft version of the informal note and a --
MR. SKALABAN: And a final. It looks like a final version.
BY MR. SKALABAN:
Q. It appears to be a copying error, Mr. Campbell, and you don't have 33 and 34 in front of you. Let's look at 35 and 36. Are these Ms. Bubar's comments on this informal note?
MS. HERRMANN: Objection, foundation.
THE WITNESS: As best I can tell, yes.
BY MR. SKALABAN:
Q. Now, is this a summary of the conclusions? What's the main purpose of the informal note?
MS. HERRMANN: Objection, foundation, speculation, asked and answered.
THE WITNESS: The purpose of the informal note is to let her know that what's attached is a policy paper. And this summarizes what's in the policy paper and hits the salient issues and summarizes the recommendations.
BY MR. SKALABAN:
Q. Now, here there is a reference to program ownership. Do you see where it says "Recommendation:



The issues and recommendations are fully analyzed and supported in the attached policy paper, but the bottom line recommendations are provided below"? Do you see that?
A. Yes.
Q. "Program ownership: The nuclear utility activated metal portion of GTCC waste should be transferred to RW." Is that the recommendation being made to Jessie Roberson at the time?
MS. HERRMANN: Objection, foundation, speculation, asked and answered.
THE WITNESS: On this particular iteration of this draft, yes.
BY MR. SKALABAN:
Q. How about the final version, do you know? Was that recommendation still there when this --
MS. HERRMANN: Same --
BY MR. SKALABAN:
Q. When this finally went to Jessie Roberson, was that recommendation still made?
MS. HERRMANN: Same objections and best evidence.
THE WITNESS: The last version I saw, that was the recommendation.
BY MR. SKALABAN:

# Defendant

Page 632

A. I don't know.
Q. I think we are completed for today.
MS. HERRMANN: I just have a couple, just to take care of them now in case we don't come back.
MR. SKALABAN: Okay.
EXAMINATION BY COUNSEL FOR DEFENDANT
BY MS. HERRMANN:
Q. Mr. Campbell, do you make policy for the Department of Energy?
A. No.
Q. Do you make policy for the Office of Environmental Management?
A. No.
Q. Do you make any policy with regard to the storage, disposal or handling of GTCC?
A. No.
MS. HERRMANN: That's it for me.
MR. SKALABAN: Can you read back those three questions to me?
THE REPORTER: "Question: Do you make policy for the Department of Energy?"
"Question: Do you make policy for the Office of Environmental Management?
"Question: Do you make any policy with regard to the storage, disposal or handling of GTCC?"

Page 633

FURTHER EXAMINATION BY COUNSEL FOR PLAINTIFFS
BY MR. SKALABAN:
Q. Who makes policy for the Department of Energy?
MS. HERRMANN: Objection, foundation.
THE WITNESS: My assumption is the Secretary of Energy.
BY MR. SKALABAN:
Q. Who makes policy for the Office of Environmental Management?
MS. HERRMANN: Objection, foundation.
THE WITNESS: The Assistant Secretary for Environmental Management.
BY MR. SKALABAN:
Q. And who is that now?
A. Jessie Roberson.
Q. And since you've been working on GTCC activities, has it always been Jessie Roberson?
A. No.
Q. Who was it before Jessie?
A. It was Carolyn Huntoon was the previous Assistant Secretary. It's possible Mr. Jim Owendorf was acting between Administrations. I don't have a clear recollection.
Q. Now, who makes policy on the storage or

Page 634

disposal or handling of GTCC waste?
MS. HERRMANN: Objection, foundation.
THE WITNESS: My management.
BY MR. SKALABAN:
Q. And who is that?
A. I think it would depend on the specific aspects of the policy.
Q. Who currently would you say is making policy on the storage or disposal or handling of GTCC waste?
MS. HERRMANN: Same objection.
THE WITNESS: Jessie Roberson and higher than her in the Department of Energy.
BY MR. SKALABAN:
Q. If there are questions that arise regarding greater than Class C waste within the Department of Energy, are you one of the lead contacts within DOE for answering those questions?
MS. HERRMANN: Objection, speculation, vague.
THE WITNESS: I don't know.
BY MR. SKALABAN:
Q. Is there anyone who spends more time within DOE than yourself on greater than Class C waste issues?

Page 635

MS. HERRMANN: Objection, speculation.
THE WITNESS: I don't know.
BY MR. SKALABAN:
Q. Do you believe there is anyone who may be?
MS. HERRMANN: Objection, speculation.
THE WITNESS: I would have no way of knowing how much time other people spend doing whatever it is they're doing.
BY MR. SKALABAN:
Q. You have no idea, it's your testimony under oath that you have no idea whether anyone else spends more time than you?
MS. HERRMANN: Objection, speculation, asked and answered.
THE WITNESS: I said I have no way of knowing.
BY MR. SKALABAN:
Q. Who do you think could potentially spend more time than you do on greater than Class C waste issues at DOE?
MS. HERRMANN: Objection, speculation.
THE WITNESS: Again, my answer is I have no way of knowing.
BY MR. SKALABAN:
Q. Can you identify anybody who might?

# Susan Klein

# Plaintiff

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---X

YANKEE ATOMIC ELECTRIC COMPANY (98-126C)(Merow, S.J.) :
CONNECTICUT YANKEE ATOMIC POWER COMPANY (98-154C)(Merow, S.J.) :
MAINE YANKEE ATOMIC POWER COMPANY (98-474C)(Merow, S.J.) :
FLORIDA POWER & LIGHT COMPANY (98-483C)(Wilson, J.) :
NORTHERN STATES POWER COMPANY (98-484C)(Wiese, J.) :
DUKE POWER, a Division of DUKE ENERGY CORP. (98-485C)(Sypolt, J.) :
INDIANA MICHIGAN POWER COMPANY (98-486C)(Hodges, J.) :
SACRAMENTO MUNICIPAL UTILITY DISTRICT (98-488C)(Yock, S.J.) :
SOUTHERN NUCLEAR OPERATING COMPANY, et al. (98-614C)(Merow, S.J.) :
COMMONWEALTH EDISON COMPANY (98-621C)(Hewitt, J.) :
BOSTON EDISON COMPANY (99-447C) (Allegra, J.) :
GPU NUCLEAR, INCORPORATED (00-440C)(Bush, J.) :
WISCONSIN ELECTRIC POWER COMPANY (00-697C)(Merow, S.J.) : VOLUME I
POWER AUTHORITY OF THE STATE OF NEW YORK (00-703C)(Damich, J.) :
OMAHA PUBLIC POWER DISTRICT (01-115C)(Bush, J.) :
NEBRASKA PUBLIC POWER DISTRICT (01-116C)(Sypolt, J.) :Discovery Judge:
TENNESSEE VALLEY AUTHORITY (01-249C)(Bruggink, J.) :(Judge Sypolt)

Plaintiffs, :PAGES

v. :1 - 274

THE UNITED STATES, :

Defendant. :

-----------------------------------------X

Deposition of Susan Klein

Washington, DC

Wednesday, April 24, 2002

Reported by: Denise Dobner Vickery, RMR, CRR

JOB NO. 144539

# Susan Klein

Page 9

Thereupon,
SUSAN KLEIN
was called for examination, and, after having been duly sworn or affirmed, was examined and testified as follows:
EXAMINATION BY COUNSEL FOR THE PLAINTIFF, COMMONWEALTH EDISON
BY MR. HIRSCH:
Q. Ms. Klein, my name is Norm Hirsch. I'm a lawyer at Jenner & Block in Chicago. I represent Commonwealth Edison Company. I'm going to be asking you some questions today.
If you don't understand a question I've asked, please tell me and I'll try and rephrase it. Otherwise, I'll assume you understood my question.
A. (Nods head).
Q. If you need a break at any point today, please let me know and we'll stop and take a break.
A. (Nods head).
Q. Mr. Zabransky -- I'm sorry.
A. That's okay. You got Zabransky on your brain.
Q. Move from the last deposition.

Page 10

Ms. Klein, are you aware that there's a protective order in the spent nuclear fuel cases?
A. I think there is, yes.
Q. All right. What I'm going to do is I'm going to hand you a copy of the protective order and I'd like you to take a minute to look at it.
A. Okay.
MR. HIRSCH: Mark that as Exhibit 1.
(Thereupon, the reporter marked for identification Deposition Exhibit No. 1.)
THE WITNESS: (Pause). Okay. I don't fully understand it at this point, but I've read through it.
BY MR. HIRSCH:
Q. Okay. Would you generally agree to abide by the terms in the protective order, Ms. Klein?
A. If something is labeled confidential, yes, I will keep it confidential.
Q. Okay. All right. That's fine.
Ms. Klein, I've handed you what's been marked as Klein Deposition Exhibit 1 or I'm handing you that document, which is the notice of deposition that was

Page 11

issued on April 18th for today's Rule 30(b)(6) deposition. And if you look on the exhibit page, you'll see four topics. That's page 5. You see those topics?
A. Yes, I see those topics.
Q. And you understand you're supposed to be the Rule 30(b)(6) designated Department of Energy witness for these four topics?
A. Yes.
Q. What's your current position, Ms. Klein?
A. I'm a senior policy adviser to the Director and Deputy Director of the Office of Civilian Radioactive Waste Management at the Department of Energy.
Q. And how long have you been the senior policy adviser?
A. For about three years.
Q. So, since about 1999?
A. Yes. I was transferred there but detailed back to general counsel for a couple years.
Q. When was your detail back to General Counsel's Office?

Page 12

A. I think it was '97 that I was transferred to RW, but I was detailed back to general counsel to work with the general counsel at the time on any legal issues and then later on it was limited to issues involving this litigation.
Q. Okay. We'll get back to that in a second. But who do you report to as the senior policy adviser?
A. Lake Barrett. Ron Milner and Lake Barrett.
Q. And Mr. Barrett's current title is?
A. Deputy Director of the Office of Civilian Radioactive Waste Management.
Q. And Mr. Milner's title is?
A. He's the COO, the Chief Operating Officer of the Office of Civilian Radioactive Waste Management at DOE.
Q. And is the Office of Civilian Radioactive Waste Management otherwise known by its acronym as OCRWM?
A. OCRWM, yes, and actually with regard to Ron, I think now I just report to Lake. I was reporting to Ron when he was also Acting Deputy, but now that Margaret is here, to just correct the record. I don't