# Defendant

# Susan Klein (vol 2)

Page 275

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
------------------------------------------X
YANKEE ATOMIC ELECTRIC COMPANY :
(98-126C)(Merow, S.J.) :
CONNECTICUT YANKEE ATOMIC POWER COMPANY :
(98-154C)(Merow, S.J.) :
MAINE YANKEE ATOMIC POWER COMPANY :
(98-474C)(Merow, S.J.) :
FLORIDA POWER & LIGHT COMPANY :
(98-483C)(Wilson, J.) :
NORTHERN STATES POWER COMPANY :
(98-484C)(Wiese, J.) :
DUKE POWER, a Division of DUKE ENERGY CORP.:
(98-485C)(Sypolt, J.) :
INDIANA MICHIGAN POWER COMPANY :
(98-486C)(Hodges, J.) :
SACRAMENTO MUNICIPAL UTILITY DISTRICT :
(98-488C)(Yock, S.J.) :
SOUTHERN NUCLEAR OPERATING COMPANY, et al. :
(98-614C)(Merow, S.J.) :
COMMONWEALTH EDISON COMPANY :
(98-621C)(Hewitt, J.) :
BOSTON EDISON COMPANY :
(99-447C) (Allegra, J.) :
GPU NUCLEAR, INCORPORATED :
(00-440C)(Bush, J.) :
WISCONSIN ELECTRIC POWER COMPANY : VOLUME
(00-697C)(Merow, S.J.) : II
POWER AUTHORITY OF THE STATE OF NEW YORK :
(00-703C)(Damich, J.) :
OMAHA PUBLIC POWER DISTRICT :
(01-115C)(Bush, J.) :
NEBRASKA PUBLIC POWER DISTRICT :Discovery
(01-116C)(Sypolt, J.) :Judge:
TENNESSEE VALLEY AUTHORITY :(Judge
(01-249C)(Bruggink, J.) :Sypolt)
Plaintiffs, :PAGES
v. :275 - 533

Page 276

THE UNITED STATES, :
Defendant. :
------------------------------------------X

Deposition of Susan Klein
Washington, DC
Thursday, April 25, 2002

Reported by: Denise Dobner Vickery, RMR, CRR
JOB NO. 144540

Page 277

April 25, 2002
9:54 A.M.

Deposition of Susan Klein, held at the offices of:

Jenner & Block
601 13th Street, NW
12th Floor
Washington, DC 20005

Pursuant to notice, before Denise Dobner Vickery, a Registered Merit Reporter, Notary Public of the District of Columbia.

Page 278

APPEARANCES:

Jenner & Block
For the Plaintiff COMMONWEALTH EDISON
One IBM Plaza
Chicago, IL 60611-7603
(312) 222-9350
BY: Norman M. Hirsch, Esq.

Shaw Pittman Potts & Trowbridge
For the Plaintiffs NORTHERN STATES POWER COMPANY, et al.
1650 Tysons Boulevard
McLean, VA 22102-4859
(703) 770-7962
BY: Alex D. Tomaszczuk, Esq.

Balch & Bingham LLP
For the Plaintiffs SOUTHERN NUCLEAR OPERATING COMPANY, et al.
1275 Pennsylvania Avenue, NW, Tenth Floor
Washington, DC 20004

is the Nuclear Waste Disposal Fund and the other is the Defense Waste Disposal Fund. Some of it is appropriated for the purpose of disposing of defense waste. But we use all that money for the program.

BY MR. TOMASZCZUK:

Q. You testified in response to some of the questions posed by Mr. Hirsch that DOE expected for planning purposes when it begins performance to ramp up to 3,000 MTU rate and stay at that steady state rate for a number of years. Do you recall that testimony?

A. Yes, I do.

Q. And that's reflected in various documents that Mr. Hirsch showed you yesterday and today as well?

A. Yes.

Q. And you used that term planning purposes in your answer?

A. Yes.

Q. That intention of DOE to ramp up to the 3,000 MTU rate, is that being used by DOE for purposes other than planning purposes?

A. No, not that I know of.

Q. Is that 3,000 MTU rate the rate that DOE was



to use to determine if the fees are sufficient?

MS. SULLIVAN: Objection, beyond the scope. Answer if you know.

THE WITNESS: I don't know. I'd have to look at the TSLCC to know.

BY MR. TOMASZCZUK:

Q. Would you do so. If you need to refer to a document to answer the question, that's fine. TSLCC, Number 16.

A. That's the most recent one. I have a few of them here. And would you repeat the question?

MR. TOMASZCZUK: Ms. Reporter, could you read it back.

(Requested material was read.)

THE WITNESS: (Pause). I haven't found it. I'm working on it.

BY MR. TOMASZCZUK:

Q. That's all right. Take your time.

A. It appears from this document that those are the rates that we assumed in determining the cost of the program.

Q. And did you have a page of the document that



you referred to?

A. Well, page 4-14 has the -- actually 4-13 says assumptions about. These are the assumptions on waste acceptance. The table that's on page 4-14. That's what I based my answer on.

Q. All right. Can I just direct your attention also to the letter, which is the third page in Exhibit 16. It's the third page. I think you passed it.

A. Not the iii page you mean. Where is it? There we go.

Q. And you're welcome to read the entire letter. I was going to direct your attention to the third paragraph, first sentence.

A. Okay. I've read the third paragraph, yes.

Q. All right. Could you read the first sentence for me out loud.

A. "The TLSCC analysis provides the basis for assessment of the adequacy of the Nuclear Waste Fund fee as required by the NWPA."

Q. And that's in a letter from Mr. Barrett, right, to the readers?

A. That's correct.



Q. All right. So, DOE is using the 3,000 MTU rate for the purposes of determining adequacy of the fee, correct?

MS. SULLIVAN: Objection, beyond the scope and also the document speaks for itself. You can answer the question.

THE WITNESS: Yes.

BY MR. TOMASZCZUK:

Q. They're using that rate basically to design the facility that they're planning to build at Yucca Mountain; is that right?

A. Yes.

Q. They're using it in any number of documents that we've seen here over the last couple of days, correct?

A. Yes.

Q. Wouldn't it be fair to say, Ms. Klein, that the lower rate that DOE is using, that is, the rate that goes up to 900 MTU and stops there, is being used for one purpose and that is for this litigation?

MS. SULLIVAN: Objection, beyond the scope. You can answer as to your personal opinion.

Page 355

Oh, also to the extent it calls for legal conclusion.

THE WITNESS: That seems to be a legal conclusion, but I'm thinking, though, whether this is only for this litigation. I would say no.

BY MR. TOMASZCZUK:

Q. What other purpose is it using that for?

MS. SULLIVAN: Objection, beyond the scope.

THE WITNESS: We have always thought of the DCSs -- approved DCSs as our legal obligation even before the litigation. So that's why I would say no. But we do use it for purposes of determining our legal obligation and -- yeah.

BY MR. TOMASZCZUK:

Q. Did you want to add to your answer or are you finished?

A. No.

MR. TOMASZCZUK: Ms. Reporter, I'd like to mark as Klein Exhibit 32 a set of documents which were attached to the government's Motion for Summary Judgment on the spent nuclear fuel acceptance rate and these are a series of DCSs -- since you've just

Page 356

referred to DCSs in your answer -- and related correspondence from one of my clients, Duke Energy Corporation.

(Thereupon, the reporter marked for identification Deposition Exhibit No. 32.)

MS. SULLIVAN: I'm sorry. Exhibit?

THE WITNESS: 32.

MR. TOMASZCZUK: 32 I believe.

THE WITNESS: Yes.

BY MR. TOMASZCZUK:

Q. Have you seen any of those pages of that document before today?

A. I've seen some of them, yes.

Q. Okay. And it appears to reflect as I represented, a series of DCS forms and letters back from the DOE to Duke, correct?

A. Yes.

Q. Can I direct your attention, Ms. Klein, to the DCS which has the page number Bates number 0297 at the bottom. It's about I guess --

A. I have it.

Q. -- five, six pages back.

Page 357

A. I have it.

Q. All right. And this appears to be a DCS form and in Section 4.0 the "Approved" box is checked, correct, at the bottom of the page?

A. Yes, it is.

Q. And do you know whether that's Mr. Zabransky's signature?

A. It kind of looks like it. It is hard to tell, but I think that he was the person to sign that during -- what year was this? 199 -- when was this?

Q. This looks like 1995.

A. '5. Yes.

Q. Can I direct your attention about a third of the way down.

A. Yes.

Q. And you see there's two asterisks on the right-hand side of the page with some text which follows?

A. Yes, I do.

Q. All right. And can you read that for me, that text?

A. "The proposed delivery date is dependent upon

Page 358

the existence of an operational repository or an interim storage facility constructed under the" -- and I assume it says "Act." I can't read it and I assume it means the Nuclear Waste Policy Act.

Q. Do you know the source of that notation on this page?

A. No, I don't.

Q. Do you know whether you drafted that notation?

A. I did not. I don't remember drafting that notation.

Q. Do you know whether somebody within OCRWM drafted it?

A. No, I don't know.

Q. Do you know whether someone within the DOE Office of General Counsel drafted it?

A. No, I don't. I don't remember this being done, actually. I'm not saying it wasn't directed by the Office of General Counsel. It could have been, but I don't remember.

Q. You don't recall any discussions with anyone at OCRWM concerning the insertion of this notation on this DCS?

# Plaintiff

# Susan Klein (vol 2)



rate specified in the ACR or the APR for that time period.

BY MR. TOMASZCZUK:

Q. Well, I think the rate issue is dealt with in Interrogatory number 93, if I understand it. I was asking you about 92.

A. Oh, sorry. I'm sorry. DOE does not contend that it has no obligation.

MS. SULLIVAN: Could I ask the reporter to read the pending question back again, please.

(Requested material was read.)

MS. SULLIVAN: Objection, the document speaks for itself. Objection, beyond the scope. You can answer the question. But I would direct the witness not to testify as to any attorney-client communications regarding the preparation of this Interrogatory response.

THE WITNESS: I'm going to ask you to repeat the question one more time. I'm sorry.

(Requested material was read.)

THE WITNESS: That's not what it says. It says we -- we have not made that contention that it



has no obligation, but I don't know that we have ever said that we have that obligation as a department beyond the 10-year period.

BY MR. TOMASZCZUK:

Q. Well, I commend you for dancing on that high wire, but maybe you can just tell me what this answer is communicating to me because, frankly, I don't understand it.

MS. SULLIVAN: Objection.

BY MR. TOMASZCZUK:

Q. What is DOE's position with respect to its obligation to accept spent nuclear fuel from purchasers beyond the 10 years of allocations addressed in the ACR? Can you explain that to me what is DOE's position because I don't understand it in this answer.

MS. SULLIVAN: Objection, the document speaks for itself. Objection to the extent it calls for a legal conclusion. Objection, it's beyond the scope. You can answer the question.

And I would note for the record that to the extent the utility plaintiffs have questions about these Interrogatories, a proper vehicle would be a



letter, perhaps a motion with the court, but Ms. Klein is here to testify as to her personal knowledge. If she can.

THE WITNESS: I don't know that the DOE has at this time a position on that.

BY MR. TOMASZCZUK:

Q. Do you have a position?

A. I do.

Q. Can you tell me what it is?

A. My own personal position? Yes.

Q. Yes?

A. Yes, we have an obligation.

MR. TOMASZCZUK: Ms. Klein, I don't have any further questions at this time.

I am going to adjourn your deposition because there are some pending issues with respect to the government's privilege log and documents contained thereon. There were also some instructions not to answer both from questions posed by Mr. Hirsch as well as some questions posed by me, and we're going to reserve the right to look at that and potentially call you back.



And subject to that reservation of rights to bring you back, I'm going to adjourn. I want to thank you for your time and participation. It's a pleasure meeting you.

Are you all going to have questions?

MS. SULLIVAN: No.

(Recess, 12:37 to 1:36 p.m.)

(Mr. Tomaszczuk not present.)

AFTERNOON SESSION

EXAMINATION BY COUNSEL FOR THE PLAINTIFFS, SOUTHERN NUCLEAR OPERATING COMPANY, ET AL.

BY MS. REMINGTON:

Q. Good afternoon. My name is Kristi Remington and I represent the Southern Company, and as my colleagues have instructed you earlier --

A. I'm sorry. I can't hear you.

Q. It's one of my problems. If you can't hear me, please let me know. I don't always talk loud enough.

A. Okay.

Q. If you don't understand any of my questions, please ask me to restate and I will. It's just so we

# Plaintiff

Page 435

contract?
A. I believe in this process, which we call the ACR resolution process, utilities raised issues and the department addressed them. I don't know what all the issues were. That could have been one of them, and in that case we would have looked at it, but other than that I don't know. Maybe we did look at it in that context. As a request from a utility company.
Q. Sitting here today, do you recall DOE considering changing the definition of high-level waste?
A. No, I do not recall.
Q. Is the Federal government responsible for disposing of greater than Class C waste?
A. Yes, it is.
Q. Would you look at the definition of high-level waste in the standard contract, Exhibit 38, specifically I'd ask you to turn to page 589.
A. Yes.
Q. Number 12. The term high-level waste means?
A. Uh-huh.
Q. You see there under B it states: "Other

Page 436

highly radioactive material that the Commission, consistent with existing law, determines by rule requires permanent isolation."
A. Uh-huh.
Q. You see that?
A. Yes, I do.
Q. Do you know why that was put in the standard contract?
A. It's in the statute. I believe comes directly from the Nuclear Waste Policy Act.
Q. And does this provision leave the Nuclear Regulatory Commission the decision whether to determine if material requires permanent isolation such that it's covered by the standard contract?
MS. SULLIVAN: Objection to the extent it calls for a legal conclusion. Objection, the document speaks for itself. Objection, vague. You can answer if you know.
THE WITNESS: Well, I think it gives -- they have to determine that it's other highly radioactive material and determine by rule that it requires permanent isolation. And there is another

Page 437

way. Congress could legislate that we would put GTCC in repository or give us authority either by NRC rule or by legislation. There are -- those are the two methods that I see that it could become included under the standard contract.
BY MR. MACDONALD:
Q. If the NRC determines that material requires permanent isolation, is it covered by the standard contract?
MS. SULLIVAN: Objection to the extent it calls for legal conclusion.
THE WITNESS: I would say they have to find that it's other highly radioactive material and determined by rule that it requires permanent isolation.
BY MR. MACDONALD:
Q. What do you understand the term other highly radioactive material to mean?
MS. SULLIVAN: Objection, document speaks for itself. Objection to the extent it calls for a legal conclusion.
THE WITNESS: I just know from reading the

Page 438

rulemaking that NRC did several years ago, had an advanced notice of proposed rulemaking and then a proposed and then a final that it had a very difficult time finding that this was highly radioactive.
BY MR. MACDONALD:
Q. Finding that?
A. That GTCC was always highly radioactive. That was one of the things they discussed in the preamble.
Q. When you said they had a very difficult time finding that GTCC was always highly radioactive, could some GTCC be highly radioactive?
A. I believe that's true. I believe some is highly radioactive.
Q. Do you understand the term other highly radioactive material to have a formal definition?
A. I don't --
MS. SULLIVAN: Objection to the extent it calls for a legal conclusion.
THE WITNESS: I don't know. I don't know of one.
BY MR. MACDONALD:

# Defendant

# Susan Klein (vol 2)

Page 435

contract?

A. I believe in this process, which we call the ACR resolution process, utilities raised issues and the department addressed them. I don't know what all the issues were. That could have been one of them, and in that case we would have looked at it, but other than that I don't know. Maybe we did look at it in that context. As a request from a utility company.

Q. Sitting here today, do you recall DOE considering changing the definition of high-level waste?

A. No, I do not recall.

Q. Is the Federal government responsible for disposing of greater than Class C waste?

A. Yes, it is.

Q. Would you look at the definition of high-level waste in the standard contract, Exhibit 38, specifically I'd ask you to turn to page 589.

A. Yes.

Q. Number 12. The term high-level waste means?

A. Uh-huh.

Q. You see there under B it states: "Other

Page 436

highly radioactive material that the Commission, consistent with existing law, determines by rule requires permanent isolation."

A. Uh-huh.

Q. You see that?

A. Yes, I do.

Q. Do you know why that was put in the standard contract?

A. It's in the statute. I believe comes directly from the Nuclear Waste Policy Act.

Q. And does this provision leave the Nuclear Regulatory Commission the decision whether to determine if material requires permanent isolation such that it's covered by the standard contract?

MS. SULLIVAN: Objection to the extent it calls for a legal conclusion. Objection, the document speaks for itself. Objection, vague. You can answer if you know.

THE WITNESS: Well, I think it gives -- they have to determine that it's other highly radioactive material and determine by rule that it requires permanent isolation. And there is another

Page 437

way. Congress could legislate that we would put GTCC in repository or give us authority either by NRC rule or by legislation. There are -- those are the two methods that I see that it could become included under the standard contract.

BY MR. MACDONALD:

Q. If the NRC determines that material requires permanent isolation, is it covered by the standard contract?

MS. SULLIVAN: Objection to the extent it calls for legal conclusion.

THE WITNESS: I would say they have to find that it's other highly radioactive material and determined by rule that it requires permanent isolation.

BY MR. MACDONALD:

Q. What do you understand the term other highly radioactive material to mean?

MS. SULLIVAN: Objection, document speaks for itself. Objection to the extent it calls for a legal conclusion.

THE WITNESS: I just know from reading the

Page 438

rulemaking that NRC did several years ago, had an advanced notice of proposed rulemaking and then a proposed and then a final that it had a very difficult time finding that this was highly radioactive.

BY MR. MACDONALD:

Q. Finding that?

A. That GTCC was always highly radioactive. That was one of the things they discussed in the preamble.

Q. When you said they had a very difficult time finding that GTCC was always highly radioactive, could some GTCC be highly radioactive?

A. I believe that's true. I believe some is highly radioactive.

Q. Do you understand the term other highly radioactive material to have a formal definition?

A. I don't --

MS. SULLIVAN: Objection to the extent it calls for a legal conclusion.

THE WITNESS: I don't know. I don't know of one.

BY MR. MACDONALD:

# Plaintiff

Q. Do you know if DOE has ever formulated a position as to whether there's a formal definition for the term other highly radioactive material?

A. I don't believe we have.

Q. What does the phrase requires permanent isolation mean?

MS. SULLIVAN: Objection to the extent it calls for legal conclusion. Objection, document speaks for itself.

THE WITNESS: That's a good question. It's a very good question. I think it's pretty vague. I don't know. It would be for NRC to determine in our rulemaking.

BY MR. MACDONALD:

Q. Would disposal in a permanent repository constitute -- strike that.

Would disposal in a deep geologic repository constitute permanent isolation?

MS. SULLIVAN: Objection, vague. Objection to the extent it calls for legal conclusion.

THE WITNESS: Even if it would, it doesn't say that NRC has determined that it requires it. But I



would say if you put it in a repository and we're going to leave -- one of our plans is to leave ours open for 300 years, I guess after 300 years hopefully it's permanent isolation. But the requirement is they have to determine by rule that it requires permanent isolation. So that to me is different than saying if you put it in the repository. That doesn't mean that NRC has determined that it's required. But it is -- that's all.

BY MR. MACDONALD:

Q. I'm not sure that that exactly answered my question.

A. Okay. Ask it again, please.

Q. Would disposal constitute -- strike that.

Would disposal in a deep geologic repository constitute permanent isolation, in your view?

MS. SULLIVAN: Objection, vague.

THE WITNESS: I guess so, yeah. I would hope it would be isolated and it wouldn't leak out.

MR. MACDONALD: I'd like to mark as Exhibit 40.

(Thereupon, the reporter marked for



identification Deposition Exhibit No. 40.)

BY MR. MACDONALD:

Q. Ms. Klein, I've had marked as Exhibit 40 a document with a Bates label DF-101718 and at the top it's entitled "Draft DOE Position on the Acceptance of Nonfuel Assembly Hardware Under the 10 CFR 961 Standard Contract." Do you have that before you?

A. Yes, I do.

Q. If I could direct your attention to the third bullet point.

A. Yes.

Q. Which states: "Some of the NFA hardware is not GTCC and thus may qualify for shallow land burial and some will be GTCC waste. However, as it now stands, DOE appears to be obligated to accept all such wastes under the Standard Contract, regardless of radiological classification."

A. I see that, yes.

Q. Do you agree that some of the NFA hardware will be GTCC waste?

A. First of all --

MS. SULLIVAN: Objection, vague.



THE WITNESS: I just want to point out, I believe this was written by a contractor JAI. This is not a DOE document that I'm aware of. May qualify for shallow land burial. Would you ask the question again. I'm sorry.

BY MR. MACDONALD:

Q. Would you agree with the statement that some NFA hardware will be GTCC waste?

A. If it falls under the definition in the standard contract. I would say it is not GTCC waste as far as the definition that the NRC and DOE would use. Even though it might have radionuclide concentrations above Class C. It would be spent fuel under the definition in this contract if it falls under that definition.

Q. Despite the fact that it would also be considered GTCC correct?

A. Well, I would say it couldn't be both, but it's not low-level waste. So that exceeds the concentrations in the NRC regs. It would be spent fuel. So it couldn't be low-level waste. And now we're talking definitional issues here. But the

# Plaintiff

# Susan Klein (vol 2)

Page 447

but I believe that Barnwell, South Carolina. It's a licensed facility. It might be licensed under the state. I'm not sure, but they get their authority through the Commission and they have GTCC buried in Barnwell, South Carolina I believe.

Q. Is it your testimony that the NRC has licensed DOE to dispose of GTCC somewhere other than a deep geologic repository?

A. No, not DOE. NRC doesn't license us to dispose of GTCC. I'm sorry. Barnwell is a commercial facility.

Q. Is DOE authorized to dispose of GTCC waste anywhere other than a deep geologic repository?

MS. SULLIVAN: Objection, beyond the scope. You can answer.

THE WITNESS: DOE presently isn't authorized to dispose of it in any place but a licensed facility and we have no licensed facility, but if we sought a license for other than a deep geologic repository, I believe the Commission would entertain it. But we don't have. We have not sought such a license and they have not yet entertained it. So I

Page 448

don't know.

BY MR. MACDONALD:

Q. Do you know if DOE is considering a proposal to the NRC to dispose of GTCC somewhere other than Yucca Mountain?

A. Not at this time.

Q. If you take a look at Klein Exhibit 40, which you may still have before you. That's the draft letter, the draft position from JAI.

A. Yes.

Q. I would direct your attention to the second bullet point, which states that: "The regulations of the Nuclear Regulatory Commission issued subsequent to the Standard Contract, require that low-level radioactive wastes that contain concentrations of radionuclides that exceed the limits for Class C waste as defined in 10 CFR 61.55 must be disposed of in a repository." Do you see that?

A. I see that sentence, yes.

Q. And you'd agree with that statement, correct?

A. No, I would not agree with that statement.

Q. What aspect of that statement would you

Page 449

disagree with?

A. I think that it requires further words. It requires, unless the Commission approves alternative disposal methods.

Q. Would that be the next sentence, which states: "It is noted that the regulations do not preclude the possibility of disposal of such greater than Class C wastes in other ways so long as such disposal is approved by NRC."

A. If I had this for review and I was in General Counsel, I would not permit those two sentences to be that way and stand alone. I would say one conditions the other and the first stand-alone sentence is not accurate by itself.

Q. And the first sentence is not accurate because if the NRC approves of disposal other than geologic repository?

A. Uh-huh.

Q. GTCC waste could be disposed --

A. Uh-huh.

Q. -- in that other place?

A. That's correct.

Page 450

Q. And as of yet, the NRC has not approved of an another place, correct?

A. That is correct.

MR. MACDONALD: Exhibit 41.

(Thereupon, the reporter marked for identification Deposition Exhibit No. 41.)

BY MR. MACDONALD:

Q. Mrs. Klein, I've had marked as Exhibit 41 a document with Bates range CTR-001-1510 through 1552 entitled "Proposed Contract Changes Revision 0 April 13, 1992." Do you have that document before you?

A. Yes, I do.

Q. If I could direct your attention to the fourth page of the document. Bates number 1513.

A. Yes.

Q. And if you would take a look at the numbered paragraph 12, specifically the 4 stars and the word change that states: For purposes of this contract delete "(b) other highly radioactive material that the Commission, consistent with existing law, determines by rule requires permanent isolation." Do you see that?

A. Yes, I do.

# Defendant

# Susan Klein (vol 2)

Page 487

to.

MS. POWELL: Object, the document speaks for itself, but...

THE WITNESS: I don't know what it's referring to.

BY MR. MACDONALD:

Q. Do you have any idea what the document is referring to when it states that "The standard contract mandates acceptance of a small portion of GTCC" waste?

MS. POWELL: Same objection?

THE WITNESS: My guess -- it's only my guess -- it's a misinterpretation of the nonfuel bearing components part of our definition of spent nuclear fuel, but that's the only thing I could guess that they mean by that. But it's a misinterpretation.

BY MR. MACDONALD:

Q. And this you're suggesting is a misinterpretation as of 1996?

A. Oh, yes. I would say as of -- yeah, because it's spent -- because the standard contract has never called for accepting any portion of GTCC LLW. Only spent fuel and high-level waste.

Page 488

Q. Even though this appears to be a document produced by the Yucca Mountain project that states that the standard contract mandates that the waste management system accept a small portion of GTCC waste?

MS. POWELL: I'm going to object. I don't think that's what Ms. Klein testified it appeared, but you can answer.

THE WITNESS: That's correct. It just says YMP and I would say that it says not for public distribution. I think somebody made a determination that they weren't comfortable with what's in here. They didn't want the public to see it. So I don't know whether they think the whole thing is inappropriate or a particular sentence is or what. But this is clearly not a position paper of anybody. Because it's a working draft, not for public distribution.

BY MR. MACDONALD:

Q. Ms. Klein, if I can also now refer you to page -- the same page we're on, page 10 of Exhibit 45. In the Background section about five or six lines down, there is the statement: "In May 1989, the NRC ruled

Page 489

that GTCC low-level waste must be disposed of in a deep geologic repository, unless disposal elsewhere has been approved by the NRC." Do you see where I'm reading?

A. Yes, I do.

Q. And we discussed this concept a little while ago. Is this a better formulation, one that you would agree with?

A. Well, I don't remember the date of the rule. So, but the NRC ruled that GTCC low-level waste, unless disposal elsewhere has been approved by the NRC. That sounds correct to me.

Q. The statement sounds correct?

A. Yes.

Q. Setting aside whether or not the date was actually May of 1989 but that the NRC ruled that GTCC low-level waste must be disposed of in a deep geologic repository, unless disposal elsewhere has been approved by the NRC, correct?

A. Yes.

Q. And I believe you already testified to this, but I just wanted to make sure I understood. DOE -- strike that.

Page 490

NRC has not approved of disposal anywhere other than the repository as of today; is that correct?

A. Well, has not approved of the department disposal anywhere. Any commercial, yes. As I said before, I think in Barnwell, South Carolina there's some disposal of greater than Class C waste in a shallow land burial and that is a licensed facility, but other than that I'm not aware of anything.

Q. Let me rephrase my question.

A. Okay.

Q. Because I keep mixing up. I'm not asking my question clearly enough. So I apologize for that. As of today April 2002, the NRC has not approved of DOE disposing any commercial GTCC anywhere other than a repository, correct?

A. Yes, but they also haven't approved it in a repository either. But yes, that's correct.

Q. They haven't approved of it anywhere period?

A. Period. This is true.

Q. Although they have published a rule requiring DOE to dispose of GTCC -- commercial GTCC at the repository unless they approve of another location?

Page 491

A. I hate to be a stickler here, but I wouldn't quite word it that way.
Q. I'm sorry. How would you word it?
A. I'm sorry. Well, first of all, I don't believe they mentioned DOE in their rule per se, but they just have a rule for what's required to dispose of GTCC and they said they must be -- if it's to be disposed of, it's to be disposed of in deep geologic repository. Or an alternative approved by the Commission, but they don't say the repository. To me that means something because we do not have authority right now to put it in the repository. The one that we're looking at right now, and that would require some other action. We do not have authority to put it in there now. I don't think there's any question about that.
Q. There isn't any -- there isn't a repository right now?
A. That's correct. That's true.
Q. And DOE has not made any proposal to the NRC for disposing of commercial GTCC anywhere other than the repository?

Page 492

A. That's true. They also haven't proposed to put it in a repository either, yes.
Q. But you're aware of studies suggesting -- DOE studies suggesting that the most economical place to put commercial GTCC is in the repository?
A. I can't cite you to any studies, but that's an understanding I have from conversations with people that it could be economical to put it in the repository when we are authorized to do that.
Q. And it would be difficult to get -- to site another repository for disposal of GTCC, correct?
A. Yes, that is correct.
(Discussion off the record.)
MR. MACDONALD: 46.
(Thereupon, the reporter marked for identification Deposition Exhibit No. 46.)
BY MR. MACDONALD:
Q. Ms. Klein, I've had marked as Exhibit 46 a document entitled "Teleconference Call Summary." It is Bates page SNL-001-0227 and it refers to a teleconference call held on June 22, 1999. Do you have that before you?

Page 493

A. Yes, I do.
Q. Please take a minute to review that document and let me know when you've had a chance to review it.
A. I've read it.
Q. Could you identify -- well, first, the document lists several people participating in the telephone conference call, including Mary Jane Wisenbaker, Rob Campbell, Joe Coleman, Larry Ball, Mark Frei, F-r-e-i, Greg Duggan, Sandy Birk and Bob Hanson. Do you know -- we've already spoken about Mr. Campbell. Do you know the other people listed as being on this conference call?
A. I know Joe Coleman and I know Mark Frei and I believe I have spoken to Mary Jane Wisenbaker.
Q. Could you tell me who first Ms. Wisenbaker is?
A. I believe she works for EM. I think most of these people work for the Environmental Management group in DOE. But I can't remember. I have spoken to Mary Jane, but I can't remember. I told you who Rob Campbell is.
Q. When you say EM, you're referring to?
A. It's within --

Page 494

Q. Environmental --
A. It's within the Department of Energy and it's called Environmental Management. We call it Environmental Management. I think it's a longer name. It's in charge of the cleanup of DOE facilities, and they also have historically been in charge of the low-level waste programs.
Q. And Mark Frei you said?
A. Mark Frei.
Q. You said is who?
A. He's in the Environmental Management group.
Q. Have you spoken with him before?
A. Yes.
Q. On what issues have you spoken with Mr. Frei about?
A. I don't know if I've actually spoken to him about this issue. Mostly I have seen him in the hall and said hello and talked to him about his transfer and where he -- I mean, I don't remember discussing anything substantive with him in years. He used to be in my Office of Civilian Office Radioactive Waste Management.

# Plaintiff

# Susan Klein (vol 2)

Page 491

A. I hate to be a stickler here, but I wouldn't quite word it that way.

Q. I'm sorry. How would you word it?

A. I'm sorry. Well, first of all, I don't believe they mentioned DOE in their rule per se, but they just have a rule for what's required to dispose of GTCC and they said they must be -- if it's to be disposed of, it's to be disposed of in deep geologic repository. Or an alternative approved by the Commission, but they don't say the repository. To me that means something because we do not have authority right now to put it in the repository. The one that we're looking at right now, and that would require some other action. We do not have authority to put it in there now. I don't think there's any question about that.

Q. There isn't any -- there isn't a repository right now?

A. That's correct. That's true.

Q. And DOE has not made any proposal to the NRC for disposing of commercial GTCC anywhere other than the repository?

Page 492

A. That's true. They also haven't proposed to put it in a repository either, yes.

Q. But you're aware of studies suggesting -- DOE studies suggesting that the most economical place to put commercial GTCC is in the repository?

A. I can't cite you to any studies, but that's an understanding I have from conversations with people that it could be economical to put it in the repository when we are authorized to do that.

Q. And it would be difficult to get -- to site another repository for disposal of GTCC, correct?

A. Yes, that is correct.

(Discussion off the record.)

MR. MACDONALD: 46.

(Thereupon, the reporter marked for identification Deposition Exhibit No. 46.)

BY MR. MACDONALD:

Q. Ms. Klein, I've had marked as Exhibit 46 a document entitled "Teleconference Call Summary." It is Bates page SNL-001-0227 and it refers to a teleconference call held on June 22, 1999. Do you have that before you?

Page 493

A. Yes, I do.

Q. Please take a minute to review that document and let me know when you've had a chance to review it.

A. I've read it.

Q. Could you identify -- well, first, the document lists several people participating in the telephone conference call, including Mary Jane Wisenbaker, Rob Campbell, Joe Coleman, Larry Ball, Mark Frei, F-r-e-i, Greg Duggan, Sandy Birk and Bob Hanson. Do you know -- we've already spoken about Mr. Campbell. Do you know the other people listed as being on this conference call?

A. I know Joe Coleman and I know Mark Frei and I believe I have spoken to Mary Jane Wisenbaker.

Q. Could you tell me who first Ms. Wisenbaker is?

A. I believe she works for EM. I think most of these people work for the Environmental Management group in DOE. But I can't remember. I have spoken to Mary Jane, but I can't remember. I told you who Rob Campbell is.

Q. When you say EM, you're referring to?

A. It's within --

Page 494

Q. Environmental --

A. It's within the Department of Energy and it's called Environmental Management. We call it Environmental Management. I think it's a longer name. It's in charge of the cleanup of DOE facilities, and they also have historically been in charge of the low-level waste programs.

Q. And Mark Frei you said?

A. Mark Frei.

Q. You said is who?

A. He's in the Environmental Management group.

Q. Have you spoken with him before?

A. Yes.

Q. On what issues have you spoken with Mr. Frei about?

A. I don't know if I've actually spoken to him about this issue. Mostly I have seen him in the hall and said hello and talked to him about his transfer and where he -- I mean, I don't remember discussing anything substantive with him in years. He used to be in my Office of Civilian Office Radioactive Waste Management.

Q. Mr. Frei used to work in OCRWM?
A. Yes.
Q. Do you know when he transferred to DOE's Environmental Management?
A. No, I don't know.
Q. You've identified Ms. Wisenbaker, Mr. Campbell, Mr. Frei. Is there anyone else on that list?
A. I know Joe Coleman. He used to be head of the low-level waste program when I was their lawyer. I don't know whether he still works for DOE. He could be a contractor now. I don't know. I haven't talked to him in years.
Q. Any of the other people?
A. I don't know the other names, no.
Q. And we were just talking about the difficulty in siting another repository for disposal of GTCC waste. Do you remember our discussion just a few minutes ago?
A. Yes, I do.
Q. If you look down at the bullets, the fourth bullet on Exhibit 46 states that: "Options other than



the repository are considered politically undesirable in light of overall DOE waste management objectives." Do you see that?
A. I do see that, yes.
Q. Is that consistent with your view in your prior testimony that we just talked about?
A. Well, I would say this is EM's view as I understand EM's view to be. It has at times been RW's view. I don't know that it's RW's view right now, but...
Q. Do you have any reason to disagree with this statement?
A. Well, as you stated, it would be difficult to site another disposal facility for greater than Class C. So, politically undesirable. Those aren't words that I like to use. But it would be difficult. I think that's fair to say.
Q. It would be difficult to --
A. Site a greater than.
Q. -- site a greater than Class C repository?
A. Uh-huh. It would be difficult.
Q. The bullet point just above the one we're



talking about states: "Mark Frei indicated that there is an understanding between GCRW and EM that GTCC waste will go to the repository." Do you see where I'm reading?
A. I do.
Q. RW obviously refers to the Office of Civilian -- OCRWM?
A. Yes.
Q. The Office of Civilian Radioactive Waste Management?
A. That's correct.
Q. EM is DOE's Environmental Management?
A. That's correct.
Q. And GC. Do you know what that refers to?
A. General Counsel.
Q. Do you know whether there is an understanding between the General Counsel's Office, RW and EM that GTCC waste will go to the repository? Is that your understanding?
A. I think there's an understanding that if we were required to do so, authorized to do so and there was a method to pay for it, we would do that, but



there's no written understanding that I'm aware of.
Q. When you say that "we were required to do so," what do you mean?
A. If Congress passed a law and said take GTCC in the repository, we wouldn't necessarily object to that legislation, for example. We would not object to that legislation as long as there was a way for generators to pay for it.
Q. It wouldn't require a Congressional statute to have GTCC go to the repository, would it?
A. Either that or NRC by rule under those particular terms. I think it's either a NRC rule or a statute, and I personally think it will eventually be a statute, but I think it will be legislation.
Q. And do you know if RW, EM and the General Counsel's Office all have an understanding that there will either be a statute or a NRC rule that GTCC will go to the repository?
A. Well, I think at the levels and the people that I spoke to, yes. I don't know if you asked somebody in the staff. I don't know how educated they are to the issue.

Page 499

Q. At the high-level --
A. Yes, I think.
Q. -- policy level, all three branches, General Counsel, OCRWM and EM have an understanding that GTCC waste will ultimately go to the repository?
A. If it's authorized. If, but that it first must be authorized.
Q. And do all three branches believe that it will be authorized?
A. Well, I don't know whether each individual believes, but I believe that we will need new legislation after the site is designated, and we have a whole series of issues that need to be resolved by legislation and that will be on the list. So it's one of many. I think that it will -- if the site is designated, I think we'll get legislation that will take care of other cats and dogs.
Q. Among the cats and dogs would be the disposal of GTCC waste in the repository?
A. Yes.
Q. At the bottom of Exhibit 46, there's a handwritten notation, "Keep generic per Millington."

Page 500

That's what it looks like to me.
A. That's what it looks like to me, too.
Q. Do you know who Millington is?
A. Well, this looks like an EM document and I don't know anyone in EM named Millington. There is a woman at Yucca Mountain named Mellington, but -- so I don't know.
MR. MACDONALD: 47.
(Thereupon, the reporter marked for identification Deposition Exhibit No. 47.)
BY MR. MACDONALD:
Q. Ms. Klein, I've had marked as Exhibit 47 a document entitled "Issue Paper, Maine Yankee Request for DOE to Observe Loading of GTCC Waste." The Bates number on the bottom of this document is difficult to follow, but it at least is SFEE 110701. Do you have that document before you?
A. I do.
Q. Please take as much time as you need to look at the document, but I'm going to ask you about page 2 of this document.
A. Okay. (Pause). Okay. I have read it.

Page 501

Q. Ms. Klein, I'd like to direct your attention to page 2 of Exhibit 47. Specifically under the heading DOE's Obligation.
A. Yes.
Q. And the second sentence states: "In the February 1987 report to Congress required by Public Law 99-240, DOE committed to providing acceptance and storage of GTCC waste prior to disposal being available. By 1989 DOE has failed to provide the acceptance and storage of this waste per our commitment to Congress and DOE has not lived up to its responsibilities under Public Law 99-240." Do you see where I'm reading?
A. I do.
Q. Do you know -- first, is this -- do you know whether this February 1987 report to Congress required by Public Law 99-240 is the report that you mentioned earlier in your testimony today?
A. Yes, I believe it is.
Q. And as I recall, you reviewed that report sometime either when it came out in February of 1987; is that correct?

Page 502

A. I reviewed it in draft before it was submitted to Congress and I've looked at it since. I've reviewed it since several times.
Q. And do you recollect that in that report, which you looked at in draft form and subsequently in final form, that DOE committed to providing acceptance and storage of GTCC waste by 1989?
A. I wouldn't characterize it as DOE committed to providing acceptance and storage, but we did say that we would provide for -- I don't remember the exact word. I'd have to look at it. We implied that we would do something sooner on storage and that we were -- and, well, in the meantime -- we were working on the disposal issue, but in the meantime we would be coming up with a plan for storage.
Q. And why would you not use the word committed?
A. It was in a report to Congress as DOE's intention at the time, not a plan. It wasn't a commitment of. It depends. Legally I wouldn't use the word committed. But we did tell Congress that we planned to do that.
Q. And when you say that, you mean provide

# Plaintiff

MR. MACDONALD: Exhibit 49.
(Thereupon, the reporter marked for identification Deposition Exhibit No. 49.)
(Discussion off the record.)
THE WITNESS: I don't know where it is. Do you? Somewhere in here we say.
BY MR. MACDONALD:
Q. If it will help, if it gets us out of here earlier, I will refer you to page 0005 at the bottom, which I believe is the fifth page of the document on the left-hand column, the first full paragraph. And this is referring to Exhibit 49 for the record, the April 18, 1983 Federal Register Notice Publication of the final version of the standard contract.
A. Okay. I have read it. It does say, "This type of priority is necessary to prevent reactors from waiting 20 to 30 years to be decommissioned after they finish generating electricity." You have a question that I'm supposed to be answering? I'm sorry. I forgot where we were.
Q. I believe you were previously testifying that -- strike that.



My question is: Was the reason this provision was included, the priority shutdown provision, that is because it was necessary to prevent reactors from waiting 20 or 30 years to be decommissioned?
A. Yes.
Q. And DOE included this provision despite the fact that four commenters recommended the deletion of the provision?
A. Yes, that's correct.
Q. And as you explained I believe earlier, acceptance of fuel from a shutdown reactor would allow that reactor to go to green fields I believe is the word that you used; is that correct?
A. Yes, it would. In most cases, it would allow them to go to green fields, yes.
Q. If DOE had begun accepting fuel in 1998 at a 3,000 MTU rate or a ramp-up, a reasonable ramp-up to a 3,000 MTU rate, do you have an opinion as to whether DOE could have given priority to shutdown reactors without harming or prejudicing the rights of operating utilities.



MS. POWELL: Object to beyond the scope, but you can answer.
THE WITNESS: It could have given. I think that would be policy considerations that would be looked at, but it would make it certainly --
BY MR. MACDONALD:
Q. Would have made it easier?
A. Much easier, yes.
(Discussion off the record.)
(Thereupon, the reporter marked for identification Deposition Exhibit No. 50.)
BY MR. MACDONALD:
Q. Ms. Klein, I've just marked -- had marked for you Exhibit 50, which is a memo dated June 28, 1991 from P. N. McDuffie and S. A. Vance to D. C. Langstaff and A. B. Brownstein. Do you have that there before you?
A. Yes, I do.
Q. I believe we discussed earlier Mr. Vance, Scott Vance, who you know; is that right?
A. That's correct.
Q. And Mr. A. B. Brownstein is Alan Brownstein;



is that right?
A. Yes.
Q. And you are familiar with Mr. Brownstein?
A. Yes, I am.
Q. And D. C. Langstaff, is that Dave Langstaff?
A. I don't know D. C. Langstaff.
Q. You don't know D. C. Langstaff?
A. I have no idea.
Q. But Mr. Brownstein works -- currently works for OCRWM; is that correct?
A. That's correct.
Q. And he worked for OCRWM in 1991; is that correct?
A. Yes.
Q. To the best of your knowledge?
A. Yes. Sorry.
Q. The subject of this memo is "Recommended DOE positions on 17 contract implementation issues"?
A. Yes.
Q. Please look at as much -- look at as much of the document as you need to, but I'm going to ask you questions about page 5. The first issue at the top of

ESQUIRE DEPOSITION SERVICES
1020 19TH STREET, NORTHWEST
SUITE 620
WASHINGTON, D.C. 20036

ERRATA SHEET

Case Name: Yankee Atomic Electric Co., et al. V. The United States

Witness Name: Susan Klein

Deposition Date: April 24, 2002 4/25/02

Job No.: 144539

| Page No. | Line No. | Change from | to |
|---|---|---|---|
| 14 | 17 | general counsel | general law |
| 17 | 2 | Shamora | Shimamura |
| 19 | 17 | assessment was | assessment, which was |
| 21 | 21 | that | so was |
| 23 | 13 | on | in |
| 29 | 21 | I know | No |
| 32 | 15 | I think was | I think, to. |
| 34 | 14 | now else | else now |
| 36 | 2 | alyssa | Elissa |
| 36 | 7 | Alyssa | Elissa |
| 38 | 10 | Alyssa | Elissa |
| 39 | 2 | that | if that |
| 39 | 16 | Olson | Olsen |
| 49 | 7 | privilege | privileged |
| 54 | 19 | cue | queue |

Signature [illegible] Date 5-17-02

ESQUIRE DEPOSITION SERVICES
1020 19TH STREET, NORTHWEST
SUITE 620
WASHINGTON, D.C. 20036

ERRATA SHEET

Case Name: Yankee Atomic Electric Co., et al. V. The United States
Witness Name: Susan Klein
Deposition Date: April 24, 2002
Job No.: 144539 4/25/02

| Page No. | Line No. | Change from | to |
|---|---|---|---|
| 58 | 22 | for | for a |
| 69 | 14 | in | at |
| 77 | 8 | elective | collective |
| 86 | 16 | Bentham | Bernatheim |
| 86 | 22 | " | " |
| 88 | 5 | time from the | time from? They |
| 88 | 20 | was | worked |
| 92 | 17 | Mark | Marc |
| 93 | 5 | " | " |
| 93 | 22 | " | " |
| 97 | 1 | as | at |
| 110 | 20 | reaction is yes | reaction, yes |
| 117 | 4 | Pardi | Pardon |
| 118 | 17 | Calendar | Calendar year |
| 119 | 1 | to be put | to put |

Signature Susan Klein Date 5-23-02

ESQUIRE DEPOSITION SERVICES
1020 19TH STREET, NORTHWEST
SUITE 620
WASHINGTON, D.C. 20036

ERRATA SHEET

Case Name: Yankee Atomic Electric Co., et al. V. The United States

Witness Name: Susan Klein

Deposition Date: April 24, 2002 4/25/02

Job No.: 144539

| Page No. | Line No. | Change from | To |
|---|---|---|---|
| 128 | 12 | never | have never |
| 133 | 13 | are | were |
| 133 | 18 | were | was |
| 134 | 5 | Mark | Marc |
| 135 | 13 | may we | may |
| 142 | 15 | circumstance changing | "circumstances changing" |
| 147 | 14 | reevaluate | reevaluate. |
| 156 | 1 | privilege | privileged |
| 158 | 6 | ~~[illegible]~~ because | question |
| 160 | 16 | they | we |
| 164 | 3 | Mountain | Mountain Project |
| 165 | 9 | It's not -- after | It's not. After |
| 165 | 9 | effect | effect, |
| 165 | 20 | plan is to | plan, to |
| 166 | 2 | plan | plan -- |

Signature Susan E. Klein Date 5/23/02

ESQUIRE DEPOSITION SERVICES
1020 19TH STREET, NORTHWEST
SUITE 620
WASHINGTON, D.C. 20036

ERRATA SHEET

Case Name: Yankee Atomic Electric Co., et al. V. The United States

Witness Name: Susan Klein

Deposition Date: April 24, 2002 4/25/02

Job No.: 144539

| Page No. | Line No. | Change from | To |
|---|---|---|---|
| 166 | 3 | week 2004 | week – 2004 – |
| 166 | 3 | Bryan | Barton |
| 166 | 10 | at. They | at – They |
| 166 | 11 | to. | to meet. |
| 166 | 13 | process, down | process down |
| 171 | 18 | it is They | it is – they |
| 174 | 2 | that's | that |
| 179 | 13 | ask | answer |
| 179 | 14 | WIP | WIPP |
| 179 | 17 | plan, | plant |
| 180 | 5 | Transatlantic | Transuranic |
| 180 | 7 | plan | plant |
| 180 | 14 | Transatlantic | Transuranic |
| 180 | 18 | Class-C I guess | Class-C; I guess that |
| 181 | 6 | done | there |

Signature [signature] Date 5 23 02

ESQUIRE DEPOSITION SERVICES
1020 19TH STREET, NORTHWEST
SUITE 620
WASHINGTON, D.C. 20036

ERRATA SHEET

Case Name: Yankee Atomic Electric Co., et al. V. The United States

Witness Name: Susan Klein

Deposition Date: April 24, 2002 4/25/02

Job No.: 144539

| Page No. | Line No. | Change from | To |
|---|---|---|---|
| 184 | 11 | there | there, |
| 200 | 10 | we would work on | would work on |
| 201 | 21 | Ones in a | One's a |
| 210 | 17 | offices | office |
| 212 | 5 | appropriates | coordinates |
| 212 | 6 | So, who | So, who? |
| 213 | 18 | this is the | this. The |
| 215 | 18 | site. | see it. |
| 227 | 5 | Jack | Jeff |
| 224 | 7 | budget is | budget. It is |
| 237 | 5 | acceptance" 2010. | acceptance 2010." |
| 238 | 12 | just a pie | just pie |
| 238 | 13 | sky the | sky, the |
| 238 | 19 | just we | just -- we |
| 239 | 2 | of that, | of, that |

Signature [signature] Date 5-23-02

ESQUIRE DEPOSITION SERVICES
1020 19TH STREET, NORTHWEST
SUITE 620
WASHINGTON, D.C. 20036

ERRATA SHEET

Case Name: Yankee Atomic Electric Co., et al. v. The United States

Witness Name: Susan Klein

Deposition Date: April 24, 2002

Job No.: 144539 4/25/02

| Page No. | Line No. | Change from | To: |
|---|---|---|---|
| 244 | 5 | that's the | that's not the |
| 245 | 10 | too | two |
| 245 | 11 | less | for |
| 246 | 7 | 3,000 was | 3,000, which was |
| 248 | 13 | possibilities is building | possibilities, building |
| 257 | 19 | DOE pays | DOE, it pays. |
| 262 | 10 | but doesn't | but that doesn't |
| 264 | 3 | is | it is |
| 264 | 19 | Make | I could make. |
| 266 | 14 | M&O hire | the M&O |
| 266 | 15 | Policy & Sec | BSC |
| 267 | 2 | he's in the | he's the |
| 268 | 7 | Semmeline | Summerlin |
| 288 | 8 | really | really what |
| 288 | 8 | is | is: |

Signature [illegible] Date 5-23-02

ESQUIRE DEPOSITION SERVICES
1020 19TH STREET, NORTHWEST
SUITE 620
WASHINGTON, D.C. 20036

ERRATA SHEET

Case Name: Yankee Atomic Electric Co., et al. V. The United States

Witness Name: Susan Klein

Deposition Date: April 24, 2002

Job No.: 144539 4/25/02

| Page No. | Line No. | Change from | To: |
|---|---|---|---|
| 293 | 11 | licensing | license |
| 302 | 15 | in | about |
| 303 | 11 | Donna | Don |
| 306 | 6 | construction | construction authorization |
| 307 | 11 | in | it |
| 315 | 11 | three | two |
| 315 | 11 | had been | had to be |
| 321 | 19 | paid | pardon |
| 323 | 16 | what | not what |
| 337 | 1 | one | queen |
| 337 | 10 | " | " |
| 342 | 1 | now | all |
| 342 | 2 | they | they've |
| 342 | 3 | by ~~court~~ | that's |
| 342 | 3 | court | it |

Signature: Sue Klein    Date: 5-23-02

ESQUIRE DEPOSITION SERVICES
1020 19TH STREET, NORTHWEST
SUITE 620
WASHINGTON, D.C. 20036

ERRATA SHEET

Case Name: Yankee Atomic Electric Co., et al. V. The United States

Witness Name: Susan Klein

Deposition Date: April 24, 2002

Job No.: 144539 4/25/02

| Page No. | Line No. | Change from | To |
|---|---|---|---|
| 342 | 11 | required | requirement |
| 342 | 12 | amended | in |
| 342 | 14 | cooperation | corporation |
| 344 | 15 | management | Management and |
| 348 | 8 | much practical | much as practicable |
| 348 | 10 | they're | those |
| 350 | 9 | call | call it. |
| 359 | 13 | And | in |
| 364 | 8 | hope depends | hope, it depends |
| 364 | 9 | is the near future | "is the near future" |
| 367 | 8 | things | requests |
| 367 | 16 | Jervis | Gervis. |
| 382 | 4 | existing provision in | the existing provision is |
| 382 | 18 | binding commitment | "binding commitment" |
| 392 | 13 | that | what are |

Signature [signature] Date 5-23-02

ESQUIRE DEPOSITION SERVICES
1020 19TH STREET, NORTHWEST
SUITE 620
WASHINGTON, D.C. 20036

ERRATA SHEET

Case Name: Yankee Atomic Electric Co., et al. V. The United States

Witness Name: Susan Klein

Deposition Date: April 24, 2002

Job No.: 144539 4/25/02

| Page No. | Line No. | Change from | To |
|---|---|---|---|
| 394 | 12 | That | That's |
| 398 | 4 | we | "We |
| 398 | 5 | views. | views." |
| 400 | 3 | Cue | Queue |
| 401 | 13 | That it | Q at |
| 401 | 16 | Cue | Queue, |
| 401 | 16 | as | is |
| 402 | 2 | for | for a |
| 404 | 10 | [illegible] | We'll |
| 404 | 22 | on -- | on what |
| 464 | 22 | but | but not |
| 406 | 16 | also | also have, |
| 406 | 16 | EPA rules | EPA rules, |
| 406 | 16 | NRC rules, | NRC rules, |
| 411 | 2 | agreement | the agreement |

Signature Date 5-23-02

ESQUIRE DEPOSITION SERVICES
1020 19TH STREET, NORTHWEST
SUITE 620
WASHINGTON, D.C. 20036

ERRATA SHEET

Case Name: Yankee Atomic Electric Co., et al. V. The United States
Witness Name: Susan Klein
Deposition Date: April 24, 2002 4/25/02
Job No.: 144539

| Page No. | Line No. | Change from | To |
|---|---|---|---|
| 411 | 8 | notice | it |
| 411 | 22 | moved | own |
| 412 | 1 | was | is |
| 414 | 11 | worker | weren't |
| 415 | 1 | W18 | W188 |
| 416 | 12 | and not a | and a |
| 416 | 13 | engineering | engineer or |
| 416 | 14 | of it is | of it — is |
| 418 | 4 | it's | it's — |
| 418 | 5 | up with a | up a |
| 424 | 18 | Collaboration | ellaboration |
| 429 | 3 | I read | I've read |
| 429 | 14 | not, | not. |
| 434 | 9 | believe comes | believe it |
| 437 | 2 | in reporting | in the deposition |

Signature [signature] Date 5-23-02

ESQUIRE DEPOSITION SERVICES
1020 19TH STREET, NORTHWEST
SUITE 620
WASHINGTON, D.C. 20036

ERRATA SHEET

Case Name: Yankee Atomic Electric Co., et al. V. The United States

Witness Name: Susan Klein

Deposition Date: April 24, 2002 → 4/25/02

Job No.: 144539

| Page No. | Line No. | Change from | To |
|---|---|---|---|
| 437 | 14 | determined | determine |
| 439 | 12 | our | a |
| 443 | 14 | called, JAI | , called JAI, |
| 445 | 21 | the | a |
| 445 | 22 | as defined under | pursuant to |
| 445 | 22 | 10 CFR | 10 CFR Part 961 |
| 445 | 22 | approved | are approved |
| 452 | 3 | it as this is true | it, that's true |
| 454 | 15 | NRC, it is | NRC is saying it is |
| 455 | 12 | false | false. |
| 465 | 13 | graph | graf (sp?) |
| 465 | 13 | can't | can. |
| 466 | 14 | Shore | Shoreham |
| 466 | 15 | identification | identifying |
| 469 | 3 | the line | line |
| 469 | 5 | in EEI | in the EEI |

Signature Susan E Klein Date 5-24-02

ESQUIRE DEPOSITION SERVICES
1020 19TH STREET, NORTHWEST
SUITE 620
WASHINGTON, D.C. 20036

ERRATA SHEET

Case Name: Yankee Atomic Electric Co., et al. V. The United States

Witness Name: Susan Klein

Deposition Date: April 24, 2002

Job No.: 144539 4/25/02

| Page No. | Line No. | Change from | To |
|---|---|---|---|
| 469 | 8 | Bower | Bauer |
| 471 | 7 | Bower | Bauer. |
| 471 | 8 | "OCRWM 2." | "OCRWM." |
| 473 | 6 | at | in |
| 477 | 10 | think GTCC | Think they do |
| 479 | 15 | the EM | that EM |
| 483 | 7 | it and in | it in |
| 485 | 2 | WMP | YMP |
| 491 | 9 | repository. Or | repository or |
| 511 | 11 | Because the 1985 | Because before the 1985 act |
| 522 | 22 | was ultimately | was the rulemaking |
| 529 | 13 | believe | believed |
| 530 | 15 | was | is |
| 530 | 16 | cue | queue |

Signature [signature] Date 5-29-02

# Ronald Milner

# Plaintiff

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - - - - -x

YANKEE ATOMIC ELECTRIC COMPANY :
(98-126C)(Merow, S.J.) :
CONNECTICUT YANKEE ATOMIC POWER COMPANY :
(98-154C)(Merow, S.J.) :
FLORIDA POWER & LIGHT COMPANY :
(98-483C)(Wilson, J.) :
NORTHERN STATES POWER COMPANY :
(98-484C)(Wiese,J.) :
DUKE POWER, A Division of :
DUKE ENERGY CORP. :
(98-485C)(Sypolt,J.) :
INDIANA MICHIGAN POWER COMPANY :
(98-486C)(Hodges, J.) :
SACRAMENTO MUNICIPAL UTILITY DISTRICT :
(98-488C)(Yock, S.J.) :
SOUTHERN NUCLEAR OPERATING COMPANY, :
et al. :
(98-488C)(Yock, S.J.) :
COMMONWEALTH EDISON COMPANY :
(98-621C)(Hewitt, J.) :
BOSTON EDISON COMPANY :
(99-447C)(Allegra, J.) :
GPU NUCLEAR, INCORPORATED :

Page 2

(00-440C)(Bush, J.) :
WISCONSIN ELECTRIC POWER COMPANY :
(00-697C)(Merow, S.J.) :
POWER AUTHORITY OF THE STATE OF NEW YORK :
(00-703C)(Damich, J.) :
OMAHA PUBLIC POWER DISTRICT :
(01-115C)(Bush, J.) :
NEBRASKA PUBLIC POWER DISTRICT :
(01-116C)(Sypolt, J.) :
TENNESSEE VALLEY AUTHORITY :
(01-249C)(Bruggink, J.) :
Plaintiffs, :
v. :Discovery
THE UNITED STATES, :Judge:
Defendant. :(Judge
--------------------xSypolt)
McLean, Virginia
Wednesday, May 1, 2002

Deposition of RONALD A. MILNER, a witness, called for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to notice, the witness being duly sworn by CATHERINE S. BOYD, a Notary Public in and for the Commonwealth of Virginia, taken at the offices of Shaw Pittman, LLP, 1650 Tysons

Page 3

Boulevard, McLean, Virginia 22102-4859, at 9:30 a.m., Wednesday, May 1, 2002, and the proceedings being taken down by Stenotype by CATHERINE S. BOYD and transcribed under her direction.

Page 4

APPEARANCES:

On behalf of the Plaintiffs Florida Power & Light Company, Northern States Power Company, Duke Power, Indiana Michigan Power Company, Boston Edison Company, GPU Nuclear, Incorporated, Power Authority of the State of New York, Omaha Public Power District, Nebraska Public Power District:
ALEX D. TOMASZCZUK, ESQ.
DANIEL S. HERZFELD, ESQ.
Shaw Pittman, LLP
1650 Tysons Boulevard
McLean, Virginia 22102-4859
(703) (770-7901)

On behalf of Plaintiff Sacramento Municipal Utility District:
DAVID S. NESLIN, ESQ.
Arnold & Porter
370 Seventeenth Street, Suite 4500
Denver, Colorado 80202-1370
(303) 863-2301

Page 5

APPEARANCES: (Continued)
On behalf of Plaintiffs Southern Nuclear Operating Company, Alabama Power Company, Georgia Power Company:
RONALD A. SCHECHTER, ESQ.
Arnold & Porter
555 Twelfth Street, N.W.
Washington, D.C. 20004-1206
(202) 942-5160

On behalf of Plaintiff Wisconsin Electric Power Company:
DONALD J. CARNEY, ESQ.
Perkins Coie, LLP
607 Fourteenth Street, N.W.
Washington, D.C. 20005-2011
(202) 434-1675

On behalf of Plaintiff Commonwealth Edison Company:
CHRISTOPHER P. TOMPKINS, ESQ.
Jenner & Block, LLC
One IBM Plaza
Chicago, Illinois 60611-7603
(312) 222-9350

ask you some questions about your knowledge concerning issues which underlie those cases.
If at any time you don't understand my question, let me know, and I'll try and rephrase it so that we have a common understanding as to my question and your answer.
A. Okay.
Q. Any time you want to take a break, just say so, and we'll be happy to take a break.
I would prefer that it not be while a question is pending, but after you have answered the question, if you want to break, just speak up, and we'll be happy to accommodate that.
A. Great.
Q. There is a protective order that has been entered in these cases, and have you had occasion to read it?
A. No, I haven't.
Q. Okay. I'm going to hand you a copy and ask you to take a moment and read it. It concerns certain material which has been designated as confidential, and through the course of the examination, I may hand you some documents which fall within the scope of that protective order.



I would ask you to take a moment and read the protective order.
It basically requires that you're going to treat that information as confidential and limited to --
A. Okay.
Q. These cases, and matters relating thereto and for no other purpose, but take a moment and read it if you will.
(The witness reviewed the document.)
BY MR. TOMASZCZUK:
Q. Mr. Milner, have you read the order?
A. Yes, I have.
Q. And do you understand it?
A. Yes.
Q. You do you agree to comply with its provisions?
A. Yes.
MR. TOMASZCZUK: All right. Counsel, any objection to proceeding on that basis?
MR. SHULTIS: No.
BY MR. TOMASZCZUK:
Q. Mr. Milner, what is your present position at DOE?
A. My present position is Chief Operating



Officer for the Civilian Radioactive Waste Program.
Q. And how long have you held that position?
A. About two and a half years.
Q. And to whom do you report?
A. Lake Barrett, who is the deputy director.
Q. And how many people report to you as the Chief Operating Officer?
A. I guess approximately 150 federal staff.
Q. Are there contractors that report to you also?
A. Not directly, but there are contractors in the organization.
Q. Can you describe for me your duties as the, what I'll refer to as the COO for OCRWM?
A. Okay. Basically it's to manage the operational aspect of the program.
Q. What do you mean by operational aspect?
Can you tell me what you mean by that term?
A. Day-to-day operations of the program,



administrative principally.
Q. All right. When you say administrative, do you mean you're primarily involved in personnel matters, or am I misunderstanding what you mean by that term?
A. Personnel matters, contractual matters.
Q. When you say contractual matters, what do you mean by that?
A. Matters relating to our support service contracts, our contract with our M&O.
Q. What is your educational background?
A. I'm a mechanical engineer by education.
Q. Okay. From what institution did you obtain a degree?
A. University of Mississippi.
Q. And that was a Bachelor of Science Degree?
A. A Bachelors and a Masters.
Q. What year did you obtain your Bachelors Degree?
A. 1966.
Q. And in what year did you obtain your Masters Degree?