# Defendant

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - - - - -x
YANKEE ATOMIC ELECTRIC COMPANY :
(98-126C) (Merow, S.J.) :
CONNECTICUT YANKEE ATOMIC POWER COMPANY :
(98-154C) (Merow, S.J.) :
FLORIDA POWER & LIGHT COMPANY :
(98-483C) (Wilson, J.) :
NORTHERN STATES POWER COMPANY :
(98-484C) (Wiese, J.) :
DUKE POWER, A Division of :
DUKE ENERGY CORP. :
(98-485C) (Sypolt, J.) :
INDIANA MICHIGAN POWER COMPANY :
(98-486C) (Hodges, J.) :
SACRAMENTO MUNICIPAL UTILITY DISTRICT :
(98-488C) (Yock, S.J.) :
SOUTHERN NUCLEAR OPERATING COMPANY, :
et al. :
(98-488C) (Yock, S.J.) :
COMMONWEALTH EDISON COMPANY :
(98-621C) (Hewitt, J.) :
BOSTON EDISON COMPANY :
(99-447C) (Allegra, J.) :
GPU NUCLEAR, INCORPORATED :

Page 2

(00-440C)(Bush, J.) :
WISCONSIN ELECTRIC POWER COMPANY :
(00-697C)(Merow, S.J.) :
POWER AUTHORITY OF THE STATE OF NEW YORK :
(00-703C)(Damich, J.) :
OMAHA PUBLIC POWER DISTRICT :
(01-115C)(Bush, J.) :
NEBRASKA PUBLIC POWER DISTRICT :
(01-116C)(Sypolt, J.) :
TENNESSEE VALLEY AUTHORITY :
(01-249C)(Bruggink, J.) :
Plaintiffs, :
v. :Discovery
THE UNITED STATES, :Judge:
Defendant. :(Judge
--------------------xSypolt)

McLean, Virginia
Wednesday, May 1, 2002

Deposition of RONALD A. MILNER, a witness, called for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to notice, the witness being duly sworn by CATHERINE S. BOYD, a Notary Public in and for the Commonwealth of Virginia, taken at the offices of Shaw Pittman, LLP, 1650 Tysons

Page 3

Boulevard, McLean, Virginia 22102-4859, at 9:30 a.m., Wednesday, May 1, 2002, and the proceedings being taken down by Stenotype by CATHERINE S. BOYD and transcribed under her direction.

Page 4

APPEARANCES:

On behalf of the Plaintiffs Florida Power & Light Company, Northern States Power Company, Duke Power, Indiana Michigan Power Company, Boston Edison Company, GPU Nuclear, Incorporated, Power Authority of the State of New York, Omaha Public Power District, Nebraska Public Power District:
ALEX D. TOMASZCZUK, ESQ.
DANIEL S. HERZFELD, ESQ.
Shaw Pittman, LLP
1650 Tysons Boulevard
McLean, Virginia 22102-4859
(703) (770-7901)

On behalf of Plaintiff Sacramento Municipal Utility District:
DAVID S. NESLIN, ESQ.
Arnold & Porter
370 Seventeenth Street, Suite 4500
Denver, Colorado 80202-1370
(303) 863-2301

Page 5

APPEARANCES: (Continued)
On behalf of Plaintiffs Southern Nuclear Operating Company, Alabama Power Company, Georgia Power Company:
RONALD A. SCHECHTER, ESQ.
Arnold & Porter
555 Twelfth Street, N.W.
Washington, D.C. 20004-1206
(202) 942-5160

On behalf of Plaintiff Wisconsin Electric Power Company:
DONALD J. CARNEY, ESQ.
Perkins Coie, LLP
607 Fourteenth Street, N.W.
Washington, D.C. 20005-2011
(202) 434-1675

On behalf of Plaintiff Commonwealth Edison Company:
CHRISTOPHER P. TOMPKINS, ESQ.
Jenner & Block, LLC
One IBM Plaza
Chicago, Illinois 60611-7603
(312) 222-9350

Page 26

MR. SHULTIS: Objection -- vague.
THE WITNESS: I don't know that I could call out any particular area.
BY MR. TOMASZCZUK:
Q. Are there aspects of the Civilian Radioactive Waste Program with which you're not familiar?
MR. SHULTIS: The same objection.
THE WITNESS: Probably.
BY MR. TOMASZCZUK:
Q. Do you know what they are?
A. I would be hard pressed to call it out.
Q. The reason I ask the question, Mr. Milner, is you have been in the office of OCRWM for a long time, and I'm trying to find out areas where you might have particular expertise and knowledge, and if there are some, it would I think speed things along if you could identify those for me.
If you can't, then I will have to assume that all areas are fair game and I'll proceed accordingly.
Are there any areas that you feel you have particular expertise or knowledge in?

Page 27

A. No, I wouldn't say so.
Q. In preparation for your deposition here today, did you review any documents?
A. No, I did not.
Q. Did you speak with anyone concerning your deposition?
A. Very briefly with the two Justice Department attorneys.
Q. Other than counsel for the Department of Justice, did you speak with anyone concerning your deposition?
A. No, not concerning the deposition.
Q. Did you speak with anyone at OCRWM concerning their deposition?
A. No.
Q. Did you speak with anyone at OCRWM concerning any topics or issues on which you thought I might ask you about?
A. No.
MR. SHULTIS: Objection -- asked and answered.
BY MR. TOMASZCZUK:
Q. Are you familiar with the standard contract for disposal that's at issue in these cases, for disposal of spent nuclear fuel and

Page 28

high-level radioactive waste?
A. Yes.
Q. Did you have any role to play in the drafting of this, what I'll refer to as the standard contract?
A. No, I did not.
Q. It had already been executed at the time you became an OCRWM employee?
A. Correct.
Q. At the time you became an OCRWM employee, did you have occasion to read the contract?
A. Yes.
Q. At the time that you became an OCRWM employee, did you read any other documents?
A. I'm not sure I understand that question.
Q. Okay. I understood you became a branch chief at OCRWM in, in or about 1984?
A. Um-hm.
Q. Right. And you have testified you have read the standard contract?
A. Um-hm.
Q. At or about that time, correct?
A. Um-hm.

Page 29

Q. Did you read any other documents relating to OCRWM or its programs at that time?
A. Relating to OCRWM, yes.
Q. Okay. And what were they?
A. The most recent total system life cycle cost report, final draft of the Mission Plan, most recent fee adequacy analysis report.
Q. Why did you read those documents?
A. Those are items under my responsibility.
Q. Do I understand it correctly that at the time you became the branch chief, a total systems life cycle cost report had already been prepared?
A. Yes.
Q. All right. I'm going to refer to that as a TSLCC report.
A. Much easier.
Q. Right -- certainly easier to say. And what was the -- you said, I believe you have testified that you had read the final draft of the Mission Plan.
Had a final Mission Plan been prepared at the time you became the branch chief?
A. No, it had not.



Alderson Reporting Company, Inc.
1111 14th Street, N.W. Suite 400 1-800-FOR-DEPO Washington, DC 20005

# Plaintiff

Page 70

Q. Do you recall seeing this Table 2-1 before today?
A. I don't recall it, no.
Q. It shows under the column first repository acceptance, a spent nuclear fuel acceptance rate starting in 1998 of 1800 metric tons?
A. Correct.
Q. And maintaining at that 1800 metric ton rate for five years, correct?
A. Correct.
Q. And then ramping up to 3,000 metric tons?
A. Correct.
Q. And then continuing at a steady-state rate of 3,000 metric tons for roughly 20 years I think?
A. Correct.
Q. And does that column accurately reflect DOE's intentions at this time with respect to spent nuclear fuel acceptance rate commencing in 1998?
MR. SHULTIS: Objection. Calls for a legal conclusion.
Also Mr. Milner is not a 30(b)(6)

Page 71

witness.
MR. TOMASZCZUK: I don't want my silence to be construed as acquiescence in the notion that I can't ask him these questions because he is not a 30(b)(6) witness.
I don't know what --
MR. SHULTIS: You're asking about DOE's intention or position.
Mr. Milner has not been designated as a witness who is qualified to speak to DOE's position.
MR. TOMASZCZUK: Oh, I understand that Mr. Milner has been at OCRWM for 18 years and is the Chief Operating Officer, and if he is not qualified to answer these questions, I don't know who would be, but in any event, your objection is noted for the record.
MR. SHULTIS: The people we designated for those responses is qualified, but you can answer.
THE WITNESS: At the point this draft was prepared, December of 1983, I was not with the program.
I don't know what the department's intent was.

Page 72

BY MR. TOMASZCZUK:
Q. Did you have any understanding about the data reflected on this table at or about the time you read it?
MR. SHULTIS: Same objections.
THE WITNESS: I don't understand the question.
BY MR. TOMASZCZUK:
Q. Did you have any understanding as to what information was being conveyed by the data on this table at or about the time you became an OCRWM employee and looked at this document?
MR. SHULTIS: The same objections -- asked and answered.
The document speaks for itself.
THE WITNESS: I don't recall seeing this specific table.
I can look at it now and see what's on it.
BY MR. TOMASZCZUK:
Q. Okay. This table goes on to, under the column remaining backlog MTU, do you see that?
A. Yes.
Q. In the right-hand side? It shows a

Page 73

pre-1998 backlog of 40,809 metric tons?
A. Yes.
Q. Correct? And that number basically decreases over time, and the table shows a backlog as of 2020 of 23,775 metric tons, right?
A. Correct.
Q. Showing that the backlog is being reduced over time?
A. Correct.
Q. And was that a fair statement of DOE's intentions at or about this time, to work off the backlog of spent nuclear fuel that utilities were storing?
MR. SHULTIS: Objection. Calls for a legal conclusion, and Mr. Milner is not a 30(b)(6) witness.
THE WITNESS: Well, at this specific point in time, I don't know what the department's intent was.
At the point I joined the program, my understanding of the intent was to work off the backlog.
(There was a pause in the proceedings.)
MR. TOMASZCZUK: Mr. Milner, I'm going

# Plaintiff

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - - - - -x

YANKEE ATOMIC ELECTRIC COMPANY :
(98-126C)(Merow, S.J.) :
CONNECTICUT YANKEE ATOMIC POWER COMPANY :
(98-154C)(Merow, S.J.) :
FLORIDA POWER & LIGHT COMPANY :
(98-483C)(Wilson, J.) :
NORTHERN STATES POWER COMPANY :
(98-484C)(Wiese,J.) :
DUKE POWER, A Division of :
DUKE ENERGY CORP. :
(98-485C)(Sypolt,J.) :
INDIANA MICHIGAN POWER COMPANY :
(98-486C)(Hodges, J.) :
SACRAMENTO MUNICIPAL UTILITY DISTRICT :
(98-488C)(Yock, S.J.) :
SOUTHERN NUCLEAR OPERATING COMPANY, :
et al. :
(98-488C)(Yock, S.J.) :
COMMONWEALTH EDISON COMPANY :
(98-621C)(Hewitt, J.) :
BOSTON EDISON COMPANY :
(99-447C)(Allegra, J.) :
GPU NUCLEAR, INCORPORATED :

Page 198

(00-440C)(Bush, J.) :
WISCONSIN ELECTRIC POWER COMPANY :
(00-697C)(Merow, S.J.) :
POWER AUTHORITY OF THE STATE OF NEW YORK :
(00-703C)(Damich, J.) :
OMAHA PUBLIC POWER DISTRICT :
(01-115C)(Bush, J.) :
NEBRASKA PUBLIC POWER DISTRICT :
(01-116C)(Sypolt, J.) :
TENNESSEE VALLEY AUTHORITY :
(01-249C)(Bruggink, J.) :
Plaintiffs, :
v. :Discovery
THE UNITED STATES, :Judge:
Defendant. :(Judge
--------------------xSypolt)

McLean, Virginia
Thursday, May 2, 2002

Continued deposition of RONALD A. MILNER, a witness, recalled for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to notice, the witness being duly sworn by CATHERINE S. BOYD, a Notary Public in and for the Commonwealth of Virginia, taken at the offices of Shaw Pittman, LLP, 1650 Tysons

Page 199

Boulevard, McLean, Virginia 22102-4859, at 9:51 a.m., Thursday, May 2, 2002, and the proceedings being taken down by Stenotype by CATHERINE S. BOYD and transcribed under her direction.

Page 200

APPEARANCES:

On behalf of the Plaintiffs Florida Power & Light Company, Northern States Power Company, Duke Power, Indiana Michigan Power Company, Boston Edison Company, GPU Nuclear, Incorporated, Power Authority of the State of New York, Omaha Public Power District, Nebraska Public Power District:
ALEX D. TOMASZCZUK, ESQ.
DANIEL S. HERZFELD, ESQ.
Shaw Pittman, LLP
1650 Tysons Boulevard
McLean, Virginia 22102-4859
(703) (770-7901)

On behalf of Plaintiff Sacramento Municipal Utility District:
DAVID S. NESLIN, ESQ.
Arnold & Porter
370 Seventeenth Street, Suite 4500
Denver, Colorado 80202-1370
(303) 863-2301

Page 201

APPEARANCES: (Continued)
On behalf of Plaintiffs Southern Nuclear Operating Company, Alabama Power Company, Georgia Power Company:
RONALD A. SCHECHTER, ESQ.
Arnold & Porter
555 Twelfth Street, N.W.
Washington, D.C. 20004-1206
(202) 942-5160

On behalf of Plaintiff Wisconsin Electric Power Company:
SUZETTE W. DERREVERE, ESQ.
Perkins Coie, LLP
607 Fourteenth Street, N.W.
Washington, D.C. 20005-2011
(202) 434-1609

On behalf of Plaintiff Commonwealth Edison Company:
CHRISTOPHER P. TOMPKINS, ESQ.
Jenner & Block, LLC
One IBM Plaza
Chicago, Illinois 60611-7603
(312) 222-9350

Page 214

published by OCRWM which would have stated or suggested different repository receipt rates?
A. At that point in time, not that I can recall.
Q. Is it fair to assume that if there were such accounts, you would have known about them?
A. Yes. I think that would be true.
MR. TOMASZCZUK: Ms. Reporter, could you mark as Milner 24 the Volume 1 of the TSLCC analysis dated April 1986?
(Milner Exhibit No. 24 was marked for identification.)
BY MR. TOMASZCZUK:
Q. Mr. Milner, are you familiar with this exhibit Milner No. 24?
A. I believe I would have been, yes.
Q. And did you have a role in the preparation of this document?
A. Likely I would have.
Q. And can you state for me what that role would have been?
A. Again, it would have been a review and approval.

Page 215

Q. You would have reviewed it, edited drafts, and approved the final version?
A. Correct.
Q. I have to say with the benefit of hindsight sitting here sixteen years later that these reports suggest to me that they were prepared with a great deal of thought and care.
Is that a sort of a fair characterization do you think?
A. We certainly attempted to do that at that time.
Q. And they also reflect in my layman's view a substantial amount of detail about the costs and anticipated costs of the system?
A. Correct.
Q. Can I direct your attention to page 14.
And this table at page 14, Table 2-2, identifies key assumptions for the TSLCC analysis, right?
A. Correct.
Q. And directing your attention to the repository design receipt rate there in the middle of the page?
A. Um-hm. Yes.

Page 216

Q. This would appear to indicate to me that the repository design receipt rate that DOE intended at the time was 3,000 metric tons per year of spent fuel and 400 metric tons equivalent per year of defense high-level waste?
A. That's correct. It does indicate that it would begin, Phase 1 facility of the repository would begin at a rate of 400, but steady state to 3,000.
Q. And does the text here accurately reflect DOE's intentions at the time with respect to repository design receipt rate?
MR. SHULTIS: Objection. Calls for a legal conclusion.
Mr. Milner is not a 30(b)(6) witness.
THE WITNESS: Again, judging that it was, by the fact that it was listed as an assumption, that would have been the program's goal at that time.
BY MR. TOMASZCZUK:
Q. Are you aware of any other documents published in or about April of 1986 when this report was issued that would indicate a different intention by DOE with respect to repository design receipt rates?

Page 217

MR. SHULTIS: Objection. Calls for a legal conclusion.
Mr. Milner is not a 30(b)(6) witness.
THE WITNESS: At this point in time, I don't recall any I was aware of at that point in time.
BY MR. TOMASZCZUK:
Q. Isn't it true, Mr. Milner, that the DOE's intentions with respect to repository design receipt rates have stayed constant over the years at 3,000 metric tons?
MR. SHULTIS: Objection. Calls for a legal conclusion.
Mr. Milner is not a 30(b)(6) witness.
THE WITNESS: It indicates that the steady-state rate stayed at 3,000, yes.
BY MR. TOMASZCZUK:
Q. And that hasn't changed really in 16 years, has it?
MR. SHULTIS: The same objection.
THE WITNESS: Would appear not to have.
MR. TOMASZCZUK: Give me just one second.
THE WITNESS: Sure.

# Defendant

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - - - - -x

YANKEE ATOMIC ELECTRIC COMPANY :
(98-126C)(Merow, S.J.) :
CONNECTICUT YANKEE ATOMIC POWER COMPANY :
(98-154C)(Merow, S.J.) :
FLORIDA POWER & LIGHT COMPANY :
(98-483C)(Wilson, J.) :
NORTHERN STATES POWER COMPANY :
(98-484C)(Wiese,J.) :
DUKE POWER, A Division of :
DUKE ENERGY CORP. :
(98-485C)(Sypolt,J.) :
INDIANA MICHIGAN POWER COMPANY :
(98-486C)(Hodges, J.) :
SACRAMENTO MUNICIPAL UTILITY DISTRICT :
(98-488C)(Yock, S.J.) :
SOUTHERN NUCLEAR OPERATING COMPANY, :
et al. :
(98-488C)(Yock, S.J.) :
COMMONWEALTH EDISON COMPANY :
(98-621C)(Hewitt, J.) :
BOSTON EDISON COMPANY :
(99-447C)(Allegra, J.) :
GPU NUCLEAR, INCORPORATED :

Page 198

(00-440C)(Bush, J.) :
WISCONSIN ELECTRIC POWER COMPANY :
(00-697C)(Merow, S.J.) :
POWER AUTHORITY OF THE STATE OF NEW YORK :
(00-703C)(Damich, J.) :
OMAHA PUBLIC POWER DISTRICT :
(01-115C)(Bush, J.) :
NEBRASKA PUBLIC POWER DISTRICT :
(01-116C)(Sypolt, J.) :
TENNESSEE VALLEY AUTHORITY :
(01-249C)(Bruggink, J.) :
Plaintiffs, :
v. :Discovery
THE UNITED STATES, :Judge:
Defendant. :(Judge
- - - - - - - - - - - - - - - - - - - - -xSypolt)
McLean, Virginia
Thursday, May 2, 2002
Continued deposition of RONALD A. MILNER, a witness, recalled for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to notice, the witness being duly sworn by CATHERINE S. BOYD, a Notary Public in and for the Commonwealth of Virginia, taken at the offices of Shaw Pittman, LLP, 1650 Tysons

Page 199

Boulevard, McLean, Virginia 22102-4859, at 9:51 a.m., Thursday, May 2, 2002, and the proceedings being taken down by Stenotype by CATHERINE S. BOYD and transcribed under her direction.

Page 200

APPEARANCES:

On behalf of the Plaintiffs Florida Power & Light Company, Northern States Power Company, Duke Power, Indiana Michigan Power Company, Boston Edison Company, GPU Nuclear, Incorporated, Power Authority of the State of New York, Omaha Public Power District, Nebraska Public Power District:
ALEX D. TOMASZCZUK, ESQ.
DANIEL S. HERZFELD, ESQ.
Shaw Pittman, LLP
1650 Tysons Boulevard
McLean, Virginia 22102-4859
(703) (770-7901)

On behalf of Plaintiff Sacramento Municipal Utility District:
DAVID S. NESLIN, ESQ.
Arnold & Porter
370 Seventeenth Street, Suite 4500
Denver, Colorado 80202-1370
(303) 863-2301

Page 201

APPEARANCES: (Continued)
On behalf of Plaintiffs Southern Nuclear Operating Company, Alabama Power Company, Georgia Power Company:
RONALD A. SCHECHTER, ESQ.
Arnold & Porter
555 Twelfth Street, N.W.
Washington, D.C. 20004-1206
(202) 942-5160

On behalf of Plaintiff Wisconsin Electric Power Company:
SUZETTE W. DERREVERE, ESQ.
Perkins Coie, LLP
607 Fourteenth Street, N.W.
Washington, D.C. 20005-2011
(202) 434-1609

On behalf of Plaintiff Commonwealth Edison Company:
CHRISTOPHER P. TOMPKINS, ESQ.
Jenner & Block, LLC
One IBM Plaza
Chicago, Illinois 60611-7603
(312) 222-9350

Page 390

Shelor's office that prepared it?
A. I believe so.
Q. Now at some point in time, you came back to that office, that is, the Office of Waste Acceptance, Storage and Transportation, is that right?
A. That's correct.
Q. But that would have been after this APR/ACR was published?
A. I believe it was.
Q. Notwithstanding the fact that your office didn't publish this, did you have occasion to review this and sign off on it before it was published?
A. I don't recall specifically, but it's likely that I would have concurred in it.
Q. Can I ask you to look at page 1 of the document? And the second paragraph is what I'm going to ask you a few questions about.
There is a reference to the APR and the ACR?
A. Um-hm.
Q. And then there is a sentence in the middle of the paragraph which states the ACR applies projected nominal acceptance rates for

Page 391

the system to the priority ranking and the APR, resulting in individual allocations for the owners and generators expressed in metric tons of uranium.
Do you have an understanding of what is meant by the phrase nominal acceptance rates in that sentence.
A. No. I don't know.
Q. Did you have any discussions with any OCRWM employees concerning what was meant by that phrase nominal acceptance rates?
A. Not that I recall.
Q. The last sentence of this paragraph states as specified in the standard contract, the ACR is for planning purposes only and thus is not contractually binding on either DOE or the purchasers, right?
That's what it says?
A. That's correct.
Q. Did I understand your testimony earlier, Mr. Milner, to be that the DCSs represented a binding commitment of the parties?
A. That was my opinion, yes.
Q. And the DCSs as indicated by this paragraph, are based on the capacity allocations

Page 392

as listed in the ACR, right?
A. Correct.
Q. Can you explain to me how it is that if the ACRs which form the basis for the DCSs are not binding, that the DCSs are binding?
MR. SHULTIS: Objection. Calls for a legal opinion.
THE WITNESS: The DCSs were submitted by the utilities to the department based upon the information in the ACR, the allocations.
Then the department would either approve or disapprove those, and if approved, then in my opinion, that became a binding agreement.
A utility could certainly choose to submit a DCS which reflected lower amounts than were contained in the ACR.
BY MR. TOMASZCZUK:
Q. Is there any reason of which you're aware why a utility would do that?
A. None that I know of.
Q. Wouldn't it be in the utility's interest to try and put as much fuel as they could in the DCS to get that fuel moved off site?

Page 393

MR. SHULTIS: Calls for speculation.
THE WITNESS: If I were a utility fuel manager, I would have.
BY MR. TOMASZCZUK:
Q. Can I ask you to look back at the DCS instructions?
We looked at those this afternoon -- 43.
And in particular, I was going to ask you to look at, Mr. Milner, paragraph 7C.
(The witness reviewed the document.)
BY MR. TOMASZCZUK:
Q. And this paragraph reflects in the first sentence that the rates in the ACR provide an approximation and are for planning purposes, right?
A. Correct.
Q. And then the next sentence, there is an assumption stated that the waste management system will begin acceptance of spent nuclear fuel in 1998, correct?
A. Correct.
Q. And then there is this third sentence in the event that such circumstances change, all DCSs previously approved by DOE may need to be

# Defendant

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - - - - X

YANKEE ATOMIC ELECTRIC COMPANY, :
(98-126C) :
CONNECTICUT YANKEE ATOMIC POWER COMPANY :
(98-154C) :
MAINE YANKEE ATOMIC POWER COMPANY :
(98-474C) :
FLORIDA POWER & LIGHT COMPANY :
(98-483C) :
NORTHERN STATES POWER COMPANY :
(98-484C) :
DUKE POWER, A Division of DUKE :
ENERGY CORP. (98-485C) :
INDIANA MICHIGAN POWER COMPANY :
(98-486C) :
SACRAMENTO MUNICIPAL UTILITY DISTRICT :
(98-488C) :
SOUTHERN NUCLEAR OPERATING COMPANY, :
et al., (98-614C) :
COMMONWEALTH EDISON COMPANY :
(98-621C) :
BOSTON EDISON COMPANY :
(99-447C) :
GPU NUCLEAR, INCORPORATED :
(00-440C) :
WISCONSIN ELECTRIC POWER COMPANY, :
(00-697C) :
POWER AUTHORITY OF THE STATE OF :
NEW YORK (00-703C) :
OMAHA PUBLIC POWER DISTRICT :
(01-115C) :
NEBRASKA PUBLIC POWER DISTRICT :
(01-116C) :
TENNESSEE VALLEY AUTHORITY :
(01-249C) :
Plaintiffs, :
v. :
UNITED STATES OF AMERICA, :
Defendant. :

- - - - - - - - - - - - - - - - - - - - X

Washington, D.C.
Friday, May 3, 2002

Continued Deposition of RONALD MILNER, a witness herein, called for examination by counsel for

Page 404

Plaintiffs in the above-entitled matter, pursuant to notice, the witness being previously duly sworn by CATHERINE S. BOYD, Notary Public in and for the Commonwealth of Virginia, taken at the offices of Shaw Pittman, 1650 Tysons Boulevard, McLean, Virginia, at 9:15 a.m., Friday, May 3, 2002, and the proceedings being taken down by Stenotype by CYNTHIA R. SIMMONS, RMR, CRR, and transcribed under her direction.

Page 405

APPEARANCES:

On behalf of the Plaintiffs Florida Power & Light Company, Northern States Power Company, Duke Power, Indiana Michigan Power Company, Boston Edison Company, GPU Nuclear, Inc., Power Authority of the State of New York, Omaha Public Power District, and Nebraska Public Power District:
ALEX D. TOMASZCZUK, ESQ.
DANIEL S. HERZFELD, ESQ.
Shaw Pittman LLP
1650 Tysons Boulevard
McLean, Virginia 22102-4859
(703) 770-7940

On behalf of the Plaintiffs Yankee Atomic, Maine Yankee and Connecticut Yankee:
PETER SKALABAN, JR., ESQ.
Spriggs & Hollingsworth
1350 I Street, N.W.
Ninth Floor
Washington, D. C. 20005-3305
(202) 898-5821

Page 406

APPEARANCES (Continued):

On behalf of the Plaintiff Wisconsin Electric Power Company:
DONALD J. CARNEY, ESQ.
Perkins Coie LLP
607 Fourteenth Street, N.W.
Washington, D. C. 20005-2011
(202) 434-1690

On behalf of the Plaintiff Southern Nuclear Power:
RONALD A. SCHECHTER, ESQ.
Arnold & Porter
555 Twelfth Street, N.W.
Washington, D.C. 20004-1206
(202) 942-5160

On behalf of the Plaintiff Sacramento Municipal Utility District:
DAVID S. NESLIN, ESQ.
Arnold & Porter
370 Seventeenth Street, Suite 4500
Denver, Colorado 80202-1370
(303) 863-2301

Page 407

APPEARANCES (Continued):

On behalf of the Plaintiff Commonwealth Edison Company:
CHRISTOPHER P. TOMPKINS, ESQ.
Jenner & Block, LLP
One IBM Plaza
Chicago, Illinois 60611-7603
(312) 222-9350

On behalf of the Defendant:
RUSSELL A. SHULTIS, ESQ.
HEIDE L. HERRMANN, ESQ.
United States Department of Justice
Civil Division
1100 L Street, N.W.
Washington, D. C. 20530
(202) 305-7561

Page 416

Q. Again, any questions at all, please let me know. If you don't understand my question, please let me know. Is that fair?
A. That's fair.
Q. And if you disagree with any assumption in my question, please advise me.
A. Okay.
Q. If I could ask you to turn to Exhibit 3 to your deposition, that's the standard contract. Do you have it in front of you now?
A. I do.
Q. If I could ask you to turn to page 16593. If you'd look in the first column, the first full paragraph that begins, Article VI.B.3(b), do you see that?
A. I do.
Q. Could you read that paragraph?
A. Article VI.B --
Q. You don't need to read it out loud. You can just read it to yourself.
A. Okay.
Q. Are you familiar with this language?
A. Vaguely, yes.
Q. Do you think you've reviewed it in the past?

Page 417

A. Not this specific language. I have reviewed it after the contract was final, after the registered notice was final.
Q. You're familiar with the concept of the Department having the right to grant priority to shut down reactors?
MR. SHULTIS: Objection as to characterization.
THE WITNESS: I'm familiar with that, yes.
BY MR. NESLIN:
Q. It states here that, in the second sentence, this type of priority is necessary to prevent reactors from waiting 20 or 30 years to be commissioned -- decommissioned after they've finished generating electricity. Do you understand that DOE had a goal of avoiding reactors from experiencing such delays?
MR. SHULTIS: Objection, Mr. Milner is not a 30(b)(6) witness.
THE WITNESS: My recollection was that the Department preferred not to prohibit giving priority to shutdown reactors.
BY MR. NESLIN:
Q. Well, this paragraph states that certain commenters had recommended that a provision allowing

Page 418

for such priority be deleted, that the Department had not accepted that recommendation because again it states that this type of priority is necessary to prevent reactors from waiting 20 or 30 years to be decommissioned after they finish generating electricity.
And, again, my question is, was avoiding that kind of delay a goal or objective of the Department?
MR. SHULTIS: Objection, same objection.
THE WITNESS: No, and again, my recollection of the situation is that the Department preferred not to preclude the ability to give some priority to shutdown reactors. But of course we are reading from the preamble to the rule and discussing how comments were addressed.
BY MR. NESLIN:
Q. That's correct. Did the Department have any interest in the timely decommissioning of shutdown reactors?
A. It did.
MR. SHULTIS: Same objection.
BY MR. NESLIN:
Q. That was an interest of the Department's?
A. It was an interest, yes.

Page 419

Q. The Department, would it be fair to say that the Department had an objective of allowing shutdown reactors to decommission in a timely manner?
MR. SHULTIS: Same objection.
THE WITNESS: Well, again, I think it was more a case that the Department preferred not to preclude that ability.
BY MR. NESLIN:
Q. What do you mean by not preclude that ability?
A. The Department did not as I recall have an objective to give priority to shutdown reactors, it simply preferred not to preclude that ability in the future.
Q. My question isn't about asking granting priority, my question is simply did the Department have an objective of allowing shutdown reactors to decommission in a timely manner?
MR. SHULTIS: Same objection.
THE WITNESS: It did, yes.
BY MR. NESLIN:
Q. And would that remain an objective of the Department's today?
A. I believe so.
Q. If we could turn to page 16606, do you see

# Plaintiff

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

```
- - - - - - - - - - - - - - - - - - - - - x
YANKEE ATOMIC ELECTRIC COMPANY,           :
(98-126C)                                 :
CONNECTICUT YANKEE ATOMIC POWER COMPANY   :
(98-154C)                                 :
MAINE YANKEE ATOMIC POWER COMPANY         :
(98-474C)                                 :
FLORIDA POWER & LIGHT COMPANY             :
(98-483C)                                 :
NORTHERN STATES POWER COMPANY             :
(98-484C)                                 :
DUKE POWER, A Division of DUKE            :
ENERGY CORP. (98-485C)                    :
INDIANA MICHIGAN POWER COMPANY            :
(98-486C)                                 :
SACRAMENTO MUNICIPAL UTILITY DISTRICT     :
(98-488C)                                 :
SOUTHERN NUCLEAR OPERATING COMPANY,       :
et al., (98-614C)                         :
COMMONWEALTH EDISON COMPANY               :
(98-621C)                                 :
BOSTON EDISON COMPANY                     :
(99-447C)                                 :
GPU NUCLEAR, INCORPORATED                 :
(00-440C)                                 :
WISCONSIN ELECTRIC POWER COMPANY,         :
(00-697C)                                 :
POWER AUTHORITY OF THE STATE OF           :
NEW YORK (00-703C)                        :
OMAHA PUBLIC POWER DISTRICT               :
(01-115C)                                 :
NEBRASKA PUBLIC POWER DISTRICT            :
(01-116C)                                 :
TENNESSEE VALLEY AUTHORITY                :
(01-249C)                                 :
            Plaintiffs,                   :
     v.                                   :
UNITED STATES OF AMERICA,                 :
           Defendant.                     :
- - - - - - - - - - - - - - - - - - - - - x
```

Washington, D.C.
Friday, May 3, 2002

Continued Deposition of RONALD MILNER, a witness herein, called for examination by counsel for

Page 404

Plaintiffs in the above-entitled matter, pursuant to notice, the witness being previously duly sworn by CATHERINE S. BOYD, Notary Public in and for the Commonwealth of Virginia, taken at the offices of Shaw Pittman, 1650 Tysons Boulevard, McLean, Virginia, at 9:15 a.m., Friday, May 3, 2002, and the proceedings being taken down by Stenotype by CYNTHIA R. SIMMONS, RMR, CRR, and transcribed under her direction.

Page 405

APPEARANCES:
On behalf of the Plaintiffs Florida Power & Light Company, Northern States Power Company, Duke Power, Indiana Michigan Power Company, Boston Edison Company, GPU Nuclear, Inc., Power Authority of the State of New York, Omaha Public Power District, and Nebraska Public Power District:
ALEX D. TOMASZCZUK, ESQ.
DANIEL S. HERZFELD, ESQ.
Shaw Pittman LLP
1650 Tysons Boulevard
McLean, Virginia 22102-4859
(703) 770-7940

On behalf of the Plaintiffs Yankee Atomic, Maine Yankee and Connecticut Yankee:
PETER SKALABAN, JR., ESQ.
Spriggs & Hollingsworth
1350 I Street, N.W.
Ninth Floor
Washington, D. C. 20005-3305
(202) 898-5821

Page 406

APPEARANCES (Continued):

On behalf of the Plaintiff Wisconsin Electric Power Company:
DONALD J. CARNEY, ESQ.
Perkins Coie LLP
607 Fourteenth Street, N.W.
Washington, D. C. 20005-2011
(202) 434-1690

On behalf of the Plaintiff Southern Nuclear Power:
RONALD A. SCHECHTER, ESQ.
Arnold & Porter
555 Twelfth Street, N.W.
Washington, D.C. 20004-1206
(202) 942-5160

On behalf of the Plaintiff Sacramento Municipal Utility District:
DAVID S. NESLIN, ESQ.
Arnold & Porter
370 Seventeenth Street, Suite 4500
Denver, Colorado 80202-1370
(303) 863-2301

Page 407

APPEARANCES (Continued):

On behalf of the Plaintiff Commonwealth Edison Company:
CHRISTOPHER P. TOMPKINS, ESQ.
Jenner & Block, LLP
One IBM Plaza
Chicago, Illinois 60611-7603
(312) 222-9350

On behalf of the Defendant:
RUSSELL A. SHULTIS, ESQ.
HEIDE L. HERRMANN, ESQ.
United States Department of Justice
Civil Division
1100 L Street, N.W.
Washington, D. C. 20530
(202) 305-7561

Page 416

Q. Again, any questions at all, please let me know. If you don't understand my question, please let me know. Is that fair?
A. That's fair.
Q. And if you disagree with any assumption in my question, please advise me.
A. Okay.
Q. If I could ask you to turn to Exhibit 3 to your deposition, that's the standard contract. Do you have it in front of you now?
A. I do.
Q. If I could ask you to turn to page 16593. If you'd look in the first column, the first full paragraph that begins, Article VI.B.3(b), do you see that?
A. I do.
Q. Could you read that paragraph?
A. Article VI.B --
Q. You don't need to read it out loud. You can just read it to yourself.
A. Okay.
Q. Are you familiar with this language?
A. Vaguely, yes.
Q. Do you think you've reviewed it in the past?

Page 417

A. Not this specific language. I have reviewed it after the contract was final, after the registered notice was final.
Q. You're familiar with the concept of the Department having the right to grant priority to shut down reactors?
MR. SHULTIS: Objection as to characterization.
THE WITNESS: I'm familiar with that, yes.
BY MR. NESLIN:
Q. It states here that, in the second sentence, this type of priority is necessary to prevent reactors from waiting 20 or 30 years to be commissioned -- decommissioned after they've finished generating electricity. Do you understand that DOE had a goal of avoiding reactors from experiencing such delays?
MR. SHULTIS: Objection, Mr. Milner is not a 30(b)(6) witness.
THE WITNESS: My recollection was that the Department preferred not to prohibit giving priority to shutdown reactors.
BY MR. NESLIN:
Q. Well, this paragraph states that certain commenters had recommended that a provision allowing

Page 418

for such priority be deleted, that the Department had not accepted that recommendation because again it states that this type of priority is necessary to prevent reactors from waiting 20 or 30 years to be decommissioned after they finish generating electricity.
And, again, my question is, was avoiding that kind of delay a goal or objective of the Department?
MR. SHULTIS: Objection, same objection.
THE WITNESS: No, and again, my recollection of the situation is that the Department preferred not to preclude the ability to give some priority to shutdown reactors. But of course we are reading from the preamble to the rule and discussing how comments were addressed.
BY MR. NESLIN:
Q. That's correct. Did the Department have any interest in the timely decommissioning of shutdown reactors?
A. It did.
MR. SHULTIS: Same objection.
BY MR. NESLIN:
Q. That was an interest of the Department's?
A. It was an interest, yes.

Page 419

Q. The Department, would it be fair to say that the Department had an objective of allowing shutdown reactors to decommission in a timely manner?
MR. SHULTIS: Same objection.
THE WITNESS: Well, again, I think it was more a case that the Department preferred not to preclude that ability.
BY MR. NESLIN:
Q. What do you mean by not preclude that ability?
A. The Department did not as I recall have an objective to give priority to shutdown reactors, it simply preferred not to preclude that ability in the future.
Q. My question isn't about asking granting priority, my question is simply did the Department have an objective of allowing shutdown reactors to decommission in a timely manner?
MR. SHULTIS: Same objection.
THE WITNESS: It did, yes.
BY MR. NESLIN:
Q. And would that remain an objective of the Department's today?
A. I believe so.
Q. If we could turn to page 16606, do you see

# Defendant

Page 432

submittal timing procedures and approval process.
Is that accurate?
MR. SHULTIS: Objection, go ahead. I'm sorry.
THE WITNESS: Well, I don't recall not having been directly involved in the issue resolution process. But certainly we believed that the clarification was necessary in the exchange process.
BY MR. NESLIN:
Q. And why was that?
A. You know, apparently we believed at the time that there were some areas that needed clarification, some ambiguities.
Q. Is that a recollection that you have or is that your inference from the material on this page?
A. Probably a little of both.
Q. Do you recall were there ambiguities or issues that the Department wished to clarify that are not listed on this page?
MR. SHULTIS: Objection, Mr. Milner is not a 30(b)(6) witness.
THE WITNESS: I don't recall.
BY MR. NESLIN:
Q. If you could turn to the next page, HQR0060154. I ask you to read lines 2 through 6.

Page 433

Mr. Milner, this indicates that under the contract, DCS's could be exchanged between different utilities?
MR. SHULTIS: Objection as to characterization.
THE WITNESS: In reading this I believe this was a proposed position, a draft position that our M&O had submitted. But my understanding is under the contract certainly utilities could exchange DCS's.
BY MR. NESLIN:
Q. And is it also your understanding that under the contract DSC's could be exchanged or modified within a utility?
MR. SHULTIS: Objection, calls for a legal conclusion.
THE WITNESS: I don't recall that in the contract.
BY MR. NESLIN:
Q. If I could ask you to turn back to Exhibit 3. Turn to page 16601, bottom of the third column. Article Roman V, E, Exchanges. The first sentence reads, "Purchaser shall have the right to determine which SNF and/or HLW is delivered to DOE."
Would that allow purchasers to exchange within a utility?

Page 434

MR. SHULTIS: Objection, calls for a legal conclusion.
THE WITNESS: I guess in my opinion I wouldn't view that as an exchange. My view had always been that a utility once it reached its place in the queue could ship whatever fuel it wanted to, not necessarily just the oldest fuel that it had. As long as it was older than five years.
BY MR. NESLIN:
Q. What if a utility has several generating stations and wished to shift the generating station?
MR. SHULTIS: Same objection. Calls for speculation.
THE WITNESS: My recollection was that it wasn't limited to a reactor site, that the utility had a right in the queue when it chose.
BY MR. NESLIN:
Q. If I could take you back to Exhibit 52, still on the same page.
A. Okay.
Q. Lines 29 through 32, there's a sentence that states DOE will evaluate the exchange request in accordance with the projected DOE transportation capabilities and the projected available civilian radioactive waste management systems acceptance

Page 435

capacity for the indicated delivery years.
Is that accurate in your opinion?
A. In my opinion, yes.
Q. The Department would evaluate an exchange request with reference to the systems transportation capabilities?
MR. SHULTIS: Objection, Mr. Milner is not 30(b)(6) witness.
THE WITNESS: In my opinion, yes.
BY MR. NESLIN:
Q. And the system's acceptance capacity for the year in question?
MR. SHULTIS: Same objection.
THE WITNESS: Correct.
BY MR. NESLIN:
Q. Do you recall discussing with others at the Department what criteria that the Department would use in reviewing exchange requests?
A. I don't recall any specific discussions, certainly there were issues that you would have to look at for an exchange request, and I think reading further on in this proposed position statement gives an indication of some of them. If one utility with an approved DCS was intending to ship 20-year-old fuel and an exchange request came through where

Page 436

another utility was going to ship five-year-old fuel, that would certainly make a difference in our transportation abilities.
Q. And why is that?
A. Younger fuel, hotter fuel.
Q. So that would be a consideration that DOE would look at?
A. Correct.
MR. SHULTIS: Objection, Mr. Milner is not a 30(b)(6) witness.
BY MR. NESLIN:
Q. But the fact that the fuel might involve different ages wouldn't preclude an exchange from being proposed?
MR. SHULTIS: Same objection.
THE WITNESS: Well, in my opinion it wouldn't necessarily preclude it. In the example I gave it could certainly affect the quantity at any one time.
BY MR. NESLIN:
Q. And the fact that -- I didn't wish to cut you off?
A. Using a hypothetical case if the Department had one transport cask available at the time, an unlikely situation, and all of a sudden a

Page 437

change was made from 20-year-old to five-year-old fuel, that cask certainly would have the ability to carry less fuel at five years old than it would at 20.
Q. Let me ask it another way. If an exchange request would be consistent with the Department's transportation capabilities and acceptance capacity for the delivery year, is it your opinion that it should have been approved?
MR. SHULTIS: Objection, calls for speculation. Also Mr. Milner is not a 30(b)(6) witness.
THE WITNESS: Well, since we never did receive any change requests, I can't indicate, but in my opinion that would have been the case, yes, it should have been approved.
BY MR. NESLIN:
Q. If I could turn you to the next page, HQR-006-0155. You see there's a proposed contract revision which is set forth in lines 19 through 30. It's your recollection that the contract was never revised in this matter, was it?
MR. SHULTIS: Objection, calls for a legal opinion.
THE WITNESS: I don't recall that it had

Page 438

been revised, no.
BY MR. NESLIN:
Q. Do you recall the Department ever adopting a position statement on the DCS exchange process?
MR. SHULTIS: Objection, Mr. Milner's not a 30(b)(6) witness.
THE WITNESS: I don't recall a position statement, no.
BY MR. NESLIN:
Q. Do you recall any further work being done on this proposed position statement?
A. No, I don't recall.
Q. Do you recall the Department taking other work on the exchange process?
A. Not that I can recall.
Q. Sitting here today, you can't recall any other analysis or assessment that the Department did of the exchange process under the contract?
MR. SHULTIS: Asked and answered.
THE WITNESS: Not offhand, no.
BY MR. NESLIN:
Q. If I could direct you to page HQR0060162. Mr. Milner, this is another proposed OCWRM position on issues 019, 021, and 024, nonfuel and structural components.

Page 439

Do you recall receiving or reviewing this in the past?
MR. SHULTIS: Objection, asked and answered.
THE WITNESS: No, I don't recall.
BY MR. NESLIN:
Q. Do you recall the Department ever taking any work relating to a position statement on nonfuel and structural components?
A. No, I don't.
Q. Do you recall the Department considering any amendments to the contract to address nonfuel or structural components?
MR. SHULTIS: Asked and answered.
THE WITNESS: Other than the indication in this document that it was under consideration, no, I don't recall specifically.
BY MR. NESLIN:
Q. Other than what's set forth in this document?
A. Correct.
Q. You have no recollection?
A. No, I don't.
Q. And reviewing this document doesn't refresh your memory?

# Defendant

Page 452

Q. And the members of your staff would have been Mr. Brownstein and Ms. Slater and/or Ms. Payton?
A. Including them, yes.
Q. Others?
A. There were others on the staff, I don't recall at the time which ones they were.
Q. If I could direct you to page CTR-001-1306. Under heading III, Time Phased Review Criteria, I'd like to ask you to review the first paragraph.
You see it states in the second sentence that, "These sets of review criteria will be time phased with the time dependency being linked to when the DCS exchange request is received by the Department." What does that mean to you, time phased?
MR. SHULTIS: Objection, foundation. Calls for speculation.
THE WITNESS: Reading these words at this point in time, my opinion would be that we would be looking at dealing with exchange requests in the order they were received.
BY MR. NESLIN:
Q. Do you recall any consideration by the Department that different criteria might apply

Page 453

depending upon how far along the waste management system planning and procurement had progressed?
MR. SHULTIS: Objection, assumes facts not in evidence. Mr. Milner's not a 30(b)(6) witness.
THE WITNESS: I'm sorry, would you repeat that, I'm not sure I understand that question.
BY MR. NESLIN:
Q. Let me ask it a different way. Do you recall the Department considering using different criteria for reviewing an exchange request depending upon how far along the waste management system planning and procurement had progressed?
MR. SHULTIS: Same objection.
BY MR. NESLIN:
Q. In other words that if an exchange request were made very early in the system before final planning or procurement decisions had been made, the criteria might be in one form, but other criteria might apply if decisions had been made regarding system planning or procurement?
A. No, I don't recall that.
Q. Let me ask you to turn to the next page, page 1307, under heading VI, First Set of Time Phased Review Criteria?
A. Uh-huh.

Page 454

Q. The third from the last sentence states, that in fact since the facility, the waste disposal facility locations and system designs are still being evaluated, it could be argued that there would be no impact to the system of any DCS exchanges at this time. Do you see that language?
MR. SHULTIS: Objection. I don't.
THE WITNESS: I found it here. I'm going to read it in context.
BY MR. NESLIN:
Q. Let me restate my question. This paragraph states that in fact since the facility locations and system designs are still being evaluated, it could be argued that there would be no impact to the system of any DCS exchanges at this time.
Would you agree that there would be no impact to the system of a DCS exchange if as of March 1994 the facility locations and system designs were still being evaluated?
A. I think at that point in time there was no known reason why there would be any impact. For example the designs were early enough along that presumably you could have adjusted designs if there had been any impact. But that can't be said with

Page 455

certainty because you just simply didn't know.
Q. So if the system could be adjusted at that point to address the requirements of an exchange, did that make it more likely that an exchange would be approved by the Department?
MR. SHULTIS: Objection, Mr. Milner's not a 30(b)(6) witness. Calls for speculation.
THE WITNESS: I guess my personal opinion would be if you could adjust the system design at whatever point an exchange request was received and that change in design didn't impact the system adversely in another way, such as cost or schedule, yeah, that probably would have made it more likely.
BY MR. NESLIN:
Q. Under that circumstance, the Department should approve an exchange?
MR. SHULTIS: Same objections.
BY MR. NESLIN:
Q. In your opinion?
A. Well, that would not have been the sole criteria, I don't believe. But that would certainly have been factored in.
(Milner Exhibit No. 55 was marked for identification.)
BY MR. NESLIN:

# Defendant

Page 464

such a review occurring with respect to the development of exchange criteria?
MR. SHULTIS: Same objection.
THE WITNESS: I don't specifically recall. Presumably there were departmental reviews of drafts of criteria.
BY MR. NESLIN:
Q. But sitting here today you don't recall who might have been involved in those reviews?
A. No. Or even if they occurred. But presumably they did.
Q. If I could turn you to page 0010. You see a couple bullets at the bottom of the page, Mr. Milner?
A. Yes.
Q. The sentence preceding the bullet states that, "Consequently, several questions must be answered to determine if an exchange request can be approved. The foremost being do the proposed changes adversely impact the system's ability to meet the commitments made on other DCS's, and have the designs or procurements in any of the CRWMS elements been based on the original DCS's, and if so will approval of the exchange request adversely affect them."
Would you agree that those were the

Page 465

foremost questions that need to be answered by the Department in determining whether to approve an exchange request?
MR. SHULTIS: Objection, Mr. Milner's not a 30(b)(6) witness.
THE WITNESS: In my opinion they would be at least two of the more important ones.
BY MR. NESLIN:
Q. Can you think sitting here today of other important considerations?
MR. SHULTIS: Same objection.
THE WITNESS: Not offhand.
BY MR. NESLIN:
Q. So if a proposed exchange wouldn't adversely impact the system's ability to meet the commitments made on other DCS's, and wouldn't adversely affect the designs or procurements of the waste management system elements, is it your opinion it should be approved by the Department?
A. It would be my opinion that it shouldn't be disapproved at that point.
Q. If it weren't disapproved, wouldn't it be approved?
A. No, because there may be other criteria that you would look at.

Page 466

Q. Are there other criteria that you can identify sitting here that would be important to that question?
MR. SHULTIS: Asked and answered.
THE WITNESS: No.
BY MR. NESLIN:
Q. If I could ask you to turn to page 0021. The third paragraph, if I could ask you to review the third paragraph on that page. The second sentence states that, "Whereas the review could be terminated after the first failed review criteria, performing a complete review will provide the purchaser with as much information as possible for preparing a revised exchange request, if desired."
Do you see that language?
A. Yes.
Q. Was it important to the Department to provide purchasers with information on why an exchange request might be disapproved so that they could attempt to correct the problem and resubmit?
MR. SHULTIS: Objection, Mr. Milner's not a 30(b)(6) witness.
THE WITNESS: In my personal opinion it would have been important, sure.
BY MR. NESLIN:

Page 467

Q. And in your opinion, would the Department have done so?
MR. SHULTIS: Same objection, calls for speculation.
THE WITNESS: In my opinion it would have, I believe.
BY MR. NESLIN:
Q. The last sentence of, the last two sentences state that the, "Furthermore, the review process will aid DOE in identifying patterns of change in purchaser servicing capabilities or desires. These trends will provide DOE with an early indication of the need to change existing procurements." Do you see that language?
A. Yes, I do.
Q. Would you agree with those statements?
A. Yeah, I would agree.
Q. On the next page, page 16, there's a figure?
A. Which?
Q. Page CTR0010022?
A. 22, yes.
Q. Figure 1. See, this suggests?
A. You switched page references on me, so --
Q. I apologize. Figure 1 indicates that in

# Defendant

Page 492

Rudy and others from Yankee Rowe.
Q. By that issue you mean the issue of?
A. Priority for Yankee Rowe.
Q. The second paragraph of the letter in the second sentence states that you, meaning Mr. Barrett, indicated during our discussion that you would be receptive to suggestions on a process for allocation of priority under the contract which DOE could follow with public notice or through a rulemaking.
Do you recall Mr. Barrett encouraging Yankee Atomic to suggest a process for granting priority to shutdown reactors?
A. I don't recall him encouraging it. I recall him being willing to have a discussion of the public rulemaking process.
Q. This is the rulemaking process that you've referred to earlier in your testimony?
A. Yes. Which, as I recall, did not actually take place.
Q. Do you recall having previously received or reviewed the attachment to this letter?
A. No.
Q. Let me ask you to turn to the second page of the attachment. Would you review the suggested process language? Do you recall having reviewed

Page 493

these or similar criteria for making decisions on whether to grant priority to shutdown reactors?
A. No, I don't.
Q. Do you have an opinion sitting here today as to whether these criteria would be appropriate for making that decision?
A. Well, I guess in my view sitting here looking at this today some of these don't appear to be criteria so much as statements of opinion.
Q. Do you disagree with certain of these, sir?
A. I do.
Q. Do you disagree with the first item, that granting priority can be shown to be less costly --
A. I do.
Q. -- to the Department's waste management system?
A. I do.
Q. Why do you disagree with that?
A. Because I can't envision how granting the priority would be less costly.
Q. What would the additional cost be for granting priority?
A. Huh?
Q. What would the additional cost be for

Page 494

granting priority?
A. I don't know where there would be additional cost. I can't see where the cost would be reduced.
Q. Well, the cost to the utilities in question, the shutdown utility would certainly be reduced?
A. Yes, it would. I think that's what's being reflected in number 3.
Q. And with respect to number 2, item 2, granting priority can be shown to involve a shipment of small enough quantities of spent fuel compared to the overall DOE acceptance rate so as not to jeopardize the timely removal of spent fuel from other sites, or other compensation should be provided.
Do you disagree with that?
A. I do.
Q. And why do you disagree with that?
A. Any amount of fuel that you accepted from a shutdown by granting priority would certainly impact other utilities in the queue.
Q. But this refers to jeopardizing the timely removal of spent fuel from other sites. Would such an impact necessarily jeopardize the timely removal

Page 495

of spent fuel from other sites?
A. I believe it would. If over some period of time the Department were to -- according to the priority ranking, the ACR of 1995, since that combined both, one utility would expect to have X number of MTUs removed from their reactor within some specified time period. So if a portion of that allocation was given to another reactor, it would not be as timely.
Q. But would a portion of that allocation have to be given to another reactor if in fact the receipt rate exceeded the discharge rate?
A. Certainly.
Q. Why do you say that?
A. Any time there's a finite amount of fuel being accepted, and that finite amount of fuel is allocated amongst the utilities in the queue, whatever that number may be, if you reallocate that, a portion of that, to other utilities farther down in the queue, you're certainly impacting that.
Q. Would you disagree with criterion 3 here that granting priority can be shown to avoid the establishment of an otherwise unneeded reactor site storage facility?
A. I don't completely agree with that.

Page 496

Q. And how do you disagree with it?
A. If a reactor is shutting down, presumably it has all of its spent fuel stored on site either in the pool or dry storage or a combination thereof. That storage exists when the reactor shuts down. Since no more fuel is being generated by the reactor I'm not sure what additional storage would be established.
Q. Would you agree that it would avoid the need to continue an otherwise unneeded reactor site storage facility?
A. I would.
Q. And the next item states that granting priority can be shown to be clearly cost effective for consumers from the standpoint of timely decommissioning?
A. I would agree with that.
Q. And the last item is that granting priority can be shown to support the national policy of efficient operation of the country's waste management system.
A. I can neither agree or disagree with that. I'm not quite sure what that means.
Q. You don't understand --
A. Correct.

Page 497

Q. -- the criteria?
A. Correct.
Q. Do you know whether you or Mr. Barrett responded to this letter by Mr. Grube?
A. I don't recall for certain, I don't believe we did.
Q. Do you know whether the Department has ever adopted any criteria for making decisions on shutdown reactors?
MR. SHULTIS: Objection, asked and answered.
THE WITNESS: I don't recall. I don't believe.
BY MR. NESLIN:
Q. You're not aware of it?
MR. SHULTIS: Same objection.
THE WITNESS: I'm not aware of it, no.
BY MR. NESLIN:
Q. Do you believe you would have been aware of it if such criteria had been developed?
A. I think I would have.
(Milner Exhibit No. 62 was marked for identification.)
BY MR. NESLIN:
Q. Mr. Milner, Exhibit 62 is a letter from

Page 498

you to Dr. Andrew Kadak dated June 16th, 1994. Are you familiar with this letter?
A. I vaguely remember this letter, yes.
Q. Did you draft this letter?
A. I don't believe I did.
Q. But you would have reviewed and approved it?
A. Certainly.
Q. And the purpose of this letter was to respond to certain questions that Yankee Atomic had raised with the Department?
A. Apparently so, yes.
Q. Is that your recollection?
A. Yes.
Q. In the second paragraph of the first page, the first sentence reads that, "In designing the waste management system, the Department and the nuclear utilities share mutual goals of initiating federal acceptance of spent nuclear fuel as soon as possible and accommodating economic and physical situations confronting utilities such as yours."
What did you mean by mutual goals of initiating federal acceptance of spent nuclear fuel as soon as possible?
A. I think both the Federal Government, the

Page 499

program and the utilities had a goal of taking fuel off the sites as soon as possible, to begin to take fuel off the sites as soon as possible.
Q. And what did you mean by accommodating economic and physical situations confronting utilities such as yours?
A. I think there was a goal to at least mitigate the economic situation relative to cost of storage, but I don't know what physical situation meant.
Q. What was meant by utilities such as yours? Were you referring to shutdown, utilities with shutdown reactors?
A. I don't recall. Likely that would have been the case.
Q. So you've testified that Department had an interest in mitigating the economic situation confronting such utilities. What do you mean by mitigating the economic situation for them?
A. Well, I don't know that -- hypothetically I don't know whether the condition of the economic situation could be totally alleviated, but potentially at least you could mitigate it.
Q. How?
A. Well, I guess one example I might think of