# Defendant

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - -)
YANKEE ATOMIC ELECTRIC COMPANY )
(98-126C) (Merow, S.J.) )
CONNECTICUT YANKEE ATOMIC POWER )
COMPANY ) Volume II
(98-154C) (Merow, S.J.) ) Washington, D.C.
MAINE YANKEE ATOMIC POWER COMPANY) Wednesday
(98-474C) (Merow, S.J.) ) May 8, 2002
Plaintiffs, )
v. )
THE UNITED STATES, )
Defendant. )
- - - - - - - - - - - - - - - - - -)

Continued Deposition of RONALD A. MILNER, a witness herein, called for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to agreement, the witness being duly sworn by CHERYL A. LORD, a Notary Public in and for the District of Columbia, taken at the offices of SPRIGGS & HOLLINGSWORTH, 1350 I Street, N.W., Washington, D.C., at 9:20 a.m., Wednesday, May 8, 2002, and the proceedings being taken down by Stenotype by CHERYL A. LORD, RPR, CRR, and transcribed under her direction.

Page 48

APPEARANCES:

On behalf of Plaintiffs:
PETER J. SKALABAN JR., ESQ.
SPRIGGS & HOLLINGSWORTH
1350 I Street, N.W.
Washington, D.C. 20005-3305
(202) 898-5821

On behalf of Defendant:
RUSSELL A. SHULTIS, ESQ.
UNITED STATES DEPARTMENT OF JUSTICE
CIVIL DIVISION
Commercial Litigation Branch
Federal Claims Section
1100 L Street, N.W.
Washington, D.C. 20530
(202) 305-7561

Page 49

CONTENTS


| WITNESS | EXAMINATION PAGE NO. |
|---|---|
| RONALD A. MILNER | |
| By Mr. Skalaban | 51 |
| Afternoon Session | 159 |


EXHIBITS


| MILNER EXHIBIT NO. | PAGE NO. |
|---|---|
| 96 1992 Annual Capacity Report, Nos. HQ002314-352 | 61 |
| 97 Letter, 9-25-92, and attachments, Nos. YDK008922-229 | 68 |
| 98 Letter, 4-20-94, No. YDK-005-0417 | 120 |
| 99 Letter, 9-29-92, and attachments, various MOF and MPA numbers | 160 |
| 100 Letter, 9-25-92, and attachments, Nos. CDB006458-6437, and various other numbers | 166 |
| 101 10 CFR 61.55, Waste | |


Page 50

EXHIBITS CONTINUED


| MILNER EXHIBIT NO. | PAGE NO. |
|---|---|
| Classification | 186 |
| 102 Nuclear Waste Technical Review Board Full Board Meeting, 1-11-94, Nos. YDK-013-0001-035 | 216 |
| 103 Memorandum, 3-8-94, and attachments, Nos. HQR-028-2747-762 | 221 |
| 104 Memorandum, Nos. HQR-058-0330-331 | 223 |
| 105 Defendant's Proposed Stipulation of Facts, Case No. 98-126C | 226 |
| 106 Letter, 7-15-98, Nos. HQR-041-0600-601 | 276 |
| 107 Memorandum, Nos. EL-115711-713 | 277 |
| 108 Letter, 7-30-93, and attachments, Nos. HQ0013568-578 | 283 |


Page 51

PROCEEDINGS

Whereupon,

RONALD A. MILNER

was called as a witness by counsel for Plaintiffs, and, having been duly sworn by the Notary Public, was examined and testified as follows:

FURTHER EXAMINATION BY COUNSEL FOR PLAINTIFFS

BY MR. SKALABAN:

Q. Okay. Hello, Mr. Milner. How are you today?

A. Morning. Fine. How are you?

Q. And just before we begin this morning, the same ground rules that we discussed apply. Is that okay?

A. Fine with me.

Q. I wanted to cover something about failed fuel we were talking about at the end of yesterday's session. And I asked you if there was an NRC-licensed container for failed fuel with the department then accepted upon the currently agreed schedule, and your answer was, as I understand your answer, in your opinion you thought yes.

I mean, do you recall that exchange?

A. Yeah. My recollection was that

Page 72

MR. SHULTIS: Objection. Mr. Milner is not a 30(b)(6) witness.
MR. SKALABAN: Well, he was the director of the office with responsibility at the time.
MR. SHULTIS: I understand, that but he's not a 30(b)(6) witness.
MR. SKALABAN: Your objection is noted.
BY MR. SKALABAN:
Q. Can you answer, Mr. Milner?
A. I'm sorry. Would you repeat the question.
MR. SKALABAN: Could you read it back, please.
(The reporter read the next-to-last question.)
MR. SHULTIS: Same objections.
A. And I believe that was so stated in the instructions from the DCS.
BY MR. SKALABAN:
Q. And so that was the department's position?
A. I believe so.
Q. Do you remember ever talking about that instruction while you were director?
A. Not specifically. I don't know.
Q. And if you do need to refer to the instructions, they are No. 43. The item is 2.7 on

Page 73

page 6.
A. Okay.
Q. Do you have any reason to believe that the department ever talked about deviating from that instruction and the approval and disapproval process?
MR. SHULTIS: Objection, foundation.
A. I'm not aware of any discussions that had taken place that deviate from the instruction, no.
BY MR. SKALABAN:
Q. Do you know if the pos- -- I mean, was it something even open for discussion, is that maybe there would be cases where a purchaser would be allowed to exceed their allocation?
MR. SHULTIS: Asked and answered.
A. I think I had indicated previously that in a number of points throughout the conduct of the program, there had been discussions and considerations as to whether priority should be given to shutdown reactors. I believe in each case, the final outcome in discussing it with the industry as a whole was that we should maintain the ranking, I guess, if you will, that's specified in the contract, that is, oldest fuel first. Priority should be given on oldest fuel first rather than shutdown.
BY MR. SKALABAN:

Page 74

Q. Thank you. I appreciate that, but my question is actually a little bit more specific.
Was there any discussions that you are aware of or that you can recall where the department was considering or discussing whether or not it could or should deviate from this instruction 2.7 and approve any DCS that exceeded the 1991 ACR allocation?
MR. SHULTIS: Objection, asked and answered.
A. Yeah. I believe I stated that I wasn't aware of any discussion specific to deviating from the instruction.
BY MR. SKALABAN:
Q. And so then the only -- if I understand correctly the only conversations you recall generally about the topic of deviating from the 1991 ACR allocation would be the possibility of shutdown priority?
MR. SHULTIS: Objection, assumes facts not in evidence, asked and answered.
A. I think what I stated was that, yes, there had been discussions about should we maintain a priority based on oldest fuel first, should there be priority for shutdown reactors. I don't recall if

Page 75

there were any other situations other than shutdown reactors that we discussed as to whether or not priority should be given, but certainly.
BY MR. SKALABAN:
Q. Turning back to this letter in Yankee -- this Sept- -- this December 1, 1992, letter in Milner 97, second paragraph says, as a result of these errors, the DCS has been approved --
MR. SHULTIS: Objection.
MR. SKALABAN: I'm sorry. Thank you, counsel.
BY MR. SKALABAN:
Q. -- has disapproved -- or, has been disapproved, so as a result of these errors, the DCS numbers specified here have been disapproved.
Was it the department's position at the time that Yankee Atomic had submitted -- had committed errors in submitting its DCSs as it did?
MR. SHULTIS: Objection. The document speaks for itself, calls for a legal conclusion.
A. In my opinion, certainly the department felt that Yankee had deviated from the instructions and submitted DCRs that were far in excess of the allocation.
BY MR. SKALABAN:

# Defendant

Page 76

Q. If you look at the next letter in the series, it is a January 7th, 1993, letter to Linda Strand, the contracting officer, from a Mr. J.M. Buchheit, and the letter is under Yankee Atomic Electric Company letterhead. If you want to take a moment to review the letter, please feel free.
(Pause.)
BY MR. SKALABAN:
Q. Okay. From your review of this letter, is it fair to say that Yankee Atomic is taking exception to the DCS instruction 2.7?
MR. SHULTIS: Objection. The document speaks for itself, calls for speculation.
A. In my opinion, that's what's characterized here, m-hm.
BY MR. SKALABAN:
Q. Did you review this letter when it came in from Yankee Atomic?
A. I don't recall having done that.
Q. Would that be something you would probably review in your ordinary course of business as the director of office of storage and transport?
A. Not necessarily. It could have been handled by one of my staff.
Q. Who do you think that would be?

Page 77

A. Exhibit 1 doesn't help me, so at this point in time, I can't really recall.
Q. Do you remember in early 1993 the subject coming up at all that Yankee Atomic was taking issue with the DCS instructions and not submitting DCSs per that instruction?
A. I generally recall that.
Q. What do you generally recall was being said within DOE at that time about this?
A. I think at that point in time as the best of my recollection, the industry in general had made it pretty clear to the department that they wanted to maintain the oldest fuel first as the basis for priority ranking.
Q. You remember anything else about internal DOE discussions about Yankee Atomic's objections?
A. Nothing specific within the department. I certainly remember the industry in general raising equity issues if we gave priority to shutdown reactors.
Q. If you look at page 2 of Mr. Buchheit's letter, in the last paragraph, he says: Storing spent fuel on-site for an extended period after a plant has shut down or could be dismantled is not what Congress had in mind when it passed the waste

Page 78

policy act.
Do you agree with that statement?
MR. SHULTIS: Objection, calls for a legal conclusion.
A. I'm sorry. Where are you reading?
MR. SHULTIS: I can help you, I think.
A. I can neither agree or disagree. I don't know what Congress had in mind.
BY MR. SKALABAN:
Q. Well, when you came to the program in the early years, in 1984 and 1985 and were, if I understand your prior testimony correctly -- I mean, you were doing things to get orientated and learn about the program when you came on board.
At that time in, you know, '84, '85, did you have that -- an understanding similar to what's reflected here?
MR. SHULTIS: Objection, calls for a legal conclusion, also, asked and answered.
A. I guess the best of my recollection, when I first joined the program, oldest fuel first had been in essence the basis for priority ranking.
BY MR. SKALABAN:
Q. But when you came on board with DOE in '84 and '85, did you have any understanding about what

Page 79

Congress had in mind or Congress intended when it passed NWPA?
MR. SHULTIS: Objection, calls for a legal conclusion, asked and answered.
A. No, other than what was in the act itself, which is certainly subject to interpretation.
BY MR. SKALABAN:
Q. If we turn to the next letter in the stack, that's an April 8, 1993, letter. And this letter is from Ms. Tomasoni, the contracting officer, to Mr. Buchheit. It has a Bates label of YDK 037406.
MR. SHULTIS: I'm sorry?
MR. SKALABAN: The small number.
MR. SHULTIS: Oh, okay. Thank you.
Q. If you could just take a moment to review that.
Does this letter appear to be a response to Yankee Atomic's January 7, 1993, letter?
A. Appears to be.
Q. And that January 7, 1993, letter was again a resubmittal after the first rejection of the DCSs?
A. I believe that's correct.
Q. And so this letter -- this DOE letter of April 8, 1993, is a second rejection, if you will, of Yankee Atomic's DCSs.

# Defendant

Page 172

discussions in the sense of affecting all utilities that given the inability at that point or the highly unlikely ability to meet a '98 date that to approve schedules that were year-specific didn't seem appropriate.

Q. Was there anything else about those discussions that you can remember?

MR. SHULTIS: Objection, asked and answered.

A. No.

BY MR. SKALABAN:

Q. And I used the term suspending.

The processing of DCSs and FDSs, I mean, is that a fair characterization of what was happening at the department?

They were no longer suspending consideration of these DCSs and FDSs?

A. That would be how I would characterize it, suspended rather than stopped processing. Stopped to me would be more permanent than suspend.

Q. So at some point in the future, this process may open up again?

A. Certainly that's my anticipation.

Q. I'd like to switch gears for a moment and talk about greater than class C waste, and for the

Page 173

record. I may refer to that as GTCC waste, and you're familiar with that term?

A. Yes. I am.

Q. There was a few documents we looked at previously or that have been looked at previously in the coordinated portion of your deposition. I'd like to if you could please pull those out. That's No. 64 and 79.

Starting first with Exhibit 64, this describes a meeting that was scheduled for February 8, 1995, and it indicates here in this document that the meeting was scheduled for four hours?

A. It indicates that, yes.

Q. Is it fair to say the letter is indicating that the meeting is about the coordination between the office of environmental management. GTCC, LLW program, and the 5office of Civilian Radioactive Waste Management repository program?

A. I'm sorry. Would you --

Q. Sure. The document reflects that there was a -- that someone has recognized the need for coordination between the office of environmental management and RW regarding GTCC waste?

A. Yeah. It states that here.

Q. Do you remember who it was that kind of

Page 174

came to that recognition, that there was a need for coordination?

A. Well, it would infer from this memo it was Mr. Plummer.

Q. Do you know prior to the time of this memo, dated January 27, 1995, were there any discussions in RW about accepting GTCC waste as part of RW's waste management program?

A. I can't remember -- I can't recall any specific meetings or discussions. I guess I do recall in general terms discussions which essentially focused on the idea that greater than class C was not required to be disposed of in a repository.

Q. And who -- do you recall who those discussions were with?

A. I can only recall just vaguely in general terms having such discussions. No, I can't recall who I had them with.

Q. And why were those discussions being held?

Was there a question in people's mind or a doubt in people's mind whether or not GTCC would have to be taken by RW as far as a waste program?

A. Actually, no. The nature of the discussions I recall were basically either in response to a question from somebody within the

Page 175

program or perhaps even somebody from environmental management simply informing them that there was no requirement for RW, DOE -- RW.

Q. Did you make that decision, or did someone else?

A. I did not make that decision. I guess the program held that position stemming from -- I guess language in the NWPA, which indicated that the program would dispose of high-level waste that NRC had determined required disposal in the deep geologic repository, and NRC had not made that determination.

Q. Do you remember anyone in particular on RW who was -- may have studied this question or may have --

A. No, no.

Q. Now, I don't want to cover the same ground that was covered before, and I recall your answer being -- about this February 8, 1995, meeting being that you communicated to the office of environmental management RW's position that GTCC was not RW's responsibility.

I mean, is that what you recall you testified to?

A. Yes. I recall I guess having a meeting with Mr. Plummer and stating that. Whether it was a

# Plaintiff

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

\- - - - - - - - - - - - - - - - - -)
YANKEE ATOMIC ELECTRIC COMPANY )
(98-126C)(Merow, S.J.) )
CONNECTICUT YANKEE ATOMIC POWER )
COMPANY ) Volume II
(98-154C)(Merow, S.J.) ) Washington, D.C.
MAINE YANKEE ATOMIC POWER COMPANY) Wednesday
(98-474C)(Merow, S.J.) ) May 8, 2002
Plaintiffs, )
v. )
THE UNITED STATES, )
Defendant. )
\- - - - - - - - - - - - - - - - - -)

Continued Deposition of RONALD A. MILNER, a witness herein, called for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to agreement, the witness being duly sworn by CHERYL A. LORD, a Notary Public in and for the District of Columbia, taken at the offices of SPRIGGS & HOLLINGSWORTH, 1350 I Street, N.W., Washington, D.C., at 9:20 a.m., Wednesday, May 8, 2002, and the proceedings being taken down by Stenotype by CHERYL A. LORD, RPR, CRR, and transcribed under her direction.

Page 48

APPEARANCES:

On behalf of Plaintiffs:
PETER J. SKALABAN JR., ESQ.
SPRIGGS & HOLLINGSWORTH
1350 I Street, N.W.
Washington, D.C. 20005-3305
(202) 898-5821

On behalf of Defendant:
RUSSELL A. SHULTIS, ESQ.
UNITED STATES DEPARTMENT OF JUSTICE
CIVIL DIVISION
Commercial Litigation Branch
Federal Claims Section
1100 L Street, N.W.
Washington, D.C. 20530
(202) 305-7561

Page 49

CONTENTS


| WITNESS | EXAMINATION PAGE NO. |
| --- | --- |
| RONALD A. MILNER | |
| By Mr. Skalaban | 51 |
| Afternoon Session | 159 |


EXHIBITS


| MILNER EXHIBIT NO. | PAGE NO. |
| --- | --- |
| 96 1992 Annual Capacity Report, Nos. HQ002314-352 | 61 |
| 97 Letter, 9-25-92, and attachments, Nos. YDK008922-229 | 68 |
| 98 Letter, 4-20-94, No. YDK-005-0417 | 120 |
| 99 Letter, 9-29-92, and attachments, various MOF and MPA numbers | 160 |
| 100 Letter, 9-25-92, and attachments, Nos. CDB006458-6437, and various other numbers | 166 |
| 101 10 CFR 61.55, Waste | |


Page 50

EXHIBITS CONTINUED


| MILNER EXHIBIT NO. | PAGE NO. |
| --- | --- |
| Classification | 186 |
| 102 Nuclear Waste Technical Review Board Full Board Meeting, 1-11-94, Nos. YDK-013-0001-035 | 216 |
| 103 Memorandum, 3-8-94, and attachments, Nos. HQR-028-2747-762 | 221 |
| 104 Memorandum, Nos. HQR-058-0330-331 | 223 |
| 105 Defendant's Proposed Stipulation of Facts, Case No. 98-126C | 226 |
| 106 Letter, 7-15-98, Nos. HQR-041-0600-601 | 276 |
| 107 Memorandum, Nos. EL-115711-713 | 277 |
| 108 Letter, 7-30-93, and attachments, Nos. HQ0013568-578 | 283 |


Page 51

PROCEEDINGS

Whereupon,

RONALD A. MILNER

was called as a witness by counsel for Plaintiffs, and, having been duly sworn by the Notary Public, was examined and testified as follows:

FURTHER EXAMINATION BY COUNSEL FOR PLAINTIFFS
BY MR. SKALABAN:

Q. Okay. Hello, Mr. Milner. How are you today?

A. Morning. Fine.
How are you?

Q. And just before we begin this morning, the same ground rules that we discussed apply.
Is that okay?

A. Fine with me.

Q. I wanted to cover something about failed fuel we were talking about at the end of yesterday's session. And I asked you if there was an NRC-licensed container for failed fuel with the department then accepted upon the currently agreed schedule, and your answer was, as I understand your answer, in your opinion you thought yes.
I mean, do you recall that exchange?

A. Yeah. My recollection was that

Page 264

little bit less than that, but again I really don't recall.
Q. If I wanted to find out the answer to that question, who would I ask in the department?
A. Well, I believe that the estimates of turnaround times and so forth are embodied somewhere in the TSLCC analysis. Whether it's specifically stated in the published report, I don't recall. The person responsible for the TSLCC analysis is currently the acting director of the -- I forget what we call it now -- acceptance transportation and integration office.
Q. And who is that?
A. That's Jeff Williams.
Q. Does the department anticipate any problems handling higher burnup fuel?
What I mean by that is fuel --
A. I understand the term higher burnup, yeah.
MR. SHULTIS: Objection, vague.
A. I guess I'm vaguely aware that somebody has raised the question as to whether or not there would be any difficulty in handling higher burnup fuel. I don't recall any specifics or any specific concern.
BY MR. SKALABAN:

Page 265

Q. And in general hasn't the industry been moving towards higher burnup fuels in general matter because that reduces the amount of spent fuel generated?
A. It has.
Q. And as you sit here today, do you have any reason to believe that the department would have difficulties handling fuel burned up to say levels of 50,000?
A. The only -- in a general term, I don't know of any reason why the department would not handle higher burnup fuel. I think one potential difficulty that comes to mind is that higher burnup fuel could potentially have the effect of reducing the capacity of a transport cask.
Q. One way of possibly dealing with that would be mixing within a particular transportation cask some higher and some lower burned-up fuel?
A. Yes, that's a potential, sure.
Q. And still reach a full cask?
A. Potentially, yeah. You have to look at the specifics there.
Q. Sure. And if I could call your attention to Milner Exhibit 12.
For the record this is the 1987 annual

Page 266

capacity report.
I'd like to call your attention to the -- inside the first page, there's a letter from Ben Rusche, or a statement signed by Mr. Rusche.
Do you see that there's a statement there where Mr. Rusche says: Even more importantly, comma, it activates a mechanism through which contract holders can express their views on how the waste management system can achieve maximum efficiency while assuring equity among the parties?
What did Mr. Rusche mean to your knowledge about achieving maximum efficiency?
MR. SHULTIS: Objection, calls for a legal conclusion, calls for speculation.
A. I don't know what specifically what Mr. Rusche was referring to. I can form an opinion in my own mind at this point in time reading that that the start of issuing this document indicated to the utilities at that time what the capacity in the rankings plans were, and that could be the basis for comment on how efficiencies might be improved
BY MR. SKALABAN:
Q. Has it been the objective of OCRWM to operate the waste management system in a way that can achieve maximum efficiency?

Page 267

A. Yes.
Q. And that's been an objective throughout your time in RW?
A. Yeah, I believe it has.
Q. And when you consider efficiency in operating the waste management system, is it also proper in your view to take into account utility costs?
A. My personal opinion, that should be a consideration.
Q. And that would be particularly appropriate given that it is a full-cost recovery contract?
A. Well, I don't know that I would blend those two ideas together. Full-cost recovery only refers to the DOE expenditures. Full-cost recovery doesn't consider utility costs.
Q. Do you think given it is a full-cost recovery contract and program that it puts some kind of responsibility on the department to operate it in a way where practicable to minimize utility costs?
MR. SHULTIS: Objection, mischaracterizes prior testimony, asked and answered.
A. In my personal opinion, I think it -- the department should and in fact I think the department did consider utility costs, and that's factored in

# Plaintiff

outside of the United States?
A. I certainly don't recall the number, but I don't have any reason to disagree with that.
Q. And in view of the history of spent fuel transportation in this country and the substantial body of spent fuel transportation abroad, would the sort of history and experiences of those -- of that spent fuel transportation have been something that DOE would have drawn upon if it had performed in 1998?
MR. SHULTIS: Objection, calls for speculation.
BY MR. SKALABAN:
Q. Well, let me say this, I mean, that history of transportation here and abroad, is that something that DOE draws upon now in planning its spent fuel transportation program?
A. I'm not sure I understand what you mean by, draw upon.
Q. I mean, in the history and experience within this country and abroad, does RW use any of that information and experience --
A. Well, we're certainly aware of experiences and shipments that have been accomplished in other countries, yeah. In terms of for example casks, I



don't know that any of the casks used for shipments have been certified by the United States Nuclear Regulatory Commission, but certainly we're aware of what's been done and utilize that information.
Q. Would you agree with the opinion that with sufficient advance planning, DOE could develop the casks or casks for nonstandard fuel, failed fuel, and GTCC waste and obtain the necessary licenses from the NRC --
MR. SHULTIS: Objection, calls for speculation, asks for a legal conclusion.
BY MR. SKALABAN:
Q. -- to perform in 1998 if it had been able to do so?
MR. SHULTIS: Same objection.
A. Transport casks, you're referring to?
BY MR. SKALABAN:
Q. M-hm.
A. Certainly transport casks could have been developed and in fact I believe were developed that were certified by the NRC for transport of spent fuel. I guess in my recollection, I don't know of any that had been developed for failed fuel or GTCC. I can't offhand at this point -- I have no reason to believe at this point that that couldn't have been



done.
Q. And in the period of 1991 approximately through part of 1994 when you were the director of storage and transport, did you have any concerns at that time?
And I believe you had testified previously that at that time you still believed DOE could make 1998?
A. M-hm.
Q. Did you have any -- during that '91 through '94 time period, did you have any concerns that the transportation system wouldn't be able to be in place if you were going to perform in 1998?
A. No, I didn't.
Q. In view of the documents that we've been seeing about the department's current plans or current objectives to reach a steady state of 3,000 MTUs shortly after the beginning of repository operations in approximately 2010, do you have any reason to believe that the department can't develop a corresponding transportation system that can take that 3,000 MTU a year?
MR. SHULTIS: Objection, asked and answered.
A. No, I see no reason why a transportation



system can't be developed to eventually handle 3,000 MTUs.
BY MR. SKALABAN:
Q. And how about if the department had been performing in 1998?
Do you think it could have developed a transportation system that could have handled 3,000 MTUs in 1998 or within a few years thereafter?
MR. SHULTIS: Objection, asked and answered.
A. It had never been the department's plan to begin accepting 3,000 MTUs in 1998, but according to the schedule that existed, I don't recall what the year that we ramped up to 3,000 was, but, yes, I think the system could have been developed.
BY MR. SKALABAN:
Q. A system could have been developed in 1998 after a reasonable rampup that would have been capable of handling 3,000 MTU?
A. A system could have been developed with a rampup which began in 1998 and ultimately have ended up with 3,000 MTU whatever that year was, yes, I believe that a system could have been developed.
Q. Because for example from the early mission plans, we see rampup period beginning in 1998 and



Alderson Reporting Company, Inc.
1111 14th Street, N.W. Suite 400 1-800-FOR-DEPO Washington, DC 20005

Page 276

within a few years thereafter making 3,000 MTU.
A. M-hm.
Q. Again on that kind of schedule, you wouldn't see a problem on making -- on developing a transportation system to do that?
A. Developing a transportation system? No. Because that's simply -- how many MTU you can handle relates strictly to how many casks trailers and railcars there are.
MR. SKALABAN: Off the record briefly.
(Discussion off the record.)
MR. SKALABAN: I'd like to mark Exhibit 106.
(Milner Exhibit No. 106 was marked for identification.)
BY MR. SKALABAN:
Q. Mr. Milner, I'd like to call your attention -- this is a letter that's actually signed by you for Lake Barrett, and it's dated July 15, 1998.
A. I just received it, so if I can take a moment.
Q. Sure. Please.
(Pause.)

Page 277

A. Okay.
BY MR. SKALABAN:
Q. I just want to call your attention to the last sentence in this letter dated July 15, 1998, the last sentence in the third full paragraph.
It states that: Due to the delay in opening a disposal facility, the department has been unable to finalize the schedules.
Does that further confirm your recollection that the department was unable to -- or stopped processing -- scratch that.
Does that further confirm your recollection of that the department was unable to finalize schedules because of the delay in opening a disposal facility?
MR. SHULTIS: Objection, vague, calls for a legal conclusion, asked and answered, document speaks for itself.
A. Yes, in my opinion, it does.
MR. SKALABAN: And I believe this will be Exhibit 107.
(Milner Exhibit No. 107 was marked for identification.)
BY MR. SKALABAN:

Page 278

Q. Mr. Milner, can you identify for the record what is Exhibit 107?
A. Appears to be a memo from myself to then acting director Lake Barrett requesting his approval of a letter from the contracting officer to Yankee denying priority acceptance.
Q. Now, in the second paragraph in the background section, it indicates that the director committed to subject this issue, shutdown priority, to rule making to clarify how this provision of the contract should be implemented; is that right?
A. That's what it states, yes.
Q. And in view of that, does that confirm for you that the DOE had told Yankee Atomic that the issue of shutdown priority was going to be addressed by rule making?
A. Yes, I believe so.
Q. In fact it goes on a little bit further here and says that: Secretary O'Leary reaffirmed our intent to clarify this issue through rule making in response to a question from Congressman Gallo.
Do you see that?
A. Yes.
Q. Do you recall that exchange between Secretary O'Leary and Congressman Gallo?

Page 279

A. No, I don't.
Q. It also reflects that in the interim the director encouraged Yankee to exercise a contractual right to exchange allocations with other interested utilities; is that correct?
A. Correct.
Q. And that is in fact what the department did?
A. I believe so, yes.
Q. On the second page, a few bullet points down under the department's position is that, colon, there's a provision -- well, can you tell me what you understand what's being talked about in this first -- the first bullet point under, the department's position is that, and I'm referring to the part that it says the contract provides a priority may be granted?
MR. SHULTIS: Objection, calls for a legal conclusion.
A. Well, in my opinion, I believe that that particular bullet is responding to the first bullet under the section that's labeled Yankee's position. Yankee's position was that they believed that priority acceptance was provided for in the contract, and I think this states that the department's

# Thomas Pollog

# Defendant

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

\- - - - - - - - - - - - - - - - - - - -x

YANKEE ATOMIC ELECTRIC COMPANY :
(98-126c) (Merow, S.J.) :
CONNECTICUT YANKEE ATOMIC POWER :
COMPANY, (98-154C) (Merow, S.J.) :
FLORIDA POWER & LIGHT COMPANY :
(98-483C) (WILSON, J.) :
NORTHERN STATES POWER COMPANY :
(98-484c (Wiese, J.) :
DUKE POWER, A Division of DUKE :
ENERGY CORP. (98-485C) (Sypolt, J.):
INDIANA MICHIGAN POWER COMPANY :
(98-486C) (Hodges, J.) :
SACRAMENTO MUNICIPAL UTILITY :
DISTRICT (98-488c) (Yock, S.J.) :
SOUTHERN NUCLEAR OPERATING COMPANY :
et. al. (98-488c) (Yock, S.J.) :
COMMONWEALTH EDISON COMPANY :
(98-621c) (Hewitt, J.) :
BOSTON EDISON COMPANY :
(99-447C) (Allegra, J.) :
GPU NUCLEAR, INCORPORATED :
(00-440C) (Bush, J.) :
WISCONSIN ELECTRIC POWER COMPANY :
(00-697C) (Merow, S.J.) :
POWER AUTHORITY OF THE STATE OF :
NEW YORK (00-703C) (Damich, J.) :
OMAHA PUBLIC POWER DISTRICT :
(01-115C) (Bush, J.) :
NEBRASKA PUBLIC POWER DISTRICT :
(01-116C) (Sypolt, J.) :
TENNESSEE VALLEY AUTHORITY :
(01-249C) (Bruggink, J.) :
Plaintiff, :
:
vs :
:
THE UNITED STATES, :
Defendant. :

\- - - - - - - - - - - - - - - - - - -x

McLean, Virginia
Thursday, April 11, 2002

Page 62

date based upon the statement that's here.
Q Is it your testimony that DOE would never consider changing the date?
A My testimony is, I don't know that it's ever been evaluated whether we could change the date in the delivery commitment schedule consistent with the statement here.
Q I'm asking you what DOE's view is, whether they could change the commitment schedule?
A I don't know. I mean, I have not thought about that question before, if we could.
Q You don't know the answer?
A No, I've never thought of that question before. I know of no discussion concerning that.
Q But you don't have an answer as to what DOE's position is in that regard?
A I don't.
Q Why would they re-evaluate them if they weren't going to consider to change the date?
A Can you say it again slower this time?
Q Why would DOE re-evaluate, as they indicated they might do in this instruction, if they weren't going to change something about the delivery commitment schedule, presumably the

Page 63

date?
A There were other things we might seek from purchasers.
Q Such as?
A There were other things on the DCSs, like whether they would ship by truck, rail or barge. I mean, there were certain things that we might find beneficial for the system, such as doing more rail shipment as opposed to more truck shipment.
Q And is it your testimony that DOE would seek to change that term or requirement in the DCS?
A I wouldn't say we would seek to change it. We would seek to negotiate it with the utility or purchaser if we had a wish for something that would be beneficial for the system.
Q But how would that relate to changing the dates from 1998 to some time later?
A I don't think it would relate to that.
Q And of course, what the sentence says is if the circumstances change with regard to 1998, then they would re-evaluate. So it suggests the re-evaluation would be based on

Page 64

changing the date, not on other circumstances.
A Okay. Is that a question?
Q Yes. My question is, you said they would re-evaluate them based on these other issues. But that sentence talks about re-evaluation with regards to the date, which you previously said doesn't relate to these other issues you mentioned.
A Okay. So is there a question there?
Q So, my question is, the re-evaluation that's referenced in this instruction would be based on the changing of the dates, not on transportation issues as you identified?
A Is that a question?
Q Yes, that is a question.
A What's the question?
Q Can you repeat the question?
(Whereupon, the question was read by the court reporter as requested.)
THE WITNESS: Yes.
BY MS. HEWITT:
Q The DCSs were a reflection of allocations awarded purchasers in the ACRs; is that correct?
A I wouldn't use awarded.

Page 65

Q What word would you use?
A Allocated purchasers.
Q Okay. Now, were the ACRs contractually binding?
A No.
Q And why not?
A They were put out as -- for planning purposes.
Q And does that mean that they could change over time?
A Yes.
Q So a purchaser's allocation would change over time?
A Possibly.
Q And if that's the case, then would a delivery commitment schedule change over time?
A No.
Q How would that be if you have a delivery commitment schedule that's supposed to reflect an allocation in ACR, but it changes over time?
A Once they are signed in, those are locked in. Once the DCSs are signed, those allocations were locked in.
Q Of course, they wouldn't be locked in

Page 66

if you otherwise exchange DCSs with another purchaser?
A Correct.
Q And the new purchaser could submit different fuel from a different location?
A The purchaser would have to trade an approved DCS with the other purchaser.
So, I'm not sure if you're saying the same thing I'm saying. I mean, a purchaser could change in the sense that they could exchange the DCS. But the sum total has to be equal for MTUs. You couldn't exchange ten for five or five for ten. It had to be a zero net sum gain.
And we would have the right to approve or disapprove any such proposed exchange.
Q Do you know who introduced the concept of delivery commitment schedules in the contract?
A No.
Q Was there any comments or discussions regarding the delivery commitment schedule process when the contract was negotiated?
A I don't know.
Q Other than the instructions that we've referred to here today, which are Exhibit 3 to your deposition, did DOE publish any guidelines

Page 67

with regards to filling out the DCSs?
A I know of nothing else that was published by DOE regarding filling out instructions.
Q Was there something else communicated to purchasers, but not published as I use that term?
A I believe so.
Q And what are you referring to?
A I believe there were several presentations given by either DOE personnel or contractors regarding DCS process at various waste management meetings.
Q And what contractors would have worked on the DCS element of the waste management program?
A The DCS process you're saying?
Q Yes.
A That would have been -- at what point in time? You mean the whole process from --
Q As far as you know.
A From when it started, day one, till today?
Q Yes.
A Contractors?

Page 68

Q Yes.
A Okay. Scott Vance, Pat McDuffy, Billy Cole, Doug Williamson and, I believe, Bill Tear (ph). They are the ones that I believe I know were involved. There may have been others that had somewhat site involvement. They had direct involvement.
Q Who at DOE had the principal responsibility for the DCS process?
A At what point in time?
Q At any point in time.
A At its origin, it would have been Alan Brownstein.
Q And then subsequent to that?
A Nancy Slater Thompson.
Q Anyone else?
A David Zabransky.
Q Did there come a point in time that DOE did not approve or disapprove delivery commitment schedules submitted by purchasers?
A Yes.
Q And when did that happen?
MS. SULLIVAN: Objection. There's another -- that's another topic of your rule 30(b)6 deposition and will be answered by another

Page 69

deponent.
MS. HEWITT: Well, I think this comes within the DCS process.
MS. SULLIVAN: Topic 3, DOE's responses to DCS form submitted by utility plaintiffs, including DOE's decision to stop approving such DCS forms.
I read that question as being within Topic 3 and Mr. Pollog is not prepared to answer that question today. It will be answered by another deponent.
BY MS. HEWITT:
Q Do you have any personal knowledge about disapproval of the DCS process? For DCSs submitted by offerors, by purchasers?
A I know we stopped submitting them.
Q Why did DOE stop submitting them?
MS. SULLIVAN: Objection. That's another Rule 30(b)6 witness --
MS. HEWITT: I can ask about his personal knowledge.
MS. SULLIVAN: It's beyond the scope of the Rule 30(b)6 deposition.
MS. HEWITT: I don't think it is, and I think I can ask about his personal knowledge.

# Defendant

Page 142

A I believe so.
Q Okay. And the next paragraph in that introductory section under program strategy, it discusses the approach. And the approach here is said to insure that all the owners and generators of spent nuclear fuel and high level waste will be able to establish firm planning schedules for the disposition of their radioactive waste sufficiently early to determine their on-site in term storage needs.
My question is, is this the same objective that was referred to when the terms, firm schedule, was used in the prior iteration of this document?
A I believe so.
Q And what is the term, sufficiently early to determine their on-site in term storage needs? What is that addressing or reflecting?
A I would say that means that they wouldn't have to wait until the very last minute when their pool is filled to determine whether they need to build dry storage, re-rack their pool, trans-ship pool or make any other spent fuel management decisions.
Q And why was timeliness relevant or

Page 143

important in this context?
A The department's objective was to let the utilities know early enough so they wouldn't be in a situation where their pool is full and they had to make a decision.
Q Take a look at Table 2. I think it's one, but I'm not exactly clear. The Xerox copy is not very clear. It's entitled waste acceptance schedule. It looks very similar to the one we just talked about in the earlier draft of the Mission Plan, but I want to make sure that it is similar and that the columns represent the same sort of columns we were talking about earlier.
Can you let me know whether the same definitions and terms we've used with respect to the earlier table in the 1983 draft of this document, whether these are the same terms that are used in this table?
A I believe they are.
Q And included in two of these columns are repository acceptance rates. The term repository acceptance rates used in these columns, is that equal to what's called the in-placement rate in the earlier pages of this

Page 144

document?
A I believe so.
Q In this case there's a ramp-up rate of 400 MTUs on an annual basis, to 900 MTUs, then to 1800, and then to 3,000. This is different than we've seen in some of the earlier documents. What accounts for the difference?
A I believe what happened was when we issued the draft December, 1983 Mission Plan, we received comments from interested parties. And I believe the interested parties commented that our ramp-up rate was too ambitious and would not be easily achievable. And in response to those comments, I think they decided to decrease acceptance in the first few years.
Q Okay. Other than that, the -- is the reasons for using 1800 and 3,000 as the ultimate acceptance rate the same as the reasons that we've discussed for the use of these rates in earlier documents?
A Yes.
Q And just so the record is clear, can you tell me again what those reasons are?
A Number one reason being, if you'll look at the capacity for both repositories and the

Page 145

total amount of spent fuel that would need to be disposed of, you look at the total amount, 140, the capacity for each repository would be approximately 70,000.
You look at the operating lifetime of each repository being approximately 25 years, including the ramp-up rate. If you divide 70,000 by 25, you come to approximately 3,000 metric tons.
The second reason would be it was the objective for the department to alleviate or lessen any need for out of pool storage for the utilities, but considering the challenges that the program had to meet from the financial, legal and technical perspectives.
Q Take a look at page -- I think it's, it's 10-8 at the bottom. I don't know if this is chapter ten, but it's fairly far back in the document. It talks about the cost estimation?
A Ten slash.
Q Ten hyphen eight. It talks about the cost estimating assumptions used in this Mission Plan. And about the, I don't know, seventh bullet down or sixth bullet down says annual waste acceptance rate for each repository is 1800

# Defendant

Page 210

allocation process could effectively reduce the utility's needs for further expanding their at reactor storage capacity after the waste management system begins to accept spent fuel for disposal. What does that mean?
A I need to re-read. It a long sentence.
Q I agreement?
A Okay. I think I'm ready to start.
Q Okay.
A I believe what this sentence states is that the initial acceptance rate, let's say in the year one or year two, whatever year you want to use, must be greater than the additional storage requirements that's above pool; dry storage or whatever things they're talking about here, consolidation transfer. The things one, two, three listed above in order for the -- any allocation process, any additional, to be effective, any exchange process.
So if the capacity is less -- if the acceptance rate is less than what the additional storage needs are, an exchange process probably would not be effective.
Q Okay. And with regard to the acceptance rates that were included, for example,

Page 211

in the 1987 ACR, was it your testimony that those acceptance rates were sufficient to address the additional storage capacity needs of utilities after 1998?
A I don't think I've testified one way or another if they were sufficient or not earlier. I would have to look at what the specific additional storage needs are and what the acceptance rates specifically in a given year are.
Q Did you testify -- I believe you testified that one the objectives of implementing the acceptance rate was to achieve that goal; is that right?
A Yes, in aggregate over a period of time.
Q But you don't know whether or not those rates actually did achieve that goal?
A I do not know in any given year that those rates achieved that goal. I know in the aggregate it was believed to over a several year process.
MS. HEWITT: I want to take about a five minutes break. I want to see if I can finish it up, and if you have anything else.

Page 212

(Brief recess.)
BY MS. HEWITT:
Q I had mentioned the term TSLCC earlier today. Do you have an understanding of that term?
A Yes.
Q What does that term mean?
A Total system life cycle cost. I can't remember what the last C means.
Q Were there reports issued that -- by DOE that reflected total system life cycle cost?
A Yes.
Q And why did DOE issue these reports?
A I think it's done as part of -- it goes into the fee adequacy study. In order to determine if the fee is going to be adequate, you have to know what your cost will be.
Q Do you know if that was issued annually or on a periodic basis?
A Periodic.
Q Do you know whether the acceptance rate as we used that term today effected into the total system life cycle cost?
A I believe so.
Q And do you know whether the acceptance

Page 213

rates DOE relied on in the total system life cycle cost?
A There are many documents, so I can't respond, X rate was in X document at this point in time. Just my general response would be they would have used --
Like the ACR used a generally published schedule at that time, such as mission plans, other documents, program plans, ACR, whatever was the current published document or one of the design requirement documents.
Q Okay. Is it your understanding that a TSLCC document that was published after the Nuclear Waste Policy Amendments Acts of 1987, which included the capacity limitation on the MRS as you previously testified, would the TSLCC document reflect the acceptance rates that reflected those capacity limits?
A It could have.
Q Do you know whether it did or not?
A There have been many TSLCC publications, so I can't speak for every document whether they incorporated the rates you referenced earlier or a moment ago.
Q I'm talking about TSLCC documents that

# Defendant

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - - - - - - - - x

YANKEE ATOMIC ELECTRIC COMPANY :
(98-126C)(Merow, S.J.) :
CONNECTICUT YANKEE ATOMIC POWER COMPANY :
(98-154C)(Merow, S.J.) :
MAINE YANKEE ATOMIC POWER COMPANY :
(98-474C)(Merow, S.J.) :
FLORIDA POWER & LIGHT COMPANY :
(98-483C)(Wilson, J.) :
NORTHERN STATES POWER COMPANY :
(98-484C)(Wiese, J.) :
DUKE POWER, A Division of DUKE ENERGY CORP. :
(98-485C)(Sypolt, J.) :
INDIANA MICHIGAN POWER COMPANY :
(98-486C)(Hodges, J.) :
SACRAMENTO MUNICIPAL UTILITY DISTRICT :
(98-488C)(Yock, S.J.) :
SOUTHERN NUCLEAR OPERATING COMPANY, et al. :
(98-614C)(Merow, S.J.) :
COMMONWEALTH EDISON COMPANY :
(98-621C)(Hewitt, J.) :
BOSTON EDISON COMPANY :
(98-477C)(Allegra, J.) :
GPU NUCLEAR, INCORPORATED :

Page 10

mission plan. I'll mark it.
(Pollog Exhibit No. 19 was marked for identification.)
MS. SULLIVAN: Is this an excerpt or volume 1?
MS. HEWITT: No. This is volume 1. And actually it's only chapter -- I guess it's only volume 1. I didn't have everything.
MS. SULLIVAN: That's fine.
MS. HEWITT: Actually, I think it's just chapters 1 and 2.
MS. SULLIVAN: Good.
BY MS. HEWITT:
Q. But what I handed you is pages 1 through 29, so make sure you have 29 pages.
(Witness reviewing document)
A. Actually there seems to be --
Q. There's some on your right there?
A. Yeah. These come at the end. Actually page 14 seems to be missing. Let me check one more time.
Q. Okay.
(Witness reviewing document)
MS. SULLIVAN: Yeah.
MS. HEWITT: Page 14's missing?

Page 11

MS. SULLIVAN: That's fine. We can change that later, just note it right now.
MS. HEWITT: Well, yes, page 14 is missing from mine as well.
MS. SULLIVAN: Did you have questions about it.
MS. HEWITT: No. I don't have questions from page 14, but I don't know why -- it might be in the actual original document. In any event, we don't have any questions about page 14. And I apologize. Here's the stapler. Other than that, we are a very sophisticated law firm. We provide extensive resources for our clients.
BY MS. HEWITT:
Q. Anyway, what I'd like to ask you about is the waste acceptance schedules that are included in this document.
Have you had a chance to look at this document before, Mr. Pollog?
A. Yes, I have.
Q. In particular, I think there's a table at the very end on page 26. Have you found that table? It's Table 2-2.
A. Yes, I have.
Q. Set forth here are acceptance rates for

Page 12

repository, first repository and second repository. In particular, I'd like you to look at the spent fuel column under the first repository.
Do you know the basis for the acceptance rate figures listed therein?
A. Are you referring to the section under first repository, spent fuel starting with No. 400 in 1998.
Q. Yes, I am.
A. Yes, I am.
Q. And what is the basis of those acceptance rates?
A. The basis would be twofold, or two parts. One would be, again, we anticipated two repositories of total amount of spent fuel approximately 130 to 140,000 MTUs with equal amounts in both repositories and that number being approximately 70,000 dividing the operational life of approximately 25 years, you get approximately 3000 per year as a steady state rate with a several-year ramp up rate in the early years. It would be part 1.
The second reason for that would be again to try and keep up with spent fuel discharges and the need for alleviating the need for additional on-site dry storage at the purchaser sites.

Page 13

Q. And these were the same reasons for the acceptance rates that were included in prior drafts of the mission, this mission plan, is that correct?
A. I believe so.
Q. And we may have discussed this yesterday with regard to the drafts, but the ramp-up rates from 400 in the first three years to 900 and then 1800, why were the numbers segregated that way for the ramp-up years?
A. Can you explain for me what you mean by segregated?
Q. Yes. Why was 400 chosen for the first three years and then 900 for the fourth year and then 1800 for the fifth year?
A. Okay. Originally we had suggested an earlier drafted mission plan, 1800 metric tons per year for the ramp-up period. I believe we received public comments, the document mission plan itself, including the schedules and one of the comments or several, I'm not sure how many, stated that they thought that would be an overly ambitious ramp up rate to go from zero to 1800 in your first year and suggested scaling back which way were initial ramp up would be.
In response to those comments, I think the



Alderson Reporting Company, Inc.
1111 14th Street, N.W. Suite 400 1-800-FOR-DEPO Washington, DC 20005

Page 14

decision was made to reduce the ramp up the numbers in the early years in order to get the system going from basically zero up to the 3000.
Q. Do you know why it was broken down to 400 and then 900 and then 1800? There seems to be a relationship between those numbers but I would rather not guess.
A. I think they were just approximately doubling every -- you do a couple of years at 400 and you double that and get comfortable with that and you double that again until you reach your essential steady state rate.
Q. Okay. If you take a look at the next chart that follows that on page 27, Table 2-3, have you located that chart?
A. Yes.
Q. What is the difference between this chart and the prior chart that we just were discussing?
A. This chart is for improved performance system which includes an MRS in the waste management system.
Q. Okay. And is the idea that the waste would be transferred first to an MRS before going to a repository? Is that what this chart reflects?
A. Let me examine it for a second.

Page 15

(Witness reviewing document)
MS. HEWITT: Can we go off the record for a second?
(Discussion off the record)
THE WITNESS: I believe this chart includes a system where waste would first go in the first, from pre-'98 through 2005, if I'm reading this across correctly. To an MRS and then to the first repository and then starting I believe in 2006, waste would still be going to an MRS to a first repository and some of it would be going straight to a second repository. Some would be going to an MRS and some would be going to a second repository, starting in I believe if I'm reading this chart correctly, 2006. Yeah, I believe 2006.
MS. SULLIVAN: Are --
BY MS. HEWITT:
Q. What is the basis for the acceptance rates that are listed here for the MRS?
A. I believe the basis is the 3000 again comes from the two objectives we had discussed just a few minutes ago, the first one being looking at how much was going to eventually, to the first repository being the 70,000 MTUs, taking that number and looking at the lifetime -- anticipated lifetime for the MRS

Page 16

repository for approximately 25 years dividing 75,000 by 25 and reaching an approximate number of 3000 per year in steady state and the second being the goal to alleviate the additional need for dry storage or out of full storage at a facility, at a purchaser's facility.
Q. How come there's not a ramp up rate for the MRS acceptance?
A. Well, I believe there is. If you look at the pre-'98, it doesn't give specific years. It just says pre-'98. So I believe that includes more than one year, the 2200 number.
Q. I see. And do you know when this assumes the MRS would be operational or able to take spent nuclear fuel?
A. I believe it was based on starting in 1996.
Q. I don't think I have any more questions for you Mr. Pollog. I will turn it over to my colleagues. I will note for the record that you did yesterday not know some basis for some of the rates in the ACRs which was supposed to be part of your responsibility, so I'm not going to end my questioning and just keep it open. And I don't know whether they're going to bring you back to speak on

Page 17

that after you've learned more about it or have another witness for that, but there were a couple of areas that you didn't know any information about. So I just reserve that right on an examination basis for a 30(b)(6) witness, whoever that might be.
MS. SULLIVAN: Well, we would object to that because the topics asked for the basis for the ACR rates and he told you they were found in other published documents up until 1991 and was able to explain from 1991 where those rates came from and he did walk you through the mission plan for 1997, although that was not a document and was able to track that back. So we would object to any -- but let's leave it on record right now and we can ask Judge Sypolt.
BY MS. HEWITT:
Q. Let me just clarify. I'm just talking about the rates that appear on two ACRs based on the 1998 mission plan when he said he did not look at and did not know the basis of those generations?
A. The topics set forth the rates in the ACRs. And as the ACRs say, they were found in the mission plans.
MS. HEWITT: But that's all he could say.
MS. SULLIVAN: Then you did put the 1997



Alderson Reporting Company, Inc.
1111 14th Street, N.W. Suite 400 1-800-FOR-DEPO Washington, DC 20005