# Defendant

Page 18

mission plan draft amendment in front of him. He was able to.
MS. HEWITT: But he said he had not reviewed the 1998, so --
MS. SULLIVAN: He said he hadn't reviewed the 1998 mission plan.
MS. HEWITT: He did say he had reviewed that.
MS. SULLIVAN: Not recently.
MS. HEWITT: Well, he had reviewed it. Anyway, I'm going to reserve the right. We can discuss that later.
MS. SULLIVAN: Well, we will object and let Judge Sypolt decide. Can we take a few minutes to see if we have any cross?
MS. HEWITT: Sure.
(Recess)
MS. SULLIVAN: Okay. Who's next?
MR. EIDUKAS: I think I'll go next.
EXAMINATION BY COUNSEL FOR PLAINTIFF COMMONWEALTH EDISON
BY MR. EIDUKAS:
Q. Good morning, Mr. Pollog, my name is Ted Eidukas. I represent Commonwealth Edison.
A. Good morning.

Page 19

Q. My question is yesterday we had some discussion about plans for spent fuel being sent to the MRS or the repository based on whether they were western reactors or eastern reactors. And I just had a clarifying question.
Was there a specific dividing line as to what was a western reactor and what was an eastern reactor?
A. I know of no dividing line between western and eastern reactors.
Q. So there was no designations made or assignments made as to whether this reactor is an eastern or western?
A. As far as I know, there were no designations made from this reactor is eastern and this reactor is western.
Q. Okay, thank you.
Yesterday you gave some testimony about the 1995 ACR APR and the acceptance schedule present in that document. And I don't remember what exhibit it was, if you want to look at it. But I believe that was the -- and I believe that is an acceptance schedule that uses rather than calendar years, it uses years 1 through 10?
A. Correct.

Page 20

Q. And just to be -- and I believe you testified that -- and correct me if I'm wrong, but I believe you testified that utilities would be unable to submit DCS based on that schedule because there were no calendar years given but rather years 1 through 10.
A. Yes, I did.
Q. Does the DOE have a position on whether or not after the publication of that ACR, that schedule, does the DOE have a position as to whether purchasers were obligated or required to submit DCSs after that point?
A. We had informed purchasers that at this point in time we weren't going to be further processing schedules starting in 19 -- I believe it was the end of '96. Then after we started, we did not believe it was necessary for purchasers to further submit DCSs.
Q. I'm done with that document. You can put that aside for now. In testifying about the basis for the acceptance schedules found, the acceptance rates found in a lot of these documents, you've testified that there were two objectives or principles that underlied the rate.
One was -- and I'm going to focus on what

Page 21

I believe you characterized as the first objective being the -- I can have you say that again, but let me see if I understand it.
You believe that each repository would accept up to approximately 70,000 MTU of spent fuel, and then you took the -- you also anticipated that there would be approximately 25-year operational life? And I'm not sure if operational life is the word you've used, and then I'll let you correct me. Operational period or operational life of the facility or the program and by taking and dividing 25 into 70,000, you got approximately a steady rate of 3000.
Is that an accurate paraphrasing of what you've testified or perhaps if you want to --
A. I would say that's close enough.
Q. Close enough, Okay. The 25 years for the anticipated operational life of the facility, could you just clarify again what that 25 years represents?
A. I believe it represents what was anticipated in normal lifetime of the equipment that would be used in one of these facilities such as transportation casks, handling equipment, any type of hardware that was going to need to be purchased to operate the facility was thought to have about an

Page 22

operational life before you would need to basically just get rid of it and buy new stuff of 25 years.
Q. So the 3000, or the rate that was generated by looking at that, the rate was based on the calculation or the estimation that the life of this equipment would be about 25 years, not vice versa? I sense by your expression they were as clear as mud?
A. The vice versa, I wasn't sure.
Q. Sorry. In other words, as I understand it, the DOE in developing this acceptance schedule or this acceptance rate didn't approach it in the manner of we want a rate of 3000 and then let's calculate what the life of this equipment would be.
Rather, they took the 70,000 MTU limit or what they felt would be the limit on the acceptance, what the repository would accept and then looked at the life of the equipment, what they expected the life of the equipment would be and took those numbers and then came up with the 3000, not the other way around.
A. We looked at what the life of the equipment was and not -- and then divided the total anticipated capacity to determine the rate. We didn't look at the rate first. We did not look at

Page 23

the rate first and then back calculate what the life of the equipment would be.
Q. Okay. I think that expressed what I was trying to say. Was there any expectation by the DOE that the program would last longer than this 25 years? In other words, that they would have to go out and buy a new set of this equipment?
A. Well, if you look at the early documents, it actually includes two repositories. So the first one would be operating for approximately 25 years and then the second one coming on line or starting several years, I'm thinking -- it varied at different points of permanence, but I'm going to say approximately 10 years after the first one so that would be 25 years past, so you're talking approximately 35 years or so.
Q. At each repository, was there any expectation that at each of the repository there would be a replacement of the equipment so that each repository would be operating for more than 25 years?
A. I don't believe so. Well, let me just clarify that. When you say operation, you mean you're still going to be done after no more fuels come in after the repository. The acceptance part of files coming into the gate was expected to last 25

Page 24

years.
There are additional requirements such as everything would not necessarily be in place within that 25 year period of time. It would take a little bit longer to work off the backlog, and I believe the nuclear policy act specifies we have to provide a 50-year retreatability, capability at the repository. So there would be certain activities going on to fulfill those statutory requirements. But regarding I think accepting fuels through the front gate and doing what we need to do to get into placement would last 25 years plus a few additional years to work off any lag fuel storage.
Q. I think with that clarification we're still on the same page as far as what I meant by operational life and what you said in your earlier testimony -- just to clarify, when you were talking about operational life of the equipment, you've been referring to the operation life of the acceptance equipment?
A. For the most part, yes.
Q. Briefly look at the 1997 annual capacity report. And again, it should be one of the middle -- or early documents, No. 4.
A. Okay.

Page 25

Q. I'm going to focus on the bottom of page 4 and top of page 5. It's a Section 1.2.3. Submittal of comments on the annual capacity report. Yesterday I believe you were asked that question about whether or not -- and I can't remember the exact question. But I believe it was a question as to whether or not the standard contract required comments or provided for a method for commentary on the annual or draft annual capacity reports.
And I believe you gave some testimony as to whether -- you know, that the standard contract provided a mechanism for comment when something had been delivered to a purchaser by a contracting officer, do you remember giving testimony like that?
A. Yes.
Q. If you could just take a look at Section 1.2.3 on Exhibit 4 there, you'll see it -- I'll read it. It just starts, "Wherein comments are requested, specifically from the purchasers, on the content of this initial ACR."
Do you know whether or not this request for comments was being made pursuant to the standard contract?
MS. SULLIVAN: Objection beyond the scope. You can answer if you know.



Alderson Reporting Company, Inc.
1111 14th Street, N.W. Suite 400 1-800-FOR-DEPO Washington, DC 20005

# Defendant

Q. So by either 1987 or 1988, DOE had determined that it wouldn't begin accepting SNF at the repository in 1998?
A. Yes.
Q. Prior to that time, were there any DOE studies suggesting an acceptance rate of 900 MTU?
MS. SULLIVAN: Objection. Vague. 1900 MTU, what time period?
MR. MACDONALD: Did you understand the question?
THE WITNESS: Are you saying 1900 MTUs per year?
MR. MACDONALD: I'm sorry. I thought I said 900 MTUs.
THE WITNESS: 900 MTUs on a yearly basis?
MR. MACDONALD: Yes.
THE WITNESS: On a steady state basis not just given any year?
MR. MACDONALD: That's right. With a reasonable ramp-up period.
THE WITNESS: Steady state acceptance rate of 900 MTUs. I don't know of any.
BY MR. MACDONALD:
Q. You don't know of any DOE studies before 1998 in which DOE intended to operate its facilities



with a steady state acceptance rate of 900 MTU per year?
A. I'm sorry. Maybe you misspoke or maybe I misheard you. You say before 1998?
Q. I may have said that. If I did, I apologize. I'm trying in my head to refer to 1988.
A. Okay. If you're asking me do I know of any studies that were prior to 1998 that this steady --
Q. 1988.
A. 1988, excuse me, with steady state acceptance rate of 900 MTUs, I do not recall any.
Q. Are you aware of any studies where DOE planned on accepting fuel at a repository at less than a 3000 MTU per year steady state rate?
MS. SULLIVAN: Objection, vague.
MS HEWLITT: Before 1998?
MR. MACDONALD: At any time.
THE WITNESS: I am not aware of any studies that stated that the steady state acceptance rate at a repository would be less than -- other than in the ramp-up period, less than 3000 MTUs per year.
BY MR. MACDONALD:
Q. And the question is sort of convoluted, so I apologize. Another way of putting that is assuming



the operation of a repository DOE planned on a 3000 MTU per year steady state rate, is that correct?
MS. SULLIVAN: Objection, vague.
THE WITNESS: No. I would say that's not correct.
BY MR. MACDONALD:
Q. Okay. In what way is it not correct?
A. I think if you look at documents such as the 91 ACR, 95 ACR, we looked at steady state rates of 900.
Q. Were either of those ACRs based on accepting fuel at the repository at the time during the period where the rate was 900 MTU?
MS. SULLIVAN: Objection, vague.
THE WITNESS: Can you restate that for me?
MR. MACDONALD: Could you read the question back?
THE REPORTER: "Question: Were either of those ACRs based on accepting fuel at the repository at the time during the period where the rate was 900 MTU?"
THE WITNESS: I don't believe so.
BY MR. MACDONALD:
Q. Maybe my earlier question was inartful, then. Assuming an operation at a repository, not an



MRS, did DOE plan to use a 3000 MTU acceptance rate once it ramped up to a steady state?
A. I believe so.
MS. SULLIVAN: Can I have a --
(Counsel conferring with witness)
BY MR. MACDONALD:
Q. Mr. Pollog, I'd like to ask you a couple of questions about the '83 draft mission plan which you have looked at previously and it should be Exhibit 7. I'd like you to turn to page 2-3.
For the record, this is a table that Ms. Hewett asked you about yesterday entitled Waste Acceptance Schedule, is that right?
A. I believe so.
Q. One of the questions that Ms. Hewett asked you before about -- she asked about this third column discharge from decommisioned reactors, and I believe your testimony was you didn't think this had or was related to the acceptance rate in any way?
A. Correct.
Q. Do you know why this table includes information about the discharge rate from decommissioned reactors?
MS. SULLIVAN: Objection. Asked and answered. You can answer it again if you remember.

# Defendant

Page 46

THE WITNESS: No, I don't.
BY MR. MACDONALD:
Q. Are you aware of a provision in the standard contract that provides authority to DOE to give shutdown reactors a priority in the acceptance of SNF?
A. I'm aware of a provision that DOE may provide priority for shutdown reactors.
Q. Do you know why that provision was put in the standard contract?
A. No, I do not.
Q. Would you turn to page 2-5?
A. The same document?
Q. Same document. The first full paragraph on page 2-5 begins, "The main plan and primary effort is to have an operating geologic repository in 1998."
Do you see that?
A. Yes.
Q. As of December 20, 1983, the date of this document, was it DOE's main plan and primary effort to have a repository?
MS. SULLIVAN: Objection. Beyond the scope. You can answer if you know.
THE WITNESS: I believe it was the objective of the Department to have a repository

Page 47

operating by 1998.
BY MR. MACDONALD:
Q. Would you turn to page 3-B-12. It's a ways in the back.
A. 3-B-12?
Q. Yes. And in particular, if you would look at the paragraph B entitled Licensing.
A. Yes. I'm there.
Q. I had some questions about this which maybe you will be able to explain. This paragraph states that, "It has been estimated that the Nuclear Regulatory Commission would require two-and-a-half years to review and monitor retrievable storage facility licensing application."
Can you explain to me what would go into that estimate of why it would take two-and-a-half years for the NRC to review an NRS licensing application?
MS. SULLIVAN: Objection. Beyond the scope. You can answer as to your personal knowledge.
THE WITNESS: I must admit I'm not that familiar with NRC licensing regarding a facility, so I can't explain to you why it would take two-and-a-half years to do that.
BY MR. MACDONALD:

Page 48

Q. Is the 2.5 year time period consistent with your current understanding of how long the NRC would take to license an MRS?
MS. SULLIVAN: Same objection.
THE WITNESS: My current understanding is based on work that was done I believe a CISF, centralized interim storage facility submittal we sent to NRC in the late 1990s, and I believe the licensing time approximates that.
BY MR. MACDONALD:
Q. And what was again the CISF proposal that you're talking about?
MS. SULLIVAN: Same.
THE WITNESS: Centralized interim storage facility.
BY MR. MACDONALD:
Q. And you worked on that proposal in what period of time?
A. I did not work on that proposal.
Q. When was that proposal sent in?
MS. SULLIVAN: Same objection.
THE WITNESS: I believe in the late '90s, mid to late '90s.
BY MR. MACDONALD:
Q. If you didn't work on it, how are you

Page 49

aware of the time that the study estimated for NRC approval of an MRS license?
A. I believe I picked a copy up just for some general light reading one afternoon.
Q. You're an engineer at heart. Do you know who did work on that?
MS. SULLIVAN: Same objection.
THE WITNESS: Yes, I do.
BY MR. MACDONALD:
Q. Who was that?
MS. SULLIVAN: Same objection.
THE WITNESS: Dan Kane, K-a-n-e.
BY MR. MACDONALD:
Q. In 1983, did DOE anticipate that utilities would have to build additional on-site storage facilities?
A. I believe so, yes.
Q. Did DOE anticipate the utilities would have to about the additional on-site storage facilities after 1998?
A. I believe so.
Q. Why do you believe so?
A. Because we believe utilities would need to build additional on-site storage facilities by the mid-'90s.

# Defendant

Q. And do you know when generally, what year SMUD would have submitted and had DCSs approved?
A. Yes.
Q. What year generally would that have been?
A. I believe it would have started in 1992.
Q. And would have been approved under the contract shortly after being sent in -- there were time lines set out in the contract for when they had to be approved?
A. There are time lines set into the contract for specific actions regarding approval of DCSs, yes.
Q. So at the time that they were approved, assume that was in 1992 or 1993, it was DOE's position that it was contractually obligated to begin picking up fuel from SMUD on this schedule set out here that we're looking at?
A. It was the DOE's contention that once the DCSs submitted by SMUD and approved by the department, it was obligated to pick up set amounts in those DCSs of fuel.
Q. If you would look at Exhibit 3 to your deposition which should be the DCS instructions. Were the DCS instructions based on allocations in the 1991 ACR?
MS. SULLIVAN: Objection. Vague.



THE WITNESS: I don't quite understand what you're asking. I'm sorry.
BY MR. MACDONALD:
Q. Well, the purchasers had to submit DCRs based on some allocation, correct?
A. Yes.
Q. My question is, on what allocation in what DOE document were the purchasers' DCS submissions based?
A. The purchasers were supposed to use for their DCS submittals allocations in the 1991 ACR.
Q. Is there anything in the DCS instructions that would suggest to a utility that DOE believed that the DCSs would be contractually binding?
A. If you allow me several minutes to review this very quickly.
Q. Please take as much time as you need.
(Witness reviewing document)
THE WITNESS: I'm ready. Can you repeat that question for me?
THE REPORTER: "Question: Is there anything in the DCS instructions that would suggest to a utility that DOE believed that the DCSs would be contractually binding?"
THE WITNESS: I think there's something



here that suggests it's contractually binding for the purchaser, but not for DOE.
BY MR. MACDONALD:
Q. And when you say for the purchaser not DOE, could you explain what you mean, contractually?
A. Yeah. If you look on page 5 under certifications, it says, "Any individual duly authorized to bind the purchaser must sign DCS certifying the purchaser has a legal right to deliver such SNF to DOE."
Q. And explain to me why that suggests that the DCSs are contractually binding for the purchaser but not DOE.
A. I didn't say they weren't contractually binding for DOE. I just said that the statement here indicates to me it binds the purchaser to DCSs instructions. But there's no statements in here that state that it binds DOE.
Q. And in fact, this statement doesn't state that the DCSs bind the purchaser; it states that a certification that the individual authorized to bind the purchaser must sign the DCS certifying that the purchaser has the legal right to deliver such SNF to DOE.
MS. SULLIVAN: Object. The document



speaks for itself. You can answer.
THE WITNESS: It says any individual that we must certifying that the purchaser has legal right to deliver such SNF to DOE.
BY MR. MACDONALD:
Q. So this provision is speaking to whether or not the purchaser has the legal right to deliver the SNF to DOE, correct?
A. I believe so.
Q. Other than that statement, is there anything in these DCS instructions that suggest DOE believed that the DCSs were contractually binding?
A. No.
Q. If I could ask you to turn to page 2, little paragraph C, just take a quick look at that paragraph. Is there anything in these DCS instructions that suggest that the DCSs are not binding commitments on behalf of DOE?
A. No.
Q. The sentence they believe you spoke discussed with Ms. Hewett yesterday that's in little subparagraph C says, "In the event that such circumstances change, all DCSs previously approved by DOE may need to be reevaluated by DOE and the purchasers."

# James Shiffer

# Defendant

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| PACIFIC GAS & ELECTRIC COMPANY<br>Plaintiff,<br>-vs-<br>THE UNITED STATES,<br>Defendant. | No. 04-0074C, which has been consolidated No. 04-0075C (Judge Hewitt) |

DEPOSITION OF JAMES D. SHIFFER

DATE: July 28, 2005

TIME: 9:11 a.m.

LOCATION: PG&E Building
77 Beale Street
Conference Room 303
San Francisco, California

REPORTED BY: Joanmarie Torreano, CSR, CRR, CRP
Certified Shorthand Reporter
License Number C-6504

Page 10

specialize in nuclear engineering you were technically a member of some other established engineering group, either mechanical engineering or civil. Since I'd previously been a chemical engineer I stayed technically in the chemical.

Q. And you are a registered nuclear engineer?

A. Well, I was. I haven't kept it up-to-date. I'm not sure whether I still am or not. At one time I was.

Q. I want to start with your work as a power production engineer at Humboldt from 1961 to '69. What was the -- just can you just generally tell me what your job responsibilities were in that capacity?

A. Yeah. Basically, I was in charge of sort of the mechanical nuclear engineering aspects of running Diablo Canyon, as I would -- and I did a lot of training also, training of people to become licensed operators, but we would plan refueling outages, we would oversee the outages. I would test efficiency of, you know, pumps and valves and, you know, just generally general over -- engineering oversight of the plant operations.

Q. And in that job did you have any responsibility for dealing with spent nuclear fuel?

A. Well, I had responsibility in the sense that I inventoried it. I mean, I didn't handle it ordinarily.

Page 11

I mean the operators handled it and I would plan out the refueling outage sequence; in other words, you know, when we would make changes in the thing, and I would keep track of, presumably, of where the fuel assemblies were, but that's about it I guess.

Q. All right. In your next job, senior power production engineer, it says on your resumé that you -- that appears to be a supervisory position over technical staff; is that right?

A. Yeah. I think right at the end of my Humboldt career they made me senior power production engineer, which means I had my successors as the power production engineering. I had the chemical radiation engineers report to me, so I had what I previously did with the chemistry and radiation protection.

Q. You've also worked at the besides Rochester Gas & Electric -- I always pronounce it wrong -- is it "Ginna"?

A. Ginna.

Q. Ginna, the startup of that facility?

A. Yes, they were -- I was scheduled to move down to Diablo Canyon, which is a pressurized water reactor, a different type of reactor than Humboldt Bay, so since my experience was purely on a boiling water reactor they sent me and another fellow back to New York to observe

Page 12

the startup of the Ginna plant to get some experience on this new different type of reactor.

Q. And after that it looks like you came back to Diablo Canyon, where you were a plant engineer; is that right?

A. Let's me just -- I see what I'm writing here. Okay. Well, anyway, I came back in 1970 very briefly in a house trailer in a parking lot at Humboldt Bay park land, but I was assigned at that time to be working at Diablo Canyon Power Plant, and as soon as they got the facility -- office facilities built in 1979, I physically transferred down to Diablo Canyon.

Q. When did Diablo Canyon start operating?

A. Well, it started operating -- I think it went critical in 1984.

Q. So in your job, then, responsibilities through manager of nuclear plant options, which terminates in 1984, were you primarily working on the startup of Diablo Canyon?

A. Yes.

Q. After that your resumé lists you as a vice president for nuclear power generation.

MR. STOUCK: Excuse me. He's looking at it. He's consulting it.

MR. EKMAN: That's fine.

Page 13

MR. STOUCK: He probably wrote it so -- I don't know.

THE WITNESS: Yeah, I did. I'm sorry.

BY MR. EKMAN:

Q. First of all, what's the nuclear power generation?

A. Okay. Basically, the company -- the generation department of the company was split into three groups. Steam generation, which ran your fossil fuel plants, hydro generation, which ran the hydroelectric plants, and nuclear generation, which ran the nuclear plants, and so nuclear power generation was a subset of the overall generation department for Pacific Gas & Electric.

Q. Now, as an executive, what was your day-to-day role in the management of spent nuclear fuel generated by Diablo Canyon?

MR. STOUCK: In which time frame are we?

MR. EKMAN: 1984 to 1990.

THE WITNESS: 1984 to 1990. Let's see, how do I explain this simply.

I was technically not responsible for the design of storage facilities or anything like that. I was responsible for the operation of the plant, which, of course, generated spent fuel, and I was responsible

for being the interface between PG & E and the Nuclear Regulatory Commission; in other words, what we called the licensing function so that when we had, you know, issues like reracking and we sent correspondence back and forth it went out under my signature, but the detail --

I was also involved in trying to get authorization for expenditures for things that would be required to operate Diablo Canyon. Of course, one thing is obviously spent fuel, so I had to get involved in the authorization of expenditures, but I was not ordinarily involved in any detail anyway in the actual design of these things.

BY MR. EKMAN:

Q. So the legwork was being performed by people below you?

A. Well, in all of these areas the legwork was being performed by people below me, that's correct.

Q. Other than the rerack during this time period, do you remember if there were any other major projects at the Diablo Canyon facility that you were part of getting authorization to expend capital?

A. Yeah, there was replacing our turbine rotors from the original design to a new upgraded design. There was a lot of facilities that had to get approved.



By that let me explain what that means. You know, the plant, as you can tell, was many, many years delayed getting into operation, and in that time frame you had a lot of events like the TMI things and -- for example, and so the facilities that were originally designed, assuming that the plant was going to go into operation in 1973 or whatever it was, in a lot of cases were kind of obsolete.

I mean it was -- at one point in time, for example, we thought it would take two or three hundred people to run the plant. When we actually started up we had 2,000 people to run the plant. So office space and things like that. A lot of those kinds of facilities, office space, training facilities, laboratory facilities were upgraded after we went into operation and that all had to be budgeted and put in place. So those are the kinds of things.

Q. How about the wet pool?

A. The --

Q. The wet pools at Diablo Canyon, were there any modifications to those from the original design to the -- I guess right around the operational startup?

A. Well, other than the reracking, I can't think of any.

Q. And why was the reracking needed in the late



1980s?

A. Well, because we were aware that the government had changed its policy and was no longer accepting fuel to be reprocessed, and the original design of the spent nuclear fuel pool was done on the assumption that you would take fuel off site, you know, maybe a year or so after that had been discharged and reprocess it. So you really only had a very small amount of storage space.

Once it became apparent that that was, you know, that was no longer going to be the case, that you were going to be required to store it on site for many, many years, then we had to expand the storage capability of the pools.

Q. All right. After that position you go and become senior vice president and general manager of the Nuclear Power Generation Business Unit. Do you see that?

A. Yes.

Q. And that was only for a year, year and a half; is that right?

A. Yes.

Q. In this role did you have any involvement in the operations of the Diablo Canyon facility?

A. Well, I had the same role fundamentally that I had had when I was vice president.



Q. Had your tasks, your responsibilities expanded? Because certainly it looks, from the description here, that it did.

A. To an extent that's true, they had expanded, but as I had indicated previously, when I was vice president nuclear power generation was one of three subsets of the generation business unit. Okay.

After we signed the Diablo Canyon rate case with the Public Utilities Commission we went on an incentive rate making proposal that was unique. In other words, we only got paid if we generated power, okay, which is not the way a normal utility rate making works.

Because of the totally different business condition that we were now faced with, they decided to take nuclear power out and make a separate business unit out of it, so it -- and then one other thing that they did at that time is they took the engineering groups which had previously been over in an engineering business unit and they took the key elements that were required to support Diablo and they put them in that business unit.

Q. During this time period were there any projects at Diablo Canyon related to spent nuclear fuel storage expansion that were ongoing?

# Plaintiff

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

PACIFIC GAS & ELECTRIC COMPANY )
)
Plaintiff, )
)
-vs- ) No. 04-0074C, which
) has been consolid-
THE UNITED STATES, ) ated No. 04-0075C
) (Judge Hewitt)
Defendant. )
______________________________)

DEPOSITION OF JAMES D. SHIFFER

DATE: July 28, 2005
TIME: 9:11 a.m.
LOCATION: PG&E Building
77 Beale Street
Conference Room 303
San Francisco, California

REPORTED BY: Joanmarie Torreano, CSR, CRR, CRP
Certified Shorthand Reporter
License Number C-6504

By that let me explain what that means. You know, the plant, as you can tell, was many, many years delayed getting into operation, and in that time frame you had a lot of events like the TMI things and -- for example, and so the facilities that were originally designed, assuming that the plant was going to go into operation in 1973 or whatever it was, in a lot of cases were kind of obsolete.

I mean it was -- at one point in time, for example, we thought it would take two or three hundred people to run the plant. When we actually started up we had 2,000 people to run the plant. So office space and things like that. A lot of those kinds of facilities, office space, training facilities, laboratory facilities were upgraded after we went into operation and that all had to be budgeted and put in place. So those are the kinds of things.

Q. How about the wet pool?

A. The --

Q. The wet pools at Diablo Canyon, were there any modifications to those from the original design to the -- I guess right around the operational startup?

A. Well, other than the reracking, I can't think of any.

Q. And why was the reracking needed in the late

1980s?
A. Well, because we were aware that the government had changed its policy and was no longer accepting fuel to be reprocessed, and the original design of the spent nuclear fuel pool was done on the assumption that you would take fuel off site, you know, maybe a year or so after that had been discharged and reprocess it. So you really only had a very small amount of storage space.
Once it became apparent that that was, you know, that was no longer going to be the case, that you were going to be required to store it on site for many, many years, then we had to expand the storage capability of the pools.
Q. All right. After that position you go and become senior vice president and general manager of the Nuclear Power Generation Business Unit. Do you see that?
A. Yes.
Q. And that was only for a year, year and a half; is that right?
A. Yes.
Q. In this role did you have any involvement in the operations of the Diablo Canyon facility?
A. Well, I had the same role fundamentally that I had had when I was vice president.

# Defendant

Page 14

for being the interface between PG & E and the Nuclear Regulatory Commission; in other words, what we called the licensing function so that when we had, you know, issues like reracking and we sent correspondence back and forth it went out under my signature, but the detail --

I was also involved in trying to get authorization for expenditures for things that would be required to operate Diablo Canyon. Of course, one thing is obviously spent fuel, so I had to get involved in the authorization of expenditures, but I was not ordinarily involved in any detail anyway in the actual design of these things.

BY MR. EKMAN:

Q. So the legwork was being performed by people below you?

A. Well, in all of these areas the legwork was being performed by people below me, that's correct.

Q. Other than the rerack during this time period, do you remember if there were any other major projects at the Diablo Canyon facility that you were part of getting authorization to expend capital?

A. Yeah, there was replacing our turbine rotors from the original design to a new upgraded design. There was a lot of facilities that had to get approved.

Page 15

By that let me explain what that means. You know, the plant, as you can tell, was many, many years delayed getting into operation, and in that time frame you had a lot of events like the TMI things and -- for example, and so the facilities that were originally designed, assuming that the plant was going to go into operation in 1973 or whatever it was, in a lot of cases were kind of obsolete.

I mean it was -- at one point in time, for example, we thought it would take two or three hundred people to run the plant. When we actually started up we had 2,000 people to run the plant. So office space and things like that. A lot of those kinds of facilities, office space, training facilities, laboratory facilities were upgraded after we went into operation and that all had to be budgeted and put in place. So those are the kinds of things.

Q. How about the wet pool?

A. The --

Q. The wet pools at Diablo Canyon, were there any modifications to those from the original design to the -- I guess right around the operational startup?

A. Well, other than the reracking, I can't think of any.

Q. And why was the reracking needed in the late

Page 16

1980s?

A. Well, because we were aware that the government had changed its policy and was no longer accepting fuel to be reprocessed, and the original design of the spent nuclear fuel pool was done on the assumption that you would take fuel off site, you know, maybe a year or so after that had been discharged and reprocess it. So you really only had a very small amount of storage space.

Once it became apparent that that was, you know, that was no longer going to be the case, that you were going to be required to store it on site for many, many years, then we had to expand the storage capability of the pools.

Q. All right. After that position you go and become senior vice president and general manager of the Nuclear Power Generation Business Unit. Do you see that?

A. Yes.

Q. And that was only for a year, year and a half; is that right?

A. Yes.

Q. In this role did you have any involvement in the operations of the Diablo Canyon facility?

A. Well, I had the same role fundamentally that I had had when I was vice president.

Page 17

Q. Had your tasks, your responsibilities expanded? Because certainly it looks, from the description here, that it did.

A. To an extent that's true, they had expanded, but as I had indicated previously, when I was vice president nuclear power generation was one of three subsets of the generation business unit. Okay.

After we signed the Diablo Canyon rate case with the Public Utilities Commission we went on an incentive rate making proposal that was unique. In other words, we only got paid if we generated power, okay, which is not the way a normal utility rate making works.

Because of the totally different business condition that we were now faced with, they decided to take nuclear power out and make a separate business unit out of it, so it -- and then one other thing that they did at that time is they took the engineering groups which had previously been over in an engineering business unit and they took the key elements that were required to support Diablo and they put them in that business unit.

Q. During this time period were there any projects at Diablo Canyon related to spent nuclear fuel storage expansion that were ongoing?

# Plaintiff

A. In 1990 I don't recall any. I think we pretty much finished what we were doing.
Q. By 1991 you go up to executive vice president, and in the description it states that you were initially responsible for three of PG & E's five business units.
Have we now -- are you now in a different position than you were as a senior vice president --
A. Yes.
Q. -- of the nuclear power generation unit?
A. Yes. Now instead of having any direct responsibility for Diablo Canyon I simply supervised my presented -- successor as senior vice president.
Q. Who was your successor?
A. Greg Rueger.
Q. Did you, in this capacity, have any responsibility for Humboldt Bay?
A. Only in the sense that Humboldt Bay was part of the nuclear business unit that rolled up to me.
Q. Would your involvement -- would you characterize your involvement as a high-level involvement?
A. Very high level as it relates to Humboldt Bay.
Q. And I don't want to compare Humboldt Bay and Diablo Canyon, but if I was to ask you independently if you considered your involvement during this time period

# Defendant

Page 18

A. In 1990 I don't recall any. I think we pretty much finished what we were doing.

Q. By 1991 you go up to executive vice president, and in the description it states that you were initially responsible for three of PG & E's five business units.

Have we now -- are you now in a different position than you were as a senior vice president --

A. Yes.

Q. -- of the nuclear power generation unit?

A. Yes. Now instead of having any direct responsibility for Diablo Canyon I simply supervised my presented -- successor as senior vice president.

Q. Who was your successor?

A. Greg Rueger.

Q. Did you, in this capacity, have any responsibility for Humboldt Bay?

A. Only in the sense that Humboldt Bay was part of the nuclear business unit that rolled up to me.

Q. Would your involvement -- would you characterize your involvement as a high-level involvement?

A. Very high level as it relates to Humboldt Bay.

Q. And I don't want to compare Humboldt Bay and Diablo Canyon, but if I was to ask you independently if you considered your involvement during this time period

Page 19

at Diablo Canyon to be high level, what would your answer be?

A. We're now talking about the time from 1991 to '93 when I'm executive --

Q. Yes.

A. It's very -- it's high level, but Diablo Canyon is obviously a much bigger element than Humboldt Bay.

Q. Because it's operating?

A. Because it's operating and it's also much greater -- larger facility.

Q. Do you recall if during this time period, '91 to '93, there were any expansion activities at Diablo Canyon?

A. Not that I'm aware of.

Q. After that you spend, again, it's '94 to '95, chairman, president and chief executive officer of PG & E Enterprises?

A. That's correct.

Q. In reading this description, it seemed to be another sort of fundamental change in the organization that you're with, and I'm just wondering, first of all, is that a correct statement that I just made? That you're now doing different stuff from what you're doing executive V.P. and below?

A. Yes.

Page 20

Q. Just generally tell me what you were doing.

Let's start with this: What is PG & E Enterprises?

A. Okay. As you may or may not be aware of, California went through an electricity deregulation experiment, I guess I could call it, in the late '90s. Anyway, what that -- one of the elements of that deregulation process was that they were going to require PG & E divest itself of a good portion of their generating facilities and they were going to allow independent power generators to take up the slack and operate in California. So our business was going to be reduced, our scope of business was going to be reduced.

One of the things, however, that they -- one of the caveats, I guess, was that we could now -- PG & E that is, could now start doing business outside of the State of California, which we had previously never been allowed to do, and we could run unregulated businesses, as long as they weren't involved in our service territory in regulated matters.

And so PG & E started up a totally independent entity called PG & E Enterprises that worked throughout the rest of the United States and internationally, and it had its own separate management team, and I was eventually made president and C.E.O. of that activity.

Page 21

Q. And in that capacity did you have any responsibility for spent nuclear fuel issues at Diablo Canyon or Humboldt Bay?

A. No.

Q. When you were working at -- when your work involved the Diablo Canyon facility, where were you located, you personally, physically?

A. Well, when I first started work in 1970, say in 1970, I was for a few months located in a parking lot at Humboldt Bay Power Plant, but basically from 1971 to 1980 I was physically located at the plant site. From 1980 on I was located up here in the corporate headquarters.

Q. Your next job, again, it's the '96 to '97 period, is executive vice president. What was your primary role as executive vice president during this year?

A. Well, I'd intended to retire after 1996, and there had been a couple of operational problems at Diablo Canyon and so they asked me if I would stay on for one year, relinquish my PG & E Enterprises connection but stay on as an executive vice president and go resume some sort of oversight of Diablo Canyon for a while, make sure we got our problems resolved.

Q. When you say "problems," what problems are you

# Plaintiff

at Diablo Canyon to be high level, what would your answer be?

A. We're now talking about the time from 1991 to '93 when I'm executive --

Q. Yes.

A. It's very -- it's high level, but Diablo Canyon is obviously a much bigger element than Humboldt Bay.

Q. Because it's operating?

A. Because it's operating and it's also much greater -- larger facility.

Q. Do you recall if during this time period, '91 to '93, there were any expansion activities at Diablo Canyon?

A. Not that I'm aware of.

Q. After that you spend, again, it's '94 to '95, chairman, president and chief executive officer of PG & E Enterprises?

A. That's correct.

Q. In reading this description, it seemed to be another sort of fundamental change in the organization that you're with, and I'm just wondering, first of all, is that a correct statement that I just made? That you're now doing different stuff from what you're doing executive V.P. and below?

A. Yes.

# Defendant

Page 30

Q. So would you have any knowledge concerning the yearly operations of maintenance costs associated with SAFSTOR operations at Humboldt Bay?

A. Only the most superficial to the extent they rolled up to my budget, but I didn't review them in any great detail.

Q. What about sitting here today, do you have any recollection?

A. I have no recollection sitting here today, no.

MR. STOUCK: Can we go off the record for one second?

(Recess taken: 9:49 a.m. until 9:54 a.m.)

(Defendant's Exhibit 1 was marked for identification.)

BY MR. EKMAN:

Q. Mr. Shiffer, you've been handed what's been marked as Exhibit Number 1 to your deposition. It's a letter dated May 13th, 1981 to a Mr. G.A. Tidrick from something that looks like J.R. Raggio, R-a-g-g-i-o.

A. It's J.H. Raggio.

Q. J.H. Raggio. And you are listed as a copy on this letter?

A. Yeah.

Q. I just have a few questions about this. First of all, could you tell me who Mr. Tidrick was at this

Page 31

time?

A. Gary Tidrick is his name. I could be wrong, but I believe that Mr. Tidrick was an engineer working in the engineering organization at the time.

Q. And how about Mr. Raggio?

A. Mr. Raggio, possibly he may have worked in our licensing group. I can't remember exactly where he worked.

Q. And do you know why you would have been copied on this type of letter dealing with Humboldt Bay during this time period?

A. Well, at this point in time I was that manager of nuclear plant operations before I got to be vice president, and so I was responsible for operating the plants. And so if somebody is putting together a proposal for whether we start up at Humboldt Bay or not or whether we tear it down or whatever it is, obviously they would have copied me so I was aware of what was going on.

Q. There's also a J.O. Schuyler copied?

A. Yes.

Q. Who was Mr. Schuyler at this time?

A. He was the vice president that I succeeded.

Q. And who were you reporting to during this time period?

Page 32

A. Mr. Schuyler.

Q. I noticed when I was looking at this that this letter is not signed by Mr. Raggio. Do you see that?

A. Yeah, I see that.

Q. Yet it looks like, based on this stamp in the upper right-hand corner of the first page, that this letter or memo was circulated around nuclear plant operations at PG & E. Is that a fair characterization?

A. Well, it appears to have been circulated to EDW, which is Ed Weeks, and AWM, which is Al Metcalf.

Q. Is there a -- I notice there's also a number up in the top corner, 62.6224. Do you know what that is?

A. No, I have no idea.

Q. Just based on what you see on this letter, do you have any reason to believe that you weren't actually copied on this particular letter?

A. No, as far as I can assume, a copy was sent to me.

Q. All right. If you just look at paragraph 5 under comments, it's number 5.

A. Uh-huh.

Q. Says that "the plan is to be decommissioned rather than maintained as is. We believe the SAFSTOR mode with future decom is preferable to immediate decom."

Page 33

Do you see that?

A. Yes.

Q. Do you recall why at this time the SAFSTOR mode with future decom was preferred over immediate decommissioning?

A. No, because I can't remember exactly what those terms mean anymore.

Q. Do you know what --.do you know what SAFSTOR means?

A. Only my recollection. I didn't review anything to prepare for this meeting on that subject, but it was just that we would put the fuel in the pool and guard it and that was pretty much what it involved.

Q. And what about decom, do you know what that is?

A. Well, decom refers to some sort of decomtamination, which means we're going to be removing a lot of radioactive materials from the plant, as opposed to just keeping things in place.

Q. So then you don't know -- you can't speak to that paragraph?

A. No.

Q. Then there's a -- there's a chart that's attached entitled "Alternatives for Humboldt Bay Unit 3." Do you see that?

A. Yes.

# Plaintiff

A. Mr. Schuyler.
Q. I noticed when I was looking at this that this letter is not signed by Mr. Raggio. Do you see that?
A. Yeah, I see that.
Q. Yet it looks like, based on this stamp in the upper right-hand corner of the first page, that this letter or memo was circulated around nuclear plant operations at PG & E. Is that a fair characterization?
A. Well, it appears to have been circulated to EDW, which is Ed Weeks, and AWM, which is Al Metcalf.
Q. Is there a -- I notice there's also a number up in the top corner, 62.6224. Do you know what that is?
A. No, I have no idea.
Q. Just based on what you see on this letter, do you have any reason to believe that you weren't actually copied on this particular letter?
A. No, as far as I can assume, a copy was sent to me.
Q. All right. If you just look at paragraph 5 under comments, it's number 5.
A. Uh-huh.
Q. Says that "the plan is to be decommissioned rather than maintained as is. We believe the SAFSTOR mode with future decom is preferable to immediate decom."

# Defendant

Page 46

the decommissioning studies on behalf of Pacific Gas & Electric?
A. No.
Q. Have you ever heard of a company called TLG?
A. There's so many companies that are just initials like that that I can't remember specifically.
Q. I want to talk for a minute about the corporate structure at Pacific Gas & Electric and the decision-making structure, because I think that you're probably the right guy to answer some of these kinds of questions.
Can you tell me, and if there's a better way to ask this question I'll be happy to try to figure it out, but generally speaking, how is Pacific Gas & Electric's nuclear division, you know, organized?
A. Well, I'm not talking about today specifically, but I mean back let's say in the '80s and the '90s; right? I mean, I can go into a fair amount of detail about this up to that time if you're interested, but fundamentally, back in the, say, prior to 1983 -- no, excuse me, prior to 1980 I would guess it is. In the '70s the nuclear organization was a subset of, I think, the steam generation department, which was responsible for running our fossil fuel plants. And in those days nuclear plants were just

Page 47

sort of a different kind of fossil fuel plant, supposedly.
Subsequent to TMI, the Nuclear Regulatory Commission required more or less stand-alone nuclear organizations, and so we first proposed nuclear plant operations, with me as the manager. They said that wasn't enough, you had to have a corporate officer responsible for nuclear power. So they promoted Jim Schuyler, and they made nuclear power generation with Jim Schuyler as the first vice president.
At that point in time we were a subsidiary of the electric generation business unit. The company was divided into several business units and so, as I indicated earlier, we had hydroelectric generation, steam generation, and nuclear generation.
Then in 1988 we signed this rate case settlement, which dramatically changed the way we got our money back for Diablo Canyon. It made it, you know, purely incentive based on how much we ran, how much the plant operated and so they, at that point in time, took us out from the regular generation business unit and made a separate nuclear generation business unit, with its own senior vice president.
Now, that's the way it has remained, to the best of my knowledge, until whatever has happened just

Page 48

in the last two or three, few years here with the -- I don't -- I don't quite understand the relationship of Greg Rueger and the fellows down at the plant now. I'm not quite sure now with that bankruptcy, but up to that other period of time was a stand-alone business unit.
Q. Well, let me ask about the bankruptcy. Are you -- in terms of the effect of the bankruptcy on PG & E and on its nuclear generation unit specifically, do you have knowledge about that?
A. I was retired when that took place.
Q. So Mr. Rueger might be a better person to talk to?
A. Absolutely.
Q. Now, in 1988 there's this nuclear generation business unit. Is that a subsidiary of Pacific Gas & Electric, or how -- what's its relationship to PG & E?
A. Basically, you had the C.E.O. and the president of the company, and then you had the senior vice president of each of the business units reported to the president and C.E.O. of the corporation. Okay.
Q. And then plant manager is --
A. Plant manager was physically located at the plant, reporting to the senior vice president of the business unit. The business unit as originally structured, the nuclear generation business unit had

Page 49

two vice presidents, the plant manager and the engineering vice president.
Q. And how is work divided between those two positions?
A. The plant manager is responsible for overall operation of the plant and for managing any activities that are going on at the plant, training and all of that type of thing.
The vice president of engineering is responsible for developing design details and, you know, designs of the plant, modifications of the plant, but developing the plans for them and that kind of thing.
And I think -- it's been a while since I thought about it, licensing may have been -- I think licensing was put over under the engineering vice president. That's the interface with the Nuclear Regulatory Commission.
Q. Does Pacific Gas & Electric have a board of directors?
A. Yes.
Q. Where do they fit into this chain?
A. Well, the board of directors -- I mean the C.E.O. of the company is the chairman of the board, at least normally he's the chairman of the board. That's

# Defendant

Page 50

not the case today I understand. And so the board of directors, back in the days when I was involved, had the C.E.O. of the company, usually the president of the company were the two employees that were on the board of directors, and then everybody else was an outside member of the board of directors.
Q. Do you know how it is today?
A. I -- no, you better -- you ought to ask Rueger that. He's up-to-date with what they're doing today. Right now I know, for example, that the retired -- recently retired C.E.O. is now chairman of the board and he's -- and a current C.E.O. is on the board, but what they do beyond that, I don't know.
Q. Have you ever heard of something called the President's Nuclear Advisory Counsel?
A. President's Nuclear Advisory Committee.
Q. Committee?
A. Right.
Q. PNAC?
A. PNAC, yes.
Q. What is that organization?
A. That's an organization that we started up when the president of the company was George Maniatis, and it was -- when we had -- our startup was delayed with a myriad of difficulties and all this kind of thing.

Page 51

One of the things that we committed to the Nuclear Regulatory Commission was that the president of the company, George Maniatis, was going to be very closely involved in the operation. This was to give the Nuclear Regulatory Commission some sort of feeling that we were going to pay attention, right, when we went into operation.
So George put together the President's Nuclear Advisory Committee, which included me and some of the engineering people and a few -- just a small committee to keep him abreast and informed of nuclear issues.
Q. And what type of issues would come before the committee?
A. Well, I mean, operating history, what we were doing these days, you know, would be probably the principal one, but planned expenditures and, you know, what was going on with the regulators and that kind of -- you know, we had the NRC interface and that kind of thing. Just to keep a curious president up-to-date on it so he didn't get blind sided I guess.
Q. Were you a member of PNAC?
A. Yes.
Q. Does PNAC still exist, do you know?
A. It did when I finally left the organization. Whether it does now or not, I don't know.

Page 52

Q. And when was PNAC started again? I'm sorry.
A. Well, I can't give you the exact date, but it was started around the time that we got started out as one of our initiatives to make sure to convince the NRC that we were serious about running the plant.
So it would have been started up prob -- I'm only guessing. I would have guessed it would have been started up in the early -- early to mid '80s.
Q. And how many people are on this committee?
A. I can't tell you exactly, but probably seven or eight, something like that.
Q. And you were on it. Are plant managers also on it?
A. I don't think they were officially members, but they attended all the meetings.
Q. How often did it meet?
A. I want to say quarterly, but I could be wrong.
Q. And were minutes of these meetings kept?
A. Oh, yes, I believe so.
Q. Were minutes circulated among the members of PNAC?
A. I would assume so, but it's been so long since I've seen one, I can't tell you for sure.
(Mr. Damelin enters the deposition room.)
BY MR. EKMAN:

Page 53

Q. And of board of directors -- are minutes kept of the board of directors meetings? Do you know?
A. Yes.
Q. You were not on the board of directors; is that right?
A. No, I was not a member of the board of directors, no.
Q. Did you attend any meetings at the board of directors?
A. Yes.
Q. Did you ever see minutes, meeting minutes for the board of directors?
A. Yeah, I'm sure that I did.
Q. Now, at the PNAC meetings were attorneys for Pacific Gas & Electric present at PNAC meetings?
A. I believe that our -- yeah, one of the members was a member of the law department.
Q. Do you know why PNAC had a member of the law department as a member of its committee?
A. Just to give a broad perspective, I'm sure, on issues that came up, or I'm sure that the law department was kept up to speed on what was going on at the plant as well.
Q. PNAC -- PNAC obviously addressed operational issues at the plant; is that right?

# Defendant

Page 58

A. No.
Q. And again, same question for the Diablo Canyon ISFSI, do you know what approval level?
A. No, I mean, I could guess, but I don't know.
Q. You weren't involved?
A. No.
Q. In terms of entering into contracts with vendors, let's say that the -- whatever level, let's say it's a board level project, in other words, a project had to go to the board for approval, the board has approved the expenditure and now it's time to enter into contracts with the vendor, what's the process internally at Pacific Gas & Electric for, first of all, selecting the vendor? Let's start with selecting the vendor.
A. Well, ordinarily you would put out a, you know, a request for proposal, and potential bidders on the project would identify themselves and then you'd -- you'd prepare... my brain just went to sleep. I can't remember what -- you know, you prepare a project description of some sort, something that they -- you know, and send it to them.
Q. An RFP, for example?
A. Yeah, I guess so, an RFP. And you get back your bids and then an appropriate group would evaluate

Page 59

the bids, and then ordinarily it would go to the chief -- if it's a big project it would go to the chief nuclear officer to award the thing.
Q. All right. Now, where does the chief nuclear officer fit in in the structure that you gave me?
A. Well, that's a new title, but that would have been the senior vice president, you know, in the old days or the vice president.
Q. So senior V.P. and C.N.O.
A. Are the same, right.
Q. All right. So once -- it's your understanding then that once the board has approved the capital expenditure itself, that ultimately the implementation and the contracting associated with the project goes up to the C.N.O. senior V.P. level, but stops there?
A. Right.
Q. in other words, a decision to pick Vendor A over Vendor B doesn't go up to the C.E.O. and president of the company?
A. Not on a formal basis. I mean if he has an interest in the project you might keep him informed, but usually the senior vice president would approve the contracts.
Q. Have you ever been involved in taking a capital project up through the board of directors?

Page 60

A. Yes.
Q. How is -- how is the board informed of the project and why the project's needed? How does that happen?
A. Well, again, I'll tell you how it happened back in my day.
Q. Sure.
A. They may have changed things now.
Q. By the way, that's all I'm asking for here.
A. Okay. They had a -- you know, the organization, the sponsoring organization would prepare, you know, a description paper with a cost estimate of the project. That project went to a committee of vice presidents, supplemented by people, a few people from corporate planning and, I don't know, a couple of other -- I think it was called the Capital Expenditure Review Committee, and they would look at all these projects. And by the way, this is coming from all throughout the company, not just nuclear, right.
And they'd look at all these projects and they'd look at the justifications and things, and they'd make a preliminary evaluation, you know, is this a non starter or is it worth passing on. Okay?
Assuming that you got by that committee, then

Page 61

what it did, you wrote up a more formal job estimate, although usually it was pretty much the same document, and that went to what was called the management committee. And the management committee of the utility was a committee that included the senior officers, the general counsel, the vice president of corporate planning, and the vice president of public relations. Okay. I think that's everybody that was on it.
So in other words, when I was a senior vice president in charge of a business unit I was on the management committee. And then that committee would review the job estimate and the justification that went along with it and would approve it.
Now, if it was below the magic number like, say, I'll just say 5 million dollars -- that could be the wrong number, but it was something like that -- then since the C.E.O. of the company was on the management committee, if you got management committee approval for that level of project, it was approved and it was gone.
If it was above that number then it had to go to the board of directors, and the -- you usually slightly rewrote the job estimate to simplify it a little bit, make it a little more understandable to the board. And then it was presented at the board,