# Defendant

Page 74

government responsible for the disposal of spent nuclear fuel.

Q. Have you ever read the Nuclear Waste Policy Act?

A. No.

Q. Did you have any involvement in its promulgation?

A. No.

Q. Do you know if anyone at Pacific Gas & Electric was involved in the promulgation of the Nuclear Waste Policy Act?

A. Not to my knowledge.

Q. And when you say not to your knowledge, is that not to your knowledge, you don't think anyone from PG & E was involved in its promulgation or you really don't know?

A. Well, I really don't think anyone was involved. I mean we probably had people that paid attention to what was going on, but we weren't really involved.

Q. Are you familiar with something called contract for disposal of spent nuclear fuel and/or high level radioactive waste?

A. Once again, I'm aware of what it is, yes.

Q. And it's more commonly called the Standard

Page 75

Contract; you've heard that term?

A. Yeah, I guess so. I know there's a contract, yes.

Q. All right. How do you know about the Standard Contract?

A. Well, I mean I just can remember from way back when, that we were required to sign something up and then in this meeting I went to last week they showed something to me, but I didn't read it.

Q. That is my next question. Have you ever read it?

A. No.

Q. Were you involved in the -- to your recollection, were you involved in the drafting of the Standard Contract?

A. My recollection is no, we were not -- I was not.

Q. Do you recall whether you provided any comments concerning the Standard Contract?

A. I don't think I did.

Q. Did you have any discussions with folks at DOE during the contract formation?

A. No.

Q. Do you recall whether you had discussions with other people in the industry, the nuclear industry,

Page 76

during the contract formation process?

A. Not me personally; you know, I had people that tried to keep abreast of what was going on, generally speaking, but I don't think we were really involved in any great degree.

Q. Do you know, was there any PG & E employee who was responsible for, let's say, keeping up with the Standard Contract during this time period, the early 1980s?

A. I can't remember any specific individual. I mean if there was it would have been on just attendance at industry meetings, you know, that kind of thing, pretty superficial involvement.

Q. Since the execution of the -- are you aware that Pacific Gas & Electric signed what I'm calling the Standard Contract with the Department of Energy?

A. Yes.

Q. Since the execution of the Standard Contract, was it ever part of your job to deal with issues that arose under the Standard Contract with the Department of Energy?

A. Well, I don't remember any specific detailed issues, but I mean, you know, the idea that the DOE was going to start taking fuel in the late '90s obviously impacted what we had to do at Diablo Canyon to prepare

Page 77

for that. So I mean it wasn't, you know, legal involvement with the contract, but just knowledge of when we were going to get -- when DOE was going to take our fuel.

Q. And how did that impact Diablo Canyon?

A. Well, we had to -- as I indicated previously, you know, the spent fuel pool was originally designed as if we would off load a load of spent fuel and a year or two later it would be taken off site for reprocessing, and now we were going to have to store fuel for, you know, many years.

Q. Do you have any understanding of what Pacific Gas & Electric's obligations are under the Standard Contract?

A. Only that we were responsible for the fuel prior to the time that DOE took it off of our hands and said that we had to provide for storage and that kind of thing.

Q. Do you know if Pacific Gas & Electric had any payment obligations under the Standard Contract?

A. Oh, yeah, we had to make payments into the fund that was supposed to fund, you know, the high level waste.

Q. The Nuclear -- have you heard of the Nuclear Waste Fund?

# Plaintiff

during the contract formation process?

A. Not me personally; you know, I had people that tried to keep abreast of what was going on, generally speaking, but I don't think we were really involved in any great degree.

Q. Do you know, was there any PG & E employee who was responsible for, let's say, keeping up with the Standard Contract during this time period, the early 1980s?

A. I can't remember any specific individual. I mean if there was it would have been on just attendance at industry meetings, you know, that kind of thing, pretty superficial involvement.

Q. Since the execution of the -- are you aware that Pacific Gas & Electric signed what I'm calling the Standard Contract with the Department of Energy?

A. Yes.

Q. Since the execution of the Standard Contract, was it ever part of your job to deal with issues that arose under the Standard Contract with the Department of Energy?

A. Well, I don't remember any specific detailed issues, but I mean, you know, the idea that the DOE was going to start taking fuel in the late '90s obviously impacted what we had to do at Diablo Canyon to prepare

for that. So I mean it wasn't, you know, legal involvement with the contract, but just knowledge of when we were going to get -- when DOE was going to take our fuel.

Q. And how did that impact Diablo Canyon?

A. Well, we had to -- as I indicated previously, you know, the spent fuel pool was originally designed as if we would off load a load of spent fuel and a year or two later it would be taken off site for reprocessing, and now we were going to have to store fuel for, you know, many years.

Q. Do you have any understanding of what Pacific Gas & Electric's obligations are under the Standard Contract?

A. Only that we were responsible for the fuel prior to the time that DOE took it off of our hands and said that we had to provide for storage and that kind of thing.

Q. Do you know if Pacific Gas & Electric had any payment obligations under the Standard Contract?

A. Oh, yeah, we had to make payments into the fund that was supposed to fund, you know, the high level waste.

Q. The Nuclear -- have you heard of the Nuclear Waste Fund?

# Defendant

Page 78

A. Yeah, it's whatever, you know, the Nevada --
Q. Did you ever have any involvement in the payment of those fees of these under the Standard Contract?
A. No.
Q. Do you have any understanding of what the Department of Energy's obligations are under the Standard Contract, vis-a-vis Pacific Gas & Electric?
A. Only that, you know, ultimately the DOE was supposed to take title to this fuel and, you know, remove it from your site, and up to that point in time it was our responsibility to store it.
Q. Without looking at the Standard Contract, which I understand you haven't read, do you have an understanding as to when DOE was obligated to begin waste acceptance from the nuclear industry under that contract?
A. The only date that sticks in my mind was originally 1998.
Q. January 31, 1998, does that --
A. It's close. I'm a musician so it's close enough for jazz is what we say in the music business.
Q. We'll go with 1988.
Do you have an understanding as to when DOE was obligated to begin waste acceptance -- my first

Page 79

question is from the industry and my second question is do you have any understanding of when they were obligated to begin waste acceptance from Diablo Canyon?
A. No. I mean, I'm aware of the fact that the nominal date for the industry was 1998, but that there would be, you know, have to apportion it amongst different plants and that kind of stuff and they'd have to set up schedules, but I'm not aware that it ever got to a point where there was any detailed schedules for Diablo Canyon put together.
Q. And the same may be true for Humboldt Bay also?
A. That's correct.
Q. Have you ever heard of the term "oldest fuel first"?
A. Yeah.
Q. Do you know -- and when I ask you that, I'm talking about in the context of the Standard Contract.
A. Well, again, I haven't spent any time at all studying the legal implications of this, but I mean, it was a question of, you know, common sense would tell you that one possibility for DOE would be to take the oldest fuel first, but, you know, that's just one consideration I presume.
Q. And you don't know what the contract provides

Page 80

in that regard?
A. No, I don't.
Q. Do you know if the contract provides -- do you have an understanding of whether the contract provides any specific rate at which DOE will accept spent fuel from the industry?
A. No, I'm not aware of it.
Q. When I use the -- when I say "rate," let me use a phrase "rate of acceptance." Do you have an understanding of what that means?
A. Well, that they would take over responsibility is I guess what it means. That's what I would have -- I didn't read the contract and see if there was a legal definition of that.
Q. Do you have any understanding of -- of the rate at which DOE -- the rate at which DOE is required to accept spent nuclear fuel under the Standard Contract from the industry?
A. No.
Q. Do you have any understanding of whether there is a test that ultimately would establish the rate of acceptance set forth in the Standard Contract?
A. No.
MR. STOUCK: What number is this?
MR. EKMAN: This is number 3.

Page 81

(Defendant's Exhibit 3 was marked for identification.)
BY MR. EKMAN:
Q. Mr. Shiffer, I've handed you what's been marked as Exhibit 3, which is a letter dated February 22nd, 1983, from you to Mr. Schuyler.
A. Uh-huh.
Q. And it's regarding, at least in the first paragraph, Pacific Gas & Electric's obligations under the recently passed National Waste Policy Act, NWPA, of 1982.
First of all, have I correctly identified this document?
A. Yes.
Q. And is that your signature at the bottom?
A. Yes.
Q. Just so you know, I have a few documents from this time period, which I recognize it's 22 years ago. I'm showing these to you not to trick you, but to just to see if I can refresh your recollection about some things that you may or may not have been involved in at that time. Okay?
With respect to this letter, I actually have just a few questions about who some of these folks are.
First of all, there are these acronyms, FP&A,

# Defendant

Page 82

P&ES. What is FP&A under disposal contracts? Do you remember what that was?
A. No.
Q. What about P&ES?
A. I don't remember that either.
Q. My best guess on that was plant and engineering services, is that an organization that means anything to you?
A. You know, this is -- this is 1983 and at that point in time we had a little -- I mean, I was -- at that point in time we were -- nuclear plant operations I guess was a subgroup. I wasn't a vice president at that point in time, so we just had a little operating group, and engineering was over in a separate business unit and everything.
And I -- I can't remember -- that organization didn't last very long because -- you know, and so I don't remember what these acronyms meant anymore.
Q. Do you know who R.B. Witzel was?
A. His name is Ron Witzel. You know, he would have been a guy that was either involved in engineering oversight or possibly in the engineering organization or in the licensing group. I mean that kind of thing.
Q. And what about W.H. Fujimoto, which I believe is Warren Fujimoto?

Page 83

A. Yeah, that's Warren Fujimoto. Yeah, I don't remember specifically what he was doing in 1983, but eventually he was assigned to the plant and became the plant manager, but he was -- and vice president of the engineering group too for a while.
Q. Do you know where Mr. Fujimoto is today?
A. I think he lives in San Luis Obispo.
Q. And is he no longer with Pacific Gas & Electric?
A. Right. He's retired and he's a consultant.
Q. There's also an NPG under "Submit S&F discharge reports. NPG analysis," do you know what that NPG acronym stands for?
A. Nuclear power generation.
Q. And who was Mr. Klatt?
A. Russ Klatt. Well, again, I can't remember the organization. He would have been another person that was in this kind of interface group that looked at licensing and interfaced with engineering, that kind of thing.
Q. On the second page of this -- well, let me ask you this: Do you recall why you would have signed -- do you know why you would have signed a letter that is basically assigning tasks under -- following from the Nuclear Waste Policy Act?

Page 84

A. Most likely it was because -- well, when I became vice president I was certainly involved in the licensing interface was my responsibility. Back in '83 I think it's still -- we were more involved in interaction with the NRC and that kind of thing, and so I guess Mr. Schuyler turned to me to write things for him or to get my people to look into it.
Q. I was going to ask, if you go to page 2, actually to the left of your signature.
A. Right.
Q. There's a line of initials and then somebody C.T. Polidoroff?
A. Right.
Q. Who is C.T. Polidoroff at this time?
A. Tim, his name is Tim Polidoroff. And R.W.L. is Ray Lorenz and W.H.F. is Warren Fujimoto and once again, I think that they were in a group that I had for a short period of time that kind of acted as an interface between engineering and operations and tried to keep abreast of, you know, what was going on in the industry.
Q. Does that line indicate to you that this letter probably was not written by you, but instead was written by one of those three or potentially all three of those guys?

Page 85

A. Right. Absolutely.
Q. So this would have been something that was written by your staff but that you signed off on because of your capacity at the plant at that time?
A. My -- 1983 I was in the general office but I was a manager reporting to Mr. Schuyler so I would have signed it off and sent it to him, right.
Q. As opposed to having one of your reports assign something to Mr. Schuyler?
A. Yes, that's right.
Q. All right. And you would have reviewed the letter prior to sending it?
A. Yeah.
Q. And just on page 2 I notice there is a reference to "Provide additional S&F storage capacity at DCPP." Do you see that?
A. You mean the additional reports required? "Five years prior to DOE's" -- wait a minute.
Q. Well, actually, the one right above that.
A. "To ensure that DCP addresses DCPP's interim spent fuel -- nuclear fuel storage requirements." Yes.
Q. What is that referencing?
A. That's ultimately referencing the reracking.
Q. Well, and again, that's the reracking in the late 1980s, mid to late '80s?

# Plaintiff

A. Right. Absolutely.
Q. So this would have been something that was written by your staff but that you signed off on because of your capacity at the plant at that time?
A. My -- 1983 I was in the general office but I was a manager reporting to Mr. Schuyler so I would have signed it off and sent it to him, right.
Q. As opposed to having one of your reports assign something to Mr. Schuyler?
A. Yes, that's right.
Q. All right. And you would have reviewed the letter prior to sending it?
A. Yeah.
Q. And just on page 2 I notice there is a reference to "Provide additional S&F storage capacity at DCPP." Do you see that?
A. You mean the additional reports required? "Five years prior to DOE's" -- wait a minute.
Q. Well, actually, the one right above that.
A. "To ensure that DCP addresses DCPP's interim spent fuel -- nuclear fuel storage requirements." Yes.
Q. What is that referencing?
A. That's ultimately referencing the reracking.
Q. Well, and again, that's the reracking in the late 1980s, mid to late '80s?

A. Mid to late '80s, right.

Q. Do you know who prepared the attachments to this letter?

A. No, I have no idea.

Q. Is it -- is it fair to say that you did not prepare the summary of the Nuclear Waste Policy Act that's attached to this letter?

A. Right.

Q. Would you have read the summary at this time, prior to sending it to Mr. Schuyler?

A. Probably.

Q. Do you recall reading that summary?

A. I don't specifically recall it, but that was my tendency.

Q. And just to make sure the record's clear. The letter says attachments at the bottom of the second page, which indicates to me that the letter and the attachments would have been sent to Mr. Schuyler at that time?

A. Correct.

Q. You can put that aside.

(Defendant's Exhibit 4 was marked for identification.)

MR. STOUCK: Thank you. Number 4; right?

MR. EKMAN: Number 4.

# Defendant

Page 86

A. Mid to late '80s, right.
Q. Do you know who prepared the attachments to this letter?
A. No, I have no idea.
Q. Is it -- is it fair to say that you did not prepare the summary of the Nuclear Waste Policy Act that's attached to this letter?
A. Right.
Q. Would you have read the summary at this time, prior to sending it to Mr. Schuyler?
A. Probably.
Q. Do you recall reading that summary?
A. I don't specifically recall it, but that was my tendency.
Q. And just to make sure the record's clear. The letter says attachments at the bottom of the second page, which indicates to me that the letter and the attachments would have been sent to Mr. Schuyler at that time?
A. Correct.
Q. You can put that aside.
(Defendant's Exhibit 4 was marked for identification.)
MR. STOUCK: Thank you. Number 4; right?
MR. EKMAN: Number 4.

Page 87

Q. All right. Exhibit 4 is a letter from you to Mr. Schuyler, dated May 25, 1983. It deals with a variety of issues but focuses really on Diablo Canyon. Have I correctly identified this letter?
A. Yes.
Q. Were the reasons that you would have been sending this letter to Mr. Schuyler the same for Exhibit 4 as for Exhibit 3?
A. Yes.
Q. And again, I note at the bottom of the second page there's a note SD Kamdar. Does that indicate that Mr. Kamdar prepared this letter for your signature?
A. Yes.
Q. Who is Mr. Kamdar at this time?
A. His name was Suresh Kamdar, but again, he was -- again, I don't recall exactly what position he held, but he would have been in that -- probably the group that we were talking about with the previous one.
Q. Just have a couple questions about this letter, just to see what you remember.
The third paragraph of the letter discusses dry cask storage as possible solution for future storage issues at Diablo Canyon. Do you see that?
A. Yeah.
Q. At this time do you recall what the status of

Page 88

dry cask storage was in the -- in the industry as a whole, in terms of its availability?
A. At this time I think it sort of alludes to that in the next sentence or two; that it was just starting to be an alternative that was going through a licensing process at other plants.
Q. Do you know if at this time high density storage racks had been -- had been licensed for use at nuclear facilities?
A. It's my understanding, once again, that some utilities had already reracked, yes. In fact, I think it -- it alludes to that in that same paragraph, Devco having previously reracked both north and Surrey plants.
Q. And you believe that would have been with the high density technology?
A. Right. Comparable to what we were looking at.
Q. Do you know why you were discussing -- in the 1983 time frame, why you would have been sending a letter to Mr. Schuyler that discusses the possibility of ultimately using dry storage for the storage of spent nuclear fuel?
A. Well, I mean we just talked about this Nuclear Waste Policy Act and contracts having been signed in this general time frame, and so it's natural to assume

Page 89

that he was asking, okay, what do you think we ought to do.
Q. I notice in the subject line it says "Question on Dry Cask Storage." That's the subject?
A. Uh-huh.
Q. Do you know, would that have been a question that Mr. Schuyler had asked?
A. I don't know. I can guess, but I don't know.
Q. In the last paragraph of that first page there is a statement that says: "The Nuclear Waste Policy Act of 1983 promises to relieve long-term storage needs at the sites."
Do you see that?
A. Yes.
Q. Do you know what -- do you know what was meant by the words "long-term storage needs"?
A. Well, I mean not specifically. I assume it means, you know long-term storage, storage beyond -- it's, particularly at Diablo Canyon, storage beyond the first refueling outage, you know, since we didn't have much storage capacity.
Q. And then the rest of that paragraph states, "But the repositories for permanent storage are not scheduled to be opened until the late 1990s. Acceptance dates for Diablo spent fuel shipments could

# Plaintiff

Q. All right. Exhibit 4 is a letter from you to Mr. Schuyler, dated May 25, 1983. It deals with a variety of issues but focuses really on Diablo Canyon. Have I correctly identified this letter?

A. Yes.

Q. Were the reasons that you would have been sending this letter to Mr. Schuyler the same for Exhibit 4 as for Exhibit 3?

A. Yes.

Q. And again, I note at the bottom of the second page there's a note SD Kamdar. Does that indicate that Mr. Kamdar prepared this letter for your signature?

A. Yes.

Q. Who is Mr. Kamdar at this time?

A. His name was Suresh Kamdar, but again, he was -- again, I don't recall exactly what position he held, but he would have been in that -- probably the group that we were talking about with the previous one.

Q. Just have a couple questions about this letter, just to see what you remember.

The third paragraph of the letter discusses dry cask storage as possible solution for future storage issues at Diablo Canyon. Do you see that?

A. Yeah.

Q. At this time do you recall what the status of

dry cask storage was in the -- in the industry as a
whole, in terms of its availability?
A. At this time I think it sort of alludes to that in the next sentence or two; that it was just starting to be an alternative that was going through a licensing process at other plants.
Q. Do you know if at this time high density storage racks had been -- had been licensed for use at nuclear facilities?
A. It's my understanding, once again, that some utilities had already reracked, yes. In fact, I think it -- it alludes to that in that same paragraph, Devco having previously reracked both north and Surrey plants.
Q. And you believe that would have been with the high density technology?
A. Right. Comparable to what we were looking at.
Q. Do you know why you were discussing -- in the 1983 time frame, why you would have been sending a letter to Mr. Schuyler that discusses the possibility of ultimately using dry storage for the storage of spent nuclear fuel?
A. Well, I mean we just talked about this Nuclear Waste Policy Act and contracts having been signed in this general time frame, and so it's natural to assume

that he was asking, okay, what do you think we ought to do.

Q. I notice in the subject line it says "Question on Dry Cask Storage." That's the subject?

A. Uh-huh.

Q. Do you know, would that have been a question that Mr. Schuyler had asked?

A. I don't know. I can guess, but I don't know.

Q. In the last paragraph of that first page there is a statement that says: "The Nuclear Waste Policy Act of 1983 promises to relieve long-term storage needs at the sites."

Do you see that?

A. Yes.

Q. Do you know what -- do you know what was meant by the words "long-term storage needs"?

A. Well, I mean not specifically. I assume it means, you know long-term storage, storage beyond -- it's, particularly at Diablo Canyon, storage beyond the first refueling outage, you know, since we didn't have much storage capacity.

Q. And then the rest of that paragraph states, "But the repositories for permanent storage are not scheduled to be opened until the late 1990s. Acceptance dates for Diablo spent fuel shipments could

# Defendant

Page 86

A. Mid to late '80s, right.
Q. Do you know who prepared the attachments to this letter?
A. No, I have no idea.
Q. Is it -- is it fair to say that you did not prepare the summary of the Nuclear Waste Policy Act that's attached to this letter?
A. Right.
Q. Would you have read the summary at this time, prior to sending it to Mr. Schuyler?
A. Probably.
Q. Do you recall reading that summary?
A. I don't specifically recall it, but that was my tendency.
Q. And just to make sure the record's clear. The letter says attachments at the bottom of the second page, which indicates to me that the letter and the attachments would have been sent to Mr. Schuyler at that time?
A. Correct.
Q. You can put that aside.
(Defendant's Exhibit 4 was marked for identification.)
MR. STOUCK: Thank you. Number 4; right?
MR. EKMAN: Number 4.

Page 87

Q. All right. Exhibit 4 is a letter from you to Mr. Schuyler, dated May 25, 1983. It deals with a variety of issues but focuses really on Diablo Canyon. Have I correctly identified this letter?
A. Yes.
Q. Were the reasons that you would have been sending this letter to Mr. Schuyler the same for Exhibit 4 as for Exhibit 3?
A. Yes.
Q. And again, I note at the bottom of the second page there's a note SD Kamdar. Does that indicate that Mr. Kamdar prepared this letter for your signature?
A. Yes.
Q. Who is Mr. Kamdar at this time?
A. His name was Suresh Kamdar, but again, he was -- again, I don't recall exactly what position he held, but he would have been in that -- probably the group that we were talking about with the previous one.
Q. Just have a couple questions about this letter, just to see what you remember.
The third paragraph of the letter discusses dry cask storage as possible solution for future storage issues at Diablo Canyon. Do you see that?
A. Yeah.
Q. At this time do you recall what the status of

Page 88

dry cask storage was in the -- in the industry as a whole, in terms of its availability?
A. At this time I think it sort of alludes to that in the next sentence or two; that it was just starting to be an alternative that was going through a licensing process at other plants.
Q. Do you know if at this time high density storage racks had been -- had been licensed for use at nuclear facilities?
A. It's my understanding, once again, that some utilities had already reracked, yes. In fact, I think it -- it alludes to that in that same paragraph, Devco having previously reracked both north and Surrey plants.
Q. And you believe that would have been with the high density technology?
A. Right. Comparable to what we were looking at.
Q. Do you know why you were discussing -- in the 1983 time frame, why you would have been sending a letter to Mr. Schuyler that discusses the possibility of ultimately using dry storage for the storage of spent nuclear fuel?
A. Well, I mean we just talked about this Nuclear Waste Policy Act and contracts having been signed in this general time frame, and so it's natural to assume

Page 89

that he was asking, okay, what do you think we ought to do.
Q. I notice in the subject line it says "Question on Dry Cask Storage." That's the subject?
A. Uh-huh.
Q. Do you know, would that have been a question that Mr. Schuyler had asked?
A. I don't know. I can guess, but I don't know.
Q. In the last paragraph of that first page there is a statement that says: "The Nuclear Waste Policy Act of 1983 promises to relieve long-term storage needs at the sites."
Do you see that?
A. Yes.
Q. Do you know what -- do you know what was meant by the words "long-term storage needs"?
A. Well, I mean not specifically. I assume it means, you know long-term storage, storage beyond -- it's, particularly at Diablo Canyon, storage beyond the first refueling outage, you know, since we didn't have much storage capacity.
Q. And then the rest of that paragraph states, "But the repositories for permanent storage are not scheduled to be opened until the late 1990s. Acceptance dates for Diablo spent fuel shipments could

Page 90

be even farther in the future. We have to consider this in our storage expansion plans."
Do you see that?
A. Yes.
Q. And that's consistent with your understanding of this acceptance queue set forth in the Standard Contract?
A. That's correct.
Q. And then the last paragraph it ends with this -- the last substantive paragraph --
A. Correct.
Q. -- is on page 2 actually, ends with this sentence: "However, once reracked, we will not have to look into any long-term solutions until mid 1990s."
Do you see that?
A. Yes.
Q. Why -- first of all, how did you determine or how was it determined that the mid 1990s were the point at which Diablo Canyon would have to start looking at additional or at long-term solutions?
A. Well, you can postulate that, you know, with something more than 1,000 storage spaces in the pool, you can make estimates based on how many assemblies you discharge at each refueling outage as to how long you're going to take before you run out of storage

Page 91

space in the fuel -- or in the pool, excuse me.
And so that would have -- you know, if you rerack with something over 1,000 storage spaces, it's going to take you out until the late 1990s or early 2000s before you run out of space.
Q. All right. And do you know why -- the paragraph before that we talked about noted that the repositories for permanent storage are not scheduled to open until the late 1990s. Do you see that?
A. Yes.
Q. If that had been the case, do you know why Diablo Canyon would have needed to look at long-term solutions prior to the opening of those Federal repositories?
A. I mean we had a -- we had a spent fuel pool that would take one discharge, plus one core off load, so that's going to get us through a year and a half of operation; right? And so we're going to run out of space in the mid, you know, 1980s, so even to get to the 1990s we're going to have to do something.
Q. Then the last paragraph actually, though, as I read it, assumes that the rerack has been performed and then goes on to state that or appears to state that there will still be a need to look at long-term solutions in the mid 1990s, and I'm just wondering if

Page 92

you recall why that is?
A. Well, I think it explains itself in the sentence there, "Acceptance dates for Diablo spent fuel shipments could be even farther in the future."
So I mean we're 1983, we're sort of flying blind here as to what's going to actually take place, so you want to give yourself some room.
(Defendant's Exhibit 5 was marked for identification.)
BY MR. EKMAN:
Q. Mr. Shiffer, I've handed you what's been marked as Exhibit 5 and, again, feel free to review it as I ask questions, but I just have a few questions about this -- about this letter and attachments.
Specifically, it is a letter dated August 5th, 1983, to Mr. Schuyler from you, regarding PG & E action on DOE waste contract. Do you see that?
A. Uh-huh. Yes.
Q. And that's your signature on page 2?
A. Yes.
Q. And it appears, again, from the left-hand side of the page below your signature that this letter was not written by you?
A. That's correct.
Q. Would have been written by Mr. Tompkins?

Page 93

A. Right.
Q. And you had reviewed this letter prior to sending it?
A. Right.
Q. Who's Mr. Tompkins at this time?
A. His name is Jim Tompkins, and he's one I actually do remember. He was in the licensing group that tried to stay abreast of, you know, interface with the NRC and issues related to licensing and that kind of thing.
Subsequently, he was reassigned to Diablo Canyon, and I understand he just left the company a year or so ago. Whether he still lives in San Luis Obispo or not, I don't know.
Q. The first sentence of this letter mentions an E.E.I. position. What is E.E.I?
A. Edison Electric Institute.
Q. And what are they?
A. That's an industry group that utilities have representatives on that purports to generate an industry position on various issues.
Q. And you say "purports to generate an industry position." Why did you use the word "purports"?
A. Well, I mean, I guess it's -- you know, each individual utility may have its own individual issues

# Plaintiff

space in the fuel -- or in the pool, excuse me.
And so that would have -- you know, if you rerack with something over 1,000 storage spaces, it's going to take you out until the late 1990s or early 2000s before you run out of space.
Q. All right. And do you know why -- the paragraph before that we talked about noted that the repositories for permanent storage are not scheduled to open until the late 1990s. Do you see that?
A. Yes.
Q. If that had been the case, do you know why Diablo Canyon would have needed to look at long-term solutions prior to the opening of those Federal repositories?
A. I mean we had a -- we had a spent fuel pool that would take one discharge, plus one core off load, so that's going to get us through a year and a half of operation; right? And so we're going to run out of space in the mid, you know, 1980s, so even to get to the 1990s we're going to have to do something.
Q. Then the last paragraph actually, though, as I read it, assumes that the rerack has been performed and then goes on to state that or appears to state that there will still be a need to look at long-term solutions in the mid 1990s, and I'm just wondering if

# Defendant

be even farther in the future. We have to consider this in our storage expansion plans."
Do you see that?
A. Yes.
Q. And that's consistent with your understanding of this acceptance queue set forth in the Standard Contract?
A. That's correct.
Q. And then the last paragraph it ends with this -- the last substantive paragraph --
A. Correct.
Q. -- is on page 2 actually, ends with this sentence: "However, once reracked, we will not have to look into any long-term solutions until mid 1990s."
Do you see that?
A. Yes.
Q. Why -- first of all, how did you determine or how was it determined that the mid 1990s were the point at which Diablo Canyon would have to start looking at additional or at long-term solutions?
A. Well, you can postulate that, you know, with something more than 1,000 storage spaces in the pool, you can make estimates based on how many assemblies you discharge at each refueling outage as to how long you're going to take before you run out of storage



space in the fuel -- or in the pool, excuse me.
And so that would have -- you know, if you rerack with something over 1,000 storage spaces, it's going to take you out until the late 1990s or early 2000s before you run out of space.
Q. All right. And do you know why -- the paragraph before that we talked about noted that the repositories for permanent storage are not scheduled to open until the late 1990s. Do you see that?
A. Yes.
Q. If that had been the case, do you know why Diablo Canyon would have needed to look at long-term solutions prior to the opening of those Federal repositories?
A. I mean we had a -- we had a spent fuel pool that would take one discharge, plus one core off load, so that's going to get us through a year and a half of operation; right? And so we're going to run out of space in the mid, you know, 1980s, so even to get to the 1990s we're going to have to do something.
Q. Then the last paragraph actually, though, as I read it, assumes that the rerack has been performed and then goes on to state that or appears to state that there will still be a need to look at long-term solutions in the mid 1990s, and I'm just wondering if



you recall why that is?
A. Well, I think it explains itself in the sentence there, "Acceptance dates for Diablo spent fuel shipments could be even farther in the future."
So I mean we're 1983, we're sort of flying blind here as to what's going to actually take place, so you want to give yourself some room.
(Defendant's Exhibit 5 was marked for identification.)
BY MR. EKMAN:
Q. Mr. Shiffer, I've handed you what's been marked as Exhibit 5 and, again, feel free to review it as I ask questions, but I just have a few questions about this -- about this letter and attachments.
Specifically, it is a letter dated August 5th, 1983, to Mr. Schuyler from you, regarding PG & E action on DOE waste contract. Do you see that?
A. Uh-huh. Yes.
Q. And that's your signature on page 2?
A. Yes.
Q. And it appears, again, from the left-hand side of the page below your signature that this letter was not written by you?
A. That's correct.
Q. Would have been written by Mr. Tompkins?



A. Right.
Q. And you had reviewed this letter prior to sending it?
A. Right.
Q. Who's Mr. Tompkins at this time?
A. His name is Jim Tompkins, and he's one I actually do remember. He was in the licensing group that tried to stay abreast of, you know, interface with the NRC and issues related to licensing and that kind of thing.
Subsequently, he was reassigned to Diablo Canyon, and I understand he just left the company a year or so ago. Whether he still lives in San Luis Obispo or not, I don't know.
Q. The first sentence of this letter mentions an E.E.I. position. What is E.E.I?
A. Edison Electric Institute.
Q. And what are they?
A. That's an industry group that utilities have representatives on that purports to generate an industry position on various issues.
Q. And you say "purports to generate an industry position." Why did you use the word "purports"?
A. Well, I mean, I guess it's -- you know, each individual utility may have its own individual issues

Page 94

or something like this, and so they may or may not be totally in agreement with the quote, "industry position."

Q. Is it an attempt -- do they try to get a consensus position?

A. Yeah, I believe they try to get a consensus.

Q. But some utilities might disagree?

A. Disagree or have some special circumstance, right.

Q. Is PG & E a member of E.E.I.?

A. Well, it was in those days.

Q. There's a sentence at the -- that ends the first paragraph that says, "We do not feel that participating in a lawsuit is appropriate."

Do you see that?

A. Yes.

Q. Do you know what that's talking about?

A. No, I don't recall anymore.

Q. Were you aware or do you recall, sitting here today, that E.E.I. submitted comments to the Department of Energy during the contract formation process?

A. I wouldn't have been aware of it, absent handing me this document, which seems to imply that.

Q. And does this document at all refresh your recollection as to whether Pacific Gas & Electric

Page 95

submitted its own independent comments on the Standard Contract to the Department of Energy?

A. No, it doesn't bring that to mind to me.

Q. This letter in the second paragraph purports to identify seven issues that PG & E has strong feelings about. Do you see that?

A. I see a list of issues here, yes.

Q. All right. There are seven specific ones, although they're not numbered sequentially.

A. Right.

Q. The first one is lack of standards or milestones for DOE's performance. Do you recall what PG & E's issue was with respect to the Standard Contract and the lack of milestones or standards?

A. No.

Q. And it looks like to me that the -- do you know what's referenced here in 2, where it uses the phrase "proposed dates"; that DOE will meet the proposed dates? Do you know what that is referencing?

A. You lost me. Where is that?

Q. It's in Lack of Standards or Milestones For DOE's Performance on that first page. It's the second sentence. "We need to have some assurance that DOE will meet the proposed dates in order to allow us to make decisions now on what type of spent fuel storage

Page 96

to utilize at Diablo Canyon."

Do you see that?

A. Yes.

Q. Do you know what the proposed dates is?

A. Well, I know what -- I don't know what it was at the time they were going through this negotiation. It ended up being 1998, as I remember.

Q. So it's the date of commencement of acceptance?

A. Right.

Q. Do you know whose handwriting is at the bottom of this first page? There's a note "or rod consolidation utility owned cask," etcetera?

A. No.

Q. If you could turn to page 2. There's a heading right at the top "Priority and Allocations." Do you see that?

A. Yes.

Q. If you can take a look at that paragraph, but my question is: Do you have an understanding as to what priority means?

A. Well, my understanding would be that that's the sequence in which DOE is going to be taking fuel from the different plants around the country.

Q. Have you ever heard the term "priority for

Page 97

shut down reactors"?

A. No.

Q. Other than speculating?

A. Yeah, I can speculate what it means, but I don't recall.

Q. And any speculation on what it means is based on the fact that that's just plain English?

A. Right.

Q. You don't have any specific knowledge about any priority provisions that may or may not be in the Standard Contract?

A. Not in any depth, because I know that's an issue, but I didn't read the contract, so I don't remember.

Q. That paragraph also mentions an emergency requirement. Are you familiar at all with whether the Standard Contract provides anything for emergency deliveries of spent nuclear fuel to DOE?

A. No, I'm not that -- I'm not familiar with it.

Q. So you don't have an understanding then of what sort of circumstances might allow an emergency delivery?

A. No.

Q. If you could turn to the -- there's an attachment dated July 13th, 1983. And this actually

# Plaintiff

to utilize at Diablo Canyon."
Do you see that?
A. Yes.
Q. Do you know what the proposed dates is?
A. Well, I know what -- I don't know what it was at the time they were going through this negotiation. It ended up being 1998, as I remember.
Q. So it's the date of commencement of acceptance?
A. Right.
Q. Do you know whose handwriting is at the bottom of this first page? There's a note "or rod consolidation utility owned cask," etcetera?
A. No.
Q. If you could turn to page 2. There's a heading right at the top "Priority and Allocations." Do you see that?
A. Yes.
Q. If you can take a look at that paragraph, but my question is: Do you have an understanding as to what priority means?
A. Well, my understanding would be that that's the sequence in which DOE is going to be taking fuel from the different plants around the country.
Q. Have you ever heard the term "priority for

shut down reactors"?
A. No.
Q. Other than speculating?
A. Yeah, I can speculate what it means, but I don't recall.
Q. And any speculation on what it means is based on the fact that that's just plain English?
A. Right.
Q. You don't have any specific knowledge about any priority provisions that may or may not be in the Standard Contract?
A. Not in any depth, because I know that's an issue, but I didn't read the contract, so I don't remember.
Q. That paragraph also mentions an emergency requirement. Are you familiar at all with whether the Standard Contract provides anything for emergency deliveries of spent nuclear fuel to DOE?
A. No, I'm not that -- I'm not familiar with it.
Q. So you don't have an understanding then of what sort of circumstances might allow an emergency delivery?
A. No.
Q. If you could turn to the -- there's an attachment dated July 13th, 1983. And this actually

# Defendant

what the letter says, quote, "Refers to the total on-site storage capability for the lifetime of Diablo, assuming that Federal repositories or any other facility will not become available to receive Diablo's spent fuel."

Do you see that?

A. Yes.

Q. Do you know if the maximum or the minimum desired storage was used as the planning basis for Diablo Canyon during this time period?

A. My understanding is that the -- that it was more based on the technology of what was licensed and what was available and the space that we had and if -- that presumably if that technology gave us, you know, reasonably adequate storage, you know, accounting for some uncertainties, that that's what we took.

Q. But it's your understanding, again, with the exception of a few of the spaces that were left open in the two wet pools at Diablo Canyon, that Diablo Canyon did rerack ultimately to the highest capacity then technologically available to it?

A. Go ahead.

MR. STOUCK: No, I'm sorry. Can we have the question back?

(The record was read as follows:



"Q. But it's your understanding, again, with the exception of a few of the spaces that were left open in the two wet pools at Diablo Canyon, that Diablo Canyon did rerack ultimately to the highest capacity then technologically available to it?")

THE WITNESS: Well, I think that there may have been some exotic technologies that could have added to it, but I think that what we reracked to was, you know, what had been done comparable to what had been done at other facilities, what was licensable, and since that seemed to handle us until, well, as you can see, all the way up into the 2000s, that that was felt to be the appropriate and prudent reracking.

So there might have been other technologies out there, but what we were doing was pretty much state-of-the-art with what others were doing.

BY MR. EKMAN:

Q. Now, you say "exotic technologies." Would you place rod consolidation options in the exotic technologies?

A. No, rod consolidation is not a technology for reracking. As I understand the term, rod consolidation would be after you've got the racks in can you take the fuel assembly apart and store it in a smaller space,



which I guess would mean could store maybe two fuel assemblies in one space.

Q. The second paragraph of this letter states, second sentence, "We believe we should consider a rack design with the rod consolidation option, which offers a potential for a storage capacity that is good for the design lifetime of Diablo"?

MR. STOUCK: Where is that?

MR. EKMAN: It's on the second paragraph, second page, last sentence.

MR. STOUCK: Okay.

MR. EKMAN: Sorry.

THE WITNESS: Yeah, I see that.

BY MR. EKMAN:

Q. The rack design that ultimately was placed in the pool, did that include a rod consolidation option or not?

A. I don't really know the answer to that. My understanding, and I could be wrong, you'd probably be better off to check with some of these more technical people, was that rod consolidation is a separate process that could be done. And I'm not aware of anything that would preclude using the existing racks in a rod consolidation mode, but maybe there is. I just haven't studied it for so many years.



Q. But to your knowledge, the racks weren't specifically designed for the rod consolidation?

A. I don't think there was any specific design, but I'm not saying that -- I don't know that it would have been precluded.

Q. On the third page there is some handwriting, just says "they need it." Just curious if you know whose handwriting that is?

A. No, I don't know whose that is.

MR. EKMAN: If we could go off the record.

(Discussion off the record.)

BY MR. EKMAN:

Q. Mr. Shiffer, do you know what a delivery commitment schedule is?

A. Other than my understanding of English, I don't.

Q. So you don't know what its purpose is?

A. No.

(Defendant's Exhibit 7 was marked for identification.)

MR. STOUCK: Thank you very much.

BY MR. EKMAN:

Q. All right. I've handed you what's been marked as Exhibit 7, which is -- first page is a letter from Mr. Bartlett to Mr. Clarke, chairman and C.E.O. of

PG & E, dated May 20, 1991. And attached to it is a letter to Mr. Barrett, who's listed as the contract administrator for PG & E at this time from Carol Rueter, listing you as a copy.
A. Uh-huh.
Q. And then I will represent to you that what's attached is something called "The draft acceptance priority ranking, May 1991." It is not the entire priority ranking, as it is a voluminous document. It's just a sample.
My first question is: If I were to -- do you know what the 1991 annual capacity report is? Have you ever heard of that before?
A. (No audible response.)
Q. Have you ever heard of -- oh, sorry.
A. No.
Q. Have you ever heard of an annual capacity report just generally?
A. Not really.
Q. Do you know what an annual priority ranking is, outside of your review of this document?
A. Again, outside of my understanding of English and generally what was going on, no.
Q. Do you know why you would have been copied on this letter from the Department of Energy to



Mr. Barrett?
A. Once again, because we were the licensing people, so almost anything that related to Federal government went through us on a licensing group.
Q. And who was Mr. Barrett -- where was Mr. Barrett in relation to you in the organization?
A. Mr. Barrett?
Q. Yeah, Mr. J.E. Barrett.
A. Oh. He must have been in the purchasing department, which did not report to me. I don't know him at all, but we did have a purchasing department that signed the contracts and that kind of thing and it was not under my direction.
Q. And you'll see on the third page of this exhibit, second page on this Reuters letter, it just said -- the third paragraph, last sentence begins: "In accordance with the contract." Do you see that?
A. Yes.
Q. Says "Purchasers may submit commitment delivery schedules, DCS, based on these allocations, beginning January 1, 1992." Do you see that?
A. Yes.
Q. Again, you didn't -- you don't recall having any role in the DCS submission process with the Department of Energy during this time period?



A. No.
Q. And you didn't have any -- you don't recall being involved in any decision making concerning PG & E's response to this particular letter from Ms. Rueter?
A. I don't have any personal recollection of it, no.
Q. Do you have any understanding of a provision in the Standard Contract that concerns the exchanges of -- of acceptance allocations among nuclear utilities?
A. No.
Q. Are you familiar with the term "failed fuel"?
A. Well, yes, I believe so.
Q. Okay.
A. Unless you mean something different than what I know.
Q. All right. Well, maybe I do, but let me ask, what is your understanding of what failed fuel is?
A. Well, my understanding of it is it's fuel that the cladding has perforated by -- through one mechanism or another, which allows the release of more radioactive materials than you would otherwise expect.
Q. Do you know if Humboldt Bay has any failed fuel, as you would characterize it?



A. Well, it did originally, and I believe that all of it, or most of it anyway, if not all of it -- you'll have to check with the Humboldt guys -- has been sent off site for reprocessing.
See, the original fuel we put into Humboldt had gross cladding failures, but once that was removed, we were still in the reprocessing mode, so I think that most of it has been reprocessed, but you should check with the Humboldt people to know exactly what's going on with the fuel.
Q. That's the current Humboldt people that would know that?
A. The current Humboldt people would know.
MR. STOUCK: Couldn't resist?
THE WITNESS: Couldn't resist this, huh?
(Defendant's Exhibit 8 was marked for identification.)
BY MR. EKMAN:
Q. I'm actually showing this to you for two reasons, the first which relates to what we're talking about right now. And I can direct your attention to the second page of what's marked as Exhibit 8, which appears to be an article written by you. It's called On Par with Jim Shiffer.
A. Uh-huh.

# Plaintiff

PG & E, dated May 20, 1991. And attached to it is a letter to Mr. Barrett, who's listed as the contract administrator for PG & E at this time from Carol Rueter, listing you as a copy.

A. Uh-huh.

Q. And then I will represent to you that what's attached is something called "The draft acceptance priority ranking, May 1991." It is not the entire priority ranking, as it is a voluminous document. It's just a sample.

My first question is: If I were to -- do you know what the 1991 annual capacity report is? Have you ever heard of that before?

A. (No audible response.)

Q. Have you ever heard of -- oh, sorry.

A. No.

Q. Have you ever heard of an annual capacity report just generally?

A. Not really.

Q. Do you know what an annual priority ranking is, outside of your review of this document?

A. Again, outside of my understanding of English and generally what was going on, no.

Q. Do you know why you would have been copied on this letter from the Department of Energy to

# Defendant

PG & E, dated May 20, 1991. And attached to it is a letter to Mr. Barrett, who's listed as the contract administrator for PG & E at this time from Carol Rueter, listing you as a copy.
A. Uh-huh.
Q. And then I will represent to you that what's attached is something called "The draft acceptance priority ranking, May 1991." It is not the entire priority ranking, as it is a voluminous document. It's just a sample.
My first question is: If I were to -- do you know what the 1991 annual capacity report is? Have you ever heard of that before?
A. (No audible response.)
Q. Have you ever heard of -- oh, sorry.
A. No.
Q. Have you ever heard of an annual capacity report just generally?
A. Not really.
Q. Do you know what an annual priority ranking is, outside of your review of this document?
A. Again, outside of my understanding of English and generally what was going on, no.
Q. Do you know why you would have been copied on this letter from the Department of Energy to



Mr. Barrett?
A. Once again, because we were the licensing people, so almost anything that related to Federal government went through us on a licensing group.
Q. And who was Mr. Barrett -- where was Mr. Barrett in relation to you in the organization?
A. Mr. Barrett?
Q. Yeah, Mr. J.E. Barrett.
A. Oh. He must have been in the purchasing department, which did not report to me. I don't know him at all, but we did have a purchasing department that signed the contracts and that kind of thing and it was not under my direction.
Q. And you'll see on the third page of this exhibit, second page on this Reuters letter, it just said -- the third paragraph, last sentence begins: "In accordance with the contract." Do you see that?
A. Yes.
Q. Says "Purchasers may submit commitment delivery schedules, DCS, based on these allocations, beginning January 1, 1992." Do you see that?
A. Yes.
Q. Again, you didn't -- you don't recall having any role in the DCS submission process with the Department of Energy during this time period?



A. No.
Q. And you didn't have any -- you don't recall being involved in any decision making concerning PG & E's response to this particular letter from Ms. Rueter?
A. I don't have any personal recollection of it, no.
Q. Do you have any understanding of a provision in the Standard Contract that concerns the exchanges of -- of acceptance allocations among nuclear utilities?
A. No.
Q. Are you familiar with the term "failed fuel"?
A. Well, yes, I believe so.
Q. Okay.
A. Unless you mean something different than what I know.
Q. All right. Well, maybe I do, but let me ask, what is your understanding of what failed fuel is?
A. Well, my understanding of it is it's fuel that the cladding has perforated by -- through one mechanism or another, which allows the release of more radioactive materials than you would otherwise expect.
Q. Do you know if Humboldt Bay has any failed fuel, as you would characterize it?



A. Well, it did originally, and I believe that all of it, or most of it anyway, if not all of it -- you'll have to check with the Humboldt guys -- has been sent off site for reprocessing.
See, the original fuel we put into Humboldt had gross cladding failures, but once that was removed, we were still in the reprocessing mode, so I think that most of it has been reprocessed, but you should check with the Humboldt people to know exactly what's going on with the fuel.
Q. That's the current Humboldt people that would know that?
A. The current Humboldt people would know.
MR. STOUCK: Couldn't resist?
THE WITNESS: Couldn't resist this, huh?
(Defendant's Exhibit 8 was marked for identification.)
BY MR. EKMAN:
Q. I'm actually showing this to you for two reasons, the first which relates to what we're talking about right now. And I can direct your attention to the second page of what's marked as Exhibit 8, which appears to be an article written by you. It's called On Par with Jim Shiffer.
A. Uh-huh.

# Plaintiff

A. No.
Q. And you didn't have any -- you don't recall being involved in any decision making concerning PG & E's response to this particular letter from Ms. Rueter?
A. I don't have any personal recollection of it, no.
Q. Do you have any understanding of a provision in the Standard Contract that concerns the exchanges of -- of acceptance allocations among nuclear utilities?
A. No.
Q. Are you familiar with the term "failed fuel"?
A. Well, yes, I believe so.
Q. Okay.
A. Unless you mean something different than what I know.
Q. All right. Well, maybe I do, but let me ask, what is your understanding of what failed fuel is?
A. Well, my understanding of it is it's fuel that the cladding has perforated by -- through one mechanism or another, which allows the release of more radioactive materials than you would otherwise expect.
Q. Do you know if Humboldt Bay has any failed fuel, as you would characterize it?