# Defendant

Page 118

Q. When you make your comment that you could have done it in your head in 30 seconds, would that statement apply equally to sending fuel to dry storage at Diablo Canyon?
A. No, to wet storage is what I'm talking about.
Q. And that is primarily based upon the fact that the fuel assemblies are different sizes and require different rack systems?
A. Well, that's -- that's a technical reason, but then there's licensing reasons and everything else, you know; that you open up a quagmire of issues probably when you start sending fuel around. You have transportation issues and -- but physically they're a different size and totally different design, so...
Q. Do you have any opinion as to whether it is or was possible to send dry storage casks, dry storage transportation casks from Humboldt Bay to Diablo Canyon, where they would be stored at Diablo Canyon's ISFSI?
A. I'm not -- I don't know. That never got very far that I'm aware of, so I don't know what the answer to that is.
(Defendant's Exhibit 10 was marked for identification.)
BY MR. EKMAN:

Page 119

Q. I've handed you what's been marked as Exhibit 10, and I'm marking this for a very limited reason. It's a 1989 letter from Mr. Nelson to you, again, dated August 10th, 1989. If you could take a quick look at the letter.
A. You want me to read it in detail here?
Q. You don't need -- well, let me ask my question, then you can read whatever you feel you need to read in order to answer it. The last sentence --
All right. I think we just realized that we're missing the response, although these numbers are consecutive.
Let me ask this question: In just reviewing this first letter, does that jog your memory at all as to whether you were involved in the issue of shipment of assemblies in dry storage to Diablo Canyon?
A. It's not an issue that ever occupied very much of my thought and time, I'll tell you that.
Q. Hopefully we could find the attachment for Mr. Nelson's deposition. Thank you.
MR. EKMAN: Can we take a break?
(Lunch taken: 12:23 p.m. until 1:15 p.m.)

Page 120

P R O C E E D I N G S

EXAMINATION BY MR. EKMAN (Resumed)
Q. Mr. Shiffer, over the course of your career at Pacific Gas & Electric, did you have any role in -- and by "role" I mean active role in any proceedings before the NRC? And I mean that generally.
A. Yes.
Q. What kinds of proceedings did you have an active role in, what types?
A. Well, we had hearings on topics such as the emergency plan, adequacy of our quality assurance program, adequacy of our training programs for operators. I think I also testified or I was part of the panel that testified on the reracking, if I can remember correctly; waste discharge hearings. I don't know, just a myriad of topics like that.
Q. What is a waste discharge hearing?
A. Chemical wastes and that kind of stuff, not nuclear waste.
Q. Did you have any active role that you recall in the -- in any proceedings before the NRC concerning Humboldt's Unit 3 decommissioning plan?
A. I don't recall any on Humboldt.
Q. Again, over the course of your role at PG & E

Page 121

did you have any role, active role in any proceedings before FERC?
A. No.
Q. And how about before -- is it the C.U.C., California Utilities Commission?
MR. STOUCK: C.P.U.C.
THE WITNESS: C.P.U.C., California Public Utilities Commission.
BY MR. EKMAN:
Q. Did you have any active role in any matters pending before them over your career?
A. I don't recall any in front of the C.P.U.C. I had an active role in the California Coastal Commission. Again, that involved chemical waste discharges and stuff like that.
(Defendant's Exhibit 11 was marked for identification.)
BY MR. EKMAN:
Q. Exhibit 11 is a cover letter from Richard Locke to Scott Fielder, Esquire, dated July 20, 1987 and attaches a memorandum of agreement dated June 8th, 1987, with several signatures, both on behalf of Pacific Gas, as well as on behalf of joint intervenors.
First of all, have I correctly identified this document?

Page 122

A. Yes.
Q. Who is Mr. Locke?
A. He's an attorney with PG & E.
Q. Did you have an opportunity to look through this short settlement agreement?
A. Just now I did, yeah, glanced at it.
Q. Your signature appears on page 3 of the agreement; is that right?
A. Yes.
Q. As is Mr. Locke's. Do you recall the issues that prompted this settlement agreement?
A. Well, yes. I mean basically it was a -- it was a desire by these, you know, environmentalists and intervenor people at -- in that area to completely get all of the radioactive materials and things out of -- out of that site and, you know, put the site back in pristine condition.
And so we went up and talked to them and explained to them that that wasn't totally possible at the present time, and we put together this memorandum of understanding.
Q. Were you involved in the conversations with these intervenors?
A. Yes.
Q. And do you recall what -- so what specifically

Page 123

they wanted Humboldt Bay to do in connection with decommissioning -- let me actually ask this. First of all, this is in relation to the decommissioning plan for Humboldt; is that right?
A. Yes, uh-huh.
Q. And what did the intervenors specifically want Humboldt Bay -- do you recall what did they want Humboldt Bay to agree to in connection with decommissioning?
A. Well, I mean really what they wanted us to do is remove all radioactive materials and put the site back in pre Humboldt Bay condition and, you know, we told them that we would -- we'd love to do that too, but it's just not feasible at the present time.
Q. Why wasn't it feasible?
A. Because we have the spent fuel and there's no place to put it and that's, you know, that's where we mentioned, alluded to, you know, well, couldn't you take it down to Diablo Canyon or something like that, which was kind of a non starter, you know, but we said -- so after I explained to them that that was never going to go anywhere, you know, they said well, what about dry cask storage.
We said well, again, it's not licensed anywhere and stuff like this, you know, it's going to

Page 124

take a while to do that kind of thing, but we'll look into it when the time comes. So parted as friends I guess, best I can say.
Q. Was part of the point of this agreement to have the intervenors withdraw their opposition to the decommissioning plan?
A. I don't remember the details anymore of what extent they had intervened or opposed it or anything like that. I just remember that we went up and we talked to them and tried to explain to them some of the realities of the business and they may -- it may have caused them to withdraw some motion, but I don't remember what they had done specifically.
Q. What's the Redwood Alliance?
A. Well, again, just a group of environmental -- you know, tended to intervene in these kinds of things in that area.
Q. Would you characterize them as anti-nuclear, an anti-nuclear organization?
A. Well, I would characterize them as pro environment. I mean, I don't want to call them anti-nuclear, but probably they were or a lot of them were.
Q. They're an environmentalists group?
A. They're environmental, yeah.

Page 125

Q. Why would you have signed this agreement on behalf of PG & E at this time?
A. Well, I was either vice president or senior vice president, I forget which year. I guess I was vice president of the nuclear group, so that's why.
Q. So you would have had authority then to bind the company to the extent --
A. Right.
Q. -- that this agreement is at all binding?
A. Right.
Q. Do you know who drafted this agreement?
A. My recollection is that Dick Locke worked on it. It may have been in conjunction with some of them too. I didn't personally draft it.
Q. Do you know if you reviewed drafts of it?
A. I don't recall anymore.
Q. In the first paragraph, the number 1 term states: "Licensee agrees to ship the spent fuel assemblies presently stored at the Humboldt Bay Power Plant, Unit 3, to the Department of Energy, hereinafter DOE, as soon as the DOE has a repository or some other facility in operation capable of receiving the spent fuel assemblies under the terms of the existing contract entered into between the licensee and DOE on June 30, 1983."

# Plaintiff

they wanted Humboldt Bay to do in connection with decommissioning -- let me actually ask this. First of all, this is in relation to the decommissioning plan for Humboldt; is that right?
A. Yes, uh-huh.
Q. And what did the intervenors specifically want Humboldt Bay -- do you recall what did they want Humboldt Bay to agree to in connection with decommissioning?
A. Well, I mean really what they wanted us to do is remove all radioactive materials and put the site back in pre Humboldt Bay condition and, you know, we told them that we would -- we'd love to do that too, but it's just not feasible at the present time.
Q. Why wasn't it feasible?
A. Because we have the spent fuel and there's no place to put it and that's, you know, that's where we mentioned, alluded to, you know, well, couldn't you take it down to Diablo Canyon or something like that, which was kind of a non starter, you know, but we said -- so after I explained to them that that was never going to go anywhere, you know, they said well, what about dry cask storage.
We said well, again, it's not licensed anywhere and stuff like this, you know, it's going to

take a while to do that kind of thing, but we'll look into it when the time comes. So parted as friends I guess, best I can say.

Q. Was part of the point of this agreement to have the intervenors withdraw their opposition to the decommissioning plan?

A. I don't remember the details anymore of what extent they had intervened or opposed it or anything like that. I just remember that we went up and we talked to them and tried to explain to them some of the realities of the business and they may -- it may have caused them to withdraw some motion, but I don't remember what they had done specifically.

Q. What's the Redwood Alliance?

A. Well, again, just a group of environmental -- you know, tended to intervene in these kinds of things in that area.

Q. Would you characterize them as anti-nuclear, an anti-nuclear organization?

A. Well, I would characterize them as pro environment. I mean, I don't want to call them anti-nuclear, but probably they were or a lot of them were.

Q. They're an environmentalists group?

A. They're environmental, yeah.

# Defendant

A. Yes.

Q. Who is Mr. Locke?

A. He's an attorney with PG & E.

Q. Did you have an opportunity to look through this short settlement agreement?

A. Just now I did, yeah, glanced at it.

Q. Your signature appears on page 3 of the agreement; is that right?

A. Yes.

Q. As is Mr. Locke's. Do you recall the issues that prompted this settlement agreement?

A. Well, yes. I mean basically it was a -- it was a desire by these, you know, environmentalists and intervenor people at -- in that area to completely get all of the radioactive materials and things out of -- out of that site and, you know, put the site back in pristine condition.

And so we went up and talked to them and explained to them that that wasn't totally possible at the present time, and we put together this memorandum of understanding.

Q. Were you involved in the conversations with these intervenors?

A. Yes.

Q. And do you recall what -- so what specifically



they wanted Humboldt Bay to do in connection with decommissioning -- let me actually ask this. First of all, this is in relation to the decommissioning plan for Humboldt; is that right?

A. Yes, uh-huh.

Q. And what did the intervenors specifically want Humboldt Bay -- do you recall what did they want Humboldt Bay to agree to in connection with decommissioning?

A. Well, I mean really what they wanted us to do is remove all radioactive materials and put the site back in pre Humboldt Bay condition and, you know, we told them that we would -- we'd love to do that too, but it's just not feasible at the present time.

Q. Why wasn't it feasible?

A. Because we have the spent fuel and there's no place to put it and that's, you know, that's where we mentioned, alluded to, you know, well, couldn't you take it down to Diablo Canyon or something like that, which was kind of a non starter, you know, but we said -- so after I explained to them that that was never going to go anywhere, you know, they said well, what about dry cask storage.

We said well, again, it's not licensed anywhere and stuff like this, you know, it's going to



take a while to do that kind of thing, but we'll look into it when the time comes. So parted as friends I guess, best I can say.

Q. Was part of the point of this agreement to have the intervenors withdraw their opposition to the decommissioning plan?

A. I don't remember the details anymore of what extent they had intervened or opposed it or anything like that. I just remember that we went up and we talked to them and tried to explain to them some of the realities of the business and they may -- it may have caused them to withdraw some motion, but I don't remember what they had done specifically.

Q. What's the Redwood Alliance?

A. Well, again, just a group of environmental -- you know, tended to intervene in these kinds of things in that area.

Q. Would you characterize them as anti-nuclear, an anti-nuclear organization?

A. Well, I would characterize them as pro environment. I mean, I don't want to call them anti-nuclear, but probably they were or a lot of them were.

Q. They're an environmentalists group?

A. They're environmental, yeah.



Q. Why would you have signed this agreement on behalf of PG & E at this time?

A. Well, I was either vice president or senior vice president, I forget which year. I guess I was vice president of the nuclear group, so that's why.

Q. So you would have had authority then to bind the company to the extent --

A. Right.

Q. -- that this agreement is at all binding?

A. Right.

Q. Do you know who drafted this agreement?

A. My recollection is that Dick Locke worked on it. It may have been in conjunction with some of them too. I didn't personally draft it.

Q. Do you know if you reviewed drafts of it?

A. I don't recall anymore.

Q. In the first paragraph, the number 1 term states: "Licensee agrees to ship the spent fuel assemblies presently stored at the Humboldt Bay Power Plant, Unit 3, to the Department of Energy, hereinafter DOE, as soon as the DOE has a repository or some other facility in operation capable of receiving the spent fuel assemblies under the terms of the existing contract entered into between the licensee and DOE on June 30, 1983."

Page 126

Do you see that?
A. Yeah.
Q. Then the sentence continues -- continues on. Do you know why there's language that -- why the "as soon as DOE has a repository or some other facility in operation" is qualified by the -- under the language "under the terms of the existing contract"?
MR. STOUCK: Objection to form. It's vague, but you may answer if you understand it.
THE WITNESS: Well, I mean basically what we're telling them is we have a contract with DOE and we can't unilaterally ship these fuel assemblies, we have to follow the contract and the capabilities to take the fuel.
BY MR. EKMAN:
Q. And again, this is a recognition of the fact that the DOE repository or the date of operation may or may not be the first year in which Humboldt Bay's fuel is removed under that contract; correct?
A. That's correct.
Q. And then that term or that paragraph -- what I mean by that is paragraph 1 ends: "Licensee further agrees to reasonably pursue the highest DOE priority for the removal of the Humboldt Bay Power Plant, Unit 3, spent fuel assemblies."

Page 127

Do you see that?
A. Yes.
Q. Do you know what -- do you have an understanding of what that obligated PG & E to do at this time and then going forward?
A. Not beyond what it just says.
Q. Then on paragraph 3 on the second page of that agreement it ends by saying, "The licensee agrees to re-examine the possibility of utilizing dry cask storage, if and when such a storage option becomes available for sites such as Humboldt Bay Power Plant, Unit 3."
Do you see that?
A. Yes.
Q. After this agreement was signed did PG & E do anything to -- was there a continual examination of the availability of dry storage or -- well, let me start there.
A. I don't remember the details. I know we had people that kept abreast of what was going on in the industry on a more or less continuous basis, but I can't point to any specific study that we did immediately after this.
Q. Do you know, based on your experience, when dry cask storage suitable for use in Humboldt Bay

Page 128

became available on the marketplace?
A. No, I don't have that date on the top of my head.
Through with that one?
Q. Yup.
MR. STOUCK: Thank you.
(Defendant's Exhibit 12 was marked for identification.)
BY MR. EKMAN:
Q. This is Exhibit 12, which is an April 10th, 1987 letter from a Scott Fielder to Bruce Norton, care of Richard Locke, and concerning the Humboldt Bay NRC license amendment proceeding, Docket Number 50-1333.
First of all, have I correctly identified this letter?
A. Yes.
Q. And I see that you're copied on this letter?
A. Yeah, you want me to read it in detail here?
Q. If you want. It's a fairly short letter.
A. Which one preceded which one here?
Q. Actually, the exhibit I showed you is the last in the line.
A. I was inferring that by reading this that this proceeded that, but anyway.
Q. I went out of order because you signed the

Page 129

settlement.
A. Oh, okay.
Q. First of all, based on your review of this letter, does that refresh your recollection as to whether the settlement agreement at 11 was in exchange for them dropping objections that they had filed with respect to PG & E's request for a license amendment?
A. Well, I still don't remember it very well, but by reading the letter it appears that that's a response to this.
Q. You have no reason to doubt that Mr. Fielder was misstating the current posture of that proceeding, do you?
A. No.
Q. The only question about this letter that I have, and it does predate the final agreement, in paragraph 3, number 3; do you see that?
A. Uh-huh.
Q. Again, this relates to this dry cask storage issue and it ends by stating: "By placing the fuel in dry cask storage all risk of a liquid spill from the spent fuel pool during extended storage would be at an end."
Do you see that?
A. Yes.

# Plaintiff

settlement.

A. Oh, okay.

Q. First of all, based on your review of this letter, does that refresh your recollection as to whether the settlement agreement at 11 was in exchange for them dropping objections that they had filed with respect to PG & E's request for a license amendment?

A. Well, I still don't remember it very well, but by reading the letter it appears that that's a response to this.

Q. You have no reason to doubt that Mr. Fielder was misstating the current posture of that proceeding, do you?

A. No.

Q. The only question about this letter that I have, and it does predate the final agreement, in paragraph 3, number 3; do you see that?

A. Uh-huh.

Q. Again, this relates to this dry cask storage issue and it ends by stating: "By placing the fuel in dry cask storage all risk of a liquid spill from the spent fuel pool during extended storage would be at an end."

Do you see that?

A. Yes.

Q. Up to this point, 1987, had Humboldt Bay had problems with -- had any liquid spills from its spent nuclear fuel?

A. No, there was no liquid spills from its spent nuclear fuel, but the -- the pool is a concrete pool and it has a stainless steel liner to make it leak tight. We had discovered some leaks in the stainless steel liner that allowed some of the water to leak out of the pool and we -- we corrected that, so there wasn't a spill, but there had been a little bit of water leakage.

Q. Since you're more familiar with these environmentalist groups than I am, is it a fair characterization, based on your involvement in this, that these groups that were acting as intervenors, these people as intervenors were concerned about the safety of extended storage in the wet pool?

A. Yes, I'm sure they were, and I'm sure that they would also have been concerned about the safety of extended storage in a dry cask storage, they're just, you know --

Q. They seem to be choosing which one they're less concerned about?

A. Well, that's -- yeah, that's the way it is, but I mean whatever the latest proposal is they'll have

a concern about it. That's my experience.

Q. Do you share -- based on your experience at Pacific Gas & Electric and your knowledge of Humboldt Bay, do you share the intervenors' concerns about extended storage of spent fuel in Humboldt Bay's wet pool?

A. No, not really. I mean first I think the thing is, you know, structurally sound, you know, earthquake proof and if you can remember a previous comment you made or question you asked me that fuel is so old that even if it was dry it wouldn't melt or anything like that.

So I mean you'd have to refill it to keep the radiation level down, but it's not a meltdown probability. So I don't have a great deal more concern about storing it in a wet pool than storing it any other way.

(Defendant's Exhibit 13 was marked for identification.)

BY MR. EKMAN:

I've handed you what's been marked as Exhibit 13, and this is a situation -- since it's a little bit longer letter, you're welcome to read it or can read it as I ask questions, if you think you need to read it.

But specifically this letter is a May 20th,

# Defendant

Page 130

Q. Up to this point, 1987, had Humboldt Bay had problems with -- had any liquid spills from its spent nuclear fuel?

A. No, there was no liquid spills from its spent nuclear fuel, but the -- the pool is a concrete pool and it has a stainless steel liner to make it leak tight. We had discovered some leaks in the stainless steel liner that allowed some of the water to leak out of the pool and we -- we corrected that, so there wasn't a spill, but there had been a little bit of water leakage.

Q. Since you're more familiar with these environmentalist groups than I am, is it a fair characterization, based on your involvement in this, that these groups that were acting as intervenors, these people as intervenors were concerned about the safety of extended storage in the wet pool?

A. Yes, I'm sure they were, and I'm sure that they would also have been concerned about the safety of extended storage in a dry cask storage, they're just, you know --

Q. They seem to be choosing which one they're less concerned about?

A. Well, that's -- yeah, that's the way it is, but I mean whatever the latest proposal is they'll have

Page 131

a concern about it. That's my experience.

Q. Do you share -- based on your experience at Pacific Gas & Electric and your knowledge of Humboldt Bay, do you share the intervenors' concerns about extended storage of spent fuel in Humboldt Bay's wet pool?

A. No, not really. I mean first I think the thing is, you know, structurally sound, you know, earthquake proof and if you can remember a previous comment you made or question you asked me that fuel is so old that even if it was dry it wouldn't melt or anything like that.

So I mean you'd have to refill it to keep the radiation level down, but it's not a meltdown probability. So I don't have a great deal more concern about storing it in a wet pool than storing it any other way.

(Defendant's Exhibit 13 was marked for identification.)

BY MR. EKMAN:

I've handed you what's been marked as Exhibit 13, and this is a situation -- since it's a little bit longer letter, you're welcome to read it or can read it as I ask questions, if you think you need to read it.

But specifically this letter is a May 20th,

Page 132

1987 letter to Mr. Fielder, and that's F-i-e-l-d-e-r, from Mr. Locke, responding to the April 10th letter that we just took a look at.

First of all, have I correctly identified the letter?

A. Yes.

Q. And on the third page of this letter you are listed as a cc or bcc actually. Do you see that?

A. Okay. Yeah.

Q. I just have a couple questions about some of the language just to confirm my understanding of it.

On page 2 -- and just so you know, if you want to read, this relates to the paragraph on the first page that appears to be a revision to the first paragraph on Exhibit 12 that Mr. Fielder proposed, but my question is the paragraph explained in the revision ends by saying: "Under these circumstances, PG & E will not incur any additional costs and will be assured that the schedule for shipments will be in accordance with priorities established by DOE, over which PG & E has no control."

Do you see that at the top of the page?

A. Uh-huh.

Q. Again, is that consistent with our earlier discussion about the manner in which acceptance

Page 133

allocations are going to be provided under the contract with DOE?

A. You'll have to let me read the thing.

Q. Please do.

A. Okay. Now, what was your question?

Q. My question is just with respect to that sentence and particularly the statement that the schedule for shipments is something that PG & E does not have control over.

Is that consistent with our -- we've discussed it I think several times today that there is an acceptance queue that's set by the contract and ultimately it's your understanding that y'all are in the queue where you're in the queue?

A. Right. I agree.

Q. The last paragraph, and you can just read to yourself, your final condition concerning dry cask storage. Do you see that?

A. Yes.

Q. If you could just read that to yourself.

A. Okay.

Q. Do you know where Mr. Locke would have gotten the information concerning estimated costs associated with dry storage, assumptions about operations and maintenance costs? Do you know where he would have

# Defendant

Page 134

gotten that kind of information?
A. I can't say specifically. I mean, I'm sure he got it from, you know, some studies that must have been done, you know, in these job estimates and things. I don't know about specifically for Humboldt Bay, however. I couldn't tell you.
Q. You didn't provide that information to Mr. Locke?
A. Somebody in my organization may have provided it to him, but I didn't personally.
Q. And you say that there's a possibility that there were studies. Do you specifically recall whether there were any studies at this time?
A. No, I don't specifically recall. It's just that there were studies going on all the time of everything under the sun basically, so it wouldn't surprise me if there was a study, but I don't specifically recall one.
(Defendant's Exhibit 14 was marked for identification.)
BY MR. EKMAN:
Q. I've handed you what's been marked as Exhibit 14 to your deposition, and it's a handwritten document entitled "For Reply to Immediate Inquiry, Draft, Re Settlement Reached in Humboldt Bay Decommissioning

Page 135

Proceedings."
Have I correctly identified this document?
A. It appears that you have.
Q. I see that at the bottom of it there's a name G.C. Sarkisian?
A. George Sarkisian.
Q. Who is Mr. Sarkisian in the 1987 time frame?
A. I remember the name, and I'm trying to place him in the organization. My recollection, and I could be wrong, but my recollection is that he was a lower level person in the public relations or the media department.
Q. Do you recognize the handwriting on this?
A. No.
Q. Would you know what Mr. Sarkisian's handwriting would look like if you saw it?
A. No. No.
Q. You don't know what the -- at the top of this page there's a note on the fax line, "SLBI hearings." Do you know what that is?
A. I'm sorry, SL --
Q. Yeah, it's in the fax line.
MR. STOUCK: Right at the top.
BY MR. EKMAN:
Q. Says "SLBI hearings."

Page 136

A. No, I don't know what that means. I -- just to try to help you though, there is a group called the ASLB, which is the Atomic Safety and Licensing Board, so maybe this is safety licensing board, but I don't know what the "I" would be. The ASLB was Atomic Safety and Licensing Board as part of the NRC.
(Defendant's Exhibit 15 was marked for identification.)
BY MR. EKMAN:
Q. I've handed you what's been marked as Exhibit 15, which is a letter dated December 18th, 1986, from you to Mr. Varga with the NRC, regarding additional information on spent nuclear fuel reracking.
Have I correctly identified the document?
A. Yes.
Q. And is that your signature on page 2?
A. Yes.
Q. And I see that there -- there's no -- doesn't appear to be another author off to the left below your signature. Does that mean that you likely wrote this letter yourself?
A. Yeah, I don't know why there's no other signature, but I'm sure that I did not write the letter.
Q. One of your staff would have written it?

Page 137

A. Yeah, one of my staff.
Q. Now, this concerns the spent nuclear fuel reracking at Diablo Canyon that you were involved with; is that right?
A. Yes.
Q. There's an attachment to this letter, variety of attachments?
A. Uh-huh.
Q. Do you know who would have prepared this document?
A. It would have been the engineering group, working in conjunction with the licensing group.
Q. Would you have reviewed this in your capacity, this enclosure, prior to sending it to the NRC?
A. Yes, I'm sure I read it, uh-huh.
Q. And obviously, if there was anything incorrect that stood out to you, you would have fixed it?
A. Right.
Q. If you could go to Table 1, which is page 17 of the enclosure. It's entitled "Estimated Personnel Doses For Wet Spent Fuel Reracking." See that?
A. Yes.
Q. There's an assumption down here at the bottom, "Assumption 1, says length of reracking job estimated at nine weeks, 40 hours per week per shift two shifts

per day."

Do you see that?

A. Yes.

Q. Is that a standard or was that at the time a standard shift for Diablo Canyon?

A. Well, it's hard for me to answer that question, because there's all manner of standard shifts, depending upon what your position in the organization is. I mean the standard shift for an individual is a 40-hour workday -- but, of course, in certain positions, in particular, operators and stuff, it's a 24-hour-seven-day-a-week thing.

So this I -- well, I'd have to read the whole document to know exactly, but I mean presumably they were going to -- 40 hours per week is a standard shift, two shifts a day. Okay. You know, it's either one, two or three shifts a day, so two shifts a day I guess.

Q. Do you recall how many shifts -- did Diablo Canyon have three shifts a day?

A. It did in operations, but like in most maintenance and, you know, things like that, it was one shift a day, but a few people would hang over to handle problems that might occur in the middle of the night or something like that.

Q. When you said for operations folks it's a



seven-day-a-week 24-hour-a-day job I assume you're talking about people like you who had -- salaried folks who had managerial responsibility at the plant?

A. No, I mean I'm talking about the physical force operators who have to sit in the control room and man the controls.

Q. They're there all the time?

A. Somebody's there all the time, right, a person like myself. One of the management would have had a normal day shift job, and as I said, most maintenance people we had on the day shift, 40 hours per week, but we kept, you know, skeleton crews on in the evenings and for problems that arose in the middle of the night.

Q. And did the operators -- would they have worked eight hours? Would you need three shifts of operators --

A. Yes.

Q. -- to go through all 24 hours?

A. Yes.

Q. And if you could look at Figure -- Figure 1 is I think a then current version of the rack configuration in the wet pool, is that right, of Unit 1?

A. Yes.

Q. And then the next page, Figure 2, it says it's



a layout of new high density racks, Unit 1 shown?

A. Right.

Q. Do you see that?

A. Yes.

Q. Is this what the pool actually ultimately looked like following the rerack?

A. Yes.

Q. And is the cask pit area this bottom left-hand corner with the X?

A. Yes.

Q. And I see that there are some empty spaces in a few other locations around the pool. What are those for?

A. Well, these things in the -- in the upper left-hand corner are, as I recall, the spaces that we set aside for storage of non fuel type things that we might have to put in the pool.

Q. And then what about the -- you know, I see two gaps that are in the third row over. I see two gaps, one at the top and one at the bottom. Do you know what that is?

A. I don't specifically remember, but there was some -- you know, there was piping and stuff like this that would get in the way. It's probably that kind of thing. I will say though that when you look at that



picture you can see we filled up the pool pretty much.

(Defendant's Exhibit 16 was marked for identification.)

BY MR. EKMAN:

Q. Mr. Shiffer, I've handed you what I've marked as Exhibit 16, which is a memo from a G.C. Wu, W-u, to you dated June 9th, 1987.

First of all, again, have I correctly identified this document?

A. Yes.

Q. Who was Mr. Wu at this time, in relation to you?

A. George Wu, he was in the licensing group.

Q. Which again reported to you?

A. It reported to me, yeah, as the group that interfaced with the industry and with the regulators.

Q. All right. It attaches a summary, reports to be a summary of a meeting with the Department of Energy that's entitled "Spent Fuel Storage Technical Exchange Meeting held in Germantown, Maryland, May 13th, 1987."

My first question is: Do you know why Mr. Wu would have been forwarding a summary of that meeting to you?

A. No, other than to keep me informed.

Q. And I actually didn't see -- although Mr. Wu

# Defendant

Page 146

A. Yes, unless you were going to be seeing him. He refers at the end here if I'm going to be attending some meeting in Arizona in mid January, so if you're going to see him next week, you may have just responded verbally to him, I don't know.
Q. Do you know Mr. Kadak?
A. Yeah.
Q. And when he says -- well, let me ask this -- do you recall meeting him at a C.E.O. meeting in Arizona around that same time period?
A. No. I met him earlier in meetings, chief nuclear officer meetings type of thing, mostly in Atlanta I believe. As I indicated, by 1995 I think I was off doing other things and I wouldn't have attended any meeting like that.
Q. In your dis-cussions-and again, I know we talked about this earlier. In your discussions, in your meetings -- let me ask this: When you met Mr. Kadak, did you ever talk to him or did you just introduce yourself and move on?
A. Well, he was -- oh, I'm sure -- I mean, I've talked to him. I mean he was a -- the chief nuclear officer, again, that's his title. We didn't use that term in those days, but he would have been the chief nuclear officer back at Yankee Atomic Plant or

Page 147

something like this and, you know, industry leaders get together periodically and discuss issues, so I've met him at those kinds of things. I'm not a good friend of his, but I've met him lots of times.
Q. I know we briefly talked about this earlier, whether the concept of Yankee Atomic exchanging acceptance allocations came up, with Pacific Gas & Electric that is?
A. Well, not with me particularly. Not with me specifically.
Q. Do you know if it came up with someone else?
A. At all? No, I don't.
(Defendant's Exhibit 18 was marked for identification.)
BY MR. EKMAN:
Q. Mr. Shiffer, I've handed you what's been marked as Exhibit 18. You don't need to read it, although you're welcome to. I'm asking you this in the event that I've missed something and avoiding having to call you back at some point.
This is an E-mail. It's from pwm3@pad@mtrlpbcctr, and it's to a variety of people, including, it appears, you in that first line.
A. Uh-huh.
Q. The to line, do you see that?

Page 148

A. Yeah.
Q. My question is: If we have E-mails such as this that have your E-mail address, indicate your E-mail address, is it a reasonable assumption -- is it reasonable to believe that you did receive the E-mail?
A. I would assume so. I used to get E-mails.
Q. And your E-mail here obviously reflects your then current title. Did your E-mail address change over time?
A. I have no idea.
Q. You have no reason to -- if your name or E-mail address is in a letter you have no reason to believe that you did not receive that E-mail?
A. No, I would assume I received it, but I couldn't tell you what my E-mail address was.
Q. All right.
(Defendant's Exhibit 19 was marked for identification.)
BY MR. EKMAN:
Q. Mr. Shiffer, before you read the whole document, again, I only have a couple questions about this. It's mostly just to make sure that I authenticate the document so that I can eventually use them if I decide they're relevant.
A. Uh-huh.

Page 149

Q. What I've handed you has been marked Exhibit 19, which is a July 6th, 1990 letter from you. It appears to be the Nuclear Management and Resources Council in Washington D.C. Have I correctly identified this document?
A. Yes.
Q. First of all, do you know what the Nuclear Management and Resources Council was?
A. I'm getting these all confused but it's, again, one of these things that's like the, you know, Edison Electric Institute and what was the other one? I forget the name, but they kept changing the names of these things, so it was one of these industry lobbying efforts I guess.
Q. And who signed this letter on behalf of you?
A. Brian Dettman.
Q. And who was he?
A. He was my administrative assistant at that time.
Q. Would you have written this letter?
A. No.
Q. Do you know -- and then with respect to the attachment, would you have written the attachment?
A. No.
Q. Do you know who would have at this time

written this attachment?
A. No, I'm sure it was somebody in our engineering group, but who it might have been, I have no idea. It could have been in our licensing group, too, they handled a lot of this kind of stuff.
Q. If you could go to page 2 of that document and read -- you can read yourself the questions and responses to 6 and 7 on page 2 of the attachment.
A. Okay.
Q. Do you know why at this time it was anticipated that Diablo Canyon would construct -- would be constructing an above-ground dry storage facility?
MR. STOUCK: Wait a minute. Can we have that question back, please?
(The record was read as follows:
"Q. Do you know why at this time it was anticipated that Diablo Canyon would construct -- would be constructing an above-ground dry storage facility?")
THE WITNESS: Only that, you know, if we weren't able to ship our fuel off site we were going to have to do something, you know, in the 21st century.
BY MR. EKMAN:
Q. And would you have -- again, would you have read this document prior to sending it on your demand?



A. Well, I don't specifically remember reading it. I mean, I tried to read as much as I could, but I don't recall this one in particular.
Q. You don't have any reason to believe it wasn't sent though?
A. That it wasn't sent?
Q. Yeah.
A. Oh, no, I'm sure that it was sent.
(Recess taken: 2:16 p.m. until 2:24 p.m.)
BY MR. EKMAN:
Q. Did Diablo Canyon have a spent fuel management plan? Do you recall?
A. Not -- not some stand-alone document that I can recall.
Q. Was it part of another document or other documents?
A. Once we completed the reracking and we kind of put that on the back burner, I don't recall anything specific.
Q. How about a strategic plan, a strategic plan related to spent fuel management?
A. There was a -- you know, there was an annual business plan and spent fuel may have been mentioned from time to time, but I don't -- I don't remember a specific strategic plan for spent fuel, again, during



the times that I was involved.
Q. And you would not have prepared such a plan during the times in which you were involved at Diablo Canyon?
A. No, because reracking took care of the problem to a certain extent, at that point in time.
Q. And you don't recall any of those kinds of plans that you were involved in, say, in the mid 1990s?
A. In the mid 1990s I definitely don't because I was off doing other things.
Q. All right. If you could just go back to this article, I just had a couple follow-up questions on that.
A. Sure.
Q. Go back to that second page.
A. Second page.
Q. And that column I was asking you about.
When was the first refueling outage, do you remember the year, for Humboldt Bay?
MR. STOUCK: For Humboldt Bay?
BY MR. EKMAN:
Q. For Humboldt Bay.
A. It would probably -- I don't remember the exact year, but I can only assume it was about a year after we went into operation, so it would have been in



1964 or '65.
Q. All right. Now, you stated that these bloody stumps, as you call them, were sent off site for reprocessing ultimately; is that right?
A. That's correct.
Q. Do you know if Humboldt Bay recovered all of the broken rods, all of the pellets, or if any pellets were left either in the reactor or in the wet pool?
A. Oh, I'm sure that there was pellets left in the -- probably in the reactor and certainly in the pool.
Q. All right. So in other words, there are -- there were pellets that were present that were not sent off site for reprocessing?
A. That's correct.
Q. Are you aware of a recent investigation of missing pieces of spent fuel assemblies at Humboldt Bay?
A. Yes.
Q. And how are you aware of that investigation?
A. Because the people from Humboldt called me up and asked me what I could remember from 1968 or whatever it was.
Q. And why do you say -- what's significant about 1968?

Page 154

A. Well, it may not have been 1968, it may have been early '70s, but I mean basically, there was apparently an experiment that was going to be run where some of these broken fuel assemblies or something were -- they were looking at different ways to ship them or something, and apparently they asked for a piece of one of these fuel assemblies.

So it was cut out of the fuel assembly and was going to be sent off site, but then they decided it wasn't necessary and so they kept it in the pool, but apparently it wasn't very well marked as to where they put it in the pool, so they were asking if I could remember what they did with it, which I couldn't.

Q. Do all of the little pellets of -- I say "little," I shouldn't say that. Do all the pellets ultimately have to be removed from a wet pool in order to drain it and decommission it, decomtaminate it, decommission it?

A. Yes.

Q. What did you tell the folks from Humboldt Bay when they called you concerning this issue?

A. Well, that I really wasn't involved that much in that particular little operation. I told them the names of a couple of people who probably were and that's basically about it. And they asked -- you know,

Page 155

I wasn't a great deal of help to them I don't think.

Q. Who did you tell them might be of more help?

A. Fellow by the name of John Gisclón.

Q. How do you spell that?

A. G-i-s-c-l-o-n.

Q. And who is Mr. Gisclon?

A. Well, he's an engineer who took over for me at Humboldt Bay when I started going off doing Diablo Canyon things. And so I think he was the person that was doing more of that kind of thing at that time frame than I was. I was really off doing Diablo Canyon stuff by that time.

Q. Was there anyone else that you told them might have that information?

A. Well, I gave them the names of several people who I remembered worked there. Most of them they already knew and they already contacted them so I just --

Q. Do you remember who they were?

A. Oh, fellow by the name of Don Bakens, who was a maintenance man.

Q. How do you spell that?

A. B-a-c-k-e-n-s.

Q. Okay.

A. I think one of the old operators, Dick Leach,

Page 156

L-e-a-c-h. Few names that I could remember. Randy Parker.

Q. Who's that?

A. Randy Parker. These are just names that I could remember from that era that might remember something that I didn't remember.

Q. Were you contacted at all by the NRC concerning this issue?

A. No.

Q. Any regulatory agency contacted you?

A. No.

Q. Just the people from Humboldt Bay?

A. Right.

Q. And what did they tell -- I mean what did they tell you was -- when they called you, got you on the phone, what did they tell you was the reason for the call?

A. That they were, you know, they were cleaning up the pool and consolidating waste, you know, not fuel assemblies, but other waste that was in there and that somehow they had lost track of where this 13-inch or whatever it is, 13-inch segment of one fuel rod had gotten to.

Q. Outside of that 13-inch piece that you're talking about, did they tell you that there were other

Page 157

things that were missing or needed to be accounted for in the pool?

A. No, that was the only one that I can remember that they told me was missing.

Q. Did you review any reports that wexe ultimately prepared by PG & E concerning this matter?

A. No.

Q. Were you ever contacted again by PG & E concerning this matter?

A. Well, I think I got called a couple of times. Most recent time was by Bruce Norton, who was working on it. I don't remember what he asked me specifically, other than there was a chance that the NRC might call me up and ask me questions or something.

Q. And they didn't?

A. They haven't so far.

Q. When was that call with Mr. Norton?

A. Oh, I don't know, couple months ago I guess.

Q. Who is Bruce Norton? What's his job?

A. Bruce Norton is a private attorney that PG & E has used on nuclear matters for years. He was involved in the Diablo licensing.

Q. And who called you? Is Mr. Norton the only one you've had contacts with concerning this issue?

A. No, the current plant manager I believe.

# Nancy Slater

# Plaintiff

00001

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - X

YANKEE ATOMIC ELECTRIC :
COMPANY, :
Plaintiff, : Case No. 98-126C
v. : Senior Judge
: Merow
THE UNITED STATES, :
Defendant. :

- - - - - - - - - - - - - - - X

Washington, D.C.
Wednesday, April 21, 1999

Deposition of NANCY H. SLATER, a witness herein, called for examination by counsel for Plaintiff in the above-entitled matter, pursuant to agreement, the witness being duly sworn by JAN A. WILLIAMS, a Notary Public in and for the District of Columbia, taken at the offices of Spriggs & Hollingsworth, 1350 I Street, N.W., Washington, D.C., at 10:10 a.m., Wednesday, April 21, 1999, and the proceedings being taken down by Stenotype by JAN A. WILLIAMS, RPR, and transcribed under her direction.

waste acceptance.

Q. And let me tell you just briefly procedurally how it will work. I'll be asking you a series of questions and you will be expected to answer the questions. As we discussed even before we went on the record, the court reporter is taking everything down and we'll get a written transcript of everything that's said today. Do you understand that?

A. Yes.

Q. And it will also be helpful for the court reporter's purposes so we get a clean transcript if you will respond as you just did.

A. Verbally.

Q. A nice verbal answer, yes or no or whatever the appropriate response might be.

A. I understand.

Q. Also I would ask, if you don't understand one of my questions, you're not sure what I'm asking in one of my questions, if you would please ask me to rephrase it rather than trying to answer a question you're not sure what the question is.

A. Will do.

Q. I appreciate that. Where do you work?

00006

A. At the U.S. Department of Energy in the Office of Civilian Radioactive Waste Management in the Regulatory Coordination Division.

Q. What's your job title there?

A. Team leader.

Q. And what are you a team leader of?

A. The entire division basically. I serve in lieu of a deputy division director. And we deal with the regulatory concerns between the program and the Nuclear Regulatory Commission, the EPA, National Academy of Science, and dealings with the Nuclear Waste Technical Review Board.

Q. When you say you deal with regulatory concerns of EPA, NRC, and the other agencies, what do you do on a day-to-day basis vis-a-vis the NRC?

A. Let's see, a typical example would be the fact that we are involved in developing safeguards and security policy guidelines for the eventual acceptance and disposal of a variety of waste forms. And those policy guidelines will be translated into actual waste acceptance criteria by another group.

And the waste owners will then have to

00007

assure that the waste they deliver falls within the boundary parameters established by the guidelines with one exception, there will be no new requirements imposed on the utilities because the standard contract is quite clear in terms of what can be asked for and what cannot.

Q. And so you're constantly working with EPA, NRC in developing various guidelines that they're going to be using?

A. Right, reporting on progress in the program and quality assurance issues, things like that.

Q. How many people are in this division?

A. I don't know, I have to count. Six.

Q. And who heads up the division?

A. Alan Brownstein, he's the division director.

Q. And what is this the division of?

A. Regulatory Coordination.

Q. It's the Regulatory Coordination Division. Is this a division of a larger office?

A. It would be the office of -- we have reorganized, we have new names for everything. But it would be the program management and integration function.

00008

Q. What is the program management and integration function?

A. These are in one division the budget folks, in another division the information management folks, it might be human resource folks in another division. And we are the division -- the only division within that group that has any technical or policy responsibilities. There is a separate office, there are two offices, in the other office is acceptance and transportation integration.

Q. And who heads up the program management and integration office?

A. Let's see, that would be Dwight Shelor.

Q. How long have you been a team leader in the Regulatory Coordination Division?

A. Let's see, I moved in late '95. About three and a half years, almost four years.

Q. Since that move three and a half, four years ago, have there been any other reorganizations within your office?

A. Within my particular Office of Program Management?

Q. Well, let me start with the Regulatory

00009

Coordination Division. Has there been any
reorganization within that division?
A. Yes, because, in fact, we had a RIF last year. And we RIF'd two people out of the division, one of whom was a team leader. Our roles and responsibilities did not change.
Q. When you had two team leaders, was there any division as to what the two team leaders were leading?
A. Yes.
Q. What were the two team leaders leading at that point?
A. The other team leader was leading environmental regulatory issues and issues dealing with the Nuclear Waste Technical Review Board. And my function was primarily Nuclear Regulatory Commission interface.
Q. And now you're basically team leader for all of them?
A. Doing it all.
Q. In that same three and a half to four year time span since you've been in your current position, has there been any other reorganization at the office, the Office of Program Management and Integration?

00010

A. Yes, as a matter of fact, up until December -- actually January 1 of this year, the two offices would have had two associate directors. One retired and so the remaining office director now manages both. That was Dwight Shelor.

Q. And who was the associate director that left?

A. Samuel Rousso.

Q. Before Mr. Rousso left, how did they have it divided up?

A. Mr. Rousso would have had program management and Mr. Shelor had acceptance and transportation. Let's see. Yes, that's right.

Q. Maybe I misunderstood. So this is within the Office of Program Management and Integration that's now headed up by Mr. Shelor?

A. There were two offices. Samuel Rousso headed the management group, basically management functions, Dwight Shelor headed the acceptance and transportation group. Samuel Rousso retired. Both offices continue to exist. But now Dwight Shelor manages both.

Q. I see. And above the office level the next thing you get to is the Office of Civilian

00011

Radioactive Waste Management itself?

A. Is the deputy director and the director, it's the highest level.

Q. And has there been any other organizations within the -- reorganizations within the whole RW organization besides the ones that you've just mentioned in the last three and a half to four years?

A. To be honest with you, I try not to keep track of that. We play musical chairs. And I believe that the systems integration group may have moved from program management to acceptance and transportation.

Q. Three and a half years ago, when you came into your current position, what position did you have previously?

A. Prior to that I was the team leader in waste acceptance.

Q. And waste acceptance was part of what division at that time?

A. Well, it was a division, waste acceptance was a division.

Q. And who was director of the division at that time?

A. We had acting directors. I served as

# Plaintiff

00014
division?

A. Let's see. I joined DOE in August 1991. And at that time we had branch chiefs. And Alan Brownstein was the branch chief. I honestly do not remember precisely when the department decided it would no longer have branch chiefs, it would rename them and it would create division directors and team leaders.

And I would have to guess -- I'd have to go back and look to make sure, but my recollection is it might have been around 1993, 1994.

Q. What is a team leader?

A. Team leader is responsible for individual contributions, being a subject matter expert in some areas or a particular area, responsible for managing the entire team, eliminating obstacles, giving people a fresh look by stepping outside the box they're standing in, trying to solve the problem. So they're a little bit of both, technical worker and manager.

Q. But technically a team leader is not a supervisor?

A. No, no. Unfortunately you have the responsibilities but not the privileges of

00015

writing evaluations, signing leave slips, that kind of thing.

Q. That position is that of the division director?

A. Right.

Q. When you were team leader of waste acceptance roughly somewhere around 1993 to '95, who was on your team?

A. I have to do this by going around the room. Phil Smith, Bill Floyd, Mary Lee Payton, Kristin Svinicki, John Vlahakis, and I would consider my secretary to be part of the team as well, Deborah Evans.

Q. Were there any changes in the team during your tenure as team leader?

A. Yes. In fact, we hired Dave Zabransky. And, when Dave came into the division, we reorganized the division with two team leaders and divided the work load up.

Q. Why did that happen?

A. It was certainly a more efficient way to operate. And, to be quite frank, I was overloaded with too much work.

Q. When did that reorganization take place?