# Plaintiff

00019

A. An office, right.

Q. What office would it have been part of?

A. I don't know, I think they may have called it the waste acceptance storage and transportation office. But again I don't commit things like that to memory. I feel there are organization charts that I can go pull to look it up.

Q. And, between 1991 and 1993, Mr. Brownstein was the branch chief?

A. Yes.

Q. And after 1993 Mr. Brownstein became division director?

A. Director.

Q. And, between '91 and '93, do you recall who was the division director?

A. Jim Carlson.

Q. And then who was the office director above Mr. Carlson?

A. Ron Milner.

Q. What were your duties in this 1991 to 1993 period when you were an industrial specialist?

A. I was involved in the preparation of the annual capacity report, the acceptance

00020

priority ranking, answering questions both internal and external about the terms and conditions of the contract. Let's see. And whatever else may have arisen at the time.

I know, when we came in, we were on the tail end of a rulemaking, net versus gross, as sold was that clarification. So I wrapped part of that up. I believe I terminated a couple of nonutility contracts at the contract holder's request because they either no longer had the material or had, in fact, in one case I believe sold it to the government.

Q. Do you remember any other issues you worked on during that period?

A. '91 to '93, I think we began to discuss delivery commitment schedules at that point. Would that be about right? That would be about right.

Q. That would also have included exchange of approved delivery commitment schedules?

A. Actually my recollection is that we discussed exchanges not concurrently, because there was the opportunity to do that a little later. And it was more important given the timing requirement in the contract to have that

00021

guidance issue.

Q. And guidance as to what to do with the delivery commitment schedules themselves?

A. How to fill them out, instructions. I believe, if I'm not incorrect, that that's an OMB reviewed form. And you know that process, that takes time and there must be instructions on how to complete the form.

Q. What was the time concern?

A. I believe the contract requires delivery commitment schedules to be submitted by the purchaser 63 months in advance of the year in which they have an allocation. So back it out from 1998, and they would have been submitting in '92, late '92.

Q. Are there any other issues that you recall working on in the '91 to '93 period?

A. Let's see. I know we addressed priority for shutdown reactors. And nothing else comes to mind right now.

Q. What about the period '93 to '95, what issues did you work on?

A. During that time period, I believe I worked on delivery commitment schedule exchanges, many of the same things from '91 and '93, the

00022

acceptance, priority ranking, the annual capacity report, DCS review and approval.

We began conversations about final delivery schedules and what would be included in those, safeguards and security, and that was policy development. I know that I worked on numerous reviews of system baseline documents, system requirements documents primarily from a waste acceptance standpoint. And I know we kept working on priority for shutdown reactors.

Q. Let me ask you to clarify what you mean by just a couple of these categories. Safeguards and security, what was involved with safeguards and security?

A. NRC regulations require that a licensee have in place a safeguards and security system. And that means physical security as in physical protection. And that physical protection is based on the attractiveness of the material, would someone want to steal it to make a bomb.

They also require as another subelement material control and accounting. That is that, if you as a utility tell me that you're giving me ten MTU, you have to provide me with some documentation to give me confidence that you are;

00023

because, once I accept it, I'm going to have to swear and affirm to the NRC that I've got ten MTU.

And what we were working with the utilities to do, and it was an iterative process, it was lots of help and lot of involvement from the utility as well, was a process that would not impose an undo burden on them to do something that they weren't currently doing.

For example, they would address material control and accounting issues through calculation, burnup, for example, but they would not measure. And measurements would have been an operational impact. So we were looking for ways to get what we needed to accomplish without disrupting their operations. So there were lots of people talking to each other about that.

Q. You said you reviewed a number of what you called system baseline or system requirements documents. What's a system baseline document?

A. I guess the simplest way to describe it would be that these are the overall driving requirements for the design and operation of a repository. They are, in fact, obtained from legislation, regulation, and that's probably the

# Defendant

Nancy H. Slater April 22, 1999

Page 206 to Page 312

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

ALDERSON REPORTING CO. INC.
1111 14th St, N.W.
4th Floor
Washington, DC 20005
Phone: 1-800-FOR-DEPO
FAX: 1-800-367-3310

Page 206

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
---------------X
YANKEE ATOMIC ELECTRIC :
COMPANY, :
Plaintiff, : Case No. 98-126C
v. : Senior Judge
: Merow
THE UNITED STATES, :
Defendant. :
---------------X
Washington, D.C.
Thursday, April 22, 1999

Continued deposition of NANCY H. SLATER, a witness herein, called for examination by counsel for Plaintiff in the above-entitled matter, pursuant to agreement, the witness being previously duly sworn, taken at the offices of Spriggs & Hollingsworth, 1350 I Street, N.W., Washington, D.C., at 2:10 p.m., Thursday, April 22, 1999, and the proceedings being taken down by Stenotype by JAN A. WILLIAMS, RPR, and transcribed under her direction.

Page 207

APPEARANCES:

On behalf of the Plaintiff:
ROBERT L. SHAPIRO, ESQ.
SUSAN SACHS, ESQ.
Spriggs & Hollingsworth
1350 I Street, N.W
Washington, D.C. 20005-3305
(202) 898-5854

On behalf of the Defendant:
MARIAN E. SULLIVAN, ESQ.
Trial Attorney
Commercial Litigation Branch
U.S. Department of Justice
1100 L Street, N.W.
Room 10150
Washington, D.C. 20530
(202) 307-6289

Page 208

CONTENTS

| WITNESS | EXAMINATION BY COUNSEL FOR PLAINTIFF |
|---|---|
| NANCY H. SLATER | |
| By Mr. Shapiro | 209 |

EXHIBITS

| SLATER EXHIBIT NO. | PAGE NO. |
|---|---|
| 17 - Memo dated 8/5/94 | 209 |
| 18 - Memo dated 5/16/90 with attachments | 215 |
| 19 - Letter dated 2/10/95 with attachments | 221 |
| 20 - Memo dated 6/24/93 | 233 |
| 21 - Letter dated 6/24/93 | 249 |
| 22 - Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste dated 6/22/83 | 254 |
| 23 - Acceptance Priority Ranking & Annual Capacity Report dated March 1995 | 275 |
| 24 - Complaint | 306 |

Page 209

PROCEEDINGS

Whereupon,

NANCY H. SLATER,

the witness on the stand at the time of recess, having been previously duly sworn, was further examined and testified as follows:

EXAMINATION BY COUNSEL
FOR PLAINTIFF - RESUMED
BY MR. SHAPIRO:

Q. Ms. Slater, we're here for the continuation of your deposition. You understand you're still under oath?
A. Yes.
Q. Do you understand that?
A. Yes, I do.
Q. You may recall at the end of yesterday we were talking about exchanges of approved delivery commitment schedules?
A. Yes.
Q. I want to just have a few more questions on that subject. Let me have another document marked and show it to you.

(Slater Exhibit No. 17 was marked for identification.)

BY MR. SHAPIRO:

Page 210

Q. Ms. Slater, you've been given what's been marked as Slater Exhibit 17. Take a look at that document and tell us if you recognize it?
A. Without reviewing it in detail, yes.
Q. Can you tell us what Slater Exhibit 17 is?
A. The program had envisioned that there would need to be some idea of what actual operations for the entire system would look like. That included waste acceptance, transportation, perhaps storage at some point, and then the repository.
The transportation division was focusing on a transportation concept of operations. And we were focusing on a waste acceptance concept of operations.
The M&O had drafted a document that described what that concept would involve. And I had asked that Scott Vance who works for JAI review that draft generated by the M&O and provide me with his comments on topics that were particularly relevant to the waste acceptance process and the standard contract, because again this was an opportunity to make sure that no requirements were to be imposed on utilities that

Page 211

were not entirely consistent with the standard contract.
Q. Let me make sure I understand. Mr. Vance was looking at two things separate or in combination, he was looking at concept of operations draft for the acceptance and transportation plan and then he was also looking at the exchange process. Was he looking at those two things together?
A. He needed to look at the exchange process to assure that the concept of operations did not contradict anything that was in the exchange process document. So the focus of the review was the concept of operations. And you would use as the basis for your review the standard contract and then documents that supported the contract.
Q. So Mr. Vance worked for JAI. Was he an engineer or what sort of role does he play?
A. Yes, he is, I believe he's a nuclear engineer that graduated from MIT.
Q. And he was one of the consultants that you would occasionally go to to ask for advice such as this?
A. Yes.

Page 212

Q. Let me point you to a particular page of the document, page 3. The top paragraph on that page, in the middle of that paragraph, there's a sentence that begins approved DCS's are the basis for the establishment of the transportation system performance requirements. Do you see that?
A. Yes.
Q. And then he says, once this baseline system is established, the ability to approve/disapprove an exchange request should be very straightforward and involves answer to the simple question can we accomplish this new proposed delivery using the system that we designed for the original delivery?
A. Yes.
Q. Does that statement in Mr. Vance's memorandum, Slater Exhibit 17, is that consistent with your understanding of how RW was intending the exchange process to work?
A. I'm not going to speak for everyone in RW, but I will speak for myself. And it is consistent with my understanding of how that process would work.
As we discussed yesterday, it is

Page 213

possible, if two utilities exchange slots in the queue, one owning a PWR, one owning a BWR, that twice as much fuel could be delivered. That would obviously affect transportation because you could conceivably need twice as many casks.
And you might have to procure additional casks. There's a lead time on procurements. And so it would conceivably be possible, if enough exchanges were submitted, to entirely disrupt the transportation operation. You might not have sufficient resources allocated to perform the actual acceptance and transportation.
Q. You said you were speaking for yourself, not necessarily all of RW.
A. Yes.
Q. Are you aware of anyone in RW who had a different view of how the exchange process would work?
A. Not specifically.
Q. Generally are you aware?
A. Not generally either.
Q. To the best of your understanding, is the view that you have with respect to this concept of the exchange process, is it consistent

Page 214

, what was generally held at least within the utility interface branch where you worked?

A. At the time this was done, I think I would have been it in that sense. So, when you're asking if it was consistent with the branch's or the division's perspective, it would have been my perspective; and yes, it is consistent with my perspective. So this is not something that I recall anyone having specific decision-making involvement other than me.

Q. Why was the baseline as it was called here the basis system that was being used based upon the delivery commitment schedules as opposed to an expectation of what expected exchange requests would look like?

A. Let me see if I understand the question. At the time this was generated, we had received delivery commitment schedules. Those were absolute quantitative and easily analyzed.

The other involves prediction. And your guess would be equally as valid as my guess as to what exchanges would occur between which utilities. You cannot in my opinion procure, plan for, and operate a system based on that type [illegible]ojection, particularly when you have in your

Page 215

hands approved DCS's.

MR. SHAPIRO: Let me show you another document.

(Slater Exhibit No. 18 was marked for identification.)

BY MR. SHAPIRO:

Q. Ms. Slater, you've been handed what we've had marked as Slater Exhibit 18. Do you recognize this document?

A. Not offhand. And I note that the date on it is approximately a year and a quarter before I came to DOE. Would you mind if I took a moment to look at it?

Q. Definitely take a look.

A. Okay.

Q. Now that you've had a chance to review it, do you recognize the document better?

A. Not specifically, no. But I recognize the topics discussed in the document.

Q. Let me ask then at least about the people mentioned in the cover. It says it's a memo from Pat McDuffie. Do you know who Pat M[illegible]ffie is?

[illegible] Pat McDuffie was a consultant at PNL, now retired as I understand it.

Page 216

Q. Do you know what her role would have been around May 16, 1990, the date on Slater Exhibit 18?

A. His role.

Q. His role.

A. No, I don't, because I was not there at the time. I have no idea what his particular role was.

Q. What was his role when you were working in that office?

A. An advisor on various standard contract issues, primarily to Alan Brownstein.

Q. And then it says on Slater Exhibit 18 that the memo was written to A.B. Brownstein. I assume that's Alan Brownstein?

A. That's Alan Brownstein.

Q. And D.C. Langstaff. Do you know who that is?

A. That's Dave Langstaff. And I cannot recall what his affiliation is.

Q. Maybe this is purely as a matter of curiosity, but it seems to have a header on it that says don't say it, write it. Did someone in particular tend to put that on their memoranda?

A. No. I've seen that before, but I don't

Page 217

recall who would have done that.

(Discussion off the record.)

BY MR. SHAPIRO:

Q. Ms. Slater, the first page of Slater Exhibit 18 is sort of a cover memo and then there's a document entitled The DCS Exchange Process. And I'd like to point your attention to the second page of that document.

A. Okay.

Q. On this page the lines are numbered. And, if you look at line 5, the sentence that begins at the end of line 5, it says, "If the Purchasers who find themselves at the limit of their pool storage capacity are not those who can anticipate timely delivery of SNF to the WMS, they will have to develop alternative storage capacity."

And then it says, "This shortcoming of the OFF allocation method was recognized when the Contract was written. In an effort to minimize this shortcoming, and at the request of the Purchasers, DOE included in the Contract a provision for the exchange of approved DCSs among Purchasers." Do you see that?

A. Yes.

# Defendant

Page 222

A. Yes, I do. May I have a moment to look through it?
Q. Definitely.
A. Okay.
Q. Can you tell us what Slater Exhibit 19 is?
A. In our parlance it appears to be a preliminary draft of a process by which we would evaluate delivery commitment schedule exchanges for their impacts on the total system. And that would include waste acceptance, transportation, storage and disposal to the extent that those portions of the system were sufficiently developed to be able to evaluate those impacts.
Q. You said this document is titled a preliminary draft. Do you have a recollection or a sense from looking at this document and its transmittal letter how far along in the process this draft was?
A. I do not recall. But it would be my belief that we were perhaps three-quarters of the way through the process. Generally speaking a document that's submitted formally like this is being submitted for a formal review, if you
So you're close.

Page 223

Q. Would the individual components to do an acceptance transportation and whatever other appropriate components, would they have already seen parts of the document or are they seeing it for the first time?
A. I couldn't speak to that, I don't know. For example, I can speak for waste acceptance. We would have likely seen the waste acceptance portion.
Q. If you could turn to page 20 of Slater Exhibit 19. I would point your attention to the last paragraph on page 20, the first sentence of that paragraph that says, based on approved delivery commitment schedules, transportation would have developed a cask procurement strategy which will result in a cask fleet of the required size and for each planning horizon.
Is this then that same concept we've been discussing, that, when looking at whether or not to approve a proposed exchange of delivery commitment schedules, that you would first look at a transportation plan based upon trying to [illegible]e the original delivery commitment [illegible]ules, not anticipating exchanges?
A. You would look at whether or not you

Page 224

could accommodate a change. You would first look at whether or not the DCS exchange itself met the conditions set out in the DCS exchange procedure in terms of no more MTU being requested than being allocated.
And then you would assess various impacts on various parts of the system with an eye towards accommodating, if possible, and I know that we wrote this in at least one document, perhaps recommending alternative ways to accomplish what the utility wished to accomplish.
Q. If you could explain that, the idea would be that, if DOE had to reject a particular exchange, DOE would take it upon itself to offer up an alternative?
A. Not in the sense of a precise alternative but in the sense that, for example, if the MTU allocation, if they had -- let's see, this will get into another topic.
We've talked about the plus or minus 20 percent and the theory that you want a full cask, not a half full cask. If they actually submitted for less than the allocation because they believed that they could not submit at the

Page 225

allocation because it would be rounded down, we would tell them submit the full allocation because it will likely be rounded up. So we would send it back to them and say you're really entitled to more, resubmit your DCS exchange.
Q. When you say rounded up or rounded down, you mean rounded up to the next full cask?
A. Full cask, right. If they had -- if they were one assembly short in a full cask, then, at the time of acceptance, it was understood that we would permit them to include the additional assembly and debit their next year's allocation for that amount.
Q. We might have covered this yesterday. But, just to make clear, the reason for allowing rounding to a full cask is that it was just more efficient to use full casks rather than partial casks?
A. System efficiencies, yes.
Q. And the reason for that is you have to move the cask anyway so you might as well move it full, it's the same amount of trouble to move it full or half full?
A. Yes.
Q. Let me go back to Slater Exhibit 19,

Page 226

that page on the transportation issue. Perhaps if you could take a look at that whole page and let me try to rephrase my question. What I'm trying to get at is, by the time this issue got to this level of draft, was the plan still to base the decision on whether or not to approve a proposed exchange of delivery commitment schedules on the transportation plan that would have been created based on the queue as opposed to a transportation plan based on anticipated exchanges?

A. Yes, it would have been based on approved delivery commitment schedules.

Q. Do you recall any discussions or considerations at this stage of the process on transportation plan or acceptance plan or any other plan for that matter being based upon anticipated exchanges as opposed to approved delivery commitment schedules?

A. I don't recall myself having any significant thoughts about that, because my intention was that it be based on approved DCS's. I cannot speak for the transportation people.

Q. You just don't know what was going on

Page 227

with them?

A. Right.

Q. And, other than Bill Teer who you mentioned earlier, you can't tell us anyone else we might talk to who might be able to give us more information on that issue, on what was being done in the transportation area?

A. I seem to recall that Jim Carlson at DOE might have been involved.

Q. Anyone else?

A. I can't recall.

Q. Now, is your recollection that ultimately a final draft was developed of this document, evaluation of delivery commitment schedule exchange requests?

A. I believe it was.

Q. Do you have a sense of when that final document was prepared?

A. No, I really don't.

Q. This draft says it was prepared by TRW. It would have been your expectation that the final would also been prepared by TRW?

A. Yes.

Q. And the transmittal letter for that draft is from a James Blandford at TRW. Do you

Page 228

recall Mr. Blandford?

A. Yes, I do.

Q. Was he directly involved in that project?

A. Not directly. He would probably have been the equivalent of Sam Rousso who was our office director. So there were probably – there was at least one, if not two levels of supervision below Mr. Blandford.

Q. Who at TRW would have been most directly involved in putting together the final document?

A. I believe it would have been Bill Teer and Jim Clark.

Q. Let's turn to a different subject. We touched on this a little bit yesterday. You said that utilities beginning 63 months prior to January 31, 1998, had to submit their initial proposed delivery commitment schedules?

A. Yes.

Q. Do you recall that amongst those was Yankee Atomic?

A. I vaguely recall that. I don't really – I couldn't give you the details.

Q. Do you recall that Yankee Atomic,

Page 229

that's Yankee Atomic Electric Company, requested to deliver more spent fuel in the first few years of the program starting after January 31, 1998, than was provided for in their allocation in the annual priority report?

A. Yes, I do.

Q. And do you recall there was a number of pieces of correspondence back and forth between DOE and Yankee Atomic on that issue?

A. Yes.

Q. What was your role in that process?

A. I was responsible at the time for performing an initial review, higher level review of the DCS's when they came in. I would have been responsible for communicating to the utility, drafting the letter that would go back to the utility that would explain why their DCS was being rejected. A specific basis for that rejection would have been provided.

Those letters would have been reviewed by the contracting officer. And I don't recall who signed the letters.

Q. Who else would have been involved in that process?

A. Our M&O would have been involved in

# Plaintiff

00206

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - X

YANKEE ATOMIC ELECTRIC :
COMPANY, :
Plaintiff, : Case No. 98-126C
v. : Senior Judge
: Merow
THE UNITED STATES, :
Defendant. :

- - - - - - - - - - - - - - - X

Washington, D.C.
Thursday, April 22, 1999

Continued deposition of NANCY H. SLATER, a witness herein, called for examination by counsel for Plaintiff in the above-entitled matter, pursuant to agreement, the witness being previously duly sworn, taken at the offices of Spriggs & Hollingsworth, 1350 I Street, N.W., Washington, D.C., at 2:10 p.m., Thursday, April 22, 1999, and the proceedings being taken down by Stenotype by JAN A. WILLIAMS, RPR, and transcribed under her direction.

00289

such consideration of campaigning?

A. I don't recall who specifically was in the transportation group at that time. In fact, I'm having a tough time recalling who the transportation division director was. I really don't know.

Q. Going back to this table 2 in Slater Exhibit 23, other than the notion of campaigning, do you recall any other ways in which DOE or utilities for that matter might have expected that actual acceptances of spent fuel might occur in an order different than what is depicted on this table?

A. Plus or minus 20 percent rounding, campaigning, DCS exchanges, because, if exchanges occurred, although the amount wouldn't change, the individual utility that would be serviced in that year would. So that would have represented a departure from what's published in here.

Q. And it was generally anticipated that there would be some amount of DCS exchanges?

A. Yes, I did anticipate that there would be some amount of DCS exchanges.

Q. You said that was your expectation. To what extent did you understand that that

# Defendant

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

\- - - - - - - - - - - - - - - - - - - - X

YANKEE ATOMIC ELECTRIC :
COMPANY, MAINE YANKEE ATOMIC :
POWER CO., and CONNECTICUT :
YANKEE ATOMIC POWER CO., : Case No. 98-126C
Plaintiffs : 98-474C, 98-154C
-v- : (Senior Judge
: Merrow)
UNITED STATES OF AMERICA, :
Defendant :

\- - - - - - - - - - - - - - - - - - - - X

Washington, D.C.
Thursday, June 13, 2002

Deposition of NANCY SLATER THOMPSON, a witness herein, called for examination by counsel for the Plaintiff in the above-entitled matter, pursuant to notice, the witness being duly sworn, taken at the offices of Spriggs & Hollingsworth, 1350 I Street, N.W., Washington, D.C., at 9:40 a.m., Thursday, June 13, 2002, and the proceedings being taken down in Stenotype by DEBORAH K. WILKINS, RPR, and transcribed under her direction.

APPEARANCES:

On behalf of the Plaintiffs:
ROBERT L. SHAPIRO, ESQ.
Spriggs & Hollingsworth
1350 I Street, N.W.
Washington, D.C. 20005-3305
(202) 898-5839

On behalf of the Defendant:
MARIAN E. SULLIVAN, ESQ.
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530
(202) 305-7594



CONTENTS


| WITNESS | EXAMINATION |
|---|---|
| NANCY SLATER THOMPSON | |
| By Mr. Shapiro | 4 |
| By Ms. Sullivan | 149 |
| By Mr. Shapiro | 153 |

Afternoon Session - Page 67


EXHIBITS

| Ex.No. | Description | Page |
|---|---|---|
| 1 | December, 1990 ACR | 17 |
| 2 | 6-22-83 contract | 25 |
| 3 | March, 1995 APR and ACR | 32 |
| 4 | June, 1987 ACR | 47 |
| 5 | June, 1988 ACR | 67 |
| 6 | December, 1991 ACR | 69 |
| 7 | May, 1993 ACR | 84 |
| 8 | March, 1993 ACR | 86 |
| 9 | 9-28-95 letter, Dreyfus to Kadak | 113 |
| 10 | Instructions for Completing the Appendix C - Delivery Commitment Schedule | 127 |
| 11 | Review Record | 139 |



PROCEEDINGS

\- - - - - -

Whereupon,
NANCY SLATER THOMPSON,
was called as a witness by counsel for Plaintiff, and having been duly sworn, was examined and testified as follows:

EXAMINATION BY COUNSEL FOR PLAINTIFF:

BY MR. SHAPIRO:
Q. Would you state your name for the record, please?
A. Nancy Slater Thompson.
Q. Ms. Slater Thompson, my name is Robert Shapiro. As you recall I deposed you, gee --
A. Some time ago.
Q. -- a couple years ago now in these cases, and they are still going on. I won't have to go back over the procedures, I have your deposition, and I think you understand what we are doing today. It also saves -- I mean, we are not going to cover the same material the same way again, either. I just have a couple, I guess, catch-up items to make sure I understand what's happened with your background in the last couple years, and I have some additional topics I want to



cover with you today.
What is your current position?
A. I am the acting division director of the regulatory coordination division.
Q. How long have you been in that position?
A. I have been in that position since January of 2001.
Q. What was your position before that one?
A. Team leader in the regulatory coordination division.
Q. How did your duties change when you moved from the team leader position to the acting director position?
A. In the main, I believe that most of the technical and policy-related duties that I had been performing didn't change, but I have now assumed responsibility for personnel actions.
Q. Are there any other teams in that division other than the one in which you were team leader?
A. No, there are not.
Q. How many people are in that division?
A. There are, including details, four in

Page 114

Does that statement comport with your understanding of how the exchange provision was supposed to work?
MS. SULLIVAN: Objection. Foundation.
A. Yes, it is. It's consistent with my understanding that the exchange process would permit the utilities to alter their slot in the cue. And in the case of Yankee, who had requested priority for shutdown reactor acceptance, the exchange provision which they were encouraged to use would permit them to alter their slot in the cue.
Q. It was the department's belief at least in 1995 that the exchange provision would have worked and actually have enabled a utility like Yankee Atomic to alter their space in the cue?
MS. SULLIVAN: Objection, vague. Objection, compound.
A. Conceptually, yes, the exchange process could result in a utility's ability to alter their slot in the cue.
Q. What about practically?
MS. SULLIVAN: Objection. Vague.
Q. I asked that because you used the word

Page 115

conceptually. Were you using the word conceptually to distinguish from practically?
A. This will take us back to my utilities' side of the table.
From a practical standpoint, I believe most of the older utilities in my opinion would have been unlikely to engage in exchanges. I believe it would have been possible for Yankee to exchange with some of the younger utilities, but I do seem to recall when asked by me directly whether or not they had attempted to in fact conduct an exchange, the answer was no.
Q. Do you think the Yankee Atomic would have been able to have exchanged with younger utilities because the younger utilities would have had less need for early acceptance of their spent fuel?
MS. SULLIVAN: Objection, vague. Objection, calls for speculation.
A. My opinion, it would be more likely that they could effect a trade with a utility that had made provisions for additional storage or that had no particular need for additional storage.
Q. If Yankee Atomic had actually sought out such exchanges, do you think that they would

Page 116

have been successful in getting utilities without need for immediate spent fuel acceptance to exchange with them?
MS. SULLIVAN: Objection, calls for speculation. Objection, vague.
A. I think that's so predictive that I couldn't possibly predict the outcome of those conversations. It's within the realm of possibilities.
Q. Did the department have any view as to the likelihood of the success that Yankee Atomic might experience in seeking out exchanges in 1995?
A. I'm not aware of any.
Q. Would it have made sense for the department to tell Yankee Atomic that it could use the exchange provision to optimize their spent fuel acceptance schedule if in fact the department thought that Yankee Atomic wouldn't be successful in attempting to use the exchange provision in that manner?
MS. SULLIVAN: Objection, argumentative. Objection, calls for speculation.
A. I think the letter speaks for itself, it encourages them to avail themselves of contractually mandated privilege, the outcome of

Page 117

which could not be predicted until the effort had been made.
Q. I will recommend to you, Ms. Slater Thompson, that a few years after this letter was sent Yankee Atomic did make an effort to find exchange partners and that that effort proved unsuccessful, nobody offered to exchange with them. Why do you think Yankee Atomic was unsuccessful in finding exchange partners in -- I believe it was roughly the 1998 time frame.
MS. SULLIVAN: Objection, calls for speculation. Objection to your characterization of the facts as incomplete.
A. I really don't know.
Q. Can you speculate as to why you think that would have been?
A. Without knowing the complete context of the exchange conversations that went on, no.
Q. I will represent to you there really weren't conversations, there was a written request for proposals, and Yankee Atomic didn't get responses back.
MS. SULLIVAN: Is there a question?
Q. You said you wanted to know the context of the discussion; that's the extent of

# Defendant

Page 122

speculation. Objection, compound. Objection, foundation.
A. I am not sure I really understand your question, to be honest.
Q. Did you understand before what I meant by campaign shipments of spent fuel?
A. Yes.
Q. To make sure we are on the same page, what's your understanding of what a campaign shipment of spent fuel is?
A. At the time that I was in the industry as well as during the time when I was at DOE, my understanding of the term campaign was at one point, for example, you might wish to -- for example, you have a list of utilities you have in your one, it may be all over the map in terms of where they are in the country. You might wish to define campaign in terms of during that calendar year of acceptance I will go to the southeast and pick all the southeastern reactor fuel up first which people have an allocation in that year and then I will move to the northeast, but the nature of the campaign would tend to argue against I go from Georgia to Illinois to Texas to New York to California and that kind of thing, so campaigning

Page 123

is an efficiency consideration.
Q. A considering being that it is less efficient to pick up small amounts of spent fuel, relatively small amounts of spent fuel, from the utility multiple times as opposed to picking up a relatively larger amount of spent fuel from a utility a fewer number of times?
MS. SULLIVAN: Objection, vague. Objection, asked and answered to the extent we went into this in the previous deposition.
You can answer.
A. I think in the context I just discussed it with you actually, it would be in the context, for example, of weather-related concerns. Campaign, I might not want to go pick things up in Illinois and New York in the middle of the winter and I might want to pick fuel up during the middle of the winter in the south, and so again a matter of efficiency. I know at one point there was consideration, and I believe we have discussed this before, that you might in fact wish on a 3-year rolling front to pick up the first year's fuel, you might have room for the second year's fuel, you would debit additional allocations against that, and theoretically in year 2 you

Page 124

wouldn't come back to that utility. So there are aspects of campaigning that deal with many factors, and actually that again is not my area of expertise. This is kind of like the acceptance rates and the utility of those.
Frankly, the group that would find the information most useful would be in transportation, which is not my responsibility, and I think that extends, for example, to the DCSs. That's why when you asked the question do I have any knowledge of what the department would use it for, not really, not my area. Campaigning is really not my area, either.
Q. Focusing back on exchanges, proposed exchanges of approved delivery commitment schedules, I believe you did testify that when you were at the department you did work on consideration of how the department would go about evaluating proposed exchanges.
A. That's correct.
Q. It was the department's intent to approve proposed exchanges to the extent practicable?
MS. SULLIVAN: Objection, vague. Objection, foundation.

Page 125

A. Practicable is a very broad word, but if, for example, a utility wanted to exchange with another utility with exactly the same age fuel, the same type fuel, reasonably close locations, the same number of MTU, I would say that would be practicable. I don't think it was the department's intention, nor mine, to hinder that process.
Q. Would it be reasonable to say that the department intended to minimize the number of proposed exchanges that it would have to disapprove?
MS. SULLIVAN: Objection, vague.
A. I don't think we had a specific intention to minimize or maximize. I think it was our intention to accommodate, to the extent practicable, all reasonable requests to exchange.
Q. Let's switch subjects to failed fuel, something that I think you mentioned briefly before. I believe that you mentioned before that you had at least a vague recollection of an understanding that acceptance by the department of failed fuel might be delayed. Am I remembering that correctly?
A. Correct.

# Plaintiff

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

\- - - - - - - - - - - - - - - - x

YANKEE ATOMIC ELECTRIC :
COMPANY, MAINE YANKEE ATOMIC :
POWER CO., and CONNECTICUT :
YANKEE ATOMIC POWER CO., : Case No. 98-126C
Plaintiffs : 98-474C, 98-154C
-v- : (Senior Judge
: Merrow)
UNITED STATES OF AMERICA, :
Defendant :

\- - - - - - - - - - - - - - - - x

Washington, D.C.
Thursday, June 13, 2002

Deposition of NANCY SLATER THOMPSON, a witness herein, called for examination by counsel for the Plaintiff in the above-entitled matter, pursuant to notice, the witness being duly sworn, taken at the offices of Spriggs & Hollingsworth, 1350 I Street, N.W., Washington, D.C., at 9:40 a.m., Thursday, June 13, 2002, and the proceedings being taken down in Stenotype by DEBORAH K. WILKINS, RPR, and transcribed under her direction.

Page 122

speculation. Objection, compound. Objection, foundation.
A. I am not sure I really understand your question, to be honest.
Q. Did you understand before what I meant by campaign shipments of spent fuel?
A. Yes.
Q. To make sure we are on the same page, what's your understanding of what a campaign shipment of spent fuel is?
A. At the time that I was in the industry as well as during the time when I was at DOE, my understanding of the term campaign was at one point, for example, you might wish to -- for example, you have a list of utilities you have in your one, it may be all over the map in terms of where they are in the country. You might wish to define campaign in terms of during that calendar year of acceptance I will go to the southeast and pick all the southeastern reactor fuel up first which people have an allocation in that year and then I will move to the northeast, but the nature of the campaign would tend to argue against I go from Georgia to Illinois to Texas to New York to California and that kind of thing, so campaigning

Page 123

is an efficiency consideration.
Q. A considering being that it is less efficient to pick up small amounts of spent fuel, relatively small amounts of spent fuel, from the utility multiple times as opposed to picking up a relatively larger amount of spent fuel from a utility a fewer number of times?
MS. SULLIVAN: Objection, vague. Objection, asked and answered to the extent we went into this in the previous deposition.
You can answer.
A. I think in the context I just discussed it with you actually, it would be in the context, for example, of weather-related concerns. Campaign, I might not want to go pick things up in Illinois and New York in the middle of the winter and I might want to pick fuel up during the middle of the winter in the south, and so again a matter of efficiency. I know at one point there was consideration, and I believe we have discussed this before, that you might in fact wish on a 3-year rolling front to pick up the first year's fuel, you might have room for the second year's fuel, you would debit additional allocations against that, and theoretically in year 2 you

Page 124

wouldn't come back to that utility. So there are aspects of campaigning that deal with many factors, and actually that again is not my area of expertise. This is kind of like the acceptance rates and the utility of those.
Frankly, the group that would find the information most useful would be in transportation, which is not my responsibility, and I think that extends, for example, to the DCSs. That's why when you asked the question do I have any knowledge of what the department would use it for, not really, not my area. Campaigning is really not my area, either.
Q. Focusing back on exchanges, proposed exchanges of approved delivery commitment schedules, I believe you did testify that when you were at the department you did work on consideration of how the department would go about evaluating proposed exchanges.
A. That's correct.
Q. It was the department's intent to approve proposed exchanges to the extent practicable?
MS. SULLIVAN: Objection, vague. Objection, foundation.

Page 125

A. Practicable is a very broad word, but if, for example, a utility wanted to exchange with another utility with exactly the same age fuel, the same type fuel, reasonably close locations, the same number of MTU, I would say that would be practicable. I don't think it was the department's intention, nor mine, to hinder that process.
Q. Would it be reasonable to say that the department intended to minimize the number of proposed exchanges that it would have to disapprove?
MS. SULLIVAN: Objection, vague.
A. I don't think we had a specific intention to minimize or maximize. I think it was our intention to accommodate, to the extent practicable, all reasonable requests to exchange.
Q. Let's switch subjects to failed fuel, something that I think you mentioned briefly before. I believe that you mentioned before that you had at least a vague recollection of an understanding that acceptance by the department of failed fuel might be delayed. Am I remembering that correctly?
A. Correct.

# Victor Trebules

# Plaintiff

Page 1

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
-----------------------------------------X
YANKEE ATOMIC ELECTRIC COMPANY :
(98-126C)(Merow, S.J.) :
CONNECTICUT YANKEE ATOMIC POWER COMPANY :
(98-154C)(Merow, S.J.) :
MAINE YANKEE ATOMIC POWER COMPANY :
(98-474C)(Merow, S.J.) :
FLORIDA POWER & LIGHT COMPANY :
(98-483C)(Wilson, J.) :
NORTHERN STATES POWER COMPANY :
(98-484C)(Wiese, J.) :
DUKE POWER, a Division of DUKE ENERGY CORP.:
(98-485C)(Sypolt, J.) :
INDIANA MICHIGAN POWER COMPANY :
(98-486C)(Hodges, J.) :
SACRAMENTO MUNICIPAL UTILITY DISTRICT :
(98-488C)(Yock, S.J.) :
SOUTHERN NUCLEAR OPERATING COMPANY, et al. :
(98-614C)(Merow, S.J.) :
COMMONWEALTH EDISON COMPANY :
(98-621C)(Hewitt, J.) :
BOSTON EDISON COMPANY :
(99-447C) (Allegra, J.) :
GPU NUCLEAR, INCORPORATED :
(00-440C)(Bush, J.) :
WISCONSIN ELECTRIC POWER COMPANY :
(00-697C)(Merow, S.J.) :VOLUME
POWER AUTHORITY OF THE STATE OF NEW YORK : I
(00-703C)(Damich, J.) :
OMAHA PUBLIC POWER DISTRICT :
(01-115C)(Bush, J.) :Discovery
NEBRASKA PUBLIC POWER DISTRICT :Judge:
(01-116C)(Sypolt, J.) :(Judge
TENNESSEE VALLEY AUTHORITY :Sypolt)
(01-249C)(Bruggink, J.) :PAGES
Plaintiffs, :1 - 241
v.

Page 2

THE UNITED STATES, :
Defendant. :
-----------------------------------------X

Deposition of Victor W. Trebules, Jr.
Washington, DC
Wednesday, April 17, 2002

Reported by: Denise Dobner Vickery, RMR, CRR
JOB NO. 144458

Page 3

April 17, 2002
9:32 A.M.

Deposition of Victor W. Trebules, Jr., held at the offices of:

Jenner & Block
601 13th Street, NW
12th Floor
Washington, DC 20005

Pursuant to notice, before Denise Dobner Vickery, a Registered Merit Reporter, Notary Public of the District of Columbia.

Page 4

APPEARANCES:

Jenner & Block
For the Plaintiff COMMONWEALTH EDISON
One IBM Plaza
Chicago, IL 60611-7603
(312) 222-9350
BY: Theodore T. Eidukas, Esq.

Shaw Pittman Potts & Trowbridge
For the Plaintiffs NORTHERN STATES POWER COMPANY, et al.
1650 Tysons Boulevard
McLean, VA 22102-4859
(703) 770-7962
BY: Devon E. Hewitt, Esq.

Arnold & Porter
For the Plaintiffs SOUTHERN NUCLEAR OPERATING COMPANY, et al.
555 Twelfth Street, NW
Washington, DC 20004-1206

# Victor W. Trebules, Jr.

Page 9

answer them as best you can.
A. Okay.
Q. If at any time you don't understand a question, it's probably because I've misphrased it or I'm not making any sense. So, just stop me, ask me to ask the question again or rephrase the question so it makes sense to you.
A. (Nods head).
Q. Also, because the court reporter can only take down what we say and not any gestures or physical answers like nods of the head, you know, in other words, what I'm saying, your answers have to be verbal.
And also because she can only take down what one person is saying at any one time, it's important that I try not to talk over your answers and, you know, wait until I finish the questions just so that she can get down exactly what's been said and there's not two people trying to talk at one time.
A. (Nods head).
Q. So that the record is accurate.
A. Okay.
Q. And if at any time you need a break for

Page 10

whatever reason, as long as a question is not pending, I would be more than happy to accommodate you in taking a break.
A. (Nods head).
Q. Could you just quickly just describe your education after high school.
A. All right. I went to Ohio University for five years. I got a degree in engineering and a bachelor's degree in physics. I then did graduate work at Lehigh University in Bethlehem, Pennsylvania. I got a master's degree in mechanical engineering.
Q. And when did you receive that final degree?
A. 1972 I graduated from Lehigh.
Q. And that was the master's?
A. Yes. Master's degree in mechanical engineering.
Q. Okay. When did you first -- strike that.
Do you presently work for the Department of Energy?
A. Yes, I do.
Q. Okay. When did you first -- when did you start working for the Department of Energy?

Page 11

A. Actually, I started working for the Atomic Energy Commission in 1972, which became the Energy Research and Development Administration, which became the Department of Energy. I don't remember the exact year ERDA became the Department of Energy. I think it was about -- I don't remember.
Q. Okay. But you were there when the Department of Energy was first formed it sounds like?
A. Yes. Yes.
Q. What was your first position in the Department of Energy?
A. The Department of Energy or the Atomic Energy Commission?
Q. I'm going to start with the Department of Energy.
A. Okay. Again, I don't remember exactly when name changed, but I spent the first five years working for the Pittsburgh Naval Reactors Office after I graduated from college, and then I transferred to the Atomic Energy Commission headquarters in Germantown, Maryland and I worked in the Office of Nuclear Energy Programs.

Page 12

Q. In the Office of Nuclear Energy Programs, did your responsibilities include the handling of spent nuclear fuel at that time?
A. The handling of spent. No, we never handled any spent nuclear fuel.
Q. All right. I will rephrase that. Did your responsibilities include the disposal of spent nuclear fuel?
A. We did planning for activities involving radioactive waste and spent nuclear fuel. We never actually handled, though, any material.
Q. Could you briefly describe what the planning you did entailed that involved the disposal of radioactive waste and spent nuclear fuel.
MR. SHULTIS: Objection. Could we get a little more specific on the time period we're talking about here? I think that's important.
MR. EIDUKAS: I'm talking of the time period where you were at the Office of Nuclear Energy Programs, and I believe the witness has said he doesn't know a specific date when he was doing this.
BY MR. EIDUKAS:

Q. Mr. Trebules, if you can specify a date that you were working on the planning for the disposal of radioactive waste and spent nuclear fuel while at the Office of Nuclear Energy Programs, that would be helpful.
A. Let me try to clarify what I think you asked. I don't remember exactly when ERDA switched over to the Department of Energy. My guess, that was sometime in the 1980s. But in 1977, I joined the Office of Nuclear Energy Programs, which may have been part of ERDA or, you know, Atomic Energy Commission or ERDA or Department of Energy. It was 1977 and at that time I was involved in the planning activities for nuclear energy programs, which included breeder reactor development like the Clinch River breeder reactor, and I was responsible for preparing what was called the Fish and Energy Program Plan for the Department of Energy, which included some at that time it was called fuel cycle activities, which included handling of radioactive waste.
Q. Did that planning for the handling of nuclear radioactive waste that you just described, did that



involve planning for the disposal of those wastes in a deep geologic repository?
MR. SHULTIS: Objection, relevance.
BY MR. EIDUKAS:
Q. Generally, when your lawyer objects --
MR. SHULTIS: You still have to answer.
BY MR. EIDUKAS:
Q. You still have to answer unless he instructs you not to, if you're able to.
A. As best as I could remember, we did in the Fish and Energy Program document talk about reactor development and waste activities, and it did include I believe reprocessing at that time. This was prior to the ban on reprocessing and ultimate disposal of radioactive waste.
Q. Did those plans that you worked on go so far as to discuss the design of a repository? Did it get that specific?
MR. SHULTIS: Objection, relevance.
THE WITNESS: As best as I could remember, I don't believe we got involved in the -- at least I didn't get involved in the design of repositories for



the disposal of waste. My primary area of emphasis at that time was on reactor development. As I said, the Clinch River breeder reactor and, for example, Whitewater breeder reactor.
BY MR. EIDUKAS:
Q. At some point did your position at either ERDA or the Department of Energy change?
MR. SHULTIS: Objection, vague.
THE WITNESS: I had a number of activities during my career. As I mentioned, I stayed in the Office of Nuclear Energy Programs for a while and then soon after the passage of the Nuclear Waste Policy Act, about a year or two after the act was passed, then I joined the Office of Civilian Radioactive Waste Management.
BY MR. EIDUKAS:
Q. When you joined the Office of Civilian Radioactive Waste Management, you say a year or two after the act was passed, so we're talking somewhere in the 1983-1984 time frame?
A. That's correct.
Q. What was your first position at the Office of



Radioactive Waste Management?
A. I don't remember the title of my first position. It was probably program analyst or something like that, but I'm not exactly sure.
Q. What did that position entail? What were your responsibilities in that position?
A. First major assignment I could remember was coordinating the preparation of the mission plan for the Civilian Radioactive Waste Management Program.
Q. Was there anything else that your role entailed in that position?
MR. SHULTIS: Objection, vague.
THE WITNESS: That preparation of the mission plan was pretty much a full-time activity for a number of years. So there might have been other minor assignments I was given, but, you know, overall it was primarily the mission plan.
BY MR. EIDUKAS:
Q. Okay. Did there come a time when your position at the Office of Civilian Radioactive Waste Management changed from program analyst working on the mission plan?

MR. SHULTIS: Objection, vague.

THE WITNESS: I had a number of different assignments in the Office of Civilian Radioactive Waste Management over the nearly 20 years that I've worked in that program.

BY MR. EIDUKAS:

Q. I guess what I'm trying to get at is I'd like to have just a brief chronology of the different positions you've been in with dates, if possible.

So you started out as a program analyst in the Office of Civilian Radioactive Waste Management in the approximately 1983-1984 time frame. What I'd like you to do is going forward to the present with dates, if possible, just state the various positions you've held in the OCRWM.

A. Okay. Around the 1984-'85 time frame, as I said, I believe I was a program analyst. I think in 1985 or '86 I became the senior technical adviser and technical assistant to the Director of Office of Civilian Radioactive Waste Management. I don't remember the exact time frame, but when Admiral Watkins became Secretary of Energy, I was detailed to his



office for I think little over half a year as an adviser to the Secretary.

I then came back into the Office of Civilian Radioactive Waste Management I think in 1990 or 1991, and I was the Acting Director of what was called the M&O Management Division with responsibility to bring on board the M&O contractor for the program. I think that was 1991. About the a year or two after that, I became the Director of the Storage Division. The primary responsibility was to work on a proposed monitored retrievable storage facility.

A few years after that, I became the Director of the Program Management Division. And let's see. About four years ago I transferred out to Las Vegas to the Yucca Mountain site characterization office, and I'm currently the Director of the Office of Project Control.

Q. Did you have any involvement in the drafting of the Nuclear Waste Policy Act?

MR. SHULTIS: Objection, asks for legal conclusion.

BY MR. EIDUKAS:



Q. My question was whether or not you had any involvement in actually writing or preparing the text of the Act.

A. Not that I could remember.

Q. At the time that the Act was being -- and when I say the Act, I'm referring to the Nuclear Waste Policy Act of 1982. At the time that Act was being drafted, did you have discussions with people who were involved in drafting that Act?

MR. SHULTIS: Objection, vague.

THE WITNESS: I don't believe so. I obviously talked to people in the department, you know, who were talking to people, you know, involved in nuclear energy activities, but I don't know that I've ever had any conversations with anyone that was actually involved in drafting the Nuclear Waste Policy Act.

BY MR. EIDUKAS:

Q. Okay. Do you have an understanding as to what the intent of the Nuclear Waste Policy Act is?

MR. SHULTIS: Objection, asks for legal conclusion.



THE WITNESS: I'm not sure what you mean by intent of the Nuclear Waste Policy Act. Obviously I was familiar with some of the provisions and some of the requirements. As I said, my main job when I was in the Office of Civilian Radioactive Waste Management was to prepare the mission plan. That was clearly required by the Nuclear Waste Policy Act.

BY MR. EIDUKAS:

Q. I'll try to clarify what I mean. Do you have an understanding of what the primary purpose of the Nuclear Waste Policy Act is?

MR. SHULTIS: Objection, asks for legal conclusion.

THE WITNESS: My understanding of the Nuclear Waste Policy Act is that it laid out a blueprint for this country to follow to provide for the management and disposal of spent nuclear fuel and high level radioactive waste with a number of specific provisions.

BY MR. EIDUKAS:

Q. Are you familiar with the term standard contract?

# Defendant

# Victor W. Trebules, Jr.

Page 1

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
-----------------------------------------X
YANKEE ATOMIC ELECTRIC COMPANY :
(98-126C)(Merow, S.J.) :
CONNECTICUT YANKEE ATOMIC POWER COMPANY :
(98-154C)(Merow, S.J.) :
MAINE YANKEE ATOMIC POWER COMPANY :
(98-474C)(Merow, S.J.) :
FLORIDA POWER & LIGHT COMPANY :
(98-483C)(Wilson, J.) :
NORTHERN STATES POWER COMPANY :
(98-484C)(Wiese, J.) :
DUKE POWER, a Division of DUKE ENERGY CORP.:
(98-485C)(Sypolt, J.) :
INDIANA MICHIGAN POWER COMPANY :
(98-486C)(Hodges, J.) :
SACRAMENTO MUNICIPAL UTILITY DISTRICT :
(98-488C)(Yock, S.J.) :
SOUTHERN NUCLEAR OPERATING COMPANY, et al. :
(98-614C)(Merow, S.J.) :
COMMONWEALTH EDISON COMPANY :
(98-621C)(Hewitt, J.) :
BOSTON EDISON COMPANY :
(99-447C) (Allegra, J.) :
GPU NUCLEAR, INCORPORATED :
(00-440C)(Bush, J.) :
WISCONSIN ELECTRIC POWER COMPANY :
(00-697C)(Merow, S.J.) :
POWER AUTHORITY OF THE STATE OF NEW YORK :VOLUME
(00-703C)(Damich, J.) : I
OMAHA PUBLIC POWER DISTRICT :
(01-115C)(Bush, J.) :
NEBRASKA PUBLIC POWER DISTRICT :Discovery
(01-116C)(Sypolt, J.) :Judge:
TENNESSEE VALLEY AUTHORITY :(Judge
(01-249C)(Bruggink, J.) :Sypolt)
Plaintiffs, :PAGES
v. :1 - 241

Page 2

THE UNITED STATES, :
Defendant. :
-------------------------------------------X

Deposition of Victor W. Trebules, Jr.
Washington, DC
Wednesday, April 17, 2002

Reported by: Denise Dobner Vickery, RMR, CRR
JOB NO. 144458

Page 3

April 17, 2002
9:32 A.M.

Deposition of Victor W. Trebules, Jr., held at the offices of:

Jenner & Block
601 13th Street, NW
12th Floor
Washington, DC 20005

Pursuant to notice, before Denise Dobner Vickery, a Registered Merit Reporter, Notary Public of the District of Columbia.

Page 4

APPEARANCES:

Jenner & Block
For the Plaintiff COMMONWEALTH EDISON
One IBM Plaza
Chicago, IL 60611-7603
(312) 222-9350
BY: Theodore T. Eidukas, Esq.

Shaw Pittman Potts & Trowbridge
For the Plaintiffs NORTHERN STATES POWER COMPANY, et al.
1650 Tysons Boulevard
McLean, VA 22102-4859
(703) 770-7962
BY: Devon E. Hewitt, Esq.

Arnold & Porter
For the Plaintiffs SOUTHERN NUCLEAR OPERATING COMPANY, et al.
555 Twelfth Street, NW
Washington, DC 20004-1206

# Victor W. Trebules, Jr.

Page 13

Q. Mr. Trebules, if you can specify a date that you were working on the planning for the disposal of radioactive waste and spent nuclear fuel while at the Office of Nuclear Energy Programs, that would be helpful.

A. Let me try to clarify what I think you asked. I don't remember exactly when ERDA switched over to the Department of Energy. My guess, that was sometime in the 1980s. But in 1977, I joined the Office of Nuclear Energy Programs, which may have been part of ERDA or, you know, Atomic Energy Commission or ERDA or Department of Energy. It was 1977 and at that time I was involved in the planning activities for nuclear energy programs, which included breeder reactor development like the Clinch River breeder reactor, and I was responsible for preparing what was called the Fish and Energy Program Plan for the Department of Energy, which included some at that time it was called fuel cycle activities, which included handling of radioactive waste.

Q. Did that planning for the handling of nuclear radioactive waste that you just described, did that

Page 14

involve planning for the disposal of those wastes in a deep geologic repository?

MR. SHULTIS: Objection, relevance.

BY MR. EIDUKAS:

Q. Generally, when your lawyer objects --

MR. SHULTIS: You still have to answer.

BY MR. EIDUKAS:

Q. You still have to answer unless he instructs you not to, if you're able to.

A. As best as I could remember, we did in the Fish and Energy Program document talk about reactor development and waste activities, and it did include I believe reprocessing at that time. This was prior to the ban on reprocessing and ultimate disposal of radioactive waste.

Q. Did those plans that you worked on go so far as to discuss the design of a repository? Did it get that specific?

MR. SHULTIS: Objection, relevance.

THE WITNESS: As best as I could remember, I don't believe we got involved in the -- at least I didn't get involved in the design of repositories for

Page 15

the disposal of waste. My primary area of emphasis at that time was on reactor development. As I said, the Clinch River breeder reactor and, for example, Whitewater breeder reactor.

BY MR. EIDUKAS:

Q. At some point did your position at either ERDA or the Department of Energy change?

MR. SHULTIS: Objection, vague.

THE WITNESS: I had a number of activities during my career. As I mentioned, I stayed in the Office of Nuclear Energy Programs for a while and then soon after the passage of the Nuclear Waste Policy Act, about a year or two after the act was passed, then I joined the Office of Civilian Radioactive Waste Management.

BY MR. EIDUKAS:

Q. When you joined the Office of Civilian Radioactive Waste Management, you say a year or two after the act was passed, so we're talking somewhere in the 1983-1984 time frame?

A. That's correct.

Q. What was your first position at the Office of

Page 16

Radioactive Waste Management?

A. I don't remember the title of my first position. It was probably program analyst or something like that, but I'm not exactly sure.

Q. What did that position entail? What were your responsibilities in that position?

A. First major assignment I could remember was coordinating the preparation of the mission plan for the Civilian Radioactive Waste Management Program.

Q. Was there anything else that your role entailed in that position?

MR. SHULTIS: Objection, vague.

THE WITNESS: That preparation of the mission plan was pretty much a full-time activity for a number of years. So there might have been other minor assignments I was given, but, you know, overall it was primarily the mission plan.

BY MR. EIDUKAS:

Q. Okay. Did there come a time when your position at the Office of Civilian Radioactive Waste Management changed from program analyst working on the mission plan?

# Defendant

just re-ask the question. Do you know whether it is the Department of Energy's position that it entered into contracts with utilities to begin accepting waste in 1998 on the basis that it would have a repository available for permanent waste disposal in 1998?

MR. SHULTIS: Same objections.

THE WITNESS: As I understand your question, the Department of Energy did enter into contracts and the date I believe you indicated was correct, 1983, on the basis that it planned to have a repository or it was planning to have a repository in operation by 1998.

BY MR. EIDUKAS:

Q. I'm done with that document. If you want to put that aside. You just want to turn it over. That way.

MR. SHULTIS: Keep in order.

BY MR. EIDUKAS:

Q. Keep in order if you have to refer back to something in the future.

Do you know what the parties to the standard contract intended with respect to how fast spent



nuclear fuel would be taken by the Department of Energy?

MR. SHULTIS: Objection. It asks for a legal conclusion, vague, asks for speculation.

THE WITNESS: Yeah. I do not know what the parties had intended in terms of the rate of waste acceptance. If you're referring to the utilities, I do not know that.

BY MR. EIDUKAS:

Q. Okay. Do you know what the DOE intended with respect to the rate of waste acceptance?

MR. SHULTIS: Objection, asks for a legal conclusion, speculative.

THE WITNESS: I would have to answer that as follows. I know what the plans were that the Department of Energy was working on to develop the facilities because I was primarily responsible for developing those plans. We had planned or our objective was to try to have the facilities, primarily the repository, online in operation by 1998. But, again, those were plans.

BY MR. EIDUKAS:



Q. And I'm sorry, were you done with your answer?

A. Yes.

Q. Okay. When you're referring to working on those plans in that answer, what time frame are you talking about?

A. The early schedules that we prepared indicated that we had hoped to have the repository in operation by 1998, but we clearly I guess the word would be identified caveats or issues or uncertainties associated with that because we, again, as I had indicated before, we recognized the schedules were optimistic and success oriented was the phrase we used to describe them. And we had also identified, as I think I indicated before, schedules for the MRS facility, if that were to eventually be authorized by Congress, that showed that that could go into operation at least by 1998, perhaps a year or two earlier.

Q. Okay. I think -- well, I think I may have misphrased my question. What I was trying to get at was: What was the time frame that you were working on the plans you had referred to? Are you referring to the mission plan, or is this something earlier than



that?

A. It was the mission plan again. We worked on that in 1984, and I think we published it after a round of public review and comment. I think we published it in June of 1985.

Q. Okay. And I think you said that you personally at least were primarily involved in the planning for the designing of the facility. Did I understand you correctly?

A. No, not the design. I was responsible for developing the overall plan, which included design, included some of the siting issues, some of the permitting issues, some of the institutional issues that we had to deal with, as well as the bulk of the activity at that time, though, was the scientific programs that we had to conduct.

Q. Okay. Do you have knowledge as to he what rate of acceptance of spent fuel the repository was designed to operate at this time?

MR. SHULTIS: Objection, asks for legal conclusion.

THE WITNESS: Again, going back to the

# Victor W. Trebules, Jr.

Page 45

mission plan of some 17 years ago, we had put in the mission plan what were called waste acceptance schedules, which were again planning targets of what we thought the system could do if it were developed, you know, in total as we had laid it out. Starting in 1998 with one repository operating. We had laid out what we thought were practical waste acceptance rates.

What I mean by that is it allowed for a ramp-up. I think the number that we started with was for the first repository, for example, 400 metric tons and then it increased. I don't remember the other numbers, but it increased 400 to 600 up to a rate of about 3,000 metric tons per year for a single repository, but at that time we also had authorization to pursue a second repository. That was a provision in the Nuclear Waste Policy Act that we laid out waste acceptance schedules for that two-repository system.

BY MR. EIDUKAS:

Q. Do you have any knowledge about whether there were waste acceptance schedules prepared or proposed prior to the mission plan?

MR. SHULTIS: Objection, asks for

Page 46

speculation.

THE WITNESS: No, I have no knowledge of any waste acceptance schedules proposed prior to the mission plan.

BY MR. EIDUKAS:

Q. Just so I'm clear on the scope of your knowledge or your involvement, is it correct to say that your first involvement or encounter with waste acceptance schedules was when you began working on the mission plan in about 1984?

MR. SHULTIS: Objection, mischaracterizes witness's testimony.

THE WITNESS: Could you repeat the question, please.

BY MR. EIDUKAS:

Q. Sure. I'll rephrase it. I'm trying to make sure I understand whether or not your first involvement with waste acceptance schedules in connection with the Nuclear Waste Policy Act and the standard contract was when you began working on the mission plan in, I believe you said, 1984?

A. I don't remember the exact date, but I think I

Page 47

joined the Civilian Radioactive Waste Management Program in 1984. And my first assignment was working on the mission plan and in that mission plan we did include proposed waste acceptance schedules.

Q. But you personally didn't work on waste acceptance schedules prior to that time? This is what I'm asking.

A. I do not remember working on any waste acceptance schedules prior to that time.

Q. When you joined the Office of Civilian Radioactive Waste Management and you said you were assigned to work on the mission plan, at that time had there already -- had work already been done on preparing the mission plan?

MR. SHULTIS: Objection, asks for speculation.

BY MR. EIDUKAS:

Q. If you know.

A. I honestly don't remember. I know it was a provision of the Nuclear Waste Policy Act, which I believe was passed by the Congress in December of '82, signed by the President in January '83. As I said, I

Page 48

joined the program in '84. I don't remember if people had worked on that before I did, but I know that when I joined the program, that was the first assignment I was given.

MR. EIDUKAS: I'm going to go ahead and mark this as Number 3 and for the record I'm having marked Bates MS 069588 --

MR. STOUCK: 528?

MR. EIDUKAS: I'm sorry.

MR. STOUCK: I didn't hear.

MR. EIDUKAS: I'm sorry. I'll repeat. It's actually three pages. The first page is Bates number SH 069588D and then it skips some Bates numbers and then you have SH 069599 through 600. It's a document entitled "Proceedings of the 1983 Civilian Radioactive Waste Management Information Meeting," December 12th through 15th, 1983 in Washington, DC and the date of the actual document is February 1984.

(Thereupon, the reporter marked for identification Deposition Exhibit No. 3.)

BY MR. EIDUKAS:

Q. Mr. Trebules, as you can see, this is three