# Defendant

pages from what appears to be a larger document. But if you can just take a moment to take a look at these and let me know if you're familiar with this.

A. (Pause). I note that from the two pages you gave me, it's only page 11 and 12. So I assume it was from a larger document.

Q. That's correct.

A. That's not included here.

Q. That's correct.

A. All right. I've looked over these two pages.

Q. Okay. Do you recall, have you seen these pages before?

A. I don't ever remember seeing these two pages.

Q. Okay. These refer to -- purport to refer to apparently a meeting or a conference that was held in mid-December 1983, during which Robert Morgan at the time appears to have been the Acting Director of Civilian Radioactive Waste Management gave this presentation or talk about the mission plan.

A. Right.

Q. Were you present for such a conference or meeting, whatever you want to call it?



A. I don't remember being at this meeting. I'm not even sure that I was working in the program at this time.

Q. Right.

A. This was in 1983.

Q. At the top of the middle page, page 11, on the right-hand side, the first full paragraph there says: "We have just received a preliminary draft of Volume I of the mission plan and we hope to have this available to interested parties, the states and others by Christmas."

Does that refresh your recollection as to whether or not work had been performed in preparing a mission plan prior to your arrival at the Office of Civilian Radioactive Waste Management?

A. I honestly don't remember that. I could only speculate that when he said we have just received a preliminary draft, it might have been a draft prepared by the support service contractor at the time, but I honestly don't remember that.

Q. Okay. I want to move down to that same column. It's the largest paragraph there on the



right-hand side.

A. Uh-huh.

Q. The paragraph starts out "I would like to talk a little bit about." You see that?

A. Yes.

Q. What I want to refer you to is about midway through that paragraph. There's a sentence that starts, "The basic strategy which we've outlined."

A. Yes.

Q. Okay. I just refer from there on to the end of the paragraph that says: "The basic strategy which we've outlined in the mission plan is that beginning in 1998, utilities will not have to provide any additional storage facilities on-site. During the first year of operation of the repository in 1998, we should be receiving fuel at a rate so that no utility would have to add any further storage facilities either on-site or at any -- I'm sorry -- or at another location." You see where it says that there?

A. Yes, I see that.

Q. Okay. Do you know whether that was -- or strike that.



Do you know was that the intent of the DOE at the time?

MR. SHULTIS: Objection, asks for legal conclusion. Mr. Trebules is not a 30(b)(6) witness, asks for speculation.

THE WITNESS: Again, as I understand your question, did I understand that to be the intent of DOE at the time. I don't believe I worked in the program at that time.

BY MR. EIDUKAS:

Q. When you worked in the program, do you know whether or not it was the intent of DOE to receive fuel at a rate beginning in 1998 that no utility would have to add any further storage facilities?

MR. SHULTIS: Same objections and relevance.

THE WITNESS: When I started working in the program on the mission plan, I remember that we discussed the objective of reaching waste acceptance rates that would preclude the utilities from having to provide additional on-site storage. That was our objective or planning target.

Page 53

I believe what happened early on was that when we sent the draft mission plan out for public review and comment, we got a number of comments that said our schedules were too optimistic and we, I believe, revised those schedules in the actual document that went out in June of 1985 to the point where it didn't quite meet the intent of the words described here.

We started out as best as I could remember with a number like 400 metric tons in 1998, and we incorporated a ramp-up period that after four or five years or so we would eventually get up to about 3,000 metric tons a year, which we believed was the accepted spent fuel generation rate of the nuclear power plants at that time.

And it was over that ramp-up period that we hoped to get to the point where we would preclude the utilities from having to provide additional on-site storage. And then when the second repository came into operation, then we could, when that one reached full capacity, be able to reduce the backlog.

So, again, I'm speculating that when this

Page 54

was written that was the intent, but that was changed after we got comments on those early draft versions of the mission plan. We adjusted those waste acceptance schedules a bit.

BY MR. EIDUKAS:

Q. Okay. Do you know whether or not it was the intent of the parties to the standard contract when they entered those contracts back in 1983 that fuel would be received at the repository at a rate that no utility would have to add any further storage facilities either on-site or at another location?

MR. SHULTIS: Objection, asks for a legal conclusion, calls for speculation.

THE WITNESS: As I think I heard your question, did I know the intent of the parties to the contract. Again, if you're referring to the utilities, I do not.

BY MR. EIDUKAS:

Q. Okay. Do you know whether or not the DOE had an intent -- had this intent when they entered into the standard contracts with the utilities?

MR. SHULTIS: Objection, asks for a legal

Page 55

conclusion. Mr. Trebules is not a 30(b)(6) witness. Calls for speculation.

THE WITNESS: Could you help me? Could you clarify what you mean by the word intent?

BY MR. EIDUKAS:

Q. Sure.

A. Because I know we had planning targets or objectives or goals that we were trying to meet, but I know there was concern about the characterization of those and we put in, as I said before, caveats as this document indicates, you know, that represented some of the difficulties. And as I say on page 11 where it says, at the end of the second full paragraph. "Our intent is to fully comply with the act in process and in technical mandates. However, if we must slip a date in the schedule to accomplish the requirements and intent of consultation, we will do so." Again, can you clarify your question by what you mean by intent?

Q. Sure. I mean, I think we're talking about DOE here because you said you don't know what the utilities intended. What I mean by intent is what the DOE expected to do when -- and I was talking and my

Page 56

question was referring to the time that the standard contracts were entered into back in 1983. You may not know the answer to that, but that was my question.

MR. SHULTIS: Same objections as before. Legal conclusion, 30(b)(6) witness, calls for speculation.

THE WITNESS: Again, I would have to characterize my answer by saying that our planning targets or our objectives or our strategies were such that, you know, we tried to have the facilities in operation to take the field by 1998. You know, with the caveats that I previously indicated. If that's what you mean by intent, that's how I would answer that question.

BY MR. EIDUKAS:

Q. Look quickly at the section of this paragraph right above where we've been looking. Starting with the sentence "I think most of you know." Do you see where I'm referring to? It's the second sentence of that paragraph. "I think most of you know."

A. I see that.

Q. Okay. Great. "I think most of you know that

# Defendant

# Victor W. Trebules, Jr.

Page 73

remember. His name was Tom Longo, who wrote a lot of the geology and hydrology sections of the mission plan, and then we had a support service contractor and I think at that time their name was Weston.

BY MR. EIDUKAS:

Q. And do you recall what Weston worked on for the mission plan?

A. Well, they were, again, support service contractors under DOE direction. They were drafting up various sections of the plan, you know, for DOE review. DOE had final approval and authority over the content of the mission plan, and I was responsible for a lot of the individual sections myself.

Q. I'm sorry. When you say responsible, do you mean to review what Weston had drafted?

A. Yes.

Q. Who else was responsible for reviewing sections of the mission plan drafted by the contractor?

A. Well, it was always DOE individuals within the organization that had to review and give final approval of anything that went out as part of the mission plan. Again, I don't remember the names of many of the

Page 74

people, other than perhaps Tom Longo or Charlie Head or Bob Rosselli that were involved in the review.

And I believe during the time we issued the draft to when we issued the final in June, we actually went through an organizational change. And I think when the June '85 version was issued, I actually ended up working in a different group and that was probably called the office of -- Office of Policy and Institutional something or other, and people there that were involved were people like Tom Isaacs, Roger Gale and Ben Easterling.

Q. Do you recall what their involvement was?

A. Ben Easterling was my immediate supervisor at that time in June of '85 I believe and Tom Isaacs was the director of that office, and I think Roger Gale was the deputy.

Q. I'm going to go back to -- so when you first started, you said your first supervisor was Charlie Head and then when this reorganization occurred, it became Ben Easterling.

Was there anyone in between those two people to whom you reported to?

Page 75

A. Not that I can remember.

Q. Did you have final say over approving the sections of the mission plan that you were responsible for, or did you have to take that to your supervisor for them to have your decision approved?

MR. SHULTIS: Objection, compound.

THE WITNESS: Yeah. Did I have final say. I would say no. I had to get approval of several layers of my management at the time, starting with Ben Easterling, Roger Gale, Tom Isaacs, and ultimately the director of the program had to approve release of the document.

BY MR. EIDUKAS:

Q. So Ben Easterling -- after this reorganization occurred, is that when Ben Easterling became your supervisor?

A. I don't remember the exact time, but I think when we issued the document in June of '85, he was my immediate supervisor.

Q. Okay. And to whom did he report?

A. To Roger Gale and Tom Isaacs.

Q. Did Mr. Gale report to Mr. Isaacs or vice

Page 76

versa, or were they kind of at the same level of management?

A. I'm trying to recollect. I believe Roger Gale was the Deputy of the Office of Policy and Institutional, whatever it was called, and Tom Isaacs was the director. So, in a sense I believe Roger Gale reported to Tom Isaacs.

Q. Okay. And then did Tom Isaacs report to the director of the program?

A. Yes, I believe so, and I think that was Ben Rusche at the time.

Q. You had said I think that you had drafted some of the sections of the mission plan. Is that correct or am I --.

A. Yes, I wrote or drafted some of the sections of the mission plan.

Q. Could you just briefly list or describe which of the sections you were responsible for drafting?

A. The one in particular was I think what was called Chapter 1, which was an introduction, which I remember clearly we discussed the kinds of radioactive waste that we intended to deal with, and we put in a

Page 77

picture of a person standing next to a fuel assembly before it got inserted into a reactor. I essentially wrote that first chapter.

I was heavily involved in the second chapter, which was sort of the strategy, which we talked about before, laid out the authorized system and the improved performance system. Although I remember Tom Isaacs provided a lot of the direction as to how that chapter should be structured and what it should say.

I compiled the table of assumptions that went into that second chapter. Sort of give people an understanding of the magnitude of the issue that we were dealing with. It talked about the quantities of spent fuel, the modes of transportation, the number of repositories, you know, some of the parameters. The waste acceptance schedule, that was also included in Chapter 2.

And then I wrote a lot of the response to comments in the comment response document that we prepared, and again all these had to be reviewed by my management, and ultimately the director of the program before it got published.

Page 78

MR. EIDUKAS: Mark this as 4.

(Thereupon, the reporter marked for identification Deposition Exhibit No. 4.)

BY MR. EIDUKAS:

Q. Mr. Trebules, I have marked as Exhibit 4 -- this version doesn't have Bates stamps on it. This is a December 20, 1983 marked as "Draft, Civilian Radioactive Waste Management Program Mission Plan, Volume 1, Overview and Current Program Plans." This appears to be a December 20, 1983 draft of the mission plan. Are you familiar with this document?

A. Could I have a few minutes to look at it?

Q. Sure, sure.

A. (Pause).

MR. SHULTIS: Ted, ours has Bates numbers.

MR. EIDUKAS: Let me read it into the record. For the record, the Bates stamp of the exhibit is CTR-042-1065 through 1190. Thank you.

(Counsel and witness conferring).

MR. EIDUKAS: There's a question pending. If you want to ask questions of the witness, you can ask them on the record, but I prefer you don't have

Page 79

these consultations while there's a question pending.

MR. SHULTIS: What is the question pending?

MR. EIDUKAS: Are you familiar with this document, and you'll have a turn to ask questions of the witness when I'm done.

THE WITNESS: I'm ready to answer.

BY MR. EIDUKAS:

Q. Sure. I believe the question ~~was:~~ Are you familiar with this document?

A. To be honest with you, I don't remember specifically seeing this document before. I believe this was probably prepared before I joined the Civilian Radioactive Waste Management Program. However, I'm very familiar with some of the material in here and the reasons why we changed it in the eventual mission plan that got published in June of 1985.

Q. Okay. Would you describe what was changed --

MR. SHULTIS: Objection, vague.

BY MR. EIDUKAS:

Q. -- that you're referring to in your earlier answer.

Page 80

A. Just very briefly, in looking at Chapter 1, for example, just skimming through it, this only has, for example, two pages and I believe in the version that I was responsible for, the one that got issued in June of '85, we had a much more extensive discussion in Chapter 1 on, as I indicated before, the types of wastes. We had a picture of the fuel assembly, you know, as to what it looks like, you know, before going into a reactor. We talked about other kinds of waste that we might have to deal with. The high level waste that came from the DOE operations.

Chapter 2, for example, looks like an early, early version of the strategy, which I think bears no resemblance to the one that ultimately got published in June of '85 where we talked about the authorized system and the improved performance system. This does have an early version of a waste acceptance schedule, but it's got numbers that were changed significantly from the one that got published in June of '85.

So, again, I mean, it's obviously an early version of the mission plan. I can't say for certain whether this is the one that was issued for public

# Defendant

BY MR. EIDUKAS:

Q. And what I mean by how was it prepared, I don't mean how was it typed. I mean, how were these numbers decided upon? How was this schedule developed?

MR. SHULTIS: Objection, vague. Asks for a legal conclusion.

THE WITNESS: As best as I could remember, we had two overriding goals or objectives that we were trying to meet. One was to begin waste acceptance in 1998. The other was to reach a rate for which the amounts of additional at-reactor storage would be minimal or zero.

As Table II-1 in Exhibit 5 shows, in the second column, the annual spent fuel generation rate, these were numbers that we got from the Department of Energy's Energy Information Administration. Based on their analysis of the nuclear power plants in operation and the expected amount of spent fuel that they'd be generating, and as you can see in this table, the numbers start at in 1998 at 2,700 metric tons. They go up a little bit. They approach 3,000 metric tons.



So, for the first 10 years of operation, our target was sort of to reach an acceptance rate of about 3,000 metric tons, which would more than the generation rate from all the nuclear plants.

We did recognize, though, at that time we still had a backlog, which is shown in column 4, you know, of over 40,000 metric tons that already was in storage. So, again, our two objectives or goals were to try to begin, as you know, as soon as possible, you know, 1998 or as soon as possible thereafter. And as we indicated before, those were what we characterize as optimistic schedules and reach an acceptance rate of 3,000 metric tons, which would preclude the utilities from having to provide any additional on-site storage.

Then when we got a second repository in operation, again, this is shown in Table 2.1 in column 6, a second repository would come into operation about a half a dozen years after the first, and we expected that to ramp-up faster because we would have experience from operating the first repository. And when those two repositories were then operating in tandem, at that point then we'd be able to start reducing the backlog,



which is indicated in the column on the far right.

You know, eventually to the point where we'd between the two repositories accommodate all the expected spent fuel, which at that time was still judged to be 140,000 metric tons.

BY MR. EIDUKAS:

Q. Okay. So, just looking at the -- let's take the first repository acceptance rate that starts at 400 and ramps up to 3,000 and then stays at 3,000 until it looks like 2025 or 2026 where it goes to has 100 and then stops.

I guess, how were those numbers actually -- how did you actually come up with those numbers? Was there a source or a basis for the actual numbers you have here in this for that schedule?

MR. SHULTIS: Objection, vague.

BY MR. EIDUKAS:

Q. I mean, do you understand what I'm asking? I mean, in other words, is this representing a physical limitation that was projected or recognized? Were these numbers picked out and then the idea was to design repository around them? I guess what I'm



trying to get at what, I guess, first the source for these numbers?

A. Okay.

MR. SHULTIS: Objection, compound.

THE WITNESS: It's a compound answer. It's somewhat complicated, but again my recollection is that going back to the Nuclear Waste Policy Act, which indicated that the country planned on developing two repositories, and there were various reasons for that, but the plan was to develop two repositories. And based on the projections at the time, again, the source that I'm familiar with is the Department of Energy's Energy Information Administration, which projected we'd have a total of about 140,000 metric tons of spent nuclear fuel to accommodate or dispose of.

There was a provision in the law that said the first repository could not emplace more than 70,000 metric tons until the second repository goes into operation, and I think there were various reasons for that. But that was sort of a guideline that we used that said the first repository should be designed, if the geology permits, to accommodate 70,000 metric tons

and then the other 70,000 metric tons would go in a second repository.

It was that in combination with what I indicated earlier that the objective was to get an acceptance rate of about 3,000 metric tons, which at that time was the anticipated annual spent fuel generation rate from the nuclear power plants in operation. So if you just do the math, you have a capacity for repository of 70,000 metric tons divided by 3,000 metric tons per year. That would indicate that that repository would operate for about 25 years as this table shows.

And then the second repository would be in operation. Again, a capacity of about 70,000 metric tons, at about 3,000 metric tons per year. That one would operate for about 25 years, and the sum of those two would accommodate all the anticipated spent fuel to be generated by the nuclear power plants in operation at that time.

BY MR. EIDUKAS:

Q. Okay. Referring to -- I think other witnesses have called it the steady state rate or the



maximum rate. The 3,000 that's carried out for the most of the years on this schedule for the repository. Does that represent a limitation on how fast the repository was designed to accept waste?

MR. SHULTIS: Objection, calls for legal conclusion.

THE WITNESS: I'm not quite sure how to answer your question. You said does it. You could design the repository to operate in a number of different ways, and if money or schedule or no object, you could increase its capacity. Although you complicate the operations.

I believe we again established various goals or objectives and operating parameters which we thought were reasonable based on the experience to date because you also had to consider, for example, the transportation requirements to service these repositories. And in 3,000 metric tons per year, that equates to a large number of truck shipments or, you know, somewhat lesser number of train shipments. And, again, you're looking for the reasonable accommodation of all these interrelated factors.



But I think my earlier answer is still pertinent that the overriding objectives were, again, to develop two repositories. The first with the capacity suggested by the Nuclear Policy Act of 70,000 metric tons with an acceptance rate that would accommodate the expected spent fuel generation rate from nuclear power plants in operation. So when you balance all those design factors, you know, for the engineering solution, you get something I think that was represented at the time by the parameters in this Table 2.1 in Exhibit 5.

Let me point out, though, that this is not our current approach because there have been subsequent actions by Congress which essentially have postponed any work on the second repository. So we knew at the time when we published the mission plan back in the '84-'85 time frame that there were a lot of things beyond our control and, again, this was just a plan. These were just objectives we were trying to meet, and we knew we'd have to accommodate a lot of, you know, prohibitions and hiccups as we began to execute the program.



BY MR. EIDUKAS:

Q. Okay. You had set forth the two objectives and the second was that you wanted the rate to reach -- to basically reach -- you wanted to basically reach a rate that would equal the waste generation rate. So that the need for additional reactor storage would be either minimal or zero.

My question is: What was the source of that objective? Why was that an objective you had?

A. Okay. Could you give me a minute --

Q. Sure.

A. -- to review some of these previous documents. Because I think there were words in one of those that I remember being presented to me when I joined the program. Let me just... Is it Bob Morgan?

Q. It's Number 3.

A. Yes. Let me quote from Exhibit 3, page 11, column 2, the large paragraph in that column about halfway through the paragraph. There's a sentence that begins "The basic strategy which we've outlined in the mission plan is that beginning in 1998, utilities will not have to provide any additional storage

# Defendant

# Victor W. Trebules, Jr.

Page 113

any discussion. To my recollection, at that time I'm sure the answer was yes, but I don't remember any of the details of the discussions. I mean, again, I was fairly new to the program back in 1984. My primary involvement was on developing the numbers that went in the waste acceptance schedule that seemed to make sense, you know, from an operational standpoint.

Again, meeting the two criteria talked about before. You know, beginning in 1998 trying to get up to an acceptance rate that would preclude the utilities from having to add additional on-site storage. In looking at the combination of the two repositories, that would eventually reduce the backlog and accommodate all the waste. I'm sure there were discussions, but if there were discussions, I don't remember the details of them, you know, at this time.

BY MR. EIDUKAS:

Q. And when you were working, to the extent you were working on developing these waste acceptance schedules, did you view yourself as trying to meet a requirement that waste be taken as expeditiously as practicable as set forth as an obligation in the

Page 114

contract? Did you have that in your mind when you were developing these schedules?

MR. SHULTIS: Objection, asks for a legal conclusion. Asks for speculation.

THE WITNESS: I'm trying to remember, you know, again, what was in my mind back at that time. I honestly don't remember if we in the planning group, you know, looked upon that as a, as you say, as a requirement. We're trying to establish what we thought were possible schedules, you know, based on assumptions, strategies, objectives that we thought we could meet. Again, they were -- we were concerned about those becoming fixed dates. We were concerned about that. We put caveats in there.

Some of this documentation shows, you know, we said the schedules may change, you know, as other developments occur. I remember fairly clearly the concern of some people -- and I'd have a hard time remembering exactly who the people were, but the answer that I came up with to address that was incorporating key words in our explanation of the waste acceptance schedules as illustrative. You know, they were

Page 115

examples. They were ways the system could be operated.

You know, we put in words like that to sort of caveat, you know, being overly committal on what we thought we could do. And as you saw the words in some of these other documents, it said that the schedules may change, you know, and if they change, you know, we will have to change.

So, back to your original question, did I consider it as a requirement we were trying to meet? I don't believe so. It was a planning objective more than anything, and I think -- even as this cover letter that transmitted Exhibit 5 and I think I was involved in writing this. The one that starts off "Dear Recipient."

BY MR. EIDUKAS:

Q. Okay. I see that.

A. Signed by Mike Lawrence.

Q. Yes.

A. It states right in the first paragraph that: "The purpose of this report is to provide an informational basis sufficient to permit informed

Page 116

decisions to be made in carrying out the repository program and the research development demonstration programs required under the Act." Again, it was an informational basis sufficient for decision making. So we didn't want to, you know, overly commit or prescribe to anything.

You know, we knew there were a lot of issues that we would deal with. And, in fact, I think as we discussed before, if you compare Exhibit 4 to Exhibit 5, there were significant changes just from that early draft to this May 1984 draft. I mean, we were making changes, you know, in response to comments, you know, and the development of the planning activities at that time.

Q. Okay. In referring to that letter, when you talked about the document being provided as an informational basis that would allow use of people to rely or make decisions upon it, who are you referring to as making those decisions?

A. It would have primarily been the decision-makers in the Department of Energy, you know, who are charged by Congress with responsibility for

# Defendant

# Victor W. Trebules, Jr.

Page 121

of those objects being that it would ramp up to equal, at least equal the waste generation rate. So that it would either eliminate or, you know, reduce to either minimal or zero the need for utilities to build additional on-site storage after 1998?

MR. SHULTIS: Objection, calls for legal conclusion.

THE WITNESS: Again, as best as I can remember, we had two overriding objectives. One was to begin acceptance in 1998 and the other one was to ramp up, you know, as fast as realistically possible, you know, with all the engineering constraints to preclude the need for utilities to add additional on-site storage. But we did anticipate that the schedules would change and, in fact, in Exhibit 5 on page 2-1, just quickly looking at the section that's entitled "(A) Waste Acceptance Schedule."

BY MR. EIDUKAS:

Q. Yes.

A. The second paragraph begins by saying that: "This waste acceptance schedule will eventually be further developed to show not only the aggregate

Page 122

acceptance schedule, but also an acceptance program ranking by utility and fuel element." So we anticipated that these waste acceptance schedules would continue to evolve, you know, would change based on, you know, new or updated information.

The next sentence goes on to read: "The schedule will serve as a planning base, which will be updated annually, with responsible latest projections." So, again, we anticipated that they would be updated.

Q. To stop you there, that sentence that you referred to is that "The schedule will serve as a planning basis, which will be updated annually in response to the latest projections of nuclear power growth." Is that connected to the objective you stated that the schedule was intended to ramp up and then to meet the generation rate?

MR. SHULTIS: Objection, looking for a legal conclusion.

THE WITNESS: My recollection is that the main reason we said "The schedule will serve as a planning basis, which will be updated annually in response to the latest projections," the projections

Page 123

that we were monitoring closely were the EIA projections, the Energy Information Administration projections. And I believe at the time the Nuclear Waste Policy Act was passed, those projections indicated there were would be 140,000 metric tons of spent fuel generated. And if I can look back quickly to Exhibit 4 here.

BY MR. EIDUKAS:

Q. Sure.

A. Again, when the Act was passed in the end of 1982, the number was 140,000 metric tons, which divided by two was the basis for the 70,000 metric ton limit. By the time this draft of the mission plan was published in December of '83, those projections had already fallen to 133,000 metric tons, and one of the factors obviously was Three Mile Island in 1977 I think. You know, that the number of power plants under construction was dropping. Some were being canceled.

And let me just look here. Well, this one still says 133,000 metric tons. But, you know, we thought that the total amount of spent fuel to be generated might continue to decrease. You know, so we

Page 124

wanted to make sure we could accommodate that.

Q. Okay. To your knowledge, was the objective of having a rate that would meet the generation rate, did that objective ever change over time?

MR. SHULTIS: Objection, asks for a legal conclusion.

THE WITNESS: I think we tried to maintain that as an objective and that sort of became institutionalized with this 3,000 metric tons per year, you know, acceptance capability for one repository, and again when the second one would come online with an additional 3,000 metric tons, then we'd be able to reduce the backlog. That remained a planning objective or assumption for a number of years but got seriously set back when Congress I believe in 1987 pretty much put the second repository program on hold. So, at that time we sort of had to regroup and figure out what we were going to do.

BY MR. EIDUKAS:

Q. Looking again at the schedule in Exhibit 5, it provides for schedules for the first and second repository, but there's no acceptance schedule in this

# Defendant

included and doesn't include Volumes II and III of the entire mission plan.

Q. I also was going to refer there was a page-out of order. There was like a cover page for part 2 of Volume I.

A. Oh, it's the one that was in place at page 13 in the front section.

Q. Right. So the page that's Bates numbered CE 14820 is out of place. It should go later in the document and then, in addition to that, I've also represented and the witness has confirmed I believe that Chapter 11 of this volume, Volume I, is not present and Volume II and Volume III of the mission plan are also not present and part of this exhibit.

Is that an accurate statement of what --

MR. SHULTIS: That's consistent with my understanding. Mr. Trebules found the discrepancy. So...

THE WITNESS: I think that covers it.

MR. SHULTIS: Okay.

BY MR. EIDUKAS:

Q. Okay. With all of those caveats and



clarification as to what is present in Exhibit 6 for this deposition, is what is present here, those portions here, are they from the June 1985 mission plan that you worked on?

A. I believe so, yes.

Q. If you could turn to page 3. It's titled Chapter 1 Introduction and that section appears to go through page 13 that we added to this document. Is this the chapter that you testified to earlier as being the author of?

A. Yes.

Q. If you could turn to pages 6 and 7, and in particular on page 7 there's a section that starts: "The following specific program objectives have been established to implement the provisions of the Act. They evolve from the previously mentioned policy goals."

And then the third objective listed here says, "To insure the acceptance of waste for disposal by January 31, 1998 in accordance with the acceptance schedule provided for in the DOE standard disposal contracts and in conformance with the Act."



My question is: When you wrote this section, what did you mean by "the acceptance schedule provided for in the DOE standard disposal contracts"?

MR. SHULTIS: Objection, calls for a legal conclusion.

THE WITNESS: This is on page 7 with the introductory sentence that says, again, "The following specific program objectives have been established." So, again, this was an objective for the program. It was a goal or a target. And we identified the five objectives. One of our objectives was to insure the acceptance of waste. It says for disposal by January 1998. Again, this is one of our objectives.

"In accordance with the acceptance schedule provided in DOE standard disposal contract." My understanding was that the contracts that the government entered into with the utilities at some point in the future would have more detailed schedule information, and I believe that was to be provided after, you know, later. It was to come after this mission plan and when those specific schedules were developed, that's what we would -- that's what the



government would target to meet.

BY MR. EIDUKAS:

Q. The language you used here does say that "the acceptance schedule provided for in the DOE standard disposal contracts" and I would just, if you could tell me, what it is, what are you referring to in the contracts in this passage?

MR. SHULTIS: Objection, calls for legal conclusion.

THE WITNESS: Again, I was not the person that worked directly on the standard disposal contracts. My understanding was that they were to -- I'm trying to think of the terms. There were going to be documents issued later in the late 1980s or early 1990s and I think they were related to -- and these are documents I'm not familiar with -- the annual capacity report, annual priority rankings that were to be -- I think they were going to be negotiated with utilities and those would become the specific schedules that the government would try to meet in terms of accepting spent fuel.

BY MR. EIDUKAS:

# Defendant

# Victor W. Trebules, Jr.

Page 177

BY MR. EIDUKAS:

Q. Okay.

A. There's obviously a different heat load that the repository has to accommodate and the size of -- which is why we put the pictures in the document. The size of the waste forms we're dealing with are significantly different. If you look at the spent fuel picture on page 9, okay? We would design waste packages to accommodate multiple fuel assemblies, you know, from reactors. The spent fuel assemblies.

The high level waste is in the form of the picture on page 11, you know, which is a different geometry. So, I mean, to me it's obvious. There's got to be some differences in the design now that you're going to accommodate a different waste geometry, waste form, waste heat load, but I can't give you any of the specifics of what those design changes would be.

Q. Okay. But the decision was made apparently that there might be a design change, but there was not going to be a difference in what the steady state rate of accepted spent fuel range was going to be?

MR. SHULTIS: Objection, vague, assumes

Page 178

facts not in evidence.

THE WITNESS: As best as I could remember, again our objectives were to try to reach a steady state rate, you know, along the lines that we talked about to preclude for need for utilities to add storage, which, you know, was still estimated to be around 3,000 metric tons per year. And that's still supported by the spent fuel generation column on both waste acceptance schedules. There's still around 3,000 metric tons per year in the early years of repository operation.

BY MR. EIDUKAS:

Q. So, even after it was determined that you were going to start accepting the high level waste in addition to spent nuclear fuel, the objective to continue accepting at the 3,000 rate or because of the objective you've identified, you didn't decrease the 3,000 steady state rate in order to accommodate the additional need to accept high level waste. Is that a fair statement?

A. I believe that's a fair statement.

Q. Okay. Turning to the -- you're looking at

Page 179

the next. Do you need a break? We've been going for a while.

A. I'm okay.

Q. Going to the next page, waste acceptance schedule on page 27. This is for the improved performance system or plan that we've discussed today, correct?

A. Right.

Q. Okay. Did you work on developing this acceptance schedule?

A. Yes.

Q. And is this the first acceptance schedule involving an integral MRS facility that the DOE published?

A. To the best of my recollection it is.

Q. So, because we didn't see an acceptance schedule like this involving an MRS in the earlier drafts of the mission plan, right?

A. The reason I'm hesitating is I don't know if there were any presentations like that one meeting you referred to. You had the handout from that one meeting. I don't know if there were any others at the

Page 180

time where DOE might have, you know, released some preliminary numbers. This is the one first one I'm aware of.

Q. Okay.

A. I can answer it that way. This is the first one I'm aware of.

Q. So one of the additions, changes here is that there's a column for MRS acceptance, which is the third column. What's the basis or how was this rate for the MRS facility determined?

A. The best answer I could give you is that we, again, had as -- it can sound repetitive, but we again had as our objective to accept spent fuel to preclude the need for additional at-reactor storage, which again was 3,000 metric tons per year at that time. That was our projection. In 1984-'85 we were trying to anticipate what the spent field generation rate would be, you know, some 13, 14 years into the future. So, again, based on the EIA projections, it looked like it would be about 3,000 metric tons per year based on the number of nuclear power plants online. So that was our design target for the MRS. Okay.

# Victor W. Trebules, Jr.

Page 181

Q. So, before you go on, so, is it fair to say that that objective, which you've stated several times now, that objective was the basis for the design rate of the MRS you were anticipating at the time of this document?

A. That's correct. If you look at the column on page 27, column 4, MRS Acceptance, you'll see that it starts out at 2200 metric tons first year, 3,000 metric tons the second year and stays at 3,000 metric tons. Again, remember, that was our design target, our design objective. You could have probably designed a smaller MRS, you could have designed a bigger MRS, but this was our designed target.

Inventory at MRS is the next column, column 5, which increases the first couple of years but then in 1998 starts to discharge to the repository. So it continues to increase until its rate of receipt equals its rate of discharge where then it stays constant, you know, until the MRS ceases operation and then the MRS eventually unloads into the repository. Okay?

Let me caution you one thing about this Table 2.3. The first year was 2200 metric tons does not

Page 182

necessarily mean that in 1998 we would have accepted 2200 metric tons. That column is entitled, if you look over on the far left, Pre-1998 and, again, it looked like there was a chance we could get the MRS into operation in 1996. So it would be '96, '97, '98, the total of those three years that would have gotten us up to 2200 metric tons. Again, we thought we needed a ramp-up during that period before we reached a steady state rate of 3,000 metric tons.

Q. Okay. And would that ramp-up rate be similar to what would be the ramp-up rate that was proposed for the repository in the other schedule; the 400, 400, 400, 900, 1800?

A. I don't remember what the exact numbers are.

Q. Okay.

A. I mean, the only thing I could refer you to was the number in the table where it says pre-1998, you know, 2200.

Q. And as this proposed system would work, would there be -- would the MRS -- would any of the spent fuel accepted at the MRS be accepted or moved to the second repository, or was it planned that waste would

Page 183

be received directly at the second repository from the utilities?

A. I need a second because I believe we talked about that as an option, but I don't remember where. (Pause). All right. Let me refer you to page 25. The bottom paragraph, the one starts: "On the basis of the integrated system approach described in the approved performance plan, the DOE has identified many possible waste acceptance schedules."

Again, one of the caveats, this is only an illustrative schedule that we're talking about. There were many others, you know, with all the questions and uncertainties. Depending on the size and operating characteristics of the system facilities. That's MRS and the repository. One such waste acceptance schedule that illustrates -- and again illustrates was the word we coined to try to, again, sort of serve as caveat.

That illustrates the quantity of waste that we feel we could accept beginning in 1996 with the completion of the integral MRS facilities presented in Table 2-3. The schedule assumes that one MRS facility

Page 184

services the first repository. Other scenarios are possible, such as a larger MRS facility servicing part or all of both repositories or two MRS facilities serving two repositories.

Again, a lot of different ways you could design and operate the system. The schedules we presented were illustrative only for those two concepts. But we indicated that, again, there were lots of different ways to do the job.

Q. Even though that -- so, if these are illustrative schedules and as this section indicates that the DOE has in effect many possible ways to do acceptance schedules, to your knowledge, were all those schedules, though, consistent with the objective you've identified of ramping up to a steady state rate that would act to eliminate the need for additional at-reactor storage?

MR. SHULTIS: Objection, calls for speculation.

THE WITNESS: There are a couple of places in this chapter. If I had more time I could probably find better words, but let me just show you a few that

Page 185

I think get to your question. On page 24 under Section 3. Assumptions about an MRS facility.

BY MR. EIDUKAS:

Q. Okay.

A. If you look down to B, waste receipt rate. "The waste acceptance rate will be approximately 3,000 metric tons per year of spent fuel or equivalent high level waste." Again, the 3,000 was based on the EIA projection of the amount of spent fuel we thought would be generated in that time frame. So, again, that was sort of like our target. That was a design objective.

If you also look on page 28, for example. These are just some I can find relatively quickly. Down at the bottom of the page, it's got numbers 1 and 2.

Q. Yes.

A. Number 1 says, if you look at the sentence: "The rate at which an integral MRS facility would accept spent fuel is based on two major considerations. The need to relieve the utilities of on-site fuel storage pressures that could result in the disruption of orderly nuclear reactor operations after January

Page 186

1998." Again, the need to relieve utilities of on-site fuel storage pressures. Those were some of our considerations, our planning objectives. Our targets that, you know, we incorporated into the plan.

Jumping ahead, the unfortunate thing about all these references to the MRS facility is that when we proposed it to Congress, they didn't accept it.

Q. Or didn't they accept it with certain linkages that made it possible to --

A. We proposed a specific site and a design for the MRS. We proposed the Clinch River breeder reactor site down in Tennessee with a number of different design concepts. Congress said, if I remember right, we accept the concept of an MRS, but don't build it at Clinch River. You know, go find another site. And then they put linkages on it, too, like it couldn't begin until a repository goes into operation or it passes a certain licensing phase, which made it impractical. I mean, the real one is you got to have a site to build it, okay, and that's a whole other story with the nuclear waste negotiator, the volunteer siting process and all that other stuff.

Page 187

MR. EIDUKAS: Okay. Why don't we take off record.

(Recess, 3:30 to 3:43 p.m.)

BY MR. EIDUKAS:

Q. Mr. Trebules, we've looked at Chapters 1 and 2 of the section of the '85 mission plan that's contained in Exhibit 6. What other, if any, portions of what's in Exhibit 6 here did you have involvement in preparing yourself? You know, if it would be easier, if you want to look at the table of contents, if that would help.

A. Yeah, I think so. For example, at page 55, the small section on sub-seabed disposal, I was involved in probably writing or getting the information from the other office in DOE that was in charge of that activity to put it in the plan.

I think the easiest way to answer this was my job was to coordinate the preparation of the mission plan, which meant I had to write individual sections if there was no one else in the program that was the recognized expert, or I had to make sure that we had people assigned to these other areas to draft up the

Page 188

material. In most cases, I would review and comment on their input to make sure it was consistent in content and style and level of detail with other parts of the plan.

There were probably some other individual sections that I wrote, but I'd have to go through sort of page by page to try to remember which those are. But, for example, Chapter 9 and 10 of Volume II, the waste generation rates, requirements for disposal of past or repository schedules, I believe I wrote or compiled, you know, much of that information directly.

Chapter 10, cost of managing the program. I played a substantial part in that. Chapter 11, which is not even in this exhibit, I contributed to that. Probably the list of acronyms and abbreviations, which, you know, is a very important. I probably put that together. And the other two volumes that aren't in here, the responses to comments, you know, I wrote many of those sections individually. In general, that was my responsibility with this document at that time.

Q. Turning to -- you said you did some work on Chapter 9. I just want to direct your attention. We

# Defendant

# Victor W. Trebules, Jr. - vol. 2

Page 242

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
---------------------------------------------X
YANKEE ATOMIC ELECTRIC COMPANY :
(98-126C)(Merow, S.J.) :
CONNECTICUT YANKEE ATOMIC POWER COMPANY :
(98-154C)(Merow, S.J.) :
MAINE YANKEE ATOMIC POWER COMPANY :
(98-474C)(Merow, S.J.) :
FLORIDA POWER & LIGHT COMPANY :
(98-483C)(Wilson, J.) :
NORTHERN STATES POWER COMPANY :
(98-484C)(Wiese, J.) :
DUKE POWER, a Division of DUKE ENERGY CORP. :
(98-485C)(Sypolt, J.) :
INDIANA MICHIGAN POWER COMPANY :
(98-486C)(Hodges, J.) :
SACRAMENTO MUNICIPAL UTILITY DISTRICT :
(98-488C)(Yock, S.J.) :
SOUTHERN NUCLEAR OPERATING COMPANY, et al. :
(98-614C)(Merow, S.J.) :
COMMONWEALTH EDISON COMPANY :
(98-621C)(Hewitt, J.) :
BOSTON EDISON COMPANY :
(99-447C) (Allegra, J.) :
GPU NUCLEAR, INCORPORATED :
(00-440C)(Bush, J.) :
WISCONSIN ELECTRIC POWER COMPANY :
(00-697C)(Merow, S.J.) :
POWER AUTHORITY OF THE STATE OF NEW YORK :VOLUME
(00-703C)(Damich, J.) : II
OMAHA PUBLIC POWER DISTRICT :
(01-115C)(Bush, J.) :
NEBRASKA PUBLIC POWER DISTRICT :Discovery
(01-116C)(Sypolt, J.) :Judge:
TENNESSEE VALLEY AUTHORITY :(Judge
(01-249C)(Bruggink, J.) :Sypolt)
Plaintiffs, :PAGES
v. :242 - 396

Page 243

THE UNITED STATES, :
Defendant. :
---------------------------------------------X

Deposition of Victor W. Trebules, Jr.
Washington, DC
Thursday, April 18, 2002

Reported by: Denise Dobner Vickery, RMR, CRR
JOB NO. 144459

Page 244

April 18, 2002
9:30 A.M.

Deposition of Victor W. Trebules, Jr., held at the offices of:

Jenner & Block
601 13th Street, NW
12th Floor
Washington, DC 20005

Pursuant to notice, before Denise Dobner Vickery, a Registered Merit Reporter, Notary Public of the District of Columbia.

Page 245

APPEARANCES:

Jenner & Block
For the Plaintiff COMMONWEALTH EDISON
One IBM Plaza
Chicago, IL 60611-7603
(312) 222-9350
BY: Theodore T. Eidukas, Esq.

Shaw Pittman Potts & Trowbridge
For the Plaintiffs NORTHERN STATES POWER COMPANY, et al.
1650 Tysons Boulevard
McLean, VA 22102-4859
(703) 770-7962
BY: Devon E. Hewitt, Esq.

Arnold & Porter
For the Plaintiffs SOUTHERN NUCLEAR OPERATING COMPANY, et al.
555 Twelfth Street, NW
Washington, DC 20004-1206

# Victor W. Trebules, Jr. - vol. 2

Page 266

1200 metric tons. It would operate through about 2028. It would reach a maximum capacity of 14,700 metric tons until it off-loaded the spent fuel into the repository. So, according to that schedule, it looks like it operates for about 30 years.

Q. And according to this Table F-1 and to clarify it's on page 61; is that correct?

A. Yes.

Q. Of Exhibit I think you said 6?

A. 8.

Q. 8. I'm sorry. That's okay. It seems to indicate that in the MRS facility in year 2004, the acceptance rate for spent fuel would be 2650; is that correct?

MR. SHULTIS: Object.

THE WITNESS: That's correct.

BY MS. HEWITT:

Q. Why was that figure chosen, 2650?

MR. SHULTIS: Objection, asked and answered. Calls for speculation.

THE WITNESS: Yeah. I don't remember why that specific number was selected at that time.

Page 267

BY MS. HEWITT:

Q. Do you recall what the components of the MRS submission to Congress included?

MR. SHULTIS: Objection, asked and answered.

THE WITNESS: Could you please repeat the question.

BY MS. HEWITT:

Q. Do you recall what the MRS submission to Congress included in terms of the components of the proposal?

MR. SHULTIS: Same objection and vague.

THE WITNESS: Only generally that we had to identify a site and design options for the MRS facility.

BY MS. HEWITT:

Q. Do you recall whether it included an environmental assessment?

MR. SHULTIS: Same objection. Asked and answered.

THE WITNESS: I believe I -- I'm not sure but I believe it did. I believe I remember seeing the

Page 268

document. Although I never read through it or contributed to the development of it.

BY MS. HEWITT:

Q. Do you have an understanding of the term emplacement rate?

MR. SHULTIS: Objection, vague.

THE WITNESS: My understanding of the term emplacement rate would be the rate at which we would emplace spent nuclear fuel in the underground portion of the geologic repository.

BY MS. HEWITT:

Q. Do you have an understanding of the term design receipt rate?

MR. SHULTIS: Same objection.

THE WITNESS: Again, my understanding of the term design receipt rate is the rate at which spent fuel would be received at the repository at primarily the surface handling buildings, which would come in either by rail or truck.

BY MS. HEWITT:

Q. Is the design receipt rate the same thing as the design acceptance rate?

Page 269

MR. SHULTIS: Same objection.

THE WITNESS: I think under certain conditions it can be. Under other conditions it doesn't have to be. For example, the -- I'm sorry. Could you give me that question again, the two terms?

BY MS. HEWITT:

Q. Design receipt rate and acceptance rate.

A. Okay. The acceptance rate could be dependent on the facilities that the system may have. For example, you could be receiving at an MRS facility and at a repository. Okay. The design receipt rate could apply to either one of those facilities, particularly the repository, and the emplacement rate is obviously the emplacement rate only at the repository.

Q. Is the emplacement rate the same thing as the design receipt rate?

MR. SHULTIS: Objection. Asked and answered.

THE WITNESS: Again, it could be, but it doesn't have to be. You can receive rate at a certain -- you could receive spent fuel at a certain rate with the surface facilities of the repository.

You could put spent fuel in storage above ground. You could emplace underground at a different rate. Obviously then you'd have an accumulation of spent fuel at the storage facilities above the repository or you could be reducing the backlog. They don't have to be the same. They could be independent. Although if you reach steady state operation, ideally they're very close, if not identical.

BY MS. HEWITT:

Q. When I use the term OCRWM, do you have an understanding of what that term is?

A. Yes, I do.

Q. Were you ever involved in OCRWM's efforts to design a repository?

MR. SHULTIS: Objection, vague.

THE WITNESS: I think I would have to answer yes.

BY MS. HEWITT:

Q. What was the extent of your involvement?

A. Again, my primary role over the past 10 years or so has been in the planning, budgeting and scheduling part of the program of the OCRWM program,



the Office of Civilian Radioactive Waste Management, and I'm primarily responsible for the cost and schedule baselines for the program. But obviously the cost and schedule baselines have to relate to the technical baseline, which includes as a subset the design solution for the system. So I had to have some familiarity of the design or the evolving parameters of the design to be able to fully integrate the cost and schedule activities.

Q. What is the present design receipt rate for the repository?

MR. SHULTIS: Objection, assumes -- well, calls for speculation. Assumes facts not in evidence, vague.

THE WITNESS: I cannot say for certain what the present receipt rate is. We typically talk about the current design as the design in our site recommendation documents that have been submitted to Congress. I do not know the exact numbers. I believe they are, though, close to the 3,000 metric tons once it reaches a steady state. Although we are looking at a variety of design options or modifications



to that conceptual design.

BY MS. HEWITT:

Q. Are those designs or possible modifications going to affect the design receipt rate?

MR. SHULTIS: Same objection.

THE WITNESS: Yeah, that would be speculation on my part. That's not my major area of focus and I really would be speculating at that point.

BY MS. HEWITT:

Q. During your tenure at OCRWM, has the design receipt rate at a steady state been different than 3,000 MTUs on an annual basis?

MR. SHULTIS: Objection, vague.

BY MS. HEWITT:

Q. Do you understand my question?

A. Yes, and as we discussed in some detail yesterday, the receipt rate changed significantly through the various documents we went through yesterday. In the early versions of the draft mission plan and in the subsequent versions of the amendment, it changed because of the facilities involved.

Q. Understand.



A. Obviously when we had a two-repository system, the receipt rate for the system in total was higher than a single repository system or in, again, referring to Exhibit 8, I believe the waste acceptance schedule we were just talking about, this shows a significant delay in the operation of the second repository. So yesterday in the earlier documents, the earlier exhibits and mission plan documents, we had a combination of the two repositories which had a receipt rate much greater than what this latest version would show.

Q. You're absolutely correct. My question was a little bit unclear. It wasn't very specific. I'm going to further narrow it.

At any time during your tenure at the DOE program, was the design receipt rate for the single repository other than 3,000 MTU on an annual basis?

A. You said at any time during my? I believe basically the nominal design receipt rate target -- again, this was a target; this was an objective -- on an annual basis was 3,000 metric tons.

Q. And that's also what you refer to as the

# Defendant

# Victor W. Trebules, Jr. - vol. 2

Page 270

You could put spent fuel in storage above ground. You could emplace underground at a different rate. Obviously then you'd have an accumulation of spent fuel at the storage facilities above the repository or you could be reducing the backlog. They don't have to be the same. They could be independent. Although if you reach steady state operation, ideally they're very close, if not identical.

BY MS. HEWITT:

Q. When I use the term OCRWM, do you have an understanding of what that term is?

A. Yes, I do.

Q. Were you ever involved in OCRWM's efforts to design a repository?

MR. SHULTIS: Objection, vague.

THE WITNESS: I think I would have to answer yes.

BY MS. HEWITT:

Q. What was the extent of your involvement?

A. Again, my primary role over the past 10 years or so has been in the planning, budgeting and scheduling part of the program of the OCRWM program,

Page 271

the Office of Civilian Radioactive Waste Management, and I'm primarily responsible for the cost and schedule baselines for the program. But obviously the cost and schedule baselines have to relate to the technical baseline, which includes as a subset the design solution for the system. So I had to have some familiarity of the design or the evolving parameters of the design to be able to fully integrate the cost and schedule activities.

Q. What is the present design receipt rate for the repository?

MR. SHULTIS: Objection, assumes -- well, calls for speculation. Assumes facts not in evidence, vague.

THE WITNESS: I cannot say for certain what the present receipt rate is. We typically talk about the current design as the design in our site recommendation documents that have been submitted to Congress. I do not know the exact numbers. I believe they are, though, close to the 3,000 metric tons once it reaches a steady state. Although we are looking at a variety of design options or modifications

Page 272

to that conceptual design.

BY MS. HEWITT:

Q. Are those designs or possible modifications going to affect the design receipt rate?

MR. SHULTIS: Same objection.

THE WITNESS: Yeah, that would be speculation on my part. That's not my major area of focus and I really would be speculating at that point.

BY MS. HEWITT:

Q. During your tenure at OCRWM, has the design receipt rate at a steady state been different than 3,000 MTUs on an annual basis?

MR. SHULTIS: Objection, vague.

BY MS. HEWITT:

Q. Do you understand my question?

A. Yes, and as we discussed in some detail yesterday, the receipt rate changed significantly through the various documents we went through yesterday. In the early versions of the draft mission plan and in the subsequent versions of the amendment, it changed because of the facilities involved.

Q. Understand.

Page 273

A. Obviously when we had a two-repository system, the receipt rate for the system in total was higher than a single repository system or in, again, referring to Exhibit 8, I believe the waste acceptance schedule we were just talking about, this shows a significant delay in the operation of the second repository. So yesterday in the earlier documents, the earlier exhibits and mission plan documents, we had a combination of the two repositories which had a receipt rate much greater than what this latest version would show.

Q. You're absolutely correct. My question was a little bit unclear. It wasn't very specific. I'm going to further narrow it.

At any time during your tenure at the DOE program, was the design receipt rate for the single repository other than 3,000 MTU on an annual basis?

A. You said at any time during my? I believe basically the nominal design receipt rate target -- again, this was a target; this was an objective -- on an annual basis was 3,000 metric tons.

Q. And that's also what you refer to as the

Page 274

steady state rate?
A. That's correct.
Q. When you use the term nominal, what do you mean by nominal?
A. Nominal in my jargon typically means like an average or a design number that you try to meet. You know, it usually implies a certain degree of precision. You know, you could say 3,000 plus or minus 20 metric tons, you know, but nominal, when you say nominally 3,000 metric tons, it could vary. In some years it could, depending on the truck and train shipments, it could be 2,980. Next year it could be 3,022, but we sort of average that out over the operation of the facility and say the nominal rate of 3,000 metric tons.
Q. And I believe you testified earlier that the 3,000 annual MTU steady state rate corresponded to the discharge rate by utilities; is that correct?
MR. SHULTIS: Objection, calls for -- mischaracterizes prior testimony.
THE WITNESS: Yeah. I believe I said yesterday that we had two overriding design objectives, you know, two goals. One was to initiate operations

Page 275

in 1998. The other was to design a system to try to meet the EIA projection that we were using at the time of the spent fuel discharge rate from the utilities, which at that time I think was nominally, again, nominally about 3,000 metric tons a year. Although it varied, you know, year by year.
BY MS. HEWITT:
Q. I believe yesterday also you testified regarding that -- regarding the 3,000 MTU annual rate and said that it was at some point designed to ensure that utilities did not "have to engage in additional storage, on-site storage after 1998." Is that a correct fair reading of your testimony yesterday?
MR. SHULTIS: Objection, asked and answered.
THE WITNESS: Again, without looking at the transcript, I think that was close to what I said. I guess I would also want to refer to a paper that was worked on I think before I joined the program. This is Exhibit 3. This is the proceedings of the 1983 Civilian Radioactive Waste Management Information Meeting. Again, this was developed before I got to

Page 276

the program, but this became sort of my understanding of the design objective that we were trying to meet.
It's on page 11. There's only two pages in this exhibit, but on page 11, the second column, the largest paragraph near the end. This says, "During the first year of operation of the repository in 1998, we should be receiving fuel at a rate so that no utility would have to add any further storage facilities either on-site or at another location."
Again, I think I referred to that as sort of one of our design objectives, you know, with the proper caveats.
BY MS. HEWITT:
Q. When you use the term design objective, do you mean the design objective for the facility that DOE ultimately would build?
A. Facility or facilities; that's correct.
Q. And so that the term design objective would apply equally to MRS or a repository?
A. I think that's a fair statement.
Q. And then I'd like to explore the meaning of the term on-site storage. Do you have an

Page 277

understanding of what consists of on-site storage?
A. I have an understanding of what I think that term means, yes.
Q. What's your understanding?
A. The spent fuel discharged from nuclear power plants, first of all, has to be aged a certain amount of time, and it goes into storage at the reactor sites or on the site of the reactor power plants. Typically it goes into storage pools, or I believe if it meets certain conditions, it could go into dry storage on the sites of the nuclear power plants.
Q. And when the term additional on-site storage is used, for example, in that document, does that refer to storage in the spent fuel -- spent nuclear fuel pools as well?
A. I'm sorry. Can you repeat the question again, please.
Q. When the term is used -- and you've used it and other witnesses have used it -- saying that the MTU rate is designed at some point to preclude the need for "on-site storage," does that include storage in the spent nuclear fuel pools that are on site?

# Defendant

Page 302

adequacy reports that DOE issues; is that correct?
A. Input into the fee adequacy report.
Q. And what kind of input do you provide to the fee adequacy report?
A. I work on the Yucca Mountain cost and schedule and plans. So I'm right now responsible for coordinating the input of the Yucca Mountain part of the fee adequacy report in the total system life cycle cost.
Q. Are you familiar with the actual fee adequacy reports that DOE issues?
A. Yes.
Q. Do acceptance rates factor into that report?
MR. SHULTIS: Objection, calls for a legal conclusion.
THE WITNESS: I believe the answer is yes. It's a fairly complicated analysis that needs to be prepared, but I believe acceptance rates are one of the parameters that needs to be evaluated.
BY MS. HEWITT:
Q. And how do the acceptance rates affect the fee adequacy analysis?

Page 303

MR. SHULTIS: Objection, vague.
THE WITNESS: This may be a rather long, complicated answer. But basically the fee adequacy analysis, which is required by the Nuclear Waste Policy Act, is analysis that the Secretary of the department has to conduct to evaluate whether the one mill per kilowatt hour fee is judged to be sufficient to cover the total cost of the program.
(Mr. Stouck entered.)
To do that, we prepare what's called a total system life cycle cost analysis, which looks at the cost of basically the facilities we have to build to accept fuel. That would include the surface facilities of the repository, the underground facilities of the repository, the waste package that the waste would be disposed in, the transportation system, equipment needed to move the waste, and we have to estimate the cost of that and balance that against the incoming money from the one mill per kilowatt hour.
And you have to relate the timing of those facilities and when they need to be online to be able to accept the waste. And since there's a time related

Page 304

cost of money depending upon when you build and construct and have facilities in operation, in that sense it relates to the waste acceptance rates.
BY MS. HEWITT:
Q. You mentioned that the total system life cycle cost analysis -- and is that also called the TSLCC analysis?
A. That's the common acronym to describe it; that's correct.
Q. You testified that that analysis comprises cost of the system, which include the facilities; is that right?
A. That's correct.
Q. And when you use the term facilities, are you referring to facilities that would store or dispose of the waste? What do you mean by facilities when you used that term in your prior answer?
A. Generally it's meant to include the waste handling surface facilities at the repository location, the underground area of the repository in which the waste will be placed, and another major component which may or may not fall under the term facilities is the

Page 305

waste package that the spent fuel elements will be placed in for disposal underground. That's a major cost contributor.
Q. So, is it fair to say that when you use the term facilities, you are not including possibility of an MRS in that term?
MR. SHULTIS: Objection, mischaracterizes prior testimony.
THE WITNESS: At one time in the program's evolution, we did include I believe the cost of an MRS facility, but over the past 10 years or so when Congress never acted or we were never able to get an MRS facility authorized, we haven't included it in our TSLCC estimates.
BY MS. HEWITT:
Q. So, the acceptance rates that are used in the TSLCC estimates reflect an acceptance rate of a repository; is that correct?
A. That's correct.
MR. SHULTIS: Object.
THE WITNESS: That's correct.
BY MS. HEWITT:

# Victor W. Trebules, Jr. - vol. 2

Page 306

Q. And has that been the case since you've been working on TSLCC reports?

A. I think, as I just said, I've been working on the program for quite a while, and at one point we did include estimates that had an MRS, but over the past 10 years or so we have not included that. It's just been focused on repository facilities.

Q. And what is the purpose of the TSLCC and fee adequacy reports?

A. The fee adequacy report -- fee adequacy assessment is required by the Nuclear Waste Policy Act to determine on a periodic basis whether or not the one mill per kilowatt fee is still judged to be sufficient to cover the cost of the program.

Q. And are these reports submitted to Congress?

A. Yes.

Could we take a break?

Q. Yes, absolutely.

(Recess, 10:48 to 10:56 a.m.)

BY MS. HEWITT:

Q. I just have a couple of more questions, Mr. Trebules.

Page 307

A. Okay.

Q. Are you aware that DOE has announced that it will not be able to take spent nuclear fuel until the year 2010 at the earliest?

A. I would say that DOE has issued -- the part that I'm familiar with, DOE has recently issued new schedules to have a repository begin operations in 2010.

Q. Do you believe that DOE will have a repository in operation in 2010?

MR. SHULTIS: Objection, relevance.

THE WITNESS: Do I believe? Again, I'm speculating, forecasting. I would still characterize our schedules as success oriented and optimistic, but there's a lot of things beyond our control like future appropriations, which has been a problem historically through the program that we don't control. There's a chance if everything goes right we could have facilities in operation by 2010. But the schedules are success oriented and optimistic.

BY MS. HEWITT:

Q. Do you think that 2010 is a realistic date?

Page 308

MR. SHULTIS: The same objection. Asked and answered.

THE WITNESS: I would, you know, I would answer the question the same way. Again, the schedules that we are currently working to are success oriented and optimistic.

BY MS. HEWITT:

Q. Are you aware of any slippages in the schedule for getting a repository online by 2010?

MR. SHULTIS: Objection, vague. Asked and answered.

THE WITNESS: Could you clarify what time frame? Because as we saw yesterday going through these various documents, in the early days of the program we issued schedules to show 1998. Then we went through some documents that showed that slipped to 2003. Then we went from 2003 to 2010.

BY MS. HEWITT:

Q. I'm talking about now are you aware of any schedule slippages that would affect the 2010 deadline?

MR. SHULTIS: Objection, vague.

THE WITNESS: The current schedules we're working to today still show that we hope to have a repository in operation by 2010.

Page 309

MS. HEWITT: Okay. I don't have any more questions.

MR. SHULTIS: I just have one question in follow-up.

EXAMINATION BY COUNSEL FOR THE DEFENDANT

BY MR. SHULTIS:

Q. Vic, when you were discussing the schedules and the mission plan and it showed rates, and we're talking about acceptance rates, you're talking about rates that could be accommodated in the facilities being designed, correct?

A. That's correct. My area of specialization or primary focus has to do with, as I indicated before, the schedules and the costs for the program, and we're developing schedules to try to meet a number of competing interests; and we focused on the design of the facilities to try to balance these interests as those waste acceptance schedules showed. That's my primary area that I've been working in.

Q. So, was it limited -- it wasn't limited to

# Defendant

# Victor W. Trebules, Jr. - vol. 2

Page 378

need for storage beginning in 1998, but a utility with an immediate need for additional storage in 1998 did not have an allocation for that year?
MR. SHULTIS: Objection.
BY MR. NESLIN:
Q. Wouldn't that exchange allow those utilities to exchange their rights for that year?
MR. SHULTIS: Objection, calls for speculation. Lack of foundation.
MR. NESLIN: Let me finish my question, counsel.
BY MR. NESLIN:
Q. And would that not assist the system in meeting the objective of avoiding the need for additional storage beginning with that year?
MR. SHULTIS: Same objection, and asked and answered.
THE WITNESS: Yeah, it sounds possible. That's the best way I could answer it now. It sounds reasonable.
BY MR. NESLIN:
Q. You never thought about that before?

Page 379

MR. SHULTIS: Objection, relevance.
THE WITNESS: I probably have. I don't remember specifically at this time, you know, thinking about it in detail or in-depth, but, you know, I'm sure over the course of 20 years I probably, you know, thought about it to some extent.
BY MR. NESLIN:
Q. Do you recall in your work on the mission plan in 1984-1985 any consideration of exchanges as part of the mission?
MR. SHULTIS: Objection, asked and answered.
THE WITNESS: I'm fairly certain back in the '84-'85 time frame I probably didn't consider it at all. It was probably subsequent to that.
BY MR. NESLIN:
Q. Mr. Trebules, can you explain to me how you would meet this objective if utilities did not exchange allocations?
MR. SHULTIS: Objection, vague.
THE WITNESS: I'm not sure I --
BY MR. NESLIN:

Page 380

Q. Do you understand my question, sir?
A. If you can repeat it again, please.
Q. How would the department meet the objective of avoiding the need for utilities to have to add storage beginning in January of 1998 if utilities did not exchange -- did not have the right to exchange allocations?
MR. SHULTIS: Objection, calls for speculation.
THE WITNESS: I'm not sure I'm able to answer that question at this time. Again, as I indicated earlier, our primary objectives when we put together those initial schedules were to twofold. To begin accepting by 1998 and in a grosser aggregate sense to preclude the need for the utilities to add additional storage. Because we based our planning on the EIA projections, which looked at utilities as a whole and came up with that number of about 3,000 metric tons per year.
I don't remember that we focused on particular storage capabilities at individual utilities, you know, within that context of, you know,

Page 381

they would be producing 3,000 metric tons per year. I don't think I ever got into those kind of considerations.
BY MR. NESLIN:
Q. Well, sir, if the objective was that utilities would not have to add additional storage after 1998, wasn't that objective intended to apply either at a gross or at an individual level? You understand my question?
MR. SHULTIS: Objection, vague, and I think he's answered the question.
MR. NESLIN: No.
BY MR. NESLIN:
Q. You may answer, sir.
A. Again, our objective was to try to accept once we reached the steady state operation of 3,000 metric tons, which we thought would be about the generation rate from the utilities as a whole, and I believe we were assuming that up until we reached that point, it was the utilities' responsibility in the aggregate to provide for the storage of the fuel up to 1998 and to continue to add storage up until the time we reached

Page 382

that 3,000 metric tons per year.
So we didn't look at -- at least I never looked at individual utilities' capabilities. We just assumed that they would, you know, provide the required storage until we reached that steady state operation. Now, I think your question says now beyond that some utilities might be generating more and not have additional capability. Others may have additional storage capability that they may not need and they were going to try to mix and match. Okay.
But as far as my involvement in the planning process went, I never got into those kind of considerations when we put together our plans, which were, you know, plans sort of in the aggregate.
Q. Do you recall in your work on the planning documents any consideration of exchanges and shutdown reactors?
MR. SHULTIS: Objection, asked and answered. Calls for speculation.
THE WITNESS: Again, I don't remember specifically considering exchanges. I know there were discussions on trying to respond to what I thought were

Page 383

requests from particular utilities to give priority to shutdown reactors, but I don't know that the department ever reached a clear policy decision on how to handle that. I remember people continuing to talk about the basic approach of oldest fuel first.
BY MR. NESLIN:
Q. Do you remember the department receiving requests for priority from shutdown reactors?
A. I believe I heard people talk about -- I was never involved directly in any specific request, but I believe there were discussions within the department about receiving indications or requests from some utilities for that.
Q. Do you know who was involved in those discussions?
A. Again, not specifically. I can't trace it to a particular meeting or particular group of people, other than the ones that I've already mentioned before that were more involved in those issues than I was.
Q. Do you recall the time period that those discussions would have occurred?
A. I can't be specific, you know, other than

Page 384

during my, you know, 18 years of involvement. It was probably in the latter stages more so than the earlier stages. I mean, again back in the time of the early mission plans, the '84 draft, the '85, I don't have any recollection at that time because I maybe didn't understand the issue. But, you know, after I had some experience in the program, I remember that became a topic of discussion.
Q. So, would you be talking about the 1990s, the late '80s?
MR. SHULTIS: Objection, asked and answered.
THE WITNESS: Again, I can't pin it down other than maybe I just understood it more so, you know, in the '90s rather than the '80s.
BY MR. NESLIN:
Q. Do you recall which utilities were involved in those requests?
A. I remember I believe one of the Yankee plants being mentioned more than others, and I think there was another -- well, there were various plants that were shut down, you know, for whatever reason. I think in

Page 385

addition to the Sacramento Municipal District Plant, the Trojan plant I think was shut down. Most of the time I think I heard of -- and I don't know which of the Yankee plants, but it was one of the Yankee plants I think.
Q. Do you recall how that issue was resolved?
MR. SHULTIS: Objection, asked and answered.
THE WITNESS: Yeah. As I think I indicated, I don't remember a clear policy decision on the part of the DOE, other than the oldest fuel first principle, sort of what we were talking about earlier.
BY MR. NESLIN:
Q. Let's come back to exchanges. Mr. Trebules, did you participate in developing any agency guidance or procedures for the agency's review of exchange requests by utilities?
MR. SHULTIS: Objection, asked and answered.
THE WITNESS: No, none that I could remember.
BY MR. NESLIN:

# Defendant

Page 1

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

-------------------------------------------X

YANKEE ATOMIC ELECTRIC COMPANY :VOLUME
(98-126C)(Merow, S.J.) : I
CONNECTICUT YANKEE ATOMIC POWER COMPANY :Discovery
(98-154C)(Merow, S.J.) :Judge:
MAINE YANKEE ATOMIC POWER COMPANY :(Judge
(98-474C)(Merow, S.J.) :Sypolt)
Plaintiffs, :
v. :
THE UNITED STATES, :PAGES
Defendant. :1 - 160

-------------------------------------------X

Deposition of Victor W. Trebules, Jr.
Washington, DC
Thursday, April 18, 2002

Reported by: Denise Dobner Vickery, RMR, CRR
JOB NO. 144559

Page 2

April 18, 2002
2:15 P.M.

Deposition of Victor W. Trebules, Jr., held at the offices of:

Spriggs & Hollingsworth
1350 I Street, NW
Ninth Floor
Washington, DC 20005-3305

Pursuant to notice, before Denise Dobner Vickery, a Registered Merit Reporter, Notary Public of the District of Columbia.

Page 3

APPEARANCES:

Spriggs & Hollingsworth
For the Plaintiffs YANKEE ATOMIC ELECTRIC COMPANY, CONNECTICUT YANKEE ATOMIC POWER COMPANY AND MAINE YANKEE ATOMIC POWER COMPANY
1350 I Street, NW
Ninth Floor
Washington, DC 20005-3305
(202) 898-5839
BY: Jerry Stouck, Esq.

Jenner & Block
For the Plaintiff COMMONWEALTH EDISON
One IBM Plaza
Chicago, IL 60611-7603
(312) 222-9350
BY: Theodore T. Eidukas, Esq.

United States Department of Justice, Civil Division
For the Defendant THE UNITED STATES
Commercial Litigation Branch

Page 4

Federal Claims Section
1100 L Street, NW
Washington, DC 20530
(202) 305-7561
BY: Russell A. Shultis, Esq.
Heide L. Herrmann, Esq.

I N D E X


| | |
|---|---|
| EXAMINATION OF VICTOR W. TREBULES, JR. | PAGE |
| BY MR. STOUCK | 5 |
| TREBULES DEPOSITION EXHIBITS: | PAGE |
| No. 14 Defendant's Witness List. | 51 |
| 15 Documents CTR 006-1645, 1648 to 53, 1657 to 58, 1661 to 65. | 71 |
| 16 Documents DE-110060 to 70. | 71 |
| 17 Letter of April 19. HQR 064-2234 to 2253. | 71 |
| 18 Memo of 6-21-93. HQR 064-6684 to 85. | 71 |
| 19 Memo of 7-28-93. DE-108508 to 8515. | 71 |
| 20 NCAI Briefing. HQR 064-5423 to 5435. | 71 |
| 21 Privilege Log Excerpts. | 145 |


**Exhibits are attached.

# Victor W. Trebules, Jr.

Page 125

A reference, which I think is where the data is from. If we were to look at current estimates, you don't know whether or not they'd be similar, more, less, the same?
A. No, I don't.
Q. Okay. But I believe you also testified that the current plans today, in your job today, the current plans -- it's not written down anywhere, but the thinking is that if and when the repository begins operation, the annual acceptance rates will, at least at the steady state, the ultimate steady state rate, will be approximately 3,000 tons a year; is that right?
A. I think that's one of our design objectives still, yes, that's right.
Q. And is that also related in some way to an objective of being able to accommodate all of the aggregate industry wide annual generation of spent fuel?
MR. SHULTIS: Objection, asked and answered.
THE WITNESS: I'm hesitant because when we prepared these schedules back in 1985, we were considering the two-repository system and, remember,

Page 126

our objective was to try to reach 3,000 metric tons with the first repository. And then when the second repository came online with its added capacity, we would begin to reduce the backlog. Because of the evolution of the program, the fact that Congress told us to delay work on the second repository, you know, our current design objectives are for a single repository. Again, I think at about the 3,000 metric ton rate, which has impacts on future generation.
BY MR. STOUCK:
Q. Okay. I didn't understand the last part. Why does it have impacts on the future generation?
A. Well, again, as I just mentioned, I don't know what the current projections are, but if you look at Table 2-2.
Q. Yes.
A. Spent fuel generation, okay? Around 1998-2000, the spent fuel generation rate was about 3,000 metric ton per year, which the one repository system could accommodate, but this shows that the numbers continued to grow, okay, to, you know, in the 4,000 range, you know, or higher and obviously the one

Page 127

repository system wouldn't be able to accommodate that.
Q. Okay. And so --
A. I thought your question had to do with, you know, if our current plans enough to accommodate --
Q. Right.
A. -- the current spent fuel generation rates.
Q. Okay. What you're saying, you don't know?
A. Yeah, I don't know.
Q. But if they're the same generation rates, --
A. Right.
Q. -- then it would not be able to accommodate because the number is smaller than these numbers here?
A. Exactly.
Q. Okay. I see. And so that suggests to me that I think it just follows that the three -- well, what is the 3,000 ton? So it seems to follow that the 3,000 ton a year acceptance rate that is in the current planning, current as of today planning, thinking for this program when it starts operating, it sound like is not based on a consideration of the actual annual discharge rates in the future and an ability to accommodate them. Would you agree with that?

Page 128

MR. SHULTIS: Objection, mischaracterizes --.
BY MR. STOUCK:
Q. At least to your knowledge it's not based?
MR. SHULTIS: -- prior testimony.
THE WITNESS: Again, I haven't kept up on the current generation rates. I do believe, though, that the total amount of spent fuel that was expected to be generated has continued to shrink substantially. We're no longer considering 130,000 metric tons as the '85 mission plan did. I think the number in total is down to around 90,000 metric tons.
BY MR. STOUCK:
Q. Okay.
A. Of spent fuel generated.
Q. Okay.
A. So there are significant changes, you know, that would have to be looked at to update this table, and I'm just not familiar with all the current numbers.
Q. That's fine. All I'm saying is, you are familiar with what the current planning and thinking is about the annual acceptance rates once the repository

# Plaintiff

00001

In the U.S. Court of Federal Claims

------------------------------x

Yankee Atomic Electric Co., :

et al :

: NO. 98-126C

v. : 98-154C

: 98-474C

United States of America :

------------------------------x

April 19, 2002

DEPOSITION OF:

Victor W. Trebules, Jr.

a witness, called by counsel pursuant to notice, commencing at 9:00 a.m., which was taken at Spriggs and Hollingsworth, 1350 I St., NW, Washington, DC



00002

Appearances

Jerry Stouck, Esq.
Spriggs and Hollingsworth
1350 I Street, NW
Washington, DC 20005-3305
for Yankee

Russell A. Shultis, Esq.
Heide L. Herrmann, Esq.
U.S. Dept. of Justice, Civil Division
Commercial Litigation Branch
1100 L Street, NW
Washington, DC 20530
for the government

Richard Johnson, Esq.
Jenner and Block
for Commonwealth Edison



00003

INDEX OF EXAMINATIONS


| WITNESS | D | C | RD | RC |
|---|---|---|---|---|
| Victor W. Trebules, Jr. | 4 | | | |


Index of Exhibits

(Exhibits maintained by counsel)


| Description | Page |
|---|---|
| exhibit number 22 | 39 |




00004

(Morning Session)

Stipulations

(It is stipulated and agreed by and between counsel for the respective parties that the reading and signing of this transcript by the witness are not waived.

It is further stipulated and agreed that the filing of this transcript with the clerk of the court be and the same is hereby waived.)

* * * * *

Whereupon,

Victor W. Trebules, Jr.

was called for examination by counsel and, having been previously sworn, was recalled and testified as follows:

DIRECT EXAMINATION:

BY MR. STOUCK:

Q. Good morning, Mr. Trebules. Would you

00004

(Morning Session)

Stipulations

(It is stipulated and agreed by and between counsel for the respective parties that the reading and signing of this transcript by the witness are not waived.

It is further stipulated and agreed that the filing of this transcript with the clerk of the court be and the same is hereby waived.)

* * * * *

Whereupon,

Victor W. Trebules, Jr.

was called for examination by counsel and, having been previously sworn, was recalled and testified as follows:

DIRECT EXAMINATION:

BY MR. STOUCK:

Q. Good morning, Mr. Trebules. Would you



00005

agree that at the time that you were working on the plan in 1984 and 1985 it was an objective of the spent fuel program that that program be operated in an economically efficient manner?

MR. SHULTIS: Objection as to "economically efficient." It's vague.

A. I believe we said words to that effect in the mission plan, that's correct.

Q. Why was that an objective?

A. To the best of my recollection, I think we used phrases like fiduciary responsibility. People working in the program felt that they had an obligation to try to execute the program efficiently and effectively.

Q. Why was that an objective?

A. We knew the program was going to cost a lot of money over its lifetime.

I guess it's my opinion that the people felt they ought to try to be efficient in carrying out that program.

Q. Let's pull out the mission plan which I think is exhibit six, if you would, please.



00006

A. Okay.

Q. Take a look at page six, please, which is Bates CE14813. It's a listing of goals and objectives. We discussed this earlier.

Number four, do you see that? "The program must be conducted in a cost effective manner with full cost recovery."

Do you see that?

A. Yes.

Q. What does "full cost recovery" mean?

MR. SHULTIS: Objection to the extent it's calling for a legal conclusion.

A. It was my understanding that the Nuclear Waste Policy Act had a provision that the owners and generators of the spent nuclear fuel and the radioactive waste would pay for the cost of the program. It would not be funded by taxpayer money. It would be funded by the owners and generators of the waste.

The Act initially established a rate of one mill per kilowatt hour for the nuclear utilities which would go into a nuclear waste fund



00007

and the government would draw on that money plus any other monies, for example monies for the disposal of defense high level waste, and that would cover the cost of the program.

Q. Is that concept of full cost recovery related to the objective of economic efficiency?

MR. SHULTIS: Same objection.

A. To the best of my understanding, it is.

Q. What's the relationship, if you would just explain that?

MR. SHULTIS: The same objection.

A. Not being an economist, I guess I would explain it in more or less layman's terms.

The people working in the program knew they had a source of funds, that was the nuclear waste fund, and any appropriations to cover the disposal of defense high level waste.

They wanted to conduct the activities, the scientific characterization, the design and the engineering aspects essentially at minimum cost, do the necessary, minimum necessary, but sufficient work to develop the facilities, the geologic