# Defendant

# Victor Trebules

In the U.S. Court of Federal Claims

--------------------------------x

Yankee Atomic Electric Co., :
et al :
: NO. 98-126C
v. : 98-154C
: 98-474C
United States of America :

--------------------------------x

April 19, 2002

DEPOSITION OF:

Victor W. Trebules, Jr.

a witness, called by counsel pursuant to notice, commencing at 9:00 a.m., which was taken at Spriggs and Hollingsworth, 1350 I St., NW, Washington, DC

Page 2

Appearances

Jerry Stouck, Esq.
Spriggs and Hollingsworth
1350 I Street, NW
Washington, DC 20005-3305
for Yankee

Russell A. Shultis, Esq.
Heide L. Herrmann, Esq.
U.S. Dept. of Justice, Civil Division
Commercial Litigation Branch
1100 L Street, NW
Washington, DC 20530
for the government

Richard Johnson, Esq.
Jenner and Block
for Commonwealth Edison

Page 3

INDEX OF EXAMINATIONS


| WITNESS | D | C | RD | RC |
|---|---|---|---|---|
| Victor W. Trebules, Jr.. | 4 | | | |


Index of Exhibits

(Exhibits maintained by counsel)


| Description | Page |
|---|---|
| exhibit number 22.. . . . . . . . . . . . | 39 |


Page 4

(Morning Session)

Stipulations

(It is stipulated and agreed by and between counsel for the respective parties that the reading and signing of this transcript by the witness are not waived.

It is further stipulated and agreed that the filing of this transcript with the clerk of the court be and the same is hereby waived.)

* * * * *

Whereupon,

Victor W. Trebules, Jr.

was called for examination by counsel and, having been previously sworn, was recalled and testified as follows:

DIRECT EXAMINATION:

BY MR. STOUCK:

Q. Good morning, Mr. Trebules. Would you

# Victor Trebules

Page 5

agree that at the time that you were working on the plan in 1984 and 1985 it was an objective of the spent fuel program that that program be operated in an economically efficient manner?

MR. SHULTIS: Objection as to "economically efficient." It's vague.

A. I believe we said words to that effect in the mission plan, that's correct.

Q. Why was that an objective?

A. To the best of my recollection, I think we used phrases like fiduciary responsibility. People working in the program felt that they had an obligation to try to execute the program efficiently and effectively.

Q. Why was that an objective?

A. We knew the program was going to cost a lot of money over its lifetime.

I guess it's my opinion that the people felt they ought to try to be efficient in carrying out that program.

Q. Let's pull out the mission plan which I think is exhibit six, if you would, please.

Page 6

A. Okay.

Q. Take a look at page six, please, which is Bates CE14813. It's a listing of goals and objectives. We discussed this earlier.

Number four, do you see that? "The program must be conducted in a cost effective manner with full cost recovery."

Do you see that?

A. Yes.

Q. What does "full cost recovery" mean?

MR. SHULTIS: Objection to the extent it's calling for a legal conclusion.

A. It was my understanding that the Nuclear Waste Policy Act had a provision that the owners and generators of the spent nuclear fuel and the radioactive waste would pay for the cost of the program. It would not be funded by taxpayer money. It would be funded by the owners and generators of the waste.

The Act initially established a rate of one mill per kilowatt hour for the nuclear utilities which would go into a nuclear waste fund

Page 7

and the government would draw on that money plus any other monies, for example monies for the disposal of defense high level waste, and that would cover the cost of the program.

Q. Is that concept of full cost recovery related to the objective of economic efficiency?

MR. SHULTIS: Same objection.

A. To the best of my understanding, it is.

Q. What's the relationship, if you would just explain that?

MR. SHULTIS: The same objection.

A. Not being an economist, I guess I would explain it in more or less layman's terms.

The people working in the program knew they had a source of funds, that was the nuclear waste fund, and any appropriations to cover the disposal of defense high level waste.

They wanted to conduct the activities, the scientific characterization, the design and the engineering aspects essentially at minimum cost, do the necessary, minimum necessary, but sufficient work to develop the facilities, the geologic

Page 8

depository and the transportation system to manage and dispose of the radioactive waste.

Q. Is it your understanding at the time of this mission plan, at the time this mission plan was written, these words we've been looking at, is it your understanding that this objective of economic efficiency was a requirement for the program?

MR. SHULTIS: Objection to the degree it's calling for a legal conclusion.

A. I don't ever remember back then some 16, 17, 18 years ago it being described as a requirement.

My recollection is, as exhibit six states, it was a policy goal that guided DOE's implementation of that program.

I don't ever remember the terms requirement when it came to conducting the program in a cost effective manner.

Q. Let's turn to page 37. Under mission 3.1.4, mission and objectives, do you see that?

A. Yes.

# David Zabransky

# Defendant

1

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

-----------------x
YANKEE ATOMIC ELECTRIC COMPANY; : Case Nos. 98-126C,
CONNECTICUT YANKEE ATOMIC POWER : 98-154C, 98-474C,
COMPANY; MAINE YANKEE ATOMIC : 98-483C, 98-484C,
POWER COMPANY; FLORIDA POWER & : 98-485C, 98-486C,
LIGHT COMPANY; NORTHERN STATES : 98-488C, 98-614C,
POWER COMPANY; DUKE POWER, a : 98-621C, 99-447C,
Division of DUKE ENERGY CORP.; : 00-440C, 00-695C,
INDIANA MICHIGAN POWER COMPANY; : 00-703C, 01-115C,
SACRAMENTO MUNICIPAL UTILITY : 01-116C, 01-249C
-----------------X
(Caption continued on the next page)

Deposition of DAVID ZABRANSKY
Washington, D.C.
Wednesday, April 17, 2002
9:38 a.m.

Job No.: 12597-1
Pages 1 through 226, Volume 1
Reported by: Diane Gomez, RPR

2

DISTRICT; SOUTHERN NUCLEAR :
OPERATING COMPANY, et al.; :
COMMONWEALTH EDISON COMPANY; :
BOSTON EDISON COMPANY; GPU :
NUCLEAR, INCORPORATED; WISCONSIN :
ELECTRIC POWER COMPANY; POWER :
AUTHORITY OF THE STATE OF NEW :
YORK; OMAHA PUBLIC POWER DISTRICT;:
NEBRASKA PUBLIC POWER DISTRICT; :
and TENNESSEE VALLEY AUTHORITY, :
Plaintiffs :
v. :
THE UNITED STATES, :
Defendant :
-----------------X

3

Deposition of DAVID ZABRANSKY, held at the offices of:

ARNOLD & PORTER
555 12th Street, Northwest
Washington, D.C. 20004
(202) 942-5000

Pursuant to agreement, before Diane Gomez, Registered Professional Reporter and Notary Public of the District of Columbia.

4

APPEARANCES

ON BEHALF OF PLAINTIFFS FLORIDA POWER & LIGHT COMPANY, NORTHERN STATES POWER COMPANY, DUKE POWER, INDIANA MICHIGAN POWER COMPANY, BOSTON EDISON COMPANY, GPU NUCLEAR, INC., POWER AUTHORITY OF THE STATE OF NEW YORK, OMAHA PUBLIC POWER DISTRICT, and NEBRASKA PUBLIC POWER DISTRICT:

ALEX D. TOMASZCZUK, ESQUIRE
SHAW PITTMAN LLP
1650 Tysons Boulevard
McLean, Virginia 22102-4859
(703) 847-5097

ON BEHALF OF PLAINTIFF SACRAMENTO MUNICIPAL UTILITY DISTRICT:

JEFFREY L. HANDWERKER, ESQUIRE
ARNOLD & PORTER
555 12th Street, Northwest
Washington, D.C. 20004-1206
(202) 942-5000

149

based on this meeting?
A That's what it says.
Q Am I reading that correctly?
A That's what it appears to say.
Q Do you have any idea what you meant by using the term "significant quantities" in 1998 --
MR. CRAWFORD: Objection.
Q -- as used in the minutes marked Zabransky Exhibit 17?
MR. CRAWFORD: Objection. Assumes facts not in evidence.
A I wouldn't know the specific number that I meant at that point in time, but it would have been, from my perspective at that point in time, enough so that I wouldn't have had trouble at my plant. That was my concern.
Q And trouble, define how --
A Having to do with spent fuel that I didn't need to deal with. That was my position, the company's position in 1987.
Q Having to add storage space outside your pool?

150

A That was the industry position, yes.
Q And you agreed with it?
A Sure. Yes.
(Deposition Exhibit Zabransky 18 was marked for identification and was attached to the transcript.)
Q Mr. Zabransky, I'm going to hand you what's been marked as Zabransky Exhibit 18 which is page 411 through -- what? I can't tell.
A 417, 18, 19?
Q I can't tell. It's a letter, the signature sign is John J. Kearney, Senior Vice President, Edison Electric Institute, a letter to Ben C. Rusche on the draft mission plan amendment. Take a second and review that if you want to.
A In its entirety?
MR. CRAWFORD: Let's get on the record just kind of where this thing was pulled out of.
MR. HANDWERKER: It's from the 1987 mission plan, June '87 mission plan amendment. It's 411 through 418 of the comments.
Q If it helps you, I'm not going to ask you

151

anything after page four -- well, wait a minute. Maybe I will.
MR. CRAWFORD: Don't tie yourself down.
MR. BLANTON: As a matter of fact, I think I will.
(There is a recess from the record.)
Q Have you had a chance to review number 18, Exhibit 18 to your deposition, Mr. Zabransky?
A Yes, sir.
Q Is this letter the letter that resulted from the meeting that we just talked about that was Exhibit 17 to your deposition? It refers to comments that were transmitted to DOE on April 3, 1987?
A It appears to be.
Q Do you know if you, in connection with your work with the UNWMG, participated in drafting these comments?
A I did not participate in drafting these comments.
Q Did you review and comment on the comments before they went in?
A I would have, yes.

152

Q Okay. Do you recall whether you disagreed with any of these comments?
A I did not, to my knowledge, disagree with any comments as far as I'm aware.
Q On page 417 of the comments they say "A significant change between the mission plan DMPA" -- which I assume refers to the draft mission plan amendment -- "occurs in the magnitude, time of, and rate at which DOE will accept spent fuel." Do you see that?
A Uh-huh.
Q Do you recall any discussions about the content of that particular paragraph among the UNWMG members?
A Not specifically about that particular paragraph, no.
Q Are you aware of whether what is expressed in this paragraph is generally the same subject matter as what you discussed in the meeting on March 25th, 1987, as chairman of the Program Strategy and Schedule Task Force?
A I have no reason to believe it isn't a

153

draft letter that was discussed.
Q Okay. Well, and what I'm talking about are the problems with the draft mission plan this identifies. Would that have been part of your discussion on the --
A I have no specific recollection of that.
Q Okay. Do you have any reason to think it would not have been?
A I have no reason to think it would not have been.
Q On page 412, the second page of the letter, the comments address a five-year slippage in the first repository operations day. Do you see that?
A What's the side bar number there?
Q Two and three over there in the brackets.
A I see, yes.
Q Okay. The middle of that paragraph the comments say "This change can be acceptable to the electric utilities if and only if DOE makes a more substantial and achievable commitment to begin taking spent fuel in January 1998 as required under the NWPA and the standard contract."

154

A Yes.
Q Do you recall at that time what you believed the DOE contractual commitment to be other than --
MR. CRAWFORD: Objection.
Go ahead.
MR. BLANTON: Go ahead.
MR. CRAWFORD: Well, no. You finish the question.
Q -- other than to accept fuel in January 1998?
MR. CRAWFORD: Well, objection. Assumes facts not in evidence, foundation, relevance. It's vague.
A Specifically with the contractual commitment, no, I don't recall beyond the fact that I believe we believed we were advised by counsel that there was a contractual commitment to begin accepting in 1998.
Q Was the issue of the quantity of fuel that they would accept part of that commitment, in your judgment?

155

A The reason for the sternly worded letter was our concern that there appeared to be no commitment to the quantity of fuel and that we were upset and wanted them to commit to a large quantity of fuel but we saw no such commitment.
Q In the draft mission plan amendment?
A Anywhere.
Q Would a commitment to accept spent fuel in 1998, without some commitment to accept a sufficient quantity to relieve the utilities of its storage problems as you referred to a second ago, have been of any real use to the utilities?
A Yes.
Q In what way?
A Ultimately even with respect to -- without regard to the amount of storage required, they need to dispose of the spent fuel.
Q But that implies, doesn't it, that they're going to pick up all of it?
A Eventually, yes. That's a necessity. That's of value to the utilities, as you asked me.
Q Is there some period of time in your

156

judgment beyond which that process becomes unreasonable?
MR. CRAWFORD: Objection. Speculation.
Q How long is it supposed to take to pick up the spent fuel?
MR. CRAWFORD: Objection. Vague.
A I don't have an answer. I don't know.
Q In your judgment would 80 years to clear out spent fuel from a reactor site be consistent with DOE's commitment and obligation under the contract?
MR. CRAWFORD: Objection. Argumentative. Lack of foundation, speculative, vague.
A I don't believe the contract contains a commitment with respect to rate.
Q So is the answer to my question no, it's not unreasonable for DOE to extend the period of performance under the contract for 80 years?
MR. CRAWFORD: Objection to the extent it calls for a legal conclusion and all the other objections to the first question.
A If that's how long it takes to remove the spent fuel, that's how long it takes to remove the

# Defendant

spent fuel.
Q Look at page 414 of the document. Talking about monitored retrievable storage facility.
A Uh-huh.
Q The last sentence of that paragraph says "Now the MRS is more important to NWPA implementation because it is the only feasible way that DOE can meet its 1998 statutory and contractual obligation."
Why was the MRS important to the DOE's ability to meet its contractual obligation?
MR. CRAWFORD: Objection. Foundation.
A Why did the industry say this -- why was that the industry position? Is that what you're asking me?
Q Well, do you think that's not correct now? Do you think the position you took in 1987 is not correct?
A But this -- okay. Why did the industry believe in 1998 or at that point in time why the only way to meet the contractual and statutory obligation was to have an MRS?
Q Did you believe that then?



A Yes, I did.
Q Why?
A Because there was no way they could have built a repository by 1998 at this point in time.
Q Would it have made any sense to have a repository or an MRS and accept fuel at such a small rate that it took decades to remove it from the plant sites?
MR. CRAWFORD: Objection to the extent it assumes facts not in evidence.
A It wouldn't have made sense to the industry, no.
Q Would it have made sense to anyone? Would it have made sense to DOE?
A No.
Q Doesn't the longer you take to remove the fuel the more it costs?
A I can't make that conclusion.
Q Certainly the longer you operate a repository and MRS the more it costs to operate. Is that a fair statement?
A That could be a fair statement, but there's



a lot of facts that need to be considered.
Q All other things being equal, it costs less to run one for 40 years than to run one for 90?
MR. CRAWFORD: Objection to the extent it calls for speculation.
A Speculating that all other things are being equal, that would be a true statement. But all other things are never equal.
Q Was there anything that caused you to agree with the comments in the draft mission plan or in these EEI comments other than the fact that you happen to work in the electric utility industry?
A I'm not sure what you're asking me. Is there anything that caused me --
Q I'm asking did you come to the conclusion that these comments were correct based on your own judgment or just based on the fact that that's what your employer thought?
A Given the information I had available to me, I believed these comments. I still do believe these comments given the information I had available to me.



Q Are you aware of any information that you have now that you didn't have then that calls these comments into question?
MR. CRAWFORD: Objection. Vague.
A My personal opinion is that these comments were valid then, and as customer of DOE, as a member of the industry, this was my industry position as to what they should be doing pursuant to our relationship.
Q I guess my question is, Mr. Zabransky, don't take this the wrong way, but were you posturing or did you really believe what was in here?
A I believe these things, sure.
Q And do you believe them now?
A Do I believe specifically which comments now?
Q Do you believe at the time these were written that all the -- do you believe now that at the time these were written they were all valid comments?
MR. CRAWFORD: Objection. Vague.
A I believe now that at the time these were written these were all valid comments.

# Defendant

161

Q Do you know how long the repository receiving facilities at Yucca Mountain are designed to operate?
A **At this time we haven't finalized a design. There are design requirements that appear in the systems requirements documents that give the designers guidance as to how long they must have the facility operational. Those are -- it's also predicated on the fact that the contracts run as long as the nuclear plants run, if not longer. So as soon as we know how long you're going to run nuclear plants, we can then have an idea how long the facilities have to operate.**
Q Well, is there any assumption in the system requirements regarding how long after the last plant shuts down the repository is scheduled to operate?
A **There are assumptions in the systems requirements documents for planning bases that postulate the length of operation assuming a beginning of acceptance of a repository in 2010. I do not know specifically what those numbers are.**
Q Okay. I don't remember whether you told me or not. Are you aware of anything that -- any facts

162

now that makes these comments on April 3, 1987, inaccurate?
MR. CRAWFORD: Objection. Vague. Objection, relevance.
A **Facts now that are in existence that weren't in existence at this point in time where that there is an MRS linkage. MRS couldn't be constructed as these comments suggested.**
Q Okay. And you're referring to -- okay, anything else before I ask follow-up on that?
A **Other comments in here, if you want to go specifically one by one, with respect to quantities and things like that are no longer valid. But --**
Q Why are they no longer valid?
A **Because the industry no longer projects it's going to generate 79,000 tons of spent fuel.**
Q They project less now?
A **More now.**
Q More?
A **So, I mean, this document is 15 years old. It was valid then. Certain assumptions that went into its preparation are no longer valid.**

163

Q Okay. The linkages that you're referring to that would have prevented the MRS development in the way it's suggested in Zabransky 18, are you referring to the linkages in the Nuclear Waste Policy Act amendments of 1987?
A **That's correct.**
Q Other than the Nuclear Waste Policy Act amendments of 1987, is there any other reason why an MRS could not be developed the way it's envisioned to have been -- it should be developed in Zabransky 18?
A **By 1998 as envisioned here, all -- were there no linkages, there still would be the issue of siting and development of a facility, just as there is with a repository.**
Q Okay. But I thought I understood you to say that it could not be developed because of the linkages.
A **And again this presumed -- this called for an MRS by '98. Even without linkages there's no assurance one could have been developed by '98.**
Q No assurance, but as I understand your testimony the linkages made development of an MRS as

164

envisioned in Zabransky 18 impossible?
A **That's correct.**
Q Okay. Is there anything else other than the linkages that make it impossible, to your knowledge?
A **Not that I'm aware of, no.**
Q And again the linkages we're talking about are the ones contained in the 1987 amendments to the Nuclear Waste Policy Act?
A **Correct.**
MR. CRAWFORD: Are you going to move on to another exhibit at this point?
MR. BLANTON: Let me see.
Yeah.
MR. CRAWFORD: Okay.
MR. BLANTON: Kind of the same general subject but another exhibit.
MR. CRAWFORD: Let's give Dave a break.
(There is a recess from the record.)
(Deposition Exhibit Zabransky 19 was marked for identification and was attached to the transcript.)

# Defendant

227

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
- - - - - - - - - - - - - - - - x
YANKEE ATOMIC ELECTRIC COMPANY; : Case Nos. 98-126C,
CONNECTICUT YANKEE ATOMIC POWER : 98-154C, 98-474C,
COMPANY; MAINE YANKEE ATOMIC : 98-483C, 98-484C,
POWER COMPANY; FLORIDA POWER & : 98-485C, 98-486C,
LIGHT COMPANY; NORTHERN STATES : 98-488C, 98-614C,
POWER COMPANY; DUKE POWER, a : 98-621C, 99-447C,
Division of DUKE ENERGY CORP.; : 00-440C, 00-695C,
INDIANA MICHIGAN POWER COMPANY; : 00-703C, 01-115C,
SACRAMENTO MUNICIPAL UTILITY : 01-116C, 01-249C
- - - - - - - - - - - - - - - - X
(Caption continued on the next page)

Continued Deposition of DAVID ZABRANSKY
Washington, D.C.
Thursday, April 18, 2002
9:44 a.m.

Job No.: 112597-2
Pages 227 through 458, Volume 2
Reported by: Diane Gomez, RPR

228

DISTRICT; SOUTHERN NUCLEAR :
OPERATING COMPANY, et al.; :
COMMONWEALTH EDISON COMPANY; :
BOSTON EDISON COMPANY; GPU :
NUCLEAR, INCORPORATED; WISCONSIN :
ELECTRIC POWER COMPANY; POWER :
AUTHORITY OF THE STATE OF NEW :
YORK; OMAHA PUBLIC POWER DISTRICT;:
NEBRASKA PUBLIC POWER DISTRICT; :
and TENNESSEE VALLEY AUTHORITY, :
Plaintiffs :
v. :
THE UNITED STATES, :
Defendant :
- - - - - - - - - - - - - - - - - X

229

Continued Deposition of DAVID ZABRANSKY, held at the offices of:

ARNOLD & PORTER
555 12th Street, Northwest
Washington, D.C. 20004
(202) 942-5000

Pursuant to agreement, before Diane Gomez, Registered Professional Reporter and Notary Public of the District of Columbia.

230

APPEARANCES

ON BEHALF OF PLAINTIFFS FLORIDA POWER & LIGHT COMPANY, NORTHERN STATES POWER COMPANY, DUKE POWER, INDIANA MICHIGAN POWER COMPANY, BOSTON EDISON COMPANY, GPU NUCLEAR, INC., POWER AUTHORITY OF THE STATE OF NEW YORK, OMAHA PUBLIC POWER DISTRICT, and NEBRASKA PUBLIC POWER DISTRICT:

ALEX D. TOMASZCZUK, ESQUIRE
SHAW PITTMAN LLP
1650 Tysons Boulevard
McLean, Virginia 22102-4859
(703) 847-5097

ON BEHALF OF PLAINTIFF SACRAMENTO MUNICIPAL UTILITY DISTRICT:

JEFFREY L. HANDWERKER, ESQUIRE
ARNOLD & PORTER
555 12th Street, Northwest
Washington, D.C. 20004-1206
(202) 942-5000

291

A That to me would be a system that would have one purpose being storage, one purpose being transport, and would be comprised of the inner canister as we just talked about, the overpack for storage, whether it's horizontal or vertical, and an additional overpack for transport.
Q The overpack for storage being the concrete cylinder you described a minute ago?
A Concrete cylinder or a mausoleum, whatever.
Q Okay. And is there an additional overpack or a different overpack for transportation with the dual-purpose cask?
A For that kind of system it's a different overpack. There's also dual-purpose casks that don't have canisters, that are just transportable and storable.
Q Okay. From a technical standpoint does the type of -- and I'm limiting myself to standard fuel right now. From a technical standpoint does the type of dry storage system being used by a utility have any impact on DOE in terms of receiving that utility's spent fuel?

292

MR. OLSEN: Objection. Vague.
A The type of storage should have no impact on the integrity or quality of the spent fuel that, when removed from the cask, DOE would receive.
Q Okay. Is it DOE's current plan to remove fuel from the casks rather than to use the casks, assuming they're licensed for transport?
A It's DOE current plan to accept spent fuel, not to accept the containers that they're stored in.
Q Okay. Does that mean that DOE will need to procure a transport system for the spent fuel?
MR. OLSEN: Objection to the extent it calls for a legal conclusion.
Q Technically. I'm trying to understand how the process work?
A The answer is yes, and let me amplify the last question. The department has had discussions with utilities and has corresponded with utilities and expressed its programmatic intent to discuss including in a contract amendment dual-purpose systems licensed for storage and transport as acceptable waste forms, and the department intends to do that. In a contract

293

amendment.
So those casks, when the contract is amended, it's our intent to have -- the program has expressed that intent and to then include those as acceptable waste forms under the contract.
Q Okay. What difference does it make to the utility whether or not DOE accepts those systems, the storage systems in use by the utility as a waste form or not?
A The difference it makes to the utility is the same difference it makes to the department is that if the department doesn't take them the utility will have to unload that material and dispose of that cask.
Q Okay.
A If the department takes them we will have to unload that material and dispose of that cask.
Q Okay. Is that because the casks at the current time are not licensed for disposal?
A They're not licensed for disposal.
Q What is the status of the contract amendment process by which the contract would be amended to specify that the storage systems would be

294

accepted as spent fuel?
A We've never had -- at this point we've never had discussions with the utilities on that issue.
Q I'm sorry, I must have misunderstood your earlier testimony. I thought you said that you had decided to amend the contract?
A We offered to enter into discussions to amend the contract.
Q Has any decision been made by DOE with respect to amending the contract to accept the dry storage systems?
A We've offered to enter into discussions to amend the contract, but we haven't done it yet.
Q And the reason for my question, you said you offered to discuss it but not offered to amend it. Do you see the distinction in my question?
A I think I would have to read the letter that was sent out in 1993. It's available to everybody. It says offer to begin -- offer to initiate the contract modification to include this. But, again, we need to look at that. We haven't

spec'd out what we need. Some of these canisters will have an impact on the system. Some, should we go down this path and enter into an amendment, may be standard; some may be nonstandard. Haven't yet determined what those criteria would be.

(Deposition Exhibit Zabransky 33 was marked for identification and was attached to the transcript.)

Q Mr. Zabransky, we've marked Exhibit 33 to your deposition, a 1987 annual capacity report. Did you have any responsibilities either at Wisconsin Electric or for the UNWMG for reviewing or commenting on this document?

A I don't recollect.

Q Do you recall having seen the document before?

A I've seen the document before.

Q Do you recall having seen it at or about the time it was issued?

A I'm sure -- I'm sure I saw it when it was issued.

Q. In the time you've been at the Department



of Energy have you had any occasion to use this document in the course of your duties?

A This document? No.

Q On the first page of the document under Summary.

A Okay.

Q The second paragraph says "The system configuration used as the basis for this report is defined in the plan amendment. It includes a monitored retrievable storage facility as an integral system component." Do you know how the waste-management system as described in this ACR in June of 1987 was designed?

A What do you mean "designed?"

Q From an operational standpoint. And in what way was an MRS facility an integral system component, for instance?

A I don't recollect the details of what DOE had planned for that design, no.

Q Well, when I say "design" I'm not talking about technical design. I'm talking about what function was the MRS supposed to serve.



A I don't recollect.

Q Okay. At the point in time of this document, were there any linkages between MRS development, any statutory linkages between MRS development and repository development?

MR. OLSEN: Objection to the extent it calls for a legal conclusion.

A I don't recollect.

Q On page two of the document, the last sentence in the first paragraph that actually begins on page one says "As specified in the contract, the ACR is for planning purposes only and thus is not contractually binding on either DOE or the purchasers." As a person involved with the utility nuclear waste management group, what significance did you place on the ACR?

A The significance I placed on it at that point in time was that it gave me an indication under what the planning basis was here as to what fuel -- which fuel I could expect to be removed from my plant as a planning basis. So it gave me, gave Wisconsin Electric, an indication of what this system meant for



Wisconsin Electric, how many assemblies would leave Point Beach in what year as a planning basis.

Q What did you take it to mean that the ACR was not contractually binding on DOE?

A That I couldn't rely upon them to do this.

Q What did you take it to mean that it was not contractually binding on the purchaser?

A That they couldn't make me do this, provide that fuel.

Q Anything else?

A That's it.

Q Did you take it to mean that the purchasers weren't bound to the acceptance rates in the document?

MR. OLSEN: Objection to the extent it calls for a legal conclusion.

A I didn't draw that conclusion.

Q Did you draw the opposite conclusion, that the purchasers were bound to the acceptance rates in the document?

A Didn't draw that conclusion.

MR. OLSEN: Again, the same objection, that it calls for a legal conclusion.

# Defendant

460

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

-----------------x

YANKEE ATOMIC ELECTRIC COMPANY; : Case Nos. 98-126C,
CONNECTICUT YANKEE ATOMIC POWER : 98-154C, 98-474C,
COMPANY; MAINE YANKEE ATOMIC : 98-483C, 98-484C,
POWER COMPANY; FLORIDA POWER & : 98-485C, 98-486C,
LIGHT COMPANY; NORTHERN STATES : 98-488C, 98-614C,
POWER COMPANY; DUKE POWER, a : 98-621C, 99-447C,
Division of DUKE ENERGY CORP.; : 00-440C, 00-695C,
INDIANA MICHIGAN POWER COMPANY; : 00-703C, 01-115C,
SACRAMENTO MUNICIPAL UTILITY : 01-116C, 01-249C

-----------------X

(Caption continued on the next page)

Continued Deposition of DAVID ZABRANSKY
Washington, D. C.
Friday, April 19, 2002
10:03 a.m.

Job No.: 12597-3
Pages 460 through 722 - Volume 3
Reported by: Diane Gomez, RPR

461

DISTRICT; SOUTHERN NUCLEAR :
OPERATING COMPANY, et al.; :
COMMONWEALTH EDISON COMPANY; :
BOSTON EDISON COMPANY; GPU :
NUCLEAR, INCORPORATED; WISCONSIN :
ELECTRIC POWER COMPANY; POWER :
AUTHORITY OF THE STATE OF NEW :
YORK; OMAHA PUBLIC POWER DISTRICT;:
NEBRASKA PUBLIC POWER DISTRICT; :
and TENNESSEE VALLEY AUTHORITY, :
Plaintiffs :
v. :
THE UNITED STATES, :
Defendant :

-----------------X

462

Continued Deposition of DAVID ZABRANSKY, held at the offices of:

ARNOLD & PORTER
555 12th Street, Northwest
Washington, D. C. 20004
(202) 942-5000

Pursuant to agreement, before Diane Gomez, Registered Professional Reporter and Notary Public in and for the District of Columbia.

463

APPEARANCES

ON BEHALF OF PLAINTIFFS FLORIDA POWER & LIGHT COMPANY, NORTHERN STATES POWER COMPANY, DUKE POWER, INDIANA MICHIGAN POWER COMPANY, BOSTON EDISON COMPANY, GPU NUCLEAR, INC., POWER AUTHORITY OF THE STATE OF NEW YORK, OMAHA PUBLIC POWER DISTRICT, and NEBRASKA PUBLIC POWER DISTRICT:

ALEX D. TOMASZCZUK, ESQUIRE
SHAW PITTMAN LLP
1650 Tysons Boulevard
McLean, Virginia 22102-4859
(703) 847-5097

ON BEHALF OF PLAINTIFF SACRAMENTO MUNICIPAL UTILITY DISTRICT:

JEFFREY L. HANDWERKER, ESQUIRE
ARNOLD & PORTER
555 12th Street, Northwest
Washington, D. C. 20004-1206
(202) 942-5000

636

Q Mr. Zabransky, in Exhibit 5, can I direct your attention to page six. Given the department's decision to suspend the DCS approval process in or about February or March of 1997, was there any need for any utility to submit DCS approval forms after that date?
MS. SULLIVAN: Objection, vague. Objection to the extent it calls for a legal conclusion.
**A I don't know that the department ever told utilities not to continue to submit. So whether there was need or not was up to the utility from their perspective.**
Q The Department of Energy did tell utilities in or about March 13th, 1997, that they were -- that it, the Department of Energy, was no longer going to act upon DCS forms. Isn't that true?
**A At that time, yes.**
Q And has that direction changed since March 13th, 1997?
MS. SULLIVAN: Objection, vague.
**A That position has not changed.**
Q And has the department approved any DCS

637

forms submitted after March 13th, 1997?
**A Not to my knowledge.**
Q And you would know if they had, would you not?
**A I would hope I would.**
Q Now, I understood your testimony to be that DOE's current intention is to begin contract performance in 2010?
**A That's DOE's current plans.**
Q And if I could direct your attention to page six of Exhibit 5, do you have that?
**A Yes.**
Q So in interpreting this table, is it fair that year one should now be read to mean year 2010?
MS. SULLIVAN: Objection to the extent it calls for a legal conclusion.
**A That's a way of interpreting this table.**
Q Is there any other way to interpret it?
**A I'm sure there are. I don't know.**
Q Can you tell me what they are?
**A Interpret year one to be any year you want but I don't know how else -- it seems reasonable from**

638

**your statement that year one was the first year of operations.**
Q And your testimony is, as I understand it, that DOE's current intention is to begin performance in 2010?
MS. SULLIVAN: Objection to the extent it calls for a legal conclusion.
**A That's DOE's current plans, are repository plans commence in 2010.**
Q And you would agree this the last APR ACR that was published by DOE, correct?
**A Yes, I would agree with that.**
Q Are you aware of any other guidance, instruction, memoranda or other information provided by DOE to the utilities concerning how to utilize this table and the instructions for purposes of determining when to submit a DCS?
**A No, I'm not.**
Q Do you have an understanding of the term "nonbreach world."
MS. SULLIVAN: Objection to the extent it calls for a legal conclusion. And it's also beyond

639

the scope but I'll allow him to answer.
**A I have heard the term used, and I believe I have an understanding of it.**
Q Can you tell me, sir, what your understanding of it is?
MS. SULLIVAN: Objection to the extent it calls for a legal conclusion. You can answer the question.
**A My understanding is what would have happened had DOE not breached its obligation to begin performance in 1998.**
Q And do you have an understanding, sir, as to what rate DOE would use for acceptance of spent nuclear fuel in the nonbreach world?
MS. SULLIVAN: Objection to the extent it calls for a legal conclusion. You can answer the question.
**A Had DOE begun performance in '98 as originally anticipated, at an interim storage facility, it would have been the rates in the ACR.**
Q You understand the term "nonbreach world" to assume an interim storage facility?

640

MS. SULLIVAN: Objection to the extent it calls for a legal conclusion.
**A DOE's plans for 1998 performance included, required the use of an interim storage facility.**
Q Did that change at some point in time?
**A Not --**
MS. SULLIVAN: Objection, vague.
**A Not for 1998 performance.**
MR. TOMASZCZUK: I just want to look at my notes.
Q Mr. Zabransky, could you identify for me all of the assumptions on which you relied or do rely in your understanding of the term "nonbreach world."
MS. SULLIVAN: Objection to the extent it calls for a legal conclusion. Objection as to relevance. You can answer the question.
**A In my understanding it would have been that DOE had performed in accordance with the contract at its facility which I believe would have been in interim storage before a repository and would have been in accordance with the DCSs in the contract. That were approved.**

641

Q And those approved DCSs were subject to a 20 percent adjustment, right?
MS. SULLIVAN: Objection to the extent it calls for a legal conclusion. You may answer.
**A The contract allows the purchaser to adjust the DCSs plus or minus 20 percent.**
Q I don't have any further questions at this time, Mr. Zabransky. I'm going to reserve the right to call you back based on some instructions not to answer, number one. And second, based on certain documents which have been designated by the government as privileged as to which we have a dispute with the government. And subject to that right, I want to thank you for your time and cooperation, and as Mr. Oehler has correctly pointed out, we have just gotten some documents as well that we have not had a chance to review prior to the taking of your deposition. I want thank you for your time. Depositions can be tedious and litigation is a tough business. I appreciate your cooperation.
EXAMINATION BY COUNSEL FOR PLAINTIFF
SACRAMENTO MUNICIPAL UTILITY DISTRICT

642

BY MR. MACDONALD:
Q Mr. Zabransky, good afternoon. My name is Tim Macdonald. We met earlier off the record the last couple today of days. I represent Sacramento Municipal Utility District, another one of the plaintiffs in this litigation. I'll refer to them as SMUD as lots of people do. I assume you've heard that acronym before?
**A Yes, I have.**
Q When you were speaking with Mr. Tomaszczuk he was asking you about assumptions for your view of what would happen in the nonbreach world. Do you recall that testimony?
**A I recollect, yes.**
Q And I believe your testimony was that as one of the assumptions performance would have to be consistent with the contract. Is that correct?
MS. SULLIVAN: Objection to the extent it calls for a legal conclusion.
**A Yes, I guess that's one of my assumptions.**
Q Is another one of your assumptions that performance would have to be consistent with the

643

statute?
MS. SULLIVAN: Objection to the extent it calls for a legal conclusion.
**A I believe we would have to be consistent with the statute from what I know about legal things, but, yeah.**
Q Mr. Tomaszczuk also asked you a series of questions about communications you had with his collection of clients.
**A Yes.**
Q And I would like to ask you the same question with respect to SMUD. So I think the first question was whether you remember having conversations with SMUD employees while you were at WEPCO about matters relating to performance under the standard contract?
**A I don't recollect a conversation with SMUD employees when I was at WEPCO.**
Q The second question then is while you have been an employee of DOE have you had or do you recollect having conversations with SMUD employees regarding issues related to the performance under the

# Defendant

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

\- - - - - - - - - - - - - - - x

YANKEE ATOMIC ELECTRIC :
COMPANY, MAINE YANKEE ATOMIC :
POWER CO., and CONNECTICUT :
YANKEE ATOMIC POWER CO., : Case No. 98-126C,
Plaintiff, : 98-474C, 98-154C
vs. : (Senior Judge Merrow)
UNITED STATES OF AMERICA, :
Defendant. :

\- - - - - - - - - - - - - - - x

Washington, D.C.
Thursday, June 6, 2002

Deposition of DAVE ZABRANSKY, Volume II, a witness herein, called for examination by counsel for the Plaintiff in the above-entitled matter, pursuant to notice, the witness being duly sworn, taken at the offices of Spriggs & Hollingsworth, 1350 I Street, N.W., Washington, D.C., commencing at 9:32 a.m., Thursday, June 6, 2002, and the proceedings being taken down by Stenotype by CAPPY HALLOCK, RPR-CRR, and transcribed under her direction.

CONTAINS CONFIDENTIAL INFORMATION
PURSUANT TO THE PROTECTIVE ORDER

Page 229

A. I don't know how to answer that question.
Q. I'm asking what you think.
A. I have no idea what people would do. As many people as there are out there, I don't know what they all think.
Q. What do you think WEPCO would have done?
MR. CRAWFORD: Objection, calls for speculation. Objection, assumes facts not in evidence.
A. I think WEPCO would have done what WEPCO did. They understood the basis for prioritization and acted accordingly. WEPCO didn't like the quantities but WEPCO signed up for the quantities, bought as many as it could as soon as it could.
Q. Didn't WEPCO do that in part because it didn't have confidence that the department was going to be able to accept spent fuel when WEPCO really needed the department to do that?
MR. CRAWFORD: Objection, calls for speculation.
A. I think WEPCO signed up for that for the reason it saw it as a binding commitment, and

Page 230

it was concerned that the department would some day stop approving these documents and wanted them signed before they came to their senses.
Q. I'm asking you to suppose a different world.
A. I can't suppose a different world. I don't know what would have happened and I can't speculate about things I have not thought about.
Q. I'm asking you to think about it right now.
A. I will try.
MR. CRAWFORD: Indulge Mr. Shapiro.
THE WITNESS: I will indulge him to the extent that I can.
Q. If WEPCO had not had a concern that the department would stop approving delivery commitment schedules, if WEPCO didn't have a concern that the department would not be picking up spent fuel at a rate of, let's say, 3,000 metric tons per year from utilities, if it didn't have those concerns, do you think WEPCO would have asked for all of its spent fuel to be picked up as soon as possible?
MR. CRAWFORD: Objection to the extent it assumes facts not in evidence. Objection to

Page 231

the speculation.
A. I don't know what WEPCO would have done. I would not have recommended that WEPCO take such an action.
Q. Take what action?
A. To request that all its spent fuel be picked up immediately.
Q. Why wouldn't you have recommended that?
A. Because it makes no sense either.
Q. Why doesn't it make any sense for a utility to have all of its spent fuel picked up immediately?
A. Assuming our group, and utilities are a group, everybody wanted to go first, and in that idiot fashion no one would go anywhere. It didn't make sense. Everybody had their allocation but it was the world we had to live with. Utilities that didn't buy into that acted differently. We didn't act that way at WEPCO.
Q. I'm not sure you are understanding my hypothetical --
A. That's probably true.
Q. -- So let me try to rephrase and make it simpler.

Page 232

Other than a concern that it will not be able to get the department to pick up its spent fuel at a later time, why would a utility want to have the department come to pick up its spent fuel earlier if the presence of that spent fuel in its pool is not causing that utility any marginal cost?
A. Again, you will have to ask those utilities who did that. I can't speculate what their motivation was. I never could figure out their actions. Ask those utilities. Don't ask me to speculate. I never could figure it out.
Q. So you're saying you don't see a reason why a utility would be anxious to have the Department of Energy pick up its spent fuel early if the utility otherwise had confidence that the department would later come to pick up its spent fuel when the utility needed to have the spent fuel picked up?
MR. CRAWFORD: Objection. Calls for speculation --
Don't speak over me. Wait until I finish. Then you can respond to Mr. Shapiro.
Objection to the extent it calls for speculation.

# Defendant

Page 233

Go ahead.
A. Again, we are sitting here saying why would someone act that way? The way I acted, I signed a deal. The deal says it works this way. We worked that way. It said there was a line, we got in line.
Q. That's where I'm not sure you understand my hypothetical. You got in line because you were concerned that the department was not going to accommodate everyone in line on a timely basis.
MR. CRAWFORED: Objection to the extent it mischaracterizes the prior testimony.
A. I didn't say that. How do you draw that from what I said? What are you trying to say that I said?
Q. Why were you, and I assume you were talking about WEPCO, why was WEPCO anxious to get in line as early as possible?
A. To get in line? We were in line. You're in line from the basis of discharging fuel, so I'm not sure what you are alluding to.
Q. I thought you said that's the way your understanding was that the system was set up and you got in line?

Page 234

A. We were in line. You were in line pursuant to being in the contract. You don't get in line, you are in line. You got in line when you signed the contract.
Q. We will move on.
Another thing we covered yesterday, Mr. Zabransky, was the acceptance rates in the Annual Capacity Report, and if you recall, you distinguished between the acceptance rates in documents such as the program plan versus acceptance rates in an Annual Capacity Report. You said one would be -- the one in a program plan would simply be a plan of what the system might be capable of doing, but it was your opinion that the projections in the Annual Capacity Report should reflect what you referred to as dependable performance.
Do you recall that testimony?
MR. CRAWFORD: Objection to the extent it mischaracterizes his prior testimony.
A. I think what I was trying to refer to or trying to state was the fact that when the contracting officer chose a document to bind the government, which I believe they were doing, they should base it on the maximum dependable capacity,

Page 235

not on an engineer's planned capacity, so even though the APR or the ACR was a planning document, when it was utilized for the basis of the DCSs, it became a commitment document, and the contracting officer needed to exercise judgment that that was the right amount to commit to. Apparently they did.
Q. Well, you're aware that earlier Annual Capacity Reports used acceptance rates that were consistent with the planning documents that went right up to 3,000 BTU. Are you saying that was ill-advised?
MR. CRAWFORD: Objection to the lack of foundation. Objection in that it calls for speculation. And objection, it may call for a legal conclusion.
A. I'm saying they were never used by the contracting officer for the submittal or approval of DCSs.
Q. Is it your understanding that the department made a decision to reduce the amounts of spent fuel in its projections in the Annual Capacity Reports once those could be used for the purpose of submitting delivery commitment schedules?

Page 236

MR. CRAWFORD: Objection to the lack of foundation and to the extent it calls for speculation.
A. I was not there. I don't know why they do what they do.
Q. Well, for the 1995 Annual Capacity Report, is it your understanding that a lower acceptance rate was put in that report in order to limit the government's commitments to utilities?
MR. CRAWFORD: Objection, asked and answered. Objection, lack of foundation. Objection, speculation.
A. Again, as I stated yesterday, the numbers in the '95 report were carried over from the previous report, and I'm not aware of any discussion about changing them.
Q. Other than yourself, are you aware of anyone else at DOE that shares your view that the Annual Capacity Report should reflect what you term as dependable performance projections as opposed to projections consistent with the department's current plans for spent fuel receiving facilities?
MR. CRAWFORD: Objection to the extent it mischaracterizes the prior testimony.

# Defendant

Page 281

I guess, and I'm not sure when it ceased.
Q. During your tenure in the waste acceptance team, has your office done work studying exchanges of approved delivery schedules?
A. I think work was done after I came, but it wasn't done for me.
Q. Who would that have been done for?
A. I believe Ms. Slater looked at that.
Q. Did you have any involvement in the work that was done for Ms. Slater?
A. Not to any great degree. I remember on a tangential basis it was going on, but I really didn't get involved in it too much of the time.
Q. You said a moment ago that you believed that DOE would try to facilitate exchanges if the DOE was otherwise accepting waste. Why do you believe that DOE would try to facilitate exchanges?
A. Well, I think it has always been DOE's stated position, and back in the old days, I mean at one point DOE went as far as developing the -- an electronic bulletin board to try to facilitate exchanges so utilities could see who had what approved DCSs.

Page 282

Q. When did DOE develop this electronic bulletin board?
A. That was probably in the '94 time frame. I'm not sure exactly when in that time frame.
Q. And the intent of the bulletin board was to facilitate exchanges by making information available to utilities as to what was available to be exchanged?
A. It was to basically make available the approved DCSs so people would know, you know, what was available to exchange with.
Q. If you believe that DOE would have tried to facilitate exchanges, do you believe that DOE would have approved most of the exchanges that would have been proposed by utilities?
MR. CRAWFORD: Objection, vague. Objection to the extent it calls for speculation.
A. I can't speculate without knowing the circumstances of the specific exchanges.
Q. Do you have an understanding as to what would cause DOE to disapprove a proposed exchange?
MR. CRAWFORD: Objection to the lack of foundation and to the vagueness and to the

Page 283

extent it calls for speculation.
A. I mean, part of the process would be -- first of all, the contracting officer retains sole discretion to approve any exchange, but to the extent there would be a technical implication it would have to consider whether or not the exchange could be accomplished without adversely affecting the operation of the facility or other contractholders.
Q. Well, you mentioned the contracting officer retains sole discretion. What do you see as the significance of the contracting officer's retention of sole discretion to approve or not approve exchanges?
A. I don't know. It is in the contract. We would have to ask the contracting officer.
Q. Why did you preface your last answer with that part of the contract?
A. Because I was quoting from the contract, I believe. I will go back and check.
Q. I think the phrase sole discretion is in there somewhere.
A. Um-hmm.
Q. Is it your understanding that the contracting officer would exercise that discretion

Page 284

to approve proposed delivery commitment schedules to the extent that they would not cause technical problems that would adversely affect the operations of the facility or other contractholders?
MR. CRAWFORD: Objection to the vagueness of that, and to the lack of foundation. Objection to the extent it calls for a legal conclusion.
A. I can't speak to what criteria the contracting officer would use beyond the technical attributes that I would consider.
Q. What technical attributes would you consider?
A. As I just mentioned, whether or not the exchange could physically be accomplished without adversely impacting the operation of the system or other contractholders.
Q. How would an exchange adversely affect the waste acceptance system?
MR. CRAWFORD: Objection to the vagueness and to the lack of foundation.
A. Again, I didn't say all exchanges would. It depends on the specifics of the exchange.

Page 285

Q. Any exchange. What are you thinking of that a potential exchange, why would an exchange adversely affect the waste acceptance system?
A. Speculating as to what could happen, given that an exchange would come in at any time, and the system was, with a certain capacity was expecting to get a certain number of casks the following year, whatever period it might be, and the exchange came in and now it is double that number of casks, that would adversely affect the operations of the system. It may not be able to be accommodated.
Q. How would an exchange result in a need to double the number of casks?
A. We went from ten rail casks to 50 truck casks because the exchange was between a utility that can only ship truck casks and one that can ship rail casks, so without knowing the specifics I can't answer the question.
Q. Well, let me just go through the possibilities. You mentioned a potential cask issue. Can you think of any other technical problems that might be posed by a potential proposed exchange?

Page 286

MR. CRAWFORD: I will objection to the extent it calls for speculation and to foundation.
A. Again, further speculation could be that waste packages had already been procured for the fuels to be delivered under one regime and under the exchange different waste packages were required. I don't know what could happen. Without reviewing the circumstances at the time the exchange was requested, I can't answer as to whether it would be acceptable or not.
Q. You mentioned waste packages and a transportation cask. Can you think of any other potential technical problems that would be imposed by a proposed exchange?
MR. CRAWFORD: Let me object to the overbroadness of that, and to the extent it mischaracterizes what he previously testified to.
A. I mean, I'm giving you speculation as to what items may have to be considered and could be in the way of an exchange. Other things that could happen is the exchange could be between different geographic parts of the country where training has not yet occurred or in sufficient time before the shipment to allow us to transport in accordance with the provisions to transport.

Page 287

Q. Any other potential problems?
MR. CRAWFORD: Again, object to the overbroadness of that, vagueness of it. Objection to the extent it requires -- to the extent it calls for speculation.
A. Because of the different locations of plants, distances, time traveled, there might not be enough casks to service that facility at that time. Another one would be that the casks requested were already committed to service someplace else and could not be available within that time, so most of these are logistic in nature. Until you know what you are dealing with you can't pass judgment on it.
Q. I want to see if I have all the issues that you can think of right now. Not necessarily an exhaustive list but what you can think of right now, what logistical issues that might come up that would cause a technical problem with approving a proposed exchange.
A. And again those -- responding to your question, those are the ones I can think of right now but I also believe it is impossible to think of right now even exhaustively things that could happen over the next 20, 30 years that would be

Page 288

new issues so there is no way to come up with an exhaustive list to cover items in the future.
Q. One of the items you mentioned was how different waste packages might have been procured. I'm not sure what you mean by -- what is a waste package as opposed to a transportation cask?
A. A waste package is what is used for disposal.
Q. DOE's current plan is to use different waste packages for different spent fuel?
A. Different spent fuel has different physical characteristics, and you couldn't use the same waste package.
Q. Ultimately DOE will need the appropriate number of various kinds of waste packages to handle all the waste that is in the stream to come to Yucca Mountain; isn't that true?
A. Ultimately.
Q. But you're saying that to handle some proposed exchanges they might need more of a particular type of waste package sooner than they might have otherwise predicted, and then they might not have the right kind of waste package available?
A. That could be an outcome, yes.

Page 289

Q. Is that the problem that you were referring to when you said there could be a problem with the waste package that might cause a technical problem to accommodate an exchange?
A. Correct.
Q. You mentioned training in the region where the fuel is supposed to come from. What is the potential problem with training? I'm not sure what you're referring to there.
A. The DOE is obligated to provide funding for emergency response training a certain number of years prior to the shipments. If it had not been done, shipments couldn't occur.
Q. Is DOE planning to conduct this required training in different parts of the country at different times?
A. I think DOE is planning on doing the training at the appropriate time, recognizing that training people who aren't going to use it, who will leave those positions is wasted, Since it is mostly volunteer organizations that will get trained and you have turnover rates, so you try to track the training to your need. And there is a requirement for continuing training.
Q. Who is being trained?

Page 290

A. Emergency responders. The Act requires DOE to train, for funds and equipment for emergency responders. The states will also require certain training prior to allowing nuclear fuels to traverse their territories.
Q. You said DOE would plan to do such training at what you termed an appropriate time. DOE has to at least conduct such training prior to the first delivery of spent fuel from a utility in a particular region?
A. And continuing training is to be provided.
Q. So even if there were no exchanges of a utility's spent fuel allocation, DOE would need to do the requisite training to remove fuel from the utility consistent with where that utility is in the oldest fuel first queue to make deliveries to DOE?
A. At some point, yes. But if it is somebody who is in the twentieth year, it makes no sense to do it the fifth year before operations.
Q. But if a utility otherwise has an allocation in the first year, but is merely exchanging to get more allocations in that first year, then that exchange would not necessarily

Page 291

implicate this potential concern that you have raised about regional training?
A. That's why every exchange has to be reviewed on its own individual merits. There are no generalities.
Q. I don't think you quite answered my question, about if a utility had an allocation in the first year, and that if the utility was merely exchanging for a greater allocation in that year, that wouldn't affect DOE's training obligation, at least with respect to that utility with that year one allocation, would it?
A. With that specific utility and with that specific condition, probably not.
Q. Another potential concern you mentioned was transportation of the casks. I'm not sure, what is the nature of the logistical concern there?
MR. CRAWFORD: Objection vague.
A. A certain number of casks will be procured to meet a certain need within certain turnaround times. It takes longer to move the casks from the east coast to Nevada than it does from the west coast to Nevada. To the extent exchanges move it more to the east coast with

Page 292

short notice there may not be sufficient casks to service everybody else after that exchange because the casks have already been committed for the year.
Q. In general you need fewer casks if larger transportation campaigns are used to ship spent fuel?
A. No --
MR. CRAWFORD: Objection. Vague.
A. No. You may need more casks for larger campaigns.
Q. How could that be?
A. Because a utility can only load a certain number of casks a week, and if you are waiting for a campaign you will let them sit there until you fill the last cask, so it may actually require more casks, not less.
Q. Do you have any expectation as to the extent to which you believe that DOE will be able to resolve these logistical concerns -- I'm sorry, I think was the word that you used -- in order to approve proposed exchanges of approved delivery commitment schedules?
MR. CRAWFORD: Objection to the foundation. Objection, assumes facts not in

Page 293

evidence. Objection to the extent it calls for speculation.
A. And I'm not sure, when you say DOE resolved these issues, what do you mean?
Q. The issues that you have raised, since they are capable of being anticipated, aren't they capable of being addressed such that when a proposed exchange is actually put in DOE would be prepared to accommodate the exchange?
MR. CRAWFORD: Objection to the extent it mischaracterized what he said, and objection to the extent it calls for speculation or assumes facts not in evidence.
A. And again depending on when an exchange is requested and what the exchange is, if you're asking me can the department, can anybody buy enough of everything, having it sitting around uselessly until somebody decides at the last minute, sure. Would that be right? No. There are budget constraints. It depends on when the request occurs and what the request is, and I can't envision all the circumstances in the future in order to get it addressed.
Q. Well, you said the department would not want to buy a lot of extra casks and other

Page 294

material in anticipation of exchanges uselessly, particularly if such exchanges don't happen. Wouldn't the department be able to model and predict with some fair amount of reliability what exchanges would likely be proposed?
MR. CRAWFORD: Objection to the foundation. Objection to the extent it calls for speculation.
A. I don't think so. I can't model how utilities will act for their own self-interest.
Q. You could model to determine who likely would want spent fuel at particular times, couldn't you?
A. I can't model individual self-interests. I also need to be accountable to other contractholders who continue to pay for expenditures that are not used.
Q. Let's do it one question at a time. My question is you could model which utilities would want spent fuel removed at particular times, couldn't you?
MR. CRAWFORD: Objection to the extent it calls for speculation. Object to the foundation. Objection to the extent it assumes facts not in evidence.

Page 295

A. No, I can't. I can't model as to what utilities might want to do.
Q. My question is, you could model to determine which utilities would need spent fuel removed in order the avoid otherwise incurring additional costs.
MR. CRAWFORD: Objection. Asked and answered.
A. I can't model -- I can model what utility inventories might be. I can't model as to what the behaviors would be. And again one thing I think you are missing, it is not as simple as a cask for this type or that type. Each fuel may require a different type of cask from the same facility.
Q. A different transportation cask?
A. Yes.
Q. Well, let me go back to the discussion we were just having where you were saying you can't predict self-interest. Are you saying that in such a model it wouldn't be reasonable to presume that utilities would act in their economic self-interest in order to minimize their costs and maximize their profits?
MR. CRAWFORD: Objection to the

Page 296

vagueness of that.
A. For a perception model to work I would not only have to model who needed it early but who would be willing to give it up later, because it has to be a trade, and I can't model the infinite number of variables that would come to that scenario unless I modeled everything possible. I'm not sure what the purpose would be. When a trade is proposed it can be evaluated. The sooner it is proposed, the easier the evaluation.
Q. Well, the Department of Energy, you are aware, has done studies to determine which utilities are likely to run out of pool space at various times.
A. I'm aware of that, yes.
Q. Wouldn't those studies also show which utilities have plenty of pool space at given times?
MR. CRAWFORD: Objection to the facts.
A. Yes.
Q. Wouldn't the utilities with ample pool space be likely sellers of allocations during those time periods when they have plenty of space?
MR. CRAWFORD: Objection to the vagueness. Objection to the extent it calls for