# Plaintiff

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| PACIFIC GAS & ELECTRIC COMPANY, Plaintiff, | |
| vs. | No. 04-074C into which has been consolidated No. 04-075C |
| UNITED STATES OF AMERICA, Defendant. | |

Washington, D.C.

Tuesday, November 1, 2005

Deposition of:

DAVID ZABRANSKY

called for oral examination by counsel for Plaintiff, pursuant to notice, at Greenberg, Traurig, L.L.P., 800 Connecticut Avenue, Northwest, Suite 500, Washington, D.C., before Shari R. Broussard, a Notary Public in and for the District of Columbia, beginning at 9:29 a.m., when were present on behalf of the respective parties:

00012

(PG&E Z/P Exhibit Number 2
was marked for identification.)

MR. STOUCK: Here's a copy for you, Alan.

MR. LO RE: Thank you.

BY MR. STOUCK:

Q Mr. Zabransky, you've been handed what's been marked as Exhibit Number 2, which consists of a letter on Department of Energy letterhead May 19, 1997 to Judith Sellers at PG&E, from Beth Tomasoni identified as contracting officer, forwarding a document called Office of Civilian Radioactive Waste Management Spent Nuclear Fuel Verification Plan, March 1997. Is that what you have?

A That's what it appears to be, yes.

Q Have you seen this plan before?

A Yes, I have.

Q What is it?

A As it's titled, the spent fuel -- Spent Nuclear Fuel Verification Plan, Rev 0, dated March 1997.

Q What is the purpose of this plan?

MR. LO RE: Objection. Calls for

# Plaintiff

their intent, yes.
Q At that time do you know whether DOE had any intent one way or the other as to whether those canisters would be opened again after they were sealed at the purchaser's site?
A Well, at that time they didn't exist, so I don't think DOE had any intent or plans whatsoever about them that I recollect. It was merely a potential that was being investigated and that was the intent of those investgations. They didn't exist.
Q Well, did DOE have any -- excuse me for one second. Let's go off the record. There's one more document.
(Discussion off the record)
BY MR. STOUCK:
Q Was there any part of DOE's planning for the program in this March '97 time frame that involved plans for whether or not these containers, if used, would be reopened at the disposal facility?
MR. LO RE: Objection, calls for



speculation. Objection, compound. You may answer.
THE WITNESS: Can you clarify what you just asked me?
BY MR. STOUCK:
Q Yeah. Well, subsequent to 1997 DOE did plan to reopen these containers at the repository site; isn't that right?
A Well, I think chronologically I think prior to this point in time when these first came up in the late '80s, early '90s, I think DOE had expressed an opinion or sent letters to people that talked about the use of dual-purpose casks, and that had gone on. At some point in time the requirements documents were -- included the capability of opening canisters or casks and repackaging them at the repository facilities, but that would, you know, as would be required should DOE accept them and because they wouldn't have disposal. So those were eventually at some point included in the requirements documents. I don't know exactly when those were --
Q The "those" in your sentence --



A The requirement that the facilities be capable of some limited capability of repackaging canisters.
Q You're talking about the reactor sites?
A No, the repositories.
Q Repository. And, in fact, there was a design that was developed to include that capability at the repository site, correct?
A It was a requirement for the contractor to develop such a design. I'm not sure it was ever finalized at this point.
Q Well, I didn't ask whether it was finalized. I've seen pictures of a canister at a handling facility. Have you seen those?
A I've seen pictures. I don't know the design.
Q Well, that's part of the plans though, we agree with that, at some point subsequent to 1997?
A Yes.
Q So, therefore, subsequent to the time of this document it was a part of DOE's plan to reopen at least some of these containers; is that correct?



MR. LO RE: Objection. Mischaracterizes the prior testimony. You may answer.
BY MR. STOUCK:
Q I think we're quibbling over whether the plans were finalized.
A No, I think we're quibbling over whether DOE's intent to actually do it or to have the facility to decide to do it. It was going to have the facilities should it decide to implement the provisions necessary to accept such canisters.
BY MR. STOUCK:
Q Fine. At the time of this document, Exhibit Number 2, was that same thing part of DOE's plans? I mean had the thinking progressed far enough where DOE was planning at the time of this document to have the capability to open the containers if it wanted to?
A Yes, the capability would have been there consistent with earlier discussions that DOE had had with the industry, yes.
Q But the purpose of this document though that's in front of you was to provide guidance for

verification of the spent fuel before it was put into the containers in the event that they ultimately were not going to be reopened at the repository site; isn't that correct?

A No.

Q That's not correct?

A That's not correct.

Q What's wrong with that statement?

A It was to provide guidance to allow for verification at the time of receipt so that should DOE and the utilities have concluded whatever arrangements were necessary to make these acceptable waste forms and that DOE had then agreed to pick them up, that the lack of a verification activity physically taking place wouldn't prevent that from happening.

Q Well, I think that's what I just said. In case it was decided that the containers were not going to be reopened --

A No, they always have to be reopened.

Q They always have to be reopened.

A At the repository.



Q Why is that?

A They're not disposable.

Q Then I'm not understanding what the purpose of the plan was. This plan was to provide verification before they went into the cans even though they were going to be reopened and it would have been possible to verify the spent fuel?

A Afterwards.

Q Afterwards?

A After DOE receives it. This would just say that DOE could receive without physically verifying the contents that it was receiving.

Q Ah, I see. Okay.

Did you have any role in the development of this Exhibit 2 document?

A I believe I was -- participated in the development of this document, yes.

Q What was your role specifically?

A I believe I provided input and guidance to the contractors that were developing this document. For instance, I believe that it was my position that we should be able to rely upon the



documentation that the utilities had in lieu of, physical verification, in lieu of canisters should we decide to accept those, that that shouldn't be the impediment for acceptance.

Q What would be the impediment for acceptance in your view in 1997? If you had a view about that, what was your view about what might, let me put it this way, might be an impediment to acceptance, if not the lack of verification?

A Well, the impediment to acceptance I believe is that the contract doesn't cover the acceptance of the canisters.

Q Is that a particular impediment in your view? It sounds like a legal issue.

A I would say it's a legal issue.

Q So we change the contract to make them acceptable?

A And DOE has said that, yes.

Q There's no technical impediment to accepting these canisters; is that correct?

MR. LO RE: Objection. Calls for speculation.



THE WITNESS: Well, at this point there is. I mean the mere fact at this point there is no facility licensed to accept them makes it more than a legal impediment. It makes it a physical impediment at this point.

BY MR. STOUCK:

Q A facility could be licensed to accept these containers; isn't that correct?

A I can't speak to what the NRC may or may not license.

Q The Department of Energy could ask the NRC to license a facility that would accommodate the receipt of these dual-purpose containers; is that correct?

A The receipt and reopening and repackaging, yes, they could, yes.

Q There's no technical reason why DOE could not ask the NRC to license a facility that would accommodate the receipt and disposal perhaps in some overpack but disposal of these containers as well; isn't that right? I mean are you aware of any impediment?

# Plaintiff

00027
conclusion; in other words, was there a final analysis done that led DOE to conclude that there was no way that these containers could be disposed of or was the analysis, the alternative would be, you know, some analysis was done, but it never really got to a final answer one way or the other?

A I don't how final it got to, but, you know, using the comparator ever could be -- it's not something that anybody would ever say, but as currently envisioned they don't meet the long-term disposability requirements for Yucca Mountain that the Department intends to license.

Q So if brought to the repository, they would have to be reopened?

A That would be the current plan should we take them in.

Q Oh, that would be the current plan as of now should we take them in?

A It's been the plan for several years.

Q And that's still the plan today if you should take them?

A That's the requirement that has been

Page 26

A Yeah.

Q Do you have any reason why DOE would not or could not ask NRC to license such a disposal?

A Well, it's my understanding that the disposability of these is technically right now not something we know how to do.

Q Well, you know --

A We could ask for lots of things, but we don't have a basis for saying why they would be disposable.

Q But if it's a path that DOE wanted to pursue?

A No, I'm not saying it couldn't be pursued. We don't know how to do it technically. There's no way to make these disposable because DOE is currently picking --

Q Has the disposability of these containers been studied by DOE?

A I believe it has.

Q In overpacks?

A Yes.

Q And did those studies come to a complete

Page 27

conclusion; in other words, was there a final analysis done that led DOE to conclude that there was no way that these containers could be disposed of or was the analysis, the alternative would be, you know, some analysis was done, but it never really got to a final answer one way or the other?

A I don't how final it got to, but, you know, using the comparator ever could be -- it's not something that anybody would ever say, but as currently envisioned they don't meet the long-term disposability requirements for Yucca Mountain that the Department intends to license.

Q So if brought to the repository, they would have to be reopened?

A That would be the current plan should we take them in.

Q Oh, that would be the current plan as of now should we take them in?

A It's been the plan for several years.

Q And that's still the plan today if you should take them?

A That's the requirement that has been

Page 28

placed on the contractor, to design such a facility. Whether it could be licensed is another question.

Q When was that requirement placed on the contractor, approximately?

A I don't recall. It's been there for years. I don't know exactly when it went on.

Q So that, you know, plan or potential plan to reopen these dual-purpose containers at the repository is not affected by the recently announced or revived idea of having standardized containers developed by DOE; is that right?

MR. LO RE: I'm going to object to this question on the grounds that it is clearly outside the scope of discovery in this matter. As Judge Hewitt has made perfectly clear, discovery is to be cut off of on the date of plaintiff's complaint, which I believe is January '04, so I'm going to object to this question and ask you to withdraw it.

BY MR. STOUCK:

Q I'm not going to withdraw it. I'll come at it from a different angle. But he's the one who

Page 29

brought up the subject. He's the one who has already testified to that. It's literally my last question on this line.

MR. LO RE: You said you were going to come at it from a different angle.

MR. STOUCK: Well, I will try to, surely. If this doesn't satisfy -- that's going to come later in the outline. If we can have an answer now, I would appreciate it.

I think he's already signaled what the answer is. It's really just confirmation of what's already implied by the last answer.

MR. LO RE: Would you read that back?

MR. STOUCK: Well, if you don't mind, would you read back the last question and answer?

(The reporter read the record as requested.)

MR. STOUCK: And I think, again, it's still the plan today I think the answer to the question is.

MR. LO RE: That's fine, if you want to ask whether it's still the plan today.



202.857.DEPO www.CapitalReportingCompany.com
1000 Connecticut Avenue, NW Suite 505 Washington, D.C. 20006

Page 30

MR. STOUCK: Well, I asked him if it's still the plan today and he said yes, a potential plan.

BY MR. STOUCK:

Q If you accept the containers, the plan is to reopen them at the repository; is that correct?

A That's the plan today.

Q May I infer by logic then that that plan is not affected by the recently -- well, whatever recent announcements DOE has made on any subject?

MR. LO RE: Well, to the extent you're asking him about the recent changes --

MR. STOUCK: Alan, you're drawing a line that's not tenable. He just answered a question that had to do with something today, current. You can't cut it off at the time of the complaint, so I would just like him to confirm that there's been no effect on these plans by the recent announcement. I mean I'm sorry to get argumentative about it, but I'm not asking an extensive number of questions about today's plans. I'm just asking really a clean-up question about something that's already

Page 31

been covered, so I'd like to have an answer and what I'd really like to do is move on so I can get the witness out of here.

THE WITNESS: That's still the plan today.

BY MR. STOUCK:

Q And not affected by the recently announced revival of a standardized container idea? Is that a reasonable inference?

MR. LO RE: I'm going to place the same objection, Jerry, and I think you've gotten the answer that you were looking for twice.

MR. STOUCK: Well, are you instructing him not to answer?

MR. LO RE: I am lodging the objection. I think you've gotten your answer. I'm asking you to move on. If you're not going to move on, we'll take it up, we'll address it.

MR. STOUCK: Are you instructing him not to answer?

MR. LO RE: You're asking him to testify --

Page 32

MR. STOUCK: Just tell me yes or no. Are you instructing him not to --

MR. LO RE: To the extent you are asking him about events that occurred after January, whenever your complaint was filed, January of '04, I'll instruct him not to answer. Having said that, I believe that you got the answer that you were looking for.

MR. STOUCK: Mark this as Exhibit Number 3.

(PG&E Z/P Exhibit Number 3 was marked for identification.)

BY MR. STOUCK:

Q Mr. Zabransky, you've been handed what's been marked as Exhibit Number 3 to this deposition. It's a letter dated March 18, 1983 on Department of Energy letterhead to Mr. J.E. Barrett, Contract Administrator, Pacific Gas & Electric Company, from the contracting officer, forwarding what appear to be approved delivery commitment schedule forms. Do you see that?

A I see that.

Page 33

Q Do you agree with my description of what this exhibit is?

A That's what it appears to be, yes.

Q And if you take a look back at Exhibit 1 -- do you still have that before you -- and you see the delivery commitment schedule forms that are attached to Exhibit 1 are signed by Mr. Stock, not me, a different Mr. Stock, and dated 8/24/92, the ones that are attached to Exhibit Number 3 were signed by Mr. Stock and dated apparently by him on November 24? Do you see that?

A I see that.

Q So that's consistent with what we were calling previously a back and forth. Maybe there were some mistakes or discrepancies and they had to be redone; is that right?

A I don't know what happened between this one and that one. I wasn't at DOE for either of these.

Q You do have an understanding that there was some back and forth about mistakes or whatever?

A There was correspondence. I don't know

# Plaintiff

Page 126

DOE that more documentation or more information was needed?

A I don't recall specifically.

Q You don't recall?

A No.

Q You don't recall discussing that with PG&E?

A Other than this concept in general.

Q I think that does it for this exhibit, let me just make sure, unless you have something else you want to tell me, which I'm always happy to have.

A No.

Q The last very bullet on page six it says "DOE" -- are you with me?

A Uh-huh.

Q -- "DOE recommends we not concern ourselves with an MPC spec at this time because there is too much uncertainty. Concentrate on getting a revised contract that allows DPC priority acceptance." Do you see that?

A I see that.

Page 127

Q Is that something that, you know, you would have said or does that reflect your views at that time?

A Well, the first sentence I agree with, that we didn't have an MPC spec, we had just withdrawn an MPC spec, so there's no help we could give them on that issue at that time. The second sentence, that might be their conclusion.

Q You can't say that you would have told them that?

A I can't say I would have told them that, no.

Q But if one of them said that you told them that, you couldn't dispute it either?

A I couldn't dispute it either.

Q Let's then move on to number -- oh.

A Seventeen?

Q Since it's the same meeting, a bunch of minutes, I just have one or two questions here.

MR. LO RE: Counsel, before we do that I just want to note for the record on what is stamped as page four of the exhibit we just looked at,

Page 128

PHB0033309, is a blank sheet, and I am assuming, based on the numbering, that that was just simply left blank by whoever created the document, it's not that the material has been removed for any privilege or anything.

MR. STOUCK: Thank you for that. I did notice that myself yesterday when I was looking at this. Page three has question number four, page five has question number five, so I agree with your interpretation, but I don't know. We all know how the return button works on the Word documents.

MR. LO RE: Yeah, and my point is only nothing has been removed for privilege or anything like that.

MR. STOUCK: That is my understanding as well, that what you have is what I have.

BY MR. STOUCK:

Q On Exhibit Number 17, which has a different date at the top, but it says November 11th, I believe this is the same meeting. I think that may be an automatic date. Let's see. Well, actually I have no questions about that. I'm

Page 129

sorry. Let's just leave it for the record though. Can we take a short break off the record for a moment?

(Brief recess)

BY MR. STOUCK:

Q Do you, Mr. Zabransky, recall now, with whatever amount of time you've had to refresh and look at these documents we've been discussing, any subsequent meetings with PG&E?

A No, I don't.

Q You don't recall whether or not there was a follow-up to the meeting we've been discussing?

A I don't recall at this point in time, no.

Q Well, let's go back off because I was hoping that the document would fly in.

(PG&E Z/P Exhibit Numbers 19 and 20 were marked for identification.)

BY MR. STOUCK:

Q Mr. Zabransky, what's been marked as Exhibit Number 19 is an e-mail that says it's sent Tuesday, January 25, 2000, "Subject: DOE Meeting Minutes 1/18/00," and then the first sentence says,

"Attached are the meeting minutes of the 1/18/00 meeting between PG&E and DOE to discuss possible standard contract renegotiation." Do you see that?
A I see that, yes.
Q And then the minutes are attached identifying as attendees you, Mr. Pollog, and Mr. Burgoyne, and from PG&E Mr. Moulia, Judy Sellers, and Mr. Willis. Do you see that?
A I do.
Q Still no recollection?
A No.
Q Any recollection of discussing specific contract amendments with PG&E and --
A No.
Q Then I'll just ask you a couple questions here. It says, as a result, you know, following next steps, second bullet, "Discuss the issue of possible renegotiation with potentially interested parties."
Do you know whether DOE was interested in renegotiating the contract or making revisions to PG&E's contract at that time? Do you recall that?



A I think we were willing to discuss it with anybody. I don't recall PG&E specifically.
Q You don't recall specifically whether there was any level of interest or how much interest there was, if any, or, you know, how far it went, if there were discussions?
A With PG&E specifically?
Q Yes.
A No. I don't know who JUV or SCE refer to at this point.
Q All righty. Fine.
If you go back to page 0007, Attachment 1, it is identified as an agenda, first bullet -- are you there?
A Okay.
Q -- "Review (and explore in greater detail) DOE needed revisions to SC," standard contract. Do you see that?
A I see that, yes.
Q Do you know what's referred to here as "DOE needed revisions to standard contract"?
A Well, again, I think we talked earlier



that, again, I don't think we prepared this agenda, this wasn't prepared by PG&E, but DOE was willing to talk about contract modifications before we talked about fuel selection, scheduling, more data, those types of issues.
Q If you look on the next page, it says, "What DOE wants." There's the fuel temperature issue, there's the 12-month notification issue, there's the training and procedural requirements, a similar list of what we saw on the notes from the prior meeting.
A That's correct.
Q Those would have been topics that DOE would have had some level of interest in discussing in terms of a contract modification?
A At that point in time DOE was willing to discuss that, yes.
Q The second page of this exhibit, which 0003 are the Bates numbers, under the 12-month notification issue it says, "DOE offered up two proposals." Do you see that?
A That's what it says.



Q "The second of which they appeared to prefer:". Do you see it says that?
A That's what it says yes.
Q Let me read number two. "An arrangement in which the licensee would consolidate annual shipping allocations over some period and process to be determined. DOE would only need to coordinate a periodic rather than annual shipping campaign from a particular facility. This would be significantly more efficient from a mobilization and transportation coordination perspective - all of which are DOE responsibilities." Do you see that?
A Yes, and I don't agree with it.
Q You don't agree with it?
A No.
Q That was not DOE's view at that time?
A No.
Q That was not your view at the time?
A I didn't say that.
Q Okay.
A I don't believe -- I believe that that

Page 134

view is appropriate, but I don't believe those are all benefits that accrue to DOE.
Q Strike the last --
A I said all of these.
Q These are not all the benefits that accrue to DOE; is that what you're saying?
A No, I'm saying all the benefits don't accrue to DOE.
Q Some benefits accrue to the utility?
A Absolutely.
Q Was it DOE's view at that time that this was a preferred course to follow?
A I don't know that we had a preferred view. I think that's a mis -- I don't recall that A or B, one or two was more preferred. I think DOE was -- would be willing to discuss either. I think the other clarification was that, in general, that two referred to was taking allocations that would have appeared over let's say a five-year period once a year and aggregating them into one place but not necessarily at the utility's desire.
Q Aggregating them. What about aggregating

Page 135

them into one year?
A That's right, but it may mean that DOE takes all five fuels in the fifth year and that's what -- that was what the discussion was to be about there.
Q And your view is that would have had benefits over the strict oldest fuel first system?
A That would have had benefits to both parties, to take those and make them campaigns that would have had benefits, yes.
Q You don't recall discussing that specifically at this January 2000 meeting?
A No, I don't recall the meeting specifically.
Q So, therefore, it very well may have been discussed, as these notes reflect?
A It may have been discussed, but I would be surprised that -- again, I don't recall ever discussing in any form -- I've explained how DOE thought about it. How they took it was another issue.
Q I'm not asking you -- I appreciate that

Page 136

you can't speak for these people.
A Right.
Q But you do agree with the DOE that there would have been benefits to concentrated campaign pick-ups, you know, maybe not in the first year, you know, the example you gave, you may be able to move back rather than move up but rather than come every year, you do agree there were benefits to coming once rather than five times, other things being equal?
A If they can work out for both parties, yes.
Q Thank you very much.
Let's try to keep this short here as I can. Fuel heat, page two, would you take a look under number three, Mr. Zabransky, and just in the interest of speeding this up can you read those two paragraphs that are on page 0004 and just tell me if these two paragraphs are consistent with what you told me a few moments ago about this allocation of responsibilities issue? In other words, if the allocation was clear, if I understood your

Page 137

testimony, the allocation of responsibility was clear, but there needs to be a lot more or at least some more detail about exactly what each party is going to do?
A I think this better reflects it. It talks about the fact that it is really getting down to issues such as when are they going to be staffed, so --
Q This better reflects your understanding of this issue?
A Yes, it does.
Q Just one question on the next page, 005, under Appendix E, "Standard Fuel."
A Uh-huh.
Q Are you with me there? The second paragraph where it says "Comments," do you see that?
A Uh-huh.
Q "DOE agreement on the characteristics of canisterized fuel which will qualify it as 'standard' is on the surface a difficult issue for them because of the moving target of Yucca

# Defendant

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| PACIFIC GAS & ELECTRIC COMPANY, Plaintiff, | |
| vs. | No. 04-074C into which has been consolidated No. 04-075C |
| UNITED STATES OF AMERICA, Defendant. | |

Washington, D.C.

Tuesday, November 1, 2005

Deposition of:

DAVID ZABRANSKY

called for oral examination by counsel for Plaintiff, pursuant to notice, at Greenberg, Traurig, L.L.P., 800 Connecticut Avenue, Northwest, Suite 500, Washington, D.C., before Shari R. Broussard, a Notary Public in and for the District of Columbia, beginning at 9:29 a.m., when were present on behalf of the respective parties:

Page 130

"Attached are the meeting minutes of the 1/18/00 meeting between PG&E and DOE to discuss possible standard contract renegotiation." Do you see that?

A I see that, yes.

Q And then the minutes are attached identifying as attendees you, Mr. Pollog, and Mr. Burgoyne, and from PG&E Mr. Moulia, Judy Sellers, and Mr. Willis. Do you see that?

A I do.

Q Still no recollection?

A No.

Q Any recollection of discussing specific contract amendments with PG&E and --

A No.

Q Then I'll just ask you a couple questions here. It says, as a result, you know, following next steps, second bullet, "Discuss the issue of possible renegotiation with potentially interested parties."

Do you know whether DOE was interested in renegotiating the contract or making revisions to PG&E's contract at that time? Do you recall that?

Page 131

A I think we were willing to discuss it with anybody. I don't recall PG&E specifically.

Q You don't recall specifically whether there was any level of interest or how much interest there was, if any, or, you know, how far it went, if there were discussions?

A With PG&E specifically?

Q Yes.

A No. I don't know who JUV or SCE refer to at this point.

Q All righty. Fine.

If you go back to page 0007, Attachment 1, it is identified as an agenda, first bullet -- are you there?

A Okay.

Q -- "Review (and explore in greater detail) DOE needed revisions to SC," standard contract. Do you see that?

A I see that, yes.

Q Do you know what's referred to here as "DOE needed revisions to standard contract"?

A Well, again, I think we talked earlier

Page 132

that, again, I don't think we prepared this agenda, this wasn't prepared by PG&E, but DOE was willing to talk about contract modifications before we talked about fuel selection, scheduling, more data, those types of issues.

Q If you look on the next page, it says, "What DOE wants." There's the fuel temperature issue, there's the 12-month notification issue, there's the training and procedural requirements, a similar list of what we saw on the notes from the prior meeting.

A That's correct.

Q Those would have been topics that DOE would have had some level of interest in discussing in terms of a contract modification?

A At that point in time DOE was willing to discuss that, yes.

Q The second page of this exhibit, which 0003 are the Bates numbers, under the 12-month notification issue it says, "DOE offered up two proposals." Do you see that?

A That's what it says.

Page 133

Q "The second of which they appeared to prefer:". Do you see it says that?

A That's what it says yes.

Q Let me read number two. "An arrangement in which the licensee would consolidate annual shipping allocations over some period and process to be determined. DOE would only need to coordinate a periodic rather than annual shipping campaign from a particular facility. This would be significantly more efficient from a mobilization and transportation coordination perspective - all of which are DOE responsibilities." Do you see that?

A Yes, and I don't agree with it.

Q You don't agree with it?

A No.

Q That was not DOE's view at that time?

A No.

Q That was not your view at the time?

A I didn't say that.

Q Okay.

A I don't believe -- I believe that that

# Defendant

Page 134

view is appropriate, but I don't believe those are all benefits that accrue to DOE.
Q Strike the last --
A I said all of these.
Q These are not all the benefits that accrue to DOE; is that what you're saying?
A No, I'm saying all the benefits don't accrue to DOE.
Q Some benefits accrue to the utility?
A Absolutely.
Q Was it DOE's view at that time that this was a preferred course to follow?
A I don't know that we had a preferred view. I think that's a mis -- I don't recall that A or B, one or two was more preferred. I think DOE was -- would be willing to discuss either. I think the other clarification was that, in general, that two referred to was taking allocations that would have appeared over let's say a five-year period once a year and aggregating them into one place but not necessarily at the utility's desire.
Q Aggregating them. What about aggregating

Page 135

them into one year?
A That's right, but it may mean that DOE takes all five fuels in the fifth year and that's what -- that was what the discussion was to be about there.
Q And your view is that would have had benefits over the strict oldest fuel first system?
A That would have had benefits to both parties, to take those and make them campaigns that would have had benefits, yes.
Q You don't recall discussing that specifically at this January 2000 meeting?
A No, I don't recall the meeting specifically.
Q So, therefore, it very well may have been discussed, as these notes reflect?
A It may have been discussed, but I would be surprised that -- again, I don't recall ever discussing in any form -- I've explained how DOE thought about it. How they took it was another issue.
Q I'm not asking you -- I appreciate that

Page 136

you can't speak for these people.
A Right.
Q But you do agree with the DOE that there would have been benefits to concentrated campaign pick-ups, you know, maybe not in the first year, you know, the example you gave, you may be able to move back rather than move up but rather than come every year, you do agree there were benefits to coming once rather than five times, other things being equal?
A If they can work out for both parties, yes.
Q Thank you very much.
Let's try to keep this short here as I can. Fuel heat, page two, would you take a look under number three, Mr. Zabransky, and just in the interest of speeding this up can you read those two paragraphs that are on page 0004 and just tell me if these two paragraphs are consistent with what you told me a few moments ago about this allocation of responsibilities issue? In other words, if the allocation was clear, if I understood your

Page 137

testimony, the allocation of responsibility was clear, but there needs to be a lot more or at least some more detail about exactly what each party is going to do?
A I think this better reflects it. It talks about the fact that it is really getting down to issues such as when are they going to be staffed, so --
Q This better reflects your understanding of this issue?
A Yes, it does.
Q Just one question on the next page, 005, under Appendix E, "Standard Fuel."
A Uh-huh.
Q Are you with me there? The second paragraph where it says "Comments," do you see that?
A Uh-huh.
Q "DOE agreement on the characteristics of canisterized fuel which will qualify it as 'standard' is on the surface a difficult issue for them because of the moving target of Yucca

# Lake Barrett

# Plaintiff

# UNITED STATES
# COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| TENNESSEE VALLEY AUTHORITY, | ) | |
| Plaintiff, | ) | Case No. |
| v. | ) | 01-249C |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

Pages: 751 through 1014

Place: Chattanooga, Tennessee

Date: June 24, 2005

**HERITAGE REPORTING CORPORATION**
*Official Reporters*
1220 L Street, N.W., Suite 600
Washington, D.C. 20005-4018
(202) 628-4888
hrc@concentric.net

MR. SMALL: Your Honor, for purposes of clarity of the record, I will, of course, announce the name of the witness and the source of them prior to beginning. The first testimony will be the testimony of Lake H. Barrett, which was conducted in consolidated discovery in a number of spent nuclear fuel cases, including the TVA case, and the date of the deposition, Your Honor, was April 2002, reading from April 22nd, 2002:

"Lake H. Barrett, having been duly sworn, testified as follows:

"What is your current position, Mr. Barrett?

"ANSWER: I'm the deputy director of the Office of Civilian Radioactive Waste Management."

MS. SHEA: Do I need to use the answer, or can I just answer the question when you read it, when you say question, and answer?

MR. SMALL: I'll ask the question and you can just --

MS. SHEA: I don't have to say, "Answer"?

MR. SMALL: You don't have to say answer.

MS. SHEA: Okay.

MR. SMALL: "QUESTION: For how many years have you been employed by the Department of Energy.

# Plaintiff

"ANSWER: Since mid-'85 in various different positions.

"QUESTION: And prior to 1985, what was your position?

"ANSWER: I worked for the Nuclear Regulatory Commission since end of '74 in various positions.

"QUESTION: Can you describe for me your educational background?

"ANSWER: B.S. degree in mechanical engineering, University of Connecticut, '67; MS mechanical engineering, nuclear, '72; did business courses, '72, '73, '74.

"QUESTION: So based on your prior testimony, Mr. Barrett, the 3,000 rate would be consistent with your understanding of the intent of the Act and to reduce, over a reasonable period of time, the backlog of spent nuclear fuel throughout the nation, correct?

"ANSWER: Yes."

MR. LO RE: Objection.

THE COURT: Mr. Lo Re?

MR. LO RE: Objection, based on relevance, as we've stated before and I will put on record generally again, Your Honor, we believe that any

# Plaintiff

MR. LO RE: And could you ask the witness to wait until the objection is lodged?

THE COURT: If Mr. Lo Re stands, Ms. Shea, if you'd just wait?

MR. LO RE: Thank you, Ms. Shea. Objection, Your Honor, vague and, in addition, assumes facts not in evidence.

THE COURT: Well, the latter point is certainly true. Insofar as this proceeding is concerned, it doesn't seem to be based upon his deposition, however, and the Court will overrule the objection.

MR. SMALL: Ms. Shea, if you will read the answer?

MS. SHEA: "ANSWER: Yes."

MR. SMALL: Skipping to page 349, line 8.

"QUESTION: To your knowledge, Mr. Barrett, have all TSLCC or fee adequacy studies issued on or after 1982 assumed a 3,000, paren, MTU acceptance rate or a repository design receipt rate?"

MR. LO RE: Objection, lack of foundation, best evidence.

THE COURT: Why do you say, refer to the best evidence rule, Mr. Lo Re?

MR. LO RE: Because, Your Honor, the

question refers to the specific TSLCC reports and those documents obviously are the best evidence of what is contained therein.

THE COURT: That's true, but on the other hand, obviously, Mr. Barrett has personal knowledge of those documents. He testified earlier that he had.

MR. LO RE: Your Honor, if I may on that?

THE COURT: Yes, certainly.

MR. LO RE: To the extent Mr. Barrett may have an opinion and that opinion is proved correct or incorrect by the document, I believe it is simply the document that determines the accuracy of the issue, and frankly, I think Mr. Barrett's testimony in this regard is superfluous.

THE COURT: Well, except that what he does is refer in the -- or what the question refers to is fee adequacy studies issued on or after 1982, and he would have knowledge about the whole spectrum of studies, and the Court will allow the question accordingly.

MR. LO RE: Thank you, Your Honor.

MR. SMALL: Ms. Shea, if you would read the answer?

"ANSWER: Some had more.

"QUESTION: Some had more. Which ones had more?

"ANSWER: Ones that had two repositories in it had higher rates than 3,000.

"QUESTION: What was the highest annual aggregate rate of any of the TSLCC or fee adequacy studies that you're referring to?"

MR. LO RE: Again, Your Honor, objection, best evidence.

THE COURT: I suppose one could go through all the reports of the studies, this just seems to be a more efficient way to get at it. Overruled.

MR. SMALL: Please read the answer.

"ANSWER: Some of the earlier ones, pre-'87, had two repositories at steady state which were run higher; at nominal, 6,000 tons."

"QUESTION: Per year?

"ANSWER: Per year. All recent ones since '87 or so, to my knowledge, are basically steady state at 3,000.

"QUESTION: And by recent ones -- I'm sorry.

"ANSWER: In the 1990s, the TSLCCs had a steady -- had a state steady receipt rate at 3,000 tons per year."

# Plaintiff

we can do a fee adequacy report as to the adequacy of the charge to the utilities."

Skipping to page 958, line 1:

"QUESTION: Did you have any involvement in the preparation of Exhibit 45?

"ANSWER: Probably, I probably signed off on it.

"QUESTION: And take your time to review the document to refresh your recollection, but I'd like to discuss how these rates were determined by the Department of Energy, the rates in table 1-2.

"ANSWER: These would have been the, you know, the repository receipt rates that we used at that time. They're not dissimilar to the 3,000 metric tons steady state rate that we've always had for the repository. I don't know what more detail you wish."

Skipping to a succeeding date in the deposition, May 10th, 2002, page 1163, line 10:

"QUESTION: But you do disagree with the statement that there is not a clearly documented rationale for 3,000 MTU per year receipt rate, correct?

"ANSWER: Correct.

"CORRECT: Because you believe that there

is in fact a clearly documented rationale for a 3,000 MTU per year receipt rate, correct?

"ANSWER: Yes.

"QUESTION: And could you explain to me that rationale that you believe has been clearly documented by the Department?

"ANSWER: There was one in the old mission plans. It basically was that the rate of 3,000 tons per year exceeded a generation rate of a nominal 2,000 tons per year and allowed a catchup of 1,000 tons per year delta, and for where the program was at that time, that was sufficient, and I felt that was sufficient at that time."

Page 1164, line 16:

"QUESTION: And when you just stated 'allowed a catchup of 1,000 tons per year delta,' what did that statement refer to?

"ANSWER: The receipt of a nominal 3,000 tons per year steady state when the generation rate was approximately 2,000 tons per year. The system capacity and take rate was exceeding the generation rate in the nation.

"QUESTION: Why was that important?

"ANSWER: Because we would like to catch up and, you know, remove the waste that had been

accumulating at whatever the start date of the facility would be."

Page 1165, line 16:

"QUESTION: Why would you have liked to have caught up, as you stated in that answer?

"ANSWER: Because waste existed in the United States, both commercial waste and defense waste, and we were to start, either be it '98 or some other date, there would be an inventory existing, and you wanted to work off that inventory as soon as practicable.

"QUESTION: Why did you want to work off that inventory of spent nuclear fuel as soon as practicable?

"ANSWER: Because I believe that's the intent of the Act.

"QUESTION: By, 'the Act,' you're referring to the Nuclear Waste Policy Act of 1982?

"ANSWER: Correct."

Page 1331, line 7:

"QUESTION: You used a term often in your testimony, the term 'generation rate.' Do you recall using that term?

"ANSWER: Yes.

"QUESTION: What does that term mean?

"ANSWER: To me, that's the amount of spent fuel that the nation's nuclear power reactors produced per year, which is approximately 2,000 tons per year.

"QUESTION: Has it always been approximately 2,000 tons per year?

"ANSWER: I think it's been pretty close.

"QUESTION: Is that the same meaning or definition that you would give to the term 'discharge rate'?

"ANSWER: Yes.

"QUESTION: We had talked quite a bit about a steady state rate of 3,000 MTUs per year with reference to a variety of DOE documents. My question is, do you have an understanding of the term 'steady state'?

"ANSWER: I believe so.

"QUESTION: What's your understanding of that term?

"ANSWER: Basically, constant over time.

"QUESTION: I believe you testified that there's a relationship between the 3,000 MTU annual steady state rate and either the discharge rate or generation rate, is that correct?

"ANSWER: There's a difference.

"QUESTION: Is there a relationship between the two?

"ANSWER: Discharge rate is what it is. Utilities control that. The receipt rate, which is what you call 3,000, is something that is variable, but depending upon the system we designed to build, we can vary that, so there's no direct relationship between the two.

"QUESTION: My understanding from your testimony, and please correct me if I am wrong, was that the 3,000 MTU steady state rate or receipt rate, as you just used that term, was chosen in part because it exceeded the discharge rate or the generation rate by utilities, is that right?

"ANSWER: Correct.

"QUESTION: What other factors went into choosing a 3,000 MTU receipt rate?

"ANSWER: The 3,000 rate that we have was established before I was ever involved in the program. It's my understanding that it was looked at then as a proper balance for total life cycle cost, as well as near term cash flow requirements and performance. If you make the number too high, then you have, you would quickly work off the backlog, and then you would have a lot of idle capacity. If it

was too low, you would have reactors needing to put in dry storage, and 3,000, based on the early 1980s, seemed like a reasonable number to use."

Skipping to page 1334, line 6:

"QUESTION: And am I right in understanding that the 3,000 steady state rate has been used as the steady state rate in the majority of design documents for the facility that DOE eventually, will eventually use to take an emplacement of spent nuclear fuel?

"ANSWER: Yes, it's around 3,000.

"QUESTION: And am I also right in understanding that the 3,000 steady state rate has been the rate that is used in the majority of documents issued by DOE with regard to total system life cycle costs?

"ANSWER: Correct.

"QUESTION: With regard to those documents, the documents issued in connection with estimating total system life cycle costs, what is that document supposed to reflect, the TSLCC document?

"ANSWER: Our best estimates of what the cost would be, you know, year-by-year for the program, and to determine those, you would have some assumption as to what the receipt rate would be, and we used 3,000.