# Plaintiff

enough detail to get an assessment of what happened. As I said, I was hopeful we wouldn't have to get into those areas, but in any event, it just seems that this evidence is part of the background. It is rudimentary, but it is part of the background that leads up to those considerations.

Now, we had a series of objections before to rates of acceptance as they stemmed from a repository as contrasted to an MRS. I don't see how we can avoid that issue in this case. So I'm going to overrule the objection here because this seems to be a repository related set of studies and on the somewhat dissimilar grounds that I did before, and we'll go forward on that basis. But we've explored this in enough depth that I think everybody kind of has a road map of where we need to go from here.

MR. LO RE: Thank you, Your Honor.

MR. SMALL: Ms. Shea, could you read the answer to that question?

"ANSWER: At steady state, yes."

Skipping to page 1370, line 13:

"QUESTION: And I'll take it a step further. Do you believe that the 3,000 annual steady state rate is a reasonable rate for DOE to plan to use terms of taking spent nuclear fuel from

utilities?

"ANSWER: I think it's a reasonable rate. There may be better rates that if we, if the nation gets a little clearer that we're going to really perform, I think we will refine that number, and we may, based on events of September 11th, maybe it will be raised.

"QUESTION: And would you agree that the 3,000 annual steady state rate is a rate that is consistent with achieving the objectives that you enumerated earlier?

"ANSWER: Generally so, yes.

"QUESTION: In your opinion, would a steady state rate of 2,000 MTUs on an annual basis be consistent with achieving those same objectives?

"ANSWER: I would think that's low.

"QUESTION: Why?

"ANSWER: Because that's about what the generation rate is and if we start with that, matching the generation rate at 2010, if we steady state at 2010 all the fuel that's in dry storage and a lot of the shutdown reactors, it will be difficult to avoid new storages or prolonged decommissionings."

Skipping to May 14, 2002, the deposition of Lake H. Barrett, page 67, line 20:

# Plaintiff

out yet. Maybe you can help me.

MR. LO RE: We have 60, Your Honor.

THE COURT: I understand. I have a fair percentage, so I'm really trying to be careful here, and I am familiar with -- let's just put it this way, through the motions practice in all these cases, I am familiar with the exchange provisions of the contract, not like you folks are, but, you know, I have half a clue what's happening, and I'm going to take this testimony, I'm going to allow this testimony.

I'm going to take this testimony as just referring to the generic possibility and allowance for exchanges in the standard contract without specific reference to TVA's facts. Let's just leave it at that.

MR. LO RE: Thank you, Your Honor.

MR. SMALL: Your Honor, and that's exactly how we're offering it.

THE COURT: Okay.

MR. SMALL: Ms. Shea, do you remember where we were?

"ANSWER: I don't, I'm hopeful, but I don't know what the actual utility contract holders will do.

"QUESTION: Why are you hopeful?

"ANSWER: From a macroscopic perspective, it has always been my hope that utilities that have a lesser need earlier would exchange the appropriate remuneration or compensation with others that might have a greater need to work out the most effective national utilization of whatever capacity you were able to bring online."

Skipping to page 119, line 12:

"QUESTION: Interrogatory number 50, let me read it. It says, 'Identify the three individuals within DOE with the most knowledge of the schedule DOE would have followed had it begun to take SNF from the purchasers by January 31, 1998 pursuant to the standard contract.' Do you see that?

"ANSWER: Yes.

"QUESTION: If you look at the bottom of the page, there's a couple of paragraphs here of objections and whatnot, but at the bottom, we have got, we have more than three names in response, but the first name, Mr. Barrett, is yours, is that correct?

"ANSWER: Yes.

"QUESTION: Do you consider yourself to be knowledgeable about the schedule DOE would have

# Plaintiff

followed had it begun to take SNF from purchasers by January 31, 1998, pursuant to the contract?

"ANSWER: I suppose I have as much knowledge as many."

Page 120, line 22:

"QUESTION: What schedule would DOE have followed had it begun to take SNF from purchasers by January 31, 1998, pursuant to this contract?"

MR. LO RE: Objection. Your Honor, this question is an inappropriate question because Mr. Barrett was not designated as a 30(b)(6) witness, nor was he testifying as such in this hearing -- in this deposition. In addition, the question lacks foundation.

THE COURT: I'll hear from Mr. Small in a minute, but respecting the first ground of objection, is it fair to assume that that is the, that is, the 30(b)(6) issue, is the reason the -- there must have been interrogatory responses about knowledgeable people in the prior questions, was asked and answered?

MR. SMALL: That's correct, Your Honor. He was not testifying as a 30(b)(6) witness on this specific point, but he was testifying as the deputy director of the Office of Civilian Radioactive Waste

Management, and the interrogatories did identify him as the, one of the individuals with knowledge, with the most knowledge of the schedule that DOE would have followed.

MR. LO RE: Your Honor, if I may?

THE COURT: Yes, certainly.

MR. LO RE: That does not make Mr. Barrett the party representative for 30(b)(6) purposes, and the question that we are discussing here is what schedule would DOE have followed, and we believe that is inappropriate. The Court has several times during this hearing referred to witnesses and indicated, what is your personal understanding, and that's exactly where we are here, Your Honor. What Mr. Barrett's understanding is may be one thing, but what DOE was planning to do is something quite different.

THE COURT: Well, that's exactly right, and that's right where we deal with 801 -- I'm sorry, Federal Rule of Evidence 801, differently than 804 -- well, I'm sorry, 802 and 804. 801 -- Rule 801(d)(2)(d) makes admissible "a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship." Now, that, I

take it, is really what Mr. Small is driving at.

802 deals -- let me think about this. That's one thing, you catch me unawares here, and it's the admissibility of deposition testimony generally. It's Rule 32, but Rule 32 deals with a, let me find it, deals with the deposition testimony of a 30(b)(6) designee differently. We just aren't there. That's the problem. We aren't dealing with Rule 32. We're dealing with, of the RCFC, we're dealing with Rule 801 of the Federal Rule of Evidence.

You see what I'm driving at? I'm sorry to be -- I had to have you hear my thought processes as I was doing it.

MR. LO RE: No, Your Honor, and I believe I understand the distinction because I think we have had this discussion with the Court, with you and other judges on the Court, several times.

THE COURT: That's right. I'm afraid I might have influenced a couple of other judges on the Court in a couple of published rulings.

MR. LO RE: There's nothing wrong with making law, Your Honor.

THE COURT: Well, I've tried very hard not to make law, but this was set out the way it seemed

to be.

MR. LO RE: But I would say, Your Honor, in that vein, that the admission of a party opponent, as far as my understanding of 801(d)(2), certainly that person may be speaking in their capacity in their job, but nonetheless, they are speaking as that individual, not as the Defendant.

THE COURT: Yes.

MR. LO RE: That is the distinction between that and the 30(b)(6), and this was not a 30(b)(6) deposition.

THE COURT: No, and it comes in under 801, but it's not the be-all and end-all of the matter. There is lots of room for other evidence on the subject, and, you know, it's hard to predict just from a particular statement what the outcome will be, if that makes, if that distinction makes it.

MR. LO RE: It does, Your Honor. In my mind, the problem I have is we have a cold record here that says, question, what schedule would DOE follow? And I am more than confident that if Mr. Barrett were sitting in the stand and that question were asked, I would stand up and object, and I am almost sure you would say, Mr. Barrett, I would like you to testify from your personal knowledge.

THE COURT: That's right.

MR. LO RE: And he would.

THE COURT: If you know, you're in the kind of position where you're entitled to have that view.

MR. LO RE: Exactly, and that's the concern I have here, that if this comes into the record, then I understand what you're saying, but we have a cold record where, all of a sudden, it appears to be the party speaking.

THE COURT: On the other hand, you haven't started your case yet, Mr. Lo Re.

MR. LO RE: Right, Your Honor.

THE COURT: You have lots of opportunity to go at this subject.

MR. SMALL: Your Honor, if it would help the Court?

THE COURT: Yes.

MR. SMALL: We are offering this, of course, under Rule 801, and we have had this discussion before, and the argument here is that we are offering it into evidence. We are not, at this point, arguing, and frankly, I don't anticipate arguing, we are not anticipating arguing that this is somehow such an admission of the Department of Energy, that they are estopped from arguing or

introducing evidence otherwise.

THE COURT: Well --

MR. SMALL: They can introduce evidence, Your Honor.

THE COURT: I think we're all agreed on that subject. May we proceed? This is always educational.

MR. SMALL: Ms. Shea, if you would please read the answer?

"ANSWER: We would have operated our system and our plant which was, you know, whatever the operation rate, which transcended in a level out at 3,000 metric tons per year after five years, that's what we were planning to do.

"QUESTION: That's what you would have done?

"ANSWER: That's what we would have done if we could have gotten the, you know, the sites approved, et cetera."

Skipping to page 177, line 20:

"QUESTION: I think much earlier today, we looked at the mission plan" --

MR. LO RE: Excuse me, I'm sorry. Counsel, did you say 177?

MR. SMALL: Excuse me.

# David Huizenga

# Plaintiff

Page 4365

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

YANKEE ATOMIC ELECTRIC ) Case Nos.
COMPANY, CONNECTICUT YANKEE ) 98-126C
ATOMIC POWER COMPANY, and MAINE ) 98-154C
YANKEE ATOMIC POWER COMPANY, ) 98-474C
Plaintiffs, )
v. )
THE UNITED STATES, )
Defendant. )

Courtroom Number 5

National Courts Building
717 Madison Street, Northwest
Washington, D.C.

Tuesday, August 10, 2004

VOLUME 20

The parties met, pursuant to the notice of the Judge, at 10:06 a.m.

BEFORE: THE HONORABLE JAMES F. MEROW

Page 4366

APPEARANCES:
ON BEHALF OF YANKEE ATOMIC ELECTRIC COMPANY, CONNECTICUT YANKEE ATOMIC POWER COMPANY and MAINE YANKEE ATOMIC POWER COMPANY:
JERRY STOUCK, ESQ.
ROBERT SHAPIRO, ESQ.
SPRIGGS & HOLLINGSWORTH
1350 I Street, N.W.
Washington, DC 20005
(202) 898-5800

ON BEHALF OF THE UNITED STATES:
HAROLD LESTER, JR., ESQ.
JOHN EKMAN, ESQ.
HEIDE L. HERRMANN, ESQ.
U.S. Department of Justice
1100 L Street, N.W.
Washington, DC 20530
(202) 305-7562

*** Index appears at end of transcript ***

Page 4367

P R O C E E D I N G S

MR. SHAPIRO: We have one preliminary matter, if I might, before we start with the government's first witness of the day.

As you may recall, at the end of the cross-examination of Mr. Rusch there was a question about an exhibit that we were offering into evidence, 1951, which looked to be a partial concurrence chain which had a -- a letter from Mr. Rusch. The government was concerned it wasn't complete in the way it was left. As far as we know, we looked to see if we could find the complete set and we went back and we did find the consecutive Bates-numbered set that was produced in the government's files.

The prior document we had assigned an exhibit number of 1951. To avoid confusion, we put a new exhibit number on a complete set of 1972, which we would now like to offer to the Court and to -- to move into -- into evidence.

JUDGE MEROW: So what happens to 1951?

MR. SHAPIRO: We withdraw that one. The 1951 -- all the pages in 1951 are a subset of the complete document 1972.

JUDGE MEROW: Okay. So I take it there's

Page 4368

no objection to 1972. Or is there?

MR. LESTER: If I could look at it, this is actually a little different than what I got from my litigation support people so let me look at it. And I -- I actually forgot to bring with me the stack of materials I had dealing with this issue, but I might be able to deal with it without that stack with me.

JUDGE MEROW: Okay.

MR. LESTER: But I could look at it from Mr. Huizenga's testimony.

MR. STOUCK: Your Honor, a preliminary matter, if I could just raise another one, which is even more preliminary, perhaps.

The government served a response to our deposition designations, I don't know, a week ago Friday, something like that. By our count, our response in turn -- and there was a -- there were some substantive objections and whatnot. Our response to that is due Thursday of this week, and I don't know we're going to be able to meet that, so I'd like to just orally ask the Court for another -- yeah, well, I'll ask for another ten days, if we could have that, but I hear from my colleagues that we expect to be done by next Monday, but given the trial schedule, I can understand that it's difficult, and I --

Page 4369

JUDGE MEROW: That's the last response?
MR. STOUCK: I think that's right.
MR. LESTER: I guess my only concern would be if we're talking about having counter-counter-designations. I'm not sure that's provided for in the rules, but I don't know what the Plaintiff is intending in terms of a response. If it's just dealing with the objections that were raised, that's fine. I don't have any problem with that. If it's adding additional testimony, I might have a little concern about that.
MR. STOUCK: I think, Your Honor, although we're not going to have any additional testimony on the subjects addressed in our original designations, we do have some views that some of the reported counter-designations are outside the scope of the designations. To that extent, whether we'll actually counter counter those or whether we'll just point out they're improperly designated, I'm not sure we decided yet. In any event, I don't think there's much of that. It's mostly response to their objections, I believe.
JUDGE MEROW: Let's do the best we can, and I'll consider them when they're in. And if you have to do more, then we'll have to consider that at

Page 4370

the time.
MR. STOUCK: And we would certainly be reasonable about that, Your Honor, but for now –
JUDGE MEROW: Won't take any precipitous action, then, one way or the other. Okay.
MR. STOUCK: Thank you.
JUDGE MEROW: Thank you, sir, for the notice. I'll reserve ruling on 1972 until I hear from Mr. Lester.
MR. LESTER: Thank you, Your Honor.
JUDGE MEROW: Okay.
MS. HERRMANN: The government calls Mr. David Huizenga.
DAVID HUIZENGA
was sworn and testified as follows:
DIRECT EXAMINATION
BY MS. HERRMANN:
Q Good morning. Would you introduce yourself to the Court, please.
A My name is David Gary Huizenga.
Q Mr. Huizenga, who is your employer?
A Department of Energy.
Q How long have you worked for DOE?
A Since March of 1990.
Q What is your current position at DOE?

Page 4371

A I'm the assistant deputy administrator for the Office of International Material Protection and Cooperation.
Q How long have you held that position?
A Approximately two years.
Q What office is that? I'm sorry, did I interrupt you?
A I'm just trying to get the – the – the timing exactly right. Since November of 2002, so a little less than two years.
Q Fair enough. What office is that within?
A That is within – within the Office of Advanced Nuclear Nonproliferation.
Q And is Defense Nuclear Nonproliferation part of NNSA?
A Yes, it is.
Q What is NNSA?
A National Nuclear Security Administration.
Q That's all within the umbrella of DOE?
A That's one of the two main arms of the Department of Energy.
Q What are your responsibilities as assistant deputy administrator?
A My current responsibilities focus mostly

Page 4372

on protecting highly enriched uranium and plutonium in Russia and other countries of the former Soviet Union.
Q What position did you hold before your current one, before November of 2002?
A From February of 2002 to November, I was an associate assistant deputy administrator in the Office of International Nuclear Safety and Cooperation.
Q And was that still within Defense Nuclear Nonproliferation?
A Yes, it was.
Q What were your responsibilities in that position?
A In that regard, it was primarily to improve the safety of the Chernobyl-style reactors in the former Soviet Union.
Q I think you told me you started that position in February of 2002.
A That's correct.
Q What did you do before that?
A Before that I was a deputy assistant secretary in the Office of Environmental Management.
Q What is the Office of Environmental Management?
A It's one of the assistant secretary

offices within the Department of Energy that deals with primarily cleanup of nuclear materials and other wastes associated with the cold war legacy.

Q What did you personally do as deputy assistant secretary for the Office of Integration at this position?

A There are dozens of sites across the – the US, and our office was responsible for coordinating policy issues relative to different types of activities that might be taking place at those sites in conjunction with the radioactive cleanup.

Q How long did you hold that position?

A Approximately two years.

Q So that would have been 2000 to 2002?

A That's correct.

Q Did your job as deputy assistant secretary include responsibility for greater-than-Class C radioactive waste?

A Yes, it did.

Q For shorthand purposes, can we refer to that as GTCC?

A That would be good.

Q What responsibility did you have for GTCC?

A My office was responsible, as I indicated, for policy issues and so to the extent that we were



pursuing a policy with respect to disposal and management of greater-than-Class C waste, we were in the very early stages of forming some options and alternatives that would ultimately be analyzed in an environmental impact statement.

Q While you were deputy assistant secretary, did you actually have responsibility for making policy with regard to the storage or disposal of GTCC?

A No, we were responsible for developing alternatives that would be ultimately presented to the decision-maker to actually establish the policy.

Q Who would be the decision-maker who could establish the policy for GTCC?

A I don't think that that was entirely decided relative to who, for instance, would sign a record of decision associated with an environmental impact statement, but it could, perhaps, be the assistant secretary or the undersecretary or the Secretary of Energy herself.

Q I want to sort of define what we're talking about so that everybody has a clear understanding. What exactly is GTCC?

A The Nuclear Regulatory Commission has established a category of wastes which are generally in the A, B and C categories. There's limits on



radionucleide concentrations associated with those categories, and to the extent some wastes have radionucleide concentrations that are higher than the Class C limits, that would be the greater-than-Class C wastes.

Q Are there different kinds of GTCC?

A It's a broad range of different types of Class C wastes from small sealed sources that – that are used for medical purposes, for instance, or industrial purposes, to the nuclear utility wastes associated with power reactors, and I think that we had a kind of a catch-all process waste category to – that was a – a third category.

Q Sort of an "other" category?

A That's my understanding.

Q Speaking of – of GTCC in general, what is your understanding as to DOE's responsibility with regard to GTCC?

A I believe the Low-Level Waste Policy Amendments Act ascribed responsibility for disposal of GTCC waste to the Department of Energy.

Q You talked a little bit about, I think, what you called sealed sources.

A Uh-huh.

Q Do I remember that right?



A Uh-huh.

Q Has DOE accepted any sealed sources for disposal?

A For the past few years, Department of Energy has been accepting orphaned or abandoned sources from commercial entities, and they have been packaged up and transported and stored at the Los Alamos National Laboratory in New Mexico.

Q You said they have been stored at Los Alamos. Does that mean they have been disposed of, or are they just in storage there?

A When I left the position, they – to my knowledge, we hadn't disposed of any. They were all being stored. And I don't know since February of 2002 whether they've actually progressed beyond that or not.

Q Why has DOE been accepting sealed – sealed sources for storage?

A For security reasons and safety reasons as well, the – there are times when small operations would no longer find a use for the nuclear material and not really have a clear understanding of what to do with it, so we would be called at times from the Nuclear Regulatory Commission identifying that one of their users had a sealed source in a – in a shed in

# Defendant

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

YANKEE ATOMIC ELECTRIC COMPANY, CONNECTICUT YANKEE ATOMIC POWER COMPANY, and MAINE YANKEE ATOMIC POWER COMPANY,
Plaintiffs,
v.
THE UNITED STATES,
Defendant.

Case Nos. 98-126C, 98-154C, 98-474C

Courtroom Number 5

National Courts Building
717 Madison Street, Northwest
Washington, D.C.

Tuesday, August 10, 2004

VOLUME 20

The parties met, pursuant to the notice of the Judge, at 10:06 a.m.

BEFORE: THE HONORABLE JAMES F. MEROW



APPEARANCES:
ON BEHALF OF YANKEE ATOMIC ELECTRIC COMPANY, CONNECTICUT YANKEE ATOMIC POWER COMPANY and MAINE YANKEE ATOMIC POWER COMPANY:
JERRY STOUCK, ESQ.
ROBERT SHAPIRO, ESQ.
SPRIGGS & HOLLINGSWORTH
1350 I Street, N.W.
Washington, DC 20005
(202) 898-5800

ON BEHALF OF THE UNITED STATES:
HAROLD LESTER, JR., ESQ.
JOHN EKMAN, ESQ.
HEIDE L. HERRMANN, ESQ.
U.S. Department of Justice
1100 L Street, N.W.
Washington, DC 20530
(202) 305-7562

*** Index appears at end of transcript ***



P R O C E E D I N G S

MR. SHAPIRO: We have one preliminary matter, if I might, before we start with the government's first witness of the day.

As you may recall, at the end of the cross-examination of Mr. Rusch there was a question about an exhibit that we were offering into evidence, 1951, which looked to be a partial concurrence chain which had a -- a letter from Mr. Rusch. The government was concerned it wasn't complete in the way it was left. As far as we know, we looked to see if we could find the complete set and we went back and we did find the consecutive Bates-numbered set that was produced in the government's files.

The prior document we had assigned an exhibit number of 1951. To avoid confusion, we put a new exhibit number on a complete set of 1972, which we would now like to offer to the Court and to -- to move into -- into evidence.

JUDGE MEROW: So what happens to 1951?

MR. SHAPIRO: We withdraw that one. The 1951 -- all the pages in 1951 are a subset of the complete document 1972.

JUDGE MEROW: Okay. So I take it there's



no objection to 1972. Or is there?

MR. LESTER: If I could look at it, this is actually a little different than what I got from my litigation support people so let me look at it. And I -- I actually forgot to bring with me the stack of materials I had dealing with this issue, but I might be able to deal with it without that stack with me.

JUDGE MEROW: Okay.

MR. LESTER: But I could look at it from Mr. Huizenga's testimony.

MR. STOUCK: Your Honor, a preliminary matter: if I could just raise another one, which is even more preliminary, perhaps.

The government served a response to our deposition designations, I don't know, a week ago Friday, something like that. By our count, our response in turn -- and there was a -- there were some substantive objections and whatnot. Our response to that is due Thursday of this week, and I don't know we're going to be able to meet that, so I'd like to just orally ask the Court for another -- yeah, well, I'll ask for another ten days, if we could have that, but I hear from my colleagues that we expect to be done by next Monday, but given the trial schedule, I can understand that it's difficult, and I --

Page 4369

JUDGE MEROW: That's the last response?

MR. STOUCK: I think that's right.

MR. LESTER: I guess my only concern would be if we're talking about having counter-counter-designations. I'm not sure that's provided for in the rules. but I don't know what the Plaintiff is intending in terms of a response. If it's just dealing with the objections that were raised. that's fine. I don't have any problem with that. If it's adding additional testimony. I might have a little concern about that.

MR. STOUCK: I think. Your Honor. although we're not going to have any additional testimony on the subjects addressed in our original designations. we do have some views that some of the reported counter-designations are outside the scope of the designations. To that extent. whether we'll actually counter counter those or whether we'll just point out they're improperly designated. I'm not sure we decided yet. In any event. I don't think there's much of that. It's mostly response to their objections. I believe.

JUDGE MEROW: Let's do the best we can. and I'll consider them when they're in. And if you have to do more. then we'll have to consider that at

Page 4370

the time.

MR. STOUCK: And we would certainly be reasonable about that, Your Honor, but for now –

JUDGE MEROW: Won't take any precipitous action, then, one way or the other. Okay.

MR. STOUCK: Thank you.

JUDGE MEROW: Thank you, sir, for the notice. I'll reserve ruling on 1972 until I hear from Mr. Lester.

MR. LESTER: Thank you, Your Honor.

JUDGE MEROW: Okay.

MS. HERRMANN: The government calls Mr. David Huizenga.

DAVID HUIZENGA
was sworn and testified as follows:
DIRECT EXAMINATION
BY MS. HERRMANN:

Q Good morning. Would you introduce yourself to the Court, please.
A My name is David Gary Huizenga.
Q Mr. Huizenga, who is your employer?
A Department of Energy.
Q How long have you worked for DOE?
A Since March of 1990.
Q What is your current position at DOE?

Page 4371

A I'm the assistant deputy administrator for the Office of International Material Protection and Cooperation.
Q How long have you held that position?
A Approximately two years.
Q What office is that? I'm sorry, did I interrupt you?
A I'm just trying to get the – the – the timing exactly right. Since November of 2002, so a little less than two years.
Q Fair enough.
What office is that within?
A That is within – within the Office of Advanced Nuclear Nonproliferation.
Q And is Defense Nuclear Nonproliferation part of NNSA?
A Yes, it is.
Q What is NNSA?
A National Nuclear Security Administration.
Q That's all within the umbrella of DOE?
A That's one of the two main arms of the Department of Energy.
Q What are your responsibilities as assistant deputy administrator?
A My current responsibilities focus mostly

Page 4372

on protecting highly enriched uranium and plutonium in Russia and other countries of the former Soviet Union.
Q What position did you hold before your current one, before November of 2002?
A From February of 2002 to November, I was an associate assistant deputy administrator in the Office of International Nuclear Safety and Cooperation.
Q And was that still within Defense Nuclear Nonproliferation?
A Yes, it was.
Q What were your responsibilities in that position?
A In that regard, it was primarily to improve the safety of the Chernobyl-style reactors in the former Soviet Union.
Q I think you told me you started that position in February of 2002.
A That's correct.
Q What did you do before that?
A Before that I was a deputy assistant secretary in the Office of Environmental Management.
Q What is the Office of Environmental Management?
A It's one of the assistant secretary

Page 4373

offices within the Department of Energy that deals with primarily cleanup of nuclear materials and other wastes associated with the cold war legacy.
Q What did you personally do as deputy assistant secretary for the Office of Integration at this position?
A There are dozens of sites across the – the US, and our office was responsible for coordinating policy issues relative to different types of activities that might be taking place at those sites in conjunction with the radioactive cleanup.
Q How long did you hold that position?
A Approximately two years.
Q So that would have been 2000 to 2002?
A That's correct.
Q Did your job as deputy assistant secretary include responsibility for greater-than-Class C radioactive waste?
A Yes, it did.
Q For shorthand purposes, can we refer to that as GTCC?
A That would be good.
Q What responsibility did you have for GTCC?
A My office was responsible, as I indicated, for policy issues and so to the extent that we were

Page 4374

pursuing a policy with respect to disposal and management of greater-than-Class C waste, we were in the very early stages of forming some options and alternatives that would ultimately be analyzed in an environmental impact statement.
Q While you were deputy assistant secretary, did you actually have responsibility for making policy with regard to the storage or disposal of GTCC?
A No, we were responsible for developing alternatives that would be ultimately presented to the decision-maker to actually establish the policy.
Q Who would be the decision-maker who could establish the policy for GTCC?
A I don't think that that was entirely decided relative to who, for instance, would sign a record of decision associated with an environmental impact statement, but it could, perhaps, be the assistant secretary or the undersecretary or the Secretary of Energy herself.
Q I want to sort of define what we're talking about so that everybody has a clear understanding. What exactly is GTCC?
A The Nuclear Regulatory Commission has established a category of wastes which are generally in the A, B and C categories. There's limits on

Page 4375

radionucleide concentrations associated with those categories, and to the extent some wastes have radionucleide concentrations that are higher than the Class C limits, that would be the greater-than-Class C wastes.
Q Are there different kinds of GTCC?
A It's a broad range of different types of Class C wastes from small sealed sources that – that are used for medical purposes, for instance, or industrial purposes, to the nuclear utility wastes associated with power reactors, and I think that we had a kind of a catch-all process waste category to – that was a – a third category.
Q Sort of an "other" category?
A That's my understanding.
Q Speaking of – of GTCC in general, what is your understanding as to DOE's responsibility with regard to GTCC?
A I believe the Low-Level Waste Policy Amendments Act ascribed responsibility for disposal of GTCC waste to the Department of Energy.
Q You talked a little bit about, I think, what you called sealed sources.
A Uh-huh.
Q Do I remember that right?

Page 4376

A Uh-huh.
Q Has DOE accepted any sealed sources for disposal?
A For the past few years, Department of Energy has been accepting orphaned or abandoned sources from commercial entities, and they have been packaged up and transported and stored at the Los Alamos National Laboratory in New Mexico.
Q You said they have been stored at Los Alamos. Does that mean they have been disposed of, or are they just in storage there?
A When I left the position, they – to my knowledge, we hadn't disposed of any. They were all being stored. And I don't know since February of 2002 whether they've actually progressed beyond that or not.
Q Why has DOE been accepting sealed – sealed sources for storage?
A For security reasons and safety reasons as well, the – there are times when small operations would no longer find a use for the nuclear material and not really have a clear understanding of what to do with it, so we would be called at times from the Nuclear Regulatory Commission identifying that one of their users had a sealed source in a – in a shed in

Page 4377

the back lot, for instance, and – and with that – and not a particularly secure or safe condition, and we would go package that material up and retrieve it and transport it to a – a more safe, secure location within the Department of Energy.

Q I think you mentioned that one of the kinds of GTCC was nuclear utility waste. Do I have that right?

A Yes.

Q Do you have the – well, let me ask you this first: Has DOE accepted any of Department of Energy's nuclear utility waste, GTCC waste for storage, like with the sealed sources?

A Not to my knowledge.

Q And why not?

A I think that the conditions are – are such that the material is being safely and securely stored at the nuclear power plants.

Q I want to talk to you a little bit, now that we understand what we're talking about, about the status of GTCC while you were deputy assistant secretary – do I have that title right, deputy assistant secretary?

A Yes.

Q – for integration and disposition, so

Page 4378

still in that 2000 to 2002 time frame. During the time that you had responsibility for GTCC, had DOE decided how it would deal with GTCC waste generated by the nuclear utilities?

A No, we had not. As a matter of fact, in the budget-building process for the 2002 budget, which takes place in the middle of the year 2000, we had indicated in our budget request that we would want to request money from Congress to start preparing an environmental impact statement in 2002, so that was an indication that we were in the very early stages of trying to prepare for probably a two- or three-year process that would ultimately result in the completion of an environmental impact statement and a record of decision of establishment of a policy at that time.

Q You gave me a lot there, so let me break it down a little bit. So you mentioned that you had put in a request for funding. Do I have that correct?

A In the 2002 budget request.

Q Okay. And that was in the year 2000 that you put in the request?

A Mid 2000 year working on the 2002 budget request.

Page 4379

Q And the request for funding was for an environmental impact statement?

A That's correct.

Q What is an environmental impact statement?

A An environmental impact statement is a document required by the National Environmental Policy Act whereby for major federal actions, decision-makers have to be aware of the environmental – environmental impacts associated with their proposed action, so you lay out a set of reasonable alternatives and analyze environmental impacts associated with those alternatives and ultimately present that in a – a final environmental impact statement for the decision-makers' consideration.

Q Can we call it an EIS for short?

A Yes.

Q Does an EIS actually represent a decision on the part of DOE?

A 30 days after you complete the environmental impact statement, you can issue a record of decision based on that analysis, and that actually constitutes the – the decision.

Q But the decision would not actually be in the EIS?

A No. A preferred alternative probably

Page 4380

would be identified in the final environmental impact statement, but the decision is a second procedure.

Q Was the EIS that you were contemplating in the 2000 to 2002 time frame, was that to address only nuclear utility GTCC?

A Our goal was to address all of the – the GTCC for which the department had responsibility, so it would be a – a range of activities from the sealed sources to the nuclear utility and the others.

Q Other than requesting funding, was any other work done in preparation for the development of an EIS while you were deputy assistant secretary?

A Parallel with that and in – in – in anticipation of actually starting in 2002, there were various staff-level activities going on, but the technical experts that were looking at various options and generating alternatives that probably would have been considered in the EIS, but we hadn't progressed to actually starting the EIS.

Q So when you left that position in 2002, an EIS had not yet been done?

A It certainly hadn't been done, and I'm not actually sure whether it was even started.

Q After you left the – the deputy assistant secretary position in 2002, did you have any further

Page 4381

involvement in GTCC-related matters?
A No, I did not.
Q While you were deputy assistant secretary, did your work ever include – I think you talked a little bit about this when you talked about staff-level discussions. Did your work involve discussions about the possible alternatives for disposing of nuclear utility-generated GTCC?
A Yes, there were discussions about which alternatives ultimately might be reasonable.
Q Did your discussions involve the possibility of disposing of nuclear utility GTCC in the spent nuclear fuel high-level waste repository?
A That would have been one of several options that were being discussed.
Q Do you know, could nuclear utility GTCC be disposed of in that repository?
A We didn't actually conduct any analyses that would have let one conclude that. To my knowledge, that it's a reasonable alternative, but I don't really know whether something would have turned up in the analysis that would have indicated it couldn't have been, but at this point, I'm – I'm not aware one way or the other.
Q What kind of analysis would need to be

Page 4382

done in order for that call to be made?
A I guess I'm speculating somewhat now on the process, but one would –
MR. STOUCK: Objection, Your Honor, to the speculation.
JUDGE MEROW: Well –
MS. HERRMANN: If I could just ask for the witness's understanding, Your Honor.
JUDGE MEROW: Right. I think his background is sufficient so he could – he can speculate, but it goes to the weight. Overrule the objection.
BY MS. HERRMANN:
Q Your understanding, sir, of what kinds of analysis would need to be done to make that kind of technical determination?
A Well, one would have to understand, first of all, how much material there was and what was the scope of – of the nuclear utility-generated GTCC waste, and then an analysis would be conducted to understand transportation impacts associated with moving that to a repository and – and then some assumptions would have to be made relative to where it would be placed spatially in the repository. And at that point, there would be an

Page 4383

analysis of, you know, what would happen over a long period of time to the materials in the repository and what – whether – whether the radionucleides may or may not migrate through associated with that placement in the repository.
Q Apart from what it – what would actually be entailed in that analysis, can a decision be made as to whether GTCC could be disposed of in the repository without going through the analysis of an EIS?
A Well, the – the – the federal manager and decision-maker is precluded from taking a federal action without going through the proper NEPA analysis, so from a procedural standpoint, you have to go through the NEPA process to make a decision and independently of that, you – you need to have actually some analysis to look at.
I mean, we didn't generate any analysis when I left the position that would have allowed one to have drawn that conclusion one way or the other.
Q While we're – we were speaking a little bit about the spent nuclear fuel and high-level waste repository, while we're speaking about spent nuclear fuel, while you were deputy assistant secretary, between 2000 and 2002, did DOE plan to leave nuclear

Page 4384

utility GTCC at the utilities even after it had accepted their spent nuclear fuel?
A We had not established a policy one way or the other.
Q Do you know who Rob Campbell is?
A He was a staff member, used to work for me.
Q What was his position when he worked for you?
A I believe he was a GS-12 or 13 level staffer that worked for one of my offices.
Q Did Mr. Campbell have any authority to make policy for GTCC, or for DOE, I should say, regarding GTCC?
A No, he did not.
Q If Mr. Campbell indicated that DOE did not plan to leave utility GTCC at the utilities once their spent nuclear fuel had been accepted, would that mean that DOE had made a decision to that effect?
MR. STOUCK: Your Honor, that's not a factual question and I don't think it's appropriate to answer so I object.
MS. HERRMANN: I'm asking about the scope of Mr. Campbell's authority, Your Honor. Mr. Campbell's testimony is –

Page 4385

MR. STOUCK: He answered that question and now you're asking about something that Campbell may have said or may not have said which wouldn't even – it's not really a proper question is my objection.

MS. HERRMANN: I'm not sure what "not a proper question means," Your Honor. The plaintiffs have attempted to designate – to designate Mr. Campbell's testimony. They've brought – attempted to admit documents to this effect. I'm simply asking Mr. Huizenga about the documents that the plaintiffs have attempted to introduce.

MR. STOUCK: It doesn't call for personal knowledge, Your Honor. He testified Campbell – or whatever he said about the policy making for the Department of Energy, and it seems to me that's fine, but beyond that, I – I just think it's an objectionable question.

MS. HERRMANN: I'm not sure what the objection is, Your Honor.

JUDGE MEROW: Well, you can ask – can ask if any of Campbell's statements to the witness's knowledge are – are DOE policy.

MS. HERRMANN: Let's do that.

JUDGE MEROW: Or – or consistent with DOE policy.

Page 4386

BY MS. HERRMANN:

Q Mr. Huizenga, any documents that Mr. Campbell may have prepared in the scope of his work for DOE, would they be a reflection of DOE policy?

MR. STOUCK: Just for the record, Your Honor, the "may have" part of that – the "may have" part of that concerns me. That's my objection. I understand the Court's perspective on this.

JUDGE MEROW: What about those that he actually prepared?

MS. HERRMANN: Okay.

BY MS. HERRMANN:

Q Mr. Huizenga, any documents that Rob Campbell prepared while he was a staff member at DOE, did they reflect DOE policy?

A Rob wasn't in a position to actually determine DOE policy. He would make technical recommendations to the decision-makers.

Q Mr. Huizenga, at the time that you were deputy assistant secretary, was the Office of Environmental Management the responsible office for all GTCC-related issues?

A I believe so from a policy standpoint, that – that that was the office that was responsible

Page 4387

for developing policy.

Q And is that still the case?

A I'm not sure.

Q Okay. Do you know what the status is as far as what office is responsible for sealed sources?

A They're in the process, I believe, of transitioning the responsibility for securing sealed sources from Environmental Management to an office within the Office of National Nuclear Security Administration. I don't know whether that transition is completed or it's still in the process.

Q And that would be NNSA, the office that you work with?

A Another deputy assistant secretary office within this office is actually going to be responsible for that.

Q As for nuclear –

JUDGE MEROW: Have we defined what the sealed source is? Have we defined what a sealed source is?

BY MS. HERRMANN:

Q I'm sorry, Mr. Huizenga, could you define a sealed source?

A There's a wide range of sealed sources, Your Honor, from very small ones, including those that

Page 4388

would be in a – a pacemaker, for instance, as a plutonium 238 as a source for electricity, to large things, large sources perhaps the size of a 55-gallon drum that are used in remote locations to generate electricity, and so there's a – a wide range of quantities of radionucleides associated with those, obviously, as well.

They are quite ubiquitous. They're used for well logging purposes all over the world. So you might find them in the back of a pickup truck someplace in Texas or Saudi Arabia, for instance. Obviously, you find them in teletherapy units in most major hospitals.

JUDGE MEROW: What about the term? I mean, is it actually sealed?

THE WITNESS: The reason it's sealed is because you don't want the radioactive material to get out into the environment, so it really just – it's a term associated with – there's a – usually a very small capsule of radioactivity, radioactive material in a large metal-shielded container to make sure that only the appropriate amount of radioactivity could get out of it.

JUDGE MEROW: But you could just have the capsule lying there. It wouldn't be a sealed source?

Page 4389

THE WITNESS: It would be a source.
JUDGE MEROW: But not a sealed source.
THE WITNESS: Right.
JUDGE MEROW: Okay.
THE WITNESS: If you had the capsule lying someplace without any shielding, it would be dangerous.
JUDGE MEROW: Yeah. Would it be treated like a sealed source, though, I take it?
THE WITNESS: Well, the – the – the fact that the sources are generated in hot cells and then they're put in a sealed container and then they're able to be shipped around to their various locations, there's really no distinction.
What we used to do at Los Alamos is we'd take the sealed source and bring it into a – an area where we could work with it remotely and we would take the source out of the shielding and – and reuse it, in a sense. They are mobile. They're quite small and they're mobile I guess is a thing you need to keep in mind.
JUDGE MEROW: You gave an example of a shed could be a sealed source.
THE WITNESS: No, I may have misspoke, but I said we would find those sealed sources in sheds.

Page 4390

JUDGE MEROW: Oh, okay. The shed itself would not be the sealed –
THE WITNESS: No, the shed would be a place where you probably shouldn't have been storing it.
BY MS. HERRMANN:
Q So my understanding, then, is that DOE goes to get the sealed source –
A That's correct.
JUDGE MEROW: Out of the shed.
BY MS. HERRMANN:
Q – because you don't want it sitting around in a shed?
A Right.
JUDGE MEROW: Don't take the shed.
THE WITNESS: No, we – depending on whether the sealed sources, you know, have actually become unsealed, we might do something to help clean up the shed. There was a – well, I digress a little bit, but one of the more recent stories of a problem with sealed sources was in the country of Georgia where people took one of these large containers that was used to generate electricity, and for the scrap metal value, they took the source out and put it in a shed and – and took the metal and – and sold it.

Page 4391

And then the source was warm and they were sleeping by the source, and after a period of time, they got radiation – severe radiation burns. I don't think anybody died, but three people were severely irradiated and the International Atomic Energy went in and with the Department of Energy. We – we retrieved those sources.
MS. HERRMANN: I've learned a lot from this witness, Your Honor.
BY MS. HERRMANN:
Q Okay. So the sealed source program is going to NNSA?
A That's correct.
Q Do I have that right?
A It's either – either has already or it's soon to go, yes.
Q Okay. What about nuclear utility-generated GTCC? Do you know what program has responsibility for that type of GTCC?
A When I left Environmental Management, it was still within the Office of Environmental Management. I don't know if it's been transitioned since then.
Q Do you recall discussions about the program being moved to any other offices?

Page 4392

A There was a general discussion within the Office of Environmental Management about things that were or were not within their mission or scope of their mission, so this was one of the things that was being discussed as to whether this would be better placed in some other office and – and – and not in Environmental Management.
Q Remind us what the scope of Environmental Management's mission is.
A The dozens of sites that were used from the Manhattan Project in the '40s on to make nuclear weapons that resulted in significant contamination at a number of those sites and significant quantities of radioactive material, and the Office of Environmental Management was started up to basically deal with that cold war legacy.
Q During the discussions of whether this was in the scope of EM's mission, were there discussions of what other offices could take responsibility for commercial utility-generated GTCC?
A Yes.
Q What offices were discussed?
A The Office of Civilian Radioactive Waste Management was one of the options that was being discussed.

Page 4393

Q Any others?

A The Office of Environmental Safety and Health was being discussed to the extent that they would prepare the environmental impact statement. That office actually isn't responsible for implementing things, so I don't know ultimately who would have been responsible for implementing the decision once it had been made.

Q At what point would a decision be made with regard to what program should be responsible for commercial utility-generated GTCC?

A There was nothing in particular driving that other than the Office of Environmental Management wanting to make sure that it stayed focused on things that were – you know, the clear intent of its mission. I don't – I don't know that there was a timing associated with when that decision had to be made.

Q You mentioned the Office of Environmental – is it Environmental Safety and Health?

A Office of Environment Safety and Health, yes.

Q They were doing the EIS?

A They were asked to prepare the EIS.

Page 4394

Q And that was the status when you left that position in 2002?

A That's correct.

MS. HERRMANN: Your Honor, may I have a moment?

JUDGE MEROW: Yes, sure.

MS. HERRMANN: Your Honor, I have nothing further for Mr. Huizenga.

MR. STOUCK: Can we – I know it hasn't been very long, Your Honor, but if we could have maybe a ten-minute break to get organized?

JUDGE MEROW: Sure. Ten minutes of?

MR. STOUCK: Yeah, sure, that's fine.

JUDGE MEROW: All right.

(Recess taken from 10:38 a.m. through 10:55 a.m.)

CROSS-EXAMINATION

BY MR. STOUCK:

Q Mr. Huizenga, good morning. I guess it still is. I'm actually not sure we've ever met. I did not take your depositions in the case. To the extent we haven't met, hi.

A Good morning.

Q I am going to be asking you some questions, as I'm sure you know. Some of them may

Page 4395

involve your deposition testimony, so for convenience, I thought I'd just pass that out now rather than – so everybody can have it at hand in case it does come up. Couple for the Court, one for you. You know, you may not need it, you may need it, but if you do need it, there it is.

Actually, my first question is about Plaintiff's Exhibit 1724, which I will now also hand out, if I may. Do you recognize this document at all, Mr. Huizenga? Let me just say for the record this is a draft of a letter to Governor King of Maine from Secretary of Energy Spencer Abraham. Is that what you have?

A Yes, I see it.

Q If you take a look at the third paragraph, last sentence, it says, quote: It is my intention that nuclear utilities would not have to store GTCC waste beyond the time that they will have to store spent nuclear fuel.

Do you see that?

A Yes, I do.

Q Right. And you testified in your deposition that that statement that I just read is consistent with your understanding of the Department of Energy's intentions with respect to

Page 4396

greater-than-Class C waste at nuclear utility sites during your tenure in that '00 to '02 period, right?

A Could you refer me to the – the point in my deposition?

Q You don't recall that testimony?

A I don't recall –

Q That's consistent with your intention – with your understanding of DOE's intentions?

A I don't recall that exact statement. If you could point it out, that'd be fine.

Q Take a look at page – at tab 2, it's the second deposition in '04, if you would. And if you would turn to page – it actually starts at the bottom of page 36 on line 9. Are you there, Mr. Huizenga? Are you there?

A Yes, I am.

Q Line 9 the question was asked: On paragraph 3 of that letter – I'm reading from the deposition transcript – it states in the second sentence it is my intention that utilities would not have to store GTCC waste beyond the time that they will have to store spent nuclear fuel.

And you were asked then: Do you see that?

And you answered: Yes.

And then the next question: Is that your

# Plaintiff

Page 4513

A Yes, yes, I do.
Q You told me earlier this morning that that was consistent with your understanding of DOE's intentions. Correct?
A I don't believe I said that.
Q That was not consistent with your understanding of DOE's intentions at the time, Mr. Huizenga?
A I don't – I just honestly don't remember exactly what the – what the position was at the time on this issue.
Q I'm asking for your understanding about DOE's intentions.
A Uh-huh.
Q Isn't that consistent with your understanding?
A The reason I'm hesitating on this is because in the context of preparing the document, the EIS and – document, this would indeed have been one of the issues that would have been analyzed, so I don't remember some firm policy or firm guidance having been established that we'd already prejudged that process.
Q I'm asking you whether this was consistent with your understanding at the time of – of DOE's

Page 4514

intentions with regard to GTCC waste.
A And I'm telling you now that I can't recall what my understanding was at that time.
Q Well, I believe you testified a few hours ago that it was consistent, and I know you testified at your deposition that it was consistent because I have the transcript, so let's take a look at it.
A Okay.
Q Take a look at tab 2 of your notebook, please, page 37. Actually, it's the bottom of page 36. Do you have that? Page 36, tab 2, page 36, line 9. Are you with me?
A I'm on page 36, but do I want to be on big page 36 on the bottom right?
Q That's a good question. It's actually little page 36, it's big page 10.
A All right. Okay, all right. We're at line 9.
Q Line 9 you were asked: On paragraph 3 of that letter it states in the second sentence: It is my intention that utilities would not have to store GTCC waste beyond the time that they will have to store spent nuclear fuel. Do you see that? And you answered yes. Correct? Do you see that, Mr. Huizenga?

Page 4515

A Yes. Let me just take a second. Well, I answered yes to the question did I see that.
Q Yes. Right now we're going to go forward with the next question. Are you with me?
A Yes.
Q Line 15: Is that your understanding of the Department of Energy's intentions at this time? Answer: I don't have any knowledge of what the Department of Energy policy is relative to GTCC waste. Do you see that?
A I do.
Q And then Mr. Skalaban said: I understand that is current, uh-huh. Then he asked you this: How about during the time period of your tenure? Is this statement consistent with your understanding of the Department of Energy's intentions with respect to greater-than-Class C waste at nuclear utility sites during your tenure as EM20? Do you see that question?
A Yes, it's coming back to me.
Q And your answer on line 10 was: Yes. Isn't that correct?
A Yes.

Page 4516

Q Now, this letter was never sent, however, was it, to Governor King with that sentence in it?
A I don't know.
Q You don't know?
A Well, let's – you got quite a few exhibits in front of me here now so –
Q Let me have Plaintiff's 1847, please. Excuse me for one second here. Okay, this is, if I can just identify this for the record, this is a – the cover note here looks like an informal note to Jesse, re: letter to Governor King, parentheses, Maine, close parentheses, re: greater-than Class C, parentheses, GTCC waste. Do you see this? Do you see that?
A Yes.
Q Then there's a reference at least to the July 6 letter and the October 1 letter that we have been discussing. Do you see that?
A I do.
Q And a handwritten note at the bottom that says Patty. Would that be Patty Bubar?
A Yes, it would.
Q Okay. Here it says in the middle of this first page – well, actually there's some attachments, which I guess I'll get to, but on this first page it