# Ronald Milner

# Plaintiff

Page 4614

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

YANKEE ATOMIC ELECTRIC ) Case Nos.
COMPANY. CONNECTICUT YANKEE ) 98-126C
ATOMIC POWER COMPANY. and MAINE ) 98-154C
YANKEE ATOMIC POWER COMPANY. ) 98-474C
Plaintiffs. )
v. )
THE UNITED STATES. )
Defendant. )

Courtroom Number 5

National Courts Building
717 Madison Street. Northwest
Washington. D.C.

Wednesday. August 11. 2004

VOLUME 21

The parties met. pursuant to the notice of the Judge. at 10:06 a.m.

BEFORE: THE HONORABLE JAMES F. MEROW

Page 4615

APPEARANCES:

ON BEHALF OF YANKEE ATOMIC ELECTRIC COMPANY. CONNECTICUT YANKEE ATOMIC POWER COMPANY and MAINE YANKEE ATOMIC POWER COMPANY:
JERRY STOUCK. ESQ.
ROBERT SHAPIRO. ESQ.
SPRIGGS & HOLLINGSWORTH
1350 I Street. N.W.
Washington. DC 20005
(202) 898-5800

ON BEHALF OF THE UNITED STATES:
HAROLD LESTER. JR.. ESQ.
JOHN EKMAN. ESQ.
MARIAN E. SULLIVAN. ESQ.
HEIDE L. HERRMANN. ESQ.
U.S. Department of Justice
1100 L Street. N.W.
(202) 305-7562

*** Index appears at end of transcript ***

Page 4616

P R O C E E D I N G S

JUDGE MEROW: Ms. Herrmann?
MS. HERRMANN: Ready to continue with Mr. Buchheit. Your Honor?
MR. STOUCK: I've got a couple of preliminary points if I could mention it. Your Honor.
JUDGE MEROW: Sure.
MR. STOUCK: One is we do want to get to the exhibits that came up yesterday. We do want to get to the exhibits from yesterday. I've looked at the transcript and we're certainly ready to deal with those. We're not proposing at this moment because we would like to get finished with Mr. Buchheit. but either between witnesses or at the end of the day.
JUDGE MEROW: Fine.
MR. STOUCK: That's number one. Number two. also. I would like today to address the counterclaim. the motion to amend the counterclaim. which we've given some thought to.
Thirdly. one thing I need to take care of right now. on the question of notice and documents. as I was looking back over the transcript thinking about the exhibit issues. I noticed that little colloquy and I just didn't want there to be any remaining

Page 4617

misunderstanding. We certainly have worked well. you know. for six years and don't want to run into a misunderstanding now. There's really two rules: one is disclosure and the other is cross-examination.
There certainly may be documents that we want to show the government's witnesses that we don't want to show the government's lawyers the night before and. you know. unless we get some different direction. we're not intending to do that. and I just don't want to be vilified again if that comes up. because I think it might.
JUDGE MEROW: Okay.
MR. LESTER: I think we addressed this several times. The issue here is the difference between impeachment documents and documents which the plaintiffs are going to ask be introduced as substantive evidence. We did not play this kind of game when we were doing our cross-examination. We didn't pull out unidentified exhibits and then just sort of pop them in during the cross-examination. then say please admit this as a substantive exhibit. We didn't do that.
We identified our exhibits. and if and when we identified that there's an exhibit on our may-use list that we're going to want to introduce as

Page 4710

memo to which the plaintiffs have referred that
Mr. Rusch had -- that has Mr. Rusch's name on it in
fact somehow goes with the concurrence on the prior
page.
With that understanding, we will not
object to this series of documents being admitted as a
single exhibit.
JUDGE MEROW: Well, okay. Then with that
explanation, Plaintiff's Exhibit 1972 is admitted into
evidence.
(PX Exhibit 1972 was received in
evidence.)
MR. LESTER: I've been told, Your Honor,
the prior exhibit the plaintiffs had tried to
introduce was Plaintiff's Exhibit 1951, and I
understand that that exhibit's being withdrawn and
that it will not be admitted here.
MR. SHAPIRO: That's correct, Your Honor.
That was subsumed within the larger one.
JUDGE MEROW: Okay. 1951 is considered
withdrawn. Does that take up our prelunch -- anything
else?
MR. STOUCK: Take up the other matters at
the end of the day.
JUDGE MEROW: Fair enough. We'll break

Page 4711

for lunch. And what time?
MR. LESTER: I'm told Mr. Milner cannot be
here until 2 o'clock, so if we could resume at 2, that
would be great.
JUDGE MEROW: Okay, we'll resume at
2 o'clock.
(Luncheon recess taken from 12:40 p.m.
through 2:06 p.m.)
- AFTERNOON SESSION -
MS. SULLIVAN: Government's ready to call
its next witness.
JUDGE MEROW: Fine.
MS. SULLIVAN: We call Ronald Milner to
the stand, please.
(The witness was sworn.)
MS. SULLIVAN: Thank you, Your Honor.
RONALD MILNER
was sworn and testified as follows:
DIRECT EXAMINATION
BY MS. SULLIVAN:
Q Good afternoon, Mr. Milner.
A Good afternoon.
Q Mr. Milner, are you currently employed in
the Office of Civilian Radioactive Waste Management at
the Department of Energy?

Page 4712

A Yes, I am.
Q What is your current position?
A Chief operating officer.
Q What are your responsibilities as chief
operating officer?
A I assist the deputy director for strategy
and program development in the day-to-day management
of that office.
Q And do you report to the deputy director?
A Yes, I do.
Q And who is the department director?
A Ted Gerrish.
Q Does anybody report to you?
A Not directly.
Q How long have you served as chief
operating officer?
A In total, about four years.
Q When did you first join the Office of
Civilian Radioactive Waste Management?
A I believe it was April of '84.
Q What was your first position? And I'm
going to refer to it as RW, if that's all right.
A Okay.
Q What was your first position with RW?
A I was the branch chief of the

Page 4713

organization.
Q What were your responsibilities in that
position?
A Preparation of total system life cycle
cost, adequacy analyses and the first mission plan.
Q What position did you next hold in RW?
A I was a division director.
Q And what were your responsibilities in
that position?
A Budget, human resources, total system life
cycle costs, fee adequacy analyses.
Q And what position did you next hold in RW?
A Next, I was first acting director and then
permanent director of the Office of Storage and
Transportation.
Q And do you remember when you became acting
director of the Office of Storage and Transportation?
A Roughly 1990.
Q And how long did you serve as director of
the Office of Storage and Transportation?
A About four years.
Q What were your responsibilities as acting
and then director of the Office of Storage and
Transportation?
A Management of the MRS monitor to treatable

# Plaintiff

Page 4774

reactors will be granted?
A Well, I mean, at that time we were discussing what – what possible amendments there might be to the – to the contract through the issue resolution process, which was a – a lengthy discussion between the department and utilities. The standard contract gives priority to oldest fuel first, and consideration was given, again in collaboration and discussion with the utilities, as to whether that should be changed or in any way modified. And in 1990 I believe we had not concluded that process so then had not made any determination as to whether we would or would not change the contract. Ultimately, the determination was made not to change the contract and to continue with oldest fuel first as a priority.
Q So it's your understanding, Mr. Milner, that the contract would have to be changed in order to provide the option of providing priority to shutdown reactors?
A Well, I believe the contract says that – that you may give priority to shutdown reactors but it – it does state oldest fuel first as the main consideration, I believe.
Q Let me go back to my initial question. So

Page 4775

the option is – is there in the contract – and I'm reading focusing on what the department's plans are with respect to that option in – in the contract. And isn't it true that there has been no final decision on whether or not such priority will be granted? Is that not true?
A Yes, I think that is not true, that – that we have determined that we will – we use oldest fuel first as the means for establishing the queue, and have.
Q Let me go back to your – your deposition once again, Mr. Milner. Tab 3, May 3rd, page 474. Have you found that page, Mr. Milner?
A Yes, sir, I have.
Q If you would look on – starting on line 23, were you not asked the following question and gave the following answer?
Question: Are you saying that the department's not decided whether or not it would accord priority to a shutdown reactor, or are you saying that the department has decided that it would not grant priority to any shutdown reactors?
Objection by Mr. Shultis.
And your answer: Well, I think that there has been no final decision as to whether or not,

Page 4776

although it is not under active discussion.
That was your truthful testimony, Mr. Milner?
A It was.
Q You can't think of any other reason other than equity to other utilities why the Department of Energy would be unwilling to grant priority to shutdown reactors. True?
A I think that's the principal reason, equity, yes. I can't think of any others offhand, no.
Q Granting shutdown priority avoids the need to continue otherwise unneeded reactor site storage or shutdown reactors?
A It does.
Q And granting shutdown priority can be shown to be clearly cost-effective for consumers from the standpoint of timely decommission. True?
A Certainly – certainly cost-effective for the consumers of – of that particular utility.
Q And in your opinion, the department would have looked favorably on exchange requests from shutdown reactors?
A Yes, I think in general terms, I think – I think we would have. Certainly would have to see the – the terms of an exchange request but we never

Page 4777

received any.
Q Finally on this topic, Mr. Milner, it's – in your opinion, just taken in isolation and without other considerations, it would be desirable not to have utilities who have completed decommissioning to have to incur operations and maintenance expenses for 20 years to watch over spent fuel casks on their sites?
A Certainly, I would think that would be desirable.
Q You mentioned a couple times, Mr. Milner, that – I think it came up in your direct testimony that you don't recall utilities asking about exchanges of approved delivery commitment schedules. I want to ask you just a few questions about that topic. First of all, if an exchange request were consistent with the department's transportation capabilities and acceptance capacity for a given delivery year in your opinion, that request would have been approved. True?
A I think so, yeah. Again, you'd have to look at the specifics of a request but yes, I wouldn't see why it would not be.
Q You recall maintaining a list of approved delivery commitment schedules and comparing it to a

# Defendant

Page 4614

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

YANKEE ATOMIC ELECTRIC ) Case Nos.
OMPANY, CONNECTICUT YANKEE ) 98-126C
ATOMIC POWER COMPANY, and MAINE ) 98-154C
YANKEE ATOMIC POWER COMPANY, ) 98-474C
Plaintiffs, )
v. )
THE UNITED STATES, )
Defendant. )

Courtroom Number 5

National Courts Building
717 Madison Street, Northwest
Washington, D.C.

Wednesday, August 11, 2004

VOLUME 21

The parties met, pursuant to the notice of the Judge, at 10:06 a.m.

BEFORE: THE HONORABLE JAMES F. MEROW

Page 4615

APPEARANCES:
ON BEHALF OF YANKEE ATOMIC ELECTRIC COMPANY, CONNECTICUT YANKEE ATOMIC POWER COMPANY and MAINE YANKEE ATOMIC POWER COMPANY:
JERRY STOUCK, ESQ.
ROBERT SHAPIRO, ESQ.
SPRIGGS & HOLLINGSWORTH
1350 I Street, N.W.
Washington, DC 20005
(202) 898-5800

ON BEHALF OF THE UNITED STATES:
HAROLD LESTER, JR., ESQ.
JOHN EKMAN, ESQ.
MARIAN E. SULLIVAN, ESQ.
HEIDE L. HERRMANN, ESQ.
U.S. Department of Justice
1100 L Street, N.W.
(202) 305-7562

*** Index appears at end of transcript ***

Page 4616

P R O C E E D I N G S

JUDGE MEROW: Ms. Herrmann?

MS. HERRMANN: Ready to continue with Mr. Buchheit, Your Honor?

MR. STOUCK: I've got a couple of preliminary points if I could mention it, Your Honor.

JUDGE MEROW: Sure.

MR. STOUCK: One is we do want to get to the exhibits that came up yesterday. We do want to get to the exhibits from yesterday. I've looked at the transcript and we're certainly ready to deal with those. We're not proposing at this moment because we would like to get finished with Mr. Buchheit, but either between witnesses or at the end of the day.

JUDGE MEROW: Fine.

MR. STOUCK: That's number one. Number two, also, I would like today to address the counterclaim, the motion to amend the counterclaim, which we've given some thought to.

Thirdly, one thing I need to take care of right now, on the question of notice and documents, as I was looking back over the transcript thinking about the exhibit issues, I noticed that little colloquy and I just didn't want there to be any remaining

Page 4617

misunderstanding. We certainly have worked well, you know, for six years and don't want to run into a misunderstanding now. There's really two rules: one is disclosure and the other is cross-examination.

There certainly may be documents that we want to show the government's witnesses that we don't want to show the government's lawyers the night before and, you know, unless we get some different direction, we're not intending to do that, and I just don't want to be vilified again if that comes up, because I think it might.

JUDGE MEROW: Okay.

MR. LESTER: I think we addressed this several times. The issue here is the difference between impeachment documents and documents which the plaintiffs are going to ask be introduced as substantive evidence. We did not play this kind of game when we were doing our cross-examination. We didn't pull out unidentified exhibits and then just sort of pop them in during the cross-examination, then say please admit this as a substantive exhibit. We didn't do that.

We identified our exhibits, and if and when we identified that there's an exhibit on our may-use list that we're going to want to introduce as

Page 4790

of that deposition. If you could review those pages to yourself, you don't need to read those into the record.
A Yes, okay.
Q Thank you. Having reviewed those pages, do you now recall whether you could recall at your deposition whether the DCSs could be adjusted up or down by 20 percent?
A Well, from this, apparently at my deposition I did not recall that plus or minus 20 percent adjustment. The attorney pointed that out to me and I recognized that at that time.
Q And the question about the binding nature of the DCSs was in the context of that 20 percent provision, correct?
A The plus or minus 20 percent.
Q Thank you.
Could you go to tab 3 of the deposition binder, page 474?
A Okay.
Q Mr. Shapiro read the question and answer that begins on line 23 of page 74.
Could you read the material that's set forth at lines 1 through 21 of that – on that page into – out loud?

Page 4791

A Question: If I could direct your attention to the third paragraph on the first page, the second sentence states that the department has not determined whether or not priority would be accorded shutdown reactors or if priority is granted under what specific circumstances. Was that accurate as of 1990?
Mr. Shultis, objection. Mr. Milner's not a 30(b)(6) witness.
The witness: I suspect it probably was.
Mr. Neslin: That's your recollection sitting here today?
Mr. Shultis: Same objection.
The witness: Yes.
By Mr. Neslin: Would that be accurate to the –
Mr. Shultis: Same objection.
The witness: I think at this point in time today, the department has not decided to give priority to shutdown reactors.
Q Thank you.
And similarly, Mr. Milner, could you go to page 419 of that same deposition?
A Okay.
Q Mr. Milner, I believe Mr. Shapiro read the question and answer that begin on page 418, line 18.

Page 4792

Could you read the question and answer that follows that exchange beginning on line 1, page 419 through line 7?
A Question: The department – would it be fair to say that the department had an objective of allowing shutdown reactors to decommission in a timely manner?
Mr. Shultis: Same objection.
The witness: Well, again, I think it was more a case that the department preferred not to preclude that ability.
Q Could you continue to line 14?
A By Mr. Neslin, question: What do you mean by "not preclude that ability"?
Answer: The department did not, as I recall, have an objective to give priority to shutdown reactors, it simply preferred not to preclude that ability in the future.
Q And your use of the word "objective" on line 12 of that deposition, is that – your use of that term then is the same as your – how you define "objective" today?
A Yes, yes.
Q Mr. Milner, you were asked by Mr. Shapiro whether it was DOE's goal to remove spent nuclear fuel

Page 4793

from shutdown reactors to prevent long-term storage.
Do you recall that testimony?
A Yes, uh-huh.
Q Okay. Would that be goal – would that goal be implemented if it came at the expense of operating reactors?
A No, absolutely not.
MS. SULLIVAN: One moment, Your Honor.
JUDGE MEROW: Sure.
MS. SULLIVAN: Nothing further, Your Honor.
MR. SHAPIRO: We have nothing further, Your Honor.
JUDGE MEROW: Well, Mr. Milner, I don't know if you can answer this, but under the current posture of the VOICE program, is it subject to being shut down by executive branch action at this point or would that require legislation?
THE WITNESS: I believe it would require legislation.
JUDGE MEROW: You're committed to file a license application at this point?
THE WITNESS: Yes, sir. Yes, sir.
JUDGE MEROW: Okay. Any questions?
MS. SULLIVAN: Nothing further, Your

# Plaintiff

# UNITED STATES
# COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| TENNESSEE VALLEY AUTHORITY, | ) | |
| Plaintiff, | ) | Case No. |
| v. | ) | 01-249C |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

Pages: 751 through 1014

Place: Chattanooga, Tennessee

Date: June 24, 2005


**HERITAGE REPORTING CORPORATION**

*Official Reporters*

1220 L Street, N.W., Suite 600

Washington, D.C. 20005-4018

(202) 628-4888

hrc@concentric.net

Mr. Small?

MR. SMALL: The date was August 11, 2004, Your Honor.

THE COURT: Thank you.

MR. SMALL: "QUESTION: Mr. Milner, are you currently employed in the Office of Civilian Radioactive Waste Management at the Department of Energy?

"ANSWER: Yes, I am.

"QUESTION: What is your current position?

"ANSWER: Chief operating officer.

"QUESTION: When did you first join the Office of Civilian Radioactive Waste Management?

"ANSWER: I believe it was April of '84."

Skipping, skipping ahead to, I believe, page 4716, line 24:

"QUESTION: Mr. Milner, do you recognize the document that I've handed to you and put up on the computer screen?

"ANSWER: Yes, I do.

"QUESTION: Could you identify it for the Court, please?

"ANSWER: It's the original 1985 mission plan for the program.

"QUESTION: Were you responsible for the

preparation of this document?

"ANSWER: I was responsible for developing and issuing this document."

Skipping ahead to page 4725, line 11:

"QUESTION: Mr. Milner, in your various positions within DOE, have you had responsibility for preparing total system life cycle costs?

"ANSWER: Yes, I have.

"QUESTION: Have you also had responsibility for preparing what are referred to as fee adequacy studies?

"ANSWER: Yes.

"QUESTION: Could you please -- strike that.

Could you explain to the Court what a total system life cycle cost is, or a TSLCC?

"ANSWER: It was a, an estimate at any given time of, of the total cost of, of the entire Waste Management System from identifying sites, characterizing sites, through construction, operation of the system, and, and ultimately decommissioning.

"QUESTION: Decommissioning of what?

"ANSWER: Of the repository facilities.

"QUESTION: What is a fee adequacy study?

"ANSWER: The fee adequacy studies using

the, the cost estimates as a basis attempted to analyze whether or not the fee that was being paid by the utilities was adequate to cover the, the costs.

"QUESTION: Why is a TSLCC or total system life cycle cost report prepared?

"ANSWER: Well, one, it's, it's good to keep track of the estimate of the program costs, but principally is, is input to the fee adequacy analysis.

"QUESTION: And why are fee adequacy studies prepared?

"ANSWER: They are mandated by the Act."

Skipping ahead to page 4748, line 16:

"QUESTION: Now, it's true that the Department of Energy's intentions with respect to the repository designed receipt rates have stayed constant pretty much to the present day, 3,000 MTU per year?

"ANSWER: I am sorry, would you repeat that?

"QUESTION: It's true, is it not, that the Department of Energy's intentions with respect to the repository design receipt rates have stayed constant to the present day, 3,000 MTU per year?

"ANSWER: Yes, uh-huh.

"QUESTION: And that that 3,000 MTU steady state acceptance rate has been used fairly consistently in the OCRWM published documents, correct?

"ANSWER: As far as the steady state rate, yes.

"QUESTION: And that's a reasonable rate?

"ANSWER: Yes, I think so."

Your Honor, we are now going to the May 1, 2002 deposition of Ronald A. Milner, page 12, line 9:

"QUESTION: And how many people report to you as the chief operating officer?

"ANSWER: I guess approximately 150 federal staff.

"QUESTION: Can you describe for me your duties as the, what I'll refer to as the COO for OCRWM?

"ANSWER: Okay. Basically, it's to manage the operational aspect of the program."

Page 60, line 5:

"QUESTION: And you're serving as chief operating officer, correct?

"ANSWER: Correct.

"QUESTION: And in that capacity, you're responsible for all of OCRWM's publications?

# Plaintiff

"ANSWER: Certainly, to the utility that would have had to build the dry storage."

Skipping to page 266, and to May 8 in the deposition, line 23:

"QUESTION: Has it been the objective of OCRWM to operate the Waste Management System in a way that can achieve maximum efficiency?

"ANSWER: Yes.

"QUESTION: And that's been an objective throughout your time in RW?

"ANSWER: Yeah, I believe it has.

"QUESTION: And when you consider efficiency in operating the Waste Management System, is it also proper, in your view, to take into account utility costs?

"ANSWER: My personal opinion, that should be a consideration."

Your Honor, that concludes our readings from Mr. Milner's testimony.

THE COURT: Mr. Lo Re, will the government also have counterdesignations?

MR. LO RE: Yes, Your Honor, and we'd like to put those in on Monday.

THE COURT: Thank you.

MR. SMALL: Your Honor, we would next offer

# Thomas Pollog

# Plaintiff

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

YANKEE ATOMIC ELECTRIC COMPANY, CONNECTICUT YANKEE ATOMIC POWER COMPANY, and MAINE YANKEE ATOMIC POWER COMPANY,
Plaintiffs,

v.

THE UNITED STATES,
Defendant.

Case Nos.: 98-126C, 98-154C, 98-474C

Courtroom 5
National Courts Building
717 Madison Place, N.W.
Washington, D.C.

Wednesday, August 4, 2004
Volume 17

The parties met, pursuant to the notice of the Judge, at 10:00 a.m.

BEFORE: THE HONORABLE JAMES F. MEROW



APPEARANCES:

ON BEHALF OF YANKEE ATOMIC ELECTRIC COMPANY, CONNECTICUT YANKEE ATOMIC POWER COMPANY and MAINE YANKEE ATOMIC POWER COMPANY:

JERRY STOUCK, ESQ.
ROBERT SHAPIRO, ESQ.
PETER J. SKALABAN, JR., ESQ.
VIVEK K. HATTI, ESQ
Spriggs & Hollingsworth
1350 I Street, N.W.
Washington, D.C. 20005
(202) 898-5800

ON BEHALF OF YANKEE ATOMIC ELECTRIC COMPANY, CONNECTICUT YANKEE ATOMIC POWER COMPANY:

MERRILL J. ATKINS, ESQ.
Assisting General Counsel
19 Midstate Drive
Auburn, Massachusetts 01560
(508) 721-3042

(Appearances Continued on the Next Page.)



APPEARANCES CONTINUED:

ON BEHALF OF MAINE YANKEE ATOMIC POWER COMPANY:

JOSEPH D. FAY, ESQ.
General Counsel
Maine Yankee
321 Old Ferry Road
Wiscasset, Maine 04578
(207) 882-5603

On Behalf of the Defendant:

HAROLD LESTER, JR., ESQ.
JOHN EKMAN, ESQ.
MARIAN E. SULLIVAN, ESQ.
HEIDE L. HERRMANN, ESQ.
R. ALAN MILLER, ESQ.
KEVIN B. CRAWFORD, ESQ.
RUSSELL SHULTIS, ESQ.
U.S. Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530
(202) 305-7562

***Index appears at end of transcript***



P R O C E E D I N G S

\- - - - - - -

THE COURT: Another witness today?

MR. STOUCK: Your Honor, I've got a couple of preliminary matters very briefly, if I may. Sorry to interrupt, but it's really just for the record, if I can just stay here. Mr. Lester mentioned a couple of days ago that we had filed a list of all of the documents that had been admitted -- exhibits that had been admitted by the Court, either because they were on one or the other exhibit list and not objected to and, therefore, admitted at the pretrial conference, or because they were admitted during the course of our case.

And he said that he thought the list was fine, if I recall correctly, except there were four documents on there that he, I'm not exactly sure what he said, my recollection is they may have been on the government's list and so forth, but they wanted to withdraw them, and I said I'd take a look at that.

And I just want to address that because the, I've looked at the documents, a couple of them are contracts, one is a contract between Yankee Atomic and Duke Engineering, that's Defendant's 261, one is a contract between Maine Yankee and Securitas.

Page 3992

AFTERNOONSESSION
(2:04 p.m.)
MR. STOUCK: Your Honor, thank you for that. I do hope we can be a little more efficient. I'm just using the last couple minutes of break here. Finishing off the efficiency.
THE COURT: Okay, fine.
BY MR. STOUCK:
Q. Good afternoon, Mr. Pollog.
A. Good afternoon.
Q. Just one, perhaps, minor point that I wanted to clear up from this morning before we move on. You told me this morning that the contracting officer had a responsibility for making determinations about what the standard contract meant. Do you recall that?
A. Yes.
Q. You told me at your deposition, or you told us, Mr. Skalaban's here with me, at your deposition in May of 2002, that it was Mr. Brownstein who had the responsibility to make any determinations on what provisions of the contract meant. Do you recall that?
MS. SULLIVAN: Objection. Can we ask the witness be shown the statement?

Page 3993

MR. STOUCK: I'm asking him if he recalls it. If he recalls it and says yes, then I think we're done.
THE WITNESS: Not specifically, I don't recall that.
BY MR. STOUCK:
Q. You don't recall that testimony?
A. I don't explicitly recall making that statement in my deposition.
Q. Let's show it to you then. In fact, there might be some more testimony, so in an abundance of caution, I will hand out the whole package now. There's a number of depositions, transcripts here, Mr. Pollog. If you would take a look behind tab five – I'm sorry, that's wrong, behind tab four, on page 63, bottom of 63, the last line of page 60. If you can let me know when you're there?
A. Can you repeat those pages for me again?
Q. Tab four, page 63.
A. Yes, I'm there.
Q. You see there are four on the page, it's actually page 17, but page 63 of the deposition, do you see that?
A. Yes.
Q. Line 25, "Was part of your function, in

Page 3994

working with Mr. Brownstein on these matters, was part of your function reading and trying to understand the standard contract?
"Yes.
"Did you have responsibility to issue or make any determinations on what the provision of the contract meant?"
And your answer was on line nine, "No, Mr. Brownstein may have asked my opinion, but he was the branch chief for logistics and utility interface that was responsible for making the determinations."
Do you see that?
A. Yes, I do.
Q. That was your testimony?
A. Apparently so.
Q. That was your testimony then?
A. Yes, it was.
Q. Okay. Now, let's talk a little bit more about DCSes. Is it correct that DOE received some DCS and FDS submittals from utilities in the '98, '99, 2001 time frame?
A. Yes, we did.
Q. And DOE wrote back to those utilities saying it was not approving any DCSes or FDSes at that time, right?

Page 3995

A. Some words to that effect, yes.
Q. And you were not involved in discussions about whether to continue processing DCSes in the fall of '96 or '97?
A. No, I was not.
Q. Right. But you were involved, to some extent, your duties and responsibilities for the waste acceptance and transportation division did involve, to some extent, processing DCSes, is that right?
A. To some minor extent, yes.
Q. Okay. Do you know when the Department stopped processing or stopped reviewing and approving DCSes or FDSes?
A. I believe I do.
Q. When was that?
A. I believe it was either the end of 1996 or in the very beginning of 1997.
Q. And your understanding is that the Department of Energy stopped processing these DCS and FDS submittals to limit its contractual liability, isn't that right?
MS. SULLIVAN: Objection, legal conclusion.
THE WITNESS: I'm not sure.
THE COURT: What's the objection?

Page 3996

MS. SULLIVAN: It was asking for a legal conclusion.

THE COURT: Oh.

MR. STOUCK: I asked for his understanding.

THE COURT: If you have an understanding, you can answer. I'll overrule the objection.

THE WITNESS: I wasn't told that, I don't believe, by anybody, but that was my understanding of the situation.

BY MR. STOUCK:

Q. That was your understanding?

A. I believe that was.

Q. Were you told anything at the time about why the Department of Energy had decided to stop processing and approving DCSes and FDSes?

A. I believe so.

Q. Pardon me?

A. I believe so.

Q. Yeah, you were told that counsel told the Department to stop doing that, is that right?

A. I believe counsel advised the Office of Civilian Radioactive Waste Management and the contracting officer to do that, yes.

Q. Counsel told Mr. Zabransky to do that, and Mr. Zabransky told you that counsel had told him to

Page 3997

do that, is that right?

A. I said I believe they advised us to do it, not told us to do that.

Q. Okay. Counsel advised Mr. Zabransky to stop processing these documents, and Mr. Zabransky told you that counsel had advised him of that?

A. I don't know if counsel advised Mr. Zabransky or other program personnel in RW directly. I don't know how the conversation between counsel and the Office of Civilian Radioactive Waste Management actually occurred, but the bottom line is Mr. Zabransky told me that, on advice of counsel, we're going to stop processing them. I don't know if he was told directly by counsel or through his superiors.

Q. But in any event, the advice came from counsel?

A. Yes.

Q. And the purpose was to limit the Department's liability?

A. That was my understanding.

Q. And you have no personal view on whether stopping the DCS process was a proper thing to do under the contract, right?

A. No, I do not have any personal view.

Page 3998

Q. And Mr. Zabransky also told you that the Department of Energy would not publish an ACR in 1997 because it probably would never be approved by the Office of General Counsel, isn't that correct?

A. I believe that is correct.

Q. Now, we were talking about a sentence in the instructions before lunch, the business about if these circumstances changed, they could be reevaluated. Do you recall that? It's Exhibit Number 030.001, if you want to get that in front of you and take a look at it.

I want to ask you one or two more questions about that sentence. This is on page two, the last sentence of 7C, I believe. Do you recall that?

A. Yes, I recall that conversation we had this morning.

Q. Do you know what the Department of Energy was attempting to convey to contract holders through that sentence?

A. I have no specific recollection of what we were intending to convey in 1992 when we wrote that sentence, no.

Q. Do you know why the sentence was placed in the instructions?

A. I don't recall at this time why it was

Page 3999

placed in the instructions in 1992.

Q. Did you know in 1992?

A. I may have.

Q. But you can't tell us today?

A. I don't recall right now why we did that in 1992, no.

Q. And you didn't recall at your deposition, which was two years ago, either, right?

A. I don't recall if I recalled in my deposition two years ago or not.

Q. Well, let's find out. Take a look at tab five, page, I believe it's 328, but it might be 329, let me just take a look, 330, excuse me, line 10. Let me know when you're there behind tab five.

A. I am there.

Q. "You have no recollection of any discussions about this sentence, and why it appeared in the DCS instructions?" Do you see that?

A. Yes, I do.

Q. And your answer was, "No," correct?

A. That's correct.

Q. So you didn't recall it then, you don't recall it today?

A. That is correct.

Q. Right, thanks. This is just for the

# Plaintiff

do this. The Court has asked a number of questions about --

THE COURT: By the way, I should have mentioned, whenever I ask a question, counsel can object.

MR. LESTER: Now, you tell us.

THE COURT: I should have mentioned that before, but I know that sometimes you don't deliberately go into a subject for good reasons, and if I ask a question that both counsel, for good reasons, don't want covered, I expect an objection in that regard.

MS. SULLIVAN: They're all good questions, Your Honor.

THE COURT: In the future, please ask.

MR. STOUCK: They're the best questions, Your Honor, along with the fact that we don't have to stand up, Your Honor.

BY MR. STOUCK:

Q. Just on the funding issue, which the Court has asked about over a number of days, I think many people in this room understand this, and it's not particularly controversial, and maybe the Court understands this as well, but maybe we can do it this way.





On the nuclear, the collections into the Nuclear Waste Fund since 1983, Mr. Pollog, and I don't know if you're the best person to do this, but since it's come up, do you know approximately the total amount that's come into the Fund since 1983?

A. I think so.

Q. And I realize you may not have been prepared for it, but approximately how much has been collected?

A. I think it's approximately $20 billion.

Q. Does that include interest or not interest?

A. I don't know the answer to that. I think it does, but I'm not positive about that.

Q. And I'm certainly not up on the latest on this. The numbers I had in mind were like $9 billion in fees and 5 or 6 in interest, but the numbers are out there somewhere. But I guess my real question is, do you know, I mean, you do know that not all of that has been appropriated to this program?

A. Yes, I am quite aware of that.

Q. Do you know how much of the total amount that's been collected approximately has not been appropriated to this program?

A. Approximately, I'd say it's less than half.

Q. Less than half has been appropriated to the





program?

A. That's my best recollection, but I'm not the expert on that.

Q. Billions and billions of collections from the utilities have not been appropriated to this program?

A. That's my understanding.

Q. And then just on the -- do you know what happens to that money?

A. Not really.

THE COURT: It's like Social Security, I guess.

MR. STOUCK: What's that?

THE COURT: It's like Social Security.

MR. STOUCK: And the Court may understand that. I thought since the questions had come up, we would just put it in the record. That's certainly my understanding.

BY MR. STOUCK:

Q. Is that your understanding?

A. It's something like the Social Security trust Fund, I believe.

Q. Now, on this question of the canisters that the Court raised, what's the basis for your understanding that a contract amendment would be the





answer? Is there something in the contract that says that?

A. Well, the contract doesn't currently state anything regarding canistered multi-element canister material. It only discusses bare spent nuclear fuel.

Q. Does the word "bare" appear in the contract?

A. I'm not sure. I think it does, but I'm not positive.

Q. Well, do you know whether canisters are addressed in the contract one way or the other?

A. I do not believe the word "canister" is in the contract.

Q. So it's silent about that matter?

A. That is my understanding, yes.

Q. All right. Do you know that Ivan Itkin -- do you know who Ivan Itkin was?

A. Yes, I do.

Q. And do you know that Ivan Itkin gave assurances to the governor of Maine, in connection with some correspondence involving Maine Yankee, that the contracts did in fact cover canistered fuel?

A. No, I'm not familiar with that.

Q. You're not aware of that?

A. I'm not familiar with what you just said.

# Plaintiff

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

----------------------------x

SACRAMENTO MUNICIPAL UTILITY :
DISTRICT, :
:NO. 98-488C
Plaintiff :
vs. :
UNITED STATES, :
Defendant. :
----------------------------:

Courtroom 5
National Courts Building
715 Madison Place
Washington, D.C.

Tuesday, March 29, 2005

VOLUME 7

The parties met, pursuant to the notice of the Judge at 9:00 a.m.





APPEARANCES:

ON BEHALF OF PLAINTIFF:

DAVID S. NESLIN, ESQ.
TIMOTHY R. MACDONALD, ESQ.
Arnold & Porter LLP
370 Seventeenth Street
Suite 4500
Denver, Colorado 80202-1370
(303) 863-2301

HOWARD N. CAYNE, ESQ.
Arnold & Porter LLP
555 Twelfth Street, N.W.
Washington, D.C. 20004-1206
(202) 942-5656





APPEARANCES (Continued:)

ON BEHALF OF THE DEFENDANT:

ALAN J. LO RE, ESQ.
JOSHUA E. GARDNER, ESQ.
TODD J. COCHRAN, ESQ.
SCOTT DAMELIN, ESQ.
RUSSELL SHULTIS, ESQ.
ELIZABETH THOMAS, ESQ.
U.S. Department of Justice
1100 L Street, N.W.
Washington, D.C. 20036

ALSO PRESENT:

STEVEN M. COHN, ESQ.
STEVE J. REDEKER
THOMAS POLLOG

***Index appears at end of transcript***





P R O C E E D I N G S

\- - - - -

THE COURT: Let's go.

Whereupon--

DAVID ZABRANSKY

a witness, called for examination, having previously been duly sworn, was examined and testified further as follows:

CROSS-EXAMINATION (Resumed)

BY MR. CAYNE:

Q. Good morning, Mr. Zabransky.

A. Good morning.

Q. I'd like to turn your attention to Plaintiff's Exhibit 121. I believe that will be in the first binder, one out of three. Do you have that document before you, sir?

A. Yes, I see it.

Q. And is this document a memorandum from you to -- was this a memorandum from you, sir?

A. It's an e-mail from me to Mr. -- I believe it's Auke Piersma.

Q. And who is that person?

02025

2025

Department of Energy in 1988, did you understand that the five-year delay in the plan start of the waste management operations at DOE would increase purchasers' need for at-reactor storage?

THE COURT: Counsel?

MR. GARDNER: Your Honor, I'd object, assumes facts not yet in evidence.

THE COURT: I don't know that that's the right objection.

MR. GARDNER: He, I think Mr. Pollog testified that he's not aware of, when he started, that there was a five-year delay.

THE COURT: Right. And, I mean, I think there are many things probably in this document that are useful to you, Counsel, if you want to have him read certain provisions in for emphasis, that's fine with me, but if that's what it says, then I'm going to take it that's what the situation is. It doesn't make any difference what his view is. He wasn't there. He didn't bind the Department. I assume this is a document that binds the Department, reflects their best information and judgment at the time.

If you want him to read something to emphasize it, I think that's fine, but otherwise, I would move to a document where he was at DOE, then



02026

2026

you can go through the same exercise. Do you see what I'm saying?

MR. MACDONALD: Very well, Your Honor.

THE COURT: But, you know, if you want to emphasize some points to me from the document, or you can do it during argument later on or in a brief, you don't need him for the document, is what I'm saying.

BY MR. MACDONALD:

Q. Mr. Pollog, to your knowledge, there is no group within DOE today that disagrees that a 3000-ton rate is the appropriate rate to use as a steady state acceptance rate, isn't that correct?

THE COURT: I'm going to sustain the objection which is coming, I am sure, unless the bureaucracy has changed, that there are people on every floor of every department, someplace, that disagree with something that's been done. It doesn't make any difference what a group of people within the bureaucracy think. The issue is, what is the official Department position?

MR. MACDONALD: Well, Your Honor --

THE COURT: Or those in the position of authority to bind the Department.

MR. MACDONALD: I understand that, Your Honor, I think the question includes those within



02027

2027

Mr. Pollog's knowledge. He has testified on this, this very topic previously.

THE COURT: Do you know whether, do you know if there are people within the Department that disagree with the Department's official position?

THE WITNESS: Well, I can't speak for everybody, but I don't know of anyone who raised objections to that.

THE COURT: All right.

BY MR. MACDONALD:

Q. Who disagrees with the 3000-ton rate as the appropriate steady state rate?

A. Just, are you talking about right now or throughout the history of the program?

Q. Let's start with right now, sir.

A. Okay. Right now, I know of no one who disagrees with that rate.

Q. And do you know of anyone throughout the life of the program, sir?

A. Nothing comes to mind, but I am sure at some point in time, someone disagreed with that. For example, when we put together the '91 ACR, we used a lower rate because we thought it was more appropriate for acceptance at a MRS. I guess the question sort of brings to mind, are you talking about a



02028

2028

repository-based system or an MRS-based system, or some combination thereof?

It's a very broad question, and without more information, I can't really refine my answer very well for you.

Q. Sir, when you prepared the 1991, when you were involved in the preparation of the 1991 ACR, was it DOE's plan to operate its facilities on a 900-ton steady state basis?

A. It was DOE's plans for the year 1998 through 2010 -- or, excuse me, 2007, to operate at a 4, 6, 9 continuous rate, yes.

Q. Let's take a look at the 1991 ACR, sir. Mr. Gardner asked you a series of questions about it. It's Defendant's Exhibit 290 in your original binder.

A. You said in the Defendant's binder?

Q. The binder that Mr. Gardner provided to you.

A. It's not in yours?

Q. That's correct. And let me clean one answer, one thing up, Mr. Pollog, in your last answer, you specified that it was DOE 's plan to operate at the 4, 6, 9 number through 2007. What was DOE's plan at the time, in your view, as to how it would operate after 2007, sir?