# Plaintiff

A. Certain provisions of it, yes, that's correct.

Q. Let me ~~be clear, the~~ schedule set forth on this page five of the 1991 ACR was inconsistent with the 1987 amendments, correct?

A. It was inconsistent with at least one of the provisions of the 1987 Nuclear Waste Policy Amendments Act, yes.

Q. And what provision is that, sir?

A. I believe that was the provision that restricted start of operations of the MRS to not before construction authorization issuance by the Nuclear Regulatory Commission.

Q. And if this ACR were to reflect a schedule fully consistent with the 1987 amendments, it would show zero acceptance until 2007, is that right?

A. I believe that's correct, yes.

Q. And that's because a repository had been delayed until at least 2010 at this point?

A. I believe that's correct too. If I might adjust one point to that, that's assuming no other legislation was passed in the interim.

Q. So the schedule set forth on page five of the 1991 ACR would require a change in the law in order to be accomplished, is that right?





A. Yes, that's correct.

Q. In preparing this schedule, Mr. Pollog, the Department of Energy only assumed that the schedule restriction would be abolished by Congress, is that right, as opposed to the capacity limitation?

A. Probably, I think that's correct. I'm trying to think -- there's several restrictions in the Nuclear Waste Policy Act. I'm trying to remember of any other restrictions that were imposed besides the schedule one we were assuming at the time, but I don't believe so, but I don't -- I believe you're correct.

THE COURT: We spent a little bit of time with the prior witness, and you were in the room, talking about the restrictions that Congress placed on it, so I thought, you know, do you have any recollection?

THE WITNESS: No, Your Honor.

THE COURT: He had about five or six things he ticked off.

THE WITNESS: Exactly, Your Honor, I was just going through my head right now of other restrictions, and I was trying to remember --

THE COURT: But there were others?

THE WITNESS: Yes, and I was trying to





remember if we assumed anything else. I don't believe we did.

BY MR. MACDONALD:

Q. Mr. Pollog, you don't know why the Department of Energy, in promulgating the schedule set forth on page five of the 1991 ACR, assumed that only the schedule linkage would be abolished, do you?

THE COURT: I think the question is kind of confusing. Why don't you say, do you, do you know? You started out, "You don't know."

MR. MACDONALD: Very well, let me just rephrase that.

THE COURT: It's confusing the way it's phrased.

BY MR. MACDONALD:

Q. Mr. Pollog, do you know why --

THE COURT: There you go.

BY MR. MACDONALD:

Q. -- the Department of Energy assumed that only the schedule linkage would be abolished by Congress in publishing the schedule set forth on page five of the 1991 ACR?

A. I believe so.

Q. Why is that, sir?

A. Because the schedule linkage, if it was





abolished, would allow us to start waste acceptance in 1998.

Q. Let me ask a follow-up question. Why did the Department of Energy assume that only the schedule linkage would be abolished, sir?

A. Because we saw that as one of the main impediments to accepting waste in 1998 at an MRS.

Q. Sir, you don't know how important the schedule linkage was when it was passed by Congress in the 1987 amendments, correct?

THE COURT: Important to whom?

MR. GARDNER: Objection.

THE COURT: Well, I -- okay.

MR. GARDNER: I was going to say objection, speculation, and vague. I'm not quite sure what Mr. Macdonald's getting at. If he's trying to ask any point to Congress, obviously, Mr. Pollog can't testify to that.

THE COURT: Right. And the, we know from the prior witness that there were a handful of different restrictions, and if you can use the word "restriction," rather than "linkage," in your questions, I think that's certainly helpful to me when I go back to look at it, and probably any other human being in the world that doesn't speak in

# Plaintiff

knew for sure they weren't going anywhere, they weren't coming to get the waste.

MR. MACDONALD: And if I could just turn the witness' attention to page four of this same exhibit, Number 290, the 1991 ACR?

BY MR. MACDONALD:

Q. And Mr. Gardner, I think, had you read the entire paragraph, the middle paragraph on page four into the record, Mr. Pollog. I'd like to focus your attention on the last sentence of that paragraph, and I'd ask you to read that into the record, sir.

A. Certainly. "If the current linkages between MRS facility construction and repository construction authorization are maintained, it is estimated that commencement of facility operations and initial acceptance of spent nuclear fuel by DOE could not start until at least 2007."

Q. And you were responsible in getting the concurrence chain completed on the 1991 ACR, is that correct, Mr. Pollog?

A. Yes, that's correct.

Q. Your boss at the time was Mr. Alan Brownstein, is that right?

A. Yes, that's correct.

Q. He was ultimately responsible for issuing





this document, is that right?

A. Yes, it fell under his responsibility as the branch chief, certain functions or tasks, so management would look to him, upper management would look to him to complete his tasks.

Q. Did Mr. Brownstein ever tell you that the reason for including the 900-ton rate, we were just discussing in the 1991 ACR, was to limit the Department of Energy's obligations to pick up waste from utilities, sir?

A. No.

Q. Did anyone else ever tell you that, sir?

A. No.

Q. Mr. Pollog, was it DOE's plan for an MRS to become a long-term substitute for the repository?

MR. GARDNER: Your Honor, my only objection, if we could just be clear as to time frames, it might help out for the record.

BY MR. MACDONALD:

Q. At any time, sir?

A. I don't believe so.

Q. In 1989, DOE slipped the start date for the repository from 2003 until 2010, is that right?

A. I believe that's correct. I'm not sure of the exact day and month, but it's approximately





correct, yes. I don't recall a specific time frame going back that far.

Q. Let's take a look, Mr. Pollog, at Plaintiff's Exhibit 169, which is a November -- it's in the cross binder.

A. Can you give me that number once again, Counselor?

Q. It is 169, Mr. Pollog, and for the record, this is a November 1989 report to Congress on reassessment of the Civilian Radioactive Waste Management Program. Have you seen this document before, sir?

A. Probably. I have no specific recollection of seeing it, but since I was employed there at the time, I probably saw a version of it, or a final version of it.

Q. If I could turn your attention to VII? It's Bates page 1448 at the bottom.

A. Can you give me the Bates number again, please? I'm getting confused with the Roman numbers.

Q. It is 1448. And if I could direct your attention to the fourth paragraph and ask you to read the second and third sentences into the record, sir?

A. Starting with, "For the first time"?

Q. Correct.





A. "For the first time since the passage of the Nuclear Waste Policy Act, the program has put together a schedule based on a realistic assessment of activities, duration, and past experience. The schedule shows significant slip for the expected part of repository operations from the year 2003 to approximately 2010."

Q. Mr. Pollog, if you would turn to page 12 of this 1989 reassessment?

A. This is Bates 1463, is that right?

Q. That's correct. And before I ask you a question on this page, sir, did you have any role in the, putting together a schedule based on a realistic assessment of the activities, durations, and past experience that's referenced in this exhibit?

A. Nothing that I recall.

Q. On page 12, sir, the first full paragraph begins, "If a site cannot be obtained." Do you see that?

A. Yes, I do.

Q. If you'd look at the sentence, the second sentence states, "If the current statutory linkages to the repository are maintained, an additional delay of five years would result with start-up estimated at 2007 for the basic MRS facility." Do you see that?

# Plaintiff

A. Yes.

Q. Whatever that capacity is?

A. Correct.

Q. And I believe you testified about this earlier, but let me be clear, your current plans are to have a capacity of 3000 tons acceptance, is that right, per year?

A. I believe the repository is being designed for a steady state acceptance rate of 3000 metric tons per year, yes.

Q. Sir, that's not going to be a precise amount every year, right at 3000, is it?

A. I don't know, I mean, I don't know the answer to that, probably not, but close.

Q. Likely, it could be 3100, one year, 2950, another year, sir?

MR. GARDNER: Your Honor, I'm just going to object --

THE COURT: Sustained.

MR. GARDNER: Thank you.

BY MR. MACDONALD:

Q. Mr. Pollog, I'd like to direct your attention to Plaintiff's Exhibit 3 --

THE COURT: Just to clarify, I mean, he didn't choose those numbers, you chose the numbers.





He said he thought it would vary, is that fair?

THE WITNESS: Mr. Macdonald thought it would vary?

THE COURT: No, that you thought it would vary, but you didn't put any numbers on it. He put numbers on it.

THE WITNESS: I'm not understanding, Your Honor, I'm sorry.

THE COURT: Let's go back to that again then.

MR. MACDONALD: Very well. If I could ask a few more questions to clarify that, Your Honor?

THE COURT: You want to ask me questions?

MR. MACDONALD: No, no. I wasn't sure if you were preparing your own questions, Your Honor. If not, I'll ask --

THE COURT: I don't prepare mine. They just kind of pop out. It's a sloppy area of the transcript. Let's see if we can clean it up here.

BY MR. MACDONALD:

Q. Sir, how would the number vary?

THE COURT: Would the number vary, first of all, yes or no?

THE WITNESS: Well, I think it's very difficult to say right now because there's many





issues involved, like the contract allows a plus or minus 20 percent --

THE COURT: Okay.

THE WITNESS: -- change. There was issues like cask rounding and how exactly we're going to deal with all these issues, but I think it's an approximate average of what we may see in any given time period. It may be 2975 in one year, it may be 3100 another year. Yeah, it can vary based upon several things going on in operating a system. All the details will be worked out, I hope, in the future.

BY MR. MACDONALD:

Q. Sir, the Department of Energy did not issue an ACR or APR in 1996 or '97, did it?

A. No, we did not.

Q. Were you told why the Department of Energy did not issue an ACR or APR in 1997, sir?

A. Yes, I believe so.

Q. What were you told?

A. I believe Mr. Zabransky told me we'd probably get it -- not get it approved by all the people that would have to approve it on a concurrence chain.

Q. Who would that include, sir?





A. Oh, it would include many parts of the Department of Energy, the contracting officer's office, the office of general counsel, different parts of the RW program, maybe even some other departments, such as department of environmental management, it would depend on who we put on the concurrence chain.

But other parts of the organization besides the Office of Civilian Radioactive Waste Management would have had to concur on that final document.

Q. And why did you believe that you wouldn't be able to get it signed by the concurrence chain, sir?

MR. GARDNER: Your Honor, I just want to interpose an objection and admonish the witness to the extent there's attorney-client issues that are present here, that he not divulge those communications.

THE COURT: You've been so advised.

THE WITNESS: Okay. Could you repeat the question for me, please?

MR. MACDONALD: Could you read the question back, please?

(The reporter read the record as requested.)

# Plaintiff

# UNITED STATES
# COURT OF FEDERAL CLAIMS

TENNESSEE VALLEY AUTHORITY, )

Plaintiff,) Case No.

v. ) 01-249C

THE UNITED STATES, )

Defendant.)

Pages: 751 through 1014

Place: Chattanooga, Tennessee

Date: June 24, 2005

**HERITAGE REPORTING CORPORATION**

*Official Reporters*

1220 L Street, N.W., Suite 600

Washington, D.C. 20005-4018

(202) 628-4888

hrc@concentric.net

testimony on August 4, 2004, trial testimony in the Yankee Atomic cases in this court.

"Thomas E. Pollog, a witness called for examination, having been duly sworn, was examined and testified as follows:

"QUESTION: Mr. Pollog, are you currently employed at the Department of Energy?

"ANSWER: Yes, I am.

"QUESTION: And to what office within the Department of Energy are you currently assigned?

"ANSWER: I work in the Office of Civilian Radioactive Waste Management, the Office of Systems Analysis and Strategy Development.

"QUESTION: What are your current responsibilities?

"ANSWER: Generally, I'm assigned to implement a standard contract between the Department of Energy and the contract holders.

"QUESTION: How long have you been in your current position?

"ANSWER: Approximately eight years.

"QUESTION: So when did you join the office?

"ANSWER: The office I'm currently in, that office was formed in October of 2002, but my

responsibilities were the same in the prior organization.

"QUESTION: When did you join the prior organization?

"ANSWER: September of 1996.

"QUESTION: Prior to September of 1996, did you serve in the office that had responsibility for the waste acceptance function at DOE?

"ANSWER: Yes, I did. In 1990, '91, and early '92, I was in the office that performs the same functions.

"QUESTION: Mr. Pollog, do you also serve as the contracting officer's technical representative?

"ANSWER: Yes, I do, in an unofficial capacity.

"QUESTION: When did you assume the responsibilities of the contracting officer's technical representation?

"ANSWER: When Mr. Zabransky assumed the responsibilities of the contracting officer, which I believe was in the summer of 2002, I was unofficially assigned the responsibilities of the contracting officer's technical representative.

Page 3919, line 19:

# Plaintiff

nuclear fuel cases, including this case, on April 11th, 2002. Page five, "Thomas Pollog, called as a witness herein, having been first duly sworn, was examined and testified as follows:"

Page 95, line 16:

"QUESTION: When these documents -- I think you testified that DOE could determine the excess storage that was needed for SNF by utilities, is that right?

"ANSWER: I would say DOE was able to approximate how much out of pool, what excess would have been.

"QUESTION: Excess of what a utility could store in their pool" --

Excuse me, Your Honor, I just read part of Mr. Pollog's answer. I apologize.

THE COURT: If you would just reiterate what the question was and then --

MR. SMALL: Yes, Your Honor, we'll just restart that question.

THE COURT: Thank you.

MR. SMALL: "QUESTION: From these documents, I think you testified that DOE could determine the excess storage that was needed for SNF by utilities, is that right?

"ANSWER: I would say DOE was able to approximate how much out of pool, what the excess would have been.

"QUESTION: Continue, please.

"ANSWER: Excess of what a utility could store in their pool."

THE COURT: Mr. Lo Re.

MR. LO RE: I'm sorry, I was anticipating. Please --

THE COURT: You're quick. It's good to be quick.

MR. SMALL: "QUESTION: And so how is that information used by DOE?"

MR. LO RE: Your Honor, I'm going to raise a relevance objection here and a foundation objection that, again, I can't tell from this record even what Mr. Pollog is addressing.

THE COURT: The Court has a clue. Overruled.

MR. SMALL: "ANSWER: It had various issues, I would guess, over periods of time, when --

"QUESTION: How was it used, for example, in regards to developing an acceptance rate?

"ANSWER: There were points in time that one of the goals of the program was to develop a

system where the acceptance rates would account -- would alleviate a purchaser's need to have storage outside of their pools.

"QUESTION: At what point in time was this the goal of the program?

"ANSWER: I believe in the mid-80s."

Your Honor, that concludes the testimony of Mr. Pollog that we're offering.

THE COURT: Mr. Lo Re, do you have counterdesignations?

MR. LO RE: Your Honor, I believe we will be having counterdesignations.

THE COURT: Thank you.

MR. LO RE: Thank you, Your Honor.

MR. SMALL: Finally, Your Honor, we have one remaining witness that we would offer through prior testimony. That would be testimony of Mr. David Zabransky. We begin with testimony given on August 5, 2004 in the Yankee Atomic trial in this court.

THE COURT: Mr. Zabransky, you must get used to hearing your trial testimony, not just reading it, but hearing it.

MR. ZABRANSKY: First time for this.

THE COURT: First time you heard it?

# Plaintiff

# UNITED STATES
# COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| TENNESSEE VALLEY AUTHORITY, | | ) |
| | Plaintiff, | ) Case No. 01-249C |
| v. | | ) |
| THE UNITED STATES, | | ) |
| | Defendant. | ) |

Pages: 1264 through 1560

Place: Washington, D.C.

Date: July 11, 2005

**HERITAGE REPORTING CORPORATION**
*Official Reporters*
1220 L Street, N.W., Suite 600
Washington, D.C. 20005-4018
(202) 628-4888
hrc@concentric.net

would reflect in-pool storage?

"ANSWER: I believe it would be the in-pool spent fuel storage document, there was one document, I'm not sure, may have been a second one, I don't recall. One was entitled, at least one was called spent fuel storage requirements."

MS. SNYDER: And then shifting to designations for context, continuing on that page.

"QUESTION: Okay. From these documents, I think you testified that DOE could determine the excess storage that was needed for SNF by utilities, is that right?

"ANSWER: I would say DOE was able to approximate how much out of pool, what the excess would have been.

"QUESTION: And so --

"ANSWER: Excess of what a utility could store in their pool.

"QUESTION: And so how was that information used by DOE?

"ANSWER: It had various uses, I would guess, over periods of time, when.

"QUESTION: How was it used, for example, in regards to developing an acceptance rate?

"ANSWER: There were points in time that

one of the goals of the program was to develop a system where the acceptance rates would account -- would alleviate the purchaser's need to have storage outside of their pool.

"QUESTION: And what point in time was this the goal of the program?

"ANSWER: I believe in the mid-'80s."

MS. SNYDER: And then shifting to counterdesignations.

"QUESTION: Mid-'80s?

"ANSWER: Yeah.

"QUESTION: Was there a different goal before the mid-'80s?

"ANSWER: I don't know.

"QUESTION: Was this DOE's goal when it signed the standard contract?

"ANSWER: I don't know.

"QUESTION: Was there a different goal after the mid-'80s?

"ANSWER: I would say so, yes.

"QUESTION: And what was that goal after the mid-'80s?

"ANSWER: Well, essentially, what happened was these acceptance rates that were generated in mid-'80s were based on several goals. One was to

alleviate the need for excessive storage capacity for utilities. Also, we looked at the, as I described earlier, the 70,000 metric tons of the reactor and divided it by what we thought was the anticipated lifetime of the facility and came up with the 3,000. They were fairly approximate for a while.

After the mid-'80s, these 3,000 MTU rates sort of became our design objectives. So I'm not saying our goal changed, per se, but we didn't reflect it as a goal of the program anymore.

"QUESTION: Was there a new goal for the program?

"ANSWER: Regarding?

"QUESTION: The acceptance rate.

"ANSWER: Eventually, there was, yes.

"QUESTION: What was that goal?

"ANSWER: Well, that would have been -- we had new constraints put on us regarding the Nuclear Waste Policy Amendments Act. I will refer to it as the NWPAA for future discussion, if that's okay.

"QUESTION: And how did that affect, I guess, goal of the acceptance rates?

"ANSWER: Eventually, it would reduce it significant ly.

"QUESTION: Is there a -- is it your

# David Zabransky

# Plaintiff

04107

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

YANKEE ATOMIC ELECTRIC COMPANY, )
CONNECTICUT YANKEE ATOMIC POWER )Case Nos.:
COMPANY, and MAINE YANKEE ATOMIC ) 98-126C
POWER COMPANY, ) 98-154C
Plaintiffs, ) 98-474C
)
THE UNITED STATES, )
Defendant. )

Courtroom 5
National Courts Building
717 Madison Place, N.W.
Washington, D.C.

Thursday, August 5, 2004
Volume 18

The parties met, pursuant to the notice of the Judge, at 10:00 a.m.

BEFORE: THE HONORABLE JAMES F. MEROW



04108

APPEARANCES:

ON BEHALF OF YANKEE ATOMIC ELECTRIC COMPANY, CONNECTICUT YANKEE ATOMIC POWER COMPANY and MAINE YANKEE ATOMIC POWER COMPANY:

JERRY STOUCK, ESQ.
ROBERT SHAPIRO, ESQ.
PETER J. SKALABAN, JR., ESQ.
VIVEK K. HATTI, ESQ
Spriggs & Hollingsworth
1350 I Street, N.W.
Washington, D.C. 20005
(202) 898-5800

ON BEHALF OF YANKEE ATOMIC ELECTRIC COMPANY, CONNECTICUT YANKEE ATOMIC POWER COMPANY:

MERRILL J. ATKINS, ESQ.
Assisting General Counsel
19 Midstate Drive
Auburn, Massachusetts 01560
(508) 721-3042

(Appearances Continued on the Next Page.)



04109

APPEARANCES CONTINUED:

ON BEHALF OF MAINE YANKEE ATOMIC POWER COMPANY:

JOSEPH D. FAY, ESQ.
General Counsel
Maine Yankee
321 Old Ferry Road
Wiscasset, Maine 04578
(207) 882-5603

On Behalf of the Defendant:

HAROLD LESTER, JR., ESQ.
JOHN EKMAN, ESQ.
MARIAN E. SULLIVAN, ESQ.
HEIDE L. HERRMANN, ESQ.
R. ALAN MILLER, ESQ.
KEVIN B. CRAWFORD, ESQ.
RUSSELL SHULTIS, ESQ.
U.S. Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530
(202) 305-7562

***Index appears at end of transcript***



04110

PROCEEDINGS

- - - - -

MS. SULLIVAN: Good morning, Your Honor. We're ready to call our next witness unless there's anything we need to handle preliminarily.

THE COURT: Okay.

MS. SULLIVAN: The government calls David Zabransky.

Whereupon--

DAVID ZABRANSKY

a witness, called for examination, having been duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. SULLIVAN:

Q. Good morning, Mr. Zabransky. Are you currently employed at the Department of Energy?

A. Yes, I am.

Q. And to what office within the Department of Energy are you currently assigned?

A. I'm in the Office of Civilian Radioactive Waste Management, and I work in the Office of Systems Analysis and Strategy Development within that office.

Q. What are your current responsibilities?

A. I report to Chris Kouts, and I work on issues related to the standard contract, other

04111

technical issues on commercial waste acceptance, waste acceptance issues, and I serve as the contracting officer for the standard contracts.

Q. You testified you report to Mr. Kouts. Do you know who Mr. Kouts reports to?

A. Yes, Mr. Kouts reports to Ted Garrish, the deputy director.

Q. And to whom does Mr. Garrish report?

A. Mr. Garrish reports to Dr. Choo, the director of the program.

Q. When did you become the contracting officer?

A. I believe it was in July of 2002.

Q. Have you also served as the technical representative to the contracting officer?

A. Yes, I have.

Q. And when did you serve as the technical representative to the contracting officer?

A. From, I believe, around 1995 through July of 2002.

Q. And what were your responsibilities as the contracting officer's technical representative?

A. To provide technical advice to the contracting officer on issues relating to administration of the standard contract.

04112

Q. When did you join DOE?

A. I came to DOE in 1994, I believe July of 1994.

Q. Prior to joining DOE, where were you employed?

A. I was employed by Wisconsin Electric Power Company in Milwaukee, Wisconsin.

Q. How long were you employed by Wisconsin Electric Power Company?

A. I started there in 1978 and left in 1994.

Q. What was your position at Wisconsin Electric Power Company when you left?

A. When I left Wisconsin Electric in 1994, I was the manager of nuclear fuel services.

Q. Did your responsibilities as manager of nuclear fuel services include administering Wisconsin Electric's standard contract with Department of Energy?

A. Yes, my responsibilities were for all the contracts that the nuclear power department had for fuel and fuel disposal, as well as analysis of fuel designs and storage of spent fuel at Point Beach.

Q. Mr. Zabransky, do you hold a Bachelor's degree?

A. Yes, I do.

# Plaintiff

04117

months prior to 1998, and that's really when the process was started by the government.

Q. Turning now to your time at DOE, when you came to DOE, did you have responsibility for reviewing and approving DCSes submitted by utilities?

A. When I became the COTR in 1995, I acted as the individual that reviewed them and gave the contracting officer technical recommendations as to whether they should be approved or not.

Q. And when would you recommend approval of DCSes?

A. The DCSes were approved as long as they were complete and the allocations put forth on them were consistent with the allocations in the ACRs that provided the allocation to the utility. So generally, it was a review of completeness and compliance with the allocation size.

Q. Did you recommend approval or disapproval of all DCSes that were submitted after you became the COTR?

A. I think there were a few that were eventually approved or initially not approved because of numbering errors or other administrative errors, but beyond that, yes, they were all generally approved through the period of time that we processed



04118

them.

Q. Was there a time at which DOE stopped processing these DCSes?

A. Yes, I believe it was in early '97. It's hard to remember the exact year that the Department stopped processing DCSes. We did acknowledge that we had received them, but we no longer processed them. We neither approved or disapproved them.

Q. Who made the decision to stop processing DCSes?

A. I think the decision was made by the contracting officer on the advice of counsel.

Q. Can we pull up DX-29.002?

MS. SULLIVAN: One moment, Your Honor.

THE COURT: Sure.

MS. SULLIVAN: Your Honor, this is two exhibits with multiple pages. I'd like to provide copies to the Court.

BY MS. SULLIVAN:

Q. Mr. Zabransky, I've actually handed you copies of what have been marked as Defendant's Exhibit 29.002 and 29.003. Do you recognize these documents?

A. I do.

Q. Do you recognize these documents to be a



04119

set of DCS submittals from Maine Yankee?

A. Yes, 29.002 is a set of submittals from Maine Yankee to the Department of Energy, in September of '92, for allocations for Maine Yankee.

Q. And what is 29.003?

A. 29.003 is the approved DCSes being sent back by the contracting officer to Maine Yankee.

Q. Okay. And you were not involved in the processing of these DCSes?

A. I was not at DOE at the time, no.

Q. And just based on your review of the document, is it your understanding that Maine Yankee submitted DCSes for all of its allocations in the first 10 years in 1992?

A. From review of this document and review of the '91 ACR, this appears to be a DCS for each of the allocations that Maine Yankee had in the '91 time frame that they could have submitted in 1992, yes.

Q. Okay. And looking at 29.003, is it your understanding that these DCSes were approved by DOE?

A. Looking at the exhibit, yes, they all seem to have been approved by DOE.

Q. Thank you. Mr. Zabransky, are you familiar with the former industry organization known as the Utility Nuclear Waste Management Group?



04120

A. I am familiar with the organization known as the Utility Nuclear Waste Management Group, also known as UNWMG.

Q. Was Wisconsin Electric a member of UNWMG while you were there?

A. Yes, Wisconsin Electric was a member of UNWMG when I was employed at Wisconsin Electric.

Q. And did you represent Wisconsin Electric at meetings of UNWMG?

A. I was a representative of Wisconsin Electric at meetings of UNWMG, yes, I was.

Q. What did you understand to be the purpose of UNWMG?

A. UNWMG was a organization within, I believe, Edison Electric Institute that was set up to work on issues related to nuclear waste disposal, interfaces with DOE. It was an organization to facilitate industry involvement on those topics.

Q. Are you familiar with the process commonly referred to as the ACR issue resolution process?

A. Yes, I am.

Q. What was the ACR issue resolution process?

A. The ACR issue resolution process was a group, subgroup that was set up within the UNWMG, a high-level waste working group, which focused on

# Defendant

**Yankee Atomic Electric v. U.S Nos.: 98-126C, 98-154C, 98-474C August 5, 2004**

**Heritage Reporting Corporation**

**Page 4107 to Page 4238**

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

*HERITAGE REPORTING CORPORATION*
*1220 L Street, N.W.*
*Suite 600*
*Washington, DC 20005*
*Phone: 202-628-4888*
*FAX: 202-371-0935*

Page 4127

designed to accept MESCs?
A. Yes, they do.
Q. Why is that?
A. The requirements documents require the contractor designing the facilities and developing the license application to include the capability in the facilities to handle multi-element sealed canisters, so that if the Department were to execute these contract amendments, we'd be able to actually implement them.
Q. Can we highlight the fifth paragraph of this letter on the second page? Could you read that portion of the letter, please?
A. "It is our current expectation that after receipt at the repository, dual purpose systems will be opened and the spent nuclear fuel removed for placement in a waste disposal package, unless the internal canister can be demonstrated and Nuclear Regulatory Commission licensed as part of the final waste disposal package assembly.
Therefore, in order for a dual purpose system to be classified as standard, we anticipate that, at a minimum, it must provide that the spent nuclear fuel stored allows for its unloading and handling like an intact fuel assembly.

Page 4128

Dual purpose systems that cannot be unloaded and handled in the same manner as an intact assembly will be classified as nonstandard under the terms of the contract."
Q. The first sentence refers to, discusses the waste disposal package and the NRC, or the NRC license. Is that part of the technical analysis to which you were just discussing?
A. That's one of the issues that has to get looked at, as to whether this canister can be directly disposable, or if it needs to be reopened and repackaged when it's received at the repository.
Q. Has a decision been made as to the schedule upon which DOE will accept MESCs?
A. No, I'm not aware that any decision has been made on the schedule as to which we would accept MESCs.
Q. And when can a schedule for the acceptance of MESCs be determined?
A. As I said, I think before, until we get the license and the utilities actually licensed, and we know what its capabilities are, and we know if there are any technical limitations or technical specifications that limit our ability to open cans or facility limitations as to how many cans we can open

Page 4129

at once, we won't be in a position to determine what schedule we can work on.
Q. And the license that you're referring to, when does DOE expect to receive that license?
A. You really wouldn't know the final details of that until you receive the license to receive and possess right before the repository was ready to open. I'm not sure what the schedule is for that without reviewing other documents, but it's subsequent to the receipt of the construction authorization.
Q. Was the subject of MESCs part of the ACR issue resolution process?
A. I believe it was, yes.
Q. Why was that?
A. It was an issue that the utilities identified, and I think DOE mutually agreed with the utilities that it needed resolution because they didn't appear to be covered under the contract.
Q. Could we go back to Plaintiffs' Exhibit 81? Which we don't have on computer. Could I direct your attention to the page that is Bates-numbered ending in 1703?
A. Yes.
Q. And could you read the issues stated there?

Page 4130

A. The issue stated there is, "Should Appendix E be amended to include multi-element sealed canisters as either a standard or nonstandard SNF classification."
Q. And I think you've already explained this. This document contains issues that the industry wanted to discuss with DOE?
A. It contained issues, and it contained industry positions that we thought DOE should adopt.
Q. While you were at Wisconsin Electric, did you understand that MESCs were not an acceptable waste form, pursuant to the contract?
A. That was my understanding, yes.
Q. What is the effect of the – or do you have an understanding as to what the effect of the fact that MESCs are currently not an acceptable waste form would have upon utilities?
A. Well, it's my understanding that if the issue isn't resolved through a contract amendment, that the effect of MESCs not being an acceptable waste form would be that the utilities would either have to remove the fuel from those canisters and put it in the DOE provided transportation casks as their fuel or amend their contracts to allow it as a acceptable waste form.

# Plaintiff

04204

choose the best option it had, isn't that correct?

A. Well, utility, when you say, "individually," I mean, if someone is going to exchange, they have to exchange with somebody else. So they would look at -- a utility who needed to move up would look at, I need to move up, and optimize its options, which could be move up, buy a place in line or add storage.

So it had spent fuel management need. It could optimize implementation of its need as it saw fit, which could be either exchange it with another utility or developing additional storage capacity.

Q. So each individual utility would view optimization differently. Isn't that your understanding of what is meant in Dr. Dreyfus' letter?

A. I think they're in the best position to decide what makes best sense for them from that perspective, yes.

Q. And you still believe the exchange provision can work, don't you?

A. I believe it can work in a mature performing system, yes.

Q. And you still believe, as Dr. Dreyfus indicated in Plaintiffs' Exhibit 145, in his letter,



04205

that the exchange provision would allow utilities to optimize allocation of waste capacity, don't you?

A. Yes.

Q. In fact, it's been your belief that the exchange provision would work much like pollution offset credits, isn't that correct?

A. That's one type of model that I think I've said before might be a way this could work, yes.

Q. People will buy, sell, trade -- a willing seller will find a willing buyer, and an exchange will be proffered, the deal will be accepted, isn't that correct?

A. Between those two, yes.

Q. And it's your belief that buyers and sellers of swaps would incur little, if any, brokerage fee for arranging those trades, isn't that correct?

A. Whether a broker gets involved or not, I don't know. I mean, that's something up to the utilities. If they want to do it themselves, that's fine. In the old days, going back a decade, brokers were very active in the uranium exchange market and the enrichment exchange market. I don't know whether they're that active today. I haven't kept pace with it.



04206

Q. In fact, it's your understanding that brokers aren't doing too well today in the uranium markets, isn't that true?

A. That's what I've heard from talking with friends, but I haven't done any specific research.

THE COURT: Well, you're actually interpreting the contract, perhaps, maybe certain circumstances are a little different from the wording, like Oldest Fuel First actual acceptance. Do you believe you could interpret the contract to permit DOE to compel exchanges to have cost-efficiency in the process?

THE WITNESS: I haven't thought about that previously, being at DOE. I, my personal opinion --

THE COURT: In the way you approve ACRs -- I mean, approve DCSes, rather.

THE WITNESS: We haven't acted that way. We've basically approved DCSes that met the requirements of being within the allocation and left the rest of it up to utilities to decide what made sense for them, as opposed to DOE trying to move the system one way or another, because I don't know that we'd be in the best position to decide what was in the best interest for each utility.

THE COURT: I was thinking of your



04207

transportation system that you'd have to develop for transportation to Yucca Mountain, might be the exchanges would be crucial to developing an efficient transportation system.

THE WITNESS: I think it's fair to say, Your Honor, that without, as laid out in the ACRs and as followed up in the Oldest Fuel First, it doesn't necessarily go to the most efficient transportation system, but it's the system that, in the absence of somebody exchanging with each other, we're going to have to live with.

I think the scheduling process that's laid out doesn't always lend itself to the most efficient operation of the system.

BY MR. SHAPIRO:

Q. So if utilities exchanged, Mr. Zabransky, that might actually result in a more efficient transportation system that will be actually easier for the Department to accommodate?

A. If the circumstances of the exchange were to that effect, it could, yes.

Q. You can't think of any reason, can you, Mr. Zabransky, why a utility wouldn't participate in a market for approved delivery commitment schedules if the DOE acceptance system was otherwise up and

# Plaintiff

01464

1464

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---------------------------------x

SACRAMENTO MUNICIPAL UTILITY :

DISTRICT, :

:NO. 98-488C

Plaintiff :

vs. :

UNITED STATES, :

Defendant. :

---------------------------------:

Courtroom 5

National Courts Building

715 Madison Place

Washington, D.C.

Monday, March 28, 2005

VOLUME 6

The parties met, pursuant to the notice of the Judge at 9:39 a.m.

BEFORE THE HONORABLE SUSAN G. BRADEN



01465

1465

APPEARANCES:

ON BEHALF OF PLAINTIFF:

DAVID S. NESLIN, ESQ.

TIMOTHY R. MACDONALD, ESQ.

Arnold & Porter LLP

370 Seventeenth Street

Suite 4500

Denver, Colorado 80202-1370

(303) 863-2301

HOWARD N. CAYNE, ESQ.

Arnold & Porter LLP

555 Twelfth Street, N.W.

Washington, D.C. 20004-1206

(202) 942-5656



01466

1466

APPEARANCES (Continued:)

ON BEHALF OF THE DEFENDANT:

ALAN J. LO RE, ESQ.

JOSHUA E. GARDNER, ESQ.

TODD J. COCHRAN, ESQ.

SCOTT DAMELIN, ESQ.

RUSSELL SHULTIS, ESQ.

ELIZABETH THOMAS, ESQ.

U.S. Department of Justice

1100 L Street, N.W.

Washington, D.C. 20036

ALSO PRESENT:

STEVEN M. COHN, ESQ.

STEVE J. REDEKER

THOMAS POLLOG

**Index appears at end of transcript***



01467

1467

P R O C E E D I N G S

\- - - - -

THE CLERK: All rise. The United States Court of Federal Claims is now in session, the Honorable Susan G. Braden presiding.

MR. LO RE: Your Honor, I know the Plaintiffs are going to put on Ms. Supko. It looks like Mr. Neslin may have some housekeeping matters, we do also.

MR. NESLIN: Your Honor, we have an additional demonstrative to add to our demonstrative book, Number 78.

THE COURT: And you'll be working with this, this morning?

MR. NESLIN: I don't believe this morning. This is actually a chart from Mr. Stuart's expert report we may be referring to later during the day or this week.

THE COURT: Well, it's going to be interesting to know why it's relevant.

MR. NESLIN: It relates to Mr. Stuart's opinion regarding campaigning that was the subject of some of his testimony Friday.

THE COURT: It doesn't really matter what happens in the U.K. and France.

Q. Thank you.

THE COURT: And this document was prepared after there was a lawsuit filed?

THE WITNESS: It continues to be prepared today.

THE COURT: Right. So it's unlikely that you would have him talking to the enemy in that sense.

BY MR. CAYNE:

Q. Did your office, Mr. Zabransky, use the information of the type reflected in Plaintiff's Exhibit 675 to determine the Department's potential liability to the utilities for the breach of contract?

THE COURT: Sustained.

MR. LO RE: Thank you, Your Honor.

MR. CAYNE: Your Honor, may I, for the record, ask why that objection was sustained?

THE COURT: You just asked him a legal question, to determine the Department's potential liability. They're arguing they had no liability.

MR. CAYNE: Your Honor, let me get to the next document then, and the Court will see where I'm going.

THE COURT: All right.





BY MR. CAYNE:

Q. Mr. Zabransky, could you please turn to Plaintiff's Exhibit 626? Are you there, sir?

A. Yes, I'm there.

Q. And the first page says, "Parametric Analysis For Future Program Costs Scenarios," September 16th, 1999.

A. Okay.

Q. And it has Lake Barrett's name, correct?

A. Correct.

Q. And was he the acting director of the, your department at this time?

A. Yes, he was.

Q. Okay. And if I could turn your attention --

THE COURT: Have you seen the document before?

THE WITNESS: I recall a document, I'm not sure it was this one, but I recall a document like this that was used to brief OMB.

THE COURT: Okay.

BY MR. CAYNE:

Q. To brief who?

A. OMB.

Q. Mr. Zabransky, take whatever time you need





to look at the document to refresh your recollection, but what I want to ask you about, the information I'd like to ask you about appears on page 21, are you there?

A. Yes, okay.

Q. Okay. This says, "Take title cost assumptions," and there is an entry for dry storage facility start-up, do you see that, 10 million dollars?

A. Now, you're on page?

Q. 21, Bates number 5090.

A. I don't have that on my 21.

THE COURT: I don't either. The witness and I have the same document.

MR. CAYNE: I'm on Exhibit 625, Your Honor.

THE WITNESS: 626, you said.

BY MR. CAYNE:

Q. Then I misspoke, I apologize, Plaintiff's Exhibit 625, sorry, sir, and Bates number 5090.

A. So we're on page 21 of this document?

Q. Yes.

A. Okay.

Q. Are you there? And then you see it says, "Take title cost assumptions"?

A. Yes.





Q. Now, how did your office use the information in this document, particularly on this page, to brief OMB or for any other purpose?

MR. LO RE: Your Honor, I'm going to object on foundation grounds. Mr. Zabransky has not testified that he is familiar with where these data came from. I believe he only --

THE COURT: We can ask some questions about it then. Why don't you do that?

BY MR. CAYNE:

Q. Mr. Zabransky, and, again, as I said, feel free to look at the whole document to put it into context, but my first question is, where did the information on page 21 come from? For example, it says, "10 million dollars for dry storage facility start-up." Do you see that?

A. Yes.

Q. Where did that figure come from?

A. I believe, quite frankly, Mr. Pollog, myself, based upon advice we received from other parties, like our contractors, decided this was an appropriate number, based upon my past experience and what I was reading things were costing in the paper.

Q. So dry storage facility start-up, that entry refers to what?

01809

1809

A. Building a facility.

Q. What kind of a facility?

A. A dry storage facility, this is a very general, not specific exercise. This is, this was done to try to at the time, as you pointed out earlier, Secretary Richardson was interested in a take title proposal. This was fleshing out what it might cost to take title, so it was done, by necessity, very generally.

Q. And am I correct, sir, and I don't think I have the document here, but if you don't recall, I'll get the document tomorrow, did you prepare similar analyses in earlier years with different and lower figures?

A. I don't recall. These figures, we adjusted periodically.

Q. Okay. And how often did you prepare this chart?

A. This is the only time I did this chart.

Q. Well, you said you adjusted periodically, I thought.

A. Well, you asked me if my estimates or assumptions as to what it costs to adjust to -- if some of these are adjusted, and the answer is, they would be, based upon what we're observing people are



01810

1810

saying they're paying for things in papers and other things.

Q. Do you see the next entry, "Dry Storage Operations"? What is that referring to?

A. That's the cost to operate a stand-alone dry storage facility, and this was a DOE kind of cost. We looked at this as DOE take title, so as I recall, that's what we estimated it would take us to maintain the facility.

Q. So in other words, to put it in context, if DOE had settled this litigation by taking title to Rancho Seco, if these numbers had applied to that, this would mean your estimate was it would take 5 million dollars to operate the Rancho Seco dry storage facility, the ISFSI?

MR. LO RE: Objection, Your Honor, calls for speculation, assumes facts not in evidence.

THE WITNESS: No, I didn't say that. I said that's what we figured DOE's costs would be, recognizing that DOE does nothing as cheaply as the private sector.

BY MR. CAYNE:

Q. Do you see the next entry, "Storage Casks"?

A. Uh-huh.

Q. $100 per KG?



01811

1811

A. Yes.

Q. Now, I had to check this myself, I'm embarrassed, but am I correct that an MTU is equal to 1000 KG?

A. Yes.

Q. Okay. So what would the costs for storage casks be if you were looking at 229 MTU under this, under these assumptions?

A. I'd have to get a calculator. I recall it was like a -- boy --

Q. I'll get a calculator, sir.

A. Then you can calculate it.

MR. CAYNE: Your Honor, may I hand the witness a calculator?

THE COURT: Sure.

BY MR. CAYNE:

Q. Under this assumption from, this is from 2002, Mr. Zabransky -- excuse me, 1999, from September 16th, 1999, based on this assumption of $100 per KG, how much would it cost to build, construct storage casks capable of holding 229 metric ton units?

A. Well, let's see, if I did that right, it's 100 times 1000, times -- is that right? So $100 per kilogram, times 1000 kilograms per metric ton, times



01812

1812

229, 2 point -- that's too many zeros. $22,900,000, I believe.

Q. And so then the total under those, under these assumptions on Exhibit 625, as of September 1999, the total assumed cost to start up a dry storage facility, together with storage casks to hold -- sufficient to hold 229 metric ton units, would be a little north of 32 million dollars, as of 1999, correct?

A. Yes.

Q. Okay. And do you recall, the information for your estimates on the storage cask costs, who developed that information?

A. Again, I think myself and Mr. Pollog, based upon information we obtained from contractors and what we had read in papers and other filings, this was a good average number, and it included building incremental pads and everything else. So it wasn't just the storage cask, per se, it was just a general number, since this isn't any specific analysis to any specific type of cask, any specific facility, any specific location.

Q. But you said it's a good, what was your phrase, good average number?

A. General number, it was a good number for --

01813
1813

THE COURT: It's a back of an envelope number he's doing, basically, for the purposes of bean counters at OMB.

THE WITNESS: Yes.

BY MR. CAYNE:

Q. But the contractors you spoke to, who were the contractors?

A. I would have spoken to Mr. Benz and -- probably Mr. Benz at that point in time.

Q. You said you looked at filings?

A. We had looked at FERC filings from other people, and we had looked at, in the past, I had bought casks, I had designed and had filed for a facility, so I had some general knowledge of this.

Q. So in 1999, you thought this was a reasonable rough calculation of the costs to build a dry storage facility and storage casks to hold, as we said in my example, 229 metric ton units, correct?

A. Yes.

Q. Thank you. Could you turn to the next page, please, page 22?

A. Okay.

Q. Bates 5091.

A. Yes.

Q. Do you see there are a number of, the top



01814
1814

of the chart says, "Cumulative Take Title (MTUs)," do you see that?

A. Yes.

Q. And there are a number of lines?

A. Yes.

Q. The bottom line says, "ACR Cumulative"?

A. Yes.

Q. First, can you explain to me what this chart is? And then we can break down what these individual lines are.

A. Okay. These, this is the chart that goes to show that, under a scenario where DOE would take title, under different acceptance rates or different take title rates, how much it would ultimately take title to.

Q. What is the line, "ACR Cumulative"?

(6:00 p.m.)

THE WITNESS: That's 46999 for 10 years, and no more, it's 8200 tons.

BY MR. CAYNE:

Q. And what is, "ACR-E Cumulative"?

A. That's 46999999 extended, ad nauseam.

Q. Well, why does the first entry end -- not go up after, it looks like 2007, am I reading that right?



01815
1815

A. Yes, because it stops in 2007.

Q. And why does it stop in 2007?

A. Because that's all that was published in the ACR.

Q. Was it your view that the Department's obligation didn't go beyond that?

A. This is an illustrative example.

MR. LO RE: Objection, Your Honor.

THE COURT: Sustained.

BY MR. CAYNE:

Q. Mr. Zabransky, what is, did you already say what the top line is? If you did, I apologize.

A. The top line?

Q. The line for, "Utility Legal Claim Cumulative"?

A. That was the claim that utilities had made in litigation, that the rates should be the rates used in DOE planning documents.

Q. And what's, "Fitzgerald Cumulative"?

A. That was a rate put forth by Senator Fitzgerald at one point in time.

Q. Rate put forth in what context, do you know?

A. I don't know if he had proposed legislation or he was talking about proposed legislation.



01816
1816

Q. Then can you turn to the next page?

A. Yes.

Q. Are you there?

THE COURT: This "Cumulative Take Title"?

MR. CAYNE: Yes, Your Honor, page 5092.

THE WITNESS: Yes.

BY MR. CAYNE:

Q. Can you tell me how this chart differs from the one preceding? There seems to be a few additional entries.

A. There's only one additional entry.

Q. Okay.

A. And that was a -- starting in 2010, at the rates that were in DOE's planning documents, assuming Yucca Mountain began operations in 2010.

Q. And what does "VA" stand for?

A. Viability assessment.

Q. And what's viability assessment?

A. That was a document that was prepared around 1999 demonstrating the viability of Yucca Mountain, to assess the viability of Yucca Mountain.

Q. Can you turn to the next page, please?

A. Yes.

Q. Bates number 5093, and can you identify the additional line or lines that appear on this page?

# Plaintiff

01826



IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---x

SACRAMENTO MUNICIPAL UTILITY :
DISTRICT, :
:NO. 98-488C
Plaintiff :
vs. :
UNITED STATES, :
Defendant. :
---:

Courtroom 5
National Courts Building
715 Madison Place
Washington, D.C.

Tuesday, March 29, 2005

VOLUME 7

The parties met, pursuant to the notice of the Judge at 9:00 a.m.

BEFORE THE HONORABLE SUSAN G. BRADEN



01827



APPEARANCES:

ON BEHALF OF PLAINTIFF:

DAVID S. NESLIN, ESQ.
TIMOTHY R. MACDONALD, ESQ.
Arnold & Porter LLP
370 Seventeenth Street
Suite 4500
Denver, Colorado 80202-1370
(303) 863-2301

HOWARD N. CAYNE, ESQ.
Arnold & Porter LLP
555 Twelfth Street, N.W.
Washington, D.C. 20004-1206
(202) 942-5656



01828



APPEARANCES (Continued:)

ON BEHALF OF THE DEFENDANT:

ALAN J. LO RE, ESQ.
JOSHUA E. GARDNER, ESQ.
TODD J. COCHRAN, ESQ.
SCOTT DAMELIN, ESQ.
RUSSELL SHULTIS, ESQ.
ELIZABETH THOMAS, ESQ.
U.S. Department of Justice
1100 L Street, N.W.
Washington, D.C. 20036

ALSO PRESENT:

STEVEN M. COHN, ESQ.
STEVE J. REDEKER
THOMAS POLLOG

***Index appears at end of transcript***



01829



P R O C E E D I N G S

\- - - - -

THE COURT: Let's go.

Whereupon--

DAVID ZABRANSKY

a witness, called for examination, having previously been duly sworn, was examined and testified further as follows:

CROSS-EXAMINATION (Resumed)

BY MR. CAYNE:

Q. Good morning, Mr. Zabransky.
A. Good morning.
Q. I'd like to turn your attention to Plaintiff's Exhibit 121. I believe that will be in the first binder, one out of three. Do you have that document before you, sir?
A. Yes, I see it.
Q. And is this document a memorandum from you to -- was this a memorandum from you, sir?
A. It's an e-mail from me to Mr. -- I believe it's Auke Piersma.
Q. And who is that person?
A. Mr. Piersma used to be with a group called Public Citizen.
Q. And there's also a CC?
A. Yes.

01913
1913

Q. Were you, yourself, an official at the Department of Energy at this time?

A. I was an eight-month employee at the Department of Energy, so, no, I was not an official at the Department of Energy.

Q. What was the basis for your opinion, sir?

A. Because I felt they had an obligation before I came to the Department of Energy and I saw this as a way of trying to manage an obligation, if you had an obligation and you had a question about meeting it, you didn't make it bigger than you had to. Now, that's what I would have done, but that was my opinion.

Q. What do you mean you thought they had an obligation before? You felt they had what obligation before?

A. I think I testified yesterday that when I was at Wisconsin Electric, we thought that there was a obligation on the part of the Department of Energy to begin picking up fuel in 1998.

Q. And at that time, did you believe the obligation was at a level of 3000 MTU?

A. No, I didn't. I believe it was what we signed up to in the DCSes, sir.

Q. Sir, did you believe, back when you were at



01914
1914

Wisconsin Power, that a reasonable acceptance rate would have been a rate that reflected the aggregate rate of discharges of the industry, plus some amount of work off?

A. Absolutely.

Q. And what does that mean, in your mind?

A. What it equates to simply is about 3000 metric tons a year, sir, I believe that would have been a reasonable acceptance rate.

Q. So you believe that a reasonable acceptance rate was 3000 MTU per year, correct?

A. I believe that.

Q. Thank you, sir. And turning to transcript page 4167, you indicated that you weren't sure whether there were any other reasons, other than to limit liability, that --

THE COURT: Sustained.

MR. LO RE: Thank you, Your Honor.

BY MR. CAYNE:

Q. Mr. Zabransky --

THE COURT: I don't see the word "liability" anywhere on the page, counsel.

BY MR. CAYNE:

Q. Mr. Zabransky, am I correct, and does this transcript, particularly page 4167, refresh your



01915
1915

recollection that at the time of the Yankee trial, you were unable to identify any reasons for the Department's use of the acceptance chart in the 1995 ACR, other than constituting an effort to minimize the Department's obligations?

A. Again, that was my opinion. I couldn't recall any other specific reasons.

THE COURT: I see you, Mr. Lo Re, do you want to talk about something? I mean, I think he corrected his characterization of the witness' testimony. That was my problem.

MR. LO RE: That's fine.

THE COURT: Do you have an additional problem?

MR. LO RE: That's fine. I am just going to state for the record that I think we are passing the refresh the witness' recollection.

THE COURT: He's trying to impeach him, I know that.

MR. LO RE: Clearly, Your Honor. Thank you.

THE COURT: I mean, typically, what you do is, you know, is that you ask him what he knows. If he says he doesn't remember, then you read the question and the answers as they appear in the



01916
1916

transcript, and you ask him, do you remember giving, being asked that question and giving that answer? You've kind of slopped over the formalities here. But why don't you continue with your next question?

MR. CAYNE: Thank you, Your Honor. I'd like to turn the witness' attention to Plaintiff's Demonstrative number 33. I'm going to put it on the overhead.

BY MR. CAYNE:

Q. Do you have that document, Mr. Zabransky?

THE COURT: It's the big black binder. It's the one that has the plastic. That's the acceptance rate announcements and teeny-weeny print at the bottom. Let me know if you can read it because I can't.

BY MR. CAYNE:

Q. Mr. Zabransky, do you have the exhibit in front of you?

A. Yes, I do.

THE COURT: Do you have a magnifying glass? I really cannot see the bottom print at all. If you don't, I'll bring one. No, I've got glasses, that's not the issue. I read better with the glasses off. For distance, it's fine.

MR. CAYNE: I can read the entries into the