IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| PACIFIC GAS & ELECTRIC COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES,<br><br>Defendant. | No. 04-0074C into which has been consolidated No. 04-0075C<br>(Judge Hewitt) |

DEFENDANT'S DEPOSITION DESIGNATIONS FOR DAVID DUKE

Pursuant to paragraph IV of the Court's pretrial order, dated June 4, 2006, defendant, the United States, designates certain testimony from the deposition of David Duke, taken Tuesday, June 13, 2006.

As we discussed in our motion filed May 31, 2006, plaintiff, Pacific Gas and Electric Company ("PG&E"), produced to defendant, on May 24, 2006, a 1991 document that was prepared by Mr. Duke. This document, identified as Plaintiff's Exhibit 721 ("PX 271"), was admitted by the Court at trial. Until the May 24, 2006 production of PX 721, PG&E withheld the document on the basis of attorney-client privilege and attorney work product doctrine, and PG&E only produced the document to defendant after the close of discovery, the filing of the pre-trial briefs, and the pre-trial conference. In paragraph IV of its June 4, 2006 order, the Court ordered Mr. Duke's telephone deposition and further ordered that it "will accept for filing deposition designations and counter-designations for Mr. Duke's deposition, if any, until the close of trial." Order, at 6-7 (June 4, 2006). We are filing these designations within 24 hours of having received the expedited transcript of the Court-ordered deposition to provide PG&E with an opportunity to identify any appropriate counter-designations.

Defendant's designations of Mr. Duke's testimony are listed on Attachment A to this filing.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/ Harold D. Lester, Jr.
HAROLD D. LESTER, JR.
Assistant Director

s/ John C. Ekman by Scott R. Damelin
JOHN C. EKMAN
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, NW
Washington, D.C. 20530
Tel: (202) 353-0897
Fax: (202) 307-2503

Attorneys for Defendant

OF COUNSEL:

JANE K. TAYLOR
Office of General Counsel
U.S. Department of Energy
1000 Independence Ave., S.W.
Washington, D.C. 20585

SCOTT R. DAMELIN
SHARON A. SNYDER
JOSHUA E. GARDNER
Civil Division
Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530

June 14, 2006

## A. Deposition Designations

| **Deponent** | **Date** | **Page(s)** **From**: | **To**: |
|---|---|---|---|
| **David Duke** | (PG&E) 6/13/06 | 6:22 | 7:2 |
| | | 8:10 | 8:14 |
| | | 12:20 | 12:22 |
| | | 13:22 | 16:10 |
| | | 17:11 | 18:3 |
| | | 19:5 | 21:13 |
| | | 21:20 | 21:22 |
| | | 22:7 | 22:12 |
| | | 23:5 | 23:11 |
| | | 25:9 | 25:12 |
| | | 25:22 | 26:2 |
| | | 27:3 | 27:18 |
| | | 29:7 | 32:21 |
| | | 34:1 | 35:12 |
| | | 35:22 | 36:15 |
| | | 36:22 | 38:17 |
| | | 39:3 | 41:4 |
| | | 43:4 | 43:24 |
| | | 44:2 | 46:5 |
| | | 46:9 | 47:24 |

# Appendix

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| PACIFIC GAS & ELECTRIC COMPANY,<br><br>Plaintiff,<br><br>vs.<br><br>THE UNITED STATES,<br><br>Defendant. | No. 04-0074C, into which has been consolidated No. 04-0075C |

DEPOSITION OF DAVID DUKE

San Luis Obispo, California

Tuesday, June 13, 2006

11:04 a.m. PST - 12:15 p.m. PST

Reported by: Lora L. Shoffstall, RPR, CSR 9271

File No. 207086

the most is going to last no more than two hours. Generally I take a break about every hour and 15 minutes or so. If at any time you need a break at all, just let me know and I will accommodate you. The only request I have is that if there's a question pending, you answer the question before we take that break. Is that fair?
A. Okay.
Q. Now, Mr. Duke, you had mentioned that you had your deposition taken I think about 20 years ago you said.
A. Right.
Q. Is that right?
A. Right.
Q. And what was the subject of that deposition?
A. It was a -- it was for a previous employer and before I worked for PG&E that was -- we were going through a regulatory legal issue on whether we would retain our radioactive material license.
Q. Okay. And which employer was that?
A. The name of the company was American Atomics Corporation.
Q. Okay. Now, can you give me your educational background, Mr. Duke, starting with post-high-school education?
A. Okay. After high school I attended the



University of Arizona, and I have a bachelor of science degree in nuclear engineering.
Q. Okay. And is that -- do you have any degrees other than the BA in nuclear engineering?
A. A BS.
Q. Oh, I'm sorry. A BS.
A. And no.
Q. Okay. Thank you. Now, if we could -- I understand, Mr. Duke, are you currently retired?
A. I am not.
Q. You're not retired. Where are you currently employed?
A. I currently work for Foster Farms.
Q. And what's Foster Farms?
A. Foster Farms is a west-coast poultry company, and I am an environmental affairs manager.
Q. Okay. And how long have you held that position for?
A. Six years.
Q. I apologize. The phone cut out there. How long was that?
A. Six years.
Q. Six years. Thank you. So from approximately -- I guess you started in 2000?
A. Correct.



Q. Okay. And what position or what job did you hold before you were the environmental affairs at Foster Farms?
A. Before then I worked at PG&E and I was a governmental relations consultant.
Q. Okay. And maybe to make this easy -- oh, and one thing I neglected to ask you. When did you graduate from the University of Arizona? What year was that?
A. 1971.
Q. 1971. Thank you. When did you first start working at PG&E?
A. I started working for PG&E in 1980.
Q. Okay. So you were there for 20 years. Right?
A. Correct.
Q. Okay. And we're definitely going to focus obviously upon your time at PG&E, but if we could go to prior to 1980 and your employment at PG&E, where did you work before that?
A. Well, I worked at a few places. I worked at National Semiconductor for a while.
Q. National Semiconductor?
A. Correct.
Q. And how long did you hold a position at National Semiconductor?
A. That was only about six months.



Q. Okay. So the last half of 1980 -- or I'm sorry -- 1979, I guess?
A. Right.
Q. Okay. And what did you do for National Semiconductor?
A. I was a supervisor making integrated circuits.
Q. Okay. And what about before that?
A. I worked for American Atomics Corporation.
Q. Okay. And how long did you hold -- or how long did you work at American Atomics?
A. I worked there for three and a half, four years.
Q. Okay. So it looks like by my watch about 1977 to 1979. Is that right?
A. May have been '76. I don't recall exactly, but about that time. Right.
Q. Okay. So approximately three, three and a half years, roughly 1976 to 1979. Now, what is American Atomics? I've never heard of that before.
A. Okay. Well, this was a company that manufactured radioluminescent sources, and these were devices that were glass tubes that were coated on the inside with a zinc sulfide phosphor filled with tritium gas, which is a radioactive gas. The radioactive gas, beta particle from the radioactive gas interacts with

the phosphor and it glows. They were used in exit signs and also as backlights for LCD watches.
Q. Oh, okay. I always wondered what made those things glow. Now I know.
And what position did you hold at American Atomics?
A. I started as a production supervisor and then after a short period of time became the radiation safety officer.
Q. Okay. And then I guess that takes us to roughly 1976. Where did you work before American Atomics?
A. Before I worked for American Atomics, after I graduated from college, I worked in construction in Arizona for Wilson Pools and was working on like an MBA at night. I never completed the degree program.
Q. Okay. So is it fair to say, then, from graduating from the University of Arizona in 1971 through roughly 1976 you were doing construction in Arizona?
A. Right.
Q. Okay. Great. Well, I think that ties up all that. Now let's talk about your employment at PG&E. And why don't we work in chronological order from the first position to the most current. In 1980 when you



started at PG&E, what position did you hold?
A. It was called a chemical and radiation protection technician. And I worked at Diablo Canyon Power Plant for the chemistry and radiation protection department. The plant was not operational at that time. Most of the -- most of the work involved collecting water samples and analyzing them in the laboratory for various constituents.
Q. Okay. And how long -- okay. So you were a chemical and radiation technician beginning in 1980 for Diablo. How long did you hold that position?
A. Roughly nine months.
Q. Okay. And do you have just a rough sense? Did you start in early 1980?
A. No. I started in March 1980.
Q. Okay. So roughly till the end of 1980 you were a chemical and radiation technician?
A. November.
Q. November. Okay. Fair enough. And then in November what position did you hold?
A. Then I got promoted to a nuclear generation engineer in San Francisco working for a corporate operating support organization for the nuclear plants that PG&E operated.
Q. Okay. And who did you report to in that



position?
A. I worked -- I reported to Robert Lorenz.
Q. Okay. And what was his position or what was his title?
A. He was a senior nuclear generation engineer.
Q. Okay. And what type of job duties did you have as a nuclear generation engineer?
A. My job was primarily aimed at radiation protection support. I developed -- I wrote procedures on how to perform various activities at the power plant and reports.
Q. What types of procedures did you work on?
A. Oh, procedures on how to conduct radiation surveys. Basically radiation protection procedures. Maybe operating of instruments.
Q. Okay. And how long did you hold the position of nuclear generation engineer?
A. I held it up until I would say 1993, '94, something in that range.
Q. Okay. So from November 1980 through roughly 1993 or 1994 you were a nuclear generation engineer?
A. Right.
Q. Correct?
A. Yeah, but my job responsibilities changed during that period of time.



Q. Okay. Could you give me sort of a high-level overview as to how they changed over time as you were a nuclear generation engineer?
A. I spent several years focusing on radiation protection, then started to specialize in low-level radioactive waste management.
Q. Okay.
A. And then after doing that for several years, also looked at spent nuclear fuel management in addition to low-level radioactive waste management.
Q. And when did you start looking at spent nuclear fuel management issues? What year would that have been?
A. And again, my recollection is not good on this. I would -- I believe it would be around 1998, 1999. Oh, I'm sorry. 1989, 1988. Something in that range, 1989 probably.
Q. Okay. And the phone is cutting off just a little bit. I think I got that entire last answer, but if I ask you to repeat yourself, it's not because I'm not listening. It's the connection isn't perfect, but we'll try to plow ahead anyway.
Now, beginning in the 1988-'89 time frame, what sort of responsibilities did you have with respect to spent nuclear fuel management?
A. My function was primarily to stay aware of what

was -- what was occurring within the -- within the industry, what was occurring external to PG&E and to take that information and determine how it applied to PG&E and provide reports, recommendations on strategy and those type things.
Q. And who would you be providing these reports and recommendations to?
A. I would --
Q. I'm sorry. I -- you got cut off there. Who would you be providing reports and recommendations to?
A. I had various clients. It depended on the type of report or recommendation. Frequently they would go to my department manager. Sometimes it might go to plant staff.
Q. Okay. And was Mr. Lorenz your supervisor the entire time you were in nuclear generation?
A. No, he was not.
Q. Okay. Who -- after Mr. -- after you reported to Mr. -- pardon me -- with Mr. Lorenz, who did you report to after that?
A. There was a period of time that I reported to Mike Angus.
Q. Okay. And when did you start reporting to Mr. Angus?
A. I would -- and again, the recollection is not



real clear, but 1993-'94, in that time frame.
Q. Okay. Now, I have in my notes here that in roughly about 1993-1994 time frame you left nuclear generation or you left your position as nuclear generation engineer and you went to another position at PG&E. Is that right?
A. Right. It -- basically I transitioned from the nuclear department into governmental relations. Most of the work I was doing had a lot of components that were -- lended themselves to governmental relations department. I was working closely with that department and ultimately transferred into that department.
Q. I see. And that would have been in roughly the 1993-1994 time frame?
A. I believe the transition probably occurred in '95, maybe '96. '95 is probably more like it.
Q. Okay. You didn't hold any position in PG&E between the time when you were nuclear generation engineer and the time you worked in governmental relations, did you?
A. For a period of time when I worked for Mike Angus I had the title nuclear waste coordinator.
Q. Nuclear waste coordinator. Okay. And I'm guessing based upon the chronology you've given me that would have been in the 1993-1994 time frame?



A. Yes.
Q. Okay. And what responsibilities did you have as a nuclear waste coordinator?
A. Well, again, it was -- it was a similar position that I had been doing previously. It was strategic planning, recommendations on actions that the company should be pursuing based on what was occurring outside of the company in terms of development of radioactive waste disposal sites, new technologies that were occurring and similar tasks.
Q. I see. Okay. So that, I think, takes us through -- well, in the 1995-1996 time frame you went to government relations. How long did you hold that position for?
A. Again, it was about four years. It was the position I retired PG&E from.
Q. Okay. Now that makes perfect sense, then. And I don't think we covered this. What responsibilities did you have in your position as government relations?
A. Essentially I analyzed legislation that was proposed, bills that were proposed in both Sacramento and Washington to a lesser extent for impact on PG&E and provided recommendations to our lobbyists on whether we should support, oppose any bills, whether -- how active they were. I also worked on developing some state



legislation that was of interest to PG&E and working with lobbyists to seek changes in state law that made sense and were beneficial to PG&E.
Q. Okay. And who did you report to in your position at government relations?
A. In that position I reported to Bill Stock.
Q. Okay. I was going to guess that's what you were going to say, and that was my understanding of sort of where things were at that time, so I'm glad that kind of lines up.
Now I want to turn back to the 1988 time frame, and you talked about spent nuclear fuel management. And you told me, I think, that one of your responsibilities was to stay aware of what was going on in the industry and how it might apply to PG&E. Do you recall that?
A. Yes.
Q. Okay. How would you go about staying aware of what was going on in the industry?
A. Much of it was through industry groups that PG&E was a member of.
Q. What groups were those?
A. Edison Electric Institute had a spent fuel working group that I participated in. Later on they were encompassed by Nuclear Energy Institute, so those were certain areas. I also attended conferences. I was

Page 18

on a mailing list for DOE documents and reviewed documents that DOE was preparing and discussing how they would manage spent nuclear fuel for the industry.
Q. Okay. And would you do -- did you have any discussions with individual representatives from other utilities about what they were doing to address their spent-fuel-storage needs?
A. Certainly.
Q. I'm sorry. I couldn't hear your answer.
A. Yes.
Q. Yes, you did. Okay. Who did you have discussions with?
A. I -- boy, I -- lots of individuals. Specific names kind of escape me, but I -- for example, I had traveled to Rancho Seco where they were developing an independent spent-fuel storage facility and would hold meetings back in Washington with pretty much all of the nuclear -- attended meetings back in Washington, D.C. with representatives from pretty much every utility that had a nuclear power plant and discussed what was going on, what were plans. People would report out on new and interesting things.
Q. Okay. Now, at Rancho Seco did you deal with Steve Retiker out there?
A. No, I did not. That name does not sound

Page 19

familiar.
Q. Okay. And then the only other person I can think of would be Jim Shetler or Ken Miller.
A. Ken Miller sounds familiar.
Q. Yeah, okay. Okay. Now, the reports and recommendations that you would make based upon after you would get this information, did you ever make any reports to the management committee at PG&E?
A. Yes.
Q. Okay. How often or how many times did you make reports to the management committee?
A. There was one report that I worked on that -- for Diablo Canyon that went to the management committee.
Q. And what was the subject of that report?
A. That was a recommendation on pursuing dry-cask storage at Diablo Canyon.
Q. And I think I know the report you are talking about. Is that the 1995 management committee briefing book?
A. Yes, it is.
Q. Okay. Good. And you would have worked on that then with Mr. Womack?
A. Worked on it with Mr. Stock primarily.
(Plaintiff's Exhibit 721 was marked for identification and is attached hereto.)

Page 20

BY MR. GARDNER:
Q. Okay. Now, we have already marked what is Plaintiff's Exhibit 721, which is a February 6, 1992, cover letter to an individual named Dave from an individual named Pete, which I believe is Peter E. Rigney, and it has as an attachment a December 1991 report from David L. Duke. Do you have that in front of you?
A. Yes, I do.
Q. Okay. Now, I want to first talk about the cover letter. Do you know who Peter Rigney is?
A. Yes, I do.
Q. Who is Peter Rigney?
A. Well, at this particular point in time, he was -- he was either plant manager or second in command at Humboldt Bay Power Plant.
Q. Okay. Now, the cover letter also references an individual named Terry Nelson. Do you know who Terry Nelson is?
A. Well, Terry Nelson had been plant manager at Humboldt Bay Power Plant. He -- both he and Peter went through job changes right about this time. I don't recall their positions when this report was written, but Peter followed Terry Nelson as plant manager for a period of time, and then he ultimately moved on and Tom

Page 21

Moulia took over.
Q. Now, if you turn to the attachments, the second page of this document, which is the report, and if you thumb through it, you'll see some handwritten notes throughout this document. That's not your handwriting, is it?
A. I recognize my handwriting only on the first page.
Q. So the first page of the report?
A. Where it says "draft" and it's underlined.
Q. Okay. So the word "draft," that's you that wrote that?
A. Right.
Q. Do you know? Are the rest of the comments Peter Rigney's?
A. I do not know.
Q. Okay. You don't recognize the handwriting one way or the other?
A. No.
Q. Okay. Now, if you turn to the report itself, were you the one that actually drafted this report?
A. Yes.
Q. Okay. Was there anyone else that participated in the drafting of this report?
I'm sorry. If you answered, we got cut off.

A. No, I hadn't answered yet.
Q. Oh, okay. I'm sorry. It's hard when we're across the phone to know whether you've answered. I apologize.
A. I don't recall that anyone else had substantial writings in the report. These are mainly my words.
Q. Okay. Why did you prepare this report?
A. It was prepared at the request of the -- it was either Peter Rigney or Terry Nelson. It was prepared at their request to fulfill a commitment that the company had made to a group of individuals known as the Joint Intervenors.
Q. Okay. Now, let me ask you a question, because I'm familiar with the whole issue about the Joint Intervenors. Was this December 1991 report the first time that PG&E evaluated dry-storage options based upon the Joint Intervenor agreement or were there prior studies done?
MR. MONROE: Objection. Vague.
BY MR. GARDNER:
Q. And of course, Mr. Duke, you can answer the question, to the extent you understand it.
A. I do not know of another report that predated this report.
Q. Okay.



A. My recollection is that this was the first report.
Q. Okay.
A. But I don't know that to be a fact.
Q. Okay. Now, do you know? Was this report ultimately presented to anyone at PG&E?
A. It was provided to -- and again, it was provided to the individual that requested it.
Q. Which would have been either Mr. Rigney or Mr. Nelson?
A. Correct.
Q. Okay. Do you know if Mr. Rigney or Mr. Nelson presented this to any other individuals at PG&E?
A. I do not know that.
Q. Now, you had indicated that that was your handwriting on the second page which says "draft." Right?
A. Right.
Q. Was there ever a final version of this study prepared?
A. I don't recall.
Q. Okay. Is it fair to say that after you transmitted this copy of this report to Mr. Nelson that you didn't do any subsequent reports on this topic?
MR. MONROE: Objection. Assumes facts not in



evidence. He didn't say that it was sent to Mr. Nelson.
BY MR. GARDNER:
Q. Do you understand my question, Mr. Duke?
A. No, I don't. Could you restate it?
Q. Sure. Of course. After you prepared this document, which is entitled "draft" -- and you had testified that you would have given it to either Mr. Nelson or Mr. Rigney. Correct?
A. Correct.
Q. After you had given it to Mr. Rigney or Mr. Nelson, did you have any other work that you did in terms of report writing about dry-cask storage options at Humboldt Bay?
A. I don't recall anything -- another report that I prepared on this topic for Humboldt Bay. I -- I don't recall that. I didn't recall this report actually until I saw it recently.
Q. Okay. And so then I take it you don't know whether this report was ever presented to the management committee at PG&E. Correct?
A. I don't know that it was presented.
Q. Okay. Now, the cover letter, if you go back one page, indicates that the Redwood Alliance requested a copy of the report. Do you see that?
A. Yes, I do.



Q. Do you have any personal understanding as to why the Redwood Alliance had an interest in this report?
A. I don't have any personal knowledge of why they participated. I guess my understanding was that the Joint Intervenors and the Redwood Alliance were either closely involved or were essentially the same people, but I don't know that to be a fact. I -- that was kind of my understanding.
Q. Okay. And by the way, I neglected to ask you. The "Dave" on this cover letter, I presume that's you. Right?
A. It is.
Q. Okay. I assumed that, but it's always better to ask.
Now, do you happen to know, Mr. Duke? Was the Redwood Alliance ever actually provided this report?
A. I -- I do not know that.
Q. Okay. So I presume you don't know, then, if the Redwood Alliance ever provided any feedback on this report. Correct?
A. I don't recall any -- hearing of any feedback.
Q. Now, is it fair to say that when you're preparing a report for the plant manager, be it Mr. Nelson or Mr. Rigney, that you would want that report to be as accurate as possible? Is that fair to

say?
A. Yes, that's fair to say.
Q. Yeah. And of course, if you saw an error in the report, you would do your best to correct it. Right?
A. Well, in this particular case, I don't know whether I went back and took comments that were prepared and did anything with them or not.
Q. Let me sort of ask a more fundamental question. After you prepared this report, did you ever have any discussions about the contents of the report with Mr. Nelson or Mr. Rigney?
A. I -- I don't recall.
Q. Okay. Do you recall having discussions with anyone at PG&E about the contents of this report after you prepared it?
MR. MONROE: Objection. Vague.
Mr. Duke, you may go ahead and answer.
THE WITNESS: Okay. Well, I guess I'm not clear on the question. I -- do you mean ever? Actually, I don't recall anything about this report after it was written. I --
BY MR. GARDNER:
Q. Okay. Well, that might make this deposition much shorter, then.



A. It makes it plausible that I -- I might have, but I don't recall.
Q. Okay. That's fine. So in other words, you don't have any recollection of Mr. Nelson or Mr. Rigney coming to you with questions about this report. Is that fair to say?
A. Yes, it is.
Q. Okay. Now, do you recall -- I recognize some of these questions I think your answer probably would be the same for all of them, but I just gotta ask them anyway. Do you recall how you went about collecting the information that's contained in this report?
A. Well, it depends on the information. Some of it came from Department of Energy documents. Most of it came from Department of Energy documents. Some information was by interview with plant staff, and some information was from my own experience on other projects.
Q. Do you have any recollection as to who at the plant you would have interviewed for the purposes of this report?
A. I don't recall who I spoke to specifically. It --
MR. MONROE: I have to lodge an objection of vague here as well. Mr. Gardner, is there a particular



part of the report you're asking about?
MR. GARDNER: No. He -- Mr. Duke said that some of the information came from interviews with plant staff. My question is simply which plant staff did he interview, if he recalls.
THE WITNESS: And I -- and I don't recall. I -- it perhaps could have been, you know, Peter Rigney, but I don't recall specifically. There were a number of people that I spoke to at the plant, but I don't recall who in particular.
BY MR. GARDNER:
Q. Now, you'll notice -- I'm sure you have had the opportunity to read through this document before the deposition. Correct?
A. Yes.
Q. Okay. And you'll notice there's a discussion of various dry-storage systems in this document. Correct?
A. Right.
Q. Where would you have gotten that information from?
A. Most of it came from the Department of Energy dry-cask storage study.
Q. Okay. And is that -- let me just see here. That is -- if you turn to the page which is page 20,



"References," that's the first reference. Right?
A. Yes, it is.
Q. So any of the information about the different dry-storage systems you would have gotten from that February 1989 report. Correct?
A. I believe most of it.
Q. Okay. Now, if you turn to the -- I'm going to refer to the page numbers rather than the Bates numbers. The Bates numbers are the long things that begin with "PHB." I'm going to refer to the page numbers which are sort of towards the bottom of the page. Okay? And you'll see there's a page labeled 1, and you'll see "Introduction." Do you see that?
A. Yes, I do.
Q. Now, you had referenced the Joint Intervenors. Do you recall that a little while ago?
A. Yes.
Q. And if you look at the fifth paragraph of this introduction, it's the one that begins "The fulfillment of this agreement." Do you see that?
A. Yes.
Q. And it says, "The fulfillment of this agreement requires a periodic evaluation of the availability and feasibility of utilizing dry-cask storage at the Humboldt Bay Power Plant." Do you see that sentence?

A. Yes.
Q. And I think -- I think you already said this, but I just want to make sure I understand this. The reason that PG&E was looking at dry storage in this time frame in 1991 was because of that '87 agreement with the Joint Intervenors. Is that correct?
MR. MONROE: Objection. Calls for a legal conclusion.
BY MR. GARDNER:
Q. You can answer the question, Mr. Duke.
A. Well, the reason this report was written was a result of that. I -- I don't know about -- you know, other activities could have been going on involving dry-cask storage, but this report was intended to satisfy that commitment.
Q. Okay. And then if you go down to the very last paragraph on this page, it says, "The intent of this evaluation is to review the current status of dry-storage technology for spent fuel in the U.S. and determine if the dry-storage option is presently available and feasible for implementation at Humboldt Bay Power Plant." Do you see that?
A. Yes, I do.
Q. And is that -- is that statement consistent with your understanding of the intent of this study?



MR. MONROE: Objection. Best evidence.
BY MR. GARDNER:
Q. You can answer the question, Mr. Duke.
A. Yes, it is.
Q. Okay. Now, if you turn to the very next page, section 2, it details the dry-cask storage options. Do you see that?
A. Yes.
Q. Okay. And the very first option discussed is metal dry-cask storage. Correct?
A. Yes.
Q. Okay. And that option would not help address Humboldt Bay's needs because it would have to maintain its wet pool. Correct?
A. That would be -- that would be one -- one reason. There were others perhaps. Availability of one that was licensed to work at that facility would be another.
Q. Okay. Now, if you turn to the next page, page 3, that very last paragraph there about lifting the filled casks. Do you see that, Mr. Duke?
A. Yes, I do.
Q. And this says here that "Lifting the filled cask out of the spent fuel pool requires a large capacity crane. The casks used at Surry weigh 117 tons



when loaded. This could limit the feasibility of this technology at Humboldt Bay Power Plant where the existing refueling building crane has a design capacity of only 75 tons. All of the presently approved metal dry-storage casks weigh at least 100 tons when filled." Do you see that?
A. Yes, I do.
Q. Now, if I read this correctly, this indicates to me that if Humboldt Bay made no modifications to its facilities that it could only handle up to a 75-ton cask. Correct?
A. Well, that's -- that's not exactly correct because the crane itself I don't know was qualified to even handle 75 tons. So --
Q. Okay. So as of the time of this report, 1991, what was the largest size cask that Humboldt Bay could handle absent any modifications to its crane?
A. I don't -- I don't recall.
Q. But it would certainly be under 75 tons. Correct?
A. I believe that's right.
Q. Now, let me ask you this: Based upon your knowledge of the industry at the time, at the time of this study in 1991, do you know? Were there any rail casks that weighed less than 100 tons that were



available?
A. I -- I believe there were.
Q. Okay. Do you know what the size would be of that under-100-ton rail cask?
A. I don't recall.
Q. Do you happen to know who the manufacturer was of that rail cask that was under 100 tons?
A. No, I do not.
Q. While you were looking at spent-fuel storage options, did you ever have occasion to do any analyses to compare the cost of loading, say, a small truck cask versus a large rail cask and what the cost difference would be between those two?
A. No.
Q. Okay. Do you know if anyone at PG&E had -- in this time frame would have done such an analysis?
A. I don't know of anyone at PG&E that would have done an analysis.
Q. Okay. I presume it would be fair to say, though, that it would cost more to load a smaller truck cask than it would to load a large rail cask. Correct?
MR. MONROE: Objection. Speculation.
BY MR. GARDNER:
Q. Is that fair to say, Mr. Duke?
A. I don't know the answer to that question.

Q. All right. If you go on to the next option considered, beginning on page 5, it says, "Dual Purpose Storage and Transportation Casks." Do you see that beginning on page 5?
A. Right.
Q. And it goes down to -- the second full sentence, it says that "an advantage of a dual-purpose cask is that only one on-site fuel movement would normally be required." Do you see that?
A. Yes.
Q. Do you know what that sentence means?
A. Well, a dual-purpose cask would be certified for both storage and transportation, so after the fuel was loaded into the cask, it would not have to be moved again. The cask could be placed on a truck or a rail car and transported off site.
Q. Oh, okay. I see. So in other words, if PG&E were to have used dual-purpose casks, then it wouldn't need to move the fuel on site a second time when DOE would come to accept the fuel. Is that right?
A. That's correct.
Q. Now, the last sentence here says, "The cask may then be used as the transportation cask for shipping the fuel to the DOE's geologic repository or Monitored Retrievable Storage, MRS, facility." Do you see that?



A. Yes.
Q. What's an MRS?
A. A monitored retrievable storage facility would be a remote independent fuel-storage facility that the Department of Energy was looking at developing at some point in time to comply with the standard contract provisions.
Q. Okay. And if you turn to the next page, which is page 6, it says, "Dual-purpose casks have not yet been approved for use in the U.S., though they are approved for use in Germany." Do you see that?
A. Yes, I do.
Q. Mr. Duke, do you know when dual-purpose casks were first approved by the NRC for use in the United States?
A. No, I do not.
Q. Do you have a -- a more generalized recollection? For example, maybe not a year but a -- well, like would it have been around the mid 1990's do you think, or would it have been later?
A. I really don't recall.
Q. But certainly as of 1991, dual-purpose casks were not available for use in the United States. Is that fair to say?
A. Obviously that's what I thought at the time.



Q. And you have no reason to think that was incorrect, do you?
A. I -- I believe it's accurate.
Q. Now, if you go down to the end of this section, you'll see a paragraph that says, "While no dual-purpose casks are presently certified by NRC, it would be expected that the cost of dual-purpose casks would be somewhat higher than metal dry-storage casks. The increased cost is a result of the additional licensing effort required to obtain transportation certification and due to the design enhancements required for transportation." Now, obviously this sentence was written before dual-purpose technology had actually been developed and licensed. Correct?
A. Again, I believe so.
Q. Yeah. I mean, based upon what we just talked about, that would make some sense. Do you know, once the technology was developed, dual-purpose dry-storage technology, how much more expensive dual-purpose dry storage was as compared to storage-only dry storage?
A. I do not.
Q. The end of this paragraph states that "Some cost savings would be realized at the end of storage period because no transfer to a shipping cask would be required." Now, this is consistent with what you were



just telling me about before about the handling one time. Correct?
A. Correct.
Q. Okay. We are going to skip through a few pages here to page 12. And it says "economic issues," and let me know when you're there, sir.
A. Okay. I'm on page 12.
Q. Okay. It's the heading that says "Economic Issues." Right?
A. Right.
Q. Now, this starts off -- I'm just going to read the paragraph, and then I want to discuss it a little bit. It says, "The application to NRC for SAFSTOR envisioned a 30-year period prior to the final decontamination and dismantlement of HBPP Unit 3. The presence of fossil fueled electrical generating units located on the same site greatly minimizes the cost for SAFSTOR. The staff required for operation and maintenance of the fossil fueled units also perform most of the minor custodial duties required during SAFSTOR. There is no pressing economic need for PG&E to complete the decommissioning of the HBPP Unit 3 based on operating and maintenance costs during SAFSTOR. The costs to maintain HBPP Unit 3 in SAFSTOR are estimated to be in the range of $1,000,000 per year." Did I read

Page 38

that accurately?
A. Yes, you did.
Q. Okay. Was this an accurate statement as of December 1991?
A. Well, I probably would have -- probably should have phrased it differently. I think I was looking at strictly operations and maintenance cost and not including capital, administrative, general, other type factors. And again, it was -- this was information that was taken from simply talking to plant staff and not based on a detailed review of general rate case information or other potential sources of economic data.
Q. Okay. But is it fair to say that this would be accurate with respect to the operation and maintenance costs?
A. I would say it would -- it would be accurate based on my understanding at that point in time.
Q. I understand. And just to close the loop, the basis for this paragraph is your interviews with staff employees, plant employees?
A. Right. And again, it was not something that I put a lot of effort into because it was -- I guess at the point in time it did not seem a hugely important issue. The $1 million number was intended to be kind of an order-of-magnitude estimate.

Page 39

Q. I was going to use the same word. You beat me to it.
Now I want to sort of break this paragraph up a little bit. And you -- you say in the second sentence that the presence of fossil fueled electrical generating units located on the same site greatly minimizes the cost for SAFSTOR. What does that mean?
A. Well, it means that PG&E kept a staff available to operate and maintain the oil-fired electric-generation units at the same site, and because we had that staff available, they were able to do work on SAFSTOR, the spent fuel pool, that it would have been more expensive had it been a stand-alone unit. If the only facility at that site was a spent fuel pool, then you would have to have dedicated people just for that application, so that's -- that is the concept.
Q. I think I understand. In other words, the fossil staff could also have been used to -- to do some of the functions at the nuclear plant. Correct?
A. Right. My understanding was that the staff was the staff, and they did not -- there was not a nuclear staff and a fossil staff, that many of the people worked on both -- both sites.
Q. I see. Now, let me ask you a question. As of 1991 -- I understand that Humboldt, obviously because

Page 40

it's been shut down for a while, their fuel is relatively cool compared to, say, some other -- some other site. Is that fair to say?
A. Yes.
Q. And it's also my understanding that Humboldt's fuel pool actually has sort of a cover on it that you basically just lock up. Is that right?
A. I believe that's correct.
Q. As of 1991, the time period of this report, can you describe for me the activities associated with maintaining the spent fuel pool in SAFSTOR?
A. Well, again, I -- I was based in San Francisco, so my knowledge is spotty. However, my understanding was that maintaining the spent fuel pool, maintaining the water chemistry and the spent fuel pool, you would have water filters, ion exchange media that would become depleted over time and need to be replaced and disposed of. You would require maintenance on pumps, on valves, on various components associated with the equipment. I don't recall what requirements there were for environmental monitoring around the site. You would have security requirements.
Q. Now, is it fair to say, then, that these activities you just described, would the individuals responsible for those activities also be doing work on

Page 41

the fossil side as well?
A. My understanding is that's correct. Maintenance individuals would work on both sides of the plant, and as did most of the other staff.
Q. Now, obviously after September 11th, I'm sure that security increased, and I don't want to get into safeguards information. That's not really the intention of my question. But other than an increase in security, do you know? Did the level of activities associated with SAFSTOR increase at any time after, say, 1991?
MR. LOCKE: This is Mr. Locke here. This gentleman was not employed by PG&E after 2000. He can't answer that question.
MR. GARDNER: Well, he can answer the question as to increases other than security, but okay. Let me -- I think that's a fair objection.
MR. LOCKE: He can't answer any question after the termination of his employment with regard to operations of that facility or any facility at PG&E.
MR. GARDNER: Although I would say, Mr. Locke, that Mr. Monroe has made very clear that he is defending the deposition, and only one of you guys can lodge objections, so --
MR. LOCKE: Well --
MR. GARDNER: -- I will take that under

advisement.
Q. Now, Mr. Duke, before you left in 2000, so from 1991 to 2000, did the level of activities associated with SAFSTOR and maintaining the wet pool at Humboldt Bay, did the level of activities increase over time?
MR. MONROE: Objection. Speculation. Relevance. Mr. Duke did not work at the plants. He is not a plant manager. He does not have necessarily firsthand knowledge of these issues.
MR. GARDNER: Okay. And I would appreciate no speaking objections, Mr. Monroe. If you have an objection, make it succinctly.
Q. Mr. Duke, do you understand my question?
A. I -- again, I had -- I've had no knowledge of what's gone on at PG&E since I left the company.
Q. And my question really goes to --
MR. MONROE: Mr. Gardner, would you please let him finish his answer?
THE WITNESS: And for the last four or five years at PG&E, I was working on a number of other topics and was not intimately involved in the -- in the nuclear waste issue. So -- so I really couldn't answer -- I really couldn't say how things changed after 1991. I know that that's -- you know, I'm probably not your best source of information on that.



BY MR. GARDNER:
Q. No. That's fair. Thank you, Mr. Duke. I appreciate that.
Now, if you turn to the next page, page 13, it says that -- give me two seconds here. I think I skipped a page. Here we go. The very first paragraph, the last sentence says, "With the advent of SAFSTOR the level of effort required to maintain HBPP Unit 3 has been reduced to the point that no plant staffing reductions would be expected from the implementation of dry storage." Do you see that?
A. Yes.
Q. What does that sentence mean?
A. I believe the concept was that prior to SAFSTOR, the facility had an operating license from the Nuclear Regulatory Commission and required a higher level of staffing. After SAFSTOR had been approved, staffing levels had been reduced, and dry storage level of effort would be -- would be similar to the -- to what was being required during SAFSTOR.
Q. So in other words, the concept here is that the staffing levels would be similar between, say, storage of the spent fuel in the wet pool versus dry storage?
A. Correct.
Q. Correct?



A. Correct.
Q. Okay. And was this also -- based upon this sentence here, was the basis for this statement also interviews you had with plant staff?
A. I think part of it was based on the interviews with plant staff. Then the other would be trying to anticipate the work that would be required to maintain an independent spent-fuel storage facility with dry cask and the maintenance required for the equipment and --
Q. Okay.
A. -- associated with that.
Q. Now, if you go down to the next paragraph, it says, "The only potential cost savings resulting from dry storage may be derived from the earlier final decommissioning of HBPP Unit 3. If a dry-storage technology was used that precluded further need for the spent fuel pool, PG&E could proceed with the complete decontamination and dismantlement of HBPP Unit 3." Do you see that?
A. Yes, I do.
Q. Now, I read this sentence as indicating or reflecting that the only potential cost savings from going to dry storage would be that it could facilitate earlier decommissioning. Is that correct?
A. I guess the concept that I was trying to convey



was that there were economic advantages in decommissioning the plant earlier based on low-level waste-disposal costs escalating.
Q. And that's my understanding as well. In the early '90s the costs for disposing of low-level waste was increasing quite a bit. Correct?
A. Right. There was an issue of both the costs and also the availability of being able to dispose of low-level waste.
Q. Because for a while Barnwell looked like it wasn't going to be accepting low-level waste. Correct?
A. Right. Of course, at this point in time, it looked like we were going to have a low-level waste-disposal facility in California also.
Q. Yeah, I remember that. Was that part of the Needles Compact?
A. Yes.
Q. Now, if you turn back one page back to page 12, you'll see that in the second full paragraph, there's a reference to a cost estimate for using dry-storage casks at Diablo. Do you see that?
A. Yes.
Q. Do you know why PG&E was estimating the costs for dry storage at Diablo in the 1991 time frame?
A. I -- I do not. I don't know why that was --

why that was done, and I don't recall how that was brought to my attention, but I guess during the course of developing this report, then that information was brought to my attention that a department within the company had done that.

Q. Okay. And you don't know who in the company was responsible for that estimate, do you?

A. No, I do not.

Q. Okay. We're just about done here, Mr. Duke. I just want to turn to the findings and conclusions on page 18. Let me know when you're there.

A. Okay.

Q. Okay. Now, the first finding and conclusion is that there's no clear advantage between wet and dry storage from a safety or environmental standpoint. Correct?

A. Right.

Q. Okay. And then if you go down to the third finding or conclusion, that says, "Design features at Humboldt limit the feasibility of certain dry-cask storage technologies." And it says that "The design capacity of the existing refueling building crane is 75 tons. With few exceptions, all of the current dry-storage casks or on-site fuel-transfer casks weigh more than 75 tons when loaded." And then it says,



"Also, the HBPP crane is not single-failure proof and no cask-drop analysis has been performed. Significant expenditures would be required to upgrade or replace the refueling building crane if the decision was made to pursue dry-cask storage." Do you see that?

A. Yes, I do.

Q. And that was accurate at the time you wrote that. Correct?

A. I believe it was.

Q. Okay. Now, if you go down to the fifth finding and conclusion, it says, "The cost of implementing dry-cask storage at HBPP is estimated to be in the range of $20 million. This expenditure would likely not be considered reasonable and prudent solely based on safety or environmental considerations or based on reduced operations and maintenance costs." Do you see that?

A. Yes, I do.

Q. What does that mean?

A. Well, for PG&E to be reimbursed for a cost, they -- by the public utility commission, they need to be reasonable and prudent. So this was just bringing that issue to the information of the reader that we could not proceed with this type of a project without some -- some good basis for moving forward.

Q. I see. If you could hold on just 30 seconds, I



want to consult with my colleague, but I think we are done. So hold on one second. All right?

(Pause in the proceedings.)

MR. GARDNER: Mr. Duke?

THE WITNESS: Yes.

MR. GARDNER: I'm sorry about that delay. We have no further questions for you at this time. I appreciate -- I understand it's your vacation, so I appreciate you taking the time to talk with the government. Obviously you have the right to review and sign your transcript.

MR. MONROE: And we are going to reserve that right.

I do have at least one question for Mr. Duke.

EXAMINATION

BY MR. MONROE:

Q. Mr. Duke, as we've established through the past hour plus, you prepared this report back in 1991. I think one thing that we haven't talked about was what was the ultimate conclusion of this report, of this cursory investigation?

A. Well, I think the ultimate conclusion was that SAFSTOR made sense to continue on at this particular point in time, that there wasn't a -- there wasn't a --



we were -- you know, our commitment was to look at dry-storage technology to see if it was feasible to be implemented at Humboldt Bay Power Plant, and at this point in time, it did not seem to be feasible.

Q. Okay. And were there particular reasons, other than what we've discussed, about why it was not feasible?

A. I think most of the reasons have been -- have been covered. Yeah, there were -- to be fair, there were, you know, advantages the company -- if it did become feasible, you know, there were advantages in moving forward.

Q. So were there technological obstacles to implementing dry-cask storage at that point?

A. Certainly. You had no cask that was approved for that site.

Q. I think your report does say that there were some cask options that were approved. Why were they not feasible for Humboldt?

A. Part of it had to do with the licensing of the cask and the seismic -- most of the casks were designed for and licensed for a certain acceleration based on a seismic event, and Humboldt Bay is in an area that experiences much stronger earthquakes.

Q. Okay. Terrific. Thank you. And just one last

CERTIFICATE OF SERVICE

I hereby certify that on this 14th day of June, 2006, a copy of foregoing "DEFENDANT'S DEPOSITION DESIGNATIONS FOR DAVID DUKE" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Scott R. Damelin