No. 04-0074C
into which has been consolidated No 04-0075C
Judge Hewitt

Electronically filed on June 30, 2006

---

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---

PACIFIC GAS & ELECTRIC COMPANY,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

---

# PACIFIC GAS & ELECTRIC'S POST TRIAL BRIEF

---

JERRY STOUCK
Greenberg Traurig, LLP
800 Connecticut Avenue, NW
Suite 500
Washington, DC 20006
(202) 331-3173 phone
(202) 261-4751 fax
Counsel for Plaintiff
Pacific Gas & Electric Company

Of Counsel:

ROBERT L. SHAPIRO
Greenberg Traurig, LLP

# TABLE OF CONTENTS

**PAGE**

INTRODUCTION ........................................................................................ 1

DISCUSSION ........................................................................................ 2

I. PG&E BACKGROUND ........................................................................................ 2

II. GOVERNMENT SPENT FUEL DISPOSAL PROGRAM ........................................ 4

A. Development of Federal Responsibility for Disposal Program ..... 4

B. Development of the Standard Contract ........................................ 6

C. Reasonable Acceptance Rate ........................................ 7

D. Reasonable Sequence of Acceptance ........................................ 13

E. GTCC Waste ........................................ 18

F. DOE's Failure to Make Progress Toward Performance ................ 20

III. BY FAILING TO PROVIDE PG&E SPENT FUEL REMOVAL SERVICES BY 1998, DOE BREACHED THE PARTIES' CONTRACT ..............................24

A. Damages Caused by DOE's Breach Were Both Foreseeable and Actually Foreseen. ........................................ 24

B. DOE's Breach Was A Substantial Causal Factor – And Indeed the Only Cause – of PG&E's Damages ........................................ 25

1. Background ........................................ 26

2 DOE's Anticipated Breach Led PG&E To Undertake Reasonable Steps Prior To 1998 To Investigate and Plan for Extended Spent Fuel Storage ........................................ 27

3. It Was Reasonable For PG&E To Pursue Dry Storage at DCPP & HBPP While Maintaining Other Options For On and Off-site Storage ........................................ 29

4. PG&E's Implementation of Dry Storage Has Been Reasonable. . 33

C. Reasonable Certainty ........................................ 38

IV. DAMAGES SHOULD BE AWARDED PURSUANT TO RCFC 54(B). ........... 43

CONCLUSION ........................................................................................ 44

# TABLE OF AUTHORITIES

**PAGE**

FEDERAL CASES

*Aktiebolaget Bofors v. United States*, 139 Ct. Cl. 642, 153 F. Supp. 397 (1957)............. 44

*American Satellite Co. v. United States*, 998 F.2d 950 (Fed. Cir. 1993) .......................... 18

*Beraha v. Baxter Health Care Corp.*, 956 F.2d 1436 (7th Cir. 1992) ............................. 17

*Cities Services Helex, Inc. v. United States*, 211 Ct. Cl. 222, 543 F.2d 1306 (1976)....... 44

*Gonzales v. Denning*, 394 F.3d 388 (5th Cir. 2004) ....................................................... 18

*Indiana Michigan Power Co. v. Dep't of Energy*, 88 F.3d 1272 (D.C. Cir. 1996) ..... 17, 23

*Indiana Michigan Power Co. v. United States*, 422 F.3d 1369 (Fed. Cir. 2005) ............. 24

*Northern States Power Co. v. Dep't of Energy*, 128 F.3d 754 (D.C. Cir. 1997)............... 23

*San Carlos Irrigation & Drainage Dist. v. United States*,
23 Cl. Ct. 276 (1991), *aff'd*, 111 F.3d 1557 (Fed. Cir. 1997) ...................................... 44

*Wood v. Lucy, Lady Duff-Gordon*, 222 N.Y. 88 (1918) .................................................. 17

FEDERAL STATUTES AND OTHER AUTHORITIES

42 U.S.C. § 2021c(b)(1)(c) ......................................................................................... 36

42 U.S.C. § 10156(a)(1) (2000) ................................................................................... 25

42 U.S.C. § 10222(a)(5)(B) ........................................................................................... 5

42 U.S.C. § 10222(b)(2)(A) ........................................................................................... 6

48 Fed. Reg. 5458 (1983) ............................................................................................. 6

48 Fed. Reg. 16,590 (1983) ..................................................................................... 7, 14

48 Fed. Reg. 54,391 (1983) ......................................................................................... 25

54 Fed. Reg. 22,578 (1989) ......................................................................................... 19

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| PACIFIC GAS & ELECTRIC COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 04-0074C, into which has been |
| v. | ) | consolidated No. 04-0075C |
| | ) | (Judge Hewitt) |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

**PG&E'S POST-TRIAL BRIEF**

Pursuant to ¶ 4 of the Court's Order of May 4, 2006, PG&E submits its post-trial brief:

**INTRODUCTION**

This case involves a straightforward claim for breach of contract damages. Although PG&E has paid all fees required to date under its contract with DOE (the "Contract," PX 54) – fees totaling about $300 million, *see* PX 418 – PG&E has not received any performance in return from DOE. Instead, as a result of DOE's breach, PG&E has been required to incur and has reasonably incurred additional and very substantial costs to investigate, implement and operate means to store its spent fuel and high-level radioactive waste (together, "spent fuel") for an extended and indefinite period after 1998. Under well-established law, those costs are recoverable as damages here.

PG&E set forth the governing legal principles in its pretrial memorandum of contentions of fact and law ("PG&E's Pretrial Brief"), and except for a few

legal points discussed here that insert primarily address the government's trial evidence, PG&E respectfully refers the Court to that brief for PG&E's position on the applicable legal issues. As the Court directed in its Order of May 25, 2002, in this brief PG&E "support[s] the elements of [its] legal arguments with specific citations to the trial transcript and deposition designations, and to exhibits that were admitted at trial and discussed with a witness." *Id.* at 2.

**DISCUSSION**

I. PG&E BACKGROUND

PG&E owns two nuclear power plants. The Diablo Canyon Power Plant ("Diablo Canyon") is an operational two-unit generating facility located on the Pacific Coast near San Louis Obispo, California. Trial Transcript ("Tr.") 978:13-19, 979:14-17 (Womack). The Humboldt Bay Power Plant Unit 3 ("Humboldt Bay") is a permanently shutdown reactor located on Humboldt Bay near Eureka, California. Tr. 979:8-980:4, 981:1-4 (Womack).

Humboldt Bay began operation in 1963. DX 792 at 7851. The plant last operated to generate electricity in 1976, when Humboldt Bay entered a planned shutdown for refueling. Tr. 981:15-18 (Womack). For a number of reasons, including the Three Mile Island incident, several years transpired before PG&E made a final decision not to restart the plant. Tr. 1419:13-1421:5 (Stock). PG&E ultimately decided not to restart the plant in 1984, and at that time moved the last load of fuel from the reactor core to the spent fuel pool. Tr. 1419:8-1420:2 (Stock).

PG&E commissioned Battelle, Pacific Northwest National Laboratory to perform an independent assessment of alternatives for extended storage of its spent fuel at Humboldt Bay. PX 83 at 1.1. That study, completed in July 1985, concluded that

continued storage of the spent fuel in the spent fuel pool was the most attractive option. *Id.* at 2.3. Based on that recommendation, PG&E decided to use the SAFSTOR decommissioning option. Tr. 1001:15-1003:2 (Womack). Under SAFSTOR, the plant is essentially in "mothballs" for a period of time waiting for the right opportunity (in this case, removal of the spent fuel) for dismantlement of the plant. *Id.* Removal of the spent fuel was considered an appropriate time to complete dismantlement since it would have been substantially more difficult to complete decommissioning of the plant with spent fuel in the pool. Tr. 1003:3-22 (Womack).

Diablo Canyon was designed in the 1960's, substantially constructed in the 1970s and the two units there began operation in the mid-1980's. Tr. 994:18 - 995:14 (Womack). At that time, the capacity of Diablo Canyon's two spent fuel pools (one for each reactor, Tr. 984:15-21 (Womack)) was quite small, consistent with that of other nuclear power plants designed in the 1960's through the mid-1970's, when it was anticipated that commercial spent fuel would be reprocessed. Tr. 994:18 - 995:14 (Womack).

DOE and PG&E entered into their spent fuel disposal contract on June 30, 1983 (the "Contract"). PX 54. The Contract required DOE to provide spent fuel disposal services by January 31, 1998. PX 54, Art. II. Under the Contract, PG&E paid DOE a one-time fee for the spent fuel at Humboldt Bay in 1985. Tr. 1417:8-25 (Stock); PX 54, Art. VIII. At that time, PG&E calculated that fee by treating the spent fuel that remained in the Humboldt Bay reactor core until 1984, following the 1976 shutdown, as "in core" fuel under the Contract terms. Tr. 1418:4-1421:5 (Stock); PX 169 at 1; *see* PX 54, Art. VIII.A.3. In its 1991 Acceptance Priority Ranking ("APR"), DOE treated that fuel as

discharged in 1984, when it was removed to the Humboldt Bay spent fuel pool, even though some of that fuel had never been used to operate the reactor. Tr. 1423:17-1425:2 (Stock). In 1992, PG&E and DOE agreed that this last core of Humboldt Bay's nuclear fuel would be treated as discharged in 1976, when the plant shut down, rather than "in core" fuel as of 1984. Tr. 1419:8-1421:5 (Stock); PX 169; PX 200 at 1. Under that agreement, PG&E paid an additional one-time fee amount to DOE. *See* PX 200 at 1.

In addition to the one-time fee, PG&E has paid and continues to pay additional Contract fees (of about $5 million) each calendar quarter for DOE's services to accept and dispose of PG&E's spent fuel. PX 418; *see* Tr. 3030:15-3031:2 (Zabransky). PG&E is fully up to date on such fee payments. *See* PX 418.

## II. GOVERNMENT SPENT FUEL DISPOSAL PROGRAM

### A. Development of Federal Responsibility for Disposal Program

Until 1977, commercial nuclear utilities in the United States had expected that their spent fuel would be reprocessed. Tr. 122:11-124:7 (Mills); Tr. 995:9-14 (Womack (PG&E's expectation)). Indeed, some commercial spent fuel was reprocessed at a facility in West Valley, New York in the 1960s, including some transported by rail from Humboldt Bay. Tr. 673:8-674:1 (Stuart). Reprocessing enables additional energy from the uranium and plutonium in the spent fuel to be utilized, and also substantially reduces the volume of waste requiring disposal. Tr. 442:10-443:1 (Bartlett). However, with traditional technologies, reprocessing also results in the separation of plutonium from the uranium and fission products. Tr. 442:10-443:20 (Bartlett).

In 1977, President Carter put a moratorium on reprocessing of spent fuel from commercial nuclear power plants in the United States. Tr. 124:8 - 125:14 (Mills). That moratorium effectively thwarted the development of a domestic reprocessing industry.

Tr. 125:15-23 (Mills). In light of the cessation of reprocessing, the federal government undertook the development of a solution for the disposition of spent fuel from commercial nuclear power plants. Tr. 126:17-127:18 (Mills). The federal solution that was developed was for deep geologic disposal of the material. Tr. 127:19-25; (Mills); 42 U.S.C. § 10131(b).

The federal program for the disposal of spent fuel from commercial nuclear reactors was set out in the Nuclear Waste Policy Act of 1982, 42 U.S.C. § 10101 through 10270 ("NWPA"). The NWPA required DOE to provide spent fuel disposition services by January 31, 1998. 42 U.S.C.§ 10222(a)(5)(B). The 1998 date reflected a legislative compromise. Tr. 136:8-137:15 (Mills). Utilities wanted DOE to begin removing their spent fuel within 10 years, and DOE representatives believed 10 years was sufficient to implement the program. *Id.* Other interested parties urged a much longer period. *Id.* Pursuant to the compromise date of 1998, the developers of the NWPA understood that utilities would be responsible for the costs of storing their spent fuel until January 31, 1998, but that after that time, such storage and ultimately disposal would be a federal government responsibility. Tr. 137:16-138:20 (Mills).

The NWPA required that DOE's obligations to utilities be set out in contracts. 42 U.S.C. § 10222(a)(1). The developers of the NWPA employed the contract mechanism to ensure that utilities had a firm commitment from the federal government. Tr. 138:21-140:12 (Mills). The utility industry had agreed to fully fund the program, principally through payment of the 1 mil per kilowatt hour fee, which the industry proposed in order to make sure the job got done even though it was several times the fee that DOE had

proposed. Tr. 132:24-135:9 (Mills). In return, the utilities insisted on a firm contractual commitment, as was ultimately provided for in the NWPA. Tr. 139:21-140:15 (Mills).

The NWPA did not set out the specific terms for the rate or sequence of spent fuel acceptance from utilities. However, the developers of the NWPA understood and intended that spent fuel would be accepted from utilities at a reasonable rate consistent with the purpose of the NWPA to alleviate the problem (and costs) of spent fuel accumulation caused by the termination of reprocessing. In particular, the developers of the NWPA understood and intended that spent fuel acceptance from utilities would be at a sufficient rate such that by January 31, 1998, no utility would have to add to the spent fuel storage capacity of its nuclear plants nor incur otherwise avoidable spent fuel storage costs; in other words, January 31, 1998 would be a point of demarcation between utility and federal financial responsibility for spent fuel storage and disposition costs. *E.g.*, PX 59 at 2-1 (1983 draft Mission Plan); PX 61 at 1; PX 62 at 0228; Tr. 51:10-19 (Warner); Tr. 145:6-146:11, 137:16-138:20 (Mills).

B. Development of the Standard Contract

President Reagan signed the NWPA into law on January 7, 1983. Tr. 148:16-25 (Mills). Because the NWPA required that contracts between DOE and utilities be signed by June 30, 1983, 42 U.S.C. § 10222(b)(2)(A), the contracts were developed hurriedly. DOE decided not to negotiate the terms of individual contracts with each commercial nuclear utility. 48 Fed. Reg. 5458 at 5459 (1983), PX 36 at 5459. Instead, DOE decided to develop a standard contract to be used with all utilities through notice and comment rulemaking. *Id.* Ultimately, DOE drafted the standard contract and provided for little input from utilities. Tr. 153:25 - 154:17 (Mills). Utility input was largely limited to providing comments in response to the proposed rule containing the initial draft standard

contract published in February 1983 and attendance at a few meetings with DOE officials. Tr. 153:25-156:24 (Mills).

In the standard contract published as a final rule by DOE in April 1983, DOE largely refused to include terms in the contract that were not otherwise set out as requirements in the NWPA. 48 Fed. Reg. 16,590 at 16,590-98 (1983), DX 2.02. Accordingly, DOE did not include an acceptance rate term in the standard contract and instead left that as an open term. Tr. 156:14 - 157:21 (Mills); Tr. 2514:12-2515:22 (Morgan). In one of the very few instances where DOE accepted a suggestion from utilities to alter the draft standard contract published in February 1983, DOE added a provision providing for the exchange of spent fuel acceptance allocations among utilities. 48 Fed. Reg. 16,590 at 16,592, DX 2.02 at 16,592; PX 47 (Tab D at 1 ¶ 1) (noting acceptance of utility suggestion); *see* Tr. 163:5-165:6 (Mills) (explaining that EEI proposed exchanges as "necessary . . . to achieve an efficient operation"). In the final standard contract, DOE rejected requests from some commenters to delete a provision in the draft contract permitting DOE to accord priority acceptance to spent fuel from permanently shutdown nuclear power plants. 48 Fed. Reg. 16,590 at 16,593, DX 2.02 at 16,593. Tr. 243:21 - 245:25 (Mills). In rejecting calls to delete this provision, DOE explained that "[t]his type of priority is necessary" to ensure that utilities not be required to store spent fuel at reactors for prolonged periods after those reactors permanently shut down. *Id*.

C. Reasonable Acceptance Rate

The parties left the rate of acceptance term as an open item in the Contract, in part because it was unclear at the time of contracting in 1983 exactly what rate of acceptance would be appropriate approximately 15 years later. Tr. 2466:12 - 2467:2 (Morgan);

157:3-21 (Mills). Nevertheless, the parties understood from the time of contracting at least until DOE started experiencing significant delays in its spent fuel program that a reasonable acceptance rate should accomplish certain objectives. The parties understood and intended that no utility would have to add additional spent fuel storage capacity after January 31, 1998. Tr. 44:22-51:19 (Warner); Tr. 145:6 - 146:11, 197:3-17 (Mills); Tr. 479:5 - 480:8, 484:21 - 487:4 (Bartlett); Tr. 2527:20-25, 2546:15 - 2549:21, 2551:19 - 2553:25 (Morgan); PX 59 at 2-1; PX 60 at 11; PX 61 at 11; PX 62 at 0228; PX 73 at 2.1; PX 82 at 17-18. The parties also understood and intended that the DOE should accept enough spent fuel to exceed utility discharges of spent fuel and to be able to work off the backlog of previously discharged spent fuel. Tr. 146:14 - 148:15, 157:3-21, 189:17-25 (Mills); Tr. 484:14-21, 487:5-22 (Bartlett); PX 60 at 11-12; PX 61 at 11-12; deposition of Lake Barrett (5/10/02) 1163:10 - 1166:7; deposition of Ronald Milner (5/1/02) 73:10-22. The parties also understood and intended that the acceptance rate should reflect an efficient spent fuel program. Tr. 480:1 - 481:5 (Bartlett); PX 82 at 15, 17-18; deposition of Ronald Milner (5/8/02) 266:23 - 267:4.

An acceptance rate from commercial nuclear utilities of 3000 MTU per year starting in 1998 would have been necessary to achieve the recognized objectives, noted above, of a reasonable acceptance rate. Tr. 486:14 - 487:4 (Bartlett). An acceptance rate significantly less than 3000 MTU per year would not have been consistent with achieving those objectives for a reasonable acceptance rate. First, it was understood in the early 1980s that an acceptance rate of more than 2000 MTU per year starting in 1998 would have been necessary to enable utilities to avoid additional at-reactor storage costs. PX 73 at DG-000038 (comments on 1984 draft Mission Plan from former DOE spent fuel

program director: "to eliminate the need for additional at-reactor storage after January 31, 1998, the initial waste acceptance rate for 1998 should be about 2,800 MTU, plus some amount up to 630 MTU . . . ."); Tr. 2525:4 - 2529:1 (Morgan) (agreeing that "something somewhat over 2,000 MTU of additional at-reactor storage [would be] needed" by utilities by 1997-98); PX 35 at 14. Second, it has been understood that utilities would be discharging in excess of 2000 MTU of spent fuel per year in and after 1998. Tr. 147:9-22 (Mills); Tr. 484:14-21 (Bartlett); Tr. 2251:19 - 2253:25 (Morgan); PX 59 at 2-3; Trial Transcript in *Sacramento Municipal Utility District v. United States*, No. 98-488 (Fed. Cl.) ("SMUD Tr.") 1913:26 - 1914:13 (Zabransky). Thus, to avoid at-reactor storage costs after 1998 and also work off the spent fuel backlog existing at that time would require an acceptance rate above 2,000 MTU. *See also* deposition of Lake Barrett (5/10/02) 1368:10 - 1370:14. In addition, an acceptance rate of somewhat higher than that needed to avoid at-reactor storage costs after January 31, 1998 and to work off the backlog of already discharged spent fuel would have been appropriate to provide enough flexibility to handle contingencies such as reactor shutdowns. Tr. 487:5-22 (Bartlett).

Third, an acceptance rate of 3000 MTU per year would have been efficient for the government's spent fuel removal program. PX 144 at 1152; PX 187 at ix (1993 DOE "Throughput Rate Analysis"); Tr. 488:13 - 479:10 (Bartlett). In fact, 3000 MTU per year has been the design basis acceptance rate for the ultimate spent fuel repository. Tr. 179:13 - 180:6 (Mills); Tr. 462:24 - 463:10 (Bartlett). And while the parties have understood that the government might not begin acceptance of utility spent fuel at a repository, it would have been efficient to accept spent fuel at a rate that would have

made full use of the repository design. Tr. 460:25 - 461:22 (Bartlett). An acceptance rate of 3000 MTU per year would also have been efficient in that it would have fostered the use of acceptance campaigns. Tr. 743:14-24 (Stuart). In acceptance campaigns, relatively large amounts of spent fuel are accepted from a utility at one time. Tr. 503:14 - 504:10 (Bartlett); 744:6 - 745:11 (Stuart). This method of acceptance is much more efficient for the government and utilities as opposed to more frequent and small acceptance amounts because campaigns reduce the amount of effort spent to gear up for spent fuel transfer from utilities to the government. Tr. 503:14 - 504:10 (Bartlett); Tr. 743:14 - 747:18 (Stuart); PX 2 at 509; deposition of Lake Barrett (5/14/02) 64:6 - 65:24, 174:7 - 175:5.

An acceptance rate of 3000 MTU per year from utilities starting in 1998 also would have been readily achievable by DOE. The necessary casks could have readily been procured. Tr. 685:1-686:19, 689:7-691:14, 692:16-694:9, 698:17-699:16 (Stuart); PX 86 at 15-18, 22. And the requisite transportation network could have been readily made available. Tr. 701:19-705:24 (Stuart); Tr. 499:8-500:25 (Bartlett). Indeed, DOE was planning to procure casks and have a transportation network in place by the mid-1990's to support start of spent fuel acceptance operations by 1996. PX 86 at 1-5. To this end, DOE studied all reactor sites and found no impediment to acceptance of spent fuel at virtually all sites, including Humboldt Bay and Diablo Canyon. PX 499 at 2 (FICA study); Tr. 727:23-728:14 (Stuart); PX 720 at 1-2 (NSTI study); Tr. 734:6-735:13 (Stuart).

DOE could also have readily had available a facility at which to store 3000 MTU per year of commercial spent fuel starting in 1998 through the use of a monitored

retrievable storage facility ("MRS"). Tr. 466:13-467:6 (Bartlett) ("[w]ell, the MRS, as I've indicated before, is a very simplistic technology, lots of experience with it, and the only real issue was siting . . ."). At the outset of the program, the MRS was viewed as a facility to be implemented only if there were program delays that would prevent repository operations by 1998. PX 59 at 3-B-1; Tr. 191:8 - 195:10 (Mills), PX 57 at 1284. In 1983, the parties viewed the repository as a substantial and new effort, the opening of which could not be assured by 1998. Conversely, the parties understood that there was no technological difficulty in developing an MRS. Tr. 456:15-23, 466:13 - 467:6 (Bartlett).

The role of the MRS evolved as the DOE developed its statutorily-mandated Mission Plan. Although the initial draft of the Mission Plan noted the parties' intent that spent fuel be accepted starting in 1998 at a rate that would preclude the need for utilities to incur additional at-reactor storage costs, the spent fuel acceptance scenarios in that draft focusing primarily on a repository did not appear sufficient to achieve that objective. PX 57 at 1284-89; Tr. 191:19-195:10 (Mills); PX 59 at 2.1-2.14; Tr. 195:18 - 199:19 (Mills); PX 68 at 2-2; Tr. 214:13-218:6 (Mills). The utility industry expressed concerns to DOE about this mismatch. Tr. 195:18 - 199:19, 214:13 - 218:6, 228:5 - 229:14 (Mills).

After hearing those concerns, DOE changed its concept for the MRS in its final version of the Mission Plan in 1985. PX 82 at 17-18; Tr. 228:21 - 233:13 (Mills). In the final Mission Plan, DOE explained that its preferred performance would include an MRS as an integral part of the DOE waste management system. PX 82 at 71-75; Tr. 457:8-460:10 (Bartlett). The plan with an integral MRS, termed the "improved-performance

plan," was understood to provide both better waste acceptance from utilities and a more efficient waste management system for DOE. Tr. 457:8-460:10, 460:22-461:22 (Bartlett); PX 82 at 17-18. Under that plan, DOE was to accept 3,000 MTU of commercial utility spent fuel per year starting in 1998. PX 82 at 27; Tr. 460:22 - 462:21 (Bartlett). The plan also anticipated acceptance of some amount of spent fuel prior to 1998 as part of DOE's effort to achieve full performance by the 1998 deadline. PX 82 at 27; Tr. 462:10-21 (Bartlett).

Importantly, the final Mission Plan specifically recognized that including in the spent fuel program an integrated MRS capable of accepting 3000 MTU in 1998 was necessary to "provide assurance that the DOE's acceptance of spent fuel in 1998 and subsequent years will be at *sufficient rates to meet obligations*," PX 82 at 87 (emphasis added), meaning DOE's contract obligations. Tr. 2797:25-2798:9 (Kouts). The final Mission Plan also recognized that, in order to accept 3000 MTU in 1998 and fulfill DOE obligations, spent fuel acceptance should begin prior to 1998. PX 82 at 27. Doing so would have been consistent with the understanding of the developers of the NWPA, *see* Tr. 233:5-13 (Mills), and also with the fact that DOE's contract with each separate utility requires DOE to perform by 1998 – thus necessitating an earlier start. Tr. 175:4-176:2, 177:21-178:12 (Mills).

A comprehensive 1993 study commissioned by DOE confirmed that the "preferred" acceptance rate for the spent fuel program was 3000-4000 MTU per year. PX 187 at ix. Indeed, the 3000 MTU acceptance rate has been accepted and used by DOE during the course of the program's development in the majority of facility design document and also the majority of total life cycle cost analyses. Deposition of Lake

Barrett (5/10/02) 1368:10-1369:14; Rule 30(b)(6) deposition of Susan Klein (4/25/02) 354:1-16. DOE continues to confirm the reasonableness and appropriateness of a 3000 MTU per year acceptance rate from utilities in that such an acceptance rate continues to be the basic plan for DOE's waste acceptance system. PX 377 at 2.

D. Reasonable Sequence of Acceptance

A reasonable sequence of spent fuel acceptance would have made liberal use of the standard contract's exchange mechanism. The standard contract indicates that spent fuel acceptance allocations should be provided to utilities in the order in which they discharged spent fuel from their reactors – an oldest-fuel-first ("OFF") sequence. PX 54, Art. VI.B.1.(a); Tr. 501:1-502:3 (Bartlett).[1] If DOE had started performance in 1998 at an acceptance rate 3000 MTU per year, PG&E would have needed no alteration of its initial OFF acceptance allocations through exchanges in order to minimize its spent fuel storage costs. Had DOE accepted at least 1945 MTU of spent fuel from utilities in 1998, PG&E would not have needed any exchanges in order to have delivered all of its spent fuel from Humboldt Bay to DOE in that year. PX 377 at A.4 (showing PG&E queue locations).[2] Such an acceptance rate, particularly if it promptly rose to 3000 MTU per year, would also have been more than sufficient even without exchanges to have met spent fuel acceptance needs at Diablo Canyon, since PG&E did not need spent fuel

[1] Importantly, the standard contract provides for the OFF sequence only if utilities "wishes to deliver" more spent fuel than DOE facilities have capacity to accept. PX 54, Art. V.B.I.

[2] This page shows the last discharge from Humboldt Bay being among the first 1944.1 MTU discharged by utilities.

acceptance at Diablo Canyon until 2006. PX 377 at A.14-16, A-18-20, A-22, A-24, A-26, A-27-34 (showing PG&E queue locations).[3]

Nonetheless, from the outset of the program, DOE and utilities recognized that if DOE were performing, exchanges of acceptance allocations would have occurred, would have made DOE's spent fuel acceptance schedule far more efficient, and would be helpful and appropriate to achieve the intent that all utilities avoid additional at-reactor storage costs after January 31, 1998. PX 57 at 1283; PX 59 at 2-2 to 2-4; Tr. 162:21-163:23 (Mills); Tr. 502:4-504:24 (Bartlett) (exchanges facilitate campaigns and thereby make the program more efficient for all parties). Moreover, utilities and DOE recognized that an OFF pickup schedule would have been inefficient and largely unworkable. Tr. 240:8-243:20 (Mills); Tr. 773:25-776:7 (Stuart) (discussing PX 377 at 3); Tr. 501:1-504:10 (Bartlett). Indeed, as noted above the exchange mechanism was one of the few utility-suggested amendments DOE agreed to make to the draft of the standard contract. 48 Fed. Reg. 16,590 at 16,596, DX 2.02 at 16,596; PX 47 at Tab D, p. 1 ¶ 1. Although the exchange mechanism provides that DOE would have the discretion to approve such exchanges, DOE has always intended to be reasonable regarding such approval in order to effectuate the purpose of the exchange mechanism. PX 47 at Tab D, p. 1 ¶ 1; PX 59 at ; Tr. 504:25-505:8 (Bartlett); Tr. 3014:21-24 (Zabransky); PX 239 (DOE spent fuel program Director letter recognizing that exchange mechanism would "allow industry to

[3] These pages show PG&E discharges totaling 275.7 MTU (not counting Humboldt Bay's spent fuel) among the first 22,598.5 MTU discharged by utilities. Had DOE started removing spent fuel from utilities at a 3000 MTU rate in 1998, it would have removed this much spent fuel from Diablo Canyon (assuming no exchanges) before 2006. PG&E's storage needs are much less than 275 MTU at Diablo Canyon by 2006. Tr. 986:17 - 987:5 (Womack) (emphasizing that total spent fuel inventory in Diablo Canyon pools is only approximately 470 to 480 MTU in each pool).

optimize the allocation of waste acceptance capacity to meet individual utility needs, without the overt involvement of [DOE]"). There certainly would have been no technical impediments for DOE to have accommodated exchanges. Tr. 747:25 - 750:5 (Stuart). In fact, at one point, DOE made efforts to facilitate exchanges of acceptance allocations among utilities, Tr. 3018:8 - 3019:10 (Zabransky), and DOE's current contracting officer testified that if the DOE program were operational, DOE "would try to facilitate exchanges." Tr. 3018:4 - 3018:18 (Zabransky).

Utilities, including PG&E, have substantial experience in trading commodities in other parts of the fuel cycle. Tr. 165:7 - 167:1 (Mills); 1146:24-1151:7 (Womack). More generally, utilities have a history and practice of cooperating with each other in order to improve operations at each company. 1146:24 - 1147:24, 1151:8 - 1152:19 (Womack). Moreover, utilities provide exchanges of various commodities to one another as a reasonable accommodation without charge and not as a means of generating additional revenue. Tr. 1150:13-21 (Womack). It is therefore reasonable to conclude that if DOE were performing, utilities would have exchanged allocations to avoid at-reactor storage costs. Tr. 1155:15 - 1157:14 (Womack). Both PG&E and DOE recognize that demand for spent fuel storage varies depending on utilities' needs for additional spent fuel storage, and varying needs would promote exchanges. Deposition of Alan Brownstein (5/23/02) 105. Exchanges would also allow utilities to avoid interference with plant operations from DOE pickups during outages. Tr. 1158:14 - 1161:16 (Womack); Tr. 503:14-25 (Bartlett). PG&E would have had a further reason to exchange, and thereby facilitate larger and fewer transportation campaigns, to address local community concerns. Tr. 1161:22 - 1164:10 (Womack); *see* PX 104 at 2410-11. PG&E showed its

willingness to transact to improve the place of some of its fuel in DOE's spent fuel allocation queue by transacting with DOE in 1994 to adjust that fuel's queue place forward. Tr. 1417:3-1421:5, 1423:17-1425:2 (Stock); PX 169; PX 200 at 1.[4]

In addition, the parties expected the exchange provision to work well enough to eliminate the need for DOE to accord priority acceptance to spent fuel from permanently shutdown reactors. PX 239. But to the extent exchanges sufficient to eliminate that need did not develop, DOE would have used the priority acceptance from shutdown reactors mechanism as necessary to have ensured that no shutdown commercial reactor would have waited for an extended period before delivering the last of its spent fuel to DOE. 243:21-247:3 (Mills).

In sum, ample evidence demonstrates that either through acceptance of at least 1945 MTU per year of spent fuel starting in 1998, or initial annual acceptance of some smaller amount with reasonable exchanges or through the use of priority acceptance of spent fuel from permanently shut down reactors, had DOE performed in a reasonable manner starting in 1998, DOE would have and could have removed all of Humboldt Bay's spent fuel by 1998, and DOE also would have started removing spent fuel from Diablo Canyon by 2006 in sufficient amounts to avoid the need for additional spent fuel storage capacity at that site. More generally, ample evidence also demonstrates that DOE would have and could have performed at an acceptance rate of 3000 MTU in or promptly after 1998, and that reasonable exchanges would have occurred throughout DOE's

[4] And despite DOE's current litigation position, that transaction with PG&E caused all later-discharged fuel to "move back" in the allocation queue, a consequence of no apparent concern to DOE pre-breach.

performance to make the program more efficient and to achieve the objective of avoiding additional at-reactor storage costs for utilities after 1998.

Testimony the government elicited from its witnesses suggests the government may view the parties' contract as imposing on DOE only a "best efforts" obligation. *E.g.* Tr. 2485:1-17 (Morgan). But that would be contrary to the D.C. Circuit's holding in *Indiana Michigan Power Co. v. Dep't of Energy*, 88 F.3d 1272, 1276 (D.C. Cir. 1996), that DOE's obligation to provide disposal services by 1998 was unconditional and not dependent on the existence of any particular receiving facility. More fundamentally, a best efforts obligation could only be imposed by the Court if the contract otherwise imposed essentially no obligation on DOE, such that implying a best efforts term was necessary to prevent the contract from being declared void for lack of mutuality of obligation. *Beraha v. Baxter Health Care Corp.*, 956 F.2d 1436, 1441-42 (7th Cir. 1992) (refusing to imply a “best efforts” clause where the contract at issue offered monetary consideration, not just an exclusive dealing obligation like that found in the classic case of *Wood v. Lucy, Lady Duff-Gordon*, 222 N.Y. 88 (1918)). Here, DOE's contract obligations are clearly specified: it must commence performance by January 31, 1998 and "continue" removing PG&E's spent fuel until such time as all SNF and/or HLW from commercial nuclear power reactors has been removed. Indeed, as the D.C. Circuit recognized and both the contract language and trial testimony confirm, the contract embodies a very definite "*quid pro quo*," *Indiana Michigan*, 88 F.3d at 1276, under which PG&E (and other utilities) pay substantial fees and, in return, DOE removes their spent fuel. Without an express “best efforts” provision in the contract, DOE cannot be heard to assert as a defense that its unconditional obligation to accept PG&E’s fuel

beginning in 1998 is only a "best efforts" undertaking. *Gonzales v. Denning*, 394 F.3d 388, 393 (5th Cir. 2004) (citing *American Satellite Co. v. United States*, 998 F.2d 950 (Fed. Cir. 1993)), and finding that defendant may not attempt to imply a "best efforts" provision to excuse its failure to comply with its contractual obligations). *See* Tr. 479:14-25 (Mills).

In its pre-trial memorandum of contentions of fact and law at 67-68, the government asserted that DOE's removal of PG&E's spent fuel from Humboldt Bay might have been delayed indefinitely even in the non-breach world because some of that fuel is "failed." Under Appendix E of the Contract, failed fuel is a type of standard fuel, as distinguished from "nonstandard fuel," which includes, for example, fuel which is beyond a certain length. PX 54 at Appendix E. As such, DOE's removal of failed fuel is subject to the same scheduling as other spent fuel absent a problem with the "technical feasibility" of its removal under the "currently agreed to schedule." *Id.* at Art. VII.A.2(b). Humboldt Bay's failed fuel is "stable" and can be handled just like any other spent fuel. Tr. 714:2-19 (Stuart). Furthermore, PG&E will place this fuel in failed-fuel cans, at which point this damaged fuel will be handled in the same manner as regular spent fuel. Tr. 710:7-25 (Stuart). It can and has been grappled, loaded, and transported just like regular spent fuel. Tr. 250:17-19 (Mills) ("[T]he industry had transported good fuel and some failed fuel in the same containers."); 711:1-24 ("Stuart") ("[Failed fuel] does not require any special handling for transportation."). Therefore, the government's argument is meritless.

E. <u>GTCC Waste</u>

The parties understood when they entered the contract in 1983 that the decommissioning of commercial nuclear power plants would result in the generation of

Greater-than-Class-C ("GTCC") waste from reactor internals. DX 445, Tr. 1364:3-18 (Womack).

The NRC has determined by rule that GTCC waste requires permanent isolation, meaning that it must be disposed of in a deep geologic repository. 54 Fed. Reg. 22,578, 22,583 (1989). Tr. 962:21-963:12 (Huizenga), (disposal in the repository would meet standard of permanent isolation). And while that regulation permits DOE to seek NRC approval of an alternative means of disposal for GTCC waste, DOE has never sought such approval. Tr. 964:12-964:22 (Huizenga). As with spent fuel, the parties' Contract does not include terms governing the specific timing for DOE's removal of GTCC waste from utilities. PX 54. A reasonable term requires that utility GTCC waste be removed no later than the last of utilities' spent nuclear fuel. PX 338 at 165; Tr. 2870:7-2873:19 (Kouts); PX 8 at 1; Tr. 966:11-971:23 (Huizenga).

And even if GTCC waste were not technically covered by the terms of the parties' contract, DOE would have removed Humboldt Bay's GTCC waste with its spent fuel absent the breach. Deposition of Lake Barrett (5/15/02) 395:18 - 396:22. DOE has long planned to dispose of utility GTCC waste in the deep geologic repository also being planned for disposal of spent fuel. PX 92 at HQR:077-0671; PX 238 at 13; PX 302 at v, 1, 2. And DOE could readily have accepted GTCC waste from Humboldt Bay absent the breach. Tr. 715:7-717:12, 719:12-720:8 (Stuart). DOE's long-standing plan has been to provide GTCC waste removal services when the need arises. DOE has not removed Humboldt Bay's GTCC waste and has no plans to do so because it intends to manage and dispose of utility GTCC waste together with utility spent nuclear fuel, and in the absence of DOE removal of spent nuclear fuel from utility sites, there is no urgency for DOE to

remove GTCC waste from utility sites. PX 8 at 1; Tr. 966:11-971:21 (Huizenga). Moreover, DOE has failed to take actions to plan for or dispose of utility GTCC waste so as not to undermine its litigation position in this and other spent fuel cases before the Court. PX 6 at 0063; Tr. 955:1-956:11 (Huizenga); Tr. 965:1-966:10 (Huizenga); deposition of Lake Barrett (5/14/02) 140:8 - 141:19.

F. DOE's Failure to Make Progress Toward Performance

Within the first few years of the start of DOE's program for spent fuel disposal, it became evident that the program was not making progress toward development of a repository that would enable DOE to start accepting spent fuel by January 31, 1998. By January of 1987, DOE distributed a draft mission plan amendment acknowledging that development of the repository would be delayed by at least five years. PX 125 at 8. DOE confirmed this delay by publishing the 1987 Mission Plan Amendment. PX 97 at 6.

The delay in the repository development effort also affected the MRS. In an effort to gain Congressional approval of the MRS concept, DOE itself proposed linking the MRS to progress on the repository so as to allay concerns from prospective host states for the MRS that the MRS would not become the *de facto* repository. Tr. 468:10 - 471:10, 472:4-473:20 (Bartlett). DOE proposed limiting the size of the MRS to 15,000 MTU. DOE also proposed prohibiting the MRS from receiving spent fuel until the NRC authorized construction of the repository. PX 97 at 12; Tr. 472:9-473:3 (Bartlett). Congress approved the DOE-proposed linkages between repository progress and the MRS and strengthened them through the passage of the Nuclear Waste Policy Amendments Act of 1987. Tr. 474:2-475:14 (Bartlett); PX 125 at 16. The 1987 amendments prohibit the siting of an MRS until a repository site is recommended to the President; the amendments also prohibit DOE from storing more than 10,000 MTU of

spent fuel at a MRS facility until the repository begins receiving spent fuel. *Id*.

Enactment of the 1987 amendments put DOE's ability to perform its contractual obligations by January 1998 in great jeopardy. Tr. 475:15-476:1 (Bartlett). DOE acknowledged the likelihood that it would not start accepting spent fuel from utilities by January 31, 1998 through publication of the 1989 Report to Congress on the Reassessment of the Civilian Radioactive Waste Management Program. PX 125 (*see* p. vii). As a result of these developments, statements by DOE and utilities regarding expected rates of utility spent fuel acceptance made in and after January 1987 do not accurately reflect the parties' views as to how DOE should have performed absent the breach.

DOE further acknowledged difficulties in its performance by 1998 in documents such as the 1991 Annual Capacity Report ("ACR"), PX 158, in which it made clear that DOE would not be able to accept any spent fuel from utilities by 1998 unless Congress cut the linkages between the repository and an MRS facility. *Id.* at 4. The 1991 ACR also projected only limited acceptance of spent fuel from utilities in the first years of the program purportedly in anticipation that, at best, only some of the linkages between the repository and a MRS would be cut. *Id*. But if some linkages could be cut, there would be no reason why spent fuel acceptance at an MRS would be at the very low rates portrayed in the 1991 ACR. Tr. 2767:14-2768:11 (Kouts). For these reasons, the acceptance rates set out in the 1991 ACR do not reflect reasonable performance absent the breach, and such acceptance would not have been sufficient to have met the objectives for the program noted above of avoiding the need for additional at-reactor

storage costs after January 31, 1998 or being able to work off the backlog of previously discharged spent fuel.

DOE's internal approval memorandum for the 1991 ACR asserted that its acceptance rates would have been sufficient, in the aggregate, to have enabled utilities to avoid building additional at-reactor storage after 1998. DX 195 at 2. This statement confirms DOE's understanding that an acceptance rate with this feature was consistent with the intent of utilities and DOE for DOE's performance under the standard contract. However, the acceptance rate actually set out in the 1991 ACR would manifestly not have been sufficient to have achieved this objective. As noted above, and as set out in PX 35 at 14 and PX 73 at 0038, an acceptance rate in excess of 2000 MTU per year would have been needed absent the breach in order to have achieved this objective of the parties.

By December 1992, DOE recognized and acknowledged that its efforts at developing an MRS were not going to be successful. PX 177 at HQR-038-0090; Tr. 476:11-478:24 (Bartlett). Nonetheless, DOE continued to publish very low and inadequate acceptance rates in the 1994 and 1995 ACR. PX 158 at 5; DX 307 at 4. In addition, it suspended the DCS process, at least in part in an attempt to limit liability to contracting utilities. Trial Transcript in Yankee Atomic Elec. Co. v. United States, No. 98-1261 (Fed. Cl. Ct.) ("Yankee Tr.") 3995:19-3997:21 (Pollog).

As a further response to its anticipated delay in performance of spent fuel removal services from utilities, DOE initiated a "multi-purpose" (*i.e.*, storage and transportation) canister program in the early 1990s to help accommodate utility spent fuel that required storage outside of spent fuel pools until DOE could start accepting (and transporting)

utility spent fuel. PX 209 at 36; Tr. 659:12-660:6 (Stuart). This effort reflected DOE's view that the use of such systems would be a reasonable response to DOE's anticipated delay in removing spent fuel from utilities. PX 177 at 2.

In light of the publicly-available information on the lack of progress in the DOE program, by the early 1990's, PG&E had substantial doubts as to whether DOE would meet its obligation to begin removing utility spent fuel, including PG&E's spent fuel, by January 31, 1998. *See* pp. 26-27 below. By the mid-1990s, it became clear to PG&E that DOE would not perform at all by January 31, 1998. *Id*. This was clear from the continued lack of reported progress in the DOE program. DOE further made clear the likelihood that it would not perform by 1998 by arguing that it lacked an obligation to do so in the absence of a repository in a Notice of Inquiry published in 1994, 59 Fed. Reg. 27,007, and in a Final Interpretation of the Standard Contract published in 1995, 60 Fed. Reg. 21,793. Even after the D.C. Circuit rejected the Final Interpretation in *Indiana Michigan*, 88 F.3d 1272, holding that DOE's obligation to perform by January 31, 1998 was "unconditional," DOE responded by formally informing utilities in 1996 that it would nonetheless not perform by 1998. *See Northern States Power Co. v. Dep't of Energy*, 128 F.3d 754, 757 (D.C. Cir. 1997).

DOE did not accept any spent fuel from any utility, including PG&E, by January 31, 1998. DOE has still not removed any spent fuel from PG&E. It is entirely unclear when, if ever, DOE will start to accept spent fuel from PG&E. DOE has previously said that it would not perform before 2010. Tr. 1732:24-1733:7 (Rueger). More recently, DOE has acknowledged that it cannot start accepting spent fuel from utilities until well

after 2010. Tr. 2698:25-2699:9 (Kouts). DOE currently has no target date for commencing spent fuel acceptance from utilities. *Id.*

## III. BY FAILING TO PROVIDE PG&E SPENT FUEL REMOVAL SERVICES BY 1998, DOE BREACHED THE PARTIES' CONTRACT

As a result of DOE's anticipated and now actual breach, PG&E incurred damages in the following seven categories: (1) Diablo Canyon ISFSI; (2) Diablo Canyon temporary racks; (3) Diablo Canyon pre-1998 investigations; (4) Humboldt Bay SAFSTOR; (5) Humboldt Bay ISFSI; (6) Humboldt Bay stack take-down; (7) Offsite storage options. These damages are recoverable because "(1) the damages were reasonably foreseeable by the breaching party. . . , (2) the breach is a substantial causal factor in the damages, and (3) the damages are shown with reasonable certainty." *Indiana Michigan Power Co. v United States*, 422 F.3d 1369, 1373 (Fed. Cir. 2005); *see* PG&E's Pre-trial Brief at 23-24.

### A. Damages Caused by DOE's Breach Were Both Foreseeable and Actually Foreseen

PG&E's damages were both reasonably foreseeable and actually foreseen. *See generally* PG&E's Pretrial Brief at 24-27. As shown above, *see* pp. 8-9, the DOE spent fuel contracts obligated DOE to help the utilities, including PG&E, avoid costs pertaining to spent fuel storage after January 31, 1998. *See* PX 61 at 11 (SN069599); Tr. 479:5-480:8 (Bartlett); Tr. 47:3-48:12 (Warner); Tr. 137:16-138:20 (Mills). Costs pertaining to utility on-site spent fuel storage after January 31, 1998 are therefore a reasonably foreseeable consequence of DOE's breach. *See* Tr. 478:25-479:25 (Bartlett). Most of PG&E's claimed damages are of this type – costs to investigate or implement spent fuel storage after January 31, 1998. The DOE contracts were also intended to help shutdown

plants avoid excess decommissioning costs. *See* pp. 15-16 above; Tr. 51:10-19 (Warner); DX 2.02 at 16583; Tr. 484:21- 4 85:21 (Bartlett). PG&E's incremental stack take-down costs at Humboldt Bay thus were also reasonably foreseeable.

The magnitude as well as the nature of the damages PG&E has incurred was reasonably foreseeable. Tr. 133:16 - 135:4 (Mills). Indeed, DOE actually foresaw costs of the type and magnitude PG&E has incurred due to DOE's breach. PX 57 attachment at 2 (at PNL-173-1284). *See* 48 Fed. Reg. 54,391 (Dec. 2 1983) (fee schedules DOE developed in 1983 for "Federal Interim Storage" under NWPA section 136(a) (1), 42 U.S.C. § 10156(a)(1) (2000) (expired), established a "full cost recovery" fee of $670 per kg. of uranium/fuel, at which rate Humboldt Bay's 28.2 metric tons of spent fuel (each MTU equals 1000 kg.) would cost almost $19 million, and storage of the 122 MTU of Diablo Canyon fuel to be loaded into the ISFSI there in the first two loads would cost more than $81 million).

B. <u>DOE's Breach Was A Substantial Causal Factor – And Indeed the Only Cause – of PG&E's Damages</u>

Beginning in the mid-1990's DOE's anticipated breach, and after January 31, 1998 DOE's actual breach, is what motivated PG&E to incur the mitigation costs it claims as damages. Tr. 1127:25 - 1130:2 (Womack). The government has not and cannot point to anything else that caused PG&E to incur these costs, and there was no other cause. PG&E simply had no reason – other than DOE's default – to investigate off-site spent fuel storage, or study the relative merits of re-racking versus dry storage at Diablo Canyon, or design and build dry storage facilities at both Humboldt Bay and Diablo Canyon, or continue maintaining Humboldt Bay in SAFSTOR after 1998. *Id.* Thus, DOE's breach was more than a "substantial factor" causing PG&E to incur the

damages claimed here, it was the *only* causal factor. Most importantly under the governing legal standard, PG&E's costs in each of the seven damages categories were reasonably incurred as part of a reasonable response to DOE's anticipated and actual breach of contract. *See generally* PG&E's Pretrial Brief at 28-33, 37.

1. Background

The unavailability of spent fuel reprocessing after 1977 led PG&E to re-rack the spent fuel pools at Diablo Canyon in the mid 1980's, after the NWPA became law. Tr. 994:22 - 996:3 (Womack). In that re-racking, PG&E added enough capacity to the pools to store all spent fuel Diablo Canyon was projected to discharge until approximately 2006. Tr. 996:4-10 (Womack). PG&E expected that would be sufficient capacity to assure continued operations at Diablo Canyon, given DOE's contract obligation to remove PG&E's spent fuel beginning in 1998. *Id.*; Tr. 1031:18-23 (Womack).

As noted above, at Humboldt Bay PG&E had studied spent fuel storage options at the time the plant entered SAFSTOR status in the mid-1980's. Tr. 998:20-1001:24 (Womack). That study recommended that "extended storage in the on-site storage pool would be the most attractive course of action." PX 83 at 2.3. That recommendation "dictated the SAFSTOR decommissioning option," Tr. 1002:20-22 (Womack), because until the spent fuel was removed from the Humboldt Bay pool, decommissioning would be "substantially more difficult than was planned or accepted by" the NRC or California Public Utilities Commission ("CPUC"). Tr. 1003:18-22 (Womack). Under the SAFSTOR license, PG&E is required to decommission Humboldt Bay by 2015. Tr. 981:19 - 982:10 (Womack).

In 1987, to settle regulatory proceedings concerning SAFSTOR, PG&E entered an agreement with joint interveners, PX 104; *see* Tr. 1007:15 - 1008:5 (Womack), in which (1) PG&E agreed to ship the Humboldt Bay spent fuel to DOE under the parties' contract "as soon as" a repository or other receiving facility was available, (2) PG&E agreed to "reasonably pursue the highest priority for the removal of the Humboldt Bay. . . spent fuel," and (3) the parties acknowledged that "dry storage is not yet authorized by the NRC for sites such as Humboldt Bay," and PG&E agreed "to re-examine the possibility of utilizing dry cask storage if and when such storage option becomes available for sites such as Humboldt Bay." PX 104 at ¶¶ 1, 3. Consistent with that agreement, in 1991 PG&E again evaluated the possibility of dry storage at Humboldt Bay. *See* PX 721. That evaluation concluded that "[d]ry storage of spent fuel at Humboldt Bay is presently not feasible." *Id.* at 19; *see* Tr. 1019:1 - 1021:11 (Womack); *see* Tr. 1021:12 - 1022:5 (Womack) (reasons dry storage not feasible at that time).

2. <u>DOE's Anticipated Breach Led PG&E To Undertake Reasonable Steps Prior To 1998 To Investigate and Plan for Extended Spent Fuel Storage</u>

By the early 1990s, serious doubts existed regarding DOE's ability to perform its contract obligations in 1998. Tr. 997:13 ("handwriting was on the wall" by early 1990's) (Womack); *see* Tr. 466:7-12, 475:15 - 476:13 (Bartlett); PX 177 enclosure at 1. This posed potential problems for Diablo Canyon, because if the pools there filled to capacity PG&E would have to shut the plant down, Tr. 997:18-21 (Womack), and also for Humboldt Bay, where DOE's failure to perform by 1998 could delay decommissioning. Tr. 998:12-15 (Womack). As a result, as early as 1993 PG&E studied storage expansion options for Diablo Canyon. PX 185; *see* Tr. 1024:5-1029:23 (Womack). Noting that various storage expansion options seemed viable, that study concluded that because of

uncertainties in the DOE program and because the available options were continually being upgraded, "it would be prudent to wait as long as practical before implementing an alternative or incurring major expenses for expanding on-site storage. . . . PG&E should select an alternative . . . in approximately 1999." PX 185 at 14.

Larry Womack became PG&E's Vice President for Nuclear Technical Services effective January 1, 1995. Tr. 993:18 - 994:2 (Womack). "[I]t was very clear at that time, based upon communications from the Department [of Energy], that they would not be coming in 1998 to pick up fuel." Tr. 1031:7-17 (Womack); Tr. 994:3-14 (Womack). This underscored both that continued operation of Diablo Canyon was at risk and that the timing of decommissioning of Humboldt Bay also was at risk. Tr. 1031:18 - 1032:12 (Womack). PG&E's Senior Vice President and Chief Nuclear Officer, Greg Rueger, therefore directed Mr. Womack to complete the necessary technical and financial evaluations and develop a recommendation concerning what spent fuel storage options PG&E should pursue. Tr. 1030:20 - 1031:6 (Womack). In developing those recommendations, Mr. Womack also concluded that PG&E should decide whether or not to implement dry storage at both nuclear sites in about 1998 or 1999. Tr. 1032:23 - 1033:22 (Womack) (explaining reasons).

In addition to the need to periodically re-evaluate dry storage at Humboldt Bay under the1987 agreement with the joint interveners, PG&E's interest in pursuing dry storage at Humboldt Bay was heightened in the mid-1990's by the significant caisson in-leakage problem at the site and the recent nearby earthquake identified as a cause of the in-leakage. Tr. 1042:21 - 1044:8 (Womack). Those events raised PG&E's awareness of risks attending continued SAFSTOR, and led PG&E to begin considering an accelerated

schedule for decommissioning. Tr. 1045:9 - 1046:18 (Womack). Because by then it was clear that that DOE would not remove the Humboldt Bay spent fuel in 1998 or for some time thereafter, accelerated decommissioning favored (and indeed required) dry storage as an alternative means of removing the spent fuel from the Humboldt Bay pool so that decommissioning could proceed. Tr. 1046:25 - 1047:19 (Womack).

3. It Was Reasonable For PG&E To Pursue Dry Storage at DCPP & HBPP While Maintaining Other Options For On and Off-site Storage

Mr. Rueger and Mr. Womack presented their recommendations to the PG&E management committee with briefing materials on June 13, 1995. PX 228. For Diablo Canyon, the recommendation was to seek a generic dry cask license suitable for the seismic conditions at the site, evaluate siting issues to prepare for dry cask storage and as a contingency develop but not file a re-racking license amendment. *Id.* at 4-5; Tr. 1035:12 - 1036:19 (Womack); *see* Tr. 1041:19 - 1042:20 (Womack) (explaining perceived benefits of generic licensing). For Humboldt Bay, the June 1995 briefing materials noted that earlier rather than later dismantlement of the plant would be to PG&E's ratepayers' financial benefit, and the recommendation was to try to ensure that the generic dry cask license for Diablo also enveloped Humboldt Bay's seismic and other requirements. PX 228 at 7; Tr. 1036:20 - 1038:20 (Womack). The June 1995 materials also included a recommendation that PG&E should support off-site spent fuel storage and disposal initiatives, including specifically that PG&E should continue its participation in the "Mescalaro utility initiative" through at least the submittal of an NRC license application at an expected cost to PG&E of about $1 million over the succeeding two years. PX 228 at 5; Tr. 1038:21 - 1040:13 (Womack). All these recommendations were approved by PG&E's management committee. Tr. 1040:23 - 1041:1 (Womack).

The Mescalaro project was an effort by a group of nuclear utilities to construct a storage facility for their spent fuel on the Mescalaro Apache reservation in New Mexico. PG&E joined the project in 1993. Tr. 1401:6-9 (Stock). The reason for this "private fuel storage" or "PFS" project, and for PG&E's participation in it, was concern that DOE would not commence contract performance in 1998 or pick up and remove the participant's spent fuel as their contracts with DOE required. Tr. 1401:21 - 1403:5 (Stock); Tr. 107:8-23 (Warner). In late 1995 or early 1996, PG&E ceased making monetary contributions to PFS, because by that time other spent fuel storage options appeared better able to meet PG&E's needs. Tr. 1411:9-24, 1414:19 - 1415:5 (Stock). But PG&E retained (and still retains) certain rights to send spent fuel to the PFS facility. Tr. 1403:13-25, 1405:4-19, 1415:17 - 1416:8 (Stock). PG&E's participation in and financial contributions to PFS were reasonable. *See* Tr. 1402:13 - 1403:25 (Stock); PX 208; Tr. 107:1-11 (Warner).

PG&E also implemented the other recommendations approved by the management committee following the June 1995 meeting. At Diablo Canyon, PG&E attempted to pursue a generic dry cask license and developed the re-racking contingency. *See* Tr. 1073:13 - 1074:7 (Womack); Tr. 1041:2-10 (Womack). During this timeframe, the NRC staff expressed to PG&E a preference for dry storage at both Humboldt Bay and Diablo Canyon. Tr. 1054:17 - 1056:1 (Womack); *see* PX 209 (7/94 speech by NRC Chair endorsing dry storage). In addition, PG&E investigated and ultimately proposed a change in the company's decommissioning strategy for Humboldt Bay, to accelerate decommissioning and thus reduce risk. *See* DX 402 at 2-3 (exploration of early decommissioning); Tr. 1046:19 - 1049:19 (Womack). Absent DOE performance and

removal of PG&E's spent fuel, that proposed change in strategy necessarily involved implementing dry storage to empty the Humboldt Bay spent fuel pool and thereby facilitate decommissioning. *E.g.*, Tr. 1046:25-1047:19 (Womack).

Such a proposed change in decommissioning strategy (and decommissioning costs) for Humboldt Bay required PG&E to obtain the approval of the CPUC. *See* PX 266 at 1 (11/10/97 recommendation to management committee that PG&E "[p]roceed with early decommissioning of Humboldt Bay. . . , contingent on obtaining all necessary NRC and CPUC approvals"); Tr. 1049:11-16 (Womack). CPUC approval of such a significant matter would be obtained in a PG&E General Rate Case ("GRC") proceeding, which occurs every three years. Tr. 1051:18-24 (Womack). Unlike Diablo Canyon, which at the time operated under a unique settlement with the CPUC, *see* Tr. 1005:12 - 1006:11 (Womack), Humboldt Bay was subject to a more traditional utility ratemaking process where costs were reviewed prospectively by the CPUC and, if the costs were determined to be reasonable, PG&E could collect the costs in future rates to customers. Tr. 1006:12-22 (Womack). PG&E generally sought CPUC approval of major costs before incurring them. *E.g.*, Tr. 2244:10 - 2245:5 (Kapus). Submissions for PG&E's 1999 GRC were to be made in December 1997, with a decision expected by the end of 1998 or early 1999. Tr. 1051:7 - 1052:6 (Womack). Prior to PG&E board of directors approval of the new decommissioning strategy for Humboldt Bay, PG&E submitted both the old and new strategies to the CPUC in the 1999 GRC, and after the board approved the new strategy PG&E revised its submission to request CPUC approval of that strategy. *See* PX 266; PX 272 at 1.

For Diablo Canyon, a recommendation to fund and proceed with dry storage was prepared under Mr. Womack's direction beginning in 1998 and was presented to the PG&E management committee by Mr. Rueger and Mr. Womack in March 1999. Tr. 1060:2 - 1061:2 (Womack); Tr. 1061:14-17 (Womack); *see* PX 284 at 1 (recommendation). That recommendation reflected a phased approach, so the project could be stopped if "an alternative presented itself that solved Diablo's fuel storage problem." Tr. 1063:2-5 (Womack); *see* PX 284 at 2-4 (describing four phases). That recommendation followed "detailed investigation" of re-racking and the status quo, as well as dry storage, *id.* at 2, and rested on an assessment of various factors including the "financial impact" of those alternatives, "overall costs and benefits" of dry storage, and "key non-financial issues and risks" including the potential for NRC licensing/legal delays and other permitting delays. *See id.* at 4-8. PG&E's President approved the recommendation and funding for the dry storage project in May 1999. PX 649; Tr. 1069:1 - 1070:16 (Womack). Such approval was reasonable, particularly given DOE's then-actual breach.

The CPUC decision in the 1999 GRC addressing PG&E's new accelerated decommissioning strategy for Humboldt Bay was not issued until February 2000, more than 15 months later than originally expected. Tr. 1070:21 - 1071:9 (Womack). PG&E did not wait for that decision to work on the Humboldt Bay ISFSI, but began such work immediately after the management committee's approval of the new decommissioning strategy. Tr. 1071:18-25 (Womack); Tr. 1079:23 - 1080:5 (Womack). By the time of the CPUC decision in 2000, PG&E had advanced more than $2.5 million "at risk" on the Humboldt Bay ISFSI. Tr. 1071:18 - 1072:9 (Womack); *see* Tr. 2244:10-24 (Kapus).

Importantly, the CPUC approval was only of PG&E's proposal, which was to proceed fully with early decommissioning only if and after it was determined that dry storage was technically feasible and could be licensed at the site. Tr. 1072:10-24 (Womack).

PG&E did proceed with a couple of decommissioning-related structural projects at Humboldt Bay in the late 1990's, including removal and replacement of the 250-foot vent stack over the spent fuel building, which occurred in late 1998. Tr. 1074:16 - 1075:5 (Womack); *see* PX 553 (RFP); Tr. 1567:18 - 1568:3 (Willis). If at that time DOE had been performing its contract obligations and was removing or would soon be removing PG&E's spent fuel, the stack removal work would have been postponed until the spent fuel was removed. That work required all personnel to exit the building where the spent fuel pool is located (as well as the control room and liquid rad waste building). Tr. 1566:19-23 (Willis). Thus, if the Humboldt Bay spent fuel were being loaded into DOE transport containers, the stack removal project could not proceed concurrently. PG&E also would have saved almost $1 million (out of about $5 million total for the project) if it could have postponed the stack removal and replacement project until after the spent fuel was removed. Tr. 2148:10-17 (Kapus).

4. <u>PG&E's Implementation of Dry Storage Has Been Reasonable</u>

Through the end of 2004, implementation of dry storage at both Diablo Canyon and Humboldt Bay involved three major activities – (1) soliciting and obtaining contractors, including primarily a cask vendor; (2) preparing applications for and pursuing an NRC license under 10 CFR Part 72, for dry storage, and a license amendment under 10 CFR Part 50, for necessary modifications to existing facilities; and (3) pursuing and obtaining permits from the California Coastal Commission and other state and local authorities. Tr. 1081:6-1082:22 (Womack); Tr. 1100:19 - 1101:7

(Womack); *see* Tr. 1004:16-19 (Womack) (noting need for Coastal Commission permit). Mr. Womack had direct oversight of all this work and was intimately involved with it. Tr. 1080:11 - 1081:3 (Womack).

At Diablo Canyon, the cask vendor selection process involved detailed evaluation of bids from four vendors, and resulted in the selection of Holtec International in July 2000. Tr. 1083:4 - 1087:10 (Womack). The process was comparable for Humboldt Bay, and also led PG&E to select Holtec as the cask vendor. Tr. 1101:8-22, 1103:25 - 1104:14 (Womack). Holtec commenced work immediately at both sites, Tr. 1087:11 - 1088:17 (Womack); Tr. 1106:20 - 1107:20 (Womack), initially on cask design and license development activities. Tr. 1083:4 - 1085:1 (Womack). PG&E did not sign contracts with Holtec until July 2001 and December 2002, respectively, however, due to extended negotiations and, at Humboldt Bay, PG&E's desire in view of geotechnical challenges to develop a defensible NRC license application prior to contract execution. Tr. 1106:14 - 1108:8 (Womack).

PG&E ultimately determined to seek site specific rather than general NRC dry cask licenses at both sites, largely because of the high seismic conditions at both sites and for other reasons. Tr. 1073:7 - 1074:15 (Womack). Following several meetings with NRC representatives during the license application preparation process, *see* Tr. 1091:8 - 1093:14 (Womack), PG&E submitted Diablo Canyon's application for a Part 72 dry storage license in December 2001, and its application for Part 50 license amendments later in April 2002. Tr. 1093:23 - 1094:17, 1098:3-17 (Womack). The Part 50 license was issued in December 2003. In view of substantial intervention and the need for a full NRC hearing, however, the Part 72 license was not issued until in March 2004. Tr.

1095:19 - 1096:22 (Womack). Humboldt Bay's Part 72 license application was submitted in December 2003 and its Part 50 application in July 2004. PDX 47. In order to prepare (and before submitting) those applications, PG&E needed to complete an extraordinary amount of geotechnical and ISFSI design work due to the very high seismic activity conditions (and tsunami potential) at Humboldt Bay. Tr. 1101:23 - 1103:24 (Womack) (explaining unique, underground, earthquake- and tsunami- resistant design of Humboldt Bay ISFSI); Tr. 1115:1 - 1116:9 (Womack) (describing PG&E's geosciences department and challenges it faced (also addressed in PX 330) in designing and licensing the Humboldt Bay ISFSI); Tr. 1595:8-17 (Willis). The NRC part 72 license for Humboldt Bay was issued in November 2005. Tr. 1674:20-23 (Willis).

At both sites, PG&E reasonably determined to use dual-purpose (storage and transportation) containers, which will avoid the extra work, cost and radiation dose exposure to workers attending transfer of the spent fuel from storage-only containers to transportation containers when DOE eventually arrives to remove the spent fuel. Tr. 1089:23 - 1090:17 (Womack); Tr. 3028:25 - 329:5, 3032:22 - 3033:12 (Zabransky). Indeed, such a transfer process would be virtually impossible at Humboldt Bay once the spent fuel pool is decommissioned. Tr. 1108:18-1109:10 (Womack) (also noting dual-purpose containers "better envelope the seismic requirements for both Diablo and Humboldt"). *See* Tr. 657:7 - 658:16, 661:4-12 (Stuart) (DOE MPC initiative); PX 177 (same); PX 185 (PG&E 1993 storage options study) at 11-12 ("The universal container system currently being developed by the DOE offers substantial benefits in spent fuel handling, transportation and disposal . . . . When this design becomes available, a dry storage alternative can be easily integrated with spent fuel disposal plants [sic]."). At

Humboldt Bay, PG&E also determined to procure a sixth dry storage container for GTCC waste, which also is reasonable because it will allow decommissioning to proceed and in view of PG&E's expectation that DOE would pick up the GTCC waste at the same time it picks up PG&E's spent fuel, Tr. 1109:11 - 1110:5 (Womack) – an expectation that itself is reasonable given DOE's statutory obligation under the Low-Level Radioactive Waste Policy Amendments Act of 1985 to dispose of GTCC waste, 42 U.S.C. § 2021c(b)(1)(c), and its longstanding plans to do so at the Yucca Mountain repository. *See* p. 18 above.

The process of obtaining a Coastal Development Permit for the ISFSI at Diablo Canyon was prolonged and contentious. Although PG&E submitted its application as early as possible, in November 2001, *see* Tr. 1097:13 - 1098:17 (Womack), the permit was only issued in December 2004 – and then with substantial "mitigation" conditions attached, Tr. 1100:7-18 (Womack) – due to intervention by anti-nuclear groups, a requirement imposed over PG&E's objection for an environmental review in addition to the one submitted to the NRC, and successive proceedings before the San Luis Obispo County planning board and the California Coastal Commission. Tr. 1098:3 - 1099:16 (Womack), Tr. 1851:15 - 1852:18 (Strickland). At Humboldt Bay, PG&E obtained a Coastal Development Permit for the ISFSI in straightforward fashion, from application in January 2005 to permit issuance in September 2005. The contrast from the prolonged process at Diablo Canyon reflects different public policy issues at Humboldt Bay, the lack of local opposition and the Coastal Commission's lack of desire to extract mitigating conditions. Tr. 1113:1 - 1114:7 (Womack).

In 2002, as a reasonable precaution against the possibility the Diablo Canyon ISFSI would not be ready to receive spent fuel when the spent fuel pools there reached capacity in or about 2006, PG&E began to look at alternatives for extending the storage capacity of those pools for a sufficient time to assure that the Diablo Canyon reactors could continue operating and discharging spent fuel unit the ISFSI is available. Tr. 1118:18 - 1119:4 (Womack). After due consideration, PG&E determined to design, license, and use for this purpose a temporary rack to be placed in the cask pit in each Diablo Canyon spent fuel pool, which would allow storage of all spent fuel projected to be discharged until about 2010. Tr. 1119:6 - 1121:9 (Womack); *see* PX 362. Consistent with its role as a contingency plan or "insurance policy," the temporary cask pit rack project was structured in a manner that allowed implementation as late as possible while maintaining a high degree of confidence that the temporary racks could be put to use in time to allow continued plant operations. Tr. 1124:7 - 1125:8 (Womack); *see* PX 365 at 9120. Implementing the temporary cask pit rack was reasonable.

As set forth above, DOE's anticipated and actual breach of its contract obligation to remove PG&E's spent fuel beginning in 1998 is what motivated – *i.e.*, "caused" – PG&E to investigate alternatives for extended spent fuel storage and ultimately to implement dry storage at both Diablo Canyon and Humboldt Bay. Absent DOE's default, PG&E would not have needed to study alternatives for extended storage, and would not have undertaken dry storage at either site or the temporary rack project at Diablo Canyon. Tr. 1127:25 - 1130:2 (Womack). At Humboldt Bay, if DOE had removed PG&E's spent fuel by 1998 "as PG&E expected," *see* Tr. 1129:8-9 (Womack), PG&E could have proceeded with decommissioning unimpeded by the spent fuel in the

pool and would not have needed to implement dry storage to facilitate decommissioning by removing the spent fuel from the pool. Tr. 1128:5 - 1129:17 (Womack). At Diablo Canyon, had DOE performed as required and picked up PG&E's spent fuel by 1998 – or any time before 2006 – the storage capacity in the spent fuel pools would have been sufficient to allow continued operation of the reactors without need for the study of storage alternatives or for dry storage or the temporary cask pit racks. And as also set forth above, PG&E's implementation of dry storage at both sites and of the temporary cask pit rack at Diablo Canyon proceeded in a reasonable manner in all respects including contracting, licensing and permitting. Finally, PG&E's participation in the PFS project and the costs PG&E incurred doing so were reasonable for a number of reasons identified at trial, Tr. 1402:13 - 1403:25 (Stock), and as shown by the management committee's approval of PG&E's participation and expenditure of $1 million.

C. <u>Reasonable Certainty</u>

The amount of damages PG&E has incurred and seeks here in each of the seven damages categories – damages totaling $92.1 million – more than satisfies the applicable "reasonable certainty" standard. *See* PX 427, PX 429, PX 430, PX 431, PX 432, PX 433, PX 722 (separate schedules showing damages in each category plus a summary schedule aggregating the total): PG&E's Pretrial Brief at 33 (regarding reasonable certainty standard).

All the damages amounts were incurred prior to 2005, and the underlying costs have already been paid, making the amounts inherently certain. The $899,517 PG&E incurred for offsite storage options (payments to PFS) is shown by undisputed invoices. PX 631; *see* PX 433; Tr. 2167:9 - 2169:24 (Kapus). For the other six categories, PG&E's

claimed damages are based on cost schedules Robert Kapus prepared and explained, PX 427-432, Tr. 2127:9 - 2167:8, and adjustments to those schedules that (i) add additional, actual costs of the work in each category consistent with PG&E's third-party billing policy, and (ii) exclude from those "third-party" costs and from Mr. Kapus' cost schedules allocated costs that are not part of the true economic cost, or "marginal cost," *see* Tr. 2304:23 - 2305:25 (Cornell), of DOE's breach. PG&E's claimed damages, including those adjustments and the PFS costs from PX 433, are shown in cost schedules Professor Cornell prepared and explained, PX 722; Tr. 2415:20 - 2417:9, 2341:4 - 2349:22 (Cornell).

The cost data on the schedules Mr. Kapus prepared is highly accurate. Tr. 2263:6-16 (Kapus). The $1,595,228 PG&E incurred in pre-1998 storage options study costs is shown on a business record cost schedule prepared contemporaneously in 1995-97 by Mr. Kapus, PX 430; *see* Tr. 2159:8-2162:20 (Kapus). Costs shown on that schedule from 1995 and early 1996 reflect detailed reporting to Mr. Kapus from people working on the projects, Tr. 2160:2-11, 2161:22 - 2162:9 (Kapus), and costs shown for periods after implementation of PG&E's SAP accounting system in mid-1996 are from that system, Tr. 2162:22 - 2163:10 (Kapus), none of which cost data is controverted, *see* Tr. 2251:21 - 2252:17 (Kapus) (cross examination re PX 430). Nor can there be any legitimate dispute about the accuracy of the cost data on Mr. Kapus' other five schedules, data he personally obtained from and checked against PG&E's SAP accounting system, which itself is highly accurate and reliable. Tr. 2116:13 - 2117:23 (Kapus).

Under PG&E's SAP accounting system, costs of all work performed in any of the damages categories are charged to a work order associated with that damages category.

Tr. 1955:24 - 1953:5 (Phillips); *see* Tr. 2112:6-20, 2129:25 - 2130:5, 2137:23 - 2138:5 (Kapus). The amount of costs to be charged, and the manner in which costs are charged, are prescribed by various cost accounting policies issued by PG&E and implemented under the direction of Betty Phillips. *See* PX 306, 329, 380, 384 (current versions of policies); Tr. 1949:9-15 (Phillips); Tr. 2096:1 - 2097:25 (Phillips) (all policies predated current versions). For external costs, like material purchases and contract charges, costs are entered into the SAP system from requisitions, invoices and other such documents. Tr. 1988:15 - 1989:2 (Phillips). For work performed by departments or groups within PG&E, termed "provider cost centers" or "PCCs" within the SAP system, an "activity price" is charged to the pertinent work order, including the work orders in the various damages categories relevant here. Tr. 1951:22 - 1952:22 (Phillips). Activity prices include appropriate costs of the work performed, initially based on estimated "rates" administered by Ms. Phillips' group in the annual budget process for the succeeding year, Tr. 2026:11 - 2027:5 (Phillips), and then adjusted approximately quarterly during the year to assure accuracy. Tr. 1970:5-16 (Phillips). Rates for other "allocated costs" applied by the SAP system, like labor burden and materials burden are also initially estimated and then periodically adjusted for accuracy. Whether costs are direct charged or allocated, the result is generally the same. Tr. 1980:15 - 1981:3 (Phillips) ("pretty close").

The costs shown on the schedules Mr. Kapus prepared were all properly charged to and thus are appropriately attributed to work in the respective damages category to which the schedule relates. With respect to Mr. Kapus' cost schedules for the two ISFSIs, SAFSTOR and the Diablo Canyon temporary cask pit rack, PX 428, PX 429, PX

431, PX 432, all work reflected in the costs shown on those schedules was performed reasonably and properly by PG&E or its contractors in connection with the respective project covered by the schedule. Tr. 1843:10 - 1864:2 (Strickland) (re Diablo ISFSI); Tr. 1869:14 - 1872:21 (Strickland) (re Temporary cask pit racks); Tr. 1530:10 - 1562:9 (Willis) (re: SAFSTOR). With respect to Mr. Kapus' cost schedule for the Humboldt Bay stack take-down project, the costs and work shown on that schedule are work and costs that would not have been performed or incurred, respectively, if PG&E's spent fuel were not in the Humboldt Bay spent fuel pool. Tr. 1575:16 - 1593:25 (Willis); Tr. 2141:6 - 2148:17 (Kapus).

Activity prices in PG&E's SAP accounting system do not include all costs of the work performed by the pertinent provider cost center. Tr. 2003:24 - 2004:18 (Phillips). There are two reasons for this – regulatory accounting rules and to keep accountability for certain costs at a higher level consistent with sound cost accounting principles. Tr. 2004:25 - 2006:18 (Phillips). Thus, the costs that Mr. Kapus obtained from the SAP system and included in the cost schedules he prepared are not all the costs of the projects and work orders covered by those schedules. When PG&E bills a third party for work performed, including work made necessary by a breach of contract as here, *see* Tr. 2012:10 - 2014:7 (Phillips), the two reasons noted above that activity prices do not include certain costs are inapplicable. When billing others for work performed, PG&E therefore adds other costs of the work performed on the particular project or order, consistent with PG&E's third-party billing policy, PX 22. Tr. 2006:20 - 2009:21 (Phillips); *see* PX 22 at 1 ("Third Party Billing Rates achieve the following goals: Provide a more complete picture of fully loaded costs. Allow for recovery of costs not

included in activity prices."). There are three categories of costs billed to third parties under this policy: certain benefits, insurance and casualty costs (including workers' comp) and company support costs. Tr. 2011:1 - 2012:3 (Phillips). As with activity prices and labor and benefit burden, Ms. Phillips' group calculates "rates" for these cost categories consistent with the third-party billing policy as part PG&E's annual budget process, though third party rates are not adjusted during the year. Tr. 2018:10 - 2021:10 (Phillips). An appropriate amount of the costs in each category is applied to third party bills by applying the rate for each category to activity prices charged for the underlying work. *See* PX 22 at 1; Tr. 2327:15 - 2328:17 (Cornell).

Damages in this case should represent the true economic, or marginal costs to PG&E of DOE's breach of contract. Tr. 2304:23 - 2305:25 (Cornell). Calculation of such damages appropriately recognizes the economic consequences of the fact that in a partial breach case such as this, various costs are merely deferred and not ultimately avoided. Tr. 2309:4 - 2310:24 (Cornell). In order for the costs on the schedules prepared by Mr. Kapus to represent the true economic, or marginal costs resulting from DOE's breach of contract, it is necessary to make the adjustments noted above to add the costs that PG&E adds to third party bills and to exclude from those costs and from activity prices on Mr. Kapus' cost schedules allocated costs that are not part of the true economic cost, or "marginal cost," of DOE's breach and allocated costs. Tr. 2317:21 - 2319:10 (Cornell). Professor Cornell has made these adjustments and set forth in PX 722 the appropriate damages amounts that PG&E should recover. *See* Tr. 2416:9-22 (Cornell).

In order to make the second adjustment (to exclude costs not properly considered part of the true economic or marginal cost to PG&E of DOE's breach), Professor Cornell

used categories, numbered 1 through 5, to divide costs that he deemed truly marginal or caused by the breach (categories 1-3) from those costs not caused by or unrelated to the breach Categories 4-5). Tr. 2306:18 - 2307:10, 2312:7 - 2313:4, 2314:10 - 23, 2315:24 - 2317:12, 2318:15 - 2319:10 (Cornell). Working with his staff and with Ms. Phillips and Mr. Kapus, respectively, Professor Cornell then placed into one of those five categories all costs that PG&E bills third parties and all costs included in activity prices shown on Mr. Kapus' cost schedules. Tr. 2319:5-10, 2322:19 - 2323:6, 2326:20 - 2327:12 (Cornell). Professor Cornell then removed costs in categories 4 and 5 from all activity prices shown on Mr. Kapus' cost schedules for each damages category, had calculated the appropriate deductions from each damages category on a year by year basis, and deducted those amounts on his damages schedules in PX 722. Professor Cornell also removed costs in categories 4 and 5 from PG&E's third-party costs, calculated new "adjusted" rates for those costs (net of the 4 and 5 costs), applied the adjusted rates to activity prices in all damages categories and added the resulting "adjusted" third-party costs to his damages schedules in PX 722.

The schedules in PX 722 thus set forth the damages PG&E is entitled to recover in this case.

## IV. DAMAGES SHOULD BE AWARDED PURSUANT TO RCFC 54(B)

The Court's March 30, 2006 Opinion and Order stated that it will deem PG&E's complaint amended to include damages for DOE's partial breach through December 31, 2004. *Id.* at 11. The Court acknowledged that PG&E has and will continue to incur damages beyond 2004 and into the foreseeable future and would be allowed to recover them. Hearing Tr. 21:25-23:6, March 22, 2006. Consequently, the Court should exercise its authority under RCFC 54(b) to award damages to PG&E through December 31, 2004,

and to enter judgment on that award, allowing this case to continue so as to address post-2004 damages in subsequent proceedings. *See Cities Services Helex, Inc. v. United States*, 211 Ct. Cl. 222, 543 F.2d 1306 (1976) (each failure to pay for helium deliveries gave rise to additional action for damages); *San Carlos Irrigation & Drainage Dist. v. United States*, 23 Cl. Ct. 276, 281-82 (1991), *aff'd*, 111 F.3d 1557 (Fed. Cir. 1997) (each failure to open flood gates gave rise to new claims for damages); *Aktiebolaget Bofors v. United States*, 139 Ct. Cl. 642, 153 F. Supp. 397, 399 (1957) (new action arose each time government improperly exported guns in violation of licensing agreement). Awarding PG&E its damages incurred through 2004 in this manner will enable PG&E to be appropriately compensated for those damages now while avoiding any potential statute of limitations arguments with respect to PG&E's claims for damages incurred after 2004.

## CONCLUSION

For the reasons set forth above and to be established through trial evidence, the Court should enter judgment for PG&E for damages in the amount of $92.1 million.

Dated: June 30, 2006

Respectfully submitted,

s/ Jerry Stouck
Jerry Stouck
Greenberg Traurig, LLP
800 Connecticut Avenue, NW
Suite 500
Washington, DC 20006
(202) 331-3173 Phone
(202) 261-4751 Fax
Counsel for Plaintiff
Pacific Gas & Electric Company

Of Counsel:

Robert L. Shapiro
Greenberg Traurig, LLP