No. 04-0075C
(Judge Hewitt)

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

PACIFIC GAS & ELECTRIC COMPANY,

Plaintiff,

v.

UNITED STATES,

Defendant.

# DEFENDANT'S POST-TRIAL BRIEF

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

HAROLD D. LESTER, JR.
Assistant Director

JOHN C. EKMAN
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, NW
Washington, D.C. 20530
Tel: (202) 353-0897
Fax: (202) 307-2503

OF COUNSEL:

JANE K. TAYLOR
Office of General Counsel
U.S. Department of Energy
1000 Independence Ave., S.W.
Washington, D.C. 20585

SCOTT R. DAMELIN
JOSHUA E. GARDNER
ALAN J. LO RE
SHARON A. SNYDER
Civil Division
Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530

June 30, 2006

Attorneys for Defendant

# TABLE OF CONTENTS

PAGE

DISCUSSION ........................................................................................................... 1

I. PG&E BEARS THE BURDEN OF ESTABLISHING ALL ELEMENTS OF ITS CLAIM, INCLUDING LIABILITY, CAUSATION, FORSEEABILITY, AND REASONABLE CERTAINTY ................................................................... 1

II. PG&E HAS ARGUED POSITIONS THAT WOULD RENDER THE STANDARD CONTRACT UNENFORCEABLE ............................................... 2

III. ASSUMING AN ENFORCEABLE CONTRACT, PG&E HAS FAILED TO ESTABLISH THE COSTS THAT IT WOULD INCUR IN THE "BUT FOR' WORLD, FAILING TO MEET ITS BURDEN OF PROVING CAUSATION .. 4

IV. WITH RESPECT TO THE LIMITED CHARACTERISTICS OF THE "BUT FOR" WORLD THAT IT TRIED TO PROVE, PG&E HAS FAILED TO MEET ITS BURDEN ......................................................................................... 6

A. PG&E Failed To Meet Its Burden Of Proving That DOE Was Obligated To Accept SNF Pursuant To A Two-Part Test Or At An Annual Rate Of 3,000 MTU ........................................................................... 6

1. The NWPA Did Not Require Acceptance Of SNF At Any Particular Rate Or Under Any Particular Qualitative Standard .... 6

2. The Standard Contract Did Not Require Acceptance Of SNF At Any Particular Rate Or Pursuant To Any Particular Rate ............ 8

B. PG&E's Reliance Upon Program Documents That Post-Date The Contract Is Misplaced As A Matter of Law And Fact ........................... 11

1. PG&E's Reliance Upon Program Documents Fails As A Matter of Law ................................................................ 11

2. PG&E Improperly Relies Upon The 1985 Mission Plan ............ 13

C. Ultimately, DOE's Ability To Perform Was Tied Directly To The MRS ........................................................................... 15

**TABLE OF CONTENTS (cont'd)**

PAGE


D. PG&E's Contemporaneous Conduct Belies The Statutory And Contractual "Understanding" Upon Which Its Claim Is Based ............. 19

1. PG&E's Statements Concerning The NWPA And Standard Contract Belie The Existence Of A Two-Part Obligation .......... 19

2. PG&E Participated, Without Objection, In The 1991 DCS Process Initiated By DOE Under The Standard Contract .. 20

3. PG&E Viewed The MRS As Performance Under The Standard Contract And Actively Supported Its Development ..... 22

E. PG&E Cannot Establish The Necessary Causal Link Between Its Claimed Storage Costs And DOE's Delay ...................................... 24

1. PG&E Would Have Incurred Costs Associated With The Storage Of GTCC Waste In The "But For" World ..................... 26

2. PG&E's Damages Claim Fails To Account For Failed Fuel ...... 27

3. PG&E's Claim Fails To Account For Substantial "But For" Loading Costs ................................................................. 28

4. PG&E Cannot Establish Causation For Costs Associated With Projects Or Activities At HBPP ................................................ 29

5. PG&E Failed To Establish Causation For Certain Costs It Allegedly Incurred For Internal Labor And "Overheads" .......... 32

a. PG&E Failed To Demonstrate That Its Internal Labor Costs Were Incremental ...................................... 32

b. PG&E's Internal Labor Costs Contain Embedded Non-Incremental Components That Cannot Be Segregated ............................................................. 33

c. PG&E Failed To Establish That The Other Support Costs Included In Its Claim Are Incremental ........................... 36

d. PG&E's Claim Includes Embedded Costs Associated With HBPP's Fossil Plant ............................................. 38

## TABLE OF CONTENTS (cont'd)

PAGE

V. PG&E FAILED TO ESTABLISH THAT CERTAIN OF ITS CLAIMED DAMAGES WERE FORSEEABLE .......... 39

VI. PG&E MUST PROVE ITS DAMAGES WITH REASONABLE CERTAINTY .......... 40

VII. PG&E FAILED TO MITIGATE ITS DAMAGES .......... 41

A. PG&E Had An Obligation To Mitigate Damages .......... 41

B. The HBPP ISFSI Met With Repeated, Unexplained And Costly Delays .......... 42

C. The DCPP ISFSI Likewise Suffered From Delay .......... 46

VIII. PG&E MAY NOT RECOVER COSTS ASSOCIATED WITH PRIVATE FUEL STORAGE .......... 48

CONCLUSION .......... 50

## TABLE OF AUTHORITIES

### CASES

PAGE(S)

AES Technical Systems, Inc. v. Coherent Radiation,
583 F.2d 933 (7th Cir. 1978) ........ 33

Alaska Pulp Corp. v. United States,
59 Fed. Cl. 400 (2004) ........ 1

Autotrol Corp. v. Cont'l Water Sys. Corp.,
918 F.2d 689 (7th Cir. 1990) ........ 33

Barron Bancshares, Inc. v. United States,
366 F.3d 1360 (Fed. Cir. 2004) ........ 12

Bluebonnet Savings Bank, FSB v. United States,
67 Fed. Cl. 231 (2005) ........ 4, 40

Bluebonnet Savings Bank, F.S.B. v. United States,
339 F.3d 1341 (Fed. Cir. 2003) ........ 2, 5, 24

Boyajian v. United States,
423 F.2d 1231 (Ct. Cl. 1970) ........ 33

Branhill Realty Co. v. Montgomery Ward & Co.,
60 F.2d 922 (2d Cir. 1932) ........ 12

California Sand & Gravel, Inc. v. United States,
22 Cl. Ct. 19 (1990), aff'd, 937 F.2d 624 (Fed. Cir. 1991) ........ 14

Cambridge Plating Co., Inc. v. Napco, Inc.,
85 F.3d 752 (1st Cir. 1996) ........ 41, 42

Coast Federal Bank, FSB v. United States,
48 Fed. Cl. 402 (2000) ........ 4, 40

**TABLE OF AUTHORITIES (cont'd)**

PAGE(S)

Commercial Metals Co. v. United States,
176 Ct. Cl. 343 (1966) .................... 12

Consolidated Gas Supply Co. v. Federal Energy Regulatory Comm'n,
745 F.2d 281 (4th Cir. 1984) .................... 10

Fawick Corp. v. United States,
149 Ct. Cl. 623 (1960) .................... 1

Glendale Fed. Bank, FSB v. United States,
239 F.3d 1374 (Fed. Cir. 2001) .................... 4, 40

Goldberger Foods, Inc. v. United States,
23 Cl. Ct. 295 (1991) .................... 42

Indiana Michigan Power Co. v. Department of Energy,
88 F.3d 1272 (D.C. Cir. 1996) .................... 11

Indiana Michigan Power Co. v. United States,
422 F.3d 1369 (Fed. Cir. 2005) .................... passim

International Fidelity Ins. Co. v. United States,
25 Cl. Ct. 469 (1992) .................... 42

Matter of James Wilson Assocs.,
965 F.2d 160 (7th Cir. 1992) .................... 35

In re Kellett Aircraft Corp.,
186 F.2d 197 (3d Cir. 1950) .................... 42

Ketchikan Pulp Co. v. United States,
20 Cl. Ct. 164 (1990) .................... 41, 42

Koby v. United States,
53 Fed. Cl. 493 (2002) .................... 41, 42

In Re Lake States Commodities, Inc.,
272 B.R. 233 (Bankr. N.D. Ill. 2002) .................... 35

**TABLE OF AUTHORITIES (cont'd)**

PAGE(S)

Landmark Land Co. v. United States,
256 F.3d 1365 (Fed. Cir. 2001) ........ 39, 48

Maine Yankee Atomic Power Co. v. United States,
225 F.3d 1336 (Fed. Cir. 2000) ........ 4

Massengill v. Guardian Mgt. Co.,
19 F.3d 196 (5th Cir. 1994) ........ 3

Midwest Indus. Painting of Fla., Inc. v. United States,
4 Cl. Ct. 124 (1983) ........ 41

Myerle v. United States,
33 Cl. Ct. 1 (1897) ........ 2

National By-Products, Inc. v. United States,
186 Ct. Cl. 546, 405 F.2d 1256 (1969) ........ 12

Neeley v. Bankers Trust Co. of Tex.,
757 F.2d 621 (5th Cir. 1985) ........ 3

Northern States Power Co. v. United States,
128 F.3d 754 (D.C. Cir. 1997) ........ 4

Northrop Grumman Corp. v. United States,
47 Fed. Cl. 20 (2000) ........ 3

Paddack v. Dave Christensen Inc.,
745 F.2d 1254 (9th Cir. 1984) ........ 35

Prudential Ins. Co. v. United States,
801 F.2d 1295 (Fed. Cir. 1986) ........ 39

Ramsey v. United States,
121 Ct. Cl. 426, 101 F. Supp. 353 (1951) ........ 2

Robinson v. United States,
305 F.3d 1330 (Fed. Cir. 2002) ........ 41

Rochez Brothers, Inc. v. Rhoades,
527 F.2d 891 (3d Cir. 1975) ........ 40

**TABLE OF AUTHORITIES (cont'd)**

PAGE(S)

Rumsfeld v. Applied Cos.,
325 F.3d 1328 (Fed. Cir. 2003) .......... 6

S.W. Engineering Co. v. Cajun Elec. Power Coop.,
915 F.2d 972 (5th Cir. 1990) .......... 33

Sacramento Municipal Utility District v. United States,
70 Fed. Cl. 332 (2005) .......... 27, 39

Saddler v. United States,
287 F.2d 411 (Ct. Cl. 1961) .......... 33

San Carlos Irrigation & Drainage Dist. v. United States,
111 F.3d 1557 (Fed. Cir. 1997) .......... 1, 2

San Carlos Irrigation & Drainage Dist. v. United States,
877 F.2d 957 (Fed. Cir. 1989) .......... 1

Shea-S&M Ball v. Massman-Kiewit-Early,
606 F.2d 1245 (D.C. Cir 1979) .......... 41

Southern California Fed. Sav. & Loan Assoc. v. United States,
422 F.3d 1319 (Fed. Cir. 2005) .......... 12

Turner v. Burlington Northern Santa Fe R.R. Co.,
338 F.3d 1058 (9th Cir. 2003) .......... 35

United States v. Smith,
869 F.2d 348 (7th Cir. 1989) .......... 35

Wells Fargo Bank, N.A. v. United States,
88 F.3d 1012 (Fed. Cir. 1996) .......... 6, 39, 40

White v. Delta Construction International, Inc.,
285 F.3d 1040 (Fed. Cir. 2002) .......... 24

Willred Co. v. Westmoreland Metal Mfg. Co.,
200 F. Supp. 59 (E.D. Pa. 1961) .......... 33

## TABLE OF AUTHORITIES (cont'd)

PAGE(S)

Wilner v. United States,
23 Cl. Ct. 241 (1991) .......... 33

Wilson v. Marquette Electronics., Inc.,
630 F.2d 575 (8th Cir. 1980) .......... 33

## STATUTES

10 C.F.R. § 961.11, Art. IX.A .......... 3, 4, 11

42 U.S.C. § 2021c(b)(3)(E) .......... 27, 28, 33

42 U.S.C. § 10161 (1983) .......... 16

42 U.S.C. § 10168(d)(3) .......... 17

42 U.S.C. § 10222(a)(5) .......... 7

42 U.S.C. §§ 2021b-2021i .......... 27

42 U.S.C. §§ 10101-10270 .......... 4, 6

## MISCELLANEOUS

Am. Jur. 2d *Damages* § 416 (2004) .......... 33

5 Arthur Corbin, Corbin on Contracts, § 1012, at 88 (1964) .......... 39

Restatement (Second) of Contracts § 350, cmt. b .......... 41

Restatement (Second) of Contracts § 351, cmt. a .......... 39

Restatement (Second) of Contracts § 352, cmt. a .......... 40

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| PACIFIC GAS & ELECTRIC COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 04-0074C into which has been |
| | ) | consolidated No. 04-0075C |
| UNITED STATES, | ) | (Judge Hewitt) |
| | ) | |
| Defendant. | ) | |

DEFENDANT'S POST-TRIAL BRIEF

Pursuant to this Court's order dated May 25, 2006, defendant, the United States, respectfully submits the following post-trial brief.

DISCUSSION

I. PG&E BEARS THE BURDEN OF ESTABLISHING ALL ELEMENTS OF ITS CLAIM, INCLUDING LIABILITY, CAUSATION, FORESEEABILITY, AND REASONABLE CERTAINTY

"To recover for breach of contract, a party must allege and establish: (1) a valid contract between the parties, (2) an obligation or duty arising out of the contract, (3) a breach of that duty, and (4) damages caused by the breach." San Carlos Irrig. & Drainage Dist. v. United States, 877 F.2d 957, 959 (Fed. Cir. 1989). The mere fact of the partial breach of the Standard Contract by the Department of Energy ("DOE") does not "perforce" make all of a utility's costs "to store its SNF recompensable: [a plaintiff] must prove foreseeability, causation, and reasonableness," Indiana Michigan Power Co. v. United States, 422 F.3d 1369, 1376 (Fed. Cir. 2005), and it must prove these three elements "by a preponderance of the evidence." Alaska Pulp Corp. v. United States, 59 Fed. Cl. 400, 413-14 (2004). Pacific Gas & Electric Company ("PG&E") also is required to establish that, "but for" the breach, the asserted harm would not have been suffered. Fawick Corp. v. United States, 149 Ct. Cl. 623, 637 (1960); see San Carlos Irrig. & Drainage

Dist. v. United States, 111 F.3d 1557, 1563 (Fed. Cir. 1997). PG&E also bears the burden of introducing clear proof that it was injured as a direct result of DOE's delay in accepting its spent nuclear fuel ("SNF"). Myerle v. United States, 33 Ct. Cl. 1, 27 (1897). "For a damage to be direct there must appear no intervening incident . . . ; the cause must produce the effect inevitably and naturally, not possibly nor even probably." Ramsey v. United States, 121 Ct. Cl. 426, 434, 101 F. Supp. 353, 357 (1951). "There must not be two steps between cause and damage." Myerle, 33 Ct. Cl. at 27.

The remedy for a breach of contract is damages sufficient to place the injured party in as a good a position as it would have been had the breaching party fully performed. Indiana Michigan, 422 F.3d at 1373. Conversely, "the non-breaching party should not be placed in a better position through the award of damages than if there had been no breach." Bluebonnet Sav. Bank, F.S.B. v. United States, 339 F.3d 1341, 1344-45 (Fed. Cir. 2003) (citation omitted). As discussed below, if PG&E's claim were to be accepted by this Court, PG&E would be placed in a markedly better position than had DOE performed under the Standard Contract.

## II. PG&E HAS ARGUED POSITIONS THAT WOULD RENDER THE STANDARD CONTRACT UNENFORCEABLE

In this litigation, PG&E has argued that the delivery commitment schedules ("DCSs") that DOE approved are meaningless. This argument, however, leaves the contract devoid of any enforceable schedule or schedule term. As discussed at pages 55 through 60 of our pretrial brief, the contractual process that generates the Annual Priority Ranking ("APR") and the Annual Capacity Report ("ACR"), and that ultimately leads to the DCS submittal and approval process is the method by which the schedule of spent nuclear fuel ("SNF") acceptance is determined. Tr. 2497:22-2499:1-15 (Morgan). If this process, which was initiated in 1991 consistent with the

contract and which resulted in approved DCSs for all SNF at Humboldt Bay Power Plant ("HBPP"), is found to be unenforceable or otherwise meaningless, the contract simply becomes too indefinite to enforce. See Massengill v. Guardian Mgt. Co., 19 F.3d 196, 202 (5th Cir. 1994). For the reasons that we discussed in our pretrial brief, "[c]ourts refuse to enforce agreements that contain indefinite promises or terms they deem essential because judicial clarification of the uncertainty entails great danger of creating intentions and expectations that the parties themselves never entertained." Neeley v. Bankers Trust Co. of Tex., 757 F.2d 621, 628-29 (5th Cir. 1985). Further, a court must ensure that it does not "inject[] itself into the contracting process to create the contract that it determines is best for the situation," rather than one actually created by mutual agreement. Northrop Grumman Corp. v. United States, 47 Fed. Cl. 20, 41 (2000). As we discuss below and in our pretrial brief, DOE initiated a process in 1991, resulting in the approval of PG&E's DCSs, that definitized the first 10 years of SNF acceptance from PG&E under the contract, guiding any schedule analysis in this case. Nevertheless, to the extent that the Court adopts PG&E's argument that the approved DCSs that it obtained are meaningless and that the only schedule applicable to the contract is one that the Court will have to create, PG&E will have rendered one of the most significant and essential terms of the contract completely indefinite, precluding any recovery in this case.[1]

---

[1] As the Court is aware, the DOE contracting officer, in 1997, made a preliminary determination that DOE's delay was unavoidable under the "Unavoidable Delays" clause of the Standard Contract. That provision states that "[n]either the Government nor Purchaser shall be liable under this contract for damages caused by failure to perform its obligations hereunder, if such failure arises out of causes beyond the control and without the fault or negligence of the party failing to perform." 10 C.F.R. § 961.11, Art. IX.A (emphasis added). Included in the excusable bases for a failure to perform are delays in the scheduled delivery, acceptance, or transport of SNF arising out of causes beyond the "reasonable control of . . . [the Department of Energy ('DOE')]," including "acts of Government in either its sovereign or contractual

## III. ASSUMING AN ENFORCEABLE CONTRACT, PG&E HAS FAILED TO ESTABLISH THE COSTS THAT IT WOULD INCUR IN THE "BUT FOR" WORLD, FAILING TO MEET ITS BURDEN OF PROVING CAUSATION

A plaintiff must establish a plausible "but-for world" as part of its causation analysis. Bluebonnet Sav. Bank, FSB v. United States, 67 Fed. Cl. 231, 238-39 (2005); see Coast Fed. Bank, FSB v. United States, 48 Fed. Cl. 402, 403 n.25 (2000); Glendale Fed. Bank, FSB v. United States, 239 F.3d 1374, 1380 (Fed. Cir. 2001). A plausible "but for" world is required

---

capacity:" Id. The United States Court of Appeals for the Federal Circuit has held that DOE's delay in accepting spent nuclear fuel constitutes a "[f]ailure to perform." Maine Yankee Atomic Power Co. v. United States, 225 F.3d 1336, 1343 (Fed. Cir. 2000). Nevertheless, following the contracting officer's issuance of her preliminary determination, the United States Court of Appeals for the District of Columbia Circuit issued a writ of mandamus, ordering DOE "to proceed with contractual remedies in a manner consistent with NWPA's command that it undertake an unconditional obligation to begin disposal of the SNF by January 31, 1998." Northern States Power Co. v. United States, 128 F.3d 754, 760 (D.C. Cir. 1997). The D.C. Circuit, after barring "DOE from concluding that its delay is unavoidable on the ground that it has not yet prepared a permanent repository or that it has no authority to provide storage in the interim," held that the "Unavoidable Delays" clause, "insofar as it is applied to DOE's failure to perform by 1998, is inconsistent with DOE's statutory obligation to assume an unconditional duty" and issued its writ to preclude DOE from relying upon that provision. Id. at 760-61.

We have consistently argued, most recently in briefing before the Federal Circuit in PSEG Nuclear, LLC v. United States, No. 05-5162 (Fed. Cir.), that the D.C. Circuit overstepped its jurisdiction and authority in issuing this writ of mandamus (given that the judicial review provision of the NWPA, 42 U.S.C. § 10139, does not permit the D.C. Circuit to review contract administration matters) and, further, that the "Unavoidable Delays" clause in the Standard Contract was wholly appropriate and legal. The D.C. Circuit has eliminated one of the central provisions of the Standard Contract that governs the parties' liability in the event of delays in SNF acceptance. With this clause, DOE would have had the ability to present an absolute defense to liability in this case. The effect of the D.C. Circuit's elimination of at least a portion of this contract clause from the Standard Contract, 14 years after the contract was entered, has a staggering effect upon the United States: rather than excusing DOE's liability for the course of the unavoidable delay, DOE now faces billions of dollars in damages claims. The writ of mandamus wholly changes the nature of the Standard Contract, essentially and inappropriately creating a contract (one without an "Unavoidable Delays" clause) between the parties to which DOE never agreed, further bringing into question the appropriateness of a liability finding here. Nevertheless, because the D.C. Circuit's writ of mandamus is continuing, we are barred from attempting to invoke the "Unavoidable Delays" clause.

because a plaintiff, to prove that a breach caused its damages, must establish what costs it would have incurred absent the breach so that the Court can determine which costs actually incurred were an incremental result of that breach. See Bluebonnet, 339 F.3d at 1345. PG&E has failed even to attempt to establish the costs that it would have incurred, and activities in which it would have engaged, in the "but for" world. Even if PG&E established a rate at which DOE was obligated to accept SNF, it completely failed to identify the activities in which PG&E would necessarily have engaged, and costs incurred, absent any delay by DOE (Tr. 2171:6-18, 2172:12-16 (Kapus) (never asked to identify costs PG&E would have incurred in the "but for" world)),[2] including substantial "but for" costs related to cask loading activities, Greater-Than-Class-C ("GTCC") waste storage, and failed fuel storage. See Tr. 2400:10-2401:11 (Cornell).[3] PG&E essentially argues, in error, for strict liability and asks the Court to assume that all of its claimed costs are incremental to DOE's delay.

This brief responds to PG&E's arguments regarding the characteristics of the "but for" world. However, even if the Court were to make findings upon each of these issues, it still would be left with a materially incomplete "but for" world. PG&E has not simply omitted discussion of minor "but for" activities and costs, but has ignored the "but for" world altogether, leaving this Court with no basis upon which to establish causation, determine what costs are incremental to the delay, and award damages. PG&E's failure to meet its burden of proving the

[2] Bradford Cornell, PG&E's damages expert, testified that he relied upon PG&E to identify "but for" costs and believed that PG&E was asked to identify such costs. Tr. 2358:10-25 (Cornell). Yet, no such testimony or evidence was introduced at trial.

[3] For example, it is quite clear that PG&E would have to store its GTCC waste in the "but for" world, but PG&E presented no evidence of what it would have done with it or the associated costs.

activities in which it would have engaged and the associated costs in the "but for" world – a burden that it has attempted to pass to the Government – should be dispositive of its entire claim.

## IV. WITH RESPECT TO THE LIMITED CHARACTERISTICS OF THE "BUT FOR" WORLD THAT IT TRIED TO PROVE, PG&E HAS FAILED TO MEET ITS BURDEN

### A. PG&E Failed To Meet Its Burden Of Proving That DOE Was Obligated To Accept SNF Pursuant To A Two-Part Test Or At An Annual Rate Of 3,000 MTU

#### 1. The NWPA Did Not Require Acceptance of SNF At Any Particular Rate Or Under Any Particular Qualitative Standard

"Because the purpose of a damages award is to put the non-breaching party 'in as good a position as [it] would have been in had the breaching party fully performed,' the logical starting point for a damages analysis is an understanding of the breaching party's obligations under the contract." Rumsfeld v. Applied Cos., 325 F.3d 1328, 1336 (Fed. Cir. 2003) (brackets in original) (quoting Wells Fargo Bank, N.A. v. United States, 88 F.3d 1012, 1021 (Fed. Cir. 1996)). In this case, the rate of acceptance is the lynchpin to any causation analysis.

PG&E has asserted at least two distinct contract obligations that the Standard Contract allegedly imposes upon DOE. First, PG&E alleged that the NWPA, 42 U.S.C. §§ 10101-10270, and the Standard Contract obligated DOE to begin accepting SNF in a manner that would obviate the need for any Standard Contract holder to incur additional costs related to on-site storage of SNF after January 31, 1998. Tr. 197:3-24, 207:7-22, 246:11-3 (Mills); Tr. 1128:24-1130:2 (Womack). Second, PG&E asserted that DOE was obligated to accept SNF at a rate that (1) removed SNF at the rate at which it was being generated; and (2) reduced the backlog of SNF at reactor sites prior to January 31, 1998. Tr. 280:7-12 (Mills).

However, the NWPA contains no reference to a qualitative two-part obligation or a particular rate of acceptance. At trial, PG&E offered the testimony of Loring Mills, a former

vice president of nuclear activities at the Edison Electric Institute ("EEI"), a trade association of investor owned electric utilities, concerning the NWPA. Tr. 120:25-121:19 (Mills). Mr. Mills was unable to point to any provision of the NWPA that obligated DOE to begin acceptance of SNF in January 1998 at a rate that met any qualitative two-part obligation. Tr. 291:15-292:22 (Mills).[4] Mr. Mills' contemporaneous statements likewise establish that no two-part obligation was contained in the NWPA. DX 12 (SN145831-832); Tr. 286:11-15, 290:3-291:14 (Mills); DX 19 (SN145738). In a presentation made to an industry group regarding the NWPA, Mr. Mills represented that, upon commencement of acceptance, DOE "may" accept 3,000 MTU of SNF, but made no reference to DOE being obligated to accept that amount. Tr. 169:20-171:8 (Mills); DX 57 (YDK024128). The understanding that the requirements of the NWPA regarding acceptance of SNF related only to the date of commencement – January 31, 1998 – and not to any specific rate of acceptance was confirmed by Robert Morgan, the first Director of DOE's Office of Civilian Radioactive Waste Management ("OCRWM"), who testified that he understood the NWPA "said [DOE] would accept fuel [by] January 31, 1998, but did not specify any acceptance schedule." Tr. 2507:12-20 (Morgan). Simply stated, the NWPA is devoid of any requirement that DOE begin acceptance at any particular level, let alone a level that would obligate DOE to meet the two-part obligation that PG&E espoused at trial.

---

[4] Although Mr. Mills suggested that a two-part obligation could be "inferred" from the NWPA's requirement that DOE take title to SNF "as expeditiously as possible," Tr. 279:15-281:3 (Mills), that requirement begins only after a repository, rather than some other storage facility, becomes available. 42 U.S.C. § 10222(a)(5).

2. The Standard Contract Did Not Require Acceptance of SNF At Any Particular Rate Or Pursuant To Any Particular Test

The parties' understanding that DOE was not obligated to accept SNF at any particular rate continued through the development of the Standard Contract. On February 4, 1983, DOE published a notice of proposed rulemaking in the Federal Register, proposing terms for the Standard Contract (48 Fed. Reg. 5458 (Feb. 4, 1983); DX 2.01), which identified a mechanism for determining the order and rate at which SNF would be accepted. Mr. Morgan met with Mr. Mills, prior to DOE's issuance of the final Standard Contract, and Mr. Mills expressly requested that DOE "put in the contract a rate of acceptance." Tr. 2466:12-20 (Morgan). In January 1983, EEI received an advance draft and submitted to DOE its own draft contract for DOE to use in its Federal Register notice. Tr. 298:22-299:11 (Mills). EEI's draft contract included language obligating DOE to begin accepting SNF at a rate tied to the amount of SNF that was being generated plus work off the backlog. Tr. 299:24-300:17 (Mills); see also DX 29 (TV1325).

After DOE issued the draft contract, EEI and UNWMG provided member utilities with comments upon the draft. Tr. 277:14-278:6, 315:12-317:1 (Mills). A February 18, 1983 letter reflected EEI/UNWMG's consideration that the inclusion of a "repository receiving rate adequate to cover current generation plus working of the backlog on a reasonable schedule" was among the "significant issues" to be addressed in their comments to the draft contract. Tr. 318:12-319:4; DX 35 (GPE0010323); see also DX 2.34 (ADM002.0279-80). However, in a March 7, 1983 letter from Mr. Mills transmitting the formal EEI/UNWMG comments to the draft Standard Contract, EEI requested that DOE permit Standard Contract holders to negotiate with DOE regarding the rate of acceptance after the promulgation of the Standard Contract. Tr. 327:4-11 (Mills); DX 2.34 (ADM002.0277); Tr. 2479:15-2480:14 (Morgan).

Despite the requests of EEI – and others – to include the two-part obligation in the Standard Contract, DOE did not include any particular rate of acceptance or qualitative test in the contract. Tr. 2466:21-2467:2 (Morgan); Tr. 562:13-21 (Bartlett). Mr. Morgan explained that uncertainties surrounding the waste acceptance program that was to commence 15 years in the future prevented DOE from committing to any particular rate of acceptance. Tr. 2466:22-2468:9 (Morgan). Instead of including a rate of acceptance or qualitative test in the contract, DOE included a provision that obligated DOE to begin issuing an APR and ACR as the date for commencement drew closer. The Standard Contract obligated DOE to begin publishing ACRs in 1987. Tr. 2497:22-2499:1-15 (Morgan); PX 48. As Mr. Morgan explained, the clauses tied to the issuance of the APRs and ACRs defined for contract holders the manner by which DOE would commit to acceptance. Tr. 2499:16-23 (Morgan).

Even after the promulgation and execution of the Standard Contract, representatives of EEI and UNWMG continued to request that DOE add to the Standard Contract an obligation concerning the rate of acceptance. In December 1983, Mr. Mills delivered a speech in which he suggested that he "fully expected to see a petition for rule-making initiated" regarding several DOE performance standards. PX 60 SN069619; Tr. 331:1-333:1-15 (Mills). Following those comments, EEI prepared a draft memorandum in support of rulemaking which expressly recognized that the Standard Contract was "silent on the standards for DOE's performance in accepting spent fuel from Purchasers." DX 88 (SMUD0014896). EEI proposed that DOE revise the Standard Contract to include an obligation that DOE accept SNF at annual acceptance rate equal to the rate at which SNF was being discharged and that eliminated the entire backlog that existed as of January 31, 1998. Tr. 339:22-340:22 (Mills). On April 28, 1987, UNWMG

submitted a formal request that DOE "provide for a minimum receiving rate for SNF – an annual receiving rate not less than the rate at which SNF is being discharged – and that DOE commit to accept the entire backlog of SNF over a ten year period." DX 111 (CTR006-0249). DOE did not accept UNWMG's 1987 request for a minimum receiving rate for SNF. Tr. 343:2-345:3 (Mills). Despite the repeated rejection of its request for inclusion of a rate into the Standard Contract, EEI continued to press the matter. As late as December 1992, Mr. Mills still was advocating that contract holders request the inclusion of a rate of acceptance in the Standard Contract. Tr. 345:4-24, 347:6-18 (Mills). On December 3, 1992, Mr. Mills advised ACORD, a group of utility CEOs whose mission was to advise Standard Contract holders, that rulemaking upon the Standard Contract could achieve the establishment of "a minimum spent fuel acceptance rate." DX 236 (PPGE001336, PPGE0013349).

The record demonstrates that, not only did the Standard Contract not obligate DOE to accept SNF at any particular rate or consistent with any particular test, DOE rejected, both before and after contracting, repeated attempts by the industry to include such terms. These repeated requests, and DOE's rejection of the requests, is unequivocal evidence that the terms were not included in the contract. Consolidated Gas Supply Co. v. Federal Energy Regulatory Comm'n, 745 F.2d 281, 289 (4th Cir. 1984) (unilateral statements of position before an integrated contract is entered do not become part of contract when party arguing for their inclusion was unable to secure adoption of statements in contract). PG&E should not be allowed to obtain through litigation what it failed to obtain through the contract formation process.

B. PG&E's Reliance Upon Program Documents That Post-Date The Contract Is Misplaced As A Matter Of Law And Fact

1. PG&E's Reliance Upon Program Documents Fails As A Matter Of Law

PG&E apparently believes that DOE is obligated to satisfy the 3,000 MTU rate because it has appeared in numerous DOE planning documents. The documents upon which PG&E relies to evidence DOE's "intent" eventually to accept 3,000 MTUs of SNF upon an annual basis generally depend upon the existence of an operational repository.[5] Yet, the Standard Contract does not require DOE to begin SNF acceptance at a repository. Indeed, by 1987, the only method of performance available to DOE by 1998 was the Monitored Retrievable Storage ("MRS") facility. Tr. 2625:4-2627:12 (Kouts); Tr. 466:7-12 (Bartlett); Tr. 570:12-24 (Bartlett). The language of the Standard Contract explicitly contemplates that DOE may accept SNF either at a repository or at "such other facility(ies) to which [SNF] and/or [HLW] may be shipped by DOE prior to its transportation to a disposal facility." 10 C.F.R. § 961.11, Art. I.10. Pursuant to the rationale of the D.C. Circuit in Indiana Michigan Power Co. v. Department of Energy, 88 F.3d 1272 (D.C. Cir. 1996), DOE was not obligated to have an operational repository by January 31, 1998, precluding any argument that DOE was somehow obligated to accept SNF at the rates that it had hoped to satisfy for SNF acceptance at a repository. Consequently, reliance upon planning documents assuming SNF acceptance at a repository is irrelevant.

---

[5] PG&E argues that the 3,000 MTU rate was selected based upon its application to the two-part obligation tied to the generation rate and backlog. However, PG&E's witness, Dr. Bartlett, testified that the rate was selected based upon the assumed handling capacity at the repository. Tr. 462:25-463:10 (Bartlett). The fact that the rate now conforms with such an obligation is "just happenstance." Tr. 487:1-4 (Bartlett).

PG&E's reliance upon program documents that post-date the Standard Contract fails for several other reasons. First, reliance upon these documents is barred by an integration clause which provides that the contract "contains the entire agreement between the parties with respect to the subject matter hereof." PX 54, Art. XXII(A). The contract further provides that "[a]ny representation, promise, or condition not incorporated in this contract shall not be binding on either party" and that "[n]o course of dealing or usage of trade or course of performance shall be relevant to explain or supplement any provision contained in this contract." Id. PG&E's interpretation, which reads into the contract selective program hopes and goals over a 20-year period from DOE program documents, renders the integration clause meaningless. Reference to program documents runs afoul of the integration clause and should be disregarded. See Barron Bancshares, Inc. v. United States, 366 F.3d 1360, 1375 (Fed. Cir. 2004); Southern California Fed. Sav. & Loan Assoc. v. United States, 422 F.3d 1319, 1330 (Fed. Cir. 2005).

Second, PG&E identifies no language which demonstrates that DOE agreed or suggested that the acceptance rates in planning documents were contractually binding. See National By-Prods., Inc. v. United States, 186 Ct. Cl. 546, 558-59, 405 F.2d 1256, 1263 (1969) ("[b]efore a representation can be contractually binding, it must be in the form of a promise or undertaking . . . and not a mere statement of intention, opinion, or prediction"); see also Commercial Metals Co. v. United States, 176 Ct. Cl. 343, 349 (1966); Branhill Realty Co. v. Montgomery Ward & Co., 60 F.2d 922, 923 (2d Cir. 1932). PG&E's reliance upon program documents to evidence contractual obligations is misplaced and should be disregarded.

2. PG&E Improperly Relies Upon The 1985 Mission Plan

Throughout trial, PG&E repeatedly argued that the rate of acceptance to which DOE was obligated was the "improved performance schedule" set forth in DOE's June 1985 Mission Plan. Mr. Mills testified that the rates set forth in this schedule amounted to the acceptance schedule "that would allow [DOE] to achieve what we thought we had as an understanding in 1983 when we signed the contracts." Tr. 229:20-230:9, 270:23-271:4 (Mills). PG&E's argument suffers from several fatal factual and legal flaws. First, the parties were well-aware that the rates set forth in DOE's Mission Plan were not contractually binding. During the promulgation of the Standard Contract, one EEI and UNWMG member expressly requested that DOE include the acceptance rates set forth in its Mission Plans as contractual obligations. Tr. 350:6-352:11 (Mills); DX 2.43 (ARC0010439). However, DOE expressly rejected this proposal and instead provided that DOE would "make commitments for acceptance rates at a later point in time when the program was better known." Tr. 2491:5-15 (Morgan); 352:12-14 (Mills). DOE's improved performance schedule, by definition, was not a contractual obligation.

Second, the Mission Plan expressly stated that the schedules used in the Mission Plan were "for illustrative purposes only at this time" and expressly referred to the Standard Contract, which provided the mechanism by which, in 1991, DOE would "begin to publish firm waste acceptance schedules for individual reactors, including shipment allocations." PX 82 (Vol. I, 28-29); Tr. 2616:2-11 (Kouts). DOE's current Director of Waste Management, Christopher Kouts, testified that DOE included this language in the Mission Plan to indicate that the identified waste acceptance schedules were "an estimate and that it was not in any way a commitment." Tr. 2613:18-24 (Kouts). Mr. Kouts further explained that DOE made clear in the 1985 Mission Plan

that the improved performance schedule was simply a "best guess" at the time as to how the waste acceptance system might work, but given the uncertainties of the program, DOE would further define and specify the system acceptance parameters as the program progressed. PX 82 (Vol. I, 29); Tr. 2614:12-2615:2 (Kouts).

Third, PG&E cherry-picks components of the Mission Plan and ignores fundamental assumptions – such as the projected generation rate (then in excess of 3,000 MTU), number of operational repositories in the system (two), and the projected annual acceptance rate (6,000 MTUs). PX 82 (Vol. I, 25-29). Indeed, the 3,000 MTU rate set forth in the improved performance schedule would not meet PG&E's two-part test using the assumptions underlying that schedule. Tr. 356:15-358:14 (Mills).[6]

Finally, PG&E's reliance upon the terms of the improved performance schedule constitutes improper reliance upon parol evidence. "[T]he parol evidence rule, a rule of substantive law rather than evidence, bars the introduction of extrinsic evidence antecedent to or contemporaneous with contract formation for the purpose of adding to, subtracting from, varying, or contradicting the terms of a written contract, which if final, complete, unambiguous, and unaffected by mistake, fraud, or accident." California Sand & Gravel, Inc. v. United States, 22 Cl. Ct. 19, 25 (1990), aff'd, 937 F.2d 624 (Fed. Cir. 1991). PG&E's reliance upon the schedule set forth in the "improved performance schedule" necessarily relies upon parol evidence. Yet, the improved performance schedule that allegedly depicts DOE's contractual obligation contemplates DOE commencing performance in 1996, and not in 1998, as the contract

[6] Mr. Mills acknowledged that he could not demonstrate that the improved performance plan met PG&E's two-part test. Tr. 273:12-274:9 (Mills).

clearly provides. PX 82. Yet, nothing requires DOE to begin acceptance prior to January 31, 1998. Tr. 264:8-265:5 (Mills); Tr. 71:10-72:2 (Warner). PG&E likewise admitted in its comments to the 1985 Mission Plan that DOE's contractual obligation began in 1998. PX 82 (Vol. IV, 596); Tr. 2798:23-2801:5 (Kouts).[7] Mr. Kouts testified that he considered the improved performance schedule beginning in 1996 to be "over and above the level of performance" required of DOE by either the NWPA or the Standard Contract. Tr. 2603:20-25 (Kouts). PG&E is asking the Court to accept evidence that varies the express terms of the Standard Contract, in violation of the parol evidence rule. Similarly, if this Court found that DOE was obligated to accept SNF at a rate that eliminated the need for additional at-reactor storage, it would render the contractual oldest-fuel-first ("OFF") queue, exchanges, and priority provisions meaningless. As a matter of law, such an interpretation would be improper.

C. Ultimately, DOE's Ability To Perform Was Tied Directly To The MRS

Over the course of the development of the waste acceptance program, DOE envisioned numerous scenarios in the 'but for" world, including the use of the MRS. Although the NWPA contemplated the use of an MRS, DOE first envisioned performance beginning in 1998 at a repository, followed by a second repository, but left open the possibility of an MRS. DOE subsequently envisioned performance at a repository in 1998 with the MRS complementing the repository and beginning operations as early as 1996. By 1987, the MRS was the only way in which DOE could meet its obligation to begin acceptance in 1998. See Tr. 267:20-268:10

[7] Similarly, in its briefing before the D.C. Circuit in Northern States Power Co. v. United States Department of Energy, No. 97-1064 (D.C. Cir.), to which PG&E was a party, PG&E argued only for the 1998 date, not 1996.

(Mills); 42 U.S.C. § 10161 (1983); Tr. 2599:5-18, 2603:10-2606:16, 2616:18-2617:7 (Kouts); PX 82 (Vol. I, 25-27).

In March 1987, Mr. Kouts actively was engaged in the submission of a proposal to Congress for authorization of an MRS. Tr. 2616:18-2617:14 (Kouts). DOE's MRS proposal made clear that the repository would be delayed until 2003. Tr. 2618:21-2619:25 (Kouts); DX 107 (PNL-037-0312). DOE's MRS proposal formally recognized that it was relying upon the MRS as the method by which DOE would commence performance in 1998. Tr. 2620:1-12, 2623:22-2624:5 (Kouts); DX 107 (PNL037-0312). In an effort to avoid making the MRS a *de facto* repository, DOE proposed to limit capacity at the MRS to 15,000 MTUs (at an annual acceptance rate of 1200 MTUs) and tied commencement of the MRS to the scheduled opening of the repository. Tr. 2621:19-2623:21 (Kouts). DOE submitted an amendment to its 1985 Mission Plan reflecting program changes that had occurred since the issuance of the Mission Plan. Tr. 2625:4-18, 2637:8-25, 2640:15-2641:15 (Kouts). In this amendment, DOE reiterated that an MRS would permit DOE to meet its contractual obligation to accept SNF beginning in 1998. Tr. 2628:22-2629:16 (Kouts); PX 97 (HQ0005848). The amendments further proposed a 15,000 MTU capacity for the MRS and the linkage between MRS operation and the construction authorization for the repository. Tr. 2642:17-2643:19 (Kouts); PX 97 (HQ0005816-17).

DOE submitted its amendments for public comment. Tr. 2646:4-2648:2 (Kouts); PX 97 (HQ0005966, HQ0006212-219). In its comments, EEI stated that:

> Previously, EEI/UNWMG/NTG indicated that strong support for the MRS concept for numerous, and still valid, reasons. <u>Now, the MRS is more important to NWPA implementation, because it is the only feasible way that DOE can meet its 1998 statutory and contractual obligation</u>.

PX 97 (HQ0006215) (emphasis added); see Tr. 2651:14-21 (Kouts). EEI requested that DOE delete the proposed linkages between the MRS and the repository because the linkage could lead DOE to "breach its commitment to take delivery of spent fuel starting in January 1998." Id. (HQ0006216). EEI did not assert that DOE was contractually obligated to meet the schedule set forth in the 1985 Mission Plan. PX 97 (HQ0006218). In response to EEI's comments, DOE reminded contract holders that it planned to begin the process of establishing firm acceptance schedules through the ACR, APR, and DCS processes. Tr. 2896:8-2897:8 (Kouts); PX 97 (HQ0005913).

Congress approved DOE's request for an MRS, but placed additional restrictions upon the operation and capacity of the MRS. Tr. 2658:15-2660:14 (Kouts). Congress mandated that the MRS could not receive more than 10,000 tons until the repository was operational and no more than 15,000 tons overall while the repository was in operation. Tr. 2660:2-14 (Kouts); see 42 U.S.C. § 10168(d)(3). Although DOE did not attempt to remove the 10,000 MTU capacity limit, it worked for years with the Office of the Nuclear Waste Negotiator to modify the schedule linkages between the MRS and repository so that DOE could begin performance in 1998. Tr. 2655:6-2656:16, 2663:17-25, 2665:18-2669:14; 2672:13-2677:6 (Kouts); PX 125 (DB0001450-451, 0001462-63); PX 155 (HQR0005001).

By November 1989, DOE determined that the repository would not open until 2010. PX 155 (HQ0004975). However, DOE still planned to begin performance of the Standard Contract in 1998 through the use of an MRS, id.; Tr. 2672:13-2674:3 (Kouts), a plan that it maintained until 1995. Tr. 2694:20-2695:25 (Kouts). During this time, both PG&E and EEI recognized the MRS would allow DOE to begin timely performance under the Standard Contract. Specifically,

in 1989, EEI acknowledged that an MRS unlinked to a repository could allow DOE to meet the contractual obligation to begin receiving SNF by January 31, 1998. DX 138 (PPGE16639); Tr. 374:13-23 (Mills). On April 23, 1990, PG&E indicated that "the only apparent option that would allow DOE not to violate the Standard Contract would be the construction of" an MRS. DX 148 (PHBP0000005); Tr. 105:16-23 (Warner). Neither EEI nor PG&E ever indicated that the 10,000 MTU limit amounted to a breach of DOE's statutory or contract obligations.

In December 1991, DOE issued its 1991 ACR. PX 158; Tr. 2680:1-2681:13 (Kouts).[8] As set forth in the Standard Contract, and as repeatedly referenced by DOE officials and documents, the 1991 ACR, in conjunction with the 1991 APR, was the document by which DOE began making firm acceptance commitments to individual utilities. PX 54 (PDCP0013031); PX 82 (Vol. I, 29); Tr. 2616:2-11 (Kouts); Tr. 2497:1-2499:23 (Morgan); Tr. 2914:6-9 (Pollog). In the 1991 ACR, DOE assumed that the schedule linkages between the MRS and repository would be removed so that an MRS could be available by 1998. Tr. 2681:19-2682:11 (Kouts); PX 158 (HQ0003592). The ACR set forth projected annual acceptance rates for the first ten years of the waste acceptance program, consistent with the 10,000 MTU limit at the MRS prior to repository operations. Tr. 2683:20-2684:15 (Kouts); PX 158 (HQ0003597). Dr. Bartlett testified that the assumptions in the 1991 ACR were reasonable at the time and he approved its issuance. Tr.

---

[8] As Mr. Kouts testified, DOE did not seek to change the 10,000 MTU limit at the MRS for several reasons. First, DOE believed the limit to be reasonable in that it assured that the MRS would not become a *de facto* repository. Tr. 2688:19-2689:12, 2892:6-23 (Kouts). Further, the limit comported with DOE's belief that it made good engineering sense to have a slow ramp up to full capability at the MRS. Tr. 2829:21-2830:21 (Kouts). Mr. Kouts added that as DOE's understanding of the complexities surrounding the MRS evolved, DOE's estimate of the capability of the MRS, particularly during initial operations, became tempered. Tr. 2830:22-2831: 12, 2825:23-25, 2836:23-2837:9 (Kouts).

579:24-580:5 (Bartlett). EEI ultimately conducted workshops with Standard Contract holders to ensure that they properly completed their DCS forms in compliance with the data included in the ACR/APR. DX 196 (SN169910); Tr. 379:1-16 (Mills).

D. PG&E's Contemporaneous Conduct Belies The Statutory And Contractual "Understanding" Upon Which Its Claim Is Based

1. PG&E's Statements Concerning The NWPA And Standard Contract Belie The Existence Of A Two-Part Obligation

PG&E's "understanding" that DOE agreed to a two-part acceptance rate obligation is belied by the contemporaneous documents and by testimony that reflect PG&E's single-minded concern regarding the commencement of SNF acceptance in 1998, as opposed to any concerns relating to the acceptance rate. In an analysis of the NWPA, which PG&E prepared in February 1983, PG&E fails to mention any acceptance rate obligation and merely references DOE's obligation to begin acceptance by January 31, 1998. DX 38 (PPGE0059873-875). Similarly, the 30 pages of comments that PG&E submitted regarding the proposed rule in 1983 are devoid of any reference to the acceptance rate or any two-part qualitative rate obligation. DX 2.60.

After contract execution, PG&E's documents reflect its focus upon the 1998 date of commencement and not upon any alleged two-part obligation. On July 24, 1984, PG&E submitted comments to DOE upon the draft Mission Plan, advising DOE that "[o]f greatest concern to us is the apparent slippage in the schedule set by Congress for an operational storage facility by 1998." PX 82 (Vol. IV, 596). PG&E continued that, "[i]f the repository is not available at that time, DOE will have had to make alternative plans, since DOE is obligated to accept spent fuel after 1998." Id. (Vol. IV, 597). PG&E concluded by requesting that DOE provide assurance that the repository would be operational by 1998 or, "alternatively, that an

MRS facility will be available." Id. In a 1995 management briefing book, PG&E referenced DOE's obligation to begin acceptance of SNF beginning in 1998, but failed to reference any alleged obligation tied to rate. PX 228 (PDCP0016153). The briefing book, prepared by Larry Womack and Greg Rueger (Tr. 1034:14-21 (Womack); Tr. 1765:20-1766:24 (Rueger)), continued:

> To manage this situation, DOE has created a "queuing" system to accept the oldest fuel first. Humboldt Bay's fuel is among the oldest in the industry and would be shipped to the repository soon after it is opened. Because Diablo Canyon began operating late compared to other nuclear power plants, its fuel will not begin to be accepted by the federal government until at least 14 years after the first operation of a DOE storage or disposal facility.

PX 228 (PDCP0016153). These queue positions are consistent with the rates contained in the 1991 ACR.

2. PG&E Participated, Without Objection, In The 1991 DCS Process Initiated By DOE Under The Standard Contract

The evidence further demonstrates that PG&E fully participated – without objection – in the DCS process initiated by DOE in 1991 and that PG&E understood that the DCS process, including the issuance of the APR/ACR, was the contractual mechanism by which the utilities would deliver, and DOE would accept, SNF. In response to DOE's May 1991 draft APR, PG&E noted that "[t]his is the first step in setting the schedule for receiving Spent Fuel at the DOE Spent Fuel Disposal facility when it opens," and promptly circulated the draft APR throughout its organization to review the "correctness and accuracy" of the draft APR. DX 179 (PDCP0009753).[9]

---

[9] Upon review, PG&E discovered that HBPP's final discharge was listed in January 1984. Id. (PDCP0014514). For the purposes of the final APR, PG&E believed that the date for

Other documents underscore PG&E's understanding of the contractual significance of the 1991 APR/ACR and the DCS process. PG&E recognized that both the 1991 APR and the ACR were "needed to complete and submit" DCSs. Id. In a memorandum pre-dating the 1991 APR/ACR, PG&E noted that OCRWM "has begun the process of developing procedures necessary to implement the Delivery Commitment Schedule (DCS) as outlined in the Standard Contract." DX 192 (PHBP0074984). Even before the instructions were issued, PG&E planned to complete "[o]ne DCS form . . . for each allocation of fuel described in the 1991 Acceptance Priority Ranking published by DOE." Id. With respect to Diablo Canyon ("DCPP"), which had no allocations in the 1991 APR/ACR, PG&E concluded that "DCSs would be completed as the APR added allocations for Diablo Canyon." Id. (PHBP0074985).

Even before receiving the 1991 APR/ACR, PG&E began internal efforts to prepare and submit its DCSs in accordance with DOE's instructions. DX 193 (PPGE0059971). In August 1992, PG&E submitted DCSs for allocations over the first four years of acceptance from the HBPP facility. DX 224. PG&E raised no objection to the DCS instructions, to the DCS process, to PG&E's allocations, or to the rate of acceptance that resulted in the four-year delivery schedule and made no reservation of rights. See DX 224, DX 235, DX 272; Tr. 1502:3-1503:17 (Stock). PG&E's contemporaneous internal documents likewise reflect no objection to the DCS

---

HBPP's final discharge should be reclassified from 1984 to 1976, the date upon which HBPP ceased its operations. PX 169 (PDCP0013746); Tr. 1421:22-1422:17 (Stock). PG&E approached DOE seeking to reclassify the final discharge date from 1984 to 1976 and ultimately agreed to pay $1.2 million to reclassify HBPP's final discharge. Tr. 1463:3-18, 1474:13-1475:15 (Stock). DOE accepted PG&E's request to move the final SNF discharge date from the date of physical discharged from HBPP's reactor to the date of shutdown. DX 198 (PHBP0075042). PG&E concluded that, in exchange for approximately $1.2 million, modifying the discharge date from 1984 to 1976 would result in "all fuel [being] removed in the first 3 years of operation of a repository or MRS." DX 210 (PDCP0013716).

process, to the 1991 APR/ACR, or to PG&E's allocations. For example, in meeting minutes from a November 1992 workshop on SNF storage, PG&E noted that DCSs "for allocations of spent nuclear fuel to be accepted by DOE were submitted last week." DX 232 (PHBP0075127). The meeting minutes noted that all HBPP SNF would be accepted in the first four years of the DOE program, while DCPP's SNF would not be accepted until 13 years after the facility becomes operational. Id. The memorandum recommended that PG&E "continue to submit DCS Forms annually as required." Id. Ultimately, DOE approved and/or reinstated DCSs for all of HBPP's SNF. DX 242, DX 361.

3. PG&E Viewed The MRS As Performance Under The Standard Contract And Actively Supported Its Development

PG&E's lack of objection to the DCS process and the associated rate of acceptance is consistent with its contemporaneous belief that DOE could meet its contractual obligations through acceptance at the MRS, under the limitations set by Congress, beginning in 1998. Christopher Warner, an attorney for PG&E, unequivocally testified that, prior to this litigation, PG&E believed that DOE could satisfy its contractual obligation by accepting at an MRS beginning in 1998. Tr. 90:17-91:2 (Warner). Mr. Rueger, the highest level PG&E employee to testify in this case, agreed that PG&E considered the MRS as a means by which DOE could meet its contractual obligation to accept SNF by January 31, 1998. Tr. 1756:7-12 (Rueger). PG&E's contemporaneous documents are in accord. For example, in its 1994 response to DOE's Notice of Inquiry, which solicited comments concerning DOE's obligation to begin waste acceptance in 1998, PG&E submitted comments that repeatedly referenced DOE's contractual obligation to commence SNF acceptance beginning in 1998. DX 282 (PDCP0012624, 628). To meet that obligation, PG&E advocated for the construction of an MRS facility. Id. (PDCP0012625, 629);

Tr. 1753:21-1754:5 (Rueger).[10] Significantly, PG&E requested that liquidated damages be available to utilities in the event that DOE did not begin SNF acceptance in 1998 at an MRS. Id. (PDCP0012630); Tr. 1756:17-1757:11 (Rueger). Other internal documents are in accord:

- January 5, 1990 letter from James Shiffer applauding DOE's "reassessment of the program and the effort . . . to meet its contractual responsibilities" to accept SNF beginning in 1998. DX 143 (PPGE0002213).

- August 7, 1990 meeting minutes that note that "DOE has indicated that [the MRS] is how it intends to comply with the requirement (in the spent fuel Standard Contract) to begin accepting spent fuel in 1998." DX 155 (PPGE0011641).

- In its 1995 Management Committee briefing book, the Management Committee for PG&E adopted the recommendation that PG&E work with industry coalitions to "promot[e] the timely deployment of a monitored, retrievable storage system, including related cask and transportation systems. PX 228 (PDCP0016157-158); see also DX 325 (PPGE0004866-867). PG&E made this recommendation while acknowledging that, under the then-current acceptance queue, "Diablo Canyon fuel would not be shipped to DOE until 2012, even if the 1998 operation target is met." PX 228 (PDCP0016156-157).

Finally, in 1992, PG&E produced a strategic planning document for DCPP's future spent fuel storage. DX 226. In that document, PG&E noted DOE's plans to have an MRS "open for temporary storage of spent nuclear fuel in 1998." Id. (PPGE0014443). However, since DOE "will use the oldest fuel first concept in assigning priority for the acceptance of spent fuel at the repository or MRS," SNF would not be shipped from DCPP until 2011, assuming the commencement of MRS operations in 1998. Id. (PPGE0014444). PG&E recommended continuing participation in industry groups "that support DOE efforts toward establishing a MRS or geologic repository." Id.; DX 263 (PHBP0028883).

[10] Mr. Warner testified that PG&E's response did not expressly request that the 10,000 MTU limit upon the MRS be lifted. Tr. 82:10-15, 83:2-19 (Warner).

E. PG&E Cannot Establish The Necessary Causal Link Between Its Claimed Storage Costs And DOE's Delay

PG&E cannot recover any of its alleged damages if it fails to establish that it would not have incurred those costs had DOE timely begun SNF acceptance. See Bluebonnet, 339 F.3d at 1344-45 (citing White v. Delta Constr. Int'l, Inc., 285 F.3d 1040, 1043 (Fed. Cir. 2002)). To the contrary, "the non-breaching party 'should on no account get more than would have accrued if the contract had been performed.'" White, 285 F.3d at 1043 (quoting DPJ Co. v. FDIC, 30 F.3d 247, 250 (1st Cir. 1994)). PG&E has failed to establish causation for its storage activities.

First, PG&E alleges damages for SAFSTOR operations beginning in 1999. However, PG&E has failed to establish any causation for costs beginning that year. As an initial matter, HBPP's SNF would not have been removed from its site until at least 2001. See DX 242. To the extent that PG&E would have been required to store GTCC and failed fuel beyond that date, PG&E has failed to prove causation for any SAFSTOR costs. Finally, the testimony of Mr. Rueger and David Duke raises significant questions as to the incremental nature of any PG&E employee participating in SAFSTOR operations. Tr. 1793:10-1796:14 (Rueger); Duke Desig., 37:4-38:17; PX 721 (PHBP0091655). Causation for SAFSTOR costs has not been established.

Second, PG&E's claim for costs relating to the HBPP ISFSI is premised upon its contention that the ISFSI would not have been constructed but for DOE's partial breach. The evidence does not support PG&E's causation argument. Instead, PG&E could have elected to keep its SNF in its wet pool in its SAFSTOR condition. Tr. 1209:5-14 (Womack). The evidence also demonstrates that other factors actually caused PG&E to move to dry storage at HBPP.

For example, PG&E was required, by a 1987 settlement agreement with intervenors, to investigate dry storage for HBPP and, ultimately, transfer its SNF to dry storage when

technically feasible. PX 104 (PPGE0002410-411); Tr. 1211:7-16 (Womack). In 1991, PG&E performed a study of dry storage options for HBPP to perform its obligations under that agreement. Tr. 1209:23-1210:11 (Womack); PX 712 (PHBP0091642). Ultimately, the agreement with the intervenors, and not DOE's partial breach, caused PG&E to construct dry storage. Additionally, had the California Public Utility Commission ("CPUC") failed to authorize spending for the HBPP ISFSI from the decommissioning trust fund, PG&E would have terminated the ISFSI project. Tr. 2245:17-2246:23 (Kapus); Tr. 1274:4-1276:16 (Womack). That PG&E would have terminated the project without the decommissioning funding demonstrates that the costs do not directly result from DOE's breach. In either event, causation for the HBPP ISFSI has not been established.

Third, any causation analysis for the DCPP ISFSI hinges upon this Court's determination of the acceptance rate. In a 1993 study circulated to senior PG&E management (DX 254), PG&E acknowledged that "[o]n-site spent fuel storage requirements for DCPP are governed by spent fuel discharges, the maximum capacity of the spent fuel pools, and the starting date and rate of acceptance of spent fuel by DOE." PX 185 (PDCP0001692). As early as 1983, PG&E recognized that storage expansion issues at DCPP were tied to DOE acceptance. In a letter to the Vice President of Nuclear Power Generation, James Shiffer wrote that:

> The [NWPA] promises to relieve long term storage needs at the sites. But the repositories for permanent storage are not scheduled to open until late 1990s. Acceptance dates for Diablo spent fuel shipments could be even farther in the future. We have to consider this in our storage expansion plans.

DX 65 (PDCP0008236). Likewise, a 1992 strategy document noted that "[a]dditional spent fuel storage must be provided at DCPP to support operation after the year 2006," assuming that DOE

commenced acceptance beginning in 1998 at the MRS. DX 226 (PPGE0014443); see also DX 355 (PDCP0000874). By 1992, PG&E began planning for storage capacity expansion at DCPP. DX 226. Soon thereafter, PG&E clearly had focused its efforts on expanding capacity at DCPP through the implementation of dry storage. PG&E's dry storage plans were made assuming timely DOE performance under the rate of acceptance set forth in the 1991 ACR. See DX 226 (PPGE0014443). Assuming DOE performance beginning in 1998 under the 1991 ACR, PG&E would have constructed the dry storage facility at DCPP. Id.; Tr. 1177:21-25 (Womack). As a result, causation has not been established.[11]

1. PG&E Would Have Incurred Costs Associated With The Storage Of GTCC Waste In The "But For" World

PG&E's damages claim fails to account for costs that it would have incurred in the "but for" world associated with the storage of Greater-Than-Class-C low-level radioactive waste ("GTCC"). Even though PG&E's claim would require the incurrence of expenses for GTCC waste – in additional storage costs or in additional payments to DOE and higher costs associated with segmentation of reactor internals in the wet pool in the presence of SNF (Tr. 1389:5-1390:23 (Womack)) – PG&E failed to account for any of these costs. GTCC is not covered by the Standard Contract. See Tr. 616:14-15 (Bartlett). DOE has a statutory obligation to develop a plan for the disposal of commercially-generated GTCC, pursuant to the Low-Level Waste Policy Amendments Act of 1985, 42 U.S.C. §§ 2021b-2021i. However, that statute does not require DOE to develop or implement an acceptance and disposal plan by any particular date.

---

[11] Likewise, PG&E has failed to establish causation for the rack addition undertaken due to delays in the ISFSI project. In the "but for" world, the rack additions also would have been needed to carry DCPP through to the completion of the ISFSI.

Sacramento Municipal Utility District v. United States, 70 Fed. Cl. 332, 374 (2005). Further, the statute requires that "the beneficiaries of the activities resulting in the generation of [GTCC] bear all reasonable costs of disposing of such wastes," 42 U.S.C. § 2021c(b)(3)(E), yet no utility has contracted for or paid for the disposal of its GTCC. Tr. 2725:8-13 (Kouts). PG&E admits that it possesses GTCC waste and will generate significant additional GTCC during decommissioning. Tr. 1109:11-18 (Womack). PG&E is legally responsible for the continued storage of its GTCC waste for the indefinite future. Yet, it failed to present any evidence of how it would store its GTCC in the "but for" world or the costs and activities that would be associated with GTCC.

PG&E's assertion that DOE "would have" accepted GTCC waste concurrently with PG&E's SNF, outside of any contractual obligation, is predicated upon a fundamental misstatement of fact and constitutes pure speculation, particularly because the amount that PG&E will have to pay for that disposal has not yet been established and PG&E has not yet contracted or paid for that disposal. Tr. 1301:11-21 (Womack); DX 445 (PHBP0022700). The contention that GTCC would have been available for pick-up with the SNF is belied by the evidence. Tr. 1389:5-1390:23 (Womack). As long as PG&E is required to store GTCC waste on-site, it will be required to incur significant costs for that storage that are duplicative of the costs that it would have to incur if it was storing only SNF. PG&E's failure to account for these costs is fatal to its damages claim.

2. PG&E's Damages Claim Fails To Account For Failed Fuel

The Standard Contract provides three broad classifications of fuel: (1) Standard Fuel; (2) Nonstandard Fuel; and (3) Failed Fuel. See PX 54, App. E, ¶ A (PDCP0013065). Although DOE is required to accept failed fuel and nonstandard fuel, DOE is not necessarily obligated to

accept them under the same schedule as standard fuel. Id., Art. VI.A.2(b) (PDCP0013035). PG&E's damages claim fails to account for the presence of failed fuel at HBPP – some of it grossly failed. Tr. 2401:3-11 (Cornell); Tr. 1780:7-15 (Rueger) (describing certain fuel assemblies as "debris"); Tr. 1242:20-1243:6 (Womack). As a result, PG&E has failed to meet its burden of establishing when DOE was obligated to accept its failed fuel. Accordingly, PG&E failed to establish what costs it would have incurred in the "but for" world in connection with the storage of its failed fuel. PG&E also failed to account for at least $1.2 million in canister costs for the canisterization of failed fuel under the Standard Contract that it must bear. Tr. 2213:7-24 (Kapus); PX 54, App. E, ¶A (PDCP0013065).

3. PG&E's Claim Fails To Account For Substantial "But For" Loading Costs

PG&E's damages claim fails to account for the costs avoided in the "but for" world for loading small truck casks at HBPP. Prior to upgrading its facility to facilitate the handling of large rail casks, HBPP's facility did not have the ability to accommodate overweight truck or rail casks. Tr. 1495:8-1496:19 (Stock); Tr. 2938:19-2939:6 (Pollog); PX 136 (PHBP0028442-445). Absent upgrades to its facility or additional analyses, the only cask that HBPP could accommodate was a 25-ton truck cask. Tr. 2939:7-2940:11 (Pollog). In its DCSs, PG&E requested that DOE provide truck casks that could be used with a 25-ton crane. DX 242 (PHBP0000801); Tr. 1387:4-1388:10 (Womack). The casks that HBPP intends to load in the actual world are large rail casks. Tr. 2729:17-23 (Kouts). PG&E has not accounted for any of the avoided costs associated with loading 25-ton truck casks.[12]

---

[12] Based upon PG&E's failure to prove this material characteristic of the "but for" world, the Government offered the testimony of Warren Brewer to quantify this avoided cost. However, Mr. Brewer's testimony was stricken by the Court, leaving the Court with no evidence

4. PG&E Cannot Establish Causation For Costs Associated With Projects Or Activities At HBPP

First, PG&E's seeks costs associated with a ventilation stack removal project at HBPP. These costs did not result from DOE's breach. Instead, for a variety of reasons – including personnel safety (Tr. 1784:16-1785:3 (Rueger)) – the project would have been completed in the same manner and at the same time and cost regardless of DOE's performance. In fact, PG&E justified the project, and its timing, by focusing upon the benefits to personnel safety gained from the project. Mr. Rueger testified that personnel safety is significant to PG&E and that PG&E spends money every year simply to benefit worker safety. Tr. 1788:10-16 (Rueger). Mr. Rueger also testified that PG&E could not continue with SAFSTOR without completing the project at that time. Tr. 1790:16-1792:11 (Rueger). Additionally, the smaller vent stack (or similar ventilation system) would have been needed in the "but for" world to support decommissioning. Tr. 2237:14-2240:1 (Kapus); DX 443 (PHBP0060435).[13]

Second, costs associated with the SNF document discrepancy project would have been incurred in the "but for" world. The total cost for the document discrepancy project through

---

of this avoided cost. Mr. Willis testified that PG&E sought loading costs totaling $5.5 million from the CPUC. Tr. 1680:12-19 (Willis); PX 382 (PHBP0045005-12); DX 1122 (PHBP0080337).

[13] PG&E has significant evidentiary issues with respect to the admissibility of testimony concerning these allegedly incremental costs. The determination of "incremental" costs was undertaken in connection with this litigation. Tr. 2229:23-2231:20 (Kapus). Mr. Kapus worked with Ed Kahler, the project manager, to identify the activities and costs covered by the "incremental" work. Tr. 2231:21-2232:1 (Kapus). At trial, Mr. Kapus evidenced a lack of knowledge concerning several components of that estimate (Tr. 2235-2236:11 (Kapus)) and he admitted that the estimate changed based upon Mr. Kahler's input. Tr. 2229:23-2231:20 (Kapus). Mr. Willis was unaware of what activities were involved in certain line items and could not explain the cost components. Tr. 1580:3-9, 1610:10-1616:15 (Willis).

December 31, 2004, is $1.2 million. Tr.2202:5-2203:4 (Kapus); PX432 (PHBP0091635). The document discrepancy was caused by PG&E's failure to properly account for its SNM inventory, and the "document discrepancy" at issue related back to 1969. Tr.1797:11-1798:10 (Rueger). PG&E acknowledged that it would have needed to investigate and resolve this document discrepancy in the "but for" world, and PG&E missed prior opportunities in the 1980s to discover the document discrepancy. Tr. 1798:15-22, 1801:5-1802:8, 1804:22-1806:10 (Rueger); DX1062 (PPGE0006580); DX 1094 (PPGE0056782). PG&E failed to account for any "but for" costs of this project (Tr. 2203:5-9 (Kapus)), and Mr. Rueger was "surprised" that PG&E was seeking all the costs related to the document discrepancy from the Government. Tr. 1804:22-1805:3, 1806:20-24, 1807:8-1808:5 (Rueger).

Third, the removal of the off-gas equipment, totaling $391,000, would have been incurred in the "but for" world. Tr. 2203:10-20 (Cornell); see also Tr. 1684:9-1685:9 (Willis). This cost originally was included in Mr. Kapus' workpapers but was removed from the claim in connection with Professor Cornell's initial expert report. Tr. 2203:21-2205:10 (Cornell). The amount was reinserted, without explanation, in Professor Cornell's supplemental expert report (Tr. 2202:10-2203:9, 2205:11-19 (Cornell)), but should be removed by the Court.

Fourth, PG&E's claim includes $241,403 associated with the investigation of the Taiwan (or Chi Chi) earthquake included in the HBPP ISFSI costs. To the extent that the HBPP ISFSI was not caused by the breach, PG&E would not recover these costs. In any event, these costs are not recoverable because they would have been incurred regardless of DOE's performance. For example, DCPP's operating license requires investigation of international earthquakes, and PG&E's Geosciences Department performs investigations of all major earthquakes in the world.

Tr. 1808:6-13 (Rueger); Tr. 1604:5-22 (Willis). These investigations have application to PG&E's nuclear facilities and to its other generation facilities and office buildings statewide. Tr. 1808:14-1809:19 (Rueger). In fact, the Chi Chi earthquake investigation was relevant to the DCPP ISFSI license. Tr. 1808:6-13, 1811:10-12 (Rueger); Tr. 1902:22-1903:17 (Strickland); DX 3.13 (PDCP0026570). Notably, Mr. Rueger did not expect PG&E to seek reimbursement for the Taiwan earthquake investigation in this litigation. Tr. 1812:17-1813:4 (Rueger). Although Messrs. Rueger and Willis both testified that design changes resulting from the investigation would be appropriately included in damages (Tr. 1810:25-1811:22 (Rueger); Tr. 1602:18-1603:16 (Willis)), this line item does not cover design changes. Instead, it represents the actual costs of the investigation itself, including the costs of travel to Taiwan. Tr. 2211:8-2212:14 (Kapus). The costs of this investigation simply are not incremental to DOE's delay.

Finally, costs associated with the visual inspection of HBPP's SNF would have been incurred in the "but for" world. PX431 (PHBP0091637). The visual fuel inspection costs totaled $627,000. Tr. 2209:3-2211:3 (Kapus). At trial, PG&E asserted that the costs associated with visual inspection in the actual world were higher than the costs would have been in the "but for" world. However, PG&E never attempted to account for visual fuel inspection costs that would have been incurred in the "but for" world, despite acknowledging that PG&E would have needed to conduct a visual assessment of the SNF prior to loading to DOE. Tr. 1602:2–10

(Willis); 2211:4-7 (Kapus).[14] The costs of this inspection are not incremental to DOE's partial breach.[15]

5. PG&E Failed To Establish Causation For Certain Costs It Allegedly Incurred For Internal Labor And "Overheads"

a. PG&E Failed To Demonstrate That Its Internal Labor Costs Were Incremental

PG&E failed to meet its burden of establishing causation with respect to costs associated with internal labor and "other support costs." As part of its claim, PG&E has included all internal labor costs that were billed to any allegedly damages-related project. Tr. 2377:3-9 (Cornell). PG&E is seeking all of these costs without regard to the job duties of the employees performing the tasks, to the scheduling of the tasks, or to the amount of time spent by each employee upon a damages-related project. Id. Consistent with its strict liability presentation of damages, PG&E presented little testimony supporting the inclusion of all labor hours in the damages claim, and that testimony largely was based upon supposition and not fact. See Tr. 2368:15-22, 2369:9-14, 2369:18-24, 2370:18-23, 2370:24-2371:6 (Cornell); Tr. 1863:2-1865:7, 1880:14-1882:19, 1884:18-1885:16 (Strickland). "It is settled . . . that a contractor is not entitled to recover 'expenses which would properly have been incurred regardless of the [breach].'"

[14] Following the loading of the SNF to the HBPP ISFSI, PG&E plans to decommission the facility, including the dismantlement of the wet pool. The SNF will be sealed into canisters and placed into the Hi-STAR casks. PG&E will no longer have a wet pool at the site to use for handling SNF, and does not plan to reopen the sealed canisters. Tr. 1213:3-1214:18 (Womack); 1696:19-23; 1701:21-1702:4 (Willis). As a result, no future inspection is possible.

[15] PG&E's pre-1998 investigation costs for DCPP are not recoverable because PG&E was unable to provide evidence of significant components of those costs. Tr. 2251:21-2252:18 (Kapus). Additionally, based upon the applicable six-year statute of limitations in this case, PG&E is limited to damages incurred as of January 1998.

Boyajian v. United States, 423 F.2d 1231, 1236 (Ct. Cl. 1970) (quoting Saddler v. United States, 287 F.2d 411, 415 (Ct. Cl. 1961)). Rather, PG&E only may recover for labor performed by its employees to the extent that it can show that these labor costs represent an incremental cost to PG&E. See Wilner v. United States, 23 Cl. Ct. 241, 258, 262-63 (1991); Wilson v. Marquette Elecs., Inc., 630 F.2d 575, 586 (8th Cir. 1980); AES Tech. Sys., Inc. v. Coherent Radiation, 583 F.2d 933, 943 (7th Cir. 1978). Courts also have sustained recovery for employees' lost time where the plaintiff has foregone other contractual opportunities. Autotrol Corp. v. Cont'l Water Sys. Corp., 918 F.2d 689, 693 (7th Cir. 1990) (Posner J.); 22 Am. Jur. 2d *Damages* § 416 (2004); accord S.W. Eng'g Co. v. Cajun Elec. Power Coop., 915 F.2d 972, 978-979 (5th Cir. 1990); Willred Co. v. Westmoreland Metal Mfg. Co., 200 F. Supp. 59, 66 (E.D. Pa. 1961). It is a question for the fact-finder to determine whether such a contract reasonably could have been acquired. Autotrol, 918 F.2d at 693. Here, PG&E failed to demonstrate any alternative, profitable responsibilities to which it could have allocated its employees "but for" DOE's delay. Ultimately, these costs are not incremental simply because PG&E so asserts.

b. PG&E's Internal Labor Costs Contain Embedded Non-Incremental Components That Cannot Be Segregated

At trial, PG&E presented evidence that its labor costs contain embedded non-incremental costs and attempted, through its damages expert, to isolate and remove those costs from its claim. Tr. 1958:11-1959:6, 1960:23-1962:5 (Phillips) (describing embedded costs in labor rate); Tr. 2304:8-2307:10 (Cornell). However, PG&E's attempt to remove those costs lacks

evidentiary support, thereby counseling for the elimination of all labor costs as non-incremental.[16]

PG&E implemented an elaborate analysis seeking to remove the non-incremental components of its labor costs. Mr. Kapus and employees of CRA International ("CRA") met to assign numerical values (1-5) to the hundreds of categories of embedded costs in PG&E's labor rates. Tr. 2304:8-2307:10 (Cornell). Ultimately, Mr. Kapus' description of each category to CRA resulted in the numerical designation, with activities designated 1-3 passing through to damages and 4-5 being backed-out. Tr. 2312:7-2315:8, 2315:24-2319:10 (Cornell). However, the back-outs could not be performed without a complicated mathematical exercise. Tr. 2336:2-18 (Cornell). That exercise was performed by Celerity Consulting, a third party retained by PG&E for this litigation. Id. While Professor Cornell adopted the calculations, he failed to review them prior to the submission of his expert report. Tr. 2362:24-2365:22 (Cornell).[17] At trial, Professor Cornell admitted that he could not explain the calculations and testified that he was not the sponsoring witness for the calculations. Tr. 2366:23-2368:15 (Cornell). No PG&E

---

[16] In the alternative, the Government presented evidence through Ms. Phillips of what the burdened labor rates would be in each year such a figure is available. Tr. 2025:24-2031:12 (Phillips); PX 402-407 (describing burdened labor rates between 81 and 87 percent). To the extent that the Court finds that an award of certain labor costs is appropriate, multiplying the amounts sought by PG&E by the burdened labor rate would eliminate the non-incremental costs PG&E tried to remove from its claim.

[17] Professor Cornell's "opinions" are of little value to the Court. Indeed, Professor Cornell analogized his work upon this case with the President's Council of Economic Advisors; that is, that he is reporting information that was collected for his report. Tr. 2359:24-2360:9 (Cornell). Professor Cornell relied upon PG&E personnel to identify damages and failed to review any documents supporting PG&E's damages claim. Tr. 2359:18-23, 2360:20-2361:25 (Cornell). Professor Cornell demonstrated a fundamental lack of knowledge concerning many components of PG&E's claim and opinions that he provided, such as those concerning accounting for "but for" loading costs were ill-informed. Tr. 2358:5-2359:23 (Cornell).

or Celerity employee testified concerning the calculations. Without the calculations, the back-outs of embedded non-incremental labor costs cannot be completed. Tr. 2366:17-22 (Cornell).

As a matter of law, expert witnesses may not simply summarize the out-of-court statements of others as their testimony. United States v. Smith, 869 F.2d 348, PP (7th Cir. 1989). An expert also cannot testify for the purpose of vouching for the truth of another expert or a report that is not in evidence. See Matter of James Wilson Assocs., 965 F.2d 160, 172-73 (7th Cir. 1992). Professor Cornell admittedly had no knowledge or understanding of the calculations utilized in the otherwise inadmissible report. Instead, his testimony improperly was used as substantive evidence relating to calculations that were outside his domain of expertise, and his Celerity testimony should be rejected. Id.; see also Turner v. Burlington Northern Santa Fe R.R. Co., 338 F.3d 1058, 60-61 (9th Cir. 2003); Paddack v. Dave Christensen Inc., 745 F.2d 1254, 1262 (9th Cir. 1984); In Re Lake States Commodities, Inc., 272 B.R. 233, 244 (Bankr. N.D. Ill. 2002). Professor Cornell cannot even vouch for the accuracy of those calculations. Tr. 2362:24-2365:22 (Cornell). Additionally, Mr. Kapus – the individual responsible for describing each embedded costs to CRA – offered no testimony concerning this process. As with the Celerity calculations, Professor Cornell could not explain why each cost element was designated a 1, 2, 3, 4, or 5. Tr. 2352:8-2353:16 (Cornell). As a result, the 1-5 categorization itself is unsupported. As a matter of law and evidence, PG&E's attempts to disaggregate embedded non-incremental labor costs fails and PG&E's claim for labor costs should be denied.

c. PG&E Failed To Establish That The Other Support Costs Included In Its Claim Are Incremental

As further evidence that PG&E wants to hold the Government strictly liable for the delay in SNF acceptance, PG&E has included a variety of "other support costs" in its claim that have no relationship to DOE's delay. Examples of improper items in PG&E's damages claim include:

- "Pension, VRI Interest," which relates to pensions for employees from years in the past and does not reflect costs associated with current employees. Tr. 2049:19-2050:8 (Phillips).

- "PBOP Medical" and "PBOP Life," which relates post-retirement benefits other than pensions and whose cost fluctuates from year to year depending upon the performance of the stock market. Tr. 2050:9-2052:15 (Phillips).

- Company support costs, which include miscellaneous items such as total department items and legal administration costs. Tr. 2053:7-12 (Phillips). Ms. Phillips acknowledged that PG&E does not charge company support costs to third parties when PG&E's property is damaged, because insurance companies were complaining about these costs. Tr. 2053:13-2054:18 (Phillips).

- Depreciation costs for computers, furniture and office items, which Ms. Phillips acknowledged included depreciation costs for items acquired before 1998. Tr. 2064:6-13 (Phillips). However, the determination of what portion of depreciation costs were incremental to the Government's delay was not made by Ms. Phillips, but rather were made by Mr. Burgess, a former employee of CRA who PG&E did not present as a witness at trial. Tr. 2055:24-2057:15, 2066:1-17 (Phillips).[18]

Ms. Phillips admitted that, although she was responsible for providing information concerning particular line items to an employee of CRA who prepared the damages calculations

---

[18] At trial, Professor Cornell, admitted that, from an economics perspective, depreciation generally would not be included in a damages claim. Tr. 2381:24-2382:3 (Cornell). Indeed, at the time of his deposition, Professor Cornell did not know if depreciation was included in the damages claim. Tr. 2382:5-2383:3 (Cornell). In any event, the amount of depreciation used to calculate the damages changed radically between 1999 and 2004 – from a low of $9 million to a high of $95 million. Tr. 2058:20-22 (Phillips); Tr. 2381:5-23 (Cornell). Professor Cornell found this significant increase in depreciation "astonishing." Tr. 2387:3-4 (Cornell). The increase in depreciation added to PG&E's damages claim increased from 1.66 percent to 8.48 percent, an increase by almost a factor of five. Tr. 2388:6-12 (Cornell).

in this case and assigned a numerical 1-5 value to each category (Tr. 2021:20-2022:18, 2042:3-2043:1 (Phillips), she did not know the details of the specific line items included in the damages claim. Tr. 2043:2-7, 2044:9-2045:1 (Phillips).[19] In fact, Ms. Phillips consulted other PG&E employees to provide descriptions of certain line items to the experts. Id. Even with that consultation, certain categories of damages remain unexplained, including:

- Line 14, described as "office machines." Tr. 2074:16-25 (Phillips).
- Lines 32-35, which included costs associated with "COMM equip." Tr. 2075:1-19 (Phillips). Significantly, Professor Cornell testified that Ms. Phillips would be the knowledgeable individual concerning this item. Tr. 2386:6-18 (Cornell).
- Line 58, "DCPP COMM equip, computer base." Tr. 2076:2-9 (Phillips).
- Line 61, "DCPP transmission system." Tr. 2075:20-2076:1 (Phillips).

Finally, although PG&E claimed as a damage a portion of its CEO's time that PG&E claimed was diverted from non-delay-related projects as a result of DOE's delay, no PG&E witness could identify how much time had been diverted, the non-breach projects the CEO had been diverted from, or even the nature of the breach-related projects over which the CEO allegedly had involvement. Tr. 2081:3-2082:20 (Phillips). PG&E's attempts to add in millions of dollars of damage through the "other support costs added in" is without factual and evidentiary support, and the Court should deny PG&E recovery of these amounts.

[19] Ms. Phillips acknowledged that, on a number of occasions, she had to call on other employees, both within and outside her department, to determine or describe to Mr. Burgess what particular line items included in the damages claim meant. Tr. 2044:15-22 (Phillips). PG&E failed to present any of these other employees at trial.

d. PG&E's Claim Includes Embedded Costs Associated With HBPP's Fossil Plant

Outside of fundamental questions of causation, PG&E's claim includes significant costs associated with its fossil plant at HBPP and other non-incremental costs, and these costs should be removed from damages. These cost include the following:

- $883,659 for SAFSTOR Support Services; however, some portion of this cost supports fossil operations and no separate identification has been made by PG&E. Tr. 2182:17-2183:3 (Kapus).

- $688,782 for SAFSTOR Maintenance; however, some portion of this cost supports the fossil operations and no separate identification has been made by PG&E. Tr. 2188:17-2189:2 (Kapus).

- $119,154 for dry active waste in 2004. This amount represents disposal of waste that had been stored on site for a period of years; however, Mr. Kapus was unable to identify how long the dry active waste included in this shipment had been on site. Tr. 2187:5-20 (Kapus).

- $3,354,476 for "Operate HBPP SAFSTOR;" however, some portion of this cost supports the fossil operation and no separate identification has been made by PG&E. Tr. 2201:12-18 (Kapus).

Additionally, PG&E has claimed $7,750,232 for security costs from 1999 to 2004. However, in 2005, a decision was made to allocate a portion of total security costs at HBPP to fossil operations because PG&E forecasted that a component of security was related to the fossil facility. Tr. 2195:4-2196:6 (Kapus). For 2005, Mr. Kapus estimated that the fossil security component of the total security costs was approximately in the $400,000-$500,000. Tr. 2198:22-25 (Kapus). This estimate was based upon the number of guards (three to four) that are involved in badging everyone who comes into the HBPP site. Tr. 2199:1-8 (Kapus). However, prior to 2005, no separate accounting was made for fossil security. Tr. 2200:20-24 (Kapus). In years prior to 2005, Mr. Kapus testified his estimate for 2005 could be de-escalated in prior years

to arrive at approximately $300,000 per year from 1999 through 2004 for the industrial security. Tr. 2200:10-19 (Kapus). Indeed, Mr. Kapus believes that there should have been an allocation of the total security costs to the fossil operation in each year prior to 2005. Tr. 2198:14-21 (Kapus). PG&E's damages claim should be reduced to reflect these non-incremental costs.

## V. PG&E FAILED TO ESTABLISH THAT CERTAIN OF ITS CLAIMED DAMAGES WERE FORESEEABLE

In assessing whether particular damages are reasonably foreseeable, the Federal Circuit has held that both the type and magnitude of damages must be foreseeable at the time of contracting. See Landmark Land Co. v. United States, 256 F.3d 1365, 1378 (Fed. Cir. 2001) (citing 5 Arthur Corbin, Corbin on Contracts, § 1012, at 88 (1964); and Restatement (Second) of Contracts § 351, cmt. a); see also Wells Fargo, 88 F.3d at 1024-25; Prudential Ins. Co. v. United States, 801 F.2d 1295 (Fed. Cir. 1986).

PG&E failed to meet its burden of proving that certain of its claimed damages were reasonably foreseeable at the time of contract formation. Specifically, PG&E failed to established that the dual-purpose canisters and casks that it plans to load at HBPP were foreseeable at the time of contracting. In SMUD, 70 Fed. Cl. 332 (2005), the Court recently denied damages associated with a dual-purpose dry storage facility upon the grounds that the activities were not foreseeable at the time of contracting. Id. at 373-74. The Court's conclusion should apply with equal force here. PG&E failed to demonstrate that its costs associated with the pursuit of dual-purpose dry storage were reasonably foreseeable in 1983 with respect to either the type or magnitude of the costs. The evidence demonstrates that dual-purpose dry storage did not exist in 1983 and was not licensed and available for use until the mid-1990s. Tr. 989:20-990:2, 1021:19-22, 1212:24-1213:2 (Womack); PX 721 (PHBP0091661). Indeed,

PG&E claims that the reason it did not pursue dry storage earlier was because the technology did not exist in the early 1990s. Tr. 1212:3-9 (Womack). PG&E also failed to demonstrate that the magnitude of costs associated with dual-purpose dry storage were foreseeable in 1983. Designations from Deposition of David Duke at 36:4-15; PX 721 (PHBP0091648).[20] Consequently, PG&E should not be allowed to recover the costs associated with the pursuit of dual-purpose dry storage.

## VI. PG&E MUST PROVE ITS DAMAGES WITH REASONABLE CERTAINTY

PG&E failed to meet its burden of establishing reasonable certainty with respect to its claimed damages. Wells Fargo, 88 F.3d at 1023; see Restatement (Second) of Contracts § 352 cmt. a ("[a] party cannot recover damages for breach of a contract for loss beyond the amount that the evidence permits to be established with reasonable certainty"). "Failure to put into evidence all the proof necessary for sustaining a judgment is generally fatal." Rochez Brothers, Inc. v. Rhoades, 527 F.2d 891, 894 (3d Cir. 1975) (explaining that plaintiff failed to place into evidence all the necessary elements for an accurate determination of damages). As discussed above, PG&E has the burden to prove a plausible "but for" world. See Bluebonnet, 67 Fed. Cl. at 238-39; Coast Fed. Bank, 48 Fed. Cl. at 403 n.25; Glendale Fed. Bank, 239 F.3d at 1380. Yet, as discussed above, PG&E has completely ignored its obligation to define the "but for" world and, instead, seeks to hold the Government strictly liable for its delay in SNF acceptance. PG&E's failure to prove a contractually required rate and schedule of SNF acceptance and associated "fuel out" dates, its failure to account for the presence of GTCC low-level radioactive

[20] Dual purpose casks are licensed for transportation and storage. The Standard Contract requires that DOE provide transportation casks to the utilities. PX 54 (PDCP0013030).

waste and failed fuel, its inability to explain why certain of its overhead labor charges constituted incremental costs, and its failure to account for loading costs it would have incurred in the "but for" world, among other significant deficiencies, renders PG&E's damages claim too uncertain to allow for an award of damages.

## VII. PG&E FAILED TO MITIGATE ITS DAMAGES

### A. PG&E Had An Obligation To Mitigate Damages

Even if PG&E satisfies its burden of proving causation, foreseeability, and reasonable certainty for any of its categories of costs, the general rule in any damages claim is that "a party cannot recover damages for loss that he could have avoided by reasonable efforts." Robinson v. United States, 305 F.3d 1330, 1333 (Fed. Cir. 2002) (quoting Restatement (Second) of Contracts § 350, cmt. b) (emphasis in original). To determine whether an attempt at mitigation was appropriate, courts consider whether a reasonable person, in light of the known facts and circumstances, would have taken steps to avoid certain damages. Koby v. United States, 53 Fed. Cl. 493, 497 (2002); Ketchikan Pulp Co. v. United States, 20 Cl. Ct. 164, 166 (1990).

"[T]he law does not permit an injured party to stand idly by, accumulating damages, when certain obvious, reasonable steps, if taken, would have greatly reduced the damages." Shea-S&M Ball v. Massman-Kiewit-Early, 606 F.2d 1245, 1249 (D.C. Cir 1979). If the non-breaching party does not act reasonably to mitigate damages, that party cannot recover costs that could have been avoided by reasonable mitigation. Midwest Indus. Painting of Fla., Inc. v. United States, 4 Cl. Ct. 124, 133 (1983); Cambridge Plating Co., Inc. v. Napco, Inc., 85 F.3d 752, 772 (1st Cir. 1996). Courts determine reasonable mitigation by examining the circumstances known by the parties at the time the problem was presented. In re Kellett Aircraft

Corp., 186 F.2d 197, 198 (3d Cir. 1950); Koby, 53 Fed. Cl. at 497 (quoting In re Kellet). In that analysis, courts often will look to whether the non-breaching party unreasonably delayed its mitigation efforts. See, e.g., Ketchikan Pulp Co., 20 Cl. Ct. at 166; Int'l Fidelity Ins. Co. v. United States, 25 Cl. Ct. 469, 480 (1992); Goldberger Foods, Inc. v. United States, 23 Cl. Ct. 295, 313 (1991). If a non-breaching party has an available method of mitigating damages and that party unreasonably delays those efforts, courts have reduced the damages awarded to that party. See, e.g., Cambridge Plating,85 F.3d at 772-73.

B. The HBPP ISFSI Met With Repeated, Unexplained, And Costly Delay

Even viewing the HBPP ISFSI as mitigation, PG&E's implementation of that ISFSI project was unreasonable and wholly failed to mitigate damages. From the beginning, PG&E understood that the cost savings that allegedly would be realized through the construction of the ISFSI were tied directly to the speed at which the ISFSI came on-line and SAFSTOR operations and maintenance ("O&M") costs were eliminated. Tr. 1259:15-1260:2 (Womack); DX 374 (PHBP0023381). Mr. Kapus acknowledged that PG&E's ratepayers would benefit from earlier implementation of the HBPP ISFSI than currently scheduled. Tr. 2276:1-18 (Kapus). In fact, Professor Cornell testified that, from an economics perspective, PG&E had an obligation to move its SNF to dry storage as soon as it was technically feasible and safe to do so. Tr. 2411:5-21 (Cornell). PG&E clearly failed in that obligation.

Under Indiana Michigan, PG&E was obligated to begin mitigating any alleged damages in May 1994. Indiana Michigan, 422 F.3d at 1375. However, PG&E undertook no action to mitigate its damages at HBPP until 1998. Tr. 2206:1-3; 2216:1-2218:12 (Kapus); PX428; PX431. In fact, the only costs that pre-date 1998 involve PG&E's "investigation" of SNF

storage options for DCPP and contributions to PFS efforts. Tr. 2164:19-2167:11, 2219:13-2220:2 (Kapus); PX 430 (PDCP0045175); PX 433 (PPGE0070248). PG&E neither sought nor spent any funds until 1998 on the actual development of either ISFSI project. Tr. 2150:22-2151:19; 2206:1-3 (Kapus); PX428 (PDCP0045176); PX431 (PHBP0091637). Under the current schedule for the HBPP ISFSI, more than 15 years will pass between PG&E's duty to mitigate and the implementation of the five cask ISFSI. For each year of delay, any savings in O&M costs between dry storage and wet storage go unrealized. Tr. 2271:7-20 (Kapus).

In 1998, PG&E began to develop schedules for the two ISFSI projects. Tr. 1310:1-1314:6, 1314:16-1318:22, 1319:1-1321:11, 1325:24-1329:25, 1331:1-1333:12 (Womack); DX470 (PHBP0006282-287); DX475 (PDCP0004641); DX477 (PHBP0028730); DX483 (PHBP0058889-891). These early schedules planned for the two ISFSIs to be developed, in large part, on parallel tracks with concurrent activities, although the HBPP ISFSI would be completed prior to the DCPP ISFSI. Tr. 2269:13-2270:13, 2274:25-2275:9 (Kapus); Tr. 1617:13-1622:13, 1628:13-1635:16 (Willis); DX547 (PHBP0008987-988); DX547A (PHBP0011705-706); DX 559 (PHBP0007307). Substantive activities related to ISFSIs did not begin until 1999. Tr. 1887:23-1889:22 (Strickland); DX 525 (PDCP0005356); Tr.1060:2-1061:13 (Womack); PX 284 (PDCP0003658-667).

In March 1998, PG&E requested $7 million to the CPUC for the licensing and design of the HBPP ISFSI. Tr. 1344:9-18 (Womack). Because PG&E "fully expected" that the CPUC would approve its $7 million request, it approved $2 million in expenditures prior to the CPUC approval. Tr. 1781:1-25, 1783:1-1784:11 (Rueger); DX579 (PDCP0004698). In April 1999, PG&E issued a HBPP ISFSI project charter which reflected plans to complete loading of the

ISFSI by 2003. Tr. 1628:13-1635:18 (Willis); DX559 (PHBP0007307). PG&E determined that it needed immediately to start certain activities, such as the seismic hazard analysis, to minimize the impact on the planned schedule. Tr. 1634:11-1635:12 (Willis). Ultimately, work on the seismic hazard analysis was delayed as PG&E's Geosciences Department turned its attention to DCPP in the 1999 time frame. The internal job estimate for the expenditure of up to $7 million was authorized in June 1999. Tr.1625:12-1628:5 (Willis); DX550 (PHBP0029303).

Even after the authorization was obtained, PG&E delayed in implementing the project charter. See Tr. 1083:9-18 (Womack); Tr. 1669:15-1670:12 (Willis); DX 831 (PPGE0056518). In 1999, PG&E slowed down funding and directed that all work on non-RFP activities cease until further notice. Tr. 1638:8-25 (Willis); DX590 (PHBP0007251). By early 2000, the HBPP ISFSI project was effectively halted pending additional CPUC funding. Tr. 1670:6-16 (Willis); DX831 (PPGE0056518). When the project was halted, PG&E already had received approval for $7 million, yet only had expended about $3 million on the project. Id.; Tr. 2205:20 (Kapus); PX 431 (PHBP0091637). As of the end of 2004, PG&E still had not spent the entire $10.5 million authorized by the CPUC. Tr. 2205:20-2207:15 (Kapus).

In March 2001, PG&E requested an additional $3.5 million from the CPUC, which was approved in October 2001. Tr.1345:11-24 (Womack); Tr. 1644:22-1648:9 (Willis); DX713 (PPGE0057447, 455-457); see also Tr. 1647:3-1648:9 (Willis) (2003 loading date); DX 713 (PPGE0057455-7457). However, PG&E faced continuing delays as a result of the priority allocation of resources to DCPP and funding issues. Tr. 2269:13-2270:13 (Kapus); Tr. 1668:20-1671:12, 1650:18-1652:13, 1661:15-1665:14 (Willis); DX831 (PPGE0056518); DX787 (PHBP0032600). From 2001 through 2002, PG&E's expenditures for the HBPP ISFSI totaled

approximately $500,000, while, during that same time, PG&E spent almost $14 million upon the DCPP ISFSI. Tr. 2206:1-2208:15, 2216:2-2218:12 (Kapus). The number of labor hours expended on the ISFSI projects reflected a similar disparity. Tr.2220:18-2221:9 (Kapus).

In August 2001, PG&E held a "wake up Humboldt ISFSI project" meeting to restart work on the project. Tr. 1648:22-1650:16; 1650:18-1652:13 (Willis); DX744 (PHBP0032599). However, the HBPP ISFSI project still failed to make progress, and in November 2001, PG&E held a "kickoff meeting" in another effort to restart the project. Tr. 1653:18-1656:25 (Willis); DX765 (PHBP0033712). In April 2002, PG&E held a third meeting to "restart" the HBPP ISFSI project. Tr. 1665:21-1668:7 (Willis); DX815 (PHBP0033285). PG&E still had not completed the seismic hazard analysis, and recognized that the "biggest issue" regarding Geosciences' completion of the analysis were time and manpower conflicts with the continuing DCPP ISFSI project. Id.; Tr. 1663:5-1665:11; 1666:22-1668:7 (Willis). Notably, as of 2002, PG&E could have had an operational ISFSI at HBPP by 2006 (as set forth in its decommissioning studies) had resources been re-directed from DCPP to support the HBPP ISFSI.[21] Tr. 2242:18-2243:24 (Kapus). In December 2003, PG&E filed its Part 72 licensing application with the NRC for HBPP (Tr.1110:20-1111:10; 1322:16-19 (Womack)), and in July 2004, filed its Part 50 license amendment application. Id. By May 2004, PG&E's schedule to load the HBPP ISFSI had slipped to late 2009. Tr. 1672:15-1674:1; 1675:3-6 (Willis); DX 641 (PHBP0005747). The NRC granted the HBPP Part 72 and Part 50 licenses in November and December 2005,

[21] In 2002, PG&E decided to license rack additions for DCPP's two wet pools that would expand the life of the wet pools by three years each. In addition to charging the Government for these rack additions, PG&E failed to utilize the additional space by reallocating resources to the HBPP ISFSI to achieve loading in 2006. PG&E's actions result in substantially higher damages than had PG&E simply left the HBPP SNF in SAFSTOR and focused exclusively on DCPP.

respectively (Tr. 1674:20-23 (Willis)), more quickly than PG&E planned in its original schedules. See DX559 (PHBP0007307). In 2006, PG&E released Holtec to procure materials needed to fabricate the Hi-Star casks and canisters for HBPP. Tr. 1676:6-18 (Willis). Given the lead time required for the fabrication and delivery of all five Hi-Star casks from Holtec to HBPP, PG&E will not complete the loading of the HBPP ISFSI until at least 2009. Tr. 1675:3-1677:18 (Willis); DX 641 (PHBP0005747).

The delays in the HBPP ISFSI project were due entirely to PG&E's own choices. PG&E was aware of the asserted mitigative qualities of the ISFSI and failed in all material respects timely to implement it. The delay comes at a significant cost to the Government if we are ordered to pay for the continuing SAFSTOR costs and for the ISFSI costs. PG&E's actions render any alleged mitigation unreasonable.[22]

C. The DCPP ISFSI Likewise Suffered From Delay

In March 1999, PG&E's Management Committee approved the initial design and license preparation phase of the DCPP ISFSI project. Tr.1060:2-1063:17 (Womack); PX284 (PDCP0003658-3660). PG&E's original schedule called for the first casks to be loaded by mid-2005, almost 18 months prior to the anticipated loss of full core reserve. Tr. 1617:13-1622:13

[22] PG&E's explanation for its failure to account for "but for" loading costs, offered through Professor Cornell, also counsels against a finding that the HBPP ISFSI constitutes reasonable mitigation. PG&E asserts that, in the future, it is possible that DOE will require the SNF to be offloaded from the transportation casks and canisters for direct placement in DOE shipping casks. Tr. 2403:20-2407:25 (Cornell). If correct, and given the planned dismantlement of the wet pool, future loading costs could be extreme and would, in all likelihood, render any mitigative qualities of the ISFSI moot. PG&E should not be allowed to argue that its ISFSI (and decision to load transportable casks and canisters) constitutes proper mitigation, on the one hand, while arguing on the other hand that future loading costs from that ISFSI may be substantial because DOE might not accept those casks.

(Willis); DX547 (PHBP0008988); DX547A (PHBP0011706); Tr.1062:7-1064:3, 1069:1-1070:11 (Womack); PX 284 (PDCP0003658-3660); PX649 (PDCP0003712). Nearly 17 months passed after the Management Committee approval before PG&E finally reached agreement with Holtec to start licensing support work for PG&E. Tr.1084:24-1085:1 (Womack); Tr.1890:15-1893:16 (Strickland); DX 682 (PPGE0053771). By early 2001, PG&E's plan to submit its Part 72 license application had slipped. Tr.1897:7-1899:12, 1900:16-1901:16, 1904:3-1906:7 (Strickland); DX 0003.11 (PHBP0052573); DX0003.13 (PDCP0026571); DX0003.22 (PHBP0052549). PG&E's efforts to complete the license application further were delayed by PG&E's bankruptcy in 2001. Tr.1906:12-1907:15 (Strickland); DX 3.37 (PDCP0026612). Additionally, errors in the site investigation, conducted by the Geosciences Department, resulted in cost and schedule impacts to the DCPP ISFSI project. Tr.1907:16-1908:12, 1912:24-1913:13 (Strickland); DX 684.03 (PHBP0072108); DX 3.37 (PDCP0026612). The geosciences work was the "critical path" for the completion of the Part 72 license application, and delayed the planned submission of the Part 72 license application until December 2001. Tr. 1913:21-1916:12 (Strickland); DX 3.38 (PHBP0052546).[23] The NRC granted the Part 50 license amendment in November 2003, and approved the Part 72 license in March 2004 following hearings and a technical review (which were held in parallel). Tr. 1095:19-1096:22 (Womack). The NRC review and the related hearings for the Part 72 license were completed in slightly over

---

[23] In August 2002, PG&E began to explore contingency plans for additional SNF storage at DCPP to maintain FCR. Tr. 1118:18-1121:16 (Womack); PX362 (PDCP0017848); Tr.1867:22-1868:10; 1917:25-1919:13 (Strickland). PG&E decided to pursue temporary cask pit racks for each of its units, which would allow DCPP to operate Unit 1 with FCR through 2010 and to operate Unit 2 through 2011. Tr. 1094:18-1095:15, Tr. 1123:2-10 (Womack); PX365 (PDCP0009119-9124). At the time of trial, PG&E planned to install both the racks by October 2006, at a total cost of $7.7 million. Tr. 1868:13-24 (Strickland); Tr. 2259:4-25 (Kapus).

two years, very close in duration to PG&E's original schedule. Tr. 1617:13-1622:13 (Willis); DX547 (PHBP0008988); DX547A (PHBP0011706). Had the DCPP ISFSI proceeded even close to its original schedule, the additional expenses associated with the cask pit racks would have been unnecessary. Those costs should be denied.

## VIII. PG&E MAY NOT RECOVER COSTS ASSOCIATED WITH PRIVATE FUEL STORAGE

PG&E is seeking to recover approximately $900,000 in costs associated with its participation in Private Fuel Storage ("PFS"). PX 433 (PPGE0070248). PFS was a limited liability company formed by several nuclear utilities to explore alternative options for SNF storage. Tr. 106:16-21 (Warner). PG&E actively participated in the initial stages of PFS in the early-to-mid 1990s, but ultimately discontinued its contribution to PFS in late 1995 or early 1996. Tr. 107:1-108:12 (Warner); Tr. 1414:19-24 (Stock).

As a matter of law, the Federal Circuit's Indiana Michigan decision precludes recovery of PG&E's contributions in PFS:

> The credited evidence also showed that the utility's investment in the private storage facility was speculative and that the high cost of the venture was unforeseeable. * * * While DOE should have foreseen that its breach would force Indiana Michigan to find alternate storage for its SNF, it is not liable for such a speculative venture and unforeseeable costs.

Indiana Michigan, 422 F.3d at 1376. Because foreseeability is measured from the perspective of the defendant, and given that Indiana Michigan's contract with DOE is materially identical to the contract at issue here, Indiana Michigan is dispositive of PG&E's claim for costs associated with PFS. Indeed, PG&E presented absolutely no evidence that PFS was reasonably foreseeable at the time of contracting. See Landmark Land, 256 F.3d at 1378.

Likewise, the Federal Circuit's conclusion that the PFS effort was "speculative" should bar any claim for those costs here. The evidence at trial supports the conclusion that PG&E's PFS investment was a speculative investment in a venture with no real chance of resolving PG&E's SNF storage concerns. PG&E had concerns that, with public opposition to PFS in Utah, PFS would not be licensed in time to meet PG&E's storage needs. Tr. 108:23-109:2 (Warner); Tr. 1230:3-1231:3 (Womack); PX 228 (PDCP0016153). PG&E's contemporaneous documents reflect its belief that PFS had a low probability of ultimate success. Tr. 1258:4-11 (Womack); DX 366 (PHBP0029950). In fact, PG&E identified significant obstacles and disadvantages to participating in PFS. Tr. 109:3-23 (Warner); Tr. 1443:7-1444:8 (Stock); Tr. 1226:12-1227:3 (Womack); PX 228 (PDCP0016194). These hurdles included community concerns about transporting SNF out of California, opposition from the State of Utah, and negative public reaction. Tr. 109:11-23 (Warner); Tr. 1229:17-23, 1257:18-1258:3 (Womack); DX 366 (PHBP0029955) (noting disadvantage of participating in PFS included the fact that ownership of the SNF remained with the plant operator, transportation of fuel will be controversial, and participation costs may be high, "with considerable uncertainty over the eventual success of the project."). PG&E also recognized that licensing of a PFS facility would be particularly contentious. PX 228 (PDCP0016193). As a result of the uncertainty surround PFS, PG&E staff recommended to management that PFS not be pursued as an off-site storage option (Tr. 1256:22-1257:17 (Womack); DX 366 (PHBP0029950).[24]

[24] Notably, rather than participate in PFS because of the belief that the Government was in breach of its obligations, PG&E participated in PFS as a contingency to lack of performance and to other on-site storage expansion options. Tr. 107:8-23 (Warner); Tr. 1413:19-1414:10 (Stock); PX 208 (PPGE0014520). The reason that PG&E ultimately stopped contributing to PFS was its belief that it could obtain the same benefit from PFS as a customer as it could from being

Outside of the dispositive precedent and facts precluding recovery for PFS, PFS did not constitute reasonable mitigation. From a cost perspective, PFS was a significantly more expensive option than the dry storage option that PG&E ultimately pursued. Tr. 1432:24-1433:6, 1436:15-1437:17 (Stock); PX 228 (PDCP0016194); DX 258 (SN179014). Further, the PFS figures were potentially lower than actually would be realized, given PG&E's ability to earn a return on its investment in PFS. PX 208 (PPGE0014520); Tr. 1433:25-1435:12 (Stock). Consistent with Indiana Michigan, these costs should be denied.

## CONCLUSION

For the reasons outlined above, the Government respectfully requests that the Court enter judgment in the Government's favor.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/ Harold D. Lester, Jr.
HAROLD D. LESTER, JR.
Assistant Director

an equity participant. Tr.108:13-18 (Warner). In other words, PG&E could have taken advantage of PFS without its monetary contribution. Tr.108:19-22 (Warner).

OF COUNSEL:

JANE K. TAYLOR
Office of General Counsel
U.S. Department of Energy
1000 Independence Ave., S.W.
Washington, D.C. 20585

SCOTT R. DAMELIN
JOSHUA E. GARDNER
ALAN J. LO RE
SHARON SNYDER
Civil Division
Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530

June 30, 2006

s/John C. Ekman
JOHN C. EKMAN
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, NW
Washington, D.C. 20530
Tel: (202) 353-0897
Fax: (202) 307-2503

Attorneys for Defendant

CERTIFICATE OF FILING

I hereby certify that on this 30th day of June, 2006, a copy of foregoing "DEFENDANT'S POST-TRIAL BRIEF" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ John C. Ekman