No. 04-0074C, into which has been
consolidated No. 04-0075C
(Judge Hewitt)

IN THE UNITED STATES COURT OF THE FEDERAL CLAIMS

PACIFIC GAS & ELECTRIC COMPANY,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

# DEFENDANT'S RESPONSE TO PLAINTIFF'S POST-TRIAL BRIEF

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

HAROLD D. LESTER, JR.
Assistant Director

JOHN C. EKMAN
Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street N.W.
Washington, DC 20530
Tele: (202) 353-0897
Fax: (202) 307-2503

Attorneys for Defendant

OF COUNSEL:

JANE K. TAYLOR
Office of General Counsel
U.S. Department of Energy
1000 Independence Ave., S.W.
Washington, D.C. 20585

ALAN J. LO RE
Senior Trial Counsel

SCOTT R. DAMELIN
JOSHUA E. GARDNER
SHARON A. SNYDER
HEIDE L. HERRMANN
MARIAN SULLIVAN

Trial Counsel

July 7, 2006

**TABLE OF CONTENTS**

PAGE(S)

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

I. PG&E'S ASSERTION OF A BRIGHT-LINE ACCEPTANCE OBLIGATION IS CONTRADICTED BY THE EVIDENCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

A. PG&E's Cited Evidence Does Not Support Its Assertions . . . . . . . . . . . . 2

B. The Standard Contract Does Not Obligate DOE To Satisfy PG&E's Purported Acceptance Obligation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

C. DOE's Understanding Of Its Obligations Under The Standard Contract Has Remained Consistent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

II. PG&E'S ARGUMENTS VIOLATE ESTABLISHED LEGAL PRINCIPLES AND ARE CONTRADICTED BY ITS OWN CLAIM . . . . . . . . . . . . . . . . . . . 11

III. PG&E'S RELIANCE UPON EXCHANGES IS UNSUPPORTED BY THE RECORD AND CONTRADICTS ITS LEGAL THEORIES . . . . . . . . . . . . . . . 13

IV. PG&E FAILED TO ESTABLISH THAT GTCC IS COVERED BY THE STANDARD CONTRACT OR THAT IT WOULD HAVE BEEN ACCEPTED WITH PG&E'S SNF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

V. PG&E'S DAMAGES CLAIM SHOULD BE REJECTED FOR ADDITIONAL REASONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

VI. PG&E'S REQUEST THAT THE COURT RETAIN JURISDICTION OVER THIS CASE AFTER IT ISSUES A FINAL JUDGMENT IS BASELESS . . . . 19

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

# TABLE OF AUTHORITIES

## CASES

PAGE(S)

Barseback Kraft AB v. United States,
121 F.3d 1475 (Fed. Cir. 1997) . . . . . . . . . . 4

Bituminous Trucking & Equipment Co., Inc. v. Delta Air Lines, Inc.,
189 F.2d 307 (7th Cir. 1951) . . . . . . . . . . 11

California Sand & Gravel, Inc. v. United States,
22 Cl. Ct. 19 (1990), aff'd, 937 F.2d 624 (Fed. Cir. 1991) . . . . . . . . . . 12

Cities Services Helex, Inc. v. United States National Helium Corp.,
543 F.2d 1306 (Ct. Cl. 1976) . . . . . . . . . . 11

Hartford Underwriters Insurance Co. v. Union Planters Bank,
530 U.S. 1 (2000) . . . . . . . . . . 2, 3

Indiana Michigan Power Co. v. Department of Energy,
88 F. 3d 1272 (D.C. Cir. 1996) . . . . . . . . . . 7

Indiana Michigan Power Co. v. United States,
422 F.3d 1369 (Fed. Cir. 2005) . . . . . . . . . . 20

Lyon Development Co. v. Business Men's Assurance Co.,
76 F.3d 1118 (10th Cir. 1996) . . . . . . . . . . 8

Mudge v. United States,
308 F.3d 1220 (Fed. Cir. 2002) . . . . . . . . . . 3

National By-Prods., Inc. v. United States,
186 Ct. Cl. 546, 405 F.2d 1256 (1969) . . . . . . . . . . 4

Pacific Gas & Electric Co. v. United States,
70 Fed. Cl. 758 (2006) . . . . . . . . . . 20

Sacramento Municipal Utility District v. United States,
70 Fed. Cl. 332 (2006) . . . . . . . . . . 15

**TABLE OF AUTHORITIES (cont'd)**

PAGE(S)

San Carlos Irrigation & Drainage Dist. v. United States,
111 F.3d 1557 (Fed. Cir. 1997) . . . . . . . . . . 15

Selman v. United States,
204 Ct. Cl. 675 (1974) . . . . . . . . . . 3

Southwestern Elec. Coop., Inc. v. Federal Energy Regulatory Commission
347 F.3d 975 (D.C. Cir. 2003) . . . . . . . . . . 8

The Federal Group v. United States,
67 Fed. Cl. 87 (2005) . . . . . . . . . . 4

**STATUTES**

42 U.S.C. § 10131 . . . . . . . . . . 3

42 U.S.C. § 10222(a)(5) . . . . . . . . . . 3

# INDEX TO APPENDIX

OBJECTIONS TO PACIFIC GAS & ELECTRIC COMPANY'S
DESIGNATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A.1-A.3

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| PACIFIC GAS & ELECTRIC COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES,<br><br>Defendant. | ) | No. 04-0074C into which has been consolidated No. 04-0075C (Judge Hewitt) |

DEFENDANT'S RESPONSE TO PLAINTIFF'S POST-TRIAL BRIEF

Pursuant to this Court's order dated May 25, 2006, defendant, the United States, respectfully submits the following response to the post-trial brief that plaintiff, Pacific Gas & Electric Company ("PG&E"), filed on June 30, 2006.

SUMMARY OF ARGUMENT

Based upon the arguments set forth in PG&E's brief, it is apparent that PG&E's claim rises and falls entirely upon this Court's decision concerning the alleged existence of a statutory and contractual obligation that requires the Department of Energy ("DOE") to accept spent nuclear fuel ("SNF") at a rate that precludes additional at-reactor storage costs after January 31, 1998. The only "but for" world that PG&E has even attempted to construct is one in which DOE is responsible for every post-January 31, 1998 cost that PG&E might incur. This "obligation" finds no support in the plain language of the Nuclear Waste Policy Act ("NWPA") or the Standard Contract. In fact, this purported obligation does not exist in documents pre-dating the execution of the Standard Contract, and DOE rejected the inclusion of any rate obligation at the time of contracting. If the Court finds, consistent with the evidence, that PG&E has failed to meet its burden of proving the existence of this statutory and contractual obligation, PG&E's

decision to rely exclusively upon this theory of liability and causation is fatal to PG&E's claim as a whole.

## ARGUMENT

### I. PG&E'S ASSERTION OF A BRIGHT-LINE ACCEPTANCE OBLIGATION IS CONTRADICTED BY THE EVIDENCE

#### A. PG&E's Cited Evidence Does Not Support Its Assertions

At trial, we established that neither the NWPA nor the Standard Contract obligated DOE to accept SNF at a predetermined rate of acceptance or in a manner that satisfies an alleged qualitative obligation tied to additional at-reactor storage after January 31, 1998. Defendant's Post-Trial Brief ("Def. Br.") 7-9. However, PG&E's entire claim rests upon this Court's acceptance of a fixed obligation tied to the elimination of additional at-reactor storage costs after January 31, 1998. Plaintiff's Post-Trial Brief ("Pl. Br.") 6. Specifically, PG&E argues that, at the time of the passage of the NWPA, there was an "understanding" that "January 31, 1998 would be a point of demarcation between utility and federal financial responsibility for spent fuel storage and disposition costs." Id. PG&E then argues that the Standard Contract reflected this "understanding" by imposing upon DOE the obligation to eliminate additional at-reactor storage costs after that date. Id. Yet, PG&E does not, and cannot, point to a term in the NWPA or the Standard Contract that reflects this obligation. Upon examination, PG&E's assertions regarding the NWPA misstate the evidence and violate basic tenants of statutory interpretation.

When performing an analysis of statutory construction, the Court should examine the plain language of the statute and should look outside the four corners of the statute to examine legislative intent only if the statutory language is ambiguous. Hartford Underwriters Ins. Co. v. Union Planters Bank, 530 U.S. 1, 6 (2000). If the text of the statute is clear, the Court's inquiry

ends. Id. Here, PG&E failed to point to any ambiguous language in the NWPA that would justify reliance upon legislative history. In fact, PG&E's assertion that January 31, 1998, constituted a clear "point of demarcation" demonstrates its apparent belief that there is no ambiguity in the NWPA. Accordingly, there is no need to examine the legislative history to determine whether the statute included the "point of demarcation" that PG&E now advocates.

PG&E's reliance upon testimony to explain congressional intent in promulgating the NWPA also is improper. PG&E's sole basis for the "understanding" or "intent" of Congress is the testimony of Messrs. Mills and Warner. Pl. Br. 5, 6, 12. PG&E's reliance upon Messrs. Mills and Warner to establish the intent of Congress is improper. See Mudge v. United States, 308 F.3d 1220, 1230 (Fed. Cir. 2002); Selman v. United States, 204 Ct. Cl. 675, 685 n.6 (1974). Instead, this Court should be guided by the plain and unambiguous language of the NWPA.

In any event, the NWPA did not obligate DOE to accept SNF at any particular rate of acceptance. 42 U.S.C. § 10222(a)(5); Def. Br. 7-9. In fact, PG&E concedes that the NWPA did not set forth specific terms regarding the rate of acceptance. Pl. Br. 6. This concession is fatal to PG&E's claim. PG&E asks this Court to find that, although the NWPA imposes no specific rate of acceptance, it nevertheless obligated DOE to perform at a rate sufficient to eliminate additional at-reactor storage costs after January 31, 1998. However, the purpose of the NWPA was to protect the public health and safety, 42 U.S.C. § 10131, not to protect commercial utilities' financial profits. Had Congress intended the statute to include such a bright-line obligation for the benefit of utilities, it would have included the obligation in the statute, as it did the January 31, 1998, commencement date. Accordingly, PG&E's request that the Court insert such a requirement into the NWPA should be rejected.

In support of its assertion that the NWPA subjected DOE to a bright-line obligation tied to post-January 31, 1998 storage costs, PG&E points to several pieces of evidence, none of which support PG&E's assertion. First, PG&E points to language in the 1983 draft Mission Plan. Pl. Br. 6. The language in the draft Mission Plan, which PG&E did not discuss with a witness at trial, simply sets forth a goal of DOE, not a statutory or contractual requirement. A statement of intent or an aspirational goal is plainly distinct from a contractual obligation. Barseback Kraft AB v. United States, 121 F.3d 1475, 1481 (Fed. Cir. 1997); The Federal Group v. United States, 67 Fed. Cl. 87, 103-04 (2005); National By-Prods., Inc. v. United States, 186 Ct. Cl. 546, 558-59, 405 F.2d 1256, 1263 (1969). Further, the language to which PG&E refers was not included in the Mission Plan submitted to Congress in 1985. PX 82 (HQ05288).

Second, PG&E cites the statement of Mr. Morgan at a December 1983 Office Of Civilian Radioactive Waste Management meeting. Pl. Br. 6. In that document, Mr. Morgan simply discusses DOE's "basic strategy" regarding acceptance as of late-1983. Indeed, Mr. Morgan concludes his statement by making clear that, although DOE's basic strategy is to have a repository operational by 1998, because of the many uncertainties surrounding the waste acceptance program, DOE would seek congressional approval to begin acceptance at a Monitored Retrievable Storage ("MRS") facility so that DOE "will be able to comply with the law – to begin accepting waste in 1998."[1] PX 61 (SN069900). Third, PG&E cites to a document in which Michael Lawrence, then-director of OCRWM, discusses DOE's Mission Plan. Pl. Br. 6 (PX 62). In that document, however, Mr. Lawrence simply acknowledges that the fundamental

[1] The MRS that Mr. Morgan referenced in this speech had an annual throughput rate of 1,800 MTU, far below the rate of acceptance needed to satisfy PG&E's alleged bright-line obligation. PX 60 (SN069685); Tr. 373:6-13 (Mills); Pl. Br. 8.

objective of the NWPA is for DOE to begin waste acceptance by January 31, 1998. PX 62 (PNL173-0228, 0240). Again, this objective is distinct from PG&E's notion of a bright-line rate requirement. Finally, PG&E cites to Mr. Mills' testimony to support its assertion of a bright-line acceptance obligation. Pl. Br. 6. However, Mr. Mills merely testified about what he "thinks, or hopes possibly" the NWPA required. Tr. 145:15-17 (Mills). Mr. Mills' "hopes" cannot substitute for the plain language of the NWPA. Tr. 279:15-281:3 (Mills) (two-part test tied to SNF generation rate and the backlog must be "inferred" from language of NWPA).

B. The Standard Contract Does Not Obligate DOE To Satisfy PG&E's Purported Acceptance Obligation

In its post-trial brief, PG&E argues that "the parties left open the acceptance term in the contract . . . ." Pl. Br. 7. This statement is incorrect, is belied by PG&E's theory of liability, and demonstrates a fundamental misconception of DOE's acceptance obligations under the Standard Contract. As set forth in our post-trial brief, at contract formation, DOE recognized that uncertainties surrounding a waste acceptance program that was to commence 15 years in the future prevented DOE from committing to any particular rate of acceptance. Tr. 2466:22-2468:9 (Morgan). However, DOE's refusal to commit to a rate of acceptance in 1983 did not mean that the terms regarding DOE's acceptance were left open. Instead, the contract included a provision that obligated DOE to begin issuing an Annual Priority Ranking ("APR") and Annual Capacity Report ("ACR"), as the date for commencement of acceptance drew closer, which would define the parties' obligations to deliver and accept SNF. Def. Br. 18. Contrary to PG&E's assertion, the terms surrounding DOE's acceptance obligations were established by the Standard Contract.

PG&E's argument that "the parties intended that no utility would have add additional spent fuel storage capacity after January 31, 1998" (Pl. Br. 8) is illogical and refuted by the

evidence. From a logic perspective, PG&E asks the Court to believe that DOE refused to agree to a particular acceptance rate in the contract, but agreed to include an unwritten bright-line obligation that would require a particular – then unknown – rate of acceptance. However, by rejecting industry suggestions that it commit to <u>any</u> numerical rate or qualitative test beginning in 1998, DOE also was rejecting the notion that acceptance in 1998 would meet the tests referenced by PG&E during this litigation.[2] Tr. 2466:18-2677:2 (Morgan).

From an evidentiary perspective, PG&E's claim also fails. In support of its notion that the Standard Contract somehow obligated DOE to accept financial responsibility for SNF storage as of January 31, 1998, PG&E points to the same evidence cited for its argument that the NWPA established January 31, 1998 as a demarcation line for the assumption of storage costs. Pl. Br. 8. That evidence fails for the same reasons set forth above and in our post-trial brief. In addition, PG&E points to the testimony of Dr. John Bartlett. However, Dr. Bartlett has no basis for discussing what the parties "understood and intended," as he had no involvement in the drafting of the Standard Contract or the NWPA and had no involvement in the Standard Contract prior to becoming director of OCRWM in 1990. Tr. 532:18-25 (Bartlett). Dr. Bartlett acknowledged that, prior to 1990, he could not speak to what individuals thought was going to happen with regard to the Standard Contract (Tr. 533:1-5 (Bartlett)), and admitted that he had never read the Standard Contract prior to the SNF litigation. Tr. 537:16-538:5 (Bartlett). Additionally, Dr. Bartlett stated that, when he discussed an "appropriate" rate of acceptance in his direct testimony, he was not stating that the Standard Contract required such a rate. Tr.

[2] Those tests are that DOE's SNF acceptance rate, as of January 31, 1998, (1) would match the SNF generation rate plus begin to work off the backlog of SNF; or (2) place upon DOE the financial obligation of SNF storage after that date. Pl. Br. 8.

562:17-21 (Bartlett). In fact, Dr. Bartlett admitted that, while he was the Director of OCRWM, he believed that DOE could meet its obligation of accepting SNF by January 31, 1998, at an MRS. DX 151; Tr. 570:12-24 (Bartlett). Dr. Bartlett was responsible for providing utilities with the 1991 APR and ACR, which stated that utilities should base their delivery commitment schedules ("DCSs") upon the allocations contained therein. DX 175; DX 195; Tr. 573:4-574:14, 576:10-577-16 (Bartlett). When Dr. Bartlett published the 1991 ACR, both he and DOE believed the rate reflected in that document was reasonable. Tr. 581:23-583:12 (Bartlett).

PG&E also points to the testimony of Mr. Morgan. However, Mr. Morgan testified that, although DOE had certain goals and hopes for the waste program, the Standard Contract did not impose program aspirations as contract obligations upon DOE. Tr. 2490:21- 2491:15 (Morgan); see Pl. Deposition Designation of R. Milner, 266:23-267:4 (5/8/02).[3] Further, PG&E's citation to a contractor document and testimony upon that document from Mr. Mills fails to advance PG&E's argument. Pl. Br. 8, 22 (citing PX 73). Mr. Mills did not know who wrote the document and had no contact with the author either before or after the document was drafted. Tr. 360:8-361:20, 363:10-18 (Mills). Mr. Mills also admitted that, on its face, the document suggests that, if DOE were responsible for storage costs after 1997, utilities might owe an additional $1 billion into the Nuclear Waste Fund in 1983 dollars. Tr. 416:19- 417:13 (Mills).

Similarly, PG&E's reliance upon Mr. Warner concerning PG&E's "understanding" of the Standard Contract is misplaced. Pl. Br. 6. Mr. Warner was not employed at PG&E until 1988 and did not read the Standard Contract prior to working at PG&E. Tr. 61:16-63:2 (Warner).

---

[3] PG&E's argument that Indiana Michigan Power Co. v. Department of Energy, 88 F.3d 1272 (D.C. Cir. 1996), requires "best efforts" upon the rate of acceptance (Pl. Br. 17) is unsupported, as that decision concerned the date of acceptance and not the rate. Id. at 1276.

Courts have rejected the testimony of witnesses concerning contractual intent who were not involved in contract formation. Southwestern Elec. Cooperative, Inc. v. Federal Energy Reg. Comm'n., 347 F.3d 975, 983 (D.C. Cir. 2003); Lyon Dev. Co. v. Business Men's Assurance Co., 76 F.3d 1118, 1123 (10th Cir. 1996). Further, Mr. Warner's letters to DOE belie any "understanding" of an obligation to accept SNF at a particular rate or under a qualitative obligation. PG&E's 1994 response to DOE's Notice of Inquiry, which Mr. Warner prepared, fails to mention a contractual obligation tied to additional at-reactor storage and advocates for the commencement of SNF acceptance at the MRS, which Mr. Warner unequivocally stated constituted performance under the Standard Contract.[4] DX 282; Tr. 78:23-80:21, 90:17-91:2 (Warner). Similarly, in a March 14, 1997 letter to DOE's contracting officer, Mr. Warner articulated what he believed to be DOE's obligation to commence acceptance of SNF by January 31, 1998, PX 256; Tr. 69:1-14 (Warner), and did not reference any obligation to accept SNF at a rate that would preclude PG&E from incurring costs for additional storage at DCPP or that would facilitate the decommissioning of HBPP. Tr. 73:15-74:4; 76:9-21 (Warner); see PX 263 (August 4, 1997 letter to DOE); Tr. 77:14-24 (Warner). In light of the contemporaneous evidence from Mr. Warner, his litigation-inspired views concerning DOE's obligations should be given little, if any, weight.

Finally, PG&E fails to cite to any documents that pre-date the Standard Contract in support of the alleged acceptance obligation tied to additional at-reactor storage. This failure is

---

[4] PG&E asserts that, but for the 10,000 MTU limit placed upon the MRS, "there would be no reason" for DOE to follow the rate set forth in the 1991 ACR. Pl. Br. 21. The testimony cited by PG&E does not support this proposition. Further, Mr. Kouts testified that there were valid reasons to retain the 10,000 MTU limit. See Def. Br. 18, n.8.

striking, though easily explained. PG&E cannot cite to the administrative record for this obligation because the alleged obligation, and "understanding," tied to additional at-reactor storage after January 31, 1998, does not appear in that record. None of the utilities or their advocacy groups, including EEI, sought the inclusion of the term that PG&E now asks this Court to impose upon DOE. See generally DX 2.01-2.63.

### C. DOE's Understanding Of Its Obligations Under The Standard Contract Has Remained Consistent

In its brief, PG&E asserts that, once DOE experienced delays in the execution of the program, DOE changed its position regarding its contractual obligation relating to a rate of SNF acceptance. Pl. Br. 8, 21. This position is wholly unsupported. Even before the execution of the Standard Contract, DOE recognized that: (1) there were many uncertainties surrounding the program; (2) the performance date of January 31, 1998, was aggressive; and (3) as a result of uncertainties, DOE could not commit to a minimum acceptance obligation until 1991. Tr. 2466:21-2468:9, 2502:21-2503:19 (Morgan); PX 61 (SN069600). Further, when DOE began the process of making firm acceptance commitments in 1991, the waste acceptance program evolved from the program that DOE envisioned in 1983. Def. Br. 15-19. Significantly, however, the parties, including PG&E, expressly understood that, despite iterations of the waste acceptance program, DOE's statutory and contractual obligations focused upon performance as of January 31, 1998, and not upon performance at some particular rate or pursuant to some particular obligation. Def. Br. 19-20. Indeed, the strongest evidence of this fact comes from PG&E itself, which, in its comments to DOE's 1985 Mission Plan, made clear that it understood that DOE's contractual obligation was to begin performance in 1998, not to reach any particular rate of

acceptance or to meet any preordained test by that date. PX 82 (Vol. IV, 596); Tr. 2798:23-2801:5 (Kouts).

In its post-trial brief, PG&E attempts to dismiss more than 10 years of contemporaneous evidence contradicting PG&E's litigation position by arguing that "statements by DOE and utilities regarding expected rates of utility spent fuel acceptance made in or after January 1987 do not accurately reflect the parties' views as to how DOE should have performed absent the breach." Pl. Br. 21. Essentially, PG&E contends that this Court only should consider portions of the period between June 1983 and December 1986 and ignore, in its entirety, the actions of PG&E, EEI, and DOE for the remainder of the developing program thereafter. PG&E should not be allowed to distance itself from its actions, and those of its representatives, so easily.

Both before and after 1987, PG&E repeatedly acted in a manner inconsistent with its current assertion that DOE was contractually obligated to accept SNF at a rate that precluded additional at-reactor storage after January 31, 1998. In and after 1987, PG&E was presented with opportunities to voice its "understanding" regarding DOE's performance obligations or assert that DOE was in breach of those obligations. Yet, PG&E repeatedly failed even to insinuate that DOE was proceeding in breach of its obligations: PG&E never objected to DOE's program reassessment in the late 1980s; PG&E never objected to – and, indeed, actively supported – DOE's pursuit of the MRS; PG&E paid more than $1 million to advance its discharge date reflected in the 1991 APR; PG&E never objected to the 1991 ACR and, without objection, submitted DCSs consistent with that rate;[5] PG&E, when presented with a clear

[5] PG&E's citation to Mr. Pollog's testimony regarding the suspension of the DCS process "to limit liability to contracting utilities," Pl. Br. 22, demonstrates DOE's consistent position that the DCSs constitute binding commitments. Def. Counter-Designation of T. Pollog,

opportunity to assert a breach in 1994, failed to object to the MRS or to the 1991 ACR and demanded performance by 1998; and, PG&E failed, as late as 1997, to argue that DOE was obligated to accept at any particular acceptance rate or consistent with any particular qualitative test.[6] EEI's repeated statements after 1987 which belie the contractual term that PG&E now seeks to impose also should be considered. PG&E's and EEI's contemporaneous conduct should control. Upon examination, it is not DOE which has shifted its position; rather, PG&E, in the context of litigation, has performed an about-face regarding its "understanding" of DOE's performance obligation under the NWPA and the Standard Contract.

## II. PG&E'S ARGUMENTS VIOLATE ESTABLISHED LEGAL PRINCIPLES AND ARE CONTRADICTED BY ITS OWN CLAIM

PG&E contends that the acceptance rate that meets DOE's contractual obligations is the improved performance schedule included in DOE's 1985 Mission Plan whereby "spent fuel acceptance should begin prior to 1998." Pl. Br. 12.[7] In making this argument, PG&E

---

65:15-24 (4/11/02), 91:7-92:18 (4/12/02); Def. Counter-Designation of R. Milner, 391:13-392:17 (5/2/02).

[6] As a matter of law, PG&E arguably has waived its right to argue that the rate contained in the 1991 ACR constituted a breach. Under the doctrine of waiver, if a party to a contract elects, in the face of a material breach, to continue the contract, it results in a loss of the right, "unless the other party assents to its retention by the aggrieved party." Cities Service Helex, Inc. v. United States Nat'l Helium Corp., 543 F.2d 1306, 1313-14 (Ct. Cl. 1976); Bituminous Trucking & Equip. Co., Inc. v. Delta Air Lines, Inc., 189 F.2d 307, 310 (7th Cir. 1951) (citations omitted).

[7] PG&E has failed to prove that any rate would meet the obligation that it asserts was part of the Standard Contract. For example, Mr. Barrett's testimony, cited by PG&E to support the required rate of acceptance to meet its asserted obligation (Pl. Br. 9), does not support the proposition. Further, although devoting several pages of its brief to hypothetical acceptance schedules, PG&E fails to explain how DOE's performance obligations under the Standard Contract could be dictated by the operating decisions of individual utilities that necessarily create a moving performance target. Tr. 2950:12-2951:2, 2955:13-2956:7, 2957:18-2958:7, 2958:17-25 (Pollog).

necessarily asserts that DOE was obligated to begin performance of the Standard Contract prior to January 31, 1998, despite the unequivocal language in both the NWPA and the Standard Contract that DOE's obligation began on January 31, 1998. This position violates the parol evidence rule because it advocates for a contract term that contradicts the express terms of the contract. California Sand & Gravel, Inc. v. United States, 22 Cl. Ct. 19, 25 (1990), aff'd, 937 F.2d 624 (Fed. Cir. 1991); Def. Br. 14-15. Accordingly, the Court should reject PG&E's reliance upon the improved performance schedule included in the 1985 Mission Plan.

PG&E's interpretation of DOE's contractual obligation also would read out of the contract provisions upon which PG&E relies: namely, the exchanges and priority provisions. If DOE was obligated to accept SNF consistent with an obligation to prevent any utility from having to incur additional storage costs after January 31, 1998, Pl. Br. 6, there would be no need for utilities to utilize the exchanges or priority provisions of the Standard Contract to advance their positions in the SNF queue. DOE's performance of its obligations cannot be tied to the independent decisions of utilities to engage in exchanges or to seek priority. Instead, DOE would be required to meet that obligation without third-party cooperation. As a matter of law, the Court should reject PG&E's interpretation of DOE's contractual obligations. See Def. Br. 12.

Finally, PG&E's damages claim belies its assertion that DOE was obligated to eliminate all additional at-reactor storage costs after January 31, 1998. PG&E is not claiming as damages its SAFSTOR costs at Humboldt Bay until 1999. However, under the performance obligation asserted by PG&E, PG&E would not be responsible for its SAFSTOR costs beginning February 1, 1998. The fact that PG&E has not included its 1998 costs as a damage is strong evidence that

even PG&E does not believe that the test which it is advancing in this litigation constitutes an unequivocal obligation.[8]

## III. PG&E'S RELIANCE UPON EXCHANGES IS UNSUPPORTED BY THE RECORD AND CONTRADICTS ITS LEGAL THEORIES

In its brief, PG&E asserts that, because DOE and the utilities recognized that the oldest-fuel-first ("OFF") queue was "inefficient," exchanges of approved DCSs would result in a more efficient DOE waste acceptance program. Pl. Br. 14. However, PG&E failed to meet its burden of proving: (i) that it would have engaged in exchanges of approved DCSs; (ii) the effect that such exchanges would have had upon the timing of DOE's acceptance of PG&E's SNF; and (iii) the price that PG&E would have paid to modify its position in the acceptance queue. PG&E's reliance upon exchanges also belies its assertions that the DCS process is meaningless.

Although PG&E asserts that it is "reasonable to conclude that if PG&E were performing, utilities would have exchanged allocations to avoid at-reactor storage costs," Pl. Br. 15, the only PG&E employee offered to support that statement, Larry Womack, was woefully uninformed concerning the Standard Contract, generally, and the exchanges provision, specifically. Mr. Womack first read the contract in preparation for his testimony at trial and, even then, only read the exchanges provision of the contract. Tr. 1178:16-1179:17 (Womack). Mr. Womack testified that exchanges could have taken place years before DOE acceptance (Tr. 1384:20-1385:13 (Womack)), and that, to determine the willingness of other utilities to exchange approved DCSs, he would have called or e-mailed his counterpart at other utilities. Tr. 1156:1-14 (Womack).

---

[8] PG&E is not consistent in the terms that it uses to discuss the alleged qualitative obligation. PG&E refers to "no additional at-reactor storage" both as an obligation (see Pl. Br. 6, 8) and as an "objective." See Pl. Br. 14, 21.

Although PG&E possessed approved DCSs in the early 1990s, it never approached other utilities to ascertain their willingness to exchange acceptance rights. Tr. 1197:3-7, 1201:5-8, 1388:11-1389:4 (Womack). Mr. Womack could not say how much PG&E would have been willing to pay to engage in exchanges[9] (Tr. 1198:14-17, 1199:3-7 (Womack)), and he could not identify any utility with whom PG&E would have exchanged. Tr. 1201:1-4 (Womack). Mr. Womack could not even say whether PG&E would have used exchanges to advance or decelerate its place in the acceptance queue. Tr. 1199:14-1200:24 (Womack). He agreed that political or social factors could have impeded an exchanges market. Tr. 1203:13-1205:7 (Womack). Further, contemporaneous documents reflect PG&E's belief that exchanges would be "very expensive" and "unlikely." Tr. 1220:8-14 (Womack); PX 185; Tr. 1745:14-1746:3 (Rueger); DX 232.

Although several of PG&E's witnesses testified about the alleged desirability of exchanges,[10] David Zabransky explained that the development of an exchanges marketplace would have occurred slowly over time. Tr. 2997:16-2999:1 (Zabransky). He further explained

---

[9] To find exchanges, without finding the amount that PG&E would have paid for exchanges, would result in a windfall to PG&E.

[10] Mr. Mills testified about the general willingness of utilities to engage in exchanges in the "but for" world, but provided no testimony concerning the mechanics and outcomes of any exchanges, such as the effect of exchanges upon PG&E's position in the OFF queue. Tr.393:15-17 (Mills). Mr. Stuart likewise failed to offer testimony concerning whether PG&E would have engaged in exchanges, the price that PG&E would have paid, and the effect that exchanges would have had on PG&E's place in the acceptance queue. Tr. 830:1-4, 804:9-14, 830:9-17, 830:18-22 (Stuart). Although Dr. Bartlett testified that it was his expectation that utilities would have engaged in the exchange of approved DCSs, Tr. 501:24-502:3 (Bartlett), he did not know when, in the OFF queue, PG&E would have obtained acceptance allocations. Tr. 555:7-10 (Bartlett). Indeed, another utility, Yankee Atomic, expressed concern to Dr. Bartlett that "exchanges may not be practically available, or if they are, the competition for making such exchanges among utilities with concerns over site decommissioning and other issues will make them economically unattractive." Tr. 544:21-545:7 (Bartlett); PX 184, HQR-006-0611.

that exchanges of approved DCSs likely would occur only after the start-up phase of the acceptance program had been completed after the transportation of SNF was not as controversial. Tr. 3010:8-3012:10 (Zabransky).[11] Consequently, even if an exchanges market had developed, such a market likely would not have developed in such a manner as to allow PG&E to take advantage of an exchanges market prior to 1998.[12] To the extent that causation hinges upon exchanges, these failures of proof are fatal.[13]

PG&E's reliance upon exchanges belies any assertion that the DCS process in the Standard Contract is meaningless. The Standard Contract allows for the exchange of approved DCSs. PX 54, Art. V.E. However, if approved DCSs lack any contractual meaning – that is, if

---

[11] Mr. Mills analogized the exchange of DOE acceptance rights to the exchange of long-term fixed commitments under uranium enrichment contracts. Tr.165:10-21 (Mills). However, he explained that these exchanges did not occur until years after the uranium enrichment contracts were originally signed. Tr.394:4-14 (Mills).

[12] Exchanges of approved DCSs are subject to DOE's approval, (PX 54, Art. V.E; Tr. 295:25-296:10 (Mills); Tr. 550:23-551:1 (Bartlett)), and DOE may reject proposed exchanges for many reasons. Tr. 552:19-553:5 (Bartlett); PX 239; Tr. 2999:16-3002:5 (Zabransky); Def. Counter-Designation R. Milner, at Tr.435:16-436:5 (5/3/02); Def. Counter-Designation N. Slater, at Tr.196:1-197:19 (4/21/99). Mr. Zabransky expects that DOE would be unable to approve of all requested exchanges and that exchanges would be analyzed upon a case-by-case basis. Tr. 2999:16-3000:3 (Zabransky). The fact that DOE has the discretion to disapprove exchange requests renders PG&E's exchanges claim speculative. See San Carlos Irrigation & Drainage Dist. v. United States, 111 F.3d 1557, 1563 (Fed. Cir. 1997); Sacramento Mun. Util. Dist. v. United States, 70 Fed. Cl. 332, 375 n.40 (2006) (rejecting claim that SNF plaintiff would have advanced place in acceptance queue through exchanges as "highly speculative").

[13] PG&E also suggests that DOE would have granted HBPP priority as a shutdown reactor. Pl. Br. 16. As with exchanges, DOE has the discretion, not the obligation, to provide priority in the SNF acceptance queue for shutdown reactors. PX 54, Art. VI.B.1(a). The evidence established that there was industry consensus that priority should not be afforded to shutdown reactors. PX 184 (HQR-006-0813); Tr. 546:1-20 (Bartlett); Def. Counter-Desig. R. Milner, Tr. 73:10-24 (5/8/02). Further, unlike other utilities, PG&E never requested priority for HBPP. Tr. 549:18-21 (Bartlett). Further, PG&E failed to present any testimony concerning the effect of priority upon DOE's acceptance of HBPP's SNF.

they are not a binding promise by a utility to deliver a specific quantity of SNF, in a specific year, to DOE and a binding promise by DOE to accept that specific quantity of SNF from the utility in that specific year – PG&E fails to explain the enforceable contractual right that would be exchanged.

Finally, PG&E's contention, in its post-trial brief, that DOE would have accepted SNF in transportation campaigns fails for three reasons. First, DOE was not contractually obligated to use transportation campaigns. Tr. 385:10-15 (Mills); Tr. 556:13-15 (Bartlett); Tr. 820:5-11 (Stuart). Second, PG&E failed to establish how transportation campaigns could have been implemented in the "but for" world without violating the OFF terms of the Standard Contract and to articulate how the campaigns would have been effectuated. Finally, PG&E failed to meet its burden of demonstrating the effect of transportation campaigns upon PG&E's place in the acceptance queue.

## IV. PG&E FAILED TO ESTABLISH THAT GTCC IS COVERED BY THE STANDARD CONTRACT OR THAT IT WOULD HAVE BEEN ACCEPTED WITH PG&E'S SNF

PG&E asserts that, "[a]s with spent fuel, the parties' Contract does not include terms governing the specific timing for DOE's removal of GTCC waste from utilities." Pl. Br. 19. The reason is obvious: GTCC is not covered by the Standard Contract. Tr. 616:14-15 (Bartlett); Tr. 2891:22-2892:5 (Kouts); see Tr. 2725:8-13 (Kouts) (Nuclear Waste Fund does not receive money for disposal of GTCC); 53 Fed. Reg. 17,709 (May 18, 1988) (GTCC not defined as high level radioactive waste); 54 Fed. Reg. 22,578 (May 25, 1989) (same). Consequently, contrary to PG&E's suggestion, it would be inappropriate to read into the Standard Contract a "reasonable

term" for the acceptance of GTCC.[14] Notwithstanding the lack of any contractual obligation to accept GTCC (Def. Br. 26-27), PG&E's contention concerning the contemporaneous acceptance of SNF and GTCC by DOE is belied by the evidence. First, HBPP did not intend to generate its GTCC until after its SNF was removed from the spent fuel pool. Tr. 1389:5-1390:23 (Womack). Therefore, DOE could not have accepted HBPP's GTCC at the same time as its SNF. Second, DOE does not have any plans to accept GTCC at a permanent Federal repository. Tr. 2722:7-13 (Kouts). Mr. Kouts explained the policy reasons that counsel against GTCC acceptance at the SNF repository: (1) the NWPA only allowed for the disposal of SNF and high-level radioactive waste ("HLW"), and GTCC is a form of low-level radioactive waste; and (2) because the capacity of the repository is a precious commodity, that capacity should be used for the emplacement of SNF and HLW. Tr. 2723:2-2724:3, 2858:17-20 (Kouts).[15] As a matter of law and fact, PG&E's assertions of a contractual obligation to accept GTCC – and to do so upon the same schedule as SNF – is contradicted by the evidence.

---

[14] PG&E claims that "[t]he parties understood when they entered the contracts in 1983 that the decommissioning of commercial nuclear power plants would result in the generation of [GTCC] waste from reactor internals," and cites to Mr. Womack's testimony. Pl. Br. 19. However, Mr. Womack simply testified that it was reasonable to assume in PG&E's 1993 decommissioning cost study that the GTCC PG&E generated would be stored at an ISFSI until DOE ultimately accepted the GTCC. Tr. 1364:3-18 (Womack). Mr. Womack offered no testimony concerning the parties' understanding in 1983 concerning the creation of GTCC waste, nor could he. Tr. 1178:21-1179:2 (Womack).

[15] At trial, Mr. Kouts repeatedly explained that, although one division within DOE – the Division of Environmental Management – explored the option of emplacing GTCC in the permanent Federal repository, the consideration of this option did not represent the view of DOE. Tr. 2865:2-20, 2869:4-16 (Kouts).

## V. PG&E'S DAMAGES CLAIM SHOULD BE REJECTED FOR ADDITIONAL REASONS

PG&E's post-trial brief does not attempt to demonstrate how its alleged damages are causally related to DOE's delay. Instead, PG&E simply makes a blanket assertion that all of its alleged $92 million in purported SNF storage costs are related directly to DOE's delay in SNF acceptance. Pl. Br. 25. This conclusory statement is further evidence of PG&E's blind reliance upon the alleged obligation concerning "no additional at reactor storage." Id. However, PG&E's assertion that the "government has not and cannot point to anything else that caused PG&E to incur these costs, and there was no other cause" is false. Id. As set forth in our post-trial brief, under the 1991 ACR rate of acceptance, PG&E would have incurred significant costs for HBPP SAFSTOR and the DCPP ISFSI. Once again, PG&E's decision to eschew the acceptance rate or to construct a "but for" world is in error. Numerous other factors led to the decision to construct dry storage at HBPP. Def. Br. 24-26. We also demonstrated numerous causal flaws with respect to individual components of PG&E's damages claim.[16] Id. 26-39. Ultimately, PG&E's reliance upon strict liability should be rejected.

Next, PG&E implicitly concedes its failure to account for significant "but for" world costs. In its post-trial brief, PG&E asserts that it was reasonable to use dual-purpose dry storage technology because it will be able to "avoid the extra work, cost and radiation does exposure to workers attending transfer of the spent fuel from storage-only containers to transportation

[16] Two key statements in PG&E's brief regarding the ventilation stack project – "[i]f at that time DOE had been performing its contract obligations and was removing or would soon be removing PG&E's spent fuel, the stack removal work would have been postponed until the spent fuel was removed," and "if the [HBPP] [SNF] were being loaded into DOE transport containers, the stack removal project could not proceed concurrently" (Pl. Br. 33) – are factual statements that lack citations and are not supported by the record.

containers when DOE eventually arrives to remove the spent fuel." Pl. Br. 35. PG&E's contention that it was reasonable to use dual-purpose dry storage necessarily assumes that DOE will accept SNF contained in dual-purpose dry storage. PG&E's statements betray its defense to accounting for "but for" loading costs: that is, that PG&E anticipates significant future loading costs to DOE casks.[17]

Finally, PG&E cannot avoid the significant evidentiary issues raised by the embedded non-incremental components of its labor costs. Although PG&E argues that its expert witness, Professor Cornell, "made adjustments" to PG&E's damages claim and "calculated" or "removed" non-incremental components of its labor costs (Pl. Br. 42), the evidence demonstrates that Professor Cornell only possessed a rudimentary understanding of the facts underlying PG&E's damages claim and merely parroted the work of PG&E witnesses and a third party consulting firm in reaching his "opinions" concerning PG&E's damages. Def. Br. 34-35. PG&E's attempts to "back out" from the claim non-incremental costs and add into the claim "other support costs" remain unsupported as a matter of fact and law. Id.

## VI. PG&E'S REQUEST THAT THE COURT RETAIN JURISDICTION OVER THIS CASE AFTER IT ISSUES A FINAL JUDGMENT IS BASELESS

PG&E requests that, when this Court enters judgment in this case, it do so pursuant to Rule 54(b) and that it retain jurisdiction over this case to consider claims for future damages. Pl. Br. 43-44. RCFC 54(b) provides that, "[w]hen more than one claim for relief is presented in an action, . . . the court may direct the entry of a final judgment as to one or more but fewer than all

[17] Of course, to the extent the Court concludes that DOE would not accept SNF contained in dual-purpose storage, Tr. 2734: 7-21 (Kouts), PG&E has not engaged in reasonable mitigation.

of the claims . . . only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment." RCFC 54(b). Here, there are no post-complaint breach claims pending in this case, beyond the Court's order providing for the filing of a supplemental complaint to cover damages through 2004. As a result, once the Court issues a judgment resolving all damages claims that pre-date the filing of PG&E's amended complaint, there will be no other claim properly before this Court over which it could retain jurisdiction. Indeed, the Federal Circuit specifically envisioned that SNF plaintiffs would file new complaints in future cases after additional costs are incurred as a result of future partial breaches by DOE. Indiana Michigan Power Co. v. United States, 422 F.3d 1369 (Fed. Cir. 2005). Under PG&E's interpretation of RCFC 54(b), no new complaint need ever be filed. PG&E's interpretation of RCFC 54(b) is inconsistent with Indiana Michigan and this Court's decision in Pacific Gas & Electric Co. v. United States, 70 Fed. Cl. 758, 763 (2006), requiring PG&E to file future complaints to recover for future partial breaches by DOE.

## CONCLUSION

For the reasons outlined above and in the Government's post-trial brief, we respectfully request that the Court enter judgment in the Government's favor.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/ Harold D. Lester, Jr.
HAROLD D. LESTER, JR.
Assistant Director

OF COUNSEL:

JANE K. TAYLOR
Office of General Counsel
U.S. Department of Energy
1000 Independence Ave., S.W.
Washington, D.C. 20585

ALAN J. LO RE
Senior Trial Counsel

SCOTT R. DAMELIN
JOSHUA E. GARDNER
HEIDE L. HERRMANN
SHARON SNYDER
MARIAN E. SULLIVAN
Civil Division
Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530

s/John C. Ekman
JOHN C. EKMAN
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, NW
Washington, D.C. 20530
Tel: (202) 353-0897
Fax: (202) 307-2503

July 7, 2006

Attorneys for Defendant

# APPENDIX

**OBJECTIONS TO PACIFIC GAS & ELECTRIC COMPANY'S DESIGNATIONS**

| PAGE OF PG&E POST-TRIAL BRIEF | PG&E Designation | Government Objection |
|---|---|---|
| 8 | The parties understood and intended that the DOE should accept enough spent fuel to exceed utility discharges of spent fuel and to be able to work off the backlog of previously discharged spent fuel. Deposition of Lake Barrett, 5/10/02 1163:10-1166:7, Deposition of Ronald Milner, 5/1/02 73:10-22. | **FOUNDATION.** The testimony of neither Mr. Barrett nor Mr. Milner can be cited in support of the parties' "intentions" because they did not join DOE until 1985 and 1984, respectively. Barrett Depo. 4/22/02 11:2-5 & 38:14-15, Barrett Dep. 4/26/02 742:14-743:1; Milner, TVA Designations, 6/24/05 863:12-14 & Milner Depo. 5/1/02 27:23-28:6. Accordingly, PG&E cannot establish the proper foundation for the testimony cited. Mr. Milner's cited testimony also lacks foundation because he was being asked about statements in the December 1983 draft Mission Plan, which Mr. Milner testifies he was not involved in preparing. Milner 5/1/02 73:10-22.<br><br>**VIOLATES PRE-TRIAL ORDER.** PG&E claims that the cited testimony of Mr. Barrett discusses PX 123, which was not admitted as an exhibit at trial. Pursuant to the Court's May 25, 2006 Order, this testimony should not be considered. |
| 8 | The parties understood and intended that the acceptance rate should reflect an efficient spent fuel program. Milner, 5/8/02 266:23-267:4. | **FOUNDATION**. As noted above, Mr. Milner cannot testify as to the parties' understandings and intentions because he did not join DOE until 1984 and had no involvement in the drafting of the Standard Contract. Milner, TVA Designations, 6/24/05, 863:12-14 & Milner, 5/1/02 27:23-28:6. |

| | | |
|---|---|---|
| 12-13 | Indeed, the 3000 MTU acceptance rate has been accepted and used by DOE during the course of the program's development in the majority of facility design document and also the majority of total life cycle cost analyses. Barrett 5/10/02 1368:10-1369:14; Klein 4/25/02 354:1-16. | **VIOLATES PRE-TRIAL ORDER.** The citation to this testimony of Mr. Barrett and Ms. Klein should be stricken because it violates the Court's May 25, 2006 Order that documents be specifically discussed with witnesses and that designated testimony that discusses exhibits that are not admitted will not be considered. PG&E, having failed to seek admission of any TSLCC documents and a variety of other documents related to the repository design, now attempts to rely solely upon general statements of witnesses in depositions regarding those documents. Barrett 5/10/02 1368:10-1369:14; Klein 4/25/02 354:1-16.<br><br>**BEYOND THE SCOPE OF 30(b)(6) DESIGNATION.** The testimony cited for Ms. Klein is also objectionable because it goes beyond the scope of the Rule 30(b)(6) deposition notice pursuant to which Ms. Klein was testifying.<br><br>If the Court allows this testimony, it should also consider the following testimony regarding the 3,000 MTU rate: Barrett 4/22/02 80:17-20 ("It's my understanding the monies paid by the utilities were a function of the kilowatt hours of nuclear energy delivered, not on the system design that we're doing."); Barrett 4/22/02 121:8-12 ("It was a system goal to receive the material at a reasonable rate, okay, of which the 3,000, ramp up to 3,000 tons was a reasonable rate. It was never a – in my opinion it was never a legal requirement to do 3,000 tons per year."); Milner 5/2/02 217:8-22 (Milner: 3,000 MTU rate used consistently as repository design receipt rate). |

| | | |
|---|---|---|
| 15 | Both PG&E and DOE recognize that demand for spent fuel storage varies depending on utilities' needs for additional spent fuel storage and varying needs would promote exchanges. Brownstein 5/23/02 105. | **FOUNDATION.** PG&E may not rely upon Mr. Browstein's testimony in support of PG&E's recognition or understanding. |

CERTIFICATE OF FILING

I hereby certify that on this 7th day of July, 2006, a copy of foregoing "DEFENDANT'S RESPONSE TO PLAINTIFF'S POST-TRIAL BRIEF" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ John C. Ekman