No. 04-0074C
into which has been consolidated No 04-0075C
(Judge Hewitt)

Electronically filed on July 7, 2006

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

PACIFIC GAS & ELECTRIC COMPANY,

Plaintiff,

v.

UNITED STATES,

Defendant.

# PG&E's REPLY TO THE GOVERNMENT'S POST-TRIAL BRIEF

JERRY STOUCK
Greenberg Traurig, LLP
800 Connecticut Avenue, NW
Suite 500
Washington, DC 20006
(202) 331-3173 phone
(202) 261-4751 fax
Counsel for Plaintiff
Pacific Gas & Electric Company

Of Counsel:

ROBERT L. SHAPIRO
Greenberg Traurig, LLP

# TABLE OF CONTENTS

PAGE


I. THE GOVERNMENT'S ARGUMENTS CONCERNING DELIVERY COMMITMENT SCHEDULES ARE FACTUALLY AND LEGALLY WRONG ........... 1

II. PG&E ESTABLISHED A NON-BREACH WORLD SUFFICIENT FOR AN AWARD OF DAMAGES ........ 3

III. PG&E HAS ESTABLISHED A REASONABLE ACCEPTANCE RATE ........ 4

IV. DAMAGES ISSUES ........ 9

1. GTCC waste ........ 9
2. Failed fuel ........ 10
3. But for loading costs ........ 11
4. Miscellaneous Humboldt Bay costs ........ 12
5. Labor hours ........ 14
6. "Embedded" allocated costs ........ 15
7. Third-Party costs ........ 16
8. Purportedly "embedded" Humboldt Bay fossil costs ........ 17
9. Foreseeability ........ 18

V. PG&E HAS APPROPRIATELY MITIGATED ITS DAMAGES FROM THE GOVERNMENT'S BREACH ........ 18

# TABLE OF AUTHORITIES

PAGE

Federal Cases

*Ace-Federal Reporters, Inc. v. Barram*, 226 F.3d 1329 (Fed. Cir. 2000) ................................ 4

*Bluebonnet Sav. Bank, FSB v. United States*, 339 F.3d 1341 (Fed. Cir. 2003) ........................ 3

*Commonwealth Edison Co. v. United States*, 56 Fed. Cl. 652 (2003) ..................................... 2

*Consolidated Gas Supply Co. v. FERC*, 745 F.2d 281 (4th Cir. 1984) ................................... 5

*Creswell v. United States*, 173 F. Supp. 805 (Ct. Cl. 1959) .................................................... 6

*David Nassif Assocs. v. United States*, 557 F.2d 249 (Fed. Cir. 1977).................................... 2

*District Concrete Co. v. Bernstein Concrete Corp.*, 418 A.2d 1030 (D.C. 1980) .................. 18

*Home Savings of America v. United States*, 399 F.3d 1341 (Fed. Cir. 2005)......................... 19

*In re Kellet Aircraft Corp.* 186 F.2d 197 (3d Cir. 1950). ...................................................... 19

*Indian Michigan Power Co v. United States*, 422 F.3d 1369 (Fed. Cir. 2005) ................ 17, 18

*Ketchikan Pulp Co. v. United* States, 20 Cl. Ct. 164 (1990)................................................. 19

*Landmark Land Co., Inc. v. FDIC*, 256 F.3d 1365 (Fed. Cir. 2001 ...................................... 18

*Locke v. United States*, 283 F.2d 521 (Ct. Cl. 1960) ............................................................... 4

*Maine Yankee Atomic Power Co. v. United States*, 225 F.3d 1336 (Fed. Cir. 2000) ............... 9

*Northern States Power Co. v. United States*, 128 F.3d 754 (D.C. Cir. 1997) .......................... 8

*Northrop Grumman Corp. v. United States*, 47 Fed. Cl. 20 (2000)......................................... 3

*Perry and Wallis v. United States*, 427 F.2d 722 (Ct. Cl. 1970)............................................. 6

*Sacramento Municipal Utility Dist. v. United States*, 70 Fed. Cl. 332 (2006) ................. 11, 18

*San Luis Obispo Mother of Peace v. Nuclear Regulatory Comm'n*,
449 F.3d 1016 (9th Cir. 2006) ......................................................................................... 20

*Tennessee Valley Authority v. United States*, 69 Fed. Cl. 515 (2006)................................ 4, 11

*United States v. Smith*, 869 F.2d 348 (7th Cir. 1989) ........................................................ 16

*United States v. Winstar Corp.*, 518 U.S. 839 (1996) .......... 9

Other Authorities

*Restatement (Second) of Contracts* § 201(2)(a)-(b) .......... 6

*Restatement (Second) of Contracts* § 351(2)(a) .......... 18

42 U.S.C. § 10221(a) .......... 6

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| PACIFIC GAS & ELECTRIC COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 04-0074C, into which has been consolidated No. 04-0075C<br>(Judge Hewitt) |

PG&E's REPLY TO THE GOVERNMENT'S POST-TRIAL BRIEF

Pursuant to the Court's Orders of May 4, 2006 and May 25, 2006, PG&E submits this reply to the government's post-trial brief.

I. THE GOVERNMENT'S ARGUMENTS CONCERNING DELIVERY COMMITMENT SCHEDULES ARE FACTUALLY AND LEGALLY WRONG

The government argues, Govt. Post-Trial Brief ("GB") at 2-3, that PG&E's position on the delivery commitment schedules ("DCS") would render the parties' contract unenforceable. The government misconstrues PG&E's position and ignores binding Federal Circuit precedent on this issue. First, contrary to the government's argument, GB at 2, PG&E does not contend that approved DCSs are meaningless. Rather, consistent with the contract language, PX 54, Arts. IV.B.5 and V.B. PG&E presented evidence that DCSs, along with the Annual Capacity Reports ("ACRs") and Acceptance Priority Rankings ("APRs"), are "for planning purposes." Tr. 1423:17 – 1425:2, (Stock); DX 193 at 2. PG&E's position is consistent with DOE's pre-litigation position on this issue. The instructions DOE distributed for completion of the DCSs made this point plain. DX 201 at 14471, ¶ 1 ("The DCS provides the Purchasers with the opportunity to inform DOE of their plans . . ."), at 14472, ¶ 7(a) ("The 1991 ACR applied a 10

year projected waste acceptance rate to the 1991 APR for planning purposes, resulting in individual purchaser allocations"), ¶ 7(c) ("The annual acceptance rates in the 1991 ACR provide an approximation of the FWMS acceptance capacity for planning purposes."). Indeed, the instructions also made clear that DOE did not intend to be bound by approved DCSs. *Id.* at 14472, ¶ 7(c) ("The process described herein assumes that the FWMS will be able to accept the Purchaser's SNF beginning in 1998 according to the acceptance rate reflected in the 1991 ACR. In the event that such circumstances change, all DCSs previously approved by DOE may need to be reevaluated by DOE and the Purchasers."). In 2004, given changed circumstances, DOE solicited new DCSs. *See* Tr. 2746:8-12 (Kouts). *See also Commonwealth Edison Co. v. United States*, 56 Fed. Cl. 652, 663 (2003) ("The ACR issuance and the DCS submission is . . . for the exchange of information between the parties. As Article V specifically states, the DCSs merely 'identify all SNF and/or HLW the Purchaser *wishes to deliver* to DOE . .' . . .. This mechanism does not create a contractually binding obligation for either party.") (emphasis in original).[1]

Second, as this Court has recognized, *Commonwealth Edison*, 56 Fed. Cl. at 662, *citing David Nassif Assocs. v. United States*, 557 F.2d 249, 258 (Fed. Cir. 1977), Federal Circuit precedent makes clear that this Court must supply a missing, but essential term of the contract.

---

[1] Ultimately, DOE's DCS instructions prevented even a useful exchange of information, since contrary to Art. V's reference to all SNF the Purchaser wishes to deliver, they made clear that "only DCSs submitted by Purchasers with an allocation in the delivery year will be considered for approval." DX 201 at 14472, ¶ 7(a). *See also id.* at 14476, ¶ 2.7 (" . . . the total quantity of SNF designated for delivery must not exceed the allocation in the ACR; exceeding the allocation will result in disapproval of the DCS(s)."). More fundamentally, by its plain terms a DCS reflects a utility's obligation to *deliver* a minimum amount of spent fuel, not DOE's obligation to accept spent fuel.

The government's reliance on Fifth Circuit decisions applying state law from Mississippi and Texas is misplaced.[2]

## II. PG&E ESTABLISHED A NON-BREACH WORLD SUFFICIENT FOR AN AWARD OF DAMAGES

Contrary to the government's contention that PG&E has ignored the "but for" world, GB at 5, PG&E has established a compelling picture of the non-breach world. As set out in PG&E's Post-Trial Brief ("PB") at 4-20, PG&E established what government performance should have looked like. PG&E has also established how its costs would have been different in the non-breach world – it would not have incurred the seven categories of costs it suffered absent the breach. Tr. 2300:13 – 2303:24 (Cornell) (explaining seven categories of damages), PDX 44; PB at 25-33 (explaining why PG&E incurred these costs), PB at 38-43 (detailing the calculation of PG&E's costs incurred in the seven categories of damages); *see* Tr. 1128:1 – 1130:2 (Womack) (absent DOE's breach of contract, PG&E would not have undertaken the dry storage projects at either Humboldt Bay or Diablo Canyon.). Moreover, contrary to the government's unsupported claim that PG&E "asks the Court to assume that all of its claimed costs are incremental to DOE's delay," GB at 5, PG&E's expert, Professor Cornell, carefully examined the costs in the seven damages categories and backed out those he determined not to be incremental to the government's breach. Tr. 2310:25 – 2313:4 (Cornell).

The government asserts that PG&E must establish what costs it would have incurred absent the breach. GB at 5. Neither *Bluebonnet Sav. Bank, FSB v. United States*, 339 F.3d 1341, 1345 (Fed. Cir. 2003), relied upon by the government, nor any other case supports this proposition. In *Bluebonnet*, the Federal Circuit explicitly rejected the very same argument the

---

[2] The government also cites *Northrop Grumman Corp. v. United States*, 47 Fed. Cl. 20, 41 (2000). GB at 3. But the portion of that decision referenced by the government refers to reformation of contracts, not the Court's obligation to supply a reasonable missing term.

government makes here. *Id.* ("The government argues that the plaintiffs should receive no damages because they have not proved the costs they would have incurred absent a breach . . . .We do not accept [the government's or the plaintiffs'] extreme positions."). Not surprisingly, the caselaw is replete with damages awarded without any reference to comprehensive delineations of the non-breaching party's costs absent the breach. *See, e.g., Locke v. United States* 283 F.2d 521, 525 (Ct. Cl. 1960) (setting out simple elements for calculation of a damages award in a lost profits case); a*ccord Ace-Federal Reporters, Inc. v. Barram,* 226 F.3d 1329, 1333 (Fed. Cir. 2000); *Tennessee Valley Authority v. United States*, 69 Fed. Cl. 515, 524-25 (2006) (awarding the costs of constructing an ISFSI in another spent fuel case without any evidence or discussion of how the entirety the plaintiff's enterprise might have looked different in the non-breach world). Indeed, it would be nonsensical for the parties and the Court to expend time and effort addressing the totality of costs in a multi-billion dollar company such as PG&E when only a very small portion of its costs are at issue.

PG&E has acknowledged that the government's breach resulted in the deferral of certain costs, such as the cost of decommissioning Humboldt Bay Power Plant, Unit 3. Tr. 2309:4 – 2310:24 (Cornell). Professor Cornell explained that he did not adjust for such costs in his analysis since PG&E will eventually will have to pay them. *Id.* The government presented no evidence to suggest that Professor's Cornell treatment of such costs would result in overcompensation of PG&E. And Professor Cornell's treatment of such costs is fully consistent with this Court's prior treatment of them. *See* PB at 42-43 (noting similar treatment of deferred costs in both *TVA* and *SMUD*).

III. PG&E HAS ESTABLISHED A REASONABLE ACCEPTANCE RATE

The government devotes a large portion of its post-trial brief to a straw-man, namely that the evidence does not establish that DOE is "obligated" under the contract to accept spent fuel at

any particular rate or at a rate that would meet certain criteria. GB at 6-15. The government's argument is meritless. As noted above, at p. 2, Federal Circuit precedent requires this Court to supply a "reasonable" acceptance rate term given the absence of any acceptance rate term in the parties' contract. *See also* PB at 7-8 (citing evidence that parties left acceptance rate term open). The evidence developed by PG&E establishes such a reasonable acceptance rate; it does not attempt to establish as a factual matter a legal obligation that is not otherwise contained in the contract. Thus, contrary to the government's argument, GB at 6-7, evidence showing that the parties intended that utilities would not have to incur avoidable at-reactor spent fuel storage costs after January 31, 1998 and that DOE would be accepting spent fuel at a rate sufficient to work off the backlog of already discharged spent fuel is sound evidence of what a reasonable acceptance rate would have been.

The government neither argues for a different, "reasonable" rate nor even acknowledges that controlling law requires a reasonable rate. Instead, it argues that DOE's failure to adopt utilities' requests for an acceptance rate term somehow absolves the government of an obligation to accept spent fuel at any rate. GB at 8-10. The government's reliance on *Consolidated Gas Supply Co. v. FERC*, 745 F.2d 281, 289, fn. 18 (4th Cir. 1984), is misplaced. That was a straightforward parole evidence case in which the Fourth Circuit refused to let a party use a cover letter transmitting a settlement agreement to reserve rights to litigate a claim that was otherwise clearly intended to be resolved by the agreement; the letter sought to alter the terms of the integrated agreement. Here, utilities' statements of their understanding of the acceptance rate contemplated by the parties' contract (as fast enough to enable utilities to not incur avoidable costs after January 31, 1998 and for DOE to work off the backlog of previously discharged spent fuel) are not inconsistent with an existing contract term, because the acceptance rate term is

open. And since the government has acknowledged that it was fully aware of the utilities' understanding of the acceptance rate contemplated by the contract and willingly entered into contracts without protesting that understanding, the long-standing rule controlling cases in this Court holds that the government is bound by the utilities' previously-articulated view. *See, e.g., Perry and Wallis v. United States*, 427 F.2d 722, 725 (Ct. Cl. 1970); *Creswell v. United States*, 173 F. Supp. 805, 811 (Ct. Cl. 1959); *Restatement (Second) of Contracts* § 201(2)(a)-(b) & Notes (citing and embracing rule of *Perry and Wallis*).

For similar reasons, the government's plea for the Court to ignore the overwhelming evidence that a 3000 MTU acceptance rate would have been reasonable, including evidence in DOE's own program documents, GB at 12-15, is also meritless. The government's claim that the evidence violates the parole evidence rule, GB at 12 and 14-15, is wrong because the evidence helps establish a reasonable acceptance rate, it does not alter any existing contract term.[3] Likewise, the government's claim that DOE did not agree that the acceptance rates in DOE's own documents were binding, GB at 12-13, is beside the point; those documents certainly help establish that DOE believed that the acceptance rates noted in those documents – typically 3000 MTU per year – would have been reasonable. The government makes a particular effort to walk away from DOE's 1985 Mission Plan, PX 82. GB at 13-15. But the Mission Plan is a seminal document. It's publication was mandated by the NWPA, 42 U.S.C. § 10221(a), and as the OCRWM Director reported in his transmittal letter behind the front cover of PX 82, the document "presents [DOE's] best estimate at [that] time of the objectives and the strategy of the

[3] The government argues that the improved performance plan in the 1985 Mission Plan, PX 82, which contemplates acceptance of some spent fuel two years before 1998 attempts to alter the January 31, 1998 date in the parties' contract, PX 54, Art. II. GB at 14. But PG&E has cited that evidence merely as support for its position that that a reasonable acceptance rate in 1998 would have been 3000 MTU per year, not that DOE was obligated to start accepting waste in 1996.

[program] and of the facilities, institutions, activities, management approach and information needed to implement the program."[4]

Statements by PG&E and the Edison Electric Institute ("EEI") supportive of an MRS are not contrary to PG&E's position that a 3000 MTU annual acceptance rate starting in 1998 would have been reasonable. The government argues that such statements impliedly supported DOE's plans regarding an MRS in the 1990s that would have accepted 10,000 MTU of spent fuel spread over a twelve year period between 1998 and the beginning of repository operations in 2010. GB at 17-18, 22-23. But the documents cited by the government merely comport with the reality at the time reported by DOE – that a repository would not be available before at least 2010, PX 125 at vii, making the MRS the only hope for DOE performance in 1998. Neither the cited documents, nor the testimony cited by the government contain any agreement with the slow acceptance rate set out in documents such as the 1991 ACR, PX 158. Moreover, the government does not fairly describe all of the referenced documents. For example, although DX 155 does note that DOE planned in 1990 to use an MRS to meet the 1998 deadline for its performance, GB at 23, DX 155 at 2 also states that DOE contemplated that the nuclear waste negotiator would be successful and that if a State voluntarily accepted the MRS, then the linkages between the MRS and the repository would be inapplicable.

Furthermore, contrary to the government's arguments, GB at 19-20, PG&E's statements concerning the NWPA and its contract with the government do not reflect indifference regarding

[4] The government's claim that Mr. Mills acknowledged that the improved performance plan would not meet utilities' criteria for a reasonable acceptance rate, GB at 14 and n.6, is belied by the record cited by the government. The passage cited in the main text of the government's brief refers to an acceptance rate that DOE might employ if Congress did not authorize the integrated MRS contemplated by the improved performance plan. Tr. 356:15 – 357:5 (Mills). And in the questioning referenced in the footnote, the government's counsel attempted to artificially limit Mr. Mills' demonstration to a single column in a chart of the Mission Plan. Tr. 272:2 – 274:3 (Mills).

the rate of spent fuel acceptance beginning by January 31, 1998. That every PG&E utterance regarding the NWPA or its contract with DOE is not comprehensive regarding its views of the parties' obligations is neither surprising nor informative of what PG&E's views have been. The evidence of PG&E's consistent understanding of the government's obligation to accept spent fuel from PG&E at a rate that would prevent it from incurring avoidable at-reactor spent fuel storage costs after January 31, 1998 is ultimately undisputed. Tr. 45:14 – 49:12, 50:19 – 51:19, 58:7 -15 (Warner); PX 256 at 2, 7; Tr. 1721:3-10, 1756:23 – 1759:15 (Rueger), Tr. 1179:18 – 1181:6, 1181:25 – 1182:22, 1183:12-19 (Womack). Moreover, the contention that PG&E has been concerned only with commencement of DOE performance in 1998 but indifferent regarding the rate of that performance is contrary to common sense and belied by the evidence cited by the government. In its comments regarding the draft mission plan, for example, PG&E noted its concern that slippage in the schedule to have an operational storage facility by 1998 because PG&E had "been counting on the availability of a repository in 1998 . . ." PX 82, Vol. III at 596. It would obviously make no sense for PG&E to count on the availability of a facility in 1998 if PG&E was indifferent as to whether the facility would accept spent fuel from PG&E at a rate that would be of any use to the company. Finally, PG&E's statements in the 1990s regarding expectations of DOE performance reflect PG&E's planning for DOE's anticipated breach rather than its understanding of what performance consistent with the parties' contract might have been. Tr. 994:3-14 (Womack) (by 1995, PG&E expected breach and was assessing its options regarding spent fuel storage at Diablo Canyon and Humboldt Bay).

The government's arguments regarding the mandamus order in *Northern States Power Co. v. United States*, 128 F.3d 754, 760 (D.C. Cir. 1997), GB at 3-4, n. 1, are also meritless. Right or wrong, the D.C. Circuit's writ of mandamus (which the government has violated by

making this argument) is not material to this litigation. Although the government asserts that the writ prevents the government from asserting that its failure to perform is an excusable, unavoidable delay, no such argument is available to the government. The Federal Circuit held clearly in *Maine Yankee Atomic Power Co. v. United States*, 225 F.3d 1336, 1341 (Fed. Cir. 2000), that the Delays Clause, Art. IX, is not a general provision covering all delays, "but a more limited one dealing with specified delays. . . They are the kind of delays that routinely may arise during the performance of the contract. For them to arise, however, the parties must have begun performance of their obligations relating to disposal of the nuclear waste." And while the Federal Circuit was focused on Art. IX.B. covering avoidable delays, rather than Art. IX.A. covering unavoidable delays, it is not plausible for "delay" to have different meanings in different parts of the same Article of the same contracts. Moreover, the government could not establish that its failure to perform was due to events beyond its control. As the government itself relates, GB at 15-18, the government could have performed its spent fuel removal obligations with an MRS, but it lacked the political will to accomplish the task. Such political decisions cannot relieve the government of its contractual obligations. *See, e.g., United States v. Winstar Corp.*, 518 U.S. 839, 887 (1996).

IV. DAMAGES ISSUES

1. <u>GTCC waste</u>. The government complains that PG&E "fails to account for costs it would have incurred in the 'but for' world associated with the storage of GTCC waste." GB at 26. There is no evidence to support the claim that there would have been any such costs. As PG&E has shown, GTCC waste is covered by the parties' contract, PB at 51-55, and regardless of contract coverage, DOE was planning to and would have removed PG&E's GTCC waste with its spent fuel, PB at 18-20. But even in the unlikely (and implausible) event that DOE would have come and gone and stranded the PG&E's GTCC waste at Humboldt Bay, the trial record is

devoid of any evidence that PG&E would then incur *any* additional cost to store that waste over and above PG&E's ongoing costs to store other low-level radioactive waste. *See* Tr. 1238:15-25, 2133:14 – 2134:7 (Kapus) (noting low-level radioactive waste storage and its costs).

And the government's complaint that PG&E has not paid DOE for GTCC waste removal, GB at 27, is both wrong and beside the point. PG&E has paid substantial fees under its contract with DOE, and as the government brought out, *see* Tr. 2714:19-2715:1 (Kouts), such contract fees by utilities have vastly exceeded DOE expenditures on the waste removal program, thus leaving a large surplus to handle such matters as GTCC waste disposal. If DOE is permitted to impose additional fees in the future for GTCC waste, PG&E will be subject to those fees. But there can be no legitimate claim that PG&E has failed to pay existing fees for GTCC waste disposal.

2. <u>Failed fuel</u>. The government similarly complains that PG&E's damages claim "fails to account for the presence of failed fuel at HBPP," GB at 28, stating that DOE is not "necessarily" obligated to accept failed fuel under the same schedule as other fuel. *Id.* But the government notably omits to argue that DOE would have or could have actually neglected to accept PG&E's failed fuel along with PG&E's other fuel. *Id.* That omission is not surprising, because absent a need for "special handling" no such argument is possible, *see* PX 54, Art. VI.A.2.(b), and the only evidence on point demonstrates that special handling is not required for any of the Humboldt Bay failed fuel. Tr. 714:20-715:6 (Stuart). Indeed, the whole notion of delayed acceptance for failed fuel is not only unsupported, but entirely of recent vintage. In 1985, in response to industry requests for guidance, DOE wrote that failed fuel "will be subject to the same scheduling procedures as other fuel." PX 84 at 1.

The government's statement that PG&E has "failed to account for at least $1.2 million in canister costs . . . that it must bear," GB at 28, is true in a sense but does not help the government. The reference is to the cost of failed fuel "cans" that PG&E will obtain in the future in the "breach" world in order to store the failed fuel in the Humboldt Bay ISFSI. Tr. 2213:1-24 (Kapus). This is thus a good example of a cost that because of the breach PG&E has not avoided, but merely deferred. PG&E has appropriately not accounted for this cost in its current claim for damages through 2004, because the cost has not yet been incurred, but will be incurred in the future. *See* Tr. 2309:4-2310:11 (Cornell) (economic rationale for treatment of deferred costs in a partial breach case); PB at 42-44 (legal and factual rationale). To take account of this future cost now would also be speculative because there is no evidence of similarity between the future cans to be used at the Humboldt ISFSI and the cans that may have been used for failed fuel (or their cost) in the but for world. *See generally* PB at 49-51 (re failed fuel issues).

3. <u>But for loading costs</u>. The government also contends that PG&E's claim "fails to account for the costs avoided in the 'but for' world for loading small truck casks at HBPP." GB at 28. This contention, too, is doubly speculative. First, as PG&E explained in its pretrial brief (at 42-44), and as this Court recognized in both the *TVA* and *SMUD* cases, because these loading costs are merely deferred and not avoided, any purported benefit to PG&E is "entirely speculative." *Sacramento Municipal Utility Dist. v. United States*, 70 Fed. Cl. 332, 372 (2006); *TVA*, 69 Fed. Cl. at 542. Second, though the government focuses on truck casks, and specifically "the avoided costs associated with loading 25-ton truck casks," GB at 28, here as in *TVA*, "[it] is not possible to ascertain the method DOE will ultimately use for SNF acceptance." 69 Fed. Cl. 542. If anything, the record suggests that rail transport would have been used, *see* Tr. 1495:21 –

1496:10 (Stock), as it was when PG&E actually shipped spent fuel from Humboldt Bay in the past. *Id.* The notation in DX 242, PG&E's 1992 DCS forms, was not a "request" for truck transportation as the government implies, GB at 28, but only a recognition that heavy haul trucks would be used to move the Humboldt Bay spent fuel to the nearby rail head. *See* DX 201, Encl. at 6, ¶2.3.

More to the point, and similar to the situation addressed above regarding failed fuel, accounting for "but for" world loading costs now would also be entirely speculative because the record contains no evidence addressing the relative costs of loading bare Humboldt Bay spent fuel into rail versus truck transport containers in the "but for" world, and no evidence comparing either of those alternatives to the actual future cost of transferring the dual-purpose containers at the Humboldt Bay ISFSI to DOE for transport. The government acknowledges as much in a footnote, all but conceding that its arguments on this point are left over from before its putative expert testimony was excluded. GB at 28-29 n. 12 ("Mr. Brewer's testimony was stricken by the Court, leaving the Court with no evidence of this avoided cost.").[5]

4. Miscellaneous Humboldt Bay costs. The government argues that five discrete cost items at Humboldt Bay should not be recoverable as damages. GB at 29-32. None of those arguments has merit. Regarding the ventilation stack removal and replacement in late 1998, the government asserts that "the project would have been completed . . . at the same time and cost

---

5 What is clear is that there is no basis for comparing, much less equating, the $5.5 million in "loading costs" the government mentions in that same footnote with the "but for" world loading costs the government would like to discuss, but cannot properly discuss in the absence of any evidence of those "but for" costs. Notably, the Holtec contract, DX 891, includes a line item price of $1.403 million for "loading and closure operations, including movement of the loaded [containers] to the storage vault." *Id.* at 5763. Absent the costly closure (*i.e.*, welding) work, which is not necessary when loading bolted transport casks, the cost of loading DOE transport containers would at most be a fraction of the Holtec line item price. Of course, whatever that cost might be, it is still only deferred not avoided and thus should not be accounted for at all in PG&E's present claim.

regardless of DOE's performance." GB 29. But that cannot be true. Because all personnel had to exit the spent fuel building at Humboldt Bay during the stack removal work, Tr. 1566:19-23 (Willis), that work and loading of DOE transport casks could not take place "at the same time." Rather, if as PG&E contends DOE casks were being loaded in 1998 (or were soon to be loaded), either the DOE casks would have been loaded before PG&E was ready to take down the stack or PG&E would have had every reason to defer the stack removal work, thereby saving nearly $1 million dollars in incremental costs, and would have done so. *See* PB. at 33. The government's further assertion that "Mr. Rueger [] testified that PG&E could not continue with SAFSTOR without completing the project at that time," GB at 29, is also wrong. *See* Tr. 1789:15 – 1790:15 (Rueger) ("No, I wouldn't say that. We probably could have continued with SAFSTOR.").

The sole basis for the government's argument about the cost of removing "off-gas" equipment from an existing PG&E facility (so the facility could be used for plant security) is the notation on a workpaper by one of Professor Cornell's assistants to the effect that this cost would also be incurred in the "but for" world. GB at 30; *see* Tr. 2204:20-2205:7 (Kapus). But that is not true, as the testimony of Mr. Willis and Mr. Kapus make clear: this cost was only incurred as part of security upgrades after the events of 9/11/01, Tr. 2204:23 – 2205:7 (Kapus); Tr. 1561:21 – 1562:9 (Willis), and if the spent fuel were gone, such security would have been unnecessary. Tr. 2266:7-25 (Kapus). That the off-gas equipment removal costs would have been incurred during decommissioning is of no consequence, because the replacement security facility also will have to be decommissioned later at significant cost. Tr. 2268:2-12 (Kapus); *see* Tr. 2309:4-2310:11 (Cornell) (appropriate not to account now for decommissioning costs, which PG&E merely defers not avoids due to DOE breach).

The government next asserts that the cost in PG&E's claim for investigating the Chi Chi earthquake in Taiwan (the government misstates the included amount, which is $175,954, PX 431, ln. 13) would have been incurred regardless of DOE's performance. GB at 30. The only testimony on point is to the contrary, as it demonstrates that the claimed amount is net of the estimated amount PG&E would have incurred solely as part of its long-term seismic program for Diablo Canyon. Tr. 1602:18 – 1604:22 (Willis) (noting "use" and "need" for earthquake data to validate seismic hazard study supporting Humboldt Bay ISFSI licensing).

The government's objection to PG&E's claimed costs for "visual inspection" of Humboldt Bay's spent fuel, GB at 31, appears to rest on nothing more than a misnomer. In fact these costs are not for a mere "visual" inspection, but for videotaping and preparation of other required documentation and "extensive records" that PG&E needs only because the fuel is being sealed in welded containers. Tr. 1600:22-1602:16 (Willis). Had DOE performed and arrived with bolted transport casks, none of that work would have been necessary and PG&E instead would only have performed a true "visual" inspection, which so far as the record reveals would not have added any additional cost to the "but for" world loading process. Tr. 1602:2-16 (Willis).

5. Labor hours. The government's challenge to the labor costs PG&E incurred on breach-related projects provides no basis for any deduction. GB at 32-33. Following the 75% downsizing of its nuclear engineering staff in 1995, Tr. 1822:17 – 1823:5 (Strickland), PG&E no longer maintains all the expertise it needs internally, nor does it have any "floating reserve of staff" to support special projects like those caused by DOE's breach. Tr. 1853:13 – 1854:1 (Strickland). PG&E thus make much use of "staff augmentation" contractors on such projects, Tr. 1854:2 – 1856:23 (Strickland), and when PG&E does use its own labor, "typically . . . then

the departments we bring them from are put in a bind, where they have to then . . . bring someone behind them to backfill." Tr. 1858:9-14 (Strickland). PG&E's very lean staffing also leads it to defer lower-priority projects. Tr. 1864:3 – 1865:17 (Strickland). All internal labor used on breach-related projects is appropriately charged to those projects through PG&E's SAP accounting system. Tr. 1863:4 – 1864:2, 1861:20 – 1862:4 (Strickland). Taken together, this evidence demonstrates that the cost of DOE labor devoted to breach projects is a true economic, or marginal cost of DOE's breach. Tr. 2337:20 – 2338:20, 2313:5-11 (Cornell); *see* Tr. 2340:5-9 (Cornell) ("I don't care if they've been diverted for a year or a half-a-day, the cost of that diversion to the company is at least what the company was paying that employee."); Tr. 2317:24 – 2318:14 (Cornell). *See generally* PB at 46-49 (no basis for deducting labor or overhead costs).

6. <u>"Embedded" allocated costs</u>. The government's sole challenge to what it terms "embedded" costs included in PG&E's reported labor charges, or "activity prices," is that "PG&E's attempt to remove those costs lacks evidentiary support." GB at 33-34. The government claims that when Professor Cornell eliminated certain embedded costs (those in his categories "4" and "5") in order to determine the true economic costs of DOE's breach, he relied upon calculations performed by Celerity Consulting which, according to the government, he "admitted he could not explain" and "testified he was not the sponsoring witness for. . . ." GB at 34. Those government allegations are both wrong factually and unimportant under evidentiary principles applicable to expert witnesses. Factually, Professor Cornell testified: "I don't know what exactly sponsoring a witness [sic] means here. I can describe the process that I went through." Tr. 2367:8-14 (Cornell). More importantly, Federal Rule of Evidence 703 explicitly allows experts to rely on otherwise inadmissible facts or data "[i]f of a type reasonably relied upon by experts in the particular field in forming opinions." That is unquestionably the case

here, given the "huge" quantitative task involved in netting out all the "4's" and "5's" from the accounting data, Tr. 2336:2-18, 2418:6-16 (Cornell), and Professor Cornell's explanation that it was reasonable to rely on Celerity's work since he "commonly" relies on accounting experts. Tr. 2418:17 – 2419:10 (Cornell). Caselaw the government cites fully supports PG&E's position. *E.g.*, *United States v. Smith*, 869 F.2d 348, 355 (7th Cir. 1989) ("[I]t is well settled that expert witnesses may rely on material commonly used by others in the field, even if those materials were prepared by others").

7. Third-Party costs. Despite the government's isolated criticisms of some third-party cost items (or "other support costs") included in PG&E's damages, *see* GB at 36-37, Ms. Phillips' testimony establishes beyond any reasonable question that PG&E's third-party costs, when charged to particular projects pursuant to PG&E's third-party billing policy, are every bit as real and appropriate as costs charged through PG&E's SAP accounting system. Tr. 2004:25 – 2007:13, 2009:18 – 2010:25, 2015:10-23 (Phillips). It was certainly reasonable for Professor Cornell to use the third-part cost data he got from PG&E. *See* Tr. 2420:22 – 2421:18 (Cornell). And ultimately, despite Ms. Phillips' inability to recall a few cost items, her testimony demonstrated that Professor Cornell, by using PG&E's historical third-party rates, has presented a much lower overall estimate of "marginal" third-party costs (net of "4's" and "5's") than if he had used PG&E's current third-party cost methodology and applied that policy to all prior year's third-party costs. Tr. 2086:25 – 2093:10 (Philips); Tr. 2333:18 – 2335:7 (Cornell). Thus, PG&E's claimed damages include a "reasonably certain" – and indeed a quite conservative – estimate of marginal, third-party costs. Moreover, most of the government's criticisms of discrete cost items are belied by the trial record. *E.g.*, 2094:15 – 2095:25 (Philips) (sometimes

efficient not to bill for company support costs); Tr. 2419:17 – 2420:21 (Cornell) (depreciation an appropriate proxy absent other cost data).

8. Purportedly "embedded" Humboldt Bay fossil costs. The government's claim that certain Humboldt Bay SAFSTOR line items improperly include "significant costs" associated with the site's fossil unit, GB at 38-39, also should be rejected. First, the government's suggestion that a portion of PG&E's claimed security costs at Humboldt Bay are attributable to fossil operations there ignores the relevant trial testimony to the point of misrepresenting it: Mr. Kapus explained that the allocation of security costs to fossil operations in 2005 was an aberration that PG&E now recognizes to be improper since the fossil units require no security, Tr. 2265:17 – 2266:25 (Kapus), a fact confirmed by Mr. Willis, Tr. 1538:8 – 1539:9 (Willis). Regarding the other four line items the government discusses, *see* GB at 38, for the largest ($3.35 million) and smallest ($119,782) the testimony the government cites shows no relationship whatsoever to fossil operations. Mr. Kapus did indicate that the other two line items may each include some costs for one individual that are attributable to fossil operations, *see* Tr. 2182:25 – 2183:3, 2188:22 – 2189:2 (Kapus), though for one line item most such costs would be separately billed to fossil. Tr. 2188:15-21 (Kapus). These two isolated examples, however, do not make PG&E's overall damages claim less than "reasonably certain," particularly given the overall reliability of PG&E's accounting system and the fact it necessarily embodies a number of estimates and allocations. *See Indiana Michigan Power Co v. United States*, 422 F.3d 1369, 1373 (Fed. Cir. 2005) ("'[T]he amount of damages need not be 'ascertainable with absolute exactness or mathematical precision.'") (citation omitted); *see also* PX 54, Art. 1, ¶ 11 (defining "full cost recovery" for purposes of the parties' contract).

9. Foreseeability. The government contends, GB at 39-40, based solely on *SMUD*, *see* 70 Fed. Cl. 373-74, that PG&E's costs of using of "dual-purpose" dry storage containers were not foreseeable. But *SMUD*'s conclusion on this point is fundamentally at odds with long-established foreseeability principles. A loss is foreseeable if it falls in the ordinary course of events. *Landmark Land Co., Inc. v. FDIC*, 256 F.3d 1365, 1378 (Fed. Cir. 2001, *citing Restatement (Second) of Contracts*, § 351(2)(a). In particular, if it is foreseeable that a breach will cause the non-breaching party to take corrective action, the foreseeability analysis is at an end, and the appropriateness of the particular corrective action taken is governed by mitigation principles. *See District Concrete Co. v. Bernstein Concrete Corp.*, 418 A.2d 1030, 1037 (D.C. 1980). ("Foreseeability of the particular injury is what is contemplated by the doctrine. The reasonableness of the method of correction is a different matter going to mitigation of damages issues.") As *Indiana Michigan* reaffirmed, PG&E had an affirmative duty to mitigate, and under settled law could fulfill that duty by acting "reasonably" under the known circumstances. 422 F.3d at 1375. The government has not argued that PG&E's use of dual-purpose containers was not reasonable, and the evidence establishes affirmatively it was reasonable. *See* PB at 35. That same evidences indicates that use of storage-only containers would *not* have been reasonable. *E.g.*, Tr. 1090:3-17 (Womack); Tr. 3028:6-11 (Zabransky).

## V. PG&E HAS APPROPRIATELY MITIGATED ITS DAMAGES FROM THE GOVERNMENT'S BREACH

The government asserts that PG&E should have implemented dry storage facilities at Humboldt Bay and Diablo Canyon faster than it has in order to have better mitigated its damages. GB at 42-48. The government's position is meritless, and also immaterial since it does not even allege, much less prove, that PG&E conduct was unreasonable. In fact, the undisputed evidence is that implementation of dry storage was not believed to be feasible at

Humboldt Bay through the mid-1990s. Tr. 1021:12 – 1022:9 (Womack), PX 721 at 1, 18-19, PX 228 at 7. And when PG&E explored the feasibility of implementing dry storage there, it was appropriate to first obtain approval from the California Public Utilities' Commission ("CPUC") before moving forward with such a significant decision. Tr. 1051:7 – 1053:13 (Womack). Although PG&E is not required to put its money at risk in order to mitigate its damages due to the government's breach, *see, e.g., Home Savings of America v. United States*, 399 F.3d 1341, 1353 (Fed. Cir. 2005); *Ketchikan Pulp Co. v. United* States, 20 Cl. Ct. 164, 166 (1990), PG&E did put some of its money at risk to advance the Humboldt Bay ISFSI project before receiving approval from the CPUC. Tr. 1071:18 – 1072:9, 1079:9 – 1080:5 (Womack). Ultimately, the geosciences work required for the Humboldt Bay ISFSI took a significant period of time. Tr. 1106:20 – 1107:14 (Womack). But the undisputed evidence is that this length of time is due to the novelty of the issue rather than any mismanagement by PG&E. Tr. 1594:21 – 1595:7 (Willis). And to the extent PG&E gave priority for its limited geosciences resources to the Diablo Canyon ISFSI project over the one for Humboldt Bay, that choice was reasonable given the greater importance of the issue for Diablo Canyon – ensuring that the plant could continue operation. Tr. 1031:7 – 1032:12 (Womack). Indeed, given DOE's statements that spent fuel in welded containers may need to be reopened, Tr. 3004:13 – 3029:5, 3032:11 – 3033:12 (Zabransky), the government is not in a position to complain that PG&E should have rushed to implement dry storage there earlier. *See, e.g., Ketchikan Pulp*, 20 Cl. Ct. at 166; *see also In re Kellet Aircraft Corp.* 186 F.2d 197, 198 (3d Cir. 1950).[6]

---

[6] Apparently not concerned with consistency, the government also argues in this section of its brief that PG&E should not have implemented dry storage at all given the possibility that it might have to reopen the dry storage containers. GB at 46, n.22. The government's argument is both incoherent and disputed by its own contracting officer in the testimony cited above in which he agrees that PG&E's implementation of dry storage at Humboldt Bay is reasonable

Similarly, the government complains that PG&E could have avoided the need for developing a temporary rack at Diablo Canyon if it had implemented dry storage there faster. GB at 46-48. Although the government cites evidence that early PG&E plans for the Diablo Canyon ISFSI showed earlier completion of that project, the government cites no evidence that indicates that PG&E's inability to achieve the dates in that early schedule reflected unreasonable management of that project as opposed to simply an overly optimistic initial schedule. *See also San Luis Obispo Mother of Peace v. Nuclear Regulatory Comm'n*, 449 F.3d 1016 (9th Cir. 2006) (granting in part, petition for review of NRC licensing of Diablo Canyon ISFSI).

Dated: July 7, 2006

Respectfully submitted,

s/ Jerry Stouck
Jerry Stouck
Greenberg Traurig, LLP
800 Connecticut Avenue, NW
Suite 500
Washington, DC 20006
(202) 331-3173 Phone
(202) 261-4751 Fax
Counsel for Plaintiff
Pacific Gas & Electric Company

Of Counsel:

Robert L. Shapiro
Greenberg Traurig, LLP

---

notwithstanding its need to be mindful of the possibility that there is a risk that the dry storage containers may need to be reopened.