No. 04-0074C
into which has been consolidated No. 00-0075C
(Judge Hewitt)

---

IN THE UNITED STATES COURT OF THE FEDERAL CLAIMS

---

PACIFIC GAS & ELECTRIC COMPANY,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

---

DEFENDANT'S RESPONSE TO PLAINTIFF'S MOTION TO AMEND FINDINGS AND JUDGMENT

---

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

HAROLD D. LESTER, JR.
Assistant Director

JOHN C. EKMAN
Trial Counsel
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tel: (202) 353-0897
Fax: (202) 307-2503

Attorneys for Defendant

OF COUNSEL:

JANE K. TAYLOR
Office of General Counsel
U.S. Department of Energy
1000 Independence Avenue, S.W.
Washington, D.C. 20585

ALAN J. LO RE
Senior Trial Counsel

SCOTT R. DAMELIN
JOSHUA E. GARDNER
SHARON A. SNYDER
HEIDE L. HERRMANN
MARIAN E. SULLIVAN
Trial Counsel

November 20, 2006

# TABLE OF CONTENTS

**PAGE(S)**


TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

INDEX TO APPENDIX . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

DISCUSSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

I. PG&E'S MOTION FAILS TO MEET THE LEGAL STANDARD FOR RECONSIDERATION OR AMENDMENT OF THE COURT'S FINDINGS . . 3

A. PG&E Must Show A Mistake Of Fact And Cannot Relitigate Issues Already Before The Court . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

B. PG&E Has Failed To Identify Any Mistake Of Fact Requiring Reconsideration Or Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

C. PG&E's Motion Constitutes An Attempt To Relitigate An Issue Placed Squarely Before The Court By The Government At Trial And In Post-Trial Briefs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

D. PG&E's Motion Is Not Founded Upon Previously Unavailable Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

E. PG&E Elicited Evidence At Trial That Belies Its Current Position Concerning Reracking . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

F. PG&E's Failure To Discuss The Relevant Portions Of PX 185 With A Witness Should Be Dispositive Of Its Motion . . . . . . . . . . . . . 15

II. EVEN IF THE COURT CONSIDERS PX 185, PG&E'S MOTION SHOULD BE DENIED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

A. PX 185 Does Not Support The Conclusion That PG&E *Would Have* Reracked Its Wet Pools Assuming DOE Performance At An MRS . . . . 16

B. For Myriad Additional Reasons, PX 185 Does Not Support The Amendment Or Reconsideration Of The Court's Findings . . . . . . . . . . 18

**TABLE OF CONTENTS (cont'd)**

**PAGE(S)**

1. Even If PX 185 Supported PG&E's Argument, The Totality Of Evidence Refutes The Unsupported Suppositions In That Document . . . . . 18

2. PG&E's Failure To Identify This Newly-Cited Portion Of PX 185 During Trial Precluded The Government From Presenting Evidence Of The Deficiencies In It At Trial . . . . . 21

3. PG&E's New Argument, If Considered By The Court, Calls Into Question Whether PG&E Properly Mitigated Its Damages . . . . 22

CONCLUSION . . . . . 24

# TABLE OF AUTHORITIES

## CASES

PAGE(S)

Abbott Labs. v. Syntron Bioresearch, Inc.,
334 F.3d 1343 (Fed. Cir. 2003) .......... 4

Ammex, Inc. v. United States,
52 Fed. Cl. 555 (2002) .......... 3

Bishop v. United States,
26 Cl. Ct. 281 (1992) .......... 4

Circle K Corp. v. United States,
23 Cl. Ct. 659 (1991) .......... 4

Corrigan v. United States,
70 Fed. Cl. 665 (2006) .......... 3, 4, 12

Dolphin Tours, Inc. v. Pacifico Creative Service, Inc.,
773 F.2d 1506 (9th Cir. 1985) .......... 17

Fru-Con Constr. Corp. v. United States,
44 Fed. Cl. 298 (1999) .......... 3

Griswold v. United States,
61 Fed. Cl. 458 (2004) .......... 3, 13

Henderson County Drainage Dist. No. 3 v. United States,
55 Fed. Cl. 334 (2003) .......... 3, 4

Murphy Tugboat Co. v. Crowley,
658 F.2d 1256 (9th Cir. 1981) .......... 17-18

Pacific Gas & Elec. Co. v. United States,
58 Fed. Cl. 1 (2003) .......... 3

Pacific Gas & Elec. Co. v. United States,
Nos. 04- 0074C & -0075C, 2006 WL 2925649 (Fed. Cl. Oct. 13, 2006)...5, 6, 7, 8, 13, 22

**TABLE OF AUTHORITIES (cont'd)**

**PAGE(S)**

Principal Mutual Life Ins. Co. v. United States,
29 Fed. Cl. 157 (1993) ........ 3

Roseburg Lumber Co. v. Madigan,
978 F.2d 660 (Fed. Cir. 1992) ........ 17

Seldovia Native Ass'n, Inc. v. United States,
36 Fed. Cl. 593 (1996) ........ 3, 4, 9

Yuba Natural Resources, Inc. v. United States,
904 F.2d 1577 (Fed. Cir. 1990) ........ 3

Zenith Radio Corp. v. Hazeltine Research, Inc.,
401 U.S. 321 (1971) ........ 3

# INDEX TO APPENDIX

**PAGE(S**

1. Trial Transcript, Pacific Gas & Electric Company v. United States, Nos. 04-0074C & 04-0075C (Hewitt, J.), June 5, 2006 . . . . . . . . . . . . . . . . . . . . . A.1-A.2

2. Trial Transcript, Pacific Gas & Electric Company v. United States, Nos. 04-0074C & 04-0075C (Hewitt, J.), June 7, 2006. . . . . . . . . . . . . . . . . . . . . A.3-A.11

3. Trial Transcript, Pacific Gas & Electric Company v. United States, Nos. 04-0074C & 04-0075C (Hewitt, J.), June 8, 2006 . . . . . . . . . . . . . . . . . . . .A.12-A.13

4. DX 226 (Spent Fuel Storage Action Plan Development) (PPGE0014442-4447) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A.14-A.19

5. PX 284 (Licensing On-Site Dry Storage For Spent Nuclear Fuel At Diablo Canyon, Project Submitted To The Management Committee, Pacific Gas & Electric Company For Approval At Its Meeting On March 23, 1999) (PDCP0003658-3667) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A.20-A.29

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| PACIFIC GAS & ELECTRIC COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES,<br><br>Defendant. | No. 04-0074C into which has been consolidated No. 04-0075C (Judge Hewitt) |

DEFENDANT'S RESPONSE TO PLAINTIFF'S
MOTION TO AMEND FINDINGS AND JUDGMENT

Pursuant to this Court's order dated November 6, 2006, defendant, the United States, respectfully submits the following response to the Motion to Amend Findings and Judgment ("Pl. Mot."), that plaintiff, Pacific Gas & Electric Company ("PG&E"), filed on October 27, 2006. Based upon the extensive trial record and post-trial briefing in this case, the Court should deny PG&E's motion.

## INTRODUCTION

The purpose of PG&E's motion is clear. After an adverse finding upon a central issue in this case – the rate of acceptance applicable to the Standard Contract – and the issuance of additional findings by this Court regarding causation for the Diablo Canyon Independent Spent Fuel Storage Installation ("ISFSI"), PG&E now seeks to revise the legal theories and factual evidence that it elected to present to the Court. Based upon PG&E's revised arguments, it now requests that the Court reconsider or amend those findings, which were based upon two weeks of trial testimony and 140 pages of post-trial briefing by the parties.

PG&E's motion should be denied for several reasons. First, PG&E's motion simply articulates a disagreement with the conclusion reached by the Court from its predicate factual

findings, as PG&E does not dispute any of the factual findings that form the basis for the Court's conclusions regarding the actions that PG&E would have undertaken in the "but for" world. Second, PG&E's motion is predicated upon the factually incorrect statement that "at trial neither party focused on which storage option PG&E would have selected if faced with the MRS pickup schedule." Pl. Mot., 5. Contrary to PG&E's representation, in testimony elicited at trial and as discussed in the Government's post-trial briefs, causation for the Diablo Canyon ISFSI, assuming performance by the Department of Energy ("DOE") at a monitored retrievable storage facility ("MRS"), squarely was placed at issue. Instead of addressing the Government's argument during the trial or even in its post-trial briefs, PG&E elected silence, choosing instead to rely upon its argument that no additional storage would have been needed in the "but for" world. Having elected to rely upon an all-or-nothing litigation strategy, PG&E should not be allowed to raise arguments concerning evidence that either was presented at trial or that could have been presented at trial or, only after a final judgment has been issued, finally to meet the clear and concise causation theory set forth in our post-trial briefs. Third, the evidence upon which PG&E's motion is based – PX 185 – does not support PG&E's assertion that it would have reracked its wet pools in the "but for" world assuming DOE performance at an MRS. PG&E's motion should be denied.

## DISCUSSION

### I. PG&E'S MOTION FAILS TO MEET THE LEGAL STANDARD FOR RECONSIDERATION OR AMENDMENT OF THE COURT'S FINDINGS

#### A. PG&E Must Show A Mistake Of Fact And Cannot Relitigate Issues Already Before The Court

The decision whether to grant a motion for reconsideration is within the sound discretion of the Court. Zenith Radio Corp. v. Hazeltine Research, Inc., 401 U.S. 321, 331-32 (1971); Yuba Natural Resources, Inc. v. United States, 904 F.2d 1577, 1583 (Fed. Cir. 1990). However, the Court "must consider such motion with 'exceptional care.'" Henderson County Drainage Dist. No. 3 v. United States, 55 Fed. Cl. 334, 337 (2003) (quoting Fru-Con Constr. Corp. v. United States, 44 Fed. Cl. 298, 300 (1999)). To prevail upon a motion for reconsideration, "the movant must point to a manifest (i.e., clearly apparent or obvious) error of law or a mistake of fact." Ammex, Inc. v. United States, 52 Fed. Cl. 555, 557 (2002); see also Pacific Gas & Elec. Co. v. United States, 58 Fed. Cl. 1, 2 (2003); Principal Mutual Life Ins. Co. v. United States, 29 Fed. Cl. 157, 164 (1993). More specifically, the moving party must show: (1) the occurrence of an intervening change in the controlling law; (2) the availability of previously unavailable evidence; or (3) the necessity of allowing the motion to prevent manifest injustice. Griswold v. United States, 61 Fed. Cl. 458, 460-61 (2004). A motion for reconsideration "should not be based on evidence that was readily available at the time the motion was heard." Seldovia Native Ass'n, Inc. v. United States, 36 Fed. Cl. 593, 594 (1996); see also Corrigan v. United States, 70 Fed. Cl. 665, 668 (2006).

As this Court recently held in Corrigan, a party "does not persuade the court to grant . . . [a] motion [for reconsideration] by merely reasserting arguments which were previously made

and were carefully considered by the court." 70 Fed. Cl. at 667-68 (bracketed text in original) (citing Henderson County Drainage Dist., 55 Fed. Cl. at 337). "By failing to raise an issue when it is first available to be litigated, a party waives consideration by the court of the issue on reconsideration, even when the party is *pro se*." Id. at 668 (citing Lamle v. Mattel, Inc., 394 F.3d 1355, 1359 n.1 (Fed. Cir. 2005)); see also Abbott Labs. v. Syntron Bioresearch, Inc., 334 F.3d 1343, 1355 (Fed. Cir. 2003) (holding that party waived issue by failing to raise issue in its opening brief). A motion for reconsideration "is not intended to give an unhappy litigant an additional chance to sway the court." Bishop v. United States, 26 Cl. Ct. 281, 286 (1992); see also Corrigan 70 Fed. Cl. at 668; Seldovia Native Assoc., 36 Fed. Cl. at 594; Circle K Corp. v. United States, 23 Cl. Ct. 659, 664-65 (1991). A motion for reconsideration also is "not a vehicle for parties to present arguments that they should have made during the regular briefing." Seldovia Native Assoc., 36 Fed. Cl. at 598 (citing General Elec. v. United States, 189 Ct. Cl. 116, 117-18, 416 F.2d 1320-1321 (1969) (per curiam)). To prevail, PG&E must make the requisite showing that the evidence upon which it now relies previously was unavailable because the "litigation process rests on the assumption that both parties present their case once, to their best advantage." Seldovia Native Assoc., 36 Fed. Cl. at 594 (quoting Aerolease Long Beach v. United States, 31 Fed. Cl. 342, 376, aff'd, 39 F.3d 1198 (Fed. Cir. 1994) (Table)).

PG&E's motion fails to meet the standards set by this Court for reconsideration. First, PG&E has failed to identify a "clearly apparent or obvious" mistake of fact. Second, instead of asserting a mistake of fact based upon newly-available evidence, PG&E's motion simply is an attempt to relitigate an issue – with pre-existing evidence – that was placed squarely before the Court by the Government during the trial and in post-trial briefing and that PG&E, as a matter of

litigation strategy, elected to ignore. As a result, PG&E cannot establish any of the requirements that support reconsideration or amendment of the Court's findings.

### B. PG&E Has Failed To Identify Any Mistake Of Fact Requiring Reconsideration Or Amendment

Upon analysis of the Court's order and the alleged "mistake of fact" identified by PG&E in its motion, it is apparent that PG&E does not allege a mistake of fact, but, rather, simply disagrees with the logical and well-supported inferences that the Court drew from the evidence presented at trial. Significantly, PG&E does not assert that, in the Court's numerous findings related to PX 185 – the document upon which PG&E's motion is based – the Court committed a clearly apparent mistake of fact. Instead, PG&E appears to take issue with the Court's conclusion – that PG&E would have constructed dry storage in the "but for" world – which was founded upon reasonable inferences drawn from the Court's reading of PX 185 and other trial evidence. However, a disagreement of the conclusions drawn by the Court from the undisputed factual findings concerning PX 185 and other trial evidence does not support a motion for reconsideration.

In connection with a motion for reconsideration or amendment, a review of the Court's factual findings – in their entirety – is the beginning of any analysis. In this case, the Court made numerous factual findings regarding PG&E's actions from the information in PX 185 and from other evidence presented at trial by both parties. For example, the Court found that PG&E "evaluated three storage technologies: in order 'to allow selection of a storage expansion alternative or a combination of alternatives that is mature, and cost effective,'" including reracking, rod consolidation, and dry storage. Pacific Gas & Elec. Co. v. United States, Nos. 04-0074C & -0075C, 2006 WL 2925649, at *86 (Fed. Cl. Oct. 13, 2006) (citing PX 185 at 4-12).

PG&E has not challenged this finding. The Court then made more detailed factual findings regarding PG&E's decision to develop additional spent fuel storage for Diablo Canyon. For example, the Court found that PG&E evaluated two scenarios for each SNF storage alternative it considered for Diablo Canyon, including a "MRS scenario" premised upon DOE performance starting in 1998 at an MRS:

> The 1993 Diablo Canyon Storage Technology Evaluation [PX185] studied each alternative using a "base case," in which there was no DOE performance of the Standard Contract, and an "MRS scenario," in which DOE performed under the rates as envisioned at that time by DOE's issuance of ACRs and APRs. *See, e.g., id.* at 5.

Id. at *87. Next, the Court found that the1993 evaluation concluded that most utilities were choosing dry storage to address their SNF storage needs and that dry storage had been licensed and demonstrated by several nuclear utilities:

> With respect to dry cask storage, the 1993 Diablo Canyon Storage Technology Evaluation noted that "[m]ost utilities that require additional spent fuel storage on-site currently are opting for a dry storage alternative over fuel rod consolidation, because it has been demonstrated and licensed in several ISFSIs." *Id.* at 10. The "base case" projected that a total of approximately 72 casks would need to be constructed at Diablo Canyon, while the "MRS scenario" projected that a total of only 51 casks would need to be constructed. *Id.* at 9. The 1993 Diablo Canyon Storage Technology Evaluation stated that "[t]he [net present value] life cycle cost for the dry storage alternative was calculated to be about $40.6 million. The dry storage cost would be reduced by about $9 million, if the MRS [facility] becomes available as currently scheduled." Id. at 11.

Id. Once again, PG&E has not challenged any of these factual findings.

The Court found that PX 185 noted many positive features favoring the dry storage alternative and further found, based upon PX 185 and the testimony of Mr. Womack, that PG&E determined, in the early 1990s, that a storage expansion alternative should be selected in the

1999 time frame and that the alternative should be available by 2004. Id. at *87. The Court's analysis of PG&E's decision-making continued, as the Court recognized, that PG&E "continued to evaluate the dry storage options at Diablo Canyon in order to make a final decision in approximately 1998 or 1999" and, ultimately, in March 1999, that PG&E recommended the development of dry storage for Diablo Canyon. Pacific Gas & Elec., 2006 WL 2925649, at *88. The Court found that the recommendation to develop dry storage "was based on a detailed investigation of reracking, dry storage, and the status quo, and rested on an assessment of various factors including the 'Financial Impact' of those alternatives, 'Overall Costs and Benefits' of dry storage, and 'Key Non-Financial Issues and Risks' including the potential for NRC licensing delays and other permitting delays." Id. PG&E has not disputed any of these factual findings, all of which come directly from documents and testimony offered at trial.

In addressing the issue of causation, the Court found that DOE, with performance starting in 1998, would not have started acceptance of Diablo Canyon's SNF until after 2007 and likely not before 2013:

> Based on PG&E's approved DCSs, PG&E's allocations in the 1991 APR, and DOE's acceptance rate provided in the 1991 ACR, that DOE would not have begun accepting PG&E's spent fuel at Diablo Canyon until after 2007, and likely not before approximately 2013, had DOE performed the parties' Standard Contract by beginning to collect the utilities' spent fuel by January 31, 1998. *See supra* Part I.B.2.c.iii; DX 197 (DOE memorandum with attached 1991 APR) at 25; PX 185 (August 1993 PG & E Preliminary Evaluation of Spent Fuel Storage Technologies for Diablo Canyon Power Plant) at 2.

Pacific Gas & Elec., 2006 WL 2925649, at *89. The Court also found that, "[u]nder such circumstances, PG&E would have been required in the ordinary course of its business to construct additional at-reactor storage at Diablo Canyon in order to prevent it from reaching

capacity in 2006 even if DOE had performed under the Standard Contract by accepting the utilities' spent fuel beginning no later than January 31, 1998 and by performing according to the 1991 ACR/APR and the utilities' approved DCSs." Id. As with the prior findings, PG&E does not allege any errors in these factual findings.

Finally, drawing upon trial testimony and several documents, including PX 185, the Court concluded that, in 1993, when PG&E still assumed that DOE performance would begin in 1998 at an MRS, PG&E believed that dry storage was the most favorable SNF storage option for Diablo Canyon:

> In 1993 when it was still envisioned that DOE could be performing the Standard Contract by 1998 using an MRS facility, the preponderance of the credible evidence indicates that the dry storage option was the most favorable to PG&E. *See id.* at 10 ("Most utilities that require additional spent fuel storage on-site currently are opting for a dry storage alternative over fuel rod consolidation, because it has been demonstrated and licensed in several ISFSIs."), 12 (noting positive features of dry storage, including ease of decommissioning); PX 209 (July 19, 1994 speech by Ivan Selin, Chair, NRC, endorsing dry storage) at 1.

Pacific Gas & Elec., 2006 WL 2925649, at *89 (emphasis added). As with the other factual findings referenced above, PG&E has not challenged any of the quotes cited by the Court, and PG&E does not assert any error in the Court's finding that dry storage was "the most favorable" option. Simply stated, PG&E does not dispute any of the Court's predicate factual findings regarding dry storage at Diablo Canyon. Instead, PG&E disagrees with the Court's ultimate conclusion regarding causation for the Diablo Canyon ISFSI, assuming DOE performance at an MRS. However, the Court's factual findings upon this issue, which PG&E has not disputed, support the conclusion that the Court ultimately reached.

Additionally, while the Court's order references certain evidence taken at trial, additional evidence, cited in the Government's post-trial briefs, supports the conclusions that the Court reached concerning PG&E's actions in the "but for" world. As will be discussed below, additional trial testimony by Mr. Womack and several other exhibits, including DX 226 (App. 14-19),[1] provide further support for the Court's conclusions. See Def. Post-Trial Brief, at 26. PG&E has failed to identify any clearly apparent or obvious mistake of fact – and simply articulates a disagreement with the ultimate conclusion drawn by the Court from the evidence – and its motion should be denied.

### C. PG&E's Motion Constitutes An Attempt To Relitigate An Issue Placed Squarely Before The Court By The Government At Trial And In Post-Trial Briefs

In an attempt to meet the legal standards applicable to a motion under RCFC 52 and RCFC 59, PG&E argues that "neither party focused on which storage option PG&E would have selected if faced with the MRS pickup schedule." Pl. Mot. 5. PG&E goes even further, arguing that "[t]here was no occasion for either party to establish *which* of the storage options evaluated in PX 185 (and other PG&E planning documents) PG&E would have selected if faced with the MRS pickup schedule, and neither party did so." Pl. Mot. 5-6 (italics in original, underscore emphasis added). PG&E's argument clearly is intended to address the Court's proscriptions that a motion for reconsideration may not be used as "a vehicle for parties to present arguments that they should have made during the regular briefing." Seldovia Native Assoc., 36 Fed. Cl. at 598 (citations omitted).

---

[1] "App. __" refers to the appendix attached to this response.

PG&E's statements as to the issues that were (or were not) raised by the parties and placed before the Court are demonstrably false. Throughout the presentation of evidence and in post-trial briefing, the Government repeatedly demonstrated that, assuming performance at an MRS, PG&E would have constructed the dry storage facility. For example, as referenced in the Government's post-trial brief, the following testimony was elicited upon cross-examination of Larry Womack, a former PG&E employee:

> Q. So in other words, if there was a slower schedule, and let's take Diablo Canyon as a great example, Diablo was going to run out of pool space, or they were going to impinge upon full core reserve in 2006, correct?
>
> A. That's correct.
>
> Q. And so if there was no acceptances at Diablo Canyon before 2006, PG&E would have had to have built dry storage, correct?
>
> A. I believe that's what I stated yesterday.

Tr. 1177:21-25 (Womack) (App. 13); see also Def. Post-Trial Brief, at 26. Likewise, the Government's post-trial brief clearly articulated the Government's position that the Diablo Canyon ISFSI would have been built assuming DOE performance at an MRS:

> [A] 1992 strategy document noted that "[a]dditional spent fuel storage must be provided at DCPP to support operation after the year 2006," assuming that DOE commenced acceptance beginning in 1998 at the MRS. DX 226 (PPGE0014443); see also DX 355 (PDCP0000874) (noting that DOE acceptance will be based upon OFF and that, under OFF, DCPP's SNF does not begin shipping until 14 years after commencement of DOE acceptance). Indeed, by 1992, PG&E began planning for storage capacity expansion at DCPP. DX 226. Soon thereafter, PG&E clearly had focused its efforts on expanding capacity at DCPP through the implementation of dry storage. PG&E's dry storage plans were made assuming timely DOE performance under the rate of acceptance set forth in the 1991 ACR. See DX 226 (PPGE0014443).

Def. Post-Trial Brief, at 26. To the extent that this argument lacked sufficient clarity, we concluded by asserting that, "[a]ssuming DOE performance beginning in 1998 under the 1991 ACR, PG&E would have constructed the dry storage facility at DCPP." Id. at 26 (citing DX 226 (PPGE0014443) (App. 15); Tr. 1177:21-25 (Womack) (App. 13)).

The Government's demonstration concerning causation for the Diablo Canyon ISFSI did not end with its initial post-trial brief. In its response to PG&E's post-trial brief, the Government again referenced the Diablo Canyon ISFSI in a discussion of the parties' respective burdens of proof. Specifically, the Government noted that, under the 1991 ACR rate of acceptance, PG&E would have utilized dry storage regardless of any DOE delay:

> PG&E's post-trial brief does not attempt to demonstrate how its alleged damages are causally related to DOE's delay. Instead, PG&E simply makes a blanket assertion that all of its alleged $92 million in purported SNF storage costs are related directly to DOE's delay in SNF acceptance . . . [U]nder the 1991 ACR rate of acceptance, PG&E would have incurred significant costs for HBPP SAFSTOR and the DCPP ISFSI. Once again, PG&E's decision to eschew the acceptance rate or to construct a "but for" world is in error."

Def. Resp. to Pl. Post-Trial Brief, at 18 (emphasis added).[2]

PG&E wholly failed to respond to these clear and concise legal and factual statements in PG&E's two post-trial briefs. PG&E also failed to elicit any testimony at trial responsive to the

[2] In our pre-trial briefs, we raised similar arguments. For example, we argued that, "if DOE would not have begun accepting SNF from Diablo Canyon until 2011 in the 'but for' world, DOE is not responsible for storage costs until that date." Def. Pretrial Brief, at 39. We further tied causation for the Diablo Canyon ISFSI and temporary rack directly to the rate of acceptance, arguing that, "[i]f the Court properly finds that the Government only was obligated to accept the amounts of SNF set forth in the 1991 ACR against which the utilities submitted DCSs, PG&E's claim for . . . the costs associated with additional capacity at Diablo Canyon, among other costs, are reduced or eliminated." Id. at 61.

testimony that Mr. Womack presented, cited above, or in connection with DX 226, the exhibit upon which the Government relied for some of its factual conclusions. Instead of responding to the possibility that the Court might find in the Government's favor upon the central issue of the rate of acceptance, PG&E elected to marginalize the relevance of the rate of acceptance upon damages and rely instead upon a litigation position that the Government was obligated to meet a qualitative standard that precluded the need for additional at-reactor storage after 1998. See Pl. Post-Trial Brief, at 6, 8.[3] Under that theory, PG&E argued that all of the storage costs incurred at Diablo Canyon were caused by DOE's partial breach. Id. PG&E could have presented an alternative theory assuming performance under the acceptance rates set forth in the 1991 Annual Capacity Report ("ACR"). Yet, in the face of clear and unambiguous statements from the Government of its position, PG&E chose not to present any alternatives to this Court. It intentionally did not argue that, were DOE obligated to perform at the 1991 ACR rates, PG&E would have reracked its Diablo Canyon wet pools in the "but for" world. PG&E has identified no briefing in which it made such an argument. Because PG&E failed to raise this issue "when it is first available to be litigated," it therefore "waive[d] consideration by the court of the issue on reconsideration." Corrigan, 70 Fed. Cl. at 668.

[3] In his opening statement, counsel for PG&E stated PG&E's litigation position as follows: "These damages are what the case is all about. What this case is not about is the issue that the government focuses on primarily, the so-called schedule issue. PG&E has had to deal with and pay for its spent fuel since January 1998 or for storage after '98 because the fuel was there, and the whole purpose of the contract was to remove the fuel. . . . [T]he fact of damage in this case . . . does not depend upon those schedule details. PG&E built these dry storage facilities, which is the bulk of the damages, for one reason only, to store the spent fuel that DOE has failed to remove in breach of its contract obligation." Tr. 26:20-27:11 (App. 2).

D. PG&E's Motion Is Not Founded Upon Previously Unavailable Evidence

As is clear from PG&E's motion and the Court's order, the document upon which PG&E bases its motion for reconsideration was not "previously unavailable," as required by the standards for reconsideration established by this Court. See Griswold, 61 Fed. Cl. at 460-61. Instead, PX 185 was subject to testimony from Mr. Womack during direct examination and the document was cited in PG&E's post-trial brief for the proposition that, "as early as 1993[,] PG&E studied storage expansion options for Diablo Canyon" and for a recommendation that PG&E should wait until 1999 to decide among the storage options. Pl. Post-Trial Brief, at 27. Both of these conclusions were referenced by the Court in its decision. See Pacific Gas & Elec., 2006 WL 2925649, at *86-88. At no time, however, did any witness discuss the sections of PX 185 upon which PG&E's motion is based, and PG&E's post-trial briefs do not cite PX 185 for the proposition that a full reracking would have been performed in the "but for" world assuming performance consistent with the 1991 ACR.

The evidence upon which PG&E relies is not new, having been used by PG&E at trial, having been cited in its post-trial brief, and having been referenced by this Court in its findings of fact. PG&E cannot contend that its motion is proper based upon previously unavailable evidence, as required by this Court. PG&E's motion therefore should be denied.

E. PG&E Elicited Evidence At Trial That Belies Its Current Position Concerning Reracking

In addition to PG&E's reliance upon the imposition of a 3,000 MTU rate of acceptance for causation and resulting failure to address the Government's factual contentions regarding causation under the 1991 ACR rate of acceptance, PG&E's instant motion represents a material change in PG&E's litigation position concerning the viability of reracking that PG&E presented

at trial. Although the Court heard limited evidence concerning the possibility of reracking Diablo Canyon's wet pools, the evidence that was presented by PG&E contradicts its current position that reracking would have been performed in the "but for" world. Specifically, on direct examination, PG&E elicited testimony from Mr. Womack that the Nuclear Regulatory Commission, in the late 1990s, "indicated a preference for dry cask storage" at Diablo Canyon. Tr. 1054:7-24 (Womack). Mr. Womack testified that the NRC's preference was based upon "concerns [the NRC] had with the viability of licensing a rerack of the spent fuel pool, given the additional heat load and the seismic issues that we would have to deal with." Tr. 1054:19-24 (Womack). Similarly, PG&E elicited testimony that identified the lower up-front costs associated with dry storage and its incremental nature as an advantage over the "large initial investment" associated with reracking. Tr. 1066:1-10 (Womack) (App. 9) (discussing PX 284 (App. 20-29)).

While the record reflects relatively few references to reracking Diablo Canyon, those that exist contradict the assertion that reracking was a preferred alternative assuming DOE performance at the 1991 ACR rate of acceptance. PG&E should not be allowed, through a motion for reconsideration after final judgment, to modify its prior trial strategy that focused on marginalizing the reracking possibilities at Diablo Canyon.[4]

---

[4] PG&E's marginalization of reracking alternatives can be explained several ways. In marginalizing reracking in advance of the Government's cross-examination and case-in-chief, PG&E could have been attempting to support the conclusion that proceeding with dry storage was a reasonable decision over other, potentially available, alternatives. The Government never challenged the propriety of selecting dry storage at Diablo Canyon, regardless of the acceptance obligation imposed upon DOE by the Standard Contract. It also is possible that PG&E was attempting to preclude any argument by the Government that, by foregoing a potentially cheaper expansion alternative to dry storage, PG&E failed to mitigate its damages. The Government never made that argument based upon the evidence presented at trial and our belief that the

F. PG&E's Failure To Discuss The Relevant Portions Of PX 185 With A Witness Should Be Dispositive Of Its Motion

PG&E's new-found reliance on PX 185 to persuade the Court to amend its findings and judgment violates the Court's repeated admonitions concerning the use of evidence at trial and the parties' reliance upon evidence not discussed with a witness. Despite the Court's repeated directions and warnings to both parties that witnesses should testify regarding specific portions of exhibits upon which the parties would rely in post-trial briefing – and upon which the Court would rely in making its findings – PG&E failed to discuss with any witness at trial the portions of PX 185 upon which PG&E now relies. Indeed, the significance of the Court's admonition becomes clear in any examination of PG&E's reliance upon PX 185. As discussed above, PX 185 was cited in PG&E's post-trial brief in support of relatively innocuous facts concerning the timing of PG&E's decision-making, and PX 185 was used with witnesses for a similar purpose. The only reference to reracking during the discussion of PX 185 with Mr. Womack related to the fact that the report "indicates that reracking was also considered at that time by this study" (Tr. 1025:18- 21 (Womack) (App. 7)), and the terms "rerack" and "reracking" do not even appear in PG&E's initial post-trial brief. PG&E's failure to discuss the relevant portions of PX 185 with a witness, and subject that witness to cross-examination upon those sections, should be dispositive of PG&E's motion here.

record demonstrated that reracking was not a viable alternative under any acceptance scenario.

## II. EVEN IF THE COURT CONSIDERS PX 185, PG&E'S MOTION SHOULD BE DENIED

### A. PX 185 Does Not Support The Conclusion That PG&E *Would Have* Reracked Its Wet Pools Assuming DOE Performance At An MRS

Even if the Court were to consider PX 185 for the purposes of amending its findings and judgment, PX 185 does not support the proposition that PG&E now advocates. Specifically, PG&E asks that the Court apply statements in PX 185, to the effect that the reracking assumed in that report could provide adequate storage assuming the MRS "became available as planned," to conclude that PG&E would have reracked the spent fuel pools had DOE performance at an MRS been assured. However, PG&E failed to elicit any testimony that PG&E would have reracked the Diablo Canyon wet pools in the "but for" world, assuming DOE performance at an MRS. Further, PX 185 does not support the proposition that, assuming DOE performance under the 1991 ACR rate of acceptance, PG&E would have reracked its wet pools. Instead of detailing how PG&E would have acted in the face of performance by DOE at an MRS, PX 185 simply concluded that "all three storage expansion alternatives [dry storage, reracking, and rod consolidation[5]] should be considered potentially viable at this time." PX 185 (PDCP0001704).[6]

---

[5] The conclusion in PX 185 that rod consolidation could "work well with other spent fuel expansion technologies" (PX 185 at PDCP 0001699), when combined with testimony taken at trial, provides additional support for concluding that PX 185 should not be relied upon by the Court as justification for amending its findings. At trial, PG&E introduced testimony that rod consolidation was experimental in the 1980s and was "subsequently determined to be not feasible." Tr. 988:24-989:10; 1013:20-1014:1 (Womack) (App. 4-6). When a report advocates, as viable, a storage expansion option that was, as a matter of fact, not viable at the time that PG&E needed to make its decisions, conclusions regarding the viability of any option should be called into doubt.

[6] PG&E attached a copy of PX 185 to its motion. As a result, we have not included that document in the appendix to this response.

Moreover, as is clear from the Court's undisputed findings, PX 185 clearly references PG&E's preference for dry storage over other potential technologies. PX 185 simply does not support the conclusion – as PG&E states in its motion to amend – that "PG&E, if faced with the MRS pickup schedule that the Court has now determined to be controlling, would not have implemented dry storage, but rather would have pursued the far less costly reracking alternative set out in PX 185." Pl. Mot. at 2.

Any assertion that reracking was a possible alternative does not lead to the conclusion that reracking would have been used in the "but for" world, assuming timely performance by DOE. In fact, the lack of any evidence concerning what PG&E would have done in the "but for" world defined by the Court ultimately is laid bare by PG&E's reliance upon case law concerning the assumption, by courts, of "economic rationality" in hypothetical free markets.[7] Pl. Mot. 7. Yet, none of these cases involves the selection of competing technologies in the face of a breach where economic (narrowly defined to encompass cost only), technical, regulatory, licensing, and socio-political concerns all hold sway in dictating behavior. See Dolphin Tours, Inc. v. Pacifico Creative Service, Inc., 773 F.2d 1506, 1511 (9th Cir. 1985) (in lost profits case, requiring that damages models assume rational economic behavior by plaintiff's competitors within a free market); Roseburg Lumber Co. v. Madigan, 978 F.2d 660, 668 (Fed. Cir. 1992) (in lost profits case, concluding that an assumption of normative economic behavior by plaintiff's competitors in free market would have forced bid prices up, thereby eliminating plaintiff's asserted lost profits); Murphy Tugboat Co. v. Crowley, 658 F.2d 1256, 1262 (9th Cir. 1981) (in lost profits

[7] As will be discussed below, PG&E's cost assumptions from its motion are tenuous, at best.

case, requiring that damages model assume rational economic behavior by plaintiff's competitors). The cases that discuss "economic rationality" that PG&E cites all discuss that issue within the context of a lost profits model where a party failed to assume rational economic behavior by other market participants, resulting in damages being overstated. This case law does not translate to PG&E's selection of a storage technology that requires the consideration of, among other things, economic, technical, and political viability.[8] No testimony or evidence exists that supports the evidentiary leap that PG&E's motion requires. Even if the Court were to consider this previously available evidence, and we believe that it should not, PG&E's motion should be denied because PX 185 does not support the finding that PG&E now advocates.

B. For Myriad Additional Reasons, PX 185 Does Not Support The Amendment Or Reconsideration Of The Court's Findings

1. Even If PX 185 Supported PG&E's Argument, The Totality Of Evidence Refutes The Unsupported Suppositions In That Document

As discussed above, at trial, PG&E failed to elicit any testimony explaining the reracking section of PX 185. In light of all the evidence presented at trial, PX 185 is not persuasive on the issue for which PG&E relies upon it, namely its alleged performance in the "but for" world. In fact, other evidence provides further support for the Court's conclusions and contradicts PG&E's most recent argument. In 1992, PG&E produced a strategic planning document for DCPP's future spent fuel storage (DX 226), that noted DOE's plans to have an MRS "open for temporary

[8] A party could select a more expensive technology and still be acting in an economically rational manner. To determine rationality, the Court would need to look at the cost implications of each alternative, as well as at technical, licensing, regulatory, political, and safety concerns that exist for each alternative. As the Court correctly concluded here, dry storage was favored for many reasons, and the construction of dry storage therefore was rational in both the "but for" and actual worlds.

storage of spent nuclear fuel in 1998." DX 226 (PPGE0014443) (App. 15). Soon thereafter, PG&E clearly had focused its efforts on expanding capacity at DCPP through the implementation of dry storage. PG&E's dry storage plans were made assuming timely DOE performance under the rate of acceptance set forth in the 1991 ACR. See Id.; Tr. 1177:21-25 (Womack) (App. 13).

On direct examination, PG&E elicited testimony from Mr. Womack that the Nuclear Regulatory Commission, in the late 1990s, "indicated a preference for dry cask storage" at Diablo Canyon. Tr. 1054:7-24 (Womack) (App. 8). Mr. Womack testified that the NRC's preference was based upon "concerns [the NRC] had with the viability of licensing a rerack of the spent fuel pool, given the additional heat load and the seismic issues that we would have to deal with." Tr. 1054:19-24 (Womack) (App. 8). In PG&E's management presentation to the company's board of directors seeking approval for the Diablo Canyon dry storage project, PG&E emphasized that a "commitment to wet storage (re-racking) would require a large initial investment," while "dry storage has a lower initial investment than wet storage." PX 284 (PDCP0003661) (App. 23). Similarly, Mr. Womack testified on direct examination that PG&E identified the lower up-front costs associated with dry storage and its incremental nature as an advantage over the "large initial investment" associated with reracking. Tr. 1066:1-10 (Womack) (App. 9) (discussing PX 284).

Contrary to the assertions in PG&E's motion, the technical hurdles to reracking at Diablo Canyon – referenced in PX 185[9] – were so substantial that PG&E elicited testimony from Mr. Womack belying the feasibility of the Diablo Canyon rerack:

> [For] Diablo, in and about the '97 time frame, while Greg Rueger was meeting with senior NRC officials in Washington, D.C., they indicated a preference for dry cask storage, citing concerns they had with the viability of licensing a rerack of the spent fuel pool, given the additional heat load and the seismic issues that we would have to deal with."

Tr. 1054:17-23 (Womack) (App. 8);[10] see also Tr. 1055:21-1056:1 (Womack) (App. 8) ("NRC's preference indicated that we were likely to have an easier course of it and indicated that, particularly with regard to Diablo, that there were some technical concerns at NRC staff regarding the reracking alternative.").

In addition to the preliminary nature of PX 185 from a technical and engineering perspective, the cost components of PX 185 related to reracking, upon which PG&E's revised claim is based, appear not to be reliable. PX 185 acknowledges that the basis for the cost estimates for the three alternatives considered was obtained on an "informal basis at approximate levels." PX 185 (PDCP0001695). PX 185 further recognized the uncertainties of the cost estimates upon which PG&E now relies:

---

[9] For example, PG&E's motion does not reference the language from PX 185 that the "viability of [the reracking] alternative could depend on the results of seismic, structural and cooling capability analyses." PX 185 (PDCP0001703).

[10] PG&E cited this same testimony in its post-trial brief. Pl. Post-Trial Brief, at 30.

> Obviously, their application for DCPP's projections can have large uncertainties, and as such the results should be treated for comparison only. Also, the cost estimates discussed identify major elements only and are not intended to provide a full cost of the alternative. The estimates do not include potential legal or additional licensing costs related to public hearings and court interventions as they are almost impossible to estimate, and the three alternatives could be assumed to carry the same potential of this type of costs.

PX 185 (PDCP0001695). PG&E's motion also fails to cite to language from PX 185 that indicates the reracking option potentially was more costly than the $15.9 million figure upon which PG&E relies in its motion, or that the "dry storage costs appear to be trending down." PX 185 (PDCP0001696, PDCP0001703). At trial, PG&E failed to elicit <u>any</u> testimony regarding the purported "cost" for the reracking option contained in PX 185 that, upon its face, appears to be a "soft" cost estimate.

2. <u>PG&E's Failure To Identify This Newly-Cited Portion Of PX 185 During Trial Precluded The Government From Presenting Evidence Of The Deficiencies In It At Trial</u>

From a technical and cost perspective, PX 185 is not a document upon which this Court should base an amendment to its findings of fact. Notwithstanding that the document was available to PG&E at the time of trial – indeed, it was used by PG&E at trial – had PG&E discussed any of the sections upon which it now relies at trial, any deficiencies of the document, as it related to reracking, could have been elicited from those witnesses as well. Of course, instead of promoting the reracking alternative, PG&E's trial strategy appeared to focus upon

discussions of why reracking was not viable. PG&E's reversal of position, based solely on an admittedly preliminary report whose authors failed to testify at trial, should be rejected.[11]

3. PG&E's New Argument, If Considered By The Court, Calls Into Question Whether PG&E Properly Mitigated Its Damages

Finally, to the extent that Court elects to consider PX 185, and PG&E's characterization of that exhibit, PG&E's newfound argument calls into question whether it successfully mitigated its damages in the face of DOE's partial breach. According to PG&E's interpretation of PX 185, reracking would have provided adequate SNF storage nearly through the end of Diablo Canyon's licensed life, even without the MRS. The Government initially investigated pursuing the argument that PG&E, by selecting dry storage at Diablo Canyon, failed to mitigate its damages given the potential reracking alternative. However, during both discovery and at trial, substantial evidence was adduced that the reracking alternative that PG&E now argues would have been implemented in the "but for" world was not feasible; carried higher up-front cost as compared to modular dry storage; was not preferred by PG&E, its ratepayers, and regulatory bodies; and faced uncertain technical and licensing issues. In fact, the Court's findings concur with many of the Government's independent conclusions. See Pacific Gas & Elec., 2006 WL 2925649, at *86-91. Based upon that evidence, and upon PG&E's failure to raise its new reracking argument prior to final judgment, we did not challenge PG&E's selection of dry storage in either the "but for" or actual worlds.

---

[11] All trial testimony regarding PX 185 was provided by Mr. Womack. PG&E did not call either of the two individuals identified on the document itself, Messrs. Kamdar and Budke, as witnesses. Mr. Womack was working in PG&E's steam generation group when PX 185 was drafted. Mr. Womack testified regarding some portions of PX 185 over the Government's objection that he was not involved with the development of the document. Tr. 1132:25-1134:12 (Womack) (App. 10-11).

However, if we had been presented with PG&E's current position at trial or in post-trial briefing, we could have raised the failed mitigation argument. If successful, instead of reducing PG&E's damages by the cost of the rerack, while allowing all dry storage costs to pass through to damages (as PG&E now advocates), we would have requested that the Court exclude from PG&E's damages any dry storage costs incurred through the end of the licensed life for the Diablo Canyon facility. In that event, instead of increasing PG&E's past and future damages – as its current motion seeks – PG&E's damages would decrease substantially.

PG&E cannot have it both ways. Having failed to argue reracking as a viable alternative in the "but for" world, it should be precluded from arguing that alternative now. However, if the Court were to conclude that reracking was technically, politically, and economically viable in the "but for" world based upon PG&E's new contentions, the Court should issue similar findings in the actual world, reducing PG&E's past damages and eliminating PG&E's ability to seek future damages until the mid-2020s.[12] We believe, however, that our initial conclusions regarding the rerack, and the conclusions of the Court, are supported by the evidence and that the Court should not further reconsider evidence presented at trial now.

[12] PG&E's motion, if granted, effectively could render moot the Court's ruling upon DOE's contractual obligations, including the rate of acceptance.

## CONCLUSION

For the reasons outlined above, the Government respectfully requests that the Court deny PG&E's motion for reconsideration or amendment of its findings of fact and judgment.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/ Harold D. Lester, Jr.
HAROLD D. LESTER, JR.
Assistant Director

s/John C. Ekman
JOHN C. EKMAN
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, NW
Washington, D.C. 20530
Tel: (202) 353-0897
Fax: (202) 307-2503

OF COUNSEL:

JANE K. TAYLOR
Office of General Counsel
U.S. Department of Energy
1000 Independence Ave., S.W.
Washington, D.C. 20585

ALAN J. LO RE
Senior Trial Counsel

SCOTT R. DAMELIN
JOSHUA E. GARDNER
HEIDE L. HERRMANN
SHARON SNYDER
MARIAN E. SULLIVAN
Civil Division
Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530

November 20, 2006

Attorneys for Defendant

# APPENDIX

**Pacific Gas & Electric v. U.S. No. 04-74C June 5, 2006**

**Heritage Reporting Corporation**

**Page 1 to Page 410**

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

*HERITAGE REPORTING CORPORATION*
*1220 L Street, N.W.*
*Suite 600*
*Washington, DC 20005*
*Phone: 202-628-4888*
*FAX: 202-371-0935*

main options were to either expand capacities in the pool or implement dry storage. Number four, PG&E did spend almost a million dollars investigating and participating in a private fuel storage initiative that centered around a couple of Native American Indian sites, one of which is still ongoing, although PG&E is no longer participating. Number five, Humboldt's SAFSTOR refers to – SAFSTOR is a regulatory term, S-A-F-S-T-O-R. This refers to the cost of running the spent fuel pools at Humboldt Bay prior to the time that the fuel is removed and put into dry storage and past a time when, if DOE had been performing its obligations as required, the fuel would have been removed from the site.

These SAFSTOR costs would have been cut off. The pool would not have to run any longer if the fuel was not in it. The company could go immediately, once the fuel is removed, go immediately into decommissioning. And so, unable to do that, the pool runs, and the SAFSTOR costs continue until the pool is now emptied in the breach world, if you will, into



the dry storage facility.

Number six is the Humboldt ISFSI costs, licensing, design, permitting, and so forth of the dry storage facility at Humboldt Bay. And number seven, the Humboldt stack removal, these are, you'll see in some photographs we'll show later, large vent stack directly over the spent fuel pool at Humboldt Bay which had to be removed. And the cost of doing that was higher because of the need to take greater care to avoid problems with the spent fuel directly below, and also, another stack had to be constructed, a smaller stack had to be constructed, which would not have been necessary if the fuel were gone. So those are the categories, and you'll be hearing more detail about that, obviously, as the trial goes along.

These damages are what the case is all about. What this case is not about is the issue that the government focuses on primarily, the so-called schedule issue. PG&E has had to deal with and pay for its spent fuel since January 1998 or for storage after '98 because



the fuel was there, and the whole purpose of the contract was to remove the fuel. Our view is that the details of the pickup schedule are not unimportant, and we'll prove the details certainly, but the fact of damage in this case, Your Honor, does not depend upon those schedule details. PG&E built these dry storage facilities, which is the bulk of the damages, for one reason only, to store the spent fuel that DOE has failed to remove in breach of its contract obligation.

Now, the government's view of the schedule issues, I touched on this before, focuses on problems that DOE encountered carrying out the statute and the contract. Whenever the Court sees a DOE document or a witness talks about a start date after 1998 or an acceptance rate less than approximately 3,000 MTU, the reason for that late start date, or the reason for that low rate is some problem that DOE has encountered in carrying out its mission.

The repository is not going to be done until 2010 is one good example of that, and the government's position here is that those



problems that DOE encountered can now define what DOE's obligation is. They encounter a problem, they have to start later at a lower rate, and they say that's all we have to do.

Well, the problems that they encountered can't define the obligation. It's not only circular, Your Honor, but it's contrary to the D.C. Circuit's holdings that DOE's obligations are not conditional on any particular facility or anything else. DOE's obligations are unconditional.

And the ultimate example of the government's circular definition of DOE's obligation, Your Honor, is the DCS argument, which is a primary one that the government is putting forward here. In the early 1990s, because DOE knew that the repository would not be ready until at least 2010, that was announced in the late 1980s, DOE proposed to perform in 1998 using a monitored retrievable storage facility.

But due to these linkages that were put in place in the 1987 NWPA, Nuclear Waste Policy Act amendments, the MRS could not be built until DOE retained a repository

002

**Pacific Gas & Electric Company v. U.S. No. 04-74C June 7, 2006**

**Heritage Reporting Corporation**

**Page 781 to Page 1171**

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

*HERITAGE REPORTING CORPORATION*
*1220 L Street, N.W.*
*Suite 600*
*Washington, DC 20005*
*Phone: 202-628-4888*
*FAX: 202-371-0935*

Page 985

Q. Anything on this photo worth pointing out now that you haven't already?
A. Just the configuration I described previously, water above racks at the bottom of the pool, there's in excess of 20 feet of water above those racks for shielding purposes.
Q. And let's go to number 8, now, please, if we could, Demonstrative 8.
A. This is Demonstrative 8. This is a photo of the Humboldt Bay spent fuel pool. Again, there is water in that pool. It's just at a purity level that it appears there is no water there. At the bottom of the pool, again, are the racks that hold the 390 fuel assemblies at Humboldt Bay.
MR. STOUCK: Your Honor, if I could interrupt for just a second, I've been reminded by one of my colleagues, we have in the courtroom Mr. Bob Kapus, he is a PG&E employee. He will be a witness. He is also the company's corporate designee under Rule 615, so I wanted to put that on the record.
THE COURT: Thank you.
BY MR. STOUCK:
Q. And is all of PG&E's spent nuclear

Page 986

fuel at both sites currently stored in one of the spent fuel pools?
A. It is.
THE COURT: Let me just ask, how many assemblies are in each of those squares?
THE WITNESS: Each of those squares that stick up holds four assemblies in this particular design.
BY MR. STOUCK:
Q. Is that true at Diablo as well?
A. No. On Demonstrative 6, each of the squares in that photo holds a single assembly. A Diablo assembly is roughly twice as wide as a Humboldt assembly and almost twice as long.
THE COURT: Thank you.
BY MR. STOUCK:
Q. Do you know, try to do some math in public here, do you know how many assemblies approximately are contained in each of the Diablo Canyon pools at the present time?
A. Yes, my understanding is they're just under 1,100 in the unit 1 pool at Diablo, that there are approximately 1,100 in the unit 2 pool, and Humboldt has 390 assemblies in its pool.

Page 987

Q. And if you can, can you translate that to MTU in each pool?
A. Yes. For the two Diablo pools, it's approximately 470 to 480 MTU. For the Humboldt pool, it's approximately 29 MTU.
Q. Thank you. Now, is this wet, this pool storage, wet pool storage widely used in the industry?
A. At every water cooled nuclear power plant that I know of.
Q. Mr. Womack, are you familiar with the term "full core reserve"?
A. Yes.
Q. What is that?
A. Full core reserve, sometimes also called full core offload capability, is an operating practice employed by most all U.S. utilities that reserves space in the spent fuel pool for the complete discharge of the reactor. In the case of the Diablo units, that would be the full discharge of 193 fuel assemblies.
Q. And PG&E maintains this practice at Diablo Canyon?
A. That has been a practice at Diablo and I believe continues to be the practice in

Page 988

place.
Q. And briefly, the reason for that practice is what?
A. The reason is really twofold. It does facilitate routine refueling outage performance, but more importantly, should equipment or events require offload of the reactor during an operating cycle, and an operating cycle is roughly 18 months, that full core offload capacity or full core reserve would be necessary in order to perform critical maintenance on the reactor.
Q. And an operating cycle is what?
A. An operating cycle runs between refueling outages and is approximately 18 months.
Q. Are you familiar with the term "reracking," and if so, what does that mean?
A. Yes, I am familiar with the term. Typically, reracking involves the replacement of some or all of the racks within a spent fuel pool, typically for the purpose of increasing its storage capacity.
Q. What about rod consolidation, what does that term mean in the context we're

004

Page 989

discussing?

A. Rod consolidation, again, referring to the Humboldt assembly here, you would take the fuel rods in the assembly, take the nonfuel hardware, the top nozzle, bottom nozzle, the grids off, and then you would be able to store those fuel rods more compactly, or approximately 2:1, that practice was demonstrated in the, I believe, in the '80s, and it's not in use in the industry today.

Q. And you mentioned also in addition to wet storage, concept of dry storage, which, of course, we've heard some about already in this trial, but just briefly, what does dry storage of spent nuclear fuel entail?

A. Dry storage is the storage of spent fuel outside of the spent fuel pool in specially built containers made of steel and typically of concrete.

Q. And are there different types of dry storage, to your understanding, in use?

A. Yes, there are two that come readily to mind, storage only containers, which was the first step in the evolution, and more recently, so-called dual purpose containers that are

Page 990

suitable both for storage at the reactor site or transport.

Q. And we're almost at the end of the terminology, but we've also heard some testimony about a phrase, "independent spent fuel storage installation," or the acronym being ISFSI. What is that?

A. Yes. An ISFSI, in most regards, is just another name for dry cask storage facility, but typically, when the term "ISFSI" is used, it comprises not only the storage cask and storage system, but the pad and any security or other measures that would be necessary for the facility.

Q. And let's take a brief look at Demonstrative 13, and we'll come back to this later. Actually, pass that out. What is this, Mr. Womack?

A. This is a photo of what I characterize as a typical implementation of dry cask storage.

Q. Sorry. Excuse me?

A. I don't know what facility it is, one that we've gained along the way.

Q. Actually, again, we will come back to

Page 991

it, but I wanted – let's take a look at Demonstrative 10, is actually the one I had in mind, just for a brief view now, and then we'll come back to it later. What is this?

A. You'll recall in the earlier photo of Diablo, I pointed out the two water storage reservoirs. This is now a view from the north, looking south, at an artist rendition of the Diablo facility when it would be fully built out. So what we see is a large concrete pad surrounded by security fences and, on that pad, the artist's characterization of storage casks.

Q. And similarly, if we could look just briefly now and come back later to Demonstrative Number 28, what is this, Mr. Womack?

A. This is, again, an artist rendition of the proposed facility for Humboldt Bay Power Plant. In this facility, you see some clear differences to the Diablo design. First, the pad, so to speak, is below grade, below ground. The casks themselves, the top of those casks are roughly at ground level, and you'll see the six casks or the six storage locations depicted for Diablo – or, excuse me, for Humboldt.

Page 992

Q. Thank you. Now, let's try to move on. Do you have a general understanding of what the Nuclear Waste Policy Act is?

A. Yes, I have a general understanding.

Q. And what is that?

A. Nuclear Waste Policy Act was put in place to resolve storage issues for the nation's commercial nuclear reactors, and by that Act, utilities and, in this case, Pacific Gas & Electric were required to enter into contracts with the Department of Energy for disposal of fuel, and the expectation was that that would occur in 1998.

Q. Okay. And are there fees that PG&E pays under those contracts?

A. Yes, those fees are paid, I believe they're paid quarterly.

Q. And to-date, has DOE, the Department of Energy picked up any of PG&E's spent nuclear fuel at either site?

A. They have not.

Q. All right. Now, when you became vice president of nuclear technical services – is that the right title?

A. That's correct. That was my title in

005

Page 1013

have to address the appropriate environment of the Humboldt Plant.
The industry as a whole at that time was moving in both the direction of reracking of spent fuel pools and, where that was not feasible, to dry cask storage implementation.
And at that time, dry cask storage implementation was not available in the higher seismic regions of California.
Q. When you say, "at that time," what time are you referring to?
A. I'm referring to the early '90s.
Q. Now, I believe you referred to this, but let me ask, before you took over in 1995, I believe you said PG&E had started – already done some work in exploring options for extended spent fuel storage?
A. That's correct.
Q. And what options were available?
A. Really not very many, four that I think of, the first being reracking of a spent fuel pool, adding additional storage space, second being the implementation of dry cask storage, third, rod consolidation, which I described earlier and was subsequently

Page 1014

determined to be not feasible.
And the fourth was a venture that Pacific Gas & Electric joined along with other utilities to build an away from reactor ISFSI on a Indian reservation. That facility subsequently was named – or that enterprise was Private Fuel Storage or PFS.
Q. So at Diablo Canyon, even though there had been one reracking already in the mid-'80s, further reracking, I guess, was technically possible?
A. Yes, it was.
Q. And what would have been the result of further reracking of Diablo Canyon?
A. Well, the additional reracking of Diablo, we had determined that we would be able to replace the racks with a capacity sufficient to cover the remaining licensed life of unit 1, but that it would fall short of the remaining license life for unit 2.
Q. And was reracking also an option at Humboldt?
A. No, it was not.
Q. And why do you say that?
A. The issue at Humboldt was not storage

Page 1015

of additional assemblies. The facility was not operating. The issue at Humboldt was to continue storage.
Q. Okay. Now, still in the early, after the 1985 study that we looked at where – I believe it was Battelle recommended continued wet storage at Humboldt Bay, this is at Humboldt Bay, did PG&E, again, subsequent to that, but before you took over in 1995, look at option, storage options at Humboldt Bay?
A. Yes, it did.
Q. Okay. And let's take a look, if we could, at Exhibit 721 and see if you recognize that.
THE COURT: Did you want to move in 85, Counsel?
MR. STOUCK: Your Honor, I will do that, yes. I would like to move PX-85 into evidence.
THE COURT: PX-85 is admitted.
(Plaintiff Exhibit Number 85 was received in evidence.)
BY MR. STOUCK:
Q. 721, do you recognize this?
A. Yes, I do.

Page 1016

MR. STOUCK: Your Honor, I just want to be sure the Court is with us. This was the document that was associated with Mr. Duke. I think I delivered it a day or two ago, but I just want to make sure, it was not originally in your notebooks, PX-721. Do you have it?
THE COURT: We're looking at it.
MR. GARDNER: And, Your Honor, we just have a foundation objection.
THE COURT: Sure.
MR. GARDNER: Based upon Mr. Womack's testimony, he was apparently in steam generation back in this time frame, there's been no indication that he had any familiarity with this document outside of this litigation.
THE COURT: You may inquire, Counsel.
BY MR. STOUCK:
Q. Were you familiar with the studies that had been done of storage options at Humboldt Bay prior to your arrival in 1995 as vice president?
A. Prior to my rotation in '94, no. Shortly thereafter, part of my research was to determine what PG&E had done prior to that point in time.

006

Page 1025

intro before the colon into the record for us, "in reviewing the storage"?

A. Yes. "In reviewing the storage expansion technologies, the option of transshipping fuel to Humboldt Bay (HBPP) unit 3 spent fuel pool was not considered viable because of the following formidable obstacles."

Q. And then if you just review those obstacles that are listed, rather than going through reading all of them, and I'm going to ask you whether this correctly reports your understanding of why that option was not considered viable.

A. I have looked at the bulleted items.

Q. And are those the reasons why at least at that time that option was not viable?

A. Yes, they all make clear sense.

Q. Okay. Now, on page five, this report indicates that reracking was also considered at that time by this study, is that right?

A. That is correct.

Q. And you will see if you turn to page seven, fuel consolidation was studied at this time, is that correct?

A. That's correct.

Page 1026

Q. And then on page 12, we see a discussion of dry storage – sorry about that, page nine, we see a couple of pages of discussion of dry cask storage at Diablo Canyon, do you see that?

A. I do.

Q. Okay. Now, let's turn to page, at the bottom of page 11, at the bottom, the last bullet point there, and it goes over to page 12. Would you just read that for us?

A. Yes. "The universal container system currently being developed by the DOE offers substantial benefits in spent fuel handling, transportation, and disposal at both the utility and the DOE ends. When this design becomes available, a dry storage alternative can be easily integrated with spent fuel disposal plants."

Q. Now, is that consistent with your understanding of the company's view – well, first of all, what's being referred to there, let me just ask you that, what is the universal container system being developed by DOE?

A. I believe that's referring to the so-called multi-purpose canister, MPC.

Page 1027

Q. Okay. And this statement that you just read, is that consistent with your understanding of PG&E's view at that time of that particular technology?

A. Yes.

Q. And certainly –

MR. GARDNER: Your Honor, I'm sorry. I have to lodge a foundation objection. Mr. Womack testified that he was involved in steam generation in August 1993. I don't know how he can testify as to whether that's consistent with the understanding of PG&E's view at that time.

THE COURT: It seems like it's something that counsel will be able to correct quickly.

MR. STOUCK: Yes, thank you, Your Honor.

BY MR. STOUCK:

Q. Does this report correctly report the company's view of that technology at that time?

A. Yes, it does.

Q. And now, let's look at, do you recall –

THE COURT: Would you ask, before

Page 1028

Mr. Gardner stands up again, I will simply ask you how you happen to know that.

THE WITNESS: Well, most simply, I retained some contact with the nuclear organization while I was in steam generation, but most importantly, this is my area of expertise. It was easy to ascertain these facts upon returning to nuclear power generation on a full-time basis.

THE COURT: Okay.

THE WITNESS: Thank you.

MR. STOUCK: Thank you, Your Honor.

BY MR. STOUCK:

Q. Do you recall what the recommendations of this study were, Mr. Womack? Let's take a look and see if page 14 –

A. Briefly, they were to continue to investigate the reracking of the Diablo spent fuel pools and continue to monitor the development of dry storage technology, and I believe this study also singled out the year 1999, possibly 1998, as a decisional time frame.

Q. Let's take a look at page 14, under, "Recommendations," paragraph one, let's see if,

007

Page 1053

for alternative number two, the investigation of early decommissioning for Humboldt Bay and its attendant activities. Alternative one really is the status quo which would have also been addressed in the prior rate or decommissioning triennial proceeding.

Q. How often did these rate cases take place? What's the cycle?

A. Roughly every three years.

Q. So it would have been a '96 rate case?

A. That's correct.

Q. And a '99 rate case?

A. '99, that's correct.

Q. And presumably 2002?

A. That's correct.

Q. All right. And is this the course that PG&E followed? In other words, were two alternatives submitted to the CPUC?

A. Yes. Upon management committee approval, two alternatives were submitted in December 1997.

Q. And did the board eventually approve or accept the recommendation to proceed with the early decommissioning alternative?

A. Yes, it did.

Page 1054

MR. STOUCK: All right. I'd like to move this into evidence, Your Honor, please, Plaintiff's 266.

THE COURT: PX-266 is admitted.

(Plaintiff Exhibit Number 266 was received in evidence.)

BY MR. STOUCK:

Q. Now, was there in this time period, let's say 1997 or close on the beginning and end of '97, did PG&E have interaction with the Nuclear Regulatory Commission concerning dry cask storage?

A. Yes, it did.

Q. Can you explain what the nature --

A. Well, they're really -- an interaction associated with each facility comes to mind. First, for Diablo, in and about the '97 time frame, while Greg Rueger was meeting with senior NRC officials in Washington, D.C., they indicated a preference for dry cask storage, citing concerns they had with the viability of licensing a rerack of the spent fuel pool, given the additional heat load and the seismic issues that we would have to deal with. In the case of Humboldt and, again,

Page 1055

roughly that same time frame, mid-'90s, I think this was in the '95 time frame, NRC officials, engineering officials had visited the plant in response or in follow-up to the earthquake I've mentioned, I believe in 1992, and had indicated two things at that time, that PG&E really ought to look hard at removing the stack and additionally that the fuel stored in the spent fuel pool would be better stored in dry cask storage.

Q. And did that interaction with the Nuclear Regulatory Commission that you just described, what effect, did that have an effect on PG&E's decision-making about storage options?

A. I believe it confirmed the recommendations we carried to management committee in mid-1995.

Q. And why do you say it confirmed those recommendations?

A. NRC's preference indicated that we were likely to have an easier course of it and indicated that, particularly with regard to Diablo, that there were some technical concerns at NRC staff regarding the reracking

Page 1056

alternative.

Q. Take a look, please, now at Plaintiff's 272, if you would. This was a document entitled, "Humboldt Bay Power Plant unit 3, decommissioning project, submitted to the boards of directors of PG&E Corporation and Pacific Gas & Electric Company for approval at their meeting on January 21, 1998," is that a correct description of what this is?

A. Yes, except it was January 21st, 1998.

Q. I'm sorry.

A. But otherwise, it's correct.

Q. And you were involved in preparing this recommendation?

A. I was.

Q. And you'll see under, "Action Recommended," that there was a recommendation to the board to -- it says, "It is recommended to the board of directors of PG&E Corporation and Pacific Gas & Electric Company that the boards of both companies approve an expenditure by PG&E of 193.2 million dollars over the period 1998 through 2015 for the decommissioning and dismantlement of Humboldt Bay Power Plant unit 3, with the bulk of the

008

Page 1065

shareholder value for the years following 2006. In 2006, the existing spent fuel pools will be filled, thus preventing further operation of the plant."

Q. Okay. Would it be fair to say that that was a consideration that was material to the recommendation here?

A. Yes, it was.

Q. All right. And then on page two, we see, under, "Background," second paragraph, three lines down, it says, "Three options have been investigated in detail, one, dry storage; two, increasing the storage capacity of the existing spent fuel pools; and three, maintaining the status quo." Do you see that?

A. I do.

Q. And is that a correct statement of generally the scope of investigation that went into this recommendation?

A. Yes, it's correct as of that time.

Q. Okay. Now, on page four, under, "Financial Impact," does this – well, why don't you – can we just have this for the record? Why don't you read these three paragraphs into the record for us?

Page 1066

A. "When comparing storage alternatives, it is important to consider the timing of when costs will be incurred, as well as total life cycle costs. A commitment to wet storage (reracking) would require a large initial investment with minor additional ongoing costs. On the other hand, dry storage has a lower initial investment than wet storage, and additional storage capacity can be added incrementally as plant operation continues. Regarding life cycle costs, it is reasonable to assume that, given DOE's inability to-date to meet its obligation to accept spent fuel, dry storage facilities eventually will be needed at Diablo Canyon to allow for decommissioning to begin in the late 2020s. This means that if the wet storage option is chosen, based on the assumption that DOE will not perform, it is likely we (shareholders and rate payers) will also have to pay for the dry storage option at the point the plant shuts down permanently. However, on an NPV basis, all else being equal, the wet storage costs, along with the costs of subsequently adding dry storage in

Page 1067

the late 2020s, is about equal to the cost of dry storage alone."

Q. And, again – well, what role did those considerations play in the recommendation that was made here?

A. Well, my own words, don't throw good money after bad. It really made no sense at this point to rerack, understanding that there would remain a substantial likelihood that dry storage would be needed to house Diablo's fuel in the 2020s to facilitate decommissioning.

Q. And then on page seven and eight. If I could just call your attention to a section here entitled, "Key Nonfinancial Issues and Risks"?

A. Yes.

Q. The first subheading is, "Risks – NRC licensing/legal delays," do you see that?

A. I do.

Q. So one thing, it appears that in connection with this recommendation, those risks were evaluated?

A. That is correct.

Q. And presented to the management committee?

Page 1068

A. That is correct.

Q. And likewise, the second subheading there, "Risk – permitting/legal delays," were there other permitting risks than those involved with NRC licensing?

A. Yes, there were.

Q. And briefly, those were?

A. Chief among them, the need for a coastal development permit under the California Coastal Act, as Diablo, the facility sat within the coastal zone.

Q. And, again, those risks were evaluated in connection with this recommendation?

A. They were.

Q. And was the recommendation accepted – approved by the management committee?

A. Yes, it was.

Q. Take a look at Exhibit –

MR. STOUCK: Actually, I would like to move into evidence that last document, Your Honor, which is 284, please.

THE COURT: PX-284 is admitted.

(Plaintiff Exhibit Number 284 was received in evidence.)

BY MR. STOUCK:

009

Page 1129

it would not have necessitated an investment and investigation in the ISFSI, as we would have been able to proceed with the decommissioning of the facility by 2015.

Q. 2008, you said?

A. Excuse me, 1998.

Q. Okay.

A. Thank you. Had DOE performed, as PG&E expected, to pick up the fuel by 1998, it would not have necessitated the subsequent actions taken by PG&E.

Q. And, again, why is that?

A. Why is that? PG&E, with removal of the fuel, would have been able to proceed with its evaluation of decommissioning and had no impacts, no impediments to the decommissioning of the facility.

Q. And –

A. Go on to Diablo?

Q. Fine.

A. In the case of Diablo, again, it was PG&E's expectation that DOE would pick up fuel by 1998. This would have, the racks, the capacity that PG&E had in its spent fuel pools would have been more than sufficient to cover

Page 1130

plant operation and would not have necessitated the implementation of dry cask storage.

MR. STOUCK: Thank you. Your Honor, I've got, I think, sort of two more – I'm going to turn to another subject now. It's 6:00. I frankly desired and intended to end today. I just wanted to advise the Court that.

THE COURT: Are we talking 15 minutes, half hour, 10 minutes?

MR. STOUCK: No, no. I cannot give assurance it will be 15. I would be very surprised if it's 30, but I just don't want to get to 25 after and be left with – so I just want to – I'm happy to go or start tomorrow morning.

THE COURT: Let me first ask the witness, then I'll hear from the other side. Are you good for another half-hour? Is what's being proposed –

THE WITNESS: Yes, Your Honor.

THE COURT: Let me hear from the United States. People have been planning, we have a pretty robust 9:00 to 6:00 day, so people making plans on that, let me hear from the United States.

Page 1131

MR. GARDNER: It would be the government's preference that we just press on and finish direct today, if possible.

THE COURT: Please continue.

MR. STOUCK: Could we take a short humanitarian break?

THE COURT: Certainly. This will be a seven-minute break.

(Whereupon, a short recess was taken.)

(6:00 p.m.)

BY MR. STOUCK:

Q. Are you with us and ready, Mr. Womack?

A. I am ready.

Q. I would like to turn back now to Plaintiff's 185, which is the August 1993 document entitled, "Preliminary Evaluation of Spent Fuel Storage Technologies and Diablo Canyon Power Plant." If you would turn to page two of that document, please?

A. I am there.

Q. And if you would read for us, I want to ask you some questions about the second paragraph, so let's get that front and center here. If you could read that into the record for us?

Page 1132

A. Second paragraph under, "Introductions"?

Q. It starts, "the DOE."

THE COURT: PX-185, page two?

MR. STOUCK: That's correct, Your Honor.

THE WITNESS: Yeah. "The DOE hopes to begin operating a monitored retrievable storage (MRS) for spent nuclear fuel by 1998. Even if the MRS opens as scheduled, no DCPP fuel is scheduled to be shipped before 2013 (reference 11 and 12) due to the facility's limited acceptance rate and DCPP fuel's priority ranking within the industry. Further delays in this schedule cannot be ruled out. Because of the uncertainty in the date when DOE will begin accepting spent fuel, PG&E should plan to give a serious consideration to the on-site storage of Diablo Canyon spent fuel for at least the licensed life of the plant."

BY MR. STOUCK:

Q. And how does that paragraph sort of fit into the overall purpose of this document?

MR. GARDNER: Your Honor, I'm going to

010

Page 1133

object again, foundation. Again, Mr. Womack was not doing the nuclear fuel in August 1993. He was doing the turbine generation. While he may have spoken with other PG&E employees, he has no foundational basis to talk about how that meshes with the overall purposes of this document.

MR. STOUCK: I'll actually withdraw that question for a different reason, Your Honor. Let me ask a different one.

BY MR. STOUCK:

Q. Do you know what references 11 and 12 are to this document, Mr. Womack?

A. Yes, I believe they are the annual capacity report and annual priority ranking, and I believe they're for 1991.

Q. Let's take a look at page 16, please. Under, "References," if we could highlight that?

A. Excuse me, they're the 1992 APR and ACR reports.

Q. Okay. What's your understanding about why those documents were referenced in connection with this information?

MR. GARDNER: Your Honor, same

Page 1134

objection, lack of foundation. Mr. Womack did not draft this document.

THE COURT: He took over a position two years later, and he has indicated to the Court, in response to another objection, that he became highly acquainted with these materials at the time he took over that responsibility, and the Court from its own observations believes he is highly acquainted with the materials, even though they weren't prepared on his direct supervision, so I'm going to overrule the objection.

MR. GARDNER: Thank you, Your Honor.

MR. STOUCK: Can we have the question back?

(The reporter read the record as requested.)

THE WITNESS: Simply, I believe those documents are referenced as that is what the Department of Energy was telling PG&E and the industry was going to be their acceptance rate and priority.

BY MR. STOUCK:

Q. Now, let's take a look at Plaintiff's 284, which is the – let's take a look at

Page 1135

Plaintiff's 284, please, which I believe should be the management – sorry, 284, yes. This is – I'm sorry, this is not the management report. This is the March 1999 recommendation to the management committee. Do you have that?

A. I do.

Q. And on page two, under, "Background," it says, I'll read this one, it says, "The circumstances related to the storage of spent fuel at Diablo Canyon have not changed significantly since the management committee was last briefed on this issue on June 20, 1995.

The Department of Energy is still not prepared to accept spent nuclear fuel from any U.S. power reactor until at least 2010 and under the current schedule will not begin accepting fuel from Diablo Canyon until after 2022." Do you see that?

A. I do.

Q. What's the basis for the statement about the current schedule?

A. That is what DOE was telling us.

Q. At that time?

A. At that time.

Page 1136

Q. And I believe, if you go back to Plaintiff's 228, which is the June 13 management committee presentation, it's dated June 13th, 1995. At the bottom, the page, I guess it's page one, there's not a one on it, but it is page one, under, "Background," do you see that?

A. I do.

Q. Why don't you – let's have the last paragraph here, if you would read the last paragraph, and then I'll ask the question?

A. The one that begins just below the bottom of the page?

Q. "DOE now disclaims."

A. Yes. "DOE now disclaims its obligation to begin accepting spent fuel in 1998 because there is no federal repository for the permanent disposal of spent fuel. The first date on which DOE forecasts it will have the permanent repository at Yucca Mountain complete and ready to accept spent fuel has slipped repeatedly, with the most recent projection at 2010.

Few believe this date will be met.

Though Congressional action to provide

011

**Pacific Gas & Electric Company v. U.S. No. 04-74C June 8, 2006**

**Page 1172 to Page 1545**

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

*HERITAGE REPORTING CORPORATION*
*1220 L Street, N.W.*
*Suite 600*
*Washington, DC 20005*
*Phone: 202-628-4888*
*FAX: 202-371-0935*

Page 1176

taking Mr. Womack back through it again. We'll see what happens. I wanted to make the Court aware of it.

Whereupon–

LAWRENCE WOMACK

a witness, called for examination, having been previously duly sworn, was examined and testified further as follows:

CROSS-EXAMINATION

BY MR. GARDNER:

Q. Good morning, Mr. Womack.

A. Good morning.

Q. I think we met briefly yesterday. I'm Josh Gardner with Department of Justice, on behalf of the United States. Now, you testified yesterday, I believe, that DOE is obligated to accept PG&E's fuel in 1998, correct?

A. I believe that's what I said yesterday.

Q. And I believe you further testified that had DOE not breached the standard contract, PG&E would not have built ISFSIs or dry storage facilities at Diablo or Humboldt, right?

Page 1177

A. I believe I stated, had the fuel been picked up on the schedule which PG&E anticipated when it entered the contract, that PG&E would not have found it necessary to build ISFSIs at either location.

Q. And you mentioned the schedule that PG&E anticipated or expected. You'd agree that the rate at which DOE would have accepted PG&E's fuel would have had an effect on if and when PG&E would have built dry storage, correct?

A. I don't believe so.

Q. You don't believe so?

A. No.

Q. So in other words, if there was a slower schedule, and let's take Diablo as a great example, Diablo was going to run out of pool space, or they were going to impinge upon full core reserve in 2006, correct?

A. That's correct.

Q. And so if there was no acceptances at Diablo Canyon before 2006, PG&E would have had to have built dry storage, correct?

A. I believe that's what I stated yesterday.

Page 1178

Q. So in other words, the assumption of rate does matter in terms of when and if PG&E built dry storage, correct?

A. I guess I'm not fully following you here.

Q. It's really just a timing issue, is that based upon the rate of acceptance will dictate whether or not PG&E would have had to have built dry storage in, say, the nonbreach world, isn't that correct?

A. I simply go back to my understanding that DOE was to pick up fuel in 1998. Had DOE picked up the fuel and not breached the contract, PG&E would not have found it necessary to build ISFSIs.

Q. Let's talk about your understanding for a second. Mr. Womack, you've never read the standard contract, correct?

A. Not cover to cover, I've read portions of it.

Q. Let me ask you this, at the time of your deposition, had you ever read the standard contract?

A. No, I had not.

Q. So you've read the standard contract

Page 1179

since your deposition, correct?

A. That's true.

Q. In preparation for your testimony today?

A. In the process of preparation, yes.

Q. In the course of your employment at PG&E, you never had need to look at the standard contract, is that correct?

A. I had individuals working for me that, through various portions of my employ at PG&E, were familiar with the standard contract.

Q. And just out of curiosity for, you know, your testimony, what portions of the standard contract did you read?

A. I have looked at provisions regarding exchanges, and I don't recall other portions of the contract.

Q. And when we talk about the standard contract, you only have a broad understanding as to what the standard contract requires, correct?

A. I think that would follow.

Q. And you have no specific understanding what DOE's obligations were under the standard contract, correct?

013

*Memorandum*

195062

Date: August 25, 1992

File #:

To: VARIOUS

From: MANAGER, NUCLEAR OPERATIONS SUPPORT

Subject: Spent Fuel Storage Action Plan Development
NOS Log #2968

PG&E

RICHARD C. ANDERSON
WILLIAM G. CROCKETT
JOHN B. HOCH
WILLIAM B. KAEFER
DAVID B. MIKLUSH

Spent fuel storage has been identified as one of the significant strategic issues facing Nuclear Power Generation. (See Attachment.) My staff is in the process of establishing a team to plan for the resolution of long-term, multi-year issues regarding spent fuel storage at DCPP. Two major items to be considered are removal of the spent fuel pool exclusionary zone from the Technical Specifications and long-term, on-site spent fuel storage.

I have requested Terry Nelson to assume overall leadership of this effort. To assure appropriate representation of involved departments, please assign an individual(s) to serve on this team. Norman Pratt (2-0368) should be notified by August 31 with the name of the assigned individual.

To develop an action plan, NOS is planning a one day workshop on August 31.

for JOHN M. GISCLON

NVPratt(2-0368)nvp

cc: WHFujimoto--A8024/333
JDTownsend--104/5/502
SGBanton--104/4/401
PEBeckham--A7088/333
SBhattacharya--F1615/1Calif.
RLBudke--1435/77
DLDuke--1405/77
EMGreene--A1196/333
JAHays--1409/77
RWLorenz--1411/77
TAMack--1401/77
MLMayer--104/4/4B
RTNelson--1459/77
WCStock--A1099/333
CJWarner--3011/77
RECE Reading File--1412/77

Attachments

RECEIVED
AUG 28 1992
CHRISTOPHER J. WARNER
cc: RFL

Defendant's Exhibit 0226

62-6218 (rev. 3-88)



PPGE0014442

NPGBU
**ISSUE**
SPENT NUCLEAR FUEL STORAGE AND DISPOSAL

195062 Date: 07/20/92

Page: (1)

Validator: GMR

Initiator: DLD/RWL

## CRITICAL ISSUE:

There is no disposal facility for spent nuclear fuel, and DCPP does not have adequate storage capacity for all of the spent fuel that will be generated during the projected operating life of the plant. PG&E currently pays the federal government for the future disposal of DCPP's spent fuel. This cost could increase in the future if additional funds are required to provide for spent fuel disposal. Additional spent fuel storage must be provided at DCPP to support operation after the year 2006, when the available spent fuel storage space will be filled.

## SUPPORTING DATA:

- The high density reracking of the spent fuel storage pools at DCPP provided adequate storage space for spent fuel until around the year 2006.
- Continued operation of DCPP beyond 2006 is dependent upon being able to safely discharge and store the spent nuclear fuel generated.
- Acceptance of DCPP spent fuel by the Department of Energy (DOE) is not expected until well after 2006.
- The options that are available for providing additional spent fuel storage capacity, will be costly, involve long lead times and may involve contested licensing actions.

## ROOT CAUSES:

- Federal law (the Nuclear Waste Policy Act) specifies that the Department of Energy (DOE) is responsible for the disposal of spent nuclear fuel from commercial nuclear power reactors.
- PG&E was required to contract with DOE for the future disposal of spent nuclear fuel from DCPP, and pays 1 mill/kilowatt-hr for this future disposal service.
- DOE estimates that a geologic repository for spent fuel will not become operational until 2010.
- DOE plans to have a Monitored Retrievable Storage facility (MRS) open for the temporary storage of spent nuclear fuel in 1998.
- DOE will use the oldest fuel first concept in assigning priority for the acceptance of spent fuel at the repository or MRS.

015

A complete detailed report is available giving a full analysis of the Critical Issue and is to remain in the Initiator's possession.
**(All acronyms should be written out the first time.)**

002 | 0000

"If you can not summarize a management report in two pages or less then you are not summarizing it."

NPGBU
**ISSUE**
SPENT NUCLEAR FUEL STORAGE AND DISPOSAL

195062 Date: 07/20/92

Page: (2)

Validator: GMR

Initiator: DLD/RWL

- Current DOE projections indicate that the first allotment of DCPP spent fuel would be accepted in the 13th year of facility operation. With DOE's current schedule, this would be the year 2011 if DCPP spent fuel is shipped to a MRS, or the year 2023 if the spent fuel is shipped directly to the repository.
- At current generation rates, DCPP's Spent Fuel Pools will be effectively filled by the year 2006.
- The most feasible options for providing additional spent fuel storage space at DCPP presently appear to be modular dry storage or rod consolidation.
- Either rod consolidation or dry storage will likely require a license amendment, will be costly, and may take several years to implement.

**STRATEGIES:**

- Submit LAR (if required) well in advance of necessary date, expecting a lengthy approval process.
- When possible, transfer spent fuel to the DOE for storage at a MRS, or disposal at a geologic repository.
- Perform plant modifications necessary for expanded on-site storage of spent fuel at DCPP, such as through modular dry cask storage or rod consolidation.
- Explore a public awareness campaign.

**RECOMMENDED SOLUTION AND REQUIRED ACTIONS:**

- NOS continues to participate in industry groups (e.g., EPRI, EEI) that support DOE efforts toward establishing a MRS or geologic repository.
- NBFM continues to perform actions specified in the Standard Contract to assure that DCPP spent fuel will be accepted by DOE at the earliest possible date.
- NOS continues to monitor the activities of other nuclear power plants that have a more pressing need for spent fuel storage space, and evaluate spent fuel storage technologies and related regulatory issues.
- NOS continues to monitor DCPP operations that may impact the need for additional spent fuel storage.
- NOS coordinates the formation of an interdepartmental team to develop a long term action plan aimed at assuring adequate spent fuel storage options remain available at DCPP. Specific actions are expected to

016

**A complete detailed report** is available giving a full analysis of the Critical Issue and is to remain in the Initiator's possession.
**(All acronyms should be written out the first time.)**

002 | 0000

"If you can not summarize a management report in two pages or less then you are not summarizing it."

NPGBU **195062** Date: 07/20/92

**ISSUE**

SPENT NUCLEAR FUEL STORAGE AND DISPOSAL

Page: (3)

Validator: GMR Initiator: DLD/RWL

include development of a License Amendment Request (if required), Safety/Environmental Evaluation, Development of Specification/Request for Proposals, Selection of Vendor/Technology, Communications Plan, and Coordination with Other Planning Efforts (e.g., Long-Term Plan, Site Plan, Business Plan).

## IMPACT STATEMENTS:

- DCPP cannot continue to operate if it cannot safely store the spent fuel that is generated.

## CURRENT MANAGEMENT ACTIONS:

- DOE efforts toward establishment of a MRS or repository are supported through participation in industry groups.
- Standard Contract issues are monitored and required actions are taken.
- Internal and external technical, and institutional issues are monitored.
- An ad hoc team has been formed, and has met several times to consider spent fuel storage and disposal issues.
- Management concurrence is desired to proceed with development of a multi-year action plan aimed at assuring adequate spent fuel storage capacity at DCPP.

017

**A complete detailed report** is available giving a full analysis of the Critical Issue and is to remain in the Initiator's possession.
**(All acronyms should be written out the first time.)**

002 | 0000

"If you can not summarize a management report in two pages or less then you are not summarizing it."

195062

NPGBU
**ISSUE**
SPENT FUEL POOL STORAGE

Date: 12/22/92

Page: (1)

Validator: GMR

Initiator: RLB/JET

## CRITICAL ISSUE:

The capability of having adequate space in the spent fuel pools for refueling and for cask movement to transfer spent fuel out of the pools must be maintained and is essential for continued operations. The strategy for dealing with this issue must be developed and implemented.

## SUPPORTING DATA:

- During installation of the high density spent fuel storage racks DCPP incurred a unique Tech Spec "restriction". This prohibits spent fuel shipping cask movements near the pool when spent fuel is in the "exclusion zone"--an area near the spent fuel shipping cask pit. This restriction is needed to address the consequences of a cask drop accident. If not resolved, it could advance the time by which something like fuel transshipment could be required.
- The restriction to the Tech Spec (i.e., 3/4.9.13) was imposed during the 1985-86 reracking effort.
- The exclusion zone consists of 585 storage cells, ~44% of the pool capacity.
- Cognizant engineers involved during the rack design, installation, and licensing process maintain that the restriction could be lifted by relatively minor analyses addressing the consequences of a cask drop accident.
- Removal of a TS restriction would require a license amendment.
- In the past, especially in the 85-86 timeperiod, there was intense public scrutiny in regards to DCPP spent fuel storage and the racks.
- Present fuel discharge plans project impinging on the exclusion zone no earlier than 1997. For conservatism we could assume that 1996 is the lastest time by which we want to have a solution in hand and or approved.
- Processing of a license amendment request by the NRC and issuance of the amendment would probably take six to nine months. Should the request be contested, it might take up to two years.
- Fuel consolidation could compact discharged assemblies--thereby delaying the time to impinging upon the exclusion zone. Routine consolidation (i.e., 2 for 1) could also require an amendment to the operating license.

018

**A complete detailed report** is available giving a full analysis of the Critical Issue and is to remain in the Initiator's possession. **(All acronyms should be written out the first time.)**

009 | 0000

NPGBU
**ISSUE**
SPENT FUEL POOL STORAGE

195062 Date: 05/22/92

Page: (2)

Validator: GMR

Initiator: RLB/JET

- The lack of a single-failure proof crane may well be the cause of the restriction.

## ROOT CAUSES:

- The spent fuel storage racks have a unique regulatory restriction.

## STRATEGIES:

- Commission the necessary criticality and dose analyses to technically remove the exclusion zone restriction.
- Prior to receiving a spent fuel shipping cask (circa 2005-2006), consolidate enough of the discharged fuel to leave all of the exclusion zone cells free of fuel. This would require the consolidation of about 870 assemblies per DCPP unit (i.e., conservatively: 1300 cells - 1150 discharges = 150 open cells, 585 open cells needed 435 more. @ 2-for-1, consolidate 870 assemblies).
- Upgrade the crane to single failure proof, which could eliminate the necessity to perform a cask drop accident analyses.

## RECOMMENDED SOLUTION AND REQUIRED ACTIONS:

- Submit budget requests to perform the analyses in 1993.
- Reevaluate upgrading the crane to single failure proof as an ultimate solution to this issue.

## IMPACT STATEMENTS:

## CURRENT MANAGEMENT ACTIONS:

019

A complete detailed report is available giving a full analysis of the Critical Issue and is to remain in the Initiator's possession. (All acronyms should be written out the first time.)

009 | 0000

## LICENSING ON-SITE DRY STORAGE FOR SPENT NUCLEAR FUEL AT DIABLO CANYON

**PROJECT SUBMITTED TO THE MANAGEMENT COMMITTEE**
**PACIFIC GAS AND ELECTRIC COMPANY**
**FOR APPROVAL AT ITS MEETING ON MARCH 23, 1999**

| | Estimated Project Cost | Amount in Approved 1999 Budget | Planned Expenditure in 1999 | Scheduled Completion Date |
|---|---|---|---|---|
| **Phase 1** | $1.5 million | $1.5 million | $1.5million (expense) | January, 2000 |
| Phase 2 | $5.0 million | $0 | $0 | October, 2004 |
| Phase 3 | $18.9 million | $0 | $0 | October, 2005 |
| Phase 4 | $36.0 million | $0 | $0 | April, 2024 |
| Total | Up to $61.4 million | $0 | $0 | April, 2024 |

**Action Recommended**

Nuclear Power Generation recommends that the Management Committee authorize expenditure of $1.5 million in 1999 for Phase 1 of a project to license and construct a dry storage facility for spent nuclear fuel at the Diablo Canyon Power Plant. This added storage capacity is needed to support the operation of the plant beyond 2006. The complete project includes: preparing and obtaining the necessary licenses and permits; construction of the storage facility; and, the purchase of equipment for the long term storage of Diablo Canyon's spent nuclear fuel. During Phase 1 NPG will be engaged in preliminary design, selecting a vendor to supply the storage casks, and in preparing an application to obtain a Nuclear Regulatory Commission license for the construction and operation of the facility. In the future NPG expects to seek Management Committee and Board approval for the subsequent phases of the project.

Maintaining the *status quo* will likely result in a substantial loss of shareholder value for the years following 2006. In 2006 the existing spent fuel pools will be filled thus preventing further operation of the plant. Should sale of the plant be deemed to be desirable the dry storage option would preserve the maximum shareholder value. Conversely, not pursuing expanded spent fuel storage would greatly reduce the value of the plant. Finally, having dry storage in place will reduce the costs associated with permanent plant shutdown since such a facility would be needed to begin plant dismantlement. Based on reasonable estimates of the time needed to complete this project approval is needed in early 1999 to ensure the availability of the dry storage facility when it is needed in 2006.



Plaintiff's
Exhibit
284
04-74C(04-75C)

CONTAINS CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER


PDCP0003658

**Background**

The circumstances related to the storage of spent fuel at Diablo Canyon have not changed significantly since the Management Committee was last briefed on this issue on June 20, 1995. The Department of Energy (DOE) is still not prepared to accept spent nuclear fuel from any US power plant until at least 2010 and under the current schedule will not begin accepting fuel from Diablo Canyon until after 2022[1].

Planning for on-site storage must necessarily balance the need for additional storage if the plant continues to operate and the costs of maintaining the plant if it is shut down before the end of its licensed life. Three options have been investigated in detail: 1)dry storage; 2)increasing the storage capacity of the existing spent fuel pools; and 3) maintaining the *status quo*. Dry storage consists of building a large concrete pad on which large concrete shielded steel containers would rest. The spent fuel would be placed into the containers for storage away from the spent fuel pools until it is shipped off-site. Increasing the capacity of the spent fuel pools would entail storing spent fuel in new storage racks which allow the fuel to be stored more densely.

**DESCRIPTION OF RECOMMENDATION**

The following is a description of the four phases of the on-site dry storage project.

**Phase 1** Preparation of an NRC license application, preliminary facility design and storage cask vendor award. Calendar year 1999; budget $ 1.5 million (expense).

This phase of the project consists of creating a preliminary design of the new facilities to be built, selecting and negotiating a contract with a storage cask vendor and developing a NRC license application. The design of new facilities will include additional storage cask handling and other miscellaneous equipment needed for that facility. There will be on-going discussions with the NRC staff to expedite the review of the license application. No construction or equipment purchases are required during this phase.

PG&E will enter into a contract with a cask vendor to supply the cask system. The vendor selection at that point will be necessary to obtain use of the vendor's cask system license in PG&E's NRC licensing application. Appropriate off ramps will be included in the agreement with the vendor to cap PG&E's exposure prior to our obtaining Board approval for Phases 2 through 4.

[1] There have been several attempts in Congress to authorize a centralized interim storage facility for spent fuel pending the construction and operation of a permanent repository. While these efforts have not succeeded for political reasons, Congress is revisiting the issue during the current session.



CONTAINS CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER


PDCP0003659

The major activities in Phase 1 of the project include the following:

- Develop the preliminary design of the dry storage facility in sufficient detail to prepare an Environmental Impact Report and license application.
- Award contract to cask vendor.
- Review of cask vendor seismic design for inclusion into site specific license application.
- Prepare a site specific NRC license application.
- Prepare the Environmental Impact Report.
- Develop detailed project plans and cost estimates suitable for obtaining the Board's full approval to proceed with the project.
- Develop the public affairs program and implement initial public relations efforts.

Although public interest is likely to be greater during the later phases of the project, nonetheless, an important feature of the overall project plan is a public affairs program which will be integral with the design, licensing and construction work. The potential for building additional storage at Diablo Canyon has already been broached with the community through the local media and currently there is little active concern regarding additional on-site spent fuel storage. During Phase 1 we expect to update community leaders in the context of other regular discussions. We also expect to meet with key staff members at the county Planning Commission, the Coastal Commission and the Air and Water Boards. Broader outreach will be done to respond to public and agency questions and concerns about the project.

<u>Phase 2</u> Review and approval of license application by NRC. January 2000 to October 2004; estimated budget $5 million (expense).

During Phase 2 of the project the license application prepared in Phase 1 will be submitted to the NRC for its consideration. This regulatory matter is likely to be a matter for public debate. Based on past experience with similar licensing actions it is highly likely that we will have hearings. Most of the costs of Phase 2 are design support, regulatory and legal costs. No construction or equipment purchases are required in this phase. There is some overlap with the work in Phase 3.

- Respond to requests for additional information generated by NRC review of license application.
- Public relations work supporting the license application.
- Public hearings and all legal processes necessary to obtain NRC license.
- Resolve last hearings and judicial review of hearing process.

<u>Phase 3</u> Complete the detailed design, construct the dry storage facility and load the first set of casks: June 2003 to October 2005. There is some schedule overlap with

022



CONTAINS CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER


PDCP0003660

Phase 2 due to the need to complete the detailed design and to purchase long lead time equipment; estimated budget $18.6 million (mostly capital). Methods to minimize risks associated with expenditures prior to receiving final regulatory approvals will be developed and included in the plans for this phase.

The following are the major cost items for this phase.

- Final design and construction of the dry storage facility.
- Order vendor provided cask system equipment.
- Purchase the initial set of 8 casks and canisters.
- Prepare plant procedures, perform startup testing and load first casks.

**Phase 4** Ongoing operation. October 2005 to end of license/operation; total cost is estimated to be up to $35.9 million (expense and capital).

This phase consists of dry storage facility operation and cask loading as required. Every second or third year a decision will be made on the purchase of additional casks. Some annual expense costs will be incurred for facility operation and maintenance. The cost of casks and maintaining the facility after plant shut down is not included in this project.

The public affairs program is expected to be continued through Phase 4 but at a substantially reduced level. The scope of that work will be tailored to meet any public concerns that may arise as they develop.

Major work items during the operational phase of the project include the following.

- Maintenance of the storage facility and cask loading equipment
- Review the spent fuel storage projections and purchase casks as required.
- Load casks on roughly 3 year intervals.

**Financial Impact**

When comparing storage alternatives, it is important to consider the timing of when costs will be incurred as well as total life cycle costs.

A commitment to wet storage (re-racking) would require a large initial investment with minor additional ongoing costs. On the other hand, dry storage has a lower initial investment than wet storage, and additional storage capacity can be added incrementally as plant operation continues.

Regarding life cycle costs, it is reasonable to assume that given DOE's inability to date to meet its obligation to accept spent fuel, dry storage facilities eventually will be



CONTAINS CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER


PDCP0003661

needed at Diablo Canyon to allow for decommissioning to begin in the late 2020's. This means that if the wet storage option is chosen, based on the assumption that DOE will not perform, it is likely we (shareholders and ratepayers) will also have to pay for the dry storage option at the point the plant shuts down permanently. However, on an NPV basis, all else being equal, the wet storage cost along with the cost of subsequently adding dry storage in the late 2020's is about equal to the cost of dry storage alone.

**Overall Costs and Benefits**

The overall cost of the dry storage option on a shareholder present value basis is about $20 million. This may be increased if San Luis Obispo county or the Coastal Commission demand additional compensation or imposes additional regulatory conditions for having the storage facility in the county. The costs imposed by the county may be lower if the facilities are built while the plant is operational and contributing to the local economy. The cost of the facility may be partially offset by the Department of Energy if a claim can be won on the argument that some or all of these costs would not have been incurred but for the failure of the DOE to meet its obligations. These additional factors will not be known until later and are not included in this analysis.

Benefits of building this facility include allowing for the continued operation of the plant, preservation of the market value of the plant, and facilitating decommissioning when needed. Decommissioning will be facilitated in two ways. If dry storage is built now fuel can be removed from the spent fuel pools over time. This would avoid having to build the facility and then remove all of the spent fuel after plant shutdown, thus reducing interim shutdown O&M costs. Future decommissioning costs may be reduced on a nominal basis since the dry storage facility will be completed before decommissioning begins. Current decommissioning cost estimates include expansion of a dry storage facility. If the dry storage facility is not started at this time, the decommissioning cost estimate would need to be revised to reflect the cost of licensing and constructing dry storage facilities during decommissioning.

**Sources of Revenue for Cost Recovery, Regulatory Treatment of Costs, and Related Changes.**

The sources of revenues will be the ICIP (incremental cost incentive pricing) revenues through 2001 and market prices thereafter. No additional CPUC action is required. These costs are included in Diablo Canyon's current budget and Competitive Business Plan.

Subject to accounting review the intent is to expense the cost of the project for book purposes and to capitalize most of the costs for tax purposes.



CONTAINS CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER


PDCP0003662

**Financial Statement Impacts**

The licensing effort is not substantial enough to affect the company's financial statements materially.

On the other hand, if these facilities are not built, operation beyond 2006 is unlikely. Future profits from Diablo Canyon would be foregone. Post-2006 profits are expected to be substantial. NPG's long term plans assume that adequate facilities will be available in which to store spent fuel. If PG&E has no plan for additional spent fuel storage, the public as well as employees would naturally assume that the plant would be shut down after 2006. This would also affect future resource construction as well as energy prices in California.

**Financial Risks & Option Values**

In addition to the inherent risk in the choice of the usual variables used in the financial analysis, the following variables may impact the cost for this project.

- Additional regulatory requirements may increase costs.
- Availability of DOE funds may reduce the cost of the facility to ratepayers and shareholders.

Of significant importance is the effect that a lack of this facility will have on the value of the plant to a potential buyer. If fuel storage facilities are not available the plant cannot operate and its potential market value will be eliminated.

The level of profitability depends upon electricity market prices, continued reliable and safe operation of the plant and rigorous cost controls. However, there is a meaningful financial upside for shareholders. Expanding spent fuel storage protects this potential upside.

The dry storage solution provides significant additional value allowing for a quicker transition to "decommissioning" under current NRC and CPUC regulations. This would allow the plant to be decommissioned as soon as possible following shut down in the event DOE is not able to immediately accept Diablo Canyon's spent fuel.

The dry storage option would allow for possible extension of the plant's operating license by the Nuclear regulatory Commission if operation beyond 2021 and 2025 were deemed to be feasible.

**Environmental Impact**

Dry storage facilities are static in nature and do not have any process related environmental impacts. Nonetheless, three types of siting issues will be of concern and need to be managed.


PDCP0003663

Concerns that may be raised about the environmental impact of the siting and construction of the facility should be manageable. The chosen site is in an area where plant construction removed over 100 feet of the original ground. The site being considered presents an opportunity to build the facility with a minimal amount of new grading. Concerns may still be raised about the effects of the construction process and the impact of constructing a large concrete pad. Appropriate planning and construction techniques should minimize these impacts.

Second, there may be NRC and local concerns regarding the seismic qualification and suitability of the site. Given the NRC's endorsement of PG&E's Long Term Seismic Program criteria and continuing involvement of outside geosciences consultants, these seismic concerns should be manageable.

Third, there may be concerns about the visual impact of the facility. While difficult to quantify, this will translate into a challenging permitting process and perhaps mitigation measures.

**Key Non-Financial Issues and Risks**

**Risks - NRC Licensing/Legal Delays**
The NRC license process, including hearings, re-hearings and appeals, could take up to four years.

Many nuclear facilities are in the same predicament as Diablo Canyon, and the timing of their need for licensed facilities is coincident with that of Diablo Canyon. This means that many plants will be applying for dry storage licenses at around the same time as PG&E. The NRC is concerned about how it will manage this work load and the NRC has confirmed that the situation will be worse in future years. It is imperative that PG&E begin its licensing process now and not be caught behind this wave of competing applications.

**Risks - Permitting/Legal Delays**
PG&E can expect that a significant amount of time and effort will be needed to obtain local permits for a dry storage facility.

For a dry storage project NPG expects that permits or approvals may be needed from the Regional Water Quality Control Board, the local Air Pollution Control District, the San Luis Obispo County Building and Zoning Commission and, the California Coastal Commission. Basic permitting will take time and each permitting effort will afford avenues for intervention by project opponents and this will result in delays. Post permitting and licensing litigation could result in further delays. The state Legislature may also become involved, further lengthening the process. The extent of the delays will be mitigated by the public affairs program. The success of that program will be



CONTAINS CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER


PDCP0003664

dependent on having and maintaining good working relationships with the permitting authorities.

**Risks - Public Affairs**

Managing local public affairs will be critical. Absent support from most of the community's opinion leaders, attempts to build dry storage facilities will have a low probability of success. It would be best to license the facilities now in an environment that assumes continued plant operation since Diablo Canyon provides a large economic benefit to the community.

**Project Management**

This project will be managed by the Nuclear Power Generation Business Unit and is sponsored by Larry Womack, Vice President-Nuclear Technical Services. The Project Manager is Bruce Patton.

**Project Review Schedule**

- The next significant milestone is the submittal of the license application to the NRC during the first quarter of 2000. NPG will advise the Management Committee on the status of the project and obtain Management Committee and Board approval for Phase 2 of the project prior to the submittal of that license application.

- NPG will also report on progress every six months through July, 2002. In late 2002 NPG will seek approval to purchase the needed dry storage equipment and to build the facility.

- NPG will thereafter report on the progress of the project every six months up to the time the first fuel is transferred from the spent fuel pools to the dry storage facility.

027



CONTAINS CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER


PDCP0003665

**DRY STORAGE FOR SPENT NUCLEAR FUEL AT DIABLO CANYON**
**[PROJECT NUMBER XXX]**
**TOTAL PROJECT COST = $61.4 million (nominal)**

**This project is required for**

| | | | |
|---|---|---|---|
| | Safety | | New Business |
| X | Service Reliability | | Efficiency/Cost Reduction |
| | Environmental Quality | X | Legal/Regulatory Compliance |
| X | Other Business Requirements (specify) -- Will allow for continued plant operation and/or expedited decommissioning of the plant. | | |

**The following alternatives were considered:**

| Alternatives | Present Value of Project Costs |
|---|---|
| 1. Status Quo | N/A |
| 2. Dry Storage | $200-300 million |
| 3. Wet Storage | $200-300 million |

**The following anticipated benefits were not included in the economic analysis:**

- Dry storage facilities will allow for early plant decommissioning in the absence of an off-site spent fuel storage facility.
- Additional storage allows for the maximum number of operating options.
- Dry storage allows for license extension at minimal cost.

**For this project the:**

The alternative with highest probable NPV was chosen. There is a considerable amount of uncertainty about the availability of off-site storage options and the uncertainty of the competitiveness of Diablo Canyon in the new energy marketplace. Dry storage allows for decisions to be made incrementally as the market develops. If the plant remains competitive, additional storage can be added at a reasonable cost. If the plant becomes noncompetitive, the dry storage facility can be used to accelerate the decommissioning of the plant thereby reducing costs.

One alternative, doing nothing, would put continued operation of the plant in jeopardy after 2006, and forego much of the potential market value of the plant.

The remaining alternative, expansion of the existing wet storage facility, would provide storage for nearly the current licensed life of the plant, but it does not provide for incremental decisions to be made regarding the continued life of the plant. Significant



CONTAINS CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER


PDCP0003666

costs would be incurred up-front and dry storage may be needed to be built later anyway.

**Costs are expected to be incurred on the following schedule (millions):**

| Prior Years | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | Future |
|---|---|---|---|---|---|---|---|---|
| N/A | 1.5 | 2.0 | 2.2 | 1.0 | 3.5 | 3.7 | 3.5 | 1.2/yr |

**The project expenditures for 1999 are fully provided for in the approved 1999 budget**

**Approvals**

Project Sponsor (signature):______________________________________
Date:____________

Business Unit General Manager (signature): ____________________________
Date:____________

029



CONTAINS CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER


PDCP0003667

CERTIFICATE OF FILING

I hereby certify that on this 20th day of November, 2006, a copy of foregoing "DEFENDANT'S RESPONSE TO PLAINTIFF'S MOTION TO AMEND FINDINGS AND JUDGMENT" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ John C. Ekman