IN THE UNITED STATES COURT OF FEDERAL CLAIMS

Filed Electronically on November 30, 2006

| | | |
|---|---|---|
| PACIFIC GAS & ELECTRIC COMPANY, | ) | |
| Plaintiff, | ) | No. 04-0074C, into which has been consolidated No. 04-0075C |
| v. | ) | |
| UNITED STATES OF AMERICA, | ) | (Judge Hewitt) |
| Defendant. | ) | |

REPLY IN SUPPORT OF
PG&E'S MOTION TO AMEND FINDINGS AND JUDGMENT

Jerry Stouck
Greenberg Traurig, LLP
800 Connecticut Avenue, NW
Suite 500
Washington, DC 20006
(202) 331-3173 Phone
(202) 261-4751 Fax
Counsel for Plaintiff
Pacific Gas and Electric Company

Of Counsel:

Robert L. Shapiro
Greenberg Traurig, LLP

TABLE OF CONTENTS

PAGE

SUMMARY OF ARGUMENT ....................................................................................1

ARGUMENT ..........................................................................................................3

CONCLUSION......................................................................................................11

# TABLE OF AUTHORITIES

<u>FEDERAL CASES</u> <u>PAGE</u>

*Cane Tenn, Inc. v. United States*, 62 Fed. Cl. 703 (2004) ................................................ 4

*Pacific Gas and Elec. Co. v. United States*, Nos. 04-74C, 04-75C, 2006 (Fed. Cl. Oct. 13, 2006) ........................................................................................ *passim*

*Pacific Gas and Electric Co. v. United States*, 58 Fed. Cl. 1 (2003) ................................. 4

*Unites States v. Gypsum*, 333 U.S. 364 (1948)................................................................. 9

REPLY IN SUPPORT OF
PG&E'S MOTION TO AMEND FINDINGS AND JUDGMENT

SUMMARY OF ARGUMENT

The government's lengthy response to PG&E's narrow motion to amend addresses a range of issues, but never comes to grips with the basic – and only – issue posed by PG&E's motion. That issue actually was first posed by the Court in its October 13, 2006 opinion. After the Court set forth its conclusions regarding the rate of acceptance issue, and in the course of applying those conclusions to the claimed damages at Diablo Canyon, the Court concluded that 1993 was the relevant time for determining which method PG&E would have used to expand on-site spent fuel storage at Diablo Canyon in the "non-breach" world. As determined by the Court, "in 1993 when it was still envisioned that DOE could be performing the Standard Contract by 1998 using an MRS facility, the preponderance of the credible evidence indicates that the dry storage option was the most favorable to PG&E." *Pacific Gas and Elec. Co. v. United States*, Nos. 04-74C, 04-75C, 2006 WL 2925649, at*89 (Fed. Cl. Oct. 13, 2006). Since the record evidence was scant on which storage method was most favorable to PG&E as of 1993 (neither party having anticipated that issue), the Court reached its conclusion on that issue by relying on only one piece of evidence that was actually dated 1993 – PX 185, the "Preliminary Evaluation of Spent Fuel Storage Technologies for Diablo Canyon Power Plant." The sole issue posed by PG&E's motion is whether the Court's conclusion about the "most favorable" storage option at Diablo Canyon as of 1993, based on that one piece of evidence from 1993, was correct.

The government's response does not address that issue, presumably because the government knows that PX 185 does not support the Court's conclusion. In particular, and very tellingly, the government's response does not even *mention* the fact that the 1993 study, PX 185, concluded that the cost of reracking would be *half* the cost of dry storage, "should MRS become available as planned." *See* PG&E motion at 1, citing PX 185 at 5, 6, 11. The government's response thus makes no attempt to refute the obvious fact that the compelling cost disparity made reracking the option "most favorable" to PG&E at that time. Nor does the government refute the straightforward conclusion from that fact that PG&E likely would have pursued that more favorable reracking option at that time.

Instead, the government discusses evidence (other than PX 185) that is either from later time periods, after it was clear the MRS would not be available by 1998, and/or evidence from the "breach world," where PG&E obviously did implement dry storage and sought to justify that decision as the appropriate one *in the breach world*. For example, the government cites PX 284, a PG&E document dated March 1999 that recommended dry storage. *See* Response at 19. But, by that time DOE had already breached (in 1998), and the MRS was long dead. *See Pacific Gas and Elec. Co.*, 2006 WL 2925649, at *27 (noting "it may have been doubtful by 1992 that an MRS facility ready to accept utilities' spent fuel and/or HLW by January 31, 1998 would be sited"); *id.* at *28 (observing that by 1995 an MRS was "unlikely," quoting Mr. Kouts). The government similarly relies upon trial testimony "that the [NRC], *in the late 1990's*, 'indicated a preference for dry cask storage' at Diablo Canyon." Response at 14

(emphasis added), 19 (citing same testimony). That "late 1990's," breach-world evidence is likewise irrelevant to the sole issue posed by PG&E's motion. Indeed, most of the evidence the government discusses, including the testimony from Mr. Womack that the government response quotes at p. 10 (which is taken completely out of context, as noted below), simply supports the reasonableness of PG&E's breach-world decision – made in the late 1990's – to implement dry storage.

In sum, the government's response fails to address the sole issue raised in PG&E's motion, which is whether the one piece of 1993 evidence the Court cites, PX 185, supports the Court's conclusion that "*in 1993* . . . the preponderance of the credible evidence indicates that the dry storage option was the *most favorable* to PG&E." *Pacific Gas and Elec. Co.*, 2006 WL 2925649, at *89 (emphasis added). As further discussed below, the answer to that question is "no." Given PG&E's own assessment of the overwhelming cost advantage of reracking in the 1993 timeframe, the Court's conclusion about the "most favorable" storage option is not supported by the record, and PG&E's motion therefore should be granted.

ARGUMENT

1. The government wrongly contends that reconsideration of the Court's mistaken finding is somehow legally precluded. Response at 3-5. As the case law the government cites makes clear, *see id.*, the Court may amend its findings after judgment when necessary to prevent a "manifest injustice" – which surely occurs when, as here, a mistaken finding would deny a plaintiff more than $8.7 million of the damages it is entitled to recover under a correct interpretation of the relevant evidence. *See* PG&E motion at 9 (derivation of $8.7 million figure). Indeed, this Court has counseled that

"'[a] motion for reconsideration "enables a trial court to address oversights, and the court appreciates the opportunity to do so.'" *Cane Tenn, Inc. v. United States*, 62 Fed. Cl. 703, 705 (2004) (citation omitted); *see also Pacific Gas and Electric Co. v. United States*, 58 Fed. Cl. 1, 2 (2003) ("The court, upon reconsideration, concludes that an amendment of its judgment in this regard would be in the interests of justice.") (involving mistake of law).

2. The government argues at length that the question of which method PG&E would have used in the non-breach world to expand spent fuel storage capacity at Diablo Canyon was addressed at trial, or that it should have been addressed by PG&E. Response at 9-15. The government is wrong on both counts.

The question at trial was whether the costs for dry storage implementation that PG&E has actually incurred at Diablo Canyon, in the breach world, would have been incurred had DOE performed. PG&E's position was that those costs would not have been incurred if DOE had performed as the contract required. The government's position was that the same costs would have been incurred, even if DOE had performed beginning in 1998. Given PG&E's claim for the recovery of its actual, breach-world Diablo Canyon dry storage costs, PG&E's appropriate response to the government's position was not that some different costs (*i.e.*, for reracking) would have been incurred in the non-breach world; PG&E's appropriate response, to support the claim it was making, was that no costs would have been incurred in the non-breach world. PG&E had no reason to advance evidence about any non-breach world storage costs – PG&E's position was that there would not have been any such costs – and as noted above PG&E also had no prior

notice that the Court would identify 1993 as the proper time for assessment of PG&E's non-breach world behavior.

Similarly, after the Court reached its determination about DOE performance in the non-breach world, the Court did not adopt the only position the government advanced about the consequences of that determination for PG&E's claimed Diablo Canyon dry storage costs, namely that PG&E would have incurred the same dry storage costs in the non-breach world as it actually incurred. Instead, the Court recognized that it had to make an independent assessment of what spent fuel storage costs PG&E would have incurred in the non-breach world determined by the Court. *Pacific Gas and Elec. Co.*, 2006 WL 2925649, at *90. The Court had to do so precisely because neither party had addressed the relevant question framed by the Court in its October 13 opinion – "in 1993 when it was still envisioned that DOE could be performing the Standard Contract by 1998 using an MRS facility, [what does the available evidence show regarding what] storage option was the most favorable to PG&E [?]" *Id.* at *89.

The government attempts to support its suggestion that the above question was addressed at trial by citing this exchange between government counsel and Mr. Womack: "Q. And so if there was no acceptances at Diablo Canyon before 2006, PG&E would have had to build dry storage, correct? A. I believe that's what I stated yesterday." Response at 10, quoting Trial Transcript ("TT") 1177:21-25. But even apart from Mr. Womack's very next statement, which acknowledged confusion, *i.e.*, "I'm not fully following you here," TT 1178:4-5, in context this testimony cannot fairly be read as addressing a *choice* of spent fuel storage technologies in the non-breach world, an issue not addressed at trial. Mr. Womack's pertinent direct testimony the day before, to which

he refers, was simply referred to the fact that SPG&E had to implement *some* option for adding to Diablo Canyon's spent fuel storage capacity by 2006. *See* TT 1033:15 ("whatever option necessary"). Indeed, the only time Mr. Womack's testimony touched on a possible choice between reracking and dry storage he clearly refused to address the choice, in the passage PG&E quoted in its motion: "Q. How much fuel was DOE obligated to take from Diablo Canyon beginning in 1998? A. Enough . . . for PG&E to have avoided future unnecessary expense, for example, the necessity for an additional reracking *or* construction of a dry storage facility."). *See* PG&E motion at 5, quoting TT 1183:12-19 (emphasis added).

Despite its protestations, the government ultimately acknowledges that neither party previously addressed the question of which of the various available spent fuel storage methods PG&E would have used in the non-breach world. In a footnote, the government concedes it did not place that question in issue: "The Government never challenged the propriety of selecting dry storage at Diablo Canyon, regardless of the acceptance obligation impose upon DOE by the Standard Contract." Response at 14 n.4. And the government also concedes that PG&E likewise did not advance evidence or argument about which spent fuel storage method it would have used at Diablo Canyon in the non-breach world: "PG&E chose not to present any alternatives to the Court. It intentionally did *not* argue that. . . PG&E would have reracked its Diablo Canyon pools in the 'but-for' world." Response at 12.

Accordingly, since neither party addressed the issue, the record evidence on this issue is very sparse, as the government also concedes. *See* Response at 17 (noting "the lack of any evidence concerning what PG&E *would have* done in the 'but for' world

defined by the Court"). But the fact that evidence on this issue was extremely sparse does not obviate the need to resolve the issue based on such evidence as does exist. Therefore, in addressing the issue, the Court quite rightly focused on the one piece of record evidence – PX 185 – that was dated 1993 and that set forth a reasonably thorough evaluation of the various spent fuel storage options available to PG&E. Although based on that one exhibit from 1993 the Court concluded that dry storage was the "most favorable" option to PG&E at that time, for reasons set out in PG&E's motion (and reiterated here) PX 185 actually demonstrates that reracking – which could be implemented at *half* the cost of dry storage – was the most favorable option.

3. While failing to mention the compelling cost advantage of reracking set out in PX 185, the government also attempts to downplay the significance of that factor by arguing that evidence showing that reracking was a "*possible* alternative" does not lead to the conclusion that reracking "*would have* been used in the 'but for' world, assuming timely performance by DOE." Response at 17. But PX 185 is far more than evidence that reracking was a "possible" alternative; it explicitly concludes that the cost of reracking would be "substantially lower" than that of dry storage, PX 185 at 13 – reracking would cost $15.9 million whereas dry storage would cost $31.6 million, both assuming an MRS. *See* PX 185 at 6, 11.

Nevertheless, in defending its position the government makes two points. First, the government argues that cost would not be the only consideration, and suggests that "technical, regulatory, licensing," and other concerns would also have to be considered. *See, e.g.*, Response at 17. But such concerns (to the extent they may exist) did not prevent PG&E from successfully completing a reracking of both Diablo Canyon spent

fuel pools in the mid-1980's, *see* TT 995-96, and nothing in the trial record suggests that PG&E could not also overcome any such concerns again in order to reap the huge financial benefits of reracking set out in PX 185. Indeed, as PX 185 states explicitly and the government itself notes, "all three storage expansion alternatives [dry storage, reracking, and rod consolidation] should be considered potentially viable at this time." Response at 16, quoting PX 185 at 14.[1]

Second, the government cites evidence, largely presented by PG&E itself, showing that PG&E favored dry storage and in fact decided to implement dry storage for good and valid reasons. *See, e.g.*, Response at 13-14, 16-19. But as noted at the outset, except for PX 185, virtually all the evidence the government cites either is from later time periods, after the MRS had been abandoned by DOE, and/or simply supports PG&E's breach-world decision to implement dry storage, which is undisputed. The only exception is an attachment to a 1992 memo, DX 226, which notes vaguely (and without mentioning cost issues) that the "most feasible options" for obtaining additional spent fuel storage space at Diablo Canyon "appear to be modular dry storage or rod consolidation." *See* DX 226 at PPGE0014444, Gov't App. at 16. This document was attached to a memo noting that PG&E was in the process of "establishing a team" to develop a spent fuel "action plan," *id.* at PPGE0014442, Gov't App. at 14, and it stated as a "recommended solution and required action" that PG&E "evaluate spent fuel storage technologies." *Id.* The most logical inference is that this document and the team it spoke of establishing led one year later, in 1993, to the far more thorough, formal evaluation of

[1] The government also contends that the cost components of PX 185 "appear not to be reliable." Response at 20. But the Court, recognizing that cost estimates from that exhibit are the best available evidence, already relied on those cost estimates to make its initial findings.

the available storage technologies set out in PX 185. Nothing in DX 226 lends any support to the Court's initial finding that in 1993, dry storage was the "most favorable option" for PG&E.

4. Ultimately, the correctness of the Court's findings about what was "most favorable" to PG&E as of 1993 and what spent fuel storage method PG&E "would have used" at that time depends upon a correct interpretation of PX 185. That is the only real evidence of record that speaks to the question – as the Court already recognized by citing PX 185 in connection with its original findings. PG&E acknowledges that PX 185 does not state explicitly that reracking was "most favorable" or "would have been used" by PG&E. Nevertheless, when the Court's finding that dry storage was the "most favorable option to PG&E" in 1993 is considered alongside the compelling cost advantage of reracking set forth in PX 185 as well as that exhibit's explicit statement that "all" spent fuel storage expansion options (including reracking) were then "viable," "one is left with the definite and firm conviction that a mistake has been committed." *See Unites States v. Gypsum*, 333 U.S. 364, 395 (1948).

5. The government's final argument, that PG&E's motion somehow "calls into question whether it successfully mitigated its damages in the face of DOE's partial breach," Response at 22, is a far-fetched red herring. The argument improperly confuses the breach and non-breach worlds. Whether PG&E appropriately mitigated its damages depends on the reasonableness of the decision PG&E made in 1999, in the breach world, to implement dry storage at Diablo Canyon. PG&E's motion to amend presents an entirely distinct issue that arises only in the non-breach world as determined by the Court. That issue is, "*in 1993* when it was still envisioned that DOE could be performing the

Standard Contract by 1998 using an MRS," *Pacific Gas and Elec. Co.*, 2006 WL 2925649, at *89 (emphasis added), what does the relevant evidence show was the spent fuel storage option at Diablo Canyon that was "most favorable" to PG&E and what option would PG&E have pursued at that time, based on that evidence? The government never explains what one issue has to do with the other, but simply asserts that "if the Court were to conclude that reracking was . . . viable in the 'but for' world based upon PG&E's new contentions, the Court should issue similar findings in the actual world." Response at 23.

There is no reason for the Court to confuse the two worlds in the way that the government is suggesting. In fact, the record evidence requires that the Court reject the government's attempt to confuse the two worlds. As the government notes, "[a]ccording to PG&E's interpretation of PX 185, reracking would have provided adequate SNF storage *nearly* through the end of Diablo Canyon's licensed life, even without the MRS." Response at 22 (emphasis added). That is not just PG&E's interpretation, that is what PX 185 says. *See* PX 185 at 5 ("Without MRS relief, the new racks would lose full core reserve by 2019 in Unit 1 and by 2020 in Unit 2"). It would not be reasonable in any "world" for PG&E to pursue a course that provided only "nearly" enough spent fuel storage capacity Diablo Canyon. And as confirmed by PG&E's 1999 management presentation recommending dry storage in the breach world, PX 284, if the wet storage option were chosen at that time, it was "likely" PG&E would eventually also have to build dry storage anyway, given DOE's then-known non-performance. *See* PX 284 at 4-5, Gov't App. at 23-24. Thus, in the breach world in 1999 reracking made no sense, but

in the non-breach world, as of 1993, the record evidence shows that reracking was the "most favorable" option to PG&E.

It is also implausible to suggest – as the government does, *id*. at 23 – that the government failed to mount a failure-to-mitigate defense because it was lulled into believing that dry storage was reasonable in the breach world by PG&E's litigation strategy. The reason the government failed to present a failure-to-mitigate defense is that the breach-world evidence demonstrated overwhelmingly that PG&E's decision in 1999 to implement dry storage at Diablo Canyon was in fact reasonable. What PG&E would have done in the non-breach world, in 1993, is a distinct question that has no bearing on the mitigation issue.

## CONCLUSION

For the reasons set forth above and in PG&E's motion to amend findings and judgment, the Court should grant that motion and provide PG&E the relief specified on p. 9 of that motion.[2]

[2] Under Federal Rule of Appellate Procedure 4(a)(4)(B)(i), if a party files a notice of appeal prior to resolution of post-judgment motion(s), the notice takes effect upon resolution of the motion(s). PG&E notes this provision so the Court will understand if PG&E files its notice of appeal before the Court rules on PG&E's motion to amend.

Respectfully submitted,

s/ Jerry Stouck

Jerry Stouck
Greenberg Traurig, LLP
800 Connecticut Avenue, NW
Suite 500
Washington, DC 20006
(202) 331-3173 Phone
(202) 261-4751 Fax
Counsel for Plaintiff
Pacific Gas and Electric Company

Of Counsel:

Robert L. Shapiro
Greenberg Traurig, LLP